**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | Criminal No. AMD-04-029 |
| : | |
| **SHAWN GARDNER, et al.,** : | |
| : | |
| **Defendants** : | |

...oooOooo...

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT SHAWN GARDNER'S LETTER MOTION CONCERNING *MASSIAH***

The United States of America, by and through its undersigned counsel, respectfully submits its memorandum of law in opposition to the request by defendant Shawn Gardner ("Gardner") to preclude a portion of the testimony of government witness Ernest Reynold on the grounds of *Massiah*. For the reasons discussed below, the motion should be denied.

**INTRODUCTION**

Shawn Gardner ("Gardner") has asked the Court to preclude a portion of the testimony of witness Reynolds on the grounds that it would violate his Sixth Amendment right to counsel.

The facts relating to the evidence are as follows. On February 6, 2004, Reynolds, who was then facing federal gun charges, made a proffer with his counsel at the U.S. Attorney's Office. Reynolds ultimately made a decision to enter into a cooperation agreement with the government, and signed such an agreement dated May 24, 2004. Reynolds subsequently pled guilty pursuant to that agreement.

At some point following the first proffer in February 2004, Reynolds encountered defendant Gardner at Supermax, where the two were both detained. Because they knew each other, Reynolds inquired with a guard about being allowed to be in a cell with Gardner. The request was apparently

granted and the two ended up sharing a cell together. The government had no involvement in causing Reynolds to be placed in a cell with Gardner, and no knowledge at that time that they were in contact. Moreover, the government never advised Reynolds to seek out Gardner or to have any communication with him, either at the February 2004 proffer or thereafter.

During that time, Gardner made statements to Reynolds about the June 7, 2002 murder of Tonya Jones-Spence. Among other things, Gardner told Reynolds that part of the reason Gardner participated in the crime was to come up with money to pay for a lawyer for co-defendant Shelly Wayne Martin ("Martin"). At the time of these conversations, Gardner was facing the charges now included in the indictment.

As discussed above, the government did not know and had no suspicion or reason to believe that Reynolds had received any information from Gardner or had spoken with Gardner. Indeed, the government had no idea of the contact between the two until Reynolds alerted during a later proffer on March 22, 2004. It is anticipated that Reynolds will testify that he did not do anything to draw information out of Gardner, or to "elicit" such information from him. Rather, Reynolds and Gardner simply engaged in the conversations casually, because they were former associates.

Reynolds first alerted the government about his communications with Gardner in March 2004 in connection with a grand jury appearance at that time. The government (AUSA Harding) immediately directed a letter to Reynold's attorney advising the following:

> Following up on our meeting with your client on March 22nd, 2004, we want to memorialize our position in writing regarding information obtained by your client while he is incarcerated.
>
> Your client surprised us on March 22nd, 2004, with the information that he is currently sharing a cell with Shawn Gardner, who is a Defendant in another case we are prosecuting. We have not asked or suggested to your client that he elicit any

2

> information from Garder or any other prisoner. You have told us that your client has been moved, so this issue may now be moot.
>
> In an abundance of caution, however, we ask you to reiterate to your client that we are not instructing him or asking him to obtain information from prisoners.

Reynolds himself acknowledged those instructions during a later grand jury appearance on December 1, 2004. It does appear that Reynolds never had any additional contact with Gardner following the receipt of this letter. All of the conversations at issue took place before the government learned of them and sent the above-quoted letter to Reynolds' counsel.

To the government's knowledge, Reynolds had no additional contact with Gardner, and at no point made any attempt to elicit information (incriminating or otherwise) from Gardner during their 2004 contact.

## **ARGUMENT**

In *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court ruled that the Sixth Amendment precluded the government from "deliberately elicit[ing]" incriminating information from an accused after that defendant had been indicted and in absence of his counsel. *Id.* Courts construing *Massiah* have recognized that not every communication between a defendant and a jailhouse informant violates the Sixth Amendment; rather, the court must look at all of the circumstances to determine whether a particular informant's actions are "fairly attributable to the government." *See United States v. Lentz*, 524 F.3d 501, 520 (4th Cir 2008).

