**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) **AMD 04-029** |
| WILLIE MITCHELL, | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT MITCHELL'S MOTION *IN LIMINE*
### REQUESTING ADMISSION OF RECORDED STATEMENT OF WITNESS
### DAMITA GREEN AND MEMORANDUM IN SUPPORT THEREOF

Willie Mitchell, by and through his attorneys, Laura Kelsey Rhodes and Michael Lawlor,

hereby moves the Court's *in limine* to admit the police transcript of and allow the playing of

Witness Damita Green's recorded statement to Detectives Niedermeier and Patton on March 28,

2002, in light of the witness' inability to recall her prior statements to those officers, and in

support submits the following memorandum in support thereof.

### PROCEDURAL BACKGROUND

Ms. Damita Green testified in trial for the government on October 29, 2008. Ms. Green's

information is important for both the government and Mr. Mitchell because it includes the

following, *inter alia*:

(a) She is one of the last people to see the Wyche brothers the night they were murdered,

(b) She spent several hours with both of them and Dwayne Denham earlier on the day

they were murdered,

© She overheard parts of a telephone call between Darryl Wyche and "Bo,"

(d) She heard from Darryl Wyche, of his plans for meetings later in the evening.

1

Ms. Green provided a tape-recorded statement to Detectives Niedermeier and Patton on March

28, 2002, *three days* after the Wyche brothers were murdered. In that interview she made the

following statements, *inter alia*:

Niedermeier: And what is that information [about Darryl and Anthony Wyche's activities before their murder]?

Green: Before he [Darryl] left he got a phone call about 11:40, it was Bo 'cause he said his name and um they were talking on the terms of meeting to exchange something. Um, present with him was Anthony Wyche, and Shabazz otherwise known as Dezo, all three of them left together and they got in the same car and they never came back, they dropped Dezo off though. I know they dropped him off. [p. 2]

Patton: Did they say when they were leaving, where they were going? Did they mention that?

Green: Darryl said that he had to go out Essex, and he said he had to go over um he said he had to go over East Baltimore and he had to go back over West Baltimore but I don't think that he did all that because it's ... it's not coming right out into the time frame right. [p. 4]

Patton: How long were they at your place?

Green: Well, Anthony was there all day. He was there from breakfast to dinner. Um, Darryl came in periodically like all three of them left together but Darryl would like leave. He has kids, I know he had to pick his daughter up and then he had come back. He came, he came over there maybe twice out of the day. But Pete, well Anthony he was there the whole day. [p. 5]

Niedermeier: When you talk about the ah the white Honda station wagon, had you ever seen Darryl or Anthony in that car before?

Green: Anthony has never been in that car before because well until Sunday 'cause Darryl just got that car. Um, Darryl might have been in it maybe a couple of times. He just got it two days before. It's a new car. [p. 8]

See Exhibit 1, Green Taped Police Statement Transcript of March 28, 2002 ("Taped Statement").

Ms. Green testified before the Grand Jury on January 21, 2004 (See Exhibit 2, Grand Jury

Transcript of January 21, 2004 ("GJ Statement")), but did *not* testify to the above information

because the government did not ask her about it. At trial, six and a half years after the killings,

Ms. Green was unable to remember most of the issues she had talked about in either her police

interview or in her Grand Jury appearance.

For example, one piece of information Ms. Green could not recall was who was with her

at Brandy's house on the night of the murder. As a result, the government showed Ms. Green her

Grand Jury transcript to attempt to refresh her recollection. The following ensued:

> Q  Ms. Green, I've handed you a copy of your grand jury testimony in January
> of 2004. Do you remember appearing in the grand jury?
> A  Yes.
> Q  I'm going to ask you right now, if it's okay, I would like to turn to page
> five of the grand jury transcript I'm going to ask you to read something to
> yourself. I want you to take a look at line ten of page five of your grand
> jury transcript. It's question and answer. Just read it to your sell *(sic)* and
> tell me when you've had a chance to read that?
> A  I read it.
> Q  Does that refresh your recollection about who was present at Brandy's
> house that night, the night before the Wyche brothers were killed?
> A  No. I don't remember all those people being there.
> Q  That's fine. You do remember testifying in the grand jury, is that correct?
> A  Yes.
> Q  And you were taken under oath at that time and you swore it *(sic)* tell the
> truth, is that correct?
> A  Yes.
> Q  And you understood at the time it was important to be as truthful and
> honest as you could, is that right?
> A  Yes
> Q  And this was back, your grand jury appearance is in January of 2004 so it
> was a little bit closer in time than we are today, is that right?
> A  Yes.
> Q  Be fair to say your memory would have been a little fresher when you
> appeared in the grand jury than it is today, is that right?
> A  Yes.

3

See Exhibit 3, Trial Transcript of Damita Green, Oct. 29, 2008 ("Green Trial Tr."), pp. 7-9.

After several more questions to which the witness says she cannot recall the answers, the Court

intercedes and asks the witness the following:

| | |
|---|---|
| THE COURT: | Ms. Green, you said reading the transcript does not refresh your recollection. Is that what you're saying? |
| THE WITNESS: | Yes. |
| THE COURT: | Now, you're acknowledging that that's how you testified before the grand jury? |
| THE WITNESS: | Yes. |
| THE COURT: | But as you sit here today, you don't remember whether what you said then is true? |
| THE WITNESS: | It was a long time ago. |
| THE COURT: | Okay. But my question is, do you remember whether what you said in the grand jury was true? |
| THE WITNESS: | I one [wouldn't] have lied. |
| THE COURT: | You wouldn't have lied. Okay. But reading the transcript doesn't refresh your recollection about the event back in 2002. |
| THE WITNESS: | No. Not that night. |

*Id.* at 13-14.

The Court found that her inability to recall was genuine.[1]  Subsequent cross-examination by Ms.

Rhodes elicited the following:

| | |
|---|---|
| Q | Okay. And then do you also remember [an] interview with the police shortly after the homicide? |
| A | Yes. |
| Q | Okay. And that was around the 28th of March, in 2002? |
| A | Yes. (*Sic* - Counsel remembers this answer as "no.") |
| Q | Okay. Well, does it sound right that it was within, say, a week after the homicides? |
| A | Yes. |
| Q | Okay. So at the point certainly your memory would have been more fresh |

---

[1]  During a colloquy on the admission of Ms. Green's recorded testimony, the Court stated "I have no difficulty whatsoever in concluding that the witness' assertion of a failure of recollection is genuine.  Green Trial Tr. at 30-31.

          than it was at the grand jury, right?
A     Yes.
*Id.* at 19.


Twice later, Ms. Green acknowledged that what she told the police, and cannot now remember

would have been the truth:


Q     Okay.  Now, in terms of the time, again, going back to the interview in
      March of 2002, when everything was much more fresh, do you remember
      that the, you told them that, the call came in, that they were asking you
      about, around 11:40pm?
A     I don't remember the time the call came in.
Q     Okay, do you, but if you told them that, that would have been the truth
      then?
A     Yes.
*Id.* at 20.

Q     Do you remember him having to go with his wife and Sasha [*sic*: Natasha]
      to pick up their kids somewhere?
A     No.
Q     But if you told the police that, that would have been the truth?
A     Yes.
*Id.* at 21.

She also acknowledged that her recorded police statement was used to refresh her recollection in

preparation for her Grand Jury testimony.


Q     Okay.  So in 2004, the prosecutors used your, the police interview to
      refresh your memory?
A     Yes.
*Id.* at 27.

Q     Okay.  But now you're not sure whether it was before the phone
      conversation or not?
A     No, I don't know if it was before or after, after the conversation.
Q     But it could have been, when you were under oath before, you have said to
      the judge you would not have lied, right?
A     Right.

5

*Id.* at 32.

## LEGAL ARGUMENT ON RULE 803(5) RECORDED RECOLLECTIONS

Under Federal Rule of Evidence 803(5), Ms. Damita Green's recorded statement to

Detective Niedermeier is admissible.   FRE 803 sets forth hearsay exceptions for which the

declarant's availability is immaterial and in subsection (5) states:

> **Recorded recollection.**  A memorandum or record concerning a
> matter about which a witness once had knowledge but now has
> insufficient recollection to enable the witness to testify fully and
> accurately, shown to have been *made or adopted by the witness*
> *when the matter was fresh in the witness' memory and to reflect*
> *that knowledge correctly.*  If admitted, the memorandum or record
> may be read into evidence but may not itself be received as an
> exhibit unless offered by an adverse party.  (Emphasis added.)

Thus the four elements required for admission of evidence under this rule are:

1. The witness does not fully and accurately remember information available in the

record;

2. The witness made the record, or adopted it as correct, close to the time of the event

when his or her memory was still fresh;

3. The witness had first hand knowledge of the matter contained in the record; and

4. The witness must vouch for the accuracy of the record: (a) by remembering that the

record was accurate, or (b) by stating that he or she would not have adopted it if it had not been

accurate.

Based on the excerpts provide above, Ms. Green's testimony and lack of recollection fit

squarely into the requirement: 1) As the judge found, she is honestly unable to recall her prior

taped statement to the police or her Grand Jury testimony;  2) She provided the taped statement

within three days of the evening of the murders and her Grand Jury statement two years later in

2004; 3) She was present with the Wyche brothers and Dwayne Denham shortly before they left

together and heard or was part of some conversations; and 4) She testified at trial that she would

not have lied to either the Grand Jury or to the police and acknowledged that what she said would

have been correct. And, of course, both statements were contemporaneously recorded or taken

down by a court reporter.

Many federal circuits have upheld the admission of recorded statements in situations such

as Ms. Green's. In *Hatch v. Oklahoma*, 58 F.3d 1447, 1467 (10th Cir. 1995), a statement given

to the police was held to fall within past recorded recollection and noted as "a firmly rooted"

hearsay exception:

> Reliability can be inferred without more in a case where the evidence falls within
> a firmly rooted hearsay exception." *Roberts, 448 U.S. at 66*; *see also White v
> Illinois, 502 U.S. 346, 356 n.8, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992)*. The
> exception for past recorded recollections is clearly a firmly rooted hearsay
> exception. *See Fed. R. Evid. 803(5)*; *J.C. Penney Co. v. NLRB, 384 F.2d 479, 484
> (10th Cir. 1967)* ("The use of a writing as a recorded past recollection has become
> a firm practice as one of the many exceptions to the hearsay rule."). We therefore
> hold that the use of this recorded recollection testimony did not violate petitioner's
> rights under the *Confrontation Clause. Accord United States v. Picciandra, 788
> F.2d 39, 42-43* (1st Cir.) (upholding the use of recorded past recollection against a
> defendant's *Sixth Amendment* challenge), *cert. denied, 479 U.S. 847, 93 L. Ed. 2d
> 104, 107 S. Ct. 166 (1986)*; *United States v. Smalls, 438 F.2d 711, 714* (2d Cir.)
> (same), *cert. denied, 403 U.S. 933, 29 L. Ed. 2d 712, 91 S. Ct. 2261 (1971)*;
> *United States v. Kelly, 349 F.2d 720, 770 (2d Cir. 1965)* (same), *cert. denied, 384
> U.S. 947, 16 L. Ed. 2d 544, 86 S. Ct. 1467 (1966)*.

*Hatch*, 58 F.3d 1447, 1467. *See also, United States v. Williams,* 571 F.2d 344 (6th Cir.

1978)(Witness' prior sworn and adopted statement concerning his conversation with the

defendant was admissible where witness once had knowledge, but lacked sufficient recollection

at trial).

7

Similarly, in *U.S. v. Sollars*, 979 F.2d 1294, 1298 (8th Cir. 1992) a tape recording of a

witness' statement to a BATF agent only two months after the incident when she could not later

sufficiently recollect to testify was properly admissible under 803(5). The court wrote:

> [Defendant] also claims the district court erred by permitting the government to
> play a tape recording in which witness Joleena Wade, [Defendant's] stepdaughter,
> told an agent of the Bureau of Alcohol, Tobacco, and Firearms (BATF) that she
> saw [Defendant] on the roof of the Milk Barn the night of the fire. Under *Fed. R.*
> *Evid. 803(5)*, a recorded recollection is admissible hearsay if the witness once had
> knowledge, but no longer has sufficient recollection to testify and the matter was
> recorded when fresh in the witness' memory. Wade testified at trial that she
> remembered talking to the BATF agent, but she could not remember whether she
> told him [Defendant] was on the roof. She made the recorded statement only two
> months after the fire, when her memory was still fresh. The evidence was properly
> admitted under *Fed. R. Evid. 803(5). See United States v. Riley, 657 F.2d 1377,*
> *1386 (8th Cir. 1981).*

*Sollars*, 979 F.2d 1294, 1296-97.

*United States v. Picciandra*, 788 F.2d 39 (1st Cir. 1986), the report of a government agent

made at the time of conversation with an individual is admissible as a past recollection recorded

where the agent failed at trial to remember details of the conversation that took place several

years earlier. A substantial pretrial delay caused the DEA agent to forget most of the content of

his report (*not* recorded) though he was able to authenticate it. The court admitted the report

under the past recollection recorded exception.

> Picciandra argues that the report should be excluded based on the holding in
> *United States v. Oates, 560 F.2d 45 (2d Cir. 1977)*, that law enforcement reports
> and evaluation reports of government agencies are inadmissible under the
> exceptions to the hearsay rule. *Oates* addressed the admissibility of a government
> chemist's official report and worksheet under the business records exception but
> stated in dictum that, because of *confrontation clause* problems under the *sixth*
> *amendment*, no law enforcement reports should be admitted under any hearsay
> exception. *Id. at 83-84*. Two courts, however, have taken exception with the
> application of *Oates* outside the business records exception. *See United States v.*
> *Quezada, 754 F.2d 1190, 1193 (5th Cir. 1985)*; [\*\*15] *United States v. Sawyer,*

*607 F.2d 1190, 1192-93 (7th Cir. 1979), cert. denied, 445 U.S. 943, 100 S. Ct. 1338, 63 L. Ed. 2d 776 (1980).* Moreover, *Oates* is contrary to *McGarry v. United States, 388 F.2d 862 (1st Cir. 1967), cert. denied, 394 U.S. 921, 89 S. Ct. 1178, 22 L. Ed. 2d 455 (1969),* in which this court held that the admission of an IRS agent's record of a conversation with a defendant under the past recollection recorded hearsay exception under circumstances similar to the instant case is not an abuse of discretion. The exception is a discretionary aid in the search for truth and has indicia of trustworthiness. "The guarantee of trustworthiness is found in the reliability inherent in a record made while events were still fresh in mind and accurately reflecting them." Notes of Advisory Committee on *Fed. R. Evid. 803(5). McGarry, 388 F.2d at 869 n.8.* We conclude that the district court did not err in admitting agent Dever's report made at the time of his conversation with Picciandra.

Thus, even when the confrontation clause is an issue, the courts have repeatedly held that past recollection recorded statements are admissible under FRE 803(5). *See also, United States v. Williams,* 571 F.2d 344 (6th Cir. 1978)(Witness' prior sworn and adopted statement concerning his conversation with the defendant was admissible where witness once had knowledge, but lacked sufficient recollection at trial. *United States v. Payne*, 491 F.2d 449 (4th Cir. 1974)(Confrontation clause does not preclude admission under this exception of a recorded and signed statement)). *Compare, United States v. Benson*, 961 F.2d 707 (8th Cir. 1992)(Hearsay exception of past-recorded recollection did not apply to FBI agent's report and probation officer's case record where interviews with defendant were **not reported verbatim** and were unsigned and unsworn).

