UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

UNITED STATES OF AMERICA    Criminal No.  AMD-04-029

                                                    Baltimore, Maryland

              v.                          June 7, 2007

WILLIE MITCHELL,                         9:30 a.m.

SHELTON HARRIS,

SHELLY MARTIN,

SHAWN GARDNER,

              Defendants.

---------------------------------------------------------/

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ANDRE M. DAVIS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          United States Attorney's Office
                             By:  ROBERT HARDING, ESQ.
                                  MICHAEL HANLON, ESQ.
                             36 South Charles Street
                             Fourth Floor
                             Baltimore, Maryland 21201


For the Defendant Mitchell:  Albright and Rhodes LLC
                             By:  LAURA RHODES, ESQ.
                             200 A Monroe Street
                             Suite 305
                             Rockville, Maryland 20850

                             Brennan Sullivan and McKenna
                             By:  TIMOTHY SULLIVAN, ESQ.
                             6305 Ivy Lane
                             Suite 700
                             Greenbelt, Maryland 20770

1   For the Defendant Harris:   Rosenberg Martin Funk Greenberg
                                By: GERARD MARTIN, ESQ.
2                               25 South Charles Street
                                Suite 2115
3                               Baltimore, Maryland 21201

4                               Schulman Treem Kaminkow
                                Ravenell & Gilden
5                               By.  JOSHUA TREEM, ESQUIRE
                                401 East Pratt Street
6                               Suite 1800
                                Baltimore, Maryland 21202
7

8   For the Defendant Martin:   Law Offices of James Pyne PA
                                By:  JAMES PYNE, ESQ.
9                               305 West Chesapeake Avenue
                                Suite 209
10                              Towson, Maryland 21204

11                              Law Office of Thomas Crowe
                                By:  THOMAS CROWE, ESQ.
12                              401 East Pratt Street
                                Suite 1622
13                              Baltimore, Maryland 21202

14  For Defendant Gardner:      Howard University School of Law
                                By:  ADAM KURLAND, ESQ.
15                              2900 Van Ness Street, NW
                                Washington, D.C.  20008
16
                                Trout Catheris PLLC
17                              By: BARRY COBURN, ESQ.
                                1350 Connecticut Avenue, NW
18                              Suite 300
                                Washington, D.C.  20036
19

20

21  Court Reporter             Lisa K. Bankins RMR
                               101 West Lombard Street
22                             Room 5012
                               Baltimore, Maryland 21201
23

24      Proceedings recorded by mechanical stenography,
        transcript produced by notereading.
25

1            T A B L E   O F   C O N T E N T S

2                 WITNESSES

3                DX     CX   RDX   RCX

4 On behalf of the Government:

5 COMMISIONER ROLAND HAYES

6      (By Mr. Harding)     14
      (By Ms. Rhodes)          17

7

8 DETECTIVE JOHN GIGANTI

9      (By Mr. Harding)     21

10 CORPORAL GREGORY MEAD

11      (By Mr. Hanlon)     28            35
      (By Mr. Kurland)       33

12

13 DETECTIVE BRIAN EDWARDS

14      (By Mr. Hanlon)     36
      (By Mr. Kurland)       45

15

16 LIEUTENANT JAMES HAGIN

17      (By Mr. Harding)     63        76
      (By Ms. Rhodes)        70         77

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2        THE COURT:    We're back on the record for continued

3   motions hearings.  The record will reflect that in accordance

4   with a letter received from Mr. Sullivan, Mr. Sullivan is not

5   present.  Ms. Rhodes representing Mr. Mitchell is present.  I

6   propose that we proceed, counsel, in accordance with the

7   Government's earlier proposal and more recent proposal.  I

8   appreciate that Mr. Sullivan is not here and he's been the lead

9   counsel on the issue of Mr. Mitchell's statements surrounding the

10  April 17, 2002 interrogation.  It seems to me the Government

11  apparently has a couple of witnesses that it wants to complete

12  its presentation with respect to the evidence on that question.

13  And I see no reason we shouldn't go ahead and do the evidence and

14  I will withhold final argument on that until the July motions

15  session.

16        I appreciate the additional briefing that's been

17  submitted.  It's been very helpful.  Let me give you my

18  preliminary views about some of those issues which I don't think,

19  in fact we certainly aren't going to finalize them today.

20        With respect to the identification, I understand

21  Mr. Hanlon intends either by stipulation or by a sponsoring

22  witness to supplement the hearing record on the identification of

23  Mr. Garner in respect to the Jones-Spence murder and so we should

24  start with that today I think.  And then we'll proceed with the

25  Mitchell interrogation issues.

1        With respect to the Tanya Jones-Spence murder and the

2   attendant showup, I'll certainly look at whatever additional

3   evidence Mr. Hanlon offers today.  But I am strongly of the view

4   not finally, but strongly of the view that the statement of most

5   concern to counsel for Mr. Gardner regarding the one with the

6   gray t-shirt was the shooter made apparently shortly after the

7   showup procedure should not be admissible.  Again that's a

8   preliminary view.  I'll hear further argument on it.  But I have

9   grave doubt as to its reliability as Mr. Gardner argues strongly

10  it's not necessary to the Government's case.  It's not entirely

11  clear to me why the Government feels strongly about it if it

12  does.  But I'll see the other evidence and I'll make a final

13  ruling, but probably not today.

14        On the co-conspirator issue regarding Mr. Montgomery's

15  testimony, proposed testimony regarding the statements of

16  Mr. Gardner which Mr. Martin has strongly objected to as well as

17  Mr. Gardner in part, the material that I've looked at so far

18  seems to me clearly to show that Mr. Montgomery was, one, not a

19  member of this conspiracy and, two, that the statement was not

20  made in furtherance of the charged conspiracy.  But I'm not

21  making that ruling.  All I'm saying is that based on what I've

22  seen so far, it seems pretty obvious that the Government has

23  other evidence that it intends to offer in support of the

24  admissibility of Mr. Gardner's statements as co-conspirator

25  statements.  And, of course, I have an absolutely open mind to

1    receive that evidence.  But having reviewed the grand jury

2    testimony, the recorded statement of Mr. Montgomery, there's just

3    an absence of compelling evidence to support the Government's

4    proffer and that's all it's been so far, I understand that, that

5    this statement by Mr. Gardner comes in under the co-conspirator

6    exception.  But again, I emphasize if the Government and I agree

7    with the Government strongly that it would be best to wait until

8    trial to fully assess Mr. Montgomery's alleged role here and then

9    fully to assess the circumstances under which Mr. Gardner's

10   statements were made.  But that's a preliminary view.

11            Mr. Harris has filed a motion to dismiss Count 19 and

12   to strike portions of the special circumstances contained in the

13   notice.  The Government hasn't had an opportunity to file a

14   written response to that and certainly, the Government will be

15   given an opportunity to do so.  And indeed, under the

16   circumstances if the Government believes it should make an ex

17   parte submission to the Court in whole or in part to respond to

18   Mr. Harris' arguments regarding the notice and the issues raised

19   in that motion, I certainly would understand if the Government

20   made such a request and I suspect that I would grant the

21   Government's request to submit ex parte.  But it's clearly

22   something that needs to be responded to in a serious way.

23            DEFENDANT HARRIS:   Your Honor, may I review the facts?

24            THE COURT:   No.  No.  No.  Please be seated.  Thank

25   you.

1          DEFENDANT HARRIS:    I except, Your Honor.

2          THE COURT:   Okay.  So those are some preliminary

3    remarks that I hope sort of point us in a good direction.  I

4    should mention for the record that an issue has arisen that the

5    Court will need to examine on an ex parte basis.  And it's an

6    issue that has only recently come to the attention of counsel and

7    it was promptly brought to the attention of the Court and I will

8    do my best to resolve that issue as promptly as possible so as to

9    avoid any delay of these proceedings.  But there is the potential

10   at this point that our schedule will be disrupted in whole or in

11   part.

12          Let me say that I'm very anxious to get the jury

13   questionnaire in the mail.  And it's my hope and expectation that

14   counsel for defendants other than Mr. Gardner will have by the

15   end of the day today or tomorrow thoroughly reviewed the earlier

16   jury questionnaire in anticipation of Mr. Gardner's trial last

17   fall and that whatever supplemental requests counsel deem

18   appropriate can be quickly included in that approved

19   questionnaire so that we can get it in the mail within the next

20   week or so.

21          Okay.  Let's start with you, Ms. Rhodes.  Go ahead.

22          MS. RHODES:    On that last issue, did the Court get a

23   copy from Mr. Sullivan of the proposed questionnaire?

24          THE COURT:   I did.

25          MS. RHODES:    Okay.

1          THE COURT:   It was --

2          MS. RHODES:    I think that incorporates the positions of

3   the other, of Mr. Treem and Mr. Martin as well.

4          THE COURT:   Okay.  Good.  I understand that Mr. Coburn

5   on behalf of Mr. Gardner had some question about that and I'll

6   hear from them and I haven't heard from the Government and I

7   don't know if that means the Government has signed off or if the

8   Government hasn't had a chance to look at it, but I'll hear from

9   them as well.  But I do have it.  Thank you, Ms. Rhodes.

10          Mr. Crowe, congratulations on your recent well-deserved

11   honor.

12          MR. CROWE:   Thank you, Your Honor.

13          THE COURT:   Do you have anything on Mr. Martin at this

14   point?

15          MR. CROWE:    Nothing other than the one motion the

16   Court's already discussed.

17          THE COURT:   All right.  Thank you.  Mr. Treem?

18          MR. TREEM:    Your Honor, I think the only motion that's

19   pending on behalf of Mr. Harris is the motion to suppress which

20   Mr. Martin is going to handle.  While we're on the subject

21   though, Your Honor, would it be possible for me to be excused

22   from this afternoon's session?  There is a scheduling conference

23   that I do have to attend to.

24          THE COURT:   Certainly, Mr. Treem.

25          MR. TREEM:   Thank you.  Mr. Herson will be here in my

8

1    stead.

2              THE COURT:    Very well.  Mr. Coburn, Mr. Kurland?

3              MR. KURLAND:    Your Honor, with regard to the juror

4    questionnaire, we submitted a letter to you.

5              THE COURT:    I have that and it included a proposed, one

6    or two additional questions that I reviewed.  I'm not sure if I

7    shouldn't wait on that; that is to say, not include that in the

8    questionnaire, but cover that material in the individual voir

9    dire of the jurors.  But I can assure you and Mr. Coburn that

10   those matters will be taken account of.  I'm not sure it's

11   appropriate for the questionnaire.

12             MR. KURLAND:    Your Honor, just for the record, one of

13   those questions I think was in the old questionnaire.

14             THE COURT:    Okay.  Then it should stay in there.

15             MR. KURLAND:    That would be our position.  The second

16   thing, Your Honor, is with respect to the hearing with respect to

17   the other aspect of the showup with respect to Mr. Mead, Officer

18   Mead, we've got some substantive objections.  So I guess we'll

19   take it up at the time that the witnesses are called and --

20             THE COURT:    Are you not going to stipulate?

21             MR. KURLAND:    No.  We weren't in a position to

22   stipulate with respect to that.

23             THE COURT:    Okay.  I thought it was just photographs

24   and real evidence.  But is there also testimony is your

25   understanding?  I'll hear from you in a moment.

1          MR. KURLAND:    My understanding there's the testimony

2     and there's one issue in particular that's going to require a

3     little bit of cross-examination from me.  The other thing, judge,

4     has to do with I guess the ex parte matter which I don't know

5     anything about and then the scheduling.  But I guess there's

6     nothing to do about it right now.

7          THE COURT:    It doesn't affect you.

8          MR. KURLAND:    Well, it might, but --

9          THE COURT:    Well, yeah, in terms of scheduling,

10    obviously it affects you.  But no, it's not related to you and

11    Mr. Gardner.  Yes, Mr. Hanlon?

12         MR. HANLON:    Your Honor, just by way of background and

13    this alludes to the issue that counsel was raising a moment ago.

14    The two issues, I have two witnesses I'll present today from the

15    Government.  They'll be really very brief I anticipate.  One of

16    them is really just a vehicle for bringing in these photographs.

17    I also have someone for clothing that the defendants were wearing

18    which I actually think is something that Mr. Kurland wants to put

19    into the record as well --

20         THE COURT:    Okay.

21         MR. HANLON:    -- either by stipulation or real evidence.

22    The other witness the Government has, Your Honor, is somebody who

23    testified in the prior hearing on the question of the

24    identification.  I brought him back to supplement one issue which

25    I didn't cover which was the issue of whether or not a portion of

1    Ms. Andrea Smith's initial statement to the police would come in

2    as an excited utterance.  It's a question that's been briefed to

3    the Court.

4                    THE COURT:    Right.

5                    MR. HANLON:    And I want to point out it's not the point

6    of the shooter being the one with the braids.  That's not covered

7    by the excited utterance.  This is her very initial first talking

8    to a police officer at the scene which would be covered by the

9    excited utterance.

10                   THE COURT:    All right.

11                   MR. KURLAND:    Your Honor, I'll get to this when we

12   cross-examine the witness, but the Government has -- my

13   supposition when I saw this in a letter, in an email was that the

14   Government was going to try to at least keep open the option of

15   having that testimony come in without Andrea Smith testifying.

16   We fully briefed that we think that that's a confrontational

17   clause violation.  I'll argue that at the time.  But just to kind

18   of fully understand what the Government is trying to do here.  It

19   isn't simply just trying to establish a piece of evidence coming

20   in.

21                   THE COURT:    All right.  Well, she's testified and she's

22   been subject to cross-examination.  So I don't think that's a

23   serious issue.  She testified at the hearing.

24                   MR. KURLAND:    Well, no.  But the Government wants to --

25   well, I'll wait until when it's over, when the Government argues

                                                                        11

1  it at the time.

2          THE COURT:   All right.

3          MR. HANLON:   That's all I have by way of background,

4  Your Honor.  I'm not sure if there were any other preliminary

5  matters to be raised.

6          THE COURT:   Okay.  Mr. Harding, anything?

7          MR. HARDING:   Well, just by way of explanation, Your

8  Honor, I have actually three witnesses today.  One is a court

9  commissioner named Roland Hayes who --

10          THE COURT:   Who did the initial appearance.

11          MR. HARDING:   No.  He has been a court commissioner for

12  20-some years.

13          THE COURT:   I know Mr. Hayes.

14          MR. HARDING:   I gather you do.  He told me that you

15  knew each other.  He's simply going to testify that court

16  commissioners follow a script when they meet with prisoners at

17  Central Booking and they never include warnings relating to the

18  Fifth Amendment right to remain silent.  This was an issue that

19  Mr. Sullivan brought up when he was cross-examining a government

20  witness last time about --

21          THE COURT:   I thought Mr. Sullivan's point was that he

22  had advised him of his right to counsel.  But okay.  I

23  understand.

24          MR. HARDING:   Okay.  Well, I was actually going to

25  raise with the Court the possibility that the Court is already

1  familiar with the proceedings followed by court commissioners and

2  could take judicial notice of this.  But it might be better if I

3  called Mr. Hayes to testify very briefly about it.

4           THE COURT:    That's fine.

5           MR. HARDING:    I also have Detective Giganti and

6  Lieutenant Hagin who isn't here right now, but will be here --

7           THE COURT:    Sometime today?

8           MR. HARDING:    Sometime between 12 and 1:00 today and he

9  can testify later.  He was the commander of the group that did

10 the arrest at the time in 2002.

11          THE COURT:    Okay.  As I said, we're not going to take

12 any legal argument today in Mr. Sullivan's absence.  But just so

13 the Government is clear, my focus has been as you note in your

14 memorandum the question of whether in connection with the arrests

15 on April 1st, Mr. Mitchell was advised of his Miranda rights and

16 invoked his right to counsel.

17          MR. HARDING:    Right.

18          THE COURT:    You've argued strenuously and presented

19 some evidence and will complete that evidence today that no one

20 advised Mr. Mitchell of his Miranda rights including the right to

21 counsel, that he did not invoke his right to counsel prior to

22 April 17th and that's been my focus.  I still intend to write a

23 letter to Judge Holland and the judge in charge of criminal of

24 the Circuit Court for Baltimore City who I think is still Judge

25 Glenn expressing my concerns about this routine practice of

1    writting people from Central Booking over to homicide because I

2    think it's fraught with danger and I think they ought to know

3    that as a result of the evidence in this case, I've reached that

4    conclusion.  Now they're free to ignore it and I respect their

5    freedom to ignore it, but I think it's a very bad practice and

6    I'm going to just do that.  But that's where I am on that issue,

7    which is not to say Mr. Sullivan may have more to say.  But

8    that's where I am.

9              MR. HARDING:    Let me first call Commissioner Roland

10   Hayes, Your Honor.

11             THE CLERK:    Raise your right hand.

12             (Witness sworn.)

13             THE CLERK:    Please be seated.  State your name for the

14   record.

15             THE WITNESS:    Roland Hayes.

16             THE CLERK:    Speak directly into the microphone.

17             THE WITNESS:    Yes.  Roland Hayes.

18             THE COURT:    Good morning, Commissioner Hayes.

19             THE WITNESS:    Good morning, Your Honor.

20                        DIRECT EXAMINATION

21             BY MR. HARDING:

22        Q    Good morning, Mr. Hayes.  Mr. Hayes, could you tell us,

23   sir, how are you employed?

24        A    I'm a district court commissioner for Baltimore City.

25        Q    And how long have you been employed as a district court

1    commissioner?

2           A      24 1/2 years.

3           Q      Can you tell us where your workplace is located?

4           A      Yes.  Right now it's at Central Booking which is 300

5    East Madison Street.

6           Q      Okay.  Have you been located at Central Booking for the

7    last, since it opened?

8           A      Yes.

9           Q      And when did it open to your knowledge?

10          A      November 1995.

11          Q      Mr. Hayes, as part of your employment as a commissioner

12   for Baltimore City, do you give standardized advice to prisoners

13   when they're brought in after being arrested?

14          A      Yes.

15          Q      Okay.  Can you give us an idea about how many prisoners

16   you might see in a typical workday?

17          A      If the prisoners are there, we see an average of 16

18   defendants a day.

19          Q      And your qualification I assume refers to the fact that

20   you might not have that many in a day.  Is that right?

21          A      That's correct.

22          Q      Has the advice that you give to prisoners changed since

23   in recent years let's say since Central Booking opened?

24          A      No.

25          Q      Okay.  Do you give any advice to prisoners when they're

1   brought in about their Fifth Amendment rights including the right

2   to remain silent?

3        A       We give an advisement, but that's not part of our

4   advisement about the right to remain silent.

5        Q       What is your advisement about?

6        A       Our advisement basically is about legal counsel and

7   advisement of constitutional rights.

8        Q       By constitutional rights, do you mean Sixth Amendment

9   right to counsel?

10       A       Yes.  Um-hum.

11       Q       Let me show you what I have marked as Government's

12   Exhibit RH1.  Can you tell us what that is, sir?

13       A       It's a notice of advice of right to counsel.

14               MR. HARDING:    Okay.  Let me give a copy of this

15   document to Ms. Rhodes.

16       Q       Can you tell us what that is?  Is that the advice of

17   rights that you read to prisoners when they come into Central

18   Booking?

19       A       Basically, we read it or once we read it to them, then

20   we have them initial it that they have been advised of their

21   rights or some prefer to read it themselves.

22       Q       Okay.  And so do you give them any rights that aren't

23   on that -- do you give them advice about any rights that aren't

24   on that form?

25       A       No, we do not.

                                                        16

1          MR. HARDING:    Okay.  I'd like to offer this in

2    evidence, Your Honor.

3          THE COURT:    It's admitted.

4          MR. HARDING:    Okay.  One moment, Your Honor.

5     Q     Is it fair to say, Mr. Hayes, that you never give

6    advice to prisoners when they're brought in about their right to

7    remain silent?

8     A     No.  Never do that.

9          MR. HARDING:    Okay.  Thank you.  I have no further

10    questions, Your Honor.

11                       CROSS-EXAMINATION

12          BY MS. RHODES:

13     Q     Commissioner Hayes, this form that you've just referred

14    to is entitled Notice of Advice of Right to Counsel.  Right?

15     A     Yes.

16     Q     And it tells somebody who's in front of you about their

17    right to get an attorney.  Right?

18     A     That's correct.

19     Q     It tells them, in fact it makes it pretty clear that

20    it's important to have a lawyer.  Right?

21     A     Yes.

22     Q     Okay.  And it goes over that by saying, by explicitly

23    saying here are the things that a lawyer can do for you?

24     A     Yes.

25     Q     Okay.  Even if you're pleading guilty, it says a lawyer

17

1   can be helpful.

2          A       Yes.

3          Q       Okay.  And it says if you can't afford a lawyer, you

4   can get one through the Public Defender office?

5          A       That's correct.

6          Q       And it also urges the person not to wait too late to

7   get a lawyer.

8          A       That's correct.

9          Q       Okay.  It says further that a lawyer can help protect

10  their constitutional rights.

11         A       That's correct.

12         Q       Is that right?

13         A       Um-hum.

14         Q       Okay.  And after this is read or people read this, they

15  often will ask you questions about it.  Right?

16         A       When you say ask questions, as to?

17         Q       Anything, anything to do with this form.  They'll often

18  say well and ask you a question about a particular part of it.

19  Isn't that true?

20         A       What I'll do is I'll ask them after I have advised them

21  at this time do you know what you're going to do about a lawyer,

22  whether or not you're going to retain private counsel or whether

23  or not you're going to seek the services of the Public Defender's

24  Office.

25         Q       Um-hum.  Okay.  And then often they'll say well, what

1    do you think I should do.  Even though that's not what you're

2    supposed to be there for, they'll say that.  Right?

3         A      No.  They won't say that.  A lot of them will say what

4    they're going to do.  I'm going to get -- I have to go through

5    the Public Defender's Office.  I'm going to get my personal

6    attorney or I'm going to speak to my family members for advice

7    first.

8         Q      Okay.  And I mean having been through what you've been

9    through in the system, I'm sure you're familiar with what the

10   Miranda rights are for a suspect?

11        A      Yes.  Um-hum.

12        Q      Okay.  I mean even apart from your job, you hear them

13   on T.V. and that sort of thing all the time.  Right?

14        A      That's correct.

15        Q      Okay.  And one of the very important parts of our

16   system is that somebody does have the right to remain silent.

17   Isn't that right?

18        A      They do have a right to remain silent, but we don't

19   solicit that from them.  All we're doing is a pretrial

20   determination.

21        Q      Um-hum.

22        A      In other words, we're not soliciting, any whether or

23   not they are innocent or guilty.  We're not --

24        Q      Right.  You're not going into that kind of information.

25        A      Um-hum.

1      Q      But it is important, I mean you know it's important to

2 suspects that they do have that right.

3      A      You mean to remain silent?

4      Q      Right.

5      A      If they do, we would never advise them of that.

6      Q      That's not what I'm asking.  I'm just asking you know

7 that that is an important right that suspects have?

8      A      Yes.  Um-hum.

9      Q      And this form does remind them that a lawyer is going

10 to help them protect their constitutional rights.

11      A      Yes.

12      Q      Okay.  And one of those important rights is the right

13 to remain silent?

14      A      I would imagine so.  Yes.

15           MS. RHODES:    Okay.  Nothing further, Your Honor.

16           THE COURT:    Thank you, Commissioner Hayes.

17           MR. HARDING:    I have no further questions, Your Honor.

18           THE COURT:    All right.  You're excused, sir.

19           THE WITNESS:    All right, sir.

20           MR. HARDING:    Your Honor, the United States calls

21 Detective John Giganti.

22           THE CLERK:    Come forward, sir, and stand over here,

23 please. Raise your right hand.

24           (Witness sworn.)

25           THE CLERK:    Please be seated.  State your name for the

1    record.  Speak directly into that microphone and spell your name,

2    please.

3             THE WITNESS:   My name is John Giganti.  G-I-G-A-N-T-I.

4    I'm with the Baltimore City Police Department.  Currently

5    assigned to the Lone Apprehension Task Force.

6                        DIRECT EXAMINATION

7             BY MR. HARDING:

8        Q      Good morning, Detective Giganti.  Can you tell us how

9    long you've been employed by the Baltimore City Police

10   Department?

11       A      Thirteen years.

12       Q      Where were you if I may ask on April 1, 2002 in the

13   late afternoon hours?

14       A      I was in a staging area on Liberty Road and Old Court

15   Road in Baltimore County, Maryland.

16       Q      And what was your purpose in being there?

17       A      To be near the location of 3 Valdevia Court in case

18   Willie Mitchell came home.

19       Q      Okay.  Who is Willie Mitchell?

20       A      He was a defendant that was wanted on two arrest

21   warrants and we also had a search warrant for his residence.

22       Q      And you were located at Valdevia Court you say.  Is

23   that in Baltimore County?

24       A      Yes, it is.

25       Q      And what was your purpose for being near that location?

1       A       In case he returned home to effect the arrest on the

2   arrest warrants and to serve the search warrants.

3       Q       Were there other officers located elsewhere at that

4   time?

5       A       Yes.

6       Q       Okay.  Let me ask were you in uniform or in plain

7   clothes?

8       A       I was in plain clothes.

9       Q       And were you on foot or in a vehicle?

10      A       I was in a vehicle.

11      Q       Were you alone in the vehicle or were there other

12  officers with you?

13      A       I was by myself in my vehicle.

14      Q       Were there other vehicles that were part of your little

15  team there at the same staging area as you call it near Valdevia

16  Court?

17      A       Yes.

18      Q       Were some of those uniformed officers?

19      A       Yes, sir.

20      Q       And were they from Baltimore County or Baltimore City

21  or what?

22      A       Baltimore County Police Department.

23      Q       So is Valdevia Court in Baltimore County?

24      A       Yes.

25      Q       Okay.  Were you involved in the arrest of Willie

1  Mitchell that day?

2      A    No.

3      Q    You said you had a warrant or warrants for his arrest.

4  Do you remember what the warrants were for?

5      A    One arrest warrant was for the stabbing that occurred

6  at Hammerjacks in Baltimore City, Maryland.  The other one was a

7  failure to appear warrant from Altoona, Pennsylvania.

8      Q    Okay.  Did there come a time when you heard that Willie

9  Mitchell had been arrested?

10     A    Yes.

11     Q    And that was at some other location than where you

12  were.  Is that correct?

13     A    Yes.

14     Q    Okay.  Do you recall how you heard about him being

15  arrested?

16     A    No, I don't.

17     Q    What did you do after you heard about the arrest having

18  taken place?

19     A    We served the search warrant on 3 Valdevia Court.

20     Q    Okay.  When you say we, can you tell us who else was

21  with you?

22     A    Myself and Baltimore County Police Department.

23     Q    Okay.  Were there other city officers there, too, or do

24  you remember?

25     A    I don't remember.

1      Q      Okay.  I imagine it took a while to execute the search

2  warrant at Valdevia Court.  Is that correct?

3      A      Yes.

4      Q      What did you do after you got done executing a search

5  warrant at Valdevia Court?

6      A      I returned to the Baltimore City Police headquarters to

7  submit my evidence.

8      Q      Okay.  You submitted your evidence.  Do you recall how

9  long you stayed at Baltimore City Police headquarters?

10     A      No, I don't.

11     Q      Is that in downtown Baltimore here?

12     A      Yes, sir.

13     Q      Same headquarters building that you're in now?

14     A      Yes, sir.

15     Q      Okay.  Did there come a time when you left

16 headquarters?

17     A      Yes.

18     Q      Do you remember where you went when you left

19 headquarters?

20     A      Went to Central District.

21     Q      And what was the purpose of your going to Central

22 District?

23     A      To check to see what the status of Willie Mitchell was.

24     Q      Was Willie Mitchell there when you got to Central

25 District?

1      A     No, he wasn't.

2      Q     Did you speak to anybody at Central District if you

3 recall?

4      A     I spoke to someone.  Yes.

5      Q     Do you remember who you spoke to?

6      A     No, I do not.

7      Q     Do you know Detective Robar?

8      A     Yes.

9      Q     Did you speak to Detective Robar?

10     A     I don't remember.

11     Q     Do you know Detective Keith Benson?

12     A     Yes, I do.

13     Q     Did you see or speak to Detective Keith Benson that day

14 at Central Booking?

15     A     Central Booking, no.

16     Q     Okay.  Did you see or speak to him on some other

17 occasion that day?

18     A     No.

19     Q     Okay.  So did you ever see Willie Mitchell at all that

20 day?

21     A     No.

22     Q     Have you ever seen Willie Mitchell apart from court

23 appearances?

24     A     No.

25     Q     Did you do a report on all of the events that occurred

1    that day, a sort of global summary report?

2         A      Yes, I did.

3         Q      And did that include the search at Valdevia Court and

4    other matters?

5         A      Yes.

6         Q      Did you make a note in that report that Willie Mitchell

7    had stated that he didn't want to give a statement and wanted a

8    lawyer or words to that effect?

9         A      Yes.

10        Q      Do you know where you got that information from?

11        A      No.  I don't remember.

12        Q      When you got done at Central Booking, what did you do?

13        A      I never went to Central Booking.

14        Q      I'm sorry.  Central District.

15        A      I went back to police headquarters and finished my

16   administrative duties and went home.

17             MR. HARDING:   Okay.  Thank you.  I have no further

18   questions.

19             MS. RHODES:   Court's indulgence.

20             (Counsel conferred with her client.)

21             MS. RHODES:   I have no questions, Your Honor.

22             THE COURT:   Thank you.  Detective Giganti, I hope that

23   you will spread the word in the Baltimore City Police Department

24   that sometimes getting too imbedded in a routine can have

25   significant consequences.  I don't mean this to be critical.  But

1    all too often statements and assertions show up in police

2    reports, search warrant affidavits and other documents that don't

3    belong there and get in there not because an officer is acting

4    maliciously or intending to do wrong.  But in all occupations,

5    there's a threat that if we get too comfortable and too

6    routinized in what we do and don't pay close enough attention to

7    what we do, even when we do the same thing over and over and over

8    and over and over, there is likely to come an occasion when the

9    routine is not the right thing to do.  So I just hope you go back

10    to your fellow officers and detectives and say, hey, you know

11    what, this was really important.  What seemed no doubt to be a

12    very routine, innocuous, probably legally correct insertion in a

13    police report has really taken on significance in a way that at

14    the time you did your report and included that language about

15    Mr. Mitchell having invoked his right to silence even though

16    today, you can't even remember where you would have gotten that

17    idea and I take it from your testimony, you never even had any

18    contact with Mr. Mitchell.  Correct?

19                    THE WITNESS:   Yes, sir.

20                    THE COURT:    So I think it's a teaching moment for you

21    and your fellow detectives.  It's a good idea not ever to get too

22    caught up in the routine.  So sorry for that lecture, but I

23    couldn't help but make a comment on that.  Thank you.  You're

24    excused.

25                    THE WITNESS:   Thank you.

1      MR. HANLON:    Your Honor, the Government's first witness

2  will be Corporal Gregory Mead.

3      THE COURT:    All right.

4      MR. HANLON:    Your Honor, I handed up a set of exhibits

5  for the Court.

6      THE COURT:    They appear to be all photographs.  Is that

7  right?

8      MR. HANLON:    That is correct, Your Honor, and actually,

9  I won't even be using them with this witness.  I just want to

10 make sure the Court --

11     THE COURT:    All right.

12     THE CLERK:    Come forward, sir.  Stand over here,

13 please.

14     THE COURT:    Corporal Mead, good morning.  You're still

15 under oath for purposes of this hearing, sir.  You may be seated.

16 Please state your name for the record.

17     THE WITNESS:    It's Corporal Gregory Mead.  M-E-A-D.

18 Thank you, Your Honor.

19                    DIRECT EXAMINATION

20     BY MR. HANLON:

21     Q      Corporal, good morning.  I won't go over all of your

22 testimony again, but my questions will again ask that I direct

23 your attention to June 7th of 2002.  Do you recall that date?

24     A      Yes, sir.

25     Q      On that date, you had an occasion to speak with a young

1  lady named Andrea Smith.  Is that right?

2      A    Yes, sir.

3      Q    And again you've already testified about this.  I'm

4  just going to ask you a few specific questions about that.

5      A    Okay.

6      Q    Where was it that you spoke with Ms. Andrea Smith the

7  very first time you talked with her?

8      A    Right out front of the apartment complex on the

9  sidewalk directly in front of the front door to the apartment

10  building.

11      Q    Now in your previous testimony, I believe you testified

12  that what had brought you to this location was that you were at

13  another location and heard some sounds?

14      A    Yes, sir.

15      Q    What were the sounds that you heard?

16      A    Sounded like gunshots at the time.

17      Q    You then proceeded to this apartment complex?

18      A    Yes, sir.

19      Q    Approximately, corporal, how much time passed from when

20  you first heard the shots that you described until when you found

21  yourself talking with Ms. Smith for the first time approximately?

22      A    Approximately five minutes.

23      Q    Now when you were speaking with Ms. Smith, describe the

24  scene around you and the young lady.

25      A    The medics were working on the victim.  I would say

1    there was approximately between five and eight other subjects out

2    front of the house along with Andrea.  So there was quite a bit

3    of commotion going on.

4         Q    You mentioned the victim.  Is that Ms. Tanya

5    Jones-Spence?

6         A    Yes, sir.

7         Q    Was she within sight of you and Ms. Andrea Smith?

8         A    Yes.  I'd probably say she's approximately 15 feet away

9    from where we were talking.

10        Q    Could you see her from where you were?

11        A    Yes, sir.

12        Q    That is the victim.

13        A    Yes, sir.

14        Q    Now you had a conversation or spoke with Ms. Smith at

15   this scene?

16        A    Yes, sir.

17        Q    And again that conversation took place at the location

18   you just described?

19        A    Yes, sir.

20        Q    If you can, describe Ms. Smith's demeanor as you spoke

21   with her and as she spoke with you.

22        A    A nervous excitement.  Eyes are wide open.  She had

23   fast speech.  You could tell she was nervous, but not exactly

24   afraid at that point.

25        Q    You mentioned a couple of things.  What was the pace of

1    her voice as she spoke to you?

2        A      Her speech was fast.  I had to slow her down a couple

3    of times so I could get what she was saying because I was

4    relaying what she was giving to me over the radio.

5        Q      As she was speaking, did you notice anything about her

6    breath, her respiration?

7        A      You could tell she was breathing heavy with the fast

8    speech and like I said, her eyes were wide open.  You could tell

9    she was pretty excited.

10       Q      Was she crying or anything like that?

11       A      No, sir.

12       Q      Was she shaking or trembling?

13       A      Not that I can recall.

14       Q      Approximately how long did your first conversation with

15   Ms. Smith last?

16       A      Just a couple minutes.

17       Q      Now in terms of the conversation itself, how did you

18   communicate with Ms. Smith?  Did you ask her a series of

19   questions or did she just give you information on her own?

20       A      I asked her what she had, what she observed.  She went

21   through that whole describing the subjects running out of the

22   apartment complex, what they did and then after she repeated

23   what, after she gave me what she had seen, I asked her for

24   descriptions and then she gave descriptions of the subjects.

25       Q      So you asked her what she had seen and then you asked

1    for descriptions after that?

2           A      Yes, sir.

3           Q      All right.  Any other specific questions that you posed

4    to Ms. Smith that you remember during this first exchange?

5           A      No, sir.

6           Q      And just so we're clear for the record, you did talk to

7    her again later on in the day.  Is that right?

8           A      Yes, sir.

9           Q      She actually provided you a written statement?

10          A      Yes, sir.

11          Q      And that was again just, I'll lead you a little bit if

12   it's all right, but that was a little bit later on.  A couple of

13   --

14          A      Yes.  I'm not sure of the exact time, but it was a

15   while later.

16          Q      And I believe you mentioned that there were paramedics

17   there at the time?

18          A      Yes, sir.

19                 MR. HANLON:    A moment please, Your Honor.

20                 (Pause.)

21                 MR. HANLON:    Nothing further for the corporal.

22                 DEFENDANT GARDNER:    Can I read the facts, sir?  Your

23   Honor?

24                 THE COURT:    What is it, Mr. Gardner?

25                 DEFENDANT GARDNER:    May I read the facts, please?

                                                                    32

1          THE COURT:    No, please.  I'll permit the defendants to

2    have a word later on.

3          DEFENDANT GARDNER:    You said that last time, sir.

4          THE COURT:    Right.  And you got yourself kicked out of

5    here.

6          DEFENDANT GARDNER:    No.  That was the time before.  I'm

7    talking about last time.

8          THE COURT:    You'll have a chance later on.

9                    CROSS-EXAMINATION

10         BY MR. KURLAND:

11    Q      Good morning, Officer Mead.

12    A      Good morning, Your Honor.

13         DEFENDANT GARDNER:    I accept your offer for value and

14    return your offer for value --

15    Q      I just have a few followup questions.  At the time you

16    first saw Andrea Smith on that date, you were aware that the

17    assailants had already left the immediate vicinity.  Isn't that

18    correct?

19    A      Yes.

20    Q      That's what we were being told.

21    A      Okay.

22    Q      And that you didn't have your gun drawn, did you?

23    A      Oh, no, sir.

24    Q      Okay.  Now isn't it true that at the time you got

25    there, you said that there were at least eight or nine other

1   people around not counting Andrea Smith?

2          A        Approximately.  Yes, sir.

3          Q        Okay.  And you made a determination that she was the

4   best witness?

5          A        I had asked who had seen and they had pointed to

6   Andrea.  So that's how my attention was directed directly to her.

7          Q        But isn't it true you've testified previously in

8   another hearing though that you've used the specific terms that

9   you determined that she was the best witness?  I can show you the

10  transcript.

11         A        I'd have to look at it, but --

12                 MR. KURLAND:   All right.  May I approach?

13                 THE COURT:   Well, the record will --

14                 MR. HANLON:   Your Honor, the Government will stipulate

15  to that.

16                 THE COURT:   Okay.  Go ahead.

17                 MR. KURLAND:   All right.

18         Q        Now is it your testimony that you asked just two

19  questions, what happened and give me the descriptions?

20         A        Yes, sir.

21         Q        Okay.  And so you didn't say how many people there

22  were.  She just rambled on and then stopped and then you said

23  give me the descriptions.

24         A        I asked her to explain what she had seen and then I

25  asked for descriptions.  Yes, sir.

1      Q      Okay.  You indicated though that while you were doing

2    this, you were then relaying the information I guess over the

3    radio?

4      A      Yes, sir.

5      Q      And after you relayed the information over the radio,

6    is it your testimony you didn't say go on or anything like that?

7      A      I would have -- probably.  Yes, sir.

8      Q      Okay.  So you probably in all accuracy, you asked more

9    than two questions?

10     A      I would tell her to go ahead and continue.  I would

11   give out what the important information that needed to be given

12   out.

13          MR. KURLAND:   May I just have a moment with co-counsel?

14          (Counsel conferred.)

15          MR. KURLAND:   I have no further questions.

16          THE COURT:   Thank you.

17          MR. HANLON:   Just one question, Your Honor.

18                    REDIRECT EXAMINATION

19          BY MR. HANLON:

20     Q      Corporal, why were you relaying the information Ms.

21   Smith gave you over the radio?

22     A      So we could get a perimeter set up or a general idea

23   where to start looking for the suspects.

24     Q      So they could be arrested?

25     A      Yes, sir.

1              MR. HANLON:    Nothing further, Your Honor.

2              THE COURT:    Thank you, Corporal Mead.  You're excused.

3              THE WITNESS:    Thank you, sir.

4              MR. HANLON:    Your Honor, the Government will call

5    Detective Brian Edwards.

6              THE CLERK:    Step up here.  Raise your right hand.

7              (Witness sworn.)

8              THE CLERK:    Please be seated.  State your name for the

9    record.

10             THE WITNESS:   Detective Brian Edwards.

11                        DIRECT EXAMINATION

12             BY MR. HANLON:

13        Q    Detective Edwards, good morning.  May I ask how you are

14   employed?

15        A    I am employed by the Baltimore County Police

16   Department.

17        Q    How long have you been with the county police?

18        A    A little over 12 years.

19        Q    What is your current posting?

20        A    Currently, I'm assigned to the homicide unit.

21        Q    And you're a detective there?

22        A    Correct.

23        Q    How long have you been working homicide?

24        A    About two and a half years.

25             MR. HANLON:    Your Honor, may I approach the witness?

1          THE COURT:   Yes.

2      Q      Detective, going back to June 7 of 2002, were you on

3  duty that day?

4      A      I was.  I was currently assigned to the robbery unit

5  that day.

6      Q      But you had occasion to participate in a homicide

7  investigation?

8      A      I did.

9      Q      What was your involvement in that investigation?

10     A      I initially responded to the scene.  The incident

11  originally came in as a home invasion robbery which and shooting

12  which would have been handled by the robbery unit.  Went to the

13  scene, got a brief walk-thru of the scene and then I went to the

14  Woodlawn precinct where there were two suspects in custody.

15     Q      Did you interact with those two suspects?

16     A      I did.

17     Q      Do you recall their names?

18     A      Yes.  The one was Shawn Gardner and the other had given

19  a name if I remember it was Lamar Brown that was later identified

20  as Aaron Holley.

21     Q      You spoke with or rather interacted with both

22  individuals?

23     A      Correct.

24     Q      What did you do with them?

25     A      Attempted an interview.  Didn't get very far with an

1    interview and at that point learned that the victim had died and

2    that homicide detectives were going to take over the

3    investigation.  So we kind of backed off of the interview to

4    allow them to come in, but was asked in the meantime to seize

5    their personal property and their clothing.

6         Q      And you actually did take clothing from the two

7    gentlemen?

8         A      Yes.

9         Q      Let me show you a couple of items and actually in terms

10   of the physical descriptions before we get to the clothes, let me

11   ask you about the individual and I've shown you a, I've put in

12   front of you a series of photographs.  You assisted me in the

13   last couple of days and in fact this morning in assembling these

14   photographs.  Is that correct, detective?

15        A      That's correct.

16        Q      What are, just in general, what are all of these

17   various photographs?

18        A      They are photographs of the two individuals I

19   previously mentioned.

20        Q      From where?

21        A      They are booking photographs through -- our online

22   booking system is now a computerized system rather than the old

23   film photographs.  Every time somebody is arrested or booked,

24   digital photographs are taken and these are copies of those

25   photographs.

1      Q      Detective, let me start by showing you, asking you to

2  take a look at what's been marked as Government's Exhibit 10 and

3  on your sheet, I think there's a small handwritten 10 --

4      A      Correct.

5      Q      -- near the bottom.  Do you see that?

6      A      Yes.

7      Q      Who is shown in that photograph?

8      A      That is Shawn Gardner.

9      Q      And when was this photograph taken?

10     A      That was taken the very early morning hours of the 8th,

11  June 8th of 2002.

12     Q      In relation to the same arrest that you testified

13  about?

14     A      Correct.

15     Q      Does this photograph basically accurately represent

16  Mr. Gardner as he appeared when you interacted with him?

17     A      Yes.

18     Q      Now were any -- I've asked you to look for and have you

19  been able to find if any profile shots were taken of Mr. Gardner?

20     A      There were no profile shots taken during that arrest.

21     Q      Now you also looked through the Baltimore County

22  booking system for any other photographs during that timeframe of

23  Mr. Gardner.  Is that correct?

24     A      That's correct.

25     Q      Were you able to locate any during the June 2007

1  timeframe?

2      A      Yes.  There were other photographs from June 26.

3      Q      And I'll ask you then to take a look at Government's

4  Exhibit 11 and Government's Exhibit 12 if you could.  Where did

5  you obtain these two photographs, 11 and 12?

6      A      These are profile photographs that were taken of

7  Mr. Gardner on June 26 of 2002 and electronically stored in the

8  department's arrest database.

9      Q      Now detective, did you have any personal involvement in

10  that processing of Mr. Gardner for that --

11      A      No.

12      Q      -- for that other case?  And in terms of whether this

13  was a new arrest or a new case, am I correct that Mr. Gardner

14  remained in custody from the time that Government's Exhibit 10

15  was taken until 11 and 12 were taken?

16      A      That's correct.

17      Q      Why was he re-photographed again if you know?

18      A      If I remember correctly from viewing that arrest

19  report, there were other charges placed against him on that date

20  in addition to the ones from the June 8th arrest.

21      Q      So just to be clear, you did not see Mr. Gardner at the

22  time 11 and 12 were taken?

23      A      No, I did not.

24      Q      But do those two exhibits, 11 and 12, appear to, who do

25  they appear to be to you?

40

1      A      Shawn Gardner.

2      Q      Now taking all of these exhibits together, let me ask

3  you about Mr. Gardner's hairstyle on going back to June 7 and

4  June 8 when you did see him.  What was his hairstyle?

5      A      His hairstyle was very tightly braided, corn rows on

6  his head.

7      Q      Now looking at Government's Exhibit 10 for the moment

8  which is the one that on the day you interacted with him, it's

9  unfortunately it's a digital photo and this is pretty much as far

10  as you know the best we have?

11      A      Correct.

12      Q      Taking a look at his hair in particular, can you

13  pinpoint for the judge whether or not there's anything that

14  indicates braiding in that photograph?

15      A      In --

16          MR. KURLAND:   Objection, Your Honor.  The photograph

17  speaks for itself and that's sort of outside of his -- unless

18  he's a hair stylist.

19          THE COURT:   The objection is overruled.  Go ahead,

20  detective.

21      A      The photograph is consistent with what I saw of him

22  that evening which was very tightly braided corn rows.  The

23  bright lighting I think is one of the things that contributes to

24  it, not showing as clearly on this photograph.  But there are

25  what I can see is different variations in the coloring on the

1    photograph that indicates some pattern there which is consistent

2    with the pattern I saw of the corn rows running backwards.

3        Q      And then taking a look at Government's Exhibit 11 and

4    12 and I'm drawing to the end on this, detective, just how does

5    the hairstyle of Mr. Gardner's two profile shots which are a

6    couple weeks later compare with when you actually did see him on

7    June 7th and 8th?

8        A      Relatively consistent.  The braids are not as tight as

9    they were the first time that I saw Mr. Gardner.

10       Q      Now moving on to the additional exhibits.  Let me ask

11   you about Government's Exhibit 13.

12       A      Yes.

13       Q      Who is shown in Government's 13?

14       A      Aaron Holley.

15       Q      And again when was this photograph taken?

16       A      This was taken I believe the very early morning hours

17   of June 8th or very late evening hours of June 7th of 2002.

18       Q      And is this the day when you actually saw Mr. Holley?

19       A      That's correct.

20       Q      And does this photograph basically show what he looked

21   like when you saw him?

22       A      That's correct.

23       Q      And just to round it out, taking a look at Government's

24   Exhibits 14 and 15, do you see them in front of you?

25       A      I do.

1    Q      Are those both profile shots from the same day for the

2    same person?

3    A      Correct.

4    Q      Now when you interacted with Mr. Gardner and Mr. Holley

5    on the 7th and the 8th, did you take note of whether one was

6    taller than the other?

7    A      I recall one being taller and relatively thin and the

8    other being a little bit shorter and a little bit more muscular.

9    Q      Do you recall who was the taller, thinner man?

10   A      Aaron Holley was the taller, thinner man.

11   Q      And then finally, you indicated you took possession of

12   some of their clothing?

13   A      I did.

14   Q      Let me show you what I'll mark as Government's Exhibit

15   2 for this hearing.  Take a look at this and it's a bag with a

16   tag on it if you can and taking a look at the tag, tell me what

17   this bag is.

18   A      This is an evidence bag.  This is a bag that I put

19   clothing in.  This white tag is the Baltimore County Police

20   evidence label, my handwriting and it's labeled as a gray t-shirt

21   recovered from Shawn Earl Gardner on June 7th of 2002.  On the

22   bag itself, what I did when I seized each piece of clothing was I

23   made notes to myself.  It says Gardner t-shirt, 6-7-02, 20:35 and

24   that indicates June 7th of 2002 at 20:35 military time which is

25   8:35 p.m.

1          MR. HANLON:    Now I'll just briefly take it out, Your

2    Honor, so the Court can see it.

3          Q      Do you recognize this shirt, detective?

4          A      I do.

5          Q      And from what defendant did this shirt come from?

6          A      Shawn Gardner.

7          MR. HANLON:    Your Honor, have you had --

8          THE COURT:    (Indicating affirmatively.)

9          Q      And I'll now show you Government's Exhibit 3 for the

10   record.  Tell me what this bag contains.

11         A      Again consistent labeling.  This is originally labeled

12   Tavon Lamar Brown which was the name originally provided by Aaron

13   Dwayne Holley.  Again this label is prepared in my handwriting,

14   my handwritten note to myself, brown t-shirt, a brown t-shirt.  I

15   didn't write the date and time on that one.  That was recovered

16   on June 7th of 2002.  The name, Brown, is crossed through with

17   the handwritten name, Holley, and then on the label itself that's

18   crossed out and labeled Aaron Dwayne Holley with the initials,

19   PJM, and that is labeled as a white t-shirt recovered from Aaron

20   Dwayne Holley.

21         Q      And is this the shirt in question, detective?

22         A      Yes, it is.

23         MR. HANLON:    Your Honor?

24         THE COURT:    Thank you, Mr. Hanlon.

25         MR. HANLON:    Nothing further, Your Honor.

44

1          MR. KURLAND:    Your Honor, we just received these

2     photographs this morning.  Could I just have a minute to confer

3     with Mr. Coburn?

4          THE COURT:    Of course.

5          (Counsel conferred.)

6                       CROSS-EXAMINATION

7          BY MR. KURLAND:

8     Q     Officer, just one question.  Any reason why profile

9     shots taken of Holly and not of Gardner on --

10    A     I did not book him.  So the specific reason why the

11    officer did it on one and not on the other, I couldn't say.  I

12    remember some policy at the time that could explain it.

13         MR. KURLAND:    Okay.  No further questions.

14         THE COURT:    Well, I'm going to ask.  What's the policy?

15    What was the policy?

16         THE WITNESS:    This was when that booking system was

17    originally installed and just starting to be used.  They weren't

18    sure how much memory and how many photographs the system would

19    hold before crashing and so the original instructions were to

20    take all the photographs, you know, frontal, a right profile, a

21    left profile, pictures of scars, marks, tattoos and I think

22    quickly when somebody realized that the capacity might be being

23    filled up, they started telling people reduce that to a frontal.

24    Some people did frontal and some people did all the photographs

25    until they added enough memory.  I don't know without looking at

1    the actual arrest reports.  They might have been booked by two

2    individual officers, one operating under the old policy, one

3    under the new.  Fortunately, that's all been corrected.

4             MR. HANLON:    No followup from me, Your Honor.  I assume

5    I don't need a continuance to bring someone from county I.T.

6    services or anything like that.

7             THE COURT:    No.  Not at all.  Thank you very much,

8    detective.  You are excused.

9             MR. HANLON:    I believe that concludes our evidence on

10   the identification issues, Your Honor.

11            THE COURT:    All right.

12            MR. KURLAND:    Judge, are we going to argue that

13   sometime today?

14            THE COURT:    I think so.  The Government has no more

15   witnesses.  Are we ready to go on to Mr. Harris?

16            MR. HARDING:    Actually, Lieutenant Hagen will be here

17   very soon and he may be here already.  Detective Benson is seeing

18   if he's here right now.

19            THE COURT:    Okay.

20            MR. HARDING:    Not here yet, Your Honor.

21            THE COURT:    All right.  It seems to me we ought to have

22   some further argument, Mr. Kurland.

23            MR. KURLAND:    Your Honor, I have no problem going

24   first.  But since the Government is trying to admit it as an

25   excited utterance, I think they should try to go first.

1              THE COURT:    Well, I think prima facie they've

2    established it.  So why don't you approach the podium?

3              MR. KURLAND:    Okay.

4              THE COURT:    Perhaps you can stand by for a moment,

5    Mr. Kurland.  Mr. Hanlon, what is the point?

6              MR. HANLON:    Of the excited utterance?

7              THE COURT:    Yes.

8              MR. HANLON:    Well, that's a fair question, Your Honor.

9              THE COURT:    Thank you.

10             MR. HANLON:    The Government anticipates presenting the

11   testimony of Ms. Smith and I anticipate she's going to be in

12   court which would eliminate the Crawford issue.  But --

13             THE COURT:    And if for some reason she's unavailable,

14   do you agree that Mr. Gardner's opportunity to cross-examine her

15   at the suppression hearing will satisfy Crawford and the Sixth

16   Amendment?

17             MR. HANLON:    Assuming Crawford applied, yes, I would

18   agree --

19             THE COURT:    Okay.

20             MR. HANLON:    -- had there been such an opportunity.

21             THE COURT:    All right.  So go ahead.  So you're just

22   being extra careful?

23             MR. HANLON:    Well, we're being extra careful, Your

24   Honor.  I also believe that -- I mean the Court had an

25   opportunity to hear Ms. Smith's testimony and we do anticipate

1    presenting her as a witness, of course.  But she was also 12

2    years old at the time of this initial statement.  Her ability to

3    narrate and recollect although I think pretty solid in light of a

4    young woman who's 12 years old at the time of the incident and

5    five years have passed.  Although I think relatively strong given

6    the circumstances, it's still a little bit limited in the sense

7    of some of the details.  The Government would like to be able to

8    also have that initial excited utterance that she gave to a

9    police officer to come in along with her own testimony so that

10   the jury can hear the complete record.  Yes, the witness will be

11   on the stand and subject to cross-examination.  But I think it

12   would also be appropriate in a situation where the hearsay

13   exception so plainly applies to give the jury an opportunity to

14   hear that initial excited utterance as well.  I don't anticipate

15   there would be any inconsistencies, but frankly, if there were,

16   the jury would be entitled to hear that as well.  But I think

17   that the excited utterance ought to come in even if Ms. Smith

18   does testify.  If she does not testify, of course I assume that

19   the Court would understand then why the Government would want to

20   bring her --

21             THE COURT:   All right.  Mr. Kurland, briefly.

22             MR. KURLAND:   Judge, unlike when I teach evidence to a

23   class of sixty, the only person I need to persuade is the Court

24   on this one.  Your Honor, there's two aspects of the issue that

25   the Government and they've misconstrued the Crawford issue.

1    Andrea Smith testified at the hearing.  Was obviously subjected

2    to cross-examination.  If she is unavailable at trial, not

3    because the Government for whatever reason doesn't want to call

4    her, but if she's unavailable, then her testimony with respect to

5    the original identification or description would be admissible as

6    former testimony including the cross-examination.  The Government

7    has made it clear that they want to get in in addition to that

8    and also in addition if she testifies in court, they don't simply

9    just want her in court testimony, they also want to get admitted

10   the statement that she made at the scene either through herself

11   or through Officer Mead.

12              THE COURT:    But no.  The Government's not claiming that

13   the statement -- I'm sorry.  You said at the scene.

14              MR. KURLAND:    Yeah.  They want to -- the Government

15   apparently wants the option of admitting two discreet pieces of

16   evidence.  Either her in-court testimony as to what happened

17   and/or if she's unavailable, getting that in through the former

18   testimony based on the transcript.

19              THE COURT:    Okay.

20              MR. KURLAND:    And in addition to that, this additional

21   testimony coming in I guess presumably through Officer Mead about

22   the initial statement made at the scene, which would be

23   duplicative of her, the other testimony, but it's a separate

24   piece of evidence and the Government is trying to admit that as

25   an excited utterance.  My position on -- I'm sorry.  You have a

1  --

2             THE COURT:    Yeah.  You seem to be giving me a list of

3  three and I only see a list of two items.  I'm trying to --

4             MR. KURLAND:    All right.  The first is that if she

5  testifies at the trial, presumably she will testify similar to

6  the manner that she testified at the hearing.

7             THE COURT:    Right.  She's testified now three times or

8  only twice on the identification?

9             MR. KURLAND:    She's testified once.

10            THE COURT:    Well --

11            MR. KURLAND:    Her only --

12            THE COURT:    So that's right.  She didn't testify in the

13  state trial.

14            MR. KURLAND:    At any proceeding of the state trial.

15            THE COURT:    Okay.  So she's only testified once.  Well,

16  she testified in front of the grand jury?

17            MR. KURLAND:    No.

18            THE COURT:    No.

19            MR. KURLAND:    Well, I mean we've not received it.  So I

20  assume she hasn't.

21            MR. HANLON:    No, Your Honor.

22            THE COURT:    Okay.  All right.  So she's testified once

23  in the hearing and of course, she said whatever she said at the

24  time.

25            MR. KURLAND:    Um-hum.

1          THE COURT:    All right.  So either the testimony comes

2    in fresh as a witness at trial --

3          MR. KURLAND:    Yes.

4          THE COURT:    -- which will presumably be consistent with

5    her motions testimony --

6          MR. KURLAND:    And if it's different, we'll impeach her

7    with --

8          THE COURT:    Right.  Sure.

9          MR. KURLAND:    All right.

10         THE COURT:    And her motions hearing testimony was

11   essentially consistent with her statements at the time.

12         MR. KURLAND:    Yes.

13         THE COURT:    Okay.  So she'll presumably testify at

14   trial and you'll have her cross-examination.  If for some reason

15   she's not available, then former testimony comes in, direct and

16   cross and that's what the jury will hear.

17         MR. KURLAND:    Of the hearing testimony.

18         THE COURT:    Okay.  Now the Government crossing its T's

19   and dotting its I's has asked for a pretrial ruling that

20   according to the testimony today as elaborated further by

21   Corporal Mead, the Government says it would also be admissible as

22   an excited utterance.

23         MR. KURLAND:    Yes.  And what that means as a

24   consequence is that -- okay.  There's two different things.

25         THE COURT:    But they're not going to get both.

1          MR. KURLAND:    Well, I think they're being --

2          THE COURT:    No.  They're not --

3          MR. KURLAND:    They want both.

4          THE COURT:    They're not going to get both.  They're not

5   going to get both.

6          MR. KURLAND:    Well, okay.

7          THE COURT:    So if that's why you are imposing it,

8   they're not going to get both.  If she's here to testify, then --

9          MR. KURLAND:    Then the excited utterance, then this is

10  not coming in?

11         THE COURT:    I don't need to call it an excited

12  utterance.  Obviously, they'll be able to ask Officer Mead --

13         MR. KURLAND:    No, judge.

14         THE COURT:    -- did she make an identification and he

15  can say yes.  But as far as the details of braids and red

16  baseball cap --

17         MR. KURLAND:    Well, let me then --

18         THE COURT:    -- that would depend significantly on the

19  nature of the cross-examination.

20         MR. KURLAND:    Well, I'm still going to then need to

21  make the separate argument.  Assuming that she does not testify

22  at trial --

23         THE COURT:    Okay.  All right.

24         MR. KURLAND:    All right.  And she is not determined to

25  be unavailable --

                                                              52

1    THE COURT:   Okay.

2    MR. KURLAND:   -- under 804(b)(1) --

3    THE COURT:   I'm with you.

4    MR. KURLAND:   -- it's my understanding based on my

5    conversation with the Government earlier today, I sort of gleaned

6    from them and made more consistent now, they want to admit in

7    this as an excited utterance.

8    THE COURT:   But even --

9    MR. KURLAND:   Well, no, Your Honor, but here's the

10   point though.  Under Crawford and this is where the Government is

11   wrong on the evidence.  Under Crawford --

12   THE COURT:   I'm sorry, Mr. -- hold that thought one

13   second.

14   MR. KURLAND:   All right.

15   THE COURT:   If she testifies at trial, none of this

16   matters.

17   MR. KURLAND:   That's not true, Your Honor.  If she

18   testifies at trial, there's still a Crawford issue if they try to

19   get in this additional statement as an excited utterance.  The

20   fact that she --

21   THE COURT:   But no -- wait, wait, wait.

22   MR. KURLAND:   All right.

23   THE COURT:   If she testifies at trial, either as a live

24   witness or by former testimony, I don't expect to admit anything

25   in the guise of an excited utterance.

1              MR. KURLAND:    I will accept that preliminary ruling.

2              THE COURT:    Okay.  So she's going to testify at trial

3    either because she's here or because she was at the suppression

4    hearing.

5              MR. KURLAND:    That's correct.

6              THE COURT:    So I don't need to reach this.  Now you

7    say, well, but suppose she's not available, but the Government

8    has some complicity somehow in her unavailability and so forth --

9              MR. KURLAND:    Yes.  And they want to get in her initial

10   description through Officer Mead as an excited utterance.

11             THE COURT:    Okay.

12             MR. KURLAND:    I just want to state for the record the

13   legal argument with respect to that and that's two-fold.  The

14   first part is it doesn't qualify as an excited utterance.  The

15   second part is even if it does and even if she were to testify at

16   trial also, under Crawford, it's testimonial and is inadmissible

17   as a matter of constitutional law even if she is otherwise

18   available, subject to cross-examination because it isn't that

19   she's available to be cross-examined about other statements.

20   It's the fact that she made that statement at a time that she was

21   not subject to cross-examination and the fact that she is

22   otherwise available for cross-examination even at the earlier

23   hearing or at trial is irrelevant under the Crawford analysis.

24   Now the first part is that with respect to this being an excited

25   utterance.  It isn't.  Officer Mead testified a couple of things

1    and this is also consistent with his pretrial testimony at the

2    state court trial that he got there.  There was no ongoing

3    exigency.  He didn't have guns drawn.  The assailants had left

4    the immediate vicinity.  Andrea Smith is not a victim.  She's a

5    witness.  Through eight or nine people, he makes a quick, but

6    calculated premeditated determination that she is the best

7    witness.  That is the language he used and it's the language he

8    used that the Government stipulated to at an earlier hearing

9    under oath.  So a determination is made that she is the best

10   witness.  Now under Crawford then, this is no longer pleas for

11   help or cries for help.  This has shifted into in the

12   Government's own terms, this is now the accumulation of evidence

13   in a criminal case and they're dealing with a witness.  So a

14   determination is made that she's the best witness and she is

15   asked a series of questions, more than two.  I mean if a pattern

16   under RICO is at least two, this was clearly more than two, a

17   series of questions.  The Government has cited and I don't think

18   they, they can't find.  The excited utterance exception was never

19   meant to apply to serial questioning by a police officer

20   eliciting information.  This wasn't just one blurt out.  This was

21   a series of questions of which there were pauses, short pauses,

22   but pauses nonetheless in which he is getting both what happened

23   and descriptions of multiple persons.  So for all of those

24   reasons, this does not qualify as an excited utterance.  Even if

25   it did, Your Honor, and again even if she is otherwise subject to

1    cross-examination either through the earlier hearing or at trial,

2    the Crawford line of cases doesn't, isn't solved by the fact that

3    she is now available for cross-examination.  The question goes to

4    at the time the statement was made that the Government is trying

5    to admit, what is it?  Is it testimonial and if it's testimonial,

6    it's inadmissible absolutely unless she was subject to

7    cross-examination at the time she made the statement the

8    Government is trying to admit.  She was not.  So with respect to

9    this coming in as an excited utterance from the Government, it

10   doesn't qualify under the rule.  There's no case that supports

11   this police questioning in this context.  And even if it does,

12   under Crawford, it's a confrontational clause violation.

13          THE COURT:   All right.  Thank you, Mr. Kurland.  I

14   don't have to finally rule, but I disagree with you on both

15   points preliminarily.  It seems to me it almost clearly is an

16   excited utterance.  It's difficult to imagine how a 12-year-old

17   girl who observes a woman known to her, a neighbor fall from a

18   third floor balcony where upon two men with guns walk past the

19   declarant, approach the fallen woman, fire shots into her body

20   and run off, it's difficult to imagine a circumstance where a

21   12-year-old girl five minutes later wouldn't still be under the

22   grip of that startling, remarkable event.  And I credit Corporal

23   Mead's testimony and his description of Andrea Smith's reaction

24   to his approaching her.  I don't find there was a series of

25   questions.  In fact, I credit Corporal Mead's testimony that he

1    asked two questions.  Tell me what you saw.  Whereupon, there was

2    a narrative given by Andrea Smith which he interrupted from time

3    to time to be sure in order to repeat what she was telling him by

4    radio.  But his indication to her to stop and to continue do not

5    constitute questions.  And so the Court credits his testimony

6    that after the narrative, during which he did interrupt her a few

7    times, he asked her for descriptions.  So maybe there were three

8    questions.  Maybe there were four.  But it was not a series of

9    questions.  So she was nervous as you would expect.  She was

10   wide-eyed as he described.  She was talking fast.  She was

11   breathing rapidly.  She clearly was in the grip of this

12   extraordinary event that she had just witnessed.  I disagree with

13   you on Crawford.  I don't read Crawford at all to suggest that

14   there must be cross-examination at the time the statement is

15   made.  I mean if you really said that --

16          MR. KURLAND:    Judge, that's --

17          THE COURT:    -- that's not what --

18          MR. KURLAND:    Your Honor, you're going to make the

19   ruling, but that's exactly what Crawford requires and that is --

20          THE COURT:    That's exactly not what Crawford requires.

21   It is what Crawford -- Crawford says there has to be

22   cross-examination at trial, confrontation at trial.

23          MR. KURLAND:    I don't even believe the Government --

24   Your Honor, on that point if it's testimonial, there needs to be

25   cross-examination at the time the statement was made and I would

57

1   assume that the Government would agree with me.  The Government's

2   position probably is that it's not testimonial.  But if it's

3   testimonial, even if the witness shows up, it's a Crawford

4   violation if it's deemed testimonial and I'd be surprised if the

5   Government disagrees with me on that legal point.  But I don't

6   deign to speak for the Government.

7            THE COURT:   Okay.  Maybe I'm misunderstanding your

8   point.  But --

9            MR. KURLAND:   Even if it's an excited utterance, Your

10  Honor, if it's testimonial under Crawford and I believe it is,

11  even if it's an excited utterance --

12           THE COURT:   So your argument is that if the former

13  testimony exception were not there, then none of the other

14  hearsay exceptions would be sufficient to admit a statement where

15  there has been an opportunity pretrial to cross-examine the

16  declarant.

17           MR. KURLAND:   Well, Your Honor --

18           THE COURT:   That's what you're saying.

19           MR. KURLAND:   Well, yeah, because --

20           THE COURT:   Because you had an opportunity to

21  cross-examine at the suppression hearing.  But of course, defense

22  counsel is never going to be at the scene where an excited

23  utterance arising out of a homicide is made.

24           MR. KURLAND:   That's correct and that's why they either

25  come in because if it's not -- the 911 calls come in in Hammond

1   because it is determined to be cries for help that are not

2   testimonial.  So excited utterances if they're nontestimonial --

3              THE COURT:    But there there was no cross-examination --

4              MR. KURLAND:    I understand that.  That's right.  But it

5   comes in though, Your Honor, it came in in Hammond because it was

6   determined to be nontestimonial.  It is our position here that

7   this is an excited utterance.  Assuming that the Court finds it's

8   an excited utterances and the excited utterance can either be

9   testimonial or nontestimonial depending on the circumstances.

10  That's exactly what Hammond dealt with.  And this is a

11  testimonial excited utterance.  And going back to --

12             THE COURT:    So you would even go so far as to say going

13  back to my earlier observation that if you were to cross-examine

14  Andrea Smith in some fashion that I thought it appropriate to

15  permit the Government to rehabilitate her trial testimony through

16  Officer Mead, through Corporal Mead's testimony about what she

17  said at the scene, you would say that would be a Crawford

18  violation?

19             MR. KURLAND:    No, judge.

20             THE COURT:    Why would that be a Crawford --

21             MR. KURLAND:    Your Honor, because if it's coming in to

22  rehabilitate either as a prior consistent statement or a prior

23  inconsistent statement, but not for the truth of the matter

24  asserted, then it would be --

25             THE COURT:    A prior consistent statement is offered to

1    prove the truth of the matter asserted.

2             MR. KURLAND:    If it meets all of the requirements of

3    804.  So I'm not saying that it can never come in.  If it's going

4    to come in, it has to meet a hearsay exception.  By the way, a

5    prior consistent statement, one of the requirements is the

6    witness is present testifying in court at the time.  This is all,

7    what the Government is trying to do here is they're trying to

8    keep open the options.  They were very candid about it.  They're

9    trying to keep open the options of getting this testimony

10   admitted as substantive evidence without having to call Andrea

11   Smith at trial.  This is all moot if she's unavailable without

12   the Government, you know, saying well, we don't want to upset

13   you.  If she's unavailable under 804, this testimony is going to

14   come in as former testimony, the substance of it.  So this trial

15   will have unless the Government does something very odd, this

16   trial will have Andrea Smith's testimony as to what she observed

17   at the scene.  The confrontation clause requires though, the

18   preference is, the ultra preference is that she testifies live in

19   court.

20             THE COURT:    Okay.  Well, this has been very

21   interesting.  I agree with you, it's almost certainly moot, but

22   that doesn't make it any less interesting.

23             MR. KURLAND:    Well, I don't want to waste the Court's

24   time on moot points --

25             THE COURT:    Okay.  All right.

1          MR. KURLAND:    Your Honor, thank you.

2          THE COURT:    Your record is preserved, Mr. Kurland.

3          MR. KURLAND:    Thank you.

4          THE COURT:    Is he here yet?

5          MR. HARDING:    I just asked Detective Benson to find

6    out.

7          THE COURT:    Okay.  While we're waiting, Mr. Martin, how

8    far did we get on Mr. Harris' statement?

9          MR. MARTIN:    I think the Government put all the

10   witnesses on that they intend to put on.  They didn't put any

11   witnesses on with respect to and they probably don't have to,

12   with respect to the validity of the warrant to start with.

13         THE COURT:    Right.  Right.

14         MR. MARTIN:    We still have an argument about that based

15   upon the papers.

16         THE COURT:    Okay.  So we're going to argue --

17         MR. MARTIN:    We'll argue both the validity of the

18   warrant, of them being there to start with and then we're going

19   to argue the issue of the statement to him that if you don't fess

20   up, we're going to arrest your mother.

21         THE COURT:    All right.

22         MR. MARTIN:    Those are the two parts.

23         MR. HARDING:    Your Honor, I did not anticipate argument

24   today about the validity of the warrant.  We haven't had that on

25   any of the other searches in this case and I --

1          THE COURT:    We have a copy of the warrant here.  I

2   don't think that that --

3          MR. MARTIN:    Your Honor, I filed a motion which lays

4   out what my argument is and the warrant is attached to the

5   motion.

6          THE COURT:    Okay.  We do have the court file here, Ron?

7          MR. MARTIN:    If it's not, I'll have it here, Your

8   Honor.

9          THE COURT:    Okay.  So what I hear him saying,

10  Mr. Harding, is that he's got a Fourth Amendment challenge to the

11  statements arising from what he will argue, Mr. Martin will argue

12  are deficiencies in the warrant in the first place and a fruit of

13  the poisonous tree kind of argument and then separately, there is

14  a Fifth Amendment voluntariness challenge arising from alleged

15  threats against family members and that kind of thing.

16         MR. HARDING:    Yes.  And --

17         THE COURT:    I think you're perfectly prepared to argue

18  those issues.

19         MR. HARDING:    I don't even have a copy of the warrant.

20         THE COURT:    Okay.  Mr. Martin does I'm sure and we'll

21  get the court file up here.

22         MR. HARDING:    I understand Lieutenant Hagin is here,

23  Your Honor.

24         THE COURT:    Excellent.  All right.  We'll shift gears

25  once again.

1          MR. COBURN:    Your Honor, while they're getting him, can

2    I, just one very brief question.  At the Court's convenience at

3    some point during the day, I have a question for Your Honor about

4    the mental health disclosure issue.  Just whenever is a good

5    time, I just want to let the Court know.

6          THE COURT:   Okay.

7          THE CLERK:    Step forward, please.  Stand up here.

8    Raise your right hand.

9          (Witness sworn.)

10          THE CLERK:    Please be seated.  State your name for the

11    record.  Speak directly into that microphone.

12          THE WITNESS:    My name is Lieutenant James William

13    Hagin.  H-A-G-I-N.  I'm assigned to the Baltimore Police

14    Department as a lieutenant.  I'm currently on a drug task force

15    with the Drug Enforcement Administration.

16                    DIRECT EXAMINATION

17          BY MR. HARDING:

18    Q      Okay.  Lieutenant Hagin, can you tell us how long

19    you've been employed by the Baltimore City Police Department?

20    A      27 years.

21    Q      How long have you been assigned to the Drug

22    Enforcement, the federal Drug Enforcement Administration?

23    A      Currently since 2003.

24    Q      Okay.  Where were you in 2002?

25    A      In homicide and also detailed to the D.E.A.

63

1       Q       So you were already detailed to D.E.A. in 2002?

2       A       Yes.

3       Q       What was your position at D.E.A. in 2002?

4       A       I was the Redrum sergeant.

5       Q       Okay.  Does that mean you were the commander of the

6   Redrum Unit there?

7       A       Yes, sir.  I was in charge of the squad which was

8   called the Redrum Unit.

9       Q       And why was it called the Redrum Unit?

10      A       It's affiliated with the homicide unit.  It's an

11  acronym that D.E.A. put on.  So it's murder spelled backwards.

12      Q       Okay.  And was murder a part of your, was murder the

13  special responsibility of the Redrum Unit at D.E.A.?

14      A       Yes, sir.

15      Q       Okay.  During the time that you were the head of the

16  Redrum Unit, did you become involved in an investigation of a guy

17  named Oliver McCafferty?

18      A       Yes, sir.

19      Q       And was a GPS device installed on Oliver McCafferty's

20  car in the course of that investigation?

21      A       Yes, sir.

22      Q       And were people under your command monitoring that GPS

23  device?

24      A       No, sir.

25      Q       Who was?

64

1        A        The operations unit of the homicide unit.

2        Q        Okay.  Did you become involved in the investigation of

3   the murders of Oliver McCafferty and Lisa Brown?

4        A        Yes, sir.

5        Q        Okay.  And did you subsequently become involved in the

6   arrest of Willie Mitchell?

7        A        Yes.

8        Q        Okay.  Do you remember what Willie Mitchell was to be

9   arrested for?

10        A        For an assault which was being investigated by the

11   Central District D.D.U.

12        Q        Where did the assault occur?

13        A        At the Hammerjacks Night Club in the Central District.

14        Q        Was it the responsibility of your Redrum group to

15   arrest Mr. Mitchell that day?

16        A        Yes, sir.

17        Q        Okay.  Were you aware of Mitchell being the target of

18   any other investigation that homicide had going at that time?

19        A        Yes, sir.

20        Q        Can you tell us what that was?

21        A        He was a identified suspect in a murder.

22        Q        Can you tell us what murder you're referring to?

23        A        Well, the Darryl Weisch murder and we believe he had

24   affiliation with the Brown murder that the GPS was attached with.

25        Q        I see.  The Brown, is that the Brown/McCafferty murder?

1      A     Yes.

2      Q     And was Darryl Weisch's brother also murdered at the

3 same time he was?

4      A     Yes, sir.

5      Q     Do you remember who the detectives were that were

6 investigating the Weisch brothers murder?

7      A     The Weisch brothers would be Curt Hastings and Gary

8 Niedemeyer.

9      Q     Okay.  Let me call your attention to April 1, 2002, the

10 day that Mr. Mitchell was arrested.  Did you have a plan for how

11 to do the arrest that day?

12      A     Yes, sir, we did.

13      Q     Can you tell us what the plan was?

14      A     That we would go to the employment of his girlfriend.

15 I believe it was global systems in Baltimore County.  Wait for

16 him to show up, follow him away from there and effect the car

17 stop and arrest him.  At which time, he would be taken into

18 custody, transported to the Central District D.D.U. and turned

19 over to detectives at that time.

20      Q     Okay.  Where were you located at the time of the

21 arrest?

22      A     We were waiting in a location near the residence on

23 Valdevia Court in Baltimore County.

24      Q     Okay.  When you say we, who are you referring to?

25      A     Other members of my squad.

1       Q       Did you have a discussion with the members of your

2   squad prior to the arrest about what would happen if Mr. Mitchell

3   were taken into custody that afternoon?

4       A       Yes, sir.  We were not going to interview him.  We were

5   just going to arrest him and take him into Central District and

6   turn him over to the D.D.U. detectives at that time.

7       Q       Can you tell us why there was a decision not to

8   interview him?

9       A       Well, we were doing the investigation into the murder

10   case.  When we had learned about the arrest warrant for him for

11   the assault and also the arrest warrant for the drug case in

12   Pennsylvania, we were going to make that as part of our

13   investigation.  However, we were not going to interview him on a

14   case that we were not a part of and we would not.  That wouldn't

15   be proper protocol.

16       Q       Okay.  Do you remember who was present at your location

17   when you had this discussion, who the squad members were or do

18   you remember any of them?

19       A       Yeah.  It would be Detective Kramer, Detective Benson.

20   It would have been Detective McGillivary, Detective -- who's now

21   retired.  Detective Benson, Detective Giganti, Detective Graul,

22   who's now retired.  And I believe we had one or two people from

23   Baltimore County who were going to assist us.

24       Q       Okay.  Did you ever see Mitchell that day?

25       A       No, sir.

1    Q    Did there come a time when you heard that he had been

2    arrested by other people under your command?

3    A    Yes, sir.

4    Q    Were you aware of what kind of vehicle he was put into

5    when he was transported down to the Central District?

6    A    He was transported by Baltimore County.  The exact type

7    of vehicle I'm not sure.  But it was a Baltimore County police

8    vehicle.

9    Q    Was there any significance to the fact that a Baltimore

10   County Police vehicle was used to transport him down to Central

11   District?

12   A    Well, normally if we were going to interview the

13   person, we would transport him ourselves and we would start the

14   relationship from that point on.  At this point, the plan was not

15   to interview him at any point and take him down to Central

16   District and turn him over to those detectives.

17   Q    Was it part of the plan to give him Miranda warnings?

18   A    No, it was not.

19   Q    Did you specifically plan not to give him Miranda

20   warnings?

21   A    Yes, sir.

22   Q    Is giving Miranda warnings something that you would

23   normally do when you arrest someone?

24   A    Yes.  If we wanted to interview him, we would, the

25   normal course would be, we would transport him.  We would give

1    him the verbal Miranda rights in the event that anything was said

2    and that we'd attached to those what was said.  And once we get

3    him into an interview room, give him the advisement of rights

4    form and a sheet of paper.

5         Q      Would you always give an advice of rights form if you

6    gave Miranda warnings?

7         A      I'm sorry, sir?

8         Q      If you had an advice of rights form available, would

9    you always give one to a prisoner if you were going in interview

10   him?

11        A      Yes, sir.

12        Q      Was there ever an advice of rights form filled out in

13   this case as far as you know?

14        A      No, sir.

15        Q      Was there ever a report done by you or anyone under

16   your command that summarized a statement that Mr. Mitchell gave?

17        A      Yes, sir.

18        Q      Well, let me ask you.  Was there a statement given by

19   Mr. Mitchell?

20        A      No, sir.  Not to my knowledge.

21        Q      So I'm just asking you if there was a summary of

22   Mr. Mitchell's statement prepared by anyone under your command?

23        A      Oh, no, sir.

24        Q      Okay.  Did you ever see Mitchell at any time that day?

25        A      No, sir.

69

Case 1:04-cr-00029-AMD   Document 636   Filed 03/27/09   Page 70 of 188

1      Q      Okay.

2             MR. HARDING:    No further questions, Your Honor.

3                         CROSS-EXAMINATION

4             BY MS. RHODES:

5      Q      Good morning, Detective Hagin.

6      A      Good morning.

7      Q      You were in charge of the unit that was in Redrum.

8  Right?

9      A      Yes, ma'am.

10     Q      And what was that unit responsible for?

11     A      We investigate drug-related murders and we try and

12  develop a drug nexus to get it into federal court.  That's our

13  goal.

14     Q      Okay.  And who was in charge on April 1st?

15     A      That day?

16     Q      Yes.

17     A      For the raid?  I was.

18     Q      Okay.  And as the person in charge, what were you

19  responsible for?

20     A      Overseeing the execution of the raid and also the

21  arrest.

22     Q      Okay.  So basically it was your word was being carried

23  out by both, the Baltimore City Police Department, Baltimore

24  County Police Department and any D.E.A. Task Force Members.  Is

25  that right?

1      A      Yes.

2      Q      Okay.  And you had a plan for that day?

3      A      Yes, ma'am.

4      Q      And that plan was, included how the arrest was going to

5  happen and everything surrounding that.  Right?

6      A      Yes.

7      Q      And where is that plan written?

8      A      We discussed the plan.  It's not a written plan.

9      Q      Okay.  So it involved about 15 to 20 officers.  Is that

10  right?

11      A      Probably 10 to 15.

12      Q      10 to 15.  And from at least three different

13  jurisdictions or branches.  Right?

14      A      Yes.

15      Q      Federal money?

16      A      I'm sorry?

17      Q      Federal money was involved in terms of the cost, the

18  resources?

19      A      You could say I guess if you want to -- yes.

20      Q      And state funds and city funds?

21      A      Well, we're subsidized from the federal government.

22      Q      Okay.  And the Baltimore City police officers are being

23  paid by the city?

24      A      Yes.  But if we're up on the task force, we're

25  subsidized by the federal government.

1        Q        Okay.  So federal, state and Baltimore City funds are

2    involved and the officers that are doing this work that day on

3    April 1st.  Is that right?

4        A        I would say we're subsidized by the federal government.

5        Q        Was there anything in writing you had about the plan of

6    action that day?

7        A        Not that I can remember.

8        Q        Do you know how many people were involved from the

9    Baltimore County S.W.A.T. team?

10        A        No, I don't.

11        Q        Okay.  It would be pretty safe to say there are about

12    16 to 20 people involved though, wouldn't you say, more than just

13    the 10 to 12 you mentioned earlier?

14        A        I mean it's an approximate.

15        Q        Okay.

16        A        I'd say 10 to 15.  If you want to go 20, I'll --

17        Q        Well, I mean you were in charge.  Right?

18        A        Yeah.  But how many S.W.A.T. would bring if they come

19    out, that's not up to me.  That's up to them.

20        Q        Okay.  And you mentioned when you were speaking to Mr.

21    Harding that when, that normally you would do a verbal Miranda

22    initially and then when you get into the interview room, you'd

23    give the person if they've already agreed to speak, you give them

24    the written form.  They fill that out and the interview is

25    conducted.  Right?

1      A       If that was the plan, yes.

2      Q       If you wanted to interview them?

3      A       Yes.

4      Q       That's what you would do.  So the written form would

5  come out in the interview room?

6      A       Yes, ma'am.

7      Q       So if somebody were verbally given their Miranda rights

8  and said I don't want to talk or I want a lawyer, you wouldn't go

9  any further.  Right?

10     A       Correct.

11     Q       You would never, you'd never get into the interview

12  room?

13     A       Depends on the circumstances.

14     Q       Okay.  Well, if they say I want a lawyer, I don't want

15  to talk, would you take them into the interview room and try to

16  speak to him further?

17     A       It depends on the circumstances.

18     Q       Okay.  But in this case on this day, you had no

19  intention to try to interview Mr. Mitchell you're saying?

20     A       No.

21     Q       So that would explain why there's no written Miranda

22  form or advice of rights in this case, right, on that day?

23     A       Well --

24     Q       In other words, your orders were followed.

25     A       As far as I know, yes.

1       Q       Okay.  So there was no, so as far as you know, there

2    was no written, nothing signed by Mr. Mitchell indicating he had

3    received his rights or waived them or anything.  Right?

4       A       As far as I know, they were never given in any verbal

5    form or written form.

6       Q       Okay.  Well, you've reviewed all the paperwork in this.

7    I mean after that day, reports were filed.  Right?

8       A       Correct.

9       Q       Okay.  Did you write a report up about that day?

10      A       Did I?

11      Q       Yes.

12      A       No.

13      Q       Okay.  Do you recall what report you reviewed from that

14   day, how it went, the expense of all these resources going into

15   that arrest on that day?  Did you review the reports?

16      A       There were reports I reviewed.  I don't remember each

17   one that I reviewed.  No.

18      Q       Would you have reviewed Detective Giganti's report?

19      A       Yes.

20      Q       Okay.  And if you had noticed an error in it, would you

21   have brought that to his attention?

22      A       Yes.

23      Q       Okay.  As far as the verbal warnings go, you weren't

24   around Mr. Mitchell that day.  Right?

25      A       No, I was not.

1      Q      So you don't know whether or not he got any verbal

2   Miranda warnings?

3      A      No.  I wasn't a witness to it.  But I was advised by

4   the detectives that it didn't occur.

5      Q      That it didn't occur.

6      A      That it did not occur.

7      Q      Okay.  So whatever information you got from them, you

8   assume was correct.  Right?

9      A      Yes, ma'am.

10     Q      And you would assume that was the same information

11   provided to Officer Giganti, correct, Detective Giganti?

12     A      I can't answer for Detective Giganti.  You'll have to

13   ask him.

14     Q      Well, no.  I just said you would assume that the

15   information that you got from what was happening was the same

16   information that Detective Giganti got?

17            MR. HARDING:    Objection.

18            THE COURT:    Overruled.  You may answer.

19     A      Ma'am, in my 27 years in law enforcement, I don't

20   assume anything.

21     Q      So we can't really rely on what another officer, what

22   information they got then?

23     A      I can only rely on what was given to me.

24     Q      Okay.  And you can rely on what somebody else writes up

25   in a report.  Right?

1          A          Well, I need to have further clarification of that.

2          Q          Okay.  But we are clear that you did review Detective

3    Giganti's report?

4          A          I did.

5          Q          Okay.  And if you had seen any errors, you would have

6    called them to his attention?

7          A          Yes.

8          Q          Okay.

9                     MS. RHODES:    Nothing further, Your Honor.

10                            REDIRECT EXAMINATION

11                     BY MR. HARDING:

12         Q          Lieutenant Hagin, when did you review Detective

13   Giganti's report?

14         A          The day after the incident occurred.

15         Q          Were you happy with Detective Giganti's report?

16         A          No, I was not.

17         Q          Did you criticize Detective Giganti for the report?

18         A          Yes, I did.

19         Q          What did you tell Detective Giganti?

20         A          I had told him that, number one, he had gone in and he

21   had written the report in the homicide unit in a database that we

22   do not use and that form that he wrote his report on should have

23   had a supervisor's signature on it, which it did not.  And I

24   instructed him if he had ever filed another report in that

25   fashion without it coming through me first before it went into

1    the system, that he would be out of the unit.

2         Q     So the report was already in the system by the time you

3    reviewed it.  Is that correct?

4         A     Yes, sir.

5         Q     Is it possible to change a report at that point?

6         A     No, sir.  I wouldn't even try to attempt it.

7              MR. HARDING:    Thank you.  I have no further questions.

8                        RECROSS-EXAMINATION

9              BY MS. RHODES:

10        Q     Did you make any written notations of your concerns

11   about Detective Giganti's report?

12        A     No, ma'am.  I talked to him verbally about it and the

13   report was already submitted.  If I had tried to change the

14   report in any fashion, we would be sitting here and you would be

15   accusing me of tampering with evidence.  No, ma'am.

16        Q     Did it occur to you to write a memo or a note saying

17   that I am concerned about this and here's why and here's what my

18   concerns are about the report?

19        A     It's not a situation where I would want that.  No.

20        Q     So it wasn't that important?

21        A     It's important, but I gave him, we had a meeting about

22   it.  He understood where I was coming from and once it's written

23   in the system, we just have to live with it and deal with it as

24   we are here today.

25        Q     Do you recall what it was you were not satisfied about

1    other than the signature and the review?

2         A      It had to do with an advisement of rights with your

3    client and the fact that apparently, he was told, he put in a

4    report that he was advised of his rights and requested a lawyer.

5         Q      And that made you very --

6         A      Now that's summarizing.  If you had the report, I can

7    read it verbatim for you.  But that's a summary.

8         Q      Okay.  Showing you a copy of Detective Giganti's report

9    from that date which is marked Exhibit Number 1.  Could you just

10   read through the narrative to yourself and show us what parts of

11   the and then tell us what parts of the report you were not happy

12   with?

13        A      It's what you highlighted here with regard --

14        Q      That is the only part that you were not happy with.

15        A      Pretty much.  Yes, ma'am.

16        Q      Okay.  And what does it say?

17        A      Mitchell provided no statements and requested a lawyer.

18        Q      Okay.  And this made you very unhappy when you saw

19   that.  Right?

20        A      Yes, ma'am.

21        Q      Okay.

22               MS. RHODES:    Thank you.  I have nothing further, Your

23   Honor.

24               THE COURT:    Thank you very much, Lieutenant Hagin.

25   You're excused.

1              THE WITNESS:   Yes, sir.

2              THE COURT:    Does that conclude the Government's

3    evidentiary presentation for this round?

4              MR. HARDING:   Yes, Your Honor.

5              THE COURT:    All right.  So from the Government's

6    perspective, all that remains is the Harris statement and perhaps

7    search or search warrant and -- anything else?

8              MR. HARDING:   Well, yes, Your Honor.  First of all,

9    Mr. Gardner has a motion to admit the prior conviction in

10   Baltimore County of his client --

11             THE COURT:    Okay.  We can discuss that.  Anything else?

12             MR. HARDING:    And also Your Honor made a preliminary

13   ruling this morning regarding the admissibility of co-conspirator

14   statements.  I don't know what the best way to proceed with that

15   is.  Your Honor indicated that you would give the Government an

16   opportunity to respond and frankly, I did respond in writing, but

17   I didn't go into very much detail for two reasons.  One is that

18   Your Honor had given a different preliminary ruling back in late

19   April.  At the April 26th hearing, you indicated that you

20   believed that Mr. Montgomery was a conspirator and that these

21   were co-conspirator statements and so --

22             THE COURT:    Let me if I can interrupt you there,

23   Mr. Harding.  You're quite right and I'd like to tell you very

24   quickly among other things what changed for me and maybe I

25   misheard it and maybe I misrecollect it.  But I actually thought

                                                               79

1    you had proffered that Mr. Gardner's statements were made while

2    Mr. Gardner and Mr. Montgomery were incarcerated together.

3                MR. HARDING:   No, Your Honor.

4                THE COURT:   Okay.  And that I think clearly we all

5    recall that you said and indeed it is the Government's contention

6    that Mr. Montgomery was a member of this conspiracy.  Correct?

7                MR. HARDING:   Yes.

8                THE COURT:   And again I want to be very clear.  All I

9    have seen since the last hearing tells me that the contrary is

10   true.  When I read through Mr. Montgomery's grand jury testimony,

11   when I read through Mr. Montgomery's recorded statement, when I

12   read through the search warrant application, what comes through

13   loud and clear is that Mr. Montgomery is a lone ranger largely.

14   That he is a hit man and most importantly for present purposes,

15   according to the information that the Court's been provided and

16   again I want to emphasize it's only the information that the

17   court's been provided, the whole Darius Spence episode came

18   directly from Mr. Montgomery.  That again I'm just going by what

19   I have read.  What I have read is that Jaman was targeted by

20   Spence.  Montgomery talked to Holley and Jaman.  Jaman was

21   Holley's boy and Montgomery decided not to do Jaman and to the

22   contrary suggested to Jaman that he do Spence.  And there's not a

23   word about Mr. Gardner or Mr. Martin or anybody else in what I

24   have read.  To the contrary, Gardner steps into it apparently at

25   the invitation if it was an invitation according to what I have

1  seen of Mr. Holley because Mr. Gardner as Mr. Montgomery put it

2  took a fall, needed some money.  So this robbery, murder of

3  Mr. Spence, that's what I've seen.  I hadn't seen any of that --

4          MR. HARDING:   Well, let me --

5          THE COURT:   -- at the time of the last hearing.  Now --

6          MR. HARDING:   I don't know whether I should proffer --

7          THE COURT:   You shouldn't, you shouldn't because

8  proffers can often be very useful and helpful.  But I'm going to

9  need more than a proffer.

10          MR. HARDING:   Well, there's information even in the

11  grand jury transcript, Your Honor.

12          THE COURT:   Well, not in the grand jury transcript that

13  I read from page to page.  You know, by the way, which grand jury

14  transcript we're talking about.  Right?  January 14, 2004?

15          MR. HARDING:   That's correct, Your Honor.

16          THE COURT:   Looks like 42 pages.  By the way, who is

17  Goose?

18          MR. HARDING:   Goose has been identified, Your Honor,

19  and I'd be happy to discuss Goose with you, but I'd have to do

20  that ex parte, Your Honor.

21          THE COURT:   Okay.  Okay.  See, that's what I think at

22  the least the Government ought to do.  Rather than try to make

23  and I really respect as you know, Mr. Harding, the Government's

24  need to be careful in what it proffers and discloses before the

25  time required by the rules.  But if the Government wants to make

1    an ex parte submission on Mr. Montgomery, I'll be glad to receive

2    it.

3              MR. HARDING:    I will submit something --

4              THE COURT:    But what is not going to be sufficient is a

5    carefully circumscribed proffer in open court that the Government

6    is not able to make the full disclosure.  Now having said all of

7    that before I hear from you, the Government's position all along

8    has been that I should wait until trial and I actually agree with

9    the Government.  But if now the Government's taking the position

10   since I've, you know, shifted on the basis of incomplete

11   information, then I'm happy to consider it before trial.  But

12   really you need to make a comprehensive ex parte submission which

13   I will then have to assess and decide in fairness to the

14   defendants what if any part of any such submission needs to be

15   disclosed so that the defendants have a fair opportunity to

16   respond.

17             MR. HARDING:    Well, very little of it has to be

18   submitted ex parte, Your Honor.  Actually 99% of it is, could be

19   made available to defense counsel.  The problem with not

20   proffering though is that I would then either have to put

21   Montgomery on the stand or get an affidavit as Mr. Crowe

22   suggested from Mr. Montgomery.  I'd create Jencks material --

23             THE COURT:    Right.  You don't want to do that.

24             MR. HARDING:    No.  I don't want to do that and that's

25   why I either prefer waiting until trial when these issues are

1  normally decided or else would prefer to proffer the information.

2  Now I'd be happy to proffer the information with reference

3  insofar as I can to these documents that defense counsel have

4  attached to their pleadings, but I urge the Court to bear in mind

5  that none of these pleadings were done with the idea of laying a

6  foundation for the admission of co-conspirator statements.

7           THE COURT:    Of course.  That's why I've said over and

8  over again that I've only looked at what I've looked at.

9  Exactly.  I mean I've been very clear that I know that the

10  Government has other evidence.

11           MR. HARDING:    Now I do have a great deal of relevant

12  information that I have gotten from my discussions with

13  Mr. Montgomery and others that I'm happy to proffer to the Court

14  and I would like to do that and I will share that information

15  with defense counsel because it would not be Jencks material.

16           THE COURT:    Then I'd suggest you do it in writing.

17           MR. HARDING:    Okay.  I'd be happy to do that, Your

18  Honor, and I consider it very reliable because Mr. Montgomery is

19  going to be testifying in this courtroom.  And so I'm not going

20  to be representing things that Mr. Montgomery is not going to

21  support when he testifies.

22           THE COURT:    That's perfectly acceptable.

23           MR. HARDING:    Okay.  Thank you, Your Honor.

24           THE COURT:    As I just said, for some reason, I somehow

25  had Mr. Gardner and Mr. Montgomery incarcerated together at the

1  time of the statement and I don't fault you for that really.   It

2  was some --

3         MR. HARDING:    Actually, it was Mr. Crowe that said that

4  back on April 26th and I corrected him.

5         THE COURT:    Okay.  You see.  So I got half of it.

6         MR. HARDING:    Yes.

7         THE COURT:    And that's one of the reasons among others

8  that it's really useful in matters of this importance to do

9  written proffers so that I don't confuse defense arguments with

10 Government proffers.  I appreciate that.

11        MR. HARDING:    Thank you.

12        THE COURT:    While we're on that subject, Mr. Harding,

13 and while you have the podium, obviously Mr. Sullivan is not here

14 and the record is still open on Mr. Mitchell's statement.  But

15 now the Bruton issue really, really is staring me in the face.

16 And I don't want to catch you unawares by this observation.  But

17 I have a level of discomfort if the Court were to admit that

18 statement and I know this is critical.  Indeed I take from your

19 letter sort of reading between the lines which is dangerous to

20 say the least.  But that statement is very, very important to the

21 Government.

22        MR. HARDING:    It is, Your Honor.

23        THE COURT:    It's absolutely critical to the Government.

24 And I take from your letter that if and I'm not saying what I'm

25 going to do and I appreciate the Government's need for a ruling

1    earlier rather than later.  But if per chance, the Court should

2    grant the motion to suppress that statement or some part of it, I

3    am inferring that the Government would not want to go forward

4    with the trial in this case and would seek appellate review.  It

5    concerns me that that statement relating, if it's admissible, it

6    essentially establishes Mr. Mitchell's connection to the murders

7    of the Weisch brothers and that's a count of the indictment in

8    which all four defendants are charged.  And while it's

9    exculpatory, the Government would say falsely exculpatory, I am

10   really concerned about a joint trial in a capital case where one

11   defendant has made a statement that's going to be admissible that

12   shall we say although the Government claims it's falsely

13   exculpatory intricately ties that defendant to the events of the

14   evening leading to a double homicide in which all four defendants

15   are charged.

16              MR. HARDING:   Well --

17              THE COURT:    That's just an observation.  I'd love to

18   have your response.

19              MR. COBURN:    Your Honor, pardon me and please forgive

20   the interruption.  I really do apologize.  But we haven't had a

21   morning break and my client I think has an urgent need to --

22              THE COURT:    Okay.  I suspect we all do.  Perhaps Mr.

23   Harding, this will be a good time to break and that will give you

24   a chance to reflect on what I just said.

25              MR. HARDING:   Yes, Your Honor.  But -- yes, I will --

1          THE COURT:    If you've got 12 words you really need to

2    get out, I want to give you a chance to do that or 22.

3          MR. HARDING:    Your Honor, the Government's case has

4    been so undermined and prejudiced by the three years of delay in

5    bringing this case to trial, that it would be only under the most

6    extreme circumstances that the Government would do anything that

7    would further delay the proceedings in this case.

8          THE COURT:    Okay.  I appreciate that.  All right.  So

9    counsel, I think all we've got left for this afternoon is the

10   Harris issues.  Am I missing anything?  And the jury

11   questionnaire and the state court conviction.

12         MR. COBURN:    I had a question about the mental health

13   issue, Your Honor.

14         THE COURT:    The mental health issue and maybe we want

15   to spend just a minute trying to wrap up the identification now

16   that I've seen the t-shirt.  Maybe we can finish that this

17   afternoon as well.  Mr. Kurland, was there something I left off

18   that list?

19         MR. KURLAND:    Well, no.  I want to have a moment after

20   the break to make a comment with respect to the co-conspirator

21   statement issue.

22         THE COURT:    Sure.  Okay.  And let me just say as well,

23   Mr. Harding, on Montgomery, obviously, we all recognize that

24   Mr. Montgomery's, whether Mr. Montgomery is a member of the

25   conspiracy is largely irrelevant, not totally irrelevant, but

1    largely irrelevant.  You're right about that.  Here's the

2    relevance.  And we've all seen it in cases.  There are certain

3    statements that are more likely than not in furtherance of a

4    conspiracy depending on the hearer.  So that statements can be

5    made to a nonmember of the conspiracy where the same statement

6    can be made to a member of the conspiracy.  The one not in

7    furtherance of the conspiracy.  The second, the latter in

8    furtherance of the conspiracy.  So it's really very closely

9    wound.  And so while they are separate issues, I'm not prepared

10   to say that Mr. Montgomery's status as a member of the conspiracy

11   is irrelevant.  I think it may be important.  So that's where we

12   are.

13              We will break for luncheon recess.  We'll resume at

14   2:00.  Right now it appears that we can complete all of our

15   business in this round this afternoon and that we will not need

16   to have a session tomorrow.  That's what I'm hoping.  The

17   defendants will have an opportunity, Mr. Gardner, Mr. Harris,

18   Mr. Martin and Mr. Mitchell to make brief statements at the end

19   of the afternoon session, I assure you.  We're in recess until

20   2:00.

21              (Luncheon Recess.)

22                   AFTERNOON SESSION

23              THE COURT:   Please be seated.  Good afternoon.  Mr.

24   Martin?

25              MR. MARTIN:   Good afternoon, Your Honor.  It seems like

1    a couple of lifetimes ago when we had this hearing on this

2    matter.  It took me a little while to try to figure out what was

3    going on here.  As I said this morning, Your Honor, we've

4    challenged both the warrant itself and I understand the problems

5    with doing that.  And we've also challenged what happened after

6    they got there.  Those are the two components and we had the

7    hearing on the second component.  As for the warrant, Your Honor,

8    I mean it's a pretty simple argument.  I didn't think there's any

9    connection between the home invasion.  I don't know whether Your

10   Honor had a chance to look at the affidavit.  I gave it to Ron.

11              THE COURT:    May I have it, please, Ron?  Thanks.

12              MR. MARTIN:    Let me try to sketch it out for you.

13   There was a home invasion that took place --

14              THE COURT:    Down the street.  Correct?

15              MR. MARTIN:    Well, it was like two blocks down the

16   street and two males came in the house and they were looking for

17   drug money and drugs and they apparently left at least as best

18   you can tell from the affidavit without getting anything.  Each

19   of them had a silver revolver and at least one of them had on a

20   black cap with an orange emblem.  That sounds a like lot an

21   Oriole hat to me.  That's not how they describe it.  And they

22   left and when they left, some people observed, at least one of

23   the males run by a backyard across the street on Lexington Street

24   I think it was and throw something in the yard.  The police knew

25   that individual or believed that individual to be a guy named

1    Michael Taylor who I think was involved in some of these other

2    cases around here, perhaps the Lexington Terrace Boys case and he

3    was being watched by the police.  It's clear from the affidavit

4    that they had, as early as the Friday before this home invasion

5    checked and learned that Michael Taylor didn't have a driver's

6    license.  So his car was seen in the area the day of this home

7    invasion and the police saw him walking quickly away from this

8    yard on Lexington Street getting in his car.  And they stopped

9    his car thinking he didn't have a driver's license, but it turned

10   out that he did.  So they gave him a citizen contact form and

11   sent him on his way.  Then they went back to this yard that

12   somebody had seen him walking quickly away from and they didn't

13   find anything in the yard.  Now if I have this right, it wasn't

14   and they went back and they interviewed the victims of the home

15   invasion and learned that nothing had been taken and two guys,

16   two black males had come in there brandishing silver handguns.

17   And they also knew that or believed that the person with Michael

18   Taylor was a fellow named Aaron Holley who they had apparently

19   also had been investigating and knew about.

20           Now they then find out sometime a week later somebody

21   who lived or resided at that place where the yard was where they

22   saw somebody walking by, called him and said I have this gun, I

23   want to turn it in.  Somebody who he believed to be, he didn't

24   know him by name, but the police deduced that it was Michael

25   Taylor, had thrown it in the yard and eyeballed him and told him

1   to hold it for him, he would come back and get it.  At some point

2   during the week, some people came by trying to get the gun and he

3   turned it into the police.  So now he had this gun.  Then they

4   went back and searched the yard eight days later and they found

5   an orange emblemed black cap.  So now they got one gun and one of

6   the caps worn by allegedly worn by the people in the home

7   invasion.  From that, they make the deduction, they say, the next

8   thing in the affidavit is Michael Taylor has a girlfriend and she

9   lives at 250 West Amity Street, which is about two blocks away

10  from where the home invasion took place.  And therefore, the

11  connection is we believe that fruits of the crime would be found

12  at 250 West Amity Street.  So they take, that's what they take to

13  the magistrate who signs the affidavit, gives them a search

14  warrant.  They go to the house and that's when the events that

15  you heard testimony about take place at the house.  They go in

16  and Mr. Harris' sister and his mother are there and the sister

17  says, makes a statement that something to the effect of if there

18  are any drugs, they're in Shelton's room upstairs and the police

19  had already gone through the room and searched the whole house

20  before they asked any questions and didn't find anything in the

21  room and they hadn't tossed it, but they had gone in and

22  eyeballed everything.  So on their view of the room they didn't

23  see anything.  Then they came back and when the sister told them

24  that, they went back upstairs to the front bedroom and they

25  looked in the mattresses and elsewhere and they found drug

1   paraphernalia, some drugs and some other things and that's when

2   Mr. Harris happened to call home.  And when he called home, the

3   police officer told him as he testified here in court, you know,

4   do you want to man up and take the hit or am I going to have to

5   arrest your mother.  That's a paraphrase.  But that's pretty much

6   what I remember him saying.  Shelton then came back to the house

7   and ended up taking the wrap for that.  But they arrested the

8   mother anyway, but then they took her to the police station and

9   then they unarrested her, if you can do that.  I'm not sure how

10  they do that.

11          The Government to start with the second issue first,

12  the Government says that -- but what we say is you can't threaten

13  him to get him to take the wrap for those drug crimes because

14  there was no probable cause to arrest the mother to start with.

15  So the threat is not, it's not, it's a coercion because there is

16  no valid reason to arrest the mother and based on those facts,

17  Your Honor, I don't think there were.  The police had no reason

18  to believe that the mother knew about any drug dealing and just

19  because they found some drugs in the house which the sister said

20  belonged to -- if anybody had any, it would be her brothers and

21  they would be upstairs.  I don't think that gives anybody

22  probable cause to threaten the mother.  But they did that and

23  that's how they got Mr. Harris to man up and say that the drugs

24  were his and the paraphernalia was his.  And we think that that

25  was a coercion that is unlawful and shouldn't be permitted.  But

1    more than that, Your Honor, they shouldn't have even been there

2    and I know there's the Leon exception.  But how could anybody in

3    good faith -- nobody bothered to tell the magistrate how they

4    know that this woman is Michael Taylor's girlfriend.  Even if

5    that were enough because it's still two blocks away from where

6    they were seen.  And if the other evidence in the affidavit is to

7    be believed, the gun and the hat that belonged to Mr. Taylor had

8    already been recovered.  So what were they expecting to find at

9    the alleged girlfriend's residence when Mr. Taylor's gun had been

10   thrown in the yard.  Mr. Taylor's hat if you read the affidavit,

11   they believed that the hat was Michael Taylor's and the only

12   other participant was a man named I think it's Foster or Holley.

13   I can't remember.  He lived in the neighborhood.  He lived a

14   block away.  So where would be the logical place where he would

15   take his gun or his hat.  He would take it to his house, not to

16   Michael Taylor's alleged girlfriend's house.  And the second part

17   of the argument, Your Honor, is that they don't bother to tell

18   the magistrate how they know that this woman is Michael Taylor's

19   girlfriend.  They don't even, they don't bother to give the Court

20   any evidence whatsoever about that.  Your Honor, if that passes

21   muster under Leon, then everything passes muster under Leon and I

22   don't believe that Leon should be used that way and I don't think

23   that you believe that either, Your Honor.  This is not the kind

24   of warrant that should have ever been signed and it shows me at

25   least that whoever signed it, probably didn't even read it or pay

1   any attention to it.  It was hastily put together.  It doesn't

2   logically follow that they'll find anything at the house and

3   there is no evidence in the affidavit whatsoever about why it is

4   that this officer knows that this woman, Shamia Delvison,

5   whatever her name is, is the girlfriend of this person who is

6   alleged to have been involved in a home invasion which took place

7   two blocks away.  So I don't think the warrant should have ever

8   been issued and I think that everything should be quashed on that

9   basis.  But moreover, Your Honor, the threat to arrest

10  Mr. Harris' mother was a threat not based on any probable cause

11  whatsoever that the officer had at the time and therefore, I

12  think that any statements made by Mr. Harris and any confession

13  made and any evidence found at the house, they should all be

14  suppressed based on that, Your Honor.  Thank you.

15          THE COURT:   All right.  Give me one moment to refresh

16  my review of the affidavit.

17          MR. HARDING:   Sure.

18          (Pause.)

19          THE COURT:   Okay.  Thank you, Mr. Harding.  Let me make

20  your job somewhat more straightforward having now reviewed again

21  the affidavit.  It's clear that the issuing judge was entitled to

22  infer actual knowledge on the part of the affiant from his

23  familiarity with the area, his or her familiarity with Mr.

24  Taylor, having done a motor vehicle check on Mr. Taylor and

25  specifically having seen Mr. Taylor's vehicle in the area of the

1   residence and having specific information as to the name and date

2   of birth of the pregnant girlfriend, alleged girlfriend.  It's

3   pretty clear that the judge could have inferred and clearly did

4   infer that the affiant had reliable information as to Mr.

5   Taylor's connection to this residence through the alleged

6   girlfriend.

7           MR. HARDING:    Okay.  Let me just try to fill in a few

8   gaps then and correct a few things that Mr. Martin said.  211

9   Amity Street where the home invasion robbery occurred is not two

10  blocks from 205 Amity Street.  It is just several doors down in

11  the same block.  I've actually been to the location and there are

12  a series of rowhouses.  So it's very near to the location that

13  was searched.  The other guy who was known to Gregory House and

14  was observed by House to be in the black Acura that was

15  registered to Mr. Taylor was not Aaron Holley, but Aaron Foster.

16  Aaron Holley is the guy who committed the Tanya Jones-Spence

17  murder with Mr. Gardner and Mr. Montgomery.

18          THE COURT:   Yeah.  I'm sure Mr. Martin misspoke.

19          MR. HARDING:    The gun was recovered not ten days later

20  or twelve days later, but two days later.  On June 14th, the guy

21  who occupies the location at 940 West Lexington Street told the

22  police he had this gun and he told the police exactly how it got

23  there and he told them exactly who threw it there, too.  This is

24  on page 499, the last paragraph after he tells about how this guy

25  ran past his house two days earlier.  In other words, what

1    happens here, Your Honor, is that this Officer Tolson sees these

2    two guys running from the scene of the home invasion robbery,

3    gives a description of them.  The clothing description is closely

4    parallel to the description given by the victims of the home

5    invasion robbery down to the fact that there were, one was

6    wearing gray sweatpants with blue stripes and one was wearing

7    blue jeans.  They were both wearing white t-shirts.  They were

8    both wearing baseball caps.  So these are very similar

9    descriptions.  The guys that Tolson saw running from the location

10   and run down toward Lexington Street are clearly the same guys

11   that the victim say had just robbed them.  And the officer,

12   Officer Tolson saw them grabbing their sides as if they were

13   trying to hold guns close to their bodies.

14            What happens on June 14th is that this witness who

15   resides at 940 West Lexington Street said that two days earlier

16   on June 12th, at around the time of the home invasion, he was

17   hanging clothes in the rear of 940 West Lexington Street.  He

18   advised that a black male ran past the rear yard and threw the

19   aforementioned weapon into the yard.  The witness advised that he

20   made eye contact with the suspect who he subsequently positively

21   identified as Michael Taylor.  It wasn't the police that made the

22   connection to Taylor.  It was this third party eyewitness to the

23   abandonment of the gun.  The witness advised that Taylor

24   instructed him to hold the weapon for him and then they

25   interviewed another witness who's discussed on the next page who

95

1    tells about how the guys in this Acura, one of whom he knew to be

2    Aaron Foster came by demanding the gun back.  They wanted their

3    gun returned.  So there's a very tight connection between the

4    gun, the home invasion robbery and this location at 940 West

5    Lexington, which we learned toward the end of the affidavit is

6    immediately -- let's see how they describe it here.  This

7    particular residence -- this is the third to the last paragraph

8    on page 500.  This particular residence, 205 North Amity Street

9    is in close proximity to 111 North Amity Street.  It is also

10   directly across from the rear of the 900 block of West Lexington

11   Street.  Therefore, making it highly possible that items of

12   evidentiary value relating to these crimes were being stored

13   inside this location.  940 West Lexington, Lexington and Amity

14   Street are cross streets and so these guys ran down Lexington

15   Street and that's when they threw the gun into the backyard.

16   They got away from the police and the officer is inferring that

17   they eventually made their way back to Ms. Delvison's residence

18   and there may be evidence there in the form of these clothing

19   items.  This is a search warrant essentially for the clothing

20   items that the victims described as well as for indicia of

21   occupancy at the house, 205 North Amity Street.  And then on June

22   15, not 15 days after the home invasion robbery, but three days

23   after the home invasion robbery, they discover this hat with the

24   orange emblem on it near the location at 940 Amity Street and

25   they take it back to the victim and she positively identifies

1   that hat as the hat worn by the taller of the two home invasion

2   robbers.  So it's clear that these guys who ran from the police

3   that night on June 12th were throwing things away as they ran

4   along or at least they threw a hat, a gun and also one glove

5   which was also recovered near 940 Lexington Street.  And it was

6   entirely possible that additional items of clothing would be

7   recovered at the home of Ms. Delvison who was Mr. Taylor's

8   girlfriend.  That is the logical nexus that the police asked the

9   magistrate to make and he was acting reasonably and responsibly

10  in making that inference in the first place, Your Honor.  Even if

11  he wasn't, this is the farthest thing from a bare bones

12  affidavit.  It is actually quite a detailed and somewhat

13  complicated affidavit so much so that Mr. Martin got many of the

14  details mixed up.  It's a good affidavit and it should be

15  protected by Leon even if the probable cause is not the strongest

16  possible probable cause.  So the Government submits that the

17  search warrant is good.

18            If I may move on to the other issues raised by --

19            THE COURT:   Yes.  The threat.

20            MR. HARDING:    Your Honor, there are two aspects to the

21  threat.  One is whether there was probable cause to arrest the

22  mother at the time of the search and the other is the law in this

23  circuit and others pertaining to truthful statements made by the

24  police.  I cited and discussed Pringle v. Maryland at some length

25  in my most recent submission on this issue.  Pringle v. Maryland

1    dealt with three guys who were in a car that was stopped by the

2    police and Pringle himself is in the front passenger seat.  Drugs

3    were recovered --

4                  THE COURT:    Your former boss was vindicated.  Judge

5    Battaglia wrote the --

6                  MR. HARDING:    Oh, she did.

7                  THE COURT:    -- the dissenting opinion in Pringle.

8                  MR. HARDING:    Oh, well, good for her.  I didn't realize

9    that.  I didn't read the state opinion.  I only read the Supreme

10   Court opinion.

11                 THE COURT:    Only judges who have the time to do that

12   kind of thing can be expected to do that.

13                 MR. HARDING:    Well, the drugs were stuffed between the

14   rear armrest and the back seat in the back out of plain view.

15   Pringle who's in the front seat is not the registered owner of

16   the car.  There's somebody else in the back seat and then there's

17   a driver.  The Supreme Court concluded based on those facts that

18   there was probable cause to arrest all three of them simply

19   because they had control and dominion over the area where the

20   drugs were found.  The Court emphasized the difference between

21   probable cause and what it calls the finely tuned standards of

22   proof appropriate to the courtroom.  And they emphasize in

23   Pringle as in Illinois v. Gates that such standards of proof such

24   as preponderance of the evidence and beyond a reasonable doubt

25   have no place in the probable cause determination.  Probable

1  cause determination refers simply to a reasonable suspicion.

2  This is the kind of case, Pringle is the kind of case that we

3  would routinely decline eventually in my office.  And I have

4  declined many such cases because we cannot ultimately prove that

5  any particular occupant of the car absent a statement or

6  something like that had knowledge that the drugs were where they

7  were found.  Nevertheless, as the Supreme Court makes clear,

8  there was probable cause to arrest because that is a very

9  different determination and a much lower determination than the

10  one we make when we decide we want to take a case to trial.  So

11  the Government's position is that the Harris situation is

12  actually in 205 North Amity is actually an easier case than

13  Pringle because Harris' mother was the sole tenant of that

14  residence.  Her name was listed on the lease.  The lease is

15  mentioned in the affidavit and she is named as the sole tenant in

16  the lease and she resided at the location.  In Pringle, the

17  police had no idea how long Pringle had been in the front seat of

18  that car.  He could have been in for five minutes.  It could have

19  been his car.  He could have owned it.  But they had no idea, no

20  way of knowing one way or the other.  But Harris' mother is the

21  sole tenant of this house and she resided there.

22            Now on the coercion issue, Your Honor, the Fourth

23  Circuit case that I have cited, besides Braxton, there's this

24  Pelton case which stands for the proposition that "a law

25  enforcement officer may properly tell the truth to the accused no

1    matter how threatened an accused may feel by it.  The Wertz case

2    from the Fourth Circuit makes clear that in police interrogation

3    situations, there is always some coercion.  The voluntariness

4    test in police interrogation situations is very different from

5    the Rule 11 context, for example.  And it's very different also

6    from standards of preponderance of the evidence or beyond a

7    reasonable doubt as the Supreme Court made clear.  There is

8    always some coercion in a police interrogation situation.  But a

9    police officer telling the truth to people can never be guilty of

10   coercion of those people.

11            Now what I could not find was a case from the Fourth

12   Circuit that dealt with a threat directed not at the person being

13   questioned, but at a third party.  There are many cases from

14   other circuits and I discussed many of these in my pleadings.

15   The Johnson and Haines cases from the Sixth Circuit, the Thompson

16   case from the Eleventh Circuit and the Stewart case, a District

17   Court decision from the Eastern District of Louisiana are the

18   most similar, very similar to the one in the Harris case.  All of

19   them hold that a threat -- as long as it is a truthful threat, as

20   long as it is a threat that's supported by probable cause against

21   a third party is not coercion.  And the Pelton rule which is also

22   enunciated in the Braxton decision, which I discussed in my

23   pleading should -- those cases mean that the Fourth Circuit would

24   adopt the same rule that Johnson, Haines, Thompson and Stewart

25   adopt because if it's not coercion to threaten a third party

1  truthfully, it's surely not coercion -- if that is -- it's even

2  more obvious that the police can -- let's put it this way.  The

3  Pelton case which says that it is not coercion to truthfully

4  threaten a party himself, that is a clearer situation than the

5  situations in Johnson, Haines, Thompson and Stewart.  It is more

6  obvious that somebody would be threatened by a threat to himself

7  than it would to a third party normally.  So the Fourth Circuit

8  is almost certainly going to follow the same reasoning that

9  Johnson, Haines, Thompson and Stewart follow and there are other

10  circuits that have ruled similarly.  And I discuss a Fifth

11  Circuit decision in some cases from other circuits.  And they're

12  all uniform.  There's no dissenting opinion from any circuit.

13  Mr. Treem and Mr. Martin discuss an older Sixth Circuit case, the

14  Finch case which is completely distinguishable because there the

15  police in searching the house had not recovered any drugs at all.

16  They had probable cause to arrest no one and the decision that

17  the Court reached to find that the statement was involuntary was

18  based on a multitude of factors that aren't present in those

19  other cases or in the Harris case.  Namely, the police had broken

20  down the front door.  They broke down the bedroom door and they

21  held Mr. Finch at gun point when they were questioning him in his

22  bedroom after just breaking into it.  They had not yet discovered

23  any evidence.  That's the key point.  They had not yet achieved

24  probable cause to arrest anyone.  So when they threatened him and

25  the other members of his family with arrest, that was unsupported

1   by probable cause and therefore, went beyond the line drawn in

2   the cases.

3                In the Harris case, there's nothing like that.  Quite

4   the contrary.  Mr. Harris is on a telephone at another location

5   when he is initially questioned by the police officer.  He's not

6   even at 205 North Amity Street.  He's not being detained.  He

7   couldn't possibly be threatened by guns or be intimidated.  He's

8   on the telephone.  He had called home and the cop got on the

9   telephone with him and told him that he should come back because

10  his mother might be arrested if he doesn't take responsibility

11  for the drugs and he agrees to do that and agrees that the drugs

12  are his.  He makes incriminating statements both in the phone

13  conversation and after he gets back to the location, 205 North

14  Amity Street.  There are two separate statements, one made when

15  he was at the location, one made on the telephone.  It's true,

16  Your Honor, that the mother was eventually released when she came

17  downtown and that's not surprising.  The State's Attorney --

18  first of all, by that time --

19                THE COURT:   She was not present, was she?

20                MR. HARDING:   She was present.

21                THE COURT:   She was present at the time of the search.

22                MR. HARDING:   Yes, she was.

23                THE COURT:   Okay.  But when you say she came downtown,

24  you mean she was --

25                MR. HARDING:   She was --

1          THE COURT:    She was arrested and --

2          MR. HARDING:    She was arrested and taken downtown and

3     the State's Attorney released her.  By that time, of course

4     Mr. Harris had taken responsibility for the drugs for one thing.

5     For another thing, that State's Attorney had to make a

6     calculation, something like the one I just made in the Pringle

7     situation which is that if you don't have evidence that the

8     person knows it, knows that the drugs are there, you may have

9     probable cause to arrest as the Supreme Court says you surely do,

10    but you don't want to prosecute the case.

11         THE COURT:    Mr. Harding, would you remind me, please,

12    apart from the two statements, accepting responsibility for the

13    narcotics, what evidence was seized that the Government intends

14    to use in this case?

15         MR. HARDING:    It's all drugs as I recall, Your Honor.

16         THE COURT:    The narcotics and the paraphernalia I

17    guess.

18         MR. HARDING:    Yes.  And all would have been seized

19    under the plain view exception because none of those items are

20    named in the search warrant.  This is not a search warrant for

21    drugs.  This is a search warrant for the clothing items being

22    worn by those home invasion robbers that night.

23         THE COURT:    Can you refresh my recollection as to the

24    testimony because Mr. Martin said they, essentially not his

25    words, but essentially completed the search for the items listed

1    in the warrant and then somebody in the house said if you want

2    drugs, they're going to be in Shelton's bedroom.

3              MR. HARDING:   I don't -- I attached the transcript of

4    Barnes' testimony.  I do recall that Ms. Delvison said something

5    about if there are any drugs here, they'd be upstairs in

6    so-and-so's bedroom.  Ms. Delvison is the girlfriend of Michael

7    Taylor.  She was there and she was residing there and she was

8    Shelton Harris' sister.  And she's the one I believe who made

9    that statement to Officer Barnes.  But he testifies about it and

10   it's in the transcript that I attached to one of my pleadings.

11             THE COURT:   Okay.  There's been no real issue made

12   about that aspect of it.  I mean Mr. Martin may have something

13   more to say about it.  But I don't recall any argument regarding

14   the propriety of the execution of the warrant as such.

15             MR. HARDING:   I don't either, Your Honor.

16             THE COURT:   Okay.

17             MR. HARDING:   So the Government's position is, Your

18   Honor, that there was probable cause to arrest the mother.  Even

19   though there wasn't and I freely admit this, no prosecutor would

20   have actually indicted her on the basis or no prudent prosecutor

21   would have actually indicted her under the circumstances of

22   having someone else take responsibility for the drugs and not

23   having any statement from her or other evidence that she knew the

24   drugs were upstairs in the drawers.  They were in dresser drawers

25   and under the mattress of the bed in Shelton Harris' room.  So

1    yes, she would not have been prosecuted, but that doesn't mean

2    there wasn't probable cause to arrest her.  Under Pringle, there

3    clearly was and the Government's position is that it's not

4    coercion for a police officer like Barnes to tell Shelton Harris

5    that she could be arrested if he doesn't take responsibility for

6    the drugs.  A truthful statement is never coercive under the

7    Fourth Circuit law.  Thank you.

8              THE COURT:    Thank you, Mr. Harding.  Mr. Martin?

9              MR. MARTIN:    Your Honor, I wasn't clear.  I was

10   receiving instructions from my client when you asked that last

11   question.  So I wasn't clear what you were asking.  It had

12   something to do with the statement made by his sister.

13             THE COURT:    Yes.  Your argument was that as I

14   understood it was that the search I guess was either underway or

15   had been completed or was nearing completion, nothing had been

16   seized and Mr. Harris' sister made a statement, if there are any

17   drugs here, they're in Shelton's bedroom.

18             MR. MARTIN:    What I understand to have happened was

19   they came in, they conducted the search, they walked around,

20   looked for the gun, the hat, whatever it was.  They gathered the

21   people in the house who I guess was Mr. Harris' mother and his

22   sister in the living room and then asked them if there were any

23   drugs in the house and that's when she said if there are any,

24   they'd be in my brother's bedroom upstairs.  It was after that

25   that Mr. Harris called.  And they then said, you know, are you

1    going to man up and take these charges or are we going to have to

2    arrest your mother.  That's essentially what they testified to.

3    I'm not sure, I think it was Officer Barnes.  That's what he said

4    that had happened.  And it's my contention, Your Honor, that at

5    that point when they made that statement, the probable cause that

6    they have is that Shelton Harris had drugs in the house upstairs.

7    I don't think they have probable cause to believe -- I don't care

8    what Pringle says.  Pringle is a car.  There is still a

9    difference between a car and a house as far as I'm concerned.

10   There's a difference between a car where everybody is sitting in

11   the same small confined space and a house where even if she is

12   the tenant, she's got a son who lives in a bedroom and has his

13   own privacy within that bedroom.  I don't think that there's

14   probable cause to believe that she knows everything that goes on

15   in that bedroom and that you can arrest her for anything that's

16   going on in that bedroom unless we have some evidence that

17   indicates that she knows.  Here it's just the opposite.  The

18   evidence they had was that she didn't know.  That the evidence

19   they had was he was involved in dealing drugs, not the mother.

20   And so when they made that threat, they knew all of that.  And so

21   all I'm saying is I don't believe that it was made in good faith

22   and so while it may be true that a police officer can say, can

23   speak the truth to anybody he wants to even if it turns out to be

24   coercive, in this instance, I don't believe it was the truth.

25   And the fact that Mr. Harding seems to say well, the proof is in

1    the putting.  They actually did arrest the mother.  But then they

2    unarrested her and let her go.  You know, I don't know why they

3    did what they did other than maybe they were worried that the

4    statement that they made might be, some day come back to haunt

5    them.  I don't know.  All I know is that at the time the officer

6    made it I believe that there was no probable cause to arrest the

7    mother for that crime.  There was probable cause to arrest

8    Mr. Harris for that crime based upon what they had been told by

9    the sister.  So to that extent, Your Honor, I think that the,

10   that the evidence that was seized should be suppressed and the

11   Government should not be allowed to use it.

12            THE COURT:    Thank you very much, Mr. Martin.

13            MR. MARTIN:    Thank you, Your Honor.

14            THE COURT:    The defendant has clarified that this is

15   both as I said this morning a Fourth Amendment challenge as well

16   as a Fifth Amendment voluntariness challenge to all of the

17   evidence and in particular the statements of Mr. Harris both on

18   the phone and when he arrived back at the apartment and the Court

19   finds first that the warrant was validly issued.  It was indeed a

20   warrant to search for clothing, although it also mentions

21   computers and cellular telephones.  But the Court is not here

22   concerned with any overbreadth or general search issues.  The

23   Court agrees that there is probable cause to believe that one or

24   more items of clothing worn by one or both of the home invaders a

25   few days earlier might be found at this property on the basis of

1   the facts and circumstances drawing the inferences in favor of

2   the Government as set out in the affidavit at this property and

3   as I suggested in my colloquy with Mr. Harding at the beginning,

4   to the extent that Mr. Harris focuses on the lack of any nexus or

5   reliable showing within the four corners of the affidavit between

6   Mr. Taylor, the suspect in the home invasion attempted robbery

7   and his girlfriend who's identified and allegedly resided at 205

8   North Amity Street, Apartment Number 9, the Court is satisfied

9   that the district court judge who issued this warrant and I

10  believe it was a district court judge, but I'm not entirely

11  certain would have been perfectly justified in reading the

12  affidavit to suggest as I suggested that the affiant, Officer

13  Stewart, excuse me, Officer House, Sergeant House of the Housing

14  Authority Police had a reliable basis for drawing the conclusion

15  as he did that 205 North Amity, Apartment Number 9 was indeed the

16  residence of a woman named Shamia Delvison, S-H-A-M-I-A,

17  D-E-L-V-I--S-O-N, who was the girlfriend of Mr. Taylor, the

18  suspect in the home invasion robbery.  So while there's clearly

19  probable cause for issuance of the warrant, more fundamentally

20  perhaps in current jurisprudence, the Court has no difficulty in

21  concluding that the judge who issued this warrant had a

22  substantial basis for concluding that there was probable cause.

23  That this is not a barebones warrant nor do any of the other

24  exceptions to the Leon good faith exception apply.  The Court

25  finds and concludes that unquestionably, the officers acted in

1    good faith in executing the warrant and searching for the items

2    listed in the warrant.  So that the search itself is beyond

3    constitutional infirmity.

4              There was a question that I had about exactly how the

5    warrant was executed because one interpretation of the record is

6    that the search for the clothing and the guns had essentially

7    concluded and that new probable cause allegedly ripened into

8    being based on the statements by Ms. Delvison.  Mr. Harris

9    doesn't press that point.  The Court is prepared to find and does

10   find that in fact the search for the items listed in the warrant

11   had not been concluded, that this was an evolving continuing

12   dynamic, that there was interaction between the searching

13   officers and the two women on the premises and that this

14   statement about drugs being if anywhere in Mr. Harris' bedroom

15   was made at a time when the search was ongoing, clearly, the

16   search for weapons, baseball caps, gloves, gray sweatpants

17   reasonably could take the officers under the mattress of a bed

18   and into dresser drawers and so the search did not exceed the

19   scope of the search which would reasonably be contemplated by the

20   warrant as issued by the issuing judge.  If anything, the

21   statement attributed to Ms. Delvison could be and no doubt was

22   interpreted by the officers as suggestive of the presence of

23   contraband in the property, whether or not it actually gave

24   probable cause to believe there was drugs in the property.  But

25   the drugs were seized as the Government contends in plain view as

1   a result of a legitimate search of the premises for the items

2   listed in the warrant as issued by the state judge.

3          When we come to the question of the statements, the

4   Court is satisfied that the Government has carried its burden to

5   demonstrate that there was no involuntary indicia sufficient to

6   vitiate the constitutionally-permissible obtaining of the

7   statements.  I don't agree with the Government's argument that

8   any truthful statement is per se a permissible threat.  I have in

9   mind cases where truthfully officers have threatened to "remove"

10  children or deprive parents of custody of their children under

11  circumstances where criminal activity might truthfully, such a

12  statement could truthfully be made in the terms of involvement of

13  the Department of Social Services and at least a temporary

14  termination of parental custody and there are cases out there

15  where such statements as that though literally true have

16  contributed to a conclusion that a statement was involuntary.

17  But I don't need to go that far to conclude as I do here that the

18  threat made by the officer to Mr. Harris that his mother was

19  likely to be arrested unless some other pathway to resolution of

20  the presence of the drugs was forthcoming was not the kind of

21  threat that would likely lead to an involuntary statement.  I

22  agree with the Government unhesitatingly that under the

23  circumstances, there was indeed probable cause to arrest Mrs.

24  Harris.  As the lessee of the property under well-settled

25  principles, she's in constructive possession of any contraband on

1   the property.  Without being fanciful, one can infer that the

2   co-habitants of a residence have knowledge of what's on the

3   premises and what activities co-habitants are engaged in.  We've

4   all seen cases, for example, where regrettably lessees and indeed

5   parents are paid rent by offspring through illegal activity and

6   so it would be no close call at all for a law enforcement officer

7   to infer at the level of probable cause that a lessee, long-time

8   lessee of a residence has guilty knowledge as to the presence and

9   therefore, constructive possession of contraband found on the

10  premises.  As Mr. Harding argued quite appropriately, the fact of

11  the matter is under the circumstances of this case, no reasonable

12  prosecutor would prosecute Mrs. Harris under these facts and

13  circumstances, but we're dealing here with the question of

14  probable cause and so I don't fault the arresting officers for

15  their decision notwithstanding Mr. Harris' admission on the

16  telephone as well as his apparently prompt appearance at the

17  residence to take responsibility for the narcotics and other

18  contraband to arrest Mrs. Harris as well leaving it to the

19  prosecuting authorities for Baltimore City quite appropriately to

20  decide whether this was a case that ought to go forward.

21          So for all these reasons, the Court agrees with the

22  Government that whether or not any truthful threat is per se

23  non-coercive, under the facts and circumstances of this case, it

24  was indeed a truthful threat.  There was indeed probable cause to

25  arrest Mrs. Harris and Mr. Harris has not suggested that his will

1   was overborne, that the threat to involve his mother in the

2   possession of these narcotics as a matter of a charge and an

3   arrest was the kind of truthful threat that would overbear the

4   will of an individual and make it likely that that individual

5   would provide an unreliable statement inculpating himself in

6   criminal activity.  There were no other threats, inducements or

7   coercive acts undertaken by the officers.  It was quite a

8   fortuity that Mr. Harris happened to call when the search was

9   ongoing and so he made the decision quite voluntarily in an

10  effort understandably to absolve his mother from any involvement

11  in the narcotics that were found apparently in his own bedroom.

12  So for all these reasons, Mr. Harris' motion to suppress evidence

13  arising from the I guess June 21, 2002 search of his residence or

14  that of his mom and the statements made in connection therewith

15  is denied.  Okay.  Mr. Harding, do you have anything to say about

16  the jury questionnaire submitted by Mr. Sullivan?

17            MR. HARDING:   Yes, Your Honor.  I went through it and I

18  marked the sections that I objected to.  I think that in general

19  it is way too redundant, way too detailed.  It would be

20  oppressive to expect venire persons to fill out such a enormously

21  complicated document.  It elicits information that is vastly more

22  detailed than would be of any use to any of us.  It needs to be

23  cut down drastically and that's the Government's general

24  position.  Some of the questions are exact duplicates of other

25  questions and the thing wasn't proofread very well and there are

1    a great many sections that overlap with one another.  So I

2    thought it was just a redundant document.  So that's the

3    Government's position in general.  If the Court would like the

4    Government to submit a pared down version of the same thing to

5    give the Court an idea of what the competing views are of what

6    the questionnaire should be, I'd be happy to do that.

7            THE COURT:   Certainly.  I would like a marked-up copy

8    from you noting your objections and suggestions.  But perhaps

9    even more importantly than that, Ms. Rhodes, I would like to get

10    a red-lined copy -- I suppose, Ms. Rhodes, I need to ask you and

11    I suspect you can't answer this question.  Did Mr. Sullivan use

12    the earlier version and expand upon it?  Is there a Word Perfect

13    or Word document somewhere in somebody's computer that actually

14    has the one we all agreed with on with respect to Mr. Gardner

15    that we actually sent out?

16            MS. RHODES:   I don't --

17            THE COURT:   Because what I'd like to see is the one I

18    earlier approved red-lined with the changes, if that's the right

19    word, that Mr. Sullivan has effected.

20            MS. RHODES:   I don't believe so, Your Honor.  I believe

21    this came from the trial in Philadelphia that he did last year.

22            MR. HARDING:   Judge, there's no similarity between the

23    Gardner document and this document.

24            THE COURT:   I've long thought we should be in the Third

25    Circuit, but we're not.

1          MS. RHODES:    Well, this is just one step towards that,

2     Your Honor.

3          THE COURT:    Well, Mr. Sullivan is not here and I

4     certainly -- he took the laboring oar for all of -- oh, I guess

5     he didn't take a laboring oar.  He just submitted --

6          MS. RHODES:    I reviewed it --

7          MR. COBURN:    He circulated it --

8          MS. RHODES:    -- and others have all reviewed it and

9     so --

10         THE COURT:    Well, that's not consistent with what I

11    requested and maybe I wasn't as clear as I should have been.

12    What I asked counsel to do is to look at the -- I'll refer to it

13    as the Gardner questionnaire which Mr. Coburn and Mr. Kurland and

14    Mr. Harding and then Ms. Manuelian I believe and the Court really

15    labored over rather carefully and we all reached agreement.  I

16    think there may have been one or two remaining problems from the

17    point of view of Mr. Coburn and Mr. Kurland, but it was, it was

18    something we all agreed on with minor exceptions and I really

19    like to stay with that and not reinvent the wheel and have to

20    read 75 pages more of redundant or not so redundant stuff.

21         MR. COBURN:    And, Your Honor, we actually agree with

22    that approach.

23         THE COURT:    I suspect that you would.  Now there will

24    have to be some additions, of course, to include the names of the

25    other defendants and so forth.  But we really need to get this

1  done like yesterday.

2          MS. RHODES:   Your Honor, we'll be happy to take the

3  Gardner version and provide --

4          THE COURT:   Well --

5          MS. RHODES:   -- insert it in a different font the

6  additions we would like to see.

7          THE COURT:   Okay.  Can you do that in a week?

8          MS. RHODES:   Yes.  Yes.

9          THE COURT:   Okay.  Would you do that, please, really

10  and get it into Mr. Harding's hands by end of business next

11  Thursday and of course, other counsel and I'd really like to have

12  it in my hands by no later than Monday, the 18th.  Okay.

13          MS. RHODES:   Your Honor, just for the record, I do and

14  the Court probably recalls that when this was going on previously

15  with Mr. Gardner's counsel, we were told that we would have a

16  chance later to get our input in.

17          THE COURT:   Sure.  And this is it.

18          MS. RHODES:   Right.  Okay.  But we didn't, we didn't,

19  we stayed far away from it at that time so --

20          THE COURT:   Sure.  I understand that.

21          MS. RHODES:   All right.  Thank you.

22          THE COURT:   Okay.  So we'll start with the Gardner

23  questionnaire and counsel will make whatever proposed changes and

24  to the extent that you and the Government can't reach agreement,

25  please by Monday the 18th submit electronically and in hard copy

1   whatever blue-lined or red-lined proposals you want to submit and

2   I'll just make a decision and we'll go forward.  But we got to

3   get it in the hands of the jury folks so that they can get it in

4   the mail so that we can get it to people well before the 4th of

5   July so that we get can it back, you know, before the July

6   sessions that we have scheduled.  So we can talk about it at that

7   time.  And we're really up against that deadline.  Okay.  What

8   else do we have to do this afternoon before I hear from the

9   defendants?

10              MR. COBURN:   I had a question, Your Honor --

11              THE COURT:   Approach the podium, please, Mr. Coburn.

12              MR. COBURN:   Certainly, Your Honor.  Your Honor, my

13   question relates to the scope of the Court's order with respect

14   to the disclosure of mental health evidence.

15              THE COURT:   There was a question about whether I had

16   signed that order.  Has that been clarified?

17              MR. HARDING:   Yeah.  I just never got a copy of the

18   order when Your Honor signed it.  So I called chambers and Toni

19   eventually informed me that you had signed it and she sent me a

20   copy of it.

21              THE COURT:   Okay.

22              MR. HARDING:   I don't know why I never got a copy.

23              THE COURT:   Great.  Thank you, Mr. Harding.

24              MR. COBURN:   And I can just get a copy of it from

25   Mr. Harding or from the Court.  I don't think we got it either.

1    THE COURT:   You didn't get it either.

2    MR. COBURN:   I could be wrong about that.  I didn't

3 think we got it.

4    THE COURT:   I signed it right here on the bench.  I

5 actually remember -- it was docketed.

6    MR. COBURN:   Yeah.  I remember Your Honor signing it.

7 What I was focused on was a line in the docket that came out on

8 May 10th and it says the docket text which I think probably

9 parallels at least part of the order that Your Honor signed says

10 order directing that within 30 days of the date of this order,

11 "the defendants shall notify the Government in writing if they

12 intend to insert an insanity defense or to introduce expert

13 evidence relating to a mental disease or defect or any other

14 mental condition of the defendant bearing on either the issue of

15 guilt or the issue of punishment and requires a notice shall be

16 filed with the clerk" and I'm just assuming that that's probably

17 part of the order that Your Honor signed.  I would bet it would

18 be maybe the first paragraph because that's probably the first

19 deadline.

20    THE COURT:   Ron, may I have the last court file,

21 please?  Do you know the docket number you're referring to,

22 Mr. Coburn?

23    MR. COBURN:   The docket number of the line entry is

24 319.

25    THE COURT:   319.  Thank you.  Okay.  I've got it,

1   Mr -- okay.  Right.  And I struck paragraph 16.  All right.

2   What's your question?

3                MR. COBURN:    So then, Your Honor, could I inquire of

4   the Court?  Is 319 also the docket number of the order that was

5   proposed?

6                THE COURT:    Yes.

7                MR. COBURN:    Okay.  So in other words, what must have

8   happened, the clerk must have entered the document as 319 and

9   then sort of put it some -- this must be descriptive information.

10               THE COURT:    Yeah.  It's the docket entry describing the

11  order.

12               MR. COBURN:    I understand.  So I take it then that this

13  initial deadline expires 30 days from May 10th, which is Monday.

14               THE COURT:    Correct.

15               MR. COBURN:    And I guess I was initially thinking that

16  I might beg Your Honor for a little bit more time if possible,

17  but there has been a lot of time that's passed.  My impediment is

18  I've got a trial staring in Norfolk in federal court on Monday.

19               THE COURT:    Well --

20               MR. COBURN:    You know, I'm not going to ask, Your

21  Honor.  We've already, first of all, we've already made a

22  significant mental health disclosure in this case and, you know,

23  it's just a question of sort of trying to supplement it to the

24  extent we can.  The real reason I wanted to come up here, the

25  question I had for the Court is and this is a -- I don't know how

1    the other defense counsel feel about this, but my own sort of

2    death penalty experience is that this tends to be an issue that

3    becomes very troublesome oftentimes in the penalty phase, which

4    is to say what is the scope.  When the Government asked for

5    mental health disclosure and the Court quite properly ordered

6    some kind of advance disclosure, I totally understand that if

7    we're going to try and this is a big if, but if we were going to

8    try to present testimony from like a neuropsychologist or a

9    psychiatrist or something like that, that's just squarely within

10   this language and there's no question about it.  But the bigger

11   question from my point of view is in a penalty phase, there's

12   just all kinds of other categories of information that typically

13   comes out and different lawyers think it's expert testimony and

14   other lawyers think it's lay testimony.  I mean what you have is

15   testimony from, you know, somebody who's a social worker, but

16   doesn't necessarily testify as a social worker.  They testify as

17   what you call, you know, a mitigation specialist or a mitigation

18   investigator.  Then you have other people like we have a

19   potential expert who's going to come in and testify or I hope

20   he'll testify about potential, you know, adjustment to lengthy

21   incarceration.  Then there's another potential sociology expert,

22   you know, with respect to, you know, the sociology of the area,

23   the geographic area, the neighborhoods where these individuals

24   grew up and so on.  My position is that if this order encompasses

25   all of that, that's a terrible burden on us at this juncture,

1   Your Honor.  But if it just encompasses real mental health

2   evidence, that's something that I think is doable and I don't

3   know whether any of the other lawyers have similar concerns.  I

4   bet everybody has got a mitigation specialist.  I'll bet that

5   nobody was planning to file a designation with respect to any of

6   those people.  But the scary thing from our point of view, Your

7   Honor, is that they are the heart of the mitigation case.  And

8   sometimes it happens that, you know, months and months go by and

9   then there's a conviction.  You get into the penalty phase and

10  the Government says well, I haven't had any notice, this person

11  is a social worker, I haven't had any notice and they should be

12  barred and so I just want to make sure that's not going to

13  happen.

14          THE COURT:    And you're not going to get that assurance.

15  I don't know what's going to happen.  I don't have any idea

16  what's going to happen any more than you do, Mr. Coburn.  We

17  discussed those orders and, of course, remember, it was two

18  orders because the Court issued the Government's proposed order

19  somewhat belatedly.  In fact the Government would say quite

20  belatedly.  And then at the last hearing as we all know, there

21  was much back and forth.  The order that you just referred to,

22  Docket 319 was redacted or I struck out one paragraph at the

23  insistence of the defense.  So the order is the order.  And if

24  there is a dispute down the road about what the order means,

25  obviously, we'll have to have argument on that.  I would

1    encourage you and all of counsel to err on the side of

2    disclosure.  That goes without saying.  I can't give you any more

3    guidance than that.

4                MR. COBURN:    Let me just, just to then perfect the

5    record and Your Honor's probably already ruled on what I'm about

6    to ask for.  My request is that Your Honor explicitly limit the

7    scope of this order to true expert mental health evidence which

8    would be testimony from a psychologist or a psychiatrist.

9                THE COURT:    Your request is denied.

10                MR. COBURN:    Thank you, Your Honor.

11                THE COURT:    I deem all of counsel to have joined in

12    that request.  Okay.

13                MR. KURLAND:    Judge --

14                THE COURT:    Mr. Kurland, approach the podium, please.

15    Mr. Crowe, did you have something?

16                MR. CROWE:    Two very brief housekeeping matters.

17                THE COURT:    All right.  Yes.

18                MR. CROWE:    Earlier this morning, the Court alluded to

19    three exhibits, copies of which I furnished to the Court in

20    conjunction with our motion under co-conspirator statement.  I

21    furnished copies of those to Ron.  What I would just like to have

22    would be to have those admitted into evidence so that the record

23    is clear.

24                THE COURT:    All right.  They'll be admitted as Martin

25    Hearing Exhibits as numbered.

1          MR. CROWE:   The second thing, Your Honor, is that I had

2    noticed that many counsel have been submitting individual

3    requests that they be allowed to adopt motions which

4    co-defendants have filed.  What Mr. Pyne and I did initially was

5    just in our initial motion to ask to be permitted to adopt, that

6    would be deemed to have adopt such motions as applied to us.  I

7    did that because it's a standard request I do in much simpler

8    cases than this.  And I was just curious whether the Court would

9    prefer to have specific requests from us.

10          THE COURT:   No.  I am perfectly satisfied.  I don't

11   think the Government is confused or prejudiced in any way by such

12   a standing motion and I've granted that motion and I'm deeming as

13   I just mentioned all counsel to have joined in that request

14   unless there's a specific opt-out.

15          MR. CROWE:   Thank you, Your Honor.

16          THE COURT:   All right.  Mr. Kurland?

17          MR. KURLAND:   Your Honor, two things.  One is I did

18   some quick research on the lunch break and I legally misspoke

19   about one issue with regard to Crawford and there are some things

20   I want to clarify and then in addition I guess at some point this

21   afternoon there's the outstanding issue of the possible

22   admissibility from the defense perspective of Mr. Gardner's prior

23   conviction.

24          THE COURT:   Yeah.  In fact you're handling that?

25          MR. KURLAND:   Yes.

1          THE COURT:   Okay.  We can go right to that after you're

2    done.

3          MR. KURLAND:   Can I do the Crawford --

4          THE COURT:   Yes.  Yes.  Please.

5          MR. KURLAND:   I looked at Crawford and I want to, I

6    legally misspoke on one point or I misspoke on one legal issue.

7    With respect to Crawford, if Andrea Smith and the Court was

8    correct on this.  If Andrea Smith testifies, then her excited

9    utterances even if those excited utterances were made at a time

10   when obviously there was no opportunity for cross-examine.  If

11   she is in court and actually testifies, those additional

12   statements can come in if they qualify as excited utterances.  So

13   that's cleared up.  On the other hand, if she does not testify,

14   then we get back to the position that even if something qualifies

15   as an excited utterance, then we do have a Crawford issue and the

16   question then becomes is the excited utterance, is it testimonial

17   or not?  If it's testimonial and it's our position based on the

18   prior pleadings that we filed, it's our position that even if

19   those initial statements made to Officer Mead at the time, if

20   those are excited utterances, they're clearly testimonial and

21   that was amplified I think today by Officer Mead's testimony when

22   he made it clear that he had identified her as the best witness.

23   I'm not going to restate all the other things.

24          THE COURT:   All right.

25          MR. KURLAND:   The one other related point with respect

123

1  to that is as I indicated before, with regard to the possible

2  other uses of the prior statements whether as a prior consistent

3  statement or prior inconsistent statement, under the rule for

4  those to come in, one of the predicates is the witness has to

5  actually be present in court testifying.  So I think that

6  clarifies that.  With respect to the other issue --

7            THE COURT:   Yeah.  Tell me again and I realize you

8  haven't made a final decision, but can you tell me as best as you

9  can, please, what is it that you intend to do or might do without

10  giving me the reasons yet.  Just what is it that you want to put

11  before the jury because and I tell you why I ask the question.

12  It's easy for me to imagine that in the course of some very early

13  cross-examination of a government witness, whether it's

14  Montgomery or I mean it could be almost any government witness

15  that you could inquire and bring out on cross-examination quite

16  legitimately the fact that Mr. Gardner has been charged, tried

17  and convicted and sentenced for the Jones-Spence murder in state

18  court.  It just seems to me you could clearly do that.  And again

19  I can imagine that there must be surely half a dozen government

20  witnesses, non-law enforcement witnesses who probably have actual

21  knowledge of that kind of fact that you could legitimately ask

22  the question whether for impeachment or for any number of

23  purposes.  So with that background, I'm not real clear about this

24  present dispute between Mr. Gardner and the Government over the

25  admissibility of his state conviction because it just seems to me

1    that there are 20 ways to Sunday that that comes in if

2    Mr. Gardner wants it in.

3              MR. KURLAND:    I believe that is correct.

4              THE COURT:    Okay.  So given that background, what is

5    this dispute between you and the Government all about?

6              MR. KURLAND:    Well, the Government's position is

7    that --

8              THE COURT:    I mean in other words, before I hear you,

9    you ascribe a certain motive to the Government and I'm sure

10   that's part of what got the Government's hackles up about it.

11   But that's all closing argument.

12             MR. KURLAND:    True.  As the Court's pointed out, there

13   is a much sounder and substantial and clearly unobjectionable

14   basis if the defense decides to admit it and that goes to, you

15   know, again the nature of what's going to happen in this case,

16   there's going to be several opportunities through several

17   witnesses to understand there were prior proceedings and it's our

18   position that if we want to, we would be able to elicit that.  To

19   give one example, I'm using Mr. Montgomery as an example.

20   Mr. Montgomery testified at the state court trial and received a

21   huge sentencing break as a result of his testimony in that case.

22             THE COURT:    Did you say 20 years?

23             MR. KURLAND:    Excuse me.

24             THE COURT:    Did somebody tell me he got 20 years for

25   second-degree murder?

125

1          MR. KURLAND:    Well, Montgomery got, Montgomery got a

2    total walk on the Spence murder.

3          THE COURT:    No.  I understand that -- well, I didn't

4    understand that.  But in terms of --

5          MR. KURLAND:    He received --

6          THE COURT:    Of the sentence he is now serving or the

7    sentence he received --

8          MR. KURLAND:    In the Cheeks, in the --

9          THE COURT:    Cheeks murder.

10          MR. KURLAND:    Maybe the Government can --

11          THE COURT:    Is it 20 years?

12          MR. KURLAND:    I think it's less than that.

13          MR. HARDING:    Judge, I don't think he has been -- yeah.

14    I know he hasn't been sentenced.

15          THE COURT:    Oh, he hasn't been sentenced yet.  Okay.

16          MR. HARDING:    He's subject to a much longer sentence

17    than that.

18          THE COURT:    Okay.

19          MR. KURLAND:    But he's already gotten a huge break

20    obviously with respect to the Spence homicide.

21          THE COURT:    So he got immunity from prosecution --

22          MR. KURLAND:    Yeah.

23          THE COURT:    -- on the Spence homicide.

24          MR. KURLAND:    And he got some and it was favorable.  So

25    he's already gotten something.  He's already delivered the goods,

1    so to speak, once.  He now is going to deliver the goods or wants

2    to again to get even more.  That is why it's important to

3    understand as basic impeachment and we cited in a pleading tons

4    and tons of cases.  So I think the Court is clear that if we want

5    to do it, we should be able to do it.  We even submitted a couple

6    of days ago a proposed instruction whether it's a mid trial

7    instruction or an end of trial instruction as to how the Court

8    could handle that.  So subject to responding to whatever the

9    Government has to say, we would just like a, you know, a clear

10   ruling because we haven't decided what we're going to do.

11            THE COURT:   Okay.  Now let me ask you this while you

12   have the podium.  What if one of the other defendants wants to do

13   this?  I understand they're not charged in the murder count

14   relating to Ms. Jones-Spence.  But have you thought about that

15   and --

16            MR. KURLAND:   Well, judge, I hadn't thought about that

17   specifically.  Generally I thought about it in the context that

18   there are a variety of other ways in which the issue could arise.

19   For example, had we decided, if we decide or if Mr. Gardner

20   decides he wants to testify, then his prior conviction would be

21   --

22            THE COURT:   Of course.  That's easy --

23            MR. KURLAND:   Subject to 403.  So I think to say there

24   would be obviously additional constitutional and 403 issues that

25   would arise, I'm not in a position right now to say absolutely.

1   I am in a position to say and to assert that if Mr. Gardner wants

2   it admitted, it's absolutely admissible.

3          THE COURT:   All right.  I just want to flag for you to

4   think about, you and Mr. Coburn, what your position is going to

5   be and to prepare your arguments in the event that one of the

6   other defendants, one or more of the other defendants believes

7   that it's appropriate to go into that.  And I really need you to

8   be prepared because this -- I mean unless you file a motion in

9   limine in advance of trial, it's going to come up in the midst of

10  trial if it comes up and I just want everybody to be ready for

11  that.

12         MR. KURLAND:   One way, Your Honor, that it would be --

13  obviously, if the Court's preliminary ruling on Mr. Montgomery

14  not being a part of the conspiracy, if that holds, that obviously

15  would limit, I'm not going to obviously speak for the defense or

16  their strategy, but that would obviously factor into whether or

17  not the defense decided to because then Montgomery's testimony

18  with respect to them wouldn't be as substantial.  But I

19  understand --

20         THE COURT:   Okay.  All right.  One other thing,

21  Mr. Kurland, while you've got the podium.  This argument that

22  you've made which I understand fully -- well, that's not true.  I

23  don't understand it fully.  You care an awful lot about whether

24  the Montgomery statements about what Mr. Gardner said is covered

25  by the co-conspirator exception and in particular in furtherance

1    of.  It's not entirely clear to me why you care so much.  I

2    understand the argument aimed at my state of mind.  You don't

3    want me either in instructing the jury or in ruling on your

4    defenses and I really understand that part of it.  But I just

5    want to make sure that we're in agreement that if I admit

6    Mr. Montgomery's testimony regarding Mr. Gardner's statements,

7    the jury is not going to know or care what the basis of that

8    legal ruling is.

9              MR. KURLAND:   I understand that --

10             THE COURT:   Okay.

11             MR. KURLAND:   -- and that's often the case.

12             THE COURT:   Well, it should always be the case.

13             MR. KURLAND:   Well, I mean we all anecdotally, nothing

14   is ever always the case.  But I understand exactly what the Court

15   is saying.  I would only add that with regard to the issue as to

16   how it pertains to a particular jurisdictional defense we have,

17   the nexus which I think if the Court obviously would take a look

18   at the pleadings --

19             THE COURT:   I understand that fully.

20             MR. KURLAND:   But I do understand and we do appreciate

21   the fact that the jury will not, the jury will not based on at

22   least when the Court says when it comes in, necessarily know

23   obviously, that it obviously impacts on other issues down the

24   line.

25             THE COURT:   Okay.  All right.

1        MR. KURLAND:    But we appreciate that, Your Honor.

2        THE COURT:    We're on the same page.

3        MR. KURLAND:    Thank you very much, Your Honor.  Subject

4    to responding to whatever --

5        THE COURT:    Okay.  Mr. Harding?

6        MR. HARDING:    Judge, I think this issue of admitting

7    the prior conviction is an extremely serious one.  I think it

8    would result in a 2255 issue that under Supreme Court law would

9    almost surely result in a overturning of this conviction.

10        THE COURT:    Wow.  That's a profound statement.

11        MR. HARDING:    I urge the Court to read Florida v.

12    Nixon.  The case that I discussed back in my pleading number 273.

13        THE COURT:    Well, I think the more important case is

14    Strickland v. Washington.  I mean really --

15        MR. HARDING:    Well, what we're dealing with here, Your

16    Honor, is a situation where so far as I know, these attorneys are

17    not able to consult with their clients.

18        THE COURT:    Actually, happily, I've observed

19    Mr. Mitchell consult with Ms. Rhodes repeatedly today.  I'll hear

20    from the defendants before we leave today and I appreciate your

21    concern, Mr. Harding.  It's been a rough, it's been a rough trip.

22    This has been a rough trip.  But the fact of the matter is it

23    appears that there's been a breakthrough of some sort.

24        MR. HARDING:    I don't know whether that's the case or

25    not.  But in any event, in the absence of consultation with the

1    defendants and an express approval to adopt this strategy, I

2    believe it would surely be ineffective assistance of counsel

3    under Florida v. Nixon for these defense attorneys to admit their

4    clients were convicted in a prior proceeding for the same crime.

5                THE COURT:    See, it's not the same crime.  That's the

6    key.  That's exactly right.  Is this a RICO conspiracy?  Is this

7    a RICO case?  Is there any connection between any of this?  I

8    mean let's face it, those are real issues in this case.  I mean

9    from where I sit, those are real issues.

10               MR. HARDING:    The murder of Tanya Jones-Spence is the

11   same crime.  That's what I'm referring to.  It's true there are

12   differing elements.  But this is a relative fine point in the

13   minds of jurors compared to the fact that this defendant,

14   Mr. Gardner, has already been convicted by a jury of their peers

15   of murdering Tanya Jones-Spence.  I think that unless the defense

16   attorneys can represent and have their clients represent to this

17   Court that they agree without strategy and I urge the Court to

18   read this Florida v. Nixon case which is discussed and it's

19   pleading 273, pages --

20               THE COURT:    I will.  I will look at it again.  I'm

21   familiar with it.  You're talking about functional guilty pleas

22   and that kind of thing.  And yes, there needs to be a clear

23   record of consultation.

24               MR. HARDING:    It's important because these attorneys

25   have been fired by their clients several times at least during

131

1    the course of these proceedings.  They've moved to withdraw.

2    Mr. Coburn and Mr. Kurland moved to withdraw from representing

3    Mr. Gardner and they made some of their pleadings filed under

4    seal.  So I don't even know what horrible things they say about

5    their relationship with Mr. Gardner although the Court is aware

6    of what they say.  But it is quite obvious on the record that

7    there is up until today at least no relationship between these

8    defendants and their attorneys anymore.

9               The second, third and fourth points are also discussed

10   in my pleading, Your Honor.  What defense counsel want this in

11   for is so that they can argue the Government's motives in

12   bringing this prosecution.  That is not a proper subject for jury

13   deliberation.  Rule 12(b)3(a) expressly provides that any

14   argument relating to the institution of a prosecution must be an

15   issue submitted to the Court.  It's not optional.  It has to be

16   submitted to the Court pretrial.  And there are case law, there's

17   cases that go into the rationale for this.  I discussed the

18   Barrigan, the Third Circuit decision and the Bertolli case in my

19   pleading.  They clearly differentiate 404(b).  Mr. Kurland and

20   Mr. Coburn attempt to rely on 404(b), but the Bertolli case in

21   particular makes it clear that this is not 404(b) evidence

22   because it is not relevant -- 404(b) evidence must be relevant to

23   a decision the jury has to make.  But an argument about the

24   motives of the prosecution is not relevant because it's not

25   something the jury is charged with making a decision about and

1    that's the rationale of those cases.

2              THE COURT:    I hear you, Mr. Harding.  You make sound

3    arguments.  Not necessarily winning arguments, but sound

4    arguments.  Perhaps the use of the term the prosecution's motive

5    paints with too broad a brush.  Obviously, the defense is

6    entitled to attack the motives, the bias, the interest of every

7    government witness.  And if that doesn't add up to the

8    prosecution's motive, I don't know what does.  I hear you.  I

9    understand.  I especially appreciate your concern over the work I

10   may have to do on a 2255.  We all know that if there's a

11   conviction in this case, the Court is going to have to work on a

12   2255, no matter what.  I'll take another look at the case.

13             MR. HARDING:    If I may raise one other --

14             THE COURT:    But I don't see a 2255 coming out of the

15   midst with respect to this issue of Mr. Gardner.

16             MR. HARDING:    One other issue that's different --

17             MR. COBURN:    Your Honor, forgive me for interrupting.

18   I don't mean to.  But I mean, you know, this is a Strickland

19   argument that's just been made.

20             THE COURT:    I understand.  I understand, Mr. Coburn.

21   Please, let me hear the Government.

22             MR. COBURN:    Okay.

23             MR. HARDING:    The case law also raises case management

24   concerns and they are very important in this case, too.

25   Mr. Gardner's state case is still on appeal.  Do I get to bring

1    out the fact that his case is still on appeal in state court?  Do

2    I get to bring out the fact that the Government applied to the

3    Attorney General for permission to offer a life sentence to

4    Mr. Gardner and that that application was pending when he became

5    live flesh and blood which destroyed any possibility of a plea

6    and that's why there's no longer any discussion about offering

7    him a life sentence in this case.  Does the Government get to

8    bring that out?  The Government has a right to rebut any evidence

9    put on relating to something like prosecution motive.  Surely.

10   And that threatens and the case law agrees with this to turn this

11   into a mini trial about what the Government's motives really are

12   in this case.  That threatens to turn this trial into a circus,

13   Your Honor.

14            THE COURT:   You'll recall, you'll recall when I began

15   with Mr. Kurland, I clearly, I think clearly disclaimed or at

16   least largely dismissed as a basis for admitting such evidence an

17   attack on Government motive.  I essentially took that off the

18   table.  What I said to Mr. Kurland was it seems to me and I admit

19   I'm speculating to a certain degree.  I think what I said was 20

20   ways to Sunday, something like that, as to how the fact of

21   Mr. Gardner's prior conviction for the Jones-Spence murder could

22   be brought before the jury.  And you raise very good points, very

23   good points which the Court is going to have to consider.  I

24   don't need to hear from counsel for Mr. Gardner at this stage.

25   If there's something that Mr. Harding said that you feel you've

1   just got to respond to, okay.  But we will cross that bridge when

2   we get to it.  It's not going to be in the jury questionnaire.

3   If I get into it in voir dire, it will be because we've had

4   further discussions about it.  And you raise some very, very good

5   points, Mr. Harding.  But I don't need to resolve that now.  It

6   just seems very clear to me as I say that there are any number of

7   bases on which the jury can learn during the guilt/innocence

8   phase of this proceeding that Mr. Gardner has previously been

9   convicted.  Frankly, the fact that so many of the Government

10  witnesses are I take it, a number of the Government witnesses are

11  almost certain to be impeached by counsel using or attempted

12  impeachment to occur using transcripts, the jury is going to

13  infer that there's been a prior proceeding involving Mr. Gardner.

14  I mean clearly, the jury is going to know that.  And so --

15              MR. HARDING:   Yes.  Well, this is routinely dealt with

16  simply by referring to the prior proceeding.  The jury doesn't

17  know whether it's a suppression hearing like the ones we've had

18  so many of or a state trial.

19              THE COURT:   I hear you, Mr. Harding.  I appreciate it.

20              MR. COBURN:   Your Honor, I appreciate very much the

21  opportunity --

22              THE COURT:   Very briefly, Mr. Coburn.

23              MR. COBURN:   Very briefly.  I promise, Your Honor.

24  First of all, you know, just with respect to the comment

25  Mr. Harding made about, you know, terrible things we might have

1    said in a sealed --

2              THE COURT:    You don't have to respond to that.  He

3    doesn't know what you said.

4              MR. COBURN:    Okay.  Well, let me just state for the

5    record we didn't say anything like that.  And moreover, with

6    respect to the Strickland issue, you know, I suppose the

7    Government has interest in, some legitimate interest in making

8    sure that a conviction, you know, stands if it's obtained at

9    trial and, you know, but I don't think that entitles him to kind

10   of leap over the podium and sit on our side and substitute his

11   tactical judgment for ours.  And moreover, I just would observe

12   and this will take two seconds, Your Honor.  I mean this case has

13   been going on for a long time.  But we've all got long memories,

14   you know.  At the very beginning of this case when we informed

15   Your Honor that this was a murder, the Spence murder of which

16   Mr. Gardner had been convicted and sentenced to life without

17   parole, I distinctly remember Your Honor making a remark which I

18   strenuously agreed with which was to the effect of the following.

19   I think if I were them, that the fact of that conviction and

20   sentence is one of the first things I'd tell the jury if I was

21   trying this case.

22             THE COURT:    Well, I didn't say whether I would say that

23   in the first part of the guilt/innocence phase or the penalty

24   phase if we get there.  Anyway, yes.  Briefly, Mr. Kurland.

25             MR. KURLAND:    Very briefly, judge.  Your Honor, I am

1   not at a position right now to say that we don't want to pursue

2   the motive issue.  But on the second issue with regard to the

3   credibility issues, we've exhaustively briefed.  Mr. Harding

4   ignored that aspect.  That particularly with respect to the issue

5   that this is not the same charge.  In particular, we're not

6   conceding anything.  There's no functional guilty plea here.  But

7   in particular with respect to the jurisdictional defense as we've

8   seen based on our co-conspirator issue, that we fully expect that

9   Mr. Montgomery is going to get up here again and fabricate issues

10   with regard to add the new element.  Based on the fact that he's

11   now looking to, you know, to get more stuff now, whether or not

12   he was successful the first time around is absolutely critical

13   and with respect to the jury speculation, not only will they know

14   there was a prior proceeding, but the case law and a lot of

15   empirical research suggests that if they don't know and they know

16   there's a second proceeding, they think that there was an

17   acquittal and that's why they're doing it again.  Thank you very

18   much, Your Honor.

19                    THE COURT:    Thank you, Mr. Kurland.

20                    MS. RHODES:    Your Honor, I have a quick question if I

21   could.

22                    THE COURT:    Yes.  Approach the podium, please, Ms.

23   Rhodes.

24                    MS. RHODES:    On the juror questionnaire issue, would it

25   be easier for the Court if I just lay out the two side by side

1    although the font will be small so you can do a comparison as we

2    go along of the Gardner version and the proposed version?

3                    THE COURT:    Actually, I don't want to see the proposed

4    version.

5                    MS. RHODES:    Okay.

6                    THE COURT:    What I'm hoping you'll give us is the

7    Gardner questionnaire with the inclusion therein in the same font

8    red-lined in Word Perfect or Word the additions that you want.

9    So I'm hoping you'll give me a single document.

10                   MS. RHODES:    All right.  All right.

11                   THE COURT:    Do you follow me?

12                   MS. RHODES:    Sure.  Sure.

13                   THE COURT:    Just in bold or in italics include in and

14   Mr. Kurland I guess or Mr. Coburn will have the or maybe it's the

15   Government.  Who has the final version of the Gardner

16   instructions?

17                   MR. COBURN:    I'm sure we have it, Your Honor.

18                   THE COURT:    Okay.

19                   MR. HARDING:    I have a hard copy.  I'm not sure I have

20   a --

21                   THE COURT:    Okay.  I think Mr. Coburn finalized it.  So

22   if Mr. Coburn can give you in either Word or Word Perfect a

23   digitized copy of the Gardner questionnaire, if you would then go

24   through with counsel and just add in italics or in bold what else

25   you want, okay, and underline what you want out of there.  I

1    don't think there's going to be anything that you're going to

2    want out.  So it's just a question of supplementing the Gardner

3    questionnaire in a way that when we look at it, we can see what

4    you want added and then the Government can easily respond to

5    whether it's okay or not and I can resolve it.

6           MR. COBURN:    And I'm happy to do that, Your Honor.

7           MS. RHODES:    That's fine, Your Honor.

8           THE COURT:   Okay.  Great.  Mr. Martin?

9           MR. MARTIN:   Yes, Your Honor.  Just briefly.

10          THE COURT:    And Mr. Martin, as you approach the podium

11   there are two, maybe three matters I think, ex parte matters that

12   you submitted and I want to make sure --

13          MR. MARTIN:    Judge, an order that I asked you to sign

14   that hasn't been signed I think.

15          THE COURT:   Just one order or is it --

16          MR. MARTIN:   I think you did the others, but I'm not

17   sure.  I know there's one.  I was going talk to you about that

18   when we quit.

19          THE COURT:   Okay.  Good.

20          MR. MARTIN:   If we could do that?

21          THE COURT:   All right.

22          MR. MARTIN:   And I have to tell you, Your Honor, I need

23   to speak with Mr. Treem who's not here as you know.  The exchange

24   between you and Mr. Coburn about your mental health order has me

25   taken aback a little bit.  I certainly never expected that I

1   would be disclosing as part of that.  I've had some discussion

2   with Mr. Harding about what I'm going to disclose and he's

3   actually agreed to give me a couple of extra days because my

4   expert can't meet with me until after the deadline.  But I never

5   intended to disclose at this time my mitigation specialist or my

6   sociologist and we are exploring the issue of whether we will

7   have some sort of expert witness on the issue of the flesh and

8   blood issue if you will and I never intended to disclose that.

9   But it seems to me based on what you told Mr. Coburn, I ought to

10  be thinking about that and that's troublesome to me and I may be

11  coming back to the Court and asking for a little more time.

12          THE COURT:   Okay.

13          MR. MARTIN:   But we hadn't planned on doing that.

14          THE COURT:   Well, I have no doubt that the Government

15  will be reasonable.  The order says 30 days --

16          MR. MARTIN:   He will.

17          THE COURT:   Excuse me?

18          MR. MARTIN:   He will, Your Honor.  I'm sure.

19          THE COURT:   Yes.  Of course.  And the order says 30

20  days.  Everybody understands that you didn't get the order until

21  what, two weeks, after it was entered --

22          MR. MARTIN:   Your Honor, that wasn't an issue with me.

23  I got the order.  I interpreted it as a mental health order.

24          THE COURT:   Okay.

25          MR. MARTIN:   And I looked at my mental health evidence

1   and made some decisions about what we would disclose.  But I

2   never intended, I never thought that it would go to my mitigation

3   specialist.  I didn't think it would go to a sociologist we might

4   hire and we're just in the discussions with some of these people

5   now.  So we're not even ready to disclose.

6                   THE COURT:    Okay.  I don't want to leave counsel high

7   and dry and I didn't mean to be flip with Mr. Coburn.  If you all

8   can't reach agreement with the Government about what's covered by

9   that order and you can narrow the disagreement to specific

10  topical or subject matter issues, I'll be glad --

11                  MR. MARTIN:    That's fine, Your Honor.  That's what I

12  was looking for.

13                  THE COURT:    -- to consider it.

14                  MR. MARTIN:    And, Your Honor, I think you might find

15  because I know you want to hear from the defendants, you might

16  find that your notion of a breakthrough is not quite accurate.

17                  THE COURT:    Well, optimistic if not accurate.

18                  MR. MARTIN:    Yes, Your Honor.  Thank you.

19                  MR. HARDING:    Could I just, two points, Your Honor?

20  This issue about the social workers and the para mental health

21  experts is precisely the one that I bought up before this court

22  in advocating paragraph 16 back in April.  For defense counsel to

23  say they don't have notice of this is incredible because I

24  brought up this very issue.  I invited them to submit all mental

25  health evidence pursuant to your order.  They objected.  We

1    crossed out paragraph 16.  I agreed.  But I also made it clear

2    that I was going to object to mental health evidence brought in

3    through people like social workers and psychologists and people

4    who aren't necessarily pure mental health experts.  That's

5    precisely why I brought this issue up.

6                    THE COURT:    I have a distinct recollection of that, Mr.

7    Harding.  No question about it.  There will be further

8    discussions between the Government and the defense.  And not

9    everything that comes from a social worker fits within the rubric

10   of mental health, but some things do.  So you all will work that

11   out and --

12                   MR. MARTIN:    That's precisely why we asked you to

13   strike paragraph 16.

14                   THE COURT:    Right.

15                   MR. HARDING:    Judge, the other thing is there's a

16   mistake in the indictment involving one single word and one

17   single count.  It pertains to Mr. Gardner.  A count that names

18   only Mr. Gardner.  It refers to a previous count.  It

19   incorporates a previous count and it gives the wrong number for

20   that count.  Mr. Coburn and Mr. Kurland have told me that they

21   will not consent to my simply changing the count number.

22                   THE COURT:    What count are we talking about?

23                   MR. HARDING:    I believe the --

24                   THE COURT:    The count that where the error appears.

25                   MR. HARDING:    I believe it's Count 13, Your Honor.  I'm

1  not asking the Court to --

2          THE COURT:   13 is --

3          MR. HARDING:   No.  It's 15.

4          THE COURT:   15.

5          MR. HARDING:   15 it says as set forth in Count 8 of

6  this -- it should say as set forth in Count 7 of this third

7  superseding indictment.

8          THE COURT:   Okay.

9          MR. HARDING:   The Government since the same grand jury

10  is sitting that voted the third superseding indictment, I was

11  going to go back and get the grand jury to correct it since

12  defense counsel won't agree.  I don't want to have this be an

13  issue on appeal which it surely will be if defense counsel don't

14  agree to the change.  If the Court were to change it without

15  defense counsel's approval, that will make it an issue on appeal.

16  It's easier for me to spend five minutes in the grand jury.  The

17  problem is, the only problem is it will mean we have a fourth

18  superseding indictment, but I don't want the Court to faint or

19  have a heart attack when you see a fourth superseding indictment

20  in this case.  It's just one word that we're talking about.

21          THE COURT:   Well, I appreciate your concern for the

22  Court's heart.

23          MR. KURLAND:   And Your Honor, we don't mean to be

24  unreasonable about this at all, but, you know, there are some

25  issues that just precludes us from doing it.

1      THE COURT:   All right.  I understand.  All right.  Mr.

2  Hanlon?

3      MR. HANLON:   Yes, Your Honor.

4      THE COURT:   Anything else you want to say about Andrea

5  Smith and the gray t-shirt?

6      MR. HANLON:   Is this the component of Ms. Smith's

7  statement where it's the question about the man with the braids

8  being the one who is the shooter?

9      THE COURT:   (Indicating affirmatively.)  Well, it's,

10  yeah, all of the above.  Let me tell you what my understanding

11  is.

12      MR. HANLON:   Certainly, Your Honor.

13      MR. KURLAND:   There's no testimony -- I'm sorry.

14      THE COURT:   Why don't you summarize your evidence for

15  me briefly?

16      MR. HANLON:   Sure, Your Honor.  On the question of the

17  showup --

18      THE COURT:   Mr. Holley is the taller.

19      MR. HANLON:   Yes.

20      THE COURT:   Mr. Holley is wearing the baseball, the red

21  baseball cap.

22      MR. HANLON:   Yes, Your Honor.

23      THE COURT:   Mr. Gardner is the braids.

24      MR. HANLON:   Yes, Your Honor.

25      THE COURT:   They're both wearing gray shirts, gray

1    t-shirts when they come out of the building.

2              MR. HANLON:   Yes, Your Honor.

3              THE COURT:   All of that comes from Ms. Smith.

4              MR. HANLON:   Yes, Your Honor.

5              THE COURT:   And she tells Officer Mead all of that.

6              MR. HANLON:   Yes, Your Honor.

7              THE COURT:   At the showup, Holley has removed his gray

8    t-shirt and now what we have standing there or sitting there on

9    the curb when Ms. Smith is brought to the showup is one suspect

10   in a gray t-shirt and one suspect in a white t-shirt.

11             MR. HANLON:   That's correct, Your Honor.

12             THE COURT:   And Ms. Smith says it was the one in the

13   gray t-shirt --

14             MR. HANLON:   Yes, Your Honor.

15             THE COURT:   -- who did the shooting?

16             MR. HANLON:   Yes, Your Honor.

17             THE COURT:   But in fact at that moment in time that

18   statement by Ms. Smith contradicts her earlier statement.

19             MR. HANLON:   Yes, Your Honor.

20             THE COURT:   Okay.  That's the state of the evidence.

21   And what I'm prepared to find and conclude is that that statement

22   made at the showup that it was the one in the gray shirt who was

23   the shooter is sufficiently unreliable as it contradicts her

24   earlier statement and is sufficiently unnecessary to the

25   Government's case since it doesn't matter to the Government's

1 | case who the shooter was.  That the jury should not be exposed to

2 | that statement.

3 | 　　　　MR. HANLON:   Yes, Your Honor.

4 | 　　　　THE COURT:   Okay.  That's where I am.

5 | 　　　　MR. HANLON:   That's the current state.

6 | 　　　　THE COURT:   Okay.

7 | 　　　　MR. HANLON:   So not the entire showup identification

8 | process, but just this one particular --

9 | 　　　　THE COURT:   Oh, just the one statement that Mr. Kurland

10 | was really pretty agitated about.

11 | 　　　　MR. HANLON:   And I did misstate it a moment ago, Your

12 | Honor.  It was the gray shirt was the shooter.  My only

13 | suggestion might be this, Your Honor, and the Court heard me out

14 | the other day.  I think the Court understands my position.  I

15 | don't have anything dramatically impressive to say about it.  My

16 | one proposal would be this.  A substantial part of I think

17 | Mr. Kurland's argument and the Court's ruling is as you

18 | indicated, the fact that the Government doesn't need that

19 | particular comment to come in.  We're still two or three months

20 | away from trial assuming the schedule doesn't change and things

21 | are still fluid.  They're going to remain fluid.  There's a

22 | number of issues that the Court's reserving on other issues

23 | because who knows what the picture is going to be.  My proposal,

24 | my request would be this.  That the Court at least to the extent

25 | that your ruling is based on the fact that the Government doesn't

146

1    need that part --

2             THE COURT:    Which is a very small part of my ruling.

3             MR. HANLON:    I understand, Your Honor.

4             THE COURT:    But go ahead.

5             MR. HANLON:    But to the extent that it is a factor or

6    enough of a factor to make a decision, I would at least allow, I

7    would at least ask that the Court reserve on this particular

8    issue just to make sure that nothing comes up between now and

9    trial that does make it --

10            THE COURT:    Even if I didn't --

11            MR. HANLON:    I'm speculating as to whether or not

12   anything will come up.

13            THE COURT:    Even if I didn't, I always -- what I do

14   reserve is the right to change my mind.

15            MR. HANLON:    Certainly, Your Honor.

16            THE COURT:    So whether we call it a preliminary ruling

17   subject to preliminary reconsideration or a final ruling subject

18   to preliminary reconsideration, we'll call it a preliminary

19   ruling.  But you will be heard further if the exigencies of the

20   circumstances warrant it.  I assure you of that.

21            MR. HANLON:    Thank you, Your Honor.

22            THE COURT:    But that's my strongly held preliminary

23   view.

24            MR. HANLON:    I understand.

25            THE COURT:    Okay.  All right.  All right.  I think

1  that's --

2            MR. KURLAND:   Judge --

3            THE COURT:   -- everything.

4            MR. KURLAND:   With some trepidation, could I just

5  briefly --

6            THE COURT:   With a lot of trepidation, Mr. Kurland.

7  Please approach the podium.

8            MR. KURLAND:   Two things.  The first, Your Honor, is --

9            THE COURT:   By the way, your supplemental memorandum

10  was excellent, Mr. Kurland, and I'm sorry we went through all of

11  the difficulty we went through on that piece of your argument,

12  but we finally got to the same page in the same book.

13            MR. KURLAND:   Yes, we did.  And I'm pretty thick

14  skinned about it.  So that was fine.  Also the law clerk that

15  assisted me on that is in the audience and he deserves some of

16  the credit as well.

17            THE COURT:   Absolutely.

18            MR. KURLAND:   Just two quick things.  One is that I

19  would imagine that ultimately, the ruling will be final at the

20  time trial starts so I can incorporate that as to what I want to

21  do.

22            THE COURT:   Well, not contradicting myself, but I told

23  Mr. Hanlon it was preliminary.  I'm telling you it's final

24  because it doesn't matter.  Either way I can reconsider it.

25            MR. KURLAND:   I understand that, Your Honor.

1        THE COURT:    But you should take it, you should take it

2    as that's going to be ruling and that should inform your trial

3    preparation.

4        MR. KURLAND:    Thank you.

5        MR. COBURN:    Thank you, Your Honor.

6        MR. KURLAND:    And as a consequence of that though,

7    it's -- yeah, because it still goes because whatever they come up

8    with, it's still not going to change the inherent factor that

9    it's inconsistent.  It's contradictory.  Thank you very much,

10   Your Honor.

11        THE COURT:    The basis of the Court's ruling just so

12   that I'm clear is the questionable reliability of the

13   identification at that moment and we talked a little bit and you

14   mentioned in your memorandum this whole question of state action.

15   I don't think that's a problem for the defense.  Hindsight is

16   always 20/20.  But clearly they should have separated these

17   suspects and they should have done one on ones, not one on twos.

18   And again, hindsight is always 20/20, but that would have been

19   the way to obtain if it could be obtained from Ms. Smith an

20   affirmative identification of the shooter.  And indeed as I

21   thought about it after the last hearing, what made the, what

22   really made the show-ups especially suggestive beyond the normal

23   showup is that they had both of them there together.  And

24   whatever else she might have seen or didn't see or recall, seeing

25   two men standing there together clearly was suggestive to her and

1   the Government, Mr. Hanlon, is going to have another chance if he

2   can, you know, to make some arguments.  But even though the

3   Government didn't remove Mr. Holley's t-shirt, the fact of the

4   matter is the Government's responsible for the manner in which it

5   conducted the showup.

6            MR. KURLAND:   Also I believe the Government admitted a

7   piece of the evidence at the last hearing that a red hat and a

8   gray shirt that was found in the --

9            THE COURT:   Oh, yeah.  But I don't know that they had

10  been found by the time of the showing.

11           MR. KURLAND:   No, they hadn't.  They were found

12  subsequently.

13           THE COURT:   Right.

14           MR. KURLAND:   Thank you very much, Your Honor.

15           THE COURT:   Okay.  Thank you.  All right.  You'll get a

16  chance, Mr. Mitchell.  I think that concludes the work we have to

17  do.  The defendants will have an opportunity briefly to address

18  the Court before we break.  We've got a lot of work yet to do on

19  July 26 and 27.  The Court's got work to do with respect to the

20  motions to dismiss and challenges to the federal death penalty

21  statute.  And of course, we want to get the jury questionnaire

22  rolling.  But I think that we've concluded all of our evidentiary

23  issues.  I'm going to hear argument on the sufficiency and

24  adequacy, propriety of the notices and there may be more to do on

25  this issue of mental health evidence.  Is there anything else

1   from the Government that is lurking out there, Mr. Harding?

2          MR. HARDING:   Your Honor mentioned something this

3   morning about there being a Bruton problem with Mr. Mitchell's

4   statement.  I just wanted to tell the Court that the Government's

5   position is that there is no Bruton problem because he doesn't

6   implicate any of the other defendants.  It's an exculpatory

7   statement in the first place.  He says he was on the phone

8   talking to Darryl Weisch frequently that night and he was trying

9   to arrange a drug deal with a guy named L.  L he describes and

10  it's not a description that matches any of these defendants and

11  none of these defendants is none as L anyway.  So it's not a -- L

12  is the only other person implicated by Mr. Mitchell.  So it's

13  not, I don't see a Bruton problem in the statement.

14          THE COURT:   Okay.  Maybe there isn't, but I just wanted

15  to raise it so that it doesn't sneak up on me.  All right.  I

16  need to see Mr. Martin after everyone else has left ex parte and

17  I'm going to need Ms. Rhodes and Mr. Mitchell to remain after

18  everyone else has departed.  So if there are any overlooked

19  issues hanging out there, I urge counsel to let me know promptly

20  next week by letter so that we can tee these issues up.  I remind

21  you that we have a pretrial conference scheduled for August,

22  perhaps it's September.  I guess it is September.  September 7.

23  Friday, September 7th at 10:00, we'll have a final pretrial

24  conference.

25          All right.  Now Mr. Mitchell, Mr. Martin, Mr. Harris,

1   Mr. Gardner, the Court appreciates the way you have conducted

2   yourselves today.  As you heard me say earlier, the Court remains

3   hopeful that you will see fit, each of you, to cooperate with

4   your counsel.  I will tell you, each of you that as I have

5   learned more and more about the case, it has become even more

6   regrettable to me in all honesty that you have chosen to engage

7   in the activities here in the courtroom starting back in October

8   of 2005.  I regret very much that you have impeded your lawyers'

9   efforts to represent you because I think that they were doing a

10   very excellent job on your behalf and they will continue to do

11   so.  As I learn more and more about the case, it becomes quite

12   apparent to me that your own best interests unquestionably lies

13   in full complete cooperation with your attorneys and I hope that

14   you will take that observation to heart.

15            Now I'm going to give each of you a very, very brief

16   opportunity starting with Mr. Harris because I believe he was the

17   first to ask and then Mr. Gardner and then Mr. Mitchell and then

18   Mr. Martin.  Before you speak, I want to remind you and warn you

19   that anything and everything that you say could be used against

20   you.  I urge you not to say anything.  But since you've indicated

21   a desire to speak, I'm going to give you an opportunity very

22   briefly to do so.  I have continued to receive your filings pro

23   se and notice of dishonor and other papers.  They will be made a

24   part of the court file and of course, if you insist on continuing

25   to do that, the Court will receive those papers and they will be

1    part of this file.  But again, anything you say in open court,

2    anything you send to the Court in writing that you've signed will

3    become a part of this record and I urge you that you shouldn't do

4    it.  Okay.  Mr. Harris, what would you like to say?

5            DEFENDANT HARRIS:    Your Honor, I have reviewed all the

6    facts.  I have accepted each motion for value.  I return each

7    motion for value.  Indicated my acceptance by my signature and

8    date and requested that Gerald P. Martin, Attorney At Law and

9    Joshua R. Treem, Attorney At Law to perform the following five

10   duties:  Do not argue the facts.  Request the Court issue me an

11   appearance bond and waive all public costs.  Request the Court

12   close the accounts and release the order of the court to me

13   immediately.  Request the Court set off and adjust all public

14   charges by the exemptions in accord with UCC3-419, House Joint

15   Resolution 192 and Public Law 73-10.  Request immediate

16   discharge.  Your Honor, if both attorneys are unable to perform

17   the following duties they have agreed to as my private lawyers, I

18   will accept their dishonor.

19           THE COURT:    Thank you, Mr. Harris.  Mr. Gardner?

20           DEFENDANT GARDNER:    I would like to accept the offer of

21   the Government and Mr. Attorney Coburn and Mr. Attorney Adam

22   Kurland for the motion for value and return and return for value

23   for the -- excuse me.  Let me start over.  I accept the offer of

24   the Government and Mr. Attorney Coburn and Mr. Attorney Kurland

25   on cross-examination on the motion for value and return the offer

1   for value for settlement and close the account.  I request for

2   them do not argue the facts, request that the judge issue me

3   appearance bond and waive all public cost and request the judge

4   close the account and release the order of the court to me

5   immediately, request that a judge set off and adjust all public

6   charges by the exemptions in accord with UCC 3-419, House Joint

7   Resolution 192, Public Law 7310.  I request discharge.

8             THE COURT:   Thank you, Mr. Gardner.  Mr. Mitchell?

9             DEFENDANT MITCHELL:   First of all, I would like the

10  record to reflect I would accept and return the Government's

11  offer when speaking to Ms. Attorney today.  I will also like the

12  record should reflect I have accepted both attorneys, Mr. and

13  Ms. Attorney doing business as Laura Rhodes and Mr. Attorney

14  doing business as Tim Sullivan offer to be my private lawyer for

15  value.  That's for the record.  I would also like to accept the

16  offer of all court proceedings that took place today.  I would

17  like to return all the offer of all court proceedings that took

18  place today for value for close and settlement of the account.  I

19  request the following:  Do not argue the facts, request the Court

20  issue me an appearance bond, waive all public cost, request the

21  Court close the account.  Release the order of court to me

22  immediately, request the Court set off and adjust all public

23  charges by their exemption in accord with Uniform Commercial Code

24  3-419, House Joint Resolution 192, Public Law 73-10.  I request

25  immediate discharge.  Furthermore, I have asked Ms. Attorney and

1    Mr. Attorney on, I asked Mr. Attorney three times of the court

2    order whereas though the Court appointed each attorney to

3    represent me.  I would like to review that order.

4                  THE COURT:    Thank you, Mr. Mitchell.  Mr. Martin?

5                  DEFENDANT MARTIN:    Your Honor, let the record reflect

6    that I accept your offer for value and return your offer to you

7    for value for settlement and close of the account.  I do not wish

8    to argue the facts.  I request the Court to issue me an

9    appearance bond and waive all public costs.  I request the Court

10   offset against all public charge in accord with Uniform

11   Commercial Code 3-419, House Joint Resolution 192 and Public Law

12   73-10 and I request immediate discharge.  I also request the

13   Court to close all accounts and release the order of court to me

14   immediately.  Also I have requested the order of the court of

15   Thomas Crowe three times and I have yet to receive it.  May I

16   review the order of the Court, please?

17                  THE COURT:    Thank you, Mr. Martin.  Mr. Harris, do you

18   wish to represent yourself?

19                  DEFENDANT HARRIS:    I'm not here to testify.

20                  THE COURT:    Mr. Gardner, do you wish to represent

21   yourself?

22                  DEFENDANT GARDNER:    I'm not here to testify, sir.

23                  THE COURT:    Mr. Mitchell, do you wish to represent

24   yourself?

25                  DEFENDANT MITCHELL:    I accept your offer for value,

1   Your Honor.  I return your offer to you for value for close and

2   settlement of account.  I request the following.  Do not argue

3   the facts, request the Court issue me an appearance bond, waive

4   all public costs, request the Court close the account and release

5   the order of court to me immediately.  Request the Court set off

6   and adjust all public charges by the exemption of Uniform

7   Commercial Code 3-419, House Joint Resolution 192, Public Law

8   73-10.  I request immediate discharge.

9             THE COURT:    All right.  The Court will treat that

10   response as no.  Mr. Martin, do you wish to represent yourself?

11             DEFENDANT MARTIN:    Your Honor, I accept your offer for

12   value and return the offer to you for value for settlement and

13   close of the account.  I do not wish to argue the facts.  I

14   request the Court to issue me an appearance bond and waive all

15   public costs, request the Court to close all accounts and release

16   the order to me immediately.  I request the Court to set off and

17   adjust all public charges in accord to the Uniform Commercial

18   Code 3-419, House Joint Resolution 192 and Public Law 73-10 and I

19   request immediate discharge.

20             THE COURT:    All right.  I accept that response as a no

21   response.

22             MS. RHODES:    Your Honor, if I could just briefly --

23             THE COURT:    Yes, Ms. Rhodes.

24             MS. RHODES:    I neglected to mention that Mr. Sullivan

25   asked that we keep the record open on the motion to suppress the

1   statement.

2           THE COURT:   Yes.  I expect to have final, any evidence

3   from the defense and final argument on that question on July 26th

4   --

5           MS. RHODES:   Thank you, Your Honor.

6           THE COURT:   -- at our next session.  All right.  I

7   thank the marshals.  Mr. Mitchell will need to remain in the

8   courtroom briefly.  But counsel and the defendants other than

9   Mr. Mitchell and Ms. Rhodes are excused.  Mr. Martin, would you

10  approach the bench please ex parte on that matter?

11          (Mr. Martin approached the bench and discussed a matter

12  ex parte with the Court which was not placed on the record.)

13          (Proceedings concluded.)

14

15

16

17  I, LISA K. BANKINS, certify that the foregoing is
    a correct transcript from the record of
18  proceedings in the above-entitled matter.

19

20  _____          _____

21  Signature of Court Reporter/                 Date
    Transcriber

22

23  _____

24  Typed or Printed Name

25

1

2

3

4          THE COURT:    All right.  We are on the record ex parte

5   other than the marshals and the court staff.  Only Ms. Rhodes and

6   Mr. Mitchell are in the courtroom and these proceedings are to

7   remain under seal pending any order of the Court releasing.  Ms.

8   Rhodes, just you want to summarize the circumstances that

9   prompted Mr. Sullivan's recent letter to the Court very briefly?

10          MS. RHODES:    Sure, Your Honor.  And we received some

11   discovery, I don't have the dates with me, but some discovery a

12   few weeks ago that indicated that somebody whose name is Nathan

13   and his nickname is "Bodie" Barksdale was implicated in Oliver

14   McCafferty's murder and that was by somebody who was picked up --

15          THE COURT:    Now I have to ask you, I'm sorry to

16   interrupt, Ms. Rhodes, but there was apparently a major typo on

17   the underlying report which you may or may not have actually

18   seen.

19          MS. RHODES:    The nicknames?

20          THE COURT:    No.  I'm sure it's a typo.  Let me tell you

21   what I'm referring to.  Mr. Sullivan sent his letter ex parte of

22   course.  In fact he may have filed it under seal.

23          MS. RHODES:    I think he did.  Yes.

24          THE COURT:    Okay.

25          MS. RHODES:    And I apologize, Your Honor.  I left it on

1    my desk this morning.  So I wouldn't have it with me.

2            THE COURT:    That's quite all right.  That's quite all

3    right.  I have it right here.  Mr. Sullivan's letter is dated May

4    25, 2007 and he attached a copy of the discovery.

5            MS. RHODES:    Oh, the date issue.  I noticed that, but I

6    think it is correct.

7            THE COURT:    Well, but surely, that can't be right.

8            MS. RHODES:    No.  I think the person just came into

9    custody.  Because I thought it must have been from their Jencks

10   material or something and I'm looking through it.  But I realize

11   I think that he was just picked up a few weeks ago in '07.  And

12   while they were debriefing him, he mentioned, oh, I know

13   something about the McCafferty murder and here's what I know or

14   something to that effect.

15           THE COURT:    Okay.  All right.  So --

16           MS. RHODES:    So that's why -- because initially I was

17   thinking, well, how did the Government not give this to us

18   earlier and I think that's why.  There's another date that also

19   says something like March '07 or April '07 --

20           THE COURT:    Right.

21           MS. RHODES:    -- when I looked.  So I think it was, I

22   think maybe it is correct.

23           THE COURT:    Okay.  So this was discovery that has just

24   recently come into the possession of the Government --

25           MS. RHODES:    Right.

1              THE COURT:    -- as the result of a recent arrest.

2              MS. RHODES:    Right.  Of somebody who then said this is

3    what I know and his information was that Barksdale was

4    responsible for that homicide.

5              THE COURT:    Okay.  And Mr. Sullivan states in his ex

6    parte submission that he wrote to Mr. Mitchell apprising

7    Mr. Mitchell of this development.

8              MS. RHODES:    Yes.  I don't know if Mr. Mitchell has

9    seen that or not.

10              THE COURT:    Right.

11              MS. RHODES:    Recent mail has been coming back.

12              THE COURT:    Okay.  Mr. Mitchell, please, just listen to

13    me briefly.  A recent letter sent to you by Mr. Sullivan dated

14    May 25th discusses this matter that we're now talking about.  The

15    Government has turned over a recent report of investigation as

16    the result of the arrest of a man in Baltimore City who reports

17    as Ms. Rhodes just said that he heard on the street I guess that

18    somebody named Bodie was involved in the Oliver McCafferty murder

19    back in 2002.  What Mr. Sullivan advised you in the letter is

20    that this person, Bodie, is a former client of Mr. Sullivan.  And

21    therefore, Mr. Sullivan may have a conflict of interest,

22    potentially has a conflict of interest in representing you in

23    view of the fact that he formerly represented this person, Bodie.

24    Now I really need you, whatever else you believe and this is all

25    under seal.  Nobody is going to know about this conversation.  I

1  really need you to talk to Ms. Rhodes and Mr. Sullivan as soon as

2  he gets back and listen to them and make a decision about what

3  you want to do.  I don't know how the Court is going to handle

4  this.  Obviously, I don't know what Mr. Sullivan wants to do

5  because he hasn't been able to talk to you yet.  At this point,

6  Mr. Sullivan is not asking for permission to withdraw from the

7  case.  And I believe he wants to continue representing you.

8  Whether he can, I just don't know yet.  But we're going to have

9  to deal with this and we're going to have to deal with this

10  promptly.  If it turns out that Mr. Sullivan cannot continue

11  representing you and it's up to the Court ultimately to make that

12  determination, there are several possibilities.  One is that the

13  whole trial gets postponed.  That's not likely.  Another is that

14  your trial will be severed from the other three and a new lawyer

15  will be appointed to join Ms. Rhodes in representing you.

16  Another could be that Mr. Sullivan could be permitted to

17  withdraw.  Ms. Rhodes could take the lead in representing you and

18  a new lawyer could be added to your legal team and your trial

19  could go forward in September as scheduled.  Those are just a few

20  of the possibilities.  There's also the possibility that

21  Mr. Sullivan will continue in the case and things will go forward

22  as planned.  What's important for you now at this stage is that

23  you actually talk to them and try to make a decision about what

24  you want to do.  So I'm going to ask Ms. Rhodes to re-mail that

25  letter to you and I hope that you will not send it back.  That

1    you will take the letter and respond to Mr. Sullivan and Ms.

2    Rhodes and arrange for a meeting with them in the next week so

3    that you can fully discuss this.  Is there anything else, Ms.

4    Rhodes?

5            MS. RHODES:    At some point would the Court be inclined

6    to appoint independent counsel to meet with Mr. Mitchell about

7    this?

8            THE COURT:    I certainly would be inclined to do that

9    upon your request.  Yes.  Do you have a question, Mr. Mitchell?

10           DEFENDANT MITCHELL:    I would just like to say I accept

11   this ex parte hearing for value and return it to you for value

12   for close and settlement of the account.  I request the

13   following:  Do not argue the facts, request the Court issue me an

14   appearance bond, waive all public charges.  I request the Court

15   close the account, release the order of court to me immediately.

16   I request the Court set off and adjust all public charges by the

17   exemption in accord with Uniform Commercial Code 3-419, House

18   Joint Resolution 192, Public Law 73-10.  I request immediate

19   discharge.

20           THE COURT:    Ms. Rhodes, I understand Mr. Mitchell has

21   one year of college.  Is that right?

22           MS. RHODES:    A little bit more than that.  One and a

23   half to two.

24           THE COURT:    Do you recall where he was in school?

25           MS. RHODES:    It was Bryant College in Rhode Island and

162

1    another, a community college in New Jersey was the first one.

2                   THE COURT:   Okay.  Thank you.  All right.  This will

3    conclude the ex parte matter.  Again no transcript of these

4    proceedings is to be prepared without order of Court.  And indeed

5    I should order, Ms. Bankins, please prepare a transcript of these

6    proceedings so that as soon as possible of this ex parte

7    proceeding so that you can provide a copy to Ms. Rhodes so that

8    Mr. Sullivan will be fully abreast of what was said here in this

9    proceeding.  When will he return, Ms. Rhodes?

10                   MS. RHODES:   I don't know.  But I think within three

11   days.

12                   THE COURT:   All right.  Thank you, Ms. Rhodes.  We're

13   in recess.

14                   (Proceedings concluded.)

15

16

17   I, LISA K. BANKINS, certify that the foregoing is
     a correct transcript from the record of
18   proceedings in the above-entitled matter.

19

20   _____   _____
     Signature of Court Reporter/                    Date
21   Transcriber

22

23   _____
     Typed or Printed Name
24

25

                                                                 163

**0**

02 [1] 43/23
029 [1] 1/3

**1**

1/2 [1] 15/2
10 [14] 39/2 39/3 40/14 41/7 71/11
71/12 72/13 72/16 153/15 154/24
155/12 156/8 156/18 162/18
101 [1] 2/21
10:00 [1] 151/23
10th [2] 117/8 118/13
11 [7] 40/4 40/5 40/15 40/22 40/24 42/3
100/5
111 [1] 96/9
12 [13] 13/8 36/18 40/4 40/5 40/15
40/22 40/24 42/4 48/1 48/4 72/13 86/1
132/13
12-year-old [2] 56/16 56/21
12th [2] 95/16 97/3
13 [4] 42/11 42/13 142/25 143/2
1350 [1] 2/17
14 [3] 3/6 42/24 81/14
14th [2] 94/20 95/14
15 [11] 30/8 42/24 71/9 71/11 71/12
72/16 96/22 96/22 143/3 143/4 143/5
16 [6] 15/17 72/12 118/1 141/22 142/1
142/13
1622 [1] 2/12
17 [2] 3/6 4/10
17th [1] 13/22
1800 [1] 2/6
18th [2] 115/12 115/25
19 [1] 6/11
192 [7] 153/15 154/7 154/24 155/11
156/7 156/18 162/18
1995 [1] 15/10
1:00 [1] 13/8
1st [3] 13/15 70/14 72/3

**2**

20 [10] 71/9 72/12 72/16 125/1 125/22
125/24 126/11 134/19 149/16 149/18
20-some [1] 12/12
20/20 [2] 149/16 149/18
200 [1] 1/20
20008 [2] 2/15
2002 [17] 4/10 13/10 21/12 28/23 37/2
39/11 40/7 42/17 43/21 43/24 44/16
63/24 64/1 64/3 66/9 112/13 160/19
2003 [1] 63/23
20036 [1] 2/18
2004 [1] 81/14
2005 [1] 152/8
2007 [3] 1/5 39/25 159/4
205 [8] 94/10 96/8 96/21 99/12 102/6
102/13 108/7 108/15
20770 [1] 1/24
20850 [1] 1/21
209 [1] 2/9
20:35 [2] 43/23 43/24
21 [2] 3/9 112/13
211 [1] 94/8
2115 [1] 2/2
21201 [3] 1/17 2/3 2/22
21202 [2] 2/6 2/13
21204 [1] 2/10
22 [1] 86/2
2255 [4] 133/8 133/10 133/12 133/14
24 [1] 15/2
25 [2] 2/2 159/4
250 [2] 90/9 90/12
25th [1] 160/14

26 [3] 40/2 40/7 150/19
26th [3] 79/19 84/4 157/3
27 [3] 40/2 79/6 150/19
273 [2] 130/12 131/19
28 [1] 3/11
2900 [1] 2/15
2:00 [2] 87/14 87/20

**3**

3-419 [6] 154/6 154/24 155/11 156/7
156/18 162/17
30 [4] 117/10 118/13 140/15 140/19
300 [2] 2/18 15/4
305 [2] 1/20 2/9
319 [5] 117/24 117/25 118/4 118/8
120/22
33 [1] 3/11
35 [1] 3/11
36 [2] 1/16 3/14

**4**

401 [2] 2/5 2/12
403 [2] 127/23 127/24
404 [4] 132/19 132/20 132/21 132/22
419 [7] 153/14 154/6 154/24 155/11
156/7 156/18 162/17
42 [1] 81/16
45 [1] 3/14
499 [1] 94/24
4th [1] 116/4

**5**

500 [1] 96/8
5012 [1] 2/22

**6**

6-7-02 [1] 43/23
63 [1] 3/17
6305 [1] 1/23

**7**

70 [1] 3/17
700 [1] 1/23
73-10 [6] 153/15 154/24 155/12 156/8
156/18 162/18
7310 [1] 154/7
75 [1] 114/20
76 [1] 3/17
77 [1] 3/17
7th [8] 28/23 42/7 42/17 43/5 43/21
43/24 44/16 151/23

**8**

804 [3] 53/2 60/3 60/13
8:35 [1] 43/25
8th [6] 39/10 39/11 40/20 42/7 42/17
43/5

**9**

900 [1] 96/10
911 [1] 58/23
940 [7] 94/21 95/15 95/17 96/4 96/13
96/24 97/5
99 [1] 82/18
9:30 [1] 1/6

**A**

a.m [1] 1/6
Aaron [11] 37/20 42/14 43/10 44/12
44/18 44/19 89/18 94/15 94/15 94/16
96/2
aback [1] 139/25
abandonment [1] 95/23
ability [1] 48/2
able [9] 39/19 39/25 48/7 52/12 82/6
125/18 127/5 130/17 161/5
about [122] 4/18 5/11 8/5 10/5 10/6

12/20 13/3 13/25 15/15 16/1 16/4 16/5
16/6 16/23 17/6 17/16 18/15 18/18
18/24 18/24 23/20 26/24 29/3 29/4 31/5
33/7 36/24 38/11 39/13 41/3 42/11
49/21 54/19 59/16 60/8 61/14 61/24
63/3 67/2 67/10 71/9 72/5 72/11 74/9
77/11 77/12 77/17 77/18 77/21 77/25
80/23 81/14 85/10 86/12 87/1 89/19
90/9 90/15 91/18 92/20 93/3 94/24 96/1
104/5 104/9 104/12 104/13 109/4
109/14 112/15 116/6 116/15 117/2
119/1 119/10 119/20 120/24 121/5
122/19 124/23 125/5 125/10 127/14
127/16 127/17 128/4 128/23 128/24
131/21 132/4 132/23 132/25 134/6
134/11 135/4 135/25 139/17 139/24
140/2 140/10 141/1 141/8 141/20 142/7
142/22 143/20 143/24 144/4 144/7
146/10 146/15 148/14 149/21 151/3
152/5 152/11 159/13 160/14 160/25
161/2 161/23 162/6
above [3] 144/10 157/18 163/18
above-entitled [2] 157/18 163/18
abreast [1] 163/8
absence [3] 6/3 13/12 130/25
absent [1] 99/5
absolutely [7] 5/25 56/6 84/23 127/25
128/2 137/12 148/17
absolve [1] 112/10
accept [12] 33/13 54/1 153/18 153/20
153/23 154/10 154/15 155/6 155/25
156/11 156/20 162/10
acceptable [1] 83/22
acceptance [1] 153/7
accepted [2] 153/6 154/12
accepting [1] 103/12
accord [3] 153/14 154/6 154/23 155/10
156/17 162/17
accordance [2] 4/3 4/6
according [3] 51/20 80/15 80/25
account [11] 9/10 154/1 154/4 154/18
154/21 155/7 156/2 156/4 156/13
162/12 162/15
accounts [3] 153/12 155/13 156/15
accumulation [1] 55/12
accuracy [1] 35/8
accurate [2] 141/16 141/17
accurately [1] 39/15
accused [2] 99/25 100/1
accusing [1] 77/15
achieved [1] 101/23
acquittal [1] 137/17
acronym [1] 64/11
across [2] 88/23 96/10
acted [1] 108/25
acting [2] 27/3 97/9
action [2] 72/6 149/14
activities [2] 111/3 152/7
activity [3] 110/11 111/5 112/6
acts [1] 112/7
actual [3] 46/1 93/22 124/20
actually [33] 10/18 12/8 12/24 28/8 32/9
38/6 38/9 42/6 42/18 46/16 79/25 82/8
82/18 84/3 94/11 97/12 99/12 99/12
104/20 104/21 107/1 109/23 113/13
113/15 114/21 117/5 123/11 124/5
130/18 138/3 140/3 158/17 161/23
Acura [2] 94/14 96/1
ADAM [2] 2/14 153/21
add [4] 129/15 133/7 137/10 138/24
added [3] 45/25 139/4 161/18
addition [5] 40/20 49/7 49/8 49/20
122/20
additional [9] 4/16 5/2 9/6 42/10 49/20
53/19 97/6 123/11 127/24
additions [3] 114/24 115/6 138/8
address [1] 150/17

A

adequacy [1] 150/21
adjust [6] 153/13 154/5 154/22 156/6
156/17 162/16
adjustment [1] 119/20
Administration [2] 63/15 63/22
administrative [1] 26/16
admissibility [4] 5/24 79/13 122/22
124/25
admissible [6] 5/7 49/5 51/21 85/5 85/11
128/2
admission [2] 83/6 111/15
admit [14] 46/24 49/24 53/6 53/24 56/5
56/8 58/14 79/9 84/17 104/19 125/14
129/5 131/3 134/18
admitted [7] 17/3 49/9 60/10 121/22
121/24 128/2 150/6
admitting [3] 49/15 130/6 134/16
adopt [6] 100/24 100/25 122/3 122/5
122/6 131/1
advance [1] 119/6 128/9
advice [13] 15/12 15/22 15/25 16/13
16/16 16/23 17/6 17/14 19/6 69/5 69/8
69/12 73/22
advise [1] 20/5
advised [11] 12/22 13/15 13/20 16/20
18/20 75/3 78/4 95/18 95/19 95/23
160/19
advisement [7] 16/3 16/4 16/5 16/6 16/7
69/3 78/2
advocating [1] 141/22
affect [1] 10/7
affects [1] 10/10
affiant [3] 93/22 94/4 108/12
affidavit [19] 82/21 88/10 88/18 89/3
90/8 90/13 92/6 92/10 93/3 93/16 93/21
96/5 97/12 97/13 97/14 99/15 108/2
108/5 108/12
affidavits [1] 27/2
affiliated [1] 64/10
affiliation [1] 65/24
affirmative [1] 149/20
affirmatively [2] 44/8 144/9
afford [1] 18/3
aforementioned [1] 95/19
afraid [1] 30/24
after [27] 5/6 15/13 18/14 18/20 23/17
24/4 31/22 31/23 32/1 35/5 57/6 74/7
76/14 86/19 88/5 94/24 96/22 96/23
101/22 102/13 105/24 123/1 140/4
140/21 149/21 151/16 151/17
afternoon [11] 21/13 67/3 86/9 86/17
87/15 87/19 87/22 87/23 87/25 116/8
122/21
afternoon's [1] 8/22
again [29] 5/7 6/6 28/22 28/22 29/3
30/17 32/7 32/11 40/17 42/15 44/11
44/13 55/25 62/25 80/8 80/16 80/18
83/8 93/20 124/7 124/18 125/15 127/2
131/20 137/9 137/17 149/18 153/1
163/3
against [6] 40/19 62/15 100/20 116/7
152/19 155/10
agitated [1] 146/10
ago [6] 10/13 88/1 127/6 146/11 158/12
159/11
agree [12] 6/6 47/14 47/18 58/1 60/21
82/8 110/7 110/22 114/21 131/17
143/12 143/14
agreed [7] 72/23 113/14 114/18 136/18
140/3 142/1 153/17
agreement [4] 114/15 115/24 129/5
141/8
agrees [5] 102/11 102/11 107/23 111/21
134/10
ahead [7] 4/13 7/21 34/16 35/10 41/19

47/21 147/4
aimed [1] 129/2
Albright [1] 119/25
all [165]
alleged [7] 6/8 62/14 92/9 92/16 93/6
94/2 94/5
allegedly [3] 90/6 108/7 109/7
allow [2] 38/4 147/6
allowed [1] 107/11 122/3
alluded [1] 121/18
alludes [1] 10/13
almost [6] 56/15 60/21 101/8 124/14
130/9 135/11
alone [1] 22/11
along [5] 30/2 48/9 82/7 97/4 138/2
already [18] 8/16 12/25 29/3 33/17
46/17 64/1 72/23 77/2 77/13 90/19 92/8
118/21 118/21 121/5 126/19 126/25
126/25 131/14
also [41] 9/24 10/17 13/5 18/6 21/21
39/21 47/24 48/1 48/8 48/12 49/8 49/9
51/21 54/16 55/1 63/25 66/2 67/11
70/20 79/12 88/5 89/17 89/19 96/9 97/4
97/5 100/5 100/21 107/20 118/4 132/9
133/23 142/1 148/14 150/6 154/11
154/15 155/12 155/14 159/18 161/20
although [6] 48/3 48/5 85/12 107/20
132/5 138/1
Altoona [1] 23/7
always [9] 69/5 69/9 100/3 100/8 129/12
129/14 147/13 149/16 149/18
am [14] 5/3 14/6 14/8 36/15 40/13 77/17
85/3 85/9 86/10 91/4 122/10 128/1
136/25 146/4
AMD [1] 1/3
AMD-04-029 [1] 1/3
Amendment [8] 12/18 16/1 16/8 47/16
62/10 62/14 107/15 107/16
AMERICA [1] 1/3
Amity [14] 90/9 90/12 94/9 94/10 96/8
96/9 96/13 96/21 96/24 99/12 102/6
102/14 108/8 108/15
among [2] 79/24 84/7
amplified [1] 123/21
analysis [1] 54/23
and Mr. Kurland [1] 132/2
and/or [1] 49/17
ANDRE [1] 1/12
Andrea [19] 11/1 11/15 29/1 29/6 30/2
30/7 33/16 34/1 34/6 49/1 55/4 56/23
57/2 59/14 60/10 60/16 123/7 123/8
144/4
anecdotally [1] 129/13
another [15] 29/13 34/8 75/21 76/24
95/25 102/4 103/5 113/1 119/21 133/12
150/1 159/18 161/13 161/16 163/1
answer [3] 75/12 75/18 113/11
anticipate [6] 10/15 47/11 47/25 48/14
61/23
anticipates [1] 47/10
anticipation [1] 7/16
anxious [1] 7/12
any [89] 7/9 12/4 13/12 15/25 16/22
16/23 19/22 27/17 32/3 39/18 39/19
39/22 39/25 40/9 45/8 48/15 50/14
60/22 61/10 61/25 65/18 67/18 68/9
68/15 69/24 70/24 73/9 74/4 75/1 76/5
77/10 77/14 81/3 82/14 82/14 88/8
90/18 90/20 91/18 91/20 92/20 93/1
93/10 93/12 93/12 93/13 99/5 101/12
101/15 101/23 104/5 104/13 104/23
105/16 105/22 105/23 107/22 108/4
108/23 110/8 110/25 111/22 112/10
112/22 112/22 117/13 120/3 120/5
120/10 120/11 120/15 120/16 121/2
122/11 124/14 124/22 130/25 131/7
131/7 132/13 134/5 134/6 134/8 135/6

151/6 151/10 151/18 157/2 158/7
anybody [6] 25/2 80/23 91/20 91/21
92/1 106/25
anymore [1] 132/8
anyone [3] 69/15 69/22 101/24
anything [39] 8/13 10/5 12/6 18/17
18/17 31/5 31/10 35/6 41/13 46/6 53/24
69/1 72/5 74/3 75/20 79/7 79/11 86/6
86/10 88/18 89/13 90/20 90/23 93/2
106/15 109/20 112/15 136/5 137/6
139/1 144/4 146/5 147/12 150/25
152/19 152/20 163/1 153/2 162/3
anyway [3] 91/8 136/24 151/11
anywhere [1] 109/14
apart [3] 19/12 25/22 103/12
apartment [7] 29/8 29/9 29/17 31/22
107/18 108/8 108/15
apologize [2] 85/20 158/25
apparent [1] 152/12
apparently [10] 4/11 5/6 49/15 78/3
80/24 88/17 89/18 111/16 112/11
158/16
appeal [4] 133/25 134/1 143/13 143/15
appear [4] 23/7 28/6 40/24 40/25
appearance [2] 12/10 111/16 153/11
154/3 154/20 155/9 156/3 156/14
162/14
appearances [2] 1/14 25/23
appeared [1] 39/16
appears [3] 87/14 130/23 142/24
appellate [1] 85/4
application [2] 80/12 134/4
applied [3] 47/17 122/6 134/2
applies [1] 48/13
apply [2] 55/19 108/24
appoint [1] 162/6
appointed [2] 155/2 161/15
appreciate [12] 4/8 4/16 84/10 84/25
86/8 129/20 130/1 130/20 133/9 135/19
135/20 143/21
appreciates [1] 152/1
Apprehension [1] 21/5
apprising [1] 160/6
approach [11] 34/12 36/25 47/2 56/19
114/22 116/11 121/14 137/22 139/10
148/7 157/10
approached [1] 157/11
approaching [1] 56/24
appropriate [6] 7/18 9/11 48/12 59/14
98/22 128/7
appropriately [2] 111/10 111/19
approval [2] 131/1 143/15
approved [2] 7/18 113/18
approximate [1] 72/14
approximately [7] 29/19 29/21 29/22
30/1 30/8 31/14 34/2
April [12] 4/10 13/15 13/22 21/12 66/9
70/14 72/3 79/19 79/19 84/4 141/22
159/19
are [98] 7/2 9/19 9/20 14/23 15/17 17/23
19/10 19/23 30/22 36/13 38/16 38/16
38/18 38/21 38/24 38/24 38/24 40/6 41/24
42/5 42/8 43/1 46/8 46/12 46/15 52/7
59/1 61/22 62/12 66/24 71/22 72/1 72/2
72/11 76/2 77/18 77/24 82/25 85/8
85/15 87/2 87/3 87/9 87/12 88/6 90/16
90/18 94/11 95/8 95/10 96/14 97/20
100/13 100/17 101/9 102/12 102/14
103/8 103/19 104/5 105/16 105/23
105/25 106/1 110/14 111/3 111/5
112/24 112/25 113/5 120/7 122/19
123/20 125/1 127/18 130/16 131/8
131/9 131/11 132/9 132/16 133/24
134/11 135/6 135/10 135/10 139/11
140/6 142/22 143/24 146/21 151/18
153/16 157/9 158/4 158/6 158/6 161/12
161/19

# A

area [8] 19/22 20/24 89/8 90/22 93/9
98/19 119/22 119/23
aren't [5] 4/19 16/22 16/23 101/18 142/4
argue [16] 11/17 46/12 61/16 61/17
61/19 62/11 62/11 62/17 132/11 153/10
154/2 154/19 155/8 156/2 156/13
162/13
argued [2] 13/18 111/10
argues [2] 5/9 11/25
argument [27] 4/14 5/8 13/12 46/22
52/21 54/13 58/12 61/14 61/23 62/4
62/13 88/8 92/17 104/13 105/13 110/7
120/25 125/11 128/21 129/2 132/14
132/23 133/19 146/17 148/11 150/23
157/3
arguments [7] 6/18 84/9 128/5 133/3
133/3 133/4 150/2
arise [2] 127/18 127/25
arisen [1] 7/4
arising [4] 58/23 62/11 62/14 112/13
armrest [1] 98/14
around [7] 29/24 34/1 74/24 89/2 95/16
105/19 137/12
arrange [2] 151/9 162/2
arrest [53] 13/10 21/20 22/1 22/2 22/25
23/3 23/5 23/17 39/12 39/20 40/8 40/13
40/18 40/20 46/1 61/20 65/6 65/15
66/11 66/17 66/21 67/2 67/5 67/10
67/11 68/23 70/21 71/4 74/15 91/5
91/14 91/16 93/9 97/21 98/18 99/8
101/16 101/24 101/25 103/9 104/18
105/2 106/2 106/15 107/1 107/6 107/7
110/23 111/18 111/25 112/3 160/1
160/16
arrested [14] 15/13 23/9 23/15 35/24
38/23 65/9 66/10 68/2 91/7 102/10
103/1 103/2 105/5 110/19
arresting [1] 111/14
arrests [1] 13/14
arrived [1] 107/18
as [201]
ascribe [1] 125/9
ask [29] 18/15 18/16 18/18 18/20 21/12
22/6 28/22 29/4 31/18 36/13 38/11 40/3
41/2 42/10 45/14 52/12 69/18 75/13
113/10 118/20 121/6 122/5 124/11
124/21 127/11 147/7 152/17 158/15
161/24
asked [27] 31/20 31/23 31/25 31/25
34/5 34/18 34/24 34/25 35/8 38/4 39/18
51/19 55/15 57/1 57/7 61/5 90/20 97/8
105/10 105/22 114/12 119/4 139/13
142/12 154/25 155/1 156/25
asking [8] 20/6 20/6 39/1 69/21 105/11
140/11 143/1 161/6
aspect [3] 9/17 104/12 137/4
aspects [2] 48/24 97/20
assailants [2] 33/17 55/3
assault [3] 65/10 65/12 67/11
assembling [1] 38/13
assert [1] 128/1
asserted [2] 59/24 60/1
assertions [1] 27/1
assess [3] 6/8 6/9 82/13
assigned [5] 21/5 36/20 37/4 63/13
63/21
assist [1] 67/23
assistance [1] 131/2
assisted [2] 38/12 148/15
assume [9] 15/19 46/4 48/18 50/20 58/1
75/8 75/10 75/14 75/20
assuming [5] 47/17 52/21 59/7 117/16
146/20
assurance [1] 120/14
assure [3] 9/9 87/19 147/20
at [211]
attached [7] 62/4 65/24 69/2 83/4 104/3
149/11
attack [3] 133/6 134/17 143/19
attempt [2] 77/6 132/20
attempted [3] 37/25 108/6 135/11
attend [1] 8/23
attendant [1] 5/2
attention [9] 7/6 7/7 27/6 28/23 34/6
66/9 74/21 76/6 93/1
attorney [19] 17/17 19/6 102/17 103/3
103/5 134/3 153/8 153/9 153/21 153/21
153/24 153/24 154/11 154/13 154/13
154/25 155/1 155/1 155/2
Attorney's [1] 1/15
attorneys [8] 130/16 131/3 131/16
131/24 132/8 152/13 153/16 154/12
attributed [1] 109/21
audience [1] 148/15
August [1] 151/21
authorities [1] 111/19
Authority [1] 108/14
available [8] 51/15 54/7 54/18 54/19
54/22 56/3 69/8 82/19
Avenue [2] 2/9 2/17
average [1] 89/9
avoid [1] 7/9
aware [4] 33/16 65/17 68/4 132/5
away [12] 30/8 66/16 89/7 89/12 90/9
92/5 92/14 93/7 96/16 97/3 115/19
146/20
awful [1] 128/23

# B

back [39] 4/2 10/24 26/15 27/9 37/2
41/3 59/11 59/13 79/18 84/4 89/11
89/14 90/1 90/4 90/23 90/24 91/6 96/2
96/17 96/25 98/14 98/14 98/16 102/9
102/13 107/4 107/18 116/5 120/21
123/14 130/12 140/11 141/22 143/11
152/7 160/11 160/19 161/2 161/25
backed [1] 38/3
background [4] 10/12 12/3 124/23 125/4
backwards [2] 42/2 64/11
backyard [2] 88/23 96/15
bad [1] 14/5
bag [6] 43/15 43/17 43/18 43/18 43/22
44/10
balcony [1] 56/18
Baltimore [42] 1/4 1/17 2/3 2/6 2/13 2/22
13/24 14/24 15/12 21/4 21/9 21/15
21/23 22/20 22/20 22/22 22/23 23/6
23/22 24/6 24/9 24/11 26/23 36/15
39/21 43/19 63/13 63/19 66/15 66/23
67/23 68/6 68/7 68/9 70/23 70/23 71/22
72/1 72/9 79/10 111/19 160/16
Baltimore County [1] 36/15
Bankins [4] 2/21 157/17 163/5 163/17
bare [1] 97/11
barebones [1] 108/23
Barksdale [2] 158/13 160/3
Barnes [3] 104/9 105/4 106/3
Barnes' [1] 104/4
barred [1] 120/12
Barrigan [1] 132/18
BARRY [1] 2/17
baseball [5] 52/16 95/8 109/16 144/20
144/21
based [17] 5/21 49/18 53/4 61/14 91/6
93/10 93/14 98/17 101/18 107/8 109/8
123/17 129/21 137/8 137/10 140/9
146/25
bases [1] 135/7
basic [1] 127/3
basically [5] 16/6 16/19 39/15 42/20
70/22
basis [11] 7/5 82/10 93/9 104/20 107/25

108/14 108/22 125/14 129/7 134/16
149/11
be [214]
bear [1] 83/4
bearing [1] 117/14
became [1] 134/4
because [57] 14/1 27/3 31/3 49/3 54/3
54/3 54/18 58/19 58/20 58/25 59/1 59/5
59/21 81/1 81/7 83/15 83/18 91/13
91/15 91/19 92/5 98/19 99/4 99/8 99/13
100/25 101/14 102/9 103/19 103/24
109/5 113/17 117/18 120/18 122/7
124/11 124/25 127/10 128/8 128/17
131/24 132/22 132/24 135/3 140/3
141/15 141/23 146/23 148/24 149/7
149/7 151/5 152/9 152/16 159/9 159/16
161/5
become [5] 64/16 65/2 65/5 152/5 153/3
becomes [3] 119/3 123/16 152/11
bed [2] 104/25 109/17
bedroom [13] 90/24 101/20 101/22
104/2 104/6 105/17 105/24 106/12
106/13 106/15 106/16 109/14 112/11
been [82] 4/8 4/16 4/17 6/4 11/2 11/22
12/11 13/13 13/22 14/25 15/6 16/20
19/8 19/8 21/9 23/9 36/17 36/23 37/12
39/2 39/19 46/1 46/3 47/20 58/15 60/20
63/19 63/21 67/20 68/1 80/15 80/17
81/18 82/8 83/9 86/4 89/15 89/19 92/1
92/8 92/9 92/24 93/6 93/8 94/11 99/7
99/18 99/19 103/18 104/11 105/1
105/15 105/15 107/8 108/11 109/11
114/11 114/16 116/16 118/17 122/2
124/16 126/13 126/14 126/15 130/21
130/21 130/22 130/23 131/14 131/25
133/19 135/8 135/13 136/13 136/16
139/14 149/18 150/10 159/9 160/11
161/5
before [21] 1/12 33/6 38/10 45/19 76/25
81/24 82/7 82/11 89/4 90/20 116/4
116/5 116/8 124/1 124/11 125/8 130/20
134/22 141/21 150/18 152/18
beg [1] 118/16
began [1] 134/14
beginning [2] 108/3 136/14
behalf [4] 3/4 8/5 8/19 152/10
being [29] 11/6 15/13 21/16 21/25 23/14
33/20 43/7 43/8 45/22 47/22 47/23 52/1
54/24 61/18 65/10 65/17 70/22 71/22
89/3 96/12 100/12 102/6 103/21 109/8
109/14 111/1 128/14 144/8 151/3
belatedly [2] 120/19 120/20
believe [34] 29/11 32/16 42/16 46/9
47/24 57/23 58/10 65/23 66/15 67/22
90/11 91/18 92/22 92/23 104/8 106/7
106/14 106/21 106/24 107/6 107/23
108/10 109/24 113/20 113/20 114/14
125/3 131/2 142/23 142/25 150/6
152/16 160/24 161/7
believed [6] 79/20 88/25 89/17 89/23
92/7 92/11
believes [2] 6/16 128/6
belong [1] 27/3
belonged [2] 91/20 92/7
bench [3] 117/4 157/10 157/11
Benson [6] 25/11 25/13 46/17 61/5
67/19 67/21
Bertolli [2] 132/18 132/20
besides [1] 99/23
best [16] 6/7 7/8 34/4 34/9 41/10 55/6
55/9 55/14 79/14 88/17 123/22 124/8
152/12
bet [3] 117/17 120/4 120/4
better [1] 13/2
between [19] 13/8 30/1 84/19 88/9 96/3
98/13 98/20 106/9 106/10 108/5 109/12

**B**

between [8] 11/2 12/20 125/4
131/7 132/7 139/24 142/8 147/8
beyond [5] 98/24 100/6 102/1 109/2
149/22
bias [1] 133/6
big [1] 119/7
bigger [1] 119/10
birth [1] 94/2
bit [11] 10/3 30/2 32/11 32/12 43/8 43/8
48/6 118/16 139/25 149/13 162/22
black [5] 88/20 89/16 90/5 94/1 95/18
block [3] 92/14 94/11 96/10
blocks [5] 88/15 90/9 92/5 93/7 94/10
blood [2] 134/5 140/8
blue [3] 95/6 95/7 116/1
blue-lined [1] 116/1
blurt [1] 55/20
Bodie [4] 158/13 160/18 160/20 160/23
bodies [1] 95/13
body [1] 56/19
bold [2] 138/13 138/24
bond [7] 153/11 154/3 154/20 155/9
156/3 156/14 162/14
bones [1] 97/11
book [2] 45/10 148/12
booked [2] 38/23 46/1
booking [14] 12/17 14/1 15/4 15/6 15/23
16/18 25/14 25/15 26/12 26/13 38/21
38/22 39/22 45/16
boss [1] 98/4
both [22] 37/21 43/1 51/25 52/3 52/4
52/5 52/8 55/22 56/14 61/17 70/23 88/4
95/7 95/8 102/12 107/15 107/17 107/24
144/25 149/23 153/16 154/12
bother [2] 92/17 92/19
bothered [1] 92/3
bottom [1] 39/5
bought [1] 141/21
boy [1] 80/21
Boys [1] 89/2
braided [2] 41/5 41/22
braiding [1] 41/14
braids [5] 11/6 42/8 52/15 144/7 144/23
branches [1] 71/13
brandishing [1] 89/16
Braxton [2] 99/23 100/22
break [8] 85/21 85/23 86/20 87/13
122/18 125/21 126/19 150/18
breaking [1] 101/22
breakthrough [2] 130/23 141/16
breath [1] 31/6
breathing [2] 31/7 57/11
Brennan [1] 1/22
BRIAN [3] 3/13 36/5 36/10
bridge [1] 135/1
brief [6] 10/15 37/13 63/2 87/18 121/16
152/15
briefed [3] 11/2 11/16 137/3
briefing [1] 4/16
briefly [16] 13/3 44/1 48/21 135/22
135/23 136/24 136/25 139/9 144/15
148/5 150/17 152/22 156/22 157/8
158/9 160/13
bright [1] 41/23
bring [7] 46/5 48/20 72/18 124/15
133/25 134/2 134/8
bringing [3] 10/16 86/5 132/12
broad [1] 133/5
broke [1] 101/20
broken [1] 101/19
brother [1] 66/2
brother's [1] 105/24
brothers [4] 66/6 66/7 85/7 91/20
brought [13] 7/7 10/24 12/19 15/13 16/1
17/6 29/12 74/21 134/22 141/24 142/2
142/5 145/9
brown [9] 37/19 44/12 44/14 44/14
45/6 66/3 66/12 88/25 95/20
Brown/McCafferty [1] 65/25
brush [1] 133/5
Bruton [4] 84/15 151/3 151/5 151/13
Bryant [1] 162/25
building [3] 24/13 29/10 145/1
burden [2] 110/4 119/25
business [4] 87/15 115/10 154/13
154/14
but [204]
but that's [1] 57/19
But we [1] 135/1

**C**

calculated [1] 55/6
calculation [1] 103/6
call [13] 14/9 22/15 36/4 49/3 52/11
62/10 66/9 91/2 111/6 112/8 119/17
147/16 147/18
called [10] 9/19 13/3 64/8 64/9 76/6
89/22 91/2 102/8 105/25 116/18
calls [3] 20/20 58/25 98/21
came [15] 21/18 37/11 59/5 80/17 88/16
90/2 90/23 91/6 96/2 102/16 102/23
105/19 113/21 117/7 159/8
can [86] 7/18 7/19 9/9 13/9 15/3 15/15
16/12 16/16 17/23 18/1 18/4 18/9 21/8
23/20 26/24 30/24 31/13 32/22 34/9
41/12 41/25 43/16 44/2 47/4 48/10
52/15 59/8 60/3 63/1 63/18 65/20 65/22
66/13 67/7 72/7 75/23 75/24 78/6 79/11
79/22 81/8 83/3 86/16 87/4 87/6 87/14
88/18 91/9 98/12 100/9 101/2 103/23
106/15 106/22 106/22 111/1 115/7
116/3 116/4 116/5 116/6 116/24 118/24
123/1 123/3 123/12 124/8 124/9 124/19
126/10 131/16 132/11 135/7 138/1
138/22 139/3 139/4 139/5 141/9 148/20
148/24 150/2 151/20 161/8 162/3 163/7
can't [13] 18/3 27/16 55/18 75/12 75/21
91/12 92/13 113/11 115/24 121/2 140/4
141/8 159/7
candid [1] 60/8
cannot [2] 99/4 161/10
cap [4] 52/16 88/20 90/5 144/21
capacity [1] 45/22
capital [1] 85/10
caps [3] 90/6 95/8 109/16
car [13] 64/20 66/16 89/6 89/8 89/9 98/1
98/16 99/5 99/18 99/19 106/8 106/9
106/10
care [4] 106/7 128/23 129/1 129/7
careful [2] 47/22 47/23 81/24
carefully [2] 82/5 114/15
carried [2] 70/22 110/4
case [79] 5/10 14/3 21/17 22/1 40/12
40/13 55/13 56/10 61/25 67/10 67/11
67/14 69/13 73/18 73/22 85/4 85/10
86/3 86/5 86/7 89/2 99/2 99/2 99/10
99/12 99/23 99/24 100/1 100/11 100/16
100/16 100/18 101/3 101/13 101/14
101/19 102/3 103/10 103/14 111/11
111/20 111/23 118/22 120/7 125/15
125/21 129/11 129/12 129/14 130/12
130/13 130/24 131/7 131/8 131/18
132/16 132/18 132/20 133/11 133/12
133/23 133/23 133/24 133/25 134/1
134/7 134/10 134/12 136/12 136/14
136/21 137/14 143/20 145/25 146/1
152/5 152/11 161/7 161/21
cases [17] 56/2 87/2 89/2 99/4 100/13
100/15 100/23 101/11 101/19 102/2
110/9 110/14 111/4 122/8 127/4 132/17
133/1
catch [1] 84/16
categories [1] 119/12
Catheris [1] 2/16
ca-... [1] 89/20
cause [32] 91/14 91/22 93/10 97/15
97/16 97/21 98/18 98/21 98/25 99/1
99/8 100/20 101/16 101/24 102/1 103/9
104/18 105/2 106/5 106/7 106/14 107/6
107/7 107/23 108/19 108/22 109/7
109/24 110/23 111/7 111/14 111/24
cellular [1] 107/21
Central [22] 12/17 14/1 15/4 15/6 15/23
16/17 24/20 24/21 24/24 25/2 25/14
25/15 26/12 26/13 26/14 65/11 65/13
66/18 67/5 68/5 68/10 68/15
certain [5] 87/2 108/11 125/9 134/19
135/11
certainly [14] 4/19 5/2 6/14 6/19 8/24
60/21 101/8 113/7 114/4 116/12 139/25
144/12 147/15 162/8
certify [2] 157/17 163/17
challenge [4] 62/10 62/14 107/15 107/16
challenged [2] 88/4 88/5
challenges [1] 150/20
chambers [1] 116/18
chance [9] 8/8 33/8 85/1 85/24 86/2
88/10 115/16 150/1 150/16
change [7] 77/5 77/13 143/14 143/14
146/20 147/14 149/8
changed [5] 15/22 79/24
changes [2] 113/18 115/23
changing [1] 142/21
charge [9] 13/23 64/7 70/7 70/14 70/18
72/17 112/2 137/5 155/10
charged [6] 5/20 85/8 85/15 124/16
127/13 132/25
charges [9] 40/19 106/1 153/14 154/6
154/23 156/6 156/17 162/14 162/16
Charles [2] 1/16 2/2
check [2] 24/23 93/24
checked [1] 89/5
Cheeks [2] 126/8 126/9
Chesapeake [1] 2/9
children [2] 110/10 110/10
chosen [1] 152/6
circuit [15] 13/24 97/23 99/23 100/2
100/12 100/15 100/16 100/23 101/7
101/11 101/12 101/13 105/7 113/25
132/18
circuits [3] 100/14 101/10 101/11
circulated [1] 114/7
circumscribed [1] 82/5
circumstance [1] 56/20
circumstances [17] 6/9 6/12 6/16 48/6
59/9 73/13 73/17 86/6 104/21 108/1
110/11 110/23 111/11 111/13 111/23
147/20 158/8
circus [1] 134/12
cited [4] 55/17 97/24 99/23 127/3
citizen [1] 89/10
city [19] 13/24 14/24 15/12 21/4 21/9
22/20 23/6 23/23 24/6 24/9 26/23 63/19
70/23 71/20 71/22 71/23 72/1 111/19
160/16
claiming [1] 49/12
claims [1] 85/12
clarification [1] 76/1
clarified [2] 107/14 116/16
clarifies [1] 124/6
clarify [1] 122/20
class [1] 48/23
clause [3] 11/17 56/12 60/17
clear [31] 5/11 13/13 17/19 32/6 40/21
49/7 76/2 80/8 80/13 83/9 89/3 93/21
94/3 97/2 99/7 100/2 100/7 105/9
105/11 114/11 121/23 123/22 124/23
127/4 127/9 129/1 131/22 132/21 135/6
142/1 149/12

# C

cleared [1] 101/4
clearer [1] 101/4
clearly [21] 5/18 6/21 41/24 55/16 56/15
57/11 80/4 94/3 95/10 105/3 108/18
109/15 123/20 124/18 125/13 132/19
134/15 134/15 135/14 149/16 149/25
clerk [3] 117/16 118/8 148/14
client [6] 26/20 78/3 79/10 85/21 105/10
160/20
clients [4] 130/17 131/4 131/16 131/25
close [17] 27/6 95/13 96/9 111/6 153/12
154/1 154/4 154/18 154/21 155/7
155/13 156/1 156/4 156/13 156/15
162/12 162/15
closely [2] 87/8 95/3
closing [1] 125/11
clothes [4] 22/7 22/8 38/10 95/17
clothing [14] 10/17 38/5 38/6 43/12
43/19 43/22 95/3 96/18 96/19 97/6
103/21 107/20 107/24 109/6
Club [1] 65/13
co [4] 5/14 5/24 6/5 35/13 79/13 79/21
83/6 86/20 111/2 111/3 121/20 122/4
128/25 137/8
co-conspirator [10] 5/14 5/24 6/5 79/13
79/21 83/6 86/20 121/20 128/25 137/8
co-counsel [1] 35/13
co-defendants [1] 122/4
co-habitants [2] 111/2 111/3
COBURN [24] 2/17 8/4 9/2 9/9 45/3
114/13 114/17 116/11 117/22 120/16
128/4 132/2 132/20 133/20 135/22
138/14 138/21 138/22 139/24 140/9
141/7 142/20 153/21 153/24
Code [5] 154/23 155/11 156/7 156/18
162/17
coercion [11] 91/15 91/25 99/22 100/3
100/8 100/10 100/21 100/25 101/1
101/3 105/4
coercive [4] 105/6 106/24 111/23 112/7
college [3] 162/21 162/25 163/1
colloquy [1] 108/3
coloring [1] 41/25
come [36] 7/6 11/1 11/15 16/17 20/22
23/8 24/15 27/8 28/12 38/4 44/5 48/9
48/17 58/25 58/25 60/3 60/4 64/10 68/1
72/18 73/5 89/16 90/1 102/9 107/4
110/3 118/24 119/19 123/12 124/4
128/9 145/1 146/19 147/12 149/7
159/24
comes [12] 6/5 51/1 51/15 59/5 80/12
119/13 125/1 128/10 129/22 142/9
145/3 147/8
comfortable [1] 27/5
coming [10] 11/19 49/21 52/10 56/9
59/21 76/25 77/22 133/14 140/11
160/11
command [4] 64/22 68/2 69/16 69/22
commander [2] 13/9 64/5
comment [4] 27/23 86/20 135/24 146/19
Commercial [5] 154/23 155/11 156/7
156/17 162/17
COMMISIONER [1] 3/5
commissioner [9] 12/9 12/11 14/9 14/18
14/24 15/1 15/11 17/13 20/16
commissioners [2] 12/16 13/1
committed [1] 94/16
commotion [1] 30/3
communicate [1] 31/18
community [1] 163/1
compare [1] 42/6
compared [1] 131/13
comparison [1] 138/1
compelling [1] 6/3
competing [1] 113/5
complete [5] 4/11 13/19 48/10 87/14
152/13
completed [2] 63/25 151/25
completely [1] 101/14
completion [1] 105/15
complex [3] 29/8 29/17 31/22
complicated [2] 97/13 112/21
complicity [1] 54/8
component [2] 88/7 144/6
components [1] 88/6
comprehensive [1] 82/12
computer [1] 113/13
computerized [1] 38/22
computers [1] 107/21
conceding [1] 137/6
concern [4] 5/5 130/21 133/9 143/21
concerned [4] 77/17 85/10 106/9 107/22
concerns [6] 13/25 77/10 77/18 85/5
120/3 133/24
conclude [3] 79/2 110/17 145/21 163/3
concluded [6] 98/17 109/7 109/11
150/22 157/13 163/14
concludes [3] 46/9 108/25 150/16
concluding [2] 108/21 108/22
conclusion [3] 14/4 108/14 110/16
condition [1] 117/14
conducted [4] 72/25 105/19 150/5 152/1
confer [1] 45/2
conference [3] 8/22 151/21 151/24
conferred [3] 26/20 35/14 45/5
confession [1] 93/12
confined [1] 106/11
conflict [2] 160/21 160/22
confrontation [2] 57/22 60/17
confrontational [2] 11/16 56/12
confuse [1] 84/9
confused [1] 122/11
congratulations [1] 8/10
conjunction [1] 121/20
Connecticut [1] 2/17
connection [9] 13/14 85/6 88/9 90/11
94/5 95/22 96/3 112/14 131/7
consent [1] 142/21
consequence [2] 51/24 149/6
consequences [1] 26/25
consider [4] 82/11 83/18 134/23 141/13
consistent [13] 41/21 42/1 42/8 44/11
51/4 51/11 53/6 55/1 59/22 59/25 60/5
114/10 124/2
conspiracy [12] 5/19 5/20 80/6 86/25
87/4 87/5 87/6 87/7 87/8 87/10 128/14
131/6
conspirator [11] 5/14 5/24 6/5 79/13
79/20 79/21 83/6 86/20 121/20 128/25
137/8
constitute [1] 57/5
constitutional [7] 16/7 16/8 18/10 20/10
54/17 109/3 127/24
constitutionally [1] 110/6
constitutionally-permissible [1] 110/6
constructive [2] 110/25 111/9
consult [2] 130/17 130/19
consultation [2] 130/25 131/23
contact [3] 27/18 89/10 95/20
contained [1] 6/12
contains [1] 44/10
contemplated [1] 109/19
contends [1] 109/25
contention [2] 80/5 106/4
context [3] 56/11 100/5 127/17
continuance [1] 46/5
continue [6] 35/10 57/4 152/10 161/7
161/10 161/21
continued [2] 4/2 152/22
continuing [2] 109/11 152/24
contraband [1] 109/23 110/25 111/9
111/18
contradicting [1] 148/22
contradictory [1] 149/9
contraposition [1] 145/23
contrary [4] 80/9 80/22 80/24 102/4
contributed [1] 110/16
contributes [1] 41/23
control [1] 98/19
convenience [1] 63/2
conversation [7] 30/14 30/17 31/14
31/17 53/5 102/13 160/25
convicted [5] 124/17 131/4 131/14 135/9
136/16
conviction [12] 79/9 86/11 120/9 122/23
124/25 127/20 130/7 130/9 133/11
134/21 136/8 136/19
cooperate [1] 152/3
cooperation [1] 152/13
cop [1] 102/8
copies [3] 38/24 121/19 121/21
copy [16] 7/23 16/14 62/1 62/19 78/8
113/7 113/10 115/25 116/17 116/20
116/22 116/24 138/19 138/23 159/4
163/7
corn [2] 41/5 41/22 42/2
corners [1] 108/5
corporal [13] 3/10 28/2 28/14 28/17
28/21 29/19 32/21 35/20 36/2 51/21
56/22 56/25 59/16
correct [46] 15/21 17/18 18/5 18/8 18/11
19/14 23/12 24/2 27/12 27/18 28/8
33/18 36/22 37/23 38/14 38/15 39/4
39/14 39/23 39/24 40/13 40/16 41/11
42/19 42/22 43/3 54/5 58/24 73/10 74/8
75/8 75/11 77/3 80/6 81/15 88/14 94/8
118/14 123/8 125/3 143/11 145/11
157/17 159/6 159/22 163/17
corrected [2] 46/3 84/4
correctly [1] 40/18
cost [3] 71/17 154/3 154/20
costs [4] 153/11 155/9 156/4 156/15
could [46] 13/2 14/22 30/10 30/23 31/3
31/7 31/8 35/22 35/24 40/4 45/2 45/12
71/19 78/9 82/18 92/2 94/3 99/18 99/18
99/19 100/11 105/5 109/17 109/21
110/12 117/2 118/3 124/14 124/15
124/18 124/21 127/8 127/18 134/21
137/21 139/20 141/19 148/4 149/19
152/19 156/22 161/16 161/16 161/17
161/18 161/19
couldn't [3] 27/23 45/11 102/7
counsel [47] 4/6 4/9 5/5 7/6 7/14 7/17
10/13 12/22 13/16 13/21 13/21 16/6
16/9 16/13 17/14 18/22 26/20 35/13
35/14 45/5 58/22 82/19 83/3 83/15 86/9
114/12 115/11 115/15 115/23 119/1
121/1 121/11 122/2 122/13 131/2
132/10 134/24 135/11 138/24 141/6
141/22 143/12 143/13 151/19 152/4
157/8 162/6
counsel's [1] 143/15
count [14] 6/11 85/7 127/13 142/17
142/17 142/18 142/19 142/20 142/21
142/22 142/24 142/25 143/5 143/6
counting [1] 34/1
county [20] 21/15 21/23 22/20 22/22
22/23 23/22 36/15 36/17 39/21 43/19
46/5 66/15 66/23 67/23 68/6 68/7 68/10
70/24 72/9 79/10
couple [12] 4/11 30/25 31/2 31/16 32/12
38/9 38/13 42/6 54/25 88/1 127/5 140/3
course [20] 5/25 45/4 48/1 48/18 50/23
58/21 64/20 68/25 83/7 103/3 114/24
115/11 120/17 124/12 127/22 132/1
140/19 150/21 152/24 158/22
court [166]
court's [14] 8/16 26/19 60/23 63/2 80/15
80/17 116/13 125/12 128/13 143/22

**C**

court's [4] ... 150/19
courtroom [5] 83/19 98/22 152/7 157/8 158/6
cover [2] 9/8 10/25
covered [4] 11/6 11/8 128/24 141/8
crashing [1] 45/19
Crawford [27] 47/12 47/15 47/17 48/25 53/10 53/11 53/18 54/16 54/23 55/10 56/2 56/12 57/13 57/13 57/19 57/20 57/21 57/21 58/3 58/10 59/17 59/20 122/19 123/3 123/5 123/7 123/15
create [1] 82/22
credibility [1] 137/3
credit [3] 56/22 56/25 148/16
credits [1] 57/5
cries [2] 55/11 59/1
crime [6] 90/11 107/7 107/8 131/4 131/5 131/11
crimes [2] 91/13 96/12
criminal [5] 1/3 13/23 55/13 110/11 112/6
critical [4] 26/25 84/18 84/23 137/12
criticize [1] 76/17
cross [35] 10/3 11/12 11/22 12/19 17/11 33/9 45/6 47/14 48/11 49/2 49/6 51/14 51/16 52/19 54/18 54/19 54/21 54/22 56/1 56/3 56/7 57/14 57/22 57/25 58/15 58/21 59/3 59/13 70/3 96/14 123/10 124/13 124/15 135/1 153/25
cross-examination [24] 10/3 11/22 17/11 33/9 45/6 48/11 49/2 49/6 51/14 52/19 54/18 54/21 54/22 56/1 56/3 56/7 57/14 57/22 57/25 59/3 70/3 124/13 124/15 153/25
cross-examine [6] 11/12 47/14 58/15 58/21 59/13 123/10
cross-examined [1] 54/19
cross-examining [1] 12/19
crossed [3] 44/16 44/18 142/1
crossing [1] 51/18
Crowe [7] 2/11 2/11 8/10 82/21 84/3 121/15 155/15
crying [1] 31/10
curb [1] 145/9
curious [1] 122/8
current [3] 36/19 108/20 146/5
currently [5] 21/4 36/20 37/4 63/14 63/23
Curt [1] 66/7
custody [7] 37/14 40/14 66/18 67/3 110/10 110/14 159/9
cut [1] 112/23
CX [1] 3/3

**D**

D-E-L-V-I--S-O-N [1] 108/17
D.C [2] 2/15 2/18
D.D.U [3] 65/11 66/18 67/6
D.E.A [6] 63/25 64/1 64/3 64/11 64/13 70/24
danger [1] 14/2
dangerous [1] 84/19
Darius [1] 80/17
Darryl [3] 65/23 66/2 151/8
database [2] 40/8 76/21
date [13] 28/23 28/25 33/16 40/19 44/15 78/9 94/1 117/10 153/8 157/20 159/5 159/18 163/20
dated [2] 159/3 160/13
dates [1] 158/11
DAVIS [1] 1/12
day [35] 7/15 15/18 15/20 23/1 25/13 25/17 25/20 26/1 32/7 37/3 37/5 41/8 42/18 43/1 63/3 65/15 66/10 66/11
67/24 69/24 70/15 71/2 72/2 72/6 73/18 73/22 74/7 74/9 74/14 74/15 74/24 76/1 88/6 107/6 131/15
days [17] 38/13 90/4 94/19 94/20 94/20 94/25 95/15 96/22 96/22 107/25 117/10 118/13 127/6 140/3 140/15 140/20 163/11
deadline [4] 116/7 117/19 118/13 140/4
deal [5] 77/23 83/11 151/9 161/9 161/9
dealing [5] 55/13 91/18 106/19 111/13 130/15
dealt [4] 59/10 98/1 100/12 135/15
death [2] 119/2 150/20
debriefing [1] 159/12
decide [4] 82/13 99/10 111/20 127/19
decided [5] 80/21 83/1 127/10 127/19 128/17
decides [1] 125/14 127/20
decision [15] 67/7 100/17 100/22 101/11 101/16 111/15 112/9 116/2 124/8 132/18 132/23 132/25 147/6 161/2 161/23
decisions [1] 141/1
declarant [2] 56/19 58/16
decline [1] 99/3
declined [1] 99/4
deduced [1] 89/24
deduction [1] 90/7
deem [2] 7/17 121/11
deemed [2] 58/4 122/6
deeming [1] 122/12
defect [1] 117/13
defendant [11] 1/19 2/1 2/8 2/14 21/20 44/5 85/11 85/13 107/14 117/14 131/13
defendants [26] 1/10 7/14 10/17 15/18 33/1 82/14 82/15 85/8 85/14 87/17 114/25 116/9 117/11 122/4 127/12 128/6 128/6 130/20 131/1 132/8 141/15 150/17 151/6 151/10 151/11 157/8
Defender [1] 18/4
Defender's [2] 18/23 19/5
defense [25] 58/21 82/19 83/3 83/15 84/9 117/12 119/1 120/23 122/22 125/14 128/15 128/17 129/16 131/3 131/15 132/10 133/5 137/7 141/22 142/8 143/12 143/13 143/15 149/15 157/3
defenses [1] 129/4
deficiencies [1] 62/12
degree [2] 125/25 134/19
deign [1] 58/6
delay [7] 7/9 86/4 86/7
deliberation [1] 132/13
deliver [1] 127/1
delivered [1] 126/25
Delvison [7] 93/4 97/7 104/4 104/6 108/16 109/8 109/21
Delvison's [1] 96/17
demanding [1] 96/2
demeanor [1] 30/20
demonstrate [1] 110/5
denied [2] 112/15 121/9
departed [1] 151/18
Department [11] 21/4 21/10 22/22 23/22 26/23 36/16 63/14 63/19 70/23 70/24 110/13
department's [1] 40/8
depend [1] 52/18
depending [2] 59/9 87/4
depends [2] 73/13 73/17
deprive [1] 110/10
describe [4] 29/23 30/20 88/21 96/6
described [4] 29/20 30/18 57/10 96/20
describes [1] 151/9
describing [2] 31/21 118/10
description [7] 49/5 54/10 56/23 95/3 95/3 95/4 151/10
descriptions [10] 31/24 31/24 32/1 34/19 34/23 34/25 38/10 55/23 57/7 95/9
deserved [1] 8/10
deserves [1] 148/15
designation [1] 120/5
desire [1] 152/21
desk [1] 159/1
destroyed [1] 134/5
detail [1] 79/17
detailed [5] 63/25 64/1 97/12 112/19 112/22
details [3] 48/7 52/15 97/14
detained [1] 102/6
detective [44] 3/8 3/13 13/5 20/21 21/8 25/7 25/9 25/11 25/13 26/22 36/5 36/10 36/13 36/21 37/2 38/14 39/1 40/9 41/20 42/4 44/3 44/21 46/8 46/17 61/5 67/19 67/19 67/20 67/20 67/21 67/21 67/21 70/5 74/18 75/11 75/12 75/16 76/2 76/12 76/15 76/17 76/19 77/11 78/8
detectives [8] 27/10 27/21 38/2 66/5 66/19 67/6 68/16 75/4
determination [10] 19/20 34/3 55/6 55/9 55/14 98/25 99/1 99/9 99/9 161/12
determined [4] 34/9 52/24 59/1 59/6
develop [1] 70/12
development [1] 160/7
device [2] 64/19 64/23
did [101] 7/22 7/24 12/10 13/9 13/21 15/9 23/8 23/17 24/4 24/15 25/2 25/9 25/13 25/16 25/19 25/25 26/2 26/3 26/6 26/12 27/14 31/5 31/14 31/17 31/18 31/19 31/22 32/6 33/22 37/8 37/15 37/16 37/24 38/6 40/4 40/9 40/21 40/23 41/4 42/6 43/5 43/13 43/22 44/5 45/10 45/11 45/24 45/24 52/14 55/25 57/6 61/8 61/23 64/16 65/2 65/5 65/12 66/10 66/12 67/1 67/24 68/1 68/19 69/24 74/9 74/10 74/15 75/6 76/2 76/4 76/12 76/17 76/18 76/19 76/23 77/10 77/16 79/16 89/10 91/22 94/3 98/6 107/1 107/3 107/3 108/15 109/18 113/11 113/21 121/15 122/4 122/7 122/17 125/22 125/24 139/16 145/15 146/11 148/13 158/23 159/17
didn't [39] 10/25 26/7 33/22 34/21 35/6 37/25 44/15 50/12 55/3 61/10 75/4 75/5 79/17 88/8 89/5 89/9 89/12 89/23 90/20 90/22 92/25 98/8 98/9 106/18 114/5 115/18 115/18 117/1 117/2 126/3 136/5 136/22 140/20 141/3 141/7 147/10 147/13 149/24 150/3
died [1] 38/1
difference [3] 98/20 106/9 106/10
different [11] 41/25 51/6 51/24 71/12 79/18 99/9 100/4 100/5 115/5 119/13 133/16
differentiate [1] 132/19
differing [1] 131/12
difficult [2] 56/16 56/20
difficulty [2] 108/20 148/11
digital [2] 38/24 41/9
digitized [1] 138/23
dire [2] 9/9 135/3
direct [7] 14/20 21/6 28/19 28/22 36/11 51/15 63/16
directed [2] 34/6 100/12
directing [1] 117/10
direction [1] 7/3
directly [7] 14/16 21/1 29/9 34/6 63/11 80/18 96/10
disagree [2] 56/14 57/12
disagreement [1] 141/9
disagrees [1] 15/8
discharge [7] 153/16 154/7 154/25 155/12 156/8 156/19 162/19

**D**

disclaimed [1] 13/15
disclose [5] 140/2 140/5 140/8 141/1
141/5
disclosed [1] 82/15
discloses [1] 81/24
disclosing [1] 140/1
disclosure [7] 63/4 82/6 116/14 118/22
119/5 119/6 121/2
discomfort [1] 84/17
discover [1] 96/23
discovered [1] 101/22
discovery [4] 158/11 158/11 159/4
159/23
discreet [1] 49/15
discuss [5] 79/11 81/19 101/10 101/13
162/3
discussed [12] 8/16 71/8 95/25 97/24
100/14 100/22 120/17 130/12 131/18
132/9 132/17 157/11
discusses [1] 160/10
discussion [4] 67/1 67/17 134/6 140/1
discussions [4] 83/12 135/4 141/4 142/8
disease [1] 117/13
dishonor [2] 152/23 153/18
dismiss [2] 6/11 150/20
dismissed [1] 134/16
dispute [3] 120/24 124/24 125/5
disrupted [1] 7/10
dissenting [2] 98/7 101/12
distinct [1] 142/6
distinctly [1] 136/17
distinguishable [1] 100/14
district [21] 1/1 1/1 1/13 14/24 14/25
24/20 24/22 24/25 25/2 26/14 65/11
65/13 66/18 67/5 68/5 68/11 68/16
100/16 100/17 108/9 108/10
DIVISION [1] 1/2
do [162] 4/13 6/15 7/8 8/9 8/13 8/23
10/4 10/6 11/18 12/14 14/6 15/12 15/25
16/8 16/22 16/23 16/25 17/8 17/23
18/17 18/20 18/21 18/21 19/1 19/1 19/4
19/18 20/2 20/5 23/4 23/14 23/17 23/23
24/4 24/8 24/18 25/5 25/6 25/7 25/11
25/12 25/25 26/10 26/12 27/4 27/6 27/7
27/7 27/9 28/23 37/17 37/24 39/5 40/24
40/24 42/24 42/25 43/9 44/3 44/4 47/14
47/25 57/4 60/7 62/6 65/8 66/5 66/11
67/16 67/17 68/23 72/8 72/21 73/4
74/13 76/22 77/25 78/2 80/21 80/22
81/19 81/22 82/23 82/24 83/11 83/14
83/16 83/17 84/8 84/25 85/20 85/22
86/2 86/6 91/4 91/9 91/10 98/11 98/12
102/11 103/9 104/4 105/12 108/23
110/17 112/15 113/6 114/12 115/7
115/9 115/13 116/8 116/8 117/21
120/16 122/7 123/3 123/15 124/9 124/9
124/18 127/5 127/5 127/10 127/12
129/20 129/20 133/10 133/25 134/1
138/1 138/11 139/6 139/20 142/10
147/13 148/21 150/17 150/18 150/19
150/24 152/10 152/22 152/25 153/3
153/10 154/2 154/19 155/7 155/17
155/20 155/23 156/2 156/10 156/13
161/3 161/4 161/24 162/8 162/9 162/13
162/24
doable [1] 120/2
docket [7] 117/7 117/8 117/21 117/23
118/4 118/10 120/22
docketed [1] 117/5
document [8] 16/15 112/21 113/2
113/13 113/23 113/23 118/8 138/9
documents [2] 27/2 83/3
does [22] 5/12 19/16 20/9 39/15 42/4
42/20 48/18 48/18 52/21 54/15 55/24
56/11 60/15 62/20 64/5 78/16 79/2

109/9 123/13 133/8 134/7 147/9
doesn't [22] 10/7 49/3 54/14 56/2 56/10
60/22 90/16 90/16 105/11 106/13 109/9
119/16 133/7 135/16 136/3 145/25
146/18 146/20 146/25 148/24 151/5
151/15
doing [11] 19/19 35/1 67/9 72/2 88/5
137/17 140/13 143/25 152/9 154/13
154/14
dominion [1] 98/19
don't [112] 4/18 8/7 10/4 11/22 19/18
23/16 23/25 24/10 25/10 26/11 26/25
27/2 27/6 45/25 46/5 47/2 48/14 49/8
52/11 53/24 54/6 55/17 56/14 56/24
57/13 57/23 58/5 60/12 60/22 61/3
61/19 62/2 62/19 72/10 73/8 73/14
74/16 75/1 75/19 79/14 81/6 82/23
82/24 84/1 84/9 84/16 88/9 91/17 91/21
92/17 92/19 92/19 92/22 92/22 93/7
103/7 103/10 104/3 104/13 104/15
106/7 106/7 106/13 106/21 106/24
107/2 107/5 110/7 110/17 111/14
113/16 113/20 116/22 116/25 118/25
120/2 120/15 120/15 122/10 126/13
128/23 129/2 130/24 132/4 133/8
133/14 133/18 134/24 135/5 136/2
136/9 137/1 137/15 138/3 139/1 141/6
141/23 143/12 143/13 143/18 143/23
144/14 146/15 149/15 150/9 151/13
158/11 160/8 161/3 161/4 161/8 163/10
done [8] 24/4 26/12 69/15 83/5 93/24
115/1 123/2 149/17
door [3] 29/9 101/20 101/20
doors [1] 94/10
dotting [1] 51/19
double [1] 85/14
doubt [6] 5/9 27/11 98/24 100/7 109/21
140/14
down [16] 31/2 68/5 68/10 68/15 88/14
88/15 94/10 95/5 95/10 96/14 101/20
101/20 112/23 113/4 120/24 129/23
downtown [2] 24/11 102/17 102/23
103/2
dozen [1] 124/19
dramatically [1] 146/15
drastically [1] 112/23
drawers [3] 104/24 104/24 109/18
drawing [2] 4/24 108/1 108/14
drawn [3] 33/22 55/3 102/1
dresser [2] 104/24 109/18
driver [1] 98/17
driver's [2] 89/5 89/9
drug [12] 63/14 63/15 63/21 63/22 67/11
70/11 70/12 88/17 90/25 91/13 91/18
151/9
drug-related [1] 70/11
drugs [29] 88/17 90/18 91/1 91/19 91/23
98/2 98/13 99/20 99/6 101/15 102/11
102/11 103/4 103/8 103/15 103/21
104/2 104/5 104/22 104/24 105/6
105/17 105/23 106/6 106/19 109/14
107/13 108/21 110/20 110/20
dry [1] 141/7
duplicates [1] 112/24
duplicative [1] 49/23
during [10] 32/4 39/20 39/22 39/25 57/6
63/3 64/15 90/2 131/25 135/7
duties [2] 26/16 153/10 153/17
duty [1] 37/3
Dwayne [3] 44/13 44/18 44/20
DX [1] 3/3
dynamic [1] 109/12

**E**

each [10] 12/15 43/22 74/16 88/18
152/3 152/4 152/15 153/6 153/6 155/2
Earl [1] 43/21

earlier [19] 4/7 7/15 53/5 54/22 55/8
56/1 59/13 72/13 85/1 94/25 95/15
102/6 117/10 118/3 131/8 141/18 145/18
145/24 152/2 159/18
early [4] 39/10 42/16 89/4 124/12
easier [3] 99/12 137/25 143/16
easily [1] 139/4
East [3] 2/5 2/12 15/5
Eastern [1] 100/17
easy [2] 124/12 127/22
EDWARDS [4] 3/13 36/5 36/10 36/13
effect [6] 22/1 26/8 66/16 90/17 136/18
159/14
effected [1] 113/19
effort [1] 112/10
efforts [1] 152/9
eight [4] 30/1 33/25 55/5 90/4
either [22] 4/21 10/21 49/10 49/16 51/1
53/23 54/3 56/1 58/24 59/8 59/22 82/20
82/25 92/23 104/15 105/14 116/25
117/1 117/14 129/3 138/22 148/24
elaborated [1] 51/20
electronically [2] 40/7 115/25
element [1] 137/10
elements [1] 131/12
Eleventh [1] 100/16
elicit [1] 125/18
eliciting [1] 55/20
elicits [1] 112/21
eliminate [1] 47/12
else [17] 23/20 75/24 79/7 79/11 80/23
83/1 98/16 104/22 116/8 138/24 144/4
149/24 150/25 151/16 151/18 160/24
162/3
elsewhere [2] 22/3 90/25
email [1] 11/13
emblem [2] 88/20 96/24
emblemed [1] 90/5
emphasize [3] 6/6 80/16 98/22
emphasized [1] 98/20
empirical [1] 137/15
employed [6] 14/23 14/25 21/9 36/14
36/15 63/19
employment [2] 15/11 66/14
encompasses [2] 119/24 120/1
encourage [1] 121/1
end [6] 7/15 42/4 87/18 96/5 115/10
127/7
ended [1] 91/7
enforcement [7] 63/15 63/22 63/22
75/19 99/25 111/6 124/20
engage [1] 152/6
engaged [1] 111/3
enormously [1] 112/20
enough [4] 27/6 45/25 92/5 147/6
entered [2] 118/8 140/21
entire [1] 146/7
entirely [4] 5/10 97/6 108/10 129/1
entitled [6] 17/14 48/16 93/21 133/6
157/18 163/18
entitles [1] 136/9
entry [2] 117/23 118/10
enunciated [1] 100/22
episode [1] 80/17
err [1] 121/1
error [2] 74/20 142/24
errors [1] 76/5
especially [2] 133/9 149/22
ESQ [9] 1/15 1/16 1/19 1/22 2/1 2/8
2/11 2/14 2/17
ESQUIRE [1] 2/5
essentially [8] 51/11 85/6 96/19 103/24
103/25 106/2 109/6 134/17
establish [1] 11/19
established [1] 47/2
establishes [1] 85/6
even [48] 17/25 19/1 19/12 27/7 27/15

# E

even... [13] 27/10 27/17 28/8 28/17 AMD
54/15 54/15 54/17 54/22 55/24 55/25
56/11 57/23 58/3 58/9 58/11 59/12
62/19 77/6 81/10 92/1 92/4 92/19 92/25
97/10 97/15 101/1 102/6 104/18 106/11
106/23 113/9 123/14 123/18
127/2 127/5 132/4 141/5 147/10 147/13
150/2 152/5
evening [3]  41/22 42/17 85/14
event [5]  56/22 57/12 69/1 128/5 130/25
events [2]  25/25 85/13 90/14
eventually [4]  96/17 99/3 102/16 116/19
ever [11]  25/19 25/22 27/21 67/24 69/12
69/15 69/24 76/24 92/24 93/7 129/14
every [2]  38/23 133/6
everybody [4]  106/10 120/4 128/10
140/20
everyone [2]  151/16 151/18
everything [8]  71/5 90/22 92/21 93/8
106/14 142/9 148/3 152/19
evidence [61]  4/12 4/13 5/3 5/12 5/23
6/1 6/3 9/24 10/21 11/19 13/19 13/19
14/3 17/2 24/7 24/8 43/18 43/20 46/9
48/22 49/16 49/24 53/11 55/12 60/10
77/15 83/10 92/6 92/20 93/3 93/13
96/18 98/24 100/6 101/23 103/7 103/13
104/23 106/16 106/18 106/18 107/10
107/17 112/12 116/14 117/13 120/2
121/7 121/22 132/21 132/22 134/8
134/16 140/25 141/25 142/2 144/14
145/20 150/7 150/25 157/2
evidentiary [3]  79/3 96/12 150/22
evolving [1]  109/11
ex [18]  6/16 6/21 7/5 10/4 81/20 82/1
82/12 82/18 139/11 151/16 157/10
157/12 158/4 158/21 160/5 162/11
163/3 163/6
exact [3]  32/14 68/6 112/24
exactly [10]  30/23 57/19 57/20 59/10
83/9 94/22 94/23 109/4 129/14 131/6
examination [32]  10/3 11/22 14/20 17/11
21/6 28/19 33/9 35/18 36/11 45/6 48/11
49/2 49/6 51/14 52/19 54/18 54/21
54/22 56/1 56/3 56/7 57/14 57/22 57/25
59/3 63/16 70/3 76/10 77/8 124/13
124/15 153/25
examine [7]  7/5 11/12 47/14 58/15
58/21 59/13 123/10
examined [1]  12/19
examining [1]  12/19
example [5]  100/5 111/4 125/19 125/19
127/19
exceed [1]  109/18
excellent [3]  62/24 148/10 152/10
except [1]  7/1
exception [9]  6/6 48/13 55/18 58/13 60/4
92/2 103/19 108/24 128/25
exceptions [3]  58/14 108/24 114/18
exchange [2]  32/4 139/23
excited [37]  11/2 11/7 11/9 31/9 46/25
47/6 48/8 48/14 48/17 49/25 51/22 52/9
52/11 53/7 53/19 53/25 54/10 54/14
54/24 55/18 55/24 56/9 56/16 58/9
58/11 58/22 59/2 59/7 59/8 59/8 59/11
123/8 123/9 123/12 123/15 123/16
123/20
excitement [1]  30/22
exculpatory [4]  85/9 85/9 85/13 151/6
excuse [4]  108/13 125/23 140/17 153/23
excused [7]  8/21 20/18 27/24 36/2 46/8
78/25 157/9
execute [1]  24/1
executed [1]  109/5
executing [2]  24/4 109/1
execution [2]  70/20 104/14

exemption [3]  154/23 156/6 162/17
exemptions [2]  153/14 154/6
exhaustively briefed [1]  137/3
Exhibit [11]  16/12 39/2 40/4 40/4 40/14
41/7 42/3 42/11 43/14 44/9 78/9
exhibits [7]  28/4 40/24 41/2 42/10 42/24
121/19 121/25
exigencies [1]  147/19
exigency [1]  55/3
expand [1]  113/12
expect [5]  53/24 57/9 112/20 137/8
157/2
expectation [1]  7/13
expected [2]  98/12 139/25
expecting [1]  92/8
expense [1]  74/14
experience [1]  119/2
expert [7]  117/12 119/13 119/19 119/21
121/7 140/4 140/7
experts [2]  141/21 142/4
expires [1]  118/13
explain [3]  34/24 45/12 73/21
explanation [1]  12/7
explicitly [2]  17/22 121/6
exploring [1]  140/6
exposed [1]  146/1
express [1]  131/1
expressing [1]  13/25
expressly [1]  132/13
extent [6]  107/9 108/4 115/24 118/24
146/24 147/5
extra [3]  47/22 47/23 140/3
extraordinary [1]  57/12
extreme [1]  86/6
extremely [1]  130/7
eye [1]  95/20
eyeballed [2]  89/25 90/22
eyed [1]  57/10
eyes [2]  30/22 31/8
eyewitness [1]  95/22

# F

fabricate [1]  137/9
face [2]  84/15 131/8
facie [1]  47/1
fact [34]  4/19 15/19 17/19 38/13 53/20
54/20 54/21 56/2 56/25 68/9 78/3 95/5
106/25 109/10 111/10 120/19 122/24
124/16 124/21 129/21 130/22 131/13
134/1 134/2 134/20 135/9 136/19
137/10 145/17 146/18 146/25 150/3
158/22 160/23
factor [4]  128/16 147/5 147/6 149/8
factors [1]  101/18
facts [16]  6/23 32/22 32/25 91/16 98/17
108/1 111/12 111/23 153/6 153/10
154/2 154/19 155/8 156/3 156/13
162/13
failure [1]  23/7
faint [1]  143/18
fair [3]  17/5 47/8 82/15
fairness [1]  82/13
faith [4]  92/3 106/21 108/24 109/1
fall [3]  7/17 56/17 81/2
fallen [1]  56/19
falsely [2]  85/9 85/12
familiar [3]  13/1 19/9 131/21
familiarity [2]  93/23 93/23
family [3]  19/6 62/15 101/25
fanciful [1]  111/1
far [17]  5/17 5/22 6/4 37/25 41/9 52/15
59/12 61/8 69/13 73/25 74/1 74/4 74/23
106/9 110/17 115/19 130/16
farthest [1]  90/17
fashion [1]  59/14 76/25 77/14
fast [4]  30/23 31/2 31/7 57/10

fault [2]  84/1 111/14
favor [1]  108/1
average [1]
federal [10]  63/22 70/12 71/15 71/17
71/21 71/25 72/1 72/4 118/18 150/20
feel [3]  100/1 119/1 134/25
feels [1]  5/11
feet [1]  30/8
fellow [3]  27/10 27/21 89/18
fess [1]  61/19
few [9]  29/4 33/15 57/6 94/7 94/8
107/25 158/12 159/11 161/19
Fifth [5]  12/18 16/1 62/14 101/10 107/16
figure [1]  88/2
file [8]  6/13 62/6 62/21 117/20 120/5
128/8 152/24 153/1
filed [9]  6/11 62/3 74/7 76/24 117/16
122/4 123/18 132/3 158/22
filings [1]  152/22
fill [3]  72/24 94/7 112/20
filled [2]  45/23 69/12
film [1]  38/23
final [10]  4/14 5/12 124/8 138/15 147/17
148/19 148/23 151/23 157/2 157/3
finalize [1]  4/19
finalized [1]  138/21
finally [4]  5/4 43/11 56/14 148/12
Finch [2]  101/14 101/21
find [16]  39/19 55/18 56/24 61/5 89/13
89/20 90/20 92/8 93/2 100/11 101/17
109/9 109/10 141/14 141/16 145/21
finds [3]  59/7 107/19 108/25
fine [5]  13/4 131/12 139/7 141/11
148/14
finely [1]  98/21
finish [1]  86/16
finished [1]  26/15
fire [1]  56/19
fired [1]  131/25
first [35]  11/7 14/9 19/7 28/1 29/7 29/20
29/21 31/14 32/4 33/16 42/9 46/24
46/25 50/4 54/14 54/24 62/12 76/25
79/8 91/11 97/10 102/18 107/19 117/18
117/18 118/21 135/24 136/20 136/23
137/12 148/8 151/7 152/17 154/9 163/1
fit [1]  152/3
fits [1]  142/9
five [7]  29/22 30/1 48/5 56/21 99/18
143/16 153/9
flag [1]  128/3
flesh [2]  134/5 140/7
flip [1]  141/7
floor [2]  1/17 56/18
Florida [3]  130/11 131/3 131/18
fluid [2]  146/21 146/21
focus [2]  13/13 13/22
focused [1]  117/7
focuses [1]  108/4
fold [1]  54/13
folks [1]  116/3
follow [6]  12/16 66/16 93/2 101/8 101/9
138/11
followed [2]  13/1 73/24
following [6]  136/18 153/9 153/17
154/19 156/2 162/13
followup [2]  33/15 46/4
font [3]  115/5 138/1 138/7
foot [1]  22/9
force [4]  21/5 63/14 70/24 71/24
foregoing [2]  157/17 163/17
forgive [2]  85/19 133/17
form [16]  16/24 17/13 18/17 20/9 69/4
69/5 69/8 69/12 72/24 73/4 73/22 74/5
74/5 76/22 89/10 96/18
former [8]  49/6 49/17 51/15 53/24 58/12
60/14 98/4 160/20
formerly [1]  160/23

## F

forth [5] 54/8 114/25 120/9 125/1 126/2
forthcoming [1] 110/20
fortuity [1] 112/8
Fortunately [1] 46/3
forward [8] 20/22 28/12 63/7 85/3
 111/20 116/2 161/19 161/21
Foster [3] 92/12 94/15 96/2
found [14] 29/20 90/4 90/11 90/25 91/19
 93/13 98/20 99/7 107/25 111/9 112/11
 150/8 150/10 150/11
foundation [1] 83/6
four [4] 57/8 85/8 85/14 108/5
fourth [12] 1/17 62/10 99/22 100/2
 100/11 100/23 101/7 105/7 107/15
 132/9 143/17 143/19
frankly [3] 48/15 79/16 135/9
fraught [1] 14/2
free [1] 14/4
freedom [1] 14/5
freely [1] 104/19
frequently [1] 151/8
fresh [1] 51/2
Friday [2] 89/4 151/23
front [13] 17/16 29/8 29/9 29/9 30/2
 38/12 42/24 50/16 90/24 98/2 98/15
 99/17 101/20
frontal [3] 45/20 45/23 45/24
fruit [1] 62/12
fruits [1] 90/11
full [2] 82/6 152/13
fully [10] 6/8 6/9 11/16 11/18 128/22
 128/23 129/19 137/8 162/3 163/8
functional [2] 131/21 137/6
fundamentally [1] 108/19
funds [3] 71/20 71/20 72/1
Funk [1] 2/1
furnished [2] 121/19 121/21
further [24] 5/8 17/9 18/9 20/15 20/17
 26/21 32/21 35/15 36/1 44/25 45/13
 46/22 51/20 70/2 73/9 73/16 76/1 76/9
 77/7 78/22 86/7 135/4 142/7 147/19
furtherance [5] 5/20 87/3 87/7 87/8
 128/25
Furthermore [1] 154/25

## G

G-I-G-A-N-T-I [1] 21/3
gaps [1] 94/8
GARDNER [68] 1/9 2/14 5/5 5/9 5/16
 5/17 6/5 7/14 8/5 10/11 32/24 37/18
 39/8 39/16 39/19 39/23 40/7 40/10
 40/13 40/21 41/1 42/9 43/4 43/21 43/23
 44/6 45/9 79/9 80/2 80/23 80/24 81/1
 83/25 87/17 94/17 113/14 113/23
 114/13 115/3 115/22 124/16 124/24
 125/2 127/19 128/1 128/24 131/14
 132/3 132/5 133/15 134/4 134/24 135/8
 135/13 136/16 138/2 138/7 138/15
 138/23 139/2 142/17 142/18 144/23
 152/1 152/17 153/19 154/8 155/20
Gardner's [12] 5/24 6/9 7/16 41/3 42/5
 47/14 80/1 115/15 122/22 129/6 133/25
 134/21
Garner [1] 4/23
Gary [1] 66/7
Gates [1] 98/23
gather [1] 12/14
gathered [1] 105/20
gave [10] 31/23 31/24 35/21 48/8 69/6
 69/16 77/21 88/10 89/10 109/23
gears [1] 62/24
general [7] 35/22 38/16 107/22 112/18
 112/23 113/3 134/3
Generally [1] 127/17
gentlemen [1] 38/7

geographic [1] 119/23
Gerald [1] 153/8
GERARD [1] 2/6
get [61] 7/12 7/19 7/22 11/11 17/17 18/4
 18/7 19/4 19/5 27/3 27/5 27/21 31/3
 35/22 37/25 38/10 49/7 49/9 51/25 52/4
 52/5 52/8 53/19 54/9 61/8 62/21 69/2
 70/22 72/22 73/11 82/21 86/2 90/1 90/2
 91/13 113/9 114/25 115/10 115/16
 116/3 116/3 116/4 116/5 116/24 117/1
 120/9 120/14 123/14 127/2 133/25
 134/2 134/7 135/2 135/3 136/24 137/9
 137/11 140/20 143/11 150/15 150/21
gets [3] 102/13 161/2 161/13
getting [7] 26/24 49/17 55/22 60/9 63/1
 88/18 89/8
GIGANTI [13] 3/8 13/5 20/21 21/3 21/8
 26/22 67/21 75/11 75/11 75/12 75/16
 76/17 76/19
Giganti's [6] 74/18 76/3 76/13 76/15
 77/11 78/8
Gilden [1] 2/4
girl [2] 56/17 56/21
girlfriend [12] 66/14 90/8 92/4 92/19
 93/5 94/2 94/2 94/6 97/8 104/6 108/7
 108/17
girlfriend's [2] 92/9 92/16
give [39] 4/17 15/12 15/15 15/22 15/25
 16/3 16/14 16/22 16/23 17/5 26/7 31/19
 34/19 34/23 35/11 48/13 68/17 68/19
 68/25 69/3 69/5 69/9 72/23 72/23 79/15
 85/23 86/2 92/19 93/15 113/5 121/2
 125/19 138/6 138/9 138/22 140/3
 152/15 152/21 159/17
given [12] 6/15 35/11 37/18 48/5 57/2
 69/18 73/7 74/4 75/23 79/18 95/4 125/4
gives [4] 90/13 91/21 95/3 142/19
giving [4] 31/4 50/2 68/22 124/10
glad [2] 82/1 141/10
gleaned [1] 53/5
Glenn [1] 13/25
global [2] 26/1 66/15
glove [1] 97/4
gloves [1] 109/16
go [37] 4/13 7/21 19/4 27/9 28/21 34/16
 35/6 35/10 41/19 46/15 46/25 47/21
 59/12 66/14 72/16 73/8 74/23 79/17
 85/3 90/14 90/15 107/2 110/17 111/20
 116/2 120/8 123/1 128/7 132/17 138/2
 138/23 141/2 141/3 143/11 147/4
 161/19 161/21
goal [1] 70/13
goes [6] 17/22 56/3 106/14 121/2
 125/14 149/7
going [113] 4/19 8/20 9/20 10/2 11/14
 12/15 12/24 13/11 14/6 18/21 18/22
 18/23 19/4 19/4 19/5 19/6 19/24 20/9
 24/21 29/4 30/3 37/2 38/2 41/3 45/14
 46/12 46/23 47/11 51/25 52/4 52/5 52/8
 52/20 54/2 57/18 58/22 59/11 59/12
 60/3 60/13 61/16 61/18 61/20 65/18
 67/4 67/5 67/12 67/13 67/23 68/2 68/19
 71/4 74/14 80/18 81/8 82/4 83/19 83/19
 83/20 84/25 85/11 88/3 91/4 101/8
 104/2 106/1 106/1 106/16 115/14
 118/20 119/7 119/7 119/19 120/12
 120/14 120/15 120/16 123/23 125/15
 125/16 127/1 127/10 128/4 128/9
 128/15 129/7 133/11 134/23 135/2
 135/12 135/14 136/13 137/9 139/1
 139/1 139/17 140/2 142/2 143/11
 146/21 146/23 149/2 149/8 150/1
 150/23 151/17 152/15 152/21 160/25
 161/3 161/8 161/9 161/24
gone [3] 76/20 90/19 90/21
good [29] 7/3 8/4 14/18 14/19 14/22
 21/8 27/21 28/14 28/21 33/11 33/12

36/13 63/4 70/5 70/6 85/23 87/23 87/25
 92/3 97/14 97/17 98/8 106/21 108/24
 108/24 127/23 129/4 139/19
goods [2] 126/25 127/1
Goose [3] 81/17 81/18 81/19
got [47] 9/18 24/4 24/24 26/10 26/12
 33/4 33/24 37/13 55/2 62/10 75/1 75/7
 75/15 75/16 75/22 84/5 86/1 86/9 88/6
 90/5 91/23 94/22 96/16 97/13 102/8
 106/12 116/12 116/17 116/22 116/25
 117/3 117/25 118/18 120/4 125/10
 125/24 126/1 126/1 126/21 126/24
 128/21 135/1 136/13 140/23 148/12
 150/18 150/19
gotten [4] 27/16 83/12 126/19 126/25
government [121] 1/15 3/4 4/10 5/11
 5/22 6/6 6/7 6/13 6/14 6/16 6/19 8/6 8/7
 8/8 10/15 10/22 11/12 11/14 11/18
 11/24 11/25 12/19 13/13 14/14 36/4
 46/14 46/24 47/10 48/7 48/19 48/25
 49/3 49/6 49/14 49/24 51/18 51/21 53/5
 53/10 54/7 55/8 55/17 56/4 56/8 56/9
 57/23 58/1 58/5 58/6 59/15 60/7 60/12
 60/15 61/9 71/21 71/25 72/4 79/15
 81/22 81/25 82/5 82/9 83/10 84/10
 84/21 84/23 85/3 85/9 85/12 86/6 91/11
 91/12 97/16 103/13 107/11 108/2
 109/25 110/4 110/22 111/22 113/4
 115/24 117/11 119/4 120/10 120/19
 122/11 124/13 124/14 124/19 124/24
 125/5 125/9 126/10 127/9 133/7 133/21
 134/2 134/7 134/8 134/17 135/9 135/10
 136/7 138/15 139/4 140/14 141/8 142/8
 143/9 146/18 146/25 150/1 150/3 150/6
 151/1 153/21 153/24 159/17 159/24
 160/15
Government's [44] 4/7 5/10 6/3 6/21
 16/11 28/1 39/2 40/3 40/4 40/14 41/7
 42/3 42/11 42/13 42/23 43/14 44/9
 49/12 55/12 58/1 79/2 79/5 80/5 81/23
 82/7 82/9 84/25 86/3 99/11 104/17
 105/3 110/7 112/23 113/3 120/18 125/6
 125/10 132/11 134/11 145/25 145/25
 150/4 151/4 154/10
GPS [3] 64/19 64/22 65/24
grabbing [1] 95/12
grand [9] 6/1 50/16 80/10 81/11 81/12
 81/13 143/9 143/11 143/16
grant [2] 6/20 85/2
granted [1] 122/12
Graul [1] 67/21
grave [1] 5/9
gray [13] 5/6 43/20 95/6 109/16 144/5
 144/25 144/25 145/7 145/10 145/13
 145/22 146/12 150/8
great [4] 83/11 113/1 116/23 139/8
Greenbelt [1] 1/24
Greenberg [1] 2/1
GREGORY [4] 3/10 28/2 28/17 94/13
grew [1] 119/24
grip [2] 56/22 57/11
group [2] 13/9 65/14
guess [16] 9/18 10/4 10/5 35/2 49/21
 71/19 103/17 105/14 105/21 112/13
 114/4 118/15 122/20 138/14 151/22
 160/17
guidance [1] 121/3
guilt [3] 117/15 135/7 136/23
guilt/innocence [2] 135/7 136/23
guilty [6] 17/25 19/23 100/9 111/8
 131/21 137/6
guise [1] 53/25
gun [18] 33/22 89/22 90/2 90/3 90/5
 92/7 92/9 92/15 94/19 94/22 95/23 96/2
 96/3 96/6 96/15 97/4 101/21 105/20
guns [5] 55/3 56/18 95/13 102/7 109/6
gunshots [1] 29/16

G

guy [7] 64/16 86/21 94/10 96/1
94/24 151/9

guys [8] 89/15 95/2 95/9 95/10 96/1
96/14 97/2 98/1

H

H-A-G-I-N [1] 63/13
habitants [2] 111/2 111/3
hackles [1] 125/10
had [123] 6/13 8/5 8/8 12/22 21/21 23/3
23/9 26/7 27/17 28/25 29/12 30/14
30/22 31/2 31/20 31/23 31/25 33/17
34/5 34/5 34/5 34/24 37/6 37/18 38/1
44/7 47/20 47/24 55/3 57/12 58/20
61/24 65/18 65/23 67/10 67/17 67/22
68/1 69/8 71/2 72/5 73/18 74/2 74/20
76/5 76/20 76/20 76/21 76/23 76/24
77/13 77/21 78/2 78/6 79/18 80/1 83/25
85/20 86/12 88/1 88/6 88/10 88/19
88/19 89/4 89/12 89/15 89/16 89/18
89/19 89/25 90/3 90/19 90/21 91/17
91/20 92/7 92/9 93/11 94/4 94/22 95/11
98/19 99/6 99/17 99/17 99/19 101/15
101/16 101/19 101/22 101/23 102/8
103/4 103/5 105/11 105/15 105/15
106/4 106/6 106/18 106/19 107/8
108/14 108/21 109/4 109/6 109/11
116/10 116/15 116/19 118/25 120/10
120/11 122/1 123/22 127/19 135/3
135/17 136/16 140/1 149/23 150/9
hadn't [5] 81/3 90/21 127/16 140/13
150/11
Hagen [1] 46/16
HAGIN [8] 3/16 13/6 62/22 63/13 63/18
70/5 76/12 78/24
Haines [4] 100/15 100/24 101/5 101/9
hair [2] 41/12 41/18
hairstyle [4] 41/3 41/4 41/5 42/5
half [4] 36/24 84/5 124/19 162/23
Hammerjacks [2] 23/6 65/13
Hammond [3] 58/25 59/5 59/10
hand [5] 14/11 20/23 36/6 63/8 123/13
handed [1] 28/4
handguns [1] 89/16
handle [8] 8/20 127/8 161/3
handled [1] 37/12
handling [1] 122/24
hands [3] 115/10 115/12 116/3
handwriting [2] 43/20 44/13
handwritten [1] 39/3 44/14 44/17
hanging [2] 95/17 151/19
HANLON [14] 1/16 3/11 3/14 4/21 5/3
10/11 28/20 35/19 36/12 44/24 47/5
144/2 148/23 150/1
happen [6] 67/2 71/5 120/13 120/15
120/16 125/15
happened [9] 34/19 49/16 55/22 88/5
91/2 105/18 106/4 112/8 118/8
happening [1] 75/15
happens [3] 95/1 95/14 120/8
happily [1] 130/18
happy [11] 76/15 78/11 78/14 81/19
82/11 83/2 83/13 83/17 113/6 115/2
139/6
hard [2] 115/25 138/19
HARDING [37] 1/15 3/6 3/9 3/17 12/6
14/21 21/7 62/10 63/17 72/21 76/11
79/23 81/23 84/12 85/23 86/23 93/19
103/11 105/8 106/25 108/3 111/10
112/15 114/14 116/23 116/25 130/5
130/21 133/2 134/25 135/5 135/19
135/25 137/3 140/2 142/7 151/1
Harding's [1] 115/10
HARRIS [36] 1/7 2/1 6/11 8/19 46/15
79/6 86/10 87/17 91/2 91/23 93/12
99/11 100/18 101/19 102/3 102/4 103/4
105/4 105/25 106/6 107/8 107/17 108/4
109/11 111/25 112/8 151/25 152/16
153/4 153/19 155/17
Harris' [13] 6/18 61/8 90/16 93/10 99/13
99/20 104/8 104/25 105/16 105/21
109/14 111/15 112/12
has [68] 4/11 5/16 5/22 6/11 7/4 7/6 8/7
10/4 10/22 11/12 12/11 13/3 13/22
27/13 46/14 49/7 51/19 54/8 55/11
55/17 57/21 58/15 60/4 60/20 79/9
81/18 82/8 82/17 83/10 85/11 85/21
86/3 90/8 106/12 107/14 108/20 110/4
111/8 111/25 113/14 113/19 116/16
118/17 120/4 124/4 124/16 126/13
127/9 130/22 131/14 132/15 132/23
134/8 135/8 136/7 136/12 138/15
139/24 145/7 151/16 151/18 152/5
159/23 160/8 160/11 160/15 160/22
162/20
hasn't [7] 6/13 8/8 50/20 126/14 126/15
139/14 161/5
hastily [1] 93/1
Hastings [1] 66/7
hat [11] 88/21 92/7 92/10 92/11 92/15
96/23 97/1 97/1 97/4 105/20 150/7
haunt [1] 107/4
have [224]
haven't [7] 8/6 61/24 85/20 120/10
120/11 124/8 127/10
having [13] 6/1 11/15 19/8 23/17 27/15
60/10 82/6 93/20 93/24 93/25 94/1
104/22 104/23
HAYES [14] 3/5 12/9 12/13 13/3 14/10
14/15 14/17 14/18 14/22 14/22 15/11
15/17 17/13 20/16
he [140] 12/11 12/14 12/19 12/21 13/8
13/9 13/21 21/20 22/1 25/1 26/7 39/16
40/17 42/20 46/17 52/14 55/2 55/3 55/5
55/7 55/7 55/22 56/25 57/2 57/6 57/7
57/10 61/4 62/11 65/21 65/23 66/3
66/17 68/1 68/4 68/5 68/6 74/2 75/1
76/20 76/20 76/22 76/24 77/1 77/22
78/3 78/3 78/4 80/14 80/22 83/21 89/2
89/9 89/10 89/23 89/23 90/1 90/2 90/3
91/2 91/3 92/13 92/13 92/14 92/15
94/22 94/22 94/23 94/24 95/16 95/17
95/19 95/20 96/1 97/9 97/11 99/18
99/19 102/5 102/6 102/8 102/9 102/10
102/11 102/12 102/13 102/15 104/9
105/5 106/3 106/19 106/23 107/18
108/15 112/9 113/21 114/4 114/5 114/5
114/7 123/22 123/22 125/24 126/5
126/6 126/7 126/13 126/14 126/15
126/21 126/24 127/1 127/20 134/4
136/2 137/12 140/16 140/18 148/15
150/1 151/5 151/7 151/7 151/8 151/9
152/16 158/22 158/23 159/4 159/11
159/12 160/6 160/17 160/23 161/2
161/5 161/7 161/8 162/24 163/9
he'll [1] 119/20
he's [14] 4/8 12/15 41/18 46/18 62/10
102/5 102/6 102/7 126/16 126/19
126/25 126/25 137/10 140/2
head [2] 41/6 64/15
headquarters [6] 24/6 24/9 24/13 24/16
24/19 26/15
health [17] 63/4 86/12 86/14 116/14
118/22 119/5 120/1 121/7 139/24
140/23 140/25 141/20 141/25 142/2
142/4 142/10 150/25
hear [22] 5/8 6/8 8/8 9/25 19/12 47/25
48/10 48/14 48/16 51/16 62/9 82/7
116/8 125/8 130/19 133/2 133/8 133/21
134/24 135/19 141/15 150/23
heard [13] 8/6 23/8 23/14 23/17 29/13
29/15 29/20 68/1 90/15 146/13 147/19
152/2 160/17
hearing [30] 1/12 4/22 9/16 10/23 11/23
28/15 34/8 43/15 47/15 49/1 50/6 50/23
51/10 51/17 54/4 54/23 55/8 56/1 58/21
79/19 80/9 81/5 88/1 88/7 120/20
121/25 135/17 149/21 150/7 162/11
hearings [1] 4/3
hearsay [3] 48/12 58/14 60/4
heart [4] 120/7 143/19 143/22 152/14
heavy [1] 31/7
held [2] 101/21 147/22
help [6] 18/9 20/10 27/23 55/11 55/11
59/1
helpful [3] 4/17 18/1 81/8
her [65] 11/7 26/20 29/7 30/10 30/21
31/1 31/2 31/2 31/5 31/6 31/8 31/18
31/19 31/20 31/23 31/25 32/7 34/6
34/24 35/10 47/14 48/1 48/2 48/9 48/20
49/4 49/4 49/9 49/16 49/23 50/11 51/5
51/6 51/10 51/11 51/14 54/8 54/9 56/17
56/19 56/24 57/4 57/6 57/7 59/15 91/8
91/9 91/20 93/5 93/23 98/8 99/14 103/3
104/20 104/21 104/23 105/2 106/15
107/2 107/2 123/8 123/22 145/18
145/23 149/25
here [54] 4/8 6/8 8/25 11/18 13/6 13/6
17/23 20/22 24/11 28/12 33/5 36/6
46/16 46/17 46/18 46/20 52/8 54/3 59/6
60/7 61/4 62/1 62/6 62/7 62/21 62/22
63/7 77/14 77/24 78/13 84/13 88/3 89/2
91/3 95/1 96/6 104/5 105/17 106/17
107/21 110/17 111/13 114/3 117/4
118/24 130/15 137/6 137/9 139/23
152/7 155/19 155/22 159/3 163/8
here's [5] 53/9 77/17 77/17 87/1 159/13
herself [1] 49/10
Herson [1] 8/25
hey [1] 27/10
high [1] 141/6
highlighted [1] 78/13
highly [1] 96/11
him [68] 10/24 12/22 23/14 25/16 39/16
40/19 41/4 41/8 41/21 42/6 42/21 45/10
57/3 61/19 62/9 63/1 66/16 66/16 66/17
67/4 67/5 67/5 67/6 67/8 67/10 67/13
68/10 68/13 68/15 68/16 68/17
68/19 68/24 68/25 69/1 69/3 69/3 69/10
73/16 75/13 76/20 76/24 77/12 77/21
84/4 89/7 89/10 89/11 89/12 89/22
89/24 89/25 89/25 90/1 91/3 91/6 91/13
91/13 95/24 95/24 101/21 101/24 102/9
102/9 134/7 136/9 159/12
himself [4] 98/2 101/4 101/6 112/5
hindsight [2] 149/15 149/18
hire [1] 141/4
his [66] 12/22 13/15 13/16 13/20 13/21
21/21 23/3 27/15 41/4 41/5 41/6 41/12
41/17 55/1 56/23 56/24 57/4 57/5 66/14
74/3 74/21 76/6 76/22 78/4 79/10 89/6
89/8 89/9 89/11 90/16 91/24 91/24
92/15 92/15 92/15 93/22 93/23 94/25
99/19 101/21 101/25 102/10 102/12
103/24 105/12 105/21 106/12 108/7
110/18 111/16 111/25 112/1 112/10
112/11 112/13 112/14 124/25 125/21
127/20 134/1 136/10 145/7 158/13
158/21 160/3 160/5
hit [2] 80/14 91/4
hold [6] 45/19 53/12 90/1 95/13 95/24
100/19
holds [1] 128/14
Holland [1] 13/23
Holley [18] 37/20 42/14 42/18 43/4
43/10 44/13 44/17 44/18 44/20 80/20
81/1 89/18 92/12 94/15 94/16 144/18

## H

Holley [2] 141/20 145/7
Holley's [2] 80/21 150/3
Holly [1] 45/9
home [28] 21/18 22/1 26/16 37/11 88/9
88/13 89/4 89/6 89/14 90/6 90/10 91/2
91/2 93/6 94/9 95/2 95/4 95/16 96/4
96/22 96/23 97/1 97/7 102/8 103/22
107/24 108/6 108/18
homicide [15] 14/1 36/20 36/23 37/6
38/2 58/23 63/23 64/10 65/1 65/18
76/21 85/14 126/20 126/23 160/4
honesty [1] 152/6
honor [193]
Honor's [1] 121/5
HONORABLE [1] 1/12
hope [7] 7/3 7/13 26/22 27/9 119/19
152/13 161/25
hopeful [1] 152/3
hoping [3] 87/16 138/6 138/9
horrible [1] 132/4
hours [4] 21/13 39/10 42/16 42/17
house [32] 30/2 88/16 90/14 90/15
90/19 91/6 91/19 92/15 92/16 93/2
93/13 94/13 94/14 94/25 96/21 99/21
101/15 104/1 105/21 105/23 106/6
106/9 106/11 108/13 108/13 153/14
154/6 154/24 155/11 156/7 156/18
162/17
housekeeping [1] 121/16
Housing [1] 108/13
how [45] 14/23 14/25 15/15 21/8 23/14
24/8 29/19 31/14 31/17 34/6 34/21
36/13 36/17 36/23 42/4 45/18 45/18
56/16 61/7 63/18 63/21 66/10 71/4 72/8
72/18 74/14 88/21 91/9 91/23 92/2 92/3
92/18 94/22 94/24 96/1 96/6 99/17
100/1 109/4 118/25 127/7 129/16
134/20 159/17 161/3
Howard [1] 2/14
However [1] 67/13
huge [2] 125/21 126/19
hum [8] 16/10 18/13 18/25 19/11 19/21
19/25 20/8 50/25

## I

I'd [17] 17/1 30/8 34/11 58/4 72/16
79/23 81/19 81/19 82/22 83/2 83/16
83/17 85/17 113/6 113/17 115/11
136/20
I'll [28] 5/2 5/8 5/12 5/12 8/5 8/8 9/25
10/14 11/11 11/17 11/25 18/20 18/20
32/11 33/1 40/3 43/14 44/1 44/9 62/7
72/16 82/1 114/12 116/2 120/4 130/19
133/12 141/10
I'm [92] 5/20 5/21 7/12 9/6 10/24 12/4
14/6 14/24 19/4 19/5 19/6 19/9 20/6
20/6 21/4 26/14 29/3 32/14 33/6 36/20
42/4 45/14 49/13 49/25 50/3 52/20 53/3
53/12 58/7 60/3 62/20 63/13 63/14 68/7
69/7 69/21 71/16 80/18 81/8 82/11
83/13 83/19 84/24 84/24 87/9 87/16
91/9 94/18 106/3 106/9 106/21 108/10
117/16 118/20 121/5 122/12 123/23
124/23 125/9 125/19 127/25 128/15
131/11 131/20 134/19 138/6 138/9
138/17 138/19 139/6 139/16 140/2
140/18 142/25 144/13 145/21 147/11
148/10 148/13 148/23 149/12 150/23
151/17 152/15 152/21 155/19 155/22
158/15 158/20 158/21 159/10 161/24
I's [1] 51/19
I've [20] 5/17 5/21 14/3 38/11 38/11
39/18 81/3 82/10 83/7 83/8 83/8 83/9
86/16 94/11 113/24 117/25 118/18
122/12 130/18 140/1

## I.T [1] 46/5

idea [9] 15/15 27/17 27/21 35/22 83/5
99/17 99/18 102/20 119/5
identification [11] 4/20 4/22 10/24 46/10
49/5 50/8 52/14 86/15 146/7 149/13
149/20
identified [6] 37/19 65/21 81/18 95/21
108/7 123/22
identifies [1] 96/25
if [191]
ignore [1] 14/4 14/5
ignored [1] 137/4
illegal [1] 111/5
Illinois [1] 98/23
imagine [7] 20/14 24/1 56/16 56/20
124/12 124/19 148/19
imbedded [1] 26/24
immediate [8] 33/17 55/4 153/15 154/25
155/12 156/8 156/19 162/18
immediately [8] 96/6 153/13 154/5
154/22 155/14 156/5 156/16 162/15
immunity [1] 126/21
impacts [1] 129/23
impeach [1] 51/6
impeached [1] 135/11
impeachment [3] 124/22 127/3 135/12
impeded [1] 152/8
impediment [1] 118/17
implicate [1] 151/6
implicated [2] 151/12 158/13
importance [1] 84/8
important [17] 17/20 19/15 20/1 20/1
20/7 20/12 27/11 35/11 77/20 77/21
84/20 87/11 127/2 130/13 131/24
133/24 161/22
importantly [2] 80/14 113/9
imposing [1] 52/7
impressive [1] 146/15
in [514]
in-court [1] 49/16
inadmissible [2] 54/16 56/6
incarcerated [2] 82/2 83/25
incarceration [1] 119/21
incident [3] 37/10 48/4 76/14
inclined [2] 162/5 162/8
include [5] 9/7 12/17 26/3 114/24 138/13
including [3] 13/20 16/1 49/6
inclusion [1] 138/7
incomplete [1] 82/10
inconsistencies [1] 48/15
inconsistent [3] 59/23 124/3 149/9
incorporate [1] 148/20
incorporates [2] 8/2 142/19
incredible [1] 141/23
incriminating [1] 102/12
inculpating [1] 7/14
indeed [11] 6/15 80/5 84/18 107/19
108/15 110/23 111/4 111/24 111/24
149/20 163/4
independent [1] 162/6
indicated [9] 35/1 43/11 79/15 79/19
124/1 146/18 152/20 153/7 158/12
indicates [4] 41/14 42/1 43/24 106/17
indicating [3] 44/8 74/2 144/9
indication [1] 12/25
indicia [2] 96/20 110/5
indicted [2] 104/20 104/21
indictment [6] 85/7 142/16 143/7 143/10
143/18 143/19
individual [8] 9/8 38/11 46/2 88/25 88/25
112/4 112/4 122/2
individuals [3] 37/22 38/18 119/23
inducements [1] 112/6
indulgence [1] 26/19
ineffective [1] 131/2
infer [5] 93/22 94/4 111/1 111/7 135/13

inference [1] 97/10
inferences [1] 108/1
inferring [2] 85/3 96/16
infirmity [1] 109/3
inform [1] 149/2
information [27] 19/24 26/10 31/9 35/2
35/5 35/11 35/20 55/20 75/7 75/10
75/15 75/16 75/22 80/15 80/16 81/10
82/11 83/1 83/2 83/12 83/14 94/1 94/4
112/21 118/9 119/12 160/3
informed [2] 116/19 136/14
inherent [1] 149/8
initial [12] 11/1 11/7 12/10 16/20 48/2
48/8 48/14 49/22 54/9 118/13 122/5
123/19
initially [6] 37/10 72/22 102/5 118/15
122/4 159/16
initials [1] 44/18
innocence [2] 135/7 136/23
innocent [1] 19/23
innocuous [1] 27/12
input [1] 115/16
inquire [2] 118/3 124/15
insanity [1] 117/12
insert [2] 115/5 117/12
insertion [1] 27/12
inside [1] 96/13
insist [1] 152/24
insistence [1] 120/23
insofar [1] 83/3
installed [2] 45/17 64/19
instance [1] 106/24
institution [1] 132/14
instructed [2] 76/24 95/24
instructing [1] 129/3
instruction [3] 127/6 127/7 127/7
instructions [3] 45/19 105/10 138/16
intend [4] 13/22 61/10 117/12 124/9
intended [3] 140/5 140/8 141/2
intending [1] 27/4
intends [3] 4/21 5/23 103/13
intention [1] 73/19
interact [1] 37/15
interacted [4] 37/21 39/16 41/8 43/4
interaction [1] 109/12
interest [5] 133/6 136/7 136/7 160/1
160/22
interesting [2] 60/21 60/22
interests [1] 152/12
interpretation [1] 109/5
interpreted [2] 109/22 140/23
interrogation [5] 4/10 4/25 100/2 100/4
100/8
interrupt [3] 57/6 79/22 158/16
interrupted [1] 57/2
interrupting [1] 133/17
interruption [1] 85/20
interview [18] 37/25 38/1 38/3 67/4 67/8
67/13 68/12 68/15 68/24 69/3 69/9
72/22 72/24 73/2 73/5 73/11 73/15
73/19
interviewed [2] 89/14 95/25
intimidated [1] 102/7
into [39] 10/19 14/16 16/17 19/24 21/1
55/11 56/19 63/11 66/17 67/3 67/5 67/9
68/4 69/3 70/12 72/22 73/11 73/15
74/14 76/25 79/17 80/24 90/3 95/19
96/15 101/22 109/7 109/18 115/10
120/9 121/22 128/7 128/16 132/17
134/11 134/12 135/3 159/8 159/24
intricately [1] 85/13
introduce [1] 117/12
invaders [1] 107/24
invasion [20] 37/11 88/9 88/13 89/4 89/7
89/15 90/7 90/10 93/6 94/9 95/2 95/5
95/16 96/4 96/22 96/23 97/1 103/22

## I

invasion [2] 108/2 108/08
investigate [1] 70/11
investigated [1] 65/10
investigating [2] 66/6 89/19
investigation [10] 37/7 37/9 38/3 64/16
64/20 65/2 65/18 67/9 67/13 160/15
investigator [1] 119/18
invitation [2] 80/25 80/25
invited [1] 141/24
invoke [1] 13/21
invoked [2] 13/16 27/15
involuntary [4] 101/17 110/5 110/16
110/21
involve [1] 112/1
involved [13] 22/25 64/16 65/2 65/5 71/9
71/17 72/2 72/8 72/12 89/1 93/6 106/19
160/18
involvement [4] 37/9 40/9 110/12 110/10
involving [2] 135/13 142/16
irrelevant [5] 54/23 86/25 86/25 87/1
87/11
is [436]
isn't [11] 11/19 13/6 18/19 19/17 33/17
33/24 34/7 54/18 54/25 56/2 151/14
issuance [1] 108/19
issue [67] 4/9 5/14 7/4 7/6 7/8 7/22 10/2
10/13 10/24 10/25 11/23 12/18 14/6
47/12 48/24 48/25 53/18 61/19 63/4
84/15 86/13 86/14 86/21 91/11 97/25
99/22 104/11 117/14 117/15 119/2
122/19 122/21 123/6 123/15 124/6
127/18 129/15 130/6 130/8 132/15
133/15 133/16 136/6 137/2 137/2 137/4
137/8 137/24 140/6 140/7 140/8 140/22
141/20 141/24 142/5 143/13 143/15
147/8 150/25 153/10 154/2 154/20
155/8 156/3 156/14 159/5 162/13
issued [7] 93/8 107/19 108/9 108/21
109/20 110/2 120/18
issues [24] 4/18 4/25 6/18 10/14 46/10
62/18 82/25 86/10 87/9 97/18 107/22
127/24 129/23 131/8 131/9 137/3 137/9
141/10 143/25 146/22 146/22 150/23
151/19 151/20
issuing [2] 93/21 109/20
it [396]
it's [140] 4/17 5/10 5/10 6/4 6/21 7/5
7/13 9/10 10/10 11/2 11/5 11/25 14/2
14/5 15/4 16/13 17/3 17/20 20/1 27/20
27/21 28/17 32/12 41/8 41/9 43/15
43/20 48/6 49/23 51/6 53/4 54/16 54/20
55/7 56/5 56/6 56/12 56/16 56/20 57/24
58/2 58/2 58/3 58/4 58/9 58/10 58/11
58/25 59/7 59/21 60/3 60/21 62/7 64/10
64/10 64/11 71/8 72/14 77/19 77/21
77/22 78/13 80/16 84/8 84/23 85/5 85/8
85/12 87/8 88/8 89/3 91/15 91/15 92/5
92/12 93/21 94/2 94/12 97/2 97/14
100/5 100/25 101/1 101/1 102/15
103/15 104/10 105/3 106/4 106/17
118/10 118/23 119/13 119/14 122/7
123/17 123/17 123/18 124/12 124/13
125/17 126/12 127/2 127/6 128/2 128/7
128/9 129/1 130/21 130/21 131/5
131/11 131/18 131/24 132/15 132/24
135/2 135/17 136/8 138/14 139/2 139/5
142/25 143/3 143/16 143/20 144/7
144/9 148/23 149/7 149/8 149/9 149/9
151/6 151/10 151/11 151/12 151/22
158/20 161/11
italics [2] 138/13 138/24
items [13] 38/9 50/3 96/11 96/19 96/20
97/6 103/19 103/21 103/25 107/24
109/1 109/10 110/1

## J

Jaman [5] 80/19 80/20 80/20 80/21
80/22
James [4] 2/8 2/8 3/16 63/12
January [1] 81/14
jeans [1] 95/7
Jencks [3] 82/22 83/15 159/9
Jersey [1] 163/1
job [3] 19/12 93/20 152/10
JOHN [3] 3/8 20/21 21/3
Johnson [4] 100/15 100/24 101/5 101/9
join [1] 161/15
joined [2] 121/11 122/13
joint [8] 85/10 153/14 154/6 154/24
155/11 156/7 156/18 162/18
Jones [9] 4/23 5/1 30/5 94/16 124/17
127/14 131/10 131/15 134/21
Jones-Spence [8] 4/23 5/1 30/5 94/16
124/17 131/10 131/15 134/21
JOSHUA [2] 2/5 163/9
judge [81] 1/13 10/3 13/23 13/23 13/24
41/13 46/12 48/22 52/13 57/16 59/19
93/21 94/3 98/4 108/9 108/10 108/21
109/20 110/2 113/22 121/13 126/13
127/16 130/6 136/25 139/13 142/15
148/2 154/2 154/3 154/5
judges [1] 98/11
judgment [1] 136/11
judicial [1] 13/2
July [5] 4/14 116/5 116/5 150/19 157/3
juncture [1] 119/25
June [22] 1/5 28/23 37/2 39/11 39/25
40/2 40/7 40/20 41/3 41/4 42/7 42/17
42/17 43/21 43/24 44/16 94/20 95/14
95/16 96/21 97/3 112/13
jurisdictional [2] 129/16 137/7
jurisdictions [1] 71/13
jurisprudence [1] 108/20
juror [2] 9/3 137/24
jurors [2] 9/9 131/13
jury [37] 6/1 7/12 7/16 48/10 48/13
48/16 50/16 51/16 80/10 81/11 81/12
81/13 86/10 112/16 116/3 124/11 129/3
129/7 129/21 129/21 131/14 132/12
132/23 132/23 134/22 135/2 135/7
135/12 135/14 135/16 136/20 137/13
143/9 143/11 143/16 146/1 150/21
just [123] 6/2 9/12 9/23 10/12 10/16
11/17 11/19 12/7 13/12 14/6 17/13 20/6
27/9 28/9 29/4 30/18 31/16 31/19 32/6
32/11 33/15 34/18 34/22 35/13 35/17
38/16 40/21 42/4 42/23 44/1 45/1 45/2
45/8 45/17 47/21 49/9 54/12 55/20
57/12 61/5 63/2 63/4 63/5 67/5 69/21
72/12 75/14 77/23 78/9 80/18 83/24
85/17 85/24 86/15 86/22 91/18 94/7
94/10 95/11 101/22 103/6 106/17 113/2
114/1 114/5 115/13 116/2 116/17
116/24 117/16 118/23 119/9 119/12
120/1 120/12 120/21 121/4 121/4
121/21 122/5 122/8 122/13 124/10
124/18 124/25 127/9 128/3 128/10
129/4 133/19 135/1 135/6 135/24 136/4
136/11 137/25 138/13 138/24 139/2
139/9 139/15 141/4 141/19 143/20
143/25 146/8 146/9 147/8 148/4 148/18
149/11 151/4 151/14 156/22 158/8
159/8 159/11 159/23 160/12 160/17
161/8 161/19 162/10
justified [1] 108/11

## K

Karniskow [1] 173/6f 188
keep [4] 11/14 60/8 60/9 156/25
Keith [2] 25/11 25/13
key [2] 101/23 131/6
kicked [1] 33/4
kind [16] 11/17 19/24 38/3 62/13 62/15
68/4 92/23 98/12 99/2 99/2 110/20
112/3 119/6 124/21 131/22 136/9
kinds [1] 119/12
knew [8] 12/15 88/24 89/17 89/19 91/18
96/1 104/23 106/20
know [97] 8/7 10/4 12/13 14/2 18/21
20/1 20/6 25/7 25/11 26/10 27/10 40/17
41/10 45/20 45/25 60/12 63/5 69/13
72/8 73/25 74/1 74/4 75/1 79/14 81/6
81/13 81/23 82/10 83/9 84/18 88/9
89/24 91/3 92/2 92/4 92/18 105/25
106/18 107/2 107/2 107/5 107/5 116/5
116/22 117/21 118/20 118/22 118/25
119/15 119/17 119/20 119/22 119/22
120/3 120/8 120/15 120/20 125/15
126/14 127/9 129/7 129/22 130/16
130/24 132/4 133/8 133/10 133/18
135/14 135/17 135/24 135/25 136/3
136/6 136/8 136/9 136/14 137/1
137/13 137/15 139/17 139/17 139/23
141/15 143/24 150/2 150/9 151/19
159/12 159/13 160/3 160/8 160/25
161/3 161/4 161/8 163/10
knowing [1] 99/20
knowledge [7] 15/9 69/20 93/22 99/6
111/2 111/8 124/21
known [2] 56/17 94/13
knows [6] 93/4 103/8 103/8 106/14
106/17 146/23
Kramer [2] 67/19
KURLAND [31] 2/14 3/11 3/14 9/2 10/18
33/10 45/7 46/22 47/5 48/21 56/13 61/2
86/17 114/13 114/17 121/14 122/16
128/21 132/2 132/19 134/15 134/18
136/24 137/19 138/14 142/20 146/9
148/6 148/10 153/22 153/24
Kurland's [1] 146/17

## L

label [3] 43/20 44/13 44/17
labeled [4] 43/20 44/11 44/18 44/19
labeling [1] 44/11
labored [1] 114/15
laboring [2] 114/4 114/5
lack [2] 108/4
lady [2] 29/1 29/24
Lamar [2] 37/19 44/12
Lane [1] 1/23
language [4] 27/14 55/7 55/7 119/10
largely [4] 80/13 86/25 87/1 134/16
last [8] 7/16 7/22 12/20 15/7 31/15
33/3 33/7 38/13 40/9 81/5 94/24 96/7
105/10 113/21 117/20 120/20 149/21
150/7
late [4] 18/6 21/13 42/17 79/18
later [17] 13/9 32/7 32/12 32/15 33/2
33/8 37/19 42/6 56/21 85/1 89/20 90/4
94/19 94/20 94/20 115/12 115/16
latter [1] 87/7
LAURA [2] 1/19 154/13
law [25] 2/8 2/11 2/14 54/17 75/19 97/22
99/24 105/7 111/6 124/20 130/8 132/16
133/23 134/10 137/14 148/14 153/8
153/9 153/15 154/7 154/24 155/11
156/7 156/18 162/12
lawyer [16] 17/20 17/23 17/25 18/3 18/7
18/9 18/21 20/9 26/8 73/8 73/14 78/4
78/17 154/14 161/14 161/18
lawyers [4] 119/13 119/14 120/3 153/17

**L**

lawyers [1] 152/8
lay [2] 119/14 137/25
laying [1] 83/5
lays [1] 62/3
lead [4] 4/8 32/11 110/21 161/17
leading [1] 85/14
leap [1] 136/10
learn [2] 135/7 152/11
learned [6] 38/1 67/10 89/5 89/15 96/5 152/5
lease [3] 99/14 99/14 99/16
least [20] 11/14 33/25 55/16 71/12 81/22 84/20 88/17 88/19 88/22 92/25 97/4 110/13 117/9 129/22 131/25 132/7 134/16 146/24 147/6 147/7
leave [2] 130/20 141/6
leaving [1] 111/18
lecture [1] 27/22
left [12] 24/15 24/18 33/17 45/21 55/3 86/9 86/17 88/17 88/22 88/22 151/16 158/25
legal [7] 13/12 16/6 54/13 58/5 123/6 129/8 161/18
legally [3] 27/12 122/18 123/6
legitimate [2] 110/1 136/7
legitimately [2] 124/16 124/21
length [1] 97/24
lengthy [1] 119/20
Leon [6] 92/2 92/21 92/21 92/22 97/15 108/24
less [2] 60/22 126/12
lessee [3] 110/24 111/7 111/8
lessees [1] 111/4
let [32] 4/17 7/12 14/9 16/11 16/14 22/6 38/9 38/10 39/1 41/2 42/10 43/14 52/17 63/5 66/9 69/18 79/22 81/4 86/22 88/12 93/19 94/7 107/2 121/4 127/11 133/21 136/4 144/10 151/19 153/23 155/5 158/20
let's [5] 7/21 15/23 96/6 101/2 131/8
letter [14] 4/4 9/4 11/13 13/23 84/19 84/24 151/20 158/9 158/21 159/3 160/13 160/19 161/25 162/1
level [2] 84/17 111/7
Lexington [13] 88/23 89/2 89/8 94/21 95/10 95/15 95/17 96/5 96/10 96/13 96/13 96/14 97/5
Liberty [1] 21/14
license [2] 89/6 89/9
lies [1] 152/12
lieutenant [9] 3/16 13/6 46/16 62/22 63/12 63/14 63/18 76/12 78/24
life [3] 134/3 134/7 136/16
lifetimes [1] 88/1
light [1] 48/3
lighting [1] 41/23
like [45] 17/1 29/16 31/8 31/10 35/6 42/21 46/6 48/7 79/23 81/16 83/14 87/25 88/15 88/20 99/6 102/3 103/6 105/4 113/3 113/7 113/9 113/17 114/19 115/1 115/6 115/11 119/8 119/9 119/18 121/21 127/9 134/9 134/20 135/17 136/5 142/3 153/4 153/20 154/9 154/11 154/15 154/17 155/3 159/19 162/10
likely [6] 27/8 87/3 110/19 110/21 112/4 161/13
limine [1] 128/9
limit [2] 121/6 128/15
limited [1] 48/6
line [5] 56/2 102/1 117/7 117/23 129/24
lined [3] 113/10 113/18 116/1 116/1 138/8
lines [1] 84/19
Lisa [4] 2/21 65/3 157/17 163/17
list [3] 50/2 50/3 86/18
listed [5] 99/14 103/25 109/2 109/10 110/2
listen [3] 16/1 23/5
literally [1] 110/15
little [15] 10/3 22/14 32/11 32/12 36/18 43/8 43/8 48/6 82/17 88/2 118/16 139/25 140/1 149/13 162/22
live [4] 53/23 60/18 77/23 134/5
lived [3] 89/21 92/13 92/13
lives [2] 90/9 106/12
living [1] 105/22
LLC [1] 1/19
locate [1] 39/25
located [5] 15/3 15/6 21/22 22/3 66/20
location [19] 21/17 21/25 23/11 29/12 29/13 30/17 66/22 67/16 94/11 94/12 94/21 95/9 96/4 96/13 96/24 99/16 102/4 102/13 102/15
logical [2] 92/14 97/8
logically [1] 93/2
Lombard [1] 2/21
lone [2] 21/5 80/13
long [15] 14/25 21/9 24/9 31/14 36/17 36/23 63/18 63/21 99/17 100/19 100/20 111/7 113/24 136/13 136/13
long-time [1] 111/7
longer [1] 55/10 126/16 134/6
look [17] 5/2 8/8 34/11 39/2 39/18 40/3 41/12 42/3 42/23 43/15 43/16 88/10 114/12 129/17 131/20 133/12 139/3
looked [10] 5/17 39/21 42/20 83/8 83/8 90/25 105/20 123/5 140/25 159/21
looking [7] 35/23 41/7 45/25 88/16 137/11 141/12 159/10
Looks [1] 81/16
lot [7] 19/3 88/20 118/17 128/23 137/14 148/6 150/18
loud [1] 80/13
Louisiana [1] 100/17
love [1] 85/17
lower [1] 99/9
lunch [1] 122/18
luncheon [2] 87/13 87/21
lurking [1] 151/1

**M**

M-E-A-D [1] 28/17
ma'am [9] 70/9 71/3 73/6 75/9 75/19 77/12 77/15 78/15 78/20
made [65] 5/6 5/20 6/10 6/20 34/3 43/23 49/7 49/10 49/22 53/6 54/20 55/9 55/14 56/4 56/7 57/15 57/25 58/23 78/5 78/18 79/12 80/1 82/19 85/11 87/5 87/6 93/12 93/13 95/20 95/21 96/17 97/23 100/7 102/14 102/15 103/6 104/8 104/11 105/12 105/16 106/5 106/20 106/21 107/4 107/6 109/15 110/12 110/18 112/9 112/14 118/21 123/9 123/19 123/22 124/8 128/22 132/3 133/19 135/25 141/1 142/1 145/22 149/21 149/22 152/23
Madison [1] 15/5
magistrate [4] 90/13 92/3 92/18 97/9
mail [5] 7/13 7/19 116/4 160/11 161/24
major [1] 158/16
make [38] 5/12 6/16 26/6 27/23 28/10 52/14 52/21 57/18 60/22 67/12 77/10 81/22 81/25 82/6 82/12 86/20 87/18 90/7 93/19 97/9 99/10 103/5 112/4 115/23 116/2 120/12 129/5 132/23 133/2 139/12 143/15 147/6 147/8 147/9 150/2 161/2 161/11 161/23
makes [7] 17/19 55/5 90/17 99/7 100/2 102/12 132/21
making [6] 5/21 96/11 97/10 132/25 136/7 136/17
male [1] 95/18

males [2] 88/16 88/23 89/16
maliciously [1] 27/4
man [30] 4/13 4/25 91/4 91/23 92/12 106/1 144/7 160/16
management [1] 133/23
manner [2] 50/6 150/4
Manuelian [1] 114/14
many [14] 15/15 15/20 34/21 45/18 72/8 72/18 73/13 99/4 100/13 100/14 113/1 122/2 135/9 135/18
March [1] 159/19
mark [1] 43/14
marked [5] 16/11 39/2 78/9 112/18 113/7
marked-up [1] 113/7
marks [1] 45/21
marshals [2] 157/7 158/5
MARTIN [34] 1/8 2/1 2/1 2/8 5/16 8/3 8/13 8/20 61/7 62/11 62/20 80/23 87/18 87/24 94/8 94/18 97/13 101/13 103/24 104/12 105/8 107/12 121/24 139/8 139/10 151/16 151/25 152/18 153/8 155/4 155/17 156/10 157/9 157/11
MARYLAND [14] 1/1 1/4 1/17 1/21 1/24 2/3 2/6 2/10 2/13 2/22 21/15 23/6 97/24 97/25
matches [1] 151/10
material [5] 5/17 9/8 82/22 83/15 159/10
matter [20] 10/4 54/17 59/23 60/1 88/2 100/1 111/11 112/2 130/22 133/12 141/10 145/25 148/24 150/4 157/10 157/11 157/18 160/14 163/3 163/18
matters [8] 9/10 12/5 26/4 53/16 84/8 121/16 139/11 139/11
mattress [2] 104/25 109/17
mattresses [1] 90/25
may [35] 6/23 14/7 21/12 28/15 32/25 34/12 35/13 36/13 36/25 46/17 75/18 87/11 88/11 96/18 97/18 99/25 100/1 103/8 104/12 106/22 114/16 117/8 117/20 118/13 133/10 133/13 140/10 150/24 155/15 158/17 158/17 158/22 159/3 160/14 160/21
maybe [15] 57/7 57/8 58/7 79/24 79/25 86/14 86/16 107/3 114/11 117/18 126/10 138/14 139/11 151/14 159/22
McCafferty [5] 64/17 65/3 65/25 159/13 160/18
McCafferty's [2] 64/19 158/14
McGillivary [1] 67/20
McKenna [1] 1/22
me [116] 4/10 4/17 5/11 5/18 7/12 8/21 10/3 12/14 14/9 16/11 16/14 22/6 31/4 31/23 34/19 34/23 38/9 38/10 38/12 39/1 41/2 42/10 43/14 43/16 44/10 46/4 46/21 50/2 52/17 56/15 57/1 58/1 58/5 66/9 69/18 72/19 75/23 76/25 77/15 79/22 79/24 80/9 81/4 84/15 85/5 85/19 86/22 88/2 88/12 88/21 92/24 93/15 93/19 94/7 103/11 108/13 116/19 116/19 121/4 124/7 124/8 124/10 124/12 124/18 124/25 125/23 125/24 127/11 129/1 129/3 133/17 133/21 134/18 135/6 136/9 138/11 139/24 140/3 140/4 140/9 140/10 140/17 140/22 142/20 143/16 144/10 144/15 146/13 148/15 151/15 151/19 152/2 152/6 152/12 153/10 153/12 153/4 154/4 154/20 154/21 155/3 155/8 155/13 156/3 156/5 156/14 156/16 156/11 158/20 159/1 160/13 162/13 162/15
MEAD [7] 3/10 9/17 9/18 28/2 28/14 28/17 33/11 36/2 49/11 49/21 51/21 52/12 54/10 54/25 59/16 123/19 145/5
Mead's [1] 56/23 56/25 59/16 123/21
mean [35] 16/8 19/8 19/12 20/1 20/3

**M**

mean.. [30] 29/25 47/24 50/25 55/11
57/15 64/5 72/14 72/17 74/7 83/9 88/8
100/23 102/24 104/12 105/1 119/14
124/14 125/8 128/8 129/13 130/14
131/8 131/8 133/18 133/18 135/14
136/12 141/7 143/17 143/23
means [3] 8/7 51/23 120/24
meant [1] 55/19
meantime [1] 38/4
mechanical [1] 2/24
medics [1] 29/25
meet [4] 12/16 60/4 140/4 162/6
meeting [2] 77/21 162/2
meets [1] 60/2
member [5] 5/19 80/6 86/24 87/6 87/10
members [7] 19/6 62/15 66/25 67/1
67/17 70/24 101/25
memo [1] 77/16
memorandum [3] 13/14 148/9 149/14
memories [1] 136/13
memory [2] 45/18 45/25
men [2] 56/18 149/25
mental [19] 63/4 86/12 86/14 116/14
117/13 117/14 118/22 119/5 120/1
121/7 139/24 140/23 140/25 141/20
141/24 142/2 142/4 142/10 150/25
mention [2] 7/4 156/24
mentioned [11] 30/4 30/25 32/16 38/19
72/13 72/20 99/15 122/13 149/14 151/2
159/12
mentions [1] 107/20
MICHAEL [12] 1/16 89/1 89/5 89/17
89/24 90/8 92/4 92/11 92/16 92/18
95/21 104/6
microphone [3] 14/16 21/1 63/11
mid [1] 127/6
midst [2] 128/9 133/15
might [18] 10/8 13/2 15/16 15/20 45/22
46/1 102/10 107/4 107/25 110/11
118/16 124/9 135/25 141/3 141/14
141/15 146/13 149/24
military [1] 43/24
mind [5] 5/25 83/4 110/9 129/2 147/14
minds [1] 131/13
mini [1] 134/11
minor [1] 114/18
minute [2] 45/2 86/15
minutes [5] 29/22 31/16 56/21 99/18
143/16
Miranda [12] 13/15 13/20 19/10 68/17
68/19 68/22 69/1 69/6 72/21 73/7 73/21
75/2
misconstrued [1] 48/25
misheard [1] 79/25
misrecollect [1] 79/25
missing [1] 86/10
misspoke [4] 94/18 122/18 123/6 123/6
misstate [1] 146/11
mistake [1] 142/16
misunderstanding [1] 58/7
MITCHELL [51] 1/6 1/19 4/5 4/25 13/15
13/20 21/18 21/19 23/1 23/9 24/23
24/24 25/19 25/22 26/6 27/15 27/18
65/6 65/8 65/15 65/17 66/10 67/2 67/24
69/16 69/19 69/24 73/19 74/2 74/24
78/17 87/18 130/19 150/16 151/12
151/17 151/25 152/17 154/8 155/4
155/23 157/7 157/9 158/6 160/6 160/7
160/8 160/12 162/6 162/9 162/20
Mitchell's [5] 4/9 69/22 84/14 85/6 151/3
mitigation [6] 119/17 119/17 120/4 120/7
140/5 141/2
mixed [1] 97/14
mom [1] 112/14
moment [13] 9/25 10/13 17/4 27/20

32/19 35/13 41/7 47/4 86/19 93/15
145/17 146/11 149/13
money [4] 71/15 71/17 81/2 88/17
monitoring [1] 64/22
Monroe [1] 1/20
Montgomery [28] 5/18 6/2 79/20 80/2
80/6 80/13 80/18 80/20 80/21 81/1 82/1
82/21 82/22 83/13 83/18 83/20 83/25
86/23 86/24 94/17 124/14 125/19
125/20 126/1 126/1 128/13 128/24
137/9
Montgomery's [8] 5/14 6/8 80/10 80/11
86/24 87/10 128/17 129/6
months [3] 120/8 120/8 146/19
moot [3] 60/11 60/21 60/24
more [36] 4/7 14/7 35/8 43/8 46/14 53/6
55/15 55/16 72/12 81/9 87/3 92/1 93/20
101/2 101/5 104/13 107/24 108/19
112/21 113/9 114/20 118/16 120/16
121/2 127/2 128/6 130/13 137/11
140/11 150/24 152/5 152/5 152/5
152/11 152/11 162/22
moreover [3] 93/9 136/5 136/11
morning [22] 14/18 14/19 14/22 21/8
28/14 28/21 33/11 33/12 36/13 38/13
39/10 42/16 45/2 70/5 70/6 79/13 85/21
88/3 107/15 121/18 151/3 159/1
most [5] 5/4 80/14 86/5 97/25 100/18
mother [23] 61/20 90/16 91/5 91/8 91/14
91/16 91/18 91/22 93/10 97/22 99/13
99/20 102/10 102/16 104/18 105/21
106/2 106/19 107/1 107/7 110/18 112/1
112/10
motion [20] 6/11 6/19 8/15 8/18 8/19
62/3 62/5 79/9 85/2 112/12 121/20
122/5 122/12 122/12 128/8 153/6 153/7
153/22 153/25 156/25
motions [8] 1/12 4/3 4/14 51/5 51/10
122/3 122/6 150/20
motive [6] 125/9 133/4 133/8 134/9
134/17 137/2
motives [4] 132/11 132/24 133/6 134/11
motor [1] 93/24
move [1] 97/18
moved [2] 132/1 132/2
moving [1] 42/10
Mr [61] 3/6 3/9 3/11 3/11 3/14 3/14 3/17
4/8 10/18 14/21 21/7 28/20 33/10 35/19
36/12 45/7 53/12 61/2 63/17 72/20
76/11 80/11 84/3 85/22 87/23 92/9
92/10 93/23 93/24 93/25 94/4 94/15
94/17 97/7 105/8 105/8 108/6 108/17
115/15 118/1 124/24 128/1 132/20
134/18 135/22 138/21 139/10 140/2
142/6 142/17 144/1 148/10 153/19
153/24 154/8 154/13 157/11 162/6
162/9 162/20 163/8
Mr -- okay [1] 118/1
Mr. [302]
Mr. and [1] 154/12
Mr. Attorney [5] 153/21 153/21 153/24
155/1 155/1
Mr. Coburn [18] 8/4 9/2 9/9 45/3 114/13
114/17 116/11 117/22 120/16 128/4
132/2 133/20 138/14 138/22 139/24
140/9 141/7 142/20
Mr. Crowe [3] 8/10 82/21 121/15
Mr. Finch [1] 101/21
Mr. Gardner [44] 5/5 5/9 5/16 5/17 6/5
7/14 8/5 10/11 32/24 39/16 39/19 39/23
40/7 40/10 40/13 40/21 42/9 43/4 79/9
80/2 80/23 81/1 83/25 87/17 113/14
124/16 125/2 127/19 128/24 131/14
132/3 132/5 133/15 134/4 134/24 135/8
135/13 136/16 142/18 144/23 152/1

152/17 154/8 155/20
Mr. Gardner's [11] 5/24 6/9 7/16 41/3
42/24 124/8 127/18 128/22 129/6 133/25
134/21
Mr. Garner [1] 4/23
Mr. Hanlon [7] 4/21 5/3 10/11 44/24 47/5
148/23 150/1
Mr. Harding [24] 12/6 62/10 79/23 81/23
84/12 86/23 93/19 103/11 106/25 108/3
111/10 112/15 114/14 116/23 116/25
130/5 130/21 133/2 134/25 135/5
135/19 135/25 137/3 151/1
Mr. Harding's [1] 115/10
Mr. Harris [22] 6/11 8/19 46/15 87/17
91/2 91/23 93/12 102/4 103/4 105/25
107/8 107/17 108/4 109/8 110/18
111/25 112/8 151/25 152/16 153/4
153/19 155/17
Mr. Harris' [9] 6/18 61/8 90/16 93/10
105/16 105/21 109/14 111/15 112/12
Mr. Hayes [6] 12/13 13/3 14/22 14/22
15/11 17/5
Mr. Herson [1] 8/25
Mr. Holley [5] 42/18 43/4 81/1 144/18
144/20
Mr. Holley's [1] 150/3
Mr. Kurland [19] 9/2 46/22 47/5 48/21
56/13 86/17 114/13 114/17 121/14
122/16 128/21 132/19 134/15 136/24
137/19 138/14 142/20 146/9 148/6
Mr. Kurland's [1] 146/17
Mr. Martin [24] 5/16 8/3 8/13 8/20 61/7
62/11 62/20 80/23 87/18 94/8 94/18
97/13 101/13 103/24 104/12 107/12
139/8 151/16 151/25 152/18 155/4
155/17 156/10 157/9
Mr. Mead [1] 9/17
Mr. Mitchell [29] 4/5 13/15 13/20 27/15
27/18 65/15 66/10 67/2 69/16 69/19
73/19 74/2 74/24 87/18 130/19 150/16
151/12 151/17 151/25 152/17 155/4
155/23 157/7 157/9 158/6 160/6 160/7
160/8 160/12
Mr. Mitchell's [5] 4/9 69/22 84/14 85/6
151/3
Mr. Montgomery [20] 5/18 6/2 79/20
80/2 80/6 80/13 80/18 81/1 82/1 82/21
83/13 83/18 83/20 83/25 86/24 94/17
125/19 125/20 128/13 137/9
Mr. Montgomery's [6] 5/14 6/8 80/10
86/24 87/10 129/6
Mr. Pyne [1] 122/4
Mr. Spence [1] 81/3
Mr. Sullivan [24] 4/4 4/4 7/23 12/19 14/7
84/13 112/16 113/1 113/19 114/3
156/24 158/21 160/5 160/13 160/19
160/20 160/21 161/1 161/4 161/6
161/10 161/16 161/21 162/1
Mr. Sullivan's [4] 12/21 13/12 158/9
159/3
Mr. Taylor [1] 92/7
Mr. Treem [5] 8/3 8/17 8/24 101/13
139/23
Mrs [1] 110/23
Mrs. [3] 111/12 111/18 111/25
Mrs. Harris [3] 111/12 111/18 111/25
Ms [44] 3/6 3/17 4/5 7/21 8/9 11/1 17/12
29/6 29/23 30/4 30/7 30/14 31/15 31/18
32/4 35/20 47/11 47/25 48/17 70/4 77/9
96/17 109/21 113/9 113/10 130/19
137/22 144/6 145/3 154/11 156/23
157/9 158/5 158/7 158/16 161/17
161/24 162/1 162/3 162/20 163/5 163/7
163/9 163/12
Ms. [19] 16/15 29/21 30/20 97/7 104/4
104/6 109/8 114/14 127/14 145/9
145/12 145/18 149/19 151/17 154/13

## M

Ms.... [1] 154/20
Ms. Attorney [2] 154/13 154/25
Ms. Delvison [4] 97/7 104/4 104/6 109/8
Ms. Jones-Spence [1] 127/14
Ms. Manuelian [1] 114/14
Ms. Rhodes [5] 16/15 151/17 160/17 161/1 161/15
Ms. Smith [5] 29/21 145/9 145/12 145/18 149/19
Ms. Smith's [1] 30/20
much [22] 29/19 41/9 45/18 46/7 78/15 78/24 79/17 91/5 97/13 99/9 107/12 120/21 122/7 125/13 126/16 129/11 130/3 135/20 137/18 149/9 150/14 152/8
multiple [1] 55/23
multitude [1] 101/18
murder [26] 4/23 5/1 64/11 64/12 64/12 65/21 65/22 65/23 65/24 65/25 66/6 67/9 81/2 94/17 124/17 125/25 126/2 126/9 127/13 131/10 134/21 136/15 136/15 158/14 159/13 160/18
murdered [1] 66/2
murdering [1] 131/15
murders [3] 65/3 70/11 85/6
muscular [1] 43/8
must [8] 57/14 118/7 118/8 118/9 124/19 132/14 132/22 159/9
muster [2] 92/21 92/21
my [74] 4/17 7/8 7/13 8/25 10/1 11/12 13/13 13/22 13/25 19/5 19/6 21/3 22/13 24/7 26/15 28/22 34/6 43/20 44/13 44/14 49/25 53/4 53/4 59/13 62/4 63/12 66/25 69/20 75/19 77/17 83/12 85/21 93/16 97/25 99/3 100/14 100/22 103/23 104/10 105/10 105/24 106/4 108/3 115/12 116/12 118/17 119/1 119/11 119/24 121/6 129/2 130/12 132/10 132/18 140/3 140/5 140/5 140/25 141/2 142/21 144/10 146/12 146/14 146/15 146/23 146/24 147/2 147/14 147/22 153/7 153/7 153/17 154/14 159/1
myself [5] 22/13 23/22 43/23 44/14 148/22

## N

name [19] 14/13 20/25 21/1 21/3 28/16 36/8 37/19 44/12 44/16 44/17 63/10 63/12 89/24 93/5 94/1 99/14 157/23 158/12 163/23
named [11] 12/9 29/1 64/17 88/25 89/18 92/12 99/15 103/20 108/16 151/9 160/18
Namely [1] 101/19
names [3] 37/17 114/24 142/17
narcotics [5] 103/13 103/16 111/17 112/2 112/11
narrate [1] 48/3
narrative [3] 57/2 57/6 78/10
narrow [1] 141/9
Nathan [1] 158/12
nature [2] 52/19 125/15
near [8] 21/17 21/25 22/15 39/5 66/22 94/12 96/24 97/5
nearing [1] 105/15
necessarily [4] 119/16 129/22 133/3 142/4
necessary [1] 5/10
need [28] 7/5 46/5 48/23 52/11 52/20 54/6 76/1 81/9 81/24 82/12 84/25 85/21 86/1 87/15 110/17 113/10 114/25 128/7 134/24 135/5 139/22 146/18 147/1 151/16 151/17 157/7 160/24 161/1
needed [2] 35/11 81/2
needs [5] 6/22 57/24 82/14 112/22

131/22
neglected [1] 156/24
neighbor [1] 56/25
neighborhood [1] 92/13
neighborhoods [1] 119/23
nervous [3] 30/22 30/23 57/9
Ness [2] 2/15
neuropsychologist [1] 119/8
never [21] 12/17 17/5 17/8 20/5 26/13 27/17 55/18 58/22 60/3 73/11 73/11 74/4 100/9 105/6 116/17 116/22 139/25 140/4 140/8 141/2 141/2
Nevertheless [1] 99/7
new [8] 40/13 40/13 46/3 109/7 137/10 161/14 161/18 163/1
next [7] 7/19 90/7 95/25 115/10 151/20 157/6 162/2
nexus [4] 70/12 97/8 104/8 129/17
nickname [1] 158/13
nicknames [1] 158/19
Niedemeyer [1] 66/8
night [4] 65/13 97/3 103/22 151/8
nine [2] 33/25 55/5
Nixon [3] 130/12 131/3 131/18
no [127] 1/3 4/13 6/24 6/24 6/24 9/21 10/10 11/24 12/11 13/19 15/24 16/25 17/8 17/9 19/3 20/17 23/2 23/16 24/10 25/1 25/6 25/15 25/18 25/21 25/24 26/11 26/17 26/21 27/11 31/11 32/5 33/1 33/6 33/23 35/15 39/20 40/11 40/23 45/13 46/4 46/7 46/14 46/23 49/12 50/17 50/18 50/21 52/2 52/13 53/9 53/21 55/2 55/10 56/10 59/3 59/19 64/24 67/25 68/18 69/14 69/20 69/23 69/25 70/12 72/10 73/18 73/20 73/21 74/1 74/2 74/12 74/17 74/25 75/3 75/14 76/16 77/6 77/7 77/12 77/15 77/19 78/17 80/3 82/24 86/19 91/14 91/16 91/17 93/3 98/25 99/17 99/19 99/19 99/25 101/12 101/16 104/11 104/19 104/20 107/6 108/20 109/21 110/5 111/6 111/11 112/6 113/22 115/12 119/10 122/10 123/10 126/3 132/7 133/12 134/6 137/6 140/14 142/7 143/3 144/13 150/11 151/5 156/10 156/20 158/20 159/8 163/3
nobody [3] 92/3 120/5 160/25
non [2] 111/23 124/20
non-coercive [1] 111/23
non-law [1] 124/20
none [6] 53/15 58/13 83/5 103/19 151/11 151/11
nonetheless [1] 55/22
nonmember [1] 87/5
nontestimonial [3] 59/2 59/6 59/9
nor [1] 108/23
Norfolk [1] 118/18
normal [2] 68/25 149/22
normally [5] 68/12 68/23 72/21 83/1 101/7
North [8] 96/8 96/9 96/21 99/12 102/6 102/13 108/8 108/15
NORTHERN [1] 1/2
not [240]
notations [1] 77/10
note [5] 13/13 26/6 43/5 44/14 77/16
notereading [1] 2/24
notes [1] 43/23
nothing [14] 8/15 10/6 20/15 32/21 36/1 44/25 74/2 76/9 78/22 89/15 102/3 105/15 129/13 147/8
notice [11] 6/13 6/18 13/2 16/13 17/14 31/5 117/15 120/10 120/11 141/23 152/23
noticed [3] 74/20 122/2 159/5
notices [1] 150/24
notify [1] 117/11

noting [1] 113/8
notion [1] 141/16
notwithstanding [1] 54/15
November [1] 15/10
now [66] 10/6 13/6 14/4 15/4 24/13 29/11 29/23 30/14 31/17 33/24 34/18 38/22 39/18 39/21 40/9 41/2 41/7 42/10 43/4 44/1 44/9 46/18 50/7 51/18 53/6 54/6 54/24 55/10 55/12 56/3 67/20 67/22 78/6 81/5 82/6 82/9 83/2 83/11 84/15 86/15 87/14 89/13 89/20 90/3 90/5 93/20 99/22 100/11 114/23 126/6 127/1 127/11 127/25 135/5 137/1 137/11 137/11 141/5 145/8 147/8 151/25 152/15 158/15 160/14 160/24 161/22
number [14] 76/20 78/9 108/8 108/15 117/21 117/23 118/4 124/22 130/12 135/6 135/10 142/19 142/21 146/22
numbered [1] 121/25
NW [2] 2/15 2/17

## O

oar [2] 114/4 114/5
oath [2] 28/15 55/9
object [1] 142/2
objected [3] 5/16 112/18 141/25
objection [3] 41/16 41/19 75/17
objections [2] 9/18 113/8
observation [4] 59/13 84/16 85/17 152/14
observe [1] 136/11
observed [5] 31/20 60/16 88/22 94/14 130/18
observes [1] 56/17
obtain [2] 40/5 149/19
obtained [2] 136/8 149/19
obtaining [1] 110/6
obvious [4] 5/22 101/2 101/6 132/6
obviously [18] 10/10 49/1 52/12 84/13 86/23 120/25 123/10 126/20 127/24 128/13 128/14 128/15 128/16 129/17 129/23 129/23 133/5 161/4
occasion [4] 25/17 27/8 28/25 37/6
occupancy [1] 96/21
occupant [1] 99/5
occupations [1] 27/4
occupies [1] 94/21
occur [6] 65/12 75/4 75/5 75/6 77/16 135/12
occurred [4] 23/5 25/25 76/14 94/9
October [1] 152/7
odd [1] 60/15
off [11] 8/7 38/3 56/20 86/17 134/17 153/13 154/5 154/22 156/5 156/16 162/16
offer [18] 5/23 17/1 33/13 33/14 134/3 153/20 153/23 153/25 154/11 154/14 154/16 154/17 155/6 155/6 155/25 156/1 156/11 156/12
offered [1] 59/25
offering [1] 134/6
offers [1] 5/3
office [6] 1/15 2/11 18/4 18/24 19/5 99/3
officer [38] 9/17 11/8 27/3 33/11 45/8 45/11 48/9 49/11 49/21 52/12 54/10 54/25 55/19 59/16 75/11 75/21 91/3 93/4 93/11 95/1 95/11 95/12 96/16 99/25 100/9 102/5 104/9 105/4 106/3 106/22 107/5 108/12 108/13 110/18 111/6 123/19 123/21 145/5
officers [16] 22/3 22/12 22/18 23/23 27/10 46/2 71/9 71/22 72/2 108/25 109/13 109/17 109/22 110/9 111/14 112/7
Offices [1] 2/8
offset [1] 155/10

**O**

offspring [1] 11/4
often [6] 18/15 18/17 18/25 27/1 81/8
129/11
oftentimes [1] 119/3
oh [10] 33/23 69/23 98/6 98/8 114/4
126/15 146/9 150/9 159/5 159/12
okay [181]
old [8] 9/13 21/14 38/22 46/2 48/2 48/4
56/16 56/21
older [1] 101/13
Oliver [5] 64/17 64/19 65/3 158/13
160/18
on [236]
on moot [1] 60/24
once [8] 16/19 50/9 50/15 50/22 62/25
69/2 77/22 127/1
one [108] 5/5 5/18 8/15 9/5 9/12 10/2
10/15 10/24 11/6 12/8 13/19 17/4 18/4
19/15 20/12 23/5 23/6 35/17 37/18 41/8
41/23 43/5 43/7 44/15 45/8 45/11 46/2
46/2 48/24 53/12 55/20 60/5 63/2 67/22
69/9 74/17 76/20 79/17 84/7 85/10 87/6
88/19 88/22 90/5 90/5 93/15 95/5 95/6
96/1 97/4 97/21 99/10 99/20 100/18
101/16 102/14 102/15 103/4 103/6
104/8 104/10 107/23 107/24 109/5
111/1 113/1 113/14 113/17 114/1
114/16 120/22 121/17 122/19 123/6
123/6 123/25 124/4 125/19 127/12
128/5 128/6 128/12 128/20 130/7
133/13 133/16 136/20 139/15 139/17
141/21 142/16 142/16 143/20 144/8
145/9 145/10 145/12 145/22 146/8
146/9 146/16 148/18 149/17 149/17
161/12 162/21 162/22 163/1
ones [3] 40/20 135/17 149/17
ongoing [3] 55/2 109/15 112/9
online [1] 38/21
only [22] 7/6 8/18 48/23 50/3 50/8 50/11
50/15 75/23 78/14 80/16 83/8 86/5
92/11 98/9 98/11 129/15 137/13 142/18
143/17 146/12 151/12 158/5
open [11] 5/25 11/14 15/9 30/22 31/8
60/8 60/9 82/5 84/14 153/1 156/25
opened [2] 15/7 15/23
operating [1] 46/2
operations [1] 65/1
opinion [4] 98/7 98/9 98/10 101/12
opportunities [1] 125/16
opportunity [16] 6/13 6/15 47/14 47/20
47/25 48/13 58/15 58/20 79/16 82/15
87/17 123/10 135/21 150/17 152/16
152/21
opposite [1] 106/17
oppressive [1] 112/20
opt [1] 122/14
opt-out [1] 122/14
optimistic [1] 141/17
option [2] 11/14 49/15
optional [1] 132/15
options [2] 60/8 60/9
or [163] 4/21 6/17 7/10 7/15 7/20 8/7 9/6
10/21 10/25 16/19 16/21 18/14 18/22
18/22 18/23 19/6 19/22 19/23 22/6 22/9
22/11 22/20 22/21 23/3 23/23 25/13
25/16 26/8 27/14 30/1 30/10 31/12
31/19 33/25 35/6 35/22 37/21 38/23
40/13 41/13 42/17 46/6 49/5 49/11
49/17 50/7 53/24 54/3 54/23 55/5 55/11
56/1 59/9 59/22 67/17 67/22 69/15
71/13 73/8 73/22 74/3 74/3 74/5 75/1
77/16 79/7 80/23 80/23 82/21 83/1 85/2
86/2 88/25 89/17 89/21 91/4 92/12
92/15 92/25 93/23 94/20 97/4 99/5
99/20 100/6 101/19 102/7 104/20

104/23 105/14 105/15 106/1 107/22
107/23 107/24 108/4 109/23 110/10
110/23 112/1 112/5 112/12 112/13
114/20 116/1 116/25 117/12 117/13
117/13 117/15 119/8 119/9 119/17
119/19 120/22 121/8 122/11 123/6
123/17 124/3 124/9 124/14 124/22
126/6 127/1 127/7 127/19 128/6 128/15
128/16 129/3 129/7 130/24 134/15
135/11 135/18 136/23 137/11 138/8
138/13 138/14 138/14 138/22 138/24
139/5 139/15 140/5 141/10 143/18
145/8 146/19 147/5 147/11 147/17
149/24 149/24 157/23 158/17 159/10
159/13 159/19 160/9 163/23
orange [3] 88/20 90/5 96/24
order [41] 57/3 116/13 116/16 116/18
117/9 117/10 117/10 117/17 118/4
118/11 119/24 120/18 120/21 120/23
120/23 120/24 121/7 139/13 139/15
139/24 140/15 140/19 140/20 140/23
140/23 141/9 141/25 153/12 154/4
154/21 155/2 155/3 155/13 155/14
155/16 156/5 156/16 158/7 162/15
163/4 163/5
order that [1] 118/4
ordered [1] 119/5
orders [3] 73/24 120/17 120/18
original [2] 45/19 49/5
originally [4] 37/11 44/11 44/12 45/17
Oriole [1] 88/21
other [95] 5/12 5/23 7/14 8/3 8/15 9/17
10/3 10/22 12/4 12/15 19/22 22/3 22/11
22/14 23/6 23/11 23/23 25/16 26/4 27/2
30/1 32/3 33/25 37/18 39/22 40/2 40/12
40/19 43/6 43/8 45/11 49/23 54/19
58/13 61/25 65/18 66/25 68/2 73/24
78/1 79/24 83/10 89/1 91/1 92/6 92/12
94/13 94/25 97/18 97/22 99/20 100/14
101/9 101/11 101/19 101/25 104/23
107/3 108/23 110/19 111/17 112/6
112/24 114/25 115/11 117/13 118/7
119/1 119/12 119/14 119/18 120/3
123/13 123/23 123/25 124/2 124/6
125/8 127/12 127/18 128/6 128/6
128/20 129/23 133/13 133/16 142/15
146/14 146/22 151/6 151/12 152/23
157/8 158/5 161/14
others [5] 83/13 84/7 97/23 114/8
139/16
otherwise [3] 54/17 54/22 55/25
ought [6] 14/2 46/21 48/17 81/22 111/20
140/9
our [22] 7/10 9/15 16/3 16/6 19/15 38/21
46/9 59/6 67/12 70/12 87/14 115/16
120/6 121/20 122/5 123/17 123/18
125/17 136/10 137/8 150/22 157/6
ours [1] 136/11
ourselves [1] 68/13
out [51] 11/5 29/8 30/1 31/21 33/4 35/11
35/12 42/23 44/1 44/18 55/20 58/23
61/6 62/4 69/12 70/23 72/19 72/24 73/5
77/1 86/2 88/2 88/12 89/10 89/20 98/14
106/23 108/2 110/14 112/20 113/15
117/7 119/13 120/22 122/14 124/15
125/12 133/14 134/1 134/2 134/8
137/25 138/25 139/2 142/1 142/11
145/1 146/13 151/1 151/19 161/10
outside [1] 41/17
outstanding [1] 122/21
over [29] 11/25 14/1 17/22 20/22 27/7
27/7 27/7 27/8 27/8 28/12 28/21 31/4
35/2 35/5 35/21 36/18 38/2 66/19 67/6
68/16 83/7 83/8 98/19 114/15 124/24
133/9 136/10 153/23 160/15
overbear [1] 112/3
overborne [1] 112/1

overbreadth [1] 107/22
overlap [1] 113/1
overruled [2] 41/19 75/18
Overseeing [1] 70/20
overturning [1] 130/9
own [7] 31/19 48/9 55/12 106/13 112/11
119/1 152/12
owned [1] 99/19
owner [1] 98/15

**P**

p.m [1] 43/25
PA [1] 2/8
pace [1] 30/25
page [7] 81/13 81/13 94/24 95/25 96/8
130/2 148/12
pages [3] 81/16 114/20 131/19
paid [2] 71/23 111/5
paints [1] 133/5
paper [1] 69/4
papers [3] 61/15 152/23 152/25
paperwork [1] 74/6
para [1] 141/20
paragraph [8] 94/24 96/7 117/18 118/1
120/22 141/22 142/1 142/13
parallel [1] 95/4
parallels [1] 117/9
paramedics [1] 32/16
paraphernalia [3] 91/1 91/24 103/16
paraphrase [1] 91/5
pardon [1] 85/19
pared [1] 113/4
parental [1] 110/14
parents [2] 110/10 111/5
parole [1] 136/17
part [32] 5/17 6/17 7/11 15/11 16/3
18/18 22/14 54/14 54/15 54/24 64/12
67/12 67/14 68/17 78/14 82/14 85/2
92/16 93/22 117/9 117/17 125/10
128/14 129/4 136/23 140/1 146/16
147/1 147/2 152/24 153/1 153/3
parte [18] 6/17 6/21 7/5 10/4 81/20 82/1
82/12 82/18 139/11 151/16 157/10
157/12 158/4 158/21 160/6 162/11
163/3 163/6
participant [1] 92/12
participate [1] 37/6
particular [15] 10/2 18/18 41/12 96/7
96/8 99/5 107/17 128/25 129/16 132/21
137/5 137/7 146/8 146/19 147/7
particularly [1] 137/4
parts [4] 19/15 61/22 78/10 78/11
party [6] 95/22 100/13 100/21 100/25
101/4 101/7
passed [3] 29/19 48/5 118/17
passenger [1] 98/2
passes [2] 92/20 92/21
past [5] 56/18 94/25 95/18
pathway [1] 110/19
pattern [3] 42/1 42/2 55/15
Pause [2] 32/20 93/18
pauses [1] 55/21 55/21 55/22
pay [2] 27/6 92/25
peers [1] 131/14
Pelton [3] 99/24 100/21 101/3
penalty [6] 119/2 119/3 119/11 120/9
136/23 150/20
pending [3] 8/19 134/4 158/7
Pennsylvania [2] 23/7 67/12
people [25] 14/1 18/14 34/1 34/21 45/23
45/24 45/24 55/5 64/22 67/22 68/2 72/8
72/12 88/22 90/2 90/6 100/9 100/10
105/21 116/4 119/18 120/6 141/4 142/3
142/3
per [35] 85/1 110/8 111/22
perfect [4] 113/12 121/4 138/8 138/22

perfectly [4] 62/10 83/22 108/20 113/8 133/4 151/22
perform [2] 153/9 153/16
perhaps [8] 47/4 79/6 85/22 89/2 108/20 113/8 133/4 151/22
perimeter [1] 35/22
permissible [2] 110/6 110/8
permission [2] 134/3 161/6
permit [2] 43/1 59/15
permitted [3] 91/25 122/5 161/16
person [15] 18/6 43/2 48/23 68/13 70/18 72/23 89/17 93/5 100/12 103/8 120/10 151/12 159/8 160/20 160/23
personal [3] 19/5 38/5 40/9
persons [2] 55/23 112/20
perspective [2] 79/6 122/22
persuade [1] 48/23
pertaining [1] 97/23
pertains [2] 129/16 142/17
phase [6] 119/3 119/11 120/9 135/8 136/23 136/24
Philadelphia [1] 113/21
phone [3] 102/12 107/18 151/7
photo [1] 41/9
photograph [10] 39/7 39/9 39/15 41/14 41/16 41/21 41/24 42/1 42/15 42/20
photographed [1] 40/17
photographs [19] 9/23 10/16 28/6 38/12 38/14 38/17 38/18 38/21 38/23 38/24 38/25 39/22 40/2 40/5 40/6 45/2 45/18 45/20 45/24
physical [1] 38/10
picked [2] 158/14 159/11
picture [1] 146/23
pictures [1] 45/21
piece [5] 11/19 43/22 49/24 148/11 150/7
pieces [1] 49/15
pinpoint [1] 41/13
PJM [1] 44/19
place [14] 23/18 30/17 62/12 88/13 89/21 90/10 90/15 92/14 93/6 97/10 98/25 151/7 154/16 154/18
placed [2] 40/19 157/12
plain [5] 22/6 22/8 98/14 103/19 109/25
plainly [1] 48/13
plan [12] 66/10 66/13 68/14 68/17 68/19 71/2 71/4 71/7 71/8 71/8 72/5 73/1
planned [2] 140/13 161/22
planning [1] 120/5
plea [2] 134/5 137/6
pleading [7] 17/25 100/23 127/3 130/12 131/19 132/10 132/19
pleadings [7] 83/4 83/5 100/14 104/10 123/18 129/18 132/3
pleas [2] 55/10 131/21
please [31] 6/24 14/13 20/23 20/25 21/2 28/13 28/16 32/19 32/25 33/1 36/8 63/7 63/10 85/19 87/23 88/11 103/11 115/9 115/25 116/11 117/21 121/14 123/4 124/9 133/21 137/22 148/7 155/16 157/10 160/12 163/5
PLLC [1] 2/16
podium [10] 47/2 84/13 116/11 121/14 127/12 128/21 136/10 137/22 139/10 148/7
point [32] 7/3 7/10 8/14 11/5 11/5 12/21 30/24 38/1 47/5 53/10 57/24 58/5 58/8 63/3 68/14 68/14 68/15 77/5 90/1 101/21 101/23 106/5 109/9 114/17 119/11 120/6 122/20 123/6 123/25 131/12 161/5 162/5
pointed [2] 34/5 125/12
points [7] 56/15 60/24 132/9 134/22 134/23 135/5 141/19
poisonous [1] 62/13

police [54] 11/1 11/8 21/4 21/9 22/22 23/22 24/6 24/9 26/15 26/23 27/1 27/13 30/15 36/17 48/5 55/19 63/17 63/18 63/13 63/19 68/7 68/10 70/23 70/24 71/22 88/24 89/3 89/7 89/24 90/3 90/18 91/3 91/8 91/17 94/22 94/22 95/21 96/16 97/2 97/8 97/24 98/2 99/17 100/2 100/4 100/8 100/9 101/2 101/15 101/19 102/5 105/4 106/22 108/14
policy [4] 45/12 45/14 45/15 46/2
portion [1] 10/25
portions [1] 6/12
posed [1] 32/3
position [25] 9/15 9/21 49/25 58/2 59/6 64/3 82/7 82/9 99/11 104/17 105/3 112/24 113/3 119/24 123/14 123/17 123/18 125/6 125/18 127/25 128/1 128/4 137/1 146/14 151/5
positions [1] 8/17
positively [2] 95/20 96/25
possession [5] 43/11 110/25 111/9 112/2 159/24
possibilities [2] 161/12 161/20
possibility [3] 12/25 134/15 161/24
possible [10] 7/8 8/21 77/5 96/11 97/6 97/16 118/16 122/21 124/1 163/6
possibly [1] 102/7
posting [1] 36/19
postponed [1] 161/13
potential [4] 7/9 119/19 119/20 119/21
potentially [1] 160/22
practice [2] 13/25 14/5
Pratt [2] 2/5 2/12
precinct [1] 37/14
precisely [3] 141/21 142/5 142/12
precludes [1] 143/25
predicates [1] 124/4
prefer [4] 16/21 82/25 83/1 122/9
preference [2] 60/18 60/18
pregnant [1] 94/2
prejudiced [2] 86/4 122/11
preliminarily [1] 56/15
preliminary [15] 4/18 5/8 6/10 7/2 12/4 54/1 72/9 72/12 79/18 128/13 147/16 147/17 147/18 147/18 147/22 148/23
premeditated [1] 55/6
premises [4] 109/13 110/1 111/3 111/10
preparation [1] 149/3
prepare [2] 128/5 163/5
prepared [8] 44/13 62/17 69/22 87/9 109/9 128/8 145/21 163/4
preponderance [2] 98/24 100/6
presence [3] 109/22 110/20 111/8
present [13] 4/5 4/5 10/14 60/6 67/16 80/14 101/18 102/19 102/20 102/21 119/8 124/5 124/24
presentation [2] 12/4 79/3
presented [1] 13/18
presenting [1] 47/10 48/1
preserved [1] 61/2
press [1] 109/9
presumably [4] 49/21 50/5 51/4 51/13
pretrial [7] 19/15 51/19 55/1 58/15 132/16 151/21 151/23
pretty [12] 5/22 17/19 31/9 41/9 48/3 72/11 78/15 88/8 91/5 94/3 146/10 148/13
previous [3] 29/11 142/18 142/19
previously [4] 34/7 38/19 115/14 135/8
prima [1] 47/1
principles [1] 110/25
Pringle [14] 97/24 97/25 98/2 98/7 98/15 98/23 99/2 99/13 99/16 99/17 103/6 105/2 106/8 106/8
Printed [2] 157/23 163/23
prior [21] 10/23 13/21 59/22 59/22 59/25 60/5 67/2 79/9 122/22 123/18 124/2

124/2 124/3 125/17 127/20 130/7 131/4 134/21 135/13 135/16 137/14
prison [1] 80/9
prisoners [8] 12/16 15/12 15/15 15/17 15/22 15/25 16/17 17/6
privacy [1] 106/13
private [3] 18/22 153/17 154/14
pro [1] 152/22
probable [32] 91/14 91/22 93/10 97/15 97/16 97/21 98/18 98/21 98/25 98/25 99/8 100/20 101/16 101/24 102/1 103/9 104/18 105/2 106/5 106/7 106/14 107/6 107/7 107/23 108/19 108/22 109/7 109/24 110/23 111/7 111/14 111/24
probably [15] 5/13 27/12 30/8 35/7 35/8 58/2 61/1 71/11 92/25 115/14 117/8 117/16 117/18 121/5 124/20
problem [8] 46/23 82/9 143/17 143/17 149/15 151/3 151/5 151/13
problems [2] 88/4 114/16
procedure [1] 5/7
proceed [3] 4/6 4/24 79/14
proceeded [1] 29/17
proceeding [9] 50/14 131/4 135/8 135/13 135/16 137/14 137/16 163/7 163/9
proceedings [15] 2/24 7/9 13/1 86/7 125/17 132/1 154/16 154/17 157/13 157/18 158/6 163/4 163/6 163/14 163/18
process [1] 146/8
processing [1] 40/10
produced [1] 2/24
proffer [7] 6/4 81/6 81/9 82/5 83/1 83/2 83/13
proffered [1] 80/1
proffering [1] 82/20
proffers [4] 81/8 81/24 84/9 84/10
profile [8] 39/19 39/20 40/6 42/5 43/1 45/8 45/20 45/21
profound [1] 130/10
promise [1] 135/23
prompt [1] 111/16
prompted [1] 158/9
promptly [4] 7/7 7/8 151/19 161/10
proof [3] 98/22 98/23 106/25
proofread [1] 112/25
proper [2] 67/15 132/12
properly [2] 99/25 119/5
property [7] 38/5 107/25 108/2 109/23 109/24 110/24 111/1
proposal [4] 4/7 4/7 146/16 146/23
proposals [1] 116/1
propose [1] 4/6
proposed [6] 5/15 7/23 9/5 115/23 118/5 120/18 127/6 138/2 138/3
proposition [1] 99/24
propriety [2] 104/14 150/24
prosecute [2] 103/10 111/12
prosecuted [1] 105/1
prosecuting [1] 111/19
prosecution [5] 126/21 132/12 132/14 132/24 134/9
prosecution's [2] 133/4 133/8
prosecutor [3] 104/19 104/20 111/12
protect [2] 18/9 20/10
protected [1] 97/15
protocol [1] 67/15
prove [2] 60/1 99/4
provide [3] 112/5 115/3 163/7
provided [6] 32/9 44/12 75/11 78/17 80/15 80/17
provides [1] 132/13
proximity [1] 96/9
prudent [1] 104/20
psychiatrist [2] 119/9 121/8
psychologist [1] 121/8

# P

psychologists [1] 142/3
public [24] 18/4 18/23 19/5 153/11
153/13 153/15 154/3 154/5 154/7
154/20 154/22 154/24 155/9 155/10
155/11 156/4 156/6 156/7 156/15
156/17 156/18 162/14 162/16 162/18
punishment [1] 117/15
pure [1] 142/4
purpose [3] 21/16 21/25 24/21
purposes [3] 28/15 80/14 124/23
pursuant [1] 141/25
pursue [1] 137/1
put [16] 10/18 38/11 43/18 61/9 61/10
61/10 64/11 68/4 78/3 81/1 82/20 93/1
101/2 118/9 120/14 134/9
putting [1] 107/1
Pyne [3] 2/8 2/8 122/4

# Q

qualification [1] 15/19
qualifies [1] 123/14
qualify [4] 54/14 55/24 56/10 123/12
quashed [1] 93/8
question [38] 4/12 8/5 10/23 11/2 13/14
18/18 35/17 44/21 45/8 47/8 56/3 63/2
63/3 86/12 105/11 109/4 110/3 111/13
113/11 116/10 116/13 116/15 118/2
118/23 118/25 119/1 119/11 123/16
124/11 124/22 137/20 139/2 142/7
144/7 144/16 149/14 157/3 162/9
questionable [1] 149/12
questioned [2] 100/13 102/5
questioning [3] 55/19 56/11 101/21
questionnaire [19] 7/13 7/16 7/19 7/23
9/4 9/8 9/11 9/13 86/11 112/16 113/6
114/13 115/23 135/2 137/24 138/7
138/23 139/3 150/21
questions [30] 9/6 9/13 17/10 18/15
18/16 20/17 26/18 26/21 28/22 29/4
31/19 32/3 33/15 34/19 35/9 35/15
45/13 55/15 55/17 55/21 56/25 57/1
57/5 57/8 57/9 70/2 77/7 90/20 112/24
112/25
quick [4] 55/5 122/18 137/20 148/18
quickly [5] 7/18 45/22 79/24 89/7 89/12
quit [1] 139/18
quite [16] 30/2 79/23 97/12 102/3
111/10 111/19 112/7 112/9 119/5
120/19 124/15 132/6 141/16 152/11
159/2 159/2

# R

radio [5] 31/4 35/3 35/5 35/21 57/4
raid [2] 70/17 70/20
raise [9] 12/25 14/11 20/23 36/6 63/8
133/13 134/22 135/4 151/15
raised [3] 6/18 12/5 97/18
raises [1] 133/23
raising [1] 10/13
rambled [1] 34/22
ran [5] 94/25 95/18 96/14 97/2 97/3
ranger [1] 80/13
rapidly [1] 57/11
rather [5] 37/21 38/22 81/22 85/1 114/15
rationale [2] 132/17 133/1
Ravenell [1] 2/4
RCX [1] 3/3
RDX [1] 3/3
re [2] 40/17 161/24
re-mail [1] 161/24
re-photographed [1] 40/17
reach [3] 54/6 115/24 141/8
reached [3] 14/3 101/17 114/15
reaction [1] 56/23
read [25] 16/17 16/19 16/19 16/21 18/14
18/14 32/22 32/25 57/13 78/7 78/10
80/10 80/11 80/12 80/19 80/19 80/24
80/25 82/10 98/6 98/8 98/9 129/10
130/11 131/18
reading [2] 84/19 108/11
ready [3] 46/15 128/10 141/5
real [8] 9/24 10/21 104/11 118/24 120/1
124/23 131/8 131/9
realize [3] 98/8 124/7 159/10
realized [1] 45/22
really [30] 10/15 10/16 27/11 27/13
57/15 75/21 81/23 82/12 84/1 84/8
84/15 84/15 85/10 85/20 86/1 87/8
114/14 114/18 114/25 115/9 115/11
116/7 128/17 129/4 130/14 134/11
146/10 149/22 160/24 161/1
rear [4] 95/17 95/18 96/10 98/14
reason [10] 4/13 45/8 45/10 47/13 49/3
51/14 83/24 91/16 91/17 118/24
reasonable [5] 98/24 99/1 100/7 111/11
140/15
reasonably [3] 97/9 109/17 109/19
reasoning [1] 101/8
reasons [5] 55/24 79/17 84/7 111/21
112/12 124/10
rebut [1] 134/8
recall [18] 23/14 24/8 25/3 28/23 31/13
37/17 43/7 43/9 74/13 77/25 80/5
103/15 104/4 104/13 134/14 134/14
149/24 162/24
recalls [1] 115/14
receive [5] 6/1 82/1 152/22 152/25
155/15
received [8] 4/4 45/1 50/19 74/3 125/20
126/5 126/7 158/10
receiving [1] 105/10
recent [9] 4/7 8/10 15/23 97/25 158/9
160/1 160/11 160/13 160/15
recently [2] 7/6 159/24
recess [2] 87/13 87/19 87/21 163/13
recognize [2] 44/3 86/23
recollect [1] 48/3
recollection [2] 103/23 142/6
reconsider [1] 148/24
reconsideration [2] 147/17 147/18
record [35] 4/2 4/3 4/22 7/4 9/12 10/19
14/14 21/1 28/16 32/6 34/13 36/9 44/10
48/10 54/12 61/2 63/11 84/14 109/5
115/13 121/5 121/22 131/23 132/6
136/5 153/3 154/10 154/12 154/15
155/5 156/25 157/12 157/17 158/4
163/17
recorded [2] 2/24 6/2 80/11
recovered [9] 43/21 44/15 44/19 92/8
94/19 97/5 97/7 98/3 101/15
RECROSS [1] 77/8
RECROSS-EXAMINATION [1] 77/8
red [7] 52/15 113/10 113/18 116/1 138/8
144/20 150/7
red-lined [4] 113/10 113/18 116/1 138/8
redacted [1] 120/22
REDIRECT [2] 35/18 76/10
Redrum [8] 64/4 64/6 64/8 64/9 64/13
64/16 65/14 70/7
reduce [1] 45/23
redundant [4] 112/19 113/2 114/20
114/20
refer [1] 114/12
reference [1] 83/2
referred [2] 17/13 120/21
referring [6] 65/22 66/24 117/21 131/11
135/16 158/21
refers [5] 15/19 99/1 142/18
reflect [5] 4/3 85/24 154/10 154/12
155/5
refresh [1] 93/15 103/23
regard [7] 9/3 78/13 122/19 124/1
129/15 137/2 137/10
regarding [7] 5/5 5/14 5/15 6/18 79/13
79/13 79/13
registered [2] 94/15 98/15
regret [1] 152/8
regrettable [1] 152/6
regrettably [1] 111/4
rehabilitate [2] 59/15 59/22
reinvent [1] 114/19
related [3] 10/10 70/11 123/25
relates [1] 116/13
relating [7] 12/17 85/5 96/12 117/13
127/14 132/14 134/9
relation [1] 39/12
relationship [3] 68/14 132/5 132/7
relative [1] 131/12
relatively [3] 42/8 43/7 48/5
relayed [1] 35/5
relaying [3] 31/4 35/2 35/20
release [7] 153/12 154/4 154/21 155/13
156/4 156/15 162/15
released [2] 102/16 103/3
releasing [1] 158/7
relevance [1] 87/2
relevant [4] 83/11 132/22 132/22 132/24
reliability [2] 5/9 149/12
reliable [4] 83/18 94/4 108/5 108/14
rely [4] 75/21 75/23 75/24 132/20
remain [2] 12/18 16/2 16/4 17/7 19/16
19/18 20/3 20/13 146/21 151/17 157/7
158/7
remained [1] 40/14
remaining [1] 114/16
remains [2] 79/6 152/2
remark [1] 136/17
remarkable [1] 56/22
remarks [1] 7/3
remember [24] 23/4 23/24 23/25 24/18
25/5 25/10 26/11 27/16 32/4 37/19
40/18 45/12 65/8 66/5 67/16 67/18 72/7
74/16 91/6 92/13 117/5 117/6 120/17
136/17
remind [4] 20/9 103/11 151/20 152/18
remove [2] 110/9 150/3
removed [1] 145/7
rent [1] 111/5
repeat [1] 57/3
repeated [1] 31/22
repeatedly [1] 130/19
report [30] 25/25 26/1 26/6 27/13 27/14
40/9 69/15 74/9 74/13 74/18 75/25
76/3 76/13 76/15 76/17 76/21 76/22
76/24 77/2 77/5 77/11 77/13 77/14
77/18 78/4 78/6 78/8 78/11 158/17
160/15
Reporter [3] 2/21 157/20 163/20
reports [6] 27/2 46/1 74/7 74/15 74/16
160/16
represent [9] 39/15 131/16 131/16 152/9
155/3 155/18 155/20 155/23 156/10
represented [1] 160/23
representing [8] 4/5 83/20 132/2 160/22
161/7 161/11 161/15 161/17
request [41] 6/20 6/21 121/6 121/9
121/12 122/7 122/13 146/24 153/10
153/11 153/13 153/15 154/1 154/2
154/3 154/5 154/7 154/19 154/19
154/20 154/22 154/24 155/8 155/9
155/12 155/12 156/2 156/3 156/4 156/5
156/8 156/14 156/15 156/16 156/19
162/9 162/12 162/13 162/14 162/16
162/18
requested [5] 78/4 78/17 114/11 153/8
155/14
requests [3] 77/17 122/3 122/9
require [1] 10/2
required [1] 81/25

**R**

requirements [2] 69/2 69/5
requires [4] 57/19 57/20 60/17 117/15
research [2] 122/18 137/15
reserve [2] 147/7 147/14
reserving [1] 146/22
resided [4] 89/21 99/16 99/21 108/7
residence [14] 21/21 66/22 92/9 94/1
94/5 96/7 96/8 96/17 99/14 108/16
111/2 111/8 111/17 112/13
resides [1] 95/15
residing [1] 104/7
resolution [8] 110/19 153/15 154/7
154/24 155/11 156/7 156/18 162/18
resolve [3] 7/8 135/5 139/5
resources [2] 71/18 74/14
respect [33] 4/12 4/20 4/23 5/1 9/16
9/16 9/17 9/22 14/4 49/4 54/13 54/24
56/8 61/11 61/12 81/23 86/20 113/14
116/13 119/22 120/5 123/7 123/25
124/6 126/20 128/18 133/15 135/24
136/6 137/4 137/7 137/13 150/19
respiration [1] 31/6
respond [8] 6/17 79/16 79/16 82/16
135/1 136/2 139/4 162/1
responded [2] 6/22 37/10
responding [2] 127/8 130/4
response [5] 6/14 85/18 156/10 156/20
156/21
responsibility [8] 64/13 65/14 102/10
103/4 103/12 104/22 105/5 111/17
responsible [4] 70/10 70/19 150/4 160/4
responsibly [1] 97/9
restate [1] 123/23
result [7] 14/3 110/1 125/21 130/8 130/9
160/1 160/16
resume [1] 87/13
retain [1] 18/22
retired [2] 67/21 67/22
return [12] 33/14 153/6 153/22 153/22
153/25 154/10 154/17 155/6 156/1
156/12 162/11 163/9
returned [3] 22/1 24/6 96/3
review [9] 6/23 74/15 76/2 76/12 78/1
85/4 93/16 155/3 155/16
reviewed [13] 6/1 7/15 9/6 74/6 74/13
74/16 74/17 74/18 77/3 93/20 114/6
114/8 153/5
revolver [1] 88/19
RH1 [1] 16/12
Rhode [1] 162/25
Rhodes [33] 1/9 1/19 3/6 3/17 4/5 7/21
8/9 16/15 17/12 70/4 77/9 113/9 113/10
130/19 137/23 151/17 154/13 156/23
157/9 158/5 158/8 158/16 160/17 161/1
161/15 161/17 161/24 162/2 162/4
162/20 163/7 163/9 163/12
RICO [3] 55/16 131/6 131/7
right [152] 8/17 10/6 11/4 11/10 11/21
12/2 12/18 12/22 13/6 13/16 13/17
13/20 13/21 14/11 15/4 15/20 16/1 16/4
16/9 16/13 17/6 17/14 17/14 17/17
17/17 17/20 18/12 18/15 19/2 19/13
19/16 19/17 19/18 19/24 20/2 20/4 20/7
20/12 20/18 20/19 20/23 27/9 27/15
28/3 28/7 28/11 29/1 29/8 32/3 32/7
32/12 33/4 34/12 34/17 36/6 45/20
46/11 46/18 46/21 47/21 48/21 50/4
50/7 50/12 50/22 51/1 51/8 51/9 52/23
52/24 53/14 53/22 56/13 59/4 60/25
61/13 61/13 61/21 62/24 63/8 70/8
70/25 71/5 71/10 71/13 72/3 72/17
72/25 73/9 73/22 74/3 74/7 74/24 75/8
75/25 78/19 79/5 79/23 81/14 82/23
86/8 87/1 87/14 89/13 93/15 113/18
115/18 115/21 117/4 118/1 118/1

121/17 121/24 122/16 123/1 123/24
127/25 128/3 128/20 129/25 131/6
131/7 131/8 131/18 138/10 138/11
142/14 144/1 144/1 147/14 147/25
147/25 150/13 150/15 151/15 151/25
156/9 156/20 157/6 158/4 159/2 159/3
159/3 159/7 159/15 159/20 159/25
160/2 160/10 162/21 163/2 163/12
rights [23] 13/15 13/20 16/1 16/7 16/8
16/17 16/21 16/22 16/23 18/10 19/10
20/10 20/12 69/1 69/3 69/5 69/8 69/12
73/7 73/22 74/3 78/2 78/4
ripened [1] 81/8
RMR [1] 2/21
road [3] 21/14 21/15 120/24
Robar [2] 25/7 25/9
robbed [1] 95/11
robbers [2] 97/2 103/22
robbery [23] 37/4 37/11 37/12 81/2 94/9
95/2 95/5 96/4 96/22 96/23 108/6
108/18
ROBERT [1] 1/15
Rockville [1] 1/21
ROLAND [5] 3/5 12/9 14/9 14/15 14/17
role [1] 6/8
rolling [1] 150/22
Ron [5] 62/6 88/10 88/11 117/20 121/21
room [2] 2/22 69/3 72/22 73/5 73/12
73/15 90/18 90/19 90/21 90/22 104/25
105/22
Rosenberg [1] 2/1
rough [3] 130/21 130/21 130/22
round [3] 42/23 79/3 87/15
routine [5] 13/25 26/24 27/9 27/12 27/22
routinely [2] 99/3 135/15
routinized [1] 27/6
rowhouses [1] 94/12
rows [3] 41/5 41/22 42/2
rubric [1] 142/9
rule [7] 56/10 56/14 100/5 100/21
100/24 124/3 132/13
ruled [2] 101/10 121/5
rules [1] 81/25
ruling [21] 5/13 5/21 51/19 54/1 57/19
79/13 79/18 84/25 127/10 128/13 129/3
129/8 146/17 146/25 147/2 147/16
147/17 147/19 148/19 149/2 149/11
run [3] 56/20 88/23 95/10
running [4] 31/21 42/2 95/2 95/9

**S**

S-H-A-M-I-A [1] 108/16
S.W.A.T [2] 72/9 72/18
safe [2] 72/11
said [42] 13/11 23/3 31/8 33/3 33/25
34/22 49/13 50/23 50/23 57/15 59/17
69/1 69/2 73/8 75/14 80/5 82/6 83/7
83/24 84/3 85/24 88/3 89/22 91/19 94/8
95/15 103/24 104/1 104/4 105/23
105/25 106/3 107/15 128/24 134/18
134/19 134/25 136/1 136/3 160/2
160/17 163/8
same [25] 22/15 24/13 27/7 39/12 43/1
43/2 66/3 75/10 75/15 87/5 94/11 95/10
100/24 101/8 106/11 113/4 130/2 131/4
131/5 131/11 137/5 138/7 143/9 148/12
148/12
satisfied [4] 77/25 108/8 110/4 122/10
satisfy [1] 47/15
saw [13] 11/13 33/16 41/21 42/2 42/9
42/18 42/21 57/1 78/18 89/7 89/22 95/9
95/12
say [70] 7/12 9/7 14/7 14/7 15/3 17/6
16/16 18/18 18/25 19/2 19/3 19/3 21/22
23/20 27/10 29/25 30/8 34/21 35/6
45/11 52/15 54/7 59/12 59/17 66/24
71/19 72/4 72/11 72/12 72/16 73/14

78/16 84/20 85/9 85/12 86/22 87/10
90/7 91/12 91/23 95/11 102/23 104/13
104/22 108/21 113/18 119/4 120/19
125/22 127/9 127/23 127/25 128/1
132/4 132/6 135/6 136/5 136/22 136/22
137/1 141/23 143/6 144/4 146/15 152/2
152/19 152/20 153/1 153/4 162/10
saying [15] 5/21 17/22 17/23 31/3 58/18
60/3 60/12 62/9 73/19 77/16 84/24 91/6
106/21 121/2 129/15
says [21] 17/25 18/3 18/9 43/23 51/21
57/21 90/17 91/12 101/3 103/9 106/8
117/8 117/9 120/10 129/22 140/15
140/19 143/5 145/12 151/7 159/19
scars [1] 45/21
scary [1] 120/6
scene [13] 11/8 29/24 30/15 37/10
37/13 37/13 49/10 49/13 49/22 58/22
59/17 60/17 95/2
schedule [2] 7/10 146/20
scheduled [3] 116/6 151/21 161/19
scheduling [3] 8/22 10/5 10/9
school [2] 2/14 162/24
Schulman [1] 2/4
scope [4] 109/19 116/13 119/4 121/7
script [1] 12/16
se [3] 110/8 111/22 152/23
seal [4] 132/4 158/7 158/22 160/25
sealed [1] 136/1
search [33] 21/21 22/2 23/19 24/1 24/4
26/3 27/2 79/7 79/7 80/12 90/13 96/19
97/17 97/22 102/21 103/20 103/20
103/21 103/25 105/14 105/19 107/20
107/22 109/2 109/6 109/10 109/15
109/16 109/18 109/19 110/1 112/8
112/13
searched [3] 90/4 90/19 94/13
searches [1] 61/25
searching [3] 101/15 109/1 109/12
seat [5] 98/2 98/14 98/15 98/16 99/17
seated [7] 6/24 14/13 20/25 28/15 36/8
63/10 87/23
second [12] 9/15 53/13 54/15 87/7 88/7
91/11 92/16 122/1 125/25 132/9 137/2
137/16
second-degree [1] 125/25
seconds [1] 136/12
sections [2] 112/18 113/1
see [35] 4/13 5/12 15/16 15/17 24/23
25/13 25/16 25/19 30/10 39/5 40/21
41/4 41/25 42/6 42/24 44/2 50/3 65/25
67/24 69/24 81/21 84/5 90/23 96/6
113/17 115/6 131/5 131/14 138/3 139/3
143/19 149/24 151/13 151/16 152/3
seeing [2] 46/17 149/24
seek [2] 18/23 85/4
seem [1] 50/2
seemed [1] 27/11
seems [12] 4/10 5/18 5/22 46/21 56/15
87/25 106/25 124/18 124/25 134/18
135/6 140/9
seen [22] 5/22 25/22 31/23 31/25 34/5
34/24 76/5 80/9 81/1 81/3 81/3 86/16
87/2 89/6 89/12 92/6 93/25 111/4 137/8
149/24 158/18 160/9
sees [1] 95/1
seize [1] 38/4
seized [6] 43/22 103/13 103/18 105/16
107/10 109/25
send [2] 153/2 161/25
sense [1] 48/6
sent [5] 89/11 113/15 116/19 158/21
160/13
sentence [6] 126/6 126/7 126/16 134/3
134/7 136/20
sentenced [4] 124/17 126/14 126/15
136/16

sentenced [1] 135/21
separate [4] 49/23 52/21 87/9 102/14
separated [1] 149/16
separately [1] 62/13
September [5] 151/22 151/22 151/22 151/23 161/19
sergeant [2] 64/4 108/13
serial [1] 55/19
series [8] 31/18 38/12 55/15 55/17 55/21 56/24 57/8 94/12
serious [3] 6/22 11/23 130/7
serve [1] 22/2
served [1] 23/19
services [3] 18/23 46/6 110/13
services or [1] 46/6
serving [1] 126/6
session [6] 4/15 8/22 87/16 87/19 87/22 157/6
sessions [1] 116/6
set [11] 28/4 35/22 108/2 143/5 143/6 153/13 154/5 154/22 156/5 156/16 162/16
settled [1] 110/24
settlement [6] 154/1 154/18 155/7 156/2 156/12 162/12
several [5] 94/10 125/16 125/16 131/25 161/12
severed [1] 161/14
shaking [1] 31/12
shall [3] 85/12 117/11 117/15
Shamia [2] 93/4 108/16
share [1] 83/14
SHAWN [6] 1/9 37/18 39/8 41/1 43/21 44/6
she [105] 11/23 30/7 30/21 30/22 30/23 31/1 31/3 31/4 31/5 31/7 31/9 31/10 31/12 31/19 31/20 31/20 31/20 31/22 31/23 31/23 31/24 31/25 32/9 34/3 34/9 34/22 34/24 48/1 48/8 48/18 49/2 49/8 49/10 50/4 50/5 50/6 50/12 50/16 50/20 50/23 50/23 52/14 52/21 52/24 53/15 53/17 53/20 53/23 54/3 54/15 54/17 54/20 54/20 54/21 55/6 55/9 55/14 55/25 56/3 56/6 56/7 56/8 57/3 57/9 57/9 57/10 57/10 57/11 57/12 59/16 60/16 60/18 90/8 96/25 98/6 99/15 99/16 99/21 102/16 102/19 102/19 102/20 102/21 102/22 102/23 102/24 102/25 103/1 103/2 104/7 104/7 104/7 104/23 105/1 105/5 105/23 106/11 106/14 106/17 106/18 116/19 123/11 123/13 145/5 149/24
she'll [1] 51/13
she's [24] 11/21 11/21 30/8 47/11 47/13 49/4 49/17 50/7 50/8 51/14 52/2 51/15 52/8 54/2 54/3 54/7 54/19 55/4 55/14 60/11 60/13 104/8 106/12 110/25
sheet [2] 39/3 69/4
SHELLY [1] 1/8
SHELTON [6] 1/7 91/6 104/8 104/25 105/4 106/6
Shelton's [3] 90/18 104/2 105/17
shift [1] 62/24
shifted [2] 55/11 82/10
shirt [19] 5/6 43/20 43/23 44/3 44/5 44/14 44/14 44/19 44/21 86/16 144/5 145/8 145/10 145/10 145/13 145/22 146/12 150/3 150/8
shirts [3] 95/7 144/25 145/1
shooter [7] 5/6 11/6 144/8 145/23 146/1 146/12 149/20
shooting [2] 37/11 145/15
short [1] 55/21
shorter [1] 43/8
shortly [1] 5/6

shots [7] 29/20 39/19 39/20 42/5 43/1 45/9 56/19
shoulder [16] 42/3 46/4 46/4 46/24 46/25 76/22 81/6 82/8 85/1 92/22 92/24 93/7 93/8 93/13 97/14 100/23 102/9 107/10 107/11 113/6 113/24 114/11 120/11 127/5 129/12 143/6 146/1 149/1 149/1 149/2 149/16 149/17 154/12 163/5
shouldn't [7] 4/13 9/7 81/7 81/7 91/25 92/1 153/3
show [11] 5/18 16/11 27/1 34/9 38/9 42/20 43/14 44/9 66/16 78/10 149/22
show-ups [1] 149/22
showing [5] 39/1 41/24 78/8 108/5 150/10
shown [3] 38/11 39/7 42/13
shows [2] 58/3 92/24
showup [10] 5/2 5/7 9/17 144/17 145/7 145/9 145/22 146/7 149/23 150/5
side [4] 121/1 136/10 137/25 137/25
sides [1] 95/12
sidewalk [1] 29/9
sight [1] 30/7
sign [1] 139/13
signature [5] 76/23 78/1 153/7 157/20 163/20
signed [12] 8/7 74/2 92/24 92/25 116/16 116/18 116/19 117/4 117/9 117/17 139/14 153/2
significance [2] 27/13 68/9
significant [2] 26/25 118/22
significantly [1] 52/18
signing [1] 117/6
signs [1] 90/13
silence [1] 27/15
silent [8] 12/18 16/2 16/4 17/7 19/16 19/18 20/3 20/13
silver [2] 88/19 89/16
similar [3] 50/5 95/8 100/18 100/18 120/3
similarity [1] 113/22
similarly [1] 101/10
simple [1] 88/8
simpler [1] 122/7
simply [7] 11/19 12/15 49/8 98/18 99/1 135/16 142/21
since [11] 15/7 15/22 15/23 46/24 63/23 80/9 82/10 143/9 143/11 145/25 152/20
single [3] 138/9 142/16 142/17
sir [61] 14/23 16/12 20/18 20/19 20/22 22/19 24/12 24/14 27/19 28/12 28/15 28/24 29/2 29/14 29/18 30/6 30/11 30/13 30/16 30/19 31/11 32/2 32/5 32/8 32/10 32/18 32/22 33/3 33/23 34/2 34/20 34/25 35/4 35/7 35/25 36/3 64/7 64/14 64/18 64/21 64/24 65/4 65/16 65/19 66/4 66/12 67/4 67/25 68/3 68/21 69/7 69/11 69/14 69/17 69/20 69/23 69/25 77/4 77/6 79/1 155/22
sister [9] 90/16 90/16 90/23 91/19 104/8 105/12 105/16 105/22 107/9
sit [2] 131/9 136/10
sitting [14] 77/14 106/10 143/10 145/8 104/4 103/7 130/16
situation [7] 48/12 77/19 99/11 100/8 101/4 103/7 130/16
situations [3] 100/3 100/4 101/5
Sixth [4] 16/8 47/15 100/15 101/13
sixty [1] 48/23
sketch [1] 88/12
skinned [1] 148/14
slow [1] 31/2
small [4] 39/3 106/11 138/1 147/2
Smith [28] 11/15 29/1 29/6 29/21 29/23 30/7 30/14 31/15 31/18 32/4 33/16 34/1 35/21 47/11 48/17 49/1 55/4 57/2 59/14 60/11 123/7 123/8 144/5 145/3 145/9

145/12 145/18 149/19
Smith's [6] 11/1 30/20 47/25 56/23 60/14 160/16
sneak [1] 151/15
so [195]
so's [1] 104/6
so-and-so's [1] 104/6
social [7] 110/13 119/15 119/16 120/11 141/20 142/3 142/9
sociologist [2] 140/6 141/3
sociology [2] 119/21 119/22
sole [3] 99/13 99/15 99/21
solicit [1] 19/19
soliciting [1] 19/22
solid [1] 48/3
solved [1] 56/2
some [66] 4/18 7/2 8/5 9/18 12/12 13/19 16/21 22/18 23/11 25/16 29/13 42/1 43/12 45/12 45/24 45/24 46/22 47/13 48/7 51/14 54/8 59/14 63/3 81/2 83/24 84/2 85/2 88/22 89/1 90/1 90/2 91/1 91/1 91/19 97/24 100/3 100/8 101/11 106/16 107/4 110/19 112/24 114/24 118/9 119/6 122/18 122/19 122/20 124/12 126/24 130/23 132/3 135/4 136/7 140/1 140/7 141/1 141/4 142/10 143/24 148/4 148/15 150/2 158/10 158/11 162/5
somebody [20] 10/22 17/16 19/16 38/23 45/22 73/7 75/24 89/12 89/20 89/22 89/23 98/16 101/6 104/1 119/15 125/24 158/12 158/14 160/2 160/18
somebody's [1] 113/13
somehow [2] 54/8 83/24
someone [5] 10/17 25/4 46/5 68/23 104/22
something [28] 6/22 10/18 60/15 68/22 82/3 86/17 88/24 90/17 99/6 103/6 104/4 104/12 105/12 114/18 119/9 120/2 121/15 123/14 126/25 132/25 134/9 134/20 134/25 151/2 159/10 159/13 159/14 159/19
sometime [4] 13/7 13/8 46/13 89/20
sometimes [2] 26/24 120/8
somewhat [3] 93/20 97/12 120/19
somewhere [1] 113/13
son [1] 106/12
soon [3] 46/17 161/1 163/6
sorry [10] 26/14 27/22 49/13 49/25 53/12 69/7 71/16 144/13 148/10 158/15
sort [11] 7/3 19/13 26/1 41/17 53/5 84/19 118/9 118/23 119/1 130/23 140/7
sound [2] 133/2 133/3
Sounded [1] 29/16
sounder [1] 125/13
sounds [3] 29/13 29/15 88/20
South [2] 1/16 2/2
space [1] 106/11
speak [18] 14/16 19/6 21/1 25/2 25/9 25/13 25/16 28/25 58/6 63/11 72/23 73/16 106/23 127/1 128/15 139/23 152/18 152/21
speaking [4] 29/23 31/5 72/20 154/11
speaks [1] 41/17
special [2] 6/12 64/13
specialist [4] 119/17 120/4 140/5 141/3
specific [8] 29/4 32/3 34/8 45/10 94/1 122/9 122/14 141/9
specifically [3] 68/19 93/25 127/17
speculating [2] 134/19 147/11
speculation [1] 137/13
speech [3] 30/23 31/2 31/8
spell [1] 21/1
spelled [1] 64/11
Spence [17] 4/23 5/1 30/5 80/17 80/20 80/22 81/3 94/16 124/17 126/2 126/20 126/23 127/14 131/10 131/15 134/21

**S**

Spencer [1] 130/15
spend [2] 86/15 143/16
spoke [8] 25/4 25/5 29/6 30/14 30/20 30/21 31/1 37/21
sponsoring [1] 4/21
spread [1] 26/23
squad [4] 64/7 66/25 67/2 67/17
squarely [1] 119/9
stabbing [1] 23/5
staff [1] 158/5
stage [2] 134/24 161/22
staging [2] 21/14 22/15
stand [6] 20/22 28/12 47/4 48/11 63/7 82/21
standard [1] 122/7
standardized [1] 15/12
standards [3] 98/21 98/23 100/6
standing [3] 122/12 145/8 149/25
stands [2] 99/24 136/8
staring [2] 84/15 118/18
start [11] 4/24 7/21 35/23 39/1 61/12 61/18 68/13 91/11 91/14 115/22 153/23
started [1] 45/23
starting [3] 45/17 152/7 152/16
startling [1] 56/22
starts [1] 148/20
state [25] 14/13 20/25 28/16 36/8 50/13 50/14 54/12 55/2 63/10 71/20 72/1 86/11 98/9 110/2 124/17 124/25 125/20 129/2 133/25 134/1 135/18 136/4 145/20 146/5 149/14
State's [3] 102/17 103/3 103/5
stated [1] 26/7
statement [70] 5/4 5/19 6/2 6/5 11/1 26/7 32/9 48/2 49/10 49/13 49/22 53/19 54/20 56/4 56/7 57/14 57/25 58/14 59/22 59/23 59/25 60/5 61/8 61/19 69/16 69/18 69/22 79/6 80/11 84/1 84/14 84/18 84/20 85/2 85/5 85/11 86/21 87/5 90/17 99/5 101/17 104/9 104/23 105/6 105/12 105/16 106/5 107/4 109/14 109/21 110/8 110/12 110/16 110/21 112/5 121/20 124/3 124/3 130/10 144/7 145/18 145/18 145/21 145/24 146/2 146/9 151/4 151/7 151/13 157/1
statements [33] 4/9 5/15 5/24 5/25 6/10 27/1 51/11 54/19 62/11 78/17 79/14 79/21 80/1 83/6 87/3 87/4 87/18 93/12 97/23 102/12 102/14 103/12 107/17 109/8 110/3 110/7 110/15 112/14 123/12 123/19 124/2 128/24 129/6
states [6] 1/1 1/3 1/13 1/15 20/20 160/5
station [1] 91/8
status [2] 24/23 87/10
statute [1] 150/21
stay [2] 9/14 114/19
stayed [2] 24/9 115/19
stead [1] 9/1
stenography [1] 2/24
step [3] 36/6 63/7 114/1
steps [1] 80/24
Stewart [5] 100/16 100/24 101/5 101/9 108/13
still [17] 13/22 13/24 28/14 48/6 52/20 53/18 56/21 61/14 84/14 92/5 106/8 133/25 134/1 146/19 146/21 149/7 149/8
stipulate [3] 9/20 9/22 34/14
stipulated [1] 55/8
stipulation [2] 4/21 10/21
stop [2] 57/4 66/17
stopped [3] 34/22 89/8 98/1
stored [2] 40/7 96/12
straightforward [1] 93/20

strategy [3] 128/16 131/1 131/17
street [33] 1/16 1/20 2/2 2/5 2/12 2/15 23/16 65/21 85/13 89/14 90/4 90/6 90/9 90/12 94/9 94/10 94/11 95/10 95/15 95/17 96/8 96/9 96/11 96/14 96/15 96/21 96/24 97/5 102/6 102/14 108/8 160/17
streets [1] 96/14
strenuously [2] 13/18 136/18
Strickland [3] 130/14 133/18 136/6
strike [2] 6/12 142/13
stripes [1] 95/6
strong [1] 48/5
strongest [1] 97/15
strongly [7] 5/3 5/4 5/9 5/11 5/16 6/7 147/22
struck [2] 1/18 120/22
stuff [2] 114/20 137/11
stuffed [1] 98/13
stylist [1] 41/18
subject [16] 8/20 11/22 48/11 54/18 54/21 55/25 56/6 84/12 126/16 127/8 127/23 130/3 132/12 141/10 147/17 147/17
subjected [1] 49/1
subjects [3] 31/1 31/21 31/24
submission [6] 6/17 82/1 82/12 82/14 97/25 160/6
submit [7] 6/21 24/7 82/3 113/4 115/25 116/1 141/24
submits [1] 97/16
submitted [11] 4/17 9/4 24/8 77/13 82/18 112/16 114/5 127/5 132/15 132/16 139/12
submitting [1] 122/2
subsequently [3] 65/5 95/20 150/12
subsidized [3] 71/21 71/25 72/4
substance [1] 60/14
substantial [4] 108/22 125/13 128/18 146/16
substantive [2] 9/18 60/10
substitute [1] 136/10
successful [1] 137/12
such [13] 6/20 47/20 82/14 98/23 98/23 99/4 104/14 110/11 110/15 112/20 122/6 122/11 134/16
sufficiency [1] 150/23
sufficient [3] 58/14 82/4 110/5
sufficiently [2] 145/23 145/24
suggest [3] 57/13 83/16 108/12
suggested [5] 80/22 82/22 108/3 108/12 111/25
suggestion [1] 146/13
suggestions [1] 113/8
suggestive [3] 109/22 149/22 149/25
suggests [1] 137/15
Suite [7] 1/20 1/23 2/2 2/6 2/9 2/12 2/18
Sullivan [29] 1/22 1/22 4/4 4/4 4/8 7/23 12/19 14/7 84/13 112/16 113/11 113/19 114/3 154/14 156/24 158/21 160/5 160/13 160/19 160/20 160/21 161/1 161/4 161/6 161/10 161/16 161/21 162/1 163/8
Sullivan's [4] 12/21 13/12 158/9 159/3
summarize [2] 144/14 158/8
summarized [1] 78/6
summarizing [1] 78/6
summary [3] 26/1 69/21 78/7
Sunday [2] 125/1 134/20
superseding [4] 143/7 143/10 143/18 143/19
supervisor's [1] 76/23
supplement [3] 4/22 10/24 118/23
supplemental [2] 7/17 148/9
supplementing [1] 139/2
support [3] 5/23 6/3 83/21
supported [1] 100/20

supports [1] 56/10
suppose [3] 54/7 113/10 136/6
supposition [1] 11/13
suppress [4] 8/19 85/2 112/12 156/25
suppressed [2] 93/14 107/10
suppression [4] 47/15 54/3 58/21 135/17
Supreme [6] 98/9 98/17 99/7 100/7 103/9 130/8
sure [33] 9/6 9/10 12/4 19/9 28/10 32/14 45/18 51/8 57/3 62/20 68/7 86/22 91/9 93/17 94/18 106/3 115/17 115/20 120/12 125/9 129/5 136/8 138/12 138/12 138/17 138/19 139/12 139/17 140/18 144/16 147/8 158/10 158/20
surely [8] 101/1 103/9 124/19 130/9 131/2 134/9 143/13 159/7
surprised [1] 58/4
surprising [1] 102/17
surrounding [2] 4/9 71/5
suspect [11] 6/20 19/10 65/21 85/22 95/20 106/8 108/18 113/11 114/23 145/9 145/10
suspects [6] 20/2 20/7 35/23 37/14 37/15 149/17
suspicion [1] 99/1
sweatpants [2] 95/6 109/16
sworn [4] 14/12 20/24 36/7 63/9
system [10] 19/9 19/16 38/22 38/22 39/22 45/16 45/18 77/1 77/2 77/23
systems [1] 66/15

**T**

T's [1] 51/18
t-shirt [13] 5/6 43/20 43/23 44/14 44/14 44/19 46/16 144/5 145/8 145/10 145/10 145/13 150/3
t-shirts [2] 95/7 145/1
T.V [1] 19/13
table [1] 134/18
tactical [1] 136/11
tag [3] 43/16 43/16 43/19
take [44] 9/19 13/2 13/11 27/17 38/2 38/6 39/2 40/3 43/5 43/15 44/1 45/20 67/5 68/15 73/15 84/18 84/24 90/12 90/12 90/15 91/4 91/13 92/15 92/15 96/25 99/10 102/10 104/22 105/5 106/1 109/17 111/17 114/5 115/2 118/12 129/17 133/12 135/10 136/12 149/1 149/1 152/14 161/17 162/1
taken [21] 9/10 23/18 27/13 38/24 39/9 39/10 39/19 39/20 40/6 40/15 40/15 40/22 42/15 42/16 45/9 66/17 67/3 89/15 103/2 103/4 139/25
taking [7] 41/2 41/12 42/3 42/23 43/16 82/9 91/7
talk [8] 32/6 73/8 73/15 116/6 139/17 161/1 161/5 161/23
talked [4] 29/7 77/12 80/20 149/13
talking [11] 11/7 29/21 30/9 33/7 57/10 81/14 131/21 142/22 143/20 151/8 160/14
taller [6] 43/6 43/7 43/9 43/10 97/1 144/18
tampering [1] 77/15
Tanya [5] 5/1 30/4 94/16 131/10 131/15
target [1] 65/17
targeted [1] 80/19
task [4] 21/5 63/14 70/24 71/24
tattoos [1] 45/21
Tavon [1] 44/12
Taylor [15] 89/1 89/5 89/18 89/25 90/8 92/7 93/24 93/24 94/15 95/21 95/22 95/23 104/7 108/6 108/17
Taylor's [9] 92/4 92/9 92/10 92/11 92/16 92/18 93/25 94/5 97/7
teach [1] 48/22

T

Case 1:27-cr-00029-AMD   Document 630   Filed 03/27/09   Page 185 of 188

teaching [1] 107/21
team [3] 22/15 72/9 161/18
tee [1] 151/20
telephone [5] 102/4 102/8 102/9 102/15
111/16
telephones [1] 107/21
tell [36] 14/22 15/3 16/12 16/16 21/8
23/20 30/23 31/7 31/8 35/10 43/16
44/10 57/1 63/18 65/20 65/22 66/13
67/7 76/19 78/11 79/23 88/18 92/3
92/17 99/25 105/4 124/7 124/8 124/11
125/24 136/20 139/22 144/10 151/4
152/4 158/20
telling [4] 45/23 57/3 100/9 148/23
tells [6] 17/16 17/19 80/9 94/24 96/1
145/5
temporary [1] 110/13
ten [1] 94/19
tenant [4] 99/13 99/15 99/21 106/12
tends [1] 119/2
term [1] 133/4
termination [1] 110/14
terms [9] 10/9 31/17 34/8 38/9 40/12
55/12 71/17 110/12 126/4
Terrace [1] 89/2
terrible [2] 119/25 135/25
test [1] 100/4
testified [18] 10/23 11/21 11/23 29/3
29/11 34/7 39/12 49/1 50/6 50/7 50/9
50/15 50/16 50/22 54/25 91/3 106/2
125/20
testifies [10] 49/8 50/5 53/15 53/18
53/23 60/18 83/21 104/9 123/8 123/11
testify [20] 12/15 13/3 13/9 48/18 48/18
50/5 50/12 51/13 52/8 52/21 54/2 54/15
119/16 119/16 119/19 119/20 123/13
127/20 155/19 155/22
testifying [4] 11/15 60/6 83/19 124/5
testimonial [14] 54/16 56/5 56/5 57/24
58/2 58/3 58/4 58/10 59/2 59/9 59/11
123/16 123/17 123/20
testimony [53] 5/15 5/16 6/2 9/24 10/1
11/15 27/17 28/22 29/11 34/18 35/6
47/11 47/25 48/9 49/4 49/6 49/9 49/16
49/18 49/21 49/23 51/1 51/5 51/10
51/15 51/17 51/20 53/24 55/1 56/23
56/25 57/5 58/13 59/15 59/16 60/9
60/13 60/14 60/16 80/10 90/15 103/24
104/4 119/8 119/13 119/14 119/15
121/8 123/21 125/21 128/17 129/6
144/13
text [1] 117/8
than [31] 7/14 8/15 23/11 35/9 38/22
43/6 55/15 55/16 72/12 78/1 81/9 81/22
85/1 87/3 92/1 99/9 99/12 101/4 101/7
107/3 112/22 113/9 115/12 120/16
121/3 122/8 126/12 126/17 157/8 158/5
162/22
thank [55] 6/24 8/9 8/12 8/17 8/25 17/9
20/16 26/17 26/22 27/23 27/25 28/18
35/16 36/2 36/3 44/24 46/7 47/9 56/13
61/1 61/3 77/7 78/22 78/24 83/23 84/11
93/14 93/19 105/7 105/8 107/12 107/13
115/21 116/23 117/25 121/10 122/15
130/3 137/17 137/19 141/18 147/21
149/4 149/5 149/9 150/14 150/15
153/19 154/8 155/4 155/17 157/5 157/7
163/2 163/12
Thanks [1] 88/11
that [1000]
that's [130] 4/16 5/7 6/4 6/10 8/18 10/2
11/2 11/6 11/16 11/22 12/3 13/4 13/22
14/6 14/8 15/21 16/3 17/18 18/5 18/8
18/11 19/1 19/14 20/6 33/20 34/6 38/15
39/24 40/16 41/17 42/19 42/22 44/17

46/3 47/8 50/12 51/16 52/7 53/17 54/5
54/13 57/16 57/17 57/19 57/20 58/18
59/24 59/24 59/25 59/14 60/23 67/5
72/19 73/4 78/6 78/7 81/3 81/15 81/21
82/24 83/7 83/22 84/7 85/7 85/11 85/17
87/11 87/16 88/21 90/12 90/14 91/1
91/5 91/5 91/23 96/15 100/20 101/23
102/17 105/20 106/2 106/3 106/15
112/23 113/2 113/18 114/10 117/16
117/18 118/17 119/9 119/25 120/2
120/12 123/13 125/10 125/11 127/22
128/22 129/11 130/10 130/24 131/5
131/6 131/11 133/1 133/16 133/19
134/6 137/17 139/7 140/10 141/11
141/11 142/4 142/12 145/11 145/20
146/4 146/5 147/22 148/1 149/2 149/15
154/15 159/2 159/2 159/16 159/18
161/13
their [32] 14/4 16/1 16/20 17/6 17/16
18/10 20/10 37/17 38/5 38/5 43/12 73/7
83/4 90/22 95/12 95/13 96/2 96/17
110/10 111/15 128/16 130/17 131/3
131/14 131/16 131/25 132/3 132/5
132/8 153/18 154/23 159/9
them [51] 4/19 8/6 8/9 10/16 16/19
16/20 16/22 16/23 17/19 18/20 26/20
19/3 19/12 19/19 20/5 20/9 20/10 28/9
37/24 38/4 42/24 53/6 61/18 67/18
72/19 72/23 73/2 73/15 74/3 75/7 76/6
88/19 88/19 90/13 90/23 94/23 95/3
95/11 95/12 98/18 100/19 105/22 107/5
128/18 136/19 141/24 149/23 154/2
161/2 161/23 162/2
themselves [1] 16/21
then [77] 4/24 6/8 9/14 10/5 16/19 18/25
29/17 31/22 31/24 31/25 34/22 34/22
34/24 35/2 37/13 40/3 42/3 43/11 44/17
48/19 49/4 51/15 52/8 52/9 52/9 52/17
52/20 55/10 58/13 59/24 61/18 62/13
72/22 75/22 78/11 82/11 82/13 82/20
83/16 89/11 89/20 90/3 90/23 91/6 91/8
91/9 92/21 94/8 95/24 96/21 98/16
104/1 105/22 105/25 107/1 114/14
118/3 118/9 118/12 119/18 119/21
120/9 120/20 121/4 122/20 123/8
123/14 123/15 123/16 127/20 128/17
138/23 139/4 152/17 152/17 152/17
160/2
there [166]
there's [49] 6/2 10/1 10/2 10/5 27/5 39/3
41/13 48/24 51/24 53/18 56/10 73/21
80/22 81/10 88/8 92/2 96/3 98/16 98/16
99/23 101/12 102/3 104/11 106/10
106/13 108/18 113/22 119/10 119/11
119/21 120/9 122/14 122/21 125/16
130/23 132/16 133/10 134/6 134/25
135/13 137/6 137/16 139/1 139/17
142/15 144/13 146/21 159/18 161/20
therefore [6] 90/10 93/11 96/11 102/1
111/9 160/21
therein [1] 138/7
therewith [1] 112/14
these [41] 7/9 10/16 38/13 38/16 38/24
40/5 40/6 41/2 45/1 74/14 79/20 82/25
83/3 83/5 89/1 95/1 95/8 96/12 96/14
96/18 97/2 100/14 106/1 111/12 111/21
112/2 112/12 119/23 130/16 131/3
131/24 132/1 132/7 141/4 149/16
151/10 151/11 151/20 158/6 163/3
163/5
they [179]
they'd [2] 104/5 105/24
they'll [7] 10/15 18/17 18/25 19/2 52/12
93/2 121/24
they're [25] 14/4 15/13 15/25 17/6 19/4
51/25 52/1 52/2 52/4 52/4 52/8 55/13
59/2 60/7 60/8 63/1 90/18 101/11 104/2

105/17 123/20 127/13 137/17 144/25
146/21
they've [8] 18/7 72/25 72/25 84/2 97/23
137/23 152/11 132/1
thick [1] 148/13
thin [1] 43/7
thing [18] 9/16 10/3 19/13 27/7 27/9
62/15 90/8 97/11 98/12 103/4 103/5
112/25 113/4 120/6 122/1 128/20
131/22 142/15
things [21] 17/23 30/25 41/23 51/24
54/25 79/24 83/20 91/1 94/8 97/3
122/17 122/19 123/23 132/4 135/25
136/20 142/10 146/20 148/8 148/18
161/21
think [97] 4/18 4/24 8/2 8/18 9/13 10/18
11/16 11/22 13/24 14/2 14/2 14/5 19/1
27/20 39/3 41/23 45/21 46/14 46/25
47/1 48/3 48/5 48/11 48/16 52/1 55/17
61/9 62/2 62/17 80/4 81/21 85/21 86/9
87/11 88/8 88/24 89/1 91/17 91/21
91/24 92/12 92/22 93/7 93/8 93/12
106/3 106/7 106/13 107/9 112/18
114/16 116/25 117/3 117/8 119/13
119/14 120/2 122/11 123/21 124/5
126/12 126/13 127/4 127/23 128/4
129/17 130/6 130/7 130/13 131/15
134/15 134/19 136/9 136/19 137/16
138/21 139/1 139/11 139/14 139/16
141/3 141/14 146/14 146/16 147/25
149/15 150/16 150/22 152/9 158/23
159/6 159/8 159/11 159/18 159/21
159/22 163/10
think they're [1] 52/1
thinking [4] 89/9 118/15 140/10 159/17
thinner [2] 43/9 43/10
third [12] 56/18 95/22 96/7 100/13
100/21 100/25 101/7 113/24 132/9
132/18 143/6 143/10
Thirteen [1] 21/11
this [278]
Thomas [3] 2/11 2/11 155/15
Thompson [4] 100/15 100/24 101/5
101/9
thoroughly [1] 7/15
those [38] 4/18 7/2 9/10 9/13 20/12
22/18 37/15 38/24 40/24 43/1 55/23
61/22 62/18 68/16 69/2 88/6 91/13
91/16 98/17 100/10 100/23 101/18
103/19 103/22 120/6 120/17 121/21
121/22 123/9 123/11 123/19 123/20
124/4 131/8 131/9 133/1 152/25 161/19
though [15] 8/21 19/1 27/15 34/8 35/1
53/10 59/5 60/17 72/12 82/20 104/19
110/15 149/6 150/2 155/2
thought [13] 9/23 12/21 53/12 59/14
79/25 113/2 113/24 127/14 127/16
127/17 141/2 149/21 159/9
threat [19] 27/5 91/15 93/9 93/10 97/19
97/21 100/12 100/19 100/19 100/20
101/6 106/20 110/8 110/18 110/21
111/22 111/24 112/1 112/3
threaten [4] 91/12 91/22 100/25 101/4
threatened [5] 100/1 101/6 101/24 102/7
110/9
threatens [2] 134/10 134/12
threats [2] 62/15 112/6
three [16] 12/8 50/3 50/7 57/7 71/12
86/4 96/22 98/1 98/18 121/19 139/11
146/19 155/1 155/15 161/14 163/10
threw [4] 94/23 95/18 96/15 97/4
through [33] 18/4 19/4 19/8 19/9 31/21
38/21 39/21 44/16 49/10 49/11 49/17
49/21 54/10 55/5 56/1 59/15 59/16
76/25 78/10 80/10 80/11 80/12 80/12
90/19 94/5 111/5 112/17 125/16 138/24
142/3 148/10 148/11 159/10
throw [1] 88/24

# T

throwing [1]...
thrown [2] 89/25 92/10
thru [1] 37/13
Thursday [1] 115/11
ties [1] 85/13
tight [2] 42/8 96/3
tightly [2] 41/5 41/22
Tim [1] 154/14
time [80] 9/19 11/17 12/1 12/20 13/10 18/21 19/13 22/4 23/8 24/15 27/14 29/7 29/16 29/19 29/21 32/14 32/17 33/3 33/6 33/7 33/15 33/24 38/23 40/14 40/22 42/9 43/24 44/15 45/12 48/2 48/4 50/24 51/11 54/20 56/4 56/7 57/2 57/3 57/14 57/25 60/6 60/24 63/5 64/15 65/18 66/3 66/17 66/19 66/20 67/6 68/1 69/24 77/2 81/5 81/25 84/1 85/23 93/11 95/16 97/22 98/11 102/18 102/21 103/3 107/5 109/15 111/7 115/19 116/7 118/16 118/17 123/9 123/19 136/13 137/12 140/5 140/11 145/17 148/20 150/10
timeframe [2] 39/22 40/1
times [6] 31/3 50/7 57/7 131/25 155/1 155/15
TIMOTHY [1] 1/22
today [25] 4/19 4/24 5/3 5/13 7/15 10/14 12/8 13/7 13/8 13/12 13/19 27/16 46/13 51/20 53/5 61/24 77/24 123/21 130/19 130/20 132/7 152/2 154/11 154/16 154/18
together [6] 41/2 80/2 83/25 93/1 149/23 149/25
told [16] 12/14 33/20 76/20 78/3 89/25 90/23 91/3 94/21 94/22 94/23 102/9 107/8 115/15 140/9 142/20 148/22
Tolson [3] 95/1 95/9 95/12
tomorrow [2] 7/15 87/16
Toni [1] 116/18
tons [2] 127/3 127/4
too [12] 18/6 23/23 26/24 27/1 27/5 27/5 27/21 94/23 112/19 112/19 133/5 133/24
took [13] 24/1 30/17 43/11 81/2 88/2 88/13 90/10 91/8 93/6 114/4 134/17 154/16 154/17
topical [1] 141/10
tossed [1] 90/21
total [1] 126/2
totally [2] 86/25 119/6
toward [2] 95/10 96/5
towards [1] 114/1
Towson [1] 2/10
Transcriber [2] 157/21 163/21
transcript [13] 1/12 2/24 34/10 49/18 81/11 81/12 81/14 104/3 104/10 157/17 163/3 163/5 163/17
transcripts [1] 135/12
transport [3] 68/10 68/13 68/25
transported [3] 66/18 68/5 68/6
treat [1] 156/9
tree [1] 62/13
Treem [8] 2/4 2/5 8/3 8/17 8/24 101/13 139/23 153/9
trembling [1] 31/12
trepidation [2] 148/4 148/6
trial [48] 6/8 7/16 49/2 50/5 50/13 50/14 51/2 51/14 52/22 53/15 53/18 53/23 54/2 54/16 54/23 55/21 56/24 57/22 57/22 59/15 60/11 60/14 60/16 82/8 82/11 82/25 85/4 85/10 86/5 99/10 113/21 118/18 125/20 127/6 127/7 128/9 128/10 134/11 134/12 135/18 136/9 146/20 147/9 148/20 149/2 161/13 161/14 161/18

tried [2] 77/13 124/16
trip [2] 130/21 130/22
troublesome [3] 83/13 84/6 140/10
Trout [1] 2/16
true [12] 18/19 33/24 34/7 53/17 80/10 102/15 106/22 110/15 121/7 125/12 128/22 131/11
truth [6] 59/23 60/1 99/25 100/9 106/23 106/24
truthful [7] 97/23 100/19 105/6 110/8 111/22 111/24 112/3
truthfully [5] 101/1 101/3 110/9 110/11 110/12
try [14] 11/14 46/25 53/18 70/11 73/15 73/19 77/6 81/22 88/2 88/12 94/7 119/7 119/8 161/23
trying [16] 11/18 11/19 46/24 49/24 50/3 56/4 56/8 60/7 60/7 60/9 86/15 90/2 95/13 118/23 136/21 151/8
tuned [1] 98/21
turn [5] 67/6 68/16 89/23 134/10 134/12
turned [4] 66/18 89/9 90/3 160/15
turns [2] 106/23 161/10
twelve [1] 94/20
twice [1] 50/8
two [61] 5/19 9/6 10/14 10/14 21/20 34/18 35/9 36/24 37/14 37/15 38/6 38/18 40/5 40/24 42/5 46/1 48/24 49/15 50/3 51/24 54/13 55/15 55/16 55/16 56/18 57/1 61/22 67/22 79/17 88/6 88/15 88/16 89/15 89/16 90/9 92/5 93/7 94/9 94/20 94/25 95/2 95/15 97/1 97/20 102/14 103/12 109/13 114/16 120/17 121/16 122/17 136/12 137/25 139/11 140/21 141/19 146/19 148/8 148/18 149/25 162/23
two-fold [1] 54/13
twos [1] 149/17
type [1] 68/6
Typed [2] 157/23 163/23
typical [1] 15/16
typically [1] 119/12
typo [2] 158/16 158/20

# U

UCC [1] 154/6
UCC3 [1] 153/14
UCC3-419 [1] 153/14
ultimately [3] 99/4 148/19 161/11
ultra [1] 60/18
Um [8] 16/10 18/13 18/25 19/11 19/21 19/25 20/8 50/25
Um-hum [8] 16/10 18/13 18/25 19/11 19/21 19/25 20/8 50/25
unable [1] 153/16
unarrested [1] 91/9 107/2
unavailability [1] 54/8
unavailable [7] 47/13 49/2 49/4 49/17 52/25 60/11 60/13
unawares [1] 84/16
under [46] 6/5 6/9 6/15 28/15 46/2 46/3 53/2 53/10 53/11 54/16 54/23 55/9 55/10 55/16 56/10 56/12 56/21 58/10 60/13 64/22 68/2 69/15 69/22 86/5 92/21 92/21 103/19 104/21 104/25 105/2 105/6 109/17 110/10 110/22 110/24 111/11 111/12 111/23 121/20 124/3 130/8 131/3 132/3 158/7 158/22 160/25
underline [1] 138/25
underlying [1] 158/17
undermined [1] 86/4
understand [36] 4/20 6/4 6/19 8/4 11/18 12/23 48/19 59/4 62/22 88/4 105/18 115/20 118/12 119/6 125/17 126/3 126/4 127/3 127/13 128/19 128/22 128/23 129/2 129/4 129/9 129/14

129/19 129/20 133/9 133/20 133/20 144/1 147/3 147/24 148/25 162/20
understanding [4] 9/25 10/1 53/4 144/10
understands [2] 140/20 146/14
understood [2] 77/22 105/14
undertaken [1] 112/7
underway [1] 105/14
unfortunately [1] 41/9
unhappy [1] 78/18
unhesitatingly [1] 110/22
uniform [7] 22/6 101/12 154/23 155/10 156/6 156/17 162/17
uniformed [1] 22/18
unit [15] 36/20 37/4 37/12 64/6 64/8 64/9 64/10 64/13 64/16 65/1 65/1 70/7 70/10 76/21 77/1
UNITED [5] 1/1 1/3 1/13 1/15 20/20
University [1] 2/14
unlawful [1] 91/25
unless [8] 41/17 56/6 60/15 106/16 110/19 122/14 128/8 131/15
unlike [1] 48/22
unnecessary [1] 145/24
unobjectionable [1] 125/13
unquestionably [2] 108/25 152/12
unreasonable [1] 143/24
unreliable [2] 112/5 145/23
unsupported [1] 101/25
until [12] 4/14 6/7 11/25 29/20 40/15 45/25 82/8 82/25 87/19 132/7 140/4 140/20
up [46] 9/19 12/19 27/1 27/22 28/4 35/22 36/6 45/23 58/3 61/20 62/21 63/7 66/16 71/24 72/19 72/19 74/9 75/24 86/15 91/4 91/7 91/23 97/14 106/1 113/7 116/7 118/24 119/24 123/13 125/10 128/9 128/10 132/7 133/7 137/9 141/21 141/24 142/5 147/8 147/12 149/7 151/15 151/20 158/14 159/11 161/11
upon [5] 56/18 61/15 107/8 113/12 162/9
ups [1] 149/22
upset [1] 60/12
upstairs [7] 90/18 90/24 91/21 104/5 104/24 105/24 106/6
urge [6] 83/4 130/11 131/17 151/19 152/20 153/3
urgent [1] 85/21
urges [1] 18/6
us [23] 7/3 14/22 15/3 15/15 16/12 16/16 21/8 23/20 63/18 65/20 65/22 66/13 67/7 67/23 78/10 78/11 112/22 119/25 122/6 122/9 138/6 143/25 159/17
use [6] 76/22 103/14 107/11 112/22 113/11 133/4
used [7] 34/8 45/17 55/7 55/8 68/10 92/22 152/19
useful [2] 81/8 84/8
uses [1] 124/2
using [4] 28/9 125/19 135/11 135/12
utterance [30] 11/2 11/7 11/9 46/25 47/6 48/8 48/14 48/17 49/25 51/22 52/9 52/12 53/7 53/19 53/25 54/10 54/14 54/25 55/18 55/24 56/9 56/16 58/9 58/11 58/23 59/7 59/8 59/11 123/15 123/16
utterances [6] 59/2 59/8 123/9 123/9 123/12 123/20

# V

Valdevia [9] 21/17 21/22 22/15 22/23 23/19 24/2 24/5 26/3 66/23
valid [1] 91/16
validity [3] 61/12 61/17 61/24

**V**

validly [1] 97/19
value [19] 33/13 33/14 96/12 153/6
153/7 153/22 153/22 153/25 154/1
154/15 154/18 155/6 155/7 155/25
156/1 156/12 156/12 162/11 162/11
Van [1] 2/15
variations [1] 41/25
variety [1] 127/18
various [1] 38/17
vastly [1] 112/21
vehicle [11] 10/16 22/9 22/10 22/11
22/13 68/4 68/7 68/8 68/10 93/24 93/25
vehicles [1] 22/14
venire [1] 112/20
verbal [5] 69/1 72/21 74/4 74/23 75/1
verbally [2] 73/7 77/12
verbatim [1] 78/7
version [7] 113/4 113/12 115/3 138/2
138/2 138/4 138/15
very [70] 4/17 7/12 9/2 10/15 11/7 13/3
14/5 19/15 27/12 29/7 37/25 39/10 41/5
41/22 42/16 42/17 46/7 46/17 60/8
60/15 60/20 63/2 78/5 78/18 78/24
79/17 79/23 80/8 81/8 82/17 83/9 83/18
84/20 84/20 87/8 94/12 95/8 96/3 99/8
100/4 100/5 100/18 107/12 112/25
119/3 121/16 124/12 130/3 133/24
134/22 134/22 135/4 135/4 135/6
135/20 135/22 135/23 136/14 136/25
137/17 141/24 147/2 149/9 150/14
152/8 152/10 152/15 152/15 152/21
158/9
vicinity [1] 33/17 55/4
victim [7] 29/25 30/4 30/12 38/1 55/4
95/11 96/25
victims [3] 89/14 95/4 96/20
view [13] 5/3 5/4 5/8 6/10 90/22 98/14
103/19 109/25 114/17 119/11 120/6
147/23 160/23
viewing [1] 40/18
views [2] 4/18 113/5
vindicated [1] 98/4
violation [4] 11/17 56/12 58/4 59/18
vitiate [1] 110/6
voice [1] 31/1
voir [2] 9/8 135/3
voluntarily [1] 112/9
voluntariness [3] 62/14 100/3 107/16
voted [1] 143/10

**W**

wait [9] 6/7 9/7 11/25 18/6 53/21 53/21
53/21 66/15 82/8
waiting [1] 61/7 66/22 82/25
waive [7] 153/11 154/3 154/20 155/9
156/3 156/14 162/14
waived [1] 74/3
walk [3] 37/13 56/18 126/2
walk-thru [1] 37/13
walked [1] 105/19
walking [3] 89/7 89/12 89/22
want [68] 11/5 26/7 28/9 48/19 49/3
49/7 49/9 49/9 49/14 52/3 53/6 54/9
54/12 60/12 60/23 63/5 71/19 72/16
73/8 73/8 73/14 73/14 77/19 80/8 80/16
82/23 82/24 84/16 85/3 86/2 86/14
86/19 89/23 91/4 99/10 103/10 104/1
116/1 120/12 122/20 123/5 124/10
125/18 127/14 128/3 128/10 129/3 129/5
132/10 137/1 138/3 138/8 138/25
138/25 139/2 139/4 139/12 141/6
141/15 143/12 143/18 144/4 148/20
150/21 152/18 158/8 161/3 161/24
wanted [8] 21/20 26/7 68/24 73/2 96/2
118/24 151/4 151/14

wants [13] 4/11 10/18 11/24 49/15 81/25
106/23 125/2 127/1 127/12 127/20
135/4 140/6 161/22
warn [1] 152/18
warnings [7] 12/17 68/17 68/20 68/22
69/6 74/23 75/2
warrant [44] 21/21 23/3 23/5 23/7 23/19
24/2 24/5 27/2 61/12 61/18 61/24 62/1
62/4 62/12 62/19 67/10 67/11 79/7
80/12 88/4 88/7 90/14 92/24 93/7 96/19
97/17 103/20 103/20 103/21 104/1
104/14 107/19 107/20 108/9 108/19
108/21 108/23 109/1 109/2 109/5
109/10 109/20 110/2 147/20
warrants [5] 21/21 22/2 22/2 23/3 23/4
was [348]
Washington [3] 2/15 2/18 130/14
wasn't [14] 25/1 55/20 75/3 77/20 89/13
95/21 97/11 104/19 105/2 105/9 105/11
112/25 114/11 140/22
waste [1] 60/23
watched [1] 89/3
way [24] 6/22 10/12 12/3 12/7 27/13
60/4 79/14 81/13 81/16 89/21 92/22
96/17 99/20 99/20 101/2 112/19 112/19
122/11 128/12 139/3 148/9 148/24
149/19 152/1
ways [3] 125/1 127/18 134/20
we [185]
we'd [1] 69/2
we'll [13] 4/24 9/18 51/6 61/17 62/20
62/24 87/13 115/2 115/22 116/2 120/25
147/18 151/23
we're [36] 4/2 8/20 13/11 19/19 19/22
19/23 32/6 47/23 61/7 61/16 61/18
61/20 71/21 71/24 71/24 72/4 81/14
84/12 87/19 111/13 113/25 116/7 119/7
127/10 129/5 130/2 130/15 137/5 141/4
141/5 143/20 146/19 160/14 161/8
161/9 163/12
we've [16] 9/18 50/19 86/9 87/2 88/3
88/5 111/3 118/21 118/21 135/3 135/17
136/13 137/3 137/7 150/18 150/22
weapon [2] 95/19 95/24
weapons [1] 109/16
wearing [7] 10/17 95/6 95/6 95/7 95/8
144/20 144/25
week [6] 7/20 89/20 90/2 115/7 151/20
162/2
weeks [4] 42/6 140/21 158/12 159/11
Weisch [5] 65/23 66/6 66/7 85/7 151/8
Weisch's [1] 66/2
well [93] 5/16 8/3 8/9 10/9 10/2 10/8 10/9
10/19 11/21 11/24 11/25 12/7 12/24
18/18 18/25 34/13 45/14 47/1 47/8
47/23 48/14 48/16 50/10 50/15 50/19
52/1 52/6 52/17 52/20 53/9 54/7 58/17
58/19 60/12 60/20 60/23 65/23 67/9
68/12 69/18 71/21 72/17 73/14 73/23
74/6 75/14 76/1 79/8 81/4 81/10 81/12
82/17 85/16 86/17 86/19 86/22 88/15
96/20 98/8 98/13 106/25 107/15 110/24
111/16 111/18 112/25 114/1 114/3
114/10 115/4 116/4 118/19 120/10
125/6 126/1 126/3 127/16 128/22
129/12 129/13 130/13 130/15 135/15
136/4 136/22 140/14 141/17 143/21
144/9 148/16 148/22 159/7 159/17
well-deserved [1] 8/10
well-settled [1] 110/24
went [34] 24/18 24/20 26/13 26/15
26/16 31/20 37/12 37/13 74/14 76/25
89/11 89/14 90/4 90/24 102/1 112/17
148/10 148/11
were [133] 6/10 10/17 12/4 21/12 21/22
22/3 22/6 22/9 22/11 22/11 22/14 22/14
22/18 22/20 22/25 23/4 23/12 23/23

29/12 29/15 29/23 29/25 30/9 30/10
31/8 32/16 33/16 33/20 33/25 34/22
35/6 35/20 35/25 37/14 37/18 38/2 39/18
39/19 39/20 39/25 40/2 40/6 40/15
40/19 40/22 42/9 45/19 48/15 54/15
55/21 57/7 57/8 58/13 59/13 60/8 63/24
64/1 64/5 64/15 64/22 65/17 66/5 66/5
66/20 66/22 67/3 67/4 67/4 67/9 67/12
67/13 67/14 67/17 67/23 68/4 68/12
69/9 70/7 70/18 72/8 72/17 72/20 73/7
73/24 74/4 74/7 74/16 76/15 77/25
78/11 78/14 79/21 80/1 80/2 83/5 84/17
88/16 91/17 91/24 92/5 92/6 92/8 95/5
95/7 95/7 95/12 96/12 97/3 98/1 98/3
98/13 98/20 99/6 99/7 101/21 104/24
104/24 105/11 105/22 107/3 109/25
112/6 112/11 115/15 119/7 123/9
125/17 131/4 136/19 143/14 150/11
152/9 159/12
weren't [3] 9/21 45/17 74/23
Wertz [1] 100/1
West [10] 2/9 2/21 90/9 90/12 94/21
95/15 95/17 96/4 96/10 96/13
what [200]
what's [9] 39/2 45/14 111/2 118/2
120/15 120/16 125/15 141/8 161/22
whatever [14] 5/2 7/17 49/3 50/23 75/7
93/5 105/20 115/23 116/1 127/8 130/4
149/7 149/24 160/24
whatsoever [4] 92/20 93/3 93/11
wheel [1] 114/19
when [93] 11/11 11/13 11/25 11/25
12/16 12/19 15/9 15/13 15/25 16/17
17/6 18/16 23/8 23/20 24/15 24/18
24/24 26/12 27/7 27/8 29/19 29/20
29/23 39/9 39/16 41/4 42/6 42/15 42/18
42/21 43/4 43/22 45/16 45/22 48/22
66/24 67/10 67/17 68/1 68/5 68/23
72/20 72/21 72/22 76/12 78/18 80/10
80/11 80/11 82/25 83/21 88/1 88/22
90/14 90/23 91/1 91/2 92/9 96/15 99/10
101/21 101/24 102/5 102/14 102/16
102/23 105/10 105/23 106/5 106/20
107/18 109/15 110/3 112/8 115/14
116/18 119/4 123/10 123/21 129/22
129/22 134/4 134/14 135/1 136/14
139/3 139/18 143/19 145/1 145/9
154/11 159/21 163/9
whenever [1] 63/4
where [52] 14/6 14/8 15/3 21/12 23/11
24/18 26/10 27/16 29/6 30/9 30/10
35/23 37/14 38/20 40/4 48/12 53/10
56/18 56/20 58/14 58/22 63/24 65/12
66/20 71/7 77/19 77/22 85/10 87/5
87/11 89/21 89/21 90/10 92/5 92/14
92/14 94/9 98/19 99/6 106/10 106/11
110/9 110/11 110/15 111/4 119/23
130/16 131/9 142/24 144/7 146/4
162/24
whereas [1] 155/2
Whereupon [1] 57/1
whether [34] 10/25 13/14 18/22 18/22
19/22 40/12 41/13 43/5 75/1 81/6 86/24
88/9 97/21 109/23 111/20 111/22
116/15 120/3 122/8 124/2 124/13
124/22 127/6 128/16 128/23 130/24
135/17 136/22 137/11 139/5 140/6
147/11 147/16 161/8
which [71] 4/18 5/16 6/9 8/19 10/4 10/18
10/24 10/25 11/8 14/7 15/4 37/11 37/12
41/8 41/22 42/1 42/5 43/24 44/12 47/12
49/22 51/4 55/21 55/22 57/2 57/6 62/3
64/7 65/10 66/17 76/23 78/9 81/13
82/12 84/19 85/8 85/14 90/9 91/19 93/6
96/5 97/5 99/24 100/21 100/22 101/3
101/14 103/7 109/19 114/13 117/8
118/13 119/3 121/7 121/19 122/3

**W**

which...[15] 17/18 128/20
131/18 134/5 134/23 135/7 136/15
136/17 136/18 143/13 147/2 150/4
157/12 158/17
while [17] 8/20 24/1 32/15 35/1 61/7
63/1 80/1 84/12 84/13 85/8 87/9 88/2
106/22 108/18 127/11 128/21 159/12
white [4] 43/19 44/19 95/7 145/10
who [56] 10/22 12/9 12/10 13/6 13/24
21/19 23/20 25/5 34/5 39/7 40/24 42/13
43/9 56/17 64/25 66/5 66/24 67/16
67/17 67/23 70/14 81/16 89/1 89/18
89/21 89/23 90/13 93/5 94/13 94/16
94/21 94/23 95/14 95/20 95/25 97/2
97/7 98/1 98/11 104/8 105/21 106/12
108/9 108/17 108/21 124/20 138/15
142/4 144/8 145/15 145/22 146/1
146/23 158/14 160/2 160/16
who's [10] 17/16 48/4 67/20 67/22 95/25
98/15 108/7 119/15 119/19 139/23
whoever [1] 92/25
whole [7] 6/17 7/10 31/21 80/17 90/19
149/14 161/13
whom [1] 96/1
whose [1] 158/12
why [29] 5/11 35/20 40/17 45/8 45/10
47/2 48/19 52/7 58/24 59/20 64/9 67/7
73/21 77/17 82/25 83/7 93/3 107/2
116/22 124/11 127/2 129/1 134/6
137/17 142/5 142/12 144/14 159/16
159/18
wide [3] 30/22 31/8 57/10
wide-eyed [1] 57/10
will [89] 4/3 4/14 6/14 7/5 7/7 7/10 7/14
8/25 9/10 13/6 13/19 18/15 19/3 26/23
28/2 28/22 34/13 34/14 36/4 46/16
47/15 48/10 50/5 51/4 51/16 54/1 60/15
60/16 62/11 62/11 82/3 82/13 83/14
85/23 85/23 85/25 87/13 87/15 87/17
111/25 112/4 114/23 115/23 129/21
129/21 131/20 131/20 135/1 135/3
136/12 137/13 138/1 138/14 140/6
140/8 140/15 140/16 140/18 142/7
142/10 142/21 143/13 143/15 143/17
147/12 147/19 148/19 150/17 152/3
152/4 152/10 152/14 152/23 152/25
152/25 153/2 153/18 154/11 156/9
157/7 161/14 161/15 161/21 161/21
161/25 162/1 163/2 163/8 163/9
William [1] 63/12
WILLIE [12] 1/6 21/18 21/19 22/25 23/8
24/23 24/24 25/19 25/22 26/6 65/6 65/8
winning [1] 133/3
wish [6] 155/7 155/18 155/20 155/23
156/10 156/13
withdraw [4] 132/1 132/2 161/6 161/17
withhold [1] 4/14
within [8] 7/19 30/7 106/13 108/5 117/10
119/9 142/9 163/10
without [13] 11/15 45/25 60/10 60/11
76/25 88/18 111/1 121/2 124/9 131/17
136/16 143/14 163/4
witness [35] 4/22 10/22 11/12 12/20
14/12 20/24 28/1 28/9 34/4 34/9 36/7
36/25 48/1 48/10 51/2 53/24 55/5 55/7
55/10 55/13 55/14 58/3 60/6 63/9 75/3
95/14 95/19 95/23 95/25 123/22 124/4
124/13 124/14 133/7 140/7
witnessed [1] 57/12
witnesses [13] 3/2 4/11 9/19 10/14 12/8
46/15 61/10 61/11 124/20 124/20
125/17 135/10 135/10
woman [7] 48/4 56/17 56/19 92/4 92/18
93/4 108/16
women [1] 109/13

won't [4] 19/3 28/9 28/21 143/12
Woodlawn [1] 37/14
won't [3] 26/23 36/7 70/10 90/3
113/12 113/13 113/19 138/8 138/8
138/22 138/22 142/16 143/20
words [8] 19/22 26/8 73/24 86/1 94/25
103/25 118/7 125/8
work [7] 72/2 133/9 133/11 142/10
150/16 150/18 150/19
workday [1] 15/16
worker [1] 119/15 119/16 120/11 142/9
workers [2] 141/20 142/3
working [2] 29/25 36/23
workplace [1] 15/3
worn [5] 90/6 90/6 97/1 103/22 107/24
worried [1] 107/3
would [162] 6/7 6/19 6/20 8/21 9/15 11/1
11/8 20/5 20/14 27/16 29/25 35/7 35/10
35/10 37/12 45/18 47/12 47/17 48/7
48/12 48/15 48/16 48/19 48/19 49/5
49/22 51/21 52/18 57/9 57/25 58/1
58/14 59/12 59/17 59/17 59/20 59/24
66/7 66/14 66/17 67/2 67/14 67/19
67/20 68/13 68/13 68/22 68/24 68/25
68/25 68/25 69/5 69/8 72/4 72/11 72/18
72/21 73/4 73/4 73/11 73/15 73/21
74/18 74/20 75/10 75/14 76/5 77/1
77/14 77/14 77/19 79/15 82/20 83/1
83/14 83/15 85/3 85/4 85/9 86/5 86/6
86/7 90/1 90/11 91/20 91/21 92/14
92/14 92/15 97/6 99/3 100/23 101/6
101/7 103/11 103/18 104/19 104/21
105/1 108/11 109/19 110/21 111/6
111/12 112/3 112/5 112/19 112/22
113/3 113/7 113/9 114/23 115/6 115/9
115/15 117/17 117/17 120/19 120/25
121/8 121/21 121/22 122/6 122/8
125/18 127/9 127/20 127/24 127/25
128/12 128/15 128/16 129/15 129/17
130/8 130/8 131/2 136/11 136/22
137/24 138/23 140/1 141/1 141/2 141/3
146/16 146/24 147/6 147/7 148/19
149/18 153/4 153/20 154/9 154/10
154/15 154/16 155/3 157/9 162/5 162/8
162/10
wouldn't [17] 56/21 67/14 72/12 73/8 77/6
128/18 159/1
wound [1] 87/9
Wow [1] 130/10
wrap [3] 86/15 91/7 91/13
write [4] 13/22 44/15 74/9 77/16
writes [1] 75/24
writing [5] 72/5 79/16 83/16 117/11
153/2
written [13] 6/14 32/9 71/7 71/8 72/24
73/4 73/21 74/2 74/5 76/21 77/10 77/22
84/9
writting [1] 14/1
wrong [4] 27/4 53/11 117/2 142/19
wrote [3] 76/22 98/5 160/6

**Y**

yard [10] 88/24 89/8 89/11 89/13 89/21
89/25 90/4 92/10 95/18 95/19
yeah [17] 10/9 49/14 50/2 58/19 67/19
72/18 94/18 116/17 117/6 118/10
122/24 124/7 126/13 126/22 144/10
149/7 150/9
year [6] 56/16 56/21 113/21 162/21
years [15] 12/12 15/2 15/23 21/11 36/18
36/24 48/2 48/4 48/5 63/20 75/19 86/4
125/22 125/24 126/11
yes [154] 6/11 7/5 15/4 15/8 15/14
16/10 17/15 17/21 17/24 18/2 19/11
20/8 20/11 20/14 21/24 22/5 22/17
22/19 22/24 23/10 23/13 24/3 24/12
24/14 24/17 25/4 25/8 25/12 26/2 26/5

26/9 27/19 28/24 29/2 29/14 29/18 30/6
30/8 30/11 30/13 30/16 30/19 32/2 32/8
32/12 32/21 32/24 33/20 34/2 34/20
34/25 35/4 35/7 35/25 37/1 37/18 38/8
39/6 39/17 40/2 42/12 44/22 47/7 47/17
48/10 51/3 51/12 51/23 52/15 54/9
62/16 64/2 64/7 64/14 64/18 64/21 65/4
65/7 65/16 65/19 66/1 66/4 66/12 67/4
68/3 68/21 68/24 69/11 69/17 70/9
70/16 71/1 71/3 71/6 71/14 71/19 71/24
73/1 73/3 73/6 73/25 74/11 74/19 74/22
75/9 76/7 76/18 77/4 78/15 78/20 79/1
79/4 79/8 80/7 84/6 85/25 85/25 97/19
102/22 103/18 105/1 105/13 112/17
115/8 115/8 118/6 121/17 122/25 123/4
123/4 131/22 135/15 136/24 137/22
139/9 140/19 141/18 144/3 144/19
144/22 144/24 145/2 145/4 145/6
145/14 145/16 145/19 146/3 146/13
156/23 157/2 158/23 160/8 162/9
yesterday [1] 115/1
yet [10] 46/20 61/4 101/22 101/23
124/10 126/15 150/18 155/15 161/5
161/8
you [620]
you'd [2] 72/22 73/11
you'll [8] 33/8 51/14 75/12 134/14
134/14 138/6 138/9 150/15
you're [28] 17/25 18/21 18/22 18/23
19/1 19/9 19/24 20/18 24/13 27/23
28/14 36/2 36/21 47/21 57/18 58/18
62/17 65/22 73/19 78/25 79/23 87/1
117/21 120/12 122/24 123/1 131/21
139/1
you've [15] 13/18 17/13 19/8 21/9 29/3
34/7 34/8 63/19 74/6 86/1 128/21
128/22 134/25 152/20 153/2
young [3] 28/25 29/24 48/4
your [292]
yourself [7] 29/21 33/4 78/10 155/18
155/21 155/24 156/10
yourselves [1] 152/2