1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3

4     UNITED STATES OF AMERICA

5          VS.                    CRIMINAL NO. AMD-04-029

6     WILLIE MITCHELL, et al.

7                    DEFENDANTS

8                                  Baltimore, Maryland

9                                  April 26, 2007

10

11

12         The above-entitled case came on for a motions

13    hearing before the Honorable Andre M. Davis, United

14    States District Judge

15

16                  A P P E A R A N C E S

17

18    For the Government:

19         Robert R. Harding, Esquire
           Michael C. Hanlon, Esquire

20
      For Defendant Mitchell:
21
           Timothy J. Sullivan, Esquire
22         Laura Kelsey Rhodes, Esquire

23

24

25    Gail A. Simpkins, RPR
      Official Court Reporter

1      <u>For Defendant Martin:</u>

2          Thomas L. Crowe, Esquire
           James G. Pyne, Esquire
3

4

5      <u>For Defendant Gardner:</u>

           Barry Coburn, Esquire
6          Adam H. Kurland, Esquire

7

8      <u>For Defendant Harris:</u>

9          Gerard P. Martin, Esquire
           Joshua R. Treem, Esquire
10         Brendan A. Hurson, Esquire

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  We are on the record in United

3     States of America versus defendants, Case Number

4     AMD-04-0029.  Counsel are present with their clients,

5     government represented by Mr. Harding and Mr. Hanlon.

6          This is the first in a series of motions

7     hearings, status conferences that the Court has

8     scheduled in the months leading up to the September

9     trial.  The government has helpfully provided a series

10    of road maps on how we might best proceed through this

11    series of proceedings.

12         It is my hope -- it seems to me the government's

13    proposals make sense, as supplement by the defense.

14    It is my hope that we can accomplish what we want to

15    accomplish in this two-day period with a one-day

16    session and not have to resume tomorrow.  But if we

17    resume tomorrow, it would be my hope that we can

18    conclude with just a couple of hours of additional

19    proceedings, so that you can all be excused before

20    lunch tomorrow.

21         I understand, Mr. Harding, the government has

22    two witnesses it would like to proceed with on one

23    remaining Fourth Amendment issue?

24         MR. HARDING:  Yes.  Actually, I have two

25    witnesses, but I told one of them he could go to a

1    meeting and come back at lunchtime.  So I was in hopes

2    the Court would permit me to put him on immediately

3    following lunch this afternoon.

4            THE COURT:  Sure.

5            MR. HARDING:  So I have Detective Donald Kramer

6    here, Your Honor, and I will call him straightaway if

7    the Court permits it.

8            THE COURT:  Okay.  Let me hear from counsel on

9    the other side to see if there are any concerns.

10           DEFENDANT MITCHELL:  Mr. Davis, I would like to

11   address the Court, with permission.

12           THE COURT:  All right.  Mr. Mitchell, you may

13   speak.

14           DEFENDANT MITCHELL:  I, Willie Edward Mitchell,

15   III, sentient moral being, would like to rescind my

16   initial plea of not guilty.  I would like to rescind

17   any controversy I caused, known, unknown.  I would

18   like to rescind my signature for cause.  I repented my

19   debt.  I made a mistake.  I reserve all rights with

20   explicit reservations and without prejudice.

21           I will also like the record to reflect I have

22   accepted Mr. Attorney's, doing business as Tim

23   Sullivan, offer to be my private lawyer for value and

24   I have returned his offer to him for value for close

25   and settlement of the account.  As my private

1       attorney, I would like him to perform the following

2       duties:

3            Do not argue the facts, request the Court to

4       issue me an appearance bond and waive all public

5       costs, request the Court to close the account and

6       release the order of the Court to me immediately,

7       request the Court to set off and adjust all public

8       charges by the exemption and in accord with Uniform

9       Commercial Code 3-419, House Joint Resolution 192,

10      Public Law 73-10, request immediate discharge.

11           If this attorney is not able to perform his

12      following duties, I will accept his dishonor.

13           THE COURT:  Mr. Mitchell, the only part of what

14      you just said that I understood is, one, you said you

15      would like to rescind your plea of not guilty, and I

16      am not even certain I understand what you mean by

17      that.

18           The other part that you said that I thought I

19      understood was you do not want your attorney to argue

20      the facts.  I didn't understand the rest of what you

21      said.

22           Now let me ask Mr. Sullivan to address what you

23      just said and see if he has a better understanding,

24      and I am sure he does, than I do.  Then I'll come back

25      to you to see if you can better explain yourself.

1          Mr. Sullivan, good morning.

2          MR. SULLIVAN:  Good morning, Your Honor.

3          THE COURT:  By the way, I note that Ms. Rhodes

4     is not present with us this morning.  She will be

5     arriving a little bit later.

6          MR. SULLIVAN:  That's correct.

7          Your Honor, Mr. Mitchell, I met with Mr.

8     Mitchell last week, and he indicated to me that as

9     long as I requested and performed the five requests

10    that he just made to the Court, that I could continue

11    on as his attorney, he would not be disruptive or

12    cause problems in court.  But in the event that I

13    could not perform the five requests that he made, I

14    would be dishonored.

15         I have done, and we have met as a collective

16    group the defense and discussed these things because

17    both Mr. Pyne and Mr. Crowe have also received from

18    their client the same instructions.

19         I have researched Mr. Mitchell's requests and

20    can't find any cognizable legal basis upon which to

21    embark upon what he is requesting of counsel.

22         THE COURT:  Can you, as best as you can, explain

23    to the Court what the request is?

24         MR. SULLIVAN:  Yes, I can do that, Your Honor,

25    to the best of my ability.

1          The first request is that I not argue any facts

2     whatsoever, that I not address the Court, that I not

3     address any witnesses, that I not cross-examine any

4     witnesses, that I not do a direct case on behalf of

5     Mr. Mitchell, that I don't introduce any exhibits,

6     that I absolutely do nothing during the

7     guilt/innocence phase of the proceeding, and if he is

8     convicted of the authorized count, do nothing in terms

9     of mitigation or defending against the government's

10     statutory, non-statutory aggravators in the penalty

11     phase.  So I don't do anything.

12          The basis for that is that if I do something,

13     argue a fact, I will waive Mr. Mitchell's legal

14     defense and ruin whatever he has created by this

15     record.  I told him that I wasn't inclined to do that,

16     and we haven't really crossed that Rubicon yet.

17          So the first is I can't argue anything.  I can't

18     do anything, no opening, no jury selection.  In fact,

19     this morning Mr. Mitchell advised me that not

20     discussing the facts began this morning.

21          The second is --

22          THE COURT:  Now the obvious follow-up question,

23     what is it that he wants or expects you to do if you

24     are to do noting?  Why does he want you in the case?

25          MR. SULLIVAN:  I don't know, Your Honor.

8

1          THE COURT:  Okay.

2          MR. SULLIVAN:  It's a varying of the earlier

3     quandary that counsel collectively found ourselves in,

4     where we're basically left unfettered to defend our

5     clients, even though they did not want us to represent

6     them, but would not ask for us to be discharged by the

7     Court.  Now they have made a Faretta request and the

8     Court hasn't done a Faretta inquiry on the right of

9     self-representation.

10          I could tell the Court most candidly my position

11    is that whatever Mr. Mitchell's request is, that I

12    think I have an obligation ethically to make the

13    tactical and strategic decision on behalf of my

14    client, taking into consideration the scope of

15    representation and how he wants to proceed.  This is

16    not one of the big three, whether to plea or not plea,

17    whether to testify or not testify, and the like.  I

18    made it absolutely clear to Mr. Mitchell that I won't

19    honor any of these requests in any penalty phase.

20          So I'm not quite sure, maybe the Court could ask

21    Mr. Mitchell, I am not quite sure what my role would

22    be, except for a potted plant.  I don't know.

23          THE COURT:  All right.  So there are four other

24    items on this list?

25          MR. SULLIVAN:  There are four other items, Your

1    Honor.  An appearance bond and waiving all public

2    costs, again, I don't know the basis for that, despite

3    inquiry.

4         Settling all accounts and releasing an order to

5    Mr. Mitchell immediately, I don't know the legal basis

6    for that as well, despite trying to figure out.

7         As to the setoff and adjustment of the public

8    charges under the Uniform Commercial Code, Section

9    3-419, House Joint Resolution 192 and Public Law

10   73-10, I will tell Your Honor that I did research

11   those three factors and they deal with the federal

12   reserve, the gold standard and --

13        THE COURT:  They have nothing to do with this

14   case.

15        MR. SULLIVAN:  In my opinion, that's correct,

16   Your Honor.

17        Then a request that the Court release Mr.

18   Mitchell was the fifth, the fifth request.

19        THE COURT:  All right.  Is there anything more

20   you want to say, Mr. Mitchell, on this score?

21        DEFENDANT MITCHELL:  Are you making me an offer?

22        THE COURT:  No, I'm not making you an offer

23   whatsoever.

24        DEFENDANT MITCHELL:  Are you asking me to do

25   something with force?  Are you using threats, duress

1    and coercion or forcing me to do something for your

2    benefit?

3         THE COURT:  No.  I'm asking you is there any

4    other elaboration or explanation, in light of what you

5    just heard between the Court and Mr. Sullivan, that

6    you can offer to explain what it is you are doing?

7         DEFENDANT MITCHELL:  I am not here to testify.

8    I'm here to accept offers and return offers for value.

9         THE COURT:  All right.  Mr. Mitchell, the Court

10   is not going to bargain with you.  Mr. Sullivan and

11   Ms. Rhodes represent you.  They will represent you as

12   your attorneys, and that's the way it's going to be.

13        DEFENDANT MITCHELL:  I accept your offer for

14   value.  I return your offer to you for value for close

15   and settlement of the account.  I request the

16   following:

17        I do not argue the fact.  I request the Court to

18   issue me an appearance bond and waive all public

19   costs, request the Court to close all accounts and

20   release the order of the Court to me immediately.

21        I request the Court to set off and adjust all

22   public charges by the exemption, in accord with the

23   Uniform Commercial Code 3-419, House Joint Resolution

24   192, Public Law 73-10.  I request immediate discharge.

25        THE COURT:  All right.

1       DEFENDANT MARTIN:  May I address the Court, Mr.

2   Davis?

3       THE COURT:  Yes, Mr. Martin.

4       DEFENDANT MARTIN:  Let the record reflect that

5   I, Shelley Wayne Martin, sentient moral being, rescind

6   my initial plea of not guilty.  I rescind any and all

7   motions enter on my behalf.  I rescind my signature

8   and cancel any consent for cause.  I made a mistake.

9   I repented my debt.  I reserve all my rights with

10  explicit reservation and without prejudice.

11      THE COURT:  Mr. Martin, are you in effect

12  joining in Mr. Mitchell's position?  Is that what you

13  are doing?

14      DEFENDANT MARTIN:  I'm not here to testify.  Are

15  you making me an offer?

16      THE COURT:  All right.  Mr. Pyne, Mr. Crowe, can

17  you shed any light beyond what Mr. Sullivan has

18  already shared?

19      MR. CROWE:  I may able to a degree, Your Honor.

20      As Mr. Sullivan indicated, both Mr. Pyne and I

21  have received papers from our client, two sets of

22  papers, and each of those instructs us to notify all

23  parties, including the Judge, the U.S. Attorney,

24  various court personnel, and the Department of Justice

25  of his position.  I think that being the case, I am at

1    a minimum free to share those papers with the Court,

2    and I would like to do that at this time.

3        THE COURT:  Well, before you do that, can just

4    summarize your understanding of them?

5        MR. CROWE:  Yes, Your Honor.  The first request

6    is not to argue the facts, and my understanding from

7    the papers and from a brief conversation with my

8    client today is that he wishes me to do absolutely

9    nothing.  I am not to argue the facts.  I am not to

10   argue the law, which in fact is a matter which he

11   indicated in the strongest of terms begins today.

12       His second request is to request that the Judge

13   issue me an appearance bond and waive all public

14   costs.  My assumption was that the appearance bond was

15   a request that I ask to reopen his detention hearing

16   and ask that the Court either release him on his

17   personal recognizance or an unsecured appearance bond.

18       Indeed, we have prepared papers that we would be

19   willing to file to that effect today, because that's

20   certainly, if I am interpreting correctly, that's a

21   proper request.

22       Requests three and four are those which Mr.

23   Sullivan has recited and it is to request that the

24   Court close and settle all accounts and release the

25   order to me immediately.  The next request is to

1    request the Court to set off and adjust all public

2    charges by the exemption, in accordance with the

3    authorities which Mr. Sullivan mentioned.

4         I would say that the one that I think Mr.

5    Sullivan didn't discuss was U.C.C. 3-419, which has to

6    do with accommodation parties for negotiable

7    instruments and has no possible, in my opinion, no

8    possible relevance to this case.

9         Then the final matter was to request that the

10    Court release me.

11         I guess, like Mr. Sullivan, I also feel that if

12    I have been appointed to represent my client, I simply

13    can't sit back and not argue the law and not argue the

14    facts.

15         The client certainly has the right to make the

16    three decisions Mr. Sullivan mentioned.  Both Mr. Pyne

17    and I, of course, would consult very, very closely

18    with the client on any other decisions, and I am

19    generally guided, and I take their wishes even on

20    tactical decisions very seriously.  But it's not a

21    situation where we can simply sit back and, as Mr.

22    Sullivan indicated, sit here like potted plants in

23    this case.

24         I think what the clients may be asking for is

25    the right to represent themselves.  It seems to me

1    that the only way that they can have a situation where

2    their lawyers don't argue the law and their lawyers

3    don't argue the facts is if they in fact represent

4    themselves, either with or without standby counsel.

5         I am not certain that that is what the clients

6    make, but I think that the request that we have

7    received today, that Mr. Pyne and I have gotten in

8    writing and that Mr. Sullivan at least has gotten

9    orally, would require the Court to initiate a Faretta

10   inquiry.

11        I know the Court did that to a degree I believe

12   last November, but I think a full-fledged Faretta

13   inquiry is appropriate at this time because it appears

14   that that may be what the clients are asking for.

15        THE COURT:  Thank you, Mr. Crowe.

16        I should stand corrected.  Defendant Harris is

17   not present with us, and I will hear from counsel in

18   just a moment.

19        Yes, Mr. Gardner.

20        DEFENDANT GARDNER:  May I speak, sir?

21        THE COURT:  Yes.

22        DEFENDANT GARDNER:  Let the record reflect that

23   I, Shawn-Earl Gardner, sentient moral being --

24        THE COURT:  I'm sorry.  Mr. Crowe, could you

25   move that microphone down, please?

1        DEFENDANT GARDNER:  Let the record reflect that

2    I, Shawn-Earl Gardner, sentient moral being, rescind

3    my initial plea of not guilty, also any and all

4    motions and entered on my behalf, my signature, and

5    counsel, any consent for cause.  I made a mistake.  I

6    repent of my debt.  I reserve all rights with explicit

7    reservation and without prejudice.

8        THE COURT:  Thank you, Mr. Gardner.

9        Mr. Coburn, anything to add to what counsel have

10   already stated for the record?

11       MR. COBURN:  No.  Thank you, Your Honor.  I

12   don't think we have anything to add to what has

13   already been stated.  I don't think we have any

14   requests for the Court at this time either.

15       There is one scheduling issue relating to

16   tomorrow, which at an opportune time I will raise with

17   the Court.  I know that Your Honor may have had a

18   conversation with Judge Lambert, but that's nothing

19   that needs to be addressed right now.

20       THE COURT:  All right.  Thank you, Mr. Coburn.

21       Mr. Treem, Mr. Martin, good morning.

22       MR. TREEM:  Good morning, Your Honor.

23       MR. MARTIN:  Good morning, Your Honor.

24       MR. TREEM:  Your Honor, as you noted, Mr. Harris

25   is not here.  We were advised, Mr. Martin and I and

1      Mr. Hurson, this morning by the marshals that he had

2      apparently this morning suffered another or had

3      another epileptic seizure and we are uncertain as to

4      what his health status is at the moment.  We assume he

5      is getting treated appropriately at Super Max, where

6      he is being detained, and we have no further

7      information about either his availability later today

8      or tomorrow or what the prognosis might be.

9           So we are somewhat in a quandary as to how to

10     proceed this morning.  We are here.  We have not had

11     the opportunity to meet with Mr. Harris beforehand to

12     discuss with him the proceedings today or what

13     instructions he might want to give us in terms of how

14     to proceed.

15          I think we can infer from prior proceedings that

16     he would join in the statements made by the other

17     defendants and the positions taken by them, and in

18     light of that, we, I guess we suffer from somewhat the

19     same dilemma as the other defense attorneys in terms

20     of how we can proceed even today.

21          But we cannot tell the Court that we have that

22     specific instruction, but I think it would be safe for

23     us to infer and assume that that would be his

24     instructions to us.

25          THE COURT:  Thank you, Mr. Treem.

1          Mr. Mitchell, do you wish to represent yourself

2     in this case?

3          DEFENDANT MITCHELL:  Are you making me an offer?

4          THE COURT:  I am asking you whether you wish to

5     represent yourself.

6          DEFENDANT MITCHELL:  Are you giving me legal

7     advice from the bench?

8          THE COURT:  Do you wish to discharge your

9     attorneys and represent yourself through the balance

10    of these proceedings?

11         DEFENDANT MITCHELL:  I accept your offer for

12    value.  I return your offer to you for value for close

13    and settlement of the account.  I request the

14    following:

15         I do not argue the facts.  I request the Court

16    to issue an appearance bond, waive all public costs.

17    I request the Court to close the account and release

18    the order of Court to me immediately.  I request the

19    Court to set off and adjust all public charges by the

20    exemption and in accord with the Uniform Commercial

21    Code 3-419, House Joint Resolution 192, Public Law

22    73-10.  I request immediate discharge.

23         THE COURT:  Thank you, Mr. Mitchell.

24         Mr. Martin, do you wish to represent yourself in

25    this case?

1          DEFENDANT MARTIN:  Are you using threats, duress

2     coercion, force or fear to get me to accept something

3     for your benefit?

4          THE COURT:  I am asking you if you wish to

5     discharge your attorneys and represent yourself for

6     the balance of these proceedings?

7          DEFENDANT MARTIN:  I accept your offer for

8     value, return your offer to you for value for settling

9     and close the account.  I do not wish to argue the

10    facts.

11         I request the Judge to issue me an appearance

12    bond and waive all public cost, request the Court to

13    close all accounts and release the order of the Court

14    to me immediately.

15         I request the Court to set off an adjust all

16    public charges by exemption, in accord with the

17    Uniform Commercial Code 3-419, House Joint Resolution

18    192, and Public Law 73-10, and I request immediate

19    discharge.

20         THE COURT:  Thank you, Mr. Martin.

21         Mr. Gardner, do you wish to represent yourself

22    in this case?

23         DEFENDANT GARDNER:  Are you making me an offer,

24    sir?

25         THE COURT:  I'm asking you whether you wish to

1    discharge your counsel and represent yourself for the

2    balance of these proceedings.

3         DEFENDANT GARDNER:  Are you offering me legal

4    advice from the bench?

5         THE COURT:  Thank you, Mr. Gardner.  You may be

6    seated.

7         Mr. Mitchell, Mr. Martin, Mr. Gardner, your

8    responses --

9         DEFENDANT GARDNER:  I wasn't finished.

10        THE COURT:  -- to the Court are no, you do not

11   wish to represent yourself.

12        DEFENDANT GARDNER:  You're not going to let me

13   finish?

14        THE COURT:  So, therefore, your attorneys will

15   continue to represent you under appointment of the

16   Court.  The question that remains is do you wish to

17   remain here today through the balance of these

18   proceedings or do you wish to leave the courtroom?

19        Mr. Mitchell, what is your desire?

20        DEFENDANT MITCHELL:  I accept your offer for

21   value.  I return your offer to you for value for close

22   and settling of the account.  I request the following:

23        I do not argue the facts.  I request the Court

24   to release the order of the Court to me immediately.

25   I request the Court to issue me an appearance bond and

1    waive all public cost.  I request the Court to close

2    all accounts and release the order of the Court to me

3    immediately.  I request the Court to set off and

4    adjust all public charges by the exemption and in

5    accord with Uniform Commercial Code 3-419, House Joint

6    Resolution 192, Public Law 73-10.  I request immediate

7    discharge.

8         THE COURT:  All right.  Mr. Martin, do you wish

9    to remain in the courtroom or do you wish to depart

10   the courtroom?

11        DEFENDANT MARTIN:  I accept your offer for

12   value, return your offer to you for value for settling

13   and close the account.  I do not wish to argue the

14   facts.  I request the Court to issue an appearance

15   bond and waive all public costs.  I request the Court

16   to close all accounts and release the order of the

17   Court to me immediately.  I request the Court to set

18   off and adjust all public charges by exemption, in

19   accord with the Uniform Commercial Code 3-419, House

20   Joint Resolution 192, and Public Law 73-10, and I

21   request immediate discharge.

22        THE COURT:  Mr. Gardner, do you wish to remain

23   in the courtroom or do you wish to depart the

24   courtroom for the remainder of the proceedings?

25        DEFENDANT GARDNER:  I accept your offer for

1     value and return your offer to you for value for

2     closure, for full close and settlement of the account

3     and request -- I do not wish to argue the facts.  I

4     request that you issue me an appearance bond and waive

5     all public costs.  I request that you close the

6     account and release the order of the Court to me

7     immediately.

8          I request you setoff and adjust all public

9     charges by exemption, in accord with UCC 3-419, House

10    Joint Resolution 192, and Public Law 73-10, and

11    request discharge immediately, sir.

12         THE COURT:  Thank you, Mr. Gardner.

13         All right.  I treat the responses of the

14    defendants as a yes.  They wish to remain here, unless

15    and until they demonstrate through their behavior that

16    they wish not to be here.

17         Was it Mr. Kramer that you have available now,

18    Mr. Harding?

19         MR. HARDING:  Yes, Your Honor.

20         THE COURT:  All right.  We will proceed with the

21    suppression hearing with respect to Mr. Mitchell's

22    arrest on April 1, 2002.  You may call the witness.

23         MR. TREEM:  Your Honor, before Mr. Harding does

24    that, may I be heard for one moment?

25         THE COURT:  Yes, Mr. Treem.

1          MR. TREEM:  Your Honor, as I said, we are

2     somewhat at a loss as to what our role should be here

3     today, and we would request that unless and until Mr.

4     Harris has had the opportunity to respond to the

5     Faretta inquiry that the Court has just engaged in

6     with other defendants, that Mr. Harris and us, as his

7     lawyers, not be, not participate in the remainder of

8     these hearings and that Mr. Martin and Mr. Hurson and

9     I be excused.

10          THE COURT:  I certainly understand the request,

11     Mr. Treem, and don't find it unreasonable, but the

12     request is denied.  As we all know, while a defendant

13     has the right to be present for all proceedings, the

14     right to be present for legal argument is more limited

15     than relevant factual development and factual

16     evidentiary-type hearings.

17          I don't intend to have an evidentiary hearing

18     today with respect to Mr. Harris.  You and Mr. Hurson

19     and Mr. Martin are fully capable of presenting your

20     legal arguments that we will focus on today on behalf

21     of Mr. Harris.

22          I think that your earlier comments are well

23     taken.  The Court has every reason to believe that Mr.

24     Harris's responses to the Court will echo those of the

25     other defendants, and the Court's determination as to

1    Mr. Harris will be exactly the same as the Court's

2    determination as to the remaining three defendants.

3         So, counsel, remain fully engaged in the case.

4    Counsel will continue to advocate on behalf of your

5    clients with the vigor that is customary in your

6    professional lives, and we will proceed in that

7    fashion.

8         MR. TREEM:  Might I inquire, Your Honor, what

9    would be the Court's intention in terms of conducting

10   an appropriate Faretta inquiry with regard to Mr.

11   Harris so at least we can advise him as to what the

12   Court's intentions are?

13        THE COURT:  As soon as he is available either

14   tomorrow or perhaps later this afternoon, if he can be

15   brought over, which I don't assume he will be, but

16   perhaps he will.  But as soon as he is next in court,

17   the Court will certainly undertake a Faretta inquiry

18   of Mr. Harris.

19        MR. TREEM:  To the extent, therefore, Your

20   Honor, that on the chance that he does decide to

21   discharge us as counsel, that he not be prejudiced by

22   any arguments that we might make since his intention

23   would have been to discharge us today had he been

24   here.

25        THE COURT:  I don't believe that would be his

1    intention, but I certainly don't perceive any

2    possibility of prejudice to Mr. Harris from any

3    arguments you might make on his behalf.

4         To the extent that Mr. Harris or any defendant

5    truly wishes not to contest the facts of the case,

6    your argument on his behalf on legal issues, such as

7    severance, dismissal of the indictment and such, can't

8    possibly prejudice his desire if it is his desire in

9    effect to stand mute.

10        MR. TREEM:  Well, Your Honor, in that regard, I

11   suspect that there is a very real possibility,

12   especially with regard to the severance issues, that

13   there may be representations of what the factual

14   development might be both in the guilt/innocence phase

15   and in the sentencing phase, which would directly

16   implicate Mr. Harris and his relationship to the other

17   defendants, which he may not wish us to disclose.

18        THE COURT:  Except at this point you represent

19   him.

20        MR. TREEM:  Very well, Your Honor.  Therefore,

21   my request at least that should he decide that he does

22   wish to discharge us and had he been here today, he

23   would have done so, that he not be bound by whatever

24   representations we might make on his behalf in that

25   regard.

1          THE COURT:  I appreciate it, Mr. Treem.  Even

2     were he present and even were he to tell the Court

3     that he wished to discharge counsel, as the

4     government's memorandum quite accurately points out,

5     there is no strong reason to believe that the Court

6     would grant that request.

7          MR. TREEM:  Well, I would like --

8          THE COURT:  There is in fact very strong reason

9     to believe that the Could would deny the request.  I'

10    not saying I will deny it.  I'm not saying I'll grant

11    it.  I don't know what I'll do if the request is ever

12    made.

13         But I'm satisfied that on the present record,

14    under the present circumstances, it is entirely

15    consistent with Mr. Harris's due process rights to a

16    fair proceeding to have you and co-counsel continue to

17    represent him.

18         MR. TREEM:  Very well, Your Honor.

19         THE COURT:  Thank you.

20         MR. SULLIVAN:  Before we call Mr. Kramer, can I

21    just address one other thing?

22         THE COURT:  Yes, Mr. Sullivan.

23         MR. SULLIVAN:  To complete the Court's inquiry

24    on the interpretation issue, I understand the Court's

25    ruling and certainly Ms. Rhodes and I, and probably

1      all counsel, will continue to zealously and

2      effectively represent our clients.  But there is an

3      ethical issue here that I think the Court needs to

4      give us some guidance on.

5           So the Court has defaulted to the constitutional

6      issue that because there is an ambiguous or no

7      response, that we are still their attorneys, that they

8      have not invoked sufficiently their right to

9      self-representation.

10          THE COURT:  I'm sorry to interrupt.  Let me be

11     clear.  It was not an ambiguous response.

12          MR. SULLIVAN:  Okay.

13          THE COURT:  The response was no, I don't want

14     self-representation.

15          MR. SULLIVAN:  That's fine.  It's the same

16     thing.

17          Your Honor, that leaves us with Rule, Model Rule

18     1.2, for those lawyers who are licensed in Maryland,

19     which are incorporated by this Court's Local Rules.

20     That rule says that a lawyer shall abide by a client's

21     decision concerning the objectives of the

22     representation and, when appropriate, shall consult

23     with the client as of means by which they are to be

24     pursued.

25          Now what has happened now before today, they

1    didn't want us, but they didn't want us fired.  So we

2    were unfettered to continue our preparations, continue

3    developing for the trial, both phases if we get there.

4        But now Mr. Mitchell has done this factor one,

5    no arguments, no facts.  It's going to come to a head

6    as soon as Mr. Harding finishes his direct examination

7    of the detective, and I'm with a quandary to recognize

8    and abide by Mr. Mitchell's --

9        THE COURT:  Excuse me.  The record will reflect

10   that Ms. Rhodes has arrived.  Good morning, Ms.

11   Rhodes.

12       MS. RHODES:  Good morning.

13       THE COURT:  Sorry, Mr. Sullivan.  Go ahead.

14       MR. SULLIVAN:  That's quite all right.

15       To abide by the scope of representation that Mr.

16   Mitchell has instructed me.  Your Honor, I fear that

17   unless the Court directs us that your scope of Mr.

18   Mitchell shall be unfettered, that, you know, at some

19   point in time Mr. Hirshman will be asking me, you had

20   a client who wanted to go down a specific path.  He

21   wanted his defense to be in a specific way and you

22   ignored him essentially.

23       So I'm just looking for the Court --

24       THE COURT:  Of course, Mr. Sullivan, I will take

25   every phone call placed to you by Mr. Hirshman, and

1       that's true for each of the counsel here.

2             MR. SULLIVAN:  Thank you.

3             THE COURT:  I invite you to put call forwarding

4       on your phone and any call any counsel in this case

5       should receive from the Attorney Grievance Commission

6       Office should come directly to my office.

7             MR. SULLIVAN:  Thank you.

8             THE COURT:  But to be clear, and perhaps less

9       whimsical, I am indeed directing counsel, as officers

10      of the court, as appointed counsel under the Criminal

11      Justice Act, to continue your representation

12      vigorously and zealously on behalf of your respective

13      clients and to continue to make the customary tactical

14      and strategic decisions that tradition assigns to the

15      role of counsel in a criminal case.

16            The Court obviously has an independent

17      responsibility under the Sixth Amendment to insure

18      that each defendant, no matter what his desire,

19      receives a fair trial and a fair and impartial

20      adjudication of the facts.  So the Court has no

21      hesitation whatsoever in its conclusion expressed to

22      counsel that the proceedings will go forward in the

23      customary way.

24            As I said, the defendant will either be present

25      or not, at their election.

1           Mr. Harding, you may call your witness.

2           MR. HARDING:  Thank you.

3           THE CLERK:  Raise your right hand.

4                        DONALD KRAMER

5      a witness called on behalf of the Government, having

6      been previously duly sworn, was examined and testified

7      as follows:

8           THE CLERK:  Be seated.

9           For the record, state your name and spell it for

10     the record, please.

11          THE WITNESS:  Sergeant Donald Kramer.  Last name

12     K R A M E R, Baltimore City Police Department.

13                      DIRECT EXAMINATION

14     BY MR. HARDING:

15     Q     Good morning, Sergeant Kramer.

16     A     Good morning.

17     Q     Can you tell us, sir, what is your assignment

18      with the Baltimore City Police Department right now?

19     A     Narcotics division.

20     Q     Okay.  Is that in some particular precinct or --

21     A     Northern district.

22     Q     Can you tell us -- well, tell us how long you

23      have been a Baltimore City Police Department.

24     A     18 years.

25     Q     Can you tell us what your assignment was back in

1     April, the early part of April of 2002?

2     A      I was assigned to the Baltimore City Homicide

3      Division and I was working with the Drug Enforcement

4      Administration, the Red Run Group.

5     Q      So were you on a long-term detail to the Red Run

6      Group at DEA?

7     A      Yes, sir.  I was there approximately three

8      years.

9     Q      Do you recall, were you involved in an arrest on

10      April 1, 2002?

11    A      Yes, sir.

12    Q      Can you tell us the name of the person who you

13      arrested or participated in arresting?

14    A      Willie Mitchell.

15    Q      Can you tell us, were you involved in the

16      investigation of Mr. Mitchell prior to that day or did

17      you simply become involved at the time of the arrest?

18    A      I became involved on that date for enforcement

19      purposes.

20           MR. SULLIVAN:  I'm sorry.  For what purposes?

21           THE WITNESS:  Enforcement purposes, to place him

22      under arrest.

23           MR. SULLIVAN:  Thank you.

24     BY MR. HARDING:

25    Q      Did you have an understanding with your fellow

1    officers, Sergeant Kramer, and the other agents in Red

2    Run about whether you would interview Mr. Mitchell?

3    A    We had an agreement that we would not.

4    Q    Can you tell us what you did agree to, what you

5     were intending to do?

6    A    Simply place him under arrest.

7    Q    What were your arresting him for?

8    A    Outstanding warrant, at least one outstanding

9     warrant of violence.

10   Q    Okay.  Were you the one that made the decision

11    that you and your fellow officers and agents were not

12    going to interview Mr. Mitchell that day?

13   A    I did not make that decision.

14   Q    Okay.  Do you remember who did or do you --

15   A    There came a time I received that information

16    before arresting him, but I don't recall from whom.

17   Q    Were you on foot or in a vehicle that day?

18   A    I was in a vehicle.

19   Q    Was it an unmarked vehicle or a marked patrol

20    car?

21   A    It was an unmarked minivan.

22   Q    Were you in plainclothes or in uniform that day?

23   A    I was in plainclothes.

24   Q    Can you tell us, were you alone in the vehicle

25    or were you with other people?

1    A      There were two others in my vehicle.  I was

2    driving.  Detective Keith Benson, who was my partner

3    at the time, was with me, and sometime before

4    arresting Mr. Mitchell, there was a Baltimore County

5    detective placed in the van with me for communication

6    purposes.

7    Q      I see.  Were you positioned in Baltimore County

8    at this time?

9    A      Yes, sir.  There came a time when we received

10   information that he may be at his girlfriend's place

11   of work.

12   Q      I see.  Can you tell us where that was?

13   A      That was in the vicinity of Owings Mills Mall

14   near Red Run Boulevard.

15   Q      Do you recall the name of the Baltimore County

16   detective who was in your vehicle with you?

17   A      I do not.

18   Q      You said he was present in the vehicle for

19   communication purposes.  Can you explain what you mean

20   by that?

21   A      Being a Baltimore City detective at the time, I

22   had communications with Baltimore City KGA or

23   communications, but I, myself, or Keith Benson did not

24   have communications with Baltimore County.  So at some

25   point in time, someone made the decision to place a

1      Baltimore County detective in the van with myself and

2      Detective Benson so we could communicate with

3      Baltimore County if in fact we had to, because we were

4      in the county.  We were not in the city.

5      Q      Was your vehicle the only one deployed at Red

6      Run Boulevard near Owings Mills Mall?

7      A      I believe there were others, but I can't be sure

8      who or where they were.

9      Q      Well, were there other vehicles at other

10     locations?

11     A      Absolutely.

12     Q      Were you within -- could you see other vehicles

13     from where you were?

14     A      I don't recall.

15     Q      Did there come a time when you started to follow

16     a certain vehicle that afternoon?

17     A      There came a time we received information that

18     Willie Mitchell was a passenger in a small dark color

19     sedan and that his girlfriend was driving the vehicle.

20     Q      Do you recall the means by which you learned

21     that information?

22     A      No, I do not.

23     Q      What did you do when you got that information?

24     A      We started following the vehicle.

25     Q      Do you recall, was it by radio that you got this

1    information or was it by some --

2    A     I believe it was by radio communications, but I

3    don't know who actually told us that.

4    Q     Were you driving the vehicle that day or were

5    you a passenger?

6    A     I was driving.

7    Q     Did there come a time when someone in your

8    vehicle made a radio transmission to other people in

9    the police department?

10   A     I remember telling Baltimore County -- myself or

11   Detective Benson, I don't recall who, told the

12   Baltimore County detective that we would need a marked

13   patrol car to stop the vehicle, because we did not

14   have emergency equipment on the minivan.

15   Q     Could you see who was in the vehicle at the time

16   from your van?

17   A     I could see there were two occupants.

18   Q     Okay.  So what happened after this radio

19   transmission was made about a marked patrol car?  What

20   happened?

21   A     We were on Reisterstown Road, headings towards

22   Baltimore City -- we were still in Baltimore County --

23   when a Baltimore County police cruiser pulled up

24   behind the vehicle, the suspect vehicle, and in front

25   of me.

1          That Baltimore County cruiser activated its

2     emergency lights.  The vehicle did pull over in front

3     of an Exxon on Reisterstown Road.

4          At that time I placed -- I drove the minivan to

5     the passenger side, basically taking up a tactical

6     position in case Mr. Mitchell was to flee or try to do

7     something else.

8     Q     Okay.  What happened next?

9     A     I exited my vehicle.  He got out.  He did not

10    give any resistance.

11    Q     You're talking about Mr. Mitchell?

12    A     Mr. Mitchell that is.

13    Q     Okay.

14    A     He placed his hands in the air as I requested.

15    I did a pat down of his person and found a loaded nine

16    millimeter handgun in his ankle area, in his boot or

17    sock.

18    Q     Did you notice anything unusual about Mr.

19    Mitchell that day?

20    A     He was a bit jittery.  I thought he was nervous.

21    He smelled strongly of alcohol, and there was a bottle

22    of alcohol on the floor of the vehicle where he was

23    sitting.

24    Q     Okay.  Did Mr. Mitchell say anything when you

25    arrested him?

1    A      He did not.

2    Q      How much time passed before Mr. Mitchell was

3     transported away from the scene on Reisterstown Road?

4    A      Maybe a minute went by.

5           MR. SULLIVAN:  Objection to maybe.

6           THE COURT:  Overruled.  Go head, officer, or

7     detective.

8           THE WITNESS:  Approximately a minute went by and

9     he was placed into a Baltimore County prisoner

10    transport vehicle, a patrol car with a cage in the

11    back.

12   BY MR. HARDING:

13   Q      And what did you do during that minute or so

14    before he was transported away?

15   A      I did a search of his vehicle for any more

16    weapons.  Basically I held onto him, and then I did a

17    search of the vehicle after he was taken from me.

18   Q      Were there other officers on the scene by that

19    time?  I guess there were the uniformed officers, but

20    were there any other officers?

21   A      One or two uniformed officers, myself, Detective

22    Benson, and the Baltimore County detective at least.

23   Q      Did you ever talk to Willie Mitchell that day?

24   A      I did not.

25   Q      Did you give him Miranda warnings?

1    A      The only thing I said to him was I gave him

2    orders to step out of the vehicle and place his hands

3    up.

4    Q      So you did or did not give him Miranda warnings?

5    A      I did not give him Miranda.

6    Q      Did you see or hear anyone give him Miranda

7    warnings that day?

8    A      I did not.

9    Q      What did you do after he was cuffed and put in

10   this patrol car?

11   A      At that time, he wasn't my responsibility.   He

12   was in the custody of the officer operating that

13   vehicle.

14   Q      What did you do?

15   A      I responded to Valdivia Court, I believe it

16   is -- I may be mistaken on the name -- to conduct the

17   search warrant at his girlfriend's apartment with

18   other detectives in the Red Run Group.

19   Q      I see.  Did you have any more contact with

20   Willie Mitchell that day?

21   A      I did not.

22          MR. HARDING:  Thank you.  I have no further

23   questions, Your Honor.

24          DEFENDANT MITCHELL:  I fully accept the

25   government's offer for value.  I return the offer to

1     him for value for close and settlement of the account.

2     I request the following:

3           I do not argue the facts, request the Court to

4     issue me an appearance bond and waive all public cost.

5           I request the Court to close all accounts and

6     release the order of the Court to me immediately.  I

7     request the Court to set off and adjust all public

8     charges by the exemption, in accord with Uniform

9     Commercial Code 3-419, House Joint Resolution 192,

10    Public Law 73-10.  I request immediate discharge.

11          THE COURT:  I am not going to permit repeated

12    disruptions, Mr. Mitchell.

13          You may proceed, Mr. Sullivan.

14          MR. SULLIVAN:  Thank you, Your Honor.

15                     CROSS-EXAMINATION

16    BY MR. SULLIVAN:

17    Q     Good morning, sergeant.

18    A     Good morning.

19    Q     Did you bring any reports that you prepared

20     about this April 1, 2002 arrest of Mr. Mitchell,

21     because I don't see any up there?

22    A     Because I didn't bring any.

23    Q     Okay.  Just so I understand, there are no

24     reports by you of what you just testified to?

25    A     Correct.

1    Q      Are there reports about who you arrested on

2     March 30th of 2002.

3    A      I believe there is.

4    Q      Who did you arrest on March 30th of 2002?

5    A      Willie Mitchell.

6    Q      I thought he was April 1, 2002.

7    A      My mistake.

8    Q      Well, when you arrested people -- let's pick a

9     date, any date.

10           March 1, 2002, who did you arrest that day?

11   A      I don't recall.

12   Q      That's why you keep reports, right?

13   A      We keep reports to keep accurate dates on file.

14   Q      And also sergeant -- you have been a detective,

15    what?  You've been a police officer 18 years, right?

16   A      That's correct?

17   Q      So you know, detective, do you not, that one of

18    the reasons that you keep reports is when you are

19    called to testify against a person that you arrested,

20    you can refresh your recollection and remember what

21    happened, right?

22   A      I did not make any reports that day.

23   Q      I understand that.  But the answer to my

24    question is that's one of the reasons why you keep

25    reports, correct?

1    A       We do keep reports for those purposes.  I did

2     not record that on that date.

3    Q       Just so I understand, on this day you were

4     working Red Run with the DEA, right?

5    A       Yes, sir.

6    Q       You know, of course, what a DEA-6 is, don't you?

7    A       Yes, sir.

8    Q       What is that?

9    A       It's an administrative report.

10   Q       Or a report of investigation, right?  Something

11    you had done that day, right?

12   A       Yes, sir.

13   Q       In your official law enforcement capacity,

14    correct?

15   A       Yes, sir.

16   Q       Are you telling me, just so I understand this,

17    that you are telling Judge Davis today there is not a

18    single report penned by you about what you just

19    testified to?

20   A       That's correct.

21   Q       Now, on April 26, 2007, you are just testifying

22    from your recall of your April 1, not March 30th, your

23    April 1, 2002 arrest of Mr. Mitchell?

24   A       I am going from my memory recall and

25    administrative report that was authored by someone

1    else.

2    Q       What report was that?

3    A       That was a report authored by Detective Giganti.

4            THE COURT:  I'm sorry?

5    Q       Detective who?

6    A       Detective Giganti.  I'm sorry.

7    Q       Could you spell that?

8    A       G I G A N T I, I believe.

9    Q       Who is this person?

10   A       He is a detective with the City police

11    department.

12   Q       Homicide or narcotics?

13   A       He was in homicide at that time.

14   Q       And when did you look at this report?

15   A       About a month ago.

16   Q       Did it refresh your recollection?

17   A       It did.

18   Q       Okay.  Before you looked at it, did you have no

19    recollection of this?

20   A       I had -- yes, I did have some recollection, but

21    it was five years ago.

22   Q       Do you have --

23           MR. SULLIVAN:  Let me ask the government.

24    Court's indulgence.

25           (Pause.)

1    Q      Now help me out with something else, sergeant.

2    When a task force that you were a member of is going

3    to arrest somebody who had outstanding warrants, law

4    enforcement does some kind of planning, right?

5    A      Yes.

6    Q      You just don't go out into the neighborhood and

7    hope that you run into the person.  You have a meeting

8    and you discuss an action plan or an execution plan or

9    whatever you guys call it, right?

10   A      Not necessarily all of that or in that order.

11   No, sir.

12   Q      Well, on April 1, 2002, could you tell us who

13   was at the meeting to discuss the arrest of Mr.

14   Mitchell?

15   A      I don't recall a meeting per se.  I do remember

16   receiving information, as I was working on other cases

17   myself, that there was an outstanding warrant for

18   Willie Mitchell.  I don't know exactly where I was or

19   who gave me that information at that time, but I did

20   meet up with other investigators, both county and

21   city, to safely arrest him on at least one open

22   warrant.

23   Q      Well, who is the person, detective or sergeant,

24   who told you don't question Mr. Mitchell?

25   A      I don't recall.

1    Q      Well, who was there?

2    A      Who was there, who was working with me that day?

3    Q      Who --

4    A      Who was part of the operation?

5    Q      That wasn't a good question.  Let me ask it this

6     way.

7           Who told you not to ask Mr. Mitchell any

8     questions?

9    A      I don't recall.

10   Q      Well, who was involved with you in executing the

11    arrest warrant on Mr. Mitchell?

12   A      Several detectives, both city and county.

13   Q      And they have names?

14   A      I can recall some of their names.

15   Q      Sure.  That's what I would like.

16   A      Sergeant James Hagin, Detective Chris Graul,

17    Detective Keith Benson, Detective Giganti.

18   Q      Which one of these, sergeant, told you whatever

19    you do, don't ask Mr. Mitchell any questions?

20   A      I don't recall.  I don't know if it was told to

21    me like that.

22   Q      Well, how was it told to you?

23   A      I don't recall.

24   Q      Well, didn't you just --

25          You remember Mr. Harding asking you some

1    questions about ten minutes ago, right?

2    A      Yes, I do.

3    Q      And didn't you answer to him, sergeant, that you

4    were simply to arrest him and not ask him any

5    questions, do not interview him?

6    A      I do remember that, yes.

7    Q      Who told you that?

8    A      I don't recall.

9    Q      How many members of the arrest team were there?

10   A      I don't know.

11   Q      Just so I understand this, your actual contact

12   with Mr. Mitchell lasted approximately one minute,

13   right, your actual physical contact?

14   A      Approximately, yes, sir.

15   Q      Right.  If I understand your testimony, you

16   drove your minivan up to the passenger side once the

17   county cruiser effectuated the traffic stop, got Mr.

18   Mitchell out of his vehicle, patted him down, and then

19   turned him over to a county police officer, correct?

20   A      Yes, sir.

21   Q      The only thing you said to Mr. Mitchell was I

22   guess put your hands up?

23   A      I asked him to get out of the car and place his

24   hands where I could see them in the air.

25   Q      And your demeanor and tone was just like you're

1    testifying today?

2    A     Probably not.

3    Q     And you probably had your service weapon drawn

4     on him, correct?

5    A     Correct.

6    Q     And other officers probably had their service

7     weapons drawn too, correct?

8    A     I know that I did.  I don't know what they were

9     doing.

10   Q     Right.

11   A     My focus was on Mr. Mitchell.

12   Q     Right.  So you drew your weapon, got Mr.

13    Mitchell out, told him to put his hands up, patted him

14    down, gave him to a county officer, and that ended

15    your involvement, correct?

16   A     That is correct.

17   Q     Now would it be a fair statement, sergeant, that

18    you might have been a part of the Red Run Task Force,

19    but that this was not your case?

20   A     That's correct?

21   Q     And while you were busy working other cases,

22    somebody called for your assistance on this occasion

23    in April of 2002, correct?

24   A     That's correct.

25   Q     Who was that person who called for your

1     assistance?

2     A      I don't recall.

3            MR. SULLIVAN:  Thank you.

4            DEFENDANT MITCHELL:  Your Honor, Your Honor.

5            THE COURT:  Thank you.  Anything further, Mr.

6      Harding?

7            MR. HARDING:  No, Your Honor.

8            DEFENDANT MITCHELL:  Your Honor.

9            MR. COBURN:  I have some questions, Your Honor,

10     if I may?

11           THE COURT:  All right, Mr. Coburn.

12           DEFENDANT MITCHELL:  May I speak?

13           THE COURT:  No, Mr. Mitchell.

14           DEFENDANT MITCHELL:  I accept your offer.  I

15      reserve all rights with explicit reservation and

16      without prejudice.

17           THE COURT:  Go ahead, Mr. Coburn.

18           MR. COBURN:  Thank you so much, Your Honor.

19                        CROSS-EXAMINATION

20      BY MR. COBURN:

21     Q      Good morning, Sergeant Kramer.

22     A      Good morning, sir.

23     Q      You are an employee of the Baltimore City Police

24      Department; is that correct?

25     A      Yes, sir.

1    Q      And you were so employed back in April of 2002;

2     is that correct?

3    A      I was.

4    Q      You were working as part of what you referred to

5     as the Red Run -- that's R E D R U N -- Task Force; is

6     that right?

7    A      Yes, sir.

8    Q      But your assignment within the Baltimore City

9     Police Department was, did you say it was in the

10    Homicide Division?

11   A      Correct.

12   Q      You testified I believe in response to some

13    questions that I think were both from Mr. Harding and

14    from Mr. Sullivan that you were in an unmarked minivan

15    at the time the stop of Mr. Mitchell's vehicle was

16    effected; is that right?

17   A      That's correct.

18   Q      The minivan was on Reisterstown Road; is that

19    correct?

20   A      As I remember, yes, sir.

21   Q      Mr. Mitchell's vehicle was also on Reisterstown

22    Road; is that correct?

23   A      I don't know if it was actually his vehicle or

24    not.

25   Q      No.  I didn't mean his vehicle.

1    A       The vehicle he was in.

2    Q       I withdraw the question.

3            The vehicle in which he was a passenger was also

4     on Reisterstown Road at the time the stop was

5     effected; is that right?

6    A       Yes, sir.

7    Q       Now this particular location on Reisterstown

8     Road is in Baltimore County; is that right?

9    A       It is.

10   Q       It's not part of Baltimore City; is that right?

11   A       That's correct.

12   Q       You testified, did you not, in response to one

13    of Mr. Sullivan's questions, and again, I think also

14    in response to Mr. Harding, that it was you who, after

15    the vehicle was stopped, ordered Mr. Mitchell out; is

16    that correct?

17   A       Yes, sir.

18   Q       I believe your words were you ordered him to get

19    out of the vehicle and put his hands where you could

20    see them; is that right?

21   A       Correct.

22   Q       And you indicated in response to Mr. Sullivan

23    that you had your service weapon drawn and pointed in

24    his direction at the time; is that right?

25   A       Yes, sir.

1          THE COURT:  I'm sorry.  Mr. Coburn, where are we

2     going?

3          MR. COBURN:  I have no further questions, Your

4     Honor.

5          THE COURT:  Okay.  Good.

6          Anything else, Mr. Harding?

7          MR. HARDING:  No, Your Honor.

8          THE COURT:  Thank you very much, Detective

9     Kramer.

10         All right.  We had a number of legal issues I

11    think counsel may or may not want to be heard on.  Let

12    me start with this whole issue of mental health.

13    Where do we stand on those issues, counsel?  Mr.

14    Harding?

15         MR. HARDING:  Your Honor, the government

16    submitted a proposed order for discovery on mental

17    health issues many months ago.  We request that the

18    Court -- we also submitted modeled proposed orders

19    that were issued in similar capital cases recently in

20    this district.

21         So the government requests that the Court issue

22    a discovery order on mental health issues.  I guess

23    the complication here is that we don't know how much

24    mental health evidence there is going to be or exactly

25    how to schedule when it appears that there isn't going

1    to be an opportunity to conduct, for example,

2    psychiatric or psychological examinations of these

3    defendants.  But I think we have to proceed somehow

4    because we are getting within five months or so now, a

5    little over five months before the trial.

6        So the government requests that the Court enter

7    a scheduling order on mental health issues.

8        THE COURT:  Let me start with Mr. Sullivan or

9    Ms. Rhodes if there is anything to be said on that.

10        MR. SULLIVAN:  Only, Your Honor, that 12.2 sets

11    forth the procedure for the Court and parties to

12    consider.  I think Mr. Harding is right, that it might

13    be much ado about nothing because whether we have it

14    done now or not done before Mr. Mitchell elected to

15    proceed like he did, it's not ripe until such time as

16    we make a declaration that we are going to do it.

17        Now if we did it, we have to give the government

18    notice of that, but I wouldn't object to the Court

19    placing an order into effect.

20        THE COURT:  Thank you, Mr. Sullivan.

21        Mr. Crowe, Mr. Pyne?

22        MR. CROWE:  Your Honor, we are in a somewhat

23    different position because the government is not

24    seeking to execute our client.  At this point we don't

25    know of any likely mental health defense.

1            THE COURT:  All right.

2            MR. CROWE:  But we certainly wouldn't object to

3     the entry of an order.

4            THE COURT:  Thank you.

5            Mr. Coburn.

6            MR. COBURN:  Thank you, Your Honor.  Your Honor,

7     I think the inquiry that Mr. Harding just made was

8     directed mainly at us.

9            There has been some pretty extensive briefing

10     about this already that's in the file.  The government

11     filed a motion with respect to disclosure.  We filed

12     at least a couple of responses.  I guess we have no

13     objection to Your Honor resolving that on the papers

14     after reviewing the motion and responses that have

15     been propounded on this.

16            There is, I mean there is an issue about it or a

17     couple of issues procedurally in terms of just sort of

18     when this has to happen and, you know, when any sort

19     of preclusive effect of non-disclosure might take

20     effect, that sort of thing.

21            I should tell Your Honor that we've actually

22     already made an initial Rule 12.2 disclosure in this

23     case.  In fact, I think we've made several of them.

24     But our suggestion to the Court is just that Your

25     Honor review the paperwork and rule on the papers.

1          THE COURT:  All right.  I intend to enter the

2     government's proposed order.

3          MR. COBURN:  Your Honor knows, we do object to

4     it.

5          THE COURT:  I understand.

6          MR. COBURN:  Okay.

7          THE COURT:  All right.  Mr. Treem.

8          DEFENDANT GARDNER:  Can I speak, sir?

9          THE COURT:  No, Mr. Gardner.  Thank you.

10          DEFENDANT GARDNER:  I would like to reserve my

11     rights with explicit reservation and without

12     prejudice.

13          THE COURT:  It's reserved.

14          MR. TREEM:  Your Honor, we, as the Court knows,

15     we are just now getting the budget approved, and so

16     Mr. Martin and I have not even had the opportunity to

17     discuss the possibility of mental health issues with

18     regard to Mr. Harris with any potential experts or

19     otherwise discuss it even with him.  So we are not in

20     a position to put anyone on notice just yet.

21          But having said that, I think it is obvious from

22     at least today's events and from other events that,

23     other seizures that Mr. Harris has had which are known

24     because they occurred while he was in custody, that

25     there may well, very well be the likelihood of some

1    historical mental health evidence with respect to his

2    conditions.  Whether that amounts to a defense or not,

3    we don't know at this point, but I think it would be

4    -- it's certainly likely that there would be some

5    historical testimony about all of this.

6         THE COURT:  All right.  Thank you, Mr. Treem.

7         Well, the Court certainly is going to be as

8    accommodating as it possibly can be under the

9    circumstances, with the efforts by counsel to produce

10   what is required under the rules.  But as I have said

11   before on the record, it's not an open-ended pathway,

12   and there is a risk that the defendants could forfeit

13   their opportunities to adduce such evidence if good

14   faith isn't shown.  I will leave it at that.

15        All right.  Why don't we move to issues of

16   discovery, if there are any remaining.  Mr. Sullivan.

17        MR. SULLIVAN:  Your Honor, I don't believe we

18   have any outstanding discovery-related pleadings.

19        THE COURT:  All right.  Mr. Crowe.

20        MR. CROWE:  Your Honor, on behalf of Mr. Martin,

21   I believe we have a number of discovery issues which

22   are open.

23        We have filed an initial motion for a Bill of

24   Particulars, I believe sometime in 2005.

25        Subsequently, when the third superseding

54

1      indictment came down last November, we asked for a

2      more limited Bill of Particulars because we felt at

3      that time it was going to be necessary to get a little

4      additional information to understand the third

5      superseding indictment and its extension of the

6      conspiracy through August of 2006, and the other

7      allegations that were in there as well.

8           Just to review for the Court, in terms of our

9      initial motion, we asked for what I think is pretty

10     standard stuff, the names and other identification

11     information of co-conspirators and aiders and

12     abetters, the roles which were played by any unnamed

13     conspirator and aider and abetter.

14          THE COURT:  Mr. Crowe, it would be helpful if

15     you could just tell me what you don't presently have

16     that you believe you are entitled to.

17          MR. CROWE:  Your Honor, I don't think I have

18     ever been in a case where I received so much paper and

19     I really know so little.

20          I do not know -- although my client is charged

21     with two murders, those being the murders of the two

22     Wyche brothers, I don't know whether they are claiming

23     that my client was an individual who was present at

24     the scene, whether the government is claiming that he

25     is the person who actually pulled the trigger and

1     fired a bullet, whether he was an aider and abettor in

2     some other, whether he was an aider and abettor in

3     some other situation.

4          In addition to that, the --

5          THE COURT:  Well, I'm sorry.  What do you know?

6          MR. CROWE:  I know very, very little.  I know

7     that there is no physical evidence in terms of the

8     fingerprints or forensic evidence that connects him to

9     the crime.

10         I am informed that some individuals have

11    apparently identified his voice on a tape which the

12    government alleges was made shortly after the murder.

13         So just to bring it down to, I mean to

14    particulars, the government asserts that after the

15    murder was committed, individuals were riding in a

16    car.  One of the items they had with them was a cell

17    phone, which was seized from one the of Wyche

18    brothers.  They began talking, and somebody apparently

19    pushed a button which caused the conversation to be

20    sent into the voice mail.

21         THE COURT:  Right.  Yeah, I understand all of

22    that.  But from what you are saying, it sounds like

23    you are saying you received no reports, no autopsies,

24    no, you haven't received anything on this, and

25    that's --

1          MR. CROWE:  No.  We've certainly gotten that.  I

2     mean I understand that people died, that people were

3     arrested.  But in terms of what it is alleged that my

4     client has done, I have no idea what that is about.

5          Perhaps equally important, we were told that

6     there were apparently all of these co-conspirators and

7     aiders and abetters and that in the RICO enterprise,

8     there were people who weren't members, but they were

9     associates and they were in some fashion involved, in

10    some fashion involved in either the RICO conspiracy,

11    the drug conspiracy or the RICO enterprise.  We

12    certainly don't know that.

13         We asked, for example, for the names of the

14    individuals who physically committed each murder.

15    That doesn't seem to be anything which is particularly

16    revolution-like, and we asked --

17         THE COURT:  When you say physically committed

18    each murder, you mean you want to know the identity of

19    the trigger person?

20         MR. CROWE:  Yes, and we also wanted to know the

21    names of the individuals who aided and abetted the

22    murder and the roles that they played.  Those were for

23    the two substantive counts for the murders of Darryl

24    and Anthony Wyche.

25         As I said, it was really a very, very limited

1     Bill of Particulars that we asked for in that

2     instance.

3          With respect to the third superseding

4     indictment, and, as the Court knows, we have made a

5     motion to dismiss certain allegations and to bar the

6     government from putting on any evidence of activities

7     after February 2004, which was the date which was

8     supposedly the end date for all of these activities in

9     the various counts, we just want to know who the

10    members of the RICO enterprise were and to tell us who

11    the people they thought were members after February

12    2004.  We want the same information for associates,

13    which is a term that the indictment uses, and what

14    they did after 2004.

15         Then we asked for acts of racketeering activity,

16    as that term is defined in the statutes, which were

17    committed after February of 2004.

18         In our motion to dismiss we make the claim, and

19    it's pretty, you know, I think fairly forcefully, that

20    we don't think that the government really has any

21    evidence that this RICO enterprise, and the conspiracy

22    to violate RICO, subsisted beyond that time.

23         We are asking for what I think is really the

24    most basic type of information, and in a case such as

25    this, which is both complex and very serious, we think

58

1    that it's something which is warranted.

2         Bills of particulars are funny things.  I mean

3    you can find authority for almost any proposition

4    under the sun for a Bill of Particulars for either

5    granting information or denying information.

6         The points which are clear under the Will case

7    is that we don't have to show any cause for getting a

8    Bill of Particulars.  The Fourth Circuit decisions are

9    quite clear that we are entitled to a Bill of

10   Particulars and the Court has the discretion to grant

11   a Bill of Particulars either where it furnishes

12   necessary information about the crime that is charged

13   or where it is necessary in order to prepare a

14   defense.

15        We think that as far as that concerned, that it

16   is just quite clear that what we have asked for, and

17   again I would say that it is very, very limited, that

18   we should be entitled to it.

19        THE COURT:  Okay.  Let me hear from the

20   government.

21        MR. HARDING:  Well, Judge, the --

22        THE COURT:  I guess the focus is the Wyche

23   murders, Mr. Harding.

24        MR. HARDING:  Yes.  We have turned over

25   everything that the government is required to turn

```
 1        over under Rule 16 and in fact, because of the

 2        scheduling of the trial of Mr. Gardner a year ago, we

 3        turn over the Jencks material for that murder to Mr.

 4        Gardner's attorneys at that time.  I assume that Mr.

 5        Gardner's attorneys have not shared that information

 6        with their fellow defense counsel, but I can assure

 7        the Court that nothing that has been withheld from Mr.

 8        Crowe and Mr. Pyne is material that they should have

 9        been receiving under Rule 16.  It's Jencks material,

10        or Grand Jury transcripts is basically what we are

11        talking about here.

12             The evidence that we have addressing the issues

13        that Mr. Martin, I mean, sorry, that Mr. Crowe spoke

14        to come from Grand Jury transcripts of our cooperators.

15             THE COURT:  When are you going to provide Jencks

16        for the September 17 trial?

17             MR. HARDING:  Well, we provided it to Mr.

18        Gardner's attorneys approximately a month before the

19        start of that trial.

20             THE COURT:  Are you going to keep with that

21        schedule?

22             MR. HARDING:  Yes, I think so, Your Honor.  I

23        might add for the benefit of Mr. Crowe, he already

24        knows one of the cooperators who identifies his

25        client's role in this murder and it is quite clear on
```

1       the papers because he has filed another motion to

2       preclude the government from using that evidence,

3       claiming that there is a Bruton issue.  The

4       government's position is that it is a co-conspirator

5       statement.

6            But Mr. Crowe is not completely unaware of what

7       the evidence is going to be regarding his client's

8       participation in that crime.

9            THE COURT:  When are you going to disclose who

10      the shooter was in all the murders, to the extent you

11      haven't so far?

12           MR. HARDING:  Your Honor, there are disputes

13      over who the shooters were.

14           THE COURT:  Okay.  Understandable.

15           MR. HARDING:  And that's certainly true as to

16      Mr. Coburn and Mr. Kurland.  Now that's true for the

17      Tanya Jones-Spence murder.

18           THE COURT:  Is it true about all the murders?

19           MR. HARDING:  I would say so.  Yes, Your Honor.

20           THE COURT:  Okay.  When you say disputes, do you

21      mean disputes among and between the government

22      witnesses, between --

23           MR. HARDING:  To some extent, and also there is

24      some evidence that points in one direction and some

25      evidence that points in another direction.

1          THE COURT:  All right.

2          MR. HARDING:  The government doesn't, of course,

3     have to prove that some particular person was the

4     shooter in order to convict someone of murder.

5          THE COURT:  Right.

6          MR. HARDING:  So we don't consider this to be an

7     essential issue in our case.

8          In other words, some of what Mr. Crowe is

9     seeking, he is probably never going to get in the form

10     he would like it.

11          THE COURT:  Because it doesn't exist.

12          MR. HARDING:  That's right.

13          THE COURT:  All right.  Well, I'm going to deny

14     the motion for a Bill of Particulars.

15          DEFENDANT MARTIN:  Your Honor --

16          THE COURT:  Mr. Crowe, you can expect to receive

17     Jencks no later than August 17th.  I'm going to hear

18     from Mr. Coburn in a moment why I shouldn't order Mr.

19     Coburn and Mr. Kurland to share with other counsel any

20     discovery that they received that they haven't so far

21     shared.  If I need to hear that in camera, I will hear

22     that in camera.  But it seems to me --

23          It's hard for me to imagine a reason why I

24     shouldn't do that, but I will hear from Mr. Coburn and

25     Mr. Kurland in a moment.

1            Anybody else on --

2            DEFENDANT MARTIN:  I accept --

3            THE COURT:  Mr. Martin, I'm not going to permit

4      repeated, I'm not going to permit repeated disruptions

5      of the proceedings, sir.

6            DEFENDANT MARTIN:  May I speak, Your Honor?

7            THE COURT:  No, you may not.  Please be seated.

8            DEFENDANT MARTIN:  I accept your offer for

9      value.

10            THE COURT:  Thank you.

11            DEFENDANT MARTIN:  I return your offer to you

12      for value to close and settlement of the account.

13            THE COURT:  Anybody else want to be heard on

14      discovery issues?  Mr. Martin?

15            MR. MARTIN:  Your Honor, our motion was

16      identical to Mr. Crowe's.

17            THE COURT:  Okay.

18            MR. MARTIN:  So since you denied the motion.

19            THE COURT:  Thank you, Mr. Martin.

20            Mr. Coburn, can we take up that issue that I

21      identified just now?

22            MR. COBURN:  Absolutely, Your Honor.  Actually,

23      I haven't discussed this with Professor Kurland, but

24      I'm sure he will just come up and grab me if I say

25      anything that he disagrees with.

63

1          THE COURT:  Well, you're pretty far away from

2     him, so maybe he better come stand next to you.

3          MR. COBURN:  Maybe I'll just talk fast before he

4     can get here.

5          THE COURT:  Go ahead.

6          MR. COBURN:  I mean from my own point of view, I

7     don't see any reason why, you know, we are entitled to

8     some sort of special access to this material based on

9     the fortuity of our having had an earlier single trial

10    date.  I think it would be appropriate.

11         Frankly, I mean there isn't any legitimate

12    security concern here with respect to this Jencks

13    material.  I mean, you know --

14         THE COURT:  Well, why don't you share it?  Have

15    you not been requested or do you feel some obligation

16    or what?

17         MR. COBURN:  We just wanted to be sure we

18    weren't going to violate 6(c).  But if Your Honor

19    tells us that it's okay for us to share it, we are

20    more than, I think we are more than delighted to do

21    that.

22         In fact, it would be a lot easier, quite

23    frankly, Your Honor, if the government would just make

24    copies and distribute them rather than our taking care

25    of that task.

1          THE COURT:  Is it anything other than Grand

2     Jury, any 302's or sixes or --

3          MR. COBURN:  I don't remember much of that, Your

4     Honor.  I think it is pretty much Grand Jury.  There

5     might be some additional material, but it is minimal.

6          THE COURT:  All right.  Mr. Kurland.

7          MR. KURLAND:  Yeah.  We haven't shared it up to

8     this point, absent a Court order.  There is some --

9     most of it is Grand Jury material, not all of it.  One

10    aspect, which we'll talk about a little bit later to

11    the extent we get to some of the severance and Bruton

12    issues, none of it has been disclosed, at least

13    directly.

14         There is one particular witness who in other

15    discovery that has been given to all counsel, similar

16    relevant statements were part of other discovery.

17         Again, if there is other additional material

18    that the government eventually is going to give as

19    Jencks material to everybody later on --

20         Like I'm not sure if what Mr. Harding gave us,

21    the Jencks material a year ago, that was with respect

22    to a truncated trial just for Mr. Gardner.  There

23    might well be other Jencks material that comes to

24    everybody a month before.

25         But other than that, pursuant to a Court order,

1      if the Court wants us to do that or again, I echo Mr.

2      Coburn's comment, it would be easier for the

3      government to simply make additional copies of this

4      stuff.

5           THE COURT:  Well, I'm not sure if that's true or

6      not.  Let me ask Mr. Harding.

7           What makes the most sense, Mr. Harding?  Are you

8      able to just have it photocopied three more times?

9           MR. HARDING:  Judge, the government objects to

10     turning it over to the other attorneys.

11          THE COURT:  What's the basis for the objection?

12          MR. HARDING:  The basis is the whole reason why

13     the government withholds things like 6(e) information

14     until it absolutely has to turn it over in the first

15     place, which is that we have security concerns

16     regarding our witnesses.  We have --

17          THE COURT:  Okay.

18          MR. HARDING:  Ongoing --

19          THE COURT:  All right.  Let me cut you off,

20     because that's exactly what I was thinking why I

21     should order Mr. Coburn and Mr. Kurland to turn it

22     over.  The government is going to object.  I don't

23     need to override the government's concerns.

24          Defense counsel have it.  Defense counsel should

25     have it.  It's really to me a very simple proposition.

1    There's absolutely no reason whatsoever why the

2    fortuity of the scheduling of the trials --

3         And I understand the government would have

4    preferred that there not be severance in the case, but

5    there was.  It was postponed.

6         There's just no reason why these other six

7    lawyers shouldn't have what Mr. Kurland and Mr. Coburn

8    have, particularly in light of what Mr. Coburn has

9    described, from the defense perspective, at least

10   their perspective, it's not earth-shaking stuff.

11        But I'm not going to order the government to do

12   it if the government really feels strongly that the

13   government shouldn't have to do it.  It's just a

14   matter of who pays for it, who pays for the

15   photocopying.

16        MR. HARDING:  Judge, would Your Honor order

17   defense counsel not to share the material with their

18   clients?  Maybe this is moot, given their clients'

19   refusal to cooperate or communicate with their counsel

20   anyway.  But the government feels that as a security

21   measure --

22        THE COURT:  But that wasn't the condition that

23   Mr. Kurland and Mr. Coburn received.

24        MR. HARDING:  No, they benefited from the fact

25   that the government believed it was within a month of

1    trial and, therefore, turned over the bulk of the

2    Jencks material prematurely.

3          THE COURT:  Okay.  I'm not going to order

4    counsel not to share it with their clients.  I am very

5    concerned, as always, about the security of

6    participants in a criminal trial, not least certainly

7    witnesses that the government intends to call.  But

8    I'm not going to order counsel not to share this

9    information with their clients.

10          As you point out, that may be a moot point

11    anyway since the defendants aren't talking to their

12    lawyers about anything meaningful.

13          MR. HARDING:  Could I ask Your Honor that --

14    it's a standard part of our discovery agreements with

15    defense counsel that they not provide copies.

16          THE COURT:  Absolutely, absolutely.  Copies are

17    not to be provided.

18          MR. HARDING:  Thank you, Your Honor.

19          THE COURT:  Absolutely.  But sharing the

20    information is permitted.

21          Yes, Mr. Coburn.

22          MR. COBURN:  Your Honor, may I just raise one

23    logistical concern with the Court for which I

24    apologize, which is when we got this packet of

25    material --

1          THE COURT:  You marked it all up?

2           MR. COBURN:  I usually don't put markings on

3     it.  But when it came in, it was very shortly before

4     we were going to try the case, and I'm just not sure

5     that I segregated it before integrating it into all of

6     my witness folders.

7          THE COURT:  Was there a cover letter?

8          MR. KURLAND:  Yes.

9          THE COURT:  I'm sure the government is very

10    careful.

11         All right.  Copy what you need to, including the

12    cover letter, and counsel can review it and let you

13    know if there is something missing when they compare

14    what's in the cover letter from what they get from

15    you.  Okay?

16         MR. COBURN:  Very well.

17         THE COURT:  If you need to black out your own

18    work product or something, of course, you can do that.

19         MR. COBURN:  Okay.  I appreciate it, Your Honor.

20         THE COURT:  Of course, you will be reimbursed

21    for the photocopying cost, Mr. Coburn.

22         MR. COBURN:  That wasn't the concern, Your

23    Honor.

24         THE COURT:  Okay.

25         MR. KURLAND:  I just want to make it clear,

1          though, that we are specifically ordered to provide

2          those copies and we are not going to be criminally

3          prosecuted for violating 6(e).

4               THE COURT:  Absolutely.  I will enter an order

5          to that effect, Mr. Kurland.

6               MR. KURLAND:  Thank you very much.

7               THE COURT:  Absolutely.

8               All right.  Who wants to be heard on severance?

9          It's fully briefed I think.

10              MR. TREEM:  Your Honor, just way of

11         introduction, this is Brendan Hurson, who is an

12         associate in our office.  I will defer to his

13         authorship and research on this.

14              THE COURT:  Thank you.  Welcome, Mr. Hurson.

15              MR. HURSON:  Thank you, Your Honor.

16              We sort of piggybacked off somebody else.  I

17         think that the form of our motion to sever actually

18         comes in a reply to the government's responses to

19         someone else's.  So to some extent, like you said, it

20         has been well briefed.

21              I mean to be frank, Your Honor, at some point

22         this trial is going to start pitting people against

23         each other, whether it be at the guilt --

24              And again, renewing Mr. Treem's comments

25         earlier, our client is not here.

1          THE COURT:  Let me do us all a favor, if it is

2     that.  Let's not even consider bifurcation of the

3     penalty phase yet.  We don't have to cross that bridge

4     for a long time.

5          I understand it would seem perhaps odd to

6     suggest that we could have what could be I suppose a

7     four-month trial on guilt or innocence and then have a

8     series of three-or-four-day penalty trials with the

9     same jury, one at a time, but I'm not ruling that out.

10     I agree it's unlikely, but it could happen that way.

11          So my point is we don't need to talk about

12     severance for purposes of penalty.

13          MR. HURSON:  Your Honor, I would say that it has

14     been made clear by the government, and the statute

15     says it has to be the same jury.

16          THE COURT:  Right.  I'm saying the same jury,

17     but one at a time.

18          MR. HURSON:  Well, we would say that that makes

19     -- I mean that's exactly why we want the severance, to

20     have the same jury hearing all these same facts.

21          THE COURT:  Okay.  Well, maybe I'm not being

22     clear.  As I understand the argument, there is the

23     argument that you need severance for guilt or

24     innocence and you need a severance for the penalty

25     phase.

1          Yes, under federal law, the same jury must hear

2     the penalty phase that heard guilt or innocence.  What

3     I'm saying to you is I don't see anything in the law

4     that says you can't have four defendants go to trial

5     in front of one jury, fewer than all four are subject

6     to capital penalty, and then at the penalty phase have

7     defendant number one have a penalty trial, defendant

8     number two have a penalty trial, and then defendant

9     number three have a penalty trial.

10          There is no, in other words, there is no

11    compelling reason, it seems to me, to muddle the issue

12    of severance with respect to guilt or innocence

13    because you can always, by considering penalty issues,

14    because you can always sever penalty issues, even in

15    front of the same jury.  Do you see what I'm saying?

16          MR. HURSON:  I do I think.

17          THE COURT:  So I would like to limit the present

18    consideration to the question of whether there should

19    be a severance for purposes of guilt and innocence.

20          MR. HURSON:  Well, I think I understand what you

21    are saying, Your Honor, and I certainly understand

22    that there can be a case where the jury hears separate

23    penalty phases, but again, it's the same jury.

24          THE COURT:  Right, right.

25          MR. HURSON:  And I understand there may be some

72

1    precedent for that.  But our position is that whether

2    or not the jury sits and hears separate penalty

3    phases, they still know what they did in a previous

4    proceeding.

5         What our argument is as to guilt/innocence and

6    as to the penalty phase is that this may be shaping up

7    to be a situation where we have no choice but to go

8    after other co-defendants, and to do so pits a

9    situation where not only is it us against the United

10   States, it's us against one another.  I think I termed

11   it in the reply that we become in essence de facto

12   prosecutors, one after another.

13        In our situation, it's quite simple factually.

14   We may have an argument where our client was somehow

15   under the control of another co-defendant.  If the

16   jury hears that, then they are put in a situation

17   where they decide not only as to the factual

18   culpability, where we may have some sort of argument

19   as to a lesser degree, for example, on a murder

20   charge, but more than that --

21        THE COURT:  You mean a duress defense to a RICO

22   prosecution?

23        MR. HURSON:  Well, I'm certainly no expert in

24   all these fields.  But again, and not to take it back

25   to the penalty phase, we are still sifting through

1    volumes of documents and trying to figure out exactly

2    what tack to take, and with no cooperation, it's

3    obviously very difficult.  So some of this is

4    conjecture, but what is certainly clear --

5         THE COURT:  Excuse me.  Go ahead.  I'm sorry.

6         MR. HURSON:  What is certainly clear is that as

7    it pertains to our client, who is facing the death

8    penalty, mitigating factors, and I don't mean to draw

9    it into the second part --

10         THE COURT:  That's what you keep doing.

11         MR. HURSON:  I know, because in some ways it's

12    impossible because it's going to be --

13         THE COURT:  No, it's not impossible.  Talk to me

14    about why Mr. Harris can't receive a fair trial if his

15    guilt or innocence is determined in front of the same

16    jury as these three defendants.

17         MR. HURSON:  Well, like I said, it's very

18    difficult for me to answer that in the sense that we

19    don't necessarily have all the ducks in a row that I

20    could stand up there and say this is going to be point

21    A, B or C, nor would I.  Given the obvious spirit of

22    sharing information that has been presented to the

23    Court, we are not about to stand up there and lay out

24    exactly what it is we plan on saying.

25         In some sense, I guess you've made it clear you

1      don't want to hear it, but if the same jury is secured

2      in both phases of the trial, which they have to do --

3           THE COURT:  Right.

4           MR. HURSON:  -- we can't escape the issue of

5      what happens in the sentencing phase.  Whether it is

6      presented separately, with only one defendant sitting

7      at the table, or whether we are all here, it's still

8      the same jury.  To the extent that they make a

9      decision as to defendant number one, they know why

10     they've made that decision.

11         If defendant number two comes into the courtroom

12     and begins to claim that the reason that he did

13     something was because he was under a particular, did

14     it for a particular reason, probably related to his

15     control in our case by another defendant, they may

16     have questions.  They may have residual questions

17     about why they made a decision in the first place.

18         THE COURT:  I'm sorry.  I'm not following, I'm

19     not following, I'm not following.

20         MR. HURSON:  And I can completely understand why

21     you are not, Your Honor, because it is a bit

22     confusing.  But let me put it this way, if we're all

23     seated together in a sentencing phase, and that has --

24         THE COURT:  We're not talking about the

25     sentencing phase.

1          MR. HURSON:  So here's what --

2          THE COURT:  We're talking about the guilt/

3     innocence phase.

4          MR. HURSON:  Well, I can't speak to the guilt/

5     innocence phase clearly, except to say that it may

6     become apparent, and as Your Honor is well aware, that

7     there is no clear bright line in between the guilt/

8     innocence and the sentencing.  Some arguments are made

9     at guilt/innocence that may in effect bleed into

10    sentencing.  So to the extent that you can drop a wall

11    in between the two, I don't necessarily think you can

12    do that.

13         But obviously, as you stated, if we had separate

14    penalty phases, as to the first person to go, some of

15    my concerns may be obviated; but as to those who come

16    later, probably not.

17         But I can't necessarily speak to, aside from

18    what I've already said, if we choose to attack, I mean

19    culpability, factual culpability in the first portion

20    of the trial, we would certainly pit one another

21    against each other.

22         That's our major overriding concern here, is

23    that we don't want a situation where we're set up

24    having to go against each other and have the same jury

25    sit and listen to all of this and put in their head

1    the ultimate question, who deserves to live and who

2    deserves to die, and that may well be a conclusion

3    that they draw at whatever stage of the trial.  It may

4    be in guilt/innocence, it may be in penalty, but they

5    are looking at these individuals or perhaps not even,

6    if they are not present, and saying somebody has to

7    die.  If the case is not severed --

8         THE COURT:  Well, if the jury said that, I would

9    hope the law would address it appropriately.  That

10   wouldn't be appropriate under any circumstances,

11   somebody has to die.

12        MR. HURSON:  Nobody knows what goes on behind

13   the closed doors, Your Honor.  That's my point.

14        As to the government's arguments, they seem to

15   be drawing on the resource argument, that it's a

16   question of resources and time.  Maybe it's because

17   I'm just out of law school and too ideal, but I don't

18   think questions of resource and time should ever come

19   into play in a death penalty case.  This is the

20   ultimate penalty.  Whether or not we can save money

21   here on there, I don't think that should ever be a

22   concern.

23        Plus there has been arguments about extending

24   the length of trial and this and that.  If we are all

25   pitted against one another, I don't see how a trial

1    could, you know, the length of trial would change.  In

2    fact, I'd argue that separate individual trials would

3    possibly be shorter than one long trial, where

4    everyone is grouped together.

5         You know, again, this is the government's

6    problem by seeking the ultimate penalty, and I don't

7    see why our client should be, based on a resource

8    issue, penalized.

9         THE COURT:  Are you arguing that -- I guess my

10   question is how would your argument be different, if

11   at all, if this were not a capital case?

12        MR. HURSON:  Well, it certainly would eliminate

13   some of the concerns as to whether or not, because

14   frankly, the real concern is what is a jury, faced

15   with deciding the question of life or death, going to

16   do when faced with three individuals who are facing

17   the death penalty?  I mean if --

18        THE COURT:  All right.  So if I'm following you,

19   you're suggesting that Mr. Mitchell and Mr. Gardner,

20   in order to avoid the death penalty, could possibly

21   cast Mr. Harris as exercising influence over them and

22   forced him to commit murders?

23        MR. HURSON:  To me, it's almost the opposite.

24        THE COURT:  Well, what's the opposite?

25        MR. HURSON:  I guess I feel somewhat

1    uncomfortable without having the client here and with

2    the express reservations of not arguing the facts, but

3    I'll say this.  We have a client, Mr. Harris, who did

4    not, at any point is it alleged, begin the commission

5    of any violent acts until he met Mr. Mitchell, and our

6    argument may be that it is Mr. Mitchell's influence on

7    our client that led him to act in the way that the

8    government is alleging.  It's almost the opposite of

9    what you are saying.  It's not that others --

10           THE COURT:  And why wouldn't you rather do that

11   in a case, in a trial with Mr. Mitchell?

12           MR. HURSON:  Well, because obviously Mr.

13   Mitchell's counsel, and particularly knowing now, is

14   going to go after us and go after our claims that he

15   could be under any sort of influence.

16           THE COURT:  I don't, I don't know that that's

17   necessarily true.

18           MR. HURSON:  Well, again --

19           THE COURT:  It's not a situation of tit for tat.

20           MR. HURSON:  Well, we don't know, and that's the

21   point.  Why err on the side of maybe, maybe not, when

22   it's very simple to sever the trials and make sure

23   that that concern is completely obviated?

24           THE COURT:  Well, it's not simple to sever

25   trials.  The Court actually severed the trials and it

1    was the defendants' own acts that countermanded that

2    order.

3         Look, I am going to deny your motion without

4    prejudice.  It's apparent that at some point perhaps,

5    perhaps, in the next couple of months you may want to

6    make an in camera proffer to somehow flesh out, shall

7    we say, your argument.  But right now I see no basis

8    whatsoever for thinking, in the face of this third

9    superseding indictment, that there is likely to be the

10   kind of antagonistic defenses that the Fourth Circuit

11   contemplates and the Supreme Court contemplates that

12   justifies a severance.

13        Of course, a capital case is different, of

14   course; but I just don't see how the Court can order a

15   severance on the basis of this somewhat abstract

16   argument.  All right.  Thank you.

17        MR. HURSON:  I understand.

18        THE COURT:  Anybody else want to be heard on

19   severance?

20        MS. RHODES:  Yes, Your Honor.

21        THE COURT:  Ms. Rhodes.

22        MS. RHODES:  Even in light of your decision,

23   Your Honor.

24        THE COURT:  Well, that's only Harris.

25        MS. RHODES:  Right.  On behalf of Mr. Mitchell,

1      we think, first of all, we would deserve a severance,

2      whether or not it's for a capital case.  I can assure

3      you that there will be substantially antagonistic

4      defenses if they are going to be arguing that Mr.

5      Mitchell was controlling other people when we don't

6      think there is going to be evidence that Mr. Mitchell

7      was a shooter in these cases.

8           So that's going to be a critical part of the

9      case.  If he wasn't a shooter ever, then he may not

10     have much responsibility here, and they are clearly --

11          THE COURT:  That's not true as a matter of fact

12     or as a matter of law, but I take your point.

13          MS. RHODES:  Well, if he is not a shooter and he

14     is not a leader, he may, he may simply be involved in

15     a conspiracy, but that's going to be --

16          THE COURT:  Well, it's called the Mitchell

17     organization by the Grand Jury.

18          MS. RHODES:  See, there are going to be three

19     prosecutors.  I mean we are going to have -- there are

20     going to be substantially, I'm just saying not just

21     antagonistic defenses, but like completely

22     antagonistic defenses that are directly contradicted

23     and finger pointing, and probably not just Harris to

24     Mitchell, other ways as well.

25          So it's going to be, it's going to be, you know,

1    three or four prosecutors ganging up on each

2    defendant, which, for one thing, may take longer.

3         But I think to answer the Court's inquiry of

4    counsel who just spoke, that is going to be an issue.

5    There are going to be antagonistic defenses.  How can

6    there not be?  If somebody says that Mr. Mitchell was

7    the leader of this organization and controlling

8    things, how can we not, how do we refrain from

9    attacking that?  That's going to be the essential --

10   that's going to be the essence of our defense then if

11   that's the only way they can get to us.

12        THE COURT:  But the government witnesses are

13   going to say that.

14        MS. RHODES:  Well, the government witnesses are

15   going to say we don't know who the shooter was

16   apparently.

17        THE COURT:  The focus on who the shooter was, is

18   that what you are talking about?

19        MS. RHODES:  That's part of what it is.  Mr.

20   Harding has acknowledged that his witnesses are going

21   to be going different ways on who the shooters are in

22   these different offenses.  Not just one killing, but

23   all three of them there is conflicting information.

24        THE COURT:  I'm not sure how important the

25   specific identity of the shooter is in this context.

1          MS. RHODES:  What I'm saying is the identity, it

2     becomes important if people are saying it wasn't me,

3     or if somebody says it was me, it was because Mr.

4     Mitchell told me to.

5          In other words, if nobody, it's particularly

6     important to us if nobody is identifying Mr. Mitchell

7     as a shooter in any of these incidents, then we think

8     it makes it that much more important to us that we not

9     be attacked by others and be claimed to have been

10    directing things from afar.

11         THE COURT:  Okay.  Go ahead.

12         MS. RHODES:  Well, I think it's also, on top of

13    the fact that this we believe would be severable under

14    those circumstances, there is also the issue of the

15    substantial Bruton problem we see with the lyrics that

16    comes in under Mr. Harris's case.

17         THE COURT:  I'm letting them in as

18    co-conspirator statements.  That's the basis on which

19    I'm admitting, I'm admitting the lyrics.

20         MS. RHODES:  I understand that.  Our position is

21    that they, we are objecting to that, and our position

22    is they shouldn't come in and, therefore, create a

23    Bruton problem.

24         The other issue where we believe there is a

25    Bruton problem is an identification by Mr. Martin by a

```
 1    co-defendant of, allegedly of our client's voice on --

 2         THE COURT:  Remind me of those facts.

 3         MS. RHODES:  On one of the --

 4         THE COURT:  I remember that there was a cell

 5    phone --

 6         MS. RHODES:  Right.

 7         THE COURT:  -- taken from one of the Wyches.

 8         MS. RHODES:  Right.

 9         THE COURT:  There was a speed dial to the voice

10    mail of the Wyches' mother --

11         MS. RHODES:  In-law.

12         THE COURT:  -- in-law.

13         MS. RHODES:  Yes.  Her machine picked up.

14         THE COURT:  And the machine picked up, without

15    knowledge of those persons in possession of the cell

16    phone.

17         MS. RHODES:  Right.

18         THE COURT:  And the recording was preserved.

19         MS. RHODES:  Right.

20         THE COURT:  Okay.  Pick it up from there.

21         MS. RHODES:  About 11 minutes or so.

22         THE COURT:  All right.

23         MS. RHODES:  Voices can be heard.

24         THE COURT:  All right.

25         MS. RHODES:  And different government witnesses
```

1    have identified defendant people as the voices.

2          THE COURT:  Okay.

3          MS. RHODES:  And Mr. Martin has identified Mr.

4    Mitchell as one of the voices.

5          THE COURT:  Okay.  So at best, perhaps -- I

6    don't know -- but at best, Mr. Martin's statement

7    would be cumulative because others are going to

8    identify Mr. Mitchell's voice?

9          MS. RHODES:  There are conflicting -- the

10   government's witnesses we believe conflict.  In other

11   words, there are many people who have been identified.

12         THE COURT:  You mean whose voices have been

13   identified?

14         MS. RHODES:  Yes, yes, and it's not clear how

15   many people are in fact on the tape.

16         THE COURT:  All right.  Now --

17         MS. RHODES:  So there is some confusion.

18         THE COURT:  Okay.  So on what theory -- remind

19   me how Martin made this statement.  Under what

20   circumstances?  In other words, how does the statement

21   come in against --

22         MS. RHODES:  He was in custody I believe at the

23   time, Your Honor.

24         THE COURT:  Right.

25         MS. RHODES:  And --

1          THE COURT:  And they played the tape for him?

2          MS. RHODES:  Yes.

3          THE COURT:  He waived his Miranda rights,

4     answered questions, and identified voices on the tape?

5          MS. RHODES:  I don't recall if he waived Miranda

6     on that.

7          MR. CROWE:  Your Honor, I believe the Court --

8          THE COURT:  Okay.  We don't need to get into

9     that.  Yes, Mr. Harding.

10         MR. HARDING:  I can simply this.  I have

11     conceded several times in my pleadings that that is a

12     Bruton problem and we aren't going to use Mitchell's --

13         THE COURT:  Identification by Mr. Martin.

14         MR. HARDING:  Martin's identification of

15     Mitchell's voice.

16         THE COURT:  Right.  That's where I was going.

17     There would be no basis to admit -- it wouldn't even

18     be admissible against Mr. Martin.  Well, I mean it's

19     an admission that he knows Mr. Mitchell's voice, if

20     that were relevant.

21         But yeah, it wouldn't be admissible under any

22     circumstances in the trial of Mr. Mitchell, whether or

23     not he is tried with Mr. Martin, the voice

24     identification.

25         So that's not a problem, and the government says

1    it's clearly not a problem because they are not going

2    to use it.

3         MS. RHODES:  All right.  Your Honor, the other

4    aspect of this is getting to the concern that it is a

5    capital case and our concern is that by trying them

6    together at the guilt/innocence phase, you are

7    essentially forcing the jury on mitigation to do a

8    comparative analysis.

9         THE COURT:  Okay.  And that's going to be true

10   in any capital case with two or more defendants.

11        MS. RHODES:  Right, right.

12        THE COURT:  And so?

13        MS. RHODES:  Our request as a result of that is

14   for severance from everybody.

15        THE COURT:  If we were writing on a clean slate,

16   I would agree with the defense arguments that in a

17   capital case, every defendant should be tried by

18   himself or herself.  That would be my position, but

19   that's not the law.  That's not the law.

20        MS. RHODES:  Well, the Court has discretion,

21   though, to grant a severance.

22        THE COURT:  But the Court doesn't have

23   discretion to do it the way the Court thinks it ought

24   to be done.  The Court only has discretion to do it

25   the way the law requires or compels or permits it to

1    be done.

2         MS. RHODES:  Well, when there are other

3    significant problems that present themselves, like

4    this issue of the antagonistic defenses, which is

5    going to involve multiple prosecutors, I think that's

6    certainly an appropriate legal basis.

7         THE COURT:  Okay.  Again, it may be that at some

8    point, I don't know, in June or July, you are able to

9    make some kind of in camera proffer.  But on the basis

10   of -- and I don't mean to diminish this notion of

11   antagonistic defenses, but it's just an abstraction at

12   this point.  It's an abstraction.

13        Again, as we know, it's not just antagonistic

14   defenses.  It's antagonistic defenses that cut to the

15   core of the defendant's right to a fair and impartial

16   consideration of the case against him.  So it's not

17   jut antagonistic defense.

18        Of course, in this case, what we are stuck with

19   is the record after November 2005, the record of these

20   proceedings.  The Court has perceived no antagonism

21   between and among these defendants whatsoever.  Even

22   today we see the defendants continuing to make these

23   parroted speeches.

24        MS. RHODES:  True.  But as the Court's earlier

25   ruling indicates, we're going to be proceeding,

1    counsel will be proceeding as counsel sees fit.

2         THE COURT:  Oh, absolutely, sure, and I wanted

3    that, absolutely.  But there is no perception on my

4    part of antagonistic defenses.

5         MS. RHODES:  How is blaming somebody else for

6    being the shooter or you are going to be the shooter

7    and somebody else denying that and positing a

8    different, a contradictory theory --

9         THE COURT:  I'm not even sure I would call that

10   a defense.  I mean I said to Mr. Hurson, do you mean

11   duress, a duress defense to murder, a duress defense

12   to a three or four or five or a six-year membership in

13   a conspiracy?

14        Anybody else?  Mr. Crowe?

15        MR. CROWE:  Yes, Your Honor.

16        DEFENDANT MITCHELL:  Your Honor, Your Honor, may

17   I address the Court?

18        THE COURT:  No, Mr. Mitchell.

19        DEFENDANT MITCHELL:  I accept your offer.  I

20   reserve all rights, with explicit reservations and

21   without prejudice.

22        THE COURT:  Yes, Mr. Crowe.

23        MR. CROWE:  Your Honor, we have two principal

24   arguments for severance and I would like to address

25   the two principal ones first.

1           Initially, when Mr. Martin is the only defendant

2     against whom the government is not seeking the death

3     penalty, I think it's a pretty fair assumption that

4     Mr. Harding and Mr. Hanlon are going to seek a

5     death-qualified petit juror.  What I understand from

6     my recent reading was that the people, under the

7     Witherspoon decision, feel that the death penalty is

8     morally permissible punishment and number two, and

9     more importantly, that they are willing to impose it,

10    and that they are going to challenge for cause, and

11    the Court is going to grant challenges for cause, to

12    people who do not meet the Witherspoon criteria.

13    Intuitively, I think we all know that death-qualified

14    jurors are more likely to convict.

15          Mr. Mitchell, fairly early on in this case,

16    filed a motion to strike a supplemental notice of the

17    intent to seek the death penalty, and he cited to some

18    polls which had been taken in Maryland which indicated

19    that, number one, people opposed to the death penalty

20    are much less likely to come from Montgomery County

21    and Baltimore City and Prince George's County.  He

22    also indicated that there was a statistical study

23    which was published in the Law Review, which he cited,

24    which indicated that the opposition to the death

25    penalty was twice as high in African Americans as it

1    was with whites.

2         I'm fully aware of the Supreme Court's decision

3    in Buchanan versus Kentucky.  That was a case where a

4    non-capital defendant did not ask for a severance, but

5    what he asked for was --

6         He objected to the trial because he said he was

7    going to be deprived of the right to an impartial jury

8    selected from a fair cross-section of the community.

9    The Court in that case found, among other things, that

10   there was not convincing, compelling statistical

11   evidence that that was the situation.

12        The guy, the petitioner, Buchanan, however,

13   didn't ask for a severance.  We are asking for a

14   severance.

15        I would point out that even if the Court would

16   hold that the defendant has no constitutional right to

17   a trial by a regular, non-death qualified jury, even a

18   defendant who is not charged with a capital offense,

19   by the same token, the government can't make any claim

20   that it has a right to try Mr. Martin before a jury

21   which is not death qualified.

22        So we have asked either for a severance, which

23   seems to me is an easier solution, or that there in

24   fact be two juries impaneled, one for Mr. Martin, who

25   is not going to be subjected to the death penalty, and

1     that jury would not have to be death qualified, and

2     the second for the other defendants.

3         We feel, quite honestly, that if Mr. Martin was

4     tried before a death-qualified jury, that the chances

5     of his being convicted go up, and they go up

6     substantially, and I doubt if there is any person in

7     this courtroom, and we have all had a substantial

8     amount of experience prosecuting and defending federal

9     cases, who would really argue with that proposition.

10    In fact, I don't even know that Mr. Harding would be

11    likely to argue about it.

12        THE COURT:  What is the second ground, Mr.

13    Crowe?

14        MR. CROWE:  The second ground, Your Honor, is

15    that the one cooperator that we do know about is a

16    fellow by the name of William Montgomery.  We have

17    received discovery.  In fact, I think the Court may

18    have this itself.

19        There is an affidavit which Detective Giganti

20    filed in an effort to obtain a search warrant I think

21    for property associated with Mr. Harris.  In that

22    affidavit Mr. Giganti says that Mr. Montgomery, who he

23    refers to as an individual with the name of CS-3, said

24    that he had a conversation with Mr. Gardner when both

25    of them were in jail, and that Mr. Gardner at that

1    point recited some of the facts concerning the Wyche

2    murder.  One of our papers actually sets that out in

3    some detail.

4        We know that this conversation from other

5    references included sometime between April 17th of

6    2002, which is the date that my client was in jail,

7    and June 7th, which was the date of the arrest of Mr.

8    Gardner.  So this is pretty, pretty, pretty far back.

9        Montgomery says that he heard from Gardner all

10   about the problems that Mitchell and Martin had with

11   their murder charges, and then Gardner went on to

12   explain about the accidentally transmitted voice mail

13   messages.  Gardner said that he didn't know who had

14   pushed the button.  He didn't know whether it was one

15   of the Wyches or Mitchell who pushed the button on the

16   phone.

17       Then he said Gardner explained, Gardner who is

18   in custody with him, a co-defendant, explained that

19   Martin was going to beat the charge because he had an

20   alibi.  He, that is Martin, had gone to a movie

21   theater and bought two tickets, deliberately using a

22   charge card to create a paper record for his alibi.

23       THE COURT:  Why is that admissible?

24       MR. CROWE:  I don't think it is admissible.  The

25   government has taken the position that it is

1    admissible under I think a fairly far-fetched theory

2    that it is a statement in furtherance of the

3    conspiracy.  I don't think it's admissible for that

4    purpose.

5           THE COURT:  I tend to agree with you.

6           MR. CROWE:  If the Court agrees with me, I

7    probably will sit down right now.

8           THE COURT:  I think I probably agree with you.

9    I mean I can't imagine admitting Montgomery's

10   statement, if this is what you are suggesting,

11   Montgomery's statement that Gardner told him that

12   Martin did all of this, went to the movies, blah,

13   blah, blah, I don't see how that's in furtherance of

14   any conspiracy.

15          MR. CROWE:  We agree.

16          THE COURT:  Other parts of the conversation may

17   be, but the specific business about Martin, that's not

18   in furtherance of any conspiracy.

19          MR. CROWE:  I couldn't agree more, Your Honor.

20          As to the points other people have made, I think

21   we have an antagonistic defense issue also which may

22   impact other defendants more than it does us.  But the

23   Court is probably correct.  That's maybe a matter

24   which should be brought up closer to the point, closer

25   to the point of trial.

1          THE COURT:  Okay.  Before I hear from you Mr.

2     Harding, I'll hear finally from Mr. Kurland.

3          DEFENDANT MARTIN:  Can I speak?

4          THE COURT:  No, Mr. Martin.

5          DEFENDANT MARTIN:  I accept your offer for

6     value, return it to you for value to settle and close

7     the account.  I do not wish to argue the facts.  I

8     request the Court to issue me an appearance bond and

9     waive all public costs.  I request the Court to close

10    all accounts, to release the order of the Court to me

11    immediately.  I request the Court to set off and

12    adjust all public charges by exemption, in accordance

13    with the Uniform Commercial Code 3-419, House Joint

14    Resolution 192 and Public Law 17-10, and request

15    immediate discharge.

16         THE COURT:  Yes, Mr. Kurland.

17         MR. KURLAND:  Your Honor, subject to responding

18    to whatever Mr. Harding might say with respect to

19    that, we had filed a series of pleadings dealing with

20    potential Bruton issues related to the statement that

21    the Court has just indicated on.  We also feel very

22    strongly that that statement is not in furtherance of

23    the conspiracy, and if that's the Court ruling, I have

24    nothing else to say.  I suspect, though, that I might

25    want to --

1          THE COURT:  Well, Gardner's statement, some of

2     Gardner's statements --

3          MR. KURLAND:  Gardner's statement, Gardner's

4     alleged statement might well be admissible, subject to

5     redaction, as an admission against Gardner.

6          THE COURT:  Exactly.

7          MR. KURLAND:  But as a statement in furtherance

8     of the conspiracy, which carries with it Bruton

9     problems, but also ancillary evidentiary issues as

10    well, as long as it comes in redacted as an admission,

11    we can deal with that.

12         THE COURT:  All right.

13         MR. KURLAND:  We strenuously say that the

14    evidence -- well, I'll see what Mr. Harding has to

15    say.

16         THE COURT:  Now, is Mr. Montgomery a member of

17    the conspiracy?

18         MR. KURLAND:  Well, our position is no.  I

19    suspect --

20         THE COURT:  I mean was he at the time?

21         MR. KURLAND:  He is not named in the indictment.

22         THE COURT:  Well, we don't need to name him in

23    the indictment for him to be a member of the

24    conspiracy.

25         MR. KURLAND:  You have to ask the government

1    that.

2         THE COURT:  That's what I'm going to do.

3         MR. KURLAND:  I will say this, though, that the

4    government has already in another federal court

5    pleading indicated that he was a member of another

6    conspiracy at the time.

7         THE COURT:  Okay.  Let me hear from Mr. Harding.

8         MR. KURLAND:  Subject to being able to respond

9    to whatever Mr. Harding says.

10        THE COURT:  Please sit down, Mr. Gardner.

11   Please sit down.  Yes, Mr. Harding.

12        DEFENDANT GARDNER:  I would like to reserve all

13   rights with explicit reservations and without

14   prejudice, sir.

15        THE COURT:  Thank you.

16        Mr. Harding.

17        MR. HARDING:  Yes.  Judge, first of all --

18        THE COURT:  First, is there anything generally

19   on severance before you focus on any particular

20   argument?

21        MR. HARDING:  Well, Your Honor, let me just

22   briefly say, since Your Honor doesn't want to deal

23   with the sentencing phase at this point --

24        THE COURT:  Right, yeah.  I mean I understand

25   that's not a panacea.  It just occurs to me that I

1    don't need to focus on that right now.

2         MR. HARDING:  The issue of severance in capital

3    cases has been directly addressed by the Supreme Court

4    in Richardson versus Marsh, Buchanan versus Kentucky,

5    and by the Fourth Circuit in the Tipton decision.

6    Those decisions are quoted at great length in my

7    pleading.

8         They argue that joint trials of capital

9    defendants and joint trials with non-capital

10   defendants is very appropriate, and one of the reasons

11   it's appropriate is because it allows the jurors to

12   compare culpability.  This is something that the

13   Supreme Court expects jurors to be able to do.  So

14   that's one of the concerns.

15        The Richardson decision speaks of the scandal

16   and inequity of inconsistent verdicts that would

17   result from severed trials in capital cases.  The

18   Buchanan decision speaks of the heightened reliability

19   that results from a joint trial of capital defendants

20   and non-capital defendants as well in a joint

21   proceeding.  These are the values that the government

22   and the Supreme Court's case law are most interested

23   in.

24        You know, Mr. Hurson also alludes to the

25   resources issue and the interests of our victims and

1       the interests of our witnesses, and those are

2       important values also.  The Tipton decision treats

3       those as important values that must be considered in

4       the context of a severance motion in a capital case.

5            However, that is not the prime issue.  The prime

6       issue is the one that the Supreme Court stressed

7       having to do with the fairness and equity of the

8       decision-making process, and the government believes

9       that those are the things that the government should

10      -- that the Court should focus on most of all.

11           Your Honor, Mr. Crowe just raised the issue of

12      the unfairness of having his client tried by a

13      death-qualified jury, and he alluded to Buchanan

14      versus Kentucky.  He pointed out that the Court there

15      was not faced with a motion to sever, but the

16      defendant there claimed that he should be entitled to

17      a non-death qualified jury.  The other defendants

18      could have a death-qualified jury and he should have a

19      non-death-qualified jury.

20           The reason why Mr. Crowe hasn't cited any cases

21      in support of this request is that there aren't any.

22      It has been decided by the Supreme Court, and there

23      are string cites of subsequent decisions.  I'll simply

24      read to you, if I may, very briefly the decision by

25      another district court in this circuit, the Eastern

1    District of Virginia, in 316 F.Supp.2d 330, United

2    States versus Lee, a 2004 decision, where the Court

3    held, and I'm quoting from page 339 here, "The

4    noncapital defendants' first argument has been

5    squarely addressed and rejected by the Supreme Court

6    in Buchanan versus Kentucky.  There, the Supreme Court

7    held that use of a death-qualified jury for a joint

8    trial in which the death penalty is sought against

9    only one defendant does not violate the noncapital

10   defendant's Sixth Amendment right to an impartial

11   jury.  In so holding, the Supreme Court relied on its

12   decision in the Lockhart versus McCree (expressly

13   approving the practice of using the same jury in both

14   the guilt and penalty phases of a capital murder

15   trial).

16       In McCree, the Supreme Court made clear that the

17   Constitution presupposes that a jury selected from a

18   fair cross-section of the community is impartial,

19   regardless of the mix of individual viewpoints

20   actually represented on the jury, so long as the

21   jurors can conscientiously and properly carry out

22   their sworn duty to apply the law to the facts of the

23   particular case.

24       Given this presupposition, and the government's

25   significant 'interests in having a joint trial,' the

1    Supreme Court in Buchanan found no infringement of the

2    petitioner's right to an impartial jury.  In short,

3    binding Supreme Court precedent makes clear that a

4    death-qualified jury --"

5         THE COURT:  Slow down.

6         MR. HARDING:  -- binding Supreme Court precedent

7    makes clear that a non-qualified jury, I'm sorry, that

8    a death-qualified jury poses no constitutional problem

9    with respect to noncapital defendants in a joint

10   trial.  As a result, defendants' argument for

11   severance in this respect is without merit.

12        I should add, Your Honor, that in the Lockhart

13   case, the Supreme Court was confronted with a lot of

14   statistical and social science evidence about the

15   supposed predisposition of death-qualified jurors to

16   be more likely to convict, and the Supreme Court ruled

17   that it was unconvincing and rejected the evidence.

18        Your Honor, I would like to respond, if I may,

19   to the second argument that Mr. Crowe just made, and

20   it is also one, as Mr. Kurland says, that he has dealt

21   with in pleadings.

22        THE COURT:  Yes.  How does Montgomery's

23   statement to Gardner -- how does Gardner's statement

24   to Montgomery about what Mr. Martin did come in?

25        MR. HARDING:  Okay.  This is, of course, not a

1    constitutional issue, so I haven't actually dealt with

2    it in writing, and I would appreciate the Court giving

3    me an opportunity to do so.

4          THE COURT:  Of course, of course.

5          MR. HARDING:  I will briefly summarize my

6    answer, however.

7          THE COURT:  Okay.

8          MR. HARDING:  Montgomery is, first of all,

9    clearly a member of the conspiracy, as Mr. Kurland and

10   Mr. Coburn well know, because they have his Grand Jury

11   testimony.

12         THE COURT:  And other than his assertion that he

13   was a member of the conspiracy, I assume you have

14   evidence aliunde that he is a member of the --

15         MR. HARDING:  Yes, Your Honor.

16         THE COURT:  Is he a member of the Mitchell

17   organization?

18         MR. HARDING:  He wouldn't know what -- none of

19   these defendants would say they were members of the

20   Mitchell organization I suppose, Your Honor, because

21   that's just the phrase we used in our indictment.

22         THE COURT:  Okay.

23         MR. HARDING:  He was a member of this crew on

24   numerous criminal ventures, going back to 1997.  Mr.

25   Montgomery grew up --

1          THE COURT:  Give me a sample of the kind of

2     things he did.

3          MR. HARDING:  He went to New York with these

4     defendants to buy --

5          THE COURT:  Any criminal things he did.

6          MR. HARDING:  With these defendants?

7          THE COURT:  Yes, or of which they have

8     knowledge.

9          MR. HARDING:  He got guns from these defendants

10    on several occasions.

11         THE COURT:  From them?

12         MR. HARDING:  Yes, from them.

13         THE COURT:  To dispose of or something?

14         MR. HARDING:  No, no, to use.

15         THE COURT:  To use.

16         MR. HARDING:  Yes.

17         THE COURT:  Okay.  Did he ever use --

18         MR. HARDING:  Including the murder weapon and

19    the other gun used in the Tanya Jones-Spence murder.

20         THE COURT:  What did he do with the weapons, if

21    you can say?

22         MR. HARDING:  He hid them until they were used

23    in the murder.  He and Gardner concealed them in

24    Gardner's girlfriend's house.  Then they were used in

25    the murder.

1          THE COURT:  I see.

2          MR. HARDING:  But one of them was a .40 caliber

3     gun and he -- it's a kind of complicated story, Your

4     Honor.

5          THE COURT:  Oh, no, I'm getting it.  I'm getting

6     it.

7          So I mean when I said to Mr. Kurland that it

8     wasn't a co-conspirator statement, obviously I

9     responded to Mr. Kurland and added that element, which

10    I anticipated might be the one thing that you were

11    going to point out to me.

12         MR. HARDING:  Yes, and I should point out too

13    that Mr. Kurland and Mr. Coburn in their pleading

14    based their argument that this was a Bruton problem on

15    the claim that Mr. Montgomery was not a conspirator,

16    and they cite the fact that in another federal

17    indictment, specifically the Tyree Stewart indictment,

18    there was a reference to the person who was hired to

19    kill a man named Terry Cheeks as a co-conspirator with

20    Tyree Stewart.

21         Well, this person, although he is not named in

22    the indictment, was in fact Will Montgomery, and Will

23    Montgomery was indeed hired, did a hit for Tyree

24    Stewart.

25         That does not mean that he is not a member of

1    this crew.  Murder for profit is one of the named

2    purposes of the Mitchell organization in the

3    indictment.  It is perfectly possible to be a member

4    of two different criminal agreements.  In fact, Mr.

5    Montgomery's involvement with the Tyree Stewart

6    organization was limited, limited to that one

7    incident, where he participated in a hit with Mr., on

8    behalf of Mr. Stewart and got paid for it.

9         I'm not intending to introduce any evidence of

10   that, of course, but the point is --

11        THE COURT:  I know.

12        MR. HARDING:  -- since 1997, Mr. Montgomery has

13   been involved in home invasion robberies, street

14   robberies, drug trafficking on a continuing basis with

15   these defendants, traveling to New York with them to

16   get drugs.

17        He has gotten firearms from them.  He has been

18   involved in shootings with them, not murders so far as

19   we know, until the Tanya Jones-Spence murder, but

20   other kinds of shooting incidents he was involved in

21   with these defendants.

22        THE COURT:  So in effect, this encounter is,

23   what, at the Baltimore City Detention Center?

24        MR. HARDING:  No.  This is not a statement that

25   was made in the detention statement.

1          THE COURT:  Mr. Crowe said it was while they

2     were both locked up together.

3          MR. HARDING:  No.  Mr. Crowe, I don't recall him

4     saying that.

5          THE COURT:  I thought that was what he said.

6          MR. HARDING:  I'm sure he would agree with me

7     that that was not the case.  It was made while they

8     were planning to do an act in furtherance of this

9     conspiracy; namely, to rob Darius Spence, and also

10    they had a plan involving the robbery of a drug dealer

11    by the name of Goose.  Mr. Martin was involved in

12    this.

13         THE COURT:  Wait a minute.  I thought this was a

14    discussion after the Spence murders.

15         MR. HARDING:  No, no.

16         THE COURT:  Isn't that where the --

17         MR. HARDING:  No.

18         THE COURT:  -- cell phone thing happened?

19         MR. HARDING:  That was the Wyche brothers'

20    murders.

21         THE COURT:  I'm sorry.  I'm sorry.  So it was

22    after the Wyche brothers --

23         MR. HARDING:  After.

24         THE COURT:  -- which was before the Spence

25    murder.

1          MR. HARDING:  Yes.  Mr. Martin and Mr. Gardner

2     and Mr. Montgomery and possible other co-conspirators

3     were discussing who they were going to rob.

4          THE COURT:  Like who they were going to rob

5     next.

6          MR. HARDING:  Yes.

7          THE COURT:  Okay.  All right.

8          MR. HARDING:  Mr. Martin is then abruptly

9     arrested for the Wyche brothers' murders on April

10    17th.

11         Mr. Gardner also actually was arrested

12    coincidentally on a violation of parole around the

13    same time, but he only stayed in jail a very short

14    time and he got out.

15         He discussed how this was going to affect their

16    plans with Mr. Montgomery by pointing out that, first

17    of all, Gardner was not a risk.  He was not a danger

18    because his voice was not on the tape.  So that's the

19    first thing he had to do to inform Montgomery of.  He

20    was going to be available.

21         Martin got picked up, according to Gardner,

22    because his voice was on the tape and they mentioned

23    the name Wayne actually on this taped conversation

24    that was inadvertently intercepted on the Wyche

25    brothers' mother's cell phone, on the voice mail.

1           Mr. Gardner also has to explain to Mr.

2    Montgomery that they need money to pay for Martin's

3    attorney.  They need money quickly, and that in fact

4    is the reason why they transformed their immediate

5    target from the drug dealer named Goose to Darius

6    Spence.  They figured they could get the Spence murder

7    or robbery done more quickly, and they proceeded along

8    those lines.

9           They needed to get money for Martin's attorney

10   and Goo, Mr. Gardner, explained that Martin also was

11   going to be out of jail soon because he had this

12   alibi.  He would be able to rejoin them.  He would be

13   on the street with them pretty soon because his alibi

14   was so good.

15          Martin was so clever, that he had gone to a

16   movie theater prior to the Wyche brothers' murder and

17   bought a ticket using his credit card and he had the

18   receipt and it would show that he was watching a movie

19   at the time of the murder.

20          THE COURT:  Okay.  I'm with you.  I see.

21          MR. HARDING:  So the government's position is

22   going to be when we submit something in writing, Your

23   Honor, that this clearly was a statement made by a

24   co-conspirator -- Gardner is a co-conspirator.  He's a

25   declarant.  He is the one who has to be member of the

1    conspiracy, but Montgomery is a member of the

2    conspiracy too -- and it was made in furtherance of

3    the conspiracy.  There is copious case law on this.

4         THE COURT:  No, no.  I hear you, Mr. Harding.  I

5    was assuming that Mr. Montgomery was just somebody who

6    happened to be at the detention center who, for

7    whatever reason, became a government witness.

8         MR. HARDING:  No, Your Honor.

9         THE COURT:  I understand exactly what you are

10   saying.  Clearly, a conversation between two members

11   of a conspiracy about plans, about needing lawyers,

12   about getting money, about the next crime, all of that

13   would be in furtherance of the conspiracy.  I agree

14   with you.

15        MR. HARDING:  Thank you.  I'll be happy to put

16   all this on paper so defense counsel will have a full

17   opportunity to respond.

18        But I would note that Mr. Kurland and Mr. Coburn

19   didn't even raise the in furtherance of the conspiracy

20   argument in their motion.  They argued simply that

21   Montgomery was not a member of the conspiracy, and I

22   suggest to Court that they have read the case law well

23   enough to know that these statements were quite

24   clearly in furtherance of the conspiracy.  That's why

25   they confine it to a footnote.  Actually, they do

1    preserve that issue in a footnote.

2         THE COURT:  Okay.  Let me give Mr. Crowe a

3    chance because I think I seriously misunderstood Mr.

4    Crowe, and I want to give him a chance before we break

5    for lunch to respond if he wants.

6         I'm sorry, Mr. Crowe.  I misunderstood.

7         MR. CROWE:  Your Honor, I believe that I did

8    make a mistake when I said they were both in custody

9    at that point.

10        THE COURT:  Okay.

11        MR. CROWE:  I don't believe that that is the

12   situation.

13        THE COURT:  The picture that emerged from my

14   mind was simply, you know, Mr. Gardner got arrested

15   for something, Mr. Montgomery happened to get arrested

16   for something, they were together at the detention

17   center, and they were having chitchat.

18        MR. CROWE:  I would ask the Court to understand

19   that 90 percent of what I just heard from Mr.

20   Harding --

21        THE COURT:  You're learning for the first time.

22        MR. CROWE:  -- I'm hearing for the first time.

23   I expect --

24        THE COURT:  Because they have the Montgomery

25   Jencks and you don't.

1           MR. CROWE:  That's correct.  I, of course, knew

2      that Montgomery was, I think he was the person driving

3      the car at the time of the Tanya Jones-Spence murder.

4           But it had always been my understanding that

5      although a claim would be made that he was a member of

6      the conspiracy, that certainly Gardner's attorneys

7      were going to be arguing very vociferously that he was

8      not.  I knew that they were going to do that on the

9      basis of the transcript in other proceedings in

10     Baltimore County in the Tanya Jones-Spence murder,

11     which I had read, and also that they mentioned in a

12     footnote that they had had some Grand Jury testimony.

13     In their response, they noted in a footnote that they

14     had Grand Jury testimony from Montgomery, which I

15     understood was supportive.

16          Be that as it may, and whatever the evidence is

17     going to show, I think the Court would be hard

18     pressed, even on the basis of what is at this point a

19     proffer from the government, to say that simply

20     Gardner's statement that my client had an alibi,

21     perhaps a false alibi, was in any fashion in

22     furtherance of a conspiracy.

23          But I'm really going to have to wait until I see

24     what Mr. Harding says, and perhaps more importantly,

25     until we have a chance to read the additional

1    discovery, which we are going to be getting I guess

2    sort of third hand from Mr. Coburn and Professor

3    Kurland.

4         THE COURT:  Thank you, Mr. Crowe.

5         Briefly, Mr. Kurland.

6         DEFENDANT MARTIN:  Your Honor, I accept my

7    attorney's offer for value and return it to him for

8    value to settle and close the account.  I do not wish

9    to argue the facts.  I request the Court to issue me

10   an appearance bond, waive all public costs.  I request

11   the Court to close all accounts and issue an order of

12   the Court immediately.  I request the Court to set off

13   and adjust all public charges by exemption, in

14   accordance with the Uniform Commercial Code 3-419,

15   House Joint Resolution 192, and Public Law 73-10, and

16   request immediate discharge.

17        THE COURT:  I want to remind the defendants what

18   I said before.  Everything you say in this courtroom

19   potentially becomes evidence against you.  I can't

20   make it more clear than that, everything you say.

21        Yes, Mr. Kurland.

22        MR. KURLAND:  Judge, I just want to make sure

23   that even though we had filed some preliminary motions

24   with respect to this, that when the government files

25   its more detailed issue with respect to the

1    co-conspirator statements, that we have an opportunity

2    to respond specifically to what the government has

3    filed.

4        I want to correct one misimpression, and without

5    hopefully violating 6(e).  May I read one line out of

6    Mr. Montgomery's Grand Jury testimony?

7        THE COURT:  Why don't you just paraphrase

8    whatever it is.  Just paraphrase.

9        MR. KURLAND:  Well, in his testimony he

10   basically says, when asked specifically about selling

11   drugs together, the question, do you guys sell drugs

12   together or separately or what; answer, no.  They sold

13   their drugs and I sold mine.

14       THE COURT:  Okay.

15       MR. KURLAND:  But the point is --

16       THE COURT:  That doesn't exclude --

17       MR. KURLAND:  Your Honor, I understand that.

18   But with respect to this critical issue as to whether

19   or not Mr. Montgomery is both a member of the

20   conspiracy and separately whether or not the statement

21   is in furtherance of the conspiracy, at the time the

22   Court evaluates what is now going to be a pretrial

23   proffer, which is fine with us, the Court has to make

24   a finding that the government has established by a

25   preponderance of the evidence.  I submit to you, Your

1    Honor, that with respect to the voluminous information

2    we have, not just the Grand Jury testimony, but the

3    tons of under oath evidence that Mr. Montgomery has

4    provided in other proceedings, that at best it's going

5    to be about 48, 52 --

6         THE COURT:  Well, Mr. Gross says he was the

7    driver at the Spence murder.

8         MR. KURLAND:  That's irrelevant to whether or

9    not --

10        THE COURT:  It's not irrelevant.

11        MR. KURLAND:  Your Honor, it's irrelevant.  I

12   submit, Your Honor, that it's irrelevant whether or

13   not that murder was part of the Mitchell organization

14   that's charged in the indictment.  That's still an

15   open issue.

16        THE COURT:  It's not an open issue for the Grand

17   Jury.

18        MR. KURLAND:  But the Grand Jury --

19        Your Honor, again, rather than fight this out

20   here -- I mean this is significant for a variety of

21   issues.

22        Simply because Mr. Montgomery may or may not

23   have been involved in the Spence murder doesn't

24   automatically mean that the Spence murder is part of

25   the larger conspiracy, despite what is alleged in the

1    indictment.

2         THE COURT:  I understand that.  I understand

3    that.  I was only saying that if the Spence murder, as

4    alleged, is part and parcel of the conspiracy, and if

5    he was the wheelman, that pretty much clenches it.

6    Then he is a part of the conspiracy.  If only for one

7    night, if only for a half an hour, he is a member of

8    the conspiracy.

9         MR. KURLAND:  Your Honor, in every trial that I

10   have been in, the Court gives an instruction to the

11   jury that the indictment is jut a piece of paper.  So

12   the allegations --

13        THE COURT:  No, no, no.  The Court doesn't say

14   it's just a piece of paper.

15        MR. KURLAND:  Yes, it does.

16        THE COURT:  No.  The Court says it's an

17   accusation.  It's not evidence.  It's much more than

18   just a piece of paper.

19        MR. KURLAND:  In light of that, again, the

20   government is still going to have to prove, after we

21   get to present our case, responding to what evidence

22   they proffer on the significant hurdle with respect to

23   the evidentiary issue as to whether something is done

24   in furtherance of the conspiracy.  It's not just

25   automatic simply because it's in the indictment.

1          But I am sure the Court will keep an open mind

2     on that.

3          THE COURT:  Of course.

4          MR. KURLAND:  I will welcome the opportunity to

5     respond to whatever the government files.

6          THE COURT:  Of course.

7          We are going to break for lunch and we will

8     return at two p.m.  I think we will have the one

9     witness.  We will have argument on the motion to

10    dismiss, and I think that should conclude what we need

11    to do I hope for this week.  But if we have to come

12    back tomorrow morning, we will.

13         If the defendants continue to be disruptive, I

14    am going to exclude the defendants.  I hope that Mr.

15    Harris can join us this afternoon; but if not, we will

16    proceed as we have.

17         Yes, Mr. Martin.

18         MR. MARTIN:  Your Honor, with your permission, I

19    would like to be excused this afternoon.  I had

20    surgery recently and I have to go back to the doctor

21    this afternoon.

22         THE COURT:  Certainly, Mr. Martin.  We are in

23    recess till 2 o'clock.

24         (A luncheon recess was taken.)

25                    AFTERNOON SESSION

1          THE COURT:  Good afternoon.  Ready to proceed,

2     Mr. Harding.

3          MR. HARDING:  Yes, Your Honor.

4          MR. TREEM:  Your Honor.

5          THE COURT:  Yes, Mr. Treem.

6          MR. TREEM:  I ran up to the Marshal's Office

7     just to get an update.  Mr. Harris is not going to be

8     allowed to travel out of the institution today.  So he

9     won't be here at least today.

10          THE COURT:  All right.

11          MR. TREEM:  We will advise the Court as we get

12     more information.

13          THE COURT:  Thank you, Mr. Treem.

14          MR. HARDING:  Your Honor, the United States

15     calls Sergeant Richard Willard.

16                         RICHARD WILLARD

17     a witness called on behalf of the Government, having

18     been previously duly sworn, was examined and testified

19     as follows:

20          THE CLERK:  Please be seated.

21          Please speak directly toward it and state your

22     name and spell it for the record.

23          THE WITNESS:  I'm Sergeant Richard Willard,

24     common Richard, last name Willard, W I L L A R D.

25                       DIRECT EXAMINATION

1    BY MR. HARDING:

2    Q      Good afternoon, Sergeant Willard.  Can you tell

3    us how you are employed right now?

4    A      I am employed with the Baltimore City Police

5    Department.

6    Q      How long have you been employed by them?

7    A      15 years.

8    Q      Can you tell us where your assignment is right

9    now?

10   A      I'm currently in charge of a new task force

11   dealing with straw purchases of handguns that were

12   before me, the Organized Crime Division of Baltimore

13   City.

14   Q      Okay.  That would be in the Headquarters

15   Building then?

16   A      Yes, sir.

17   Q      Can I ask you what your assignment was back in

18   June of 1999?

19   A      In June of 1999, I was assigned to the Flex Unit

20   in the southwestern district.

21   Q      Let me call your attention to an arrest at about

22   1:30 p.m. on June 18, 1999.  Did you participate in an

23   arrest at about 1:30 in the afternoon that day?

24   A      Yes, sir, I did.

25   Q      Was that arrest initiated by informant

1    information?

2    A    We received information into the office of a

3    person carrying guns and selling drugs in the area of

4    the 300 block of South Pulaski Street.

5    Q    Well, what kind of person was this informant, to

6    the best of your recollection?

7    A    It has been eight years, sir.  I mean we used to

8    get a lot of informants and people calling into the

9    station and giving information.

10   Q    Okay.  People from the neighborhood?

11   A    Yes, sir.

12   Q    So is it fair to say you can't remember the name

13   of the informant at this point?

14   A    No.  I mean a lot of times we went out on the

15   street, and as the Flex Unit, we would get calls into

16   the station and we would get information from

17   informants, and we were expected to go on the street

18   and try to track down the leads and information on

19   that.

20   Q    What did this informant tell you?

21   A    He told us that there would be a person that

22   drives a gold station wagon, a Ford Taurus, that drops

23   off cocaine in the area of the 300 block of South

24   Pulaski Street, that when he came into the area to

25   drop off drugs, he always carried a handgun in his

1    car.

2    Q      Was that in your district, the 300 block of

3    South Pulaski Street?

4    A      Yes, sir.

5    Q      So what did you do after you got this

6    information?

7    A      We got the information.  We went up to area.  A

8    group of us set up.  While we were there, we observed

9    a car pulling into the neighborhood.  When we observed

10   him come around and turn the corner of the 300 block

11   of South Pulaski Street -- I belive that's Ashton

12   Street, westbound -- he was smoking a hand-rolled

13   cigar, like a rerolled cigar, commonly used, commonly

14   called a blunt to smoke marijuana out of.

15   Q      Was there anybody in the vehicle with him?

16   A      To the best of my knowledge, I don't believe

17   there was.  I didn't put it in my report, so I

18   wouldn't assume there was anyone else.

19   Q      So you did prepare a report on this event; is

20   that correct?

21   A      Yes, sir.

22   Q      And a Statement of Probable Cause?

23   A      Yes, sir.

24   Q      Now you said, you just said that a vehicle came

25   into the neighborhood.  What was the description of

1    the vehicle?

2    A       It was a gold Ford Taurus station wagon.

3    Q       So did that match the description that you had

4    been given by this informant who called into your

5    unit?

6    A       Yes, sir.

7    Q       Okay.  So what did you decide to do after you

8    saw this guy smoking a rerolled blunt pull into the

9    area?

10   A       We stopped the vehicle.  We caught up with the

11   vehicle and stopped it in the 200 block of South

12   Smallwood Street.  I approached the driver's side of

13   the vehicle.

14           As we were approaching, we observed him making

15   motions down towards the floorboard area of the

16   vehicle.  We asked him to step from the vehicle.  We

17   could smell the marijuana.  It was very strong.

18           Down at the floorboard, there was burnt

19   marijuana laying down near the right side of the

20   console, like under where his leg would be, and the

21   butt of a handgun sticking out from underneath the car

22   -- underneath the seat, on the driver's side.

23   Q       Was the driver's side window open or closed, do

24   you recall?

25   A       To the best of my recollection, it was open.  I

1    can't --

2    Q      Okay.  Did you put in your report anything about

3     when you first smelled the marijuana?

4    A      As we walked up to the vehicle.

5    Q      Is that to the best of your recollection now?

6    A      Yes, sir.

7    Q      Okay.  What happened then after you got up to

8     the vehicle?

9    A      Well, once we got up to the vehicle, we smelled

10    the marijuana.  Based on the information from the

11    source of information, and based on the other

12    observations of him smoking the rerolled cigar and

13    possible marijuana, we asked him to exit.  We removed

14    him from the vehicle and observed the marijuana

15    sticking on the floorboard, laying on the floorboard

16    right under his seat where he made the gestures.  We

17    recovered that and located the handgun underneath the

18    seat.

19    Q      When did you first notice the handgun?

20    A      As we going down for the cigar, where it was

21    laying, you could see the handgun sticking right up

22    under the seat, the butt of it.

23    Q      So did you at that point arrest the occupant of

24    the car?

25    A      Yes, he was.

1      Q      What was his name?

2      A      Shelley Wayne Martin.

3             MR. HARDING:  I have no further questions at

4      this time.  I have one more piece of evidence in this

5      case, Your Honor, but I will wait until

6      cross-examination is over with.

7             THE COURT:  Very well.  Mr. Crowe.

8             DEFENDANT MARTIN:  Your Honor, I accept the

9      government's offer for value, return it to the

10     government for value, request settlement and close the

11     account.  I do not wish to argue the facts.  I request

12     the Court to issue me an appearance bond, waive all

13     public costs.  I request the Court to close all

14     accounts, release the order of the Court to me

15     immediately.

16             I request the Court to offset, setoff and adjust

17     all public charges by exemption, in accord with

18     Uniform Commercial Code 3-419, House Joint Resolution

19     192, and Public Law 73-10.  I request immediate

20     discharge.

21             THE COURT:  You may proceed, Mr. Crowe.

22                        CROSS-EXAMINATION

23     BY MR. CROWE:

24     Q      Good afternoon, sergeant.  Are you in fact a

25     detective.

1    A        I'm a detective sergeant right now, yes, sir.

2    Q        Are you aware that this case involves the

3    murders of individuals by the name of Darryl and

4    Anthony Wyche?

5    A        I have no knowledge of the case past Mr. Martin.

6    I have been involved in other cases.

7    Q        Now you, at the time this occurred, you were in

8    the southwest district; is that correct?

9    A        Yes, sir.

10   Q        Is the 800 block of Vine Street in the southwest

11   district?

12   A        I believe that's the western district.

13   Q        The time that we are talking about, what other

14   officer or officers were with you?

15   A        I remember Kevin O'Gavin was there and possibly

16   Cliff McWhite.  I'm not sure of everyone else, but I

17   remember Kevin Roberts was with me at the car.

18   Q        Do you know an Officer Hollingsworth?

19   A        Christopher Hollingsworth?

20   Q        Yes.  Do you know if he was with you?

21   A        He was in the unit.  I'm not sure if he was

22   there.

23   Q        This arrest, as I understand it, occurred about

24   1:30 in the afternoon; is that correct?

25   A        Yes, sir.

1    Q      When did you speak with the informant?

2    A      I don't recall the exact time I spoke with him.

3     It was prior to the arrest.

4    Q      Was it minutes before, hours before?

5    A      It could have been both.  It could have been

6     days.

7    Q      You have no idea?

8    A      Sir, this was eight years ago.

9    Q      Now you told Mr. Harding that you don't recall

10    the name of the informant.  Was the informant a man or

11    a woman?

12    A      Our unit used to get calls every day, sir.  We

13    got the information of what I wrote in the report at

14    the time.

15    Q      As you sit here today, how do you know that you

16    talked to an informant?

17    A      Because that's what I wrote in my report, sir.

18    Q      So you are testifying on the basis of the

19    information in your report, not on the basis of any

20    independent recollection whatsoever; is that correct?

21    A      I remember the car and I remember Mr. Martin.  I

22    remember walking up to the car.  I don't remember how

23    we got the information and when the call came in.  We

24    got calls every day.

25    Q      But you have no independent recollection, no

1    recollection independent of your report that you in

2    fact talked with an informant; is that correct?

3    A    No, sir.

4    Q    The report didn't even refresh your recollection

5    that you had talked to an informant, did it?

6    A    It leads me to believe that I did talk to an

7    informant because that's what I wrote in the report,

8    sir.

9    Q    The informant in question, was this a concerned

10   citizen who made a call out of the blue to say that he

11   disliked drugs and that there is this person you

12   should know about?

13   A    It could have been.

14   Q    Could it have been a person who was arrested?

15   A    It could have been.

16   Q    But you have no recollection whatsoever; is that

17   correct?

18   A    Like I said, sir, it was eight years ago.  I

19   don't remember.

20   Q    Now did the individual who is the informant, did

21   that individual have anything to do with what you

22   claim is my client's appearance on that street in the

23   described vehicle?

24   A    I don't understand your question, sir.

25   Q    Did the informant in fact say that my client was

1       coming there to meet him?

2       A       I don't remember the informant or the source.  I

3       couldn't tell you that.  I don't remember any case

4       where, while I was in the Flex Unit, that we did an

5       operation like that.

6       Q       Can you tell me whether or not the informant in

7       fact made the phone call to have the individual come

8       there?

9       A       I seriously doubt that.  At that level of Flex,

10      we didn't do those types of operations.  When I went

11      to HIDTA, we did operations like that, but never in

12      Flex, because the Flex Unit was a lower level than a

13      drug unit.  We were more focused on street violence

14      and street crimes.  We didn't work operations where

15      people were set up in general, back eight years ago.

16              MR. CROWE:  Just a moment, Your Honor.

17              I would like to have marked as Defendant Martin

18      Motion Exhibit 1 a report which we received from the

19      government with their Bates Number 421D.

20              THE COURT:  All right.  It will be marked.  You

21      hold onto it for now.

22              DEFENDANT MARTIN:  Your Honor, can I review

23      that?  I'm not aware of that.  May I read that?

24              MR. CROWE:  Certainly.

25              THE COURT:  I'm glad to see you participating,

1    Mr. Martin.  You can't write on it, sir.

2         MR. CROWE:  The judge said you can't write on

3    it.

4         THE COURT:  Thank you, marshal.

5         MR. CROWE:  Actually, Your Honor, I have another

6    copy.  We will have the other copy marked.

7         (Defendant Martin's Motion Exhibit Number 1 was

8    received.)

9    BY MR. CROWE:

10   Q    Do you recognize that document?

11   A    No, sir, I don't.  I know what the document is,

12    but that specific one, no.

13   Q    You indicated that Detective, that Officer

14    Hollingsworth was an individual at that time?

15   A    Yes.

16   Q    I will tell you that we received this document

17    in a series of documents which we were told related to

18    the arrest of my client on that day.  Is it your

19    reading of that document that at approximately 10:30

20    on June 18th of 1999, that there was seized from 836

21    Vine Street four razor blades with white powder

22    residue, and the defendant's name was Charles Staton?

23   A    That's what is written on here, yes, sir.

24   Q    Was Charles Staton in fact the informant in that

25    case, if you know?

1    A      I have no idea, sir.

2    Q      You have no idea whether the -- okay.

3           You have no idea whether the individual who gave

4     you the information was or was not somebody in trouble

5     with the criminal law; is that correct?

6    A      He could have been, sir, but I don't know.  I

7     don't recall.

8    Q      In fact, for all we know, that individual could

9     be sitting in the courtroom today and you wouldn't

10    know him or her; is that right?

11   A      You are actually right, sir.

12   Q      And you wouldn't even know whether it was a him

13    or a her?

14   A      You are absolutely right.

15   Q      Now you testified about smelling the odor of

16    marijuana as you approached the car; is that right?

17   A      Yes, sir.

18   Q      At the time that you approached the car, had it

19    already been ordered to stop?

20   A      Yes, we ordered it to stop.

21   Q      Was this an investigative stop or was this for

22    purposes of making an arrest?

23   A      At that point?

24   Q      Yes.

25   A      Purposes for making an arrest.

1    Q      Why were you making an arrest?

2    A      Because at that point in my career, I had been

3    involved in well over a thousand arrests.  I've seen

4    rerolled cigars, and when we stopped the car, we

5    believed at that point he was smoking marijuana, which

6    is still a violation of Maryland law.

7    Q      But the stop was made before you smelled the

8    odor again?

9    A      It was when we observed him smoking the

10   marijuana.

11   Q      How far away from him were you when you

12   initially observed him?

13   A      He passed our car driving by.  He made the

14   left-hand turn onto Ashton Street.

15   Q      What was the distance between you and him at the

16   time the observation was made?

17   A      At the closest point, five feet.  At the

18   furthest point, maybe 25 feet or 50.

19   Q      Where were you located?

20   A      In the driver's side of the vehicle, in the 300

21   block of South Pulaski Street.

22   Q      He was in the driver's side of the vehicle on

23   the other side of South Pulaski Street?

24   A      He was driving north.  We were facing south.

25   Q      You observed the cigar; is that correct?

1    A      Correct.

2    Q      What was it that you saw about the cigar which

3     caused you, yourself, to determine that it was, that

4     it was a rerolled cigar?

5    A      Like I said, we've made numerous marijuana

6     arrests, numerous arrests.  I've seen rerolled cigars

7     thousands of times.

8    Q      What was it that you saw on this occasion which

9     caused you to believe that it was a rerolled cigar, if

10    you can recall?

11   A      The way it was rolled.

12   Q      Do you recall what you saw at the time?

13   A      A rerolled cigar.

14   Q      As you sit here today, can you actually, I mean

15    do you actually have a picture in your mind of this

16    cigar, or are you going by your report?

17   A      I'm going by my report basically, a lot of it,

18    but that's what I wrote at the time.  That's what I

19    observed at the time that day.

20   Q      In fact, the truth is that you are going on your

21    report for virtually everything that you said; is that

22    correct?

23   A      No, sir.

24          MR. CROWE:  Can I have marked as Defendant's

25    Exhibit 2, and we will submit this in a moment, Your

1    Honor, a copy of the officer's report which shows the

2    government's Bates Numbers 409 and 410?

3         THE COURT:  They are admitted.

4         (Defendant Martin's Motion Exhibit Number 2 was

5    received.)

6    BY MR. CROWE:

7    Q    Is that in fact the report that you wrote?

8    A    Yes, sir.

9    Q    Would you turn to the second page of that

10   report?  Does that indicate, "Upon stopping vehicle,

11   we observed 30-1," which was the defendant, "smoking

12   number one.  30-1 then placed number one on the floor,

13   then placed number one on the floor between his legs."

14   A    Yes.

15   Q    Does that indicate that you didn't, that the

16   first time that you observed the individual stopping,

17   smoking what you described was a rerolled cigar was

18   after you had stopped him?

19   A    It wasn't after.  We stopped him -- we saw him

20   smoking it before we stopped.

21   Q    Does the report say upon stopping vehicle, we

22   observed 30-1 smoking?

23   A    It's a very brief report.  A more detailed

24   report is in the statement of charges.

25   Q    Again, does this report, which you relied on for

1     everything else, say that upon stopping vehicle, you

2     observed the defendant smoking?

3     A     I relied on the statement of charges, sir.

4     Q     Pardon?  Well, you have been testifying about

5     your report.  Again, can you just give me a yes or no

6     answer?

7           Does your report say that it was upon stopping

8     the vehicle that you observed the man smoking what you

9     described as a rerolled cigar?

10    A     It does say that.  It doesn't mention prior to

11    stopping the vehicle either.

12          MR. CROWE:  Nothing further, Your Honor.

13                    REDIRECT EXAMINATION

14    BY MR. HARDING:

15    Q     Sergeant --

16          DEFENDANT MARTIN:  Your Honor.

17          MR. HARDING:  Oh, I'm sorry.

18          DEFENDANT MARTIN:  I accept the attorney's offer

19    for value, return it to him for value, request him to

20    settle and close the accounts.  I request -- I do not

21    argue the facts.  I request the judge to issue me an

22    appearance bond, waive all public costs.  I request

23    you to settle and close all accounts, release the

24    order to me immediately.

25          I request him, request the Court to set off and

1      adjust all public charges by exemption, in accord with

2      Uniform Commercial Code 34-301, House Joint Resolution

3      192, and Public Law 73-10.  I request immediate

4      discharge.  I accept his offer for value and I return

5      his offer to you for value.

6              THE COURT:  Marshals, Mr. Martin is excused.

7              (Pause.)

8              Let the record reflect that Mr. Martin has

9      indicated by his repeated disruptions that he wish not

10     to be present.  The Court could only anticipate that

11     when Mr. Crowe rose to argue the motion, that there

12     would be further disruptions by Mr. Martin, and his

13     behavior here indicates that he has chosen not to

14     participate through the balance of this hearing

15             You may proceed, Mr. Harding.

16             MR. HARDING:  Thank you, Your Honor.

17     BY MR. HARDING:

18     Q      Your Honor, did I show you --

19             I'm sorry.  Sergeant Willard, did I show you

20     that chemist report previously, the one that Mr. Crowe

21     just showed you and which is marked as defense

22     exhibit, and bears Bates Stamp 421D?

23     A      Yes, sir.

24     Q      What did you conclude after seeing that

25     document?

1    A       In those days, when we had the Flex Unit, we

2    were averaging well over 1500 arrests a year.

3    Typically, in a day we would arrest ten people.  One

4    person was designated as the submitting person.  They

5    would write all the submissions and submit things.

6           But this doesn't look like anything that was

7    even recovered from the report.  It was common and

8    typically happened that people wrote numbers down

9    wrong when they did the submissions.

10          MR. HARDING:  Let me also offer an exhibit.

11   This is the Statement of Probable Cause and bears

12   Bates Stamp Number 413 and 414.

13          THE COURT:  It's admitted.

14          (Government's Motion Exhibit Number 2 was

15   received.)

16   BY MR. HARDING:

17   Q       Taking a look at this, Sergeant Willard, is this

18   the Statement of Probable Cause that you swore out

19   that day?

20   A       Yes, sir, it is.

21   Q       Let me call your attention to the sentence that

22   begins your officer, with this information, and I just

23   want you to read the next several sentences.

24   A       Yes, sir.

25          MR. CROWE:  Your Honor, would the Court note my

1    objection?  This is an inadmissible prior consistent

2    statement.

3         THE COURT:  The objection is overruled.

4         THE WITNESS:  Your officer, with this

5    information --

6         THE COURT:  Slowly, please, sergeant.

7         THE WITNESS:  Your officer, with this

8    information, went to the 300 block of South Pulaski

9    Street and set up covert surveillance.  While there,

10   we observed a gold Ford Taurus station wagon drive

11   into the area.  This vehicle had Delaware temp tag of

12   XY1257.  Your officer also observed Mr. Martin was

13   smoking what looked to be a rerolled cigar.  Your

14   officer knows that it is common -- that a common use

15   for rerolled cigars is to smoke marijuana.  Your

16   officer, with this information and observation,

17   stopped the vehicle as it turned onto the 200 block of

18   South Smallwood Street.

19   BY MR. HARDING:

20   Q    Why don't you just keep reading a couple lines.

21   A    During the stop, as your officers approached the

22   driver's side door of the vehicle, as your officers

23   approached, we observed Mr. Martin placing an object

24   between his legs on the floorboard of the vehicle.  We

25   could smell a strong odor of burnt marijuana.  Your

1       officer asked Mr. Martin to step from the vehicle.

2       Your officer then recovered a half burnt rerolled

3       cigar containing a green leafy substance, suspected

4       marijuana.

5               Your officer also located, sticking from under

6       the driver's seat of the vehicle, the butt of what was

7       found to be a Hi-Point nine millimeter handgun, Serial

8       Number P040255.

9               MR. HARDING:  Thank you.  That's good enough.

10              I believe that's all the questions I have for

11      Sergeant Willard.  As I say, I have one more exhibit.

12              THE COURT:  Thank you, Sergeant Willard.  I

13      assume there are no further questions from counsel?

14              MR. CROWE:  Just a couple, Your Honor.

15              THE COURT:  All right, Mr. Crowe.

16                        RECROSS EXAMINATION

17      BY MR. CROWE:

18      Q       Officer, as I understand it, you were in the 300

19       block of South Pulaski Street; is that correct?

20      A       When this started, yes, sir.

21      Q       And when you saw the gold Taurus?

22      A       Yes, sir.

23      Q       How many lanes are there in that block of South

24       Pulaski Street?

25      A       One lane in each direction.

1    Q      You were facing in which direction?

2    A      I was facing southbound.

3    Q      And the car was driving --

4    A      Northbound.

5    Q      -- northbound?

6           MR. CROWE:  Thank you.  That's all that I have,

7    Your Honor.

8           THE COURT:  Thank you very much, Sergeant

9    Willard.  You are excused.

10          Will you hand those documents to the clerk,

11   please?

12          Do you have an exhibit, Mr. Harding?

13          MR. HARDING:  Yes, Your Honor.  This is RW-1.

14   It is a copy of Mr. Martin's plea agreement in the

15   federal case that resulted from this arrest, dated

16   November 16, 1999.  It is signed by Mr. Martin and his

17   attorney, James Wyda, from the Federal Public

18   Defender's Office.

19          Actually, the dates next to his signature on the

20   last page are November 24, 1999.  The November 16th

21   date is on the front of the document.

22          I would ask the Court's permission to -- well, I

23   offer into evidence, and I ask the Court's permission

24   to permit me to read aloud the first paragraph of the

25   factual stipulation.

1           THE COURT:  It's admitted.  You may.

2           (Government's Motion Exhibit RW-1 was received.)

3           MR. HARDING:  On June 18, 1999, at approximately

4    1:30 p.m., Baltimore City police officers responded to

5    the 300 block of Pulaski Street, Baltimore, Maryland,

6    in response to informant information that the driver

7    of a particular vehicle may be in possession of a

8    firearm.

9           During the surveillance of the defendant, Mr.

10   Martin was observed in the area driving the described

11   vehicle, a gold Ford Taurus.  The officers stopped the

12   car.  At which time, Mr. Martin was asked to step out

13   of the vehicle.  At which time, the butt of a handgun

14   found to be one Hi-Point nine millimeter semiautomatic

15   handgun, Serial Number P040255 was observed under the

16   driver's seat.  The firearm was recovered and Mr.

17   Martin was arrested.

18          There are a series of factual stipulations that

19   follow in the document having to do with the serial

20   number of the gun, the definition of firearm, the fact

21   that it was in interstate commerce, and that he had a

22   prior conviction.  That's all, Your Honor.

23          THE COURT:  Thank you, Mr. Harding.  It's the

24   government's burden, but I will hear you first, Mr.

25   Crowe.  I think I understand the government's theory.

1          MR. CROWE:  Thank you, Your Honor.

2          I was, quite frankly, surprised at Detective

3     Willard's recollection.  It was not sparse, but

4     probably non-existent.  He had no -- he appeared to

5     have absolutely no recollection of the facts

6     concerning this case and was testifying, as I

7     understood it, if not entirely, then virtually

8     entirely from the basis of statements which he had

9     made, which he had made at a previous time.

10         My recollection of the Rules of Evidence is that

11    they are quite clear the police report is not a

12    business report, and for that reason, we do not think

13    that the search can be supported on the basis of, on

14    the basis of the report itself.

15         In addition to that, there was not the standard

16    examination that one would expect, which would be

17    necessary to get this in as past recollection

18    recorded.

19         THE COURT:  You know, it occurred to me when I

20    got Mr. Harding's letter, and particularly now that

21    Mr. Harding has read into the record the stipulated

22    facts, I'm not even sure we have to have a hearing.

23         MR. CROWE:  Well, that's the second part.

24         THE COURT:  I don't understand the law to be

25    that in case one, a defendant can waive his rights to

1      challenge under the Fourth Amendment the admissibility

2      of evidence, and then come along in case two, when

3      that issue becomes important again, to have the

4      defendant's right to challenge under the Fourth

5      Amendment and apply the suppression remedy to be

6      reinvigorated.

7           I mean it's an unusual kind of situation, and I

8      haven't done any legal research, but I am not sure the

9      stipulated facts wouldn't get the government exactly

10     where it needs to get to.

11          MR. CROWE:  I also, Your Honor, have not done

12     any research on that point.  It is my understanding

13     that essentially a waiver of rights in one proceeding

14     does not necessarily carry over to another proceeding.

15          THE COURT:  That would be a peculiar application

16     of the suppression remedy under the Supreme Court's

17     evolving jurisprudence.

18          Anyway, go ahead.  I understand the point.

19          MR. CROWE:  I mean the only discovery we had

20     gotten in this case was the officer's or the various

21     reports from the officer, many of which have been

22     referred to here.  With simply those and his

23     testimony, we don't believe this evidence comes in.

24          It's a warrantless arrest.  It's the

25     government's burden of proof in this matter, and we

1     don't believe that they have carried it.

2             THE COURT:  All right.  Thank you, Mr. Crowe.

3             I don't need to hear from you, Mr. Harding.

4             The facts and the law are quite self-evident.

5     Even assuming, from the point of view of Mr. Martin,

6     that the Court had some doubt, which I don't, but even

7     assuming that, as Mr. Crowe's questioning suggested,

8     that the officer is mistaken, the detective is

9     mistaken, that he didn't actually observed the

10    rerolled cigar when Mr. Martin drove past him, I think

11    there would still be adequate grounds, given the

12    description of the vehicle, to make a traffic stop.

13            But I don't need to go to that point because I

14    do credit the testimony of the detective that he

15    observed the hand-rolled, rerolled cigar and

16    reasonably concluded that there was a possibility,

17    certainly sufficient to establish reasonable

18    suspicion, that Mr. Martin was in possession of

19    contraband and, therefore, the traffic stop was

20    permissible.

21            Once the traffic stop was effected, and as he

22    approached the vehicle, he could smell the odor of

23    burning marijuana and, therefore, he had probable

24    cause therefrom to effect an arrest of Mr. Martin

25    and/or to search the vehicle, which Mr. Martin was the

1      operator.

2            The Court credits the witness's testimony that

3      when Mr. Mitchell (sic.) came out of the vehicle and

4      the officer properly went into the vehicle to search

5      for what he believed to be a hand-rolled or a rerolled

6      cigar containing contraband, he observed in plain view

7      the butt of a weapon.  Clearly, therefore, there was

8      probable cause to believe that Mr. Martin was in

9      violation of state law by transporting a handgun in a

10     vehicle.

11           So for all these reasons, the stop and search of

12     the vehicle comported with Fourth Amendment

13     requirements, and the arrest of Mr. Martin was

14     permissible.

15           But the Court also concludes, for what it's

16     worth, that the stipulation in the federal prosecution

17     of Mr. Martin did indeed effect a once-and-for-all

18     waiver of his Fourth Amendment rights in respect to

19     this particular stop, search and seizure.

20           Therefore, as an alternative basis of decision,

21     the Court finds that Mr. Martin has knowingly,

22     voluntarily and intelligently waived his right to

23     invoke a suppression remedy in respect to the seizure

24     of the handgun.

25           Anything further, Mr. Harding, on this?

1          MR. HARDING:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  I believe the final

3     issue is the issue of the motions to dismiss.  Am I

4     right?  I think so.  So I am happy to hear from

5     counsel in any particular order you choose, unless you

6     want to submit on the papers.

7          MR. COBURN:  I'm ready to go if no one else is.

8          THE COURT:  All right, Mr. Coburn.  I'll hear

9     from you.

10         MR. COBURN:  Thank you, Your Honor.

11         The motion that I was hoping to argue, and, of

12    course, I'll be brief, is the motion related to the

13    Interstate Agreement on Detainers.

14         THE COURT:  Okay.

15         MR. COBURN:  The government has filed a fairly

16    comprehensive response to this motion.  The issues

17    that I think continue to exist and that really, from

18    my point of view at least, don't appear to be

19    substantively addressed are as follows:

20         The government admits, generally speaking, how

21    the IAD works.  You know, of course, what we are

22    focused on here is what is called the anti-shuttling

23    provisions of the Interstate Agreement on Detainers,

24    particularly Article IV of the IAD.

25         The government's position seems to be that after

1    the federal case, that is to say this case, started,

2    that all that happened was that Mr. Gardner was kind

3    of repeatedly transported to various county facilities

4    typically for proceedings relating to the state

5    proceeding that's focused on the Spence murder.

6        I don't think that the record is consistent with

7    that proposition, at least as far as I can tell.  I

8    mean the government gives, provides kind of an

9    interesting summary, and I think it's just a partial

10   summary actually, of the number of the various

11   transfers that occurred.

12       For example, the government says that on August

13   4th --

14       THE COURT:  Just a moment, please.  Let me pull

15   up the government's memorandum.

16       MR. COBURN:  Absolutely, Your Honor.  I know I

17   have Mr. Hanlon's --

18       MR. HANLON:  I have another copy of it, Your

19   Honor.

20       THE COURT:  -- master work.  Yeah, here it is.

21       Go ahead, Mr. Coburn.

22       MR. COBURN:  Thank you very much, Your Honor.

23       Directing your attention -- I can pretty much

24   just calibrate my argument to what's written there in

25   their memorandum.

1          I mean on page three of the memorandum, the

2     government concedes that on August 4th --

3          Actually, I should start at the little bullet

4     point above that.

5          From February 20, 2004 until August 4, 2004, the

6     government concedes or says the defendant was held as

7     a federal prisoner at the Maryland Correctional and

8     Adjustment Center, MCAC.

9          Now the distinction that they are drawing in

10    this submission, if I understand it, the notion that

11    they are urging is that Mr. Gardner was never sent

12    back to a Maryland Department of Corrections facility,

13    and the cases that they are relying upon are cases in

14    which typically, you know, a defendant is held in

15    state custody, serving a sentence at a particular

16    prison facility.

17         Then this defendant is sent to federal custody

18    or is sent to federal detention to face a federal

19    charge on a federal detainer, and when is sent back to

20    state custody in a completely unrelated, like a third

21    case, to the same state, that is to say, the sending

22    state that the defendant originally came from, and

23    typically held in like sort of a temporary jail, a

24    temporary detention facility other than a facility

25    that's a correctional facility or a prison facility,

1     at least not the same prison facility that the

2     defendant came from originally.

3          So the government relies on a couple of cases.

4     There is a recent 2007 case suggesting that that

5     doesn't violate the IAD.

6          But here, the facts that we have here, at least

7     as I see them, are materially different because here,

8     the government concedes right in the first bullet

9     point that the defendant is held from -- after this

10    case, the case we are in right now commences.

11         From February 20, 2004 until August 4, 2004,

12    they say he is held as a federal prisoner at the

13    Maryland Correctional and Adjustment Center.

14         Now actually, I was just trying to do -- and I

15    hope Your Honor will forgive me.  I'm in trial, as

16    Your Honor knows, down in D.C.  So I just wasn't able

17    to kind of scrutinize this issue as closely as I

18    should have before this hearing.  But I'm pretty sure

19    that the MCAC is part of the Maryland Department of

20    Corrections.

21         That's different from the cases that the

22    government is relying on.  In other words, he is not

23    being sent, you know, to like the Frederick County

24    Jail in order to face a new robbery charge in

25    Frederick County or something like that.  He is being

1      sent from whence he came.

2           In other words, he is initially serving a

3      sentence in a Maryland Department of Corrections

4      facility.  He comes here and then he is sent back, at

5      least as I think, if I'm figuring this out correctly,

6      he is sent back to another Maryland Department of

7      Corrections facility.  I'm pretty sure MCAC is part of

8      the Department of Corrections.  I was actually just

9      looking him up.

10          THE COURT:  Of course, it is, but I'm not -- we

11     don't have a federal detention facility.

12          MR. COBURN:  And I know that's a subject of a

13     lot of controversy in this district.

14          THE COURT:  Actually, there's no controversy.

15     We need one.  We've got to have one.

16          MR. COBURN:  I don't mean to disagree with that

17     at all.  I strongly agree with you.

18          THE COURT:  Yeah.

19          MR. COBURN:  But I mean as a result then of just

20     sort of the fortuity, the chance that there isn't one,

21     he then comes back, not to a county jail, but he comes

22     back to a Maryland State Department of Corrections

23     facility.

24          THE COURT:  But he is in federal custody.

25          MR. COBURN:  Now I hear that.  That's certainly

1      the government's position with respect to that

2      particular, that particular moment.

3           THE COURT:  Right.

4           MR. COBURN:  But A, if I understand correctly,

5      there's a contract between the federal government

6      and --

7           THE COURT:  The State of Maryland.

8           MR. COBURN:  -- the State of Maryland.  It may

9      be State of Maryland or, according to --

10          Actually, there is a Wikipedia write-up on the

11     MCAC, believe it or not, Your Honor, and it says the

12     contract is with the MCAC specifically.

13          THE COURT:  Which is an agency, department of

14     the State of Maryland.

15          MR. COBURN:  Now the government, you know, they

16     haven't proffered a copy of this contract.  I haven't

17     seen it.  I mean I sort of take their word, I suppose,

18     that the contract exists.

19          But I don't think that takes, with respect to

20     even that particular transfer, I don't think it takes

21     that out of the IAD.  In other words, he is not being

22     transferred to sort of some other facility.  He is not

23     being transferred, let's say, to, you know, a state

24     facility in a third state that has this contract.  He

25     is being transferred, at least as I see it, directly

1      in violation of the IAD, back to the Maryland

2      Department of Corrections, and I don't think the

3      existence of that contract changes that situation at

4      all.  I don't think it does.

5           Now they are citing some cases relating to

6      transfers to other places, not relating to transfer

7      back to the sending jurisdiction of the Department of

8      Corrections, you know, for this proposition that he

9      sort of remains in federal custody because of the

10     existence of these contracts.

11          A, you know, I'm not at all sure those cases, to

12     the extent they exist, are correct because I mean --

13          THE COURT:  Okay.  But -- all right.

14          MR. COBURN:  I mean you have to -- I'm sorry.  I

15     didn't mean to interrupt, Your Honor.

16          THE COURT:  I'm just trying to understand your

17     position, and maybe I should hear from Mr. Hanlon

18     first.  Would that be helpful to you?

19          MR. COBURN:  It would be perfectly fine with me

20     if it's helpful to the Court, but I mean from my point

21     of view, you know, this is a direct and unambiguous

22     violation of the IAD because he is being sent back to

23     the same agency within the sending state.  You know,

24     contract or no contract, that's where he is going.

25          THE COURT:  Let's hear from Mr. Hanlon and then

1    you respond to the government's argument.

2            MR. COBURN:  I appreciate that, Your Honor.

3            DEFENDANT GARDNER:  Excuse me, sir.  I accept

4    everything for value that the attorney said, return it

5    for full value.  I do not wish to argue the facts.  I

6    request the judge to issue me an appearance bond, and

7    waive all public costs.  I request the judge to close

8    the accounts and release the order of the Court to me

9    immediately.  I request the judge to set off and

10   adjust all public charges by exemption, in accord with

11   U.C.C. 3-419, House Joint Resolution 192, and Public

12   Law 73-10, and I request discharge.

13           THE COURT:  You are discharged, Mr. Gardner.

14   Mr. Gardner is excused.  Thank you, marshal.

15           (Pause.)

16            Okay, Mr. Hanlon.

17           MR. HANLON:  Thank you.

18           THE COURT:  Walk us through it.

19           MR. HANLON:  Certainly.  What I did, in

20   attempting to brief this issue, I had to begin by sort

21   of reconstructing what the defendant's sort of

22   custodial status had been.  The defendant's motion had

23   attached various documentation dealing with the fact

24   that he was shifted here and there.  It basically said

25   this is in violation of the IAD, and that was about

1    it.  Then we had Mr. Gardner's own written submission.

2        So I relied on that and then I obtained

3    documentation from the marshals and essentially put

4    together the chronology that we have and that I put in

5    the memorandum.

6        I looked at it in terms of sort of two

7    categories of transfers, and the categories were based

8    on whether or not it was a situation where the

9    defendant is being housed in a state facility as a

10   federal prisoner or a situation where the defendant

11   was being placed in a state facility as a state

12   prisoner.  So it was the Baltimore County situation on

13   the one hand and then sort of all the other situations

14   on the other.

15       They were different situations, and it is true,

16   he was always being held in a state facility, because

17   that's how we do things here in the federal courts in

18   Maryland because we have no facility.

19       A number of decisions, including the Hunnewell

20   decision which I cite in my brief, have essentially

21   stated that it is clear under the IAD, and this

22   appears to be uniform -- I found no Fourth Circuit

23   law, but it appears to be uniform -- that the

24   formality of treating a prisoner as a federal

25   prisoner, whether he is being housed in a state

1    facility or not, simply takes it out of the IAD.  That

2    prisoner has not been transferred back to the original

3    place of imprisonment or even the sending state in a

4    way that would violate the IAD.

5        Frankly, that was the easier problem.  The

6    Baltimore County issue was I thought a bit more

7    complicated because there you actually have a transfer

8    to the sending state.

9        But focusing first on the issues that I think

10   Mr. Coburn focused on a moment ago, during the time

11   that Mr. Gardner was held as a federal prisoner at the

12   state facilities, all of the case law makes clear, it

13   doesn't matter where you go.  It doesn't matter what

14   facility you are at.  If you are treated as a federal

15   prisoner, if you are credited federal time, then you

16   are in federal custody.  There has been no transfer

17   back to the sending state.

18       It appears the way the cases have dealt with it,

19   including the First Circuit in Hunnewell, is that the

20   term sending state means you are within the sovereign

21   custody of the state.  In this case, it would be the

22   State of Maryland.

23       That wasn't the case here, with the exception of

24   the Baltimore County transfers.  Mr. Gardner was a

25   federal prisoner.  He was getting credit accounted to

1     him by the marshals.  The marshals are counting his

2     days as federal time, as indicated in that prisoner

3     transfer log.  He was brought to court if he needed to

4     be brought to court on the basis of a come-up, not on

5     the basis of a federal writ issued to a state judge.

6          THE COURT:  There has never been a federal writ

7     issued for Mr. Gardner, has there?

8          MR. HANLON:  Not to the best of my knowledge,

9     with the exception I think with the original one that

10    brought him to court in the first place where he

11    invoked his IAD rights.  Then subsequently, he did

12    waive his IAD rights later on.  I don't know what his

13    history has been after that because I don't really

14    think that's in controversy here.

15         But during the issues that we are dealing with,

16    no, there were no federal writs.  He was brought in

17    and then he remained a federal prisoner, with the

18    exception of the times when he was held in Baltimore

19    County custody on the basis of a state writ.

20         So the government's answer to this first point

21    dealing with his housing in state facilities is there

22    is no IAD violation because he was never sent back to

23    the sending state.  If he were, I guess we are

24    violating the IAD with all of our prisoners who invoke

25    the Interstate Agreement on Detainers.  Of course,

1        that's now how all of the federal courts that have

2        looked at this have addressed the issue.

3            Now that's the first category.  The other

4        category are the Baltimore County situations and

5        again, that seems to be squarely addressed again in

6        the Hunnewell decision and also in, I believe it's the

7        Pursley decision, which arose out of Colorado I

8        believe.

9            Again, both of those cases are dealing with

10       exactly the same situation we have here, both of them

11       reaching the same result that the government urges

12       here.  A state prisoner, a state prisoner in sentence

13       is transferred to federal court on a new charge.  He

14       is then picked up on a state writ or a state transfer

15       order to another state jurisdiction for a new state

16       charge, and that is simply not a violation of the IAD

17       because he is not being returned to his original place

18       of imprisonment pursuant to Article V.

19           Those are the two prongs that have to be shown

20       if there is a violation of the anti-shuttling

21       provision.  There needs to be a return to the original

22       place of imprisonment and that return has to be done

23       pursuant to Article V of the IAD, which contemplates a

24       return of a prisoner to serve his state sentence and

25       return to rehabilitation after the conclusion or

1          during, if it's a violation of the ongoing current

2          case.

3                  The fact is that at no time during Mr. Gardner's

4          federal incarceration, from the day of his initial

5          appearance until the day that he made his reserved

6          waiver of rights under the AID, was he ever returned

7          to a DOC facility in a way that he resumed his state

8          sentence and entered back into rehabilitation.

9          Therefore, there has been no violation of the IAD.

10                 THE COURT:  All right.  Thank you, Mr. Hanlon.

11                 MR. HANLON:  Thank you, Your Honor.

12                 THE COURT:  All right.  I hope that was helpful,

13         Mr. Coburn.

14                 MR. COBURN:  Absolutely, Your Honor.  I think it

15         helped to sharpen the issues and, you know, I will try

16         to address them directly, to the extent that I can.

17                 First of all, he spoke of a waiver, and I hope

18         it's clear from the paperwork, and I am sure the

19         prosecutor didn't mean to suggest anything to the

20         contrary, that the waiver is only prospective.

21                 THE COURT:  Right, April 14, 2005.

22                 MR. COBURN:  Exactly.  So we are only talking

23         about -- you know, there is no waiver with respect to

24         prior to that date, and there is a federal detainer

25         prior to that date.  So the IAD is squarely set up

1     here, at least as I understand it.

2          So with respect to that first -- again, I'm not

3     going to detain Your Honor long on this.

4          But with respect to that first bullet point in

5     terms of the MCAC custody, what you typically have, at

6     least as I understand it with respect to the cases on

7     which the government relies, is a situation in which

8     let's say, you know, there is a county facility

9     somewhere that has like a block set aside for federal

10    prisoners.  And the argument is made, and I don't know

11    how, you know, carefully it has ever been vetted,

12    frankly, but the argument typically is made to the

13    effect that those prisoners in the federal block in

14    the county facility are, for IAD purposes or other

15    purposes, they are still in "federal custody."

16         But here, Your Honor, you have a situation in

17    which my client is sitting for several months at the

18    MCAC.

19              THE COURT:  In a federal cell.

20              MR. COBURN:  But he is not in federal custody.

21    There may be a contract, you know, which is a piece of

22    paper.  That's fine.  You know, I'm sure it regulates

23    where the funding comes from and so on, but he is

24    supervised by state people.

25              THE COURT:  What dates are you saying he was not

1    in federal custody?

2         MR. COBURN:  At least as I understand it, Your

3    Honor, he is not in federal custody from February 20,

4    2004 until August 4, 2004.  It says that he is held --

5    this is just a conclusory allegation by the

6    government.  It says he is held as a "federal

7    prisoner" at the Maryland Correctional and Adjustment

8    Center.

9         Now that's what they -- you know, that's just

10   putting a label on it.

11        THE COURT:  Well, what kind of label do you put

12   on it?

13        MR. COBURN:  The label I put on it, Your Honor,

14   is that he is being held at a state facility.

15        THE COURT:  Slow down.  That's not disputed.  He

16   is in a state-owned facility.

17        MR. COBURN:  He is being supervised, regulated,

18   controlled by state personnel in a state facility.

19        THE COURT:  Who are acting for those purposes as

20   agents of the United States Marshal Service.

21        MR. COBURN:  I don't know that, Your Honor.

22        THE COURT:  Well, I'm telling you that.

23        MR. COBURN:  I mean --

24        THE COURT:  That's what they do.

25        MR. COBURN:  Well, I don't know that --

1          THE COURT:  They don't have federal employees

2      over there doing feedup at Supermax.  They are state

3      employees.

4          MR. COBURN:  That's exactly my point.

5          THE COURT:  But the United States government

6      pays for those meals.

7          MR. COBURN:  That's true.  The United States

8      government pays for the meals and the United States

9      government I suspect, pursuant to the contract that I

10     am sure exists between the U.S. government and the

11     Maryland Department of Corrections, you know, pays

12     some sort of proportionate share of the salary and the

13     other overhead expenses that the institution incurs.

14         THE COURT:  Actually, I think it's a per diem.

15         MR. COBURN:  That would be easier, I mean a per

16     diem, but it's still being done by state people in a

17     state facility that is part of the Maryland Department

18     of Corrections.

19         I don't think, if you look at the language of

20     the IAD and you look at the particular cases that they

21     cite, I don't think that that takes this out of the

22     ambit of the IAD, not for one minute.  I don't think

23     it does.

24         THE COURT:  Okay.  I'll take another look at it.

25     I don't think you are going to persuade me.  I'll take

1    another look at it.

2         MR. COBURN:  That's the feeling I am getting

3    also, Your Honor.

4         There is one other thing which I should bring to

5    Your Honor's attention.

6         THE COURT:  What's that?

7         MR. COBURN:  You know, there is some very

8    careful phraseology in this submission.  I mean he is

9    taken to the Northern Neck Regional Jail in Virginia.

10   That is not an IAD violation, I concede, because

11   that's not the sending jurisdiction.

12        But right after that, they point out, they

13   say -- this is on page five of their submission --

14   between March 24, 2005 and April 11, 2005 -- and this

15   is, like I say, this is carefully written -- the

16   Defendant was housed for 18 days --

17        And I know, Your Honor, this sounds just

18   hypertechnical.

19        THE COURT:  It is hypertechnical.  That's what

20   we all get paid to do.

21        MR. COBURN:  It's a bizarre piece of

22   legislation, I concede to you, Your Honor.

23        When I was an Assistant U.S. Attorney in D.C.,

24   we had a serial rape case that was dismissed with

25   prejudice because of a one-day violation of the

1        Interstate Agreement on Detainers.  I think it was

2        probably the hardest thing that judge ever did.

3              THE COURT:  Did he get reversed?

4              MR. COBURN:  No, he didn't.

5              THE COURT:  Did the government appeal?

6              MR. COBURN:  The defendant was discharged.

7              THE COURT:  Did the government appeal?

8              MR. COBURN:  I don't believe they did.  It was a

9        serial rapist.

10             THE COURT:  Well, an alleged serial rapist.

11             MR. COBURN:  And he will always remain alleged.

12             THE COURT:  All right.

13             MR. COBURN:  But here we have on page five --

14             THE COURT:  It's the same argument, Mr. Coburn.

15       Whether it's the Maryland Adjustment and Training

16       Center or the Allegany, what difference does it make?

17             MR. COBURN:  Here's the difference.

18             THE COURT:  What's the difference?

19             MR. COBURN:  Because according to the

20       phraseology here, do you see the way they say --

21             I have to say, Your Honor, I haven't scrutinized

22       the internal paperwork of the Allegany County

23       Detention Center, but it says again, the USMS

24       considered him a federal prisoner during that time.

25             I would wager --

1          THE COURT:  He is a federal detainee.

2          MR. COBURN:  I would wager that there is no

3     contract with respect to that institution.

4          THE COURT:  You're going to lose a lot of money.

5     We've got takers over here.

6          MR. SULLIVAN:  I'll take him.

7          THE COURT:  We'll all take that bet.

8          MR. COBURN:  Really?

9          THE COURT:  You think that Allegany County, out

10    of the goodness of its heart, says U.S. marshals,

11    bring us your downtrodden, your --

12         MR. COBURN:  There may be some other

13    methodology, Your Honor.  There may have been a

14    contract later or something, but I don't think they

15    would have said considered him.

16         The fact that the U.S. Marshal Service considers

17    somebody a federal prisoner is meaningless.  It means

18    nothing from the point of view of the IAD.

19         THE COURT:  On that, I can agree with you.  Mr.

20    Hanlon, I'm sure, probably would draft that a little

21    differently.

22         But you're right.  It's not what the U.S.

23    marshals consider him to be.  It is what he is in law

24    and in fact, and he is being held by the United States

25    Marshal under Judge Grimm's order, plain and simple.

1   They can ship him to California.  They can ship him to

2   Oklahoma, state or federal.  They can leave him here

3   overnight.  It doesn't make any difference, it seems

4   to me.  That's the only common sense interpretation.

5       But I'll take another look at it, Mr. Coburn.

6   They may be, there may be something there.

7       MR. COBURN:  I guess the main point from my

8   point of view, I think in terms of if it is viewed

9   through the prism of common sense, the statute really

10  makes very little sense.

11      But I don't think it is a common sense

12  proposition.  I think it is a technical, a highly

13  technical proposition.  From our point of view, it

14  seems to me it has just been violated.

15      THE COURT:  Okay.  You understand, of course,

16  there wouldn't be a dismissal with prejudice in this

17  case under any circumstance.

18      MR. COBURN:  You know, Your Honor could exercise

19  your discretion and dismiss this case with prejudice

20  for the following reason.

21      THE COURT:  I'm going to stop you.  Now you are

22  really --

23      MR. COBURN:  Have gone too far.

24      THE COURT:  -- going too far, yes.

25      While you are up there, did you want to argue on

1    the third superseding indictment?  Do you have any

2    issues on that?

3         MR. COBURN:  I don't think we do, Your Honor.

4         THE COURT:  Okay.  Does anybody?  You can submit

5    on the papers if you want or I'll be glad to hear some

6    brief argument.

7         Good afternoon again.

8         MR. HURSON:  Thank you, Your Honor.

9         The papers have laid it out, and I think it has

10   been tossed around as -- the government has labeled it

11   a proof issue.  What's at issue here is the amendment

12   to the -- it's really just a small amendment, but

13   large in the sense that it extends the date of this

14   alleged RICO conspiracy two years.

15        It doesn't add any new racketeering acts, but it

16   does change the purpose of the so-called Mitchell

17   organization to preventing and obstructing arrests and

18   prosecution through witness intimidation and disruption.

19        THE COURT:  The part that I liked was your

20   suggestion that maybe I need to recuse.

21        MR. HURSON:  Well, Your Honor, I guess we jump

22   right into the proof part.

23        THE COURT:  I don't think the governments needs

24   me as a witness.

25        MR. HURSON:  Well, Your Honor, it is sort of

1     unchartered waters, I think it has been described as.

2     It's in-court behavior.  Now it has been labeled as

3     disruption; but frankly, as a former middle school

4     teacher, I have seen disruption, and it's relatively

5     tame, if you ask me.

6          THE COURT:  I'm afraid I don't have the option

7     of a time-out.

8          MR. HURSON:  None of my students cared either;

9     hence, I'm here.  But either way, the Fourth Circuit

10    just a few weeks ago had a case before it, U.S. v.

11    Banks, where the same flesh and blood argument was

12    presented.

13         THE COURT:  There have been a couple, yes.

14         MR. HURSON:  Actually, I think the Fourth

15    Circuit, to my knowledge, went as far as ever in

16    describing it in this particular case.  They called it

17    an ill-advised self-defeating legal strategy, which

18    perhaps is correct.

19         But the point is that this third superseding

20    indictments seems to criminalize what it is albeit a

21    strange, bizarre, what have you, but a legal argument.

22    And to do that, we have entered into a really strange

23    world, which I think is what you are alluding to,

24    where we all become in some sense co-conspirators to

25    criminal acts every time we come into the courtroom.

1          THE COURT:  Well, no, not co-conspirators.  You

2     certainly become witnesses of disruptive behavior

3     which the government contends, and the Grand Jury

4     agreed, was evidence of an ongoing conspiratorial

5     understanding.

6          MR. HURSON:  Well, that certainly raises another

7     issue that I think --

8          What was presented to the Grand Jury?  What

9     witnesses came forward?  How was this even proven?

10    The point of all this --

11         THE COURT:  It would haven't taken much beyond

12    reading the transcripts of the proceedings.

13         MR. HURSON:  Perhaps, but at trial --

14         The point I guess, Your Honor, is to say at what

15    point can we just narrow this down, cut the fat, and

16    get to what this case is really about?  It can't

17    extend the life of a conspiracy for two years.

18         I mean in some sense it is a proof discussion.

19    But you have defendants who are cooperative at a point

20    and then, you know, cease cooperating.  To reindict

21    that and claim that it somehow stretches into the

22    future, are we to expect I guess a fourth superseding

23    indictment after today's proceedings?  This goes on

24    and on and on.

25         So you can call it a proof issue, you can call

1       it a pleading issue, but the point is the Court should

2       step in and say enough is enough, limit this to what

3       is really the issue here, and that is the supposed

4       drug organization, and cut the flesh and blood out of

5       it.  That's what in essence we are asking the Court to

6       do.

7             To the point that you made, whether or not you

8       would be a witness, I mean it was in there, some

9       argument over this, but as I read it, it was your

10      suggestion, albeit maybe not -- you didn't expect it

11      to be carried out, I don't know, but it was in the

12      transcript where you said you know, I can actually

13      envision a third superseding indictment.

14            THE COURT:  And I think every one of us could.

15            MR. HURSON:  Well, certainly now.

16            THE COURT:  I mean it was as clear as the nose

17      on our faces.

18            MR. HURSON:  Well, I wasn't here at the time, of

19      course.  I would think that the behavior that was

20      being exhibited here is an ill-advised legal strategy,

21      and to turn that into evidence or a component of a

22      criminal charge is a very dangerous direction.  When

23      we are talking about --

24            THE COURT:  See, I don't think, I don't think it

25      is any more a legal strategy than murder is a legal

1     strategy.  I say that most respectfully.  The Fourth

2     Circuit was being, I was going to say

3     uncharacteristically generous, but I won't say that.

4         The Fourth Circuit called it a "legal strategy,"

5     right?  It's not a legal strategy.  It's not a legal

6     strategy other than it's just the most expansive

7     colloquial sense of that term one can imagine.

8         MR. HURSON:  Certainly, perhaps not to us, but I

9     do know that we may be hearing more about it as we are

10    learning more about what it is and its genesis, and

11    this and that, and I don't want to give it any more

12    respect than it deserves.

13        But my point is it is a strategy, and if these

14    gentlemen presenting it together somehow turns it into

15    part of a criminalism, then four co-defendants saying

16    not guilty can just as easily be turned into some sort

17    of collected behavior designed to thwart the ends of

18    the justice system.

19        So by that, I would say that is generally our

20    issue.  If anything, this is a separate, just one

21    final point, a separate conspiracy, if you even want

22    to go that far, whereby it would be perhaps a cover-up

23    or some sort of disruptive -- but it can't be part of

24    the initial drug organization.  That's really our

25    issue.

1          THE COURT:  Thank you, Mr. Hurson.

2          MR. HURSON:  Thank you.

3          THE COURT:  I will certainly anticipate various

4     motions in limine from the defense as we go forward,

5     and I will give those motions careful consideration,

6     to be sure, but I don't have within the Court's power

7     to start amending indictments and making pretrial

8     rulings on the scope of a conspiracy.  We are just

9     going to have to see how this plays out.

10          Yes, Mr. Crowe.  I didn't mean to shortcut your

11     argument on your motion to dismiss.

12          MR. CROWE:  I will make it extraordinarily

13     brief.  I believe Mr. Hurson has certainly covered the

14     high points and I think we have briefed it as well as

15     we can in our second set of motions.  I would just

16     like to point out a couple of important dates for

17     this.

18          June 7, 2002 we think is probably the critical

19     date.  That is the date of the last murder, the Tanya

20     Jones-Spence murder.  Mr. Harris was arrested for that

21     murder that day.

22          My client and Mr. Mitchell had been in jail

23     since April of 2002.  So by that time, we had three of

24     the four people who were named as members of the RICO

25     enterprise and three of the four people who were part

1      of, who were named as members of the conspiracy in

2      jail.

3            As Mr. Hurson has pointed out, that is also the

4      date, even through the third superseding indictment,

5      of the last racketeering act, and we only have a

6      couple of crimes past that point.  One is -- excuse

7      me.

8            The arrest of Mr. Harris, he was actually in

9      2004.  He had a gun on him.  Then there was the

10     assault up in the Marshal's Office.

11           None of those were pled to be part of the

12     conspiracy.  None of those were pled to be part of the

13     RICO enterprise.

14           Clients were in jail for months under the state

15     indictment.  They were in jail for about a year and a

16     half under the federal indictment.

17           This Court made the formal finding itself that

18     at all times they conducted themselves properly and

19     they acted in a completely decorous manner while they

20     were in court until the activity, the outburst,

21     whatever you want to call it, in November of 2005.

22           The law is quite clear that for there to be a

23     RICO enterprise, it has to be something that is

24     continuing and ongoing.  It can't be something which

25     is punctuated by a lapse of -- actually, years is what

1    we are talking about here.

2         We don't think it's an ongoing activity.  Under

3    the cases we cited, we don't think that it is an

4    ongoing activity in terms of being a RICO enterprise

5    or in terms of being a garden variety conspiracy.

6         THE COURT:  All right.  Thank you, Mr. Crowe.

7         Mr. Harding.

8         MR. HARDING:  Thank you, Your Honor.

9         Judge, in my response to this motion about when

10   the conspiracy or the racketeering enterprise ends, I

11   talked mostly about RICO cases, the Shores case and

12   the Stokes case and other similar cases.

13        There's another line of authority which I think

14   can be applied to this, and has been by the Fourth

15   Circuit, and that's the case law dealing with

16   withdrawal from a conspiracy.

17        I agree with Mr. Martin that the issue of when

18   an enterprise ends is largely the same as the question

19   of when a conspiracy ends.  Of course, that's

20   especially the case when what we have charged is a

21   RICO conspiracy.

22        There is a section -- Section 170 of the Fourth

23   Circuit Criminal Handbook summarizes the case law on

24   withdrawal from a conspiracy.  It talks about the rule

25   in this circuit.  I'll give you the Leavis case, 853

1    F.2d at 218-219.  The rule applies in this circuit

2    that a conspiracy continues until there is affirmative

3    evidence of its abandonment or defeat of its purpose.

4         For withdrawal from a conspiracy, a particular

5    member has to take affirmative steps to defeat the

6    conspiracy, and it is his burden to show that he has

7    done that.

8         There is a particularly good case that I pulled

9    up in this line of cases about withdrawal from a

10   conspiracy.  It's the West case, and it is good

11   because it deals with being incarcerated or getting

12   locked up as an argument for withdrawing from a

13   conspiracy.

14        This case, United States versus West, which is

15   at 877 F.2d 281, dealt with a situation where a guy

16   named Thomas was locked up in January of, I'm sorry,

17   in May of 1986, and about seven or eight months later,

18   in January of 1987, two of his co-conspirators were

19   caught doing a marijuana transaction in Bermuda.  Mr.

20   Thomas claimed that he wasn't a member of the

21   conspiracy, that evidence shouldn't be admissible

22   against him.

23        The Fourth Circuit says in the West case, Thomas

24   argues instead that his arrest constituted evidence of

25   his withdrawal from the conspiracy and, therefore, the

1    post-arrest evidence should not have been admissible,

2    absent an affirmative showing that Thomas somehow

3    continued in his role as a conspirator from jail.  We

4    disagree.  A defendant's membership in a conspiracy is

5    presumed to continue until he withdraws from the

6    conspiracy by affirmative action.  Withdrawal must be

7    shown by evidence that the defendant acted to defeat

8    or disavow the purposes of the conspiracy.

9        It goes on to say that the District Court

10   determined that the post-arrest evidence was relevant

11   on the basis of the government's uncontested

12   representation that two of the participants in the

13   January 1987 marijuana transaction were

14   co-conspirators with Thomas prior to his arrest.

15   Given this presumption that Thomas's membership in the

16   conspiracy, if proven, continued after his arrest,

17   evidence of that transaction was relevant to proving

18   the scope of the conspiracy's activities.  We,

19   therefore, find that the evidence was properly

20   admitted.

21       There are similar provisions in a number of

22   Fourth Circuit cases that deal with this issue.

23       I would also like to speak, and I'll rely on my

24   written submission that I provided to the Court for

25   the argument as it relates to a RICO enterprise, which

1       is very similar case law actually.

2           I want to say one thing about the courtroom

3       disruption activity of these defendants, Your Honor.

4       It is not charged in the RICO count.  It is, however,

5       racketeering activity because Section 1503 of Title 18

6       of the U.S. Code is listed as racketeering activity in

7       Section 1961.  Section 1503 is a sort of federal

8       contempt and obstruction of justice statute.  It

9       contains a sort of catchall provision.

10          There is a case, a United States Supreme Court

11      case called U.S. v. Aguilar, 515 U.S. 593.  At page

12      598 it talks about this omnibus clause in 1503, and

13      says that it serves as a catchall, prohibiting persons

14      from endeavoring to influence, obstruct, or impede the

15      due administration of justice.  The latter clause, it

16      can be seen, is far more general in scope than the

17      earlier clauses of the statute.

18          The clause basically makes it a crime to

19      corruptly influence, obstruct or impede or endeavor to

20      influence, obstruct or impede the administration of

21      justice, corruptly, which is a word, I believe it was

22      Mr. Martin's motion, talks about.

23          There is an abundance of case law that simply

24      says this is a specific intent requirement.  It

25      requires that the defendant specifically intend to

1        disrupt the administration of justice.

2              I'll give the Court another case, United States

3        versus Alwan from the Fifth Circuit, a 2004 case, 388

4        F. 3d 507, where its talks about a witness's failure

5        to testify, his refusal to testify after being

6        subpoenaed to court, which would be a classic example

7        of contempt of court.  It holds that that kind of

8        activity is cognizable under the catchall provision of

9        1503.

10             There is a string of case citations in the U.S.

11       Code Annotated that speaks of this as a contempt

12       provision.

13             So even though it's not charged, the courtroom

14       disruption activity is racketeering activity under the

15       law and would be admissible to show the pattern of

16       racketeering activity in this case.

17             I had proposed to address that issue in writing,

18       Your Honor, and I will do so, but I want to give you

19       the government's position on that now.

20             The key point of that is the government doesn't

21       say anything about live flesh and blood or the

22       defendants' defenses, legal defenses in its third

23       superseding indictment.  It simply cites courtroom

24       disruption, along with witness intimidation, as two of

25       the purposes of the Mitchell organization, and witness

1    intimidation has in fact always been there in the

2    indictment.  It is one of the ongoing permanent

3    features of this organization, and Your Honor got a

4    flavor of it in the rap song that was played in court

5    here one day.

6        But there are other instances.  It's not just

7    Mr. Harris who has attempted to assault or intimidate

8    government witnesses.  The Court will hear evidence of

9    other such occasions that have punctuated the

10   post-arrest history of this case.  It's not jut Mr.

11   Harris.  It's other defendants as well, and it is an

12   ongoing permanent feature of the organization.

13       So the government's position is that the new

14   language that was inserted into the third superseding

15   indictment is perfectly appropriate, proper language

16   in the indictment and doesn't compromise any rights

17   that the defendants have.  Thank you.

18       THE COURT:  Thank you, Mr. Harding.

19       Well, I am not persuaded to dismiss the

20   indictment on account of the changes effected in the

21   third superseding indictment.  So the motions to

22   dismiss or to strike certain language from the

23   indictment is denied.

24       I will take another look at this IAD issue.

25   It's kind of interesting actually, but I don't expect

1      to grant any relief to Mr. Gardner on account of that

2      motion.

3            I think that -- yes, Mr. Hurson.

4            MR. HURSON:  Not to interrupt, we have a

5      separate motion to dismiss as well.

6            THE COURT:  Oh, okay.

7            MR. HURSON:  Not simply this one.

8            THE COURT:  All right.

9            MR. HURSON:  I can briefly summarize.  This

10     will, actually will be brief I think.

11           The papers pretty much lay it all out.  It's the

12     motion to dismiss.  It was Count 1 of the second

13     superseding indictment.  I guess I would orally amend

14     to make it the third superseding indictment.  It's the

15     whole issue of the separation between the person and

16     the enterprise under 1962(c).

17           Again, the papers sum it up pretty well.  I just

18     wanted to draw attention to a couple interesting

19     things.

20           One was Mr. Harding's representation in the

21     courtroom today about how the fact that no one would

22     have ever even called this an organization, the

23     Mitchell organization.  I thought that probative of

24     the issue because our point all along is that there is

25     no separation here between the individuals and what is

1          now being called a RICO organization.  As the papers

2          make clear, the Fourth Circuit has been very specific

3          on the requirement that this be separate.

4              I was trying to think of an example that may sum

5          it up, and something that came to mind was like a

6          baseball team.  The 1941 New York Yankees -- some

7          might call them a criminal organization of sorts --

8          would be different if they didn't have Joe Dimaggio on

9          the team, but they would still be an organization.

10         They would still continue on.

11             So in that sense, there is separation between

12         the individual, albeit a key individual, but an

13         organization.

14             Here, we have an organization, but if you take

15         any one of the defendants out of it, it simply falls

16         apart.  It is not what the government claims that it

17         is, a long-standing organized enterprise.

18             The case law is laid out clear in the briefs,

19         but I just wanted to draw attention to that.

20             THE COURT:  Okay.  Thank you.  I'll take another

21         look at that.  I'm aware that that is an issue that

22         has been raised by Mr. Harris and I believe joined in

23         at least by Mr. Gardner and perhaps by the other

24         defendants as well.

25             All right.  I appreciate counsel's efficient

1       presentation of your arguments today.  We don't need

2       to be in session tomorrow.  We are next scheduled for

3       May 10 and 11, and I believe that's when you wish to

4       do the identification.

5               MR. KURLAND:  Yes.  I have a couple of

6       procedural housekeeping matters that I would like to

7       address with the Court.

8               THE COURT:  Okay.

9               DEFENDANT MITCHELL:  Excuse me, Your Honor.

10      Without being dishonorable, I wanted to know can I

11      address the Court when you finish?

12              THE COURT:  When we are done, yes, Mr. Mitchell.

13              DEFENDANT MITCHELL:  Thank you.

14              MR. KURLAND:  Your Honor, at the lunch break I

15      was talking to the government with respect to some of

16      the potential witnesses.  I indicated to the

17      government that we wanted Mr. Montgomery present, and

18      the government politely, but certainly refused.  I was

19      wondering if the Court could order --

20              THE COURT:  Why do you need Mr. Montgomery?

21              MR. KURLAND:  Well, without going into too much

22      of displaying what our, part of our defense is --

23              THE COURT:  I'm sorry.  This is on the

24      eyewitness identification.

25              MR. KURLAND:  The array of issues with respect

1    to the Andrea Smith identification.

2         From the moving papers that we filed years ago,

3    it's clear that Ms. Smith has made several

4    contemporaneous statements concerning the identity of

5    the perpetrators right after the initial shooting.  Of

6    critical import, she describes a tall person, much

7    taller than Mr. Gardner, wearing a red hat as the

8    shooter.  This has been testified to under oath by

9    some of the police officers.

10        Mr. Montgomery, we have reason to believe that

11   Mr. Montgomery has under oath to the government said

12   that Mr. Holly was wearing a red hat.  That is

13   critical with respect to --

14        THE COURT:  I'm sorry, Mr. Kurland.  I'm not

15   following this.  We are talking about Mr. Gardner's

16   motion to suppress photographic identification,

17   correct?

18        MR. KURLAND:  No.

19        THE COURT:  No.  Okay.  What are we talking

20   about?

21        MR. KURLAND:  Andrea Smith made several

22   statements to officers with respect to what happened

23   at the scene.  She also allegedly made a show-up

24   identification.

25        THE COURT:  Right.  The show-up identification

1    of Mr. Gardner.

2         MR. KURLAND:  Well, it's unclear as to what

3    exactly.  The government's positions is going to be

4    that she identified Mr. Gardner in the show-up as the

5    shooter.

6         THE COURT:  Okay.  All right.  Just stop there

7    for a moment.  So the government's contention,

8    proffer, expected evidence is that she identified Mr.

9    Gardner at the Spence murder --

10        MR. KURLAND:  Yes.

11        THE COURT:  -- as the shooter.

12        MR. KURLAND:  Yes.

13        THE COURT:  She has testified already in the

14   state court proceeding.

15        MR. KURLAND:  No.  She never did testify.

16        THE COURT:  She didn't testify.

17        MR. KURLAND:  But she made a statement to a

18   police officer who did testify under oath at both a

19   preliminary hearing and at the state court trial that

20   the shooter was a tall guy wearing a red hat.

21        THE COURT:  Okay.

22        MR. KURLAND:  Which is not --

23        THE COURT:  She knew it was a tall guy wearing a

24   red hat.

25        MR. KURLAND:  Which is not Mr. Gardner.

1          THE COURT:  What does that have to do with the

2     identification evidence in this case?

3          MR. KURLAND:  Well, because, because that isn't

4     Mr. Gardner and --

5          THE COURT:  Okay.  So she might be a defense

6     witness, but I'm trying to focus on what we need to do

7     in the way of Mr. Gardner's motion to suppress

8     identification evidence.

9          MR. KURLAND:  If part of putting on that

10    evidence --

11         THE COURT:  Part of putting on what evidence?

12         MR. KURLAND:  If part of putting on the evidence

13    concerning the constitutional unreliability of the

14    show-up procedures with respect to how Andrea Smith

15    allegedly made an identification of Mr. Gardner, we

16    have proffered evidence, and it's in the file from

17    years ago, that Andrea Smith also made a statement at

18    the scene where she described what happened and

19    described the shooter as a taller guy, six foot three,

20    six foot three, wearing a red hat.

21         THE COURT:  Okay.  So that will go to the

22    reliability and thus, the admissibility of her

23    out-of-court identification.

24         MR. KURLAND:  Yes.  In addition to that --

25         THE COURT:  Go ahead.

1          MR. KURLAND:  -- we had earlier heard today in

2      graphic and flowing things that Mr. Montgomery has

3      been self-described, or not self-described, as the

4      wheelman with respect to that shooting.

5          The government's argument is, and it is their

6      contention that Mr. Montgomery was present during, or

7      at or around the time of that.  Mr. Montgomery has

8      testified that on that day --

9          THE COURT:  In the state court proceeding?

10          MR. KURLAND:  Well, in the Grand Jury.

11          THE COURT:  In the Grand Jury.  All right.

12          MR. KURLAND:  That Mr. Holly that day, who is

13      about six foot three, wore a red hat.

14          THE COURT:  Okay.

15          MR. KURLAND:  Again, without going all into what

16      our defense is going to be with respect to that,

17      that's critical evidence for the Court in evaluating

18      the accuracy and the reliability, and all of the

19      factors concerning the accuracy and the reliability of

20      her alleged show-up identification.

21          THE COURT:  Okay.  I'm not going to order the

22      government to produce Mr. Montgomery.  I don't see the

23      connection.  In fact, you just told me that he

24      testified in the Grand Jury that Mr. Holly was wearing

25      a red hat.

1        MR. KURLAND:  Oh, I'm sorry.  I forgot one

2    critical factor.  Ms. Smith says at the scene that the

3    guy wearing the red hat is the shooter.  I'm sorry.

4        THE COURT:  Okay.  So she will be cross-examined

5    on that and the Court will make a reliability

6    determination.

7        MR. KURLAND:  Well, the government has also told

8    me that if I try to admit into evidence Mr.

9    Montgomery's statement in the Grand Jury, they are

10   going to object on hearsay grounds.  How can they

11   object on hearsay grounds if they are not going to

12   present him?

13       THE COURT:  Well, it's --

14       MR. KURLAND:  Well, you have to make the ruling.

15       THE COURT:  I can consider that on a motion to

16   suppress identification.  I mean we are not concerned

17   about a jury at the hearing.  So we don't need Mr.

18   Montgomery is what I'm saying.

19       MR. KURLAND:  Well, as long as that testimony

20   with respect to Holly wearing the red hat is --

21       THE COURT:  Well, I'll decide whether I'm going

22   to consider it at the time of the hearing.  I

23   understand that, but we don't need him here to repeat

24   that if you've got the Grand Jury testimony.

25       MR. KURLAND:  All right.  That's the first

1      thing.  The second thing --

2            THE COURT:  Let me just hear briefly from Mr.

3      Harding, please, again.  I know you have been over

4      this.

5            Mr. Harding, are you going to introduce the

6      evidence of the show-up?

7            MR. HARDING:  Yes, Your Honor.

8            THE COURT:  And through what witness?

9            MR. HARDING:  I'm going to let Mr. Hanlon --

10           THE COURT:  Mr. Hanlon, do you have a detective

11     who is going to testify to that?

12           MR. HANLON:  There were two.  I believe they

13     were uniformed officers.

14           THE COURT:  Uniformed officers.

15           MR. HANLON:  Then they will be prepared to

16     testify about the procedure that was followed.  One of

17     the things Mr. Kurland and I spoke about this

18     afternoon is Mr. Kurland has a couple of officers he

19     is expecting to see at the hearing.  I told him to

20     give me a list.  I want to make sure they are

21     available and so forth.

22           THE COURT:  Okay.

23           MR. HANLON:  That's essentially how the

24     government anticipates setting forth this procedure.

25           THE COURT:  All right.  Okay.

1          All right.  Go ahead, Mr. Kurland.

2          MR. KURLAND:  Two other things, Your Honor.  One

3     is that, Mr. Harding and I had talked about this over

4     the phone, the earlier transcripts of several of the

5     proceedings --

6          THE COURT:  Right.  I saw that in the papers.

7     Have you been in touch with Ms. Cook?

8          MR. KURLAND:  I personally have not, but we need

9     the full, I think all counsel need the full

10    transcript, not just simply the testimonial part.

11         THE COURT:  I agree.  I am sure if you are in

12    touch with Ms. Cook, she will do whatever she needs to

13    do to get them produced.

14         MR. HARDING:  Mr. Kurland and I left a voice

15    mail message for Ms. Cook.

16         THE COURT:  Yeah.  She has been ill, and as you

17    can see, she is not here today.  She has had some

18    issues, but I am sure she will produce them for you.

19         MR. HARDING:  She did call me back and she did

20    agree to produce that stuff.

21         THE COURT:  Sure.  They will be available.  They

22    will be available.

23         MR. KURLAND:  Your Honor, the other housekeeping

24    matter is based on what happened this morning, I will

25    get together with Mr. Harding to see if we can come up

1        with a proposal with respect to a schedule with

2        respect to written pleadings on the co-conspirator

3        issue that we talked about this morning.

4              THE COURT:  You mean Montgomery?

5              MR. KURLAND:  Yeah.  Yes.

6              THE COURT:  Well, I don't think we need much of

7        a schedule.  I mean just submit a motion.  I mean I

8        thought I heard pretty comprehensive argument this

9        morning.

10             MR. KURLAND:  Your Honor --

11             THE COURT:  It appears to me, based on Mr.

12       Harding's proffer, that prima facially, Mr. Montgomery

13       is a member of the conspiracy at the time he has the

14       conversation with Mr. Gardner.

15             Now it is true that for a co-conspirator

16       exception to come into play, the recipient doesn't

17       have to be a member of the conspiracy.

18             MR. KURLAND:  That's true.

19             THE COURT:  But there are certain statements

20       made to a non-conspirator which fall outside the rule

21       under circumstances where those same statements made

22       to a member of the conspiracy clearly are encompassed

23       by the rule.

24             Based on Mr. Harding's proffer of Mr.

25       Montgomery's alleged membership in the conspiracy, and

1       the circumstances under which these alleged

2       conversations occurred between Mr. Gardner and Mr.

3       Montgomery, I would be prepared to conclude that Mr.

4       Gardner's statements about Mr. Martin were indeed

5       statements made in furtherance of the conspiracy, and

6       during the conspiracy.  That's not a final ruling.

7              MR. KURLAND:  I understand.

8              THE COURT:  But I don't think I need 27 pages of

9       legal briefs on that.  I think I need at most a couple

10      of citations, and maybe Mr. Harding can reduce his

11      proffer to writing so that you can better get your

12      hands around it.

13             MR. KURLAND:  Judge, here's my problem.  The

14      representations that Mr. Harding made today are

15      substantially at variance with all of the evidence and

16      discovery that I have, not just the Grand Jury

17      testimony, but of the pages and pages and pages of the

18      prior statements of Mr. Montgomery, including his

19      under oath testimony and the full record in the state

20      court case.

21             So if Mr. Harding is not going to submit

22      anything, that's fine, but I then certainly want to

23      file a very detailed counter-proffer that will support

24      the position --

25             THE COURT:  I absolutely invite you to do that.

1    In fact, that's probably the way we ought to go.  You

2    ought to make the first filing, and I will ask you to

3    do it in two weeks, and Mr. Harding will have an

4    opportunity to respond.

5        But Mr. Montgomery's own motion or belief or

6    even his protestation about whether he was or was not

7    a member of a particular conspiracy, as you all know,

8    is not controlling.

9        MR. KURLAND:  It's certainly not controlling.

10        THE COURT:  Exactly.

11        MR. KURLAND:  But neither is it irrelevant.

12        THE COURT:  Mr. Harding clearly is correct, a

13    person can be a member of a conspiracy and at the same

14    time do some solo work or do some work for some other

15    conspiracy.

16        MR. KURLAND:  And vice versa.  That's the thing.

17        THE COURT:  What's the vice?

18        MR. KURLAND:  That simply because somebody is a

19    member of one conspiracy doesn't mean they can't be a

20    member of another, and simply because they are a

21    member of a conspiracy doesn't mean that everything

22    they do is in furtherance of that conspiracy.

23        But rather than belabor the point now, Your

24    Honor, I just wanted to get this clear.  I will

25    certainly be -- I have no problem with being the first

1      person to draft.  I will say this, though, that the

2      representations again made by the government today are

3      substantially inconsistent with the under oath record.

4           So to the extent that Mr. Harding in his

5      representations is relying on information or evidence

6      that I don't have, I would like to see that because

7      again, the status, and the nature and the

8      circumstances surrounding that alleged conversation,

9      and the motivations for the Darius Spence robbery,

10     have been established under oath time and time and

11     time again, and none of them comport with the

12     representations that were made today.

13          THE COURT:  Okay.  All right.

14          MR. KURLAND:  And I will lay it out, Your Honor.

15     Thank you.

16          THE COURT:  Okay.  Very good.  Thank you.

17          Mr. Harding.

18          MR. HARDING:  Well, I think it's actually a good

19     idea for the Court to consider some of this

20     co-conspirator statement evidence pretrial because I

21     do think there are some issues that the Court is going

22     to have to decide, and it might be better to do it

23     before trial rather than during trial, which is when

24     motions like this are normally decided.  But I don't

25     see why it has to be done five and a half or six

1    months before trial.

2         I think that this is not a constitutional issue.

3    This is simply an issue about whether or not evidence

4    comes in under 801(d)(2)(E) and I think that the Court

5    should allow this to be briefed in the weeks

6    immediately before trial, not now.

7         THE COURT:  I'm not going to do that.  If Mr.

8    Kurland wants to file a motion in two weeks or three

9    weeks, he can do that and you can respond, and I will

10   give you whatever time you need to respond, but let's

11   get it worked out.

12        I'm not even sure, I mean I'm not sure why Mr.

13   Kurland is so interested in this.  Well, I think I

14   know.  It's Mr. Crowe who really is most interested in

15   this.

16        MR. HARDING:  Mr. Crowe is interested also.

17        THE COURT:  All right.  He is interested a lot

18   more than Mr. Kurland because the statement is going

19   to come in against Mr. Gardner no matter what.  It is

20   Mr. Martin who has the standing to challenge Mr.

21   Gardner's hearsay statement.  Mr. Gardner doesn't have

22   standing to challenge a hearsay statement by Mr.

23   Gardner.

24        MR. HARDING:  Right.

25        THE COURT:  Right?  But Mr. Kurland, Mr. Kurland

1       is concerned about this and it seems to be related

2       perhaps to the identification, and it clearly is

3       related significantly to the specific Spence murder.

4              So you can file it.  You can file it.

5              MR. KURLAND:  Thank you.

6              THE COURT:  You don't have to wait until August.

7              MR. HARDING:  I would add, Your Honor, just by

8       way of explanation that there is nothing about the

9       Wyche brothers' murder or about Mr. Martin or Mr.

10      Mitchell or Mr. Harris in the state court record that

11      Mr. Kurland keeps referring to.

12             THE COURT:  Okay.

13             MR. HARDING:  Of course there isn't, because Mr.

14      Gardner was tried for a single murder in Baltimore

15      County.  The state court prosecutor didn't even know

16      about the Wyche brothers' murder until I told him

17      about it.  So there isn't going to be anything about

18      any of that stuff in the transcript of the state case,

19      the record of the state case.

20             Mr. Kurland's pleadings on this cited things

21      like the statement of facts in Jermaine Johnson's plea

22      agreement and some statement that Dean Stocksdale, the

23      state prosecutor, made.  They haven't got a clue about

24      this Mitchell organization.

25             THE COURT:  Okay.  All right.

1          MR. HARDING:  Okay.

2          THE COURT:  All right.

3          MR. KURLAND:  Your Honor, one brief --

4          THE COURT:  No, Mr. Kurland.

5          MR. KURLAND:  That was a bastion of

6    misrepresentation.  If the Court would give me a

7    moment to correct one thing?

8          THE COURT:  Go a head.

9          MR. KURLAND:  This highly compromised key

10   witness of the government, Mr. Montgomery, it has been

11   said over and over again, including I think in

12   statements to the U.S. Attorneys, that as part of his

13   wonderful deal that Mr. Montgomery got, he was to tell

14   them everything about everything, and there is no

15   mention, and the connection to the government is, it

16   has halfway convinced the Court today of this seamless

17   connection between the Mitchell enterprise, robbery of

18   Mr. A that morphs into the plan to rob Darius Spence,

19   this seamless connection.

20         Mr. Montgomery was told over and over and over

21   again that he had to be completely truthful and candid

22   on every connection, and he fessed up to all sorts of

23   other crimes that he got passes on.

24         And so for the government to stand up here and

25   make it seem like I'm the idiot, a disingenuous idiot

1        to the Court by saying that, of course, he was only

2        tried for one murder blatantly distorts the record

3        which will be set forth in the pleadings.

4              THE COURT:  I don't think Mr. Harding called you

5        a disingenuous idiot.

6              MR. KURLAND:  Not in so many words.

7              THE COURT:  All right.  May 10 and 11, we will

8        do the identification.  Then we have two days in June.

9              I haven't forgotten you, Mr. Mitchell.

10             Then we have two days in June.

11             What are we going to do in June, Mr. Harding,

12       that you think we should or can?

13             MR. HARDING:  Your Honor, could I address a

14       letter to the Court and counsel on that?

15             THE COURT:  That would be great.  I am looking

16       at your prior status report.  We still have Mr.

17       Mitchell's post-arrest statements issue?

18             MR. HARDING:  Yes.

19             THE COURT:  I haven't resolved that?

20             MR. HARDING:  There would be a couple witnesses

21       on that on May 10th, if that's all right with the

22       Court.

23             THE COURT:  Can you do that and the

24       identification?

25             MR. HARDING:  Oh, sure.

1          THE COURT:  Okay.  Then Mr. Harris's post-arrest

2     statements.

3          MR. HARDING:  Well, I don't have more witnesses

4     on that.

5          THE COURT:  Okay.

6          MR. HARDING:  There are a number of pleadings

7     relating to that, and I think it's ripe for decision

8     on the papers, unless Mr. Martin and Mr. Treem

9     disagree.

10          THE COURT:  Okay.  I may want some brief

11     additional argument.

12          The death penalty motions are all submitted, I

13     believe.

14          MR. HARDING:  Oh, yeah.  They have been

15     submitted for some time.

16          THE COURT:  Right.

17          MR. HARDING:  And I think those can be decided

18     on the papers.

19          THE COURT:  On the papers, definitely.

20          MR. SULLIVAN:  Your Honor, no.  The notice to

21     strike, they filed a new notice in January, which we

22     haven't filed.  We will get it in in the next two

23     weeks or so.  They added new aggravators.  We have the

24     right to move to strike those.

25          THE COURT:  Of course.

1          MR. SULLIVAN:  So those aren't ripe yet.

2          THE COURT:  All right.  So perhaps we will get

3     to those in June or perhaps not until July.

4          All right.  Now we need to get serious about the

5     jury questionnaire.  Mr. Kurland and Mr. Coburn, I

6     guess preserving certain exceptions, signed off on it.

7     I assume that all counsel have a copy or that a copy

8     is readily available.  So I would ask you to take a

9     look at it and be prepared on May 11th to bring to the

10    Court's attention any changes or modifications that

11    need to be put in.

12         Obviously it's going to be expanded because now

13    we are talking about all four defendants.  So we need

14    to massage that, but I would like to get it out by

15    June 1st or certainly by June 15th.  Okay?

16         All right.  Anything else, anybody, other than

17    Mr. Mitchell?

18         MR. COBURN:  No, Your Honor.

19         THE COURT:  All right.  Mr. Mitchell, I'll hear

20    you briefly, sir.

21         DEFENDANT MITCHELL:  First of all, let me thank

22    the Court for honoring me.  I would like to state that

23    I fully accept the government's offer for value.  I

24    fully accept Mr. Attorney, doing business as Timothy

25    Sullivan, cross-examination of the said officer on

1      April 1st.

2           I would like to accept for value Mrs. Attorney

3      doing business, motion to sever, trial and sentencing

4      proceedings.  I would like to return each and every

5      offer for value for close and settlement of the

6      account.  I would like to state my five requests.

7           I do not argue the facts, request the Court to

8      issue me an appearance bond, waive all public costs.

9      I request the Court to close all the accounts and

10     release order of the Court to me immediately.  I

11     request the Court to set off and adjust all public

12     charges by the exemption, in accord with Uniform

13     Commercial Code 3-419, House Joint Resolution 192,

14     Public Law 73-10.  I request immediate discharge, and

15     I thank you.

16          THE COURT:  All right.  Mr. Mitchell, I am

17     willing to permit you to make those statements at the

18     beginning of each session and at the end of each

19     session.  But as you saw, to the extent that there is

20     disruption during court proceedings, the defendants

21     are going to be excluded from the courtroom.

22          So the way you did it here this afternoon is

23     exactly the way the Court -- doesn't think it's

24     appropriate, but the Court is willing to accede to

25     your request to make that speech at the conclusion of

1      the proceedings.

2              All right.  Thank you very much, counsel.  I'll

3      see you on May 10th.

4              (The proceedings concluded.)

1                          INDEX

2    GOVERNMENT'S' WITNESSES          PAGE

3    DONALD KRAMER

4    By Mr. Harding:                  29

5    By Mr. Sullivan:                 38

6    By Mr. Coburn:                   46

7    RICHARD WILLARD

8    By Mr. Harding:                  116-133

9    By Mr. Crowe:                    122-136

10   GOVERNMENT'S MOTION EXHIBIT          MARKED      REC'D

11   RW-1                                             137

12   2                                                134

13   DEFENDANT MARTIN MOTION EXHIBITS     MARKED      REC'D

14   1                                                127

15   2                                                131

16

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2            I hereby certify that the foregoing transcript in

3       the matter of United States of America vs. Willie

4       Mitchell, et al., Defendants, Criminal Action No.

5       AMD-04-029, before the Honorable Andre M. Davis,

6       United States District Judge, on April 26, 2007 is

7       true and accurate.

8

9                       _____

10                          Gail A. Simpkins

11                       Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'interests** - 99:25

**1**

**1** - 21:22, 30:10, 38:20, 39:6, 39:10, 40:22, 40:23, 42:12, 126:18, 127:7, 176:12, 198:14
**1.2** - 26:18
**10** - 178:3, 193:7
**10:30** - 127:19
**10th** - 193:21, 197:3
**11** - 83:21, 159:14, 178:3, 193:7
**116-133** - 198:8
**11th** - 195:9
**12.2** - 50:10, 51:22
**122-136** - 198:9
**127** - 198:14
**131** - 198:15
**134** - 198:12
**137** - 198:11
**14** - 155:21
**15** - 117:7
**1500** - 134:2
**1503** - 173:5, 173:7, 173:12, 174:9
**15th** - 195:15
**16** - 59:1, 59:9, 137:16
**16th** - 137:20
**17** - 59:16
**17-10** - 94:14
**170** - 170:22
**17th** - 61:17, 92:5, 106:10
**18** - 29:24, 39:15, 117:22, 138:3, 159:16, 173:5
**18th** - 127:20
**192** - 5:9, 9:9, 10:24, 17:21, 18:18, 20:6, 20:20, 21:10, 38:9, 94:14, 111:15, 122:19, 133:3, 150:11, 196:13
**1941** - 177:6
**1961** - 173:7
**1962(c** - 176:16
**1986** - 171:17
**1987** - 171:18, 172:13
**1997** - 101:24, 104:12
**1999** - 117:18, 117:19, 117:22, 127:20, 137:16, 137:20, 138:3
**1:30** - 117:22, 117:23, 123:24, 138:4
**1st** - 195:15, 196:1

**2**

**2** - 115:23, 130:25, 131:4, 134:14, 198:12, 198:15
**20** - 145:5, 146:11, 157:3
**200** - 120:11, 135:17
**2002** - 21:22, 30:1, 30:10, 38:20, 39:2, 39:4, 39:6, 39:10, 40:23, 42:12, 45:23, 47:1, 92:6, 168:18, 168:23

**2004** - 57:7, 57:12, 57:14, 57:17, 99:2, 145:5, 146:11, 157:4, 169:9, 174:3
**2005** - 53:24, 87:19, 155:21, 159:14, 169:21
**2006** - 54:6
**2007** - 1:9, 40:21, 146:4, 199:6
**218-219** - 171:1
**24** - 137:20, 159:14
**25** - 129:18
**26** - 1:9, 40:21, 199:6
**27** - 187:8
**281** - 171:15
**29** - 198:4

**3**

**3-419** - 5:9, 9:9, 10:23, 13:5, 17:21, 18:17, 20:5, 20:19, 21:9, 38:9, 94:13, 111:14, 122:18, 150:11, 196:13
**30-1** - 131:11, 131:12, 131:22
**300** - 118:4, 118:23, 119:2, 119:10, 129:20, 135:8, 136:18, 138:5
**302's** - 64:2
**30th** - 39:2, 39:4, 40:22
**316** - 99:1
**330** - 99:1
**339** - 99:3
**34-301** - 133:2
**38** - 198:5
**388** - 174:3
**3d** - 174:4

**4**

**4** - 145:5, 146:11, 157:4
**40** - 103:2
**409** - 131:2
**410** - 131:2
**413** - 134:12
**414** - 134:12
**421d** - 126:19, 133:22
**46** - 198:6
**48** - 113:5
**4th** - 144:13, 145:2

**5**

**50** - 129:18
**507** - 174:4
**515** - 173:11
**52** - 113:5
**593** - 173:11
**598** - 173:12

**6**

**6(c** - 63:18
**6(e** - 65:13, 69:3, 112:5

**7**

**7** - 168:18
**73-10** - 5:10, 9:10, 10:24, 17:22, 18:18, 20:6, 20:20, 21:10,

**8**

**38:10**, 111:15, 122:19, 133:3, 150:12, 196:14
**7th** - 92:7

**8**

**800** - 123:10
**801(d)(2)(e** - 190:4
**836** - 127:20
**853** - 170:25
**877** - 171:15

**9**

**90** - 109:19

**A**

**abandonment** - 171:3
**abetted** - 56:21
**abetter** - 54:13
**abetters** - 54:12, 56:7
**abettor** - 55:1, 55:2
**abide** - 26:20, 27:8, 27:15
**ability** - 6:25
**able** - 5:11, 11:19, 65:8, 87:8, 96:8, 97:13, 107:12, 146:16
**above-entitled** - 1:11
**abruptly** - 106:8
**absent** - 64:8, 172:2
**absolutely** - 7:6, 8:18, 12:8, 65:14, 66:1, 67:16, 88:2, 88:3, 128:14, 139:5, 187:25
**Absolutely** - 33:11, 62:22, 67:16, 67:19, 69:4, 69:7, 144:16, 155:14
**abstract** - 79:15
**abstraction** - 87:11, 87:12
**abundance** - 173:23
**accede** - 196:24
**accept** - 5:12, 10:8, 10:13, 17:11, 18:2, 18:7, 19:20, 20:11, 20:25, 37:24, 46:14, 62:2, 62:8, 88:19, 94:5, 111:6, 122:8, 132:18, 133:4, 150:3, 195:23, 195:24, 196:2
**accepted** - 4:22
**access** - 63:8
**accidentally** - 92:12
**accommodating** - 53:8
**accommodation** - 13:6
**accomplish** - 3:14, 3:15
**accord** - 5:8, 10:22, 17:20, 18:16, 20:5, 20:19, 21:9, 38:8, 122:17, 133:1, 150:10, 196:12
**accordance** - 13:2, 94:12, 111:14
**according** - 106:21, 148:9, 160:19
**account** - 4:25, 5:5, 10:15, 17:13, 17:17, 18:9, 19:22, 20:13, 21:2, 21:6, 38:1,

**62:12**, 94:7, 111:8, 122:11, 175:20, 176:1, 196:6
**accounted** - 152:25
**accounts** - 9:4, 10:19, 12:24, 18:13, 20:2, 20:16, 38:5, 94:10, 111:11, 122:14, 132:20, 132:23, 150:8, 196:9
**accuracy** - 182:18, 182:19
**accurate** - 39:13, 199:7
**accurately** - 25:4
**accusation** - 114:17
**acknowledged** - 81:20
**Act** - 28:11
**act** - 78:7, 105:8, 169:5
**acted** - 169:19, 172:7
**acting** - 157:19
**action** - 42:8, 172:6
**Action** - 199:4
**activated** - 35:1
**activities** - 57:6, 57:8, 172:18
**activity** - 57:15, 169:20, 170:2, 170:4, 173:3, 173:5, 173:6, 174:8, 174:14, 174:16
**acts** - 57:15, 78:5, 79:1, 163:15, 164:25
**actual** - 44:11, 44:13
**Adam** - 2:6
**add** - 15:9, 15:12, 59:23, 100:12, 163:15, 191:7
**added** - 103:9, 194:23
**addition** - 55:4, 139:15, 181:24
**additional** - 3:18, 54:4, 64:5, 64:17, 65:3, 110:25, 194:11
**address** - 4:11, 5:22, 7:2, 7:3, 11:1, 25:21, 76:9, 88:17, 88:24, 155:16, 174:17, 178:7, 178:11, 193:13
**addressed** - 15:19, 97:3, 99:5, 143:19, 154:2, 154:5
**addressing** - 59:12
**adduce** - 53:13
**adequate** - 141:11
**adjudication** - 28:20
**adjust** - 5:7, 10:21, 13:1, 17:19, 18:15, 20:4, 20:18, 21:8, 38:7, 94:12, 111:13, 122:16, 133:1, 150:10, 196:11
**adjustment** - 9:7
**Adjustment** - 145:8, 146:13, 157:7, 160:15
**Administration** - 30:4
**administration** - 173:15, 173:20, 174:1
**administrative** - 40:9, 40:25
**admissibility** - 140:1, 181:22
**admissible** - 85:18,

**85:21**, 92:23, 92:24, 93:1, 93:3, 95:4, 171:21, 172:1, 174:15
**admission** - 85:19, 95:5, 95:10
**admit** - 85:17, 183:8
**admits** - 143:20
**admitted** - 131:3, 134:13, 138:1, 172:20
**admitting** - 82:19, 93:9
**ado** - 50:13
**advice** - 17:7, 19:4
**advise** - 23:11, 116:11
**advised** - 7:19, 15:25, 164:17, 166:20
**advocate** - 23:4
**afar** - 82:10
**affect** - 106:15
**affidavit** - 91:19, 91:22
**afraid** - 164:6
**African** - 89:25
**afternoon** - 4:3, 23:14, 33:16, 115:15, 115:19, 115:21, 116:1, 117:2, 117:23, 122:24, 123:24, 163:7, 184:18, 196:22
**Afternoon** - 115:25
**agency** - 148:13, 149:23
**agents** - 31:1, 31:11, 157:20
**aggravators** - 7:10, 194:23
**ago** - 41:15, 41:21, 44:1, 49:17, 59:2, 64:21, 124:8, 125:18, 126:15, 152:10, 164:10, 179:2, 181:17
**agree** - 31:4, 70:10, 86:16, 93:5, 93:8, 93:15, 93:19, 105:6, 108:13, 147:17, 161:19, 170:17, 185:11, 185:20
**agreed** - 165:4
**Agreement** - 143:13, 143:23, 153:25, 160:1
**agreement** - 31:3, 137:14, 191:22
**agreements** - 67:14, 104:4
**agrees** - 93:6
**Aguilar** - 173:11
**ahead** - 27:13, 46:17, 63:5, 73:5, 82:11, 140:18, 144:21, 181:25, 185:1
**Aid** - 155:6
**aided** - 56:21
**aider** - 54:13, 55:1, 55:2
**aiders** - 54:11, 56:7
**air** - 35:14, 44:24
**al** - 1:6, 199:4
**albeit** - 164:20, 166:10, 177:12
**alcohol** - 35:21, 35:22
**alibi** - 92:20, 92:22, 107:12, 107:13, 110:20, 110:21
**aliunde** - 101:14
**Allegany** - 160:16, 160:22, 161:9
**allegation** - 157:5

**allegations** - 54:7, 57:5, 114:12
**alleged** - 56:3, 78:4, 95:4, 113:25, 114:4, 160:10, 160:11, 163:14, 182:20, 186:25, 187:1, 189:8
**allegedly** - 83:1, 179:23, 181:15
**alleges** - 55:12
**alleging** - 78:8
**allow** - 190:5
**allowed** - 116:8
**allows** - 97:11
**alluded** - 98:13
**alludes** - 97:24
**alluding** - 164:23
**almost** - 58:3, 77:23, 78:8
**alone** - 31:24
**aloud** - 137:24
**alternative** - 142:20
**Alwan** - 174:3
**ambiguous** - 26:6, 26:11
**ambit** - 158:22
**Amd-04-0029** - 3:4
**Amd-04-029** - 1:5, 199:5
**amend** - 176:13
**amending** - 168:7
**Amendment** - 3:23, 28:17, 99:10, 140:1, 140:5, 142:12, 142:18
**amendment** - 163:11, 163:12
**America** - 1:4, 3:3, 199:3
**Americans** - 89:25
**amount** - 91:8
**amounts** - 53:2
**analysis** - 86:8
**ancillary** - 95:9
**Andre** - 1:12, 199:5
**Andrea** - 179:1, 179:21, 181:14, 181:17
**ankle** - 35:16
**Annotated** - 174:11
**answer** - 39:23, 44:3, 73:18, 81:3, 101:6, 112:12, 132:6, 153:20
**answered** - 85:4
**antagonism** - 87:20
**antagonistic** - 79:10, 80:3, 80:21, 80:22, 81:5, 87:4, 87:11, 87:13, 87:14, 87:17, 88:4, 93:21
**Anthony** - 56:24, 123:4
**anti** - 143:22, 154:20
**anti-shuttling** - 143:22, 154:20
**anticipate** - 133:10, 168:3
**anticipated** - 103:10
**anticipates** - 184:24
**anyway** - 66:20, 67:11
**Anyway** - 140:18
**apart** - 177:16
**apartment** - 37:17
**apologize** - 67:24
**apparent** - 75:6, 79:4
**appeal** - 160:5, 160:7

**appear** - 143:18
**appearance** - 5:4, 9:1, 10:18, 12:13, 12:14, 12:17, 17:16, 18:11, 19:25, 20:14, 21:4, 38:4, 94:8, 111:10, 122:12, 125:22, 132:22, 150:6, 155:5, 196:8
**appeared** - 139:4
**application** - 140:15
**applied** - 170:14
**applies** - 171:1
**apply** - 99:22, 140:5
**appointed** - 13:12, 28:10
**appointment** - 19:15
**appreciate** - 25:1, 68:19, 101:2, 150:2, 177:25
**approached** - 120:12, 128:16, 128:18, 135:21, 135:23, 141:22
**approaching** - 120:14
**appropriate** - 14:13, 23:10, 26:22, 63:10, 76:10, 87:6, 97:10, 97:11, 175:15, 196:24
**appropriately** - 16:5, 76:9
**approved** - 52:15
**approving** - 99:13
**April** - 1:9, 21:22, 30:1, 30:10, 38:20, 39:6, 40:21, 40:22, 40:23, 42:12, 45:23, 47:1, 92:5, 106:9, 155:21, 159:14, 168:23, 196:1, 199:6
**area** - 35:16, 118:3, 118:23, 118:24, 119:7, 120:9, 120:15, 135:11, 138:10
**argue** - 5:3, 5:19, 7:1, 7:13, 7:17, 10:17, 12:6, 12:9, 12:10, 13:13, 14:2, 14:3, 17:15, 18:9, 19:23, 20:13, 21:3, 38:3, 77:2, 91:9, 91:11, 94:7, 97:8, 111:9, 122:11, 132:21, 133:11, 143:11, 150:5, 162:25, 196:7
**argued** - 108:20
**argues** - 171:24
**arguing** - 77:9, 78:2, 80:4, 110:7
**argument** - 22:14, 24:6, 70:22, 70:23, 72:5, 72:14, 72:18, 76:15, 77:10, 78:6, 79:7, 79:16, 96:20, 99:4, 100:10, 100:19, 103:14, 108:20, 115:9, 144:24, 150:1, 156:10, 156:12, 160:14, 163:6, 164:11, 164:21, 166:9, 168:11, 171:12, 172:25, 182:5, 186:8, 194:11
**arguments** - 22:20, 23:22, 24:3, 27:5, 78:8, 76:14, 76:23, 86:16, 88:24, 178:1

**arose** - 154:7
**array** - 178:25
**arrest** - 21:22, 30:9, 30:17, 30:22, 31:6, 38:20, 39:4, 39:10, 40:23, 42:3, 42:13, 42:21, 43:11, 44:4, 44:9, 92:7, 117:21, 117:23, 117:25, 121:23, 123:23, 124:3, 127:18, 128:22, 128:25, 129:1, 134:3, 137:15, 140:24, 141:24, 142:13, 169:8, 171:24, 172:1, 172:10, 172:14, 172:16, 175:10, 193:17, 194:1
**arrested** - 30:13, 35:25, 39:1, 39:8, 39:19, 56:3, 106:9, 106:11, 109:14, 109:15, 125:14, 138:17, 168:20
**arresting** - 30:13, 31:7, 31:16, 32:4
**arrests** - 129:3, 130:6, 134:2, 163:17
**arrived** - 27:10
**arriving** - 6:5
**Article** - 143:24, 154:18, 154:23
**Ashton** - 119:11, 129:14
**aside** - 75:17, 156:9
**aspect** - 64:10, 86:4
**assault** - 169:10, 175:7
**assertion** - 101:12
**asserts** - 55:14
**assigned** - 30:2, 117:19
**assignment** - 29:17, 29:25, 47:8, 117:8, 117:17
**assigns** - 28:14
**assistance** - 45:22, 46:1
**Assistant** - 159:23
**associate** - 69:12
**associated** - 91:21
**associates** - 56:9, 57:12
**assume** - 16:4, 16:23, 23:15, 59:4, 101:13, 119:18, 136:13, 195:7
**assuming** - 108:5, 141:5, 141:7
**assumption** - 12:14, 89:3
**assure** - 59:6, 80:2
**attached** - 150:23
**attack** - 75:18
**attacked** - 82:9
**attacking** - 81:9
**attempted** - 175:7
**attempting** - 150:20
**attention** - 117:21, 134:21, 144:23, 159:5, 176:18, 177:19, 195:10
**attorney** - 5:1, 5:11, 5:19, 6:11, 107:3, 107:9, 137:17, 150:4
**Attorney** - 11:23, 28:5, 159:23, 195:24, 196:2
**attorney's** - 111:7,

132:18
**Attorney's** - 4:22
**attorneys** - 10:12, 16:19, 17:9, 18:5, 19:14, 26:7, 59:4, 59:5, 59:18, 65:10, 110:6
**Attorneys** - 192:12
**August** - 54:6, 61:17, 144:12, 145:2, 145:5, 146:11, 157:4, 191:6
**authored** - 40:25, 41:3
**authorities** - 13:3
**authority** - 58:3, 170:13
**authorized** - 7:8
**authorship** - 69:13
**automatic** - 114:25
**automatically** - 113:24
**autopsies** - 55:23
**availability** - 16:7
**available** - 21:17, 23:13, 106:20, 184:21, 185:21, 185:22, 195:8
**averaging** - 134:2
**avoid** - 77:20
**aware** - 75:6, 90:2, 123:2, 126:23, 177:21

**B**

**balance** - 17:9, 18:6, 19:2, 19:17, 133:14
**Baltimore** - 1:8, 29:12, 29:18, 29:23, 30:2, 32:4, 32:7, 32:15, 32:21, 32:22, 32:24, 33:1, 33:3, 34:10, 34:12, 34:22, 34:23, 35:1, 36:9, 36:22, 46:23, 47:8, 48:8, 48:10, 89:21, 104:23, 110:10, 117:4, 117:12, 138:4, 138:5, 151:12, 152:6, 152:24, 153:18, 154:4, 191:14
**Banks** - 164:11
**bar** - 57:5
**bargain** - 10:10
**Barry** - 2:5
**baseball** - 177:6
**Based** - 121:10, 186:24
**based** - 63:8, 77:7, 103:14, 121:11, 151:7, 185:24, 186:11
**basic** - 57:24
**basis** - 6:20, 7:12, 9:2, 9:5, 65:11, 65:12, 79:7, 79:15, 82:18, 85:17, 87:6, 87:9, 104:14, 110:9, 110:18, 124:18, 124:19, 139:8, 139:13, 139:14, 142:20, 153:4, 153:5, 153:19, 172:11
**bastion** - 192:5
**Bates** - 126:19, 131:2, 133:22, 134:12
**bears** - 133:22, 134:11
**beat** - 92:19
**became** - 30:18,

108:7
**become** - 30:17, 72:11, 75:6, 164:24, 165:2
**becomes** - 82:2, 111:19, 140:3
**beforehand** - 16:11
**began** - 7:20, 55:18
**begin** - 78:4, 150:20
**beginning** - 196:18
**begins** - 12:11, 74:12, 134:22
**behalf** - 7:4, 8:13, 11:7, 15:4, 22:20, 23:4, 24:3, 24:6, 24:24, 28:12, 29:5, 53:20, 79:25, 104:8, 116:17
**behavior** - 21:15, 133:13, 164:2, 165:2, 166:19, 167:17
**behind** - 34:24, 76:12
**belabor** - 188:23
**belief** - 188:5
**believes** - 98:8
**belive** - 119:11
**bench** - 17:7, 19:4
**benefit** - 10:2, 18:3, 59:23
**benefited** - 66:24
**Benson** - 32:2, 32:23, 33:2, 34:11, 36:22, 43:17
**Bermuda** - 171:19
**best** - 3:10, 6:22, 6:25, 84:5, 84:6, 113:4, 118:6, 119:16, 120:25, 121:5, 153:8
**bet** - 161:7
**better** - 5:23, 5:25, 63:2, 187:11, 189:22
**between** - 10:5, 60:21, 60:22, 75:7, 75:11, 87:21, 92:5, 108:10, 129:15, 131:13, 135:24, 148:5, 158:10, 159:14, 176:15, 176:25, 177:11, 187:2, 192:17
**beyond** - 11:17, 57:22, 165:11
**bifurcation** - 70:2
**big** - 8:16
**Bill** - 53:23, 54:2, 57:1, 58:4, 58:8, 58:9, 58:11, 61:14
**Bills** - 58:22
**binding** - 100:3, 100:6
**bit** - 6:5, 35:20, 64:10, 74:21, 152:6
**bizarre** - 159:21, 164:21
**black** - 68:17
**blades** - 127:21
**blah** - 93:12, 93:13
**blaming** - 88:5
**blatantly** - 193:2
**bleed** - 75:9
**block** - 118:4, 118:23, 119:2, 119:10, 120:11, 123:10, 129:21, 135:8, 135:17, 136:19, 136:23, 138:5, 156:9, 156:13
**blood** - 164:11, 166:4, 174:21

**blue** - 125:10
**blunt** - 119:14, 120:8
**bond** - 5:4, 9:1, 10:18, 12:13, 12:14, 12:17, 17:16, 18:12, 19:25, 20:15, 21:4, 38:4, 94:8, 111:10, 122:12, 132:22, 150:6, 196:8
**boot** - 35:16
**bottle** - 35:21
**bought** - 92:21, 107:17
**Boulevard** - 32:14, 33:6
**bound** - 24:23
**break** - 109:4, 115:7, 178:14
**Brendan** - 2:10, 69:11
**bridge** - 70:3
**brief** - 12:7, 131:23, 143:12, 150:20, 151:20, 163:6, 168:13, 176:10, 192:3, 194:10
**briefed** - 69:9, 69:20, 168:14, 190:5
**briefing** - 51:9
**briefly** - 96:22, 98:24, 101:5, 176:9, 184:2, 195:20
**Briefly** - 111:5
**briefs** - 177:18, 187:9
**bright** - 75:7
**bring** - 38:19, 38:22, 55:13, 159:4, 161:11, 195:9
**brothers** - 54:22, 55:18, 105:22
**brothers'** - 105:19, 106:9, 106:25, 107:16, 191:9, 191:16
**brought** - 23:15, 93:24, 153:3, 153:4, 153:10, 153:16
**Bruton** - 60:3, 64:11, 82:15, 82:23, 82:25, 85:12, 94:20, 95:8, 103:14
**Buchanan** - 90:3, 90:12, 97:4, 97:18, 98:13, 99:6, 100:1
**budget** - 52:15
**Building** - 117:15
**bulk** - 67:1
**bullet** - 55:1, 145:3, 146:8, 156:4
**burden** - 138:24, 140:25, 171:6
**burning** - 141:23
**burnt** - 120:18, 135:25, 136:2
**business** - 4:22, 93:17, 139:12, 195:24, 196:3
**busy** - 45:21
**butt** - 120:21, 121:22, 136:6, 138:13, 142:7
**button** - 55:19, 92:14, 92:15
**buy** - 102:4

**C**

**cage** - 36:10
**caliber** - 103:2

**calibrate** - 144:24
**California** - 162:1
**camera** - 61:21, 61:22, 79:6, 87:9
**cancel** - 11:8
**candid** - 192:21
**candidly** - 8:10
**cannot** - 16:21
**capable** - 22:19
**capacity** - 40:13
**capital** - 49:19, 71:6, 77:11, 79:13, 80:2, 86:5, 86:10, 86:17, 90:4, 90:18, 97:2, 97:8, 97:9, 97:17, 97:19, 97:20, 98:4, 99:14
**car** - 31:20, 34:13, 34:19, 36:10, 37:10, 44:23, 55:16, 110:3, 119:1, 119:9, 120:21, 121:24, 123:17, 124:21, 124:22, 128:16, 128:18, 129:4, 129:13, 137:3, 138:12
**card** - 92:22, 107:17
**care** - 63:24
**cared** - 164:8
**career** - 129:17
**careful** - 68:10, 159:8, 168:5
**carefully** - 156:11, 159:15
**carried** - 118:25, 141:1, 166:11
**carries** - 95:8
**carry** - 99:21, 140:14
**carrying** - 118:3
**case** - 1:11, 7:4, 7:24, 9:14, 11:25, 13:8, 13:23, 17:2, 17:25, 18:22, 23:3, 24:5, 28:4, 28:15, 35:6, 45:19, 51:23, 54:18, 57:24, 58:6, 61:7, 66:4, 68:4, 71:22, 74:15, 76:7, 76:19, 77:11, 78:11, 79:13, 80:2, 80:9, 82:16, 86:5, 86:10, 86:17, 87:16, 87:18, 89:15, 90:3, 90:9, 97:22, 98:4, 99:23, 100:13, 105:7, 108:3, 108:22, 114:21, 122:5, 123:2, 123:5, 126:3, 127:25, 137:15, 139:6, 139:25, 140:2, 140:20, 144:1, 145:21, 146:4, 146:10, 152:12, 152:21, 152:23, 155:2, 159:24, 162:17, 162:19, 164:10, 164:16, 165:16, 170:11, 170:12, 170:15, 170:20, 170:23, 170:25, 171:8, 171:10, 171:14, 171:23, 173:1, 173:10, 173:11, 173:23, 174:2, 174:3, 174:10, 174:16, 175:10, 177:18, 181:2, 187:20, 191:18, 191:19

**Case** - 3:3
**cases** - 42:16, 45:21, 49:19, 80:7, 91:9, 97:3, 97:17, 98:20, 123:6, 145:13, 146:3, 146:21, 149:5, 149:11, 152:18, 154:9, 156:6, 158:20, 170:3, 170:11, 170:12, 171:9, 172:22
**cast** - 77:21
**catchall** - 173:9, 173:13, 174:8
**categories** - 151:7
**category** - 154:3, 154:4
**caught** - 120:10, 171:19
**caused** - 4:17, 55:19, 130:3, 130:9
**cease** - 165:20
**cell** - 55:16, 83:4, 83:15, 105:18, 106:25, 156:19
**center** - 108:6, 109:17
**Center** - 104:23, 145:8, 146:13, 157:8, 160:16, 160:23
**certain** - 5:16, 14:5, 33:16, 57:5, 175:22, 186:19, 195:6
**certainly** - 12:20, 13:15, 22:10, 23:17, 24:1, 25:25, 51:2, 53:4, 53:7, 56:1, 56:12, 60:15, 67:6, 71:21, 72:23, 73:4, 73:6, 75:20, 77:12, 87:6, 110:6, 141:17, 147:25, 165:2, 165:6, 166:15, 168:3, 168:13, 178:18, 187:22, 188:9, 188:25, 195:15
**Certainly** - 115:22, 126:24, 150:19, 167:8
**Certificate** - 199:1
**certify** - 199:2
**challenge** - 89:10, 140:1, 140:4, 190:20, 190:22
**challenges** - 89:11
**chance** - 23:20, 109:3, 109:4, 110:25, 147:20
**chances** - 91:4
**change** - 77:1, 163:16
**changes** - 149:3, 175:20, 195:10
**charge** - 72:20, 92:19, 92:22, 117:10, 145:19, 146:24, 154:13, 154:16, 166:22
**charged** - 54:20, 58:12, 90:18, 113:14, 170:20, 173:4, 174:13
**charges** - 5:8, 9:8, 10:22, 13:2, 17:19, 18:16, 20:4, 20:18, 21:9, 38:8, 92:11, 94:12, 111:13, 122:17, 131:24, 132:3, 133:1, 150:10, 196:12
**Charles** - 127:22, 127:24
**Cheeks** - 103:19

**chemist** - 133:20
**chitchat** - 109:17
**choice** - 72:7
**choose** - 75:18, 143:5
**chosen** - 133:13
**Chris** - 43:16
**Christopher** - 123:19
**chronology** - 151:4
**cigar** - 119:13, 121:12, 121:20, 129:25, 130:2, 130:4, 130:9, 130:13, 130:16, 131:17, 132:9, 135:13, 136:3, 141:10, 141:15, 142:6
**cigars** - 129:4, 130:6, 135:15
**Circuit** - 58:8, 79:10, 97:5, 151:22, 152:19, 164:9, 164:15, 167:2, 167:4, 170:15, 170:23, 171:23, 172:22, 174:3, 177:2
**circuit** - 98:25, 170:25, 171:1
**circumstance** - 162:17
**circumstances** - 25:14, 53:9, 76:10, 82:14, 84:20, 85:22, 186:21, 187:1, 189:8
**citations** - 174:10, 187:10
**cite** - 103:16, 151:20, 158:21
**cited** - 89:17, 89:23, 98:20, 170:3, 191:20
**cites** - 98:23, 174:23
**citing** - 149:5
**citizen** - 125:10
**city** - 33:4, 42:21, 43:12
**City** - 29:12, 29:18, 29:23, 30:2, 32:21, 32:22, 34:22, 41:10, 46:23, 47:8, 48:10, 89:21, 104:23, 117:4, 117:13, 138:4
**claim** - 57:18, 74:12, 90:19, 103:15, 110:5, 125:22, 165:21
**claimed** - 82:9, 98:16, 171:20
**claiming** - 54:22, 54:24, 60:3
**claims** - 78:14, 177:16
**classic** - 174:6
**clause** - 173:12, 173:15, 173:18
**clauses** - 173:17
**clean** - 86:15
**clear** - 8:18, 26:11, 28:8, 58:6, 58:9, 58:16, 59:25, 68:25, 70:14, 70:22, 73:4, 73:6, 73:25, 75:7, 84:14, 99:16, 100:3, 100:7, 111:20, 139:11, 151:21, 152:12, 155:18, 166:16, 169:22, 177:2, 177:18, 179:3, 188:24
**Clearly** - 108:10, 142:7

**clearly** - 75:5, 80:10, 86:1, 101:9, 107:23, 108:24, 186:22, 188:12, 191:2
**clenches** - 114:5
**Clerk** - 29:3, 29:8, 116:20
**clerk** - 137:10
**clever** - 107:15
**client** - 6:18, 8:14, 11:21, 12:8, 13:12, 13:15, 13:18, 26:23, 27:20, 50:24, 54:20, 54:23, 56:4, 69:25, 72:14, 73:7, 77:7, 78:1, 78:3, 78:7, 92:6, 98:12, 110:20, 125:25, 127:18, 156:17, 168:22
**client's** - 26:20, 59:25, 60:7, 83:1, 125:22
**Clients** - 169:14
**clients** - 3:4, 8:5, 13:24, 14:5, 14:14, 23:5, 26:2, 28:13, 66:18, 67:4, 67:9
**clients'** - 66:18
**Cliff** - 123:16
**close** - 4:24, 5:5, 10:14, 10:19, 12:24, 17:12, 17:17, 18:9, 18:13, 19:21, 20:1, 20:13, 20:16, 21:2, 21:5, 38:1, 38:5, 62:12, 94:6, 94:9, 111:8, 111:11, 122:10, 122:13, 132:20, 132:23, 150:7, 196:5, 196:9
**closed** - 76:13, 120:23
**closely** - 13:17, 146:17
**closer** - 93:24
**closest** - 129:17
**closure** - 21:2
**clue** - 191:23
**co** - 25:16, 54:11, 56:6, 60:4, 72:8, 72:15, 82:18, 83:1, 92:18, 103:8, 103:19, 106:2, 107:24, 112:1, 164:24, 165:1, 167:15, 171:18, 172:14, 186:2, 186:15, 189:20
**co-conspirator** - 60:4, 82:18, 103:8, 103:19, 107:24, 112:1, 186:2, 186:15, 189:20
**co-conspirators** - 54:11, 56:6, 106:2, 164:24, 165:1, 171:18, 172:14
**co-counsel** - 25:16
**co-defendant** - 72:15, 83:1, 92:18
**co-defendants** - 72:8, 167:15
**Coburn** - 2:5, 15:9, 15:11, 15:20, 46:9, 46:11, 46:17, 46:18, 46:20, 49:1, 49:3, 51:5, 51:6, 52:3, 52:6, 60:16, 61:18, 61:19, 61:24, 62:20, 62:22, 63:3, 63:6, 63:17, 64:3, 65:21, 66:7,

66:8, 66:23, 67:21, 67:22, 68:2, 68:16, 68:19, 68:21, 68:22, 101:10, 103:13, 108:18, 111:2, 143:7, 143:8, 143:10, 143:15, 144:16, 144:21, 144:22, 147:12, 147:16, 147:19, 147:25, 148:4, 148:8, 148:15, 149:14, 149:19, 150:2, 152:10, 155:13, 155:14, 155:22, 156:20, 157:2, 157:13, 157:17, 157:21, 157:23, 157:25, 158:4, 158:7, 158:15, 159:2, 159:7, 159:21, 160:4, 160:6, 160:8, 160:11, 160:13, 160:14, 160:17, 160:19, 161:2, 161:8, 161:12, 162:5, 162:7, 162:18, 162:23, 163:3, 195:5, 195:18, 198:6
  **Coburn's** - 65:2
  **cocaine** - 118:23
  **Code** - 5:9, 9:8, 10:23, 17:21, 18:17, 20:5, 20:19, 38:9, 94:13, 111:14, 122:18, 133:2, 173:6, 174:11, 196:13
  **coercion** - 10:1, 18:2
  **cognizable** - 6:20, 174:8
  **coincidentally** - 106:12
  **collected** - 167:17
  **collective** - 6:15
  **collectively** - 8:3
  **colloquial** - 167:7
  **color** - 33:18
  **Colorado** - 154:7
  **come-up** - 153:4
  **coming** - 126:1
  **commences** - 146:10
  **comment** - 65:2
  **comments** - 22:22, 69:24
  **commerce** - 138:21
  **Commercial** - 5:9, 9:8, 10:23, 17:20, 18:17, 20:5, 20:19, 38:9, 94:13, 111:14, 122:18, 133:2, 196:13
  **Commission** - 28:5
  **commission** - 78:4
  **commit** - 77:22
  **committed** - 55:15, 56:14, 56:17, 57:17
  **common** - 116:24, 134:7, 135:14, 162:4, 162:9, 162:11
  **commonly** - 119:13
  **communicate** - 33:2, 66:19
  **communication** - 32:5, 32:19
  **communications** - 32:22, 32:23, 32:24, 34:2
  **community** - 90:8, 99:18
  **comparative** - 86:8

  **compare** - 68:13, 97:12
  **compelling** - 71:11, 90:10
  **compels** - 86:25
  **complete** - 25:23
  **completely** - 60:6, 74:20, 78:23, 80:21, 145:20, 169:19, 192:21
  **complex** - 57:25
  **complicated** - 103:3, 152:7
  **complication** - 49:23
  **component** - 166:21
  **comport** - 189:11
  **comported** - 142:12
  **comprehensive** - 143:16, 186:8
  **compromise** - 175:16
  **compromised** - 192:9
  **concealed** - 102:23
  **concede** - 159:10, 159:22
  **conceded** - 85:11
  **concedes** - 145:2, 145:6, 146:8
  **concern** - 63:12, 67:23, 68:22, 75:22, 76:22, 77:14, 78:23, 86:4, 86:5
  **concerned** - 58:15, 67:5, 125:9, 183:16, 191:1
  **concerning** - 26:21, 92:1, 139:6, 179:4, 181:13, 182:19
  **concerns** - 4:9, 65:15, 65:23, 75:15, 77:13, 97:14
  **conclude** - 3:18, 115:10, 133:24, 187:3
  **concluded** - 141:16, 197:4
  **concludes** - 142:15
  **conclusion** - 28:21, 76:2, 154:25, 196:25
  **conclusory** - 157:5
  **condition** - 66:22
  **conditions** - 53:2
  **conduct** - 37:16, 50:1
  **conducted** - 169:18
  **conducting** - 23:9
  **conferences** - 3:7
  **confine** - 108:25
  **conflict** - 84:7
  **conflicting** - 81:23, 84:9
  **confronted** - 100:13
  **confusing** - 74:22
  **confusion** - 84:17
  **conjecture** - 73:4
  **connection** - 182:23, 192:15, 192:17, 192:19, 192:22
  **connects** - 55:8
  **conscientiously** - 99:21
  **consent** - 11:8, 15:5
  **consider** - 50:12, 61:6, 70:2, 161:23, 183:15, 183:22, 189:19
  **consideration** -

8:14, 71:18, 87:16, 168:5
  **considered** - 98:3, 160:24, 161:15
  **considering** - 71:13
  **considers** - 161:16
  **consistent** - 25:15, 135:1, 144:6
  **console** - 120:20
  **conspiracy** - 54:6, 56:10, 56:11, 57:21, 80:15, 88:13, 93:3, 93:14, 93:18, 94:23, 95:8, 95:17, 95:24, 96:6, 101:9, 101:13, 105:9, 108:1, 108:2, 108:3, 108:11, 108:13, 108:19, 108:21, 108:24, 110:6, 110:22, 112:20, 112:21, 113:25, 114:4, 114:6, 114:8, 114:24, 163:14, 165:17, 167:21, 168:8, 169:1, 169:12, 170:5, 170:10, 170:16, 170:19, 170:21, 170:24, 171:2, 171:4, 171:6, 171:10, 171:13, 171:21, 171:25, 172:4, 172:6, 172:8, 172:16, 186:13, 186:17, 186:22, 186:25, 187:5, 187:6, 187:7, 188:13, 188:15, 188:19, 188:21, 188:22
  **conspiracy's** - 172:18
  **conspirator** - 54:13, 60:4, 82:18, 103:8, 103:15, 103:19, 107:24, 112:1, 172:3, 186:2, 186:15, 186:20, 189:20
  **conspiratorial** - 165:4
  **conspirators** - 54:11, 56:6, 106:2, 164:24, 165:1, 171:18, 172:14
  **constituted** - 171:24
  **Constitution** - 99:17
  **constitutional** - 26:5, 90:16, 100:8, 101:1, 181:13, 190:2
  **consult** - 13:17, 26:22
  **contact** - 37:19, 44:11, 44:13
  **containing** - 136:3, 142:6
  **contains** - 173:9
  **contemplates** - 79:11, 154:23
  **contemporaneous** - 179:4
  **contempt** - 173:8, 174:7, 174:11
  **contends** - 165:3
  **contention** - 180:7, 182:6
  **contest** - 24:5
  **context** - 81:25, 98:4
  **continue** - 6:10,

19:15, 23:4, 25:16, 26:1, 27:2, 28:11, 28:13, 115:13, 143:17, 172:5, 177:10
  **continued** - 172:3, 172:16
  **continues** - 171:2
  **continuing** - 87:22, 104:14, 169:24
  **contraband** - 141:19, 142:6
  **contract** - 148:5, 148:12, 148:16, 148:18, 148:24, 149:3, 149:24, 156:21, 158:9, 161:3, 161:14
  **contracts** - 149:10
  **contradicted** - 80:22
  **contradictory** - 88:8
  **contrary** - 155:20
  **control** - 72:15, 74:15
  **controlled** - 157:18
  **controlling** - 80:5, 81:7, 188:8, 188:9
  **controversy** - 4:17, 147:13, 147:14, 153:14
  **conversation** - 12:7, 15:18, 55:19, 91:24, 92:4, 93:16, 106:23, 108:10, 186:14, 189:8
  **conversations** - 187:2
  **convict** - 61:4, 89:14, 100:16
  **convicted** - 7:8, 91:5
  **conviction** - 138:22
  **convinced** - 192:16
  **convincing** - 90:10
  **Cook** - 185:7, 185:12, 185:15
  **cooperate** - 66:19
  **cooperating** - 165:20
  **cooperation** - 73:2
  **cooperative** - 165:19
  **cooperator** - 91:15
  **cooperators** - 59:14, 59:24
  **Copies** - 67:16
  **copies** - 63:24, 65:3, 67:15, 69:2
  **copious** - 108:3
  **copy** - 127:6, 131:1, 137:14, 144:18, 148:16, 195:7
  **Copy** - 68:11
  **core** - 87:15
  **corner** - 119:10
  **Correct** - 38:25, 45:5, 47:11, 48:21, 130:1
  **correct** - 6:6, 9:15, 39:16, 39:25, 40:14, 40:20, 44:19, 45:4, 45:7, 45:15, 45:16, 45:20, 45:23, 45:24, 46:24, 47:2, 47:17, 47:19, 47:22, 48:11, 48:16, 93:23, 110:1, 112:4, 119:20, 123:8, 123:24, 124:20, 125:2, 125:17, 128:5, 129:25, 130:22,

136:19, 149:12, 164:18, 179:17, 188:12, 192:7
  **corrected** - 14:16
  **Correctional** - 145:7, 146:13, 157:7
  **correctional** - 145:25
  **Corrections** - 145:12, 146:20, 147:3, 147:7, 147:8, 147:22, 149:2, 149:8, 158:11, 158:18
  **correctly** - 12:20, 147:5, 148:4
  **corruptly** - 173:19, 173:21
  **cost** - 18:12, 20:1, 38:4, 68:21
  **costs** - 5:5, 9:2, 10:19, 12:14, 17:16, 20:15, 21:5, 94:9, 111:10, 122:13, 132:22, 150:7, 196:8
  **Counsel** - 23:4, 23:4
  **counsel** - 4:8, 6:21, 8:3, 14:4, 14:17, 15:5, 15:9, 19:1, 23:3, 23:21, 25:3, 25:16, 26:1, 28:1, 28:4, 28:9, 28:10, 28:15, 28:22, 49:11, 49:13, 53:9, 59:6, 61:19, 64:15, 65:24, 66:17, 66:19, 67:4, 67:8, 67:15, 68:12, 78:13, 81:4, 88:1, 108:16, 136:13, 143:5, 185:9, 193:14, 195:7, 197:2
  **counsel's** - 177:25
  **Count** - 176:12
  **count** - 7:8, 173:4
  **counter** - 187:23
  **counter-proffer** - 187:23
  **countermanded** - 79:1
  **counting** - 153:1
  **counts** - 56:23, 57:9
  **County** - 32:4, 32:7, 32:15, 32:24, 33:1, 33:3, 34:10, 34:12, 34:22, 34:23, 35:1, 36:9, 36:22, 48:8, 89:20, 89:21, 110:10, 146:23, 146:25, 151:12, 152:6, 152:24, 153:19, 154:4, 160:22, 161:9, 191:15
  **county** - 33:4, 42:20, 43:12, 44:17, 44:19, 45:14, 144:3, 147:21, 156:8, 156:14
  **couple** - 3:18, 51:12, 51:17, 79:5, 135:20, 136:14, 146:3, 164:13, 168:16, 169:6, 176:18, 178:5, 184:18, 187:9, 193:20
  **course** - 13:17, 27:24, 40:6, 61:2, 68:18, 68:20, 79:13, 79:14, 87:18, 100:25, 101:4, 104:10, 110:1, 115:3, 115:6, 143:12, 143:21, 147:10, 153:25, 162:15, 166:19, 170:19,

191:13, 193:1, 194:25
**Court** - 1:1, 1:25,
3:2, 3:7, 4:2, 4:4, 4:7,
4:8, 4:11, 4:12, 5:3,
5:5, 5:6, 5:7, 5:13,
6:3, 6:10, 6:22, 6:23,
7:2, 7:22, 8:1, 8:7,
8:8, 8:10, 8:20, 8:23,
9:13, 9:17, 9:19, 9:22,
10:3, 10:5, 10:9,
10:17, 10:19, 10:20,
10:21, 10:25, 11:1,
11:3, 11:11, 11:16,
12:1, 12:3, 12:16,
12:24, 13:1, 13:10,
14:9, 14:11, 14:15,
14:21, 14:24, 15:8,
15:14, 15:17, 15:20,
16:21, 16:25, 17:4,
17:8, 17:15, 17:17,
17:18, 17:19, 17:23,
18:4, 18:12, 18:13,
18:15, 18:20, 18:25,
19:5, 19:10, 19:14,
19:16, 19:23, 19:24,
19:25, 20:1, 20:2,
20:3, 20:8, 20:14,
20:15, 20:17, 20:22,
21:6, 21:12, 21:20,
21:25, 22:5, 22:10,
22:23, 22:24, 23:13,
23:17, 23:25, 24:18,
25:1, 25:2, 25:5, 25:8,
25:19, 25:22, 26:3,
26:5, 26:10, 26:13,
27:9, 27:13, 27:17,
27:23, 27:24, 28:3,
28:8, 28:16, 28:20,
36:6, 37:15, 38:3,
38:5, 38:6, 38:7,
38:11, 41:4, 46:5,
46:11, 46:13, 46:17,
49:1, 49:5, 49:8,
49:18, 49:21, 50:6,
50:8, 50:11, 50:18,
50:20, 51:1, 51:4,
51:24, 52:1, 52:5,
52:7, 52:9, 52:13,
52:14, 53:6, 53:7,
53:19, 54:8, 54:14,
55:5, 55:21, 56:17,
57:4, 58:10, 58:19,
58:22, 59:7, 59:15,
59:20, 60:9, 60:14,
60:18, 60:20, 61:1,
61:5, 61:11, 61:13,
61:16, 62:3, 62:7,
62:10, 62:13, 62:17,
62:19, 63:1, 63:5,
63:14, 64:1, 64:6,
64:8, 64:25, 65:1,
65:5, 65:11, 65:17,
65:19, 66:22, 67:3,
67:16, 67:19, 67:23,
68:1, 68:7, 68:9,
68:17, 68:20, 68:24,
69:4, 69:7, 69:14,
70:1, 70:16, 70:21,
71:17, 71:24, 72:21,
73:5, 73:10, 73:13,
73:23, 74:3, 74:18,
74:24, 75:2, 76:8,
77:9, 77:18, 77:24,
78:10, 78:16, 78:19,
78:24, 78:25, 79:11,
79:14, 79:18, 79:21,
79:24, 80:11, 80:16,
81:12, 81:17, 81:24,
82:11, 82:17, 83:2,
83:4, 83:7, 83:9,

83:12, 83:14, 83:18,
83:20, 83:22, 83:24,
84:2, 84:5, 84:12,
84:16, 84:18, 84:24,
85:1, 85:3, 85:7, 85:8,
85:13, 85:16, 86:9,
86:12, 86:15, 86:20,
86:22, 86:23, 86:24,
87:7, 87:20, 88:2,
88:9, 88:17, 88:18,
88:22, 89:11, 90:9,
90:15, 91:12, 91:17,
92:23, 93:5, 93:6,
93:8, 93:16, 93:23,
94:1, 94:4, 94:8, 94:9,
94:10, 94:11, 94:16,
94:21, 94:23, 95:1,
95:6, 95:12, 95:16,
95:20, 95:22, 96:2,
96:7, 96:10, 96:15,
96:18, 96:24, 97:3,
97:13, 98:6, 98:10,
98:14, 98:22, 99:2,
99:5, 99:6, 99:11,
99:16, 100:1, 100:3,
100:5, 100:6, 100:13,
100:16, 100:22,
101:2, 101:4, 101:7,
101:12, 101:16,
101:22, 102:1, 102:5,
102:7, 102:11,
102:13, 102:15,
102:17, 102:20,
103:1, 103:5, 104:11,
104:22, 105:1, 105:5,
105:13, 105:16,
105:18, 105:21,
105:24, 106:4, 106:7,
107:20, 108:4, 108:9,
108:22, 109:2,
109:10, 109:13,
109:18, 109:21,
109:24, 110:17,
111:4, 111:9, 111:11,
111:12, 111:17,
112:7, 112:14,
112:16, 112:22,
112:23, 113:6,
113:10, 113:16,
114:2, 114:10,
114:13, 114:16,
115:1, 115:3, 115:6,
115:22, 116:1, 116:5,
116:10, 116:11,
116:13, 122:7,
122:12, 122:13,
122:14, 122:16,
122:21, 126:20,
126:25, 127:4, 131:3,
132:25, 133:6,
133:10, 134:13,
134:25, 135:3, 135:6,
136:12, 136:15,
137:8, 138:1, 138:23,
139:19, 139:24,
140:15, 141:2, 141:6,
142:2, 142:15,
142:21, 143:2, 143:8,
143:14, 144:14,
144:20, 147:10,
147:14, 147:18,
147:24, 148:3, 148:7,
148:13, 149:13,
149:16, 149:20,
149:25, 150:8,
150:13, 150:18,
153:6, 155:10,
155:12, 155:21,
156:19, 156:25,
157:11, 157:15,

157:19, 157:22,
157:24, 158:1, 158:5,
158:14, 158:24,
159:6, 159:19, 160:3,
160:5, 160:7, 160:10,
160:12, 160:14,
160:18, 161:1, 161:4,
161:7, 161:9, 161:19,
162:15, 162:21,
162:24, 163:4,
163:19, 163:23,
164:6, 164:13, 165:1,
165:11, 166:1, 166:5,
166:14, 166:16,
166:24, 168:1, 168:3,
169:17, 170:6, 172:9,
172:24, 173:10,
174:2, 175:8, 175:18,
176:6, 176:8, 177:20,
178:7, 178:8, 178:11,
178:12, 178:19,
178:20, 178:23,
179:14, 179:19,
179:25, 180:6,
180:11, 180:13,
180:16, 180:21,
180:23, 181:1, 181:5,
181:11, 181:21,
181:25, 182:9,
182:11, 182:14,
182:17, 182:21,
183:4, 183:5, 183:13,
183:15, 183:21,
184:2, 184:8, 184:10,
184:14, 184:22,
184:25, 185:6,
185:11, 185:16,
185:21, 186:4, 186:6,
186:11, 186:19,
187:8, 187:25,
188:10, 188:12,
188:17, 189:13,
189:16, 189:19,
189:21, 190:4, 190:7,
190:17, 190:25,
191:6, 191:12,
191:25, 192:2, 192:4,
192:6, 192:8, 192:16,
193:1, 193:4, 193:7,
193:14, 193:15,
193:19, 193:22,
193:23, 194:1, 194:5,
194:10, 194:16,
194:19, 194:25,
195:2, 195:19,
195:22, 196:7, 196:9,
196:10, 196:11,
196:16, 196:23,
196:24, 199:11
**court** - 6:12, 11:24,
23:16, 28:10, 96:4,
98:25, 153:3, 153:4,
153:10, 154:13,
164:2, 169:20, 174:6,
174:7, 175:4, 180:14,
180:19, 181:23,
182:9, 187:20,
191:10, 191:15,
196:20
**Court's** - 22:25,
23:1, 23:9, 23:12,
25:23, 25:24, 26:19,
41:24, 81:3, 87:24,
90:2, 97:22, 137:22,
137:23, 140:16,
168:6, 195:10
**courtroom** - 19:18,
20:9, 20:10, 20:23,
20:24, 74:11, 91:7,
111:18, 128:9,

164:25, 173:2,
174:13, 174:23,
176:21, 196:21
**courts** - 151:17,
154:1
**cover** - 66:7, 68:12,
68:14, 167:22
**cover-up** - 167:22
**covered** - 168:13
**covert** - 135:9
**create** - 82:22,
92:22
**created** - 7:14
**credit** - 107:17,
141:14, 152:25
**credited** - 152:15
**credits** - 142:2
**crew** - 101:23,
104:1
**Crime** - 117:12
**crime** - 55:9, 58:12,
60:8, 108:12, 173:18
**crimes** - 126:14,
169:6, 192:23
**Criminal** - 1:5,
28:10, 170:23, 199:4
**criminal** - 28:15,
67:6, 101:24, 102:5,
104:4, 128:5, 164:25,
166:22, 177:7
**criminalism** -
167:15
**criminalize** - 164:20
**criminally** - 69:2
**criteria** - 89:12
**critical** - 80:8,
112:18, 168:18,
179:6, 179:13,
182:17, 183:2
**cross** - 7:3, 70:3,
90:8, 99:18, 122:6,
183:4, 195:25
**Cross** - 38:15,
46:19, 122:22
**cross-examination**
- 122:6, 195:25
**Cross-examination**
- 38:15, 46:19, 122:22
**cross-examine** -
7:3
**cross-examined** -
183:4
**cross-section** -
90:8, 99:18
**crossed** - 7:16
**Crowe** - 2:2, 6:17,
11:16, 11:19, 12:5,
14:15, 14:24, 50:21,
50:22, 51:2, 53:19,
53:20, 54:14, 54:17,
55:6, 56:1, 56:20,
59:8, 59:13, 59:23,
60:6, 61:8, 61:16,
85:7, 88:14, 88:15,
88:22, 88:23, 91:13,
91:14, 92:24, 93:6,
93:15, 93:19, 98:11,
98:20, 100:19, 105:1,
105:3, 109:2, 109:4,
109:6, 109:7, 109:11,
109:18, 109:22,
110:1, 111:4, 122:7,
122:21, 122:23,
126:16, 126:24,
127:2, 127:5, 127:9,
130:24, 131:6,
132:12, 133:11,
133:20, 134:25,
136:14, 136:15,
136:17, 137:6,

138:25, 139:1,
139:23, 140:11,
140:19, 141:2,
168:10, 168:12,
170:6, 190:14,
190:16, 198:9
**Crowe's** - 62:16,
141:7
**cruiser** - 34:23,
35:1, 44:17
**Cs-3** - 91:23
**cuffed** - 37:9
**culpability** - 72:18,
75:19, 97:12
**cumulative** - 84:7
**current** - 155:1
**custodial** - 150:22
**custody** - 37:12,
52:24, 84:22, 92:18,
109:8, 145:15,
145:17, 145:20,
147:24, 149:9,
152:16, 152:21,
153:19, 156:15,
156:15, 156:20,
157:1, 157:3
**customary** - 23:5,
28:13, 28:23
**cut** - 65:19, 87:14,
165:15, 166:4

**D**

**danger** - 106:17
**dangerous** - 166:22
**Darius** - 105:9,
107:5, 189:9, 192:18
**dark** - 33:18
**Darryl** - 56:23,
123:3
**date** - 30:18, 39:9,
40:2, 57:7, 57:8,
63:10, 92:6, 92:7,
137:21, 155:24,
155:25, 163:13,
168:19, 169:4
**dated** - 137:15
**dates** - 39:13,
137:19, 156:25,
168:16
**Davis** - 1:12, 4:10,
11:2, 40:17, 199:5
**days** - 124:6, 134:1,
153:2, 159:16, 193:8,
193:10
**Dc** - 146:16, 159:23
**de** - 72:11
**Dea** - 30:6, 40:4
**Dea-6** - 40:6
**deal** - 9:11, 95:11,
96:22, 172:22, 192:13
**dealer** - 105:10,
107:5
**dealing** - 94:19,
117:11, 150:23,
153:15, 153:21,
154:9, 170:15
**deals** - 171:11
**dealt** - 100:20,
101:1, 152:18, 171:15
**Dean** - 191:22
**death** - 73:7, 76:19,
77:15, 77:17, 77:20,
89:2, 89:5, 89:7,
89:13, 89:17, 89:19,
89:24, 90:17, 90:21,
90:25, 91:1, 91:4,
98:13, 98:17, 98:18,
98:19, 99:7, 99:8,
100:4, 100:8, 100:15,

194:12
**death-qualified** -
89:5, 89:13, 91:4,
98:13, 98:18, 99:7,
100:4, 100:8, 100:15
**debt** - 4:19, 11:9,
15:6
**decide** - 23:20,
24:21, 72:17, 120:7,
183:21, 189:22
**decided** - 98:22,
189:24, 194:17
**deciding** - 77:15
**decision** - 8:13,
26:21, 31:10, 31:13,
32:25, 74:9, 74:10,
74:17, 79:22, 89:7,
90:2, 97:5, 97:15,
97:18, 98:2, 98:8,
98:24, 99:2, 99:12,
142:20, 151:20,
154:6, 154:7, 194:7
**decision-making** -
98:8
**decisions** - 13:16,
13:18, 13:20, 28:14,
58:8, 97:6, 98:23,
151:19
**declarant** - 107:25
**declaration** - 50:16
**decorous** - 169:19
**defaulted** - 26:5
**defeat** - 171:3,
171:5, 172:7
**defeating** - 164:17
**defend** - 8:4
**defendant** - 22:12,
24:4, 28:18, 28:24,
71:7, 71:8, 72:15,
74:6, 74:9, 74:11,
74:15, 81:2, 83:1,
84:1, 86:17, 89:1,
90:4, 90:16, 90:18,
92:18, 98:16, 99:9,
131:11, 132:2, 138:9,
139:25, 145:6,
145:14, 145:17,
145:22, 146:2, 146:9,
151:9, 151:10, 160:6,
172:7, 173:25
**Defendant** - 1:20,
2:1, 2:4, 2:7, 4:10,
4:14, 9:21, 9:24, 10:7,
10:13, 11:1, 11:4,
11:14, 14:16, 14:20,
14:22, 15:1, 17:3,
17:6, 17:11, 18:1,
18:7, 18:23, 19:3,
19:9, 19:12, 19:20,
20:11, 20:25, 37:24,
46:4, 46:8, 46:12,
46:14, 52:8, 52:10,
61:15, 62:2, 62:6,
62:8, 62:11, 88:16,
88:19, 94:3, 94:5,
96:12, 111:6, 122:8,
126:17, 126:22,
127:7, 131:4, 132:16,
132:18, 150:3,
159:16, 178:9,
178:13, 195:21,
198:13
**defendant's** -
87:15, 99:10, 127:22,
140:4, 150:21,
150:22, 172:4
**Defendant's** -
130:24
**Defendants** - 1:7,
199:4

**defendants** - 3:3,
16:17, 21:14, 22:6,
22:25, 23:2, 24:17,
50:3, 53:12, 67:11,
71:4, 72:8, 73:16,
86:10, 87:21, 87:22,
91:2, 93:22, 97:9,
97:10, 97:19, 97:20,
98:17, 100:9, 101:19,
102:4, 102:6, 102:9,
104:15, 104:21,
111:17, 115:13,
115:14, 165:19,
167:15, 173:3,
175:11, 175:17,
177:15, 177:24,
195:13, 196:20
**defendants'** - 79:1,
99:4, 100:10, 174:22
**Defender's** - 137:18
**defending** - 7:9,
91:8
**defense** - 3:13,
6:16, 7:14, 16:19,
27:21, 50:25, 53:2,
58:14, 59:6, 66:9,
66:17, 67:15, 72:21,
81:10, 86:16, 87:17,
88:10, 88:11, 93:21,
108:16, 133:21,
168:4, 178:22, 181:5,
182:16
**Defense** - 65:24
**defenses** - 79:10,
80:4, 80:21, 80:22,
81:5, 87:4, 87:11,
87:14, 88:4, 174:22
**defer** - 69:12
**defined** - 57:16
**definitely** - 194:19
**definition** - 138:20
**degree** - 11:19,
14:11, 72:19
**Delaware** - 135:11
**deliberately** - 92:21
**delighted** - 63:20
**demeanor** - 44:25
**demonstrate** -
21:15
**denied** - 22:12,
62:18, 175:23
**deny** - 25:9, 25:10,
61:13, 79:3
**denying** - 58:5, 88:7
**depart** - 20:9, 20:23
**Department** - 11:24,
29:12, 29:18, 29:23,
46:24, 47:9, 117:5,
145:12, 146:19,
147:3, 147:6, 147:8,
147:22, 149:2, 149:7,
158:11, 158:17
**department** - 34:9,
41:11, 148:13
**deployed** - 33:5
**deprived** - 90:7
**described** - 66:9,
125:23, 131:17,
132:9, 138:10, 164:1,
181:18, 181:19, 182:3
**describes** - 179:6
**describing** - 164:16
**description** -
119:25, 120:3, 141:12
**deserve** - 80:1
**deserves** - 76:1,
76:2, 167:12
**designated** - 134:4
**designed** - 167:17
**desire** - 19:19, 24:8,

28:18
**despite** - 9:2, 9:6,
113:25
**detail** - 30:5, 92:3
**detailed** - 111:25,
131:23, 187:23
**detain** - 156:3
**detained** - 16:6
**detainee** - 161:1
**detainer** - 145:19,
155:24
**Detainers** - 143:13,
143:23, 153:25, 160:1
**detective** - 27:7,
32:5, 32:16, 32:21,
33:1, 34:12, 36:7,
36:22, 39:14, 39:17,
41:10, 42:23, 122:25,
123:1, 141:8, 141:14,
184:10
**Detective** - 4:5,
32:2, 33:2, 34:11,
36:21, 41:3, 41:5,
41:6, 43:16, 43:17,
49:8, 91:19, 127:13,
139:2
**detectives** - 37:18,
43:12
**Detention** - 104:23,
160:23
**detention** - 12:15,
104:25, 108:6,
109:16, 145:18,
145:24, 147:11
**determination** -
22:25, 23:2, 183:6
**determine** - 130:3
**determined** - 73:15,
172:10
**developing** - 27:3
**development** -
22:15, 24:14
**dial** - 83:9
**die** - 76:2, 76:7,
76:11
**died** - 56:2
**diem** - 158:14,
158:16
**difference** - 160:16,
160:17, 160:18, 162:3
**different** - 50:23,
77:10, 79:13, 81:21,
81:22, 83:25, 88:8,
104:4, 146:7, 146:21,
151:15, 177:8
**differently** - 161:21
**difficult** - 73:3,
73:18
**dilemma** - 16:19
**Dimaggio** - 177:8
**diminish** - 87:10
**direct** - 7:4, 27:6,
149:21
**Direct** - 29:13,
116:25
**directed** - 51:8
**Directing** - 144:23
**directing** - 28:9,
82:10
**direction** - 48:24,
60:24, 60:25, 136:25,
137:1, 166:22
**directly** - 24:15,
28:6, 64:13, 80:22,
97:3, 116:21, 148:25,
155:16
**directs** - 27:17
**disagree** - 147:16,
172:4, 194:9
**disagrees** - 62:25

**disavow** - 172:8
**discharge** - 5:10,
10:24, 17:8, 17:22,
18:5, 18:19, 19:1,
20:7, 20:21, 21:11,
23:21, 23:23, 24:22,
25:3, 38:10, 94:15,
111:16, 122:20,
133:4, 150:12, 196:14
**discharged** - 8:6,
150:13, 160:6
**disclose** - 24:17,
60:9
**disclosed** - 64:12
**disclosure** - 51:11,
51:19, 51:22
**discovery** - 49:16,
49:22, 53:16, 53:18,
53:21, 61:20, 62:14,
64:15, 64:16, 67:14,
91:17, 111:1, 140:19,
187:16
**discovery-related** -
53:18
**discretion** - 58:10,
86:20, 86:23, 86:24,
162:19
**discuss** - 13:5,
16:12, 42:8, 42:13,
52:17, 52:19
**discussed** - 6:16,
62:23, 106:15
**discussing** - 7:20,
106:3
**discussion** -
105:14, 165:18
**dishonor** - 5:12
**dishonorable** -
178:10
**dishonored** - 6:14
**disingenuous** -
192:25, 193:5
**disliked** - 125:11
**dismiss** - 57:5,
57:18, 115:10, 143:3,
162:19, 168:11,
175:19, 175:22,
176:5, 176:12
**dismissal** - 24:7,
162:16
**dismissed** - 159:24
**displaying** - 178:22
**dispose** - 102:13
**disputed** - 157:15
**disputes** - 60:12,
60:20, 60:21
**disrupt** - 174:1
**disruption** - 163:18,
164:3, 164:4, 173:3,
174:14, 174:24,
196:20
**disruptions** - 38:12,
62:4, 133:9, 133:12
**disruptive** - 6:11,
115:13, 165:2, 167:23
**distance** - 129:15
**distinction** - 145:9
**distorts** - 193:2
**distribute** - 63:24
**district** - 29:21,
49:20, 98:25, 117:20,
119:2, 123:8, 123:11,
123:12, 147:13
**District** - 1:1, 1:2,
1:13, 99:1, 172:9,
199:6
**division** - 29:19
**Division** - 30:3,
47:10, 117:12
**Doc** - 155:7

**doctor** - 115:20
**document** - 127:10,
127:11, 127:16,
127:19, 133:25,
137:21, 138:19
**documentation** -
150:23, 151:3
**documents** - 73:1,
127:17, 137:10
**Donald** - 4:5, 29:4,
29:11, 198:3
**done** - 6:15, 8:8,
24:23, 27:4, 40:11,
50:14, 56:4, 86:24,
87:1, 107:7, 114:23,
140:8, 140:11,
154:22, 158:16,
171:7, 178:12, 189:25
**door** - 135:22
**doors** - 76:13
**doubt** - 91:6, 126:9,
141:6
**down** - 14:25,
27:20, 35:15, 44:18,
45:14, 54:1, 55:13,
93:7, 96:10, 96:11,
100:5, 118:18,
120:15, 120:19,
121:20, 134:8,
146:16, 157:15,
165:15
**Down** - 120:18
**downtrodden** -
161:11
**draft** - 161:20, 189:1
**draw** - 73:8, 76:3,
176:18, 177:19
**drawing** - 76:15,
145:9
**drawn** - 45:3, 45:7,
48:23
**drew** - 45:12
**drive** - 135:10
**driver** - 113:7, 138:6
**driver's** - 120:12,
120:22, 120:23,
129:20, 129:22,
135:22, 136:6, 138:16
**drives** - 118:22
**driving** - 32:2,
33:19, 34:4, 34:6,
110:2, 129:13,
129:24, 137:3, 138:10
**drop** - 75:10, 118:25
**drops** - 118:22
**drove** - 35:4, 44:16,
141:10
**Drug** - 30:3
**drug** - 56:11,
104:14, 105:10,
107:5, 126:13, 166:4,
167:24
**drugs** - 104:16,
112:11, 112:13,
118:3, 118:25, 125:11
**ducks** - 73:19
**due** - 25:15, 173:15
**duly** - 29:6, 116:18
**During** - 135:21,
138:9
**during** - 7:6, 36:13,
152:10, 153:15,
155:1, 155:3, 160:24,
182:6, 187:6, 189:23,
196:20
**duties** - 5:2, 5:12
**duty** - 99:22

**E**

earl - 14:23, 15:2
early - 30:1; 89:15
earth - 66:10
earth-shaking - 66:10
easier - 63:22, 65:2, 90:23, 152:5, 158:15
easily - 167:16
Eastern - 98:25
echo - 22:24, 65:1
Edward - 4:14
effect - 11:11, 12:19, 24:9, 50:19, 51:19, 51:20, 69:5, 75:9, 104:22, 141:24, 142:17, 156:13
effected - 47:16, 48:5, 141:21, 175:20
effectively - 26:2
effectuated - 44:17
efficient - 177:25
effort - 91:20
efforts - 53:9
eight - 118:7, 124:8, 125:18, 126:15, 171:17
either - 12:16, 14:4, 15:14, 16:7, 23:13, 28:24, 56:10, 58:4, 58:11, 90:22, 132:11, 164:8, 164:9
elaboration - 10:4
elected - 50:14
election - 28:25
element - 103:9
eliminate - 77:12
embark - 6:21
emerged - 109:13
emergency - 34:14, 35:2
employed - 47:1, 117:3, 117:4, 117:6
employee - 46:23
employees - 158:1, 158:3
encompassed - 186:22
encounter - 104:22
end - 57:8, 196:18
endeavor - 173:19
endeavoring - 173:14
ended - 45:14, 53:11
ends - 167:17, 170:10, 170:18, 170:19
Enforcement - 30:3, 30:21
enforcement - 30:18, 40:13, 42:4
engaged - 22:5, 23:3
enter - 11:7, 50:6, 52:1, 69:4
entered - 15:4, 155:8, 164:22
enterprise - 56:7, 56:11, 57:10, 57:21, 168:25, 169:13, 169:23, 170:4, 170:10, 170:18, 172:25, 176:16, 177:17, 192:17
entirely - 25:14, 139:7, 139:8
entitled - 1:11, 54:16, 58:9, 58:18,
63:7, 98:16
entry - 51:3
envision - 166:13
epileptic - 16:3
equally - 66:5
equipment - 34:14
equity - 98:7
err - 78:21
escape - 74:4
especially - 24:12, 170:20
Esquire - 1:18, 1:19, 1:21, 1:22, 2:2, 2:5, 2:6, 2:9, 2:10
essence - 72:11, 81:10, 166:5
essential - 61:7, 81:9
essentially - 27:22, 86:7, 140:13, 151:3, 151:20, 184:23
establish - 141:17
established - 112:24, 189:10
et - 1:6, 199:4
ethical - 26:3
ethically - 8:12
evaluates - 112:22
evaluating - 182:17
event - 6:12, 119:19
events - 52:22
eventually - 64:18
Evidence - 139:10
evidence - 49:24, 53:1, 53:13, 55:7, 55:8, 57:6, 57:21, 59:12, 60:2, 60:7, 60:24, 60:25, 80:6, 90:11, 95:14, 100:14, 100:17, 101:14, 104:9, 110:16, 111:19, 112:25, 113:3, 114:17, 114:21, 122:4, 137:23, 140:2, 140:23, 165:4, 166:21, 171:3, 171:21, 171:24, 172:1, 172:7, 172:10, 172:17, 172:19, 175:8, 180:8, 181:2, 181:8, 181:10, 181:11, 181:12, 181:16, 182:17, 183:8, 184:6, 187:15, 189:5, 189:20, 190:3
evident - 141:4
evidentiary - 22:16, 22:17, 95:9, 114:23
evidentiary-type - 22:16
evolving - 140:17
exact - 124:2
Exactly - 95:6, 155:22, 188:10
exactly - 23:1, 42:18, 49:24, 65:20, 70:19, 73:1, 73:24, 108:9, 140:9, 154:10, 158:4, 180:3, 196:23
Examination - 29:13, 116:25, 132:13, 136:16
examination - 27:6, 38:15, 46:19, 122:6, 122:22, 139:16, 195:25
examinations - 50:2
examine - 7:3
examined - 29:6,
116:18, 183:4
example - 50:1, 56:13, 72:19, 144:12, 174:6, 177:4
except - 8:22, 75:5
Except - 24:18
exception - 152:23, 153:9, 153:18, 186:16
exceptions - 195:6
exclude - 112:16, 115:14
excluded - 196:21
Excuse - 27:9, 73:5, 150:3, 178:9
excuse - 169:6
excused - 3:19, 22:9, 115:19, 133:6, 137:9, 150:14
execute - 50:24
executing - 43:10
execution - 42:8
exemption - 5:8, 10:22, 13:2, 17:20, 18:16, 20:4, 20:18, 21:9, 38:8, 94:12, 111:13, 122:17, 133:1, 150:10, 196:12
exercise - 162:18
exercising - 77:21
Exhibit - 18:18, 127:7, 130:25, 131:4, 134:14, 138:2, 198:10
exhibit - 133:22, 134:10, 136:11, 137:12
exhibited - 166:20
exhibits - 7:5
Exhibits - 198:13
exist - 61:11, 143:17, 149:12
existence - 149:3, 149:10
existent - 139:4
exists - 148:18, 158:10
exit - 121:13
exited - 35:9
expanded - 195:12
expansive - 167:6
expect - 61:16, 109:23, 139:16, 165:22, 166:10, 175:25
expected - 118:17, 180:8
expecting - 184:19
expects - 7:23, 97:13
expenses - 158:13
experience - 91:8
expert - 72:23
experts - 52:18
explain - 5:25, 6:22, 10:6, 32:19, 92:12, 107:1
explained - 92:17, 92:18, 107:10
explanation - 10:4, 191:8
explicit - 4:20, 11:10, 15:6, 46:15, 52:11, 88:20, 96:13
express - 78:2
expressed - 28:21
expressly - 99:12
extend - 165:17
extending - 76:23
extends - 163:13
extension - 54:5
extensive - 51:9
extent - 23:19, 24:4, 60:10, 60:23, 64:11, 69:19, 74:8, 75:10, 149:12, 155:16, 189:4, 196:19
extraordinarily - 168:12
Exxon - 35:3
eyewitness - 178:24

**F**

F.2d - 171:1, 171:15
F.supp.2d - 99:1
face - 73:8, 145:18, 146:24
faced - 77:14, 77:16, 98:15
faces - 166:17
facially - 186:12
facilities - 144:3, 152:12, 153:21
facility - 145:12, 145:16, 145:24, 145:25, 146:1, 147:4, 147:7, 147:11, 147:23, 148:22, 148:24, 151:9, 151:11, 151:16, 151:18, 152:1, 152:14, 155:7, 156:8, 156:14, 157:14, 157:16, 157:18, 158:17
facing - 73:7, 77:16, 129:24, 137:1, 137:2
fact - 7:13, 7:18, 10:17, 12:10, 14:3, 25:8, 33:3, 51:23, 59:1, 63:22, 66:24, 77:2, 80:11, 82:13, 84:15, 90:24, 91:10, 91:17, 103:16, 103:22, 104:4, 107:3, 122:24, 125:2, 125:25, 126:7, 127:24, 128:8, 130:20, 131:7, 138:20, 150:23, 155:3, 161:16, 161:24, 175:1, 176:21, 182:23, 188:1
facto - 72:11
factor - 27:4, 183:2
factors - 9:11, 73:8, 182:19
facts - 5:3, 5:20, 7:1, 7:20, 12:6, 12:9, 13:14, 14:3, 17:15, 18:10, 19:23, 20:14, 21:3, 24:5, 27:5, 28:20, 38:3, 70:20, 78:2, 83:2, 92:1, 94:7, 99:22, 111:9, 122:11, 132:21, 139:5, 139:22, 140:9, 141:4, 146:6, 150:5, 191:21, 196:7
factual - 22:15, 24:13, 72:17, 75:19, 137:25, 138:18
factually - 72:13
failure - 174:4
fair - 25:16, 28:19, 45:17, 73:14, 87:15, 89:3, 90:8, 99:18, 118:12
fairly - 57:19, 89:15, 93:1, 143:15
fairness - 98:7
faith - 53:14
fall - 186:20
falls - 177:15
false - 110:21
far - 58:15, 60:11, 61:20, 63:1, 92:8, 93:1, 104:18, 129:11, 144:7, 162:23, 162:24, 164:15, 167:22, 173:16
far-fetched - 93:1
Faretta - 8:7, 8:8, 14:9, 14:12, 22:5, 23:10, 23:17
fashion - 23:7, 56:9, 56:10, 110:21
fast - 63:3
fat - 165:15
favor - 70:1
fear - 18:2, 27:16
feature - 175:12
features - 175:3
February - 57:7, 57:11, 57:17, 145:5, 146:11, 157:3
Federal - 137:17
federal - 9:11, 71:1, 91:8, 96:4, 103:16, 137:15, 142:16, 144:1, 145:7, 145:17, 145:18, 145:19, 146:12, 147:11, 147:24, 148:5, 149:9, 151:10, 151:17, 151:24, 152:11, 152:14, 152:15, 152:16, 152:25, 153:2, 153:5, 153:6, 153:16, 153:17, 154:1, 154:13, 155:4, 155:24, 156:9, 156:13, 156:15, 156:19, 156:20, 157:1, 157:3, 157:6, 158:1, 160:24, 161:1, 161:17, 162:2, 169:16, 173:7
feedup - 158:2
feet - 129:17, 129:18
fellow - 30:25, 31:11, 59:6, 91:16
felt - 54:2
fessed - 192:22
fetched - 93:1
few - 164:10
fewer - 71:5
fields - 72:24
Fifth - 174:3
fifth - 9:18
fight - 113:19
figure - 9:6, 73:11
figured - 107:6
figuring - 147:5
file - 12:19, 39:13, 51:10, 181:16, 187:23, 190:8, 191:4
filed - 51:11, 53:23, 60:1, 89:16, 91:20, 94:19, 111:23, 112:3, 143:15, 179:2, 194:21, 194:22
files - 111:24, 115:5
filing - 188:2
final - 13:9, 143:2, 167:21, 187:6
finally - 94:2
fine - 26:15, 112:23, 149:19, 156:22,

187:22
**finger** - 80:23
**fingerprints** - 55:8
**finish** - 19:13, 178:11
**finished** - 19:9
**finishes** - 27:6
**firearm** - 138:8, 138:16, 138:20
**firearms** - 104:17
**fired** - 27:1, 55:1
**first** - 3:6, 7:1, 7:17, 12:5, 65:14, 74:17, 75:14, 75:19, 80:1, 88:25, 96:17, 99:4, 101:8, 106:16, 106:19, 109:21, 109:22, 121:3, 121:19, 131:16, 137:24, 138:24, 146:8, 149:18, 152:9, 153:10, 153:20, 154:3, 156:2, 156:4, 183:25, 188:2, 188:25
**First** - 96:18, 152:19, 155:17, 195:21
**fit** - 88:1
**five** - 6:9, 6:13, 41:21, 50:4, 50:5, 88:12, 129:17, 159:13, 160:13, 189:25, 196:6
**flavor** - 175:4
**fledged** - 14:12
**flee** - 35:6
**flesh** - 79:6, 164:11, 166:4, 174:21
**Flex** - 117:19, 118:15, 126:4, 126:9, 126:12, 134:1
**floor** - 35:22, 131:12, 131:13
**floorboard** - 120:15, 120:18, 121:15, 135:24
**flowing** - 182:2
**focus** - 22:20, 45:11, 58:22, 81:17, 96:19, 97:1, 98:10, 181:6
**focused** - 126:13, 143:22, 144:5, 152:10
**focusing** - 152:9
**folders** - 68:6
**follow** - 7:22, 33:15, 138:19
**follow-up** - 7:22
**followed** - 184:16
**following** - 4:3, 5:1, 5:12, 10:16, 17:14, 19:22, 33:24, 38:2, 74:18, 74:19, 77:18, 162:20, 179:15
**follows** - 29:7, 116:19, 143:19
**foot** - 31:17, 181:19, 181:20, 182:13
**footnote** - 108:25, 109:1, 110:12, 110:13
**force** - 9:25, 18:2, 42:2, 117:10
**Force** - 45:18, 47:5
**forced** - 77:22
**forcefully** - 57:19
**forcing** - 10:1, 86:7
**Ford** - 118:22, 120:2, 135:10, 138:11
**foregoing** - 199:2
**forensic** - 55:8

**forfeit** - 53:12
**forgive** - 146:15
**forgot** - 183:1
**forgotten** - 193:9
**form** - 61:9, 69:17
**formal** - 169:17
**formality** - 151:24
**former** - 164:3
**forth** - 50:11, 184:21, 184:24, 193:3
**fortuity** - 63:9, 66:2, 147:20
**forward** - 28:22, 165:9, 168:4
**forwarding** - 28:3
**four** - 8:23, 8:25, 12:22, 70:7, 70:8, 71:4, 71:5, 81:1, 88:12, 127:21, 167:15, 168:24, 168:25, 195:13
**four-month** - 70:7
**fourths** - 165:22
**Fourth** - 3:23, 58:8, 79:10, 97:5, 140:1, 140:4, 142:12, 142:18, 151:22, 164:9, 164:14, 167:1, 167:4, 170:14, 170:22, 171:23, 172:22, 177:2
**frank** - 69:21
**Frankly** - 63:11, 152:5
**frankly** - 63:23, 77:14, 139:2, 156:12, 164:3
**Frederick** - 146:23, 146:25
**free** - 12:1
**front** - 34:24, 35:2, 71:5, 71:15, 73:15, 137:21
**full** - 14:12, 21:2, 108:16, 150:5, 185:9, 187:19
**full-fledged** - 14:12
**fully** - 22:19, 23:3, 37:24, 69:9, 90:2, 195:23, 195:24
**funding** - 156:23
**funny** - 58:2
**furnishes** - 58:11
**furtherance** - 93:2, 93:13, 93:18, 94:22, 95:7, 105:8, 108:2, 108:13, 108:19, 108:24, 110:22, 112:21, 114:24, 187:5, 188:22
**furthest** - 129:18
**future** - 165:22

**G**

**Gail** - 1:25, 199:10
**ganging** - 81:1
**garden** - 170:5
**Gardner** - 2:4, 14:19, 14:20, 14:22, 14:23, 15:1, 15:2, 15:8, 18:21, 18:23, 19:3, 19:5, 19:7, 19:9, 19:12, 20:22, 20:25, 21:12, 52:8, 52:9, 52:10, 59:2, 64:22, 77:19, 91:24, 91:25, 92:8, 92:9, 92:11, 92:13, 92:17, 93:11, 95:5, 96:10, 96:12,

100:23, 102:23, 106:1, 106:11, 106:17, 106:21, 107:1, 107:10, 107:24, 109:14, 144:2, 145:11, 150:3, 150:13, 150:14, 152:11, 152:24, 153:7, 176:1, 177:23, 179:7, 180:1, 180:4, 180:9, 180:25, 181:4, 181:15, 186:14, 187:2, 190:19, 190:21, 190:23, 191:14
**Gardner's** - 59:4, 59:5, 59:18, 95:1, 95:2, 95:3, 100:23, 102:24, 110:6, 110:20, 151:1, 155:3, 179:15, 181:7, 187:4, 190:21
**general** - 126:15, 173:16
**generally** - 13:19, 96:18, 143:20, 167:19
**generous** - 167:3
**genesis** - 167:10
**gentlemen** - 167:14
**George's** - 89:21
**Gerard** - 2:9
**gestures** - 121:16
**Giganti** - 41:3, 41:6, 43:17, 91:19, 91:22
**girlfriend** - 33:19
**girlfriend's** - 32:10, 37:17, 102:24
**Given** - 73:21, 99:24, 172:15
**given** - 64:15, 66:18, 120:4, 141:11
**glad** - 126:25, 163:5
**gold** - 9:12, 118:22, 120:2, 135:10, 136:21, 138:11
**Goo** - 107:10
**goodness** - 161:10
**Goose** - 105:11, 107:5
**government** - 3:5, 3:9, 3:21, 41:23, 49:15, 49:21, 50:6, 50:17, 50:23, 51:10, 54:24, 55:12, 55:14, 57:6, 57:20, 58:20, 58:25, 60:2, 60:21, 61:2, 63:23, 64:18, 65:3, 65:9, 65:13, 65:22, 66:3, 66:11, 66:12, 66:13, 66:20, 66:25, 67:7, 68:9, 70:14, 78:8, 81:12, 81:14, 83:25, 85:25, 89:2, 90:19, 92:25, 95:25, 96:4, 97:21, 98:8, 98:9, 108:7, 110:19, 111:24, 112:2, 112:24, 114:20, 115:5, 122:10, 126:19, 140:9, 143:15, 143:20, 144:4, 144:12, 145:2, 145:6, 146:3, 146:8, 146:22, 148:5, 148:15, 154:11, 156:7, 157:6, 158:5, 158:8, 158:9, 158:10, 160:5, 160:7, 163:10, 165:3, 174:20, 175:8,

177:16, 178:15, 178:17, 178:18, 179:11, 182:22, 183:7, 184:24, 189:2, 192:10, 192:15, 192:24
**Government** - 1:17, 29:5, 116:17
**government's** - 3:12, 7:9, 25:4, 37:25, 52:2, 60:4, 65:23, 69:18, 76:14, 77:5, 84:10, 99:24, 107:21, 122:9, 131:2, 138:24, 138:25, 140:25, 143:25, 144:15, 148:1, 150:1, 153:20, 172:11, 174:19, 175:13, 180:3, 180:7, 182:5, 195:23
**Government's** - 134:14, 138:2, 198:10
**Government's'** - 198:2
**governments** - 163:23
**grab** - 62:24
**Grand** - 59:10, 59:14, 64:1, 64:4, 64:9, 80:17, 101:10, 110:12, 110:14, 112:6, 113:2, 113:16, 113:18, 165:3, 165:8, 182:10, 182:11, 182:24, 183:9, 183:24, 187:16
**grant** - 25:6, 25:10, 58:10, 86:21, 89:11, 176:1
**granting** - 58:5
**graphic** - 182:2
**Graul** - 43:16
**great** - 97:6, 193:15
**green** - 136:3
**grew** - 101:25
**Grievance** - 28:5
**Grimm's** - 161:25
**Gross** - 113:6
**ground** - 91:12, 91:14
**grounds** - 141:11, 183:10, 183:11
**Group** - 30:4, 30:6, 37:18
**group** - 6:16, 119:8
**grouped** - 77:4
**guess** - 13:11, 16:18, 36:19, 44:22, 49:22, 51:12, 58:22, 73:25, 77:9, 77:25, 111:1, 153:23, 162:7, 163:21, 165:14, 165:22, 176:13, 195:6
**guidance** - 26:4
**guided** - 13:19
**guilt** - 69:23, 70:7, 70:23, 71:2, 71:12, 71:19, 73:15, 75:2, 75:4, 75:7, 99:14
**guilt/innocence** - 7:7, 24:14, 72:5, 75:9, 76:4, 86:6
**guilty** - 4:16, 5:15, 11:6, 15:3, 167:16
**gun** - 102:19, 103:3, 138:20, 169:9
**guns** - 102:9, 118:3
**guy** - 90:12, 120:8, 171:15, 180:20, 180:23, 181:19, 183:3

**guys** - 42:9, 112:11

**H**

**Hagin** - 43:16
**half** - 114:7, 136:2, 169:16, 189:25
**halfway** - 192:16
**hand** - 29:3, 111:2, 119:12, 129:14, 137:10, 141:15, 142:5, 151:13
**hand-rolled** - 119:12, 141:15, 142:5
**Handbook** - 170:23
**handgun** - 35:16, 118:25, 120:21, 121:17, 121:19, 121:21, 136:7, 138:13, 138:15, 142:9, 142:24
**handguns** - 117:11
**hands** - 35:14, 37:2, 44:22, 44:24, 45:13, 48:19, 187:12
**Hanlon** - 1:19, 3:5, 89:4, 144:18, 149:17, 149:25, 150:16, 150:17, 150:19, 153:8, 155:10, 155:11, 161:20, 184:9, 184:10, 184:12, 184:15, 184:23
**Hanlon's** - 144:17
**happy** - 108:15, 143:4
**hard** - 61:23, 110:17
**hardest** - 160:2
**Harding** - 1:18, 3:5, 3:21, 3:24, 4:5, 21:18, 21:19, 21:23, 27:6, 29:1, 29:2, 29:14, 30:24, 36:12, 37:22, 43:25, 46:6, 46:7, 47:13, 48:14, 49:6, 49:7, 49:14, 49:15, 50:12, 51:7, 58:21, 58:23, 58:24, 59:17, 59:22, 60:12, 60:15, 60:19, 60:23, 61:2, 61:6, 61:12, 64:20, 65:6, 65:7, 65:9, 65:12, 65:18, 66:16, 66:24, 67:13, 67:18, 81:20, 85:9, 85:10, 85:14, 89:4, 91:10, 94:2, 94:18, 95:14, 96:7, 96:9, 96:11, 96:16, 96:17, 96:21, 97:2, 100:6, 100:25, 101:5, 101:8, 101:15, 101:18, 101:23, 102:3, 102:6, 102:9, 102:12, 102:14, 102:16, 102:18, 102:22, 103:2, 103:12, 104:12, 104:24, 105:3, 105:6, 105:15, 105:17, 105:19, 105:23, 106:1, 106:6, 106:8, 107:21, 108:4, 108:8, 108:15, 109:20, 110:24, 116:2, 116:3, 116:14, 117:1, 122:3, 124:9, 132:14, 132:17, 133:15, 133:16, 133:17, 134:10, 134:16,

135:19, 136:9,
137:12, 137:13,
138:3, 138:23,
139:21, 141:3,
142:25, 143:1, 170:7,
170:8, 175:18, 184:3,
184:5, 184:7, 184:9,
185:3, 185:14,
185:19, 185:25,
187:10, 187:14,
187:21, 188:3,
188:12, 189:4,
189:17, 189:18,
190:16, 190:24,
191:7, 191:13, 192:1,
193:4, 193:11,
193:13, 193:18,
193:20, 193:25,
194:3, 194:6, 194:14,
194:17, 198:4, 198:8
**Harding's** - 139:20,
176:20, 186:12,
186:24
**Harris** - 2:7, 14:16,
15:24, 16:11, 22:4,
22:6, 22:18, 22:21,
23:1, 23:11, 23:18,
24:2, 24:4, 24:16,
52:18, 52:23, 73:14,
77:21, 78:3, 79:24,
80:23, 91:21, 115:15,
116:7, 168:20, 169:8,
175:7, 175:11,
177:22, 191:10
**Harris's** - 22:24,
25:15, 82:16, 194:1
**hat** - 179:7, 179:12,
180:20, 180:24,
181:20, 182:13,
182:25, 183:3, 183:20
**head** - 27:5, 36:6,
75:25, 192:8
**headings** - 34:21
**Headquarters** -
117:14
**health** - 16:4, 49:12,
49:17, 49:22, 49:24,
50:7, 50:25, 52:17,
53:1
**hear** - 4:8, 14:17,
37:6, 58:19, 61:17,
61:21, 61:24, 71:1,
74:1, 94:1, 94:2, 96:7,
108:4, 138:24, 141:3,
143:4, 143:8, 147:25,
149:17, 149:25,
163:5, 175:8, 184:2,
195:19
**heard** - 10:5, 21:24,
49:11, 62:13, 69:8,
71:2, 79:18, 83:23,
92:9, 109:19, 182:1,
186:8
**hearing** - 1:12,
12:15, 21:21, 22:17,
70:20, 109:22,
133:14, 139:22,
146:18, 167:9,
180:19, 183:17,
183:22, 184:19
**hearings** - 3:7,
22:8, 22:16
**hears** - 71:22, 72:2,
72:16
**hearsay** - 183:10,
183:11, 190:21,
190:22
**heart** - 161:10
**heightened** - 97:18
**held** - 36:16, 99:3,

99:7, 145:6, 145:14,
145:23, 146:9,
146:12, 151:16,
152:11, 153:18,
157:4, 157:6, 157:14,
161:24
**help** - 42:1
**helped** - 155:15
**helpful** - 54:14,
149:18, 149:20,
155:12
**helpfully** - 3:9
**hence** - 164:9
**hereby** - 199:2
**herself** - 88:18
**hesitation** - 28:21
**Hi** - 136:7, 138:14
**Hi-point** - 136:7,
138:14
**hid** - 102:22
**Hidta** - 126:11
**high** - 89:25, 168:14
**highly** - 162:12,
192:9
**himself** - 86:18
**hired** - 103:18,
103:23
**Hirshman** - 27:19,
27:25
**historical** - 53:1,
53:5
**history** - 153:13,
175:10
**hit** - 103:23, 104:7
**hold** - 90:16, 126:21
**holding** - 99:11
**holds** - 174:7
**Hollingsworth** -
123:18, 123:19,
127:14
**Holly** - 179:12,
182:12, 182:24,
183:20
**home** - 104:13
**Homicide** - 30:2,
41:12, 47:10
**homicide** - 41:13
**honestly** - 91:3
**Honor** - 4:6, 6:2,
6:7, 6:24, 7:25, 9:1,
9:10, 9:16, 11:19,
12:5, 15:11, 15:17,
15:22, 15:23, 15:24,
21:19, 21:23, 22:1,
23:8, 23:20, 24:10,
24:20, 25:18, 26:17,
27:16, 37:23, 38:14,
46:4, 46:7, 46:8, 46:9,
46:18, 49:4, 49:7,
49:15, 50:10, 50:22,
51:6, 51:13, 51:21,
51:25, 52:3, 52:14,
53:17, 53:20, 54:17,
59:22, 60:12, 60:19,
61:15, 62:6, 62:15,
62:22, 63:18, 63:23,
64:4, 66:16, 67:13,
67:18, 67:22, 68:19,
68:23, 69:10, 69:15,
69:21, 70:13, 71:21,
74:21, 75:6, 76:13,
79:20, 79:23, 84:23,
85:7, 86:3, 88:15,
88:16, 88:23, 91:14,
93:19, 94:17, 96:21,
96:22, 98:11, 100:12,
100:18, 101:15,
101:20, 103:4,
107:23, 108:8, 109:7,
111:6, 112:17, 113:1,

113:11, 113:12,
113:19, 114:9,
115:18, 116:3, 116:4,
116:14, 122:5, 122:8,
126:16, 126:22,
127:5, 131:1, 132:12,
132:16, 133:16,
133:18, 134:25,
136:14, 137:7,
137:13, 138:22,
139:1, 140:11, 143:1,
143:10, 144:16,
144:19, 144:22,
145:16, 146:16,
148:11, 149:15,
150:2, 155:11,
155:14, 156:3,
156:16, 157:3,
157:13, 157:21,
159:3, 159:17,
159:22, 160:21,
161:13, 162:18,
163:3, 163:8, 163:21,
163:25, 165:14,
170:8, 173:3, 174:18,
175:3, 178:9, 178:14,
184:7, 185:2, 185:23,
186:10, 188:24,
189:14, 191:7, 192:3,
193:13, 194:20,
195:18
**honor** - 8:19
**Honor's** - 159:5
**Honorable** - 1:12,
159:5
**honoring** - 195:22
**hope** - 3:12, 3:14,
3:17, 42:7, 76:9,
115:11, 115:14,
146:15, 155:12,
155:17
**hopefully** - 112:5
**hopes** - 4:1
**hoping** - 143:11
**hour** - 114:7
**hours** - 3:18, 124:4
**house** - 102:24
**House** - 5:9, 9:9,
10:23, 17:21, 18:17,
20:5, 20:19, 21:9,
38:9, 94:13, 111:15,
122:18, 133:2,
150:11, 196:13
**housed** - 151:9,
151:25, 159:16
**housekeeping** -
178:6, 185:23
**housing** - 153:21
**Hunnewell** -
151:19, 152:19, 154:6
**hurdle** - 114:22
**Hurson** - 2:10, 16:1,
22:8, 22:18, 69:11,
69:14, 69:15, 70:13,
70:18, 71:16, 71:20,
71:25, 72:23, 73:6,
73:11, 73:17, 74:4,
74:20, 75:1, 75:4,
76:12, 77:12, 77:23,
77:25, 78:12, 78:18,
78:20, 79:17, 88:10,
97:24, 163:8, 163:21,
163:25, 164:8,
164:14, 165:6,
165:13, 166:15,
166:18, 167:8, 168:1,
168:2, 168:13, 169:3,
176:3, 176:4, 176:7,
176:9
**hypertechnical** -

159:18, 159:19

I

**I'** - 25:9
**Iad** - 143:21,
143:24, 146:5,
148:21, 149:1,
149:22, 150:25,
151:21, 152:1, 152:4,
153:11, 153:12,
153:22, 153:24,
154:16, 154:23,
155:9, 155:25,
156:14, 158:20,
158:22, 159:10,
161:18, 175:24
**idea** - 56:4, 124:7,
128:1, 128:2, 128:3,
189:19
**ideal** - 76:17
**identical** - 62:16
**Identification** -
54:10, 82:25, 85:14,
85:24, 178:4, 178:24,
179:1, 179:16,
179:24, 179:25,
181:2, 181:8, 181:15,
181:23, 182:20,
183:16, 191:2, 193:8,
193:24
**Identification** -
85:13
**identified** - 55:11,
62:21, 84:1, 84:3,
84:11, 84:13, 85:4,
180:4, 180:8
**identifies** - 59:24
**identify** - 84:8
**identifying** - 82:6
**identity** - 56:18,
81:25, 82:1, 179:4
**idiot** - 192:25, 193:5
**ignored** - 27:22
**iii** - 4:15
**iii** - 164:17, 166:20,
185:16
**ill-advised** - 164:17,
166:20
**imagine** - 61:23,
93:9, 167:7
**immediate** - 5:10,
10:24, 17:22, 18:18,
20:6, 20:21, 38:10,
94:15, 107:4, 111:16,
122:19, 133:3, 196:14
**immediately** - 4:2,
5:6, 9:5, 10:20, 12:25,
17:18, 18:14, 19:24,
20:3, 20:17, 21:7,
21:11, 38:6, 94:11,
111:12, 122:15,
132:24, 150:9, 190:6,
196:10
**impact** - 93:22
**impaneled** - 90:24
**impartial** - 28:19,
87:15, 90:7, 99:10,
99:18, 100:2
**impede** - 173:14,
173:19, 173:20
**implicate** - 24:16
**import** - 179:6
**important** - 56:5,
81:24, 82:2, 82:6,
82:8, 98:2, 98:3,
140:3, 168:16
**importantly** - 89:9,
110:24
**impose** - 89:9

**impossible** - 73:12,
73:13
**imprisonment** -
152:3, 154:18, 154:22
**in-court** - 164:2
**in-law** - 83:11
**in-law** - 83:12
**inadmissible** -
135:1
**inadvertently** -
106:24
**incarcerated** -
171:11
**incarceration** -
155:4
**incident** - 104:7
**incidents** - 82:7,
104:20
**inclined** - 7:15
**included** - 92:5
**including** - 11:23,
68:11, 151:19,
152:19, 187:18,
192:11
**Including** - 102:18
**inconsistent** -
97:16, 189:3
**incorporated** -
26:19
**incurs** - 158:13
**Indeed** - 12:18
**indeed** - 28:9,
103:23, 142:17, 187:4
**independent** -
28:16, 124:20,
124:25, 125:1
**Index** - 198:1
**indicate** - 131:10,
131:15
**indicated** - 6:8,
11:20, 12:11, 13:22,
48:22, 89:18, 89:22,
89:24, 94:21, 96:5,
127:13, 133:9, 153:2,
178:16
**indicates** - 87:25,
133:13
**indictment** - 24:7,
54:1, 54:5, 57:4,
57:13, 79:9, 95:21,
95:23, 101:21,
103:17, 103:22,
104:3, 113:14, 114:1,
114:11, 114:25,
163:1, 165:23,
166:13, 169:4,
169:15, 169:16,
174:23, 175:2,
175:15, 175:16,
175:20, 175:21,
175:23, 176:13,
176:14
**indictments** -
164:20, 168:7
**individual** - 54:23,
77:2, 91:23, 99:19,
125:20, 125:21,
126:7, 127:14, 128:3,
128:8, 131:16, 177:12
**individuals** - 55:10,
55:15, 56:14, 56:21,
76:5, 77:16, 123:3,
176:25
**indulgence** - 41:24
**inequity** - 97:16
**infer** - 16:15, 16:23
**influence** - 77:21,
78:6, 78:15, 173:14,
173:19, 173:20
**inform** - 106:19

**informant** - 117:25,
118:5, 118:13,
118:20, 120:4, 124:1,
124:10, 124:16,
125:2, 125:5, 125:7,
125:9, 125:20,
125:25, 126:2, 126:6,
127:24, 138:6
**informants** - 118:8,
118:17
**information** - 16:7,
31:15, 32:10, 33:17,
33:21, 33:23, 34:1,
42:16, 42:19, 54:4,
54:11, 57:12, 57:24,
58:5, 58:12, 59:5,
65:13, 67:9, 67:20,
73:22, 81:23, 113:1,
116:12, 118:1, 118:2,
118:9, 118:16,
118:18, 119:6, 119:7,
121:10, 121:11,
124:13, 124:19,
124:23, 128:4,
134:22, 135:5, 135:8,
135:16, 138:6, 189:5
**informed** - 55:10
**infringement** -
100:1
**initial** - 4:16, 11:6,
15:3, 51:22, 53:23,
54:9, 155:4, 167:24,
179:5
**initiate** - 14:9
**initiated** - 117:25
**innocence** - 70:7,
70:24, 71:2, 71:12,
71:19, 73:15, 75:3,
75:5, 75:8
**inquire** - 23:8
**inquiry** - 8:8, 9:3,
14:10, 14:13, 22:5,
23:10, 23:17, 25:23,
51:7, 81:3
**inserted** - 175:14
**instance** - 57:2
**instances** - 175:6
**instead** - 171:24
**institution** - 116:8,
158:13, 161:3
**instructed** - 27:16
**instruction** - 16:22,
114:10
**instructions** - 6:18,
16:13, 16:24
**instructs** - 11:22
**instruments** - 13:7
**insure** - 28:17
**integrating** - 68:5
**intelligently** -
142:22
**intend** - 22:17, 52:1,
173:25
**intending** - 31:5,
104:9
**intends** - 67:7
**intent** - 89:17,
173:24
**intention** - 23:9,
23:22, 24:1
**intentions** - 23:12
**intercepted** -
106:24
**interested** - 97:22,
190:13, 190:14,
190:16, 190:17
**interesting** - 144:9,
175:25, 176:18
**interests** - 97:25,
98:1

**internal** - 160:22
**interpretation** -
25:24, 162:4
**interpreting** - 12:20
**interrupt** - 26:10,
149:15, 176:4
**interstate** - 138:21
**Interstate** - 143:13,
143:23, 153:25, 160:1
**interview** - 31:2,
31:12, 44:5
**intimidate** - 175:7
**intimidation** -
163:18, 174:24, 175:1
**introduce** - 7:5,
104:9, 184:5
**introduction** -
69:11
**Intuitively** - 89:13
**invasion** - 104:13
**investigation** -
30:16, 40:10
**investigative** -
128:21
**investigators** -
42:20
**invite** - 28:3, 187:25
**invoke** - 142:23,
153:24
**invoked** - 26:8,
153:11
**involve** - 87:5
**involved** - 30:9,
30:15, 30:17, 30:18,
43:10, 56:9, 56:10,
80:14, 104:13,
104:18, 104:20,
105:11, 113:23,
123:6, 129:3
**involvement** -
45:15, 104:5
**involves** - 123:2
**involving** - 105:10
**irrelevant** - 113:8,
113:10, 113:11,
113:12, 188:11
**issue** - 3:23, 5:4,
10:18, 12:13, 15:15,
17:16, 18:11, 19:25,
20:14, 21:4, 25:24,
26:3, 26:6, 38:4,
49:12, 49:21, 51:16,
60:3, 61:7, 62:20,
71:11, 74:4, 77:8,
81:4, 82:14, 82:24,
87:4, 93:21, 94:8,
97:2, 97:25, 98:5,
98:6, 98:11, 101:1,
109:1, 111:9, 111:11,
111:25, 112:18,
113:15, 113:16,
114:23, 122:12,
132:21, 140:3, 143:3,
146:17, 150:6,
150:20, 152:6, 154:2,
163:11, 165:7,
165:25, 166:1, 166:3,
167:20, 167:25,
170:17, 172:22,
174:17, 175:24,
176:15, 176:24,
177:21, 186:3, 190:2,
190:3, 193:17, 196:8
**issued** - 49:19,
153:5, 153:7
**issues** - 24:6,
24:12, 49:10, 49:13,
49:17, 49:22, 50:7,
51:17, 52:17, 53:15,
53:21, 59:12, 62:14,

64:12, 71:13, 71:14,
94:20, 95:9, 113:21,
143:16, 152:9,
153:15, 155:15,
163:2, 178:25,
185:18, 189:21
**items** - 8:24, 8:25,
55:16
**itself** - 91:18,
139:14, 169:17
**Iv** - 143:24

**J**

**Jail** - 146:24, 159:9
**jail** - 91:25, 92:6,
106:13, 107:11,
145:23, 147:21,
168:22, 169:2,
169:14, 169:15, 172:3
**James** - 2:2, 43:16,
137:17
**January** - 171:16,
171:18, 172:13,
194:21
**Jencks** - 59:3, 59:9,
59:15, 61:17, 63:12,
64:19, 64:21, 64:23,
67:2, 109:25
**Jermaine** - 191:21
**jittery** - 35:20
**Joe** - 177:8
**Johnson's** - 191:21
**join** - 16:16, 115:15
**joined** - 177:22
**joining** - 11:12
**Joint** - 5:9, 9:9,
10:23, 17:21, 18:17,
20:5, 20:20, 21:10,
38:9, 94:13, 111:15,
122:18, 133:2,
150:11, 196:13
**joint** - 97:8, 97:9,
97:19, 97:20, 99:7,
99:25, 100:9
**Jones** - 60:17,
102:19, 104:19,
110:3, 110:10, 168:20
**Jones-spence** -
60:17, 102:19,
104:19, 110:3,
110:10, 168:20
**Joshua** - 2:9
**judge** - 127:2,
132:21, 150:6, 150:7,
150:9, 153:5, 160:2
**Judge** - 1:13, 11:23,
12:12, 15:18, 18:11,
40:17, 58:21, 65:9,
66:16, 96:17, 111:22,
161:25, 170:9,
187:13, 199:6
**July** - 87:8, 195:3
**jump** - 163:21
**Jump** - 87:8, 92:7,
117:18, 117:19,
117:22, 127:20,
138:3, 168:18, 193:8,
193:10, 193:11,
195:3, 195:15
**juries** - 90:24
**jurisdiction** - 149:7,
154:15, 159:11
**jurisprudence** -
140:17
**juror** - 89:5
**jurors** - 89:14,
97:11, 97:13, 99:21,
100:15
**jury** - 7:18, 70:9,

70:15, 70:16, 70:20,
71:1, 71:5, 71:15,
71:22, 71:23, 72:2,
72:16, 73:16, 74:1,
74:8, 75:24, 76:8,
77:14, 86:7, 90:7,
90:17, 90:20, 91:1,
91:4, 98:13, 98:17,
98:18, 98:19, 99:7,
99:11, 99:13, 99:17,
99:20, 100:2, 100:4,
100:7, 100:8, 114:11,
183:17, 195:5
**Jury** - 59:10, 59:14,
64:2, 64:4, 64:9,
80:17, 101:10,
110:12, 110:14,
112:6, 113:2, 113:17,
113:18, 165:3, 165:8,
182:10, 182:11,
182:24, 183:9,
183:24, 187:16
**justice** - 167:18,
173:8, 173:15,
173:21, 174:1
**Justice** - 11:24,
28:11
**justifies** - 79:12
**jut** - 87:17, 114:11,
175:10

**K**

**keep** - 39:12, 39:13,
39:18, 39:24, 40:1,
59:20, 73:10, 115:1,
135:20
**keeps** - 191:11
**Keith** - 32:2, 32:23,
43:17
**Kelsey** - 1:22
**Kentucky** - 90:3,
97:4, 98:14, 99:6
**Kevin** - 123:15,
123:17
**key** - 174:20,
177:12, 192:9
**Kga** - 32:22
**kill** - 103:19
**killing** - 81:22
**kind** - 42:4, 79:10,
87:9, 102:1, 103:3,
118:5, 140:7, 144:2,
144:8, 146:17,
157:11, 174:7, 175:25
**kinds** - 104:20
**knowing** - 78:13
**knowingly** - 142:21
**knowledge** - 83:15,
102:8, 119:16, 123:5,
153:8, 164:15
**known** - 4:17, 52:23
**knows** - 52:3,
52:14, 57:4, 59:24,
76:12, 85:19, 135:14,
146:16
**Kramer** - 4:5, 21:17,
25:20, 29:4, 29:11,
29:15, 31:1, 46:21,
49:9, 198:3
**Kurland** - 2:6,
60:16, 61:19, 61:25,
62:23, 64:6, 64:7,
65:21, 66:7, 66:23,
68:8, 68:25, 69:5,
69:6, 94:2, 94:16,
94:17, 95:3, 95:7,
95:13, 95:18, 95:21,
95:25, 96:3, 96:8,
100:20, 101:9, 103:7,

103:9, 103:13,
108:18, 111:3, 111:5,
111:21, 111:22,
112:9, 112:15,
112:17, 113:8,
113:11, 113:18,
114:9, 114:15,
114:19, 115:4, 178:5,
178:14, 178:21,
178:25, 179:14,
179:18, 179:21,
180:2, 180:10,
180:12, 180:15,
180:17, 180:22,
180:25, 181:3, 181:9,
181:12, 181:24,
182:1, 182:10,
182:12, 182:15,
183:1, 183:7, 183:14,
183:19, 183:25,
184:17, 184:18,
185:1, 185:2, 185:8,
185:14, 185:23,
186:5, 186:10,
186:18, 187:7,
187:13, 188:9,
188:11, 188:16,
188:18, 189:14,
190:8, 190:13,
190:18, 190:25,
191:5, 191:11, 192:3,
192:4, 192:5, 192:9,
193:6, 195:5
**Kurland's** - 191:20

**L**

**label** - 157:10,
157:11, 157:13
**labeled** - 163:10,
164:2
**laid** - 163:9, 177:18
**Lambert** - 15:18
**lane** - 136:25
**lanes** - 136:23
**language** - 158:19,
175:14, 175:15,
175:22
**lapse** - 169:25
**large** - 163:13
**largely** - 170:18
**larger** - 113:25
**Last** - 29:11
**last** - 6:8, 14:12,
54:1, 116:24, 137:20,
168:19, 169:5
**lasted** - 44:12
**latter** - 173:15
**Laura** - 1:22
**Law** - 5:10, 9:9,
10:24, 17:21, 18:18,
20:6, 20:20, 21:10,
38:10, 89:23, 94:14,
111:15, 122:19,
133:3, 150:12, 196:14
**law** - 12:10, 13:13,
14:2, 40:13, 42:3,
71:1, 71:3, 76:9,
76:17, 80:12, 83:11,
83:12, 86:19, 86:25,
97:22, 99:22, 108:3,
108:22, 128:5, 129:6,
139:24, 141:4, 142:9,
151:23, 152:12,
161:23, 169:22,
170:15, 170:23,
173:1, 173:23,
174:15, 177:18
**lawyer** - 4:23, 26:20
**lawyers** - 14:2,

22:7, 26:18, 66:7, 67:12, 108:11
**lay** - 73:23, 176:11, 189:14
**laying** - 120:19, 121:15, 121:21
**leader** - 80:14, 81:7
**leading** - 3:8
**leads** - 118:18, 125:6
**leafy** - 136:3
**learned** - 33:20
**learning** - 109:21, 167:10
**least** - 14:8, 23:11, 24:21, 31:8, 36:22, 42:21, 51:12, 52:22, 64:12, 66:9, 67:6, 116:9, 143:18, 144:7, 146:1, 146:6, 147:5, 148:25, 156:1, 156:6, 157:2, 177:23
**leave** - 19:18, 53:14, 162:2
**leaves** - 26:17
**Leavis** - 170:25
**led** - 78:7
**Lee** - 99:2
**left** - 8:4, 129:14, 185:14
**left-hand** - 129:14
**leg** - 120:20
**legal** - 6:20, 7:13, 9:5, 17:6, 19:3, 22:14, 22:20, 24:6, 49:10, 87:6, 140:8, 164:17, 164:21, 166:20, 166:25, 167:4, 167:5, 174:22, 187:9
**legislation** - 159:22
**legitimate** - 63:11
**legs** - 131:13, 135:24
**length** - 76:24, 77:1, 97:6
**less** - 28:8, 89:20
**lesser** - 72:19
**letter** - 68:7, 68:12, 68:14, 139:20, 193:14
**letting** - 82:17
**level** - 126:9, 126:12
**licensed** - 26:18
**life** - 77:15, 165:17
**light** - 10:4, 11:17, 16:18, 66:8, 79:22, 114:19
**lights** - 35:2
**likelihood** - 52:25
**likely** - 50:25, 53:4, 79:9, 89:14, 89:20, 91:11, 100:16
**limine** - 168:4
**limit** - 71:17, 166:2
**limited** - 22:14, 54:2, 56:25, 58:17, 104:6
**line** - 75:7, 112:5, 170:13, 171:9
**lines** - 107:8, 135:20
**list** - 8:24, 184:20
**listed** - 173:6
**listen** - 75:25
**live** - 76:1, 174:21
**lives** - 23:6
**loaded** - 35:15
**Local** - 26:19
**located** - 121:17, 129:19, 136:5
**location** - 48:7

**locations** - 33:10
**locked** - 105:2, 171:12, 171:16
**Lockhart** - 99:12, 100:12
**log** - 153:3
**logistical** - 67:23
**long-standing** - 177:17
**long-term** - 30:5
**Look** - 79:3
**look** - 41:14, 134:6, 134:17, 158:19, 158:20, 158:24, 159:1, 162:5, 175:24, 177:21, 195:9
**looked** - 41:18, 135:13, 151:6, 154:2
**looking** - 27:23, 76:5, 147:9, 193:15
**lose** - 161:4
**loss** - 22:2
**lower** - 126:12
**lunch** - 3:20, 4:3, 109:5, 115:7, 178:14
**luncheon** - 115:24
**lunchtime** - 4:1
**lyrics** - 82:15, 82:19

**M**

**machine** - 83:13, 83:14
**mail** - 55:20, 83:10, 92:12, 106:25, 185:15
**main** - 162:7
**major** - 75:22
**Mall** - 32:13, 33:6
**man** - 103:19, 124:10, 132:8
**manner** - 169:19
**maps** - 3:10
**March** - 39:2, 39:4, 39:10, 40:22, 159:14
**marijuana** - 119:14, 120:17, 120:19, 121:3, 121:10, 121:13, 121:14, 128:16, 129:5, 129:10, 130:5, 135:15, 135:25, 136:4, 141:23, 171:19, 172:13
**Marked** - 198:10, 198:13
**marked** - 31:19, 34:12, 34:19, 68:1, 126:17, 126:20, 127:6, 130:24, 133:21
**markings** - 68:2
**Marsh** - 97:4
**Marshal** - 157:20, 161:16, 161:25
**marshal** - 127:4, 150:14
**Marshal's** - 116:6, 169:10
**Marshals** - 133:6
**marshals** - 16:1, 151:3, 153:1, 161:10, 161:23
**Martin** - 2:1, 2:9, 11:1, 11:3, 11:4, 11:5, 11:11, 11:14, 15:21, 15:23, 15:25, 17:24, 18:1, 18:7, 18:20, 19:7, 20:8, 20:11, 22:8, 22:19, 52:16, 53:20, 59:13, 61:15, 62:2, 62:3, 62:6, 62:8,

62:11, 62:14, 62:15, 62:18, 62:19, 82:25, 84:3, 84:19, 85:13, 85:18, 85:23, 89:1, 90:20, 90:24, 91:3, 92:10, 92:19, 92:20, 93:12, 93:17, 94:3, 94:4, 94:5, 100:24, 105:11, 106:1, 106:8, 106:21, 107:10, 107:15, 111:6, 115:17, 115:18, 115:22, 122:2, 122:8, 123:5, 124:21, 126:17, 126:22, 127:1, 132:16, 132:18, 133:6, 133:8, 133:12, 135:12, 135:23, 136:1, 137:16, 138:10, 138:17, 141:5, 141:10, 141:18, 141:24, 141:25, 142:8, 142:13, 142:17, 142:21, 170:17, 187:4, 190:20, 191:9, 194:8, 198:13
**Martin's** - 84:6, 85:14, 107:2, 107:9, 127:7, 131:4, 137:14, 173:22
**Maryland** - 1:2, 1:8, 26:18, 89:18, 129:6, 138:5, 145:7, 145:12, 146:13, 146:19, 147:3, 147:6, 147:22, 148:7, 148:8, 148:9, 148:14, 149:1, 151:18, 152:22, 157:7, 158:11, 158:17, 160:15
**massage** - 195:14
**master** - 144:20
**match** - 120:3
**material** - 59:3, 59:8, 59:9, 63:8, 63:13, 64:5, 64:9, 64:17, 64:19, 64:21, 64:23, 66:17, 67:2, 67:25
**materially** - 146:7
**matter** - 12:10, 13:9, 28:18, 66:14, 80:11, 80:12, 93:23, 140:25, 152:13, 185:24, 190:19, 199:3
**matters** - 178:6
**Max** - 16:5
**Mcac** - 145:8, 146:19, 147:7, 148:11, 148:12, 156:5, 156:18
**Mccree** - 99:12, 99:16
**Mcwhite** - 123:16
**meals** - 158:6, 158:8
**mean** - 5:16, 32:19, 47:25, 51:16, 55:13, 56:2, 56:18, 58:2, 59:13, 60:21, 63:6, 63:11, 63:13, 69:21, 70:19, 72:21, 73:8, 75:18, 77:17, 80:19, 84:12, 85:18, 87:10, 88:10, 93:9, 95:20, 96:24, 103:7, 103:25, 113:20, 113:24, 118:7, 118:14,

130:14, 140:7, 140:19, 144:8, 145:1, 147:16, 147:19, 148:17, 149:12, 149:14, 149:15, 149:20, 155:19, 157:23, 158:15, 159:8, 165:18, 166:8, 166:16, 168:10, 183:16, 186:4, 186:7, 188:19, 188:21, 190:12
**meaningful** - 67:12
**meaningless** - 161:17
**means** - 26:23, 33:20, 152:20, 161:17
**measure** - 66:21
**meet** - 16:11, 42:20, 89:12, 126:1
**meeting** - 4:1, 42:7, 42:13, 42:15
**member** - 4:2, 95:16, 95:23, 96:5, 101:9, 101:13, 101:14, 101:16, 101:23, 103:25, 104:3, 107:25, 108:1, 108:21, 110:5, 112:19, 114:7, 171:5, 171:20, 186:13, 186:17, 186:22, 188:7, 188:13, 188:19, 188:20, 188:21
**members** - 44:9, 56:8, 57:10, 57:11, 101:19, 108:10, 168:24, 169:1
**membership** - 88:12, 172:4, 172:15, 186:25
**memorandum** - 25:4, 144:15, 144:25, 145:1, 151:5
**memory** - 40:24
**mental** - 49:12, 49:16, 49:22, 49:24, 50:7, 50:25, 52:17, 53:1
**mention** - 132:10, 192:15
**mentioned** - 13:3, 13:16, 109:22, 110:11
**merit** - 100:11
**message** - 185:15
**messages** - 92:13
**met** - 6:7, 6:15, 78:5
**methodology** - 161:13
**Michael** - 1:17
**microphone** - 14:25
**middle** - 164:3
**might** - 3:10, 16:8, 16:13, 23:22, 24:3, 24:14, 24:24, 45:18, 50:12, 51:19, 59:23, 64:5, 64:23, 94:18, 94:24, 95:4, 103:10, 177:7, 181:5, 189:22
**Might** - 23:8
**millimeter** - 35:16, 136:7, 138:14
**Mills** - 32:13, 33:6
**mind** - 109:14, 115:1, 130:15, 177:5
**mine** - 112:13
**minimal** - 64:5
**minimum** - 12:1
**minivan** - 31:21,

34:14, 35:4, 44:16, 47:14, 47:18
**minute** - 36:4, 36:8, 36:13, 44:12, 105:13, 158:22
**minutes** - 44:1, 83:21, 124:4
**Miranda** - 36:25, 37:4, 37:5, 37:6, 85:3, 85:5
**misimpression** - 112:4
**misrepresentation** - 192:6
**missing** - 68:13
**mistake** - 4:19, 11:8, 15:5, 39:7, 109:8
**mistaken** - 37:16, 141:8, 141:9
**misunderstood** - 109:3, 109:6
**Mitchell** - 1:6, 1:20, 4:10, 4:12, 4:14, 5:13, 6:7, 6:8, 7:5, 7:19, 8:18, 8:21, 9:5, 9:18, 9:20, 9:21, 9:24, 10:7, 10:9, 10:13, 17:1, 17:3, 17:6, 17:11, 17:23, 19:7, 19:19, 19:20, 27:4, 27:16, 27:18, 30:14, 30:16, 31:2, 31:12, 32:4, 33:18, 35:6, 35:11, 35:12, 35:19, 35:24, 36:2, 36:23, 37:20, 37:24, 38:12, 38:20, 39:5, 40:23, 42:14, 42:18, 42:24, 43:7, 43:11, 43:19, 44:12, 44:18, 44:21, 45:11, 45:13, 46:4, 46:8, 46:12, 46:13, 46:14, 48:15, 50:14, 77:19, 78:5, 78:11, 79:25, 80:5, 80:6, 80:16, 80:24, 81:6, 82:4, 82:6, 84:4, 85:22, 88:16, 88:18, 88:19, 89:15, 92:10, 92:15, 101:16, 101:20, 104:2, 113:13, 142:3, 163:16, 168:22, 174:25, 176:23, 178:9, 178:12, 178:13, 191:10, 191:24, 192:17, 193:9, 195:17, 195:19, 195:21, 196:16, 199:4
**Mitchell's** - 6:19, 7:13, 8:11, 11:12, 21:21, 27:8, 47:15, 47:21, 78:6, 78:13, 84:8, 85:12, 85:15, 85:19, 193:17
**mitigating** - 73:8
**mitigation** - 7:9, 86:7
**mix** - 99:19
**Model** - 26:17
**modeled** - 49:18
**modifications** - 195:10
**moment** - 14:18, 16:4, 21:24, 61:18, 61:25, 126:16, 130:25, 144:14, 148:2, 152:10, 180:7, 192:7

**money** - 76:20, 107:2, 107:3, 107:9, 108:12, 161:4
**Montgomery** - 89:20, 91:16, 91:22, 92:9, 95:16, 100:24, 101:8, 101:25, 103:15, 103:22, 103:23, 104:12, 106:2, 106:16, 106:19, 107:2, 108:1, 108:5, 108:21, 109:15, 109:24, 110:2, 110:14, 112:19, 113:3, 113:22, 178:17, 178:20, 179:10, 179:11, 182:2, 182:6, 182:7, 182:22, 183:18, 186:4, 186:12, 187:3, 187:18, 192:10, 192:13, 192:20
**Montgomery's** - 93:9, 93:11, 100:22, 104:5, 112:6, 183:9, 186:25, 188:5
**month** - 41:15, 59:18, 64:24, 66:25, 70:7
**months** - 3:8, 49:17, 50:4, 50:5, 79:5, 156:17, 169:14, 171:17, 190:1
**moot** - 66:18, 67:10
**moral** - 4:15, 11:5, 14:23, 15:2
**morally** - 89:8
**morning** - 6:1, 6:2, 6:4, 7:19, 7:20, 15:21, 15:22, 15:23, 16:1, 16:2, 16:10, 27:10, 27:12, 29:15, 29:16, 38:17, 38:18, 46:21, 46:22, 115:12, 185:24, 186:3, 186:9
**morphs** - 192:18
**most** - 8:10, 57:24, 64:9, 65:7, 97:22, 98:10, 167:1, 167:6, 187:9, 190:14
**mostly** - 170:11
**mother** - 83:10
**mother's** - 106:25
**motion** - 51:11, 51:14, 53:23, 54:9, 57:5, 57:18, 60:1, 61:14, 62:15, 62:18, 69:17, 79:3, 89:16, 98:4, 98:15, 108:20, 115:9, 133:11, 143:11, 143:12, 143:16, 150:22, 161:11, 170:9, 173:22, 176:2, 176:5, 176:12, 179:16, 181:7, 183:15, 186:7, 188:5, 190:8, 196:3
**Motion** - 126:18, 127:7, 131:4, 134:14, 138:2, 198:10, 198:13
**motions** - 1:11, 3:6, 11:7, 15:4, 111:23, 120:15, 143:3, 168:4, 168:5, 168:15, 175:21, 189:24, 194:12
**motivations** - 189:9
**move** - 14:25, 53:15, 194:24

**movie** - 92:20, 107:16, 107:18
**movies** - 93:12
**moving** - 179:2
**muddle** - 71:11
**multiple** - 87:5
**Murder** - 104:1
**murder** - 55:12, 55:15, 56:14, 56:18, 56:22, 59:3, 59:25, 60:17, 61:4, 72:19, 88:11, 92:2, 92:11, 99:14, 102:18, 102:19, 102:23, 102:25, 104:19, 105:25, 107:6, 107:10, 107:19, 110:3, 110:10, 113:7, 113:13, 113:23, 113:24, 114:3, 144:5, 166:25, 168:19, 168:20, 168:21, 180:9, 191:3, 191:9, 191:14, 191:16, 193:2
**murders** - 54:21, 56:23, 58:23, 60:10, 60:18, 77:22, 104:18, 105:14, 105:20, 106:9, 123:3
**must** - 71:1, 98:3, 172:6
**mute** - 24:9

**N**

**name** - 29:9, 29:11, 30:12, 32:15, 37:16, 91:16, 91:23, 95:22, 105:11, 106:23, 116:22, 116:24, 118:12, 122:1, 123:3, 124:10, 127:22
**named** - 95:21, 103:19, 103:21, 104:1, 107:5, 168:24, 169:1, 171:16
**namely** - 105:9
**names** - 43:13, 43:14, 54:10, 56:13, 56:21
**Narcotics** - 29:19
**narcotics** - 41:12
**narrow** - 165:15
**nature** - 189:7
**near** - 32:14, 33:6, 120:19
**necessarily** - 42:10, 73:19, 75:11, 75:17, 78:17, 140:14
**necessary** - 54:3, 58:12, 58:13, 139:17
**Neck** - 159:9
**need** - 34:12, 61:21, 65:23, 68:11, 68:17, 70:11, 70:23, 70:24, 85:8, 95:22, 97:1, 107:2, 107:3, 115:10, 141:3, 141:13, 147:15, 163:20, 178:1, 178:20, 181:6, 183:17, 183:23, 185:8, 185:9, 186:6, 187:8, 187:9, 190:10, 195:4, 195:11, 195:13
**needed** - 107:9, 153:3
**needing** - 108:11
**needs** - 15:19, 26:3, 140:10, 154:21, 163:23, 185:12

**negotiable** - 13:6
**neighborhood** - 42:6, 118:10, 119:9, 119:25
**nervous** - 35:20
**never** - 61:9, 126:11, 145:11, 153:6, 153:22, 180:15
**New** - 102:3, 104:15, 177:6
**new** - 117:10, 146:24, 154:13, 154:15, 163:15, 175:13, 194:21, 194:23
**next** - 12:25, 23:16, 35:8, 63:2, 79:5, 106:5, 108:12, 134:23, 137:19, 178:2, 194:22
**night** - 114:7
**nine** - 35:15, 136:7, 138:14
**Nobody** - 76:12
**nobody** - 82:5, 82:6
**non** - 7:10, 51:19, 90:4, 90:17, 97:9, 97:20, 98:17, 98:19, 100:7, 139:4, 186:20
**non-capital** - 90:4, 97:9, 97:20
**non-conspirator** - 186:20
**non-death** - 90:17, 98:17
**non-death-qualified** - 98:19
**non-disclosure** - 51:19
**non-existent** - 139:4
**non-qualified** - 100:7
**non-statutory** - 7:10
**noncapital** - 99:4, 99:9, 100:9
**none** - 64:12, 101:18, 189:11
**None** - 84:6, 169:11, 169:12
**normally** - 189:24
**north** - 129:24
**Northbound** - 137:4
**northbound** - 137:5
**Northern** - 29:21, 159:9
**nose** - 166:16
**note** - 6:3, 108:18, 134:25
**noted** - 15:24, 110:13
**nothing** - 7:6, 7:8, 9:13, 12:9, 15:18, 50:13, 59:7, 94:24, 161:18, 191:8
**Nothing** - 132:12
**notice** - 35:18, 50:18, 52:20, 89:16, 121:19, 194:20, 194:21
**notify** - 11:22
**noting** - 7:24
**notion** - 87:10, 145:10
**November** - 14:12, 54:1, 87:19, 137:16, 137:20, 169:21
**Number** - 3:3, 126:19, 127:7, 131:4,

134:12, 134:14, 136:8, 138:15
**number** - 49:10, 53:21, 71:7, 71:8, 71:9, 74:9, 74:11, 89:8, 89:19, 131:12, 131:13, 138:20, 144:10, 151:19, 172:21, 194:6
**Numbers** - 131:2
**numbers** - 134:8
**numerous** - 101:24, 130:5, 130:6

**O**

**o'clock** - 115:23
**O'gavin** - 123:15
**oath** - 113:3, 179:8, 179:11, 180:18, 187:19, 189:3, 189:10
**object** - 50:18, 51:2, 52:3, 65:22, 135:23, 183:10, 183:11
**objected** - 90:6
**objecting** - 82:21
**objection** - 51:13, 65:11, 135:1, 135:3
**Objection** - 36:5
**objectives** - 26:21
**objects** - 65:9
**obligation** - 8:12, 63:15
**observation** - 129:16, 135:16
**observations** - 121:12
**observed** - 119:8, 119:9, 120:14, 121:14, 129:9, 129:12, 129:25, 130:19, 131:11, 131:16, 131:22, 132:2, 132:8, 135:10, 135:12, 135:23, 138:10, 138:15, 141:9, 141:15, 142:6
**obstruct** - 173:14, 173:19, 173:20
**obstructing** - 163:17
**obstruction** - 173:8
**obtain** - 91:20
**obtained** - 151:2
**obviated** - 75:15, 78:23
**obvious** - 7:22, 52:21, 73:21
**obviously** - 28:16, 73:3, 75:13, 78:12, 103:8
**Obviously** - 195:12
**occasion** - 45:22, 130:8
**occasions** - 102:10, 175:9
**occupant** - 121:23
**occupants** - 34:17
**occurred** - 52:24, 123:7, 123:23, 139:19, 144:11, 187:2
**occurs** - 96:25
**odd** - 70:5
**odor** - 128:15, 129:8, 135:25, 141:22
**offense** - 90:18
**offenses** - 81:22
**offer** - 4:23, 4:24, 9:21, 9:22, 10:6, 10:13, 10:14, 11:15,

17:3, 17:11, 17:12, 18:7, 18:8, 18:23, 19:20, 19:21, 20:11, 20:12, 20:25, 21:1, 37:25, 46:14, 62:8, 62:11, 88:19, 94:5, 111:7, 122:9, 132:18, 133:4, 133:5, 134:10, 137:23, 195:23, 196:5
**offering** - 19:3
**offers** - 10:8
**Office** - 28:6, 116:6, 137:18, 169:10
**office** - 28:6, 69:12, 118:2
**Officer** - 123:18, 127:13, 136:18
**officer** - 36:6, 37:12, 39:15, 44:19, 45:14, 123:14, 134:22, 135:4, 135:7, 135:12, 135:14, 135:16, 136:1, 136:2, 136:5, 140:21, 141:8, 142:4, 180:18, 195:25
**officer's** - 131:1, 140:20
**officers** - 28:9, 31:1, 31:11, 36:18, 36:19, 36:20, 36:21, 45:6, 123:14, 135:21, 135:22, 138:4, 138:11, 179:9, 179:22, 184:13, 184:14, 184:18
**official** - 40:13
**Official** - 1:25, 199:11
**offset** - 122:16
**Oklahoma** - 162:2
**omnibus** - 173:12
**once** - 44:16, 121:9, 142:17
**Once** - 141:21
**once-and-for-all** - 142:17
**one** - 3:15, 3:22, 3:25, 5:14, 8:16, 13:4, 15:15, 21:24, 25:21, 27:4, 31:8, 31:10, 33:5, 39:17, 39:24, 42:21, 43:18, 44:12, 48:12, 55:17, 59:24, 60:24, 64:14, 67:22, 70:9, 70:17, 71:5, 71:7, 72:10, 72:12, 74:6, 74:9, 75:20, 76:25, 77:3, 81:2, 81:22, 83:3, 83:7, 84:4, 89:19, 90:24, 91:15, 92:14, 97:10, 97:14, 98:6, 99:9, 100:20, 103:2, 103:10, 104:1, 104:6, 107:25, 112:4, 112:5, 114:6, 115:8, 122:4, 127:12, 131:12, 131:13, 133:20, 136:11, 138:14, 139:16, 139:25, 140:13, 143:7, 147:15, 147:20, 151:13, 153:9, 158:22, 159:4, 159:25, 166:14, 167:7, 167:20, 173:2, 175:2, 175:5, 176:7, 176:21, 177:15, 183:1, 188:19, 192:3, 192:7, 193:2

**One** - 36:21, 55:16, 64:9, 92:2, 134:3, 136:25, 169:6, 176:20, 184:16, 185:2
**one-day** - 3:15, 159:25
**ones** - 88:25
**Ongoing** - 65:18
**ongoing** - 155:1, 165:4, 169:24, 170:2, 170:4, 175:2, 175:12
**open** - 42:21, 53:11, 53:22, 113:15, 113:16, 115:1, 120:23, 120:25
**open-ended** - 53:11
**opening** - 7:18
**operating** - 37:12
**operation** - 43:4, 126:5
**operations** - 126:10, 126:11, 126:14
**operator** - 142:1
**opinion** - 9:15, 13:7
**opportune** - 15:16
**opportunities** - 53:13
**opportunity** - 16:11, 22:4, 50:1, 52:16, 101:3, 108:17, 112:1, 115:4, 188:4
**opposed** - 89:19
**opposite** - 77:23, 77:24, 78:8
**opposition** - 89:24
**option** - 164:6
**orally** - 14:9, 176:13
**order** - 5:6, 9:4, 10:20, 12:25, 17:18, 18:13, 19:24, 20:2, 20:16, 21:6, 38:6, 42:10, 49:16, 49:22, 50:7, 50:19, 51:3, 52:2, 58:13, 61:4, 61:18, 64:8, 64:25, 65:21, 66:11, 66:16, 67:3, 67:8, 69:4, 77:20, 79:2, 79:14, 94:10, 111:11, 122:14, 132:24, 143:5, 146:24, 150:8, 154:15, 161:25, 178:19, 182:21, 196:10
**ordered** - 48:15, 48:18, 69:1, 128:19, 128:20
**orders** - 37:2, 49:18
**organization** - 80:17, 81:7, 101:17, 101:20, 104:2, 104:6, 113:13, 163:17, 166:4, 167:24, 174:25, 175:3, 175:12, 176:22, 176:23, 177:1, 177:7, 177:9, 177:13, 177:14, 191:24
**organized** - 177:17
**Organized** - 117:12
**original** - 152:2, 153:9, 154:17, 154:21
**originally** - 145:22, 146:2
**otherwise** - 52:19
**ought** - 86:23, 188:1, 188:2
**ourselves** - 8:3
**out-of-court** -

181:23
**outburst** - 169:20
**outside** - 186:20
**Outstanding** - 31:8
**outstanding** - 31:8, 42:3, 42:17, 53:18
**overhead** - 158:13
**overnight** - 162:3
**override** - 65:23
**overriding** - 75:22
**overruled** - 135:3
**Overruled** - 36:6
**Owings** - 32:13, 33:6
**own** - 63:6, 68:17, 79:1, 151:1, 188:5
**owned** - 157:16

**P**

**P040295** - 136:8, 138:15
**packet** - 67:24
**page** - 99:3, 131:9, 137:20, 145:1, 159:13, 160:13, 173:11
**Page** - 198:2
**pages** - 187:8, 187:17
**paid** - 104:8, 159:20
**panacea** - 75:22
**paper** - 54:18, 92:22, 108:16, 114:11, 114:14, 114:18, 156:22
**papers** - 11:21, 11:22, 12:1, 12:7, 12:18, 51:13, 51:25, 60:1, 92:2, 143:6, 163:5, 163:9, 176:11, 176:17, 177:1, 179:2, 185:6, 194:8, 194:18, 194:19
**paperwork** - 51:25, 155:18, 160:22
**paragraph** - 137:24
**paraphrase** - 112:7, 112:8
**parcel** - 114:4
**Pardon** - 132:4
**parole** - 106:12
**parroted** - 87:23
**part** - 5:13, 5:18, 30:1, 43:4, 45:18, 47:4, 48:10, 64:16, 67:14, 73:9, 80:8, 81:19, 88:4, 113:13, 113:24, 114:4, 114:6, 139:23, 146:19, 147:7, 158:17, 163:19, 163:22, 167:15, 167:23, 168:25, 169:11, 169:12, 178:22, 181:9, 181:12, 185:10, 192:12
**Part** - 181:11
**partial** - 144:9
**participants** - 67:6, 172:12
**participate** - 22:7, 117:22, 133:14
**participated** - 30:13, 104:7
**participating** - 126:25
**participation** - 60:8
**particular** - 29:20, 48:7, 61:3, 64:14,

74:13, 74:14, 96:19, 99:23, 138:7, 142:19, 143:5, 145:15, 148:2, 148:20, 158:20, 164:16, 171:4, 188:7
**particularly** - 56:15, 66:8, 78:13, 82:5, 139:20, 143:24, 171:8
**Particulars** - 53:24, 54:2, 57:1, 58:4, 58:8, 58:10, 58:11, 61:14
**particulars** - 55:14, 58:2
**parties** - 11:23, 13:6, 50:11
**partner** - 32:2
**parts** - 93:16
**passed** - 36:2, 129:13
**passenger** - 33:18, 34:5, 35:5, 44:16, 48:3
**passes** - 192:23
**past** - 123:5, 139:17, 141:10, 169:6
**pat** - 35:15
**path** - 27:20
**pathway** - 53:11
**patrol** - 31:19, 34:13, 34:19, 36:10, 37:10
**patted** - 44:18, 45:13
**pattern** - 174:15
**Pause** - 41:25, 133:7, 150:15
**pay** - 107:2
**pays** - 66:14, 158:6, 158:8, 158:11
**peculiar** - 140:15
**penalized** - 77:8
**penalty** - 7:10, 8:19, 70:3, 70:8, 70:12, 70:24, 71:2, 71:6, 71:7, 71:8, 71:9, 71:13, 71:14, 71:23, 72:2, 72:6, 72:25, 73:8, 75:14, 76:4, 76:19, 76:20, 77:6, 77:17, 77:20, 89:3, 89:7, 89:17, 89:19, 89:25, 90:25, 99:8, 99:14, 194:12
**penned** - 40:18
**People** - 118:10
**people** - 31:25, 34:8, 39:8, 56:2, 56:8, 57:11, 69:22, 80:5, 82:2, 84:1, 84:11, 84:15, 89:6, 89:12, 89:19, 93:20, 118:8, 126:15, 134:3, 134:8, 156:24, 158:16, 168:24, 168:25
**per** - 42:15, 158:14, 158:15
**perceive** - 24:1
**perceived** - 87:20
**percent** - 109:19
**perception** - 88:3
**perfectly** - 104:3, 149:19, 175:15
**perform** - 5:1, 5:11, 6:13
**performed** - 6:9
**Perhaps** - 56:5, 165:13
**perhaps** - 23:14, 23:16, 28:8, 70:5, 76:5, 79:4, 79:5, 84:5,

110:21, 110:24, 164:18, 167:8, 167:22, 177:23, 191:2, 195:2, 195:3
**period** - 3:15
**permanent** - 175:2, 175:12
**permissible** - 89:8, 141:20, 142:14
**permission** - 4:11, 115:18, 137:22, 137:23
**permit** - 4:2, 38:11, 62:3, 62:4, 137:24, 196:17
**permits** - 4:7, 86:25
**permitted** - 67:20
**perpetrators** - 179:5
**person** - 30:12, 35:15, 39:19, 41:9, 42:7, 42:23, 45:25, 54:25, 56:19, 61:3, 75:14, 91:6, 103:18, 103:21, 110:2, 118:3, 118:5, 118:21, 125:11, 125:14, 134:4, 176:15, 179:6, 188:13, 189:1
**personal** - 12:17
**personally** - 185:8
**personnel** - 11:24, 157:18
**persons** - 83:15, 173:13
**perspective** - 66:9, 66:10
**persuade** - 158:25
**persuaded** - 175:19
**pertains** - 73:7
**petit** - 89:5
**petitioner** - 90:12
**petitioner's** - 100:2
**phase** - 7:7, 7:11, 8:19, 24:14, 24:15, 70:3, 70:25, 71:2, 71:6, 72:6, 72:25, 74:5, 74:23, 74:25, 75:3, 75:5, 86:6, 96:23
**phases** - 27:3, 71:23, 72:3, 74:2, 75:14, 99:14
**phone** - 27:25, 28:4, 55:17, 83:5, 83:16, 92:16, 105:18, 106:25, 126:7, 185:4
**photocopied** - 65:8
**photocopying** - 66:15, 68:21
**photographic** - 179:16
**phrase** - 101:21
**phraseology** - 159:8, 160:20
**physical** - 44:13, 55:7
**physically** - 56:14, 56:17
**Pick** - 83:20
**pick** - 39:8
**picked** - 83:13, 83:14, 106:21, 154:14
**picture** - 109:13, 130:15
**piece** - 114:11, 114:14, 114:18, 122:4, 156:21, 159:21
**piggybacked** - 69:16

**pit** - 75:20
**pits** - 72:8
**pitted** - 76:25
**pitting** - 69:22
**place** - 30:21, 31:6, 32:10, 32:25, 37:2, 44:23, 65:15, 74:17, 152:3, 153:10, 154:17, 154:22
**placed** - 27:25, 32:5, 35:4, 35:14, 36:9, 131:12, 131:13, 151:11
**places** - 149:6
**placing** - 50:19, 135:23
**plain** - 142:6, 161:25
**plainclothes** - 31:22, 31:23
**plan** - 42:8, 73:24, 105:10, 192:18
**planning** - 42:4, 105:8
**plans** - 106:16, 108:11
**plant** - 8:22
**plants** - 13:22
**play** - 76:19, 186:16
**played** - 54:12, 56:22, 85:1, 175:4
**plays** - 168:9
**plea** - 4:16, 5:15, 8:16, 11:6, 15:3, 137:14, 191:21
**pleading** - 96:5, 97:7, 103:13, 166:1
**pleadings** - 53:18, 85:11, 94:19, 100:21, 186:2, 191:20, 193:3, 194:6
**pled** - 169:11, 169:12
**Plus** - 76:23
**Pm** - 115:8, 117:22, 138:4
**point** - 24:18, 27:19, 32:25, 50:24, 53:3, 63:6, 64:8, 67:10, 69:21, 70:11, 73:20, 76:13, 78:4, 78:21, 79:4, 80:12, 87:8, 87:12, 90:15, 92:1, 93:24, 93:25, 96:23, 103:11, 103:12, 104:10, 109:9, 110:18, 112:15, 118:13, 121:23, 128:23, 129:2, 129:5, 129:17, 129:18, 136:7, 138:14, 140:12, 140:18, 141:5, 141:13, 143:18, 145:4, 146:9, 149:20, 153:20, 156:4, 158:4, 159:12, 161:18, 162:7, 162:8, 162:13, 164:19, 165:10, 165:14, 165:15, 165:19, 166:1, 166:7, 167:13, 167:21, 168:16, 169:6, 174:20, 176:24, 188:23
**pointed** - 48:23, 98:14, 169:3
**pointing** - 80:23, 106:16
**points** - 25:4, 58:6, 60:24, 60:25, 93:20,

168:14
**Police** - 29:12, 29:18, 29:23, 46:23, 47:9, 117:4
**police** - 34:9, 34:23, 39:15, 41:10, 44:19, 138:4, 139:11, 179:9, 180:18
**politely** - 178:18
**polls** - 89:18
**portion** - 75:19
**poses** - 100:8
**positing** - 88:7
**position** - 8:10, 11:12, 11:25, 35:6, 50:23, 52:20, 60:4, 72:1, 82:20, 82:21, 86:18, 92:25, 95:18, 107:21, 143:25, 148:1, 149:17, 174:19, 175:13, 187:24
**positioned** - 32:7
**positions** - 16:17, 180:3
**possession** - 83:15, 138:7, 141:18
**possibility** - 24:2, 24:11, 52:17, 141:16
**possible** - 13:7, 13:8, 104:3, 106:2, 121:13
**possibly** - 24:8, 53:8, 77:3, 77:20, 123:15
**post** - 172:1, 172:10, 175:10, 193:17, 194:1
**post-arrest** - 172:1, 172:10, 175:10, 193:17, 194:1
**postponed** - 66:5
**potential** - 52:18, 94:20, 178:16
**potentially** - 111:19
**potted** - 8:22, 13:22
**powder** - 127:21
**power** - 168:6
**practice** - 99:13
**precedent** - 72:1, 100:3, 100:6
**precinct** - 29:20
**preclude** - 60:2
**preclusive** - 51:19
**predisposition** - 100:15
**preferred** - 66:4
**prejudice** - 4:20, 11:10, 15:7, 24:2, 24:8, 46:16, 52:12, 79:4, 88:21, 96:14, 159:25, 162:16, 162:19
**prejudiced** - 23:21
**preliminary** - 111:23, 180:19
**prematurely** - 67:2
**preparations** - 27:2
**prepare** - 58:13, 119:19
**prepared** - 12:18, 38:19, 184:15, 187:3, 195:9
**preponderance** - 112:25
**present** - 3:4, 6:4, 14:17, 22:13, 22:14, 25:2, 25:13, 25:14, 28:24, 32:18, 54:23, 71:17, 76:6, 87:3,

114:21, 133:10, 178:17, 182:6, 183:12
**presentation** - 178:1
**presented** - 73:22, 74:6, 164:12, 165:8
**presenting** - 22:19, 167:14
**presently** - 54:15
**preserve** - 109:1
**preserved** - 83:18
**preserving** - 195:6
**pressed** - 110:18
**presumed** - 172:5
**presumption** - 172:15
**presupposes** - 99:17
**presupposition** - 99:24
**pretrial** - 112:22, 168:7, 189:20
**pretty** - 51:9, 54:9, 57:19, 63:1, 64:4, 89:3, 92:8, 107:13, 114:5, 144:23, 146:18, 147:7, 176:11, 176:17, 186:8
**preventing** - 163:17
**previous** - 72:3, 139:9
**previously** - 29:6, 116:18, 133:20
**prima** - 186:12
**prime** - 98:5
**Prince** - 89:21
**principal** - 88:23, 88:25
**prism** - 162:9
**prison** - 145:16, 145:25, 146:1
**prisoner** - 36:9, 145:7, 146:12, 151:10, 151:12, 151:24, 151:25, 152:2, 152:11, 152:15, 152:25, 153:2, 153:17, 154:12, 154:24, 157:7, 160:24, 161:17
**prisoners** - 153:24, 156:10, 156:13
**private** - 4:23, 4:25
**Probable** - 119:22, 134:11, 134:18
**probable** - 141:23, 142:8
**probative** - 176:23
**problem** - 77:6, 82:15, 82:23, 82:25, 85:12, 85:25, 86:1, 100:8, 103:14, 152:5, 187:13, 188:25
**problems** - 6:12, 87:3, 92:10, 95:9
**procedural** - 178:6
**procedurally** - 51:17
**procedure** - 50:11, 184:16, 184:24
**procedures** - 181:14
**proceed** - 3:10, 3:22, 8:15, 16:10, 16:14, 16:20, 21:20, 23:6, 38:13, 50:3, 50:15, 115:16, 116:1, 122:21, 133:15
**proceeded** - 107:7
**proceeding** - 7:7,

25:16, 72:4, 87:25, 88:1, 97:21, 140:13, 140:14, 144:5, 180:14, 182:9
**proceedings** - 3:11, 3:19, 16:12, 16:15, 17:10, 18:6, 19:2, 19:18, 20:24, 22:13, 28:22, 62:5, 87:20, 110:9, 113:4, 144:4, 165:12, 165:23, 185:5, 196:4, 196:20, 197:1, 197:4
**process** - 25:15, 98:8
**produce** - 53:9, 182:22, 185:18, 185:20
**produced** - 185:13
**product** - 68:18
**professional** - 23:6
**Professor** - 62:23, 111:2
**proffer** - 79:6, 87:9, 110:19, 112:23, 114:22, 180:8, 186:12, 186:24, 187:11, 187:23
**proffered** - 148:16, 181:16
**profit** - 104:1
**prognosis** - 16:8
**prohibiting** - 173:13
**prongs** - 154:19
**proof** - 140:25, 163:11, 163:22, 165:18, 165:25
**proper** - 12:21, 175:15
**properly** - 99:21, 142:4, 169:18, 172:19
**property** - 91:21
**proportionate** - 158:12
**proposal** - 186:1
**proposals** - 3:13
**proposed** - 49:16, 49:18, 52:2, 174:17
**proposition** - 58:3, 65:25, 91:9, 144:7, 149:8, 162:12, 162:13
**propounded** - 51:15
**prosecuted** - 69:3
**prosecuting** - 91:8
**prosecution** - 72:22, 142:16, 163:18
**prosecutor** - 155:19, 191:15, 191:23
**prosecutors** - 72:12, 80:19, 81:1, 87:5
**prospective** - 155:20
**protestation** - 188:6
**prove** - 61:3, 114:20
**proven** - 165:9, 172:16
**provide** - 59:15, 67:15, 69:1
**provided** - 3:9, 59:17, 67:17, 113:4, 172:24
**provides** - 144:23
**proving** - 172:17
**provision** - 154:21, 173:9, 174:8, 174:12
**provisions** - 143:23, 172:21

**psychiatric** - 50:2
**psychological** - 50:2
**public** - 5:4, 5:7, 9:1, 9:7, 10:18, 10:22, 12:13, 13:1, 17:16, 17:19, 18:12, 18:16, 20:1, 20:4, 20:15, 20:18, 21:5, 21:8, 38:4, 38:7, 94:9, 94:12, 111:10, 111:13, 122:13, 122:17, 132:22, 133:1, 150:7, 150:10, 196:8, 196:11
**Public** - 5:10, 9:9, 10:24, 17:21, 18:18, 20:6, 20:20, 21:10, 38:10, 94:14, 111:15, 122:19, 133:3, 137:17, 150:11, 196:14
**published** - 89:23
**Pulaski** - 118:4, 118:24, 119:3, 119:11, 129:21, 129:23, 135:8, 136:19, 136:24, 138:5
**pull** - 35:2, 120:8, 144:14
**pulled** - 34:23, 54:25, 171:8
**pulling** - 119:9
**punctuated** - 169:25, 175:9
**punishment** - 89:8
**purchases** - 117:11
**purpose** - 93:4, 163:16, 171:3
**Purposes** - 128:25
**purposes** - 30:19, 30:20, 30:21, 32:6, 32:19, 40:1, 70:12, 71:19, 104:2, 128:22, 156:14, 156:15, 157:19, 172:8, 174:25
**Pursley** - 154:7
**pursuant** - 64:25, 154:18, 154:23, 158:9
**pursued** - 26:24
**pushed** - 55:19, 92:14, 92:15
**put** - 4:2, 28:3, 37:9, 44:22, 45:13, 48:19, 52:20, 68:2, 72:16, 74:22, 75:25, 108:15, 119:17, 121:2, 151:3, 151:4, 157:11, 157:13, 195:11
**putting** - 57:6, 157:10, 181:9, 181:11, 181:12
**Pyne** - 2:2, 6:17, 11:16, 11:20, 13:16, 14:7, 50:21, 59:8

## Q

**qualified** - 89:5, 89:13, 90:17, 90:21, 91:1, 91:4, 98:13, 98:17, 98:18, 98:19, 99:7, 100:4, 100:7, 100:8, 100:15
**quandary** - 8:3, 16:9, 27:7
**questioning** - 141:7
**questionnaire** - 195:5
**questions** - 37:23,

43:8, 43:19, 44:1, 44:5, 46:9, 47:13, 48:13, 49:3, 74:16, 76:18, 85:4, 122:3, 136:10, 136:13
**quickly** - 107:3, 107:7
**quite** - 8:20, 8:21, 25:4, 27:14, 58:9, 58:16, 59:25, 63:22, 72:13, 91:3, 108:23, 139:2, 139:11, 141:4, 169:22
**quoted** - 97:6
**quoting** - 99:3

## R

**racketeering** - 57:15, 163:15, 169:5, 170:10, 173:5, 173:6, 174:14, 174:16
**radio** - 33:25, 34:2, 34:8, 34:18
**Raise** - 29:3
**raise** - 15:16, 67:22, 108:19
**raised** - 98:11, 177:22
**raises** - 165:6
**ran** - 116:6
**rap** - 175:4
**rape** - 159:24
**rapist** - 160:9, 160:10
**rather** - 63:24, 78:10, 113:19, 188:23, 189:23
**razor** - 127:21
**reaching** - 154:11
**read** - 98:24, 108:22, 110:11, 110:25, 112:5, 126:23, 134:23, 137:24, 139:21, 166:9
**readily** - 195:8
**reading** - 89:6, 127:19, 135:20, 165:12
**Ready** - 116:1
**ready** - 143:7
**real** - 24:11, 77:14
**really** - 7:16, 54:19, 56:25, 57:20, 57:23, 65:25, 66:12, 91:9, 110:23, 143:17, 153:13, 162:9, 162:22, 163:12, 164:22, 165:16, 166:3, 167:24, 190:14
**Really** - 161:8
**reason** - 22:23, 25:5, 25:8, 61:23, 63:7, 65:12, 66:1, 66:6, 71:11, 74:12, 74:14, 98:20, 107:4, 108:7, 139:12, 162:20, 179:10
**reasonable** - 141:17
**reasonably** - 141:16
**reasons** - 39:18, 39:24, 97:10, 142:11
**Rec'd** - 198:10, 198:13
**receipt** - 107:18
**receive** - 28:5, 61:16, 73:14
**received** - 6:17, 11:21, 14:7, 31:15, 32:9, 33:17, 54:18,

55:23, 55:24, 61:20, 66:23, 91:17, 118:2, 126:18, 127:8, 127:16, 131:5, 134:15, 138:2
**receives** - 28:19
**receiving** - 42:16, 59:9
**recent** - 89:6, 146:4
**recently** - 49:19, 115:20
**recess** - 115:23, 115:24
**recipient** - 186:16
**recited** - 12:23, 92:1
**recognizance** - 12:17
**recognize** - 27:7, 127:10
**recollection** - 39:20, 41:16, 41:19, 41:20, 118:6, 120:25, 121:5, 124:20, 124:25, 125:1, 125:4, 125:16, 139:3, 139:5, 139:10, 139:17
**reconstructing** - 150:21
**record** - 3:2, 4:21, 7:15, 11:4, 14:22, 15:1, 15:10, 25:13, 27:9, 29:9, 29:10, 40:2, 53:11, 87:19, 92:22, 116:22, 133:8, 139:21, 144:6, 187:19, 189:3, 191:10, 191:19, 193:2
**recorded** - 139:18
**recording** - 83:18
**recovered** - 121:17, 134:7, 136:2, 138:16
**Recross** - 136:16
**recuse** - 163:20
**red** - 179:7, 179:12, 180:20, 180:24, 181:20, 182:13, 182:25, 183:3, 183:20
**Red** - 30:4, 30:5, 31:1, 32:14, 33:5, 37:18, 40:4, 45:18, 47:5
**redacted** - 95:10
**redaction** - 95:5
**Redirect** - 132:13
**reduce** - 187:10
**reference** - 103:18
**references** - 92:5
**referred** - 47:4, 140:22
**referring** - 191:11
**refers** - 91:23
**reflect** - 4:21, 11:4, 14:22, 15:1, 27:9, 133:8
**refrain** - 81:8
**refresh** - 39:20, 41:16, 125:4
**refusal** - 66:19, 174:5
**refused** - 178:18
**regard** - 23:10, 24:10, 24:12, 24:25, 52:18
**regarding** - 60:7, 65:16
**regardless** - 99:19
**Regional** - 159:9
**regular** - 90:17
**regulated** - 157:17
**regulates** - 156:22

**rehabilitation** - 154:25, 155:8
**reimbursed** - 68:20
**reindict** - 165:20
**reinvigorated** - 140:6
**Reisterstown** - 34:21, 35:3, 36:3, 47:18, 47:21, 48:4, 48:7
**rejected** - 99:5, 100:17
**rejoin** - 107:12
**related** - 53:18, 74:14, 94:20, 127:17, 143:12, 191:1, 191:3
**relates** - 172:25
**relating** - 15:15, 144:4, 149:5, 149:6, 194:7
**relationship** - 24:16
**relatively** - 164:4
**release** - 5:6, 9:17, 10:20, 12:16, 12:24, 13:10, 17:17, 18:13, 19:24, 20:2, 20:16, 21:6, 38:6, 94:10, 122:14, 132:23, 150:8, 196:10
**releasing** - 9:4
**relevance** - 13:8
**relevant** - 22:15, 64:16, 85:20, 172:10, 172:17
**reliability** - 97:18, 181:22, 182:18, 182:19, 183:5
**relied** - 99:11, 131:25, 132:3, 151:2
**relief** - 176:1
**relies** - 146:3, 156:7
**rely** - 172:23
**relying** - 145:13, 146:22, 189:5
**remain** - 19:17, 20:9, 20:22, 21:14, 23:3, 160:11
**remainder** - 20:24, 22:7
**remained** - 153:17
**remaining** - 3:23, 23:2, 53:16
**remains** - 19:16, 149:9
**remedy** - 140:5, 140:16, 142:23
**remember** - 31:14, 34:10, 39:20, 42:15, 43:25, 44:6, 47:20, 64:3, 83:4, 118:12, 123:15, 123:17, 124:21, 124:22, 125:19, 126:2, 126:3
**Remind** - 83:2
**remind** - 84:18, 111:17
**removed** - 121:13
**renewing** - 69:24
**reopen** - 12:15
**repeat** - 183:23
**repeated** - 38:11, 62:4, 133:9
**repeatedly** - 144:3
**repent** - 15:6
**repented** - 4:18, 11:9
**reply** - 69:18, 72:11
**report** - 40:9, 40:10, 40:18, 40:25, 41:2, 41:3, 41:14, 119:17,

119:19, 121:2, 124:13, 124:17, 124:19, 125:1, 125:4, 125:7, 126:18, 130:16, 130:17, 130:21, 131:1, 131:7, 131:10, 131:21, 131:23, 131:24, 131:25, 132:5, 132:7, 133:20, 134:7, 139:11, 139:12, 139:14, 193:16
**Reporter** - 1:25, 199:11
**Reporter's** - 199:1
**reports** - 38:19, 38:24, 39:1, 39:12, 39:13, 39:18, 39:22, 39:25, 40:1, 55:23, 140:21
**represent** - 8:5, 10:11, 13:12, 13:25, 14:3, 17:1, 17:5, 17:9, 17:24, 18:5, 18:21, 19:1, 19:11, 19:15, 24:18, 25:17, 26:2
**representation** - 8:9, 8:15, 26:9, 26:14, 26:22, 27:15, 28:11, 172:12, 176:20
**representations** - 24:13, 24:24, 187:14, 189:2, 189:5, 189:12
**represented** - 3:5, 99:20
**request** - 5:3, 5:5, 5:7, 5:10, 6:23, 7:1, 8:7, 8:11, 9:17, 9:18, 10:15, 10:17, 10:19, 10:21, 10:24, 12:5, 12:12, 12:15, 12:21, 12:23, 12:25, 13:1, 13:9, 14:6, 17:13, 17:15, 17:17, 17:18, 17:22, 18:11, 18:12, 18:15, 18:18, 19:22, 19:23, 19:25, 20:1, 20:3, 20:6, 20:14, 20:15, 20:17, 20:21, 21:3, 21:4, 21:5, 21:8, 21:11, 22:3, 22:10, 22:12, 24:21, 25:6, 25:9, 25:11, 38:2, 38:3, 38:5, 38:7, 38:10, 49:17, 86:13, 94:8, 94:9, 94:11, 94:14, 98:21, 111:9, 111:10, 111:12, 111:16, 122:10, 122:11, 122:13, 122:16, 122:19, 132:19, 132:20, 132:21, 132:22, 132:25, 133:3, 150:6, 150:7, 150:9, 150:12, 196:7, 196:9, 196:11, 196:14, 196:25
**requested** - 6:9, 35:14, 63:15
**requesting** - 6:21
**Requests** - 12:22
**requests** - 6:9, 6:13, 6:19, 8:19, 15:14, 49:21, 50:6, 196:6
**require** - 14:9
**required** - 53:10, 58:25
**requirement** - 173:24, 177:3
**requirements** -

142:13
**requires** - 86:25, 173:25
**rerolled** - 119:13, 120:8, 121:12, 129:4, 130:4, 130:6, 130:9, 130:13, 131:17, 132:9, 135:13, 135:15, 136:2, 141:10, 141:15, 142:5
**rescind** - 4:15, 4:16, 4:18, 5:15, 11:5, 11:6, 11:7, 15:2
**research** - 9:10, 69:13, 140:8, 140:12
**researched** - 6:19
**reservation** - 11:10, 15:7, 46:15, 52:11
**reservations** - 4:20, 78:2, 88:20, 96:13
**reserve** - 4:19, 9:12, 11:9, 15:6, 46:15, 52:10, 88:20, 96:12
**reserved** - 52:13, 155:6
**residual** - 74:16
**residue** - 127:22
**resistance** - 35:10
**Resolution** - 5:9, 9:9, 10:23, 17:21, 18:17, 20:6, 20:20, 21:10, 38:9, 94:14, 111:15, 122:18, 133:2, 150:11, 196:13
**resolved** - 193:19
**resolving** - 51:13
**resource** - 76:15, 76:18, 77:7
**resources** - 76:16, 97:25
**respect** - 21:21, 22:18, 51:11, 53:1, 57:3, 63:12, 64:21, 71:12, 94:18, 100:9, 100:11, 111:24, 111:25, 112:18, 113:1, 114:22, 142:18, 142:23, 148:1, 148:19, 155:23, 156:2, 156:4, 156:6, 161:3, 167:12, 178:15, 178:25, 179:13, 179:22, 181:14, 182:4, 182:16, 183:20, 186:1, 186:2
**respectfully** - 167:1
**respective** - 28:12
**respond** - 22:4, 96:8, 100:18, 108:17, 109:5, 112:2, 115:5, 150:1, 188:4, 190:9, 190:10
**responded** - 37:15, 103:9, 138:4
**responding** - 94:17, 114:21
**response** - 26:7, 26:11, 26:13, 47:12, 48:12, 48:14, 48:22, 110:13, 138:6, 143:16, 170:9
**responses** - 19:8, 21:13, 22:24, 51:12, 51:14, 69:18
**responsibility** - 28:17, 37:11, 80:10
**rest** - 5:20
**result** - 86:13, 97:17, 100:10,

147:19, 154:11
**resulted** - 137:15
**results** - 97:19
**resume** - 3:16, 3:17
**resumed** - 155:7
**return** - 10:8, 10:14, 17:12, 18:8, 19:21, 20:12, 21:1, 37:25, 62:11, 94:6, 111:7, 115:8, 122:9, 132:19, 133:4, 150:4, 154:21, 154:22, 154:24, 154:25, 196:4
**returned** - 4:24, 154:17, 155:6
**reversed** - 160:3
**Review** - 89:23
**review** - 51:25, 54:8, 68:12, 126:22
**reviewing** - 51:14
**revolution** - 56:16
**revolution-like** - 56:16
**Rhodes** - 1:22, 6:3, 10:11, 25:25, 27:10, 27:11, 27:12, 50:9, 79:20, 79:21, 79:22, 79:25, 80:13, 80:18, 81:14, 81:19, 82:1, 82:12, 82:20, 83:3, 83:6, 83:8, 83:11, 83:13, 83:17, 83:19, 83:21, 83:23, 83:25, 84:3, 84:9, 84:14, 84:17, 84:22, 84:25, 85:2, 85:5, 86:3, 86:11, 86:13, 86:20, 87:2, 87:24, 88:5
**Richard** - 116:15, 116:16, 116:23, 116:24, 198:7, 97:15
**Richardson** - 97:4, 97:15
**Rico** - 56:7, 56:10, 56:11, 57:10, 57:21, 57:22, 72:21, 163:14, 168:24, 169:13, 169:23, 170:4, 170:11, 170:21, 172:25, 173:4, 177:1
**riding** - 55:15
**rights** - 4:19, 11:9, 15:6, 25:15, 46:15, 52:11, 85:3, 88:20, 96:13, 139:25, 140:13, 142:18, 153:11, 153:12, 155:6, 175:16
**ripe** - 50:15, 194:7, 195:1
**risk** - 53:12, 106:17
**Road** - 34:21, 35:3, 36:3, 47:18, 47:22, 48:4, 48:8
**road** - 3:10
**rob** - 105:9, 106:3, 106:4, 192:18
**robberies** - 104:13, 104:14
**robbery** - 105:10, 107:7, 146:24, 189:9, 192:17
**Robert** - 1:18
**Roberts** - 123:17
**role** - 8:21, 22:2, 28:15, 59:25, 172:3
**roles** - 54:12, 56:22
**rolled** - 119:12, 130:11, 141:15, 142:5
**rose** - 133:11

**row** - 73:19
**Rpr** - 1:25
**Rubicon** - 7:16
**ruin** - 7:14
**Rule** - 26:17, 51:22, 59:1, 59:9
**rule** - 26:20, 51:25, 170:24, 171:1, 186:20, 186:23
**ruled** - 100:16
**rules** - 53:10
**Rules** - 26:19, 139:10
**ruling** - 25:25, 70:9, 87:25, 94:23, 183:14, 187:6
**rulings** - 168:8
**run** - 42:7
**Run** - 30:4, 30:5, 31:2, 32:14, 33:6, 37:18, 40:4, 45:18, 47:5
**Rw-1** - 137:13, 138:2, 198:11

**S**

**safe** - 16:22
**safely** - 42:21
**salary** - 158:12
**sample** - 102:1
**satisfied** - 25:13
**save** - 76:20
**saw** - 120:8, 130:2, 130:8, 130:12, 131:19, 136:21, 185:6, 196:19
**scandal** - 97:15
**scene** - 36:3, 36:18, 54:24, 179:23, 181:18, 183:2
**schedule** - 49:25, 59:21, 186:1, 186:7
**scheduled** - 3:8, 178:2
**scheduling** - 15:15, 50:7, 59:2, 66:2
**school** - 76:17, 164:3
**science** - 100:14
**scope** - 8:14, 27:15, 27:17, 168:8, 172:18, 173:16
**score** - 9:20
**scrutinize** - 146:17
**scrutinized** - 160:21
**se** - 42:15
**seamless** - 192:16, 192:19
**search** - 36:15, 36:17, 37:17, 91:20, 139:13, 141:25, 142:4, 142:11, 142:19
**seat** - 120:22, 121:16, 121:18, 121:22, 136:6, 138:16
**seated** - 19:6, 29:8, 62:7, 74:23, 116:20
**second** - 7:21, 12:12, 73:9, 91:2, 91:12, 91:14, 100:19, 131:9, 139:23, 168:15, 176:12, 184:1
**Section** - 9:8, 170:22, 173:5, 173:7
**section** - 90:8, 99:18, 170:22
**secured** - 74:1
**security** - 63:12, 65:15, 66:20, 67:5

**sedan** - 33:19
**see** - 4:9, 5:23, 5:25, 32:7, 32:12, 33:12, 34:15, 34:17, 37:6, 37:19, 38:21, 44:24, 48:20, 63:7, 71:3, 71:15, 76:25, 77:7, 79:7, 79:14, 82:15, 87:22, 93:13, 95:14, 103:1, 107:20, 110:23, 121:21, 126:25, 146:7, 148:25, 160:20, 168:9, 182:22, 184:19, 185:17, 185:25, 189:6, 189:25, 197:3
**See** - 80:18, 166:24
**seeing** - 133:24
**seek** - 89:4, 89:17
**seeking** - 50:24, 61:9, 77:6, 89:2
**seem** - 56:15, 70:5, 76:14, 192:25
**sees** - 88:1
**segregated** - 68:5
**seized** - 55:17, 127:20
**seizure** - 16:3, 142:19, 142:23
**seizures** - 52:23
**selected** - 90:8, 99:17
**selection** - 7:18
**self** - 8:9, 26:9, 26:14, 141:4, 164:17, 182:3
**self-defeating** - 164:17
**self-described** - 182:3
**self-evident** - 141:4
**self-representation** - 8:9, 26:9, 26:14
**sell** - 112:11
**selling** - 112:10, 118:3
**semiautomatic** - 138:14
**sending** - 145:21, 149:7, 149:23, 152:3, 152:8, 152:17, 152:20, 153:23, 159:11
**sense** - 3:13, 65:7, 73:18, 73:25, 162:4, 162:9, 162:10, 162:11, 163:13, 164:24, 165:18, 167:7, 177:11
**sent** - 55:20, 145:11, 145:17, 145:18, 145:19, 146:23, 147:1, 147:4, 147:6, 149:22, 153:22
**sentence** - 134:21, 145:15, 147:3, 154:12, 154:24, 155:8
**sentences** - 134:23
**sentencing** - 24:15, 74:5, 74:23, 74:25, 75:8, 75:10, 96:23, 196:3
**sentient** - 4:15, 11:5, 14:23, 15:2
**separate** - 71:22, 72:2, 75:13, 77:2, 167:20, 167:21, 176:5, 177:3
**separately** - 74:6,

112:12, 112:20
**separation** - 176:15, 176:25, 177:11
**September** - 3:8, 59:16
**Sergeant** - 29:11, 29:15, 31:1, 43:16, 46:21, 116:15, 116:23, 117:2, 132:15, 133:19, 134:17, 136:11, 136:12, 137:8
**sergeant** - 38:17, 39:14, 42:1, 42:23, 43:18, 44:3, 45:17, 122:24, 123:1, 135:6
**Serial** - 136:7, 138:15
**serial** - 138:19, 159:24, 160:9, 160:10
**series** - 3:6, 3:9, 3:11, 70:8, 94:19, 127:17, 138:18
**serious** - 57:25, 195:4
**seriously** - 13:20, 109:3, 126:9
**serve** - 154:24
**serves** - 173:13
**service** - 45:3, 45:6, 48:23
**Service** - 157:20, 176:16
**serving** - 145:15, 147:2
**Session** - 115:25
**session** - 3:16, 178:2, 196:18, 196:19
**set** - 5:7, 10:21, 13:1, 17:19, 18:15, 20:3, 20:17, 38:7, 75:23, 94:11, 111:12, 119:8, 126:15, 132:25, 135:9, 150:9, 155:25, 156:9, 168:15, 193:3, 196:11
**setoff** - 9:7, 21:8, 122:16
**sets** - 11:21, 50:10, 92:2
**setting** - 184:24
**settle** - 12:24, 94:6, 111:8, 132:20, 132:23
**settlement** - 4:25, 10:15, 17:13, 21:2, 38:1, 62:12, 122:10, 196:5
**settling** - 18:8, 19:22, 20:12
**Settling** - 9:4
**seven** - 171:17
**sever** - 69:17, 71:14, 78:22, 78:24, 98:15, 196:3
**severable** - 82:13
**several** - 51:23, 85:11, 102:10, 134:23, 156:17, 179:3, 179:21, 185:4
**Several** - 43:12
**severance** - 24:7, 24:12, 64:11, 66:4, 69:8, 70:12, 70:19, 70:23, 70:24, 71:12, 71:19, 79:12, 79:15, 79:19, 80:1, 86:14, 86:21, 88:24, 90:4, 90:13, 90:14, 90:22, 96:19, 97:2, 98:4,

100:11
**severed** - 76:7, 78:25, 97:17
**shaking** - 66:10
**shall** - 26:20, 26:22, 27:18, 79:6
**shaping** - 72:6
**share** - 12:1, 61:19, 63:14, 63:19, 66:17, 67:4, 67:8, 158:12
**shared** - 11:18, 59:5, 61:21, 64:7
**sharing** - 67:19, 73:22
**sharpen** - 155:15
**Shawn** - 14:23, 15:2
**Shawn-earl** - 14:23, 15:2
**shed** - 11:17
**Shelley** - 11:5, 122:2
**shifted** - 150:24
**ship** - 162:1
**shooter** - 60:10, 61:4, 80:7, 80:9, 80:13, 81:15, 81:17, 81:25, 82:7, 88:6, 179:8, 180:5, 180:11, 180:20, 181:19, 183:3
**shooters** - 60:13, 81:21
**shooting** - 104:20, 179:5, 182:4
**shootings** - 104:18
**Shores** - 170:11
**short** - 100:2, 106:13
**shortcut** - 168:10
**shorter** - 77:3
**shortly** - 55:12, 68:3
**show** - 58:7, 107:18, 110:17, 133:18, 133:19, 171:6, 174:15, 179:23, 179:25, 180:4, 181:14, 182:20, 184:6
**show-up** - 179:23, 179:25, 180:4, 181:14, 182:20, 184:6
**showed** - 133:21
**showing** - 172:2
**shown** - 53:14, 154:19, 172:7
**shows** - 131:1
**shuttling** - 143:22, 154:20
**sic** - 142:3
**side** - 4:9, 35:5, 44:16, 78:21, 120:12, 120:19, 120:22, 120:23, 129:20, 129:22, 129:23, 135:22
**sitting** - 72:25
**signature** - 4:18, 11:7, 15:4, 137:19
**signed** - 137:16, 195:6
**significant** - 87:3, 99:25, 113:20, 114:22
**significantly** - 191:3
**similar** - 49:19, 64:15, 170:12, 172:21, 173:1
**Simpkins** - 1:25, 199:10
**simple** - 65:25, 72:13, 78:22, 78:24, 161:25

**simply** - 13:12, 13:21, 30:17, 44:4, 65:3, 80:14, 85:10, 98:23, 108:20, 109:14, 110:19, 114:25, 140:22, 152:1, 154:16, 173:23, 174:23, 176:7, 177:15, 185:10, 188:18, 188:20, 190:3
**Simply** - 31:6, 113:22
**single** - 40:18, 63:9, 191:14
**sit** - 13:13, 13:21, 13:22, 75:25, 93:7, 96:10, 96:11, 124:15, 130:14
**sits** - 72:2
**sitting** - 35:23, 74:6, 128:9, 156:17
**situation** - 13:21, 14:1, 55:3, 72:7, 72:9, 72:13, 72:16, 75:23, 78:19, 90:11, 109:12, 140:7, 149:3, 151:8, 151:10, 151:12, 154:10, 156:7, 156:16, 171:15
**situations** - 151:13, 151:15, 154:4
**six** - 66:6, 88:12, 181:19, 181:20, 182:13, 189:25
**six-year** - 88:12
**sixes** - 64:2
**Sixth** - 28:17, 99:10
**slate** - 86:15
**Slow** - 100:5, 157:15
**Slowly** - 135:6
**small** - 33:18, 163:12
**Smallwood** - 120:12, 135:18
**smell** - 120:17, 135:25, 141:22
**smelled** - 35:21, 121:3, 121:9, 129:7
**smelling** - 128:15
**Smith** - 179:1, 179:3, 179:21, 181:14, 181:17, 183:2
**smoke** - 119:14, 135:15
**smoking** - 119:12, 120:8, 121:12, 129:5, 129:9, 131:11, 131:17, 131:20, 131:22, 132:2, 132:8, 135:13
**so-called** - 163:16
**social** - 100:14
**sock** - 35:17
**sold** - 112:12, 112:13
**solo** - 188:14
**solution** - 90:23
**someone** - 32:25, 34:7, 40:25, 61:4, 69:19
**sometime** - 32:3, 53:24, 92:5
**somewhat** - 16:9, 16:18, 22:2, 50:22, 77:25, 79:15
**somewhere** - 156:9
**song** - 175:4
**soon** - 23:13, 23:16,

27:6, 107:11, 107:13
**Sorry** - 27:13
**sorry** - 14:24, 26:10, 30:20, 41:4, 41:6, 49:1, 55:5, 59:13, 73:5, 74:18, 100:7, 105:21, 109:6, 132:17, 133:19, 149:14, 171:16, 178:23, 179:14, 183:1, 183:3
**sort** - 51:17, 51:18, 51:20, 63:8, 69:16, 72:18, 78:15, 111:2, 145:23, 147:20, 148:17, 148:22, 149:9, 150:20, 150:21, 151:6, 151:13, 158:12, 163:25, 167:16, 167:23, 173:7, 173:9
**sorts** - 177:7, 192:22
**sought** - 99:8
**sounds** - 55:22, 159:17
**source** - 121:11, 126:2
**south** - 129:24
**South** - 118:4, 118:23, 119:3, 119:11, 120:11, 129:21, 129:23, 135:8, 135:18, 136:19, 136:23
**southbound** - 137:2
**southwest** - 123:8, 123:10
**southwestern** - 117:20
**sovereign** - 152:20
**sparse** - 139:3
**speaking** - 143:20
**speaks** - 97:15, 97:18, 174:11
**special** - 63:8
**specific** - 16:22, 27:20, 27:21, 81:25, 93:17, 127:12, 173:24, 177:2, 191:3
**specifically** - 69:1, 103:17, 112:2, 112:10, 148:12, 173:25
**speech** - 196:25
**speeches** - 87:23
**speed** - 83:9
**spell** - 29:9, 41:7, 116:22
**spence** - 60:17, 102:19, 104:19, 110:3, 110:10, 168:20
**Spence** - 105:9, 105:14, 105:24, 107:6, 113:7, 113:23, 113:24, 114:3, 144:5, 180:9, 189:9, 191:3, 192:18
**spirit** - 73:21
**squarely** - 99:5, 154:5, 155:25
**stage** - 76:3
**Stamp** - 133:22, 134:12
**stand** - 14:16, 24:9, 49:13, 63:2, 73:20, 73:23, 192:24
**standard** - 9:12, 54:10, 67:14, 139:15
**standby** - 14:4

**standing** - 177:17, 190:20, 190:22
**start** - 49:12, 50:8, 59:19, 69:22, 145:3, 168:7
**started** - 33:15, 33:24, 136:20, 144:1
**State** - 147:22, 148:7, 148:8, 148:9, 148:14, 152:22
**state** - 29:9, 116:21, 142:9, 144:4, 145:15, 145:20, 145:21, 145:22, 148:23, 148:24, 149:23, 151:9, 151:11, 151:16, 151:25, 152:3, 152:8, 152:12, 152:17, 152:20, 152:21, 153:5, 153:19, 153:21, 153:23, 154:12, 154:14, 154:15, 154:24, 155:7, 156:24, 157:14, 157:16, 157:18, 158:2, 158:16, 158:17, 162:2, 169:14, 180:14, 180:19, 182:9, 187:19, 191:10, 191:15, 191:18, 191:19, 191:23, 195:22, 196:6
**state-owned** - 157:16
**statement** - 45:17, 60:5, 84:6, 84:19, 84:20, 93:2, 93:10, 93:11, 94:20, 94:22, 95:1, 95:3, 95:4, 95:7, 100:23, 103:8, 104:24, 104:25, 107:23, 110:20, 112:20, 131:24, 132:3, 135:2, 180:17, 181:17, 183:9, 189:20, 190:18, 190:21, 190:22, 191:21, 191:22
**Statement** - 119:22, 134:11, 134:18
**statements** - 16:16, 64:16, 82:18, 95:2, 108:23, 112:1, 139:8, 179:4, 179:22, 186:19, 186:21, 187:4, 187:5, 187:18, 192:12, 193:17, 194:2, 196:17
**States** - 1:1, 1:4, 1:13, 3:3, 72:10, 99:2, 116:14, 157:20, 158:5, 158:7, 158:8, 161:24, 171:14, 173:10, 174:2, 199:3, 199:6
**station** - 118:9, 118:16, 118:22, 120:2, 135:10
**statistical** - 89:22, 90:10, 100:14
**Staton** - 127:22, 137:3, 164:4
**status** - 3:7, 16:4, 150:22, 189:7, 193:16
**statute** - 70:14, 162:9, 173:8, 173:17
**statutes** - 57:16
**statutory** - 7:10

**stayed** - 106:13
**step** - 37:2, 120:16, 136:1, 138:12, 166:2
**steps** - 171:5
**Stewart** - 103:17, 103:20, 103:24, 104:5, 104:8
**sticking** - 120:21, 121:15, 121:21, 136:5
**still** - 26:7, 34:22, 72:3, 72:25, 74:7, 113:14, 114:20, 129:6, 141:11, 156:15, 158:16, 177:9, 177:10, 193:16
**stipulated** - 139:21, 140:9
**stipulation** - 137:25, 142:16
**stipulations** - 138:18
**Stocksdale** - 191:22
**Stokes** - 170:12
**stop** - 34:13, 44:17, 47:15, 48:4, 128:19, 128:20, 128:21, 129:7, 135:21, 141:12, 141:19, 141:21, 142:11, 142:19, 162:21, 180:6
**stopped** - 48:15, 120:10, 120:11, 129:4, 131:18, 131:19, 131:20, 135:17, 138:11
**stopping** - 131:10, 131:16, 131:21, 132:1, 132:7, 132:11
**story** - 103:3
**straightaway** - 4:6
**strange** - 164:21, 164:22
**strategic** - 8:13, 28:14
**strategy** - 164:17, 166:20, 166:25, 167:1, 167:4, 167:5, 167:6, 167:13
**straw** - 117:11
**street** - 104:13, 107:13, 118:15, 118:17, 125:22, 126:13, 126:14
**Street** - 118:4, 118:24, 119:3, 119:11, 119:12, 120:12, 123:10, 127:21, 129:14, 129:21, 129:23, 135:9, 135:18, 136:19, 136:24, 138:5
**strenuously** - 95:13
**stressed** - 98:6
**stretches** - 165:21
**strike** - 89:16, 175:22, 194:21, 194:24
**string** - 98:23, 174:10
**strong** - 25:9, 25:8, 120:17, 135:25
**strongest** - 12:11
**strongly** - 35:21, 66:12, 94:22, 147:17
**stuck** - 87:18
**students** - 164:8
**study** - 89:22
**stuff** - 54:10, 65:4, 66:10, 185:20, 191:18
**Subject** - 96:8

**subject** - 71:5, 94:17, 95:4, 147:12
**subjected** - 90:25
**submission** - 145:10, 151:1, 159:8, 159:13, 172:24
**submissions** - 134:5, 134:9
**submit** - 107:22, 112:25, 113:12, 130:25, 134:5, 143:6, 163:4, 186:7, 187:21
**submitted** - 49:16, 49:18, 194:12, 194:15
**submitting** - 134:4
**subpoenaed** - 174:6
**subsequent** - 98:23
**Subsequently** - 53:25
**subsequently** - 153:11
**subsided** - 57:22
**substance** - 136:3
**substantial** - 82:15, 91:7
**substantially** - 80:3, 80:20, 91:6, 187:15, 189:3
**substantive** - 56:23
**substantively** - 143:19
**suffer** - 16:18
**suffered** - 16:2
**sufficient** - 141:17
**sufficiently** - 26:8
**suggest** - 70:6, 108:22, 155:19
**suggested** - 141:7
**suggesting** - 77:19, 93:10, 146:4
**suggestion** - 51:24, 163:20, 166:10
**Sullivan** - 1:21, 4:23, 5:22, 6:1, 6:2, 6:6, 6:24, 7:25, 8:2, 8:25, 9:15, 10:5, 10:10, 11:17, 11:20, 12:23, 13:3, 13:5, 13:11, 13:16, 13:12, 14:8, 25:20, 25:22, 25:23, 26:12, 26:15, 27:13, 27:14, 27:24, 28:2, 28:7, 30:20, 30:23, 36:5, 38:13, 38:14, 38:16, 41:23, 46:3, 47:14, 48:22, 50:8, 50:10, 50:20, 53:16, 53:17, 161:6, 194:20, 195:1, 195:25, 198:5
**Sullivan's** - 48:13
**sum** - 176:17, 177:4
**summarize** - 12:4, 101:5, 176:9
**summarizes** - 170:23
**summary** - 144:9, 144:10
**sun** - 58:4
**Super** - 16:5
**Supermax** - 158:2
**superseding** - 53:25, 54:5, 57:3, 79:9, 163:1, 164:19, 165:22, 166:13, 169:4, 174:23, 175:14, 175:21, 176:13, 176:14
**supervised** -

156:24, 157:17
**supplement** - 3:13
**supplemental** - 89:16
**support** - 98:21, 187:23
**supported** - 139:13
**supportive** - 110:15
**suppose** - 70:6, 101:20, 148:17
**supposed** - 100:15, 166:3
**supposedly** - 57:8
**suppress** - 179:16, 181:7, 183:16
**suppression** - 21:21, 140:5, 140:16, 142:23
**Supreme** - 79:11, 90:2, 97:3, 97:13, 97:22, 98:6, 98:22, 99:5, 99:6, 99:11, 99:16, 100:1, 100:3, 100:6, 100:13, 100:16, 140:16, 173:10
**surgery** - 115:20
**surprised** - 139:2
**surrounding** - 189:8
**surveillance** - 135:9, 138:9
**suspect** - 24:11, 34:24, 94:24, 95:19, 158:9
**suspected** - 136:3
**suspicion** - 141:18
**swore** - 134:18
**sworn** - 29:6, 99:22, 116:18
**system** - 167:18

**T**

**table** - 74:7
**tack** - 73:2
**tactical** - 8:13, 13:20, 28:13, 35:5
**tag** - 135:11
**takers** - 161:5
**talks** - 170:24, 173:12, 173:22, 174:4
**tall** - 179:6, 180:20, 180:23
**taller** - 179:7, 181:19
**tame** - 164:5
**Tanya** - 60:17, 102:19, 104:19, 110:3, 110:10, 168:19
**tape** - 55:11, 84:15, 85:1, 85:4, 106:18, 106:22
**taped** - 106:23
**target** - 107:5
**task** - 42:2, 63:25, 117:10
**Task** - 45:18, 47:5
**tat** - 78:19
**Taurus** - 118:22, 120:2, 135:10, 136:21, 138:11
**teacher** - 164:4
**team** - 44:9, 177:6, 177:9
**technical** - 162:12, 162:13
**temp** - 135:11
**temporary** - 145:23, 145:24

**ten** - 44:1, 134:3
**tend** - 93:5
**term** - 30:5, 57:13, 57:16, 152:20, 167:7
**termed** - 72:10
**terms** - 7:8, 12:11, 16:13, 16:19, 23:9, 51:17, 54:8, 55:7, 56:3, 151:6, 156:5, 162:8, 170:4, 170:5
**Terry** - 103:19
**testified** - 29:6, 38:24, 40:19, 47:12, 48:12, 116:18, 128:15, 179:8, 180:13, 182:8, 182:24
**testify** - 8:17, 10:7, 11:14, 39:19, 174:5, 180:15, 180:16, 180:18, 184:11, 184:16
**testifying** - 40:21, 45:1, 124:18, 132:4, 139:6
**testimonial** - 185:10
**testimony** - 44:15, 53:5, 101:11, 110:12, 110:14, 112:6, 112:9, 113:2, 140:23, 141:14, 142:2, 183:19, 183:24, 187:17, 187:19
**theater** - 92:21, 107:16
**themselves** - 13:25, 14:4, 87:3, 169:18
**theory** - 84:18, 88:8, 93:1, 138:25
**Therefore** - 24:20, 142:20, 155:9
**therefore** - 19:14, 23:19, 67:1, 82:22, 141:19, 141:23, 142:7, 171:25, 172:19
**therefrom** - 141:24
**they've** - 74:10
**thinking** - 65:20, 79:8
**thinks** - 86:23
**third** - 53:25, 54:4, 57:3, 79:8, 111:2, 145:20, 148:24, 163:1, 164:19, 166:13, 169:4, 174:22, 175:14, 175:21, 176:14
**Thomas** - 2:2, 171:16, 171:20, 171:23, 172:2, 172:14
**Thomas's** - 172:15
**thousand** - 129:3
**thousands** - 130:7
**threats** - 9:25, 18:1
**three** - 8:16, 9:11, 12:22, 13:16, 23:2, 30:7, 65:8, 70:8, 71:9, 73:16, 77:16, 80:18, 81:1, 81:23, 88:12, 145:1, 168:23, 168:25, 181:19, 181:20, 182:13, 190:8
**three-or-four-day** - 70:8
**thwart** - 167:17
**ticket** - 107:17
**tickets** - 92:21
**Tim** - 4:22
**time-out** - 164:7
**Timothy** - 1:21, 195:24

**Tipton** - 97:5, 98:2
**tit** - 78:19
**Title** - 173:5
**today** - 12:8, 12:11, 12:19, 14:7, 16:7, 16:12, 16:20, 19:17, 22:3, 22:18, 22:20, 23:23, 24:22, 26:25, 40:17, 45:1, 87:22, 116:8, 116:9, 124:15, 128:9, 130:14, 176:21, 178:1, 182:1, 185:17, 187:14, 189:2, 189:12, 192:16
**today's** - 52:22, 165:23
**together** - 74:23, 77:4, 86:6, 105:2, 109:16, 112:11, 112:12, 151:4, 167:14, 185:25
**token** - 90:19
**tomorrow** - 3:16, 3:17, 3:20, 15:16, 16:8, 23:14, 115:12, 178:2
**tone** - 44:25
**tons** - 113:3
**top** - 82:12
**tossed** - 163:10
**touch** - 185:7, 185:12
**toward** - 116:21
**towards** - 34:21, 120:15
**track** - 118:18
**tradition** - 28:14
**traffic** - 44:17, 141:12, 141:19, 141:21
**trafficking** - 104:14
**Training** - 160:15
**transaction** - 171:19, 172:13, 172:17
**transcript** - 110:9, 166:12, 185:10, 191:18, 199:2
**transcripts** - 59:10, 59:14, 165:12, 185:4
**transfer** - 148:20, 149:6, 152:7, 152:16, 153:3, 154:14
**transferred** - 148:22, 148:23, 148:25, 152:2, 154:13
**transfers** - 144:11, 149:6, 151:7, 152:24
**transformed** - 107:4
**transmission** - 34:8, 34:19
**transmitted** - 92:12
**transport** - 36:10, 36:14, 144:3
**transported** - 36:3, 36:14, 144:3
**transporting** - 142:9
**travel** - 116:8
**traveling** - 104:15
**treat** - 21:13
**treated** - 16:5, 152:14
**treating** - 151:24
**treats** - 98:2
**Treem** - 2:9, 15:21, 15:22, 15:24, 16:25, 21:23, 21:25, 22:1, 22:11, 23:8, 23:19, 24:10, 24:20, 25:1, 25:7, 25:18, 52:7,

52:14, 53:6, 69:10, 116:4, 116:5, 116:6, 116:11, 116:13, 194:8
**Treem's** - 69:24
**trial** - 3:9, 27:3, 28:19, 50:5, 59:2, 59:16, 59:19, 63:9, 64:22, 67:1, 67:6, 69:22, 70:7, 71:4, 71:7, 71:8, 71:9, 73:14, 74:2, 75:20, 76:3, 76:24, 76:25, 77:1, 77:3, 78:11, 85:22, 90:6, 90:17, 93:25, 97:19, 99:8, 99:15, 99:25, 100:10, 114:9, 146:15, 165:13, 180:19, 189:23, 190:1, 190:6, 196:3
**trials** - 66:2, 70:8, 77:2, 78:22, 78:25, 97:8, 97:9, 97:17
**tried** - 85:23, 86:17, 91:4, 98:12, 191:14, 193:2
**trigger** - 54:25, 56:19
**trouble** - 128:4
**true** - 28:1, 60:15, 60:16, 60:18, 65:5, 78:17, 80:11, 86:9, 151:15, 158:7, 186:15, 186:18, 199:7
**True** - 87:24
**truly** - 24:5
**truncated** - 64:22
**truth** - 130:20
**truthful** - 192:21
**try** - 35:6, 68:4, 90:20, 118:18, 155:15, 183:8
**trying** - 9:6, 73:1, 86:5, 146:14, 149:16, 177:4, 181:6
**turn** - 58:25, 59:3, 65:14, 65:21, 119:10, 129:14, 131:9, 166:21
**turned** - 44:19, 58:24, 67:1, 135:17, 167:16
**turning** - 65:10
**turns** - 167:14
**twice** - 89:25
**two** - 3:15, 3:22, 3:24, 11:21, 32:1, 34:17, 36:21, 54:21, 56:23, 71:8, 74:11, 75:11, 86:10, 88:23, 88:25, 89:8, 90:24, 92:21, 104:4, 108:10, 115:8, 140:2, 151:6, 154:19, 163:14, 165:17, 171:18, 172:12, 174:24, 184:12, 188:3, 190:8, 193:8, 193:10, 194:22
**Two** - 185:2
**two-day** - 3:15
**type** - 22:16, 57:24
**types** - 126:10
**Typically** - 134:3
**typically** - 134:8, 144:4, 145:14, 145:23, 156:5, 156:12
**Tyree** - 103:17, 103:20, 103:23, 104:5

**U**

**Ucc** - 13:5, 21:9, 150:11
**ultimate** - 76:1, 76:20, 77:6
**unambiguous** - 149:21
**unaware** - 60:6
**uncertain** - 16:3
**uncharacteristicall y** - 167:3
**unchartered** - 164:1
**unclear** - 180:2
**uncomfortable** - 78:1
**uncontested** - 172:11
**unconvincing** - 100:17
**under** - 9:8, 19:15, 25:14, 28:10, 28:17, 30:22, 31:6, 53:8, 53:10, 58:4, 58:6, 59:1, 59:9, 71:1, 72:15, 74:13, 76:10, 78:15, 82:13, 82:16, 85:21, 89:6, 93:1, 113:3, 120:20, 121:16, 121:22, 136:5, 138:15, 140:1, 140:4, 140:16, 151:21, 155:6, 161:25, 162:17, 169:14, 169:16, 174:8, 174:14, 176:16, 179:8, 179:11, 180:18, 186:21, 187:1, 187:19, 189:3, 189:10, 190:4
**Under** - 84:19, 170:2
**underneath** - 120:21, 120:22, 121:17
**Understandable** - 60:14
**understood** - 5:14, 5:19, 110:15, 139:7
**undertake** - 23:17
**unfairness** - 98:12
**unfettered** - 8:4, 27:2, 27:18
**Uniform** - 5:8, 9:8, 10:23, 17:20, 18:17, 20:5, 20:19, 38:8, 94:13, 111:14, 122:18, 133:2, 196:12
**uniform** - 31:22, 151:22, 151:23
**uniformed** - 36:19, 36:21, 184:13
**Uniformed** - 184:14
**Unit** - 117:19, 118:15, 126:4, 126:12, 134:1
**unit** - 120:5, 123:21, 124:12, 126:13
**United** - 1:1, 1:4, 1:12, 3:2, 72:9, 99:1, 116:14, 157:20, 158:5, 158:7, 158:8, 161:24, 171:14, 173:10, 174:2, 199:3, 199:6
**unknown** - 4:17
**unless** - 21:14, 22:3, 27:17, 143:5, 194:8
**unlikely** - 70:10
**unmarked** - 31:19,

31:21, 47:14
**unnamed** - 54:12
**unreasonable** - 22:11
**unrelated** - 145:20
**unreliability** - 181:13
**unsecured** - 12:17
**unusual** - 35:18, 140:7
**up** - 3:8, 7:22, 34:23, 35:5, 37:3, 38:21, 42:20, 44:16, 44:22, 45:13, 62:20, 62:24, 64:7, 68:1, 72:6, 73:20, 73:23, 75:23, 81:1, 83:13, 83:14, 83:20, 91:5, 93:24, 101:25, 105:2, 106:21, 116:6, 119:7, 119:8, 120:10, 121:4, 121:7, 121:9, 121:21, 124:22, 126:15, 135:9, 144:15, 147:9, 148:10, 153:4, 154:14, 155:25, 162:25, 167:22, 169:10, 171:9, 171:12, 171:16, 176:17, 177:5, 179:23, 179:25, 180:4, 181:14, 182:20, 184:6, 185:25, 192:22, 192:24
**update** - 116:7
**urges** - 154:11
**urging** - 145:11
**uses** - 57:13
**Usms** - 160:23

**V**

**Valdivia** - 37:15
**value** - 4:23, 4:24, 10:8, 10:14, 17:12, 18:8, 19:21, 20:12, 21:1, 37:25, 38:1, 62:9, 62:12, 94:6, 111:7, 111:8, 122:9, 122:10, 132:19, 133:4, 133:5, 150:4, 150:5, 195:23, 196:2, 196:5
**values** - 97:21, 98:2, 98:3
**van** - 32:5, 33:1, 34:16
**variance** - 187:15
**variety** - 113:20, 170:5
**various** - 11:24, 57:9, 140:20, 144:3, 144:10, 150:23, 168:3
**varying** - 8:2
**vehicle** - 31:17, 31:18, 31:19, 31:24, 32:1, 32:16, 32:18, 33:5, 33:16, 33:19, 33:24, 34:4, 34:8, 34:13, 34:15, 34:24, 35:2, 35:9, 35:22, 36:10, 36:15, 36:17, 37:2, 37:13, 44:18, 47:15, 47:21, 47:23, 47:25, 48:1, 48:3, 48:15, 48:19, 119:15, 119:24, 120:1, 120:10, 120:11, 120:13, 120:16,

121:4, 121:8, 121:9, 121:14, 125:23, 129:20, 129:22, 131:10, 131:21, 132:1, 132:8, 132:11, 135:11, 135:17, 135:22, 135:24, 136:1, 136:6, 138:7, 138:11, 138:13, 141:12, 141:22, 141:25, 142:3, 142:4, 142:10, 142:12

**vehicles** - 33:9, 33:12

**ventures** - 101:24

**verdicts** - 97:16

**versa** - 188:16

**versus** - 3:3, 90:3, 97:4, 98:14, 99:2, 99:6, 99:12, 171:14, 174:3

**vetted** - 156:11

**vice** - 188:16, 188:17

**vicinity** - 32:13

**victims** - 97:25

**view** - 63:6, 141:5, 142:6, 143:18, 149:21, 161:18, 162:8, 162:13

**viewed** - 162:8

**viewpoints** - 99:19

**vigor** - 23:5

**vigorously** - 28:12

**Vine** - 123:10, 127:21

**violate** - 57:22, 63:18, 99:9, 146:5, 152:4

**violated** - 162:14

**violating** - 69:3, 112:5, 153:24

**violation** - 106:12, 129:6, 142:9, 149:1, 149:22, 150:25, 153:22, 154:16, 154:20, 155:1, 155:9, 159:10, 159:25

**violence** - 31:9, 126:13

**violent** - 78:5

**Virginia** - 99:1, 159:9

**virtually** - 130:21, 139:7

**vociferously** - 110:7

**voice** - 55:11, 55:20, 83:1, 83:9, 84:8, 85:15, 85:19, 85:23, 92:12, 106:18, 106:22, 106:25, 185:14

**Voices** - 83:23

**voices** - 84:1, 84:4, 84:12, 85:4

**volumes** - 73:1

**voluminous** - 113:1

**voluntarily** - 142:22

**vs** - 199:3

**Vs** - 1:5

**W**

**wager** - 160:25, 161:2

**wagon** - 118:22, 120:2, 135:10

**wait** - 110:23, 122:5, 191:6

**Wait** - 105:13

**waive** - 5:4, 7:13, 10:18, 12:13, 17:16, 18:12, 20:1, 20:15, 21:4, 38:4, 94:9, 111:10, 122:12, 132:22, 139:25, 150:7, 153:12, 196:8

**waived** - 85:3, 85:5, 142:22

**waiver** - 140:13, 142:18, 155:6, 155:17, 155:20, 155:23

**waiving** - 9:1

**Walk** - 150:18

**walked** - 121:4

**walking** - 124:22

**wall** - 75:10

**wants** - 7:23, 8:15, 65:1, 69:8, 109:5, 190:8

**warnings** - 36:25, 37:4, 37:7

**warrant** - 31:8, 31:9, 37:17, 42:17, 42:22, 43:11, 91:20

**warranted** - 58:1

**warrantless** - 140:24

**warrants** - 42:3

**watching** - 107:18

**waters** - 164:1

**Wayne** - 11:5, 106:23, 122:2

**ways** - 73:11, 80:24, 81:21

**weapon** - 45:3, 45:12, 48:23, 102:18, 142:7

**weapons** - 36:16, 45:7, 102:20

**wearing** - 179:7, 179:12, 180:20, 180:23, 181:20, 182:24, 183:3, 183:20

**week** - 6:8, 115:11

**weeks** - 164:10, 188:3, 190:5, 190:8, 190:9, 194:23

**welcome** - 115:4

**Welcome** - 69:14

**West** - 171:10, 171:14, 171:23

**westbound** - 119:12

**western** - 123:12

**whatsoever** - 7:2, 9:23, 28:21, 66:1, 79:8, 87:21, 124:20, 125:16

**wheelman** - 114:5, 182:4

**whence** - 147:1

**whereby** - 167:22

**whimsical** - 28:9

**white** - 127:21

**whites** - 90:1

**whole** - 49:12, 65:12, 176:15

**Wikipedia** - 148:10

**Willard** - 116:15, 116:16, 116:23, 116:24, 117:2, 133:19, 134:17, 136:11, 136:12, 137:9, 198:7

**Willard's** - 139:3

**William** - 91:16

**Willie** - 1:6, 4:14,

30:14, 33:18, 36:23, 37:20, 39:5, 42:18, 199:3

**willing** - 12:19, 89:9, 196:17, 196:24

**window** - 120:23

**wish** - 17:1, 17:4, 17:8, 17:24, 18:4, 18:9, 18:21, 18:25, 19:11, 19:16, 19:18, 20:8, 20:9, 20:13, 20:22, 20:23, 21:3, 21:14, 21:16, 24:17, 24:22, 94:7, 111:8, 122:11, 133:9, 150:5, 178:3

**wished** - 25:3

**wishes** - 12:8, 13:19, 24:5

**withdraw** - 48:2

**withdrawal** - 170:16, 170:24, 171:4, 171:9, 171:25

**Withdrawal** - 172:6

**withdrawing** - 171:12

**withdraws** - 172:5

**Witherspoon** - 89:7, 89:12

**withheld** - 59:7

**withholds** - 65:13

**Witness** - 29:11, 30:21, 36:8, 116:23, 135:4, 135:7

**witness** - 21:22, 29:1, 29:5, 64:14, 68:6, 108:7, 115:9, 116:17, 163:18, 163:24, 166:8, 174:24, 174:25, 181:6, 184:8, 192:10

**witness's** - 142:2, 174:4

**Witnesses** - 198:2

**witnesses** - 3:22, 3:25, 7:3, 7:4, 60:22, 65:16, 67:7, 81:12, 81:14, 81:20, 83:25, 84:10, 98:1, 165:2, 165:9, 175:8, 178:16, 193:20, 194:3

**woman** - 124:11

**wonderful** - 192:13

**wondering** - 178:19

**word** - 148:17, 173:21

**words** - 48:18, 61:8, 71:10, 82:5, 84:11, 84:20, 146:22, 147:2, 148:21, 193:6

**wore** - 182:13

**works** - 143:21

**world** - 164:23

**worth** - 142:16

**writ** - 153:5, 153:6, 153:19, 154:14

**write** - 127:1, 127:2, 134:5, 148:10

**write-up** - 148:10

**writing** - 14:8, 86:15, 101:2, 107:22, 174:17, 187:11

**writs** - 153:16

**written** - 127:23, 144:24, 151:1, 159:15, 172:24, 186:2

**wrote** - 124:13, 124:17, 125:7, 130:18, 131:7, 134:8

**Wyche** - 54:22,

55:17, 56:24, 58:22, 92:1, 105:19, 105:22, 106:9, 106:24, 107:16, 123:4, 191:9, 191:16

**Wyches** - 83:7, 92:15

**Wyches'** - 83:10

**Wyda** - 137:17

**X**

**Xy1257** - 135:12

**Y**

**Yankees** - 177:6

**year** - 59:2, 64:21, 88:12, 134:2, 169:15

**years** - 29:24, 30:8, 39:15, 41:21, 117:7, 118:7, 124:8, 125:18, 126:15, 163:14, 165:17, 169:25, 179:2, 181:17

**York** - 102:3, 104:15, 177:6

**yourself** - 5:25, 17:1, 17:5, 17:9, 17:24, 18:5, 18:21, 19:1, 19:11, 130:3

**Z**

**zealously** - 26:1, 28:12