1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3


 4       UNITED STATES OF AMERICA

 5            v.                          CRIMINAL CASE NO.
 6                                          AMD-04-029

         WILLIE MITCHELL,
 7       SHELTON HARRIS,
         SHELLY WAYNE MARTIN,
 8       SHAWN GARDNER,

 9            Defendants
         _____/
10
                     VOLUME VIII OF XXXVII
11              Monday, September 29, 2008
                   Baltimore, Maryland
12

13    Before:  Honorable Andre M. Davis, Judge
                        And a Jury
14
      Appearances:
15            On Behalf of the Government:
               Robert Harding, Esquire
16             Michael Hanlon, Esquire
              On Behalf of Defendant Mitchell:
17             Laura Kelsey Rhodes, Esquire
               Michael E. Lawlor, Esquire
18            On Behalf of Defendant Harris:
               Gerard P. Martin, Esquire
19             Paul Flannery, Esquire
              On Behalf of Defendant Martin:
20             Thomas L. Crowe, Esquire
               James G. Pyne, Esquire
21            On Behalf of Defendant Gardner:
               Adam H. Kurland, Esquire
22             Barry Coburn, Esquire

23    Reported by:
      Mary M. Zajac, RPR
24    Room 5515, U.S. Courthouse
      101 West Lombard Street
25    Baltimore, Maryland 21201
```

2

1          (Defendants not present in courtroom.  Proceedings at

2     9:43 p.m.)

3          THE COURT:  While we wait for the defendants, counsel,

4     are there any issues of a legal nature that you need to bring to

5     the Court's attention?  Good morning, Mr. Harding.

6          MR. HARDING:  Yes, sir.  Good morning, Your Honor.

7     Your Honor, for the Court's information, we lost our civilian

8     witness today.  She's in the hospital.  She just had a baby

9     recently and she has some kind of complication today.  So we

10    nevertheless have, I think, enough witnesses to fill up the day

11    with, but they're all going to be experts and detectives.

12         I think today is the day that Your Honor wanted to know

13    the answers to questions from Mr. Mitchell's counsel about the

14    issue of the Coach Lynch and the juror on the one hand.  And

15    also, Your Honor asked more than a week ago of Mr. Gardner's

16    counsel whether they were going to attempt to elicit testimony

17    about the fact that Mr. Gardner has previously been convicted of

18    this murder in state court.

19         In addition, one other issue, Your Honor.  We have a

20    witness, Rodney Hayes, who has not long ago been released from

21    jail.  We now know where he's residing and where he, and what his

22    phone number is.  He's gotten a phone.  And defense counsel have

23    served reverse alibi notice.

24         We would seek a protective order to exempt us from

25    having to turn over his address and phone number because of the

3

1       security risks involved in this case.  This is the same witness

2       whom Mr. Harris assaulted in the lockup and who also will provide

3       testimony about an attempt by these defendants to, after they

4       were locked up, Mr. Mitchell ordered a hit in this case against

5       someone he thought was a witness against him.  So of course Mr.

6       Hayes is very concerned about his security.

7               So we request that the Court give us sort of a verbal

8       protective order to exempt us from having to supply the address

9       and phone number of Mr. Hayes.

10              THE COURT:  When do you anticipate Mr. Hayes will

11      testify?

12              MR. HARDING:  Not for two weeks at least, maybe more.

13      Near the end of the trial.

14              THE COURT:  Do you know, Mr. Harding, whether Mr. Hayes

15      has expressed any desire or lack of desire to speak to defense

16      counsel?

17              MR. HARDING:  I haven't spoken to him about that

18      recently.  But I'd be happy to find out what his position would

19      be on it.

20              THE COURT:  Perhaps the way to handle this would be for

21      you to provide the Court with the phone number.  And rather than

22      have you speak to Mr. Hayes about this under the circumstances,

23      to simply have me telephone him and inquire neutrally whether he

24      is willing to speak to defense counsel in advance of his

25      testimony while advising him, of course, that he is neither

4

1    required nor prohibited from speaking to defense counsel, which

2    is exactly what the government would do and does do ordinarily.

3          But under the circumstances and given the sensitivity

4    of the matter, it probably makes more sense for the Court to make

5    that inquiry, with the idea, of course, that if Mr. Hayes chooses

6    not to speak to defense counsel that would largely be the end of

7    it and would moot any concern about Mr. Hayes producing phone

8    numbers.

9          (Defendants enter the courtroom.)

10         THE COURT:  The record will reflect that the defendants

11   have entered the courtroom.

12         Let me hear, how does that sound to you, Mr. Harding?

13         MR. HARDING:  Well, there is, the problem with that is

14   that the witness is very leery when he gets phone calls from

15   people he's not expecting phone calls from.  He may not answer

16   the phone or he may not --

17         THE COURT:  Oh, sure.  I would want you to leave him a

18   message that he's going to be called by the judge.

19         MR. HARDING:  Okay.

20         THE COURT:  You're right.  I wouldn't dare call him

21   without his anticipating a call from the Court.

22         MR. HARDING:  Okay.  Then that's fine, Your Honor.

23         THE COURT:  All right.  Mr. Martin, good morning.

24         MR. MARTIN:  Good morning, Your Honor.  Your Honor,

25   it's me who asked for this.  Mr. Hayes, I believe, is represented

5

1    by Alan Bussard.

2              THE COURT:  Oh.

3              MR. MARTIN:  And I have spoken briefly with Mr. Bussard

4    a couple weeks ago.  He said he really hadn't had any contact

5    with his client and actually described this as kind of a strange

6    relationship.  The events occurred in the jail house and then he

7    was appointed, whatever.  I'll let Mr. Bussard discuss that with

8    whoever he wants to.

9              I had intended on contacting Mr. Bussard and asking him

10   if he would contact his client and find out if we could talk to

11   him.  That seems to me to be the most efficient way.

12             THE COURT:  That's orders of magnitude preferable, Mr.

13   Martin, of course.  It didn't occur to me that he had counsel.

14             MR. MARTIN:  Your Honor, there will be another issue

15   about Mr. Hayes.  I don't want to take the Court's time now to do

16   it.  But I'm going to file a motion probably tomorrow so we'll

17   all have a chance to look at it.  And you won't have to decide it

18   because he's not coming on for a while, anyway.

19             THE COURT:  All right.  Great.  Thank you, Mr. Martin.

20   Mr. Harding, I'm satisfied to have Mr. Martin work through

21   counsel and make that determination and we'll handle it that way.

22             MR. HARDING:  And I should explain that I didn't

23   realize that Mr. Bussard still considered himself as representing

24   Mr. Hayes.

25             THE COURT:  What were the circumstances of the

6

1    appointment?

2              MR. HARDING:  He had a, he had a federal case that he

3    pled guilty to.

4              THE COURT:  Oh, I see.

5              MR. HARDING:  He pled guilty and ultimately pled in

6    state court.

7              THE COURT:  I see.  All right.  But Mr. Bussard was

8    appointed through CJA?

9              MR. HARDING:  Yes.

10             THE COURT:  All right.

11             MR. MARTIN:  Your Honor, I'm not saying he does

12   consider himself to represent him or not.  But he did represent

13   him and that's why I called him.

14             THE COURT:  Of course.

15             MR. MARTIN:  Because I didn't think it was appropriate

16   to try to contact him directly.

17             THE COURT:  Absolutely.  Of course.

18             MR. MARTIN:  And if he doesn't represent him, I suppose

19   the Court could say, why don't you represent him for this?

20             THE COURT:  Exactly.  And Mr. Bussard, I just saw him

21   moments ago, of course he would be happy, even if he's submitted

22   his voucher already, to make the phone call.

23             MR. MARTIN:  Thank you, Your Honor.

24             THE COURT:  And do that.  Sure.  Mr. Crowe, good

25   morning.  Yes, Mr. Martin.

1          MR. MARTIN:  Your Honor, it may be that Mr. Bussard

2     doesn't know how to get a hold of him, either.

3          THE COURT:  So he'll have to get the number from

4     counsel for the government.

5          MR. MARTIN:  Right.

6          MR. CROWE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. CROWE:  One of the government's projected witnesses

9     today is Gary Niedermeier.  He's the individual who participated

10    in the interrogation of both Mr. Mitchell and my client.  During

11    the course of the interrogation of my client, the tape was played

12    for him and he indicated that he thought possibly that one of the

13    voices on the tape was that of Mr. Mitchell.

14          We consider this evidence which exculpates Mr. Martin

15    in the sense that if he were truly a participant in this murder,

16    the last thing that he would have done would have been to

17    identify another participant in the murder.  It would be my

18    intention to ask Detective Niedermeier about that.  I, of course,

19    recognize the obvious Bruton problem.  But we think, we think it

20    is evidence that's exculpatory of my client and conceivably

21    evidence that the jury could even consider in terms of withdrawal

22    from a conspiracy.

23          So unless I'm directed not to, I intend to ask that

24    question.

25          THE COURT:  Mr. Lawlor?

8

1          MR. LAWLOR:  Your Honor, as Mr. Crowe said, there's an

2     obvious Bruton problem, so we would object.  I don't know what

3     more the Court wants to hear on the issue.  But at a minimum we

4     would obviously have an objection to the confrontation problem.

5          THE COURT:  Mr. Harding?

6          MR. HARDING:  Your Honor, this was an issue that came

7     up during the suppression hearings at least one time.  And I

8     remember reaching a firm conclusion that the government wasn't

9     going to seek to offer the, either the identification of Mr.

10    Mitchell's voice by Mr. Martin or the identification of Mr.

11    Mitchell's voice by Mr. Gardner just because of the obvious

12    Bruton problem.  And I've made that position in open court for

13    many months now.

14          For Mr. Crowe to wait until the day the witness is

15    testifying to present this theory that it's exculpatory as to his

16    client, I think is just too late.  And in any event, Your Honor,

17    it's very, it's a very debatable theory that it is exculpatory to

18    Mr. Martin, that he should seek to incriminate somebody else.  I

19    don't, I don't think that's very exculpatory at all.  I don't

20    think, I don't think it's exculpatory, actually.  I just think

21    that one of the, from my experience one of the most common things

22    that people do when they're being questioned by the police after

23    they've been arrested is point the finger at someone else.  It

24    doesn't mean that they're innocent.  It means they're coming up

25    with some other target.

9

1          In fact, that's indeed what Mr. Mitchell did.  He came

2    up with L as the guy who committed this crime.  So it's not

3    really exculpatory as to Mr. Martin at all.  So the government

4    thinks that the Court should stick with the original and ongoing

5    resolution of this matter, which is that the testimony won't be

6    elicited.

7          THE COURT:  Thank you, Mr. Harding.  Mr. Crowe, Mr.

8    Harding has focused, obviously, on exactly the issue that I need

9    to hear you on.  How rationally is it exculpatory of Mr. Martin

10   to have made a tentative identification of one of his

11   codefendants on the tape?  And we're talking about the voice mail

12   tape.

13         MR. CROWE:  It's exculpatory in the sense that an

14   individual who had been a participant in that murder would hardly

15   identify another participant in the murder when he knew that law

16   enforcement could then use his, his statement to turn that other,

17   to turn the other participant against him.  That's what they do.

18   That's what they do all the time.

19         I would say that I have, I made this point and I think

20   I made it fairly, fairly strongly during the period of the

21   pretrial motions.  This is not a, this is not the first time I've

22   raised this issue.

23         THE COURT:  How do you get around the hearsay

24   objection?

25         MR. CROWE:  Excuse me?

1          THE COURT:  How do you get around the hearsay

2    objection, even before we get to Sixth Amendment?

3          MR. CROWE:  I don't understand hearsay.

4          THE COURT:  It's an out-of-court statement by Mr.

5    Martin offered to prove the truth of the matter asserted, that it

6    was Mr. Mitchell's voice on the tape.

7          MR. CROWE:  I am only offering it for the purpose of

8    showing that he made the statement and that making that statement

9    would be inconsistent, would be, would be exculpatory with

10   respect to him.  Clearly, the Court could give a limiting

11   instruction to that effect.

12         THE COURT:  Well, but you wouldn't be able to introduce

13   through Detective Niedermeier Mr. Martin's statement "I wasn't

14   there."  The government could do that but you couldn't because

15   Mr. Martin's statement to Detective Niedermeier during an

16   out-of-court interview, I wasn't there, is hearsay as to Mr.

17   Martin.  And I don't see the difference between that kind of

18   exculpatory statement and any other exculpatory statement.  It's

19   clearly hearsay.

20         I understand your point that, well, we don't really

21   mean to introduce it, we're not trying to prove that Mr. Mitchell

22   was actually on the tape.  But this is one of those instances

23   where it came up earlier in the trial, where an asserted

24   non-hearsay use gets swallowed up by the clear hearsay nature of

25   the statement.

1          MR. CROWE:  Well, the other point, Your Honor, is that

2     if the government intends to go into Mr. Martin's, other aspects

3     of Mr. Martin's statement to law enforcement, the rule of

4     completeness certainly allows us to get in the entire statement.

5          THE COURT:  I don't think you're going to persuade me

6     of that.  There's no rule of completeness.  This is not a

7     transcript where the government, it is -- is it a recorded

8     statement?

9          MR. CROWE:  It is a recorded statement.

10          THE COURT:  It's a recorded statement.  I don't see how

11     Mr. Martin's statement, That's Mr. Mitchell's voice on the tape,

12     completes anything.  In other words, to the extent you're going

13     for a rule of completeness that says anything the government

14     introduces that was elicited during the interview opens the door

15     to the introduction by Mr. Martin himself to anything and

16     everything else that he said during that interview, I'm not going

17     to be persuaded of that broad principle.

18          But surely, there may be some aspect of what the

19     government wants to use that, in my view, does come within the

20     compass of a rule of completeness admission.  But this wouldn't

21     seem to be it.

22          Let me ask Mr. Harding if he can recall off the top of

23     his head, beyond general exculpatory, I wasn't there, I don't

24     know anything about it, is there anything else in that interview

25     that you intend to elicit as to Mr. Martin?

1    MR. HARDING:  Well, yes, Your Honor, because he admits

2    to knowing Mr. Gardner and Mr. Mitchell.  He knows a certain

3    amount of, he knows the full name of Mr., of Bo, for example.  So

4    there is some value to --

5    THE COURT:  Okay.

6    MR. HARDING:  -- the statement.

7    THE COURT:  Other than that, though?  I mean, I know

8    Mr. Gardner, I know Mr. Mitchell, yes, we hang out sometimes but

9    we're not that close or we're kind of close, I mean, other than

10   those kinds of sort of general acknowledgments of knowledge and

11   familiarity, I mean, is there anything else?

12   MR. HARDING:  There's nothing else that --

13   THE COURT:  And does he, does he, in fact, say, I don't

14   know anything about this murder?

15   MR. HARDING:  Yes.

16   THE COURT:  And it was, I don't remember the

17   suppression hearing, but he was fully advised of Miranda and so

18   forth?

19   MR. HARDING:  Yes.

20   THE COURT:  Okay.  I don't see a rule of completeness

21   issue here at all.

22   MR. HARDING:  Okay.  I should --

23   THE COURT:  Go ahead.

24   MR. HARDING:  One point for the Court's, just for the

25   Court's information.  We have these witnesses today and

1    Niedermeier was going to testify last.  I have not yet prepared a

2    redacted version of the tape that leaves out that very statement.

3             THE COURT:  Okay.

4             MR. HARDING:  So I was hoping we don't finish with

5    Niedermeier today.  He's got a very lengthy testimony and that

6    would come at the end of his testimony.  So my hope is that we,

7    we reach this issue sometime after today, anyway.

8             THE COURT:  Okay.  It sounds like you're hoping, in

9    fact, that we don't even finish his direct.

10            MR. HARDING:  That's what I mean, yes.

11            THE COURT:  Yeah.  I think you're going to get your

12   wish in that regard.  My plan is, as I suggested on Wednesday,

13   since we won't get started now for another five minutes or so, I

14   expect to go to, pretty close to 12:00, take a recess, not a

15   luncheon recess, but maybe 30 minutes, and then come back

16   hopefully by about 12:30 and go for another hour, hour and 15

17   minutes, and break, break pretty close to 2:00.  So it doesn't

18   sound like we're going to, if you're going to hold him until

19   last, I don't think we're going to finish his direct today.

20            MR. HARDING:  Thank you, Your Honor.

21            THE COURT:  You will have the redacted version by

22   Wednesday?

23            MR. HARDING:  Yes.

24            THE COURT:  Because you're going to want to play it in

25   his direct?  Or not?

1          MR. HARDING:  I'm going to want to play Mr. Mitchell's

2     statement in his direct, also.  And I do have that transcript

3     ready.  But I'm not sure, if we don't finish with Niedermeier

4     today, it may be that we'll interrupt him, as we did with Ron

5     Berger, because of witnesses that we've already got scheduled for

6     Wednesday.

7          THE COURT:  Okay.  Would Niedermeier come back on

8     Wednesday or are you talking next week?

9          MR. HARDING:  I would like an opportunity to speak to

10    Mr. Hanlon about that before I definitively answer, Your Honor.

11          THE COURT:  All right.  Mr. Crowe.

12          MR. CROWE:  Your Honor, do I understand that the Court

13    is ruling that I cannot ask that question?

14          THE COURT:  Yes.  The Court is ruling, though it's

15    still somewhat preliminary, obviously, we'll see what happens,

16    the Court is ruling that the statement by Mr. Martin is, one, not

17    exculpatory, and I'm not even sure if it were it would, it would

18    be admissible on that basis.  In fact, I'm pretty sure it

19    wouldn't be admissible just on that basis.  But it is hearsay.

20    And that it does not deprive Mr. Martin of anything the

21    Constitution guarantees him insofar as he chooses, if he so

22    chooses, not to take the witness stand and tell the jury that he

23    believes that's Mr. Mitchell's voice on that tape.  But there's

24    no basis before the Court on which the Court is persuaded that

25    it's admissible against any of the other defendants.

1          And it's not admissible as rationally suggestive of a

2     reasonable doubt as to Mr. Martin's alleged participation or

3     knowledge of the Wyche murders.

4          So if the government opens the door somehow, Mr. Crowe,

5     of course, before you ask that question, if you think you've got

6     a fresh basis for doing so, ask to approach the bench, and I hope

7     I remember that you need to approach the bench to discuss that.

8     But the Court's ruling is --

9          MR. CROWE:  But if nothing new comes up, I don't have

10    to do anything else, I covered myself.

11         THE COURT:  Exactly.  Your exception is noted.

12         MR. CROWE:  Your Honor, I realize in light of the

13    Court's ruling and the rationale for it, this is probably

14    over-protective, but we would move for severance on that basis,

15    also.

16         THE COURT:  All right.  Your motion for severance is

17    noted and denied.  Mr. Coburn, good morning.

18         MR. COBURN:  Good morning, Your Honor.  Just to be

19    sure, I assume that the Court's ruling with respect to Mr.

20    Martin's statement also applies to Mr. Gardner's statement?

21         THE COURT:  Yes.  Mr. Gardner was interviewed by

22    Detective Niedermeier, also?

23         MR. COBURN:  The government contends that he made

24    exactly the same kind of identifying statement.

25         THE COURT:  And is that recorded, also?

1          MR. HARDING:  I don't believe so, Your Honor.  Mr.

2     Gardner wasn't arrested for the murder.  He was arrested on a

3     probation violation and he came in with his attorney, Margaret

4     Mead.  It may have been recorded.  Did we turn over a copy of --

5     apparently, it wasn't recorded, Your Honor.

6          THE COURT:  All right.  But the answer to your question

7     is, yes, Mr. Coburn.

8          MR. COBURN:  Thank you, Your Honor.  And Your Honor,

9     just as if the Court didn't already have enough issues to be

10    addressing right at this moment, there are just a couple of

11    others I wanted to mention.

12          First of all, Mr. Harding mentioned this question

13    about, you know, what's our position in terms of the jury being

14    informed of Mr. Gardner's conviction in state court.  And this

15    kind of dovetails with another issue concerning Detective Giganti

16    and Detective Niedermeier.

17          It's my understanding, and I'm not sure exactly how the

18    government intends to do this, whether they're going to call each

19    of them more than once during the course of the trial or whether

20    they plan to go out of order and elicit things from them about

21    the Tonya Spence homicide, but from our point of view, what we

22    seek to do in all likelihood is just to kind of reserve a lot of

23    our examination of that homicide until our case.

24          We've already talked to Mr. Hanlon about that.

25    Apparently, it's understood that both of them are subject to

1    recall in the defense case.  Just wanted to let Your Honor know

2    that.

3            In light of that, I'm not sure that it would be

4    necessary for us to make that decision now in terms of whether we

5    would want the jury apprised of the state court conviction.

6            THE COURT:  I'm not sure I'm following you.  When you

7    say -- it's generally my practice, when it can be done fairly,

8    not to have a witness recalled by the defense, again, if the

9    defense cross can fairly cover the matters of concern,

10   notwithstanding any more narrow scope of the direct.  So are you

11   saying, what are you saying about that?

12           MR. COBURN:  If it's okay with Your Honor, I'd better

13   not poach on Mr. Kurland, on this.  They're actually his

14   witnesses.  So with Your Honor's permission, I will let him

15   address that.

16           Just before I vacate the podium, I just wanted to let

17   Your Honor know, on a separate issue, the subject of my letter

18   earlier this morning, given that the government's civilian

19   witness is not here, it looks like they're leading off with, I

20   believe his first name is James Wagster.  And he is their

21   ballistics/firearms examiner.

22           I'm not seeking any kind of a, you know, a full blown

23   Daubert, Kumho Tire type hearing here.  But I would request that

24   Your Honor just adopt the conclusion of the judge whose opinion I

25   sent to the Court, in the Southern District of New York, which

1    invokes a series of other courts.

2             Basically, what those courts all essentially conclude,

3    if I understand correctly, is that the expert's allowed to

4    testify, he's allowed to get testified as an expert, but can't

5    express the conclusion to any greater degree of certainty than

6    more likely than not.

7             THE COURT:  I forgot.  I printed out your letter and

8    the attachments, including Judge Rakoff's opinion, which I

9    haven't read fully.  I've only skimmed it very quickly.  The

10   tradition, as you know, is that a witness says to a reasonable

11   degree of scientific certainty.

12            MR. COBURN:  That's what Judge Rakoff explicitly

13   considers and refuses to allow.

14            THE COURT:  And what's Judge Rakoff's -- who's a fine

15   judge, by the way, and a friend of mine -- what's his problem

16   with "to a reasonable degree of certainty?"

17            MR. COBURN:  He had either one or two full blown

18   evidentiary Daubert hearings.  So he considered the record that

19   he had and also the record of, I think, Judge Saris in the

20   District of Massachusetts and at least one other judge.

21            THE COURT:  Another fine judge, a friend of mine.

22            MR. COBURN:  Agreed, Your Honor.  And essentially

23   concludes, and he's got some conclusions in here which are just,

24   you know, I think it took a lot of courage, frankly, for him to

25   say it the way he said it.

1          He says ballistics opinions are significantly

2    subjective based on twin assumptions that have never been

3    definitively tested.  He goes into a lot of detail about kind of

4    mass produced firearms sharing what they call quote-unquote

5    "class characteristics."

6          THE COURT:  All right.  Let me stop you, Mr. Coburn.  I

7    think you've waited too long to bring this to the Court's

8    attention.  And I realize Judge Rakoff's opinion was just, what?

9    Last week?

10          MR. COBURN:  It was.

11          THE COURT:  And I commend you for the diligence you've

12    displayed in even learning about it and getting a copy of it.

13    But clearly, the government, have you read it?

14          MR. HARDING:  No, Your Honor.  I got his letter from

15    Mr. Coburn this morning by e-mail, along with the opinion.  I had

16    a chance to print it out but not a chance to read it.  And I note

17    that Judge Rakoff had a Daubert hearing on this.  We have not had

18    a Daubert hearing on this issue.  We haven't had any kind of

19    hearing at all.

20          Instead, it's being brought to the Court's attention

21    literally minutes before the witness is supposed to testify.

22          THE COURT:  What is your understanding of what he is

23    going to say, Mr. Harding?  That to a reasonable degree, how does

24    he articulate?  He's testified in front of me many times but I

25    don't have a specific recollection of how he testifies.

1          MR. HARDING:  The testimony is hardly critical in this

2     case.  First off, he's going to testify that with respect to the

3     two bullets recovered from the McCaffity/Brown shootings, they

4     are too damaged to be compared.  So he can't say they were fired

5     by the same firearm although he can say they're the same caliber.

6          THE COURT:  All right.

7          MR. HARDING:  With respect to the Wyche brothers

8     murder, he's going to testify that all five of the shell casings

9     were fired by the same firearm and all four of the bullets were

10    fired by the same firearm.  But that's it.

11         THE COURT:  I don't think I have to reach Judge

12    Rakoff's issue.

13         MR. COBURN:  It sounds like you probably don't, Your

14    Honor.  That's good because there may well be another firearms

15    examiner down the road about whom we're going to be more

16    concerned.

17         THE COURT:  I'm sure there will be because of the two

18    gun issue.

19         MR. COBURN:  Exactly.

20         THE COURT:  Right.  Or the four gun issue.  Whatever it

21    is.  Mr. Kurland, good morning.

22         MR. KURLAND:  Good morning, Your Honor.  Your Honor,

23    with respect to a couple of the government witnesses today,

24    Detective Giganti and Niedermeier, it's my understanding that,

25    with Giganti in particular, his direct testimony today is going

1   to be very limited on a couple of things that relate to some of

2   the murders that we've already heard testimony on.  And with

3   respect to Detective Niedermeier, the same thing, only his is

4   going to be a longer direct examination, largely because of the

5   series of interviews that he's conducted with witnesses that,

6   having nothing to do with the Spence homicide.

7          It was my intention or our intention today to do a

8   very, a relatively limited cross relating to the matters that

9   have essentially already come up and he testified to.

10         I appreciate the Court's concern that when it's

11  feasible to try to not have people on recall.  But given that,

12  one, we just received some of the full grand jury testimony of

13  the witnesses over the weekend, and that it's my understanding

14  that no aspect of Detective Niedermeier's and Detective Giganti's

15  testimony today is going to have anything to do with the Spence

16  murder today.

17         MR. HARDING:  I don't know what testimony they would

18  have about the Spence murder.

19         THE COURT:  Yeah.  It was a Baltimore County homicide.

20  So he wasn't the investigating --

21         MR. KURLAND:  No, but there are certain things

22  concerning the, again, I want to tread delicately, not to reveal

23  too much.

24         THE COURT:  Well, let me make it easy, Mr. Kurland.  If

25  you need to recall Niedermeier and/or Giganti, you can do it.

1          MR. KURLAND:  Thank you, Your Honor.

2          THE COURT:  It's not a problem.

3          MR. KURLAND:  That means could we defer, co-counsel and

4    I are in constant discussion with respect to the ultimate issue,

5    and we're coming close to resolution.  But it's pretty clear it's

6    not going to happen today.  And if those witnesses are subject to

7    recall, they would be some of the witness who would be able to

8    testify as to Mr. Gardner's incarceration status, which would

9    lead to that.  But we won't get into that today.

10          THE COURT:  Right.

11          MR. KURLAND:  Thank you, Your Honor.

12          THE COURT:  Thank you.  On the Coach Lynch issue, I

13    thought I had left it a little less clear than Mr. Harding seems

14    to recall, Ms. Rhodes.  Do you have a decision today?

15          MS. RHODES:  I also wasn't aware of any deadline today.

16    We're really in the same position, that at this point we still

17    need to call him.  And if the --

18          THE COURT:  So is that likely to change?  I mean, I

19    guess what I'm asking is, are you continuing to discuss and think

20    about it or is your situation now solidified?

21          MS. RHODES:  Well, no.  I guess what I'm saying I think

22    it's more likely than not that we're going to need to call him.

23    We still are talking.  The problem is the replacement witnesses,

24    the other coaches from other schools are out of state and it's

25    football season.  So it's really difficult for us to know if they

1    can commit to being here, which raises another question I have

2    for the judge.

3              At the beginning of this, at the beginning of this, we

4    were told that we could have our witnesses or to have them

5    available on October 20th or beginning that week -- rather, the

6    27th.  Sorry.  The 20th is a week off.  And I want to ask the

7    Court if you think that still is the best estimate at this point

8    to tell witnesses?

9              THE COURT:  I think so.

10             MS. RHODES:  Okay.  That's what we've been doing.  As I

11   said, we still don't know if we're going to be able to replace

12   him.

13             THE COURT:  All right.  Ms. Rhodes, I'm going to direct

14   you and Mr. Lawlor by next Monday to prepare a formal written

15   proffer of what you expect Herb lynch to testify to.

16             MS. RHODES:  Very well.

17             THE COURT:  And it's going to be marked a court's

18   exhibit because I think where we're headed is that I'm going to

19   preclude you from calling that witness.  So I want you to prepare

20   a formal written proffer.  Include in it everything you can

21   reasonably anticipate you want to elicit from the witness so that

22   I have in front of me, when I make a final ruling, as complete a

23   proffer as possible.  Because I think I'm going to preclude the

24   witness.  I'm not saying I will.  But that's where I think I'm

25   very heavily leaning.

1          MS. RHODES:  All right.  In that event, Your Honor, we

2     may need to have you speak to Ms. Shearer about some extra funds

3     we need from the witnesses that are coming from out of state,

4     because it's going to be a major issue with her, I think.

5          THE COURT:  Of course.  I'll do that.  Why would I need

6     to speak to her?  I mean, if you've got a witness in Montana who

7     you need to fly here, you issued a subpoena and get the witness

8     here.

9          MS. RHODES:  Well --

10         THE COURT:  I mean, the budget doesn't --

11         MS. RHODES:  In my conversation with her, I think we're

12    going to have to pay their way here.

13         THE COURT:  Right.

14         MS. RHODES:  And my conversations with her about

15    bringing out-of-state witnesses are not particularly encouraging.

16         THE COURT:  Okay.  All right.  I will speak to her

17    generally about that.

18         MS. RHODES:  All right.  Thank you.

19         THE COURT:  Obviously, we'll pay to bring a witness

20    here if you need the witness.

21         All right.  We've got a couple of jury issues.  Let me

22    read this note.  And it will be available for you to examine

23    during the recess, from Ms. Arrington.  But I don't want to make

24    copies of it.

25         So I'll just read it into the record.  This is a note

25

1    that was delivered this morning.  And it's perfectly innocuous,

2    actually better than innocuous.

3           It's from Juror Number Six.  Judge, at a department

4    lunch my coworkers were teasing me good naturedly about serving

5    on a jury so long "but at least the case was interesting",

6    quote/close quote, to which my boss replied, quote, "Yeah, but

7    the defense is bogus", close quote.  I promptly scolded her for

8    saying anything and left the table.  She apologized and said she

9    was kidding.  Her comment didn't bother or affect me one way or

10   the other but I felt like I should bring it to your attention.

11   Juror Number Six.

12          So as I say, counsel can look at this during the recess

13   if you want to see it.  But I've read it.  I don't see any need,

14   in light of the juror's affirmation that this had no effect on

15   her and, consistent with my instructions, the juror immediately

16   removed herself from the environment.  But if counsel believe the

17   Court should make inquiry to confirm that, I will do so.  But I

18   don't see the need to do so.  Yes, Mr. Lawlor.

19          MR. LAWLOR:  Your Honor, my only concern is that she

20   said her boss said the defense is bogus, which raises the issue,

21   is she talking about the case, because how else would her boss

22   know what the defense was in the first place?

23          THE COURT:  No.  I think it's perfectly clear.  Well, I

24   should say it's perfectly clear.  Anybody on this jury has

25   coworkers and supervisors.  They know they're on jury duty in the

1    United States District Court in Baltimore.  And it would take

2    anybody no more than five seconds through quick research to

3    determine, including looking at the Court's web site, to know

4    that it's United States of America versus Willie Mitchell et al.,

5    and so that doesn't surprise me at all.

6            And I'm confident that the fact that it's a

7    quote-unquote "interesting case", etc., didn't come from the

8    juror.

9            Yes, Mr. Kurland, Mr. Coburn.

10           MR. COBURN:  We just completely agree with Your Honor.

11   Very impressed that the juror handled it as they did and we don't

12   see the need for any inquiry.

13           THE COURT:  Thank you.  The other jury issue is, you'll

14   recall that one of our jurors, one of our venire people, persons,

15   told us that she might be moving to Guam.  And it turns out that

16   she is moving to Guam.  I guess this was a telephonic

17   conversation between, I believe, one of my law clerks.  You

18   didn't get the call, did you, Belinda?

19           THE CLERK:  I got it.

20           THE COURT:  Oh, you got the call.  Okay.  The juror

21   apparently is shipping her car to Guam next week and plans to

22   take herself to Guam, apparently, I think, October 27th,

23   somewhere that week.

24           What I propose to do is, at the recess, have the juror

25   remain in the courtroom.  It's Juror Number 11.  And I can

1    inquire whether it isn't possible for her to stick with us, with

2    the assurance from the Court that any increased expense related

3    to her travel and any housing expense that she might incur would

4    be covered by the government.  Does anybody have any different

5    ideas or different feelings about the matter?

6             MR. COBURN:  No, Your Honor.  We agree.

7             THE COURT:  I really fault myself on this because I had

8    intended to doublecheck with counsel before we did the final jury

9    selection to see whether you all wanted to strike that juror by

10   agreement.  Obviously, she continues to be qualified for jury

11   service.  And the mere fact that she changes her domicile in the

12   midst of trial, it seems to me, without having looked at any law,

13   seems to me clear that she continues to be qualified to serve as

14   a juror because she will not have moved to Guam until after the

15   trial is concluded.  So she remains a citizen of this district

16   and this division.

17            So that's what I'll do, again, at the break when I

18   excuse all the other jurors.  I'll ask her to remain in the

19   courtroom and ask here whether there isn't some way we could

20   delay her trip.  Obviously, if she says no, it's not going to

21   work, then we'll have to cross that bridge when we get to it.

22            Anything else?  Mr. Martin?

23            MR. MARTIN:  Your Honor, the thought just occurs to me

24   that if she's shipping her car because there's necessary lead

25   time, she may have trouble getting here.

1        THE COURT:  In fact, you reminded me that she did, in

2   fact, specifically mention that.  And whether the government can

3   pay for her to rent a car for two or three weeks is something

4   I'll have to look into.  But obviously, that will be one answer.

5   Either that or if she could delay shipping her car, that would be

6   another possible answer.  But she did mention that issue

7   specifically, transportation back and forth.

8        Okay.  We'll have the jury, please.  Note pads are out.

9   Thank you, Ms. Arrington.

10       (Jury enters the courtroom.)

11       THE COURT:  Ladies and gentlemen of the jury, good

12  morning.  Please be seated.  Make yourself comfortable.  We trust

13  you had a pleasant weekend, ladies and gentlemen.  We're ready to

14  continue.

15       The government may call its next witness.

16       MR. HARDING:  Yes, Your Honor.  The United States calls

17  James Wagster.

18       JAMES WAGSTER, GOVERNMENT'S WITNESS, SWORN

19       THE WITNESS:  I do.

20       THE CLERK:  Be seated.  Scoot up and speak directly

21  toward the mike.  State your name and spell it for the record.

22       THE WITNESS:  James L. Wagster, W-A-G-S-T-E-R.

23       DIRECT EXAMINATION

24  BY MR. HARDING:

25  Q    Good morning, Mr. Wagster.

Case 1:04-cr-00029-RDB    Document 678    Filed 06/08/09    Page 29 of 207

1    A    Good morning.

2    Q    Can you tell us how you're employed, sir?

3    A    I'm a firearms examiner with the Baltimore City Police

4    Department Crime Lab.

5    Q    Okay.  How long have you been working for the Baltimore City

6    Police Crime Lab?

7    A    Since September 14th, 1992.

8    Q    Can you give us an idea, Mr. Wagster, what your educational

9    background is?

10   A    There's no schools that teach firearms identification.  I

11   was trained at the Maryland State Police under Mr. Don Flohr.

12   Q    Well, let me back up first and ask you what your, how far

13   did you get in school?  I mean, did you, tell us what your

14   degrees are.

15   A    I just have an AA degree in construction technology from the

16   Community College of Baltimore.

17   Q    Okay.  Tell us, then, what your training and educational

18   experience has been in the area of firearms examination.

19   A    In 1986, I was a Baltimore County Police detective in their

20   Crime Lab.  I started training in August of '86 under Mr. Don

21   Flohr at the Maryland State Police.

22        And I basically finished training there in 1992,

23   retired, and came to work for Baltimore City.

24   Q    Okay.  Can you give us an idea of what -- how much time have

25   you spent training as a firearms examiner?

1    A    I spent basically five years over the State Police training

2    under Mr. Don Flohr.  Much like an apprenticeship.  I sat

3    alongside of him for those years and did cases.  And then shortly

4    after that, I was offered a job by Baltimore City.  I retired

5    from Baltimore County.  And I've been with Baltimore City ever

6    since.

7    Q    Okay.  Have you attended seminars and conferences in the

8    area of firearms examination and identification?

9    A    Yes, sir.  I'm a member of AFTE, which is Association of

10   Fire and Toolmark Examiners.  I've attended several of their

11   national training sessions and some of their East Coast training

12   sessions.

13   Q    Have you also attended FBI courses and seminars in the area

14   of firearms identification and examination?

15   A    An evidence photography course with them.  Moot court.  Week

16   long course with them.  I believe 9 millimeter issues and

17   training seminars with them.

18   Q    Can you give us an idea how many firearms comparisons you've

19   had to make in the course of your career?

20   A    Be several thousand.  But I've never exactly counted.

21   Q    Okay.  Have you ever been qualified as an expert in the area

22   of firearms identification and examination in court?

23   A    Yes, sir.

24   Q    Can you give us an idea how many times and in what courts?

25   A    It's been 404 previous times, Baltimore City, Baltimore

1    County, Howard County, Harford County, US District Court in

2    Greenbelt and Baltimore.

3    Q    Okay.  So you're adding up all of the state and federal

4    appearances where you were qualified as an expert in the area of

5    firearms examination and identification?

6    A    Yes, sir.

7    Q    And it's 404 times?

8    A    Yes, sir.

9    Q    Have you had occasion to teach courses or programs in

10   firearms identification and examination?

11   A    I taught one course at, it was outside of DC, I don't

12   remember the college now.  And also teach a limited course up in

13   Baltimore City Police academy.

14   Q    Okay.  Was the course you taught in Montgomery County?

15   A    It was Montgomery County Community College, yes, sir.

16   Q    And you teach at the Baltimore City Police Academy?

17   A    Occasionally, yes, sir.

18   Q    Okay.  Your Honor, I would like to offer Mr. Wagster as an

19   expert in the area of firearms identification and examination.

20             CROSS EXAMINATION

21   BY MR. COBURN (On Voir Dire):

22   Q    May I voir dire, Your Honor?  Mr. Wagster, good morning.

23   A    Good morning, sir.

24   Q    I have just a very few questions for you.  Are you aware of

25   any instances in which federal courts have limited the degree of

1    probability or certainty with which an opinion about firearms

2    examination can be expressed?

3    A    No, sir.

4    Q    Do you believe it to be true that ballistics examination not

5    only lacks the rigor of science but suffers from greater

6    uncertainty than many other kinds of forensic evidence?

7    A    No, sir, I don't believe that.

8    Q    Okay.  Do you believe it to be true that although attempts

9    have been made to introduce similar minimum standards and

10   protocols into ballistics analysis, such attempts have not yet

11   met with general acceptance?

12   A    No, sir, I'm not aware of that.

13   Q    Okay.  Do you believe it to be true that ballistics

14   comparisons involve the exercise -- excuse me -- of a

15   considerable degree of subjective judgment?

16   A    I believe there's some subjective judgment.

17   Q    Okay.  Thank you.  I'm not challenging him, Your Honor.

18              THE COURT:  The witness is accepted as an expert in the

19   area of firearms identification.

20              CONTINUED DIRECT EXAMINATION

21   BY MR. HARDING:

22   Q    Mr. Wagster, I have here two exhibits which I'm going to put

23   on the screen.  The first is MB-23, which is already in evidence.

24   And the second is MB-24, which is already in evidence.  These are

25   two projectiles that you had a chance to look at earlier this

1    morning, is that correct, Mr. Wagster?

2    A    Yes, sir.

3    Q    And does your name appear scrawled on the back of these

4    envelopes?

5    A    I believe on that one it was Agent Barber's name, since she

6    was primary on this.

7    Q    Okay.  So one of your colleagues scrawled her name on it, is

8    that correct?

9    A    Correct.

10   Q    Did you prepare a report on your firearms examination of

11   these two projectiles which, according to the envelopes, were

12   recovered on 2/28/02, one from Lisa Brown and one from the

13   vehicle?

14   A    Yes, sir.

15   Q    Let me, is this what your report looks like, Mr. Wagster?

16   A    That's a copy of it, yes, sir.

17   Q    You call each bullet, you call one bullet Q-1B and the other

18   Q-2B, is that correct?

19   A    Yes, sir.

20   Q    One is recovered from the vehicle, one from Lisa Brown, is

21   that correct?

22   A    Yes, sir.

23   Q    Were you able to determine whether these two bullets were

24   fired by the same firearm or by different firearms?

25   A    I was unable to express an opinion either way.

1  Q    Why is that?

2  A    They were mutilated and distorted.  They were no value for

3  microscopic comparison.

4  Q    How would you normally make a comparison that could lead you

5  to say whether they were fired by the same firearm or not?

6  A    You'd have to be able to see the lands and grooves and the

7  microscopic marks on those lands and grooves.  And in this case

8  the surface of the bullet was pretty much destroyed.

9  Q    Can you explain to the ladies and gentlemen of the jury what

10  land and grooves are?

11  A    When a bullet is fired down the barrel of a firearm, modern

12  firearms have lands and grooves.  It's what makes the bullets

13  spin.  Those marks are impressed on to the surface of that

14  bullet.  The manufacturing marks and wear and tear over the life

15  of that gun are impressed on to those lands and grooves and

16  that's what we use to microscopically identify or say that it

17  wasn't fired with that gun.

18        First off, class characteristics have to match.  If

19  they were six right or they were both six left.  In this case,

20  couldn't even determine that.  And there was just no surface area

21  to microscopically compare on these two bullets.

22  Q    Were you able to determine what caliber bullets they were?

23  A    They were caliber .38 or.357.

24  Q    Okay.  Are .38 caliber and .357 caliber bullets the same

25  thing?

1    A    They can be.  You can fire a .38 in a .357, but you can't

2    fire a .357 in a .38.

3         However, they load some of the same bullets in both

4    cartridges.  The difference is in the length of the cartridge

5    case, not the diameter of the bullet.  Generally, we write

6    .38/.357 because without the cartridge case you can't really tell

7    which caliber they are.

8    Q    So is it accurate to say, then, that these two projectiles

9    which were too distorted to permit you to make a comparison could

10   have been either a .38 caliber or a .357 caliber, and even if

11   they were one and not the other, they could have been fired from

12   either kind of gun, is that correct?

13   A    Yes, sir.

14   Q    Okay.  In sum, then, on that particular comparison, if you

15   were asked whether those two bullets were fired by one gun or two

16   guns, you couldn't say, is that correct?

17   A    That's correct.

18   Q    Let me show you now some other projectiles and shell

19   casings.  First of all, Government Exhibit W-1.  Does this have

20   your writing on the back of it?

21   A    Yes, sir, it does.

22   Q    And actually, does it have your signature on the tape on the

23   flip side?

24   A    Yes, sir.

25   Q    And this is Government Exhibit W-3.  Does this one also have

1   your signature on the tape, on the flip side?

2   A    Yes, sir.

3   Q    And this is Government Exhibit W-4, also with your

4   signature, is that correct?

5   A    Yes, sir.

6   Q    Did you have a chance to look at these exhibits earlier this

7   morning?

8   A    Yes, sir, I did.

9   Q    Are these bullets and shell casings that were recovered from

10  the scene or from the corpses in the double homicide of Anthony

11  and Darryl Wyche?

12  A    I have the names Darryl Wyche and Anthony Wyche.  I don't

13  know at the time if they were deceased or not.

14  Q    I see.  Let me show you your report so that we know what

15  you're talking about.  First of all, did you do a comparison of

16  four bullets in this case bearing this CC number?

17  A    Yes, sir.

18  Q    And you called the four bullets Q-1B, Q-2B, Q-3B and Q-4B?

19  A    Yes, sir.

20  Q    And one was recovered from Darryl Wyche, one from Anthony

21  Wyche, one from Honda, and one from scene, is that correct?

22  A    Yes, sir.

23  Q    Did you perform a microscopic comparison of these four

24  projectiles?

25  A    Yes, sir.

1    Q    And were you able to reach any conclusions about whether

2    they were fired by the same firearm or by a different firearms?

3    A    They were fired from the same firearm.

4    Q    Okay.  And what caliber are they?

5    A    They're 40 S&W/10 millimeter.

6    Q    And what does S&W stand for?

7    A    That's just 40 Smith & Wesson is the caliber.

8    Q    Does .40 caliber and 10 millimeter, are they the same thing?

9    A    They're the same bullet.  There again, they load different

10   bullets in the cartridge case.  A 10 millimeter cartridge case is

11   longer than a 40 S&W cartridge case, but the bullet's the same.

12   Q    Okay.  And with respect to the five shell casings, did you

13   also perform an examination to determine whether they were fired

14   by the same firearm or by different firearms?

15   A    They were fired with the same firearm.

16   Q    And are you able, how are you able to make that

17   identification with respect to shell casings?  You've explained

18   to us about the lands and grooves on projectiles.  How do you

19   make the determination with respect to shell casings?

20   A    On a shell casing, what we're looking at is the breech face

21   marks.  When the gun fires, the bullet goes down the barrel, but

22   the cartridge case goes rearward with the same force that the

23   bullet goes forward.  In a semiautomatic, it hits against the

24   rear of the breech face of the gun.  That's also what operates

25   the gun.  The cartridge case pushes the slide back.  That fired

1    cartridge case is extracted and ejected out of the firearm.  The

2    slide comes forward, loads another round.  You get the same

3    action with the pull of the trigger.

4              That's what we would like to use as the breech face

5    marks.  And they're also usually the biggest marks on the

6    cartridge case.

7    Q    So can you determine with, just from breech face marks,

8    whether a shell casing was fired by different handguns or by the

9    same handgun?

10   A    Yes, sir.

11   Q    So the breech face marks are in some way unique to a shell

12   casing?

13   A    They're individual to the firearm.

14   Q    To the firearm, I mean.  But the mark left on the shell

15   casing would be --

16   A    Yes.  Yes, sir.

17   Q    Okay.  Let me ask you one other question.  Can you ever take

18   a projectile and a shell casing and determine whether they were

19   fired by the same handgun?

20   A    If you had the handgun, you would match the cartridge case

21   to the breech and the bullet to the barrel, but you can't match

22   the bullet to the cartridge case.

23   Q    I see.  So although you can say that the four bullets were

24   fired by the same handgun and the five shell casings were fired

25   by the same handgun, absent the handgun you can't say that these

1    four bullets were from four of the five shell casings, is that

2    correct?

3    A    Yes, sir.

4    Q    Okay.  That completes my direct examination, Your Honor.

5            MR. LAWLOR:  No questions, Your Honor.

6            THE COURT:  Mr. Wagster, thank you very much.  You're

7    excused.  Next witness.

8            MR. HARDING:  Your Honor, the United States calls

9    Teniera Williams.

10            TENIERA BROWN, GOVERNMENT'S WITNESS, SWORN

11            THE WITNESS:  I do.

12            THE CLERK:  Be seated.  Scoot up and speak directly

13    toward the mike.  State your name and spell it for the record.

14            THE COURT:  State your name and spell it for the

15    record, please.

16            THE WITNESS:  Teniera Brown.  T-E-N-I-E-R-A.  Brown,

17    B-R-O-W-N.

18            DIRECT EXAMINATION

19    BY MR. HARDING:

20    Q    Good morning, Ms. Brown.  Did you formerly have the name

21    Williams?

22    A    Yes, sir.  I just got married.

23    Q    When did you get married?

24    A    In August of this year.

25    Q    Congratulations.

Case 1:04-cr-00029-RDB   Document 678   Filed 06/08/09   Page 40 of 207

1          THE COURT:  Congratulations.

2     A    Thank you.

3     Q    Ms. Brown, can you tell us, what is your educational

4     background?

5     A    I have a Bachelor's Degree in Criminal Justice with a heavy

6     course load in biology.  I changed majors.  And I have a Master's

7     Degree in Forensic Science.

8     Q    Can you tell us what institutions you got those degrees

9     from?

10    A    My Bachelor's Degree is from University of Maryland Eastern

11    Shore.  And my Master's Degree is from University of New Haven.

12    Q    New Haven, Connecticut?

13    A    Yes, sir.

14    Q    How are you employed right now?

15    A    I'm currently a Crime Lab Technician II with the Baltimore

16    City Police Department Laboratory Division, working in the

17    Firearms Examination Unit.  I just was transferred to that unit

18    in March of 2007.

19    Q    Okay.  You said you were a crime scene technician, is that

20    correct?

21    A    Yes, Crime Lab Technician II.

22    Q    Okay.  What is that exactly?

23    A    Crime Lab Technician II -- well, first I was Crime Lab

24    Technician I.  And that's basically a training position.  You

25    hold that for two years and then you're promoted to a Crime Lab

1   Technician II.  The only difference is, in the two positions,

2   well, both positions entail Crime Lab processing, crime scene

3   processing.  We do all property crimes, burglaries, and then we

4   do serious crimes as far as homicides, rapes, carjackings,

5   robberies, child abuses, abductions.  We do all the photography

6   on crime scenes.  We recover evidence, physical evidence,

7   biological, latent print evidence.  We sketch the crime scenes.

8   Q    Okay.  I think that gives us a pretty good idea.

9   A    Okay.

10  Q    How long have you been working for the Baltimore City Crime

11  Lab?

12  A    I started in 2001.  I currently been there for, it will be

13  seven years in December.

14  Q    Okay.  Let me call your attention to 2002, around February

15  28th of 2002.  What position did you have at that time?

16  A    I was a Crime Lab Technician I.

17  Q    Okay.  Did you participate in processing an Infiniti Q-45

18  automobile for latent prints?

19  A    Yes, sir.

20  Q    Okay.  Can you tell us the license tag number of that Q-45?

21  A    Can I refer to a copy of my report?

22  Q    Yes, you may.

23  A    Okay.  It was a 1999 Infiniti Q-45, Maryland tag 045-BEK.

24  Q    Okay.  Where was it that you processed this?

25  A    I processed this vehicle inside the Headquarters Crime Lab

DIRECT EXAMINATION OF TENIERA BROWN                42

1    mobile bay.

2    Q    Okay.  What did you process it for?

3    A    Well, there was a request to process it for latent prints,

4    the interior and exterior of the vehicle, and to recover physical

5    evidence.

6    Q    Okay.  According to your report, was this run 2023, Ms.

7    Brown?

8    A    Yes.

9    Q    What does that mean exactly?  What's a run?

10   A    The run number is basically a tracking number, the number

11   that we use on all the crime scenes that we respond to.  So 2023

12   would mean that that was the 20023rd call we responded to that

13   year.

14   Q    Okay.  Can you tell us, Ms. Brown, what surfaces did you

15   process for latent fingerprints?

16   A    Okay.  Exterior surfaces, I processed the front and rear

17   driver and passenger doors and windows, the front and rear driver

18   and passenger quarter panels, hood, roof, trunk.

19        Interior surfaces, I processed the front and rear

20   driver and passenger doors, window glass, front and rear driver

21   and passenger seats, cell phone on front driver floor, cell phone

22   in storage compartment behind front driver's seat, front arm

23   rest, cup holder cover, radio console, rear view mirror, glove

24   compartment, CD on back seat, book on rear driver floor,

25   Chapstick and lotion bottle on rear seat.

1    Q    And what do you do, exactly, when you process all these

2    surfaces for latent prints?

3    A    Well, we use a fingerprint powder and a fingerprint brush.

4    And the fingerprint powder is usually a bichromatic powder

5    because some of these surfaces may have been porous.  So it

6    destroys the surface a little bit.  But that's the best way we

7    can get fingerprints from it.

8         We dip the fingerprint brush inside a jar that has the

9    fingerprint powder, shake the excess off.  And then we just, for

10   lack of a better word, wave or brush the surface across it to

11   reveal anything that's there.  It will, anything that's, that has

12   some type of oil to it, sort of stick on, like clumps of dirt.

13   And a lot of times you can see ridge patterns of the fingerprints

14   on the glass if that's there.  In this situation, then we use

15   lift tape, which is a transparent tape, just like a roll of

16   regular tape.  We take that, we rub it across the surface, and

17   then we pull the tape up.  And we put it on the back of an index

18   card that's issued to us by the Baltimore Police Department Lab

19   Division.  Has information on the front that we fill out to say

20   where the lift came from, the number of the lift, who took the

21   lift, where we were when we recovered the lift, the time.

22        Then we put that on the back of that card and we sign

23   across the lift to let you know who did the lift.

24   Q    Okay.  Can you tell us, of all those surfaces that you

25   examined that day, both on the car and on various items inside

DIRECT EXAMINATION OF TENIERA BROWN                44

1    the car, how many latent prints were you able to recover?

2    A    We recovered seven.

3    Q    When you say "we", who are you referring to?

4    A    Oh, in this particular scene, it was myself, Technician

5    Minehart, and Technician Iggy (phonetic).

6    Q    So there were three of you processing it for latent prints?

7    A    Yes, sir.

8    Q    And the three of you recovered seven latent prints?

9    A    Yes, sir.

10   Q    Let me call your attention to one particular lift.

11   Actually, I'm just going to put this on the screen here.  This

12   is, this has been marked Government Exhibit MB-30.  You've had a

13   chance to look at this today and last week, have you not, Ms.

14   Brown?

15   A    Yes, sir.

16   Q    Does this, does this envelope contain the seven lifts that

17   you and your colleagues recovered from the car and contents of

18   the car that day?

19   A    Yes, sir.

20   Q    Let me open them up.  I'm going to take one particular card.

21   Lift number three.  Did you recover that particular lift

22   yourself?

23   A    Yes, sir.

24   Q    And does it have your name at the bottom?

25   A    Yes, sir.

1    Q    And it tells the date when you recovered it, the vehicle

2    with the license number.  Where did you recover the lift from?

3    A    The driver's side rear door glass, exterior surface.

4    Q    Okay.  And you've got the run number on here, 2023.  And on

5    the flip side, is that the actual lift that you recovered?

6    A    Yes, sir.  It has my initials on it.

7    Q    I see.  Those are your initials right here?

8    A    Yes, sir.

9    Q    Did you make this writing here or did someone else make that

10   writing?

11   A    Someone else made that.

12   Q    Okay.  Now, is this, was this recovered the same way you

13   described earlier, by first of all applying a bichromatic powder

14   to the surface and then sticking a piece of tape on it and

15   lifting the tape off?

16   A    Yes, sir.

17   Q    Is this, then, the index card to which you stuck the tape

18   when you were complete, after you'd completed the lift?

19   A    Yes, sir.

20   Q    Okay.  What do you do after you finish filling out these

21   lift cards for each of the lifts you get?

22   A    Oh, after we finish filling out the lift cards, then we then

23   put it on our formal report.  In this case, it was other things

24   that we also recovered and had to submit to Evidence Control

25   Unit.  And then once we get our Evidence Control Unit numbers, we

1    put, compile a report and put everything together.

2    Q    And then are these submitted to a fingerprint examiner?

3    A    Yes.

4    Q    Who is it that makes a determination as to whether these

5    latent prints are suitable for comparison or not?

6    A    Oh, the latent print examiner does that.

7    Q    So you do not do that?

8    A    No.  I just lift all that I see.

9    Q    Okay.  One moment.  No further questions, Your Honor.

10          MR. LAWLOR:  No questions, Your Honor.

11          CROSS EXAMINATION

12   BY MR. FLANNERY:

13   Q    Ms. Brown, good morning.

14   A    Good morning.

15   Q    My name's Paul Flannery.  I represent the defendant, Shelton

16   Harris.

17   A    Okay.

18   Q    Ms. Brown, you processed the 1999 Q-45 Infiniti on February

19   28th, 2002?

20   A    Yes.

21   Q    You noted in your report that there was damage to the front

22   and passenger doors?

23   A    Okay.

24   Q    That's correct?

25   A    Can I find it in the report?

1    Q    Please.

2    A    Yes.

3    Q    Is it your understanding that there was damage to the doors?

4    A    Yes.  Damage was observed to the front driver door and rear

5    passenger door window glass.

6    Q    Is it your understanding that the doors were damaged in an

7    attempt for the fire department to enter the vehicle at the crime

8    scene?

9    A    No, sir.  I had no idea about the fire department.  I just

10   got the request to process it.  So we processed what we had.

11   Q    Were there detectives present at the processing of the

12   vehicle?

13   A    Yes.  Detective, it says detective advised that the fire

14   department had attempted to force open the front driver and that

15   the fire department had broken the rear passenger door glass.

16   Yes.  Sorry.

17   Q    Is it your understanding that the fire department damaged

18   the front doors in entering because the doors were locked at the

19   crime scene?

20   A    I don't have that here.  I just have noted that that's where

21   the damage came from, the fire department.  I don't know why they

22   broke into the car.

23   Q    Ms. Brown, you observed that, in your report, that there was

24   blood throughout the vehicle?

25   A    Yes.

1  Q    Both in the front passenger seats and in the rear seats?

2  A    Blood was observed throughout the front of the passenger

3  compartment area of the vehicle.

4  Q    And you processed the entire interior, exterior of the

5  vehicle for what you determined at the time to be latent

6  fingerprints?

7  A    Yes, sir.

8  Q    You processed the front and rear passenger doors and

9  windows?

10  A    Yes, sir.

11  Q    You processed the exterior and the interior of the doors?

12  A    Yes, sir.

13  Q    You processed the door locks, the door handles?

14  A    Yes, sir.

15  Q    You processed the rear driver's seats?  You processed the

16  front passenger seats?

17  A    We don't, whatever I have here I processed.  Sometimes,

18  depending on the surface of the seats.  I don't have it noted.

19  But if the seats were leather or cloth, you don't sometimes get

20  suitable, well, you don't result because the type of things we

21  use, when you dust porous surfaces, which is fabric, leather, you

22  don't yield any results from those type of surfaces.  It just

23  absorbs it.

24  Q    And you processed several items that were in the back seat

25  of the car at the time?

1   A    Yes, sir.

2   Q    For instance, you processed the CD on the back seat?

3   A    Yes, sir.

4   Q    You processed the Chapstick and lotion bottle on the rear

5   seat?

6   A    Yes, sir.

7   Q    You described the process that you go through in lifting the

8   prints.  You first dust an area that you think latent prints

9   exist?

10  A    Yes.

11  Q    You then apply some sort of adhesive to that?

12  A    Yes.

13  Q    And then you lift the print?

14  A    Yes.

15  Q    And you apply it to a card?

16  A    Yes.

17  Q    At any time do you photograph the dusted lift, the dusted

18  print?  Excuse me.

19  A    No, sir.

20  Q    You don't photograph, for example, the dust?  When you dust

21  it -- excuse me.  Let me back up for a second.  When you dust the

22  print, you can visually see at that point what you determine to

23  be a latent print?

24  A    What I determine to be something, yes.

25  Q    And you don't photograph that at the time?

1    A    No, sir.

2    Q    You simply lift the tape and applied it to a card?

3    A    Yes, sir.

4    Q    And then you make your initials on the card?

5    A    Yes, sir.

6    Q    You mentioned there was three techs processing this crime

7    scene?

8    A    Yes, sir.

9    Q    There was three of you dusting at the same time?

10   A    Well, most times we all take a task.  You know, someone

11   might do dusting.  Since it was things inside the car that need

12   to be recovered, one person may have done the recovery.

13   Q    Were you the only one dusting?

14   A    No.  To my understanding, the other technician, Lauren Iggy

15   also dusted the vehicle.

16   Q    So there was more than one of you dusting at the time?

17   A    Yes, sir.

18   Q    There was more than one of you lifting prints at the time?

19   A    Yes, sir.

20   Q    And there was more than one of you making cards at the time?

21   A    Yes, sir.

22   Q    Did anyone dust the rear bumper?

23   A    No, sir.

24   Q    Do you know what the other tech was dusting?

25   A    No.  I don't know exactly.  No, sir.  We just, I just, we

1   just have, we all dusted as a whole.

2   Q    You weren't observing her at the time?  That's not your job?

3   A    Not that it's not my job but -- no, I wasn't observing her.

4   If I'm dusting the same time she's dusting, I can't see

5   everything she's doing.  No.

6   Q    Fair to say you're concentrating on your own work?

7   A    Yes, sir.

8   Q    When you pull the print, Ms. Brown, off of a particular

9   surface, do you orient that print to the surface you pull it

10  from?

11  A    You mean if I lift it, do I put it on the card the same way?

12  Q    You don't do that?

13  A    Yes.  I lift it and put it on the card the same way.  I try

14  to have the cards upright and just put it down the same way, yes.

15  Q    Okay.  But you can't, by the card itself, you can't tell,

16  for example, where that print is taken from?

17  A    No, sir.

18  Q    You can't tell where on any particular surface a print is

19  taken from?

20  A    Right.  I just have it I took it from the glass.  If you're

21  saying if I took it from the top of the glass versus the bottom,

22  no, sir.

23  Q    You don't know?

24  A    No.

25  Q    You removed many items from inside the car?

1    A    Yes, sir.

2    Q    You removed a center console from inside the car?

3    A    I removed a lot.

4    Q    Would it help, Ms. Brown, if I showed you the police report?

5    A    Yes.  Are you looking at the police report or the run sheet?

6    Q    You recognize this report, Ms. Brown?

7    A    No, I don't.  Is this a computer printout?  The Evidence

8    Control Section sheet?

9    Q    You recognize these reports?

10        THE COURT:  Perhaps if you zoom back, Mr. Flannery, so

11   that the witness can see the entire page, it might help.

12   Q    Ms. Brown, this is a Baltimore Police Department Evidence

13   Control Section sheet.

14   A    Okay.

15        THE COURT:  Do you recognize it now, Ms. Brown?

16   A    Yes, I've seen it before.

17   Q    Does this accurately reflect the items that were removed

18   from the car on 2/28/02 during your processing?

19   A    This is a lot of the personal property.  The Crime Lab

20   report I'm looking at shows more, and some different stuff.  Like

21   vacuum samples and things of that nature.

22   Q    I understand.  But is it your understanding that a console

23   top, this indicated, six rows down, was removed from the car at

24   that time?

25   A    I see that here but I don't see it on my report.  So I don't

1    recall that.

2    Q    Okay.  You also extracted several, several samples of

3    physical evidence from the car on 2/28/02, correct?

4    A    Yes.

5    Q    You extracted a vacuum sample recovered from the rear

6    ceiling of the vehicle?

7    A    Yes.

8    Q    You vacuumed the rear head, the rear head seat to the

9    vehicle?

10   A    Yes.

11   Q    And you even removed the carpet from the rear floors of the

12   vehicle?

13   A    Yes.

14   Q    What do you do with all this physical evidence?

15   A    After I package it, which basically consists of us putting

16   it in a brown paper bag, we seal it, sign across the seal, then

17   we transport it to our Evidence Control Unit, which is located in

18   the headquarters building, and we submit it.

19        At that point, whatever lab it goes to, that person

20   comes down and take it out to do their analysis.

21   Q    So you -- I'm sorry.

22   A    So at that point the type of evidence it is, a trace

23   evidence person will come down and pick that up.

24   Q    And you recover that because there may be instances of trace

25   evidence or DNA in those materials?

1    A    Yes, sir.

2    Q    Or even on some of those items that are removed from the

3    car?

4    A    Yes, sir.

5    Q    One second, Your Honor.  No further questions.

6                  REDIRECT EXAMINATION

7    BY MR. HARDING:

8    Q    Ms. Brown, first of all, lift number three, you said, came

9    from the driver's side rear door glass?

10   A    Yes, sir.

11   Q    Exterior surface, is that correct?

12   A    Yes, sir.

13   Q    And the door that was smashed was, I believe you said, on

14   the passenger side, is that correct?  I mean the one with glass

15   that was broken.

16   A    Damage was also observed to the front driver door and rear

17   passenger door window glass.  Yes.

18   Q    Okay.  This particular window was not smashed, the one from

19   which you got the latent print, is that correct?

20   A    Yes.  That window I wasn't smashed.  It was the front driver

21   door and rear passenger door.

22   Q    Okay.  Was the front driver door damaged or was the glass

23   broken or could you tell from your --

24   A    The damage -- it was just the front driver door that was

25   damaged and the rear passenger door window glass.

1   Q    I see.  Thank you.  Also, Mr. Flannery just put on the

2   screen what's known as an ECU log sheet.  Do you remember that?

3   A    Yes.

4   Q    Does that include all of the evidence that is submitted in a

5   case under a particular CC number?

6   A    Yes.  When you put in the CC number, everything that was

7   ever submitted came from, it's all listed.

8   Q    So would that include things that were submitted by, say,

9   the detectives at the scene?

10  A    Yes, sir.  It would be everything that was submitted under

11  one complaint number.

12  Q    It's not necessarily just stuff you submitted, is that

13  correct?

14  A    No, sir.  Not if they submitted it under the same complaint

15  number.

16  Q    Okay.  Thank you.  I believe I have no further questions,

17  Your Honor.

18          THE COURT:  Thank you very much, Ms. Brown.  You're

19  excused.  Next witness.

20          MR. HARDING:  Yes.  Your Honor, the government calls

21  Lorraine Lansey.

22          LORRAINE LANSEY, GOVERNMENT'S WITNESS, SWORN

23          THE WITNESS:  I do.

24          THE CLERK:  Be seated.  Speak directly toward the mike.

25  State your name and spell it for the record, please.

1       THE WITNESS:  My name is Lorraine Lansey.  L-A-N-S-E-Y.

2  I'm assigned to the Baltimore Police Department's Crime

3  Laboratory, Latent Print Unit.

4       DIRECT EXAMINATION

5  BY MR. HARDING:

6  Q    Good morning, Ms. Lansey.

7  A    Good morning, Mr. Harding.

8  Q    Can you tell us how long you've been working for the Crime

9  Lab?

10 A    25 years.

11 Q    So since, what year would that be since?

12 A    1983.

13 Q    And how long have you been working specifically in the

14 Fingerprint Unit of the Crime Lab?

15 A    I worked in the Latent Print Unit since 1984.

16 Q    So that makes 22 years now, is that correct?

17 A    That makes it 24 years.

18 Q    24 years.  I'm sorry.  Can you give us an idea what your

19 educational background is, Ms. Lansey?

20 A    I have a Bachelor of Science degree in Biology from Towson

21 State University.

22 Q    What training have you had in the area of latent print

23 comparison and identification and examination?

24 A    Firstly, I worked as a Crime Laboratory technician for one

25 year.  I responded to various types of crime scenes, where we

DIRECT EXAMINATION OF LANSEY 57

1    processed those crime scenes for the recovery of various types of

2    evidence, including latent prints.

3           In 1984, I was assigned to the Latent Print Unit,

4    during which time I trained for a minimum of four years under the

5    direct supervision of three certified examiners, all of whom were

6    certified by the International Association For Identification.

7           During that training period, I trained in the analysis

8    of latent prints, at which point you determine whether a latent

9    print is or is not of good quality to be compared to someone's

10   known prints.  That was followed by making comparisons to the

11   known prints of suspect defendants or victims.  And whenever my

12   results resulted in or my comparisons resulted in either

13   identification or non-identifications or were inconclusive, all

14   of my examinations and cases were re-examined by two other

15   certified examiners.

16          I was also trained in the processing of physical

17   evidence recovered from crime scenes, utilizing various types of

18   techniques, in an attempt to develop latent prints on items that

19   were recovered from crime scenes.

20          I was also trained in the operation of our AFIS system,

21   which is the Automated Fingerprint Identification System, that we

22   use in an attempt to make an identification on unknown latent

23   prints recovered from crime scenes or evidence.

24          I've completed the FBI's course in advanced latent

25   prints and also fingerprint classification.

1          I am also certified by the International Association

2     For Identification as a latent examiner.

3     Q    Have you had occasion to train other people in fingerprint

4     identification and examination, Ms. Lansey?

5     A    Yes.

6     Q    Can you give us an idea how you train other people?

7     A    When we train individuals who are training as a latent

8     examiner, they are normally, they all hold a Bachelor of Science

9     degree in one of the sciences, firstly.  They were all crime lab

10    technicians at one point in their career so they are familiar

11    with the processing of some types of items that they are able to

12    do on crime scenes.

13         They are familiar, also, with what is called friction

14    ridge detail, which they develop on crime scenes and bring into

15    the laboratory to be analyzed by us.

16         We also examine every latent that they examine when we

17    are training them, so that they're able to determine what latent

18    quality is that can be compared.  They're trained in the

19    comparison of a latent print to lots of known prints.  They train

20    for a minimum now of two to three years before they're even

21    allowed to take the certification exam.

22         All of their cases are examined by myself or two of the

23    other latent examiners who are certified within the unit.  Every

24    piece of evidence that they process is also re-examined by one of

25    the senior examiners within that Latent Print Unit.

1          We also train them in operation of our Automated

2     Fingerprint Identification System.

3     Q    Can you give us an idea how many fingerprint comparisons

4     you've had an opportunity to make in the course of your 24 year

5     career?

6     A    Tens of thousands.

7     Q    Have you ever, Ms. Lansey, made a misidentification?

8     A    No.

9     Q    Has anyone ever appeared in court to contradict your

10    evidence about a fingerprint identification?

11    A    No.

12    Q    How many times have you been qualified in court as an expert

13    in latent print examination, identification, and comparison?

14    A    I've been qualified on 149 occasions.

15    Q    Can you give us an idea what courts you've been qualified

16    in?

17    A    I've been qualified in the Circuit Courts of Baltimore City,

18    Baltimore County, Harford County, the two District Courts in

19    Baltimore City, the Juvenile Justice Center, and also here in

20    Federal Court.

21    Q    How many times have you been qualified in Federal Court?

22    A    Twelve.

23    Q    What are proficiency tests, Ms. Lansey?

24    A    Proficiency tests are examinations which examiners must

25    complete annually.  We have one that is given annually by an

1    outside organization, which is known as collaborative testing, in

2    which you have to examine latent prints and determine if any of

3    them result in identifications or not.

4            Also, the International Association For Identification

5    gives you a proficiency test every five years.

6    Q    Okay.  Have you ever failed a proficiency test?

7    A    No.

8    Q    Have you ever gotten anything less than a perfect score on a

9    proficiency test?

10   A    No.

11   Q    When you do a comparison, are your results always subject to

12   peer review by others in your lab?

13   A    Yes.

14   Q    Okay.  Is that a sort of verification process, could you

15   call it?

16   A    Yes, it is.

17   Q    Is an identification ever completed without it first having

18   been verified by at least one other latent print examiner?

19   A    No report is ever sent out of our office without that case

20   being completely reviewed by another certified examiner.

21   Q    And do you yourself, do you peer review the work of other

22   latent print examiners in your lab?

23   A    Yes.  Their identifications, I do.

24   Q    Okay.  When you testify as an expert, Ms. Lansey, about

25   fingerprint identification, do you understand and appreciate the

1    consequences of your testimony?

2    A    Absolutely.

3    Q    Can you explain to the ladies and gentlemen of the jury what

4    a latent print is?

5    A    A latent print is the transference of the friction ridge

6    detail that is found on the undersides of your fingers, your

7    palms, and the soles of your feet, onto a surface in either

8    perspiration or oil or some other type of substance when that

9    surface is touched.

10         What I mean by friction ridge detail is, if you were to

11   examine, for instance, the first joint of your finger, or where

12   it may be more readily seen on your palm, and really on the soles

13   of your feet, which of course you can't do here today, you would

14   see a type of skin which the examiner calls your friction ridge

15   skin.  It would appear to you, the lay person, as skin that has

16   various lines in it.  And those lines are flowing in various

17   directions.  They have various shapes to them.

18         Those lines are what the examiner calls your friction

19   ridges.  They are the raised portions of your skin and they are

20   raised much like the waling, for instance, in corduroy material

21   or, for instance, the ruffles in a potato ship, for instance,

22   where you have a raised portion on the surface and a valley in

23   between.

24         Your friction ridges have pores on the surface.  So

25   when you perspire, the perspiration comes out of those pores and

1    coats those ridges.  Should your hands come in contact with some

2    other type of substance, for instance, oil from your face or neck

3    or hair, or if you're eating something and you get some other

4    type of substance, grease or lotions or things like that, when

5    those types of substances also get on the ridge detail, it makes

6    it possible to transfer that friction ridge arrangement on to a

7    surface when it's touched.

8             It normally is not visible to the naked eye.  It

9    normally requires some sort of development in order to make it

10   visible so that it can be recovered and preserved for analysis in

11   a laboratory situation.

12   Q    And is that development often done using fingerprint powder

13   and tape?

14   A    It depends on the circumstances.  But most commonly, that is

15   one of the techniques we use.

16   Q    Can you explain when a known print is?

17   A    A known print, unlike the latent, which is a chance or

18   accidental impression, is deliberately made and it is made by

19   applying black printer's ink to the undersides of the fingers and

20   palms.  And for instance, in the case of infants, on the soles of

21   the feet.  You press or roll those friction areas on to a white

22   contrasting background, much like an 8 by 8 fingerprint card,

23   which creates a permanent recording of that ridge detail that can

24   be used for future analysis.

25             The other way in which known prints can be made are

Case 1:04-cr-00029-RDB   Document 678   Filed 06/08/09   Page 63 of 207

1    where you have what's called a live scan reader, in which the

2    finger is rolled or the palm is pressed on to a glass surface and

3    it is read by the instrument, and then a hard copy is then

4    printed out of that ridge detail.

5    Q    What is it, Ms. Lansey, that makes a latent print a valuable

6    means of identification?

7    A    Friction ridge skin is the most reliable means of personal

8    identification, which is unique and permanent to every

9    individual.

10   Q    When you say "unique", do you mean to say that no two people

11   have the same fingerprints?

12   A    No two people have the same fingerprint and no, your

13   friction ridge detail differs from finger to finger and digit to

14   digit on the same individual.

15   Q    Has there ever been a case of two people having the same

16   fingerprint on any of their fingers?

17   A    No.

18   Q    Okay.  Are you aware of a FBI-commissioned study called the

19   50/50 K Study, which determined the probability of two persons

20   possibly having the same, sharing a fingerprint in common?

21   A    Yes, I am.

22   Q    And what was the result of that study?

23   A    When they did that particular study, they made a

24   determination that when an entire fingerprint is searched against

25   their known database, they determined that the probability of two

1    people having the same prints were 1 in 10 to the 97th power,

2    which is greater than the population of the world.

3    Q    Okay.  You said before that you have never yourself made a

4    misidentification, is that correct?

5    A    That's correct.

6    Q    Has there ever been a misidentification by, as a result of

7    human error, by a fingerprint examiner?

8    A    Yes.

9    Q    Okay.  Has there ever been -- first of all, let me ask

10   another question.  Do you employ a uniform method of fingerprint

11   comparison?

12   A    Yes.

13   Q    What is it called?

14   A    It's called the ACE-V methodology.

15   Q    Can you tell us what it is?

16   A    ACE-V is an acronym for the steps that we take when we are

17   doing the analysis, comparison, evaluation and verification

18   process when we're doing latent print comparison.

19         In the analysis phase what we do is we break the latent

20   print down to its most basic components.  We are looking at the

21   ridge detail in that latent print.  We're looking to see the

22   ridge flow and the direction that those ridges are flowing in.

23   That helps us to orient the print, tells us what's up, what's

24   down, whether or not it could be a finger or a palm.  We're

25   looking for the individual ridge formations.

1          I spoke to you earlier about friction ridges appearing

2     as lines and that they have shapes to them.  Some of those

3     formations are things like you would see a line that would flow

4     and come to an abrupt end.  That would be a type of formation we

5     call a ridge ending.  That's one type of individualized

6     characteristic that we look for.

7          There is also another type which we refer to as a

8     bifurcation, where you have a ridge that would appear to you as

9     one line that flows and splits off into two pieces, much like a

10    Y-shaped formation.

11         There's another type of formation, for instance, that's

12    known as a dot, where the ridge appears just like the name says.

13    It can be circular.

14         There can be combinations of those formations found in

15    the ridge detail.  There can be other types of information within

16    that latent print, like scars, warts, creases, other types of

17    individualizing features that we can use in a comparison.

18         We look for the clarity, how clear those formations

19    are.  We take into consideration the type of surface it's off of,

20    the type of development medium that was used to make it visible.

21         We take into consideration what's known as deposition

22    pressure, when the hand comes in contact with the surface.  We do

23    all of that in the analysis phase when we're looking at the

24    latent before we make a determination whether that latent is good

25    enough to be compared to someone's known prints.

1          Once we determine that the latent is what we call

2     suitable for comparison, we then move to the comparison phase.

3     During that time, we then place the unknown latent alongside the

4     known latent.  We begin with an area that is common in both

5     impressions.

6          We look to see if we first have agreement in the

7     overall ridge flow and ridge configuration.  Once we determine

8     that we have agreement at that point, we then start to look at

9     those items or those formations that are common in both.

10          We look to see that they are of the same type, that

11     they are in the same location, that they are in the same

12     sequential order in both of the impressions.

13          Then we move from that point into what's called the

14     evaluation phase.  And that is when we make a determination based

15     on what we've done in the comparison phase as to whether or not

16     we have an identification or not.

17          If we have an identification, then we move to the

18     verification phase, at which point it's given to another

19     examiner.  And they repeat and do the entire analysis all over

20     again.

21     Q    So you identify four phases, is that correct?  Analysis,

22     comparison, evaluation and verification?

23     A    That's correct.

24     Q    Okay.  Is this method, this ACE-V method, generally

25     recognized in the forensic community as reliable?

1   A    Yes.

2   Q    Is it the method employed by the FBI?

3   A    Yes, it is.

4   Q    Have the federal courts uniformly recognized this test as

5   reliable?

6   A    Yes.

7   Q    Is there any other method, competing method, that is used by

8   any crime labs around the world?

9   A    None that I know of.

10  Q    Okay.  Now, I asked you a moment ago if there had ever been

11  a misidentification as a result of human error and you answered

12  that there had been.  Has there ever been a misidentification

13  attributable to this method or methodology as opposed to human

14  error?

15  A    No.

16  Q    I'd like to call your attention now to a series of latent

17  prints that were created in Run 2023 and which were submitted to

18  you for examination.  And I'll show you what's been marked

19  Government's Exhibit MB-30.  Did you bring this over to court

20  today, Ms. Lansey?

21  A    Yes, I did.

22  Q    And does this have your name repeatedly on the back of it?

23  A    Yes, it does.

24  Q    Okay.  Were these a series of latent prints that were

25  recovered by crime scene technicians, including Teniera Brown,

1    formerly known as Teniera Williams, in 2002 from an Infiniti

2    Q-45?

3    A    Yes.

4    Q    How many latent print cards were recovered in this exhibit?

5    A    There were seven.

6    Q    Did you, first of all, examine these cards to determine if

7    any of these latent prints were suitable for evaluation and

8    comparison by you?

9    A    Yes.

10   Q    Were any of the seven lifts suitable for evaluation and

11   comparison?

12   A    Yes, they were.

13   Q    How many?

14   A    One.

15   Q    So six of them were of insufficient quality to permit you to

16   make an evaluation and comparison, is that correct?

17   A    That's correct.

18   Q    Okay.  Let me call your attention now to Lift Number Three.

19   Is this the one that was suitable for comparison and evaluation?

20   A    Yes.

21   Q    And did you write on both sides of this various things, Ms.

22   Lansey?

23   A    Yes, I did.

24   Q    Are those your initials at the bottom on the, on the printed

25   side of the card?

1    A    Yes.

2    Q    Let me ask you, is it unusual to get only one latent print

3    off of so many surfaces, an entire car and all of the contents of

4    the car?  Is it unusual to get only one single suitable latent

5    print?

6    A    No.

7    Q    What factors affect whether a person leaves a latent print

8    on a surface that's suitable for comparison?

9    A    There are a myriad of factors that can affect whether or not

10   you'll leave a latent print on a surface or not and whether or

11   not that latent print that's left is going to have sufficient

12   quality to be compared to someone's known prints or to lead to an

13   identification.

14   Q    Can you tell us what the factors are?

15   A    Those factors fall basically into three categories.  The

16   first being that of the individual that's leaving the print or

17   touching that surface.  The second is the surface types.  And the

18   third would be the environmental or external factors that can

19   affect both the individual, the latent, and the surface after

20   it's been handled.

21        Beginning with the individual factors.  Everyone does

22   not perspire at the same rate under the same circumstances.

23   Depending on, for example, what a person may have ingested in the

24   form of food or drink or medications, those types of things can

25   affect the rate at which you may perspire or not.

1          You also want to consider the conditions of an

2    individual's hands.  All of our hands are not the same, and our

3    friction ridge, friction ridge skin is not the same, obviously,

4    dependent upon what you subject your hands to on a regular basis.

5          If you're someone who doesn't maintain your hands

6    properly, take care of them, that can affect the quality of your

7    ridge detail, how it will appear.  Dependent on, for instance,

8    the type of occupation you may have.  For instance, if you're in

9    an occupation where your hands are constantly subjected to harsh

10   conditions, that can also affect what a ridge, how the ridge

11   detail will appear on the undersides of your fingers and your

12   palms.

13         For instance, if your hands are in constant contact

14   with harsh chemicals, if your hands are constantly subjected to

15   chronic washing, which helps to dry the hands out, and you do

16   nothing to help maintain that ridge detail, just in regular care,

17   that can affect, one, how dry your hands can possibly be, and

18   what the ridge detail could eventually end up looking like.

19         You also have to consider if an individual's hands have

20   come in contact with an absorbent type material prior to touching

21   a surface.  For instance, wiping your hands on your clothing

22   prior to touching something, having your hands in your pockets.

23   These types of situations help to remove any of the residue that

24   could be left on your hands prior to touching a particular item.

25         If your hands are dry, that's one thing.  If you have,

1    you can also have too much perspiration or residue on your hands

2    prior to touching a surface.

3            And you can have a situation, for instance, where

4    instead of that residue staying on the surface of the ridge

5    detail, you could have so much perspiration or oil or some other

6    substance on the hand, for instance, if you've ever shaken hands

7    with someone whose hands are sopping wet, in a situation like

8    that, when that type of condition in the hand comes in contact

9    with the surface, it can make it difficult to leave the actual

10   detail that an examiner needs to examine.  And you could actually

11   end up with something that would appear much like that of a kid's

12   finger painting for instance, where you can make out fingers, you

13   can make out a palm, but you can't make out the actual minute

14   detail that the examiner needs.

15           You also have to consider how the hand comes in contact

16   with the surface, how much pressure is applied when a surface is

17   touched.  If it's a lot, if the hand comes in contact with the

18   surface in a sliding motion, your friction ridge detail is very

19   thin and very close together.  And sometimes with too much

20   pressure, too much movement, that can help to destroy a latent or

21   it can also affect the appearance of that detail when an examiner

22   looks at it.

23           You also have to consider if the individual may have

24   had some type of barrier on their hands, a barrier being

25   something like a pair of gloves which can help to block the ridge

1    detail from being left on the surface when it's touched.

2            Secondly, you want to consider surface types.  You have

3    what are called porous surfaces and your nonporous surfaces.

4    Porous surfaces would be surfaces like woods that don't have a

5    high sheen to them or varnish, surfaces that are painted with

6    flat-based paints, fabrics, those types of surfaces.  Paper that

7    doesn't have a high gloss to them.  Those types of surfaces are

8    absorbent.  It allows the residue to seep down into the surface

9    and it leaves nothing on the surface for the powder that a Crime

10   Lab technician uses at the crime scene to adhere to when they're

11   trying to develop a latent.

12           The porous surface differs from the nonporous surface

13   in that nonporous surfaces would be things like glass, metals,

14   plastics, vinyls, woods that have a high gloss to them, and even

15   very glossy type paper.

16           In a situation like that, when the hand comes in

17   contact with that type of surface, it makes it possible for the

18   residue to stay on top of that surface, leaving for something,

19   leaving something for the powder to develop when a latent is

20   left.  However, that latent then becomes vulnerable to other type

21   of factors, like someone else coming along and handling that

22   surface, which can help to possibly destroy that latent print.

23   That latent now becomes exposed to things like dust and dirt and

24   the elements, which can help to either cover that latent or

25   destroy it altogether.

Case 1:04-cr-00029-RDB   Document 678   Filed 06/08/09   Page 73 of 207

1          The latent then becomes vulnerable to things like heat

2     and air currents, which can help to dry out any residue that is

3     left in that particular latent.

4          You also have to consider, is that surface clean versus

5     one that's dirty?  A dirty surface creates what we call

6     background noise, so that you're not necessarily going to be able

7     to distinguish the ridge detail of the latent from the actual

8     background that it's on.  Background noise can be created by

9     things like dirt.  Background noise can also be created by things

10    like the texture of the surface.

11         There are a lot of surfaces that are deliberately made

12    so that latent prints will become more difficult to be able to be

13    left.  You see sometimes in commercials where they advertise

14    things like kid-proof refrigerator fronts.  There are lots of

15    textures and things like vehicles, on all types of surfaces, that

16    might not necessarily be visible to the eye but they actually

17    have a grain to them which makes it more difficult to actually

18    receive the latent print when it's touched.

19         You also want to consider the third category, which are

20    your external or environmental factors, which are things like too

21    much heat in a particular area, which can do several things.  As

22    I stated earlier, it can dry the residue out of a latent.  It can

23    cause an individual to perspire profusely so that they will,

24    their hands will have too much residue on them.  You can have an

25    environment that is too cool, in which you won't perspire

1    sufficiently in order to coat your ridges and be able to leave a

2    print.

3            You can be in an environment which is dirty, which

4    makes it difficult to leave a latent on a surface.  You can be in

5    an environment in which you have constant air currents, which is

6    helping to dry out residue.

7            So you don't always leave latent prints on everything

8    you touch and everywhere you go.  It is not like you see a lot of

9    times on CSI and a lot of other shows and movies like that.

10   Q    Okay.  Thank you.  I guess the three factors, then, are ones

11   associated with the person leaving the latent and then the

12   surface, the nature of the surface, and then the environmental

13   factors like air currents and heat and weather conditions and

14   things like that?  Is that an accurate summary?

15   A    Yes.

16   Q    You mentioned metal as an example of a nonporous surface.

17   Can you give us an idea, do you, do you frequently recover

18   fingerprints off of firearms, for example?

19   A    No, not in our office, we haven't.

20   Q    Can you give us an idea how many firearms examined in 2002

21   actually resulted in the recovery of latent fingerprints?

22   A    We examined, in 2002, 18,334 firearms-related items and we

23   were only able to develop approximately 200 suitable prints on

24   all of those items in which attempts were made to develop latent

25   prints.

1    Q    So what percent is that?

2    A    It's about 1%.

3    Q    Well, why is it that on a non-porous surface like firearms

4    and firearms-related items -- would that include things like

5    clips and bullets and things like that?

6    A    It includes those items and others.

7    Q    Why on a metal, on metal surfaces like that do you recover

8    latent prints so infrequently?

9    A    For all of those reasons that I just mentioned.  Because

10   they also apply to things like firearms-related materials.  And

11   when you're talking about firearms-related materials, which

12   includes things like ammunition, various types of firearms that

13   we get within the unit, they all have different types of

14   surfaces.  And metal just happens to be one of them, it being a

15   nonporous surface.  Depending on what you subject that item to is

16   going to affect whether or not you're going to be able to leave

17   anything on it.

18          You have to consider with a weapon, for instance, how

19   it's handled, for one, how it's stored, how it's maintained, as

20   far as before, after usage.  If it's been, come in contact with

21   some abrasive materials.  If it's been discarded, for example.

22   If it's been fired, which involves heat.  If it's, if the hand is

23   gloved in its usage.

24          There are a lot of things like that and factors, as I

25   mentioned, that you have to consider even though it is a metal

1    surface.

2    Q    Is glass a good surface for recovering latent prints?

3    A    Glass can be an excellent surface.

4    Q    Let me ask you this, Ms. Lansey.  Can you determine ever how

5    long a print has been on a particular surface, how long a latent

6    print has been on a particular surface?

7    A    No.

8    Q    Let me ask you this.  You mentioned heat as something that

9    could destroy a fingerprint because it makes the moisture

10   evaporate, is that correct?

11   A    Yes.  If the latent is made purely of moisture, which would

12   be mainly water, then it will, it increases the chance that it

13   will evaporate, depending on the temperature.

14   Q    If the heat were on in the car, then, for example, would

15   that tend to destroy latent prints that might be on the interior

16   or exterior of the car?

17   A    If the heat -- yeah, that's very possible, depending on how

18   long it's on and how much residue there is.

19   Q    And is the outside of the driver's side rear window on a car

20   the sort of area that might be exposed to air currents and rain

21   and other weather conditions that might damage or destroy latent

22   fingerprints?

23   A    Yes.

24   Q    Did there come a time when you were asked to make a

25   comparison between the latent print --

1          THE COURT:  I'm sorry, Mr. Harding.  Do any of counsel

2     have any questions on qualifications?

3          MR. COBURN:  No thank you, Your Honor.

4          THE COURT:  All right.  You may proceed.

5     BY MR. HARDING:

6     Q    I'm sorry.  Did I forget to qualify this witness, Your

7     Honor?

8          THE COURT:  You qualified her.  You just didn't tender

9     the witness.

10         MR. HARDING:  I will tender the witness as an expert.

11         THE COURT:  All right.  The witness will be accepted as

12    an expert in fingerprint identification.

13    BY MR. HARDING:

14    Q    Thank you, Your Honor.  Did there come a time when you were

15    asked to make a comparison between the latent print in lift

16    number three and the known fingerprints of a person named Shelton

17    Harris?

18    A    Yes.

19    Q    Okay.  Can you tell us when that was, when you were asked to

20    make that comparison?

21    A    I need to refer to my notes.  We received a request in our

22    office on October the 6th, 2003.

23    Q    Okay.  Now I want to show you what's been marked as MB-31.

24    I'll ask you if you recognize this exhibit.  Do you recognize it?

25    A    Yes, I do.

1   Q    What is it?

2   A    It is the ten print card in the name of Shelton Harris.

3   Q    Okay.  And does it contain on the flip side palm prints?

4   A    Yes, it does.

5   Q    Were you able to make an identification of Lift Number Three

6   in MB-30 with the known prints of Shelton Harris in MB-31?

7   A    Yes.

8   Q    Is MB-31, Lift Number Three, a fingerprint or palm print of

9   Shelton Harris?

10  A    Yes.

11  Q    Now, when were you able to make that identification?

12  A    I need to see the back of the lift card.  October the 8th,

13  2003.

14  Q    Okay.  And you said before that no identification is

15  complete unless it's been verified by another examiner.  Was this

16  also verified by another examiner?

17  A    Yes, it was.

18  Q    Who was that?

19  A    My supervisor, Sharon Talmadge.

20  Q    So did she go through the same sort of analysis and

21  evaluation and comparison that you described earlier that you

22  went through?

23  A    Yes.

24  Q    And did you write this writing at the bottom?

25  A    Yes, I did.

1    Q    Can you tell us what it says and what it means?

2    A    It says L period palm, which stands for left palm, Shelton

3    Harris, ID number 1792036.  The date beneath it is 10/8/2003, my

4    initials LL, my supervisor's, ST.

5    Q    Is there any difference in reliability between a palm print

6    comparison and a fingerprint comparison?

7    A    No.

8    Q    And can you tell us which of these palm prints on the known

9    prints in MB-31 is the left palm?

10    A    It is the palm that is to the right of the midline on the

11    card.  The blue line on the card, it is to the right of that.

12    Q    Okay.  Now, have you or other examiners previously attempted

13    to make comparisons between this one suitable print that you

14    recovered from the Q-45 and any other person's?

15    A    Yes.

16    Q    And did they include each of the other three defendants in

17    this case?

18    A    If you could name them for me.

19    Q    Shelly Wayne Martin, Willie Mitchell also known as Calvin

20    Wilson, and Shawn Gardner.

21    A    Yes.

22    Q    And so, I guess, obviously, since you only had one suitable

23    print and you identified that as Shelton Harris, you were able to

24    make no matches with any of these defendants, is that correct?

25    A    That's correct.

1    Q    And is it accurate to say, too, that you attempted to

2    compare this with the prints of the victims in this case, Lisa

3    Brown and Oliver McCaffity?

4    A    That's correct.

5    Q    And so is it fair to say that all of the fingerprint lift

6    work that was done on this car didn't even produce a fingerprint

7    of Oliver McCaffity, the guy who was driving the car, is that

8    correct?

9    A    Not a suitable one.

10   Q    One moment, Your Honor.

11            (Pause in proceedings.)

12            MR. HARDING:  No further questions, Your Honor.

13            THE COURT:  Would you like some water, Ms. Lansey?

14            THE WITNESS:  Please.

15            CROSS EXAMINATION

16   BY MR. FLANNERY:

17   Q    Good morning, Ms. Lansey.

18   A    Good morning.

19   Q    My name's Paul Flannery.  I represent the defendant, Shelton

20   Harris.  Ms. Lansey, you testified that materials such as glass,

21   plastic, metals, of that nature, those are better surfaces, if

22   you will, for leaving latent fingerprints.

23   A    They're very good surfaces, yes.

24   Q    Latent fingerprints or fingerprints in general tend to be

25   left behind on those surfaces?

1   A    They can be, depending upon the circumstances.

2   Q    And you already testified that you cannot date when a

3   particular print is placed on a particular surface?

4   A    That's correct.

5   Q    You have no idea when a particular print is placed on a

6   surface?

7   A    No, I do not.

8   Q    Ms. Lansey, would you describe, please, what exactly we're

9   looking at here at this print?  Could you describe, please, the

10  orientation to the hand itself?

11  A    It's a very, well, the earlier presentation of it was a

12  better view.  But the area of the palm that you're actually

13  looking at is what we refer to as the hypothenar area, which is

14  the area under the left little finger and down in this area close

15  to the side going into the edge of the left palm.

16  Q    Fair to say, Ms. Lansey, then, that it's essentially the

17  lower left part of the left hand, partly outside, partly inside,

18  if I understand you correct?

19  A    It's in this area.  It's in the lower portion of the left

20  palm, in this area.

21  Q    Ms. Lansey, that palm print, if you remember, was found on

22  the exterior glass of the rear driver's side door.

23  A    That's correct.

24  Q    It's the lower half of the left palm?

25  A    That's correct.

1    Q    This print would be consistent, for example, with someone

2    cupping their hands in a fashion like this, maybe slightly to the

3    outside, and pressing their hands up against the rear exterior

4    glass?  It would be consistent with that?

5    A    It could be.

6    Q    It could be.  Ms. Lansey, there are no arrows on this print

7    card orienting you to where this print was on the glass?

8    A    That's correct.

9    Q    There are no arrows on this print card orienting you to the

10   position that this print was on the glass?

11   A    Could you just flip it over for a minute, please?  Could you

12   slide it down so I can see it in it's entirety?

13   Q    Yes.

14   A    There are none, no.

15   Q    You don't know where this was taken on the exterior rear

16   driver's side door?

17   A    No, I do not.

18   Q    And you don't know in what position it was on the door?

19   A    I do not.

20   Q    For instance, this could even be consistent, for example, if

21   I was to lean back on a door, it's consistent that that print

22   possibly could have been placed in that manner, again, with the

23   lower left hand, with the left palm?

24        MR. HARDING:  Objection.  Defense counsel is making

25   gestures that are not going to be part of the record, Your Honor.

1          THE COURT:  Yeah.  Perhaps you can --

2    Q    I can clarify.

3          THE COURT:  -- clarify, Mr. Flannery.

4    Q    Ms. Lansey, if I were to, for instance, be standing in front

5    of the rear driver's side door of this car, if I were to have my

6    hands up, so to speak, beyond my waist, and I were to lean back

7    against the glass, this palm print would be consistent with

8    placing that impression upon the glass?  It could be consistent,

9    correct?

10   A    It could be.

11   Q    Ms. Lansey, there were no photographs of the prints

12   submitted to you, correct?

13   A    That's correct.

14   Q    You have no photographs of which prints were taken from

15   which surfaces?

16   A    I have the actual latent lift cards that were taken from the

17   surfaces.

18   Q    But you have no photographs that indicate where on, where

19   the prints were on those surfaces before they were lifted?

20   A    That's correct.

21   Q    Ms. Lansey, were you asked to make another comparison in

22   this case later than October of 2003?

23   A    I need to review my reports.  Yes, I was.

24   Q    Do you recognize this report, Ms. Lansey?

25   A    No, I do not.

1    Q    Were you asked to make a comparison of a console, of a

2    Chapstick, of a book, of a vaseline lotion container in this

3    case?

4    A    I am not familiar with this document at all.

5    Q    Do you remember being asked, do you recall being asked to

6    compare any of the known prints to a console that was taken from

7    the car?

8    A    No.

9    Q    Thank you.  No further questions.

10                   REDIRECT EXAMINATION

11   BY MR. HARDING:

12   Q    Just to reiterate, Ms. Lansey.  There was only one latent

13   print that was suitable for comparison recovered from the car or

14   its contents, to the best of your knowledge, is that correct?

15   A    That's correct.

16   Q    Thank you.  I have no further questions.

17                   THE COURT:  Thank you, Ms. Lansey.  You're excused.

18                   THE WITNESS:  Thank you, Your Honor.

19                   MR. HARDING:  Next witness?

20                   THE COURT:  Who is?

21                   MR. HARDING:  Detective John Giganti, Your Honor.

22                   THE COURT:  All right.  Members of the jury, you recall

23   that we're going to have a shortened day today.  I'm not certain

24   how long this witness will be.  But in the next 15 to 20 minutes

25   or so or thereabouts we'll take an extended recess and I'll

1    permit you to leave the jury room during that recess.  But it

2    won't be a luncheon recess.  It will be about 25 or 30 minutes.

3            And then we'll resume for about another hour, hour and

4    a half, and you'll be excused early today.

5            DETECTIVE JOHN GIGANTI, GOVERNMENT'S WITNESS, SWORN

6            THE WITNESS:  Yes, I do.

7            THE CLERK:  Be seated.  Speak directly toward the mike.

8    State your name and spell it for the record.

9            THE WITNESS:  My name is John Giganti.  G-I-G-A-N-T-I.

10           DIRECT EXAMINATION

11   BY MR. HARDING:

12   Q    Good morning, Mr. Giganti.  Can you tell us how you're

13   employed, sir?

14   A    I'm a detective with the Baltimore City Police Department.

15   Q    What's your assignment now, Detective Giganti?

16   A    Currently, I'm assigned to the Regional Warrant Apprehension

17   Task Force.

18   Q    And can you explain what that is?

19   A    I chase fugitives.

20   Q    Okay.  How long have you been employed by the Baltimore City

21   Police Department?

22   A    Fourteen years.

23   Q    How long have you been in the Regional Warrant Apprehension

24   Task Force?

25   A    I've been back on this task force for two and a half years.

1    Q    Okay.  Can you tell us what your assignment was back in

2    2002?

3    A    2002, I was assigned to the Homicide Operations Unit of the

4    Baltimore City Police Department.

5    Q    And what does "Homicide Operations" mean?

6    A    At the time, I was responsible for investigating violence on

7    the west side of Baltimore City.  There was an increase in

8    violence at the time.

9    Q    Okay.  But what specifically does Homicide Operations do as

10   opposed to, say, Homicide?

11   A    We investigate people of a violent nature to try to get them

12   off the street legally, either through drug investigations,

13   handguns.

14   Q    Do you assist homicide detectives in their investigations?

15   A    Yes, sir.

16   Q    Okay.  Did you get involved in an investigation of a man by

17   the name of Oliver McCaffity?

18   A    Yes, I did.

19   Q    Was that a homicide investigation or not?

20   A    No, it was not.  It was a drug investigation.

21   Q    Okay.  But you were doing it even though you were in

22   Homicide Operations because why?

23   A    Because with drugs there's violence.  And we were looking

24   into the violence, like I said, at the time on the west side.

25   Q    Okay.  Did you consider Mr. McCaffity to be a good target

1    because he was violent?

2    A     No.  I thought he was a good target because of his

3    involvement with the drug trade.

4    Q     Why were you doing a narcotics investigation of Mr.

5    McCaffity?

6    A     We were on, I forget what street on the west side of town,

7    and we observed a silver vehicle traveling a high rate of speed.

8    We conducted a car stop and found Oliver McCaffity to be driving.

9    I conducted a background investigation on Mr. McCaffity and found

10   that he was involved in the drug business and initiated an

11   investigation at the time.

12   Q     Was it part of your investigation that you attached a

13   court-ordered GPS monitoring device to Mr. McCaffity's car?

14   A     Yes, I did.

15   Q     Who was the registered owner of the car that Mr. McCaffity

16   was driving?

17   A     Hasim Rahman.

18   Q     And who was he?

19   A     He's a professional boxer, native of Baltimore.

20   Q     What kind of car was it and what was the license plate

21   number?

22   A     It was a silver Infiniti Q-45.  And the tag was 045-BEK.

23   Q     Okay.  Did you have occasion during that time period when

24   you were investigating Mr. McCaffity to try to follow him around

25   Baltimore?

Case 1:04-cr-00029-RDB    Document 678    Filed 06/08/09    Page 88 of 207

1    A    I tried several times to follow him Mr. McCaffity but was

2    unsuccessful due to the high rate of speed that he drove.

3    Q    Okay.  So you tried to follow him but it proved too

4    difficult on several occasions, is that correct?

5    A    Yes, sir.

6    Q    Who were Mr. McCaffity's association?

7    A    Desmond Dickey, Howard Rice, Horatio Rice, Tyree Stewart.  I

8    can't remember the rest.

9    Q    Are those other people involved in drug trafficking in West

10   Baltimore?

11   A    Yes, sir.

12   Q    Let me call your attention to the morning of February 28th,

13   2002.  Did you become aware of a homicide?

14   A    Yes, I did.

15   Q    And was Oliver McCaffity one of the victims in that?

16   A    Yes, he was.

17   Q    Did you assist the homicide detectives in that investigation

18   and the investigation of the homicide of Lisa Brown?

19   A    Yes, I did.

20   Q    Who was the homicide detective or detectives that you were

21   assisting?

22   A    Ron Berger and Bob Cherry.

23   Q    Okay.  Which one was the primary, do you remember?

24   A    No, I don't.

25   Q    Okay.  I have a couple of exhibits I would like to show you.

1    And these are already in evidence.  I'm just going to put them on

2    the screen.

3            First of all, Government Exhibit MB-33.  Can you tell

4    us what this is, Detective Giganti?

5    A    This is a listing of Oliver McCaffity's address book from

6    his cellular telephone.

7    Q    Okay.  And by the way, I have here MB-38 and MB-39.  Do you

8    recognize these as the telephones recovered from Oliver

9    McCaffity's Q-45 after his murder?

10   A    Yes.

11   Q    Okay.  Did you have occasion to get involved in a telephone

12   toll analysis after you came to work the day after this murder?

13   A    Yes, sir.

14   Q    Okay.  So what exactly is MB-33?

15   A    Can you flip that one more time, please?  This is, again,

16   this is the listing of all the phone numbers in Oliver

17   McCaffity's address book on a cellular telephone.

18   Q    One of the telephones, I assume, is that correct?

19   A    Yes.

20   Q    Is it this telephone number up here?

21   A    Yes, sir.  In the upper left-hand corner.

22   Q    Okay.  Let me call your attention to Government Exhibit

23   MB-34.  Do you know what these are, Detective Giganti?

24   A    Yes, sir.

25   Q    What are they?

Case 1:04-cr-00029-RDB    Document 678    Filed 06/08/09    Page 90 of 207

1    A    That's the photograph of McCaffity's telephone.

2    Q    Okay.  Were a series of photographs made by you and other

3    detectives right after the murder, showing the most recently

4    dialed and received calls on Oliver McCaffity's phone?

5    Specifically, the Panasonic phone.

6    A    Correct.

7    Q    Okay.  And did you notice, when you were at work that day

8    after the murder, that the last call dialed by Mr. McCaffity at

9    11:21 p.m. on February 27th was to someone whose name is given on

10   the screen as Bo?  Do you see that?

11   A    Yes, sir.

12   Q    And it gave a number for him on the screen, is that correct?

13   A    Yes, sir.

14   Q    And did you notice, also, that there was a received call

15   from Bo earlier in the evening, at 9:41 p.m.?

16   A    Yes, sir.

17   Q    Can you tell us, Detective, if there's only one call listed

18   as received by Bo and only one call listed as being placed to Bo,

19   does that mean that those were the only calls between Bo and Mr.

20   McCaffity that night?

21   A    No, sir.

22   Q    Why is that?

23   A    Because the telephone only registered or showed you the most

24   recent transaction.  So if you made a phone call early in the

25   evening, say around, for example, 6 p.m., and a different call

1    came in at 8:15 p.m., the 8:15 p.m. would show rather than the 6

2    p.m. call.

3    Q    In other words, the 6 p.m. call would get pushed off the

4    list, is that right?

5    A    It would get, on the telephone but not on the toll records.

6    Q    So you could always examine the toll records to determine

7    what other calls existed between the two men that night, is that

8    correct?

9    A    Yes, sir.

10   Q    Okay.  And let me show you, also, Government Exhibit MB-35.

11   Do you know what this is?

12   A    Yes, sir.

13   Q    What is it?

14   A    This is the handwritten notes or directory of Oliver

15   McCaffity's telephone, received calls, outgoing calls and dialed

16   calls.

17   Q    Okay.  So would this be a repeat of what you have

18   photographs for in MB-34?

19   A    Yes, sir.

20   Q    Is there also a category of incoming missed calls that are

21   recorded here?

22   A    Yes, sir.

23   Q    So in addition to incoming calls, there's incoming calls

24   that were never answered, is that correct?

25   A    They're missed calls, yes.

1   Q    Okay.  Now then, you then went through the directory on this

2   Panasonic telephone and you wrote down the names that appeared in

3   the contact directory, is that correct?

4   A    Yes, I did.

5   Q    So, for example, Number Nine is that number attributed to Bo

6   on the screen, is that correct?

7   A    Yes, sir.

8   Q    Let me call your attention to two other entries on here.

9   Number 31.  Can you read that?

10  A    Number 31 says Bo Lil Nig, 410-669-6731.

11  Q    What's this pink stripe in here, anyway, Detective?

12  A    I don't remember why I had that on there when I did it.

13  Q    Did you make that yourself?

14  A    Yes, I did.

15  Q    Was that an attempt to highlight something or what?

16  A    I don't remember.

17  Q    Okay.  And Number Eight, is that also an entry for the same

18  person?

19  A    It's the same name, different phone number.

20  Q    Okay.  Were you able to, were you able to pull subscriber

21  information on this 669-6731 number?

22  A    Yes, I did.

23  Q    Okay.  And I'm going to show you now what's been marked as

24  Government Exhibit T-5.  Is this a subscriber report that you got

25  back on your subpoena for that phone number?

1    A    Yes.

2    Q    Okay.  Let me turn to where the actual subscriber is listed

3    on here.  This is T-5.  Who is listed as the subscriber of that

4    phone?

5    A    Arlene Williams.

6    Q    And what is the address?  Is this a land line phone or a

7    cell phone?

8    A    This is cellular telephone.

9    Q    What is the address given for Arlene Williams?

10   A    205 Amity Street, Baltimore, Maryland.

11   Q    May I have just one moment with the detective?

12        THE COURT:  Certainly.

13        (Pause in proceedings.)

14   Q    What is the phone company listed as the service provider for

15   this phone?

16   A    This says Verizon.

17   Q    Is that a land line provider or a cell phone provider?

18   A    They're actually both.  But this one looks like more of a

19   land line provider.

20   Q    Okay.  Do you now think this is a land line phone rather

21   than a cell phone?

22   A    Yes, sir.

23   Q    Okay.  Have you, did you, in the course of your

24   determination, who resided, learn who resided at 205 Amity

25   Street, Apartment Number Nine in Baltimore?

1    A    Yes, I did.

2    Q    Who was that?

3    A    Shelton Harris.

4    Q    Okay.  And who is Arlene Williams?  Is she related to

5    Shelton Harris?

6    A    That is his mother.

7    Q    Okay.  Who was the subscriber to the phone listed in Mr.

8    McCaffity's telephone directory as Bo's phone, the 5811 number?

9    A    That was Maryland Land Design.

10   Q    What is that?

11   A    It's a civil engineering company.  I forget the city and

12   state they are located.  But it was Maryland Land Design.

13   Q    Did you -- Your Honor, would this be a good time to take the

14   break?

15        THE COURT:  Perhaps it would.  Is this a good breaking

16   point?

17        MR. HARDING:  Yes.

18        THE COURT:  All right.  Members of the jury, we will

19   take a 30 minute recess at this time.  You are free to leave the

20   jury room, but please be back in the jury deliberation room,

21   ready to resume, in 30 minutes.

22        Have no discussion about the case.  Continue to keep an

23   open mind about all issues.  Please leave your note pads on your

24   chairs.

25        I'm going to ask Juror Number 11 if she would just

1    remain in the courtroom briefly.  The rest of you are now

2    excused.  You may step down, Detective Giganti.

3             THE WITNESS:  Thank you, Your Honor.

4             (All jurors except Number 11 leave the courtroom.)

5             THE COURT:  Ma'am, why don't you have a seat right

6    there on the front row?  You're excused, Detective.

7             (Witness leaves the courtroom.)

8             THE COURT:  Good afternoon.  I think we may need to

9    give her a microphone, Belinda.  Thank you.  You are Juror Number

10   11?

11            A JUROR:  Yes, sir.

12            THE COURT:  Good afternoon.

13            A JUROR:  Good afternoon.

14            THE COURT:  We got word from you late last week, and

15   you had told us, of course, right at the beginning of the voir

16   dire, I guess it was two weeks ago today, on Monday, that you

17   anticipated relocating out of this country to Guam.

18            A JUROR:  Yes, sir.

19            THE COURT:  And apparently you've learned that your

20   plans have crystallized and, indeed, that is your present

21   intention.

22            A JUROR:  Yes, sir.

23            THE COURT:  Well, first, let me say congratulations.

24   I'm sure it's a great opportunity, or I hope it's a great

25   opportunity --

1              A JUROR:  It is.

2              THE COURT:  -- that prompts this move.  Obviously, the

3     question that we have for you to consider, because we'd very much

4     like you to complete your service as a juror in this case, our

5     question would be, is there any mechanism, means, by which you

6     are able to adjust your plans so that you are able to delay your

7     departure until after the case is concluded?

8              Now, I am fully aware of the financial implications of

9     that.  I believe your message indicated that you'd already

10    arranged to ship your car, for example, I believe next week.  And

11    so one of the issues that you would confront if you went ahead

12    and shipped your car next week would be how do you get back and

13    forth to the courthouse, even if you were otherwise able to delay

14    your own departure for Guam.

15             So you may want to say something now.  You may want to

16    think about it overnight and address this question on Wednesday.

17    Or maybe you've already thought about it and you already know the

18    answer.  But I leave it to you to decide whether you want to

19    think about it.

20             I believe, although I haven't checked specifically yet,

21    I am confident, reasonably confident, that the court would be in

22    a position to cover any additional expense to you in some

23    appropriate way, either by delaying shipping your car or delaying

24    your flight, if you have to pay some penalty or something, in

25    order to get a later flight.  I'm confident that the court would

1    be in a position to cover any financial repercussions to you from

2    your having to delay this.

3             But obviously, the Court would never ask you to do

4    anything that would ultimately cost any money.

5             I realize it's not just a question of money.  There are

6    other considerations, I'm aware there may well be.  And I believe

7    you actually told us this may have had something to do with your

8    parents.

9             A JUROR:  Yes, sir.

10            THE COURT:  Go ahead if you want to tell us.

11            A JUROR:  My parents, they run, they have a restaurant.

12   It's just both of them.  My parents are getting quite ill.

13   They're unable to continue working there.  So they're asking me

14   to come back to continue the business.

15            So it's quite certain that I should leave as soon as

16   possible but based on, because I do have an apartment with my

17   fiancee.

18            THE COURT:  I see.

19            A JUROR:  Our lease is ending on the 28th.  So

20   conveniently, we can leave on that day so we don't have to get

21   another lease where we have to pay another additional days or so.

22   So it works out for us to leave on that day.  And for shipping

23   wise, for the car, because -- I have to ship my car first,

24   apparently, because it's an SUV.  They only have one dock

25   available on October 8th.  My fiancee's car, he needs it because

Case 1:04-cr-00029-RDB   Document 678   Filed 06/08/09   Page 98 of 207

1    he works in DC.  And unfortunately, I do not stay close to any of

2    the, like the Amtrak or any bus stops.

3          So during the time when I'll have no car, I'll be home

4    taking care of, I'm in the apartment taking care of all the

5    boxing, packing up and getting all that straight in there.  So

6    financially right now I am unemployed.  So I'm having a financial

7    difficulty and stress getting everything ready and shipping stuff

8    out.  So my fiancee and I are kind of like on a tight string.  So

9    we're kind of working things out until we leave on the 28th of

10   October, so I can start my employment on the business as well.

11         THE COURT:  If the case were to go just a little bit

12   past the 28th of October, say into the first and perhaps the

13   second week of November, as opposed to past Thanksgiving, which

14   is what I told the jury before, is there any possibility, again,

15   with financial remuneration from the government, if it should

16   work out that way, is there any possibility that you could extend

17   it for as much as two weeks?

18         In other words, if the government were able to, let's

19   say just hypothetically, speak to your landlord and have you

20   extend your lease without a whole new year lease or something,

21   for another two weeks or so, and if the government were to make

22   arrangements for you to be able to rent a car -- again, I'm just

23   speaking hypothetically -- so that you could get back and forth

24   to the courthouse, is that something within the realm of

25   possibility?

1          A JUROR:  As of right now, it's not.

2          THE COURT:  You just can't see that that could happen.

3          A JUROR:  Yeah.  I'm thinking about my parents, that's

4     why.

5          THE COURT:  I see.  Okay.  As I said, I fully realized

6     that financial considerations, though important, are not really

7     what this is about for you.

8          A JUROR:  Right.

9          THE COURT:  It's your parents.

10         A JUROR:  Right.

11         THE COURT:  So you're going to be providing some,

12    beyond running their restaurants, actually looking after them?

13         A JUROR:  Yeah.

14         THE COURT:  And taking care of them physically.  All

15    right.  Thank you very much for answering our questions.

16         You are excused until 30 minutes.

17         A JUROR:  Okay.  Thank you.

18         THE COURT:  Thank you very much, Juror Number 11.

19         (Juror exits the courtroom.)

20         THE COURT:  Well, I don't know if counsel have any

21    different view of the matter, but it seems to me that this is a

22    situation that, even if my hypothetical had any plausibility, it

23    seems pretty clear we're going to lose this juror.  Even if

24    somehow, I think, as you just saw, even if the juror were to

25    stick around, chances are pretty good with her packing and

1    thinking about her parents, it is likely that her mind and

2    attention will be focused elsewhere.  And it is not beneficial, I

3    think, to place either the jury or the interest of the defendants

4    in that posture.

5            Clearly, Ms. Rhodes, this puts, frankly, in all

6    honesty, further pressure on you and Mr. Lawlor in deciding what

7    you want to do about Mr. Lynch.  I've already told you what my

8    preliminary view on that issue is likely to be.  So it may be

9    that you'll just, you know, make your record and let the Court

10   rule as I have indicated I'm preliminarily inclined to do, and

11   see what the Fourth Circuit thinks of it.

12           But I don't quite see much way out of this conundrum.

13   We're going to lose this juror.  Go ahead, Ms. Rhodes.

14           MS. RHODES:  I understand, Your Honor.  And in light of

15   our concerns about Mr. Lynch, we would object to this juror being

16   excused.

17           THE COURT:  Wait a minute.  Wait a minute.  Which

18   juror?

19           MS. RHODES:  To this juror, the Number 11.

20           THE COURT:  In other words, you want me to issue an

21   order directing this juror not to leave the United States?  Is

22   that what you're saying?  Did Mr. Lawlor make you get up and say

23   that?

24           (Laughter.)

25           THE COURT:  Mr. Lawlor usually handles these kind of

1    issues.

2              MR. LAWLOR:  I have an alibi.

3              MS. RHODES:  He has an alibi witness.  He has an alibi

4    witness.

5              THE COURT:  You were talking to him the whole time?

6              MS. RHODES:  In all honesty, Your Honor --

7              THE COURT:  Yes, Ms. Rhodes.

8              MS. RHODES:  -- my position changed 180 degrees when

9    you brought up the Mr. Lynch witness issue because if I have to

10   choose between my witness and this juror, I want my witness.

11             THE COURT:  I see.  Okay.  So you're just making a

12   record.  I understand.  Of course.  All right.  Mr. Coburn.

13             MR. COBURN:  We're in complete accord with the Court's

14   observations about this.  There's no way this juror can stay.

15   She's gotten, as Your Honor pointed out, not just economic

16   motivations, but she has to care for her elderly parents in Guam.

17   As Your Honor said, she'd be distracted.  I think she'd be

18   resentful.  And I just don't think there's any way that can

19   happen.

20             THE COURT:  Okay.  It's very regrettable.  As I said

21   earlier, I think I said I blame myself.  That was too strong a

22   word.  I did intend, as the voir dire proceeded, to inquire of

23   counsel whether we could agree to excuse this juror.  Her

24   comments, you'll remember, during the voir dire, I suspect,

25   struck most of you the way it struck me.  Wow, people can't be

1    sure whether they're moving to Guam in the next couple of months,

2    they probably aren't moving to Guam in the next couple of months.

3    But we probably should have paid closer attention and probably

4    excused the juror.

5         To the extent I thought about it at all while you were

6    exercising your strikes, I guess I thought, since we cleaned out

7    the panel, I think I only left two jurors standing at the end, I

8    was reasonably confident that one of you would strike this juror.

9    But nobody did.  And here we are.

10        So I think under the circumstances, unless anybody else

11   want to be heard, I'm going to have the juror come in immediately

12   after the recess, express our thanks, and move juror, Alternate

13   Juror Number Two, now occupying the seat of Alternate Juror

14   Number One, into Seat 11.

15        All right.  We're in recess for 25 minutes.

16        (Recess at 12:20 p.m.)

17        (Defendants present in courtroom.)

18        THE COURT:  Mr. Harding, how much more do you have with

19   Detective Giganti, ballpark?

20        MR. HARDING:  25 minutes.  Ballpark.

21        THE COURT:  Okay.  I'm thinking maybe you can release

22   Niedermeier.

23        MR. HARDING:  Okay.

24        THE COURT:  I mean, does that make sense, or do you

25   want to try to get 15 or 20 or 30 minutes of Niedermeier in?  I

1    assume you don't know how long the cross is going to be of

2    Giganti.  But I gather from the e-mail traffic in the last few

3    days, it might be somewhat lengthy.  Is that what you think?

4              MR. HARDING:  I suspect there will be some cross

5    examination of Mr. --

6              THE COURT:  How much do you have, Mr. Martin, do you

7    know, off the top?

8              MR. MARTIN:  Get used to this.  I'm so used to just

9    yelling.

10             THE COURT:  Well, you'll notice, I put the mikes back.

11             MR. MARTIN:  I think you could release him, Your Honor.

12   I'm going to be a while.  I can't say how long I'll be, because

13   it depends on what he does on direct.  But I've got some things

14   planned.

15             THE COURT:  Anybody else have cross for Giganti?  You

16   can do it from there, Mr. Kurland.  We'll get you a mike later.

17             MR. KURLAND:  Thank you.  I'll have a brief cross and

18   it would really help me out a lot if we can get out of here

19   earlier rather than later.

20             THE COURT:  All right.  You can release Niedermeier.

21             MR. KURLAND:  Thanks, Judge.

22             THE COURT:  We'll have the jury.  Ask Juror Number

23   Eleven to come in, please.

24             It occurred to me, counsel, to perhaps ask the juror if

25   there's any chance that she might change her mind or the

1    situation might change, but I think that would just be oppressive

2    to the juror, so I'm not going to ask that.  I'm just going to

3    release her.

4                (Juror Number 11 enters the courtroom).

5                THE COURT:  Well, ma'am, with deep regret and with

6    sincere thanks for your availability and your short-lived

7    participation as a juror in the case, we are going to excuse you.

8    It occurred to me that perhaps by having you continue to sit for

9    at least a few more weeks, there's the possibility that the

10   situation could change.  But I think that that would be unfair to

11   you.

12               So we're going to release you at this time.  Please

13   continue not to discuss the case or any of the evidence you've

14   heard.  And we wish you well.

15               Please return to the jury room, if you have personal

16   property in the jury room, and take just a moment to say goodbye

17   to your fellow jurors, but do not mention to them your concerns

18   or your plans, unless you've already mentioned them.  Okay?  And

19   you can take any notes you may have made, or Ms. Arrington will

20   destroy them.

21               A JUROR:  Thank you.

22               THE COURT:  Good luck to you.

23               A JUROR:  Thank you.

24               THE COURT:  And best, all the best to your parents.

25               A JUROR:  Thank you.

1              (Juror Number 11 exits the courtroom.)

2              THE COURT:  All right.  We'll have the jury, Ms.

3    Arrington.  And can we get Detective Giganti back on the stand.

4              (Jury enters the courtroom.)

5              THE COURT:  Please be seated, ladies and gentlemen.

6              Well, ladies and gentlemen, much to our regret, it's

7    been necessary for the Court to excuse your fellow Juror Number

8    11, who will no longer be participating in the trial.  I'll ask

9    Alternate Juror Number One if you would now please step forward

10   and take the seat for Juror Number 11.  And if our three

11   important remaining alternate jurors would move down, become

12   Alternates One, Two, and Three.

13             Again, ladies and gentlemen, as I've told you and as

14   you know and as you've seen, our alternates are very important to

15   us, and we will call upon those remaining to step in should that

16   prove to be necessary.

17             We're going to proceed for probably less than another

18   hour and you will be excused for the day, ladies and gentlemen.

19             You may proceed whenever you're ready, Mr. Harding.

20   BY MR. HARDING:

21   Q    Thank you, Your Honor.  Detective Giganti, when we broke I

22   was talking to you about the subscriber for the telephone

23   indicated as Bo's telephone in Mr. McCaffity's cell phone

24   directory.  And you said it was Maryland Land Design, a civil

25   engineering company, is that correct?

1    A    Yes, sir.

2    Q    Did you speak to that company?

3    A    Yes, I did.

4    Q    Okay.  Did they have any information about that telephone?

5          MR. MARTIN:  Objection.

6          MR. LAWLOR:  Objection.

7          THE COURT:  You can answer yes or no, Detective.  Did

8    they have any information about that telephone?

9          THE WITNESS:  No.

10   BY MR. HARDING:

11   Q    Who was the service provider?

12   A    Without looking at my, at the notes or the subscriber, if

13   you have that available.

14   Q    Yes.  May I approach the witness, Your Honor?

15         THE COURT:  Yes.  Yes.

16   A    Should be right here.  T-Mobile.

17   Q    Did you contact the service provider?

18   A    I'm sorry.  Could you repeat that?

19   Q    Did you contact the service provider?

20   A    Yes, I did.

21   Q    Did they have information for you about the service on that

22   telephone?

23         MR. LAWLOR:  Objection.

24         THE COURT:  Overruled.  Again, yes or no.

25   A    Yes.

1    Q    Let me call your attention to that document that's there in

2    front of you, Government Exhibit T-1.  Are those the subpoenaed

3    subscriber and toll records for the telephone listed to Bo in Mr.

4    McCaffity's directory, but actually subscribed under the name

5    Maryland Land Design?

6    A    Yes, it is.

7    Q    Did they tell you when the service began and when it was

8    discontinued?

9              MR. LAWLOR:  Objection.

10             MR. KURLAND:  Objection.

11             THE COURT:  Are you going to have somebody here from

12   T-Mobile, Mr. Harding?

13   Q    No.  It's in the certified documents, Your Honor.

14             THE COURT:  All right.  I haven't seen the

15   certification.  Can you hand that to the clerk, please?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  We're proceeding under the rule?

18             MR. HARDING:  Yes, Your Honor.

19             THE COURT:  I don't see a certification here, Mr.

20   Harding.  All I see is a cover letter.  Nothing under penalties

21   of perjury.

22             MR. HARDING:  All right.  We'll obtain that.

23             THE COURT:  Get somebody here.  I'm sorry?

24             MR. HARDING:  We'll obtain that or get somebody here,

25   Your Honor.  May I give to the witness --

1          THE COURT:  I'll overrule the objection subject to your

2     bringing somebody in to authenticate the records.

3          Overruled, subject to authentication.

4     BY MR. HARDING:

5     Q    When was service commenced and discontinued on that phone?

6          MR. KURLAND:  Objection.

7          THE COURT:  Overruled.  You may answer.

8     A    February 14th, 2002, is when it was established.  And the

9     disconnect date was March 4th, 2002.

10    Q    Okay.  Were you able to determine whether the service on

11    that phone was fraudulent or real?

12         MR. LAWLOR:  Objection.

13         THE COURT:  Rephrase the question, please.

14    Q    According to the service provider, was this a legitimate

15    subscription or was it fraudulent?

16         MR. LAWLOR:  Objection.

17         MR. KURLAND:  Objection.

18         THE COURT:  Sustained.

19    BY MR. HARDING:

20    Q    Did you determine, were you able to determine who Bo was,

21    Detective Giganti?

22         MR. LAWLOR:  Objection.

23         THE COURT:  Overruled.  You may answer yes or no,

24    Detective.

25    A    Yes.

1    Q    Can you tell us how you went about that?

2    A    Utilizing the phone records on Bo's phone, which is, which

3    listed to Maryland Land Design under T-Mobile, I cross-referenced

4    the toll records and I saw a lot of calls to a C. Terry at 4916

5    Gilray Drive in Baltimore, Maryland.

6         As I did a background into C. Terry, it became known to

7    me as Crystal Terry.

8    Q    Could I back up just one moment, Detective Giganti?  You

9    found a lot of calls to a phone number, is that correct, that was

10   subscribed to by C. Terry, is that correct?

11   A    Yes, sir.

12   Q    Okay.  Okay.  Then what?

13   A    As I did a background on to C. Terry, who is actually known

14   as Crystal Terry, she had a registered vehicle with a Jaquetta

15   Smith, who I later learned to be her daughter.  Jaquetta Smith is

16   the same age group as Oliver McCaffity.  And I did a background

17   into Jaquetta Smith.  As I delved into her background, she had a

18   paternity suit against a Willie Mitchell.

19        MR. LAWLOR:  Objection, Your Honor, move to strike.

20        THE COURT:  The Motion to Strike is granted.  Ladies

21   and gentlemen, the witness' mention of a paternity suit is simply

22   provided to you to explain the course of his investigation.  Of

23   course, the fact that Ms. Smith brought a paternity suit against

24   Mr. Mitchell is not to be considered by you as any evidence of

25   his guilt.

1          Now, Ms. Smith has already been here, as you know, and

2     has identified Mr. Mitchell as the father of her child.  And she

3     says he's helped her raise her other children as well.  So the

4     objection's overruled to that extent.  Go ahead, Detective

5     Giganti.

6          THE WITNESS:  As I looked into Willie Mitchell's

7     background, listed on the state record is the nickname of Bo.

8     And also, that Mr. Mitchell and Ms. Smith shared the same

9     addresses or lived in the same neighborhood on Etting Street, and

10    they also used the address of 4916 Gilray Drive.

11    BY MR. HARDING:

12    Q    So they had at some point used an address on Etting Street

13    but also had address at the address where this telephone was,

14    this C. Terry phone was listed?

15    A    Yes, sir.

16    Q    Okay.  So was Bo a suspect in your mind after you went

17    through that process you just described to us?

18    A    Yes, sir, he was.

19    Q    Did you interview other people who were called by Mr.

20    McCaffity or who had called Mr. McCaffity that night?

21    A    Yes.

22    Q    February 27th and 28th?

23    A    Yes.

24    Q    Okay.  Were you able to obtain any leads that furthered your

25    investigation that way?

1    A    No.

2    Q    Did you also, as part of your work on that particular

3    homicide investigation, have occasion to go out to the Muvico

4    Theater where Woody and, where Mr. McCaffity and Lisa had been

5    earlier that evening?

6    A    Yes, I did.

7    Q    And did you get the, did you obtain the surveillance tape

8    from that movie theater?

9    A    Yes, I did.

10   Q    Did you review the surveillance tape?

11   A    Yes.

12   Q    Did you see Mr. McCaffity and Ms. Brown in the surveillance

13   tape?

14   A    Yes, I did.

15   Q    Did they appear to be with anyone else when they were at the

16   movie theater?

17   A    No, they were by, they were together.

18   Q    Did you subpoena cell tower information on Mr. McCaffity's

19   cell phone?

20   A    Yes, I did.

21   Q    Okay.  Your Honor, I've got here Government Exhibit T-2.

22   And the first page here is a certification.

23        THE COURT:  Is that a part of that other exhibit?

24        MR. HARDING:  No.

25        THE COURT:  It's separate?

1          MR. HARDING:  Yes.

2          THE COURT:  Okay.  All right.

3    BY MR. HARDING:

4    Q    I want to call your attention to one column in these toll

5    records for Maryland Land Design's telephone, the 5811 number.

6    Actually, Your Honor, this is just another version of the toll

7    records that were marked as T-1.  T-1 is the documents subpoenaed

8    by Detective Giganti.  These were subpoenaed with a certification

9    later.  I believe that's the only difference between these.

10          THE COURT:  Okay.  So this exhibit you're showing now

11   really is sort of the same thing or contains the same

12   information?

13          MR. HARDING:  I believe so, Your Honor.

14          THE COURT:  All right.

15   BY MR. HARDING:

16   Q    See this column labeled "last cell", Detective Giganti?

17   A    Yes, sir.

18   Q    It gives for each call that's made a five digit number.  Can

19   you tell us what that five digit number refers to?

20          MR. LAWLOR:  Objection, Your Honor, foundation.

21   Q    Do you know?

22   A    Yes.

23   Q    What is it?

24   A    That's the cell tower location.

25          MR. LAWLOR:  Objection.

1          THE COURT:  All right.  The objection is overruled

2     subject to bringing in somebody from T-Mobile to explain this

3     information.  Go ahead, Mr. Harding.

4     BY MR. HARDING:

5     Q    I want to call your attention to the calls that were placed

6     on February 27th, 2002 in the late evening into the early morning

7     hours of February 28th.  Do you see that?

8     A    Yes, sir.

9     Q    What is the number for the cell tower listed for all those

10    calls?

11    A    10171.

12    Q    Okay.  There are a few calls in this period where there's a

13    zero entered.  Do you know what that refers to?

14    A    No.  I would -- no, I don't.

15    Q    Okay.  But for any calls for which there is a cell tower

16    listed after 4:26 in the afternoon on February 27th, it's always

17    the same cell tower, this 10171 tower, is that correct?

18    A    Yes, sir.

19    Q    And that continues into February 28th, the early morning

20    hours, up to about 2:30 in the morning on February 28th, is that

21    correct?

22    A    Yes, sir.

23    Q    And then the next call isn't until 11:00 the next morning.

24    And it's at a different cell tower location, is that correct?

25    A    Yes, sir.

1    Q    Did you determine what cell tower corresponds to the number

2    10171?

3    A    Yes, I did.

4              MR. LAWLOR:  Objection, Your Honor.

5              THE COURT:  Again, the witness is being permitted to

6    testify to this information, ladies and gentlemen, and you may

7    consider it.  However, the government will bring in another

8    witness from T-Mobile to establish the foundation for these cell

9    towers, the numbers associated with them, which is the source of

10   this witness' information.  Go ahead, Detective Giganti.

11             MR. HARDING:  Just one moment, Your Honor.

12             (Pause in proceedings.)

13             THE COURT:  Would you like some water, Detective?

14             THE WITNESS:  No, I'm good.  Thank you, Your Honor.

15             (Pause in proceedings.)

16   BY MR. HARDING:

17   Q    Judge, I'm going to wait on this until we get the T-Mobile

18   person.

19             THE COURT:  All right.

20   Q    You testified earlier, Detective Giganti, that Mr. McCaffity

21   had associates named Howard Rice and Raeshio Rice, is that

22   correct, among others?

23   A    Yes, sir.

24   Q    Okay.  And you said that they were drug traffickers in West

25   Baltimore, is that correct?

1    A    Yes, sir.

2    Q    Specifically, were they in the Park Heights area of West

3    Baltimore?

4    A    Yes, they are.

5    Q    Okay.  Did you learn, during the course of your

6    investigation, what kind of car they drove?

7    A    Yes, they drove a blue Bentley.

8    Q    And was that Bentley frequently seen by police officers in

9    the Park Heights area and elsewhere in Baltimore during this time

10   period?

11            MR. LAWLOR:  Objection.

12            THE COURT:  Overruled.

13   A    Yes.

14   Q    Did you receive information during the course of your work

15   on the homicide, the Oliver McCaffity/Lisa Brown homicide, that

16   it was related to stabbings that occurred at Hammerjacks a couple

17   of weeks earlier?

18            MR. LAWLOR:  Objection, Your Honor, move to strike.

19            THE COURT:  Overruled.  Motion denied.  You may answer.

20   A    Yes.

21   Q    Okay.  And was one of the victims in those stabbings Raeshio

22   Rice?

23   A    Yes, sir.

24   Q    Did you subsequently become aware that Willie Mitchell was a

25   suspect in another double homicide that occurred in March of

1    2002, in another secluded area in Park Heights late at night?

2              MR. LAWLOR:  Objection.

3              MR. MARTIN:  Objection, Your Honor.

4              MR. LAWLOR:  Is this a question or testifying, Your

5    Honor?

6              MR. KURLAND:  He's testifying.

7              THE COURT:  Rephrase the question, Mr. Harding.

8    By MR. HARDING:

9    Q    Was there, did you later become aware that Mr. Mitchell was

10   a suspect in another double homicide that was committed under

11   similar circumstances?

12             MR. LAWLOR:  Objection, Your Honor.

13             THE COURT:  The objection's sustained.  Obviously,

14   ladies and gentlemen, the fact that Mr. Mitchell became a suspect

15   for anything doesn't prove anything.  Rephrase the question, Mr.

16   Harding.

17   BY MR. HARDING:

18   Q    Did you get involved in the investigation of another double

19   homicide?

20   A    Yes, sir.

21   Q    Did you speak to a detective involved in that double

22   homicide?

23   A    Yes, I did.  I spoke to Detective Niedermeier.

24   Q    And did you do some work in furtherance of that

25   investigation, also?

1   A    Yes, I did.

2   Q    Was one of the suspects in that investigation Willie

3   Mitchell?

4            MR. LAWLOR:  Objection, Your Honor.

5            THE COURT:  The objection's sustained.  Mr. Harding,

6   don't refer to Mr. Mitchell as a suspect to this witness.

7            MR. LAWLOR:  Your Honor, I move for a mistrial.

8            THE COURT:  Motion denied.

9   BY MR. HARDING:

10  Q    Did you, in your work on that investigation, participate in

11  executing a search warrant?

12  A    Yes, I did.

13  Q    Where was the search warrant that you executed?

14  A    I don't remember the exact names.  All County Sports or

15  County Sports on Loch Raven Boulevard.

16  Q    Okay.  Why were you searching that location?

17  A    That was the employer, according to Parole and Probation, of

18  Shelly Wayne Martin.

19  Q    Okay.  I'm going to show you some exhibits.  First of all,

20  this is Government Exhibit W7-A, and consists of several

21  photographs.  Can you tell us what W7-A depicts, the first

22  photograph?

23  A    In the top photograph is the name of the business, County

24  Sports, with the address of 8642 Loch Raven Boulevard.  The

25  second photograph shows the numbers above the door and the front

1    door of the business.

2    Q    Okay.

3          MR. MARTIN:  Are these all W7-A, Mr. Harding?

4    Q    Yes.  Is this a picture of you inside the store when you

5    were executing the search warrant there?

6    A    Yes.

7    Q    Okay.  And W7-B contains some more photographs.  What do

8    these depict?

9    A    The merchandise inside the store.

10   Q    Okay.  Looks like there are a good many jerseys and shirts

11   of various sorts, is that correct?

12   A    Yes, sir.  All sports related.

13   Q    I also have here W-7, which includes a couple of pieces of

14   paper.  What is this?

15   A    This is a deposit slip for County Sports, also indicating

16   the name of Sherman Kemp, who was the owner of the store.

17   Q    And do you know, does Sherman Kemp have a nickname?

18   A    Goose.

19   Q    Okay.  Was Mr. Kemp there that morning when you executed the

20   search warrant?

21   A    I don't remember.  I'd have to look at the notes of that

22   report.

23   Q    Here's another item.

24   A    That's a business card for County Sports.  Has the phone

25   numbers and the hours of operation.

1   Q    Okay.  Now, calling your attention to about, I guess about

2   more than a year later, starting in October of 2003.  Did you

3   have occasion to work with a cooperator who had come forward in

4   the course of your investigation of these homicides?

5   A    Yes, sir, I did.

6   Q    What was the name of that cooperator?

7   A    Chris Dobropolski.  Dobropolski.

8   Q    And what were you, what was the nature of your operation

9   that you were trying to do with Mr. Dobropolski?

10  A    Utilize Mr. Dobropolski to try to record conversations

11  between him and Mr. Shelton Harris in reference to the homicides

12  we were investigating.

13  Q    Okay.  Did you, in the course of your work with Mr.

14  Dobropolski trying to make these -- how did you arrange for

15  meetings between Dobropolski and Mr. Harris?

16  A    I learned Mr. Harris's parole and probation schedule.  And

17  we sent Mr. Dobropolski down to Parole and Probation, like he was

18  there also for a meeting, and tried to engage in conversation

19  with Mr. Harris.

20  Q    So the meetings took place at Parole and Probation?

21  A    Yes.

22  Q    Is that a public area?

23  A    Yes, it is.

24  Q    Were there other people there waiting for appointments and

25  that sort of thing?

1    A    Yes, sir.

2    Q    And so was there noise?

3    A    Yes.

4    Q    Okay.  Were you able to get some recordings of meetings and

5    also telephone conversations between Mr. Harris and Mr.

6    Dobropolski?

7    A    Yes, I was.

8    Q    I'm going to show you now what have been marked Government

9    Exhibit 40-A, 40-B, 40-C, 40-D, 40-E, 40-F, 41, 42, 43, 44, 45,

10   and 46.  Are these CD's that contain whatever you were able to

11   record in the way of conversations between Mr. Harris and Mr.

12   Dobropolski during the course of your efforts?

13   A    Yes.

14   Q    Okay.  Was it difficult to get satisfactory recordings of

15   meetings between Mr. Harris and Mr. Dobropolski?

16           MR. MARTIN:  Objection.

17           THE COURT:  Overruled.  You may answer.

18   A    Yes, sir, there was.

19   Q    Why was that?

20   A    Sometimes due to the weather.  Just positioning of the

21   people on the street.  Wind blowing.

22   Q    Okay.  Are you saying that the CD's sometimes didn't provide

23   you with any audible conversations?

24   A    That's correct.

25   Q    Okay.  But that wouldn't have been a problem with the phone

1    calls, is that correct?

2    A    Yes, sir, that's correct.

3    Q    Okay.  Was one of the meetings that you set up that way on

4    January 6th, 2004?  Do you recall, Mr. Giganti?  Detective?

5    A    Yes.

6    Q    Okay.  Let me show you what's been marked as, okay, I don't

7    have an exhibit tag on it.  Just have one moment, Your Honor.

8              THE COURT:  Yes.

9              (Pause in proceedings.)

10   Q    Okay.  This is going to be Government Exhibit MB-50.  Does

11   this have the date, 1/6/04 on it, Detective Giganti?

12   A    Yes, sir.

13   Q    And your name?

14   A    Yes, sir.

15   Q    Okay.  I'm going to, I think I can just hold this here and

16   project this on the screen through the envelope that it's in

17   without opening the envelope.  Can you tell us what that says?

18   A    On the left it says Rock.  Has a phone number 410-880-1749.

19   And then to the right, if you could just move it to the left.

20   There you go.  It says home 410 -- I can't see with the lighting.

21   But that's 880 or 850-0380.

22   Q    Okay.

23             THE COURT:  For the record, counsel is showing to the

24   witness and to the jury a glassine container which contains a

25   scrap of paper with the writing just described by the witness in

1    red ink.  Go ahead, Mr. Harding.

2    Q    So, Detective, what is that?  Where did you get that slip of

3    paper?

4    A    That was provided to me by the cooperator, Mr. Dobropolski,

5    after it was given to him by Shelton Harris as contact numbers

6    for him.

7    Q    Okay.  Was that on January 6th, 2004?

8    A    That's the date on the -- yes.  I'd have to refer to my

9    report to get the --

10   Q    I also have here two exhibits that I'm marking MB-51 and

11   MB-52.  First, MB-51.  And also MB-52.  Can you tell us what

12   these are?

13   A    Yes, sir.  These are handwritten notes by the cooperator,

14   Mr. Dobropolski.

15            MR. MARTIN:  Objection, Your Honor.

16            THE COURT:  Do you intend to introduce those documents,

17   Mr. Harding, or --

18            MR. HARDING:  I intend to offer them when Mr.

19   Dobropolski testifies, Your Honor.

20            THE COURT:  All right.  The witness can identify them.

21   But don't put them on the monitor yet.

22   BY MR. HARDING:

23   Q    Okay.  What are they, Detective?

24   A    They're handwritten notes by Mr. Dobropolski

25   Q    And do they pertain to two of the meetings that Mr.

1    Dobropolski and Mr. Harris had?

2    A    Yes, they are.

3    Q    Okay.  Detective Giganti, did you, in April of 2004, some

4    months after the end of your operations with Mr. Dobropolski --

5              THE COURT:  You're forgiven.

6              MR. MARTIN:  I'm not used to it being turned on.

7              THE COURT:  Yeah.

8    Q    Were you present when Jaquetta Smith came to testify in the

9    grand jury, in the U.S. Attorney's office in April of 2004?

10   A    Yes, I was.

11   Q    And just to be clear, you were not present in the grand jury

12   room, I assume, is that correct, Detective?

13   A    That is correct.

14   Q    But you were present before she testified, is that correct?

15   A    Yes, sir.

16   Q    Did you -- first, did she listen to a tape of a voice mail

17   that had been recorded on Irene Magginson's voice mail?

18   A    Yes, she did.

19   Q    Okay.  Did you suggest the name of anybody you thought whose

20   voice might be on that tape?

21             MR. MARTIN:  Objection.

22             THE COURT:  Overruled.  You may answer.

23   A    No.

24   Q    Specifically, did you suggest to her that --

25             MR. MARTIN:  Objection.

1        THE COURT:  The objection's overruled.

2    Q    -- Shelton Harris's voice was on the voice mail?

3    A    No.

4    Q    Okay.  No further questions, Your Honor.

5        THE COURT:  I think you left the document up there, Mr.

6    Harding.

7        MR. LAWLOR:  Court's indulgence, please, before I

8    begin.  Can I have a minute, Your Honor?

9        THE COURT:  Oh, of course.

10        (Pause in proceedings.)

11        CROSS EXAMINATION

12   BY MR. LAWLOR:

13   Q    Detective, good afternoon.

14   A    Good afternoon.

15   Q    A couple minutes ago, when Mr. Harding was testifying in

16   your behalf, he made reference to --

17        MR. HARDING:  Objection.

18        THE COURT:  The objection is sustained.

19   BY MR. LAWLOR:

20   Q    When Mr. Harding asked you about your first involvement with

21   Mr. McCaffity, he said, you said that you pulled him over in a

22   car?

23   A    Yes, sir.

24   Q    And that fact, because he was speeding in a silver car, drew

25   your attention to him?

1    A    Yes, sir.

2    Q    Was there something about him or the car that immediately

3    drew your suspicion?

4    A    He was speeding.

5    Q    Okay.  But I trust that you don't normally associate

6    speeding with drug investigations?

7    A    No.  But he was speeding.

8    Q    Okay.  He was speeding and therefore you began to

9    investigate him as a drug trafficker?

10   A    No.

11   Q    Okay.  Fill in the gap for me.

12   A    Sure.  We were in a residential neighborhood, with a lot of

13   people on the street.  We saw him speeding.  We stopped him.

14   After I stopped him and found out who he was, that's when I did

15   his background.  That's what initiated my interest in him.

16   Q    I'm sorry.  Say that again.  You found out who he was and

17   what?

18   A    After I did my background investigation on him, that's what

19   initiated my investigation of him.

20   Q    So you asked what the word on the street was about Mr.

21   McCaffity and you found out from people on the street that he was

22   involved in drug trafficking?

23   A    Correct.

24   Q    Okay.  So the fact that you ran into him and the fact that

25   he was speeding really has nothing to do with anything, right?

1   A    I'm not really sure whether you're asking.

2   Q    Never mind.  When you ask people about him, they told you

3   that he was affiliated with the Rice brothers, right?

4   A    Yes, sir.

5   Q    And you knew who the Rice brothers were, right?

6   A    Yes, sir.

7   Q    Everyone knows who the Rice brothers are, right?

8   Everyone --

9   A    I can't answer the question.

10  Q    Everyone who wears a badge in the City of Baltimore knows

11  who the Rice brothers are, right?

12  A    I can't answer that question.

13  Q    All right.  You certainly did, right?

14  A    Yes, sir.

15  Q    And the folks that you've talked to about the Rice brothers

16  told you what they were involved in, right?

17  A    Say that one more time.

18  Q    The officers, when you investigated the background, or

19  talked to people about either Mr. McCaffity or the Rice brothers,

20  the people that you talked to knew what the Rice brothers were

21  involved in, right?

22  A    Correct.

23  Q    Okay.  And it wasn't Habitat for Humanity, right?

24  A    That's correct.

25  Q    All right.  The Rice brothers were known to you and other

1   detectives in Homicide and in drug trafficking departments within

2   the Baltimore City Police department to be large scale drug

3   traffickers, right?

4   A    Yes, sir.

5   Q    The largest of large scales, right?

6   A    They were large.

7   Q    Okay.  And how did, what was known about how the Rice

8   brothers were known to settle disputes?

9   A    With violence.

10   Q    Like what kind of violence?

11   A    Through shootings.

12   Q    Okay.  So when they had problems with somebody for whatever,

13   a myriad reasons, they might have problems with somebody, they

14   killed the people that they had problems with, right?

15   A    Or at least attempt to.

16   Q    Okay.  Attempted to or did.  How many people did the Rice

17   brothers kill or attempt to kill?

18            MR. HARDING:  Objection.

19            THE COURT:  Sustained.

20   Q    Okay.  You also said that Mr. McCaffity was involved with

21   somebody by the name of Tyree Stewart, is that right?

22   A    Yes, sir.

23   Q    How did Mr. Stewart make his living?

24   A    Drug dealing.

25   Q    Okay.  When Mr. Stewart would come to have a problem with an

1    individual, how did he settle that problem?

2              MR. HARDING:  Objection.

3              THE COURT:  Sustained.

4    Q    Okay.  Did Mr. Stewart pay a man named William, pay a man

5    named William Montgomery to shoot another man named Terry Cheeks?

6              MR. HARDING:  Objection.

7              THE COURT:  Do you have any personal knowledge of that,

8    Detective?

9              THE WITNESS:  I know who William Montgomery is but I

10   don't know the other.

11             THE COURT:  Sustained.

12   BY MR. LAWLOR:

13   Q    Who's William Montgomery?

14   A    He's a hit man.

15   Q    Okay.  He's a hit man.  Okay.  He's also a government

16   cooperating witness in this case, isn't he?

17   A    Sir, I can't answer that.

18   Q    All right.  If you don't know, just, you don't know, is that

19   what you're trying to tell me?

20   A    I don't know.

21   Q    You're a detective involved in the, in the prosecution of

22   this case.  You're aiding the government in their efforts to

23   retrieve evidence and present the evidence to this jury, right?

24   A    Yes.

25   Q    Okay.  And you testified, or Mr. Harding suggested to you

1    some theories that you have, right?  Right?  Like that, Mr.

2    Harding suggested to you, for example, that there's a link

3    between an alleged stabbing at Hammerjacks and the murder of Mr.

4    McCaffity and Ms. Brown, correct?

5              MR. HARDING:  Objection to the --

6              THE COURT:  Sustained.

7    BY MR. LAWLOR:

8    Q    Okay.  Did you testify about such a link?

9    A    Yes.

10   Q    Okay.  But you don't know who William Montgomery is?

11   A    I knew who William Montgomery is.

12   Q    All right.  You don't know that he's a cooperating witness

13   in this case?

14   A    That's right.

15   Q    Okay.  I have no further questions.

16             CROSS EXAMINATION

17   BY MR. MARTIN:

18   Q    Good afternoon, Detective.

19   A    Good afternoon.

20   Q    My name's Gerry Martin and I am one of the lawyers for Mr.

21   Shelton Harris.  I just need to ask you a couple of questions.

22             You testified a few minutes ago about, in response to a

23   question from Mr. Harding, about having attempted to record

24   conversations with Mr. Harris?

25   A    Yes, sir.

1   Q    And you recall that in order to do that, you went to

2   Baltimore County and you got this witness, I think his name is

3   Dobropolski, Mr. Dobropolski, you got him out of jail?

4   A    Yes, sir.

5   Q    Actually got his sentence cut in half, didn't you?

6   A    I don't remember, I don't remember.

7   Q    It was significant, though, wasn't it?

8   A    I don't remember.

9   Q    That's fine, if you don't remember.  Now, when you got him

10  out on the street, then you said about trying to get him in a

11  situation where he could record conversations with Mr. Harris,

12  who had just gotten out of prison, isn't that right?

13  A    Yes, sir.

14  Q    And you testified in the grand jury, did you not, that on at

15  least ten occasions you tried to contact Mr. Harris through a

16  person whose nickname was Slo?

17  A    Yes.

18  Q    And when you got frustrated because Mr. Harris wasn't taking

19  the bait is when you went to Parole and Probation, isn't that

20  correct?

21  A    No.  I think we, we actually, actually went to Slo's house

22  before we went to Parole and Probation.

23  Q    That's what I meant.  You went to Slo's house before you

24  went to Parole and Probation, right?

25  A    Correct.

1    Q    And you made a number of phone calls?

2    A    Yes, sir.

3    Q    To numbers that you knew Mr. Harris had given Mr.

4    Dobropolski about where he would be or where he could be

5    contacted, correct?

6    A    Yes.

7    Q    And when that didn't work is when you went to Parole and

8    Probation with the idea of putting Mr. Dobropolski in contact at

9    Parole and Probation with Mr. Harris, isn't that right?

10   A    Yes, sir.

11   Q    And on all those occasions that you -- and how many were

12   there?  Do you remember how many occasions where there were

13   personal meetings with Mr. Dobropolski and Mr. Harris?

14   A    Not without going back to the reports or my notes.

15   Q    Would it be fair to say there were at least three?

16   A    Sir, I would like to review my reports.

17   Q    If you have your report, please feel free to look at it.

18   A    I don't have it.

19   Q    Does Mr. Harding have it?

20        (Pause in proceedings.)

21   Q    Let me try to do it this way.  Not trying to put anybody at

22   a disadvantage here.  I have a number of reports that I received.

23   Your Honor, if I may approach, I might give him his reports.

24        THE COURT:  Yes.

25   Q    Detective, if you could look at those reports and tell us

1    how many personal meetings do you recall participating in,

2    arranging for Mr. Dobropolski to meet with Mr. Harris?

3    A    Excuse me one second.

4    Q    Sure.

5    A    At least three.

6    Q    Well, refresh your recollection.  There was a meeting on

7    October 27th, 2003, is that correct?

8    A    Yes.  I was not present at this one.

9    Q    There was a meeting at Parole and Probation?

10   A    Correct.

11   Q    And Mr. Dobropolski was given not one, but two different

12   devices to record conversations, wasn't he?

13   A    I was not here at this meeting.

14   Q    Are you aware that this happened?

15   A    Yes, I do remember that the meeting happened.

16   Q    You actually arranged for the meeting to happen with Parole

17   Officer Cavanaugh, isn't that right?

18   A    Kevin Cavanaugh, yes.

19   Q    And you had arranged for Mr. Cavanaugh to take over the

20   supervision of Mr. Harris once Mr. Harris was released, for the

21   very purpose of setting up these meetings, isn't that correct?

22   A    If I'm not mistaken, I think Kevin Cavanaugh was already his

23   agent.

24   Q    Okay.  And so you, you weren't present at the meeting in

25   October but you know that it took place?

1    A    Yes, sir.

2    Q    And then there was a meeting on November the 4th, isn't that

3    correct?

4    A    Correct.

5    Q    And that was recorded, was it not?

6    A    Yes, sir.

7    Q    And at the meeting on November the 4th, that recording, did

8    you listen to it?

9    A    Yes.

10   Q    Couldn't hear anything, could you?

11   A    No.

12   Q    And are you aware whether anything that any, anything that

13   you would consider usable as evidence was recorded at the earlier

14   meeting in October?

15   A    Say that again.  I'm sorry.

16   Q    Did you ever listen to the tape from the October meeting?

17   A    I don't remember if I did or not?

18   Q    Okay.  Now, the November meeting, you listened to the tape.

19   You didn't recover any incriminating evidence about Mr. Harris on

20   that tape, did you?

21   A    It was inaudible.

22   Q    You didn't recover any incriminating evidence on that tape,

23   did you?  You can answer my question, sir.  Calls for a yes or

24   no.

25   A    I guess no.

1    Q    And then there was a meeting on December 1, isn't that

2    correct?

3    A    I'm trying to figure out which one -- okay.  Here we go.

4    Q    Your report prepared 12/4/03?

5    A    Yes, sir.

6    Q    So there was a meeting that day, on, it records information

7    about a meeting that took place on December 1, isn't that right?

8    A    Yes, sir.

9    Q    And again, that was at Parole and Probation, wasn't it?

10   A    Yes, sir.

11   Q    And at that meeting, did you listen to the recording from

12   that meeting?

13   A    Yes.

14   Q    And that was also inaudible?

15   A    Yes.

16   Q    Okay.  And when you conducted these meetings, when you or

17   your colleagues in the police department or whatever task force

18   you were working on, when you would meet with Mr. Dobropolski,

19   you would debrief him and put the device on him, isn't that

20   correct?

21   A    Yes, sir.

22   Q    And then you would surveil him while he went to these

23   meetings?

24   A    Correct.

25   Q    And you don't want him to walk into a place where he might

1   get hurt, do you?

2   A    Correct.

3   Q    And you don't want him to go in and do something that might

4   foul up your investigation, either, do you?

5   A    Correct.

6   Q    So you and other members of the police department or task

7   force who were working would go and observe these meetings,

8   correct?

9   A    Yes.

10  Q    And then after the meetings you would meet with Mr.

11  Dobropolski and you would take the tape off of him, isn't that

12  correct?

13  A    Yes.

14  Q    And someone would secure that piece of evidence and make

15  sure that down the line somebody would listen to it for whatever

16  evidentiary value it had, correct?

17  A    Yes, sir.

18  Q    And you would also debrief Mr. Dobropolski at that time,

19  wouldn't you?

20  A    Yes.

21  Q    And he would tell you what had occurred?

22  A    Correct.

23  Q    Because you couldn't overhear it, could you?

24  A    No.

25  Q    And none of your colleagues who were doing the surveillance

1    could overhear it, either, could they?

2    A    I couldn't hear.  I can't testify --

3    Q    Are you aware that any of your colleagues ever told you that

4    they overheard any of these conversations?

5    A    I don't remember.

6    Q    Well, you were in charge of the investigation at that point,

7    weren't you?

8    A    Yes, sir.

9    Q    And you don't remember, did any of your colleagues ever told

10   you that they overheard any of these conversations?

11   A    I don't remember.

12   Q    If they had told you that, you would have reported it in

13   your report, wouldn't you?

14   A    Yes.

15   Q    You didn't report any of that in any of your reports, did

16   you?

17   A    No.

18   Q    Now, then after the December meeting, there was a meeting in

19   January, again at Parole and Probation, isn't that right?

20   A    Yes.

21   Q    And you again were in charge of that, is that correct?

22   A    Yes.

23   Q    And you recovered a tape from Mr. Dobropolski when that

24   meeting was over, didn't you?

25   A    Yes.

1  Q    And that tape, in your opinion, had no evidentiary value

2  either, did it?

3  A    Actually, it did.

4  Q    It did?  On the tape?

5  A    Without listening to the tape, again, sir, I can't answer

6  the question.

7  Q    Can you look at your report and answer the question?

8  A    No.

9  Q    Well, we'll hear the tape and then we can decide what value

10  it had.  But before then, let me ask you this.  On that

11  particular day, you didn't wire him up with one device, you wired

12  him up with two, didn't you?

13  A    Yes.

14  Q    One of them is a Kell device, K-E-L?

15  A    Correct.

16  Q    Is that a device that broadcasts from where the person who's

17  wearing a device is to a remote location where the conversation

18  is then recorded?

19  A    Yes.

20  Q    And then the other one was just a compact disk recording

21  that was on his body, is that correct?

22  A    Yes.

23  Q    So at least on this occasion, as far as you know, there

24  wasn't one, but there were two devices that recorded him, is that

25  correct?

1    A    Yes, sir.

2    Q    And when you testified in the grand jury about these

3    conversations between Mr. Dobropolski and Mr. Harris that you set

4    up, you never mentioned the fact that you were recording them,

5    did you?

6    A    I don't remember.  Can I look at the grand jury testimony?

7    Q    Let me refer you, let me see if I can figure out how to use

8    this device.  This is my first time, Your Honor.  I'm not sure.

9         Let me show you Page 29.  This is going to test me,

10   Your Honor.

11        MR. HARDING:  Objection.

12        THE COURT:  Remove the transcript, please, for a

13   moment.  If you want to approach the witness, Mr. Martin.

14   Q    That's fine, Your Honor.  I had understood you didn't want

15   us to do that.

16        THE COURT:  Yeah, I'd rather not but apparently this is

17   an instance where that might be better.

18   Q    Detective, you see, first look at the first page, just to be

19   sure I'm not pulling one over on you.  That's your grand jury

20   testimony, isn't it?

21   A    Yes.

22   Q    And that was on January 21st, 2004, correct?

23   A    Yes.

24   Q    That was just about the time that Mr. Harris was arrested

25   for this crime, isn't it?

1    A    I don't remember the exact day.

2    Q    And at Page 29, Mr. Harding asked you if you assisted Mr.

3    Dobropolski in getting out of jail early and on parole.  You

4    agreed, is that right?

5    A    Yes, sir.

6    Q    And you did that because you intended to try to use him as

7    an operational cooperator, correct?

8                MR. HARDING:  Objection.

9    Q    You testified that --

10               THE COURT:  Just a moment, just a moment.

11               The point of the transcript, Mr. Martin, was to

12   confirm, I thought, that the witness did not tell the grand jury

13   that Mr. Dobropolski had been recorded.

14               MR. MARTIN:  That's correct, Your Honor.  And to

15   demonstrate it, I may have to go through that whole portion where

16   he testified.

17               THE COURT:  Is there a stipulation to that effect?

18   Because you're right.  Otherwise, you'd have to read the entire

19   transcript.

20               MR. HARDING:  May I have just a moment, Your Honor?

21               THE COURT:  Of course.  You may have a stipulation, Mr.

22   Martin.

23               MR. MARTIN:  I hope so, Your Honor.

24               THE COURT:  We all do.

25               (Pause in proceedings.)

1          THE COURT:  You don't remember one way or the other,

2    correct, Detective, whether you mentioned the recordings to the

3    grand jury?

4          THE WITNESS:  That's correct, sir.

5          THE COURT:  Okay.

6          MR. HARDING:  Well, Your Honor --

7          THE COURT:  Why don't you confer with Mr. Martin, if

8    the two of you have a different view of it?

9          (Pause in proceedings.)

10         MR. HARDING:  Okay.  The government will stipulate that

11   there's nothing in the transcript about Detective Giganti saying

12   that the recordings were made.

13         THE COURT:  Very good.

14   BY MR. MARTIN:

15   Q    So we can agree, Detective Giganti, then, can't we, that you

16   didn't tell the grand jury that you had recorded these

17   conversations?

18   A    Correct.

19   Q    Can you tell me why?

20   A    No, I can't.

21   Q    Did you tell Mr. Harding you had recorded these

22   conversations?

23   A    At the time we were doing this?  I don't remember if we

24   conferred with him beforehand or not.

25   Q    So you don't remember ever telling Mr. Harding that these

1   conversations were recorded?

2   A    I'm sure at one point I did.  But I don't remember if we did

3   it before or after the fact.

4   Q    Did you turn over these conversations to Mr. Harding, these

5   recordings?

6   A    Yes.

7   Q    When did you do that?

8   A    I don't remember.

9   Q    Was it in the last two weeks?

10  A    No.  I haven't been with the task force for a couple years.

11  Q    So this would have been in 2004, probably, is that correct?

12  A    Again, I don't remember.

13  Q    So in those recorded conversations of the meetings, you were

14  unable to get any confirmation from Mr. Harris as to the

15  information that you were seeking, isn't that right?

16  A    Say that one more time.  I'm sorry.

17  Q    In the recorded conversations you were unable to get any

18  confirmation from Mr. Harris that he had participated in these

19  crimes that Mr. Dobropolski was trying to get him to talk about,

20  isn't that correct?

21  A    No.  Because we had Mr. Dobropolski write out what went on

22  in the conversations.

23  Q    And when did you have him do that?

24  A    After, after the meetings.

25  Q    And, and when did you give those conversations that you have

1    him write out, when did you give those to Mr. Harding?

2    A    The statements Mr. Dobropolski wrote?

3    Q    The ones that you had him write out, yes.

4    A    I'm not sure when they were turned over to Mr. Harding.

5    Q    Did you turn them over to Mr. Harding?

6    A    No.

7    Q    You don't know who did?

8    A    No, I do not.

9    Q    So we have tape recordings that, at least as far as you're

10   concerned, are unintelligible, correct?

11   A    Partly, yes.

12   Q    And you say that despite that, though, you have statements

13   from Mr. Dobropolski, who was actually making those recordings,

14   as to admissions that you say that he says that Mr. Harris made

15   to him, correct?

16   A    Correct.

17   Q    Okay.  But you have never listened to the tape to confirm

18   whether or not those admissions that Mr. Dobropolski claims were

19   made are actually on the tape, have you?

20   A    I never said never.  I did listen to the tapes.

21   Q    You couldn't confirm it, could you?

22   A    Without reviewing the tapes, again, I can't remember why --

23   Q    You don't -- excuse me.  I'm sorry.  I interrupted you.  You

24   say here today that you would have to review the tapes again to

25   recall whether or not you were able to confirm back then when you

1    listened to them that Mr. Harris admitted to these, these things

2    that Mr. Dobropolski was trying to get him to admit to?

3    A    Correct.

4    Q    You don't remember, when you listened to the tape in 2004,

5    whether he did or didn't?

6    A    Correct.

7    Q    But the tapes were unintelligible as far as you were

8    concerned?

9    A    They were partly inaudible.  That's why we had him write out

10   the statements.

11   Q    So you're telling me here today if an audible part of one of

12   those conversations had an admission from Mr. Harris, that you

13   don't remember?

14   A    That's correct.

15   Q    Did you participate in preparing a transcript of a cell

16   phone conversation that was recorded with respect to the Wyche

17   brothers homicide?

18   A    Can you be more specific?

19   Q    Did you, did you participate in preparing a transcript of a

20   conversation that was allegedly recorded shortly after the Wyche

21   brothers homicide, or wasn't that your case?

22   A    I was not, that's not my case.

23   Q    So if there's a transcript, it wouldn't have been you who

24   prepared it, correct?

25   A    That's correct.

1    Q    Okay.  And I may have asked you this.  If I did, apologize.

2    Do you recall telling the grand jury that when you first asked

3    Mr. Dobropolski to work undercover, that at least ten times you

4    had him contact Mr. Harris through Slo or others and it wasn't

5    working out, and that's when you went to Parole and Probation?

6    A    Correct.  We tried to get him on the phone and in person

7    first, and then went to Parole and Probation.

8    Q    So when he didn't take the bait is when you decided to go to

9    Parole and Probation and tape him, correct?

10   A    Correct.

11   Q    Your Honor, bear with me for just a second?

12            THE COURT:  Yes.

13            (Pause in proceedings.)

14   Q    And you were the homicide, you weren't the homicide

15   detective on this case but you were helping, assisting them in

16   this case, correct?

17   A    That's correct, sir.

18   Q    And Detective Berger was the one you remembered being in

19   charge of this particular, the McCaffity homicide?

20   A    I don't know if it was Ron Berger or Bob Cherry.

21   Q    Could have been either Ron or Bob, right?

22   A    That's correct.

23   Q    And do you recall telling the grand jury when you testified

24   about this --

25            MR. HARDING:  Objection.

1    Q    Where was the palm print found, Mr. Harris's palm print?

2    Where on the automobile was it found?

3    A    I'd have to look at the notes again to remember.

4    Q    When you testified in the grand jury, did you have the notes

5    in front of you?

6    A    I believe I did.

7    Q    Again, Your Honor, just so I don't put it on the screen, can

8    I approach the witness?

9         THE COURT:  Yes.

10   Q    If you look at your testimony at Page Six.  Where did you

11   tell the grand jury that the palm print of Shelton Harris was

12   found?

13   A    Left palm print of Shelton Harris found on the exterior

14   bumper of the vehicle.

15   Q    Thank you.  And when you set out, Detective, to engage Mr.

16   Dobropolski as a cooperating undercover person, your goal was,

17   was it not, to record each and every conversation that they had?

18   A    In regards to Mr. Harris?  Yes.

19   Q    And part of that reason was you wanted corroboration for

20   what Mr. Dobropolski was telling you, isn't that right?

21   A    Yes.

22   Q    And are you aware of any instances in which -- strike that.

23   There are, there's at least one instance, is there not, where Mr.

24   Dobropolski went and had a conversation with Mr. Harris that you

25   didn't even know about?

1    A    Yes.  I believe that is true.

2    Q    Did anybody tell him that his deal with the government was

3    off because he violated your instructions?

4    A    No.

5    Q    And it's true, isn't it, Detective, that since 1988, Mr.

6    Dobropolski has spent far more time in jail than out, isn't that

7    right?

8              MR. HARDING:  Objection.

9              THE COURT:  Sustained.

10   Q    And is there one instance that you remember, Detective, when

11   you actually videotaped a meeting between Mr. Harris and Mr.

12   Dobropolski?

13   A    Mr. Martin, without looking at my notes, unless you have it

14   right there --

15   Q    You have your notes there but let me see if I can find it.

16   Okay?  I should be able to find it.  Look at your report for

17   11/4/03.  Actually, I may have given you the wrong -- trying to

18   find it myself right now.

19             Look at your report dated 11/12/03.  That's when it was

20   prepared.  It talks about meetings that took place on 11/3/03 and

21   11/4/03.  Do you have that in front of you?

22   A    Correct.  This one right here?

23   Q    And is there a place somewhere in that record, specifically

24   look at Page Three, Paragraph Ten.  You said the conversation was

25   recorded and videotaped?

1    A    Yes, sir.

2    Q    Whatever happened to that videotape?

3    A    It was submitted to evidence under N-26.

4    Q    Can you think of any reason why it is that I don't have it?

5    A    I don't know.

6    Q    And when you would put these devices on Mr. Dobropolski, the

7    taping devices, would you test them before you sent them out?

8    A    Yes.

9    Q    That's standard procedure, correct?

10   A    Correct.

11   Q    Would you test them when they got back?

12   A    No.

13   Q    Your Honor, I don't have anything else at this time.

14                CROSS EXAMINATION

15   BY MR. CROWE:

16   Q    Good afternoon, Detective Giganti.  My name is Tom Crowe,

17   and, with Mr. Pyne, I represent Shelly Martin.  I just have a few

18   areas to go into with you.  You were working on this case as late

19   as 2004, is that correct?

20   A    I don't remember what the exact date I left.

21   Q    Your Honor, there are a couple of documents that I would

22   like to show the detective that perhaps don't lend themselves to

23   being put up on the screen.

24                THE COURT:  All right.

25   Q    Can I just hand them to him now?  Detective, have I just

1    handed you an affidavit which you've filled out in this case for

2    the search of the home on North Bradford Street?

3    A    That is correct.

4    Q    And what's the date on that affidavit?

5    A    1/21/2004.

6    Q    And just coincidentally, have I also handed you a transcript

7    of your grand jury testimony which took place on January 21,

8    2004?

9    A    Correct.

10   Q    Now, when you went in before the grand jury, one of the

11   things that you were trying to do was to summarize what the

12   prosecution's evidence was for the grand jury, is that correct?

13   A    Yes, sir.

14   Q    And was one of the things that you were doing at that time,

15   informing the grand jury of the various arrests and the

16   dispositions of arrests of various individuals?

17   A    Yes.

18   Q    What I'd like to do is to call your attention to an occasion

19   when my client, Mr. Martin, and Mr. Gardner were stopped on I-95,

20   I believe, on May 7 of 1999.  Is it your understanding that the

21   charges against my client, Mr. Martin, on that occasion were

22   dismissed or nol prossed?

23   A    I don't remember without looking at the record again.  Is it

24   in this, what you handed to me?

25   Q    It should be in the record that I handed to you.  If you

1   take a look at Page 33, just the last paragraph.  And the

2   question again is restricted to whether the charge against Mr.

3   Martin was nol prossed.

4   A    You talking about Line 23?

5   Q    I am talking about Lines 23 and 24.  Yes, sir.

6   A    The records show that Shelly Wayne Martin --

7         THE COURT:  You don't have to read it, Detective.

8   A    Yes.

9   Q    It was dismissed?  Now, you participated in a search of the

10  County Sports establishment, is that correct?

11  A    Yes, sir.

12  Q    And that was on April 17 of 2004, is that also correct?

13  A    Again, without looking at it --

14  Q    Okay.

15  A    I'll take your word for it.

16  Q    And had you determined from talking to the Probation

17  Department here in federal court that that was my client's place

18  of employment?

19  A    Yes, sir.

20  Q    And had Probation indeed informed you that they'd been

21  successful contacting my client at that place of employment?

22  A    Yes.

23  Q    And did you go in there looking for evidence of drug dealing

24  and murder?

25  A    I would say yes, but I would like to refer back to the

1   search warrant to see what the affidavit had.

2   Q    Well, you were certainly going there looking for evidence of

3   crime, is that correct?

4   A    Correct.

5   Q    And what you've shown us today is a deposit slip in the name

6   of County Sports with the name of a Sherman Kemp on it, is that

7   correct, also?

8   A    Yes, sir.

9   Q    Now, the question came up as to whether a William Montgomery

10  was a cooperator.  Do you recall Mr. Lawlor asked you that

11  question?

12  A    Yes, sir.

13  Q    And your answer was you didn't know?

14  A    That's correct.

15  Q    Was, do you know whether Mr. Montgomery was a cooperator in

16  2004?

17  A    Yes.

18  Q    And in fact, the affidavit which you have in front of you,

19  the one for this, on January 21, 2004, for the search of the

20  North Bradford Street address, refers to him as a cooperator,

21  does it not?

22  A    What page are you looking at?

23  Q    I'm looking particularly at Page Five.  Now, the jury

24  doesn't have this.  But is Mr. Montgomery referred to here as

25  CS3?

1   A    I'd have to cross-reference that to whatever you -- how did

2   you cross-reference CS3?

3   Q    Why don't you, I mean, you authored this affidavit, which

4   runs on for some 18 pages.  Why didn't you just take a look at it

5   and take as long as need to tell me whether or not CS3 is William

6   Montgomery?

7   A    Well, I wasn't going to identify, if he was I'm not going to

8   identify him in name in here.  I'd have to refer back to my other

9   notes.

10  Q    Well, there are extensive discussions of CS-3 in other parts

11  of the affidavit.

12          THE COURT:  Mr. Crowe, are you asking the witness to

13  see if he can infer the identity of CS3 from the contents of the

14  affidavit?  Is that what you're doing?

15  Q    Yes, Your Honor.

16          THE COURT:  That's what he's asking you to do,

17  Detective.  If you can read enough of it to refresh your

18  recollection as to the actual identity of the person identified

19  in the affidavit as CS-3, if that helps.

20  A    Yes.  I'm referring, from what I'm reading on Page 11.

21  Q    Okay.  And in fact, is it true that you said that CS3 and

22  another cooperator expected their cooperation will result in

23  reductions of their sentences?

24  A    Where are you reading that at?

25  Q    I'm reading that from Page Five.  Second paragraph on Page

CROSS EXAMINATION OF GIGANTI BY CROWE                    152

1    Five.

2    A    Yes.

3    Q    Now, you testified, also, that you and other detectives went

4    to the Muvico Theater down in Anne Arundel Mills to determine if

5    you could see if Oliver McCaffity and Lisa Brown had been there,

6    is that correct?

7    A    I did see Oliver McCaffity and Lisa Brown.

8    Q    That's something you'd done.  I want to ask you about

9    another movie theater.  Were you also aware of the fact, not only

10   were you aware, but did you write, did you write in a sworn

11   statement to this Court that detectives were able to confirm that

12   Martin, that's my client, went to Blade Two at an AMC Cinema in

13   Reisterstown and that Martin signed a charge slip to pay for two

14   tickets at 9:41 p.m. on March 24, 2002?

15          Again, I'd refer you to Page 11 of your affidavit, in

16   the second full paragraph of that.

17   A    I don't understand your question.

18   Q    Did you, do you know from your investigation that that is a

19   fact, that detectives were able to confirm that Martin had gone

20   to the theater and had signed a charge slip?

21   A    Yes.

22   Q    And in fact you swore, this document is a sworn statement to

23   the Court that contains that phrase, is that correct?

24   A    Yes, sir.

25   Q    Thank you.  That's all that I have.

1    THE WITNESS:  Do you want your paperwork back?

2    MR. CROWE:  Good idea.

3    THE COURT:  Oh, yes.

4    MR. KURLAND:  Your Honor, just a minute.

5    CROSS EXAMINATION

6  BY MR. KURLAND:

7  Q   Good afternoon, Detective.  My name is Adam Kurland.  Myself

8  and Barry Coburn, we represent Mr. Shawn Gardner.  I just have a

9  couple of questions.  Going back to your earlier testimony on

10 direct examination concerning your background investigation of

11 Mr. McCaffity.

12 A   Okay.

13 Q   When you went back and I guess talked with various other law

14 enforcement officials and other witnesses concerning what Mr.

15 McCaffity was involved in.  And you found out -- you're nodding

16 your head.  You need to say yes.

17 A   I'm just waiting for you to ask a question.

18 Q   All right.  So you recall that testimony concerning the

19 background investigation you conducted of what Mr. McCaffity was

20 up to?

21 A   Yes, sir.

22 Q   All right.  And you found out rather quickly that he was

23 involved in drugs?

24 A   Yes, sir.

25 Q   And you named a variety of other associates or other names

1   that came up in your investigation, which indicated that there

2   was the involvement in the drug trade in the Park Heights area?

3   A    Yes, sir.

4   Q    And is it correct that in that entire investigation, no

5   witness or no information ever came up that specifically

6   mentioned the name the Randallstown/Park Heights organization?

7   A    I'm not sure exactly what, what --

8   Q    Well, you gathered -- you're not sure of what?

9   A    I don't understand your question.

10  Q    Well, the question is, you gathered a lot of information and

11  you came up with a lot of names?

12  A    Correct.

13  Q    Of names that had involvement in the drug trade in the Park

14  Heights area of Baltimore?

15  A    Correct.

16  Q    And in that investigation, the name Randallstown/Park

17  Heights organization never came up?

18  A    Not Randallstown/Park Heights organization.

19  Q    So my question to the answer is correct, that name never

20  came up?

21  A    Not that I recall, no.

22       MR. KURLAND:  Thank you.  No further questions right

23  now.  But we would like this witness subject to recall.

24       THE COURT:  All right.

25       MR. HARDING:  One moment, Your Honor.

REDIRECT EXAMINATION OF GIGANTI                    155

1          THE COURT:  Yes.

2          (Pause in proceedings.)

3          REDIRECT EXAMINATION

4    BY MR. HARDING:

5    Q    Let me ask you about how you initially got involved with

6    investigating Oliver McCaffity very briefly, Detective.  You said

7    you stopped him for speeding, is that correct?

8    A    Yes, sir.

9    Q    And did that cause you to do a criminal history check on Mr.

10   McCaffity?

11   A    Yes, it did.

12   Q    Did he have a criminal history?

13   A    Yes, he did.

14   Q    Included narcotics and possibly violent crimes as well?

15   A    Yes.

16   Q    Did you also then interview people who were knowledgeable

17   about drug trafficking in the Park Heights area?

18   A    Yes.

19   Q    And is that how you became interested in Mr. McCaffity as a

20   possible target for investigation?

21   A    Yes, sir.

22   Q    You said that you were taken off the task force in 2004.  Is

23   that when you went to the Regional Warrant Apprehension Task

24   Force?

25   A    It was either 2004 or 2005.  I can't remember the date.  I

1    went back to the Warrant Apprehension Task Force.

2    Q    Before that you had been assisting some of the homicide

3    detectives in this case, is that correct?

4    A    Yes, sir.

5    Q    But after you joined the Warrant Apprehension Task Force,

6    you were assigned to other duties, namely, I believe you said

7    earlier, chasing fugitives, is that correct?

8    A    That is correct.

9    Q    You testified about how you made contact with Mr. Harris's

10   probation officer, Mr. Cavanaugh, is that correct?

11   A    Mr. Harris's probation officer, Kevin Cavanaugh, yes.

12   Q    You didn't take over probationary supervision of Mr. Harris,

13   did you?

14   A    No, not at all.

15   Q    Mr. Cavanaugh continued to be his probation supervisor, is

16   that correct?

17   A    Yes, sir.

18   Q    You testified that there was a meeting between Mr. Harris

19   and Mr. Dobropolski on October 27th, 2003, at which you were not

20   present, isn't that correct?

21   A    Yes, sir.

22   Q    Is that the first meeting of any kind that you're aware of

23   between Mr. Dobropolski and Mr. Harris?

24   A    Yes.

25   Q    So these efforts to contact Mr. Harris through somebody

1    named Slo, were those telephone contacts you're talking about?

2    A    Initially, they were telephone contacts and they were

3    actually attempt to do it in person.

4    Q    Okay.  But was there a meeting between Mr. Dobropolski and

5    Mr. Harris prior to the meeting on October 27th, which occurred

6    at Parole and Probation?

7    A    Yes.

8    Q    There was?

9    A    You asked if Mr. Harris --

10   Q    Was there a meeting, an actual meeting, not a conversation.

11   A    Oh, I'm sorry.  No.

12   Q    Okay.  Mr. -- well, one of the defense attorneys, I guess it

13   was Mr. Martin, was asking you about the statement on Page Six of

14   your grand jury testimony, where you indicated that the left palm

15   print of Shelton Harris was on the bumper of the vehicle.  Do you

16   recall that?

17   A    Yes.

18   Q    Are you, are you aware today that that's erroneous, or do

19   you know?

20         MR. MARTIN:  Objection.

21   A    No, I do not know.

22         MR. MARTIN:  Withdraw.

23   Q    Okay.  Can I ask you, on January 21st, 2004, I believe you

24   testified already, you were summarizing other evidence that the

25   grand jury had already heard, is that correct?

1    A    Yes, sir.

2    Q    In fact, wasn't it made clear, I'll call your attention to

3    Page 4 of the grand jury transcript, wasn't it made clear that

4    what you were doing was recapitulating for the grand jury

5    testimony they'd already heard from other witnesses?

6    A    Yes.

7    Q    Had they already heard from homicide detectives who

8    investigated the McCaffity/Brown and the Wyche brothers

9    homicides?

10            MR. MARTIN:  Objection, Your Honor.

11            THE COURT:  Overruled.  You may answer if you know.

12    A    Yes.

13    Q    Okay.  In fact, is there --

14            THE COURT:  Don't lead the witness.

15    Q    Okay.  So in other words, if the grand jury heard testimony

16    over the course of many weeks from a great many different

17    witnesses, was it your role on that particular date, in January

18    of '04, to simply provide a sort of capsule summary so that

19    they'd be up to snuff when it came time for them to vote on an

20    indictment in this case?

21            MR. MARTIN:  Objection.

22            THE COURT:  Overruled.  You may answer.

23    A    Yes.

24    Q    Mr., I believe it was Mr. Martin, was asking you about two

25    devices being placed on Mr. Dobropolski for one of these

1    undercover meetings with Mr. Harris.  Do you recall that?

2    A    Yes, sir.

3    Q    And one of the devices was called a Kell, is that correct?

4    A    Correct.

5    Q    A Kell, is that a regarding device or a transmitting device?

6    A    It's been so long I can't remember.  If it's a transmitter

7    or the recorder, I can't remember.

8    Q    Okay.  Well, there were two devices placed on Mr.

9    Dobropolski.  Was one of them a transmitter and one of them a

10   recording device?

11   A    I just don't remember.  I apologize.

12   Q    Okay.  Do you want to refer to your notes for the December

13   and January meetings?  I'm not sure which it was.  Does it refer

14   to a Kell transmitter?

15   A    Correct.  The Kell would be the transmitter and the compact

16   disk was just a recording.

17   Q    Okay.  So there's only one recording, is that correct?

18   A    Yes.

19   Q    And you testified that part of those recordings weren't very

20   good or weren't audible, is that correct?

21   A    Yes, sir.

22   Q    In your experience, is it often difficult to get

23   satisfactory recordings using wired-up cooperators in this

24   fashion?

25            MR. MARTIN:  Objection.  Foundation.

REDIRECT EXAMINATION OF GIGANTI                                   160

1          THE COURT:  Overruled.  You may answer.

2     A    Yes.

3     Q    And why is that, in general?

4     A    You could have a device work perfectly when you test it but

5     when you put it on the street, the way a person moves, meaning

6     the way they walk, their clothing, the way the air is moving, if

7     it's bad weather, background noise, could interfere with

8     anything.

9     Q    Is the recording device concealed on the person?

10    A    Yes, it is.

11    Q    Concealed how?

12    A    Either underneath of clothing or in another device, for

13    example, pagers.  Could be in, could be in anything that we could

14    use to hide it so somebody would not know that they have a Kell

15    device or recording device on.

16    Q    Okay.  And does that sometimes prevent an audible recording

17    from being made, the concealment of the device?

18    A    Yes.

19    Q    Mr. Crowe was asking you just now about a couple of passages

20    in your affidavit where you referred to the fact that, on Page

21    Five , when you referred to the fact that two cooperators

22    expected that they would get reductions in their sentences

23    through their cooperation.  Do you remember that?

24    A    Yes.

25    Q    Did you report that because you wanted to be, you wanted the

Case 1:04-cr-00029-RDB    Document 678    Filed 06/08/09    Page 161 of 207

1    Court to know all the facts about the source of your information?

2            MR. MARTIN:  Objection.

3            THE COURT:  Overruled.

4    A    Yes, I did.

5    Q    Did you also, on Page 11, provide the details of Mr.

6    Martin's alibi for the Wyche brothers murder in an effort to make

7    sure that the Court, when it reviewed this affidavit, had all,

8    all sides of the story?

9            MR. MARTIN:  Objection.

10           MR. CROWE:  Objection to the term "alibi", Your Honor.

11           THE COURT:  Overruled.  You may answer.

12   A    Yes.

13   Q    Was this information about Mr. Martin's alibi information

14   you obtained from Detective Niedermeier?

15   A    Yes.

16   Q    Okay.  Detective Niedermeier, by the way, testified in that

17   January grand jury, also, is that correct?

18   A    I would have to check.  But yes.

19   Q    Yes.  Check.  Let me refer you to a specific page.  On Page

20   Seven.  Let me call your attention to this paragraph right here.

21   Can you tell us, had Detective Niedermeier testified before the

22   grand jury that very day, before you testified?

23   A    Yes.

24   Q    Okay.  Was it your understanding that, did you know about

25   Mr. Martin's alibi from seeing the charge slip or by some other

1   way, or just by having Detective Niedermeier tell you about it?

2   A    I don't remember if it was, I don't remember which way it

3   went.

4   Q    Okay.  One second, Your Honor.  As far as you're aware,

5   there was no video of the movie that Mr. Martin raised as his

6   alibi for the Wyche brothers murder, was there, Detective

7   Giganti?

8   A    Say that one more time.  I'm sorry.

9   Q    There was no surveillance video as far as you're aware?

10  A    Correct.

11        MR. HARDING:  No further questions, Your Honor.

12        RECROSS EXAMINATION

13  BY MR. LAWLOR:

14  Q    Detective, is it fair to say that given the amount of time

15  that's passed since your involvement in this case, that your

16  memory's fairly faded?

17  A    It has faded, yes.

18  Q    Okay.  And you testified, and for example, Mr. Crowe asked

19  you about Mr. Montgomery.  He was your confidential source

20  according to an affidavit you provided to the Court --

21  A    I refer to him as a source but he was not my, I did not sign

22  him up as a confidential source.

23  Q    All right.  Sometime ago you were aware of the fact that he

24  was a cooperating witness in this case, but now you're not?  Is

25  that fair?

1    A    No.  Because I'm not understanding what you're asking.

2    Q    All right.  Mr. Crowe showed you an affidavit, correct?

3    A    Correct.

4    Q    In the affidavit it referred to Mr. Montgomery as a

5    cooperating witness in this case, correct?

6    A    At that time, yes.

7    Q    Fifteen minutes ago I asked you whether or not you knew Mr.

8    Montgomery was a cooperating witness in this case and you said

9    you didn't know.

10   A    Correct.

11   Q    All right.  So that's an example of the fact that you really

12   have a very, very -- and I'm not criticizing you, it's been four

13   years.  But is it fair to say that your memory of the facts of

14   this case has really faded?

15   A    It has faded, yes.

16   Q    Okay.  And you testified that you went into a grand jury

17   hearing several years ago and testified, and you were kind of

18   reviewing reports to the grand jury, right?

19   A    Summarizing, yes.

20   Q    Summarizing.  You weren't testifying from your own memory.

21   You were kind of reading information that had been gathered by

22   many detectives and been reporting it to grand jury, right?

23   A    Yes, sir.

24   Q    And you got questioned by four attorneys after Mr. Harding

25   asked you some questions.  And "I don't know" was a common

164

1    answer, unfortunately, right?

2    A    Yes.

3    Q    Okay.  And you don't have any notes up there that you're

4    testifying from, right?

5    A    Correct.

6    Q    And Mr. Harding asked you on direct examination a lot of

7    questions and those you knew the answer to, right?

8    A    I answered the questions I knew.

9    Q    You don't recall saying "I don't know" to any of those

10   questions, right?  Do you recall that?

11          MR. HARDING:  Objection.

12          THE COURT:  Well, the jury's recollection of all the

13   testimony and evidence will control.  Whether the witness recalls

14   a particular answer is not what's important.  Go ahead, Mr.

15   Lawlor.

16   BY MR. LAWLOR:

17   Q    Okay.  Did you meet with Mr. Harding in preparation for your

18   testimony today?

19   A    Not today.

20   Q    Did you go meet with him prior to today in preparation for

21   your testimony today?

22   A    Yes, sir.

23   Q    You met with him recently?

24   A    Yes.

25   Q    Okay.  And like your grand jury, were you sort of reviewing

1   reports so that you could come and provide to this jury

2   information that you'd gathered from a lot of different sources?

3   A    Correct.

4   Q    Okay.  So a lot of it's second-hand information, right?

5   A    Depends what you're referring to.  Some of it's first-hand

6   information.  Sometimes second-hand information.

7   Q    Okay.  Some of it's first-hand, some of it's second-hand.

8   Would you remember the answers that you gave on direct

9   examination but for the fact that you just met with Mr. Harding?

10          MR. HARDING:  Objection.

11          THE COURT:  Sustained.

12          MR. LAWLOR:  No further questions.

13          RECROSS EXAMINATION

14  BY MR. MARTIN:

15  Q    Detective, Mr. Harding asked you a couple of questions about

16  the recordings.  I think you told me on my first cross that the

17  Kell is a transmitter, correct?

18  A    Correct.

19  Q    So the Kell transmits, if it's working right, a conversation

20  to some place outside the area where the conversation's taking

21  place, correct?

22  A    Correct.

23  Q    And on that other end, there is usually somebody recording

24  it, isn't it?

25  A    Yes.

1    Q    And in addition, he wore a tape recorder?

2    A    Correct.

3    Q    And that would record a conversation right there on his

4    person, correct?

5    A    Correct.

6    Q    So there should be two recordings, isn't that right?

7    A    Correct.

8    Q    May both be inaudible, as you say, but there should be two

9    recordings?

10   A    In that statement, yes.

11   Q    And you testified that it is common for these devices to not

12   work, depending on the weather or the conditions where you're

13   trying to do the taping, correct?

14   A    Yes, sir.

15   Q    And so despite that, and despite the fact that on the first

16   occasion you got what you termed was an inaudible recording, you

17   continued over the next two months to do the same thing three

18   more times, correct?

19   A    Correct.

20   Q    So you never decided to change your methods.  You used the

21   same methods, correct?

22   A    Correct.

23   Q    And you had the federal government working with you on the

24   last couple months of that odyssey that you were on, didn't you?

25   A    Yes, sir.

1    Q    And they didn't have equipment that would work better than

2    what you had?

3    A    Worked with the equipment that was given to me.

4    Q    And those devices that Mr. Dobropolski was wearing, the, not

5    the Kell device, but the other device, taping, has a switch where

6    you can turn it off and on, doesn't it?

7    A    No.  I don't believe it does.

8    Q    So you're sure of that?  You're sure --

9    A    No.  I'm not sure.  But I'm pretty sure it doesn't.  You

10    know what?  I don't remember because I'd have to look at the

11    device again to say, yes, it did have an on and off switch.

12    Q    You wouldn't really want to give him that power, would you,

13    to turn it off and on?

14    A    No, I would not want to give him the power.

15    Q    Because the very reason you were going through this exercise

16    was you needed, you thought, some corroboration for what he had

17    to say, right?

18    A    To get cooperation, yes.

19    Q    Corroboration.  Not cooperation.  Corroboration?

20    A    Yes, sir.

21    Q    I have no further questions, Your Honor.  Thank you, sir.

22         THE COURT:  Detective, thank you very much.  You're

23    excused but you are subject to recall in this case.

24         THE WITNESS:  Okay.

25         THE COURT:  You can leave that there and we'll collect

1    it.  Thank you.

2          Members of the jury, that will conclude our abbreviated

3    court day for today.  I remind you, we will not be in session

4    tomorrow.  We'll have one more day this week on Wednesday.  And I

5    ask you to be in the jury room, we're going to start at 10 a.m.

6    on Wednesday, not 9:30.

7          So please be here no later than five of ten in the jury

8    room, ready to proceed.  I expect we'll have a full day on

9    Wednesday, go through till close to 5:00, and then that will

10   conclude your service for this week.

11         Continue to adhere to all of my instructions.  Have no

12   discussion about the case or about any of the evidence.  Continue

13   to keep an open mind.  Please leave your note pads on your

14   chairs.

15         The jury is excused until 10:00 Wednesday morning.

16         (Jury exits the courtroom.)

17         THE COURT:  Who do you expect to have on Wednesday, Mr.

18   Harding?

19         MR. HARDING:  Yes, Your Honor.  Because Mr. Martin and

20   Mr. Flannery objected to our putting Mr. Dobropolski on the stand

21   this Wednesday, we're going to postpone him until the, until next

22   Monday.  And on Wednesday, and I've already given counsel

23   notification of this late last week, we're going to call Dwayne

24   Denham and Natasha Wyche, and also a state trooper by the name of

25   Forrester.

1          THE COURT:  We've had Forrester.

2          MR. HARDING:  I'm sorry?

3          THE COURT:  We've had Forrester.

4          MR. MARTIN:  It's Wooden.

5          MR. HARDING:  I'm sorry.  It's Wooden.  We may have

6     Detective Niedermeier.  And let me just see if there's anybody

7     else.  Judge, I need to talk to Mr. Hanlon.  If there's anyone

8     else we might call, I'll notify defense counsel by e-mail this

9     afternoon.

10          THE COURT:  Okay.  Good.  That certainly sounds like a

11    full day.

12          Where do we stand on voice identifications?  Who is the

13    one, you probably told me, but who is the one witness, again,

14    that the government intended to elicit the voice identification?

15          MR. HARDING:  We were going to use Rodney Hayes, Your

16    Honor.

17          THE COURT:  Oh, Hayes.  Right.

18          MR. HARDING:  I can't say for sure right now if we're

19    going to elicit on his direct any voice identifications.

20    Obviously, Mr. Martin's attorney and Mr. Gardner's attorney would

21    elicit his testimony if we don't, judging from the, what we've

22    had already in this trial.  So it may be that we won't do it and

23    we'll rely Mr. Martin and Mr. Gardner's attorney to do it.

24          THE COURT:  All right.  Anything else for the good of

25    the order?

1          MR. MARTIN:  As I think you can tell, Your Honor, I'm

2    still troubled by the Dobropolski thing.  Now I think there's a

3    videotape and maybe another recording that I don't have.  My guy

4    in New York is working around the clock to try to get these

5    things enhanced.  We've had some success with one of them.

6          You know, at some point, Your Honor, I think there's

7    got to be some kind of sanction for this.  I'm not trying to be

8    obstreperous.  But I started asking for this stuff four years

9    ago.  You heard him testify.  He was in the grand jury.  Last

10   week Mr. Harding didn't want to let us have the grand jury

11   transcript.  When he gave it to us, lo and behold, there's a

12   statement of my client in there.  I should have had that four

13   years ago.

14         You know, I hesitate to do anything to muck this thing

15   up.  But you know, I want to think it over for a day and tell you

16   what I think I might want to do.  But you know, it is why I'm

17   objecting to him on Wednesday because I still am not sure I have

18   everything.  And because putting together what I'll do with him

19   in cross with these recordings is going to take a little time to

20   put together, anyway.

21         But I just want the Court to know that I'm still not

22   satisfied as to the explanations I've been getting about why I

23   don't have this stuff.

24         THE COURT:  All right.  Thank you, Mr. Martin.  Mr.

25   Crowe.

1        MR. MARTIN:  Your Honor, one other thing.  The two

2   letters that Mr. Dobropolski wrote, I only got those a couple

3   days ago.  I mean, those are statements supposedly my client made

4   that they've had since 2004.

5        THE COURT:  How did that happen?  How did that happen?

6        MR. MARTIN:  I cannot understand why it takes this long

7   and why I had to do this.  Your Honor, if I hadn't insisted, we

8   never would have seen that stuff.

9        THE COURT:  Why did it, why are you just getting the

10  letters?

11       MR. MARTIN:  They handed them to me the other day.  I

12  didn't know they existed.  That's all I can say.  All I can tell

13  you is what's happened, Your Honor.

14       THE COURT:  All right.  Mr. Crowe.

15       MR. CROWE:  Your Honor, one of the witnesses that the

16  government intends to call on Wednesday is Natasha Wyche.  My

17  firm recollection is that she identified my client on the voice

18  mail.  I'm 99% certain she identified Mr. Gardner.  And I believe

19  she identified Mr. Mitchell.

20       My request is that if any counsel is going to try to

21  elicit those identifications, whether on the prosecution side or

22  defense counsel, I would like to know ahead of time so that we

23  could have the voice ID suppression hearing we've talked about.

24       THE COURT:  Well, I think that's a fair request.  I

25  frankly believe that counsel, I mean, I presume it would be Mr.

1    Martin or Mr. Flannery, if anybody.

2            MR. CROWE:  From my recollection of the

3    identifications, I would think that would be true.

4            THE COURT:  All right.  So it seems to me that Mr.

5    Martin or Mr. Flannery should let us know if they intend to do

6    that before the witness takes the stand, and we'll have a brief

7    voir dire.  But from what I've heard, she would seem to be

8    untainted insofar as -- I shouldn't say "untainted."  She's the

9    mother, correct?

10           MR. CROWE:  She is the wife of Darryl Wyche.

11           THE COURT:  She's the wife.  She's the wife.  And the

12   evidence is that -- didn't she, haven't I heard a proffer that

13   she's going to testify that she helped count out some money the

14   night of the murder?  Or do I have that confused?

15           MR. CROWE:  She was aware of narcotics.

16           THE COURT:  Right.

17           MR. CROWE:  She was aware of money.  And I think she

18   counted out $26,000.

19           THE COURT:  She's a coconspirator, with all respect.

20           My point is simply that she would certainly appear,

21   from what I've heard, to be in a position to know, know the

22   defendants and their voices, from what I've heard.  Yes.  We'll

23   have a voir dire of the witness, I think it will be brief, if any

24   of counsel intend to elicit a voice identification.

25           MR. KURLAND:  Two brief things, Your Honor.  Mr.

1    Crowe's 99% certain notwithstanding, it's my understanding that

2    Natasha Wyche knows Mr. Gardner but does not identify him and, in

3    fact, it might well be the case that we elicit that on cross,

4    that she is unable to do that.

5            The other point is the government had a witness today

6    that was supposed to come but didn't.  And in their list of

7    witnesses for Wednesday, they did not list her.  I was just

8    wondering, I don't want to infer that she's not going to be a

9    witness.

10           THE COURT:  If she's in the hospital today, it's

11   unlikely she'll be here on Wednesday.

12           MR. HARDING:  I guess we should, we should hold out

13   that as a possibility, Your Honor.  We just don't know.

14           THE COURT:  Who was that again?

15           MR. HARDING:  Damita Green.

16           THE COURT:  So she may be here.

17           MR. KURLAND:  Thank you for that clarification.

18           THE COURT:  All right.  Mr. Flannery.

19           MR. FLANNERY:  Thank you, Your Honor.  Mr. Martin and I

20   understand that with these individual witnesses that would give

21   voice identifications, there's generally an inconsistency in the

22   basis that they would have to identify any particular set of

23   defendants.  Generally, one may know three of them, one may know

24   two of them.  And we believe that would probably be the case,

25   quite frankly, with Ms. Wyche as well.

1          But we believe that it's in Mr. Harris's interest for

2     as many witnesses to identify as many people because we believe

3     the very number of people that witnesses identify is in Mr.

4     Harris's interest.  So we would look to elicit those

5     identifications beyond the identification itself, but also for

6     the number of people that people are hearing on this particular

7     voice mail.

8          THE COURT:  That had occurred to me earlier, frankly.

9     I'm glad you brought that up that way, Mr. Flannery.  Rather than

10    go through all these voir dires, I wonder if counsel don't want

11    to really think about it further.  I know you thought about it

12    carefully.

13         But as you suggest, and I don't know if you're going

14    quite this far, but if it's true, as I've heard, as many as nine

15    people claim to have identified one or more persons, it's hard to

16    see why it doesn't redound to the benefit of the defendants to

17    have all of them come in and testify to who they think was there.

18    Because if I hear you right, the sheer number and inconsistency

19    among all these witnesses would suggest to the jury that nobody

20    can identify anybody.  That everybody's hearing everybody and

21    nobody really knows what they're talking about.

22         Again, I'm sure counsel have reflected on that

23    possibility.  But it certainly would reduce the amount of time if

24    we just, on Wednesday, could come in and say, okay, without voir

25    dire, let's just have at it.  And everybody ought to be asked,

1    did you listen to the tape?  Did you hear any voices?  Whose

2    voice did you think you heard?

3         And as Mr. Martin and you have suggested throughout the

4    proceedings, once the jury hears that tape, I think the jury's

5    going to have a serious question in their mind, despite my

6    earlier rulings, serious question in their minds as to the weight

7    that should be given to anybody's identification of anybody's

8    voice on that tape.

9         So I mean, am I reading you right?

10        MR. FLANNERY:  Yeah.  I think that's certainly one of

11   tones, Your Honor.  I mean, the inconsistencies in

12   identifications.  At a certain point, the identifications from

13   individual witnesses begin to bear on the number of people that

14   may have even, are picked up on that recording.  And then there's

15   the question of the veracity of the individual identifications

16   themselves.  There's three overtones to each witness, really.

17        THE COURT:  All right.  Well, what I'm reading from Mr.

18   Harding now, if I'm reading it right, is that the government does

19   not intend to elicit in any direct examination of any witness a

20   voice identification.  And so I leave it to the defense.  You all

21   can talk about this.

22        And to the extent you all just want to say, okay, let's

23   just open it up and anybody could ask anybody about a voice

24   identification, and then, of course, the government can come back

25   on redirect and do the same thing.  And then as a part of that

1    decide when you want to play the tape.  Because I think, frankly,

2    as Mr. Martin suggested last week, we ought to play the tape for

3    the jury as soon as possible so that they know what they're

4    talking about when you start asking these witnesses, did you hear

5    the tape, did you, did you recognize anybody's voice?

6            So the government may be willing to do, I mean -- well,

7    obviously, the defense can introduce the tape.

8            Anyway, so think about all of that and we may be able

9    to cut through this.  Mr. Harding, if you have a different view

10   or however you want to approach it.

11           MR. HARDING:  Well, I was going to play the tape with

12   Niedermeier.  However, I'm now not sure when he's going to be

13   testifying.  I'm happy to play it with, I think we'd be willing

14   to consider playing it with one of the other witnesses, if the

15   Court thinks that's a good idea.

16           I wanted to respond briefly about these handwritten

17   statements --

18           THE COURT:  Yes.

19           MR. HARDING:  -- by Mr. Dobropolski.  It turns out that

20   not only was there the problem that Giganti left this

21   investigation years ago, he submitted those handwritten

22   statements in the witness' CI file in order to better protect his

23   identity.  They were not submitted into evidence in this case.

24   And so we did not know of their existence until last week when

25   they were turned over to Mr. Martin and Mr. Flannery.

1          I'm not suggesting that I'm not responsible.

2    Obviously, I should have gone up to DEA personally and gone

3    through all of their files as soon as I became aware that I might

4    not have all of the evidence in this case.  I should have gone up

5    there and gone through everything personally.  All I can say is

6    that, in an investigation this complicated, that has gone on this

7    long and that has lost agents along the way, I'm inclined to

8    think that something of this nature was bound to happen.  And I'm

9    sorry that it happened in this way at this time because it's

10   actually redounded much more to the disadvantage of the

11   government than to defense counsel.

12        THE COURT:  I appreciate that sentiment, Mr. Harding, I

13   really do.

14        MR. KURLAND:  Your Honor --

15        THE COURT:  Yes, Mr. Kurland.

16        MR. KURLAND:  I just want to make sure that I'm clear

17   on something.  The Court made a comment a minute ago about the

18   voice recordings and indicated that, trying to summarize the

19   government's position, that it's the government's position they

20   wouldn't call anybody and this is all defense generated.

21        THE COURT:  Here's what I was getting at.  Mr. Harding

22   said last week, maybe it was two weeks ago, that the government

23   had narrowed its choice to a single witness from whom the

24   government intended to elicit, I believe he said two voice

25   identifications, or maybe it was only one.

1          MR. KURLAND:  And it was not Mr. Gardner.

2          THE COURT:  It wasn't Mr. Gardner.  And then we went

3    through the whole thing with -- we went through all that.  And

4    then just now, ten minutes ago when I asked Mr. Harding about it

5    again, he said, if I understood him, that the government did not

6    intend to elicit a voice identification from a witness but that

7    it was, it was, it would certainly weigh in on this issue if any

8    of the defendants intended to introduce a voice identification.

9          So maybe I misunderstood him.  But what Mr. Harding was

10   saying is that contrary to what he told me last week, now they've

11   eliminated all voice identifications as a part of the

12   government's case in chief on direct.

13          So what I'm suggesting in response to Mr. Flannery,

14   since it appears now, if I'm correct, that the government's not

15   going to be eliciting any affirmative voice identification but

16   that one or more, and it seems like all of the defendants have an

17   interest as to one or two witnesses, to elicit negative voice

18   identification testimony -- you didn't hear my client's voice,

19   right?  No, I didn't.  So it seems like everybody can do that

20   with one or two witnesses.

21          So my point was simply, why not, let's just agree we

22   don't need to voir dire the witnesses.  If you've got a couple of

23   witnesses who will give you negative voice identification

24   testimony, but there are a couple of witnesses who will give

25   affirmative voice identification testimony, what I'm suggesting

1   is when you put it all together, doesn't it possibly cancel

2   everything out?

3       Mr. Flannery's point is, it's going to be all these

4   people claiming to make identifications, some negative, some

5   affirmative, some I don't know.  So that's my point.

6       MR. KURLAND:  I don't know, I'm not going to speak, I'm

7   not going to profess to speak for the government.  But I'll

8   obviously have to talk about this with co-counsel.  But my

9   initial inclination would be that if the government now is in the

10  position where they're not going to put on any affirmative in

11  their case in chief, any voice identification evidence, Mr.

12  Gardner's position would be, we would rather have zero than have

13  him be identified by two out of seven because when the grid comes

14  up and people start comparing whatever --

15      THE COURT:  That's fine.  Then that means if that's the

16  position you and Mr. Coburn take, we'll have to go through the

17  voir dire of each witness because, as counsel have agreed,

18  contrary to my early speculation, state action is not a

19  prerequisite for Sixth Amendment guarantee regarding

20  identification testimony.

21      So that doesn't mean you're going to keep it out.

22      MR. KURLAND:  I understand that.

23      THE COURT:  Because, just to use an example, Mr.

24  Flannery wants to elicit testimony from people who know his

25  client and his client's voice, or who claim to, that they've

180

1    listened to the tape probably several times and they don't hear

2    Mr. Harris's voice on the tape.  And so some of those witnesses,

3    I assume, are going to say, But I hear Mr. Gardner's voice on the

4    tape.

5              MR. KURLAND:  Well, not many will say that.

6              THE COURT:  If only one says it, I still got to have a

7    suppression hearing, a voir dire of the witness before I permit

8    anybody to elicit Mr. Gardner's testimony, affirmative testimony

9    identifying Mr. Gardner's voice on the tape.

10             MR. KURLAND:  We might well have a severance motion

11   coming.

12             THE COURT:  Well, get in line.

13             MR. KURLAND:  I understand that.  I understand that.

14             THE COURT:  Get in line.  All right.  I think we're

15   clear.  Mr. Harding, did I read you right or did I --

16             MR. HARDING:  No.  You read me absolutely right.  But I

17   thought I indicated that that's what we were now contemplating

18   doing.  I didn't --

19             THE COURT:  Right.  No.  I understood.

20             MR. HARDING:  Also, Your Honor, of course, if the

21   defendant elicit negative ID testimony, the government will

22   elicit positive ID testimony.  I don't think the witnesses should

23   be in the position of exonerating certain defendants without

24   implicating certain defendants.

25             THE COURT:  Of course.  Absolutely.  Absolutely.

1          All right.  Thank you, counsel.  We're in recess until

2   10:00 Wednesday morning.

3          (Conclusion of Proceedings at 2:42 p.m.)

182

```
 1                        INDEX                 PAGE

 2   WITNESS: JAMES WAGSTER

 3   DIRECT EXAMINATION BY MR. HARDING             28

 4   CROSS EXAMINATION BY MR. COBURN (ON VOIR DIRE)  32

 5   CONT'D DIRECT EXAMINATION BY MR. HARDING      32

 6

 7   WITNESS: TENIERA BROWN

 8   DIRECT EXAMINATION BY MR. HARDING             39

 9   CROSS EXAMINATION BY MR. FLANNERY             46

10   REDIRECT EXAMINATION BY MR. HARDING           54

11

12   WITNESS: LORRAINE LANSEY

13   DIRECT EXAMINATION BY MR. HARDING             56

14   CROSS EXAMINATION BY MR. FLANNERY             80

15   REDIRECT EXAMINATION BY MR. HARDING           84

16

17   WITNESS: DETECTIVE JOHN GIGANTI

18   DIRECT EXAMINATION BY MR. HARDING             85

19   CROSS EXAMINATION BY MR. LAWLOR              124

20   CROSS EXAMINATION BY MR. MARTIN              129

21   CROSS EXAMINATION BY MR. CROWE               147

22   CROSS EXAMINATION BY MR. KURLAND             153

23   REDIRECT EXAMINATION BY MR. HARDING          155

24   RECROSS EXAMINATION BY MR. LAWLOR            162

25   RECROSS EXAMINATION BY MR. MARTIN            165
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on September 29,

6    2008.

7          I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                         _____

                           Mary M. Zajac,
16                         Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

**$26,000** [1] - 172:18

**'**

**'04** [1] - 158:18
**'86** [1] - 29:20

**0**

**045-BEK** [2] - 41:23, 87:22

**1**

**1** [3] - 64:1, 134:1, 134:7
**1%** [1] - 75:2
**1/21/2004** [1] - 148:5
**1/6/04** [1] - 121:11
**10** [4] - 37:8, 37:10, 64:1, 168:5
**10/8/2003** [1] - 79:3
**101** [1] - 1:24
**10171** [3] - 113:11, 113:17, 114:2
**10:00** [2] - 168:15, 181:2
**11** [14] - 26:25, 94:25, 95:4, 95:10, 99:18, 100:19, 102:14, 104:4, 105:1, 105:8, 105:10, 151:20, 152:15, 161:5
**11/12/03** [1] - 146:19
**11/3/03** [1] - 146:20
**11/4/03** [2] - 146:17, 146:21
**11:00** [1] - 113:23
**11:21** [1] - 90:9
**12/4/03** [1] - 134:4
**124** [1] - 182:19
**129** [1] - 182:20
**12:00** [1] - 13:14
**12:20** [1] - 102:16
**12:30** [1] - 13:16
**147** [1] - 182:21
**149** [1] - 59:14
**14th** [2] - 29:7, 108:8
**15** [3] - 13:16, 84:24, 102:25
**153** [1] - 182:22
**155** [1] - 182:23
**162** [1] - 182:24
**165** [1] - 182:25
**17** [1] - 149:12
**1792036** [1] - 79:3

**18** [1] - 151:4
**18,334** [1] - 74:22
**180** [1] - 101:8
**1983** [1] - 56:12
**1984** [2] - 56:15, 57:3
**1986** [1] - 29:19
**1988** [1] - 146:5
**1992** [2] - 29:7, 29:22
**1999** [3] - 41:23, 46:18, 148:20

**2**

**2/28/02** [3] - 33:12, 52:18, 53:3
**20** [2] - 84:24, 102:25
**200** [1] - 74:23
**2001** [1] - 41:12
**2002** [14] - 41:14, 41:15, 46:19, 68:1, 74:20, 74:22, 86:2, 86:3, 88:13, 108:8, 108:9, 113:6, 116:1, 152:14
**20023rd** [1] - 42:12
**2003** [6] - 77:22, 78:13, 83:22, 119:2, 132:7, 156:19
**2004** [16] - 121:4, 122:7, 123:3, 123:9, 138:22, 141:11, 143:4, 147:19, 148:8, 149:12, 150:16, 150:19, 155:22, 155:25, 157:23, 171:4
**2005** [1] - 155:25
**2007** [1] - 40:18
**2008** [2] - 1:11, 184:6
**2009** [1] - 184:11
**2023** [4] - 42:6, 42:11, 45:4, 67:17
**205** [2] - 93:10, 93:24
**20th** [2] - 23:5, 23:6
**21** [2] - 148:7, 150:19
**21201** [1] - 1:25
**21st** [2] - 138:22, 157:23
**22** [1] - 56:16
**23** [2] - 149:4, 149:5
**24** [5] - 56:17, 56:18, 59:4, 149:5, 152:14
**25** [4] - 56:10, 85:2, 102:15, 102:20
**27th** [9] - 23:6, 26:22, 90:9, 110:22, 113:6, 113:16, 132:7, 156:19, 157:5
**28** [1] - 182:3
**28th** [10] - 41:15, 46:19, 88:12, 97:19, 98:9, 98:12, 110:22, 113:7,

113:19, 113:20
**29** [4] - 1:11, 138:9, 139:2, 184:5
**2:00** [1] - 13:17
**2:30** [1] - 113:20
**2:42** [1] - 181:3

**3**

**30** [6] - 13:15, 85:2, 94:19, 94:21, 99:16, 102:25
**31** [2] - 92:9, 92:10
**32** [2] - 182:4, 182:5
**33** [1] - 149:1
**357** [4] - 34:24, 35:1, 35:2, 35:10
**38** [5] - 34:23, 34:24, 35:1, 35:2, 35:10
**38/.357** [1] - 35:6
**39** [1] - 182:8

**4**

**4** [1] - 158:3
**40** [4] - 37:5, 37:7, 37:8, 37:11
**40-A** [1] - 120:9
**40-B** [1] - 120:9
**40-C** [1] - 120:9
**40-D** [1] - 120:9
**40-E** [1] - 120:9
**40-F** [1] - 120:9
**404** [2] - 30:25, 31:7
**41** [1] - 120:9
**410** [1] - 121:20
**410-669-6731** [1] - 92:10
**410-880-1749** [1] - 121:18
**42** [1] - 120:9
**43** [1] - 120:9
**44** [1] - 120:9
**45** [1] - 120:9
**46** [2] - 120:10, 182:9
**4916** [2] - 109:4, 110:10
**4:26** [1] - 113:16
**4th** [3] - 108:9, 133:2, 133:7

**5**

**50/50** [1] - 63:19
**54** [1] - 182:10
**5515** [1] - 1:24
**56** [1] - 182:13
**5811** [2] - 94:8, 112:5
**5:00** [1] - 168:9

**6**

**6** [3] - 90:25, 91:1, 91:3
**669-6731** [1] - 92:21
**6th** [3] - 77:22, 121:4, 122:7

**7**

**7** [1] - 148:20

**8**

**8** [1] - 62:22
**80** [1] - 182:14
**84** [1] - 182:15
**85** [1] - 182:18
**850-0380** [1] - 121:21
**8642** [1] - 117:24
**880** [1] - 121:21
**8:15** [2] - 91:1
**8th** [2] - 78:12, 97:25

**9**

**9** [1] - 30:16
**97th** [1] - 64:1
**99%** [2] - 171:18, 173:1
**9:30** [1] - 168:6
**9:41** [2] - 90:15, 152:14
**9:43** [1] - 2:2

**A**

**a.m** [1] - 168:5
**AA** [1] - 29:15
**abbreviated** [1] - 168:2
**abductions** [1] - 41:5
**able** [37] - 10:12, 12:7, 23:11, 33:23, 34:6, 34:22, 37:1, 37:16, 44:1, 58:11, 58:17, 73:6, 73:12, 74:1, 74:23, 75:16, 78:5, 78:11, 79:23, 92:20, 96:6, 96:13, 98:18, 98:22, 108:10, 108:20, 110:24, 120:4, 120:10, 142:25, 146:16, 152:11, 152:19, 176:8
**abrasive** [1] - 75:21
**abrupt** [1] - 65:4
**absent** [1] - 38:25
**absolutely** [1] - 180:16
**Absolutely** [4] - 6:17, 61:2, 180:25

**absorbent** [2] - 70:20, 72:8
**absorbs** [1] - 48:23
**abuses** [1] - 41:5
**academy** [1] - 31:13
**Academy** [1] - 31:16
**acceptance** [1] - 32:11
**accepted** [2] - 32:18, 77:11
**accidental** [1] - 62:18
**accord** [1] - 101:13
**according** [3] - 33:11, 117:17, 162:20
**According** [2] - 42:6, 108:14
**accurate** [4] - 35:8, 74:14, 80:1, 184:9
**accurately** [1] - 52:17
**ACE** [3] - 64:14, 64:16, 66:24
**ACE-V** [3] - 64:14, 64:16, 66:24
**acknowledgments** [1] - 12:10
**acronym** [1] - 64:16
**action** [2] - 38:3, 179:18
**actual** [8] - 45:5, 71:9, 71:13, 73:7, 83:16, 93:2, 123:18, 151:18, 157:10
**Adam** [1] - 1:21, 153:7
**adding** [1] - 31:3
**addition** [3] - 2:19, 91:23, 166:1
**additional** [2] - 96:22, 97:21
**address** [14] - 2:25, 3:8, 17:15, 89:5, 89:17, 93:6, 93:9, 96:16, 110:10, 110:12, 110:13, 117:24, 150:20
**addresses** [1] - 110:9
**addressing** [1] - 16:10
**adhere** [2] - 72:10, 168:11
**adhesive** [1] - 49:11
**adjust** [1] - 96:6
**admissible** [4] - 14:18, 14:19, 14:25, 15:1
**admission** [2] - 11:20, 143:12
**admissions** [2] - 142:14, 142:18
**admit** [1] - 143:2
**admits** [1] - 12:1
**admitted** [1] - 143:1
**adopt** [1] - 17:24
**advance** [1] - 3:24
**advanced** [1] - 57:24
**advertise** [1] - 73:13
**advised** [2] - 12:17,

47:13
  **advising** [1] - 3:25
**affect** [10] - 25:9, 69:7, 69:9, 69:19, 69:25, 70:6, 70:10, 70:17, 71:21, 75:16
  **affidavit** [14] - 148:1, 148:4, 150:1, 150:18, 151:3, 151:11, 151:14, 151:19, 152:15, 160:20, 161:7, 162:20, 163:2, 163:4
  **affiliated** [1] - 126:3
  **affirmation** [1] - 25:14
  **affixed** [1] - 184:10
  **AFIS** [1] - 57:20
  **AFTE** [1] - 30:9
  **afternoon** [11] - 95:8, 95:12, 95:13, 113:16, 124:13, 124:14, 129:18, 129:19, 147:16, 153:7, 169:9
  **age** [1] - 109:16
  **agent** [1] - 132:23
  **Agent** [1] - 33:5
  **agents** [1] - 177:7
  **ago** [18] - 2:15, 2:20, 5:4, 6:21, 67:10, 95:16, 124:15, 129:22, 162:23, 163:7, 163:17, 170:9, 170:13, 171:3, 176:21, 177:17, 177:22, 178:4
  **agree** [5] - 26:10, 27:6, 101:23, 140:15, 178:21
  **agreed** [2] - 139:4, 179:17
  **Agreed** [1] - 18:22
  **agreement** [3] - 27:10, 66:6, 66:8
  **ahead** [10] - 12:23, 96:11, 97:10, 100:13, 110:4, 113:3, 114:10, 122:1, 164:14, 171:22
  **aiding** [1] - 128:22
  **air** [5] - 73:2, 74:5, 74:13, 76:20, 160:6
  **al** [2] - 26:4, 184:5
  **Alan** [1] - 5:1
  **alibi** [9] - 2:23, 101:2, 101:3, 161:6, 161:10, 161:13, 161:25, 162:6
  **alleged** [2] - 15:2, 129:3
  **allegedly** [1] - 143:20
  **allow** [1] - 18:13
  **allowed** [3] - 18:3, 18:4, 58:21
  **allows** [2] - 11:4, 72:8
  **alongside** [2] - 30:3, 66:3
  **Alternate** [3] - 102:12,

102:13, 105:9
  **alternate** [1] - 105:11
  **Alternates** [1] - 105:12
  **alternates** [1] - 105:14
  **altogether** [1] - 72:25
  **AMC** [1] - 152:12
  **AMD-04-029** [2] - 1:6, 184:5
  **Amendment** [2] - 10:2, 179:19
  **America** [1] - 26:4
  **AMERICA** [1] - 1:4
  **Amity** [2] - 93:10, 93:24
  **ammunition** [1] - 75:12
  **amount** [3] - 12:3, 162:14, 174:23
  **Amtrak** [1] - 98:2
  **Analysis** [1] - 66:21
  **analysis** [11] - 32:10, 53:20, 57:7, 62:10, 62:24, 64:17, 64:19, 65:23, 66:19, 78:20, 89:12
  **analyzed** [1] - 58:15
  **Andre** [1] - 1:13
  **Anne** [1] - 152:4
  **annually** [1] - 59:25
  **answer** [27] - 4:15, 14:10, 16:6, 28:4, 28:6, 96:18, 106:7, 108:7, 108:23, 115:19, 120:17, 123:22, 126:9, 126:12, 128:17, 133:23, 137:5, 137:7, 150:13, 154:19, 158:11, 158:22, 160:1, 161:11, 164:1, 164:7, 164:14
  **answered** [2] - 67:11, 91:24, 164:8
  **answering** [1] - 99:15
  **answers** [2] - 2:13, 165:8
  **Anthony** [3] - 36:10, 36:12, 36:20
  **anticipate** [2] - 3:10, 23:21
  **anticipated** [1] - 95:17
  **anticipating** [1] - 4:21
  **Anyway** [1] - 176:8
  **anyway** [4] - 5:18, 13:7, 92:11, 170:20
  **apartment** [2] - 97:16, 98:4
  **Apartment** [1] - 93:25
  **apologize** [2] - 144:1, 159:11
  **apologized** [1] - 25:8
  **appear** [8] - 33:3, 61:15, 65:8, 70:7, 70:11, 71:11, 111:15, 172:20

**appearance** [1] - 71:21
  **Appearances** [1] - 1:14
  **appearances** [1] - 31:4
  **appeared** [2] - 59:9, 92:2
  **appearing** [1] - 65:1
  **applied** [2] - 50:2, 71:16
  **applies** [1] - 15:20
  **apply** [3] - 49:11, 49:15, 75:10
  **applying** [2] - 45:13, 62:19
  **appointed** [2] - 5:7, 6:8
  **appointment** [1] - 6:1
  **appointments** [1] - 119:24
  **appreciate** [3] - 21:10, 60:25, 177:12
  **Apprehension** [5] - 85:16, 85:23, 155:23, 156:1, 156:5
  **apprenticeship** [1] - 30:2
  **apprised** [1] - 17:5
  **approach** [7] - 15:6, 15:7, 106:14, 131:23, 138:13, 145:8, 176:10
  **appropriate** [2] - 6:15, 96:23
  **April** [3] - 123:3, 123:9, 149:12
  **area** [28] - 29:18, 30:8, 30:13, 30:21, 31:4, 31:19, 32:19, 34:20, 48:3, 49:8, 56:22, 66:4, 73:21, 76:20, 81:12, 81:13, 81:14, 81:19, 81:20, 115:2, 115:9, 116:1, 119:22, 154:2, 154:14, 155:17, 165:20
  **areas** [2] - 62:21, 147:18
  **Arlene** [3] - 93:5, 93:9, 94:4
  **arm** [1] - 42:22
  **arrange** [1] - 119:14
  **arranged** [3] - 96:10, 132:16, 132:19
  **arrangement** [1] - 62:6
  **arrangements** [1] - 98:22
  **arranging** [1] - 132:2
  **arrested** [4] - 8:23, 16:2, 138:24
  **arrests** [2] - 148:15, 148:16
  **Arrington** [4] - 24:23, 28:9, 104:19, 105:3
  **arrows** [2] - 82:6, 82:9
  **articulate** [1] - 19:24

**Arundel** [1] - 152:4
  **aspect** [2] - 11:18, 21:14
  **aspects** [1] - 11:2
  **assaulted** [1] - 3:2
  **asserted** [2] - 10:5, 10:23
  **assigned** [5] - 56:2, 57:3, 85:16, 86:3, 156:6
  **assignment** [2] - 85:15, 86:1
  **assist** [2] - 86:14, 88:17
  **assisted** [1] - 139:2
  **assisting** [3] - 88:21, 144:15, 156:2
  **associate** [1] - 125:5
  **associated** [2] - 74:11, 114:9
  **associates** [2] - 114:21, 153:25
  **association** [1] - 88:6
  **Association** [4] - 30:9, 57:6, 58:1, 60:4
  **assume** [5] - 15:19, 89:18, 103:1, 123:12, 180:3
  **assumptions** [1] - 19:2
  **assurance** [1] - 27:2
  **attached** [1] - 87:12
  **attachments** [1] - 18:8
  **attempt** [9] - 2:16, 3:3, 47:7, 57:18, 57:22, 92:15, 127:15, 127:17, 157:3
  **attempted** [4] - 47:14, 79:12, 80:1, 129:23
  **Attempted** [1] - 127:16
  **attempts** [2] - 32:8, 32:10, 74:24
  **attended** [3] - 30:7, 30:10, 30:13
  **attention** [21] - 2:5, 19:8, 19:20, 25:10, 41:14, 44:10, 67:16, 68:18, 88:12, 89:22, 92:8, 100:2, 102:3, 107:1, 112:4, 113:5, 119:1, 124:25, 148:18, 158:2, 161:20
  **attorney** [4] - 16:3, 169:20, 169:23
  **Attorney's** [1] - 123:9
  **attorneys** [2] - 157:12, 163:24
  **attributable** [1] - 67:13
  **attributed** [1] - 92:5
  **audible** [4] - 120:23, 143:11, 159:20, 160:16
  **August** [2] - 29:20, 39:24

**authenticate** [1] - 108:2
  **authentication** [1] - 108:3
  **authored** [1] - 151:3
  **Automated** [2] - 57:21, 59:1
  **automobile** [2] - 41:18, 145:2
  **availability** [1] - 104:6
  **available** [4] - 23:5, 24:22, 97:25, 106:13
  **aware** [23] - 22:15, 31:24, 32:12, 63:18, 88:13, 96:8, 97:6, 115:24, 116:9, 132:14, 133:12, 136:3, 145:22, 152:9, 152:10, 156:22, 157:18, 162:4, 162:9, 162:23, 172:15, 172:17, 177:3

---

**B**

---

**B-R-O-W-N** [2] - 39:17
  **baby** [1] - 2:8
  **Bachelor** [2] - 56:20, 58:8
  **Bachelor's** [2] - 40:5, 40:10
  **background** [18] - 29:9, 40:4, 56:19, 62:22, 73:6, 73:8, 87:9, 109:6, 109:13, 109:16, 109:17, 110:7, 125:15, 125:18, 126:18, 153:10, 153:19, 160:7
  **Background** [2] - 73:8, 73:9
  **bad** [1] - 160:7
  **badge** [1] - 126:10
  **bag** [1] - 53:16
  **bait** [2] - 130:19, 144:8
  **ballistics** [4] - 19:1, 32:4, 32:10, 32:13
  **ballistics/firearms** [1] - 17:21
  **ballpark** [1] - 102:19
  **Ballpark** [1] - 102:20
  **Baltimore** [42] - 1:11, 1:25, 21:19, 26:1, 29:3, 29:5, 29:16, 29:19, 29:23, 30:4, 30:5, 30:25, 31:2, 31:13, 31:16, 40:15, 41:10, 43:18, 52:12, 56:2, 59:17, 59:18, 59:19, 85:14, 85:20, 86:4, 86:7, 87:19, 87:25, 88:10, 93:10, 93:25, 109:5, 114:25,

115:3, 115:9, 126:10, 127:2, 130:2, 154:14
**Barber's** [1] - 33:5
**barrel** [3] - 34:11, 37:21, 38:21
**barrier** [2] - 71:24
**Barry** [2] - 1:22, 153:8
**based** [4] - 19:2, 66:14, 72:6, 97:16
**basic** [1] - 64:20
**basis** [7] - 14:18, 14:19, 14:24, 15:6, 15:14, 70:4, 173:22
**bay** [1] - 42:1
**bear** [2] - 144:11, 175:13
**bearing** [1] - 36:16
**became** [4] - 109:6, 116:14, 155:19, 177:3
**become** [5] - 73:12, 88:13, 105:11, 115:24, 116:9
**becomes** [3] - 72:20, 72:23, 73:1
**beforehand** [1] - 140:24
**began** [2] - 107:7, 125:8
**begin** [3] - 66:4, 124:8, 175:13
**beginning** [4] - 23:3, 23:5, 95:15
**Beginning** [1] - 69:21
**Behalf** [5] - 1:15, 1:16, 1:18, 1:19, 1:21
**behalf** [1] - 124:16
**behind** [2] - 42:22, 80:25
**behold** [1] - 170:11
**believes** [1] - 14:23
**Belinda** [2] - 26:18, 95:9
**bench** [2] - 15:6, 15:7
**beneath** [1] - 79:3
**beneficial** [1] - 100:2
**benefit** [1] - 174:16
**Bentley** [2] - 115:7, 115:8
**Berger** [4] - 14:5, 88:22, 144:18, 144:20
**best** [5] - 23:7, 43:6, 84:14, 104:24
**better** [8] - 17:12, 25:2, 43:10, 80:21, 81:12, 138:17, 167:1, 176:22
**between** [22] - 10:17, 26:17, 61:23, 76:25, 77:15, 79:5, 79:13, 90:19, 91:7, 101:10, 112:9, 119:11, 119:15, 120:5, 120:11, 120:15, 129:3, 138:3, 146:11,

156:18, 156:23, 157:4
**beyond** [4] - 11:23, 83:6, 99:12, 174:5
**bichromatic** [2] - 43:4, 45:13
**bifurcation** [1] - 65:8
**biggest** [1] - 38:5
**biological** [1] - 41:7
**Biology** [1] - 56:20
**biology** [1] - 40:6
**bit** [2] - 43:6, 98:11
**black** [1] - 62:19
**Blade** [1] - 152:12
**blame** [1] - 101:21
**block** [1] - 71:25
**blood** [1] - 47:24
**Blood** [1] - 48:2
**blowing** [1] - 120:21
**blown** [2] - 17:22, 18:17
**blue** [2] - 79:11, 115:7
**Bo** [12] - 12:3, 90:10, 90:15, 90:18, 90:19, 92:5, 92:10, 107:3, 108:20, 110:7, 110:16
**Bo's** [3] - 94:8, 105:23, 109:2
**Bob** [3] - 88:22, 144:20, 144:21
**body** [1] - 137:21
**bogus** [2] - 25:7, 25:20
**book** [4] - 42:24, 84:2, 89:5, 89:17
**boss** [3] - 25:6, 25:20, 25:21
**bother** [1] - 25:9
**bottle** [2] - 42:25, 49:4
**bottom** [4] - 44:24, 51:21, 68:24, 78:24
**Boulevard** [2] - 117:15, 117:24
**bound** [1] - 177:8
**boxer** [1] - 87:19
**boxing** [1] - 98:5
**Bradford** [2] - 148:2, 150:20
**break** [5] - 13:17, 27:17, 64:19, 94:14
**breaking** [1] - 94:15
**breech** [6] - 37:20, 37:24, 38:4, 38:7, 38:11, 38:21
**bridge** [1] - 27:21
**brief** [4] - 103:17, 172:6, 172:23, 172:25
**briefly** [4] - 5:3, 95:1, 155:6, 176:16
**bring** [7] - 2:4, 19:7, 24:19, 25:10, 58:14, 67:19, 114:7
**bringing** [3] - 24:15,

108:2, 113:2
**broad** [1] - 11:17
**broadcasts** [1] - 137:16
**broke** [2] - 47:22, 105:21
**broken** [3] - 47:15, 54:15, 54:23
**brothers** [16] - 20:7, 126:3, 126:5, 126:7, 126:11, 126:15, 126:19, 126:20, 126:25, 127:8, 127:17, 143:17, 143:21, 158:8, 161:6, 162:6
**brought** [4] - 19:20, 101:9, 109:23, 174:9
**brown** [1] - 53:16
**BROWN** [2] - 39:10, 182:7
**Brown** [27] - 33:12, 33:20, 39:16, 39:20, 40:3, 42:7, 42:14, 44:14, 46:13, 46:18, 47:23, 51:8, 52:4, 52:6, 52:12, 52:15, 54:8, 55:18, 67:25, 80:3, 88:18, 111:12, 115:15, 129:4, 152:5, 152:7
**brush** [3] - 43:3, 43:8, 43:10
**Bruton** [3] - 7:19, 8:2, 8:12
**budget** [1] - 24:10
**building** [1] - 53:18
**bullet** [5] - 33:17, 34:8, 34:11, 34:14, 35:5, 37:9, 37:21, 37:23, 38:21, 38:22
**bullet's** [1] - 37:11
**bullets** [16] - 20:3, 20:9, 33:23, 34:12, 34:21, 34:22, 34:24, 35:3, 35:15, 36:9, 36:16, 36:18, 37:10, 38:23, 39:1, 75:5
**bumper** [2] - 50:22, 145:14, 157:15
**burglaries** [1] - 41:3
**bus** [1] - 98:2
**business** [6] - 87:10, 97:14, 98:10, 117:23, 118:1, 118:24
**Bussard** [8] - 5:1, 5:3, 5:7, 5:9, 5:23, 6:7, 6:20, 7:1
**BY** [53] - 28:24, 31:21, 32:21, 39:19, 46:12, 54:7, 56:5, 77:5, 77:13, 80:16, 84:11, 85:11, 105:20, 106:10, 108:4, 108:19, 110:11, 112:3,

112:15, 113:4, 114:16, 116:17, 117:9, 122:22, 124:12, 124:19, 128:12, 129:7, 129:17, 140:14, 147:15, 153:6, 155:4, 162:13, 164:16, 165:14, 182:3, 182:4, 182:5, 182:8, 182:9, 182:10, 182:13, 182:14, 182:15, 182:18, 182:19, 182:20, 182:21, 182:22, 182:23, 182:24, 182:25

### C

**caliber** [11] - 20:5, 34:22, 34:23, 34:24, 35:7, 35:10, 37:4, 37:7, 37:8
**Calvin** [1] - 79:19
**cancel** [1] - 179:1
**cannot** [3] - 14:13, 81:2, 171:6
**capsule** [1] - 158:18
**car** [43] - 26:21, 27:24, 28:3, 28:5, 43:25, 44:1, 44:17, 44:18, 47:22, 48:25, 50:11, 51:25, 52:2, 52:18, 52:23, 53:3, 54:3, 69:3, 69:4, 76:14, 76:16, 76:19, 80:6, 80:7, 83:5, 84:7, 84:13, 87:8, 87:13, 87:15, 87:20, 96:10, 96:12, 96:23, 97:23, 97:25, 98:3, 98:22, 115:6, 124:22, 124:24, 125:2
**card** [19] - 43:18, 43:22, 44:20, 45:17, 49:15, 50:2, 50:4, 51:11, 51:13, 51:15, 62:22, 68:25, 78:2, 78:12, 79:11, 82:7, 82:9, 118:24
**cards** [7] - 45:21, 45:22, 50:20, 51:14, 68:4, 68:6, 83:16
**care** [6] - 70:6, 70:16, 98:4, 99:14, 101:16
**career** [3] - 30:19, 58:10, 59:5
**carefully** [1] - 174:12
**carjackings** [1] - 41:4
**carpet** [1] - 53:11
**cartridge** [11] - 35:4, 35:6, 37:10, 37:11, 37:22, 37:25, 38:1, 38:6, 38:20, 38:22
**cartridges** [1] - 35:4
**CASE** [1] - 1:5

**case** [62] - 3:1, 3:4, 6:2, 16:23, 17:1, 20:2, 25:5, 25:21, 26:7, 34:7, 34:19, 35:5, 35:6, 36:16, 37:10, 37:11, 37:22, 37:25, 38:1, 38:6, 38:20, 38:22, 45:23, 55:5, 60:19, 62:20, 63:15, 79:17, 80:2, 83:22, 84:3, 94:22, 96:4, 96:7, 98:11, 104:7, 104:13, 128:16, 128:22, 129:13, 143:21, 143:22, 144:15, 144:16, 147:18, 148:1, 156:3, 158:20, 162:15, 162:24, 163:5, 163:8, 163:14, 167:23, 168:12, 173:3, 173:24, 176:23, 177:4, 178:12, 179:11
**Case** [1] - 184:5
**cases** [3] - 30:3, 57:14, 58:22
**casing** [5] - 37:20, 38:8, 38:12, 38:15, 38:18
**casings** [8] - 20:8, 35:19, 36:9, 37:12, 37:17, 37:19, 38:24, 39:1
**categories** [1] - 69:15
**category** [2] - 73:19, 91:20
**Cavanaugh** [7] - 132:17, 132:18, 132:19, 132:22, 156:10, 156:11, 156:15
**CC** [3] - 36:16, 55:5, 55:6
**CD** [2] - 42:24, 49:2
**CD's** [2] - 120:10, 120:22
**ceiling** [1] - 53:18
**cell** [17] - 42:21, 93:7, 93:17, 93:21, 105:23, 111:18, 111:19, 112:16, 112:24, 113:9, 113:15, 113:17, 113:24, 114:1, 114:8, 143:15
**cellular** [3] - 89:6, 89:17, 93:8
**Center** [1] - 59:19
**center** [1] - 52:2
**certain** [9] - 12:2, 21:21, 84:23, 97:15, 171:18, 173:1, 175:12, 180:23, 180:24
**Certainly** [1] - 93:12
**certainly** [8] - 11:4, 126:13, 150:2, 169:10, 172:20, 174:23, 175:10, 178:7
**certainty** [4] - 18:5,

18:11, 18:16, 32:1
 **CERTIFICATE** [1] -
184:1
 **certification** [5] - 58:21,
107:15, 107:19, 111:22,
112:8
 **certified** [7] - 57:5,
57:6, 57:15, 58:1, 58:23,
60:20, 107:13
 **certify** [2] - 184:3, 184:7
 **chairs** [2] - 94:24,
168:14
 **challenging** [1] - 32:17
 **chance** [9] - 5:17,
19:16, 32:25, 36:6,
44:13, 62:17, 76:12,
103:25
 **chances** [1] - 99:25
 **change** [5] - 22:18,
103:25, 104:1, 104:10,
166:20
 **changed** [2] - 40:6,
101:8
 **changes** [1] - 27:11
 **Chapstick** [3] - 42:25,
49:4, 84:2
 **characteristic** [1] - 65:6
 **characteristics** [2] -
19:5, 34:18
 **charge** [7] - 136:6,
136:21, 144:19, 149:2,
152:13, 152:20, 161:25
 **charges** [1] - 148:21
 **chase** [1] - 85:19
 **chasing** [1] - 156:7
 **Check** [1] - 161:19
 **check** [2] - 155:9,
161:18
 **checked** [1] - 96:20
 **Cheeks** [1] - 128:5
 **chemicals** [1] - 70:14
 **Cherry** [2] - 88:22,
144:20
 **chief** [2] - 178:12,
179:11
 **child** [2] - 41:5, 110:2
 **children** [1] - 110:3
 **choice** [1] - 177:23
 **choose** [1] - 101:10
 **chooses** [3] - 4:5,
14:21, 14:22
 **Chris** [1] - 119:7
 **chronic** [1] - 70:15
 **CI** [1] - 176:22
 **Cinema** [1] - 152:12
 **Circuit** [2] - 59:17,
100:11
 **circular** [1] - 65:13
 **circumstances** [8] -
3:22, 4:3, 5:25, 62:14,

69:22, 81:1, 102:10,
116:11
 **citizen** [1] - 27:15
 **City** [18] - 29:3, 29:5,
29:23, 30:4, 30:5, 30:25,
31:13, 31:16, 40:16,
41:10, 59:17, 59:19,
85:14, 85:20, 86:4, 86:7,
126:10, 127:2
 **city** [1] - 94:11
 **civil** [2] - 94:11, 105:24
 **civilian** [2] - 2:7, 17:18
 **CJA** [1] - 6:8
 **claim** [2] - 174:15,
179:25
 **claiming** [1] - 179:4
 **claims** [1] - 142:18
 **clarification** [1] -
173:17
 **clarify** [2] - 83:2, 83:3
 **clarity** [1] - 65:18
 **class** [2] - 19:5, 34:18
 **classification** [1] -
57:25
 **clean** [1] - 73:4
 **cleaned** [1] - 102:6
 **clear** [13] - 10:24, 22:5,
22:13, 25:23, 25:24,
27:13, 65:18, 99:23,
123:11, 158:2, 158:3,
177:16, 180:15
 **Clearly** [2] - 10:10,
100:5
 **clearly** [2] - 10:19,
19:13
 **clerk** [1] - 107:15
 **CLERK** [5] - 26:19,
28:20, 39:12, 55:24, 85:7
 **clerks** [1] - 26:17
 **client** [14] - 5:5, 5:10,
7:10, 7:11, 7:20, 8:16,
148:19, 148:21, 149:21,
152:12, 170:12, 171:3,
171:17, 179:25
 **client's** [3] - 149:17,
178:18, 179:25
 **clips** [1] - 75:5
 **clock** [1] - 170:4
 **close** [10] - 12:9, 13:14,
13:17, 22:5, 25:7, 71:19,
81:14, 98:1, 168:9
 **closer** [1] - 102:3
 **cloth** [1] - 48:19
 **clothing** [3] - 70:21,
160:6, 160:12
 **clumps** [1] - 43:12
 **co** [2] - 22:3, 179:8
 **co-counsel** [2] - 22:3,
179:8
 **Coach** [2] - 2:14, 22:12

 **coaches** [1] - 22:24
 **Coast** [1] - 30:11
 **coat** [1] - 74:1
 **coats** [1] - 62:1
 **COBURN** [16] - 15:18,
15:23, 16:8, 17:12,
18:12, 18:17, 18:22,
19:10, 20:13, 20:19,
26:10, 27:6, 31:21, 77:3,
101:13, 182:4
 **Coburn** [1] - 1:22,
15:17, 16:7, 19:6, 19:15,
26:9, 101:12, 153:8,
179:16
 **coconspirator** [1] -
172:19
 **codefendants** [1] - 9:11
 **coincidentally** [1] -
148:6
 **collaborative** [1] - 60:1
 **colleagues** [6] - 33:7,
44:17, 134:17, 135:25,
136:3, 136:9
 **collect** [1] - 167:25
 **college** [1] - 31:12
 **College** [2] - 29:16,
31:15
 **column** [2] - 112:4,
112:16
 **combinations** [1] -
65:14
 **comfortable** [1] - 28:12
 **coming** [6] - 5:18, 8:24,
22:5, 24:3, 72:21, 180:11
 **commenced** [1] - 108:5
 **commend** [1] - 19:11
 **comment** [2] - 25:9,
177:17
 **comments** [1] - 101:24
 **commercials** [1] -
73:13
 **commissioned** [1] -
63:18
 **commit** [1] - 23:1
 **committed** [2] - 9:2,
116:10
 **common** [6] - 8:21,
63:20, 66:4, 66:9,
163:25, 166:11
 **commonly** [1] - 62:14
 **Community** [2] - 29:16,
31:15
 **community** [1] - 66:25
 **compact** [2] - 137:20,
159:15
 **company** [4] - 93:14,
94:11, 105:25, 106:2
 **compare** [3] - 34:21,
80:2, 84:6
 **compared** [5] - 20:4,

57:9, 58:18, 65:25, 69:12
 **comparing** [1] - 179:14
 **comparison** [33] - 34:3,
34:4, 35:9, 35:14, 36:15,
36:23, 46:5, 56:23,
58:19, 59:13, 60:11,
64:11, 64:17, 64:18,
65:17, 66:2, 66:15,
66:22, 68:8, 68:11,
68:16, 68:19, 69:8,
76:25, 77:15, 77:20,
78:21, 79:6, 83:21, 84:1,
84:13
 **comparisons** [6] -
30:18, 32:14, 57:10,
57:12, 59:3, 79:13
 **compartment** [3] -
42:22, 42:24, 48:3
 **compass** [1] - 11:20
 **competing** [1] - 67:7
 **compile** [1] - 46:1
 **complaint** [2] - 55:11,
55:14
 **complete** [7] - 23:22,
45:18, 59:25, 78:15,
96:4, 101:13, 184:9
 **completed** [3] - 45:18,
57:24, 60:17
 **completely** [2] - 26:10,
60:20
 **completeness** [5] -
11:4, 11:6, 11:13, 11:20,
12:20
 **completes** [2] - 11:12,
39:4
 **complicated** [1] - 177:6
 **complication** [1] - 2:9
 **components** [1] - 64:20
 **computer** [1] - 52:7
 **concealed** [1] - 160:9
 **Concealed** [1] - 160:11
 **concealment** [1] -
160:17
 **conceivably** [1] - 7:20
 **concentrating** [1] - 51:6
 **concern** [4] - 4:7, 17:9,
21:10, 25:19
 **concerned** [4] - 3:6,
20:16, 142:10, 143:8
 **concerning** [5] - 16:15,
21:22, 153:10, 153:14,
153:18
 **concerns** [2] - 100:15,
104:17
 **conclude** [3] - 18:2,
168:2, 168:10
 **concluded** [2] - 27:15,
96:7
 **concludes** [1] - 18:23
 **conclusion** [3] - 8:8,

17:24, 18:5
 **Conclusion** [1] - 181:3
 **conclusions** [2] -
18:23, 37:1
 **condition** [1] - 71:8
 **conditions** [5] - 70:1,
70:10, 74:13, 76:21,
166:12
 **conducted** [5] - 21:5,
87:8, 87:9, 134:16,
153:19
 **confer** [1] - 140:7
 **conferences** [1] - 30:7
 **conferred** [1] - 140:24
 **confident** [5] - 26:6,
96:21, 96:25, 102:8
 **confidential** [2] -
162:19, 162:22
 **configuration** [1] - 66:7
 **confirm** [7] - 25:17,
139:12, 142:17, 142:21,
142:25, 152:11, 152:19
 **confirmation** [2] -
141:14, 141:18
 **confront** [1] - 96:11
 **confrontation** [1] - 8:4
 **confused** [1] - 172:14
 **Congratulations** [2] -
39:25, 40:1
 **congratulations** [1] -
95:23
 **Connecticut** [1] - 40:12
 **consequences** [1] -
61:1
 **consider** [17] - 6:12,
7:14, 7:21, 70:1, 70:19,
71:15, 71:23, 72:2, 73:4,
73:19, 75:18, 75:25,
86:25, 96:3, 114:7,
133:13, 176:14
 **considerable** [1] -
32:15
 **consideration** [2] -
65:19, 65:21
 **considerations** [2] -
97:6, 99:6
 **considered** [3] - 5:23,
18:18, 109:24
 **considers** [1] - 18:13
 **consistent** [7] - 25:15,
82:1, 82:4, 82:20, 82:21,
83:7, 83:8
 **consists** [2] - 53:15,
117:20
 **console** [5] - 42:23,
52:2, 52:22, 84:1, 84:6
 **conspiracy** [1] - 7:22
 **constant** [3] - 22:4,
70:13, 74:5
 **constantly** [1] - 70:9,

70:14
**constitute** [1] - 184:7
**Constitution** [1] - 14:21
**construction** [1] - 29:15
**CONT'D** [1] - 182:5
**contact** [21] - 5:4, 5:10,
6:16, 62:1, 65:22, 70:13,
70:20, 71:8, 71:15,
71:17, 72:17, 75:20,
92:3, 106:17, 106:19,
122:5, 130:15, 131:8,
144:4, 156:9, 156:25
**contacted** [1] - 131:5
**contacting** [2] - 5:9,
149:21
**contacts** [2] - 157:1,
157:2
**contain** [3] - 44:16,
78:3, 120:10
**container** [2] - 84:2,
121:24
**contains** [4] - 112:11,
118:7, 121:24, 152:23
**contemplating** [1] -
180:17
**contends** [1] - 15:23
**contents** [4] - 44:17,
69:3, 84:14, 151:13
**Continue** [3] - 94:22,
168:11, 168:12
**continue** [5] - 28:14,
97:13, 97:14, 104:8,
104:13
**CONTINUED** [1] - 32:20
**continued** [2] - 156:15,
166:17
**continues** [3] - 27:10,
27:13, 113:19
**continuing** [1] - 22:19
**contradict** [1] - 59:9
**contrary** [2] - 178:10,
179:18
**contrasting** [1] - 62:22
**Control** [5] - 45:24,
45:25, 52:8, 52:13, 53:17
**control** [1] - 164:13
**conundrum** [1] - 100:12
**conveniently** [1] -
97:20
**conversation** [12] -
24:11, 26:17, 119:18,
137:17, 143:16, 143:20,
145:17, 145:24, 146:24,
157:10, 165:19, 166:3
**conversation's** [1] -
165:20
**conversations** [20] -
24:14, 119:10, 120:5,
120:11, 120:23, 129:24,
130:11, 132:12, 136:4,

136:10, 138:3, 140:17,
140:22, 141:1, 141:4,
141:13, 141:17, 141:22,
141:25, 143:12
**convicted** [1] - 2:17
**conviction** [2] - 16:14,
17:5
**cool** [1] - 73:25
**cooperating** [6] -
128:16, 129:12, 145:16,
162:24, 163:5, 163:8
**cooperation** [4] -
151:22, 160:23, 167:18,
167:19
**cooperator** [9] - 119:3,
119:6, 122:4, 122:13,
139:7, 150:10, 150:15,
150:20, 151:22
**cooperators** [2] -
159:23, 160:21
**copies** [1] - 24:24
**copy** [5] - 16:4, 19:12,
33:16, 41:21, 63:3
**corduroy** [1] - 61:20
**corner** [1] - 89:21
**corpses** [1] - 36:10
**correct** [128] - 33:1,
33:8, 33:18, 33:21,
35:12, 35:16, 35:17,
36:4, 36:21, 39:2, 40:20,
46:24, 53:3, 54:11,
54:14, 54:19, 55:13,
56:16, 64:4, 64:5, 66:21,
66:23, 68:16, 68:17,
76:10, 79:24, 79:25,
80:4, 80:8, 81:4, 81:18,
81:23, 81:25, 82:8, 83:9,
83:12, 83:13, 83:20,
84:14, 84:15, 88:4,
89:18, 90:12, 91:8,
91:24, 92:3, 92:6,
105:25, 109:9, 109:10,
113:17, 113:21, 113:24,
114:22, 114:25, 118:11,
120:24, 121:1, 121:2,
123:12, 123:13, 123:14,
126:24, 129:4, 130:20,
131:5, 132:7, 132:21,
133:3, 134:2, 134:20,
135:8, 135:12, 135:16,
136:21, 137:21, 137:25,
138:22, 139:7, 139:14,
140:2, 140:4, 141:11,
141:20, 142:10, 142:15,
143:14, 143:24, 143:25,
144:9, 144:16, 144:17,
144:22, 147:9, 147:19,
148:3, 148:12, 149:10,
149:12, 150:3, 150:7,
150:14, 152:6, 152:23,

154:4, 154:19, 155:7,
156:3, 156:7, 156:8,
156:10, 156:16, 156:20,
157:25, 159:3, 159:17,
159:20, 161:17, 163:2,
163:5, 165:17, 165:21,
166:4, 166:13, 166:18,
166:21, 172:9, 178:14
**Correct** [38] - 33:9,
90:6, 125:23, 126:22,
130:25, 132:10, 133:4,
134:24, 135:2, 135:5,
135:22, 137:15, 140:18,
142:16, 143:3, 143:6,
144:6, 144:10, 146:22,
147:10, 148:9, 150:4,
154:12, 154:15, 159:4,
159:15, 162:10, 163:3,
163:10, 164:5, 165:3,
165:18, 165:22, 166:2,
166:5, 166:7, 166:19,
166:22
**correctly** [1] - 18:3
**corresponds** [1] - 114:1
**Corroboration** [2] -
167:19
**corroboration** [2] -
145:19, 167:16
**cost** [1] - 97:4
**counsel** [33] - 2:3, 2:13,
2:16, 2:22, 3:16, 3:24,
4:1, 4:6, 5:13, 5:21, 7:4,
22:3, 25:12, 25:16, 27:8,
77:1, 82:24, 99:20,
101:23, 103:24, 121:23,
168:22, 169:8, 171:20,
171:22, 171:25, 172:24,
174:10, 174:22, 177:11,
179:8, 179:17, 181:1
**count** [1] - 172:13
**counted** [2] - 30:20,
172:18
**country** [1] - 95:17
**County** [18] - 21:19,
29:19, 30:5, 31:1, 31:14,
31:15, 59:18, 117:14,
117:15, 117:23, 118:15,
118:24, 130:2, 149:10,
150:6
**couple** [21] - 5:4, 16:10,
20:23, 21:1, 24:21,
88:25, 102:1, 102:2,
115:16, 118:13, 124:15,
129:21, 141:10, 147:21,
153:9, 160:19, 165:15,
166:24, 171:2, 178:22,
178:24
**courage** [1] - 18:24
**course** [38] - 3:5, 3:25,
4:5, 5:13, 6:14, 6:17,

6:21, 7:11, 7:18, 15:5,
16:19, 24:5, 30:15,
30:16, 30:19, 31:11,
31:12, 31:14, 40:6,
57:24, 59:4, 61:13,
93:23, 95:15, 101:12,
109:22, 109:23, 115:5,
115:14, 119:4, 119:13,
120:12, 124:9, 139:21,
158:16, 175:24, 180:20,
180:25
**courses** [2] - 30:13,
31:9
**COURT** [248] - 1:1, 2:3,
3:10, 3:14, 3:20, 4:10,
4:17, 4:20, 4:23, 5:2,
5:12, 5:19, 5:25, 6:4,
6:7, 6:10, 6:14, 6:17,
6:20, 6:24, 7:3, 7:7,
7:25, 8:5, 9:7, 9:23,
10:1, 10:4, 10:12, 11:5,
11:10, 12:5, 12:7, 12:13,
12:16, 12:20, 12:23,
13:3, 13:8, 13:11, 13:21,
13:24, 14:7, 14:11,
14:14, 15:11, 15:16,
15:21, 15:25, 16:6, 17:6,
18:7, 18:14, 18:21, 19:6,
19:11, 19:22, 20:6,
20:11, 20:17, 20:20,
21:19, 21:24, 22:2,
22:10, 22:12, 22:18,
23:9, 23:13, 23:17, 24:5,
24:10, 24:13, 24:16,
24:19, 25:23, 26:13,
26:20, 27:7, 28:1, 28:11,
32:18, 39:6, 39:14, 40:1,
52:10, 52:15, 55:18,
77:1, 77:4, 77:8, 77:11,
80:13, 83:1, 83:3, 84:17,
84:20, 84:22, 93:12,
94:15, 94:18, 95:5, 95:8,
95:12, 95:14, 95:19,
95:23, 96:2, 97:10,
97:18, 98:11, 99:2, 99:5,
99:9, 99:11, 99:14,
99:18, 99:20, 100:17,
100:20, 100:25, 101:5,
101:7, 101:11, 101:20,
102:18, 102:21, 102:24,
103:6, 103:10, 103:15,
103:20, 103:22, 104:5,
104:22, 104:24, 105:2,
105:5, 106:7, 106:15,
106:24, 107:11, 107:14,
107:17, 107:19, 107:23,
108:1, 108:7, 108:13,
108:18, 108:23, 109:20,
111:23, 111:25, 112:2,
112:10, 112:14, 113:1,
114:5, 114:13, 114:19,

115:12, 115:19, 116:7,
116:13, 117:5, 117:8,
120:17, 121:8, 121:23,
122:16, 122:20, 123:5,
123:7, 123:22, 124:1,
124:5, 124:9, 124:18,
127:19, 128:3, 128:7,
128:11, 129:6, 131:24,
138:12, 138:16, 139:10,
139:17, 139:21, 139:24,
140:1, 140:5, 140:7,
140:13, 144:12, 145:9,
146:9, 147:24, 149:7,
151:12, 151:16, 153:3,
154:24, 155:1, 158:11,
158:14, 158:22, 160:1,
161:3, 161:11, 164:12,
165:11, 167:22, 167:25,
168:17, 169:1, 169:3,
169:10, 169:17, 169:24,
170:24, 171:5, 171:9,
171:14, 171:24, 172:4,
172:11, 172:16, 172:19,
173:10, 173:14, 173:16,
173:18, 174:8, 175:17,
176:18, 177:12, 177:15,
177:21, 178:2, 179:15,
179:23, 180:6, 180:12,
180:14, 180:19, 180:25
**court** [17] - 2:18, 6:6,
8:12, 10:4, 10:16, 16:14,
17:5, 30:15, 30:22, 59:9,
59:12, 67:19, 87:13,
96:21, 96:25, 149:17,
168:3
**Court** [34] - 3:7, 3:21,
4:4, 4:21, 6:19, 8:3, 9:4,
10:10, 14:12, 14:14,
14:16, 14:24, 16:9,
17:25, 23:7, 25:17, 26:1,
27:2, 31:1, 59:20, 59:21,
97:3, 100:9, 105:7,
152:11, 152:23, 161:1,
161:7, 162:20, 170:21,
176:15, 177:17, 184:16
**Court's** [14] - 2:5, 2:7,
5:15, 12:24, 12:25, 15:8,
15:13, 15:19, 19:7,
19:20, 21:10, 26:3,
101:13, 124:7
**court's** [1] - 23:17
**court-ordered** [1] -
87:13
**Courthouse** [1] - 1:24
**courthouse** [2] - 96:13,
98:24
**courtroom** [1] - 2:1,
4:9, 4:11, 26:25, 27:19,
28:10, 95:1, 95:4, 95:7,
99:19, 102:17, 105:1,

105:4, 168:16
  **courtroom** [1] - 104:4
  **courts** [6] - 18:1, 18:2, 30:24, 31:25, 59:15, 67:4
  **Courts** [2] - 59:17, 59:18
  **cover** [6] - 17:9, 42:23, 72:24, 96:22, 97:1, 107:20
  **covered** [2] - 15:10, 27:4
  **coworkers** [2] - 25:4, 25:25
  **creases** [1] - 65:16
  **created** [3] - 67:17, 73:8, 73:9
  **creates** [2] - 62:23, 73:5
  **crime** [22] - 9:2, 40:19, 41:2, 41:6, 41:7, 42:11, 47:7, 47:19, 50:6, 56:25, 57:1, 57:17, 57:19, 57:23, 58:9, 58:12, 58:14, 67:8, 67:25, 72:10, 138:25, 150:3
  **Crime** [18] - 29:4, 29:6, 29:20, 40:15, 40:21, 40:23, 40:25, 41:2, 41:10, 41:16, 41:25, 52:19, 56:2, 56:8, 56:14, 56:24, 72:9
  **crimes** [4] - 41:3, 41:4, 141:19, 155:14
  **CRIMINAL** [1] - 1:5
  **criminal** [2] - 155:9, 155:12
  **Criminal** [1] - 40:5
  **critical** [1] - 20:1
  **criticizing** [1] - 163:12
  **CROSS** [14] - 31:20, 46:11, 80:15, 124:11, 129:16, 147:14, 153:5, 182:4, 182:9, 182:14, 182:19, 182:20, 182:21, 182:22
  **cross** [13] - 17:9, 21:8, 27:21, 103:1, 103:4, 103:15, 103:17, 109:3, 151:1, 151:2, 165:16, 170:19, 173:3
  **cross-reference** [2] - 151:1, 151:2
  **cross-referenced** [1] - 109:3
  **CROWE** [20] - 7:6, 7:8, 9:13, 9:25, 10:3, 10:7, 11:1, 11:9, 14:12, 15:9, 15:12, 147:15, 153:2, 161:10, 171:15, 172:2, 172:10, 172:15, 172:17, 182:21

**Crowe** [14] - 1:20, 6:24, 8:1, 8:14, 9:7, 14:11, 15:4, 147:16, 151:12, 160:19, 162:18, 163:2, 170:25, 171:14
  **Crowe's** [1] - 173:1
  **Crystal** [2] - 109:7, 109:14
  **crystallized** [1] - 95:20
  **CS-3** [2] - 151:10, 151:19
  **CS3** [5] - 150:25, 151:2, 151:5, 151:13, 151:21
  **CSI** [1] - 74:9
  **cup** [1] - 42:23
  **cupping** [1] - 82:2
  **currents** [4] - 73:2, 74:5, 74:13, 76:20
  **cut** [2] - 130:5, 176:9

# D

  **damage** [5] - 46:21, 47:3, 47:21, 54:24, 76:21
  **Damage** [2] - 47:4, 54:16
  **damaged** [5] - 20:4, 47:6, 47:17, 54:22, 54:25
  **Damita** [1] - 173:15
  **dare** [1] - 4:20
  **Darryl** [4] - 36:11, 36:12, 36:20, 172:10
  **database** [1] - 63:25
  **date** [10] - 45:1, 79:3, 81:2, 108:9, 121:11, 122:8, 147:20, 148:4, 155:25, 158:17
  **dated** [1] - 146:19
  **Daubert** [4] - 17:23, 18:18, 19:17, 19:18
  **daughter** [1] - 109:15
  **Davis** [1] - 1:13
  **days** [3] - 97:21, 103:3, 171:3
  **DC** [2] - 31:11, 98:1
  **DEA** [1] - 177:2
  **deadline** [1] - 22:15
  **deal** [1] - 146:2
  **dealing** [2] - 127:24, 149:23
  **debatable** [1] - 8:17
  **debrief** [2] - 134:19, 135:18
  **deceased** [1] - 36:13
  **December** [5] - 41:13, 134:1, 134:7, 136:18, 159:12
  **decide** [4] - 5:17, 96:18, 137:9, 176:1

  **decided** [2] - 144:8, 166:20
  **deciding** [1] - 100:6
  **decision** [2] - 17:4, 22:14
  **deep** [1] - 104:5
  **defendant** [3] - 46:15, 80:19, 180:21
  **Defendant** [4] - 1:16, 1:18, 1:19, 1:21
  **defendants** [15] - 2:3, 3:3, 4:10, 14:25, 57:11, 79:16, 79:24, 100:3, 172:22, 173:23, 174:16, 178:8, 178:16, 180:23, 180:24
  **Defendants** [4] - 1:9, 2:1, 4:9, 102:17
  **defense** [18] - 2:22, 3:15, 3:24, 4:1, 4:6, 17:1, 17:8, 17:9, 25:7, 25:20, 25:22, 157:12, 169:8, 171:22, 175:20, 176:7, 177:11, 177:20
  **Defense** [1] - 82:24
  **defer** [1] - 22:3
  **definitively** [2] - 14:10, 19:3
  **degree** [9] - 18:5, 18:11, 18:16, 19:23, 29:15, 31:25, 32:15, 56:20, 58:9
  **Degree** [2] - 40:5, 40:7, 40:10, 40:11
  **degrees** [3] - 29:14, 40:8, 101:8
  **delay** [5] - 27:20, 28:5, 96:6, 96:13, 97:2
  **delaying** [2] - 96:23
  **deliberately** [2] - 62:18, 73:11
  **deliberation** [1] - 94:20
  **delicately** [1] - 21:22
  **delivered** [1] - 25:1
  **delved** [1] - 109:17
  **demonstrate** [1] - 139:15
  **Denham** [1] - 168:24
  **denied** [3] - 15:17, 115:19, 117:8
  **Department** [8] - 29:4, 40:16, 43:18, 52:12, 85:14, 85:21, 86:4, 149:17
  **department** [10] - 25:3, 47:7, 47:9, 47:14, 47:15, 47:17, 47:21, 127:2, 134:17, 135:6
  **Department's** [1] - 56:2
  **departments** [1] - 127:1
  **departure** [2] - 96:7,

96:14
  **dependent** [1] - 70:4
  **Dependent** [1] - 70:7
  **depict** [1] - 118:8
  **depicts** [1] - 117:21
  **deposit** [2] - 118:15, 150:5
  **deposition** [1] - 65:21
  **deprive** [1] - 14:20
  **describe** [2] - 81:8, 81:9
  **described** [6] - 5:5, 45:13, 49:7, 78:21, 110:17, 121:25
  **Design** [5] - 94:9, 94:12, 105:24, 107:5, 109:3
  **Design's** [1] - 112:5
  **desire** [2] - 3:15
  **Desmond** [1] - 88:7
  **despite** [4] - 142:12, 166:15, 175:5
  **destroy** [7] - 71:20, 72:22, 72:25, 76:9, 76:15, 76:21, 104:20
  **destroyed** [1] - 34:8
  **destroys** [1] - 43:6
  **detail** [21] - 19:3, 58:14, 61:6, 61:10, 62:5, 62:23, 63:4, 63:13, 64:21, 65:15, 70:7, 70:11, 70:16, 70:18, 71:5, 71:10, 71:14, 71:18, 71:21, 72:1, 73:7
  **details** [1] - 161:5
  **detective** [9] - 29:19, 47:13, 85:14, 88:20, 93:11, 116:21, 128:21, 144:15, 147:22
  **Detective** [66] - 7:18, 10:13, 10:15, 15:22, 16:15, 16:16, 20:24, 21:3, 21:14, 47:13, 84:21, 85:15, 89:4, 89:23, 90:17, 92:11, 95:2, 95:6, 102:19, 105:3, 105:21, 106:7, 108:21, 108:24, 109:8, 110:4, 112:8, 112:16, 114:10, 114:13, 114:20, 116:23, 121:4, 121:11, 122:2, 122:23, 123:3, 123:12, 124:13, 128:8, 129:18, 131:25, 138:18, 140:2, 140:11, 140:15, 144:18, 145:15, 146:5, 146:10, 147:16, 147:25, 149:7, 151:17, 153:7, 155:6, 161:14, 161:16, 161:21, 162:1, 162:6, 162:14, 165:15, 167:22,

169:6
  **DETECTIVE** [2] - 85:5, 182:17
  **detectives** [14] - 2:11, 47:11, 55:9, 86:14, 88:17, 88:20, 90:3, 127:1, 152:3, 152:11, 152:19, 156:3, 158:7, 163:22
  **determination** [7] - 5:21, 37:19, 46:4, 63:24, 65:24, 66:14, 93:24
  **determine** [2] - 26:3, 33:23, 34:20, 34:22, 37:13, 38:7, 38:18, 49:22, 49:24, 57:8, 58:17, 60:2, 66:1, 66:7, 68:6, 76:4, 91:6, 108:10, 108:20, 114:1, 154:4
  **determined** [4] - 48:5, 63:19, 63:25, 149:16
  **develop** [6] - 57:18, 58:14, 72:11, 72:19, 74:23, 74:24
  **development** [3] - 62:9, 62:12, 65:20
  **device** [19] - 87:13, 134:19, 137:11, 137:14, 137:16, 137:17, 138:8, 159:5, 159:10, 160:4, 160:9, 160:12, 160:15, 160:17, 167:5, 167:11
  **devices** [2] - 132:12, 137:24, 147:6, 147:7, 158:25, 159:3, 159:8, 166:11, 167:4
  **dialed** [3] - 90:4, 90:8, 91:15
  **diameter** [1] - 35:5
  **Dickey** [1] - 88:7
  **difference** [5] - 10:17, 35:4, 41:1, 79:5, 112:9
  **different** [27] - 27:4, 27:5, 33:24, 37:2, 37:9, 37:14, 38:8, 52:20, 75:13, 90:25, 92:19, 99:21, 113:24, 132:11, 140:8, 158:16, 165:2, 176:9
  **differs** [2] - 63:13, 72:12
  **difficult** [8] - 22:25, 71:9, 73:12, 73:17, 74:4, 88:4, 120:14, 159:22
  **difficulty** [1] - 98:7
  **digit** [4] - 63:13, 63:14, 112:18, 112:19
  **diligence** [1] - 19:11
  **dip** [1] - 43:8
  **DIRE** [1] - 182:4

**Dire** [1] - 31:21
**dire** [10] - 31:22, 95:16, 101:22, 101:24, 172:7, 172:23, 174:25, 178:22, 179:17, 180:7
**direct** [17] - 13:9, 13:19, 13:25, 14:2, 17:10, 20:25, 21:4, 23:13, 39:4, 57:5, 103:13, 153:10, 164:6, 165:8, 169:19, 175:19, 178:12
**DIRECT** [10] - 28:23, 32:20, 39:18, 56:4, 85:10, 182:3, 182:5, 182:8, 182:13, 182:18
**directed** [1] - 7:23
**directing** [1] - 100:21
**direction** [1] - 64:22
**directions** [1] - 61:17
**directly** [5] - 6:16, 28:20, 39:12, 55:24, 85:7
**directory** [6] - 91:14, 92:1, 92:3, 94:8, 105:24, 107:4
**dires** [1] - 174:10
**dirt** [3] - 43:12, 72:23, 73:9
**dirty** [3] - 73:5, 74:3
**disadvantage** [2] - 131:22, 177:10
**discarded** [1] - 75:21
**disconnect** [1] - 108:9
**discontinued** [2] - 107:8, 108:5
**discuss** [4] - 5:7, 15:7, 22:19, 104:13
**discussion** [3] - 22:4, 94:22, 168:12
**discussions** [1] - 151:10
**disk** [2] - 137:20, 159:16
**dismissed** [2] - 148:22, 149:9
**displayed** [1] - 19:12
**dispositions** [1] - 148:16
**disputes** [1] - 127:8
**distinguish** [1] - 73:7
**distorted** [2] - 34:2, 35:9
**distracted** [1] - 101:17
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 27:15
**District** [5] - 17:25, 18:20, 26:1, 31:1, 59:18
**Division** [2] - 40:16, 43:19
**DIVISION** [1] - 1:2
**division** [1] - 27:16

**DNA** [1] - 53:25
**Dobropolski** [53] - 119:7, 119:9, 119:10, 119:14, 119:15, 119:17, 120:6, 120:12, 120:15, 122:4, 122:14, 122:19, 122:24, 123:1, 123:4, 130:3, 131:4, 131:8, 131:13, 132:2, 132:11, 134:18, 135:11, 135:18, 136:23, 138:3, 139:3, 139:13, 141:19, 141:21, 142:2, 142:13, 142:18, 143:2, 144:3, 145:16, 145:20, 145:24, 146:6, 146:12, 147:6, 156:19, 156:23, 157:4, 158:25, 159:9, 167:4, 168:20, 170:2, 171:2, 176:19
**dock** [1] - 97:24
**document** [4] - 84:4, 107:1, 124:5, 152:22
**documents** [4] - 107:13, 112:7, 122:16, 147:21
**domicile** [1] - 27:11
**Don** [3] - 29:11, 29:20, 30:2
**done** [7] - 7:16, 17:7, 50:12, 62:12, 66:15, 80:6, 152:8
**door** [24] - 11:14, 15:4, 45:3, 47:4, 47:5, 47:15, 48:13, 54:9, 54:13, 54:16, 54:17, 54:21, 54:22, 54:24, 54:25, 81:22, 82:16, 82:18, 82:21, 83:5, 117:25, 118:1
**doors** [9] - 42:17, 42:20, 46:22, 47:3, 47:6, 47:18, 48:8, 48:11
**dot** [1] - 65:12
**double** [5] - 36:10, 115:25, 116:10, 116:18, 116:21
**doublecheck** [1] - 27:8
**doubt** [1] - 15:2
**dovetails** [1] - 16:15
**down** [18] - 20:15, 34:11, 37:21, 51:14, 52:23, 53:20, 53:23, 64:20, 64:24, 72:8, 81:14, 82:12, 92:2, 95:2, 105:11, 119:17, 135:15, 152:4
**drew** [2] - 124:24, 125:3
**drink** [1] - 69:24
**Drive** [1] - 109:5, 110:10

**driver** [12] - 42:17, 42:20, 42:21, 42:24, 47:4, 47:14, 54:16, 54:20, 54:22, 54:24
**driver's** [8] - 42:22, 45:3, 48:15, 54:9, 76:19, 81:22, 82:16, 83:5
**driving** [3] - 80:7, 87:8, 87:16
**drove** [3] - 88:2, 115:6, 115:7
**Drug** [1] - 127:24
**drug** [15] - 86:12, 86:20, 87:3, 87:10, 88:9, 114:24, 125:6, 125:9, 125:22, 127:1, 127:2, 149:23, 154:2, 154:13, 155:17
**drugs** [2] - 86:23, 153:23
**dry** [6] - 70:15, 70:17, 70:25, 73:2, 73:22, 74:6
**due** [2] - 88:2, 120:20
**During** [3] - 7:10, 57:7, 66:3
**during** [18] - 8:7, 9:20, 10:15, 11:14, 11:16, 16:19, 24:23, 25:12, 52:18, 57:4, 85:1, 87:23, 98:3, 101:24, 115:5, 115:9, 115:14, 120:12
**dust** [7] - 48:21, 49:8, 49:20, 49:21, 50:22, 72:23
**dusted** [4] - 49:17, 50:15, 51:1
**dusting** [7] - 50:9, 50:11, 50:13, 50:16, 50:24, 51:4
**duties** [1] - 156:6
**duty** [1] - 25:25
**Dwayne** [1] - 168:23

## E

**e-mail** [3] - 19:15, 103:2, 169:8
**early** [6] - 85:4, 90:24, 113:6, 113:19, 139:3, 179:18
**East** [1] - 30:11
**Eastern** [1] - 40:10
**easy** [1] - 21:24
**eating** [1] - 62:3
**economic** [1] - 101:15
**ECU** [1] - 55:2
**edge** [1] - 81:15
**educational** [4] - 29:8, 29:17, 40:3, 56:19

**effect** [3] - 10:11, 25:14, 139:17
**efficient** [1] - 5:11
**effort** [1] - 161:6
**efforts** [3] - 120:12, 128:22, 156:25
**Eight** [1] - 92:17
**Either** [2] - 28:5, 160:12
**either** [18] - 7:2, 8:9, 18:17, 33:25, 35:10, 35:12, 57:12, 61:7, 72:24, 86:12, 96:23, 100:3, 126:19, 135:4, 136:1, 137:2, 144:21, 155:25
**ejected** [1] - 38:1
**elderly** [1] - 101:16
**elements** [1] - 72:24
**Eleven** [1] - 103:23
**elicit** [19] - 2:16, 11:25, 16:20, 23:21, 169:14, 169:19, 169:21, 171:21, 172:24, 173:3, 174:4, 175:19, 177:24, 178:6, 178:17, 179:24, 180:8, 180:21, 180:22
**elicited** [2] - 9:6, 11:14
**eliciting** [1] - 178:15
**eliminated** [1] - 178:11
**elsewhere** [2] - 100:2, 115:9
**employ** [1] - 64:10
**employed** [5] - 29:2, 40:14, 67:2, 85:13, 85:20
**employer** [1] - 117:17
**employment** [3] - 98:10, 149:18, 149:21
**encouraging** [1] - 24:15
**end** [9] - 3:13, 4:6, 13:6, 65:4, 70:18, 71:11, 102:7, 123:4, 165:23
**ending** [2] - 65:5, 97:19
**enforcement** [3] - 9:16, 11:3, 153:14
**engage** [2] - 119:18, 145:15
**engineering** [2] - 94:11, 105:25
**enhanced** [1] - 170:5
**entail** [1] - 41:2
**enter** [2] - 4:9, 47:7
**entered** [2] - 4:11, 113:13
**entering** [1] - 47:18
**enters** [3] - 28:10, 104:4, 105:4
**entire** [8] - 11:4, 48:4, 52:11, 63:24, 66:19, 69:3, 139:18, 154:4
**entirety** [1] - 82:12

**entries** [1] - 92:8
**entry** [1] - 92:17
**envelope** [3] - 44:16, 121:16, 121:17
**envelopes** [2] - 33:4, 33:11
**environment** [4] - 25:16, 73:25, 74:3, 74:5
**environmental** [3] - 69:18, 73:20, 74:12
**equipment** [2] - 167:1, 167:3
**erroneous** [1] - 157:18
**error** [3] - 64:7, 67:11, 67:14
**Esquire** [10] - 1:15, 1:16, 1:17, 1:17, 1:18, 1:19, 1:20, 1:20, 1:21, 1:22
**essentially** [4] - 18:2, 18:22, 21:9, 81:16
**establish** [1] - 114:8
**established** [1] - 108:8
**establishment** [1] - 149:10
**estimate** [1] - 23:7
**et** [2] - 26:4, 184:5
**etc** [1] - 26:7
**Etting** [2] - 110:9, 110:12
**evaluation** [8] - 64:17, 66:14, 66:22, 68:7, 68:10, 68:16, 68:19, 78:21
**evaporate** [2] - 76:10, 76:13
**evening** [4] - 90:15, 90:25, 111:5, 113:6
**event** [2] - 8:16, 24:1
**events** [1] - 5:6
**eventually** [1] - 70:18
**everywhere** [1] - 74:8
**Evidence** [5] - 45:24, 45:25, 52:7, 52:12, 53:17
**evidence** [42] - 7:14, 7:20, 7:21, 30:15, 32:6, 32:23, 32:24, 41:6, 41:7, 42:5, 53:3, 53:14, 53:22, 53:23, 53:25, 55:4, 57:2, 57:17, 57:23, 58:24, 59:10, 89:1, 104:13, 109:24, 128:23, 133:13, 133:19, 133:22, 135:14, 147:3, 148:12, 149:23, 150:2, 157:24, 164:13, 168:12, 172:12, 176:23, 177:4, 179:11
**evidentiary** [3] - 18:18, 135:16, 137:1
**exact** [3] - 117:14,

139:1, 147:20
**exactly** [12] - 4:2, 9:8, 15:24, 16:17, 30:20, 40:22, 42:9, 43:1, 50:25, 81:8, 89:14, 154:7
**Exactly** [3] - 6:20, 15:11, 20:19
**exam** [1] - 58:21
**EXAMINATION** [34] - 28:23, 31:20, 32:20, 39:18, 46:11, 54:6, 56:4, 80:15, 84:10, 85:10, 124:11, 129:16, 147:14, 153:5, 155:3, 162:12, 165:13, 182:3, 182:4, 182:5, 182:8, 182:9, 182:10, 182:13, 182:14, 182:15, 182:18, 182:19, 182:20, 182:21, 182:22, 182:23, 182:24, 182:25
**examination** [23] - 16:23, 21:4, 29:18, 30:8, 30:14, 30:22, 31:5, 31:10, 31:19, 32:2, 32:4, 33:10, 37:13, 39:4, 56:23, 58:4, 59:13, 67:18, 103:5, 153:10, 164:6, 165:9, 175:19
**Examination** [1] - 40:17
**examinations** [2] - 57:14, 59:24
**examine** [8] - 24:22, 58:16, 60:2, 61:11, 68:6, 71:10, 91:6
**examined** [6] - 43:25, 57:14, 58:22, 58:24, 74:20, 74:22
**examiner** [19] - 17:21, 20:15, 29:3, 29:25, 46:2, 46:6, 58:2, 58:8, 60:18, 60:20, 61:14, 61:18, 64:7, 66:19, 71:10, 71:14, 71:21, 78:15, 78:16
**Examiners** [1] - 30:10
**examiners** [7] - 57:5, 57:15, 58:23, 58:25, 59:24, 60:22, 79:12
**example** [18] - 12:3, 49:20, 51:16, 69:23, 74:16, 74:18, 75:21, 76:14, 82:1, 82:20, 90:25, 92:5, 96:10, 129:2, 160:13, 162:18, 163:11, 179:23
**excellent** [1] - 76:3
**except** [1] - 95:4
**exception** [1] - 15:11
**excess** [1] - 43:9
**exculpates** [1] - 7:14

**exculpatory** [13] - 7:20, 8:15, 8:17, 8:19, 8:20, 9:3, 9:9, 9:13, 10:9, 10:18, 11:23, 14:17
**excuse** [7] - 27:18, 32:14, 49:21, 101:23, 104:7, 105:7, 142:23
**Excuse** [3] - 9:25, 49:18, 132:3
**excused** [12] - 39:7, 55:19, 84:17, 85:4, 95:2, 95:6, 99:16, 100:16, 102:4, 105:18, 167:23, 168:15
**executed** [2] - 117:13, 118:19
**executing** [2] - 117:11, 118:5
**exempt** [2] - 2:24, 3:8
**exercise** [2] - 32:14, 167:15
**exercising** [1] - 102:6
**exhibit** [6] - 23:18, 68:4, 77:24, 111:23, 112:10, 121:7
**Exhibit** [14] - 35:19, 35:25, 36:3, 44:12, 67:19, 89:3, 89:22, 91:10, 92:24, 107:2, 111:21, 117:20, 120:9, 121:10
**exhibits** [5] - 32:22, 36:6, 88:25, 117:19, 122:10
**exist** [1] - 49:9
**existed** [2] - 91:7, 171:12
**existence** [1] - 176:24
**exits** [3] - 99:19, 105:1, 168:16
**exonerating** [1] - 180:23
**expect** [4] - 13:14, 23:15, 168:8, 168:17
**expected** [2] - 151:22, 160:22
**expecting** [1] - 4:15
**expense** [3] - 27:2, 27:3, 96:22
**experience** [3] - 8:21, 29:18, 159:22
**expert** [9] - 18:4, 30:21, 31:4, 31:19, 32:18, 59:12, 60:24, 77:10, 77:12
**expert's** [1] - 18:3
**experts** [1] - 2:11
**explain** [7] - 5:22, 34:9, 61:3, 62:16, 85:18, 109:22, 113:2

**explained** [1] - 37:17
**explanations** [1] - 170:22
**explicitly** [1] - 18:12
**exposed** [2] - 72:23, 76:20
**express** [3] - 18:5, 33:25, 102:12
**expressed** [2] - 3:15, 32:2
**extend** [2] - 98:16, 98:20
**extended** [1] - 84:25
**extensive** [1] - 151:10
**extent** [4] - 11:12, 102:5, 110:4, 175:22
**Exterior** [2] - 42:16, 54:11
**exterior** [9] - 42:4, 45:3, 48:4, 48:11, 76:16, 81:22, 82:3, 82:15, 145:13
**external** [2] - 69:18, 73:20
**extra** [1] - 24:2
**extracted** [3] - 38:1, 53:2, 53:5
**eye** [2] - 62:8, 73:16

---

# F

**fabric** [1] - 48:21
**fabrics** [1] - 72:6
**face** [6] - 37:20, 37:24, 38:4, 38:7, 38:11, 62:2
**fact** [30] - 2:17, 9:1, 12:13, 13:9, 14:18, 26:6, 27:11, 28:1, 28:2, 109:23, 116:14, 124:24, 125:24, 138:4, 141:3, 150:18, 151:21, 152:9, 152:19, 152:22, 158:2, 158:13, 160:20, 160:21, 162:23, 163:11, 165:9, 166:15, 173:3
**factors** [1] - 69:7, 69:9, 69:14, 69:15, 69:18, 69:21, 72:21, 73:20, 74:10, 74:13, 75:24
**facts** [2] - 161:1, 163:13
**faded** [4] - 162:16, 162:17, 163:14, 163:15
**failed** [1] - 60:6
**fair** [6] - 80:5, 131:15, 162:14, 162:25, 163:13, 171:24
**Fair** [2] - 51:6, 81:16
**fairly** [5] - 9:20, 17:7, 17:9, 162:16

**fall** [1] - 69:15
**familiar** [3] - 58:10, 58:13, 84:4
**familiarity** [1] - 12:11
**far** [10] - 29:12, 41:4, 75:20, 137:23, 142:9, 143:7, 146:6, 162:4, 162:9, 174:14
**fashion** [2] - 82:2, 159:24
**father** [1] - 110:2
**fault** [1] - 27:7
**FBI** [3] - 30:13, 63:18, 67:2
**FBI's** [1] - 57:24
**FBI-commissioned** [1] - 63:18
**feasible** [1] - 21:11
**features** [1] - 65:17
**February** [11] - 41:14, 46:18, 88:12, 90:9, 108:8, 110:22, 113:6, 113:7, 113:16, 113:19, 113:20
**Federal** [2] - 59:20, 59:21
**federal** [6] - 6:2, 31:3, 31:25, 67:4, 149:17, 166:23
**feelings** [1] - 27:5
**feet** [3] - 61:7, 61:13, 62:21
**fellow** [1] - 104:17, 105:7
**felt** [1] - 25:10
**few** [6] - 31:24, 103:2, 104:9, 113:12, 129:22, 147:17
**fiancee** [1] - 97:17, 98:8
**fiancee's** [1] - 97:25
**Fifteen** [1] - 163:7
**figure** [2] - 134:3, 138:7
**file** [2] - 5:16, 176:22
**files** [1] - 177:3
**Fill** [1] - 125:11
**fill** [2] - 2:10, 43:19
**filled** [1] - 148:1
**filling** [2] - 45:20, 45:22
**final** [2] - 23:22, 27:8
**financial** [5] - 96:8, 97:1, 98:6, 98:15, 99:6
**financially** [1] - 98:6
**fine** [6] - 4:22, 18:14, 18:21, 130:9, 138:14, 179:15
**finger** [8] - 8:23, 61:11, 63:2, 63:13, 64:24, 71:12, 81:14
**Fingerprint** [3] - 56:14, 57:21, 59:2

**fingerprint** [25] - 43:3, 43:4, 43:8, 43:9, 46:2, 57:25, 58:3, 59:3, 59:10, 60:25, 62:12, 62:22, 63:12, 63:16, 63:20, 63:24, 64:7, 64:10, 76:9, 77:12, 78:8, 79:6, 80:5, 80:6
**fingerprints** [12] - 42:15, 43:7, 43:13, 48:6, 63:11, 74:18, 74:21, 76:22, 77:16, 80:22, 80:24
**fingers** [5] - 61:6, 62:19, 63:16, 70:11, 71:12
**finish** [6] - 13:4, 13:9, 13:19, 14:3, 45:20, 45:22
**finished** [1] - 29:22
**fire** [8] - 35:1, 35:2, 47:7, 47:9, 47:13, 47:15, 47:17, 47:21
**Fire** [1] - 30:10
**firearm** [13] - 20:5, 20:9, 20:10, 33:24, 34:5, 34:11, 37:2, 37:3, 37:14, 37:15, 38:1, 38:13, 38:14
**firearms** [28] - 19:4, 20:14, 29:3, 29:10, 29:18, 29:25, 30:8, 30:14, 30:18, 30:22, 31:5, 31:10, 31:19, 32:1, 32:19, 33:10, 33:24, 34:12, 37:2, 37:14, 74:18, 74:20, 74:22, 75:3, 75:4, 75:10, 75:11, 75:12
**Firearms** [1] - 40:17
**firearms-related** [4] - 74:22, 75:4, 75:10, 75:11
**fired** [19] - 20:4, 20:9, 20:10, 33:24, 34:5, 34:11, 34:17, 35:11, 35:15, 37:2, 37:3, 37:13, 37:15, 37:25, 38:8, 38:19, 38:24, 75:22
**fires** [1] - 37:21
**firm** [2] - 8:8, 171:17
**first** [32] - 9:21, 17:20, 25:22, 29:12, 32:23, 40:23, 45:13, 49:8, 54:8, 60:17, 61:11, 64:9, 66:6, 68:6, 69:16, 95:23, 97:23, 98:12, 111:22, 117:21, 123:16, 124:20, 138:8, 138:18, 144:2, 144:7, 156:22, 165:5, 165:7, 165:16, 166:15
**First** [8] - 16:12, 20:2, 34:18, 35:19, 36:15,

89:3, 117:19, 122:11
**first-hand** [2] - 165:5, 165:7
**Firstly** [1] - 56:24
**firstly** [1] - 58:9
**Five** [4] - 150:23, 151:25, 152:1, 160:21
**five** [11] - 13:13, 20:8, 26:2, 30:1, 37:12, 38:24, 39:1, 60:5, 112:18, 112:19, 168:7
**Flannery** [14] - 1:19, 46:15, 52:10, 55:1, 80:19, 83:3, 168:20, 172:1, 172:5, 173:18, 174:9, 176:25, 178:13, 179:24
**FLANNERY** [6] - 46:12, 80:16, 173:19, 175:10, 182:9, 182:14
**Flannery's** [1] - 179:3
**flat** [1] - 72:6
**flat-based** [1] - 72:6
**flight** [2] - 96:24, 96:25
**flip** [6] - 35:23, 36:1, 45:5, 78:3, 82:11, 89:15
**Flohr** [3] - 29:11, 29:21, 30:2
**floor** [2] - 42:21, 42:24
**floors** [1] - 53:11
**flow** [3] - 64:22, 65:3, 66:7
**flowing** [2] - 61:16, 64:22
**flows** [1] - 65:9
**fly** [1] - 24:7
**focused** [2] - 9:8, 100:2
**folks** [1] - 126:15
**follow** [3] - 87:24, 88:1, 88:3
**followed** [1] - 57:10
**following** [1] - 17:6
**food** [1] - 69:24
**football** [1] - 22:25
**FOR** [1] - 1:1
**force** [7] - 37:22, 47:14, 85:25, 134:17, 135:7, 141:10, 155:22
**Force** [5] - 85:17, 85:24, 155:24, 156:1, 156:5
**foregoing** [1] - 184:7
**forensic** [2] - 32:6, 66:25
**Forensic** [1] - 40:7
**forget** [3] - 77:6, 87:6, 94:11
**forgiven** [1] - 123:5
**forgot** [1] - 18:7
**form** [1] - 69:24
**formal** [1] - 23:14,

23:20, 45:23
**formation** [3] - 65:4, 65:10, 65:11
**formations** [5] - 64:25, 65:3, 65:14, 65:18, 66:9
**formerly** [2] - 39:20, 68:1
**Forrester** [3] - 168:25, 169:1, 169:3
**forth** [4] - 12:18, 28:7, 96:13, 98:23
**forward** [4] - 37:23, 38:2, 105:9, 119:3
**foul** [1] - 135:4
**foundation** [2] - 112:20, 114:8
**Foundation** [1] - 159:25
**four** [14] - 20:9, 20:20, 36:16, 36:18, 36:23, 38:23, 39:1, 57:4, 66:21, 163:12, 163:24, 170:8, 170:12
**Fourteen** [1] - 85:22
**Fourth** [1] - 100:11
**frankly** [6] - 18:24, 100:5, 171:25, 173:25, 174:8, 176:1
**fraudulent** [2] - 108:11, 108:15
**free** [2] - 94:19, 131:17
**frequently** [2] - 74:17, 115:8
**fresh** [1] - 15:6
**Friction** [1] - 63:7
**friction** [13] - 58:13, 61:5, 61:10, 61:14, 61:18, 61:24, 62:6, 62:21, 63:13, 65:1, 70:3, 71:18
**friend** [2] - 18:15, 18:21
**front** [29] - 19:24, 23:22, 42:16, 42:17, 42:19, 42:20, 42:21, 42:22, 43:19, 46:21, 47:4, 47:14, 47:18, 48:1, 48:2, 48:8, 48:16, 54:16, 54:20, 54:22, 54:24, 83:4, 95:6, 107:2, 117:25, 145:5, 146:21, 150:18
**fronts** [1] - 73:14
**frustrated** [1] - 130:18
**fugitives** [2] - 85:19, 156:7
**full** [7] - 12:3, 17:22, 18:17, 21:12, 152:16, 168:8, 169:11
**fully** [4] - 12:17, 18:9, 96:8, 99:5
**funds** [1] - 24:2

**furtherance** [1] - 116:24
**furthered** [1] - 110:24
**future** [1] - 62:24

# G

**G-I-G-A-N-T-I** [1] - 85:9
**gap** [1] - 125:11
**GARDNER** [1] - 1:8
**Gardner** [14] - 1:21, 2:17, 8:11, 12:2, 12:8, 15:21, 16:2, 79:20, 148:19, 153:8, 171:18, 173:2, 178:1, 178:7
**Gardner's** [10] - 2:15, 15:20, 16:14, 22:8, 169:20, 169:23, 179:12, 180:3, 180:8, 180:9
**Gary** [1] - 7:9
**gather** [1] - 103:2
**gathered** [4] - 154:8, 154:10, 163:21, 165:2
**general** [5] - 11:23, 12:10, 32:11, 80:24, 160:3
**generally** [4] - 17:7, 24:17, 66:24, 173:21
**Generally** [2] - 35:5, 173:23
**generated** [1] - 177:20
**gentlemen** [11] - 28:11, 28:13, 34:9, 61:3, 105:5, 105:6, 105:13, 105:18, 109:21, 114:6, 116:14
**Gerard** [1] - 1:18
**Gerry** [1] - 129:20
**gestures** [1] - 82:25
**Giganti** [31] - 16:15, 20:24, 20:25, 21:25, 84:21, 85:9, 85:12, 85:15, 89:4, 89:23, 95:2, 102:19, 103:2, 103:15, 105:3, 105:21, 108:21, 109:8, 110:5, 112:8, 112:16, 114:10, 114:20, 121:4, 121:11, 123:3, 140:11, 140:15, 147:16, 162:7, 176:20
**GIGANTI** [2] - 85:5, 182:17
**Giganti's** [1] - 21:14
**Gilray** [2] - 109:5, 110:10
**given** [15] - 4:3, 17:18, 21:11, 59:25, 66:18, 90:9, 93:9, 122:5, 131:3, 132:11, 146:17, 162:14, 167:3, 168:22, 175:7
**glad** [1] - 174:9

**Glass** [1] - 76:3
**glass** [22] - 42:20, 43:14, 45:3, 47:5, 47:15, 51:20, 51:21, 54:9, 54:14, 54:17, 54:22, 54:25, 63:2, 72:13, 76:2, 80:20, 81:22, 82:4, 82:7, 82:10, 83:7, 83:8
**glassine** [1] - 121:24
**gloss** [2] - 72:7, 72:14
**glossy** [1] - 72:7
**glove** [1] - 42:23
**gloved** [1] - 75:23
**gloves** [1] - 71:25
**goal** [1] - 145:16
**goodbye** [1] - 104:16
**Goose** [1] - 118:18
**Government** [14] - 1:15, 35:19, 35:25, 36:3, 44:12, 89:3, 89:22, 91:10, 92:24, 107:2, 111:21, 117:20, 120:8, 121:10
**government** [40] - 4:2, 7:4, 8:8, 9:3, 10:14, 11:2, 11:7, 11:13, 11:19, 15:4, 15:23, 16:18, 19:13, 20:23, 27:4, 28:2, 28:15, 55:20, 98:15, 98:18, 98:21, 114:7, 128:15, 128:22, 140:10, 146:2, 166:23, 169:14, 171:16, 173:5, 175:18, 175:24, 176:6, 177:11, 177:22, 177:24, 178:5, 179:7, 179:9, 180:21
**government's** [6] - 7:8, 17:18, 177:19, 178:12, 178:14
**Government's** [1] - 67:19
**GOVERNMENT'S** [4] - 28:18, 39:10, 55:22, 85:5
**GPS** [1] - 87:13
**grain** [1] - 73:17
**grand** [31] - 21:12, 123:9, 123:11, 130:14, 138:2, 138:6, 138:19, 139:12, 140:3, 140:16, 144:2, 144:23, 145:4, 145:11, 148:7, 148:10, 148:12, 148:15, 157:14, 157:25, 158:3, 158:4, 158:15, 161:17, 161:22, 163:16, 163:18, 163:22, 164:25, 170:9, 170:10
**granted** [1] - 109:20
**grease** [1] - 62:4
**great** [3] - 95:24, 158:16
**Great** [1] - 5:19

**greater** [3] - 18:5, 32:5, 64:2
**Green** [1] - 173:15
**Greenbelt** [1] - 31:2
**grid** [1] - 179:13
**grooves** [6] - 34:6, 34:7, 34:10, 34:12, 34:15, 37:18
**group** [1] - 109:16
**Guam** [10] - 26:15, 26:16, 26:21, 26:22, 27:14, 95:17, 96:14, 101:16, 102:1, 102:2
**guarantee** [1] - 179:19
**guarantees** [1] - 14:21
**guess** [12] - 22:19, 22:21, 26:16, 74:10, 79:22, 95:16, 102:6, 119:1, 133:25, 153:13, 157:12, 173:12
**guilt** [1] - 109:25
**guilty** [2] - 6:3, 6:5
**gun** [10] - 20:18, 20:20, 34:15, 34:17, 35:12, 35:15, 37:21, 37:24, 37:25
**guns** [1] - 35:16
**guy** [3] - 9:2, 80:7, 170:3

# H

**Habitat** [1] - 126:23
**hair** [1] - 62:3
**half** [4] - 81:24, 85:4, 85:25, 130:5
**Hammerjacks** [2] - 115:16, 129:3
**hand** [19] - 2:14, 65:22, 71:6, 71:8, 71:15, 71:17, 72:16, 75:22, 81:10, 81:17, 82:23, 89:21, 107:15, 147:25, 165:4, 165:5, 165:6, 165:7
**handed** [5] - 148:1, 148:6, 148:24, 148:25, 171:11
**handgun** [6] - 38:9, 38:19, 38:20, 38:24, 38:25
**handguns** [2] - 38:8, 86:13
**handle** [2] - 3:20, 5:21
**handled** [2] - 26:11, 69:20, 75:19
**handles** [2] - 48:13, 100:25
**handling** [1] - 72:21
**hands** [23] - 62:1, 70:2,

70:4, 70:5, 70:9, 70:13, 70:14, 70:15, 70:17, 70:19, 70:21, 70:22, 70:24, 70:25, 71:1, 71:6, 71:7, 71:24, 73:24, 82:2, 82:3, 83:6

**handwritten** [5] - 91:14, 122:13, 122:24, 176:16, 176:21

**hang** [1] - 12:8

**Hanlon** [4] - 1:16, 14:10, 16:24, 169:7

**happy** [3] - 3:18, 6:21, 176:13

**hard** [2] - 63:3, 174:15

**HARDING** [107] - 2:6, 3:12, 3:17, 4:13, 4:19, 4:22, 5:22, 6:2, 6:5, 6:9, 8:6, 12:1, 12:6, 12:12, 12:15, 12:19, 12:22, 12:24, 13:4, 13:10, 13:20, 13:23, 14:1, 14:9, 16:1, 19:14, 20:1, 20:7, 21:17, 28:16, 28:24, 32:21, 39:8, 39:19, 54:7, 55:20, 56:5, 77:5, 77:10, 77:13, 80:12, 82:24, 84:11, 84:19, 84:21, 85:11, 94:17, 102:20, 102:23, 103:4, 105:20, 106:10, 107:18, 107:22, 107:24, 108:4, 108:19, 110:11, 111:24, 112:1, 112:3, 112:13, 112:15, 113:4, 114:11, 114:16, 116:8, 116:17, 117:9, 122:18, 122:22, 124:17, 127:18, 128:2, 128:6, 129:5, 138:11, 139:8, 139:20, 140:6, 140:10, 144:25, 146:8, 154:25, 155:4, 162:11, 164:11, 165:10, 168:19, 169:2, 169:5, 169:15, 169:18, 173:12, 173:15, 176:11, 176:19, 180:16, 180:20, 182:3, 182:5, 182:8, 182:10, 182:13, 182:15, 182:18, 182:23

**Harding** [53] - 1:15, 2:5, 3:14, 4:12, 5:20, 8:5, 9:7, 9:8, 11:22, 16:12, 19:23, 22:13, 56:7, 77:1, 102:18, 105:19, 107:12, 107:20, 113:3, 116:7, 116:16, 117:5, 118:3, 122:1, 122:17, 124:6, 124:15, 124:20, 128:25, 129:2, 129:23, 131:19, 139:2, 140:21, 140:25,

141:4, 142:1, 142:4, 142:5, 163:24, 164:6, 164:17, 165:9, 165:15, 168:18, 170:10, 175:18, 176:9, 177:12, 177:21, 178:4, 178:9, 180:15

**hardly** [2] - 9:14, 20:1

**Harford** [2] - 31:1, 59:18

**HARRIS** [1] - 1:7

**Harris** [53] - 1:18, 3:2, 46:16, 77:17, 78:2, 78:6, 78:9, 79:3, 79:23, 80:20, 94:3, 94:5, 119:11, 119:15, 119:19, 120:5, 120:11, 120:15, 122:5, 123:1, 129:21, 129:24, 130:11, 130:15, 130:18, 131:3, 131:9, 131:13, 132:2, 132:20, 133:19, 138:3, 138:24, 141:14, 141:18, 142:14, 143:1, 143:12, 144:4, 145:11, 145:13, 145:18, 145:24, 146:11, 156:12, 156:18, 156:23, 156:25, 157:5, 157:9, 157:15, 159:1

**Harris's** [8] - 119:16, 124:2, 145:1, 156:9, 156:11, 174:1, 174:4, 180:2

**harsh** [2] - 70:9, 70:14

**Hasim** [1] - 87:17

**Haven** [2] - 40:11, 40:12

**Hayes** [13] - 2:20, 3:6, 3:9, 3:10, 3:14, 3:22, 4:5, 4:7, 4:25, 5:15, 5:24, 169:15, 169:17

**head** [4] - 11:23, 53:8, 153:16

**headed** [1] - 23:18

**headquarters** [1] - 53:18

**Headquarters** [1] - 41:25

**hear** [12] - 4:12, 8:3, 9:9, 133:10, 136:2, 137:9, 174:18, 175:1, 176:4, 178:18, 180:1, 180:3

**heard** [14] - 21:2, 102:11, 104:14, 157:25, 158:5, 158:7, 158:15, 170:9, 172:7, 172:12, 172:21, 172:22, 174:14, 175:2

**hearing** [10] - 12:17, 17:23, 19:17, 19:18, 19:19, 163:17, 171:23, 174:6, 174:20, 180:7

**hearings** [2] - 8:7, 18:18

**hears** [1] - 175:4

**hearsay** [8] - 9:23, 10:1, 10:3, 10:16, 10:19, 10:24, 14:19

**heat** [7] - 73:1, 73:21, 74:13, 75:22, 76:8, 76:14, 76:17

**heavily** [1] - 23:25

**heavy** [1] - 40:5

**Heights** [9] - 115:2, 115:9, 116:1, 154:2, 154:6, 154:14, 154:17, 154:18, 155:17

**help** [10] - 52:4, 52:11, 70:16, 70:23, 71:20, 71:25, 72:22, 72:24, 73:2, 103:18

**helped** [2] - 110:3, 172:13

**helping** [2] - 74:6, 144:15

**helps** [2] - 64:23, 70:15, 151:19

**Herb** [1] - 23:15

**hereby** [1] - 184:3

**hereunto** [1] - 184:10

**herself** [2] - 25:16, 26:22

**hesitate** [1] - 170:14

**hide** [1] - 160:14

**high** [5] - 72:5, 72:7, 72:14, 87:7, 88:2

**highlight** [1] - 92:15

**himself** [3] - 5:23, 6:12, 11:15

**history** [2] - 155:9, 155:12

**hit** [3] - 3:4, 128:14, 128:15

**hits** [1] - 37:23

**hold** [6] - 7:2, 13:18, 40:25, 58:8, 121:15, 173:12

**holder** [1] - 42:23

**home** [3] - 98:3, 121:20, 148:2

**homicide** [25] - 16:21, 16:23, 21:6, 21:19, 36:10, 86:14, 86:19, 88:13, 88:17, 88:18, 88:20, 111:3, 115:15, 115:25, 116:10, 116:19, 116:22, 143:17, 143:21, 144:14, 144:19, 156:2, 158:7

**Homicide** [6] - 86:3, 86:5, 86:9, 86:10, 86:22, 127:1

**homicides** [4] - 41:4, 119:4, 119:11, 158:9

**Honda** [1] - 36:21

**honesty** [2] - 100:6, 101:6

**Honor** [128] - 2:6, 2:7, 2:12, 2:15, 2:19, 4:22, 4:24, 5:14, 6:11, 6:23, 7:1, 7:6, 8:1, 8:6, 8:16, 11:1, 12:1, 13:20, 14:10, 14:12, 15:12, 15:18, 16:1, 16:5, 16:8, 17:1, 17:12, 17:17, 17:24, 18:22, 19:14, 20:14, 20:22, 22:1, 22:11, 24:1, 25:19, 26:10, 27:6, 27:23, 28:16, 31:18, 31:22, 32:17, 39:4, 39:5, 39:8, 46:9, 46:10, 54:5, 55:17, 55:20, 77:3, 77:7, 77:14, 80:10, 80:12, 82:25, 84:18, 84:21, 94:13, 95:3, 100:14, 101:6, 101:15, 101:17, 103:11, 105:21, 106:14, 107:13, 107:18, 107:25, 109:19, 111:21, 112:6, 112:13, 112:20, 114:4, 114:11, 114:14, 115:18, 116:3, 116:5, 116:12, 117:4, 117:7, 121:7, 122:15, 122:19, 124:4, 124:8, 131:23, 138:8, 138:10, 138:14, 139:14, 139:20, 139:23, 140:6, 144:11, 145:7, 147:13, 147:21, 151:15, 153:4, 154:25, 158:10, 161:10, 162:4, 162:11, 167:21, 168:19, 169:16, 170:1, 170:6, 171:1, 171:7, 171:13, 171:15, 172:25, 173:13, 173:19, 175:11, 177:14, 180:20

**Honor's** [1] - 17:14

**Honorable** [1] - 1:13

**hood** [1] - 42:18

**hope** [4] - 13:6, 15:6, 95:24, 139:23

**hopefully** [1] - 13:16

**hoping** [2] - 13:4, 13:8

**Horatio** [1] - 88:7

**hospital** [2] - 2:8, 173:10

**hour** [5] - 13:16, 85:3, 105:18

**hours** [3] - 113:7, 113:20, 118:25

**house** [3] - 5:6, 130:21, 130:23

**homicides** ...

**housing** [1] - 27:3

**Howard** [3] - 31:1, 88:7, 114:21

**human** [3] - 64:7, 67:11, 67:13

**Humanity** [1] - 126:23

**hurt** [1] - 135:1

**hypothenar** [1] - 81:13

**hypothetical** [1] - 99:22

**hypothetically** [2] - 98:19, 98:23

**I**

**I-95** [1] - 148:19

**ID** [4] - 79:3, 171:23, 180:21, 180:22

**idea** [17] - 4:5, 29:8, 29:24, 30:18, 30:24, 41:8, 47:9, 56:18, 58:6, 59:3, 59:15, 74:17, 74:20, 81:5, 131:8, 153:2, 176:15

**ideas** [1] - 27:5

**identification** [43] - 8:9, 8:10, 9:10, 29:10, 30:8, 30:14, 30:22, 31:5, 31:10, 31:19, 32:19, 37:17, 56:23, 57:13, 57:22, 58:4, 59:10, 59:13, 60:17, 60:25, 63:6, 63:8, 66:16, 66:17, 69:13, 77:12, 78:5, 78:11, 78:14, 169:14, 172:24, 174:5, 175:7, 175:20, 175:24, 178:6, 178:8, 178:15, 178:18, 178:23, 178:25, 179:11, 179:20

**Identification** [5] - 57:6, 57:21, 58:2, 59:2, 60:4

**identifications** [15] - 57:13, 60:3, 60:23, 169:12, 169:19, 171:21, 172:3, 173:21, 174:5, 175:12, 175:15, 177:25, 178:11, 179:4

**identified** [8] - 79:23, 110:2, 151:18, 171:17, 171:18, 171:19, 174:15, 179:13

**identify** [12] - 7:17, 9:15, 34:16, 66:21, 122:20, 151:7, 151:8, 173:2, 173:22, 174:2, 174:3, 174:20

**identifying** [2] - 15:24, 180:9

**identity** [3] - 151:13,

151:18, 176:23
**Iggy** [2] - 44:5, 50:14
**II** [4] - 40:15, 40:21, 40:23, 41:1
**ill** [1] - 97:12
**immediately** [3] - 25:15, 102:11, 125:2
**implicating** [1] - 180:24
**implications** [1] - 96:8
**important** [4] - 99:6, 105:11, 105:14, 164:14
**impressed** [3] - 26:11, 34:13, 34:15
**impression** [2] - 62:18, 83:8
**impressions** [2] - 66:5, 66:12
**IN** [1] - 1:1
**inaudible** [5] - 133:21, 134:14, 143:9, 166:8, 166:16
**incarceration** [1] - 22:8
**inclination** [1] - 179:9
**inclined** [2] - 100:10, 177:7
**Include** [1] - 23:20
**include** [4] - 55:4, 55:8, 75:4, 79:16
**Included** [1] - 155:14
**includes** [3] - 75:6, 75:12, 118:13
**including** [4] - 18:8, 26:3, 57:2, 67:25
**incoming** [3] - 91:20, 91:23
**inconclusive** [1] - 57:13
**inconsistencies** [1] - 175:11
**inconsistency** [2] - 173:21, 174:18
**inconsistent** [1] - 10:9
**increase** [1] - 86:7
**increased** [1] - 27:2
**increases** [1] - 76:12
**incriminate** [1] - 8:18
**incriminating** [2] - 133:19, 133:22
**incur** [1] - 27:3
**indeed** [3] - 9:1, 95:20, 149:20
**INDEX** [1] - 182:1
**index** [2] - 43:17, 45:17
**indicate** [1] - 83:18
**indicated** [9] - 7:12, 52:23, 96:9, 100:10, 105:23, 154:1, 157:14, 177:18, 180:17
**indicating** [1] - 118:15
**indictment** [1] - 158:20
**individual** [15] - 7:9,

9:14, 38:13, 63:9, 63:14, 64:25, 69:16, 69:19, 69:21, 71:23, 73:23, 128:1, 173:20, 175:13, 175:15
**individual's** [2] - 70:2, 70:19
**individualized** [1] - 65:5
**individualizing** [1] - 65:17
**individuals** [2] - 58:7, 148:16
**indulgence** [1] - 124:7
**infants** [1] - 62:20
**infer** [2] - 151:13, 173:8
**Infiniti** [5] - 41:17, 41:23, 46:18, 68:1, 87:22
**information** [2] - 2:7, 12:25, 43:19, 65:15, 92:21, 106:4, 106:8, 106:21, 111:18, 112:12, 113:3, 114:6, 114:10, 115:14, 134:6, 141:15, 154:5, 154:10, 161:1, 161:13, 163:21, 165:2, 165:4, 165:6
**informed** [2] - 16:14, 149:20
**informing** [1] - 148:15
**infrequently** [1] - 75:8
**ingested** [1] - 69:23
**initial** [1] - 179:9
**initials** [5] - 45:6, 45:7, 50:4, 68:24, 79:4
**initiated** [3] - 87:10, 125:15, 125:19
**ink** [2] - 62:19, 122:1
**innocent** [1] - 8:24
**innocuous** [2] - 25:1, 25:2
**inquire** [3] - 3:23, 27:1, 101:22
**inquiry** [3] - 4:5, 25:17, 26:12
**inside** [9] - 41:25, 43:8, 43:25, 50:11, 51:25, 52:2, 81:17, 118:4, 118:9
**insisted** [1] - 171:7
**insofar** [2] - 14:21, 172:8
**instance** [21] - 49:2, 61:11, 61:20, 61:21, 62:2, 62:20, 65:11, 70:7, 70:8, 70:13, 70:21, 71:3, 71:6, 71:12, 75:18, 82:20, 83:4, 138:17, 145:23, 146:10
**instances** [4] - 10:22, 31:25, 53:24, 145:22

**Instead** [1] - 19:20
**instead** [1] - 71:4
**institutions** [1] - 40:8
**instruction** [1] - 10:11
**instructions** [3] - 25:15, 146:3, 168:11
**instrument** [1] - 63:3
**insufficient** [1] - 68:15
**intend** [9] - 7:23, 11:25, 101:22, 122:16, 122:18, 172:5, 172:24, 175:19, 178:6
**intended** [6] - 5:9, 27:8, 139:6, 169:14, 177:24, 178:8
**intends** [3] - 11:2, 16:18, 171:16
**intention** [4] - 7:18, 21:7, 95:21
**interest** [5] - 100:3, 125:15, 174:1, 174:4, 178:17
**interested** [1] - 155:19
**interesting** [2] - 25:5, 26:7
**interfere** [1] - 160:7
**Interior** [1] - 42:19
**interior** [4] - 42:4, 48:4, 48:11, 76:15
**International** [1] - 57:6, 58:1, 60:4
**interrogation** [2] - 7:10, 7:11
**interrupt** [1] - 14:4
**interrupted** [1] - 142:23
**interview** [6] - 10:16, 11:14, 11:16, 11:24, 110:19, 155:16
**interviewed** [1] - 15:21
**interviews** [1] - 21:5
**introduce** [6] - 10:12, 10:21, 32:9, 122:16, 176:7, 178:8
**introduces** [1] - 11:14
**introduction** [1] - 11:15
**investigate** [2] - 86:11, 125:9
**investigated** [2] - 126:18, 158:8
**investigating** [5] - 21:20, 86:6, 87:24, 119:12, 155:6
**investigation** [31] - 86:16, 86:19, 86:20, 87:4, 87:9, 87:11, 87:12, 88:17, 88:18, 108:22, 110:25, 111:3, 115:6, 116:18, 116:25, 117:2, 117:10, 119:4, 125:18, 125:19, 135:4, 136:6,

152:18, 153:10, 153:19, 154:1, 154:4, 154:16, 155:20, 176:21, 177:6
**investigations** [3] - 86:12, 86:14, 125:6
**invokes** [1] - 18:1
**involve** [1] - 32:14
**involved** [15] - 3:1, 86:16, 87:10, 88:9, 89:11, 116:18, 116:21, 125:22, 126:16, 126:21, 127:20, 128:21, 153:15, 153:23, 155:5
**involvement** [5] - 87:3, 124:20, 154:2, 154:13, 162:15
**involves** [1] - 75:22
**Irene** [1] - 123:17
**issue** [25] - 2:14, 2:19, 5:14, 8:3, 8:6, 9:8, 9:22, 12:3, 13:7, 16:15, 17:17, 19:18, 20:12, 20:18, 20:20, 22:4, 22:12, 24:4, 25:20, 26:13, 28:6, 100:8, 100:20, 101:9, 178:7
**issued** [2] - 24:7, 43:18
**issues** [7] - 2:4, 16:9, 24:21, 30:16, 94:23, 96:11, 101:1
**item** [3] - 70:24, 75:15, 118:23
**items** [12] - 43:25, 48:24, 51:25, 52:17, 54:2, 57:18, 58:11, 66:9, 74:22, 74:24, 75:4, 75:6
**itself** [3] - 51:15, 81:10, 174:5

## J

**jail** [5] - 2:21, 5:6, 130:3, 139:3, 146:6
**JAMES** [2] - 28:18, 182:2
**James** [4] - 1:20, 17:20, 28:17, 28:22
**January** [10] - 121:4, 122:7, 136:19, 138:22, 148:7, 150:19, 157:23, 158:17, 159:13, 161:17
**Jaquetta** [4] - 109:14, 109:15, 109:17, 123:8
**jar** [1] - 43:8
**jerseys** [1] - 118:10
**job** [3] - 30:4, 51:2, 51:3
**John** [2] - 84:21, 85:9
**JOHN** [2] - 85:5, 182:17
**joined** [1] - 156:5

**joint** [1] - 61:11
**Judge** [12] - 1:13, 18:8, 18:12, 18:14, 18:19, 19:8, 19:17, 20:11, 25:3, 103:21, 114:17, 169:7
**judge** [6] - 4:18, 17:24, 18:15, 18:20, 18:21, 23:2
**judging** [1] - 169:21
**judgment** [2] - 32:15, 32:16
**juror** [26] - 2:14, 25:15, 26:8, 26:11, 26:20, 26:24, 27:9, 27:14, 96:4, 99:23, 99:24, 100:13, 100:15, 100:18, 100:19, 100:21, 101:10, 101:14, 101:23, 102:4, 102:8, 102:11, 102:12, 103:24, 104:2, 104:7
**JUROR** [17] - 95:11, 95:13, 95:18, 95:22, 96:1, 97:9, 97:11, 97:19, 99:1, 99:3, 99:8, 99:10, 99:13, 99:17, 104:21, 104:23, 104:25
**Juror** [11] - 25:3, 25:11, 26:25, 94:25, 95:9, 99:18, 99:19, 102:13, 103:22, 104:4, 105:1, 105:7, 105:9, 105:10
**juror's** [1] - 25:14
**jurors** [6] - 26:14, 27:18, 95:4, 102:7, 104:17, 105:11
**jury** [68] - 7:21, 14:22, 16:13, 17:5, 21:12, 24:21, 25:5, 25:24, 25:25, 26:13, 27:8, 27:10, 28:8, 28:11, 34:9, 61:3, 84:22, 85:1, 94:18, 94:20, 98:14, 100:3, 103:22, 104:15, 104:16, 105:2, 121:24, 123:9, 123:11, 128:23, 130:14, 138:2, 138:6, 138:19, 139:12, 140:3, 140:16, 144:2, 144:23, 145:4, 145:11, 148:7, 148:10, 148:12, 148:15, 150:23, 157:14, 157:25, 158:3, 158:4, 158:15, 161:17, 161:22, 163:16, 163:18, 163:22, 164:25, 165:1, 168:2, 168:5, 168:7, 168:15, 170:9, 170:10, 174:19, 175:4, 176:3
**Jury** [4] - 1:13, 28:10, 105:4, 168:16
**jury's** [2] - 164:12, 175:4

**Justice** [2] - 40:5, 59:19
**Juvenile** [1] - 59:19

## K

**keep** [3] - 94:22, 168:13, 179:21
**KEL** [1] - 137:14
**Kell** [9] - 137:14, 159:3, 159:5, 159:14, 159:15, 160:14, 165:17, 165:19, 167:5
**Kelsey** [1] - 1:17
**Kemp** [4] - 118:16, 118:17, 118:19, 150:6
**Kevin** [3] - 132:18, 132:22, 156:11
**kid** [1] - 73:14
**kid's** [1] - 71:11
**kid-proof** [1] - 73:14
**kidding** [1] - 25:9
**kill** [2] - 127:17
**killed** [1] - 127:14
**kind** [21] - 2:9, 5:5, 10:17, 12:9, 15:24, 16:15, 16:22, 17:22, 19:3, 19:18, 35:12, 87:20, 98:8, 98:9, 100:25, 115:6, 127:10, 156:22, 163:17, 163:21, 170:7
**kinds** [2] - 12:10, 32:6
**knowing** [1] - 12:2
**knowledge** [4] - 12:10, 15:3, 84:14, 128:7
**knowledgeable** [1] - 155:16
**known** [25] - 55:2, 57:10, 57:11, 58:19, 60:1, 62:16, 62:17, 62:25, 63:25, 65:12, 65:21, 65:25, 66:4, 68:1, 69:12, 77:16, 78:6, 79:8, 79:19, 84:6, 109:6, 109:13, 126:25, 127:7, 127:8
**knows** [6] - 12:2, 12:3, 126:7, 126:10, 173:2, 174:21
**Kumho** [1] - 17:23
**KURLAND** [25] - 20:22, 21:21, 22:1, 22:3, 22:11, 103:17, 103:21, 107:10, 108:6, 108:17, 116:6, 153:4, 153:6, 154:22, 172:25, 173:17, 177:14, 177:16, 178:1, 179:6, 179:22, 180:5, 180:10, 180:13, 182:22

**Kurland** [8] - 1:21, 17:13, 20:21, 21:24, 26:9, 103:16, 153:7, 177:15

## L

**L-A-N-S-E-Y** [1] - 56:1
**Lab** [17] - 29:4, 29:6, 29:20, 40:15, 40:21, 40:23, 40:25, 41:2, 41:11, 41:16, 41:25, 43:18, 52:19, 56:9, 56:14, 72:10
**lab** [4] - 53:19, 58:9, 60:12, 60:22
**labeled** [1] - 112:16
**Laboratory** [3] - 40:16, 56:3, 56:24
**laboratory** [2] - 58:15, 62:11
**labs** [1] - 67:8
**lack** [2] - 3:15, 43:10
**lacks** [1] - 32:5
**Ladies** [2] - 28:11, 109:20
**ladies** [9] - 28:13, 34:9, 61:3, 105:5, 105:6, 105:13, 105:18, 114:6, 116:14
**Land** [6] - 94:9, 94:12, 105:24, 107:5, 109:3, 112:5
**land** [5] - 34:10, 93:6, 93:17, 93:19, 93:20
**landlord** [1] - 98:19
**lands** [5] - 34:6, 34:7, 34:12, 34:15, 37:18
**Lansey** [25] - 55:21, 56:1, 56:6, 56:19, 58:4, 59:7, 59:23, 60:24, 63:5, 67:20, 68:22, 76:4, 80:13, 80:17, 80:20, 81:8, 81:16, 81:21, 82:6, 83:4, 83:11, 83:21, 83:24, 84:12, 84:17
**LANSEY** [2] - 55:22, 182:12
**large** [3] - 127:2, 127:5, 127:6
**largely** [2] - 4:6, 21:4
**largest** [1] - 127:5
**last** [16] - 7:16, 13:1, 13:19, 44:13, 90:8, 95:14, 103:2, 112:16, 141:9, 149:1, 166:24, 168:23, 176:2, 176:24, 177:22, 178:10
**Last** [2] - 19:9, 170:9

**late** [6] - 8:16, 95:14, 113:6, 116:1, 147:18, 168:23
**Latent** [5] - 56:3, 56:15, 57:3, 58:25, 80:24
**latent** [83] - 41:7, 41:18, 42:3, 42:15, 43:2, 44:1, 44:6, 44:8, 46:5, 46:6, 48:5, 49:8, 49:23, 54:19, 56:22, 57:2, 57:8, 57:18, 57:22, 57:24, 58:2, 58:7, 58:16, 58:17, 58:19, 58:23, 59:13, 60:2, 60:18, 60:22, 61:4, 61:5, 62:17, 63:5, 64:18, 64:19, 64:21, 65:16, 65:24, 66:1, 66:3, 66:4, 67:16, 67:24, 68:4, 68:7, 69:2, 69:4, 69:7, 69:10, 69:11, 69:19, 71:20, 72:11, 72:19, 72:20, 72:22, 72:23, 72:24, 73:1, 73:3, 73:7, 73:12, 73:18, 73:22, 74:4, 74:7, 74:11, 74:21, 74:24, 75:8, 76:2, 76:5, 76:11, 76:15, 76:21, 76:25, 77:15, 80:22, 83:16, 84:12
**Laughter** [1] - 100:24
**Laura** [1] - 1:17
**Lauren** [1] - 50:14
**law** [5] - 9:15, 11:3, 26:17, 27:12, 153:13
**LAWLOR** [32] - 8:1, 25:19, 39:5, 46:10, 101:2, 106:6, 106:23, 107:9, 108:12, 108:16, 108:22, 109:19, 112:20, 112:25, 114:4, 115:11, 115:18, 116:2, 116:4, 116:12, 117:4, 117:7, 124:7, 124:12, 124:19, 128:12, 129:7, 162:13, 164:16, 165:12, 182:19, 182:24
**Lawlor** [9] - 1:17, 7:25, 23:14, 25:18, 100:6, 100:22, 100:25, 150:10, 164:15
**lawyers** [1] - 129:20
**lay** [1] - 61:15
**lead** [5] - 22:9, 27:24, 34:4, 69:12, 158:14
**leading** [1] - 17:19
**leads** [1] - 110:24
**lean** [2] - 82:21, 83:6
**leaning** [1] - 23:25
**learn** [2] - 93:24, 115:5
**learned** [3] - 95:19,

109:15, 119:16
**learning** [1] - 19:12
**lease** [4] - 97:19, 97:21, 98:20
**least** [14] - 3:12, 8:7, 18:20, 25:5, 60:18, 104:9, 127:15, 130:15, 131:15, 132:5, 137:23, 142:9, 144:3, 145:23
**leather** [2] - 48:19, 48:21
**leave** [20] - 4:17, 69:10, 71:9, 74:1, 74:4, 74:7, 75:16, 85:1, 94:19, 94:23, 95:4, 96:18, 97:15, 97:20, 97:22, 98:9, 100:21, 167:25, 168:13, 175:20
**leaves** [4] - 13:2, 69:7, 72:9, 95:7
**leaving** [5] - 69:16, 72:18, 72:19, 74:11, 80:22
**leery** [1] - 4:14
**Left** [1] - 145:13
**left** [29] - 22:13, 25:8, 34:19, 38:14, 69:11, 70:24, 72:1, 72:20, 73:3, 73:13, 79:2, 79:9, 80:25, 81:14, 81:15, 81:17, 81:19, 81:24, 82:23, 89:21, 102:7, 121:18, 121:19, 124:5, 147:20, 157:14, 176:20
**left-hand** [1] - 89:21
**legal** [1] - 2:4
**legally** [1] - 86:12
**legitimate** [1] - 108:14
**lend** [1] - 147:22
**length** [1] - 35:4
**lengthy** [2] - 13:5, 103:3
**less** [3] - 22:13, 60:8, 105:17
**letter** [4] - 17:17, 18:7, 19:14, 107:20
**letters** [2] - 171:2, 171:10
**license** [2] - 41:20, 45:2, 87:20
**life** [1] - 34:14
**Lift** [4] - 44:21, 68:18, 78:5, 78:8
**lift** [25] - 43:15, 43:20, 43:21, 43:23, 44:10, 44:21, 45:2, 45:5, 45:18, 45:21, 45:22, 46:8, 49:13, 49:17, 50:2, 51:11, 51:13, 54:8, 77:15, 78:12, 80:5, 83:16
**lifted** [1] - 83:19

**lifting** [3] - 45:15, 49:7, 50:18
**lifts** [3] - 44:16, 45:21, 68:10
**light** [4] - 15:12, 17:3, 25:14, 100:14
**lighting** [1] - 121:20
**likelihood** [1] - 16:22
**likely** [5] - 18:6, 22:18, 22:22, 100:1, 100:8
**Lil** [1] - 92:10
**limited** [4] - 21:1, 21:8, 31:12, 31:25
**limiting** [1] - 10:10
**Line** [1] - 149:4
**line** [10] - 65:3, 65:9, 79:11, 93:6, 93:17, 93:19, 93:20, 135:15, 180:12, 180:14
**Lines** [1] - 149:5
**lines** [4] - 61:16, 61:18, 65:2
**link** [2] - 129:2, 129:8
**Lisa** [7] - 33:12, 33:20, 80:2, 88:18, 111:4, 152:5, 152:7
**list** [3] - 91:4, 173:6, 173:7
**listed** [13] - 55:7, 90:17, 90:18, 93:2, 93:3, 93:14, 94:7, 107:3, 109:3, 110:7, 110:14, 113:9, 113:16
**listen** [7] - 123:16, 133:8, 133:16, 134:11, 135:15, 142:20, 175:1
**listened** [5] - 133:18, 142:17, 143:1, 143:4, 180:1
**listening** [1] - 137:5
**listing** [2] - 89:5, 89:16
**literally** [1] - 19:21
**live** [1] - 63:1
**lived** [2] - 104:6, 110:9
**living** [1] - 127:23
**LL** [1] - 79:4
**lo** [1] - 170:11
**load** [2] - 35:3, 37:9, 40:6
**loads** [1] - 38:2
**located** [2] - 53:17, 94:12
**location** [5] - 66:11, 112:24, 113:24, 117:16, 137:17
**Loch** [2] - 117:15, 117:24
**locked** [2] - 3:4, 47:18
**locks** [1] - 48:13
**lockup** [1] - 3:2

**log** [1] - 55:2
**Lombard** [1] - 1:24
**Look** [2] - 146:16, 146:19
**look** [24] - 5:17, 25:12, 28:4, 32:25, 36:6, 44:13, 65:6, 65:18, 66:6, 66:8, 66:10, 118:21, 131:17, 131:25, 137:7, 138:6, 138:18, 145:3, 145:10, 146:24, 149:1, 151:4, 167:10, 174:4
**looked** [2] - 27:12, 110:6
**looking** [21] - 26:3, 37:20, 52:5, 52:20, 64:20, 64:21, 64:25, 65:23, 70:18, 81:9, 81:13, 86:23, 99:12, 106:12, 146:13, 148:23, 149:13, 149:23, 150:2, 150:22, 150:23
**looks** [4] - 17:19, 33:15, 71:22, 93:18
**Looks** [1] - 118:10
**Lorraine** [2] - 55:21, 56:1
**LORRAINE** [2] - 55:22, 182:12
**lose** [2] - 99:23, 100:13
**lost** [2] - 2:7, 177:7
**lotion** [3] - 42:25, 49:4, 84:2
**lotions** [1] - 62:4
**lower** [4] - 81:17, 81:19, 81:24, 82:23
**luck** [1] - 104:22
**lunch** [1] - 25:4
**luncheon** [2] - 13:15, 85:2
**Lynch** [5] - 2:14, 22:12, 100:7, 100:15, 101:9
**lynch** [1] - 23:15

**M**

**Ma'am** [1] - 95:5
**ma'am** [1] - 104:5
**Magginson's** [1] - 123:17
**magnitude** [1] - 5:12
**mail** [9] - 9:11, 19:15, 103:2, 123:16, 123:17, 124:2, 169:8, 171:18, 174:7
**maintain** [2] - 70:5, 70:16
**maintained** [1] - 75:19
**major** [1] - 24:4

**majors** [1] - 40:6
**man** [6] - 86:16, 128:4, 128:5, 128:14, 128:15
**manner** [2] - 82:22, 184:9
**manufacturing** [1] - 34:14
**March** [4] - 40:18, 108:9, 115:25, 152:14
**Margaret** [1] - 16:3
**mark** [1] - 38:14
**marked** [2] - 23:17, 44:12, 67:18, 77:23, 92:23, 112:7, 120:8, 121:6
**marking** [1] - 122:10
**marks** [8] - 34:7, 34:13, 34:14, 37:21, 38:5, 38:7, 38:11
**married** [2] - 39:22, 39:23
**MARTIN** [40] - 1:7, 4:24, 5:3, 5:14, 6:11, 6:15, 6:18, 6:23, 7:1, 7:5, 27:23, 103:8, 103:11, 106:5, 116:3, 118:3, 120:16, 122:15, 123:6, 123:21, 123:25, 129:17, 139:14, 139:23, 140:14, 157:20, 157:22, 158:10, 158:21, 159:25, 161:2, 161:9, 165:14, 169:4, 170:1, 171:1, 171:6, 171:11, 182:20, 182:25
**Martin** [48] - 1:18, 1:19, 4:23, 5:13, 5:19, 5:20, 6:25, 7:14, 8:10, 8:18, 9:3, 9:9, 10:5, 10:17, 11:15, 11:25, 14:16, 14:20, 27:22, 79:19, 103:6, 117:18, 129:20, 138:13, 139:11, 139:22, 140:7, 146:13, 147:17, 148:19, 148:21, 149:3, 149:6, 152:12, 152:13, 152:19, 157:13, 158:24, 162:5, 168:19, 169:23, 170:24, 172:1, 172:5, 173:19, 175:3, 176:2, 176:25
**Martin's** [11] - 10:13, 10:15, 11:2, 11:3, 11:11, 15:2, 15:20, 161:6, 161:13, 161:25, 169:20
**Mary** [3] - 1:23, 184:3, 184:15
**MARYLAND** [1] - 1:1
**Maryland** [14] - 1:11, 1:25, 29:11, 29:21, 40:10, 41:23, 93:10,

94:9, 94:12, 105:24, 107:5, 109:3, 109:5, 112:5
**mass** [1] - 19:4
**Massachusetts** [1] - 18:20
**Master's** [2] - 40:6, 40:11
**match** [3] - 34:18, 38:20, 38:21
**matches** [1] - 79:24
**material** [2] - 61:20, 70:20
**materials** [5] - 53:25, 75:10, 75:11, 75:21, 80:20
**matter** [7] - 4:4, 9:5, 10:5, 27:5, 99:21, 184:4, 184:9
**matters** [2] - 17:9, 21:8
**MB-23** [1] - 32:23
**MB-24** [1] - 32:24
**MB-30** [3] - 44:12, 67:19, 78:6
**MB-31** [4] - 77:23, 78:6, 78:8, 79:9
**MB-33** [2] - 89:3, 89:14
**MB-34** [2] - 89:23, 91:18
**MB-35** [1] - 91:10
**MB-38** [1] - 89:7
**MB-39** [1] - 89:7
**MB-50** [1] - 121:10
**MB-51** [2] - 122:10, 122:11
**MB-52** [2] - 122:11
**McCaffity** [33] - 80:3, 80:7, 86:17, 86:25, 87:5, 87:8, 87:9, 87:15, 87:24, 88:1, 88:15, 90:8, 90:20, 109:16, 110:20, 111:4, 111:12, 114:20, 124:21, 125:21, 126:19, 127:20, 129:4, 144:19, 152:5, 152:7, 153:11, 153:15, 153:19, 155:6, 155:10, 155:19
**McCaffity's** [12] - 87:13, 88:6, 89:5, 89:9, 89:17, 90:1, 90:4, 91:15, 94:8, 105:23, 107:4, 111:18
**McCaffity/Brown** [2] - 20:3, 158:8
**McCaffity/Lisa** [1] - 115:15
**Mead** [1] - 16:4
**mean** [27] - 8:24, 10:21, 12:7, 12:9, 12:11, 13:10, 22:18, 24:6, 24:10, 29:13, 38:14, 42:9, 42:12, 51:11, 54:14,

61:10, 63:10, 86:5, 90:19, 102:24, 151:3, 171:3, 171:25, 175:9, 175:11, 176:6, 179:21
**meaning** [1] - 160:5
**means** [7] - 8:24, 22:3, 63:6, 63:7, 79:1, 96:5, 179:15
**meant** [1] - 130:23
**mechanism** [1] - 96:5
**medications** [1] - 69:24
**medium** [1] - 65:20
**meet** [5] - 132:2, 134:18, 135:10, 164:17, 164:20
**meeting** [27] - 119:18, 132:6, 132:9, 132:13, 132:15, 132:16, 132:24, 133:2, 133:7, 133:14, 133:16, 133:18, 134:1, 134:6, 134:7, 134:11, 134:12, 136:18, 136:24, 146:11, 156:18, 156:22, 157:4, 157:5, 157:10
**meetings** [18] - 119:15, 119:20, 120:4, 120:15, 121:3, 122:25, 131:13, 132:1, 132:21, 134:16, 134:23, 135:7, 135:10, 141:13, 141:24, 146:20, 159:1, 159:13
**member** [1] - 30:9
**members** [1] - 135:6
**Members** [3] - 84:22, 94:18, 168:2
**memory** [2] - 163:13, 163:20
**memory's** [1] - 162:16
**men** [1] - 91:7
**mention** [5] - 16:11, 28:2, 28:6, 104:17, 109:21
**mentioned** [10] - 16:12, 50:6, 74:16, 75:9, 75:25, 76:8, 104:18, 138:4, 140:2, 154:6
**merchandise** [1] - 118:9
**mere** [1] - 27:11
**message** [2] - 4:18, 96:9
**met** [3] - 32:11, 164:23, 165:9
**metal** [5] - 74:16, 75:7, 75:14, 75:25
**metals** [2] - 72:13, 80:21
**method** [7] - 64:10, 66:24, 67:2, 67:7, 67:13
**methodology** [2] -

64:14, 67:13
**methods** [2] - 166:20, 166:21
**Michael** [2] - 1:16, 1:17
**microphone** [1] - 95:9
**microscopic** [3] - 34:3, 34:7, 36:23
**microscopically** [2] - 34:16, 34:21
**midline** [1] - 79:10
**midst** [1] - 27:12
**might** [22] - 26:15, 27:3, 50:11, 52:11, 73:16, 76:15, 76:20, 76:21, 103:3, 103:25, 104:1, 123:20, 127:13, 131:23, 134:25, 135:3, 138:17, 169:8, 170:16, 173:3, 177:3, 180:10
**mike** [5] - 28:21, 39:13, 55:24, 85:7, 103:16
**mikes** [1] - 103:10
**millimeter** [4] - 30:16, 37:5, 37:8, 37:10
**Mills** [1] - 152:4
**mind** [7] - 94:23, 100:1, 103:25, 110:16, 126:2, 168:13, 175:5
**minds** [1] - 175:6
**mine** [2] - 18:15, 18:21
**Minehart** [1] - 44:5
**minimum** [4] - 8:3, 32:9, 57:4, 58:20
**minute** [8] - 71:13, 82:11, 94:19, 100:17, 124:8, 153:4, 177:17
**minutes** [15] - 13:13, 13:15, 13:17, 19:21, 84:24, 85:2, 94:21, 99:16, 102:15, 102:20, 102:25, 124:15, 129:22, 163:7, 178:4
**Miranda** [1] - 12:17
**mirror** [1] - 42:23
**misidentification** [5] - 59:7, 64:4, 64:6, 67:11, 67:12
**missed** [2] - 91:20, 91:25
**mistaken** [1] - 132:22
**mistrial** [1] - 117:7
**misunderstood** [1] - 178:9
**MITCHELL** [1] - 1:6
**Mitchell** [21] - 1:16, 3:4, 7:10, 7:13, 9:1, 10:21, 12:2, 12:8, 26:4, 79:19, 109:18, 109:24, 110:2, 110:8, 115:24, 116:9, 116:14, 117:3, 117:6,

171:19, 184:5

**Mitchell's** [8] - 2:13, 8:10, 8:11, 10:6, 11:11, 14:1, 14:23, 110:6

**Mobile** [6] - 106:16, 107:12, 109:3, 113:2, 114:8, 114:17

**mobile** [1] - 42:1

**modern** [1] - 34:11

**moisture** [2] - 76:9, 76:11

**moment** [14] - 16:10, 46:9, 67:10, 80:10, 93:11, 104:16, 109:8, 114:11, 121:7, 138:13, 139:10, 139:20, 154:25

**moments** [1] - 6:21

**Monday** [4] - 1:11, 23:14, 95:16, 168:22

**money** [4] - 97:4, 97:5, 172:13, 172:17

**monitor** [1] - 122:21

**monitoring** [1] - 87:13

**Montana** [1] - 24:6

**Montgomery** [14] - 31:14, 31:15, 128:5, 128:9, 128:13, 129:10, 129:11, 150:9, 150:15, 150:24, 151:6, 162:19, 163:4, 163:8

**months** [6] - 8:13, 102:1, 102:2, 123:4, 166:17, 166:24

**Moot** [1] - 30:15

**moot** [1] - 4:7

**morning** [37] - 2:5, 2:6, 4:23, 4:24, 6:25, 7:6, 7:7, 15:17, 15:18, 17:18, 19:15, 20:21, 20:22, 25:1, 28:12, 28:25, 29:1, 31:22, 31:23, 33:1, 36:7, 39:20, 46:13, 46:14, 56:6, 56:7, 80:17, 80:18, 85:12, 88:12, 113:6, 113:19, 113:20, 113:23, 118:19, 168:15, 181:2

**most** [9] - 5:11, 8:21, 50:10, 62:14, 63:7, 64:20, 90:3, 90:23, 101:25

**mother** [2] - 94:6, 172:9

**motion** [4] - 5:16, 15:16, 71:18, 180:10

**Motion** [3] - 109:20, 115:19, 117:8

**motions** [1] - 9:21

**motivations** [1] - 101:16

**move** [11] - 15:14, 66:2, 66:13, 66:17, 96:2,

102:12, 105:11, 109:19, 115:18, 117:7, 121:19

**moved** [1] - 27:14

**movement** [1] - 71:20

**moves** [1] - 160:5

**movie** [4] - 111:8, 111:16, 152:9, 162:5

**movies** [1] - 74:9

**moving** [5] - 26:15, 26:16, 102:1, 102:2, 160:6

**MR** [245] - 2:6, 3:12, 3:17, 4:13, 4:19, 4:22, 4:24, 5:3, 5:14, 5:22, 6:2, 6:5, 6:9, 6:11, 6:15, 6:18, 6:23, 7:1, 7:5, 7:6, 7:8, 8:1, 8:6, 9:13, 9:25, 10:3, 10:7, 11:1, 11:9, 12:1, 12:6, 12:12, 12:15, 12:19, 12:22, 12:24, 13:4, 13:10, 13:20, 13:23, 14:1, 14:9, 14:12, 15:9, 15:12, 15:18, 15:23, 16:1, 16:8, 17:12, 18:12, 18:17, 18:22, 19:10, 19:14, 20:1, 20:7, 20:13, 20:19, 20:22, 21:17, 21:21, 22:1, 22:3, 22:11, 25:19, 26:10, 27:6, 27:23, 28:16, 28:24, 31:21, 32:21, 39:5, 39:8, 39:19, 46:10, 46:12, 54:7, 55:20, 56:5, 77:3, 77:5, 77:10, 77:13, 80:12, 80:16, 82:24, 84:11, 84:19, 84:21, 85:11, 94:17, 101:2, 101:13, 102:20, 102:23, 103:4, 103:8, 103:11, 103:17, 103:21, 105:20, 106:5, 106:6, 106:10, 106:23, 107:9, 107:10, 107:18, 107:22, 107:24, 108:4, 108:6, 108:12, 108:16, 108:17, 108:19, 108:22, 109:19, 110:11, 111:24, 112:1, 112:3, 112:13, 112:15, 112:20, 112:25, 113:4, 114:4, 114:11, 114:16, 115:11, 115:18, 116:2, 116:3, 116:4, 116:6, 116:8, 116:12, 116:17, 117:4, 117:7, 117:9, 118:3, 120:16, 122:15, 122:18, 122:22, 123:6, 123:21, 123:25, 124:7, 124:12, 124:17, 124:19, 127:18, 128:2, 128:6, 128:12, 129:5, 129:7, 129:17,

138:11, 139:8, 139:14, 139:20, 139:23, 140:6, 140:10, 140:14, 144:25, 146:8, 147:15, 153:2, 153:4, 153:6, 154:22, 154:25, 155:4, 157:20, 157:22, 158:10, 158:21, 159:25, 161:2, 161:9, 161:10, 162:11, 162:13, 164:11, 164:16, 165:10, 165:12, 165:14, 168:19, 169:2, 169:4, 169:5, 169:15, 169:18, 170:1, 171:1, 171:6, 171:11, 171:15, 172:2, 172:10, 172:15, 172:17, 172:25, 173:12, 173:15, 173:17, 173:19, 175:10, 176:11, 176:19, 177:14, 177:16, 178:1, 179:6, 179:22, 180:5, 180:10, 180:13, 180:16, 180:20, 182:3, 182:4, 182:5, 182:8, 182:9, 182:10, 182:13, 182:14, 182:15, 182:18, 182:19, 182:20, 182:21, 182:22, 182:23, 182:24, 182:25

**MS** [14] - 22:15, 22:21, 23:10, 23:16, 24:1, 24:9, 24:11, 24:14, 24:18, 100:14, 100:19, 101:3, 101:6, 101:8

**muck** [1] - 170:14

**murder** [19] - 2:18, 7:15, 7:17, 9:14, 9:15, 12:14, 16:2, 20:8, 21:16, 21:18, 89:9, 89:12, 90:3, 90:8, 129:3, 149:24, 161:6, 162:6, 172:14

**murders** [2] - 15:3, 21:2

**must** [1] - 59:24

**mutilated** [1] - 34:2

**Muvico** [2] - 111:3, 152:4

**myriad** [2] - 69:9, 127:13

## N

**N-26** [1] - 147:3

**naked** [1] - 62:8

**name** [38] - 12:3, 17:20, 28:21, 33:3, 33:5, 33:7, 39:13, 39:14, 39:20, 44:24, 55:25, 56:1, 65:12, 67:22, 78:2, 79:18, 85:8, 85:9, 86:17, 90:9, 92:19, 107:4, 117:23, 118:16, 119:6,

121:13, 123:19, 127:21, 130:2, 147:16, 150:5, 150:6, 151:8, 153:7, 154:6, 154:16, 154:19, 168:24

**name's** [3] - 46:15, 80:19, 129:20

**named** [7] - 77:16, 114:21, 128:4, 128:5, 153:25, 157:1

**namely** [1] - 156:6

**names** [6] - 36:12, 92:2, 117:14, 133:25, 154:11, 154:13

**narcotics** [3] - 87:4, 155:14, 172:15

**narrow** [1] - 17:10

**narrowed** [1] - 177:23

**Natasha** [3] - 168:24, 171:16, 173:2

**national** [1] - 30:11

**native** [1] - 87:19

**nature** [8] - 2:4, 10:24, 52:21, 74:12, 80:21, 86:11, 119:8, 177:8

**naturally** [1] - 25:4

**Near** [1] - 3:13

**necessarily** [3] - 55:12, 73:6, 73:16

**necessary** [4] - 17:4, 27:24, 105:7, 105:16

**neck** [1] - 62:2

**need** [24] - 2:4, 9:8, 15:7, 21:25, 22:17, 22:22, 24:2, 24:3, 24:5, 24:7, 24:20, 25:13, 25:18, 26:12, 50:11, 77:21, 78:12, 83:23, 95:8, 129:21, 151:5, 153:16, 169:7, 178:22

**needed** [1] - 167:16

**needs** [3] - 71:10, 71:14, 97:25

**negative** [4] - 178:17, 178:23, 179:4, 180:21

**neighborhood** [2] - 110:9, 125:12

**neutrally** [1] - 3:23

**Never** [1] - 126:2

**never** [13] - 19:2, 30:20, 64:3, 91:14, 97:3, 138:4, 142:17, 142:20, 154:17, 154:19, 166:20, 171:8

**nevertheless** [1] - 2:10

**New** [4] - 17:25, 40:11, 40:12, 170:4

**new** [2] - 15:9, 98:20

**Next** [3] - 39:7, 55:19, 84:19

**next** [13] - 14:8, 23:14,

26:21, 28:15, 84:24, 96:10, 96:12, 102:1, 102:2, 113:23, 166:17, 168:21

**nickname** [3] - 110:7, 118:17, 130:16

**Niedermeier** [23] - 7:9, 7:18, 10:13, 10:15, 13:1, 13:5, 14:3, 14:7, 15:22, 16:16, 20:24, 21:3, 21:25, 102:22, 102:25, 103:20, 116:23, 161:14, 161:16, 161:21, 162:1, 169:6, 176:12

**Niedermeier's** [1] - 21:14

**Nig** [1] - 92:10

**night** [5] - 90:20, 91:7, 110:20, 116:1, 172:14

**nine** [1] - 174:14

**Nine** [2] - 92:5, 93:25

**NO** [1] - 1:5

**nobody** [2] - 102:9, 174:19, 174:21

**noise** [5] - 73:6, 73:8, 73:9, 120:2, 160:7

**nol** [2] - 148:22, 149:3

**non** [3] - 10:24, 57:13, 75:3

**non-hearsay** [1] - 10:24

**non-identifications** [1] - 57:13

**non-porous** [1] - 75:3

**None** [1] - 67:9

**none** [2] - 82:14, 135:25

**nonporous** [5] - 72:3, 72:12, 72:13, 74:16, 75:15

**normally** [5] - 34:4, 58:8, 62:8, 62:9, 125:5

**North** [2] - 148:2, 150:20

**NORTHERN** [1] - 1:2

**note** [5] - 19:16, 24:22, 24:25, 94:23, 168:13

**Note** [1] - 28:8

**noted** [5] - 15:11, 15:17, 46:21, 47:20, 48:18

**notes** [5] - 77:21, 91:14, 104:19, 106:12, 118:21, 122:13, 122:24, 131:14, 145:3, 145:4, 146:13, 146:15, 151:9, 159:12, 164:3

**Nothing** [1] - 107:20

**nothing** [7] - 12:12, 15:9, 21:6, 70:16, 72:9, 125:25, 140:11

**notice** [4] - 2:23, 90:7, 90:14, 103:10

**notification** [1] - 168:23
**notify** [1] - 169:8
**notwithstanding** [2] -
17:10, 173:1
**November** [4] - 98:13,
133:2, 133:7, 133:18
**Number** [24] - 25:3,
25:11, 26:25, 68:18,
78:5, 78:8, 92:5, 92:9,
92:10, 92:17, 93:25,
94:25, 95:4, 95:9, 99:18,
100:19, 102:13, 102:14,
103:22, 104:4, 105:1,
105:7, 105:9, 105:10
**number** [42] - 2:22,
2:25, 3:9, 3:21, 7:3,
36:16, 41:20, 42:10,
43:20, 44:21, 45:2, 45:4,
54:8, 55:5, 55:6, 55:11,
55:15, 77:16, 79:3,
87:21, 89:20, 90:12,
92:5, 92:19, 92:21,
92:25, 94:8, 109:9,
112:5, 112:18, 112:19,
113:9, 114:1, 121:18,
131:1, 131:22, 174:3,
174:6, 174:18, 175:13
**Number(s** [1] - 184:5
**numbers** [8] - 4:8,
45:25, 89:16, 114:9,
117:25, 118:25, 122:5,
131:3

# O

**object** [2] - 8:2, 100:15
**objected** [1] - 168:20
**objecting** [1] - 170:17
**Objection** [43] - 82:24,
106:5, 106:6, 106:23,
107:9, 107:10, 108:6,
108:12, 108:16, 108:17,
108:22, 109:19, 112:20,
112:25, 114:4, 115:11,
115:18, 116:2, 116:3,
116:12, 117:4, 120:16,
122:15, 123:21, 123:25,
124:17, 127:18, 128:2,
128:6, 129:5, 138:11,
139:8, 144:25, 146:8,
157:20, 158:10, 158:21,
159:25, 161:2, 161:9,
161:10, 164:11, 165:10
**objection** [6] - 8:4,
9:24, 10:2, 108:1, 113:1,
124:18
**objection's** [4] - 110:4,
116:13, 117:5, 124:1
**observations** [1] -
101:14

**observe** [1] - 135:7
**observed** [5] - 47:4,
47:23, 48:2, 54:16, 87:7
**observing** [2] - 51:2,
51:3
**obstreperous** [1] -
170:8
**obtain** [4] - 107:22,
107:24, 110:24, 111:7
**obtained** [1] - 161:14
**obvious** [3] - 7:19, 8:2,
8:11
**Obviously** [7] - 24:19,
27:10, 27:20, 96:2,
116:13, 169:20, 177:2
**obviously** [9] - 8:4, 9:8,
14:15, 28:4, 70:3, 79:22,
97:3, 176:7, 179:8
**occasion** [10] - 31:9,
58:3, 87:23, 89:11,
111:3, 119:3, 137:23,
148:18, 148:21, 166:16
**Occasionally** [1] -
31:17
**occasions** [5] - 59:14,
88:4, 130:15, 131:11,
131:12
**occupation** [2] - 70:8,
70:9
**occupying** [1] - 102:13
**occur** [1] - 5:13
**occurred** [8] - 5:6,
103:24, 104:8, 115:16,
115:25, 135:21, 157:5,
174:8
**occurs** [1] - 27:23
**October** [15] - 23:5,
26:22, 77:22, 78:12,
83:22, 97:25, 98:10,
98:12, 119:2, 132:7,
132:25, 133:14, 133:16,
156:19, 157:5
**odyssey** [1] - 166:24
**OF** [3] - 1:1, 1:4, 1:10
**offer** [3] - 8:9, 31:18,
122:18
**offered** [2] - 10:5, 30:4
**offering** [1] - 10:7
**office** [4] - 60:19, 74:19,
77:22, 123:9
**Officer** [1] - 132:17
**officer** [2] - 156:10,
156:11
**officers** [2] - 115:8,
126:18
**official** [1] - 184:8
**Official** [1] - 184:16
**officials** [1] - 153:14
**often** [2] - 62:12, 159:22
**oil** [4] - 43:12, 61:8,

62:2, 71:5
**Oliver** [15] - 80:3, 80:7,
86:17, 87:8, 88:15, 89:5,
89:8, 89:16, 90:4, 91:14,
109:16, 115:15, 152:5,
152:7, 155:6
**ON** [1] - 182:4
**once** [4] - 16:19, 45:25,
132:20, 175:4
**Once** [2] - 66:1, 66:7
**one** [124] - 2:14, 2:19,
7:12, 8:7, 8:21, 9:10,
10:22, 14:16, 18:17,
18:20, 21:12, 25:9,
26:14, 26:17, 28:4,
31:11, 33:5, 33:7, 33:12,
33:17, 33:20, 35:11,
35:15, 35:25, 36:20,
36:21, 38:17, 44:10,
44:20, 50:12, 50:13,
50:16, 50:18, 50:20,
54:14, 54:18, 55:11,
56:24, 58:9, 58:10,
58:24, 59:25, 60:18,
62:15, 65:5, 65:9, 68:19,
69:2, 69:4, 70:17, 70:25,
73:5, 75:14, 75:19,
79:13, 79:22, 80:9,
84:12, 88:15, 88:23,
89:15, 90:17, 90:18,
93:11, 93:18, 96:11,
97:24, 102:8, 109:8,
112:4, 114:11, 115:21,
117:2, 121:3, 121:7,
126:17, 129:20, 132:3,
132:8, 132:11, 134:3,
137:11, 137:20, 137:24,
138:19, 140:1, 141:2,
141:16, 143:11, 144:18,
145:23, 146:10, 146:22,
148:10, 148:14, 150:19,
157:12, 158:25, 159:3,
159:9, 159:17, 162:8,
168:4, 169:13, 170:5,
171:1, 171:15, 173:23,
174:15, 175:10, 176:14,
177:25, 178:16, 178:17,
178:20, 180:6
**One** [14] - 7:8, 12:24,
33:20, 46:9, 54:5, 68:14,
80:10, 89:18, 102:14,
105:9, 105:12, 137:14,
154:25, 162:4
**ones** [2] - 74:10, 142:3
**ongoing** [1] - 9:4
**open** [6] - 8:12, 44:20,
47:14, 94:23, 168:13,
175:23
**opening** [1] - 121:17
**opens** [2] - 11:14, 15:4

**operates** [1] - 37:24
**operation** [4] - 57:20,
59:1, 118:25, 119:8
**operational** [1] - 139:7
**Operations** [4] - 86:3,
86:5, 86:9, 86:22
**operations** [1] - 123:4
**opinion** [7] - 17:24,
18:8, 19:8, 19:15, 32:1,
33:25, 137:1
**opinions** [1] - 19:1
**opportunity** [4] - 14:9,
59:4, 95:24, 95:25
**opposed** [3] - 67:13,
86:10, 98:13
**oppressive** [1] - 104:1
**or.357** [1] - 34:23
**order** [11] - 2:24, 3:8,
16:20, 62:9, 66:12, 74:1,
96:25, 100:21, 130:1,
169:25, 176:22
**ordered** [2] - 3:4, 87:13
**orders** [1] - 5:12
**ordinarily** [1] - 4:2
**organization** [4] - 60:1,
154:6, 154:17, 154:18
**orient** [2] - 51:9, 64:23
**orientation** [1] - 81:10
**orienting** [2] - 82:7,
82:9
**original** [1] - 9:4
**Otherwise** [1] - 139:18
**otherwise** [1] - 96:13
**ought** [2] - 174:25,
176:2
**out-of-court** [2] - 10:4,
10:16
**out-of-state** [1] - 24:15
**outgoing** [1] - 91:15
**outside** [6] - 31:11,
60:1, 76:19, 81:17, 82:3,
165:20
**over-protective** [1] -
15:14
**overall** [1] - 66:7
**overhear** [2] - 135:23,
136:1
**overheard** [2] - 136:4,
136:10
**overnight** [1] - 96:16
**overrule** [1] - 108:1
**overruled** [2] - 110:4,
113:1, 124:1
**Overruled** [13] - 106:24,
108:3, 108:7, 108:23,
115:12, 115:19, 120:17,
123:22, 158:11, 158:22,
160:1, 161:3, 161:11
**overtones** [1] - 175:16
**own** [3] - 51:6, 96:14,

163:20
**owner** [2] - 87:15,
118:16

# P

**p.m** [11] - 2:2, 90:9,
90:15, 90:25, 91:1, 91:2,
91:3, 102:16, 152:14,
181:3
**package** [1] - 53:15
**packing** [2] - 98:5,
99:25
**pads** [3] - 28:8, 94:23,
168:13
**PAGE** [1] - 182:1
**Page** [12] - 138:9,
139:2, 145:10, 146:24,
149:1, 150:23, 151:20,
151:25, 152:15, 157:13,
158:3, 160:20, 161:5,
161:19
**page** [5] - 52:11,
111:22, 138:18, 150:22,
161:19
**pagers** [1] - 160:13
**pages** [2] - 151:4, 184:7
**paid** [1] - 102:3
**painted** [1] - 72:5
**painting** [1] - 71:12
**paints** [1] - 72:6
**pair** [1] - 71:25
**palm** [24] - 61:12, 63:2,
64:24, 71:13, 78:3, 78:8,
79:2, 79:5, 79:8, 79:9,
79:10, 81:12, 81:15,
81:20, 81:21, 81:24,
82:23, 83:7, 145:1,
145:11, 145:13, 157:14
**palms** [1] - 61:7, 62:20,
70:12
**Panasonic** [2] - 90:5,
92:2
**panel** [1] - 102:7
**panels** [1] - 42:18
**paper** [5] - 53:16, 72:15,
118:14, 121:25, 122:3
**Paper** [1] - 72:6
**paperwork** [1] - 153:1
**Paragraph** [1] - 146:24
**paragraph** [4] - 149:1,
151:25, 152:16, 161:20
**parents** [8] - 97:8,
97:11, 97:12, 99:3, 99:9,
100:1, 101:16, 104:24
**Park** [1] - 115:2, 115:9,
116:1, 154:2, 154:13,
155:17
**Parole** [16] - 117:17,

119:17, 119:20, 130:19, 130:22, 130:24, 131:7, 131:9, 132:9, 132:16, 134:9, 136:19, 144:5, 144:7, 144:9, 157:6
**parole** [2] - 119:16, 139:3
**part** [10] - 81:17, 82:25, 87:12, 111:2, 111:23, 143:11, 145:19, 159:19, 175:25, 178:11
**participant** [5] - 7:15, 7:17, 9:14, 9:15, 9:17
**participate** [4] - 41:17, 117:10, 143:15, 143:19
**participated** [3] - 7:9, 141:18, 149:9
**participating** [2] - 105:8, 132:1
**participation** [2] - 15:2, 104:7
**particular** [26] - 20:25, 35:14, 44:4, 44:10, 44:20, 44:21, 51:8, 51:18, 54:18, 55:5, 63:23, 70:24, 73:3, 73:21, 76:5, 76:6, 81:3, 81:5, 111:2, 137:11, 144:19, 158:17, 164:14, 173:22, 174:6
**particularly** [2] - 24:15, 150:23
**Partly** [1] - 142:11
**partly** [3] - 81:17, 143:9
**parts** [1] - 151:10
**passages** [1] - 160:19
**passed** [1] - 162:15
**passenger** [15] - 42:17, 42:18, 42:20, 42:21, 46:22, 47:5, 47:15, 48:1, 48:2, 48:8, 48:16, 54:14, 54:17, 54:21, 54:25
**past** [2] - 98:12, 98:13
**paternity** [3] - 109:18, 109:21, 109:23
**patterns** [1] - 43:13
**Paul** [3] - 1:19, 46:15, 80:19
**Pause** [11] - 80:11, 93:13, 114:12, 114:15, 121:9, 124:10, 131:20, 139:25, 140:9, 144:13, 155:2
**pay** [8] - 24:12, 24:19, 28:3, 96:24, 97:21, 128:4, 152:13
**peer** [2] - 60:12, 60:21
**penalties** [1] - 107:20
**penalty** [1] - 96:24
**people** [33] - 4:15, 8:22,

21:11, 26:14, 58:3, 58:6, 63:10, 63:12, 63:15, 64:1, 86:11, 88:9, 101:25, 110:19, 119:24, 120:21, 125:13, 125:21, 126:2, 126:19, 126:20, 127:14, 127:16, 155:16, 174:2, 174:3, 174:6, 174:15, 175:13, 179:4, 179:14, 179:24
**percent** [1] - 75:1
**perfect** [1] - 60:8
**perfectly** [4] - 25:1, 25:23, 25:24, 160:4
**perform** [2] - 36:23, 37:13
**perhaps** [4] - 98:12, 103:24, 104:8, 147:22
**Perhaps** [4] - 3:20, 52:10, 83:1, 94:15
**period** [6] - 9:20, 57:7, 79:2, 87:23, 113:12, 115:10
**perjury** [1] - 107:21
**permanent** [2] - 62:23, 63:8
**permission** [1] - 17:14
**permit** [4] - 35:9, 68:15, 85:1, 180:7
**permitted** [1] - 114:5
**person** [19] - 50:12, 53:19, 53:23, 61:15, 69:7, 69:23, 74:11, 77:16, 92:18, 114:18, 130:16, 137:16, 144:6, 145:16, 151:18, 157:3, 160:5, 160:9, 166:4
**person's** [1] - 79:14
**personal** [6] - 52:19, 63:7, 104:15, 128:7, 131:13, 132:1
**personally** [2] - 177:2, 177:5
**persons** [3] - 26:14, 63:19, 174:15
**perspiration** [4] - 61:8, 61:25, 71:1, 71:5
**perspire** [5] - 61:25, 69:22, 69:25, 73:23, 73:25
**persuade** [1] - 11:5
**persuaded** [2] - 11:17, 14:24
**pertain** [1] - 122:25
**phase** [6] - 64:19, 65:23, 66:2, 66:14, 66:15, 66:18
**phases** [1] - 66:21
**phone** [42] - 2:22, 2:25, 3:9, 3:21, 4:7, 4:14,

4:15, 4:16, 6:22, 42:21, 89:16, 90:4, 90:5, 90:24, 92:19, 92:25, 93:4, 93:6, 93:7, 93:14, 93:15, 93:17, 93:20, 93:21, 94:7, 94:8, 105:23, 108:5, 108:11, 109:2, 109:9, 110:14, 111:19, 118:24, 120:25, 121:18, 131:1, 143:16, 144:6
**phonetic** [1] - 44:5
**photograph** [7] - 49:17, 49:20, 49:25, 90:1, 117:22, 117:23, 117:25
**photographs** [7] - 83:11, 83:14, 83:18, 90:2, 91:18, 117:21, 118:7
**photography** [2] - 30:15, 41:5
**phrase** [1] - 152:23
**physical** [5] - 41:6, 42:4, 53:3, 53:14, 57:16
**physically** [1] - 99:14
**pick** [1] - 53:23
**picked** [1] - 175:14
**picture** [1] - 118:4
**piece** [4] - 45:14, 58:24, 135:14
**pieces** [2] - 65:9, 118:13
**pink** [1] - 92:11
**place** [14] - 25:22, 66:3, 100:3, 119:20, 132:25, 134:7, 134:25, 146:20, 146:23, 148:7, 149:17, 149:21, 165:20, 165:21
**placed** [2] - 81:3, 81:5, 82:22, 90:18, 113:5, 158:25, 159:8
**placing** [1] - 83:8
**plan** [2] - 13:12, 16:20
**planned** [1] - 103:14
**plans** [4] - 26:21, 95:20, 96:6, 104:18
**plastic** [1] - 80:21
**plastics** [1] - 72:14
**plate** [1] - 87:20
**plausibility** [1] - 99:22
**play** [6] - 13:24, 14:1, 176:1, 176:2, 176:11, 176:13
**played** [1] - 7:11
**playing** [1] - 176:14
**pleasant** [1] - 28:13
**pled** [3] - 6:3, 6:5
**poach** [1] - 17:13
**pockets** [1] - 70:22
**podium** [1] - 17:16
**point** [28] - 8:23, 9:19,

10:20, 11:1, 12:24, 16:21, 22:16, 23:7, 49:22, 53:19, 53:22, 57:8, 58:10, 66:8, 66:13, 66:18, 94:16, 110:12, 136:6, 139:11, 141:2, 170:6, 172:20, 173:5, 175:12, 178:21, 179:3, 179:5
**pointed** [1] - 101:15
**police** [6] - 8:22, 52:4, 52:5, 115:8, 134:17, 135:6
**Police** [16] - 29:3, 29:6, 29:11, 29:19, 29:21, 30:1, 31:13, 31:16, 40:16, 43:18, 52:12, 56:2, 85:14, 85:21, 86:4, 127:2
**population** [1] - 64:2
**pores** [2] - 61:24, 61:25
**porous** [5] - 43:5, 48:21, 72:3, 72:12, 75:3
**Porous** [1] - 72:4
**portion** [3] - 61:22, 81:19, 139:15
**portions** [1] - 61:19
**position** [18] - 3:18, 8:12, 16:13, 22:16, 40:24, 41:15, 82:10, 82:18, 96:22, 97:1, 101:8, 172:21, 177:19, 179:10, 179:12, 179:16, 180:23
**positioning** [1] - 120:20
**positions** [2] - 41:1, 41:2
**positive** [1] - 180:22
**possibility** [6] - 98:14, 98:16, 98:25, 104:9, 173:13, 174:23
**possible** [9] - 23:23, 27:1, 28:6, 62:6, 72:17, 76:17, 97:16, 155:20, 176:3
**possibly** [7] - 7:12, 63:20, 70:17, 72:22, 82:22, 155:14, 179:1
**postpone** [1] - 168:21
**posture** [1] - 100:4
**potato** [1] - 61:21
**powder** [8] - 43:3, 43:4, 43:9, 45:13, 62:12, 72:9, 72:19
**power** [3] - 64:1, 167:12, 167:14
**practice** [1] - 17:7
**preclude** [2] - 23:19, 23:23
**preferable** [1] - 5:12

**preliminarily** [1] - 100:10
**preliminary** [2] - 14:15, 100:8
**preparation** [2] - 164:17, 164:20
**prepare** [2] - 23:14, 23:19, 33:10
**prepared** [4] - 13:1, 134:4, 143:24, 146:20
**preparing** [2] - 143:15, 143:19
**prerequisite** [1] - 179:19
**present** [12] - 2:1, 8:15, 47:11, 95:20, 102:17, 123:8, 123:11, 123:14, 128:23, 132:8, 132:24, 156:20
**presentation** [1] - 81:11
**preserved** [1] - 62:10
**press** [1] - 62:21
**pressed** [1] - 63:2
**pressing** [1] - 82:3
**pressure** [4] - 65:22, 71:16, 71:20, 100:6
**presume** [1] - 171:25
**pretrial** [1] - 62:10
**pretty** [9] - 13:14, 13:17, 14:18, 22:5, 34:8, 41:8, 99:23, 99:25, 167:9
**prevent** [1] - 160:16
**previous** [1] - 30:25
**previously** [2] - 2:17, 79:12
**primary** [2] - 33:6, 88:23
**principle** [1] - 11:17
**print** [64] - 19:16, 41:7, 46:6, 49:13, 49:18, 49:22, 49:23, 51:8, 51:9, 51:16, 51:18, 54:19, 56:22, 57:9, 58:19, 59:13, 60:18, 60:22, 61:4, 61:5, 62:16, 62:17, 63:5, 64:18, 64:20, 64:21, 64:23, 65:16, 68:4, 69:2, 69:5, 69:7, 69:10, 69:11, 69:16, 72:22, 73:18, 74:2, 76:5, 76:6, 76:25, 77:15, 78:2, 78:8, 79:5, 79:13, 79:23, 81:3, 81:5, 81:9, 81:21, 82:1, 82:6, 82:7, 82:9, 82:10, 82:21, 83:7, 84:13, 145:1, 145:11, 145:13, 157:15
**Print** [4] - 56:3, 56:15, 57:3, 58:25
**printed** [3] - 18:7, 63:4,

68:24
   **printer's** [1] - 62:19
   **printout** [1] - 52:7
   **prints** [42] - 41:18, 42:3, 43:2, 44:1, 44:6, 44:8, 46:5, 49:8, 50:18, 57:2, 57:8, 57:10, 57:11, 57:18, 57:23, 57:25, 58:19, 60:2, 62:25, 64:1, 65:25, 67:17, 67:24, 68:7, 69:12, 73:12, 74:7, 74:23, 74:25, 75:8, 76:2, 76:15, 78:3, 78:6, 79:8, 79:9, 80:2, 83:11, 83:14, 83:19, 84:6
   **prison** [1] - 130:12
   **probability** [3] - 32:1, 63:19, 63:25
   **Probation** [17] - 117:17, 119:17, 119:20, 130:19, 130:22, 130:24, 131:8, 131:9, 132:9, 134:9, 136:19, 144:5, 144:7, 144:9, 149:16, 149:20, 157:6
   **probation** [5] - 16:3, 119:16, 156:10, 156:11, 156:15
   **probationary** [1] - 156:12
   **problem** [12] - 4:13, 7:19, 8:2, 8:4, 8:12, 18:15, 22:2, 22:23, 120:25, 127:25, 128:1, 176:20
   **problems** [3] - 127:12, 127:13, 127:14
   **procedure** [1] - 147:9
   **proceed** [4] - 77:4, 105:17, 105:19, 168:8
   **proceeded** [1] - 101:22
   **proceeding** [1] - 107:17
   **Proceedings** [2] - 2:1, 181:3
   **proceedings** [14] - 80:11, 93:13, 114:12, 114:15, 121:9, 124:10, 131:20, 139:25, 140:9, 144:13, 155:2, 175:4, 184:4, 184:8
   **process** [10] - 42:2, 42:3, 42:15, 43:1, 47:10, 49:7, 58:24, 60:14, 64:18, 110:17
   **processed** [17] - 41:24, 41:25, 42:16, 42:19, 46:18, 47:10, 48:4, 48:8, 48:11, 48:13, 48:15, 48:17, 48:24, 49:2, 49:4, 57:1

   **processing** [9] - 41:2, 41:3, 41:17, 44:6, 47:11, 50:6, 52:18, 57:16, 58:11
   **produce** [1] - 80:6
   **produced** [1] - 19:4
   **producing** [1] - 4:7
   **profess** [1] - 179:7
   **professional** [1] - 87:19
   **proffer** [4] - 23:15, 23:20, 23:23, 172:12
   **proficiency** [4] - 59:23, 60:5, 60:6, 60:9
   **Proficiency** [1] - 59:24
   **profusely** [1] - 73:23
   **programs** [1] - 31:9
   **prohibited** [1] - 4:1
   **project** [1] - 121:16
   **projected** [1] - 7:8
   **projectile** [1] - 38:18
   **projectiles** [6] - 32:25, 33:11, 35:8, 35:18, 36:24, 37:18
   **promoted** [1] - 40:25
   **promptly** [1] - 25:7
   **prompts** [1] - 96:2
   **proof** [1] - 73:14
   **properly** [1] - 70:6
   **property** [3] - 41:3, 52:19, 104:16
   **propose** [1] - 26:24
   **prosecution** [2] - 128:21, 171:21
   **prosecution's** [1] - 148:12
   **prossed** [2] - 148:22, 149:3
   **protect** [1] - 176:22
   **protective** [3] - 2:24, 3:5, 15:14
   **protocols** [1] - 32:10
   **prove** [4] - 10:5, 10:21, 105:16, 116:15
   **proved** [1] - 88:3
   **provide** [6] - 3:2, 3:21, 120:22, 158:18, 161:5, 165:1
   **provided** [3] - 109:22, 122:4, 162:20
   **provider** [8] - 93:14, 93:17, 93:19, 106:11, 106:17, 106:19, 108:14
   **providing** [1] - 99:11
   **public** [1] - 119:22
   **pull** [5] - 38:3, 43:17, 51:8, 51:9, 92:20
   **pulled** [1] - 124:21
   **pulling** [1] - 138:19
   **purely** [1] - 76:11
   **purpose** [2] - 10:7,

132:21
   **pushed** [1] - 91:3
   **pushes** [1] - 37:25
   **put** [24] - 32:22, 43:17, 43:22, 44:11, 45:23, 46:1, 51:11, 51:13, 51:14, 55:1, 55:6, 89:1, 103:10, 122:21, 131:21, 134:19, 145:7, 147:6, 147:23, 160:5, 170:20, 179:1, 179:10
   **puts** [1] - 100:5
   **putting** [4] - 53:15, 131:8, 168:20, 170:18
   **Pyne** [2] - 1:20, 147:17

## Q

   **Q-1B** [1] - 33:17, 36:18
   **Q-2B** [1] - 33:18, 36:18
   **Q-3B** [1] - 36:18
   **Q-45** [8] - 41:17, 41:20, 41:23, 46:18, 68:2, 79:14, 87:22, 89:9
   **Q-4B** [1] - 36:18
   **qualifications** [1] - 77:2
   **qualified** [10] - 27:10, 27:13, 30:21, 31:4, 59:12, 59:14, 59:15, 59:17, 59:21, 77:8
   **qualify** [1] - 77:6
   **quality** [5] - 57:9, 58:18, 68:15, 69:12, 70:6
   **quarter** [1] - 42:18
   **questioned** [2] - 8:22, 163:24
   **questions** [25] - 2:13, 31:24, 39:5, 46:9, 46:10, 54:5, 55:16, 77:2, 80:12, 84:9, 84:16, 99:15, 124:4, 129:15, 129:21, 153:9, 154:22, 162:11, 163:25, 164:7, 164:8, 164:10, 165:12, 165:15, 167:21
   **quick** [1] - 26:2
   **quickly** [2] - 18:9, 153:22
   **quite** [5] - 97:12, 97:15, 100:12, 173:25, 174:14
   **quote** [5] - 19:4, 25:6, 25:7, 26:7
   **quote-unquote** [2] - 19:4, 26:7
   **quote/close** [1] - 25:6

## R

   **radio** [1] - 42:23

   **Raeshio** [2] - 114:21, 115:21
   **Rahman** [1] - 87:17
   **rain** [1] - 76:20
   **raise** [1] - 110:3
   **raised** [5] - 9:22, 61:19, 61:20, 61:22, 162:5
   **raises** [2] - 23:1, 25:20
   **Rakoff** [2] - 18:12, 19:17
   **Rakoff's** [4] - 18:8, 18:14, 19:8, 20:12
   **ran** [1] - 125:24
   **Randallstown/Park** [3] - 154:6, 154:16, 154:18
   **rapes** [1] - 41:4
   **rate** [4] - 69:22, 69:25, 87:7, 88:2
   **rather** [8] - 3:21, 23:5, 91:1, 93:20, 103:19, 138:16, 153:22, 179:12
   **Rather** [1] - 174:9
   **rationale** [1] - 15:13
   **rationally** [2] - 9:9, 15:1
   **Raven** [2] - 117:15, 117:24
   **re** [2] - 57:14, 58:24
   **re-examined** [2] - 57:14, 58:24
   **reach** [3] - 13:7, 20:11, 37:1
   **reaching** [1] - 8:8
   **read** [18] - 18:9, 19:13, 19:16, 24:22, 24:25, 25:13, 63:3, 92:9, 139:18, 149:7, 151:17, 180:15, 180:16
   **reader** [1] - 63:1
   **readily** [1] - 61:12
   **reading** [7] - 151:20, 151:24, 151:25, 163:21, 175:9, 175:17, 175:18
   **ready** [6] - 14:3, 28:13, 94:21, 98:7, 105:19, 168:8
   **real** [1] - 108:11
   **realize** [4] - 5:23, 15:12, 19:8, 97:5
   **realized** [1] - 99:5
   **really** [20] - 5:4, 9:3, 10:20, 22:16, 22:25, 27:7, 35:6, 61:12, 99:6, 103:18, 112:11, 125:25, 126:1, 163:11, 163:14, 167:12, 174:11, 174:21, 175:16, 177:13
   **realm** [1] - 98:24
   **rear** [29] - 37:24, 42:16, 42:17, 42:19, 42:20, 42:23, 42:24, 42:25,

45:3, 47:4, 47:15, 48:1, 48:8, 48:15, 49:4, 50:22, 53:5, 53:8, 53:11, 54:9, 54:16, 54:21, 54:25, 76:19, 81:22, 82:3, 82:15, 83:5
   **rearward** [1] - 37:22
   **reason** [3] - 145:19, 147:4, 167:15
   **reasonable** [4] - 15:2, 18:10, 18:16, 19:23
   **reasonably** [3] - 23:21, 96:21, 102:8
   **reasons** [2] - 75:9, 127:13
   **recalled** [1] - 17:8
   **recapitulating** [1] - 158:4
   **receive** [2] - 73:18, 115:14
   **received** [7] - 21:12, 77:21, 90:4, 90:14, 90:18, 91:15, 131:22
   **recent** [1] - 90:24
   **recently** [4] - 2:9, 3:18, 90:3, 164:23
   **recess** [12] - 13:14, 13:15, 24:23, 25:12, 26:24, 84:25, 85:1, 85:2, 94:19, 102:12, 102:15, 181:1
   **Recess** [1] - 102:16
   **recognize** [9] - 7:19, 52:6, 52:9, 52:15, 77:24, 83:24, 89:8, 176:5
   **recognized** [2] - 66:25, 67:4
   **recollection** [6] - 19:25, 132:6, 151:18, 164:12, 171:17, 172:2
   **record** [24] - 4:10, 18:18, 18:19, 24:25, 28:21, 39:13, 39:15, 55:25, 82:25, 85:8, 100:9, 101:12, 110:7, 119:10, 120:11, 121:23, 129:23, 130:11, 132:12, 145:17, 146:23, 148:23, 148:25, 166:3
   **recorded** [22] - 11:7, 11:9, 11:10, 15:25, 16:4, 16:5, 91:21, 123:17, 133:5, 133:13, 137:18, 137:24, 139:13, 140:16, 140:21, 141:1, 141:13, 141:17, 143:16, 143:20, 146:25, 184:3
   **recorder** [2] - 159:7, 166:1
   **recording** [15] - 62:23,

133:7, 134:11, 137:20, 138:4, 159:10, 159:16, 159:17, 160:9, 160:15, 160:16, 165:23, 166:16, 170:3, 175:14

**recordings** [14] - 120:4, 120:14, 140:2, 140:12, 141:5, 142:9, 142:13, 159:19, 159:23, 165:16, 166:6, 166:9, 170:19, 177:18

**records** [10] - 91:5, 91:6, 107:3, 108:2, 109:2, 109:4, 112:5, 112:7, 134:6, 149:6

**recover** [10] - 41:6, 42:4, 44:1, 44:21, 45:2, 53:24, 74:17, 75:7, 133:19, 133:22

**recovered** [25] - 20:3, 33:12, 33:20, 36:9, 36:20, 43:21, 44:2, 44:8, 44:17, 45:1, 45:5, 45:12, 45:24, 50:12, 53:5, 57:17, 57:19, 57:23, 62:10, 67:25, 68:4, 79:14, 84:13, 89:8, 136:23

**recovering** [1] - 76:2

**recovery** [3] - 50:12, 57:1, 74:21

**RECROSS** [4] - 162:12, 165:13, 182:24, 182:25

**red** [1] - 122:1

**redacted** [2] - 13:2, 13:21

**REDIRECT** [6] - 54:6, 84:10, 155:3, 182:10, 182:15, 182:23

**redirect** [1] - 175:25

**redound** [1] - 174:16

**redounded** [1] - 177:10

**reduce** [1] - 174:23

**reductions** [2] - 151:23, 160:22

**refer** [14] - 41:21, 65:7, 77:21, 81:13, 117:6, 122:8, 138:7, 149:25, 151:8, 152:15, 159:12, 159:13, 161:19, 162:21

**reference** [4] - 119:11, 124:16, 151:1, 151:2

**referenced** [1] - 109:3

**referred** [4] - 150:24, 160:20, 160:21, 163:4

**referring** [3] - 44:3, 151:20, 165:5

**refers** [3] - 112:19, 113:13, 150:20

**reflect** [2] - 4:10, 52:17

**reflected** [1] - 174:22

**refresh** [2] - 132:6, 151:17

**refrigerator** [1] - 73:14

**refuses** [1] - 18:13

**regard** [1] - 13:12

**regarding** [2] - 159:5, 179:19

**regards** [1] - 145:18

**Regional** [3] - 85:16, 85:23, 155:23

**registered** [3] - 87:15, 90:23, 109:14

**regret** [2] - 104:5, 105:6

**regrettable** [1] - 101:20

**regular** [3] - 43:16, 70:4, 70:16

**Reisterstown** [1] - 152:13

**reiterate** [1] - 84:12

**relate** [1] - 21:1

**related** [8] - 27:2, 74:22, 75:4, 75:10, 75:11, 94:4, 115:16, 118:12

**relating** [1] - 21:8

**relationship** [1] - 5:6

**relatively** [1] - 21:8

**release** [5] - 102:21, 103:11, 103:20, 104:3, 104:12

**released** [2] - 2:20, 132:20

**reliability** [1] - 79:5

**reliable** [3] - 63:7, 66:25, 67:5

**relocating** [1] - 95:17

**rely** [1] - 169:23

**remain** [3] - 26:25, 27:18, 95:1

**remaining** [2] - 105:11, 105:15

**remains** [1] - 27:15

**remember** [49] - 8:8, 12:16, 15:7, 31:12, 55:2, 81:21, 84:5, 88:8, 88:23, 92:12, 92:16, 101:24, 117:14, 118:21, 130:6, 130:8, 130:9, 131:12, 132:15, 133:17, 136:5, 136:9, 136:11, 138:6, 139:1, 140:1, 140:23, 140:25, 141:2, 141:8, 141:12, 142:22, 143:4, 143:13, 145:3, 146:10, 147:20, 148:23, 155:25, 159:6, 159:7, 159:11, 160:23, 162:2, 165:8, 167:10

**remembered** [1] - 144:18

**remind** [1] - 168:3

**reminded** [1] - 28:1

**remote** [1] - 137:17

**remove** [1] - 70:23

**Remove** [1] - 138:12

**removed** [8] - 25:16, 51:25, 52:2, 52:3, 52:17, 52:23, 53:11, 54:2

**remuneration** [1] - 98:15

**rent** [2] - 28:3, 98:22

**repeat** [3] - 66:19, 91:17, 106:18

**repeatedly** [1] - 67:22

**repercussions** [1] - 97:1

**Rephrase** [3] - 108:13, 116:7, 116:15

**replace** [1] - 23:11

**replacement** [1] - 22:23

**replied** [1] - 25:6

**report** [28] - 33:10, 33:15, 36:14, 41:21, 42:6, 45:23, 46:1, 46:21, 46:25, 47:23, 52:4, 52:5, 52:6, 52:20, 52:25, 60:19, 83:24, 92:24, 118:22, 122:9, 131:17, 134:4, 136:13, 136:15, 137:7, 146:16, 146:19, 160:25

**Reported** [1] - 1:23

**reported** [1] - 136:12

**Reporter** [1] - 184:16

**REPORTER'S** [1] - 184:1

**reporting** [1] - 163:22

**reports** [10] - 92:9, 83:23, 131:14, 131:16, 131:22, 131:23, 131:25, 136:15, 163:18, 165:11

**represent** [8] - 6:12, 6:18, 6:19, 46:15, 80:19, 147:17, 153:8

**represented** [1] - 4:25

**representing** [1] - 5:23

**request** [7] - 3:7, 17:23, 42:3, 47:10, 77:21, 171:20, 171:24

**required** [1] - 4:1

**requires** [1] - 62:9

**research** [1] - 26:2

**resentful** [1] - 101:18

**reserve** [1] - 16:22

**resided** [2] - 93:24

**residential** [1] - 125:12

**residing** [1] - 2:21

**residue** [10] - 70:23, 71:1, 71:4, 72:8, 72:18, 73:2, 73:22, 73:24, 74:6,

76:18

**resolution** [2] - 9:5, 22:5

**respect** [12] - 10:10, 15:19, 20:2, 20:7, 20:23, 21:3, 22:4, 37:12, 37:17, 37:19, 143:16, 172:19

**respond** [2] - 42:11, 176:16

**responded** [2] - 42:12, 56:25

**response** [2] - 129:22, 178:13

**responsible** [2] - 86:6, 177:1

**rest** [3] - 42:23, 88:8, 95:1

**restaurant** [1] - 97:11

**restaurants** [1] - 99:12

**restricted** [1] - 149:2

**result** [6] - 48:20, 60:3, 63:22, 64:6, 67:11, 151:22

**resulted** [3] - 57:12, 74:21

**results** [3] - 48:22, 57:12, 60:11

**resume** [2] - 85:3, 94:21

**retired** [2] - 29:23, 30:4

**retrieve** [1] - 128:23

**return** [1] - 104:15

**reveal** [2] - 21:22, 43:11

**reverse** [1] - 2:23

**review** [6] - 60:12, 60:21, 83:23, 111:10, 131:16, 142:24

**reviewed** [2] - 60:20, 161:7

**reviewing** [3] - 142:22, 163:18, 164:25

**Rhodes** [6] - 1:17, 22:14, 23:13, 100:5, 100:13, 101:7

**RHODES** [14] - 22:15, 22:21, 23:10, 23:16, 24:1, 24:9, 24:11, 24:14, 24:18, 100:14, 100:19, 101:3, 101:6, 101:8

**Rice** [5] - 88:7, 114:21, 115:22, 126:3, 126:5, 126:7, 126:11, 126:15, 126:19, 126:20, 126:25, 127:7, 127:16

**ridge** [31] - 43:13, 58:14, 61:5, 61:10, 61:14, 62:5, 62:6, 62:23, 63:4, 63:7, 63:13, 64:21, 64:22, 64:25, 65:5, 65:8, 65:12, 65:15, 66:7, 70:3, 70:7, 70:10, 70:16,

70:18, 71:4, 71:18, 71:25, 73:7

**ridges** [6] - 61:19, 61:24, 62:1, 64:22, 65:1, 74:1

**rigor** [1] - 32:5

**risks** [1] - 3:1

**road** [1] - 20:15

**robberies** [1] - 41:5

**Robert** [1] - 1:15

**Rock** [1] - 121:18

**Rodney** [2] - 2:20, 169:15

**role** [1] - 158:17

**roll** [2] - 43:15, 62:21

**rolled** [1] - 63:2

**Ron** [4] - 14:4, 88:22, 144:20, 144:21

**roof** [1] - 42:18

**Room** [1] - 1:24

**round** [1] - 38:2

**row** [1] - 95:6

**rows** [1] - 52:23

**RPR** [1] - 1:23

**rub** [1] - 43:16

**ruffles** [1] - 61:21

**rule** [7] - 11:3, 11:6, 11:13, 11:20, 12:20, 100:10, 107:17

**ruling** [7] - 14:13, 14:14, 14:16, 15:8, 15:13, 15:19, 23:22

**rulings** [1] - 175:6

**run** [6] - 42:6, 42:9, 42:10, 45:4, 52:5, 97:11

**Run** [1] - 67:17

**running** [1] - 99:12

**runs** [1] - 151:4

---

**S**

---

**S&W** [2] - 37:6, 37:11

**S&W/10** [1] - 37:5

**sample** [1] - 53:5

**samples** [2] - 52:21, 53:2

**sanction** [1] - 170:7

**Saris** [1] - 18:19

**sat** [1] - 30:2

**satisfactory** [2] - 120:14, 159:23

**satisfied** [2] - 5:20, 170:22

**saw** [4] - 6:20, 99:24, 109:4, 125:13

**scale** [1] - 127:2

**scales** [1] - 127:5
**scan** [1] - 63:1
**scars** [1] - 65:16
**scene** [1] - 36:10, 36:21, 40:19, 41:2, 44:4, 47:8, 47:19, 50:7, 55:9, 67:25, 72:10
**scenes** [10] - 41:6, 41:7, 42:11, 56:25, 57:1, 57:17, 57:19, 57:23, 58:12, 58:14
**schedule** [1] - 119:16
**scheduled** [1] - 14:5
**school** [1] - 29:13
**schools** [2] - 22:24, 29:10
**Science** [3] - 40:7, 56:20, 58:8
**science** [1] - 32:5
**sciences** [1] - 58:9
**scientific** [1] - 18:11
**scolded** [1] - 25:7
**Scoot** [2] - 28:20, 39:12
**scope** [1] - 17:10
**score** [1] - 60:8
**scrap** [1] - 121:25
**scrawled** [1] - 33:3, 33:7
**screen** [10] - 32:23, 44:11, 55:2, 89:2, 90:10, 90:12, 92:6, 121:16, 145:7, 147:23
**seal** [2] - 53:16
**search** [8] - 117:11, 117:13, 118:5, 118:20, 148:2, 149:9, 150:1, 150:19
**searched** [1] - 63:24
**searching** [1] - 117:16
**season** [1] - 22:25
**seat** [10] - 42:22, 42:24, 42:25, 48:24, 49:2, 49:5, 53:8, 95:5, 102:13, 105:10
**Seat** [1] - 102:14
**seated** [6] - 28:12, 28:20, 39:12, 55:24, 85:7, 105:5
**seats** [7] - 42:21, 48:1, 48:15, 48:16, 48:18, 48:19
**secluded** [1] - 116:1
**second** [3] - 32:24, 49:21, 54:5, 69:17, 98:13, 117:25, 132:3, 144:11, 152:16, 162:4, 165:4, 165:6, 165:7
**Second** [1] - 151:25
**second-hand** [3] - 165:4, 165:6, 165:7

**Secondly** [1] - 72:2
**seconds** [1] - 26:2
**Section** [2] - 52:8, 52:13
**secure** [1] - 135:14
**security** [2] - 3:1, 3:6
**See** [1] - 112:16
**see** [53] - 6:4, 6:7, 10:17, 11:10, 12:20, 14:15, 25:13, 25:18, 26:12, 27:9, 34:6, 36:14, 38:23, 43:13, 45:7, 46:8, 49:22, 51:4, 52:11, 52:25, 55:1, 61:14, 64:21, 65:3, 66:6, 66:10, 73:13, 74:8, 78:12, 82:12, 90:10, 97:18, 99:2, 99:5, 100:11, 100:12, 101:11, 107:19, 107:20, 111:12, 113:7, 121:20, 138:7, 138:18, 146:15, 150:1, 151:13, 152:5, 152:7, 169:6, 174:16
**seeing** [1] - 161:25
**seek** [4] - 2:24, 8:9, 8:18, 16:22
**seeking** [2] - 17:22, 141:15
**seem** [2] - 11:21, 172:7
**seep** [1] - 72:8
**selection** [1] - 27:9
**semiautomatic** [1] - 37:23
**seminars** [3] - 30:7, 30:13, 30:17
**senior** [1] - 58:25
**sense** [4] - 4:4, 7:15, 9:13, 102:24
**sensitivity** [1] - 4:3
**sent** [4] - 17:25, 60:19, 119:17, 147:7
**sentence** [1] - 130:5
**sentences** [2] - 151:23, 160:22
**sentiment** [1] - 177:12
**separate** [2] - 17:17, 111:25
**September** [3] - 1:11, 29:7, 184:5
**sequential** [1] - 66:12
**series** [5] - 18:1, 21:5, 67:16, 67:24, 90:2
**serious** [2] - 41:4, 175:5, 175:6
**serve** [1] - 27:13
**served** [1] - 2:23
**service** [12] - 27:11, 93:14, 96:4, 106:11, 106:17, 106:19, 106:21,

107:7, 108:5, 108:10, 108:14, 168:10
**serving** [1] - 25:4
**session** [1] - 168:3
**sessions** [2] - 30:11, 30:12
**set** [4] - 121:3, 138:3, 145:15, 173:22
**setting** [1] - 132:21
**settle** [2] - 127:8, 128:1
**seven** [7] - 41:13, 44:2, 44:8, 44:16, 68:5, 68:10, 179:13
**Seven** [1] - 161:20
**several** [11] - 30:10, 30:20, 48:24, 53:2, 73:21, 88:1, 88:4, 117:20, 163:17, 180:1
**severance** [3] - 15:14, 15:16, 180:10
**shake** [1] - 43:9
**shaken** [1] - 71:6
**shaped** [1] - 65:10
**shapes** [2] - 61:17, 65:2
**shared** [1] - 110:8
**sharing** [2] - 19:4, 63:20
**Sharon** [1] - 78:19
**SHAWN** [1] - 1:8
**Shawn** [1] - 79:20, 153:8
**Shearer** [1] - 24:2
**sheen** [1] - 72:5
**sheer** [1] - 174:18
**sheet** [4] - 52:5, 52:8, 52:13, 55:2
**shell** [13] - 20:8, 35:18, 36:9, 37:12, 37:17, 37:19, 37:20, 38:8, 38:11, 38:14, 38:18, 38:24, 39:1
**Shelly** [4] - 79:19, 117:18, 147:17, 149:6
**SHELLY** [1] - 1:7
**Shelton** [17] - 46:15, 77:16, 78:2, 78:6, 78:9, 79:2, 79:23, 80:19, 94:3, 94:5, 119:11, 122:5, 124:2, 129:21, 145:11, 145:13, 157:15
**SHELTON** [1] - 1:7
**Sherman** [3] - 118:16, 118:17, 150:6
**ship** [3] - 61:21, 96:10, 97:23
**shipped** [1] - 96:12
**shipping** [6] - 26:21, 27:24, 28:5, 96:23, 97:22, 98:7
**shirts** [1] - 118:10

**shoot** [1] - 128:5
**shootings** [2] - 20:3, 127:11
**Shore** [1] - 40:11
**short** [1] - 104:6
**short-lived** [1] - 104:6
**shortened** [1] - 84:23
**shortly** [2] - 30:3, 143:20
**show** [14] - 35:18, 36:14, 67:18, 77:23, 88:25, 91:1, 91:10, 92:23, 117:19, 120:8, 121:6, 138:9, 147:22, 149:6
**showed** [3] - 52:4, 90:23, 163:2
**showing** [4] - 10:8, 90:3, 112:10, 121:23
**shown** [1] - 150:5
**shows** [3] - 52:20, 74:9, 117:25
**side** [17] - 35:23, 36:1, 45:3, 45:5, 54:9, 54:14, 68:25, 76:19, 78:3, 81:15, 81:22, 82:16, 83:5, 86:7, 86:24, 87:6, 171:21
**sides** [2] - 68:21, 161:8
**sign** [3] - 43:22, 53:16, 162:21
**signature** [4] - 35:22, 36:1, 36:4, 184:11
**signed** [2] - 152:13, 152:20
**significant** [1] - 130:7
**significantly** [1] - 19:1
**silver** [3] - 87:7, 87:22, 124:24
**similar** [2] - 32:9, 116:11
**simply** [6] - 3:23, 50:2, 109:21, 158:18, 172:20, 178:21
**sincere** [1] - 104:6
**single** [2] - 69:4, 177:23
**sit** [1] - 104:8
**site** [1] - 26:3
**situation** [5] - 22:20, 43:14, 62:11, 71:3, 71:7, 72:16, 99:22, 104:1, 104:10, 130:11
**situations** [1] - 70:23
**six** [4] - 34:19, 52:23, 68:15
**Six** [4] - 25:3, 25:11, 145:10, 157:13
**Sixth** [2] - 10:2, 179:19
**sketch** [1] - 41:7
**skimmed** [1] - 18:9

**skin** [6] - 61:14, 61:15, 61:19, 63:7, 70:3
**slide** [3] - 37:25, 38:2, 82:12
**sliding** [1] - 71:18
**slightly** [1] - 82:2
**slip** [6] - 118:15, 122:2, 150:5, 152:13, 152:20, 161:25
**Slo** [3] - 130:16, 144:4, 157:1
**Slo's** [2] - 130:21, 130:23
**smashed** [3] - 54:13, 54:18, 54:20
**Smith** [8] - 37:7, 109:15, 109:17, 109:23, 110:1, 110:8, 123:8
**snuff** [1] - 158:19
**soles** [3] - 61:7, 61:12, 62:20
**solidified** [1] - 22:20
**someone** [10] - 3:5, 8:23, 45:9, 50:10, 70:5, 71:7, 72:21, 82:1, 90:9, 135:14
**Someone** [1] - 45:11
**sometime** [1] - 13:7
**Sometime** [1] - 162:23
**Sometimes** [3] - 48:17, 120:20, 165:6
**sometimes** [6] - 12:8, 48:19, 71:19, 73:13, 120:22, 160:16
**somewhat** [2] - 14:15, 103:3
**somewhere** [2] - 26:23, 146:23
**soon** [3] - 97:15, 176:3, 177:3
**sopping** [1] - 71:7
**sorry** [15] - 53:21, 56:18, 77:1, 77:6, 106:18, 107:23, 125:16, 133:15, 141:16, 142:23, 157:11, 162:8, 169:2, 169:5, 177:9
**Sorry** [2] - 23:6, 47:16
**sort** [12] - 3:7, 12:10, 43:12, 49:11, 60:14, 62:9, 76:20, 78:20, 112:11, 119:25, 158:18, 164:25
**sorts** [1] - 118:11
**sound** [2] - 4:12, 13:18
**sounds** [3] - 13:8, 20:13, 169:10
**source** [5] - 114:9, 161:1, 162:19, 162:21, 162:22

sources [1] - 165:2
Southern [1] - 17:25
speaking [2] - 4:1,
98:23
specific [3] - 19:25,
143:18, 161:19
specifically [7] - 28:2,
28:7, 56:13, 86:9, 96:20,
146:23, 154:5
Specifically [3] - 90:5,
115:2, 123:24
speculation [1] -
179:18
speed [2] - 87:7, 88:2
speeding [8] - 124:24,
125:4, 125:6, 125:7,
125:8, 125:13, 125:25,
155:7
spell [5] - 28:21, 39:13,
39:14, 55:25, 85:8
Spence [4] - 16:21,
21:6, 21:15, 21:18
spent [3] - 29:25, 30:1,
146:6
spin [1] - 34:13
splits [1] - 65:9
spoken [2] - 3:17, 5:3
Sports [7] - 117:14,
117:15, 117:24, 118:15,
118:24, 149:10, 150:6
sports [1] - 118:12
ST [1] - 79:4
stabbing [1] - 129:3
stabbings [2] - 115:16,
115:21
stand [6] - 14:22, 37:6,
105:3, 168:20, 169:12,
172:6
standard [1] - 147:9
standards [1] - 32:9
standing [2] - 83:4,
102:7
stands [1] - 79:2
start [5] - 66:8, 98:10,
168:5, 176:4, 179:14
started [4] - 13:13,
29:20, 41:12, 170:8
starting [1] - 119:2
state [12] - 2:18, 6:6,
16:14, 17:5, 22:24, 24:3,
24:15, 31:3, 94:12,
110:7, 168:24, 179:18
State [9] - 28:21, 29:11,
29:21, 30:1, 39:13,
39:14, 55:25, 56:21, 85:8
statement [27] - 9:16,
10:4, 10:8, 10:13, 10:15,
10:18, 10:25, 11:3, 11:4,
11:8, 11:9, 11:10, 11:11,
12:6, 13:2, 14:2, 14:16,

15:20, 15:24, 152:11,
152:22, 157:13, 166:10,
170:12
statements [6] - 142:2,
142:12, 143:10, 171:3,
176:17, 176:22
STATES [2] - 1:1, 1:4
States [5] - 26:1, 26:4,
28:16, 39:8, 100:21
status [1] - 22:8
stay [3] - 72:18, 98:1,
101:14
staying [1] - 71:4
stenographically [1] -
184:4
step [3] - 95:2, 105:9,
105:15
steps [1] - 64:16
Stewart [5] - 88:7,
127:21, 127:23, 127:25,
128:4
stick [4] - 9:4, 27:1,
43:12, 99:25
sticking [1] - 45:14
still [10] - 5:23, 14:15,
22:16, 22:23, 23:7,
23:11, 170:2, 170:17,
170:21, 180:6
stipulate [1] - 140:10
stipulation [2] - 139:17,
139:21
stop [2] - 19:6, 87:8
stopped [4] - 125:13,
125:14, 148:19, 155:7
stops [1] - 98:2
storage [1] - 42:22
store [3] - 118:4, 118:9,
118:16
stored [1] - 75:19
story [1] - 161:8
straight [1] - 98:5
strange [1] - 5:5
Street [7] - 1:24, 93:10,
93:25, 110:9, 110:12,
148:2, 150:20
street [8] - 86:12, 87:6,
120:21, 125:13, 125:20,
125:21, 130:10, 160:5
stress [1] - 98:7
strike [5] - 27:9, 102:8,
109:19, 115:18, 145:22
Strike [1] - 109:20
strikes [1] - 102:6
string [1] - 98:8
stripe [1] - 92:11
strong [1] - 101:21
strongly [1] - 9:20
struck [2] - 101:25
stuck [1] - 45:17
study [3] - 63:18, 63:22,

63:23
Study [1] - 63:19
stuff [6] - 52:20, 55:12,
98:7, 170:8, 170:23,
171:8
subject [11] - 16:25,
17:17, 22:6, 60:11, 70:4,
75:15, 108:1, 108:3,
113:2, 154:23, 167:23
subjected [2] - 70:9,
70:14
subjective [3] - 19:2,
32:15, 32:16
submit [2] - 45:24,
53:18
submitted [13] - 6:21,
46:2, 55:4, 55:7, 55:8,
55:10, 55:12, 55:14,
67:17, 83:12, 147:3,
176:21, 176:23
subpoena [3] - 24:7,
92:25, 111:18
subpoenaed [3] -
107:2, 112:7, 112:8
subscribed [2] - 107:4,
109:10
subscriber [8] - 92:20,
92:24, 93:2, 93:3, 94:7,
105:22, 106:12, 107:3
subscription [1] -
108:15
subsequently [1] -
115:24
substance [4] - 61:8,
62:2, 62:4, 71:6
substances [1] - 62:5
success [1] - 170:5
successful [1] - 149:21
suffers [1] - 32:5
sufficient [1] - 69:11
sufficiently [1] - 74:1
suggest [4] - 123:19,
123:24, 174:13, 174:19
suggested [5] - 13:12,
128:25, 129:2, 175:3,
176:2
suggesting [3] - 177:1,
178:13, 178:25
suggestive [1] - 15:1
suit [3] - 109:18,
109:21, 109:23
suitable [13] - 46:5,
48:20, 66:2, 68:7, 68:10,
68:19, 69:4, 69:8, 74:23,
79:13, 79:22, 80:9, 84:13
sum [1] - 35:14
summarize [2] - 148:11,
177:18
summarizing [1] -
157:24

Summarizing [2] -
163:19, 163:20
summary [2] - 74:14,
158:18
supervision [3] - 57:5,
132:20, 156:12
supervisor [2] - 78:19,
156:15
supervisor's [1] - 79:4
supervisors [1] - 25:25
supply [1] - 3:8
suppose [1] - 6:18
supposed [2] - 19:21,
173:6
supposedly [1] - 171:3
suppression [4] - 8:7,
12:17, 171:23, 180:7
surely [1] - 11:18
surface [58] - 34:8,
34:13, 34:20, 43:6,
43:10, 43:16, 45:3,
45:14, 48:18, 51:9,
51:18, 54:11, 61:7, 61:9,
61:22, 61:24, 62:7, 63:2,
65:19, 65:22, 69:8,
69:10, 69:17, 69:19,
70:21, 71:2, 71:4, 71:9,
71:16, 71:18, 72:1, 72:2,
72:8, 72:9, 72:12, 72:17,
72:18, 72:22, 73:4, 73:5,
73:10, 74:4, 74:12,
74:16, 75:3, 75:15, 76:1,
76:2, 76:3, 76:5, 76:6,
81:3, 81:6
surfaces [27] - 42:14,
42:16, 42:19, 43:2, 43:5,
43:24, 48:21, 48:22,
69:3, 72:3, 72:4, 72:5,
72:6, 72:7, 72:13, 73:11,
73:15, 75:7, 75:14,
80:21, 80:23, 80:25,
83:15, 83:17, 83:19
surprise [1] - 26:5
surveil [1] - 134:22
surveillance [5] - 111:7,
111:10, 111:12, 135:25,
162:9
suspect [8] - 57:11,
101:24, 103:4, 110:16,
115:25, 116:10, 116:14,
117:6
suspects [1] - 117:2
suspicion [1] - 125:3
Sustained [7] - 108:18,
127:19, 128:3, 128:11,
129:6, 146:9, 165:11
sustained [3] - 116:13,
117:5, 124:18
SUV [1] - 97:24
swallowed [1] - 10:24

switch [2] - 167:5,
167:11
swore [1] - 152:22
SWORN [4] - 28:18,
39:10, 55:22, 85:5
sworn [2] - 152:10,
152:22
system [1] - 57:20
System [2] - 57:21, 59:2

T

T-1 [3] - 107:2, 112:7
T-2 [1] - 111:21
T-5 [2] - 92:24, 93:3
T-E-N-I-E-R-A [1] -
39:16
T-Mobile [6] - 106:16,
107:12, 109:3, 113:2,
114:8, 114:17
table [1] - 25:8
tag [4] - 41:20, 41:23,
87:22, 121:7
talks [1] - 146:20
Talmadge [1] - 78:19
tape [53] - 7:11, 7:13,
9:11, 9:12, 10:6, 10:22,
11:11, 13:2, 14:23,
35:22, 36:1, 43:15,
43:16, 43:17, 45:14,
45:15, 45:17, 50:2,
62:13, 111:7, 111:10,
111:13, 123:16, 123:20,
133:16, 133:18, 133:20,
133:22, 135:11, 136:23,
137:1, 137:4, 137:5,
137:9, 142:9, 142:17,
142:19, 143:4, 144:9,
166:1, 175:1, 175:4,
175:8, 176:1, 176:2,
176:5, 176:7, 176:11,
180:1, 180:2, 180:4,
180:9
tapes [4] - 142:20,
142:22, 142:24, 143:7
taping [3] - 147:7,
166:13, 167:5
target [4] - 8:25, 86:25,
87:2, 155:20
Task [5] - 85:17, 85:24,
155:23, 156:1, 156:5
task [6] - 50:10, 85:25,
134:17, 135:6, 141:10,
155:22
taught [2] - 31:11,
31:14
teach [4] - 29:10, 31:9,
31:12, 31:16
tear [1] - 34:14

**teasing** [1] - 25:4
**tech** [1] - 50:24
**Technician** [8] - 40:15, 40:21, 40:23, 40:24, 41:1, 41:16, 44:4, 44:5
**technician** [4] - 40:19, 50:14, 56:24, 72:10
**technicians** [2] - 58:10, 67:25
**techniques** [2] - 57:18, 62:15
**technology** [1] - 29:15
**techs** [1] - 50:6
**telephone** [23] - 3:23, 89:6, 89:11, 89:17, 89:20, 90:1, 90:23, 91:5, 91:15, 92:2, 93:8, 94:8, 105:22, 105:23, 106:4, 106:8, 106:22, 107:3, 110:13, 112:5, 120:5, 157:1, 157:2
**telephones** [2] - 89:8, 89:18
**telephonic** [1] - 26:16
**temperature** [1] - 76:13
**Ten** [1] - 146:24
**ten** [5] - 78:2, 130:15, 144:3, 168:7, 178:4
**tend** [2] - 76:15, 80:24
**tender** [2] - 77:8, 77:10
**Teniera** [4] - 39:9, 39:16, 67:25, 68:1
**TENIERA** [2] - 39:10, 182:7
**Tens** [1] - 59:6
**tentative** [1] - 9:10
**term** [1] - 161:10
**termed** [1] - 166:16
**terms** [3] - 7:21, 16:13, 17:4
**Terry** [8] - 109:4, 109:6, 109:7, 109:10, 109:13, 109:14, 110:14, 128:5
**test** [8] - 60:5, 60:6, 60:9, 67:4, 138:9, 147:7, 147:11, 160:4
**tested** [1] - 19:3
**testified** [27] - 18:4, 19:24, 21:9, 80:20, 81:2, 114:20, 123:14, 128:25, 129:22, 130:14, 138:2, 139:9, 139:16, 144:23, 145:4, 152:3, 156:9, 156:18, 157:24, 159:19, 161:16, 161:21, 161:22, 162:18, 163:16, 163:17, 166:11
**testifies** [2] - 19:25, 122:19
**testify** [16] - 3:11, 13:1,

18:4, 19:21, 20:2, 20:8, 22:8, 23:15, 60:24, 114:6, 123:8, 129:8, 136:2, 170:9, 172:13, 174:17
**testifying** [7] - 8:15, 116:4, 116:6, 124:15, 163:20, 164:4, 176:13
**testimony** [35] - 2:16, 3:3, 3:25, 9:5, 13:5, 13:6, 20:1, 20:25, 21:2, 21:12, 21:15, 21:17, 61:1, 138:6, 138:20, 145:10, 148:7, 153:9, 153:18, 157:14, 158:5, 158:15, 164:13, 164:18, 164:21, 169:21, 178:18, 178:24, 178:25, 179:20, 179:24, 180:8, 180:21, 180:22
**testing** [1] - 60:1
**tests** [2] - 59:23, 59:24
**texture** [1] - 73:10
**textures** [1] - 73:15
**Thanksgiving** [1] - 98:13
**THE** [273] - 1:1, 1:1, 2:3, 3:10, 3:14, 3:20, 4:10, 4:17, 4:20, 4:23, 5:2, 5:12, 5:19, 5:25, 6:4, 6:7, 6:10, 6:14, 6:17, 6:20, 6:24, 7:3, 7:7, 7:25, 8:5, 9:7, 9:23, 10:1, 10:4, 10:12, 11:5, 11:10, 12:5, 12:7, 12:13, 12:16, 12:20, 12:23, 13:3, 13:8, 13:11, 13:21, 13:24, 14:7, 14:11, 14:14, 15:11, 15:16, 15:21, 15:25, 16:6, 17:6, 18:7, 18:14, 18:21, 19:6, 19:11, 19:22, 20:6, 20:11, 20:17, 20:20, 21:19, 21:24, 22:2, 22:10, 22:12, 22:18, 23:9, 23:13, 23:17, 24:5, 24:10, 24:13, 24:16, 24:19, 25:23, 26:13, 26:19, 26:20, 27:7, 28:1, 28:11, 28:19, 28:20, 28:22, 32:18, 39:6, 39:11, 39:12, 39:14, 39:16, 40:1, 52:10, 52:15, 55:18, 55:23, 55:24, 56:1, 77:1, 77:4, 77:8, 77:11, 80:13, 80:14, 83:1, 83:3, 84:17, 84:18, 84:20, 84:22, 85:6, 85:7, 85:9, 93:12, 94:15, 94:18, 95:3, 95:5,

95:8, 95:12, 95:14, 95:19, 95:23, 96:2, 97:10, 97:18, 98:11, 99:2, 99:5, 99:9, 99:11, 99:14, 99:18, 99:20, 100:17, 100:20, 100:25, 101:5, 101:7, 101:11, 101:20, 102:18, 102:21, 102:24, 103:6, 103:10, 103:15, 103:20, 103:22, 104:5, 104:22, 104:24, 105:2, 105:5, 106:7, 106:9, 106:15, 106:24, 107:11, 107:14, 107:16, 107:17, 107:19, 107:23, 108:1, 108:7, 108:13, 108:18, 108:23, 109:20, 110:6, 111:23, 111:25, 112:2, 112:10, 112:14, 113:1, 114:5, 114:13, 114:14, 114:19, 115:12, 115:19, 116:7, 116:13, 117:5, 117:8, 120:17, 121:8, 121:23, 122:16, 122:20, 123:5, 123:7, 123:22, 124:1, 124:5, 124:9, 124:18, 127:19, 128:3, 128:7, 128:9, 128:11, 129:6, 131:24, 138:12, 138:16, 139:10, 139:17, 139:21, 139:24, 140:1, 140:4, 140:5, 140:7, 140:13, 144:12, 145:9, 146:9, 147:24, 149:7, 151:12, 151:16, 153:1, 153:3, 154:24, 155:1, 158:11, 158:14, 158:22, 160:1, 161:3, 161:11, 164:12, 165:11, 167:22, 167:24, 167:25, 168:17, 169:1, 169:3, 169:10, 169:17, 169:24, 170:24, 171:5, 171:9, 171:14, 171:24, 172:4, 172:11, 172:16, 172:19, 173:10, 173:14, 173:16, 173:18, 174:8, 175:17, 176:18, 177:12, 177:15, 177:21, 178:2, 179:15, 179:23, 180:6, 180:12, 180:14, 180:19, 180:25
**Theater** [2] - 111:4, 152:4
**theater** [4] - 111:8, 111:16, 152:9, 152:20
**themselves** [2] - 147:22, 175:16
**theories** [1] - 129:1
**theory** [2] - 8:15, 8:17
**thereabouts** [1] - 84:25

**therefore** [1] - 125:8
**they've** [4] - 8:23, 171:4, 178:10, 179:25
**thin** [1] - 71:19
**thinking** [3] - 99:3, 100:1, 102:21
**thinks** [3] - 9:4, 100:11, 176:15
**third** [2] - 69:18, 73:19
**Thomas** [1] - 1:20
**thousand** [1] - 30:20
**thousands** [1] - 59:6
**Three** [5] - 68:18, 78:5, 78:8, 105:12, 146:24
**three** [19] - 28:3, 44:6, 44:8, 44:21, 50:6, 50:9, 54:8, 57:5, 58:20, 69:15, 74:10, 77:16, 79:16, 105:10, 131:15, 132:5, 166:17, 173:23, 175:16
**throughout** [3] - 47:24, 48:2, 175:3
**tickets** [1] - 152:14
**tight** [1] - 98:8
**Tire** [1] - 17:23
**today** [35] - 2:8, 2:9, 2:12, 7:9, 12:25, 13:5, 13:7, 13:19, 14:4, 20:23, 20:25, 21:7, 21:15, 21:16, 22:6, 22:9, 22:14, 22:15, 44:13, 61:13, 67:20, 84:23, 85:4, 95:16, 142:24, 143:11, 150:5, 157:18, 164:18, 164:19, 164:20, 164:21, 168:3, 173:5, 173:10
**together** [6] - 46:1, 71:19, 111:17, 170:18, 170:20, 179:1
**toll** [7] - 89:12, 91:5, 91:6, 107:3, 109:4, 112:4, 112:6
**Tom** [1] - 147:16
**tomorrow** [2] - 5:16, 168:4
**tones** [1] - 175:11
**Tonya** [1] - 16:21
**took** [9] - 18:24, 43:20, 51:20, 51:21, 119:20, 132:25, 134:7, 146:20, 148:7
**Toolmark** [1] - 30:10
**top** [6] - 11:22, 51:21, 52:23, 72:18, 103:7, 117:23
**touch** [1] - 74:8
**touched** [5] - 61:9, 62:7, 71:17, 72:1, 73:18
**touching** [5] - 69:17, 70:20, 70:22, 70:24, 71:2

**toward** [4] - 28:21, 39:13, 55:24, 85:7
**tower** [8] - 111:18, 112:24, 113:9, 113:15, 113:17, 113:24, 114:1
**towers** [1] - 114:9
**town** [1] - 87:6
**Towson** [1] - 56:20
**trace** [1] - 53:22, 53:24
**tracking** [1] - 42:10
**trade** [3] - 87:3, 154:2, 154:13
**tradition** [1] - 18:10
**traffic** [1] - 103:2
**trafficker** [1] - 125:9
**traffickers** [2] - 114:24, 127:3
**trafficking** [4] - 88:9, 125:22, 127:1, 155:17
**train** [5] - 58:3, 58:6, 58:7, 58:19, 59:1
**trained** [6] - 29:11, 57:4, 57:7, 57:16, 57:20, 58:18
**training** [13] - 29:17, 29:20, 29:22, 29:25, 30:1, 30:11, 30:17, 40:24, 56:22, 57:7, 58:7, 58:17
**transaction** [1] - 90:24
**transcribed** [1] - 184:8
**transcript** [13] - 11:7, 14:2, 138:12, 139:11, 139:19, 140:11, 143:15, 143:19, 143:23, 148:6, 158:3, 170:11, 184:8
**transfer** [1] - 62:6
**transference** [1] - 61:5
**transferred** [1] - 40:17
**transmits** [1] - 165:19
**transmitter** [3] - 159:6, 159:9, 159:14, 159:15, 165:17
**transmitting** [1] - 159:5
**transparent** [1] - 43:15
**transport** [1] - 53:17
**transportation** [1] - 28:7
**travel** [1] - 27:3
**traveling** [1] - 87:7
**tread** [1] - 21:22
**trial** [7] - 3:13, 10:23, 16:19, 27:12, 27:15, 105:8, 169:22
**tried** [5] - 88:1, 88:3, 119:18, 130:15, 144:6
**trigger** [1] - 38:3
**trip** [1] - 27:20
**trooper** [1] - 168:24
**trouble** [1] - 27:25

**troubled** [1] - 170:2
**true** [8] - 32:4, 32:8, 32:13, 146:1, 146:5, 151:21, 172:3, 174:14
**truly** [1] - 7:15
**trunk** [1] - 42:18
**trust** [2] - 28:12, 125:5
**truth** [1] - 10:5
**try** [11] - 6:16, 21:11, 51:13, 86:11, 87:24, 102:25, 119:10, 131:21, 139:6, 170:4, 171:20
**trying** [5] - 10:21, 72:11, 119:9, 119:14, 128:19, 130:10, 131:21, 134:3, 141:19, 143:2, 146:17, 148:11, 166:13, 170:7, 177:18
**turn** [9] - 2:25, 9:16, 9:17, 16:4, 93:2, 141:4, 142:5, 167:6, 167:13
**turned** [1] - 123:6, 142:4, 176:25
**turns** [2] - 26:15, 176:19
**Twelve** [1] - 59:22
**twin** [1] - 19:2
**Two** [4] - 102:13, 105:12, 152:12, 172:25
**two** [53] - 3:12, 18:17, 20:3, 20:17, 28:3, 32:22, 32:25, 33:11, 33:23, 34:21, 35:8, 35:15, 40:25, 41:1, 57:14, 58:20, 58:22, 59:18, 63:10, 63:12, 63:15, 63:19, 63:25, 65:9, 85:25, 91:7, 92:8, 95:16, 98:17, 98:21, 102:7, 122:10, 122:25, 132:11, 137:12, 137:24, 140:8, 141:9, 152:13, 158:24, 159:8, 160:21, 166:6, 166:8, 166:17, 171:1, 173:24, 177:22, 177:24, 178:17, 178:20, 179:13
**type** [23] - 17:23, 43:12, 48:20, 48:22, 53:22, 61:8, 61:14, 62:2, 62:4, 65:4, 65:5, 65:7, 65:11, 65:19, 65:20, 66:10, 70:8, 70:20, 71:8, 71:24, 72:15, 72:17, 72:20
**types** [16] - 56:25, 57:1, 57:17, 58:11, 62:5, 65:15, 65:16, 69:17, 69:24, 70:23, 72:2, 72:6, 72:7, 73:15, 75:12, 75:13
**Tyree** [2] - 88:7, 127:21

## U

**U.S** [2] - 1:24, 123:9
**ultimate** [1] - 22:4
**ultimately** [2] - 6:5, 97:4
**unable** [5] - 33:25, 97:13, 141:14, 141:17, 173:4
**uncertainty** [1] - 32:6
**under** [18] - 3:22, 4:3, 29:11, 29:20, 30:2, 55:5, 55:10, 55:14, 57:4, 69:22, 81:14, 102:10, 107:4, 107:17, 107:20, 109:3, 116:10, 147:3
**undercover** [3] - 144:3, 145:16, 159:1
**underneath** [1] - 160:12
**undersides** [3] - 61:6, 62:19, 70:11
**understood** [4] - 16:25, 138:14, 178:5, 180:19
**unemployed** [1] - 98:6
**unfair** [1] - 104:10
**unfortunately** [2] - 98:1, 164:1
**uniform** [1] - 64:10
**uniformly** [1] - 67:4
**unintelligible** [2] - 142:10, 143:7
**unique** [3] - 38:11, 63:8, 63:10
**Unit** [10] - 40:17, 45:25, 53:17, 56:3, 56:14, 56:15, 57:3, 58:25, 86:3
**unit** [3] - 40:17, 58:23, 75:13
**UNITED** [2] - 1:1, 1:4
**United** [5] - 26:1, 26:4, 28:16, 39:8, 100:21
**University** [3] - 40:10, 40:11, 56:21
**unknown** [2] - 57:22, 66:3
**unless** [5] - 7:23, 78:15, 102:10, 104:18, 146:13
**unlike** [1] - 62:17
**unlikely** [1] - 173:11
**unquote** [2] - 19:4, 26:7
**unsuccessful** [1] - 88:2
**untainted** [2] - 172:8
**unusual** [2] - 28:20, 29:12, 31:3, 31:12, 39:12, 43:17, 44:20, 49:21, 53:23, 64:23, 70:18, 71:11, 82:3, 83:6, 89:20,
98:5, 100:22, 101:9, 109:8, 113:20, 121:3, 124:5, 132:21, 135:4, 137:11, 137:12, 138:4, 147:23, 150:9, 153:20, 154:1, 154:5, 154:11, 154:17, 154:20, 158:19, 159:23, 162:22, 164:3, 170:15, 174:9, 175:14, 175:23, 177:2, 177:4, 179:14
**upper** [1] - 89:21
**upright** [1] - 51:14
**US** [1] - 31:1
**USA** [1] - 184:4
**usable** [1] - 133:13
**usage** [2] - 75:20, 75:23
**uses** [1] - 72:10
**Utilize** [1] - 119:10
**utilizing** [1] - 57:17
**Utilizing** [1] - 109:2

## V

**vacate** [1] - 17:16
**vacuum** [2] - 52:21, 53:5
**vacuumed** [1] - 53:8
**valley** [1] - 61:22
**valuable** [1] - 63:5
**value** [5] - 12:4, 34:2, 135:16, 137:1, 137:9
**variety** [1] - 153:25
**various** [13] - 43:25, 56:25, 57:1, 57:17, 61:16, 61:17, 68:21, 75:12, 118:11, 148:15, 148:16, 153:13
**varnish** [1] - 72:5
**vaseline** [1] - 84:2
**vehicle** [18] - 33:13, 33:20, 41:25, 42:4, 45:1, 47:7, 47:12, 47:24, 48:3, 48:5, 50:15, 53:6, 53:9, 53:12, 87:7, 109:14, 145:14, 157:15
**vehicles** [1] - 73:15
**venire** [1] - 26:14
**veracity** [1] - 175:15
**verbal** [1] - 3:7
**verification** [4] - 60:14, 64:17, 66:18, 66:22
**verified** [3] - 60:18, 78:15, 78:16
**Verizon** [1] - 93:16
**version** [3] - 13:2, 13:21, 112:6
**versus** [3] - 26:4, 51:21, 73:4

**victims** [4] - 57:11, 80:2, 88:15, 115:21
**video** [2] - 162:5, 162:9
**videotape** [2] - 147:2, 170:3
**videotaped** [2] - 146:11, 146:25
**view** [8] - 11:19, 16:21, 42:23, 81:12, 99:21, 100:8, 140:8, 176:9
**VIII** [1] - 1:10
**vinyls** [1] - 72:14
**violated** [1] - 146:3
**violation** [1] - 16:3
**violence** [6] - 86:6, 86:8, 86:23, 86:24, 127:9, 127:10
**violent** [3] - 86:11, 87:1, 155:14
**visible** [4] - 62:8, 62:10, 65:20, 73:16
**visually** [1] - 49:22
**voice** [39] - 8:10, 8:11, 9:11, 10:6, 11:11, 14:23, 123:16, 123:17, 123:20, 124:2, 169:12, 169:14, 169:19, 171:17, 171:23, 172:24, 173:21, 174:7, 175:2, 175:8, 175:20, 175:23, 176:5, 177:18, 177:24, 178:6, 178:8, 178:11, 178:15, 178:17, 178:18, 178:23, 178:25, 179:11, 179:25, 180:2, 180:3, 180:9
**voices** [3] - 7:13, 172:22, 175:1
**VOIR** [1] - 182:4
**Voir** [1] - 31:21
**voir** [11] - 31:22, 95:15, 101:22, 101:24, 172:7, 172:23, 174:10, 174:24, 178:22, 179:17, 180:7
**VOLUME** [1] - 1:10
**vote** [1] - 158:19
**voucher** [1] - 6:22
**vulnerable** [2] - 72:20, 73:1

## W

**W-1** [1] - 35:19
**W-3** [1] - 35:25
**W-4** [1] - 36:3
**W-7** [1] - 118:13
**W-A-G-S-T-E-R** [1] - 28:22
**W7A** [1] - 117:20, 117:21, 118:3

**W7-B** [1] - 118:7
**Wagster** [11] - 17:20, 28:17, 28:22, 28:25, 29:8, 31:18, 31:22, 32:22, 33:1, 33:15, 39:6
**WAGSTER** [2] - 28:18, 182:2
**waist** [1] - 83:6
**Wait** [1] - 100:17
**wait** [3] - 2:3, 8:14, 114:17
**waited** [1] - 19:7
**waiting** [2] - 119:24, 153:17
**waling** [1] - 61:20
**walk** [2] - 134:25, 160:6
**wants** [4] - 5:8, 8:3, 11:19, 179:24
**warrant** [5] - 117:11, 117:13, 118:5, 118:20, 150:1
**Warrant** [5] - 85:16, 85:23, 155:23, 156:1, 156:5
**warts** [1] - 65:16
**washing** [1] - 70:15
**water** [3] - 76:12, 80:13, 114:13
**wave** [1] - 43:10
**Wayne** [3] - 79:19, 117:18, 149:6
**WAYNE** [1] - 1:7
**weapon** [1] - 75:18
**wear** [1] - 34:14
**wearing** [2] - 137:17, 167:4
**wears** [1] - 126:10
**weather** [5] - 74:13, 76:21, 120:20, 160:7, 166:12
**web** [1] - 26:3
**Wednesday** [18] - 13:12, 13:22, 14:6, 14:8, 96:16, 168:4, 168:6, 168:9, 168:15, 168:17, 168:21, 168:22, 170:17, 171:16, 173:7, 173:11, 174:24, 181:2
**Week** [1] - 30:15
**week** [20] - 2:15, 14:8, 19:9, 23:5, 23:6, 26:21, 26:23, 44:13, 95:14, 96:10, 96:12, 98:13, 168:4, 168:10, 168:23, 170:10, 176:2, 176:24, 177:22, 178:10
**weekend** [2] - 21:13, 28:13
**weeks** [11] - 3:12, 5:4, 28:3, 95:16, 98:17,

98:21, 104:9, 115:17, 141:9, 158:16, 177:22
**weigh** [1] - 178:7
**weight** [1] - 175:6
**Wesson** [1] - 37:7
**west** [3] - 86:7, 86:24, 87:6
**West** [4] - 1:24, 88:9, 114:24, 115:2
**wet** [1] - 71:7
**Whereof** [1] - 184:10
**white** [1] - 62:21
**whole** [5] - 51:1, 98:20, 101:5, 139:15, 178:3
**wife** [3] - 172:10, 172:11
**William** [8] - 128:4, 128:5, 128:9, 128:13, 129:10, 129:11, 150:9, 151:5
**Williams** [6] - 39:9, 39:21, 68:1, 93:5, 93:9, 94:4
**Willie** [7] - 26:4, 79:19, 109:18, 110:6, 115:24, 117:2, 184:4
**WILLIE** [1] - 1:6
**willing** [3] - 3:24, 176:6, 176:13
**Wilson** [1] - 79:20
**Wind** [1] - 120:21
**window** [7] - 42:20, 47:5, 54:17, 54:18, 54:20, 54:25, 76:19
**windows** [2] - 42:17, 48:9
**wiping** [1] - 70:21
**wire** [1] - 137:11
**wired** [2] - 137:11, 159:23
**wired-up** [1] - 159:23
**wise** [1] - 97:23
**wish** [2] - 13:12, 104:14
**Withdraw** [1] - 157:22
**withdrawal** [1] - 7:21
**witness** [68] - 2:8, 2:20, 3:1, 3:5, 4:14, 8:14, 14:22, 17:8, 17:19, 18:10, 19:21, 22:7, 23:19, 23:21, 23:24, 24:6, 24:7, 24:19, 24:20, 28:15, 32:18, 39:7, 52:11, 55:19, 77:6, 77:9, 77:10, 77:11, 84:19, 84:24, 101:3, 101:4, 101:9, 101:10, 106:14, 107:25, 114:5, 114:8, 117:6, 121:24, 121:25, 122:20, 128:16, 129:12, 130:2, 138:13, 139:12,

145:8, 151:12, 154:5, 154:23, 158:14, 162:24, 163:5, 163:8, 164:13, 169:13, 172:6, 172:23, 173:5, 173:9, 175:16, 175:19, 177:23, 178:6, 179:17, 180:7
**Witness** [2] - 95:7, 184:10
**WITNESS** [27] - 28:18, 28:19, 28:22, 39:10, 39:11, 39:16, 55:22, 55:23, 56:1, 80:14, 84:18, 85:5, 85:6, 85:9, 95:3, 106:9, 107:16, 110:6, 114:14, 128:9, 140:4, 153:1, 167:24, 182:2, 182:7, 182:12, 182:17
**witness'** [3] - 109:21, 114:10, 176:22
**witnesses** [33] - 2:10, 7:8, 12:25, 14:5, 17:14, 20:23, 21:5, 21:13, 22:6, 22:23, 23:4, 23:8, 24:3, 24:15, 153:14, 158:5, 158:17, 171:15, 173:7, 173:20, 174:2, 174:3, 174:19, 175:13, 176:4, 176:14, 178:17, 178:20, 178:22, 178:23, 178:24, 180:2, 180:22
**wonder** [1] - 174:10
**wondering** [1] - 173:8
**Wooden** [2] - 169:4, 169:5
**woods** [2] - 72:4, 72:14
**Woody** [1] - 111:4
**word** [5] - 43:10, 95:14, 101:22, 125:20, 149:15
**words** [5] - 11:12, 91:3, 98:18, 100:20, 158:15
**wore** [1] - 166:1
**works** [2] - 97:22, 98:1
**world** [2] - 64:2, 67:8
**Wow** [1] - 101:25
**write** [9] - 35:5, 68:21, 78:24, 141:21, 142:1, 142:3, 143:9, 152:10
**writing** [5] - 35:20, 45:9, 45:10, 78:24, 121:25
**written** [2] - 23:14, 23:20
**wrote** [3] - 92:2, 142:2, 171:2
**Wyche** [17] - 15:3, 20:7, 36:11, 36:12, 36:20, 36:21, 143:16, 143:20, 158:8, 161:6, 162:6,

168:24, 171:16, 172:10, 173:2, 173:25

## X

**XXXVII** [1] - 1:10

## Y

**Y-shaped** [1] - 65:10
**year** [7] - 39:24, 42:13, 56:11, 56:25, 59:4, 98:20, 119:2
**years** [19] - 30:1, 30:3, 40:25, 41:13, 56:10, 56:16, 56:17, 56:18, 57:4, 58:20, 60:5, 85:22, 85:25, 141:10, 163:13, 163:17, 170:8, 170:13, 176:21
**yelling** [1] - 103:9
**yield** [1] - 48:22
**York** [2] - 17:25, 170:4
**yourself** [5] - 28:12, 44:22, 60:21, 64:3, 92:13

## Z

**Zajac** [3] - 1:23, 184:3, 184:15
**zero** [2] - 113:13, 179:12
**zoom** [1] - 52:10