```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION
 3

 4

 5      UNITED STATES OF AMERICA

 6           v.                          CRIMINAL CASE NO.
                                           AMD-04-029
 7      WILLIE MITCHELL,
        SHELTON HARRIS,
 8      SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
 9
             Defendants
10      _____/

11                    VOLUME XI OF XXXVII
                      Tuesday, October 7, 2008
12                    Baltimore, Maryland

13
        Before:  Honorable Andre M. Davis, Judge
14                    And a Jury

15      Appearances:
             On Behalf of the Government:
16            Robert Harding, Esquire
              Michael Hanlon, Esquire
17           On Behalf of Defendant Mitchell:
              Laura Kelsey Rhodes, Esquire
18            Michael E. Lawlor, Esquire
             On Behalf of Defendant Harris:
19            Gerard P. Martin, Esquire
              Paul Flannery, Esquire
20           On Behalf of Defendant Martin:
              Thomas L. Crowe, Esquire
21            James G. Pyne, Esquire
             On Behalf of Defendant Gardner:
22            Adam H. Kurland, Esquire
              Barry Coburn, Esquire
23
        Reported by:
24      Mary M. Zajac, RPR
        Room 5515, U.S. Courthouse
25      101 West Lombard Street
        Baltimore, Maryland 21201
```

1                (Proceedings at 9:55 a.m.)

2                THE COURT:  All the jurors have arrived.  I understand

3      there was a parking problem this morning.

4                Mr. Coburn, thank you for your letter, which I have

5      received and reviewed, regarding that issue we discussed late

6      yesterday.  And I'm prepared now to finalize my ruling.  And my

7      ruling is that I will not permit counsel for Mr. Gardner to

8      introduce evidence that Mr. Gardner has been tried and convicted

9      and sentenced to life without parole for the Spence murder.

10               I understand that the defendants, other than Mr.

11     Gardner, have withdrawn their objections to the admissibility of

12     that evidence.  Is that correct?  And that would certainly have

13     been a factor and was indeed a factor that I considered, the

14     objections being withdrawn.  The government, however, has not

15     withdrawn its objection.

16               MR. HANLON:  That is correct, Your Honor.

17               THE COURT:  All right.  And so I'm ruling, as I am, for

18     the reasons I indicated on the record.  I don't think I need to

19     elaborate in any great deal.  But I do have to say on calm

20     reflection over the overnight recess, it does occur to me, and I

21     think I frankly exaggerated in my response to Mr. Hanlon when I

22     said that neither the government nor the Court can make these

23     decisions for the defendant.

24               The truth of the matter is, with Mr. Gardner's refusal

25     to join in this tactic, I believe the Court does have a

1    responsibility to insure that Mr. Gardner receives a fair trial,

2    not to trump counsel's professional and well-respected

3    professional judgments about such things.  But the truth of the

4    matter is to do that would effectively plead Mr. Gardner guilty

5    to murder and essentially leave little for the jury to determine.

6            The little that the jury would have to determine

7    certainly is important -- the existence of an enterprise and Mr.

8    Gardner's motivation for that murder.  But let's be perfectly

9    frank.  It amounts to a guilty plea.  And that's how the Court is

10   approaching this question.

11           And under circumstances such as this, with Mr. Gardner

12   refusing even to respond coherently to the Court's attempt to

13   question him about the matter, let alone what I gather is his

14   refusal to cooperate with counsel, although there have been some

15   discussions, he's got to make that decision.

16           So while I'm not burdening his right to testify at all,

17   he is free to testify or not testify, under the circumstances the

18   Court has a special responsibility to insure as much as is

19   humanly possible that Mr. Gardner receive a fair trial.  And so

20   the Court will continue to make rulings intended to shield from

21   the jury the fact that Mr. Gardner has been tried and convicted

22   and sentenced for one of the murders which is charged in this, in

23   this case.

24           Now, what that means in effect, among other things, is

25   that to the extent, Mr. Coburn, you wish to cross examine Mr.

4

1    Montgomery and show to the jury that Mr. Montgomery previously

2    testified in front of a jury, that's a decision you're going to

3    have to make.  The better practice, as we all know, is to simply

4    refer to a prior proceeding.  And the Court will instruct the

5    jury, of course, as to the, that the jury is not to speculate and

6    so forth about what those prior proceedings were.

7           But I'm not prohibiting you from bringing out in front

8    of the jury that Mr. Montgomery testified in front of a jury

9    previously.  Now, obviously, that entails certain risk because it

10   sort of gets you in the box of leaving open the inference to this

11   jury that maybe Mr. Gardner was tried and acquitted or there was

12   a mistrial.  And you don't want that, of course.  So you have to

13   make your own decision as to how you want to question Mr.

14   Montgomery.

15          But the Court's ruling is clear.  There shall be no

16   evidence, argument, or speculation in front of the jury as to any

17   state murder proceedings involving any of the defendants in this

18   case.  And specifically, there is to be no question whose intent

19   or effect is to show that Mr. Gardner has been convicted in state

20   court of the Jones-Spence murder.

21          So that's the Court's ruling.

22          MR. KURLAND:  Your Honor, could I just briefly put some

23   comments on the record that I believe are necessary at this

24   point?

25          THE COURT:  I can't imagine what's necessary, Mr.

5

1    Kurland.

2            MR. KURLAND:  All right.

3            THE COURT:  I heard you fully yesterday.  All right.

4    We'll have the jury, please.  And can Mr. Dobropolski be brought

5    down?  Is he here?

6            MR. HARDING:  Should be in the back, Your Honor.

7            THE COURT:  All right.

8            MS. RHODES:  Your Honor, Ms. Arrington, when she

9    returns, if we can move the screens because I can't see the

10   witness at all.  Or do you want me to try and do it while --

11           THE COURT:  Well, it's hard.  The screen and the

12   microphone have to be sort of, you know, aligned.  I'll have her

13   move it just an inch or so towards me, if that will help.  Will

14   that help?

15           MS. RHODES:  If he sat forward that would help.

16           THE COURT:  Well, I can't make the witness sit in any

17   particular place, except in the chair.

18           MR. MARTIN:  Your Honor, when I go to play the

19   transcript, when I go to play the tape, I have the transcript of

20   the tape, and I have copies for all the jurors or I can put it on

21   the DOAR.

22           THE COURT:  Well, if you put it on DOAR -- well, no,

23   that will be kind of hard for you, won't it?

24           MR. MARTIN:  Yeah, I'm afraid I'll be out of sync.

25           THE COURT:  All right.  You can hand out the

1   transcripts.

2                  (Jury enters the courtroom.)

3                  THE COURT:  Good morning, ladies and gentlemen.

4                  I understand the parking situation was pretty awful

5   Downtown today.  That happens from time to time.  We're ready to

6   continue.  Mr. Dobropolski, you remain under oath, of course.

7   Whenever you're ready, Mr. Martin.

8                  CONTINUED CROSS EXAMINATION

9   BY MR. MARTIN:

10  Q    Thank you, Your Honor.  Good morning, Mr. Dobropolski.  Do

11  you remember yesterday, Mr. Dobropolski, when we left, you and I

12  were talking about how after you got out of prison in October of

13  2003 you were working with the detectives, Detective Giganti and

14  others?  Do you recall that?

15  A    Right.

16  Q    And they were in charge of managing you as a cooperator, I

17  guess?  Is that a good way to say it?

18  A    Right.

19  Q    With Detective Giganti.  And who else was with him in doing

20  that?

21  A    Danny Fife.

22  Q    Was TFC Benson involved as well?

23  A    Yes, he was.

24  Q    Okay.  And before you were sent out to talk to Mr. Harris,

25  they would talk with you and give you some suggestions as to how

1    you might engage him in conversation?

2    A    I believe that's right.

3    Q    So that you would have a conversation with them and, and

4    then they would offer suggestions to you as to how you might get

5    him to say what you were trying to get him to say, correct?

6    A    Correct.

7    Q    And they were the ones who placed these taping and recording

8    devices on you?

9    A    Right.

10   Q    Now, there were some occasions, weren't there, when they

11   placed more than one recording device on you?

12   A    Yes.

13   Q    And one of them was a transmitter, I guess?  Did they

14   explain that to you?

15   A    No.  It was two devices.

16   Q    Was it always two devices when you were going to have a

17   meeting with Mr. Harris?

18   A    Yes.

19   Q    And when they placed them on you, then they would test them

20   before they sent you out, wouldn't they?

21   A    They would make sure they would actually turn on.

22   Q    And made sure they were working, right?

23   A    I think.  I'm not, because it wasn't, weren't in the same

24   vehicle when they were doing this.

25   Q    It wasn't the same what?  I'm sorry.  I didn't hear you.

1    A    Weren't in the same vehicle.  I was, I was with the

2    detective.  Then you had another detective in other vehicles that

3    I guess --

4    Q    So you were in different vehicles?

5    A    That's right.

6    Q    But you believe they were testing the devices before they

7    sent you in to met with Mr. Harris, to make sure they were

8    working, correct?

9    A    I think they were.  I'm not sure.

10   Q    It would actually be pretty stupid if they didn't, wouldn't

11   it?  You have to answer.  You can say yes or no or you don't

12   know.

13   A    I don't know.

14   Q    Now, was it on every time you personally met with Mr. Harris

15   they had two of these devices on you?

16   A    Yes.

17   Q    Okay.  And when they sent you to meet Mr. Harris, they told

18   you that they would have people watching you while this was

19   taking place, didn't they?

20   A    Right.

21   Q    And did they introduce you to the people who would be

22   watching you?

23   A    No.  Not all the time.

24   Q    But you knew that from the time you got out of the car and

25   walked in to, let's say the first day was October 27th, was it

1  not?

2  A    I think it was in October.

3  Q    And that was at Parole and Probation.

4  A    Yes.

5  Q    All right.  And the idea was you were to tell Mr. Harris

6  that you were there to see your probation officer, right?

7  A    Right.

8  Q    And you knew from the detectives that he would be there to

9  see his probation officer?

10  A    Right.

11  Q    And so this was a setup for you to meet him, right?

12  A    Yes.

13  Q    In fact, his meeting with his probation officer was

14  specifically arranged so that you could be there at the same

15  time, correct?

16  A    Yes.

17  Q    So they told you that people would be watching you from the

18  time you got out of the car and walked in, isn't that right?

19  A    Right.

20  Q    And they had people outside Probation and Parole and people

21  inside, correct?

22  A    Yes.

23  Q    And if you were to report on some odd thing that Mr. Harris

24  did, some odd movement that he may have made, then one of those

25  surveilling officers would have seen the same thing you saw,

1    correct?

2    A    I assume so.

3    Q    And so they watched you go in, they watched you while you

4    were in there, and they watched you when you came out, right?

5    A    Yes.

6    Q    Now, after you came out, they would talk to you, interview

7    you after you, after you -- let's take the meeting on October

8    27th.  You went in to Parole and Probation.  You found Mr.

9    Harris.  You had a conversation with him.  You were trying to

10   tape that conversation, correct?

11   A    Right.

12   Q    And you had a tape recorder that was turned on before you

13   went in, correct?

14   A    Yep.

15   Q    And you didn't turn it off, did you?

16   A    No.

17   Q    So it was on the whole time?

18   A    Right.

19   Q    And they were surveilling you, right?

20   A    Right.

21   Q    And then when you came out of Parole and Probation, you met

22   with Detective Giganti and others, correct?

23   A    Yeah, right.

24   Q    And they sat down and talked to you about what happened,

25   didn't they?

Case 1:04-cr-00029-RDB   Document 681   Filed 06/08/09   Page 11 of 280

1    A    Yes, they did.

2    Q    And they would debrief you, asked you what went on in there

3    and who said what to whom, right?

4    A    Right.

5    Q    And you would tell them?

6    A    Yes.

7    Q    And at that point, that was what was freshest in your mind.

8    That conversation was right after you came out, correct?

9    A    Correct.

10   Q    And they took notes, didn't they?

11   A    Yes, they did.

12   Q    Okay.  And sometimes when you had these meetings -- well,

13   strike that and let me start over.  On October 27th you met with

14   him personally, correct?

15   A    Yes.

16   Q    Now, there was another day when you met with him personally

17   and we heard the tape of that yesterday, didn't we?

18   A    Right.

19   Q    Was that December 1?

20   A    I'm not sure of the date.

21   Q    But it was the tape we heard yesterday?

22   A    I believe so.

23   Q    Okay.  And on both those occasions, you were wearing two

24   wires, correct?

25   A    Yes.

1    Q    And on both of those occasions, you were surveilled before

2    you went in, you were surveilled while you were in there, and you

3    were surveilled when you left, right?

4    A    Yeah.  But sometimes it was vehicles that were patrolling

5    like around Parole and Probation so it might have been a lapse

6    where they didn't actually see me.  You know what I mean?  They

7    might have two or three cars moving at the same time.

8    Q    Were they always in a car or were they sometimes in the

9    crowd?

10   A    Sometimes they were in the crowd.

11   Q    You don't know where they were on any particular day?  Just

12   that they were there, right?

13   A    Right.

14   Q    And so you've met with Mr. Harris personally on these two

15   occasions then?

16   A    Right.

17   Q    Was there a third occasion where you were wired up and met

18   with him?

19   A    I was attempting to meet with him.  But it never happened.

20   Q    Okay.  That -- I'm sorry.  I interrupted you.  Go ahead.

21   You were attempting to meet with him.  That was on November 5th,

22   wasn't it?  Do you recall that?

23   A    I'm not sure of the dates.

24   Q    You went down to somebody's house named Slow?

25   A    Right.

1    Q    And Slow was a person whose name Mr. Harris had given to

2    you?

3    A    That's right.

4    Q    And he gave you a phone number for Slow, right?

5    A    Yes.

6    Q    And the detectives traced that phone number to an address?

7    A    Yes.

8    Q    And then you went down to see Mr. Harris there, right?

9    A    Mr. Harris wasn't there.

10   Q    All right.  You saw some woman.  She identified herself as

11   Slow's sister?

12   A    Correct.

13   Q    All right.  And they were videotaping that day, weren't

14   they?

15   A    I'm not sure.  I had the recorders on but I don't know.

16   Q    You had the recorders on you?

17   A    Right.  I don't know if they were doing anything, any.

18   Q    And that day when you went to meet with him, you actually

19   never personally met with him, did you?

20   A    No.  I spoke to him over the phone.

21   Q    In fact, this woman who was Slow's sister called him on a

22   phone or got him on the phone and you talked to him on the phone

23   there?

24   A    Right.

25   Q    And then --

1    A    Actually, her brother, Slow, did.

2    Q    And then later on that day you talked to him on the phone,

3    right?

4    A    Right.

5    Q    Okay.  Now, after these meetings on October 27th and on

6    December 1, 2003, they would debrief you and you would, you would

7    tell them what happened.  And on some occasions you even wrote

8    down what happened.  And you did it right away, right after the

9    meeting, correct?

10   A    Yeah.  Within about 45 minutes, half an hour.

11   Q    And those were the notes that we were looking at yesterday

12   and that Mr. Harding was looking at with you as well?

13   A    Yes.

14        MR. HARDING:  Your Honor, I have to object to the dates

15   that Mr. Martin gave for those written statements.

16        THE COURT:  Well, again, counsel's questions are not

17   evidence, ladies and gentlemen.  It is the witness's answers to

18   counsel's questions that constitute the evidence.  As you've seen

19   in this trial, sometimes the lawyer will go on for quite a bit of

20   time and then there's a question mark.  And sometimes the witness

21   says yes, sometimes the witness says no.  Sometimes the witness

22   says, I don't know.  And there have been a few occasions when the

23   witness didn't say anything.  I'm not talking about this witness

24   in particular, but I'm talking about all witnesses.

25        So your attention is on the witness' responses to

Case 1:04-cr-00029-RDB   Document 681   Filed 06/08/09   Page 15 of 280

1    counsel's questions.  So when counsel throw dates at a witness or

2    times or occasions or sequences or all of that, it's the witness'

3    answer that you are interested in.  Go ahead, Mr. Martin.

4    BY MR. MARTIN:

5    Q    Thank you, Your Honor.  Just so there's no mistake.  You

6    were shown yesterday notes that you wrote on December 1, 2003,

7    immediately after you had a personal meeting with Mr. Harris,

8    correct?

9    A    Yeah.  I believe that was the date.

10   Q    And Detective Giganti asked you to write those notes,

11   correct?

12   A    Right.

13   Q    And then again, you have some notes that you wrote on

14   January the 8th, 2004, after a phone conversation with Mr.

15   Harris, correct?

16   A    I might have.  If you show it to me I'll let you know.

17   Q    Okay.  We'll get to that.  I'm just asking you some general

18   questions.

19          In general, all I said is sometimes you wrote down

20   after a meting what occurred at the meeting, correct?

21   A    Right.

22   Q    Other times you simply told Detective Giganti or others what

23   had happened, correct?

24   A    I think for the most part I wrote it down.  I'm not 100%

25   sure.

1    Q    Okay.  You always spoke to Detective Giganti after the

2    meeting, though, right?

3    A    Right.

4    Q    And he always debriefed you, correct?

5    A    And I think usually I would write, write things down.  I'm

6    not sure if it was every time, but I know it was the majority of

7    the time.  I'm not 100% sure.

8    Q    Well, do you know if you wrote anything down on October

9    27th?

10   A    I don't know.

11   Q    Mr. Harding?  Do you have notes for October 27th?

12        MR. HARDING:  Judge, the government has disclosed to

13   all defense counsel all of the discovery in this case, including

14   all possible statements of witnesses.

15        THE COURT:  Thank you, Mr. Harding.

16   BY MR. MARTIN:

17   Q    All right.  So if I don't have notes for October 27th, then

18   you didn't write it down, did you?

19   A    Probably not.

20   Q    Now, you had a chance, after you taped Mr. Harris, to listen

21   to these tapes?

22   A    No.

23   Q    So they never let you listen to them?

24   A    No.

25   Q    Never went over any of these tapes with you?

1    A    No.

2    Q    Detective Giganti didn't and Mr. Harding didn't, correct?

3    A    No.

4    Q    All right.  And did anybody ever tell you about the tapes?

5    Anybody ever tell you whether they were successful or not?

6    A    I think the only mention was, as far as the tapes were

7    concerned, was that Mr. Harris speaks real low and they had to

8    listen to it themselves or something.  So I'm not sure if the

9    tape was clear enough or if it came out or something like that.

10   But I remember they made mention that Mr. Harris speaks very low.

11   Q    So your understanding from the detectives was, was that

12   these efforts that you were making to tape him were not turning

13   out to be successful, is that right?

14   A    That wasn't my understanding.  My understanding was Mr.

15   Harris speaks low.  It was just, I don't know.  It was kind of

16   said.  It wasn't like, you know, I sat down, went over these

17   tapes, yeah, like we had a problem hearing his voice because he

18   speaks soft.

19   Q    All right.  And you listened to that tape yesterday, didn't

20   you?

21   A    Right.

22   Q    And except for a very few lines in that tape, you couldn't

23   hear anything, could you?

24   A    That's right.  Hear traffic and --

25   Q    You couldn't hear but you couldn't understand it, is what I

1  meant, right?

2  A    Yeah.

3  Q    Okay.  Now, but you, you ever listen to any of the telephone

4  tapes?  Any of the conversations of the tape?

5  A    I heard them but I didn't sit down and listen to them.

6  Q    They were pretty clear, weren't they?

7  A    Yeah.  It was -- right.  The recording was --

8  Q    Right there?

9  A    -- right in front of me.  Exactly.

10  Q    So you didn't have all that interference from people sitting

11  next to you and all the people in the crowd at Parole and

12  Probation, correct?

13  A    That's right.

14  Q    Okay.  Now, bear with me for a second, Your Honor.  In the

15  efforts that you made to record him, are you aware of a single

16  statement that got recorded where you could hear Mr. Harris

17  admitting that he killed Woody?

18  A    He confirmed it.  He didn't admit on tape.  I mean, he

19  confirmed.

20  Q    He confirmed it how?  In the tape we listened to yesterday?

21  A    Right.

22  Q    Okay.  Let's talk about that.  That was December 1, 2003,

23  correct?  And what you did that day was, your goal was to trick

24  him into an admission that he killed Woody, isn't that right?

25  A    Sort of, yeah.

1    Q    And by doing that, you told him that you had spoken to

2    someone else who had claimed to have killed Woody, correct?

3    A    Yup.

4    Q    And you say, you've testified that he responded by saying,

5    "he tried to claim my work", correct?

6    A    Right.

7    Q    And after this taping session, after you came out of it and

8    you spoke to Detective Giganti, he debriefed you about that

9    session, didn't he?

10   A    Sure.

11   Q    And did you tell Detective Giganti that what Mr. Harris said

12   is, "Someone is trying to claim my shit?"

13   A    I believe so, yeah.

14   Q    So either way, whether it's, he's trying to claim my work,

15   or someone's trying to claim my shit, as far as you're concerned

16   it's the same thing, right?

17   A    Basically the same thing, right.

18   Q    And then when we listened to the tape yesterday, what we

19   heard is Mr. Harris saying, "He's trying to claim that?"  Isn't

20   that right?

21   A    I can't remember the tape word for word.

22   Q    That's fine.  If you don't remember, you don't remember.

23   A    Don't remember.

24   Q    And that's the day, December 1, when, one of the days when

25   you were being surveilled before you went in, while you were in

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN 20

1    there at Parole and Probation, and when you came out, right?

2    A    Right.

3    Q    And that's the day that, Mr. Harris, when he came out,

4    walked over to the trash can and took his, his weapon.  I guess

5    it was a --

6    A    Box cutter.

7    Q    Box cutter?

8    A    Um-hum.

9    Q    One of those things that a blade slides out?

10   A    Right.

11   Q    Took his weapon out, right?  You saw him do that?

12   A    Right.

13   Q    Now, that particular tape, are you aware -- well, you

14   listened to it so you know how it turned out.  You can understand

15   very little on it, is that right?

16   A    Yeah.

17   Q    Is that a fair representation of the tape?

18   A    Fair.

19   Q    Now, what you were told by Detective Giganti or others was

20   not that the body wires, as we'll call them, those devices you

21   were wearing, not that they didn't turn out, but that because Mr.

22   Harris speaks so low you couldn't understand what he was saying,

23   right?

24   A    Right.

25   Q    And those conditions didn't apply, however, to your

1    knowledge, to those telephone conversations you were having,

2    isn't that right?

3    A    Right.

4    Q    And you never got any admissions on those phone

5    conversations, did you?

6    A    No.  I think, when I was having the phone conversation, I

7    was attempting to set up another meeting with Mr. Harris, to

8    engage him in --

9    Q    And you spent a lot of time trying to -- I'm sorry to

10   interrupt you.  To engage him in what?

11   A    Go ahead.

12   Q    To engage?

13   A    Try to engage him in more conversation about the murders.

14   Q    Okay.  Fair enough.

15   A    Phone conversation, we were just setting up another meeting.

16   Q    So during this process, you knew that if you were talking to

17   him on the phone, you were going to get a clear recording, didn't

18   you?

19   A    I assumed they were all clear, to be honest with you.

20   Q    But you knew that the phone recordings, from having listened

21   to them, were clear, didn't you?

22   A    Right.

23   Q    And you didn't get any admissions.  But let me ask you this.

24   On January the 8th, you had a conversation with Mr. Harris and

25   you claim that Mr. Harris told you that he was interested in

1    robbing people?  You told Detective Giganti that, didn't you?

2    A    Might have.

3    Q    Well, if I show you a report that was written by Detective

4    Giganti.

5    A    Okay.

6    Q    Assuming I can find it.  But it's here somewhere.

7         THE COURT:  Mr. Martin, I don't know that you need to

8    show it to him.  He says he might have.  And if you want to

9    represent to the witness.

10   Q    I will represent to the witness that Detective Giganti wrote

11   a report in which he said you told him that Mr. Harris told you

12   that he was interested in robbing people.  Do you accept that?

13   A    Yes.

14   Q    And he told you that on a taped telephone conversation, did

15   he not?

16   A    I'm not sure but that --

17   Q    Well, Detective Giganti --

18        THE COURT:  The witness wasn't finished answering the

19   question.

20   Q    You're not sure what?

21   A    I'm not sure.  But robbing, robbing other drug dealers is

22   what I was using to attempt to get him to meet with me again.  He

23   mentioned it the first time at Parole and Probation.  Actually,

24   it was one of the first things he said.  Something we spoke about

25   at Central Booking.  He said, what's up with the Ecstasy dealer

1    out in Delaware?

2    Q    Let me read to you --

3              THE COURT:  Sir, remove your cap, please.  Thank you.

4    Q    Let me read to you what Detective Giganti wrote.  It's the

5    DEA-6 from 1/9/2004, Mr. Harding.

6              MR. HARDING:  Objection.

7              THE COURT:  Sustained.

8    Q    So your testimony is, then, that you might have told him

9    that Harris was interested in robbing people, correct?

10   A    More than likely I did.

11   Q    And the conversations that you had on the telephone with Mr.

12   Harris were all recorded, were they not?

13   A    Yes.

14   Q    So if he told you that, and we could listen to the tape and

15   you would hear on that tape Mr. Harris saying he's interested in

16   robbing people, correct?

17   A    I assume so.  I'm just confused with the dates because I

18   don't know what was said on what date.  But if they have a

19   transcript of it.

20   Q    Detective Giganti has told us --

21             MR. HARDING:  Objection.

22             THE COURT:  Sustained.

23   Q    If Detective Giganti wrote a report that says --

24             MR. HARDING:  Objection.

25   Q    -- he taped you on that day --

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 24 of 280

1          THE COURT:  The objection is sustained.

2     Q    Your Honor, then I'll just call Detective Giganti because I

3     have the report right here.  That's what it says.

4          MR. HARDING:  Objection.

5          MR. MARTIN:  Could I have N-40, please?  Your Honor, we

6     have a tape that was made on January the 8th.

7          THE COURT:  All right.

8          MR. MARTIN:  Received from the government.  Telephone

9     call.  Mr. Flannery is going to play it for the jury.

10         THE COURT:  How long is it, Mr. Martin?

11         MR. MARTIN:  Your Honor, it's about three minutes long.

12         THE COURT:  Okay.  Is this one you have a transcript

13    for?

14         MR. MARTIN:  No, Your Honor.

15         THE COURT:  Okay.

16         MR. MARTIN:  I'll tell the Court, I'll make the

17    proffer, it's the only tape of all the telephone tapes.

18         THE COURT:  Okay.  All right.  Go ahead, you can play

19    it.  No objection.

20         (Tape playing.)

21    BY MR. MARTIN:

22    Q    Mr. Dobropolski, did you hear anything at all on that tape?

23    A    No, I didn't.

24         THE COURT:  Mr. Martin, can you pull the mike a little

25    closer to you, please?

Case 1:04-cr-00029-RDB   Document 681   Filed 06/08/09   Page 25 of 280

1    Q    Yes, Your Honor.  I think that was put there for people who

2    were doing the things this morning before court.

3             THE COURT:  All right.  Let me make sure we're all

4    following this.  The record will reflect that Mr. Flannery, Mr.

5    Martin's co-counsel, sitting at trial table, using his laptop,

6    activated something.  And we all heard coming through the sound

7    system here in the courtroom a low roar.  If anybody else wants

8    to offer a better description, I'm happy to have you do that.

9             MR. MARTIN:  That's fine, Your Honor.

10             THE COURT:  For, I don't know, a minute or two.  And

11    that's represented as what, Mr. Martin?

12             MR. MARTIN:  It was represented to us as a taped

13    telephone conversation between Mr. Dobropolski and Mr. Harris on

14    January the 8th, 2004.

15             THE COURT:  Okay.  All right.

16             MR. MARTIN:  It's Government's Exhibit MB-42, Your

17    Honor.

18             THE COURT:  All right.  Great.  Thank you.

19    BY MR. MARTIN:

20    Q    Now, you also wrote notes that day, didn't you, Mr.

21    Dobropolski?

22    A    I might have.

23    Q    Let me put something on the DOAR here and ask you if these

24    are your notes from that particular day.  You see the date there?

25    1/8/04?

1   A    Yes.

2   Q    It says you called Mr. Harris, correct?

3   A    Yep.

4   Q    You asked Mr. Harris if he would meet with you, correct?

5   A    Yes.

6   Q    He agreed to meet with you, didn't he?

7   A    Yes.

8   Q    And you were going to meet him at the subway at Mount Claire

9   Junction?

10  A    Yes.

11  Q    All right.  And you asked him what he's been up to and he

12  told you he was up to nothing, correct?

13  A    Yes.

14  Q    And you added, of course, that meant that he was not

15  hustling, correct?

16  A    Right.

17  Q    But what he told you was, what are you up to, and the answer

18  was nothing, right?

19  A    Correct.

20  Q    And he told you he was on welfare, didn't he?

21  A    That's what he said.

22  Q    And then you claim that you told Mr. Harris that you have a

23  robbery set up, correct?

24  A    Right.

25  Q    And it's important that you be able to get a hold of him,

1    correct?

2    A    Sure.

3    Q    And that you wanted to get a hold of him at the time the

4    robbery was to happen, correct?

5    A    Right.

6    Q    And you gave him your phone number, right?

7    A    Right.

8    Q    And Mr. Harris's response was what?  I'm playing Play

9    Station?

10          THE COURT:  You need to push it up, Mr. Martin.

11   Q    I'm sorry.

12          THE COURT:  That's all right.

13   A    That's what I wrote.

14   Q    So in other words, his response to your request to rob

15   somebody is to tell that you he was playing Mortal Kombat on Play

16   Station II?

17   A    Um-hum.

18   Q    And he also explained to you that it might be hard for him

19   to find transportation to any meeting with you, right?

20   A    Yeah.  For are meeting, I think, in particular.

21   Q    And you said you would try to find him a ride?

22   A    Right.

23   Q    Now, Mr. Dobropolski, is it fair to say that in all these

24   attempts that you were making to get together with Mr. Harris

25   that he was ignoring you?

1    A    No.

2    Q    He never, he never met with you after that, did he?

3    A    No, he didn't.  We scheduled another meeting date and, I

4    think it might have been the following day, for the following day

5    or the day after.

6    Q    And his, his --

7              MR. HARDING:  Objection.  I don't think the witness --

8              MR. MARTIN:  I think he was finished, Your Honor.

9              THE COURT:  I thought he was.  Were you finished, Mr.

10   Dobropolski?

11             THE WITNESS:  No.

12             THE COURT:  All right.  Go ahead.

13             THE WITNESS:  We were scheduling another meeting date,

14   I think for the following day or the day after.  But the whole

15   thing started like when I first met him at Parole and Probation.

16   The first thing he said to me was something about the Ecstasy

17   dealer, trying to rob him.  And on the tape that we listened to

18   yesterday, you really can't hear it but that's one of the things

19   we were discussing.

20   BY MR. MARTIN:

21   Q    You can't hear it, correct?

22   A    You can't hear it.  But that's why I was using the whole

23   robbery thing to set up another meeting with him.  He kept

24   explaining he was having problems finding a ride.  And I offered

25   to find him a ride.  I think it was that Friday, maybe during

1    that week, that he was arrested.

2    Q    So over a period of, let's say November, December, a couple

3    weeks in January, he told you on at least a half a dozen

4    occasions that he couldn't get a ride, right?

5    A    I don't think it was that many times.  I think it was really

6    with this phone conversation.

7    Q    You think it was only once on that phone conversation that

8    he told you he couldn't get a ride?

9    A    I'm not sure.  I know he didn't have transportation.  So I

10    mean, he would have to find a ride.  He may have said it a couple

11    times.  I'm not 100%.

12    Q    With all of the police officers working with you --

13    A    Right.

14    Q    -- you could have gotten a car and gone to get him, couldn't

15    you?

16    A    They didn't want that to happen.

17    Q    You could have gotten a car and gotten to him if they had

18    wanted it to happen, couldn't you?

19    A    Sure.  But there's a reason they didn't want that to happen.

20    Q    You could have, though, couldn't you?

21    A    I could have went and saw him myself, and they didn't want

22    that to happen, either.

23    Q    You could have gone to see him and they could have

24    surveilled you, correct?

25    A    Right.  But there was a reason they didn't want that to

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 30 of 280

1    happen.

2    Q    Didn't happen, did it?

3    A    No, it didn't.

4    Q    Okay.  Now, you called Mr. Harris on November 3rd and

5    November 5th and you couldn't get him, is that right?

6    A    There was a couple occasions I couldn't get in touch with

7    him.

8    Q    And then the one time you actually went to see him at Slow's

9    house.  And you couldn't get him there and you got him on the

10   phone instead, right?

11   A    Right.

12   Q    Okay.  Now, when you, the day that you got him on the phone,

13   I suggest to you it was, I believe there's a report of November

14   the 11th, 2003.  You actually got him on the phone after, later

15   the same day where she put you on the phone with him when you

16   were at her house, at Slow's house?

17   A    Right.

18   Q    Later that day, you and he talked on the phone?

19   A    Yes.

20   Q    Correct?

21   A    Um-hum.

22   Q    And if we could have N-28 playing.  What government exhibit

23   number is that?  It looks like MB-40D, Your Honor, would be the

24   government exhibit.  MB-40D?

25            THE COURT:  Very well.

1   Q    I'm relying on Mr. Flannery to be right about that.

2            THE COURT:  Right.

3            (Tape played.)

4   BY MR. MARTIN:

5   Q    Mr. Dobropolski, that telephone tape was pretty clear,

6   wasn't it?

7   A    Yes.

8   Q    Compared to some of the others that we've heard, right?

9   A    Right.

10  Q    And you have him, actually have him on the topic of Bo still

11  being locked up, for, I think, what Mr. Harris said, was, quote,

12  "the same shit", unquote?

13  A    Right.

14  Q    And you say that he told you he was going to bet that rap,

15  correct?

16  A    Right.

17  Q    And Mr. Harris said, well, he's still fighting, right?

18  A    Right.

19  Q    He didn't say anything else about it, did he?

20  A    Nope.

21  Q    And you didn't take that opportunity to bring up what Mr.

22  Harris had told you, what you say he told you in the prison, did

23  you?  You could have done it right then, couldn't you?

24  A    What Mr. Harris told me in prison?  What are you exactly

25  talking?  What he told me --

1   Q    The story that you told about Mr. Harris and Bo having

2   committed this murder of Woody.  You didn't take the opportunity

3   to bring it up there, did you?

4   A    Not over the phone, no.

5   Q    Pardon me?

6   A    Not over the phone.  It wouldn't have been right.

7   Q    Over the phone it wouldn't have been right?

8   A    Nah.

9   Q    It would have been a lot clearer, though, wouldn't it?

10  A    Yeah.  It might have thrown some red flags and prevented me

11  from getting it later.

12  Q    But that was the perfect opportunity for you to say

13  something about it, wasn't it?

14  A    It wasn't perfect.  Not in my view, it wasn't.

15  Q    So on these taped conversations, you never mentioned,

16  because you didn't think it was the right place to do it, this

17  so-called double homicide, did you?

18  A    No.

19  Q    Just so I'm clear, Mr. Dobropolski.  When you testified in

20  the grand jury on October the 14th, 2003?  Does that sound right?

21  November the 14th, November the 14th, 2003.  When you testified

22  there, what you testified about was what information that you say

23  you got from Mr. Harris and Mr. Mitchell, correct?

24  A    Right.  I think it was the 19th, wasn't it?

25  Q    Whatever it is.  The 19th or the 14th.  I don't have it in

1    front of me.  But it was in November, correct?

2    A    Right.

3    Q    Okay.  And everything that you testified about in there is

4    information that you got from Mr. Harris and Mr. Mitchell and not

5    from anybody else, correct?

6    A    I believe that's right.

7    Q    And everything you've testified here today you say is

8    information you got from Mr. Harris and Mr. Mitchell and not from

9    anybody else, correct?

10    A    Right.

11    Q    Thank you, Mr. Dobropolski.

12    A    You're welcome.

13            THE COURT:  Would you like some water, Mr. Dobropolski?

14            THE WITNESS:  No, I'm fine.

15            CROSS EXAMINATION

16    BY MR. LAWLOR:

17    Q    Sir, good morning.

18    A    Good morning.

19    Q    Do I understand your testimony to be that when you were

20    incarcerated, you were known to be some sort of an enforcer?

21    A    Right.

22    Q    Okay.  And is that the truth, that's what you fashioned

23    yourself as?  This wasn't just chatter on the tier.  This is

24    person that you were, an enforcer?

25    A    Well, that's, the original Homicide detective kind of

1    labeled me as that.

2    Q    I'm not concerned with what other people labeled you.  I'm

3    concerned with what you are, who you are.  So my question to you

4    is, was that what you did on the street, enforce for drug

5    traffickers?

6    A    I collected money for people, yeah.

7    Q    Okay.  Have you ever described yourself in the grand jury,

8    say, or in a statement you gave to detectives as an enforcer?

9    Not a debt collect or, but as an enforcer?

10   A    Right.

11   Q    You have characterized yourself as such?

12   A    Yes.

13   Q    Okay.  And that's because that's the truth?  In the times,

14   in the infrequent times that you weren't in jail, you enforced

15   for drug traffickers?

16   A    Right.

17   Q    Okay.  And who were these folks?

18   A    Drug dealers.  Anybody.

19   Q    Who?

20   A    Several of them.

21   Q    Okay.  Do these several of them have names?

22   A    Yes, they do.

23   Q    Would you please provide them to me?

24   A    Paul Kratsis.

25   Q    Pardon me?

1    A    Paul Kratsis.

2    Q    Paul Kratsis?

3    A    Yes.

4    Q    Okay.  Where does he reside?

5    A    I think Lewisburg.  He has life and 30.

6    Q    You're going to have to speak more clearly.

7    A    I think he's in Lewisburg.

8    Q    Okay.  He's doing sometime in jail now currently?

9    A    Right.

10   Q    Where was he residing when you were enforcing for him?

11   A    South Baltimore.

12   Q    All right.  Who else?

13   A    Kenneth Dovell.

14   Q    Pardon me?

15   A    Kenneth Dovell.

16   Q    Okay.  Where did Mr. Dovell reside when you were enforcing

17   for him?

18   A    Southwest Baltimore.

19   Q    All right.  Anyone else?

20   A    They were the main two.

21   Q    Main two.  But there was some others you maybe did a little

22   contract work for?

23   A    Anybody.  Nobody I can give you the names to.

24   Q    All right.  Just can't remember now?  So these other folks,

25   they may or may not be in jail or may or may not be in South

1    Baltimore now?

2    A    That's right.

3    Q    No one you want to incriminate while you sit here today,

4    right?

5    A    That's right.

6    Q    All right.  So enforcing, what do we do?  How do we enforce

7    for a drug dealer?  What does that involve?

8    A    It involves somebody who owes some money, they ask me to go

9    collect it.

10    Q    All right.  And in what fashion do you go collect it?

11    A    I can go ask.

12    Q    You go ask.  Sir, I've been sent by Mr. Kravitz, I

13    understand that you owe him a debt, may I have it, please?

14    A    That's it.

15    Q    That's it?  And they fork over the money to you because of

16    your charming disposition?

17    A    That's right.

18            MR. HARDING:  Objection.

19    Q    Okay.  How old are you, sir?

20            THE COURT:  Overruled.

21    Q    How old are you?

22    A    37.

23    Q    How tall are you?

24    A    Five-ten.

25    Q    How much do you weigh?

1  A    170.

2  Q    All right.  You've been in jail the better part of your

3  life?

4  A    That's right.

5  Q    Three hots and a cot?

6  A    Yep.

7  Q    What else do you do while you're locked up?

8  A    Lift weights.

9  Q    So you're a pretty big guy?

10 A    I'll all right.

11 Q    Pretty tough guy?

12 A    Some say so.

13 Q    All right.  Some of your ex-girlfriends would say so, right?

14 A    Right.

15        MR. HARDING:  Objection.

16        THE COURT:  Sustained.

17 Q    All right.  So on the occasion when your charming

18 disposition --

19        MR. HARDING:  Objection.

20 Q    Does not entice a debtor to give their money over you, what

21 other means do you use to get that money?

22        MR. HARDING:  Objection.

23        THE COURT:  Overruled.  You may answer.

24 Q    Pardon?

25 A    All I have to do is ask them.

1    Q    All you have to do is ask?

2    A    That's right.

3    Q    Wow.  You must be pretty tough?

4    A    Yup.

5         MR. HARDING:  Objection.

6         THE COURT:  Sustained.

7    Q    So how many times have you had --

8         THE COURT:  Put your questions properly, Mr. Lawlor.

9    Q    Yes, sir.  How often have you had to undertake this task of

10   debt collecting for drug traffickers?

11   A    I don't know.

12   Q    Give me a ballpark.

13   A    Couldn't count.

14   Q    More than ten?

15   A    Yes.

16   Q    More than 20?

17   A    Yep.

18   Q    More than 30?

19   A    Probably.

20   Q    More than 50?

21   A    I doubt it.

22   Q    Between 30 and 50?

23   A    Right.

24   Q    Okay.  So on 30 to 50 times you enforced or collected a debt

25   for a drug trafficker, and on each of those occasions you asked

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 39 of 280

1    for money from the individual politely, according to you, and it

2    was turned over to you?

3    A    Most of the time.

4    Q    All right.  What percentage of the time was that manner

5    effective?

6    A    A majority of the time.

7    Q    All right.  So there was a minority of the time where we had

8    to resort to other means?

9    A    Yup.  Physical altercations.

10   Q    All right.  Here we go.  Now we're getting to the rub.  What

11   did those physical -- how did you characterize that?

12   A    Physical altercations.

13   Q    All right.  What did that physical altercation involve?

14   A    A fight.

15   Q    Whaling on someone's face with your fists?

16   A    Yep.

17   Q    All right.  Breaking a few ribs?

18   A    Could.

19   Q    All right.  You use a gun?

20   A    No.

21   Q    Carry a gun?

22   A    Have I ever carried a gun?

23   Q    When you were enforcing or debt collecting or whatever it is

24   you would like to characterize it as, did you carry a gun?

25   A    No, I didn't.

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 40 of 280

1    Q    All right.  Have you sold drugs?

2    A    Yes, I have.

3    Q    All right.  And you work for drug dealers?

4    A    Right.

5    Q    And I trust, then, that you're familiar with how the game

6    works?

7    A    Yep.

8    Q    So you're probably aware of the fact that drug dealers carry

9    guns?

10   A    Right.

11   Q    All right.  So even though you're five-ten and 170 and you

12   got your jail house muscles, you were never concerned that when

13   you went to collect a debt from someone they might have a gun?

14   A    Nope.  Because the majority of the time I knew the people

15   that owed it.

16   Q    And they didn't carry guns?

17   A    Nope.

18   Q    All right.  So you never needed to carry a gun?

19   A    Nope.

20   Q    All right.  So by the time you got to jail, you're saying

21   that on the tier your reputation was as a tough guy?

22   A    That's it.

23   Q    All right.  Now, let me ask you a question.  Mr. Martin made

24   reference to the fact that you've spent the majority of your

25   adult life incarcerated, is that right?

1   A    Yep.

2   Q    All right.  And it sounds like, without getting into the

3   specifics, that you just, you've been convicted of many crimes?

4   A    Right.

5   Q    All right.  And when you're released, you're released to

6   either probation or parole?

7   A    Right.

8   Q    And you've had not much success obeying the conditions of

9   either probation or parole?

10  A    That's right.

11  Q    Which leads to re-incarceration?

12  A    That's right.

13  Q    And you use drugs?

14  A    Right.

15  Q    And when you're on probation or parole you're required to,

16  number one, report to an officer, correct?

17  A    Yep.

18  Q    And number two, provide urine samples?

19  A    Correct.

20  Q    To determine whether or not you're refraining from the use

21  of drugs, right?

22  A    That's correct.

23  Q    Because that's always a condition of your probation or

24  parole?

25  A    Yeah, for the -- not all the time.  Yeah.

1   Q    Most of the time?

2   A    Most of the time, yeah.

3   Q    And it sounds like you haven't had much success either

4   reporting or providing clean urine, right?

5   A    That's right.

6   Q    All right.  And therefore, you've been unable to stay out of

7   jail?

8   A    Right.

9   Q    All right.  So now the conversations that you've relayed to

10  the jury that you purportedly had with Mr. Harris took place in

11  August of 2002, right?

12  A    That's right.

13  Q    At the Central Booking Facility, at jail, pretrial facility

14  here in the City of Baltimore and the State of Maryland, right?

15  A    Yep.

16  Q    All right.  And you were incarcerated.  And this is off of

17  the eight year sentence you were serving in bits and pieces,

18  right?

19  A    Right.

20  Q    An eight year sentence you got for domestic violence?

21  A    Right.

22  Q    For beating a woman?

23  A    Right.

24  Q    Okay.  Not the only time you've done that, though, right?

25  A    No.

CROSS EXAMINATION OF DOBROPOLSKI BY LAWLOR                43

1    Q    All right.  Let me ask you this question.  How many times

2    have you been convicted of a crime?

3    A    I have no idea.

4    Q    Roughly.

5    A    20.  25.

6    Q    Twenty times?

7    A    Yeah.

8    Q    All right.  Let me ask you this question.  In order to get

9    convicted 20 times, how many crimes do you need to commit to get

10   convicted that many times?

11   A    No.  Well, they're plea agreements.  Cop out to six charges,

12   we'll throw four out.  I'm trying to think of how many

13   convictions I have.  It's not like separate cases.

14   Q    All right.  How many separate occasions?

15   A    I still don't know.  It's a lot.

16   Q    Give me a ballpark for that one.

17   A    Can't tell you.  Maybe 10, 12.

18   Q    Maybe ten?  Is ten a fair estimate in your mind of the

19   number of times you've been to court and entered a guilty plea to

20   some crime or crimes?

21   A    About 10, in between 10 and 15.

22   Q    All right.  Between 10 and 15.  Now, my question is, when

23   you go before a judge and you say, I've committed the crime of

24   beating my girlfriend or stealing someone's car or selling drugs

25   or pounding on someone's face, you need to have committed that

1    act, right?

2    A    Not all the time.  I just sometimes think it's better

3    because it's a whole rack of charges.  They offer me a good deal,

4    I just take it.

5    Q    All right.  My point is, though, typically you've committed

6    some act that violates the laws of society and man in order to

7    put yourself before the judge in the first place?

8    A    That's right.

9    Q    All right.  And you need to have been arrested in order to

10   find yourself in this predicament?

11   A    That's right.

12   Q    And every time you've committed a crime in your life, that

13   has not resulted in either an arrest or a conviction, right?

14   You're not that unlucky, are you?

15   A    No.

16   Q    Okay.  So here we go.  Here's my question.  How many crimes

17   do you need to commit in order to end up with 10 to 15

18   convictions?

19            MR. HARDING:  Objection.

20            THE COURT:  Sustained.

21   Q    All right.  Let me ask you this.  In the five years

22   preceding August of 2002, how much time had you spent on the

23   street?

24   A    Maybe four years, five years.

25   Q    You sure about that?  You spent -- let me ask you the

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 45 of 280

1    question again.

2    A    From time I was when?  18?

3    Q    No, no, no.  Let me ask the question again.  In the five

4    years preceding 2002 --

5    A    Right.

6    Q    -- the time period of 1997 to 2002, over those five years

7    how much time had you spent on the street?

8    A    I'm not sure.  Maybe a couple years.

9    Q    Two out of five?

10   A    Something like that maybe.

11   Q    Could be less, though, right?

12   A    Right.

13   Q    Could be a lot less, right?

14   A    Could be.

15   Q    Because even as we sit here today in 2008, over a period of

16   20 years, you've only spent under five of those on the street,

17   right?

18   A    I guess.

19   Q    All right.  Well, don't guess.

20   A    Well, I don't know about today.

21   Q    This is your life.  You must know.

22            MR. HARDING:  Objection.

23   A    I mean, if you got the answer, tell me.

24   Q    No, no.  I don't have the answer.  I want to know if you

25   have the answer.

1  A    And I'm telling you I don't know.

2  Q    All right.  You don't know how much time you spent on the

3  street in the last 20 years?

4  A    That's right.

5  Q    All right.  But --

6  A    Maybe five, six.

7  Q    But you're going to accept my representation it's less than

8  five years?

9  A    If that's --

10        THE COURT:  The witness said five to six.

11  Q    Okay.  It's five to six, and that's your recollection?

12  A    Right.

13  Q    And some of that time, though, was after you worked out this

14  deal with the detectives in order to go and make these

15  unintelligible recordings of Mr. Harris, right?

16  A    Right.

17  Q    Okay.  And how much time was that out of the five to six

18  years?  About eight months?

19  A    Maybe.

20  Q    Okay.

21  A    I think.

22  Q    So notwithstanding the fact that you've been in jail the

23  majority of your life as of August of 2002, you still had a big

24  rep at the, at Central Booking for being an enforcer?

25  A    Right.

1    Q    Okay.

2    A    Being able to fight.

3    Q    Pardon me?

4    A    For being able to fight real well.

5    Q    Being able to fight real well?

6    A    Most of the people that were on that tier were in prison

7    with me.

8    Q    Fight like not Marcus of Queensbury, but fight in jail with

9    your fists?

10   A    That's right.

11   Q    In jail or out of jail?

12   A    In jail and out of jail.

13   Q    All right.  Now, is this a reputation that you earned inside

14   the jail from fighting inside the jail?

15   A    Outside and inside.

16   Q    All right.  So you would be in prison, still fighting with

17   the other inmates?

18   A    Right.

19   Q    All right.  Now, let's talk about -- you're at Central

20   Booking in August of '02?

21   A    Right.

22   Q    How many inmates there?

23   A    I don't know.

24   Q    Roughly?

25          THE COURT:  Mr. Lawlor, please be careful with the

1    water around the equipment.

2    Q    I won't spill.

3    A    I guess 40 or 50 on each side.

4    Q    How many?

5    A    Maybe 40 or 50.

6    Q    40 or 50 total inmates in all of Central Booking?

7    A    No, I'm saying on my tier.  I don't know how many at Central

8    Booking.

9    Q    All right.  How many tiers there are?

10   A    A lot.

11   Q    All right.  Lot of tiers, lot of inmates.  All right.  We

12   won't worry about the number.  A lot of men are in jail?

13   A    That's right.

14   Q    Okay.  And sadly, most of these men are there for having

15   committed crimes?

16   A    Right.

17   Q    Right?  Baltimore City's a tough place, right?

18   A    Either way.

19   Q    I can't understand you.  Yes or no?

20   A    Either way.

21   Q    Do you agree?

22   A    I have no idea.  I don't know --

23   Q    You live here.  Do you agree with that proposition?

24   A    I don't know what somebody's in jail for, if they did or

25   didn't do it.

1    Q    That wasn't the question.  Do you understand Baltimore City

2    to be a tough place?  The city itself?

3    A    It can be.

4    Q    Can be.  Right?  A lot of drug trafficking.  Too much drug

5    trafficking, right?

6    A    That's right.

7    Q    A lot of murders, right?

8    A    Yep.

9    Q    Okay.  But you've got this big rep as a fighter, right?

10   A    Um-hum.

11   Q    All right.  And is this something that, that you earned on

12   the tier by spreading your own rep or this was something that

13   just accrued to you because you're so known?

14   A    Yeah.  That's about right.

15   Q    Which?

16   A    I'm known.  I'm known in prison for fighting and I'm known

17   on the street for fighting.

18   Q    Okay.  But you don't carry a gun?

19   A    Nope.

20   Q    Never killed anyone?

21   A    Nope.

22   Q    Just beat a few people with your fists?

23   A    That's right.

24   Q    Which was the minority of the occasion, though, right?

25            MR. HARDING:  Objection.

1          THE COURT:  Rephrase the question.

2     Q    All right.  Didn't you tell us that of the 30 to 50 times

3     you had to enforce for someone or collect a debt, your charming

4     disposition and your salesmanship had made someone turn over

5     their cash to you without the need for physical force?  Didn't

6     you say that?

7     A    I'm talking --

8               MR. HARDING:  Objection.  Objection.

9               THE COURT:  The objection is overruled.  You can answer

10    and explain, Mr. Dobropolski.

11    A    I'm talking about in general, barroom fights, fights on

12    corners.  Like you said, Baltimore is a tough place.

13    Q    All right.  So you, your testimony is that the Central

14    Booking facility and the City of Baltimore --

15    A    Right.

16    Q    -- you've got a big time rep because you're a barroom

17    brawler?

18    A    Known for being able to fight.

19    Q    That's your testimony?  Pardon me?

20    A    Known for being able to fight very well.

21    Q    Okay.  All right.  Now, you were in a tier with Mr. Harris?

22    A    Right.

23    Q    You were on the tier with him and --

24    A    In the cell.

25    Q    -- in the cell with him?

1    A    Right.

2    Q    Okay.  And your testimony was, either when being questioned

3    by Mr. Harding or Mr. Martin, I forget whom, that Mr. Harris had

4    not heard of you, that you had a rep in general, but that Mr.

5    Harris had not heard of you?  Am I summarizing your prior

6    testimony?

7    A    Had not heard of me?

8    Q    Had not.

9    A    He had heard of me before I got there.

10   Q    Harris had.  Okay.  But Mr. Mitchell had not, right?  He

11   only heard of you through an introduction --

12   A    Through Mr. Harris.

13   Q    Pardon me?

14   A    Through Mr. Harris, right.

15   Q    All right.  So Mr. Mitchell had never heard of you?

16   A    Right.

17   Q    All right.  And you'd never heard of him?

18   A    Nope.

19   Q    And you weren't in a cell with him?

20   A    No, I wasn't.

21   Q    All right.  So you talked to -- obviously, you lived in a

22   cell 24/7 with Mr. Harris, right?

23   A    That's right.

24   Q    So you get to chitchatting about things?

25   A    Yep.

1    Q    All right.  And according to you, your testimony is that he

2    disclosed to you about this homicide in some detail, right?

3    A    Right.

4    Q    And we have your testimony and your testimony alone that on

5    top of disclosing this information to you, he also said that Bo

6    essentially put him up to this?

7              MR. HARDING:  Objection.

8              THE COURT:  Overruled.  You may answer.

9              MR. HARDING:  Objection as to "his testimony alone",

10   Your Honor.

11             THE COURT:  The jury has been told repeatedly,

12   counsel's questions are not evidence.

13             THE WITNESS:  Right.

14   BY MR. LAWLOR:

15   Q    All right.  You say that Mr. Harris told you that he

16   committed this crime by his own hand, correct?

17   A    Correct.

18   Q    With the assistance of no one, correct?

19   A    Assistance of Bo.  He said he gave him the gun.

20   Q    Gave him the gun, all right.  But as he was physically

21   present in this vehicle, according to you, he was on his own?

22   A    Correct.

23   Q    All right.  And according to you, Mr. Harris told you that

24   Bo gave him a gun and induced him to commit this crime?  That's

25   your testimony.  That's what Mr. Harris told you, right?

1    A    Um-hum.

2    Q    All right.  And now you did not, were you even on the same

3    tier as Bo?

4    A    I was on the same floor but different, he was on the other

5    side.  Like the only time I would see him is rec time.

6    Q    All right.  How often was rec time?

7    A    Once every other day.

8    Q    And this was out in the yard of some sort?

9    A    Right.

10    Q    And how many inmates would be out on the yard during rec

11    time at any given time?

12    A    Maybe 30.

13    Q    All right.

14    A    20 to 30.

15    Q    And how many times, you only talked to Bo like two times,

16    right?

17    A    Right.

18    Q    All right.  And the first time was sort of, how's the

19    weather, did you catch the Ravens game, unimportant things of

20    that ilk, right?

21    A    Right.

22    Q    No confessions to murder that time?

23    A    Nope.

24    Q    All right.  But then, the second time he's ever seen you,

25    you don't know him, he doesn't know you.  Because of your

1    reputation as a tough barroom thug, your testimony is, in this

2    courtroom under oath, that Mr. Mitchell confessed to you to a

3    homicide?

4    A    Told me he put work in, yes, that's right.

5    Q    Put work in, which you took to mean he committed homicides?

6    A    That's what we were discussing at the time, right.

7    Q    All right.  Who else was around to hear this jailhouse

8    confession?

9    A    Myself and Mr. Mitchell.

10   Q    Just the two of you?

11   A    That's right.  Standing off to the side.

12   Q    Wow.  Too bad we don't have anyone else who can corroborate

13   that, huh?

14           MR. HARDING:  Objection.

15           THE COURT:  Sustained.

16   Q    All right.  Now, Mr. Martin said that -- if you could

17   clarify something for me.  That when you originally went to

18   discuss this with the police, you didn't know the name of the

19   male victim, right?

20   A    No.

21   Q    All right.  But later you were able to provide that

22   information?

23   A    That's right.

24   Q    Which means, I assume, that someone provided that

25   information to you?

1    A    Yeah.

2    Q    Not Mr. Harris nor Mr. Mitchell?

3    A    No.

4    Q    A member of the law enforcement community?

5    A    Do I remember the law enforcement community?  What do you

6    mean?

7    Q    What was that information provided to you by a member of the

8    law enforcement community?

9    A    I think it was mentioned, and that's how I got the name.

10   Q    I didn't understand that.

11   A    I think it was mentioned while they were actually

12   interviewing me.

13   Q    By whom?

14   A    I think Tommy Mallin and --

15   Q    All right.  Whatever salient details were provided --

16           THE COURT:  Let him finish the answer.

17   Q    I'm sorry.

18   A    Detective Niedermeier and Tommy Mallin.

19   Q    Did Detective Niedermeier or any of these other officers

20   provide you with other salient details about the story that

21   you're telling today?

22   A    No.

23   Q    No?  All right.  Where did you go after you left Central

24   Booking?

25   A    JI building.  City Jail.

1    Q    All right.  Entirely separate facility?

2    A    That's right.

3    Q    After August of 2002, how much longer were you at Central

4    Booking?

5    A    Maybe another couple weeks.  Week or so, something.

6    Q    All right.  Who left first?  Yourself or Mr. Harris?

7    A    Mr. Harris went.  I went like a week after him, I think.

8    Q    All right.  But Mr. Mitchell was still there?

9    A    Yep.

10   Q    But he refrained from disclosing to you other criminal

11   activities he committed during that week you were both there?

12   A    After the last time we had a conversation, I think it was

13   maybe the following day or the day after, I was transferred to

14   JI.  So he was still in Central Booking, I was in another part of

15   the jail.

16   Q    All right.  And how long were you in -- is JI part of the B

17   triple C, Baltimore City Correctional facility?

18   A    Steel side.

19   Q    Pardon me?

20   A    It's the older part of City Jail.  Central Booking is the

21   newer.

22   Q    All right.  But it's a separate facility from Central

23   Booking but it's part of the City Jail.  All right.  So you were

24   there for how long?

25   A    I think maybe another few weeks.

1    Q    All right.  And then where did you go?

2    A    Baltimore County Detention Center.

3    Q    How long were you there for?

4    A    I think two weeks.

5    Q    And then where did you go?

6    A    I was given my eight year sentence back and I went to WCI,

7    Washington Correctional Facility.

8    Q    All right.  And how long were you at WCI for?

9    A    I'm not really sure.

10   Q    All right.  It was at WCI that your conscience got the

11   better of you and you decided to come forth with this

12   information, right?

13   A    No.  As soon as he told me, I was thinking about it.

14   Q    All right.  But your conscience didn't overwhelm you to come

15   forward with this information until you're at WCI, right?

16   A    That's when I actually wrote the letter, WCI.

17   Q    All right.  So that was about, that was in May.  You first

18   wrote a letter in May to the judge, right?

19   A    I think it was May.

20   Q    And these conversations purportedly occurred in August,

21   right?

22   A    Yep.

23   Q    And so it was nine months later that you wrote the letter?

24   A    Right.

25   Q    At which time you remained incarcerated?

1   A    Yes.

2   Q    You remained incarcerated at several different facilities?

3   A    Well, yeah.

4   Q    Talking to other inmates during those nine months?

5   A    Right.

6   Q    Having several different cell mates?

7   A    Sure.

8   Q    Being exposed to the word on the street?

9   A    Not concerning this.

10  Q    No?  All right.  So while you're in jail for these nine

11  months, do you and your other inmates discuss the affairs of the

12  World Bank or do you discuss other criminal endeavors?

13          MR. HARDING:  Objection.

14          THE COURT:  Sustained.

15  Q    What do you discuss with your other inmates while you're

16  incarcerated?

17  A    Anything.

18  Q    Such as?

19  A    Sports, whatever.  I mean, it could be anything.  General

20  conversation like I would have with someone on the street.

21  Q    All right.  Criminal activity?

22  A    That, yeah.  Sometimes, right.

23  Q    Court's indulgence, please.

24          (Pause in Proceedings.)

25  Q    I'm sorry.  I got distracted there for a minute.  You talk

1    about other criminal activities, though, right?

2    A    Right.

3    Q    Okay.  And so ultimately you decided, though, to write a

4    letter to --

5    A    Judge Byrnes.

6    Q    Judge Byrnes.

7    A    Right.

8    Q    Okay.  And then there was no follow-up?  You didn't hear

9    anything on that?

10   A    Nope.

11   Q    You wrote a second letter?

12   A    Yes, I did.

13   Q    And that was in September?

14   A    Yeah.

15   Q    Okay.

16   A    Same year.

17   Q    Forgive me for skipping around.  You mentioned that you were

18   provided by Detective Niedermeier the fact that Woody was the

19   name of the male victim?

20   A    I think he was discussing it with Detective Mallin.

21   Q    Okay.  So was this a conversation about what happened, to

22   whom it happened, too?  What happened?

23   A    No.  Actually, I was given the photo arrays, whatever, and I

24   told them what I knew, this and that.  And I think they were

25   discussing something about the name "Woody" or whatever, with one

1    of the victims.

2    Q    You're saying the other law enforcement officers were, in

3    your presence, discussing some of the facts of the crime?

4    A    Not the facts of the crime.  The name of the person.

5    Q    All right.  Well, I assume the conversation was more than,

6    Woody got shot, right?  It had to be some context, I assume.

7    A    I really can't remember.  I don't think it was anything

8    major.  It's just when he said "Woody", it stuck out to me

9    because I know a dude named Woody.

10   Q    So nothing major like maybe other than the name of the

11   victim who got shot first, something like that, a minor detail?

12   A    No.

13   Q    No?  Nothing like that?

14   A    No, and I --

15   Q    Definitely not.  You remember that clearly, right?

16   A    That's right.

17          MR. HARDING:  I think the witness was answering.

18   Q    Pardon me.  Go ahead.

19   A    And I remember asking him if Woody had gold teeth and

20   dreads, and he said he couldn't tell me that because it could

21   disturb anything that I might know.  He didn't want to influence

22   anything I know or distort anything I might know.

23   Q    Okay.  So the only detail you were provided with, and your

24   memory of this is clear, is the name of the male victim?

25   A    Right.

1    Q    Okay.  Now, I got to, forgive me because I think Mr. Martin

2    asked you about this but I'm not clear about it.  You wrote two

3    letters to Judge Byrnes and then the detectives came to get you?

4    A    Right.

5    Q    And this is the first you'd heard about the fact that they

6    were going to interview you?

7    A    Right.

8    Q    All right.  And notwithstanding the fact that you wanted to

9    speak to one detective and one detective only, other detectives

10   showed up?

11   A    Right.

12   Q    And this is out in Cumberland, right?

13   A    Right.

14   Q    So they picked you up from the facility and brought you to

15   the police barracks in Cumberland, Maryland?

16   A    That's right.

17   Q    Which is like two, two and half hours west of here?

18   A    I assume.

19   Q    Okay.  Give or take?

20   A    Right.

21   Q    All right.  And notwithstanding that you'd never talked to

22   them, they already had some photo spreads they wanted you to look

23   at?

24   A    Right.

25   Q    All right.  Of Mr. Harris and Mr. Mitchell?

1    A    Right.

2    Q    All right.  That's very prescient of them, don't you think?

3              MR. HARDING:  Objection.

4              THE COURT:  Sustained.

5    Q    Now, you spoke with them and you agreed to become a

6    cooperating witness.  All right.  Now, in order to do this, they

7    needed to effectuate your release, though, right?

8    A    Right.

9    Q    Now, you were released from the eight year sentence for

10   domestic violence that you were serving, right?

11   A    Right.

12   Q    But you were still on probation?

13   A    Modified my sentence to put me on probation.

14   Q    Okay.  So you got the benefit of being released but you

15   still had to be on probation?

16   A    Right.

17   Q    All right.  And you had -- how many meetings did you have,

18   how many meetings did you have with Mr. Harris?

19   A    Two meetings and a handful of phone calls.

20   Q    All right.  And part of the conditions of your probation

21   were to report to your officer and refrain from the use of drugs?

22   A    Right.

23   Q    All right.  Now, I don't want to be critical, but it sounds

24   to me like you have a drug problem.

25   A    That's correct.

1    Q    An addiction?

2    A    Right.

3    Q    And you had attempted to address this issue by going to

4    Second Genesis, right?

5    A    2001, right.

6    Q    All right.  Which is a rehab center, right?

7    A    Right.

8    Q    To use some sort of loose vernacular.  And that, I assume,

9    is not the only time you had been in rehab?

10   A    Sure.  I was --

11   Q    So you were released in 2003 to aid with the investigation,

12   right?

13   A    Right.

14   Q    And you were put on probation, right?

15   A    Right.

16   Q    And you were ordered as a condition of your probation to

17   report to your officer, right?

18   A    Right.

19   Q    Amongst other conditions.  And refrain from the use of

20   drugs?

21   A    Right.

22   Q    All right.  And you, I assume, were having regular meetings

23   with law enforcement in your role as a cooperating witness,

24   right?

25   A    Right.

1    Q    All right.  And I think, again, I apologize because I think

2    Mr. Martin asked you about this, but did you or did you not

3    refrain from the use of drugs?

4    A    No.  I was using drugs.

5    Q    All right.

6    A    I think maybe a couple months after that.

7    Q    I assume, again, I don't want to be critical, but what's

8    your, what's your, are you an addict?

9    A    Yes, I am.

10   Q    What's your drug of choice?

11   A    Cocaine.  Crack and heroin.

12   Q    All right.  So you have multiple addictions?

13   A    Right.

14   Q    And I assume once you start using, you are not a social drug

15   user?

16   A    Not for long.

17   Q    Okay.  Doesn't take long for you to get going and you're

18   using around the clock?

19   A    Right.

20   Q    So during this time when you were assisting the law

21   enforcement, you were high all the time, I guess?

22   A    No.  Not when I went to meet them.

23   Q    How often did you meet them?

24   A    Maybe, maybe once a week, every other week.

25   Q    All right.  So during that time and during the times you

1    went to Parole and Probation to try to discuss things with Mr.

2    Harris, at that time you were able to stay clean?

3    A    Right.

4    Q    But not much of the remainder of the time?

5    A    No.  Well, if, if I was high or if I was using maybe, like

6    right before that meeting, I would make an excuse why I couldn't

7    show up.

8    Q    Okay.  Dodge them a little bit?

9    A    Right.

10   Q    All right.  How were you -- I assume you weren't working at

11   the time?

12   A    I was working South Side Construction.

13   Q    All right.  Is that how you were supporting your habit?

14   A    Yeah.  That and other things.

15   Q    What other things?

16   A    Side work.

17   Q    Such as?

18   A    House fronts, doing things.  I mean --

19   Q    Nothing illegal?

20   A    No, except for using drugs.

21   Q    You were using drugs but you weren't selling drugs or

22   working as a debt collector?

23   A    No.

24   Q    All right.  You did resume those activities eventually,

25   though, right?

1    A    Not really.

2    Q    All right.  You have resumed your criminal livelihood,

3    though, right?

4    A    I've been working.  I usually work out, out of state or

5    still with South Side Construction.

6    Q    All right.  Well, I notice your attire.  Is those, does that

7    clothing provided to you by members of some prison facility or

8    did you buy that at The Gap?

9    A    Prison.

10   Q    All right.  So as you sit here today, you're serving a

11   sentence?

12   A    The eight years sentence.  I'm finishing it, yeah.

13   Q    All right.  So after your endeavor to cooperate with the

14   authorities, at some point in time you resumed committing crimes?

15   A    Right.

16   Q    All right.  Now, but you weren't high is the bottom line,

17   the times that you were working with the officers and meeting

18   with Mr. Harris?

19   A    That's right.

20   Q    Okay.  Court's indulgence, please.

21        (Pause in Proceedings.)

22   Q    Now, I just want to cover one more area with you.  You said

23   that you elected to write these letters to the judge and act on

24   this information you purportedly had received because of your

25   conscience, right?

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 67 of 280

1    A    Right.

2    Q    All right.  Define that word for me, if you would.  What is

3    your "conscience?"

4    A    I don't want anything else to happen to anybody else,

5    knowing I probably could have prevented it.

6    Q    All right.  So you're looking out for the betterment of

7    mankind?

8    A    That's right.

9    Q    Similar to the notion you expressed in the letter you wrote

10   to Judge Byrnes that, if he were to release you, you were going

11   to become some sort of community activist and clean up South

12   Baltimore, right?

13         MR. HARDING:  Objection.

14   Q    Did you write that to Judge Byrnes?

15   A    Yes, I did write that letter.

16   Q    All right.  So your sentiment to provide for the betterment

17   of mankind by coming forward with this information is a similar

18   notion to the one that you expressed to Judge Byrnes, is that

19   fair?

20   A    Right.

21   Q    All right.  Do you understand that it's troubling to

22   rationalize that notion against the things that you've done in

23   your life?  Do you get that?

24         MR. HARDING:  Objection.

25         THE COURT:  Sustained.

1   Q    Okay.  So this was your effort to look out for the

2   betterment of mankind.  And you waited, though, some nine months

3   before acting on your conscience dictating things to you, right?

4   A    It was a hard thing to do.

5   Q    All right.  I'm not asking you whether it was easy or

6   whether it was difficult.  I'm asking you only whether it took

7   you nine months to do this.

8   A    Eight, nine month.

9   Q    All right.  And you wrote a letter to Judge Byrnes and then

10  there was no activity on it from anyone.  And you wrote another

11  letter to Judge Byrnes, right?

12  A    Right.

13  Q    Okay.  Now, Mr. Martin asked you a series of questions about

14  whether or not you did this because you wanted to get out of

15  prison.

16  A    Right.

17  Q    All right.  And is it your testimony here today, under oath

18  in front of this jury, that you didn't do this because you wanted

19  to get out of prison?

20  A    No.  I wanted to finish my sentence.

21  Q    All right.  Now, I'm going to repeat this because I want to

22  make sure we're all clear, and perhaps I'm little thin upstairs.

23  Let me repeat this.

24       You wrote these letters, you offered to assist the

25  authorities, but you didn't want a reduction of your sentence,

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 69 of 280

1    right?  You got to answer verbally.

2    A    When the detectives came and saw me, I didn't even want to

3    give them this information until my sentence was over with.

4    Tommy Mallin sat down with me for about 20 minutes and talked to

5    me and asked me to give it to him right there.  I didn't even

6    want to go on a tape recorder with it.  I had eight months left.

7    Q    Okay.  Let me back up.  I get that.  When you first wrote

8    the letter in May --

9    A    Right.

10   Q    -- is it your testimony here today that you didn't want, you

11   didn't want to offer this information in exchange for your

12   release?  Yes or no?

13   A    I didn't want to offer it as a condition of my release.  I

14   wanted to wait until my sentence was over with.

15   Q    All right.  When you wrote the second letter to the judge,

16   you, you weren't offering it to get out of jail?

17   A    As a modification of sentence.  But that wasn't the reason

18   why I was giving information about Shelton.

19   Q    Okay.  That was because of your conscience?

20   A    Exactly.

21   Q    Okay.  All right.  That aside, though, did you want to get

22   out of jail?  Are you telling the ladies and gentlemen of the

23   jury that, notwithstanding the fact that you were providing this

24   information, it was your goal to stay in jail longer?  That this

25   was not a quid pro quo?

1   A    I think everybody wants to get out of jail.  Right now I

2   want to get out of jail.

3   Q    Of course.  All right.  So you were or were not providing

4   this information to get out of jail?  Which is it?

5   A    I always want to get out of jail but that's not why I wrote

6   that letter, no.

7   Q    Okay.  So you weren't offering this information in order to

8   get out of jail?

9   A    No.

10  Q    Okay.

11  A    This would have happened when I got out of jail, anyway.

12  Q    All right.  Indulge me one moment, please.  Now, is this

13  testimony that you didn't want, didn't want to offer this

14  information to get out of jail, you're saying this is as truthful

15  as the rest of your testimony, right?

16          MR. HARDING:  Objection.

17          THE COURT:  Sustained.

18  Q    All right.  Let's just read this one paragraph here.  Can

19  you see that?

20  A    Right.

21  Q    All right.  You see where it says note?  At the bottom?

22  A    Would you like me to read it?

23  Q    Look at the second sentence.  Did you write to the judge, I

24  am, however, will, I assume you meant to say willing, to sign an

25  agreement with the Court as a condition of release to work with

1    and supply information regarding the above-mentioned areas,

2    comma, Baltimore City Southern District narcotics officer, Tommy

3    Mallini?

4    A    Mallin.

5    Q    Mallini?  Is that what you said?

6    A    Mallin, Tommy Mallin.

7    Q    Is that what you said there?

8    A    Exactly.

9    Q    All right.  So I'm having a little trouble juxtaposing your

10   testimony here today with the words you wrote to the judge in May

11   of 2003.

12   A    Well, the original letter, if they needed me to do it then,

13   they would have to get me out of jail.  If they wanted to wait

14   until my sentence was over with, that's fine, I would do it then.

15   If Shelton and Bo were still locked up, they could have waited.

16   I didn't know Shelton was on the street until I was released.  I

17   found, actually the day they took me to court, I found out he was

18   released.  I didn't even know I was going to court.

19   Q    But as Mr. Martin said, you had no trouble accepting the

20   graciousness of Mr. Harding and the other prosecutors when they

21   were effectuating your release, is that right?

22   A    That's right.

23   Q    All right.  And you then cooperated with the authorities for

24   some period of time?

25   A    Right.

1   Q    And provided us with these multiple unintelligible

2   recordings, right?

3   A    Right.

4   Q    Okay.  So the corroboration of your testimony has

5   mysteriously evaporated into thin hair because of the --

6            MR. HARDING:  Objection.

7   Q    -- faultiness of --

8            THE COURT:  The objection is sustained.

9   Q    -- modern technology.

10           THE COURT:  Sounds like you're finished, Mr. Lawlor.

11  Q    I have a couple more questions.  So after, though, after

12  your conscience got the better of you and you decided to

13  cooperate with the authorities, though, you have resumed becoming

14  part of the problem in South Baltimore as opposed to part of the

15  solution, right?

16           MR. HARDING:  Objection.

17           THE COURT:  Sustained.

18  Q    All right.  You have resumed your criminal livelihood,

19  right?

20  A    No.

21  Q    You have not?  Well, other than the fact you're incarcerated

22  right now, though, you are back in jail because you resumed your

23  criminal livelihood, right?

24  A    No.

25  Q    You have not?  It's a quirk of fate, a twist of fate that

```
1    has resulted in your re-incarceration?

2               MR. HARDING:  Objection.

3               THE COURT:  Sustained.

4    Q    Okay.  But you have resumed beating your girlfriend, right?

5               MR. HARDING:  Objection.

6               THE COURT:  Sustained.

7               MR. LAWLOR:  No more questions.

8               THE COURT:  Redirect.

9               MR. KURLAND:  We just have --

10              THE COURT:  Okay.

11              MR. KURLAND:  Court's indulgence for just one second.

12              (Pause in Proceedings.)

13              CROSS EXAMINATION

14   BY MR. KURLAND:

15   Q    God morning, Mr. Dobropolski.

16   A    Good morning.

17   Q    Did I pronounce the name correctly?

18   A    Dobropolski.

19   Q    Dobropolski.  Okay.  I sometimes miss that middle syllable.

20   I just have a couple of questions.  I represent Mr. Shawn

21   Gardner, I'm one of the lawyers, who you do not know?

22   A    Nope.

23   Q    And you have never heard of him?

24   A    Never seen him.

25   Q    Never seen him, never heard of him?
```

1    A    No, never heard of him.

2    Q    And the nickname Goo, never heard of that nickname, either?

3    A    Nope.

4    Q    And in all of your, you earlier testified that in your, that

5    all of your discussions -- strike that.  You earlier testified, I

6    believe, in one of the questions on cross examination that

7    everything you claimed to know about the activities of Mr.

8    Mitchell and Mr. Harris you, you learned from them?

9    A    Right.

10    Q    Is that correct?  And in those discussions, they never

11    mentioned Mr. Gardner?

12    A    No.

13    Q    When you say no, that becomes an unclear answer.  So it

14    would be correct, it's correct to say that in all your

15    discussions with them, they never mentioned Mr. Gardner?

16    A    That's right.

17    Q    And they never asked you to join an organization called the

18    Randallstown/Park Heights Organization, isn't that also correct?

19    A    No.

20    Q    When you say no, I don't understand, that becomes a double

21    negative and I want to be very clear.

22    A    Not a double negative.  They wanted me to get involved in

23    Sheistyville or something, be a muscle for them.

24    Q    All right.  Okay.  I understand that from your direct

25    examination.

1   A    I've never heard what you're talking about.

2   Q    They wanted you to get involved in Sheistyville is your

3   testimony?

4   A    Right.

5   Q    They never asked you to get involved in the

6   Randallstown/Park Heights organization?

7   A    Never.

8   Q    No, they never asked you that?

9   A    Never asked, no, sir.

10   Q    Just a couple more questions.  Now, I take it at the time

11   that you claimed to have met Mr. Harris while you were in lockup

12   for the first time, he was, he was telling you about being a

13   performer?

14   A    Right.

15   Q    And that's what Sheistyville was all about?

16   A    Yeah.

17   Q    And that Bo was apparently the producer?

18   A    Right.

19   Q    But apparently, though, there was some transition between

20   his discussing his music career and robbing drug dealers, is that

21   your testimony?

22   A    Right.

23   Q    And was it something to the effect that the robbing of the

24   drug dealers was to kind of put cash in their pockets, to kind of

25   tide them over to help finance Sheistyville?

1    A    That and sell drugs.

2    Q    Excuse me?

3    A    That and selling drugs, things of that nature.

4    Q    All right.  And there was never any discussion about -- let

5    me go back a second.  So they did say that somehow that the

6    robbing of the drug dealers and the selling of the drugs was to

7    sort of like finance the start-up operation of the music

8    business?

9    A    Keep money in their pockets.  So I mean, maybe, I mean.

10   Q    All right.  There was never any discussion, though, about

11   they were going to rob drug dealers to help pay for lawyers, is

12   that correct?

13   A    No.

14   Q    I mean with no again --

15   A    No, they --

16   Q    That conversation never came up?

17   A    That they rob people to pay lawyers?  No, it didn't.

18   Q    All right.  Let me just check with co-counsel for just one

19   second.  I have no further questions of this witness.  Thank you,

20   Your Honor.

21              THE COURT:  Redirect.

22              REDIRECT EXAMINATION

23   BY MR. HARDING:

24   Q    Good morning, Mr. Dobropolski.

25   A    Good morning.

1    Q    You indicated that you, on cross you indicated that you had

2    gotten arrested several times or numerous times in South

3    Baltimore, is that correct?

4    A    Right.

5    Q    But you told us that you grew up in Park Heights, is that

6    correct?

7    A    Right.

8    Q    Did you get arrested while you were working in Park Heights,

9    also, on occasion?

10   A    Yeah.  I was arrested in Park Heights.  Auto thefts, escape

11   charge.

12   Q    Okay.  And you mentioned these drug traffickers on cross

13   examination whom you also mentioned on direct.  Julius Collins,

14   Stover Stockton?

15   A    Right.

16   Q    Lex.  Were those Park Heights drug traffickers or South

17   Baltimore drug traffickers?

18   A    Park Heights.

19   Q    And you knew Collins, you said?

20   A    Right.

21   Q    But you only knew of the others, is that correct?

22   A    That's correct.

23   Q    Now, I want to call your attention to this initial meeting

24   that you had with the detectives in October of '03, when they

25   came and got you out of the Western Correctional Institution?

1    A    Right.

2    Q    Did they talk to you for a while before they showed you

3    those photo arrays?

4    A    I think they asked me what I knew about it, what I thought I

5    might have known about it.  You know, like, well, you wrote us

6    about two, two homicides, what are you talking about?

7    Q    They're referring to the letter that you had written to

8    Judge Byrnes, I assume?

9    A    Right.

10   Q    Because you had given a sort of outline of what you knew

11   about in that letter, is that correct?

12   A    That's it.

13   Q    And then they asked you what you knew about it?

14   A    Right.

15   Q    So you had a discussion with them before they showed you the

16   photo arrays, is that correct?

17   A    Right.

18   Q    Also, you've told us several times about this eight year

19   sentence.  Just to clarify, Mr. Dobropolski.  If you get

20   sentenced to eight years in state court, does that mean that you

21   actually have to do eight years or are there possibilities for

22   shortening the sentence through parole and probation and good

23   time?

24   A    Yeah, you can shorten your sentence.

25   Q    Okay.  So when you get sent back on your eight year

1    sentence, does that mean that you're going to wind up having to

2    do the rest of eight years or can you actually get released early

3    again?

4    A    Again, you can get released early.

5    Q    Mr. Martin, in particular, yesterday, was asking you about

6    whether you had extracted information from Mr. Harris.  And you

7    said that, quote, "he kind of just came out with it?"

8    A    Right.

9    Q    Is that correct?

10   A    That's correct.

11   Q    Could you elaborate?  Could you explain what you mean by

12   that?

13   A    We were just in a cell having a conversation about criminal

14   activities and this and that.  And he kind of, he asked me if I

15   knew anything about Hasim Rahman.  I said, yeah, I know he's a

16   boxer, I like boxing.  And he said, you remember when he won his

17   heavyweight title, all his friends started getting killed.  I

18   wasn't aware of that.  And I was like no.  And he was like, well,

19   two people got killed in his car, I did that, it was a guy and a

20   girl.

21   Q    Okay.  So --

22   A    And he went in --

23   Q    Sorry.

24   A    And he went into more detail about it.

25   Q    I see.  So you had no idea he was going to start talking

1    about this, is that your testimony?

2    A    That's right.

3    Q    And is that the way you explained it to the detectives when

4    they came and saw you in October of '03?

5    A    Right.

6    Q    And as Mr. Martin pointed out, they tape recorded their

7    discussion with you that day, is that correct?

8    A    Yeah, they did have a tape recorder.

9    Q    And did you, in fact, tell them roughly the same account

10   you've given here today, about how the whole topic came up, that

11   Mr. Harris just sort of brought it up out of the blue?  Is that

12   correct?

13   A    Right.

14   Q    Was it any part of your goal in having these conversations

15   with Mr. Harris after he became your cell mate to try to extract

16   a confession from him about some crime he had committed?

17   A    No.

18   Q    Did you describe it the same way when you testified in the

19   federal grand jury in November of '03?

20        MR. MARTIN:  Objection, Your Honor.  How would he know?

21        THE COURT:  Overruled.  You may answer.

22   A    I described it -- are you asking me if I described it the

23   same way that I described it to the detectives?  Like to the

24   grand jury as well?

25   Q    As something that Mr. Harris brought up rather than

1    something that you had elicited?

2    A    Oh, sure.  Yeah.  Mr. Harris brought it up.

3    Q    And in fact, when you were interviewed by the detectives in

4    October of '03 --

5            THE COURT:  Don't lead the witness.

6    Q    Okay.  Did you give the same account to the detectives in

7    '03 and to the grand jury in '03 that you've given in this

8    courtroom to this jury?

9            MR. MARTIN:  Objection.

10           THE COURT:  Overruled.  You may answer.

11   A    Yes.

12   Q    You indicated that you've been locked up now for the last 17

13   months, is that correct?

14   A    Yep.  Yes.

15   Q    In coming here today to this trial and testifying before

16   this jury, are you doing anything at all to help reduce the

17   amount of time that you're getting in jail?

18   A    No.  Doing the whole eight years day for day.

19   Q    You testified this morning that you wore two devices when

20   you were attempting to record conversations with Mr. Harris in

21   late 2003 and the first part of 2004.  Was one of those a

22   recording device and one of those a transmitter, do you know?

23   A    Yeah, I believe it was.  Analog and digital.

24   Q    And do you know, did the transmitter permit the agents and

25   detectives who were surveilling you to actually listen to what

1    was going on when you were wearing this wire?

2    A    Right.  In case something happened.

3    Q    In case something happened.  What do you mean by that?

4    A    Something would have gone on with myself and the person I

5    was trying to speak with, Mr. Harris, they would be aware of it.

6    It wouldn't just be on the recorder.  They would actually be

7    aware of it.  Like they could hear the conversation that, I think

8    it was being recorded and they could also hear the conversation.

9    Q    What would happen if Mr. Harris discovered that you were

10   wearing a wire when you were having these conversations with him?

11   What did you think would happen?

12   A    If he had a weapon on him?  He might use it.  Good chance he

13   would probably use it.

14   Q    Did the transmitter then provide you with some kind of

15   safety because the detectives might know if you were threatened

16   by the, say, for example, by the discovery that you were wearing

17   a wire?

18   A    That's right.

19   Q    Did you understand that this was actually a fairly dangerous

20   kind of operation that you were involved in?

21              MR. MARTIN:  Objection.

22   A    Yes.

23              THE COURT:  Overruled.

24              MR. HARDING:  May I have just one moment, Your Honor?

25              THE COURT:  Yes.

1          MR. HARDING:  Your Honor, may I ask Ms. Arrington for

2   MB-51 and MB-52?

3          THE COURT:  Absolutely.

4          MR. HARDING:  It's not necessary that I actually have

5   the document in my hand, Your Honor.  These are the statements

6   that Mr. Dobropolski wrote out, his handwritten statements.  The

7   government would like to move them into evidence.  They've been

8   displayed on the screen several times and the government would

9   move them into evidence.

10          MR. MARTIN:  No objection, Your Honor.

11          THE COURT:  They're admitted.

12          MR. HARDING:  In addition, Your Honor, Mr. Martin used

13   yesterday, and Mr. Lawlor used this morning, a second letter that

14   Mr. Dobropolski wrote to Judge Byrnes.

15          THE COURT:  No objection?

16          MR. MARTIN:  No objection, Your Honor.

17          THE COURT:  It's admitted.  Was it premarked or has it

18   not yet been marked?

19          MR. MARTIN:  Never been marked, I don't think, Your

20   Honor.

21          THE COURT:  All right.  Let's be sure to give it a

22   number.  Can you do that now, Mr. Harding?

23          MR. HARDING:  Yes, Your Honor.

24          THE COURT:  Mr. Lawlor seems to have a copy there.

25          MR. HARDING:  We can call it MB-54, Your Honor.

Case 1:04-cr-00029-RDB   Document 681   Filed 06/08/09   Page 84 of 280

1            THE COURT:  MD-54.

2            MR. HARDING:  No.  MB.

3            THE COURT:  MB-54.

4            MR. HARDING:  As in McCaffity/Brown.

5            THE COURT:  All right.  It's admitted.

6            MR. HARDING:  May I have just a moment with this

7    letter, Your Honor?

8            THE COURT:  Yes.  Mr. Harding, I pushed past our recess

9    in the hope that we could finish with this witness.  Is that

10   likely?  Do you have much more?

11           MR. HARDING:  I have another 15 minutes or so, I think,

12   Your Honor.  If you would like to take a break now, it would be

13   fine.

14           THE COURT:  Yeah.  We'll take a morning recess, ladies

15   and gentlemen, at this time.

16           Please leave your note pads on your chairs.  Have no

17   discussion about the case.  Continue to keep an open mind about

18   all issues.  Jury's excused for 15 minute recess.

19           We're in recess for 15 minutes.

20           (Jury exits the courtroom.)

21           THE COURT:  Mr. Dobropolski is excused.

22           (Witness exits the courtroom.)

23           THE COURT:  Mr. Harding, Mr. Hanlon, I would like to

24   give the defendants some time with their attorneys in your

25   absence.  I can do that after the luncheon recess or beginning of

1    the luncheon recess.  Do you have a view?  I would be inviting

2    you to leave the courtroom and I will clear the courtroom with

3    just, so that just the marshals and the defendants and their

4    counsel are present.

5           MR. HARDING:  It's fine either way, Your Honor, with

6    the government.  Either before lunch --

7           THE COURT:  When we break for lunch, we're going to

8    break for lunch at just about 1:00.  And so I'll excuse you and

9    the jury.  And I'll leave the defendants in here for five or ten

10   minutes.

11          MR. HARDING:  Thank you.

12          THE COURT:  All right.

13          (Recess.)

14          THE COURT:  We'll have the jury.

15          MR. HARDING:  Judge, would it be efficient to have

16   defense counsel meet with their clients after this witness is

17   done with on recross and then before we proceed to the next

18   witness?  Because it's going to take a while to get him here, I'm

19   afraid.

20          THE COURT:  All right.  Let's see how long it takes.

21   That might be the better way to do it.

22          (Jury enters the courtroom.)

23          THE COURT:  Please proceed when you're ready, Mr.

24   Harding.

25   BY MR. HARDING:

1    Q    Yes.  Thank you, Your Honor.  Mr. Dobropolski, when you were

2    doing these undercover meetings and attempted meetings with Mr.

3    Harris, were you given any kind of instructions or, specifically,

4    a distress signal that you could use if you needed to?

5    A    Yeah.  A word.

6    Q    A word?

7    A    Um-hum.

8    Q    Can you explain what you mean?

9    A    Excuse me?

10   Q    A word that you could use?

11   A    For a distress signal.  If something were to happen.

12   Q    Yes.

13   A    A word.

14   Q    Do you remember what the word was?

15   A    That would change, whatever I feel like using.  I'm not even

16   sure about any one of them.

17   Q    So if you felt you were in some immediate danger, you could

18   just say this word and because you had a transmitter on, the

19   officers would come to your aid, is that it?

20   A    That's right.

21   Q    Okay.  Did you have any way of knowing, Mr. Dobropolski,

22   that these recordings of the meetings, the actual meetings that

23   you had with Mr. Harris, weren't turning out very well until you

24   were done with the meeting?

25   A    No.

1   Q    Do you know, did the detectives try to play the CD's after

2   you got done with the meetings?

3   A    Not to me.

4   Q    They didn't to you?

5   A    No.

6   Q    Do you know why they had you write out these statements

7   about what had happened?

8   A    Yeah.  They told me because it would, it would back up what

9   the recording said.

10  Q    Okay.  So you didn't know whether it had anything to do with

11  whether the recording came out or not?

12  A    No.  I think I was, I think I was actually writing

13  statements before they did anything with the recording.

14  Q    Okay.  In one of these statements that you wrote out -- let

15  me just put this on the screen.  I want to read some of this

16  aloud because I have some questions about it.

17       You say here in this paragraph, after a three to five

18  minute wait -- is this on your screen, Mr. Dobropolski?

19       THE COURT:  Perhaps you can zoom in a bit, Mr. --

20  A    I can see it.

21       THE COURT:  That's good.

22  Q    After a three to five minute wait, Shelton walked past me

23  and I got his attention and proceeded to exit Parole and

24  Probation.  When Shelton began digging in the garbage can and

25  stated, I have got my shit, and retrieved a three inch black box

1    cutter.  Both of us then exited Parole and Probation.  Is that

2    the weapon that you were talking about on cross examination, when

3    you said that Harris took his, took his weapon out?

4    A    Right.  Out of the garbage can.

5    Q    Are you allowed to take a weapon like that into Parole and

6    Probation?

7    A    No.  There's metal detectors.

8    Q    I see.  So what's your understanding about what Mr. Harris

9    had done that day when he showed up at Parole and Probation?

10   A    He put a weapon inside the garbage can and went into the

11   Probation Office.

12   Q    I see.  Now, you said, also, that the phone conversations

13   that you had with Mr. Harris were to set up meetings, not to get

14   statements.  Is that correct?

15   A    Right.

16   Q    Can you tell us, Mr. Dobropolski, based on your background

17   and criminal activities, do people involved in such activities

18   talk about them over the telephone?

19   A    No.

20   Q    Can you explain why not?

21   A    Well, because other people could be listening.  I mean, if

22   you're talking about crimes, you always have law enforcement that

23   has access to devices that actually listen to people's phone

24   conversations.  So it's just something that usually would be done

25   face to face.

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 89 of 280

1    Q    So is it your testimony that you never talked about criminal

2    activities over the telephone?

3    A    For the most part, no.

4    Q    Is that true, also, of the other people you know of who are

5    involved, say, in drug trafficking or --

6    A    Right.

7             MR. MARTIN:  Objection.

8             THE COURT:  Overruled.

9    A    Correct.

10   Q    Now, the next part of this statement that you wrote out on

11   December, regarding the December 1st meeting, you say, once

12   outside I explained to Shelton that I have a person, parentheses,

13   drug dealer, set up to be robbed but that things would get

14   serious, meaning that people would have to be killed.  So I told

15   Shelton that he might not want to get involved.  He said that he

16   had no problem with killing the people and waved his hand as to

17   mean that it's no big deal.

18             Whose idea was it originally that you and he would rob

19   drug dealers together, Mr. Dobropolski?

20   A    When he explained that's what he did, and I also explained

21   that I know some drug dealers that could be robbed.

22   Q    When did he explain that to you?

23   A    When we were in the cell in Central Booking, back in August

24   of '02.

25             THE COURT:  Can you get closer to the mike, please?

Case 1:04-cr-00029-RDB    Document 601    Filed 06/08/09    Page 90 of 280

1    Q    Okay.  So that's what he explained to you when you first met

2    him; is that your testimony?

3    A    Right.

4    Q    And did he mention it again when you had your first meeting

5    with him at Parole and Probation?

6    A    Yes, he did.

7    Q    What did he say?

8    A    What's up with that drug dealer?  What's up with the Ecstasy

9    dealer?

10   Q    An Ecstasy dealer?

11   A    Right.

12   Q    Did he have someone specific in mind that he wanted to rob?

13   A    The person that we talked about in Central Booking.

14   Q    The same person?

15   A    Right.

16   Q    Did he say what the guy's name was?

17   A    No, because he doesn't know him.

18   Q    Okay.  Now, you testified on cross examination with Mr.

19   Martin, I believe, that Shelton was not attempting to ignore you

20   and that the robbery, you might have, he was eager to do the

21   robbery, is that correct?

22   A    Right.

23   Q    And it was, was it his idea?

24   A    Sure.

25   Q    Okay.  But you said he got arrested before anything could

1    have, any further plans were made, is that correct?

2    A    That's right.

3    Q    Now, you were in touch with the agents and detectives all

4    throughout this whole operation, is that correct?

5    A    Correct.

6    Q    Was it your understanding that they were going to actually

7    let you do a robbery of drug dealers with Mr. Harris?

8    A    No.

9    Q    So what was the point of having these discussions about

10   robbing a drug dealer?

11   A    I guess it was just to get his character or whatever.

12   Q    Okay.  Did it provide a basis for your continuing to meet

13   with him?

14   A    Right.

15   Q    Okay.  When Mr., I believe it was Mr. Martin, kept asking

16   you about whether the, you kept saying the detectives didn't want

17   to have Shelton actually go out and do this robbery.  And you

18   kept saying there were reasons for that, there were reasons for

19   that.  And we never heard what the reasons were.  Do you remember

20   what I'm talking about?

21   A    Say it again, please.

22   Q    During the cross examination this morning, when Mr. Martin

23   was talking to you, I believe --

24   A    Right.

25   Q    -- he was asking you about, about this robbery plan.  And

1    you were saying that the detectives didn't actually want you to

2    go have Shelton meet with you, to have him actually catch a ride

3    and meet with you.  And you kept saying there were reasons for

4    that, there were reasons for that.  What were the reasons for

5    that?

6    A    The reason why they didn't just want to take me up to where

7    he was?

8    Q    Right.

9    A    Right.  They felt it would be hard in that area for them to

10   have surveillance like they did at Parole and Probation, no one

11   pays attention to a bunch of cars passing.  Like I was going to

12   go up to Park Heights and meet with him before and they said

13   there's no way they can get their people up there to actually

14   surveil around there.  They said they might stick out.

15   Q    Okay.  Mr. Martin played one of the taped phone calls that

16   you had with Mr. Harris this morning, the one on November 5th,

17   2003.  And I wanted to ask you about a couple of the phrases that

18   I heard in that.

19   A    Right.

20   Q    Do you remember Mr. Harris saying something like, I got a

21   little something, something working?

22   A    Yeah.

23   Q    Your responding, hold off on that, don't go get yourself

24   jammed up, words to that effect?

25   A    Right.

1  Q    What did you understand Mr. Harris to be talking about?

2  A    Selling drugs.

3  Q    Selling drugs?

4  A    Um-hum.

5  Q    Okay.  He also said near the beginning of that conversation,

6  he was trying to get to my people.  What was he talking about

7  there, as far as you -- what was your understanding of what he

8  was talking about?

9  A    He was trying to get to his people?

10  Q    Yeah.

11  A    Probably people he associates with.

12  Q    Okay.  And then we heard the discussions about Bo and how --

13  did you understand Mr. Harris to say that he was going to go take

14  stuff to Bo in jail?  Do you remember that?

15  A    Yep.

16  Q    And he said that Bo kept saying he was going to -- or no.

17  You said that Bo had told you that he was going to beat that

18  charge, is that correct?

19  A    Right.

20  Q    Do you know what Mr. Mitchell was locked up for at that

21  time?

22  A    Murder.

23  Q    Okay.  Do you know which murder?

24  A    Nope.

25  Q    Okay.  And then at the end, wasn't it Mr. Harris who asked

1    how he was going to get in touch with you, and repeated a couple

2    of times that he was going to holler at you?  Is that correct?

3    Do you remember that?

4    A    Right.

5    Q    What was he going to holler at you about?

6    A    Getting money setting up drug dealers.

7    Q    Okay.  You said on cross examination that Mr. Harris, or,

8    no, you would not have ever brought up the murder over the phone

9    because it would have raised red flags.  Do you remember that

10   phrase?

11   A    Right.

12   Q    What do you mean by that?

13   A    Most people don't talk about things like that, criminal

14   activity, over the phone.

15   Q    Okay.  Okay.  Let me read a little bit more of this letter.

16   I also told Shelton that when I was in prison I heard about his

17   work, which he told me about over CBIF.  And I told him the alias

18   name of the person he killed, Woody.  He smiled and shook his

19   head as if to let me know that I was correct.

20          So is it your testimony that Mr. Harris had actually

21   never mentioned that name, Woody, to you before you mentioned it

22   to him that day?

23   A    That's right.

24   Q    Okay.  And you testified on cross examination, did you not,

25   that you actually overheard Detective Mallins mention that name

1   at one point, is that correct?

2   A    Detective Mallin or Niedermeier, one of the two, yeah.

3   Q    Okay.  And so that name stuck in your head, I believe you

4   said?

5   A    Right.

6   Q    Why was that?

7   A    Because I know a Woody from the Park Heights area.

8   Q    You figured it was the same guy or maybe the same guy?

9   A    Yeah.  I figured it might be.  It's kind of a unique name.

10  Q    Okay.  You told us about that on direct, actually, did you

11  not?

12  A    Um-hum.

13  Q    And you said you asked the detectives to confirm some

14  description of him about gold teeth and something else, is that

15  correct?

16  A    Right.

17  Q    And they said they couldn't, they wouldn't talk to you about

18  that, is that right?

19  A    Yeah.  Because they didn't want to distort the information I

20  have.  They didn't want to subconsciously put it in my head or

21  whatever.

22  Q    Okay.  But this name "Woody" stuck in your mind, anyway,

23  apparently, is that correct?

24  A    Um-hum.

25  Q    Because a couple months later you used it as a device to get

1    Mr. Harris to talk about this, is that correct?

2    A    Yep.  Yes.

3    Q    And Mr. Harris, according to your letter, it says, I also

4    told Shelton that I had argued with the guy, Woody, and a friend

5    of his, Eric, back in 1996.  Woody and Eric sold drugs and guns

6    in the South Baltimore area back there.

7              Is that correct?

8    A    Right.

9    Q    The final thing that I said to Shelton was that the person

10   in prison that was talking about the murders he committed tried

11   to claim his work, meaning that Shelton didn't do it.  Shelton

12   got a strange look, angry look, on his face and stated, he tried

13   to claim my work?  I then told Shelton not to get mad, it was

14   good when people did that.  And I ended the conversation.

15   Shelton left and so did I.

16              When Mr. Harris told you about some of his criminal

17   activities, did he seem to be boasting at times?

18   A    Yeah.

19   Q    Did you ever hear any of his, well, you told us that you did

20   hear some of his rap songs, is that correct?

21   A    Right.

22   Q    Did he, in fact, brag about his criminal activities in his

23   rap songs?

24              MS. RHODES:  Objection.

25              THE COURT:  Overruled.  You may answer.

1    Q    Or do you recall?

2    A    He did.  He did in a couple of them.

3    Q    Okay.  Also, I want to just try to clarify the chronology of

4    this, Mr. Dobropolski.  The statements that you heard from Mr.

5    Harris and from Mr. Mitchell were in August of 2002, is that

6    correct?

7    A    Late August, 2002.

8    Q    It was then nine months later that you wrote Judge Byrnes in

9    Baltimore County first reporting what you had heard, is that

10   correct?

11   A    Yeah.  Eight or nine months.  That's right.

12   Q    And then that was in May of 2003?

13   A    Right.

14   Q    It was then in September of 2003 that you wrote Judge Byrnes

15   again that second letter, is that correct?

16   A    Correct.

17   Q    And the next month, actually on October 2nd, is when

18   Niedermeier and Mallins came out to talk to you at WCI, is that

19   correct?

20   A    Right.

21   Q    Okay.  And then you had a hearing later on in the month, I'm

22   not sure of the exact day, before Judge Byrnes.  And that's when

23   Judge Byrnes decided to release you, is that correct?

24   A    Right.

25   Q    And that's the one where the state prosecutors appeared to

1    ask that you be released, is that correct?

2    A    Correct.

3    Q    And you testified that it was a couple of, on cross

4    examination today, that it was a couple of months after you got

5    out before you started using drugs again, is that correct?

6    A    Right.

7    Q    Were you using drugs then when you first started recording

8    conversations with Mr. Harris?

9    A    No.

10   Q    Do you recall, was it toward the end of October that you

11   first started recording conversations with Mr. Harris?

12   A    It was in October.

13   Q    Okay.  And when you testified in the federal grand jury, I

14   believe you remembered the exact day this morning, November 19th

15   of 2004?

16   A    That was the grand jury, yeah.

17   Q    I'm sorry.  What did I say?

18   A    That's right.  November 19th.  Grand jury.

19   Q    Okay.  Had you started using drugs by that time?

20   A    No.  I think around December.

21   Q    Okay.  Mr. Lawlor was talking to you today about your

22   account, your account of what Mr. Harris told you about the

23   murder of Woody and the woman who was with Woody in the car that

24   day, in Rahman's car.

25   A    Right.

1   Q    And you said something about how, the way Harris described

2   it, he just described what he did, is that correct?

3   A    Right.

4   Q    So do you know where Bo was at the time?

5   A    No.

6   Q    Would you know whether he was right outside the car or a

7   block away or what?

8            MS. RHODES:  Objection.  Leading.

9            THE COURT:  Overruled.  You may answer.

10  A    Don't know.

11  Q    Okay.  Was it possible, based on what you heard from Mr.

12  Harris, that Mr. Mitchell was even in the car?

13           MS. RHODES:  Objection, Your Honor.

14           THE COURT:  Sustained.

15  Q    You testified, Mr. Lawlor was asking you about your desire

16  to get out of jail and what that had to do with your testimony

17  about this crime, this double murder that Mr. Harris and Mr.

18  Mitchell both discussed with you.  And you said, this would have

19  happened whether or not you got out of jail.

20  A    Right.

21  Q    In fact, Mr. Dobropolski, would it be fair to say that

22  you're serving the entire eight month, eight year sentence that

23  you had hanging over your head and have gotten no advantage at

24  all by coming in here and testifying today?

25           MR.MARTIN:  Objection.

1   Q    Would that be correct?

2   A    That's correct.

3   Q    Would it be accurate to say, then, that, in fact, this did

4   happen whether or not you got out of jail?

5            MS. RHODES:  Objection, Your Honor.

6            THE COURT:  Overruled.  You may answer.

7   A    That's correct.

8   Q    If I may have just one moment, Your Honor.

9            THE COURT:  Yes.

10           (Pause in Proceedings.)

11           MR. HARDING:  No further questions, Your Honor.

12           RECROSS EXAMINATION

13  BY MR. MARTIN:

14  Q    Just a few questions, Your Honor.

15           THE COURT:  All right.

16  Q    At least I hope it's just a few.  I think.  Mr. Dobropolski,

17  let's go to the last thing you said here.  That this would have

18  happened whether or not you get out of jail, correct?

19  A    Right.

20  Q    And that you got nothing out of this cooperation, right,

21  because you're serving your whole eight year sentence, right?

22  A    Right.

23  Q    You got out of jail in October of 2003 because of this

24  cooperation, didn't you?

25  A    Right.

1    Q    If you had kept your nose clean, you would have stayed out,

2    isn't that right?

3    A    Right.

4    Q    You didn't keep your nose clean, right?

5    A    Right.

6    Q    Even after the first time you didn't keep your nose clean,

7    Mr. Harding went back and went to bat for you again, didn't he?

8    A    Correct.

9    Q    And you got out again, didn't you?

10   A    Right.

11   Q    You still couldn't keep your nose clean, right?

12   A    That's right.

13   Q    And that's why you're serving the rest of the sentence,

14   right?

15   A    Yes.

16   Q    If you had done what you were supposed to do, you would have

17   gotten a break and half your sentence would have been cut, isn't

18   that right?

19   A    Right.

20   Q    You'd said that Mr. Harris boasted about his crimes.  Did

21   you listen to any of his CD's?

22   A    No.

23   Q    So he boasted in these rap songs that he was serenading you

24   with in prison.  Is that what you're saying?

25   A    Right.

1    Q    And he boasted about his crimes, or was he boasting about

2    crimes?

3    A    Some his, some about crimes.

4    Q    I'm sorry.  Go ahead.  Some of his and some others?

5    A    Yeah.  Just gangsta rap, but some of the stuff were his

6    crimes.

7    Q    How do you know?

8    A    Some of the stuff, some of the lyrics that he said.

9    Q    What did he say?

10   A    I think in one of them he was talking about killing somebody

11   with a .45, and I know you can feel me, Bo, and something

12   something.

13   Q    So one of his crimes was where he was boasting about killing

14   someone with a .45?

15   A    Right.

16   Q    And you know that that relates to something that he did?

17   A    Yeah.  He was writing it, yeah.

18   Q    And is that, you saying that relates to the crime that he

19   confessed to you about the double murder?

20   A    Right.  Some of the lyrics that he would write, he didn't

21   want to be, he didn't want to be considered a studio gangster.

22   So the stuff that he would write, he would write about actual

23   things.

24   Q    Boasting about the .45 was one of those, right?

25   A    Excuse me?

1    Q    Boasting about the use of a .45 was one of those?

2    A    Right.

3    Q    And you knew that because he told you that that double

4    murder was a .45, right?

5    A    No.  But it was right around the same time.

6    Q    It was right around the same time.  But you know that was a

7    crime he committed then?

8    A    Right.

9    Q    Because he told you that?

10   A    Yeah.  He told me that.

11   Q    You didn't tell the detectives about that when you met with

12   them, did you?

13   A    I mean, they asked me about his lyric before.

14   Q    You didn't tell the detectives about this other crime, did

15   you?

16   A    Another crime?

17   Q    Yes.

18   A    I think it's the one that's concerning Mr. Mitchell, when he

19   had him kill these two people.

20   Q    All right.  That's the one about the .45?

21   A    I think.  Called a four-fifth, whatever, whatever.

22   Q    All right.  Now, but you never heard any of the CD's, right?

23   So this is only the songs that he would rap for you in prison?

24   A    That's right.

25   Q    Now, you'd said that the name Woody stuck in your mind

1    because it was someone that you had a beef with at some time,

2    isn't that right?

3    A    That's correct.

4    Q    Back in, he and a guy named Eric back in 1996?

5    A    Yup, '96 I believe it was.

6    Q    That's right.  In Park Heights, right?

7    A    Nope, South Baltimore.

8    Q    South Baltimore.  Okay.  And the beef was in South

9    Baltimore?

10   A    Right.

11   Q    So it wasn't Park Heights, it was South Baltimore?

12   A    That's correct.

13   Q    So Mr. Harding was wrong when he asked you just now that it

14   took place in Park Heights, wasn't it?

15          MR. HARDING:  Objection.

16   A    I thought he said South Baltimore.

17   Q    Well, he used Park Heights in his question.  The jury can

18   determine.  I'm sorry.

19          THE COURT:  All right.

20   Q    So this was a beef that you had with a guy named Woody in

21   1996?

22   A    Right.

23   Q    In South Baltimore?

24   A    Correct.

25   Q    And Woody had a buddy named Eric?

1    A    Right.

2    Q    And you had a beef with Eric as well, right?

3    A    Right.

4    Q    You sure of that?

5    A    I'm sure of that.

6    Q    Okay.  Now, Mr. Harding noted in one of these conversations,

7    I believe it was a conversation that took place on November 5th,

8    Mr. Harris said he took a number from you and said he would

9    holler at you?

10   A    Right.

11   Q    He never did holler at you, did he?

12   A    I don't think so.

13   Q    In fact, the only time he ever contacted you was after you

14   contacted him, right?

15   A    Correct.

16   Q    You testified about the reasons for the surveillance of you.

17   To protect you, correct?

18   A    Right.

19   Q    But in fact, the reasons that they didn't want you to take a

20   car was because they couldn't surveil you as well.  So in other

21   words, they didn't want you to drive to Park Heights where he

22   was.

23   A    Right.

24   Q    Because it would be difficult for them to blend into the

25   neighborhood or whatever?

1    A    Right.

2    Q    But that's why Parole and Probation was perfect, because

3    they could surveil you there, right?

4    A    Correct.

5    Q    So they were able to surveil you there, both while you were

6    outside and inside Parole and Probation, right?

7    A    Right.

8    Q    You testified about the Ecstasy dealer?

9    A    Right.

10   Q    That you guys were talking about taking off?

11   A    Right.

12   Q    And Mr. Harding asked you if he gave you a name.  And your

13   answer was no, because he doesn't know the name.

14   A    That's right.

15   Q    Because it's somebody you know, right?

16   A    Somebody I would have to get in touch through somebody to

17   get his name, right.

18   Q    All right.  So it wasn't anybody that Mr. Harris had in mind

19   about knocking off.  It was your idea, right?

20   A    We were talking about robbing people and I brought up an

21   Ecstasy dealer that I know that's in Delaware.

22   Q    But he didn't know this Ecstasy dealer; that was somebody

23   you knew?

24   A    That's right.

25   Q    And you testified that you weren't using drugs when you were

1     taping Mr. Harris, correct?

2     A     That's correct.

3     Q     Do you remember your first violation of probation hearing?

4     A     Yes, I do.

5     Q     And who was your probation officer?

6     A     I think Mr. Jackson.

7     Q     Robinson?  Well, let me ask you this.

8     A     All right.  Go ahead.

9     Q     You, you didn't go give any urine samples after you were put

10    on probation, did you?

11    A     I reported one time.  I stopped reporting.  That's why I

12    wasn't giving urine.  I just wasn't going at all.

13    Q     You never gave a urine sample?

14    A     I never went.

15    Q     And one of the reasons you didn't want to go was because if

16    you had to give a urine sample, you would get caught, right?

17    A     No, not until about December.

18    Q     So miraculously, even though you didn't report in November,

19    you weren't using drugs in November?

20    A     No.

21    Q     After December you didn't report because if you had reported

22    they would have found that you were using drugs, correct?

23    A     Yeah.  After December.  I think it was --

24    Q     And after December, you had contacted Mr. Harris a number of

25    times and met with him at least once, right?

1    A    Excuse me?

2    Q    After December, the beginning of December, you contacted Mr.

3    Harris a number of times on the phone and you met with him at

4    least once, right?

5    A    Yeah, I did speak with him once.

6    Q    And you were using drugs then, weren't you?

7    A    Not at the time I made the phone call.

8    Q    During that time period you were using drugs, weren't you?

9    A    Right.

10   Q    Okay.  And when you went to court with Judge Byrnes, Judge

11   Byrnes said he didn't believe you when you said you weren't using

12   drugs as far as back as November, isn't that right?

13   A    That's right.

14            MR. HARDING:  Objection.

15            THE COURT:  Overruled.

16            MR. MARTIN:  Thank you, sir.

17            RECROSS EXAMINATION

18   BY MR. LAWLOR:

19   Q    Sir, these rap lyrics that you referenced, that was Mr.

20   Harris's activity, right?

21   A    Right.

22   Q    Mr. Mitchell had nothing to do with that?

23   A    No.  They're his lyrics, Mr. Harris's.

24   Q    Okay.  Now, regarding this eight years, Mr. Martin just

25   asked you about it and he was polite enough to suggest that you

1  failed to keep your nose clean, is that right?

2  A    Correct.

3  Q    The truth of the matter is you violated your probation by

4  stealing a car, right?

5  A    Right.

6  Q    And assaulting another woman, right?

7  A    No.

8  Q    No?  You're not sure?  You seem to be a little hesitant.

9  A    No, it wasn't.  That was in '04.

10  Q    A different occasion?

11  A    Different occasions.

12  Q    Okay.  And in terms of some other benefits you received,

13  though, you got some money from the government in this case,

14  right?

15  A    They used to give me a few dollars here and there when I

16  was --

17  Q    $150 in one time, 300 on another occasion?

18  A    Correct.

19  Q    All right.  And that was in January and February of '04,

20  after you started using again, right?

21  A    Right.

22  Q    All right.  So after you started using again, after you

23  start committing more crimes, after you failed to satisfy the

24  conditions of your probation, they give you money and they come

25  to court for you to vouch for you.  Is that how we get, is that

1    where we stand?

2    A    I mean, they came to court but I don't think they vouched

3    for my drug use or anything like that.

4    Q    Okay.  They provided you money, which I assumed you turned

5    into narcotics purchasing, right?

6    A    No.

7    Q    No?

8    A    Paid bills.

9    Q    Paid the bills.  All right.  And just the final thing.  Mr.

10   Harding went through, put a piece of paper up here on the screen.

11   That was something that you wrote, right?

12   A    Right.

13   Q    Okay.  And what you wrote unfortunately didn't translate to

14   any recording, right?

15   A    No, it didn't.

16   Q    All right.  So the veracity of what somebody writes down

17   depends on the truthfulness of the author; wouldn't you agree

18   with that?

19   A    Correct.

20           MR. HARDING:  Objection.

21           THE COURT:  Sustained.

22   Q    I could write down on a piece of paper that I'm the queen of

23   England, right?

24           MR. HARDING:  Objection.

25           THE COURT:  Sustained.

1          MR. LAWLOR:  Thank you, Your Honor.

2          THE COURT:  Mr. Dobropolski, you're excused.

3          Members of the jury, we'll break now for lunch.  It's

4    approximately 12:40.  I'll ask you to be back in the jury

5    reasonable no later than 2 p.m. in the afternoon.  We expect to

6    have a full day today, so we'll probably be here until close to

7    5:00.

8          Please leave your note pads on your chairs.  Have no

9    discussion about any of the testimony or anything you've heard so

10   far.  Enjoy your lunch.  The jury's excused.

11         (Jury exits the courtroom.)

12         THE COURT:  Government counsel are excused.

13         Ladies and gentlemen sitting in the gallery, the Court

14   will need to vacate the courtroom at this time for a sealed

15   proceeding.  Please join us again at 2:00.

16         (Government counsel leaves and spectators leave.)

17         THE COURT:  All right.  Counsel, I received an informal

18   request that counsel might appreciate an opportunity, however

19   brief, to consult with your clients.  So I'm giving you that

20   opportunity now.

21         Obviously, I expect this to be very brief.  But please

22   go ahead and take advantage of this opportunity.

23         (Pause in Proceedings.)

24         THE COURT:  All right.  The record will reflect for

25   approximately eight to ten minutes or so the Court has been here,

1    defendants have had an opportunity to consult with their counsel

2    individually.  The Court has had the husher activated and no

3    one's been present in the courtroom other than counsel and the

4    defendants, the Deputy U.S. Marshals, and the support staff of

5    the defendants.

6              Does anybody else want more time?

7              (No response.)

8              THE COURT:  All right.  We'll stand in recess until

9    2:00.  I thank the marshals.  Defendants are excused.  We're in

10   recess.

11             (Recess at 12:43 p.m.)

12             (Jury not present in courtroom.)

13             THE COURT:  Let me just finalize the Court's ruling as

14   to the admissibility of statements attributed to Mr. Harris and

15   Mr. Mitchell from the last witness.  The Court has no hesitation

16   in reaffirming its view based on the government's proffer and its

17   understanding of the record, that the conversations between Mr.

18   Harris and Mr. Dobropolski do not fall on the idle chatter side

19   of the line drawn by Shores.

20             The Court has no hesitation in finding by a

21   preponderance of the evidence, having now heard the direct and

22   cross of Mr. Dobropolski, and drawing the inferences that the

23   Court is permitted to draw, that indeed Mr. Harris's

24   conversations with Mr. Dobropolski went beyond, well beyond idle

25   chatter; that with knowledge of Mr. Dobropolski's apparent

1    reputation, Mr. Harris no doubt was seeking to bolster his own

2    reputation.

3         And the Court finds, again, that the statements Mr.

4    Harris made to Mr. Dobropolski admitting involvement in the

5    McCaffity/Brown murders and his drug dealing activities, his

6    robbery activities, were in furtherance of a conspiracy of which

7    Mr. Harris demonstrably was a part.

8         The Court is aware that Mr. Dobropolski made certain

9    admissions on cross examination and, indeed, on direct

10   examination.  For example, that he did not set out to recruit,

11   that is that Mr. Harris did not set out to recruit Mr.

12   Dobropolski and that Mr. Dobropolski, quote-unquote, "extracted

13   certain statements from Mr. Harris."  But the Court credits the

14   government's version of how these conversations took place.

15        Specifically, the Court credits Mr. Dobropolski's

16   assertion that Mr. Harris basically came out with, I think that's

17   a quote, came out with these disclosures.  And it's clear that

18   Mr. Harris expressed a willingness to engage in like activities

19   with Mr. Dobropolski.  It's clear that Mr. Mitchell ratified Mr.

20   Harris's statements to a very significant extent in the language

21   that people in this milieu employ.

22        So for all these reasons and the reasons expressed on

23   yesterday, the Court confirms that it was not necessary to hold

24   an evidentiary hearing outside the presence of the jury for it to

25   rule preliminarily on the admissibility of these statements and

1    these statements.  Clearly admissible against Mr. Harris and Mr.

2    Mitchell respectively, are likewise admissible and may be

3    considered by the jury should the jury find the other subsidiary

4    facts necessary to determine that Mr. Gardner and Mr. Martin were

5    members of the conspiracy with Mr. Mitchell and Mr. Harris.

6              We're ready for the next witness?  That would be --

7              MS. RHODES:  Could I be heard briefly in response, Your

8    Honor?

9              THE COURT:  No.  There's no response to a Court's

10   ruling.

11             MS. RHODES:  Well, it has to do with Mr. Mitchell

12   specifically.

13             THE COURT:  But there's no response.  The Court had

14   already preliminarily ruled.  And I simply made clear my ruling

15   and firmed it up.  So there's no response.

16             MS. RHODES:  Perhaps I shouldn't have called it a

17   response.

18             THE COURT:  Okay.

19             MS. RHODES:  In light of the Court's ruling.

20             THE COURT:  In light of the Court's ruling.  All right.

21             MS. RHODES:  Our position is that, just for the record,

22   our position is that what Mr. Mitchell was saying to Mr.

23   Dobropolski was, in fact, mere idle chatter, if even that,

24   because the conversations were --

25             THE COURT:  Right.  It is a response, Ms. Rhodes, and

1    I'm not going to accept a response to the Court's ruling.

2    There's argument.  There's thinking about the argument.  There's

3    a preliminary ruling.  And then there's ruling.  There's nothing

4    more to be said.

5            MS. RHODES:  Your Honor, we would move to strike, on

6    Mr. Mitchell's behalf, we move that the Court strike Mr.

7    Dobropolski's testimony and that, because we don't believe any

8    curative instruction can resolve the problem that that's coming

9    in against Mr. Mitchell.  And in lieu of that, we ask the Court

10   grant us a mistrial at this time.

11           THE COURT:  The Motion For a Mistrial is denied.  The

12   Motion to Strike is denied.

13           MR. CROWE:  Your Honor, I just point out that the next

14   witness, I understand, is Mr. Montgomery.  And we have the same

15   issue with respect to him.

16           And on that, my recollection, in fact my firm

17   recollection, because I reviewed the transcript yesterday, is

18   that the Court's preliminary indication was that Mr. Gardner's

19   statements to Mr. Montgomery were not in furtherance of the

20   conspiracy.

21           THE COURT:  What statement are you referring to, Mr.

22   Crowe?

23           MR. CROWE:  The principal statement that I'm referring

24   to is Mr. Montgomery's statement that Gardner told him that

25   Martin was going to get off on the Wyche brother murders because

1    he had set up, essentially, a phony alibi.

2           MR. HARDING:  May I be heard on that, Your Honor?

3           THE COURT:  Of course.  Just a moment.  Just a moment.

4    When was the statement made, Mr. Crowe?

5           MR. CROWE:  My understanding is, Your Honor, that the

6    statement was made probably sometime in April or May of 2002.

7           THE COURT:  And what was Mr. Montgomery's relationship

8    to any of the defendants at that time?

9           MR. CROWE:  My understanding is that he had virtually

10   no relationship to any of the defendants at that time.  And in

11   fact, the Court's ruling, and this is on the transcript on June 7

12   of 2000 -- the Court's preliminary ruling was, on the

13   coconspirator issue regarding Mr. Montgomery's testimony,

14   proposed testimony regarding the statements of Mr. Gardner which

15   Mr. Martin has strongly objected to, as well as Mr. Gardner in

16   part, the material that I've looked at so far seems to me clearly

17   to show that Mr. Montgomery was, one, not a member of this

18   conspiracy, and two, that the statement was not made in

19   furtherance of the charged conspiracy.  But I'm not making that

20   ruling.  All I'm saying is that based on what I've seen so far,

21   it seems pretty obvious that the government has other evidence

22   that it intends to offer in support of the admissibility of Mr.

23   Gardner's statements as coconspirators statements.

24           And then the Court goes on to say that it's keeping an

25   open mind.

1          The materials that had been submitted at that time were

2     a question and answer session dated June -- excuse me -- January

3     22, 2003 in the U.S. Attorney's Office, where the questioning was

4     done by Assistant State's Attorney Dean Stocksdale.  We had

5     provided a copy of that question and answer as Exhibit One to a

6     memorandum which we filed in, I believe it was May of 2007.  The

7     Court had also looked at --

8          THE COURT:  I'm sorry.  Just one moment.  You say

9     January 22?

10         MR. CROWE:  Of 2003.

11         THE COURT:  '03.  The government has handed up to me,

12    and I assume you all have this, hopefully in the same

13    aggregation, what appears to be, I don't know, nearly eight or

14    nine different statements, testimony, proffers.

15         MR. HARDING:  Your Honor, I didn't hand anything up to

16    the Court.

17         THE COURT:  I'm sorry?  Excuse me?  You say you did

18    not?

19         MR. HARDING:  Did not, no.

20         THE COURT:  Just one moment.  Where did you get this,

21    Belinda?  Oh, I'm sorry.  Mr. Crowe handed it up.

22         MR. CROWE:  Yes.  In the event the Court wanted to hear

23    argument, those are additional matters which we received

24    yesterday.  And I put exhibit labels.

25         THE COURT:  So this is the Montgomery Jencks?

1          MR. CROWE:  This is the additional Montgomery stuff

2     which we got yesterday afternoon, yesterday morning and yesterday

3     afternoon.  And I will tell the Court that I have been through

4     the 50 or 60 pages and I don't see anything in there which would

5     change the Court's preliminary ruling.  On the contrary, it would

6     seem to me to enforce it.

7          THE COURT:  Okay.  Let me hear from Mr. Harding,

8     please.

9          MR. HARDING:  Judge, Mr. Coburn filed a pleading about

10    this on Sunday, and I haven't had a chance to respond because

11    I've been so tied up with the witness preparation for this week.

12          But there's some errors in his pleading and also some

13    misunderstandings in the representations that have been made in

14    this matter all along that I want to try to address.

15          I'm not asking the Court to rule on this before we get

16    to the actual coconspirator statements because the Court has to

17    find that Montgomery was a coconspirator.  As Mr. Coburn

18    suggests, the Court has preliminarily ruled that he was a

19    coconspirator.  So that would amount to changing the position the

20    Court took when you made your preliminary ruling sometime ago.

21          THE COURT:  Mr. Crowe just read to me from a transcript

22    in which he says I said that it did not appear that Mr.

23    Montgomery was.

24          MR. HARDING:  That was at the time of a suppression

25    hearing many, many months ago.  But we've already heard a lot of

1    testimony about Will Montgomery and you're going to hear a lot

2    more today.

3            As a matter of fact, at the time these coconspirator

4    statements were made, which were shortly after April 17th of

5    2002 --

6            THE COURT:  You referring now specifically to Mr.

7    Gardner's statements to Mr. Montgomery?

8            MR. HARDING:  Yes.  Will Montgomery and Gardner and

9    Martin and Aaron Holly were all involved in a complex robbery

10   scheme, a home invasion robbery of this guy, Goose, up until the

11   time Martin was arrested.  There were also plans to rob Darius

12   Spence.  But Martin's arrest changed everything because they

13   weren't able to get to Goose any more.

14           Gardner was briefly locked up at around the same time

15   on a violation of probation.  He got out of jail and immediately

16   undertook to explain to Montgomery that this arrest of Martin was

17   not going to be a major problem because, and that they would be

18   able to resume their robbery schemes against Goose and others

19   because Martin had an alibi.  And in fact, at the time it was an

20   alibi that was intended to apply to Mr. Mitchell as well.  And

21   the alibi had to do with buying paperwork to go to a movie.  The

22   claim was going to be that they were going to say they were at a

23   movie at the time of the Wyche brothers murder.

24           And the reason this is in furtherance is that Gardner

25   is explaining to his coconspirator, Mr. Montgomery, how it is and

1   why it is that Mr. Martin is about to, going to be able to rejoin

2   them in their scheme.  It's very much in furtherance of the, of

3   the conspiracy.

4           THE COURT:  Okay.  I think that the simplest way to do

5   this, Mr. Harding -- forgive me for cutting you off -- let's

6   bring Montgomery out and have you go ahead and establish the

7   conspiracy and the in-furtherance element of Mr. Montgomery's

8   statements.  Doesn't sound like it's going to take very long.

9   Let's do that first.

10          Now, Mr. Lawlor, I think I speak for the jury.  Your

11  sarcasm has worn thin.  So I would ask you, please, to conduct

12  your cross more in line with traditional mainstream courtroom

13  practice.

14          MR. LAWLOR:  Okay, Judge.

15          THE COURT:  So what I'm asking you to do, Mr. Harding,

16  when he comes out, is simply focus on the elements under 801 and

17  let's see if we can't get this done expeditiously.

18          Mr. Montgomery, would you stand and be sworn, please?

19          WILLIAM MONTGOMERY, GOVERNMENT'S WITNESS, SWORN

20          THE WITNESS:  I do.

21          THE CLERK:  Be seated.  Speak directly toward the mike.

22  State your name and spell it for the record, please.

23          THE WITNESS:  William Montgomery.  W-I-L-L-I-A-M.

24  M-O-N-T-G-O-M-E-R-Y.

25          THE COURT:  If you want some water, Mr. Montgomery,

1    there's water available.

2            THE WITNESS:  Thank you.

3            DIRECT EXAMINATION

4    BY MR. HARDING:

5    Q    Mr. Montgomery, just by way of explanation, we're here in a

6    hearing outside the presence of the jury.  The jury's not going

7    to be here for a few minutes yet.  Okay?

8            I want to just establish, I just want to try to ask you

9    a few background factual questions, Mr. Montgomery.  Calling your

10   attention to the period a couple of months prior to the arrest of

11   Mr. Shelly Wayne Martin in April of 2002.  Were you involved in a

12   scheme with him and Shawn Gardner and Aaron Holly to commit

13   robberies?

14   A    Yes.

15   Q    Specifically --

16           THE COURT:  Could you back up just a bit and establish

17   that he knows the defendants and how long he's known them and

18   where?

19   Q    Do you know Shelly Wayne Martin?

20   A    Yes.

21   Q    Could you point him out to us, please?

22   A    With the black shirt on.

23   Q    And also, do you know Shawn Gardner?

24   A    Yes.

25   Q    Could you point him out?

1  A    White shirt on (indicating).

2  Q    And do you know Willie Mitchell, also known as Bo?

3  A    Yes.  Gray shirt on.

4        MR. HARDING:  May the record reflect that the witness

5  has identified all three defendants, Your Honor.

6        THE COURT:  So noted.

7        MR. MARTIN:  Three of four, Your Honor.

8  BY MR. HARDING:

9  Q    And how long have you known these gentlemen?

10  A    Since I was a little boy.

11  Q    You grew up with them?

12  A    Yes.

13  Q    Whereabouts?

14  A    Woodlawn, Randallstown.

15  Q    Okay.  Over the years between about 1994 and 2002, did you,

16  for example, go to New York with these three persons to purchase

17  narcotics?

18  A    Say that again, please.

19  Q    Did you go to New York to purchase narcotics with these

20  three gentlemen or --

21  A    Yes.

22  Q    Yes?  Okay.  Did you, were you involved in robberies with

23  these three gentlemen?

24  A    Yes.

25        THE COURT:  During what period of time, sir?

1        THE WITNESS:  I'd say maybe starting around like '97.

2    BY MR. HARDING:

3    Q    And were you still involved in a robbery scheme with at

4    least Mr. Martin and Mr. Gardner in the early months of 2002?

5    A    Yes.

6    Q    And was that the robbery scheme that involved -- well, what

7    was the name of the immediate target of your robbery scheme at

8    that time?

9    A    Goose.

10   Q    Do you know Goose's real name?

11   A    No.

12   Q    What line of business was Goose in?

13   A    Drug dealing.

14        THE COURT:  Could you explain, Mr. Montgomery, what you

15   understand Mr. Harding to mean by a "robbery scheme?"  He used

16   that term a couple of times, a robbery scheme.  What does that

17   mean to you?

18        THE WITNESS:  What it mean to me?

19        THE COURT:  Yes.

20        THE WITNESS:  Planning a robbery.  Planning to rob

21   somebody.

22        THE COURT:  All right.  Go ahead, Mr. Harding.

23   BY MR. HARDING:

24   Q    Did you need to know where the, where Goose lived in order

25   to do the robbery?

1    A    Yes.  That was part of it, I believe.

2    Q    And why did you need to know where he lived?

3    A    To get the money and drugs, whatever else he had.

4    Q    Was this to be a home invasion robbery?

5    A    Yes.

6    Q    Have you committed home invasion robberies on other

7    occasions?

8    A    Yes.

9              THE COURT:  With whom?

10             THE WITNESS:  Shawn Gardner.

11             THE COURT:  Anybody else?

12             THE WITNESS:  Other people that's not in this trial.

13             THE COURT:  All right.  Go ahead, Mr. Harding.

14   BY MR. HARDING:

15   Q    Okay.  In fact, were you involved in the home invasion

16   robbery of Darius Spence later on, after April of 2002?

17   A    Yes.

18   Q    Do such robberies involve substantial planning and

19   surveillance activity?

20   A    Yes.

21   Q    Were you involved in that activity with Mr. Martin and Mr.

22   Gardner prior to Mr. Martin getting locked up?

23   A    Yes.

24   Q    Did there come a time when Mr. Martin got locked up around

25   April of 2002?

1   A    Yes.

2   Q    And in fact, did Mr. Mitchell get locked up around that,

3   somewhat earlier?

4            MR. LAWLOR:  Objection, Your Honor.

5            THE COURT:  Overruled.  You may answer.

6            THE WITNESS:  I didn't hear the question.

7   BY MR. HARDING:

8   Q    Did Mr. Mitchell get locked up somewhat earlier?  Did you

9   hear about that?

10  A    No.

11  Q    Okay.  Turning to Mr. Martin, then.  You heard that he had

12  gotten locked up.  Did you have a conversation with Mr. Gardner

13  shortly thereafter?

14  A    Yes.

15  Q    Had Mr. Gardner been locked up?

16  A    Yes.

17  Q    What for and for how long, if you know?

18  A    Not for long.  I think for violation of probation or

19  something.

20  Q    Okay.

21  A    A warrant.

22  Q    Okay.  After he got out and had this conversation with you,

23  what did he tell you?

24  A    He told me a lot.  He told me that the reason Wayne was

25  locked up, because Bo made a mistake and said his name over a

1   phone.  He told me about the alibi.  Told me a lot of stuff.

2   Q    Okay.  Let's focus on the alibi.  What did he tell you about

3   the alibi?

4   A    Wayne supposed to purchase some movie tickets on his credit

5   cards, said he was going to be at the movies.  They had a receipt

6   to be at the movies during the time.

7   Q    And was anybody else involved in that alibi, do you

8   remember?

9   A    I thought all three of them was a part of it, from my

10  understanding.

11  Q    All three of them meaning who?

12  A    Wayne, Bo, and Goo.

13  Q    Okay.  Why do you think that Mr. Gardner was telling you

14  this story?

15          MR. CROWE:  Objection.

16          THE COURT:  Overruled.  You may answer.

17  A    I don't know.

18  Q    Was Mr. Martin supposed to be involved in a robbery scheme

19  with you at that time?

20          MR. CROWE:  Objection, Your Honor.

21          THE COURT:  Don't lead the witness.  Rephrase the

22  question.

23  BY MR. HARDING:

24  Q    What, if the alibi worked, what would it mean for Mr.

25  Martin?

1    A    He would beat the charge.

2    Q    Okay.  Would he then be available to --

3              MR. CROWE:  Objection.

4              THE COURT:  Don't lead the witness.

5    Q    What would that mean for your plans with Mr. Martin and Mr.

6    Gardner?

7    A    They'd be back on.

8    Q    They'd be back on?

9    A    Yeah.

10   Q    Okay.  You said that he told you a lot of things.  Do you

11   remember any of the other things that he told you about this

12   charge that Mr. Martin had picked up?

13   A    As far as the charge go, he said that when they was supposed

14   to have been doing the robbery/murder or whatever, that somebody

15   must have pressed a button on the phone and Bo voice got recorded

16   saying, you ain't check his pockets, Wayne.

17   Q    You ain't check his pockets, Wayne?

18   A    Yeah.  But he, Goo said he really said "man."

19   Q    He didn't say "Wayne", he said "man?"

20   A    Right.  But detectives took it for Wayne.

21   Q    And who was it, according to Mr. Gardner, who said the

22   phrase, "You didn't check his pockets?"

23   A    Bo.

24   Q    Okay.  And did he tell you anything about narcotics?

25   A    Yeah.  He said one detective said they left a key in the

1    car.

2    Q    What did Mr. Gardner say about that?

3    A    He ain't believe him.

4    Q    He didn't believe the detective?

5    A    Right.

6    Q    Okay.  And so did you proceed, then, on the assumption that

7    Martin would probably beat the charge and be out of jail?

8    A    Yes.

9    Q    And did you then alter your plans for who the next target of

10   your robbery --

11         THE COURT:  I'm sorry, Mr. Harding.  You're going to

12   have to back up.  You're going to have to put this evidence in

13   context.

14   Q    Oh, I see.  I thought you meant physically back up.

15         THE COURT:  No.  No.

16   Q    When did this plan to rob --

17         THE COURT:  First of all, first all, Mr. Montgomery,

18   what, if any, contact did you have in January, February, and

19   March of 2002 with any of the three people you've identified?

20   When did you see them, if at all?  How did you see them?  What

21   happened when you saw them?  What was going on in January,

22   February, and March of 2002, if anything, between you and any of

23   these individuals?  As best as you can recall.

24         THE WITNESS:  I really can't recall the dates or the

25   months.

Case 1:04-cr-00029-RDB   Document 681   Filed 06/08/09   Page 129 of 280

1          THE COURT:  Do you remember the year 2002?

2          THE WITNESS:  Yeah.

3          THE COURT:  What do you remember about that year?

4          THE WITNESS:  Well --

5          THE COURT:  The early part of that year.

6          THE WITNESS:  Wayne first came home.  I think the first

7     time I seen Wayne was at a Shell gas station.

8          THE COURT:  And when approximately was that?

9          THE WITNESS:  It was, it was early in 2002.

10          THE COURT:  All right.  Who else, if anybody, did you

11     see?

12          THE WITNESS:  I've been hooked up with Goo.

13          THE COURT:  When you say "been hooked up with Goo",

14     what do you mean by that?

15          THE WITNESS:  We, we've been in contact with each other

16     through E.

17          THE COURT:  And who is E?

18          THE WITNESS:  Aaron Holly.

19          THE COURT:  And you're still talking about 2002?

20          THE WITNESS:  Yeah.

21          THE COURT:  Anybody else?

22          THE WITNESS:  No.

23          THE COURT:  Did you engage in any activities with any

24     of these gentlemen in January or February of 2002, as best you

25     can recall?

1          MR. HARDING:  May I inquire, Your Honor?

2          THE COURT:  Yes.  Go ahead, Mr. Harding.  I'm just

3    trying to understand.  I think you see what I'm trying to

4    understand.

5    BY MR. HARDING:

6    Q    Okay.  When you ran into Mr. Martin at the Shell gasoline

7    station, the first time you saw him after he came home, where was

8    he residing at that time?

9    A    He was still in a halfway house.

10   Q    Still in a halfway house.  And when you met him, did you

11   have a discussion about a --

12         THE COURT:  What, if any, discussion did you have?

13   Q    What, if any, discussion did you have with him at that

14   initial meeting you had?

15   A    When I met him, I asked him what's up.  We tripped for a

16   minute.  I asked him what he was doing because I rolled up on

17   him, he was almost asleep for real.  So I asked him what he was

18   doing at the Shell station.  Said he was trying to sit down, wear

19   off his liquor.

20         THE COURT:  Trying to do what?  I'm sorry.

21   A    Wear off his liquor.

22         THE COURT:  Wear off some liquor.  Okay.

23   A    So we got to talking.  I don't know how it came up, but we

24   got to talking about Goose and the robbery.

25   Q    Who brought it up?  Do you remember that?

1    A    He did.

2    Q    Okay.  Were you involved in planning, plans with him after

3    that?

4    A    I wasn't really involved in planning it.  That was his

5    thing.  I told him that I knew a spot where Goose come to at

6    Randallstown, a house.  But that was his whole thing.

7    Q    Did you have a subsequent discussion in a car out in front

8    of Aaron Holly's house with Mr. Martin and Mr. Gardner?

9    A    Yes.

10   Q    Can you tell us what you discussed in that meeting?

11   A    We talked about some guns.

12   Q    What did you say about guns?

13   A    I think, I had just got, I had just got a .45 and I was

14   telling him about that, but I had needed another gun.  And I was

15   asking him can he get me another gun.

16            THE COURT:  Why did you need another gun?

17            THE WITNESS:  I was going to use it.

18            THE COURT:  That may seem like a stupid question.

19            THE WITNESS:  I was going to use it.

20            THE COURT:  But you already had a .45, you said.

21            THE WITNESS:  I was going to use it so I needed another

22   one.

23            THE COURT:  In other words, you were going to get rid

24   of the .45 after you used it?

25            THE WITNESS:  Yes.

1          THE COURT:  I see.  All right.  And approximately when

2     was this conversation in the car?  As best you can recall.

3          THE WITNESS:  It wasn't too long before he got

4     arrested.

5          THE COURT:  Okay.

6     BY MR. HARDING:

7     Q    What, if anything, did Mr. Martin say?

8     A    He was going to look into it, getting me another gun.

9     Q    What kind of gun?

10    A    He didn't say.

11    Q    Well, did he say he had a gun available?

12         MR. CROWE:  Objection.

13         THE COURT:  Overruled.  You may answer.

14    A    He didn't say he had a gun available.  He talked about a .40

15    caliber that he had and said he always used it and got about

16    three bodies on it.  But he didn't say it was available.

17    Q    Okay.  But he said --

18         THE COURT:  All right.  Now can you question the

19    witness about the March alibi?  I just don't understand when that

20    came up in the context.

21    Q    Okay.  Actually, did you hear about the murder of -- well,

22    you don't know these names perhaps, Darryl and Anthony Wyche?

23    Did you hear about murders of a couple of drug dealers in a car?

24    A    No.

25    Q    Okay.  Subsequently --

DIRECT EXAMINATION OF WILLIAM MONTGOMERY                    133

1          THE COURT:  I'm sorry.  Subsequently to what?  If he

2    didn't hear about it.

3    Q    Okay.  After this meeting that you had in the car with Wayne

4    and Gardner and Aaron Holly that you just told us about, were you

5    still involved in a plan to rob Goose?

6    A    Yes.

7    Q    Did there come a time when Mr. Martin got arrested?

8    A    Yes.

9    Q    If I told you that was April 17th, 2002, would that sound

10   about right?

11   A    Yes.

12   Q    Okay.  Was Mr. Gardner also briefly arrested around the same

13   time?

14   A    Yes.

15   Q    And you told us a few moments ago about a conversation that

16   you had with Mr. Gardner immediately after he got out of jail, is

17   that correct?

18   A    Yes.

19   Q    What were you doing at that time when you had the

20   conversation?

21   A    As far as, what you mean?  As far as what I was doing?

22   Q    What were you and Mr. Gardner doing?  Where were you and

23   what were you doing?

24   A    I don't remember where we was at.

25   Q    Okay.

Case 1:04-cr-00029-RDB    Document 681    Filed 06/08/09    Page 134 of 280

1    A    We probably was getting high.

2    Q    Okay.  Is it then that Mr. Gardner told you about this --

3         MR. CROWE:  Objection.

4    Q    -- alibi that was going to --

5         THE COURT:  Rephrase the question.

6    Q    Did you have a discussion, you've already told us about this

7    discussion that you had with Mr. Gardner.  Was there anybody else

8    present when Mr. Gardner told you about this alibi, as you called

9    it?

10   A    E.

11   Q    Aaron Holly was present?

12   A    Yes.

13   Q    And tell us again what Mr. Gardner told you.

14   A    Well, he was just coming home.  And he basically was telling

15   us basically what happened, how Wayne and Bo got arrested, what

16   was all said, what the detectives said and everything.

17        THE COURT:  And why did they get arrested?

18        THE WITNESS:  They was arrested for murder and robbery.

19        THE COURT:  Do you know of whom?

20        THE WITNESS:  No.  He never stated the name.  So if he

21   did, I didn't pay it no mind.

22        THE COURT:  All right.  Did it surprise you?

23        THE WITNESS:  No.

24        THE COURT:  Why didn't it surprise you?

25        THE WITNESS:  That's what they do.

1    BY MR. HARDING:

2    Q    And so he told you about a movie theater, is that correct?

3    A    He told me that Wayne was going to be all right because

4    Wayne had charged some movie tickets to his credit card.  That

5    was going to be his alibi.  So he was supposed to be at the

6    movies during the time that the murder and stuff went down.

7    Q    Okay.  Now, were you involved in drug trafficking in the

8    months preceding that?

9    A    Drug trafficking?

10   Q    Yeah.  Were you selling any drugs?

11   A    Yes.

12   Q    Where?

13   A    Edmondson Avenue, Lanvale and Payson, Lauretta and Monroe.

14   All through that area.

15   Q    Was Mr. Holly involved with you?

16   A    Yes.

17   Q    Was Mr. Gardner also involved in selling drugs at that time?

18   A    Yes.

19   Q    Was he involved, was he also using Mr. Holly at that time?

20   A    Yes.

21   Q    Was Mr. Holly selling for both of you in Catonsville at that

22   time?

23   A    Yes.

24   Q    On Winters Lane?

25   A    Yes.

1    Q    Okay.

2              THE COURT:  All right.  Thank you, Mr. Harding.  Any

3    questions?

4              MR. COBURN:  Yes, Your Honor.

5              THE COURT:  Wait a minute.  And I expect it to be

6    brief, counsel.  This is not discovery.

7              CROSS EXAMINATION

8    BY MR. LAWLOR:

9    Q    Understood.  Sir, how are you?  Am I correct in saying that

10   the statements that you're here discussing were made to you by

11   Mr. Gardner?

12   A    Yes.

13   Q    Okay.  And you didn't rob, you never were involved in any

14   robberies with Mr. Mitchell?

15   A    No.

16   Q    All right.  You say you don't know when he was arrested?

17             THE COURT:  Who's he?

18   Q    Mr. Mitchell.  Forgive me.

19   A    Not, not the date or nothing, no.

20   Q    All right.  So you were involved, you recall that Mr.

21   Gardner and Mr. Holly were incarcerated as of the beginning of

22   June of 2002, correct?

23   A    Repeat that again.  I didn't understand you.

24   Q    Sure.  The Spence robbery and homicide was in June of 2002,

25   right?

1   A    Yes.

2   Q    And you were involved in the planning of that with Mr.

3   Gardner and Mr. Holly for some time leading up to June?

4   A    Yes.

5   Q    You hadn't seen Mr. Mitchell or talked to Mr. Mitchell at

6   any time --

7   A    No.

8             MR. HARDING:  I'm going to object.

9             THE COURT:  Overruled.  Go ahead, Mr. Lawlor.

10            MR. LAWLOR:  Your Honor --

11            THE COURT:  Go ahead, Mr. Lawlor.  Go ahead.  Go ahead.

12   BY MR. LAWLOR:

13   Q    Do you recall seeing Mr. Mitchell at all, in fact, in 2002?

14   A    No.

15   Q    All right.  Do you recall, prior to 2002, when the last time

16   was that you saw Mr. Mitchell?

17   A    It's been a while.

18   Q    So, and I'm not trying to pin down, but to the best of your

19   recollection, you hadn't seen him in 2002 at all?

20   A    No.

21   Q    All right.  Had you seen him at all even in 2001?

22   A    No.

23   Q    2000?

24   A    I believe so.

25   Q    All right.  So it was a couple years prior to 2002 was the

1    last time that you saw Mr. Mitchell?

2    A    Right.

3    Q    All right.  And you didn't, for lack of a better term, you

4    didn't have business dealings with him then, right?

5    A    No.

6    Q    Okay.  Court's indulgence, please.

7              That's all.  Thanks.

8              THE COURT:  All right.

9              CROSS EXAMINATION

10   BY MR. CROWE:

11   Q    Good afternoon, Mr. Montgomery.  I represent Shelly Martin.

12             Did it make any difference in your plans whether Mr.

13   Martin or Mr. Martin and Mr. Mitchell or Mr. Martin and Mr.

14   Mitchell and Mr. Gardner had an alibi for the murders?

15   A    As far as the robbery of Goose?

16   Q    Yeah.

17   A    Yes.

18   Q    And why was that?

19   A    Because that was his thing.

20   Q    Okay.  It wasn't that he had some specific information that

21   you needed to effect the robbery of Goose, was it?

22   A    I believe he did.  I believe he was more closer to Goose

23   than I was.

24   Q    But you, in fact, were aware yourself of where Goose could

25   be found every day, is that correct?

1    A    Right.

2    Q    Now, you have made several statements to the police, is that

3    correct?

4    A    Yes.

5    Q    Some of those have been statements where you have simply sat

6    down and people have, people have asked you questions, is that

7    right?

8    A    Yes.

9    Q    And there are other statements, there are other instances

10   where you have sat down and people have not only asked you

11   questions, but they've eventually taped the statement that you

12   have, is that correct, also?

13   A    Yes.

14   Q    And there have been, you've had at least one appearance in

15   front of a federal grand jury, is that right, also?

16   A    Yes.

17   Q    Let me ask you if the following is true.  Were you meeting,

18   were you meeting with law enforcement authorities in September of

19   2002?

20   A    Yes.

21   Q    And did you, in fact, make a statement to law enforcement

22   authorities at that time that a guy named Goose runs Pulaski and

23   Hollins?

24   A    I believe so, yes.

25   Q    And what do you mean by runs Pulaski and Hollins?

1    A    I mean, he was supplying them.

2    Q    Pardon?

3    A    I mean he was supplying them with drugs.

4    Q    You mean he was supplying dealers at Pulaski and Hollins?

5    A    Yes.

6    Q    And --

7         THE COURT:  Note sure where this is going, Mr. Crowe.

8    Q    Did you further say that Montgomery was supposed to assist

9    Wayne and Goo in a home invasion in Randallstown on Princely Way?

10   A    Princely Way is where I told him I seen Goose go into a

11   house.

12   Q    And did you further tell the authorities on that occasion

13   that you were not aware who the victim was supposed to be at that

14   time?

15   A    No, I knew who the victim was.

16   Q    Did you tell them --

17        THE COURT:  Mr. Crowe, I'm sorry.  I don't see where

18   this is going.

19   Q    I'd just like to show this witness a debriefing memorandum

20   which was prepared by law enforcement authorities following his

21   debriefing on September 26th of 2002.  I will be fairly direct on

22   this.  Page Five.

23        THE COURT:  It's going to come you on that monitor, Mr.

24   Montgomery.

25   Q    Can you see that?  Sometimes there's difficulty coordinating

1   these monitors.

2   A    Yes.

3   Q    Do you say Montgomery advised a guy named --

4        THE COURT:  Point to the provision, please, Mr. Crowe.

5   Q    You see where it says Montgomery advised a guy named Goose

6   runs Pulaski and Hollins.  And Montgomery is supposed to assist

7   Wayne and Goo in a home invasion in Randallstown on Princely Way,

8   unknown victim.

9   A    Yes.

10  Q    Did you, in fact, tell law enforcement authorities that you

11  didn't know who the victim was going to be?

12  A    No.

13  Q    Your testimony is just that they got that wrong, is that

14  correct?

15  A    Right.

16       THE COURT:  Now Mr. Harding is showing people how to

17  use the equipment.

18       MR. CROWE:  I'm regressing.

19       THE COURT:  No, Mr. Harding is progressing.

20       MR. HARDING:  Thank you, Your Honor.

21  BY MR. CROWE:

22  Q    That may be, also.  Why -- what is your, why do you believe,

23  why do you, do you have a belief as to why it was that Mr.

24  Gardner was supposedly, had supposedly agreed to participate in

25  the robbery and attempted murder of Darius Spence?

CROSS EXAMINATION OF WILLIAM MONTGOMERY BY CROWE                142

1    A    Why do I believe?

2    Q    Yeah.

3    A    He needed some money.  Needed to help Wayne with a lawyer.

4    Q    Okay.  In fact, you recall testifying before the grand jury?

5    Do you recall testifying before grand juries twice in this

6    district?

7    A    Twice?

8    Q    Yeah.

9    A    Nah, I don't recall.

10   Q    Do you recall, do you recall testifying once?

11   A    Yeah.

12   Q    Okay.  Do you recall testifying on that occasion that the

13   reason that Mr. Gardner was participating was because he had lost

14   a couple of thousand dollars?

15   A    No.  I don't recall that.

16   Q    Just have a moment find the reference, Your Honor.

17        This is on Page 20 of the January 14th, 2004

18   transcript.  I'm sorry.  It's Page 22.  You see up at Line Two?

19   Is that, is that, can you see the full thing on your screen?

20   A    Yes.

21   Q    Question:  Did Mr., did Goo tell you anything about an alibi

22   that Martin had?  Answer:  Yes.  What did he tell you?  The alibi

23   supposed to have been that they was at the movies with some girls

24   that night or that day.  Wayne had charged the movie tickets on

25   his credit card so they had some receipts or something.

1          Question:  Okay.  So he had a paper record of the fact

2     that he had gone to the movie?  Martin did?

3          I'm sorry, Your Honor.  That's the wrong passage.  Let

4     me just continue on that.

5          Did he actually go to the movie, do you know?  I don't

6     actually know if they went to the movie.  I would think not.

7          Now, is it true, sir, that what you told the jury, what

8     you told the grand jury was that Mr. Martin had gone to, had gone

9     to the movies with a couple of girls?

10    A    That I told them that he went to the movies with a couple

11    girls?  Is that what you asking me?

12    Q    Yeah.

13    A    No.  I told them that was the alibi.

14    Q    You told them the alibi was that he had gone to the movies

15    with a couple of girls, is that correct?

16    A    I don't know if he went or not.  I wouldn't think so.

17    Q    But you told them that the alibi was that he went to the

18    movie with a couple of girls, is that correct?

19    A    Right.

20    Q    Now, getting back to the question I was originally asking

21    you.  What I really meant to do was to direct you to a question

22    and answer session you had with an Assistant State's Attorney by

23    the name of Dean Stocksdale.  You remember that, do you not?

24    A    Yes.

25    Q    And in fact, Mr. Stocksdale was, was he not, the lawyer who

CROSS EXAMINATION OF WILLIAM MONTGOMERY BY CROWE

144

1    actually prosecuted Mr. Gardner and Aaron Holly in Baltimore

2    County.  Do you recall that, also?

3    A    Yes.

4              THE COURT:  What was the outcome of Mr. Holly's case?

5              MR. CROWE:  Both, both individuals were convicted, Your

6    Honor.

7              THE COURT:  Were they tried jointly?

8              MR. CROWE:  They were tried jointly.

9    BY MR. CROWE:

10   Q    And do you, in fact, recall that sometime around January,

11   2003, that you came into this courtroom and in the U.S.

12   Attorney's Office, had an interview with Mr. Stocksdale and a

13   bunch of other people?

14   A    Yes.

15             MR. HARDING:  What page.

16   Q    That was Page One.  I'm going to Pages 10 and 11.  Do you

17   recall being asked the question by Mr. Stocksdale:  Was there a

18   particular reason that Gardner was or was part of this plan?

19   Answer:  Um, E, who would be Aaron Holly, told him about it.  He

20   had took a nice fall about that time.

21             Mr. Stocksdale:  And when you said he took a nice fall,

22   who are you referring to?  Your answer is Goo.

23             And then you are asked:  What do you mean, he took a

24   nice fall?  Answer was, he took a couple of thousand.  Do you see

25   that?

1          MR. HARDING:  Lost.  Lost.

2    Q    He lost a couple of thousand.  Do you see that?

3    A    Yeah.

4    Q    Was, in fact, the reason that Mr. Gardner agreed to

5    participate in this plan not because he was looking for money to

6    fund legal fees for Mr. Martin but rather, as you testified here,

7    he had lost a couple of thousand dollars?

8    A    That was part of the reason.

9    Q    So part of the reason -- so you say that's only part of the

10   reason?

11   A    Yes.

12   Q    Okay.  But part of the reason was that he had lost a couple

13   of thousand dollars, is that correct?

14   A    Yes.

15   Q    In fact, you've never participated in any sort of home

16   invasion robbery with Mr. Martin, had you?

17   A    No.

18   Q    And the fact that Mr. Martin dropped out of this matter

19   didn't really slow down your activities at all, did they?

20   A    No.

21   Q    You murdered a man in May of 2002, didn't you?

22   A    Yes.

23          MR. HARDING:  Objection.

24          THE COURT:  Sustained.  I think you're concluded, Mr.

25   Crowe.

1      MR. CROWE:  Thank you, Your Honor.

2      THE COURT:  Thank you.  Briefly, Mr. Coburn.

3      MR. COBURN:  Absolutely, Your Honor.  Thank you.

4      CROSS EXAMINATION

5  BY MR. COBURN:

6  Q    Just to let Your Honor know, we're going in order during

7  this proceeding.  But with the Court's permission, all the other

8  defendants, as we did with the last witness, have consented to

9  let us go first in crossing Mr. Montgomery before the jury.

10     THE COURT:  All right.

11 Q    With the Court's permission.

12     THE COURT:  All right.

13 Q    Mr. Montgomery, I'm Barry Coburn.  Just a very few questions

14 for you.  Do you remember during the course of your direct

15 examination by Mr. Harding, the gentleman sitting over here to my

16 left, you mentioned that there was a time, I think you said at a

17 gas station, where you were talking to Mr. Martin and he, did you

18 say he was wearing off some liquor?

19 A    Yes.

20 Q    Where was the gas station located?

21 A    Woodmoor Shopping Center.

22     THE COURT:  Closer to the mike, please, Mr. Montgomery.

23 A    Woodmoor Shopping Center.

24 Q    Now, how much time passed between that conversation and what

25 Mr. Harding then asked you about the subsequent discussion that

1    happened in the car when you all were talking about some guns?

2    How much time in between those two things?

3    A    I couldn't be sure.

4    Q    Can you give us an estimate, your best estimate?

5    A    A couple weeks.

6    Q    Okay.  And on both of those occasions it's your testimony

7    and response again to Mr. Harding's questions that you all were

8    talking about the planned home invasion robbery of Goose, is that

9    correct?

10   A    Right.

11   Q    Okay.  Then, also in response to one of Mr. Harding's

12   questions, you indicated that there was, in fact, a home invasion

13   that you participated in together with Mr. Gardner, right?

14   A    Right.

15   Q    And that was the home invasion that led to the death of

16   Tonya Jones-Spence, right?

17   A    Right.

18   Q    How much time passed between that second conversation, the

19   one in the car, and the time Ms. Spence was killed?

20   A    I couldn't be sure.

21   Q    The home invasion robbery that led to the death of Ms.

22   Spence, that had nothing to do with the attempted or the planned

23   home invasion of Goose, is that correct?

24   A    No.

25   Q    Is that right?

1    A    Right.

2    Q    Thank you.  Nothing further, Your Honor.

3          THE COURT:  All right.  The Court is satisfied that the

4    government has satisfied its burden.  I'll spell out in greater

5    detail at a subsequent time the reasons.  But having heard the

6    testimony here in this hearing, the Court is satisfied that the

7    government may proceed.  We'll have the jury, please.

8          MR. LAWLOR:  Your Honor, can we just get, Your Honor,

9    and I'll submit something in writing --

10          THE COURT:  Just one moment, Ms. Arrington.

11          MR. LAWLOR:  Forgive me, Your Honor.  I don't want to

12    belabor this because I know you're trying to bring the jury in,

13    and I'll put something in writing.  I'm not clear what statements

14    the government intends to introduce that will implicate Mr.

15    Mitchell or are purportedly statements Mr. Mitchell made which

16    are supposedly going to be relayed through this witness, again

17    through Mr. Gardner.

18          THE COURT:  Well, everything the government introduces

19    is intended to implicate Mr. Mitchell, as it is intended to

20    implicate Mr. Harris --

21          MR. LAWLOR:  Fair enough.

22          THE COURT:  -- Mr. Martin and Mr. Gardner.  Now, what's

23    clear is that there are a number of different conspiracies in

24    this case, some of which are sub-conspiracies of larger

25    conspiracies.  So one might say, well, that's not really a

1    different conspiracy because a sub-conspiracy of a larger

2    conspiracy is a part of that larger conspiracy.

3         So I don't know, and I'm sure you all don't know

4    ultimately how many conspiracies at the end of the day, meaning

5    at the end of the trial, will have been proven.  But it all is

6    probative evidence, some of greater probative value than other.

7    But it's all admissible against all the defendants.

8         Now, the Court will give a multiple conspiracy

9    instruction.  I'm sure it will be requested.  And the Court, as I

10   said before, is certain to give it.

11        MR. LAWLOR:  "Implicate" probably was the wrong word.

12        THE COURT:  But clearly, what the government is trying

13   to prove primarily is a RICO conspiracy and a drug conspiracy,

14   which is a subset of that RICO conspiracy.  But clearly, there's

15   some other, as I say, sub-conspiracies.

16        MR. LAWLOR:  Right.

17        THE COURT:  But I'm satisfied on this record at this

18   hearing that there were conspiracies of which Mr. Montgomery was

19   a part, of which Mr. Gardner was a part, of which Mr. Martin was

20   a part, and that conspiracy certainly appears prima facie to be a

21   subset of a larger conspiracy.

22        MR. LAWLOR:  Your Honor --

23        THE COURT:  Ultimately, it will be up for the jury to

24   parse this all out under my instructions.  I don't know if I'm

25   being responsive.  I'm trying.

1        MR. LAWLOR:  No, you are.  I used the wrong word

2   because you're right about the implication comment.  I think for

3   a Bruton analysis, though, I don't have an objection, for

4   example, what Mr. Gardner said Mr. Martin says that thereby

5   negatively affects Mr. Martin directly.  I do, though, have an

6   objection --

7        THE COURT:  But if it's in furtherance -- I'm sorry to

8   cut you off.  But if it's in furtherance of a conspiracy of which

9   Mr. Mitchell is a part, there's no Bruton problem.

10        MR. LAWLOR:  Yet you stole the words out of my mouth.

11   That's our objection here.  I only came up to ask for a

12   continuing objection so as to not belabor the jury coming out.

13   And I can flesh this record out later.  Our point is Mr. Mitchell

14   is not a member of this conspiracy and, therefore, that's one of

15   predicates to 801(d)(2)(e).

16        THE COURT:  Right.  So I guess, in effect, what you'd

17   be asking for but for my ruling is a limiting instruction to the

18   jury at the appropriate time during Mr. Montgomery's testimony,

19   among other things.

20        MR. LAWLOR:  Yeah, because I think it --

21        THE COURT:  In addition to a severance, I understand

22   that.

23        MR. LAWLOR:  Yeah.  Repeated severance request, number

24   30.

25        THE COURT:  Okay.  You have a continuing objection, as

1    do all of the defendants, with respect to the coconspirator

2    statements.

3            MR. LAWLOR:  All right.  Thank you.

4            THE COURT:  All right.  Mr. Montgomery, when the jury

5    is seated you'll be asked again to stand and be sworn.  Please

6    continue to keep your voice up and speak directly into the

7    microphone.

8            (Jury enters the courtroom.)

9            THE COURT:  Ladies and gentlemen of the jury, good

10   afternoon, and thank you for the umpteenth time for your

11   patience.  We're ready to continue.  Government may call its next

12   witness.

13           MR. HARDING:  Yes.  Thank you, Your Honor.  The United

14   States calls William Montgomery.

15           THE COURT:  Would you stand and be sworn, Mr.

16   Montgomery?

17         WILLIAM MONTGOMERY, GOVERNMENT'S WITNESS, SWORN

18           THE WITNESS:  I do.

19           THE CLERK:  Be seated.  Scoot up.  Speak directly

20   toward the mike.  State your name and spell it for the record.

21           THE WITNESS:  William Montgomery.  W-I-L-L-I-A-M.

22   M-O-N-T-G-O-M-E-R-Y.

23           DIRECT EXAMINATION

24   BY MR. HARDING:

25   Q    Good afternoon, Mr. Montgomery.  Mr. Montgomery, can you

1    tell us how old you are, sir?

2    A    28.

3    Q    And where did you grow up?

4    A    Baltimore City.

5    Q    How far did you get in school?

6    A    Ninth grade.

7    Q    And what school was that that you got through ninth grade or

8    into the ninth grade in?

9    A    Walbrook High.

10   Q    Where's Walbrook High located?

11   A    Baltimore City.

12   Q    Okay.  Have you been convicted of crimes, Mr. Montgomery?

13   A    Yes.

14   Q    Can you tell us what crimes you've been convicted of and

15   roughly when they took place?

16   A    I've been convicted of murder, first degree murder.  That

17   took place in '02.  I've been convicted of two handguns, state

18   and federal.  And a robbery.

19   Q    Okay.  Are you in the Federal Witness Protection Program,

20   Mr. Montgomery?

21   A    Yes.

22   Q    Are you locked up?

23   A    Yes.

24   Q    You said that you pled guilty or you were convicted of

25   murder, is that correct?

1   A    Yes.

2   Q    Okay.  I have three documents here that I'd like to call to

3   your attention.  The first is Government Exhibit P-17.  Do you

4   see that on the screen in front of you, Mr. Montgomery?

5   A    Yes.

6   Q    Does that have your, your name along, with a lot of other

7   signatures on Page Two?

8   A    Yes.

9   Q    Do you recognize this as a proffer letter that was given to

10  you in July of 2002 after you got arrested?

11  A    Yes.

12  Q    Was Mr. John G. Sakellaris your attorney, Mr. Montgomery?

13  A    Yes.

14  Q    Do you have another attorney?

15  A    Joan Fraser.

16  Q    Okay.  Let me show you also Government Exhibit P-2.  You

17  recognize this document, Mr. Montgomery?

18  A    Yes.

19  Q    Does this one also have your signature on the last page?

20  A    Yes.

21  Q    Is this a plea agreement that you entered in 2003 to a

22  federal handgun charge?

23  A    Yes.

24  Q    And finally, I have Government Exhibit P-3.  Can't make this

25  out very well.  But does this have your signature on it, also?

1    A    Yes.

2    Q    Is this the plea agreement that you entered to first degree

3    murder in Baltimore City in 2003?

4    A    Yes.

5    Q    And it's signed by Joan Fraser.  Is she the attorney in your

6    state murder case and Mr. Sakellaris your attorney in the federal

7    case?

8    A    Correct.

9    Q    Okay.  Now, let me ask you first about the first document in

10   time, which is signed, which is dated July 17th, 2002.  Do you

11   see that?

12   A    Yes.

13   Q    How long had you been locked up when you signed this proffer

14   letter and agreed to come in and talk to government

15   representatives?

16   A    Two weeks maybe.

17   Q    Okay.  When you were locked up, do you remember what the

18   charge was that you were locked up for?

19   A    Violation of probation and a handgun.

20   Q    Okay.  And then was the handgun case taken federally?

21   A    Yes.

22   Q    And is that how you wound up with the federal handgun charge

23   that we just saw your plea agreement for?

24   A    Yes.

25   Q    And then while you were still locked up for that, is that

1    when the state murder charge came down?

2    A    Yes.

3    Q    And you wound up pleading guilty around the same time to

4    both the murder charge and the gun charge, is that correct?

5    A    Yes.

6    Q    Now, do you understand that this proffer letter essentially

7    assures you that --

8              MR. COBURN:  Objection, leading.

9    Q    Well, it's in evidence, Your Honor.  I'm happy to simply

10   read it.

11             THE COURT:  You can summarize it for us, Mr. Harding,

12   but don't lead the witness.  But you can summarize the proffer

13   letter.

14   Q    Does this first paragraph provide that, essentially, with a

15   couple of exceptions that are detailed in Paragraphs Two and

16   Three, nothing you say will be used against you?

17   A    Right.  Yes.

18   Q    Okay.  So after you signed this proffer letter with these

19   prosecutors, do you see that the U.S. attorney was actually not

20   me or Mr. Hanlon, but a guy named James Green?  Do you see that?

21   A    Yes.

22   Q    And both of your attorneys signed this proffer letter, is

23   that correct?

24   A    Yes.

25   Q    And this is your signature right here, is it not, Mr.

1    Montgomery?

2    A    Yes.

3    Q    You know whose signatures these are?

4    A    Looks like my lawyer's.

5    Q    Did you have more lawyers than Mr. Sakellaris and Mr. Fraser

6    (sic)?

7    A    No.

8    Q    Okay.  In any event, after you signed this letter, did you

9    begin to cooperate and reveal what you knew to law enforcement

10   people about your criminal activities?

11   A    Yes.

12   Q    Okay.  And then the next document in time is actually your

13   state murder plea, which is May of 2003, is that correct?

14   A    Yes.

15   Q    Is this what's known as a cooperation plea agreement, Mr.

16   Montgomery?

17   A    Yes.

18   Q    Okay.  Does it provide that the defendant agrees to

19   cooperate with the State on the following terms and conditions?

20   Let me just run through these with you, Mr. Montgomery.  The

21   defendant represents that he has fully and truthfully responded

22   to all questions put to him by federal, state and local law

23   enforcement authorities during all prior proffer sessions.  The

24   defendant shall continue to cooperate fully with the state, and

25   the United States Attorney's Office, and so on, providing full,

1    complete and candid information concerning the activities of

2    himself and others concerning all matters about which law

3    enforcement officers inquire.

4              Is that correct, Mr. Montgomery?

5    A    Yes.

6    Q    Then it also provides that you're to turn over any documents

7    or evidence that are relevant.

8              Paragraph B provides a little more detail along the

9    same lines.  And so does Paragraph C.  It provides that if they

10   ask you to do something in an undercover capacity, you will agree

11   to wear a wire or record conversations if they ask you to, is

12   that correct?

13   A    Yes.

14   Q    And then it says that you will testify truthfully in grand

15   juries and at trial, is that correct?

16   A    Yes.

17   Q    And then there's some other conditions that are spelled out,

18   such that you shall commit no further crimes.  And then it says

19   you will enter pleas of guilty to the first count of an

20   indictment charging you with the first degree murder of Terry

21   Cheeks, as well as the second count, which charges you with use

22   of a handgun in the commission of a crime of violence.  Do you

23   see that?

24   A    Yes.

25   Q    And then it says the defendant expresses that he fully

1    understands that the maximum penalty for Count One is life

2    imprisonment and that the maximum penalty for Count Two is twenty

3    years imprisonment, with a mandatory minimum of five years

4    imprisonment without parole.  Correct?

5    A    Yes.

6    Q    And then the next paragraph, Paragraph H, provides that

7    you're also going to plead to this gun charge in federal court.

8    Is that correct?

9    A    Yes.

10   Q    And that that charge carries a maximum of ten years

11   imprisonment, as well as a possible fine.  Do you see that?

12   A    Yes.

13   Q    And then it goes on to say some things that the State of

14   Maryland is going to do in connection with this.  First of all,

15   it's going to, at your sentencing on this murder charge, inform

16   the Court of all sorts of things about your cooperation and all

17   other information about your background, character, conduct and

18   so on.  Do you see all that?

19   A    Yes.

20   Q    Including any failure by you to fulfill any and all of your

21   obligations pursuant to the agreement.  Correct?

22   A    Yes.

23   Q    And then it says what the State agrees to do pursuant to

24   this agreement, which is sort of like a contract, is that right,

25   Mr. Montgomery?

1    A    Yes.

2    Q    It says, first of all, that since you're pleading in the

3    state charge, you won't be prosecuted in federal court for the

4    homicide of Terry Cheeks.  Is that correct?

5    A    Yes.

6    Q    And then it says that it's going to bring to the Court's

7    attention all of this information.  And then in Paragraph C comes

8    the key provision, right, Mr. Montgomery?  At the defendant's

9    sentencing the State will make a recommendation regarding the

10   sentence the defendant shall receive based upon the extent of the

11   defendant's cooperation pursuant to this agreement.  If the

12   defendant completes all of the terms and conditions set forth in

13   this agreement to the satisfaction of the State, the State will

14   recommend that the defendant receive a maximum sentence of life

15   imprisonment, with all but a cap of 40 years suspended, followed

16   by five years' supervised probation upon your release.  The State

17   will have sole discretion in determining whether to make such a

18   recommendation.

19             Is that correct?

20   A    Yes.

21   Q    And then there's some other provisions about how -- did you

22   have a violation of probation case pending at that time?

23   A    Yes.

24   Q    And at this time you're going to get this cap of 40 years,

25   was going to run concurrently to any time you got for the

1    violation of probation?

2    A    Yes.

3    Q    And then it promises you the same thing that your proffer

4    letter promised you; namely, that your statements are not going

5    to be used against you.  Correct?

6    A    Yes.

7    Q    And then there are these other provisions about, it's up to

8    the State to decide whether you've completely fulfilled your

9    obligations.  It's understood that the defendant, if you commit

10   any more crimes, that would constitute a violation of this

11   agreement?  And then it says 4-A, the State may recommend to the

12   Court any sentence that the State considers appropriate up to and

13   including the maximum prison sentence allowable by law, which is

14   imprisonment for a term of life plus 20 years.  Is that your

15   understanding of what would happen if you were to violate the

16   terms of this cooperation plea agreement?

17   A    Yes.

18   Q    And then it also says you'd be subject to prosecution by

19   state or federal authorities for a variety of different kinds of

20   crimes that it lists here.  Do you see that, in Subparagraph B?

21   A    Yes.

22   Q    Bottom line, Mr. Montgomery, what does this agreement

23   require from you?

24   A    Just to tell the truth.

25   Q    And bottom line, what do you have to do pursuant to this

1  agreement?  I'm sorry.  What do you hope to get pursuant to this

2  agreement?

3  A    Nothing, nothing but what the plea agreement says.

4  Q    Who's going to sentence you, Mr. Montgomery?

5  A    The judge.

6  Q    Has anybody promised you what the judge is going to sentence

7  you to?

8  A    No.

9  Q    By the way, this judge is not Judge Davis, is it?  It's

10 going to be a state court judge, is that correct?

11 A    Right.

12 Q    Do you know the name of the judge, by any chance?

13 A    Wanda Heard.

14 Q    Okay.  And do you have any idea what kind of sentence she's

15 going to give you, apart from what's stated in this plea

16 agreement, which is that there's a cap of 40 years?

17 A    No.

18 Q    Okay.  With the federal handgun charge, Mr. Montgomery,

19 which you entered in 2003, have you actually already done your

20 time for the federal handgun charge?

21 A    Yes.

22 Q    What kind of sentence did you get on that?

23 A    Close to three years.

24 Q    Okay.  That was a charge that you possessed a firearm and

25 you weren't allowed to because you were a felon, is that correct?

1   A    Yes.

2   Q    Okay.  Where did you go to elementary school, Mr.

3   Montgomery?

4   A    I went to two elementary schools.  I went to Woodmoor

5   Elementary and I went to Scotts Branch Elementary.

6   Q    While you were in elementary school, did you meet a man by

7   the name of Shelly Wayne Martin?

8   A    Yes.

9   Q    Do you see him in the courtroom here today?

10  A    Yes.

11  Q    Could you point him out to us, please, and indicate what

12  kind of clothing he's wearing?

13  A    He got the black shirt on (indicating).

14  Q    May the record reflect that the witness has identified the

15  defendant, Shelly Wayne Martin, Your Honor?

16          THE COURT:  So noted.

17  Q    Which of those schools did you meet Mr. Shelly Wayne Martin

18  at?

19  A    Woodmoor.

20  Q    Wiltmore?

21  A    Woodmoor.

22  Q    Woodmoor.  Okay.  And so how old would you have been when

23  you first met Shelly Wayne Martin?

24  A    Six, something like that.  I don't know.

25  Q    Was he older than you or younger than you?

1   A    He was older.

2   Q    Do you know how much older?

3   A    A couple years.

4   Q    A couple of years.  Did you also get to know a man by the

5   name of Shawn Gardner?

6   A    Yes.

7   Q    Do you see him in the courtroom here today?

8   A    Yes.

9   Q    Could you point him out to us?

10  A    White shirt (indicating).

11  Q    May the record reflect that the witness has identified Shawn

12  Gardner, Your Honor?

13         THE COURT:  So noted.

14  Q    Did Shawn Gardner have a nickname?

15  A    Goo.

16  Q    Okay.  What about Shelly Wayne Martin?  What did you call

17  him?

18  A    Wayne.

19  Q    Okay.  What school were you in when you met Shawn Gardner?

20  A    Scotts Branch.

21  Q    Elementary school?

22  A    Yes.

23  Q    So you've known him from a very young age, also?

24  A    Yes.

25  Q    Let me show you what's been marked as Government Exhibit

1   PH-40.  Is that a picture of Scotts Branch Elementary School?

2   A    Yes.

3   Q    Where is that located, Mr. Montgomery?

4   A    Randallstown.

5   Q    Did you get to know a man by the name of Willie Mitchell?

6   A    No.

7   Q    Did you get to know a man by the name of Bo?

8   A    Yes.

9   Q    You see Bo in the courtroom here today?

10  A    Yes.

11  Q    Where is Bo?

12  A    Gray shirt (indicating).

13  Q    Where did you meet Bo?

14  A    Scotts Branch Elementary.

15  Q    You've known him since you were a kid, also?

16  A    Yes.

17  Q    Did you met a man by the name of Darryl Bacon?

18  A    Yes.

19  Q    How old were you when you met him?

20  A    Maybe 12, 13.

21  Q    And where were you in school, if you were in school, when

22  you met him?

23  A    Johnnycake Middle.

24  Q    Johnnycake Middle School?

25  A    Yes.

165

1   Q    So you met him sometime later than these three people you've

2   just identified in this courtroom, is that correct?

3   A    Yes.

4   Q    I'm showing you PH-70.  Can you identify who that is?

5   A    That's Darryl Bacon.

6   Q    Where's Johnnycake Middle School located, Mr. Montgomery?

7   A    Catonsville.

8   Q    Catonsville.  Okay.  Did you get to know a man by the name

9   of Aaron Holly?

10  A    Yes.

11  Q    Can you tell us how old you were when you got to know Aaron

12  Holly?

13  A    About the same age.  12, 13.

14  Q    Was there any connection between Aaron Holly and Darryl

15  Bacon?

16  A    Cousins.

17  Q    They were cousins?

18  A    Yes.

19  Q    What was Aaron Holly's nickname, if you know?

20  A    E.

21  Q    E like the letter E of the alphabet?

22  A    Yes.

23  Q    I'm showing you Government Exhibit S-59.  Can you identify

24  that?

25  A    That's E.

1    Q    That's E?

2    A    Yes.

3    Q    Did there come a time, Mr. Montgomery, when you started

4    dealing drugs?

5    A    Yes.

6    Q    Do you recall about -- well, let me ask you this.  What

7    drugs did you get involved in trafficking?

8    A    Coke, marijuana, heroin.

9    Q    Okay.  What about crack?  Have you ever dealt crack?

10   A    Yes.

11   Q    Okay.  When you were first starting out in this business,

12   where did you used to sell?

13   A    Catonsville.

14   Q    Any particular place in Catonsville?

15   A    Winters Lane.

16   Q    Winters Lane?

17   A    Yes.

18   Q    What drug were you selling on Winters Lane?

19   A    Crack.

20   Q    Let me show you Government Exhibit PH-66, which is already

21   in evidence, I believe.  Do you recognize this?

22   A    That's Winters Lane.

23   Q    And here's another shot.  This is PH-22.  Do you recognize

24   this?

25   A    Same road.

1    Q    Same road?

2    A    Yes.

3    Q    Can you see on this picture where you used to stand when you

4    sold crack on Winters Lane?

5    A    I used to stand in front of this bar right here.  This red

6    building.  One of the spots.  I can't see the corner down there.

7    Q    Okay.  But I made a spot on the screen.  Do you see that?

8    A    Yeah.

9    Q    Is that the bar you're talking about, that red building?

10   A    Yes.

11   Q    Who supplied you with crack when you were first selling

12   crack on Winters Lane in Catonsville?

13   A    Goo.

14   Q    Mr. Gardner?

15   A    Yes.

16   Q    Can you give us an idea how much crack he used to supply you

17   with at a time?

18   A    An ounce.

19   Q    Was Mr. Gardner older than you?

20   A    Yes.

21   Q    Do you know how much older?

22   A    A couple years.

23   Q    Okay.  Did you buy the crack from him or did you get it on

24   consignment or what?

25   A    Yes, on consignment.

1    Q    Can you explain what that means?

2    A    He'd front it to me.

3    Q    Okay.  What does "front" mean?

4    A    He gave me the ounce, told me to bring him back 800, 850.

5    I'm not sure what it was at that time.

6    Q    $800 or $850, because that was what he wanted back from you

7    for an ounce of crack?

8    A    Yes.

9    Q    And that means that you would have an opportunity to go sell

10   crack and raise the money before you had to pay him back, is that

11   correct?

12   A    Yes.

13   Q    So how much would you make on an ounce of crack doing that?

14   A    Depends on what I bagged up.  I'm not sure.

15   Q    Okay.  But presumably, you made a profit.  So --

16   A    Yes.

17   Q    Okay.  And then you say you sold other drugs there, also, is

18   that correct?

19   A    Not out there.

20   Q    Not out in Catonsville?

21   A    No.

22   Q    But you started selling heroin, you said, and marijuana?

23   A    Yes.

24   Q    Did you ever get pills of crack from Shelly Wayne Martin?

25   A    One time, yes.

1    Q    Okay.  Can you tell us how much you got?

2    A    I don't remember.  A bag full of pills.

3    Q    Okay.

4    A    Vials.

5    Q    Let me, calling your attention back to the 1990's.  Did you

6    have a gun at that time?

7    A    Yes.

8    Q    When did you get your first gun?

9    A    11, 12.

10   Q    How about Shelly Wayne Martin?  Did he have a gun?

11   A    During those times?

12   Q    Yes.

13   A    I wouldn't know but I believe so.

14            MR. CROWE:  Objection, move to strike.

15            THE COURT:  The jury should disregard the witness'

16   speculation.

17   BY MR. HARDING:

18   Q    Did there come a time when Shelly Wayne Martin got guns?

19   A    Yes.  He got me a gun, yes.

20   Q    He got you a gun?

21   A    Yes.

22   Q    How old were you when he got you a gun?

23   A    Maybe 16, 17.

24   Q    Okay.  How did he go about getting you a gun?

25   A    He went, he went to some dude in Winchester Apartments and

DIRECT EXAMINATION OF WILLIAM MONTGOMERY                    170

1    got me a gun.

2    Q    Did you go with him?

3    A    Yeah.  I went to the apartment but I didn't go inside the

4    house with him.

5    Q    Did you meet the dude he was getting the gun from?

6    A    No.

7    Q    Did you give him money for the gun?

8    A    Yes.

9    Q    What kind of gun was it?

10   A    A .380.

11   Q    Do you remember how much money you gave to Mr. Martin to buy

12   the gun for you?

13   A    No.

14   Q    Okay.  A .380.  Okay.  How about Mr. Gardner, did he have

15   guns?

16   A    Yes.

17   Q    Did he usually carry a gun?

18   A    Yes.

19   Q    Did there come a time when you started selling drugs in

20   Baltimore City, not just in Catonsville?

21   A    Yes.

22   Q    When you started selling in Baltimore City, what locations

23   did you sell at?

24   A    Lauretta and Monroe, Edmondson and Pulaski, Lanvale and

25   Payson.

1    Q    Three different spots?

2    A    More than that, but I just named a few.

3    Q    Okay.  I've got Government Exhibit PH-47 on the screen.  Can

4    you tell us what that is?

5    A    Lauretta and Monroe.

6    Q    Did you have a relative who lived up there, Mr. Montgomery?

7    A    Yes.  My grandmother.

8    Q    What part of Baltimore City is that in?

9    A    West.

10   Q    Okay.  Would you say southwest or northwest?

11   A    Southwest.

12   Q    Okay.  May I have a word with the agent, Your Honor?

13             THE COURT:  Certainly.

14             (Pause in Proceedings.)

15   Q    Mr. Montgomery, did Shelly Wayne Martin and Goo, Mr.

16   Gardner, and Bo, Mr. Mitchell, go to New York for drugs?

17             MR. CROWE:  Objection, Your Honor.

18             THE COURT:  Overruled.  You may answer.

19   A    Yes.

20   Q    Did you go with them sometimes?

21   A    Yes, but only one time with Bo.

22   Q    Only one time with Bo?

23   A    Yes.

24   Q    Did you go -- how many times did you go with Mr. Martin and

25   Mr. Gardner?

1    A    A couple.  A few different times.

2    Q    A few different times?

3    A    Yes.

4    Q    Can you tell us what drugs you were going to New York to

5    buy?

6    A    They would go buy coke, sometimes weed.  I would go buy

7    weed.

8    Q    Okay.  When was this?  Can you tell us what years or how old

9    you were when you were doing this?

10   A    I first started going up with them in '97.

11   Q    And so how long did you continue going up there with them?

12   A    On and off for probably since, till 2000.

13   Q    Until 2000?

14   A    Yes.

15   Q    So over the course of three years?

16   A    Right.

17   Q    And who drove on these -- or let me ask you first.  How did

18   you get up there?

19   A    We drove.

20   Q    Did you always drive every single time?

21   A    Yes.

22   Q    And who drove?

23   A    Darryl drove sometimes.  Bo drove the one time he went, that

24   I went with him.  Goo drove.

25   Q    Okay.  Did it ever happen that the people who would go up

1   there on these trips to New York to buy drugs would buy drugs for

2   other people who weren't in the car?

3   A    Yes.

4   Q    For example?

5   A    There was a time when me, Goo and Darryl went up and I knew

6   that they was buying coke for Wayne.

7   Q    Okay.  Did you ever go to New York alone, Mr. Montgomery?

8   A    No.

9   Q    Why did you always go with a group of guys?

10  A    To be safe.

11  Q    Did you take a gun or guns with you when you would go to New

12  York on these trips?

13  A    Yes.

14  Q    How many?

15  A    One.

16  Q    Always one gun?

17  A    Yes.

18  Q    Did you hide the gun somewhere?

19  A    I didn't hide it but, yes, it was always a gun in the car

20  hidden.

21  Q    Okay.  Where would the gun be hidden?

22  A    Under the carpet.

23  Q    Like, for example, was there some special place in Mr., in

24  Goo's car where he would hide a gun?

25  A    It would be under the carpet.

DIRECT EXAMINATION OF WILLIAM MONTGOMERY                    174

1    Q    Under the carpet.  Which car are we talking about now?

2    A    That would be the Honda Accord wagon.  Station wagon.

3    Q    Honda Accord station wagon?

4    A    Yes.

5    Q    And there was a place under the carpet where you could

6    conceal a gun?

7    A    Yes.

8    Q    Well, did it cause a bump in the carpet or was there some --

9    A    No.

10   Q    There was some kind of receptacle underneath the carpet, is

11   that correct?

12   A    Yes.

13   Q    Okay.  What about Shelly Wayne Martin?  Did he have a spot

14   in a vehicle where he hid a gun?

15   A    Yes.

16   Q    Where was that?

17   A    Same spot, under the carpet.

18   Q    And so was there also a receptacle in his vehicle for

19   holding a gun?

20   A    Yes.

21   Q    Darryl Bacon, did he have such a thing?

22   A    Yes.

23   Q    What kind of car did he have?

24   A    A Benz.

25   Q    Okay.  What about Shelly Wayne Martin?  I don't know that I

1    elicited what kind of car he had.  What kind of car did he have?

2    A    A Cressida Toyota.

3    Q    Toyota Cressida?

4    A    Yeah.

5    Q    Okay.  Which vehicle did you usually go in?

6    A    The Honda Accord wagon.

7    Q    So Goo's car?

8    A    Yes.

9    Q    You said that when you went up with these guys, they usually

10   bought cocaine, is that correct?

11   A    Yes.

12   Q    What was the largest amount they ever bought?

13   A    A half a key.

14   Q    Okay.  Is that, are you referring to, of the times when you

15   went with them?

16   A    Yes.

17   Q    Half a key is half a kilo, is that correct?

18   A    Yes.

19   Q    How much would a half a kilo cost in New York?

20   A    Maybe, what, nine, 10,000.

21   Q    Okay.  Do you know, did they buy larger quantities on trips

22   when you didn't go?

23        MR. COBURN:  Objection, no foundation.

24        THE COURT:  Sustained.

25   Q    Did they ever tell you about larger quantities that they

1    made, that they purchased in New York on trips when you weren't

2    there?

3              MR. CROWE:  Objection.

4              THE COURT:  You can answer yes or no.

5              THE WITNESS:  Yes.

6              THE COURT:  Do you know who told you this?

7              THE WITNESS:  I heard Goo talk about it.

8              THE COURT:  All right.  Overruled.

9    BY MR. HARDING:

10   Q    You can answer.

11   A    I heard Goo talk about buying keys.

12   Q    Whole kilos?

13   A    Yes.

14   Q    Okay.  When you went up there with these guys, did you and

15   they pool your money together so you could get a better deal on

16   drugs or did you just buy drugs individually?

17   A    They pooled their money together.

18   Q    Meaning who?

19   A    Goo, Wayne, Darryl.

20   Q    Okay.  You said that Bo went on one of these trips and drove

21   the time that you went with him, is that correct?

22   A    Yes.

23   Q    Did he pool his money with anybody, as far as you know?

24   A    I believe so.

25   Q    Who with?

1   A     Wayne and Goo.

2   Q     Okay.  And we're talking about the time period from '97 to

3   2000, is that correct?

4   A     Yes.

5   Q     Did they go on other trips when you weren't present during

6   that time period?

7   A     Yes.

8   Q     Okay.  Where did you go in New York to buy these drugs?

9   A     Manhattan.

10  Q     Whereabouts in Manhattan?

11  A     Like 142nd, all up and down there.

12  Q     You know the names of any of the people that you guys bought

13  drugs from?

14  A     No.

15  Q     You were telling us about how you also started selling drugs

16  in Baltimore City, and you named several locations.  Did Aaron

17  Holly help you sell drugs?

18  A     In Baltimore City?  Yes.

19  Q     Yes.  Whereabouts in Baltimore City?

20  A     Edmondson and Pulaski.

21  Q     So what exactly would happen?  Would you supply him with

22  drugs?

23  A     Yes.

24  Q     Would you front them the way Goo fronted you with drugs or

25  did you sell the drugs to him and then he would just sell it?

1   A   You can say I fronted him the way Goo fronted them to me.

2   Q   Okay.  What drug was he selling for you on Edmondson Avenue?

3   A   Heroin.

4   Q   Did he also sell for you elsewhere?

5   A   Catonsville.

6   Q   Oh, so you stopped selling yourself in Catonsville and got

7   him to sell for you.  Is that what happened?

8   A   Yeah, sometimes.

9   Q   Okay.  What drug did he sell for you in Catonsville?

10  A   Crack.

11  Q   Was that on Winters Lane, that street we looked at earlier?

12  A   Yes.

13  Q   Did Aaron Holly also work for Mr. Gardner?

14  A   Yes.

15  Q   What did he do for Mr. Gardner?

16  A   Sold crack for him.

17  Q   Where?

18  A   Winters Lane.

19  Q   So he sold crack on Winters Lane for both you and Mr.

20  Gardner?

21  A   Yes.

22  Q   Do you have any idea how much he could sell for you on

23  Winters Lane, say, in a day or in a week?

24  A   A couple hundred a day.

25  Q   Couple of hundred what's in a day?

1    A    Yeah.  A couple hundred dollars a day.

2    Q    Okay.  Same thing for Mr. Gardner or did Mr. Gardner give

3    him more?

4              MR. COBURN:  Objection, no foundation.

5    Q    If you know.

6              THE COURT:  Overruled.  You may answer.

7    A    Same thing.  A couple hundred.

8    Q    Okay.  Did Mr. Gardner have guys who sold for him in the

9    city, also?

10   A    Yes.

11   Q    Whereabouts in the city?

12   A    He had some guy up Park Heights, South Baltimore, near West

13   Side Shopping Center.

14   Q    Okay.  Do you know what drugs he sold in those locations in

15   the city?

16   A    Crack and heroin.

17   Q    This is Park Heights and also the West Side Shopping Center

18   area, is that correct?

19   A    Yes.

20   Q    What part of town is that in?

21   A    West Side Shopping Center?

22   Q    Yeah.

23   A    South Baltimore.

24   Q    Okay.  I have, I have a map here.  Just so that we can get

25   it straight about some of these locations you've been talking

1    about, Mr. Montgomery.

2         The court reporter is going to be mad at me for not

3    speaking in a microphone, so can I get a lavaliere microphone?

4         THE COURT:  We've got a stand alone right there.

5    Q    Thank you.  Okay.  You told us about Winters Lane in

6    Catonsville.  Is that right down there where I'm pointing right

7    now, Mr. Montgomery?  It's actually labeled so it's not much of

8    a --

9    A    Yes.

10   Q    Okay.  And you told us about Lauretta and Monroe, right

11   about here.  Is that correct?

12   A    Yes.

13   Q    That's in Southwest Baltimore and it's not too far from

14   Edmondson Avenue, is that correct?

15   A    Yes.

16   Q    Because Edmondson Avenue runs, doesn't it run east/west

17   along in here?  There it is right there.  Edmondson Avenue,

18   correct?

19   A    Yes.

20   Q    Okay.  Now, where's the West Side Shopping Center?  You

21   can't see it?

22   A    No.

23   Q    Do you know what street it's on?

24   A    No.

25   Q    Okay.  Is it down here in Southwest Baltimore somewhere?

1    A    Yes.

2    Q    All right.  I think those are all the questions I have for

3    you right now about the map.  Do you know the name of the guy who

4    sold for Mr. Gardner in Park Heights?

5              MR. COBURN:  Objection, foundation.

6              THE COURT:  Overruled.  You may answer.

7    A    No.

8    Q    Did I ask you this?  What drugs did Mr. Gardner sell in the

9    city, if you know?

10             MR. COBURN:  Objection, foundation.

11             THE COURT:  Overruled.  You may answer.

12   A    Crack and heroin.

13   Q    And you said he was, he was selling crack in Catonsville

14   through Aaron Holly, is that correct?

15   A    Yes.

16   Q    What drug was he selling in Park Heights specifically?

17   A    Sometimes heroin, and crack.

18   Q    Okay.  When Mr. Holly was selling crack in Catonsville for

19   you and Mr. Gardner, did he cook it up himself or did you and Mr.

20   Gardner supply it to him already cooked up as crack?

21   A    We gave it to him already cooked up.

22   Q    Okay.  Do you know, did Mr. Gardner cook up powder cocaine

23   into crack?

24   A    Yes.

25   Q    Okay.  And did you cook up powder cocaine into crack?

1  A    No.

2  Q    So you would buy it already as crack?

3  A    Yes.

4  Q    Okay.  Did Mr. Gardner also have a store in Baltimore that

5  he used for drug trafficking?

6  A    Yes.

7  Q    Where was that located?

8  A    McKean and Westwood.

9  Q    Okay.  Is that in Southwest Baltimore, also?

10  A    Yes.

11  Q    Let me show you what's been marked as Government Exhibit

12  PH-49.

13       THE COURT:  I think you need the eraser there, Mr. --

14  thank you.

15  Q    Maybe I should take this out of the envelope except -- I

16  could just focus it a little more.  Do you recognize what this

17  is, Mr. Montgomery?

18  A    Look like the store.

19  Q    And that's at McKean and Westwood, is that correct?

20  A    Yes.

21  Q    Actually, I should have done this when we had the map up but

22  I'll try to do it real quickly.  And I'll just leave it here, if

23  that's all right with you.  McKean and Westwood is actually

24  labeled on this map, also, if I recall correctly.  McKean and

25  Westwood is right around here, just below Druid lake, Druid Hill

1    Park.  Do you see that, Mr. Montgomery?

2    A    Yes.

3    Q    What kind of drugs did Mr. Gardner sell out of that store on

4    McKean and Westwood?

5    A    Marijuana.

6    Q    Was anybody in that business with him, in the store business

7    with him?

8    A    Darryl.

9    Q    Darryl Bacon?

10   A    Yes.

11   Q    What about Wayne Martin, Shelly Wayne Martin?  Do you know

12   where he sold his drugs or who sold for him?

13   A    He sold his drugs South Baltimore and Randallstown.

14   Q    Whereabouts in Randallstown?

15   A    Savoy Apartments.

16   Q    The Savoy Apartments?

17   A    Yeah.

18   Q    Do you know, did those get torn down at some time?

19   A    Yes.

20   Q    Okay.  Did Mr. Martin live at one time in the Savoy

21   Apartments?

22   A    Yes.

23   Q    And you said he sold in the city, also, in Southwest

24   Baltimore, is that correct?

25   A    Yes.

DIRECT EXAMINATION OF WILLIAM MONTGOMERY                184

1   Q    Whereabouts in Southwest Baltimore?

2   A    Same area, by the shopping center.

3   Q    Same one you sold near, West Side Shopping Center?

4   A    I never sold near there.

5   Q    Oh.  It's where Mr. Gardner sold?

6   A    Yes.

7   Q    Did he have somebody who sold for him in Baltimore?

8            MR. CROWE:  Objection.

9            THE COURT:  Overruled.  You may answer.

10  A    Only one I can remember right now is Xavier.

11  Q    Xavier?

12  A    Yes.

13  Q    Is that his first name or his last name?

14  A    I believe it's his first name.

15  Q    Okay.  You don't know his last name?

16  A    No.

17  Q    And he was working for Mr. Martin in the sense that Mr.

18  Martin would front him drugs?

19  A    Yes.

20  Q    Do you know what kind of drugs Mr. Martin fronted to him?

21  A    Crack, I believe.

22  Q    Okay.  Would that have been in Southwest Baltimore or

23  Randallstown?

24  A    I'm not sure if he sold for him out Randallstown.  But

25  Southwest Baltimore I know for sure.

1    Q    Southwest Baltimore?

2    A    Yes.

3    Q    Okay.  And did you say he sold both cocaine and crack, Mr.

4    Martin?

5    A    I said crack.

6    Q    Crack.  Okay.  Do you know, did Mr. Gardner or Mr. Martin

7    sell heroin?

8    A    Yes.  I know them to deal with it a for a little bit of

9    time.

10   Q    Where would they sell their heroin?

11        MR. CROWE:  Objection.

12        THE COURT:  Overruled.

13   A    I known Goo to sell some at Park Heights.

14   Q    Okay.

15   A    And Wayne down West Side Shopping Center.

16        MR. CROWE:  Your Honor, the objection was to the

17   characterization of "their heroin."

18        THE COURT:  The objection is overruled.

19   Q    Did there come a time when you and Mr. Gardner and Mr.

20   Martin and also Bo got involved in robberies?

21   A    Yes.

22   Q    Were those three guys, Bo, Wayne, and Mr. Gardner, Goo,

23   involved in robberies before you were?

24   A    Yes.

25   Q    How do you know about it?

1    A    They told me stories.

2              MR. LAWLOR:  Objection, Your Honor, move to strike.

3              THE COURT:  Can you be a little more specific, Mr.

4    Montgomery?  Who told you stories?

5              THE WITNESS:  Goo, Darryl.

6              THE COURT:  Go ahead.  I'm sorry.

7              THE WITNESS:  Goo and Darryl.

8              THE COURT:  And who would be present?

9              THE WITNESS:  Bo wasn't present.  But Goo, he'd be

10   present, I would be present, Darryl.

11             MR. LAWLOR:  Move to strike, Your Honor.

12             THE COURT:  The jury should disregard the witness'

13   testimony that Mr. Gardner told him stories insofar as it may not

14   be considered against Mr. Mitchell, who was not present.  Go

15   ahead, Mr. Harding.

16             MR. CROWE:  Your Honor, also Mr. Martin.

17             THE COURT:  And Mr. Martin.  And of course Mr. Harris.

18   Go ahead, Mr. Harding.

19   BY MR. HARDING:

20   Q    When did, when did you do a robbery?  When did you first do

21   a robbery with any of these defendants, if you can remember?

22   A    I don't remember the date or nothing like that, the year.

23   Q    Okay.  Just tell us what happened.

24   A    I think it was me, me, Goo, Wayne and Darryl and Ategra

25   (phonetic), we was going to get some weed.  And a dude come out

1    the house counting some money.  Me and Goo jumped out and robbed

2    him.

3    Q    Did you have a gun?

4    A    I don't know who carried the gun back then.  But yes, we had

5    a gun.

6    Q    You wouldn't have done the robbery without a gun, I suppose,

7    right?

8    A    Right.

9    Q    You say the dude came out of the house counting some money.

10   Do you mean the house where you were going to buy some weed?

11   A    Yes.

12   Q    Was he the guy who was dealing weed in the house or was

13   he --

14   A    Don't know.

15   Q    -- a customer or what?

16   A    I don't know.

17   Q    You just saw the money and decided that that was a good

18   target, is that it?

19   A    Right.

20   Q    And you said that you and Goo jumped out of the car, is that

21   correct?

22   A    Yes.

23   Q    What did Darryl and Mr. Martin do?

24   A    They was in the car.

25   Q    They stayed in the car?

1    A    Yes.

2    Q    Do you remember what you got in this robbery?

3    A    A couple hundred dollars.

4    Q    Okay.  Was there another time when you, or other times when

5    you got involved in robberies with any of these three defendants

6    or Darryl Bacon?

7    A    There was another time when I got in with Darryl Bacon.

8    Q    What did you do?

9    A    We robbed some people down South Baltimore.

10   Q    What kind of people?

11   A    Drug dealers.

12   Q    Did you have a gun?

13   A    Yes.

14   Q    Did you both have guns or just you?

15   A    Just me.

16   Q    And how much money did you get when you robbed these South

17   Baltimore drug dealers?

18   A    I don't remember.

19   Q    Okay.  Did you have occasion to use that gun on one of those

20   robberies with Darryl Bacon?

21   A    Use it how?

22   Q    Any way at all.

23   A    Yes.

24   Q    What did you do?

25   A    I had to pistol whip one of the dudes.

1  Q    Okay.  So you didn't fire it, you pistol whipped him, is

2  that correct?

3  A    Yes.

4  Q    Did you tell me what you got out of these robberies?

5  A    No.

6  Q    What did you get?

7  A    Out of that robbery?

8  Q    Yeah.

9  A    Some money and some drugs.

10 Q    Okay.  You don't remember how much money or how much drugs?

11 A    No.

12 Q    Let me ask you.  Did you or any of these other people you've

13 talked about get shot on any of these occasions?

14 A    No.

15 Q    Did there come a time when you got shot?

16 A    Yes.

17 Q    Tell us how you got shot.

18 A    I got shot on Lauretta and Monroe.

19 Q    Okay.  Do you know, can you tell us how you got shot?

20 A    Don't know.  Somebody rolled up behind me, shot me.

21 Q    Okay.  Did you go to the hospital?

22 A    Yes.

23 Q    Did anybody come and visit you in the hospital?

24 A    Yes.

25 Q    Who?

1   A    Wayne, Goo, and Darryl.

2   Q    Okay.  Did there come a time when Darryl got shot?

3   A    Yes.

4   Q    Tell us about that.

5   A    I was still in the hospital.  Darryl came down there and

6   Wayne and Goo.  And he was taking stuff out my room for his

7   wound.  And he was telling me about the shooting they got into at

8   the gas station.

9   Q    What gas station?

10  A    Amoco.

11  Q    What did he tell you about the shooting he got into?

12  A    Somebody started shooting at him.  He got hit and Goo had to

13  get the dude up off of him.

14  Q    How did Goo get the dude up off of him?

15  A    Shooting back.

16  Q    Goo shot at the guy?

17  A    Yes.

18  Q    Did he hit him, do you know?

19  A    Don't know.

20  Q    Okay.  Did Darryl go to the hospital on that occasion?

21  A    No.

22  Q    He wasn't hurt very badly?

23  A    No.

24  Q    Okay.  You've talked a lot about Goo and Wayne and, to a

25  lesser extent, E and Bo and Darryl.

1          MR. COBURN:  Objection to characterization.

2          THE COURT:  Overruled.  Go ahead, Mr. Harding.

3    Q    Did you guys tell one another when you got into beefs with

4    other people?

5    A    Yes.

6    Q    Were there times when you guys got into beefs with other

7    people?

8    A    Yes.

9    Q    Would you help these people that I just named if they got

10   into beefs?

11   A    If they needed me, yes.

12   Q    Would they help you if you needed them?

13   A    I believe so, yes.

14   Q    How did you think of yourselves?

15   A    I thought of us as a, a family.

16   Q    Did you have a leader in this family?

17   A    No.

18   Q    Do you remember an occasion -- well, let me ask you this.

19   Did you know a guy by the name of Smokey?

20   A    Yes.

21   Q    Do you know his real name?

22   A    Michael Gaffney.

23   Q    Michael Gaffney?

24   A    Yes.

25   Q    Did there come a time in 1999 when he got shot?

1    A    Yes.

2    Q    Did you get into a beef as a result of that?

3    A    Yes.

4    Q    With who?

5    A    Corey Smith, Tyree.

6    Q    Corey Smith and Tyree?

7    A    Yes.

8    Q    Do you know Tyree's last name?

9    A    Stewart.

10   Q    Tyree Stewart?

11   A    Yes.

12   Q    And what line of work were Corey Smith and Tyree Stewart

13   involved in?

14   A    Selling drugs.

15   Q    Okay.  Did you discuss your -- first let me ask you, why did

16   you get in a beef with those guys as a result of the shooting of

17   Smokey?

18   A    They shot family.

19   Q    They shot somebody that you regarded as family, namely

20   Smokey, is that correct?

21   A    Yes.

22   Q    Did they kill him?

23   A    No.

24   Q    Okay.  But just shooting him was bad enough, is that

25   correct?

1   A   Yes.

2   Q   Did you discuss this beef that you were having with any of

3   the defendants that you've identified in this courtroom?

4   A   Yes.

5   Q   Who?

6   A   Goo.

7   Q   Anybody else?

8   A   No.

9   Q   Did you -- why did you tell Goo about it?

10  A   Just in case something happened.

11  Q   What did you want to have happen if something happened?

12  A   Retaliation.

13  Q   Retaliation?

14  A   Yes.

15  Q   Okay.  Did there come a time when you got locked up in the

16  year 2000, Mr. Montgomery?

17  A   2000?

18  Q   Yeah.

19  A   Yes.

20  Q   What were you locked up for?

21  A   For house raid, robbery, violation of probation.

22  Q   How long did you stay locked up for?

23  A   Till '01, till end of '01.

24  Q   Till the end of '01?

25  A   Yeah.  Around there.

1    Q    Okay.  After you got out, did you run into Shelly Wayne

2    Martin?

3    A    Yes.

4    Q    Where?

5    A    At a Shell gas station.

6    Q    Okay.  Was he, where was he staying at the time?  Did he

7    tell you?

8    A    He was still in a halfway house.

9    Q    Oh, was he just coming home from a stint, also?

10   A    Yes.

11   Q    Do you know what halfway house he was in?

12   A    No.

13   Q    This is at the end of '01 or the beginning of '02 or what?

14   A    I believe beginning of '02.

15   Q    Okay.  Sorry.  Did you tell us where this Shell gas station

16   was located?

17   A    Woodmoor Shopping Center.

18   Q    Wiltmore Shopping Center?

19   A    Woodmoor Shopping Center.

20   Q    Where's that located?

21   A    Woodlawn.

22   Q    What was Mr. Martin doing when you ran into him?

23   A    Half asleep in a car.

24   Q    His car?

25   A    Yes.

1    Q    What kind of car was he driving at that time?

2    A    A little white car.

3    Q    Okay.  Did you have a discussion with him?

4    A    Yes.

5    Q    What did you discuss?

6    A    What he was up to and basically what he was getting into.

7    Came about robbing Goose.

8    Q    It came about robbing Goose?

9    A    Yes.

10   Q    So what do you, what are you telling us?  Did you develop a

11   plan to do a robbery?

12   A    First I told him I want in.

13   Q    You told him you want in?

14   A    Yes.

15   Q    Whose idea was this robbery?

16   A    Wayne's.

17   Q    Who is Goose?

18   A    A drug dealer.

19   Q    Okay.  Is he a big drug dealer or a little drug dealer?

20   A    Big drug dealer.

21   Q    Do you know his name?

22   A    No.

23   Q    Do you know where he operated?

24   A    Hollins and Pulaski, down that area.

25   Q    So that's southeast Baltimore, is that right?

1    A    Still west, I believe.

2    Q    Still west.  You said Highland and Pulaski?

3    A    Hollins and Pulaski.

4    Q    Hollins and Pulaski.  I'm sorry.  And so what kind of drugs

5    did Goose traffic in?

6    A    Coke, heroin.

7    Q    Okay.  Did you ever get drugs from Goose?

8    A    No.

9    Q    How about Wayne?

10   A    I don't know.

11   Q    Goo?  Did Goo get drugs from Goose?

12   A    I don't know.

13   Q    Okay.  Have you ever met Goose?

14   A    Yes.

15   Q    Do you know what he looks like?

16   A    Yes.

17   Q    How long have you known Goose?

18   A    Since maybe '93.

19   Q    Since you were quite young, then, is that correct?

20   A    Yes.

21   Q    Let me show you PH-69.  Can you identify this guy?

22   A    That's Goose.

23   Q    Okay.  So what was your plan with Mr. Martin that you

24   developed at that meeting at the Shell gas station regarding

25   robbing Goose?  What kind of robbery was it going to be?

1    A    Home invasion.

2    Q    Home invasion.  Well, did you know where Mr., where Goose

3    lived?

4    A    No, I had told him that I know a house where he go to, that

5    he might live there.

6    Q    And where was that house?

7    A    Out Randallstown.

8    Q    Okay.  Did Wayne have any connection with Goose that could

9    help you in figuring out where he lived or how to do this

10   robbery?

11              MR. CROWE:  Objection.

12              THE COURT:  Overruled.  You may answer.

13   A    Yes.  They were friends.

14   Q    They were friends?

15   A    Yes.

16   Q    Okay.  Did there come a time after that when you ran into

17   Goose when you were with some other people?

18   A    When I was with Goo?  Yes.

19   Q    When you were with Goo you ran into Goose?

20   A    Yes.

21   Q    Was anybody else with you?

22   A    E was in the car.

23   Q    E, you mean Aaron Holly?

24   A    Yes.

25   Q    Well, tell us what happened when you ran into Goose.

1    A    Goo didn't want him to see me.

2    Q    Why not?

3    A    Because I'm known for robbing people.

4    Q    You're known for robbing people?

5    A    Yes.

6    Q    So Goo didn't want Goose to see you because you're known for

7    robbing people?

8    A    With him.

9    Q    Oh, Goo didn't want Goose to see you with Goo?

10   A    Right.

11   Q    Why?

12   A    Because I guess he didn't want to put him on point.

13   Q    And tell the jurors what that means exactly.

14   A    Make him aware or make him nervous or suspicious.

15   Q    Well, did Goose, in fact, see you?

16   A    I don't think so, no.

17   Q    Okay.  Was Goo concerned about this, anyway?

18   A    Yes.

19   Q    How were you going to go about figuring out where Goose

20   lived and how to do this robbery?

21   A    That was all on Wayne part, basically.

22   Q    Sorry?

23   A    I said that was all on Wayne part, basically.  But I figure

24   we probably would follow him or something.  They would call him

25   up or something.  I don't know.

Case 1:04-cr-00029-RDB   Document 681   Filed 06/08/09   Page 199 of 280

1    Q    Okay.  Did you say it was Wayne's part?  Why was it Wayne's

2    part?

3    A    It was his thing.

4    Q    Okay.  Was he the closest one to Goose?

5    A    No.  I wouldn't say that.

6    Q    Somebody else was also equally close?

7    A    Goo was.

8    Q    Goo was, too?

9    A    Yes.

10   Q    So Goo was part of this plan, also?

11   A    Yes.

12   Q    Okay.  Did there come a time when you and Goo and Wayne and

13   Aaron Holly had another discussion about this?

14   A    Another discussion about what?

15   Q    Well, let me put it this way.  Did you and Goo and Wayne and

16   Aaron Holly have a discussion in a car one night?

17   A    Yes.

18   Q    Where were you located at the time?

19   A    It was in front of Aaron house.

20   Q    Aaron Holly's house?

21   A    Yes.

22   Q    Where did he live?

23   A    Off of Winters Lane.

24   Q    Off of Winters Lane.  So in Catonsville?

25   A    Yes.

1    Q    Okay.  Where were, whose car was it that you were meeting

2    in?

3    A    Wayne's.

4    Q    When kind of car was Wayne driving at the time?

5    A    A little white car.

6    Q    Okay.  Who was actually driving the car that night?

7    A    Goo.

8    Q    And so where was Wayne?

9    A    Passenger seat.

10   Q    And where were you?

11   A    Me and E was in the back seat.

12   Q    Okay.  Did you, did there come a time when you said you

13   needed something?

14   A    Yes.  I told him I needed another gun.

15   Q    Okay.  Did anybody respond to your request?

16   A    He said he would look into it.

17   Q    Who's "he?"

18   A    Wayne.

19   Q    Okay.  Did he tell you anything else?

20   A    He started talking about the .40 caliber he had, that had

21   three bodies on it.  He always keep it, always use it when he

22   need it.

23   Q    So he brought up a .40 caliber gun that he had in his

24   possession at the time that had three bodies on it?

25   A    Yes.

1    Q    What does it mean to have three bodies on it?

2    A    Murdered three people with it.

3    Q    Did he offer you the .40 caliber gun even though it had

4    three bodies on it?

5    A    No.

6    Q    But he nevertheless said he'd look into getting a gun for

7    you?

8    A    Yes.

9    Q    Did he, in fact, get a gun for you?

10   A    No.

11   Q    Well, what did you do about that?

12   A    I got another gun.

13   Q    What kind of gun?

14   A    9 millimeter.

15   Q    Why did you need a gun at that time?

16   A    Why did I need a gun?

17   Q    Well, let me ask you this.  Did you already have a gun at

18   that time?

19   A    Yes.

20   Q    What kind of gun?

21   A    .45.

22   Q    Well, then, why did you need another gun?

23   A    I was going to use it.

24   Q    You were going to use the .45?

25   A    Yes.

1    Q    And what were you going to use it on?

2    A    Murder.

3    Q    You were going to do a murder?

4    A    Yes.

5    Q    What murder were you going to do?

6    A    Darius.

7    Q    You were going to use it on Darius Spence?

8    A    Yes.

9    Q    So you were already thinking about doing a homicide of

10   Darius Spence?

11   A    Yes.

12   Q    Okay.  Tell us who Darius Spence is.

13   A    Drug dealer.

14   Q    Were you going to also rob Darius Spence?

15   A    Yes.

16   Q    And so you sort of set aside the .45 to use on that robbery

17   and you didn't want, you needed something else for other

18   purposes, is that correct?

19           MR. COBURN:  Objection, leading.

20           THE COURT:  Overruled.  You may answer.

21   A    Yes.

22   Q    Did Wayne tell you anything more about this .40 caliber that

23   had three bodies on it?

24   A    No.

25   Q    Did you have any discussion with him about why it might be

1    unwise to use a gun for anything that already had three bodies on

2    it?

3    A    No.

4    Q    Is there anything unwise about doing that?

5    A    I think so.

6    Q    What?

7    A    I think it can be traced.

8    Q    It can be traced.  You could be linked to other crimes, is

9    that correct?

10   A    Yes.

11   Q    Is that why you didn't want to use the .45 for anything more

12   than the robbery you were planning of Darius Spence?

13   A    Yes.

14            THE COURT:  Good point, Mr. Harding?

15            MR. HARDING:  Yes.  Yes.

16            THE COURT:  We'll take a brief recess, ladies and

17   gentlemen.  Please leave your note pads on your chairs.  Have no

18   discussion about the case or any of the evidence you've heard so

19   far.  Continue to keep an open mind.

20            Jury's excused for a 15 minute recess.  We're in recess

21   for 15 minutes.

22            (Recess at 4:07 p.m.)

23            (Jury not present in the courtroom.)

24            THE COURT:  Mr. Montgomery, is anybody in the courtroom

25   bothering you?

1           THE WITNESS:  No.

2           THE COURT:  All right.  You will let the Court know if

3    that happens?

4           THE WITNESS:  Yes.

5           THE COURT:  Can we go back to the document camera?  Mr.

6    Harding.

7           MR. HARDING:  Yes.

8           THE COURT:  What, if anything; who, if anybody; where,

9    if at all; how, if at all; why, if you know?  Let's hear a little

10   more of that.  Okay?

11          MR. HARDING:  Sure, Your Honor.

12          THE COURT:  All right.  Jury, please.

13          MR. MARTIN:  I think the ghost of Judge Murray is in

14   the courtroom somewhere.

15          THE COURT:  I'm channeling Judge Murray.  Would you

16   like some water, Mr. Montgomery?

17          THE WITNESS:  No, I'm good.

18          THE COURT:  All right.  Please stay as close as you can

19   to the microphone.

20          (Jury enters the courtroom.)

21          THE COURT:  Whenever you're ready, Mr. Harding.

22   BY MR. HARDING:

23   Q    Thank you, Your Honor.  Mr. Montgomery, you were telling us

24   that you had a .45 that was dedicated to another purpose and you

25   asked Wayne for a gun that he never got for you.  Did you get

1    another gun?

2    A    Yes.

3    Q    What kind of gun and from whom and for what purpose?

4    A    Don't recall who I got it from.  But it was a 9 millimeter.

5    Q    Okay.  And so why did you need that gun, anyway?

6    A    I needed to keep a gun on me.

7    Q    Okay.  Did you wind up using that 9 millimeter for another

8    purpose?

9    A    Yes.

10   Q    What?

11   A    Killing of Terry Cheeks.

12   Q    So is that the killing that you pled guilty to in the state

13   case that we looked at at the beginning of your testimony today?

14   A    Yes.

15   Q    And you did that murder with a 9 millimeter?

16   A    Yes.

17   Q    Okay.  Do you know, Mr. Montgomery, did Wayne and Goo put in

18   work for Goose?

19          MR. COBURN:  Objection, foundation.

20          MR. CROWE:  Objection.

21          THE COURT:  Overruled.  You may answer.

22   A    I don't know.

23   Q    Okay.  Did they ever discuss it?

24   A    No.

25   Q    Okay.  When you had this conversation with Wayne about the

1   .40 caliber that had three bodies on it, in the car with Gardner

2   and Aaron Holly, was Wayne still in a halfway house at that time?

3   A    I'm not sure.

4   Q    Okay.  At this time in the first part of 2002, were you guys

5   still selling drugs?

6   A    Yes.

7            MR. CROWE:  Objection.

8            THE COURT:  Overruled.

9   Q    Okay.  Was Mr. Holly still working for you?

10  A    Yes.

11  Q    Whereabouts?

12  A    Catonsville.

13  Q    And what was he selling for you?

14  A    Crack.

15  Q    Was he also working for Mr. Gardner?

16  A    Yes.

17  Q    Selling what?

18  A    Crack.

19  Q    Also in Catonsville?

20  A    Yes.

21  Q    Do you know, was Mr. Gardner selling drugs elsewhere at that

22  time?

23  A    I don't know.

24  Q    Okay.  Now, you mentioned that in addition to this plan to

25  rob and kill, were you going to kill Goose or just rob him?

1    A    Kill him, too.

2    Q    Okay.  In addition to the plan to kill and rob Goose, you

3    had another plan to kill a guy named Darius Spence, is that

4    correct?

5    A    Yes.

6    Q    Can you tell us how that plan came up?

7    A    Darius came to me one day.  And I got in the car with him.

8    He asked me to go beat up some dude named Momma.  I told him it

9    made no sense beating him up, he might as well pay me to kill

10   him.  He said he would think about it.  After that I got out of

11   the car.  I asked my man Dirty what was up with Momma.  I told

12   him what I told Darius.  He told me not to kill him.  So I told

13   Dirty tell Momma I want to speak to him.

14   Q    Okay.

15   A    Talked to Momma.  I told Momma he might as well help me rob,

16   rob Darius because he going to get killed, anyway.

17   Q    Okay.  Let me back up just a bit.

18        You said that Darius came to speak to you and he came

19   by and picked you up in a car, is that correct?

20   A    Yes.

21   Q    Where did he pick you up?

22   A    I was walking down Lanvale.

23   Q    Okay.  In what part of town on Lanvale?

24   A    Lanvale and Appleton.

25   Q    Is that in West Baltimore?

1    A    Yes.

2    Q    Okay.  Did you, were you expecting Darius to come by and

3    pick you up?

4    A    No.

5    Q    Did he just spot you on the street?

6    A    Yes.

7    Q    Did you know Darius already?

8    A    Yes.

9    Q    From where?

10   A    I knew him since I was a little boy.

11   Q    From back in Randallstown?

12   A    No.  Edmondson Avenue.

13   Q    Edmondson Avenue?

14   A    Yes.

15   Q    Okay.  And why was it that he got you to get into his car

16   with him and have this discussion with him, if you know?

17   A    I was known for fighting and stuff back in the day.  So --

18   Q    Okay.  And he told you he wanted you to beat up a guy named

19   Momma, is that correct?

20   A    Yes.

21   Q    Do you know Momma's real name?

22   A    No.

23   Q    Let me show you a picture that's been marked S-60.  Do you

24   know who that is?

25   A    I can't see it.

1    Q    Oh, it's not on your screen?

2    A    Yeah.  But --

3    Q    But it's too dark?

4    A    I see it.  That's Momma.

5    Q    Okay.  Did he tell you why he wanted you to beat up Momma?

6    A    He said Momma owed him some money.

7    Q    Okay.  And you said what?

8    A    I told him he might as well pay me to kill him because if I

9    beat him up, Momma going to come back, anyway.

10   Q    You were afraid that if you just beat up Momma, what would

11   happen?

12   A    He would come back shooting.

13   Q    I see.  So what did Darius say when you proposed that you

14   kill Momma?

15   A    He asked me how much.  I told him 5,000.  He said he'd think

16   about it.

17   Q    Was that the end of the conversation?

18   A    Pretty much, yeah.

19   Q    Did this all occur in Darius's car?

20   A    Yes.

21   Q    What kind of car was it, anyway?

22   A    He was driving, I think it was a Honda, gold Honda.

23   Q    Okay.  Now, did you, were you just driving around the block

24   with him on this occasion or were you --

25   A    Yes.

1    Q    Okay.  But then you said when you got out of the car, you

2    spoke to your man Dirty, is that right?

3    A    Yes.

4    Q    Who is Dirty?

5    A    Davon Washington.

6    Q    And when you say he's your man, what do you mean by that?

7    A    A friend.

8    Q    He's a friend of yours?

9    A    Yes.

10   Q    And he was with you at that time when you were on Lanvale

11   and Appleton?

12   A    Yes.

13   Q    So, but he didn't get into the car with you, I guess, is

14   that correct?

15   A    No.

16   Q    Okay.  When you got out of the car, you told Dirty what had

17   happened?

18   A    Right.

19   Q    And what did he say?

20   A    He said Momma was cool and don't do him.

21   Q    Do you know, was Dirty a friend of Momma's?

22   A    Yes.

23   Q    And he said, don't do him?

24   A    Yes.

25   Q    So what did you say?

1   A    Tell Momma I want to talk to him.

2   Q    Okay.  Did he do that?  Did Dirty get in touch with Momma

3   and tell him that --

4   A    Yes.

5   Q    How long after that was it that you had a conversation with

6   Momma?

7   A    It wasn't long.  Maybe a couple days.

8   Q    Did you talk to him by telephone or did you meet with him?

9   A    I flagged him down.  He was driving when I was walking up a

10  block, I flagged him down.

11  Q    So you already knew who this Momma guy was?

12  A    Yes.

13  Q    How did you know him?

14  A    I've been knowing him for while now.  He's from the

15  neighborhood.

16  Q    That area around Lanvale and Appleton or what?

17  A    Mosher and Monroe.

18  Q    Mosher and Monroe.  Did you know Momma's real name?

19  A    No.

20  Q    Okay.  By the way, you said that Darius told you he wanted

21  Momma beaten up because he owed some money to Darius, is that

22  correct?

23  A    Right.

24  Q    Did Dirty tell you anything more about the relationship

25  between Darius and Momma?

1    A    Dirty, Dirty say he fucking his wife.

2    Q    Dirty said that Momma was having an inappropriate

3    extramarital relationship with Darius Spence's wife, is that

4    correct?

5    A    Yeah.

6    Q    Okay.  And did Dirty tell you that as a way of explaining

7    why it was that Dirty might want to kill Momma?

8    A    Say that again.

9    Q    Well, why was it that Dirty told you that?  Do you know?

10    A    Because it didn't make no sense for Momma to owe Darius

11    money to us.

12    Q    Why not?

13    A    Because Momma was selling drugs, too.  He was doing his own

14    thing.

15    Q    So you didn't believe Darius about that, right?

16    A    No.

17    Q    Okay.  So you say that a couple of days later you finally

18    met up with Momma, is that correct?

19    A    Yes.

20    Q    And you said that you flagged him down.  When were you when

21    you flagged him down?

22    A    Mosher and Monroe.

23    Q    Okay.  What happened when you flagged him down?

24    A    He pulled over.

25    Q    And what happened then?

1    A    He got out of the car and I told him, I told him the reason

2    why I don't kill him because Dirty told me not to.  I say, but

3    that's not going to stop Darius from getting somebody else to

4    kill him.  So he might as well help me rob Darius and I'd kill

5    him in the process.

6    Q    And whose idea was it to rob and kill Darius instead of

7    carrying out Darius's proposal to beat up Momma?

8    A    Mines (sic).

9    Q    That was your idea?

10   A    Yes.

11   Q    Why would it be a good idea to rob Darius?

12   A    He was selling drugs.  He had some money.

13   Q    Okay.  Did you have any idea how much money?

14   A    Not at that time.

15   Q    Did there come a time when you had an idea how much money he

16   had?

17   A    Yeah.  Momma told me that his wife told him, Darius wife

18   told him that she done seen him count almost a hundred thousand.

19   Q    Okay.  Where was it that she was, where she saw him counting

20   $100,000?

21   A    In the house, I guess.

22   Q    Okay.  Why didn't you just rob Darius?  Why were you going

23   to kill him as well?

24   A    He know who I am.

25   Q    Okay.  Why you did you tell Momma that you were going to rob

1    and kill Darius?

2    A    To get his help.

3    Q    Why did you need Momma's help?

4    A    I didn't know where Darius lived at.

5    Q    Did Momma know?

6    A    He knew the building.

7    Q    Okay.  What did Momma say?

8    A    About what?

9    Q    About your idea that you would kill and rob Darius?

10   A    He liked it.

11   Q    I guess he liked it better than you killing him, didn't he?

12   A    Right.

13   Q    So did you reach any agreement?

14   A    Yes.  He agreed to help me, showed us where the house was

15   at, where the building, the apartment.

16   Q    Okay.  When you say "us", who are you talking about?

17   A    Me, Goo, and E.

18   Q    Okay.  By this time, was Mr. Martin locked up?

19   A    Yes.

20   Q    Okay.  Now, let me get back to the fact that Wayne had been

21   locked up.  Did you also hear around this time that, did there

22   come a time when you heard that Bo was locked up?

23   A    Yes.

24   Q    And you say that Wayne was locked up, also, is that correct?

25   A    Yes.

1    Q    Do you know what they were locked up for?

2    A    Murder.

3    Q    Okay.  Around the time that they got locked up, did Mr.

4    Gardner, Goo, also get locked up briefly?

5    A    Yes.

6    Q    Do you know what for?

7    A    A warrant or something like that.

8    Q    A warrant?

9    A    Yes.

10   Q    When you say -- how long was he locked up for?

11   A    A couple days.

12   Q    Just a couple days?

13   A    Yes.

14   Q    When he got out, did he have a conversation with you?

15   A    Yes.

16   Q    What did he say?

17   A    Well, he was explaining to me why Bo and Wayne was locked

18   up.

19   Q    What did he say?

20   A    He said it was Bo fault that Wayne was locked up because Bo

21   or somebody must have, or the dude, the victim, must have pressed

22   a button on the phone and it recorded both saying, did you check

23   his pockets, Wayne, but Goo said Bo really said, did you check

24   his pockets, man?

25   Q    Okay.  So Mr. Gardner explained to you that it was Bo's

1    fault that both he and Wayne had gotten locked up?

2    A    Yes.

3    Q    Correct?  And it was either because Bo pressed the button or

4    the victim pressed the button on a telephone?

5    A    Yes.

6    Q    And as a result of that, what happened?

7    A    That statement got recorded.

8    Q    Okay.  And the statement was one, according to Mr. Gardner,

9    it was a statement that Bo made, right?

10   A    Yes.

11   Q    About not checking their pockets?

12   A    Yes.

13   Q    Wayne?

14   A    Right.

15   Q    Except that Mr. Gardner said it wasn't really 'Wayne' that

16   was said, is that correct?

17   A    Right.

18            MR. COBURN:  Objection, leading.

19            THE COURT:  Overruled.

20   Q    What did, according to Mr. Gardner, what was the word that

21   was uttered in that recording?

22   A    Man.

23   Q    Man.  Okay.  By the way, when Gardner was telling you this,

24   was anybody else present?

25   A    E.

1    Q    Aaron Holly?

2    A    Yeah.

3    Q    Did Mr. Gardner tell you anything about something Wayne and

4    Bo had done in preparation for this robbery?

5    A    He said Wayne charged some movie tickets to his credit card

6    for the alibi.

7    Q    He created an alibi by charging movie tickets to his credit

8    card?

9    A    Yes.

10   Q    Was anybody else involved in this alibi?

11   A    I thought they all was involved.

12   Q    When you say they all, who?  Who do you mean?

13   A    Wayne, Bo, and Goo.

14   Q    Okay.  And that's Goo that's telling you this story, right?

15   A    Right.

16   Q    Okay.  Who did the murders, according to what Goo was

17   telling you?

18   A    They never said who did it.

19   Q    Okay.  What was your understanding?

20        MR. LAWLOR:  Objection.

21        THE COURT:  Sustained.

22   Q    Did Mr. Gardner think that he, did Mr. Gardner think that

23   Wayne would beat the charge?

24        MR. COBURN:  Objection.

25        MR. CROWE:  Objection.

1        THE COURT:  Overruled.  You may answer.

2    A    Yes.

3    Q    Why?

4    A    Because of the alibi.

5    Q    Was Mr. Gardner at all worried about being locked up

6    himself?

7    A    For that?  No.

8    Q    Why not?

9    A    I don't know.

10   Q    Okay.  Did Mr. Gardner tell you anything about drugs in

11   connection with his robbery?

12   A    He said the detectives told him that they left a key under

13   the seat of the car.

14   Q    Okay.  Did Gardner say anything more about that?

15   A    He said he ain't believe them.

16   Q    Gardner didn't believe it, that they had left some drugs in

17   the car?

18   A    No.

19   Q    Okay.  Do you know, did Mr. Gardner know the victims of this

20   robbery and murder?

21   A    He gave me the impression that they did.

22   Q    He gave you the impression that they did?

23   A    Yeah.

24   Q    And who do you mean by "they?"

25        MR. CROWE:  Objection.

1          THE COURT:  Overruled.  You may answer.

2     A    Bo, Wayne, and Goo.

3     Q    Okay.  Did this have an effect on the robbery that you were

4     planning for Goose?

5     A    Yes.

6     Q    What?

7     A    Put off.

8     Q    Why?

9     A    Because it was Wayne thing.

10    Q    It was Wayne's thing?

11    A    Yeah.

12    Q    If Wayne wasn't there, would it be more difficult to do the

13    robbery?

14    A    More difficult?  I wouldn't say.

15    Q    Well, why would you, why would you put it off, then?

16    A    Because I wouldn't want to mess it up.

17    Q    You wouldn't want to mess it up.  Were you expecting Wayne

18    to get out of jail fairly soon and --

19         MR. CROWE:  Objection.

20         THE COURT:  Overruled.  You may answer.

21    A    Yes.

22    Q    Okay.  Was Goo's attitude any different after, after this?

23    A    He was hungry.

24    Q    What do you mean by "he was hungry?"

25    A    He wanted some money.

1   Q    Why did he want money?

2              MR. CROWE:  Objection.

3              THE COURT:  Overruled.

4   A    He was trying to pay for Wayne lawyer.

5   Q    Okay.  And yet you weren't going to do the robbery of Goose

6   any more, right?

7   A    Right.

8   Q    So did your plans change direction at that point?

9   A    Change direction?  I wouldn't say.

10  Q    Well, did you focus on a different target than Goose?

11  A    No.

12  Q    Who did you focus on?

13  A    I was always focused on Darius.

14  Q    Okay.  Darius was already a plan, is that correct?

15  A    Right.

16  Q    Okay.  Once, once Wayne was arrested, who was involved in

17  your plan to rob and kill Darius?

18             MR. CROWE:  Objection, Your Honor.

19             THE COURT:  Overruled.

20  A    Me, Goo, and E.

21  Q    Okay.  Did you, in the deal that you made with Momma whereby

22  you would target Darius instead of Momma, was there any

23  understanding between you and him about any payment that would be

24  made to you if you would kill Darius?

25  A    Yes.  He was going to pay me to kill Darius.

1    Q    How much was he going to pay you?

2    A    I don't remember.

3    Q    Was it more than $5,000 or less, or do you remember?

4    A    I believe it was more.

5    Q    More than Darius had offered, more than you had requested

6    from Darius to kill Momma, is that correct?

7    A    Yes.

8    Q    And you were also going to rob Darius, is that correct?

9    A    Yes.

10   Q    Was there any understanding that you would split the loot

11   with Momma?

12   A    No.

13   Q    Who was going to get the loot from the robbery?

14   A    Me, E, and Goo.

15   Q    In your discussion with Momma, was there any discussion

16   about Darius's wife, the one with whom Momma was having an

17   affair?

18   A    Momma didn't want her hurt.

19   Q    He didn't want her hurt?

20   A    Right.

21   Q    Okay.  What was her name, do you know?

22   A    Tonya Spence.

23   Q    Okay.  Now, you said that Momma was needed to be part of

24   this because he's the one who knew at least what building Darius

25   lived in, is that correct?

1    A    Right.

2    Q    And he lived there with his wife, Tonya, is that correct?

3    A    Yes.

4    Q    So what happened?  How did, how did the knowledge that Momma

5    have get transferred to you about where they lived?

6    A    Momma took us out there one day.

7    Q    When you say "he took us out there", who are you referring

8    to?

9    A    Me, Goo, and E.

10   Q    All three of you?

11   A    Yes.

12   Q    What car did you go in?

13   A    We was in Goo car.

14   Q    What kind of car was Goo driving at that time?

15   A    An Intrepid.

16   Q    An Intrepid?  Is that a kind of Dodge?

17   A    Yes.

18   Q    Do you know what color it was?

19   A    Green.

20   Q    Okay.  So where were you living at that time, anyway?

21   A    Where was I living?

22   Q    Yeah.

23   A    Main Avenue.

24   Q    Where is that?

25   A    Liberty Heights.

1    Q    So did Goo come around and pick you up or what?

2    A    Yes.

3    Q    And then where did you go?

4    A    Oh, we went to Goo, we went to go pick Momma up on Mosher

5    and Monroe.

6    Q    Mosher and Monroe?

7    A    Yeah.

8    Q    So that's in West Baltimore still?

9    A    Yes.

10   Q    And what about E, did you pick him up?

11   A    He was with Goo when they came to get me.

12   Q    I see.  So all four of you are in the car together?

13   A    Right.

14   Q    Where did Momma direct you to go?

15   A    Out Randallstown.

16   Q    Out to Randallstown.  Do you know where in Randallstown?

17   A    No.

18   Q    Okay.  About how long before you actually attempted to do

19   this robbery and murder of Darius Spence was it that Momma drove

20   you out there or went out with you and showed you where the

21   building was?

22   A    Maybe a month and a half, two months.

23   Q    A long time?

24   A    Right.

25   Q    So you said that Momma just knew where the building was, is

1    that correct?

2    A    Right.

3    Q    Didn't you need to know specifically what apartment within

4    the building it was that they lived in?

5    A    Yes.

6    Q    How did you go about learning what apartment it was?

7    A    When we used to go out there and watch them, E and Goo used

8    to go in the little basement part.  And when one of them come in

9    the building, they follow them up, see what house they go in.

10   Q    How often did you go out there to watch the apartment?

11   A    A lot.

12   Q    Every day?

13   A    No.

14   Q    How many days a week?

15   A    I say about four or five.

16   Q    Okay.  Four or five days a week you drove out there just to

17   watch the building, is that your testimony?

18   A    Yeah.

19   Q    And you said that Goo and E would get out and go into the

20   basement.  What would you do?

21   A    I would be sitting in the car waiting for one of them to

22   come home, and let them know on a walkie-talkie.

23   Q    You had walkie-talkies?

24   A    Yes.

25   Q    Okay.  Let me ask you what you took out there when you did

1    these trips to the, to the building.  Was there anything else

2    that you took with you?

3    A    We took walkie-talkies, rubber gloves, duct tape, and guns.

4    Q    What guns?

5    A    A Glock .40 and a .357.

6    Q    I have two exhibits here that are marked S-42 and S-41.  And

7    I'm going to first put on the projector S-41.  Have you had a

8    chance to look --

9            THE COURT:  I'm sorry.  Remove the other exhibit,

10   please, Mr. Harding.

11   Q    Your Honor, these guns are safe.  They have plastic strips

12   through them.

13           THE COURT:  So noted.  Thank you.

14   Q    Do you recognize this, S-41?

15   A    Yes.

16   Q    What is it?

17   A    .357.

18   Q    And that was one of the guns that you took out there with

19   you when you did these surveillances of Darius and Tonya's

20   apartment?

21   A    Yes.

22   Q    Who had the .357?

23   A    Goo.

24   Q    Okay.  And what kind of gun is it?  You can tell just by

25   looking at it, can't you?  Is it a revolver?

1    A    Yes.

2    Q    Okay.  Let me show you S-42.  Do you recognize this?

3    A    Yes.

4    Q    Is that the other gun that you guys took out with you when

5    you went to visit, when you went to look at the apartment where

6    Tonya and Darius lived?

7    A    Yes.

8    Q    What kind of gun is it?

9    A    A .40.

10   Q    A .40 caliber?

11   A    Yes.

12   Q    Whose gun was this?

13   A    They both was bought by Goo.

14   Q    It was Goo's gun, also?

15   A    Yes.

16   Q    Okay.  Now, you said that Wayne had been locked up at this

17   time, right?

18   A    Yes.

19   Q    Is this the .40 caliber that Wayne told you about that had

20   three bodies on it?

21            MR. CROWE:  Objection.

22            THE COURT:  Overruled.  You may answer.

23   A    I wouldn't know.

24   Q    You don't know?

25   A    No.

1  Q    Okay.  Who would have this gun when you went out there?

2  A    E.

3  Q    E carried that gun?

4  A    Yes.

5  Q    Where would E carry the gun, anyway?

6  A    In his dip.

7  Q    And where would Goo carry his gun?

8  A    In his dip.

9  Q    Okay.  Your Honor, is this a good time to break?

10         THE COURT:  It is indeed, yes.  Members of the jury,

11  we'll break for the day at this time.  Please leave your note

12  pads on your chairs, have no discussion about any of the evidence

13  or about the case.  Conduct no investigation of any sort.  Do not

14  go online, do not look up any words, do not visit any of the

15  locations that have been mentioned in the evidence.

16         We will start tomorrow morning at 9:30 and we will

17  conclude a little early tomorrow, probably no later than 3:00,

18  maybe 3:15.  And of course, we will not be in session on Thursday

19  or Friday of this week.  We're still making good time despite the

20  delays that have been necessary and for which I again apologize.

21         Have a pleasant evening.  The jury is excused until

22  9:30 tomorrow morning.

23              (Jury exits the courtroom.)

24              (Witness exit the courtroom.)

25              THE COURT:  I would imagine, Mr. Harding, we'd be

1    actually rather lucky if we finish Mr. Montgomery tomorrow.

2             MR. HARDING:  I will certainly be done with my direct

3    in the morning, Your Honor.  And perhaps defense counsel will

4    abbreviate their cross examinations.  Just kidding, Your Honor.

5             THE COURT:  Perhaps not.  Yes.  I mean, judging from

6    Mr. -- how quickly I forget -- Dobropolski, Dobropolski, I think

7    it's probably going to be all day with Mr. Montgomery.  But you

8    will have a witness standing by?  No?  In the event we --

9             MR. HARDING:  Actually, Your Honor, we have two fairly

10   quick eyewitnesses that we were going to put on the stand first

11   thing in the morning because we had made, again, elaborate plans

12   to accommodate.

13             THE COURT:  Andrea?

14             MR. HARDING:  Yes.

15             THE COURT:  And the lady driving the car?

16             MR. HARDING:  Yes.  We were going to interrupt Mr.

17   Montgomery's testimony, put them on first thing in the morning,

18   and then continue with Mr. Montgomery.

19             THE COURT:  Let me see if you find it acceptable to

20   complete your direct -- how much more of the direct do you think

21   you have?  I'm not going to hold you to anything.

22             MR. HARDING:  I think less than an hour, Your Honor.

23             THE COURT:  Less than an hour.  Okay.  And what are you

24   going to play?  Oh, the Stop Snitching.  How many minutes of that

25   are you going to show?

1         MR. HARDING:  Just a couple minutes.  Just a segment.

2    Not the whole video.  That would be too much.

3         THE COURT:  Well, others may want to play it.

4         So could you finish your direct, then bring those two

5    witnesses in, then we take a break?  And then we start with Mr.

6    Coburn.  And that sounds like, that way it will be a nice, it

7    will be a reasonable break.  We can get him out of here by 11:00

8    or something.

9         MR. HARDING:  Okay.  Thank you very much, Your Honor.

10         THE COURT:  All right.  Mr. Coburn.

11    MR. COBURN:  And I know Your Honor knows that I'm,

12    particularly in terms of scheduling issues, I mean, I'm

13    definitely disposed to, you know, to be flexible and courteous.

14    But this witness is the key witness for us.  I mean, just by

15    several orders of magnitude, he's the most important witness in

16    this case for Mr. Gardner.

17         I do just, you know, and I do it reluctantly, but I'm

18    really worried about the idea of his direct getting wrapped up.

19    And then a young, a woman who was a young woman at the time, you

20    know, out there in front of this house, you know, observes the

21    shooting, she testifies before Montgomery ever gets crossed.  I

22    just need to note an objection to it, Your Honor.  I don't think

23    it's asking that much of the government, given the critical

24    nature of this particular piece of testimony, that we wrap up

25    this witness before they call Ms. Smith or Kelly David.

230

1              These people are both local, it's my understanding.  I

2       don't personally understand, nor have I heard a proffer as to

3       why, you know, I mean, if they're being flown in from Amsterdam

4       or something, that's one thing.  But they're right around the

5       block.  And I don't understand why we can't just wrap up Mr.

6       Montgomery so it's fresh in the jury's mind, and move through it

7       that way.

8              THE COURT:  I don't see any prejudice to Mr. Gardner

9       from having them testify.  There's not going to an in-court

10      identification.

11             MR. KURLAND:  Your Honor --

12             THE COURT:  Is there?

13             MR. KURLAND:  Well, Ms. David and Ms. Smith are going

14      to be my witnesses.  In light of the Court's earlier ruling,

15      there's a very good chance that the type of cross examination I

16      do with respect to those witnesses is far different.  And given

17      the manner in which we have legitimate strategic concerns, it is

18      manifestly unfair and prejudicial to Mr. Gardner if we can't get

19      Mr. Montgomery's testimony in cross examination in first before

20      those witnesses testify.

21             THE COURT:  How can it possibly be prejudicial?

22             MR. KURLAND:  Your Honor, I am reluctant to have to

23      preview a critical cross examination of some witnesses,

24      particularly in light, and Mr. Coburn and I haven't had an

25      opportunity to talk about this, but I cannot agree more with Mr.

1    Coburn's, I think, very common and very measured request.  This

2    is not a witness that should have his direct and cross broken up,

3    particularly in light of some witnesses who might not be very

4    brief.  In addition --

5             THE COURT:  How can they not be very brief?  We spent

6    hours with you arguing that we ought to tell the jury that Mr.

7    Gardner's been convicted in state court --

8             MR. KURLAND:  Your Honor, that's not going to happen

9    now.

10            THE COURT:  -- on the basis of these very witnesses.

11   And now all of a sudden they can't testify after Mr. Montgomery

12   or before Mr. Montgomery's cross?  You're going to have to tell

13   me something.

14            MR. KURLAND:  Your Honor --

15            THE COURT:  My imagination doesn't go that far.  It's

16   not going to be an in-court identification.  We went through, we

17   went through the motions hearing.

18            MR. KURLAND:  That was for a very limited purpose, Your

19   Honor.

20            THE COURT:  It was not for a limited purpose.

21            MR. COBURN:  My concern about this, Your Honor, is not

22   so much what's being discussed right now.  My concern is that the

23   jury's evaluation of this witness' credibility is going to turn

24   on some pretty fine details.  And if his direct isn't fresh in

25   their minds at the time of the cross --

1          THE COURT:  His direct won't be fresh in their mind.

2    There's an overnight recess.  Mr. Harding says maybe another

3    hour.

4          MR. COBURN:  But I think Mr. Kurland's right that, you

5    know, I mean, Smith and David, even at the motions hearing, you

6    know, their testimony took a pretty significant amount of time.

7          THE COURT:  Wasn't any fault of mine.

8          MR. COBURN:  No.  No.  Of course I'm not suggesting

9    that.

10         THE COURT:  How long, look -- I think I've been very

11   accommodating.  Others may disagree.  But I think I've been very

12   accommodating.

13         What on earth could make the difference as to whether

14   these two witnesses testify before Mr. Montgomery's cross, before

15   Mr. Harding's completion of the direct?  Are you saying you don't

16   want him at all?  Is that what you're saying?

17         MR. COBURN:  No.

18         THE COURT:  What are you saying, Mr. Coburn?  If we're

19   going to have them tomorrow, you would rather have them to start

20   the day?

21         MR. COBURN:  I would rather do it in the usual order

22   and have them after.  Can I just ask Your Honor one question,

23   very briefly?  Because I do think Your Honor's been extremely

24   accommodating during the course of this entire trial.

25         THE COURT:  Just tell me what the problem is.

1          MR. COBURN:  Actually, could I put that question back

2     to Mr. Harding?

3          THE COURT:  No.  Tell me what the problem is.  I mean,

4     look, there are no secrets here.

5          MR. COBURN:  I'm sure there aren't.

6          THE COURT:  So what's the big deal?  I don't get it.

7          MR. COBURN:  I don't think the cross is going to mean

8     as much if it's split up in that way.  That's all it is, Your

9     Honor.

10          THE COURT:  Why?

11          MR. COBURN:  Because the jury's going, there's going to

12     be this, you know, pretty significant intervening -- I'm less

13     worried about Ms. David.  But Andrea Smith, at the time of this

14     murder, Your Honor, is, she's a young girl.  I think she's 12 or

15     something like that.

16          THE COURT:  Right.

17          MR. COBURN:  She's out there playing on the grass.

18          THE COURT:  Right.

19          MR. COBURN:  When these two guys, you, she's going to

20     testify about, came up to a woman who had just fallen off a

21     balcony and put two bullets in her.

22          THE COURT:  Right.  Right.  Are you talking about the

23     emotional impact that that's going to have on the jury?

24          MR. COBURN:  Yes.

25          THE COURT:  It's a murder trial.

1    MR. COBURN:  It is.  But that particular piece of

2    testimony, it's just my view, Your Honor, I'm just telling Your

3    Honor what I think.

4    THE COURT:  You think I should make a ruling so that,

5    so that the emotional impact of a murder is lessened on the jury?

6    MR. COBURN:  No, it isn't that.

7    THE COURT:  You think Mr. Gardner's entitled to --

8    MR. COBURN:  It isn't that.

9    THE COURT:  Well, what are you saying?

10    MR. COBURN:  I'm saying that I haven't heard any reason

11    why this should happen.

12    THE COURT:  Because we want to get the witnesses in and

13    out as quickly as we can.  We want to accommodate the witnesses.

14    MR. COBURN:  Why can't that be done right after Mr.

15    Montgomery testifies?

16    THE COURT:  Because we may not finish with Mr.

17    Montgomery tomorrow.  How long are you going to be?

18    MR. COBURN:  A while.

19    THE COURT:  A while.  You're probably going to be four

20    hours.

21    MR. COBURN:  I doubt that.  But it will be a

22    significant cross.

23    THE COURT:  Well, Mr. Crowe's going to have an awful

24    lot.  Mr. Crowe's given me, you know, seven prior statements by

25    Mr. Montgomery.  Mr. Lawlor's going to be forever.  We know that.

1          MR. COBURN:  I've said my piece on it, Your Honor.

2          MR. KURLAND:  Judge, I'll be very brief.

3          MR. LAWLOR:  How did I get into it?

4          MR. KURLAND:  Your Honor, Your Honor, cross examination

5     is supposed to be the greatest engine ever designed to serve the

6     truth.  Mr. Gardner has a right -- this is the critical witness

7     against Mr. Gardner for several of the counts.  We have a right.

8     This is not some procedural witness, whether it's a lab tech

9     coming in to put up a Mercedes Benz sign and tell us about cell

10    towers.

11          This is a critical witness and we are entitled to the

12    normal progression of direct examination, even with a break and

13    cross examination.

14          THE COURT:  Okay.  You're not going to get it.  Here's

15    your choice.  Here's your choice.  Do you want Smith and Davis at

16    9:30 or do you want them after Mr. Harding submits the witness?

17    I'm looking at Mr. Kurland because Mr. Kurland's got those two

18    witnesses.  How do you want it, Mr. Kurland?

19          MR. KURLAND:  Can I have ten seconds to confer with

20    co-counsel?

21          THE COURT:  Of course.  Of course.

22          (Pause in Proceedings.)

23          MR. KURLAND:  Okay.  We'd rather have those witnesses

24    first, Your Honor.

25          THE COURT:  That's fine.

236

1          MR. KURLAND:  Okay.  Your Honor, just, the cross

2   examination is different, is going to be different based on the

3   Court's ruling.  That's something.

4          In addition to that, I just want to make a scheduling

5   thing.  Yom Kippur is tomorrow and the Court said 3, 3:15.  As a

6   personal thing, if the Court says no, I understand that.

7          THE COURT:  No.  Of course I'm not going to say no.

8   What time?

9          MR. KURLAND:  Well, three at the very latest.

10          THE COURT:  It won't be after three.  And my interest

11   is getting those three witnesses finished tomorrow.  And you

12   know, obviously, you take as much time as you need.  But I'm not

13   going to take the chance that the witnesses come in tomorrow

14   morning and they sit here all day and then at, you know, 2:45,

15   Mr. Harding stands up for redirect examination of Mr. Montgomery

16   and then I have to tell those two young women, I'm sorry, you got

17   to come back next week.

18          MR. KURLAND:  They should come back.

19          THE COURT:  That young lady has been living with this

20   thing, you know.  She's already been through the grinder at the

21   state court trial.

22          MR. KURLAND:  She did not testify at the state court

23   trial, Judge.

24          THE COURT:  Well, but she was subpoenaed.  She was

25   subpoenaed.

1          MR. KURLAND:  She was not.  She was not.

2          THE COURT:  She was subpoenaed.  Surely she was

3     subpoenaed.

4          MR. KURLAND:  She was not, Your Honor.  That's just a

5     factual record.  She was not.

6          THE COURT:  All right.  Well, she's been through the

7     grinder in the motions hearing.  So I want to get her in and out

8     so she can be done with this.

9          MR. KURLAND:  It would be our suggestion that they come

10     back on Tuesday because the manner in which they get examined --

11     I just want, for the record, you're putting us in an unfair -- I

12     should take that back.  You're putting us in a difficult position

13     where I have to cross two important witnesses.  And we have to

14     make a choice between whether or not we want a direct finished of

15     a witness as opposed to breaking up the direct for a lot of other

16     strategic concerns.  I just wanted to put that on the record.

17          THE COURT:  If you could tell me how you're prejudiced,

18     I could possibly change my mind.

19          MR. KURLAND:  Okay.  I'll just put it this way.  Your

20     Honor, the state court trial --

21          THE COURT:  I understand all the business about the

22     T-shirt and who was wearing a hat and who had the revolver and

23     who had the automatic.  I don't see how any of that is of

24     terrible importance here.

25          MR. KURLAND:  Your Honor, the state court trial took

1    two weeks.  The government is going to put on this murder thing

2    probably in a day and a half.  All right?  So the truncated

3    version requires, it's the focus and the manner in which the case

4    is going to be tried is one thing.

5          Montgomery, and I'll just, I don't want to repeat

6    myself or repeat anything Mr. Coburn said.  But the strategic

7    disadvantage is this.  Basically, as far as I can tell, other

8    than the police officers who are going to come in and do some

9    technical stuff and some evidence recovery and perhaps go through

10   how the show-up was administered, the murder case here are these

11   three witnesses, largely.  All right?  There was a two week trial

12   in state court.  There was a lot of other eyewitnesses the

13   government called in the state case we're going to have to try to

14   subpoena as part of the defense case.

15         That goes back, then, to Mr. Coburn's point, that there

16   is something uniquely singular about the manner and method of

17   getting in the full effect, both on direct and cross, of Mr.

18   Montgomery.  And to force the defense to make these other type of

19   sort of administrative choices, whatever, we'll do it and we'll

20   live with the choice that we made.  But it's an unfair choice

21   given that these are local witnesses who could come in on Tuesday

22   and Mr. Harding can tell them to just come back on Tuesday.

23   Thank you, Your Honor.

24         THE COURT:  All right.  It appears, Mr. Harding, that

25   we should have the two citizen witnesses first thing.  And

1    depending on how long they go, we will probably take a recess and

2    then bring Mr. Montgomery back.

3         MR. HARDING:  That's fine, Your Honor.

4         THE COURT:  All right.  Mr. Crowe.

5         MR. CROWE:  Your Honor, if the Court has already ruled

6    on that, I won't speak except to say that we would, we believe

7    that Mr. Coburn is right.  If you'd like me to say why in a

8    sentence, I will.

9         THE COURT:  Sure.  Say why.

10        MR. CROWE:  The cross examination of Mr. Montgomery is

11   going to be technical.  It is intended to show that, essentially,

12   that the Tonya Jones Spence thing was not part of the enterprise.

13   That, essentially, that these people were more dissociated than

14   the government says.

15        After the jury hears those two people testify, I don't

16   think they're going to want to hear that sort of technical cross

17   examination and I don't think they're going to pay as much

18   attention.

19        THE COURT:  All right.  I think you're wrong.  You're

20   shorting the jury.

21        MS. RHODES:  Your Honor, if I could be heard as well on

22   this.  I think that there is a, my concern is that we're not

23   going to be able to cross examine Mr. Montgomery until next week,

24   possibly not even until Tuesday.  And I don't think it's fair for

25   Mr. Mitchell, for us to have to wait while the jury mulls over --

1          THE COURT:  You get to go first.  You gave up -- I'm

2     sorry.  I'm sorry.  I don't know why I'm raising my voice.  Ms.

3     Rhodes, you have the first position.  If that's your concern, Mr.

4     Coburn and Mr. Kurland will understand the decision that you and

5     Mr. Lawlor are free to make now, in view of the Court's ruling,

6     to take back your first position.

7          See, I went over this.  I went over this up front on

8     the record.  I made it clear we were going to stay in this order.

9     And I'm not faulting you and Mr. Lawlor and I appreciate the good

10    relationship among counsel.  But, you know, there's certain

11    assumptions that I simply don't share.  I don't share that this

12    case on Mr. Gardner rises and falls with Mr. Montgomery.  I

13    respect Mr. Kurland and Mr. Coburn's point of view in that

14    regard.  But as I said earlier today, all of the evidence, with

15    the exceptions that I've noted, is admissible against all of

16    these defendants.

17         So go ahead and finish your point.  But that's the

18    answer.  If you don't get to cross examine Mr. Montgomery until

19    Tuesday, it will be, one, because you gave up your position in

20    first, and two, because Mr. Kurland's cross examination of these

21    two women takes too long.  And I say that with all respect to Mr.

22    Kurland.

23         MR. KURLAND:  Thanks.

24         THE COURT:  There's no reason we shouldn't finish Mr.

25    Montgomery tomorrow.

1          MS. RHODES:  I have two points I want to make.  One is

2     that, first of all, what I'm saying is not, does not only apply

3     to Mr. Mitchell.  Yes, I could say to Mr. Coburn right now, yeah,

4     we're taking back our first place and then somebody else gets the

5     shaft.  I mean, I don't think that really solves the whole

6     problem we have here.

7          But significantly, we've already interrupted Detective

8     Niedermeier's testimony and Mr. Denham's testimony because Mr.

9     Dobropolski and Mr. Montgomery had significant problems in

10    getting them here, the Witness Protection Program and the state

11    custody, and all these things the government had gone through.

12         THE COURT:  That's simply not true.  No.  I'm sorry.

13    No, it's not true.  The government was very clear.  The

14    government was very clear.

15         MS. RHODES:  That's exactly what we heard about.

16         THE COURT:  The record is very clear that the

17    government agreed to start a day with those two witnesses.  And I

18    gave counsel yesterday more than an hour to argue about

19    Dobropolski's testimony.  And now you're trying to suggest that

20    the Court hurt you, I'm referring generally to the defense, by

21    giving you all that time.

22         Now, the government asked that the Court not require it

23    to produce certain witnesses for pretrial hearings.  The Court

24    was convinced, with very good reason as far as I'm concerned, not

25    to require the government to bring its witnesses in pretrial.  As

1    an accommodation to everybody, I said, Okay, we're going to have

2    suppression hearings and voir dire of witnesses in the midst of

3    trial.  Everybody knew what we were doing.  Everybody knew that

4    that would screw up the trial schedule.

5         I said to the government weeks ago at the pretrial

6    conference, You know, let's try to start each day with a witness

7    in custody because in my mind that made sense.  It made for good

8    trial management.

9         Now, Mr. Lawlor -- and I'm not picking on anybody --

10   but you heard Mr. Lawlor's cross examination.  How many times did

11   he go over the same areas three and four times?  The transcript

12   will reflect it.  The sarcasm, the loosey-goosey.  So much so

13   that I actually had to say something to him about it this

14   afternoon.  Now that's his style, that's fine.  I don't try

15   anybody's case.

16        Mr. Martin wanted to play a tape that had nothing on

17   it.  Now, it was only a couple of minutes and he had a good

18   reason for doing that.

19        MS. RHODES:  Your Honor, I think --

20        THE COURT:  But my point is, you all try the case the

21   way you want.  My job is to manage the case.  You had first

22   position.  We weren't going to finish with Montgomery in one day,

23   anyway.  If the government had brought him in tomorrow, there's

24   no way we were going to finish it.  The government intended to

25   brings him in this morning.  We should have finished Dobropolski

1    yesterday, in my judgment.  All right?  So those are the facts in

2    the record.

3           So now all of a sudden it's a problem to break up a

4    witness' testimony.  All of a sudden.  Hasn't been a problem with

5    anybody else.  It's never been a problem in any trial that I

6    presided over.

7           Now, all of a sudden, all of a sudden we can't have

8    these two women who saw what they saw, who don't want to be here.

9    We want to make them come back next week because they're local

10   witnesses.

11          MS. RHODES:  Your Honor, I fail to see why a phone call

12   from the government today at 5:30 to them can't tell them, Come

13   back next Monday.

14          THE COURT:  Well, we could have them come back three

15   Mondays from now.

16          Now, Mr. Pyne, what is this issue you wrote to me about

17   this morning where some objection wasn't made and now you need to

18   make a record?

19          MR. PYNE:  Your Honor, that was in regards to the

20   statement, it was Sergeant Wooden testified to a statement that

21   he had taken after the 95 stop.  He took statements from Mr.

22   Martin and he took statements from Mr. Gardner.

23          Mr. Gardner's statement included references to Mr.

24   Martin that we objected to.  I meant at the end --

25          THE COURT:  What was the reference?

1          MR. PYNE:  The statement was mainly in regards to Mr.

2     Gardner, that Mr. Gardner had a source name Poppi up in New York

3     that he met and that he was dealing drugs.  But at the end of the

4     statement was two references, I believe, to Mr. Martin.  That Mr.

5     Martin and he met this source, Poppi, and that Mr. Martin was

6     present during the exchange of cocaine.

7          I objected to those because there's obvious Bruton

8     problems with those.  The Court overruled my objection, gave a

9     limiting instruction.  But I wanted to make my record that we

10    feel that the instruction was not sufficient; that the jury

11    should be, that those remarks that include Mr. Martin should, in

12    fact, be stricken from the record, and the jury should be

13    instructed to disregard those remarks.

14         THE COURT:  Wait a minute.  I'm confused.  You say I

15    gave a limiting instruction?

16         MR. PYNE:  You gave an instruction along the lines of,

17    after my objection, that the jury would receive later instruction

18    as to how they can use these statements against particular

19    defendants.

20         THE COURT:  You're saying I didn't say don't

21    consider --

22         MR. PYNE:  No, you didn't say, Don't consider this

23    evidence against Mr. Martin.  There was a much more general,

24    You'll receive instructions in regards to these statements later.

25         THE COURT:  So Martin didn't make a statement?

1          MR. PYNE:  Martin made a statement.  According to the

2     trooper's testimony, Martin's statement was only that he had been

3     with Mr. Gardner all that day.  But Mr. Gardner's statement

4     specifically made two references that would indicate Mr. Martin

5     had knowledge of the drugs in the car.

6          THE COURT:  All right.  And so do you want to submit a

7     proposed instruction?

8          MR. PYNE:  I would be happy to.

9          THE COURT:  I'll be happy to consider it and probably

10    give it.

11         MR. PYNE:  All right.

12         THE COURT:  Just so I'm clear.  You're objecting to --

13    in other words, I think what you're saying is that the

14    trooper's -- wait minute.  Didn't we go over this at the motions

15    hearing?

16         MR. PYNE:  We did litigate it to some extent at the

17    motions hearing.  I went over the transcript and, quite frankly,

18    I could not find where the Court specifically ruled on the

19    statement.  But we did, Trooper Wooden testified.  We did

20    litigate the admissibility of the statement.  You found it

21    admissible.  I could not find --

22         THE COURT:  Wait a minute.  You're saying I found a

23    statement by Gardner to the trooper incriminating Mr. Martin to

24    be admissible against Mr. Martin over an objection?

25         MR. PYNE:  I don't believe you did, Your Honor.

1          THE COURT:  I don't think I did, either.  So my

2     question is, when was this brought to my attention?

3          MR. PYNE:  The ruling was less than clear.

4          THE COURT:  I take responsibility for that.  The ruling

5     on what?  I don't remember an argument about whether a statement

6     to a law enforcement officer by Mr. Gardner was admissible

7     against any other defendant.

8          MR. PYNE:  I don't think --

9          THE COURT:  I don't even remember, I'm not even sure

10    that Mr. Kurland and Mr. Coburn challenged the admissibility of

11    that statement as to Mr. Gardner.  Do you remember?

12         MR. PYNE:  They did.

13         THE COURT:  They did?

14         MR. COBURN:  I don't remember, Your Honor.

15         THE COURT:  I mean, other than on the Fourth Amendment

16    issues.  But I mean apart from, apart from the automobile stop.

17    Is it your recollection that --

18         MR. PYNE:  When I went through the transcript, Your

19    Honor, the witness after that, I believe, was Detective

20    Niedermeier.

21         THE COURT:  Okay.  But the Miranda was pristine.  And

22    my recollection is that they made no Miranda challenge to Mr.

23    Gardner's statement.  So I would not have been called upon on the

24    basis of any motion by Mr. Gardner to consider the admissibility

25    of that statement.

1          MR. PYNE:  I believe that was the only thing that Your

2     Honor addressed, was the Miranda.

3          THE COURT:  Whether Mr. Miranda was properly

4     Mirandized -- whether Mr. Gardner was properly Mirandized?

5          MR. PYNE:  I think that was the only issue.  Because

6     there were, in the testimony there was issues as to the times

7     that the Miranda was given, where it was given, because there was

8     a question as to whether it was given out on the highway or

9     whether it was given back at the station, whether it was the

10    Trooper Bond that gave it or whether it was Sergeant Wooden.

11    Because sergeant Wooden actually testified that he never

12    Mirandized either one of the defendants.

13          THE COURT:  Right.

14          MR. PYNE:  But it had been previously given by Trooper

15    Bond.

16          THE COURT:  Right.  Okay.  Well --

17          MR. PYNE:  Quite frankly, what happened, Your Honor, as

18    I was saying, I believe Sergeant Niedermeier testified shortly

19    thereafter, I think it was Niedermeier, and we got into the whole

20    issue of Mr. Mitchell in Central Booking being transported over.

21    And that subsumed your ruling in regards to the statement.  I

22    could not find any real clear ruling on this whole Bruton issue

23    with that statement.

24          THE COURT:  Well, my recollection, which is not as good

25    as any of yours, I'm sure, my recollection is that the whole

1    focus of that traffic stop had to do with Fourth Amendment issues

2    and whether the trooper could actually see that a seat belt was

3    not being used in a vehicle traveling 60 miles per hour

4    perpendicular to the trooper sitting on the highway.  That's what

5    I remember about that.

6              And I don't remember there being a serious Miranda

7    issue, not to say there wasn't, but I don't remember that at all.

8              But in any event, obviously, you wouldn't have moved to

9    suppress Gardner's statement.

10             MR. PYNE:  And I, quite frankly, I didn't realize the

11   Bruton issue until --

12             THE COURT:  I'm sorry?

13             MR. PYNE:  Until it came up that.  I'm not sure if

14   Trooper Wooden even testified about the actual statement in

15   itself at the motions hearing.

16             THE COURT:  That's exactly my point.  So did you know

17   he was going to say that?  In other words, was it, was it a

18   timely objection or did he say it and then you objected because

19   you didn't know he was going to say what --

20             MR. PYNE:  I'm not sure it came out on direct.  But I

21   knew he was going to say it when Mr. Coburn crossed him because

22   he had the actual statement, I believe, on the DOAR, and was

23   going through it.  And then as soon as he said Martin's name, I

24   objected.

25             MR. COBURN:  That I do remember.

1          THE COURT:  So you -- I don't mean this to sound the

2     way it's going to sound -- but you permitted Mr. Coburn to put

3     the statement, was it a statement or was it the trooper's report?

4          MR. PYNE:  The trooper's report.

5          THE COURT:  So you allowed Mr. Coburn to put the

6     trooper's report on the document camera and show that to the

7     jury.  And it said -- was that in the --

8          MR. PYNE:  I believe I objected, Your Honor.

9          THE COURT:  You objected when?

10          MR. PYNE:  When he put the statement up there.  I'm not

11     sure that Your Honor appreciated why I was objecting.  Because I

12     think it was the second time that he said, referred to Mr. Martin

13     that I objected.  Then Your Honor did give, again, some type of

14     limiting instruction, but it was not nearly, don't hold this

15     against Mr. Martin.

16          THE COURT:  All right.  If you want to submit a

17     proposed instruction, I'll be happy to give it.  Obviously, I

18     haven't heard from the government.

19          When you say "strike it", obviously, I'm not going to

20     strike any testimony.  The testimony clearly was admissible

21     against Mr. Gardner.  And so what you want, I think, if I'm

22     understanding your argument, is a fuller limiting instruction

23     that tells the jury that the jury may not consider what Mr.

24     Gardner said to law enforcement about Mr. Mitchell -- excuse

25     me -- about Mr. Martin during that interview of Mr. Gardner at

1    the JFK barracks after the two of them were detained.  Do I have

2    that right?

3             MR. PYNE:  I'm not sure that that's sufficient, Your

4    Honor, because --

5             THE COURT:  What do you mean, it's not sufficient?

6    What else can I do?  I can't strike the testimony because it's

7    admissible, clearly, against Mr. Gardner.  I can't strike the

8    testimony.

9             MR. PYNE:  You can instruct them, and this is, I guess,

10   what you're asking me to propose, Your Honor, not to hold any

11   statements made by Mr. Gardner against Mr. Martin.  Should not be

12   held as evidence against, considered as evidence against Mr.

13   Martin.

14            THE COURT:  Well, wait a minute.  I don't know if that

15   would be accurate.  I thought you were just talking about the

16   mention of Mr. Martin.

17            MR. PYNE:  No, because the statements definitely

18   implicate Mr. Martin in the knowledge of 50 grams of cocaine that

19   are found in the car.

20            THE COURT:  Well, wait a minute.  Wait a minute.  The

21   coke was found in the car being driven by Mr. Martin.

22            MR. PYNE:  Secreted.

23            THE COURT:  Which was Mr. Gardner's car.  Correct?

24            MR. PYNE:  Yes.

25            THE COURT:  Mr. Gardner's statement explained to the

1   trooper that they had gone up to get the cocaine because they'd

2   been shorted.

3           MR. PYNE:  Mr. Gardner's statement.

4           THE COURT:  Right.  And Mr. Martin is driving the car

5   containing that cocaine.

6           MR. PYNE:  Yes.

7           THE COURT:  And so you want me to instruct the jury, in

8   effect, that there's no proper evidence before them to show that

9   Mr. Martin knew that there was cocaine in that car?

10          MR. PYNE:  I'm asking you to instruct them that the

11  statement of Mr. Gardner can only be taken as evidence in regards

12  to Mr. Gardner and should not be considered in any way against

13  Mr. Martin in terms of the references made to Mr. Martin within

14  that statement.  I think we would be entitled to have it

15  redacted.

16          THE COURT:  You're saying two different things.  It has

17  nothing to do -- if I'm following you, Mr. Pyne, it has nothing

18  to do with Mr. Gardner mentioning Mr. Martin's name.

19          MR. PYNE:  I think it has everything to do with that,

20  Your Honor, because we'd be entitled to have that redacted.

21          THE COURT:  Imagine that that part of it is redacted.

22          MR. PYNE:  Then we would have no objection to it or we

23  couldn't, we could not have an objection to it.  Because I think

24  we would be entitled to have Mr. Martin's name redacted from that

25  statement.  I think we should have been entitled to have it

252

1    redacted.

2         THE COURT:  All right.  Submit what you want.  I didn't

3    think it was a statement in the, in the sort of Rule 16 sense.

4    It was an interview, wasn't it?  It wasn't recorded.

5         MR. PYNE:  It was an oral statement.

6         THE COURT:  It was an oral statement after an

7    interview.

8         MR. PYNE:  Post Miranda.

9         THE COURT:  During an interview.  And the trooper wrote

10   it up, right?

11        MR. PYNE:  Yes.

12        THE COURT:  And the government didn't use it.  Was this

13   the infamous Paragraph Six?

14        MR. COBURN:  Yes.

15        THE COURT:  This is the infamous Paragraph Six?

16        MR. COBURN:  Yes, it is, Your Honor.

17        MR. PYNE:  I have never referred to it that way.

18        MR. COBURN:  From a DEA-6, Paragraph Six.

19        THE COURT:  Okay.  So Mr. Harding questioned the

20   witness without putting the report on the ELMO.  Mr. Coburn gets

21   up in cross examination and says, Mr. Harding didn't have you

22   tell us everything that's in Paragraph Six.

23        MR. PYNE:  That's exactly what happened.

24        THE COURT:  And so did the trooper put Martin -- what

25   did he say about Martin during Mr. Coburn's examination?

1          MR. PYNE:  He basically read in the paragraph that, the

2    things that implicated Mr. Martin were that Mr. Martin went up

3    with Mr. Gardner to meet this Poppi, was present during the

4    exchange, and saw or at least indicated that Mr. Martin saw the

5    cocaine being put into the car.

6          THE COURT:  So you're telling the Court that you

7    objected during Mr. Coburn's cross examination of the trooper?

8          MR. PYNE:  Yes.  Because had we been tried separately,

9    that never would have come in against Mr. Martin.

10          THE COURT:  Well, I'm not so sure.  But probably not.

11   So you want to submit a proposed limiting instruction?  I'll be

12   glad to consider anything you want to submit.

13          MR. PYNE:  Thank you, Your Honor.

14          THE COURT:  All right.  Yes, Mr. Coburn.

15          MR. COBURN:  Just on a separate issue.  Just two

16   seconds, Your Honor.  There was a display in connection with the

17   McCaffity/Jones, rather, I'm sorry, the McCaffity/Brown homicides

18   of scene photos, and I think there was a autopsy photo.  And

19   there was some colloquy about the government making sure that we

20   knew that any photos like that were going to be used before they

21   were used.  So I just wanted to mention that again.  Because I

22   don't know if they're planning to, you know, show scene photos

23   with respect to Tonya Spence.  If so, I just would want an

24   opportunity to object to them.

25          THE COURT:  They'll show them to you before they

1    display them.

2            MR. COBURN:  I appreciate that, Your Honor.

3            THE COURT:  Thank you counsel.  9:30 tomorrow.  We're

4    in recess.

5            (Conclusion of Proceedings at 5:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

255

1                              INDEX

2

3                                                    PAGE

4    WITNESS: CHRIS DOBROPOLSKI

5    CROSS EXAMINATION BY MR. MARTIN                    6

6    CROSS EXAMINATION BY MR. LAWLOR                   33

7    CROSS EXAMINATION BY MR. KURLAND                  73

8    REDIRECT EXAMINATION BY MR. HARDING               76

9    RECROSS EXAMINATION BY MR. MARTIN                100

10   RECROSS EXAMINATION BY MR. LAWLOR                108

11

12   WITNESS: WILLIAM MONTGOMERY

13   DIRECT EXAMINATION BY MR. HARDING (ON MOTION)    121

14   CROSS EXAMINATION BY MR. LAWLOR                  136

15   CROSS EXAMINATION BY MR. CROWE                   138

16   CROSS EXAMINATION BY MR. COBURN                  146

17   DIRECT EXAMINATION BY MR. HARDING                151

18

19

20

21

22

23

24

25

1                     REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., AMD-04-029, on October 7, 2008.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14         _____

           Mary M. Zajac,
15         Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**$**

**$100,000** [1] - 213:20
**$150** [1] - 109:17
**$5,000** [1] - 221:3
**$800** [1] - 168:6
**$850** [1] - 168:6

**'**

**'01** [4] - 193:23, 193:24, 194:13
**'02** [5] - 47:20, 89:24, 152:17, 194:13, 194:14
**'03** [7] - 77:24, 80:4, 80:19, 81:4, 81:7, 117:11
**'04** [2] - 109:9, 109:19
**'93** [1] - 196:18
**'96** [1] - 104:5
**'97** [3] - 123:1, 172:10, 177:2
**'Wayne'** [1] - 216:15

**1**

**1** [5] - 11:19, 14:6, 15:6, 18:22, 19:24
**1/8/04** [1] - 25:25
**1/9/2004** [1] - 23:5
**10** [6] - 43:17, 43:21, 43:22, 44:17, 144:16
**10,000** [1] - 175:20
**100** [1] - 255:9
**100%** [3] - 15:24, 16:7, 29:11
**101** [1] - 1:25
**108** [1] - 255:10
**11** [2] - 144:16, 169:9
**11:00** [1] - 229:7
**11th** [1] - 30:14
**12** [5] - 43:17, 164:20, 165:13, 169:9, 233:14
**121** [1] - 255:13
**12:40** [1] - 111:4
**12:43** [1] - 112:11
**13** [2] - 164:20, 165:13
**136** [1] - 255:14
**138** [1] - 255:15
**142nd** [1] - 177:11
**146** [1] - 255:16
**14th** [5] - 32:20, 32:21, 32:25, 142:17
**15** [8] - 43:21, 43:22, 44:17, 84:11, 84:18, 84:19, 203:20, 203:21
**151** [1] - 255:17
**16** [2] - 169:23, 252:3

**17** [2] - 81:12, 169:23
**170** [2] - 37:1, 40:11
**17th** [3] - 119:4, 133:9, 154:10
**18** [1] - 45:2
**1990's** [1] - 169:5
**1994** [1] - 122:15
**1996** [3] - 96:5, 104:4, 104:21
**1997** [1] - 45:6
**1999** [1] - 191:25
**19th** [4] - 32:24, 32:25, 98:14, 98:18
**1:00** [1] - 85:8
**1st** [1] - 89:11

**2**

**2** [1] - 111:5
**20** [9] - 38:16, 43:5, 43:9, 45:16, 46:3, 53:14, 69:4, 142:17, 160:14
**2000** [7] - 116:12, 137:23, 172:12, 172:13, 177:3, 193:16, 193:17
**2001** [2] - 63:5, 137:21
**2002** [34] - 42:11, 44:22, 45:4, 45:6, 46:23, 56:3, 97:5, 97:7, 116:6, 119:5, 121:11, 122:15, 123:4, 124:16, 124:25, 128:19, 128:22, 129:1, 129:9, 129:19, 129:24, 133:9, 136:22, 136:24, 137:13, 137:15, 137:19, 137:25, 139:19, 140:21, 145:21, 153:10, 154:10, 206:4
**2003** [21] - 6:13, 14:6, 15:6, 18:22, 30:14, 32:20, 32:21, 63:11, 71:11, 81:21, 92:17, 97:12, 97:14, 100:23, 117:3, 117:10, 144:11, 153:21, 154:3, 156:13, 161:19
**2004** [5] - 15:14, 25:14, 81:21, 98:15, 142:17
**2007** [1] - 117:6
**2008** [3] - 1:11, 45:15, 256:5
**2009** [1] - 256:10
**21201** [1] - 1:25
**22** [3] - 117:3, 117:9, 142:18
**24/7** [1] - 51:22
**25** [1] - 43:5
**26th** [1] - 140:21
**27th** [7] - 8:25, 10:8, 11:13, 14:5, 16:9, 16:11,

16:17
**28** [1] - 152:2
**2:00** [2] - 111:15, 112:9
**2:45** [1] - 236:14
**2nd** [1] - 97:17

**3**

**3** [1] - 236:5
**30** [8] - 35:5, 38:18, 38:22, 38:24, 50:2, 53:12, 53:14, 150:24
**300** [1] - 109:17
**33** [1] - 255:6
**357** [3] - 225:5, 225:17, 225:22
**37** [1] - 36:22
**380** [2] - 170:10, 170:14
**3:00** [1] - 227:17
**3:15** [2] - 227:18, 236:5
**3rd** [1] - 30:4

**4**

**4-A** [1] - 160:11
**40** [16] - 48:3, 48:5, 48:6, 132:14, 159:15, 159:24, 161:16, 200:20, 200:23, 201:3, 202:22, 206:1, 225:5, 226:9, 226:10, 226:19
**45** [15] - 14:10, 102:11, 102:14, 102:24, 103:1, 103:4, 103:20, 131:13, 131:20, 131:24, 201:21, 201:24, 202:16, 203:11, 204:24
**4:07** [1] - 203:22

**5**

**5,000** [1] - 209:15
**50** [9] - 38:20, 38:22, 38:24, 48:3, 48:5, 48:6, 50:2, 118:4, 250:18
**5515** [1] - 1:24
**5:00** [1] - 111:7
**5:30** [1] - 243:12
**5:40** [1] - 254:5
**5th** [4] - 12:21, 30:5, 92:16, 105:7

**6**

**6** [1] - 255:5
**60** [2] - 118:4, 248:3

**7**

**7** [3] - 1:11, 116:11, 256:5
**73** [1] - 255:7
**76** [1] - 255:8

**8**

**800** [1] - 168:4
**801** [1] - 120:16
**801(d)(2)(e)** [1] - 150:15
**850** [1] - 168:4
**8th** [4] - 15:14, 21:24, 24:6, 25:14

**9**

**9** [4] - 201:14, 205:4, 205:7, 205:15
**95** [1] - 243:21
**9:30** [4] - 227:16, 227:22, 235:16, 254:3
**9:55** [1] - 2:1

**A**

**a.m** [1] - 2:1
**Aaron** [22] - 119:9, 121:12, 129:18, 131:8, 133:4, 134:11, 144:1, 144:19, 165:9, 165:11, 165:14, 165:19, 177:16, 178:13, 181:14, 197:23, 199:13, 199:16, 199:19, 199:20, 206:2, 217:1
**abbreviate** [1] - 228:4
**able** [13] - 26:25, 47:2, 47:4, 47:5, 50:18, 50:20, 54:21, 65:2, 106:5, 119:13, 119:18, 120:1, 239:23
**above-mentioned** [1] - 71:1
**absence** [1] - 84:25
**Absolutely** [2] - 83:3, 146:3
**accept** [3] - 22:12, 46:7, 115:1
**acceptable** [1] - 228:19
**accepting** [1] - 71:19
**access** [1] - 88:23
**accommodate** [2] - 228:12, 234:13
**accommodating** [1] - 232:11, 232:12, 232:24
**accommodation** [1] -

242:1
**Accord** [3] - 174:2, 174:3, 175:6
**according** [9] - 39:1, 52:1, 52:21, 52:23, 96:3, 127:21, 216:8, 216:20, 217:16
**According** [1] - 245:1
**account** [4] - 80:9, 81:6, 98:22
**accrued** [1] - 49:13
**accurate** [3] - 100:3, 250:15, 256:8
**acquitted** [1] - 4:11
**act** [3] - 44:1, 44:6, 66:23
**acting** [1] - 68:3
**activated** [2] - 25:6, 112:2
**activist** [1] - 67:11
**activities** [17] - 56:11, 59:1, 65:24, 74:7, 79:14, 88:17, 89:2, 96:17, 96:22, 113:5, 113:6, 113:18, 129:23, 145:19, 156:10, 157:1
**activity** [6] - 58:21, 68:10, 94:14, 108:20, 124:19, 124:21
**actual** [5] - 86:22, 102:22, 118:16, 248:14, 248:22
**Adam** [1] - 1:22
**added** [1] - 26:14
**addict** [1] - 64:8
**addiction** [1] - 63:1
**addictions** [1] - 64:12
**addition** [6] - 83:12, 150:21, 206:24, 207:2, 231:4, 236:4
**additional** [2] - 117:23, 118:1
**address** [3] - 13:6, 63:3, 118:14
**addressed** [1] - 247:2
**administered** [1] - 238:10
**administrative** [1] - 238:19
**admissibility** [7] - 2:11, 112:14, 113:25, 116:22, 245:20, 246:10, 246:24
**admissible** [9] - 114:1, 114:2, 149:7, 240:15, 245:21, 245:24, 246:6, 249:20, 250:7
**admission** [1] - 18:24
**admissions** [3] - 21:4, 21:23, 113:9
**admit** [1] - 18:18

**admitted** [3] - 83:11, 83:17, 84:5
**admitting** [2] - 18:17, 113:4
**adult** [1] - 40:25
**advantage** [2] - 99:23, 111:22
**advised** [2] - 141:3, 141:5
**affair** [1] - 221:17
**affairs** [1] - 58:11
**affects** [1] - 150:5
**affixed** [1] - 256:9
**afraid** [3] - 5:24, 85:19, 209:10
**afternoon** [7] - 111:5, 118:2, 118:3, 138:11, 151:10, 151:25, 242:14
**age** [2] - 163:23, 165:13
**agent** [1] - 171:12
**agents** [2] - 81:24, 91:3
**aggregation** [1] - 117:13
**ago** [4] - 118:20, 118:25, 133:15, 242:5
**agree** [5] - 48:21, 48:23, 110:17, 157:10, 230:25
**agreed** [7] - 26:6, 62:5, 141:24, 145:4, 154:14, 214:14, 241:17
**agreement** [17] - 70:25, 153:21, 154:2, 154:23, 156:15, 158:21, 158:24, 159:11, 159:13, 160:11, 160:16, 160:22, 161:1, 161:2, 161:3, 161:16, 214:13
**agreements** [1] - 43:11
**agrees** [2] - 156:18, 158:23
**ahead** [22] - 12:20, 15:3, 21:11, 24:18, 28:12, 60:18, 102:4, 107:8, 111:22, 120:6, 123:22, 124:13, 130:2, 137:9, 137:11, 186:6, 186:15, 186:18, 191:2, 240:17
**aid** [2] - 63:11, 86:19
**ain't** [4] - 127:16, 127:17, 128:3, 218:15
**al** [1] - 256:5
**alias** [1] - 94:17
**alibi** [23] - 116:1, 119:19, 119:20, 119:21, 126:1, 126:2, 126:3, 126:7, 126:24, 132:19, 134:4, 134:8, 135:5, 138:14, 142:21, 142:22, 143:13, 143:14, 143:17,

217:6, 217:7, 217:10, 218:4
**aligned** [1] - 5:12
**allowable** [1] - 160:13
**allowed** [3] - 88:5, 161:25, 249:5
**almost** [2] - 130:17, 213:18
**alone** [5] - 3:13, 52:4, 52:9, 173:7, 180:4
**aloud** [1] - 87:16
**alphabet** [1] - 165:21
**alter** [1] - 128:9
**altercation** [1] - 39:13
**altercations** [2] - 39:9, 39:12
**AMD-04-029** [2] - 1:6, 256:5
**Amendment** [2] - 246:15, 248:1
**AMERICA** [1] - 1:5
**Amoco** [1] - 190:10
**amount** [4] - 81:17, 118:19, 175:12, 232:6
**amounts** [1] - 3:9
**Amsterdam** [1] - 230:3
**Analog** [1] - 81:23
**analysis** [1] - 150:3
**Andre** [1] - 1:13
**Andrea** [2] - 228:13, 233:13
**angry** [1] - 96:12
**answer** [40] - 8:11, 15:3, 26:17, 37:23, 45:23, 45:24, 45:25, 50:9, 52:8, 55:16, 69:1, 74:13, 80:21, 81:10, 96:25, 99:9, 100:6, 106:13, 117:2, 117:5, 125:5, 126:16, 132:13, 143:22, 144:22, 171:18, 176:4, 176:10, 179:6, 181:6, 181:11, 184:9, 197:12, 202:20, 205:21, 218:1, 219:1, 219:20, 226:22, 240:18
**Answer** [3] - 142:22, 144:19, 144:24
**answering** [2] - 22:18, 60:17
**answers** [1] - 14:17
**Anthony** [1] - 132:22
**anyway** [10] - 70:11, 95:22, 198:17, 205:5, 207:16, 209:9, 209:21, 222:20, 227:5, 242:23
**apart** [3] - 161:15, 246:16
**apartment** [7] - 170:3, 214:15, 224:3, 224:6,

224:10, 225:20, 226:5
**Apartments** [4] - 169:25, 183:15, 183:16, 183:21
**apologize** [2] - 64:1, 227:20
**apparent** [1] - 112:25
**appear** [1] - 118:22
**appearance** [1] - 139:14
**Appearances** [1] - 1:15
**appeared** [1] - 97:25
**Appleton** [3] - 207:24, 210:11, 211:16
**apply** [3] - 20:25, 119:20, 241:2
**appreciate** [3] - 111:18, 240:9, 254:2
**appreciated** [1] - 249:11
**approaching** [1] - 3:10
**appropriate** [2] - 150:18, 160:12
**April** [6] - 116:6, 119:4, 121:11, 124:16, 124:25, 133:9
**area** [9] - 66:22, 92:9, 95:7, 96:6, 135:14, 179:18, 184:2, 195:24, 211:16
**areas** [2] - 71:1, 242:11
**argue** [1] - 241:18
**argued** [1] - 96:4
**arguing** [1] - 231:6
**argument** [6] - 4:16, 115:2, 117:23, 246:5, 249:22
**arranged** [1] - 9:14
**arrays** [3] - 59:23, 78:3, 78:16
**arrest** [4] - 44:13, 119:12, 119:16, 121:10
**arrested** [16] - 29:1, 44:9, 77:2, 77:8, 77:10, 90:25, 119:11, 132:4, 133:7, 133:12, 134:15, 134:17, 134:18, 136:16, 153:10, 220:16
**Arrington** [3] - 5:8, 83:1, 148:10
**arrived** [1] - 2:2
**aside** [2] - 69:21, 202:16
**asleep** [2] - 130:17, 194:23
**assaulting** [1] - 109:6
**assertion** [1] - 113:16
**assist** [3] - 68:24, 140:8, 141:6
**assistance** [1] - 52:18

**Assistance** [1] - 52:19
**Assistant** [2] - 117:4, 143:22
**assisting** [1] - 64:20
**associates** [1] - 93:11
**assume** [14] - 10:2, 23:17, 54:24, 60:5, 60:6, 61:18, 63:8, 63:22, 64:7, 64:14, 65:10, 70:24, 78:8, 117:12
**assumed** [2] - 21:19, 110:4
**Assuming** [1] - 22:6
**assumption** [1] - 128:6
**assumptions** [1] - 240:11
**assures** [1] - 155:7
**Ategra** [1] - 186:24
**attempt** [2] - 3:12, 22:22
**attempted** [5] - 63:3, 86:2, 141:25, 147:22, 223:18
**attempting** [5] - 12:19, 12:21, 21:7, 81:20, 90:19
**attempts** [1] - 27:24
**attention** [10] - 14:25, 77:23, 87:23, 92:11, 121:10, 153:3, 159:7, 169:5, 239:18, 246:2
**attire** [1] - 66:6
**attitude** [1] - 219:22
**Attorney** [2] - 117:4, 143:22
**attorney** [3] - 153:12, 153:14, 154:5, 154:6, 155:19
**Attorney's** [3] - 117:3, 144:12, 156:25
**attorneys** [2] - 84:24, 155:22
**attributed** [1] - 112:14
**August** [9] - 42:11, 44:22, 46:23, 47:20, 56:3, 57:20, 89:23, 97:5, 97:7
**author** [1] - 110:17
**authorities** [11] - 66:14, 68:25, 71:23, 72:13, 139:18, 139:22, 140:12, 140:20, 141:10, 156:23, 160:19
**Auto** [1] - 77:10
**automatic** [1] - 237:23
**automobile** [1] - 246:16
**autopsy** [1] - 253:18
**available** [5] - 121:1, 127:2, 132:11, 132:14, 132:16
**Avenue** [8] - 135:13,

178:2, 180:14, 180:16, 180:17, 208:12, 208:13, 222:23
**aware** [10] - 18:15, 20:13, 40:8, 79:18, 82:5, 82:7, 113:8, 138:24, 140:13, 198:14
**awful** [2] - 6:4, 234:23

**B**

**background** [3] - 88:16, 121:9, 158:17
**Bacon** [8] - 164:17, 165:5, 165:15, 174:21, 183:9, 188:6, 188:7, 188:20
**bad** [2] - 54:12, 192:24
**badly** [1] - 190:22
**bag** [1] - 169:2
**bagged** [1] - 168:14
**balcony** [1] - 233:21
**ballpark** [2] - 38:12, 43:16
**Baltimore** [53] - 1:12, 1:25, 35:11, 35:18, 36:1, 42:14, 48:17, 49:1, 50:12, 50:14, 56:17, 57:2, 67:12, 71:2, 72:14, 77:3, 77:17, 96:6, 97:9, 104:7, 104:8, 104:9, 104:11, 104:16, 104:23, 144:1, 152:4, 152:11, 154:3, 170:20, 170:22, 171:8, 177:16, 177:18, 177:19, 179:12, 179:23, 180:13, 180:25, 182:4, 182:9, 183:13, 183:24, 184:1, 184:7, 184:22, 184:25, 185:1, 188:9, 188:17, 195:25, 207:25, 223:8
**Bank** [1] - 58:12
**bar** [2] - 167:5, 167:9
**barracks** [2] - 61:15, 250:1
**barroom** [3] - 50:11, 50:16, 54:1
**Barry** [2] - 1:22, 146:13
**based** [6] - 88:16, 99:11, 112:16, 116:20, 159:10, 236:2
**basement** [2] - 224:8, 224:20
**basis** [3] - 91:12, 231:10, 246:24
**bat** [1] - 101:7
**bear** [1] - 18:14
**beat** [11] - 49:22, 93:17,

127:1, 128:7, 207:8, 208:18, 209:5, 209:9, 209:10, 213:7, 217:23

**beaten** [1] - 211:21

**beating** [4] - 42:22, 43:24, 73:4, 207:9

**became** [1] - 80:15

**become** [2] - 62:5, 67:11

**becomes** [2] - 74:13, 74:20

**becoming** [1] - 72:13

**beef** [7] - 104:1, 104:8, 104:20, 105:2, 192:2, 192:16, 193:2

**beefs** [3] - 191:3, 191:6, 191:10

**began** [1] - 87:24

**begin** [1] - 156:9

**beginning** [7] - 84:25, 93:5, 108:2, 136:21, 194:13, 194:14, 205:13

**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21

**behalf** [1] - 115:6

**behind** [1] - 189:20

**belabor** [2] - 148:12, 150:12

**belief** [1] - 141:23

**Belinda** [1] - 117:21

**below** [1] - 182:25

**belt** [1] - 248:2

**benefit** [1] - 62:14

**benefits** [1] - 109:12

**Benson** [1] - 6:22

**Benz** [2] - 174:24, 235:9

**best** [5] - 128:23, 129:24, 132:2, 137:18, 147:4

**bet** [1] - 31:14

**better** [10] - 4:3, 25:8, 37:2, 44:2, 57:11, 72:12, 85:21, 138:3, 176:15, 214:11

**betterment** [3] - 67:6, 67:16, 68:2

**between** [3] - 25:13, 43:21, 75:19, 112:17, 122:15, 128:22, 146:24, 147:2, 147:18, 165:14, 211:25, 220:23, 237:14

**Between** [2] - 38:22, 43:22

**beyond** [2] - 112:24

**Big** [1] - 195:20

**big** [7] - 37:9, 46:23, 49:9, 50:16, 89:17, 195:19, 233:6

**bills** [2] - 110:8, 110:9

**bit** [7] - 14:19, 65:8,

87:19, 94:15, 121:16, 185:8, 207:17

**bits** [1] - 42:17

**black** [3] - 87:25, 121:22, 162:13

**blade** [1] - 20:9

**blend** [1] - 105:24

**block** [4] - 99:7, 209:23, 211:10, 230:5

**blue** [1] - 80:11

**Bo** [44] - 31:10, 32:1, 52:5, 52:19, 52:24, 53:3, 53:15, 71:15, 75:17, 93:12, 93:14, 93:16, 93:17, 99:4, 102:11, 122:2, 125:25, 126:12, 127:15, 127:23, 134:15, 164:7, 164:9, 164:11, 164:13, 171:16, 171:21, 171:22, 172:23, 176:20, 185:20, 185:22, 186:9, 190:25, 214:22, 215:17, 215:20, 215:23, 216:3, 216:9, 217:4, 217:13, 219:2

**Bo's** [1] - 215:25

**boasted** [3] - 101:20, 101:23, 102:1

**boasting** [3] - 96:17, 102:1, 102:13

**Boasting** [2] - 102:24, 103:1

**bodies** [9] - 132:16, 200:21, 200:24, 201:1, 201:4, 202:23, 203:1, 206:1, 226:20

**body** [1] - 20:20

**bolster** [1] - 113:1

**Bond** [2] - 247:10, 247:15

**Booking** [15] - 22:25, 42:13, 46:24, 47:20, 48:6, 48:8, 50:14, 55:24, 56:4, 56:14, 56:20, 56:23, 89:23, 90:13, 247:20

**bothering** [1] - 203:25

**Bottom** [1] - 160:22

**bottom** [3] - 66:16, 70:21, 160:25

**bought** [4] - 175:10, 175:12, 177:12, 226:13

**box** [2] - 4:10, 87:25

**Box** [2] - 20:6, 20:7

**boxer** [1] - 79:16

**boxing** [1] - 79:16

**boy** [2] - 122:10, 208:10

**brag** [1] - 96:22

**Branch** [2] - 162:5, 163:20, 164:1, 164:14

**brawler** [1] - 50:17

**break** [11] - 84:12, 85:7, 85:8, 101:17, 111:3, 227:9, 227:11, 229:5, 229:7, 235:12, 243:3

**breaking** [1] - 237:15

**Breaking** [1] - 39:17

**brief** [7] - 111:19, 111:21, 136:6, 203:16, 231:4, 231:5, 235:2

**Briefly** [1] - 146:2

**briefly** [6] - 4:22, 114:7, 119:14, 133:12, 215:4, 232:23

**bring** [9] - 31:21, 32:3, 120:6, 148:12, 159:6, 168:4, 229:4, 239:2, 241:25

**bringing** [1] - 4:7

**brings** [1] - 242:25

**broken** [1] - 231:2

**brother** [2] - 14:1, 115:25

**brothers** [1] - 119:23

**brought** [11] - 5:4, 61:14, 80:11, 80:25, 81:2, 94:8, 106:20, 130:25, 200:23, 242:23, 246:2

**Bruton** [5] - 150:3, 150:9, 244:7, 247:22, 248:11

**buddy** [1] - 104:25

**building** [12] - 55:25, 167:6, 167:9, 214:6, 214:15, 221:24, 223:21, 223:25, 224:4, 224:9, 224:17, 225:1

**bullets** [1] - 233:21

**bump** [1] - 174:8

**bunch** [2] - 92:11, 144:13

**burden** [1] - 148:4

**burdening** [1] - 3:16

**business** [7] - 76:8, 123:12, 138:4, 166:11, 183:6, 237:21

**button** [4] - 127:15, 215:22, 216:3, 216:4

**buy** [13] - 66:8, 167:23, 170:11, 172:5, 172:6, 173:1, 175:21, 176:16, 177:8, 182:2, 187:10

**buying** [3] - 119:21, 173:6, 176:11

**BY** [46] - 6:9, 15:4, 16:16, 24:21, 25:19, 28:20, 31:4, 33:16, 52:14, 73:14, 76:23, 85:25, 100:13, 108:18,

121:4, 122:8, 123:2, 123:23, 124:14, 125:7, 126:23, 130:5, 132:6, 135:1, 136:8, 137:12, 138:10, 141:21, 144:9, 146:5, 151:24, 169:17, 176:9, 186:19, 204:22, 255:5, 255:6, 255:7, 255:8, 255:9, 255:10, 255:13, 255:14, 255:15, 255:16, 255:17

**Byrnes** [16] - 59:5, 59:6, 61:3, 67:10, 67:14, 67:18, 68:9, 68:11, 78:8, 83:14, 97:8, 97:14, 97:22, 97:23, 108:10, 108:11

---

## C

**caliber** [8] - 132:15, 200:20, 200:23, 201:3, 202:22, 206:1, 226:10, 226:19

**calm** [1] - 2:19

**camera** [1] - 204:5, 249:6

**candid** [1] - 157:1

**cannot** [1] - 230:25

**cap** [4] - 23:3, 159:15, 159:24, 161:16

**capacity** [1] - 157:10

**car** [67] - 8:24, 9:18, 12:8, 29:14, 29:17, 43:24, 79:19, 98:23, 98:24, 99:6, 99:12, 105:20, 109:4, 128:1, 131:7, 132:2, 132:23, 133:3, 147:1, 147:19, 173:2, 173:19, 173:24, 174:1, 174:23, 175:1, 175:7, 187:20, 187:24, 187:25, 194:23, 194:24, 195:1, 195:2, 197:22, 199:16, 200:1, 200:4, 200:5, 200:6, 206:1, 207:7, 207:11, 207:19, 208:15, 209:19, 209:21, 210:1, 210:13, 210:16, 213:1, 218:13, 218:17, 222:12, 222:13, 222:14, 223:12, 224:21, 228:15, 245:5, 250:19, 250:21, 250:23, 251:4, 251:9, 253:5

**card** [4] - 135:4, 142:25, 217:5, 217:8

**cards** [1] - 126:5

**career** [1] - 75:20

**careful** [1] - 47:25

**carpet** [7] - 173:22, 173:25, 174:1, 174:5, 174:8, 174:10, 174:17

**carried** [2] - 39:22, 187:4, 227:3

**carries** [1] - 158:10

**Carry** [1] - 39:21

**carry** [8] - 39:24, 40:8, 40:16, 40:18, 49:18, 170:17, 227:5, 227:7

**carrying** [1] - 213:7

**cars** [2] - 12:7, 92:11

**CASE** [1] - 1:6

**case** [26] - 3:23, 4:18, 16:13, 82:2, 82:3, 84:17, 109:13, 144:4, 148:24, 154:6, 154:7, 154:20, 159:22, 193:10, 203:18, 205:13, 227:13, 229:16, 238:3, 238:10, 238:13, 238:14, 240:12, 242:15, 242:20, 242:21

**cases** [1] - 143:18

**cash** [2] - 50:5, 75:24

**catch** [2] - 53:19, 92:2

**Catonsville** [17] - 135:21, 165:7, 165:8, 166:13, 166:14, 167:12, 168:20, 170:20, 178:5, 178:6, 178:9, 180:6, 181:13, 181:18, 199:24, 206:12, 206:19

**caught** [1] - 107:16

**CBIF** [1] - 94:17

**CD's** [3] - 87:1, 101:21, 103:22

**cell** [9] - 50:24, 50:25, 51:19, 51:22, 58:6, 79:13, 80:15, 89:23, 235:9

**center** [2] - 63:6, 184:2

**Center** [12] - 57:2, 146:21, 146:23, 179:13, 179:17, 179:21, 180:20, 184:3, 185:15, 194:17, 194:18, 194:19

**Central** [15] - 22:25, 42:13, 46:24, 47:19, 48:6, 48:7, 50:13, 55:23, 56:3, 56:14, 56:20, 56:22, 89:23, 90:13, 247:20

**certain** [6] - 4:9, 113:8, 113:13, 149:10, 240:10, 241:23

**certainly** [4] - 2:12, 3:7, 149:20, 228:2

**Certainly** [1] - 171:13

**CERTIFICATE** [1] - 256:1

**certify** [2] - 256:3, 256:6
**chair** [1] - 5:17
**chairs** [4] - 84:16, 111:8, 203:17, 227:12
**challenge** [1] - 246:22
**challenged** [1] - 246:10
**chance** [7] - 16:20, 82:12, 118:10, 161:12, 225:8, 230:15, 236:13
**Change** [1] - 220:9
**change** [4] - 86:15, 118:5, 220:8, 237:18
**changed** [1] - 119:12
**changing** [1] - 118:19
**channeling** [1] - 204:15
**character** [2] - 91:11, 158:17
**characterization** [2] - 185:17, 191:1
**characterize** [2] - 39:11, 39:24
**characterized** [1] - 34:11
**charge** [21] - 6:16, 77:11, 93:18, 127:1, 127:12, 127:13, 128:7, 153:22, 154:18, 154:22, 155:1, 155:4, 158:7, 158:10, 158:15, 159:3, 161:18, 161:20, 161:24, 217:23
**charged** [5] - 3:22, 116:19, 135:4, 142:24, 217:5
**charges** [3] - 43:11, 44:3, 157:21
**charging** [2] - 157:20, 217:7
**charming** [3] - 36:16, 37:17, 50:3
**chatter** [4] - 33:23, 112:18, 112:25, 114:23
**check** [6] - 76:18, 127:16, 127:17, 127:22, 215:22, 215:23
**checking** [1] - 216:11
**Cheeks** [3] - 157:21, 159:4, 205:11
**chitchatting** [1] - 51:24
**choice** [6] - 64:10, 235:15, 237:14, 238:20
**choices** [1] - 238:19
**CHRIS** [1] - 255:4
**chronology** [1] - 97:3
**circumstances** [2] - 3:11, 3:17
**citizen** [1] - 238:25
**City** [17] - 42:14, 49:1, 50:14, 55:25, 56:17, 56:20, 56:23, 71:2,

152:4, 152:11, 154:3, 170:20, 170:22, 171:8, 177:16, 177:18, 177:19
**city** [6] - 49:2, 179:9, 179:11, 179:15, 181:9, 183:23
**City's** [1] - 48:17
**claim** [10] - 19:5, 19:12, 19:14, 19:15, 19:19, 21:25, 26:22, 96:11, 96:13, 119:22
**claimed** [1] - 19:2, 74:7, 75:11
**Claire** [1] - 26:8
**clarify** [3] - 54:17, 78:19, 97:3
**clean** [8] - 42:4, 65:2, 67:11, 101:1, 101:4, 101:6, 101:11, 109:1
**clear** [25] - 4:15, 17:9, 18:6, 21:17, 21:19, 21:21, 31:5, 32:19, 60:24, 61:2, 68:22, 74:21, 85:2, 113:17, 113:19, 114:14, 148:13, 148:23, 240:8, 241:13, 241:14, 241:16, 245:12, 246:3, 247:22
**clearer** [1] - 32:9
**Clearly** [1] - 114:1
**clearly** [7] - 35:6, 60:15, 116:16, 149:12, 149:14, 249:20, 250:7
**CLERK** [2] - 120:21, 151:19
**clients** [2] - 85:16, 111:19
**clock** [1] - 64:18
**close** [3] - 111:6, 199:6, 204:18
**Close** [1] - 161:23
**Closer** [1] - 146:22
**closer** [3] - 24:25, 89:25, 138:22
**closest** [1] - 199:4
**clothing** [2] - 66:7, 162:12
**co** [3] - 25:5, 76:18, 235:20
**co-counsel** [3] - 25:5, 76:18, 235:20
**Coburn** [21] - 1:22, 2:4, 3:25, 118:9, 118:17, 146:2, 146:13, 229:6, 229:10, 230:24, 232:18, 238:6, 239:7, 240:4, 241:3, 246:10, 248:21, 249:2, 249:5, 252:20, 253:14
**COBURN** [42] - 136:4,

146:3, 146:5, 155:8, 175:23, 179:4, 181:5, 181:10, 191:1, 202:19, 205:19, 216:18, 217:24, 229:11, 231:21, 232:4, 232:8, 232:17, 232:21, 233:1, 233:5, 233:7, 233:11, 233:17, 233:19, 233:24, 234:1, 234:6, 234:8, 234:10, 234:14, 234:18, 234:21, 235:1, 246:14, 248:25, 252:14, 252:16, 252:18, 253:15, 254:2, 255:16
**Coburn's** [5] - 231:1, 238:15, 240:13, 252:25, 253:7
**cocaine** [10] - 175:10, 181:22, 181:25, 185:3, 244:6, 250:18, 251:1, 251:5, 251:9, 253:5
**Cocaine** [1] - 64:11
**coconspirator** [7] - 116:13, 118:16, 118:17, 118:19, 119:3, 119:25, 151:1
**coconspirators** [1] - 116:23
**coherently** [1] - 3:12
**Coke** [2] - 166:8, 196:6
**coke** [3] - 172:6, 173:6, 250:21
**collect** [5] - 34:9, 36:9, 36:10, 40:13, 50:3
**collected** [2] - 34:6, 38:24
**collecting** [2] - 38:10, 39:23
**collector** [1] - 65:22
**Collins** [2] - 77:13, 77:19
**colloquy** [1] - 253:19
**color** [1] - 222:18
**coming** [9] - 25:6, 67:17, 81:15, 99:24, 115:8, 134:14, 150:12, 194:9, 235:9
**comma** [1] - 71:2
**comment** [1] - 150:2
**comments** [1] - 4:23
**commission** [1] - 157:22
**commit** [6] - 43:9, 44:17, 52:24, 121:12, 157:18, 160:9
**committed** [13] - 32:2, 43:23, 43:25, 44:5, 44:12, 48:15, 52:16, 54:5, 56:11, 80:16, 96:10, 103:7, 124:6

**committing** [2] - 66:14, 109:23
**common** [1] - 231:1
**community** [4] - 55:4, 55:5, 55:8, 67:11
**Compared** [1] - 31:8
**complete** [3] - 157:1, 228:20, 256:8
**completely** [1] - 160:8
**completes** [1] - 159:12
**completion** [2] - 232:15
**complex** [1] - 119:9
**conceal** [1] - 174:6
**concern** [4] - 231:21, 231:22, 239:22, 240:3
**concerned** [7] - 17:7, 19:15, 34:2, 34:3, 40:12, 198:17, 241:24
**concerning** [4] - 58:9, 103:18, 157:1, 157:2
**concerns** [2] - 230:17, 237:16
**conclude** [1] - 227:17
**concluded** [1] - 145:24
**Conclusion** [1] - 254:5
**concurrently** [1] - 159:25
**condition** [4] - 41:23, 63:16, 69:13, 70:25
**conditions** [8] - 20:25, 41:8, 62:20, 63:19, 109:24, 156:19, 157:17, 159:12
**Conduct** [1] - 227:13
**conduct** [2] - 120:11, 158:17
**confer** [1] - 235:19
**conference** [1] - 242:6
**confessed** [2] - 54:2, 102:19
**confession** [2] - 54:8, 80:16
**confessions** [1] - 53:22
**confirm** [1] - 95:13
**confirmed** [3] - 18:18, 18:19, 18:20
**confirms** [1] - 113:23
**confused** [2] - 23:17, 244:14
**connection** [5] - 158:14, 165:14, 197:8, 218:11, 253:16
**conscience** [7] - 57:10, 57:14, 66:25, 67:3, 68:3, 69:19, 72:12
**consented** [1] - 146:8
**consider** [6] - 244:21, 244:22, 245:9, 246:24, 249:23, 253:12
**considered** [6] - 2:13,

102:21, 114:3, 186:14, 250:12, 251:12
**considers** [1] - 160:12
**consignment** [2] - 167:24, 167:25
**conspiracies** [6] - 148:23, 148:24, 148:25, 149:4, 149:15, 149:18
**conspiracy** [19] - 113:6, 114:5, 115:20, 116:18, 116:19, 120:3, 120:7, 149:1, 149:2, 149:8, 149:13, 149:14, 149:20, 149:21, 150:8, 150:14
**constitute** [3] - 14:18, 160:10, 256:6
**Construction** [2] - 65:12, 66:5
**consult** [2] - 111:19, 112:1
**contact** [2] - 128:18, 129:15
**contacted** [4] - 105:13, 105:14, 107:24, 108:2
**containing** [1] - 251:5
**context** [3] - 60:6, 128:13, 132:20
**continue** [8] - 3:20, 6:6, 143:4, 151:6, 151:11, 156:24, 172:11, 228:18
**Continue** [2] - 84:17, 203:19
**CONTINUED** [1] - 6:8
**continuing** [3] - 91:12, 150:12, 150:25
**contract** [2] - 35:22, 158:24
**contrary** [1] - 118:5
**conversation** [36] - 7:1, 7:3, 10:9, 10:10, 11:8, 15:14, 21:6, 21:13, 21:15, 21:24, 22:14, 25:13, 29:6, 29:7, 56:12, 58:20, 59:21, 60:5, 76:16, 79:13, 82:7, 82:8, 93:5, 96:14, 105:7, 125:12, 125:22, 132:2, 133:15, 133:20, 146:24, 147:18, 205:25, 209:17, 211:5, 215:14
**conversations** [20] - 18:4, 21:1, 21:5, 23:11, 32:15, 42:9, 57:20, 80:14, 81:20, 82:10, 88:12, 88:24, 98:8, 98:11, 105:6, 112:17, 112:24, 113:14, 114:24, 157:11
**convicted** [14] - 2:8, 3:21, 4:19, 41:3, 43:2,

43:9, 43:10, 144:5,
152:12, 152:14, 152:16,
152:17, 152:24, 231:7
**conviction** [1] - 44:13
**convictions** [2] - 43:13,
44:18
**convinced** [1] - 241:24
**cook** [3] - 181:19,
181:22, 181:25
**cooked** [2] - 181:20,
181:21
**cool** [1] - 210:20
**cooperate** [6] - 3:14,
66:13, 72:13, 156:9,
156:19, 156:24
**cooperated** [1] - 71:23
**cooperating** [2] - 62:6,
63:23
**cooperation** [6] -
100:20, 100:24, 156:15,
158:16, 159:11, 160:16
**cooperator** [1] - 6:16
**coordinating** [1] -
140:25
**Cop** [1] - 43:11
**copies** [1] - 5:20
**copy** [2] - 83:24, 117:5
**Corey** [3] - 192:5,
192:6, 192:12
**corner** [1] - 167:6
**corners** [1] - 50:12
**Correct** [25] - 7:6, 11:9,
13:12, 26:19, 30:20,
41:19, 52:17, 52:22,
89:9, 91:5, 97:16, 98:2,
101:8, 104:24, 105:15,
106:4, 109:2, 109:18,
110:19, 154:8, 158:4,
158:21, 160:5, 216:3,
250:23
**correct** [155] - 2:12,
2:16, 7:5, 8:8, 9:15,
9:21, 10:1, 10:10, 10:13,
10:22, 11:8, 11:14,
11:24, 14:9, 15:8, 15:11,
15:15, 15:20, 15:23,
16:4, 17:2, 18:12, 18:23,
19:2, 19:5, 23:9, 23:16,
26:2, 26:4, 26:12, 26:15,
26:23, 27:1, 27:4, 28:21,
29:24, 31:15, 32:23,
33:1, 33:5, 33:9, 41:16,
41:22, 52:16, 52:18,
62:25, 74:10, 74:14,
74:18, 76:12, 77:3, 77:6,
77:21, 77:22, 78:11,
78:16, 79:9, 79:10, 80:7,
80:12, 81:13, 88:14,
90:21, 91:1, 91:4, 93:18,
94:2, 94:19, 95:1, 95:15,

95:23, 96:1, 96:7, 96:20,
97:6, 97:10, 97:15,
97:19, 97:23, 98:1, 98:5,
99:2, 100:1, 100:2,
100:7, 100:18, 104:3,
104:12, 105:17, 107:1,
107:2, 107:22, 133:17,
135:2, 136:9, 136:22,
138:25, 139:3, 139:12,
141:14, 143:15, 143:18,
145:13, 147:9, 147:23,
152:25, 155:4, 155:23,
156:13, 157:4, 157:12,
157:15, 158:8, 159:4,
159:19, 161:10, 161:25,
165:2, 168:11, 168:18,
174:11, 175:10, 175:17,
176:21, 177:3, 179:18,
180:11, 180:14, 180:18,
181:14, 182:19, 183:24,
187:21, 189:2, 192:20,
192:25, 196:19, 202:18,
203:9, 207:4, 207:19,
208:19, 210:14, 211:22,
212:4, 212:18, 214:24,
216:16, 220:14, 221:6,
221:8, 221:25, 222:2,
224:1
**Correctional** [3] -
56:17, 57:7, 77:25
**correctly** [2] - 73:17,
182:24
**corroborate** [1] - 54:12
**corroboration** [1] - 72:4
**cost** [1] - 175:19
**cot** [1] - 37:5
**Counsel** [1] - 111:17
**counsel** [19] - 2:7, 3:14,
15:1, 16:13, 25:5, 76:18,
85:4, 85:16, 111:12,
111:16, 111:18, 112:1,
112:3, 136:6, 228:3,
235:20, 240:10, 241:18,
254:3
**counsel's** [5] - 3:2,
14:16, 14:18, 15:1, 52:12
**Count** [2] - 158:1, 158:2
**count** [4] - 38:13,
157:19, 157:21, 213:18
**counting** [3] - 187:1,
187:9, 213:19
**counts** [1] - 235:7
**County** [3] - 57:2, 97:9,
144:2
**Couple** [1] - 178:25
**couple** [44] - 29:2,
29:10, 30:6, 45:8, 56:5,
64:6, 72:11, 73:20,
75:10, 92:17, 94:1,
95:25, 97:2, 98:3, 98:4,

121:10, 123:16, 132:23,
137:25, 142:14, 143:9,
143:10, 143:15, 143:18,
144:24, 145:2, 145:7,
145:12, 147:5, 155:15,
163:3, 163:4, 167:22,
172:1, 178:24, 179:1,
179:7, 188:3, 211:7,
212:17, 215:11, 215:12,
229:1, 242:17
**course** [15] - 4:5, 4:12,
6:6, 26:14, 70:3, 116:3,
146:14, 172:15, 186:17,
227:18, 232:8, 232:24,
235:21, 236:7
**Court** [48] - 2:22, 2:25,
3:9, 3:18, 3:20, 4:4,
24:16, 70:25, 111:13,
111:25, 112:2, 112:15,
112:20, 112:23, 113:3,
113:8, 113:13, 113:15,
113:23, 114:13, 115:6,
115:9, 116:24, 117:7,
117:16, 117:22, 118:3,
118:15, 118:16, 118:18,
118:20, 148:3, 148:6,
149:8, 149:9, 158:16,
160:12, 204:2, 236:5,
236:6, 239:5, 241:20,
241:22, 241:23, 244:8,
245:18, 253:6, 256:15
**court** [21] - 4:20, 25:2,
43:19, 71:17, 71:18,
78:20, 108:10, 109:25,
110:2, 158:7, 159:3,
161:10, 180:2, 230:9,
231:7, 231:16, 236:21,
236:22, 237:20, 237:25,
238:12
**COURT** [351] - 1:1, 2:2,
2:17, 4:25, 5:3, 5:7,
5:11, 5:16, 5:22, 5:25,
6:3, 14:16, 16:15, 22:7,
22:18, 23:3, 23:7, 23:22,
24:1, 24:7, 24:10, 24:12,
24:15, 24:18, 24:24,
25:3, 25:10, 25:15,
25:18, 27:10, 27:12,
28:9, 28:12, 30:25, 31:2,
33:13, 36:20, 37:16,
37:23, 38:6, 38:8, 44:20,
46:10, 47:25, 50:1, 50:9,
52:8, 52:11, 54:15,
55:16, 58:14, 62:4,
67:25, 70:17, 72:8,
72:10, 72:17, 73:3, 73:6,
73:8, 73:10, 76:21,
80:21, 81:5, 81:10,
82:23, 82:25, 83:3,
83:11, 83:15, 83:17,
83:21, 83:24, 84:1, 84:3,

84:5, 84:8, 84:14, 84:21,
84:23, 85:7, 85:12,
85:14, 85:20, 85:23,
87:19, 87:21, 89:8,
89:25, 96:25, 99:9,
99:14, 100:6, 100:9,
100:15, 104:19, 108:15,
110:21, 110:25, 111:2,
111:12, 111:17, 111:24,
112:8, 112:13, 114:9,
114:13, 114:18, 114:20,
114:25, 115:11, 115:21,
116:3, 116:7, 117:8,
117:11, 117:17, 117:20,
117:25, 118:7, 118:21,
119:6, 120:4, 120:15,
120:25, 121:16, 122:6,
122:25, 123:14, 123:19,
123:22, 124:9, 124:11,
124:13, 125:5, 126:16,
126:21, 127:4, 128:11,
128:15, 128:17, 129:1,
129:3, 129:5, 129:8,
129:10, 129:13, 129:17,
129:19, 129:21, 129:23,
130:2, 130:12, 130:20,
130:22, 131:16, 131:18,
131:20, 131:23, 132:1,
132:5, 132:13, 132:18,
133:1, 134:5, 134:17,
134:19, 134:22, 134:24,
136:2, 136:5, 136:17,
137:9, 137:11, 138:8,
140:7, 140:17, 140:23,
141:4, 141:16, 141:19,
144:4, 144:7, 145:24,
146:2, 146:10, 146:12,
146:22, 148:3, 148:10,
148:18, 148:22, 149:12,
149:17, 149:23, 150:7,
150:16, 150:21, 150:25,
151:4, 151:9, 151:15,
155:11, 162:16, 163:13,
169:15, 171:13, 171:18,
175:24, 176:4, 176:6,
176:8, 179:6, 180:4,
181:6, 181:11, 182:13,
184:9, 185:12, 185:18,
186:3, 186:6, 186:8,
186:12, 186:17, 191:2,
197:12, 202:20, 203:14,
203:16, 203:24, 204:2,
204:5, 204:8, 204:12,
204:15, 204:18, 204:21,
205:21, 206:8, 216:19,
217:21, 218:1, 219:1,
219:20, 220:3, 220:19,
225:9, 225:13, 226:22,
227:10, 227:25, 228:5,
228:13, 228:15, 228:19,
228:23, 229:3, 229:10,

230:8, 230:12, 230:21,
231:5, 231:10, 231:15,
231:20, 232:1, 232:7,
232:10, 232:18, 232:25,
233:3, 233:6, 233:10,
233:16, 233:18, 233:22,
233:25, 234:4, 234:7,
234:9, 234:12, 234:16,
234:19, 234:23, 235:14,
235:21, 235:25, 236:7,
236:10, 236:19, 236:24,
237:2, 237:6, 237:17,
237:21, 238:24, 239:4,
239:9, 239:19, 240:1,
240:24, 241:12, 241:16,
242:20, 243:14, 243:25,
244:14, 244:20, 244:25,
245:6, 245:9, 245:12,
245:22, 246:1, 246:4,
246:9, 246:13, 246:15,
246:21, 247:3, 247:13,
247:16, 247:24, 248:12,
248:16, 249:1, 249:5,
249:9, 249:16, 250:5,
250:14, 250:20, 250:23,
250:25, 251:4, 251:7,
251:16, 251:21, 252:2,
252:6, 252:9, 252:12,
252:15, 252:19, 252:24,
253:6, 253:10, 253:14,
253:25, 254:3
**Court's** [22] - 3:12,
4:15, 4:21, 58:23, 66:20,
73:11, 112:13, 114:9,
114:19, 114:20, 115:1,
115:18, 116:11, 116:12,
118:5, 138:6, 146:7,
146:11, 159:6, 230:14,
236:3, 240:5
**courteous** [1] - 229:13
**Courthouse** [1] - 1:24
**courtroom** [27] - 6:2,
25:7, 54:2, 81:8, 84:20,
84:22, 85:2, 85:22,
111:11, 111:14, 112:3,
112:12, 120:12, 144:11,
151:8, 162:9, 163:7,
164:9, 165:2, 193:3,
203:23, 203:24, 204:14,
204:20, 227:23, 227:24
**Cousins** [1] - 165:16
**cousins** [1] - 165:17
**cover** [1] - 66:22
**Crack** [9] - 64:11,
166:19, 178:10, 179:16,
181:12, 184:21, 185:6,
206:14, 206:18
**crack** [22] - 166:9,
167:4, 167:11, 167:12,
167:16, 167:23, 168:7,

**created** [1] - 217:7
**credibility** [1] - 231:23
**credit** [5] - 126:4, 135:4, 142:25, 217:5, 217:7
**credits** [2] - 113:13, 113:15
**Cressida** [2] - 175:2, 175:3
**crime** [15] - 43:2, 43:20, 43:23, 44:12, 52:16, 52:24, 60:3, 60:4, 80:16, 99:17, 102:18, 103:7, 103:14, 103:16, 157:22
**crimes** [20] - 41:3, 43:9, 43:20, 44:16, 48:15, 66:14, 88:22, 101:20, 102:1, 102:2, 102:3, 102:6, 102:13, 109:23, 152:12, 152:14, 157:18, 160:10, 160:20, 203:8
**CRIMINAL** [1] - 1:6
**criminal** [13] - 56:10, 58:12, 59:1, 66:2, 72:18, 72:23, 79:13, 88:17, 89:1, 94:13, 96:16, 96:22, 156:10
**Criminal** [1] - 58:21
**critical** [6] - 62:23, 64:7, 229:23, 230:23, 235:6, 235:11
**CROSS** [12] - 6:8, 33:15, 73:13, 136:7, 138:9, 146:4, 255:5, 255:6, 255:7, 255:14, 255:15, 255:16
**cross** [36] - 3:25, 74:6, 77:1, 77:12, 88:2, 90:18, 91:22, 94:7, 94:24, 98:3, 112:22, 113:9, 120:12, 228:4, 230:15, 230:19, 230:23, 231:2, 231:12, 231:25, 232:14, 233:7, 234:22, 235:4, 235:13, 236:1, 237:13, 238:17, 239:10, 239:16, 239:23, 240:18, 240:20, 242:10, 252:21, 253:7
**crossed** [2] - 229:21, 248:21
**crossing** [1] - 146:9
**crowd** [3] - 12:9, 12:10, 18:11
**Crowe** [10] - 1:20, 115:22, 116:4, 117:21, 118:21, 140:7, 140:17,

141:4, 145:25, 239:4
**CROWE** [38] - 115:13, 115:23, 116:5, 116:9, 117:10, 117:22, 118:1, 126:15, 126:20, 127:3, 132:12, 134:3, 138:10, 141:18, 141:21, 144:5, 144:8, 144:9, 146:1, 169:14, 171:17, 176:3, 184:8, 185:11, 185:16, 186:16, 197:11, 205:20, 206:7, 217:25, 218:25, 219:19, 220:2, 220:18, 226:21, 239:5, 239:10, 255:15
**Crowe's** [2] - 234:23, 234:24
**Cumberland** [2] - 61:12, 61:15
**curative** [1] - 115:8
**custody** [2] - 241:11, 242:7
**customer** [1] - 187:15
**cut** [2] - 101:17, 150:8
**cutter** [3] - 20:6, 20:7, 88:1
**cutting** [1] - 120:5

**D**

**danger** [1] - 86:17
**dangerous** [1] - 82:19
**Danny** [1] - 6:21
**Darius** [45] - 119:11, 124:16, 141:25, 202:6, 202:7, 202:10, 202:12, 202:14, 203:12, 207:3, 207:7, 207:12, 207:16, 207:18, 208:2, 208:7, 209:13, 211:20, 211:21, 211:25, 212:3, 212:10, 212:15, 213:3, 213:4, 213:6, 213:11, 213:17, 213:22, 214:1, 214:4, 214:9, 220:13, 220:14, 220:17, 220:22, 220:24, 220:25, 221:5, 221:6, 221:8, 221:24, 223:19, 225:19, 226:6
**Darius's** [3] - 209:19, 213:7, 221:16
**dark** [1] - 209:3
**Darryl** [23] - 132:22, 164:17, 165:5, 165:14, 172:23, 173:5, 174:21, 176:19, 183:8, 183:9, 186:5, 186:7, 186:10, 186:24, 187:23, 188:6, 188:7, 188:20, 190:1, 190:2, 190:5, 190:20,

190:25
**date** [8] - 11:20, 15:9, 23:18, 25:24, 28:3, 28:13, 136:19, 186:22
**dated** [2] - 117:2, 154:10
**dates** [5] - 12:23, 14:14, 15:1, 23:17, 128:24
**David** [4] - 229:25, 230:13, 232:5, 233:13
**Davis** [3] - 1:13, 161:9, 235:15
**Davon** [1] - 210:5
**days** [7] - 19:24, 211:7, 212:17, 215:11, 215:12, 224:14, 224:16
**DEA-6** [2] - 23:5, 252:18
**deal** [8] - 2:19, 44:3, 46:14, 89:17, 176:15, 185:8, 220:21, 233:6
**dealer** [16] - 22:25, 28:17, 36:7, 89:13, 90:8, 90:9, 90:10, 91:10, 106:8, 106:21, 106:22, 195:18, 195:19, 195:20, 202:13
**dealers** [16] - 22:21, 34:18, 40:3, 40:8, 75:20, 75:24, 76:6, 76:11, 89:19, 89:21, 91:7, 94:6, 132:23, 140:4, 188:11, 188:17
**dealing** [5] - 113:5, 123:13, 166:4, 187:12, 244:3
**dealings** [1] - 138:4
**dealt** [1] - 166:9
**Dean** [2] - 117:4, 143:23
**death** [2] - 147:15, 147:21
**debrief** [2] - 11:2, 14:6
**debriefed** [2] - 16:4, 19:8
**debriefing** [2] - 140:19, 140:21
**debt** [8] - 34:9, 36:13, 38:10, 38:24, 39:23, 40:13, 50:3, 65:22
**debtor** [1] - 37:20
**December** [15] - 11:19, 14:6, 15:6, 18:22, 19:24, 29:2, 89:11, 98:20, 107:17, 107:21, 107:23, 107:24, 108:2
**decide** [1] - 160:8
**decided** [5] - 57:11, 59:3, 72:12, 97:23, 187:17
**decision** [4] - 3:15, 4:2, 4:13, 240:4

**decisions** [1] - 2:23
**dedicated** [1] - 204:24
**Defendant** [4] - 1:17, 1:18, 1:20, 1:21
**defendant** [11] - 2:23, 156:18, 156:21, 156:24, 157:25, 159:10, 159:12, 159:14, 160:9, 162:15, 246:7
**defendant's** [1] - 159:8, 159:11
**defendants** [21] - 2:10, 4:17, 84:24, 85:3, 85:9, 112:1, 112:4, 112:5, 116:8, 116:10, 121:17, 122:5, 146:8, 149:7, 151:1, 186:21, 188:5, 193:3, 240:16, 244:19, 247:12
**Defendants** [2] - 1:9, 112:9
**defense** [6] - 16:13, 85:16, 228:3, 238:14, 238:18, 241:20
**Define** [1] - 67:2
**Definitely** [1] - 60:15
**definitely** [2] - 229:13, 250:17
**degree** [2] - 152:16, 154:2, 157:20
**Delaware** [2] - 23:1, 106:21
**delays** [1] - 227:20
**demonstrably** [1] - 113:7
**Denham's** [1] - 241:8
**denied** [2] - 115:11, 115:12
**Deputy** [1] - 112:4
**describe** [1] - 80:18
**described** [6] - 34:7, 80:22, 80:23, 99:1, 99:2
**description** [2] - 25:8, 95:14
**designed** [1] - 235:5
**desire** [1] - 99:15
**despite** [1] - 227:19
**detail** [6] - 52:2, 60:11, 60:23, 79:24, 148:5, 157:8
**detailed** [1] - 155:15
**details** [3] - 55:15, 55:20, 231:24
**detained** [1] - 250:1
**detective** [7] - 8:2, 33:25, 61:9, 127:25, 128:4
**Detective** [26] - 6:13, 6:19, 10:22, 15:10, 15:22, 16:1, 17:2, 19:8,

19:11, 20:19, 22:1, 22:3, 22:10, 22:17, 23:4, 23:20, 23:23, 24:2, 55:18, 55:19, 59:18, 59:20, 94:25, 95:2, 241:7, 246:19
**detectives** [26] - 6:13, 9:8, 13:6, 17:11, 34:8, 46:14, 61:3, 61:9, 69:2, 77:24, 80:3, 80:23, 81:3, 81:6, 81:25, 82:15, 87:1, 91:3, 91:16, 92:1, 95:13, 103:11, 103:14, 127:20, 134:16, 218:12
**detectors** [1] - 88:7
**Detention** [1] - 57:2
**determine** [3] - 3:5, 3:6, 41:20, 104:18, 114:4
**determining** [1] - 159:17
**develop** [1] - 195:10
**developed** [1] - 196:24
**device** [3] - 7:11, 81:22, 95:25
**devices** [8] - 7:8, 7:15, 7:16, 8:6, 8:15, 20:20, 81:19, 88:23
**dictating** [1] - 68:3
**difference** [2] - 138:12, 232:13
**Different** [1] - 109:11
**different** [18] - 8:4, 53:4, 58:2, 58:6, 109:10, 117:14, 148:23, 149:1, 160:19, 171:1, 172:1, 172:2, 219:22, 220:10, 230:16, 236:2, 251:16
**difficult** [2] - 68:6, 105:24, 219:12, 219:14, 237:12
**difficulty** [1] - 140:25
**digging** [1] - 87:24
**digital** [1] - 81:23
**dip** [2] - 227:6, 227:8
**dire** [1] - 242:2
**direct** [23] - 74:24, 77:13, 95:10, 112:21, 113:9, 140:21, 143:21, 146:14, 223:14, 228:2, 228:20, 229:4, 229:18, 231:2, 231:24, 232:1, 232:15, 235:12, 237:14, 237:15, 238:17, 248:20
**DIRECT** [4] - 121:3, 151:23, 255:13, 255:17
**direction** [2] - 220:8, 220:9
**directly** [4] - 120:21, 150:5, 151:6, 151:19
**Dirty** [15] - 207:11,

207:13, 210:2, 210:4,
210:16, 210:21, 211:2,
211:24, 212:1, 212:2,
212:6, 212:7, 212:9,
213:2
  **disadvantage** [1] -
238:7
  **disagree** [1] - 232:11
  **disclosed** [2] - 16:12,
52:2
  **disclosing** [2] - 52:5,
56:10
  **disclosures** [1] -
113:17
  **discovered** [1] - 82:9
  **discovery** [3] - 16:13,
82:16, 136:6
  **discretion** [1] - 159:17
  **discuss** [9] - 54:18,
58:11, 58:12, 58:15,
65:1, 192:15, 193:2,
195:5, 205:23
  **discussed** [4] - 2:5,
99:18, 131:10, 231:22
  **discussing** [7] - 28:19,
54:6, 59:20, 59:25, 60:3,
75:20, 136:10
  **discussion** [23] - 76:4,
76:10, 78:15, 80:7,
84:17, 111:9, 130:11,
130:12, 130:13, 131:7,
134:6, 134:7, 146:25,
195:3, 199:13, 199:14,
199:16, 202:25, 203:18,
208:16, 221:15, 227:12
  **discussions** [6] - 3:15,
74:5, 74:10, 74:15, 91:9,
93:12
  **display** [2] - 253:16,
254:1
  **displayed** [1] - 83:8
  **disposed** [1] - 229:13
  **disposition** [3] - 36:16,
37:18, 50:4
  **disregard** [3] - 169:15,
186:12, 244:13
  **dissociated** [1] - 239:13
  **distort** [2] - 60:22,
95:19
  **distracted** [1] - 58:25
  **distress** [2] - 86:4,
86:11
  **District** [1] - 71:2
  **DISTRICT** [2] - 1:1, 1:2
  **district** [1] - 142:6
  **disturb** [1] - 60:21
  **DIVISION** [1] - 1:2
  **DOAR** [4] - 5:21, 5:22,
25:23, 248:22
  **DOBROPOLSKI** [1] -

255:4
  **Dobropolski** [44] - 5:4,
6:6, 6:10, 6:11, 24:22,
25:13, 25:21, 27:23,
28:10, 31:5, 32:19,
33:11, 33:13, 50:10,
73:15, 73:18, 73:19,
76:24, 78:19, 83:6,
83:14, 84:21, 86:1,
86:21, 87:18, 88:16,
89:19, 97:4, 99:21,
100:16, 111:2, 112:18,
112:22, 112:24, 113:4,
113:8, 113:12, 113:19,
114:23, 228:6, 241:9,
242:25
  **Dobropolski's** [4] -
112:25, 113:15, 115:7,
241:19
  **document** [6] - 83:5,
153:17, 154:9, 156:12,
204:5, 249:6
  **documents** [2] - 153:2,
157:6
  **Dodge** [2] - 65:8,
222:16
  **dollars** [6] - 109:15,
142:14, 145:7, 145:13,
179:1, 188:3
  **domestic** [2] - 42:20,
62:10
  **done** [19] - 31:23,
42:24, 67:22, 85:17,
86:24, 87:2, 88:9, 88:24,
101:16, 117:4, 120:17,
161:19, 182:21, 187:6,
213:18, 217:4, 228:2,
234:14, 237:8
  **double** [6] - 32:17,
74:20, 74:22, 99:17,
102:19, 103:3
  **doubt** [3] - 38:21,
113:1, 234:21
  **Dovell** [3] - 35:13,
35:15, 35:16
  **down** [37] - 5:5, 10:24,
12:24, 13:8, 14:8, 15:19,
15:24, 16:5, 16:8, 16:18,
17:16, 18:5, 69:4,
110:16, 110:22, 130:18,
135:6, 137:18, 139:6,
139:10, 145:19, 155:1,
167:6, 177:11, 180:6,
180:25, 183:18, 185:15,
188:9, 190:5, 195:24,
207:22, 211:9, 211:10,
212:20, 212:21, 212:23
  **Downtown** [1] - 6:5
  **dozen** [1] - 29:3
  **draw** [1] - 112:23

  **drawing** [1] - 112:22
  **drawn** [1] - 112:19
  **dreads** [1] - 60:20
  **drive** [2] - 105:21,
172:20
  **driven** [1] - 250:21
  **driving** [9] - 195:1,
200:4, 200:6, 209:22,
209:23, 211:9, 222:14,
228:15, 251:4
  **dropped** [1] - 145:18
  **drove** [9] - 172:17,
172:19, 172:22, 172:23,
172:24, 176:20, 223:19,
224:16
  **drug** [43] - 22:21, 34:4,
34:15, 36:7, 38:10,
38:25, 40:3, 40:8, 49:4,
62:24, 64:10, 64:14,
75:20, 75:24, 76:6,
76:11, 77:12, 77:16,
77:17, 89:5, 89:13,
89:19, 89:21, 90:8, 91:7,
91:10, 94:6, 110:3,
113:5, 132:23, 135:7,
149:13, 166:18, 178:2,
178:9, 181:16, 182:5,
188:17, 195:18, 195:19,
195:20
  **Drug** [5] - 34:18,
123:13, 135:9, 188:11,
202:13
  **drugs** [68] - 40:1, 41:13,
41:21, 43:24, 62:21,
63:20, 64:3, 64:4, 65:20,
65:21, 76:1, 76:3, 76:6,
93:2, 93:3, 96:5, 98:5,
98:7, 98:19, 106:25,
107:19, 107:22, 108:6,
108:8, 108:12, 124:3,
135:10, 135:17, 140:3,
166:4, 166:7, 168:17,
170:19, 171:16, 172:4,
173:1, 176:16, 177:8,
177:13, 177:15, 177:17,
177:22, 177:24, 177:25,
179:14, 181:8, 183:3,
183:12, 183:13, 184:18,
184:20, 189:9, 189:10,
192:14, 196:4, 196:7,
196:11, 206:5, 206:21,
212:13, 213:12, 218:10,
218:16, 244:3, 245:5
  **Druid** [1] - 182:25
  **duct** [1] - 225:3
  **dude** [9] - 60:9, 169:25,
170:5, 186:25, 187:9,
190:13, 190:14, 207:8,
215:21
  **dudes** [1] - 188:25

  **During** [5] - 91:22,
108:8, 122:25, 169:11,
252:9
  **during** [21] - 21:16,
28:25, 53:10, 56:11,
58:4, 64:20, 64:25,
126:6, 135:6, 146:6,
146:14, 150:18, 156:23,
177:5, 232:24, 244:6,
249:25, 252:25, 253:3,
253:7

# E

  **eager** [1] - 90:20
  **early** [6] - 79:2, 79:4,
123:4, 129:5, 129:9,
227:17
  **earned** [2] - 47:13,
49:11
  **earth** [1] - 232:13
  **east/west** [1] - 180:16
  **easy** [1] - 68:5
  **Ecstasy** [7] - 22:25,
28:16, 90:8, 90:10,
106:8, 106:21, 106:22
  **Edmondson** [9] -
135:13, 170:24, 177:20,
178:2, 180:14, 180:16,
180:17, 208:12, 208:13
  **effect** [9] - 3:24, 4:19,
75:23, 92:24, 138:21,
150:16, 219:3, 238:17,
251:8
  **effective** [1] - 39:5
  **effectively** [1] - 3:4
  **effectuate** [1] - 62:7
  **effectuating** [1] - 71:21
  **efficient** [1] - 85:15
  **effort** [1] - 68:1
  **efforts** [2] - 17:12,
18:15
  **eight** [19] - 42:17,
42:20, 46:18, 57:6, 62:9,
66:12, 69:6, 78:18,
78:20, 78:21, 78:25,
79:2, 81:18, 99:22,
100:21, 108:24, 111:25,
117:13
  **Eight** [2] - 68:8, 97:11
  **Either** [3] - 48:18,
48:20, 85:6
  **either** [12] - 19:14,
39:22, 41:6, 41:9, 42:3,
44:13, 51:2, 74:2, 85:5,
216:3, 246:1, 247:12
  **elaborate** [2] - 2:19,
79:11, 228:11
  **elected** [1] - 66:23

  **element** [1] - 120:7
  **elementary** [3] - 162:2,
162:4, 162:6
  **Elementary** [5] - 162:5,
163:21, 164:1, 164:14
  **elements** [1] - 120:16
  **elicited** [2] - 81:1, 175:1
  **ELMO** [1] - 252:20
  **elsewhere** [2] - 178:4,
206:21
  **emotional** [2] - 233:23,
234:5
  **employ** [1] - 113:21
  **end** [11] - 44:17, 93:25,
98:10, 149:4, 149:5,
193:23, 193:24, 194:13,
209:17, 243:24, 244:3
  **endeavor** [1] - 66:13
  **endeavors** [1] - 58:12
  **ended** [1] - 96:14
  **enforce** [4] - 34:4, 36:6,
50:3, 118:6
  **enforced** [2] - 34:14,
38:24
  **enforcement** [16] -
55:4, 55:5, 55:8, 60:2,
63:23, 64:21, 88:22,
139:18, 139:21, 140:20,
141:10, 156:9, 156:23,
157:3, 246:6, 249:24
  **enforcer** [5] - 33:20,
33:24, 34:8, 34:9, 46:24
  **enforcing** [4] - 35:10,
35:16, 36:6, 39:23
  **engage** [7] - 7:1, 21:8,
21:10, 21:12, 21:13,
113:18, 129:23
  **engine** [1] - 235:5
  **England** [1] - 110:23
  **Enjoy** [1] - 111:10
  **entails** [1] - 4:9
  **enter** [1] - 157:19
  **entered** [4] - 43:19,
153:21, 154:2, 161:19
  **enterprise** [2] - 3:7,
239:12
  **enters** [4] - 6:2, 85:22,
151:8, 204:20
  **entice** [1] - 37:20
  **entire** [2] - 99:22,
232:24
  **Entirely** [1] - 56:1
  **entitled** [6] - 234:7,
235:11, 251:14, 251:20,
251:24, 251:25
  **envelope** [1] - 182:15
  **equally** [1] - 199:6
  **equipment** [2] - 48:1,
141:17
  **eraser** [1] - 182:13

**Eric** [5] - 96:5, 104:4, 104:25, 105:2
**errors** [1] - 118:12
**escape** [1] - 77:10
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essentially** [7] - 3:5, 52:6, 116:1, 155:6, 155:14, 239:11, 239:13
**establish** [3] - 120:6, 121:8, 121:16
**estimate** [3] - 43:18, 147:4
**et** [1] - 256:5
**evaluation** [1] - 231:23
**evaporated** [1] - 72:5
**evening** [1] - 227:21
**event** [4] - 117:22, 156:8, 228:8, 248:8
**eventually** [2] - 65:24, 139:11
**evidence** [25] - 2:8, 2:12, 4:16, 14:17, 14:18, 52:12, 83:7, 83:9, 112:21, 116:21, 128:12, 149:6, 155:9, 157:7, 166:21, 203:18, 227:12, 227:15, 238:9, 240:14, 244:23, 250:12, 251:8, 251:11
**evidentiary** [1] - 113:24
**ex** [1] - 37:13
**ex-girlfriends** [1] - 37:13
**exact** [2] - 97:22, 98:14
**Exactly** [3] - 18:9, 69:20, 71:8
**exactly** [6] - 31:24, 177:21, 198:13, 241:15, 248:16, 252:23
**exaggerated** [1] - 2:21
**examination** [27] - 74:6, 74:25, 77:13, 88:2, 90:18, 91:22, 94:7, 94:24, 98:4, 113:9, 113:10, 146:15, 230:15, 230:19, 230:23, 235:4, 235:12, 235:13, 236:2, 236:15, 239:10, 239:17, 240:20, 242:10, 252:21, 252:25, 253:7
**EXAMINATION** [22] - 6:8, 33:15, 73:13, 76:22, 100:12, 108:17, 121:3, 136:7, 138:9, 146:4, 151:23, 255:5, 255:6, 255:7, 255:8, 255:9, 255:10, 255:13, 255:14,

255:15, 255:16, 255:17
**examinations** [1] - 228:4
**examine** [3] - 3:25, 239:23, 240:18
**examined** [1] - 237:10
**example** [6] - 82:16, 113:10, 122:16, 150:4, 173:4, 173:23
**Except** [1] - 216:15
**except** [5] - 5:17, 17:22, 65:20, 182:15, 239:6
**exceptions** [2] - 155:15, 240:15
**exchange** [3] - 69:11, 244:6, 253:4
**Excuse** [5] - 76:2, 86:9, 102:25, 108:1, 117:17
**excuse** [4] - 65:6, 85:8, 117:2, 249:24
**excused** [8] - 84:18, 84:21, 111:2, 111:10, 111:12, 112:9, 203:20, 227:21
**Exhibit** [10] - 25:16, 117:5, 153:3, 153:16, 153:24, 163:25, 165:23, 166:20, 171:3, 182:11
**exhibit** [4] - 30:22, 30:24, 117:24, 225:9
**exhibits** [1] - 225:6
**existence** [1] - 3:7
**exit** [2] - 87:23, 227:24
**exited** [1] - 88:1
**exits** [4] - 84:20, 84:22, 111:11, 227:23
**expect** [3] - 111:5, 111:21, 136:5
**expecting** [2] - 208:2, 219:17
**expeditiously** [1] - 120:17
**explain** [9] - 7:14, 50:10, 79:11, 86:8, 88:20, 89:22, 119:16, 123:14, 168:1
**explained** [8] - 27:18, 80:3, 89:12, 89:20, 90:1, 215:25, 250:25
**explaining** [4] - 28:24, 119:25, 212:6, 215:17
**explanation** [1] - 121:5
**exposed** [1] - 58:8
**expressed** [4] - 67:9, 67:18, 113:18, 113:22
**expresses** [1] - 157:25
**extent** [5] - 3:25, 113:20, 159:10, 190:25, 245:16
**extract** [1] - 80:15

**extracted** [2] - 79:6, 113:12
**extramarital** [1] - 212:3
**extremely** [1] - 232:23
**eyewitnesses** [2] - 228:10, 238:12

---

## F

---

**face** [5] - 39:15, 43:25, 88:25, 96:12
**facie** [1] - 149:20
**facilities** [1] - 58:2
**Facility** [2] - 42:13, 57:7
**facility** [7] - 42:13, 50:14, 56:1, 56:17, 56:22, 61:14, 66:7
**fact** [41] - 3:21, 9:13, 13:21, 40:8, 40:24, 46:22, 59:18, 61:5, 61:8, 69:23, 72:21, 80:9, 81:3, 96:22, 99:21, 100:3, 105:13, 105:19, 114:23, 115:16, 116:11, 119:3, 119:19, 124:15, 125:2, 137:13, 138:24, 139:21, 141:10, 142:4, 143:1, 143:25, 144:10, 145:4, 145:15, 145:18, 147:12, 198:15, 201:9, 214:20, 244:12
**factor** [2] - 2:13
**facts** [4] - 60:3, 60:4, 114:4, 243:1
**factual** [2] - 121:9, 237:5
**fail** [1] - 243:11
**failed** [2] - 109:1, 109:23
**failure** [1] - 158:20
**fair** [8] - 3:1, 3:19, 20:17, 27:23, 43:18, 67:19, 99:21, 239:24
**Fair** [3] - 20:18, 21:14, 148:21
**fairly** [4] - 82:19, 140:21, 219:18, 228:9
**fall** [4] - 112:18, 144:20, 144:21, 144:24
**fallen** [1] - 233:20
**falls** [1] - 240:12
**familiar** [1] - 40:5
**family** [4] - 191:15, 191:16, 192:18, 192:19
**far** [19] - 17:6, 19:15, 93:7, 108:12, 111:10, 116:16, 116:20, 127:13, 133:21, 138:15, 152:5, 176:23, 180:13, 203:19,

230:16, 231:15, 238:7, 241:24
**fashion** [1] - 36:10
**fashioned** [1] - 33:22
**fate** [2] - 72:25
**fault** [3] - 215:20, 216:1, 232:7
**faultiness** [1] - 72:7
**faulting** [1] - 240:9
**February** [4] - 109:19, 128:18, 128:22, 129:24
**Federal** [1] - 152:19
**federal** [13] - 80:19, 98:13, 139:15, 152:18, 153:22, 154:6, 154:22, 156:22, 158:7, 159:3, 160:19, 161:18, 161:20
**federally** [1] - 154:20
**fees** [1] - 145:6
**felon** [1] - 161:25
**felt** [2] - 86:17, 92:9
**few** [15] - 14:22, 17:22, 39:17, 49:22, 56:25, 100:14, 100:16, 109:15, 121:7, 121:9, 133:15, 146:13, 171:2, 172:1, 172:2
**Fife** [1] - 6:21
**fifth** [1] - 103:21
**Fight** [1] - 47:8
**fight** [7] - 39:14, 47:2, 47:4, 47:5, 47:8, 50:18, 50:20
**fighter** [1] - 49:9
**fighting** [6] - 31:17, 47:14, 47:16, 49:16, 49:17, 208:17
**fights** [2] - 50:11
**figure** [1] - 198:23
**figured** [2] - 95:8, 95:9
**figuring** [2] - 197:9, 198:19
**filed** [2] - 117:6, 118:9
**final** [2] - 96:9, 110:9
**finalize** [2] - 2:6, 112:13
**finally** [2] - 153:24, 212:17
**finance** [2] - 75:25, 76:7
**fine** [11] - 19:22, 25:9, 33:14, 71:14, 84:13, 85:5, 158:11, 231:24, 235:25, 239:3, 242:14
**finish** [10] - 55:16, 68:20, 84:9, 228:1, 229:4, 234:16, 240:17, 240:24, 242:22, 242:24
**finished** [7] - 22:18, 28:8, 28:9, 72:10, 236:11, 237:14, 242:25
**finishing** [1] - 66:12

**fire** [1] - 189:1
**firearm** [1] - 161:24
**firm** [1] - 115:16
**firmed** [1] - 114:15
**First** [3] - 128:17, 158:14, 195:12
**first** [60] - 8:25, 22:23, 22:24, 28:15, 28:16, 44:7, 53:18, 56:6, 57:17, 60:11, 61:5, 69:7, 75:12, 81:21, 90:1, 90:4, 97:9, 98:7, 98:11, 101:6, 107:3, 120:9, 128:17, 129:6, 130:7, 146:9, 152:16, 153:3, 154:2, 154:9, 155:14, 157:19, 157:20, 159:2, 162:23, 166:11, 167:11, 169:8, 172:10, 172:17, 184:13, 184:14, 186:20, 192:15, 206:4, 225:7, 228:10, 228:17, 230:19, 235:24, 238:25, 240:1, 240:3, 240:6, 240:20, 241:2, 241:4, 242:21
**fists** [3] - 39:15, 47:9, 49:22
**Five** [2] - 36:24, 140:22
**five** [19] - 40:11, 44:21, 44:24, 45:3, 45:6, 45:9, 45:16, 46:6, 46:8, 46:10, 46:11, 46:17, 85:9, 87:17, 87:22, 158:3, 159:16, 224:15, 224:16
**Five-ten** [1] - 36:24
**five-ten** [1] - 40:11
**flagged** [5] - 211:9, 211:10, 212:20, 212:21, 212:23
**flags** [2] - 32:10, 94:9
**Flannery** [4] - 1:19, 24:9, 25:4, 31:1
**flesh** [1] - 150:13
**flexible** [1] - 229:13
**floor** [1] - 53:4
**flown** [1] - 230:3
**focus** [7] - 120:16, 126:2, 182:16, 220:10, 220:12, 238:3, 248:1
**focused** [1] - 220:13
**folks** [2] - 34:17, 35:24
**follow** [3] - 59:8, 198:24, 224:9
**follow-up** [1] - 59:8
**followed** [1] - 159:15
**following** [5] - 25:4, 28:4, 28:14, 56:13, 139:17, 140:20, 156:19, 251:17
**FOR** [1] - 1:2

**force** [2] - 50:5, 238:18
**foregoing** [1] - 256:6
**forever** [1] - 234:25
**forget** [2] - 51:3, 228:6
**Forgive** [3] - 59:17, 136:18, 148:11
**forgive** [2] - 61:1, 120:5
**fork** [1] - 36:15
**forth** [3] - 4:6, 57:11, 159:12
**forward** [3] - 5:15, 57:15, 67:17
**foundation** [5] - 175:23, 179:4, 181:5, 181:10, 205:19
**four** [8] - 43:12, 44:24, 103:21, 122:7, 223:12, 224:15, 234:19, 242:11
**Four** [1] - 224:16
**four-fifth** [1] - 103:21
**Fourth** [2] - 246:15, 248:1
**frank** [1] - 3:9
**frankly** [4] - 2:21, 245:17, 247:17, 248:10
**Fraser** [2] - 153:15, 154:5, 156:5
**free** [2] - 3:17, 240:5
**fresh** [3] - 230:6, 231:24, 232:1
**freshest** [1] - 11:7
**Friday** [2] - 28:25, 227:19
**friend** [4] - 96:4, 210:7, 210:8, 210:21
**friends** [3] - 79:17, 197:13, 197:14
**front** [18] - 4:2, 4:7, 4:8, 4:16, 18:9, 33:1, 68:18, 131:7, 139:15, 153:4, 167:5, 168:2, 168:3, 177:24, 184:18, 199:19, 229:20, 240:7
**fronted** [4] - 177:24, 178:1, 184:20
**fronts** [1] - 65:18
**fucking** [1] - 212:1
**fulfill** [1] - 158:20
**fulfilled** [1] - 160:8
**full** [5] - 111:6, 142:19, 156:25, 169:2, 238:17
**fuller** [1] - 249:22
**fully** [4] - 5:3, 156:21, 156:24, 157:25
**fund** [1] - 145:6
**furtherance** [8] - 113:6, 115:19, 116:19, 119:24, 120:2, 120:7, 150:7, 150:8

## G

**Gaffney** [2] - 191:22, 191:23
**gallery** [1] - 111:13
**game** [2] - 40:5, 53:19
**gangsta** [1] - 102:5
**gangster** [1] - 102:21
**Gap** [1] - 66:8
**garbage** [3] - 87:24, 88:4, 88:10
**GARDNER** [1] - 1:8
**Gardner** [124] - 1:21, 2:7, 2:8, 2:11, 3:1, 3:4, 3:11, 3:19, 3:21, 4:11, 4:19, 73:21, 74:11, 74:15, 114:4, 115:24, 116:14, 116:15, 119:8, 119:14, 119:24, 121:12, 121:23, 123:4, 124:10, 124:22, 125:12, 125:15, 126:13, 127:6, 127:21, 128:2, 131:8, 133:4, 133:12, 133:16, 133:22, 134:2, 134:7, 134:8, 134:13, 135:17, 136:11, 136:21, 137:3, 138:14, 141:24, 142:13, 144:1, 144:18, 145:4, 147:13, 148:17, 148:22, 149:19, 150:4, 163:5, 163:12, 163:14, 163:19, 167:14, 167:19, 170:14, 171:16, 171:25, 178:13, 178:15, 178:20, 179:2, 179:8, 181:4, 181:8, 181:19, 181:20, 181:22, 182:4, 183:3, 184:5, 185:6, 185:19, 185:22, 186:13, 206:1, 206:15, 206:21, 215:4, 215:25, 216:8, 216:15, 216:20, 216:23, 217:3, 217:22, 218:5, 218:10, 218:14, 218:16, 218:19, 229:16, 230:8, 230:18, 235:6, 235:7, 240:12, 243:22, 244:2, 245:3, 245:23, 246:6, 246:11, 246:24, 247:4, 249:21, 249:24, 249:25, 250:7, 250:11, 251:11, 251:12, 251:18, 253:3
**Gardner's** [14] - 2:24, 3:8, 115:18, 116:23, 119:7, 231:7, 234:7, 243:23, 245:3, 246:23, 248:9, 250:23, 250:25, 251:3
**gas** [8] - 129:7, 146:17,

146:20, 190:8, 190:9, 194:5, 194:15, 196:24
**gasoline** [1] - 130:6
**gather** [1] - 3:13
**General** [1] - 58:19
**general** [5] - 15:17, 15:19, 50:11, 51:4, 244:23
**generally** [1] - 241:20
**Genesis** [1] - 63:4
**gentleman** [1] - 146:15
**gentlemen** [11] - 6:3, 14:17, 69:22, 84:15, 111:13, 122:9, 122:20, 122:23, 129:24, 151:9, 203:17
**Gerard** [1] - 1:19
**ghost** [1] - 204:13
**Giganti** [8] - 6:13, 6:19, 10:22, 15:10, 15:22, 16:1, 17:2, 19:8, 19:11, 20:19, 22:1, 22:4, 22:10, 22:17, 23:4, 23:20, 23:23, 24:2
**girl** [2] - 79:20, 233:14
**girlfriend** [2] - 43:24, 73:4
**girlfriends** [1] - 37:13
**girls** [5] - 142:23, 143:9, 143:11, 143:15, 143:18
**given** [18] - 13:1, 53:11, 57:6, 59:23, 78:10, 80:10, 81:7, 86:3, 153:9, 229:23, 230:16, 234:24, 238:21, 247:7, 247:8, 247:9, 247:14
**glad** [1] - 253:12
**Glock** [1] - 225:5
**gloves** [1] - 225:3
**goal** [3] - 18:23, 69:24, 80:14
**God** [1] - 73:15
**gold** [3] - 60:19, 95:14, 209:22
**Goo** [72] - 74:2, 126:12, 127:18, 129:12, 129:13, 140:9, 141:7, 142:21, 144:22, 163:15, 167:13, 171:15, 172:24, 173:5, 176:7, 176:11, 176:19, 177:1, 177:24, 178:1, 185:13, 185:22, 186:5, 186:7, 186:9, 186:24, 187:1, 187:20, 190:1, 190:6, 190:12, 190:14, 190:16, 190:24, 193:6, 193:9, 196:11, 197:18, 197:19, 198:1, 198:6, 198:9, 198:17, 199:7, 199:8, 199:10, 199:12,

199:15, 200:7, 205:17, 214:17, 215:4, 215:23, 217:13, 217:14, 217:16, 219:2, 220:20, 221:14, 222:9, 222:13, 222:14, 223:1, 223:4, 223:11, 224:7, 224:19, 225:23, 226:13, 227:7
**Goo's** [4] - 173:24, 175:7, 219:22, 226:14
**Goose** [44] - 119:10, 119:13, 119:18, 123:9, 123:12, 123:24, 130:24, 131:5, 133:5, 138:15, 138:21, 138:22, 138:24, 139:22, 140:10, 141:5, 147:8, 147:23, 195:7, 195:8, 195:17, 196:5, 196:7, 196:11, 196:13, 196:17, 196:22, 196:25, 197:2, 197:8, 197:17, 197:19, 197:25, 198:6, 198:9, 198:15, 198:19, 199:4, 205:18, 206:25, 207:2, 219:4, 220:5, 220:10
**Goose's** [1] - 123:10
**goosey** [1] - 242:12
**government** [35] - 2:14, 2:22, 16:12, 24:8, 30:22, 30:24, 83:7, 83:8, 85:6, 109:13, 116:21, 117:11, 148:4, 148:7, 148:14, 148:18, 149:12, 154:14, 229:23, 238:1, 238:13, 239:14, 241:11, 241:13, 241:14, 241:17, 241:22, 241:25, 242:5, 242:23, 242:24, 243:12, 249:18, 252:12, 253:19
**Government** [12] - 1:15, 111:12, 111:16, 151:11, 153:3, 153:16, 153:24, 163:25, 165:23, 166:20, 171:3, 182:11
**Government's** [1] - 25:16
**GOVERNMENT'S** [2] - 120:19, 151:17
**government's** [2] - 112:16, 113:14
**graciousness** [1] - 71:20
**grade** [3] - 152:6, 152:7, 152:8
**grams** [1] - 250:18
**grand** [12] - 32:20, 34:7, 80:19, 80:24, 81:7, 98:13, 98:16, 139:15, 142:4, 142:5, 143:8,

157:14
**Grand** [1] - 98:18
**grandmother** [1] - 171:7
**grant** [1] - 115:10
**grass** [1] - 233:17
**Gray** [2] - 122:3, 164:12
**Great** [1] - 25:18
**great** [1] - 2:19
**greater** [2] - 148:4, 149:6
**greatest** [1] - 235:5
**Green** [2] - 155:20, 222:19
**grew** [2] - 77:5, 122:11
**grinder** [2] - 236:20, 237:7
**group** [1] - 173:9
**grow** [1] - 152:3
**guess** [15] - 6:17, 7:13, 8:3, 20:4, 45:18, 45:19, 48:3, 64:21, 91:11, 150:16, 198:12, 210:13, 213:21, 214:11, 250:9
**guilty** [7] - 3:4, 3:9, 43:19, 152:24, 155:3, 157:19, 205:12
**gun** [74] - 39:19, 39:21, 39:22, 39:24, 40:13, 40:18, 49:18, 52:19, 52:20, 52:24, 131:14, 131:15, 131:16, 132:8, 132:9, 132:11, 132:14, 155:4, 158:7, 169:6, 169:8, 169:10, 169:19, 169:20, 169:22, 169:24, 170:1, 170:5, 170:7, 170:9, 170:12, 170:17, 173:11, 173:16, 173:18, 173:19, 173:21, 173:24, 174:6, 174:14, 174:19, 187:3, 187:4, 187:5, 187:6, 188:12, 188:19, 200:14, 200:23, 201:3, 201:6, 201:9, 201:12, 201:13, 201:15, 201:16, 201:17, 201:20, 201:22, 203:1, 204:25, 205:1, 205:3, 205:5, 205:6, 225:24, 226:4, 226:8, 226:12, 226:14, 227:1, 227:3, 227:5, 227:7
**guns** [14] - 40:9, 40:16, 96:5, 131:11, 131:12, 147:1, 169:18, 170:15, 173:11, 188:14, 225:3, 225:4, 225:11, 225:18
**guy** [23] - 37:9, 37:11, 40:21, 79:19, 95:8, 96:4, 104:4, 104:20, 119:10,

139:22, 141:3, 141:5, 155:20, 179:12, 181:3, 187:12, 190:16, 191:19, 196:21, 207:3, 208:18, 211:11

**guys** [13] - 106:10, 173:9, 175:9, 176:14, 177:12, 179:8, 185:22, 191:3, 191:6, 192:16, 206:4, 226:4, 233:19

## H

**habit** [1] - 65:13
**hair** [1] - 72:5
**half** [9] - 14:10, 29:3, 61:17, 101:17, 175:13, 175:17, 175:19, 223:22, 238:2
**Half** [2] - 175:17, 194:23
**halfway** [5] - 130:9, 130:10, 194:8, 194:11, 206:2
**hand** [5] - 5:25, 52:16, 83:5, 89:16, 117:15
**handed** [2] - 117:11, 117:21
**handful** [1] - 62:19
**handgun** [7] - 153:22, 154:19, 154:20, 154:22, 157:22, 161:18, 161:20
**handguns** [1] - 152:17
**handwritten** [1] - 83:6
**hanging** [1] - 99:23
**Hanlon** [4] - 1:16, 2:21, 84:23, 155:20
**HANLON** [1] - 2:16
**happy** [5] - 25:8, 155:9, 245:8, 245:9, 249:17
**hard** [5] - 5:11, 5:23, 27:18, 68:4, 92:9
**Harding** [47] - 1:16, 14:12, 16:11, 16:15, 17:2, 23:5, 51:3, 71:20, 83:22, 84:8, 84:23, 85:24, 101:7, 104:13, 105:6, 106:12, 110:10, 118:7, 120:5, 120:15, 123:15, 123:22, 124:13, 128:11, 130:2, 136:2, 141:16, 141:19, 146:15, 146:25, 155:11, 186:15, 186:18, 191:2, 203:14, 204:6, 204:21, 225:10, 227:25, 232:2, 233:2, 235:16, 236:15, 238:22, 238:24, 252:19, 252:21
**HARDING** [93] - 5:6, 14:14, 16:12, 23:6,

23:21, 23:24, 24:4, 28:7, 36:18, 37:15, 37:19, 37:22, 38:5, 44:19, 45:22, 49:25, 50:8, 52:7, 52:9, 54:14, 58:13, 60:17, 62:3, 67:13, 67:24, 70:16, 72:6, 72:16, 73:2, 73:5, 76:23, 82:24, 83:1, 83:4, 83:12, 83:23, 83:25, 84:2, 84:4, 84:6, 84:11, 85:5, 85:11, 85:15, 85:25, 100:11, 104:15, 108:14, 110:20, 110:24, 116:2, 117:15, 117:19, 118:9, 118:24, 119:8, 121:4, 122:4, 122:8, 123:2, 123:23, 124:14, 125:7, 126:23, 130:1, 130:5, 132:6, 135:1, 137:8, 141:20, 144:15, 145:1, 145:23, 151:13, 151:24, 169:17, 176:9, 186:19, 203:15, 204:7, 204:11, 204:22, 228:2, 228:9, 228:14, 228:16, 228:22, 229:1, 229:9, 239:3, 255:8, 255:13, 255:17
**Harding's** [3] - 147:7, 147:11, 232:15
**HARRIS** [1] - 1:7
**Harris** [116] - 1:18, 6:24, 7:17, 8:7, 8:14, 8:17, 9:5, 9:23, 10:9, 12:14, 13:1, 13:8, 13:9, 15:7, 15:15, 16:20, 17:7, 17:10, 17:15, 18:16, 19:11, 19:19, 20:3, 20:22, 21:7, 21:24, 21:25, 22:11, 23:9, 23:12, 23:15, 25:13, 26:2, 26:4, 26:22, 27:24, 30:4, 31:11, 31:17, 31:22, 31:24, 32:1, 32:23, 33:4, 33:8, 42:10, 46:15, 50:21, 51:3, 51:5, 51:10, 51:12, 51:14, 51:22, 52:15, 52:23, 52:25, 55:2, 56:6, 56:7, 61:25, 62:18, 65:2, 66:18, 74:8, 75:11, 79:6, 80:11, 80:15, 80:25, 81:2, 81:20, 82:5, 82:9, 86:3, 86:23, 88:3, 88:8, 88:13, 91:7, 92:16, 92:20, 93:1, 93:13, 93:25, 94:7, 94:20, 96:1, 96:3, 96:16, 97:5, 98:8, 98:11, 98:22, 99:1, 99:12, 99:17, 101:20, 105:8, 106:18, 107:1,

107:24, 108:3, 112:14, 112:18, 113:1, 113:4, 113:7, 113:11, 113:13, 113:16, 113:18, 114:1, 114:5, 148:20, 186:17
**Harris's** [5] - 27:8, 108:20, 108:23, 112:23, 113:20
**Hasim** [1] - 79:15
**hat** [1] - 237:22
**head** [4] - 94:19, 95:3, 95:20, 99:23
**hear** [26] - 7:25, 17:23, 17:25, 18:16, 23:15, 24:22, 28:18, 28:21, 28:22, 54:7, 59:8, 82:7, 82:8, 96:19, 96:20, 117:22, 118:7, 119:1, 125:6, 125:9, 132:21, 132:23, 133:2, 204:9, 214:21, 239:16
**Hear** [1] - 17:24
**Heard** [1] - 161:13
**heard** [45] - 5:3, 11:17, 11:21, 18:5, 19:19, 25:6, 31:8, 51:4, 51:5, 51:7, 51:9, 51:11, 51:15, 51:17, 61:5, 73:23, 73:25, 74:1, 74:2, 75:1, 91:19, 92:18, 93:12, 94:16, 97:4, 97:9, 99:11, 103:22, 111:9, 112:21, 114:7, 116:2, 118:25, 125:11, 148:5, 176:7, 176:11, 203:18, 214:22, 230:2, 234:10, 239:21, 241:15, 242:10, 249:18
**hearing** [14] - 17:17, 97:21, 107:3, 113:24, 118:25, 121:6, 148:6, 149:18, 231:17, 232:5, 237:7, 245:15, 245:17, 248:15
**hearings** [2] - 241:23, 242:2
**hears** [1] - 239:15
**heavyweight** [1] - 79:17
**Heights** [20] - 74:18, 75:6, 77:5, 77:8, 77:10, 77:16, 77:18, 92:12, 95:7, 104:6, 104:11, 104:14, 104:17, 105:21, 179:12, 179:17, 181:4, 181:16, 185:13, 222:25
**held** [1] - 250:12
**help** [16] - 5:13, 5:14, 5:15, 75:25, 76:11, 81:16, 142:3, 177:17, 191:9, 191:12, 197:9, 207:15, 213:4, 214:2,

214:3, 214:14
**hereby** [1] - 256:3
**hereunto** [1] - 256:9
**heroin** [10] - 64:11, 166:8, 168:22, 179:16, 181:12, 181:17, 185:7, 185:10, 185:17, 196:6
**Heroin** [1] - 178:3
**herself** [1] - 13:10
**hesitant** [1] - 109:8
**hesitation** [2] - 112:15, 112:20
**hid** [1] - 174:14
**hidden** [2] - 173:20, 173:21
**hide** [3] - 173:18, 173:19, 173:24
**High** [2] - 152:9, 152:10
**high** [4] - 64:21, 65:5, 66:16, 134:1
**Highland** [1] - 196:2
**highway** [2] - 247:8, 248:4
**Hill** [1] - 182:25
**himself** [3] - 157:2, 181:19, 218:6
**hit** [2] - 190:12, 190:18
**hold** [7] - 26:25, 27:3, 92:23, 113:23, 228:21, 249:14, 250:10
**holding** [1] - 174:19
**holler** [4] - 94:2, 94:5, 105:9, 105:11
**Hollins** [7] - 139:23, 139:25, 140:4, 141:6, 195:24, 196:3, 196:4
**Holly** [25] - 119:9, 121:12, 129:18, 133:4, 134:11, 135:15, 135:19, 135:21, 136:21, 137:3, 144:1, 144:19, 165:9, 165:12, 165:14, 177:17, 178:13, 181:14, 181:18, 197:23, 199:13, 199:16, 206:2, 206:9, 217:1
**Holly's** [4] - 131:8, 144:4, 165:19, 199:20
**Home** [2] - 197:1, 197:2
**home** [17] - 119:10, 124:4, 124:6, 124:15, 129:6, 130:7, 134:14, 140:9, 141:7, 145:15, 147:8, 147:12, 147:15, 147:21, 147:23, 194:9, 224:22
**homicide** [6] - 32:17, 52:2, 54:3, 136:24, 159:4, 202:9
**Homicide** [1] - 33:25
**homicides** [3] - 54:5,

78:6, 253:17
**Honda** [5] - 174:2, 174:3, 175:6, 209:22
**honest** [1] - 21:19
**Honor** [128] - 2:16, 4:22, 5:6, 5:8, 5:18, 6:10, 14:14, 15:5, 18:14, 24:2, 24:5, 24:11, 24:14, 25:1, 25:9, 25:17, 28:8, 30:23, 52:10, 76:20, 80:20, 82:24, 83:1, 83:5, 83:10, 83:12, 83:16, 83:20, 83:23, 83:25, 84:7, 84:12, 85:5, 86:1, 99:13, 100:5, 100:8, 100:11, 100:14, 111:1, 114:8, 115:5, 115:13, 116:2, 116:5, 117:15, 122:5, 122:7, 125:4, 126:20, 130:1, 136:4, 137:10, 141:20, 142:16, 143:3, 144:6, 146:1, 146:3, 146:6, 148:2, 148:8, 148:11, 149:22, 151:13, 155:9, 162:15, 163:12, 171:12, 171:17, 185:16, 186:2, 186:11, 186:16, 204:11, 204:23, 220:18, 225:11, 227:9, 228:3, 228:4, 228:9, 228:22, 229:9, 229:11, 229:22, 230:11, 230:22, 231:8, 231:14, 231:19, 231:21, 232:22, 233:9, 233:14, 234:2, 234:3, 235:1, 235:4, 235:24, 236:1, 237:4, 237:20, 237:25, 238:23, 239:3, 239:5, 239:21, 242:19, 243:11, 243:19, 245:25, 246:14, 246:19, 247:2, 247:17, 249:8, 249:11, 249:13, 250:4, 250:10, 251:20, 252:16, 253:13, 253:16, 254:2
**Honor's** [1] - 232:23
**Honorable** [1] - 1:13
**hooked** [2] - 129:12, 129:13
**hope** [3] - 84:9, 100:16, 161:1
**hopefully** [1] - 117:12
**hospital** [4] - 189:21, 189:23, 190:5, 190:20
**hots** [1] - 37:5
**hour** [6] - 14:10, 228:22, 228:23, 232:3, 241:18, 248:3
**hours** [3] - 61:17, 231:6, 234:20

**house** [27] - 12:24, 30:9, 30:16, 40:12, 130:9, 130:10, 131:6, 131:8, 140:11, 170:4, 187:1, 187:9, 187:10, 187:12, 193:21, 194:8, 194:11, 197:4, 197:6, 199:19, 199:20, 206:2, 213:21, 214:14, 224:9, 229:20
**House** [1] - 65:18
**hum** [9] - 20:8, 27:17, 30:21, 49:10, 53:1, 86:7, 93:4, 95:12, 95:24
**humanly** [1] - 3:19
**hundred** [6] - 178:24, 178:25, 179:1, 179:7, 188:3, 213:18
**hungry** [2] - 219:23, 219:24
**hurt** [4] - 190:22, 221:18, 221:19, 241:20
**husher** [1] - 112:2
**hustling** [1] - 26:15

**I**

**idea** [18] - 9:5, 43:3, 48:22, 79:25, 89:18, 90:23, 106:19, 161:14, 167:16, 178:22, 195:15, 213:6, 213:9, 213:11, 213:13, 213:15, 214:9, 229:18
**identification** [2] - 230:10, 231:16
**identified** [7] - 13:10, 122:5, 128:19, 162:14, 163:11, 165:2, 193:3
**identify** [3] - 165:4, 165:23, 196:21
**idle** [3] - 112:18, 112:24, 114:23
**ignore** [1] - 90:19
**ignoring** [1] - 27:25
**II** [1] - 27:16
**ilk** [1] - 53:20
**illegal** [1] - 65:19
**imagination** [1] - 231:15
**imagine** [2] - 4:25, 227:25
**Imagine** [1] - 251:21
**immediate** [2] - 86:17, 123:7
**immediately** [3] - 15:7, 119:15, 133:16
**impact** [2] - 233:23, 234:5

**implicate** [4] - 148:14, 148:19, 148:20, 250:18
**Implicate** [1] - 149:11
**implicated** [1] - 253:2
**implication** [1] - 150:2
**importance** [1] - 237:24
**important** [4] - 3:7, 26:25, 229:15, 237:13
**impression** [2] - 218:21, 218:22
**imprisonment** [6] - 158:2, 158:3, 158:4, 158:11, 159:15, 160:14
**IN** [1] - 1:1
**in-court** [2] - 230:9, 231:16
**in-furtherance** [1] - 120:7
**inappropriate** [1] - 212:2
**incarcerated** [8] - 33:20, 40:25, 42:16, 57:25, 58:2, 58:16, 72:21, 136:21
**incarceration** [2] - 41:11, 73:1
**inch** [2] - 5:13, 87:25
**include** [1] - 244:11
**included** [1] - 243:23
**including** [2] - 16:13, 160:13
**Including** [1] - 158:20
**incriminate** [1] - 36:3
**incriminating** [1] - 245:23
**indeed** [4] - 2:13, 112:23, 113:9, 227:10
**INDEX** [1] - 255:1
**indicate** [1] - 162:11, 245:4
**indicated** [6] - 2:18, 77:1, 81:12, 147:12, 253:4
**indicating)** [4] - 122:1, 162:13, 163:10, 164:12
**indication** [1] - 115:18
**indictment** [1] - 157:20
**individual** [1] - 39:1
**individually** [2] - 112:2, 176:16
**individuals** [2] - 128:23, 144:5
**induced** [1] - 52:24
**Indulge** [1] - 70:12
**indulgence** [4] - 58:23, 66:20, 73:11, 138:6
**infamous** [2] - 252:13, 252:15
**inference** [1] - 4:10
**inferences** [1] - 112:22

**influence** [1] - 60:21
**inform** [1] - 158:15
**informal** [1] - 111:17
**information** [25] - 32:22, 33:4, 33:8, 52:5, 54:22, 54:25, 55:7, 57:12, 57:15, 66:24, 67:17, 69:3, 69:11, 69:18, 69:24, 70:4, 70:7, 70:14, 71:1, 79:6, 95:19, 138:20, 157:1, 158:17, 159:7
**infrequent** [1] - 34:14
**initial** [2] - 77:23, 130:14
**inmates** [8] - 47:17, 47:22, 48:6, 48:11, 53:10, 58:4, 58:11, 58:15
**inquire** [1] - 130:1, 157:3
**inside** [7] - 9:21, 47:13, 47:14, 47:15, 88:10, 106:6, 170:3
**insofar** [1] - 186:13
**instances** [1] - 139:9
**instead** [3] - 30:10, 213:6, 220:22
**Institution** [1] - 77:25
**instruct** [4] - 4:4, 250:9, 251:7, 251:10
**instructed** [1] - 244:13
**instruction** [13] - 115:8, 149:9, 150:17, 244:9, 244:10, 244:15, 244:16, 244:17, 245:7, 249:14, 249:17, 249:22, 253:11
**instructions** [1] - 86:3, 149:24, 244:24
**insure** [2] - 3:1, 3:18
**intended** [6] - 3:20, 119:20, 148:19, 239:11, 242:24
**intends** [2] - 116:22, 148:14
**intent** [1] - 4:18
**interest** [1] - 236:10
**interested** [5] - 15:3, 21:25, 22:12, 23:9, 23:15
**interference** [1] - 18:10
**interrupt** [2] - 21:10, 228:16
**interrupted** [2] - 12:20, 241:7
**intervening** [1] - 233:12
**interview** [7] - 10:6, 61:6, 144:12, 249:25, 252:4, 252:7, 252:9
**interviewed** [1] - 81:3
**interviewing** [1] - 55:12
**Intrepid** [2] - 222:15,

222:16
**introduce** [3] - 2:8, 8:21, 148:14
**introduces** [1] - 148:18
**introduction** [1] - 51:11
**invasion** [14] - 119:10, 124:4, 124:6, 124:15, 140:9, 141:7, 145:16, 147:8, 147:12, 147:15, 147:21, 147:23, 197:1, 197:2
**investigation** [2] - 63:11, 227:13
**inviting** [1] - 85:1
**involve** [3] - 36:7, 39:13, 124:18
**involved** [35] - 6:22, 74:22, 75:2, 75:5, 82:20, 88:17, 89:5, 89:15, 119:9, 121:11, 122:22, 123:3, 123:6, 124:15, 124:21, 126:7, 126:18, 131:2, 131:4, 133:4, 135:7, 135:15, 135:17, 135:19, 136:13, 136:20, 137:2, 166:7, 185:20, 185:23, 188:5, 192:13, 217:10, 217:11, 220:16
**involvement** [1] - 113:4
**involves** [1] - 36:8
**involving** [1] - 4:17
**issue** [11] - 2:5, 63:3, 115:15, 116:13, 243:16, 247:5, 247:20, 247:22, 248:7, 248:11, 253:15
**issues** [5] - 84:18, 229:12, 246:16, 247:6, 248:1
**itself** [2] - 49:2, 248:15

**J**

**Jackson** [1] - 107:6
**Jail** [3] - 55:25, 56:20, 56:23
**jail** [43] - 34:14, 35:8, 35:25, 37:2, 40:12, 40:20, 42:7, 42:13, 46:22, 47:8, 47:11, 47:12, 47:14, 48:12, 48:24, 56:15, 58:10, 69:16, 69:22, 69:24, 70:1, 70:2, 70:4, 70:5, 70:8, 70:11, 70:14, 71:13, 72:22, 81:17, 93:14, 99:16, 99:19, 100:4, 100:18, 100:23, 119:15, 128:7, 133:16, 219:18

**jailhouse** [1] - 54:7
**James** [2] - 1:21, 155:20
**jammed** [1] - 92:24
**January** [13] - 15:14, 21:24, 24:6, 25:14, 29:3, 109:19, 117:2, 117:9, 128:18, 128:21, 129:24, 142:17, 144:10
**Jencks** [1] - 117:25
**JFK** [1] - 250:1
**JI** [3] - 55:25, 56:14, 56:16
**Joan** [2] - 153:15, 154:5
**job** [1] - 242:21
**John** [1] - 153:12
**Johnnycake** [3] - 164:23, 164:24, 165:6
**join** [3] - 2:25, 74:17, 111:15
**jointly** [2] - 144:7, 144:8
**Jones** [3] - 4:20, 147:16, 239:12
**Jones-Spence** [2] - 4:20, 147:16
**Judge** [26] - 1:13, 16:12, 59:5, 59:6, 61:3, 67:10, 67:14, 67:18, 68:9, 68:11, 78:8, 83:14, 85:15, 97:8, 97:14, 97:22, 97:23, 108:10, 118:9, 120:14, 161:9, 204:13, 204:15, 235:2, 236:23
**judge** [12] - 43:23, 44:7, 57:18, 66:23, 69:15, 70:23, 71:10, 161:5, 161:6, 161:9, 161:10, 161:12
**judging** [1] - 228:5
**judgment** [1] - 243:1
**judgments** [1] - 3:3
**Julius** [1] - 77:13
**July** [2] - 153:10, 154:10
**jumped** [2] - 187:1, 187:20
**Junction** [1] - 26:9
**June** [5] - 116:11, 117:2, 136:22, 136:24, 137:3
**juries** [2] - 142:5, 157:15
**jurors** [3] - 2:2, 5:20, 198:13
**Jury** [11] - 1:14, 6:2, 84:20, 85:22, 111:11, 112:12, 151:8, 203:23, 204:12, 204:20, 227:23
**jury** [66] - 3:5, 3:6, 3:21,

4:1, 4:2, 4:5, 4:8, 4:11, 4:16, 5:4, 24:9, 32:20, 34:7, 42:10, 52:11, 68:18, 69:23, 80:19, 80:24, 81:7, 81:8, 81:16, 85:9, 85:14, 98:13, 98:16, 98:18, 104:17, 111:3, 111:4, 113:24, 114:3, 120:10, 121:6, 139:15, 142:4, 143:7, 143:8, 146:9, 148:7, 148:12, 149:23, 150:12, 150:18, 151:4, 151:9, 169:15, 186:12, 227:10, 227:21, 231:6, 233:23, 234:5, 239:15, 239:20, 239:25, 244:10, 244:12, 244:17, 249:7, 249:23, 251:7

**Jury's** [2] - 84:18, 203:20

**jury's** [5] - 111:10, 121:6, 230:6, 231:23, 233:11

**juxtaposing** [1] - 71:9

## K

**Keep** [1] - 76:9
**keep** [9] - 84:17, 101:4, 101:6, 101:11, 109:1, 151:6, 200:21, 203:19, 205:6
**keeping** [1] - 116:24
**Kelly** [1] - 229:25
**Kelsey** [1] - 1:17
**Kenneth** [2] - 35:13, 35:15
**kept** [7] - 28:23, 91:15, 91:16, 91:18, 92:3, 93:16, 101:1
**key** [6] - 127:25, 159:8, 175:13, 175:17, 218:12, 229:14
**keys** [1] - 176:11
**kid** [1] - 164:15
**kidding** [1] - 228:4
**Kill** [1] - 207:1
**kill** [2] - 103:19, 192:22, 206:25, 207:2, 207:3, 207:9, 207:12, 209:8, 209:14, 212:7, 213:2, 213:4, 213:6, 213:23, 214:1, 214:9, 220:17, 220:24, 220:25, 221:6
**killed** [10] - 18:17, 18:24, 19:2, 49:20, 79:17, 79:19, 89:14,

94:18, 147:19, 207:16
**killing** [5] - 89:16, 102:10, 102:13, 205:12, 214:11
**Killing** [1] - 205:11
**kilo** [2] - 175:17, 175:19
**kilos** [1] - 176:12
**kind** [35] - 5:23, 17:15, 33:25, 75:24, 79:7, 79:14, 82:14, 82:20, 86:3, 95:9, 132:9, 161:14, 161:22, 162:12, 170:9, 174:10, 174:23, 175:1, 183:3, 184:20, 188:10, 195:1, 196:4, 196:25, 200:4, 201:13, 201:20, 205:3, 209:21, 222:14, 222:16, 225:24, 226:8
**kinds** [1] - 160:19
**Kippur** [1] - 236:5
**knocking** [1] - 106:19
**knowing** [3] - 67:5, 86:21, 211:14
**knowledge** [5] - 21:1, 112:25, 222:4, 245:5, 250:18
**known** [18] - 33:20, 49:13, 49:16, 78:5, 121:17, 122:2, 122:9, 156:15, 163:23, 164:15, 185:13, 196:17, 198:3, 198:4, 198:6, 208:17
**Known** [2] - 50:18, 50:20
**knows** [2] - 121:17, 229:11
**Kombat** [1] - 27:15
**Kratsis** [3] - 34:24, 35:1, 35:2
**Kravitz** [1] - 36:12
**KURLAND** [26] - 4:22, 5:2, 73:9, 73:11, 73:14, 230:11, 230:13, 230:22, 231:8, 231:14, 231:18, 235:2, 235:4, 235:19, 235:23, 236:1, 236:9, 236:18, 236:22, 237:1, 237:4, 237:9, 237:19, 237:25, 240:23, 255:7
**Kurland** [8] - 1:22, 5:1, 235:17, 235:18, 240:4, 240:13, 240:22, 246:10
**Kurland's** [2] - 232:4, 235:17, 240:20

## L

**lab** [1] - 235:8

**labeled** [4] - 34:1, 34:2, 180:7, 182:24
**labels** [1] - 117:24
**lack** [1] - 138:3
**ladies** [5] - 6:3, 14:17, 69:22, 84:14, 203:16
**Ladies** [2] - 111:13, 151:9
**lady** [2] - 228:15, 236:19
**lake** [1] - 182:25
**Lane** [14] - 135:24, 166:15, 166:16, 166:18, 166:22, 167:4, 167:12, 178:11, 178:18, 178:19, 178:23, 180:5, 199:23, 199:24
**language** [1] - 113:20
**Lanvale** [7] - 135:13, 170:24, 207:22, 207:23, 207:24, 210:10, 211:16
**lapse** [1] - 12:5
**laptop** [1] - 25:5
**largely** [1] - 238:11
**larger** [6] - 148:24, 149:1, 149:2, 149:21, 175:21, 175:25
**largest** [1] - 175:12
**last** [12] - 46:3, 56:12, 81:12, 100:17, 112:15, 137:15, 138:1, 146:8, 153:19, 184:13, 184:15, 192:8
**late** [2] - 2:5, 81:21
**Late** [1] - 97:7
**latest** [1] - 236:9
**Laura** [1] - 1:17
**Lauretta** [3] - 135:13, 170:24, 171:5, 180:10, 189:18
**lavaliere** [1] - 180:3
**law** [17] - 55:4, 55:5, 55:8, 60:2, 63:23, 64:20, 88:22, 139:18, 139:21, 140:20, 141:10, 156:9, 156:22, 157:2, 160:13, 246:6, 249:24
**LAWLOR** [28] - 33:16, 52:14, 73:7, 108:18, 111:1, 120:14, 125:4, 136:8, 137:10, 137:12, 148:8, 148:11, 148:21, 149:11, 149:16, 149:22, 150:1, 150:10, 150:20, 150:23, 151:3, 186:2, 186:11, 217:20, 235:3, 255:6, 255:10, 255:14
**Lawlor** [14] - 1:18, 38:8, 47:25, 72:10, 83:13, 83:24, 98:21, 99:15,

120:10, 137:9, 137:11, 240:5, 240:9, 242:9
**Lawlor's** [2] - 234:25, 242:10
**laws** [1] - 44:6
**lawyer** [4] - 14:19, 142:3, 143:25, 220:4
**lawyer's** [1] - 156:4
**lawyers** [4] - 73:21, 76:11, 76:17, 156:5
**lead** [4] - 81:5, 126:21, 127:4, 155:12
**leader** [1] - 191:16
**Leading** [1] - 99:8
**leading** [4] - 137:3, 155:8, 202:19, 216:18
**leads** [1] - 41:11
**learned** [1] - 74:8
**learning** [1] - 224:6
**least** [8] - 29:3, 100:16, 107:25, 108:4, 123:4, 139:14, 221:24, 253:4
**leave** [9] - 3:5, 84:16, 85:2, 85:9, 111:8, 111:16, 182:22, 203:17, 227:11
**leaves** [1] - 111:16
**leaving** [1] - 41:10
**led** [2] - 147:15, 147:21
**left** [10] - 6:11, 12:3, 55:23, 56:6, 69:6, 96:15, 127:25, 146:16, 218:12, 218:16
**legal** [1] - 145:6
**legitimate** [1] - 230:17
**less** [7] - 45:11, 45:13, 46:7, 221:3, 228:22, 233:12, 246:3
**Less** [1] - 228:23
**lessened** [1] - 234:5
**lesser** [1] - 190:25
**letter** [30] - 2:4, 57:16, 57:18, 57:23, 59:4, 59:11, 67:9, 67:15, 68:9, 68:11, 69:8, 69:15, 70:6, 71:12, 78:7, 78:11, 83:13, 84:7, 94:15, 96:3, 97:15, 153:9, 154:14, 155:6, 155:13, 155:18, 155:22, 156:8, 160:4, 165:21
**letters** [3] - 61:3, 66:23, 68:24
**Lewisburg** [2] - 35:5, 35:7
**Lex** [1] - 77:16
**Liberty** [1] - 222:25
**lieu** [1] - 115:9
**life** [11] - 2:9, 35:5, 37:3, 40:25, 44:12, 45:21,

120:10, 137:9, 137:11, 240:5, 240:9, 242:9
**Lift** [1] - 37:8
**light** [5] - 114:19, 114:20, 230:14, 230:24, 231:3
**likely** [2] - 23:10, 84:10
**likewise** [1] - 114:2
**limited** [2] - 231:18, 231:20
**limiting** [6] - 150:17, 244:9, 244:15, 249:14, 249:22, 253:11
**line** [6] - 66:16, 112:19, 120:12, 123:12, 160:22, 160:25, 192:12
**Line** [1] - 142:18
**lines** [3] - 17:22, 157:9, 244:16
**linked** [1] - 203:8
**liquor** [4] - 130:19, 130:21, 130:22, 146:18
**listen** [6] - 16:20, 16:23, 17:8, 18:3, 18:5, 23:14, 81:25, 88:23, 101:21
**listened** [6] - 17:19, 18:20, 19:18, 20:14, 21:20, 28:17
**listening** [1] - 88:21
**lists** [1] - 160:20
**litigate** [2] - 245:16, 245:20
**live** [5] - 48:23, 183:20, 197:5, 199:22, 238:20
**lived** [13] - 51:21, 123:24, 124:2, 171:6, 197:3, 197:9, 198:20, 214:4, 221:25, 222:2, 222:5, 224:4, 226:6
**livelihood** [3] - 66:2, 72:18, 72:23
**living** [3] - 222:20, 222:21, 236:19
**local** [4] - 156:22, 230:1, 238:21, 243:9
**located** [4] - 146:20, 152:10, 164:3, 165:6, 182:7, 194:16, 194:20, 199:18
**locations** [5] - 170:22, 177:16, 179:14, 179:25, 227:15
**locked** [34] - 31:11, 37:7, 71:15, 81:12, 93:20, 119:14, 124:22, 124:24, 125:2, 125:8, 125:12, 125:15, 125:25, 152:22, 154:13, 154:17, 154:18, 154:25, 193:15, 193:20, 193:22, 214:18,

214:21, 214:22, 214:24, 215:1, 215:3, 215:4, 215:10, 215:17, 215:20, 216:1, 218:5, 226:16
**lockup** [1] - 75:11
**Lombard** [1] - 1:25
**look** [12] - 61:22, 68:1, 96:12, 132:8, 200:16, 201:6, 225:8, 226:5, 227:14, 232:10, 233:4
**Look** [2] - 70:23, 182:18
**looked** [4] - 116:16, 117:7, 178:11, 205:13
**looking** [6] - 14:11, 14:12, 67:6, 145:5, 225:25, 235:17
**Looks** [1] - 156:4
**looks** [2] - 30:23, 196:15
**loose** [1] - 63:8
**loosey** [1] - 242:12
**loosey-goosey** [1] - 242:12
**loot** [2] - 221:10, 221:13
**lost** [4] - 142:13, 145:2, 145:7, 145:12
**Lost** [2] - 145:1
**low** [5] - 17:7, 17:10, 17:15, 20:22, 25:7
**lucky** [1] - 228:1
**lunch** [5] - 85:6, 85:7, 85:8, 111:3, 111:10
**luncheon** [2] - 84:25, 85:1
**lyric** [1] - 103:13
**lyrics** [4] - 102:8, 102:20, 108:19, 108:23

# M

**M-O-N-T-G-O-M-E-R-Y** [2] - 124:20, 151:22
**mad** [2] - 96:13, 180:2
**magnitude** [1] - 229:15
**main** [1] - 35:20
**Main** [2] - 35:21, 222:23
**mainstream** [1] - 120:12
**major** [3] - 60:8, 60:10, 119:17
**majority** [5] - 16:6, 39:6, 40:14, 40:24, 46:23
**male** [3] - 54:19, 59:19, 60:24
**Mallin** [8] - 55:14, 55:18, 59:20, 69:4, 71:4, 71:6, 95:2
**Mallini** [2] - 71:3, 71:5
**Mallins** [2] - 94:25,

97:18
**man** [14] - 44:6, 127:18, 127:19, 145:21, 162:6, 163:4, 164:5, 164:7, 164:17, 165:8, 207:11, 210:2, 210:6, 215:24
**Man** [2] - 216:22, 216:23
**manage** [1] - 242:21
**management** [1] - 242:8
**managing** [1] - 6:16
**mandatory** [1] - 158:3
**Manhattan** [2] - 177:9, 177:10
**manifestly** [1] - 230:18
**mankind** [3] - 67:7, 67:17, 68:2
**manner** [6] - 39:4, 230:17, 237:10, 238:3, 238:16, 256:8
**map** [4] - 179:24, 181:3, 182:21, 182:24
**March** [3] - 128:19, 128:22, 132:19
**Marcus** [1] - 47:8
**Marijuana** [1] - 183:5
**marijuana** [2] - 166:8, 168:22
**mark** [1] - 14:20
**marked** [6] - 83:18, 83:19, 163:25, 182:11, 208:23, 225:6
**Marshals** [1] - 112:4
**marshals** [2] - 85:3, 112:9
**MARTIN** [32] - 1:8, 5:18, 5:24, 6:9, 15:4, 16:16, 24:5, 24:8, 24:11, 24:14, 24:16, 24:21, 25:9, 25:12, 25:16, 25:19, 28:8, 28:20, 31:4, 80:20, 81:9, 82:21, 83:10, 83:16, 83:19, 89:7, 100:13, 108:16, 122:7, 204:13, 255:5, 255:9
**Martin** [124] - 1:19, 1:20, 6:7, 14:15, 15:3, 22:7, 24:10, 24:24, 25:11, 27:10, 40:23, 51:3, 54:16, 61:1, 64:2, 68:13, 71:19, 79:5, 80:6, 83:12, 90:19, 91:15, 91:22, 92:15, 108:24, 114:4, 115:25, 116:15, 119:9, 119:11, 119:16, 119:19, 120:1, 121:11, 121:19, 123:4, 124:21, 124:22, 124:24, 125:11, 126:18, 126:25, 127:5, 127:12,

128:7, 130:6, 131:8, 132:7, 133:7, 138:11, 138:13, 142:22, 143:2, 143:8, 145:6, 145:16, 145:18, 146:17, 148:22, 149:19, 150:4, 150:5, 162:7, 162:15, 162:17, 162:23, 163:16, 168:24, 169:10, 169:18, 170:11, 171:15, 171:24, 174:13, 174:25, 183:11, 183:20, 184:17, 184:18, 184:20, 185:4, 185:6, 185:20, 186:16, 186:17, 187:23, 194:2, 194:22, 196:23, 214:18, 242:16, 243:22, 243:24, 244:4, 244:5, 244:11, 244:23, 244:25, 245:1, 245:4, 245:23, 245:24, 249:12, 249:15, 249:25, 250:11, 250:13, 250:16, 250:18, 250:21, 251:4, 251:9, 251:13, 252:24, 252:25, 253:2, 253:4, 253:9
**Martin's** [6] - 25:5, 119:12, 245:2, 248:23, 251:18, 251:24
**Mary** [3] - 1:24, 256:3, 256:14
**MARYLAND** [1] - 1:2
**Maryland** [5] - 1:12, 1:25, 42:14, 61:15, 158:14
**mate** [1] - 80:15
**material** [1] - 116:16
**materials** [1] - 117:1
**mates** [1] - 58:6
**matter** [9] - 2:24, 3:4, 3:13, 109:3, 118:14, 119:3, 145:18, 256:4, 256:8
**matters** [2] - 117:23, 157:2
**maximum** [5] - 158:1, 158:2, 158:10, 159:14, 160:13
**MB** [1] - 84:2
**MB-40D** [2] - 30:23, 30:24
**MB-42** [1] - 25:16
**MB-51** [1] - 83:2
**MB-52** [1] - 83:2
**MB-54** [2] - 83:25, 84:3
**McCaffity/Brown** [1] - 84:4, 113:5, 253:17
**McCaffity/Jones** [1] - 253:17
**McKean** [5] - 182:8, 182:19, 182:23, 182:24,

183:4
**MD-54** [1] - 84:1
**mean** [53] - 12:6, 18:18, 29:10, 45:23, 54:5, 55:6, 58:19, 65:18, 76:9, 76:14, 78:20, 79:1, 79:11, 82:3, 86:8, 88:21, 89:17, 94:12, 103:13, 110:2, 123:15, 123:17, 123:18, 126:24, 127:5, 129:14, 133:21, 139:25, 140:1, 140:3, 140:4, 144:23, 168:3, 187:10, 197:23, 201:1, 210:6, 217:12, 218:24, 219:24, 228:5, 229:12, 229:14, 230:3, 232:5, 233:3, 233:7, 241:5, 246:15, 246:16, 249:1, 250:5
**meaning** [4] - 89:14, 96:11, 126:11, 149:4
**Meaning** [1] - 176:18
**means** [7] - 3:24, 37:21, 39:8, 54:24, 168:1, 168:9, 198:13
**meant** [6] - 18:1, 26:14, 70:24, 128:14, 143:21, 243:24
**measured** [1] - 231:1
**meet** [22] - 8:17, 9:11, 12:19, 12:21, 13:18, 22:22, 26:4, 26:6, 26:8, 64:22, 64:23, 85:16, 91:12, 92:2, 92:3, 92:12, 162:6, 162:17, 164:13, 170:5, 211:8, 253:3
**meeting** [27] - 7:17, 9:13, 10:7, 14:9, 15:7, 15:20, 16:2, 21:7, 21:15, 27:19, 27:20, 28:3, 28:13, 28:23, 65:6, 66:17, 77:23, 86:24, 89:11, 90:4, 130:14, 131:10, 133:3, 139:17, 139:18, 196:24, 200:1
**meetings** [2] - 11:12, 14:5, 62:17, 62:18, 62:19, 63:22, 86:2, 86:22, 87:2, 88:13
**member** [4] - 55:4, 55:7, 116:17, 150:14
**members** [2] - 66:7, 114:5
**Members** [2] - 111:3, 227:10
**memorandum** [2] - 117:6, 140:19
**memory** [1] - 60:24
**men** [2] - 48:12, 48:14
**mention** [6] - 17:6,

17:10, 90:4, 94:25, 250:16, 253:21
**mentioned** [15] - 22:23, 32:15, 55:9, 55:11, 59:17, 71:1, 74:11, 74:15, 77:12, 77:13, 94:21, 146:16, 206:24, 227:15
**mentioning** [1] - 251:18
**Mercedes** [1] - 235:9
**mere** [1] - 114:23
**mess** [2] - 219:16, 219:17
**met** [27] - 8:7, 8:14, 10:21, 11:13, 11:16, 12:14, 12:17, 13:19, 28:2, 28:15, 75:11, 90:1, 103:11, 107:25, 108:3, 130:10, 130:15, 162:23, 163:19, 164:17, 164:19, 164:22, 165:1, 196:13, 212:18, 244:3, 244:5
**metal** [1] - 88:7
**method** [1] - 238:16
**meting** [1] - 15:20
**Michael** [4] - 1:16, 1:18, 191:22, 191:23
**microphone** [5] - 5:12, 151:7, 180:3, 204:19
**Middle** [3] - 164:23, 164:24, 165:6
**middle** [1] - 73:19
**midst** [1] - 242:2
**might** [32] - 7:1, 7:4, 12:5, 12:7, 15:16, 22:8, 23:8, 25:22, 27:18, 28:4, 32:10, 40:13, 60:21, 60:22, 78:5, 82:12, 82:15, 85:21, 89:15, 90:20, 92:14, 95:9, 111:18, 148:25, 197:5, 202:25, 207:9, 207:15, 209:8, 212:7, 213:4, 231:3
**Might** [1] - 22:2
**mike** [5] - 24:24, 89:25, 120:21, 146:22, 151:20
**miles** [1] - 248:3
**milieu** [1] - 113:21
**millimeter** [4] - 201:14, 205:4, 205:7, 205:15
**mind** [14] - 11:7, 43:18, 84:17, 90:12, 95:22, 103:25, 106:18, 116:25, 134:21, 203:19, 230:6, 232:1, 237:18, 242:7
**minds** [1] - 231:25
**mine** [1] - 232:7
**Mines** [1] - 213:8
**minimum** [1] - 158:3

**minor** [1] - 60:11
**minority** [2] - 39:7, 49:24
**minute** [14] - 25:10, 58:25, 84:18, 87:18, 87:22, 130:16, 136:5, 203:20, 244:14, 245:14, 245:22, 250:14, 250:20
**minutes** [12] - 14:10, 24:11, 69:4, 84:11, 84:19, 85:10, 111:25, 121:7, 203:21, 228:24, 229:1, 242:17
**miraculously** [1] - 107:18
**Miranda** [7] - 246:21, 246:22, 247:2, 247:3, 247:7, 248:6, 252:8
**Mirandized** [3] - 247:4, 247:12
**miss** [1] - 73:19
**mistake** [2] - 15:5, 125:25
**Mistrial** [1] - 115:11
**mistrial** [2] - 4:12, 115:10
**misunderstandings** [1] - 118:13
**MITCHELL** [1] - 1:7
**Mitchell** [51] - 1:17, 32:23, 33:4, 33:8, 51:10, 51:15, 54:2, 54:9, 55:2, 56:8, 61:25, 74:8, 93:20, 97:5, 99:12, 99:18, 103:18, 108:22, 112:15, 113:19, 114:2, 114:5, 114:11, 114:22, 115:9, 119:20, 122:2, 125:2, 125:8, 136:14, 136:18, 137:5, 137:13, 137:16, 138:1, 138:13, 138:14, 148:15, 148:19, 150:9, 150:13, 164:5, 171:16, 186:14, 239:25, 241:3, 247:20, 249:24, 256:5
**Mitchell's** [1] - 115:6
**modern** [1] - 72:9
**modification** [1] - 69:17
**Modified** [1] - 62:13
**moment** [10] - 70:12, 82:24, 84:6, 100:8, 116:3, 117:8, 117:20, 142:16, 148:10
**moments** [1] - 133:15
**Momma** [43] - 207:8, 207:11, 207:13, 207:15, 208:19, 209:4, 209:5, 209:6, 209:9, 209:10, 209:14, 210:20, 211:1, 211:2, 211:6, 211:11,

211:21, 211:25, 212:2, 212:7, 212:10, 212:13, 212:18, 213:7, 213:17, 213:25, 214:5, 214:7, 220:21, 220:22, 221:6, 221:11, 221:15, 221:16, 221:18, 221:23, 222:4, 222:6, 223:4, 223:14, 223:19, 223:25
**Momma's** [4] - 208:21, 210:21, 211:18, 214:3
**Monday** [1] - 243:13
**Mondays** [1] - 243:15
**money** [34] - 34:6, 36:8, 36:15, 37:20, 37:21, 39:1, 76:9, 94:6, 109:13, 109:24, 110:4, 124:3, 142:3, 145:5, 168:10, 170:7, 170:11, 176:15, 176:17, 176:23, 187:1, 187:9, 187:17, 188:16, 189:9, 189:10, 209:6, 211:21, 212:11, 213:12, 213:13, 213:15, 219:25, 220:1
**monitor** [1] - 140:23
**monitors** [1] - 141:1
**Monroe** [10] - 135:13, 170:24, 171:5, 180:10, 189:18, 211:17, 211:18, 212:22, 223:5, 223:6
**Montgomery** [91] - 4:1, 4:8, 4:14, 115:14, 115:19, 116:17, 117:25, 118:1, 118:17, 118:23, 119:1, 119:7, 119:8, 119:16, 119:25, 120:6, 120:18, 120:23, 120:25, 121:5, 121:9, 123:14, 128:17, 138:11, 140:8, 140:24, 141:3, 141:5, 141:6, 146:9, 146:13, 146:22, 149:18, 151:4, 151:14, 151:16, 151:21, 151:25, 152:12, 152:20, 153:4, 153:12, 153:17, 156:1, 156:16, 156:20, 157:4, 158:25, 159:8, 160:22, 161:4, 161:18, 162:3, 164:3, 165:6, 166:3, 171:6, 171:15, 173:7, 180:1, 180:7, 182:17, 183:1, 186:4, 193:16, 203:24, 204:16, 204:23, 205:17, 228:1, 228:7, 228:18, 229:21, 230:6, 231:11, 234:15, 234:17, 234:25, 236:15, 238:5, 238:18, 239:2, 239:10, 239:23, 240:12,

240:18, 240:25, 241:9, 242:22
**MONTGOMERY** [3] - 120:19, 151:17, 255:12
**Montgomery's** [9] - 115:24, 116:7, 116:13, 120:7, 150:18, 228:17, 230:19, 231:12, 232:14
**month** [5] - 68:8, 97:17, 97:21, 99:22, 223:22
**months** [19] - 46:18, 57:23, 58:4, 58:11, 64:6, 68:2, 68:7, 69:6, 81:13, 95:25, 97:8, 97:11, 98:4, 118:25, 121:10, 123:4, 128:25, 135:8, 223:22
**morning** [25] - 2:3, 6:3, 6:10, 25:2, 33:17, 33:18, 73:15, 73:16, 76:24, 76:25, 81:19, 83:13, 84:14, 91:22, 92:16, 98:14, 118:2, 227:16, 227:22, 228:3, 228:11, 228:17, 236:14, 242:25, 243:17
**Mortal** [1] - 27:15
**Mosher** [5] - 211:17, 211:18, 212:22, 223:4, 223:6
**Most** [5] - 39:3, 42:1, 42:2, 47:6, 94:13
**most** [4] - 15:24, 48:14, 89:3, 229:15
**motion** [1] - 246:24
**MOTION** [1] - 255:13
**Motion** [2] - 115:11, 115:12
**motions** [6] - 231:17, 232:5, 237:7, 245:14, 245:17, 248:15
**motivation** [1] - 3:8
**Mount** [1] - 26:8
**mouth** [1] - 150:10
**move** [9] - 5:9, 5:13, 83:7, 83:9, 115:5, 115:6, 169:14, 186:2, 230:6
**Move** [1] - 186:11
**moved** [1] - 248:8
**movement** [1] - 9:24
**movie** [12] - 119:21, 119:23, 126:4, 135:2, 135:4, 142:24, 143:2, 143:5, 143:6, 143:18, 217:5, 217:7
**movies** [7] - 126:5, 126:6, 135:6, 142:23, 143:9, 143:10, 143:14
**moving** [1] - 12:7
**MR** [300] - 2:16, 4:22, 5:2, 5:6, 5:18, 5:24, 6:9,

14:14, 15:4, 16:12, 16:16, 23:6, 23:21, 23:24, 24:4, 24:5, 24:8, 24:11, 24:14, 24:16, 24:21, 25:9, 25:12, 25:16, 25:19, 28:7, 28:8, 28:20, 31:4, 33:16, 36:18, 37:15, 37:19, 37:22, 38:5, 44:19, 45:22, 49:25, 50:8, 52:7, 52:9, 52:14, 54:14, 58:13, 60:17, 62:3, 67:13, 67:24, 70:16, 72:6, 72:16, 73:2, 73:5, 73:7, 73:9, 73:11, 73:14, 76:23, 80:20, 81:9, 82:21, 82:24, 83:1, 83:4, 83:10, 83:12, 83:16, 83:19, 83:23, 83:25, 84:2, 84:4, 84:6, 84:11, 85:5, 85:11, 85:15, 85:25, 89:7, 100:11, 100:13, 104:15, 108:14, 108:16, 108:18, 110:20, 110:24, 111:1, 115:13, 115:23, 116:2, 116:5, 116:9, 117:10, 117:15, 117:19, 117:22, 118:1, 118:9, 118:24, 119:8, 120:14, 121:4, 122:4, 122:7, 122:8, 123:2, 123:23, 124:14, 125:4, 125:7, 126:15, 126:20, 126:23, 127:3, 130:1, 130:5, 132:6, 132:12, 134:3, 135:1, 136:4, 136:8, 137:8, 137:10, 137:12, 138:10, 141:18, 141:20, 141:21, 144:5, 144:8, 144:9, 144:15, 145:1, 145:23, 146:1, 146:3, 146:5, 148:8, 148:11, 148:21, 149:11, 149:16, 149:22, 150:1, 150:10, 150:20, 150:23, 151:3, 151:13, 151:24, 155:8, 169:14, 169:17, 171:17, 175:23, 176:3, 176:9, 179:4, 181:5, 181:10, 184:8, 185:11, 185:16, 186:2, 186:11, 186:16, 186:19, 191:1, 197:11, 202:19, 203:15, 204:7, 204:11, 204:13, 204:22, 205:19, 205:20, 206:7, 216:18, 217:20, 217:24, 217:25, 218:25, 219:19, 220:2, 220:18, 226:21, 228:2, 228:9, 228:14, 228:16, 228:22, 229:1, 229:9, 229:11,

230:11, 230:13, 230:22, 231:8, 231:14, 231:18, 231:21, 232:4, 232:8, 232:17, 232:21, 233:1, 233:5, 233:7, 233:11, 233:17, 233:19, 233:24, 234:1, 234:6, 234:8, 234:10, 234:14, 234:18, 234:21, 235:1, 235:2, 235:3, 235:4, 235:19, 235:23, 236:1, 236:9, 236:18, 236:22, 237:1, 237:4, 237:9, 237:19, 237:25, 239:3, 239:5, 239:10, 240:23, 243:19, 244:1, 244:16, 244:22, 245:1, 245:8, 245:11, 245:16, 245:25, 246:3, 246:8, 246:12, 246:14, 246:18, 247:1, 247:5, 247:14, 247:17, 248:10, 248:13, 248:20, 248:25, 249:4, 249:8, 249:10, 250:3, 250:9, 250:17, 250:22, 250:24, 251:3, 251:6, 251:10, 251:19, 251:22, 252:5, 252:8, 252:11, 252:14, 252:16, 252:17, 252:18, 252:23, 253:1, 253:8, 253:13, 253:15, 254:2, 255:5, 255:6, 255:7, 255:8, 255:9, 255:10, 255:13, 255:14, 255:15, 255:16, 255:17
**MR.MARTIN** [1] - 99:25
**MS** [17] - 5:8, 5:15, 96:24, 99:8, 99:13, 100:5, 114:7, 114:11, 114:16, 114:19, 114:21, 115:5, 239:21, 241:1, 241:15, 242:19, 243:11
**mulls** [1] - 239:25
**multiple** [3] - 64:12, 72:1, 149:8
**Murder** [3] - 93:22, 202:2, 215:2
**murder** [38] - 2:9, 3:5, 3:8, 4:17, 4:20, 32:2, 53:22, 93:23, 94:8, 98:23, 99:17, 102:19, 103:4, 119:23, 132:21, 134:18, 135:6, 141:25, 152:16, 152:25, 154:3, 154:6, 155:1, 155:4, 156:13, 157:20, 158:15, 202:3, 202:5, 205:15, 218:20, 223:19, 233:14, 233:25, 234:5, 238:1, 238:10

**Murdered** [1] - 201:2
**murdered** [1] - 145:21
**murders** [9] - 3:22, 21:13, 49:7, 96:10, 113:5, 115:25, 132:23, 138:14, 217:16
**Murray** [2] - 204:13, 204:15
**muscle** [1] - 74:23
**muscles** [1] - 40:12
**music** [2] - 75:20, 76:7
**must** [5] - 38:3, 45:21, 127:15, 215:21
**mysteriously** [1] - 72:5

### N

**N-28** [1] - 30:22
**N-40** [1] - 24:5
**Nah** [2] - 32:8, 142:9
**name** [51] - 13:1, 54:18, 55:9, 59:19, 59:25, 60:4, 60:10, 60:24, 73:17, 90:16, 94:18, 94:21, 94:25, 95:3, 95:9, 95:22, 103:25, 106:12, 106:13, 106:17, 120:22, 123:7, 123:10, 125:25, 134:20, 143:23, 151:20, 153:6, 161:12, 162:7, 163:5, 164:5, 164:7, 164:17, 165:8, 181:3, 184:13, 184:14, 184:15, 191:19, 191:21, 192:8, 195:21, 208:21, 211:18, 221:21, 244:2, 248:23, 251:18, 251:24
**named** [15] - 12:24, 60:9, 104:4, 104:20, 104:25, 139:22, 141:3, 141:5, 155:20, 171:2, 177:16, 191:9, 207:3, 207:8, 208:18
**namely** [2] - 160:4, 192:19
**names** [4] - 34:21, 35:23, 132:22, 177:12
**narcotics** [5] - 71:2, 110:5, 122:17, 122:19, 127:24
**nature** [2] - 76:3, 229:24
**near** [4] - 93:5, 179:12, 184:3, 184:4
**nearly** [2] - 117:13, 249:14
**necessary** [6] - 4:23, 4:25, 83:4, 113:23, 114:4, 227:20

**need** [23] - 2:18, 22:7, 27:10, 43:9, 43:25, 44:9, 44:17, 50:5, 111:14, 123:24, 124:2, 131:16, 182:13, 200:22, 201:15, 201:16, 201:22, 205:5, 214:3, 224:3, 229:22, 236:12, 243:17
**Needed** [1] - 142:3
**needed** [15] - 40:18, 62:7, 71:12, 86:4, 131:14, 131:21, 138:21, 142:3, 191:11, 191:12, 200:13, 200:14, 202:17, 205:6, 221:23
**negative** [2] - 74:21, 74:22
**negatively** [1] - 150:5
**neighborhood** [2] - 105:25, 211:15
**nervous** [1] - 198:14
**Never** [7] - 16:25, 49:20, 73:24, 73:25, 75:7, 75:9, 83:19
**never** [42] - 12:19, 13:19, 16:23, 21:4, 28:2, 32:15, 40:12, 40:18, 51:15, 51:17, 61:21, 73:23, 73:25, 74:1, 74:2, 74:10, 74:15, 74:17, 75:1, 75:5, 75:8, 76:4, 76:10, 76:16, 89:1, 91:19, 94:21, 103:22, 105:11, 107:13, 107:14, 134:20, 136:13, 145:15, 184:4, 204:25, 217:18, 243:5, 247:11, 252:17, 253:9
**nevertheless** [1] - 201:6
**New** [11] - 122:16, 122:19, 171:16, 172:4, 173:1, 173:7, 173:11, 175:19, 176:1, 177:8, 244:2
**newer** [1] - 56:21
**next** [14] - 18:11, 85:17, 89:10, 97:17, 114:6, 115:13, 128:9, 151:11, 156:12, 158:6, 236:17, 239:23, 243:9, 243:13
**nice** [4] - 144:20, 144:21, 144:24, 229:6
**nickname** [4] - 74:2, 163:14, 165:19
**Niedermeier** [8] - 55:18, 55:19, 59:18, 95:2, 97:18, 246:20, 247:18, 247:19
**Niedermeier's** [1] -

241:8
**night** [3] - 142:24, 199:16, 200:6
**nine** [10] - 57:23, 58:4, 58:10, 68:2, 68:7, 68:8, 97:8, 97:11, 117:14, 175:20
**Ninth** [1] - 152:6
**ninth** [2] - 152:7, 152:8
**NO** [1] - 1:6
**Nobody** [1] - 35:23
**normal** [1] - 235:12
**NORTHERN** [1] - 1:2
**northwest** [1] - 171:10
**nose** [5] - 101:1, 101:4, 101:6, 101:11, 109:1
**Note** [1] - 140:7
**note** [6] - 70:21, 84:16, 111:8, 203:17, 227:11, 229:22
**noted** [6] - 105:6, 122:6, 162:16, 163:13, 225:13, 240:15
**notes** [9] - 11:10, 14:11, 15:6, 15:10, 15:13, 16:11, 16:17, 25:20, 25:24
**Nothing** [4] - 60:13, 65:19, 148:2, 161:3
**nothing** [14] - 26:12, 26:18, 60:10, 100:20, 108:22, 115:3, 136:19, 147:22, 155:16, 161:3, 186:22, 242:16, 251:17
**notice** [1] - 66:6
**notion** [3] - 67:9, 67:18, 67:22
**notwithstanding** [4] - 46:22, 61:8, 61:21, 69:23
**November** [16] - 12:21, 29:2, 30:4, 30:5, 30:13, 32:21, 33:1, 80:19, 92:16, 98:14, 98:18, 105:7, 107:18, 107:19, 108:12
**number** [14] - 13:4, 13:6, 27:6, 30:23, 41:16, 41:18, 43:19, 48:12, 83:22, 105:8, 107:24, 108:3, 148:23, 150:23
**numerous** [1] - 77:2

### O

**oath** [3] - 6:6, 54:2, 68:17
**obeying** [1] - 41:8
**object** [3] - 14:14, 137:8, 253:24

**objected** [9] - 116:15, 243:24, 244:7, 248:18, 248:24, 249:8, 249:9, 249:13, 253:7
**objecting** [2] - 245:12, 249:11
**objection** [23] - 2:15, 24:1, 24:19, 50:9, 72:8, 83:10, 83:15, 83:16, 150:3, 150:6, 150:11, 150:12, 150:25, 185:16, 185:18, 229:22, 243:17, 244:8, 244:17, 245:24, 248:18, 251:22, 251:23
**Objection** [73] - 23:6, 23:21, 23:24, 24:4, 28:7, 36:18, 37:15, 37:19, 37:22, 38:5, 44:19, 45:22, 49:25, 50:8, 52:7, 52:9, 54:14, 58:13, 62:3, 67:13, 67:24, 70:16, 72:6, 72:16, 73:2, 73:5, 80:20, 81:9, 82:21, 89:7, 96:24, 99:8, 99:13, 99:25, 100:5, 104:15, 108:14, 110:20, 110:24, 125:4, 126:15, 126:20, 127:3, 132:12, 134:3, 145:23, 155:8, 169:14, 171:17, 175:23, 176:3, 179:4, 181:5, 181:10, 184:8, 185:11, 186:2, 191:1, 197:11, 202:19, 205:19, 205:20, 206:7, 216:18, 217:20, 217:24, 217:25, 218:25, 219:19, 220:2, 220:18, 226:21
**objections** [2] - 2:11, 2:14
**obligations** [2] - 158:21, 160:9
**observes** [1] - 229:20
**obvious** [2] - 116:21, 244:7
**Obviously** [2] - 111:21, 249:17
**obviously** [5] - 4:9, 51:21, 236:12, 248:8, 249:19
**occasion** [12] - 12:17, 37:17, 49:24, 77:9, 109:10, 109:17, 140:12, 142:12, 188:19, 190:20, 191:18, 209:24
**occasions** [15] - 7:10, 11:23, 12:1, 12:15, 14:7, 14:22, 15:2, 29:4, 30:6, 38:25, 43:14, 109:11, 124:7, 147:6, 189:13
**occur** [2] - 2:20, 209:19

**occurred** [2] - 15:20, 57:20
**October** [19] - 1:11, 6:12, 8:25, 9:2, 10:7, 11:13, 14:5, 16:8, 16:11, 16:17, 32:20, 77:24, 80:4, 81:4, 97:17, 98:10, 98:12, 100:23, 256:5
**odd** [2] - 9:23, 9:24
**OF** [3] - 1:2, 1:5, 1:11
**offer** [6] - 7:4, 25:8, 44:3, 69:11, 69:13, 70:13, 116:22, 201:3
**offered** [3] - 28:24, 68:24, 221:5
**offering** [2] - 69:16, 70:7
**Office** [4] - 88:11, 117:3, 144:12, 156:25
**officer** [9] - 9:6, 9:9, 9:13, 41:16, 62:21, 63:17, 71:2, 107:5, 246:6
**officers** [8] - 9:25, 29:12, 55:19, 60:2, 66:17, 86:19, 157:3, 238:8
**official** [1] - 256:7
**Official** [1] - 256:15
**often** [4] - 38:9, 53:6, 64:23, 224:10
**old** [8] - 36:19, 36:21, 152:1, 162:22, 164:19, 165:11, 169:22, 172:8
**older** [5] - 56:20, 162:25, 163:1, 163:2, 167:19, 167:21
**ON** [1] - 255:13
**Once** [2] - 53:7, 220:16
**once** [9] - 29:7, 64:14, 64:24, 89:11, 107:25, 108:4, 108:5, 142:10, 220:16
**One** [8] - 20:9, 117:5, 144:16, 158:1, 167:6, 168:25, 173:15, 241:1
**one** [85] - 3:22, 7:11, 7:13, 9:24, 19:24, 22:24, 24:12, 28:18, 30:8, 36:3, 41:16, 43:16, 52:18, 59:25, 61:9, 66:22, 67:18, 70:12, 70:18, 73:11, 73:21, 74:6, 76:18, 81:21, 81:22, 82:24, 86:16, 87:14, 92:10, 92:15, 92:16, 95:1, 95:2, 97:25, 100:8, 102:10, 102:13, 102:24, 103:1, 103:18, 103:20, 105:6, 107:11, 107:15, 109:17, 116:17, 117:8,

117:20, 127:25, 131:22, 139:14, 147:11, 147:19, 148:10, 148:25, 150:14, 153:19, 171:21, 171:22, 172:23, 173:16, 176:20, 183:20, 184:3, 184:10, 188:19, 188:25, 191:3, 199:4, 199:16, 207:7, 216:8, 221:16, 221:24, 222:6, 224:8, 224:21, 225:18, 230:4, 232:22, 238:4, 240:19, 242:22, 247:12

**one's** [1] - 112:3
**ones** [1] - 7:7
**online** [1] - 227:14
**open** [4] - 4:10, 84:17, 116:25, 203:19
**operated** [1] - 195:23
**operation** [3] - 76:7, 82:20, 91:4
**opportunity** [10] - 31:21, 32:2, 32:12, 111:18, 111:20, 111:22, 112:1, 168:9, 230:25, 253:24
**opposed** [2] - 72:14, 237:15
**oral** [2] - 252:5, 252:6
**order** [11] - 43:8, 44:6, 44:9, 44:17, 46:14, 62:6, 70:7, 123:24, 146:6, 232:21, 240:8
**ordered** [1] - 63:16
**orders** [1] - 229:15
**organization** [2] - 74:17, 75:6
**Organization** [1] - 74:18
**original** [2] - 33:25, 71:12
**originally** [3] - 54:17, 89:18, 143:20
**ought** [1] - 231:6
**ounce** [4] - 167:18, 168:4, 168:7, 168:13
**outcome** [1] - 144:4
**outline** [1] - 78:10
**outside** [6] - 9:20, 89:12, 99:6, 106:6, 113:24, 121:6
**Outside** [1] - 47:15
**overheard** [1] - 94:25
**overnight** [2] - 2:20, 232:2
**Overruled** [34] - 36:20, 37:23, 52:8, 80:21, 81:10, 82:23, 89:8, 96:25, 99:9, 100:6, 108:15, 125:5, 126:16,

132:13, 137:9, 171:18, 176:8, 179:6, 181:6, 181:11, 184:9, 185:12, 191:2, 197:12, 202:20, 205:21, 206:8, 216:19, 218:1, 219:1, 219:20, 220:3, 220:19, 226:22
**overruled** [3] - 50:9, 185:18, 244:8
**overwhelm** [1] - 57:14
**owe** [2] - 36:13, 212:10
**owed** [2] - 40:15, 209:6, 211:21
**owes** [1] - 36:8
**own** [6] - 4:13, 49:12, 52:16, 52:21, 113:1, 212:13

## P

**P-17** [1] - 153:3
**P-2** [1] - 153:16
**P-3** [1] - 153:24
**p.m** [4] - 111:5, 112:11, 203:22, 254:5
**pads** [4] - 84:16, 111:8, 203:17, 227:12
**PAGE** [1] - 255:3
**page** [2] - 144:15, 153:19
**Page** [5] - 140:22, 142:17, 142:18, 144:16, 153:7
**pages** [2] - 118:4, 256:6
**Pages** [1] - 144:16
**Paid** [2] - 110:8, 110:9
**paper** [3] - 110:10, 110:22, 143:1
**paperwork** [1] - 119:21
**Paragraph** [8] - 157:8, 157:9, 158:6, 159:7, 252:13, 252:15, 252:18, 252:22
**paragraph** [2] - 70:18, 87:17, 155:14, 158:6, 253:1
**Paragraphs** [1] - 155:15
**Pardon** [10] - 32:5, 34:25, 35:14, 37:24, 47:3, 50:19, 51:13, 56:19, 60:18, 140:2
**parentheses** [1] - 89:12
**Park** [18] - 77:5, 77:8, 77:10, 77:16, 77:18, 92:12, 95:7, 104:6, 104:11, 104:14, 104:17, 105:21, 179:12, 179:17, 181:4, 181:16, 183:1, 185:13

**parking** [2] - 2:3, 6:4
**Parole** [18] - 9:3, 9:20, 10:8, 10:21, 12:5, 18:11, 20:1, 22:23, 28:15, 65:1, 87:23, 88:1, 88:5, 88:9, 90:5, 92:10, 106:2, 106:6
**parole** [7] - 2:9, 41:6, 41:9, 41:15, 41:24, 78:22, 158:4
**parse** [1] - 149:24
**part** [42] - 15:24, 37:2, 56:14, 56:16, 56:20, 56:23, 62:20, 72:14, 80:14, 81:21, 89:3, 89:10, 113:7, 116:16, 124:1, 126:9, 129:5, 144:18, 145:8, 145:9, 145:12, 149:2, 149:19, 149:20, 150:9, 171:8, 179:20, 198:21, 198:23, 199:1, 199:2, 199:10, 206:4, 207:23, 221:23, 224:8, 238:14, 239:12, 251:21
**participate** [2] - 141:24, 145:5
**participated** [2] - 145:15, 147:13
**participating** [1] - 142:13
**particular** [12] - 5:17, 12:11, 14:24, 20:13, 25:24, 27:20, 79:5, 144:18, 166:14, 229:24, 234:1, 244:18
**particularly** [3] - 229:12, 230:24, 231:3
**passage** [1] - 143:3
**passed** [2] - 146:24, 147:18
**Passenger** [1] - 200:9
**passing** [1] - 92:11
**past** [2] - 84:8, 87:22
**patience** [1] - 151:11
**patrolling** [1] - 12:4
**Paul** [4] - 1:19, 34:24, 35:1, 35:2
**Pause** [7] - 58:24, 66:21, 73:12, 100:10, 111:23, 171:14, 235:22
**pay** [10] - 76:11, 76:17, 134:21, 168:10, 207:9, 209:8, 220:4, 220:25, 221:1, 239:17
**payment** [1] - 220:23
**pays** [1] - 92:11
**Payson** [1] - 135:13, 170:25
**penalty** [2] - 158:1, 158:2

**pending** [1] - 159:22
**people** [59] - 8:18, 8:21, 9:17, 9:20, 18:10, 18:11, 22:1, 22:12, 23:9, 23:16, 25:1, 34:2, 34:6, 40:14, 47:6, 49:22, 76:17, 79:19, 88:17, 88:21, 89:4, 89:14, 89:16, 92:13, 93:6, 93:9, 93:11, 94:13, 96:14, 103:19, 106:20, 113:21, 124:12, 128:19, 139:6, 139:10, 141:16, 144:13, 156:10, 165:1, 172:25, 173:2, 177:12, 188:9, 188:10, 189:12, 191:4, 191:7, 191:9, 197:17, 198:3, 198:4, 198:7, 201:2, 230:1, 239:13, 239:15
**people's** [1] - 88:23
**per** [1] - 248:3
**percentage** [1] - 39:4
**perfect** [2] - 32:12, 32:14, 106:2
**perfectly** [1] - 3:8
**performer** [1] - 75:13
**perhaps** [4] - 68:22, 132:22, 228:3, 238:9
**Perhaps** [3] - 87:19, 114:16, 228:5
**period** [9] - 29:2, 45:6, 45:15, 71:24, 108:8, 121:10, 122:25, 177:2, 177:6
**permission** [2] - 146:7, 146:11
**permit** [2] - 2:7, 81:24
**permitted** [2] - 112:23, 249:2
**perpendicular** [1] - 248:4
**person** [9] - 13:1, 33:24, 60:4, 82:4, 89:12, 90:13, 90:14, 94:18, 96:9
**personal** [2] - 15:7, 236:6
**personally** [6] - 8:14, 11:14, 11:16, 12:14, 13:19, 230:2
**persons** [1] - 122:16
**PH-22** [1] - 166:23
**PH-40** [1] - 164:1
**PH-47** [1] - 171:3
**PH-49** [1] - 182:12
**PH-66** [1] - 166:20
**PH-69** [1] - 196:21
**PH-70** [1] - 165:4
**phone** [35] - 13:4, 13:6, 13:20, 13:22, 14:2, 15:14, 21:4, 21:6, 21:17,

21:20, 27:6, 29:6, 29:7, 30:10, 30:12, 30:14, 30:15, 30:18, 32:4, 32:6, 32:7, 62:19, 88:12, 88:23, 92:15, 94:8, 94:14, 108:3, 108:7, 126:1, 127:15, 215:22, 243:11
**Phone** [1] - 21:15
**phonetic** [1] - 186:25
**phony** [1] - 116:1
**photo** [5] - 59:23, 61:22, 78:3, 78:16, 253:18
**photos** [3] - 253:18, 253:20, 253:22
**phrase** [2] - 94:10, 127:22
**phrases** [1] - 92:17
**Physical** [2] - 39:9, 39:12
**physical** [3] - 39:11, 39:13, 50:5
**physically** [2] - 52:20, 128:14
**pick** [5] - 207:21, 208:3, 223:1, 223:4, 223:10
**picked** [3] - 61:14, 127:12, 207:19
**picking** [1] - 242:9
**picture** [3] - 164:1, 167:3, 208:23
**piece** [5] - 110:10, 110:22, 229:24, 234:1, 235:1
**pieces** [1] - 42:17
**pills** [2] - 168:24, 169:2
**pin** [1] - 137:18
**pistol** [2] - 188:25, 189:1
**place** [17] - 5:17, 8:19, 32:16, 42:10, 44:7, 48:17, 49:2, 50:12, 104:14, 105:7, 113:14, 152:15, 152:17, 166:14, 173:23, 174:5, 241:4
**placed** [2] - 7:7, 7:11, 7:19
**plan** [14] - 91:25, 128:16, 133:5, 144:18, 145:5, 195:11, 196:23, 199:10, 206:24, 207:2, 207:3, 207:6, 220:14, 220:17
**planned** [2] - 147:8, 147:22
**Planning** [2] - 123:20
**planning** [2] - 124:18, 131:2, 131:4, 137:2, 203:12, 219:4, 253:22

**plans** [8] - 91:1, 119:11, 127:5, 128:9, 131:2, 138:12, 220:8, 228:11
**plastic** [1] - 225:11
**Play** [2] - 27:8, 27:15
**play** [8] - 5:18, 5:19, 24:9, 24:18, 87:1, 228:24, 229:3, 242:16
**played** [2] - 31:3, 92:15
**playing** [5] - 24:20, 27:8, 27:15, 30:22, 233:17
**plea** [11] - 3:9, 43:11, 43:19, 153:21, 154:2, 154:23, 156:13, 156:15, 160:16, 161:3, 161:15
**plead** [2] - 3:4, 158:7
**pleading** [4] - 118:9, 118:12, 155:3, 159:2
**pleas** [1] - 157:19
**pleasant** [1] - 227:21
**pled** [2] - 152:24, 205:12
**plus** [1] - 160:14
**pockets** [8] - 75:24, 76:9, 127:16, 127:17, 127:22, 215:23, 215:24, 216:11
**Point** [1] - 141:4
**point** [20] - 4:24, 11:7, 44:5, 66:14, 91:9, 95:1, 115:13, 121:21, 121:25, 150:13, 162:11, 163:9, 198:12, 203:14, 220:8, 238:15, 240:13, 240:17, 242:20, 248:16
**pointed** [1] - 80:6
**pointing** [1] - 180:6
**points** [1] - 241:1
**police** [5] - 29:12, 54:18, 61:15, 139:2, 238:8
**polite** [1] - 108:25
**politely** [1] - 39:1
**pool** [2] - 176:15, 176:23
**pooled** [1] - 176:17
**Poppi** [2] - 244:2, 244:5, 253:3
**position** [8] - 114:21, 114:22, 118:19, 237:12, 240:3, 240:6, 240:19, 242:22
**possessed** [1] - 161:24
**possession** [1] - 200:24
**possibilities** [1] - 78:21
**possible** [4] - 3:19, 16:14, 99:11, 158:11
**possibly** [3] - 230:21, 237:18, 239:24

**Post** [1] - 252:8
**pounding** [1] - 43:25
**powder** [2] - 181:22, 181:25
**practice** [2] - 4:3, 120:13
**preceding** [3] - 44:22, 45:4, 135:8
**predicament** [1] - 44:10
**predicates** [1] - 150:15
**prejudice** [1] - 230:8
**prejudiced** [1] - 237:17
**prejudicial** [1] - 230:18, 230:21
**preliminarily** [3] - 113:25, 114:14, 118:18
**preliminary** [5] - 115:3, 115:18, 116:12, 118:5, 118:20
**premarked** [1] - 83:17
**preparation** [2] - 118:11, 217:4
**prepared** [2] - 2:6, 140:20
**preponderance** [1] - 112:21
**prescient** [1] - 62:2
**presence** [2] - 60:3, 113:24, 121:6
**present** [16] - 52:21, 85:4, 112:3, 112:12, 134:8, 134:11, 177:5, 186:8, 186:9, 186:10, 186:14, 203:23, 216:24, 244:6, 253:3
**presided** [1] - 243:6
**pressed** [4] - 127:15, 215:21, 216:3, 216:4
**presumably** [1] - 168:15
**pretrial** [4] - 42:13, 241:23, 241:25, 242:5
**pretty** [10] - 6:4, 8:10, 18:6, 31:5, 37:9, 38:3, 116:21, 231:24, 232:6, 233:12
**Pretty** [2] - 37:11, 209:18
**prevented** [2] - 32:10, 67:5
**preview** [1] - 230:23
**previously** [3] - 4:1, 4:9, 247:14
**prima** [1] - 149:20
**primarily** [1] - 149:13
**Princely** [3] - 140:9, 140:10, 141:7
**principal** [1] - 115:23
**Prison** [1] - 66:9
**prison** [14] - 6:12,

31:22, 31:24, 47:6, 47:16, 49:16, 66:7, 68:15, 68:19, 94:16, 96:10, 101:24, 103:23, 160:13
**pristine** [1] - 246:21
**pro** [1] - 69:25
**Probation** [19] - 9:3, 9:20, 10:8, 10:21, 12:5, 18:12, 20:1, 22:23, 28:15, 65:1, 87:24, 88:1, 88:6, 88:9, 88:11, 90:5, 92:10, 106:2, 106:6
**probation** [26] - 9:6, 9:9, 9:13, 41:6, 41:9, 41:15, 41:23, 62:12, 62:13, 62:15, 62:20, 63:14, 63:16, 78:22, 107:3, 107:5, 107:10, 109:3, 109:24, 119:15, 125:18, 154:19, 159:16, 159:22, 160:1, 193:21
**probative** [1] - 149:6
**problem** [14] - 2:3, 17:17, 62:24, 72:14, 89:16, 115:8, 119:17, 150:9, 232:25, 233:3, 241:6, 243:3, 243:4, 243:5
**problems** [3] - 28:24, 241:9, 244:8
**procedural** [1] - 235:8
**proceed** [4] - 85:17, 85:23, 128:6, 148:7
**proceeded** [1] - 87:23
**proceeding** [3] - 4:4, 111:15, 146:7
**Proceedings** [9] - 2:1, 58:24, 66:21, 73:12, 100:10, 111:23, 171:14, 235:22, 254:5
**proceedings** [4] - 4:6, 4:17, 256:4, 256:7
**process** [2] - 21:16, 213:5
**produce** [1] - 241:23
**producer** [1] - 75:17
**professional** [2] - 3:2, 3:3
**proffer** [11] - 24:17, 112:16, 153:9, 154:13, 155:6, 155:12, 155:18, 155:22, 156:23, 160:3, 230:2
**proffers** [1] - 117:14
**profit** [1] - 168:15
**Program** [2] - 152:19, 241:10
**progressing** [1] - 141:19

**progression** [1] - 235:12
**prohibiting** [1] - 4:7
**projector** [1] - 225:7
**promised** [2] - 160:4, 161:6
**promises** [1] - 160:3
**pronounce** [1] - 73:17
**proper** [1] - 251:8
**properly** [3] - 38:8, 247:3, 247:4
**proposal** [1] - 213:7
**propose** [1] - 250:10
**proposed** [5] - 116:14, 209:13, 245:7, 249:17, 253:11
**proposition** [1] - 48:23
**prosecuted** [2] - 144:1, 159:3
**prosecution** [1] - 160:18
**prosecutors** [3] - 71:20, 97:25, 155:19
**protect** [1] - 105:17
**Protection** [2] - 152:19, 241:10
**prove** [1] - 149:13
**proven** [1] - 149:5
**provide** [9] - 34:23, 41:18, 54:21, 55:20, 67:16, 82:14, 91:12, 155:14, 156:18
**provided** [9] - 54:24, 55:7, 55:15, 59:18, 60:23, 66:7, 72:1, 110:4, 117:5
**provides** [4] - 157:6, 157:8, 157:9, 158:6
**providing** [4] - 42:4, 69:23, 70:3, 156:25
**provision** [2] - 141:4, 159:8
**provisions** [2] - 159:21, 160:7
**Pulaski** [10] - 139:22, 139:25, 140:4, 141:6, 170:24, 177:20, 195:24, 196:2, 196:3, 196:4
**pull** [1] - 24:24
**pulled** [1] - 212:24
**purchase** [2] - 122:16, 122:19, 126:4
**purchased** [1] - 176:1
**purchasing** [1] - 110:5
**purportedly** [4] - 42:10, 57:20, 66:24, 148:15
**purpose** [5] - 204:24, 205:3, 205:8, 231:18, 231:20
**purposes** [1] - 202:18

**pursuant** [5] - 158:21, 158:23, 159:11, 160:25, 161:1
**push** [1] - 27:10
**pushed** [1] - 84:8
**put** [39] - 4:22, 5:20, 5:22, 25:1, 25:23, 30:15, 44:7, 52:6, 54:4, 62:13, 63:14, 75:24, 87:15, 88:10, 95:20, 107:9, 110:10, 117:24, 128:12, 148:13, 156:22, 198:12, 199:15, 205:17, 219:15, 225:7, 228:10, 228:17, 233:1, 233:21, 235:9, 237:16, 237:19, 238:1, 249:2, 249:5, 249:10, 252:24, 253:5
**Put** [3] - 38:8, 54:5, 219:7
**putting** [3] - 237:11, 237:12, 252:20
**PYNE** [41] - 243:19, 244:1, 244:16, 244:22, 245:1, 245:8, 245:11, 245:16, 245:25, 246:3, 246:8, 246:12, 246:18, 247:1, 247:5, 247:14, 247:17, 248:10, 248:13, 248:20, 249:4, 249:8, 249:10, 250:3, 250:9, 250:17, 250:22, 250:24, 251:3, 251:6, 251:10, 251:19, 251:22, 252:5, 252:8, 252:11, 252:17, 252:23, 253:1, 253:8, 253:13
**Pyne** [3] - 1:21, 243:16, 251:17

### Q

**quantities** [2] - 175:21, 175:25
**queen** [1] - 110:22
**Queensbury** [1] - 47:8
**questioned** [2] - 51:2, 252:19
**questioning** [1] - 117:3
**questions** [25] - 14:16, 14:18, 15:1, 15:18, 38:8, 52:12, 68:13, 72:11, 73:7, 73:20, 74:6, 75:10, 76:19, 87:16, 100:11, 100:14, 121:9, 136:3, 139:6, 139:11, 146:13, 147:7, 147:12, 156:22, 181:2
**quick** [1] - 228:10
**quickly** [3] - 182:22,

228:6, 234:13
**quid** [1] - 69:25
**quirk** [1] - 72:25
**quite** [4] - 14:19,
196:19, 245:17, 248:10
**Quite** [1] - 247:17
**quo** [1] - 69:25
**quote** [4] - 31:11, 79:7,
113:12, 113:17
**quote-unquote** [1] -
113:12

## R

**rack** [1] - 44:3
**Rahman** [1] - 79:15
**Rahman's** [1] - 98:24
**raid** [1] - 193:21
**raise** [1] - 168:10
**raised** [1] - 94:9
**raising** [1] - 240:2
**ran** [5] - 130:6, 194:22,
197:16, 197:19, 197:25
**Randallstown** [14] -
122:14, 131:6, 140:9,
141:7, 164:4, 183:13,
183:14, 184:23, 184:24,
197:7, 208:11, 223:15,
223:16
**Randallstown/Park** [2]
- 74:18, 75:6
**rap** [7] - 31:14, 96:20,
96:23, 101:23, 102:5,
103:23, 108:19
**rather** [7] - 80:25,
145:6, 228:1, 232:19,
232:21, 235:23, 253:17
**ratified** [1] - 113:19
**rationalize** [1] - 67:22
**Ravens** [1] - 53:19
**re** [2] - 41:11, 73:1
**re-incarceration** [2] -
41:11, 73:1
**reach** [1] - 214:13
**read** [9] - 23:2, 23:4,
70:18, 70:22, 87:15,
94:15, 118:21, 155:10,
253:1
**ready** [6] - 6:5, 6:7,
85:23, 114:6, 151:11,
204:21
**reaffirming** [1] - 112:16
**real** [10] - 17:7, 47:4,
47:5, 123:10, 130:17,
182:22, 191:21, 208:21,
211:18, 247:22
**realize** [1] - 248:10
**really** [15] - 28:18, 29:5,
57:9, 60:7, 66:1, 127:18,

128:24, 131:4, 143:21,
145:19, 148:25, 215:23,
216:15, 229:18, 241:5
**reason** [18] - 29:19,
29:25, 69:17, 92:6,
119:24, 125:24, 142:13,
144:18, 145:4, 145:8,
145:9, 145:10, 145:12,
213:1, 234:10, 240:24,
241:24, 242:18
**reasonable** [2] - 111:5,
229:7
**reasons** [13] - 2:18,
91:18, 91:19, 92:3, 92:4,
105:16, 105:19, 107:15,
113:22, 148:5
**rec** [3] - 53:5, 53:6,
53:10
**receipt** [1] - 126:5
**receipts** [1] - 142:25
**receive** [5] - 3:19,
159:10, 159:14, 244:17,
244:24
**Received** [1] - 24:8
**received** [5] - 2:5,
66:24, 109:12, 111:17,
117:23
**receives** [1] - 3:1
**receptacle** [2] - 174:10,
174:18
**recess** [15] - 2:20, 84:8,
84:14, 84:18, 84:19,
84:25, 85:1, 112:8,
112:10, 203:16, 203:20,
232:2, 239:1, 254:4
**Recess** [3] - 85:13,
112:11, 203:22
**recognize** [7] - 153:9,
153:17, 166:21, 166:23,
182:16, 225:14, 226:2
**recollection** [8] - 46:11,
115:16, 115:17, 137:19,
246:17, 246:22, 247:24,
247:25
**recommend** [2] -
159:14, 160:11
**recommendation** [2] -
159:9, 159:18
**record** [26] - 2:18, 4:23,
18:15, 25:4, 81:20,
111:24, 112:17, 114:21,
120:22, 122:4, 143:1,
149:17, 150:13, 151:20,
157:11, 162:14, 163:11,
237:5, 237:11, 237:16,
240:8, 241:16, 243:2,
243:18, 244:9, 244:12
**recorded** [4] - 18:16,
23:12, 80:6, 82:8,
127:15, 215:22, 216:7,

252:4, 256:3
**recorder** [4] - 10:12,
69:6, 80:8, 82:6
**recorders** [2] - 13:15,
13:16
**recording** [12] - 7:7,
7:11, 18:7, 21:17, 81:22,
87:9, 87:11, 87:13, 98:7,
98:11, 110:14, 216:21
**recordings** [4] - 21:20,
46:15, 72:2, 86:22
**recovery** [1] - 238:9
**RECROSS** [4] - 100:12,
108:17, 255:9, 255:10
**recross** [1] - 85:17
**recruit** [2] - 113:10,
113:11
**red** [4] - 32:10, 94:9,
167:5, 167:9
**redacted** [5] - 251:15,
251:20, 251:21, 251:24,
252:1
**REDIRECT** [2] - 76:22,
255:8
**Redirect** [2] - 73:8,
76:21
**redirect** [1] - 236:15
**reduce** [1] - 81:16
**reduction** [1] - 68:25
**refer** [1] - 4:4
**reference** [3] - 40:24,
142:16, 243:25
**referenced** [1] - 108:19
**references** [4] - 243:23,
244:4, 245:4, 251:13
**referred** [2] - 249:12,
252:17
**referring** [8] - 78:7,
115:21, 115:23, 119:6,
144:22, 175:14, 222:7,
241:20
**reflect** [6] - 25:4,
111:24, 122:4, 162:14,
163:11, 242:12
**reflection** [1] - 2:20
**refrain** [3] - 62:21,
63:19, 64:3
**refrained** [1] - 56:10
**refraining** [1] - 41:20
**refusal** [2] - 2:24, 3:14
**refusing** [1] - 3:12
**regard** [1] - 240:14
**regarded** [1] - 192:19
**regarding** [8] - 2:5,
71:1, 89:11, 108:24,
116:13, 116:14, 159:9,
196:24
**regards** [5] - 243:19,
244:1, 244:24, 247:21,
251:11

**regressing** [1] - 141:18
**regular** [1] - 63:22
**rehab** [2] - 63:6, 63:9
**rejoin** [1] - 120:1
**relates** [2] - 102:16,
102:18
**relationship** [5] - 116:7,
116:10, 211:24, 212:3,
240:10
**relative** [1] - 171:6
**relayed** [2] - 42:9,
148:16
**release** [6] - 62:7,
67:10, 69:12, 69:13,
70:25, 71:21, 97:23,
159:16
**released** [10] - 41:5,
62:9, 62:14, 63:11,
71:16, 71:18, 79:2, 79:4,
98:1
**relevant** [1] - 157:7
**reluctant** [1] - 230:22
**reluctantly** [1] - 229:17
**relying** [1] - 31:1
**remain** [1] - 6:6
**remainder** [1] - 65:4
**remained** [2] - 57:25,
58:2
**remarks** [2] - 244:11,
244:13
**remember** [47] - 6:11,
17:10, 19:21, 19:22,
19:23, 35:24, 55:5, 60:7,
60:15, 60:19, 79:16,
86:14, 91:19, 92:20,
93:14, 94:3, 94:9, 107:3,
126:8, 127:11, 129:1,
129:3, 130:25, 133:24,
143:23, 146:14, 154:17,
169:2, 170:11, 184:10,
186:21, 186:22, 188:2,
188:18, 189:10, 191:18,
221:2, 221:3, 246:5,
246:9, 246:11, 246:14,
248:5, 248:6, 248:7,
248:25
**remembered** [1] - 98:14
**Remove** [1] - 225:9
**remove** [1] - 23:3
**rep** [5] - 46:24, 49:9,
49:12, 50:16, 51:4
**repeat** [4] - 68:21,
68:23, 238:5, 238:6
**Repeat** [1] - 136:23
**Repeated** [1] - 150:23
**repeated** [1] - 94:1
**repeatedly** [1] - 52:11
**Rephrase** [3] - 50:1,
126:21, 134:5
**report** [15] - 9:23, 22:3,

22:11, 23:23, 24:3,
30:13, 41:16, 62:21,
63:17, 107:18, 107:21,
249:3, 249:4, 249:6,
252:20
**reported** [2] - 107:11,
107:21
**Reported** [1] - 1:23
**Reporter** [1] - 256:15
**reporter** [1] - 180:2
**REPORTER'S** [1] -
256:1
**reporting** [3] - 42:4,
97:9, 107:11
**represent** [4] - 22:9,
22:10, 73:20, 138:11
**representation** [2] -
20:17, 46:7
**representations** [1] -
118:13
**representatives** [1] -
154:15
**represented** [2] - 25:11,
25:12
**represents** [1] - 156:21
**reputation** [5] - 40:21,
47:13, 54:1, 113:1, 113:2
**request** [5] - 27:14,
111:18, 150:23, 200:15,
231:1
**requested** [2] - 149:9,
221:5
**require** [3] - 160:23,
241:22, 241:25
**required** [1] - 41:15
**requires** [1] - 238:3
**reside** [2] - 35:4, 35:16
**residing** [2] - 35:10,
130:8
**resolve** [1] - 115:8
**resort** [1] - 39:8
**respect** [6] - 115:15,
151:1, 230:16, 240:13,
240:21, 253:23
**respected** [1] - 3:2
**respectively** [1] - 114:2
**respond** [3] - 3:12,
118:10, 200:15
**responded** [2] - 19:4,
156:21
**responding** [1] - 92:23
**response** [13] - 2:21,
27:8, 27:14, 112:7,
114:7, 114:9, 114:13,
114:15, 114:17, 114:25,
115:1, 147:7, 147:11
**responses** [1] - 14:25
**responsibility** [3] - 3:1,
3:18, 246:4
**responsive** [1] - 149:25

**rest** [3] - 70:15, 79:2, 101:13
**result** [2] - 192:2, 192:16, 216:6
**resulted** [2] - 44:13, 73:1
**resume** [2] - 65:24, 119:18
**resumed** [6] - 66:2, 66:14, 72:13, 72:18, 72:22, 73:4
**Retaliation** [2] - 193:12, 193:13
**retrieved** [1] - 87:25
**returns** [1] - 5:9
**reveal** [1] - 156:9
**reviewed** [2] - 2:5, 115:17
**revolver** [2] - 225:25, 237:22
**RHODES** [17] - 5:8, 5:15, 96:24, 99:8, 99:13, 100:5, 114:7, 114:11, 114:16, 114:19, 114:21, 115:5, 239:21, 241:1, 241:15, 242:19, 243:11
**Rhodes** [3] - 1:17, 114:25, 240:3
**ribs** [1] - 39:17
**RICO** [2] - 149:13, 149:14
**rid** [1] - 131:23
**ride** [7] - 27:21, 28:24, 28:25, 29:4, 29:8, 29:10, 92:2
**rises** [1] - 240:12
**risk** [1] - 4:9
**road** [2] - 166:25, 167:1
**roar** [1] - 25:7
**rob** [25] - 27:14, 28:17, 76:11, 76:17, 89:18, 90:12, 119:11, 123:20, 128:16, 133:5, 136:13, 202:14, 206:25, 207:2, 207:15, 207:16, 213:4, 213:6, 213:11, 213:22, 213:25, 214:9, 220:17, 221:8
**robbed** [5] - 89:13, 89:21, 187:1, 188:9, 188:16
**robberies** [10] - 121:13, 122:22, 124:6, 124:18, 136:14, 185:20, 185:23, 188:5, 188:20, 189:4
**robbery** [54] - 26:23, 27:4, 28:23, 90:20, 90:21, 91:7, 91:17, 91:25, 113:6, 119:9, 119:10, 119:18, 123:3,

123:6, 123:7, 123:15, 123:16, 123:20, 123:25, 124:4, 124:16, 126:18, 128:10, 130:24, 134:18, 136:24, 138:15, 138:21, 141:25, 145:16, 147:8, 147:21, 152:18, 186:20, 186:21, 187:6, 188:2, 189:7, 193:21, 195:11, 195:15, 196:25, 197:10, 198:20, 202:16, 203:12, 217:4, 218:11, 218:20, 219:3, 219:13, 220:5, 221:13, 223:19
**robbery/murder** [1] - 127:14
**robbing** [17] - 22:1, 22:12, 22:21, 23:9, 23:16, 75:20, 75:23, 76:6, 91:10, 106:20, 195:7, 195:8, 196:25, 198:3, 198:4, 198:7
**Robert** [1] - 1:16
**Robinson** [1] - 107:7
**role** [1] - 63:23
**rolled** [2] - 130:16, 189:20
**room** [1] - 190:6
**Room** [1] - 1:24
**roughly** [2] - 80:9, 152:15
**Roughly** [2] - 43:4, 47:24
**RPR** [1] - 1:24
**rub** [1] - 39:10
**rubber** [1] - 225:3
**Rule** [1] - 252:3
**rule** [2] - 113:25, 118:15
**ruled** [4] - 114:14, 118:18, 239:5, 245:18
**ruling** [27] - 2:6, 2:7, 2:17, 4:15, 4:21, 112:13, 114:10, 114:14, 114:19, 114:20, 115:1, 115:3, 116:11, 116:12, 116:20, 118:5, 118:20, 150:17, 230:14, 234:4, 236:3, 240:5, 246:3, 246:4, 247:21, 247:22
**rulings** [1] - 3:20
**run** [4] - 156:20, 159:25, 180:16, 194:1
**runs** [4] - 139:22, 139:25, 141:6, 180:16

---

**S**

**S-41** [3] - 225:6, 225:7, 225:14

**S-42** [2] - 225:6, 226:2
**S-59** [1] - 165:23
**S-60** [1] - 208:23
**sadly** [1] - 48:14
**safe** [2] - 173:10, 225:11
**safety** [1] - 82:15
**Sakellaris** [3] - 153:12, 154:6, 156:5
**salesmanship** [1] - 50:4
**salient** [2] - 55:15, 55:20
**sample** [2] - 107:13, 107:16
**samples** [2] - 41:18, 107:9
**sarcasm** [2] - 120:11, 242:12
**sat** [6] - 5:15, 10:24, 17:16, 69:4, 139:5, 139:10
**satisfaction** [1] - 159:13
**satisfied** [4] - 148:3, 148:4, 148:6, 149:17
**satisfy** [1] - 109:23
**Savoy** [3] - 183:15, 183:16, 183:20
**saw** [17] - 9:25, 13:10, 20:11, 29:21, 69:2, 80:4, 128:21, 130:7, 137:16, 138:1, 154:23, 187:17, 213:19, 243:8, 253:4
**scene** [2] - 253:18, 253:22
**schedule** [1] - 242:4
**scheduled** [1] - 28:3
**scheduling** [3] - 28:13, 229:12, 236:4
**scheme** [9] - 119:10, 120:2, 121:12, 123:3, 123:6, 123:7, 123:15, 123:16, 126:18
**schemes** [1] - 119:18
**School** [3] - 164:1, 164:24, 165:6
**school** [8] - 152:5, 152:7, 162:2, 162:6, 163:19, 163:21, 164:21
**schools** [2] - 162:4, 162:17
**Scoot** [1] - 151:19
**Scotts** [4] - 162:5, 163:20, 164:1, 164:14
**screen** [10] - 5:11, 83:8, 87:15, 87:18, 110:10, 142:19, 153:4, 167:7, 171:3, 209:1
**screens** [1] - 5:9
**screw** [1] - 242:4

**sealed** [1] - 111:14
**seat** [4] - 200:9, 200:11, 218:13, 248:2
**seated** [3] - 120:21, 151:5, 151:19
**Second** [1] - 63:4
**second** [13] - 18:14, 53:24, 59:11, 69:15, 70:23, 71:11, 76:5, 76:19, 83:13, 97:15, 147:18, 157:21, 249:12
**seconds** [2] - 235:19, 253:16
**Secreted** [1] - 250:22
**secrets** [1] - 233:4
**see** [61] - 5:9, 9:6, 9:9, 12:6, 13:8, 25:24, 29:23, 30:8, 53:5, 70:19, 70:21, 79:25, 85:20, 87:20, 88:8, 88:12, 118:4, 120:17, 128:14, 128:20, 129:11, 130:3, 132:1, 140:17, 140:25, 141:5, 142:18, 142:19, 144:24, 145:2, 153:4, 154:11, 155:19, 155:20, 157:23, 158:11, 158:18, 160:20, 162:9, 163:7, 164:9, 167:3, 167:6, 167:7, 180:21, 183:1, 198:1, 198:6, 198:9, 198:15, 208:25, 209:4, 209:13, 223:12, 224:9, 228:19, 230:8, 237:23, 243:11, 248:2
**See** [1] - 240:7
**seeing** [1] - 137:13
**seeking** [1] - 113:1
**seem** [4] - 96:17, 109:8, 118:6, 131:18
**segment** [1] - 229:1
**sell** [16] - 76:1, 166:12, 168:9, 170:23, 177:17, 177:25, 178:4, 178:7, 178:9, 178:22, 181:8, 183:3, 185:7, 185:10, 185:13
**Selling** [4] - 93:2, 93:3, 192:14, 206:17
**selling** [23] - 43:24, 65:21, 76:3, 76:6, 135:10, 135:17, 135:21, 166:18, 167:11, 168:22, 170:19, 170:22, 177:15, 178:2, 178:6, 181:13, 181:16, 181:18, 206:5, 206:13, 206:21, 212:13, 213:12
**sense** [5] - 184:17, 207:9, 212:10, 242:7,

252:3
**sent** [6] - 6:24, 7:20, 8:7, 8:17, 36:12, 78:25
**sentence** [31] - 42:17, 42:20, 57:6, 62:9, 62:13, 66:11, 66:12, 68:20, 68:25, 69:3, 69:14, 69:17, 70:23, 71:14, 78:19, 78:22, 78:24, 79:1, 99:22, 100:21, 101:13, 101:17, 159:10, 159:14, 160:12, 160:13, 161:4, 161:6, 161:14, 161:22, 239:8
**sentenced** [3] - 2:9, 3:22, 78:20
**sentencing** [2] - 158:15, 159:9
**sentiment** [1] - 67:16
**separate** [5] - 43:13, 43:14, 56:1, 56:22, 253:15
**separately** [1] - 253:8
**September** [4] - 59:13, 97:14, 139:18, 140:21
**sequences** [1] - 15:2
**serenading** [1] - 101:23
**Sergeant** [3] - 243:20, 247:10, 247:18
**sergeant** [1] - 247:11
**series** [1] - 68:13
**serious** [2] - 89:14, 248:6
**serve** [1] - 235:5
**serving** [6] - 42:17, 62:10, 66:10, 99:22, 100:21, 101:13
**session** [5] - 19:7, 19:9, 117:2, 143:22, 227:18
**sessions** [1] - 156:23
**set** [11] - 21:7, 26:23, 28:23, 88:13, 89:13, 113:10, 113:11, 116:1, 159:12, 202:16
**setting** [2] - 21:15, 94:6
**setup** [1] - 9:11
**seven** [1] - 234:24
**Several** [1] - 34:20
**several** [10] - 34:21, 58:2, 58:6, 77:2, 78:18, 83:8, 139:2, 177:16, 229:15, 235:7
**severance** [2] - 150:21, 150:23
**shaft** [1] - 241:5
**shall** [4] - 4:15, 156:24, 157:18, 159:10
**share** [2] - 240:11
**SHAWN** [1] - 1:8
**Shawn** [8] - 73:20,

121:12, 121:23, 124:10, 163:5, 163:11, 163:14, 163:19

**Sheistyville** [4] - 74:23, 75:2, 75:15, 75:25

**Shell** [6] - 129:7, 130:6, 130:18, 194:5, 194:15, 196:24

**Shelly** [16] - 121:11, 121:19, 138:11, 162:7, 162:15, 162:17, 162:23, 163:16, 168:24, 169:10, 169:18, 171:15, 174:13, 174:25, 183:11, 194:1

**SHELLY** [1] - 1:8

**Shelton** [17] - 69:18, 71:15, 71:16, 87:22, 87:24, 89:12, 89:15, 90:19, 91:17, 92:2, 94:16, 96:4, 96:9, 96:11, 96:13, 96:15

**SHELTON** [1] - 1:7

**shield** [1] - 3:20

**shirt** [7] - 121:22, 122:1, 122:3, 162:13, 163:10, 164:12, 237:22

**shit** [4] - 19:12, 19:15, 31:12, 87:25

**shook** [1] - 94:18

**shooting** [7] - 190:7, 190:11, 190:12, 192:16, 192:24, 209:12, 229:21

**Shooting** [1] - 190:15

**Shopping** [11] - 146:21, 146:23, 179:13, 179:17, 179:21, 180:20, 184:3, 185:15, 194:17, 194:18, 194:19

**shopping** [1] - 184:2

**Shores** [1] - 112:19

**shorted** [1] - 251:2

**shorten** [1] - 78:24

**shortening** [1] - 78:22

**shorting** [1] - 239:20

**shortly** [3] - 119:4, 125:13, 247:18

**shot** [14] - 60:6, 60:11, 166:23, 189:13, 189:15, 189:17, 189:18, 189:19, 189:20, 190:2, 190:16, 191:25, 192:18, 192:19

**show** [22] - 4:1, 4:19, 15:16, 22:3, 22:8, 65:7, 116:17, 140:19, 153:16, 163:25, 166:20, 182:11, 196:21, 208:23, 226:2, 228:25, 238:10, 239:11, 249:6, 251:8, 253:22, 253:25

**show-up** [1] - 238:10

**showed** [6] - 61:10, 78:2, 78:15, 88:9, 214:14, 223:20

**showing** [3] - 141:16, 165:4, 165:23

**shown** [1] - 15:6

**sic** [1] - 156:6

**sic)** [1] - 213:8

**Side** [9] - 65:12, 65:16, 66:5, 179:13, 179:17, 179:21, 180:20, 184:3, 185:15

**side** [5] - 48:3, 53:5, 54:11, 56:18, 112:18

**sign** [2] - 70:24, 235:9

**signal** [2] - 86:4, 86:11

**signature** [4] - 153:19, 153:25, 155:25, 256:10

**signatures** [2] - 153:7, 156:3

**signed** [6] - 154:5, 154:10, 154:13, 155:18, 155:22, 156:8

**significant** [5] - 113:20, 232:6, 233:12, 234:22, 241:9

**significantly** [1] - 241:7

**Similar** [1] - 67:9

**similar** [1] - 67:17

**simplest** [1] - 120:4

**simply** [8] - 4:3, 15:22, 114:14, 120:16, 139:5, 155:9, 240:11, 241:12

**single** [2] - 18:15, 172:20

**singular** [1] - 238:16

**sister** [2] - 13:11, 13:21

**sit** [7] - 5:16, 18:5, 36:3, 45:15, 66:10, 130:18, 236:14

**sitting** [6] - 18:10, 25:5, 111:13, 146:15, 224:21, 248:4

**situation** [1] - 6:4

**six** [5] - 43:11, 46:6, 46:10, 46:11, 46:17

**Six** [5] - 162:24, 252:13, 252:15, 252:18, 252:22

**skipping** [1] - 59:17

**slides** [1] - 20:9

**Slow** [4] - 12:24, 13:1, 13:4, 14:1

**slow** [1] - 145:19

**Slow's** [4] - 13:11, 13:21, 30:8, 30:16

**smiled** [1] - 94:18

**Smith** [8] - 192:5, 192:6, 192:12, 229:25, 230:13, 232:5, 233:13, 235:15

**Smokey** [3] - 191:19, 192:17, 192:20

**Snitching** [1] - 228:24

**so-called** [1] - 32:17

**social** [1] - 64:14

**society** [1] - 44:6

**soft** [1] - 17:18

**Sold** [1] - 178:16

**sold** [18] - 40:1, 96:5, 167:4, 168:17, 178:19, 179:8, 179:14, 181:4, 183:12, 183:13, 183:23, 184:3, 184:4, 184:5, 184:7, 184:24, 185:3

**sole** [1] - 159:17

**solution** [1] - 72:15

**solves** [1] - 241:5

**someone** [9] - 19:2, 40:13, 50:3, 50:4, 54:24, 58:20, 90:12, 102:14, 104:1

**Someone** [1] - 19:12

**sometime** [5] - 35:8, 116:6, 118:20, 144:10, 165:1

**sometimes** [13] - 11:12, 12:4, 12:8, 14:19, 14:20, 14:21, 15:19, 44:2, 73:19, 171:20, 172:6, 172:23, 178:8

**Sometimes** [5] - 12:10, 14:21, 58:22, 140:25, 181:17

**somewhat** [1] - 125:3, 125:8

**somewhere** [4] - 22:6, 173:18, 180:25, 204:14

**songs** [4] - 96:20, 96:23, 101:23, 103:23

**soon** [3] - 57:13, 219:18, 248:23

**Sorry** [3] - 79:23, 194:15, 198:22

**sorry** [29] - 7:25, 12:20, 21:9, 27:11, 55:17, 58:25, 98:17, 102:4, 104:18, 117:8, 117:17, 117:21, 128:11, 130:20, 133:1, 140:17, 142:18, 143:3, 150:7, 161:1, 186:6, 196:4, 225:9, 236:16, 240:2, 241:12, 248:12, 253:17

**Sort** [1] - 18:25

**sort** [17] - 4:10, 5:12, 33:20, 53:8, 53:18, 63:8, 67:11, 76:7, 78:10, 80:11, 145:15, 158:24, 202:16, 227:13, 238:19, 239:16, 252:3

**sorts** [1] - 158:16

**sound** [6] - 25:6, 32:20, 120:8, 133:9, 249:1, 249:2

**sounds** [4] - 41:2, 42:3, 62:23, 229:6

**Sounds** [2] - 72:10

**source** [2] - 244:2, 244:5

**South** [20] - 35:11, 35:25, 65:12, 66:5, 67:11, 72:14, 77:2, 77:16, 96:6, 104:7, 104:8, 104:11, 104:16, 104:23, 179:12, 179:23, 183:13, 188:9, 188:16

**southeast** [1] - 195:25

**Southern** [1] - 71:2

**Southwest** [10] - 35:18, 171:11, 180:13, 180:25, 182:9, 183:23, 184:1, 184:22, 184:25, 185:1

**southwest** [1] - 171:10

**speaking** [1] - 180:3

**speaks** [5] - 17:7, 17:10, 17:15, 17:18, 20:22

**special** [2] - 3:18, 173:23

**specific** [3] - 90:12, 138:20, 186:3

**specifically** [9] - 4:18, 9:14, 86:3, 114:12, 119:6, 181:16, 224:3, 245:4, 245:18

**Specifically** [2] - 113:15, 121:15

**specifics** [1] - 41:3

**spectators** [1] - 111:16

**speculate** [1] - 4:5

**speculation** [2] - 4:16, 169:16

**spell** [3] - 120:22, 148:4, 151:20

**spelled** [1] - 157:17

**Spence** [19] - 2:9, 4:20, 119:12, 124:16, 136:24, 141:25, 147:16, 147:19, 147:22, 202:7, 202:10, 202:12, 202:14, 203:12, 207:3, 221:22, 223:19, 239:12, 253:23

**Spence's** [1] - 212:3

**spent** [8] - 21:9, 40:24, 44:22, 44:25, 45:7, 45:16, 46:2, 231:5

**spill** [1] - 48:2

**split** [2] - 221:10, 233:8

**spoken** [1] - 19:1

**Sports** [1] - 58:19

**spot** [5] - 131:5, 167:7, 174:13, 174:17, 208:5

**spots** [2] - 167:6, 171:1

**spreading** [1] - 49:12

**spreads** [1] - 61:22

**staff** [1] - 112:4

**stand** [9] - 110:1, 112:8, 120:18, 151:5, 151:15, 167:3, 167:5, 180:4, 228:10

**standing** [1] - 228:8

**Standing** [1] - 54:11

**stands** [1] - 236:15

**start** [10] - 11:13, 64:14, 76:7, 79:25, 109:23, 227:16, 229:5, 232:19, 241:17, 242:6

**start-up** [1] - 76:7

**started** [16] - 28:15, 79:17, 98:5, 98:7, 98:11, 98:19, 109:20, 109:22, 166:3, 168:22, 170:19, 170:22, 172:10, 177:15, 190:12, 200:20

**starting** [1] - 123:1, 166:11

**state** [23] - 4:17, 4:19, 66:4, 78:20, 97:25, 152:17, 154:6, 155:1, 156:13, 156:22, 156:24, 159:3, 160:19, 161:10, 205:12, 231:7, 236:21, 236:22, 237:20, 237:25, 238:12, 238:13, 241:10

**State** [13] - 42:14, 120:22, 151:20, 156:19, 158:13, 158:23, 159:9, 159:13, 159:16, 160:8, 160:11, 160:12

**State's** [2] - 117:4, 143:22

**statement** [46] - 18:16, 34:8, 89:10, 115:21, 115:23, 115:24, 116:4, 116:6, 116:18, 139:11, 139:21, 216:7, 216:8, 216:9, 243:20, 243:23, 244:1, 244:4, 244:25, 245:1, 245:2, 245:3, 245:19, 245:20, 245:23, 246:5, 246:11, 246:23, 246:25, 247:21, 247:23, 248:9, 248:14, 248:22, 249:3, 249:10, 250:25, 251:3, 251:11, 251:14, 251:25, 252:3, 252:5, 252:6

**statements** [39] - 14:15, 16:14, 83:5, 83:6, 87:6, 87:13, 87:14, 88:14,

97:4, 112:14, 113:3,
113:13, 113:20, 113:25,
114:1, 115:19, 116:14,
116:23, 117:14, 118:16,
119:4, 119:7, 120:8,
136:10, 139:2, 139:5,
139:9, 148:13, 148:15,
151:2, 160:4, 234:24,
243:21, 243:22, 244:18,
244:24, 250:11, 250:17
**States** [2] - 151:14,
156:25
**STATES** [2] - 1:1, 1:5
**Station** [3] - 27:9,
27:16, 174:2
**station** [12] - 129:7,
130:7, 130:18, 146:17,
146:20, 174:3, 190:8,
190:9, 194:5, 194:15,
196:24, 247:9
**stay** [6] - 42:6, 65:2,
69:24, 193:22, 204:18,
240:8
**stayed** [2] - 101:1,
187:25
**staying** [1] - 194:6
**stealing** [2] - 43:24,
109:4
**Steel** [1] - 56:18
**stenographically** [1] -
256:4
**Stewart** [3] - 192:9,
192:10, 192:12
**stick** [1] - 92:14
**Still** [3] - 130:10, 196:1,
196:2
**still** [24] - 31:10, 31:17,
43:15, 46:23, 47:16,
56:8, 56:14, 62:12,
62:15, 66:5, 71:15,
101:11, 123:3, 129:19,
130:9, 133:5, 154:25,
190:5, 194:8, 206:2,
206:5, 206:9, 223:8,
227:19
**stint** [1] - 194:9
**Stocksdale** [6] - 117:4,
143:23, 143:25, 144:12,
144:17, 144:21
**Stockton** [1] - 77:14
**stole** [1] - 150:10
**stop** [5] - 213:3, 243:21,
246:16, 248:1
**Stop** [1] - 228:24
**stopped** [2] - 107:11,
178:6
**store** [4] - 182:4,
182:18, 183:3, 183:6
**stories** [3] - 186:1,
186:4, 186:13

**story** [4] - 32:1, 55:20,
126:14, 217:14
**Stover** [1] - 77:14
**straight** [1] - 179:25
**strange** [1] - 96:12
**strategic** [3] - 230:17,
237:16, 238:6
**Street** [1] - 1:25
**street** [12] - 34:4, 44:23,
45:7, 45:16, 46:3, 49:17,
58:8, 58:20, 71:16,
178:11, 180:23, 208:5
**stricken** [1] - 244:12
**strike** [11] - 11:13, 74:5,
115:5, 115:6, 169:14,
186:2, 186:11, 249:19,
249:20, 250:6, 250:7
**Strike** [1] - 115:12
**strips** [1] - 225:11
**strongly** [1] - 116:15
**stuck** [4] - 60:8, 95:3,
95:22, 103:25
**studio** [1] - 102:21
**stuff** [10] - 93:14, 102:5,
102:8, 102:22, 118:1,
126:1, 135:6, 190:6,
208:17, 238:9
**stupid** [2] - 8:10, 131:18
**style** [1] - 242:14
**sub** [3] - 148:24, 149:1,
149:15
**sub-conspiracies** [2] -
148:24, 149:15
**sub-conspiracy** [1] -
149:1
**subconsciously** [1] -
95:20
**subject** [1] - 160:18
**submit** [5] - 148:9,
245:6, 249:16, 253:11,
253:12
**Submit** [1] - 252:2
**submits** [1] - 235:16
**submitted** [1] - 117:1
**Subparagraph** [1] -
160:20
**subpoena** [1] - 238:14
**subpoenaed** [4] -
236:24, 236:25, 237:2,
237:3
**subsequent** [3] - 131:7,
146:25, 148:5
**Subsequently** [2] -
132:25, 133:1
**subset** [2] - 149:14,
149:21
**subsidiary** [1] - 114:3
**substantial** [1] - 124:18
**subsumed** [1] - 247:21
**subway** [1] - 26:8

**success** [2] - 41:8, 42:3
**successful** [2] - 17:5,
17:13
**sudden** [5] - 231:11,
243:3, 243:4, 243:7
**sufficient** [3] - 244:10,
250:3, 250:5
**suggest** [3] - 30:13,
108:25, 241:19
**suggesting** [1] - 232:8
**suggestion** [1] - 237:9
**suggestions** [2] - 6:25,
7:4
**suggests** [1] - 118:18
**summarize** [2] - 155:11,
155:12
**summarizing** [1] - 51:5
**Sunday** [1] - 118:10
**supervised** [1] - 159:16
**supplied** [1] - 167:11
**supply** [4] - 71:1,
167:16, 177:21, 181:20
**supplying** [3] - 140:1,
140:3, 140:4
**support** [2] - 112:4,
116:22
**supporting** [1] - 65:13
**suppose** [1] - 187:6
**supposed** [10] - 101:16,
126:4, 126:18, 127:13,
135:5, 140:8, 140:13,
141:6, 142:23, 235:5
**supposedly** [3] -
141:24, 148:16
**suppress** [1] - 248:9
**suppression** [2] -
118:24, 242:2
**Surely** [1] - 237:2
**surprise** [2] - 134:22,
134:24
**surveil** [4] - 92:14,
105:20, 106:3, 106:5
**surveillance** [3] - 92:10,
105:16, 124:19
**surveillances** [1] -
225:19
**surveilled** [5] - 12:1,
12:2, 12:3, 19:25, 29:24
**surveilling** [3] - 9:25,
10:19, 81:25
**suspended** [1] - 159:15
**suspicious** [1] - 198:14
**Sustained** [19] - 23:7,
23:22, 37:16, 38:6,
44:20, 54:15, 58:14,
62:4, 67:25, 70:17,
72:17, 73:3, 73:6, 99:14,
110:21, 110:25, 145:24,
175:24, 217:21
**sustained** [2] - 24:1,

72:8
**sworn** [3] - 120:18,
151:5, 151:15
**SWORN** [1] - 120:19,
151:17
**syllable** [1] - 73:19
**sync** [1] - 5:24
**system** [1] - 25:7

## T

**T-shirt** [1] - 237:22
**table** [1] - 25:5
**tactic** [1] - 2:25
**talkie** [1] - 224:22
**talkies** [2] - 224:23,
225:3
**tall** [1] - 36:23
**Tape** [1] - 24:20, 31:3
**tape** [29] - 5:19, 5:20,
10:10, 10:12, 11:17,
11:21, 17:9, 17:12,
17:19, 17:22, 18:4,
18:18, 18:20, 19:18,
19:21, 20:13, 20:17,
23:14, 23:15, 24:6,
24:17, 24:22, 28:17,
31:5, 69:6, 80:6, 80:8,
225:3, 242:16
**taped** [7] - 16:20, 22:14,
23:25, 25:12, 32:15,
92:15, 139:11
**tapes** [7] - 16:21, 16:25,
17:4, 17:6, 17:17, 18:4,
24:17
**taping** [3] - 7:7, 19:7,
107:1
**target** [5] - 123:7,
128:9, 187:18, 220:10,
220:22
**task** [1] - 38:9
**tech** [1] - 235:8
**technical** [3] - 238:9,
239:11, 239:16
**technology** [1] - 72:9
**teeth** [2] - 60:19, 95:14
**telephone** [11] - 18:3,
21:1, 22:14, 23:11,
24:17, 25:13, 31:5,
88:18, 89:2, 211:8, 216:4
**Telephone** [1] - 24:8
**ten** [9] - 36:24, 38:14,
40:11, 43:18, 85:9,
111:25, 158:10, 235:19
**term** [3] - 123:16, 138:3,
160:14
**terms** [6] - 109:12,
156:19, 159:12, 160:16,
229:12, 251:13

**terrible** [1] - 237:24
**Terry** [3] - 157:20,
159:4, 205:11
**test** [1] - 7:19
**testified** [26] - 4:2, 4:8,
19:4, 32:19, 32:21,
32:22, 33:3, 33:7, 74:4,
74:5, 80:18, 81:19,
90:18, 94:24, 98:3,
98:13, 99:15, 105:16,
106:8, 106:25, 145:6,
243:20, 245:19, 247:11,
247:18, 248:14
**testifies** [2] - 229:21,
234:15
**testify** [11] - 3:16, 3:17,
157:14, 230:9, 230:20,
231:11, 232:14, 233:20,
236:22, 239:15
**testifying** [6] - 81:15,
99:24, 142:4, 142:5,
142:10, 142:12
**testimony** [35] - 23:8,
33:19, 50:13, 50:19,
51:2, 51:6, 52:1, 52:4,
52:9, 52:25, 54:1, 68:17,
69:10, 70:13, 70:15,
71:10, 72:4, 75:3, 75:21,
80:1, 89:1, 90:2, 94:20,
99:16, 111:9, 115:7,
116:13, 116:14, 117:14,
119:1, 141:13, 147:6,
148:6, 150:18, 186:13,
205:13, 224:17, 228:17,
229:24, 230:19, 232:6,
234:2, 241:8, 241:19,
243:4, 245:2, 247:6,
249:20, 250:6, 250:8
**testing** [1] - 8:6
**TFC** [1] - 6:22
**THE** [396] - 1:1, 1:2, 2:2,
2:17, 4:25, 5:3, 5:7,
5:11, 5:16, 5:22, 5:25,
6:3, 14:16, 16:15, 22:7,
22:18, 23:3, 23:7, 23:22,
24:1, 24:7, 24:10, 24:12,
24:15, 24:18, 24:24,
25:3, 25:10, 25:15,
25:18, 27:10, 27:12,
28:9, 28:11, 28:12,
28:13, 30:25, 31:2,
33:13, 33:14, 36:20,
37:16, 37:23, 38:6, 38:8,
44:20, 46:10, 47:25,
50:1, 50:9, 52:8, 52:11,
52:13, 54:15, 55:16,
58:14, 62:4, 67:25,
70:17, 72:8, 72:10,
72:17, 73:3, 73:6, 73:8,
73:10, 76:21, 80:21,

81:5, 81:10, 82:23,
82:25, 83:3, 83:11,
83:15, 83:17, 83:21,
83:24, 84:1, 84:3, 84:5,
84:8, 84:14, 84:21,
84:23, 85:7, 85:12,
85:14, 85:20, 85:23,
87:19, 87:21, 89:8,
89:25, 96:25, 99:9,
99:14, 100:6, 100:9,
100:15, 104:19, 108:15,
110:21, 110:25, 111:2,
111:12, 111:17, 111:24,
112:8, 112:13, 114:9,
114:13, 114:18, 114:20,
114:25, 115:11, 115:21,
116:3, 116:7, 117:8,
117:11, 117:17, 117:20,
117:25, 118:7, 118:21,
119:6, 120:4, 120:15,
120:20, 120:21, 120:23,
120:25, 121:2, 121:16,
122:6, 122:25, 123:1,
123:14, 123:18, 123:19,
123:20, 123:22, 124:9,
124:10, 124:11, 124:12,
124:13, 125:5, 125:6,
126:16, 126:21, 127:4,
128:11, 128:15, 128:17,
128:24, 129:1, 129:2,
129:3, 129:4, 129:5,
129:6, 129:8, 129:9,
129:10, 129:12, 129:13,
129:15, 129:17, 129:18,
129:19, 129:20, 129:21,
129:22, 129:23, 130:2,
130:12, 130:20, 130:22,
131:16, 131:17, 131:18,
131:19, 131:20, 131:21,
131:23, 131:25, 132:1,
132:3, 132:5, 132:13,
132:18, 133:1, 134:5,
134:17, 134:18, 134:19,
134:20, 134:22, 134:23,
134:24, 134:25, 136:2,
136:5, 136:17, 137:9,
137:11, 138:8, 140:7,
140:17, 140:23, 141:4,
141:16, 141:19, 144:4,
144:7, 145:24, 146:2,
146:10, 146:12, 146:22,
148:3, 148:10, 148:18,
148:22, 149:12, 149:17,
149:23, 150:7, 150:16,
150:21, 150:25, 151:4,
151:9, 151:15, 151:18,
151:19, 151:21, 155:11,
162:16, 163:13, 169:15,
171:13, 171:18, 175:24,
176:4, 176:5, 176:6,
176:7, 176:8, 179:6,

180:4, 181:6, 181:11,
182:13, 184:9, 185:12,
185:18, 186:3, 186:5,
186:6, 186:7, 186:8,
186:9, 186:12, 186:17,
191:2, 197:12, 202:20,
203:14, 203:16, 203:24,
204:1, 204:2, 204:4,
204:5, 204:8, 204:12,
204:15, 204:17, 204:18,
204:21, 205:21, 206:8,
216:19, 217:21, 218:1,
219:1, 219:20, 220:3,
220:19, 225:9, 225:13,
226:22, 227:10, 227:25,
228:5, 228:13, 228:15,
228:19, 228:23, 229:3,
229:10, 230:8, 230:12,
230:21, 231:5, 231:10,
231:15, 231:20, 232:1,
232:7, 232:10, 232:18,
232:25, 233:3, 233:6,
233:10, 233:16, 233:18,
233:22, 233:25, 234:4,
234:7, 234:9, 234:12,
234:16, 234:19, 234:23,
235:14, 235:21, 235:25,
236:7, 236:10, 236:19,
236:24, 237:2, 237:6,
237:17, 237:21, 238:24,
239:4, 239:9, 239:19,
240:1, 240:24, 241:12,
241:16, 242:20, 243:14,
243:25, 244:14, 244:20,
244:25, 245:6, 245:9,
245:12, 245:22, 246:1,
246:4, 246:9, 246:13,
246:15, 246:21, 247:3,
247:13, 247:16, 247:24,
248:12, 248:16, 249:1,
249:5, 249:9, 249:16,
250:5, 250:14, 250:20,
250:23, 250:25, 251:4,
251:7, 251:16, 251:21,
252:2, 252:6, 252:9,
252:12, 252:15, 252:19,
252:24, 253:6, 253:10,
253:14, 253:25, 254:3
**theater** [1] - 135:2
**thefts** [1] - 77:10
**themselves** [1] - 17:8
**thereafter** [2] - 125:13,
247:19
**thereby** [1] - 150:4
**therefore** [2] - 42:6,
150:14
**they've** [1] - 139:11
**They've** [1] - 83:7
**thin** [3] - 68:22, 72:5,
120:11

**thinking** [3] - 57:13,
115:2, 202:9
**third** [1] - 12:17
**Thomas** [1] - 1:20
**thousand** [6] - 142:14,
144:24, 145:2, 145:7,
145:13, 213:18
**threatened** [1] - 82:15
**Three** [4] - 37:5, 122:7,
155:16, 171:1
**three** [35] - 12:7, 24:11,
87:17, 87:22, 87:25,
122:5, 122:16, 122:20,
122:23, 126:9, 126:11,
128:19, 132:16, 153:2,
161:23, 165:1, 172:15,
185:22, 188:5, 200:21,
200:24, 201:1, 201:2,
201:4, 202:23, 203:1,
206:1, 222:10, 226:20,
236:9, 236:10, 236:11,
238:11, 242:11, 243:14
**throughout** [1] - 91:4
**throw** [2] - 15:1, 43:12
**thrown** [1] - 32:10
**thug** [1] - 54:1
**Thursday** [1] - 227:18
**tickets** [5] - 126:4,
135:4, 142:24, 217:5,
217:7
**tide** [1] - 75:25
**tied** [1] - 118:11
**tier** [8] - 33:23, 40:21,
47:6, 48:7, 49:12, 50:21,
50:23, 53:3
**tiers** [2] - 48:9, 48:11
**timely** [1] - 248:18
**title** [1] - 79:17
**today** [23] - 6:5, 33:7,
36:3, 45:15, 45:20,
55:21, 66:10, 68:17,
69:10, 71:10, 80:10,
81:15, 98:4, 98:21,
99:24, 111:6, 119:2,
162:9, 163:7, 164:9,
205:13, 240:14, 243:12
**together** [6] - 27:24,
89:19, 147:13, 176:15,
176:17, 223:12
**Tommy** [5] - 55:14,
55:18, 69:4, 71:2, 71:6
**tomorrow** [12] - 227:16,
227:17, 227:22, 228:1,
232:19, 234:17, 236:5,
236:11, 236:13, 240:25,
242:23, 254:3
**Tonya** [6] - 147:16,
221:22, 222:2, 226:6,
239:12, 253:23
**Tonya's** [1] - 225:19

**took** [31] - 11:10, 20:4,
42:10, 54:5, 68:6, 71:17,
88:3, 104:14, 105:7,
105:8, 113:14, 118:20,
127:20, 144:20, 144:21,
144:23, 144:24, 152:15,
152:17, 222:6, 222:7,
224:25, 225:2, 225:3,
225:18, 226:4, 232:6,
237:25, 243:21, 243:22
**Took** [1] - 20:11
**top** [1] - 52:5
**topic** [2] - 31:10, 80:10
**torn** [1] - 183:18
**total** [1] - 48:6
**touch** [5] - 30:6, 91:3,
94:1, 106:16, 211:2
**tough** [7] - 37:11, 38:3,
40:21, 48:17, 49:2,
50:12, 54:1
**toward** [3] - 98:10,
120:21, 151:20
**towards** [1] - 5:13
**towers** [1] - 235:10
**town** [2] - 179:20,
207:23
**Toyota** [2] - 175:2,
175:3
**traced** [3] - 13:6, 203:7,
203:8
**traditional** [1] - 120:12
**traffic** [3] - 17:24,
196:5, 248:1
**trafficker** [1] - 38:25
**traffickers** [6] - 34:5,
34:15, 38:10, 77:12,
77:16, 77:17
**trafficking** [7] - 49:4,
49:5, 89:5, 135:7, 135:9,
166:7, 182:5
**transcribed** [1] - 256:7
**transcript** [12] - 5:19,
23:19, 24:12, 115:17,
116:11, 118:21, 142:18,
242:11, 245:17, 246:18,
256:7
**transcripts** [1] - 6:1
**transferred** [2] - 56:13,
222:5
**transition** [1] - 75:19
**translate** [1] - 110:13
**transmitter** [5] - 7:13,
81:22, 81:24, 82:14,
86:18
**transportation** [2] -
27:19, 29:9
**transported** [1] -
247:20
**trash** [1] - 20:4
**traveling** [1] - 248:3

**trial** [19] - 3:1, 3:19,
14:19, 25:5, 81:15,
124:12, 149:5, 157:15,
232:24, 233:25, 236:21,
236:23, 237:20, 237:25,
238:11, 242:3, 242:4,
242:8, 243:5
**trick** [1] - 18:23
**tried** [10] - 2:8, 3:21,
4:11, 19:5, 96:10, 96:12,
144:7, 144:8, 238:4,
253:8
**triple** [1] - 56:17
**tripped** [1] - 130:15
**trips** [7] - 173:1, 173:12,
175:21, 176:1, 176:20,
177:5, 225:1
**Trooper** [4] - 245:19,
247:10, 247:14, 248:14
**trooper** [7] - 245:23,
248:2, 248:4, 251:1,
252:9, 252:24, 253:7
**trooper's** [5] - 245:2,
245:14, 249:3, 249:4,
249:6
**trouble** [2] - 71:9, 71:19
**troubling** [1] - 67:21
**true** [5] - 89:4, 139:17,
143:7, 241:12, 241:13
**trump** [1] - 3:2
**truncated** [1] - 238:2
**trust** [1] - 40:5
**truth** [7] - 2:24, 3:3,
33:22, 34:13, 109:3,
160:24, 235:6
**truthful** [1] - 70:14
**truthfully** [2] - 156:21,
157:14
**truthfulness** [1] -
110:17
**try** [13] - 5:10, 27:21,
65:1, 80:15, 87:1, 97:3,
118:14, 121:8, 182:22,
238:13, 242:6, 242:14,
242:20
**Try** [1] - 21:13
**trying** [21] - 7:5, 10:9,
19:12, 19:14, 19:15,
19:19, 21:9, 28:17,
43:12, 82:5, 93:6, 93:9,
130:3, 130:18, 137:18,
148:12, 149:12, 149:25,
220:4, 241:19
**Trying** [1] - 130:20
**Tuesday** [6] - 1:11,
237:10, 238:21, 238:22,
239:24, 240:19
**turn** [6] - 7:21, 10:15,
20:21, 50:4, 157:6,
231:23

**turned** [4] - 10:12, 20:14, 39:2, 110:4
**turning** [2] - 17:12, 86:23
**Turning** [1] - 125:11
**twenty** [1] - 158:2
**Twenty** [1] - 43:6
**twice** [1] - 142:5
**Twice** [1] - 142:7
**twist** [1] - 72:25
**two** [50] - 7:15, 7:16, 8:15, 11:23, 12:7, 12:14, 25:10, 35:20, 35:21, 41:18, 53:15, 54:10, 57:4, 61:2, 61:17, 78:6, 79:19, 81:19, 95:2, 103:19, 116:18, 147:2, 152:17, 162:4, 223:22, 225:6, 228:9, 229:4, 232:14, 233:19, 233:21, 235:17, 236:16, 237:13, 238:1, 238:11, 238:25, 239:15, 240:20, 240:21, 241:1, 241:17, 243:8, 244:4, 245:4, 250:1, 251:16, 253:15
**Two** [7] - 45:9, 62:19, 142:18, 153:7, 154:16, 155:15, 158:2
**type** [3] - 230:15, 238:18, 249:13
**typically** [1] - 44:5
**Tyree** [4] - 192:5, 192:6, 192:10, 192:12
**Tyree's** [1] - 192:8

**U**

**U.S** [5] - 1:24, 112:4, 117:3, 144:11, 155:19
**Ultimately** [1] - 149:23
**ultimately** [2] - 59:3, 149:4
**Um-hum** [9] - 20:8, 27:17, 30:21, 49:10, 53:1, 86:7, 93:4, 95:12, 95:24
**umpteenth** [1] - 151:10
**unable** [1] - 42:6
**unclear** [1] - 74:13
**under** [12] - 3:11, 3:17, 6:6, 45:16, 54:2, 68:17, 120:16, 149:24, 173:25, 174:5, 174:17, 218:12
**Under** [2] - 173:22, 174:1
**undercover** [2] - 86:2, 157:10
**underneath** [1] - 174:10

**understood** [1] - 160:9
**Understood** [1] - 136:9
**undertake** [1] - 38:9
**undertook** [1] - 119:16
**unfair** [3] - 230:18, 237:11, 238:20
**unfortunately** [1] - 110:13
**unimportant** [1] - 53:19
**unintelligible** [2] - 46:15, 72:1
**unique** [1] - 95:9
**uniquely** [1] - 238:16
**United** [2] - 151:13, 156:25
**UNITED** [2] - 1:1, 1:5
**unknown** [1] - 141:8
**unlucky** [1] - 44:14
**unquote** [2] - 31:12, 113:12
**unwise** [2] - 203:1, 203:4
**up** [175] - 12:17, 21:7, 21:15, 22:25, 26:11, 26:12, 26:17, 26:23, 27:10, 28:23, 31:11, 31:21, 32:3, 37:7, 44:17, 52:6, 59:8, 61:10, 61:14, 65:7, 67:11, 69:7, 71:15, 76:7, 76:16, 77:5, 79:1, 80:10, 80:11, 80:25, 81:2, 81:12, 87:8, 88:9, 88:13, 89:13, 90:8, 92:6, 92:12, 92:13, 92:24, 93:20, 94:6, 94:8, 106:20, 110:10, 114:15, 116:1, 117:11, 117:15, 117:21, 118:11, 119:10, 119:14, 121:16, 122:11, 124:22, 124:24, 125:2, 125:8, 125:12, 125:15, 125:25, 127:12, 128:12, 128:14, 129:12, 129:13, 130:15, 130:16, 130:23, 130:25, 132:20, 137:3, 142:18, 149:23, 150:11, 151:6, 151:19, 152:3, 152:22, 154:13, 154:17, 154:18, 154:22, 154:25, 155:3, 160:7, 160:12, 168:14, 171:6, 172:10, 172:11, 172:18, 172:25, 173:5, 175:9, 176:14, 177:11, 179:12, 181:19, 181:20, 181:21, 181:22, 181:25, 182:21, 189:20, 190:13, 190:14, 193:15, 193:20, 193:22, 195:6, 198:25, 200:23, 205:7, 207:6, 207:8, 207:9,

207:11, 207:17, 207:19, 207:21, 208:3, 208:18, 209:5, 209:9, 209:10, 211:9, 211:21, 212:18, 213:7, 214:18, 214:21, 214:22, 214:24, 215:1, 215:3, 215:4, 215:10, 215:18, 215:20, 216:1, 218:5, 219:16, 219:17, 223:1, 223:4, 223:10, 224:9, 226:16, 227:14, 229:18, 229:24, 230:5, 231:2, 233:8, 233:20, 235:9, 236:15, 237:15, 238:10, 240:1, 240:7, 240:19, 242:4, 243:3, 244:2, 248:13, 249:10, 251:1, 252:10, 252:21, 253:2
**upstairs** [1] - 68:22
**urine** [6] - 41:18, 42:4, 107:9, 107:12, 107:13, 107:16
**USA** [1] - 256:4
**user** [1] - 64:15
**usual** [1] - 232:21
**uttered** [1] - 216:21

**V**

**vacate** [1] - 111:14
**value** [1] - 149:6
**variety** [1] - 160:19
**vehicle** [7] - 7:24, 8:1, 52:21, 174:14, 174:18, 175:5, 248:3
**vehicles** [3] - 8:2, 8:4, 12:4
**veracity** [1] - 110:16
**verbally** [1] - 69:1
**vernacular** [1] - 63:8
**version** [2] - 113:14, 238:3
**Vials** [1] - 169:4
**victim** [10] - 54:19, 59:19, 60:11, 60:24, 140:13, 140:15, 141:8, 141:11, 215:21, 216:4
**victims** [2] - 60:1, 218:19
**video** [1] - 229:2
**videotaping** [1] - 13:13
**view** [6] - 32:14, 85:1, 112:16, 234:2, 240:5, 240:13
**violate** [1] - 160:15
**violated** [1] - 109:3
**violates** [1] - 44:6
**Violation** [1] - 154:19

**violation** [7] - 107:3, 119:15, 125:18, 159:22, 160:1, 160:10, 193:21
**violence** [3] - 42:20, 62:10, 157:22
**virtually** [1] - 116:9
**visit** [3] - 189:23, 226:5, 227:14
**voice** [4] - 17:17, 127:15, 151:6, 240:2
**voir** [1] - 242:2
**VOLUME** [1] - 1:11
**vouch** [1] - 109:25
**vouched** [1] - 110:2

**W**

**W-I-L-L-I-A-M** [2] - 120:23, 151:21
**wagon** [4] - 174:2, 174:3, 175:6
**Wait** [4] - 136:5, 244:14, 245:22, 250:20
**wait** [8] - 69:14, 71:13, 87:18, 87:22, 239:25, 245:14, 250:14, 250:20
**waited** [2] - 68:2, 71:15
**waiting** [1] - 224:21
**Walbrook** [2] - 152:9, 152:10
**walked** [4] - 8:25, 9:18, 20:4, 87:22
**walkie** [1] - 224:22, 224:23, 225:3
**walkie-talkie** [1] - 224:22
**walkie-talkies** [2] - 224:23, 225:3
**walking** [2] - 207:22, 211:9
**Wanda** [1] - 161:13
**wants** [2] - 25:7, 70:1
**warrant** [2] - 125:21, 215:7, 215:8
**Washington** [2] - 57:7, 210:5
**watch** [3] - 224:7, 224:10, 224:17
**watched** [2] - 10:3, 10:4
**watching** [3] - 8:18, 8:22, 9:17
**water** [5] - 33:13, 48:1, 120:25, 121:1, 204:16
**waved** [1] - 89:16
**WAYNE** [1] - 1:8
**Wayne** [76] - 121:11, 121:19, 125:24, 126:4, 126:12, 127:16, 127:17, 127:19, 127:20, 129:6,

129:7, 133:3, 134:15, 135:3, 135:4, 140:9, 141:7, 142:3, 142:24, 162:7, 162:15, 162:17, 162:23, 163:16, 163:18, 168:24, 169:10, 169:18, 171:15, 173:6, 174:13, 174:25, 176:19, 177:1, 183:11, 185:15, 185:22, 186:24, 190:1, 190:6, 190:24, 194:1, 196:9, 197:8, 198:21, 198:23, 199:12, 199:15, 200:4, 200:8, 200:18, 202:22, 204:25, 205:17, 205:25, 206:2, 214:20, 214:24, 215:17, 215:20, 215:23, 216:1, 216:13, 217:3, 217:5, 217:13, 217:23, 219:2, 219:9, 219:12, 219:17, 220:4, 220:16, 226:16, 226:19
**Wayne's** [5] - 195:16, 199:1, 200:3, 219:10
**WCI** [5] - 57:6, 57:8, 57:10, 57:15, 57:16, 97:18
**weapon** [7] - 20:4, 20:11, 82:12, 88:2, 88:3, 88:5, 88:10
**wear** [2] - 130:18, 157:11
**Wear** [2] - 130:21, 130:22
**wearing** [8] - 11:23, 20:21, 82:1, 82:10, 82:16, 146:18, 162:12, 237:22
**weather** [1] - 53:19
**weed** [5] - 172:6, 172:7, 186:25, 187:10, 187:12
**Week** [1] - 56:5
**week** [14] - 29:1, 56:7, 56:11, 64:24, 118:11, 178:23, 224:14, 224:16, 227:19, 236:17, 238:11, 239:23, 243:9
**weeks** [6] - 29:3, 56:5, 56:25, 57:4, 147:5, 154:16, 238:1, 242:5
**weigh** [1] - 36:25
**weights** [1] - 37:8
**welcome** [1] - 33:12
**welfare** [1] - 26:20
**well-respected** [1] - 3:2
**West** [1] - 1:25, 171:9, 179:12, 179:17, 179:21, 180:20, 184:3, 185:15, 207:25, 223:8
**west** [3] - 61:17, 196:1,

196:2

**Western** [1] - 77:25
**Westwood** [5] - 182:8, 182:19, 182:23, 182:25, 183:4
**Whaling** [1] - 39:15
**Whereabouts** [7] - 122:13, 177:10, 177:19, 179:11, 183:14, 184:1, 206:11
**whereby** [1] - 220:21
**Whereof** [1] - 256:9
**whip** [1] - 188:25
**whipped** [1] - 189:1
**white** [2] - 195:2, 200:5
**White** [2] - 122:1, 163:10
**Whole** [1] - 176:12
**whole** [14] - 10:17, 28:14, 28:22, 44:3, 80:10, 81:18, 91:4, 100:21, 131:6, 229:2, 241:5, 247:19, 247:22, 247:25
**wife** [6] - 212:1, 212:3, 213:17, 221:16, 222:2
**WILLIAM** [3] - 120:19, 151:17, 255:12
**William** [3] - 120:23, 151:14, 151:21
**Willie** [3] - 122:2, 164:5, 256:4
**WILLIE** [1] - 1:7
**willing** [1] - 70:24
**willingness** [1] - 113:18
**Wiltmore** [2] - 162:20, 194:18
**Winchester** [1] - 169:25
**wind** [2] - 79:1, 205:7
**Winters** [14] - 135:24, 166:15, 166:16, 166:18, 166:22, 167:4, 167:12, 178:11, 178:18, 178:19, 178:23, 180:5, 199:23, 199:24
**wire** [4] - 82:1, 82:10, 82:17, 157:11
**wired** [1] - 12:17
**wires** [2] - 11:24, 20:20
**wish** [1] - 3:25
**withdrawn** [3] - 2:11, 2:14, 2:15
**witness** [50] - 5:10, 5:16, 14:20, 14:21, 14:23, 15:1, 22:9, 22:10, 22:18, 28:7, 46:10, 60:17, 62:6, 63:23, 76:19, 81:5, 84:9, 85:16, 85:18, 112:15, 114:6, 115:14, 118:11, 122:4,

126:21, 127:4, 132:19, 140:19, 146:8, 148:16, 151:12, 155:12, 162:14, 163:11, 228:8, 229:14, 229:15, 229:25, 231:2, 235:6, 235:8, 235:11, 235:16, 237:15, 242:6, 246:19, 252:20
**WITNESS** [46] - 28:11, 28:13, 33:14, 52:13, 120:19, 120:20, 120:23, 121:2, 123:1, 123:18, 123:20, 124:10, 124:12, 125:6, 128:24, 129:2, 129:4, 129:6, 129:9, 129:12, 129:15, 129:18, 129:20, 129:22, 131:17, 131:19, 131:21, 131:25, 132:3, 134:18, 134:20, 134:23, 134:25, 151:17, 151:18, 151:21, 176:5, 176:7, 186:5, 186:7, 186:9, 204:1, 204:4, 204:17, 255:4, 255:12
**Witness** [5] - 84:22, 152:19, 227:24, 241:10, 256:9
**witness'** [6] - 14:25, 15:2, 169:15, 186:12, 231:23, 243:4
**witness's** [1] - 14:17
**witnesses** [25] - 14:24, 16:14, 229:5, 230:14, 230:16, 230:20, 230:23, 231:3, 231:10, 232:14, 234:12, 234:13, 235:18, 235:23, 236:11, 236:13, 237:13, 238:11, 238:21, 238:25, 241:17, 241:23, 241:25, 242:2, 243:10
**woman** [8] - 13:10, 13:21, 42:22, 98:23, 109:6, 229:19, 233:20
**women** [3] - 236:16, 240:21, 243:8
**won** [1] - 79:16
**Wooden** [5] - 243:20, 245:19, 247:10, 247:11, 248:14
**Woodlawn** [2] - 122:14, 194:21
**Woodmoor** [8] - 146:21, 146:23, 162:4, 162:19, 162:21, 162:22, 194:17, 194:19
**Woody** [21] - 18:17, 18:24, 19:2, 32:2, 59:18, 59:25, 60:6, 60:8, 60:9, 60:19, 94:18, 94:21, 95:7, 95:22, 96:4, 96:5,

98:23, 103:25, 104:20, 104:25
**word** [14] - 19:21, 58:8, 67:2, 86:5, 86:6, 86:10, 86:13, 86:14, 86:18, 149:11, 150:1, 171:12, 216:20
**words** [9] - 27:14, 71:10, 92:24, 105:21, 131:23, 150:10, 227:14, 245:13, 248:17
**wore** [1] - 81:19
**works** [1] - 40:6
**World** [1] - 58:12
**worn** [1] - 120:11
**worried** [3] - 218:5, 229:18, 233:13
**worry** [1] - 48:12
**wound** [3] - 154:22, 155:3, 190:7
**Wow** [2] - 38:3, 54:12
**wrap** [2] - 229:24, 230:5
**wrapped** [1] - 229:18
**write** [14] - 15:10, 16:5, 16:18, 59:3, 66:23, 67:14, 67:15, 70:23, 87:6, 102:20, 102:22, 110:22
**writes** [1] - 110:16
**writing** [4] - 87:12, 102:17, 148:9, 148:13
**written** [3] - 14:15, 22:3, 78:7
**wrote** [35] - 14:7, 15:6, 15:13, 15:19, 15:24, 16:8, 22:10, 23:4, 23:23, 25:20, 27:13, 57:16, 57:18, 57:23, 59:11, 61:2, 67:9, 68:9, 68:10, 68:24, 69:7, 69:15, 70:5, 71:10, 78:5, 83:6, 83:14, 87:14, 89:10, 97:8, 97:14, 110:11, 110:13, 243:16, 252:9
**Wyche** [3] - 115:25, 119:23, 132:22

## X

**Xavier** [2] - 184:10, 184:11
**XI** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**yard** [2] - 53:8, 53:10
**year** [14] - 42:17, 42:20, 57:6, 59:16, 62:9, 78:18,

78:25, 99:22, 100:21, 129:1, 129:3, 129:5, 186:22, 193:16
**years** [31] - 44:21, 44:24, 45:4, 45:6, 45:8, 45:16, 46:3, 46:8, 46:18, 66:12, 78:20, 78:21, 79:2, 81:18, 108:24, 122:15, 137:25, 158:3, 158:10, 159:15, 159:24, 160:14, 161:16, 161:23, 163:3, 163:4, 167:22, 172:8, 172:15
**years'** [1] - 159:16
**yesterday** [21] - 2:6, 5:3, 6:11, 11:17, 11:21, 14:11, 15:6, 17:19, 19:20, 19:18, 28:18, 79:5, 83:13, 113:23, 115:17, 117:24, 118:2, 241:18, 243:1
**Yom** [1] - 236:5
**York** [11] - 122:16, 122:19, 171:16, 172:4, 173:1, 173:7, 173:12, 175:19, 176:1, 177:8, 244:2
**young** [7] - 163:23, 196:19, 229:19, 233:14, 236:16, 236:19
**younger** [1] - 162:25
**Yourself** [1] - 56:6
**yourself** [6] - 33:23, 34:7, 34:11, 44:7, 44:10, 92:23, 138:24, 178:6
**yourselves** [1] - 191:14
**Yup** [4] - 19:3, 38:4, 39:9, 104:5

## Z

**Zajac** [3] - 1:24, 256:3, 256:14
**zoom** [1] - 87:19