1

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF MARYLAND
                         NORTHERN DIVISION
 3


 4


 5     UNITED STATES OF AMERICA

 6          v.                          CRIMINAL CASE NO.
                                         AMD-04-029
 7     WILLIE MITCHELL,
       SHELTON HARRIS,
 8     SHELLY WAYNE MARTIN,
       SHAWN GARDNER,
 9
            Defendants
10     _____/

11                 VOLUME XIII OF XXXVII
                   Tuesday, October 14, 2008
12                 Baltimore, Maryland

13

       Before:  Honorable Andre M. Davis, Judge
14                   And a Jury

15     Appearances:
               On Behalf of the Government:
16              Robert Harding, Esquire
                Michael Hanlon, Esquire
17             On Behalf of Defendant Mitchell:
                Laura Kelsey Rhodes, Esquire
18              Michael E. Lawlor, Esquire
               On Behalf of Defendant Harris:
19              Gerard P. Martin, Esquire
                Paul Flannery, Esquire
20             On Behalf of Defendant Martin:
                Thomas L. Crowe, Esquire
21              James G. Pyne, Esquire
               On Behalf of Defendant Gardner:
22              Adam H. Kurland, Esquire
                Barry Coburn, Esquire
23
       Reported by:
24     Mary M. Zajac, RPR
       Room 5515, U.S. Courthouse
25     101 West Lombard Street
       Baltimore, Maryland 21201
```

1             (Proceedings at 9:47 a.m.)

2             THE COURT:  We're ready to proceed?

3             MR. HARDING:  Yes, Your Honor.

4             THE COURT:  All right.  We'll have Mr. Mongtomery.

5        Mr. Coburn, it seems to me, if I understand the defense

6    concerns here, the really easy and obvious way to give you what

7    you want, and I don't know if you've discussed this with Mr.

8    Harding and Mr. Hanlon, why can't you simply stipulate that Mr.

9    Gardner has been incarcerated continuously, without interruption,

10   since the date of his arrest?  Have you discussed that?

11        MR. COBURN:  Your Honor, I appreciate Your Honor

12   suggesting that very much.  It's not going to, it's not really a

13   critical aspect of what's about to happen with Mr. Montgomery.

14   So if it's all right with Your Honor, can I discuss it with Mr.

15   Kurland and then we'll approach?

16             THE COURT:  Of course.  Of course.  And Mr. Crowe,

17   thank you for your letter.  We'll take this up during the break,

18   I guess.  But I essentially agree with you.  I don't see why that

19   statement is admissible.  I'll hear, of course, from the

20   government.  An admission is an admission and is for that reason

21   admissible.  But even an admission has got to be relevant.  Just

22   because an admission, just because it is an admission doesn't

23   render the relevancy requirement irrelevant.

24             So I'll hear what Mr. Harding has to say about that

25   because the Bruton problem actually, on the face of it, seems to

1   vitiate the admissibility of the statement altogether.

2            So to take out the one relevant item and play the rest

3   of it doesn't seem to me to make a lot of sense.  But the

4   government may have some other reason why it wants the jury just

5   to hear Mr. Martin's voice or something.  I don't know.  Okay?

6   But we'll take it up during the break.  You know what I'm

7   referring to, Mr. Harding?  Mr. Crowe's letter.

8            MR. HARDING:  Yes.

9            THE COURT:  All right.  We'll have the jury.  Thank

10  you.  Feeling better, Ms. Rhodes?

11           MS. RHODES:  Yes.

12           THE COURT:  Good.  You can approach the lectern, Mr.

13  Coburn.

14           MR. COBURN:  Thank you so much, Your Honor.

15           (Jury enters the courtroom.)

16           THE COURT:  Ladies and gentlemen, good morning.  We

17  trust you had a pleasant weekend.  We're told that it's not

18  properly referred to as Indian summer since we haven't had a

19  first frost yet, but we'll take it whatever they call it.

20           Mr. Montgomery, you remain under oath.  You may proceed

21  when you're ready, Mr. Coburn.

22           CONT'D CROSS EXAMINATION

23  BY MR. COBURN:

24  Q    Thank you so much, Your Honor.  Good morning, Mr.

25  Montgomery.

1    A    Good morning.

2    Q    Did I understand you correctly -- pardon me -- sir, to say

3    that there were certain occasions on which, and we're talking

4    obviously prior to the killing of Ms. Spence, certain occasions

5    on which you went up to New York City to buy drugs and you

6    indicated you went, at least on certain occasions, with the

7    people you know as Wayne, Goo and Darryl, that's Darryl Bacon,

8    right, sir?

9    A    Yes.

10   Q    Is it correct that you only went up to New York one time

11   with the person you know as Bo for that purpose?  Is that right?

12   A    That I only went up one time with Bo?

13   Q    That's my question.

14   A    Yes.

15   Q    You indicated, did you not, that when you would go up to New

16   York City to buy drugs, you would buy them in Manhattan around

17   142nd Street.  Was that your testimony?

18   A    Yes.

19   Q    Did you also indicate that Mr. Gardner was fronting you

20   drugs for you to sell?  Is that correct?

21   A    Yes.

22   Q    In other words, Mr. Gardner would give you a quantity of

23   drugs, according to your testimony, he would not ask you to pay

24   him for them at that time, you would sell the drugs, and then of

25   the money you made you'd give some to Mr. Gardner, according to

1    your testimony, and you would keep some, is that right?

2    A    Yes.

3    Q    But it's your testimony, then, that despite the fact that

4    Mr. Gardner was fronting you drugs and making money on your sale

5    of those drugs, that he took you or went with you up to New York

6    City to buy drugs from his supplier, is that correct?

7    A    Yes.

8    Q    Did you tell the jury, Mr. Montgomery, that when you would

9    go up to New York City to buy drugs, you and the other people

10   that you were with, the people you've just talked about, you

11   would pool your money together to buy the drugs.  Do you recall

12   saying that last week in response to a question from Mr. Harding?

13   A    Yes.

14   Q    Now, let's talk a little bit about this concept of pooling

15   the money.  Does that mean that together you would approach a

16   supplier and, you know, whatever money you had and whatever money

17   Goo had and whatever money other people had, you would put it all

18   in one big pot and make one transaction out of it?  Is that your

19   testimony?

20   A    Yes.

21   Q    So it would be just -- okay.  Now, you're aware, Mr.

22   Montgomery, that these four individuals to my right, the

23   defendants in this case, are being tried together in this case,

24   right, sir?

25   A    Yes.

1    Q    Did you ever -- actually, strike that.  You testified, did

2    you not, last week that you provided nine prior statements to law

3    enforcement, plus your testimony in the federal grand jury, plus

4    your testimony in another proceeding, is that correct?

5              MR. HARDING:  Objection.

6    Q    Was that your testimony?

7              THE COURT:  The objection's sustained.

8    Q    Do you recall my going through with you a list of the prior

9    statements that you had made to law enforcement?

10   A    No, not really.

11   Q    You don't have any recollection of that last week?

12   A    No.

13   Q    Do you remember my asking you whether you had given a taped

14   statement to Baltimore City homicide on July 2nd of '02 and you

15   said yes, you did?

16   A    Yes.

17   Q    Do you remember my asking you whether you had given a second

18   taped statement on July 3rd, '02, and you said you did?

19   A    Yes.

20   Q    And then a third statement to Baltimore Homicide?

21   A    Yes.

22   Q    Do you remember my asking you about, then, four proffer

23   sessions with the U.S. Attorney's office?

24   A    No.

25   Q    Okay.  Do you remember my asking you specifically, then, Mr.

1    Montgomery, whether you had a proffer session with the United

2    States Attorney's office on August 13th, 2002 and you said yes?

3    Do you remember that?

4              MR. HARDING:  Objection.

5              THE COURT:  Mr. Coburn, do you really care whether the

6    witness remembers, and you might, which is fine, or do you want

7    to know if the witness will affirm that that's when he talked to

8    people?

9    Q    I will be happy to go with just the latter, Your Honor.

10             THE COURT:  Go ahead.

11   Q    Is that true, then, did you have a proffer session with the

12   U.S. Attorney's office on August 13th, '02?

13   A    I don't know.

14   Q    Do you remember saying that, yes, you did, when I asked you

15   that question last week?

16             MR. HARDING:  Objection.

17             THE COURT:  The objection is sustained.  Are you saying

18   you don't know because you don't recall the date?

19             THE WITNESS:  Right.

20             THE COURT:  Okay.  See, that's the problem, Mr. Coburn.

21             MR. COBURN:  Okay.  Well, I appreciate that, Your

22   Honor.

23             THE COURT:  All right.

24   BY MR. COBURN:

25   Q    Do you remember having multiple proffer sessions with the

Case 1:04-cr-00029-RDB   Document 683   Filed 06/08/09   Page 8 of 221

1   U.S. Attorney's office?

2   A    Yes.

3   Q    Do you remember giving a recorded statement to a prosecutor

4   in January of 2003?

5   A    No, not really.

6   Q    Do you remember saying last week that you did?

7          MR. HARDING:  Objection.

8   Q    I mean --

9          THE COURT:  Again, you want the witness to remember a

10  date.  And I think you're really more interested in the event.

11  Again, it's up to you.

12  Q    No, no, no.  It's perfectly okay, Your Honor.  I used the

13  last date last week when I asked him the question but that's

14  fine.  Do you remember giving a recorded statement to a

15  prosecutor?

16  A    Yes.

17  Q    Do you remember testifying in the grand jury on some date?

18  A    Yes.

19  Q    And do you remember testifying in a prior proceeding in

20  September of 2004?

21  A    Yes.

22  Q    During the course of any of those things, any of those

23  conversations you had with law enforcement, your recorded

24  statement with the prosecutor, your federal grand jury testimony,

25  or your testimony in that 2004 prior proceeding, ever, did you

1    ever say that you and these other individuals had pooled your

2    money together to buy drugs up in New York?

3    A    I believe so, yes.

4    Q    Which one?

5    A    I don't know.

6    Q    Do you have any idea?

7    A    No.

8    Q    Well, is it your testimony, then, that you definitely did?

9    A    Yes.

10   Q    Do you remember whether it was in a conversation with the

11   U.S. Attorney's office or a conversation with Baltimore City

12   Homicide or in one of these other occasions?

13   A    I don't know.

14   Q    No idea?  Okay.  Is it correct that you did not sell your

15   drugs with Wayne or Goo?  Is that correct?

16   A    Correct.

17   Q    And is it correct that with respect to the drugs that you

18   sold, you kept the proceeds, is that correct?

19   A    Correct.

20   Q    Is it correct that with respect to the drugs you bought up

21   in New York when you would go up to New York, according to your

22   testimony, with these other individuals, that what you would buy

23   up there would be marijuana, is that correct?

24   A    Right.

25   Q    And is it correct that with respect to the marijuana that

1    you would buy up in New York when you would go up with the

2    individuals you mentioned, that you would smoke it?  Is that

3    correct?

4    A    Right.

5    Q    So it was for your personal use, right?

6    A    Right.

7    Q    Now, you also testified that when you would go up to New

8    York with these other individuals, they would buy cocaine, right?

9    A    Right.

10   Q    So it's your testimony, then, Mr. Montgomery, if I

11   understand correctly, that you all would go up to New York, you

12   would pool your money, whatever you had, into a pot, they would

13   buy cocaine, you would buy marijuana, you would use that

14   marijuana for personal use, and they would sell the cocaine?  Is

15   that your testimony?

16   A    They also bought marijuana.

17   Q    I see.  Is it correct that your selling of marijuana had

18   nothing to do with Goo, that's Shawn Gardner, is that correct?

19   A    Right.

20   Q    Is it correct that you do not, did not, and do not know Bo's

21   full name?  Is that correct?

22   A    Right.

23   Q    Is it correct that you did not and do not know, according to

24   your testimony, where Bo sold drugs?  Is that correct?

25   A    Right.

1    Q    Is it correct that when you spoke to law enforcement on

2    these occasions that I just referred to, you told law enforcement

3    that you could not remember the last time you had spoken to Bo,

4    is that correct?

5    A    Right.

6    Q    It's correct, also, is it not, Mr. Montgomery, that at some

7    point you took up the sale of heroin, is that right, sir?

8    A    Right.

9    Q    It's also true, is it not, Mr. Montgomery, that you did not

10   get that heroin from any of these defendants?  Is that right?

11   A    Right.

12   Q    You had a different source for your heroin that you sold,

13   right, sir?

14   A    Right.

15   Q    And it's also correct, is it not, that you do not know where

16   Wayne or Goo got the heroin that you say they sold, is that

17   right?

18   A    Right.

19   Q    So with respect to that heroin, then, sir, since you have no

20   idea where they got it, you cannot have pooled your money with

21   theirs to buy it, right, sir?

22   A    I never said we did, or I did.

23   Q    Let me ask you now, sir, about some of your prior

24   difficulties with the law.  Do you recall during the course of

25   your direct testimony Mr. Harding asking you a question about

1    whether you had ever been convicted of any criminal offenses and

2    what were they?

3    A    Yeah.

4    Q    Let me ask you about some of those specifically now.  Taking

5    you back to 1999.  Do you recall an incident, Mr. Montgomery, on

6    February, and again, I guess I'm getting into the date problem,

7    Your Honor, I'll just ask you, do you recall an incident in

8    February, 1999 in which you got arrested?

9    A    No.

10   Q    You were using the name Michael Rowe.  That's your brother,

11   right?

12   A    Right.

13   Q    Does that help refresh your recollection at all about this

14   incident?

15   A    What's the charge?

16   Q    Well, I'll tell you, basically -- I can't actually testify

17   here.  But do you remember an incident in which there were five

18   gun shots?

19           MR. HARDING:  Objection.

20           THE COURT:  Well, the question the witness needs you to

21   answer is what was the charge.  You can refresh his recollection.

22   That's not your testifying.  If you want to refresh his

23   recollection.

24   Q    Fair enough, Your Honor.  I'm just relying on the paperwork

25   you gave me.

1          MR. HARDING:  I object.

2          THE COURT:  Speak to Mr. Coburn, please.

3          MR. COBURN:  I can show you the documents right here.

4          MR. HARDING:  Your Honor, the government objects to

5   going into the underlying facts of arrests that Mr. Coburn can't

6   even verify were convictions.

7          MR. COBURN:  Well, I'm just asking.  I mean, the

8   government asked him specifically if he'd been arrested of any

9   offenses.  He said yes and delineated some of them.

10         MR. HARDING:  I asked him about prior convictions.

11         THE COURT:  Go ahead, Mr. Coburn.  Why don't you put a

12  question?

13  BY MR. COBURN:

14  Q    Okay.  Do you remember being arrested and then convicted of

15  a handgun offense in February of 1999?

16  A    Yes.

17  Q    Did that relate to an attempted robbery, also?

18  A    No.

19  Q    Do you remember an offense around that time period of which

20  I believe you were convicted, in which the complainant, the

21  victim's name was Ronald Burke?

22         MR. HARDING:  Objection.

23         THE COURT:  Sustained.

24  Q    Let me take you up, then, to November 29th of 2000.  Do you

25  remember using the name Charles Smith during that time period as

1    an alias?

2    A    I remember using the name Charles Smith.

3    Q    Okay.  I mean, you testified yesterday that you used a lot

4    of aliases, right?

5    A    Right.

6    Q    Was Charles Smith one of them?

7    A    Yes.

8    Q    Well, do you remember being arrested and convicted for an

9    offense that occurred on November 29th, 2000, in which you and

10   three other individuals driving a 1991 Mercury Grand Marquis

11   participated in a robbery?

12             MR. HARDING:  Objection.

13             THE COURT:  The objection is sustained.

14   Q    You testified last week that you had been placed on

15   probation a number of times, right?

16   A    Yes.

17   Q    And that you, I believe it was your testimony, virtually

18   always violated probation by being rearrested, is that right?

19   A    Yes.

20   Q    Do you remember being placed on probation on July 6th of

21   2000, three years supervised probation?  That was by Judge

22   Quarles.  Do you remember that?

23   A    Yes.

24   Q    Do you remember what that offense was for that you were

25   obviously convicted of since you were on probation?

1    A    Handgun.

2    Q    Handgun offense?  Okay.  During the course of that

3    probation, how many times -- actually, strike that.  I'm sorry.

4    When you were placed on probation Judge Quarles told you what the

5    conditions of your probation were, right?

6    A    Yes.

7    Q    He told you what was expected of you when you were on

8    probation, right?

9    A    Yes.

10   Q    And one of the things that was expected of you, Judge

11   Quarles told you, was that you were supposed to avoid any further

12   trouble with the law, right, sir?

13   A    I guess, yes.

14   Q    How many arrests did you have within the next few months

15   after being placed on probation?

16            MR. HARDING:  Objection.

17            THE COURT:  Overruled.  You may answer.

18   Q    How many?

19   A    I don't know.

20   Q    Well, you were placed on probation on July 6th of 2000.  Do

21   you remember being arrested on November 27th of 2000?

22            MR. HARDING:  Objection.

23            THE COURT:  Overruled.  You may answer.

24   A    What was the charge?

25   Q    The charge was CDS, that stands for controlled dangerous

1  substance.  It says not marijuana, possession with intent to

2  distribute, firearm, drug traffic crime, manufacture, distribute

3  narcotics.  Your trial date was set for May 4th, 2001.  Do you

4  remember that?

5  A    Yes.

6  Q    Okay.  So that was a violation of Judge Quarles's probation,

7  right?

8  A    No, not really.

9  Q    It wasn't a violation of probation, is that your testimony?

10 A    I wasn't found guilty.

11 Q    Okay.  So we're talking about a November 27th, 2000 arrest

12 in which it's your testimony you were not found guilty, is that

13 correct?

14 A    Right.

15 Q    Is it also correct, sir, that you were arrested again two

16 days later?

17         MR. HARDING:  Objection.

18         THE COURT:  The objection's sustained.

19 Q    Okay.  Is it correct that with respect to that probationary

20 period, you were continued on probation by Judge Quarles in

21 November of 2001, is that right?

22 A    Yes.

23 Q    Okay.  And after being continued on probation on November

24 26th, 2001, you were instructed that day to report to the

25 Division of Parole and Probation, is that right?

1    A    I believe so, yes.

2    Q    And you didn't go, right?

3    A    No.

4    Q    Is it correct that you did not report?

5    A    Right.

6    Q    Okay.  Then you were sent a letter in December of 2001

7    because you had failed to report to probation after being

8    continued on probation by Judge Quarles, and you were supposed to

9    report on December 20th of 2001, is that right?

10   A    Didn't receive no letter.

11   Q    I see.  On December 21st, 2001, the day after you were

12   instructed to report, is it correct that Probation Officer

13   Colleen Nickerson made contact with you?

14   A    No.

15   Q    That's false?

16   A    Right.

17   Q    And it would be also false, then, that Colleen Nickerson

18   told you to report to Probation on January 8th of 2002, right?

19   That's false, right?

20   A    Right.

21   Q    According to your testimony.  Okay.  It's your testimony, is

22   it not, Mr. Montgomery, that you had known Darius Spence since

23   you were a little boy, is that right?

24   A    Yes.

25   Q    It's also your testimony, is it not, sir, that the person

1    you've referred to as E, that's Aaron Holly, right?

2    A    Yes.

3    Q    That E was involved first in the scheme to rob and murder

4    Darius Spence and then Goo was involved after?  Is that your

5    testimony?

6    A    Yes.

7    Q    Now, you told the ladies and gentlemen of the jury last week

8    that you'd had a conversation with Darius Spence in which Darius

9    Spence asked you to do something to the person you called Momma,

10   right, sir?

11   A    Yes.

12   Q    Do you know Momma's full name, real name?

13   A    No.

14   Q    Okay.  And what was it that Mr. Spence asked you to do to

15   Momma?

16   A    He asked me to beat Momma up.

17   Q    Okay.  Did that conversation occur at Mosher and Monroe

18   streets, is that right?

19   A    No.

20   Q    Okay.  Let me take you back a little bit, then, sir.  You

21   told the ladies and gentlemen of the jury about someone by the

22   name of Goose, right, Mr. Montgomery?

23   A    Yes.

24   Q    Was the plan to rob Goose before or after the plan to rob

25   and murder Darius Spence?

1    A    I'm not sure.

2    Q    Is it also correct, Mr. Montgomery, that with respect to the

3    plan to rob Goose, you discussed that only with the person you

4    know as Wayne and not with Goo, is that correct?

5    A    Yes.

6    Q    That is correct?

7    A    Yes.

8    Q    Okay.  So then to the extent you had indicated to the ladies

9    and gentlemen of the jury that a conversation occurred in an

10   automobile in which Goo had been present, about the robbery of

11   Goose, that would be incorrect, right, sir?

12   A    No.  That's correct.

13   Q    Okay.  But it's also correct, then, according to your

14   testimony, that you discussed robbing Goose only with Wayne and

15   not with Goo, is that right?

16   A    Right.

17   Q    I see.  Is it also your testimony, sir, that you were not

18   sure if E was going to be part, and that's Aaron Holly, was going

19   to be part of the robbery of Goose, is that right?

20   A    Right.

21   Q    And it's also true, is it not, Mr. Montgomery, that the plan

22   to rob Goose had nothing to do with the plan to rob and murder

23   Darius Spence, is that correct?

24   A    Right.

25   Q    Pardon me?

1    A    Correct.

2    Q    Correct.  So after Darius Spence approached you about

3    beating up Momma, it's your testimony that you told him, well, I

4    might as well just kill him, right, sir?

5    A    Yes.

6    Q    And you asked him for a sum of money in exchange for killing

7    Momma, is that right, sir?  You asked him to pay you, right?

8    A    Yes.

9    Q    And what you asked him for was $5,000 in exchange for

10   putting a bullet in Momma, is that right, sir?

11   A    Yes.

12   Q    And he didn't get back to you, right?

13   A    Right.

14   Q    Now, is it correct, Mr. Montgomery, that your, it's your

15   understanding that the real reason that Momma wanted Spence dead

16   was because Momma was having an affair with Tonya Jones Spence,

17   is that right?

18   A    Yes.

19   Q    Momma admitted to you that he was having that affair with

20   the victim, right, sir?

21   A    Yes.

22   Q    And you told -- well, strike that.  It's correct, is it not,

23   that the whole neighborhood was aware of this affair, is that

24   correct?

25   A    Yes.

1    Q    Is it also correct that Momma told you, during the course of

2    planning the robbery and murder of Darius Spence, Momma told you

3    that Tonya Spence, with whom he was having this affair, had told

4    him that Darius Spence was counting a lot of money, right?

5    A    Yes.

6    Q    That she had seen him counting about $100,000, right, sir?

7    A    Yes.

8    Q    Now, you told the ladies and gentlemen of the jury here, Mr.

9    Montgomery, about this period of surveillance that occurred

10   before Tonya Spence was killed, right, sir?

11   A    Yes.

12   Q    How long was that period of surveillance?  In other words,

13   from the time that you came up with this plan until the time

14   Tonya Spence was murdered, how long was the period in which the

15   apartment and the Spences were being surveilled, according to

16   your testimony?

17   A    Maybe two months.

18   Q    Okay.  Would it have been five to six days a week for about

19   two months?

20   A    Something like that, yes.

21   Q    Now, remember that prior proceeding that we talked about in

22   September of 2004?

23   A    Yes.

24   Q    Is it a fact that when you testified at that prior

25   proceeding you said that the surveillance was a little over a

1    month?

2    A    Yes.

3    Q    Is it a fact that when you testified in the federal grand

4    jury in this case you told them that the period of surveillance

5    was, I'm referring to grand jury transcript Page 27, Line 7, you

6    told them it was a couple of weeks, is that right?

7    A    I don't know.

8    Q    Okay.  Let me see if I can refresh your recollection.

9    A    If you say it's right, I believe you.

10   Q    That's okay.  You don't need to take my word for it.  May I

11   approach the witness, Your Honor?  Or I can --

12            THE COURT:  If there's no objection, you can show it on

13   the DOAR.

14   Q    See where it says on Page 27, starting on Line 4, that Momma

15   showed you -- this is federal grand jury questioning by Mr.

16   Harding, right, sir?  The gentleman sitting over here to my left?

17   A    Yes.

18   Q    The prosecutor in this case.  Says, but Momma showed you

19   where he lived?  And you answer yes.  Do you see that?

20   A    Yes.

21   Q    And then question, so what happened after that?  I'm on Line

22   Seven now.  Answer:  We laid, we watched him for a couple weeks,

23   couldn't, couldn't never really get Darius himself.  And one day

24   we went in there, well, they went in there.  Do you see where it

25   says that?

1    A    Yes.

2    Q    So which is it, then?  Two months, a little over a month, or

3    a couple of weeks?

4    A    Almost two months.

5    Q    Pardon?

6    A    Almost two months.

7    Q    Okay.  It's a fact, is it not, Mr. Montgomery, that Aaron

8    Holly, I think you've already told the jury this, was taller than

9    Mr. Gardner, right?

10   A    Yes.

11   Q    He was considerably taller, right, sir?

12   A    Not so much.

13   Q    You think they're about the same height?  Is that your

14   testimony?

15   A    No, I think Aaron is taller.

16   Q    Okay.  It's true, also, is it not, Mr. Montgomery, that on

17   the day Tonya Spence lost her life, Aaron Holly was wearing a red

18   hat, is that right?

19   A    Yes.

20   Q    Now, you've testified, have you not, that on that day Goo,

21   Shawn Gardner, was carrying the .357, right?

22   A    Yes.

23   Q    And just to be clear, make sure that the ladies and

24   gentlemen of the jury are clear on this particular detail, then,

25   there are two guns involved, according to your testimony, right,

1    sir?

2    A    Yes.

3    Q    There's a .357, right?

4    A    Yes.

5    Q    That's a revolver, right?

6    A    Right.

7    Q    There's also what you referred to, I think, as a Glock .40,

8    right?

9    A    Yes.

10   Q    That's a semiautomatic pistol, right?

11   A    Right.

12   Q    Okay.  So it's your testimony, then, that Gardner was

13   carrying the .357 and Holly was carrying the Glock .40, right,

14   sir?

15   A    Yes.

16   Q    Now, do you recall when you were in one of these proffer

17   sessions, one of these conversations with the U.S. Attorney's

18   office, and just to state for the record, it's on September 26th,

19   2002 at 10 minutes after 11 a.m., do you recall being asked by

20   the government about what Shawn Gardner's weapon of choice was?

21   Do you remember that?

22   A    Yes.

23   Q    And you stated that his weapon of choice was a Glock .40,

24   didn't you?

25   A    Yes.

1    Q    Now, on the day Tonya Spence was -- I'm sorry.  It's proffer

2    session September 26th, 2002, 1110 hours, Page 6.  On the day

3    Tonya Spence was killed, you were not part of any what's called

4    identification procedure, right?  I mean, you weren't held

5    anywhere for anyone to come and look at you, right?

6    A    No.

7    Q    Because you were not arrested that day, right?

8    A    Right.

9    Q    Because you, in fact, have never been arrested or charged

10   with the Spence homicide, right, sir?

11   A    Right.

12   Q    So then, I take it, neither your hands nor your clothing

13   were ever tested for gunshot residue, were they?

14   A    No.

15   Q    How tall are you, Mr. Montgomery?

16   A    Five-five.

17   Q    It's correct, is it not, sir, that you have worn your hair

18   in braids in the past, right, sir?

19   A    Yes.

20   Q    And it's correct, also, is it not, Mr. Montgomery, that you

21   do not know, it's your testimony that you don't know if you had

22   braids in your hair on the day of the Spence homicide, right,

23   sir?

24   A    Right.

25   Q    It's your testimony, also, is it not, Mr. Montgomery, that

Case 1:04-cr-00029-RDB    Document 603    Filed 06/08/09    Page 26 of 221

1    Tonya Spence was not supposed to get hurt or killed, right?

2    A    Right.

3    Q    It's your testimony that the plan was not to kill Tonya

4    Spence, right?

5    A    Right.

6    Q    But when you testified last week in response to the

7    government's questions, you said, and maybe it's important to try

8    to get the language right here, it was your testimony that on

9    that morning, the morning Tonya Spence was killed, your testimony

10   is that Shawn Gardner said, "we're going to get the bitch today?"

11   A    Yes.

12   Q    So is it your testimony, then, Mr. Montgomery, that in any

13   one of these prior statements that we've referred to to the U.S.

14   Attorney's office or to Baltimore City Homicide or in your

15   recorded statements or your testimony in a prior proceeding or

16   your testimony in the grand jury, did you ever say that before,

17   ever?

18   A    I believe so, yes.

19   Q    Which one?

20   A    Don't know.

21   Q    But you're sure you've said it before in one of those

22   things, is that right?

23   A    Yes.

24         MR. HARDING:  I'm sorry, Your Honor.  I missed what

25   statement Mr. Coburn's talking about.

1   Q    Any of them.

2              MR. HARDING:  Any of what statement?

3   Q    Any of the series of proffer sessions with the US Attorney's

4   office.

5              THE COURT:  No.  No.  He means what discrete assertion

6   are you questioning the witness about?

7   Q    Oh, oh, I'm sorry, Your Honor.  His assertion that on the

8   morning of the murder, Shawn Gardner said, "we're going to get

9   the bitch today."  And my question is, in any of these prior

10  statements or your prior testimony, did you ever say that before,

11  ever?

12  A    I believe so, yes.

13  Q    Are you sure or you just think so?

14  A    I think so, yes.

15  Q    Do you recall in which one?

16  A    No.

17  Q    You also said, though, just now, that it was your testimony

18  that she wasn't supposed to get hurt, right, sir?

19  A    Right.

20  Q    So then after Mr. Gardner said, "we're going to get the

21  bitch today", you must have said, what are you talking about,

22  she's not supposed to get hurt, right, sir?

23  A    No.

24  Q    You didn't say that?

25  A    No.

1    Q    But it was your testimony that she was not supposed to get

2    hurt, right, sir?

3    A    Right.

4    Q    And in fact, you had talked with Momma about this, right,

5    about her not getting hurt, right, sir?

6    A    I told Momma it was a possibility of her getting hurt.

7    Q    But Momma told you that he didn't want her to get hurt,

8    right?

9    A    Right.

10   Q    Let me ask you, sir, and I'm referring now to your prior

11   tape recorded statement, Page 17, there are no line numbers on

12   this, whether you were asked the following questions and gave the

13   following answers?

14        (Tape played.)

15   Q    Was that your voice?

16   A    Yes.

17   Q    So then you were asked on that occasion back on January,

18   well, I won't use the date, you were asked on that occasion in

19   2003 that:  And were you aware when you drove in on June 7th,

20   '02, that this was going to be the date of the robbery?  And you

21   answered no, right, sir?

22   A    Right.

23   Q    And you were also asked:  How was it you believe that

24   Gardner was ready to do the robbery that day?  And you answered:

25   Because I know he was anxious, he was ready to do it any day.

1    Right, sir?

2    A    Right.

3    Q    And then you were asked:  And when you say anxious, what do

4    you mean?  What was he doing that led you to believe that he

5    wanted to do it that day?  And you answered:  He wanted to go out

6    there so much, stuff like that.  Um, he needed money.  He was in,

7    he was in need for money so he really want to go.  Right, sir?

8    A    Right.

9    Q    So then where in there do you say that he said "we're going

10   to get the bitch today?"

11   A    Nowhere.

12   Q    It's correct, is it not, Mr. Montgomery, that when you

13   approached Momma about your scheme, your plan to rob and murder

14   Darius Spence, you lied to him when you told him that Darius

15   Spence had hired you to kill Momma, right, sir?

16   A    Right.

17   Q    And you used that lie to get Momma to hire you to kill

18   Darius Spence, right, sir?

19   A    Right.

20   Q    And you did that because you wanted to make some money,

21   right, sir?

22   A    Right.

23   Q    It's correct, is it not, that Momma said he would give you

24   something for killing Darius Spence, is that right?

25   A    Yes.

1    Q    It's your testimony that you were right there on the scene

2    when she was killed, right, sir?

3    A    Right.

4    Q    You said that you saw her fall from the balcony, right, sir?

5    A    Right.

6    Q    Your Honor, there's Government's Exhibit S-56, which is

7    admitted into evidence.  May I put it on the presenter?

8         THE COURT:  Certainly.

9    Q    It's a photo.  You recognize that, sir?

10   A    Yes.

11   Q    What's that?

12   A    Tonya Spence building.

13   Q    Okay.  Can you see the spot where you were standing,

14   according to your testimony, sir, when Tonya Spence went over

15   that second floor balcony?

16   A    Yes.

17   Q    Can you put your finger on that spot?  It should make a

18   little mark so that the ladies and gentlemen of the jury can see

19   it.  Thank you.

20   A    (Witness complies.)

21   Q    It's your testimony, in fact, that after she went over, you

22   actually went up to her, within a couple of feet of her, right,

23   sir?

24   A    No.

25   Q    That's wrong?

1    A    Right.

2    Q    Okay.  Referring to the transcript of the prior proceeding

3    on September 29th, 2004, Page 95.  Starting on Line 8.  Let me

4    ask you, sir, whether or not at that time you were asked the

5    following questions and you gave the following answers.

6              Question:  When you came out of the apartment building,

7    you claim that she was being shot at and had fallen to the

8    ground, is that right?  Answer:  Yes.

9              Question:  You went up to her, is that right?  I'm

10   sorry.  You were within a couple of feet or the distance that you

11   demonstrated today, is that right?  Answer:  Yes.

12             Were you asked those questions and did you give those

13   answers in your testimony under oath at that prior proceeding?

14   A    Yes.

15   Q    And that was true, right, sir?

16   A    Right.

17   Q    According to your testimony?

18   A    Yes.

19   Q    It's your testimony that you were supposed to pick the other

20   two individuals who were involved in this up after the incident

21   was over, right, sir?

22   A    Yes.

23   Q    It's your testimony that you drove them there, right, sir?

24   A    No.

25   Q    Okay.  You were in the car that went there, right, sir?

1    A    Right.

2    Q    It's your testimony that after the two other individuals got

3    out of the car, you were driving what was supposed to be the

4    getaway car, right, sir?

5    A    Yes.

6    Q    Now, it's correct, is it not, Mr. Montgomery, that it was

7    your intention that it was going to be you who killed Darius

8    Spence that day, right, sir?

9    A    Yes.

10   Q    And you were going to use one of the two guns that the other

11   individuals were carrying in order to murder him, right, sir?

12   A    Yes.

13   Q    It didn't matter to you which gun, right, sir?

14   A    No.

15   Q    How many days, Mr. Montgomery, did you have the car for from

16   the time of the incident until the time it was picked up by the

17   police?

18   A    Maybe a week.

19   Q    Okay.  During that period of time, you did not make any

20   attempt to dispose of the latex gloves that were sitting in the

21   trunk of that car, did you?

22   A    No.

23   Q    It's a fact, according to your testimony, is it not, Mr.

24   Montgomery, that even after this incident, even after Tonya

25   Spence fell off that balcony and had two bullets pumped into her

1    and died, it's a fact, is it not, that you kept trying to kill

2    her husband, right, sir?

3    A    Yes.

4    Q    Even after her murder, you met with Momma and told him that

5    you would still kill Darius Spence, right, sir?

6    A    Yes.

7    Q    But you have never been charged with any offense relating to

8    the attempted robbery and murder of Darius Spence or the murder

9    of Tonya Spence, right, sir?

10   A    Right.

11   Q    Your Honor, could I have the Court's indulgence just for a

12   moment?

13          THE COURT:  Certainly.

14          (Pause in proceedings.)

15          MR. COBURN:  Thank you so much, Your Honor.  Nothing

16   further.

17          THE COURT:  Mr. Coburn, let me invite you to retrieve

18   your boom box.

19          MR. COBURN:  Absolutely.  Can I come around this way,

20   Your Honor?

21          THE COURT:  Yes.

22          MR. COBURN:  Probably the last time I use that for

23   another ten years.

24          THE COURT:  They don't build them like that any more.

25          MR. CROWE:  Seem to have a technical problem.

Case 1:04-cr-00029-RDB    Document 683    Filed 06/08/09    Page 34 of 221

1          THE COURT:  Make room for Mr. Hanlon.

2          MR. HARDING:  All this high tech and he's trying to fix

3     it with a paper clip.

4          CROSS EXAMINATION

5     BY MR. CROWE:

6     Q    Good morning, Mr. Montgomery.  My name is Tom Crowe and I

7     represent Shelly Martin.  Did you tell Mr. Coburn, I think it was

8     last Wednesday, that part of your plea agreement with the State

9     of Maryland required that you not try to withdraw your guilty

10    plea?

11    A    I think I did say that, yes.

12    Q    Okay.  And that, in fact, is your understanding, is it not?

13    A    No.

14    Q    Pardon?

15    A    That's not my understanding.

16    Q    So you told him that it was your understanding that you

17    shouldn't withdraw your guilty plea but now you say that's not

18    your understanding?

19    A    Right.

20    Q    Why did you tell him it was?

21    A    At the time I thought it was.

22    Q    Okay.  In any event, is it true that, with respect to your

23    state plea, it is your understanding that it is the state

24    prosecutors, the State's Attorney's Office for Baltimore City,

25    that makes the decision whether or not you have cooperated and,

1    thus, whether it is obligated to make the recommendation which is

2    discussed in that plea agreement?

3    A    Right.

4    Q    If they simply decide that you haven't cooperated or that

5    your cooperation isn't sufficient, they don't have to make the

6    recommendation?

7    A    Right.

8    Q    And if they decide that you've cooperated, what they've

9    agreed to do is to recommend that you get essentially no more

10   than 40 years, is that right?

11   A    Yes.

12   Q    But as you told Mr. Coburn, you realize full well that they

13   can recommend that you get less than that, is that right, also?

14   A    Yes.

15   Q    And you want them to make that recommendation, don't you?

16   A    Yes.

17   Q    And is it further your understanding that -- well, do you

18   expect that they're going to be speaking with people from the

19   United States Attorney's Office, such as Mr. Harding and Mr.

20   Hanlon, before they decide what final recommendation to make?

21   A    Yes.

22   Q    And is this something which has been, in a sense, kind of

23   held over your head for a period of many years?

24   A    Yes.

25   Q    Do you get the -- in fact, you actually signed this plea

Case 1:04-cr-00029-RDB    Document 683    Filed 06/08/09    Page 36 of 221

1    agreement, I will tell you, on May 13 of 2003.  Does that sound

2    about right?

3    A    Yes.

4    Q    Do you have any idea why it is that it's been hanging over

5    your head for a period of more than five years?

6    A    Waiting on this trial.

7    Q    Okay.  Do you think that there's a little bit of distrust in

8    terms of the state prosecutors and the federal prosecutors about

9    what you may say?

10              MR. HARDING:  Objection.

11              THE COURT:  Rephrase the question.

12   Q    Are you concerned that -- well, do you believe that the

13   federal and state prosecutors are holding, are holding back on

14   going, are holding back on your sentencing because of concerns as

15   to what you may say at this trial?

16   A    Yes.

17   Q    Okay.  And you want to make Mr. Harding and Mr. Hanlon

18   happy, don't you?

19   A    I ain't got to make them happy.

20   Q    Now, you were arrested, as I understand it, on a handgun

21   charge in July 2 of 2002?

22   A    Yes.

23   Q    Where were you arrested?

24   A    I was arrested on Edmondson Avenue.

25   Q    On Edmondson Avenue.  You were arrested out on the street?

1    A    Yes.

2    Q    And what time of day was that?

3    A    Afternoon.

4    Q    Okay.  Do you recall what time in the afternoon?

5    A    Lunch time.

6    Q    And there was a search of a house that same day, is that

7    correct?

8    A    Yes.

9    Q    And that house turned up a 9 millimeter pistol, is that

10   right, also?

11   A    Yes.

12   Q    And that was not the 9 millimeter pistol that you used to

13   kill Terry Cheeks, was it?

14   A    No.

15   Q    This is a different 9 millimeter.  What house was searched

16   where they grabbed that gun?

17   A    My girlfriend house.

18   Q    Okay.  And where's that located?

19   A    Edmondson Village.

20   Q    Okay.  And that's the weapon for which the federal

21   government has charged you in this court, is that correct?

22   A    Yes.

23   Q    And that's, that's the case that was before Chief Judge Legg

24   of this court?

25   A    I don't know.

1    Q    Now, you were arrested in the afternoon, maybe around lunch

2    time.  And is it true that you were sitting down with detectives,

3    giving them a taped statement, at about 7 p.m. on July 2?

4    A    Probably so, yes.

5    Q    And before you gave them the taped -- and you gave them the

6    taped statement in the Homicide office?

7    A    Yes.

8    Q    That would be, that would be a section in the police

9    headquarters in Downtown Baltimore?

10   A    Yes.

11   Q    Is that correct?  And when you were originally arrested, you

12   were taken over to the Western District, is that true?

13   A    Yes.

14   Q    And you gave them a second taped statement just a couple

15   minutes after midnight on July 2, which would have been the very

16   early morning hours of July 3, is that right?

17   A    Yes.

18   Q    And then you gave them the third taped statement that

19   morning, a little before lunch, is that also correct?

20   A    Yes.

21   Q    Now, in the taped statement you admitted that you had shot

22   your friend, Terry Cheeks, in the back of his head, is that

23   right?

24   A    Yes.

25   Q    And was that a murder which occurred about May 14th of 2002?

1    Mid May.

2    A    Sounds about right.

3    Q    Sounds about right.  Now, before you gave a statement, did

4    the law, did the Baltimore City Police or other law enforcement

5    people tell you that they had a great deal of information about

6    you?

7    A    Yes.

8    Q    Did they tell you that they knew that you were implicated in

9    the murder of Terry Cheeks?

10   A    No.

11   Q    Did they, did they talk to you at great length about a guy

12   by the name of Tyree Stewart?

13   A    Yes.

14   Q    Did they tell you that they knew a lot about Tyree Stewart's

15   organization?

16   A    Yes.

17   Q    Did they tell you that they had had wiretaps running for

18   months on Tyree Stewart and his organization?

19   A    Yes.

20   Q    So that's what they, that's what they told you before you

21   told them anything about Terry Cheeks, is that correct?

22   A    Yes.

23   Q    And was the fact that law enforcement had this much

24   information on Tyree Stewart something which influenced you to

25   tell them about the murder of Terry Cheeks?

1   A    Yes.

2   Q    So your statement on Tuesday that, essentially, that you

3   just, you know, sort of caved in and gave law enforcement the

4   information they wanted because you were tired of running was not

5   correct, was it?

6   A    No.

7   Q    Okay.  And the reason that you began talking with the law

8   enforcement was because they, you thought that they had you?

9   A    Yes.

10  Q    And you knew it was only going to get, you knew it was only

11  going to get worse?

12          MR. HARDING:  I want to object to the question before

13  this one, about --

14          THE COURT:  Overruled.

15          MR. HARDING:  Something that --

16          THE COURT:  Overruled.  Go ahead, Mr. Crowe.

17  BY MR. CROWE:

18  Q    Now, finally, as I understand it, when you were arrested on

19  July 2 of 2002, did you tell the police at that time that you

20  were Michael Rowe?

21  A    I probably did.

22  Q    Okay.  Could I just ask you, why, if you're arrested on a

23  criminal charge, would you tell somebody, would you tell law

24  enforcement, would you give law enforcement your brother's name?

25  A    When I was first arrested, I didn't know what charge it was.

1   Didn't know I was going to be arrested when I gave the name.

2   Q    Well, the question didn't specify the charge.  When you were

3   arrested, why did you give law enforcement your brother's name

4   rather than your own?

5   A    When they pulled me out of the truck and asked me my name,

6   that's the name I gave, not knowing that I was going to be

7   arrested.

8   Q    Well, from, from your experience when law enforcement pulls

9   you out of a vehicle on Edmondson Avenue around noon, around noon

10  time, don't you, don't your thoughts naturally go to the fact

11  that, God, they're going to arrest me?

12  A    No, I was not dirty.

13  Q    Pardon?

14  A    I was not dirty.

15  Q    But you were in violation of your probation or parole?

16  A    Right.

17  Q    Okay.

18        THE COURT:  Tell the ladies and gentlemen of the jury

19  what you mean by "dirty."

20  A    I didn't have no gun, drugs, or anything illegal on me.

21  Q    Now, would I also be correct that between, that you had a

22  couple of hours, at least a couple of hours of discussion with

23  police between the time you were arrested on noon of July 2 and

24  the time that the tape recorder was turned on at about 7 that

25  evening?

1    A    Yes.

2    Q    Did you have one or more such sessions?

3    A    I don't know.

4    Q    What place or places did the sessions take place?

5    A    Western District.

6    Q    When you came over to Homicide, were the Homicide

7    detectives, did they talk to you before they started playing the

8    tape, started rolling the tape?

9    A    No, not really.

10   Q    Now, Mr. Coburn has gone through with you what happened and

11   I have, also.  And you recalled, you recall the three sessions

12   where tape was playing, is that correct?

13   A    Right.

14   Q    Those are three sessions that occurred within 24 hours after

15   your arrest?

16   A    Right.

17   Q    Do you recall also coming over for a number of what are

18   called proffer sessions, which, I don't know, 2002, probably

19   would have been conducted in this building?

20   A    Yes.

21   Q    And there were times when you had as many as 13 and 14

22   people present in some of those proffer sessions, is that right?

23   A    Yes.

24   Q    And there were times when you had a couple of those proffer

25   sessions a day, is that right, also?

Case 1:04-cr-00029-RDB    Document 683    Filed 06/08/09    Page 43 of 221

1    A    Yes.

2    Q    Let me ask you this.  On the three taped statements that you

3    gave on July 2 and July 3, when's the last time you either

4    listened to the tape of the statement or that you've reviewed

5    sort of a question and answer thing which sets, which sets out

6    the questions you were asked and the answers you gave?

7    A    When's the last time I listened to it?

8    Q    Either you listened to it or you reviewed what we lawyers

9    call a transcript.

10   A    Never.

11   Q    Never?

12   A    Except for what was played today.

13   Q    Now, you have also indicated that, in addition to those five

14   proffer sessions or so, that there was another question and

15   answer session that you had with the prosecutor that had turned,

16   that occurred sometime later than that, is that correct?

17   A    Yes.

18   Q    And was that prosecutor a man by the name of Dean

19   Stocksdale?

20   A    Yes.

21   Q    And did you understand that he was a state prosecutor in

22   Baltimore County?

23   A    Yes.

24   Q    Have you either listened, have you had the occasion either

25   to listen to that tape or to read a transcript of that question

1    and answer session since the time that you sat down with Mr.

2    Stocksdale?

3    A    No.

4    Q    And finally, you have testified that you testified before a

5    federal grand jury here, is that correct?

6    A    Yes.

7    Q    And have you reviewed a transcript of that testimony?

8    A    Yes.

9    Q    And when did you review a transcript of that testimony?

10   A    A couple months ago.

11   Q    And by a couple of months ago, you're talking about sometime

12   roughly in, I guess, August of this year?

13   A    Yes.

14   Q    And where did you review it?

15        MR. HARDING:  Objection.

16        THE COURT:  Sustained.

17   Q    Did you review it with federal prosecutors?

18   A    No.

19   Q    Now, am I correct that years after your arrest you didn't

20   know Bo's real name?

21   A    They have, they have said it but I don't try to remember it.

22   Q    Okay.  But it's, at the time, at the time of the Tonya

23   Jones-Spence killing, you didn't know Bo's real name, did you?

24   A    Right.

25   Q    There's an individual in this courtroom by the name of, name

CROSS EXAMINATION OF MONTGOMERY BY CROWE                45

1    of Shelton Harris.  He supposedly has street names of Rock and

2    Little Rock.  Do you know that individual at all?

3    A    No.

4    Q    Have you ever heard of that individual?

5    A    No.

6    Q    Now, is it also true that you had really more dealings with

7    Shawn Gardner or Goo than you had with Mr. Martin?

8    A    Yes.

9    Q    Is it true that Mr. Gardner would often front you drugs and

10   that he did this over an extended period of time?

11   A    Yes.

12   Q    And I think this has already been discussed, but essentially

13   by fronting, it meant that he would give you the drugs and then

14   after you would sell them you would have to give him an agreed-on

15   price, is that right?

16   A    Yes.

17   Q    So you were, even with Mr. Gardner, you weren't actually

18   buying drugs from him, were you?

19   A    Excuse me?

20   Q    I said, you weren't buying drugs from Mr. Gardner?

21   A    No.

22   Q    And did you have an understanding as to what would happen,

23   say, in a situation where you had some of Mr. Gardner's drugs and

24   somebody robbed you of the drugs?  Would you still owe Mr.

25   Gardner the money?

1    A    Yes.

2    Q    So what we commercial lawyers, do you understand the term

3    "risk of loss?"

4    A    Yes.

5    Q    Okay.  So the risk of loss would essentially be on you, is

6    that right?

7    A    Right.

8    Q    And that was the same, also, if you know, if you had sold

9    the drugs and somebody, somebody got the money?

10   A    Right.

11   Q    The loss was going to be yours, is that right?

12   A    Right.

13   Q    Now, is it, did Mr. Martin ever actually front you any

14   drugs?

15   A    Front me?

16   Q    Yeah.

17   A    Yes.  You can say so, yes.

18   Q    Okay.  Again, you say that you've recently reviewed your

19   federal grand jury testimony?

20   A    Right.

21   Q    Give me just a second to check something.

22          (Pause in proceedings.)

23   Q    Let's start at Page 10, Line 25.  You see that you're asked

24   the question, I think it's by Mr. Harding:  Did you also

25   sometimes obtain marijuana or cocaine from Goo or Wayne?  Answer:

1    Yes.

2              Question:  Both of them?  No.  Just Goo.

3              Was that, in fact, your testimony, was that, in fact,

4    your testimony in January of 2004 before the federal grand jury?

5    A    Yes.

6    Q    And you realize that that was a serious occasion?

7    A    Yes.

8    Q    You were told by the prosecutor that it was absolutely

9    essential that you tell the truth?

10   A    Yes.

11   Q    You raised your hand, is that right?

12   A    Yes.

13   Q    And you took an oath which, in terms of the words, was

14   identical to the one that you took last Tuesday?

15   A    Yes.

16   Q    And your answer there was that Mr. Martin did not front you

17   any drugs, is that right?

18   A    Yes.

19   Q    That only Mr. Gardner had?  Now, you've also testified that

20   you and Martin and Gardner and I think a guy by the name of

21   Darryl Bacon would sometimes travel to New York City together, is

22   that right?

23   A    Yes.

24   Q    And you've testified that on only one time did you go up

25   with this guy Bo, whose real name you didn't know?

1    A    Right.

2    Q    And you started going up in about 1997?

3    A    Yes.

4    Q    And your testimony was that you went up there through about

5    2000 or 2001, is that right?

6    A    Yes.

7    Q    Now, did you understand that Mr. Martin was locked up from,

8    oh, about June of 1997 until 2001, when you saw him out on the

9    street?

10   A    No.

11   Q    You didn't?  Okay.  It was your understanding that when you

12   saw him out on the street in 2001, that he had just finished a

13   sentence, is that right?

14   A    Yes.

15   Q    And that he was in a halfway house.  So I gather your answer

16   is you don't know when the sentence began.  Is that what you're

17   telling me?

18   A    Right.

19   Q    Was there indeed an extended period of time when you were

20   traveling to New York City, when Mr. Martin was not with you?

21   A    Yes.

22   Q    And were you going up with other people at that time?

23   A    Yes.

24   Q    Now, you weren't really a partner of either Mr. Martin or

25   Mr. Gardner, were you?

1    A    No.

2    Q    They didn't work for you, did they?

3    A    No.

4    Q    You didn't work for them, is that right?

5    A    No.

6    Q    In fact, you had other people working for you, did you not?

7    A    Yes.

8    Q    And one of those people was a guy by the name of Aaron

9    Holly, is that right, also?

10   A    Yes.

11   Q    And you would front drugs to Aaron Holly, is that right?

12   A    Yes.

13   Q    And your testimony was that Mr. Gardner would front drugs to

14   Aaron Holly, is that right, also?

15   A    Yes.

16   Q    But you actually, but Mr. Martin, at least as far as you

17   know, did not front drugs to Aaron Holly, is that correct, also?

18   A    Right.

19   Q    Now, you have never actually robbed anyone, whether a drug

20   dealer or anybody else, with Mr. Martin, have you?

21   A    Yes.

22   Q    And was that the one occasion that you talked about when you

23   were going on a trip to, I think it was to a marijuana house, and

24   somebody, somebody jumped out and robbed a guy coming out of the

25   house?

1    A    Yes.

2    Q    That was the time that we're talking about, is that right?

3    A    Yes.

4    Q    Did you know that Mr. Gardner was going to do that?

5    A    Yes.

6    Q    And how did you know that?

7    A    I believe it was said.

8    Q    Okay.  And Mr. Martin stayed in the car, is that right?

9    A    Yes.

10   Q    So on that one occasion, it was actually Mr. Gardner who

11   committed the, committed the robbery, is that correct?

12   A    If you say so, yes.

13   Q    Well, it's not what I say, sir.  It's what you say.  Mr.

14   Gardner is the one who jumped out and robbed the man, is that

15   correct?

16   A    Yes.

17   Q    There were, however, people with whom you regularly

18   committed robberies, is that correct?

19   A    Yes.

20   Q    There was a fellow by the name of Marty Ball.  Do you

21   recognize that name?

22   A    Yes.

23   Q    Indeed, you have testified that you and Mr. Ball did a lot

24   of bad things together, is that right?

25   A    Yes.

1    Q    Mr. --

2            THE COURT:  Is that B-A-L-L?

3    Q    B-A-L-L, Your Honor.  Mr. Ball, was, in fact, your partner

4    in extended criminal activity over a period of years, is that

5    right?

6    A    Yes.

7    Q    And Aaron Holly was also somebody that you, that you were,

8    that you had committed many crimes with, is that right, also?

9    A    Yes.

10   Q    Now, when you testified, and I think it was just about a

11   week ago, on last Tuesday, you said that you considered that you

12   and some other people were a family.  Who were the people that

13   you included in that term "family?"

14   A    Who were the people?

15   Q    Yeah.

16   A    Goo, Wayne.

17   Q    Okay.  Mr. Mitchell?

18   A    He was their family.

19   Q    Pardon?

20   A    He was their family.

21   Q    Now, in any time in any of your discussions with law

22   enforcement, and I'm going through the same series of things that

23   Mr. Coburn did, in your three taped statements, in your federal

24   grand jury testimony, in your question and answer session with

25   Assistant State's Attorney Stocksdale, in your five proffer

1  sessions, have you ever told any law enforcement that you

2  considered these people to be your family?

3  A    I believe so, yes.

4  Q    You've recently read your federal grand jury testimony.  You

5  know that it's not in there, don't you?

6  A    No.

7  Q    You don't?  Okay.  Well, if I, if I tell you that it isn't,

8  will you accept my representation?

9  A    Yes.

10        MR. HARDING:  Objection.

11        THE COURT:  Overruled.

12  Q    And if I tell you that it's not in any of the question and

13  answer sessions that have been taped, will you accept my

14  representation on that, also?

15  A    Yes.

16  Q    Now, and if I tell you that it's not mentioned in any of the

17  proffer memos, will you accept that representation?

18  A    No.

19  Q    Okay.  Because you don't know what you said there, is that

20  right?

21  A    No, because I know I have said it so it got to be somewhere.

22  Q    Who was there when you said it?

23  A    Prosecutors.

24  Q    Which prosecutors?

25  A    Agents.  Mr. Harding was there.

1   Q    Mr. Harding was there.  Now, this family, did you guys refer

2   to each other in any way?  Did it have a name?

3   A    No.

4   Q    Did it have any sort of, did you people in this family, did

5   they have any tattoos, like gangs sometimes have?

6   A    No.

7   Q    Did this family have any sort of signature clothing or

8   colors which they would typically wear?

9   A    No.

10  Q    You did belong to criminal groups which had those

11  attributes, though, didn't you?

12  A    Yes.

13  Q    And what were the names of those groups?

14  A    Groups?

15  Q    Yeah.

16  A    Just a group.  Cruddy Crew.

17  Q    Did any of them have a name?

18  A    Cruddy Crew.

19  Q    One of them was something called the Cruddy Crew, is that

20  right?

21  A    Yes.

22  Q    And who was in the Cruddy Crew?

23  A    Me, Elkie, Smokey.  It was a lot of people.

24  Q    And how many people are we talking about?

25  A    Maybe ten or more.

1    Q    Okay.  And how long did that group, how long was that group

2    in existence?

3    A    For a while.

4    Q    Well, what's -- are we talking about months, years?

5    A    Years.

6    Q    And from when to when?

7    A    Maybe '94, '95.

8    Q    Pardon?

9    A    Maybe '94, '95 when it started.

10   Q    1994 to maybe as late as 1997, is that right?  Did that

11   group --

12            MR. HARDING:  Objection.  Objection.

13            THE COURT:  Sustained.

14   Q    I'm sorry.  What were the dates that you said that the group

15   was in existence?

16   A    I said might have started maybe in '94, '95.  It's still in

17   existence today.

18   Q    Oh, it's still in existence today?

19   A    Yes.

20   Q    So this is something that's -- did that group have any

21   tattoos or wear any colors or have any sort of signature

22   clothing?

23   A    Yes.

24   Q    And what sort of tattoos did that group have?

25   A    Cruddy Crew.

CROSS EXAMINATION OF MONTGOMERY BY CROWE                    55

1    Q    Pardon?  Cruddy Crew?  Have you got a Cruddy Crew tattoo on

2    you?

3    A    Yes.

4    Q    Okay.  Was there any other group that had, criminal

5    organization that you belonged to where the members had tattoos

6    on wore colors?

7    A    No.

8    Q    Do you have a tattoo on your neck or your throat called OTM?

9    A    Yes.

10   Q    And what does that stand for?

11   A    Out that mob.

12           THE COURT:  I'm sorry.  Say that again.

13   A    Out that mob.

14   Q    O-U-T, T-H-A-T, M-O-B, is that correct?

15   A    Yes.

16   Q    And was that a gang?

17   A    No.

18   Q    Okay.  Did other people have that tattoo, also?

19   A    Yes.

20   Q    Okay.  And was one of the people who had that tattoo a guy

21   by the name of Terry Cheeks, whom you murdered?

22   A    Yes.

23   Q    And were there, in fact, a number of people, were there, in

24   fact, a number of people who had that tattoo?

25   A    Yes.

1    Q    Why did they have the, why did they have that OTM tattoo?

2    A    Neighborhood.

3    Q    Pardon?

4    A    It's a neighborhood thing.

5    Q    And was this, this is a neighborhood thing, like a community

6    association that throws barbeques or was it a bunch of people who

7    got together and committed crimes?

8    A    No.

9    Q    Never committed crimes?

10   A    They committed crimes.

11   Q    Pardon?

12   A    They committed crimes.

13   Q    They committed crimes.  And in fact, did this group actually

14   have a color that it wore?

15   A    No.

16   Q    You sure about that?

17   A    Yes.

18   Q    Okay.  Do you ever recall telling law enforcement that the

19   OTM group wore the color red?

20   A    No.

21   Q    And what was the Cruddy Crew's color?

22   A    They don't have no color.

23   Q    Did you ever tell anybody that an organization that you

24   belonged to wore the color red?

25   A    No.

1    Q    If I might have just a moment, Your Honor.

2              THE COURT:  Yes.

3              (Pause in proceedings.)

4    Q    I'm going to put up on the screen a portion of the taped

5    statement, actually the very first taped statement that you gave

6    on July 2.

7              MR. HARDING:  Objection.

8    Q    And I'm going to be referring to Pages 13 and 14.

9              THE COURT:  I think there's an objection to your

10   putting it on the screen, Mr. Crowe.

11   Q    Okay.  Let me just ask you this.  Do you recall a Detective

12   Carew asking you a question?  Okay.  All right.  The, uh, what

13   does OTM stand for?  Montgomery:  Out that mob.

14             Carew:  And Terry had a tattoo, OTM, on him, didn't he?

15   Montgomery:  Out that mob.

16             Carew:  Do you have a tattoo?  Montgomery:  Yeah, on my

17   neck.

18             Carew:  And uh, uh, what else, uh, see, where did that

19   start from, the OTM?  Your answer is:  It came from around, like

20   the time, and then it says inaudible.

21             And Carew says:  When you say Cle, C-L-E, are you

22   saying Cleo and Garrett?  And you say yeah.

23             And Carew says:  What, what colors?  Montgomery says:

24   Red.

25             Carew says:  Red?  And that's what you have on right

1    now?  Montgomery:  Yes.

2              Do you recall that, do you recall that passage?

3    A    Not really, no.

4    Q    Does it sound a little familiar to you?

5    A    Somewhat, yes.

6    Q    Okay.  Do you recall there being a discussion in, if not the

7    first taped statement, at least one of the early ones, about the

8    gang color for Out That Mob?

9    A    It's not a gang.

10   Q    Pardon?

11   A    It's not a gang.

12   Q    Okay.  Do you recall, do you recall a discussion about OTM

13   and the fact that it had the color red?

14   A    No.

15   Q    Do you recall the fact that somebody making comment about

16   the fact that you were actually wearing red the day you were

17   arrested on Edmondson and when you gave that taped statement

18   about seven hours later?

19   A    No.

20   Q    Okay.  Now, there are a whole bunch of other gangs that I,

21   that I assume that you're familiar with living in the

22   neighborhood you do, is that correct?

23   A    Yes.

24   Q    There are the Bloods, is that right?

25   A    Yes.

1   Q    Are the Crips active, were they active in the neighborhood

2   you were in?

3   A    Not when I was out there.

4   Q    Were there a whole bunch of different gangs which use the

5   word "gorilla" in them?

6   A    Yeah.

7   Q    Have you ever heard about CBS?

8   A    Yes.

9   Q    Okay.  And what is CBS?

10  A    Calhoun, Baker and Stricker.

11  Q    And was that a gang, also?

12  A    No.

13  Q    And what about Lexington Terrace?

14  A    What about it?

15  Q    Was that a gang?

16  A    No.

17  Q    The Lexington Terrace Boys were not a gang?

18  A    The Lexington Terrace Boys?

19  Q    Yeah.

20  A    They probably was.

21  Q    They probably were.  Now, do you recall that last Wednesday

22  Mr. Coburn played for you a part of the statement, of a taped

23  statement that you gave with Mr. Stocksdale?  Do you remember

24  that?

25  A    No.

1    Q    You don't?  Okay.  Well, let's put it up on the screen.  Do

2    you recall that he asked you a series of questions about your

3    relationship with Mr. Gardner and whether it was a relationship

4    of honor?

5    A    Yes.

6    Q    Okay.  And referring to Page 10.

7              MR. HARDING:  Objection.

8              THE COURT:  Again, you're not going to put it on there?

9    Q    I was planning on it, yes, Your Honor.

10             THE COURT:  There's an objection.

11   Q    Sustain the objection?

12             THE COURT:  Yes.

13   Q    Okay.  Do you recall Mr. Stocksdale asking the question,

14   could you --

15             THE COURT:  Let me explain to the jury.  Members of the

16   jury, I will instruct you at an appropriate time near the end of

17   the case and perhaps before then as to the manner in which, as

18   I've said to you before, you should evaluate witness testimony in

19   this case.

20             One of the things that you've observed now repeatedly

21   by really all the lawyers who've questioned witnesses is a lawyer

22   will ask a question of a witness and then bring to the witness'

23   attention what the lawyer may suggest or contend is a prior

24   statement by the witness that is inconsistent with the witness'

25   trial testimony.  This is entirely appropriate for a lawyer to do

1    on both the government's side as well as the defense side.

2            But what I will instruct you, with certain exceptions,

3    is that your verdict in this case to be based on the witness'

4    testimony in this courtroom.  Again, with certain exceptions, a

5    witness' prior statement which a lawyer may use to cross examine

6    or even examine a witness may be considered by you, with certain

7    exceptions, only as you may find that the prior statement assists

8    you in deciding what, if any, of the witness' in-court testimony

9    to accept.

10           So as I've told you earlier, ultimately it is up to the

11   jury to decide what, if any, testimony of any witness you choose

12   to credit or believe.  You can believe all of the testimony of a

13   witness, none of the testimony of a witness, or some of the

14   testimony of a witness.

15           So if you should find, as I will instruct you in

16   greater detail, that a witness made a prior statement and that

17   that prior statement, if you so find, is inconsistent with the

18   witness' trial testimony, then you may consider the prior

19   statement and any inconsistencies, and why there may be

20   inconsistencies, and any explanation for any inconsistencies, in

21   deciding how much weight, if any, you should give any particular

22   witness' testimony in court.

23           Again, I'll elaborate on this instruction, as I will

24   all of my instructions to you, at the appropriate time.

25           Sorry for the interruption, Mr. Crowe.

1          MR. CROWE:  That's quite all right, Your Honor.

2          THE COURT:  Oh, I left out.  So in this connection,

3    ladies and gentlemen, in my discussions with counsel, as you've

4    seen, sometimes a lawyer will put a transcript of a prior

5    interview or grand jury testimony on the DOAR when the lawyer is

6    questioning the witness about the prior statement.  Other times

7    one or the other lawyers may not want the transcript to be placed

8    on the DOAR.  And that's entirely appropriate.  So that sometimes

9    you may get to actually see the statement when the witness is

10   asked about it.  Other times you will not be permitted to see the

11   statement but you will hear the lawyer's summary or reading of

12   the statement.

13          The prior statement itself and any transcript of the

14   prior statement, unless there's an exception, is not itself

15   evidence and the transcripts that have been placed on the DOAR

16   for you to read are not exhibits in the case.  So they will not

17   be sent back into the jury room with you when you are excused to

18   begin your deliberations.

19          So I tell you this now so that you have a better

20   understanding of why it is, and perhaps you think it's been

21   somewhat inconsistent, and it has, because as I say, sometimes

22   the lawyers, the lawyers don't care if a transcript is shown to

23   you.  Other times the lawyers do care if the transcript is shown

24   to you.  You shouldn't speculate about why sometimes you're shown

25   the transcript and why other times you're not shown the

1    transcript.  What's important is that the transcript and the

2    prior statement itself is not substantive evidence for you to

3    consider in this case.  Rather, it is only matters for you to

4    consider in deciding what substantive evidence, including

5    testimony by a witness in this courtroom, you should credit.

6              Okay.  Go ahead, Mr. Crowe.

7    BY MR. CROWE:

8    Q    Just to recap.  Is it your testimony that you, in fact,

9    didn't have a serious relationship with Mr. Gardner which had any

10   component or element of honor to it?

11   A    Is that my testimony?

12   Q    Well, is that your testimony today?

13   A    No.

14   Q    Okay.  Is it true that you didn't have the same sort of

15   relationship with Mr. Gardner that you would have had for your

16   friend Dirty or Davon Watson?

17   A    Right.

18   Q    Now, you do recall that Mr. Coburn actually played for you a

19   tape of your question and answer session with Mr. Stocksdale on

20   this subject.  Do you recall that?

21   A    Yes.

22   Q    Okay.  And was the following, was, were the following

23   questions and answers given?  Stocksdale:  Could you describe

24   your relationship or association with Mr. Gardner?  Montgomery:

25   He cool.

Case 1:04-cr-00029-RDB    Document 683    Filed 06/08/09    Page 64 of 221

1          And when you say, quote, "he cool", unquote, what do

2     you mean, Mr. Montgomery?  Montgomery:  We hook up a few times.

3     It ain't, ain't no serious relationship with it, though, to have,

4     to have honor to each other, no.

5          Stocksdale:  To have honor with each other?

6     Montgomery:  Um, um, ain't nothing like that.

7          Stocksdale:  How often would you associate with Mr.

8     Gardner?  Montgomery:  Oh, we used to associate on a regular, on

9     a regular, whenever we can, basically.  If he come around, holler

10    at E, I'm there, we would rap before E.  And then there's

11    something which is inaudible.  We used to go up to New York

12    together, stuff like that.  But it wasn't nothing like we met

13    every day.  And he called me when he got in trouble.  Stuff like

14    how me and Dirty is, it ain't nothing like that?

15         Now, did you, in fact, have that discussion with Mr.

16    Stocksdale?

17    A    Yes.

18    Q    And did you believe that you were telling him the truth at

19    the time?

20    A    No.

21    Q    You thought you were lying with him at the time, lying to

22    him at the time, is that right?

23    A    Somewhat, yes.

24    Q    And would you care to tell us why it was, after you'd made

25    your agreement to cooperate and do nothing but tell the truth,

Case 1:04-cr-00029-RDB   Document 683   Filed 06/08/09   Page 65 of 221

1    that you lied to Mr. Stocksdale?

2    A    At that time I wasn't really sure that I wanted to, to get

3    out stuff out about Dirty, Spence and Goo, and all that.

4    Q    Well --

5    A    -- because I wasn't charged with it.

6    Q    Well, isn't it, in fact, true that in your prior taped

7    statements you had, and in your proffer sessions, you had gone

8    over the whole Darius Spence matter?

9    A    Prior?

10   Q    Yeah.

11   A    I don't know.

12   Q    And isn't it, in fact, that in this taped statement, you

13   spend pages and pages and pages essentially telling the same

14   story that you've told this grand, that you've told this jury

15   about, about the attempted robbery and murder of Darius Spence

16   and the killing of Tonya Jones-Spence?

17   A    Yes.

18   Q    You did it in the same session, is that right?

19   A    I don't know.

20   Q    I will tell you that this taped statement was taken in

21   January 22 of 2003.  Were you holding anything back from law

22   enforcement people at that time?

23   A    No.

24   Q    No.  Now, this Davon Dirty Watson that we've talked about

25   was, in fact, one of the guys who helped you in the murder of

1    Terry Cheeks, is that right?

2    A    Yes.

3    Q    And he was there at the murder of Terry Cheeks, is that

4    right?

5    A    Yes.

6    Q    Is he the man who pried Cheeks's .38, or whatever weapon it

7    was, out of his, out of his dead hand?

8    A    Yes.

9    Q    Okay.

10            THE COURT:  How much more do you have, Mr. Crowe?

11            MR. CROWE:  I would think, Your Honor, probably 15, 20

12    minutes.

13            THE COURT:  Okay.  We should take a break now.

14            We'll take our morning recess, ladies and gentlemen.

15    Please leave your note pads in your chairs.  Have no discussion

16    about the case.  Continue to keep an open mind about all issues.

17    We'll stand in recess for 15 minutes.

18            (Recess.)

19            THE COURT:  Mr. Kurland, I'm aware of your concern, I

20    don't think terribly concerned with my limiting instruction.  I

21    assure you I am very much aware of the fact that counsel for Mr.

22    Gardner and perhaps others will be asking the Court to instruct

23    the jury that certain prior statements should be considered by

24    the jury as substantive evidence.  That's why I said two or three

25    or four times during my limiting instruction "with exceptions."

1    I emphasized, there will be exceptions.  So I've cover that if

2    that's your concern.

3              MR. KURLAND:  Yes.  That's largely the concern.

4              THE COURT:  What's the other concern?

5              MR. KURLAND:  Well, with respect to the grand jury

6    testimony as prior inconsistent statements, which is largely, not

7    exclusively, but largely the documents of which the government is

8    having no objection to, those are all admissible as substantive

9    evidence.  And I think that the way the Court gave the

10   instruction right now, it seems to kind of --

11             THE COURT:  I think I covered it.  I think I covered

12   it.

13             MR. KURLAND:  All right, Your Honor.  Thank you.

14             THE COURT:  Jury, please.  Are we coming backwards with

15   this witness?  Is that what the agreement is?

16             MS. RHODES:  Yes.

17             MR. LAWLOR:  Yes, but I don't think we'll have

18   anything.

19             THE COURT:  Okay.

20             (Jury enters the courtroom.)

21             THE COURT:  Mr. Coburn, you may -- excuse me.  Mr.

22   Crowe, you may proceed whenever you're ready.

23   BY MR. CROWE:

24   Q    Thank you, Your Honor.  About three weeks before June 7, you

25   had murdered a man on a street corner in Baltimore County,

1    Baltimore City, had you not?

2    A    Yes.

3    Q    That man was named Terry Cheeks?

4    A    Yes.

5    Q    And you and Terry Cheeks were both out on that street corner

6    and you were both, you were both armed, is that right?

7    A    Yes.

8    Q    He thought you were your friend?

9    A    Yes.

10   Q    He thought you guys were doing things together, is that

11   right?

12   A    Yes.

13   Q    But in fact, you had a contract to put a hit out on him, is

14   that right?

15   A    I put a hit out on him?

16   Q    No.  You had a contract to kill him?

17   A    Yes.

18   Q    And your original contract was for $15,000?

19   A    Yes.

20   Q    But you wound up getting paid $10,000, is that right, also?

21   A    Yes.

22   Q    And as he peeked around the corner, was that McKean and

23   Lanvale?

24   A    Yes.

25   Q    Snuck up, you came up behind him, didn't you?

1   A    Yes.

2   Q    You put a bullet through the back of his head?

3   A    Yes.

4   Q    And that was for 10 or $15,000?

5   A    Yes.

6   Q    And who else was with you there besides, besides Davon

7   Watson?

8   A    E.

9   Q    Pardon?

10  A    E.

11  Q    E?

12  A    E.

13  Q    Mr. Holly was with you?

14  A    Yes.

15  Q    Okay.  So Mr., this is the same Mr. Holly, obviously, who

16  was there in the, for the Tonya, for the Tonya Spence killing, is

17  that right?

18  A    Yes.

19  Q    Now, there has been mention of a guy by the name of Goose.

20  And Goose is somebody that you had met, is that correct?

21  A    Yes.

22  Q    But he's not somebody that you knew terribly well, is that

23  right, also?

24  A    Right.

25  Q    In fact, do you know Goose's full name?

1    A    No.

2    Q    Have you ever, you're never known his full name, have you?

3    A    No.

4    Q    Did you know where he worked?

5    A    No.

6    Q    And it's your testimony that Mr. Martin discussed a possible

7    plan to rob this guy, Goose, is that correct?

8    A    Yes.

9    Q    What did he tell you about Goose?

10   A    What you mean?

11   Q    What did he tell you?  What did he tell you about Goose?

12   A    He just told me that he planned on robbing Goose.

13   Q    I'm sorry.  I couldn't hear the answer.  Could you repeat it

14   a little more slowly?

15   A    He told me that he have plans on robbing Goose.

16   Q    And that's it, is that right?

17   A    Right.

18   Q    Did he tell you where Goose worked?

19   A    No.

20   Q    Did he tell you that he had any particular relationship with

21   this guy named Goose?

22   A    No.

23   Q    So he just told you he had a plan on robbing this guy named

24   Goose.  And isn't it, in fact, true that you yourself knew where

25   you would be able to locate Goose if you had to?

1    A    Yes.

2    Q    So you didn't need Mr. Martin to locate Goose, is that

3    right?

4    A    No.

5    Q    You said you knew that Goose lived in the city, is that

6    right?

7    A    No.

8    Q    Did you know that Goose sometimes came out to the county and

9    parked his car in a particular place?

10   A    Yes.

11   Q    And so, and where was that particular place where Goose used

12   to park his car?

13   A    Randallstown.

14   Q    Well, where in Randallstown?

15   A    Not too far from my mother house.

16   Q    Okay.  And where was it that he parked his car in

17   Randallstown?

18   A    I don't know the street name.

19   Q    And isn't it true that you told the federal grand jury that

20   the reason that Goose wasn't robbed was because you did not get

21   the chance?

22   A    Right.

23   Q    And Mr. Martin's being available or unavailable really had

24   very little to do with the matter, did it?

25   A    Yes, it did.

1    Q    And why was that?

2    A    Because I wasn't going to touch him without him.

3    Q    Pardon?

4    A    I was not going to touch him without him.

5    Q    That's because you're such an upstanding guy that you're

6    always good to your friends, right?

7    A    Yes.

8    Q    Like Terry Cheeks?

9    A    Yes.

10   Q    You've testified that Mr. Gardner told you something about a

11   tape and the words "Wayne" and the word "man."  If I understand

12   it, Mr., if I understood you correctly, Mr. Gardner said that

13   somebody had said something on a tape and the detectives thought

14   it was "Wayne" but it was actually "man?"

15   A    He said Bo had said it, yes.

16   Q    He said Bo had said it.  How would one confuse the words

17   "Wayne" and "man?"

18   A    You got to ask the detectives, call them.

19   Q    Is it true because in some, because a lot of people you know

20   will pronounce the word "man" more like "main?"

21   A    Sometimes, yes.

22   Q    Okay.  In fact, you've heard, you've heard it that way in

23   rap songs, haven't you?

24   A    I don't know.

25   Q    You don't know.  Okay.  Fair enough.  Now, your testimony,

1   as I recall it, last week was that you understood from Gardner

2   that Mitchell, the fellow you knew as Bo and Gardner and Martin

3   all had this alibi that they were at a movie?

4   A    Yes.  That was my understanding.

5   Q    That was your understanding of it.  And was this a fairly

6   brief conversation that you had with Mr. Gardner?

7   A    Yeah.

8   Q    Now, he didn't tell you that Martin didn't go to the movie,

9   did he?

10  A    No.

11  Q    In fact, what he told you was that he understood that Martin

12  had actually purchased tickets, is that right?

13  A    Yes.

14  Q    He didn't tell you how many tickets, did he?

15  A    No.

16  Q    Did he tell you who had gone to the movie with Mr. Martin?

17  A    No.

18  Q    So for all you know, Mr. Martin was, in fact, at the movie

19  the night that he was talking about, is that right?

20  A    Yes.

21  Q    Now, in all of the statements, in your federal grand jury

22  testimony, which I have right here and which you've read a couple

23  of weeks ago, you didn't tell the federal grand jury that Mr.

24  Gardner was interested in participating in the robbery of Darius

25  Spence because he needed money in order to help fund legal costs

1    for Mr. Martin, did you?  You didn't say that in the grand jury,

2    did you?

3    A    I don't know.

4    Q    Okay.  If I represent to you that you didn't, would you

5    accept that?

6    A    Yes.

7    Q    When you were talking, however, to Mr. Stocksdale, wasn't,

8    didn't you, in fact, say that the reason, that the reason that

9    Mr. Gardner was interested in participating in this robbery was

10   that he had taken a nice fall and that he had lost a couple of

11   thousand?

12   A    Yes.

13   Q    You remember the fact that Mr. Coburn played that tape for

14   you?

15   A    Yes.

16   Q    And you certainly didn't tell Mr. Stocksdale at that point

17   that Mr. Gardner needed to participate in the robbery because he

18   wanted to raise any money for Mr. Martin, did you?

19   A    On that tape?  No.

20   Q    What you told him was that Mr. Gardner had lost some money,

21   is that correct?

22   A    Right.

23   Q    Was that true, also, or is this another time when you were

24   kind of lying to Mr. Stocksdale?

25   A    No, that was true.

1    Q    That was true.  How would he have lost the money?  Never

2    mind.  Strike that.  We don't need to go into that.  But he had

3    lost the money, is that right?

4    A    That's what was told to me.

5    Q    Now, I want to call your attention to a very specific

6    proffer session that you had.  Do you recall one session where

7    there were a whole bunch of people in the room?

8    A    What were we talking about?

9    Q    I'm talking about a session that would have taken place on

10   September 26th of 2002.  Let me just read you the names of the

11   people that I think were in there.  John Sakellaris and Joan

12   Fraser.  They were both your lawyers, weren't they?

13   A    Yes.

14   Q    An Assistant U.S. attorney named James Green.  2 ATF special

15   agents, a Thomas Love and a Michael Groth.  I'm sorry.  Mr. Love

16   may not have been there that day.  A whole bunch of Baltimore

17   City Police detectives -- John Giganti, Keith Benson.  Baltimore

18   County Detective Phil Marll.  Baltimore County Detective James

19   Tincher.  A Sergeant Garnell Green who came in from Homicide.  A

20   Ron, Ron Berger.  A Major Anthony Barksdale from the city police

21   department.  A Lieutenant Dean Palmere.  And a Detective Michael

22   Coleman.

23         Do you remember one meeting in particular where there

24   was just all of these people in the room?

25   A    I don't remember all of them people.  But yeah, I remember a

1    lot of people.

2    Q    Okay.  All right.  Do you remember at one of the last

3    proffer sessions, that you were asked about shootings which had

4    taken place at 2700 Lauretta?

5    A    Yes.

6    Q    Okay.  And do you recall that a law enforcement official

7    came in and explained how two weapons that were used in those

8    shootings, both .40 calibers, tied in to other shootings?

9    A    I think so, yes.

10   Q    Okay.  And indeed, wasn't it after that, wasn't it then that

11   you mentioned for the very first time that Mr. Gardner, that Mr.

12   Gardner's .40 caliber Glock was a weapon that he said was dirty?

13   A    I don't know.

14   Q    Might have been the first time you mentioned it, is that

15   right?

16   A    Might have been.

17   Q    And indeed, prior to that session that you had in that

18   proffer session, had you ever told anybody before that Mr. Martin

19   had made this supposed statement that had he a weapon with three

20   bodies on it?

21   A    I don't know.

22   Q    You might not have, is that right?

23   A    I might have.

24   Q    But you clearly don't recall having mentioned it before that

25   time, do you?

1    A    I don't know if I did or not.

2    Q    Okay.  Do you remember being surprised at hearing this

3    thing, and I will tell you that it was in late September, 2002,

4    being aware for the first time that there might be any connection

5    between, between weapons of the sort that I've described?

6    A    Being surprised?  No.

7    Q    Do you remember thinking that that was the first time you'd

8    ever heard anything like that?

9    A    No.

10   Q    Okay.  If I understand things correctly, in really just the

11   month before Tonya Jones-Spence died, you had murdered somebody

12   that you had known as a child for money.  And that was Terry

13   Cheeks.

14   A    I did not know him as a child.

15   Q    Okay.  You had known him, you had known him for a long time

16   and he was a friend, is that right?

17   A    I did not know him a long time, no.

18   Q    He was a friend?

19   A    Yes.

20   Q    Okay.  But you just put a bullet in the back of his head?

21   A    Yes.

22   Q    And that was for money, is that right?

23   A    Yes.

24   Q    And you were also involved in, in a plot to murder Darius

25   Spence, is that correct?

1    A    Yes.

2    Q    And that was somebody that you'd known as a child, also,

3    that you had known from the time you were a child, is that right?

4    A    Yes.

5    Q    And you have spoken about, you know, your going up with Mr.

6    Gardner and Mr. Holly and essentially casing the apartment on

7    Bramble Lane, is that right?

8    A    Yes.

9    Q    Isn't it also, in fact, true that you by yourself went out

10   into the city, you went out into clubs that Terry Cheeks

11   frequented, you spoke to women that he was close with about how

12   much money he was flashing and about the sex that he was having

13   with them, and that you were doing this as part of your plan to

14   rob him?

15   A    No.

16   Q    That's not true?

17   A    No.

18   Q    Can I just have a moment, Your Honor?

19           THE COURT:  Yes.

20           (Pause in proceedings.)

21   Q    So you don't recall making that statement in a proffer

22   session, is that right?

23   A    No.

24   Q    And that's because it never happened, right?

25   A    Right.

1    Q    Darius Spence was a friend of yours, is that right?

2    A    Yes.

3    Q    And did you know his wife?

4    A    Yes.

5    Q    And she was kind of an innocent bystander in this thing, is

6    that right?

7    A    Yes.

8    Q    She was somebody who just happened to be there?

9    A    Yes.

10    Q    And because she just happened to be there, she, she had to

11    be killed.  That's the way you felt about it, is that right?

12    A    No.

13    Q    No?  In fact, if one is to believe your testimony, you had a

14    pretty good idea before you went out there that day that

15    something bad was going to happen and something bad was going to

16    happen to Ms. Spence, is that right?

17    A    Yes.

18    Q    And you could have stopped it, couldn't you?

19    A    No.

20    Q    You couldn't have said no, we're not doing this?

21    A    No.

22    Q    Wasn't, wasn't this your caper, your idea?

23    A    Yes, it was.

24    Q    But you think that if you told these, according to your

25    testimony, you told these guys you didn't want to do it, they

1    just wouldn't have done it?

2    A    I believe they still would have done it.

3    Q    And indeed, after the shooting, you walked over, you made

4    eye contact with Ms. Spence, and you just walked away, is that

5    right?

6    A    I walked over?

7    Q    Did you make eye contact with her?

8    A    Yes.

9    Q    And you just kept on walking, is that right?

10   A    Yes.

11   Q    And that was all something you guys were going to do because

12   you thought you were going to make some money, is that right?

13   A    Yes.

14   Q    Indeed, as you were walking away, you still had another

15   murder plan, did you not?

16   A    Yes.

17   Q    And who was that person?

18   A    Darius Spence.

19   Q    Okay.  What about a fellow by the name of either Marvin or

20   Melvin?

21   A    Don't know what you're talking about.

22   Q    You're sure?

23   A    Yes.

24   Q    You don't recall telling any police officers in proffers

25   that you had a plan to murder a man by the name of Melvin or

1    Marvin, is that right?

2    A    I don't know what you're talking about, no.

3    Q    Okay.  Thank you.

4            MR. MARTIN:  No questions.

5            MR. LAWLOR:  No questions.

6            THE COURT:  Redirect.

7            REDIRECT EXAMINATION

8    BY MR. HARDING:

9    Q    Good afternoon, Mr. Montgomery.

10   A    Good afternoon.

11   Q    Mr. Coburn, and again this morning some of the other defense

12   attorneys, I guess Mr. Crowe, went through a sort of list of

13   occasions when you've given interviews to the police or to

14   prosecutors or some combination, and federal agents as well, and

15   sometimes these are called proffer sessions.  Do you recall being

16   asked --

17   A    Yes.

18   Q    -- about all that?  And although you couldn't remember the

19   dates of those sessions, you did remember that you started giving

20   those proffers the very first day you were arrested back on July

21   2nd of 2002.  Do you recall that?

22   A    Yes.

23   Q    And you testified just this morning, did you not, that the

24   police officers didn't ask you about the murder of Terry Cheeks

25   before you started telling them about it, is that correct?

1    A    That's correct.

2    Q    Because, in fact, you weren't arrested for that murder.  You

3    weren't even arrested for a handgun that day.  You were arrested

4    for violation of probation?

5             MR. LAWLOR:  Objection, Your Honor, to the leading.

6             THE COURT:  Yeah.  Don't lead the witness.

7    Q    What were you arrested for that day?

8    A    Violation of probation.

9    Q    And when they brought you down, they started talking to you,

10   is that your testimony?

11   A    Yes.

12   Q    And did you tell them about the murder of Terry Cheeks or

13   did they tell you --

14            MR. MARTIN:  Objection.

15   Q    -- about it?

16            THE COURT:  Overruled.  You may answer.

17   A    I told them about it.

18   Q    And did you tell them about the gun, the 9 millimeter, in

19   Brittany's apartment or did they tell you about it?

20   A    They told me about it.

21   Q    How did they tell you about it?

22   A    When they raided her house.

23   Q    Why did they raid her house?  How did they know to raid it?

24            MR. MARTIN:  Objection, Your Honor.

25            THE COURT:  Do you know why they raided the house?

REDIRECT EXAMINATION BY MR. HARDING                83

1          THE WITNESS:  Yes.

2          THE COURT:  You may answer.

3          THE WITNESS:  I was given a phone call down Homicide

4    and I called Brittany.  I told Brittany I was locked up.  I told

5    her I wasn't going to get no bail.  I told her to wash my clothes

6    and give them to my cousin.

7    BY MR. HARDING:

8    Q    I see.  And the police heard you say that?

9    A    Yes.

10   Q    And they knew what you were really saying, is that it?

11   A    They knew I was talking in code, yes.

12   Q    Okay.  And so they went to your apartment and recovered a

13   gun, is that correct?

14   A    Yes.

15   Q    Now, in the beginning you talked to the police mostly and it

16   was mostly about the Terry Cheeks murder, is that correct?

17   A    Yes.

18   Q    And then you did these proffer sessions that we've heard so

19   much about from both Mr. Crowe and Mr. Coburn over, at the U.S.

20   Attorney's office, except that neither me nor Mr. Hanlon was

21   present, is that correct?

22   A    Right.

23   Q    And at those sessions is it fair to say that you opened up

24   and told about a great many different crimes that you knew about?

25   A    Yes.

1    Q    And that you told all about your prior relationships with

2    Mr. Gardner, Mr. Martin, and Mr. Mitchell in those early

3    proffers, is that correct?

4    A    Yes.

5    Q    Mr. Coburn asked you last week if you had ever before,

6    before last week, disclosed the plan to rob Goose, and Mr.

7    Gardner's involvement in that.  Do you recall him asking you

8    about that?

9              MR. COBURN:  Objection, I did not.

10             THE COURT:  The jury's recollection will control.

11   Overruled.

12   A    I think so, yes.

13   Q    And you said that you did not know whether you had talked

14   about that before, is that correct?

15   A    Right.

16   Q    Let me show you.  If I may approach the witness, Your Honor?

17             THE COURT:  Yes.

18             MR. HARDING:  Or I'll put it on the screen if counsel

19   don't object.

20             MR. COBURN:  No objection.

21   BY MR. HARDING:

22   Q    No objection.  This is your grand jury testimony from

23   January 14th, 2004.  Do you recall being asked, what was the drug

24   dealer, who was the drug dealer?  His name was Goose.  And you're

25   talking about a plan to rob a drug dealer, and specifically a

1    discussion that you got into about that.  And do you recall then

2    being asked, I don't suppose you know Goose's real name, do you?

3    And you said no.  And then, and whose idea was it to rob Goose?

4    And you said Wayne's or Goo's, I ain't sure.  Is that correct?

5    A    Right.

6    Q    So nearly five years ago you put both of them in this

7    robbery scheme with you, is that correct?

8    A    Right.

9    Q    And you said, in fact, as you did this morning, that you had

10   discussed it only with Wayne, is that correct?

11   A    Right.

12   Q    But Goo was supposed to be part of it, also, is that your

13   testimony?

14   A    Yes.

15   Q    It might have even been his idea?

16        MR. COBURN:  Objection.

17        THE COURT:  Sustained.

18   Q    Mr. Coburn last week went through a long list of people whom

19   you had talked about in your proffer sessions and asked you if

20   you remembered telling the police about those people.  Do you

21   recall that?

22   A    Yes.

23   Q    And you, in fact, did give an enormous amount of information

24   over and over again about a great many different crimes to the

25   police and to federal agents?

1          MR. LAWLOR:  Objection, Your Honor.

2          MR. COBURN:  Objection.

3          THE COURT:  Sustained.  Don't lead the witness.

4   Q    Did you give a great deal of information?

5   A    Yes.

6   Q    To the police and to federal agents?

7   A    Yes.

8   Q    When Mr. Coburn got to the end of his list of names, he said

9   that he was finally at the end of his list and he wanted to ask

10  you about one last name and that name was Bunk.  Do you recall

11  that?

12  A    Yes.

13  Q    And then he wanted to know why you had never before said

14  that Bunk had tried to, why you had not said in this trial, I

15  think he's referring to, that Bunk had tried to kill you in jail.

16  Do you recall that?

17          MR. COBURN:  Objection.  I did not say that.

18          THE COURT:  The jury's recollection will control.  You

19  may proceed.

20  A    Yes.

21  Q    Do you recall him talking about a guy named Real?

22  A    Yes.

23  Q    And what did you explain to him about Real?

24  A    I told him Real wasn't in the plan of trying to kill me.

25  Q    Okay.  Do you remember, calling your attention to a proffer

1    you gave on August 13th, 2002, just a couple of, well, about five

2    or six weeks after your arrest, do you recall giving a proffer

3    session in which you described to the police this whole thing

4    about Bunk and his attempt to have you killed in jail?  Do you

5    recall that?

6    A    Yes.

7    Q    Okay.  And when you were talking about that in 2002, you

8    were talking about something that had happened in the past, were

9    you not?

10   A    Yes.

11   Q    Because, in fact, this had happened during one of the prior

12   occasions --

13         MR. COBURN:  Objection.

14   Q    Did this happen during a prior occasion when you were locked

15   up?

16   A    Yes.

17   Q    Do you have any idea how long ago it was that Bunk had tried

18   to have you killed?

19   A    2000.

20   Q    Eight years ago?

21   A    Yes.

22   Q    Okay.  So does that attempt by Bunk to have you killed in

23   2000 have anything at all to do with this case or with your

24   relationship with Bo and Goo and Wayne?

25   A    No.

1  Q    Did I ask you on direct about the fact that a guy named Bunk

2  had tried to have you killed in 2000?

3  A    Not that I remember.

4  Q    Now, during the latter part of 2003 and the early part of

5  2004, did you begin to have meetings with me and federal agents

6  about this case?

7  A    I believe so, yes.

8  Q    Okay.  Did you tell us during those proffers all about the

9  attempt to, the attempt to get Goose, to rob and kill Goose, and

10 the attempt to rob and kill Darius Spence?

11 A    Yes.

12 Q    And did you, first of all, when you met with me or Mr.

13 Hanlon or any other federal prosecutors, were there always agents

14 present, also?

15 A    I believe so, yes.

16 Q    And those agents might be Mr. Klas or Mr. Benson or other

17 federal agents, is that correct?

18 A    Yes.

19 Q    And did you use the term "family" to describe your

20 relationship with Goo and Wayne and other, other people,

21 including Mr. Mitchell and Mr. Darryl Bacon and Mr. Aaron Holly

22 during those proffer sessions?

23          MR. CROWE:  Objection.

24          THE COURT:  Overruled.  You may answer.

25 A    I believe so, yes.

1    Q    Did you come up with that word on your own?

2    A    Yes.

3    Q    Did anyone tell you to use that word?

4    A    No.

5    Q    Did you use that term repeatedly in describing your

6    relationship with --

7              MS. RHODES:  Objection.

8              THE COURT:  Overruled.  Go ahead.

9    Q    -- with these three defendants you've testified about here

10   today, as well as people like Darryl Bacon and Aaron Holly and

11   Dirty, Davon Watson?  Did you use that term "family" to describe

12   your relationship with them?

13   A    Yes.

14   Q    In your meetings with me or Mr. Hanlon or these two agents

15   here or any other federal agents, did we ever tell you to say

16   something that wasn't true?

17             MR. MARTIN:  Objection.

18             THE COURT:  Overruled.  You may answer.

19   A    No.

20   Q    What did we tell you to do, Mr. Montgomery?

21   A    Tell the truth.

22   Q    Let me go back to the Darius Spence robbery plan.  Mr.

23   Coburn asked you last week if it was your idea to rob Darius

24   Spence and you said yes.  Do you recall that?

25   A    Yes.

REDIRECT EXAMINATION BY MR. HARDING                    90

1    Q    Is that what you've always said?

2    A    Yes.

3    Q    And he asked you if it was you that got Goo involved in that

4    plan.  And you said, right.  Is that correct?

5    A    Yes.

6    Q    Was Goo reluctant to get involved in the plan?

7    A    Yes.

8    Q    Why so?

9    A    He was trying to pay for Wayne lawyer and he was hungry.

10   Q    Oh, okay.  So do you mean to say that he was eager to get

11   involved in it?

12   A    Yes.

13   Q    Okay.  And who was it that supplied both of the guns for use

14   in that kidnapping and robbery?

15   A    Goo.

16   Q    Who usually drove out there when you were doing

17   surveillances?

18   A    Goo.

19   Q    Who secured the duct tape, the latex gloves, and the

20   walkie-talkies that you used in that operation?

21   A    Goo.

22   Q    Did Goo and E sometimes go out there without you to do

23   surveillances?

24   A    Probably.  I don't know.

25   Q    Okay.  Who went into the building to figure out where in the

1    building Tonya and Darius had their apartment?

2    A    Goo and E.

3    Q    Who drove to the location on the day of the murder?

4    A    Goo.

5    Q    And who was carrying the .357 magnum when Goo and E got out

6    of the car to go in and do that robbery that day?

7    A    Goo.

8    Q    Did Goo always carry that gun?

9    A    Yes.

10   Q    Okay.  You were asked about that this morning by Mr. Coburn,

11   and he pointed out to you that on a prior occasion, he asked you

12   if on a prior occasion you had said that .40 calibers were Goo's

13   weapon of choice.  Do you recall him asking you about that this

14   morning?

15   A    Yes.

16   Q    Okay.  What I want to do is show you the passage where you

17   talked about that.

18         MR. COBURN:  Objection.  That's a memorandum, Your

19   Honor.

20         THE COURT:  All right.  Just use it with the witness.

21   Q    Do you remember saying, quote, "Montgomery advised that the"

22   --

23         MR. COBURN:  Can we have the date, please?

24   Q    This is September 26th, 2002, at 1110 hours, Page Six, the

25   passage you referred to this morning.  Montgomery advised that

1   the .40 caliber would not change hands.  Montgomery advised they

2   had a .40 caliber in Randallstown, referring to the murder of

3   Jones-Spence.  Montgomery advised that Goo, Gardner, had the .40

4   caliber but when Goo and E exited the vehicle, E had the .40

5   caliber and Goo had the .357.

6           Do you recall saying that in a prior proffer session?

7   A    Yes.

8   Q    And do you recall continuing, Montgomery cannot remember how

9   long Gardner had the .40 caliber.  Gardner would not give up the

10  gun because it was dirty.  Montgomery further explained that if

11  someone else held the weapon, they could not use it since it was

12  dirty.  Montgomery thought that Gardner has had the .40 Glock

13  weapons since 1997.  The Glock .40 caliber is Gardner's weapon of

14  choice.

15          That's the passage where you talked about Gardner's

16  weapon of choice, is that correct, Mr. Montgomery?

17               MR. CROWE:  Objection.

18               THE COURT:  Overruled.

19  A    Yes.

20  Q    And it came in the context of explaining that he actually

21  had the .357 --

22               MR. LAWLOR:  Objection, Your Honor.

23  Q    -- when he got out of the car?

24               THE COURT:  The objection is overruled.  You may

25  answer.

1    A    Yes.

2    Q    Montgomery was questioned about, why is the gun dirty?

3    Montgomery responded, because it had a body from a kidnapping or

4    murder.  Is that what you told the police back in 2002?

5    A    Yes.

6    Q    Do you recall in another prior proffer session, this is the

7    one that Mr. Coburn played you a section of when you testified.

8    Do you recall being asked about the .357?

9           MR. COBURN:  Objection.  I'm sorry.

10          THE COURT:  No objection to the use of the document?

11          MR. COBURN:  No, no objection.  My fault.

12   Q    Do you recall in this proffer with Dean Stocksdale, the

13   Baltimore County prosecutor, you were asked about the .357 and a

14   .40 caliber Glock.  And you explained that you did not carry any

15   of the guns.  And then Mr. Stocksdale said, who would carry,

16   excuse me, the .357 revolver?  And did you say Goo?

17   A    Yes.

18   Q    Who would typically carry, uh, the .40 caliber, um, Glock?

19   And did you say E?

20   A    Yes.

21   Q    Did, to the best of your knowledge, at any time, did they

22   ever switch guns or did they always carry the same gun?  Did you

23   say they always carried the same guns?

24   A    Yes.

25   Q    Whose guns were they?  You explained that they were both

1    Goo's guns, is that right?

2    A    Yes.

3    Q    And you added that Mr. Holly did not own a gun, is that

4    correct?

5    A    Right.

6    Q    Okay.  Now, back to your state plea agreement that Mr.

7    Coburn questioned you about last week.  He pointed out that under

8    its terms, you won't be prosecuted in federal court for the

9    murder of Terry Cheeks.  Do you remember that provision?

10   A    Yes.

11   Q    But, of course, by entering into this plea agreement, you

12   were convicted of the murder of Terry Cheeks in state court, is

13   that your understanding?

14   A    Yes.

15   Q    And again, you're exposed to a possible 40 year sentence for

16   that, is that correct?

17   A    Yes.

18   Q    Now, Mr. Coburn also elicited from you, and I think we went

19   over this again this morning, the fact that you do not expect to

20   be prosecuted for the murder of Tonya Jones-Spence, for your role

21   in that murder, is that correct?

22   A    Right.

23   Q    Let me ask you, Mr. Montgomery.  If you violated your plea

24   agreement, do you understand that you could be prosecuted for

25   that murder and any other crimes that you have committed?

1    A    Yes.

2    Q    If you, for example, said something knowingly untrue in this

3    trial, are you aware that under the terms of your plea agreement,

4    this is your state plea agreement, which is P-3, there is a

5    provision that says, it is understood that, should the defendant

6    commit any further crimes or should it be determined that he has

7    knowingly withheld information, given false, incomplete, or

8    misleading testimony or information, or should he otherwise fail

9    in any way to fulfill completely each and every one of his

10   obligations under this agreement, then the State will be

11   completely released from any obligation under this agreement.  In

12   such event, and then it goes on in Paragraph B to say, the

13   defendant shall be subject to prosecution by the state or federal

14   authorities for any criminal violation of which the state or

15   federal authorities have knowledge, including, but not limited

16   to, perjury, false statement, and obstruction of justice.

17          This agreement does not protect defendant in any way

18   from any prosecution for offenses which occur after the execution

19   of this agreement or for any crimes that may have occurred prior

20   to this agreement and are not part of this agreement as

21   enumerated above.  And that just refers to the murder of Terry

22   Cheeks that you pled guilty to.  Is that your understanding?

23   A    Yes.

24   Q    And so you could be prosecuted for the murder of Tonya

25   Jones-Spence or any of these other crimes that you've described

1    here today or in any of your other prior proffer sessions, is

2    that your understanding?

3    A    That I can?

4    Q    Yes.

5    A    Yes.

6    Q    In any such prosecution, this office may use as evidence in

7    any criminal proceeding all statements made by the defendant to

8    this office or other designated law enforcement agents, any

9    testimony given by the defendant before a grand jury or other

10   tribunal, and any documents or other tangible evidence provided

11   by the defendant, whether prior to or subsequent to the signing

12   of this agreement, and any leads therefrom.

13        And do you remember that there's language about this in

14   your federal proffer agreement, also, Mr. Montgomery?  This is

15   P-17.  There's this provision in here about what would happen if

16   you knowingly withhold material information from the government

17   or otherwise are not being completely truthful and candid about

18   the government.  The government may use against your client --

19   that's you -- for any purpose, including sentencing, any

20   statements made or other information provided by you or your

21   client at the meeting.  If the government ever does so conclude,

22   it will notify your client of our intent to make use of any such

23   statements or other information.

24        Whether or not Mr. Montgomery has violated the terms of

25   this agreement shall be determined by the Court at an appropriate

1    proceeding at which his disclosures and documents shall be

2    admissible and at which this office shall be required to

3    establish his breach by a preponderance of the evidence.

4              Do you understand that that means that whether or not

5    you have violated this agreement is to be decided by a judge, not

6    by me or Mr. Hanlon or anyone else who is a prosecutor?  Do you

7    understand that?

8    A    Yes.

9    Q    And you admitted in this courtroom this morning and last

10   week that you knew that Tonya Jones-Spence was going to be killed

11   that day just because you knew, you knew Goo and E very well, is

12   that correct?

13   A    Yes.

14   Q    Goo was too smart to leave a witness and E was too wild, or

15   words to that effect, is that correct?

16             MR. COBURN:  Objection to the leading.

17             THE COURT:  Overruled.

18   A    Yes.

19   Q    And is there any way on earth anyone could have known that

20   you knew that --

21             MS. RHODES:  Objection.

22   Q    -- if you didn't tell --

23             THE COURT:  Overruled.  You may answer.

24   A    No.

25   Q    Now, you had second thoughts about your decision to plead

1    guilty at one point, is that correct, Mr. Montgomery?

2    A    Yes.

3    Q    Mr. Coburn showed you a document which was marked as Gardner

4    Exhibit Number Three.  And in that document there's a Motion to

5    Withdraw Guilty Plea filed by your attorney.  This is back in

6    July 20th, 2004, in which the attorney represents that the

7    undersigned counsel received a letter from the defendant stating,

8    I have decided to try to withdraw my plea.  Do you remember that?

9    A    Yes.

10   Q    And what happened was that the judge denied the motion,

11   isn't that correct?

12   A    Yes.

13   Q    That's part of this exhibit, also.  So isn't it accurate

14   that you never did, in fact, withdraw from your plea?

15   A    Right.

16   Q    Is that what you meant this morning when you were talking to

17   Mr. Crowe and you pointed out that you realized you had never, in

18   fact, violated your plea agreement by trying to withdraw from

19   your plea agreement?

20           MR. COBURN:  Objection, leading.

21           THE COURT:  Overruled.  You may answer.

22   A    Yes.

23   Q    And what happened after that was --

24           MR. COBURN:  Your Honor, we have an objection to the

25   display of part of the letter Mr. Harding's about to use here.

1          MR. HARDING:  This is in evidence, Your Honor.  This is

2     part of the exhibit in evidence.

3          MR. COBURN:  That was the subject of some

4     correspondence over the weekend, Your Honor.

5          MR. HARDING:  I'm going to put part of it on the screen

6     that doesn't include the part you're concerned about, Mr. Coburn.

7          MR. COBURN:  Okay.

8          THE COURT:  Thank you, Mr. Harding.

9     BY MR. HARDING:

10    Q     Okay.  Now, Mr. Montgomery, this is the letter from an

11    Assistant State's Attorney.  It's the cover letter on Exhibit

12    Gardner number Three.  Do you remember Mr. Coburn asking you

13    about this?

14    A     I think so, yes.

15    Q     And this is a letter written just to some attorney.  And in

16    this letter Rachel Cogen, the State's Attorney in Baltimore

17    County, explains that Mr. Montgomery advised that he no longer

18    wished to withdraw his guilty plea.  He advised that he asked for

19    the motion to be filed because he did not like the amount of time

20    jail time he would be receiving.  Forty years is a long time,

21    isn't it, Mr. Montgomery?

22    A     Yes.

23    Q     He further advised that at no time did he intend not to

24    cooperate with state and federal authorities.

25          Now, you then gave up any attempt to withdraw your

1    plea, is that correct?

2    A    Yes.

3    Q    And also, Mr. Coburn called your attention to this sentence

4    right here.  Obviously, those discussions were private and are

5    not covered under, and are covered under attorney/client

6    privilege.  Do you remember Mr. Coburn calling your attention to

7    that?

8    A    No, not really.

9    Q    Okay.  Well, do you remember him asking you if you thought

10   the attorney/client privilege applied to your conversations with

11   all of these people mentioned up here, including me?  Do you

12   recall him asking you that?

13   A    Yes.

14   Q    And let me just call your attention to this sentence

15   immediately prior to that.  Prior to the start of the meeting,

16   Mr. Montgomery had time to confer with his attorney, Ms. Fraser.

17   Obviously, those discussions were private and are covered under

18   attorney/client privilege.

19          You understand that it's only your conversations with

20   your attorney that are privileged, don't you, Mr. Montgomery?

21   A    Yes.

22   Q    You understand that what you said in proffer sessions with

23   prosecutors and agents was not privileged?

24   A    Right.

25   Q    In other words, it's not confidential.  You understand that,

1    of course, don't you?

2    A    Yes.

3    Q    And you understand that defense counsel in this case have

4    all gotten copies of the transcripts and tapes of everything you

5    said in the past?

6    A    Yes.

7    Q    Because they referred to it many times in the course of this

8    trial, is that correct?

9    A    Yeah, some of it, yes.

10   Q    And you yourself never reviewed that material before you

11   came to testify in this trial; is that your testimony?

12   A    Right.

13   Q    Now, Mr. Coburn last week, and again this morning, Mr.

14   Crowe, went into a statement on a tape recorded proffer where you

15   explained about your relationship with Goo and E and Dirty.  And

16   we heard those passages where you said your relationship with Goo

17   was cool and that you associated with him regularly and used to

18   go to New York with him, but you didn't see him every day and he

19   would not call you whenever he got into trouble.  Do you remember

20   that?

21   A    Yes.

22            MR. CROWE:  Objection.

23            THE COURT:  Overruled.

24   A    Yes.

25   Q    And there were similar questions about E, Aaron Holly, in

1    that tape, is that correct?

2    A    Yes.

3    Q    Was Dirty somebody that you met with every day?

4    A    No.

5    Q    Was your relationship with Dirty closer than your

6    relationship with Goo and E?

7    A    I wouldn't say so, no.

8    Q    You indicated this morning that you were misleading Dean

9    Stocksdale somewhat about that.  Is that correct?

10   A    Yes.

11   Q    Why were you misleading him about that?

12   A    At the time I didn't feel comfortable telling on Goo and I

13   was still trying to build myself up to do that.

14   Q    And so it helped you to overcome that discomfort to sort of

15   play down the strength of your relationship with Goo by

16   comparison with Dirty?

17              MR. CROWE:  Objection.

18              THE COURT:  Overruled.  You may answer.

19   A    Yes.

20   Q    In fact, did you, in fact, rely on Goo when you got in

21   trouble sometimes, and E as well?

22   A    More of E.

23   Q    You've told us that you told Goo about your beef with Tyree

24   Stewart?

25   A    Yes.

Case 1:04-cr-00029-RDB   Document 683   Filed 06/08/09   Page 103 of 221

1    Q    Because you knew he would retaliate on your behalf.  Was

2    that your testimony?

3    A    Yes.

4    Q    Did you also tell E about your beef with Tyree Stewart?

5    A    E knew about it.

6    Q    Was he somebody that you could rely on if you needed help in

7    that beef with Tyree Stewart?

8    A    Yes.

9    Q    You consider both E and Goo to be part of your family, as

10   you've called it?

11   A    Yes.

12   Q    You've testified that you're in the Federal Witness

13   Protection Program, is that correct?

14   A    Yes.

15   Q    Are you nevertheless incarcerated?

16   A    Yes.

17   Q    In a federal prison, is that correct?

18   A    Yes.

19   Q    Does being in the Federal Witness Protection Program while

20   incarcerated mean you're protected from other prisoners?

21   A    Yes.

22   Q    Mr. Coburn questioned you this morning about how Goo, first

23   of all, Goo fronted drugs to you but he also took you to New York

24   to meet his supplier.  Do you recall that?

25   A    Yes.

REDIRECT EXAMINATION BY MR. HARDING

1    Q    And you, in fact, testified, did you not, that there were

2    many suppliers up in New York, is that correct?

3    A    Yes.

4    Q    Did you think there was any inconsistency between the fact

5    that, first of all, Goo was supplying you with drugs and yet,

6    nevertheless, willing to introduce you to his supplier?

7              MR. COBURN:  Objection.

8              THE COURT:  Overruled.  You may answer.

9    A    No.

10   Q    You testified that, also this morning, that you have

11   repeatedly said in proffers with the government or agents or

12   police, you've repeatedly told them about how various people on

13   these trips would pool their money together to get larger

14   supplies of drugs, is that correct?

15   A    Yes.

16   Q    Have you told that in proffers where Agent Klas and TFO

17   Benson were present, do you recall?

18   A    I believe so.

19   Q    Mr. Coburn elicited from you that on these trips you would

20   often just go to buy marijuana for personal use.  Do you recall

21   that?

22   A    Yes.

23   Q    Was it part of your role to man the gun when you went on

24   those trips?

25   A    Yes.

1   Q    You had control over the only gun you guys had in the car,

2   is that correct?

3   A    Yes.

4   Q    Would it be accurate to say you were functioning as

5   protection for the whole group on those trips?

6   A    Yes.

7   Q    Mr. Coburn asked you this morning if Wayne's, Mr. Martin's,

8   selling of marijuana, it didn't have anything to do with Goo.

9   And you agreed with that, is that correct?  Do you remember that?

10  A    I don't know.  No.

11  Q    No?  Did I get that wrong?

12  A    I think so.

13  Q    Okay.  Did he ask you about whether your selling of

14  marijuana didn't have anything to do with Goo?

15  A    Right.

16  Q    Okay.  Except, of course, that you went on these trips to

17  New York together and, among other things, you got marijuana, is

18  that correct?

19        MR. COBURN:  Objection to the leading.

20  A    Correct.

21        THE COURT:  Overruled.

22  Q    You testified that you could not remember the last time you

23  spoke to Bo, or you said that on one occasion, is that correct?

24  A    Yes.

25  Q    And you were locked up from sometime in 2000 until the end

REDIRECT EXAMINATION BY MR. HARDING                    106

1   of 2001, is that correct?

2   A    Yes.

3   Q    Was it before that or after that that you last spoke to Bo?

4   A    Before that.

5   Q    Before that?

6   A    Yeah.

7   Q    Okay.  You testified this morning that Bo was family with

8   Mr. Martin and Mr. Gardner.  Do you remember that?

9   A    Yes.

10  Q    What do you mean by that?

11       MR. LAWLOR:  Objection.

12       THE COURT:  Overruled.

13  A    I mean I didn't deal with Bo like that.  I didn't see him as

14  much as I saw, saw the other two.

15  Q    Okay.  What about Bo and the other two, though?

16       MR. LAWLOR:  Objection.

17       THE COURT:  Overruled.

18  A    That's their family.

19       MR. LAWLOR:  Objection.  Move to strike.

20       THE COURT:  Motion denied.  Objection overruled.

21  Q    You were asked this morning about your use of the phrase or

22  your description of Goo saying "we're going to get the bitch"

23  that day when, the day of the actual murder, when he got into the

24  car with you and you went off first to pick up E and then to go

25  out to Darius Spence's apartment.  Do you recall that?

1   A     Yes.

2   Q     And have you told us in your prior proffer sessions about

3   that use of that phrase that day?

4   A     I believe so, yes.

5   Q     Would it be fair to say, Mr. Montgomery, that many of your

6   prior proffer sessions have been sort of specialized around that

7   particular event?  Is that correct?

8   A     Yes.

9   Q     But when me and Mr. Hanlon and Agent Klas and TFO Benson

10  have talked to you, it's been about these defendants and your

11  whole history with them, is that correct?

12  A     Yes.

13  Q     Did we go into a great many things that you didn't really

14  talk about when you were interviewed, say, by city Homicide

15  detectives?

16              MR. CROWE:  Objection.

17              THE COURT:  Overruled.

18  A     Yes.

19  Q     You said that you were not sure the robbery was going to

20  happen that day even though Goo had made this statement about

21  "we're going to get the bitch" or "snatch up the bitch" that day.

22  Do you recall that?

23  A     Yes.

24  Q     Did you know, Mr. Montgomery, whether she would even be home

25  that day?

REDIRECT EXAMINATION BY MR. HARDING                    108

1    A    I knew that she would be coming.

2    Q    Okay.  What, what made you unsure, then, that you would

3    carry through with this that day?

4    A    We, we could have got her any other day.  We done seen her

5    coming and going plenty of times.

6    Q    Okay.  Mr. Coburn was asking you this morning about your use

7    of the term "couple of feet" to describe how far away you were

8    from Tonya Jones-Spence when she fell to the ground.  Do you

9    recall that?

10   A    No, not really.

11   Q    Well, you disputed it, you weren't really as close as a

12   couple of feet.  Do you recall that in your conversation with Mr.

13   Coburn this morning?

14   A    Yes.

15   Q    Do you recall him pointing out a passage in a transcript of

16   a prior proceeding where you said you were a couple of feet away

17   from her?  Do you recall that?

18   A    Yes.

19   Q    Do you recall that actually becoming something that you were

20   questioned about several more times in that same prior

21   proceeding?

22   A    Yes.

23   Q    And do you recall that it was eventually cleared up?

24   Calling your attention to Page 97.  Do you recall being asked

25   this question?  And you were 10 feet or few feet away from the

1    victim that you didn't want to recognize you and you had intended

2    to use a .357 magnum or a .40 caliber to kill her husband and all

3    did you was walk away?  And you answered yes.  Do you recall

4    that?

5    A    Yes.

6    Q    When you used the phrase "couple" or "couple of", does that

7    mean two to you or just some vague number, Mr. Montgomery?

8    A    Sometimes it mean two, sometimes it mean more.

9    Q    Okay.  You said that, when Mr. Crowe was questioning you

10   this morning, he questioned you about your very first proffer

11   session on July 2nd, 2002.  And he pointed out that you had

12   learned from the cops that there was this big investigation of

13   Tyree Stewart going on.  Is that correct?

14   A    Yes.

15   Q    And I believe you said that that encouraged you to tell all

16   that you knew about the Terry Cheeks murder and other crimes that

17   you described?

18   A    Yes.

19   Q    Okay.  And then I think Mr. Crowe said something about how

20   you had not exactly just caved in and told all you knew.  You did

21   it because you knew that the police knew a great deal already.

22   Is that your testimony?

23   A    Yes.

24   Q    Can you explain what you mean by that?

25   A    By what?

1    Q    What was it that led you, why don't you explain to the

2    ladies and gentlemen of the jury what led you, right after your

3    arrest, to come in and start divulging all of these crimes that

4    you had either committed yourself or that you knew had been

5    committed by other people?

6    A    When I was arrested, I was originally arrested for a

7    violation of probation by some detectives who wouldn't normally

8    be serving no warrant like that.  I gave them the name Michael

9    Rowe.  They laughed at me once we got down Western District.  The

10   person I was with, they told me to tell that person my real name.

11   Then they pulled me out and pulled me in the room, started asking

12   me questions about Tyree Stewart and marijuana.

13        They told me -- no.  First they asked me where was the

14   Tech 9 that I normally carried.  I said, how you know about the

15   Tech 9, I don't carry a Tech 9?  They said, everybody know you

16   carry a gun.

17   Q    You knew they knew a great deal about you already, is that

18   your testimony?

19   A    Yes.

20   Q    So you figured the jig was up?

21   A    Pretty much, yes.

22   Q    And you started telling everything you knew?

23   A    Yes.

24   Q    Is that correct?  So it wasn't just because you, you were

25   tired of a life of crime.  It was because you knew you were in

1   big trouble and you ought to try to help yourself out.  Is that

2   your testimony?

3   A    Yes.

4   Q    And you don't deny that, do you, Mr. Montgomery?

5   A    No.

6   Q    And when you did start telling what you knew, you told

7   everything you knew?

8              MR. LAWLOR:  Objection, Your Honor.  Leading.

9              THE COURT:  Rephrase the question.

10  BY MR. HARDING:

11  Q    Did you tell about every crime you had any knowledge of?

12  A    That I could remember, yes.

13  Q    And in fact, there were so many crimes that they used to

14  have --

15             MR. LAWLOR:  Objection, leading.

16             THE COURT:  Overruled.

17  Q    Did they have big meetings, like the one we heard about this

18  morning, where Mr. Crowe read off the list of all the Baltimore

19  City Police brass and prosecutors from this whole region who came

20  to hear what you had to say?

21             MS. RHODES:  Objection, leading.

22             THE COURT:  Overruled.  You may answer.

23  A    Yes.

24  Q    Mr. Crowe called your attention to a passage in the grand

25  jury transcript which was on the screen, so I'm going to put it

1   on the screen, also.  I believe it was on the screen.  And let me

2   just ask you generally, do you listen very carefully to questions

3   that are put to you, Mr. Montgomery?

4   A    Sometimes, yes.

5   Q    And you try to answer precisely, don't you, Mr. Montgomery?

6   A    Yes.

7   Q    Okay.  You were asked this question in the grand jury.  Did

8   you also sometimes obtain marijuana or cocaine from Goo or Wayne?

9   And your answer was yes.  And then the question was, both of

10  them?  And you said, no, just Goo.  Do you remember that?

11  A    Yes.

12  Q    Do you remember getting crack, pills, from Wayne?

13  A    Yes.

14  Q    Did you testify about that on direct in this trial?

15  A    I don't think so.

16  Q    You don't think so?

17  A    Did I?  I don't recall.

18  Q    Okay.  Now, Mr. Crowe this morning was asking you about the

19  robbery that you have described where you pulled up on some guy

20  who was coming out of a house where you four guys were going to

21  buy marijuana.  Do you remember that?

22  A    Yes.

23  Q    This was a house here in Baltimore.  And you had Wayne and

24  Goo and Darryl Bacon in the car with you.  Is that correct?

25  A    Yes.

1   Q    And it was only you and Goo that got out of the car to

2   actually do the robbery, is that correct?

3   A    Yes.

4   Q    Wayne stayed in the car, is that correct?

5   A    Yes.

6   Q    And Mr. Crowe asked you if it was actually just Goo who

7   committed that robbery.  Do you recall that?

8   A    Yes.

9   Q    Do you consider it participating in a robbery to wait in the

10  car and watch while two other guys go out and actually do the

11  dirty work?

12          MR. CROWE:  Objection.

13          THE COURT:  Overruled.  You may answer.

14  A    Yes.

15  Q    In fact, would Wayne have been available to help you if you

16  had any problem with this robbery, or do you know?

17  A    I don't remember who was driving.

18  Q    You don't remember who was driving?

19  A    Right.

20  Q    The two people in the car were Wayne and Darryl Bacon, I

21  assume, correct?

22  A    If Wayne was in the passenger seat, he would have been able

23  to help.  Yes.

24  Q    I see.  The driver wouldn't have gotten out to help?

25  A    No.

1    Q    But, of course, the driver would have been the person who

2    would drive you away from the scene of the robbery?

3    A    Right.

4    Q    And that's participating in the robbery, too, isn't it, Mr.

5    Montgomery?

6    A    Yes.

7    Q    Can you explain, Mr. Montgomery, what OTM is and what the

8    color red has to do with the little crew, which was not a gang,

9    called ATM, OTM?

10   A    OTM stands for "out that mob."  It's just a neighborhood

11   thing.  Everybody from Edmondson Avenue got an OTM tattoo.

12   Everybody from Edmondson Avenue wear red rags.  All them are not

13   Bloods.

14   Q    Okay.  So they wear red but it doesn't mean anything?

15   A    It just states wherever you from.  At one point in time when

16   you seen a red rag, you knew he was from Edmondson Avenue.

17   Q    At one point in time?

18   A    Yeah.

19   Q    Is that no longer true?

20   A    It's a lot of Bloods out there nowadays.

21   Q    So you wouldn't want to wear red if you weren't a Blood?

22   A    Right.

23   Q    Mr. Crowe also asked you about your statements to the

24   effect, on the one hand, that Goo was very eager to participate

25   in the robbery of Darius Spence because he had lost a bunch of

1    money, and also your statement that Goo was very interested in

2    participating in the robbery because he had to come up with money

3    to pay for Martin's lawyer.  Do you recall that?

4    A    Yes.

5    Q    Are those two things inconsistent, Mr. Montgomery, if you --

6             MR. COBURN:  Objection.

7             THE COURT:  Overruled.

8    Q    Do you think that those are inconsistent?

9    A    No.

10   Q    Would it be fair to say that one of the reasons you might

11   need money is because you've just lost money?

12            MR. COBURN:  Objection.  That's argument.

13            THE COURT:  Overruled.

14   A    Yes.

15   Q    How did Goo lose that money, anyway?

16   A    He said the police took it.

17   Q    The police took it?

18   A    Yes.

19   Q    When he got arrested for that violation of probation around

20   the middle of April?

21   A    Yes.

22   Q    And you've told us also that, just at the very end of Mr.

23   Crowe's cross of you this morning, that you could not have

24   stopped Goo and E from killing Tonya Jones-Spence.

25   A    No.

1    Q    Can you explain to the ladies and gentlemen of the jury why

2    you could not have stopped them?

3    A    They going to do what they want to do like I do what I want

4    to do.

5    Q    So if you had refused to go along that day, they would have

6    done it, anyway?

7    A    Probably so, yes.

8    Q    Okay.  Just one moment, Your Honor.

9             THE COURT:  Yes.

10             (Pause in proceedings.)

11   Q    Just one final thing, Mr. Montgomery, if you know.  That

12   money that you say was taken by the police when Goo got locked

13   up, was that taken as evidence?  Is that what you mean?

14             MR. COBURN:  Objection.  No way he would know that.

15             THE COURT:  Rephrase the question.

16   BY MR. HARDING:

17   Q    Do you know, was it taken as evidence?

18   A    No, I don't.

19   Q    Okay.  Thank you.  I have no further questions, Your Honor.

20             THE COURT:  Brief recross.

21             RECROSS EXAMINATION

22   BY MR. COBURN:

23   Q    Thank you, Your Honor.  Good afternoon, Mr. Montgomery.

24   A    Um-hum.

25   Q    You remember during your direct examination when Mr. Harding

1   was originally asking you questions last week, he asked you about

2   a conversation that you had with my client, Mr. Gardner, Goo,

3   during which Mr., you indicated Mr. Gardner said that he was

4   optimistic --

5              MR. HARDING:  Objection.  Scope.

6              THE COURT:  Didn't hear it.  Start over if you would,

7   please, Mr. Coburn.

8   Q    I'll just strike that question Your Honor, and just move on.

9              THE COURT:  All right.

10  Q    Do you remember at the very end of your direct examination,

11  right after being asked about a conversation with my client, with

12  Mr. Gardner, you were then shown an excerpt from the Stop

13  Snitching II video?  Do you remember that in your direct

14  examination?

15  A    Yes.

16  Q    Okay.  And then do you remember during the course of my, the

17  beginning part of my cross examination, I asked you about a long

18  series of other people that you, that you provided the government

19  with information about.  Mr. Harding just asked you about that,

20  remember?

21  A    Yes.

22  Q    And one of those people was that person by the name of Bunk,

23  right, sir?  Right?

24  A    Yes.

25  Q    And I asked you whether or not Bunk had threatened to kill

RECROSS EXAMINATION OF MONTGOMERY BY MR. COBURN          118

1    you in jail, right, sir?

2    A    Yes.

3    Q    And the answer to that was yes, right?

4    A    Yes.

5    Q    And Bunk was one of the people who, in 2002, not 2000, but

6    in 2002, August, 2002, you were telling the police about, right,

7    sir?

8    A    Yes.

9    Q    Okay.  You also told them, did you not, and I'm referring

10   now to the memorandum of your proffer session, August 13th, 2002,

11   you told them Real is to kill you.  Did you say that?  That Real

12   is going to kill you?  Is supposed to kill you?

13   A    I don't know.  I don't remember saying nothing like that.

14   No.

15   Q    So your answer is no, you didn't, right?  Correct?

16   A    Right.

17   Q    And if the memorandum of the proffer session says that, then

18   that would just be wrong, right, sir?

19   A    Okay.

20   Q    Referring to Page Six.  Correct?

21   A    It could be right.  I don't remember saying it, though.

22   Q    Okay.  And that you also said Real is scared to do the job?

23   Did you say that?

24   A    I don't remember saying nothing like that.

25   Q    So your testimony is you didn't, right, sir?  Right?

1    A    I thought I said I don't remember.

2    Q    Okay.  So you don't know one way or the other, right, sir?

3    A    Right.

4    Q    Now, do you remember in response to Mr. Harding's questions

5    just now, just a few minutes ago, he asked you, did Goo always

6    carry the .357?  Do you remember that?

7    A    Yes.

8    Q    And you answered that question, right, sir?  You said yes.

9    Right?

10   A    Yes.

11   Q    That was your testimony just now in this trial under oath,

12   right, sir?

13   A    Yes.

14   Q    Okay.  It's also correct, is it not, and this is again

15   something Mr. Harding just asked you about in a proffer session,

16   September 26th, 2002, you said that Goo had the .40 caliber, is

17   that correct?  Page Six.  Is that what you said?

18   A    Yes.

19   Q    Okay.  You also said you could not remember how long Gardner

20   had the .40 calibers, right?

21   A    Right.

22   Q    And your testimony was that Gardner would not give up the

23   .40 calibers because it was dirty, or give up a .40 caliber

24   because it was dirty, right?

25   A    Right.

1    Q    And you also said you thought he had the .40 caliber weapons

2    since 1997, right?

3    A    Right.

4    Q    And you also said the Glock .40 caliber is Gardner's weapon

5    of choice, right, sir?

6    A    Yes.

7    Q    So which is it?  Was it Gardner's weapon of choice?  Did he

8    have it since '97?  Did he have it on the, if I'm reading this

9    correctly, Montgomery advised Goo had the .40 caliber but when

10   Goo and E exited the vehicle, E had the .40 caliber and Goo had

11   the .357.  Are those things right or is it right that Goo always

12   carried the .357?  Which is it?

13   A    He always carried the .357 on that job there, yes.

14   Q    I see.

15   A    Did he have the Glock .40 that day?  Yes.

16   Q    Now, you remember Mr. Harding asking you some questions

17   about this part of your statement, the state prosecutor, about

18   whether or not your relationship with Goo was a serious

19   relationship and whether you had to honor each other?

20   A    Right.

21   Q    And you remember when I asked you questions before that, you

22   had said, when you talked to Mr. Stocksdale, the state

23   prosecutor, that you and Goo hook up a few times, it ain't, ain't

24   no serious relationship with it, though, to have to honor each

25   other, no.  Right, sir?

1    A    Right.

2    Q    And you said it ain't nothing like that, right?

3    A    Right.

4    Q    Now, when Mr. Harding was asking you questions, Mr.

5    Montgomery, you said -- or strike that.  Initially, when Mr.

6    Crowe was asking you questions, you said that you were not candid

7    with Mr. Stocksdale about the relationship with Gardner, right?

8    A    Right.

9    Q    And you said that because, the reason was because you

10   weren't sure at the time if you were going to give up the stuff

11   about Darius because you had not been charged with it, right,

12   sir?

13   A    Right.

14   Q    That's what you told Mr. Crowe under oath this morning, was

15   the reason that you kind of understated, you know, you weren't

16   candid about how close your relationship was with Mr. Gardner

17   when you were talking to the prosecutor in January, 2003, right,

18   sir?

19   A    Right.

20   Q    And then just now when Mr. Harding was asking you questions,

21   you told him, did you not, that you, the reason you weren't

22   candid, the reason you kind of said it wasn't that close, was

23   because you were not comfortable telling on Goo.  Was that your

24   testimony?

25   A    Right.

Case 1:04-cr-00029-RDB   Document 683   Filed 06/08/09   Page 122 of 221

1    Q    Okay.  Isn't it a fact, sir, that months, months prior to

2    January, 2003, you told law enforcement all about the Tonya

3    Spence homicide, your initial intention to rob and kill Darius

4    Spence, and what you said was Mr. Gardner's and E's involvement

5    in it?  Is that true?  Months before.

6    A    I don't know.

7    Q    Okay.  Isn't it a fact that you went into great detail about

8    this in August of 2002, in a proffer session in the United States

9    Attorney's Office attended by your lawyers, AUSA James Green,

10   Special Agent Tom Love, Special Agent Mike Groth, and, and

11   Sergeant James Hagin, John Giganti, and Michael Coleman?  Is that

12   true?

13   A    Probably so.

14   Q    Probably so?

15   A    Yes.

16   Q    And isn't it a fact that you went into great detail about

17   the Tonya Spence homicide and what you said was Goo's involvement

18   in it.  Ten days later, August 23rd, 2002, this would be about

19   five months before January, 2003.  And this one would have been

20   another proffer session, fifth floor conference room, U.S.

21   Attorney's office.  Again, your lawyer, John Sakellaris, was

22   there, and most of the same people in addition, to Detective Phil

23   Marll, is that right?  And you told them all about it, the whole

24   story, right, sir?

25   A    Right.

1    Q    Right.  Now, you remember some questions that Mr. Harding

2    put to you about the fact that documents about your prior

3    conversations with law enforcement had been turned over to the

4    defense lawyers in this case, as you know from the course of the

5    questioning in this trial?

6    A    Yes.

7    Q    Do you remember he asked you about that?

8    A    Yes.

9    Q    What about the other proffer sessions in which Mr. Harding

10   is indicating that you used the word "family" with respect to

11   these defendants?  Do you know whether or not any of the

12   memoranda or transcripts, tapes, anything that we have contains

13   that word in it?

14   A    I don't know what you have.

15   Q    Okay.  You don't know what we have, right, sir?

16   A    No.

17   Q    Well, when you had these other proffer sessions that would

18   have included, I believe Mr. Harding said Detectives Klas,

19   Benson, and some prosecutors, were they taking notes?

20   A    Yes.

21   Q    There was always somebody taking notes when you were giving

22   a proffer session, right, sir?

23   A    Yes.

24   Q    Okay.  Do you know whether or not we have any of those

25   notes?

1          MR. HARDING:  Objection.

2     A    I do not know.

3          THE COURT:  Sustained.

4     Q    Finally, you've told this jury that you now believe that you

5     did not violate your plea agreement by attempting to withdraw

6     your guilty plea, right, sir?

7     A    Right.

8     Q    But in point of fact, your motion, you didn't withdraw your

9     motion, you didn't take it back, the motion to withdraw your

10    guilty plea, it just got denied by a judge, right, sir?

11    A    Right.

12    Q    Right.  And it's your testimony, then, that you don't think

13    that violates language in your plea agreement that says the

14    defendant shall not be permitted to withdraw a guilty plea

15    entered pursuant to this agreement under any circumstances.  You

16    don't think you violated that now, right, sir?

17    A    Right.

18    Q    But last week you said that you did, right?

19    A    Right.

20    Q    Okay.  Last question or series of questions relates to a

21    proffer agreement dated July 17th, 2002.  If I could inquire

22    through Your Honor whether or not this has already been marked by

23    the government.  I thought it was.  I thought it might have been

24    their first exhibit with respect to this witness.  But if not,

25    I'm happy to mark it myself.

1              THE COURT:  I think it's in.

2              MR. HARDING:  P-17, Your Honor.

3    BY MR. COBURN:

4    Q    P-17, Your Honor.  Now, this is a letter written by the

5    United States Attorney's Office, the office prosecuting this

6    case, to your lawyer, John Sakellaris.  Right, sir?

7    A    Yes.

8    Q    It's dated July 17th, 2002.  Right, sir?

9    A    Right.

10   Q    That's more than six months prior to, before January, 2003,

11   when you were talking to Mr. Stocksdale and you made those

12   remarks about, you know, it ain't no serious relationship to have

13   to honor each other, ain't nothing like that.  Right, sir?

14   A    Right.

15   Q    Let me direct your attention to Paragraph Three of this

16   letter of more than six months earlier.  Your client's complete

17   truthfulness and candor are express material conditions to the

18   undertakings of the government set forth in this letter.

19   Therefore, the government may use statements made or other

20   information provided to you or your client during the proffer

21   under the following circumstances.  And it talks about a series

22   of times that they can.

23              You see where it says, your complete truthfulness and

24   candor are express material conditions?

25   A    Yes.

1   Q    So then in 2003, when, according to your testimony, you were

2   not being candid with the prosecutor you were talking to, you

3   violated that language, right, sir?

4   A    Somewhat, yes.

5   Q    Nothing further.  Thank you, Your Honor.

6         MR. CROWE:  It will be very brief, Your Honor.

7         THE COURT:  I was expecting as much.

8         RECROSS EXAMINATION

9   BY MR. CROWE:

10  Q    Do you recall that when Mr. Stocksdale asked you the

11  question as to whether there was a reason Gardner was part of the

12  plan, his precise question to you, "Was there a particular reason

13  Gardner was or was part of this plan?"

14  A    Yes.

15  Q    And when you were asked if there was a particular reason,

16  you gave one reason, didn't you?

17  A    Maybe at the time, yes.

18  Q    Okay.  Well, would you like to see it?

19  A    No.

20  Q    Well, let me, let me have you take it look at it, anyway,

21  Mr. --

22        MR. HARDING:  Objection.

23        THE COURT:  I thought that had been up there.  But if

24  it hasn't, it shouldn't be up there.

25        MR. HARDING:  The witness is not denying the statement.

1   Q    So you are admitting that you were asked if there was a

2   particular reason and that the one reason you gave was that Goo

3   had taken a nice fall because he had lost a couple of thousand,

4   is that correct?

5   A    At that time, yes.

6   Q    Okay.  Now, you were also asked a question by Mr. Harding

7   about a difference between cocaine and crack, and I gather

8   whether you drew a distinction between those.  Let me show you

9   your grand jury testimony.  It begins at Page Ten.

10          Did you sometimes obtain marijuana or cocaine from Goo

11   or Wayne?  Yes.

12          Both of them?  No.  Just Goo.  Just Goo.

13          This cocaine, by the way, when it was sold on the

14   street at those locations that you've given me some examples of,

15   was it powder cocaine or did they cook it up, cook it up into

16   crack before they sold it?  Answer:  It was powder, but yes, they

17   cook it up.

18          When they bought it, it was powder?  Answer, yes.  When

19   they sold it, it was crack.

20          Okay.  You just said that you bought some cocaine from

21   Goo.  Did you buy it as crack or as cocaine?  Answer is crack.

22          So essentially "crack" a term of, is a type of, is a

23   type of cocaine, is that correct?

24   A    Yes.

25   Q    You were read actually several paragraphs from a proffer

1   memo where you were talking, and these were not your words, but

2   this is what some law enforcement officer wrote up, where you

3   were talking about the .40 caliber gun that wouldn't change hands

4   and the fact that Mr. Gardner had supposedly said it had a body

5   on it.

6           Was that, in fact, not immediately after Sergeant Green

7   or another law enforcement officer had told you about ballistics

8   and how about various guns had tied, had been tied in supposedly

9   through ballistics?

10  A   I don't know.

11  Q   Okay.  You said earlier that you thought it might have been,

12  is that correct?

13  A   I don't think I said that earlier.

14  Q   I asked you a question about a fellow by the name of Marvin.

15  Let me be a little bit more particular.

16          MR. HARDING:  Objection.  Scope.

17          THE COURT:  Go ahead, Mr. Crowe.

18  Q   Were you planning your next crime against a man by the

19  of Marvin or Marvin Koch?

20  A   I don't think so, no.

21  Q   Okay.  Do you know a fellow by the name of Marvin from whom

22  you used to buy dope?

23          MR. HARDING:  Objection.

24          THE COURT:  Overruled.  You may answer.

25  A   Yes.

1   Q     Did this Marvin drive a Mercedes Benz?

2   A     Yes.

3   Q     And was either the designation or the license plate number

4   5-DBL-0?

5   A     I don't know.

6   Q     But he did drive a Mercedes Benz, is that correct?

7   A     Yes.

8   Q     That's all that I have.  Thank you.

9           MR. MARTIN:  No questions, Your Honor.

10          RECROSS EXAMINATION

11  BY MR. LAWLOR:

12  Q    Your Honor, very briefly.  Mr. Montgomery, good afternoon.

13          MR. HARDING:  Your Honor, I object.  There was no --

14          THE COURT:  The objection's noted.  I didn't hear

15  anything open up for you, Mr. Lawlor, but I'll let you go ahead,

16  take a stab at it.  Go ahead.

17          MR. LAWLOR:  Your Honor --

18          THE COURT:  Go ahead.

19  BY MR. LAWLOR:

20  Q    Okay.  Thank you.  I want to clear up something about the

21  notion of Mr. Mitchell or the person you know as Bo being family.

22  He's no family to you, right?

23  A    Right.

24  Q    You don't even know the man, right?

25  A    I know him, yes.

1    Q    All right.  But you hadn't seen him -- you got locked up in

2    2002, right?

3    A    Yes.

4    Q    And you hadn't seen him at least for two years prior to

5    that, right?

6    A    Something like that, yes.

7    Q    Something like that or that?

8    A    Something like that.

9    Q    All right.  And in fact, in 2003 you were shown some photo

10   spreads, right?

11   A    Yes.

12   Q    And you were asked to pick out Bo, right?

13   A    Right.

14   Q    And you don't know Shelton Harris, right?

15   A    Right.

16   Q    Never saw the man in your life, right?

17   A    Right.

18   Q    All right?

19        MR. HARDING:  Objection.  Judge, this exhibit is not in

20   evidence.  I'm going to have to ask for --

21        THE COURT:  Take it off, please.

22        MR. HARDING:  -- re-redirect if Mr. --

23        THE COURT:  I think we're way beyond any reasonable

24   cross.

25        MR. LAWLOR:  Your Honor, he was asked about this photo

1    spread on direct and he was asked about his relationship with Bo

2    on redirect.

3                THE COURT:  And he said --

4                MR. HARDING:  We're on recross, Your Honor.

5                THE COURT:  Yeah.  That was on recross.

6                MR. LAWLOR:  But he asked about his relationship with

7    Bo on recross.

8                THE COURT:  And you've just established that there's

9    additional information which had been provided to the jury.  Come

10   on.  You got another question, go ahead.  But I'm not going to

11   let you use the exhibit.

12   BY MR. LAWLOR:

13   Q    All right.  Were you shown some photo spreads and asked to

14   identify Bo?

15   A    Yes.

16   Q    And you were shown one and you picked out somebody that you

17   said, I think this is Bo, right?

18   A    Yes.

19   Q    And then four minutes later you were shown another photo

20   spread and you identified another individual who you thought was

21   Bo, right?

22   A    Yes.

23   Q    A different person?

24   A    Yes.

25   Q    Okay.  And we have established, though, that you don't know

1    Shelton Harris whatsoever?

2    A    Right.

3    Q    Okay.  Now, one final thing.  Mr. Harding asked you about

4    your sentence, said you were getting 40 years, right?

5            MR. HARDING:  Objection.  That's the cap, Your Honor.

6            THE COURT:  Yeah.

7    Q    You are getting no more than 40 years.  Forgive me.  Right?

8    A    Right.

9    Q    And he said that that's a long time, right?

10   A    Right.

11   Q    But you're parole eligible after 15 years, right?

12           MR. HARDING:  Objection.

13           THE COURT:  Sustained.

14   Q    How much time do you think you should get for the murder of

15   Mr. Cheeks --

16           MR. HARDING:  Objection.

17   Q    -- the murder of Ms. Spence --

18           THE COURT:  The objection's sustained.

19   Q    -- and the attempted murder of Darius Spence?

20           THE COURT:  The objection is sustained.

21           MR. LAWLOR:  No further questions.

22           THE COURT:  Do you have anything else, Mr. Harding?

23           MR. HARDING:  No, Your Honor.

24           THE COURT:  All right.  Mr. Montgomery is excused.

25           Members of the jury, we'll break for lunch at this

1    time.  I anticipate that we will probably not have an afternoon

2    recess.  I'm going to ask you to be back in the jury room no

3    later than 2:35.  It's now 1:15.

4         Please be back in the jury room by 2:35, and I expect

5    we'll just go straight through to pretty close to or shortly

6    after 4:00 and we'll break shortly after 4:00.

7         Please leave your note pads on your chairs.  Have no

8    discussion about the case or any of the evidence.

9         Jury's excused until 2:35 p.m.

10        (Witness exits the courtroom.)

11        (Jury exits the courtroom.)

12        THE COURT:  Counsel, we'll resume 2:35 and go until

13   about four.  I have a very short proceeding at 4:30, so I'm going

14   to ask you to clear out as promptly as you can when we break for

15   the afternoon.  But my plan is to break a little bit before

16   four -- excuse the jury a little bit before four, and then use 5

17   or 10 or 15 minutes if you have any legal issues.  I think there

18   was some correspondence this morning that I haven't even looked

19   at yet and some correspondence over the weekend.  And I believe

20   Detective Niedermeier's the next witness, Mr. Harding, is that

21   right?

22        MR. HARDING:  Yes, Your Honor.  And --

23        THE COURT:  Are we going to get to anything

24   controversial with Niedermeier before we resume?

25        MR. HARDING:  Well --

1          THE COURT:  In other words --

2          MR. HARDING:  I don't know.  He's going to be a fairly

3    substantial witness.  But I would like to be heard on this issue

4    of Martin's statement, which the government believes --

5          THE COURT:  Right.  We'll do that when we come back.

6          MR. HARDING:  Okay.

7          THE COURT:  But in other words, is there anything else,

8    in other words, can we resume -- other than Martin's statement,

9    is there anything that we need to take up before we break at

10   3:55, 4:00, regarding Detective Niedermeier?

11         MR. HARDING:  No.  Not that I'm aware of.

12         THE COURT:  It's pretty clean and straightforward, the

13   first hour and a half?

14         MR. HARDING:  It's always clean and straightforward,

15   Your Honor.

16         THE COURT:  That's a good answer.  Mr. Kurland.

17         MR. KURLAND:  Judge, if Detective Niedermeier is still

18   on direct, I would agree with the government that the issues

19   won't come up.

20         THE COURT:  Great.  All right.

21         MR. KURLAND:  Thank you, Your Honor.

22         THE COURT:  He surely will be on direct.  We're in

23   recess until 2:35.

24         (Recess at 1:15 p.m.)

25         (Jurors not present in courtroom.)

1          THE COURT:  Ready to proceed?  Mr. Harding?  What did

2     you want to say about that statement?

3          MR. HARDING:  Yes, Your Honor.  There are several

4     important admissions in Mr. Martin's statement.  And the part

5     that's not valuable admissions is a false exculpatory story

6     which, in the government's view, should come in.

7          THE COURT:  But you don't need the tape for that.  You

8     don't need the tape for the detective to say he denied, etc.  But

9     go ahead.  Go ahead.  I won't interrupt.

10          MR. HARDING:  On the tape he admits being confronted by

11     a guy named Claudus about whether he had something to do with the

12     murder of the Wyche brothers.

13          THE COURT:  Right.  Based on rumors in the street.

14          MR. HARDING:  No.  No.  He was directly confronted by

15     Claudus.  The reason that's --

16          THE COURT:  Claudus was confronting him because of

17     rumors on the street, as I understand it.  Let me pull it up and

18     make sure I'm reading the transcript correctly.  Go ahead.

19          MR. HARDING:  The important point is, Your Honor, that

20     Mr. Mitchell then puts out a hit on Claudus Lassiter, which we're

21     going to hear about in subsequent testimony.

22          THE COURT:  All right.  Well, that's a different issue

23     altogether.

24          MR. HARDING:  The jury has a right to know why Claudus

25     was targeted in this way.  And furthermore, it shows the

1   connection between Mr. Mitchell and Mr. Martin, and their mutual

2   acting in concert on this issue.

3           THE COURT:  What's your proof that Mr. Mitchell put out

4   a contract on Lassiter?

5           MR. HARDING:  A witness we have, Your Honor, is going

6   to come in and testify that he read a letter from Mr. Mitchell

7   directing Shelton Harris, who was still on the street until June,

8   to murder Claudus Lassiter, even drawing a little map about how

9   to get to Lassiter's house.

10          THE COURT:  Okay.

11          MR. HARDING:  Our witnesses then went and warned

12  Lassiter so Lassiter was not, in fact, killed.

13          THE COURT:  And what's the proof that some witness

14  warned Lassiter?

15          MR. HARDING:  The witness is going to testify that he

16  did.

17          THE COURT:  The witness who warned him?

18          MR. HARDING:  Yes.

19          THE COURT:  Is that the same --

20          MR. HARDING:  Yes.

21          THE COURT:  -- same witness?

22          MR. HARDING:  Yes.

23          THE COURT:  Okay.  Let me just pull up the -- what is

24  it?

25          MR. HARDING:  It's toward the end, Your Honor.

1           THE COURT:  Yeah.  Mr. Crowe, do you know which -- here

2      it is, 485.  Docket 485?

3           MR. HARDING:  Yes.

4           MR. CROWE:  Yes, Your Honor.

5           MR. HARDING:  It's on Page Seven of the transcript.  It

6      starts down there and then he identifies Claudus at the top of

7      Page Eight.

8           THE COURT:  Okay.  So this is at the very end of the

9      interview.

10          MR. HARDING:  He also admits in here that he knows Bo.

11          THE COURT:  All right.  Let's take them one at a time.

12     So Hastings says, Wayne, is there anything else you can tell me

13     about this case that, you know, that would help me in this

14     investigation?  So right off the bat, I mean, we could start the

15     tape there.  But let me see --

16          MR. HARDING:  Judge, the whole tape is only four or

17     five minutes.

18          THE COURT:  Of course.  I'm not trying to save time

19     here.  I'm trying to implement the Sixth Amendment.

20          So Martin says, I mean, I mean, I wasn't there so I

21     could hardly, I mean, hardly help you out, help you all get

22     somebody, no, because I wasn't there.  I mean, all I know is he

23     said-she said from off the streets.  That's all I know.  And then

24     Hastings says, And all that he said-she said stuff is, is that

25     all you heard was with your name implicated?

138

1              So I think this is just redundant because he's already

2     answered that question from Niedermeier.  Martin says, Yeah, but

3     I mean, like, they like, first they was like, I, it was like when

4     I ask somebody that was really close to the family, I'm like, yo,

5     how my name come up in that shit?  He like, they ain't, they

6     ain't saying you did it, yo, they saying you had something to do

7     with it, like you know who did it.  I'm like, how you come up

8     with that?  He's like, well, I don't know.  And who was that?

9     That was Cloris.  Okay.

10             So now you're saying because Cloris repeated to Martin

11    what Martin says is simply rumors on the street, is that the

12    reason you're proffering Mr. Mitchell put out a contract on

13    Cloris?

14             MR. HARDING:  Yes.

15             THE COURT:  And --

16             MR. HARDING:  Claudus put out, Claudus put their name

17    in it, is the way.

18             THE COURT:  Claudus.  Okay.  And his name is Claudus,

19    correct?

20             MR. HARDING:  Claudus Lassiter.

21             THE COURT:  Right.  He was a defendant before me in a

22    case.  Did you know that?

23             MR. HARDING:  I knew that Mr. Peters in my office had a

24    case against him.

25             THE COURT:  Right.  That's the case.  Okay.  So you

1    want two things, I take it.  You want, you want to show the jury

2    that Martin had at least a minimum familiarity with Claudus

3    Lassiter so that you want, you want to play this tape so that the

4    jury can hear Martin give the first name of this person who was

5    repeating these statements on the street.  And then you want to

6    tie that and be able to argue that Mr., by inference, Mr. Martin

7    told Mr. Mitchell about this and as a result Mr. Mitchell put out

8    a contract on Claudus Lassiter?

9              MR. HARDING:  Yes, Your Honor.

10             THE COURT:  Now, was that because somebody thought

11   Claudus Lassiter was going to seek revenge for the Wyche

12   brothers?  In other words, I could halfway understand why a

13   contract would be put out on somebody who was thought to have a

14   contract on somebody else but why, and this is rhetorical, why

15   would you put out a contract on somebody just for repeating a

16   rumor?

17             MR. HARDING:  He didn't just repeat a rumor.  He heard,

18   he heard the voice mail tape and identified Mr. Martin and

19   others, possibly, on the voice mail tape.

20             THE COURT:  Okay.  So Claudus Lassiter is actually a

21   witness, a voice identification witness?  I'm not suggesting

22   you're going to call him.  Are you?

23             MR. HARDING:  No.

24             THE COURT:  Okay.  So he's a witness.  So that's why

25   Mitchell put out the contract on him, not because if he was

1    repeating rumors in the street.

2            MR. HARDING:  Put out, he put out a contract on Claudus

3    because Claudus had confronted Martin about whether he had

4    something to do with this murder.  Something --

5            THE COURT:  So are you conceding that Mitchell didn't

6    know that Claudus Lassiter had identified somebody's voice on

7    the --

8            MR. HARDING:  I am assuming Martin told him that.

9            THE COURT:  Well, you're assuming that Martin -- how do

10   you know Martin knew that Claudus Lassiter had identified

11   anybody's name on the tape?

12           MR. HARDING:  I am supposing that Claudus Lassiter

13   confronted Martin with that information.

14           THE COURT:  All right.  That supposition is not going

15   to, not going to help me here.

16           So I don't see a sufficient nexus between this tape

17   and --

18           MR. HARDING:  That's not the only reason, Your Honor,

19   that the government thinks this is valuable evidence in this

20   case.

21           THE COURT:  Okay.

22           MR. HARDING:  He admits to knowing Bo and Goo.  He

23   admits to knowing the Wyche brothers since 1998.

24           THE COURT:  Okay.  Does he actually admit that or does

25   he -- where does he admit to knowing the Wyche brothers?  I

1    thought he said he heard that the Wyche brothers had been

2    murdered.

3        MR. HARDING:  Well, it may be that it's in the -- the

4    agent is going to testify about his prerecorded statement

5    interview with Mr. Martin.

6        THE COURT:  Okay.  Tell me about that.

7        MR. HARDING:  Okay.

8        THE COURT:  And by the way, did we have a motions

9    hearing on this?

10       MR. HARDING:  Yes.  We played this tape in court during

11   the motions hearing, along with the tape of Mitchell's statement.

12   And Your Honor ruled, and I of course admitted this at the

13   outset, that we weren't going to try to get into evidence.

14       THE COURT:  Right.  But I mean, was it actually

15   challenged or was it pro forms?  In other words --

16       MR. HARDING:  I think that it was just, I think we put

17   on the evidence just in response to a boilerplate motion.

18       THE COURT:  Okay.  All right.

19       MR. HARDING:  But I have maintained that we weren't

20   going to use Mr. Martin's voice ID of Bo on the tape.  But the

21   understanding, I thought, until today was that we were going to

22   simply redact that section of the tape.

23       THE COURT:  Okay.  Maybe I'm jumping ahead.  Mr. Crowe,

24   is your problem with the tape or with leaving something out of

25   the tape?  I probably should have started with you.  Maybe you

1    just want what the government says it's not going to play played,

2    leaving aside, of course, the Bruton issue.

3            MR. CROWE:  Your Honor, we had originally argued that

4    Mr. Martin's identification of Mr. Mitchell's voice on the tape

5    was exculpatory with respect to him.  And the Court didn't think

6    very much of that argument.

7            THE COURT:  Right.  Okay.  Thanks for refreshing my

8    recollection.

9            MR. CROWE:  We didn't get very far.  I would be happy

10   to have the reargument and have the Court revisit it if the Court

11   wishes.

12           THE COURT:  No.

13           MR. CROWE:  The paper that I filed yesterday was simply

14   that, there's really nothing in here that's an admission.  Yeah,

15   he knew Mr. Mitchell and, yes, he knew Mr. Gardner.  And I don't

16   think anybody in the jury thinks that he didn't know both of

17   them.

18           But the real problem we have is the last part of this

19   tape where there's discussion of what the street rumor, what the

20   street is saying about who did what.  And what I would point out

21   is what this transcript says, is not that this man Claudus or

22   Cloris, as it was in the original transcript, confronted Mr.

23   Martin, but it seems to be that Mr. Martin talked to this man

24   because he was close to the family, just to find out what was

25   happening.  It wasn't, it wasn't that Cloris or Claudus had

1    confronted Mr. Martin and therefore that there was a, there would

2    be a motive to do something to him, but simply that Mr. Martin

3    had reached out to him and had gotten this information.

4            THE COURT:  Okay.  All right.  I haven't looked back at

5    your letter.  But I thought that a part of your complaint was

6    that the government was taking the position that something

7    shouldn't be played.  And do I understand that to be simply

8    Martin's statement that he thought that was Mitchell's voice on

9    the tape?

10           MR. CROWE:  That is what the Court, that is what the

11   Court had previously ruled would be solved by a simple redaction,

12   which the government is doing.

13           THE COURT:  Right.

14           MR. CROWE:  I wasn't trying to revisit that.

15           THE COURT:  Okay.  So is there something else in your

16   letter that you --

17           MR. CROWE:  Well, I say two things.  I say, first of

18   all, it's not an admission.

19           THE COURT:  Well, it clearly is an admission.  I

20   thought -- I read your letter very quickly.  I thought that there

21   was a portion of the tape that the government didn't want to

22   play.  And you mentioned, maybe I'm confusing things, there's

23   some mention of the rule of completeness.

24           MR. CROWE:  Yeah.  We were talking, there's a second

25   element of this which I understand has been resolved.  We thought

1    that the tape was misleading because what it does not report was

2    the account Mr. Mitchell gave of his alibi.

3              THE COURT:  Mr. Martin.

4              MR. CROWE:  Mr. Martin.  I have been told by Mr.

5    Harding that they're going to elicit that from the detectives.

6    So to the extent that was a concern, that is no longer.

7              THE COURT:  Okay.  That's what I was referring to.  So

8    is that a part of this pre-taped interview, Mr. Harding?

9              MR. HARDING:  Yes, Your Honor.  The alibi is in the

10   pre-taped interview, along with some other valuable information.

11             THE COURT:  Okay.  All right.  Okay.  All right.  I've

12   got it now.  All right.

13             MR. HARDING:  So can the government play the tape, Your

14   Honor?

15             THE COURT:  Subject to hearing from any of other

16   counsel, yes.  I think the problem that I thought existed simply

17   doesn't exist, if it ever did.

18             MR. CROWE:  Your Honor, what about the portion of the

19   tape where Mr. Martin is talking about what the rumor is on

20   street?  There's no way that should come in before the jury.

21             THE COURT:  Well, sure, it should.

22             MR. CROWE:  It's clearly a hearsay statement by Mr.

23   Martin.  It's hardly an admission to say that people are talking

24   about him.  It's classic hearsay.

25             THE COURT:  Well, I don't --

1          MR. HARDING:  It's an admission.  The fact that --

2          THE COURT:  Just a moment.  Just a moment, Mr. Harding.

3    So if you're right, Mr. Crowe, the rule providing for the

4    admission of admissions is trumped.  And an otherwise admissible

5    admission is excluded because the defendant, who knowingly,

6    intelligently and voluntarily waives his rights to remain silent

7    is clever enough to include in that admission hearsay.  I don't

8    think you're going to convince me of that.  But I'll give you a

9    chance for a few seconds.

10         Now, I'll be happy to give the jury a limiting

11   instruction just as I've given the jury a limiting instruction on

12   certain other matters where words from a defendant's mouth either

13   were demonstrably not true or should not be accepted by the jury

14   for the truth of the matter asserted.  Of course, I have in mind

15   Mr. Mitchell's alleged statement that he did a bit for a body.

16   You remember all of that excitement.

17         So if your client chose to talk to these officers,

18   these detectives, about rumors, that's what he did.

19         MR. CROWE:  Well, that may be, Your Honor.  But if my

20   client says that there are rumors out on the street that are

21   false, why is that an admission by him?

22         THE COURT:  Because the government's going to say,

23   because his statement that they're false is false.  That's why we

24   have juries.  Just because he says it's a rumor and that it's a

25   false rumor doesn't make it false.

1          MR. CROWE:  It doesn't make it an admission, either.

2          THE COURT:  It's a part of his admission.  An admission

3    is, takes its character from the speaker and the proponent of the

4    evidence.  As I said this morning, an admission is admissible if

5    it's relevant.  And clearly here, based on what the government's

6    now told me, this is relevant stuff.

7          MR. CROWE:  Your Honor, our position is that an

8    admission is only an admission when it is a concession or it is

9    evidence of guilt.

10          THE COURT:  Okay.

11          MR. CROWE:  Or a false exculpatory.  In this case --

12          THE COURT:  But, you see, the whole point of whether

13    it's false, the jury has to hear it, therefore it's got to be

14    admissible for the jury to decide whether it's a false

15    exculpatory.  I can't make that decision.

16          MR. CROWE:  If that were the case, we could simply have

17    evidence in this, we could simply have evidence of what the rumor

18    on the street was.

19          THE COURT:  If it comes from the defendant's mouth, you

20    betcha.

21          MR. CROWE:  Just the fact that a defendant says that

22    somebody is saying he did something that he didn't do is an

23    admission?

24          THE COURT:  Absolutely.

25          MR. CROWE:  I --

1           THE COURT:  It's not an admission of guilt.  It's an

2      admission under the hearsay exclusion.  It's an admission.  It's

3      a custodial statement.

4           MR. CROWE:  But it has to be incriminatory to be an

5      admission.

6           THE COURT:  It's incriminatory if the government wants

7      to put it in.  That's what makes it an admission.  That's what

8      makes an admission.  You don't have to admit an element of the

9      offense or an incriminatory fact.  That's what false

10     exculpatories are.

11          MR. CROWE:  But it has to be an admission against penal

12     interest.

13          THE COURT:  No, it doesn't.  That's called a statement

14     against interest.  An admission is a different animal.

15          Let me hear from Mr. Martin.

16          MR. MARTIN:  Your Honor, I hesitate to add to the woes.

17     I think we're out on so many limbs here, I hate to give you

18     another one, but we're going to go out on the other one.

19          I object to the government being able to play this tape

20     or, let's say I object to the way this is all going to come in

21     because there is, if it wasn't for Bruton, the redacted portion

22     would come in and it would be exculpatory to my client.  And I

23     think that I should be able to explore that.

24          THE COURT:  See, I don't --

25          MR. MARTIN:  When this guy says that this is Bo on the

1    tape, he doesn't say, This is Mr. Harris.  The government's whole

2    theory is these guys all know each other, are all in this

3    together.  When he says that, I should be entitled to explore

4    that.  And I'm not going to be entitled to explore it.  But the

5    government's going to be entitled to take advantage of the rest

6    of his statement.

7           And I just think that's another limb we're out on here

8    because we're all being tried together.  I want be to able to ask

9    that question, if not have the whole tape played, to at least ask

10   Detective Niedermeier what the answer to that question was when

11   he asked it.

12          I also would say, Your Honor, that the way in which

13   they propose to play this, if you look at Page Five, and he says,

14   Were any of those voices yours?  And Martin says no.  You were

15   not there at the time?  I was not there.  And then there's a

16   blank.  And then the next question is, do you know Bo's real

17   name?  I'm not arguing Bo's case for him, Your Honor, but that

18   seems to me to give him up right there.

19          THE COURT:  All right.  Well, you've --

20          MR. MARTIN:  I think it's dangerous to do this this

21   way.

22          THE COURT:  This is a limb that I'm happy to go out on

23   with you, Mr. Martin, because I'm sure Mr. Crowe perhaps would

24   have gotten here.  So let's look at it.

25          What you're saying is, arguably, the redaction is not

1  sufficiently complete.

2          MR. MARTIN:  That's correct.  Well, that's B.  That's

3  my fallback argument.

4          THE COURT:  All right.  I'm happy to look at that.

5          MR. MARTIN:  My first argument is there shouldn't be a

6  redaction because what would be said is exculpatory to my client.

7  And if it weren't for this joint trial, I would be able to take

8  advantage of that.

9          THE COURT:  I think I agree with you.  I'll hear from

10  Mr. Harding.

11         MR. MARTIN:  Thank you, Your Honor.

12         THE COURT:  It seems to me if we're going to redact

13  discussion of the tape, we're going to, of the voice mail, we're

14  going to redact discussion of the voice mail.  So I mean, I think

15  I agree with you, that --

16         MR. MARTIN:  I wish you agreed with me on the first

17  premise.  That would make me a lot happier.

18         THE COURT:  The reason I don't is because one can be

19  persuaded that Mr. Martin identifying Mr. Mitchell's voice on the

20  voice mail is exculpatory but that's not at all self-evident.

21  And so I see that you're being deprived if Mr. Martin doesn't

22  testify of arguably exculpatory evidence, but that happens, at

23  least potentially, in every joint trial.

24             I realize I'm preaching to the choir.  But of course in

25  any joint trial there is almost certain to be either a custodial

1    statement or some other statement about Defendant Number Two made

2    by Defendant Number One that is arguably exculpatory to

3    Defendants Three, Four and Five.  I mean, that happens a lot.

4            MR. MARTIN:  My experience has pretty much been the

5    other way.  It's inculpatory.

6            THE COURT:  Perhaps I shouldn't say a lot.  But it does

7    happen.  And of course we've got, what is it, I guess, <u>Chambers</u>

8    or one of those cases.  If a case could be made and none was even

9    suggested, let alone made, that a severance here would have

10   resulted in one of these defendants testifying in the trial of

11   one of the others --

12           MR. MARTIN:  I'm not going there.

13           THE COURT:  No.  You're not going there.  But

14   obviously, it would have been interesting if, it would have been

15   interesting.  And I forget what the original configuration was.

16   Was it --

17           MR. MARTIN:  I think the way it would have worked --

18           THE COURT:  Gardner and Harris?

19           MR. MARTIN:  -- my client would have been tried alone

20   eventually.  I think that's what you initially thought was, you

21   would try Gardner first, and then you would try Martin --

22           THE COURT:  Right.

23           MR. MARTIN:  -- and Mitchell together.  And then you

24   would try Harris.  That's what I thought was going to happen.

25           THE COURT:  I think that's right.  Anyway, that's water

1    over the dam.

2           MR. MARTIN:  So Your Honor, just to say I, one of the

3    things you said is, I don't think it's, you said it's not

4    self-evident that this would be exculpatory.

5           THE COURT:  Right.  In other words, let me just fill in

6    the blanks.  The fact that Mr. Martin said to Detective

7    Niedermeier, That's Bo on the tape, doesn't remotely in my mind,

8    on the face of it, exculpate anybody.  It inculpates Mr. Mitchell

9    but it doesn't even begin to say who else was there.

10          MR. MARTIN:  I think, Your Honor, an argument could be

11   made that it does because in the context of the other evidence,

12   you have all, you have, number one, how many voices are there on

13   the tape?  I'm not even sure what the government's theory is on

14   that any more.  But I think it's three.  How many voices are

15   there on the tape?  The government's theory, maybe there's four.

16   But I think there's evidence in this case that there's only three

17   voices on tape.

18          So you plug one in there, that's Mr. Mitchell.  And

19   you've had other people identify Gardner and Martin.  And the

20   only people who are really going to identify my client are the

21   trooper and the one witness who's already said that she heard him

22   talk once or twice.  I think arguably it's exculpatory.  Maybe

23   not self-evident but more self-evident than you thought, I think.

24          THE COURT:  Well, look, it is, it is, it would be

25   passing strange, I'll put it that way, if any drug dealer like

1    Mr. Wyche would permit four guys to run up on him, you know,

2    under the, under the subway tracks on Wabash Avenue at one or

3    2:00 in the morning.  I don't care who set it up.

4         So I think it's reasonable to say that, given the

5    government's theory, I understand all four defendants are charged

6    in that incident, but I think the government's going to argue, I

7    don't know, but I think the government's going to argue that one,

8    and perhaps two, and maybe three, people were waiting in the

9    vehicle around the corner, up the street or something, and that

10   the actual murders were committed of the Wyche brothers by one

11   person.  I don't know.  Maybe two people.  I forget the

12   ballistics and all that.

13        MR. HARDING:  It was one shooter.

14        THE COURT:  It was one shooter.  Okay.  So there's one

15   gun.  And as I say, common sense tells us, there weren't four

16   people standing around that car while the Wyche brothers were

17   still alive.

18        So to say that it's exculpatory because somebody's

19   voice shows up on that voice mail, which under the government's

20   theory is made several minutes, not sure if it's 3 minutes or 13

21   minutes, but it's several minutes after the murder of the Wyche

22   brothers, it's just not exculpatory.  It doesn't tell us who was

23   in the car.  It doesn't tell us who was the shooter.  It doesn't

24   tell us where anybody was.  It doesn't tell us anything except we

25   know that there are at least two voices on the voice mail.  But

1    it doesn't, it's not exculpatory.

2           Now, it can be argued that it should be interpreted in

3    a way that if Mr. Martin heard Mr. Mitchell's voice on the voice

4    mail and didn't hear Mr. Gardner's, and didn't hear Mr. Harris's,

5    and he, Mr. Martin himself, is saying he wasn't there, then I

6    suppose a fact finder could say, oh, okay, the only one there was

7    Mr. Mitchell.

8           MR. MARTIN:  But the problem I have with the Court's

9    ruling is I can't argue that because it's not going to be in

10   evidence.  That's why I said I would prefer you agree with me on

11   the first part and not the second part.  And that's the extent to

12   the redaction.

13          THE COURT:  I see your point.

14          MR. MARTIN:  I'm deprived of being able to argue that

15   to the jury because it's not going to be in evidence.

16          THE COURT:  Exactly.  And that's what I mean, it's not

17   in evidence because so far as we know Mr. Martin's not going to

18   testify.  But of course --

19          MR. MARTIN:  The only reason it's not in evidence is

20   because it's a joint trial.  That's why it's not in evidence.

21          THE COURT:  No.  If Mr. Martin testifies, it will be in

22   evidence.

23          MR. MARTIN:  That's a different issue.  But thank you,

24   Your Honor.

25          THE COURT:  Yeah.  It's a closely related issue.  All

1    right.  Mr. Harding, what do you want to do about this further

2    redaction?

3            MR. HARDING:  Well, if Your Honor thinks that it

4    suggests that Mr. Martin identified Bo's voice on the tape, I can

5    further redact it.  But I do want to point out that there is some

6    important evidentiary value to having in evidence that Mr. Martin

7    has heard this tape.

8            The reason is that, as you know from Mr. Montgomery,

9    Gardner goes and reports to Montgomery the contents of this tape.

10   The only way Gardner could have known it was from Mr. Martin or

11   from --

12           THE COURT:  That's not true.  All the rumors on the

13   street.  Everybody was talking about this tape.

14           MR. HARDING:  Well, he gives, he reports on who said

15   what and whose voice was saying what thing.  And it seems clear

16   that he's talked to Martin about this.  So I think it's important

17   to have before the jury the fact that Martin's heard this tape.

18           I can redact it by, at the bottom of Page Five --

19           THE COURT:  Do you want to sever Mr. Mitchell?

20           MR. HARDING:  No, I certainly don't.

21           THE COURT:  I'm serious.

22           MR. HARDING:  No.

23           MR. LAWLOR:  We'll take that.

24           MR. HARDING:  No.  Definitely not.

25           THE COURT:  You sure?

1          MR. HARDING:  Yes.  In fact, I'm about to faint just

2     because you said that.

3          THE COURT:  Well, Mr. Hanlon, please, go to the lectern

4     and, with your agents.

5          MR. MARTIN:  We'll take that, Your Honor.

6          THE COURT:  No.  It's not a suggestion, Mr. Harding.

7     I'm just trying to do my job here.

8          MR. HARDING:  If Your Honor wants me to redact further

9     the --

10         THE COURT:  Yeah.  I think you're going to have to

11    redact further because I think Mr. Martin is right, that to set

12    it up this way, You did you listen to the voices?  Yes.  Was any

13    of those voices yours?  No.

14         MR. HARDING:  I'll cancel out where Hastings says, Were

15    any of those voices yours, and the three succeeding lines, the

16    three subsequent lines.

17         THE COURT:  So what will be the last line on that page?

18    That's Page Five.  What will be the last line?

19         MR. HARDING:  Yes.  Martin says yes in response to the

20    question, Did you listen to these voices?

21         THE COURT:  No.  I think we got to take that out, Mr.

22    Harding.  That's why I asked you if you want to sever.  Because

23    it looks like it's kind of important to you.  I don't think it's

24    fair to Mr. Harris, Mr. Martin -- excuse me.  It's not fair to

25    Mr. Harris and Mr. Gardner --

1          MR. HARDING:  Okay.  How about if I --

2          THE COURT:  -- to let the jury know that Mr. Martin

3     listened to the tape and just leave it hanging there.

4          MR. HARDING:  Then I also --

5          THE COURT:  It's not unfair to Mr. Mitchell because Mr.

6     Martin says he heard Mr. Mitchell's voice on the tape.  So if

7     Martin were going to testify, I mean, that wouldn't be unfair to

8     Mr. Mitchell.  It's clearly not unfair to Mr. Martin.

9          MR. HARDING:  How about if we go further up Page Five

10    and I, you see where Hastings says, Now, there was a tape that I

11    played in reference to this incident, is that correct?  And

12    Martin says yes.  I could redact everything after that.

13         THE COURT:  Including that.  Including the question,

14    Now, there was a tape that I played in reference to this

15    incident.

16         MR. HARDING:  Well, I want it in evidence, the fact

17    that Martin had had heard the tape.  That's all.  I don't think

18    there's any way a jury could suppose, because of hearing that

19    question, that Martin identified Bo's voice on the tape.

20         THE COURT:  But here the problem for Mr. Harris and Mr.

21    Gardner, and I am agreeing with Mr. Martin to this extent, it's

22    unfair to let the jury know that Martin listened to the tape, and

23    leave them hanging about what, if any, identifications he made

24    when, in fact, he made an identification of Mr. Mitchell but not

25    of Mr. Harris and Mr. Gardner.  It's the combination.

1          I don't think it's fair to Mr. Harris and Mr. Gardner.

2          MR. HARDING:  Okay.  Then I'll cancel that question and

3     answer, also.

4          THE COURT:  Right.  I mean, I see your point and I feel

5     your pain.  So we start with, Do you know what Bo's real name is?

6     That way, as Mr. Martin says, and he apologized for making Mr.

7     Mitchell's arguments for him, that doesn't set it up in a way

8     that there's a mention of the tape.  Oh, and by the way, what's

9     Bo's real name?  Okay?  So are you going to use the tape today?

10          MR. HARDING:  No.

11          THE COURT:  Okay.

12          MR. HARDING:  I will have enough to avoid using the

13     tape today.  And then the problem is, Ms. Kelly here can prepare

14     a redaction of the transcript.

15          THE COURT:  All right.

16          MR. HARDING:  I had transcript books here for

17     everybody.  We can simply replace the transcripts.

18          THE COURT:  Great.  I'm sorry to kill a few more trees.

19     But that's great.  Please be sure to show me and let me listen to

20     the tape tomorrow.  The last time I relied on a prosecutor to do

21     a redaction I got reversed by the Supreme Court of the United

22     States.  I wasn't on this court.

23          So I have a habit of always listening and reading

24     before we have the examination.  All right.  We'll have the

25     beleaguered jury, Ms. Arrington.

1          The case I referred to, counsel, is the, the contextual

2     Burton case that went to the Supreme Court about 10, 10 or 12

3     years ago.  I was on the Circuit Court, State v. -- can't

4     remember.  It was, it was the case where the detective got on the

5     stand and said, reading a statement, he said, State's Attorney

6     said, And who was there?  And the detective said, Jefferson and

7     redacted, redacted.

8          (Jury enters the courtroom.)

9          MR. LAWLOR:  Gray.

10         THE COURT:  Right.  Gray v. Maryland.  Thank you, Mr.

11    Lawlor.

12         Thank you for your patience once again, ladies and

13    gentlemen.  We're ready to continue.  The government may call its

14    next witness.

15         MR. HARDING:  Thank you, Your Honor.  Your Honor, the

16    United States calls Detective Gary Niedermeier.

17         DET. GARY NIEDERMEIER, GOVERNMENT'S WITNESS, SWORN

18         THE WITNESS:  I do.

19         THE CLERK:  Be seated.  Speak directly toward the mike.

20    State your name and spell it for the record.

21         THE WITNESS:  Detective Gary Niedermeier.

22    N-I-E-D-E-R-M-E-I-E-R.

23         THE COURT:  Detective, I know that we've kept you sort

24    of hanging around for quite a few days.  I apologize for that.

25    But you understand we've tried to manage the trial as best we

1    could.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Thank you.

4              DIRECT EXAMINATION

5    BY MR. HARDING:

6    Q    Good afternoon, Detective Niedermeier.

7    A    Good afternoon, sir.

8    Q    Could you tell us, sir, how are you employed?

9    A    I'm a homicide detective with the Baltimore City Police

10   Department.

11   Q    And how long have you been with the police department?

12   A    I'm in my 13th year.

13   Q    And how long in homicide?

14   A    Just completed seven.

15   Q    Okay.  Did you get involved back in 2002 in the

16   investigation of the murders of Darryl and Anthony Wyche?

17   A    I did.

18   Q    Can you tell us when you got involved and how you got

19   involved?

20   A    That morning our office received a call for two males

21   unresponsive in a vehicle.  At that point, I was up, I was the

22   lead detective on at that case.  I responded to the scene.

23   Q    Do you know what time you arrived there?  What time you got

24   the call and what time you arrived there?

25   A    I believe the call came in at 6:52 a.m. and we arrived at

1    the scene probably around 7:30 a.m.

2    Q    Did you go alone or with someone else?

3    A    Sergeant Petry was with me.

4    Q    Okay.  Where did you go?

5    A    The 4400 block of East Wabash Avenue.

6    Q    Okay.  I have two exhibits here and I am going to put them

7    on the screen, I think.  Once again.  You've seen this photograph

8    before, have you not, Detective?

9    A    Yes, I have.

10   Q    Okay.  Does this show the location where you went that day?

11   A    Yeah, it does.

12   Q    I'm sorry.  Did you say it was a 4400 block of East Wabash

13   Avenue?

14   A    Yes.

15   Q    Okay.  I'm now pointing to a street on this aerial

16   photograph.  Can you tell me what that is?

17   A    That's the 4400 block of East Wabash Avenue.

18        MR. MARTIN:  What's the exhibit number, Mr. Harding?

19   Q    This is W-10.  Okay.  So it looks like it's only one block

20   long, is that correct?

21   A    Yes.

22   Q    And what's this big street right here?

23   A    That's Wabash.

24   Q    And what's this, can you see my finger on your screen?

25   A    Yes, sir.  That's Coldspring.

1    Q    Okay.  And what's this thing right here?

2    A    The light rail?

3    Q    Light rail or metro?

4    A    Metro.  I'm sorry.  Metro.

5    Q    And if you know, you said this was Coldspring going all the

6    way back here like this, is that right?

7    A    Yes.

8    Q    Do you know the name of this street right here?

9    A    That would be Ridgewood.

10   Q    Okay.  And that actually goes through but it stops at the

11   metro tracks, is that correct?

12   A    Correct.  It doesn't go all the way through.

13   Q    Now, let me show you another picture.  This time it's --

14   first, let me ask you.  Can you, using your screen, if you point

15   and touch the screen it will make a little mark on the screen.

16   So can you point to where the car was that you went to that

17   night.  You said you responded to a call of two unresponsive

18   males in a car.

19   A    Approximately right here.  Looks like the little pink dot is

20   about two inches out to the right of where I touched.

21   Q    It didn't, it didn't -- two inches to the right?

22   A    I mean to the left.  Yes.  Closer to where your pen is.

23   That's where.

24   Q    Right about here?

25   A    Yes.

1    Q    Okay.

2         THE COURT:  You know, I think, counsel, what's

3    happened, for whatever reason, the witness' monitor is not quite

4    in line, I think, with all the other monitors.  So in the future,

5    it might make more sense if counsel will use your monitor or the

6    pen, probably even better, to point, to have the witness direct

7    you to the location.  Just a suggestion.

8    Q    Okay.  And that's, in effect, what I just did, is that

9    correct, Detective Niedermeier?  I made a mark where you wanted

10   me to?

11   A    Yes, sir.

12   Q    Okay.  Which side of the street was it on?  The side closest

13   to the railroad tracks or the side closest to --

14   A    Closer to the tracks.

15   Q    Okay.  And in this picture, it looks like it's a

16   construction site now with a lot of construction equipment.  Was

17   that the case when you went there back in 2002?

18   A    No.  There was a building there, actually, at that point.

19   Q    What kind of building?

20   A    I'm not even sure.  It was some type of industrial building.

21   Looked like it was possibly vacant even back then.

22   Q    Okay.  And here's another picture, which is W-11.  And I'm

23   going to call your attention on this one to this street right

24   here.  Is this the same street you were talking about?

25   A    Yes.

Case 1:04-cr-00029-RDB   Document 683   Filed 06/08/09   Page 163 of 221

1    Q    Is this taken from the other direction?

2    A    Correct.  Looking the other way.  That would be East Wabash

3    where your pen was, would be metro tracks.  And then Wabash out

4    on the far side.

5    Q    Okay.  Is this Ridgewood over here?

6    A    Yes.  That would be the part going down to the dead end.

7    Q    Tell me when I get to the spot where the car was.

8    A    Approximately right there.

9    Q    Right about here.  Okay.  Let me go back to this other map,

10   W-10, for a second.  I mean, it's not a map.  It's an aerial

11   photograph.  Is there a McDonalds down here on Coldspring?

12   A    Coldspring and Reisterstown.

13   Q    Can you see Reisterstown Road on this?

14   A    Not very well.

15   Q    There's a street right --

16   A    Yeah.  Approximately right there.

17   Q    Is that where Reisterstown crosses?

18   A    That would be Reisterstown running north and south, crossing

19   Coldspring at that point.

20   Q    Okay.  What did you do when you got to the scene that day?

21   A    At that point, I was approached by the primary officer,

22   began to gather information, direct Crime Lab what we wanted

23   done.

24   Q    What's the primary officer?

25   A    First officer responding to the scene, usually uniformed

1    officer.  They would get the call.  They go to the scene.  At

2    that point, they determine what they have and they would call our

3    office.  We're basically a secondary responder.

4    Q    Okay.  Who was the primary?

5    A    Officer Gladden.

6    Q    Okay.  And when you got there, were the medics already, was

7    there an ambulance already there or had they not yet arrived?

8    A    No, I believe the medics had already arrived.

9    Q    And the two guys in the car, were they still there?

10   A    Yes, they were.

11   Q    Had they been pronounced dead already?

12   A    They had.

13   Q    Okay.  Did they have identification on them?

14   A    Yes.

15   Q    Both of them?

16   A    Yes, they did.

17   Q    So you didn't have any trouble finding out who they were, is

18   that correct?

19   A    No, they were identified through the identifications on

20   their person.

21   Q    And what, what were their names?

22   A    The driver was identified as Anthony Wyche and the front

23   seat passenger was identified as Darryl Wyche.

24   Q    Okay.  Now, I have some photographs that I want to show you.

25   First of all, Government Exhibit W-52.  Can you tell us what that

1    depicts, Detective?

2    A    That's the Honda station wagon as it appeared that morning,

3    containing both the victims, in the 4400 block of Wabash.

4    Q    So the victims are still in the car at this point?

5    A    Yes, correct.

6    Q    Who's this guy back here with the crewcut?

7    A    That would be myself.

8    Q    Okay.  And so you're talking to a bunch of other detectives

9    and officers, is that correct?

10   A    Correct.

11   Q    Okay.  Here's another shot.  This is W-49.  Is this just

12   another shot of the same scene from a different direction?

13   A    Yes, it is.

14   Q    Looks like the seat belt is still on the driver.  Were both

15   seat belts still attached and on at the time you got there?

16   A    Yes.  Both victims were still seat belted in the vehicle.

17   Q    Here's W-51.  This is just another close-up of the same

18   thing.  And is that you with your white pants and blue blazer?

19   A    I believe so.  I can only see the edge of it.

20   Q    Is that better?

21   A    No.  I believe that's Sergeant Petry.

22   Q    Oh.  Okay.  Here's another shot from the other side.  You

23   said Anthony was in the driver's seat, is that correct?

24   A    Correct.

25   Q    Your Honor, I want to give defense counsel an opportunity to

1    see some of these photographs before I actually show them.  Can I

2    do that now?

3              THE COURT:  Yes, please.

4              (Pause in proceedings.)

5              MS. RHODES:  Your Honor, may we approach?

6              THE COURT:  Well, let's get everybody to look at them

7    first.  Everybody seen them?  Yes.  And you want to approach

8    about one or more of the photographs, Ms. Rhodes?

9              MS. RHODES:  Three of them, Your Honor.

10             THE COURT:  Three of them?  How many are there?

11             MR. HARDING:  Four.

12             THE COURT:  A total of four photographs?

13             MS. RHODES:  Yes.

14             MR. HARDING:  That I've shown to them.  There are other

15   crime scene photos here.  But there's no controversy about them,

16   Your Honor.

17             THE COURT:  All right.  Come on up.

18             (Bench conference with counsel on the record:)

19             THE COURT:  This isn't going to be long, folks.  What's

20   the problem?

21             MS. RHODES:  Just our position is that this top one is

22   okay because it shows both, and the others are not necessary.

23   The other three are not.  They're repetitive.  They don't show

24   entrance or exit wounds.  They're just gruesome.

25             THE COURT:  All right.  Objection is overruled.  I

1   think the photographs are valid.

2            (End of bench conference.)

3            THE COURT:  The objection is overruled.

4   BY MR. HARDING:

5   Q    Okay.  This is W-12.  Again, just another shot of you guys

6   at the scene.  This one is W-13.  Does that show the two bodies

7   the way they were when you arrived there, Detective Niedermeier?

8   A    Yes, it does.

9   Q    And can you clearly see both seat belts still attached

10  there?

11  A    Yes.

12  Q    Okay.  Here's a close-up of -- tell us who that is.

13           THE COURT:  The number, please, Mr. Harding?

14  Q    I'm sorry.  This is W-14.

15  A    That's Darryl Wyche.

16  Q    So he was in the passenger seat, is that correct?

17  A    Correct.

18  Q    This is W-16.  Who is that?

19  A    That's Anthony Wyche after he was removed.

20  Q    Yes.  When this picture was taken, was he taken outside of

21  car at that time?

22  A    Yes, he had been removed from the vehicle at that point.

23  Q    And here's another one.  This is W-17, shows the other side

24  of his face.  Okay?

25  A    Yes.

1   Q    Now, was the engine still on when you got there?

2   A    No, it was not.

3   Q    Do you know how it, whether it was on when Officer Gladden

4   got there?

5   A    Yes.  She reported that it was on and that she had turned it

6   off.

7   Q    Were the doors opened or locked when the police first got

8   there?

9   A    They were closed and unlocked.

10  Q    Okay.  Was the heat on?

11  A    It was.

12  Q    What was the condition of the bodies when you got there in

13  the, sometime after 7:00 in the morning?

14  A    It was apparent that they had been deceased for a little

15  while.  Rigor had started to settle in, meaning that their

16  muscles had contracted.  We had a difficult time, or the medical

17  officers, medical examiner -- excuse me -- medical examiners had

18  a difficult time removing them from the vehicle because rigor

19  mortis had set in.

20  Q    Okay.  Does that indicate they'd been dead for a while?

21  A    Yes.

22  Q    Let me show you W-26.  This a photograph of the rear of the

23  car?

24  A    It is.

25  Q    And what is this object right here on the rear seat?

1    A    It's a child seat.

2    Q    Was it positioned the way it is there when you first got

3    there or was it -- where was it in the back seat?

4    A    It was behind the passenger, behind Darryl Wyche.

5    Q    Okay.  So someone pushed it over here more to the left, is

6    that correct?

7    A    Yeah.  That's correct.  I believe they moved that to make it

8    easier to remove both Darryl and Anthony from the vehicle.

9    Q    Okay.  Could you tell there at the scene that morning what,

10   what the wounds were to the two victims?

11   A    It was obvious gunshot wounds.  Darryl sustained one to the,

12   right behind his left ear.  And Anthony was obviously shot

13   multiple times.

14   Q    Okay.  So Darryl was only shot once, is that your testimony?

15   A    That's what I observed right at the scene, yes.

16   Q    Do you know what stippling is, Detective?

17   A    I do.

18   Q    Was there stippling on the wound associated with Darryl

19   Wyche behind his left ear?

20   A    Yes, you could observe stippling.

21   Q    And what does that indicate, Detective?

22   A    Stippling is a, when a gun's fired, gunshot residue comes

23   out.  If the gun is fired in close proximity to the skin, it will

24   leave, it looks like pepper all over the skin, but it's actually

25   imbedded into the skin.  It will look like little black specs and

1    you could observe that just behind Darryl's left ear.

2    Q    And you say that Anthony Wyche was shot several times, is

3    that correct?

4    A    Yes.

5    Q    Okay.  Now, you said before that the windows were up.  Was

6    there any broken glass anywhere?

7    A    No.

8    Q    And the police didn't have to break any glass to get into

9    the car, is that correct?

10    A    Correct.

11    Q    You said the doors were open, in fact?

12    A    They were unlocked, yes.

13    Q    Unlocked.  I'm sorry.  But closed?

14    A    Yes.

15    Q    You would say?  Yes.  Now, when you looked inside the car,

16    could you see bullets and shell casings inside the car?

17    A    Yes.

18    Q    Do you recall how many bullets and how many shell casings

19    were recovered?

20    A    At that point or later on?

21    Q    Altogether.

22    A    Altogether?  Five shell casings, .40 caliber shell casings,

23    and from the vehicle, two projectiles.

24    Q    Were there additional projectiles or bullets recovered at

25    the autopsies?

1    A    Yes, there was.

2    Q    How many?

3    A    One from each victim.

4    Q    So a total of four bullets and five shell casings, is that

5    correct?

6    A    Correct.

7    Q    Let me show you, if I may, W-1, W-4, and W-3.  You've had a

8    chance to look at these before, have you not, Detective?

9    A    Yes.

10   Q    Are these the casings and bullets that were recovered at the

11   scene?

12   A    At the scene and the medical examiner's, yes.

13   Q    Yes.  Okay.  Now, I have some more photographs to show you.

14   Could you see the shell casings and the bullets when you looked

15   inside the car?

16   A    Some of them, yes.

17   Q    Okay.  Let me show you, first off, W-15.  Do you recognize

18   what this is?

19   A    Yes.  That's the projectile sticking out of the right side

20   jaw of Darryl Wyche.  You could actually observe that when he was

21   in the vehicle.

22   Q    So you said he was shot behind the left ear and this, on the

23   right side of his neck, is the bullet sticking halfway out, is

24   that correct?

25   A    Correct.

1    Q    This is W-53.  Can you tell us what this shows?

2    A    That's a photograph of the interior of the vehicle.  The

3    orange triangular shape is actually pointing at a location on

4    the -- correct -- on the steering while where a projectile was

5    also recovered.

6    Q    Okay.  And you said it was Anthony who was behind the

7    driver's seat, is that correct?

8    A    Correct.

9    Q    This is W-54.  Is this another, another shot of the hole on

10   the steering wheel?

11   A    Yes.  It's closer.

12   Q    W-55, is this just one of the bullets after it was

13   recovered?

14   A    Yes.  I believe that's the one out of the steering wheel.

15   Q    And W-56.  Do you know what this is?

16   A    It's a projectile on the floor of the vehicle, in front of

17   Anthony Wyche.  It's where it was located.  A bullet on the

18   ground there.

19   Q    Okay.  So this picture was taken while the bodies were still

20   in the car, is that correct?

21   A    Yes.  It appears to be, yeah.

22   Q    Is this one of the victim's feet here?

23   A    Yes.  Yes.

24   Q    Okay.  That was W-56.

25             I now have W-27.  Can you tell us what that is?

1    A    That's a photograph of a casing recovered from the rear of

2    the vehicle.

3    Q    This was like a station wagon, is that correct?

4    A    Yes.

5    Q    And what does this show?

6    A    The little yellow numbered tags --

7    Q    This is W-28.

8    A    -- represent three other casings, each one of them marked.

9    Q    Okay.  And they're all in the back seat area, is that

10   correct?

11   A    Correct.

12   Q    This is W-29.  This is just a close-up of one of the

13   casings, is that correct?

14   A    Yes.

15   Q    And here's W-64.  Is this yet another casing that was

16   discovered later?

17   A    Yes.

18   Q    Let me ask you about the two bodies of Darryl and Anthony

19   Wyche.  Did you recover anything from their persons?

20   A    Yes.  I believe $6.03 was recovered from Anthony.  And

21   $214.03 from Darryl.  Each had their ID.  Darryl also had a cell

22   phone on his hip.

23   Q    Okay.  What about the location on their persons where this

24   money was recovered?

25   A    That would, I believe both of them were located in their

1    front pockets.

2    Q    Pants pockets?

3    A    Yes.

4    Q    Okay.  And what about watches?  Did they have watches on?

5    A    Yes.  Each of the victims had a watch on.

6    Q    Okay.  Was there any sign at all that anybody had disturbed

7    the corpses or gone through the pockets or anything like that?

8    A    No.

9    Q    Let me show you Government Exhibit W-22.  Can you tell us

10   what that is?

11   A    That's the Nextel phone recovered from the hip of Darryl

12   Wyche.

13   Q    Part of this same exhibit, what is that?

14   A    Pager.

15   Q    Okay.  Where were these recovered from Darryl?  Where on his

16   body?

17   A    On his hip, clipped on to his sweatpants.

18   Q    Okay.  This is W-23.  Does this actually show the telephone

19   clipped to Darryl's sweatpants?

20   A    Yes.

21   Q    Do you remember what the phone number was for that phone

22   that was attached to Darryl's hip?

23   A    I believe it was 309-5057.

24   Q    Okay.  Did crime scene technicians gather blood samples from

25   the scene?

1    A    Yes.

2    Q    And did they get tested for DNA?

3    A    Yes.

4    Q    Did they just come back to the victims?

5    A    Yes.

6    Q    Where on the scene were these blood samples recovered from?

7    A    Right outside the vehicle, just to the driver's side.

8    Q    Okay.  But where outside the vehicle?

9    A    Outside of the passenger side there was approximately four

10   drops of blood.  Looks like they were leading away from the

11   vehicle.

12   Q    Which of the Wyche brothers did those drops of blood come

13   from?

14   A    Anthony.

15   Q    Let me show you one of these pictures I've already shown

16   you.  This is W-50.  Do you see these markers out here on the

17   street?

18   A    Yes.

19   Q    What are those for?

20   A    Those are used to identify the spots where the drops of

21   blood were so you could see them in the photograph.

22   Q    And so actually it's on the driver's side, is it not,

23   Detective?

24   A    I'm sorry, yes.  Rear driver's door area away from the

25   vehicle.

1   Q    Was there any sign that Anthony had moved after he had been

2   shot?

3   A    No.

4   Q    Based on your experience, can you infer why there are blood

5   spots on the street leading away from the car that come back to

6   Anthony Wyche?

7   A    There would only be two reasons in a case like this.  Either

8   the weapon used was fired so close that when the victim was shot,

9   there's what's called blow back, blood spatters back either on to

10  the shooter or on to the weapon.  And as they exited the vehicle

11  and began to walk away, blood dropped from either the weapon or

12  his hand.  Or while the incident was taking place inside the car,

13  the shooter actually had to place his hands on Anthony while he

14  shot him and got blood out of him that way.  While exiting the

15  vehicle, the droplets would then fall from him out there.

16  Q    Okay.  After the crime scene was processed, was the car

17  towed down to Police Headquarters for further processing?

18  A    Yes, it was.

19  Q    And at that point when the car was towed away, did you learn

20  about a call that had come through to Headquarters from a

21  location in Baltimore County?

22  A    I did.

23  Q    Without giving the address, did you respond to a location in

24  Baltimore County, specifically in Randallstown, that morning?

25  A    Yes.

1    Q    What residence did you respond to?

2    A    That was the Magginson residence.

3    Q    And who are the Magginsons?

4    A    It would be Darryl's mother-in-law, father-in-law, and

5    family.

6    Q    Okay.  What was the name of Darryl's mother-in-law?

7    A    Irene Magginson.

8    Q    Okay.  When you got there, was Darryl's wife there?

9    A    Yes, she was.

10   Q    And I suppose Darryl's mother-in-law was there, too, is that

11   correct?

12   A    Yes, she was.

13   Q    Were there other relatives there?

14   A    Yes.  There was a few people there.

15   Q    And did they tell you about a tape recorded voice mail?

16   A    Yes.

17   Q    Did you, in fact, record the voice mail message?

18   A    Yes.

19   Q    How did you make the recording?

20   A    I contacted the Secret Service, I mean the FBI, I'm sorry,

21   in Quantico, provided them with the phone number for the phone,

22   where that number was, or where that tape recorded message was

23   relayed to on a voice mail, and actually provided them with a

24   security number for that.  And they were able to pull it off of,

25   directly off of that.

1    Q    Where did you get the security number from?

2    A    The phone call was placed to Irene Magginson's phone and she

3    provided me with that phone number and the security code to get

4    into her voice mails.

5    Q    Okay.  Let me show you some more exhibits here.  First of

6    all, did you subsequently recover Irene Magginson's cell phone?

7    A    Yes.

8    Q    Let me show you Government Exhibit W-2.  Is the actual, is

9    this the actual cell phone from Irene Magginson?

10   A    Yes.

11   Q    I'll take it out of the bag.  This is Government Exhibit

12   W-33.  Is this a CD that contains copies of a voice mail,

13   including an enhanced copy?

14   A    Yes, it is.

15   Q    And is this, this is, I'm going to call this W-33A.  Is this

16   a CD version of the same audiotape?

17   A    Yes, it is.

18   Q    And these are Government Exhibits W-32 -- well, just one

19   exhibit, actually.  No.  I'll put them both in.  I'm going to

20   call this, this one is W-32.  Is this an audiotape that was made

21   of the voice mail?

22   A    Yes.

23   Q    And W-32A.  Is this a copy of the enhanced version of the

24   same tape?

25   A    Yes.

1    Q    When you went out to the Magginson's house, can you give us

2    a vague idea, at least, of how many of the family members and

3    others there were present?

4    A    There had to be at least eight individuals there.  Maybe

5    more.

6    Q    And without telling us what they said, can you tell us, yes

7    or no, whether the people there identified the voices on the

8    tape?

9    A    Yes.

10   Q    Did you learn from the voice mail itself or from talking to

11   the relatives what phone was used to place the call that was

12   recorded on the voice mail?

13   A    Yes.

14   Q    How do you know what phone it was?

15   A    Irene Magginson was able to provide that information of what

16   the number was calling in under her cell phone.

17   Q    Okay.  Is that because it records the number that's the

18   incoming number on the cell phone?

19   A    Yes.

20   Q    Was it one of the phones that you had recovered from the

21   car?

22   A    No.

23   Q    Okay.  Did Irene and Natasha Wyche both recognize and know

24   that number?

25   A    Yes.

1   Q    Do you know what the number is?  Can you tell it to us, what

2   it is now?

3   A    I believe it's 443-691-9203.

4   Q    9203.  And that phone was not recovered in the car, is that

5   your testimony?

6   A    Correct.

7   Q    Did you get from Natasha Wyche and from any other relatives

8   who were there other phone numbers to phones that Darryl had?

9   A    Yes.

10  Q    First of all, did you make a record of the number that Irene

11  Magginson had on her phone, the one that recorded the voice mail?

12  A    I'm sorry?

13  Q    What was the number to Irene Magginson's phone, the one that

14  recorded the voice mail?

15  A    I don't recall Ms. Magginson's phone number.

16  Q    Okay.  We'll come back to that.  Do you recognize this

17  number, 410-905-6490?

18  A    Yes.  It's familiar.

19  Q    Okay.  Was that one of the phones that was recovered from

20  the car?

21  A    Yes, I believe so.  Yes.

22  Q    Do you know, did you take notes of these numbers when the

23  family members gave them to you that day?

24  A    I had notes of the 2691 numbers that they said that Darryl

25  had used that day.

1    Q    I see.  If I showed you a copy of your notes, would that

2    refresh your recollection as to the --

3    A    Yes.

4    Q    -- information that they gave you?  May I approach the

5    witness, Your Honor?

6              THE COURT:  Yes.

7    Q    Okay.  I asked you about the 6490 number.

8    A    Yes.

9    Q    Did they give you information about that number?

10   A    Yes.  They provided that as one of Anthony's phone numbers.

11   Q    Now, was that phone actually recovered from the car?

12   A    No.

13   Q    Okay.  What about the 443-691-9203?  That's the number that

14   you say recorded the voice mail, is that correct?

15   A    Correct.

16   Q    And then there was another number, was there not?

17   A    Yes.

18   Q    What was that?

19   A    443-691-8844.

20   Q    Was that a phone that was recovered from the car?

21   A    Yes, it was.

22   Q    Where was that phone recovered from?

23   A    In the center console between the driver, front driver and

24   passenger seats.

25   Q    Okay.  And you already gave us the number for the phone that

1    was attached to Darryl's waistband, is that correct?

2    A    Correct.

3    Q    What were the last four digits of that number?

4    A    5057.

5    Q    Okay.  Did you go to the autopsy that morning, Detective

6    Niedermeier?

7    A    Yes, I did.

8    Q    Did you actually stay around for the autopsy?

9    A    No.

10   Q    Okay.  But you said that two of the bullets were recovered

11   in the course of the autopsy, is that correct?

12   A    Correct.

13   Q    Is that where you -- did you get custody of them at some

14   point?

15   A    Yes, they were turned over to me and I submitted them to

16   Evidence Control.

17   Q    Was a search subsequently conducted on the car down there at

18   Police Headquarters after it had been towed down there?

19   A    Yes.

20   Q    Okay.  Let me show you some more pictures.  First of all,

21   this is Government Exhibit W-21.  What is this?

22   A    That's a photograph of the rear of the vehicle taken to the

23   Crime Lab bay.

24   Q    And this is W-25.  What is that?

25   A    And that's the tire well area of the same vehicle.

1    Q    Was anything recovered from the tire well area?

2    A    Yes.  A large amount of narcotics, heroin and cocaine.

3    Q    Okay.  I'm showing you now W-20.  Can you tell us what this

4    shows?

5    A    Yeah.  That's the plastic garbage bag containing the

6    narcotics.

7    Q    Okay.  This green stuff, what is that?  Is that green?

8    A    It appears to be dark.  I believe that's heroin.

9    Q    Okay.  Let me show you now W, this is W-6.  It's actually a

10   bag that contains a number of things, including two telephones.

11   Where were these recovered from?

12   A    Those were recovered from the center console of the vehicle.

13   Q    Okay.  You mentioned that a moment ago.  There's also a

14   phone holder and a charger, is that correct?

15   A    Yes.  They were all in the center console.

16   Q    These are all from the center console.  Was there also money

17   recovered from the center console?

18   A    Yes.

19   Q    How much?

20   A    5,770, I believe, dollars.

21   Q    Okay.  This is W-18.  Does this show the money as it was in

22   the console --

23   A    Yes.

24   Q    -- when you recovered it?  More than $5700?

25   A    Correct.

1    Q    Is that correct?  And this is W-19.  Does this show the

2    money and the phones that were recovered from the console?

3    A    Yes.

4    Q    I showed you a picture a moment ago of the child seat in the

5    rear seat area of the car.  Do you remember that?

6    A    Yes.

7    Q    Was there anything in the child's seat?

8    A    It was a cellular phone box with a phone in it.

9    Q    Okay.  Another telephone?

10   A    Yes.

11   Q    Oh, getting back to the drug evidence for a minute.  The

12   stuff recovered from the trunk area.  Did you or any of your

13   fellow detectives who were working with you submit the drug

14   evidence for fingerprints?

15   A    Yes.

16   Q    And were any latents recovered?

17   A    No.

18   Q    Were attempts made to lift latent fingerprints from the area

19   of the car, the Honda station wagon, and the various items

20   recovered from the Honda?

21   A    Yes.

22   Q    And did you make requests for comparisons with several

23   people, including the defendants in this case, Willie Mitchell,

24   Shawn Gardner, and Shelly Wayne Martin?

25   A    Yes.

1    Q    And did you also request a comparison with a brother of Mr.

2    Gardner's, by the name of Alvin?

3    A    Yes.

4    Q    Did any matches come back?

5    A    No.

6    Q    Did you submit the request for comparison of Gardner's

7    prints in your initial request for comparisons just a couple of

8    days after the homicide on March 28th, 2002?

9    A    No.

10   Q    Why not?

11   A    At that point I didn't know Mr. Gardner, his identity.

12   Q    Okay.  Did you have a nickname for him at that point?

13   A    Yes.

14   Q    What was the nickname you had for him?

15   A    Goo.

16   Q    But you didn't have him identified as yet; is that your

17   testimony?

18   A    Correct.

19   Q    Did you subsequently learn who Goo was?

20   A    Yes.

21   Q    And did you then submit a request for comparison?

22   A    I did.

23   Q    Okay.  Let me call your attention now to April 1st of 2002.

24   Did you attend the funeral of the Wyche brothers that day?

25   A    Yes.

1    Q    Did you go inside the location where the funeral was?

2    A    No.  I was making observations from the parking area.

3    Q    Do you know what the location was?  I mean, was it a church

4    or a funeral parlor or what?

5    A    It was a large converted church.

6    Q    Okay.

7    A    My recollection, off of Reisterstown Road.

8    Q    Okay.  Did you go inside the location?

9    A    No.

10   Q    Okay.  Did you have with you at that time photographs of Mr.

11   Gardner, Mr. Martin, and Mr. Mitchell?

12   A    Yes.

13   Q    So you had by that time identified Mr. Gardner as --

14        MS. RHODES:  Objection.

15   Q    -- the guy you knew as Goo?

16        THE COURT:  Overruled.  You may answer.

17   A    Yes.

18   Q    Had you already subpoenaed telephone toll records for Darryl

19   Wyche's cell phones?

20   A    Yes.

21   Q    Had you learned the subscriber of the phones to whom, or the

22   users of the phones to whom Darryl was speaking just before he

23   died?  Let me rephrase the question.

24        You knew from the Wyche brothers' phone records who

25   they were talking to just before they died, is that correct?

1    A    Yes.

2    Q    Specifically, Darryl Wyche, is that correct?

3    A    Yes.

4    Q    Okay.  Had you learned by April 1st the subscribers for any

5    of those phones?

6    A    Yes.

7    Q    Okay.  Were you aware that Mr. Mitchell was arrested that

8    day, April 1st, 2002, riding in a car just before the funeral?

9    A    Yes.

10   Q    And do you know what he was arrested for?

11   A    He had an outstanding warrant on him at the time.

12   Q    Just one or more than one?

13   A    I believe that --

14        MR. LAWLOR:  Objection.

15   A    -- he had two.

16        THE COURT:  Overruled.

17   A    I believe he had two open warrants at that point.

18   Q    Were any of those warrants associated with your

19   investigation of the Wyche brothers murders?

20   A    No.

21   Q    What were they open warrants for?

22        MR. LAWLOR:  Objection.

23        THE COURT:  Overruled.

24   A    I believe one was for a violation of probation and one was

25   for either an assault or an attempt murder.

Case 1:04-cr-00029-RDB   Document 683   Filed 06/08/09   Page 188 of 221

1              MR. LAWLOR:  Objection.  Move to strike.

2     Q    And was there a crime --

3              THE COURT:  Excuse me.  Ladies and gentlemen, as I've

4     indicated to you, the fact that a person has been arrested or is

5     sought to be arrested is not evidence in this case of anybody's

6     guilt of anything.

7     Q    Was the attempt murder charge associated with an incident

8     that occurred at Hammerjacks?

9     A    Yes.

10    Q    And was the other warrant, in fact, out of the state of

11    Pennsylvania?

12    A    Yes.

13    Q    And are you sure that it was a violation of probation or

14    could it have been some other kind of warrant?

15    A    No.  It could have been some other kind of warrant.

16    Q    Were you aware that, following the arrest of Mr. Mitchell, a

17    telephone was recovered from him?

18    A    Yes.

19    Q    That that was the telephone that placed the call to the

20    voice mail?

21             MS. RHODES:  Objection.

22             THE COURT:  Overruled.  You may answer.

23    A    Yes.

24    Q    What was the number of that phone again?  You can use your

25    notes to refresh your recollection.  You have them right there in

1    front of you, do you not?

2    A    I have them here.

3    Q    Okay.  Sorry.  Let me back up and rephrase the question.  It

4    was actually Darryl's phone that placed the call to the voice

5    mail, is that correct?

6    A    Yes.  It was the 9203 that was in possession --

7            MR. LAWLOR:  Your Honor, forgive me.  I object.  Can we

8    have a clarification of whom called whom, please?

9            THE COURT:  Go ahead, Mr. Harding, yes.  Clarify.

10   BY MR. HARDING:

11   Q    Who called whom?  Which phone?

12   A    In the phone call that was placed to Irene Magginson's cell

13   phone, it was Darryl Wyche's phone, 443-691-9203, that placed the

14   call to Irene Magginson's cell phone.

15   Q    So the one that you recovered from Mr. Mitchell, what was

16   its involvement in this case, if any?

17   A    Through the investigation, looking at Darryl Wyche's cell

18   phone records, numerous calls were placed between that phone and

19   Darryl Wyche's phone the night of the murder.

20   Q    Okay.  We'll come back to that.

21           Okay.  Now, calling your attention to April 16th of

22   2002.  Did you obtain arrest warrants for Mr. Mitchell and Mr.

23   Martin for the murders, the Wyche brothers murders?

24   A    Yes.

25   Q    And where was Mr. Martin arrested?

1    A    At Two Cree Court in Randallstown.

2    Q    Okay.  And did you have a search warrant for that location?

3    A    Yes, I did.

4    Q    Did you participate in the search?

5    A    Yes, I did.

6    Q    Let me show you some exhibits and ask you if you can

7    identify them.  First of all, this is an exhibit that's already

8    in evidence, Government Exhibit W-5I.  What's the date on this

9    letter, Detective Neidermeier?

10   A    3/4/02.

11   Q    And what's the signature?

12   A    Lil Darryl maybe.

13   Q    Okay.  This is a letter that talks about, among other

14   things, I can come to my dogs and get an eighth with no problem.

15   It's a risky business but a nigga like me lives on the edge.  I

16   don't have no problem with ski masking it up.  Is that correct,

17   Detective?

18   A    Correct.

19           THE COURT:  At any good point, Mr. Harding, when you

20   think.

21           MR. HARDING:  For the day, Your Honor?

22           THE COURT:  For the day, yes.

23           MR. HARDING:  Well, we might, now is fine, Your Honor.

24   Or do you want me to go on a little more?

25           THE COURT:  No.  I just wanted you to choose when it's

1   a convenient spot to break.

2           MR. HARDING:  Okay.  I'll just ask one more question.

3           THE COURT:  Well, go ahead.

4   Q    This is Governments Exhibit W-5-G.  Can you tell me what

5   this is, Detective?

6   A    That's a pamphlet given out at the funeral for Darryl and

7   Anthony Wyche.

8   Q    Did you know from the day you were there at the funeral

9   whether Mr. Martin and Mr. Gardner attended the funeral?

10  A    I had no first-hand knowledge but I'd heard.

11          MR. KURLAND:  Objection.

12          MR. CROWE:  Objection.

13          THE COURT:  He didn't say what he heard.  The objection

14  is overruled.  The answer is no, he doesn't know.

15  BY MR. HARDING:

16  Q    Okay.  Let me show you on the back of this thing.  There's a

17  section called Acknowledgements from the family.  Is that you and

18  your partner down there at the bottom?

19  A    Yes, it is.

20  Q    And a bunch of pictures in here.  And I want to call your

21  attention to one name that appears in here.  You see this?

22  A    Yes.

23  Q    Claudus?

24  A    Yes.

25  Q    Also known as Lovey?

1    A    Yes.

2    Q    Who's identified as a cousin to Darryl and Pete?

3    A    Correct.

4    Q    So this is a good time, Your Honor.

5         THE COURT:  All right.  Thank you, Mr. Harding.

6    Members of the jury, you will be excused until 9:30 tomorrow

7    morning.  Please leave your note pads on your chairs.

8         Have no discussion, conduct no investigation.  Continue

9    to keep an open mind about all issues.  Avoid any media reports

10   about the case.

11        We'll see you tomorrow morning at 9:30.  Thank you.

12   The jury is excused.

13        You may step down, Detective.

14        (Jury exits the courtroom.)

15        THE COURT:  So where are we?  Let's see.  Mr. Harding,

16   you are going to arrange to have that tape further redacted and

17   you're going to modify the transcript.

18        MR. HARDING:  Yes, Your Honor.

19        THE COURT:  All right.  Mr. Kurland?

20        MR. KURLAND:  I'm just waiting in line.

21        THE COURT:  I don't think Mr. Harding had anything

22   else.  Or do you, Mr. Harding?

23        MR. HARDING:  I have nothing else, Your Honor.

24        THE COURT:  Is Detective Niedermeier likely to be all

25   day tomorrow?

1          MR. HARDING:  No, Your Honor.

2          THE COURT:  Oh.

3          MR. HARDING:  We have other witnesses.

4          THE COURT:  All right.  Good.  Yes, Mr. Kurland.

5          MR. KURLAND:  Judge, several things.  I'll be very

6     brief.  The first is that, with respect to the last exhibit that

7     was shown, that pamphlet from the funeral --

8          THE COURT:  Yes.

9          MR. KURLAND:  -- I don't believe that that has, no

10    other witness, Niedermeier wasn't there.  I'm going to object to

11    it being admitted into evidence because there's no foundation for

12    it.  There's no testimony that it was actually handed out.  He

13    wasn't at the funeral.  And Natasha Wyche testified and I don't

14    believe it was any part of her examination.  So there's no

15    foundation for that.

16         THE COURT:  Well, if you want me to require the

17    government to bring back a witness, I will.  But frankly, the

18    document would appear to be self-authenticating.

19         MR. KURLAND:  Maybe I missed something, Your Honor.  I

20    don't believe it's, it's kind of weird to have these piles of

21    documents that we've all got in boxes and we don't know their

22    serial numbers.  A document comes up and it's hard to make an

23    immediate objection.

24         Maybe the government could clarify as to, if it 's

25    going to put on -- I don't believe, I'm not asking for Natasha

1   Wyche to come back to testify.

2           THE COURT:  Okay.  I'm sure the government can find

3   somebody to come in who attended the funeral to authenticate

4   that.

5           MR. HARDING:  Judge, it was recovered from Mr. Martin's

6   apartment.  That's the nexus to this case.

7           MR. KURLAND:  All right.  That's fine, Judge.  All

8   right.  There's several issues that I guess we're going to deal

9   with, with respect to the proposed jury instruction and the

10  proposed stipulation that the Court had talked about a little bit

11  earlier.  I don't, I think there's a possibility that the

12  government, and at least Mr. Gardner, I guess the other

13  defendants, too, might be able to work out a stipulation with

14  respect to Mr. Gardner's incarceration status.  But the manner in

15  which the Court kind of just generally outlined it.

16          I think as starting point, I haven't talked, I haven't

17  had a chance to talk about this with co-counsel in detail yet,

18  but I don't have a problem with trying to work out a stipulation.

19  My hunch is the government might dispute or disagree with certain

20  aspects of that.  But I'm more than willing to try to work out

21  something this evening and perhaps then present it to the

22  government sometime early tomorrow morning.

23          THE COURT:  All right.  That would be fine.  I take no

24  pride of authorship of any sort.

25          As I understand Mr. Gardner's position, what you and

1     Mr. Coburn are interested in, not to suggest that's all you're

2     interested in, but you want clear, unmistakable, solid evidence

3     that Mr. Gardner has been in continuous custody since the day he

4     was arrested in 2002.

5               MR. KURLAND:  And --

6               THE COURT:  And perhaps you want the addition that

7     it's, for the last several years, it's been in the Division of

8     Correction.  I leave that to you.

9               MR. KURLAND:  Well, separately from the -- I understand

10    the government's concern that it's true that when Mr. Gardner is

11    transferred over here for these proceedings, he is, you know,

12    whether his physical status or his legal status changes with

13    respect to what sovereign has him.  But it's important to us that

14    it come out that he is incarcerated in a facility that is

15    separate from the other codefendants.

16              THE COURT:  Well --

17              MR. KURLAND:  Physically separate.

18              THE COURT:  Well, if you can prove that, obviously,

19    you're invited and, of course, welcome to prove that.  I don't

20    see the significance.  But it's not my call in terms of whether

21    that's significant.  I mean, you know, I'm not going to get into

22    some dual sovereignty instruction just to try to --

23              MR. KURLAND:  Not for that.

24              THE COURT:  Okay.  So talk to the government.

25              MR. KURLAND:  We'll try to work that out.  But the

1    other thing, Your Honor, is that if need be -- okay.  We'll try

2    to resolve that.  The second thing is, with respect to the, one

3    of the concerns in some of the correspondence that went on over

4    the weekend, and the government's response, I guess they filed

5    something late last night or early this morning, with respect to

6    the dual sovereignty instruction, it would be our position, I

7    don't think the Court needs to give a mid-trial dual sovereignty

8    instruction.

9          THE COURT:  Great.  Because that's what I was thinking.

10   So we don't need to talk about it any more.

11         MR. KURLAND:  Well, no.  But I think, though, that

12   given the Court's limiting instruction that it's already given,

13   once earlier in the trial and then a couple of days ago when the

14   Court, I think at the close of the day on Wednesday, indicated

15   that there are some aspects of it, that the federal charges

16   incorporate state law, I do believe that something along the

17   lines of the proposed dual sovereignty instruction that we, that

18   we previously submitted, which is an accurate statement of the

19   law, would be something that, that the Court would give.  And

20   given particularly with respect to this case.

21         And I know that it's a theoretical issue in every case

22   and the instruction isn't always given in every case but it isn't

23   simply because the defendant has objected to this, or the

24   defendants.

25         The Court's ruling has permitted, it was over

197

1    government objection, but has permitted some inquiry with respect

2    to some of the state crimes, the dispositions.  In addition, the

3    government's plea agreements and proffer agreements are the most

4    excruciatingly detailed with respect to federal prosecution,

5    state prosecution.

6         And we had earlier submitted something, I won't recite

7    all the cites in it, but it's in the file, that in a situation

8    like this, and again particularly with respect to the reference

9    to the prior proceedings, I mean, I think all counsel up to this

10   point have been incredibly restrained with respect to that.  But

11   several times we've commented on how smart this jury is.

12        This jury knows that there was a prior state court

13   proceeding of the murder trial with respect to Tonya Spence as a

14   victim.  And with respect to that, I think even if we don't go

15   down that other thing, maybe we'll talk about another time, but

16   that a general dual sovereignty instruction is manifestly

17   appropriate here because of the concern that the jury, if they

18   don't get it, is going to assume, and the case law supports this,

19   they're going to assume that the prior conviction, the prior,

20   rather, the prior proceeding resulted in acquittal.

21        And the case law is abundant that in those situations

22   it redounds to the detriment of the defendant because they say,

23   We got to convict this guy in this proceeding no matter what.

24   So --

25        THE COURT:  Well, I certainly expect to give something.

1          MR. KURLAND:  All right, Your Honor.  One last thing,

2    with respect to the redaction of the tape that was discussed

3    prior to Detective Niedermeier's testimony, I think there's a

4    possibility that the redaction could be a substantial detriment

5    to Mr. Gardner's fair trial rights.  And that's because, on the

6    basis of Mr. Montgomery's testimony, all of the statements that

7    Mr. Montgomery made concerning what Mr. Gardner allegedly told

8    him about that never put Mr. Gardner directly at the scene.  It

9    was all sort of second-hand and third-hand, that Mr. Gardner

10   allegedly knew this based on conversations from someone.

11         And we're concerned that the redaction, and again, this

12   is something, I'll think about this overnight, but we're

13   concerned that the redaction might work to the detriment of Mr.

14   Gardner because it might make it seem like his knowledge of that

15   is more first-hand than it was, than what it really was, in fact,

16   which is second or third-hand from somebody.  So we're concerned

17   about that, sort of the like the flip side.

18         THE COURT:  All right.  I'll see if you have anything

19   to say about it tomorrow.

20         MR. KURLAND:  Thank you very much.

21         THE COURT:  Thank you, Mr. Kurland.  Okay.  Counsel,

22   thank you.  I'll see you tomorrow morning at 9:30.  We're in

23   recess.

24         (Conclusion of Proceedings at 4:20 p.m.)

25

199

1                            INDEX

2

3                                                    PAGE

4  WITNESS: WILLIAM MONTGOMERY

5  CROSS EXAMINATION BY MR. COBURN                    3

6  CROSS EXAMINATION BY MR. CROWE                     34

7  REDIRECT EXAMINATION BY MR. HARDING               81

8  RECROSS EXAMINATION BY MR. COBURN                116

9  RECROSS EXAMINATION BY MR. CROWE                 126

10 RECROSS EXAMINATION BY MR. LAWLOR                129

11

12 WITNESS: DETECTIVE GARY NIEDERMEIER

13 DIRECT EXAMINATION BY MR. HARDING                159

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Willie

5   Mitchell, et al., Case Number(s) AMD-04-029, on October 14, 2008.

6          I further certify that the foregoing pages constitute

7   the official transcript of proceedings as transcribed by me to

8   the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10  signature this _____ day of _____, 2009.

11

12

13

14          _____

15          Mary M. Zajac,
            Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 68:20
**$100,000** [1] - 21:6
**$15,000** [2] - 68:18, 69:4
**$214.03** [1] - 173:21
**$5,000** [1] - 20:9
**$5700** [1] - 183:24
**$6.03** [1] - 173:20

## '

**'02** [4] - 6:14, 6:18, 7:12, 28:20
**'94** [3] - 54:7, 54:9, 54:16
**'95** [3] - 54:7, 54:9, 54:16
**'97** [1] - 120:8

## 1

**10** [8] - 24:19, 46:23, 60:6, 69:4, 108:25, 133:17, 158:2
**101** [1] - 1:25
**11** [1] - 24:19
**1110** [2] - 25:2, 91:24
**116** [1] - 199:8
**12** [1] - 158:2
**126** [1] - 199:9
**129** [1] - 199:10
**13** [4] - 36:1, 42:21, 57:8, 152:20
**13th** [5] - 7:2, 7:12, 87:1, 118:10, 159:12
**14** [4] - 1:11, 42:21, 57:8, 200:5
**142nd** [1] - 4:17
**14th** [2] - 38:25, 84:23
**15** [4] - 66:11, 66:17, 132:11, 133:17
**159** [1] - 199:13
**16th** [1] - 189:21
**17** [1] - 28:11
**17th** [2] - 124:21, 125:8
**1991** [1] - 14:10
**1994** [1] - 54:10
**1997** [5] - 48:2, 48:8, 54:10, 92:13, 120:2
**1998** [1] - 140:23
**1999** [3] - 12:5, 12:8, 13:15
**1:15** [2] - 133:3, 134:24
**1st** [3] - 185:23, 187:4, 187:8

## 2

**2** [8] - 36:21, 38:3, 38:15, 40:19, 41:23, 43:3, 57:6, 75:14
**20** [1] - 66:11
**2000** [12] - 13:24, 14:9, 14:21, 15:20, 15:21, 16:11, 48:5, 87:19, 87:23, 88:2, 105:25, 118:5
**2001** [10] - 16:3, 16:21, 16:24, 17:6, 17:9, 17:11, 48:5, 48:8, 48:12, 106:1
**2002** [33] - 7:2, 17:18, 24:19, 25:2, 36:21, 38:25, 40:19, 42:18, 75:10, 77:3, 81:21, 87:1, 87:7, 91:24, 93:4, 109:11, 118:5, 118:6, 118:10, 119:16, 122:8, 122:18, 124:21, 125:8, 130:2, 159:15, 162:17, 185:8, 185:23, 187:8, 189:22, 195:4
**2003** [11] - 8:4, 28:19, 36:1, 65:21, 88:4, 121:17, 122:2, 122:19, 125:10, 126:1, 130:9
**2004** [8] - 8:20, 8:25, 21:22, 31:3, 47:4, 84:23, 88:5, 98:6
**2008** [2] - 1:11, 200:5
**2009** [1] - 200:10
**20th** [2] - 17:9, 98:6
**21201** [1] - 1:25
**21st** [1] - 17:11
**22** [1] - 65:21
**23rd** [1] - 122:18
**24** [1] - 42:14
**25** [1] - 46:23
**2691** [1] - 180:24
**26th** [6] - 16:24, 24:18, 25:2, 75:10, 91:24, 119:16
**27** [2] - 22:5, 22:14
**2700** [1] - 76:4
**27th** [2] - 15:21, 16:11
**28th** [1] - 185:8
**29th** [3] - 13:24, 14:9, 31:3
**2:00** [1] - 152:3
**2:35** [5] - 133:3, 133:4, 133:9, 133:12, 134:23
**2nd** [3] - 6:14, 81:21, 109:11

## 3

**3** [4] - 38:16, 43:3, 152:20, 199:5
**3/4/02** [1] - 190:10
**309-5057** [1] - 174:23
**34** [1] - 199:6
**357** [14] - 23:21, 24:3, 24:13, 91:5, 92:5, 92:21, 93:8, 93:13, 93:16, 109:2, 119:6, 120:11, 120:12, 120:13
**38** [1] - 66:6
**3:55** [1] - 134:10
**3rd** [1] - 6:18

## 4

**4** [1] - 22:14
**40** [31] - 24:7, 24:13, 24:23, 35:10, 76:8, 76:12, 91:12, 92:1, 92:2, 92:3, 92:4, 92:9, 92:12, 92:13, 93:14, 93:18, 94:15, 109:2, 119:16, 119:20, 119:23, 120:1, 120:4, 120:9, 120:10, 120:15, 128:3, 132:4, 132:7, 170:22
**410-905-6490** [1] - 180:17
**4400** [4] - 160:5, 160:12, 160:17, 165:3
**443-691-8844** [1] - 181:19
**443-691-9203** [3] - 180:3, 181:13, 189:13
**485** [2] - 137:2
**4:00** [3] - 133:6, 134:10
**4:20** [1] - 198:24
**4:30** [1] - 133:13
**4th** [1] - 16:3

## 5

**5** [1] - 133:16
**5,770** [1] - 183:20
**5-DBL-0** [1] - 129:4
**5057** [1] - 182:4
**5515** [1] - 1:24

## 6

**6** [1] - 25:2
**6490** [1] - 181:7
**6:52** [1] - 159:25
**6th** [2] - 14:20, 15:20

## 7

**7** [4] - 22:5, 38:3, 41:24, 67:24
**7:00** [1] - 168:13
**7:30** [1] - 160:1
**7th** [1] - 28:19

## 8

**8** [1] - 31:3
**81** [1] - 199:7
**8th** [1] - 17:18

## 9

**9** [7] - 37:9, 37:12, 37:15, 82:18, 110:14, 110:15
**9203** [2] - 180:4, 189:6
**95** [1] - 31:3
**97** [1] - 108:24
**9:30** [3] - 192:6, 192:11, 198:22
**9:47** [1] - 2:1

## A

**a.m** [4] - 2:1, 24:19, 159:25, 160:1
**Aaron** [13] - 18:1, 19:18, 23:7, 23:15, 23:17, 49:8, 49:11, 49:14, 49:17, 51:7, 88:21, 89:10, 101:25
**able** [11] - 70:25, 113:22, 139:6, 147:19, 147:23, 148:8, 149:7, 153:14, 177:24, 179:15, 194:13
**absolutely** [1] - 47:8
**Absolutely** [2] - 33:19, 146:24
**abundant** [1] - 197:21
**accept** [5] - 52:8, 52:13, 52:17, 61:9, 74:5
**accepted** [1] - 145:13
**According** [2] - 17:21, 31:17
**according** [11] - 4:23, 4:25, 9:21, 10:23, 19:13, 21:15, 23:25, 30:14, 32:23, 79:24, 126:1
**account** [1] - 144:2
**accurate** [4] - 98:13, 105:4, 196:18, 200:8
**Acknowledgements** [1]

- 191:17
**acquittal** [1] - 197:20
**acting** [1] - 136:2
**active** [2] - 59:1
**activity** [1] - 51:4
**actual** [4] - 106:23, 152:10, 178:8, 178:9
**Adam** [1] - 1:22
**add** [1] - 147:16
**added** [1] - 94:3
**addition** [4] - 43:13, 122:22, 195:6, 197:2
**additional** [2] - 131:9, 170:24
**address** [1] - 176:23
**admissibility** [1] - 3:1
**admissible** [7] - 2:19, 2:21, 67:8, 97:2, 145:4, 146:4, 146:14
**admission** [29] - 2:20, 2:21, 2:22, 142:14, 143:18, 143:19, 144:23, 145:1, 145:4, 145:5, 145:7, 145:21, 146:1, 146:2, 146:4, 146:8, 146:23, 147:1, 147:2, 147:5, 147:7, 147:8, 147:11, 147:14
**admissions** [3] - 135:4, 135:5, 145:4
**admit** [3] - 140:24, 140:25, 147:8
**admits** [4] - 135:10, 137:10, 140:22, 140:23
**admitted** [6] - 20:19, 30:7, 38:21, 97:9, 141:12, 193:11
**admitting** [1] - 127:1
**advantage** [2] - 148:5, 149:8
**advised** [8] - 91:21, 91:25, 92:1, 92:3, 99:17, 99:18, 99:23, 120:9
**aerial** [2] - 160:15, 163:10
**affair** [4] - 20:16, 20:19, 20:23, 21:3
**affirm** [1] - 7:7
**affixed** [1] - 200:9
**Afternoon** [1] - 37:3
**afternoon** [10] - 37:4, 38:1, 81:9, 81:10, 116:23, 129:12, 133:1, 133:15, 159:6, 159:7
**agent** [1] - 141:4
**Agent** [4] - 104:16, 107:9, 122:10
**agents** [14] - 75:15, 81:14, 85:25, 86:6, 88:5, 88:13, 88:16, 88:17,

89:14, 89:15, 96:8, 100:23, 104:11, 155:4
**Agents** [1] - 52:25
**ago** [12] - 44:10, 44:11, 51:11, 73:23, 85:6, 87:17, 87:20, 119:5, 158:3, 183:13, 184:4, 196:13
**agree** [5] - 2:18, 134:18, 149:9, 149:15, 153:10
**agreed** [4] - 35:9, 45:14, 105:9, 149:16
**agreed-on** [1] - 45:14
**agreeing** [1] - 156:21
**agreement** [26] - 34:8, 35:2, 36:1, 64:25, 67:15, 94:6, 94:11, 94:24, 95:3, 95:4, 95:10, 95:11, 95:17, 95:19, 95:20, 96:12, 96:14, 96:25, 97:5, 98:18, 98:19, 124:5, 124:13, 124:15, 124:21
**agreements** [2] - 197:3
**ahead** [16] - 7:10, 13:11, 40:16, 63:6, 89:8, 128:17, 129:15, 129:16, 129:18, 131:10, 135:9, 135:18, 141:23, 189:9, 191:3
**ain't** [13] - 36:19, 64:3, 64:6, 64:14, 85:4, 120:23, 121:2, 125:12, 125:13, 138:5, 138:6
**al** [1] - 200:5
**alias** [1] - 14:1
**aliases** [1] - 14:4
**alibi** [3] - 73:3, 144:2, 144:9
**alive** [1] - 152:17
**alleged** [1] - 145:15
**allegedly** [2] - 198:7, 198:10
**almost** [1] - 149:25
**Almost** [2] - 23:4, 23:6
**alone** [3] - 150:9, 150:19, 160:2
**Altogether** [2] - 170:21, 170:22
**altogether** [2] - 3:1, 135:23
**Alvin** [1] - 185:2
**ambulance** [1] - 164:7
**AMD-04-029** [2] - 1:6, 200:5
**Amendment** [1] - 137:19
**AMERICA** [1] - 1:5
**amount** [3] - 85:23, 99:19, 183:2

**Andre** [1] - 1:13
**animal** [1] - 147:14
**Answer** [7] - 22:22, 31:8, 31:11, 46:25, 127:16, 127:18, 127:21
**answer** [36] - 12:21, 15:17, 15:23, 22:19, 43:5, 43:15, 44:1, 47:16, 48:15, 51:24, 52:13, 57:19, 63:19, 70:13, 82:16, 83:2, 88:24, 89:18, 92:25, 97:23, 98:21, 102:18, 104:8, 111:22, 112:5, 112:9, 113:13, 118:3, 118:15, 128:24, 134:16, 140:18, 157:3, 186:16, 188:22, 191:14
**answered** [6] - 28:21, 28:24, 29:5, 109:3, 119:8, 138:2
**answers** [5] - 28:13, 31:5, 31:13, 43:6, 63:23
**Anthony** [17] - 75:20, 159:16, 164:22, 165:23, 167:19, 169:8, 169:12, 170:2, 172:6, 172:17, 173:18, 173:20, 175:14, 176:1, 176:6, 176:13, 191:7
**Anthony's** [1] - 181:10
**anticipate** [1] - 133:1
**anxious** [2] - 28:25, 29:3
**Anyway** [1] - 150:25
**anyway** [3] - 115:15, 116:6, 126:20
**apartment** [8] - 21:15, 31:6, 78:6, 82:19, 83:12, 91:1, 106:25, 194:6
**apologize** [1] - 158:24
**apologized** [1] - 157:6
**apparent** [1] - 168:14
**appear** [1] - 193:18
**Appearances** [1] - 1:15
**appeared** [1] - 165:2
**applied** [1] - 100:10
**appreciate** [2] - 2:11, 7:21
**approach** [8] - 2:15, 3:12, 5:15, 22:11, 84:16, 166:5, 166:7, 181:4
**approached** [3] - 20:2, 29:13, 163:21
**appropriate** [6] - 60:16, 60:25, 61:24, 62:8, 96:25, 197:17
**April** [5] - 115:20, 185:23, 187:4, 187:8, 189:21

**area** [8] - 173:9, 175:24, 182:25, 183:1, 184:5, 184:12, 184:18, 186:2
**arguably** [4] - 148:25, 149:22, 150:2, 151:22
**argue** [5] - 139:6, 152:6, 152:7, 153:9, 153:14
**argued** [2] - 142:3, 153:2
**arguing** [1] - 148:17
**argument** [5] - 115:12, 142:6, 149:3, 149:5, 151:10
**arguments** [1] - 157:7
**armed** [1] - 68:6
**arrange** [1] - 192:16
**arrest** [9] - 2:10, 16:11, 41:11, 42:15, 44:19, 87:2, 110:3, 188:16, 189:22
**arrested** [36] - 12:8, 13:8, 13:14, 14:8, 15:21, 16:15, 25:7, 25:9, 36:20, 36:23, 36:24, 36:25, 38:1, 38:11, 40:18, 40:22, 40:25, 41:1, 41:3, 41:7, 41:23, 58:17, 81:20, 82:2, 82:3, 82:7, 110:6, 115:19, 187:7, 187:10, 188:4, 188:5, 189:25, 195:4
**arrests** [2] - 13:5, 15:14
**Arrington** [1] - 157:25
**arrived** [6] - 159:23, 159:24, 159:25, 164:7, 164:8, 167:7
**aside** [1] - 142:2
**aspect** [1] - 2:13
**aspects** [2] - 194:20, 196:15
**assault** [1] - 187:25
**asserted** [1] - 145:14
**assertion** [2] - 27:5, 27:7
**Assistant** [3] - 51:25, 75:14, 99:10
**assists** [1] - 61:7
**associate** [2] - 64:7, 64:8
**associated** [4] - 101:17, 169:18, 187:18, 188:7
**association** [2] - 56:6, 63:24
**assume** [4] - 58:21, 113:21, 197:18, 197:19
**assuming** [2] - 140:8, 140:9
**assure** [1] - 188:16
**ATF** [1] - 75:14
**ATM** [1] - 114:9

**attached** [4] - 165:15, 167:9, 174:22, 182:1
**attempt** [9] - 32:20, 87:4, 87:22, 88:9, 88:10, 99:25, 187:25, 188:7
**attempted** [4] - 13:17, 33:8, 65:15, 132:19
**attempting** [1] - 124:5
**attempts** [1] - 184:18
**attend** [1] - 185:24
**attended** [2] - 122:9, 191:9, 194:3
**attention** [1] - 60:23, 75:5, 86:25, 100:3, 100:6, 100:14, 108:24, 111:24, 125:15, 162:23, 185:23, 189:21, 191:21
**attorney** [6] - 75:14, 98:5, 98:6, 99:15, 100:16, 100:20
**Attorney** [4] - 51:25, 99:11, 99:16, 158:5
**Attorney's** [14] - 6:23, 7:2, 7:12, 8:1, 9:11, 24:17, 26:14, 27:3, 34:24, 35:19, 83:20, 122:9, 122:21, 125:5
**attorney/client** [2] - 100:5, 100:10, 100:18
**attorneys** [1] - 81:12
**attributes** [1] - 53:11
**audiotape** [2] - 178:16, 178:20
**August** [8] - 7:2, 7:12, 44:12, 87:1, 118:6, 118:10, 122:8, 122:18
**AUSA** [1] - 122:9
**authenticate** [1] - 194:3
**authenticating** [1] - 193:18
**authorities** [3] - 95:14, 95:15, 99:24
**authorship** [1] - 194:24
**automobile** [1] - 19:10
**autopsies** [1] - 170:25
**autopsy** [3] - 182:5, 182:8, 182:11
**available** [2] - 71:23, 113:15
**Avenue** [1] - 36:24, 36:25, 41:9, 114:11, 114:12, 114:16, 152:2, 160:5, 160:13, 160:17
**avoid** [2] - 15:11, 157:12
**Avoid** [1] - 192:9
**aware** [10] - 5:21, 20:23, 28:19, 66:19, 66:21, 77:4, 95:3, 134:11, 187:7, 188:16

---

**B**

**backwards** [1] - 67:14
**Bacon** [6] - 4:7, 47:21, 88:21, 89:10, 112:24, 113:20
**bad** [3] - 50:24, 79:15
**bag** [3] - 178:11, 183:5, 183:10
**bail** [1] - 83:5
**Baker** [1] - 59:10
**balcony** [3] - 30:4, 30:15, 32:25
**Ball** [3] - 50:20, 50:23, 51:3
**BALL** [2] - 51:2, 51:3
**ballistics** [3] - 128:7, 128:9, 152:12
**Baltimore** [22] - 1:12, 1:25, 6:14, 6:20, 9:11, 26:14, 34:24, 38:9, 39:4, 43:22, 67:25, 68:1, 75:16, 75:17, 75:18, 93:13, 99:16, 111:18, 112:23, 159:9, 176:21, 176:24
**barbeques** [1] - 56:6
**Barksdale** [1] - 75:20
**Barry** [1] - 1:22
**based** [3] - 61:3, 146:5, 198:10
**Based** [2] - 135:13, 176:4
**basis** [1] - 198:6
**bat** [1] - 137:14
**bay** [1] - 182:23
**beat** [1] - 18:16
**beating** [1] - 20:3
**becoming** [1] - 108:19
**beef** [3] - 102:23, 103:4, 103:7
**began** [4] - 40:7, 48:16, 163:22, 176:11
**begin** [3] - 62:18, 88:5, 151:9
**beginning** [2] - 83:15, 117:17
**begins** [1] - 127:9
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [1] - 103:1
**behind** [8] - 68:25, 169:4, 169:12, 169:19, 170:1, 171:22, 172:6
**beleaguered** [1] - 157:25
**believes** [1] - 134:4
**belong** [1] - 53:10
**belonged** [2] - 55:5,

56:24
**belt** [1] - 165:14
**belted** [1] - 165:16
**belts** [2] - 165:15, 167:9
**Bench** [1] - 166:18
**bench** [1] - 167:2
**Benson** [5] - 75:17, 88:16, 104:17, 107:9, 123:19
**Benz** [2] - 129:1, 129:6
**Berger** [1] - 75:20
**best** [2] - 93:21, 158:25
**betcha** [1] - 146:20
**better** [4] - 3:10, 62:19, 162:6, 165:20
**between** [11] - 41:21, 41:23, 77:5, 104:4, 127:7, 127:8, 136:1, 140:16, 181:23, 189:18
**beyond** [1] - 130:23
**big** [5] - 5:18, 109:12, 111:1, 111:17, 160:22
**bit** [8] - 5:14, 18:20, 36:7, 128:15, 133:15, 133:16, 145:15, 194:10
**bitch** [7] - 26:10, 27:9, 27:21, 29:10, 106:22, 107:21
**black** [1] - 169:25
**blank** [1] - 148:16
**blanks** [1] - 151:6
**blazer** [1] - 165:18
**block** [5] - 160:5, 160:12, 160:17, 160:19, 165:3
**blood** [9] - 174:24, 175:6, 175:10, 175:12, 175:21, 176:4, 176:9, 176:11, 176:14
**Blood** [1] - 114:21
**Bloods** [3] - 58:24, 114:13, 114:20
**blow** [1] - 176:9
**blue** [1] - 165:18
**Bo** [26] - 4:11, 4:12, 10:24, 11:3, 47:25, 72:15, 72:16, 73:2, 87:24, 105:23, 106:3, 106:7, 106:13, 106:15, 129:21, 130:12, 131:1, 131:7, 131:14, 131:17, 131:21, 137:10, 140:22, 141:20, 147:25, 151:7
**Bo's** [9] - 10:20, 44:20, 44:23, 148:16, 148:17, 154:4, 156:19, 157:5, 157:9
**bodies** [3] - 76:20, 167:6, 168:12, 172:19, 173:18

**body** [4] - 93:3, 128:4, 145:15, 174:16
**boilerplate** [1] - 141:17
**books** [1] - 157:16
**boom** [1] - 33:18
**bottom** [2] - 154:18, 191:18
**bought** [4] - 9:20, 10:16, 127:18, 127:20
**box** [2] - 33:18, 184:8
**boxes** [1] - 193:21
**boy** [1] - 17:23
**Boys** [2] - 59:17, 59:18
**braids** [2] - 25:18, 25:22
**Bramble** [1] - 78:7
**brass** [1] - 111:19
**breach** [1] - 97:3
**break** [10] - 2:17, 3:6, 66:13, 132:25, 133:6, 133:14, 133:15, 134:9, 170:8, 191:1
**brief** [3] - 73:6, 126:6, 193:6
**Brief** [1] - 116:20
**briefly** [1] - 129:12
**bring** [2] - 60:22, 193:17
**Brittany** [2] - 83:4
**Brittany's** [1] - 82:19
**broken** [1] - 170:6
**brother** [2] - 12:10, 185:1
**brother's** [2] - 40:24, 41:3
**brothers** [12] - 135:12, 139:12, 140:23, 140:25, 141:1, 152:10, 152:16, 152:22, 175:12, 185:24, 187:19, 189:23
**brothers'** [1] - 186:24
**brought** [1] - 82:9
**Bruton** [3] - 2:25, 142:2, 147:21
**build** [2] - 33:24, 102:13
**building** [8] - 30:12, 31:6, 42:19, 90:25, 91:1, 162:18, 162:19, 162:20
**bullet** [2] - 20:10, 69:2, 77:20, 171:23, 172:17
**bullets** [9] - 32:25, 170:16, 170:18, 170:24, 171:4, 171:10, 171:14, 172:12, 182:10
**bunch** [2] - 56:6, 58:20, 59:4, 75:7, 75:16, 114:25, 165:8, 191:20
**Bunk** [10] - 86:10, 86:14, 86:15, 87:4, 87:17, 87:22, 88:1, 117:22, 117:25, 118:5

**Burke** [1] - 13:21
**Burton** [1] - 158:2
**business** [1] - 190:15
**buy** [17] - 4:5, 4:16, 5:6, 5:9, 5:11, 9:2, 9:22, 10:1, 10:8, 10:13, 11:21, 104:20, 112:21, 127:21, 128:22
**buying** [2] - 45:18, 45:20
**BY** [30] - 3:23, 7:24, 13:13, 34:5, 40:17, 63:7, 67:23, 81:8, 83:7, 84:21, 99:9, 111:10, 116:16, 116:22, 125:3, 126:9, 129:11, 129:19, 131:12, 159:5, 167:4, 189:10, 191:15, 199:5, 199:6, 199:7, 199:8, 199:9, 199:10, 199:13
**bystander** [1] - 79:5

# C

**Calhoun** [1] - 59:10
**caliber** [18] - 76:12, 92:1, 92:2, 92:4, 92:5, 92:9, 92:13, 93:14, 93:18, 109:2, 119:16, 119:23, 120:1, 120:4, 120:9, 120:10, 128:3, 170:22
**calibers** [4] - 76:8, 91:12, 119:20, 119:23
**cancel** [2] - 155:14, 157:2
**candid** [5] - 96:17, 121:6, 121:16, 121:22, 126:2
**candor** [2] - 125:17, 125:24
**cannot** [2] - 11:20, 92:8
**cap** [1] - 132:5
**caper** [1] - 79:22
**car** [45] - 31:25, 32:3, 32:4, 32:15, 32:21, 50:8, 71:9, 71:12, 71:16, 91:6, 92:23, 105:1, 106:24, 112:24, 113:1, 113:4, 113:10, 113:20, 152:16, 152:23, 161:16, 161:18, 163:7, 164:9, 165:4, 167:21, 168:23, 170:9, 170:15, 170:16, 171:15, 172:20, 176:5, 176:12, 176:16, 176:19, 179:21, 180:4, 180:20, 181:11, 181:20, 182:17, 184:5, 184:19, 187:8

**care** [5] - 7:5, 62:22, 62:23, 64:24, 152:3
**carefully** [1] - 112:2
**Carew** [2] - 57:12, 57:14, 57:16, 57:18, 57:21, 57:23, 57:25
**carried** [4] - 93:23, 110:14, 120:12, 120:13
**carry** [9] - 91:8, 93:14, 93:15, 93:18, 93:22, 108:3, 110:15, 110:16, 119:6
**carrying** [3] - 23:21, 24:13, 32:11, 91:5
**case** [43] - 5:23, 22:4, 22:18, 37:23, 60:17, 60:19, 61:3, 62:16, 63:3, 66:16, 87:23, 88:6, 101:3, 123:4, 125:6, 133:8, 137:13, 138:22, 138:24, 138:25, 140:20, 146:11, 146:16, 148:17, 150:8, 151:16, 158:1, 158:2, 158:4, 159:22, 162:17, 176:7, 184:23, 188:5, 189:16, 192:10, 194:6, 196:20, 196:21, 196:22, 197:18, 197:21
**Case** [1] - 200:5
**CASE** [1] - 1:6
**cases** [1] - 150:8
**casing** [3] - 78:6, 173:1, 173:15
**casings** [9] - 170:16, 170:18, 170:22, 171:4, 171:10, 171:14, 173:8, 173:13
**caved** [2] - 40:3, 109:20
**CBS** [2] - 59:7, 59:9
**CD** [2] - 178:12, 178:16
**CDS** [1] - 15:25
**cell** [9] - 173:21, 178:6, 178:9, 179:16, 179:18, 186:19, 189:12, 189:14, 189:17
**cellular** [1] - 184:8
**center** [5] - 181:23, 183:12, 183:15, 183:16, 183:17
**certain** [10] - 4:3, 4:4, 4:6, 61:2, 61:4, 61:6, 66:23, 145:12, 149:25, 194:19
**Certainly** [2] - 30:8, 33:13
**certainly** [3] - 74:16, 154:20, 197:25
**CERTIFICATE** [1] - 200:1
**certify** [2] - 200:3, 200:6

**chairs** [3] - 66:15, 133:7, 192:7
**challenged** [1] - 141:15
**Chambers** [1] - 150:7
**chance** [4] - 71:21, 145:9, 171:8, 194:17
**change** [2] - 92:1, 128:3
**changes** [1] - 195:12
**character** [1] - 146:3
**charge** [9] - 12:15, 12:21, 15:24, 15:25, 36:21, 40:23, 40:25, 41:2, 188:7
**charged** [6] - 25:9, 33:7, 37:21, 65:5, 121:11, 152:5
**charger** [1] - 183:14
**charges** [1] - 196:15
**Charles** [3] - 13:25, 14:2, 14:6
**check** [1] - 46:21
**Cheeks** [21] - 37:13, 38:22, 39:9, 39:21, 39:25, 55:21, 66:1, 66:3, 68:3, 68:5, 72:8, 77:13, 78:10, 81:24, 82:12, 83:16, 94:9, 94:12, 95:22, 109:16, 132:15
**Cheeks's** [1] - 66:6
**Chief** [1] - 37:23
**child** [6] - 77:12, 77:14, 78:2, 78:3, 169:1, 184:4
**child's** [1] - 184:7
**choice** [7] - 24:20, 24:23, 91:13, 92:14, 92:16, 120:5, 120:7
**choir** [1] - 149:24
**choose** [2] - 61:11, 190:25
**chose** [1] - 145:17
**church** [2] - 186:3, 186:5
**Circuit** [1] - 158:3
**circumstances** [2] - 124:15, 125:21
**cites** [1] - 197:7
**City** [15] - 4:5, 4:16, 5:6, 5:9, 6:14, 9:11, 26:14, 34:24, 39:4, 47:21, 48:20, 68:1, 75:17, 111:19, 159:9
**city** [4] - 71:5, 75:20, 78:10, 107:14
**claim** [1] - 31:7
**clarification** [1] - 189:8
**Clarify** [1] - 189:9
**clarify** [1] - 193:24
**classic** [1] - 144:24
**Claudus** [24] - 135:11, 135:15, 135:16, 135:20,

135:24, 136:8, 137:6, 138:16, 138:18, 138:20, 139:2, 139:8, 139:11, 139:20, 140:2, 140:3, 140:6, 140:10, 140:12, 142:21, 142:25, 191:23
**Cle** [1] - 57:21
**CLE** [1] - 57:21
**clean** [2] - 134:12, 134:14
**clear** [6] - 23:23, 23:24, 129:20, 133:14, 154:15, 195:2
**cleared** [1] - 108:23
**clearly** [6] - 76:24, 143:19, 144:22, 146:5, 156:8, 167:9
**Cleo** [1] - 57:22
**CLERK** [1] - 158:19
**clever** [1] - 145:7
**client** [12] - 96:18, 96:21, 96:22, 117:2, 117:11, 125:20, 145:17, 145:20, 147:22, 149:6, 150:19, 151:20
**client's** [1] - 125:16
**clip** [1] - 34:3
**clipped** [2] - 174:17, 174:19
**Cloris** [5] - 138:9, 138:10, 138:13, 142:22, 142:25
**close** [13] - 78:11, 108:11, 121:16, 121:22, 133:5, 138:4, 142:24, 165:17, 167:12, 169:23, 173:12, 176:8, 196:14
**close-up** [3] - 165:17, 167:12, 173:12
**closed** [2] - 168:9, 170:13
**closely** [1] - 153:25
**Closer** [2] - 161:22, 162:14
**closer** [2] - 102:5, 172:11
**closest** [2] - 162:12, 162:13
**clothes** [1] - 83:5
**clothing** [3] - 25:12, 53:7, 54:22
**clubs** [1] - 78:10
**co** [1] - 194:17
**co-counsel** [1] - 194:17
**Coburn** [41] - 1:22, 2:5, 3:13, 3:21, 7:5, 7:20, 13:2, 13:5, 13:11, 33:17, 34:7, 35:12, 42:10, 51:23, 59:22, 63:18, 67:21, 74:13, 81:11,

83:19, 84:5, 85:18, 86:8, 89:23, 91:10, 93:7, 94:7, 94:18, 98:3, 99:6, 99:12, 100:3, 100:6, 101:13, 103:22, 104:19, 105:7, 108:6, 108:13, 117:7, 195:1
**COBURN** [35] - 2:11, 3:14, 3:23, 7:21, 7:24, 13:3, 13:7, 13:13, 33:15, 33:19, 33:22, 84:9, 84:20, 85:16, 86:2, 86:17, 87:13, 91:18, 91:23, 93:9, 93:11, 97:16, 98:20, 98:24, 99:3, 99:7, 104:7, 105:19, 115:6, 115:12, 116:14, 116:22, 125:3, 199:5, 199:8
**Coburn's** [1] - 26:25
**cocaine** [13] - 10:8, 10:13, 10:14, 46:25, 112:8, 127:7, 127:10, 127:13, 127:15, 127:20, 127:21, 127:23, 183:2
**code** [2] - 83:11, 178:3
**codefendants** [1] - 195:15
**Cogen** [1] - 99:16
**Coldspring** [5] - 160:25, 161:5, 163:11, 163:12, 163:19
**Coleman** [2] - 75:22, 122:11
**Colleen** [2] - 17:13, 17:17
**color** [8] - 56:14, 56:19, 56:21, 56:22, 56:24, 58:8, 58:13, 114:8
**colors** [4] - 53:8, 54:21, 55:6, 57:23
**combination** [2] - 81:14, 156:25
**comfortable** [2] - 102:12, 121:23
**coming** [4] - 42:17, 49:24, 67:14, 108:1, 108:5, 112:20
**comment** [1] - 58:15
**commented** [1] - 197:11
**commercial** [1] - 46:2
**commit** [1] - 95:6
**committed** [14] - 50:11, 50:18, 51:8, 56:7, 56:9, 56:10, 56:12, 56:13, 94:25, 110:4, 110:5, 113:7, 152:10
**common** [1] - 152:15
**community** [1] - 56:5

**comparison** [4] - 102:16, 185:1, 185:6, 185:21
**comparisons** [2] - 184:22, 185:7
**complainant** [1] - 13:20
**complaint** [1] - 143:5
**complete** [4] - 125:16, 125:23, 149:1, 200:8
**completed** [1] - 159:14
**completely** [3] - 95:9, 95:11, 96:17
**completeness** [1] - 143:23
**complies** [1] - 30:20
**component** [1] - 63:10
**conceding** [1] - 140:5
**concept** [1] - 5:14
**concern** [7] - 66:19, 67:2, 67:3, 67:4, 144:6, 195:10, 197:17
**concerned** [6] - 36:12, 66:20, 99:6, 198:11, 198:13, 198:16
**concerning** [1] - 198:7
**concerns** [2] - 2:6, 36:14, 196:3
**concert** [1] - 136:2
**concession** [1] - 146:8
**conclude** [1] - 96:21
**Conclusion** [1] - 198:24
**condition** [1] - 168:12
**conditions** [3] - 15:5, 125:17, 125:24
**conduct** [1] - 192:8
**conducted** [2] - 42:19, 182:17
**confer** [1] - 100:16
**conference** [3] - 122:20, 166:18, 167:2
**confidential** [1] - 100:25
**configuration** [1] - 150:15
**confronted** [6] - 135:10, 135:14, 140:3, 140:13, 142:22, 143:1
**confronting** [1] - 135:16
**confuse** [1] - 72:16
**confusing** [1] - 143:22
**connection** [3] - 62:2, 77:4, 136:1
**consider** [5] - 61:18, 63:3, 63:4, 103:9, 113:9
**considerably** [1] - 23:11
**considered** [4] - 51:11, 52:2, 61:6, 66:23
**console** [7] - 181:23,

183:12, 183:15, 183:16, 183:17, 183:22, 184:2
**constitute** [1] - 200:6
**construction** [2] - 162:16
**CONT'D** [1] - 3:22
**contact** [3] - 17:13, 80:4, 80:7
**contacted** [1] - 177:20
**containing** [2] - 165:3, 183:5
**contains** [3] - 123:12, 178:12, 183:10
**contend** [1] - 60:23
**contents** [1] - 154:9
**context** [2] - 92:20, 151:11
**contextual** [1] - 158:1
**Continue** [2] - 66:16, 192:8
**continue** [1] - 158:13
**continued** [3] - 16:20, 16:23, 17:8
**continuing** [1] - 92:8
**continuous** [1] - 195:3
**continuously** [1] - 2:9
**contract** [11] - 68:13, 68:16, 68:18, 136:4, 138:12, 139:8, 139:13, 139:14, 139:15, 139:25, 140:2
**contracted** [1] - 168:16
**control** [3] - 84:10, 86:18, 105:1
**Control** [1] - 182:16
**controlled** [1] - 15:25
**controversial** [1] - 133:24
**controversy** [1] - 166:15
**convenient** [1] - 191:1
**conversation** [9] - 9:10, 9:11, 18:8, 18:17, 19:9, 73:6, 108:12, 117:2, 117:11
**conversations** [6] - 8:23, 24:17, 100:10, 100:19, 123:3, 198:10
**converted** [1] - 186:5
**convict** [1] - 197:23
**convicted** [6] - 12:1, 13:14, 13:20, 14:8, 14:25, 94:12
**conviction** [1] - 197:19
**convictions** [2] - 13:6, 13:10
**convince** [1] - 145:8
**cook** [3] - 127:15, 127:17
**cool** [3] - 63:25, 64:1,

101:17
**cooperate** [2] - 64:25, 99:24
**cooperated** [3] - 34:25, 35:4, 35:8
**cooperation** [1] - 35:5
**copies** [2] - 101:4, 178:12
**cops** [1] - 109:12
**copy** [3] - 178:13, 178:23, 181:1
**corner** [4] - 67:25, 68:5, 68:22, 152:9
**corpses** [1] - 174:7
**Correct** [25] - 9:16, 9:19, 20:1, 20:2, 105:20, 118:15, 118:20, 161:12, 163:2, 165:10, 165:24, 167:17, 170:10, 171:6, 171:25, 172:8, 173:11, 180:6, 181:15, 182:2, 182:12, 183:25, 185:18, 190:18, 192:3
**correct** [143] - 4:10, 4:20, 5:6, 6:4, 9:14, 9:15, 9:17, 9:18, 9:20, 9:23, 9:25, 10:3, 10:17, 10:18, 10:20, 10:21, 10:23, 10:24, 11:1, 11:4, 11:6, 11:15, 16:13, 16:15, 16:19, 17:4, 17:12, 19:2, 19:4, 19:6, 19:12, 19:13, 19:23, 20:14, 20:22, 20:24, 21:1, 25:17, 25:20, 29:12, 29:23, 32:6, 37:7, 37:21, 38:11, 38:19, 39:21, 40:5, 41:21, 42:12, 43:16, 44:5, 44:19, 49:17, 50:11, 50:15, 50:18, 55:14, 58:22, 69:20, 70:7, 74:21, 77:25, 81:25, 82:1, 83:13, 83:16, 83:21, 84:3, 84:14, 85:4, 85:7, 85:10, 88:17, 90:4, 92:16, 94:4, 94:16, 94:21, 97:12, 97:15, 98:1, 98:11, 100:1, 101:8, 102:1, 102:9, 103:13, 103:17, 104:2, 104:14, 105:2, 105:9, 105:18, 105:23, 106:1, 107:7, 107:11, 109:13, 110:24, 112:24, 113:2, 113:4, 113:21, 119:14, 119:17, 127:4, 127:23, 128:12, 129:6, 138:19, 149:2, 156:11, 160:20, 161:11, 162:9, 164:18,

165:5, 165:9, 165:23, 167:16, 169:6, 169:7, 170:3, 170:9, 171:5, 171:24, 172:4, 172:7, 172:20, 173:3, 173:10, 173:13, 177:11, 181:14, 182:1, 182:11, 183:14, 184:1, 186:25, 187:2, 189:5, 190:16

**Correction** [1] - 195:8
**correctly** [6] - 4:2, 10:11, 72:12, 77:10, 120:9, 135:18
**correspondence** [4] - 99:4, 133:18, 133:19, 196:3
**costs** [1] - 73:25
**counsel** [13] - 62:3, 66:21, 84:18, 98:7, 101:3, 144:16, 158:1, 162:2, 162:5, 165:25, 166:18, 194:17, 197:9
**Counsel** [2] - 133:12, 198:21
**counting** [2] - 21:4, 21:6
**county** [1] - 71:8
**County** [8] - 43:22, 67:25, 75:18, 93:13, 99:17, 176:21, 176:24
**couple** [22] - 22:6, 22:22, 23:3, 30:22, 31:10, 38:14, 41:22, 42:24, 44:10, 44:11, 73:22, 74:10, 87:1, 108:7, 108:12, 108:16, 109:6, 127:3, 185:7, 196:13
**course** [23] - 2:16, 2:19, 8:22, 11:24, 15:2, 21:1, 94:11, 101:1, 101:7, 105:16, 114:1, 117:16, 123:4, 137:18, 141:12, 142:2, 145:14, 149:24, 150:7, 153:18, 182:11, 195:19
**court** [9] - 37:21, 37:24, 61:8, 61:22, 94:8, 94:12, 141:10, 157:22, 197:12
**COURT** [258] - 1:1, 2:2, 2:4, 2:16, 3:9, 3:12, 3:16, 6:7, 7:5, 7:10, 7:17, 7:20, 7:23, 8:9, 12:20, 13:2, 13:11, 13:23, 14:13, 15:17, 15:23, 16:18, 22:12, 27:5, 30:8, 33:13, 33:17, 33:21, 33:24, 34:1, 36:11, 40:14, 40:16, 41:18, 44:16, 51:2,

52:11, 54:13, 55:12, 57:2, 57:9, 60:8, 60:10, 60:12, 60:15, 62:2, 66:10, 66:13, 66:19, 67:4, 67:11, 67:14, 67:19, 67:21, 78:19, 81:6, 82:6, 82:16, 82:25, 83:2, 84:10, 84:17, 85:17, 86:3, 86:18, 88:24, 89:8, 89:18, 91:20, 92:18, 92:24, 93:10, 97:17, 97:23, 98:21, 99:8, 101:23, 102:18, 104:8, 105:21, 106:12, 106:17, 106:20, 107:17, 111:9, 111:16, 111:22, 113:13, 115:7, 115:13, 116:9, 116:15, 116:20, 117:6, 117:9, 124:3, 125:1, 126:7, 126:23, 128:17, 128:24, 129:14, 129:18, 130:21, 130:23, 131:3, 131:5, 131:8, 132:6, 132:13, 132:18, 132:20, 132:22, 132:24, 133:12, 133:23, 134:1, 134:5, 134:7, 134:12, 134:16, 134:20, 134:22, 135:1, 135:7, 135:13, 135:16, 135:22, 136:3, 136:10, 136:13, 136:17, 136:19, 136:21, 136:23, 137:1, 137:8, 137:11, 137:18, 138:15, 138:18, 138:21, 138:25, 139:10, 139:20, 139:24, 140:5, 140:9, 140:14, 140:21, 140:24, 141:6, 141:8, 141:14, 141:18, 141:23, 142:7, 142:12, 143:4, 143:13, 143:15, 143:19, 144:3, 144:7, 144:11, 144:15, 144:21, 144:25, 145:2, 145:22, 146:2, 146:10, 146:12, 146:19, 146:24, 147:1, 147:6, 147:13, 147:24, 148:19, 148:22, 149:4, 149:9, 149:12, 149:18, 150:6, 150:13, 150:18, 150:22, 150:25, 151:5, 151:24, 152:14, 153:13, 153:16, 153:21, 153:25, 154:12, 154:19, 154:21, 154:25, 155:3, 155:6, 155:10, 155:17, 155:21, 156:2, 156:5, 156:13, 156:20, 157:4, 157:11, 157:15, 157:18, 158:10, 158:23, 159:3, 162:2, 166:3, 166:6, 166:10,

166:12, 166:17, 166:19, 166:25, 167:3, 167:13, 181:6, 186:16, 187:16, 187:23, 188:3, 188:22, 189:9, 190:19, 190:22, 190:25, 191:3, 191:13, 192:5, 192:15, 192:19, 192:21, 192:24, 193:2, 193:4, 193:8, 193:16, 194:2, 194:23, 195:6, 195:16, 195:18, 195:24, 196:9, 197:25, 198:18, 198:21
**Court** [18] - 66:22, 67:9, 96:25, 142:5, 142:10, 143:10, 143:11, 157:21, 158:2, 158:3, 190:1, 194:10, 194:15, 196:7, 196:14, 196:19, 200:15
**Court's** [4] - 33:11, 153:8, 196:12, 196:25
**Courthouse** [1] - 1:24
**courtroom** [11] - 3:15, 44:25, 61:4, 63:5, 67:20, 97:9, 133:10, 133:11, 134:25, 158:8, 192:14
**cousin** [2] - 83:6, 192:2
**cover** [2] - 67:1, 99:11
**covered** [5] - 67:11, 100:5, 100:17
**crack** [7] - 112:12, 127:7, 127:16, 127:19, 127:21, 127:22
**credit** [2] - 61:12, 63:5
**Cree** [1] - 190:1
**Crew** [7] - 53:16, 53:18, 53:19, 53:22, 54:25, 55:1
**crew** [1] - 114:8
**Crew's** [1] - 56:21
**crewcut** [1] - 165:6
**crime** [8] - 16:2, 110:25, 111:11, 128:18, 166:15, 174:24, 176:16, 188:2
**Crime** [2] - 163:22, 182:23
**crimes** [16] - 51:8, 56:7, 56:9, 56:10, 56:12, 56:13, 83:24, 85:24, 94:25, 95:6, 95:19, 95:25, 109:16, 110:3, 111:13, 197:2
**CRIMINAL** [1] - 1:6
**criminal** [7] - 12:1, 40:23, 51:4, 53:10, 55:4, 95:14, 96:7
**Crips** [1] - 59:1
**critical** [1] - 2:13
**cross** [4] - 61:5, 115:23, 117:17, 130:24
**CROSS** [4] - 3:22, 34:4,

199:5, 199:6
**crosses** [1] - 163:17
**crossing** [1] - 163:18
**CROWE** [38] - 33:25, 34:5, 40:17, 62:1, 63:7, 66:11, 67:23, 88:23, 92:17, 101:22, 102:17, 107:16, 113:12, 126:6, 126:9, 137:4, 142:3, 142:9, 142:13, 143:10, 143:14, 143:17, 143:24, 144:4, 144:18, 144:22, 145:19, 146:1, 146:7, 146:11, 146:16, 146:21, 146:25, 147:4, 147:11, 191:12, 199:6, 199:9
**Crowe** [27] - 1:20, 2:16, 34:6, 40:16, 57:10, 61:25, 63:6, 66:10, 67:22, 81:12, 83:19, 98:17, 101:14, 109:9, 109:19, 111:18, 111:24, 112:18, 113:6, 114:23, 121:6, 121:14, 128:17, 137:1, 141:23, 145:3, 148:23
**Crowe's** [2] - 3:7, 115:23
**Cruddy** [6] - 53:16, 53:18, 53:19, 53:22, 54:25, 55:1, 56:21
**custodial** [2] - 147:3, 149:25
**custody** [2] - 182:13, 195:3

# D

**dam** [1] - 151:1
**dangerous** [2] - 15:25, 148:20
**Darius** [32] - 17:22, 18:4, 18:8, 18:25, 19:23, 20:2, 21:2, 21:4, 22:23, 29:14, 29:18, 29:24, 32:7, 33:5, 33:8, 65:8, 65:15, 73:24, 77:24, 79:1, 80:18, 88:10, 89:22, 89:23, 91:1, 106:25, 114:25, 121:11, 122:3, 132:19
**dark** [1] - 183:8
**Darryl** [32] - 4:7, 47:21, 88:21, 89:10, 112:24, 113:20, 159:16, 164:23, 167:15, 169:4, 169:8, 169:11, 169:14, 169:18, 171:20, 173:18, 173:21, 174:11, 174:15, 180:8, 180:24, 186:18, 186:22,

187:2, 189:13, 189:17, 189:19, 190:12, 191:6, 192:2
**Darryl's** [9] - 170:1, 174:19, 174:22, 177:4, 177:6, 177:8, 177:10, 182:1, 189:4
**date** [11] - 2:10, 7:18, 8:10, 8:13, 8:17, 12:6, 16:3, 28:18, 28:20, 91:23, 190:8
**dated** [2] - 124:21, 125:8
**dates** [2] - 54:14, 81:19
**Davis** [1] - 1:13
**Davon** [2] - 63:16, 65:24, 69:6, 89:11
**days** [7] - 16:16, 21:18, 32:15, 122:18, 158:24, 185:8, 196:13
**dead** [5] - 20:15, 66:7, 163:6, 164:11, 168:20
**deal** [6] - 39:5, 86:4, 106:13, 109:21, 110:17, 194:8
**dealer** [5] - 49:20, 84:24, 84:25, 151:25
**dealings** [1] - 45:6
**Dean** [4] - 43:18, 75:21, 93:12, 102:8
**deceased** [1] - 168:14
**December** [3] - 17:6, 17:9, 17:11
**decide** [5] - 35:4, 35:8, 35:20, 61:11, 146:14
**decided** [2] - 97:5, 98:8
**deciding** [3] - 61:8, 61:21, 63:4
**decision** [3] - 34:25, 97:25, 146:15
**defendant** [13] - 95:5, 95:13, 95:17, 96:7, 96:9, 96:11, 98:7, 124:14, 138:21, 145:5, 146:21, 196:23, 197:22
**Defendant** [6] - 1:17, 1:18, 1:20, 1:21, 150:1, 150:2
**defendant's** [2] - 145:12, 146:19
**defendants** [10] - 5:23, 11:10, 89:9, 107:10, 123:11, 150:10, 152:5, 184:23, 194:13, 196:24
**Defendants** [2] - 1:9, 150:3
**defense** [6] - 2:5, 61:1, 81:11, 101:3, 123:4, 165:25
**definitely** [1] - 9:8

**Definitely** [1] - 154:24
**deliberations** [1] - 62:18
**delineated** [1] - 13:9
**demonstrably** [1] - 145:13
**demonstrated** [1] - 31:11
**denied** [4] - 98:10, 106:20, 124:10, 135:8
**deny** [1] - 111:4
**denying** [1] - 126:25
**department** [2] - 75:21, 159:11
**Department** [1] - 159:10
**depicts** [1] - 165:1
**deprived** [2] - 149:21, 153:14
**describe** [4] - 63:23, 88:19, 89:11, 108:7
**described** [5] - 77:5, 87:3, 95:25, 109:17, 112:19
**describing** [1] - 89:5
**description** [1] - 106:22
**designated** [1] - 96:8
**designation** [1] - 129:3
**despite** [1] - 5:3
**DET** [1] - 158:17
**detail** [5] - 23:24, 61:16, 122:7, 122:16, 194:17
**detailed** [1] - 197:4
**DETECTIVE** [1] - 199:12
**Detective** [29] - 57:11, 75:18, 75:21, 122:22, 133:20, 134:10, 134:17, 148:10, 151:6, 158:16, 158:21, 158:23, 159:6, 160:8, 162:9, 165:1, 167:7, 169:16, 169:21, 171:8, 175:23, 182:5, 190:9, 190:17, 191:5, 192:13, 192:24, 198:3
**detective** [5] - 135:8, 158:4, 158:6, 159:9, 159:22
**detectives** [11] - 38:2, 42:7, 72:13, 72:18, 75:17, 107:15, 110:7, 144:5, 145:18, 165:8, 184:13
**Detectives** [1] - 123:18
**determine** [1] - 164:2
**determined** [2] - 95:6, 96:25
**detriment** [3] - 197:22, 198:4, 198:13
**died** [4] - 33:1, 77:11,

186:23, 186:25
**difference** [1] - 127:7
**different** [11] - 11:12, 37:15, 59:4, 83:24, 85:24, 131:23, 135:22, 147:14, 153:23, 165:12
**difficult** [2] - 168:16, 168:18
**difficulties** [1] - 11:24
**digits** [1] - 182:3
**DIRECT** [2] - 159:4, 199:13
**direct** [12] - 11:25, 88:1, 112:14, 116:25, 117:10, 117:13, 125:15, 131:1, 134:18, 134:22, 162:6, 163:22
**directing** [1] - 136:7
**direction** [1] - 163:1, 165:12
**directly** [4] - 135:14, 158:19, 177:25, 198:8
**dirty** [10] - 41:12, 41:14, 41:19, 76:12, 92:10, 92:12, 93:2, 113:11, 119:23, 119:24
**Dirty** [9] - 63:16, 64:14, 65:3, 65:24, 89:11, 101:15, 102:3, 102:5, 102:16
**disagree** [1] - 194:19
**disclosed** [1] - 84:6
**disclosures** [1] - 97:1
**discomfort** [1] - 102:14
**discovered** [1] - 173:16
**discrete** [1] - 27:5
**discuss** [1] - 2:14
**discussed** [9] - 2:7, 2:10, 19:3, 19:14, 35:2, 45:12, 70:6, 85:10, 198:2
**discussion** [1] - 41:22, 58:6, 58:12, 64:15, 66:15, 85:1, 133:8, 142:19, 149:13, 149:14, 192:8
**discussions** [4] - 51:21, 62:3, 100:4, 100:17
**display** [1] - 98:25
**dispose** [1] - 32:20
**dispositions** [1] - 197:2
**dispute** [1] - 194:19
**disputed** [1] - 108:11
**distance** [1] - 31:10
**distinction** [1] - 127:8
**distribute** [2] - 16:2
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 38:12, 42:5, 110:9
**distrust** [1] - 36:7
**disturbed** [1] - 174:6

**Division** [2] - 16:25, 195:7
**DIVISION** [1] - 1:2
**divulging** [1] - 110:3
**DNA** [1] - 175:2
**DOAR** [4] - 22:13, 62:5, 62:8, 62:15
**Docket** [1] - 137:2
**document** [5] - 93:10, 98:3, 98:4, 193:18, 193:22
**documents** [6] - 13:3, 67:7, 96:10, 97:1, 123:2, 193:21
**dogs** [1] - 190:14
**dollars** [1] - 183:20
**done** [5] - 80:1, 80:2, 108:4, 116:6, 163:23
**door** [1] - 175:24
**doors** [2] - 168:7, 170:11
**dope** [1] - 128:22
**dot** [1] - 161:19
**down** [15] - 38:2, 44:1, 82:9, 83:3, 102:15, 110:9, 137:6, 163:6, 163:11, 176:17, 182:17, 182:18, 191:18, 192:13, 197:15
**Downtown** [1] - 38:9
**drawing** [1] - 136:8
**drew** [1] - 127:8
**drive** [3] - 114:2, 129:1, 129:6
**driver** [6] - 113:24, 114:1, 164:22, 165:14, 181:23
**driver's** [5] - 165:23, 172:7, 175:7, 175:22, 175:24
**driving** [4] - 14:10, 32:3, 113:17, 113:18
**droplets** [1] - 176:15
**dropped** [1] - 176:11
**drops** [3] - 175:10, 175:12, 175:20
**drove** [4] - 28:19, 31:23, 90:16, 91:3
**drug** [8] - 16:2, 49:19, 84:23, 84:24, 84:25, 151:25, 184:11, 184:13
**drugs** [4] - 4:5, 4:16, 4:20, 4:23, 4:24, 5:4, 5:5, 5:6, 5:9, 5:11, 9:2, 9:15, 9:17, 9:20, 10:24, 41:20, 45:9, 45:13, 45:18, 45:20, 45:23, 45:24, 46:9, 46:14, 47:17, 49:11, 49:13, 49:17, 103:23, 104:5,

104:14
**dual** [5] - 195:22, 196:6, 196:7, 196:17, 197:16
**duct** [1] - 90:19
**during** [16] - 2:17, 3:6, 11:24, 13:25, 21:1, 66:25, 87:11, 87:14, 88:4, 88:8, 88:22, 116:25, 117:3, 117:16, 125:20, 141:10
**During** [3] - 8:22, 15:2, 32:19

# E

**E's** [1] - 122:4
**eager** [2] - 90:10, 114:24
**ear** [4] - 169:12, 169:19, 170:1, 171:22
**early** [6] - 38:16, 58:7, 84:2, 88:4, 194:22, 196:5
**earth** [1] - 97:19
**easier** [1] - 169:8
**East** [4] - 160:5, 160:12, 160:17, 163:2
**easy** [1] - 2:6
**edge** [2] - 165:19, 190:15
**Edmondson** [8] - 36:24, 36:25, 37:19, 41:9, 58:17, 114:11, 114:12, 114:16
**effect** [3] - 97:15, 114:24, 162:8
**Eight** [2] - 87:20, 137:7
**eight** [1] - 179:4
**eighth** [1] - 190:14
**either** [13] - 43:3, 43:24, 48:24, 80:19, 110:4, 129:3, 145:12, 146:1, 149:25, 176:9, 176:11, 187:25
**Either** [2] - 43:8, 176:7
**elaborate** [1] - 61:23
**element** [3] - 63:10, 143:25, 147:8
**elicit** [1] - 144:5
**elicited** [2] - 94:18, 104:19
**eligible** [1] - 132:11
**Elkie** [1] - 53:23
**emphasized** [1] - 67:1
**employed** [1] - 159:8
**encouraged** [1] - 109:15
**End** [1] - 167:2
**end** [1] - 60:16, 86:8, 86:9, 105:25, 115:22,

117:10, 136:25, 137:8, 163:6
**enforcement** [23] - 6:3, 6:9, 8:23, 11:1, 11:2, 39:4, 39:23, 40:3, 40:8, 40:24, 41:3, 41:8, 51:22, 52:1, 56:18, 65:22, 76:6, 96:8, 122:2, 123:3, 128:2, 128:7
**engine** [1] - 168:1
**enhanced** [2] - 178:13, 178:23
**enormous** [1] - 85:23
**entered** [1] - 124:15
**entering** [1] - 94:11
**enters** [3] - 3:15, 67:20, 158:8
**entirely** [2] - 60:25, 62:8
**entitled** [3] - 148:3, 148:4, 148:5
**entrance** [1] - 166:24
**enumerated** [1] - 95:21
**equipment** [1] - 162:16
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essential** [1] - 47:9
**essentially** [2] - 2:18, 35:9, 40:2, 45:12, 46:5, 65:13, 78:6, 127:22
**establish** [1] - 97:3
**established** [2] - 131:8, 131:25
**et** [1] - 200:5
**etc** [1] - 135:8
**evaluate** [1] - 60:18
**evening** [2] - 41:25, 194:21
**event** [4] - 8:10, 34:22, 95:12, 107:7
**eventually** [1] - 108:23, 150:20
**Evidence** [1] - 182:16
**evidence** [39] - 30:7, 62:15, 63:2, 63:4, 66:24, 67:9, 96:6, 96:10, 97:3, 99:1, 99:2, 116:13, 116:17, 130:20, 133:8, 140:19, 141:13, 141:17, 146:4, 146:9, 146:17, 149:22, 151:11, 151:16, 153:10, 153:15, 153:17, 153:19, 153:20, 153:22, 154:6, 156:16, 184:11, 184:14, 188:5, 190:8, 193:11, 195:2
**evident** [1] - 149:20, 151:4, 151:23
**evidentiary** [1] - 154:6

**exactly** [1] - 109:20
**Exactly** [1] - 153:16
**EXAMINATION** [14] -
3:22, 34:4, 81:7, 116:21,
126:8, 129:10, 159:4,
199:5, 199:6, 199:7,
199:8, 199:9, 199:10,
199:13
**examination** [6] -
116:25, 117:10, 117:14,
117:17, 157:24, 193:14
**examine** [2] - 61:5, 61:6
**examiner** [1] - 168:17
**examiner's** [1] - 171:12
**examiners** [1] - 168:17
**example** [1] - 95:2
**examples** [1] - 127:14
**except** [2] - 83:20,
152:24
**Except** [2] - 43:12,
105:16
**exception** [1] - 62:14
**exceptions** [5] - 61:2,
61:4, 61:7, 66:25, 67:1
**excerpt** [1] - 117:12
**exchange** [2] - 20:6,
20:9
**excitement** [1] - 145:16
**excluded** [1] - 145:5
**exclusion** [1] - 147:2
**exclusively** [1] - 67:7
**excruciatingly** [1] -
197:4
**exculpate** [1] - 151:8
**exculpatories** [1] -
147:10
**exculpatory** [14] -
135:5, 142:5, 146:11,
146:15, 147:22, 149:6,
149:20, 149:22, 150:2,
151:4, 151:22, 152:18,
152:22, 153:1
**Excuse** [2] - 45:19,
188:3
**excuse** [5] - 67:21,
93:16, 133:16, 155:24,
168:17
**excused** [5] - 62:17,
132:24, 133:9, 192:6,
192:12
**execution** [1] - 95:18
**Exhibit** [10] - 30:6, 98:4,
99:11, 164:25, 174:9,
178:8, 178:11, 182:21,
190:8, 191:4
**exhibit** [10] - 98:13,
99:2, 124:24, 130:19,
131:11, 160:18, 174:13,
178:19, 190:7, 193:6
**exhibits** [4] - 62:16,

160:6, 178:5, 190:6
**Exhibits** [1] - 178:18
**exist** [1] - 144:17
**existed** [1] - 144:16
**existence** [4] - 54:2,
54:15, 54:17, 54:18
**exit** [1] - 166:24
**exited** [3] - 92:4,
120:10, 176:10
**exiting** [1] - 176:14
**exits** [3] - 133:10,
133:11, 192:14
**expect** [4] - 35:18,
94:19, 133:4, 197:25
**expected** [2] - 15:7,
15:10
**expecting** [1] - 126:7
**experience** [3] - 41:8,
150:4, 176:4
**explain** [6] - 60:15,
86:23, 109:24, 110:1,
114:7, 116:1
**explained** [5] - 76:7,
92:10, 93:14, 93:25,
101:15
**explaining** [1] - 92:20
**explains** [1] - 99:17
**explanation** [1] - 61:20
**explore** [3] - 147:23,
148:3, 148:4
**exposed** [1] - 94:15
**express** [2] - 125:17,
125:24
**extended** [3] - 45:10,
48:19, 51:4
**extent** [4] - 19:8, 144:6,
153:11, 156:21
**eye** [2] - 80:4, 80:7

---

**F**

---

**face** [3] - 2:25, 151:8,
167:24
**facility** [1] - 195:14
**fact** [76] - 5:3, 21:24,
22:3, 23:7, 25:9, 28:4,
30:21, 32:23, 33:1,
34:12, 35:25, 39:23,
41:10, 47:3, 49:6, 51:3,
55:23, 55:24, 56:13,
58:13, 58:15, 58:16,
63:8, 64:15, 65:6, 65:12,
65:25, 66:21, 68:13,
69:25, 70:24, 72:22,
73:11, 73:18, 74:8,
74:13, 78:9, 79:13, 82:2,
85:9, 85:23, 87:11, 88:1,
94:19, 98:14, 98:18,
102:20, 104:1, 104:4,

111:13, 113:15, 122:1,
122:7, 122:16, 123:2,
124:8, 128:4, 128:6,
130:9, 136:12, 145:1,
146:21, 147:9, 151:6,
153:6, 154:17, 155:1,
156:16, 156:24, 170:11,
177:17, 188:4, 188:10,
198:15
**facts** [1] - 13:5
**fail** [1] - 95:8
**failed** [1] - 17:7
**faint** [1] - 155:1
**Fair** [2] - 12:24, 72:25
**fair** [7] - 83:23, 107:5,
115:10, 155:24, 157:1,
198:5
**fairly** [2] - 73:5, 134:2
**fall** [4] - 30:4, 74:10,
127:3, 176:15
**fallback** [1] - 149:3
**fallen** [1] - 31:7
**false** [15] - 17:15, 17:17,
17:19, 95:7, 95:16,
135:5, 145:21, 145:23,
145:25, 146:11, 146:13,
146:14, 147:9
**familiar** [3] - 58:4,
58:21, 180:18
**familiarity** [1] - 139:2
**family** [22] - 51:12,
51:13, 51:18, 51:20,
52:2, 53:1, 53:4, 53:7,
88:19, 89:11, 103:9,
106:7, 106:18, 123:10,
129:21, 129:22, 138:4,
142:24, 177:5, 179:2,
180:23, 191:17
**far** [6] - 49:16, 71:15,
108:7, 142:9, 153:17,
163:4
**father** [1] - 177:4
**father-in-law** [1] - 177:4
**fault** [1] - 93:11
**FBI** [1] - 177:20
**February** [3] - 12:6,
12:8, 13:15
**federal** [31] - 6:3, 8:24,
22:3, 22:15, 36:8, 36:13,
37:20, 44:5, 44:17,
46:19, 47:4, 51:23, 52:4,
71:19, 73:21, 73:23,
81:14, 85:25, 86:6, 88:5,
88:13, 88:17, 89:15,
94:8, 95:13, 95:15,
96:14, 99:24, 103:17,
196:15, 197:4
**Federal** [2] - 103:12,
103:19
**feet** [8] - 30:22, 31:10,

108:7, 108:12, 108:16,
108:25, 172:22
**fell** [2] - 32:25, 108:8
**fellow** [6] - 50:20, 73:2,
80:19, 128:14, 128:21,
184:13
**felt** [1] - 79:11
**few** [9] - 15:14, 64:2,
108:25, 119:5, 120:23,
145:9, 157:18, 158:24,
177:14
**fifth** [1] - 122:20
**figure** [1] - 90:25
**figured** [1] - 110:20
**file** [1] - 197:7
**filed** [4] - 98:5, 99:19,
142:13, 196:4
**fill** [1] - 151:5
**final** [3] - 35:20, 116:11,
132:3
**finally** [3] - 40:18, 44:4,
86:9
**Finally** [1] - 124:4
**finder** [1] - 153:6
**fine** [5] - 7:6, 8:14,
190:23, 194:7, 194:23
**finger** [2] - 30:17,
160:24
**fingerprints** [2] -
184:14, 184:18
**finished** [1] - 48:12
**firearm** [1] - 16:2
**fired** [3] - 169:22,
169:23, 176:8
**first** [32] - 3:19, 18:3,
40:25, 57:5, 58:7, 76:11,
76:14, 77:4, 77:7, 81:20,
88:12, 103:22, 104:5,
106:24, 109:10, 124:24,
134:13, 138:3, 139:4,
143:17, 149:5, 149:16,
150:21, 153:11, 161:14,
166:7, 168:7, 169:2,
171:17, 191:10, 193:6,
198:15
**First** [7] - 110:13,
163:25, 164:25, 178:5,
180:10, 182:20, 190:7
**first-hand** [2] - 191:10,
198:15
**five** [11] - 12:17, 21:18,
25:16, 36:5, 43:13,
51:25, 85:6, 87:1,
122:19, 137:17, 171:4
**Five** [7] - 25:16, 148:13,
150:3, 154:18, 155:18,
156:9, 170:22
**Five-five** [1] - 25:16
**fix** [1] - 34:2
**Flannery** [1] - 1:19

**flashing** [1] - 78:12
**flip** [1] - 198:17
**floor** [3] - 30:15,
122:20, 172:16
**folks** [1] - 166:19
**following** [8] - 28:12,
28:13, 31:5, 63:22,
125:21, 188:16
**FOR** [1] - 1:2
**foregoing** [1] - 200:6
**forget** [2] - 150:15,
152:11
**Forgive** [1] - 132:7
**forgive** [1] - 189:7
**forms** [1] - 141:15
**forth** [1] - 125:18
**Forty** [1] - 99:20
**foundation** [2] - 193:11,
193:15
**Four** [2] - 150:3, 166:11
**four** [17] - 5:22, 6:22,
66:25, 112:20, 131:19,
133:13, 133:16, 137:16,
151:15, 152:1, 152:5,
152:15, 166:12, 171:4,
175:9, 182:3
**frankly** [1] - 193:17
**Fraser** [2] - 75:12,
100:16
**frequented** [1] - 78:11
**friend** [6] - 38:22,
63:16, 68:8, 77:16,
77:18, 79:1
**friends** [1] - 72:6
**front** [11] - 45:9, 46:13,
47:16, 49:11, 49:13,
49:17, 164:22, 172:16,
174:1, 181:23, 189:1
**Front** [1] - 46:15
**fronted** [1] - 103:23
**fronting** [3] - 4:19, 5:4,
45:13
**frost** [1] - 3:19
**fulfill** [1] - 95:9
**full** [5] - 10:21, 18:12,
35:12, 69:25, 70:2
**functioning** [1] - 105:4
**fund** [1] - 73:25
**funeral** [10] - 185:24,
186:1, 186:4, 187:8,
191:6, 191:8, 191:9,
193:7, 193:13, 194:3
**furthermore** [1] -
135:25
**future** [1] - 162:4

---

**G**

---

**gang** [8] - 55:16, 58:8,

58:9, 58:11, 59:11, 59:15, 59:17, 114:8
**gangs** [3] - 53:5, 58:20, 59:4
**garbage** [1] - 183:5
**GARDNER** [1] - 1:8
**Gardner** [83] - 1:21, 2:9, 4:19, 4:22, 4:25, 5:4, 10:18, 23:9, 23:21, 24:12, 26:10, 27:8, 27:20, 28:24, 45:7, 45:9, 45:17, 45:20, 45:25, 47:19, 47:20, 48:25, 49:13, 50:4, 50:10, 50:14, 60:3, 63:9, 63:15, 63:24, 64:8, 66:22, 72:10, 72:12, 73:1, 73:2, 73:6, 73:24, 74:9, 74:17, 74:20, 76:11, 78:6, 84:2, 92:3, 92:9, 92:12, 98:3, 99:12, 106:8, 117:2, 117:3, 117:12, 119:19, 119:22, 121:7, 121:16, 126:11, 126:13, 128:4, 142:15, 150:18, 150:21, 151:19, 154:9, 154:10, 155:25, 156:21, 156:25, 157:1, 184:24, 185:11, 186:11, 186:13, 191:9, 194:12, 195:3, 195:10, 198:7, 198:8, 198:9, 198:14
**Gardner's** [15] - 24:20, 45:23, 76:12, 84:7, 92:13, 92:15, 120:4, 120:7, 122:4, 153:4, 185:2, 185:6, 194:14, 194:25, 198:5
**Garnell** [1] - 75:19
**Garrett** [1] - 57:22
**Gary** [2] - 158:16, 158:21
**GARY** [2] - 158:17, 199:12
**gather** [4] - 48:15, 127:7, 163:22, 174:24
**general** [1] - 197:16
**generally** [2] - 112:2, 194:15
**gentleman** [1] - 22:16
**gentlemen** [14] - 3:16, 18:7, 18:21, 19:9, 21:8, 23:24, 30:18, 41:18, 62:3, 66:14, 110:2, 116:1, 158:13, 188:3
**Gerard** [1] - 1:19
**getaway** [1] - 32:4
**Giganti** [2] - 75:17, 122:11
**girlfriend** [1] - 37:17

**given** [15] - 6:13, 6:17, 63:23, 81:13, 83:3, 95:7, 96:9, 127:14, 145:11, 152:4, 191:6, 196:12, 196:20, 196:22
**Gladden** [2] - 164:5, 168:3
**glass** [2] - 170:6, 170:8
**Glock** [10] - 24:7, 24:13, 24:23, 76:12, 92:12, 92:13, 93:14, 93:18, 120:4, 120:15
**gloves** [2] - 32:20, 90:19
**God** [1] - 41:11
**Goo** [79] - 4:7, 5:17, 9:15, 10:18, 11:16, 18:4, 19:4, 19:10, 19:15, 23:20, 45:7, 46:25, 47:2, 51:16, 65:3, 85:12, 87:24, 88:20, 90:3, 90:6, 90:15, 90:18, 90:21, 90:22, 91:2, 91:4, 91:5, 91:7, 91:8, 92:3, 92:4, 92:5, 93:16, 97:11, 97:14, 101:15, 101:16, 102:6, 102:12, 102:15, 102:20, 102:23, 103:9, 103:22, 103:23, 104:5, 105:8, 105:14, 106:22, 107:20, 112:8, 112:10, 112:24, 113:1, 113:6, 114:24, 115:1, 115:15, 115:24, 116:12, 117:2, 119:5, 119:16, 120:9, 120:10, 120:11, 120:18, 120:23, 121:23, 127:2, 127:10, 127:12, 127:21, 140:22, 185:15, 185:19, 186:15
**Goo's** [4] - 85:4, 91:12, 94:1, 122:17
**Goose** [28] - 18:22, 18:24, 19:3, 19:11, 19:14, 19:19, 19:22, 69:19, 69:20, 70:7, 70:9, 70:11, 70:12, 70:15, 70:18, 70:21, 70:24, 70:25, 71:2, 71:5, 71:8, 71:11, 71:20, 84:6, 84:24, 85:3, 88:9
**Goose's** [2] - 69:25, 85:2
**gorilla** [1] - 59:5
**Government** [8] - 1:15, 164:25, 174:9, 178:8, 178:11, 178:18, 182:21, 190:8
**government** [35] - 2:20, 3:4, 13:4, 13:8, 24:20,

37:21, 67:7, 96:16, 96:18, 96:21, 104:11, 117:18, 124:23, 125:18, 125:19, 134:4, 134:18, 140:19, 142:1, 143:6, 143:12, 143:21, 144:13, 147:6, 147:19, 158:13, 193:17, 193:24, 194:2, 194:12, 194:19, 194:22, 195:24, 197:1
**GOVERNMENT'S** [1] - 158:17
**government's** [16] - 26:7, 61:1, 135:6, 145:22, 146:5, 148:1, 148:5, 151:13, 151:15, 152:5, 152:6, 152:7, 152:19, 195:10, 196:4, 197:3
**Government's** [1] - 30:6
**Governments** [1] - 191:4
**grabbed** [1] - 37:16
**Grand** [1] - 14:10
**grand** [24] - 6:3, 8:17, 8:24, 22:3, 22:5, 22:15, 26:16, 44:5, 46:19, 47:4, 51:24, 52:4, 62:5, 65:14, 67:5, 71:19, 73:21, 73:23, 74:1, 84:22, 96:9, 111:24, 112:7, 127:9
**Gray** [2] - 158:9, 158:10
**great** [11] - 39:5, 39:11, 83:24, 85:24, 86:4, 107:13, 109:21, 110:17, 122:7, 122:16, 157:19
**Great** [1] - 134:20, 157:18, 196:9
**greater** [1] - 61:16
**Green** [4] - 75:14, 75:19, 122:9, 128:6
**green** [2] - 183:7
**Groth** [2] - 75:15, 122:10
**ground** [3] - 31:8, 108:8, 172:18
**group** [11] - 53:16, 54:1, 54:11, 54:14, 54:20, 54:24, 55:4, 56:13, 56:19, 105:5
**groups** [2] - 53:10, 53:13
**Groups** [1] - 53:14
**gruesome** [1] - 166:24
**guess** [9] - 2:18, 12:6, 15:13, 44:12, 81:12, 150:7, 194:8, 194:12, 196:4
**guilt** [3] - 146:9, 147:1,

188:6
**guilty** [10] - 16:10, 16:12, 34:9, 34:17, 95:22, 98:1, 99:18, 124:6, 124:10, 124:14
**Guilty** [1] - 98:5
**gun** [17] - 12:18, 32:13, 37:16, 41:20, 82:18, 83:13, 91:8, 92:10, 93:2, 93:22, 94:3, 104:23, 105:1, 110:16, 128:3, 152:15, 169:23
**gun's** [1] - 169:22
**guns** [9] - 23:25, 32:10, 90:13, 93:15, 93:22, 93:23, 93:25, 94:1, 128:8
**gunshot** [3] - 25:13, 169:11, 169:22
**guy** [19] - 39:11, 47:20, 47:25, 49:8, 49:24, 55:20, 69:19, 70:7, 70:21, 70:23, 72:5, 86:21, 88:1, 112:19, 135:11, 147:25, 165:6, 186:15, 197:23
**guys** [12] - 53:1, 65:25, 68:10, 79:25, 80:11, 105:1, 112:20, 113:10, 148:2, 152:1, 164:9, 167:5

## H

**habit** [1] - 157:23
**Hagin** [1] - 122:11
**hair** [2] - 25:17, 25:22
**half** [1] - 134:13
**halfway** [3] - 48:15, 139:12, 171:23
**Hammerjacks** [1] - 188:8
**hand** [9] - 47:11, 66:7, 114:24, 176:12, 191:10, 198:9, 198:15, 198:16
**handed** [1] - 193:12
**handgun** [3] - 13:15, 36:20, 82:3
**Handgun** [2] - 15:1, 15:2
**hands** [4] - 25:12, 92:1, 128:3, 176:13
**hanging** [4] - 36:4, 156:3, 156:23, 158:24
**Hanlon** [1] - 1:16, 2:8, 34:1, 35:20, 36:17, 83:20, 88:13, 89:14, 97:6, 107:9, 155:3
**happier** [1] - 149:17
**happy** [8] - 7:9, 36:18,

36:19, 124:25, 142:9, 145:10, 148:22, 149:4
**hard** [1] - 193:22
**HARDING** [127] - 2:3, 3:8, 6:5, 7:4, 7:16, 8:7, 12:19, 13:1, 13:4, 13:10, 13:22, 14:12, 15:16, 15:22, 16:17, 26:24, 27:2, 34:2, 36:10, 40:12, 40:15, 44:15, 52:10, 54:12, 57:7, 60:7, 81:8, 83:7, 84:18, 84:21, 99:1, 99:5, 99:9, 111:10, 116:16, 117:5, 124:1, 125:2, 126:22, 126:25, 128:16, 128:23, 129:13, 130:19, 130:22, 131:4, 132:5, 132:12, 132:16, 132:23, 133:22, 133:25, 134:2, 134:6, 134:11, 134:14, 135:3, 135:10, 135:14, 135:19, 135:24, 136:5, 136:11, 136:15, 136:18, 136:20, 136:22, 136:25, 137:3, 137:5, 137:10, 137:16, 138:14, 138:16, 138:20, 138:23, 139:9, 139:17, 139:23, 140:2, 140:8, 140:12, 140:18, 140:22, 141:3, 141:7, 141:10, 141:16, 141:19, 144:9, 144:13, 145:1, 152:13, 154:3, 154:14, 154:20, 154:22, 154:24, 155:1, 155:8, 155:14, 155:19, 156:1, 156:4, 156:9, 156:16, 157:2, 157:10, 157:12, 157:16, 158:15, 159:5, 166:11, 166:14, 167:4, 189:10, 190:21, 190:23, 191:2, 191:15, 192:18, 192:23, 193:1, 193:3, 194:5, 199:7, 199:13
**Harding** [42] - 1:16, 2:8, 2:24, 3:7, 5:12, 11:25, 22:16, 35:19, 36:17, 46:24, 52:25, 53:1, 99:8, 116:25, 117:19, 119:15, 120:16, 121:4, 121:20, 123:1, 123:9, 123:18, 127:6, 132:3, 132:22, 133:20, 135:1, 144:5, 144:8, 145:2, 149:10, 154:1, 155:6, 155:22, 160:18, 167:13, 189:9, 190:19, 192:5, 192:15, 192:21, 192:22
**Harding's** [2] - 98:25, 119:4

**hardly** [3] - 137:21, 144:23
**HARRIS** [1] - 1:7
**Harris** [3] - 1:18, 45:1, 130:14, 132:1, 136:7, 148:1, 150:18, 150:24, 155:24, 155:25, 156:20, 156:25, 157:1
**Harris's** [1] - 153:4
**Hastings** [4] - 137:12, 137:24, 155:14, 156:10
**hat** [1] - 23:18
**hate** [1] - 147:17
**head** [5] - 35:23, 36:5, 38:22, 69:2, 77:20
**Headquarters** [3] - 176:17, 176:20, 182:18
**headquarters** [1] - 38:9
**hear** [15] - 2:19, 2:24, 3:5, 62:11, 70:13, 111:20, 117:6, 129:14, 135:21, 139:4, 146:13, 147:15, 149:9, 153:4
**heard** [22] - 45:4, 59:7, 72:22, 77:8, 83:8, 83:18, 101:16, 111:17, 134:3, 137:25, 139:17, 139:18, 141:1, 151:21, 153:3, 154:7, 154:17, 156:6, 156:17, 191:10, 191:13
**hearing** [5] - 77:2, 141:9, 141:11, 144:15, 156:18
**hearsay** [4] - 144:22, 144:24, 145:7, 147:2
**heat** [1] - 168:10
**height** [1] - 23:13
**held** [3] - 25:4, 35:23, 92:11
**help** [11] - 12:13, 73:25, 103:6, 111:1, 113:15, 113:23, 113:24, 137:13, 137:21, 140:15
**helped** [2] - 65:25, 102:14
**hereby** [1] - 200:3
**hereunto** [1] - 200:9
**heroin** [7] - 11:7, 11:10, 11:12, 11:16, 11:19, 183:2, 183:8
**hesitate** [1] - 147:16
**high** [1] - 34:2
**himself** [2] - 22:23, 153:5
**hip** [4] - 173:22, 174:11, 174:17, 174:22
**hire** [1] - 29:17
**hired** [1] - 29:15
**history** [1] - 107:11
**hit** [3] - 68:13, 68:15,

135:20
**holder** [1] - 183:14
**holding** [4] - 36:13, 36:14, 65:21
**hole** [1] - 172:9
**holler** [1] - 64:9
**Holly** [17] - 18:1, 19:18, 23:8, 23:17, 24:13, 49:9, 49:11, 49:14, 49:17, 51:7, 69:13, 69:15, 78:6, 88:21, 89:10, 94:3, 101:25
**home** [1] - 107:24
**homicide** [6] - 6:14, 25:10, 25:22, 122:3, 122:17, 159:9, 159:13, 185:8
**Homicide** [9] - 6:20, 9:12, 26:14, 38:6, 42:6, 75:19, 83:3, 107:14
**Honda** [3] - 165:2, 184:19, 184:20
**honor** [7] - 60:4, 63:10, 64:4, 64:5, 120:19, 120:24, 125:13
**Honor** [99] - 2:3, 2:11, 2:14, 3:14, 3:24, 7:9, 7:22, 8:12, 12:7, 12:24, 13:4, 22:11, 26:24, 27:7, 30:6, 33:11, 33:15, 33:20, 51:3, 57:1, 60:9, 62:1, 66:11, 67:13, 67:24, 78:18, 82:5, 82:24, 84:16, 86:1, 91:19, 92:22, 98:24, 99:1, 99:4, 111:8, 116:8, 116:19, 116:23, 117:8, 124:22, 125:2, 125:4, 126:5, 126:6, 129:9, 129:12, 129:13, 129:17, 130:25, 131:4, 132:5, 132:23, 133:22, 134:15, 134:21, 135:3, 135:19, 136:5, 136:25, 137:4, 139:9, 140:18, 141:12, 142:3, 144:9, 144:14, 144:18, 145:19, 146:7, 147:16, 148:12, 148:17, 149:11, 151:2, 151:10, 153:24, 154:3, 155:5, 155:8, 158:15, 159:2, 165:25, 166:5, 166:9, 166:16, 181:5, 189:7, 190:21, 190:23, 192:4, 192:18, 192:23, 193:1, 193:19, 196:1, 198:1
**Honorable** [1] - 1:13
**hook** [2] - 64:2, 120:23
**hour** [1] - 134:13
**hours** [7] - 25:2, 38:16,

41:22, 42:14, 58:18, 91:24
**house** [15] - 37:6, 37:9, 37:15, 37:17, 48:15, 49:23, 49:25, 71:15, 82:22, 82:23, 82:25, 112:20, 112:23, 136:9, 179:1
**hum** [1] - 116:24
**hunch** [1] - 194:19
**hungry** [1] - 90:9
**hurt** [7] - 26:1, 27:18, 27:22, 28:2, 28:5, 28:6, 28:7
**husband** [2] - 33:2, 109:2

**I**

**ID** [2] - 141:20, 173:21
**idea** [11] - 9:6, 9:14, 11:20, 36:4, 79:14, 79:22, 85:3, 85:15, 87:17, 89:23, 179:2
**identical** [1] - 47:14
**identification** [5] - 25:4, 139:21, 142:4, 156:24, 164:13
**identifications** [2] - 156:23, 164:19
**identified** [13] - 131:20, 139:18, 140:6, 140:10, 154:4, 156:19, 164:19, 164:22, 164:23, 179:7, 185:16, 186:13, 192:2
**identifies** [1] - 137:6
**identify** [5] - 131:14, 151:19, 151:20, 175:20, 190:7
**identifying** [1] - 149:19
**identity** [1] - 185:11
**II** [1] - 117:13
**illegal** [1] - 41:20
**imbedded** [1] - 169:25
**immediate** [1] - 193:23
**immediately** [2] - 100:15, 128:6
**implement** [1] - 137:19
**implicated** [2] - 39:8, 137:25
**important** [8] - 26:7, 63:1, 135:4, 135:19, 154:6, 154:16, 155:23, 195:13
**IN** [1] - 1:1
**in-court** [1] - 61:8
**inaudible** [2] - 57:20, 64:11
**incarcerated** [4] - 2:9,

103:15, 103:20, 195:14
**incarceration** [1] - 194:14
**inches** [2] - 161:20, 161:21
**incident** [12] - 12:5, 12:7, 12:14, 12:17, 31:20, 32:16, 32:24, 152:6, 156:11, 156:15, 176:12, 188:7
**include** [2] - 99:6, 145:7
**included** [2] - 51:13, 123:18
**Including** [2] - 156:13
**including** [8] - 63:4, 88:21, 95:15, 96:19, 100:11, 178:13, 183:10, 184:23
**incoming** [1] - 179:18
**incomplete** [1] - 95:7
**inconsistencies** [3] - 61:19, 61:20
**inconsistency** [1] - 104:4
**inconsistent** [6] - 60:24, 61:17, 62:21, 67:6, 115:5, 115:8
**incorporate** [1] - 196:16
**incorrect** [1] - 19:11
**incredibly** [1] - 197:10
**incriminatory** [3] - 147:4, 147:6, 147:9
**inculpates** [1] - 151:8
**inculpatory** [1] - 150:5
**Indeed** [2] - 50:23, 80:14
**indeed** [4] - 48:19, 76:10, 76:17, 80:3
**INDEX** [1] - 199:1
**Indian** [1] - 3:18
**indicate** [3] - 4:19, 168:20, 169:21
**indicated** [8] - 4:6, 4:15, 19:8, 43:13, 102:8, 117:3, 188:4, 196:14
**indicating** [1] - 123:10
**individual** [4] - 44:25, 45:2, 45:4, 131:20
**individuals** [10] - 5:22, 9:1, 9:22, 10:2, 10:8, 14:10, 31:20, 32:2, 32:11, 179:4
**indulgence** [1] - 33:11
**industrial** [1] - 162:20
**infer** [1] - 176:4
**inference** [1] - 139:6
**influenced** [1] - 39:24
**information** [20] - 39:5, 39:24, 40:4, 85:23, 86:4, 95:7, 95:8, 96:16, 96:20,

96:23, 117:19, 125:20, 131:9, 140:13, 143:3, 144:10, 163:22, 179:15, 181:4, 181:9
**initial** [2] - 122:3, 185:7
**innocent** [1] - 79:5
**inquire** [1] - 124:21
**inquiry** [1] - 197:1
**inside** [6] - 170:15, 170:16, 171:15, 176:12, 186:1, 186:8
**instruct** [4] - 60:16, 61:2, 61:15, 66:22
**instructed** [2] - 16:24, 17:12
**instruction** [14] - 61:23, 66:20, 66:25, 67:10, 145:11, 194:9, 195:22, 196:6, 196:8, 196:12, 196:17, 196:22, 197:16
**instructions** [1] - 61:24
**intelligently** [1] - 145:6
**intend** [1] - 99:23
**intended** [1] - 109:1
**intent** [2] - 16:1, 96:22
**intention** [2] - 32:7, 122:3
**interest** [2] - 147:12, 147:14
**interested** [6] - 8:10, 73:24, 74:9, 115:1, 195:1, 195:2
**interesting** [2] - 150:14, 150:15
**interior** [1] - 172:2
**interpreted** [1] - 153:2
**interrupt** [1] - 135:9
**interruption** [2] - 2:9, 61:25
**interview** [5] - 62:5, 137:9, 141:5, 144:8, 144:10
**interviewed** [1] - 107:14
**interviews** [1] - 81:13
**introduce** [1] - 104:6
**investigation** [6] - 109:12, 137:14, 159:16, 187:19, 189:17, 192:8
**invite** [1] - 33:17
**invited** [1] - 195:19
**involved** [11] - 18:3, 18:4, 23:25, 31:20, 77:24, 90:3, 90:6, 90:11, 159:15, 159:18, 159:19
**involvement** [4] - 84:7, 122:4, 122:17, 189:16
**Irene** [10] - 177:7, 178:2, 178:6, 178:9, 179:15, 179:23, 180:10, 180:13, 189:12, 189:14

**irrelevant** [1] - 2:23
**issue** [7] - 134:3, 135:22, 136:2, 142:2, 153:23, 153:25, 196:21
**issues** [5] - 66:16, 133:17, 134:18, 192:9, 194:8
**item** [1] - 3:2
**items** [1] - 184:19
**itself** [4] - 62:13, 62:14, 63:2, 179:10

**J**

**jail** [4] - 86:15, 87:4, 99:20, 118:1
**James** [5] - 1:21, 75:14, 75:18, 122:9, 122:11
**January** [10] - 8:4, 17:18, 28:17, 47:4, 65:21, 84:23, 121:17, 122:2, 122:19, 125:10
**jaw** [1] - 171:20
**Jefferson** [1] - 158:6
**jig** [1] - 110:20
**Joan** [1] - 75:11
**job** [3] - 118:22, 120:13, 155:7
**John** [5] - 75:11, 75:17, 122:11, 122:21, 125:6
**joint** [4] - 149:7, 149:23, 149:25, 153:20
**Jones** [10] - 20:16, 44:23, 65:16, 77:11, 92:3, 94:20, 95:25, 97:10, 108:8, 115:24
**Jones-Spence** [9] - 44:23, 65:16, 77:11, 92:3, 94:20, 95:25, 97:10, 108:8, 115:24
**Judge** [14] - 1:13, 14:21, 15:4, 15:10, 16:6, 16:20, 17:8, 37:23, 130:19, 134:17, 137:16, 193:5, 194:5, 194:7
**judge** [3] - 97:5, 98:10, 124:10
**July** [18] - 6:14, 6:18, 14:20, 15:20, 36:21, 38:3, 38:15, 38:16, 40:19, 41:23, 43:3, 57:6, 81:20, 98:6, 109:11, 124:21, 125:8
**jumped** [2] - 49:24, 50:14
**jumping** [1] - 141:23
**June** [4] - 28:19, 48:8, 67:24, 136:7
**juries** [1] - 145:24

**Jurors** [1] - 134:25
**jury** [71] - 3:4, 3:9, 5:8, 6:3, 8:17, 8:24, 18:7, 18:21, 19:9, 21:8, 22:4, 22:5, 22:15, 23:8, 23:24, 26:16, 30:18, 44:18, 44:5, 46:19, 47:4, 51:24, 52:4, 60:15, 60:16, 61:11, 62:5, 62:17, 65:14, 66:23, 66:24, 67:5, 71:19, 73:21, 73:23, 74:1, 84:22, 96:9, 110:2, 111:25, 112:7, 116:1, 124:4, 127:9, 131:9, 132:25, 133:2, 133:4, 133:16, 135:24, 139:1, 139:4, 142:16, 144:20, 145:10, 145:11, 145:13, 146:13, 146:14, 153:15, 154:17, 156:2, 156:18, 156:22, 157:25, 192:6, 192:12, 194:9, 197:11, 197:12, 197:17
**Jury** [7] - 1:14, 3:15, 67:14, 67:20, 133:11, 158:8, 192:14
**jury's** [2] - 84:10, 86:18
**Jury's** [1] - 133:9
**justice** [1] - 95:16

**K**

**keep** [3] - 5:1, 66:16, 192:9
**Keith** [1] - 75:17
**Kelly** [1] - 157:13
**Kelsey** [1] - 1:17
**kept** [4] - 9:18, 33:1, 80:9, 158:23
**kidnapping** [2] - 90:14, 93:3
**kill** [19] - 20:4, 26:3, 29:15, 29:17, 33:1, 33:5, 37:13, 68:16, 86:15, 86:24, 88:9, 88:10, 109:2, 117:25, 118:11, 118:12, 122:3, 157:18
**killed** [13] - 21:10, 25:3, 26:1, 26:9, 30:2, 32:7, 79:11, 87:4, 87:18, 87:22, 88:2, 97:10, 136:12
**killing** [7] - 4:4, 20:6, 29:24, 44:23, 65:16, 69:16, 115:24
**kind** [12] - 35:22, 67:10, 74:24, 79:5, 121:15, 121:22, 155:23, 162:19, 188:14, 188:15, 193:20, 194:15

**Klas** [4] - 88:16, 104:16, 107:9, 123:18
**knowing** [4] - 41:6, 140:22, 140:23, 140:25
**knowingly** [4] - 95:2, 95:7, 96:16, 145:5
**knowledge** [5] - 93:21, 95:15, 111:11, 191:10, 198:14
**known** [10] - 17:22, 70:2, 77:12, 77:15, 78:2, 78:3, 97:19, 154:10, 191:25
**knows** [2] - 137:10, 197:12
**Koch** [1] - 128:19
**KURLAND** [19] - 67:3, 67:5, 67:13, 134:17, 134:21, 191:11, 192:20, 193:5, 193:9, 193:19, 194:7, 195:5, 195:9, 195:17, 195:23, 195:25, 196:11, 198:1, 198:21
**Kurland** [7] - 1:22, 2:15, 66:19, 134:16, 192:19, 193:4, 198:21

**L**

**Lab** [2] - 163:22, 182:23
**Ladies** [2] - 3:16, 188:3
**ladies** [12] - 18:7, 18:21, 19:8, 21:8, 23:23, 30:18, 41:18, 62:3, 66:14, 110:2, 116:1, 158:12
**laid** [1] - 22:22
**Lane** [1] - 78:7
**language** [4] - 26:8, 96:13, 124:13, 126:3
**Lanvale** [1] - 68:23
**large** [2] - 183:2, 186:5
**largely** [5] - 67:3, 67:6, 67:7
**larger** [1] - 104:13
**Lassiter** [14] - 135:20, 136:4, 136:8, 136:12, 136:14, 138:20, 139:3, 139:8, 139:11, 139:20, 140:6, 140:10, 140:12
**Lassiter's** [1] - 136:9
**Last** [1] - 124:20
**last** [41] - 5:12, 6:2, 6:11, 7:15, 8:6, 8:13, 11:3, 14:14, 18:7, 26:6, 33:22, 34:8, 43:3, 43:7, 47:14, 51:11, 59:21, 73:1, 76:2, 84:5, 84:6, 85:18, 86:10, 89:23, 94:7, 97:9, 101:13,

105:22, 106:3, 117:1, 124:18, 142:18, 155:17, 155:18, 157:20, 182:3, 193:6, 195:7, 196:5, 198:1
**late** [3] - 54:10, 77:3, 196:5
**latent** [1] - 184:18
**latents** [1] - 184:16
**latex** [2] - 32:20, 90:19
**latter** [2] - 7:9, 88:4
**laughed** [1] - 110:9
**Laura** [1] - 1:17
**Lauretta** [1] - 76:4
**law** [34] - 6:2, 6:9, 8:23, 11:1, 11:2, 11:24, 15:12, 39:4, 39:23, 40:3, 40:7, 40:23, 40:24, 41:3, 41:8, 51:21, 52:1, 56:18, 65:21, 76:6, 96:8, 122:2, 123:3, 128:2, 128:7, 177:4, 177:6, 177:10, 196:16, 196:19, 197:18, 197:21
**LAWLOR** [24] - 67:17, 81:5, 82:5, 86:1, 92:22, 106:11, 106:16, 106:19, 111:8, 111:15, 129:11, 129:17, 129:19, 130:25, 131:6, 131:12, 132:21, 154:23, 158:9, 187:14, 187:22, 188:1, 189:7, 199:10
**Lawlor** [3] - 1:18, 129:15, 158:11
**lawyer** [10] - 60:21, 60:23, 60:25, 61:5, 62:4, 62:5, 90:9, 115:3, 122:21, 125:6
**lawyer's** [1] - 62:11
**lawyers** [10] - 43:8, 46:2, 60:21, 62:7, 62:22, 62:23, 75:12, 122:9, 123:4
**lead** [3] - 82:6, 86:3, 159:22
**Leading** [1] - 111:8
**leading** [8] - 82:5, 97:16, 98:20, 105:19, 111:15, 111:21, 175:10, 176:5
**leads** [1] - 96:12
**learn** [3] - 176:19, 179:10, 185:19
**learned** [3] - 109:12, 186:21, 187:4
**least** [12] - 4:6, 41:22, 49:16, 58:7, 130:4, 139:2, 148:9, 149:23, 152:25, 179:2, 179:4,

194:12
**leave** [8] - 66:15, 97:14, 133:7, 156:3, 156:23, 169:24, 192:7, 195:8
**leaving** [2] - 141:24, 142:2
**lectern** [2] - 3:12, 155:3
**led** [3] - 29:4, 110:1, 110:2
**left** [8] - 22:16, 62:2, 161:22, 169:5, 169:12, 169:19, 170:1, 171:22
**legal** [3] - 73:25, 133:17, 195:12
**Legg** [1] - 37:23
**length** [1] - 39:11
**less** [1] - 35:13
**letter** [19] - 2:17, 3:7, 17:6, 17:10, 98:7, 98:25, 99:10, 99:11, 99:15, 99:16, 125:4, 125:16, 125:18, 136:6, 143:5, 143:16, 143:20, 190:9, 190:13
**Lexington** [3] - 59:13, 59:17, 59:18
**license** [1] - 129:3
**lie** [1] - 29:17
**lied** [2] - 29:14, 65:1
**Lieutenant** [1] - 75:21
**life** [3] - 23:17, 110:25, 130:16
**lift** [1] - 184:18
**light** [1] - 161:2
**Light** [1] - 161:3
**likely** [1] - 192:24
**Lil** [1] - 190:12
**limb** [2] - 148:7, 148:22
**limbs** [1] - 147:17
**limited** [1] - 95:15
**limiting** [5] - 66:20, 66:25, 145:10, 145:11, 196:12
**Line** [5] - 22:5, 22:14, 22:21, 31:3, 46:23
**line** [5] - 28:11, 155:17, 155:18, 162:4, 192:20
**lines** [3] - 155:15, 155:16, 196:17
**list** [6] - 6:8, 81:12, 85:18, 86:8, 86:9, 111:18
**listen** [3] - 43:25, 112:2, 155:12, 155:20, 157:19
**listened** [6] - 43:4, 43:7, 43:8, 43:24, 156:3, 156:22
**listening** [1] - 157:23
**lived** [2] - 22:19, 71:5
**lives** [1] - 190:15
**living** [1] - 58:21

**locate** [2] - 70:25, 71:2
**located** [3] - 37:18, 172:17, 173:25
**location** [11] - 91:3, 160:10, 162:7, 172:3, 173:23, 176:21, 176:23, 186:1, 186:3, 186:8, 190:2
**locations** [1] - 127:14
**locked** [7] - 48:7, 83:4, 87:14, 105:25, 116:12, 130:1, 168:7
**Lombard** [1] - 1:25
**look** [9] - 25:5, 126:20, 148:13, 148:24, 149:4, 151:24, 166:6, 169:25, 171:8
**Looked** [1] - 162:21
**looked** [4] - 133:18, 143:4, 170:15, 171:14
**looking** [1] - 189:17
**Looking** [1] - 163:2
**looks** [4] - 155:23, 160:19, 162:15, 169:24
**Looks** [3] - 161:19, 165:14, 175:10
**lose** [1] - 115:15
**loss** [3] - 46:3, 46:5, 46:11
**lost** [8] - 23:17, 74:10, 74:20, 75:1, 75:3, 114:25, 115:11, 127:3
**Love** [3] - 75:15, 122:10
**Lovey** [1] - 191:25
**Lunch** [1] - 37:5
**lunch** [3] - 38:1, 38:19, 132:25
**lying** [2] - 64:21, 74:24

**M**

**Magginson** [5] - 177:2, 177:7, 178:9, 179:15, 180:11
**Magginson's** [7] - 178:2, 178:6, 179:1, 180:13, 180:15, 189:12, 189:14
**Magginsons** [1] - 177:3
**magnum** [2] - 91:5, 109:2
**mail** [20] - 139:18, 139:19, 149:13, 149:14, 149:20, 152:19, 152:25, 153:4, 177:15, 177:17, 177:23, 178:12, 178:21, 179:10, 179:12, 180:11, 180:14, 181:14, 188:20, 189:5

**mails** [1] - 178:4
**main** [1] - 72:20
**maintained** [1] - 141:19
**Major** [1] - 75:20
**males** [2] - 159:20, 161:18
**man** [16] - 43:18, 50:14, 66:6, 67:25, 68:3, 72:11, 72:14, 72:17, 72:20, 80:25, 104:23, 128:18, 129:24, 130:16, 142:21, 142:23
**manage** [1] - 158:25
**Manhattan** [1] - 4:16
**manifestly** [1] - 197:16
**manner** [2] - 60:17, 194:14, 200:8
**manufacture** [1] - 16:2
**map** [3] - 136:8, 163:9, 163:10
**March** [1] - 185:8
**marijuana** [17] - 9:23, 9:25, 10:13, 10:14, 10:16, 10:17, 16:1, 46:25, 49:23, 104:20, 105:8, 105:14, 105:17, 110:12, 112:8, 112:21, 127:10
**mark** [4] - 30:18, 124:25, 161:15, 162:9
**marked** [1] - 98:3, 124:22, 173:8
**markers** [1] - 175:16
**Marll** [2] - 75:18, 122:23
**Marquis** [1] - 14:10
**MARTIN** [26] - 1:8, 81:4, 82:14, 82:24, 89:17, 129:9, 147:16, 147:25, 148:20, 149:2, 149:5, 149:11, 149:16, 150:4, 150:12, 150:17, 150:19, 150:23, 151:2, 151:10, 153:8, 153:14, 153:19, 153:23, 155:5, 160:18
**Martin** [81] - 1:19, 1:20, 34:7, 45:7, 46:13, 47:16, 47:20, 48:7, 48:20, 48:24, 49:16, 49:20, 50:8, 70:6, 71:2, 73:2, 73:8, 73:11, 73:16, 73:18, 74:1, 74:18, 76:18, 84:2, 106:8, 136:1, 137:20, 138:2, 138:10, 138:11, 139:2, 139:4, 139:6, 139:18, 140:3, 140:8, 140:9, 140:10, 140:13, 141:5, 142:23, 143:1, 143:2, 143:3, 144:4, 144:19, 144:23, 147:15, 148:14,

148:23, 149:19, 149:21, 150:21, 151:6, 151:19, 153:3, 153:5, 153:21, 154:4, 154:6, 154:10, 154:16, 155:11, 155:19, 155:24, 156:2, 156:6, 156:7, 156:8, 156:12, 156:17, 156:19, 156:21, 156:22, 157:6, 184:24, 186:11, 189:23, 189:25, 191:9
**Martin's** [13] - 3:5, 71:23, 105:7, 115:3, 134:4, 134:8, 135:4, 141:20, 142:4, 143:8, 153:17, 154:17, 194:5
**Marty** [1] - 50:20
**Marvin** [7] - 80:19, 81:1, 128:14, 128:19, 128:21, 129:1
**Mary** [3] - 1:24, 200:3, 200:14
**MARYLAND** [1] - 1:2
**Maryland** [4] - 1:12, 1:25, 34:9, 158:10
**masking** [1] - 190:16
**matches** [1] - 185:4
**material** [4] - 96:16, 101:10, 125:17, 125:24
**matter** [7] - 32:13, 65:8, 71:24, 145:14, 197:23, 200:4, 200:8
**matters** [2] - 63:3, 145:12
**McDonalds** [1] - 163:11
**McKean** [1] - 68:22
**mean** [37] - 5:15, 8:8, 13:7, 14:3, 25:4, 29:4, 41:19, 64:2, 70:10, 90:10, 103:20, 106:10, 106:13, 109:7, 109:8, 109:24, 114:14, 116:13, 137:14, 137:20, 137:21, 137:22, 138:3, 141:14, 149:14, 150:3, 153:16, 156:7, 157:4, 161:22, 163:10, 177:20, 186:3, 195:21, 197:9
**meaning** [1] - 168:15
**means** [2] - 27:5, 97:4
**meant** [2] - 45:13, 98:16
**media** [1] - 192:9
**medical** [4] - 168:16, 168:17, 171:12
**medics** [2] - 164:6, 164:8
**meet** [1] - 103:24
**meeting** [3] - 75:23, 96:21, 100:15
**meetings** [3] - 88:5,

89:14, 111:17
**Melvin** [2] - 80:20, 80:25
**Members** [3] - 60:15, 132:25, 192:6
**members** [3] - 55:5, 179:2, 180:23
**memo** [1] - 128:1
**memoranda** [1] - 123:12
**memorandum** [3] - 91:18, 118:10, 118:17
**memos** [1] - 52:17
**mention** [2] - 69:19, 143:23, 157:8
**mentioned** [8] - 10:2, 52:16, 76:11, 76:14, 76:24, 100:11, 143:22, 183:13
**Mercedes** [2] - 129:1, 129:6
**Mercury** [1] - 14:10
**message** [2] - 177:17, 177:22
**met** [5] - 33:4, 64:12, 69:20, 88:12, 102:3
**metro** [3] - 161:3, 161:11, 163:3
**Metro** [2] - 161:4
**Michael** [8] - 1:16, 1:18, 12:10, 40:20, 75:15, 75:21, 110:8, 122:11
**Mid** [1] - 39:1
**mid** [1] - 196:7
**mid-trial** [1] - 196:7
**middle** [1] - 115:20
**midnight** [1] - 38:15
**Might** [2] - 76:14, 76:16
**might** [18] - 7:6, 20:4, 54:16, 57:1, 76:22, 76:23, 77:4, 85:15, 88:16, 115:10, 124:23, 128:11, 162:5, 190:23, 194:13, 194:19, 198:13, 198:14
**mike** [1] - 158:19
**Mike** [1] - 122:10
**millimeter** [4] - 37:9, 37:12, 37:15, 82:18
**mind** [5] - 66:16, 75:2, 145:14, 151:7, 192:9
**minimum** [1] - 139:2
**minute** [1] - 184:11
**minutes** [12] - 24:19, 38:15, 66:12, 66:17, 119:5, 131:19, 133:17, 137:17, 152:20, 152:21
**misleading** [4] - 90:8, 102:8, 102:11, 144:1
**missed** [2] - 26:24,

193:19
**MITCHELL** [1] - 1:7
**Mitchell** [32] - 1:17, 51:17, 73:2, 84:2, 88:21, 129:21, 135:20, 136:1, 136:3, 136:6, 138:12, 139:7, 139:25, 140:5, 142:15, 144:2, 150:23, 151:8, 151:18, 153:7, 154:19, 156:5, 156:8, 156:24, 184:23, 186:11, 187:7, 188:16, 189:15, 189:22, 200:5
**Mitchell's** [8] - 141:11, 142:4, 143:8, 145:15, 149:19, 153:3, 156:6, 157:7
**Mob** [1] - 58:8
**mob** [5] - 55:11, 55:13, 57:13, 57:15, 114:10
**MOB** [1] - 55:14
**modify** [1] - 192:17
**moment** [3] - 33:12, 57:1, 78:18, 116:8, 145:2, 183:13, 184:4
**Momma** [21] - 18:9, 18:15, 18:16, 20:3, 20:7, 20:10, 20:15, 20:16, 20:19, 21:1, 21:2, 22:14, 22:18, 28:4, 28:6, 28:7, 29:13, 29:15, 29:17, 29:23, 33:4
**Momma's** [1] - 18:12
**money** [37] - 4:25, 5:4, 5:11, 5:15, 5:16, 5:17, 9:12, 10:12, 11:20, 20:6, 21:4, 29:6, 29:7, 29:20, 45:25, 46:9, 73:25, 74:18, 74:20, 75:1, 75:3, 77:12, 77:22, 78:12, 80:12, 104:13, 115:1, 115:2, 115:11, 115:15, 116:12, 173:24, 183:16, 183:21, 184:2
**Montgomery** [1] - 2:4
**monitor** [2] - 162:3, 162:5
**monitors** [1] - 162:4
**Monroe** [1] - 18:17
**MONTGOMERY** [1] - 199:4
**Montgomery** [76] - 2:13, 3:20, 3:25, 5:8, 5:22, 7:1, 10:10, 11:6, 11:9, 12:5, 17:22, 18:22, 19:2, 19:21, 20:14, 21:9, 23:7, 23:16, 25:15, 25:20, 25:25, 26:12, 29:12, 32:6, 32:15, 32:24, 34:6, 57:13,

57:15, 57:16, 57:23, 58:1, 63:24, 64:2, 64:6, 64:8, 81:9, 89:20, 91:21, 91:25, 92:1, 92:3, 92:8, 92:10, 92:12, 92:16, 93:2, 93:3, 94:23, 96:14, 96:24, 98:1, 99:10, 99:17, 99:21, 100:16, 100:20, 107:5, 107:24, 109:7, 111:4, 112:3, 112:5, 114:5, 114:7, 115:5, 116:11, 116:23, 120:9, 121:5, 129:12, 132:24, 154:8, 154:9, 198:7

**Montgomery's** [1] - 198:6

**month** [3] - 22:1, 23:2, 77:11

**Months** [1] - 122:5

**months** [5] - 15:14, 21:17, 21:19, 23:2, 23:4, 23:6, 39:18, 44:10, 44:11, 54:4, 122:1, 122:19, 125:10, 125:19

**morning** [47] - 3:16, 3:24, 4:1, 26:9, 27:8, 34:6, 38:16, 38:19, 66:14, 81:11, 81:23, 85:9, 91:10, 91:14, 91:25, 94:19, 97:9, 98:16, 101:13, 102:8, 103:22, 104:10, 105:7, 106:7, 106:21, 108:6, 108:13, 109:10, 111:18, 112:18, 115:23, 121:14, 133:18, 146:4, 152:3, 159:20, 165:2, 168:13, 169:9, 176:24, 182:5, 192:7, 192:11, 194:22, 196:5, 198:22

**mortis** [1] - 168:19

**Mosher** [1] - 18:17

**most** [2] - 122:22, 197:3

**mostly** [2] - 83:15, 83:16

**mother** [4] - 71:15, 177:4, 177:6, 177:10

**mother-in-law** [3] - 177:4, 177:6, 177:10

**Motion** [2] - 98:4, 106:20

**motion** [6] - 98:10, 99:19, 124:8, 124:9, 141:17

**motions** [2] - 141:8, 141:11

**motive** [1] - 143:2

**mouth** [2] - 145:12, 146:19

**Move** [2] - 106:19, 188:1

**move** [1] - 117:8

**moved** [2] - 169:7, 176:1

**movie** [4] - 73:3, 73:8, 73:16, 73:18

**MR** [268] - 2:3, 2:11, 3:8, 3:14, 3:23, 6:5, 7:4, 7:16, 7:21, 7:24, 8:7, 12:19, 13:1, 13:3, 13:4, 13:7, 13:10, 13:13, 13:22, 14:12, 15:16, 15:22, 16:17, 26:24, 27:2, 33:15, 33:19, 33:22, 33:25, 34:2, 34:5, 36:10, 40:12, 40:15, 40:17, 44:15, 52:10, 54:12, 57:7, 60:7, 62:1, 63:7, 66:11, 67:3, 67:5, 67:13, 67:17, 67:23, 81:4, 81:5, 81:8, 82:5, 82:14, 82:24, 83:7, 84:9, 84:18, 84:20, 84:21, 85:16, 86:1, 86:2, 86:17, 87:13, 88:23, 89:17, 91:18, 91:23, 92:17, 92:22, 93:9, 93:11, 97:16, 98:20, 98:24, 99:1, 99:3, 99:5, 99:7, 99:9, 101:22, 102:17, 104:7, 105:19, 106:11, 106:16, 106:19, 107:16, 111:8, 111:10, 111:15, 113:12, 115:6, 115:12, 116:14, 116:16, 116:22, 117:5, 124:1, 125:2, 125:3, 126:6, 126:9, 126:22, 126:25, 128:16, 128:23, 129:9, 129:11, 129:13, 129:17, 129:19, 130:19, 130:22, 130:25, 131:4, 131:6, 131:12, 132:5, 132:12, 132:16, 132:21, 132:23, 133:22, 133:25, 134:2, 134:6, 134:11, 134:14, 134:17, 134:21, 135:3, 135:10, 135:14, 135:19, 135:24, 136:5, 136:11, 136:15, 136:18, 136:20, 136:22, 136:25, 137:3, 137:4, 137:5, 137:10, 137:16, 138:14, 138:16, 138:20, 138:23, 139:9, 139:17, 139:23, 140:2, 140:8, 140:12, 140:18, 140:22, 141:3, 141:7, 141:10, 141:16, 141:19, 142:3, 142:9, 142:13, 143:10,

143:14, 143:17, 143:24, 144:4, 144:9, 144:13, 144:18, 144:22, 145:1, 145:19, 146:1, 146:7, 146:11, 146:16, 146:21, 146:25, 147:4, 147:11, 147:16, 147:25, 148:20, 149:2, 149:5, 149:11, 149:16, 150:4, 150:12, 150:17, 150:19, 150:23, 151:2, 151:10, 152:13, 153:8, 153:14, 153:19, 153:23, 154:3, 154:14, 154:20, 154:22, 154:23, 154:24, 155:1, 155:5, 155:8, 155:14, 155:19, 156:1, 156:4, 156:9, 156:16, 157:2, 157:10, 157:12, 157:16, 158:9, 158:15, 159:5, 160:18, 166:11, 166:14, 167:4, 187:14, 187:22, 188:1, 189:7, 189:10, 190:21, 190:23, 191:2, 191:11, 191:12, 191:15, 192:18, 192:20, 192:23, 193:1, 193:3, 193:5, 193:9, 193:19, 194:5, 194:7, 195:5, 195:9, 195:17, 195:23, 195:25, 196:11, 198:1, 198:20, 199:5, 199:6, 199:7, 199:8, 199:9, 199:10, 199:13

**MS** [11] - 3:11, 67:16, 89:7, 97:21, 111:21, 166:5, 166:9, 166:13, 166:21, 186:14, 188:21

**multiple** [2] - 7:25, 169:13

**murder** [46] - 18:3, 18:25, 19:22, 21:2, 27:8, 29:13, 32:11, 33:4, 33:8, 38:25, 39:9, 39:25, 65:15, 65:25, 66:3, 77:24, 80:15, 80:25, 81:24, 82:2, 82:12, 83:16, 91:3, 92:2, 93:4, 94:9, 94:12, 94:20, 94:21, 94:25, 95:21, 95:24, 106:23, 109:16, 132:14, 132:17, 132:19, 135:12, 136:8, 140:4, 152:21, 187:25, 188:7, 189:19, 197:13

**murdered** [5] - 21:14, 55:21, 67:25, 77:11, 141:2

**murders** [5] - 152:10, 159:16, 187:19, 189:23

**muscles** [1] - 168:16

**must** [1] - 27:21

**mutual** [1] - 136:1

---

**N**

---

**N-I-E-D-E-R-M-E-I-E-R** [1] - 158:22

**name** [58] - 10:21, 12:10, 13:21, 13:25, 14:2, 18:12, 18:22, 34:6, 39:12, 40:24, 41:1, 41:3, 41:5, 41:6, 43:18, 44:20, 44:23, 44:25, 47:20, 47:25, 49:8, 50:20, 50:21, 53:2, 53:17, 55:21, 69:19, 69:25, 70:2, 71:18, 80:19, 80:25, 84:24, 85:2, 86:10, 110:8, 110:10, 117:22, 128:14, 128:18, 128:21, 137:25, 138:5, 138:16, 138:18, 139:4, 140:11, 148:17, 157:5, 157:9, 158:20, 161:8, 177:6, 185:2, 191:21

**named** [7] - 68:3, 70:21, 70:23, 75:14, 86:21, 88:1, 135:11

**names** [5] - 45:1, 53:13, 75:10, 86:8, 164:21

**narcotics** [3] - 16:3, 183:2, 183:6

**Natasha** [4] - 179:23, 180:7, 193:13, 193:25

**naturally** [1] - 41:10

**near** [1] - 60:16

**nearly** [1] - 85:6

**necessary** [1] - 166:22

**neck** [2] - 55:8, 57:17, 171:23

**need** [10] - 22:10, 29:7, 71:2, 75:2, 115:11, 134:9, 135:7, 135:8, 196:1, 196:10

**needed** [4] - 29:6, 73:25, 74:17, 103:6

**needs** [2] - 12:20, 196:7

**Neidermeier** [1] - 190:9

**Neighborhood** [1] - 56:2

**neighborhood** [6] - 20:23, 56:4, 56:5, 58:22, 59:1, 114:10

**never** [12] - 11:22, 22:23, 25:9, 33:7, 49:19, 70:2, 78:24, 86:13, 98:14, 98:17, 101:10, 198:8

**Never** [5] - 43:10,

**must** [1] - 27:21

**mutual** [1] - 136:1

43:11, 56:9, 75:1, 130:16

**nevertheless** [2] - 103:15, 104:6

**New** [18] - 4:5, 4:10, 4:15, 5:5, 5:9, 9:2, 9:21, 10:1, 10:7, 10:11, 47:21, 48:20, 64:11, 101:18, 103:23, 104:2, 105:17

**next** [5] - 15:14, 128:18, 133:20, 148:16, 158:14

**Nextel** [1] - 174:11

**nexus** [2] - 140:16, 194:6

**nice** [2] - 74:10, 127:3

**Nickerson** [2] - 17:13, 17:17

**nickname** [2] - 185:12, 185:14

**Niedermeier** [14] - 133:24, 134:10, 134:17, 138:2, 148:10, 151:7, 158:16, 158:21, 159:6, 162:9, 167:7, 182:6, 192:24, 193:10

**NIEDERMEIER** [2] - 158:17, 199:12

**Niedermeier's** [2] - 133:20, 198:3

**nigga** [1] - 190:15

**night** [4] - 73:19, 161:17, 189:19, 196:5

**nine** [1] - 6:2

**NO** [1] - 1:6

**none** [2] - 61:13, 150:8

**noon** [3] - 41:9, 41:23

**normally** [2] - 110:7, 110:14

**north** [1] - 163:18

**NORTHERN** [1] - 1:2

**note** [3] - 66:15, 133:7, 192:7

**noted** [1] - 129:14

**notes** [7] - 123:19, 123:21, 123:25, 180:22, 180:24, 181:1, 188:25

**nothing** [12] - 10:18, 19:22, 64:6, 64:12, 64:14, 64:25, 118:13, 118:24, 121:2, 125:13, 142:14, 192:23

**Nothing** [2] - 33:15, 126:5

**notify** [1] - 96:22

**notion** [1] - 129:21

**November** [6] - 13:24, 14:9, 15:21, 16:11, 16:21, 16:23

**nowadays** [1] - 114:20

**Nowhere** [1] - 29:11

**Number** [3] - 98:4,

150:1, 150:2
  **number** [33] - 14:15, 42:17, 55:23, 55:24, 99:12, 109:7, 129:3, 151:12, 160:18, 167:13, 174:21, 177:21, 177:22, 177:24, 178:1, 178:3, 179:16, 179:17, 179:18, 179:24, 180:1, 180:10, 180:13, 180:15, 180:17, 181:7, 181:9, 181:13, 181:16, 181:25, 182:3, 183:10, 188:24
  **Number(s** [1] - 200:5
  **numbered** [1] - 173:6
  **numbers** [6] - 28:11, 180:8, 180:22, 180:24, 181:10, 193:22
  **numerous** [1] - 189:18

## O

  **oath** [5] - 3:20, 31:13, 47:13, 119:11, 121:14
  **object** [9] - 13:1, 40:12, 84:19, 129:13, 147:19, 147:20, 168:25, 189:7, 193:10
  **objected** [1] - 196:23
  **Objection** [69] - 6:5, 7:4, 7:16, 8:7, 12:19, 13:22, 14:12, 15:16, 15:22, 16:17, 36:10, 44:15, 52:10, 54:12, 57:7, 60:7, 82:5, 82:14, 82:24, 84:9, 85:16, 86:1, 86:2, 86:17, 87:13, 88:23, 89:7, 89:17, 91:18, 92:17, 92:22, 93:9, 97:16, 97:21, 98:20, 101:22, 102:17, 104:7, 105:19, 106:11, 106:16, 106:19, 106:20, 107:16, 111:8, 111:15, 111:21, 113:12, 115:6, 115:12, 116:14, 117:5, 124:1, 126:22, 128:16, 128:23, 130:19, 132:5, 132:12, 132:16, 166:25, 186:14, 187:14, 187:22, 188:1, 188:21, 191:11, 191:12
  **objection** [18] - 7:17, 14:13, 22:12, 57:9, 60:10, 60:11, 67:8, 84:20, 84:22, 92:24, 93:10, 93:11, 98:24, 132:20, 167:3, 191:13, 193:23, 197:1
  **objection's** [4] - 6:7,

16:18, 129:14, 132:18
  **objects** [1] - 13:4
  **obligated** [1] - 35:1
  **obligation** [1] - 95:11
  **obligations** [1] - 95:10
  **observations** [1] - 186:2
  **observe** [3] - 169:20, 170:1, 171:20
  **observed** [2] - 60:20, 169:15
  **obstruction** [1] - 95:16
  **obtain** [4] - 46:25, 112:8, 127:10, 189:22
  **obvious** [2] - 2:6, 169:11
  **obviously** [6] - 4:4, 14:25, 69:15, 150:14, 169:12, 195:18
  **Obviously** [2] - 100:4, 100:17
  **occasion** [10] - 28:17, 28:18, 43:24, 47:6, 49:22, 50:10, 87:14, 91:11, 91:12, 105:23
  **occasions** [7] - 4:3, 4:4, 4:6, 9:12, 11:2, 81:13, 87:12
  **occur** [2] - 18:17, 95:18
  **occurred** [8] - 14:9, 19:9, 21:9, 38:25, 42:14, 43:16, 95:19, 188:8
  **October** [2] - 1:11, 200:5
  **OF** [3] - 1:2, 1:5, 1:11
  **offense** [7] - 13:15, 13:19, 14:9, 14:24, 15:2, 33:7, 147:9
  **offenses** [3] - 12:1, 13:9, 95:18
  **office** [6] - 6:23, 7:2, 7:12, 8:1, 9:11, 24:18, 26:14, 27:4, 38:6, 83:20, 96:6, 96:8, 97:2, 122:21, 125:5, 138:23, 159:20, 164:3
  **Office** [4] - 34:24, 35:19, 122:9, 125:5
  **Officer** [3] - 17:12, 164:5, 168:3
  **officer** [6] - 128:2, 128:7, 163:21, 163:24, 163:25, 164:1
  **officers** [5] - 80:24, 81:24, 145:17, 165:9, 168:17
  **Official** [1] - 200:15
  **official** [2] - 76:6, 200:7
  **often** [3] - 45:9, 64:7, 104:20

**once** [5] - 110:9, 151:22, 158:12, 169:14, 196:13
  **Once** [1] - 160:7
  **One** [5] - 53:19, 60:20, 150:2, 171:3, 198:1
  **one** [101] - 3:2, 4:10, 4:12, 5:18, 9:4, 9:12, 14:6, 15:10, 22:23, 24:16, 24:17, 26:13, 26:19, 26:21, 27:15, 32:10, 40:13, 42:2, 47:14, 47:24, 49:8, 49:22, 50:10, 50:14, 55:20, 58:7, 62:7, 65:25, 72:16, 75:6, 75:23, 76:2, 79:13, 86:10, 87:11, 93:7, 95:9, 98:1, 105:23, 111:17, 114:15, 114:17, 114:24, 115:10, 116:8, 116:11, 117:22, 118:5, 119:2, 122:19, 126:16, 127:2, 131:16, 132:3, 137:11, 147:18, 149:18, 150:8, 150:10, 150:11, 151:2, 151:12, 151:18, 151:21, 152:2, 152:7, 152:10, 152:13, 152:14, 153:6, 160:19, 162:23, 166:8, 166:21, 167:6, 167:23, 169:11, 172:12, 172:14, 172:22, 173:8, 173:12, 175:15, 178:18, 178:20, 179:20, 180:11, 180:13, 180:19, 181:10, 187:12, 187:24, 189:15, 191:2, 191:21, 196:2
  **ones** [1] - 58:7
  **open** [6] - 66:16, 129:15, 170:11, 187:17, 187:21, 192:9
  **opened** [2] - 83:23, 168:7
  **operation** [1] - 90:20
  **opportunity** [1] - 165:25
  **optimistic** [1] - 117:4
  **orange** [1] - 172:3
  **order** [2] - 32:11, 73:25
  **organization** [4] - 39:15, 39:18, 55:5, 56:23
  **original** [3] - 68:18, 142:22, 150:15
  **originally** [4] - 38:11, 110:6, 117:1, 142:3
  **otherwise** [3] - 95:8, 96:17, 145:4
  **OTM** [11] - 55:8, 56:1, 56:19, 57:13, 57:14, 57:19, 58:12, 114:7,

114:9, 114:10, 114:11
  **ought** [1] - 111:1
  **OUT** [1] - 55:14
  **outlined** [1] - 194:15
  **outset** [1] - 141:13
  **outside** [3] - 167:20, 175:7, 175:8
  **Outside** [1] - 175:9
  **outstanding** [1] - 187:11
  **overcome** [1] - 102:14
  **overnight** [1] - 198:12
  **overruled** [5] - 92:24, 106:20, 166:25, 167:3, 191:14
  **Overruled** [31] - 15:17, 15:23, 40:14, 40:16, 52:11, 82:16, 84:11, 88:24, 89:8, 89:18, 92:18, 97:17, 97:23, 98:21, 101:23, 102:18, 104:8, 105:21, 106:12, 106:17, 107:17, 111:16, 111:22, 113:13, 115:7, 115:13, 128:24, 186:16, 187:16, 187:23, 188:22
  **owe** [1] - 45:24
  **own** [3] - 41:4, 89:1, 94:3

## P

  **P-17** [3] - 96:15, 125:2, 125:4
  **P-3** [1] - 95:4
  **p.m** [4] - 38:3, 133:9, 134:24, 198:24
  **pads** [2] - 66:15, 133:7, 192:7
  **PAGE** [1] - 199:3
  **Page** [18] - 22:5, 22:14, 25:2, 28:11, 31:3, 46:23, 60:6, 91:24, 108:24, 118:20, 119:17, 127:9, 137:5, 137:7, 148:13, 154:18, 155:18, 156:9
  **page** [1] - 155:17
  **Pager** [1] - 174:14
  **pages** [4] - 65:13, 200:6
  **Pages** [1] - 57:8
  **paid** [1] - 68:20
  **pain** [1] - 157:5
  **Palmere** [1] - 75:21
  **pamphlet** [2] - 191:6, 193:7
  **Pants** [1] - 174:2
  **pants** [1] - 165:18
  **paper** [2] - 34:3, 142:13
  **paperwork** [1] - 12:24

**Paragraph** [2] - 95:12, 125:15
  **paragraphs** [1] - 127:25
  **pardon** [1] - 4:2
  **Pardon** [12] - 19:25, 23:5, 34:14, 41:13, 51:19, 54:8, 55:1, 56:3, 56:11, 58:10, 69:9, 72:3
  **park** [1] - 71:12
  **parked** [2] - 71:9, 71:16
  **parking** [1] - 186:2
  **parlor** [1] - 186:4
  **Parole** [1] - 16:25
  **parole** [2] - 41:15, 132:11
  **part** [30] - 19:18, 19:19, 25:3, 34:8, 59:22, 78:13, 85:12, 88:4, 95:20, 98:13, 98:25, 99:2, 99:5, 99:6, 103:9, 104:23, 117:17, 120:17, 126:11, 126:13, 135:4, 142:18, 143:5, 144:8, 146:2, 153:11, 163:6, 193:14
  **Part** [1] - 174:13
  **participate** [3] - 74:17, 114:24, 190:4
  **participated** [1] - 14:11
  **participating** [5] - 73:24, 74:9, 113:9, 114:4, 115:2
  **particular** [11] - 23:24, 61:21, 70:20, 71:9, 71:11, 75:23, 107:7, 126:12, 126:15, 127:2, 128:15
  **particularly** [2] - 196:20, 197:8
  **partner** [3] - 48:24, 51:3, 191:18
  **passage** [6] - 58:2, 91:16, 91:25, 92:15, 108:15, 111:24
  **passages** [1] - 101:16
  **passenger** [6] - 113:22, 164:23, 167:16, 169:4, 175:9, 181:24
  **passing** [1] - 151:25
  **past** [3] - 25:18, 87:8, 101:5
  **patience** [1] - 158:12
  **Paul** [1] - 1:19
  **Pause** [6] - 33:14, 46:22, 57:3, 78:20, 116:10, 166:4
  **pay** [4] - 4:23, 20:7, 90:9, 115:3
  **peeked** [1] - 68:22
  **pen** [3] - 161:22, 162:6, 163:3

**penal** [1] - 147:11
**Pennsylvania** [1] -
188:11
**people** [52] - 4:7, 5:9,
5:10, 5:17, 7:8, 35:18,
39:5, 42:22, 48:22, 49:6,
49:8, 50:17, 51:12,
51:14, 52:2, 53:4, 53:23,
53:24, 55:18, 55:20,
55:23, 55:24, 56:6,
65:22, 72:19, 75:7,
75:11, 75:24, 75:25,
76:1, 85:18, 85:20,
88:20, 89:10, 100:11,
104:12, 110:5, 113:20,
117:18, 117:22, 118:5,
122:22, 144:23, 151:19,
151:20, 152:8, 152:11,
152:16, 177:14, 179:7,
184:23
**pepper** [1] - 169:24
**perfectly** [1] - 8:12
**perhaps** [7] - 60:17,
62:20, 66:22, 148:23,
152:8, 194:21, 195:6
**Perhaps** [1] - 150:6
**period** [13] - 13:19,
13:25, 16:20, 21:9,
21:12, 21:14, 22:4,
32:19, 35:23, 36:5,
45:10, 48:19, 51:4
**perjury** [1] - 95:16
**permit** [1] - 152:1
**permitted** [4] - 62:10,
124:14, 196:25, 197:1
**person** [15] - 4:11,
17:25, 18:9, 19:3, 80:17,
110:10, 114:1, 117:22,
129:21, 131:23, 139:4,
152:11, 164:20, 188:4
**personal** [3] - 10:5,
10:14, 104:20
**persons** [2] - 173:19,
173:23
**persuaded** [1] - 149:19
**Pete** [1] - 192:2
**Peters** [1] - 138:23
**Petry** [2] - 160:3,
165:21
**Phil** [2] - 75:18, 122:22
**phone** [40] - 83:3,
173:22, 174:11, 174:21,
177:21, 178:2, 178:3,
178:6, 178:9, 179:11,
179:14, 179:16, 179:18,
180:4, 180:8, 180:11,
180:13, 180:15, 181:10,
181:11, 181:20, 181:22,
181:25, 183:14, 184:8,
186:24, 188:24, 189:4,

189:11, 189:12, 189:13,
189:14, 189:18, 189:19
**phones** [8] - 179:20,
180:8, 180:19, 184:2,
186:19, 186:21, 186:22,
187:5
**photo** [5] - 30:9, 130:9,
130:25, 131:13, 131:19
**photograph** [8] - 160:7,
160:16, 163:11, 168:22,
172:2, 173:1, 175:21,
182:22
**photographs** [7] -
164:24, 166:1, 166:8,
166:12, 167:1, 171:13,
186:10
**photos** [1] - 166:15
**phrase** [3] - 106:21,
107:3, 109:6
**physical** [1] - 195:12
**Physically** [1] - 195:17
**pick** [3] - 31:19, 106:24,
130:12
**picked** [2] - 32:16,
131:16
**picture** [6] - 161:13,
162:15, 162:22, 167:20,
172:19, 184:4
**pictures** [3] - 175:15,
182:20, 191:20
**piles** [1] - 193:20
**pills** [1] - 112:12
**pink** [1] - 161:19
**pistol** [3] - 24:10, 37:9,
37:12
**place** [9] - 42:4, 71:9,
71:11, 75:9, 76:4,
176:12, 176:13, 179:11
**placed** [13] - 14:14,
14:20, 15:4, 15:15,
15:20, 62:7, 62:15,
178:2, 188:19, 189:4,
189:12, 189:13, 189:18
**places** [1] - 42:4
**plan** [22] - 18:24, 19:3,
19:21, 19:22, 21:13,
26:3, 29:13, 70:7, 70:23,
78:13, 80:15, 80:25,
84:6, 84:25, 86:24,
89:22, 90:4, 90:6,
126:12, 126:13, 133:15
**planned** [1] - 70:12
**planning** [3] - 21:2,
60:9, 128:18
**plans** [1] - 70:15
**plastic** [1] - 183:5
**plate** [1] - 129:3
**play** [8] - 3:2, 102:15,
139:3, 142:1, 143:22,
144:13, 147:19, 148:13

**played** [12] - 28:14,
43:12, 59:22, 63:18,
74:13, 93:7, 141:10,
142:1, 143:7, 148:9,
156:11, 156:14
**playing** [2] - 42:7, 42:12
**plea** [23] - 34:8, 34:10,
34:17, 34:23, 35:2,
35:25, 94:6, 94:11,
94:23, 95:3, 95:4, 98:8,
98:14, 98:18, 98:19,
99:18, 100:1, 124:5,
124:6, 124:10, 124:13,
124:14, 197:3
**Plea** [1] - 98:5
**plead** [1] - 97:25
**pleasant** [1] - 3:17
**pled** [1] - 95:22
**plenty** [1] - 108:5
**plot** [1] - 77:24
**plug** [1] - 151:18
**plus** [2] - 6:3
**pockets** [3] - 174:1,
174:2, 174:7
**point** [31] - 11:7, 74:16,
98:1, 114:15, 114:17,
124:8, 135:19, 142:20,
146:12, 153:13, 154:5,
157:4, 159:21, 161:14,
161:16, 162:6, 162:18,
163:19, 163:21, 164:2,
165:4, 167:22, 170:20,
176:19, 182:14, 185:11,
185:12, 187:17, 190:19,
194:16, 197:10
**pointed** [4] - 91:11,
94:7, 98:17, 109:11
**pointing** [3] - 108:15,
160:15, 172:3
**police** [24] - 32:17,
38:8, 40:19, 41:23,
75:20, 80:24, 81:13,
81:24, 83:8, 83:15,
85:20, 85:25, 86:6, 87:3,
93:4, 104:12, 109:21,
115:16, 115:17, 116:12,
118:6, 159:11, 168:7,
170:8
**Police** [6] - 39:4, 75:17,
111:19, 159:9, 176:17,
182:18
**pool** [3] - 5:11, 10:12,
104:13
**pooled** [2] - 9:1, 11:20
**pooling** [1] - 5:14
**portion** [4] - 57:4,
143:21, 144:18, 147:21
**position** [5] - 143:6,
146:7, 166:21, 194:25,
196:6

**positioned** [1] - 169:2
**possession** [2] - 16:1,
189:6
**possibility** [3] - 28:6,
194:11, 198:4
**possible** [2] - 70:6,
94:15
**possibly** [2] - 139:19,
162:21
**pot** [2] - 5:18, 10:12
**potentially** [1] - 149:23
**powder** [2] - 127:15,
127:16, 127:18
**pre** [2] - 144:8, 144:10
**pre-taped** [2] - 144:8,
144:10
**preaching** [1] - 149:24
**precise** [1] - 126:12
**precisely** [1] - 112:5
**prefer** [1] - 153:10
**premise** [1] - 149:17
**prepare** [1] - 157:13
**preponderance** [1] -
97:3
**prerecorded** [1] - 141:4
**present** [8] - 19:10,
42:22, 83:21, 88:14,
104:17, 134:25, 179:3,
194:21
**presenter** [1] - 30:7
**pretty** [4] - 79:14,
133:5, 134:12, 150:4
**Pretty** [1] - 110:21
**previously** [2] - 143:11,
196:18
**price** [1] - 45:15
**pride** [1] - 194:24
**pried** [1] - 66:6
**primary** [2] - 163:21,
163:24, 164:4
**prints** [1] - 185:7
**prison** [1] - 103:17
**prisoners** [1] - 103:20
**private** [2] - 100:4,
100:17
**privilege** [3] - 100:6,
100:10, 100:18
**privileged** [2] - 100:20,
100:23
**pro** [1] - 141:15
**probation** [24] - 14:15,
14:18, 14:20, 14:21,
14:25, 15:3, 15:4, 15:5,
15:8, 15:15, 15:20, 16:6,
16:9, 16:20, 16:23, 17:7,
17:8, 41:15, 82:4, 82:8,
110:7, 115:19, 187:24,
188:13
**Probation** [3] - 16:25,
17:12, 17:18

**probationary** [1] -
16:19
**problem** [15] - 2:25,
7:20, 12:6, 33:25,
113:16, 141:24, 142:18,
144:16, 153:8, 156:20,
157:13, 166:20, 190:14,
190:16, 194:18
**procedure** [1] - 25:4
**proceed** [5] - 2:2, 3:20,
67:22, 86:19, 135:1
**proceeding** [16] - 6:4,
8:19, 8:25, 21:21, 21:25,
26:15, 31:2, 31:13, 96:7,
97:1, 108:16, 108:21,
133:13, 197:13, 197:20,
197:23
**proceedings** [10] -
33:14, 46:22, 57:3,
78:20, 116:10, 166:4,
195:11, 197:9, 200:4,
200:7
**Proceedings** [2] - 2:1,
198:24
**proceeds** [1] - 9:18
**processed** [1] - 176:16
**processing** [1] - 176:17
**proffer** [46] - 6:22, 7:1,
7:11, 7:25, 24:16, 25:1,
27:3, 42:18, 42:22,
42:24, 43:14, 51:25,
52:17, 65:7, 75:6, 76:3,
76:18, 78:21, 81:15,
83:18, 85:19, 86:25,
87:2, 88:22, 92:6, 93:6,
93:12, 96:1, 96:14,
100:22, 101:14, 107:2,
107:6, 109:10, 118:10,
118:17, 119:15, 122:8,
122:20, 123:9, 123:17,
123:22, 124:21, 125:20,
127:25, 197:3
**proffering** [1] - 138:12
**proffers** [6] - 80:24,
81:20, 84:3, 88:8,
104:11, 104:16
**Program** [2] - 103:13,
103:19
**projectile** [3] - 171:19,
172:4, 172:16
**projectiles** [2] - 170:23,
170:24
**promptly** [1] - 133:14
**pronounce** [1] - 72:20
**pronounced** [1] -
164:11
**proof** [2] - 136:3,
136:13
**properly** [1] - 3:18
**proponent** [1] - 146:3

propose [1] - 148:13
proposed [3] - 194:9, 194:10, 196:17
prosecuted [4] - 94:8, 94:20, 94:24, 95:24
prosecuting [1] - 125:5
prosecution [5] - 95:13, 95:18, 96:6, 197:4, 197:5
prosecutor [15] - 8:3, 8:15, 8:24, 22:18, 43:15, 43:18, 43:21, 47:8, 93:13, 97:6, 120:17, 120:23, 121:17, 126:2, 157:20
Prosecutors [1] - 52:23
prosecutors [11] - 34:24, 36:8, 36:13, 44:17, 52:24, 81:14, 88:13, 100:23, 111:19, 123:19
protect [1] - 95:17
protected [1] - 103:20
Protection [2] - 103:13, 103:19
protection [1] - 105:5
prove [2] - 195:18, 195:19
provide [1] - 179:15
provided [10] - 6:2, 96:10, 96:20, 117:18, 125:20, 131:9, 177:21, 177:23, 178:3, 181:10
providing [1] - 145:3
provision [3] - 94:9, 95:5, 96:15
proximity [1] - 169:23
pull [3] - 135:17, 136:23, 177:24
pulled [4] - 41:5, 110:11, 112:19
pulls [1] - 41:8
pumped [1] - 32:25
purchased [1] - 73:12
purpose [2] - 4:11, 96:19
pursuant [1] - 124:15
pushed [1] - 169:5
put [34] - 5:17, 13:11, 30:7, 30:17, 57:4, 60:1, 60:8, 62:4, 68:13, 68:15, 69:2, 77:20, 84:18, 85:6, 99:5, 111:25, 112:3, 123:2, 136:3, 138:12, 138:16, 139:7, 139:13, 139:15, 139:25, 140:2, 141:16, 147:7, 151:25, 160:6, 178:19, 193:25, 198:8
Put [1] - 140:2
puts [1] - 135:20

putting [2] - 20:10, 57:10
Pyne [1] - 1:21

## Q

Quantico [1] - 177:21
quantity [1] - 4:22
Quarles [5] - 14:22, 15:4, 15:11, 16:20, 17:8
Quarles's [1] - 16:6
questioned [6] - 60:21, 93:2, 94:7, 103:22, 108:20, 109:10
questioning [5] - 22:15, 27:6, 62:6, 109:9, 123:5
questions [24] - 26:7, 28:12, 31:5, 31:12, 43:6, 60:2, 63:23, 81:4, 81:5, 101:25, 110:12, 112:2, 116:19, 117:1, 119:4, 120:16, 120:21, 121:4, 121:6, 121:20, 123:1, 124:20, 129:9, 132:21
quickly [1] - 143:20
quite [3] - 62:1, 158:24, 162:3
quote [2] - 64:1, 91:21

## R

Rachel [1] - 99:16
rag [1] - 114:16
rags [1] - 114:12
raid [2] - 82:23
raided [2] - 82:22, 82:25
rail [2] - 161:2, 161:3
railroad [1] - 162:13
raise [1] - 74:18
raised [1] - 47:11
Randallstown [6] - 71:13, 71:14, 71:17, 92:2, 176:24, 190:1
rap [2] - 64:10, 72:23
rather [1] - 41:4, 197:20
Rather [1] - 63:3
re [1] - 130:22
re-redirect [1] - 130:22
reached [1] - 143:3
read [9] - 43:25, 52:4, 62:16, 73:22, 75:10, 111:18, 127:25, 136:6, 143:20
reading [5] - 62:11, 120:8, 135:18, 157:23, 158:5
ready [6] - 2:2, 3:21, 28:24, 28:25, 67:22,

158:13
Ready [1] - 135:1
real [11] - 18:12, 20:15, 44:20, 44:23, 47:25, 85:2, 110:10, 142:18, 148:16, 157:5, 157:9
Real [6] - 86:21, 86:23, 86:24, 118:11, 118:22
realize [3] - 35:12, 47:6, 149:24
realized [1] - 98:17
really [26] - 2:6, 2:12, 6:10, 7:5, 8:5, 8:10, 16:8, 22:23, 29:7, 42:9, 45:6, 48:24, 58:3, 60:21, 65:2, 71:23, 77:10, 83:10, 100:8, 107:13, 108:10, 108:11, 138:4, 142:14, 151:20, 198:15
rear [5] - 168:22, 168:25, 173:1, 182:22, 184:5
Rear [1] - 175:24
reargument [1] - 142:10
rearrested [1] - 14:18
reason [24] - 2:20, 3:4, 20:15, 40:7, 71:20, 74:8, 121:9, 121:15, 121:21, 121:22, 126:11, 126:12, 126:15, 126:16, 127:2, 135:15, 138:12, 140:18, 149:18, 153:19, 154:8, 162:3
reasonable [2] - 130:23, 152:4
reasons [2] - 115:10, 176:7
recalled [1] - 42:11
recap [1] - 63:8
receive [1] - 17:10
received [2] - 98:7, 159:20
receiving [1] - 99:20
recently [2] - 46:18, 52:4
recess [5] - 66:14, 66:17, 133:2, 134:23, 198:23
Recess [2] - 66:18, 134:24
recite [1] - 197:6
recognize [6] - 30:9, 50:21, 109:1, 171:17, 179:23, 180:16
recollection [6] - 6:11, 12:13, 12:21, 12:23, 22:8, 84:10, 86:18, 142:8, 181:2, 186:7, 188:25
recommend [2] - 35:9,

35:13
recommendation [4] - 35:1, 35:6, 35:15, 35:20
record [5] - 24:18, 158:20, 166:18, 177:17, 180:10
recorded [13] - 8:3, 8:14, 8:23, 26:15, 28:11, 101:14, 177:15, 177:22, 179:12, 180:11, 180:14, 181:14, 200:3
recorder [1] - 41:24
recording [1] - 177:19
records [4] - 179:17, 186:18, 186:24, 189:18
recover [2] - 173:19, 178:6
recovered [31] - 83:12, 170:19, 170:24, 171:10, 172:5, 172:13, 173:1, 173:20, 173:24, 174:11, 174:15, 175:6, 179:20, 180:4, 180:19, 181:11, 181:20, 181:22, 182:10, 183:1, 183:11, 183:12, 183:17, 183:24, 184:2, 184:12, 184:16, 184:20, 188:17, 189:15, 194:5
recross [1] - 116:20, 131:4, 131:5, 131:7
RECROSS [6] - 116:21, 126:8, 129:10, 199:8, 199:9, 199:10
Red [1] - 57:24, 57:25
red [10] - 23:17, 56:19, 56:24, 58:13, 58:16, 114:8, 114:12, 114:14, 114:16, 114:21
redact [8] - 141:22, 149:12, 149:14, 154:5, 154:18, 155:8, 155:11, 156:12
redacted [4] - 147:21, 158:7, 192:16
redaction [11] - 143:11, 148:25, 149:6, 153:12, 154:2, 157:14, 157:21, 198:2, 198:4, 198:11, 198:13
redirect [2] - 130:22, 131:2
Redirect [1] - 81:6
REDIRECT [2] - 81:7, 199:7
redounds [1] - 197:22
redundant [1] - 138:1
refer [1] - 53:1
reference [2] - 156:11, 156:14, 197:8
referred [8] - 3:18, 11:2,

18:1, 24:7, 26:13, 91:25, 101:7, 158:1
Referring [2] - 31:2, 118:20
referring [9] - 3:7, 22:5, 28:10, 57:8, 60:6, 86:15, 92:2, 118:9, 144:7
refers [1] - 95:21
refresh [6] - 12:13, 12:21, 12:22, 22:8, 181:2, 188:25
refreshing [1] - 142:7
refused [1] - 116:5
regarding [1] - 134:10
region [1] - 111:19
regular [2] - 64:8, 64:9
regularly [2] - 50:17, 101:17
Reisterstown [5] - 163:12, 163:13, 163:17, 163:18, 186:7
relate [1] - 13:17
related [1] - 153:25
relates [1] - 124:20
relating [1] - 33:7
relationship [24] - 60:3, 63:9, 63:15, 63:24, 64:3, 70:20, 87:24, 88:20, 89:6, 89:12, 101:15, 101:16, 102:5, 102:6, 102:15, 120:18, 120:19, 120:24, 121:7, 121:16, 125:12, 131:1, 131:6
relationships [1] - 84:1
relatives [3] - 177:13, 179:11, 180:7
relayed [1] - 177:23
released [1] - 95:11
relevancy [1] - 2:23
relevant [4] - 2:21, 3:2, 146:5, 146:6
relied [1] - 157:20
reluctant [1] - 90:6
rely [2] - 102:20, 103:6
relying [1] - 12:24
remain [2] - 3:20, 145:6
remarks [1] - 125:12
remember [79] - 6:13, 6:17, 6:22, 6:25, 7:3, 7:14, 7:25, 8:3, 8:6, 8:9, 8:14, 8:17, 8:19, 9:10, 11:3, 12:17, 13:14, 13:19, 13:25, 14:2, 14:8, 14:20, 14:22, 14:24, 15:21, 16:4, 21:21, 24:21, 44:21, 59:23, 74:13, 75:23, 75:25, 76:2, 77:2, 77:7, 81:18, 81:19, 86:25, 88:3, 91:21, 92:8, 94:9, 96:13,

98:8, 99:12, 100:6, 100:9, 101:19, 105:9, 105:22, 106:8, 111:12, 112:10, 112:12, 112:21, 113:17, 113:18, 116:25, 117:10, 117:13, 117:16, 117:20, 118:13, 118:21, 118:24, 119:1, 119:4, 119:6, 119:19, 120:16, 120:21, 123:1, 123:7, 145:16, 158:4, 174:21, 184:5

**remembered** [1] - 85:20
**remembers** [1] - 7:6
**remotely** [1] - 151:7
**remove** [1] - 169:8
**removed** [2] - 167:19, 167:22
**removing** [1] - 168:18
**render** [1] - 2:23
**repeat** [2] - 70:13, 139:17
**repeated** [1] - 138:10
**repeatedly** [4] - 60:20, 89:5, 104:11, 104:12
**repeating** [3] - 139:5, 139:15, 140:1
**repetitive** [1] - 166:23
**rephrase** [2] - 186:23, 189:3
**Rephrase** [3] - 36:11, 111:9, 116:15
**replace** [1] - 157:17
**report** [7] - 16:24, 17:4, 17:7, 17:9, 17:12, 17:18, 144:1
**reported** [1] - 168:5
**Reported** [1] - 1:23
**Reporter** [1] - 200:15
**REPORTER'S** [1] - 200:1
**reports** [3] - 154:9, 154:14, 192:9
**represent** [2] - 34:7, 74:4, 173:8
**representation** [3] - 52:8, 52:14, 52:17
**represents** [1] - 98:6
**request** [4] - 185:1, 185:6, 185:7, 185:21
**requests** [1] - 184:22
**require** [1] - 193:16
**required** [2] - 34:9, 97:2
**requirement** [1] - 2:23
**residence** [2] - 177:1, 177:2
**residue** [2] - 25:13, 169:22
**resolve** [1] - 196:2
**resolved** [1] - 143:25

**respect** [25] - 9:17, 9:20, 9:25, 11:19, 16:19, 19:2, 34:22, 67:5, 123:10, 124:24, 142:5, 193:6, 194:9, 194:14, 195:13, 196:2, 196:5, 196:20, 197:1, 197:4, 197:8, 197:10, 197:13, 197:14, 198:2
**respond** [2] - 176:23, 177:1
**responded** [3] - 93:3, 159:22, 161:17
**responder** [1] - 164:3
**responding** [1] - 163:25
**response** [6] - 5:12, 26:6, 119:4, 141:17, 155:19, 196:4
**rest** [2] - 3:2, 148:5
**restrained** [1] - 197:10
**result** [1] - 139:7
**resulted** [2] - 150:10, 197:20
**resume** [3] - 133:12, 133:24, 134:8
**retaliate** [1] - 103:1
**retrieve** [1] - 33:17
**revenge** [1] - 139:11
**reversed** [1] - 157:21
**review** [3] - 44:9, 44:14, 44:17
**reviewed** [5] - 43:4, 43:8, 44:7, 46:18, 101:10
**revisit** [2] - 142:10, 143:14
**revolver** [2] - 24:5, 93:16
**rhetorical** [1] - 139:14
**RHODES** [11] - 3:11, 67:16, 89:7, 97:21, 111:21, 166:5, 166:9, 166:13, 166:21, 186:14, 188:21
**Rhodes** [3] - 1:17, 3:10, 166:8
**Ridgewood** [2] - 161:9, 163:5
**riding** [1] - 187:8
**rights** [2] - 145:6, 198:5
**Rigor** [1] - 168:15
**rigor** [1] - 168:18
**risk** [2] - 46:3, 46:5
**risky** [1] - 190:15
**Road** [2] - 163:13, 186:7
**rob** [16] - 18:3, 18:24, 19:3, 19:22, 29:13, 70:7, 78:14, 84:6, 84:25, 85:3, 88:9, 88:10, 89:23, 122:3
**robbed** [5] - 45:24,

49:19, 49:24, 50:14, 71:20
**robberies** [1] - 50:18
**robbery** [27] - 13:17, 14:11, 19:10, 19:19, 21:2, 28:20, 28:24, 33:8, 50:11, 65:15, 73:24, 74:9, 74:17, 85:7, 89:22, 90:14, 91:6, 107:19, 112:19, 113:2, 113:7, 113:9, 113:16, 114:2, 114:4, 114:25, 115:2
**robbing** [4] - 19:14, 70:12, 70:15, 70:23
**Robert** [1] - 1:16
**Rock** [2] - 45:1, 45:2
**role** [2] - 94:20, 104:23
**rolling** [1] - 42:8
**Ron** [2] - 75:20
**Ronald** [1] - 13:21
**Room** [1] - 1:24
**room** [8] - 34:1, 62:17, 75:7, 75:24, 110:11, 122:20, 133:2, 133:4
**roughly** [1] - 44:12
**Rowe** [3] - 12:10, 40:20, 110:9
**RPR** [1] - 1:24
**rule** [2] - 143:23, 145:3
**ruled** [2] - 141:12, 143:11
**ruling** [2] - 153:9, 196:25
**rumor** [1] - 139:16, 139:17, 142:19, 144:19, 145:24, 145:25, 146:17
**rumors** [7] - 135:13, 135:17, 138:11, 140:1, 145:18, 145:20, 154:12
**run** [1] - 152:1
**running** [3] - 39:17, 40:4, 163:18

## S

**S-56** [1] - 30:6
**said-she** [2] - 137:23, 137:24
**Sakellaris** [3] - 75:11, 122:21, 125:6
**sale** [2] - 5:4, 11:7
**samples** [2] - 174:24, 175:6
**sat** [1] - 44:1
**save** [1] - 137:18
**saw** [6] - 30:4, 48:8, 48:12, 106:14, 130:16
**scared** [1] - 118:22
**scene** [19] - 30:1, 114:2,

159:22, 160:1, 163:20, 163:25, 164:1, 165:12, 166:15, 167:6, 169:9, 169:15, 171:11, 171:12, 174:24, 174:25, 175:6, 176:16, 198:8
**scheme** [3] - 18:3, 29:13, 85:7
**Scope** [2] - 117:5, 128:16
**screen** [13] - 57:4, 57:10, 60:1, 84:18, 99:5, 111:25, 112:1, 160:7, 160:24, 161:14, 161:15
**search** [4] - 37:6, 182:17, 190:2, 190:4
**searched** [2] - 37:15
**seat** [16] - 113:22, 164:23, 165:14, 165:15, 165:16, 165:23, 167:9, 167:16, 168:25, 169:1, 169:3, 172:7, 173:9, 184:4, 184:5, 184:7
**seated** [1] - 158:19
**seats** [1] - 181:24
**second** [11] - 6:17, 30:15, 38:14, 46:21, 97:25, 143:24, 153:11, 163:10, 196:2, 198:9, 198:16
**second-hand** [1] - 198:9
**secondary** [1] - 164:3
**seconds** [1] - 145:9
**Secret** [1] - 177:20
**section** [4] - 38:8, 93:7, 141:22, 191:17
**secured** [1] - 90:19
**security** [3] - 177:24, 178:1, 178:3
**See** [3] - 7:20, 22:14, 147:24
**see** [43] - 2:18, 10:17, 17:11, 19:17, 22:8, 22:19, 22:24, 30:13, 30:18, 46:23, 57:18, 62:9, 62:10, 83:8, 101:18, 106:13, 113:24, 120:14, 125:23, 126:18, 137:15, 140:16, 146:12, 149:21, 153:13, 156:10, 157:4, 160:24, 163:13, 165:19, 166:1, 167:9, 170:16, 171:14, 175:16, 175:21, 181:1, 191:21, 192:11, 192:15, 195:20, 198:18, 198:22
**seek** [1] - 139:11
**Seem** [1] - 33:25
**seem** [2] - 3:3, 198:14

**self** [5] - 149:20, 151:4, 151:23, 193:18
**self-authenticating** [1] - 193:18
**self-evident** [4] - 149:20, 151:4, 151:23
**sell** [5] - 4:20, 4:24, 9:14, 10:14, 45:14
**selling** [3] - 10:17, 105:8, 105:13
**semiautomatic** [1] - 24:10
**sense** [4] - 3:3, 35:22, 152:15, 162:5
**sent** [2] - 17:6, 62:17
**sentence** [6] - 48:13, 48:16, 94:15, 100:3, 100:14, 132:4
**sentencing** [2] - 36:14, 96:19
**separate** [2] - 195:15, 195:17
**separately** [1] - 195:9
**September** [9] - 8:20, 21:22, 24:18, 25:2, 31:3, 75:10, 77:3, 91:24, 119:16
**Sergeant** [5] - 75:19, 122:11, 128:6, 160:3, 165:21
**serial** [1] - 193:22
**series** [6] - 27:3, 51:22, 60:2, 117:18, 124:20, 125:21
**serious** [7] - 47:6, 63:9, 64:3, 120:18, 120:24, 125:12, 154:21
**Service** [1] - 177:20
**serving** [1] - 110:8
**session** [24] - 7:1, 7:11, 25:2, 43:15, 44:1, 51:24, 63:19, 65:18, 75:6, 75:9, 76:17, 76:18, 78:22, 87:3, 92:6, 93:6, 109:11, 118:10, 118:17, 119:15, 122:8, 122:20, 123:22
**sessions** [28] - 6:23, 7:25, 24:17, 27:3, 42:2, 42:4, 42:11, 42:14, 42:18, 42:22, 42:25, 43:14, 52:1, 52:13, 65:7, 76:3, 81:15, 81:19, 83:18, 83:23, 85:19, 88:22, 96:1, 100:22, 107:2, 107:6, 123:9, 123:17
**set** [6] - 16:3, 125:18, 152:3, 155:11, 157:7, 168:19
**sets** [2] - 43:5

**settle** [1] - 168:15
**seven** [2] - 58:18, 159:14
**Seven** [2] - 22:22, 137:5
**sever** [2] - 154:19, 155:22
**several** [11] - 108:20, 127:25, 135:3, 152:20, 152:21, 170:2, 184:22, 193:5, 194:8, 195:7, 197:11
**severance** [1] - 150:9
**sex** [1] - 78:12
**shall** [5] - 95:13, 96:25, 97:1, 97:2, 124:14
**shape** [1] - 172:3
**SHAWN** [1] - 1:8
**Shawn** [7] - 10:18, 23:21, 24:20, 26:10, 27:8, 45:7, 184:24
**shell** [6] - 170:16, 170:18, 170:22, 171:4, 171:14
**Shelly** [2] - 34:7, 184:24
**SHELLY** [1] - 1:8
**Shelton** [4] - 45:1, 130:14, 132:1, 136:7
**SHELTON** [1] - 1:7
**shit** [1] - 138:5
**shooter** [5] - 152:13, 152:14, 152:23, 176:10, 176:13
**shooting** [1] - 80:3
**shootings** [3] - 76:3, 76:8
**short** [1] - 133:13
**shortly** [2] - 133:5, 133:6
**shot** [14] - 31:7, 38:21, 165:11, 165:12, 165:22, 167:5, 169:12, 169:14, 170:2, 171:22, 172:9, 176:2, 176:8, 176:14
**shots** [1] - 12:18
**show** [29] - 13:3, 22:12, 84:16, 91:16, 127:8, 139:1, 157:19, 160:10, 161:13, 164:24, 166:1, 166:23, 167:6, 168:22, 171:7, 171:13, 171:17, 173:5, 174:9, 174:18, 175:15, 178:5, 178:8, 182:20, 183:9, 183:21, 184:1, 190:6, 191:16
**showed** [5] - 22:15, 22:18, 98:3, 181:1, 184:4
**showing** [1] - 183:3
**shown** [12] - 22:22, 62:23, 62:24, 62:25, 117:12, 130:9, 131:13,

131:16, 131:19, 166:14, 175:15, 193:7
**shows** [6] - 135:25, 152:19, 166:22, 167:23, 172:1, 183:4
**side** [14] - 61:1, 162:12, 162:13, 163:4, 165:22, 167:23, 171:19, 171:23, 175:7, 175:9, 175:22, 198:17
**sign** [2] - 174:6, 176:1
**signature** [4] - 53:7, 54:21, 190:11, 200:10
**signed** [1] - 35:25
**significance** [1] - 195:20
**significant** [1] - 195:21
**signing** [1] - 96:11
**silent** [1] - 145:6
**similar** [1] - 101:25
**simple** [1] - 143:11
**simply** [12] - 2:8, 35:4, 138:11, 141:22, 142:13, 143:2, 143:7, 144:16, 146:16, 146:17, 157:17, 196:23
**site** [1] - 162:16
**sitting** [3] - 22:16, 32:20, 38:2
**situation** [2] - 45:23, 197:7
**situations** [1] - 197:21
**Six** [3] - 91:24, 118:20, 119:17
**six** [4] - 21:18, 87:2, 125:10, 125:16
**Sixth** [1] - 137:19
**ski** [1] - 190:16
**skin** [3] - 169:23, 169:24, 169:25
**slowly** [1] - 70:14
**smart** [1] - 97:14, 197:11
**Smith** [3] - 13:25, 14:2, 14:6
**smoke** [1] - 10:2
**Smokey** [1] - 53:23
**snatch** [1] - 107:21
**Snitching** [1] - 117:13
**Snuck** [1] - 68:25
**sold** [8] - 9:18, 10:24, 11:12, 11:16, 46:8, 127:13, 127:16, 127:19
**solid** [1] - 195:2
**solved** [1] - 143:11
**someone** [5] - 18:21, 92:11, 160:2, 169:5, 198:10
**sometime** [5] - 43:16, 44:11, 105:25, 168:13,

194:22
**Sometimes** [3] - 72:21, 109:8, 112:4
**sometimes** [14] - 46:25, 47:21, 53:5, 62:4, 62:8, 62:21, 62:24, 71:8, 81:15, 90:22, 102:21, 109:8, 112:8, 127:10
**Somewhat** [3] - 58:5, 64:23, 126:4
**somewhat** [2] - 62:21, 102:9
**somewhere** [1] - 52:21
**songs** [1] - 72:23
**Sorry** [2] - 61:25, 189:3
**sorry** [18] - 15:3, 25:1, 26:24, 27:7, 31:10, 54:14, 55:12, 70:13, 75:15, 93:9, 157:18, 160:12, 161:4, 167:14, 170:13, 175:24, 177:20, 180:12
**sort** [15] - 40:3, 43:5, 53:4, 53:7, 54:21, 54:24, 63:14, 77:5, 81:12, 102:14, 107:6, 158:23, 194:24, 198:9, 198:17
**sought** [1] - 188:5
**sound** [2] - 36:1, 58:4
**Sounds** [2] - 39:2, 39:3
**source** [1] - 11:12
**south** [1] - 163:18
**sovereign** [1] - 195:13
**sovereignty** [5] - 195:22, 196:6, 196:7, 196:17, 197:16
**spatters** [1] - 176:9
**speaker** [1] - 146:3
**speaking** [2] - 35:18, 186:22
**special** [1] - 75:14
**Special** [2] - 122:10
**specialized** [1] - 107:6
**specific** [1] - 75:5
**specifically** [5] - 6:25, 12:4, 13:8, 84:25, 176:24
**Specifically** [1] - 187:2
**specify** [1] - 41:2
**specs** [1] - 169:25
**speculate** [1] - 62:24
**spell** [1] - 158:20
**Spence** [64] - 4:4, 17:22, 18:4, 18:8, 18:9, 18:14, 18:25, 19:23, 20:2, 20:15, 20:16, 21:2, 21:3, 21:4, 21:10, 21:14, 23:17, 25:1, 25:3, 25:10, 25:22, 26:1, 26:4, 26:9, 29:14, 29:15, 29:18, 29:24, 30:12, 30:14,

32:8, 32:25, 33:5, 33:8, 33:9, 44:23, 65:3, 65:8, 65:15, 65:16, 69:16, 73:25, 77:11, 77:25, 79:1, 79:16, 80:4, 80:18, 88:10, 89:22, 89:24, 92:3, 94:20, 95:25, 97:10, 108:8, 114:25, 115:24, 122:3, 122:4, 122:17, 132:17, 132:19, 197:13
**Spence's** [1] - 106:25
**Spences** [1] - 21:15
**spend** [1] - 65:13
**spoken** [2] - 11:3, 78:5
**spot** [4] - 30:13, 30:17, 163:7, 191:1
**spots** [2] - 175:20, 176:5
**spread** [2] - 131:1, 131:20
**spreads** [2] - 130:10, 131:13
**stab** [1] - 129:16
**stand** [4] - 55:10, 57:13, 66:17, 158:5
**standing** [2] - 30:13, 152:16
**stands** [2] - 15:25, 114:10
**Start** [1] - 117:6
**start** [7] - 46:23, 57:19, 100:15, 110:3, 111:6, 137:14, 157:5
**started** [12] - 42:7, 42:8, 48:2, 54:9, 54:16, 81:19, 81:25, 82:9, 110:11, 110:22, 141:25, 168:15
**Starting** [1] - 31:3
**starting** [2] - 22:14, 194:16
**starts** [1] - 137:6
**State** [4] - 34:8, 95:10, 158:3, 158:20
**state** [19] - 24:18, 34:23, 36:8, 36:13, 43:21, 94:6, 94:12, 95:4, 95:13, 95:14, 99:24, 120:17, 120:22, 188:10, 196:16, 197:2, 197:5, 197:12
**State's** [5] - 34:24, 51:25, 99:11, 99:16, 158:5
**statement** [65] - 2:19, 3:1, 6:14, 6:18, 6:20, 8:3, 8:14, 8:24, 26:25, 27:2, 28:11, 38:3, 38:6, 38:14, 38:18, 38:21, 39:3, 40:2, 43:4, 57:5,

58:7, 58:17, 59:22, 59:23, 60:24, 61:5, 61:7, 61:16, 61:17, 61:19, 62:6, 62:9, 62:11, 62:12, 62:13, 62:14, 63:2, 65:12, 65:20, 76:19, 78:21, 95:16, 101:14, 107:20, 115:1, 120:17, 126:25, 134:4, 134:8, 135:2, 135:4, 141:4, 141:11, 143:8, 144:22, 145:15, 145:23, 147:3, 147:13, 148:6, 150:1, 158:5, 196:18
**statements** [18] - 6:2, 6:9, 26:13, 26:15, 27:10, 43:22, 51:23, 65:7, 66:23, 67:6, 73:21, 96:7, 96:20, 96:23, 114:23, 125:19, 139:5, 198:6
**states** [1] - 114:15
**States** [6] - 7:2, 35:19, 122:8, 125:5, 157:22, 158:16
**STATES** [2] - 1:1, 1:5
**stating** [1] - 98:7
**station** [3] - 165:2, 173:3, 184:19
**status** [2] - 194:14, 195:12
**stay** [1] - 182:8
**stayed** [2] - 50:8, 113:4
**steering** [3] - 172:4, 172:10, 172:14
**stenographically** [1] - 200:4
**step** [1] - 192:13
**Stewart** [8] - 39:12, 39:18, 39:24, 102:24, 103:4, 103:7, 109:13, 110:12
**Stewart's** [1] - 39:14
**sticking** [2] - 171:19, 171:23
**still** [18] - 33:5, 45:24, 54:16, 54:18, 80:2, 80:14, 102:13, 134:17, 136:7, 152:17, 164:9, 165:4, 165:14, 165:15, 165:16, 167:9, 168:1, 172:19
**stippling** [3] - 169:16, 169:18, 169:20
**Stippling** [1] - 169:22
**stipulate** [1] - 2:8
**stipulation** [3] - 194:10, 194:13, 194:18
**Stocksdale** [21] - 43:19, 44:2, 51:25, 59:23, 60:13, 63:19, 63:23,

64:5, 64:7, 64:16, 65:1,
74:7, 74:16, 74:24,
93:12, 93:15, 102:9,
120:22, 121:7, 125:11,
126:10
  **Stop** [1] - 117:12
  **stopped** [3] - 79:18,
115:24, 116:2
  **stops** [1] - 161:10
  **story** [3] - 65:14,
122:24, 135:5
  **straight** [1] - 133:5
  **straightforward** [2] -
134:12, 134:14
  **strange** [1] - 151:25
  **street** [30] - 36:25, 45:1,
48:9, 48:12, 67:25, 68:5,
71:18, 127:14, 135:13,
135:17, 136:7, 138:11,
139:5, 140:1, 142:19,
142:20, 144:20, 145:20,
146:18, 152:9, 154:13,
160:15, 160:22, 161:8,
162:12, 162:23, 162:24,
163:15, 175:17, 176:5
  **Street** [2] - 1:25, 4:17
  **streets** [2] - 18:18,
137:23
  **strength** [1] - 102:15
  **Stricker** [1] - 59:10
  **strike** [7] - 6:1, 15:3,
20:22, 106:19, 117:8,
121:5, 188:1
  **Strike** [1] - 75:2
  **Stuff** [1] - 64:13
  **stuff** [8] - 29:6, 64:12,
65:3, 121:10, 137:24,
146:6, 183:7, 184:12
  **Subject** [1] - 144:15
  **subject** [3] - 63:20,
95:13, 99:3
  **submit** [3] - 184:13,
185:6, 185:21
  **submitted** [3] - 182:15,
196:18, 197:6
  **subpoenaed** [1] -
186:18
  **subscriber** [1] - 186:21
  **subscribers** [1] - 187:4
  **subsequent** [3] - 96:11,
135:21, 155:16
  **subsequently** [3] -
178:6, 182:17, 185:19
  **substance** [1] - 16:1
  **substantial** [2] - 134:3,
198:4
  **substantive** [4] - 63:2,
63:4, 66:24, 67:8
  **subway** [1] - 152:2
  **succeeding** [1] - 155:15

  **sufficient** [2] - 35:5,
140:16
  **sufficiently** [1] - 149:1
  **suggest** [2] - 60:23,
195:1
  **suggested** [1] - 150:9
  **suggesting** [2] - 2:12,
139:21
  **suggestion** [2] - 155:6,
162:7
  **suggests** [1] - 154:4
  **sum** [1] - 20:6
  **summary** [1] - 62:11
  **summer** [1] - 3:18
  **supervised** [1] - 14:21
  **supplied** [1] - 90:13
  **supplier** [4] - 5:6, 5:16,
103:24, 104:6
  **suppliers** [1] - 104:2
  **supplies** [1] - 104:14
  **supplying** [1] - 104:5
  **supports** [1] - 197:18
  **suppose** [4] - 85:2,
153:6, 156:18, 177:10
  **supposed** [11] - 15:11,
17:8, 26:1, 27:18, 27:22,
28:1, 31:19, 32:3, 76:19,
85:12, 118:12
  **supposedly** [3] - 45:1,
128:4, 128:8
  **supposing** [1] - 140:12
  **supposition** [1] -
140:14
  **Supreme** [2] - 157:21,
158:2
  **surely** [1] - 134:22
  **surprised** [2] - 77:2,
77:6
  **surveillance** [4] - 21:9,
21:12, 21:25, 22:4
  **surveillances** [2] -
90:17, 90:23
  **surveilled** [1] - 21:15
  **Sustain** [1] - 60:11
  **Sustained** [7] - 13:23,
44:16, 54:13, 85:17,
86:3, 124:3, 132:13
  **sustained** [7] - 6:7,
7:17, 14:13, 16:18,
132:18, 132:20, 169:11
  **sweatpants** [2] -
174:17, 174:19
  **switch** [1] - 93:22
  **SWORN** [1] - 158:17

## T

  **tags** [1] - 173:6
  **talkies** [1] - 90:20

  **talks** [2] - 125:21,
190:13
  **tall** [1] - 25:15
  **taller** [3] - 23:8, 23:11,
23:15
  **tangible** [1] - 96:10
  **tape** [68] - 28:11, 41:24,
42:8, 42:12, 43:4, 43:25,
63:19, 72:11, 72:13,
74:13, 74:19, 90:19,
101:14, 102:1, 135:7,
135:8, 135:10, 137:15,
137:16, 139:3, 139:18,
139:19, 140:11, 140:16,
141:10, 141:11, 141:20,
141:22, 141:24, 141:25,
142:4, 142:19, 143:9,
143:21, 144:1, 144:13,
144:19, 147:19, 148:1,
148:9, 149:13, 151:7,
151:13, 151:15, 151:17,
154:4, 154:7, 154:9,
154:13, 154:17, 156:3,
156:6, 156:10, 156:14,
156:17, 156:19, 156:22,
157:8, 157:9, 157:13,
157:20, 177:15, 177:22,
178:24, 179:8, 192:16,
198:2
  **Tape** [1] - 28:14
  **taped** [21] - 6:13, 6:18,
38:3, 38:5, 38:6, 38:14,
38:18, 38:21, 43:2,
51:23, 52:13, 57:4, 57:5,
58:7, 58:17, 59:22, 65:6,
65:12, 65:20, 144:8,
144:10
  **tapes** [2] - 101:4,
123:12
  **targeted** [1] - 135:25
  **tattoo** [9] - 55:1, 55:8,
55:18, 55:20, 55:24,
56:1, 57:14, 57:16,
114:11
  **tattoos** [4] - 53:5,
54:21, 54:24, 55:5
  **Tech** [3] - 110:14,
110:15
  **tech** [1] - 34:2
  **technical** [1] - 33:25
  **technicians** [1] - 174:24
  **telephone** [5] - 174:18,
184:9, 186:18, 188:17,
188:19
  **telephones** [1] - 183:10
  **ten** [2] - 33:23, 53:25
  **Ten** [2] - 122:18, 127:9
  **term** [7] - 46:2, 51:13,
88:19, 89:5, 89:11,
108:7, 127:22

  **terms** [6] - 36:8, 47:13,
94:8, 95:3, 96:24, 195:20
  **Terrace** [1] - 59:13,
59:17, 59:18
  **terribly** [2] - 66:20,
69:22
  **Terry** [21] - 37:13,
38:22, 39:9, 39:21,
39:25, 55:21, 57:14,
66:1, 66:3, 68:3, 68:5,
72:8, 77:12, 78:10,
81:24, 82:12, 83:16,
94:9, 94:12, 95:21,
109:16
  **tested** [2] - 25:13, 175:2
  **testified** [24] - 6:1, 10:7,
14:3, 14:14, 21:24, 22:3,
23:20, 26:6, 44:4, 47:19,
47:24, 50:23, 51:10,
72:10, 81:23, 89:9, 93:7,
103:12, 104:1, 104:10,
105:22, 106:7, 193:13
  **testifies** [1] - 153:21
  **testify** [10] - 12:16,
101:11, 112:14, 136:6,
136:15, 141:4, 149:22,
153:18, 156:7, 194:1
  **testifying** [4] - 8:17,
8:19, 12:22, 150:10
  **testimony** [104] - 4:17,
4:23, 5:1, 5:3, 5:19, 6:3,
6:4, 6:6, 8:24, 8:25, 9:8,
9:22, 10:10, 10:15,
10:24, 11:25, 14:17,
16:9, 16:12, 17:21,
17:25, 18:5, 19:14,
19:17, 20:3, 21:16,
23:14, 23:25, 24:12,
25:21, 25:25, 26:3, 26:8,
26:9, 26:12, 26:15,
26:16, 27:10, 27:17,
28:1, 30:1, 30:14, 30:21,
31:13, 31:17, 31:19,
31:23, 32:2, 32:23, 44:7,
44:9, 46:19, 47:3, 47:4,
48:4, 49:13, 51:24, 52:4,
60:18, 60:25, 61:4, 61:8,
61:11, 61:12, 61:13,
61:14, 61:18, 61:22,
62:5, 63:5, 63:8, 63:11,
63:12, 67:6, 70:6, 72:25,
73:22, 79:13, 79:25,
82:10, 84:22, 85:13,
95:8, 96:9, 101:11,
103:2, 109:22, 110:18,
111:2, 118:25, 119:11,
119:22, 121:24, 124:12,
126:1, 127:9, 135:21,
169:14, 180:5, 185:17,
193:12, 198:3, 198:6

  **TFO** [2] - 104:16, 107:9
  **THAT** [1] - 55:14
  **THE** [266] - 1:1, 1:2, 2:2,
2:4, 2:16, 3:9, 3:12,
3:16, 6:7, 7:5, 7:10,
7:17, 7:19, 7:20, 7:23,
8:9, 12:20, 13:2, 13:11,
13:23, 14:13, 15:17,
15:23, 16:18, 22:12,
27:5, 30:8, 33:13, 33:17,
33:21, 33:24, 34:1,
36:11, 40:14, 40:16,
41:18, 44:16, 51:2,
52:11, 54:13, 55:12,
57:2, 57:9, 60:8, 60:10,
60:12, 60:15, 62:2,
66:10, 66:13, 66:19,
67:4, 67:11, 67:14,
67:19, 67:21, 78:19,
81:6, 82:6, 82:16, 82:25,
83:1, 83:2, 83:3, 84:10,
84:17, 85:17, 86:3,
86:18, 88:24, 89:8,
89:18, 91:20, 92:18,
92:24, 93:10, 97:17,
97:23, 98:21, 99:8,
101:23, 102:18, 104:8,
105:21, 106:12, 106:17,
106:20, 107:17, 111:9,
111:16, 111:22, 113:13,
115:7, 115:13, 116:9,
116:15, 116:20, 117:6,
117:9, 124:3, 125:1,
126:7, 126:23, 128:17,
128:24, 129:14, 129:18,
130:21, 130:23, 131:3,
131:5, 131:8, 132:6,
132:13, 132:18, 132:20,
132:22, 132:24, 133:12,
133:23, 134:1, 134:5,
134:7, 134:12, 134:16,
134:20, 134:22, 135:1,
135:7, 135:13, 135:16,
135:22, 136:3, 136:10,
136:13, 136:17, 136:19,
136:21, 136:23, 137:1,
137:8, 137:11, 137:18,
138:15, 138:18, 138:21,
138:25, 139:10, 139:20,
139:24, 140:5, 140:9,
140:14, 140:21, 140:24,
141:6, 141:8, 141:14,
141:18, 141:23, 142:7,
142:12, 143:4, 143:13,
143:15, 143:19, 144:3,
144:7, 144:11, 144:15,
144:21, 144:25, 145:2,
145:22, 146:2, 146:10,
146:12, 146:19, 146:24,
147:1, 147:6, 147:13,
147:24, 148:19, 148:22,

149:4, 149:9, 149:12, 149:18, 150:6, 150:13, 150:18, 150:22, 150:25, 151:5, 151:24, 152:14, 153:13, 153:16, 153:21, 153:25, 154:12, 154:19, 154:21, 154:25, 155:3, 155:6, 155:10, 155:17, 155:21, 156:2, 156:5, 156:13, 156:20, 157:4, 157:11, 157:15, 157:18, 158:10, 158:18, 158:19, 158:21, 158:23, 159:2, 159:3, 162:2, 166:3, 166:6, 166:10, 166:12, 166:17, 166:19, 166:25, 167:3, 167:13, 181:6, 186:16, 187:16, 187:23, 188:3, 188:22, 189:9, 190:19, 190:22, 190:25, 191:3, 191:13, 192:5, 192:15, 192:19, 192:21, 192:24, 193:2, 193:4, 193:8, 193:16, 194:2, 194:23, 195:6, 195:16, 195:18, 195:24, 196:9, 197:25, 198:18, 198:21

**theirs** [1] - 11:21
**theoretical** [1] - 196:21
**theory** [5] - 148:2, 151:13, 151:15, 152:5, 152:20
**Therefore** [1] - 125:19
**therefore** [2] - 143:1, 146:13
**therefrom** [1] - 96:12
**they've** [1] - 35:8
**thinking** [2] - 77:7, 196:9
**thinks** [3] - 140:19, 142:16, 154:3
**third** [4] - 6:20, 38:18, 198:9, 198:16
**third-hand** [2] - 198:9, 198:16
**Thomas** [2] - 1:20, 75:15
**thoughts** [2] - 41:10, 97:25
**thousand** [2] - 74:11, 127:3
**threatened** [1] - 117:25
**three** [17] - 14:10, 14:21, 42:11, 42:14, 43:2, 51:23, 66:24, 67:24, 76:19, 89:9, 151:14, 151:16, 152:8, 155:15, 155:16, 166:23, 173:8
**Three** [6] - 98:4, 99:12,

125:15, 150:3, 166:9, 166:10
**throat** [1] - 55:8
**throws** [1] - 56:6
**tickets** [2] - 73:12, 73:14
**tie** [1] - 139:6
**tied** [3] - 76:8, 128:8
**Tincher** [1] - 75:19
**tire** [2] - 182:25, 183:1
**tired** [2] - 40:4, 150:23
**today** [14] - 26:10, 27:9, 27:21, 29:10, 31:11, 43:12, 54:17, 54:18, 63:12, 89:10, 96:1, 141:21, 157:9, 157:13
**together** [14] - 5:11, 5:15, 5:23, 9:2, 47:21, 50:24, 56:7, 64:12, 68:10, 104:13, 105:17, 148:3, 148:8, 150:23
**toll** [1] - 186:18
**Tom** [2] - 34:6, 122:10
**tomorrow** [7] - 157:20, 192:6, 192:11, 192:25, 194:22, 198:19, 198:22
**Tonya** [28] - 20:16, 21:3, 21:10, 21:14, 23:17, 25:1, 25:3, 26:1, 26:3, 26:9, 30:12, 30:14, 32:24, 33:9, 44:22, 65:16, 69:16, 77:11, 91:1, 94:20, 95:24, 97:10, 108:8, 115:24, 122:2, 122:17, 197:13
**took** [7] - 5:5, 11:7, 47:13, 47:14, 103:23, 115:16, 115:17
**top** [2] - 137:6, 166:21
**total** [2] - 166:12, 171:4
**touch** [3] - 72:2, 72:4, 161:15
**touched** [1] - 161:20
**toward** [2] - 136:25, 158:19
**towed** [3] - 176:17, 176:19, 182:18
**tracks** [5] - 152:2, 161:11, 162:13, 162:14, 163:3
**traffic** [1] - 16:2
**transaction** [1] - 5:18
**transcribed** [1] - 200:7
**transcript** [24] - 22:5, 31:2, 43:9, 43:25, 44:7, 44:9, 62:4, 62:7, 62:13, 62:22, 62:23, 62:25, 63:1, 108:15, 111:25, 135:18, 137:5, 142:21, 142:22, 157:14, 157:16,

192:17, 200:7
**transcripts** [4] - 62:15, 101:4, 123:12, 157:17
**transferred** [1] - 195:11
**travel** [1] - 47:21
**traveling** [1] - 48:20
**trees** [1] - 157:18
**trial** [22] - 16:3, 36:6, 36:15, 60:25, 61:18, 86:14, 95:3, 101:8, 101:11, 112:14, 119:11, 123:5, 149:7, 149:23, 149:25, 150:10, 153:20, 158:25, 196:7, 196:13, 197:13, 198:5
**triangular** [1] - 172:3
**tribunal** [1] - 96:10
**tried** [8] - 5:23, 86:14, 86:15, 87:17, 88:2, 148:8, 150:19, 158:25
**trip** [1] - 49:23
**trips** [5] - 104:13, 104:19, 104:24, 105:5, 105:16
**trooper** [1] - 151:21
**trouble** [6] - 15:12, 64:13, 101:19, 102:21, 111:1, 164:17
**truck** [1] - 41:5
**true** [27] - 7:11, 11:9, 19:21, 23:16, 31:15, 34:22, 38:2, 38:12, 45:6, 45:9, 63:14, 65:6, 70:24, 71:19, 72:19, 74:23, 74:25, 75:1, 78:9, 78:16, 89:16, 114:19, 122:5, 122:12, 145:13, 154:12, 195:10
**trumped** [1] - 145:4
**trunk** [2] - 32:21, 184:12
**trust** [1] - 3:17
**truth** [5] - 47:9, 64:18, 64:25, 89:21, 145:14
**truthful** [1] - 96:17
**truthfulness** [2] - 125:17, 125:23
**try** [14] - 26:7, 34:9, 44:21, 98:8, 111:1, 112:5, 141:13, 150:21, 150:24, 194:20, 195:22, 195:25, 196:1
**trying** [11] - 33:1, 34:2, 86:24, 90:9, 98:18, 102:13, 137:18, 137:19, 143:14, 155:7, 194:18
**Tuesday** [4] - 1:11, 40:2, 47:14, 51:11
**turned** [6] - 37:9, 41:24, 43:15, 123:3, 168:5,

182:15
**twice** [1] - 151:22
**Two** [3] - 23:2, 150:1, 190:1
**two** [41] - 16:15, 21:17, 21:19, 23:4, 23:6, 23:25, 31:20, 32:2, 32:10, 32:25, 66:24, 76:7, 89:14, 106:14, 106:15, 109:7, 109:8, 113:10, 113:20, 115:5, 130:4, 139:1, 143:17, 152:8, 152:11, 152:25, 159:20, 160:6, 161:17, 161:20, 161:21, 164:9, 167:6, 169:10, 170:23, 173:18, 176:7, 182:10, 183:10, 187:15, 187:17
**type** [3] - 127:22, 127:23, 162:20
**typically** [2] - 53:8, 93:18
**Tyree** [9] - 39:12, 39:14, 39:18, 39:24, 102:23, 103:4, 103:7, 109:13, 110:12

## U

**U.S** [10] - 1:24, 6:23, 7:12, 8:1, 9:11, 24:17, 26:13, 75:14, 83:19, 122:20
**ultimately** [1] - 61:10
**Um-hum** [1] - 116:24
**unavailable** [1] - 71:23
**under** [18] - 3:20, 31:13, 94:7, 95:3, 95:10, 95:11, 100:5, 100:17, 119:11, 121:14, 124:15, 125:21, 147:2, 152:2, 152:19, 179:16
**underlying** [1] - 13:5
**undersigned** [1] - 98:7
**understated** [1] - 121:15
**understood** [4] - 72:12, 73:1, 73:11, 95:5
**undertakings** [1] - 125:18
**unfair** [4] - 156:5, 156:7, 156:8, 156:22
**uniformed** [1] - 163:25
**UNITED** [2] - 1:1, 1:5
**United** [6] - 7:1, 35:19, 122:8, 125:5, 157:21, 158:16
**unless** [1] - 62:14
**unlocked** [2] - 168:9,

170:12
**Unlocked** [1] - 170:13
**unmistakable** [1] - 195:2
**unquote** [1] - 64:1
**unresponsive** [2] - 159:21, 161:17
**unsure** [1] - 108:12
**untrue** [1] - 95:2
**up** [95] - 2:17, 3:6, 4:5, 4:10, 4:12, 4:15, 5:5, 5:9, 8:11, 9:2, 9:20, 9:21, 9:23, 10:1, 10:7, 10:11, 11:7, 13:24, 18:16, 20:3, 21:13, 30:22, 31:9, 31:20, 32:16, 37:9, 47:24, 48:2, 48:4, 48:7, 48:22, 57:4, 60:1, 61:10, 64:2, 64:11, 68:20, 68:25, 78:5, 83:4, 83:23, 87:15, 89:1, 92:9, 99:25, 100:11, 102:13, 104:2, 105:25, 106:24, 107:21, 108:23, 110:20, 112:19, 115:2, 116:13, 119:22, 119:23, 120:23, 121:10, 126:23, 126:24, 127:15, 127:17, 128:2, 129:15, 129:20, 130:1, 134:9, 134:19, 135:17, 136:23, 138:5, 138:7, 148:18, 152:1, 152:3, 152:9, 152:19, 155:12, 156:9, 157:7, 159:21, 165:17, 166:17, 167:12, 170:5, 173:12, 189:3, 190:16, 193:22, 197:9
**upstanding** [1] - 72:5
**US** [1] - 27:3
**USA** [1] - 200:4
**users** [1] - 186:22

## V

**vacant** [1] - 162:21
**vague** [2] - 109:7, 179:2
**valid** [1] - 167:1
**valuable** [3] - 135:5, 140:19, 144:10
**value** [1] - 154:6
**various** [3] - 104:12, 128:8, 184:19
**vehicle** [23] - 41:9, 92:4, 120:10, 152:9, 159:21, 165:16, 167:22, 168:18, 169:8, 170:23, 171:21, 172:2, 172:16, 173:2, 175:7, 175:8, 175:11, 175:25, 176:10, 176:15,

182:22, 182:25, 183:12
**verdict** [1] - 61:3
**verify** [1] - 13:6
**version** [2] - 178:16, 178:23
**victim** [5] - 20:20, 109:1, 171:3, 176:8, 197:14
**victim's** [2] - 13:21, 172:22
**victims** [6] - 165:3, 165:4, 165:16, 169:10, 174:5, 175:4
**video** [1] - 117:13
**view** [1] - 135:6
**Village** [1] - 37:19
**violate** [1] - 124:5
**violated** [7] - 14:18, 94:23, 96:24, 97:5, 98:18, 124:16, 126:3
**violates** [1] - 124:13
**Violation** [1] - 82:8
**violation** [9] - 16:6, 16:9, 41:15, 82:4, 95:14, 110:7, 115:19, 187:24, 188:13
**virtually** [1] - 14:17
**vitiate** [1] - 3:1
**voice** [35] - 3:5, 28:15, 139:18, 139:19, 139:21, 140:6, 141:20, 142:4, 143:8, 149:13, 149:14, 149:19, 149:20, 152:19, 152:25, 153:3, 154:4, 154:15, 156:6, 156:19, 177:15, 177:17, 177:23, 178:4, 178:12, 178:21, 179:10, 179:12, 180:11, 180:14, 181:14, 188:20, 189:4
**voices** [10] - 148:14, 151:12, 151:14, 151:17, 152:25, 155:12, 155:13, 155:15, 155:20, 179:7
**VOLUME** [1] - 1:11
**voluntarily** [1] - 145:6

## W

**W-1** [1] - 171:7
**W-10** [2] - 160:19, 163:10
**W-11** [1] - 162:22
**W-12** [1] - 167:5
**W-13** [1] - 167:6
**W-14** [1] - 167:14
**W-15** [1] - 171:17
**W-16** [1] - 167:18
**W-17** [1] - 167:23

**W-18** [1] - 183:21
**W-19** [1] - 184:1
**W-2** [1] - 178:8
**W-20** [1] - 183:3
**W-21** [1] - 182:21
**W-22** [1] - 174:9
**W-23** [1] - 174:18
**W-25** [1] - 182:24
**W-26** [1] - 168:22
**W-27** [1] - 172:25
**W-28** [1] - 173:7
**W-29** [1] - 173:12
**W-3** [1] - 171:7
**W-32** [2] - 178:18, 178:20
**W-32A** [1] - 178:23
**W-33** [1] - 178:12
**W-33A** [1] - 178:15
**W-4** [1] - 171:7
**W-49** [1] - 165:11
**W-5-G** [1] - 191:4
**W-50** [1] - 175:16
**W-51** [1] - 165:17
**W-52** [1] - 164:25
**W-53** [1] - 172:1
**W-54** [1] - 172:9
**W-55** [1] - 172:12
**W-56** [2] - 172:15, 172:24
**W-5l** [1] - 190:8
**W-6** [1] - 183:9
**W-64** [1] - 173:15
**Wabash** [8] - 152:2, 160:5, 160:12, 160:17, 160:23, 163:2, 163:3, 165:3
**wagon** [3] - 165:2, 173:3, 184:19
**waistband** [1] - 182:1
**wait** [1] - 113:9
**waiting** [2] - 152:8, 192:20
**Waiting** [1] - 36:6
**waives** [1] - 145:6
**walk** [2] - 109:3, 176:11
**walked** [1] - 80:3, 80:4, 80:6
**walkie** [1] - 90:20
**walkie-talkies** [1] - 90:20
**walking** [2] - 80:9, 80:14
**wants** [3] - 3:4, 147:6, 155:8
**warned** [3] - 136:11, 136:14, 136:17
**warrant** [4] - 110:8, 187:11, 188:10, 188:14, 188:15, 190:2

**warrants** [4] - 187:17, 187:18, 187:21, 189:22
**wash** [1] - 83:5
**watch** [2] - 113:10, 174:5
**watched** [1] - 22:22
**watches** [2] - 174:4
**water** [1] - 150:25
**Watson** [4] - 63:16, 65:24, 69:7, 89:11
**Wayne** [24] - 4:7, 9:15, 11:16, 19:4, 19:14, 46:25, 51:16, 72:11, 72:14, 72:17, 85:10, 87:24, 88:20, 90:9, 112:8, 112:12, 112:23, 113:4, 113:15, 113:20, 113:22, 127:11, 137:12, 184:24
**WAYNE** [1] - 1:8
**Wayne's** [2] - 85:4, 105:7
**weapon** [15] - 24:20, 24:23, 37:20, 66:6, 76:12, 76:19, 91:13, 92:11, 92:13, 92:16, 120:4, 120:7, 176:8, 176:10, 176:11
**weapons** [4] - 76:7, 77:5, 92:13, 120:1
**wear** [5] - 53:8, 54:21, 114:12, 114:14, 114:21
**wearing** [2] - 23:17, 58:16
**Wednesday** [3] - 34:8, 59:21, 196:14
**week** [22] - 5:12, 6:2, 6:11, 7:15, 8:6, 8:13, 14:14, 18:7, 21:18, 26:6, 32:18, 51:11, 73:1, 84:5, 84:6, 85:18, 89:23, 94:7, 97:10, 101:13, 117:1, 124:18
**weekend** [4] - 3:17, 99:4, 133:19, 196:4
**weeks** [6] - 22:6, 22:22, 23:3, 67:24, 73:23, 87:2
**weight** [1] - 61:21
**weird** [1] - 193:20
**welcome** [1] - 195:19
**West** [1] - 1:25
**Western** [3] - 38:12, 42:5, 110:9
**whatsoever** [1] - 132:1
**wheel** [2] - 172:10, 172:14
**Whereof** [1] - 200:9
**white** [1] - 165:18
**who've** [1] - 60:21
**whole** [15] - 20:23,

58:20, 59:4, 65:8, 75:7, 75:16, 87:3, 105:5, 107:11, 111:19, 122:23, 137:16, 146:12, 148:1, 148:9
**wife** [2] - 79:3, 177:8
**wild** [1] - 97:14
**WILLIAM** [1] - 199:4
**Willie** [2] - 184:23, 200:4
**WILLIE** [1] - 1:7
**willing** [2] - 104:6, 194:20
**windows** [1] - 170:5
**wiretaps** [1] - 39:17
**wish** [1] - 149:16
**wished** [1] - 99:18
**wishes** [1] - 142:11
**withdraw** [11] - 34:9, 34:17, 98:8, 98:14, 98:18, 99:18, 99:25, 124:5, 124:8, 124:9, 124:14
**Withdraw** [1] - 98:5
**withheld** [1] - 95:7
**withhold** [1] - 96:16
**Witness** [5] - 30:20, 103:12, 103:19, 133:10, 200:9
**witness** [42] - 7:6, 7:7, 8:9, 12:20, 22:11, 27:6, 60:18, 60:22, 60:24, 61:6, 61:11, 61:13, 61:14, 61:16, 62:6, 62:9, 63:5, 67:15, 82:6, 84:16, 86:3, 91:20, 97:14, 124:24, 126:25, 133:20, 134:3, 136:5, 136:13, 136:15, 136:17, 136:21, 139:21, 139:24, 151:21, 158:14, 162:6, 181:5, 193:10, 193:17
**WITNESS** [9] - 7:19, 83:1, 83:3, 158:17, 158:18, 158:21, 159:2, 199:4, 199:12
**witness'** [8] - 60:22, 60:24, 61:3, 61:5, 61:8, 61:18, 61:22, 162:3
**witnesses** [3] - 60:21, 136:11, 193:3
**woes** [1] - 147:16
**women** [1] - 78:11
**word** [8] - 22:10, 59:5, 72:11, 72:20, 89:1, 89:3, 123:10, 123:13
**words** [15] - 4:22, 21:12, 47:13, 72:11, 72:16, 97:15, 100:25, 128:1, 134:1, 134:7,

134:8, 139:12, 141:15, 145:12, 151:5
**wore** [4] - 55:6, 56:14, 56:19, 56:24
**worn** [1] - 25:17
**worse** [1] - 40:11
**wound** [2] - 68:20, 169:18
**wounds** [3] - 166:24, 169:10, 169:11
**written** [2] - 99:15, 125:4
**wrote** [1] - 128:2
**Wyche** [33] - 135:12, 139:11, 140:23, 140:25, 141:1, 152:1, 152:10, 152:16, 152:21, 159:16, 164:22, 164:23, 167:15, 167:19, 169:4, 169:19, 170:2, 171:20, 172:17, 173:19, 174:12, 175:12, 176:6, 179:23, 180:7, 185:24, 186:24, 187:2, 187:19, 189:23, 191:7, 193:13, 194:1
**Wyche's** [4] - 186:19, 189:13, 189:17, 189:19

## X

**XIII** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**year** [3] - 44:12, 94:15, 159:12
**Years** [1] - 54:5
**years** [17] - 14:21, 33:23, 35:10, 35:23, 36:5, 44:19, 51:4, 54:4, 85:6, 87:20, 99:20, 130:4, 132:4, 132:7, 132:11, 158:3, 195:7
**yellow** [1] - 173:6
**yesterday** [2] - 14:3, 142:13
**yo** [2] - 138:4, 138:6
**York** [18] - 4:5, 4:10, 4:16, 5:5, 5:9, 9:2, 9:21, 10:1, 10:8, 10:11, 47:21, 48:20, 64:11, 101:18, 103:23, 104:2, 105:17
**yourself** [5] - 70:24, 78:9, 101:10, 110:4, 111:1

## Z

**Zajac** [3] - 1:24, 200:3, 200:14