The Fourth Circuit approved of informant-defendant contact in *United States v. Lentz*, on facts nearly identical to this case. There, a jailhouse informant had received incriminating information from a charged defendant. *Id.* at 519-20. According to the court's description of the facts, the informant communications with the defendant occurred in three phases:

3

The first series of communications took place prior to the informant advising the government. The government had no knowledge of the communications and had had no involvement in bringing the defendant and the informant together. Affirming the district court, the Fourth Circuit found no *Massiah* problem with the first phase of statements. The court quoted the district court's observations that the government "did not initiate the contact" with the defendant and that the contact took place as a "matter of happenstance." *Id.* Indeed, the government "did not even know" that the informant and the defendant were in the same detention facility. *Id.*

The second phase occurred following a meeting between the informant and law enforcement, during which prosecutors and agents advised the defendant to act as a "listening post" and to discuss personal matters with the defendant, but also advised the informant not to "bring up or otherwise elicit information" about the charged kidnaping. *Id.* Again, the court found no *Massiah* issue even at that point, because once again the government had advised the informant "on two separate occasions that he could only be a listening post and must not elicit information" about the kidnaping, and did not "take any steps to place" the informant in "closer proximity to" the defendant.

Only at the third phase (following what is referred to as the "December 30 meeting" with the informant), did the court find a *Massiah* violation. At that meeting, investigating agents expressly advised the informant to elicit information from the defendant about the case. At that point, not surprisingly, the court ruled, the informant had become a government agent and the elicitation of incriminating information had begun.

The facts of this case are, if anything, far short of what the Fourth Circuit *permitted* in *Lentz*. The communications between the informant and Gardner took place without the government's knowledge or prompting. The government did not know, and could not have known, that Reynolds

4

and Gardner would be near each other or speaking.  Following Reynold's disclosure to the government of this information, the government gave instructions to Reynolds that closely mirrored the instructions approved of in *Lentz* (although *Lentz* indicates that any additional communications pursuant to those instructions would have been admissible, in this case Reynolds and Gardner had been separated from that point).  In any event, the contacts between Reynolds and Gardner are clearly admissible, because there is no evidence that Reynolds' contact at that point was "fairly attributable to the government."  *See also United States v. Love*, 134 F.3d 595, 604 (4th Cir. 1998) (no *Massiah* violation where informant previously had cooperated with government, but no evidence showed that such cooperation extended in any manner to the investigation of defendant, no evidence showed government intentionally placed informant in proximity, and informant received no instructions or promises to speak with the defendant).

In contrast with the *Lentz* and *Love* decisions (Fourth Circuit authority that approves of the admission of the testimony in this case), Gardner cites to a number of cases that are either easily distinguishable, or which support the government's position.

*United States v. Bender*, 221 F.3d 265 (1st Cir. 2000), actually supports the government's position in that it admitted testimony from a fellow prisoner, over *Massiah objections*.  In that case, a co-defendant made statements to fellow inmates about a plan to fabricate an alibi and elicit perjury in connection with a pending case.  *Id.* at 268.  The government then placed an undercover agent inside the jail facility, who received additional statements from the defendant.  *Id.*  The First Circuit did suppress the undercover agents' testimony; however, the district court admitted the testimony from the *fellow inmates*, and the defendant did not even appeal that ruling.  In sharp contrast, this case does not involve an undercover agent acting on direct instruction from the government; rather,

it involves a fellow prisoner engaging in discussions on his own, with no prompting. *Id.* The only similarity between this case and *Bender* is in the district court's decision to *admit* the testimony of two inmates who also had received information from the defendant.

In *United States v. Henry*, 447 U.S. 264 (1980), the Supreme Court found a Sixth Amendment violation where a cooperating, paid informant engaged in conversations with a defendant about his crime. *Id.* at 274. The Court was not moved by evidence that the government, in placing the paid informant in the right position to receive the information, had expressly advised the informant not to ask direct questions, but only to pay attention to what the defendant said. *Id.* The Court found that notwithstanding the warnings, the government's placement of the informant "intentionally creat[ed] a situation likely to induce [defendant] to make incriminating statements without the assistance of counsel." *Id.* The distinguishing feature here is obvious: the government did not "intentionally create" the cell-mate relationship between Reynolds and Gardner, or instruct Reynolds to act as a listening post or even to approach Gardner. Reynolds and Gardner had their conversations and the government received the information *after the fact*.