In this circuit, it has been held that "admission of portions of grand jury testimony is a proper use of the recorded recollection exception." *U.S. v. Shorter*, 1999 U.S. App. Lexis 19670 (4th Cir. 1999)(unpublished).[2] Clearly it is, and clearly so is the police statement of Ms.

---

[2] The court in *Shorter* wrote: "*Federal Rule of Evidence 803(5)* excepts from the hearsay rule a recorded recollection. Admission of portions of grand jury testimony is a proper use of the recorded recollection exception. *See United States v. Barrow, 363 F.2d 62, 67 (3d Cir. 1966).* To be admitted, the Government must establish the

Green in this case where each of the requirements under FRE 803(5) are met and where the statement has strong indicia of reliability. This is all the more important in light of Mr. Mitchell's right to present his defense. In *Washington v. Texas*, 388 U.S. 14 (1967), the U.S. Supreme Court stated: "'the right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may be decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.' *Webb v. Texas*, 409 U.S. 95, 98 (1972)."

## CONCLUSION

Mr. Mitchell is, therefore, entitled to have the tape-recorded statement of Ms. Damita Green played for the jury, and to have a copy of the transcript of the statement given to the jury to review as well. She is unable to recall what she said then, but has assured the Court that she told the police the truth. To that end, Mr. Mitchell has subpoenaed Detective Niedermeier to testify to the circumstances involved in taking Ms. Green's statement, and to affirm its contents.

Respectfully submitted,

Willie Mitchell
By Counsel

---

foundation requirements that (1) the witness once had knowledge about the matters in the document, (2) the witness now has insufficient recollection [*5] to testify fully and accurately, and (3) the record was made at a time when the matter was fresh in the witness' memory and reflected the witness' knowledge correctly *See Fed. R. Evid. 803(5)*; *United States v. Edwards, 539 F.2d 689, 691-92 (9th Cir. 1976).*" Id. at *4-5.

BY:

_____

Laura Kelsey Rhodes
MD Federal Bar # 12703
ALBRIGHT & RHODES, LLC
200-A Monroe Street, #305
Rockville, Maryland 20850
Telephone:  301-424-0094
Facsimile:    301-424-8732
Email: lkrhodes@albrightrhodes.com
Counsel for Defendant

_____

Michael Lawlor
MD Federal Bar # 013754
Lawlor & Englert LLC
6305 Ivy Lane, #704
Greenbelt, MD 20770
Telephone: (301) 474-3404
Facsimile: (301) 474-3406
E-mail: mlawlor@verizon.net
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that this motion *in limine* was served upon the following counsel via email and electronic case filing, this 13th day of November, 2008:

**For Mr. Harris:**
Gerard Martin, Esq.
Paul Flannery, Esq.

**For Mr. Martin:**
Thomas Crowe, Esq.
James Pyne, Esq.

**For Mr. Gardner:**
Barry Coburn, Esq.
Adam Kurland, Esq.

**For Government:**
Robert Harding, Esq.
Michael Hanlon, Esq.

**Exhibit 1**

Today's date is the 28th of March, 2002, The time now is 7:33 P.M. Present is myself Detective Gary Niedermeier, Detective Bobby Patton and Miss Demita Green. Miss Green, can you state your name and your date of birth for the record, please?

Green:          Demita Green.

Niedermeier:    And your address?

Green:          8015 Marley Road, Apartment 1B.

Niedermeier:    And that's in Randallstown?

Green:          Yes.

Niedermeier:    Ah, we're here discussing a case in which ah two individual's that you know ah were victim's of a homicide, is that correct?

Green:          Yeah.

Niedermeier:    And what are their names?

Green:          Darryl Wyche and Anthony Wyche.

Niedermeier:    Okay, and do you know when this occurred?

Green:          Um, early Monday morning.

Niedermeier:    Okay, and do you have information about the activities of those individual's prior to this incident?

Green:          Yes.

PAGE TWO
STATEMENT OF:   Demita Green

Niedermeier:   And what is that information?

Green:   Before he left he got a phone call about 11:40, it was Bo 'cause he said his name and um they were talking on the terms of meeting to exchange something. Um, present with him was Anthony Wyche and Shabazz otherwise known as Dezo, all three of them left together and they got in the same car and they never came back, they dropped Dezo off though. I know they dropped him off.

Niedermeier:   How do you know that they dropped Dezo off?

Green:   Because he wasn't with them. I know that they had to drop him off because otherwise he would've drove, he wouldn't have got Anthony to drive him.

Niedermeier:   Approximately what time did they leave?

Green:   They left about twelve to twelve-fifteen.

Niedermeier:   Okay, and what car were they driving?

Green:   They were driving a white Honda Accord wagon.

Niedermeier:   Do you know what, excuse me, when you said that he got a call, how was Darryl called?

Green:   By his cell phone. He got a call on his cell phone.

PAGE THREE
STATEMENT OF:   Demita Green

Niedermeier:    And then how do you know that it was Bo that he
                was talking to?

Green:          Because when he answered the phone, he said
                "Bo, what's up?"

Niedermeier:    Do you remember anything else about that
                conversation that you over heard?

Green:          I just remember him asking, ah I remember Darryl
                asking Bo was he still trying to get that, he
                didn't say what, he said "well, you still trying to
                get that" and evidently Bo must've said "yeah."
                And they hung up, they were only on the phone
                not even for a minute. It might have been a
                minute but it wasn't, it was a short conversation.

Niedermeier:    And how close to the time that they left was that?

Green:          That was about um, they left maybe twenty
                minutes after that had happened. He got the call
                probably around eleven-forty, and they left no
                later than twelve-thirty. So probably like a half
                hour.

Niedermeier:    And you recall who was driving?

Green:          Anthony was driving.

Niedermeier:    Detective Patton, do you have any questions?

PAGE FOUR
STATEMENT OF:    Demita Green

Patton:    You said they dropped off another person

Green:    Uh huh.

Patton:    But you don't know that for certain though. Did you talk to that person, Dezo you said?

Green:    No, I didn't talk to him personally and ask him....

Patton:    Have you talked to him since you found out that your friends were killed?

Green:    No, I haven't talked to him.

Patton:    Did they say when they were leaving, where they were going? Did they mention that?

Green:    Darryl said that he had to go out Essex, he said he had to go over um he said he had to go over East Baltimore and he had to go back over West Baltimore but I don't think that he did all that because it's....it's not coming right out into the time frame right.

Patton:    Did he, when he, when you over heard the conversation that he had with ah Bo....

Green:    Uh huh, he didn't say where he had to meet him at, he never said that, like they had already must have established where they'd meet, where they were meeting.

PAGE FIVE
STATEMENT OF:    Demita Green

Patton:         And you know Bo, do you know this person he
                was talking to?

Green:          I know him, I don't know him personally.

Patton:         Uh huh, you seen him before.

Green:          But I know of him.   Yeah, I seen him before.

Patton:         And was this person Bo, was he a friend, was he
                a friend of their's, or someone that they dealt
                with?

Green:          Yeah, somebody that they grew up with.  They
                weren't like this, they weren't tight, but that's
                somebody that he grew up with that he speaks to
                him, says hi and bye, they were never in any type
                of altercation or anything.

Patton:         How long were they at your place?

Green:          Well, Anthony was there all day.  He was there
                from breakfast to dinner.  Um, Darryl came in
                periodically like all three of them left together but
                Darryl would like leave.  He has kids, I know he
                had to pick his daughter up and then he had come
                back.  He came, he came over there maybe twice
                out of the day.  But Pete, well Anthony he was
                there the whole day.

Patton:         You say Dezo, when did he come in?

PAGE SIX
STATEMENT OF:    Demita Green

Green:          Dezo came in when Darryl came back for the last
                time. All of sudden Dezo was with him, Dezo
                hadn't been with him the whole day but when he
                came back the last time he came back in there
                like eleven, Dezo was with him. So when all
                three of them left, it was Anthony, Darryl and
                Dezo.

Patton:         This, who all had cell phones out of those three?

Green:          I don't know if Dezo has one but Darryl and Pete
                did, Anthony, they have cell phones.

Patton:         They have cell phones, and did both of them get
                calls or just one of them got a call?

Green:          Just one of them because Anthony wasn't even
                suppose to be going with them. He only went on
                the strength that Darryl said if he drives him
                somewhere he'll get his ah window fixed the next
                day. So he wasn't even, he didn't want to go. He
                was tired, he had to work the next morning. He
                kept telling him "no, I don't want to go, I don't
                feel like going" but Darryl didn't like to drive so
                he got him to drive him only so that he would get
                his window fixed the next day, like Anthony
                wasn't even suppose to be there and he
                wouldn't have been there. They just had started
                talking again Sunday, same day that they got
                killed. They hadn't been talking.

PAGE SEVEN
STATEMENT OF:     Demita Green

Patton:         What did you think that that phrase mean that "do you still want that" or what was that he said?

Green:          He said something on the line "are you still trying to get that" I figured that they were having some type of interaction going on.

Patton:         Do you know what they were talking about?

Green:          No, all I know is when Darryl hung up the phone he was like, he was like "yeah, I need that." Like it was a lot of money involved in it.

Patton:         Did he say a number or figure or........

Green:          No.

Patton:         Nothing, how much money?

Green:          No.

Patton:         But it was something you assumed it was money involved?

Green:          Yeah, 'cause after he hung up he was like "yeah, I needed that." So he doesn't really need money so it had to be something big, like it had to be a lot for him to say "yeah, I needed that" because he didn't want for money or anything so.

Patton:         Who else was there in the house with you?

PAGE EIGHT
STATEMENT OF:   Damita Green

Green:  It was um me, Brandy, Keisha his cousin was out there, um Brandy sister Peaches and Darryl, Dezo and Anthony.

Patton:  They were all when they left finally right after midnight?

Green:  Yes.

Patton:  That's all I have.

Niedermeier:  When you talk about the ah the white Honda stationwagon, had you ever seen Darryl or Anthony in that car before?

Green:  Anthony has never been in that car before because well until Sunday 'cause Darryl just got that car.  Um, Darryl might have been in it maybe a couple times.  He just got it two days before. It's a new car.

Niedermeier:  While we ah were discussing this earlier, I showed you a group of photographs um before that I read a statement which you identified an individual on here, is that correct?

Green:  Yes.

Niedermeier:  And who is that individual?

Green:  I know him as Bo.

PAGE NINE
STATEMENT OF:    Demita Green

Niedermeier:    Okay.  Um, just for the record above his name
                there's a number or above where you signed
                there's a number, can you read that?

Green:          1540838.

Niedermeier:    Is there anything else you'd like to add to this?

Green:          No.

Niedermeier:    Detective Patton?

Patton:         No I don't.

Niedermeier:    Alright.  That'll conclude this statement.  It is
                now 7:42 P.M.


This taped statement was transcribed by:

OAIII Dolly Dobrzycki
CID - Drug Enforcement Section

**Exhibit 2**

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF MARYLAND

3

4       IN RE:                        *      UNITED STATES

5                                     *      SPECIAL GRAND JURY

6       MITCHELL INVESTIGATION        *      PROCEEDINGS

7                         *      *      *      *      *

8

9                                 July 2003 Term

10                                January 21, 2004

11                                Room 8415

12                                United States Federal Courthouse

13                                101 West Lombard Street

14                                Baltimore, Maryland  21201

15

16      WITNESS:                      DAMITA GREEN

17

18      APPEARANCE:                   ROBERT HARDING, ESQUIRE

19                                    Assistant United States Attorney

20                                    CHRISTINE MANUELIAN, ESQUIRE

21                                    Assistant United States Attorney

22

23

24      Reported by:

25      Karen Guy

                        For The Record, Inc.
                         Waldorf, Maryland
                          (301)870-8025

```
 1                   P R O C E E D I N G S
 2                                          (10:06 a.m.)
 3       Whereupon,
 4                        DAMITA GREEN
 5       was called as a witness and, having been first duly sworn
 6       by the Foreperson of the Grand Jury, was examined and
 7       testified as follows:
 8                        EXAMINATION
 9              BY MR. HARDING:
10          Q.   Good morning.  Could you state your name,
11       please?
12          A.   Damita Green.
13          Q.   Okay.  And maybe you better spell your first
14       name for us.
15          A.   D-A-M-I-T-A.
16          Q.   Did you say D-E-M?
17          A.   D-A-M-I-T-A.
18          Q.   Okay, good, thanks.  And is your last name Green
19       spelled with an E on the end or without an E on the end?
20          A.   Without.
21          Q.   Okay.  Ms. Green, this is a Federal Grand Jury
22       that's investigating violations of Federal criminal laws.
23       Do you understand that?
24          A.   Yes.
25          Q.   And do you understand that it's a crime to say
```

3

1          something untrue in the Grand Jury and that you might have

2          to go to jail if you were to commit that crime?

3                    A.    Yes.

4                    Q.    Okay.   Were you subpoenaed to come here today,

5          Ms. Green?

6                    A.    Yes.

7                    Q.    Do you understand that you were subpoenaed here

8          as a fact witness and that you're not a target of the

9          investigation?

10                   A.    Yes.

11                   Q.    Do you have an attorney, Ms. Green?

12                   A.    No.

13                   Q.    Ms. Green, we don't anticipate asking you any

14         questions that might incriminate you, so are you

15         comfortable testifying here today in view of the fact that

16         you're not a target of the investigation?

17                   A.    No.

18                   Q.    You're not comfortable?

19                   A.    No.

20                   Q.    Why not?

21                   A.    Because my name is in their papers.

22                   Q.    So, you have concerns about security.   Well, let

23         me assure you, Ms. Green, that this is a secret

24         proceeding.   The Grand Jurors are sworn not to reveal any

25         testimony that they hear in the Grand Jury or the

4

1       identities of the people who testify.  I think that

2       security concerns we can address outside the Grand Jury,

3       but let me just put those aside because those aren't

4       really what I'm concerned about when I ask you if you're

5       comfortable or not.

6             When I'm asking you if you're comfortable, I'm

7       really asking, are you legally comfortable, are you

8       comfortable testifying here today without an attorney to

9       represent you and, also, in view of the fact that you're

10      not a target of the investigation, just answering facts

11      about what you know that's relevant to this case?  I'm

12      really asking you just about your legal comfort.  Do you

13      understand what I'm saying?

14            A.   Yes.

15            Q.   Okay.  Are you legally comfortable?

16            A.   Yes.

17            Q.   I will talk to you after the Grand Jury about

18      security concerns, okay?

19            A.   Okay.

20            Q.   Ms. Green, I want to call your attention to

21      nearly two years ago, March 25th of 2002, which was the

22      night before the murder of Darryl and Anthony Wyche.  Do

23      you remember that night?

24            A.   Yes.

25            Q.   Can I ask you where you were that night?

5

1          A.    At my friend Brandy's house.

2          Q.    Can you give us an idea where Brandy -- you

3    don't have to give us an exact address, just give us an

4    idea of where Brandy lived.