In *United States v. Johnson*, 196 F. Supp.2d 795 (N.D. Ia. 2002), the district court found a *Massiah* violation but only in the face of substantial evidence (summarized in a 105-page opinion) that the government had engaged in deliberate manipulation of the pretrial detention system in order to place a long-time, "superstar" cooperating informant in a position to engage a particular, targeted defendant in incriminating communication. *Id.* at 826. The district court found that the AUSA had specifically asked the U.S. marshal's service to place the defendant in a particular detention facility, which also happened to be the current location of the cooperator, an individual who had cooperated *with that particular prosecutor* on several prior cases all involving obtaining jailhouse confessions

from defendants. *Id.* The totality of the circumstances left no doubt in the court's mind that the government "either knew or should have known that [cooperator's] eventual contact with [defendant] and acquisition of incriminating statements from her were likely – indeed, all but inevitable."[1]

Again, the facts of *Johnson* are a far cry from this case. The government had nothing to do with Reynold's placement in a cell with Gardner and nothing to do with causing the communications to take place (either directly or indirectly). The machinations and maneuvering that led to the suppression of evidence in *Johnson* are simply not present here.

*Maine v. Moulton*, 474 U.S. 159 (1985), attached to the defendant's letter but not mentioned therein, is distinguishable for the same reasons as the evidence in *Johnson*: there, the state engaged in affirmative, strategic conduct designed to bring about the elicitation of incriminating statements by the defendant to an informant. That included arranging to "record conversations," suggesting to the informant "that he record his telephone conversations" with the defendant, and asking the informant "to let [the police] put a body wire transmitter on" the informant to make such recordings. *Id.* at 488. No such strategic conduct took place in this case; the government never asked Reynolds to record conversations or elicit information from Gardner because it *did not know* they were cell mates until after the conversations had taken place.

The defendant also cites to *United States v. Wall*, No. 00-77-P-C, 2001 WL 83263 (D. Me. 2001), a case in which the district court *denied a motion to suppress* and admitted informant

---

[1] The Eighth Circuit partially reversed the suppression of evidence and ruled on appeal that the government would be able to use the informant's testimony relative to charges in a superseding indictment that was returned *after* the jailhouse contact had taken place (and thus were not precluded by the charge-specific Sixth Amendment). *United States v. Johnson*, 352 F.3d 339 (8th Cir. 2003)

statements, on facts rather similar to this case. *Id.* at * 3.  In *Wall*, the defendant sought to suppress statements made by him to an informant, and argued that the statements were attributable to the government because the defendant actually had signed a cooperation plea agreement with the government at that time. *Id.*  Despite the presence of an actual cooperation plea agreement,[2] the court found no *Massiah* problem.  The plea agreement did not expressly mention, or "focus," on the defendant at issue, and the government had done nothing to bring the defendant in proximity to the informant.  *Id.* at *4.  Although investigators had met with the defendant, they had done nothing to direct the informant to elicit information from the defendant.  Thus, no Sixth Amendment violation had occurred.

In summary, the Fourth Circuit's holdings in *Lentz* and other cases support the admission of the testimony of Ernest Reynolds.  The cases cited by Gardner are inapposite and in several cases support the government's position.  Reynolds was not acting as a government agent at the time of his communications with Gardner, the government had no reason to know that the two would be communicating, and the evidence is therefore admissible.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendant Gardner's Motion.

---

[2] At the time that he received information from Gardner, Ernest Reynolds had not yet signed a formal plea agreement, although he had communicated with the government at that time pursuant to proffer letters.  As such, Reynolds' purported "agency" relationship with the government is even *weaker* than that in *Wall*.

        Respectfully submitted,

        Rod J. Rosenstein
        United States Attorney


By:    /s/_____
        Robert R. Harding


      /s/_____
        Michael C. Hanlon

        Assistant United States Attorneys
        36 South Charles Street
        Fourth Floor
        Baltimore, Maryland 21201
        (410) 209-4800
        Fax: (410) 962-3124

CERTIFICATE OF SERVICE

This is to certify that on this 2nd day of November 2008, a copy of the foregoing GOVERNMENT'S MEMORANDUM OF LAW was sent by ECF and by email to the following:

Michael Lawlor, Esquire

Laura Kelsey Rhodes, Esquire

Gerard P. Martin, Esquire

Paul Flannery, Esquire

Thomas Crowe, Esquire

James Pyne, Esquire

Barry Coburn, Esquire

Adam Kurland, Esquire


_____
Michael C. Hanlon
Assistant United States Attorney