5          A.    In Randallstown.

6          Q.    And that's in North -- that's northwest of

7    Baltimore City, sort of -- or west of Baltimore City in

8    the county, is that right?

9          A.    Yes.

10         Q.    Okay.  Who else was present with you at Brandy's

11   house that might?

12         A.    Me, Brandy, my friend Keisha.  I think Brandy's

13   sister was there and Darryl, Anthony and Dezo.

14         Q.    So, it sounds like there were several men and

15   several women, is that right?

16         A.    Yes.

17         Q.    And Darryl, do you know his last name?

18         A.    Wyche.

19         Q.    Okay.  And Anthony, do you know his last name?

20         A.    Wyche.

21         Q.    And you mentioned a guy named Dezo, is that

22   right?

23         A.    Yes.

24         Q.    Would that be D-E-Z-O, do you know?

25         A.    I don't know.

6

1         Q.    Do you know his real name?  I assume that's a

2     nickname.

3         A.    No.

4         Q.    You don't know his real name?

5         A.    No.

6         Q.    Had you known Anthony Wyche and Darryl Wyche

7     before that night when you were with them over at

8     Brandy's?

9         A.    Yes.

10        Q.    How long had you known them?

11        A.    For about -- I've known Anthony since I was in

12    middle school.  I didn't know his brother then.  So, about

13    12 years.  I haven't known his brother for that long,

14    though.

15        Q.    What high school would that have been that you

16    were talking about?  Were you in school --

17        A.    We went to -- me and his brother went

18    to Randallstown together and to middle school

19    together.

20        Q.    When you say "his brother," which one are you

21    talking about?

22        A.    Anthony.

23        Q.    Is he older or younger?

24        A.    Younger.

25        Q.    So, what were you doing over there at Brandy's

7

1       house that night?

2           A.   We were just chilling.

3           Q.   Okay.  Did there come a time during the course

4       of the evening when Darryl Wyche got a telephone call on

5       his cellular phone?

6           A.   Yes.

7           Q.   Were you able to hear his part of the

8       conversation?

9           A.   Yes.

10          Q.   Did he mention the name of the person he was

11      talking to during the course of that conversation?

12          A.   Yes.

13          Q.   What was the name that he mentioned?

14          A.   Bo.

15          Q.   Okay.  After the conversation on the telephone

16      with Bo -- oh, let me ask you one other question.  Do you

17      remember anything else that Darryl said during the

18      conversation that he was having?

19          A.   All he said was, are you trying to get -- are

20      you still trying to get that.

21          Q.   Okay.  And after the conversation was over, can

22      you tell us anything about Darryl's attitude or his

23      demeanor at that point?

24          A.   He seemed happy.

25          Q.   What did you understand the conversation to have

8

1          been about?   What was your --

2                  A.     Assumption?

3                  Q.     -- assumption?

4                  A.     That it was about drugs.

5                  Q.     Okay.   Now, let me ask you something, this guy

6          Bo, do you know Bo's real name?

7                  A.     No.

8                  Q.     Did you know who Bo was?

9                  A.     Yes.

10                 Q.     How did you know who Bo was?

11                 A.     He went to Randallstown before I was there, but

12         I just heard of him.

13                 Q.     Did you know who he was, did you know what he

14         looked like?

15                 A.     Yeah, sort of.

16                 Q.     And you, in fact, had heard something about Bo

17         earlier that day, is that right?

18                 A.     Yes.

19                 Q.     What did you hear?

20                 A.     He was implicated in another murder.

21                 Q.     Which murder was that?

22                 A.     Lisa and another guy, I don't know his name.

23                 Q.     Did you know Lisa?

24                 A.     No.

25                 Q.     You just know the name Lisa as one of his

1       victims?

2              A.    Yeah, I know of her, I don't know her.   I didn't

3       know her.

4              Q.    How did you hear that Bo was implicated in this

5       double murder?

6              A.    Somebody told me.

7              Q.    Somebody told you?

8              A.    Um-hum.

9              Q.    Do you remember who it was who told you?

10             A.    No.

11             Q.    All right.   Let me ask you something else.   You

12      said that you assumed that Darryl had had this

13      conversation on the telephone about some drug deal.   Did

14      you also believe that Darryl and/or Anthony were involved

15      in drug trafficking generally?

16             A.    No.

17             Q.    You didn't --

18             A.    Darryl, not Anthony.

19             Q.    Just Darryl?

20             A.    Um-hum.

21             Q.    Not Anthony?

22             A.    No.

23             Q.    Okay.   After the phone conversation, did Darryl

24      ask something of Anthony?

25             A.    He asked him before the phone conversation to

1    drive him.

2         Q.   Before the phone conversation?

3         A.   Um-hum.  And then after he asked him if he was

4    still going to drive.

5         Q.   I see.  Did he say why he wanted Anthony to

6    drive him?

7         A.   No, he didn't say why, but he told him that if

8    he drove him, he would get Anthony's car window fixed the

9    next day because somebody had broken it.

10        Q.   Do you know why Darryl asked Anthony to drive

11   him that night?

12        A.   No.

13        Q.   Was Anthony eager and willing to do it or did he

14   refuse or what?

15        A.   He didn't want to do it.

16        Q.   He didn't want to do it?

17        A.   No.

18        Q.   Why not?  Did he say?

19        A.   Because he said he was tired and he had to go to

20   work in the morning.

21        Q.   Did he wind up doing it anyway?

22        A.   Yeah.

23        Q.   So, how long after this phone conversation was

24   it before they left?

25        A.   I guess about 20 minutes.

1       Q.    Did anybody go with them when they left?

2       A.    Anthony and Dezo left with Darryl.

3       Q.    Dezo is this other guy whose name you don't

4    know, is that right?

5       A.    Yes.

6       Q.    Had he come over there with either one of the

7    Wyche Brothers that day?

8       A.    He came with Darryl.

9       Q.    Okay.  And then he left with Darryl and Anthony,

10   is that right?

11      A.    Yes.

12      Q.    Did you see them leave together in the same car

13   or did you just not see them after they walked out the

14   door?

15      A.    I didn't see them after they walked out the

16   door.

17      Q.    Okay.  Did you know whether this guy Bo, whom

18   you had known from school -- from the days when you were

19   in school, did you know whether he was a friend or an

20   acquaintance of Darryl and Anthony Wyche?

21      A.    I thought that they were like associates, not

22   like friends like they hang together, but they grew up

23   together.

24      Q.    The next day, did you hear that the Wyche

25   Brothers had been shot that night?

1          A.   Yes.

2          Q.   How did you hear about it?

3          A.   Somebody called me and told me.

4               MR. HARDING:   Let me just consult with my co-

5    counsel for a moment.

6               (Brief pause in the proceedings.)

7               MR. HARDING:   Does anybody on the Grand Jury

8    have any questions for Ms. Green?

9               (No response.)

10              MR. HARDING:  May I excuse the witness then?

11              THE FOREPERSON:  Sure.

12              BY MR. HARDING:

13         Q.   Ms. Green, if you, after you leave here today,

14   remember something that is real important or you realize

15   you said something wrong, you can come back before this

16   Grand Jury and testify again just by getting in touch with

17   me.  Do you understand that?

18         A.   Yes.

19              MR. HARDING:   Well, that completes your

20   testimony.   Thank you very much, Ms. Green.   You can step

21   outside and I'll go out with you and we'll get the next

22   witness.

23              (The witness was excused.)

24              (Whereupon, at 10:18 a.m., the taking of the

25   testimony in the above matter, before a full quorum of the

1        Grand Jury, was concluded.)

2                         -        -        -        -        -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3              I, Karen Guy, the reporter for the United States

4      Attorney's Office, do hereby certify that the witness

5      whose testimony appears in the foregoing pages was first

6      duly sworn by the Foreperson or the Deputy Foreperson of

7      the Grand Jury when there was a full quorum of the Grand

8      Jury present; that the testimony was taken by me, and

9      thereafter, reduced to typewritten form; and that the

10     transcript is a true record of the testimony given by said

11     witness.

12

13

14                              _Karen Guy_____

15                                 Karen Guy,

16                                   Official Reporter

17

18

19

20

21

22

23

24

25

For The Record, Inc.
Waldorf, Maryland
(301)870-8025

In re: Mitchell Investigation                                    Damita Green

## January 21, 2004

| A | B | | | |
|---|---|---|---|---|
| **able** 7:7 | **back** 12:15 | consult 12:4 | end 2:19,19 | 8:22 11:3,17 |
| **about** 3:22 4:4,11 | **Baltimore** 1:14 | **conversation** 7:8 | **ESQUIRE** 1:18 | 14:3,15 |
| 4:12,17 6:11,12 | 5:7,7 | 7:11,15,18,21 | 1:20 | |
| 6:16,21 7:22 8:1 | **before** 4:22 6:7 | 7:25 9:13,23,25 | evening 7:4 | **H** |
| 8:4,16 9:13 | 8:11 9:25 10:2 | 10:2,23 | exact 5:3 | **hang** 11:22 |
| 10:25 12:2 | 10:24 12:15,25 | counsel 12:5 | **EXAMINATION** | **happy** 7:24 |
| **above** 12:25 | **believe** 9:14 | county 5:8 | 2:8 | **HARDING** 1:18 |
| **acquaintance** | better 2:13 | course 7:3,11 | examined 2:6 | 2:9 12:4,7,10,12 |
| 11:20 | **Bo** 7:14,16 8:6,8 | **COURT** 1:1 | excuse 12:10 | 12:19 |
| **address** 4:2 5:3 | 8:10,16 9:4 | **Courthouse** 1:12 | excused 12:23 | **having** 2:5 7:18 |
| **after** 4:17 7:15,21 | 11:17 | crime 2:25 3:2 | | **hear** 3:25 7:7 8:19 |
| 9:23 10:3,23 | **Bo's** 8:6 | criminal 2:22 | **F** | 9:4 11:24 12:2 |
| 11:13,15 12:13 | **Brandy** 5:2,4,12 | | fact 3:8,15 4:9 | **heard** 8:12,16 |
| **again** 12:16 | **Brandy's** 5:1,10 | **D** | 8:16 | her 9:2,2,3 |
| **ago** 4:21 | 5:12 6:8,25 | **D** 2:1 | facts 4:10 | **high** 6:15 |
| **and/or** 9:14 | **Brief** 12:6 | **Damita** 1:16 2:4 | **Federal** 1:12 2:21 | **him** 8:12 9:25 |
| **another** 8:20,22 | **broken** 10:9 | 2:12 | 2:22 | 10:1,3,6,7,8,11 |
| **answering** 4:10 | **brother** 6:12,13 | **Darryl** 4:22 5:13 | **first** 2:5,13 14:5 | 12:19 |
| **Anthony** 4:22 | 6:17,20 | 5:17 6:6 7:4,17 | **fixed** 10:8 | **house** 5:1,11 7:1 |
| 5:13,19 6:6,11 | **Brothers** 11:7,25 | 9:12,14,18,19 | **follows** 2:7 | |
| 6:22 9:14,18,21 | | 9:23 10:10 11:2 | **foregoing** 14:5 | **I** |
| 9:24 10:5,10,13 | **C** | 11:8,9,20 | **Foreperson** 2:6 | **idea** 5:2,4 |
| 11:2,9,20 | **C** 2:1 | **Darryl's** 7:22 | 12:11 14:6,6 | **identifies** 4:1 |
| **Anthony's** 10:8 | **call** 4:20 7:4 | **day** 8:17 10:9 | **form** 14:9 | **implicated** 8:20 |
| **anticipate** 3:13 | **called** 2:5 12:3 | 11:7,24 | **friend** 5:1,12 | 9:4 |
| **anybody** 11:1 | **came** 11:8 | **days** 11:18 | 11:19 | **important** 12:14 |
| 12:7 | **car** 10:8 11:12 | **deal** 9:13 | **friends** 11:22 | **incriminate** 3:14 |
| **anything** 7:17,22 | **case** 4:11 | **demeanor** 7:23 | **from** 11:18,18 | **investigating** 2:22 |
| **anyway** 10:21 | **cellular** 7:5 | **Deputy** 14:6 | **full** 12:25 14:7 | **investigation** 1:6 |
| **APPEARANCE** | **CERTIFICATE** | **Dezo** 5:13,21 11:2 | | 3:9,16 4:10 |
| 1:18 | 14:1 | 11:3 | **G** | **involved** 9:14 |
| **appears** 14:5 | **certify** 14:4 | **DISTRICT** 1:1,2 | **G** 2:1 | |
| **aside** 4:3 | **chilling** 7:2 | **doing** 6:25 10:21 | **generally** 9:15 | **J** |
| **asked** 9:25 10:3 | **CHRISTINE** | **door** 11:14,16 | **getting** 12:16 | **jail** 3:2 |
| 10:10 | 1:20 | **double** 9:5 | **give** 5:2,3,3 | **January** 1:10 |
| **asking** 3:13 4:6,7 | **City** 5:7,7 | **drive** 10:1,4,6,10 | **given** 14:10 | **July** 1:9 |
| 4:12 | **co** 12:4 | **drove** 10:8 | **go** 3:2 10:19 11:1 | **Jurors** 3:24 |
| **Assistant** 1:19,21 | **come** 3:4 7:3 11:6 | **drug** 9:13,15 | 12:21 | **Jury** 1:5 2:6,21 |
| **associates** 11:21 | 12:15 | **drugs** 8:4 | **going** 10:4 | 3:1,25 4:2,17 |
| **assume** 6:1 | **comfort** 4:12 | **duly** 2:5 14:6 | **good** 2:10,18 | 12:7,16 13:1 |
| **assumed** 9:12 | **comfortable** 3:15 | **during** 7:3,11,17 | **Grand** 1:5 2:6,21 | 14:7,8 |
| **assumption** 8:2,3 | 3:18 4:5,6,7,8 | **D-A-M-I-T-A** | 3:1,24,25 4:2,17 | **just** 4:3,10,12 5:3 |
| **assure** 3:23 | 4:15 | 2:15,17 | 12:7,16 13:1 | 7:2 8:12,25 9:19 |
| **attention** 4:20 | **commit** 3:2 | **D-E-M** 2:16 | 14:7,7 | 11:13 12:4,16 |
| **attitude** 7:22 | **completes** 12:19 | **D-E-Z-O** 5:24 | **Green** 1:16 2:4,12 | |
| **attorney** 1:19,21 | **concerned** 4:4 | | 2:18,21 3:5,11 | **K** |
| 3:11 4:8 | **concerns** 3:22 4:2 | **E** | 3:13,23 4:20 | **Karen** 1:25 14:3 |
| **Attorney's** 14:4 | 4:18 | **E** 2:1,1,19,19 | 12:8,13,20 | 14:15 |
| **a.m** 2:2 12:24 | **concluded** 13:1 | **eager** 10:13 | **grew** 11:22 | **Keisha** 5:12 |
| | | **earlier** 8:17 | **guess** 10:25 | **know** 4:11 5:17 |
| | | **either** 11:6 | **guy** 1:25 5:21 8:5 | 5:19,24,25 6:1,4 |
| | | | | 6:12 8:6,8,10,13 |

For The Record, Inc.
301-870-8025

In re:  Mitchell Investigation                                    Damita Green

### January 21, 2004

| Y | | | | |
|---|---|---|---|---|
| Yeah 8:15 9:2 10:22 | | | | |
| years 4:21 6:13 | | | | |
| younger 6:23,24 | | | | |
| | | | | |
| **1** | | | | |
| 10:06 2:2 | | | | |
| 10:18 12:24 | | | | |
| 101 1:13 | | | | |
| 12 6:13 | | | | |
| | | | | |
| **2** | | | | |
| 20 10:25 | | | | |
| 2002 4:21 | | | | |
| 2003 1:9 | | | | |
| 2004 1:10 | | | | |
| 21 1:10 | | | | |
| 21201 1:14 | | | | |
| 25th 4:21 | | | | |
| | | | | |
| **8** | | | | |
| 8415 1:11 | | | | |

For The Record, Inc.
301-870-8025

**Exhibit 3**

1

1

2                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
                              NORTHERN DIVISION
3

4

5       UNITED STATES OF AMERICA

6              v.                              CRIMINAL CASE NO.
                                                AMD-04-029
7       WILLIE MITCHELL,
        SHELTON HARRIS,
8       SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
9
               Defendants
10       _____/

11              (Excerpt: Testimony of Damita Green)
                   Wednesday, October 30, 2008
12                    Baltimore, Maryland

13

        Before:   Honorable Andre M. Davis, Judge
14                      And a Jury

15      Appearances:
               On Behalf of the Government:
16              Robert Harding, Esquire
                Michael C. Hanlon, Esquire
17             On Behalf of Defendant Mitchell:
                Laura Kelsey Rhodes, Esquire
18              Michael E. Lawlor, Esquire
               On Behalf of Defendant Harris:
19              Gerard P. Martin, Esquire
                Paul Flannery, Esquire
20             On Behalf of Defendant Martin:
                Thomas L. Crowe, Esquire
21              James G. Pyne, Esquire
               On Behalf of Defendant Gardner:
22              Adam H. Kurland, Esquire
                Barry Coburn, Esquire
23
        Reported by:
24      Mary M. Zajac, RPR
        Room 5515, U.S. Courthouse
25      101 West Lombard Street
        Baltimore, Maryland 21201

DIRECT EXAMINATION OF DAMITA GREEN                           2

1              (Excerpt: Testimony of Damita Green.)

2              MR. HANLON:  Your Honor, the United States calls Damita

3       Green.

4              DAMITA GREEN, GOVERNMENT'S WITNESS, SWORN

5              THE WITNESS:  Yes.

6              THE CLERK:  Be seated.  Speak directly forward the

7       make.  State your name and spell it for the record, please.

8              THE WITNESS: Damita Green.  D-A-M-I-T-A.  G-R-E-E-N.

9              DIRECT EXAMINATION

10      BY MR. HANLON:

11      Q    Ms. Green, I know you're getting a cup of water poured for

12      you.  Let me ask you a couple of basic questions to begin.  How

13      old are you?

14      A    28.

15      Q    And did you grow up in the Baltimore area?

16      A    Yes.

17      Q    And what neighborhood did you grow up?  I don't need an

18      exact address, but what general area did you grow up in?

19      A    Baltimore County.

20      Q    And how far did you go in school, Ms. Green?

21      A    Twelfth grade.

22      Q    Did you graduate from high school?

23      A    Yes.

24      Q    And about when was that?

25      A    1998.

1    Q    Do you know -- well, you and I have spoken before about your

2    appearance today.  We've met and went over sort of the questions

3    I would ask you.  We've talked a couple of times on the phone.

4    Is that right, Ms. Green?

5    A    Yes.

6    Q    And you've told me a number of times that you're not at all

7    happy to be here today, is that correct?

8    A    No.

9    Q    And in fact, you and I had a phone conversation --

10            MS. RHODES:  Objection, Your Honor.

11            THE COURT:  I guess it's overruled.  Why don't you

12    start over, Mr. Hanlon.

13   BY MR. HANLON:

14   Q    Sure, Your Honor.  I'll just ask you a question, Ms. Green,

15   and if there's an objection, hold on just for a second.  You and

16   I had a phone conversation yesterday about making arrangements

17   for you to come in and testify, is that correct?

18   A    Yes.

19   Q    And you indicated you didn't want to --

20            MS. RHODES:  Objection, Your Honor.

21            THE COURT:  Overruled.  Go ahead, Mr. Hanlon.

22   Q    Be fair to say that I essentially have insisted that you

23   come in, is that fair to say?

24   A    Yes.

25            MS. RHODES:  Objection.

1      THE COURT:   Overruled.

2   Q    And among, among some of the concerns that you have, Ms.

3   Green, is you've recently given birth to a baby, is that correct?

4   A    Yes.

5   Q    And you're still on the mend, you're still getting over your

6   birth.   There were some complications when you gave birth a few

7   weeks ago, is that right?

8   A    Yes.

9   Q    I will try to move through this quickly and I do appreciate

10  your being here. Do you know a person named Anthony Wyche?

11  A    Yes.

12  Q    Or did you ever know a person named Anthony Wyche?

13      THE COURT:   I'm sorry, Ms. Green.   Can you get a little

14  closer to the microphone, please?   Thank you.

15  Q    Did you ever know a person named Anthony Wyche?

16  A    Yes.

17  Q    And how did you know Anthony Wyche?

18  A    I went to school with him.

19  Q    Showing you what's been marked as Government's Exhibit

20  PH-55.   Do you see that on the screen?

21  A    Yes.

22  Q    And who is this gentleman in this photograph?

23  A    Anthony Wyche.

24  Q    And did Anthony Wyche have a brother?

25  A    Yes.

1    Q    Was he Darryl Wyche?

2    A    Yes.

3    Q    Did you know Darryl?

4    A    Yes.

5    Q    How did you know him?

6    A    From his brother.

7    Q    You knew Anthony Wyche better than Darryl Wyche?

8    A    Yes.

9    Q    Showing you what's been marked as Government's Exhibit

10   PH-56.   Who is this gentleman?

11   A    Darryl Wyche.

12   Q    You're aware or you became aware, Ms. Green, that Anthony

13   Wyche and Darryl Wyche were shot to death in March of 2002, is

14   that right?

15   A    Yes.

16   Q    Prior to that time, about how long had you known the two

17   brothers?

18   A    Maybe six years, seven years.

19   Q    What kind of a relationship generally did you have with them

20   as of 2002, March of 2002, just before they died?

21   A    Friend, just friends.

22   Q    Just friends?

23   A    Um-hum.

24   Q    About how frequently did you see them at that time?

25   A    Not often.

DIRECT EXAMINATION OF DAMITA GREEN                    6

1   Q    Once in a while?

2   A    Yes.

3   Q    Just to socialize?

4   A    Yes.

5   Q    Sitting here today, Ms. Green, do you remember offhand the

6   date that they were killed?

7   A    No.

8   Q    Does March of 2002 sound accurate?

9   A    Yes.

10  Q    You remember finding out about their death, is that right?

11  A    Yes.

12  Q    And do you remember seeing them and hanging out with, with

13  Darryl Wyche and Anthony Wyche the night before their death,

14  leaving aside the date?

15  A    Yeah.

16  Q    Do you remember seeing them the night before their death?

17  A    Yes.

18  Q    Where was it, Ms. Green, that you saw Darryl Wyche and

19  Anthony Wyche the night before their death?

20  A    At a friend of mine's house.

21  Q    And what was your friend's name?

22  A    Brandy.

23  Q    Again, without getting into a particular address, what part

24  of town did Brandy live in?

25  A    In Baltimore County.

1    Q    Was it in the Randallstown section?

2    A    Yes.

3    Q    And that, that day or that night, about when was it that you

4    saw Darryl and Anthony Wyche at Brandy's house?

5    A    I'm not sure of the time, but it was at night.

6    Q    It was at night?

7    A    Um-hum.

8    Q    That's a yes?

9    A    Yes.

10   Q    And just hanging out that day?

11   A    Yes.

12   Q    Or that night, I should say.  Were there other people with

13   you?

14   A    Yes.

15   Q    If you remember, or do you remember all of the people that

16   were with you and Darryl Wyche and Anthony Wyche at Brandy's

17   house that night?

18   A    No.  I just remember Brandy's sister being there.

19   Q    You don't remember offhand whether there were other people

20   or anything like that?

21   A    No.

22   Q    Your Honor, may I approach the witness?

23            THE COURT:  Yes.

24   Q    Ms. Green, I've handed you a copy of your grand jury

25   testimony in January of 2004.  Do you remember appearing in the

1    grand jury?

2    A    Yes.

3    Q    I'm going to ask you right now, if it's okay, I would like

4    to turn to page five of the grand jury transcript I'm going to

5    ask you to read something to yourself.  I want you to take a look

6    at line ten of page five of your grand jury transcript.  It's

7    question and answer.  Just read it to your sell and tell me when

8    you've had a chance to read that?

9    A    I read it.

10   Q    Does that refresh your recollection about who was present at

11   Brandy's house that night, the night before the Wyche brothers

12   were killed?

13   A    No.  I don't remember all those people being there.

14   Q    That's fine.  You do remember testifying in the grand jury,

15   is that correct?

16   A    Yes.

17   Q    And you were taken under oath at that time and you swore it

18   tell the truth, is that correct?

19   A    Yes.

20   Q    And you understood at the time it was important to be as

21   truthful and honest as you could, is that right?

22   A    Yes.

23   Q    And this was back, your grand jury appearance is in January

24   of 2004 so it was a little bit closer in time than we are today,

25   is that right?

1    A    Yes.

2    Q    Be fair to say your memory would have been a little fresher

3    when you appeared in the grand jury than it is today, is that

4    right?

5    A    Yes.

6    Q    I'm going to read this question and answer, one I just asked

7    to you look at, on page five, line 10 of your January transcript.

8         Question:   Okay.   Who else was present with you at

9    Brandy's house that night?   For the record were it's spelled

10   might in the transcript, I'm reasonably certain that read night.

11   Does that sound correct that is correct that would say night?

12   A    Yes.

13   Q    Who was present with you at Brandy's house that night?   Your

14   answer, Ms. Green, me, Brandy, my friend, Keisha, I think

15   Brandy's sister was there, and Darryl, Anthony, and Deezo.   Have

16   I read the transcript correctly?

17   A    Yes.

18   Q    Now, moving off the transcript, there was a person you knew

19   at the time named Deezo, is that correct?

20   A    Yes.

21   Q    And how did you know Deezo?

22   A    I didn't really know him.

23   Q    You knew him by face you didn't know him well with you you

24   knew his name?

25   A    Yes.

1    Q    And did you know anything about him or what relationship he

2    had with the Wyche brothers?

3    A    No.

4    Q    But you just, you recognized him and knew his name, things

5    like that?

6    A    Yes.

7    Q    Now, during the course of that evening while you were at

8    Brandy's house, Ms. Green, did Mr. Wyche, Darryl Wyche, take a

9    phone call?

10   A    Yes.

11   Q    Do you remember if Mr. Wyche, Darryl Wyche, received the

12   phone call or if he made the phone call?  Do you remember?

13   A    He received it.

14   Q    And you were present when he received that call?

15   A    Yes.

16   Q    Were you present for part of the time that Mr. Wyche spoke

17   on the phone?

18   A    Yes.

19   Q    Was that at ban did I's house?

20   A    Yes.

21   Q    Were you able to hear Darryl Wyche's half of that cell phone

22   conversation?

23   A    Yes.

24   Q    At any point during the course of the call, Ms. Green, do

25   you remember if Mr. Wyche used the name of the person he was

1    talking to?  Did he address the person on phone by name?

2    A    Yes.

3    Q    And what name did Darryl Wyche use during that phone call?

4              MS. RHODES:  Objection.

5              THE COURT:  The objection's overruled.

6              MR. HANLON:

7    Q    You may answer?

8              THE COURT:  You may answer.

9    A    Bo.

10   Q    How many times did he use the word Bo in addressing the

11   person on other side of the cell phone call?

12   A    Just once that I remember.

13   Q    Did you hear, during this conversation, did you hear Darryl

14   Wyche ask anything of Bo?

15             MS. RHODES:  Objection, Your Honor.

16             MR. LAWLOR:  Your Honor, could we ask the grand jury

17   transcript be removed?  Appears the witness is reading from that

18   rather than testifying from memory.

19             THE COURT:  You can follow that up.  You can leave it

20   in front you have.  But you can close that up.  All right.

21   A    The objection's overruled.  Do you remember the last

22   question?

23             THE WITNESS:  No.

24             THE COURT:  Okay.  Go ahead, Mr. Hanlon.

25   BY MR. HANLON:

1    Q    I'll give you the question again, Ms. Green.  During the

2    time that you overheard this cell phone conversation between

3    Darryl Wyche and Bo, did you hear Mr. Wyche ask anything of Bo or

4    ask Bo any questions?

5    A    I don't remember.

6                MS. RHODES:  Standing objection to this.

7                THE COURT:  The objection's overruled.  The answer was

8    I don't remember.

9    Q    You do not remember that?

10   A    No.

11   Q    Now, I'm going to ask you at this point to open up your

12   grand jury transcript again and I'm going to turn to you a

13   particular page.  And give me a moment.  Page Seven of your grand

14   jury transcript.  And I want you to take a look, if you would,

15   Ms. Green, at line 15 of Page Seven of your transcript.  There's

16   a question and answer.  Read it to yourself and let me know when

17   you're done.

18   A    Okay.

19   Q    Have you had a chance it read that part of your transcript?

20   A    Yes.

21   Q    And does it refresh your recollection about whether what Mr.

22   Wyche asked Bo any questions over that cell phone call?

23   A    No.

24   Q    Understood.  I'm going to read the question and answer from

25   Page Seven, line 15 of your January sworn grand jury transcript,

1    Ms. Green.  Read along with me to yourself and tell me if I get

2    anything wrong.

3              Question:  Okay.  After the conversation on the

4    telephone with Bo -- let me ask you one other question.  Do you

5    remember anything else that Darryl said during the conversation

6    that he was having?  Your answer:  All he said was are you trying

7    to get, are you still trying to get that?  Did I read your

8    transcript, your testimony accurately?

9    A    Yes.

10   Q

11             MR. LAWLOR:  Your Honor, could I have a limiting

12   instruction, please, as to that testimony?

13             THE COURT:  Ms. Green, you said reading the transcript

14   does not refresh your recollection.  Is that what you're saying?

15             THE WITNESS:  Yes.

16             THE COURT:  Now, you're acknowledging that that's how

17   you testified before the grand jury?

18             THE WITNESS:  Yes.

19             THE COURT:  But as you sit here today, you don't

20   remember whether what you said then is true?

21             THE WITNESS:  It was a long time ago.

22             THE COURT:  Okay.  But my question is, do you remember

23   whether what you said in the grand jury was true?

24             THE WITNESS:  I one have lied.

25             THE COURT:  You wouldn't have lied.  Okay.  But reading

1   the transcript doesn't refresh your recollection about the event

2   back in 2002.

3             THE WITNESS:  No.  Not that night.

4             THE COURT:  Okay.  Is there a particular reason you

5   can't remember it?

6             THE WITNESS:  No.  It just was a long time ago.  Its

7   been a long time.

8             THE COURT:  So if reading the transcript doesn't help

9   you remember, guess nothing would help you remember, in others

10  words, your memory of this event is just totally wiped out? ?  I

11  mean, if it is, it is.

12            THE WITNESS:  I remember testifying to it on the grand

13  jury.

14            THE COURT:  Right.

15            THE WITNESS:  I just.

16            THE COURT:  But you don't remember the actual event?

17            THE WITNESS:  I remember him taking the phone call. I

18  just don't remember everything that was said on the call.

19            THE COURT:  Okay.  All right.  All right.

20            The grand jury testimony of this witness, ladies and

21  gentlemen, may is not be considered by you as the actual

22  substantive testimony for purposes of this trial.  Mr. Hanlon has

23  attempted, and you just heard me question the witness to see,

24  whether the witness has a recollection of this part of the phone

25  call about which she's testifying.  But you may not consider the

1    grand jury testimony as substantive evidence.  It was only

2    introduced for the purpose of trying to help the witness recall

3    the actual event.  Go ahead, Mr. Hanlon.

4            MR. HARDING:

5            MR. HANLON:  Your Honor, actually, may the government

6    be heard on that or may I at at least.

7            THE COURT:  Yeah I'm a probably change it, but go

8    ahead.

9            MR. HANLON:  So I should continue with the witness?

10           THE COURT:  Yes.  Oh, yes.

11   BY MR. HANLON:

12   Q    Do you recollect after the call happened, and again, I'll

13   he's asking you don't look at your grand jury transcript until I

14   tell you to, Ms. Green, after the phone call happened, Ms. Green,

15   do you remember how Mr. Wyche, how Darryl Wyche seemed after the

16   call?  Did he seem happy, sad?  Anything at all about his state

17   of mind?

18   A    I remember that night he was in a good mood.

19   Q    Was he in a good mood the whole evening or was in a better

20   mood after the phone call ended?

21   A    We had been all laughing the whole night.  But he was in a

22   good mood when he hung up as well.

23   Q    And after the phone call ended, did you cedar I will Wyche

24   make arrangements to do anything or go any place?

25   A    No.  Well, they, he left after a little while after he got

1    off the phone.

2    Q    About how long after he got off the phone did he leave?

3    A    I can't remember.

4    Q    Was it about 20 minutes?

5    A    Yes.  Maybe 20, it wasn't an hour.  So --

6    Q    And do you remember, did you cedar I will Wyche leave with

7    anyone else?

8    A    Yes.

9    Q    Who did he leave with?

10   A    I remember him leaving with his brother.

11   Q    His brother was Anthony wife?

12   A    Anthony Wyche.

13   Q    And everybody knew him as Pete, is that right?

14   A    Yes.

15   Q    Do you remember seeing the Wyche brothers have any

16   discussion about who was going to drive or anything like that?

17   A    His brother said he would drive.

18   Q    Do you remember if Anthony Wyche, also known as Pete, seemed

19   happy or unhappy to be driving?

20   A    He really didn't feel like driving but, you know what I

21   mean, he said he would drive.

22   Q    And it was late at night when they left, is that right?

23   A    Yes.

24   Q    And sitting here today, do you remember if it was just the

25   brothers who left or if they left with anyone else?

1    A    I just remembered them leaving.

2    Q    You never spoke to either Anthony Wyche or Darryl Wyche

3    again, is that correct?

4    A    No.

5    Q    And the next day you heard about the fact at that they'd

6    been shot, is that correct?

7    A    Yes.

8    Q    Do you have any concerns about testifying here today, Ms.

9    Green, aside?

10              MR. LAWLOR:   Objection.

11              THE COURT:   You can finish the question.

12   Q    Do you have any concerns about testifying here today or

13   about remembering the things you've talked about or that I've

14   asked you about?

15              MS. RHODES:   Objection.

16   Q    Aside from what you previously testified to?  And hold on.

17              THE COURT:   Overrruled, you may answer.

18              THE WITNESS:   Can you repeat question? ?

19              MR. HANLON:

20   Q    Yes, ma'am.  Do you have any concerns about testifying here

21   today or about remembering the things I've asked you about apart

22   from what you and I have already discussed, the the fact that

23   you're on mend from having a baby, things like that?

24              MS. RHODES:   Objection.

25              THE COURT:   Overruled.  You may answer.

1        THE WITNESS:  I didn't want to testify.  But I don't

2   have any concerns about remembering anything.

3   Q    Why did you not want to testify?

4        MS. RHODES:  Objection.

5        THE COURT:  Overruled.  You may answer.

6   A    Out of fear.

7   Q    Your Honor, I believe I've concluded my testimony with the

8   witness.  The issue now is I think the treatment of the grand

9   jury transcript.  I don't know if the Court would like to be her,

10  if government may be heard on that?

11       THE COURT:  Well, what's your theory, Mr. Hanlon.

12       MR. HARDING:

13       MR. HANLON:  Pass recollection recorded, Your Honor.

14       THE COURT:  No.  That's not past recollection recorded.

15  All right.  You may cross examine.

16       MR. HANLON:  Your Honor, may I give one other theory?

17       THE COURT:  Yes.

18       MR. HANLON:  Prior inconsistent statements.

19       THE COURT:  It's not inconsistent.  It's not

20  inconsistent.  She says she does not remember it.  Doesn't

21  refresh her recollection.  A failure of recollection is not an

22  inconsistent statement.

23       MR. HARDING:

24       MR. HANLON:  But it's also not a past recollection

25  recorded?

1               THE COURT:   And it's not a past recollection recorded.

2               MR. HANLON:   May I brief this subject, Your Honor?

3               THE COURT:   No.  No.  No.  Let's move on.

4               CROSS EXAMINATION

5     BY MS. RHODES:

6     Q    High, Ms. Green, I have some questions for you.  First of

7     all, congratulation is object your new baby?

8     A    Thank you.

9     Q    You testified, you said you recall testifying in front of

10    the grand jury, right?

11    A    Yes.

12    Q    And that date was around, in January of 2004.  Does that

13    sound right?

14    A    Yes.

15    Q    Okay.  And then do you also remember in interview with the

16    police shortly after the homicides?

17    A    Yes.

18    Q    Okay.  And that was around the 28th day of March, in 2002?

19    A    Yes.

20    Q    Okay.  Well, does it sound right that it was within, say, a

21    week after the homicides?

22    A    Yes.

23    Q    Okay.  So at that point certainly your memory would have

24    been even more fresh than it was at the grand jury, right?

25    A    Yes.

1   Q    Okay.  And do you remember in that interview who you, that

2   you spoke to Detective Niedermeier?  He was one of the people

3   there?

4   A    Yes.

5   Q    And another officer was there, too?

6   A    Yes.

7   Q    Okay.  Now, in terms of the time, again, going back to the

8   interview in March of 2002, when everything was much more fresh,

9   do you remember that the, you told them that, the call came in,

10  that they were asking you about, around 11 40 p.m.?

11  A    I don't remember the time the call came in.

12  Q    Okay.  Do you, but if you told them that, that would have

13  been the truth then?

14  A    Yes.

15  Q    Okay.  And do you recall, you done recall saying that it was

16  around 11 40 or do you recall that?

17  A    I don't recall.

18  Q    Okay.  Do you recall telling them that they left maybe half

19  an hour later?

20  A    Yes.

21  Q    Okay.  And do you recall telling them that Deezo, that the

22  three all left together, Deezo with the brothers?

23  A    No, I don't recall that.

24  Q    Okay.  Now, looking at these phone calls, they asked but one

25  call in particular, right?

1   A    Yes.

2   Q    Okay.  They weren't asking you about every single call he

3   got or he made that evening, right?

4   A    No.

5   Q    Okay.  And if they had, you would have been able to give

6   them a little more information about other calls he had gotten,

7   right?

8   A    Yes.

9   Q    Okay.  Now, I know it's long time ago, but do you remember

10  how many times you talked, you got a call or made a call to

11  Darryl that day?

12  A    No.

13  Q    Would it, would it have been around ten times, do you think,

14  back and forth?

15  A    No.  I don't, I don't recall.  But, I don't remember talking

16  to him ten times that day.

17  Q    How many times would you say you spoke to him that day?

18  A    Maybe twice, two or three times.  He was calling me look for

19  his cousin.

20  Q    His cousin being who?

21  A    Keisha.

22  Q    Okay.  And when he called you those times, were you at

23  Brandy's house?

24  A    I don't recall.  I wasn't at Brandy's house the whole day

25  so --

1    Q    Okay.  Do you remember when you got there to her house?

2    A    No.

3    Q    You remember telling the police that you had, that Darryl

4    had come over to the house, to Brandy's house several times that

5    day, like three times?

6    A    Yes.

7    Q    Okay.  And I gather, and that Pete had been there basically

8    all day, mean Anthony Wyche, had been there basically all day?

9    A    Yes.

10   Q    So but Darryl wasn't there all day but several times?

11   A    Yes, he wasn't there all day.

12   Q    Okay.  And last time he came back was when he came back with

13   Deezo?

14   A    Yes.

15   Q    Okay.  And then he had been there earlier and then left to

16   go get his daughter, is that right?

17   A    I don't recall.

18   Q    Do you remember him having to go with his wife and Tasha to

19   pick up their kids somewhere?

20   A    No.

21   Q    But if you told the police that, that would have been the

22   truth?

23   A    Yes.

24   Q    Okay.  So, and, so you must have gotten there, what time do

25   you think?  Would it have been around noon, say?  Or what?

1   A    Sometime that afternoon.

2   Q    Okay.  So he would have been there a couple times in the

3   afternoon at least, if not in the morning?

4   A    Yes.

5   Q    Do you know if he was there in the morning?

6   A    No I don't know.

7   Q    You don't know?

8   Q    Now, car, this white Honda, they had, Anthony had just

9   gotten at that car, is that right?

10  A    I don't recall.

11  Q    You remember that it was something that he'd had maybe for a

12  day or two?  Do you remember telling the police about that?

13  A    No.

14  Q    Okay.  You had known the Wyche brothers, well, you knew Pete

15  from back from middle school, right?

16  A    Yes.

17  Q    Okay.  And Anthony you'd met, sorry, Darryl you'd met about

18  six or seven years earlier?

19  A    Yes.

20  Q    Okay.  So how often would you say you'd talk to Darryl in a

21  week?  How many times?

22  A    Not often.

23  Q    A couple times a week?

24  A    No.

25  Q    Something like that?

1   A    No.

2   Q    What about that week?  I mean, would you say that there had

3   been a couple different days when you'd had phone calls with him?

4   A    Yes.

5   Q    Okay.  And did you know he was going to be getting a new car

6   or that he had gotten a new car, a white Honda?

7   A    No.

8   Q    No, to you don't remember?

9   A    I don't remember.

10  Q    Okay.  Okay.  Do you remember what Detective Niedermeier

11  asked you about the white Honda station wagon, if you'd ever seen

12  Darryl or Anthony in it before?

13  A    No.

14  Q    Okay.  Do you remember telling him, Anthony's never been in

15  that car before, because well, up until Sundaying because Darryl

16  just got at that car, Darryl might have been in it a couple of

17  ties, he just got it two days before, eye new car?

18              MR. HANLON:  Your Honor, objection to the reading of

19  the transcript of.

20              THE COURT:  Rephrase the question, Ms. Rhodes.

21  Q    Do you remember telling Detective Niedermeier that Darryl

22  Wyche had just gotten that car two days before, it was a new car?

23  A    No, I don't remember.

24  Q    Okay.  Do you recall seeing that car parked outside of

25  Brandy's that night?

1   A    Yes.

2   Q    Okay.  And had you ever seen it, had you ever seen it the

3   day before or the day before that, after Darryl got it?

4   A    If I had seen him, he was driving that car.

5   Q    Okay?

6   A    I don't remember if I saw him a couple days prior to that

7   because I didn't see him all the time.

8   Q    Okay.  So do you think that was the first time you saw that

9   car?

10  A    Yes.

11  Q    Okay.  And you remember they also had a green car that

12  night, too?

13  A    No, I don't remember.

14  Q    Okay.  Did you know, at some point Darryl had a sedan

15  business, doing some chauffeuring and that sort of thing.  Do you

16  remember that?  Do you remember hearing about that?

17  A    Yes.

18  Q    And in that business he had, obviously had to have a lot of

19  different cars, right, to provide the services?

20  A    Yes.

21  Q    Okay.  And did you ever see any of those cars that he had?

22  A    No.

23  Q    All right.  Do you remember telling Detective Niedermeier

24  that Deezo and Darryl and Anthony left around 12 15?

25  A    I don't even remember Deezo being there.  It was so long

1    ago.  But I thought that Darryl and Anthony left around that

2    time.

3    Q    Okay.  You know who Deezo is?  I mean you know what he looks

4    like more or less?

5    A    Not really.  I've seen him but I probably don't remember

6    what he look like.

7    Q    When was the last time you saw him?

8    A    That night, as I recall.

9    Q    Okay.  As far as you know, you've never seen him since then?

10   A    No.

11   Q    And were you aware what Darryl did for his money?

12   A    I heard what he did.  I wasn't, I've never witnessed.  But I

13   just.

14   Q    Okay.  Who did you hear it from?

15   A    Just the streets.  Nobody in particular.

16   Q    Okay.  And do you remember when, when Darryl went out

17   somewhere, just in general, did he like to drive?

18   A    No.

19   Q    Okay.  So if he was going with somebody else, he'd have them

20   drive?

21   A    Yes.

22   Q    Okay.  All right.  Do you remember Darryl telling, do you

23   remember telling the police when you were with them in March of

24   2002 some other things that Darryl had said he was going to do

25   that night?

1   A    No.

2   Q    Okay.  Do you remember -- Court's indulgence.  Do you

3   remember one of the officers asking you where they were going and

4   then your telling them that you had, that Darryl had said he had

5   to go out to Essex and he had to go over to east Baltimore and

6   that he had to go back over to West Baltimore?  Do you remember

7   that?

8   A    No.

9   Q    Okay.  But if -- all right.  Thank you.  And when do you

10  think that you kind much stopped remembering all of this stuff?

11  I mean, you remembered it in March of 2002 and you remembered it,

12  a lot of things in 2004.

13  A    Well, in '04, I, they had to refresh my memory of some

14  things because I didn't remember in '04.

15  Q    Okay.  So in 2004, the prosecutors used your, the police

16  interviews to refresh your memory?

17  A    Yes.

18  Q    Okay.  Okay.  Do you remember Darryl's getting a whole bunch

19  of phone calls that night?

20  A    No.

21  Q    Okay much do you remember, you remember what time they got

22  back from DC around?  Maybe nine, 10:00?

23  A    No.

24  Q    You don't remember?

25  A    No I don't remember him coming from DC.

CROSS EXAMINATION OF DAMITA GREEN BY RHODES                    28

1    Q    Oh, you don't remember that he and Deezo had gone to DC?

2    A    No.

3    Q    Okay.  Do you remember that -- and you have no idea what

4    time they came back?

5    A    No.

6    Q    Or do you remember what time they came in to house?

7    A    I don't remember exact time.  It was at night, though.

8    Q    Okay.  Would you remember -- okay.  Court's indulgence.

9             Okay.  Do you remember saying before to the police,

10   that when they came back that is correct when Deezo and Darryl

11   came in, that it was about roughly 10:00?

12   A    No, I don't remember.

13   Q    Okay.  Do you remember that Darryl got -- well, let me ask

14   you this.  When you would call Darryl to reach him, would you

15   call him on his cell phone?

16   A    Yes.

17   Q    And you would use your cell phone?

18   A    Yes.

19   Q    Okay.  Do you remember his cell phone number back then?

20   A    No.

21   Q    Does the number 443 691 9203 sound familiar?

22   A    No.

23   Q    Okay.  Do you remember your cell phone back then?

24   A    No.

25   Q    Okay.  Does the number four 102 six two zero seven nine

1   eight sound familiar as one of your old cell phone numbers or

2   perhaps your current cell phone number?

3   A    No.  It doesn't sound familiar.  That's not my current

4   number.

5   Q    Okay.  Could it have been your number in 2002?

6   A    Yes.

7   Q    Already.  And was, did Darryl usually have a couple

8   different sell phones or several cell phones?

9   A    Yes.

10  Q    Okay.  So to reach him, people would call hill on different

11  numbers?

12  A    Yes.

13  Q    Okay.  So on one of his sell phones that night, do you

14  recall him getting four calls between nine and 10:00?

15  A    I don't know how many calls he got.  His phones ring a lot.

16  Q    Okay.  Do you remember him getting between ten p.m. and 11

17  40 p.m., 14 calls?

18  A    No.

19  Q    Okay.  On one phone?  No.  Okay.  Now, is it, I asked you

20  about before, but I want to clarify.  Is it possible that, that

21  you spoke to Darryl ten times that week?  Is it possible?

22  A    In the week?

23  Q    In the week?

24  A    Yes.  That's possible.

25  Q    Okay.  And it's possible that you spoke to him five times

1    that day?

2    A    It's possible.  I wouldn't think I spoke to him five times

3    on the phone because I saw him in person as well.  So --

4    Q    Well, or that maybe some of calls didn't go through but

5    there were five attempts or five calls made become and for the?

6    A    That's possible.

7              MR. HANLON:  Objection, Your Honor.

8              THE COURT:  Well, you asked about whether she spoke to

9    him and then you asked about whether there were calls back and

10   forth, right?

11             MS. RHODES:

12   Q    Right.  Is it possible some of cause, some calls didn't

13   actually connect but there were five attempts?

14             THE COURT:  Okay.  And I think she said she's that's

15   possible.

16   Q    Right.  Okay.  So I'm he going to ask you.  So you have no

17   idea what Deezo's relationship was with Darryl, right?

18   A    They were friends.

19   Q    Okay.  Friends.  Do you know of any other relationship they

20   had?

21   A    No.

22   Q    Okay.  And do you know if, so you don't know if, you don't

23   know when Deezo hung out around Darryl?

24   A    No.

25   Q    And when he didn't?

1    A    No.

2    Q    Okay.  And do you remember the other nickname that you used

3    for Deezo when you talk to the police?

4    A    No.

5    Q    And you don't know anything -- do you know how, how much

6    Darryl made in a week from his drug business?

7    A    No.

8    Q    Do you know how much, how much in the way of drugs he was

9    moving a week or selling?

10   A    No.

11   Q    Okay.

12   A    I just knew that I've heard that he sold drugs because he's

13   been arrested for that.  I've never witnessed him doing anything

14   like that.

15   Q    Okay.  And do you know if his wife, Natasha helped him in

16   that business at all?

17   A    No.

18   Q    Do you know Natasha?

19   A    Yes.

20   Q    You've met her?

21   A    Yes.

22   Q    Did Darryl ever mention going to church that morning?

23   A    I don't remember but I know that he did go to church on

24   Sundays.

25   Q    Okay.  Did he use his phone a lot when he was in church?

1  A    I wouldn't know.

2  Q    Okay.  Do you recall being asked in the grand jury, again,

3  this is back to January of 2004, that they asked a lot of

4  questions about this call that, where you her the name Bo

5  mentioned by Darryl, right?

6  A    Yes.

7  Q    Okay.  And you were asked by Mr. Harding, okay, after the

8  phone conversation, did Darryl ask something of Anthony?  Do you

9  remember that question?

10  A    Yes.

11  Q    Okay.  And do you remember saying that he asked him before

12  the phone conversation to drive him?  Do you remember that?

13  A    No.

14  Q    Okay.  And Mr. Harding said, before the phone conversation?

15  Do you recall saying um-hum.  And then he ask him if he was still

16  going to drive.  Do you remember that?

17  A    I don't remember him asking before the phone conversation.

18  I remember him asking could he drive him somewhere.

19  Q    Okay.  But now you're not sure whether it was before the

20  phone conversation or not?

21  A    No, I don't know if it was before or after, after the

22  conversation.

23  Q    But it could have been, when you were under oath before, you

24  have said to the judge you would not have lied, right?

25  A    Right.

1   Q    So we -- okay.  Thank you.  Court's indulgence.

2              (Pause in proceedings.)

3              THE COURT:  Ms. Rhodes, you and Mr. Lawlor want to

4   withdraw your objection?

5              MS. RHODES:  We could leave that for another time, Your

6   Honor.

7              THE COURT:  Well, no.  The witness is here now.

8              MS. RHODES:  As to the grand jury issue?

9              THE COURT:  Yeah.

10             MS. RHODES:  I will withdraw Mr. Lawlor's objection,

11  yes.

12             THE COURT:  Okay.  Well, in that light, ladies and

13  gentlemen, the objection being withdrawn, you may consider the

14  prior statements made under oath in the grand jury by Ms. Green

15  back in 2004 as evidence in this case just as if she had

16  testified to those facts to you under oath here on the witness

17  stand.  The objection is withdrawn.  Go ahead, Ms. Rhodes.

18             MS. RHODES:

19  Q    Thank you, Your Honor.  Your Honor, does that ruling apply

20  to the police?

21             THE COURT:  No.  Only to the grand jury transcript.

22             MS. RHODES:

23  Q    All right.  Is it correct, Ms. Green, that you, that you're

24  saying today that you don't remember anything, anything that you

25  told the police that day in March of 2002?

1        THE COURT:  Well, wait.  Now, that's not a fair

2   question, Ms. Rhodes.

3   Q    Well, I knew he had to narrow it down where it is?

4        THE COURT:  But you're going to have to do it question

5   by question.  You can't ask somebody whether they don't remember

6   anything about what they said years ago.

7        MS. RHODES:

8   Q    Okay.  Court Court's indulgence.

9        THE COURT:  Why don't you confer with Mr. Hanlon and

10  see if the two of you can't reach agreement on some of this

11  stuff?

12       MS. RHODES:  All right.

13       (Pause in proceedings.)

14       THE COURT:  Would you like more watering Ms. Green?

15       (Pause in proceedings.)

16       THE COURT:  If appears, ladies and gentlemen that is

17  correct counsel may need a few more minutes to work out their

18  arrangement, if any.

19       MS. RHODES:  That's correct, Your Honor.

20       THE COURT:  Why don't we take our morning recess at

21  this time.  Please leave your note pads in your chairs.  Have no

22  discussion about the evidence you've heard so far or any aspect

23  the case.  Continue to keep an open mind about all issues.

24       We will stand in recess for 15 minutes.

25       (Recess at 11:55 a.m.)

1          (Defendants not present in courtroom.)

2          THE COURT:  Any agreement reached, Ms. Rhodes?

3          MS. RHODES:  They are still decide.  But what we are

4    propose something the grand jury transcript come in as

5    substantive evidence and with one, one redaction that we've

6    agreed on, actually two.  And then that what they're debating

7    about is how to deal with the police transcript.  And I've

8    proposed a couple of ways of doing that.

9          THE COURT:  Police transcript?

10          MS. RHODES:  The police interview transcript, which is

11    also a recorded statement.

12          THE COURT:  Oh it's a recorded statement.  Not under

13    oath?

14          MS. RHODES:  Right.  Obviously --

15          (Defendants enter the courtroom.)

16          MS. RHODES:  -- although she has said that it was used

17    as the basis for prepping her for the grand jury.

18          MR. HANLON:  Should I wait, Your Honor?

19          THE COURT:  No.  Go ahead.  What do you want to do, Mr.

20    Hanlon?

21          MR. HANLON:  Your Honor, here's the thing that the

22    government's struggling with.  I'm inclined to do this in the

23    most convenient way possible which is to essentially use both

24    documents for whatever I think they could ultimately be you a

25    then Kated for.

1           Here is the concern the government has.

2           We have a sworn grand jury transcript on one happened

3    and we have a police transcript and an underlying police

4    recording on the other.

5           My sense is that the witness has recollected being in

6    the grand jury, made reference to the fact that she was trying to

7    be truthful, would not lie to the grand jury.  She certainly

8    seemed to recognize her grand jury transcript I'm confident that

9    the defense could authenticate the transcript of the police

10   interview if they need today by bringing in Detective

11   Niedermeier.

12          What I think would ultimately be a little different,

13   the purposes for which these respective document would be used.

14          A sworn grand jury transcript I think under certain

15   circumstances could be admitted for the truth of the matter

16   asserted.  The police interview, think, could be used as

17   impeachment material but it seems to me that it would be subject

18   to the regular limitations being used for impeach.  No for the

19   truth of the matter asserted.  But simply as, as impeachment

20   material.

21          That's the difference that the government sees within

22   two documents.

23          I don't want of the defense to have to go through

24   authentication.  But I feel at the end of day that is where we

25   would be.

1          THE COURT:  I don't know if, I don't know if there's

2     anything for me to decide or not.  My ruling was clear.  The

3     objection having been withdrawn by the defense, specifically by

4     Mr. Mitchell, I'm perfectly satisfied to have the grand jury

5     transcript come in as substantive evidence.

6          The police interview stands on a very different footing

7     and if you two can't reach agreement, then, then I don't know

8     that there's anything more for me to do.

9          MR. HANLON:  Just so the Court's aware, I have no

10    problem with, the defense presenting portions of the grand jury

11    or the police interview as impeachment material here.  And rather

12    than calling back detective Niedermeyer to re testify.

13         THE COURT:  But I thought Mr., I thought Ms. Rhodes's

14    point was that it's not impeachment because it's not

15    inconsistent.  If she doesn't remember something she said to

16    Niedermeyer, eye on the same footing as the grand jury testimony.

17    The only difference is the grand jury testimony is under oath.

18    But if my /SKWR-RPBLGTS and I'd love, Mr. Hanlon, by the way,

19    really want to see your memorandum on recorded recollection of

20    grand jury testimony.

21         MR. HANLON:  I'm sorry, Your Honor?

22         THE COURT:  I said I really want you to give me a

23    memorandum on grand jury testimony as past recollection recorded.

24         MR. HARDING:  I will, Your Honor.

25         THE COURT:  But we're past that now.  Perhaps Mr.

1     Kurland can help you out with that.

2              But anyway, before you speak, Mr. Kurland, I'm sorry?

3              MS. RHODES:  Go ahead.

4              THE COURT:  If there are specific facts that you want

5     in from the Niedermeyer interview, I presume that Mr. Hanlon

6     would be willing to stipulate to those facts.  Or some of them.

7     In other words, what is it that you want, Ms. Rhodes, from, from

8     the police interview?

9              MS. RHODES:  Several paragraphs, basically.  I mean,

10    you know.

11             THE COURT:  To what effect?  To what effect?

12             MS. RHODES:  You mean what's the information?

13             THE COURT:  Yeah.

14             MS. RHODES:  Oh, she says, her time ago little bit

15    different.  She's very clear and precise in the police interview.

16             THE COURT:  What was date of that, by the way?

17             MS. RHODES:  It was the 28th of March.

18             THE COURT:  March, 2002 in.

19             MS. RHODES:  Right.

20             THE COURT:  All right.

21             MS. RHODES:  And she's very clear that Deezo was there.

22    Eye a clear she knows Deezo.  She calls him Deezo.  He also goes

23    by Shabazz.  She is clear that he had been there three times that

24    day.  She says, and this other paragraph, yeah, Darryl said he

25    had to go out S X and he said he had to go, he had to go over to

1    ease Baltimore, then he he had to go back over to West Baltimore

2    but I don't think he did all that because I'm not coming out

3    right in the time so she clearly.

4              THE COURT:  Wait.  Wait.  She doesn't believe that he

5    did all of that.

6              MS. RHODES:  We will she said that's where he was going

7    to go.  But I don't think he did all that.

8              THE COURT:  Because he got murdered.

9              MS. RHODES:  Right.

10             THE COURT:  At midnight in West Baltimore.

11             MS. RHODES:  Right.  And she says, she says its not

12   coming out right.  In other word, she's says he he didn't have

13   time to do all those things before he got murdered.

14             THE COURT:  Okay.

15             MS. RHODES:  But a part of what she does here, in, with

16   he believe, undermines some of Deezo's testimony, Dwayne den

17   ham's testimony.  So that's another reason why it's important for

18   us to have this.

19             She also says.

20             THE COURT:  Well, if, if the government's objecting,

21   the Court a sustaining the objection.  It's not admissible just

22   because it's recorded.  This isn't state court.  Not evenly sure

23   it Bob admissible in state court.

24             MS. RHODES:  Aim he sorry, Your Honor.  You're saying

25   it's not?

1              THE COURT:  Eye not admissible for the truth of the

2     matter asserted.  Her interview.

3              MS. RHODES:  Well, the only, that's fine.  Gist, before

4     I said to Mr. Hanlon was the way I was going to have her, in a

5     lump, deny remembering this.  But the Court didn't want me to do

6     that.  So I can go through the things that she denies and then

7     call Detective Niedermeier to say this this is what she told me

8     in the interview.

9              THE COURT:  Your a not going to be able to impeach

10    Deezo by having.

11             MS. RHODES:  Not Deezo.  No.  It's impeaching.

12             THE COURT:  No.  But that's the point of, the prior

13    statements that you want in as substantive evidence coming from

14    Ms. Green are for the purpose of impeaching den ham.

15             MS. RHODES:  No.  No.  Your Honor.  No.

16             THE COURT:  Okay am then I missed something.  Missed

17    something.

18             MS. RHODES:  I said it also undermines to some extent

19    the whole picture that Deezo is painting.  Its not a direct

20    impeachment of Deezo at all.  The impeachment would be of her

21    because she says I don't recall this.  And so I think I'm

22    entitled to call Detective Niedermeyer to say, yes, I had an

23    interview and play some of the interview or ask him is this what

24    happened in the interview?

25             THE COURT:  But that's not -- I have no difficulty

1     whatsoever in concluding that the witness' assertion of a failure

2     of recollection is genuine.  I have, I confess I almost never

3     seen it quite this dramatically.  But your cross examination of

4     this witness bears out the testimony of this witness to Mr.

5     Hanlon I'm sure we were all sitting here as she began her refrain

6     of I don't recall, I don't recall, even when Mr. Hanlon showed

7     her the grand jury transcript and she, she, she validated the

8     transcript.  And yet I still don't recall.  And that's why I got

9     into it.  Obviously, saw I was a little bit incredulous that you

10    read the transcript, you say, yes, I remember being in the grand

11    jury, she'd already talked about that night.  She remembers the

12    phone call.  But she -- but your cross examination, again, as I

13    say, seems to me to justify my finding that her failure of

14    recollection is genuine.  It is a genuine failure of

15    recollection.  It's is not some maneuver on her part or

16    disingenuous necessary.

17          So it's not inconsistent to say, I genuinely don't

18    remember is not inconsistent with anything anybody previously

19    said.

20          So it's not impeaching of her to show the Niedermeyer

21    interview.

22          Now, if you can get the Niedermeier interview before

23    the jury on some other basis, either by agreement of the

24    government or on some other exception to the hearsay rule,

25    obviously, you can do it.  But it's not impeaching of her to say,

1    I don't remember.  You can't impeach a genuine failure of

2    recollection.  Just not there.

3            MS. RHODES:  Well, in any event, Your Honor --

4            THE COURT:  So I mean, eye sorry?  So you can go

5    through and ask her the questions and see what she remembers and

6    what she doesn't.  But if she doesn't remember, it's not in for

7    the truth of the matter.  Nor is it in nor impeachment.  It's

8    only in to refresh her recollection.

9            MS. RHODES:  Very well.

10           THE COURT:  There's a whole line now.  Mr. Kurland.

11           MR. KURLAND:  Your Honor, because her substantive

12   testimony even to the fact it she claims that had he heard the

13   name Bo on the telephone is admissible in the coconspirator

14   context against everybody, we have stand to go comment here.  I

15   just want to point out that to the extent that the parties during

16   the break tried to work out stipulations, any stipulation

17   obviously requires the consent of all of the defendants.  And

18   anything that's going to allow in blatantly inadmissible evidence

19   like the police statement shouldn't come in as substantive

20   evidence at all and we would never, we one stipulate to that,

21   even if the government for whatever reason and one particular

22   defendant would.

23           Now, with respect to some other stuff.  Which like to

24   give a talk to all the district judges, evidence stuff, if you

25   want to arrange that after the trial.  It wasn't past

1    recollection recorded.  It couldn't come in under that.

2         THE COURT:  I still want to see Mr. Hanlon's

3    memorandum.

4         MR. KURLAND:  Never be able to do that.  I'll talk with

5    him afterwards.  But with respect to the grand jury transcripts,

6    okay, we have a problem with the entirety coming in for a variety

7    of reasons.  If the Court's finding is that, and it's clearly

8    supported by the record that is correct it's genuine

9    recollection, failure of memory, then the Court should strike it.

10   We would ask the Court to strike the testimony that she was

11   afraid because that's, that's inconsistent because that's sort of

12   like lead, she was unclear as to what she was afraid of.  But if

13   its a genuine memory loss which the Court has found, then the

14   other testimony should be stricken.  The government shouldn't be

15   able to argue anything with respect to the fear because that to

16   some extent conceivably could play into some argument with

17   respect to some of the charges.

18        THE COURT:  I admitted that because I thought it was

19   proper government impeachment /TUR you are.

20        MR. KURLAND:  All right.

21        THE COURT:  Despite what I said about the genuineness

22   of her failure of recollection the government was entitled to

23   show that there may be some other reason she's not being

24   forthcoming curt but then with respect to the finding, then, with

25   respect to the, it's genuine memory refreshment, then there's no

1   basis for the parties to stipulate that the -- we'd object to

2   that as well, then that, grand jury testimony comes in as sub

3   stand stave evidence because it is not going to be 801, only way

4   to get it in would be parts --

5         THE COURT:  No.  It's already in because Ms. Rhodes,

6   Mr. Mitchell was the only person who objected and while, yes, we

7   have, we've been operating under the rule that everybody is

8   deemed to have joined in an objection, under that rubric,

9   everybody joined in the withdrawal of the objection as well.

10        MR. KURLAND:  Because that came up.

11        THE COURT:  Just a moment, just a moment, just a

12  moment.  Thereafter I invited Ms. Rhodes and Mr. Hanlon to confer

13  to do exactly what they've now done.  They've agreed to that is

14  ridiculous, that the jury has heard it all, notwithstanding the

15  Court's limiting instruction.  The witness has testified.  She's

16  here, available for cross examination to everybody.  And Mr.

17  Hanlon and Ms. Rhodes have reached what appears to me to be the

18  perfectly sensible decision to just put the grand jury transcript

19  in with whatever redactions the two of them and any of you on the

20  other side believe might be necessary before we actually give to

21  the jury.  And that makes sense to me.

22        Now, to the extent that Mr. Gardner or Mr. Martin or

23  Mr. Harris want to object, your objection is noted and overruled.

24  To the extent that any of those three defendants wish to fly spec

25  the grand jury transcript before it's given to the jury to ask

1   for additional redactions of particularly harmful testimony,

2   obviously, eye consider that.  But that's where we are.

3              The grand jury transcript of this witness' testimony,

4   of this witness, Ms. Green, as redacted is admitted as an exhibit

5   by agreement of the government and Mr. Mitchell.

6              MR. KURLAND:  Then we want it clear on the record,

7   because this is hearsay coming in.

8              THE COURT:  Say your objection is noted.  But I

9   determined, as I said, not to repeat myself, when Ms., when Ms.,

10  Ms. Rhodes, I almost said Ms. Lawlor, when Ms. Rhodes withdrew

11  the -- by the way, with all respect, Mr. Lawlor, improper

12  objection and request for a limiting instruction by Mr. Lawlor

13  because Mr. Lawlor knew this wasn't his witness.  And under the

14  one lawyer one witness rule, Mr. Lawyer should not have spoken up

15  at all.  And I suspected as much because Ms. Rhodes had already

16  told me yesterday, when we were arranging for her to step out it

17  take care of her penal matter that is correct she was going to

18  handle Ms. Green.

19             But I went ahead, anyway, because I thought it was

20  particularly important.  And I know that I would get a chance to

21  hear from Ms. Rhodes.

22             THE COURT:  Went ahead and gave the jury that limiting

23  instruction.

24             And all other counsel were deemed to have joint in that

25  objection.  And then Ms. Rhodes, when it became perfectly clear

1   to the jury, several of them chuckled, when it became perfectly

2   clear that Ms. Rhodes had stuff in that grand jury transcript at

3   that she wanted in substantively, it became perfectly obvious to

4   everybody that the thing to do was just to put the grand jury

5   transcript in and forget about Ms. Green's failure of

6   recollection.  And when Ms. Rhodes withdrew the objection,

7   counsel for Mr. Gardner, Mr. Martin, and Mr. Harris were deemed

8   to have joined in Mr. Lawlor's improper objection and Ms.

9   Rhodes's binding and appropriate withdrawal of that objection.

10  And thus I told the jury that.

11          MR. KURLAND:  Your Honor --

12          THE COURT:  What I told them.  All right.  Mr. Kurland.

13          MR. KURLAND:  To make the record cleaner, then, with

14  respect to the evidentiary basis.  The witness is saying that she

15  doesn't recall is geniune means that she's unavailable under rule

16  eight '04.  Then the grand jury testimony as a matter of evidence

17  rule should come in under rule eight '04 but only the parts the

18  defense wants because the government has had an opportunity to

19  examine her had he grand jury.

20          That's the proper way of having the evidence

21  considered.  But that means that the can he fence should be able

22  to go through the transcript and pick out what it wants.  This is

23  just the way the rule operates, because no defendant had an

24  opportunity to examine her at the grand jury.  The government

25  did.  Unless they can prove they didn't have a similar motive.

1      THE COURT: Mr. Gardner's objection is noted and is

2   deemed joined in by Mr. Martin and Mr. Harris. Let had he hear

3   from Mr. Martin. Good morning.

4      MR. MARTIN: Your Honor --

5      THE COURT: Good afternoon.

6      MR. MARTIN: I'm not going to talk about that

7   particular subject. Think my head is exploding from all this.

8   I'm not quite sure where we are.

9      My concern is the issue you addressed briefly a few

10   minutes ago about why you allowed her to answer the question as

11   to whether she was afraid. My concern is that the way Mr. Hanlon

12   asked the question was, are you failing to remember here or, it

13   was a dual question. You didn't want to come here and your he

14   not remembering why, eventually she said because I'm afraid.

15   There's no foundation for that. What is she afraid of? Is she

16   afraid because this is a murder trial? Lots of people are

17   afraid. But there's an assumption that she's afraid because of

18   something tease people did. And that's unfair, Your Honor. To

19   that extent because you found that she has a genuine failure of

20   recollection, I would renew what Mr. Kurland said. And that is

21   that the government should not be allowed to argue when they get

22   to the end of this case that this witness didn't remember because

23   she was afraid.

24      THE COURT: Oh, oh.

25      MR. MARTIN: That's what I think Mr. Kurland's trying

1    to say.

2              THE COURT:  Oh, is that what he was trying to say?

3              MR. MARTIN:  I think so, Your Honor.

4              THE COURT:  It's so helpful to have you Mr. Martin. I

5    totally missed what Mr. Kurland was trying to say.  No.  The

6    government's not going to argue that.  Of course not.  Of course

7    not.

8              MR. MARTIN:  Otherwise, avenue objection and a motion

9    for a mistrial for allowing her to answer the question.

10             THE COURT:  No.  No.  The government's not going to

11   argue that.  And of course any of you are free, if you feeling

12   pretty robust this afternoon, to question her as to why she's

13   afraid.

14             MR. MARTIN:  I wouldn't touch that question.

15             THE COURT:  I knew you wouldn't, Mr. Martin.  But some

16   of your brethren over there might want to go there.

17             MR. MARTIN:  Thank you.

18             MR. HARDING:  Purely on scheduling, Your Honor.  We

19   have a civilian witness, Andre Drake, whom we would like to get

20   done with before lunch.  He's a very quick witness.

21             THE COURT:  Well, I'm not going to interrupt Ms. Green.

22   So let's, let's hurry up with Ms. Green.

23             MR. HARDING:  I meant after we're done with Ms. Green,

24   can we extend --

25             THE COURT:  Assuming she's not on the stand until 1:30

1    or something.

2            MS. RHODES:  Your Honor, Your Honor, I think it would

3    be helpful if I did take her after lunch because I knew he had to

4    get the tape recording cued up.

5            THE COURT:  Why do you need the tape recording?

6            MS. RHODES:  Because I want her to hear her on voice

7    and see if that refreshes her recollection.

8            THE COURT:  No.  I think you can use the transcript.

9            MS. RHODES:  I can't, un, I can't imagine anything

10   better than hearing the tape to refresh her recollection.  I

11   don't think that.

12           THE COURT:  You can use the transcript.

13           MS. RHODES:  All right.

14           THE COURT:  It's case management issues, Ms. Rhodes.

15   Mr. Pyne.

16           MR. PYNE:  Just to let you know.  Judge Grimm set in an

17   initial appearance in a case of mine at 1:30.

18           THE COURT:  We should not be in here at 1:30.

19           MR. PYNE:  Okay.

20           THE COURT:  I'm not sure you'll get some lunch but we

21   shouldn't be here at 1:30.  Thank you.  We'll have the jury,

22   please, and Ms. Green back.

23           So which one have wants to announce to the jury

24   that the grand jury transcript is being marked as an exhibit?

25           MR. HARDING:  Mr. Hanlon will.

1          THE COURT:  Well, the witness is with Ms. Rhodes.  Do

2    you want to do that, Ms. Rhodes?  Or I'll do it.

3          MS. RHODES:  Sure.

4          THE COURT:  All right.

5          MR. HANLON:  That's fine, Your Honor.

6          THE COURT:  I'll do it.  Any idea how long you're going

7    to be, Ms. Rhodes?

8          MS. RHODES: Probably not that long.

9          THE COURT:  Okay.

10         THE COURT:  Are you going to have much, if at all, Mr.

11   Martin?

12         MR. MARTIN:  You know what question I might have asked,

13   I'm not asking.

14         THE COURT:  Mr. Crowe, Mr. Pyne?

15         MR. PYNE:  20 minutes, maybe.

16         THE COURT:  Mr. Kurland?

17         MR. KURLAND:  Mr. Coburn's going to do it?

18         MR. COBURN:  With Ms. Green?  I don't think I have any

19   questions.

20         THE COURT:  All right.  It looks like we can certainly

21   get to, is it Mr. Davis?  Or Deandre --

22         MR. HARDING:  Drake.  Did Mr. Pyne say he was going to

23   take 20 minute, Your Honor?

24         THE COURT:  Yes.

25         THE COURT:  Possibly.

1       MR. HARDING:  Okay.  Who who's the witness?

2       MR. HARDING:  Andre Drake.  He's the guy, he has to get

3   to work at 3:00.

4       THE COURT:  We'll get to him.

5       (Jury enters the courtroom. .) Good afternoon, ladies

6   and gentlemen of the jury.  Counsel have agreed that it Ms.

7   Rhodes and Mr. Hanlon, have agreed that Ms. Green's grand jury

8   testimony may properly be marked as an exhibit in this case and

9   will be made available to you during your deliberations as an

10  exhibit.  And you may consider her testimony before the grand

11  jury as contained in that transcript as evidence in this case for

12  all purposes.  You may proceed when you're ready, Ms. Rhodes.

13      MS. RHODES:  Thank you, Your Honor.

14      THE COURT:  I should mention that that will be Court's

15  exhibit number one, the a grand jury testimony of Ms. Green.

16      MS. RHODES:

17  Q   Good afternoon.  I gist want to ask you a couple questions

18  about the statement that you gave to the police back in March of

19  2002.

20      You said you remember there were a couple of officers

21  there, right?

22  A   Yes.

23  Q   Okay.  And do you remember that one of them was detective

24  Niedermeier?  Do you remember that name?

25  A   Yes.

1   Q    And another one was detective Patton?  Does that ring a

2   bell?

3   A    Why he.

4   Q    Okay.  And do you recall they recorded the statement, they

5   had a recording.  Yes?

6   Q    Had a cassette machine going?

7   A    Yes.

8   Q    And they started out by saying what the date was and what

9   the time was and they said that they were, who was present.  They

10  said present is Mr., is my sell, detective Gary Niedermeier,

11  detective Bob I Patton and Ms. Damita Green.  Do you remember

12  that kind of introduction?

13  A    Yes.

14  Q    Okay.  And then that they asked to you state your name and

15  your date of birth for the record?

16  A    Yes.

17  Q    Kind of like what happened in here, right?  And then they

18  asked you your, your address and the town that you were living

19  in, right?

20  A    Yes.

21  Q    Okay.  And you gave them that information, right?

22  A    Yes.

23  Q    And at the time you were telling them the truth, right?

24  A    Yes.

25  Q    And your intention was to tell them the truth?

1   A    Yes.

2   Q    Just as it was when you testified in front of the grand

3   jury, right?

4   A    Yes.

5   Q    And just as it is here today?

6   A    Yes.

7   Q    And they told you that they were going to discuss homicide

8   of the Wyche brothers, right?

9   A    Yes.

10  Q    Okay.  And they asked you if new when it occurred.  And you

11  told them early Monday morning, right?

12  A    Yes.

13            MR. HANLON:  Objection, Your Honor.

14            THE COURT:  Sustained to the form of the question.

15  Q    They told you, they asked you if you knew what had occurred,

16  right?

17  A    Yes.

18  Q    Okay.  And you told them it occurred Monday morning, right?

19            MR. HANLON:  Objection, Your Honor.

20            THE COURT:  Sustained.

21  Q    And did you tell them it was on Monday morning?

22            MR. HANLON:  Objection, Your Honor.

23            THE COURT:  Sustained.

24            MS. RHODES:

25  Q    And then detective Niedermeier asked you if you had

1   information about the activities of Darryl and Anthony before

2   that, before they were murdered?

3   A    Yes.

4   Q    Okay.  And you told them, do you recall what you told them?

5              MR. HANLON:  Objection, Your Honor.

6              THE COURT:  Sustained.

7   Q    Do you recall now what you told them?

8   A    Not everything.

9   Q    Okay.  Would it refresh your recollection to look at the, at

10  a copy of the transcript of that recording?

11  A    Yes.

12  Q    Okay.

13  Q    If could you turn the page on that document.  And why done

14  you read through that page and see if that refreshes your memory

15  on what's, what they asked you and what you said?

16  Q    Does reading that page, Ms. Green, refresh your memory about

17  what I said in that interview?

18  A    Yes.  The second page?

19  Q    Yes.

20  A    Yes.

21  Q    Okay.  And do you recall, do you recall what you said to

22  them about when, what happened when Darryl left, what happened

23  shortly before he left?

24  A    Yes.

25  Q    And what was that?

1         MR. HANLON:  Objection, Your Honor.  What was said.

2         THE COURT:  Put a question.

3    Q    What did you, what happened after, before Darryl left?

4    A    He received a phone call.

5    Q    Okay.  And do you recall what they were talking about, what

6    he was talking about?

7    A    I could just hear his end.

8    Q    Okay.  And what did it sound like to you?

9    A    He was supposed to be meeting him is what it sounded like,

10   meeting somebody.

11   Q    Okay.  And who else was around then during that phone call?

12   A    Me, Brandy, her sister, and Keisha and his brother, Anthony

13   Wyche.

14   Q    Okay.  And was Deezo in the room, too, when that phone call

15   came?

16   A    Yes.  That's what it's saying.  I don't recall him being

17   there.

18        THE COURT:  I'm sorry to interrupt, Ms. Green.  What we

19   need to you do.  You've read the documents.

20        THE WITNESS: Um-hum.

21        THE COURT:  Okay.  You can close the document.  And now

22   answer Ms. Rhodes's questions.

23   BY MS. RHODES:

24   Q    Okay.  Do you recall, was Deezo there that night?

25   A    Yes.

1    Q    Okay.  And was he?

2              MR. HANLON:  Objection, Your Honor.

3              THE COURT:  Overruled.

4    Q    And was he, and he was there, everybody was there when

5    Darryl got that call, right?

6    A    Yes.

7    Q    Okay.  And they left about 12 or 12 15 that night, right?

8    A    Yes.

9    Q    Okay.  Back to the interview with Detective Niedermeyer.  Do

10   you remember when he asked you if, about, about what time

11   everybody, or Darryl and Pete and Deezo left that night?

12   A    Can you repeat that?

13   Q    Do you remember what Detective Niedermeier asked you about

14   what time it was everybody left that night?

15   A    I don't remember.

16   Q    Okay.  If you could look at page three of the recording, the

17   transcript, then.  If you look down towards the bottom of the

18   page, where Detective Niedermeier, it says and how close to the

19   time that they left was that?  And then you give an answer.

20   Could you read that and see if it refreshes your memory?

21   A    Yes.

22   Q    Okay.  And what time was it approximately that they left?

23   A    It doesn't say the time.

24             THE COURT:  The question, Ms. Green, is do you

25   remember?

1       THE WITNESS:  I don't remember the exact time they

2    left.

3       THE COURT:  All right.

4    Q    Okay.

5    A    After the phone call, he, they left about maybe 30 minutes

6    after he got the call.  I don't know exactly the time.

7    Q    Okay.  That's fine.  And do you recall -- -- what did Darryl

8    say to anybody that you heard about where he was going?

9    A    I don't recall.

10   Q    Okay.  Can you look at Page 4 of the transcript sorry.  Can

11   you look down at, after officer pats ton says, did they say when

12   they were leaving, where they were going, did they mention that?

13   Do you see that line?

14   A    Yes.

15   Q    Okay.  And then if you could read your answer after that?

16       THE COURT:  To yourself.

17   Q    The rest of the page, and see if that refreshes your memory.

18   A    It doesn't refresh my memory.

19   Q    Okay.  Is there any reason you can think of now that you

20   would have not told the truth to the detectives that night when

21   they were asking you questions?

22   A    No.

23   Q    Okay.  And you would not have made up anything when you were

24   speak to go them, would you?

25   A    No.

1    Q    All right.  And when Deezo came over that day, the first

2    time he showed up was when Darryl came back for the last time, is

3    that right?

4    A    Yes.

5    Q    And are you telling us that you had no idea that Deezo

6    helped Darryl with his drug business?

7    A    No.

8    Q    No?

9    A    I don't know.

10   Q    You don't, you had no idea?

11   A    No.

12   Q    Okay.  Okay.  And you still are not sure about the Honda

13   station wagon, when Darryl got that, is that right?

14   A    Correct.

15   Q    Do you recall detect at this Niedermeier asking you about

16   it?

17   A    No.

18   Q    Okay.  Could you look at page eight of the transcript?  And

19   look at about halfway down the page, where it says Niedermeyer.

20   And he asks a question about the Honda.  And can you read that,

21   the next three paragraphs to yourself? .  Okay?

22   Q    Okay.  And reading that, does that refresh your memory at

23   all about what you told Detective Niedermeier?

24   A    No.  I don't remember that he had just got that car.

25   Q    Okay.  Do you recall Detective Niedermeyer showing you some

1   photographs that night?

2   A   Yes.

3   Q   Okay.  And do you recall signing on one of those

4   photographs?

5   A   Yes.

6   Q   Thank you.  Nothing further, Your Honor.

7          MR. MARTIN:  No questions, Your Honor.

8          CROSS EXAMINATION

9   BY MR. PYNE:

10   Q   Good afternoon, Ms. Green.  I'm Jim Pyne.  I represent

11   Shelly Wayne Martin.  Ms. Rhodes did cover some of the matters

12   that I was going to cover so I'll try to avoid repeating.  But

13   there are some matters I wanted to ask you about.

14         So this night in question you're at Brandy's house, is

15   that correct.

16   A   Yes.

17   Q   And am I correct in that looking over -- let me start over

18   this.  You do recall meeting with detective Niedermeier shortly

19   after the murder happened?

20   A   Yes.

21   Q   And do you recall him interviewing you and you providing him

22   information you had regarding the night before the murder?

23   A   Yes.

24   Q   And you've had a chance to review a transcript of that

25   interview?

1    A    Yes.

2    Q    And you have been able to remember some of those things

3    after, some of things you told Detective Niedermeyer now that

4    you've reviewed that transcript?

5    A    Yes.

6    Q    Okay.  And do you recall that Keisha was present at Brandy's

7    house that night?

8    A    Yes.

9    Q    And do you recall that Peaches was present as well?

10   A    Yes.

11   Q    And who is Peaches?

12   A    Brandy's sister.

13   Q    Okay.  Were you all together in one room in the house or

14   where were you in terms of the different individuals?

15   A    We were in different rooms go okay.  Do you recall Anthony

16   Wyche being there all day.

17   A    No.

18   Q    You don't?  Do you recall what part of the day Anthony Wyche

19   was present at that house?

20   A    No.  But he was there for a while.

21   Q    Okay.  Now, you do now recall that Deezo was there, the

22   individual you know as Deezo was there?

23   A    Yes.

24   Q    Okay.  Do you recall that Darryl Wyche and Deezo came to the

25   house about 11:00?

1    A    I'm he not sure of the time.  But they came that night.

2    Q    Okay.  Can you approximate, does 11:00 sound like it was in

3    the area of when they came?

4    A    It's possible.

5    Q    Okay.  If you want it look at page six of your statement

6    that you gave to detective Niedermeier.

7         If I wanted to read your first answer at the top of the

8    page and see if that refreshes your recollection.

9    A    Okay.

10   Q    Does that refresh your recollection?

11   A    Yes.

12   Q    Okay.  So Darryl and Deezo did come back to Brandy's house

13   about 11 o'clock.  Is that what you told Detective Niedermeyer?

14   A    Yes, that's what I told him.  Just today I don't know the

15   exact time.

16   Q    Okay.  But today as you sit here today, you don't recall

17   exactly?

18   A    No.

19   Q    Okay.  I believe you told Ms. Rhodes or it might have been

20   Mr. Hanlon, that you recall Darryl Wyche getting a phone call at

21   about 11 40, is that correct?

22   A    Correct.

23   Q    Okay.  And during the course of this call, you heard only

24   Darryl's part of the conversation?

25   A    Correct.

1    Q    And you heard him refer to, you heard him say the name Bo

2    during that conversation, is that correct?

3    A    Correct.

4    Q    Okay.  And I believe your testimony, again, I'm not sure you

5    recollect this today or not, that you heard Darryl also say are

6    are you still trying to get that?  Do you recall that or not?

7    A    No Yes.

8    Q    Okay.  So you don't have a recollection of that.  Do you

9    recall telling the grand jury that you recalled that?

10   A    Yes.

11   Q    Okay.  Do you have any other recollection of anything else

12   you might have heard during that conversation?

13   A    No.

14   Q    Did you tell the grand jury anything else you might have

15   heard during that conversation?

16   A    No.

17   Q    And your testimony was that after this call, I think you've

18   given a couple different tiles.  I this at one point you said it

19   was about 20 minutes after that call that they left and then more

20   recently I think you said about 30 minutes after that call they

21   left.

22        Do you recall exactly what your best estimate of the

23   time was that they left?

24   A    No I would say 20 to 30 minutes.

25   Q    20 to 30 minutes?

1   A    I don't, I can't remember.

2   Q    Okay.  Do you recall whether or not it was after midnight?

3             MR. HANLON:  Objection, Your Honor.

4             THE COURT:  Overrruled.  You may answer.

5   A    No.  I don't recall.

6   Q    Okay.  You do recall it was between 20 and 30 minutes after

7   receiving the call?

8   A    Yes.

9   Q    Now, do you recall telling Detective Niedermeier that they

10  were driving the white Honda Accord when they left?

11  A    Yes.

12  Q    Okay.  And do you recall telling him that Anthony was

13  driving?

14  A    Yes.

15  Q    Do you recall telling detect at this Niedermeyer that Darryl

16  and Anthony and Deezo all left together?

17            MR. HANLON:  Objection, Your Honor.

18            THE COURT:  Sustained.  Pine.

19  Q    Do you recall when Deezo left?

20  A    They left together.

21  Q    Okay.  Did any of them make any statements about where they

22  were going, that you recall?

23  A    No, I don't recall.

24  Q    Do you recall any of them saying that they were going to

25  Essex?

1   A   No.

2   Q   Let me ask you to look at your statement to Detective

3   Niedermeier on Page 4.  Ms. Rhodes may have already asked you to

4   look at this?

5   A   Yes, she did.

6   Q   Okay.  Than did not refresh your recollection?

7   A   No.

8   Q   Okay.  You do recall Darryl asking Anthony to drive with

9   him, is that correct?

10  A   Yes.

11  Q   Do you recall if this was before or after -- again you may

12  have testify today this already, whether this was before or after

13  the telephone call?

14  A   I don't recall.

15  Q   Okay.  And it's your testimony today that you don't know

16  what the relationship with Deezo and Darryl Wyche was?

17  A   Correct.

18  Q   What kind of relationship?

19  A   Correct.  They were friends to my knowledge.

20  Q   Now, I believe your testimony was that when Darryl got this

21  phone call at about 11 40, that Deezo was present, is that

22  correct?

23  A   Correct.

24  Q   And you were able to hear Darryl refer to Bo and say, are

25  you still trying to get that, is that correct?

1    A    Correct.

2    Q    And how far away from Darryl were you if you recall?

3    A    I was in the living room, he was in the dining room go and

4    where was Deezo.

5    A    I don't recall.

6    Q    So you don't know whether or not he would have been able to

7    hear the same phone call?

8    A    No.

9    Q    I don't think I have anything further, Your Honor.  Thank

10   you, Ms. Green.

11              THE WITNESS:  You're welcome.

12              MR. COBURN:  No questions, Your Honor.

13              THE COURT:  Redirect.

14              REDIRECT EXAMINATION

15   BY MR. HANLON:

16   Q    Brief, I think, Your Honor.  Ms. Green, at the end of Ms.

17   Rhodes's cross examination, she asked you if you were shown any

18   photographs or if you were asked to sign any photographs?

19   A    Yes.

20   Q    You remember the detectives showed you some photographs and

21   asked you if, in any of six photographs of people you recognized

22   the person you referred to as Bo.  Is that right?

23   A    Yes.

24   Q    And did you identify somebody that you know of as Bo who

25   we've talked about today?

1   A    Yes.

2   Q    Showing you, going to put up on the screen a document which

3   is marked as W 37 B.  Is this a copy of the photo array the

4   detective showed you?

5   A    Yes.

6   Q    On top of every one of these photographs there's a place to

7   sign.  Did you sign this photograph here as Bo?

8   A    Yes.

9   Q    Nothing further, Your Honor.

10          THE COURT:  Thank you very much, Ms. Green.  Good luck

11  with the baby.

12          MS. RHODES:  Your Honor --

13          THE COURT:  I'm sorry, Ms. Rhodes.  Ms. Green, I'm

14  sorry.  I apologize, Ms. Rhodes.

15          RECROSS EXAMINATION

16  BY MS. RHODES:

17  Q    Let me put this back up that the government had up there,

18  that has the date of it, of March 28th of 2002, right?

19  A    Yes.

20  Q    And the time of 7:30 p.m.?

21  A    Yes.

22  Q    Is that, does that refresh your recollection of date and

23  time that you were interviewing with did he deck at this

24  Niedermeyer?

25  A    No.

1    Q    When you signed it, would you have checked; that your

2    handwriting, the date and time?

3    A    Yes.

4    Q    Okay.  So you would have put the correct date and time that?

5    A    Yes.

6    Q    Day?  Right?  And you are telling us today that what you

7    told Detective Niedermeyer was the truth, right?

8    A    Yes.

9    Q    Okay.  And you're under oath today, right?

10   A    Yes.

11   Q    So you are swearing under oath that what you told Detective

12   Niedermeyer on that date was the truth?

13   A    Yes.

14   Q    Okay.  And you've also told us to be clear, that when you,

15   before you did the grand jury testimony, the prosecutors went

16   over your police interview and transcript with you, is that

17   right?

18             MR. HANLON:  Objection, scope, Your Honor.

19             THE COURT:  Sustained.  That means don't answer.

20             MS. RHODES:  Nothing further.  Thank you, Your Honor.

21             THE COURT:  Thank you very much, Ms. Green.  You are

22   now excused.

23             (Conclusion of Excerpt.)

24

25