1

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                     FOR THE DISTRICT OF MARYLAND
                             NORTHERN DIVISION
 3

 4

 5      UNITED STATES OF AMERICA

 6           v.                              CRIMINAL CASE NO.
                                                AMD-04-029
 7      WILLIE MITCHELL,
        SHELTON HARRIS,
 8      SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
 9
             Defendants
10      _____/

11                    VOLUME XVI OF XXXVII
                      Monday, October 27, 2008
12                    Baltimore, Maryland

13

     Before:  Honorable Andre M. Davis, Judge
14                    And a Jury

15   Appearances:
             On Behalf of the Government:
16            Robert Harding, Esquire
              Michael Hanlon, Esquire
17           On Behalf of Defendant Mitchell:
              Laura Kelsey Rhodes, Esquire
18            Michael E. Lawlor, Esquire
             On Behalf of Defendant Harris:
19            Gerard P. Martin, Esquire
              Paul Flannery, Esquire
20           On Behalf of Defendant Martin:
              Thomas L. Crowe, Esquire
21            James G. Pyne, Esquire
             On Behalf of Defendant Gardner:
22            Adam H. Kurland, Esquire
              Barry Coburn, Esquire
23
     Reported by:
24   Mary M. Zajac, RPR
     Room 5515, U.S. Courthouse
25   101 West Lombard Street
     Baltimore, Maryland 21201
```

2

1            (Proceedings at 9:40 a.m.)

2            THE COURT:  I trust that all of counsel are well and

3    your clients, and I trust that the break we had was useful and

4    beneficial.

5            Apparently, we're still waiting for a couple of jurors.

6    Mr. Kurland, I understand you had a matter you wished to take up,

7    and perhaps other counsel need to be heard.  So we can use this

8    time.

9            MR. KURLAND:  Thank you, Your Honor.  Just gathering up

10   all my toys.  Good morning, Your Honor.

11           THE COURT:  Good morning.

12           MR. KURLAND:  Your Honor, Mr. Coburn and myself filed

13   over the weekend, I believe on Saturday, a motion that asks the

14   Court to, to either now or at the earliest opportunity actually

15   give the mid trial dual sovereignty instruction that we talked

16   about at the close of the week, I guess a week ago Thursday.

17           In the interim, one of my research assistants, who I

18   thought was going to be here today, found a case that is

19   consistent with, with a lot of the matters that we've been

20   talking about before the Giovanelli case and it's sort of, I

21   think, really on point.  It's a very good, very detailed Second

22   Circuit case which I think conclusively rebuts the government's

23   arguments that it's -- the government's been taking the position

24   that it's irrelevant, the instruction should not be given, so on,

25   so forth.

3

1          The Giovanelli case, while it's not exactly our

2     situation, it's very close to it.  And it reinforces the

3     proposition that, one, simply calling stuff prior proceedings

4     sort of misses the point.  That's a separate but related issue.

5          But given the fact of prior proceedings, prior trials

6     have been mentioned in this case through various witnesses'

7     testimony, it came out again with respect to Mr. Mitchell and Mr.

8     Martin with respect to the state prosecution of the, of the

9     initial state prosecution with respect to the Wyche brothers'

10    murders, I think under the circumstances a mid trial dual

11    sovereignty instruction that the Court had fashioned a week ago

12    Thursday I think should be given now.

13         In an ideal world, I would actually ask for some

14    additional modifications.  But in the interest of time and in the

15    interest of fairness, we would be satisfied if the Court gave the

16    mid trial instruction the way it had crafted it a week ago

17    Thursday, and then in a final instruction, you know, in the final

18    jury instructions, perhaps work out some additional modifications

19    along the lines suggested in the pleading that we filed.

20         But again, the Giovanelli case, in dealing with this

21    particular problem, says that the jury should be told that under

22    the dual sovereignty system, the language is, that it's

23    permissible for the federal government to prosecute an individual

24    for the same offense that had previously been the subject of

25    prosecution by the state and then going into, you know, not to

4

1    speculate.

2              But again, the record here is so full of references to

3    state proceedings, not just the drug stuff that was dealt with,

4    you know, earlier in the trial, we would ask that the Court give

5    that instruction now.

6              I would also add that with respect to Detective

7    Niedermeier, with respect to Darius Spence, I mean, it would seem

8    to be logical to ask Darius Spence why he didn't bother

9    testifying in the State murder trial of his, of his wife, of his

10   wife's alleged assailant.  So it's going to become even more

11   difficult with respect to the slew of witnesses testifying today

12   and Darius Spence and some other witnesses that the jury be told

13   about the dual sovereignty issues along the lines that the Court

14   proposed a week ago on Thursday.

15             There's three other matters, but I think it might make

16   more sense if the Court wanted to address them one by one rather

17   than me do all four of my issues and then the responses.

18             THE COURT:  All right.  Well, once the government has

19   had a chance to review the recent authority you've cited, I'll

20   return to this.  But focusing on what you just said, I don't see

21   why it would be appropriate to question Mr. Spence about why he

22   didn't testify in an earlier proceeding.

23             MR. KURLAND:  Well, Judge, I mean, yeah, I don't know

24   what his direct testimony's going to be.  But my hunch is he's

25   going to be testifying, he's got a standard immunity agreement.

5

1    He now feels it's in his best interests to come forward and

2    testify against these defendants now because he's, you know, been

3    trying to get something from the government and something with

4    respect to sentencing.

5           I think that, while we're not 100% certain that we

6    would do it, but it would not be beyond the pale, it seems to me,

7    to ask him that, you know, that now you have this motivation but

8    simply testifying, you know, against the people that are alleged

9    to have killed your wife wasn't important enough for him to

10   testify at the state trial.

11          Again, if the Court says we can't go there, we won't go

12   there.  But I'm using that as an example that as we get into

13   several other witnesses, it's just going to become more and more

14   clear that there was this prior proceeding that was a state

15   trial.  But I think we've already crossed that.

16          With respect to the jury instruction issue, you can

17   even rule that we can't go there with respect to Darius Spence.

18   And just on the existing record to date, the dual sovereignty

19   instruction is needed.

20          So the Court, that's what we want to focus, that's what

21   I want to focus on right now, to have the Court give the

22   instruction.  If the Court wants to make rulings with respect to

23   limitations on Darius Spence's testimony, that's fine, and we'll

24   obviously abide by the Court's rulings.

25          But I think that under the current state of the record

1    right now, that's all going on.

2            Also, I expect to ask Detective Niedermeier certain

3    questions about what he already testified to on direct and on

4    partial cross with respect to the state, the aborted state

5    prosecution of Mitchell and Martin.  I expect to ask him that

6    Gardner was never arrested or charged with that murder.  That's a

7    legitimate question to ask.  And it sort kind of gets into state

8    proceedings.

9            That's already, that's already based on direct

10   testimony and some of the other cross examination.

11           THE COURT:  I think I would have the same response.

12   Why would it be appropriate to go into a matter such as that?

13           MR. KURLAND:  Gardner has never been arrested for two

14   crimes of which he is now charged in this federal indictment.

15           THE COURT:  I don't see the relevance of that, of any

16   possible answer to that question.

17           MR. KURLAND:  Oh, the fact that the lead investigator

18   never saw fit to charge my client for a murder he's now charged

19   with?

20           THE COURT:  Exactly.

21           MR. KURLAND:  I would, I mean, I think that's, not only

22   is it relevant, I think it's highly probative.  I think the

23   jury's entitled to know that the State never bothered -- the

24   State actually --

25           THE COURT:  But the State's not a party here.

7

1          MR. KURLAND:  I understand that, Your Honor.  But the

2     detective who is testifying and speculating about, I mean, he was

3     permitted to testify about whether or not he believed Martin's

4     alibi.  Well, if he can testify about whether or not he believed

5     Martin's alibi, he certainly should be able to testify that, you

6     know, that you didn't even bother to arrest my, my client's never

7     been arrested for these charges by the lead investigator.

8          THE COURT:  Well, I --

9          MR. KURLAND:  But again --

10          THE COURT:  I am confident that I would have objected

11     under the appropriate, I would have sustained an objection,

12     rather, under the appropriate circumstances to any question to

13     any witness about what the witness believed.  And my

14     recollection, although, you know, the record will speak for

15     itself, my recollection is that I gave perhaps even more than one

16     limiting instruction to the jury about testimony regarding an

17     officer's belief.

18          So obviously, you know as well as all of us know that

19     just because a defense lawyer asks a question in a certain form

20     and elicits a certain answer from a witness in cross examination

21     doesn't open the door now to all kinds of weird questions to all

22     kinds of witnesses regarding all kinds of weird things.

23          MR. KURLAND:  Well, Judge, I'm not, I would, I'm not

24     going to take umbrage.  I wouldn't characterize the potential

25     inquiry as weird.

1          But in any event, Your Honor, even if -- the Court's

2     rulings here apparently are going to cut my cross examination of

3     Detective Niedermeier in half.  That's mine.  We can live with

4     that.  But it still is, even if -- again, that's all ancillary

5     because even under the existing state of the record with respect

6     to the dual sovereignty instruction, we believe that, that the

7     line, that the threshold, you know, has already been crossed and

8     the jury needs to be informed on that.

9          So with respect to these other matters, that kind of

10     got into my fourth point.  The judge, you apparently are going to

11     radically limit my intended cross examination that I worked all

12     week on.  But that's okay.  I mean, I can --

13          THE COURT:  Okay.  Let me just finish on this dual

14     sovereignty point.  As I think I've been clear, I do intend to

15     give an appropriate instruction.  I wanted to give the government

16     and all of counsel an opportunity to reflect on what instruction

17     should be given.

18          I was persuaded when we were last together that the

19     government should have more time to think about it and look at

20     the law.  I don't know that there's any magic about when I give

21     it.  I understand your position is the sooner the better.  But I

22     don't feel any urgency in doing that.  But I will give it during

23     the trial and of course I will give it as a part of the Court's

24     general instructions at the end.

25          MR. KURLAND:  All right.  Thank you, Your Honor.

9

1              THE COURT:  All right.

2              MR. KURLAND:  Can I go to my second point?

3              THE COURT:  Sure.  We have our jurors so I would like

4    to get started as soon as possible.

5              MR. KURLAND:  I'll be quick.  Your Honor, the second

6    point is that, that we filed with respect to our written motion,

7    has to do with eliciting evidence that Mr. Gardner's been

8    incarcerated in state prison and is serving a life without

9    possibility of parole sentence.  And this is separate and apart,

10   Your Honor, from the issue of, you know, the government's

11   position is you're just trying to sneak in through the back door

12   in contravention of the Court's ruling about, about his

13   conviction in the, that he was convicted in the Spence murder.

14              This is separate, Your Honor.  It is our intention, if

15   the Court would so rule, that we be permitted to elicit either

16   from Detective Niedermeier and other witnesses, actually, that

17   Mr. Gardner is incarcerated in state prison and is serving a life

18   without possibility of parole sentence.

19              The law with respect to one's continuation or

20   participation in the conspiracy, again, I cite Messino case on

21   Page 4 of our brief:  Although arrest may constitute withdrawal,

22   whether it does is a fact-dependent question.  While arrest or

23   incarceration may constitute withdrawal from a conspiracy, it

24   does not follow that in every instance it must.  And whether a

25   coconspirator's imprisonment constitutes a withdrawal must be

1    decided by the jury, by the jury, in light of the length and

2    location of the internment, the nature of the conspiracy, and all

3    other available evidence.

4         The fact that the government, and I believe it was the

5    third superseding indictment, it might have been the fourth, they

6    decided to extent the conspiracy period to cover at least two

7    years after Mr. Gardner had been incarcerated and convicted in

8    state court.  It is just basic conspiracy law that we're able,

9    that we're able to put on evidence as to what his physical

10   location is and his connection with and his opportunity to, to

11   communicate with his other alleged coconspirators.

12        The government's free to put on evidence that, well,

13   that during 17 different, you know, intermittent procedures, Mr.

14   Gardner's been brought over and he's not constantly in state

15   custody, but just like the government's summary chart with

16   Detective Niedermeier, when they're able to, as part of their

17   case, pick out the selective piece of evidence that helped them,

18   and then leave it up to the defense to kind of, you know, paint a

19   more complete picture with other evidence, the same thing

20   portends here.

21        Mr. Gardner's motivation to continue in a conspiracy

22   after he's been convicted of a life sentence is going to color

23   all the evidence as to the other pleadings that he's filed and

24   his conduct, and his conduct in court.  And for the government to

25   argue and for the Court to keep all that evidence out really kind

1  of, you know, cuts out a big chunk of our defense with respect to

2  his involvement in the conspiracy after his arrest.  That's a

3  factual issue for the jury.

4          And the government, I'm not going to say the government

5  has kind of brought this upon themselves because I think that

6  would be sort of an exaggeration, but they chose to allege a

7  conspiracy that extended into this period.  They're going to put

8  on evidence.  Apparently, they want to get the court reporter's

9  private property and put on selective, you know, the transcripts

10  aren't good enough, they actually want to put in the video

11  recordings of certain conduct happening in court.

12          We're certainly entitled to present our view of the

13  evidence that Mr. Gardner knows some of them, these are his

14  friends, whatever.  Even though you might think that it's sort of

15  an unusual or, or, you know, or obtuse sort of like legal

16  defense, whatever, but he's not trying to do anything that's

17  going to obstruct justice and, and defeat justice and intimidate

18  people.  Mr. Gardner's not going anywhere.  And that needs to be

19  brought out before this jury.

20          THE COURT:  Well, you haven't persuaded me.  You said

21  video recordings.  There are no videos.

22          MR. KURLAND:  I'm sorry.  Tape recording.

23          THE COURT:  You meant audio.  I'll have to see what the

24  government intends to do and how I'm going to permit the

25  government to proceed on that.  But there's nothing that you've

1  said so far that persuades me to alter my earlier ruling that

2  evidence of Mr. Gardner's prior conviction and the life without

3  parole sentence should be admissible.

4        MR. KURLAND:  All right.  So I cannot get that.  I

5  certainly --

6        THE COURT:  No.  Not on cross examination.

7        MR. KURLAND:  What about that he's incarcerated in

8  state prison?  That the Court said --

9        THE COURT:  Well, I don't know why you need to say

10  state prison.  I see why you would want to say that.  But the

11  fact that he's been incarcerated, indeed, that all four

12  defendants have been incarcerated for four years is already known

13  by the jury pretty clearly, I think.  And to the extent you want

14  to emphasize that or draw that out, you certainly are permitted

15  to do so.

16        I don't know that any witness that has testified so far

17  is a proper witness to establish that Mr. Gardner has been

18  incarcerated separate from the other defendants.

19        Now, if you want to bring in a witness or a document or

20  series of documents to establish that, or get a stipulation from

21  the government, obviously, you can do that.  But Niedermeier's,

22  no detective is in a position to say that the defendants have

23  been incarcerated, you know, in a particular place.

24        MR. KURLAND:  Detective Niedermeier testified on direct

25  with respect to how he got the blood.  He testified because --

13

1    and again, this is something that I would like to bring out.  If

2    the Court says I can't, I obviously won't.  But Detective

3    Niedermeier testified on direct examination that when he got the

4    blood, that he got a court order for Mr. Martin and Mr. Mitchell

5    because they had been arrested in the case, whereas he had to get

6    a seizure warrant, which I've a copy of, to get Mr. Gardner's

7    blood and the seizure warrant was directed to the warden at

8    Jessup state prison.

9              Now, this is, I mean --

10             THE COURT:  Yeah, you can cross examine him on that.

11             MR. KURLAND:  I want to show him that he got the

12   seizure warrant that was directed to the warden at Jessup state

13   prison.

14             THE COURT:  Well, sure.  If you want to do that, I

15   don't see why you can't show the place where he was when the

16   blood was drawn.  Sure, you can do that.  But that's not what

17   you're talking about.  You can do that.

18             MR. KURLAND:  Okay.  And then we'll leave it with

19   respect to other witnesses, even part of our defense case.  Oh,

20   the one other thing is I would like to ask the witness, earlier,

21   and this goes to the letter that Mr. Coburn and I filed, the

22   Court had earlier ruled that we couldn't elicit as a government

23   admission that the government had referred to the alleged RICO

24   organization as the Mitchell organization in prior, in prior

25   superseding indictments.

1           THE COURT:  Right.

2           MR. KURLAND:  But the Court did say, I tried to find

3    the specific language in the transcripts, I wasn't able to do it,

4    but I recall the Court ruling, though, that we could elicit from

5    investigators and law enforcement witnesses, you know, whether or

6    not the organization had been referred to as other names earlier

7    on in the proceedings.

8           I intend to ask Detective Niedermeier questions about

9    reference to the Mitchell organization, the Randallstown Park

10   organization.  I just wanted to -- no problem?

11          The other matter that I was going to bring up, Mr.

12   Hanlon and I have, we've agreed to with respect to some of the

13   things with respect to the photographs.  So I'm done.

14          THE COURT:  All right.  Thank you.

15          MR. KURLAND:  Thank you very much.

16          MR. LAWLOR:  Judge, sorry.

17          THE COURT:  Mr. Lawlor, good morning.

18          MR. LAWLOR:  We would object to any reference that this

19   was previously called the Mitchell organization.

20          THE COURT:  All right.

21          MR. LAWLOR:  Kind of an irrelevance.

22          THE COURT:  I'll rule on your objection when it's made.

23          MR. LAWLOR:  All right.

24          MR. KURLAND:  Well, okay.

25          MR. HARDING:  Could I just very briefly, Your Honor?

1          THE COURT:  Certainly.

2          MR. HARDING:  I handed out to defense counsel this

3    morning a little packet that contained the letter that I sent to

4    Your Honor last night, and which I have an original for you this

5    morning.  The stipulation that I sent last night.  A transcript

6    of the Magginson voice mail that was in existence back in 2004 at

7    the time of the grand jury, but which it is my understanding

8    Detective Niedermeier did not prepare.  And so the government

9    will oppose any attempt to try to get it into evidence through

10   Detective Niedermeier.  I simply provided it to let defense

11   counsel know what was, what was in the transcript.

12         THE COURT:  Right.

13         MR. HARDING:  And I have also provided the CV of a

14   witness by the name of Roy Jones who will testify later this

15   week, and which I believe I submitted earlier, but I am providing

16   it again in case somebody didn't get it.  And also some

17   Department of Labor records that we intend to introduce next

18   week.

19         The government also has submitted this motion that Mr.

20   Kurland referred to about getting audio tapes.  I don't know when

21   the Court wants to consider argument on that or discuss it.  But

22   we would presumably seek to introduce that kind of evidence next

23   week.  So some kind of ruling this week might be appropriate.

24         THE COURT:  All right.  Perhaps we'll have some time on

25   Wednesday.

1    MR. HARDING:  Okay.  Thank you, Your Honor.

2    THE COURT:  Mr. Harding, can you tell me what we're

3    doing today and tomorrow?

4    MR. HARDING:  Yes.  Actually, why don't I let Mr.

5    Hanlon do that because he's in charge of most of the witnesses

6    today.

7    THE COURT:  Okay, good.  Good morning, Mr. Hanlon.

8    MR. HANLON:  Good morning, Your Honor.  Obviously,

9    today, Your Honor, we're going to begin with completing Detective

10   Niedermeier.

11   THE COURT:  Okay.  Just so that I'm clear.  We're going

12   to go to Mr. Lawlor first and then Mr. Kurland.

13   MR. LAWLOR:  I believe so, yes.

14   THE COURT:  On cross.  And then there will be

15   additional government redirect.

16   MR. HANLON:  I would think so, Your Honor.

17   THE COURT:  And then any additional recross.

18   MR. HANLON:  I would think.

19   THE COURT:  Okay.  Excellent.

20   MR. HANLON:  We'll then move into a number of witnesses

21   dealing with the Tonya Jones Spence homicide again.  We will have

22   Officer Keith Ketterman and Officer Michael Toni who were

23   involved in the initial stop of Mr. Gardner and Mr. Holly.  We'll

24   have Officer Douglas Jess, who saw a yellow walkie-talkie in a

25   storm drain that day.

17

1              We will have Officer Eric Saladino, who overheard Mr.

2       Gardner make a comment to Mr. Holly to the effect of, don't say

3       anything.  This is while they're detained.

4              We will have two detectives, Brian Edwards and Phillip

5       Marll.  The order of these witnesses, Your Honor, could be an

6       issue because Detective Edwards, I understand, is involved in

7       another case just this morning.  But I think we'll get to both of

8       them today.

9              Assuming Detective Edwards goes first, he collected

10      some clothing and items from the defendants and from a locker.

11             Then Detective Marll was the lead investigator.  He's

12      going to go through all of the little woods searches.  He either

13      seized items or was present for their seizure.  So we're going to

14      use him as sort after of a generalized kind of witness.  We'll

15      get some non-controversial forensics through him.

16             I then have a number of shorter witnesses.  In fact,

17      Your Honor, I may have misspoken.  There are a number of shorter

18      witnesses, crime scene, recovery type people who might be before

19      the detectives.  Technician Bialek, Carrie Bialek will testify

20      about photographs at Shock Trauma and the recovery of a bullet or

21      a bullet fragment.

22             And then we will have -- actually, I think that might

23      conclude today, Your Honor.

24             THE COURT:  Okay.

25             MR. HANLON:  Then tomorrow we're looking at Darius

1    Spence, the husband of the victim.  We're looking at possibly

2    Maureen Bottrell, who was the soil analyst, who did the soil

3    comparison from the woods.

4            We will have, I believe, Damita Green tomorrow.  And we

5    will have Deandre Wesley, who is the son of Kelly David, who is

6    another witness to the actual shooting of Ms. Spence.  And that's

7    what we're looking at for tomorrow.

8            THE COURT:  Thank you, Mr. Hanlon.

9            MR. COBURN:  Your Honor, could I have two seconds?

10           MR. HANLON:  And also, Your Honor, I'm sorry.  Officers

11   Rutherford tomorrow and Erin Wisniewski.  She is a resident in

12   the Greens neighborhood, whose house was approached by Mr.

13   Gardner and Mr. Holly.

14           THE COURT:  All right.  Mr. Coburn, good morning.

15           MR. COBURN:  Thank you so much, Your Honor.  Just two

16   seconds.  With respect to Officer Saladino, Mr. Hanlon was just

17   noting that they're going to, it's their plan to elicit testimony

18   to the effect that right after arrest, Mr. Gardner told his

19   codefendant to essentially shut up, don't say anything.

20           I just wanted to note an objection to that because I

21   think it's a Fifth Amendment issue in terms of, you know, a

22   defendant having a right not to say anything, and one defendant

23   telling another that they could exercise that right.  I would

24   suggest to Your Honor it's not appropriate to elicit testimony as

25   if it's inculpatory.  One defendant to another saying that.

```
1              THE COURT:  You don't contend there was interrogation?
2              MR. COBURN:  I'm not actually, exactly sure how that's
3    going to come out.  I think that is definitely one important
4    factor for Your Honor to consider.  But even if there's no
5    interrogation, my understanding of the Fifth Amendment is that it
6    encompasses a defendant's right simply to remain silent.
7              THE COURT:  Well, sure, in the face of state action.
8    But there's no, if there's no interrogation, I mean, if you're
9    making a voluntariness argument just on the basis of the proffer,
10   the Court has no hesitation in concluding that Mr. Gardner's
11   decision to advise Mr. Holly to remain silent is not the product
12   of state action or coercion of any sort.
13             MR. COBURN:  I'm he not suggesting the statement is
14   coerced or that it's involuntary or that it's sort of a function
15   of, you know, any sort of a formal question and answer.  And I
16   recognize that Miranda is contingent on that.  But I think the
17   Fifth Amendment itself with respect to just remaining silent is
18   broader.  That's what my objection's based on.
19             THE COURT:  Okay.  The objection's overruled.
20             All right.  We'll have the jury.  And can we get
21   Detective Niedermeier in?
22             (Witness enters the courtroom.)
23             THE COURT:  Good morning, Detective.
24             (Jury enters the courtroom at 10 a.m.)
25             THE COURT:  Ladies and gentlemen of the jury, good
```

1    morning.  We trust that you've had a pleasant break from the

2    trial and that all is well with you and your family.  We're ready

3    to resume.

4              You will recall when we broke that Detective

5    Niedermeier, whose testimony had been interrupted, had resumed

6    the stand and he'd been questioned by Mr. Harding on direct

7    examination, and then Mr. Martin and Mr. Crowe respectively

8    conducted their cross examinations of Detective Niedermeier.  And

9    then Mr. Harding conducted a redirect examination of Detective

10   Niedermeier on the basis of the cross examination conducted by

11   Mr. Martin and Mr. Crowe.

12             So we're now ready to conclude Detective Niedermeier's

13   testimony.

14             We'll start with Mr. Lawlor's cross examination and

15   then Mr. Kurland's cross examination and then any redirect or

16   further recross examination by any of the other counsel.

17             Welcome back, Detective Niedermeier.  Please make

18   yourself comfortable.  You remain under oath for purposes of this

19   trial.  Whenever you're ready, Mr. Lawlor.

20             CROSS EXAMINATION

21   BY MR. LAWLOR:

22   Q    Thank you, Your Honor.  Good morning, Detective.

23   A    Good morning, sir.

24   Q    How are you?

25   A    Good, sir.

1   Q    Probably feels you're never going to get out of here, huh?

2   A    Been a long time, sir.

3   Q    We'll try to get you out of here, then.  And I hope I won't

4   keep you that long.

5           On the day that you were first called in to visit the

6   crime scene where the Wyche brothers had been killed, you

7   searched the vehicle, the vehicle was searched by law enforcement

8   that day?

9   A    Not at the scene.

10  Q    Not at the scene, but was towed and then searched at some

11  police facility?

12  A    Correct.

13  Q    Okay.  And in the car, you uncovered in the trunk of the car

14  a fairly large quantity of drugs?

15  A    Yes.

16  Q    Do you recall what and how much was recovered there?

17  A    It was approximately 600 grams of cocaine and I believe

18  approximately 27 grams of heroin.

19  Q    And this was just in the wheel well, essentially?

20  A    Yeah.  Basically, it was located under the cover but on top

21  of the spare tire, in a station wagon.

22  Q    Okay.  So not -- hidden but not well hidden, is that fair?

23  A    Yes.

24  Q    Okay.  And then in the center console, you recovered a

25  fairly large quantity of cash, right?

1    A    Yes.

2    Q    And that was, I don't have the number right, but

3    approximately $5500?

4    A    I believe it was 5770.  5,770.

5    Q    All right.  And then shortly thereafter that, you were

6    alerted to the fact that you should go to the home of Ms.

7    Magginson or Magginson, if I'm pronouncing it correctly?

8    A    Ms. Magginson.  No, actually, the vehicle wasn't searched

9    until after we had gone to the Magginson residence.

10   Q    Okay.  But shortly after attending the crime scene, that

11   same morning you went to Ms. Magginson's home?

12   A    Yes.

13   Q    Okay.  And there were, did you say, a large number of people

14   there?

15   A    Yes.  That I recall, yes.

16   Q    And do you recall how many?

17   A    Approximately ten, maybe.

18   Q    Ten?  Were people coming and going?

19   A    I don't recall specifically if people were coming and going.

20   There was a point when I spoke to Ms. Magginson and Natasha Wyche

21   kind of off to the side.  My attention was drawn to them.

22   Q    Okay.  Ms. Wyche was there?  Natasha Wyche was present?

23   A    Yes.

24   Q    People were listening to the tape?

25   A    Not, not when we were there, no.

1    Q    Okay.  You were aware of the fact, they had told you,

2    though, that they had listened to the tape, right?

3    A    Yes.

4    Q    People?  And I assume that emotions were running very high

5    there?

6    A    Yes.

7    Q    Okay.  Now, the tape itself, you played here, Mr. Harding

8    played for you that tape, is that right?

9    A    Correct.

10    Q    The tape that you copied off of Ms. Magginson's voice mail?

11    A    Correct.

12    Q    All right.  And you sent that, did you not, to the FBI?

13    A    I sent them the information.  They were, the information's

14    not stored on the phone itself.  The information's like in

15    cyberspace in a computer some place.  I sent them the

16    information.  They were able to go directly to that and get the

17    best copy possible.

18    Q    So the FBI eventually had their own recording of that voice

19    mail message?

20    A    Yes.

21    Q    And what we heard here in court is the version that they

22    enhanced, is that right?

23    A    I'm not sure if that was the enhanced version or the

24    original.  They sent me both.

25    Q    Okay.  You did ultimately receive an enhanced version?

1    A    Yes.

2    Q    Which is still of imperfect quality?

3    A    Yes.

4    Q    All right.  And did you ask the FBI to do anything else with

5    the tape other than enhance it?

6    A    I asked for a copy and any enhancement that they could do.

7    That was it.

8    Q    Did you ask him to do any voice comparison analysis?

9    A    Yes.  I did ask them that.

10    Q    Okay.  And then you played the tape and while the tape was

11    played the jury followed along with a transcript, is that right?

12    A    Correct.

13    Q    And who prepared that transcript?

14    A    Detective Benson and myself.

15    Q    Okay.  Now, you are aware that other transcripts have been

16    made, correct?

17    A    Yes.  I believe so, yes.

18    Q    Okay.  And do you know who made those other transcripts?

19    A    I believe the State's Attorney's Office evidently made one

20    that I hadn't seen before, that I was shown in court the other

21    day.

22    Q    All right.  You had never seen that?

23    A    No.

24    Q    The one that was made by the State's Attorney's Office?

25    A    No.

1    Q    All right.  And when you testified -- you did testify in the

2    grand jury in this case, right?

3    A    Correct.

4    Q    And you were shown a transcript at that time, correct?

5    A    I believe we provided, yeah, a transcript at that point when

6    we played that in the grand jury.

7    Q    All right.  And who prepared that transcript?

8    A    I don't recall who prepared that transcript.

9    Q    Okay.  Have you had an opportunity to look at and compare --

10   well, let me stop.  Let me ask another question.  We've just

11   identified at least three different transcripts of this voice

12   mail recording.  Is that fair?

13   A    Yes.

14   Q    Okay.  Are there any others that I haven't referenced that

15   you're aware of?

16   A    Not that I'm aware of, no.

17   Q    Have you had an opportunity to review and compare these

18   three different transcripts?

19   A    No.

20   Q    You've never sat down side by side and compared whether they

21   marry up?

22   A    No.

23   Q    Not even the one that you provided the jury and the one that

24   you provided to the grand jury?

25   A    No.  I never looked at them both together.

1    Q    Never did?  Okay.  I'm just going to skip around.  I'm not

2    trying to confuse you.  Let me just hit on some other discrete

3    areas, if I could.  You met with an individual by the name of

4    William Montgomery, is that right?

5    A    Yes.  I was present.

6    Q    Okay.  And you showed him some photo spreads with pictures

7    of some of these gentlemen here in court today, is that right?

8    A    Yes, I believe arrays were shown.

9    Q    Okay.  Now let me show you two of these arrays that have

10   been entered into evidence.  Let me see if you recognize these.

11   Is that your signature on there?  It's the array shown to Mr.

12   Montgomery 12/17/2003 at 12:30 p.m.  Do you recognize that?

13   A    Yes.

14   Q    Okay.  And is that your signature on there?  Looks like

15   there are three signatures and yours might be in the middle?

16   A    Yes.

17   Q    Okay.  And you asked him -- when you showed him this photo

18   spread, did you say, Tell us if Bo was in here, or what did you

19   tell them?

20   A    I believe Detective Giganti showed him that photo array.

21   Q    And what -- you're a trained detective, right?

22   A    Correct.

23   Q    And part of your training involves the, the preparation and

24   demonstration of photo spreads to witnesses?

25   A    Yes.

1    Q    Okay.  And the goal is to not contaminate a witness by

2    suggesting who they might see in there or whether they might

3    recognize anyone in there, right?

4    A    Yes.

5    Q    Okay.  And that's important so as to make sure that the

6    witness isn't sort of parroting what you're telling them, right?

7    A    It's important so that they make the identification.

8    Q    Without suggestion by police?

9    A    Yes.

10   Q    Okay.  So my question is, when you showed this spread to Mr.

11   Montgomery, did you, what did you tell him or what did Detective

12   Giganti tell him before he looked at the photo spread?

13   A    I don't recall specifically.  He would have read the

14   paragraph.  I believe on this type of array it would have been on

15   the other side.

16   Q    Okay.  He wouldn't have said, or you don't recall him

17   saying, Tell us if Bo is in there, right?

18   A    No, I don't recall that.

19   Q    Or he wouldn't have said, Here's six photos; do you

20   recognize the guy in slot number three, right?

21   A    No.

22   Q    Okay.  Now, here's the picture that Mr. Montgomery signed.

23   Well, first of all, he said, right, I think it is Bo, when he

24   looked at the photo spread, right?

25   A    That's what he wrote, yes.

1    Q    And then the photo spread there, Mr. Mitchell's picture is

2    not in this photo spread, is it?

3    A    No, I don't see his picture.

4    Q    Okay.  But one, two, three, see that person right there I

5    just pointed to?  Who's that?

6         THE COURT:  It's really dark on the screen, Mr. Lawlor.

7    Q    Would it be better if I just brought it up for you?

8    A    Please.

9    Q    Thank you, Your Honor.

10   A    That's Shelton Harris.

11   Q    Okay.  And then you showed him another photo spread a few

12   minutes later?

13   A    Yes.

14   Q    And the highlighted portion shows -- forgive me.  That's the

15   wrong one.  Showed him another one a few minutes later.  The date

16   there 12/17/2003, 12:34.  So just four minutes later?

17   A    Correct.

18   Q    And then he says that this looks like Bo?

19   A    Correct.

20   Q    And then he signed.  And that's a picture of Mr. Mitchell,

21   one, two, three, four, correct?  Lower left?

22   A    Yes.

23   Q    Okay.  So did he indicate that he even knew Shelton Harris?

24   A    I don't recall.

25   Q    Now, you interviewed both Mr. Mitchell and Mr. Martin,

1  right?

2  A    Correct.

3  Q    Okay.  Do you recall what time it was that you first sat

4  down with Mr. Mitchell on, was it March 17th, 2002?

5  A    April 17th.

6  Q    April 17th, 2002?

7  A    I believe he was transported to our office approximately at

8  10:00 in the morning.

9  Q    Ten a.m.?  Did you talk to him from 10:00 on for a little

10 while?

11 A    Yes, various times.

12 Q    Okay.  And then you did what's called a pre-interview?

13 A    Yes.

14 Q    Which is basically an interview that's not recorded?

15 A    Yes.

16 Q    Okay.  Because you then recorded an interview with Mr.

17 Mitchell, which I assume largely mimics what he told you in the

18 pre-interview?

19 A    Yes.

20 Q    Okay.  Now, you met with him from 10 to 11.  And then are

21 these your notes of the pre-interview?

22 A    These are notes of both the pre-interview and the taped

23 interview.

24 Q    Okay.  So that started 11, the pre-interview?

25 A    Yes.  Approximately, yes.

1    Q    All right.  And you didn't take too many notes, is that fair

2    to say?

3    A    Yes.

4    Q    All right.  And then the taped interview doesn't begin until

5    12:40, is that right?  You see there at the top?

6    A    Yes.

7    Q    All right.  So you chatted with him, he got there at ten.

8    You spent a good two and a half hours with him before you turned

9    the tape recorder on, right?

10   A    No.  Portions of that we spent with him we were also doing

11   other things.

12   Q    Okay.  Now, these notes, I don't want to mischaracterize

13   this.  But you were shown them by Mr. Harding and he walked you

14   through them.  You don't recall really what you were scribbling

15   down at the time, whether they were 100% accurate or not, is that

16   right?  I mean, you were relying for accuracy on the tape

17   recording, is that fair?

18   A    No.  If they were written down, that's what was said at that

19   point.

20   Q    All right.  Well, that top line says, heard I did something,

21   killed my man.  The first question I have is, that's a

22   paraphrasing, right?  I mean, I realize --

23   A    No.  There's quotations.

24   Q    All right.  So you're saying that's exactly what he said

25   word for word?

1    A    Yeah.  That's why the quotations are there.

2    Q    But you're not trying to suggest that he actually killed

3    something.  It says "heard", were you writing down that he heard

4    something to that effect?

5    A    That's --

6    Q    He didn't confess to a homicide to you, right?

7    A    No.  That's what he was saying, that he heard.

8    Q    He heard it.  Okay.  And then at the bottom it says

9    something about Rick Foxx?

10   A    Yes.

11   Q    And I think Mr. Harding asked you about that, did he not?  I

12   realize it's been a couple days.  Did he ask you about that?

13   A    Yes, I believe so.

14   Q    And the time of night we were dealing with was about

15   midnight, right?

16   A    Yes.

17   Q    All right.  And Rick Foxx, aside from whether he had a TV

18   show, played for the Lakers at the time, right?  Do you recall

19   that?  Los Angeles Lakers NBA basketball?

20   A    I don't recall if he was playing at that point or not.  I

21   believe he probably was.

22   Q    All right.  And the Lakers are on the West Coast, right?

23   A    Correct.

24   Q    So if their game started at 7 p.m. on the West Coast, that

25   would start at 10 p.m. on the East Coast.  Does that sound about

1    right?

2    A    Yeah.  That would be correct.

3    Q    Okay.  And then he referenced an individual by the name of

4    L, right?  Mr. Mitchell did?

5    A    Yes.

6    Q    And you tried to find out information about individuals with

7    a nickname or moniker of L, right?

8    A    Yes.

9    Q    And you went, there's a certain database that you're able to

10   utilize to find out people with that nickname?

11   A    Yes.

12   Q    And what is that database?

13   A    Well, there's different databases in the police department.

14   There's arrest database, field interviews.  Any time anybody's

15   interviewed, mentioned as a witness, a victim, a suspect or

16   anything like that.  Officers are supposed to gather as much

17   information as they can from them -- nicknames, addresses,

18   anything like that.  And they're entered into various databases.

19   Q    Okay.  But so the nickname L, you're only going to be aware

20   of that in this database if it had some contact with law

21   enforcement?

22   A    Yeah.  Doing that search, yes.

23   Q    Okay.  And you did do a search like that to try to see if

24   you could find out people with the moniker and nickname L, right?

25   A    Yes.

Case 1:04-cr-00029-RDB   Document 686   Filed 06/12/09   Page 33 of 239

1   Q    And you were able to identify ten different people who, just

2   in your database, had that nickname?

3   A    Yes.

4   Q    Okay.  Now, you also interviewed Mr. Martin, right?

5   A    Yes.

6   Q    And he indicated to you, like Mr. Mitchell did, that there

7   were rumors flying on the street about their involvement in the

8   Wyche brothers killing, right?

9   A    Yes.  They both stated that.

10  Q    Okay.  Now, you mentioned that you interviewed a person by

11  the name of Andre Noel?

12  A    Yes.

13  Q    Why did you do that?

14  A    A few months after the arrest of Mr. Martin and Mr.

15  Mitchell, a call was placed at the Southwest District.  I

16  received information, a very generic call that a guy named Andre

17  Noel killed two people in a car.  That information was passed to

18  me so I investigated it.

19  Q    All right.  Court's indulgence, please.

20         (Pause in proceedings.)

21  Q    Let me ask you just one more thing about L.  Have you heard,

22  there are various names, Muslim, Muslim names that are

23  hyphenated, like John Smith-Bey or John Smith-El.  Have you heard

24  that before?

25  A    Yes, I have at this point.

1    Q    And there, so that's not an uncommon, an uncommon thing for

2    someone's name in the Muslim community to be hyphenated Smith-Bey

3    or Smith-El, right?

4    A    I think its more common now, yes.

5    Q    Okay.  That's all I have.  Thank you.  Thank you, Detective.

6            THE WITNESS:  Thank you, sir.

7            THE COURT:  Would you like water, Detective?

8            THE WITNESS:  Please.

9            CROSS EXAMINATION

10   BY MR. KURLAND:

11   Q    Take your time.

12   A    Good morning, sir.

13   Q    Sometimes I need the water, too.  Good morning.  Detective

14   Niedermeier, I just have a couple of questions and some of this

15   is obviously going to refer back to some of the questions that

16   were asked more than a week ago.  So I think we'll both have to

17   bear with us.

18            You earlier testified, I believe on direct examination,

19   about getting blood samples from some of the defendants that you

20   were trying to match up with some blood that was found, I guess,

21   outside the car at the crime scene?

22   A    Yes.

23   Q    Okay.  And you indicated the procedures that you had to go

24   through to get the blood samples?

25   A    Yes.

1    Q    And for Mr. Mitchell and for Mr. Martin, you got a court

2    order?

3    A    I believe the State's Attorney's Office got court orders for

4    those samples.

5    Q    Okay.  All right.  Just answer the question yes or no.  With

6    respect to Mr. Gardner, it was a different procedure.  I believe

7    you testified you had to get a seizure warrant?

8    A    Yes.

9    Q    Okay.  And the seizure warrant, he was incarcerated on

10   another charge at that time, is that correct?

11   A    Yes, I believe so.  Yes.

12   Q    And the seizure warrant had to be directed to, to the warden

13   at a particular other place, isn't that correct?

14   A    No.

15   Q    Well --

16   A    The seizure warrant wasn't -- no.

17   Q    Well, can I, can I approach the witness, Your Honor?

18              THE COURT:  Yes, you may.

19   Q    Okay.  To get Mr. Gardner's blood sample, do you recall the

20   procedures you had to go through to actually get him, for his

21   blood sample to be given?

22   A    Yes.

23   Q    And just briefly, what were those, where, where did you have

24   to go to direct, to be able to get Mr. Gardner for him to, I

25   guess, get transferred to the hospital to give a blood sample?

1    A    I'm sorry.  That's the one thing I didn't look at.  I

2    believe it may have been BCDC where I picked him up from.

3    Q    All right.  Let me approach again, Your Honor?

4         THE COURT:  Yes.

5    A    I'm sorry.  It was Jessup.  MCIJ.

6    Q    And that is, what is Jessup?

7    A    Maryland Correctional Institute at Jessup.  It's a prison.

8    Q    State facility?

9    A    State facility, yes.

10   Q    All right.  And again, just to refresh the jury.  With

11   respect to the blood sample of Mr. Gardner, that did not match

12   any of the blood found at the scene?

13   A    No, it did not.

14   Q    And just to complete the record with respect to the blood

15   samples taken of the other two defendants, that didn't match

16   anything at the scene, either?

17   A    No.

18   Q    When you say no, that's a correct statement, there was no

19   match?

20   A    There was no match.  It matched the victim.

21   Q    Just a few other questions on some other matters.  Okay.  I

22   want to ask you a few questions concerning the summary chart that

23   you testified on direct examination about.  Is that

24   government's -- let me just check with Mr. Harding.  The number?

25   I just want to make an accurate representation.  Court's

1    indulgence.  I just want to make sure the report reflects

2    accurately the exhibit number.  Your Honor, could I approach?

3           MR. HARDING:  It's W-66.

4    Q    Your Honor, I've been told it's Government's 66 so I will

5    refer to it as that.

6           THE COURT:  All right.

7    Q    W-66.  Detective Niedermeier, do you have a copy of it in

8    front of you?

9    A    I do.

10   Q    And that's government's W-66.  I just want to ask you a few

11   questions concerning this compilation of cell phone

12   communications between, between phones that are associated with

13   these individuals to calls.  And again, we use that term because

14   we don't know, we can't tell for sure or you can't tell for sure

15   who actually was making the call.  But we do know that that cell

16   phone was used.  And you've gone through the records to indicate

17   a particular cell phone that's associated with a particular

18   person.

19   A    Yes.

20   Q    Okay.  And this chart focuses on a variety of cell phones

21   from the date of 3/24/2002 to the early morning hours of

22   3/25/2002?

23   A    Correct.

24   Q    Now, again, just with respect to the cell phone records that

25   you reviewed to compile the charts.  You didn't just have cell

1    phone records for those one or two days?

2    A    No.

3    Q    For those phones?  You had them for, for, in some cases a

4    month, in some cases several months, depending on the phone, is

5    that not correct?

6    A    Various time periods, yes.

7    Q    But certainly was more than one or two days?

8    A    Yes.

9    Q    And I take it with respect to the phone calls that show up

10   on this chart between a phone associated with Mr. Gardner and a

11   phone call, and phone calls associated with Mr. Martin, I take it

12   you looked at the phone records with respect to those phone calls

13   between those parties on more than just this one or two days?

14   A    I don't believe I ever looked at Mr. Gardner's phone

15   records.

16   Q    All right.  But with respect to Mr. Martin, you didn't just

17   look at Mr. Martin's phone records for the 24th and 25th.  I'm

18   sure you looked at --

19   A    Yes.

20   Q    -- that entire month.  And would it be fair to say Mr.

21   Gardner and Mr. Martin are friends, correct?

22   A    Yes, I guess that would be fair to say.

23   Q    Well, you, from, you indicated that during a, I believe a

24   search of Mr. Martin's residence, you came up with a couple of

25   photographs?

1    A    Yes.

2    Q    Of Mr. Martin and Mr. Gardner?

3    A    Yes.

4    Q    And they appeared to be, you know, friendly, in photographs

5    that one would take of friends?

6    A    Yes.

7    Q    All right.  And is it fair to say that with respect to the

8    phone records of Mr. Martin, Mr. Martin and, or the phone

9    associated with Mr. Martin and the phone associated with Mr.

10   Gardner, on many days those phones, the phone records indicated

11   that the phone associated with Mr. Martin called the phone

12   associated with Mr. Gardner?

13   A    Up till the day following the murder of the Wyche brothers,

14   yes, on that phone.

15   Q    All right.  But for, for that month, say, before, there were

16   a lot of different phone calls between Mr. Martin and Mr. Gardner

17   as reflected in the records?

18   A    I believe so.

19   Q    So the phone, the phone communications on the particular day

20   reflected here, at least in terms of volume, is not anything out

21   of the ordinary?

22   A    I don't recall a number.

23   Q    Well, I mean, would you, if I showed you, do you accept that

24   representation or do you want to go through 700 pages of records?

25   A    I would accept it.

1   Q    Also, I believe you testified either on direct examination

2   or it might have been on cross examination sometime a week ago

3   that you did not get the cell tower records from these phone

4   calls?

5   A    That's correct.

6   Q    Okay.  And you then subsequently learned that some of the

7   other homicide detectives working on other homicides were able to

8   get some cell tower records?

9   A    Yes.

10  Q    And with respect to a cell phone call, we know the phone

11  number of the phone that was used, but that doesn't give us any

12  idea as to where physically that call was made from?

13  A    That's correct.

14  Q    And that's what we need the cell tower records from?

15  A    Correct.

16  Q    So the calls associated with Mr. Gardner's phone could have

17  been made from Kansas City, Missouri?

18  A    Yes, I believe so.

19  Q    Could have been made from Pittsburgh?

20  A    I guess so.

21  Q    All right.  But again, because the records that we have

22  doesn't indicate any limitation in cell --

23  A    Right.

24  Q    With respect to the, I think there was some testimony

25  earlier about the, the Owings Mill theater where the Blade Runner

1    II movie played?

2    A    Correct.

3    Q    And that's a theater complex?

4    A    Yes.

5    Q    Is that part of a mall?

6    A    No.  I believe it's separate.  I believe there's a mall

7    close by but I don't believe it's attached.

8    Q    But there was no, and again, just to get it clear for the

9    jury, to refresh their memory, you testified that there was no

10   effort made to get any, to see if there were any surveillance

11   tapes?

12   A    No.

13   Q    Detective Niedermeier, just a few other questions on one

14   other matter.  You are, or you were at the time, you still are a

15   homicide investigator?

16   A    Yes.

17   Q    For the City of Baltimore?

18   A    Yes.

19   Q    And I take it that it is not uncommon for homicides in

20   Baltimore to, in some manner or another, be related to drugs?

21   A    No.

22   Q    That's a fairly --

23   A    Yes.

24   Q    -- unfortunately relatively common occurrence?

25   A    Yes.

1    Q    Going back to the time period 2002, when this homicide took

2    place, you had earlier testified, I think both with respect to

3    the interviews of Mr. Mitchell and Mr. Martin that there was

4    reference to rumors and what not as to stuff that was being heard

5    on the street?

6    A    Yes.

7    Q    And that's common with respect to homicide investigations;

8    that as part of your investigation, you'll be gathering

9    information and there's a lot of just kind of rumor and people

10   repeating stuff that become leads that you follow up and

11   sometimes they lead somewhere, sometimes they don't?

12   A    Correct.

13   Q    With respect to the time period 2002, could you name one or

14   two of the other -- strike that.  In the period, time period

15   2002, could you name one or two existing drug gangs in West

16   Baltimore that you had heard about, you know, through, whether

17   it's confidential informants or just kind of, just word on the

18   street?

19   A    In 2002?

20   Q    Yeah.

21   A    No.

22   Q    There were none others or you just can't name one right now?

23   A    I don't particularly remember any drug gang.

24   Q    How about if I extent the time period, say, between 2000 and

25   2004?  Anything stick out in your mind of a drug gang in

1    Baltimore?

2    A    No.

3    Q    None of your --

4    A    I mean, there's organizations.  The gangs, Bloods and Crips,

5    things like that, probably within the last, I would say, three

6    years, have really creeped up in Baltimore.  Back around the time

7    of 2002 --

8    Q    How about -- okay.  I appreciate that.  How about just a

9    name of a drug organization as it was known on the street in West

10   Baltimore in the period 2000 to, say, 2003?

11   A    Gilmore Homes.

12   Q    I'm sorry?

13   A    Gilmore Homes.

14   Q    Gilmore Homes?  And that was their name as they were known

15   on the street?

16   A    No.  That's a name that, probably given to us by the police

17   department because their location, where they, the geographic,

18   where they frequented, where they sold their drugs.

19   Q    Okay.  Did that have a designated leader, however?

20   A    It probably did.  I don't know who it would have been then.

21   Q    Okay.  Court's indulgence for just one minute.

22             (Pause in proceedings.)

23   Q    Detective Niedermeier, just one other question.  Do you have

24   any, any idea how long cell phone tower records are maintained?

25   A    Not very long, because we did attempt to get these a short

1    time later.  I believe it's, the information is only captured and

2    I believe it's about three months.

3    Q    No further questions, Your Honor.

4            THE COURT:  All right.

5    Q    Thank you, Detective Niedermeier.

6            THE WITNESS:  Yes, sir.

7            THE COURT:  Mr. Harding.

8            REDIRECT EXAMINATION

9    BY MR. HARDING:

10   Q    Good morning, Detective Niedermeier.

11   A    Good morning, Mr. Harding.

12   Q    Could I ask Ms. Arrington -- Mr. Lawlor just went over with

13   you the arrays that were shown to Will Montgomery when you first

14   interviewed him.  And I just want to clarify what happened and

15   also identify what exhibit numbers we're talking about.

16           I went over these with you on direct, Detective.  But

17   just to recapitulate.  S-62 is the array, is it not, Detective,

18   where Will Montgomery picked out the photograph of Wayne, that is

19   Mr. Martin, is that correct?

20   A    Yes.  Yes.

21   Q    And then S-63 is the one where on December 4th or December

22   17th of 2003, is that the right date, December 17th, 2003, he

23   picked out Goo, is that correct?

24   A    That's correct.

25   Q    And then you showed an array, S-64, in which Mr. Montgomery

1    didn't pick out anybody, is that correct?

2    A    Yes.

3    Q    And in fact, there are no pictures of any defendants in this

4    case in this array, is there?

5    A    No.

6    Q    And Mr. Montgomery indicated that he didn't recognize

7    anybody, is that correct?

8    A    Correct.

9    Q    Do you sometimes, why would you show a potential witness an

10   array that didn't have pictures of anybody associated with the

11   investigation, or did you?  Is there somebody in here that you

12   can identify?

13   A    No, I don't recognize anybody in this array.

14   Q    Okay.  And then you showed S-65, and Mr. Montgomery said he

15   thought it was Bo.  And then you showed S-66 and he said that it

16   looked like Bo to him --

17   A    Yes.

18   Q    -- there, too, is that correct?

19   A    Correct.

20   Q    And actually, this is a considerably better photograph in

21   S-66.

22           MS. RHODES:  Objection.

23   Q    Do you think that --

24           THE COURT:  Overruled.

25   Q    Which one's a better photograph?  The one in S-66 or the one

1    in S-65?

2    A    66 is definitely better picture of Mr. Mitchell.

3    Q    Mr. Lawlor questioned you about Mr. Mitchell's statement and

4    specifically about what he was saying about watching Rick Foxx on

5    television.  Do you recall that?

6    A    Yes.  I recall the question.

7    Q    And do you recall that in the question he asked you about

8    whether basketball games on the West Coast were played earlier

9    than basketball games on the East Coast or, that there's a time

10   difference, a three hour time difference between the West Coast

11   and East Coast.  Do you recall that?

12   A    Yes, I remember the question.

13   Q    But actually, what Mr. Mitchell told you was specifically

14   that he was watching a Rick Foxx movie, isn't that correct?

15   A    Yes.

16   Q    That's what you wrote in your W-42 notes.  And that's also

17   what we heard on the tape, is that not correct?  I'm calling your

18   attention now to the transcript at Tab Two.  What Mr. Mitchell

19   said, was it not, was that:  No, I wasn't really, I just, I just

20   knew the time went by cause, um, matter of fact, it was a movie

21   on but, um, the basketball playing, Rick Foxx on, um, one of them

22   channels, so I'm not really, you know, sure?

23   A    Correct.

24   Q    Mr. Lawlor also asked you about a guy named Andre Noel.  And

25   you said that somebody had called in to the Southwest District

1    and reported a double murder, is that correct, and that it was

2    committed by Andre Noel?

3    A    Yes.  They didn't report it.  It was, they provided

4    information.

5    Q    Okay.  They weren't claiming to be a witness.  Is that what

6    you mean?

7    A    Yes.

8    Q    Was this an anonymous phone call or did the person identify

9    himself or herself?

10   A    No.  It was an anonymous call.

11   Q    And did the person say who the victims were or just say that

12   it was two people in a car?

13   A    It was two people in a car.

14   Q    Okay.  So you didn't have anything to tie it to your case

15   other than the fact that this guy had mentioned two people in a

16   car, is that correct?

17   A    Correct.

18   Q    Nevertheless, you investigated and talked to Andre Noel, is

19   that correct?

20   A    Yes.

21   Q    And did you get anything to further your investigation from

22   that?

23   A    No.

24   Q    You mentioned that when Mr. Kurland was questioning you just

25   now that there were contacts fairly frequently between Mr.

1    Gardner and Mr. Martin over a long time period that are reflected

2    in the toll records.  But then you said up to the day following

3    the murder.

4    A    Yes.

5    Q    What happened on the day following the murder?

6    A    Well, the phone used by Mr. Gardner up to the 26th of March,

7    2002, the 493-1241 phone, the day following the murder, that

8    phone was deactivated, turned off.  And another phone associated

9    with Mr. Gardner was purchased by Mr. Martin, registered in his

10   name.

11   Q    Okay.  And does that phone turn up later on in this

12   investigation, the one in Mr. Martin's name but actually used by

13   Mr. Gardner?

14   A    Not in this investigation that I recall.

15   Q    Okay.  In the investigation of the Tonya Jones Spence

16   murder?

17   A    Yes.  It's the phone he was arrested with, I believe.

18   Q    So Mr. Gardner, it's your understanding, was arrested with a

19   phone that was, for which service was initiated the day following

20   the murder of the Wyche brothers.  And it was subscribed to in

21   Mr. Martin's name, is that your testimony?

22   A    Yes.

23   Q    Meanwhile, the phone that Mr. Gardner had been using on the

24   night of the Wyche brothers' murder was deactivated the following

25   day, is that correct?

1    A    Correct.

2    Q    And that's the 1241 phone that you're telling us about?  The

3    phone that ends in the --

4    A    Yes.

5    Q    -- 1241?  Okay.  You mentioned, Mr. Kurland was asking you

6    about names of drug groups or organizations.  And you mentioned

7    Gilmore Homes.  Even then he asked you if that was the name by

8    which they were known.  And you said it was the name the police

9    gave to the crew, is that correct?

10   A    Yes.

11   Q    Based on your experience, Detective Niedermeier, do drug

12   groups finally often get named by the police rather than by the

13   group members themselves?

14             MS. RHODES:  Objection, Your Honor.

15             THE COURT:  Overruled.  You may answer.

16   A    No.  Naming themselves is something very new.  They're

17   almost always named by somebody conducting an investigation into

18   that group.

19   Q    Okay.  Is it common, do you think, for, say, the

20   neighborhood to refer to a drug organization by a name that might

21   be different from the one the members of the organization call

22   themselves by, or perhaps they don't call themselves by any name?

23             MS. RHODES:  Objection, Your Honor.

24             THE COURT:  Overruled.  You may answer.

25   A    Neighborhoods would have probably a different name than the

1    police department would have for a drug organization, if that's

2    your question.

3    Q    Okay.  And do police departments and also grand juries come

4    up with their own names for organizations?

5              MR. KURLAND:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A    No.  The police department uses, will name an organization

8    in an attempt to further the investigation.  Kind of if there's a

9    group of 4 to 10 to 20 guys, it's easier to refer to them by one

10   common name for the purpose of intelligence, investigation, or

11   anything like that.  The police department will name them what

12   they want to name them.

13   Q    Okay.  I have no further questions, Your Honor.

14              RECROSS EXAMINATION

15   BY MR. LAWLOR:

16   Q    Detective, just one question.  The information about Andre

17   Noel that was provided to you --

18   A    Um-hum.

19   Q    Okay.  The information was provided to you that he was

20   bragging or discussing the fact that he killed two people, right?

21   A    Detective Dahoney (phonetic) wrote the, the information to

22   me.  It was, basically, as I remember, it was information that

23   the caller placed, stating this person may be responsible for.

24   Q    This is your investigation, though, the Wyche brothers

25   homicide, right?

1    A    The Wyche brothers homicide was my investigation.

2    Q    So the information that Detective Dahoney, did you say?

3    A    I believe so.

4    Q    Received, it was forwarded on to you, right?

5    A    I believe he forwarded it on to everybody in the department.

6    Q    Okay.  But he forwarded it to you because you interviewed

7    Mr. Noel, right?

8    A    Well, I picked up that information and then I went and

9    interviewed Mr. Noel.

10   Q    Okay.  Let me approach and show you something real quick.

11   Have you look at this and see if it flushes out your memory about

12   what you were told by Detective Dahoney.  Just read that to

13   yourself.

14   A    (Witness complies.)

15   Q    So the information that was provided to you was that Mr.

16   Noel was --

17              MR. HARDING:  Objection.

18              THE COURT:  You can finish the question, Mr. Lawlor.

19   Q    -- Mr. Noel was telling people that he committed a homicide,

20   right?

21              THE COURT:  The objection is sustained.

22   Q    I have no further questions.

23              THE COURT:  Looks like you're all done, Detective

24   Niedermeier.  Thank you.

25              THE WITNESS:  Thank you, Your Honor.

1            THE COURT:  Mr. Hanlon.

2            MR. HANLON:  Your Honor, the United States calls

3    Officer Keith Ketterman.

4        OFFICER KEITH KETTERMAN, GOVERNMENT'S WITNESS, SWORN

5            THE WITNESS:  Yes, I do.

6            THE CLERK:  Be seated.  Speak directly toward the mike.

7    State your name and spell it for the record, please.

8            THE WITNESS:  Officer Keith Ketterman.  Last name

9    K-E-T-T-E-R-M-A-N.

10           DIRECT EXAMINATION

11   BY MR. HANLON:

12   Q    Officer Ketterman, good morning.

13   A    Good morning.

14   Q    Where do you work?

15   A    Baltimore County Police Department, Pikesville precinct.

16   Q    And how long have you been a Baltimore County Police

17   officer?

18   A    Approximately 13 years.

19   Q    During the course of your 13 years, just briefly, what have

20   your duties been?

21   A    I started out at Garrison precinct.  Moved to Pikesville

22   precinct.  I was in patrol.  I was in business patrol.  And now

23   I'm in community outreach.

24   Q    Now, directing your attention to June 7th of 2002, you were

25   a police officer then, is that right?

1    A    Yes.

2    Q    Were you with the Pikesville precinct at that time?

3    A    Yes.

4    Q    And just approximately how long had you been in Pikesville,

5    if you can remember?

6    A    Approximately eight years.

7    Q    So you knew the area pretty well at that time?

8    A    Yes.

9    Q    Did there come an occasion in the afternoon of June 7th, the

10   early evening of June 7th, around about 5:00, that you were

11   called to assist police officers out of another precinct?

12   A    Yes.

13   Q    What was it that you were called to do?

14   A    It was a shooting, shooting call.  We went over to set up a

15   perimeter in the area of the shooting.

16   Q    Now, when you say "setting up a perimeter", what area did

17   you go to and what do you mean by a perimeter?

18   A    It's basically surrounding the area where the shooting

19   occurred.  We spread out to circle the area, try to contain

20   possible suspects in the area.

21   Q    Did there come a time -- I keep forgetting I have to be near

22   the microphone.  Did there come a time, Officer, that you

23   approached a wooded area as part of setting that perimeter?

24   A    Yes.  I went to the area of Green Brush Court and South

25   Green Road.

1    Q    And again, in terms of setting this perimeter, were you on

2    the lookout for someone?

3    A    Yes.

4    Q    And just briefly, the individuals you were on the lookout,

5    without getting into too much detail about what you were told

6    over the radio, were these individuals who were believed to be

7    suspects to be detained if you found them?

8    A    Yes.

9    Q    I'm going to try to use this laser pointer from way up here.

10   There's an overhead map that I put here, Government's Exhibit

11   S-1, Officer.  See if I can actually make this work.  I'm

12   circling a part of the map with the red pointer there.  Is that

13   the wooded area that you were nearby?

14   A    Yes, it was.  Yes, it was.

15   Q    Now, you also mentioned an intersection, a particular

16   intersection you went to.  What was the intersection?

17   A    Green Brush Court and South Green Road.

18   Q    Again, if I could aim properly.  That intersection there?

19   A    Yes, it is.

20   Q    My hand's a little shaky.  I didn't have my coffee this

21   morning.

22          Now, when you got there, were there any other officers

23   in the area?

24   A    No.

25   Q    And about how long did you stay at that intersection there

1   before you began to observe something?

2   A    When I first got there, I was riding with a lieutenant.  And

3   I'd actually dropped him off at the end of Green Brush Court, the

4   dead end.  Stationed him down there.  And I was coming back up

5   Green Brush Court towards South Green when I observed two black

6   males coming from between two houses, 3301 South Green and Three

7   Green Brush Court.

8   Q    Your Honor, may I approach the witness?

9        THE COURT:  Yes.

10  Q    Officer, for purposes of convenience, I've handed you a copy

11  of your report in case you need to make reference to it for

12  addresses.  Let me see.  I believe the jury can see it.  Going to

13  remove one of these little tags here.

14       If you can approach the chart.  If you would, Officer,

15  where did you first observe the two men that you described?

16  A    Coming from between these two houses right here.

17  Q    And you're indicating on your finger near the intersection

18  of Green Brush Court, Greens Lane and South Green Road on

19  Government's Exhibit S-1?

20  A    Yes.

21  Q    You can resume your seat.  When you first observed these

22  men, what direction were they coming from?

23  A    The wooded area that they were last seen entering on Carlson

24  lane.  Carlson Lane, they went into the wooded area on Carlson

25  Lane.  And on other side of the wooded area is Green Brush Court

1   and South Green Road.

2   Q    So you're on the side of the woods opposite Carlson Lane, is

3   that right?

4   A    Yes, sir.

5   Q    So if they're coming out of the woods, what direction were

6   they approaching?  Where did they appear to be going?

7   A    Towards South Green, coming through the woods.

8   Q    Now, did you begin to observe these men?

9   A    Yes, I did.

10   Q    And why did you begin to observe them?

11   A    Possible suspects in the actual shooting.

12   Q    Now, let me ask you a couple questions, Officer.  You were

13   in uniform that day as you are today?

14   A    Yes, I was.

15   Q    And were you in your car when you first saw the men coming

16   out of the woods?

17   A    Yes.

18   Q    Was your car marked with lights and sirens on the top?

19   A    Yes, it was.

20   Q    Was there anything that would have blocked these men's view

21   of you?  Would you have been in plain sight?

22   A    Yes, I was.

23   Q    Did the men appear to try to run away or get away or

24   anything like that?

25   A    No.

1    Q    Did you have any difficulty following them?

2    A    No, I didn't.

3    Q    Did you, in fact, follow them?

4    A    Yes, I did.

5    Q    Where did they go?

6    A    They went up to a corner house on South Green Road.  It's

7    the first house on the left from the court.

8    Q    If you would, why don't you show the jury on Government's

9    S-1 where that first house was?

10   A    (Witness complies.)

11   Q    Did you see them approach that house?

12   A    Yes, I did.

13   Q    And could you tell what they did at the house?

14   A    They went up and knocked on the door of the house.  It had a

15   handicapped ramp.  No one was answering.  They sat on the sides

16   of the handicapped ramp access, the railing, for a few minutes,

17   acted like they belonged there.  And then they continued away

18   from that location when no one answered.

19   Q    And once again, you were nearby watching them?

20   A    Yes.

21   Q    Any reason to believe that they don't know you were there?

22   A    No.

23   Q    Did you continue to watch these two men?

24   A    Yes, I did.

25   Q    Where did they go next?

1    A    They continued up South Green Road and made a left on to

2    Green Knoll Road.

3    Q    And did they approach a residence?

4    A    Yes, they did.

5    Q    If you would, show the jury the second house that the men

6    approached?

7    A    3249.  It would have been 3249 Green Knoll Road.

8    Q    You can resume your seat, Officer.  For the record, for the

9    court reporter, why don't you repeat that address one more time?

10   A    It would have been 3249 Green Knoll Road.

11   Q    And this is the second address the men approached?

12   A    Yes.

13   Q    Now, at this point, Officer, at some point did you call out

14   on your radio to other officers that you had these men in sight?

15   A    No.  Not at that point.

16   Q    Did there come a time that you did that?

17   A    Yes.  Officer Toni, I'd actually flagged him down as he was

18   driving up Green Brush or, South Green Road.  As he was coming up

19   South Green Road I flagged him over.

20   Q    Now, this was a, that's officer Michael Toni, is that right?

21   A    Yes.  Officer Mike Toni.

22   Q    And this is another uniformed car, uniformed police officer

23   who was there to help with the perimeter?

24   A    Yes.

25   Q    And did you ask him, did you flag Officer Toni and ask him

1    to come over?

2    A    Yes, I did.

3    Q    Did the two of you continue to watch the two men who are now

4    at the second residence?

5    A    Yes, we did.

6    Q    What happened, if you could tell, at the second residence?

7    What did the men do?

8    A    They knocked on the door.  I couldn't see if there was an

9    answer or anything to the door.  Myself and Officer Toni decided

10   we're going to stop them.  They had exited or left the location

11   where the house had, at 3249.  Left that location, started

12   walking back up to Green Brush Court or South Green Road.  And

13   that's when myself and Officer Toni had stopped them.

14   Q    Now, how did you and Officer Toni go about stopping these

15   two men?

16   A    They were walking right toward us.  Came up to them.  They

17   came to us.  We asked for their ID.  Said, you know, we're

18   investigating something.  We need to get your identification, to

19   ID you.

20   Q    Did you have any difficulty approaching these men or asking

21   them to stop?

22   A    No.

23   Q    Now, let me ask you about the two individuals.  Did you talk

24   to one of the men and Officer Toni talk to the other one, or was

25   it all done together?

1    A    We talked to them separately.

2    Q    During this initial encounter, did you or Officer Toni, if

3    you remember, take out your guns or put them in handcuffs or

4    anything like that?

5    A    No.

6    Q    What was, what was said between you and Officer Toni and the

7    two other men?

8    A    We received ID on one of the suspects or subjects.  The

9    other one did not have ID.  Trying to identify them, see where

10   they're coming from.

11   Q    Let me ask you about the identifications.  The one who

12   provided ID, what did that ID say?

13   A    Shawn Gardner.

14   Q    Now, this individual who identified himself as Shawn

15   Gardner.  Do you see him in court today?

16   A    Do you have a picture from that day?

17        THE COURT:  Well, I think, Mr. Hanlon, you want him to

18   first --

19   Q    I'll do it that way.  Officer, this was six years ago, is

20   that right?

21   A    Yes.

22   Q    If you saw Shawn Gardner again, would you be able to

23   identify him?

24   A    Possibly with a picture.  Possibly.

25   Q    That said, Your Honor, if I may, I'll show a photograph.

1          THE COURT:  Okay.  Just to establish, you don't want

2     him to look around the courtroom?

3     Q    Well, I think he has.  And if I'm understanding it

4     correctly, the officer's not, tell me --

5     A    Not 100%.

6     Q    You are not 100% sure you can make an identification by

7     looking around the court, which is fine?

8          THE COURT:  That's perfectly fine.  Maybe I missed it.

9     Okay.  Go ahead.

10    Q    I don't think you did, Your Honor.  Now, to your knowledge,

11    Officer, was Mr., the individual identified himself as Shawn

12    Gardner, photographed later on that day as part of the booking

13    process?

14    A    Yes, he was.

15    Q    Let me show you Government's Exhibit S-100A.  You see

16    S-100A?

17    A    Yes, I do.

18    Q    Now, does this appear to be the individual as he looked on

19    the day that you stopped him out in the Greens neighborhood?

20    A    Yes.

21    Q    And who was this individual?

22    A    Shawn Gardner.

23    Q    Now, and make your reference to your report if you need to

24    to refresh your recollection.  How was Mr. Gardner dressed when

25    you first encountered him?

1    A    Blue jeans, gray shirt, I believe.

2    Q    Did you note anything about Mr. Gardner's hairstyle?

3    A    Tight braids.

4    Q    Let me show you two other photographs.  Government's Exhibit

5    S-100B as in boy.  Do you see S-100B as in boy?

6    A    Yes, I do.

7    Q    And this is a side profile of the same individual taken the

8    same day, is that right?

9    A    Yes.

10   Q    And what do you note about his hairstyle in the photograph?

11   A    The braids.

12   Q    Now, Officer, I note that some of the braids, there's a

13   little bit of fraying on the sides there, is that right?

14   A    Yes.

15   Q    When you first encountered Mr. Gardner that day, was his

16   hair, were his braids tighter or the same as they are in the

17   photograph?

18   A    They were tighter.

19   Q    Government's Exhibit S-100C.  Is this another opposite

20   profile shot also taken of Mr. Gardner that day?

21   A    Yes.

22   Q    Now, the other individual, did he also, I believe that you

23   indicated the second individual did not have identification?

24   A    No.

25   Q    What name did he provide to you and to Officer Toni?

1    A    Tevin Brown.

2    Q    Showing you Government's Exhibit S-59.  Do you see S-59 in

3    front of you?

4    A    Yes, I do.

5    Q    And who is this individual?

6    A    Aaron Holly.

7    Q    Is this the person who identified himself to you as Tevin

8    Brown on June 7th of 2002?

9    A    Yes, it is.

10   Q    And understanding he would have been taken later that day,

11   did Mr. Holly, also known as Mr. Brown, look like this on the day

12   of the, your encounter with him?

13   A    Yes, he did.

14   Q    If you remember, Officer, was Mr. Gardner or Mr. Holly

15   taller or shorter than the other?

16   A    Mr. Holly was taller.  Mr. Gardner was shorter.

17   Q    Can you tell us, if you remember, how Mr. Holly was dressed

18   that day that you encountered them in the Greens neighborhood?

19   A    I believe he had blue jeans and also a gray shirt.

20   Q    Now, after encountering Mr. Gardner and Mr. Holly and having

21   a conversation describing any identifications, did you notify any

22   other police officers about this?

23   A    Yeah.  We called for a one-on-one.  I believe that was

24   Officer Toni that called for the one-on-one to the location.

25   Q    And a one-on-one is a police term referring to a, an

1    identification process or a possible identification process

2    involving a witness, is that correct?

3    A    Yes.

4    Q    And did you stay with Mr. Gardner and with Mr. Holly during

5    the time that those one, that the one-on-one or one-on-ones were

6    done?

7    A    Yes, I did.

8    Q    And how many witnesses were brought to the location to do

9    the one-on-ones?

10   A    Two.

11   Q    Was one brought and then the other?

12   A    Yes.

13   Q    And were you with the two suspects the entire time?

14   A    Yes.

15   Q    Would you have had any encounters with either of the two

16   eyewitnesses, Officer?  Would you have talked to them or anything

17   like that?

18   A    No.

19   Q    Basically, the car pulled up with the witness and then left?

20   And then, and then a car came back with a witness and then left?

21   A    Yes.

22   Q    After the two show-ups were done, or at some point, were Mr.

23   Gardner and Mr. Holly placed under arrest?

24   A    Yes, they were.

25   Q    And ultimately, after all of the show-ups were done, what

1    was done with Mr. Gardner and Mr. Holly?

2    A    They were transported to the, I believe the Woodlawn

3    precinct.

4    Q    Just approximately, if you can remember, Officer, how long,

5    how much time passed from when you first stopped Mr. Gardner and

6    Mr. Holly until that first witness was brought to the location to

7    do a show-up identification?

8    A    Maybe five, ten minutes.

9    Q    A matter of minutes one way or the other?

10   A    Yes.  Yes.

11   Q    Moment's indulgence, Your Honor.

12            THE COURT:  Yes.

13            MR. HANLON:  Thank you, Officer.  Nothing further, Your

14   Honor.

15            CROSS EXAMINATION

16   BY MR. KURLAND:

17   Q    Good morning, Officer Ketterman.

18   A    Good morning.

19   Q    I just have a couple of questions.  I saw, I was able to see

20   most of your testimony when you were making, when you were

21   pointing out some of this stuff on the photograph.  So if I go

22   over some stuff again, I apologize.

23            When you first pulled up near the wooded area before

24   you first saw the suspects --

25   A    Yes.

1    Q    -- you were in your car?

2    A    Yes.

3    Q    Okay.  Did you get out -- I wasn't, I was unclear on that.

4    Did you at some point get out of your when you first saw them or

5    not?

6    A    No, I did not.

7    Q    So you indicated on direct examination that you saw them

8    emerge from the wooded area?

9    A    Yeah.  From between the two houses where the wooded area is.

10   Q    Just so it's clear, though.  It might be hard to tell from

11   that chart.  But the wooded area doesn't actually front up

12   against the street.  It's the wooded area, then there are like

13   some unfenced back yards, and then there's the house, is that

14   correct?

15   A    There's a back yard and then the house, yes.

16   Q    Just so it's clear.  Did you see them come out of the wooded

17   area or did you see them come out of, between a couple of houses?

18   A    From between the houses.

19   Q    All right.  And I take it, then, you did not actually see

20   them go into the wooded area on the other side?

21   A    No, I did not.

22   Q    All right.  I have no further questions.  Thank you,

23   Officer.

24              THE WITNESS:  You're welcome.

25              THE COURT:  Thank you very much, Officer.  You're

1    excused.  Next witness.

2              MR. HANLON:  Your Honor, the United States calls

3    Corporal Michael Toni.

4          CORPORAL MICHAEL TONI, GOVERNMENT'S WITNESS, SWORN

5              THE WITNESS:  Yes, ma'am.

6              THE CLERK:  Be seated.  Speak directly toward the mike.

7    State your name and spell it for the record, please.

8              THE WITNESS:  Corporal Michael Toni.  T-O-N-I.

9              DIRECT EXAMINATION

10   BY MR. HANLON:

11   Q    Corporal, good morning to you.

12   A    Good morning.

13   Q    Where do you work, sir?

14   A    Baltimore County Police Department, Franklin precinct.

15   Q    What part of Baltimore County does the Franklin precinct

16   cover?

17   A    It is the northwestern part of the county.

18   Q    How long have you been a Baltimore County Police officer?

19   A    Almost 15 years.

20   Q    And what kind of work have you done during that 15 years?

21   A    First 12 years I was assigned to a Patrol Division.  Then I

22   was promoted.  And now I'm at my current assignment, also in

23   patrol.

24   Q    And a patrol officer, you drive around the neighborhood,

25   respond to calls for service, things like that?

1    A    Yes, sir.

2    Q    In June, specifically on June 7th of 2002, were you a county

3    police officer at that time?

4    A    Yes, sir.

5    Q    And what precinct were you assigned to?

6    A    Woodlawn precinct.

7    Q    Now, behind you, Corporal, there is an aerial photograph

8    which is marked as Government's Exhibit S-1.  It shows the

9    intersection of Old Court Road, Carlson Lane, Ramble Lane.  And

10   there's a neighborhood called The Greens.  Do you see that?

11   A    Yes, sir, I do.

12   Q    Does this aerial photograph show part of a neighborhood or

13   neighborhoods which are within the Woodlawn precinct?

14   A    Yes, sir.

15   Q    On June 7th of 2002, around about 5:00 p.m. or a few minutes

16   thereafter, did you respond to a call on Bramble Lane, which is

17   one of the areas shown on S-1?

18   A    Yes, I did.

19   Q    And what was the call for?

20   A    It was for a shooting.

21   Q    Where exactly or where approximately, I should say, rather

22   than exactly, where approximately did you drive?

23   A    I drove, knowing that units had already been arriving on the

24   scene, I drove to set up a perimeter.  I went in the area off of

25   South Green Road.

Case 1:04-cr-00029-RDB    Document 686    Filed 06/12/09    Page 69 of 239

1   Q    Now, South Green Road, that's within the, this neighborhood

2   with the number of greens streets, is that right?

3   A    Yes, sir, that's correct.

4   Q    And South Green Road, if I'm getting it correctly, runs more

5   or less along there, is that right?

6   A    Yes, sir.

7   Q    Now, you mentioned something about setting a perimeter.

8   What area were you setting a perimeter around?

9   A    The wooded area, just a little bit, looks like northeast of

10  where South Green begins to curve.

11  Q    Is that what I'm circling now?

12  A    Yes, sir.

13  Q    Now, as part of setting up a perimeter, were you basically

14  there to see if anybody came out of the woods or emerged from the

15  area around the woods?

16  A    That's correct, sir.

17  Q    As you proceeded down South Green, at some point did you see

18  a police officer you knew?

19  A    Yes.

20  Q    Who did you see?

21  A    I saw Officer Ketterman.

22  Q    Is that Officer Keith Ketterman?

23  A    Yes.

24  Q    Did you stop to talk to Officer Ketterman?

25  A    Yes, I did.

1    Q    Why did you stop to talk to him?

2    A    I knew he was from another precinct.  He had also responded

3    to the scene.  And I knew he was probably unfamiliar with the

4    area.  So I just stopped to assist him.

5    Q    The area you were in, the neighborhood, I keep referring to

6    as The Greens.  I'm not sure if it's called that.  Is it

7    sometimes maybe a little confusing?

8    A    It can be, yes.

9    Q    Because the various streets are all called greens?

10    A    Yes, sir.

11    Q    When you stopped to talk to Officer Ketterman, was he

12    already involved in doing something?

13    A    Yes.

14    Q    What was he doing?

15    A    He was watching a house down Green Knoll Road.

16    Q    Your Honor, may I approach the witness?

17         THE COURT:  Yes.

18    Q    Corporal, I've handed you a copy of a report.  If it should

19    become necessary for you to refer to that to refresh your

20    recollection or something, let me know.

21         Do you recollect the particular address that Officer

22    Ketterman was watching?

23    A    Yes.  He was looking at a home on Green Knoll Road.  The

24    numbers are 3249.

25    Q    Now, did you look at the house?

DIRECT EXAMINATION OF CORPORAL TONI                71

1   A    Yes.

2   Q    And did you see anyone or anything happening there?

3   A    Yes, I did.

4   Q    What did you see?

5   A    I saw two male subjects sitting on the front porch of the

6   steps, front porch of the house.  Two or three cement steps

7   there.  And looked like a female subject standing just inside the

8   home behind a closed screen door.

9   Q    Could you hear what was being said between the two males and

10  the lady?

11  A    No, sir.

12  Q    At some point did the males turn away and begin to walk away

13  from the house?

14  A    Yes.

15  Q    Now, again, without getting into too much detail about what

16  Officer Ketterman had told you, had you and Officer Ketterman at

17  some point made a decision that you were going to approach these

18  two men and stop them and talk to them?

19  A    Yes.

20  Q    And why did you make that decision?

21  A    Based on my conversation with Officer Ketterman and the fact

22  that these two men fit the description of a radio transmission

23  given from the scene of the incident.

24  Q    Now, did you and Officer Ketterman actually walk up to the

25  men as they walked away from the Green Knoll house?

1    A    They actually made a right turn coming up Green Knoll Road,

2    directly toward us.  So there was really not much approaching on

3    our part.  Kind of walked right in front of us.

4    Q    They didn't make any effort to get away or anything like

5    that?

6    A    No, sir.

7    Q    I should have asked you this before.  Were you in uniform

8    that day as you are today?

9    A    Yes, sir.

10   Q    And Officer Ketterman was as well?

11   A    Yes, sir.

12   Q    Were you both in marked patrol cars?

13   A    Yes.

14   Q    When the two men walked up to you, what happened?

15   A    We asked them if they wouldn't mind answering a couple

16   questions for us.  Both were very compliant.  We asked them if

17   they knew anything about what had happened up the road, at the

18   scene of the incident.  They said no.  We asked for their

19   identification.  Mr. Gardner was able to produce a Maryland

20   license or identification card.  And then the other subject, Mr.

21   Brown, just gave us his name verbally.  He didn't have any

22   identification with him.

23   Q    Let me ask you about those two, the two men separately.  One

24   of the names you mentioned was Gardner?

25   A    Yes, sir.

DIRECT EXAMINATION OF CORPORAL TONI                    73

1    Q    Corporal, understanding this encounter is about six years

2    ago, is that right?

3    A    Yes.

4    Q    If you saw Mr. Gardner again, would you be able to identify

5    him?  Would you know if you saw him?

6    A    Yes, sir.

7    Q    Do you see him in court today?

8    A    Yes, sir.

9    Q    Would you please identify him?

10   A    He's sitting with the glasses, almost directly to my left,

11   sir.

12   Q    At defense table?

13   A    Yes.

14   Q    Your Honor, for the record, identifying defendant Shawn

15   Gardner.

16            THE COURT:  So noted.

17   Q    Now, later on after your conversation with Mr. Gardner, he

18   was photographed as part of a booking process, is that right?

19   A    Yes.  That's true.

20   Q    Did you note anything about Mr. Gardner's clothing that day,

21   do you remember?

22   A    Other than the clothing that day matching a description

23   given over the radio, there was nothing, nothing odd about his

24   clothing.

25   Q    How about Mr. Gardner's hairstyle that day?

1    A    That particular day, there was some tight braids in his

2    hair, pretty close to his, pretty close to his scalp.

3    Q    I'm showing you what's been marked as Government's Exhibit

4    S-100A.  Is this Mr. Gardner as he appeared that day?

5    A    Yes, sir, that's fairly similar.

6    Q    He's wearing a blue shirt.  Would this have been a shirt

7    that would have been provided to him after he was taken into

8    custody?

9    A    Yes, sir.

10   Q    Government's Exhibit S-100B.  Is this a profile shot of Mr.

11   Gardner?

12   A    Yes, sir.

13   Q    Now, it's a bit blurred, but making reference again to Mr.

14   Gardner's hairstyle that day.  What do you see there?

15   A    Appears to have the braids pretty close to his scalp.  They

16   look like they may have begun to come out a little bit.  But the

17   style is the same as it was.

18   Q    You alluded to this already, Corporal.  There is some

19   fraying a little bit, is that correct?

20   A    Yes, sir.

21   Q    Would this photograph have been taken later in the day,

22   maybe several hours later?

23   A    It could have been, sir.

24   Q    Government's Exhibit S-100C as in Charlie, again.  This is

25   just another shot of Mr. Gardner on the other side?

1    A    That's correct, sir.

2    Q    Same hairstyle?

3    A    Yes.

4    Q    You mentioned that Mr. Gardner actually had a Maryland state

5    ID in the name "Gardner", is that right?

6    A    Yes, sir.

7    Q    Let me ask you about the other individual.  Showing you

8    what's been marked as Government's S-59.  Can you tell us who

9    that is?

10   A    That's Mr. Brown.  I believe he gave the name of Tavon

11   Brown.

12   Q    Do you know one way or the other whether or not the

13   individual in S-59 would have been identified by a different name

14   later on?

15   A    Yes, sir.  He was eventually identified as a Mr. Holly.

16   Q    But on that day he gave the name Tavon Brown?

17   A    Yes.

18   Q    Did the individual in S-59 have any identification on him

19   one way or the other?

20   A    No, sir.

21   Q    Do you remember how Mr. Holly or Mr. Brown was dressed that

22   day?  Anything in particular about their clothing?

23   A    Nothing odd about their clothing.  Again, it matched the

24   description that was given out over the, over the radio.  Jeans,

25   T-shirt, and, you know, hairstyles were a match.

1    Q    Do you remember if either Mr. Holly or Mr. Gardner was

2    taller than the other?

3    A    Mr. Holly was taller than Mr. Gardner.

4    Q    Now, you and Officer Ketterman made a decision to actually

5    detain Mr. Gardner and Mr. Brown/Holly for a show-up

6    identification process, is that right?

7    A    Yes, sir, we did.

8    Q    And did you and Officer Ketterman stay with the two suspects

9    while the show-up was done?

10   A    Yes, sir.

11   Q    And without getting into too much detail, was one witness

12   brought to the location and then taken away, and then a second

13   witness brought, then taken away?

14   A    That is correct.

15   Q    Corporal, would you have any conversation or encounters with

16   the witness or witnesses brought to the location to know whether

17   or not, by talking to the witness, whether the identification was

18   positive one way or the other?

19   A    Not from the witnesses.

20   Q    Not from the witness?  At some point after, either during or

21   after the identifications were done, was a decision made to place

22   Mr. Gardner and Mr. Holly actually under arrest as opposed to

23   just detained?

24   A    Yes, sir.

25   Q    And were they then transported to one of the Baltimore

1    County Police stations?

2    A    They were.

3    Q    Did you drive either one of them yourself?

4    A    I drove Mr. Gardner.

5    Q    At some point, I'm not sure it would have been before you

6    left the location or not, did you have occasion to go back to

7    3249 Green Knoll?

8    A    Yes.

9    Q    And did you -- this is just a yes or no -- did you talk to a

10   resident at that house?

11   A    Yes, I did.

12   Q    Did you identify that resident as an Erin Wisniewski?

13   A    Yes.

14   Q    And I'm not sure of the spelling of that, Your Honor, so

15   I'll get back to the court reporter on that if that's all right.

16          THE COURT:  All right.

17   Q    At some point did you also collect some clothing and

18   physical items from Mr. Gardner and from Mr. Holly or, as you

19   knew him, Mr. Brown?

20   A    Yes, items from their pockets.

21   Q    Where did that take place?  Where did you collect those

22   items?

23   A    On the scene, around where our police cars were parked, in

24   the area of South Green and Green Knoll.

25   Q    What did you do with the items that you collected from both

1    individuals?

2    A    I placed them in separate brown bags.

3    Q    Is this a standard procedure, Corporal, when a person's

4    placed under arrest, that they're searched and personal items may

5    be taken from them?

6    A    Yes.

7    Q    Why is that done?

8    A    So that nothing gets lost.  So that we can tell later at the

9    police station which items were with which person.  And as a

10   matter of, matter of safety to officers and the subjects

11   themselves.

12   Q    The items that you took from Mr. Gardner, what did you do

13   with those items?

14   A    I placed them in a brown bag.

15   Q    Did you mark the brown bag in any way?

16   A    I wrote a name on it.

17   Q    What name?

18   A    Gardner's name, sir.

19   Q    And how about the items you took from Aaron Holly?

20   A    Same thing.  They were placed in a bag.  His name was

21   written across it.  And those items were brought back to the

22   police station with him.

23   Q    Now, what name would have been written on the Holly bag?

24   Was it the name Holly or the name Brown?

25   A    It would have been Brown, yes, sir.

1  Q    And when you got back to the precinct, are those two bags,

2  the Gardner bag and the Holly bag, put some place?

3  A    Yes.

4  Q    Where are they put?

5  A    They're locked in a, we've got a wall with a series of

6  prisoner property lockers.  And they're locked in there.  The

7  lockers are then assigned the person's name who the property

8  belongs to.

9  Q    Would anybody have access to those lockers other than police

10  officers?

11  A    No, sir.  Prisoner, officer.

12  Q    The idea is to keep the property secure and also separated

13  as between the two suspects?

14  A    Yes, sir.

15  Q    As far as you know, Corporal, did a detective named Brian

16  Edward later go through the two individuals bags and make a

17  catalog or list of what was taken from them?

18  A    Yes, sir.

19  Q    Just a moment, please, Your Honor.

20       THE COURT:  Yes.

21  Q    Thank you, Corporal.  Nothing further, Your Honor.

22       CROSS EXAMINATION

23  BY MR. KURLAND:

24  Q    Good morning, Corporal Toni.

25  A    Good morning, sir.

1    Q    Get the rank correct.  I just have a couple of questions.

2    So you actually administered the show-up?  You were in charge of

3    the defendants?

4    A    Yes.

5    Q    Get them to stand up?

6    A    Myself and Officer Ketterman.

7    Q    Okay.  And let me just put a couple of -- okay.  Just for

8    clarification.  You didn't take these photographs?

9    A    No, sir, I didn't.

10   Q    And you can't say for sure if they were actually taken on

11   the same day that Mr. Gardner was arrested?

12   A    That's true, sir.

13   Q    That's true, meaning that you can't say for sure?

14   A    Correct.

15   Q    All right.  Now, with respect to the show-up, you testified

16   that you had no contact with anybody in the police cars when the

17   people came to make identifications?

18   A    That's correct.  Other than the officer operating the car.

19   No direct contact with the witness.

20   Q    And you had the subjects just stand up and look directly at

21   the car?

22   A    Yes.  Yes, sir.

23   Q    All right.  You would agree that, from a front view like

24   this, you really can't see any braids, is that correct?

25   A    Not on that picture, no, sir.

1    Q    Well, on a front view.  Yes or no?  On a front view you

2    can't see any braids?

3    A    That picture, correct.  Of the subject that day, you

4    certainly could.

5    Q    All right.  All right.  But again --

6    A    I'm just saying --

7    Q    I understand.  Did this picture, we think, was, your

8    testimony was this was taken the day Mr. Gardner was arrested?

9    A    Correct.

10   Q    And you would agree, though, on a front view -- this is a

11   front view picture, correct?

12   A    Correct.

13   Q    And you would agree that in this picture you can't see any

14   braids?

15   A    That's correct, sir.

16   Q    That's all.  I have no further questions.  Thank you,

17   Corporal.

18           MR. HANLON:  Your Honor, just one quick question.

19           THE COURT:  All right.

20           REDIRECT EXAMINATION

21   BY MR. HANLON:

22   Q    Corporal, would you know one way or the other if the two

23   witnesses who came to do the show-up that day, if they would have

24   been able to see braids on Mr. Gardner's hair, head as they

25   approached the show-up location or as Mr. Gardner was getting up,

1    if they would have had a side profile view at any point?  Would

2    you know one way or the other?

3    A    They would have had a front view of them, of both subjects.

4    Q    A front view absolutely, is that right?

5    A    Yes.  And as they were driving up, they would have, there

6    would certainly be a side view.  They were coming around the

7    corner.

8            MR. HANLON:  Thank you, Your Honor.  Thank you,

9    Corporal.

10           MR. KURLAND:  Your Honor, one follow-up quickly?

11           THE COURT:  All right.

12           RECROSS EXAMINATION

13   BY MR. KURLAND:

14   Q    But of course, Corporal, you have no way of knowing what the

15   witnesses were looking at as they were driving up in the police

16   car?

17   A    Certainly.

18   Q    I don't understand certainly.

19   A    I don't know exactly what they were looking at when they

20   were driving up in the police car.  I don't know at which point

21   Corporal Mitchell directed them to look at the subjects.

22   Q    Fair enough.  Thank you very much.

23           THE COURT:  Thank you very much, Corporal.  You're

24   excused.  We'll take our morning recess at this time, ladies and

25   gentlemen.

1          Please leave your note pads on your chairs.  Have no

2     discussion about any of the evidence or any aspect of the case.

3     Continue to keep an open mind.

4          Jury's excused for 15 minutes.  We're in recess.

5          (Recess.)

6          THE COURT:  Ready to proceed?

7          MR. HANLON:  Yes, Your Honor.

8          THE COURT:  All right.  We'll have the next witness,

9     please.  Mr. Flannery, Mr. Martin, Mr. Harris either slept

10    through the entire morning or appeared to, and I don't think the

11    jury appreciates that.

12         And, sir, you're welcome, you visited us several days

13    and we are glad to have you.  But you also have fallen asleep a

14    couple of times.

15         A SPECTATOR:  I work hard.

16         THE COURT:  I understand.  You work a night shift?

17         A SPECTATOR:  Yes, sir.

18         THE COURT:  Okay.  I understand.  That's what I

19    thought.  But see if you can keep your head straight.

20         A SPECTATOR:  Sure will.

21         THE COURT:  Thank you.

22         MR. LAWLOR:  Mr. Martin stayed awake the whole morning.

23         MR. MARTIN:  It wasn't easy.

24         (Jury enters the courtroom.)

25         THE COURT:  You may call your next witness, Mr. Hanlon.

1          MR. HANLON:  Thank you, Your Honor.  The United States

2    calls Officer Douglas Jess.

3          OFFICER DOUGLAS JESS, GOVERNMENT'S WITNESS, SWORN

4          THE WITNESS:  I do.

5          THE CLERK:  Speak directly toward the mike.  State your

6    name and spell it for the record.

7          THE WITNESS:  Officer Douglas Jess.  Last name J-E-S-S.

8          DIRECT EXAMINATION

9    BY MR. HANLON:

10   Q    Officer, good morning to you.  Still good morning.  Where do

11   you work?

12   A    Baltimore County Police Department, currently assigned to

13   the White Marsh precinct.

14   Q    And how long have you been a Baltimore County Police

15   officer?

16   A    Thirteen and a half years.

17   Q    I'm sorry?

18   A    Thirteen and a half years.

19   Q    And what kind of work have you done as an officer?

20   A    I've done patrol work.  I was assigned to the K-9 unit for

21   two years.  I was, have been a detective prior to now.  Now back

22   in patrol work.

23   Q    Directing your attention to June 7th of 2002, were you on

24   duty that day?

25   A    I was.

1    Q    At some point, June 7th and for a couple of days thereafter,

2    did you assist in an investigation in the Bramble Lane area of

3    Baltimore County?

4    A    I did.

5    Q    And is that in the Woodlawn precinct?

6    A    Yes.

7    Q    Were you assigned to the Woodlawn precinct at that time,

8    Officer?  Were you brought in from a neighboring precinct?

9    A    I was assigned to the Woodlawn precinct.

10    Q    Approach this easel once again.  Your Honor, again, I'm

11    assuming that the jury will be able to see this.  Certainly help

12    me.

13            THE COURT:  Use the mike, please.

14    Q    Officer, during the course of your work on this

15    investigation, you essentially helped look for evidence one or

16    two times and things like that, is that correct?

17    A    Yes.

18    Q    At some point, Officer, during the time that you were

19    helping other officers search the area, canvass the area, for

20    evidence, things like that, did you have occasion to look around

21    the area at the intersection of Green Brush Court and South Green

22    Road, where I'm indicating here on Government's Exhibit S-1?

23    A    Yes.

24    Q    And did you notice something in a storm drain?

25    A    Yes, I did.  Yes.

1    Q    Showing you Government's Exhibit S-151.  Is this a

2    photograph of part of the street near the intersection of South

3    Green and Green Brush?

4    A    Yes.  It appears to be.

5    Q    And specifically, there is something I've circled with my

6    hand there on Government's Exhibit S-151.  What is it I've

7    circled?

8    A    The storm drain in the street.

9    Q    I've focused in on it a little bit there, is that correct?

10   A    Yes.

11   Q    And just to give the jury a slightly different view.

12   Government's Exhibit S-152.  Basically, the same storm drain from

13   a slightly different angle, is that correct?

14   A    Yes.

15   Q    Now, during the course of the time you were looking for

16   evidence around this neighborhood, did you have occasion to look

17   into that storm drain?

18   A    Yes, I did.

19   Q    Why would you have looked into a storm drain?

20   A    I was searching for any evidence that could have been

21   discarded by the suspects between the woods and the area where

22   they were stopped by the other officers.

23   Q    And you were aware, Officer, in terms of explaining why

24   you're looking at this particular neighborhood, that two men had

25   been stopped and placed under arrest nearby, is that correct?

1    A    Yes.

2    Q    Were you also aware that a perimeter had been placed around

3    a wooded area between where you were and Carlson Lane, which I'm

4    indicating on S-1?

5    A    Yes.

6    Q    When you looked into this particular storm drain, what did

7    you see?

8    A    A yellow plastic walkie-talkie.  Two-way radio.  I think it

9    was a Bell South make.

10   Q    You were able to tell more or less what the item was and its

11   make just by looking down into the storm drain?

12   A    Yes, it was only maybe two feet below the grate and it was

13   laying face up on top of some leaves.

14   Q    You've alluded to my next question.  When you saw this

15   yellow walkie-talkie, was it covered over by anything?

16   A    No.  It was laying on top of the leaves, very clean,

17   pristine condition.

18   Q    And there was no dirt on it, which you've also already said,

19   is that right?

20   A    Correct.

21   Q    Did you make an attempt to actually get at the walkie-talkie

22   and pick it up?

23   A    No, I did not.

24   Q    Why not?

25   A    I notified via the radio, I made contact with one of the

1    detectives that was at the actual crime scene, letting him know

2    it was there and requesting instruction on whether or not they

3    wanted to have it collected at that time.

4    Q    Now, to your knowledge, Officer, was an attempt made to lift

5    up that grate and get into at that storm drain on that particular

6    day to pick up that yellow walkie-talkie.

7    A    No.

8    Q    It was not?

9    A    It was not.

10   Q    Now, were you ever involved, you personally ever involved in

11   going back to this location a couple weeks later to look for this

12   walkie-talkie?

13   A    No, I didn't.  I showed them where the grate was.  I showed

14   someone where the grate was at a later date but I never went back

15   for any removal.

16   Q    Understanding that, let me show you, just for identification

17   at this point, Government's Exhibit S-36.  I've put this item on

18   the, on the overhead.  Does this item look familiar to you?

19   A    Yes, it does.

20   Q    How does this compare with the yellow walkie-talkie you saw

21   in the storm drain the day that you first saw it?

22   A    It's exactly the same except for the dirt and the scratches

23   on it.

24   Q    And it doesn't come up terribly well on the screen.  But

25   there's some tarnish here and here and some other places, is that

1    right?

2    A    Yes.

3    Q    And again, just for identification purposes, is that the

4    other side of the same exhibit?

5    A    I've only seen photos of the other side of it.  But they are

6    consistent, yes.

7    Q    Would this side have been the side that you saw when you

8    first identified the object?

9    A    Yes, it was.

10   Q    And I believe that's all I have for the officer.  Thank you,

11   Your Honor.

12            CROSS EXAMINATION

13   BY MR. KURLAND:

14   Q    Good morning, for a few more minutes.  Good morning, Officer

15   Jess.

16   A    Good morning, sir.

17   Q    I just have a couple of questions.  You say that you, your

18   testimony is that you saw a walkie-talkie in the storm drain on

19   June 7th?

20   A    Yes, sir.

21   Q    Okay.  And about what time was that?

22   A    Oh, I'd say maybe 6:00 in the evening.

23   Q    Okay.  And it's summertime so it's sunlight?

24   A    Yes, sir.

25   Q    Okay.  And you were looking, you specifically were looking

1    around into gutters and storm drains to see if there was anything

2    of evidentiary value?

3    A    I was looking for guns.  I knew there'd been a shooting.

4    Q    You were looking for guns.  Okay.  Now, who did you -- you

5    say that you showed them the storm drain or, you actually took

6    another officer, a detective?

7    A    No.  I'm sorry.  I meant they showed me a map, asked me

8    which storm drain I had seen.  I showed, it was Officer Mead I

9    directed to where the drain had been at Green Brush and South

10   Green.

11   Q    Okay.  So you spoke with officer, Detective Mead about, or

12   Officer Mead about --

13   A    Yes.

14   Q    -- the location of the drain?

15   A    Yes, sir.

16   Q    All right.  And you didn't write any report --

17   A    No, sir.

18   Q    -- concerning that?  Are you aware if anybody else wrote any

19   report about your observations on that day?

20   A    I don't know, sir.  I'm not aware.

21   Q    But you for sure did not write a report about it?

22   A    That is correct.

23   Q    And obviously, the area, did you participate in any

24   subsequent searches for items of evidence on subsequent days in

25   that area?

1   A    No, sir.

2   Q    Are you aware if a permanent police line perimeter was put

3   up around all this, around the area?

4   A    You mean like a crime scene tape?

5   Q    That describes, within, you know, was there 24, did the

6   police put up 24 hour surveillance around the entire area for

7   days and weeks at a time after the event?

8   A    I don't know that, sir.

9   Q    All right.  I have no further questions.  Thank you,

10  Officer.

11       THE COURT:  Thank you, Officer Jess.  You're excused.

12  Thank you.

13       MR. HANLON:  Your Honor, the United States calls

14  Officer Eric Saladino.

15     OFFICER ERIC SALADINO, GOVERNMENT'S WITNESS, SWORN

16       THE WITNESS:  I do.

17       THE CLERK:  Speak directly toward the mike.  State your

18  name and spell it for the record.

19       THE WITNESS:  Officer Eric Saladino.  Baltimore County

20  Police Department, currently assigned to the training section.

21       THE CLERK:  Spell your last name.

22       THE WITNESS:  S-A-L-A-D-I-N-O.

23       DIRECT EXAMINATION

24  BY MR. HANLON:

25  Q    Officer, good, I guess it's afternoon now.  Good afternoon

1    to you.

2    A    Thank you.

3    Q    You've already alluded to this.  You're a member of the

4    Baltimore County Police Department, is that right?

5    A    Yes, sir.

6    Q    And how long have you been a police officer?

7    A    I've been a police officer for 15 years.

8    Q    And what kind of work have you done as an officer?

9    A    Patrol work as a patrol officer responding to calls.

10   Defense tactics, training, firearms instruction, which is where

11   I'm currently assigned.

12   Q    Now, on June 7th of 2002, you were a police officer at that

13   time?

14   A    Yes, sir.

15   Q    What precinct were you assigned to?

16   A    Woodlawn precinct, Precinct Number Two.

17   Q    And what kind of work did you do at that time at the

18   Woodlawn precinct?

19   A    Again, at that time I was a patrol officer.  I was, I would

20   either be working on the road or working inside the precinct at

21   the desk area.

22   Q    Now, specifically on the afternoon of June 7th of 2002,

23   after about 5:00, 5:30, 6:00, approximately, what specifically

24   were you doing that evening?

25   A    On that date, I was assigned to desk position three, which

1   is the prisoner processing officer responsible for maintaining

2   and coordinating the processing of prisoners that are coming in

3   after an arrest.

4   Q    Now, is this sort of a routine job that every officer has to

5   do from time to time?

6   A    Yes, sir.

7   Q    Basically, you talk to prisoners, get basic information from

8   them?

9   A    Yes.

10  Q    And keep an eye on them?

11  A    Yes.

12  Q    Now, let me ask you.  Going to talk to you about a specific

13  event in a few moments.  But let me ask you.  You wrote a report

14  about what you're about to testify about in this case, is that

15  correct?

16  A    Yes.

17  Q    And that report indicating some events taking place on June

18  9th of 2002?

19  A    Yes.

20  Q    Is that right?

21  A    Yes.  That was a typographical error.

22  Q    Have you done anything to verify that the events you're

23  going to testify about were on the 7th?

24  A    Yes.  I obtained a departmental journal page.  A journal

25  page is a calendar for the whole year, it represents every date.

1    The supervisor of every officer fills in on each box, what the

2    officer would be assigned to on a particular date and whether or

3    not they were working.  On a day that I would have been working

4    Patrol Car 212 it would have said 12.  On a day that I would have

5    been working the desk, it would say desk.  And then on a

6    particular leave day, it would give the information on what

7    particular kind of leave that was.

8    Q    Just again, so we're very clear, what you're going to talk

9    about today took place on the 7th of June?

10   A    Yes.  I verified that on the 7th I worked the desk.

11   Q    Your Honor, may I approach the witness?

12        THE COURT:  Yes.

13   Q    Officer, I'll ask you some questions now.  I've handed you a

14   copy of your report in case you need to refresh your recollection

15   about anything.  Just let me know if you do.  Did you have an

16   encounter with two prisoners that late afternoon or evening?

17   A    Yes, I did.

18   Q    Who were the two prisoners you encountered?

19   A    I identified them as Shawn Gardner and Aaron Holly.

20   Q    These were two people in custody, is that right?

21   A    Yes.

22   Q    Were they being held in connection with a particular

23   investigation?

24   A    Yes.

25   Q    What was that investigation?

1    A    It was a homicide investigation.

2    Q    Now, what kind of dealings did you have with the two

3    prisoners, Mr. Gardner and Mr. Holly, that day?

4    A    As the processing officer, I simply monitored their

5    activities, made sure that they were secured.  At a particular

6    time they were interviewed.  They were placed in the interview

7    room.  And at other times they would be placed in a holding cell.

8    Q    And your job is basically just to sort of hang out in case

9    anything needed to be done?

10   A    Yes, basically.

11   Q    You, at various points, saw the two individuals, Mr.

12   Gardner, Mr. Holly, is that correct?

13   A    Yes.

14   Q    If you saw Mr. Gardner, Shawn Gardner again, would you be

15   able to identify him?

16   A    I don't know.

17   Q    It's been six years, is that correct?

18   A    Yes, that's correct.

19   Q    Do you know whether or not they were photographed that day?

20   A    Yes.

21   Q    Let me show you some photographs.  Government's Exhibit

22   S-100A.  Do you recognize that photo?

23   A    Yes.

24   Q    Who is that?

25   A    That's Mr. Gardner.

1    Q    And did he appear more or less like this on the day of June

2    7th of '02?

3    A    Yes.

4    Q    Government's Exhibit S-100B, profile shot.  Who is this

5    person?

6    A    Yes.  The same person.

7    Q    Mr. Gardner?

8    A    Yes.

9    Q    Mr. Gardner's hair on June 7th, 2002, do you remember what

10   it looked like?  Whether it had any particular type of hairstyle?

11   A    I see, I see from the photograph that it's tight braids but

12   I didn't recall that before seeing the photograph.

13   Q    Aside from the photo, that's not something you took note of?

14   A    No, sir.

15   Q    Government's Exhibit S-100C as in Charlie.  Again, this is

16   Mr. Gardner?

17   A    Yes.

18   Q    Now, the individual that Mr. Gardner was, there was a second

19   prisoner.  And what was that person's name?

20   A    Aaron Holly.

21   Q    Government's Exhibit S-59.  Who is shown in this photo?

22   A    That is Mr. Holly.

23   Q    Did there come a time, officer Saladino, that Mr. Gardner

24   and Mr. Holly were placed in separate rooms but close to one

25   another?

1   A    Yes, they were in adjacent interview rooms.

2   Q    And was there, did there come a time when they were there in

3   the adjacent interview room and you were basically the only

4   officer sort of in their immediate presence?

5   A    Yes, that's correct.

6   Q    Did you hear anything, anything said?  Did either Mr.

7   Gardner say anything to Mr. -- strike that.  At any point, did

8   you hear Mr. Gardner say anything to Mr. Holly?

9   A    Yes.  Initially, while they were in the adjacent interview

10  rooms I heard them talking.  And at that time I removed Mr.

11  Gardner from his room and took him to a temporary holding cell,

12  which was further down the hall, with a closed door.  The

13  interview rooms had the doors open and the wall in between them

14  that separated the two subjects.

15  Q    And after that separation, did you hear anything said by Mr.

16  Gardner to Mr. Holly?

17  A    Later in the evening, Crime Lab was at the precinct

18  processing both subjects.  Mr. Holly was inside one of the

19  interview rooms and Mr. Gardner was secured to a bench outside of

20  the interview room.  Inside of the interview room where Mr. Holly

21  was, the Crime Lab tech and Officer McGlynn were asking questions

22  in reference to name and date of birth.  And at that time I heard

23  Mr. Gardner say, Don't fucking say anything, or, Don't say a

24  fucking thing.  At that time I took him off the secured bench and

25  returned him to the temporary holding cell.

1    Q    So they wouldn't be able to communicate with one another?

2    A    Correct.

3    Q    Thank you, Officer.  Nothing further, Your Honor.

4              CROSS EXAMINATION

5    BY MR. COBURN:

6    Q    Officer Saladino, good afternoon, sir.

7    A    Good afternoon, sir.

8    Q    You still have your report in front of you there?

9    A    Yes, I do.

10   Q    The date of your report, the date it was submitted, I assume

11   that's the same day you prepared it, is that correct?

12   A    Yes, sir.

13   Q    What's that date?

14   A    That is 6/14 or June 14th of 2002.

15   Q    So how many days is that after the incident that you've just

16   told the ladies and gentlemen of the jury about?

17   A    Seven days.  One week.

18   Q    One full week after?

19   A    Yes, correct.

20   Q    Is there a particular reason why a full week went by between

21   the time of the observations you've just described and the day

22   you submitted your report?

23   A    I don't recall, sir.

24   Q    See there's a blank at the bottom of your report where it

25   says signature of investigator?

1    A    Yes.

2    Q    Is there a signature in there?

3    A    No, sir.

4    Q    And under there there's a blank for supervisor, right?

5    A    Yes.

6    Q    Is there a signature there?

7    A    No, sir.

8    Q    This is the only report that you prepared with respect to

9    this matter, is that correct?

10   A    Yes, sir.

11   Q    And this, what you've just told us about is essentially your

12   only involvement in this matter, is that right?

13   A    Yes, that's correct.

14   Q    Now, the observations that you described for Mr. Hanlon,

15   when he was asking you questions, what was the time of day that

16   you encountered both individuals for the first time in, I believe

17   the words you used were, adjacent interview rooms?  What time?

18   A    Afternoon, perhaps mid evening.

19   Q    Any more specific than afternoon?

20   A    I can't be more specific.  I would, I would be guessing at

21   the time if I gave you a time.

22   Q    What were they wearing?

23   A    I don't remember.

24   Q    Do you remember anything they were wearing?

25   A    No, sir, I don't.

1    Q    How much later -- in other words, the first observation you

2    described for Mr. Hanlon, there were in adjacent interview rooms

3    and you heard some communication but you couldn't hear what's

4    being said, correct?

5    A    Yes.

6    Q    And then there's another observation you told us about later

7    on when -- is it correct at that point they're both being

8    processed by the Crime Lab?

9    A    One person was in the interview room.  And there's a hallway

10   outside of it and Mr. Gardner was secured outside of the room.

11   Q    Okay.  But my question was, is it correct that at that

12   point, were they both being processed by the Crime Lab?

13   A    Only one was being processed by the Crime Lab tech.  That

14   was Mr. Holly.

15   Q    Okay.  Well, you still got your report in front of you,

16   right?

17   A    Yes.

18   Q    It's correct, is it not, that four paragraphs down, you say,

19   actually three, say, later in the evening, both suspects were

20   being processed by Crime Lab and prisoner Gardner was then

21   secured in the hallway on the bar, is that right?

22   A    Yes.

23   Q    So were they both being processed by Crime Lab then or was

24   it only one?

25   A    I guess a clear way to state it is both suspects were being

1    processed but one at a time.

2    Q    And who, who were the Crime Lab officers who were doing the

3    processing at that point?

4    A    I don't remember and I didn't make a note of it.

5    Q    What processing were they doing?

6    A    I don't know, sir.

7    Q    Can you explain why, during the course of the processing by

8    the Crime Lab that's occurring sometime later in the evening,

9    there are officers who are obtaining name, date of birth, from

10   Mr. Holly at that moment?

11   A    I don't, I don't know.

12   Q    Okay.  Finally, you indicated that when Mr. Gardner, and

13   just forgive the language, obviously, it's right here in the

14   case, secured just outside the room, and you said you heard him

15   state, Don't fucking say anything, or Don't say a fucking thing,

16   is that right?

17   A    Yes.

18   Q    Now, it's correct, is it not, Officer Saladino, that you've

19   been present during the course of interviews of suspects on

20   numerous occasions, right?

21   A    Yes.

22   Q    And on some occasions these interviews occur just with the

23   police officers and the suspects, right?

24   A    Yes.

25   Q    On other occasions, sometimes there's an attorney for the

1   suspect who comes in, right?

2   A    Yes.

3   Q    It's correct, is it not, that it is a frequent occurrence

4   for an attorney encountering an individual who's just been

5   arrested, talking to police officers, to say, Don't say anything,

6   right?

7   A    Yes.

8   Q    Thank you.  Nothing further.

9              REDIRECT EXAMINATION

10  BY MR. HANLON:

11  Q    Officer Saladino, to the best of your knowledge, was Mr.

12  Gardner Mr. Holly's attorney at that time?

13  A    No, sir.

14  Q    Thank you, Your Honor.

15             THE COURT:  Thank you very much, Officer.  You're

16  excused.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  Next witness.

19             MR. HANLON:  Your Honor, the United States calls

20  Technician Carrie Bialek.

21      TECHNICIAN CARRIE BIALEK, GOVERNMENT'S WITNESS, SWORN

22             THE WITNESS:  I do.

23             THE CLERK:  Be seated.  Speak directly toward the mike.

24  State your name and spell it for the record, please.

25             THE WITNESS:  My name is Carrie Bialek.  C-A-R-R-I-E.

DIRECT EXAMINATION OF BIALEK                    103

1    B as in boy, I-A-L-E-K.

2            DIRECT EXAMINATION

3    BY MR. HANLON:

4    Q    Good morning.

5    A    Good morning.

6    Q    Or good afternoon.  I keep getting that wrong.  Where do you

7    work?

8    A    I work for Baltimore County Police Department in the

9    Forensic Services Section.

10   Q    What is your job title?

11   A    I'm a Forensic Services Technician Two, working as a crime

12   scene investigator.

13   Q    And briefly, Technician Bialek, what do you do as a crime

14   scene investigator, technician?

15   A    I respond to various crime scenes, everything ranging from

16   assaults, domestic abuse, burglaries, armed robberies, to

17   suicides, homicides, and suspicious deaths.  Once there, I

18   process the scene for either fingerprints, evidence, photographs,

19   sketches, hairs and fibers, and then collect the evidence package

20   and submit them.

21   Q    Technician, you indicated that you submit evidence.  Do you

22   actually analyze the evidence or do comparisons or is it your job

23   to collect and submit?

24   A    My job is to collect and submit.

25   Q    On June 7th of 2002, did you report to a hospital?

1    A    Yes, I did.

2    Q    What hospital did you report to?

3    A    I reported to Shock Trauma.

4    Q    And why did you report to Shock Trauma?

5    A    We were told that there had been a shooting prior in the

6    evening and that the victim of the shooting was at the hospital.

7    Q    And did you actually encounter the victim and some other

8    police officers?

9    A    Yes, I did.

10   Q    Was the victim undergoing medical treatment when you arrived

11   or had medical treatment ceased?

12   A    Medical treatment had ceased.

13   Q    At some point was the victim identified by you or to you as

14   Tonya Jones Spence?

15   A    Yes.

16   Q    What did you do at the scene?

17   A    At the hospital, I photographed the victim and her injuries.

18   Doing overall photographs of her face and her body while she was

19   lying at the hospital, and doing some close-ups of the injuries

20   that I could see while she was lying there.  And then I met with

21   Officer Kidwell.

22   Q    Let me show you, first of all, some of the photographs you

23   took of the victim.  I'm going to start with Government's Exhibit

24   S-99A.  Do you see S-99A on the screen?

25   A    Yes.

DIRECT EXAMINATION OF BIALEK

105

1    Q    Is this the face of the victim?

2    A    Yes, it is.

3    Q    I'm going to zoom out a little bit and show you, hopefully

4    it will come you on your screen.  But circling sort of in the

5    upper left-hand portion, does that appear to be blood near Ms.

6    Spence's shoulder?

7    A    Yes, it does.

8    Q    Government's Exhibit S-99B as in boy.  Did you also take

9    this photograph?

10   A    Yes, I did.

11   Q    And is this a bruising on a part of the victim's body?

12   A    Yes.

13   Q    I'm not sure, and you can tell me if I'm wrong, Technician,

14   this is labeled as victim's right elbow.  Is it possible that

15   that's a knee or is it an elbow?

16   A    That appears to be the elbow.

17   Q    Sorry about that.  Government's Exhibit S-99C as in Charlie.

18   Did you also take this photograph of an apparent injury?

19   A    Yes, I did.

20   Q    And this is just under Ms. Spence's right shoulder armpit,

21   is that correct?

22   A    Yes.

23   Q    Government's Exhibit S-99D. Are these some additional marks

24   or abrasions that you took on Ms. Spence's left shoulder?

25   A    Yes, it is.

Case 1:04-cr-00029-RDB   Document 686   Filed 06/12/09   Page 106 of 239

1    Q    Government's Exhibit S-99F as in Frank.  Some additional

2    markings or abrasions that you noted on the victim's left elbow,

3    is that correct?

4    A    Yes.

5    Q    And you indicated to me earlier, Technician, I believe that

6    this photograph might have been marked as the victim's left knee.

7    But just to be clear, is this the elbow?

8    A    Yes.  It's the elbow.

9    Q    And finally, Government's Exhibit S-99E.  Did you take this

10   photograph of a wound on the right side of Ms. Jones Spence's

11   body?

12   A    Yes, I did.

13   Q    Now, in addition, did you collect or receive any other

14   pieces of physical evidence during that time?

15   A    Yes, I did.

16   Q    I've marked this envelope and its contents as Government's

17   Exhibit S-4B as in Bravo.  What is this envelope?

18   A    That would be the packaging for the item number 9011-001

19   that I collected from Officer Kidwell.

20   Q    Now, Officer Kidwell, is he another uniformed Baltimore

21   County Police officer?

22   A    Yes, he is.

23   Q    And was Officer Kidwell present and sort of there to look

24   after Ms. Jones Spence's remains?

25   A    Yes.

1   Q    And inside this envelope are something Officer Kidwell

2   handed you at that time, is that right?

3   A    Yes.

4   Q    During the time that Officer Kidwell handed you this item,

5   was it actually right where the victim was?  Was the victim

6   present?

7   A    Yes.

8   Q    Showing you the contents of Government's Exhibit S-4B as in

9   Bravo.  I'll zoom in a little bit.  By looking at that,

10  Technician, can you tell what it is?

11  A    That was a possible bullet.

12  Q    And it's obviously not in the form of a bullet here.  But

13  does it appear metallic to you?

14  A    Yes.

15  Q    And did you retrieve it and submit it as a possible bullet?

16  A    Yes.

17  Q    And you submitted it into evidence for possible processing

18  by others?

19  A    Yes.

20  Q    Thank you.  Nothing further, Your Honor.

21       MR. KURLAND:  No questions, Your Honor.

22       THE COURT:  Thank you very much, ma'am.  Thank you for

23  coming in.  You're excused.

24       MR. HANLON:  Your Honor, may I go back to the witness

25  room real quickly?

1          THE COURT:  Certainly.

2          (Pause in Proceedings.)

3          MR. HANLON:  Your Honor, the United States calls

4   Detective Phil Marll.

5        DETECTIVE PHILLIP MARLL, GOVERNMENT'S WITNESS, SWORN

6          THE WITNESS:  Yes, I do.

7          THE CLERK:  Speak directly toward the mike.  State your

8   name and spell it for the record, please.

9          THE WITNESS:  It's Detective Phillip Marll.  That's

10  M-A-R-L-L.  From the Baltimore County Police Department.

11  Homicide Unit.

12          DIRECT EXAMINATION

13  BY MR. HANLON:

14  Q    Detective Marll, good afternoon to you.

15  A    Good afternoon, Mr. Hanlon.

16  Q    You've already indicated you work for the Baltimore County

17  Police Department Homicide Unit?

18  A    Yes, sir, I do.

19  Q    And you hold the rank of detective?

20  A    Yes, sir, that's correct.

21  Q    How long have you been a homicide detective?

22  A    22 years.

23  Q    And 22 years, you've investigated a number of homicides, is

24  that right?

25  A    Yes, that's correct.

1  Q    I won't attempt, unless you're comfortable to estimate how

2  many homicide you've done?

3  A    I don't have a count.

4  Q    And that's fine.  What other kind of work have you done as a

5  police officer?

6  A    I also have worked in the Burglary Unit, and in the last six

7  years, also working in homicide, but I began the Cold Case Unit

8  and started working cold cases and started investigating the old,

9  unsolved homicide cases.

10 Q    And that's what you've been doing for the last six years or

11 so?

12 A    Yes, sir.

13 Q    Directing your attention to June 7th of 2002, did you become

14 involved in a homicide investigation that day?

15 A    Yes, sir, I did.

16 Q    What part of town did you go to as part of that

17 investigation?

18 A    That was up in the Randallstown area of Baltimore County.

19 Q    And there's a large aerial photograph next to you which has

20 been marked as Government's Exhibit S-1.  Does this show the

21 neighborhood you went to?

22 A    Yes, sir, it does.

23 Q    And there's a red star near the top of Government's Exhibit

24 S-1 showing an 8618 Bramble Lane.  Do you see that?

25 A    Yes, that's correct.

1    Q    And I apologize for making you crane your neck, Detective.

2    A    That's okay.

3    Q    Is that the location you went to?

4    A    Yes, sir, it is.

5    Q    What was the name of the victim that you were investigating

6    in this case?

7    A    Ms. Tonya Jones Spence.  S-P-E-N-C-E.

8    Q    And now, do you know, when the initial call came out for

9    this homicide, when was it first reported?

10   A    The initial call --

11   Q    Well, let me ask you this, Detective.  Does 5:00 or

12   thereabouts sound right?

13   A    It was in the area of 5:00, yes, sir.

14   Q    You would have arrived at the location sometime later, is

15   that correct?

16   A    Yes.  I was advised of the incident at 8:35 p.m. and I

17   arrived there at 9:04 p.m.

18   Q    Is that often the case, that initially when something

19   happens, police officers, uniforms, crime scene personnel will

20   arrive initially and then the detective arrives later on?

21   A    That's correct.

22   Q    What did you do when you first arrived at 8618 Bramble Lane?

23   A    Upon my arrival at the location, the victim's apartment,

24   8618, Apartment 201, was already being, there was detectives and

25   officers already present inside the residence.  There was several

1    members from the Crime Lab and they'd already began collecting

2    evidence and fingerprinting and photographing the apartment.

3            At that time, upon my arrival, I found out that the

4    victim, Tonya Spence, Jones Spence, had passed on.  So what I was

5    told to do is to, that my partner and I would be the

6    investigators of the homicide.  So we began to direct the Crime

7    Lab in the collection of evidence and fingerprints and

8    photographs, things of that nature.

9    Q    Among the first things that you did was look around Ms.

10   Jones Spence's apartment, is that right?

11   A    That's correct.

12   Q    Government's Exhibit S-56.  Is this a photograph of the

13   exterior of that apartment building?

14   A    Yes, sir, it is.

15   Q    I'll move through some photographs quickly if I can,

16   Detective.  Government's Exhibit S-108.  Is this a photograph

17   near the front entrance to the apartment?

18   A    Yes, sir, it is.

19   Q    Is this the front entrance that I'm circling here?

20   A    Yes, sir, it is.

21   Q    Did you notice these items near the front, lying on the

22   ground outside the front of the Spence home?

23   A    Yes, sir.  They were still lying there upon my arrival.

24   Q    It was a couple items, including a fast food bag?

25   A    That's correct.

1   Q    Government's Exhibit S-109.  Is this the open front door to

2   the apartment?

3   A    Yes, sir, it is.

4   Q    When you arrived, Detective, and to your knowledge,

5   following the investigation, was there any sign or evidence of

6   forced entry into the Spence apartment?

7   A    No, sir, there was not.

8   Q    Government's Exhibit S-111.  111.  Is this a close-up view

9   of the open front door to the apartment?

10  A    Yes, sir, it is.

11  Q    Again, on the subject of forced entry, Detective -- excuse

12  me.  There's a, appears to be a crooked key, a crooked lock

13  mechanism there.  Did you notice that at the time?

14  A    Yes, sir, I did.

15  Q    Just some paint, things like that.  Was there anything about

16  this that you did not ascribe to normal wear and tear as opposed

17  to forced entry?

18  A    No, there was not.

19  Q    Government's Exhibit S-110.  Is this the living room of the

20  apartment?

21  A    Yes, sir, it is.

22  Q    And there was an outdoor balcony off of this third floor

23  apartment, is that right?

24  A    That's correct.

25  Q    Is this balcony here, one of the doors to the balcony?

DIRECT EXAMINATION OF DETECTIVE MARLL

113

1    A    Yes, sir, it is.

2    Q    Government's Exhibit S-114.  Is this the, a door in the

3    kitchen that also leads to the balcony?

4    A    That's correct.  It does.

5    Q    Government's Exhibit S-115.  Again, is that the balcony

6    itself on the outside?

7    A    Yes, sir.  That's correct, it is.

8    Q    Is this the kitchen door?

9    A    That's the kitchen door that was standing open upon my

10   arrival.

11   Q    Government's S-116.  Once again, balcony.  And is that the

12   living room?

13   A    Yes, sir.  That's correct.  That's the sliding glass door

14   leading back into the living room area.

15   Q    Now, at some point, Detective, you were shown a role of duct

16   tape, is that correct?

17   A    Yes, sir, I was.

18   Q    Government's Exhibit S-118 shows a photograph of duct tape

19   on the ground.  When you first saw this duct tape, was it inside

20   the apartment?

21   A    It was inside the apartment.  Yes, that's correct.

22   Q    Was it on the ground like it is here, had to be picked up to

23   shown to you?

24   A    It had already been collected by Technician Moore, and upon

25   my arrival, he had it in an evidence bag.  He pulled it out and

1  showed me the duct tape.

2  Q    The duct tape that Technician Moore, that's a crime scene

3  person, is that right?

4  A    Yes, sir, that's correct.

5  Q    The duct tape that he showed you, did it look like what's

6  shown in Government's S-118?

7  A    Yes, sir, it does.

8  Q    Let me show you what's been marked as Government's S-2.

9  Does this look familiar to you, Detective?

10 A    Yes, sir.  That appears to be the duct tape that was shown

11 to me at the victim's residence by Technician Moore.

12 Q    Now, when you first saw that duct tape, Detective Marll, did

13 you notice anything stuck to the duct tape?

14 A    Yes, sir.  There was a fingertip to a white or light colored

15 latex type glove attached to the sticky side of the tape.

16 Q    A moment's indulgence, Your Honor.  The latex glove was

17 still actually attached to the duct tape when you first saw it?

18 A    Yes, sir, it was.

19 Q    Rather, I should say a part of a latex glove?

20 A    It was like a fingertip portion of the latex glove.

21 Q    Marked as Government's Exhibit S-3 in this case, the large

22 envelope I just opened up contains a smaller envelope and its

23 contents, which I'm showing to Detective Marll.  Is that familiar

24 to you?

25 A    Yes, sir, it does.

1    Q    And what is that?

2    A    That is the portion of the latex glove that was found or

3    recovered from the sticky side of the duct tape.

4    Q    At some point, do you know, Detective, if any weapons were

5    found inside the Spence home?

6    A    Yes, sir, I am aware there was a weapon recovered inside the

7    apartment.

8    Q    Showing you Government's Exhibit S-121.  Is this a

9    photograph taken behind a piece of furniture or a dresser inside

10   the Spence home?

11   A    Yes, it is.

12   Q    And what does the item appear to be?  And it's at the bottom

13   of that photograph.

14   A    That is a handgun, automatic handgun recovered behind the

15   dresser.

16   Q    And showing you another photograph, a close-up of the same

17   item, Government's Exhibit S-113.  Is this the same apparent

18   weapon?

19   A    Yes, sir, it is.

20   Q    Was the item picked up and identified, Detective, as a

21   Taurus .40 caliber semi-automatic handgun?

22   A    Yes, sir, it was.

23   Q    And was it entered, submitted into evidence under Property

24   Number 9044-010.

25   A    That's correct, it was.

1    Q    About how long did you stay at the Spence residence on that

2    first, first time?

3    A    I would probably say at least a couple hours.  Two, three

4    hours at the most.

5    Q    Now, what else did you do on that first day, June 7th, as

6    we're approaching midnight on the morning of June 8th?

7    A    Once I left the apartment, I ended up going to Precinct 2 to

8    interview the defendants who had been arrested.  And I responded

9    to Precinct 2, which is Woodlawn police station, to interview

10   them.

11   Q    And what else did you do, aside from that?  Any other work

12   at Precinct 2 that you did?

13   A    I'm sorry.  What was that again?

14   Q    Aside from that, did you do any other work at Precinct 2 or

15   did you go out to any other locations?

16   A    After I left the residence, I went to Precinct 2.  I rode

17   past a wooded area that was, where it was pointed out to me

18   where, that the suspects who were arrested had ran into.  But it

19   was so dark at that time I didn't go into the wooded area that

20   night.

21   Q    Staying with the recovery of items.  Something I neglected

22   to ask you, Detective, and I apologize.  Government's Exhibit

23   S-101.  Is this the exterior of the Bramble Lane apartment?

24   A    Yes, sir, it is.

25   Q    And again, you would not have been present for any treatment

1    of the victim, Ms. Spence, or anything like that, is that

2    correct?

3    A    No, sir, I was not.

4    Q    You are aware that crime scene personnel would have done a

5    search around, in the space under the balcony and around about

6    the lawn, including picking up items here and there, is that

7    correct?

8    A    Yes, sir, prior to my arrival.  Yes, sir.

9    Q    Showing you what's been marked as Government's Exhibit S-4C

10   as in Charlie.  You indicated that Crime Scene Technician Moore

11   was picking up items inside the apartment?

12   A    He was processing inside and some of the outside of the

13   apartment.

14   Q    With respect to some of the outside items, does Government's

15   Exhibit S-4C contain an item labeled, marked as fragments from

16   under balcony?

17   A    That's correct.

18   Q    And there's an address listed as 8618 Bramble Lane, Number

19   201?

20   A    Yes, sir, it is.

21   Q    And there's a recovery date of 6/7/02, is that right?

22   A    That's correct.

23   Q    And for the record, this is marked as Property Number

24   9044-009, is that right?

25   A    Yes, sir, it is.

118

1    Q    Now, you alluded to something else, Detective.  At some

2    point you leave the apartment, you go back to the precinct, and

3    at some point you return to a wooded area off of Carlson Lane, is

4    that right?

5    A    That's correct.

6    Q    By that point were we getting into the morning of June 8th,

7    2002?

8    A    Yes, it would have been.

9    Q    So there were several hours worth of things that you and the

10   other officers were doing prior to your return to the woods?

11   A    That's correct.

12   Q    Again, attempting to aim my laser pointer here at

13   Government's Exhibit S-1.  And if you could crane your neck for

14   me a little bit.  Am I circling the wooded area here?

15   A    Yes, sir, you are.

16   Q    What was the purpose of returning to that wooded area that

17   day?

18   A    Well, the suspects who were arrested had been seen running

19   in from the wooded area from Carlson Lane, and they were arrested

20   on the other side of the woods, around Green Brush Court.  So I

21   wanted to go back into the woods just to see if there was any

22   physical evidence in the woods that may have been left behind by

23   the suspects responsible.

24   Q    During that initial search on the morning of June 8th of

25   2002, would you call that a complete, comprehensive search or a

1    brief search?

2    A    Very brief search.

3    Q    Did you recover anything on that particular day?

4    A    No, sir, I did not.

5    Q    Did you as the investigator feel that you should return to

6    the scene later on to see if you, if there might still be

7    something to be recovered there?

8    A    Yes, I did.

9    Q    Directing your attention, then, to June 9th of 2002,

10   Detective.  Did you and some other officers go out -- strike

11   that.  Did you send some other officers out to the location?

12   A    Yes, sir, I did.

13   Q    Now, on that particular day, June 9th of '02, you began by

14   conducting a search at a residence which was believed to be Mr.

15   Gardner's residence, one of the suspects, is that right?

16   A    Yes, sir, that's correct.

17   Q    And was that on Ambo Circle in Baltimore County?

18   A    82 Ambo Circle, yes.

19   Q    I'll ask you about that in a little while.  At some point

20   you're on Ambo Circle, you're doing things, and you received word

21   from some of the officers at the woods to come to the woods to

22   see some things, is that right?

23   A    That's correct.

24   Q    We're going to talk about a number of visits that you made

25   out to that Carlson Lane woods during the course of your

1    investigation.  Let me ask you a general kind of procedural

2    question.  You were not the first officer to discover each and

3    every one of the items we're going to talk about today, is that

4    right?

5    A    That's correct.  No, I was not.

6    Q    How was the procedure, then?  Would items be brought to you

7    by the discovering officer and they would say, look, Detective,

8    look what I found?  Or was there something different?

9    A    The procedure is that once the item is discovered, that the

10   officer would stop, whoever would find it would stop, mark the

11   items, make sure that a supervisor, or if I was there, notified

12   me to respond, and then if the Crime Lab technician was close by

13   or I'd get a Crime Lab technician to come and photograph the

14   item, where it laid, and then to recover the item by the Crime

15   Lab technician.

16   Q    The items that you are going to talk about today, did you

17   have an opportunity to look at them before they were actually

18   picked up?

19   A    Yes, sir.

20   Q    Let me ask you, then, about June 9th of 2002.  Your Honor,

21   if I may approach again.

22   A    Yes.

23   Q    Detective, you've alluded to this already, but just so we

24   can understand how you chose to frame the various searches that

25   you did.  You had information that suspects had entered the woods

1    on Carlson Lane, is that right?

2    A    Yes, sir, that's correct.

3    Q    And if I can indicate with my finger.  Am I indicating with

4    my finger to the right of the first green dot, was that what you

5    believed to be the approximate entry point?

6    A    Yes, sir, that's correct.

7    Q    And you also had information from other officers that two

8    suspects had been detained on the other side of the woods, is

9    that right?

10   A    That's correct.

11   Q    And am I indicating with my finger in between the last two

12   green dots on the left, does this reflect the approximate

13   location where those two suspects were first cited by Baltimore

14   County officers?

15   A    Yes, sir, that's correct.

16   Q    During the time of this case, did you have a chance to walk

17   the space from the first green dot to those last two green dots?

18   A    I'm sorry.  What was that again?

19   Q    Did you have an opportunity to walk along, through the woods

20   between those two green dots?

21   A    Yes, I did.  The morning of the 8th, I made a fast walk

22   through the wooded area.  There's a, sort of a beaten path that

23   cuts through from 8407 Carlson Lane to the rear of 3303 Green

24   Brush, or Number Three Green Brush Court, rather.  And I walked

25   through that area just with several other officers, just to get

DIRECT EXAMINATION OF DETECTIVE MARLL                    122

1    an idea what the location was like.

2    Q    Government's Exhibit S-122.  Does this photograph show part

3    of that wooded path?

4    A    Yes, sir, it does.

5    Q    And does it run -- the brush is sometimes a little bit more

6    full in some places than others, is that correct, in the woods?

7    A    That's correct.

8    Q    By the way, do these woods even still exist today in the

9    same form?

10   A    I'm sorry.  What was that?

11   Q    Do the woods still exist today in the same form?

12   A    No, sir, they do not.

13   Q    It's been some construction in the area?

14   A    It's a parking lot now for the hospital, Northwest Hospital.

15   Q    Now, on June 9th of 2002, you go from Ambo Circle to the

16   wooded area where you already have some officers searching.  Were

17   you directed to any discoveries?

18   A    Yes, sir, I was.

19   Q    Let me show you Government's Exhibit S-124.  What is shown

20   in S-124?

21   A    That is the front section of a Nextel I-90 cellular

22   telephone.

23   Q    And was it, was this the condition the phone was in when it

24   was first discovered, when you first saw it?

25   A    Yes, it is.

1   Q    Now, the phone as it lay here in Government's 124, was it a

2   complete cell phone?

3   A    No, sir, it was not.  That was just the front section of the

4   cell phone, with some wires hanging out the top of it.

5   Q    Did it appear to have been broken up?

6   A    Yes, sir, it was.

7   Q    Showing you Government's Exhibit S-126.  What is that?

8   A    That's what I would refer to as the back part section of the

9   telephone, the part with the key pad on it and the antenna.

10  Q    And again, this particular item seen in 126, was this also

11  photographed as it lay here?

12  A    Yes, sir.  That's correct.

13  Q    About how far were these two items, the two halves of the

14  cell phone from one another?

15  A    They weren't that far apart.  I don't have an exact

16  measurement.  I do know they were approximately 30 to 40 yards

17  from the entrance into the woods.

18  Q    Government's Exhibit S-128.  Can you tell us what that is?

19  A    Yes, sir.  That is a battery for a Nextel I-90 cellular

20  telephone.

21  Q    And again, the battery was photographed as it was found on

22  the ground there?

23  A    Yes, sir, it is.  Yes, sir, it was, rather.

24  Q    And to your recollection, and it may seem obvious, the two

25  pieces of the cell phone that we looked at earlier, did they have

1    a battery in them?

2    A    No, they did not.

3    Q    Now, was any attempt made to get either of these two pieces

4    of the cell phone, to put them back together and make the cell

5    phone work?

6    A    Yes, sir.  Once they were photographed where they lay, they

7    were recovered by the Crime Lab technician.  And once he got

8    them, and he had gloves on, we all had gloves on, the phone was

9    put back together.  The wires were still hanging out.  And they

10   were able to snap the wires back together so the phone would be

11   basically one piece again.

12        The battery that was found, the battery in this exhibit

13   here, was placed into the back of the cellular telephone, and we

14   tried to turn it on and it did not activate.  I assume that the

15   battery was dead at that time.

16        There was Officer Greg Mead was on the scene and he

17   happened to have an I-90 Nextel cellular telephone in his

18   possession.  And he decided to take his battery out of his and we

19   put it into this phone that was recovered at the location.  As

20   soon as we put his battery in, the phone began to activate.  So

21   we knew we had some type of life in the phone again.

22        I then contacted Mr. Darius Spence, the victim's

23   husband, and asked him to call her phone number, to see if this

24   phone would activate.  When he did, the phone did activate.

25   Q    Let me ask you about that last part again.  You have the

1  cell phone that you've put back together and you've put a working

2  battery into it?

3  A    First we put the battery that was recovered in the woods in

4  it and then we put Officer Mead's battery in it.

5  Q    After Officer Mead's battery was put into it, it appeared to

6  be functional?

7  A    Yes, that's correct.

8  Q    You then contacted Darius Spence, the husband of your

9  victim, Tonya Jones Spence?

10 A    That's correct.

11 Q    And what phone did you call Mr. Spence on?  Was it this

12 broken-up cell phone or your own?

13 A    I used my own at that time.

14 Q    And you asked Mr. Spence, Darius Spence, by phone to do

15 something for you?

16 A    I'm sorry.  What was that?

17 Q    You asked Mr. Spence to do something for you?

18 A    Yes, I did.

19 Q    What did you ask Mr. Spence to do?

20 A    I just asked him to call his wife's cellular telephone

21 number.  And he did so.

22 Q    After giving Mr. Spence that request, did the broken-up cell

23 phone you found in the woods then ring?

24 A    Yes, sir.  I don't know if it rang or vibrate.  But it

25 started lighting up and everything.

1    Q    And could you tell who was calling the phone?

2    A    Yes, we could.

3    Q    And how were you able to tell that?

4    A    Because the number was read out on her phone.

5    Q    And what was the phone number that was contacting the broken

6    phone in the woods?

7    A    Mr. Spence's phone.  A minute.

8    Q    Was it Mr. Spence's phone, Detective?

9    A    Yes.  I have it in here.  But I just don't have it on top.

10   443 -- no, I'm sorry.  It was Mr. Spence's phone number.  I just

11   don't have it off the top of my head.

12   Q    That's fine.  But the phone that came up on the read-out was

13   the same number that you called a moment before to reach Mr.

14   Spence, is that right?

15   A    Yes, that's correct.

16   Q    And showing you Government's Exhibit S-33.  Does this item

17   look familiar to you?

18   A    Yes, sir, it does.

19   Q    And what is this?

20   A    That is the I-90 Nextel telephone that was recovered from

21   the wooded area.

22   Q    And taking a look at it here.  It does appear to have been

23   reassembled.  Is that based on the work you did in the woods?

24   A    You can't tell it's been reassembled.  But it was

25   reassembled.  You can see the battery, it's sticking out on the

1  back part of the phone.  That's the battery that was recovered in

2  the woods.

3          THE COURT:  Is this a good point, Mr. Hanlon?

4          MR. HANLON:  That will be fine, Your Honor.

5          THE COURT:  We will break for luncheon recess at this

6  time, ladies and gentlemen of the jury.  Please leave your note

7  pads on your chairs.  Have no discussion about any of the

8  evidence you've heard so far or about the case.  Continue to keep

9  an open mind about all issues.

10         It's approximately 12:45.  Please be back in the jury,

11 room prepared to resume, at 2 p.m. in afternoon.

12         Jury's excused for luncheon recess until 2 p.m.  we're

13 in recess until two p.m.

14         (Recess at 12:45 p.m.)

15         THE COURT:  We'll have the jury.

16         (Witness enters the courtroom.)

17         (Jury enters the courtroom at 2:03 p.m.)

18         THE COURT:  Good afternoon, ladies and gentlemen.

19 Please make yourself comfortable, Detective Marll.  Whenever

20 you're ready, Mr. Hanlon.

21 BY MR. HANLON:

22 Q   Thank you, Your Honor.  Detective Marll, good afternoon to

23 you.  Before we broke for lunch, I'd asked you about the recovery

24 of this cell phone, which is pictured in this photograph, S-129.

25 And we discussed a procedure that you and some other officers

1    used to contact Darius Spence, and then having him ring or call

2    his wife's cell phone, is that correct?

3    A    Yes, sir, that's correct.

4    Q    At some point, Detective, did you go through the process of

5    verifying the phone number for this phone, the phone found in the

6    woods?

7    A    Yes, sir, I did.  It's 443-375-2168.

8    Q    Now, the, that number, 443-375-2168, is that registered to a

9    particular name?

10   A    To Darius Spence.

11   Q    And again, just so we're clear.  That is the phone number

12   for this phone found in the woods?

13   A    Yes, sir, that's correct.

14   Q    During the course of your investigation, did you obtain toll

15   records or call records for the phone from the woods,

16   443-375-2168?

17   A    Yes, sir, I did.

18   Q    And did you find any contacts, phone calls between this

19   phone and any other phone numbers that you noted?

20   A    Yes, sir, I did.

21   Q    What did you note?

22   A    I noticed that there was quite a few phone calls between

23   that phone number and there was a phone, it was a phone number --

24   one second.  443-324-1107.

25   Q    Specifically, did you find 410 phone contacts between this

1    phone in the woods and the 443-324-1107?

2    A    Yes, sir, I did.

3    Q    And were you able to verify the subscriber information or

4    the user for 443-324-1107?

5    A    Yes, sir, I was.

6    Q    And who was that?

7    A    It was, the user was a Jamane Antonio Johnson.

8    Q    And the time frame for that 401 calls was approximately a

9    five week period beginning May 1st, 2002 through the day of the

10   murder, June 7th of '02?

11   A    Yes, that's correct.

12   Q    I will ask you some additional questions about phone records

13   in a little while.  But let me continue to move through the

14   woods, if I may.  We've talk about the recovery of a cell phone

15   from the woods.  As you got closer to The Greens edge of the

16   Carlson Lane woods, did you find anything else or were you

17   directed to anything else of interest that had been discovered?

18   A    Yes, sir.  At approximately 7:00 p.m. I was discovered to a

19   large tree located in the back end of, I guess the rear yard of

20   Three Green Brush Court.  There was a K-9 officer, Officer

21   Garner, who had pointed out to me a, at the base of a tree a

22   sweatshirt and a hat.

23   Q    Let me show you what's been marked as Government's Exhibit

24   S-134.  Does this photograph show those items as you observed

25   them on that day?

1    A    Yes, sir, it does.

2    Q    And you did have an opportunity to look at the items before

3    they were actually picked up?

4    A    Yes, sir, I did.

5    Q    And you've already alluded to this.  But the two items

6    respectively, what was that, that I've circled?

7    A    The hat, the item that's circled there is a red baseball

8    style hat.  It had a New York logo on the front of it and white

9    lettering.

10   Q    And then?

11   A    That is a gray-colored Roca wear T-shirt.  It had Roca wear

12   written across, printed across the front of it.  Extra extra

13   large size.

14   Q    Government's Exhibit 133.  Is this a closer view of the same

15   items?

16   A    Yes, sir, it is.

17   Q    Now, in terms of the location of these items, they were,

18   you've already indicated they were next to a tree, is that right?

19   A    That's correct.  At the base of a tree.

20   Q    Approximately where in the Carlson Lane woods were these

21   particular items found?  In the middle or near the end?

22   A    Towards the end.

23   Q    And on the end, on The Greens side, opposite Carlson Lane?

24   A    I'm sorry.  What was that?

25   Q    The end of the woods, on The Greens side, opposite Carlson

1   Lane?

2   A    Yes, that's correct.

3   Q    Let me show you.  We see some underbrush at a tree in this

4   photograph which is S-135 -- S-133.  Let me show you another

5   photograph, Government's Exhibit S-135.  What is seen here?

6   A    This photograph depicts the location of the tree, you see

7   the large tree towards the center of the photograph, which is

8   covered by quite a bit of foliage at the bottom.  Behind that

9   foliage, on the right side of the base of the tree would be where

10  that hat and sweatshirt was recovered.

11  Q    If I'm understanding correctly, is that behind this foliage

12  here?

13  A    Yes, sir, that's correct.

14  Q    Now, obviously, over on this side of the exhibit we have the

15  wooded area, is that correct?

16  A    That's correct.

17  Q    And then on this side, are we looking at basically the edge

18  of the tree line of the Carlson Lane woods?

19  A    That's correct.

20  Q    Let me show you, take a closer look at some of these items.

21  Both of the items were recovered, picked up by police personnel,

22  is that right?

23  A    Yes, sir, that's correct.

24  Q    Let me show you what's been previously marked in this case

25  as Government's Exhibit S-67.  This exhibit has some writing on

Case 1:04-cr-00029-RDB   Document 686   Filed 06/12/09   Page 132 of 239

1    the back of it, Detective Marll.  But on the other, on the

2    opposite end, there's a photograph.  What is shown in that

3    photograph?

4    A    This photograph depicts the Roca wear lettering I was

5    speaking about just a few moments ago on the gray colored

6    T-shirt.

7    Q    And then, this is the Roca wear shirt found that we were

8    just looking at in the photos in the woods?

9    A    Yes, sir, it is.

10   Q    Your Honor, may I move out this table, out to the middle?

11        THE COURT:  Yes, of course.

12   Q    This item is marked as Government's Exhibit S-31.  I'm

13   putting it up on the screen, Detective.  Do you see that?

14   A    Yes, sir, I can.

15   Q    And what is this?

16   A    That is the actual item, the actual T-shirt that was

17   recovered from the tree at the rear of Three Green Brush Court.

18   Q    Your Honor, may I publish this to the jury?

19        THE COURT:  You may.

20   Q    Would the Court prefer for me to hand it around?

21        THE COURT:  I think you could just hold it up.  That

22   would be more than sufficient, Mr. Hanlon.

23   Q    Showing you a photograph, Government's Exhibit S-140.  What

24   is shown in this photo?

25   A    That is the baseball hat that I was referring to earlier

1    with the white lettering, the New York baseball cap.

2    Q    This is a photograph.  Showing you the item marked as

3    Government's Exhibit S-32.  What is S-32?

4    A    That is the actual baseball hat that was recovered from the

5    base of the tree in the rear of Three Green Brush Court.

6    Q    Again, Your Honor, if I may.

7         (Mr. Hanlon shows exhibit to the jury.)

8    Q    At some point, Detective, again, we're continuing to talk

9    about the June 9th of 2007 search of the wooded area.  At some

10   point, did you work your way into The Greens neighborhood itself

11   and have occasion to look in a storm drain?

12   A    Yes, sir, I did.  On both actually June 8th and June 9th I

13   had looked in the storm drain across from Three Green Brush

14   Court, in the front of the house.

15   Q    And what caused you to take a look in a storm drain?

16   A    An officer directed my attention to that location.  There

17   was a walkie-talkie, a yellow and black colored walkie-talkie in

18   a storm drain.  I looked at it.  One of the officers tried to

19   remove the storm drain to see if he could get it out.  He

20   couldn't lift the storm drain.

21        At that time, we had no reason to believe it had

22   anything to do with this incident whatsoever.  I just figured it

23   might be a toy for a child, children in the neighborhood.  So we

24   just left it there at that time.

25   Q    Government's S-152.  Is this a photograph of the storm drain

1    you looked in?

2    A    Yes, sir, it is.

3    Q    And again, you did, when you first checked, actually saw a

4    yellow walkie --

5    A    What was that?

6    Q    You actually saw a yellow walkie-talkie like object inside

7    that drain?

8    A    That's correct.

9    Q    You've already mentioned this.  The grate was kind of heavy,

10   of this storm drain, is that right?  It was rather difficult to

11   get into?

12   A    It was just difficult.  I don't know how heavy actually it

13   was.  But I know the officer pulled on it and he was a lot bigger

14   than I was, and he couldn't lift it.  So I didn't even try.

15   Q    So as of that day you made a decision, probably didn't have

16   anything to do with this case, no need to recover?

17   A    That's correct.

18   Q    There did come a time, Detective, to allude to something

19   later, that you did have cause to return to that storm drain, is

20   that right?

21   A    That's correct.

22   Q    We will come to that.  We've been talking about June 9th of

23   2002.  At some point did you call an end to the search on June

24   9th of '02?

25   A    Did I do what?

1   Q    At some point did you call an end to the search on June 9th

2   of '02?

3   A    Soon after that shirt and hat was recovered, the search was

4   concluded.  It was starting to get dark out so we called the

5   search off.

6   Q    You actually had some K 9's working with you during the

7   search on that day, is that right?

8   A    That's correct.

9   Q    To your knowledge, were the K 9's helpful in identifying the

10   clothes that were recovered that day, do you know?

11   A    Yes, that's correct.

12   Q    As of that day, you still had not recovered any firearms or

13   guns in the woods, is that right?

14   A    As of that time, no.

15   Q    Did that cause you to feel that it would make sense to

16   return to the woods?

17   A    Yes, it did.

18   Q    Let me direct you, then, to June 14th of 2002.  Was another

19   search conducted in the woods that day?

20   A    Yes, sir.  There was another limited search with several

21   members from the Homicide Unit, myself, my partner and Officer

22   Greg Mead.

23   Q    Do you remember if any dogs were involved in that search?

24   A    No, sir, there was not.

25   Q    Showing you Government's Exhibit 141.  Doesn't come out

1    great on the DOAR system.  Can you recognize what 141 is?

2    A    Yes, sir, I can.  It is a pair of latex gloves that were

3    recovered on this particular day, June 14th.

4    Q    And for the record, that was S-141, Detective, is that

5    correct?

6    A    That was what, sir?

7    Q    I marked this as Government's Exhibit S-141, for the record.

8    A    Okay.

9    Q    And showing you what has been marked as Government's Exhibit

10   S-34.  The gloves were picked up and put into evidence, is that

11   right?

12   A    Yes, sir, they were.

13   Q    Can you tell us what I've put on the screen here?

14   A    Yes, sir, I can.  That's a pair of latex gloves that were

15   recovered on June 14th in close proximity to the area where the

16   cell phone I testified to earlier was recovered.  All in the same

17   area.

18   Q    These latex gloves are both rather dark, is that correct,

19   Detective?

20   A    That's correct.  They are now, yes.

21   Q    Were they dark at the time of the recovery?

22   A    No, sir, they were not.

23   Q    Why are they dark now?

24   A    There was chemical tests to try and obtain fingerprints off

25   these gloves, which would change the color and the appearance of

1    the gloves.

2    Q    And we will talk about some of those efforts in a little

3    while.  But since we're on the subject, were any fingerprints

4    whatsoever found on these latex gloves?

5    A    No, there was not.

6    Q    Government's Exhibit 142.  Can you tell us what's pictured

7    in this photograph?

8    A    Yes, sir, I can.

9    Q    What is that?

10   A    That is a back, a backing for the cell phone, the I-90

11   Nextel cell phone.  It's actually the cover on the phone.  If you

12   remember from the photograph earlier, I said that the phone, or

13   the battery was sticking out the back of the phone.  There was no

14   cover on it.  On June 14th, when we went back in the woods, we

15   were able to locate the cover for that phone.

16   Q    Government's Exhibit S-35.  Is that the cell phone cover you

17   were just describing?

18   A    Yes, sir, that's correct.

19   Q    Detective, the various items that we've been talking about

20   that were recorded on these two respective searches that we've

21   spoken about so far, approximately where were these various items

22   found in relationship to that wooded path that follows through

23   the woods?

24   A    All the items were found approximately 30 to 40 yards from

25   the entrance of 8407 Carlson Lane, where the wood path actually

1    started off of Carlson Lane.  And all the items were, although

2    they were covered by foliage, the ground clutter, foliage, they

3    were all in fairly close proximity to one another.

4    Q    Now, during the course of your investigation, were you

5    interested in locating a Dodge Intrepid?

6    A    Yes, sir, I was.

7    Q    And why were you interested in locating a Dodge Intrepid?

8    A    Because I knew that the defendant, Shawn Gardner, had a

9    Dodge Intrepid listed to him.  And from what, the information I

10   obtained from witnesses on June 7th and June 8th, I wanted to

11   find his vehicle and search it in reference to this homicide.

12   Q    Directing your attention to June 20th of 2002.  Did you

13   receive word that day that a Dodge Intrepid had actually been

14   located by the police?

15   A    Yes, sir, I did.

16   Q    And specifically, if I understand, if I recollect, was it

17   located in Baltimore City and then moved to Baltimore County for

18   a search?

19   A    Yes, that's correct.  It was towed to Baltimore County.

20   Q    You were not involved in the actual recovery or seizure of

21   the vehicle, is that right?

22   A    No, sir, I was not.

23   Q    But you did have an opportunity to see the vehicle when it

24   got brought to the Baltimore County Police Headquarters?

25   A    Yes, sir, I did.

1    Q    Government's Exhibit S-143.  What is shown in this

2    photograph?

3    A    This is the Dodge Intrepid that lists to the defendant,

4    Shawn Gardner.  Although it looks, appears to be blue in this

5    photograph, it's actually a green color.  And the tag is KEB-173.

6    Q    You said KEB-173, Detective.  Is it a possibility, let me

7    show you what's been marked as Government's Exhibit S-145.

8    Actually, may I approach the witness, Your Honor?

9         THE COURT:  Yes.

10   Q    With respect to the tag number.

11   A    I'm sorry.  KEB-973.  My mistake.

12   Q    S-145, which is the photograph I was just showing you.  The

13   lighting blocks out the tag a little bit.  But I believe you

14   indicated it's KEB-973?

15   A    Yes, sir.  I'm sorry.  That's correct.

16   Q    And just by way of another view of the car.  This is same

17   vehicle pictured in S-144?

18   A    Yes, sir, that's correct, it is.

19   Q    When this car got brought back to the Police Headquarters,

20   what did you do with it?

21   A    Obtained a search and seizure warrant for the car, applied

22   for one through a judge in Baltimore County, Judge Cadigan.  He

23   reviewed and signed the search and seizure warrant.  And then

24   myself, along with several members from the Crime Lab, and

25   Detective Tincher, my now retired partner, searched the vehicle.

1    Q    Now, we discussed previously that the vehicle had actually

2    been located by police and brought to Baltimore County Police

3    Headquarters, is that right?

4    A    Yes, sir, that's correct.

5    Q    At any point -- and just answer this yes or no if you

6    would -- did you have an opportunity to talk to the person who'd

7    been located driving that vehicle?

8    A    Yes, I did.

9    Q    And did you identify the person who had been seen driving

10   the vehicle at the time the police found it that day?

11   A    Yes, sir, I did.

12   Q    Who was that?

13   A    It's Walter Nathaniel Gardner, III, Shawn Gardner's brother.

14   Q    Did you conduct a complete search of the vehicle back at

15   Baltimore County?

16   A    Yes, sir, I did.

17   Q    Just show, walk through a few photographs, if I may.

18   Government's Exhibit 146 shows the back seat of the vehicle, is

19   that right?

20   A    Yes, sir, it does.

21   Q    Government's Exhibit 150.  Again, it doesn't show up great

22   on the light.  But this shows a portion of the glove compartment,

23   is that right?

24   A    Yes, sir, it does.

25   Q    Did you find anything of interest in the glove compartment?

DIRECT EXAMINATION OF DETECTIVE MARLL                141

1    A    A pair of latex gloves, light in color, like off-white in

2    color, latex.

3    Q    Showing you what's been marked as Government's Exhibit S-53.

4    Are these items familiar to you, Detective?

5    A    Yes, sir.  That's a pair of latex gloves that were recovered

6    from Mr. Gardner's vehicle.

7    Q    And once again, there's some discoloration on the gloves.

8    Is that also from attempted fingerprinting?

9    A    Yes, sir, that's correct.

10   Q    Did you also find a registration for the vehicle?

11   A    Yes, sir, I did.

12   Q    Government's Exhibit S-52.  Is this the registration found

13   in the Dodge?

14   A    Yes, sir, it is.

15   Q    Did this also come out of the glove box?

16   A    Yes, sir, it did.

17   Q    And if you would, Detective, tell us to whom was this Dodge

18   Intrepid registered.

19   A    Shawn Earl Gardner, 82 Ambo Circle, Baltimore, Maryland,

20   21220.

21   Q    Government's Exhibit S-148.  This is a photograph of the

22   trunk of the vehicle?

23   A    Yes, sir, it is.

24   Q    And another photograph from a slightly different

25   perspective, Government's Exhibit S-149.  Is that another photo

1    of the trunk?

2    A    Yes, sir.  That's correct, it is.

3    Q    Was anything found in the trunk that was of interest to you?

4    A    Also a pair of latex gloves recovered from the trunk of the

5    vehicle.

6    Q    Showing you Government's S-154.  Are these the gloves in

7    question?

8    A    Yes, sir, they are.

9    Q    Once again, the discoloration, is that from attempted

10   fingerprinting?

11   A    That's correct.

12   Q    Was there also a plastic bag found inside the trunk,

13   Detective, which I've also marked as Government's Exhibit S-54?

14   A    Yes, sir, that's correct, it is.

15   Q    And specifically, this is a bag for what?

16   A    For latex disposable gloves.  Says Playtex, all purpose

17   disposable gloves.

18   Q    To your knowledge, were the two gloves also found in the

19   truck the only, or in the car the only two latex gloves that were

20   still in that plastic bag?

21   A    That's correct.

22   Q    The bag would have originally contained ten latex gloves, is

23   that right?

24   A    Yes, sir, that's correct.

25   Q    Let me ask you about this item.  This has been marked as

1    Government's Exhibit S-55, reflecting the recovery of an item

2    from the passenger side door holder, is that right?

3    A    That's correct, it was.

4    Q    Can you tell us what this slip of paper is?

5    A    It's a slip of paper that has various phone numbers and

6    names on it.

7    Q    Let me ask you about some of these names.  Is that the name

8    Bo?

9    A    That's correct, it is.

10   Q    Is there a name Purple?

11   A    Yes, sir, it is.

12   Q    Can you read that name here that I've circled?

13   A    Looks like Goose, G-O-O-S-E, is the way I interpret it.

14   Q    This piece of paper was also taken into evidence?

15   A    Yes, sir, it was.

16   Q    Let me show you Government's Exhibit S-147.  Is this the

17   front seat of the vehicle?

18   A    Yes, sir, that's correct, it is.

19   Q    The glove box which we've already talked about is up there,

20   is that correct?

21   A    That's correct.

22   Q    Was anything found under the front seat?

23   A    Yes, sir, it was.  There was a Bell South walkie-talkie,

24   yellow and black in color.  As soon as it was recovered from

25   underneath the seat, I realized that it looked identical to the

1    walkie-talkie I observed in the storm drain across from Three

2    Green Brush Court on the 8th and the 9th of June.

3    Q    Showing you Government's Exhibit S-51.  Can you tell us what

4    S-51 is?

5    A    Yes, sir.  That is the Bell South Model 1010 walkie-talkie

6    that was recovered from the front seat, from under the front seat

7    of Mr. Shawn Gardner's vehicle.

8    Q    There were also, Detective, a number of other items found in

9    the Dodge Intrepid, including a number of cellular telephones, is

10   that right?

11   A    Yes, sir, there was.

12   Q    Now, we talked about the recovery of this yellow

13   walkie-talkie on June 20th of 2002 during the search of the car.

14   After finding that yellow walkie-talkie, did you go some place?

15   A    What I did was I immediately contacted a marked unit to go

16   to the storm drain across from Three Green Brush Court to see if

17   that walkie-talkie was still in the storm drain.  When the

18   officer arrived there, the walkie-talkie was not there.

19        I also went to the location and checked the storm drain

20   and checked the discharge area and could not find the

21   walkie-talkie.

22        Based on that information, I contacted Baltimore County

23   Bureau of Utilities and asked if there was any way that they

24   could get down to the storm drain to try and see if the

25   walkie-talkie flushed down, because it had been some storms, some

1    heavy rains between the June 8th and the time of June 24th.

2           So I spoke to them and found out that they did have a

3    way of inspecting the storm drains.  And part of the inspecting

4    the storm drains, they put a camera down inside the storm drain.

5    And if there was anything inside there, they also could pick that

6    up and tell us if there was a walkie-talkie in there.

7    Q    Let me ask you a couple of questions there, Detective.  When

8    you went back to the storm drain, the storm drain is this one,

9    which is pictured in Government's S-152, is that right?

10   A    Yes, sir, that's correct.

11   Q    The yellow walkie-talkie wasn't there any more, is that

12   right?

13   A    That's correct.

14   Q    Now, you indicated that there had been some rain between

15   June 8 and 9th and June 20th when you went out there?

16   A    Yes, sir, that's correct, it did.

17   Q    Let me show you, I'm not sure how well it's going to come up

18   on the screen.  But this photograph, which was taken of the latex

19   gloves on June 14th of 2002.  Can you see any evidence of weather

20   in this photograph?

21   A    Yes.  You can clearly see that everything's wet from a prior

22   rain storm.

23   Q    So did you theorize that perhaps the yellow walkie-talkie

24   had been pushed farther down the drain?

25   A    Yes, that's what I figured possibly could have happened.

1    Q    So this is June 20th of '02.  And you're out there and the

2    walkie-talkie is not there any more.  You call utilities.  Were

3    they able to come that day?

4    A    No, sir, they were not.

5    Q    When were you able to get back out there?

6    A    They were not able to meet with us until June 24th, 2002.

7    Q    And what procedure did they go through on June 24th of 2002?

8    A    As you can see in the photograph, there's a truck backed up

9    to the storm drain.  Inside the truck they had a torpedo-shaped

10   implement that they were able to -- they removed the storm drain

11   cover and they put this torpedo-shaped instrument down inside the

12   storm drain.  On the front of the instrument, there's a camera.

13   And as it, it's also motorized, it has wheels on it.  As it rolls

14   through the storm drain, they check for cracks in storm drains,

15   things of that nature.

16        While that's doing that, there's an operator that's

17   inside the back of this truck here and he has a TV monitor.  He

18   can watch every movement that the instrument makes.

19        And as the instrument proceeded down the storm drain

20   further, he was able to pick up and photograph a yellow and black

21   walkie-talkie that appeared to be the same one I observed on June

22   8th and June 9th.

23   Q    When that walkie-talkie was picked up, it was placed on the

24   street and photographed near the man hole, is that right?

25   A    That's correct.

1    Q    Government's 154.  Is that the photograph of your recovered

2    walkie-talkie?

3    A    Yes, sir, it is.

4    Q    Showing you what has been previously marked as, for

5    identification as S-36.  Can you tell us what that item is?

6    A    Yes, sir.  Again, that is the Model 1010 Bell South

7    walkie-talkie.  You can see it's yellow and black in color.

8    Q    And is this the walkie-talkie that was recovered from the

9    storm drain that day?

10   A    Yes, sir, it is.

11   Q    Your Honor, this walkie-talkie previously had been marked

12   for identification.  I would move it into evidence at this time.

13            THE COURT:  It's admitted.

14   Q    Now, I don't want to -- did you compare the walkie-talkie

15   from the storm drain with the walkie-talkie from the Intrepid?

16   A    Yes, sir, I did.

17   Q    How did they compare, Detective?

18   A    I noticed that the walkie-talkies were identical in the

19   model.  I did notice that their serial numbers were similar

20   except for the last four digits.  One ended in 4472 and I think

21   that was the one recovered from the car, and the other one

22   recovered from the storm drain ended in 3549.  Like 923 digits

23   apart.  Other than that, they were identical.

24   Q    You've alluded to this.  The serial numbers were not

25   sequential, is that right?

1    A    That's correct, they're not.

2    Q    Did you investigate at any local stores, Detective, whether

3    yellow walkie-talkies of this type are sold in pairs or sold

4    individually?

5    A    Yes, sir, I did.

6    Q    And what did you find?

7    A    I found out they are sold individually.

8    Q    So there wouldn't necessarily be any reason for two

9    walkie-talkies bought at the same time to have sequential serial

10   numbers?

11   A    That's correct.

12   Q    Now, we've talked about the recovery of the walkie-talkie on

13   June the 25th of 2002.  Now, up to this point, Detective, you'd

14   also been out to the wooded area several times and still not

15   recovered any firearms, is that right?

16   A    Yes, sir, that's correct.

17   Q    Directing your attention to June 25, 2002.  Did you once

18   again return to the Carlson Lane woods?

19   A    Yes, sir, we did.

20   Q    And what were you looking for?

21   A    I was looking for the handguns.  I just wasn't satisfied

22   that handguns hadn't been recovered so I wanted to go back and

23   take another look to see if they were out there.  I didn't want

24   -- fear of any children finding guns in the woods, that's why I

25   kept on going back.

1    Q    And did you again probe along the wooded path between

2    Carlson and Green Bush, Brush?

3    A    Yes, sir, that's correct, we did.

4    Q    Government's Exhibit 158.  Is this another photograph of the

5    wooded area and the path taken that day, during your final search

6    for the guns?

7    A    Yes, sir, it is.

8    Q    At some point, Detective, were you directed by one of your

9    fellow officers to a pile of rocks?

10   A    Yes, sir, I was.

11   Q    Government's Exhibit 161.  Again, it shows up a little bit.

12   But what is that that I've circled in the middle there?

13   A    That is a pile of rocks I was directed to by Detective Gary

14   Childs.

15   Q    Now, up here there's a piece of orange.  Do you see that?

16   A    Yes, sir, I do.

17   Q    Can you tell us what the piece of orange is?  Is that

18   hanging off a tree or on a tree?

19   A    It's hanging off a tree.  It appears to be surveyor's tape.

20   Q    Is that surveyor's tape that to your knowledge anyone had

21   noticed before that day?

22   A    To my knowledge, no.

23   Q    Detective Childs directed you over to the pile of rocks, is

24   that correct?

25   A    Yes, sir, that's correct, he did.

1    Q    Government's 162.  Is this another closer view of the pile

2    of rocks?

3    A    That's correct.

4    Q    164.  Is that another closer-closer view of the pile of

5    rocks?

6    A    Yes, sir.  That's correct, it is.

7    Q    At some point to your knowledge, Detective, was there any

8    attempt made to look underneath these rocks?

9    A    Yes, sir, it was.

10   Q    And it can be seen a little bit here.  Inside or within or

11   between those rocks in Government's 164, can you tell us what

12   that is?

13   A    That's a semiautomatic handgun that was recovered from the

14   that hole, those rocks.

15   Q    A semiautomatic or a revolver?

16   A    I tell you, from the photograph I have here, it looks like

17   the semiautomatic.  I can't tell.  One second.

18   Q    Actually, let me show you another photograph, Detective.  It

19   might open it up a little bit more.  Government's 167.

20   A    Okay.  It's the revolver.  It's the Dan Wesson revolver that

21   was recovered from under those rocks.

22   Q    Once the item was identified, it began to be cleared away

23   and some rocks started to be moved?

24   A    I'm sorry.  What was that again?

25   Q    Once the item was identified, was there some effort to clear

1   it out, move some of the rocks?

2   A    Yes, sir, that's correct.

3   Q    And were you present for the ultimate recovery of these

4   items?

5   A    Yes, sir, I was.

6   Q    Government 168 shows another photograph of the revolver

7   being uncovered, is that right?

8   A    That's correct.

9   Q    And then finally, Government's Exhibit 169.  At this point a

10  number of rocks have been cleared out, is that right?

11  A    Yes, sir, that's correct.

12  Q    And what do we see in the middle of 169, S-169?

13  A    That's a revolver that was recovered from those rocks, under

14  those rocks.

15  Q    The item was picked up and examined, is that right?

16  A    Yes, sir, it was.

17  Q    Government's Exhibit S-41, Detective Marll.  Could you tell

18  us what S-41 is?

19  A    Yes, sir, I can.  That is the Dan Wesson make handgun that

20  was recovered from the rocks on June 25th, 2002.

21  Q    Your Honor, may I publish S-41 to the jury?

22       THE COURT:  You may.

23       (Mr. Hanlon publishes S-41 to the jury.)

24  Q    Detective, if you could, could you please tell us, I think

25  you've already alluded to the make.  Could you tell us the make

1    and caliber of this revolver?

2    A    Yes, sir.  It's Dan Wesson make.  It's a .357 caliber.

3    Q    Was there anything found inside the cylinder?

4    A    Yes, sir, there was.  There were six spent cartridge casings

5    inside.

6    Q    I think I'll leave these in the box.  They've been marked as

7    Government's Exhibit S-41A.  One, two, three, four, five, six.

8    Is that correct, Detective?

9    A    Yes, sir, that's correct.

10    Q    And you've indicated that these are spent cartridge casings?

11    A    That's correct, meaning they've been fired.

12    Q    When a revolver fires, is there, what happens when a

13    revolver fires?

14    A    When a revolver fires, it leaves a casing inside the

15    cylinder.  As you see there, that's the cartridge without the

16    bullet and without the powder inside the casing itself.

17    Q    So a projectile will come out of the barrel of the weapon

18    and the casing will be left inside the cylinder?

19    A    Yes, that's correct.

20    Q    If we can maybe see this a little bit.  I'm not sure.  It's

21    not coming up great on the DOAR.  May I approach one more time,

22    Your Honor?

23         THE COURT:  Yes.

24    Q    Detective, I'm just going to ask you what the make is of

25    these cartridges?

Case 1:04-cr-00029-RDB   Document 686   Filed 06/12/09   Page 153 of 239

1    A    They're Winchester CCI cartridge casings.

2    Q    You remembered that without me having to show them to you,

3    right, Detective?

4    A    That's correct.

5    Q    All of these were taken into evidence, is that right?

6    A    Yes, sir, they were.

7    Q    Was there anything found underneath this revolver when it

8    was picked up?

9    A    Yes, sir, there was.  There was a Glock three, a Glock .40

10   caliber handgun recovered, semiautomatic handgun found underneath

11   the Dan Wesson handgun.

12   Q    Showing you what's been marked as Government's Exhibit S-42.

13   And what is this item?

14   A    That is the Glock semiautomatic handgun that was recovered

15   under the .357 caliber handgun.

16   Q    It's a little difficult to make out, Detective.  But does it

17   say actually "40", reflecting the caliber on the weapon here?

18   A    Yes, sir, it does.

19   Q    And then near the other end -- this is unfortunately

20   probably not going to come out -- but does it actually say

21   "Glock" near the end of the barrel?

22   A    Yes, sir, it does.

23   Q    A little hard to make out on the DOAR.  Was there anything

24   inside the weapon, the Glock?

25   A    Yes, sir, there was.  There was a magazine that contained 15

1    live rounds.  No round was in the chamber.  In other words, no

2    round was, the gun couldn't be fired by pulling the trigger.  It

3    was loaded.  The gun, the bullets were in the magazine in the

4    handle part, but nothing in the actual chamber of the gun itself.

5    Q    Showing you Government's Exhibit S dash, S-42A.  What is

6    this?

7    A    That is the magazine from the Glock handgun.

8    Q    And there were a number of rounds, I think you said 15

9    rounds, inside the magazine?

10   A    Yes, sir, that's correct.

11   Q    Government's Exhibit S-42B.  Is this the box of rounds?

12   A    Yes, sir.

13   Q    And again, it probably can't be made out here.  But you

14   probably know, Detective, already, did they say .40 caliber on

15   the bottom?

16   A    Yes, they do say .40 caliber.

17   Q    Do you remember if the weapon was chambered?

18   A    That's correct.  It was not chambered.

19   Q    A chambered weapon would be a weapon that might have rounds

20   in the clip but it would have to be, something would have to be

21   done to the weapon to actually pull a round from the clip into

22   the barrel to make it immediately ready to fire?

23   A    In order to chamber that weapon, the slide would have to be

24   pulled back on the weapon.  A bullet would come up from the

25   magazine and slide into the chamber, and the gun would be ready

1    to be fired.  Just pull the trigger.  And every time you pull the

2    trigger thereafter, the casing would be ejected from the handgun

3    and the next bullet would come up from the magazine into the

4    chamber.

5    Q    Your Honor, may I publish S-42?

6              THE COURT:  You may.

7              (Exhibit S-42 published to the jury.)

8    Q    Detective, we've been talking about a number of searches

9    through the woods.  And we've looked at photographs and items

10   taken from the woods.  I would like to ask you now about the

11   specific location where these items were recovered.  We're not

12   going to walk through each individual search.  But with the

13   Court's permission, I would like you to approach Government's

14   S-1, which is the aerial map, and walk along those green dots.

15   And I'll give you the microphone.

16             Go dot by dot.  Tell us where each of the items was

17   found in this case.

18             Before you do it, again, just in terms of framing your

19   search, here at the edge of Carlson Lane was the area where you

20   understood two suspects to have entered the woods on the day of

21   the shooting, is that right?

22   A    Yes, sir, that's correct.

23   Q    And on the opposite end near a couple of residences near the

24   intersection of Green Brush Court and South Green Road is where

25   it was reported to you the two suspects had emerged from the

1    woods?

2    A     Yes, sir, that's correct.

3    Q     And they were later arrested in this neighborhood?

4    A     Yes, sir.  That's correct.

5    Q     Starting over on the Carlson Lane, just walk the jury

6    through briefly all of the items found point by point as you

7    progress through those woods.

8    A     Yes, sir.  The first green dot that you see here is what we

9    have marked down as the entrance to the woods, across from 3407

10   Carlson Lane.  You can't make it out here but there's a path

11   that's sort of beaten down.  Even though the heavy foliage in the

12   woods precluded a clear view from one end to the other end, there

13   was a noticeable path going through there.

14          As we went through the path, the second green dot

15   marked here is the recovery of the cell phone.  That would be the

16   two pieces of the cell phone and the battery, and a pair of latex

17   gloves.  And then the backing for the cell phone was also all

18   recovered in close proximity to where that green dot is there.

19          The third green dot that we have here is, depicts the

20   approximate location of where the handguns were recovered in the

21   woods.  And again, it's approximately about 40 to 50 yards, I

22   have more of a south direction, from the location of where the

23   cell phone was recovered.

24          And then the last green dot here is the location near

25   Three Green Brush Court where the Roca wear T-shirt and the New

1    York baseball hat was recovered, approximately in that location,

2    rear of that yard there.

3         The last green dot here is, would be that, where the

4    walkie-talkie was recovered on three green, across from Three

5    Green Brush Court.  Approximate location where that storm drain

6    is.

7    Q    Thank you, Detective.  So with that, we've gone through the

8    items found in the woods in the order in which they were

9    discovered.  And just now you went through the same items, only

10   in the order in which they appear along the wooded path, is that

11   right?

12   A    That's correct.

13   Q    Now, earlier during your testimony, I believe before lunch,

14   you indicated that one of the things that you did during the

15   course of your case was you conducted a search at 82 Ambo Circle,

16   is that right?

17   A    Yes, sir, I did.

18   Q    With respect to Ambo Circle, this is a location you believed

19   to be the residence of whom?

20   A    Shawn Gardner, the defendant.

21   Q    And what was the date of your search at that location?

22   A    That was on June 9th, 2002.

23   Q    Government's Exhibit S-170.  Is that a photo of the second

24   story, second story window of the residence?

25   A    Yes, sir, it is.

1    Q    And S-171, is this a photograph of the front door, which is

2    open, to the residence?

3    A    Yes, sir, it is.

4    Q    Inside the residence, let's walk through a few of the items

5    that were found.  Government's Exhibit S-172.  Can you tell us

6    what these items are?

7    A    Yes, I can.  There's a certificate of title under the name

8    of Shawn Earl Gardner.  That's got the '95 Dodge four door sedan

9    on the title part.  And it also has his name and address, 82 Ambo

10   Circle, Shawn Earl Gardner.

11   Q    Government's Exhibit S-173.  Is this some additional

12   paperwork found inside the house?

13   A    Yes, sir.  It's an insurance form from Geico Insurance

14   Company in the name of Shawn Gardner.

15   Q    Government's S-174.  Is this one of the bedrooms inside the

16   residence?

17   A    Yes, sir.  It's one of the upstairs bedrooms in the rear of

18   the residence.

19   Q    Government's Exhibit S-177.  Was this item found on the

20   floor in Mr. Gardner's residence?

21   A    Yes, sir, it was.

22   Q    What is that?

23   A    That's a Remington brand .357 caliber bullet.

24   Q    This item was actually, was also taken into evidence, is

25   that right?

DIRECT EXAMINATION OF DETECTIVE MARLL                159

1    A    Yes, sir, it was.

2    Q    And it was actually examined and powder removed from it to

3    confirm that it was a live round, is that right?

4    A    Yes, it was a live round.

5    Q    Which room of Ambo Circle was this particular item found?

6    A    This is in the upstairs rear bedroom, child, children's

7    bedroom.

8    Q    And I'll show you an item which I'll call Government's One,

9    S-177A.  This is actually part of the round in question?

10   A    That's correct.

11   Q    Sa part of the examination, was it opened up and the gun

12   powder and projectile removed?

13   A    I believe so, yes.

14   Q    And you've alluded to something already, Detective.  We

15   previously looked at some rounds or some cartridge casings,

16   rather, that were found from a revolver in the woods.  And I

17   believe you testified that they were Winchester make, is that

18   right?

19   A    Yes, sir, I did.

20   Q    This round found in Ambo Circle is not Winchester, is that

21   right?

22   A    No, sir, it's not.

23   Q    What is this make?

24   A    This is a Remington brand.

25   Q    Government's S-175.  What is this?

1    A    That's a picture of the bed in the master bedroom.  And on

2    the bed you can see there's a bag with green vegetable matter in

3    it, large plastic bag with green vegetable matter in it.  And a

4    paper bag, also.

5    Q    And what did that green vegetable matter appear to be to

6    you?

7    A    Marijuana.

8    Q    Government's S-176.  There are some papers here and then

9    there's another small bag.  Can you tell us what the smaller bag

10   appeared to be to you?

11   A    Yes, sir.  I'm sorry.  That is another small, very small bag

12   of marijuana, also.

13   Q    S-178.

14   A    That is a box that contains ninety .22 caliber bullets.

15   Q    And are these of a type of bullets that would be used for a

16   .22 caliber rival?

17   A    Yes, that's correct.

18   Q    Government's S-178.  Is this another photo of an item found

19   inside Ambo Circle?

20   A    Yes, that's correct, it is.

21   Q    And what did that item appear to be to you?

22   A    I believed that to be a BB pistol, not a live handgun or a

23   real handgun.

24   Q    And the make, I understand this may not have been a real

25   gun.  But did it, did it even appear to be a replica of a .357 as

1    opposed to another caliber?

2    A    It appeared to be a real handgun, a replica of a real

3    handgun, yes.

4    Q    Did it appear to be a replica of a particular caliber of

5    weapon or appear to have been anything?

6    A    I don't know.  I'm going by the photograph here.  It appears

7    to be a revolver, a replica revolver.

8    Q    To your knowledge, Detective, there's no connection at all

9    between this weapon and any of the weapons found inside the woods

10   or the Tonya Jones Spence killing, is that right?

11   A    No, it did not.

12   Q    During the course of your work on this case -- Your Honor,

13   may I have a word, quick, with the agents?

14             THE COURT:  Certainly.

15             (Pause in Proceedings.)

16   Q    Detective, do you recollect any paperwork, by any chance,

17   inside Ambo Circle in the name of a Donte Eldo, offhand?

18   A    Off the top my head, no, I don't.

19   Q    Now, during the course of your work on this case, did you

20   receive information that a cell phone had been recovered either

21   from the person or property of Shawn Gardner on the day of his

22   arrest, June 7th of 2002?

23   A    Yes, sir, I did.

24   Q    And at some point did you examine that cell phone?

25   A    I had records obtained for the cell phone.

1    Q    What was the cell number that you obtained for that cell

2    phone?

3    A    Cell phone number was 443-540-1253.

4    Q    And when you obtained the records for that cell phone, were

5    you able to find out in whose name this cell phone found from the

6    person or property of Shawn Gardner, in whose name that cell

7    phone was registered to?

8    A    Registered to, registered -- I'm sorry -- registered to a

9    Shelly Wayne Gardner.  I'm sorry.  Shelly Wayne Martin.

10   Q    When you examined the toll records, did you find any

11   communications between the phone from Mr. Gardner or his property

12   and anyone else that was of interest in this case?

13   A    Yes, I did.

14   Q    What contacts did you find between the Gardner phone and

15   another phone?

16   A    I saw that close to the time frame, and that's the time I

17   was concerned about, the time frame when the homicide occurred, I

18   saw that there was a phone call from Mr. Gardner's, the phone

19   that was obtained from Mr. Gardner to Jamane Johnson, who I spoke

20   about earlier.

21   Q    And you've indicated you spoke about Jamane Johnson earlier.

22   There were also contacts, 401 contacts, between Jamane Johnson

23   and the phone found in the woods which you concluded to be Tonya

24   Jones Spence's phone, is that right?

25   A    Yes, that's correct.

1   Q    Jamane Johnson, to your knowledge, did he ever go by the

2   nickname Momma?  Did that ever come up in your investigation?

3   A    Yes, sir, it did.  And he did go by that name.

4   Q    Now, one of the, among the records that you obtained for

5   this, for this 443-540-1253 phone, the phone from Mr. Gardner and

6   his property, did you examine cell tower records for that phone?

7   A    Yes, sir, I did.

8   Q    And what did you learn in your examination of cell tower

9   records?

10  A    I saw that the phone calls that were made close to the time

11  frame of when the homicide occurred, that five of five time

12  frame, were hitting off of a tower, or tower, section on tower

13  road 1.6 miles from the location of where Mrs. Jones Spence's

14  apartment was.

15  Q    So a tower that was close to the Bramble Lane apartment

16  where the shooting took place?

17  A    Yes, just north of that location by approximately 1.6 miles.

18  Q    Let me ask you about a few of, a few investigative steps

19  that you took in this case.  We've talked about fingerprinting a

20  couple of times in the context of latex gloves.  Let me take you

21  back to the Bramble Lane apartment.

22       To your knowledge, was there an attempt made to obtain

23  fingerprints from Tonya Jones Spence's apartment?

24  A    Yes, sir, there was.

25  Q    Were there any fingerprint obtained from the interior of the

1    apartment?

2    A    Yes, sir, there was.

3    Q    Would I be correct, Detective, were some of those

4    fingerprints matched to Darius Spence?

5    A    That's correct, they did.

6    Q    Were some of those fingerprints matched to Tonya Jones

7    Spence?

8    A    Yes, sir, they did.

9    Q    There were, at the end of the day, a number of prints inside

10   the apartment which were not matched to anybody, is that correct?

11   A    That's correct.

12   Q    And there were no prints found in the apartment matching up

13   to Aaron Holly or Shawn Gardner, is that right?

14   A    That's correct.

15   Q    Were there any prints matching up to Will Montgomery?

16   A    No, sir, there was not.

17   Q    Let me ask you about the unidentified prints.  Did it

18   concern you or surprise you as an investigator that there would

19   be unidentified prints inside a private residence like Tonya

20   Jones Spence's?

21   A    No, sir, not at all.

22   Q    Why not?

23   A    Because when a residence is processed for latent

24   fingerprints, anybody's fingerprints could be there.  Could be

25   relatives, workers, anybody's, prints that would be there.  Not

1    everybody's prints are in the latent print system where we can

2    track them and get a cross-reference and find out who they are.

3            Also, in this case, since it was traumatic about the

4    murder of Mrs. Jones Spence with her children, I did not

5    fingerprint her children to put them through, to have them come

6    in, to get their fingerprints, to have them compared.

7            So having prints unidentified does not surprise me one

8    bit.

9    Q    And in terms of getting latent prints, did you get

10   comparison prints against the parents of both Darius Spence and

11   Tonya Jones Spence?

12   A    No, sir, I did not.

13   Q    Did you get negatives from all of their friends and family?

14   A    I'm sorry?

15   Q    Did you get negatives from all of their friends and family?

16   A    That's correct.

17   Q    You did not, correct?

18   A    Right.

19   Q    And ultimately, did the discovery of the latex gloves inside

20   the woods factor into your decisionmaking process here,

21   Detective?

22   A    Yes, it did.

23   Q    How so?

24   A    The latex gloves, we had them processed for fingerprints to

25   see if there's any chance of fingerprints on them.  And we did

1    not get any fingerprints off of them.

2    Q    Now, let me ask you about, and we've kind of moved into

3    this.  Let me ask you about the items found in the woods, the

4    clothing, latex gloves, the weapons, all that stuff.

5         Were the weapons, the latex gloves, and anything else

6    that was suitable for fingerprinting fingerprinted?

7    A    The latex gloves were suitable for fingerprinting.  And we

8    did take them back and test them for fingerprints.

9         I'm sorry.  What was the rest of your question?

10   Q    The firearms.

11   A    The firearms, they were processed for prints.  No prints

12   were obtained from them.

13   Q    No prints from the weapons and no prints from the latex

14   gloves, either?

15   A    That's correct.

16   Q    So there was nobody that you could, there were no prints to

17   even compare against anything in that case, is that right?

18   A    That's correct.

19   Q    Again, in your experience as a detective, is it unusual to

20   recover guns or latex gloves or items and not necessarily get

21   prints on them, even if they've been dropped recently?

22   A    No, it's not.

23   Q    People don't always leave prints on everything?

24   A    That's correct, they do not.

25   Q    Let me ask you about DNA testing.  Was any DNA testing done

1    on any of the items found in the woods, the weapons, the

2    clothing, anything that you can think of?

3    A    On the clothing and on the latex gloves, they are tested

4    for, to see if they can get any type of DNA evidence off them,

5    with negative results.

6    Q    No DNA found one way or the other?

7    A    That's correct, no.

8    Q    Again, in your experience as an investigator, is it unusual

9    to have an item dropped and not necessarily get DNA off it even

10   if it's been dropped recently?

11   A    That's correct.  Not everybody leaves DNA behind.

12   Q    How about hair and fiber testing, or anything like that, on

13   these various items?  Were attempts made to do that kind of work?

14   A    They were submitted for hair analysis and nothing of value

15   was found.

16   Q    Nothing of value.  Nothing linking any of the items to the

17   defendants or anyone else that you are aware of, is that correct?

18   A    That's correct.

19   Q    Various, obviously, items with blood and, and bloody

20   material were taken from the victim, Tonya Jones Spence, and from

21   the clothing.  We've seen some photographs of that, is that

22   correct?

23   A    That's correct.

24   Q    Did you consider the possibility of submitting any of that

25   bloody material for DNA comparison testing against the defendants

1    or against anyone else?

2    A    It was considered initially, but then once we realized that

3    the defendants were not caught in any way, shape or form, it was,

4    the lab decided that the blood would be from the victim's blood,

5    where the location of the blood was found, from the victim's

6    blood.  So it was not tested any further.

7    Q    To your knowledge, when Mr. Gardner and Mr. Holly were

8    arrested over in The Greens neighborhood, was there any evidence

9    of any injuries to either of them?  Scratches, bruises, cuts,

10   bleeding, anything that would have left blood on any of the items

11   in the woods or the crime scene?

12   A    No, there was not.

13   Q    Was gunshot residue or GSR testing done on the clothing

14   found in the woods or any other items, or on the defendants?

15   A    There was on, on the defendant's clothing there was GSR

16   testing.

17   Q    With one exception, the GSR testing was all negative on the

18   defendants' clothing, is that right?

19   A    That's correct.

20   Q    There was one positive hit to an item of clothing from Mr.

21   Holly, is that right?

22   A    Yes, sir, that's correct.

23   Q    Specifically, it was a portion of Mr. Holly's jeans that

24   were taken from his person, is that right?

25   A    Yes, sir, that's correct.

1    Q    No GSR testing or GSR was found on Mr. Gardner's clothing or

2    on any other items, is that right?

3    A    That's correct.

4    Q    Detective, let me ask you something.  Again, in your

5    experience, does GSR necessarily always get on a person if they

6    fired a weapon or handled a weapon?

7    A    No.  They do not.  It does not.  And it's easily wiped off,

8    also.

9    Q    In your cases where you've investigated homicides and

10   shootings, have there been cases where you didn't necessarily get

11   GSR?

12   A    Yes.  Many times.

13   Q    How old was -- strike that.  Aaron Holly was 17 years old at

14   the time of this crime, is that correct?

15   A    Yes, sir, he was.

16   Q    At some point, Detective, you had contact with an individual

17   named Will Montgomery, is that right?

18   A    Yes, sir, I did.

19   Q    And you're aware of Will Montgomery and of information he's

20   provided in this case?

21   A    Yes, sir, I am.

22   Q    Prior to your first interview with Will Montgomery,

23   Detective, did you have any evidence in hand when you first

24   encountered Will Montgomery in a proffer or interview setting,

25   did you have any evidence in hand that you could have used to

1    prosecute Will Montgomery?

2    A    No, sir, I did not.

3    Q    Did you have any evidence that you could have used to go and

4    charge him with a crime?

5            MR. KURLAND:  Objection.

6            THE COURT:  Overruled.  You may answer.

7    A    No, sir, I did not.

8    Q    Your first encounter with Mr. Montgomery would have been

9    several years ago, is that right?

10   A    Yes, that's correct.

11   Q    Looking back several years later, to your knowledge today,

12   if you wanted to charge Will Montgomery --

13           MR. KURLAND:  Objection.

14           THE COURT:  Overruled.  You may proceed.

15   Q    -- with this crime, would you have the, any evidence that

16   you're aware of to do it, aside from Mr. Montgomery's own

17   statements that you'd have to use against him?

18           MR. KURLAND:  Objection.

19           THE COURT:  Overruled.

20           MS. RHODES:  Objection, Your Honor.

21           THE COURT:  Overruled.  You may answer.

22   A    No, sir, I would not.

23   Q    Basically, the only way to do it would be to use the

24   information he's provided against him, is that correct?

25   A    That's correct.

1    Q    A moment please, Your Honor.

2            THE COURT:  Yes.

3            (Pause in Proceedings.)

4            MR. HANLON:  Your Honor, I believe that's all I have.

5    Thank you, Detective.

6            MR. KURLAND:  Just a moment, Your Honor.  Let me just

7    gather up a few things.

8            THE COURT:  Certainly.

9            MS. RHODES:  Your Honor, could I be excused very

10   briefly to make a call?

11           THE COURT:  Certainly.  You may proceed, Mr. Kurland.

12           MR. KURLAND:  Your Honor, Mr. Crowe doesn't want to

13   waive his, he wants to go after me.  Is that acceptable to the

14   Court?

15           THE COURT:  Certainly.

16           CROSS EXAMINATION

17   BY MR. KURLAND:

18   Q    Good afternoon, Detective Marll.

19   A    Good afternoon, sir.

20   Q    I have several questions, but I don't think it should take

21   all that long.  But let's first start with some of the things

22   that you just testified to at the end of Mr. Hanlon's questioning

23   concerning Will Montgomery.

24   A    Yes, sir.

25   Q    You indicated that except for Will Montgomery's own

1    statements, you would have no evidence to prosecute him?

2    A    That's correct.

3    Q    It's true, though, that the very, just a month or so after

4    the Spence murder, Mr. Montgomery came forward and started to

5    talk to the prosecutors and to the police officers, correct?

6    A    August the 23rd is when he came forth.  That's my first

7    meeting with him.

8    Q    But in fact he had a meeting as early as July when he

9    started talking to prosecutors?

10   A    That I don't know.  I do know August 23rd was my first

11   encounter with him.

12   Q    I'll ask you a few questions concerning that August 23rd

13   meeting in a few minutes.

14         But with respect to Mr. Montgomery, it's fair to say,

15   though, that you never really tried to put a case against Mr.

16   Montgomery?

17   A    I had nothing else.  I tried fingerprints and there was no

18   DNA, so I had nothing else to link him to the --

19   Q    But you didn't, but you didn't really try after August 23rd

20   because he started cooperating?

21   A    He cooperated in the investigation.  And if there had been

22   some type of corroborating evidence, it could have been used

23   against him.

24   Q    Well, I appreciate that, Detective.  I appreciate you just

25   answering the question.  The car was recovered, Mr. Gardner's car

1    was recovered, you say from Walter Gardner?

2    A    Yes, that's correct.

3    Q    All right.  You later found out that Mr. Montgomery claims

4    to have driven the car from the crime scene and dropped it off so

5    Mr. Walter Gardner could get it, correct?

6    A    Yes, sir, that's correct.

7    Q    It's conceivable, then, that had you asked Walter Gardner,

8    he might have been an investigative lead that would have given

9    you Mr. Montgomery's name?

10         MR. HANLON:  Objection, Your Honor.

11         THE COURT:  Well, I'll overrule this.  But I think

12   we've gone as far as we need to go on this.  You can answer the

13   question or repeat the question, Mr. Kurland.

14   BY MR. KURLAND:

15   Q    Well, I mean, that's an investigative lead that you could

16   have pursued, isn't it?

17   A    I did pursue that with Mr. Gardner, with Walter Nathaniel

18   Gardner.  I interviewed him in reference to how he came in

19   possession of the car and he informed me that he recovered the

20   car at a, well, actually, he said he just happened to see it on

21   the street.  And we later found out it was actually towed to a

22   garage in Baltimore City and that he apparently had gone there

23   and picked the car up.  But that was pursued with him.

24   Q    Well, you took his word for that?

25   A    Excuse me?

1    Q    You took his word for that?

2    A    Did I take his word for that?  At that time?  I had nothing

3    to dispute it with, sir.  No, sir.

4    Q    Okay.  All right.  If you say so.

5              MR. HANLON:  Objection, Your Honor.

6              THE COURT:  Let's move on, please.

7    BY MR. KURLAND:

8    Q    All right.  Well, let's talk about some other things about

9    Mr. Montgomery in August, August 23rd.  You attended a proffer

10   session with Mr. Montgomery on that date?

11   A    Yes, sir, I did.

12   Q    Did you take any notes?

13   A    Yes, sir.

14   Q    Do you have notes of that proffer session?

15   A    Yes.  My notes were transported, transcribed, I should say,

16   into the investigative correspondence that's been provided to the

17   counsel in this.

18   Q    All right.  Can I approach the witness just to make sure I

19   have the same copy of the notes I'm referring to?

20             THE COURT:  You can look at what he's relying on,

21   certainly.

22   Q    Thank you, Your Honor.

23   A    That's right.

24   Q    All right.  I'll ask you some questions about that August

25   23rd meeting in just a minute.  Did you attend any other proffer

1    sessions other than August 23rd, which Mr. Montgomery was --

2    A    Yes, I did.  Yes, sir, I did.

3    Q    Do you know, do you know those dates?

4    A    September 20 -- I want to say September 26.  But let me,

5    instead of going by memory.  September 26th and January 22nd,

6    2003.  September 26th, 2002 and January 22nd, 2003.

7    Q    Okay.  And on September 26th, 2002, did you take any notes

8    on, with respect to that meeting?

9    A    Again, it's been transcribed to investigative correspondence

10   that you have there.

11   Q    So it's in --

12   A    It's the last page.

13   Q    -- the documents that I showed you?

14   A    That's correct.

15   Q    No other -- I'll get to the January 23rd in a minute.  But

16   other than the August 23rd and the September meeting, it's your

17   testimony that you didn't attend any other debriefing sessions

18   with Mr. Montgomery?

19   A    Just the three.

20   Q    Just the three?

21   A    Just those three.

22   Q    Right.  Have you received any other notes from other

23   debriefing sessions of Mr. Montgomery that you didn't attend?

24   A    No, I don't.

25   Q    Okay.  You know -- were you aware that there were other

1    debriefing sessions?

2    A    There may have been.  The only ones I know about is the

3    three that I attended.  That's the only ones I would have notes

4    on that I documented.

5    Q    All right.  Now, with respect to the debriefing session on

6    January 22nd, that conversation or that session was recorded,

7    correct?

8    A    Yes, sir, that's correct, it was.

9    Q    You didn't take any notes at that session?

10   A    Well, I made a brief investigator's correspondence with

11   reference to it.  But I just referred to the tape so that the

12   tape was the interview of the, recorded interview of his

13   interview.

14   Q    Is it your recollection that, that when the tape recording

15   was made, was there an earlier part of the interview that took

16   place before the tape recording was turned on?

17   A    I don't recall anything going on prior to that, anything.

18   Other than being an introduction of the individuals who were

19   there, I don't recall anything, any discussion regarding the

20   crime or anything.

21   Q    Okay.  With respect to that -- well, is it fair to say

22   you're the lead homicide investigator with respect to the Spence

23   homicide?

24   A    That's correct.

25   Q    All right.  I take it, or is it fair to say that when a

1    cooperating witness implicates other persons in a crime --

2    A    What was that again?

3    Q    When a cooperating witness implicates other persons in a

4    crime, I take it you consider that particular evidence or

5    testimony that's being given by the cooperating witness

6    extraordinarily important?

7    A    To be what?

8    Q    Excuse me?

9    A    I'm sorry.  I didn't hear the last part.

10   Q    That's important information?  When a cooperating witness

11   implicates other persons in a crime, that's obviously extremely

12   important information, isn't it?

13   A    Yes, sir, that's correct.

14   Q    And that's actually one of the reasons or the main reason

15   why you would, you know, why the police would be willing to, you

16   know, have a cooperating witness and cut them whatever sort of

17   prosecutorial or police break you could, correct?

18   A    I would say so, yes.

19   Q    All right.  And so when a, would you say that when a

20   cooperating witness describes a particular motive, a particular

21   other suspect, that's important evidence as well?

22   A    You have to repeat that.

23   Q    Is it important evidence that when a cooperating witness

24   discusses and implicates another person in a crime and also

25   describes that other person's motivation to commit the crime,

1    that is important evidence?

2    A    Yes.  That would be important evidence.

3    Q    Even though motive isn't an element of a crime, we don't

4    want to get technical, the motive or the alleged motivation of

5    anybody participating in a crime is extremely important, that's

6    of very substantial interest to the lead homicide detective?

7    A    Everything that's being provided to the homicide detective

8    during an interview would be of importance to me.

9    Q    Excuse me?

10    A    I said, I would say everything that's being provided by a

11    witness with reference to a homicide or in reference to any crime

12    would be of importance.

13    Q    Well, if he's giving background information about where he

14    went to high school, is that as important as the motive evidence?

15    A    It wouldn't be as important but it would be something that

16    we would discuss with him.  Of course, the motive would be of

17    greater importance.

18    Q    As the lead homicide investigator, I take it that if you, if

19    someone else received any information concerning a particular

20    motive that you weren't aware of you would expect them to relay

21    that information to you, correct?

22    A    That's correct.

23    Q    And motive information, particularly when you're dealing

24    with cooperating witnesses implicating somebody else, you would

25    expect that to be written down, wouldn't you?

1   A    That, or recorded on a tape.

2   Q    Okay.  Correct.  Okay.  Well, we'll get back to that in just

3   a minute.  I just wanted to get that straight.

4        Well, no.  Let me approach.  Your Honor, I want to show

5   the witness the transcript of the tape that has earlier been

6   played, so the jury has actually heard portions of the recorded

7   transcript.

8        THE COURT:  You may.  You can put it on the DOAR.

9        I'm sorry.  Wait a minute.  Which tape are you

10  referring to, Mr. Kurland?

11       MR. KURLAND:  The tape that portions of which Mr.

12  Coburn played during Mr. Montgomery's testimony.

13       THE COURT:  Okay.  No objection.  You can --

14       MR. KURLAND:  I'll do my best to kind of cover up just

15  to limit.

16       THE COURT:  Will it not do just to read it to the

17  witness?  Is it a long passage?

18  BY MR. KURLAND:

19  Q    Probably quicker.  All right.  Detective, I'm reading from

20  the transcript of the January 22nd, 2003 taped interview that you

21  have indicated that you were present at.  Do you have a copy of

22  that?

23  A    Yes, sir.  What page are you referring to?

24  Q    Turn to Page Ten.  Looking at the bottom six lines.  There's

25  a question.  Was there a particular reason that Gardner was part

1    of this plan?  WM, which is Montgomery, he told him about it.  He

2    took a nice fall around that time.  Question:  And when you said

3    he took a nice fall, what are you referring to?  Goo.  And

4    question:  And what do you mean he took a nice fall?  He lost a

5    couple of thousand.

6    A    That's correct.

7    Q    Okay.  You remember hearing that testimony?

8    A    Yes, sir, that's correct.

9    Q    Okay.  And then if we turn to Page 17, there's a question

10   concerning -- no, that's okay.  Strike that.

11          All right.  So the question and answer that we just

12   looked at on Page Ten, that refers, at least to some extent, to

13   Mr. Gardner's alleged motivation for participating in this

14   alleged crime?

15   A    That's correct.

16   Q    And if you had any other information about any other motive,

17   that's important enough or that should have been written down or

18   relayed to you in some, either in writing or in another

19   recording?

20   A    That's correct.

21   Q    And is it correct you have no other information regarding

22   any other motivation of Mr. Gardner's participation?

23   A    No, I did not.

24   Q    All right.  Let's move on to some other topics.  With

25   respect to Mr. Spence, you indicated that -- I want to get the

1    dates right because there were three or four different searches

2    that we're going to have to talk about.  The cell phone was

3    recovered on the -- let's go back.  You walked through on the

4    evening of the 7th?

5    A    No, I did not.

6    Q    I'm sorry.  When did you do your first walk-through on the

7    path through the woods?

8    A    The first walk-through was on, about 5:30 in the morning,

9    the morning of June 8th, 2002.

10   Q    Okay.  So it was the morning after the --

11   A    Approximately 12 and a half hours after the homicide

12   occurred.

13   Q    Right.  And 5:30 in June, is the sun up by then?

14   A    It was getting light out.

15   Q    It was getting light?

16   A    Yes.

17   Q    And you weren't under any time constraints, though, were

18   you?

19   A    At that time, yes, I had other things to do.  So I wanted to

20   make a fast walk through the woods with a couple other officers

21   that we had available.  And I had to go to the autopsy and I had

22   some other things that I needed to be done.

23   Q    Okay.  But you walked, generally, when you got there, you

24   walked the path?

25   A    That's right.

1    Q    Okay.  And you earlier indicated on direct examination that

2    the green dots that Mr. Hanlon pointed out, most of the items

3    were found fairly close to the path, is that correct?

4    A    In the general vicinity of the path, yes, sir.

5    Q    Okay.  And on the evening, between the evening of the

6    shooting and your time when you walked on the path, the first

7    time, on the morning of the 8th, was there police tape put up all

8    around the, all around the forest area?

9    A    No, sir, it was not.

10   Q    So it was essentially unprotected?

11   A    That's correct.

12   Q    And was there police officers stationed there during the,

13   during the evening hours and the night hours and the early

14   morning hours when it was dark?

15   A    No, sir, it was not.

16   Q    So you have no idea whether or not anybody was able to --

17   you don't know if other people had come into that area during,

18   during the evening?

19   A    No, I do not.

20   Q    When you left on the 8th --

21   A    What's that?

22   Q    When you left on the morning of the 8th to go to the autopsy

23   and go to other things, was the area cordoned off?

24   A    No, it was not.

25   Q    In between all the time you did your searches, and I think

1    you testified going at least three other times, did you, was

2    there police surveillance that covered the area the entire time?

3    A    No, sir, there was not.

4    Q    Okay.  Your Honor, can I just get a glass of water?

5            THE COURT:  Certainly.

6            (Pause in Proceedings.)

7    Q    I just want to get straight with respect to the searches.

8    The next search took place on the 9th?

9    A    That's correct, it did.

10   Q    And that was the search with the K-9 units?

11   A    Yes, sir, that's correct.

12   Q    Approximately how many dogs participated in that search?

13   A    It was approximately fifteen K-9 dogs.

14   Q    Fifteen dogs?  Did each dog have its own handler?

15   A    Yes, they would have had their own handler.

16   Q    And there were additional police officers as well?

17   A    Yes, there was.

18   Q    All right.  And from that area where did, did the search

19   start from the area where you believed the suspects went into the

20   forest on one end and through to the other end?

21   A    No.  It was -- I wasn't present when the search began.  The

22   search was done with Baltimore County K-9 and also with

23   Chesapeake Search and Rescue dogs.  I can only go by the report

24   that was filed by the Chesapeake Search and Rescue dogs.  That

25   they had approximately 15 handlers that came in at various times

1  during the day and they did several different searches.

2  Q    Okay.  Do you know how long from start to finish the dogs

3  were out there?

4  A    I can read off their report.

5  Q    All right.  Take a minute and look at that.

6  A    Okay.  It says at 10:31 article search dog reported to the

7  scene and searched designated areas.  Then it says 11:57, an

8  additional request was made for search capable personnel to

9  search the areas, possible evidence in the area.  At 12:30 hours,

10 Chesapeake Search dogs responded, an additional 15 members to

11 search for evidence.

12        At 2:43 or 1423, which is 2:43 p.m., a line of search

13 was formed to search specific areas of interest.  At 857 hours,

14 all Chesapeake Search Dog personnel cleared the scene.

15 Q    All right.  Detective, so at 8:57 p.m., so almost 9:00 p.m.,

16 the dogs finally --

17 A    According to this report, that's correct.

18 Q    That was truly a dog day afternoon.  And during that search,

19 the cell phone was recovered?

20 A    That's correct.

21 Q    And the hat?

22 A    Later on in the evening the hat was recovered, and the

23 shirt.  Yes, sir, that's correct.

24 Q    And then there was another search that you participated in

25 on June 14th?

1   A    That's correct.

2   Q    I take it that, you know, ideally it's best to recover items

3   sooner rather than later?

4   A    That's correct.

5   Q    And then on the 25th, that's when the guns were found?

6   A    Yes, sir, that's correct.  June 25th.

7   Q    All right.  You testified, and there were photographs shown,

8   that the guns were buried underneath some rocks?

9   A    That's correct.

10  Q    And would it be your professional estimation that those guns

11  just weren't, they just weren't placed there and fell there, but

12  it appears that there was some effort to try to cover them up?

13  A    Yes, that's correct.

14  Q    Okay.  By any chance, did you ever, in all your times going

15  out to the scene, did you ever time how long it took to either

16  run or walk fast from the crime scene, down the street through

17  the woods, to bury the, to bury the guns, to take off the

18  clothes, and to walk calmly to several houses in the

19  neighborhood?

20  A    No, sir, I did not.

21  Q    You know the reports show the gunshots to the time that

22  Officer Ketterman, something like 12 minutes.

23  A    Could be.  I can look at the report and tell you.

24  Q    Let's talk about the guns that were found.  The .357, six

25  spent shell casings?

1    A    That's correct.

2    Q    It had been fired?

3    A    That's correct.  It had been fired.

4    Q    The Glock .40, it's your professional estimation it had not

5    been fired?

6    A    That's correct.

7    Q    And it hadn't even been prepared to be fired because there

8    was no, all the bullets were in the magazine, correct?

9    A    Yes, sir, that's correct.

10   Q    So that gun wasn't even, nobody had even attempted to even

11   get the gun ready to be fired?

12   A    Nobody what?

13   Q    Nobody had even attempted to get that gun ready to be fired?

14   A    It wasn't chambered.

15   Q    Your Honor, can I hold up one of the, get one of the pieces

16   of evidence?

17        THE COURT:  Certainly.

18   Q    Detective, we're approximately what?  About 15, 20 feet away

19   would you estimate our distance?

20   A    That's correct.

21   Q    15, 20 feet away.  Are you, do you wear corrective lenses?

22   A    No, I do not.

23   Q    How would you describe this T-shirt?

24   A    I would say it's a gray-colored T-shirt or light-colored

25   T-shirt with red lettering and black -- I'm sorry -- red squares

CROSS EXAMINATION OF MARLL BY KURLAND                187

1    with black lettering on it.

2    Q    So you can identify the red lettering even from this

3    distance?

4    A    Yes, I can.

5    Q    I mean the black lettering.  Or the black outlined letters?

6    A    I'm sorry.  What was it?

7    Q    The black outlined letters?

8    A    That's correct.

9    Q    I just have a couple more questions.  Detective, you

10   remember, as part of your direct testimony, Mr. Hanlon showed you

11   some photographs taken inside the Spences's apartment?

12   A    Yes, sir, I do.

13   Q    And we went, the photographs showed a lot of the different

14   rooms.  It was the kitchen area, the entry way area, the living

15   room?

16   A    That's correct.

17   Q    Would it be fair to describe the, the decor and the other

18   items in the apartment as generally fairly basic, not

19   particularly extravagant?

20   A    I would say so.

21   Q    So if anybody were watching the comings and goings of people

22   in that apartment for four to six week, it doesn't appear that

23   anybody brought in any extravagant television sets, flat screen

24   TV's or opulent items, or at least you didn't see any signs --

25   A    I have would have no knowledge of that.

1    Q    Well, but not only wouldn't you have any knowledge, there

2    was nothing in the apartment that you would describe as opulent

3    or extravagant, would you?

4    A    Not at that time, no.

5    Q    Going back to your testimony concerning when you found the

6    cell phone.  You testified that you then contacted Darius Spence

7    and asked him to make a phone call to his wife's cell phone, and

8    that's how you knew that it was her phone?

9    A    Yes, sir, that's correct.

10   Q    All right.  Would you say, I guess, would you characterize

11   Mr. Spence's attitude at that time as one of cooperation with law

12   enforcement?

13   A    Yes, I would say he was.

14   Q    You indicated to some questions from Mr. Hanlon about why

15   you were interested in the Dodge Intrepid, Mr. Gardner's Dodge

16   Intrepid.  Do you remember that testimony?

17   A    I do.

18   Q    And you indicated that there was information obtained from

19   witnesses lead you, lead you to want to find that vehicle.  Do

20   you remember that testimony?

21   A    That's right.

22   Q    Isn't it true that, in addition to information you obtained

23   from witnesses that made you interested in that car, that other

24   witnesses, that you obtained other information from other

25   witnesses --

1          MR. HANLON:  Objection, Your Honor.

2          THE COURT:  Well, you can put the question.

3    Q    Other witnesses claimed that they had seen a car moving

4    slowly in the parking lot up by the doctor's office and the two

5    unknown black males were observed getting into it.  Wasn't that

6    information also part of your investigation that you'd received

7    from the witnesses?

8          MR. HANLON:  Objection, Your Honor.

9          THE COURT:  Sustained.

10   Q    Officer -- Detective, rather, had you heard, did you receive

11   any other information from any witnesses as part of your

12   investigation that there were any other vehicles in the area?

13   A    The only information --

14         MR. HANLON:  Objection, Your Honor.

15         THE COURT:  Was that an objection?

16         MR. HANLON:  Yes, Your Honor.

17         THE COURT:  It's sustained.

18   BY MR. KURLAND:

19   Q    Okay.  You earlier -- I just have a few more questions.  You

20   earlier testified that the phone that was found on Mr. Gardner,

21   that there was a phone call in the relevant time period to Jamane

22   Johnson, to Momma?

23   A    That's correct.

24   Q    As part of your investigation, did you determine that Mr.

25   Gardner did not place that call?

1    A    The phone call, phone was in his name, and the information I

2    had was that it was made by Will Montgomery, that's right.

3    Q    The information you had it was made by, the phone call was

4    made by Will Montgomery?

5    A    That's correct.

6    Q    All right.  Okay.  One other thing.  You indicated that in

7    the search of Mr. Gardner's house, you found a single live round

8    of a 35, of a 350, .357 caliber bullet that was a Remington?

9    A    That's correct.

10   Q    .357?

11   A    That's right.

12   Q    And, but that has absolutely nothing to do with, with this

13   case, is that correct?

14   A    It's a .357 caliber.  Different brand but it's a .357

15   caliber.

16   Q    So to answer my question, did the .357 caliber found in Mr.

17   Gardner's house, it has no connection to the .357 gun that was

18   found in the, in the forest area?

19   A    No, it doesn't.

20   Q    Okay.  Your Honor, just one moment.

21        (Pause in Proceedings.)

22        MR. KURLAND:  Detective, I have no further questions.

23   Thanks.

24        THE COURT:  Do you a few, Mr. Crowe?

25        CROSS EXAMINATION

1    BY MR. CROWE:

2    Q    I don't think any more than two or three minutes, Your

3    Honor.  Good afternoon, Detective.  My name is Tom Crowe and I

4    represent Shelly Wayne Martin in this case.  Mr. Montgomery was a

5    cooperator, is that correct?

6    A    He cooperated with us, yes, that's correct.

7    Q    And he is, in fact, an individual whom you understood really

8    from your first meeting had been involved in a number of criminal

9    activities, is that correct, also?

10   A    From my first meeting with him, no, I didn't know what his

11   pass dealings were, no.

12   Q    But you learned that very quickly, did you not?

13   A    I'm sorry?

14   Q    You learned that very quickly, did you not?

15   A    I'm sorry.  You to repeat that again.

16   Q    You learned that he was deeply involved in criminal activity

17   very quickly after your first meeting with him, did you not?

18   A    I can't say I learned that he was deeply involved in

19   criminal activity.  I knew that there was an investigation going

20   on with his cooperation and things like that.  But I didn't

21   really get into his background, no.

22   Q    And your initial meeting with him was when?

23   A    Would have been August the 23rd, 2002.

24   Q    And you also met with him on September 26th of 2002, is that

25   correct?

1    A    Yes, sir, that's correct.

2    Q    Now, certainly by the second meeting, you were aware that

3    Mr. Montgomery was involved in more than one homicide, had you

4    not?

5    A    Again, my partner was the primary at that time and he had

6    more, more information regarding the information of Will

7    Montgomery than I did.  My interview with Mr. Montgomery, it

8    didn't matter what he had been involved in, I just come down to

9    get my information regarding the murder of Tonya Jones Spence.

10   Q    And am I correct that your partner in that case was

11   Detective James Tincher?

12   A    Yes.

13   Q    And has he retired now?

14   A    Yes, sir, he has.  And I became primary on this case.

15   Q    Thank you.  Now, my understanding from your testimony is

16   that two weapons were recovered in the wooded area on June 25,

17   about 18 days after Ms. Jones Spence died, is that correct?

18   A    Yes, sir, that's correct.

19   Q    One of them, I think we've established, was a .357 Dan

20   Wesson.  It was a revolver.  And you determined that five, that

21   six shots had been fired from that fairly recently, is that

22   correct?

23   A    That's correct.

24   Q    And the other one was a Glock .40, which was a pistol or a

25   semiautomatic, which you determined had not been fired, is that

CROSS EXAMINATION OF MARLL BY CROWE                    193

1    right?

2    A    That's correct.

3    Q    At least it hadn't, certainly hadn't been fired on June

4    18th, is that right?

5    A    That's correct.

6    Q    Now, when you're dealing with a cooperator that you think

7    may have been involved in past criminal activities, do the police

8    generally supply that individual with information they know about

9    the crimes they're questioning him about?

10    A    Provide him information?  We may ask him questions about the

11    crime we're investigating but not necessarily provide him

12    information regarding it.

13    Q    And the reason you don't necessarily provide him information

14    is that you don't want him telling you what you already know.

15    You want to know what he, in fact, knows, is that correct?

16    A    Yes, sir, that's correct.

17    Q    Your Honor, I would like to show the detective a document

18    which I have marked as Defendant's Martin's Exhibit 12 for

19    identification only.  And it is entitled Proffer Session, United

20    States Attorney's Office, September 26th, 2002.

21            THE COURT:  Is that one you attended, Detective?

22            THE WITNESS:  I'm sorry, sir?

23            THE COURT:  Is that one of the sessions you attended?

24            THE WITNESS:  The 26th?  Yes, sir, I did.

25            THE COURT:  Okay.  He's got that, I think, in his book

1    already, Mr. Crowe.

2    BY MR. CROWE:

3    Q    I was going to ask him if he did.  Do you, in fact, have

4    that in your book already?

5    A    I have my version.  I have a copy that was just sent to me

6    recently from the U.S. Attorney's Office.  But this is not my

7    notes.

8    Q    So what I've just handed you as Martin's Exhibit 12 for

9    identification is one that the U.S. Attorney's Office recently

10   sent you, is that correct?

11   A    That's correct.  I didn't have a copy in my case folder.

12   Q    And how recently did they send that to you?

13   A    I believe it was within the last month or two.  I'm not sure

14   exactly when it was.

15   Q    What I'd like to direct your specific attention to is

16   probably the first four or five paragraphs beginning on Page Six.

17   Would you just read those to yourself?

18   A    Yeah.

19   Q    Do you recall the matters that are depicted in those

20   paragraphs?

21   A    This, I wasn't present for any of this.

22   Q    Pardon?

23   A    I wasn't present for any of this.  Is that what you asked

24   me?

25   Q    You weren't present for?

1    A    This part?  No.  I don't recall any of this.

2    Q    So you dont' -- were you present for the entire session?

3    A    No, I was not.

4    Q    Okay.  Well, I think that covers it.  That's all I have.

5             THE COURT:  Redirect?

6             MR. HANLON:  Thank you, Your Honor.

7             THE COURT:  Mr. Crowe, we don't need to hold on to that

8    if you just marked it for identification.

9             MR. CROWE:  I may be using it with further witnesses.

10   And quite honestly --

11            THE COURT:  Okay.  For identification only.

12            MR. CROWE:  -- Ms. Arrington is better at not losing

13   things than I am.

14            THE COURT:  All right.

15            REDIRECT EXAMINATION

16   BY MR. HANLON:

17   Q    Detective, you were asked a number of questions just a

18   moment ago by Mr. Crowe, and also by Mr. Kurland, about whether

19   or not the questioning came up of motive during whatever proffer

20   sessions or meeting sessions you attended with Will Montgomery.

21   Mr. Montgomery did tell you that a substantial part or the reason

22   for doing this murder was to get money from the Spence apartment,

23   and maybe drugs, is that correct?

24   A    Yes, sir, that's correct.

25   Q    To your knowledge and to your recollection did anyone

1    specifically ask Mr. Gardner, all right, you're trying to get

2    money, what are you going to do with that money?

3              THE COURT:  I'm sorry, Mr. Hanlon.  You said "Mr.

4    Gardner."

5    Q    I'm sorry.  Did anyone ask Mr. Montgomery if he knew what

6    Shawn Gardner was planning on doing with that money, whether he

7    was going to use it to buy a boat or go to Disney World or

8    anything else?

9    A    No, sir, we did not.

10   Q    Just didn't come up in the sessions you attended?

11   A    No, it did not.

12   Q    You were asked some questions about having reason to believe

13   that the phone calls between, between Jamane Johnson and the

14   phone recovered after the arrest of Mr. Gardner, whether or not

15   you came to know that they'd actually been made by Will

16   Montgomery --

17   A    That's correct.

18   Q    -- to Jamane Johnson using that phone, is that correct?

19   A    That's correct.

20   Q    You know that because Will Montgomery told you that, is that

21   right?

22   A    Yes, sir, that's correct.

23   Q    Nothing further, Your Honor.

24             THE COURT:  Thank you very much, Detective.  You're

25   excused.

1            THE WITNESS:  Thank you, Your Honor.

2            THE COURT:  Did you have another witness for today, Mr.

3    Hanlon?

4            MR. HANLON:  We do, Your Honor.  It's Court's pleasure

5    whether we want to proceed.

6            THE COURT:  Who is that?

7            MR. HANLON:  Detective Brian Edwards.

8            THE COURT:  How long will he be?  He'd have to come

9    back tomorrow, anyway.

10           MR. HANLON:  That's, I think, correct, Your Honor.

11           THE COURT:  Why don't we give the jury an early break

12   today.

13           MR. HANLON:  Certainly, Your Honor.

14           THE COURT:  Members of the jury, we'll break at this

15   time for the day.  Please leave your note pads on your chairs.

16   Have no discussion about any of the evidence you've heard so far

17   or about the case.  Continue to keep an open mind about all

18   issues.  Conduct no investigation of any sort, not online.  And

19   we'll see you tomorrow morning at 9:30.

20           Jury's excused until 9:30 tomorrow morning.

21           (Jury exits the courtroom at 3:45 p.m.)

22           THE COURT:  I hope that was okay, Mr. Hanlon.  I have

23   another proceeding.

24           MR. HANLON:  Certainly fine, Your Honor.  I don't know

25   if there were any post day proceedings to do.  May I quickly run

1    and tell the detective he can go?

2            THE COURT:  Yes, of course.  Any of counsel have any

3    concerns?  Mr. Harding, perhaps you can preview tomorrow for us.

4    This next detective?

5            MR. HARDING:  Is Brian Edwards, Your Honor.

6            THE COURT:  And what's his area?  Generally.

7            MR. HARDING:  I believe it had to do with the show-up

8    identification.  But again, this is Mr. Hanlon's witness.  Most

9    of the witnesses tomorrow are his.  I have two.  Rutherford, who

10   was involved in the perimeter to the woods situation.  And Erin

11   Wisniewski, the woman who answered the door when Mr. Gardner and

12   Mr. Holly knocked on it.  And then there are several other

13   officers associated with this particular investigation.  And

14   Darius Spence is for tomorrow.  And I believe we're going to have

15   Damita Green tomorrow.

16           THE COURT:  Remind me who she is.

17           MR. HARDING:  She was, she's an important witness in

18   the Wyche brothers investigation.  She's been unavailable because

19   she's, she actually gave birth.

20           THE COURT:  She had the baby.

21           MR. HARDING:  Yes.  So we're calling her late.

22           THE COURT:  And what's her knowledge?

23           MR. HARDING:  Well, she actually overheard --

24           THE COURT:  The arrangements?

25           MR. HARDING:  Yeah.  She overheard Darryl Wyche talking

1    to Bo on the phone from Brandy's apartment immediately prior to

2    Darryl and Anthony leaving that night.

3          THE COURT:  All right.  Now, will there be any

4    objection to that testimony from anybody?

5          MR. LAWLOR:  From Mr. Mitchell, yes.  Anything that Mr.

6    Wyche said would be hearsay, Your Honor.

7          THE COURT:  And what's the answer to that, Mr. Harding?

8          MR. HARDING:  Well --

9          THE COURT:  In other words, Ms. Green was present when

10   Mr. Wyche had a conversation.

11         MR. HARDING:  Maybe, Your Honor --

12         THE COURT:  This is Mr. Hanlon's witness?

13         MR. HARDING:  Mr. Hanlon's witness.

14         THE COURT:  Okay.  All right.  And while you have the

15   floor, Mr. Harding, is Mr. Spence your witness or Mr. Hanlon's?

16         MR. HARDING:  Mr. Hanlon, also.

17         THE COURT:  You're on deck, Mr. Hanlon.  Mr. Harding

18   says you're going to have Green tomorrow late, Spence, the

19   detective, and then a few other Baltimore County people?

20         MR. HANLON:  Yes, Your Honor.  Erin Wisniewski, who's

21   actually a civilian witnesses who actually Mr. Harding will

22   handle.  And Officer Rutherford, who's a very short Baltimore

23   County officer.

24         THE COURT:  And Wisniewski's very short as well?

25         MR. HANLON:  I'm sorry?

1          THE COURT:  Wisniewski is very short?

2          MR. HANLON:  I would think so.  I also have, Your

3     Honor, the Maureen Bottrell, who did the soil comparison analysis

4     in the woods.  And we may take a look at our witnesses and see if

5     we ought to get a couple more in.

6          THE COURT:  All right.  Now, there's an objection to

7     Ms. Green's testifying as to what Mr. Wyche said during his phone

8     conversation.  What's the government's response to the hearsay

9     objection?

10          MR. HANLON:  Well, at a minimum, Your Honor, it comes

11     in under the same rationale that I think Natasha Wyche was

12     allowed to testify to this.  This isn't just a question of Darryl

13     Wyche getting off the phone and saying, Hey, I just talked to Bo,

14     I'm going to go meet Bo tonight.  This is a situation in which

15     Damita Green is actually witnessing the conversation, at least

16     one-half of the conversation.

17          THE COURT:  Okay.  I understand that.  But it's still

18     hearsay if she comes in to testify to what Mr. Wyche said.  Can

19     you just summarize her testimony?  In other words, it would seem

20     to me that Wyche's part of the conversation with someone he was

21     about to sell drugs to or buy drugs from are statements in

22     furtherance of a conspiracy.

23          MR. HANLON:  That --

24          THE COURT:  There's that.

25          MR. HANLON:  That rationale, Your Honor.

1          THE COURT:  But what's your other rationale?

2          MR. HANLON:  My other rationale is if this is hearsay

3     with the truth content, that it would be a present sense

4     impression.  Mr. Wyche is making references to Bo while he's on

5     the phone with Bo.

6          THE COURT:  Can you, as best as you recall, tell me

7     exactly what she's going to say that he said?

8          MR. HANLON:  Yes, Your Honor.

9          THE COURT:  First of all, how does she learn that the

10    conversation was with Mr. Mitchell?

11         MR. HANLON:  There were references to Bo during the

12    conversation.  Mr. Wyche is on the phone, Hey, Bo.

13         THE COURT:  What is her inferential chain that the Bo

14    Mr. Wyche is talking to is Mr. Mitchell?

15         MR. HANLON:  She knew only one Bo, to the best of my

16    knowledge.  She knew only one Bo in comparison to Darryl Wyche,

17    who would be talking to Darryl Wyche.  And she knew who he was

18    talking to for that reason.

19         THE COURT:  And how does she know Mr. Wyche?

20         MR. HANLON:  They are fairly good friends.  All of this

21    came up at a time where I think Mr. Wyche and some other people

22    were hanging out with Damita Green and some other people at a

23    common friend's home, just socializing.

24         THE COURT:  Okay.  When they came back from Washington?

25         MR. HANLON:  That's right.

1          THE COURT:  And the conversation was on Mr. Wyche's

2    cell phone?

3          MR. HANLON:  That's correct.

4          THE COURT:  And so again, as best as you can walk me

5    through it, give me the Q and A, if you can.

6          MR. HANLON:  Ms. Green is present while Mr. Wyche takes

7    a phone call.

8          THE COURT:  So he receives a phone call?

9          MR. HANLON:  Receives a phone call.  Well, I believe he

10   receives a phone call.

11         THE COURT:  There's no conversation about his intent

12   before the phone call, is that --

13         MR. HANLON:  May I grab my notes?

14         THE COURT:  Yes.  Please, please.

15         MR. HANLON:  They're all hanging out in Randallstown at

16   the home of a common friend.  They're chilling, as Ms. Green

17   would testify.

18         THE COURT:  Now, are they romantically involved?

19         MR. HANLON:  Not to the best of my knowledge.  There

20   were other people there.  They weren't alone or anything like

21   that.  Mr. Wyche, Darryl Wyche receives a phone call.  Ms. Green

22   is able to hear Darryl Wyche's side of the conversations.  During

23   the course of the conversation, Darryl Wyche mentions and refers

24   to the name "Bo."

25         THE COURT:  All right.

1              MR. HANLON:  Mr. Wyche asks the questions, words to the

2      effect of, Are you trying to get, are you still trying to get

3      that?

4              THE COURT:  Are you still trying to get that?

5              MR. HANLON:  Yes, Your Honor.  The phone call lasts

6      momentarily.  Mr. Wyche gets off the phone and seemed happy after

7      the call.

8              THE COURT:  And --

9              MR. HANLON:  They then began to make preparations to

10     leave and Mr. Wyche --

11             THE COURT:  Just a moment.  Elaborate a bit.  If

12     somebody were to ask her, What do you mean, he seemed happy,

13     what's her answer to that?

14             MR. HANLON:  He seemed, I don't think he was jumping

15     for joy or anything like that.  He seemed cheered up.  He

16     suddenly wanted to go out.  He seemed interested.  He wanted to

17     go get something done.

18             THE COURT:  And how long after the phone call did he

19     depart?

20             MR. HANLON:  Moments.

21             THE COURT:  Moments later?

22             MR. HANLON:  Yes, Your Honor.

23             THE COURT:  Anything else?

24             MR. HANLON:  That's about it.  Mr. Wyche and Anthony

25     Wyche, Peter or Pete, immediately leave.  I believe that Deezo

1    may have been present for part of this.  That was the last that

2    they were ever seen.

3            THE COURT:  All right.  And anybody else going to

4    testify as to this conversation or this phone call?

5            MR. HANLON:  No.  We don't anticipate anyone else.

6            THE COURT:  All right.  Mr. Lawlor.  Sound like classic

7    present sense impression.

8            MR. LAWLOR:  I don't think he's making -- my

9    understanding of present sense impression, and candidly I'm

10   caught a little off guard, I may ask the Court to hear me on this

11   for a minute because I can't say my knowledge of the --

12           THE COURT:  Remember the famous case from law school?

13           MR. LAWLOR:  No, definitely not.  Absolutely positively

14   not.

15           THE COURT:  You remember, Mr. Lawlor.  You remember.

16           MR. LAWLOR:  No, I definitely don't remember any case

17   on present sense impression.  I don't even think I remembered it

18   was an exception until Mr. Hanlon said it.  So I'll probably have

19   a different objection in the morning.  But I think this isn't

20   about what he was observing or sensing.  It's --

21           THE COURT:  Present sense intention, present sense

22   impression includes present intention to do something

23   immediately.

24           MR. LAWLOR:  I think --

25           THE COURT:  To go to a place.

1          MR. LAWLOR:  I know what you're saying.  A statement of

2     future intent.  I'm not sure that's the same thing.

3          THE COURT:  I think it is.

4          MR. LAWLOR:  I don't even remember the case so I can't

5     really quarrel with the Court.

6          THE COURT:  What do you think of coconspirator

7     exception?

8          MR. LAWLOR:  I say no to that one.  I think, I'm going

9     to go on the side that that doesn't apply.

10         THE COURT:  Why wouldn't that apply?  He's making a

11    drug deal with somebody with whom he's conspiring to transfer

12    drugs.

13         MR. LAWLOR:  I don't know that we can make that

14    deduction from what he says, Your Honor.  And therefore, I would

15    say, number one, you know, I think we need a lot more of a

16    foundation to establish that, that two individuals on the phone

17    are members of a conspiracy.  But also, I don't think whatever he

18    said, Mr. Hanlon said it, I can't recall verbatim what Mr.

19    Wyche's end of this conversation was, but I think it's too vague

20    to be in furtherance of any conspiracy.

21         MR. HANLON:  Your Honor, just for the Court's

22    information, the present sense impression and state of mind would

23    be two separate rationales.

24         THE COURT:  Well, his state of mind is not material.

25    So I wouldn't admit it as state of mind.  But I'm looking at Rule

1    803(3), captioned "Then Existing Mental, Emotional Or Physical

2    Condition."  Excuse me.  Okay.  You're right, Mr. Lawlor.  It's

3    not present sense impression.

4              MR. LAWLOR:  Yes.

5              THE COURT:  It's state of mind.

6              MR. LAWLOR:  Your Honor, I've been set up.  I've been

7    set up.

8              THE COURT:  It's Subsection Three, Then Existing

9    Mental, Emotional Or Physical Condition.  Quote:

10             "A statement of the declarant's then-existing state of

11   mind, emotion, sensation or physical condition, such as intent,

12   plan, motive, design, mental feeling, pain, and bodily health,

13   but not including a statement of memory or belief to prove the

14   fact remembered or believed."

15             So I think it does come within then-existing mental

16   state, not present sense impression.

17             MR. LAWLOR:  Your Honor, I just asked Mr. Hanlon to

18   remind me what it is that Ms. Green will say Mr. Wyche said.

19             THE COURT:  He just said it.

20             MR. LAWLOR:  He just said it, yes.

21             THE COURT:  He said that he got a phone call.  She

22   heard him refer, she heard him refer to the caller as Bo.

23             MR. LAWLOR:  Right.

24             THE COURT:  And he said into the phone, Do you still

25   want to do that?

1          MR. LAWLOR:  Which isn't, okay -- statement of future

2    intent is, I'm going to the store to get milk, not a question, Do

3    you still want to do that?

4          THE COURT:  Oh, in drug talk, that's exactly what it

5    is.  You still want to do that?

6          MR. LAWLOR:  Your Honor, even in drug talk, I think

7    that's -- number one, it's a question so it's not really even a

8    statement of his intent.  He's inquiring about someone else's

9    intent.

10         THE COURT:  All right.  I'll hear you briefly tomorrow

11   morning.  But it does sound like --

12         MR. LAWLOR:  Luckily we're leaving at four because I'm

13   excited to go do this research.

14         MR. KURLAND:  Your Honor, as an advocate but as an

15   evidence professor, the 803(3) declaration of then-existing state

16   of mind, you're probably referring to the Hillman case.

17         THE COURT:  Hillman.  Thank you, Mr. Kurland.  You

18   remember Hillman?

19         MR. KURLAND:  Don't hold that against him.

20         THE COURT:  No.  You're right.  It's Hillman.

21         MR. KURLAND:  I know I'm right.  But Your Honor, the

22   issue is that the declaration of present state of mind, Lawlor

23   did a great job given that he claims that, he professes not to

24   know the law school stuff.  But the issue is, and Hillman and

25   then -- Hillman was decided before the adoption of the Federal

1    Rules of Evidence.  So whether or not Hillman is the current law

2    under the Federal Rules of Evidence is a dicey proposition at

3    best.

4             But the furthest extension of which Hillman doesn't go

5    and where courts get into problems is when it's applied in a

6    situation here where you're using Mr. A's statement to prove the

7    conduct, not only of Mr. A, but of Mr. B.  And that's the classic

8    situation here because he's trying, he, the evidence is being

9    offered circumstantially to prove that he actually met Bo.  And

10   that's, that's beyond what Hillman and what 803(3) would provide

11   for.

12            THE COURT:  So it sounds like you may have some help,

13   Mr. Lawlor.

14            MR. LAWLOR:  I'm grateful for it.

15            THE COURT:  But I'm preliminarily satisfied, having

16   looked at the rule and been corrected myself, it's not --

17            MR. KURLAND:  Your Honor, tonight you should read all

18   of the criticisms of Hillman, and why it's bad law.

19            THE COURT:  I actually remember the criticism.

20            MR. KURLAND:  You probably teach it as well.

21            THE COURT:  Anything else coming up?  What are we going

22   to get from Mr. Spence?  What I mean by that is, is it anything

23   other than just background?

24            MR. HANLON:  Well, it's background that's, that kind of

25   goes directly --

209

1          THE COURT:  Oh, is he going to corroborate the whole

2     Momma story?

3          MR. HANLON:  A lot of the Momma story, Your Honor.  Mr.

4     Spence, among other things, is going to testify that's he's a

5     drug dealer, which is of some relevance to this case.  And also,

6     a lot of the Momma story's going to come out.  He's going to talk

7     about what was going on with him and his wife and all that other

8     kind of stuff.

9          So yes, a lot of corroboration of things we heard from

10     Mr. Montgomery.

11          THE COURT:  Okay.  But we will have a full day

12     tomorrow?

13          MR. HANLON:  I believe so, Your Honor.

14          THE COURT:  All right.  What about Wednesday, while

15     we're at it?

16          MR. HANLON:  Can I get back to the Court on Wednesday?

17          THE COURT:  Sure.  But counsel know who's on tap?

18          MR. HANLON:  Yes, Your Honor, I believe they have.  But

19     things change a little bit so I want to make sure I'm updating

20     them.  I'm not telling them --

21          THE COURT:  Fine.  You're going to need some rulings

22     reasonably soon, I think.  What was that you raised this morning,

23     Mr. Harding?

24          MR. HARDING:  Just the audio tapes.  And I don't need

25     it before next week, Your Honor.  I mean, I need, the witnesses

210

1   wouldn't testify until next week.

2              THE COURT:  The audiotape?  I'm sorry.

3              MR. HARDING:  The audio tapes of the courtroom

4   proceeding.

5              THE COURT:  That's right.  The courtroom proceedings.

6   Do any of counsel need any rulings this week?

7              MR. KURLAND:  I would like my instruction.

8              THE COURT:  Right.  We'll talk about the instruction.

9   Anything else, Mr. Martin?

10             MR. MARTIN:  We have the Rodney Hayes issue, Your

11  Honor.  The jail house altercation.

12             THE COURT:  Okay.  Let's talk about that tomorrow.  Mr.

13  Coburn?

14             MR. COBURN:  Thank you, Your Honor.  I'm not too sure

15  that this is coming up any more this week.  But there was that

16  Daubert issue in terms of the firearms.

17             THE COURT:  I think the government's filed a response,

18  or not?

19             MR. HANLON:  Actually, Your Honor, we have not.  We

20  were not sure from the Court's initial comments whether or not

21  the Court wanted a response.  But the defense has put out is sort

22  of the complete record from the New York case about some of the

23  rulings up there.

24             If the Court would like us to respond, we'd certainly

25  be happy to.

211

1          THE COURT:  I would like a brief response.  I haven't

2     seen any hard copies, Mr. Coburn.  I'm not saying they're not in

3     my chambers.

4          MR. COBURN:  I did actually provide them the very next

5     day, Your Honor.

6          THE COURT:  Actually, you're right.  I do have them.

7     When are the ballistics coming in?  Next week?

8          MR. HANLON:  If they have to, yes, Your Honor.

9     Candidly, I had considered the possibility of using that as a

10    filler on Wednesday.  But if that's going to be impossible, we'll

11    have to push till next week.

12         THE COURT:  All right.  I'll find sometime tonight to

13    take a look at Mr. Coburn's submission and let you know whether

14    you can do that on Wednesday or not.  As I said preliminarily, I

15    don't think I'm going to follow Judge Rakoff.  But I'll look at

16    what you've submitted, Mr. Coburn.

17         MR. COBURN:  Appreciate it very much, Your Honor.

18         THE COURT:  Mr. Crowe?

19         MR. CROWE:  Yes, Your Honor.  This morning I attempted

20    to make an ECF filing of a fairly simple motion in limine dealing

21    with the testimony of a Mr. Ernest Reynolds.  I had my usual

22    trouble doing that.  The secretary wasn't in this morning and I

23    wasn't able to do it.

24         In the event that I have the same problem tonight, what

25    I suggested I could do would be to give the Court my copies of

1    it, and I'll get copies e-mailed over to the government tonight

2    if I can't get it filed.

3              THE COURT:  All right.  You can hand it up.  Thank you.

4              MR. CROWE:  It's not very, I mean, it's not very

5    momentous stuff.

6              THE COURT:  While you're there, I looked very quickly,

7    actually, I read the entire motion, I guess, filed by Mr. Pyne

8    regarding that Wooten or Wooden testimony.  What I'm going to do

9    is go back and listen to the tape of that testimony because, in

10   all honesty, I don't remember an objection, I don't remember a

11   timely objection.  But in any event, I note that you and Mr. Pyne

12   did not submit a proposed curative instruction.  And in fact,

13   you're calling it a motion for a mistrial.  And so I don't know

14   if that means you've given up on any possibility of a curative

15   instruction, curative limiting instruction.

16             MR. PYNE:  We did discuss that, Your Honor.  We decided

17   not to submit that and instead making a motion for mistrial.

18             THE COURT:  That's fine.  Well, I will take another

19   look at it and have Belinda key up that tape for me.  Thank you.

20             We're in recess until 9:30.

21             (Recess at 4:03 p.m.)

22

23

24

25

1                                INDEX

2

3                                                    PAGE
   WITNESS: DETECTIVE GARY NIEDERMEIER
4  CROSS EXAMINATION BY MR. LAWLOR                    20
   CROSS EXAMINATION BY MR. KURLAND                   34
5  REDIRECT EXAMINATION BY MR. HARDING                44
   RECROSS EXAMINATION BY MR. LAWLOR                  50
6
   WITNESS: OFFICER KEITH KETTERMAN
7  DIRECT EXAMINATION BY MR. HANLON                   52
   CROSS EXAMINATION BY MR. KURLAND                   65
8
   WITNESS: CORPORAL MICHAEL TONI
9  DIRECT EXAMINATION BY MR. HANLON                   67
   CROSS EXAMINATION BY MR. KURLAND                   79
10 REDIRECT EXAMINATION BY MR. HANLON                 81
   RECROSS EXAMINATION BY MR. KURLAND                 82
11
   WITNESS: OFFICER DOUGLAS JESS
12 DIRECT EXAMINATION BY MR. HANLON                   84
   CROSS EXAMINATION BY MR. KURLAND                   89
13
   WITNESS: OFFICER ERIC SALADINO
14 DIRECT EXAMINATION BY MR. HANLON                   91
   CROSS EXAMINATION BY MR. COBURN                    98
15 REDIRECT EXAMINATION BY MR. HANLON                 102

16 WITNESS: TECHNICIAN CARRIE BIALEK
   DIRECT EXAMINATION BY MR. HANLON                   103
17
   WITNESS: DETECTIVE PHILLIP MARLL
18 DIRECT EXAMINATION BY MR. HANLON                   108
   CROSS EXAMINATION BY MR. KURLAND                   171
19 CROSS EXAMINATION BY MR. CROWE                     191
   REDIRECT EXAMINATION BY MR. HANLON                 195
20

21

22

23

24

25

214

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on October 27, 2008.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14         _____
           Mary M. Zajac,
15         Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$5500** [1] - 22:3

## '

**'02** [6] - 96:2, 119:13, 129:10, 134:24, 135:2, 146:1
**'95** [1] - 158:8

## 1

**1.6** [2] - 163:13, 163:17
**10** [4] - 19:24, 29:20, 31:25, 50:9
**100%** [4] - 5:5, 30:15, 61:5, 61:6
**101** [1] - 1:25
**1010** [2] - 144:5, 147:6
**102** [1] - 213:15
**103** [1] - 213:16
**108** [1] - 213:18
**10:00** [2] - 29:8, 29:9
**10:31** [1] - 184:6
**11** [2] - 29:20, 29:24
**111** [1] - 112:8
**11:57** [1] - 184:7
**12** [6] - 67:21, 94:4, 181:11, 185:22, 193:18, 194:8
**12/17/2003** [2] - 26:12, 28:16
**124** [1] - 123:1
**1241** [2] - 49:2, 49:5
**126** [1] - 123:10
**12:30** [2] - 26:12, 184:9
**12:34** [1] - 28:16
**12:40** [1] - 30:5
**12:45** [2] - 127:10, 127:14
**13** [2] - 52:18, 52:19
**133** [1] - 130:14
**141** [2] - 135:25, 136:1
**142** [1] - 137:6
**1423** [1] - 184:12
**146** [1] - 140:18
**14th** [7] - 98:14, 135:18, 136:3, 136:15, 137:14, 145:19, 184:25
**15** [10] - 67:19, 67:20, 83:4, 92:7, 153:25, 154:8, 183:25, 184:10, 186:18, 186:21
**150** [1] - 140:21
**154** [1] - 147:1
**158** [1] - 149:4

**161** [1] - 149:11
**162** [1] - 150:1
**164** [2] - 150:4, 150:11
**167** [1] - 150:19
**168** [1] - 151:6
**169** [2] - 151:9, 151:12
**17** [3] - 10:13, 169:13, 180:9
**171** [1] - 213:18
**17th** [5] - 29:4, 29:5, 29:6, 44:22
**18** [1] - 192:17
**18th** [1] - 193:4
**191** [1] - 213:19
**195** [1] - 213:19
**1st** [1] - 129:9

## 2

**2** [7] - 116:7, 116:9, 116:12, 116:14, 116:16, 127:11, 127:12
**20** [5] - 50:9, 175:4, 186:18, 186:21, 213:4
**2000** [2] - 42:24, 43:10
**2002** [44] - 29:4, 29:6, 42:1, 42:13, 42:15, 42:19, 43:7, 48:7, 52:24, 63:8, 68:2, 68:15, 84:23, 92:12, 92:22, 93:18, 96:9, 98:14, 103:25, 109:13, 118:7, 118:25, 119:9, 120:20, 122:15, 129:9, 134:23, 135:18, 138:12, 144:13, 145:19, 146:6, 146:7, 148:13, 148:17, 151:20, 157:22, 161:22, 175:6, 175:7, 181:9, 191:23, 191:24, 193:20
**2003** [6] - 43:10, 44:22, 175:6, 179:20
**2004** [2] - 15:6, 42:25
**2007** [1] - 133:9
**2008** [2] - 1:11, 214:5
**2009** [1] - 214:10
**201** [2] - 110:24, 117:19
**20th** [4] - 138:12, 144:13, 145:15, 146:1
**212** [1] - 94:4
**21201** [1] - 1:25
**21220** [1] - 141:20
**22** [4] - 108:22, 108:23, 160:14, 160:16
**22nd** [4] - 175:5, 175:6, 176:6, 179:20
**23rd** [2] - 172:6, 172:10, 172:12, 172:19, 174:9, 174:25, 175:1,

175:15, 175:16, 191:23
**24** [2] - 91:5, 91:6
**24th** [4] - 38:17, 145:1, 146:6, 146:7
**25** [2] - 148:17, 192:16
**25th** [5] - 38:17, 148:13, 151:20, 185:5, 185:6
**26** [1] - 175:4
**26th** [7] - 48:6, 175:5, 175:6, 175:7, 191:24, 193:20, 193:24
**27** [3] - 1:11, 21:18, 214:5
**2:03** [1] - 127:17
**2:43** [2] - 184:12

## 3

**3/24/2002** [1] - 37:21
**3/25/2002** [1] - 37:22
**30** [2] - 123:16, 137:24
**3249** [6] - 58:7, 58:10, 59:11, 70:24, 77:7
**3301** [1] - 55:6
**3303** [1] - 121:23
**34** [1] - 213:4
**3407** [1] - 156:9
**35** [1] - 190:8
**350** [1] - 190:8
**3549** [1] - 147:22
**357** [12] - 152:2, 153:15, 158:23, 160:25, 185:24, 190:8, 190:10, 190:14, 190:16, 190:17, 192:19
**3:45** [1] - 197:21

## 4

**4** [2] - 9:21, 50:9
**40** [10] - 115:21, 123:16, 137:24, 153:9, 153:17, 154:14, 154:16, 156:21, 186:4, 192:24
**401** [2] - 129:8, 162:22
**410** [1] - 128:25
**44** [1] - 213:5
**443** [1] - 126:10
**443-324-1107** [3] - 128:24, 129:1, 129:4
**443-375-2168** [3] - 128:7, 128:8, 128:16
**443-540-1253** [2] - 162:3, 163:5
**4472** [1] - 147:20
**493-1241** [1] - 48:7
**4:03** [1] - 212:21
**4th** [1] - 44:21

## 5

**5,770** [1] - 22:4
**50** [2] - 156:21, 213:5
**52** [1] - 213:7
**5515** [1] - 1:24
**5770** [1] - 22:4
**5:00** [5] - 53:10, 68:15, 92:23, 110:11, 110:13
**5:30** [3] - 92:23, 181:8, 181:13

## 6

**6/14** [1] - 98:14
**6/7/02** [1] - 117:21
**600** [1] - 21:17
**65** [1] - 213:7
**66** [2] - 37:4, 46:2
**67** [1] - 213:9
**6:00** [2] - 89:22, 92:23

## 7

**7** [1] - 31:24
**700** [1] - 39:24
**79** [1] - 213:9
**7:00** [1] - 129:18
**7th** [23] - 52:24, 53:9, 53:10, 63:8, 68:2, 68:15, 84:23, 85:1, 89:19, 92:12, 92:22, 93:23, 94:9, 94:10, 96:2, 96:9, 103:25, 109:13, 116:5, 129:10, 138:10, 161:22, 181:4

## 8

**8** [1] - 145:15
**803(3** [3] - 206:1, 207:15, 208:10
**81** [1] - 213:10
**82** [5] - 119:18, 141:19, 157:15, 158:9, 213:10
**84** [1] - 213:12
**8407** [2] - 121:23, 137:25
**857** [1] - 184:13
**8618** [3] - 109:24, 110:24, 117:18
**89** [1] - 213:12
**8:35** [1] - 110:16
**8:57** [1] - 184:15
**8th** [13] - 116:6, 118:6, 118:24, 121:21, 133:12, 138:10, 144:2, 145:1,

146:22, 181:9, 182:7, 182:20, 182:22

## 9

**9's** [2] - 135:6, 135:9
**9011-001** [1] - 106:18
**9044-009** [1] - 117:24
**9044-010** [1] - 115:24
**91** [1] - 213:14
**923** [1] - 147:22
**98** [1] - 213:14
**9:00** [1] - 184:15
**9:04** [1] - 110:17
**9:30** [3] - 197:19, 197:20, 212:20
**9:40** [1] - 2:1
**9th** [13] - 93:18, 119:9, 119:13, 120:20, 122:15, 133:9, 133:12, 134:22, 134:24, 135:1, 144:2, 145:15, 146:22, 157:22, 183:8

## A

**A's** [1] - 208:6
**a.m** [3] - 2:1, 19:24, 29:9
**Aaron** [6] - 63:6, 78:19, 94:19, 96:20, 164:13, 169:13
**abide** [1] - 5:24
**able** [32] - 7:5, 10:8, 10:9, 10:16, 14:3, 23:16, 32:9, 33:1, 35:24, 40:7, 60:22, 65:19, 72:19, 73:4, 81:24, 85:11, 87:10, 95:15, 98:1, 124:10, 126:3, 129:3, 137:15, 146:3, 146:5, 146:6, 146:10, 146:20, 162:5, 182:16, 202:22, 211:23
**aborted** [1] - 6:4
**abrasions** [2] - 105:24, 106:2
**Absolutely** [1] - 204:13
**absolutely** [2] - 82:4, 190:12
**abuse** [1] - 103:16
**accept** [2] - 39:23, 39:25
**acceptable** [1] - 171:13
**access** [2] - 57:16, 79:9
**According** [1] - 184:17
**accuracy** [1] - 30:16
**accurate** [3] - 30:15, 36:25, 214:8

**accurately** [1] - 37:2
**acted** [1] - 57:17
**action** [2] - 19:7, 19:12
**activate** [4] - 124:14, 124:20, 124:24
**activities** [3] - 95:5, 191:9, 193:7
**activity** [2] - 191:16, 191:19
**actual** [8] - 18:6, 56:11, 88:1, 132:16, 133:4, 138:20, 154:4
**Adam** [1] - 1:22
**add** [1] - 4:6
**addition** [2] - 106:13, 188:22
**additional** [11] - 3:14, 3:18, 16:15, 16:17, 105:23, 106:1, 129:12, 158:11, 183:16, 184:8, 184:10
**address** [6] - 4:16, 58:9, 58:11, 70:21, 117:18, 158:9
**addresses** [2] - 32:17, 55:12
**adjacent** [5] - 97:1, 97:3, 97:9, 99:17, 100:2
**administered** [1] - 80:2
**admissible** [1] - 12:3
**admission** [1] - 13:23
**admit** [1] - 205:25
**admitted** [1] - 147:13
**adoption** [1] - 207:25
**advise** [1] - 19:11
**advised** [1] - 110:16
**advocate** [1] - 207:14
**aerial** [4] - 68:7, 68:12, 109:19, 155:14
**affixed** [1] - 214:9
**afternoon** [18] - 53:9, 91:25, 92:22, 94:16, 98:6, 98:7, 99:19, 103:6, 108:14, 108:15, 127:11, 127:18, 127:22, 171:18, 171:19, 184:18, 191:3
**Afternoon** [1] - 99:18
**agents** [1] - 161:13
**ago** [11] - 2:16, 3:11, 3:16, 4:14, 34:16, 40:2, 60:19, 73:2, 132:5, 170:9, 195:18
**agree** [3] - 80:23, 81:10, 81:13
**agreed** [1] - 14:12
**agreement** [1] - 4:25
**ahead** [1] - 61:9
**aim** [2] - 54:18, 118:12
**al** [1] - 214:5
**alerted** [1] - 22:6

**alibi** [2] - 7:4, 7:5
**allege** [1] - 11:6
**alleged** [7] - 4:10, 5:8, 10:11, 13:23, 178:4, 180:13, 180:14
**allowed** [1] - 200:12
**allude** [1] - 134:18
**alluded** [9] - 74:18, 87:14, 92:3, 118:1, 120:23, 130:5, 147:24, 151:25, 159:14
**almost** [3] - 49:17, 73:10, 184:15
**Almost** [1] - 67:19
**alone** [1] - 202:20
**alter** [1] - 12:1
**altercation** [1] - 210:11
**Ambo** [12] - 119:17, 119:18, 119:20, 122:15, 141:19, 157:15, 157:18, 158:9, 159:5, 159:20, 160:19, 161:17
**AMD-04-029** [2] - 1:6, 214:5
**Amendment** [3] - 18:21, 19:5, 19:17
**AMERICA** [1] - 1:5
**analysis** [3] - 24:8, 167:14, 200:3
**analyst** [1] - 18:2
**analyze** [1] - 103:22
**ancillary** [1] - 8:4
**Andre** [7] - 1:13, 33:11, 33:16, 46:24, 47:2, 47:18, 50:16
**Angeles** [1] - 31:19
**angle** [1] - 86:13
**anonymous** [2] - 47:8, 47:10
**answer** [16] - 6:16, 7:20, 19:15, 35:5, 49:15, 49:24, 50:6, 59:9, 140:5, 170:6, 170:21, 173:12, 180:11, 190:16, 199:7, 203:13
**answered** [2] - 57:18, 198:11
**answering** [3] - 57:15, 72:15, 172:25
**antenna** [1] - 123:9
**Anthony** [2] - 199:2, 203:24
**anticipate** [1] - 204:5
**Antonio** [1] - 129:7
**anyway** [1] - 197:9
**apart** [3] - 9:9, 123:15, 147:23
**apartment** [31] - 110:23, 111:2, 111:10, 111:13, 111:17, 112:2, 112:6,

112:9, 112:20, 112:23, 113:20, 113:21, 115:7, 116:7, 116:23, 117:11, 117:13, 118:2, 163:14, 163:15, 163:21, 163:23, 164:1, 164:10, 164:12, 187:11, 187:18, 187:22, 188:2, 195:22, 199:1
**Apartment** [1] - 110:24
**apologize** [3] - 65:22, 110:1, 116:22
**apparent** [2] - 105:18, 115:17
**appear** [16] - 56:6, 56:23, 61:18, 96:1, 105:5, 107:13, 115:12, 123:5, 126:22, 157:10, 160:5, 160:21, 160:25, 161:4, 161:5, 187:22
**appearance** [1] - 136:25
**Appearances** [1] - 1:15
**appeared** [7] - 39:4, 74:4, 83:10, 125:5, 146:21, 160:10, 161:2
**applied** [2] - 139:21, 208:5
**apply** [2] - 205:9, 205:10
**Appreciate** [1] - 211:17
**appreciate** [3] - 43:8, 172:24
**appreciates** [1] - 83:11
**approach** [17] - 35:17, 36:3, 37:2, 51:10, 55:8, 55:14, 57:11, 58:3, 70:16, 71:17, 94:11, 120:21, 139:8, 152:21, 155:13, 174:18, 179:4
**Approach** [1] - 85:10
**approached** [5] - 18:12, 52:23, 58:6, 58:11, 81:25
**approaching** [4] - 56:6, 59:20, 72:2, 116:6
**appropriate** [7] - 4:21, 6:12, 7:11, 7:12, 8:15, 15:23, 18:24
**approximate** [3] - 121:5, 121:12, 156:20
**Approximate** [1] - 157:5
**April** [2] - 29:5, 29:6
**area** [73] - 53:7, 53:15, 53:16, 53:18, 53:19, 53:20, 53:23, 53:24, 54:13, 54:23, 55:23, 55:24, 55:25, 65:23, 66:8, 66:9, 66:11, 66:12, 66:17, 66:20, 68:24, 69:8, 69:9, 69:15, 70:4,

70:5, 77:24, 85:2, 85:19, 85:21, 86:21, 87:3, 90:23, 90:25, 91:3, 91:6, 92:21, 109:18, 110:13, 113:14, 116:17, 116:19, 118:3, 118:14, 118:16, 118:19, 121:22, 121:25, 122:13, 122:16, 126:21, 131:15, 133:9, 136:15, 136:17, 144:20, 148:14, 149:5, 155:19, 182:8, 182:17, 182:23, 183:2, 183:18, 183:19, 184:9, 187:14, 189:12, 190:18, 192:16, 198:6
**areas** [5] - 26:3, 68:17, 184:7, 184:9, 184:13
**argue** [1] - 10:25
**argument** [2] - 15:21, 19:9
**arguments** [1] - 2:23
**armed** [1] - 103:16
**armpit** [1] - 105:20
**arrangements** [1] - 198:24
**array** [8] - 26:11, 26:20, 27:14, 44:17, 44:25, 45:4, 45:10, 45:13
**arrays** [3] - 26:8, 26:9, 44:13
**arrest** [14] - 7:6, 9:21, 9:22, 11:2, 18:18, 32:14, 33:14, 64:23, 76:22, 78:4, 86:25, 93:3, 161:22, 196:14
**arrested** [5] - 6:6, 6:13, 7:7, 13:5, 48:17, 48:18, 80:11, 81:8, 102:5, 116:8, 116:18, 118:18, 118:19, 156:3, 168:8
**Arrington** [2] - 44:12, 195:12
**arrival** [6] - 110:23, 111:3, 111:23, 113:10, 113:25, 117:8
**arrive** [1] - 110:20
**arrived** [6] - 104:10, 110:14, 110:17, 110:22, 112:4, 144:18
**arrives** [1] - 110:20
**arriving** [1] - 68:23
**article** [1] - 184:6
**ascribe** [1] - 112:16
**aside** [3] - 31:17, 116:11, 170:16
**Aside** [2] - 96:13, 116:14
**asleep** [1] - 83:13
**aspect** [1] - 83:2
**assailant** [1] - 4:10

**assaults** [1] - 103:16
**assigned** [12] - 67:21, 68:5, 79:7, 84:12, 84:20, 85:7, 85:9, 91:20, 92:11, 92:15, 92:25, 94:2
**assignment** [1] - 2:17
**assist** [3] - 53:11, 70:4, 85:2
**assistants** [1] - 2:17
**associated** [12] - 37:12, 37:17, 38:10, 38:11, 39:9, 39:11, 39:12, 40:16, 45:10, 48:8, 198:13
**assume** [4] - 23:4, 29:17, 98:10, 124:14
**assuming** [1] - 85:11
**Assuming** [1] - 17:9
**at8618** [1] - 110:22
**attached** [3] - 41:7, 114:15, 114:17
**attempt** [9] - 15:9, 43:25, 50:8, 87:21, 88:4, 109:1, 124:3, 150:8, 163:22
**attempted** [5] - 141:8, 142:9, 186:10, 186:13, 211:19
**attempting** [1] - 118:12
**attempts** [1] - 167:13
**attend** [3] - 174:25, 175:17, 175:23
**attended** [6] - 174:9, 176:3, 193:21, 193:23, 195:20, 196:10
**attending** [1] - 22:10
**attention** [10] - 22:21, 46:18, 52:24, 84:23, 109:13, 119:9, 133:16, 138:12, 148:17, 194:15
**attitude** [1] - 188:15
**attorney** [3] - 101:25, 102:4, 102:12
**Attorney's** [6] - 24:19, 24:24, 35:3, 193:20, 194:6, 194:9
**audio** [4] - 11:23, 15:20, 209:24, 210:3
**audiotape** [1] - 210:2
**August** [10] - 172:6, 172:10, 172:12, 172:19, 174:9, 174:24, 175:1, 175:16, 191:23
**authority** [1] - 4:19
**automatic** [2] - 115:14, 115:21
**autopsy** [2] - 181:21, 182:22
**available** [2] - 10:3, 181:21

awake [1] - 83:22
aware [18] - 23:1, 24:15, 25:15, 25:16, 32:19, 86:23, 87:2, 90:18, 90:20, 91:2, 115:6, 117:4, 167:17, 169:19, 170:16, 175:25, 178:20, 192:2

**B**

baby [1] - 198:20
backed [1] - 146:8
background [4] - 178:13, 191:21, 208:23, 208:24
backing [2] - 137:10, 156:17
bad [1] - 208:18
bag [18] - 78:14, 78:15, 78:20, 78:23, 79:2, 111:24, 113:25, 142:12, 142:15, 142:20, 142:22, 160:2, 160:3, 160:4, 160:9, 160:11
bags [3] - 78:2, 79:1, 79:16
balcony [8] - 112:22, 112:25, 113:3, 113:5, 113:11, 117:5, 117:16
ballistics [1] - 211:7
Baltimore [39] - 1:12, 1:25, 41:17, 41:20, 42:16, 43:1, 43:6, 43:10, 52:15, 52:16, 67:14, 67:15, 67:18, 76:25, 84:12, 84:14, 85:3, 91:19, 92:4, 103:8, 106:20, 108:10, 108:16, 109:18, 119:17, 121:13, 138:17, 138:19, 138:24, 139:22, 140:2, 140:15, 141:19, 144:22, 173:22, 183:22, 199:19, 199:22
bar [1] - 100:21
barrel [3] - 152:17, 153:21, 154:22
Barry [1] - 1:22
base [4] - 129:21, 130:19, 131:9, 133:5
baseball [5] - 130:7, 132:25, 133:1, 133:4, 157:1
Based [3] - 49:11, 71:21, 144:22
based [3] - 6:9, 19:18, 126:23
basic [3] - 10:8, 93:7, 187:18

basis [2] - 19:9, 20:10
basketball [4] - 31:19, 46:8, 46:9, 46:21
battery [3] - 123:19, 123:21, 124:1, 124:12, 124:15, 124:18, 124:20, 125:2, 125:3, 125:4, 125:5, 126:25, 127:1, 137:13, 156:16
BB [1] - 160:22
BCDC [1] - 36:2
bear [1] - 34:17
beaten [2] - 121:22, 156:11
became [1] - 192:14
become [5] - 4:10, 5:13, 42:10, 70:19, 109:13
bed [2] - 160:1, 160:2
bedroom [3] - 159:6, 159:7, 160:1
bedrooms [2] - 158:15, 158:17
began [9] - 55:1, 109:7, 111:1, 111:6, 119:13, 124:20, 150:22, 183:21, 203:9
begin [5] - 16:9, 30:4, 56:8, 56:10, 71:12
beginning [2] - 129:9, 194:16
begins [1] - 69:10
begun [1] - 74:16
Behalf [5] - 1:15, 1:17, 1:18, 1:20, 1:21
Behind [1] - 131:8
behind [7] - 68:7, 71:8, 115:9, 115:14, 118:22, 131:11, 167:11
belief [2] - 7:17, 206:13
Belinda [1] - 212:19
Bell [4] - 87:9, 143:23, 144:5, 147:6
belonged [1] - 57:17
belongs [1] - 79:8
below [2] - 87:12
bench [2] - 97:19, 97:24
beneficial [1] - 2:4
Benson [1] - 24:14
best [10] - 5:1, 23:17, 102:11, 179:14, 185:2, 201:6, 201:15, 202:4, 202:19, 208:3
better [6] - 8:21, 28:7, 45:20, 45:25, 46:2, 195:12
between [37] - 37:12, 38:10, 38:13, 39:16, 42:24, 46:10, 47:25, 55:6, 55:16, 60:6, 66:9, 66:17, 66:18, 71:9,

79:13, 86:21, 87:3, 97:13, 98:20, 121:11, 121:20, 128:18, 128:22, 128:25, 145:1, 145:14, 149:1, 150:11, 161:9, 162:11, 162:14, 162:22, 182:5, 182:25, 196:13
Bey [2] - 33:23, 34:2
beyond [2] - 5:6, 208:10
BIALEK [2] - 102:21, 213:16
Bialek [5] - 17:19, 102:20, 102:25, 103:13
big [1] - 11:1
bigger [1] - 134:13
birth [3] - 97:22, 101:9, 198:19
bit [19] - 62:13, 69:9, 74:13, 74:16, 74:19, 86:9, 105:3, 107:9, 118:14, 122:5, 131:8, 139:13, 149:11, 150:10, 150:19, 152:20, 165:8, 203:11, 209:19
black [11] - 55:5, 133:17, 143:24, 146:20, 147:7, 186:25, 187:1, 187:5, 187:7, 189:5
Blade [1] - 40:25
blank [2] - 98:24, 99:4
bleeding [1] - 168:10
blocked [1] - 56:20
blocks [1] - 139:13
blood [20] - 12:25, 13:4, 13:7, 13:16, 34:19, 34:20, 34:24, 35:19, 35:21, 35:25, 36:11, 36:12, 36:14, 105:5, 167:19, 168:4, 168:5, 168:6, 168:10
Bloods [1] - 43:4
bloody [2] - 167:19, 167:25
Blue [1] - 62:1
blue [3] - 63:19, 74:6, 139:4
blurred [1] - 74:13
Bo [20] - 26:18, 27:17, 27:23, 28:18, 45:15, 45:16, 143:8, 199:1, 200:13, 200:14, 201:4, 201:5, 201:11, 201:12, 201:13, 201:15, 201:16, 202:24, 206:22, 208:9
boat [1] - 196:7
bodily [1] - 206:12
body [3] - 104:18, 105:11, 106:11
book [2] - 193:25, 194:4
booking [2] - 61:12,

73:18
bother [2] - 4:8, 7:6
bothered [1] - 6:23
bottom [6] - 31:8, 98:24, 115:12, 131:8, 154:15, 179:24
Bottrell [2] - 18:2, 200:3
bought [1] - 148:9
box [6] - 94:1, 141:15, 143:19, 152:6, 154:11, 160:14
boy [4] - 62:5, 103:1, 105:8
bragging [1] - 50:20
braids [11] - 62:3, 62:11, 62:12, 62:16, 74:1, 74:15, 80:24, 81:2, 81:14, 81:24, 96:11
Bramble [8] - 68:16, 85:2, 109:24, 110:22, 116:23, 117:18, 163:15, 163:21
brand [3] - 158:23, 159:24, 190:14
Brandy's [1] - 199:1
Bravo [2] - 106:17, 107:9
break [6] - 2:3, 20:1, 127:5, 177:17, 197:11, 197:14
Brian [4] - 17:4, 79:15, 197:7, 198:5
brief [5] - 9:21, 119:1, 119:2, 176:10, 211:1
briefly [8] - 14:25, 35:23, 52:19, 54:4, 103:13, 156:6, 171:10, 207:10
bring [3] - 12:19, 13:1, 14:11
broader [1] - 19:18
broke [2] - 20:4, 127:23
broken [4] - 123:5, 125:12, 125:22, 126:5
broken-up [2] - 125:12, 125:22
brother [1] - 140:13
brothers [7] - 21:6, 33:8, 39:13, 48:20, 50:24, 51:1, 198:18
brothers' [2] - 3:9, 48:24
brought [17] - 10:14, 11:5, 11:19, 28:7, 64:8, 64:11, 65:6, 76:12, 76:13, 76:16, 78:21, 85:8, 120:6, 138:24, 139:19, 140:2, 187:23
brown [3] - 78:2, 78:14, 78:15

Brown [11] - 63:1, 63:8, 63:11, 72:21, 75:10, 75:11, 75:16, 75:21, 77:19, 78:24, 78:25
Brown/Holly [1] - 76:5
bruises [1] - 168:9
bruising [1] - 105:11
Brush [25] - 53:24, 54:17, 55:3, 55:5, 55:7, 55:18, 55:25, 58:18, 59:12, 85:21, 86:3, 90:9, 118:20, 121:24, 129:20, 132:17, 133:5, 133:13, 144:2, 144:16, 149:2, 155:24, 156:25, 157:5
brush [1] - 122:5
building [1] - 111:13
bullet [10] - 17:20, 17:21, 107:11, 107:12, 107:15, 152:16, 154:24, 155:3, 158:23, 190:8
bullets [4] - 154:3, 160:14, 160:15, 186:8
Bureau [1] - 144:23
burglaries [1] - 103:16
Burglary [1] - 109:6
buried [1] - 185:8
bury [2] - 185:17
Bush [1] - 149:2
business [1] - 52:22
buy [2] - 196:7, 200:21
BY [46] - 20:21, 34:10, 44:9, 50:15, 52:11, 65:16, 67:10, 79:23, 81:21, 82:13, 84:9, 89:13, 91:24, 98:5, 102:10, 103:3, 108:13, 127:21, 171:17, 173:14, 174:7, 179:18, 189:18, 191:1, 194:2, 195:16, 213:4, 213:4, 213:5, 213:5, 213:7, 213:7, 213:9, 213:9, 213:10, 213:10, 213:12, 213:12, 213:14, 213:14, 213:15, 213:16, 213:18, 213:18, 213:19, 213:19

**C**

C-A-R-R-I-E [1] - 102:25
Cadigan [1] - 139:22
calendar [1] - 93:25
caliber [17] - 115:21, 152:1, 152:2, 153:10, 153:15, 153:17, 154:14, 154:16, 158:23, 160:14, 160:16, 161:1, 161:4, 190:8, 190:14, 190:15,

190:16
**caller** [2] - 50:23, 206:22
**calmly** [1] - 185:18
**camera** [2] - 145:4, 146:12
**Candidly** [1] - 211:9
**candidly** [1] - 204:9
**cannot** [1] - 12:4
**canvass** [1] - 85:19
**cap** [1] - 133:1
**capable** [1] - 184:8
**captioned** [1] - 206:1
**captured** [1] - 44:1
**car** [31] - 21:13, 33:17, 34:21, 47:12, 47:13, 47:16, 56:15, 56:18, 58:22, 64:19, 64:20, 66:1, 80:18, 80:21, 82:16, 82:20, 139:16, 139:19, 139:21, 142:19, 144:13, 147:21, 172:25, 173:4, 173:19, 173:20, 173:23, 188:23, 189:3
**Car** [1] - 94:4
**card** [1] - 72:20
**Carlson** [23] - 55:23, 55:24, 56:2, 68:9, 87:3, 118:3, 118:19, 119:25, 121:1, 121:23, 129:16, 130:20, 130:23, 130:25, 131:18, 137:25, 138:1, 148:18, 149:2, 155:19, 156:5, 156:10
**CARRIE** [2] - 102:21, 213:16
**Carrie** [3] - 17:19, 102:20, 102:25
**cars** [3] - 72:12, 77:23, 80:16
**cartridge** [5] - 152:4, 152:10, 152:15, 153:1, 159:15
**cartridges** [1] - 152:25
**case** [50] - 2:18, 2:20, 2:22, 3:1, 3:6, 3:20, 9:20, 10:17, 13:5, 13:19, 15:16, 17:7, 25:2, 45:4, 47:14, 55:11, 83:2, 93:14, 94:14, 95:8, 101:14, 110:6, 110:18, 114:21, 121:16, 127:8, 131:24, 134:16, 155:17, 157:15, 161:12, 161:19, 162:12, 163:19, 165:3, 166:17, 169:20, 172:15, 190:13, 191:4, 192:10, 192:14, 194:11, 197:17, 204:12, 204:16, 205:4, 207:16, 209:5, 210:22

**Case** [2] - 109:7, 214:5
**CASE** [1] - 1:6
**cases** [6] - 38:3, 38:4, 109:8, 109:9, 169:9, 169:10
**cash** [1] - 21:25
**casing** [4] - 152:14, 152:16, 152:18, 155:2
**casings** [5] - 152:4, 152:10, 153:1, 159:15, 185:25
**catalog** [1] - 79:17
**caught** [2] - 168:3, 204:10
**caused** [1] - 133:15
**CCI** [1] - 153:1
**ceased** [2] - 104:11, 104:12
**Cell** [1] - 162:3
**cell** [50] - 37:11, 37:15, 37:17, 37:20, 37:24, 37:25, 40:3, 40:8, 40:10, 40:14, 40:22, 43:24, 95:7, 97:11, 97:25, 123:2, 123:4, 123:14, 123:25, 124:4, 125:1, 125:12, 125:22, 127:24, 128:2, 129:14, 136:16, 137:10, 137:11, 137:16, 156:15, 156:16, 156:17, 156:23, 161:20, 161:24, 161:25, 162:1, 162:4, 162:5, 162:6, 163:6, 163:8, 181:2, 184:19, 188:6, 188:7, 202:2
**cellular** [6] - 122:21, 123:19, 124:13, 124:17, 125:20, 144:9
**cement** [1] - 71:6
**center** [2] - 21:24, 131:7
**certain** [6] - 5:5, 6:2, 7:19, 7:20, 11:11, 32:9
**certainly** [12] - 7:5, 11:12, 12:5, 12:14, 38:7, 81:4, 82:6, 82:18, 174:21, 192:2, 193:3, 210:24
**Certainly** [12] - 15:1, 82:17, 85:11, 108:1, 161:14, 171:8, 171:11, 171:15, 183:5, 186:17, 197:13, 197:24
**certificate** [1] - 158:7
**CERTIFICATE** [1] - 214:1
**certify** [2] - 214:3, 214:6
**chain** [1] - 201:13
**chairs** [3] - 83:1, 127:7, 197:15
**chamber** [5] - 154:1,

154:4, 154:23, 154:25, 155:4
**chambered** [4] - 154:17, 154:18, 154:19, 186:14
**chambers** [1] - 211:3
**chance** [5] - 4:19, 121:16, 161:16, 165:25, 185:14
**change** [2] - 136:25, 209:19
**channels** [1] - 46:22
**characterize** [2] - 7:24, 188:10
**charge** [6] - 6:18, 16:5, 35:10, 80:2, 170:4, 170:12
**charged** [3] - 6:6, 6:14, 6:18
**charges** [1] - 7:7
**Charlie** [4] - 74:24, 96:15, 105:17, 117:10
**chart** [6] - 10:15, 36:22, 37:20, 38:10, 55:14, 66:11
**charts** [1] - 37:25
**chatted** [1] - 30:7
**check** [2] - 36:24, 146:14
**checked** [3] - 134:3, 144:19, 144:20
**cheered** [1] - 203:15
**chemical** [1] - 136:24
**Chesapeake** [4] - 183:23, 183:24, 184:10, 184:14
**child** [2] - 133:23, 159:6
**children** [4] - 133:23, 148:24, 165:4, 165:5
**children's** [1] - 159:6
**Childs** [2] - 149:14, 149:23
**chilling** [1] - 202:16
**chose** [2] - 11:6, 120:24
**chunk** [1] - 11:1
**circle** [1] - 53:19
**Circle** [12] - 119:17, 119:18, 119:20, 122:15, 141:19, 157:15, 157:18, 158:10, 159:5, 159:20, 160:19, 161:17
**circled** [6] - 86:5, 86:7, 130:6, 130:7, 143:12, 149:12
**circling** [5] - 54:12, 69:11, 105:4, 111:19, 118:14
**Circuit** [1] - 2:22
**circumstances** [2] - 3:10, 7:12

**circumstantially** [1] - 208:9
**cite** [1] - 9:20
**cited** [2] - 4:19, 121:13
**City** [4] - 40:17, 41:17, 138:17, 173:22
**civilian** [1] - 199:21
**claimed** [1] - 189:3
**claiming** [1] - 47:5
**claims** [2] - 173:3, 207:23
**clarification** [1] - 80:8
**clarify** [1] - 44:14
**classic** [2] - 204:6, 208:7
**clean** [1] - 87:16
**clear** [12] - 5:14, 8:14, 16:11, 41:8, 66:10, 66:16, 94:8, 100:25, 106:7, 128:11, 150:25, 156:12
**cleared** [3] - 150:22, 151:10, 184:14
**clearly** [2] - 12:13, 145:21
**CLERK** [7] - 52:6, 67:6, 84:5, 91:17, 91:21, 102:23, 108:7
**client** [1] - 6:18
**client's** [1] - 7:6
**clients** [1] - 2:3
**clip** [2] - 154:20, 154:21
**close** [18] - 2:16, 3:2, 41:7, 74:2, 74:15, 96:24, 104:19, 112:8, 115:16, 120:12, 136:15, 138:3, 156:18, 162:16, 163:10, 163:15, 182:3
**close-up** [2] - 112:8, 115:16
**close-ups** [1] - 104:19
**closed** [2] - 71:8, 97:12
**closer** [6] - 129:15, 130:14, 131:20, 150:1, 150:4
**closer-closer** [1] - 150:4
**clothes** [2] - 135:10, 185:18
**clothing** [16] - 17:10, 73:20, 73:22, 73:24, 75:22, 75:23, 77:17, 166:4, 167:2, 167:3, 167:21, 168:13, 168:15, 168:18, 168:20, 169:1
**clutter** [1] - 138:2
**Coast** [7] - 31:22, 31:24, 31:25, 46:8, 46:9, 46:10, 46:11
**Coburn** [8] - 1:22, 2:12,

13:21, 18:14, 179:12, 210:13, 211:2, 211:16
**COBURN** [9] - 18:9, 18:15, 19:2, 19:13, 98:5, 210:14, 211:4, 211:17, 213:14
**Coburn's** [1] - 211:13
**cocaine** [1] - 21:17
**coconspirator** [1] - 205:6
**coconspirator's** [1] - 9:25
**coconspirators** [1] - 10:11
**codefendant** [1] - 18:19
**coerced** [1] - 19:14
**coercion** [1] - 19:12
**coffee** [1] - 54:20
**Cold** [1] - 109:7
**cold** [1] - 109:8
**collect** [6] - 77:17, 77:21, 103:19, 103:23, 103:24, 106:13
**collected** [5] - 17:9, 77:25, 88:3, 106:19, 113:24
**collecting** [1] - 111:1
**collection** [1] - 111:7
**color** [7] - 10:22, 136:25, 139:5, 141:1, 141:2, 143:24, 147:7
**colored** [6] - 114:14, 130:11, 132:5, 133:17, 186:24
**comfortable** [3] - 20:18, 109:1, 127:19
**Coming** [1] - 55:16
**coming** [18] - 22:18, 22:19, 55:4, 55:6, 55:22, 56:5, 56:7, 56:15, 58:18, 60:10, 72:1, 82:6, 93:2, 107:23, 152:21, 208:21, 210:15, 211:7
**comings** [1] - 187:21
**comment** [1] - 17:2
**comments** [1] - 210:20
**commit** [1] - 177:25
**committed** [2] - 47:2, 51:19
**common** [7] - 34:4, 41:24, 42:7, 49:19, 50:10, 201:23, 202:16
**communicate** [2] - 10:11, 98:1
**communication** [1] - 100:3
**communications** [3] - 37:12, 39:19, 162:11
**community** [2] - 34:2, 52:23

**Company** [1] - 158:14
**compare** [6] - 25:9,
25:17, 88:20, 147:14,
147:17, 166:17
**compared** [2] - 25:20,
165:6
**comparison** [6] - 18:3,
24:8, 165:10, 167:25,
200:3, 201:16
**comparisons** [1] -
103:22
**compartment** [2] -
140:22, 140:25
**compilation** [1] - 37:11
**compile** [1] - 37:25
**complete** [7] - 10:19,
36:14, 118:25, 123:2,
140:14, 210:22, 214:8
**completing** [1] - 16:9
**complex** [1] - 41:3
**compliant** [1] - 72:16
**complies** [2] - 51:14,
57:10
**comprehensive** [1] -
118:25
**computer** [1] - 23:15
**conceivable** [1] - 173:7
**concern** [1] - 164:18
**concerned** [1] - 162:17
**concerning** [8] - 36:22,
37:11, 90:18, 171:23,
172:12, 178:19, 180:10,
188:5
**concerns** [1] - 198:3
**conclude** [2] - 17:23,
20:12
**concluded** [2] - 135:4,
162:23
**concluding** [1] - 19:10
**conclusively** [1] - 2:22
**condition** [3] - 87:17,
122:23, 206:11
**Condition** [2] - 206:2,
206:9
**conduct** [5] - 10:24,
11:11, 140:14, 208:7
**Conduct** [1] - 197:18
**conducted** [5] - 20:8,
20:9, 20:10, 135:19,
157:15
**conducting** [2] - 49:17,
119:14
**confess** [1] - 31:6
**confident** [1] - 7:10
**confidential** [1] - 42:17
**confirm** [1] - 159:3
**confuse** [1] - 26:2
**confusing** [1] - 70:7
**connection** [4] - 10:10,
94:22, 161:8, 190:17

**consider** [4] - 15:21,
19:4, 167:24, 177:4
**considerably** [1] -
45:20
**considered** [2] - 168:2,
211:9
**consistent** [2] - 2:19,
89:6
**console** [1] - 21:24
**conspiracy** [11] - 9:20,
9:23, 10:2, 10:6, 10:8,
10:21, 11:2, 11:7,
200:22, 205:17, 205:20
**conspiring** [1] - 205:11
**constantly** [1] - 10:14
**constitute** [3] - 9:21,
9:23, 214:6
**constitutes** [1] - 9:25
**constraints** [1] - 181:17
**construction** [1] -
122:13
**contact** [6] - 32:20,
80:16, 80:19, 87:25,
128:1, 169:16
**contacted** [5] - 124:22,
125:8, 144:15, 144:22,
188:6
**contacting** [1] - 126:5
**contacts** [6] - 47:25,
128:18, 128:25, 162:14,
162:22
**contain** [2] - 53:19,
117:15
**contained** [3] - 15:3,
142:22, 153:25
**contains** [2] - 114:22,
160:14
**contaminate** [1] - 27:1
**contend** [1] - 19:1
**content** [1] - 201:3
**contents** [3] - 106:16,
107:8, 114:23
**context** [1] - 163:20
**contingent** [1] - 19:16
**continuation** [1] - 9:19
**Continue** [3] - 83:3,
127:8, 197:17
**continue** [4] - 10:21,
57:23, 59:3, 129:13
**continued** [2] - 57:17,
58:1
**continuing** [1] - 133:8
**contravention** [1] - 9:12
**controversial** [1] -
17:15
**convenience** [1] - 55:10
**conversation** [17] -
63:21, 71:21, 73:17,
76:15, 176:6, 199:10,
200:8, 200:15, 200:16,

200:20, 201:10, 201:12,
202:1, 202:11, 202:23,
204:4, 205:19
**conversations** [1] -
202:22
**convicted** [3] - 9:13,
10:7, 10:22
**conviction** [2] - 9:13,
12:2
**cooperated** [2] -
172:21, 191:6
**cooperating** [9] -
172:20, 177:1, 177:3,
177:5, 177:10, 177:16,
177:20, 177:23, 178:24
**cooperation** [2] -
188:11, 191:20
**cooperator** [2] - 191:5,
193:6
**coordinating** [1] - 93:2
**copied** [1] - 23:10
**copies** [3] - 211:2,
211:25, 212:1
**copy** [11] - 13:6, 23:17,
24:6, 37:7, 55:10, 70:18,
94:14, 174:19, 179:21,
194:5, 194:11
**cordoned** [1] - 182:23
**corner** [2] - 57:6, 82:7
**Corporal** [18] - 67:3,
67:8, 67:11, 68:7, 70:18,
73:1, 74:18, 76:15, 78:3,
79:15, 79:21, 79:24,
81:17, 81:22, 82:9,
82:14, 82:21, 82:23
**CORPORAL** [2] - 67:4,
213:8
**correct** [249] - 24:16,
25:4, 28:21, 32:2, 35:10,
35:13, 36:18, 38:5,
38:21, 40:5, 40:13,
44:19, 44:23, 44:24,
45:1, 45:7, 45:18, 46:14,
46:17, 47:1, 47:16,
47:19, 48:25, 49:9, 64:2,
66:14, 69:3, 69:16,
74:19, 75:1, 76:14, 80:1,
80:18, 80:24, 81:3,
81:11, 81:15, 85:16,
86:9, 86:13, 86:25,
90:22, 93:15, 95:12,
95:17, 95:18, 97:5,
98:11, 98:19, 99:9,
99:13, 100:4, 100:7,
100:11, 100:18, 101:18,
102:3, 105:21, 106:3,
108:20, 108:25, 109:25,
110:15, 110:21, 111:11,
111:25, 112:24, 113:4,
113:7, 113:13, 113:16,

113:21, 114:4, 115:25,
117:2, 117:7, 117:17,
117:22, 118:5, 118:11,
119:16, 119:23, 120:5,
121:2, 121:6, 121:10,
121:15, 122:6, 122:7,
123:12, 125:7, 125:10,
126:15, 128:2, 128:3,
128:13, 129:11, 130:19,
131:2, 131:13, 131:15,
131:16, 131:19, 131:23,
134:8, 134:17, 134:21,
135:8, 135:11, 136:5,
136:18, 136:20, 137:18,
138:19, 139:15, 139:18,
140:4, 141:9, 142:2,
142:11, 142:14, 142:21,
142:24, 143:3, 143:9,
143:18, 143:20, 143:21,
145:10, 145:13, 145:16,
146:25, 148:1, 148:11,
148:16, 149:3, 149:24,
149:25, 150:3, 150:6,
151:2, 151:8, 151:11,
152:8, 152:9, 152:11,
152:19, 153:4, 154:10,
154:18, 155:22, 156:2,
156:4, 157:12, 159:10,
160:17, 160:20, 162:25,
164:3, 164:5, 164:10,
164:11, 164:14, 165:16,
165:17, 166:15, 166:18,
166:24, 167:7, 167:11,
167:17, 167:18, 167:22,
167:23, 168:19, 168:22,
168:25, 169:3, 169:14,
170:10, 170:24, 170:25,
172:2, 172:5, 173:2,
173:5, 173:6, 175:14,
176:7, 176:8, 176:24,
177:13, 177:17, 178:21,
178:22, 180:6, 180:8,
180:15, 180:20, 180:21,
182:3, 182:11, 183:9,
183:11, 184:17, 184:20,
184:23, 185:1, 185:4,
185:6, 185:9, 185:13,
186:1, 186:3, 186:6,
186:8, 186:9, 186:20,
187:8, 187:16, 188:9,
189:23, 190:5, 190:9,
190:13, 191:5, 191:6,
191:9, 191:25, 192:1,
192:10, 192:17, 192:18,
192:22, 192:23, 193:2,
193:5, 193:15, 193:16,
194:10, 194:11, 195:23,
195:24, 196:17, 196:18,
196:19, 196:22, 197:10,
202:3
**Correct** [25] - 21:12,

23:9, 23:11, 24:12, 25:3,
26:22, 28:17, 28:19,
29:2, 31:23, 37:23,
40:15, 41:2, 42:12, 45:8,
45:19, 46:23, 47:17,
49:1, 80:14, 81:9, 81:12,
87:20, 98:2, 179:2
**corrected** [1] - 208:16
**Correctional** [1] - 36:7
**corrective** [1] - 186:21
**correctly** [4] - 22:7,
61:4, 69:4, 131:11
**correspondence** [3] -
174:16, 175:9, 176:10
**corroborate** [1] - 209:1
**corroborating** [1] -
172:22
**corroboration** [1] -
209:9
**counsel** [10] - 2:2, 2:7,
8:16, 15:2, 15:11, 20:16,
174:17, 198:2, 209:17,
210:6
**count** [1] - 109:3
**County** [28] - 52:15,
52:16, 67:14, 67:15,
67:18, 77:1, 84:12,
84:14, 85:3, 91:19, 92:4,
103:8, 106:21, 108:10,
108:16, 109:18, 119:17,
121:14, 138:17, 138:19,
138:24, 139:22, 140:2,
140:15, 144:22, 183:22,
199:19, 199:23
**county** [2] - 67:17, 68:2
**couple** [23] - 2:5, 31:12,
34:14, 38:24, 56:12,
65:19, 66:17, 72:15,
80:1, 80:7, 83:14, 85:1,
88:11, 89:17, 111:24,
116:3, 145:7, 155:23,
163:20, 180:5, 181:20,
187:9, 200:5
**course** [17] - 8:23,
52:19, 82:14, 85:14,
86:15, 101:7, 101:19,
119:25, 128:14, 132:11,
138:4, 157:15, 161:12,
161:19, 178:16, 198:2,
202:23
**court** [16] - 10:8, 10:24,
11:8, 11:11, 13:4, 23:21,
24:20, 26:7, 35:1, 35:3,
57:7, 58:9, 60:15, 61:7,
73:7, 77:15
**Court** [49] - 2:14, 3:11,
3:15, 4:4, 4:13, 4:16,
5:11, 5:20, 5:21, 5:22,
9:15, 10:25, 12:8, 13:2,
13:22, 14:2, 14:4, 15:21,

19:10, 53:24, 54:17, 55:3, 55:5, 55:7, 55:18, 55:25, 59:12, 68:9, 85:21, 118:20, 121:24, 129:20, 132:17, 132:20, 133:5, 133:14, 144:2, 144:16, 155:24, 156:25, 157:5, 171:14, 204:10, 205:5, 209:16, 210:21, 210:24, 211:25, 214:15
**COURT** [207] - 1:1, 2:2, 2:11, 4:18, 6:11, 6:15, 6:20, 6:25, 7:8, 7:10, 8:13, 9:1, 9:3, 11:20, 11:23, 12:6, 12:9, 13:10, 13:14, 14:1, 14:14, 14:17, 14:20, 14:22, 15:1, 15:12, 15:24, 16:2, 16:7, 16:11, 16:14, 16:17, 16:19, 17:24, 18:8, 18:14, 19:1, 19:7, 19:19, 19:23, 19:25, 28:6, 34:7, 35:18, 36:4, 37:6, 44:4, 44:7, 45:24, 49:15, 49:24, 50:6, 51:18, 51:21, 51:23, 52:1, 55:9, 60:17, 61:1, 61:8, 65:12, 66:25, 70:17, 73:16, 77:16, 79:20, 81:19, 82:11, 82:23, 83:6, 83:8, 83:16, 83:18, 83:21, 83:25, 85:13, 91:11, 94:12, 102:15, 102:18, 107:22, 108:1, 127:3, 127:5, 127:15, 127:18, 132:11, 132:19, 132:21, 139:9, 147:13, 151:22, 152:23, 155:6, 161:14, 170:6, 170:14, 170:19, 170:21, 171:2, 171:8, 171:11, 171:15, 173:1, 174:6, 174:20, 179:8, 179:13, 179:16, 183:5, 186:17, 189:2, 189:9, 189:15, 189:17, 190:24, 193:21, 193:23, 193:25, 195:5, 195:7, 195:11, 195:14, 196:3, 196:24, 197:2, 197:6, 197:8, 197:11, 197:14, 197:22, 198:2, 198:6, 198:16, 198:20, 198:22, 198:24, 199:3, 199:7, 199:9, 199:12, 199:14, 199:17, 199:24, 200:1, 200:6, 200:17, 200:24, 201:1, 201:6, 201:9, 201:13, 201:19, 201:24, 202:1, 202:4, 202:8, 202:11, 202:14, 202:18, 202:25, 203:4,
203:8, 203:11, 203:18, 203:21, 203:23, 204:3, 204:6, 204:12, 204:15, 204:21, 204:25, 205:3, 205:6, 205:10, 205:24, 206:5, 206:8, 206:19, 206:21, 206:24, 207:4, 207:10, 207:17, 207:20, 208:12, 208:15, 208:19, 208:21, 209:1, 209:11, 209:14, 209:17, 209:21, 210:2, 210:5, 210:8, 210:12, 210:17, 211:1, 211:6, 211:12, 211:18, 212:3, 212:6, 212:18
**Court's** [1] - 5:24, 8:1, 8:23, 9:12, 33:19, 36:25, 43:21, 155:13, 197:4, 205:21, 210:20
**Courthouse** [1] - 1:24
**courtroom** [9] - 19:22, 19:24, 61:2, 83:24, 127:16, 127:17, 197:21, 210:3, 210:5
**courts** [1] - 208:5
**cover** [10] - 10:6, 21:20, 67:16, 137:11, 137:14, 137:15, 137:16, 146:11, 179:14, 185:12
**covered** [4] - 87:15, 131:8, 138:2, 183:2
**covers** [1] - 195:4
**cracks** [1] - 146:14
**crafted** [1] - 3:16
**crane** [2] - 110:1, 118:13
**creeped** [1] - 43:6
**crew** [1] - 49:9
**Crime** [17] - 97:17, 97:21, 100:8, 100:12, 100:13, 100:20, 100:23, 101:2, 101:8, 111:1, 111:6, 117:10, 120:12, 120:13, 120:14, 124:7, 139:24
**crime** [29] - 17:18, 21:6, 22:10, 34:21, 88:1, 91:4, 103:11, 103:13, 103:15, 110:19, 114:2, 117:4, 168:11, 169:14, 170:4, 170:15, 173:4, 176:20, 177:1, 177:4, 177:11, 177:24, 177:25, 178:3, 178:5, 178:11, 180:14, 185:16, 193:11
**crimes** [2] - 6:14, 193:9
**criminal** [4] - 191:8, 191:16, 191:19, 193:7
**CRIMINAL** [1] - 1:6
**Crips** [1] - 43:4

**criticism** [1] - 208:19
**criticisms** [1] - 208:18
**crooked** [2] - 112:12
**CROSS** [16] - 20:20, 34:9, 65:15, 79:22, 89:12, 98:4, 171:16, 190:25, 213:4, 213:4, 213:7, 213:9, 213:12, 213:14, 213:18, 213:19
**cross** [14] - 6:4, 6:10, 7:20, 8:2, 8:11, 12:6, 13:10, 16:14, 20:8, 20:10, 20:14, 20:15, 40:2, 165:2
**cross-reference** [1] - 165:2
**crossed** [2] - 5:15, 8:7
**CROWE** [7] - 191:1, 194:2, 195:9, 195:12, 211:19, 212:4, 213:19
**Crowe** [10] - 1:20, 20:7, 20:11, 171:12, 190:24, 191:3, 194:1, 195:7, 195:18, 211:18
**curative** [3] - 212:12, 212:14, 212:15
**current** [3] - 5:25, 67:22, 208:1
**curve** [1] - 69:10
**custody** [3] - 10:15, 74:8, 94:20
**cut** [2] - 8:2, 177:16
**cuts** [3] - 11:1, 121:23, 168:9
**CV** [1] - 15:13
**cyberspace** [1] - 23:15
**cylinder** [3] - 152:3, 152:15, 152:18

## D

**Dahoney** [3] - 50:21, 51:2, 51:12
**Damita** [4] - 18:4, 198:15, 200:15, 201:22
**Dan** [5] - 150:20, 151:19, 152:2, 153:11, 192:19
**Darius** [15] - 4:7, 4:8, 4:12, 5:17, 5:23, 17:25, 124:22, 125:8, 125:14, 128:1, 128:10, 164:4, 165:10, 188:6, 198:14
**dark** [7] - 28:6, 116:19, 135:4, 136:18, 136:21, 136:23, 182:14
**Darryl** [8] - 198:25, 199:2, 200:12, 201:16, 201:17, 202:21, 202:22,
202:23
**dash** [1] - 154:5
**database** [5] - 32:9, 32:12, 32:14, 32:20, 33:2
**databases** [2] - 32:13, 32:18
**date** [16] - 5:18, 28:15, 37:21, 44:22, 88:14, 92:25, 93:25, 94:2, 97:22, 98:10, 98:13, 101:9, 117:21, 157:21, 174:10
**dates** [2] - 175:3, 181:1
**Daubert** [1] - 210:16
**David** [1] - 18:5
**Davis** [1] - 1:13
**days** [12] - 31:12, 38:1, 38:7, 38:13, 39:10, 83:12, 85:1, 90:24, 91:7, 98:15, 98:17, 192:17
**deactivated** [2] - 48:8, 48:24
**dead** [2] - 55:4, 124:15
**deal** [1] - 205:11
**dealer** [1] - 209:5
**dealing** [6] - 3:20, 16:21, 31:14, 178:23, 193:6, 211:20
**dealings** [1] - 95:2, 191:11
**dealt** [1] - 4:3
**Deandre** [1] - 18:5
**deaths** [1] - 103:17
**debriefing** [4] - 175:17, 175:23, 176:1, 176:5
**December** [3] - 44:21, 44:22
**decided** [7] - 10:1, 10:6, 59:9, 124:18, 168:4, 207:25, 212:16
**decision** [6] - 19:11, 71:17, 71:20, 76:4, 76:21, 134:15
**decisionmaking** [1] - 165:20
**deck** [1] - 199:17
**declarant's** [1] - 206:10
**declaration** [2] - 207:15, 207:22
**decor** [1] - 187:17
**deduction** [1] - 205:14
**deeply** [2] - 191:16, 191:18
**Deezo** [1] - 203:25
**defeat** [1] - 11:17
**Defendant** [4] - 1:17, 1:18, 1:20, 1:21
**defendant** [7] - 18:22, 18:25, 73:14, 138:8, 139:3, 157:20

**Defendant's** [1] - 193:18
**defendant's** [2] - 19:6, 168:15
**defendants** [14] - 5:2, 12:12, 12:18, 12:22, 17:10, 34:19, 36:15, 45:3, 80:3, 116:8, 167:17, 167:25, 168:3, 168:14
**Defendants** [1] - 1:9
**defendants'** [1] - 168:18
**defense** [9] - 7:19, 10:18, 11:1, 11:16, 13:19, 15:2, 15:10, 73:12, 210:21
**Defense** [1] - 92:10
**definitely** [4] - 19:3, 46:2, 204:13, 204:16
**demonstration** [1] - 26:24
**depart** [1] - 203:19
**department** [9] - 32:13, 43:17, 50:1, 50:7, 50:11, 51:5
**Department** [9] - 15:17, 52:15, 67:14, 84:12, 91:20, 92:4, 103:8, 108:10, 108:17
**departmental** [1] - 93:24
**departments** [1] - 50:3
**dependent** [1] - 9:22
**depicted** [1] - 194:19
**depicts** [3] - 131:6, 132:4, 156:19
**describe** [3] - 186:23, 187:17, 188:2
**described** [4] - 55:15, 98:21, 99:14, 100:2
**describes** [1] - 91:5, 177:20, 177:25
**describing** [2] - 63:21, 137:17
**description** [3] - 71:22, 73:22, 75:24
**design** [1] - 206:12
**designated** [2] - 43:19, 184:7
**desk** [5] - 92:21, 92:25, 94:5, 94:10
**detail** [3] - 54:5, 71:15, 76:11
**detailed** [1] - 2:21
**detain** [1] - 76:5
**detained** [4] - 17:3, 54:7, 76:23, 121:8
**DETECTIVE** [3] - 108:5, 213:3, 213:17

**Detective** [119] - 4:6, 6:2, 8:3, 9:16, 10:16, 12:24, 13:2, 14:8, 15:8, 15:10, 16:9, 17:6, 17:9, 17:11, 19:21, 19:23, 20:4, 20:8, 20:9, 20:12, 20:17, 20:22, 24:14, 26:20, 27:11, 34:5, 34:7, 34:13, 37:7, 41:13, 43:23, 44:5, 44:10, 44:16, 44:17, 49:11, 50:16, 50:21, 51:2, 51:12, 51:23, 90:11, 108:4, 108:9, 108:14, 110:1, 110:11, 111:16, 112:4, 112:11, 113:15, 114:9, 114:12, 114:23, 115:4, 115:20, 116:22, 118:1, 119:10, 120:7, 120:23, 126:8, 127:19, 127:22, 128:4, 132:1, 132:13, 133:8, 134:18, 136:4, 136:19, 137:19, 139:6, 139:25, 141:4, 141:17, 142:13, 144:8, 145:7, 147:17, 148:2, 148:13, 149:8, 149:13, 149:23, 150:7, 150:18, 151:17, 151:24, 152:8, 152:24, 153:3, 153:16, 154:14, 155:8, 157:7, 159:14, 161:8, 161:16, 164:3, 165:21, 169:4, 169:16, 169:23, 171:5, 171:18, 172:24, 179:19, 184:15, 186:18, 187:9, 189:10, 190:22, 191:3, 192:11, 193:21, 195:17, 196:24, 197:7
**detective** [16] - 7:2, 12:22, 26:21, 79:15, 84:21, 90:6, 108:19, 108:21, 110:20, 166:19, 178:6, 178:7, 193:17, 198:1, 198:4, 199:19
**detectives** [5] - 17:4, 17:19, 40:7, 88:1, 110:24
**determine** [1] - 189:24
**determined** [2] - 192:20, 192:25
**dicey** [1] - 208:2
**died** [1] - 192:17
**difference** [2] - 46:10
**different** [18] - 10:13, 25:11, 25:18, 32:13, 33:1, 35:6, 39:16, 49:21, 49:25, 75:13, 86:11, 86:13, 120:8, 141:24, 181:1, 184:1, 187:13, 204:19

**Different** [1] - 190:14
**difficult** [4] - 4:11, 134:10, 134:12, 153:16
**difficulty** [2] - 57:1, 59:20
**digits** [2] - 147:20, 147:22
**DIRECT** [12] - 52:10, 67:9, 84:8, 91:23, 103:2, 108:12, 213:7, 213:9, 213:12, 213:14, 213:16, 213:18
**direct** [18] - 4:24, 6:3, 6:9, 12:24, 13:3, 20:6, 34:18, 35:24, 36:23, 40:1, 44:16, 66:7, 80:19, 111:6, 135:18, 182:1, 187:10, 194:15
**directed** [11] - 13:7, 13:12, 35:12, 82:21, 90:9, 122:17, 129:17, 133:16, 149:8, 149:13, 149:23
**Directing** [5] - 84:23, 109:13, 119:9, 138:12, 148:17
**directing** [1] - 52:24
**direction** [3] - 55:22, 56:5, 156:22
**directly** [11] - 23:16, 52:6, 67:6, 72:2, 73:10, 80:20, 84:5, 91:17, 102:23, 108:7, 208:25
**dirt** [2] - 87:18, 88:22
**discarded** [1] - 86:21
**discharge** [1] - 144:20
**discoloration** [2] - 141:7, 142:9
**discover** [1] - 120:2
**discovered** [5] - 120:9, 122:24, 129:17, 129:18, 157:9
**discoveries** [1] - 122:17
**discovering** [1] - 120:7
**discovery** [1] - 165:19
**discrete** [1] - 26:2
**discuss** [3] - 15:21, 178:16, 212:16
**discussed** [2] - 127:25, 140:1
**discusses** [1] - 177:24
**discussing** [1] - 50:20
**discussion** [4] - 83:2, 127:7, 176:19, 197:16
**Disney** [1] - 196:7
**disposable** [2] - 142:16, 142:17
**dispute** [1] - 174:3
**distance** [2] - 186:19, 187:3

**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 33:15, 46:25
**Division** [1] - 67:21
**DIVISION** [1] - 1:2
**DNA** [8] - 166:25, 167:4, 167:6, 167:9, 167:11, 167:25, 172:18
**DOAR** [4] - 136:1, 152:21, 153:23, 179:8
**doctor's** [1] - 189:4
**document** [2] - 12:19, 193:17
**documented** [1] - 176:4
**documents** [2] - 12:20, 175:13
**Dodge** [11] - 138:5, 138:7, 138:9, 138:13, 139:3, 141:13, 141:17, 144:9, 158:8, 188:15
**dog** [3] - 183:14, 184:6, 184:18
**Dog** [1] - 184:14
**dogs** [9] - 135:23, 183:12, 183:13, 183:14, 183:23, 183:24, 184:2, 184:10, 184:16
**domestic** [1] - 103:16
**done** [25] - 14:13, 51:23, 59:25, 64:6, 64:22, 64:25, 65:1, 67:20, 76:9, 76:21, 78:7, 84:19, 84:20, 92:8, 93:22, 95:9, 109:2, 109:4, 117:4, 154:21, 166:25, 168:13, 181:22, 183:22, 203:17
**dont'** [1] - 195:2
**Donte** [1] - 161:17
**door** [17] - 7:21, 9:11, 57:14, 59:8, 59:9, 71:8, 97:12, 112:1, 112:9, 113:2, 113:8, 113:9, 113:13, 143:2, 158:1, 158:8, 198:11
**doors** [2] - 97:13, 112:25
**dot** [10] - 121:4, 121:17, 155:16, 156:8, 156:14, 156:18, 156:19, 156:24, 157:3
**dots** [5] - 121:12, 121:17, 121:20, 155:14, 182:2
**double** [1] - 47:1
**DOUGLAS** [3] - 84:3, 213:11
**Douglas** [3] - 16:24, 84:2, 84:7
**down** [24] - 25:20, 29:4,

30:15, 30:18, 31:3, 55:4, 58:17, 69:17, 70:15, 87:11, 97:12, 100:18, 144:24, 144:25, 145:4, 145:24, 146:11, 146:19, 156:9, 156:11, 178:25, 180:17, 185:16, 192:8
**drain** [43] - 16:25, 85:24, 86:8, 86:12, 86:17, 86:19, 87:6, 87:11, 88:5, 88:21, 89:18, 90:5, 90:8, 90:9, 90:14, 133:11, 133:13, 133:15, 133:18, 133:19, 133:20, 133:25, 134:7, 134:10, 134:19, 144:1, 144:16, 144:17, 144:19, 144:24, 145:4, 145:8, 145:24, 146:9, 146:10, 146:12, 146:14, 146:19, 147:9, 147:15, 147:22, 157:5
**drains** [4] - 90:1, 145:3, 145:4, 146:14
**draw** [1] - 12:14
**drawn** [2] - 13:16, 22:21
**dressed** [3] - 61:24, 63:17, 75:21
**dresser** [2] - 115:9, 115:15
**drive** [3] - 67:24, 68:22, 77:3
**driven** [1] - 173:4
**driving** [6] - 58:18, 82:5, 82:15, 82:20, 140:7, 140:9
**dropped** [5] - 55:3, 166:21, 167:9, 167:10, 173:4
**drove** [3] - 68:23, 68:24, 77:4
**drug** [13] - 4:3, 42:15, 42:23, 42:25, 43:9, 49:6, 49:11, 49:20, 50:1, 205:11, 207:4, 207:6, 209:5
**drugs** [7] - 21:14, 41:20, 43:18, 195:23, 200:21, 205:12
**dual** [7] - 2:15, 3:10, 3:22, 4:13, 5:18, 8:6, 8:13
**duct** [11] - 113:15, 113:18, 113:19, 114:1, 114:2, 114:5, 114:10, 114:12, 114:13, 114:17, 115:3
**During** [8] - 52:19, 60:2, 107:4, 118:24, 121:16, 128:14, 161:12, 202:22

**during** [31] - 8:22, 10:13, 38:23, 64:4, 67:20, 76:20, 85:14, 85:18, 86:15, 101:7, 101:19, 106:14, 119:25, 135:6, 138:4, 144:13, 149:5, 157:13, 157:14, 161:19, 178:8, 179:12, 182:12, 182:13, 182:17, 182:18, 184:1, 184:18, 195:19, 200:7, 201:11
**duties** [1] - 52:20
**duty** [1] - 84:24

**E**

**e-mailed** [1] - 212:1
**Earl** [3] - 141:19, 158:8, 158:10
**earliest** [1] - 2:14
**early** [5] - 37:21, 53:10, 172:8, 182:13, 197:11
**easel** [1] - 85:10
**easier** [1] - 50:9
**easily** [1] - 169:7
**East** [3] - 31:25, 46:9, 46:11
**easy** [1] - 83:23
**ECF** [1] - 211:20
**edge** [3] - 129:15, 131:17, 155:19
**Edward** [1] - 79:16
**Edwards** [5] - 17:4, 17:6, 17:9, 197:7, 198:5
**effect** [4] - 17:2, 18:18, 31:4, 203:2
**effort** [4] - 41:10, 72:4, 150:25, 185:12
**efforts** [1] - 137:2
**eight** [1] - 53:6
**either** [19] - 2:14, 9:15, 17:12, 36:16, 40:1, 64:15, 76:1, 76:20, 77:3, 83:9, 92:20, 97:6, 103:18, 124:3, 161:20, 166:14, 168:9, 180:18, 185:15
**ejected** [1] - 155:2
**El** [2] - 33:23, 34:3
**Elaborate** [1] - 203:11
**elbow** [6] - 105:14, 105:15, 105:16, 106:2, 106:7, 106:8
**Eldo** [1] - 161:17
**element** [1] - 178:3
**elicit** [5] - 9:15, 13:22, 14:4, 18:17, 18:24
**eliciting** [1] - 9:7
**elicits** [1] - 7:20

emerge [1] - 66:8
emerged [2] - 69:14, 155:25
emotion [1] - 206:11
Emotional [2] - 206:1, 206:9
emotions [1] - 23:4
emphasize [1] - 12:14
encompasses [1] - 19:6
encounter [7] - 60:2, 63:12, 73:1, 94:16, 104:7, 170:8, 172:11
encountered [6] - 61:25, 62:15, 63:18, 94:18, 99:16, 169:24
encountering [2] - 63:20, 102:4
encounters [2] - 64:15, 76:15
end [21] - 8:24, 55:3, 55:4, 129:19, 130:21, 130:22, 130:23, 130:25, 132:2, 134:23, 135:1, 153:19, 153:21, 155:23, 156:12, 164:9, 171:22, 183:20, 205:19
ended [3] - 116:7, 147:20, 147:22
ends [1] - 49:3
enforcement [4] - 14:5, 21:7, 32:21, 188:12
enhance [1] - 24:5
enhanced [3] - 23:22, 23:23, 23:25
enhancement [1] - 24:6
entered [5] - 26:10, 32:18, 115:23, 120:25, 155:20
entering [1] - 55:23
enters [5] - 19:22, 19:24, 83:24, 127:16, 127:17
entire [7] - 38:20, 64:13, 83:10, 91:6, 183:2, 195:2, 212:7
entitled [3] - 6:23, 11:12, 193:19
entrance [5] - 111:17, 111:19, 123:17, 137:25, 156:9
entry [5] - 112:6, 112:11, 112:17, 121:5, 187:14
envelope [5] - 106:16, 106:17, 107:1, 114:22
Eric [3] - 17:1, 91:14, 91:19
ERIC [2] - 91:15, 213:13
Erin [4] - 18:11, 77:12, 198:10, 199:20

Ernest [1] - 211:21
error [1] - 93:21
Esquire [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
essentially [5] - 18:19, 21:19, 85:15, 99:11, 182:10
establish [4] - 12:17, 12:20, 61:1, 205:16
established [1] - 192:19
estimate [2] - 109:1, 186:19
estimation [2] - 185:10, 186:4
et [1] - 214:5
evening [5] - 53:10, 89:22, 92:24, 94:16, 97:17, 99:18, 100:19, 101:8, 104:6, 181:4, 182:5, 182:13, 182:18, 184:22
event [5] - 8:1, 91:7, 93:13, 211:24, 212:11
events [2] - 93:17, 93:22
eventually [2] - 23:18, 75:15
evidence [59] - 9:7, 10:3, 10:9, 10:12, 10:17, 10:19, 10:23, 10:25, 11:8, 11:13, 12:2, 15:9, 15:22, 26:10, 83:2, 85:15, 85:20, 86:16, 86:20, 90:24, 103:18, 103:19, 103:21, 103:22, 106:14, 107:17, 111:2, 111:7, 112:5, 113:25, 115:23, 118:22, 127:8, 136:10, 143:14, 145:19, 147:12, 153:5, 158:24, 167:4, 168:8, 169:23, 169:25, 170:3, 170:15, 172:1, 172:22, 177:4, 177:21, 177:23, 178:1, 178:2, 178:14, 184:9, 184:11, 186:16, 197:16, 207:15, 208:8
Evidence [2] - 208:1, 208:2
evidentiary [1] - 90:2
evidently [1] - 24:19
exact [1] - 123:15
Exactly [1] - 6:20
exactly [10] - 3:1, 19:2, 30:24, 68:21, 68:22, 82:19, 88:22, 194:14, 201:7, 207:4
exaggeration [1] - 11:6

EXAMINATION [40] - 20:20, 34:9, 44:8, 50:14, 52:10, 65:15, 67:9, 79:22, 81:20, 82:12, 84:8, 89:12, 91:23, 98:4, 102:9, 103:2, 108:12, 171:16, 190:25, 195:15, 213:4, 213:4, 213:5, 213:5, 213:7, 213:7, 213:9, 213:9, 213:10, 213:10, 213:12, 213:12, 213:14, 213:14, 213:15, 213:16, 213:18, 213:18, 213:19, 213:19
examination [20] - 6:10, 7:20, 8:2, 8:11, 12:6, 13:3, 20:7, 20:9, 20:10, 20:14, 20:15, 20:16, 34:18, 36:23, 40:1, 40:2, 66:7, 159:11, 163:8, 182:1
examinations [1] - 20:8
examine [3] - 13:10, 161:24, 163:6
examined [3] - 151:15, 159:2, 162:10
example [1] - 5:12
Excellent [1] - 16:19
except [3] - 88:22, 147:20, 171:25
exception [3] - 168:17, 204:18, 205:7
excited [1] - 207:13
Excuse [4] - 173:25, 177:8, 178:9, 206:2
excuse [1] - 112:11
excused [10] - 67:1, 82:24, 83:4, 91:11, 102:16, 107:23, 127:12, 171:9, 196:25, 197:20
exercise [1] - 18:23
Exhibit [88] - 54:10, 55:19, 61:15, 62:4, 62:19, 63:2, 68:8, 74:3, 74:10, 74:24, 85:22, 86:1, 86:6, 86:12, 88:17, 95:21, 96:4, 96:15, 96:21, 104:23, 105:8, 105:17, 105:23, 106:1, 106:9, 106:17, 107:8, 109:20, 109:23, 111:12, 111:16, 112:1, 112:8, 112:19, 113:2, 113:5, 113:18, 114:21, 115:8, 115:17, 116:22, 117:9, 117:15, 118:13, 122:2, 122:19, 123:7, 123:18, 126:16, 129:23, 130:14, 131:5, 131:25, 132:12, 132:23, 133:3, 135:25,

136:7, 136:9, 137:6, 137:16, 139:1, 139:7, 140:18, 140:21, 141:3, 141:12, 141:21, 141:25, 142:13, 143:1, 143:16, 144:3, 149:4, 149:11, 151:9, 151:17, 152:7, 153:12, 154:5, 154:11, 155:7, 157:23, 158:5, 158:11, 158:19, 193:18, 194:8
exhibit [7] - 37:2, 44:15, 89:4, 124:12, 131:14, 131:25, 133:7
exist [2] - 122:8, 122:11
existence [1] - 15:6
existing [6] - 5:18, 8:5, 42:15, 206:10, 206:15, 207:15
Existing [2] - 206:1, 206:8
exited [1] - 59:10
exits [1] - 197:21
expect [4] - 6:2, 6:5, 178:20, 178:25
experience [4] - 49:11, 166:19, 167:8, 169:5
explain [1] - 101:7
explaining [1] - 86:23
extended [1] - 11:7
extension [1] - 208:4
extent [4] - 10:6, 12:13, 42:24, 180:12
exterior [2] - 111:13, 116:23
Extra [1] - 130:12
extra [1] - 130:12
extraordinarily [1] - 177:6
extravagant [3] - 187:19, 187:23, 188:3
extremely [2] - 177:11, 178:5
eye [1] - 93:10
eyewitnesses [1] - 64:16

F

face [4] - 19:7, 87:13, 104:18, 105:1
facility [3] - 21:11, 36:8, 36:9
fact [20] - 3:5, 6:17, 9:22, 10:4, 12:11, 17:16, 22:6, 23:1, 45:3, 46:20, 47:15, 50:20, 57:3, 71:21, 172:8, 191:7, 193:15, 194:3, 206:14,

212:12
fact-dependent [1] - 9:22
factor [2] - 19:4, 165:20
factual [1] - 11:3
Fair [1] - 82:22
fair [11] - 21:22, 25:12, 30:1, 30:17, 38:20, 38:22, 39:7, 172:14, 176:21, 176:25, 187:17
fairly [1] - 21:14, 21:25, 41:22, 47:25, 74:5, 138:3, 182:3, 187:18, 192:21, 201:20, 211:20
fairness [1] - 3:15
fall [3] - 180:2, 180:3, 180:4
fallen [1] - 83:13
familiar [5] - 88:18, 114:9, 114:23, 126:17, 141:4
family [2] - 20:2, 165:13, 165:15
famous [1] - 204:12
far [9] - 12:1, 12:16, 79:15, 123:13, 123:15, 127:8, 137:21, 173:12, 197:16
fashioned [1] - 3:11
fast [4] - 111:24, 121:21, 181:20, 185:16
FBI [3] - 23:12, 23:18, 24:4
fear [1] - 148:24
federal [3] - 3:23, 6:14
Federal [2] - 207:25, 208:2
feet [3] - 87:12, 186:18, 186:21
fell [1] - 185:11
fellow [1] - 149:9
female [1] - 71:7
few [23] - 28:11, 28:15, 33:14, 36:21, 36:22, 37:10, 41:13, 57:16, 68:15, 89:14, 93:13, 128:22, 132:5, 140:17, 158:4, 163:18, 171:7, 172:12, 172:13, 189:19, 190:24, 199:19
fiber [1] - 167:12
fibers [1] - 103:19
field [1] - 32:14
fifteen [1] - 183:13
Fifteen [1] - 183:14
Fifth [3] - 18:21, 19:5, 9:17
figured [2] - 133:22, 145:25

**filed** [9] - 2:12, 3:19, 9:6, 10:23, 13:21, 183:24, 210:17, 212:2, 212:7
**filing** [1] - 211:20
**filler** [1] - 211:10
**fills** [1] - 94:1
**final** [3] - 3:17, 149:5
**finally** [4] - 49:12, 106:9, 151:9, 184:16
**Finally** [1] - 101:12
**fine** [8] - 5:23, 61:7, 61:8, 109:4, 126:12, 127:4, 197:24, 212:18
**Fine** [1] - 209:21
**finger** [4] - 55:17, 121:3, 121:4, 121:11
**fingerprint** [2] - 163:25, 165:5
**fingerprinted** [1] - 166:6
**fingerprinting** [6] - 111:2, 141:8, 142:10, 163:19, 166:6, 166:7
**fingerprints** [15] - 103:18, 111:7, 136:24, 137:3, 163:23, 164:4, 164:6, 164:24, 165:6, 165:24, 165:25, 166:1, 166:8, 172:17
**fingertip** [2] - 114:14, 114:20
**finish** [3] - 8:13, 51:18, 184:2
**fire** [1] - 154:22
**firearms** [6] - 92:10, 135:12, 148:15, 166:10, 166:11, 210:16
**fired** [13] - 152:11, 154:2, 155:1, 169:6, 186:2, 186:3, 186:5, 186:7, 186:11, 186:13, 192:21, 192:25, 193:3
**fires** [3] - 152:12, 152:13, 152:14
**first** [56] - 16:12, 17:9, 21:5, 27:23, 29:3, 30:21, 44:13, 55:2, 55:15, 55:21, 56:15, 57:7, 57:9, 60:18, 61:25, 62:15, 65:5, 65:6, 65:23, 65:24, 66:4, 88:21, 89:8, 96:16, 100:1, 104:22, 110:9, 110:22, 111:9, 113:19, 114:12, 114:17, 116:2, 116:5, 120:2, 121:4, 121:13, 121:17, 122:24, 134:3, 156:8, 169:22, 169:23, 170:8, 171:21, 172:6, 172:10, 181:6,

181:8, 182:6, 191:8, 191:10, 191:17, 194:16
**First** [3] - 67:21, 125:3, 201:9
**fit** [2] - 6:18, 71:22
**five** [7] - 65:8, 129:9, 152:7, 163:11, 192:20, 194:16
**flag** [1] - 58:25
**flagged** [2] - 58:17, 58:19
**Flannery** [2] - 1:19, 83:9
**flat** [1] - 187:23
**floor** [3] - 112:22, 158:20, 199:15
**flushed** [1] - 144:25
**flushes** [1] - 51:11
**flying** [1] - 33:7
**focus** [2] - 5:20, 5:21
**focused** [1] - 86:9
**focuses** [1] - 37:20
**focusing** [1] - 4:20
**folder** [1] - 194:11
**foliage** [4] - 131:8, 131:9, 131:11, 138:2, 156:11
**follow** [5] - 9:24, 42:10, 57:3, 82:10, 211:15
**follow-up** [1] - 82:10
**followed** [1] - 24:11
**following** [8] - 39:13, 48:2, 48:5, 48:7, 48:19, 48:24, 57:1, 112:5
**follows** [1] - 137:22
**food** [1] - 111:24
**FOR** [1] - 1:2
**forced** [3] - 112:6, 112:11, 112:17
**foregoing** [1] - 214:6
**Forensic** [2] - 103:9, 103:11
**forensics** [1] - 17:15
**forest** [3] - 182:8, 183:20, 190:18
**forgetting** [1] - 53:21
**forgive** [2] - 28:14, 101:13
**form** [6] - 7:19, 107:12, 122:9, 122:11, 158:13, 168:3
**formal** [1] - 19:15
**formed** [1] - 184:13
**forth** [2] - 2:25, 172:6
**forward** [2] - 5:1, 172:4
**forwarded** [3] - 51:4, 51:5, 51:6
**foundation** [1] - 205:16
**four** [13] - 4:17, 12:11, 12:12, 28:16, 28:21,

100:18, 147:20, 152:7, 158:8, 181:1, 187:22, 194:16, 207:12
**fourth** [2] - 8:10, 10:5
**Foxx** [5] - 31:9, 31:17, 46:4, 46:14, 46:21
**fragment** [1] - 17:21
**fragments** [1] - 117:15
**frame** [6] - 120:24, 129:8, 162:16, 162:17, 163:11, 163:12
**framing** [1] - 155:18
**Frank** [1] - 106:1
**Franklin** [2] - 67:14, 67:15
**fraying** [2] - 62:13, 74:19
**free** [1] - 10:12
**frequent** [1] - 102:3
**frequented** [1] - 43:18
**frequently** [1] - 47:25
**friend** [1] - 202:16
**friend's** [1] - 201:23
**friendly** [1] - 39:4
**friends** [6] - 11:14, 38:21, 39:5, 165:13, 165:15, 201:20
**front** [32] - 37:8, 63:3, 66:11, 71:5, 71:6, 72:3, 80:23, 81:1, 81:10, 81:11, 82:3, 82:4, 98:8, 100:15, 111:17, 111:19, 111:21, 111:22, 112:1, 112:9, 122:21, 123:3, 130:8, 130:12, 133:14, 143:17, 143:22, 144:6, 146:12, 158:1
**fucking** [1] - 97:23, 97:24, 101:15
**full** [5] - 4:2, 98:18, 98:20, 122:6, 209:11
**function** [1] - 19:14
**functional** [1] - 125:6
**furniture** [1] - 115:9
**furtherance** [2] - 200:22, 205:20
**furthest** [1] - 208:4
**future** [2] - 205:2, 207:1

## G

**game** [1] - 31:24
**games** [2] - 46:8, 46:9
**gang** [2] - 42:23, 42:25
**gangs** [2] - 42:15, 43:4
**garage** [1] - 173:22
**GARDNER** [1] - 1:8
**Gardner** [112] - 1:21, 6:6, 6:13, 9:17, 10:7,

11:13, 12:17, 16:23, 17:2, 18:13, 18:18, 35:6, 35:24, 36:11, 38:10, 38:21, 39:2, 39:10, 39:12, 39:16, 48:1, 48:6, 48:9, 48:13, 48:18, 48:23, 60:13, 60:15, 60:22, 61:12, 61:22, 61:24, 62:15, 62:20, 63:14, 63:16, 63:20, 64:4, 64:23, 65:1, 65:5, 72:19, 72:24, 73:4, 73:15, 73:17, 74:4, 74:11, 74:25, 75:4, 75:5, 76:1, 76:3, 76:5, 76:22, 77:4, 77:18, 78:12, 79:2, 80:11, 81:8, 81:25, 94:19, 95:3, 95:12, 95:14, 95:25, 96:7, 96:16, 96:18, 96:23, 97:7, 97:8, 97:11, 97:16, 97:19, 97:23, 100:10, 100:20, 100:12, 102:12, 138:8, 139:4, 140:13, 141:19, 157:20, 158:8, 158:10, 158:14, 161:21, 162:6, 162:9, 162:11, 162:14, 162:19, 163:5, 164:13, 168:7, 173:1, 173:5, 173:7, 173:17, 173:18, 179:25, 189:20, 189:25, 196:1, 196:4, 196:6, 196:14, 198:11
**Gardner's** [30] - 9:7, 10:14, 10:21, 11:18, 12:2, 13:6, 19:10, 35:19, 38:14, 40:16, 62:2, 73:20, 73:25, 74:14, 78:18, 81:24, 96:9, 119:15, 140:13, 141:6, 144:7, 158:20, 162:18, 169:1, 172:25, 180:13, 180:22, 188:15, 190:7, 190:17
**Garner** [1] - 129:21
**Garrison** [1] - 52:21
**GARY** [1] - 213:3
**Gary** [1] - 149:13
**gather** [2] - 32:16, 171:7
**gathering** [2] - 2:9, 42:8
**Geico** [1] - 158:13
**general** [3] - 8:24, 120:1, 182:4
**generalized** [1] - 17:14
**generally** [3] - 181:23, 187:18, 193:8
**Generally** [1] - 198:6
**generic** [1] - 33:16
**gentlemen** [6] - 19:25,

26:7, 82:25, 98:16, 127:6, 127:18
**geographic** [1] - 43:17
**Gerard** [1] - 1:19
**Giganti** [2] - 26:20, 27:12
**Gilmore** [4] - 43:11, 43:13, 43:14, 49:7
**Giovanelli** [3] - 2:20, 3:1, 3:20
**given** [13] - 2:24, 3:5, 3:12, 8:17, 35:21, 43:16, 71:23, 73:23, 75:24, 173:8, 177:5, 207:23, 212:14
**glad** [1] - 83:13
**glass** [2] - 113:13, 183:4
**glasses** [1] - 73:10
**Glock** [8] - 153:9, 153:14, 153:21, 153:24, 154:7, 186:4, 192:24
**glove** [9] - 114:15, 114:16, 114:19, 114:20, 115:2, 140:22, 140:25, 141:15, 143:19
**gloves** [30] - 124:8, 136:2, 136:10, 136:14, 136:18, 136:25, 137:1, 137:4, 141:1, 141:5, 141:7, 142:4, 142:6, 142:16, 142:17, 142:18, 142:19, 142:22, 145:19, 156:17, 163:20, 165:19, 165:24, 164:4, 166:5, 166:7, 166:14, 166:20, 167:3
**goal** [1] - 27:1
**goings** [1] - 187:21
**Goo** [2] - 44:23, 180:3
**GOOSE** [1] - 143:13
**Goose** [1] - 143:13
**Government** [2] - 1:15, 151:6
**government** [18] - 3:23, 4:18, 5:3, 8:15, 8:19, 10:4, 10:24, 11:4, 11:24, 11:25, 12:21, 13:22, 13:23, 15:8, 15:19, 16:15, 212:1
**GOVERNMENT'S** [6] - 52:4, 67:4, 84:3, 91:15, 102:21, 108:5
**government's** [9] - 2:22, 2:23, 9:10, 10:12, 10:15, 36:24, 37:10, 200:8, 210:17
**Government's** [105] - 37:4, 54:10, 55:19, 57:8, 61:15, 62:4, 62:19, 63:2,

68:8, 74:3, 74:10, 74:24,
75:8, 85:22, 86:1, 86:6,
86:12, 88:17, 95:21,
96:4, 96:15, 96:21,
104:23, 105:8, 105:17,
105:23, 106:1, 106:9,
106:16, 107:8, 109:20,
109:23, 111:12, 111:16,
112:1, 112:8, 112:19,
113:2, 113:5, 113:11,
113:18, 114:6, 114:8,
114:21, 115:8, 115:17,
116:22, 117:9, 117:14,
118:13, 122:2, 122:19,
123:1, 123:7, 123:18,
126:16, 129:23, 130:14,
131:5, 131:25, 132:12,
132:23, 133:3, 133:25,
135:25, 136:7, 136:9,
137:6, 137:16, 139:1,
139:7, 140:18, 140:21,
141:3, 141:12, 141:21,
141:25, 142:6, 142:13,
143:1, 143:16, 144:3,
145:9, 147:1, 149:4,
149:11, 150:1, 150:11,
150:19, 151:9, 151:17,
152:7, 153:12, 154:5,
154:11, 155:13, 157:23,
158:5, 158:11, 158:15,
158:19, 159:8, 159:25,
160:8, 160:18
   **grab** [1] - 202:13
   **grams** [2] - 21:17, 21:18
   **grand** [5] - 15:7, 25:2,
25:6, 25:24, 50:3
   **grate** [5] - 87:12, 88:5,
88:13, 88:14, 134:9
   **grateful** [1] - 208:14
   **gray** [5] - 62:1, 63:19,
130:11, 132:5, 186:24
   **gray-colored** [2] -
130:11, 186:24
   **great** [4] - 136:1,
140:21, 152:21, 207:23
   **greater** [1] - 178:17
   **Green** [66] - 18:4,
53:24, 53:25, 54:17,
55:3, 55:5, 55:6, 55:7,
55:18, 55:25, 56:1, 56:7,
57:6, 58:1, 58:2, 58:7,
58:10, 58:18, 58:19,
59:12, 68:25, 69:1, 69:4,
69:10, 69:17, 70:15,
70:23, 71:25, 72:1, 77:7,
77:24, 85:21, 86:3, 90:9,
90:10, 118:20, 121:23,
121:24, 129:20, 132:17,
133:5, 133:13, 144:2,
144:16, 149:2, 155:24,

156:25, 157:5, 198:15,
199:9, 199:18, 200:15,
201:22, 202:6, 202:16,
202:21, 206:18
   **green** [18] - 121:4,
121:12, 121:17, 121:20,
139:5, 155:14, 156:8,
156:14, 156:18, 156:19,
156:24, 157:3, 157:4,
160:2, 160:3, 160:5,
182:2
   **Green's** [1] - 200:7
   **greens** [2] - 69:2, 70:9
   **Greens** [11] - 18:12,
55:18, 61:19, 63:18,
68:10, 70:6, 129:15,
130:23, 130:25, 133:10,
168:8
   **Greg** [2] - 124:16,
135:22
   **ground** [5] - 111:22,
113:19, 113:22, 123:22,
138:2
   **group** [3] - 49:13,
49:18, 50:9
   **groups** [2] - 49:6, 49:12
   **GSR** [7] - 168:13,
168:15, 168:17, 169:1,
169:5, 169:11
   **guard** [1] - 204:10
   **guess** [10] - 2:16,
34:20, 35:25, 38:22,
40:20, 91:25, 100:25,
129:19, 188:10, 212:7
   **guessing** [1] - 99:20
   **gun** [10] - 154:2, 154:3,
154:4, 154:25, 159:11,
160:25, 186:10, 186:11,
186:13, 190:17
   **guns** [12] - 60:3, 90:3,
90:4, 135:13, 148:24,
149:6, 166:20, 185:5,
185:8, 185:10, 185:17,
185:24
   **gunshot** [1] - 168:13
   **gunshots** [1] - 185:21
   **gutters** [1] - 90:1
   **guy** [4] - 27:20, 33:16,
46:24, 47:15
   **guys** [1] - 50:9

## H

   **hair** [6] - 62:16, 74:2,
81:24, 96:9, 167:12,
167:14
   **hairs** [1] - 103:19
   **hairstyle** [6] - 62:2,
62:10, 73:25, 74:14,

75:2, 96:10
   **hairstyles** [1] - 75:25
   **half** [6] - 8:3, 30:8,
84:16, 84:18, 181:11,
200:16
   **hall** [1] - 97:12
   **hallway** [2] - 100:9,
100:21
   **halves** [1] - 123:13
   **hand** [6] - 86:6, 105:5,
132:20, 169:23, 169:25,
212:3
   **hand's** [1] - 54:20
   **handcuffs** [1] - 60:3
   **handed** [7] - 15:2,
55:10, 70:18, 94:13,
107:2, 107:4, 194:8
   **handgun** [16] - 115:14,
115:21, 150:13, 151:19,
153:10, 153:11, 153:14,
153:15, 154:7, 155:2,
160:22, 160:23, 161:2,
161:3
   **handguns** [3] - 148:21,
148:22, 156:20
   **handicapped** [2] -
57:15, 57:16
   **handle** [2] - 154:4,
199:22
   **handled** [1] - 169:6
   **handler** [2] - 183:14,
183:15
   **handlers** [1] - 183:25
   **hang** [1] - 95:8
   **hanging** [6] - 123:4,
124:9, 149:18, 149:19,
201:22, 202:15
   **HANLON** [84] - 16:8,
16:16, 16:18, 16:20,
17:25, 18:10, 52:2,
52:11, 65:13, 67:2,
67:10, 81:18, 81:21,
82:8, 83:7, 84:1, 84:9,
91:13, 91:24, 102:10,
102:19, 103:3, 107:24,
108:3, 108:13, 127:4,
127:21, 171:4, 173:10,
174:5, 189:1, 189:8,
189:14, 189:16, 195:6,
195:16, 197:4, 197:7,
197:10, 197:13, 197:24,
199:20, 199:25, 200:2,
200:10, 200:23, 200:25,
201:2, 201:8, 201:11,
201:15, 201:20, 201:25,
202:3, 202:6, 202:9,
202:13, 202:15, 202:19,
203:1, 203:5, 203:9,
203:14, 203:20, 203:22,
203:24, 204:5, 205:21,

208:24, 209:3, 209:13,
209:16, 209:18, 210:19,
211:8, 213:7, 213:9,
213:10, 213:12, 213:14,
213:15, 213:16, 213:18,
213:19
   **Hanlon** [28] - 1:16,
14:12, 16:5, 16:7, 18:8,
18:16, 52:1, 60:17,
83:25, 99:14, 100:2,
108:15, 127:3, 127:20,
132:22, 133:7, 151:23,
182:2, 187:10, 188:14,
196:3, 197:3, 197:22,
199:16, 199:17, 204:18,
205:18, 206:17
   **Hanlon's** [5] - 171:22,
198:8, 199:12, 199:13,
199:15
   **happy** [3] - 203:6,
203:12, 210:25
   **hard** [4] - 66:10, 83:15,
153:23, 211:2
   **HARDING** [21] - 14:25,
15:2, 15:13, 16:1, 16:4,
37:3, 44:9, 51:17, 198:5,
198:7, 198:17, 198:21,
198:23, 198:25, 199:8,
199:11, 199:13, 199:16,
209:24, 210:3, 213:5
   **Harding** [16] - 1:16,
16:2, 20:6, 20:9, 23:7,
30:13, 31:11, 36:24,
44:7, 44:11, 198:3,
199:7, 199:15, 199:17,
199:21, 209:23
   **HARRIS** [1] - 1:7
   **Harris** [4] - 1:18, 28:10,
28:23, 83:9
   **hat** [10] - 129:22, 130:7,
130:8, 131:10, 132:25,
133:4, 135:3, 157:1,
184:21, 184:22
   **Hayes** [1] - 210:10
   **head** [4] - 81:24, 83:19,
126:11, 161:18
   **Headquarters** [3] -
138:24, 139:19, 140:3
   **health** [1] - 206:12
   **hear** [9] - 71:9, 97:6,
97:8, 97:15, 100:3,
177:9, 202:22, 204:10,
207:10
   **heard** [23] - 2:7, 23:21,
30:20, 31:3, 31:7, 31:8,
33:21, 33:23, 42:4,
42:16, 46:17, 97:10,
97:22, 100:3, 101:14,
127:8, 179:6, 189:10,
197:16, 206:22, 209:9

   **hearing** [1] - 180:7
   **hearsay** [4] - 199:6,
200:8, 200:18, 201:2
   **heavy** [4] - 134:9,
134:12, 145:1, 156:11
   **held** [1] - 94:22
   **help** [3] - 58:23, 85:11,
208:12
   **helped** [2] - 10:17,
85:15
   **helpful** [1] - 135:9
   **helping** [1] - 85:19
   **hereby** [1] - 214:3
   **hereunto** [1] - 214:9
   **heroin** [1] - 21:18
   **herself** [1] - 47:9
60:14, 61:11, 63:7
   **hesitation** [1] - 19:10
   **hidden** [2] - 21:22
   **high** [2] - 23:4, 178:14
   **highlighted** [1] - 28:14
   **highly** [1] - 6:22
   **Hillman** [10] - 207:16,
207:17, 207:18, 207:20,
207:24, 207:25, 208:1,
208:4, 208:10, 208:18
   **himself** [4] - 47:9,
60:14, 61:11, 63:7
   **hit** [2] - 26:2, 168:20
   **hitting** [1] - 163:12
   **hold** [5] - 108:19,
132:21, 186:15, 195:7,
207:19
   **holder** [1] - 143:2
   **holding** [3] - 95:7,
97:11, 97:25
   **hole** [2] - 146:24,
150:14
   **Holly** [41] - 16:23, 17:2,
18:13, 19:11, 63:6,
63:11, 63:14, 63:16,
63:17, 63:20, 64:4,
64:23, 65:1, 65:6, 75:15,
75:21, 76:1, 76:3, 76:22,
77:18, 78:19, 78:23,
78:24, 79:2, 94:19, 95:3,
95:12, 96:20, 96:22,
96:24, 97:8, 97:16,
97:18, 97:20, 100:14,
101:10, 164:13, 168:7,
168:21, 169:13, 198:12
   **Holly's** [2] - 102:12,
168:23
   **home** [9] - 22:6, 22:11,
70:23, 71:8, 111:22,
115:5, 115:10, 201:23,
202:16
   **Homes** [4] - 43:11,
43:13, 43:14, 49:7
   **Homicide** [3] - 108:11,
108:17, 135:21

**homicide** [28] - 16:21, 31:6, 40:7, 41:15, 42:1, 42:7, 50:25, 51:1, 51:19, 95:1, 108:21, 109:2, 109:7, 109:9, 109:14, 110:9, 111:6, 138:11, 162:17, 163:11, 176:22, 176:23, 178:6, 178:7, 178:11, 178:18, 181:11, 192:3

**homicides** [5] - 40:7, 41:19, 103:17, 108:23, 169:9

**honestly** [1] - 195:10

**honesty** [1] - 212:10

**Honor** [132] - 2:9, 2:10, 2:12, 7:1, 8:1, 8:25, 9:5, 9:10, 9:14, 14:25, 15:4, 16:1, 16:8, 16:9, 16:16, 17:5, 17:17, 17:23, 18:9, 18:10, 18:15, 18:24, 19:4, 20:22, 28:9, 35:17, 36:3, 37:2, 37:4, 44:3, 49:14, 49:23, 50:13, 51:25, 52:2, 55:8, 60:25, 61:10, 65:11, 65:14, 67:2, 70:16, 73:14, 77:14, 79:19, 79:21, 81:18, 82:8, 82:10, 83:7, 84:1, 85:10, 89:11, 91:13, 94:11, 98:3, 102:14, 102:17, 102:19, 107:20, 107:21, 107:24, 108:3, 114:16, 120:20, 127:4, 127:22, 132:10, 132:18, 133:6, 139:8, 147:11, 151:21, 152:22, 155:5, 161:12, 170:20, 171:1, 171:4, 171:6, 171:9, 171:12, 173:10, 174:5, 174:22, 179:4, 183:4, 186:15, 189:1, 189:8, 189:14, 189:16, 190:20, 191:3, 193:17, 195:6, 196:23, 197:1, 197:4, 197:10, 197:13, 197:24, 198:5, 199:6, 199:11, 199:20, 200:3, 200:10, 200:25, 201:8, 203:5, 203:22, 205:14, 205:21, 206:6, 206:17, 207:6, 207:14, 207:21, 208:17, 209:3, 209:13, 209:18, 209:25, 210:11, 210:14, 210:19, 211:5, 211:8, 211:17, 211:19, 212:16

**Honorable** [1] - 1:13

**hope** [2] - 21:3, 197:22

**hopefully** [1] - 105:3

**Hospital** [1] - 122:14

**hospital** [7] - 35:25, 103:25, 104:2, 104:6, 104:17, 104:19, 122:14

**hour** [2] - 46:10, 91:6

**hours** [12] - 30:8, 37:21, 74:22, 116:3, 116:4, 118:9, 181:11, 182:13, 182:14, 184:9, 184:13

**house** [22] - 18:12, 57:6, 57:7, 57:9, 57:11, 57:13, 57:14, 58:5, 59:11, 66:13, 66:15, 70:15, 70:25, 71:6, 71:13, 71:25, 77:10, 133:14, 158:12, 190:7, 190:17, 210:11

**houses** [6] - 55:6, 55:16, 66:9, 66:17, 66:18, 185:18

**hum** [1] - 50:18

**hunch** [1] - 4:24

**husband** [3] - 18:1, 124:23, 125:8

**hyphenated** [2] - 33:23, 34:2

---

**I**

---

**I-90** [5] - 122:21, 123:19, 124:17, 126:20, 137:10

**I-A-L-E-K** [1] - 103:1

**ID** [7] - 59:17, 59:19, 60:8, 60:9, 60:12, 75:5

**idea** [5] - 40:12, 43:24, 79:12, 122:1, 182:16

**ideal** [1] - 3:13

**ideally** [1] - 185:2

**identical** [3] - 143:25, 147:18, 147:23

**identification** [22] - 27:7, 59:18, 61:6, 62:23, 64:1, 65:7, 72:19, 72:20, 72:22, 75:18, 76:6, 76:17, 88:16, 89:3, 147:5, 147:12, 193:19, 194:9, 195:8, 195:11, 198:8

**identifications** [4] - 60:11, 63:21, 76:21, 80:17

**identified** [12] - 25:11, 60:14, 61:11, 63:7, 75:13, 75:15, 89:8, 94:19, 104:13, 115:20, 150:22, 150:25

**identify** [12] - 33:1, 44:15, 45:12, 47:8, 60:9,

60:23, 73:4, 73:9, 77:12, 95:15, 140:9, 187:2

**identifying** [2] - 73:14, 135:9

**II** [1] - 41:1

**III** [1] - 140:13

**immediate** [1] - 97:4

**immediately** [5] - 144:15, 154:22, 199:1, 203:25, 204:23

**immunity** [1] - 4:25

**imperfect** [1] - 24:2

**implement** [1] - 146:10

**implicates** [4] - 177:1, 177:3, 177:11, 177:24

**implicating** [1] - 178:24

**importance** [3] - 178:8, 178:12, 178:17

**important** [16] - 5:9, 19:3, 27:5, 27:7, 177:6, 177:10, 177:12, 177:21, 177:23, 178:1, 178:2, 178:5, 178:14, 178:15, 180:17, 198:17

**impossible** [1] - 211:10

**impression** [8] - 201:4, 204:7, 204:9, 204:17, 204:22, 205:22, 206:3, 206:16

**imprisonment** [1] - 9:25

**IN** [1] - 1:1

**incarcerated** [9] - 9:8, 9:17, 10:7, 12:7, 12:11, 12:12, 12:18, 12:23, 35:9

**incarceration** [1] - 9:23

**incident** [5] - 71:23, 72:18, 98:15, 110:16, 133:22

**includes** [1] - 204:22

**including** [4] - 111:24, 117:6, 144:9, 206:13

**inculpatory** [1] - 18:25

**indeed** [1] - 12:11

**INDEX** [1] - 213:1

**indicate** [4] - 28:23, 37:16, 40:22, 121:3

**indicated** [25] - 33:6, 34:23, 38:23, 39:10, 45:6, 62:23, 66:7, 101:12, 103:21, 106:5, 108:16, 117:10, 130:18, 139:14, 145:14, 152:10, 157:14, 162:21, 171:25, 179:21, 180:25, 182:1, 188:14, 188:18, 190:6

**indicating** [6] - 55:17, 85:22, 87:4, 93:17, 121:3, 121:11

**indictment** [2] - 6:14, 10:5

**indictments** [1] - 13:25

**individual** [20] - 3:23, 26:3, 32:3, 60:14, 61:11, 61:18, 61:21, 62:7, 62:22, 62:23, 63:5, 75:7, 75:13, 75:18, 96:18, 102:4, 155:12, 169:16, 191:7, 193:8

**individually** [2] - 148:4, 148:7

**individuals** [11] - 32:6, 37:13, 54:4, 54:6, 59:23, 78:1, 79:16, 95:11, 99:16, 176:18, 205:16

**indulgence** [5] - 33:19, 37:1, 43:21, 65:11, 114:16

**inferential** [1] - 201:13

**informants** [1] - 42:17

**information** [50] - 23:13, 23:16, 32:6, 32:17, 33:16, 33:17, 42:9, 44:1, 47:4, 50:16, 50:19, 50:21, 50:22, 51:2, 51:8, 51:15, 93:7, 94:6, 120:25, 121:7, 129:3, 138:9, 144:22, 161:20, 169:19, 170:24, 177:10, 177:12, 178:13, 178:19, 178:21, 178:23, 180:16, 180:21, 188:18, 188:22, 188:24, 189:6, 189:11, 189:13, 190:1, 190:3, 192:6, 192:9, 193:8, 193:10, 193:12, 193:13, 205:22

**information's** [2] - 23:13, 23:14

**informed** [2] - 8:8, 173:19

**initial** [8] - 3:9, 16:23, 60:2, 110:8, 110:10, 118:24, 191:22, 210:20

**initiated** [1] - 48:19

**injuries** [3] - 104:17, 104:19, 168:9

**injury** [1] - 105:18

**inquiring** [1] - 207:8

**inquiry** [1] - 7:25

**inside** [34] - 71:7, 92:20, 97:18, 107:1, 110:25, 113:19, 113:21, 115:5, 115:6, 115:9, 117:11, 117:12, 134:6, 142:12, 145:4, 145:5, 146:11, 146:17, 152:3, 152:5, 152:14, 152:16, 152:18, 153:24, 154:9, 158:12, 158:15, 160:19, 161:9, 161:17, 164:9,

164:19, 165:19, 187:11

**Inside** [4] - 97:20, 146:9, 150:10, 158:4

**inspecting** [2] - 145:3

**instance** [1] - 9:24

**instead** [2] - 175:5, 212:17

**Institute** [1] - 36:7

**instruction** [20] - 2:15, 2:24, 3:11, 3:16, 3:17, 4:5, 5:16, 5:19, 5:22, 7:16, 8:6, 8:15, 8:16, 88:2, 92:10, 210:7, 210:8, 212:12, 212:15

**instructions** [2] - 3:18, 8:24

**instrument** [4] - 146:11, 146:12, 146:18, 146:19

**insurance** [1] - 158:13

**Insurance** [1] - 158:13

**intelligence** [1] - 50:10

**intend** [3] - 8:14, 14:8, 15:17

**intended** [1] - 8:11

**intends** [1] - 11:24

**intent** [6] - 202:11, 205:2, 206:11, 207:2, 207:8, 207:9

**intention** [3] - 9:14, 204:21, 204:22

**interest** [3] - 3:14, 3:15, 129:17, 140:25, 142:3, 162:12, 178:6, 184:13

**interested** [2] - 138:5, 138:7, 188:15, 188:23, 203:16

**interests** [1] - 5:1

**interim** [1] - 2:17

**interior** [1] - 163:25

**intermittent** [1] - 10:13

**internment** [1] - 10:2

**interpret** [1] - 143:13

**interrogation** [3] - 19:1, 19:5, 19:8

**interrupted** [1] - 20:5

**intersection** [10] - 54:15, 54:16, 54:18, 54:25, 55:17, 68:9, 85:21, 86:2, 155:24

**interview** [31] - 29:12, 29:14, 29:16, 29:18, 29:21, 29:22, 29:23, 29:24, 30:4, 95:6, 97:1, 97:3, 97:9, 97:13, 97:19, 97:20, 99:17, 100:2, 100:9, 116:8, 116:9, 169:22, 169:24, 176:12, 176:13, 176:15, 178:8, 179:20, 192:7

**interviewed** [9] - 28:25,

32:15, 33:4, 33:10, 44:14, 51:6, 51:9, 95:6, 173:18
**interviews** [4] - 32:14, 42:3, 101:19, 101:22
**intimidate** [1] - 11:17
**Intrepid** [10] - 138:5, 138:7, 138:9, 138:13, 139:3, 141:18, 144:9, 147:15, 188:15, 188:16
**introduce** [2] - 15:17, 15:22
**introduction** [1] - 176:18
**investigate** [1] - 148:2
**investigated** [4] - 33:18, 47:18, 108:23, 169:9
**investigating** [4] - 59:18, 109:8, 110:5, 193:11
**investigation** [31] - 42:8, 45:11, 47:21, 48:12, 48:14, 48:15, 49:17, 50:8, 50:10, 50:24, 51:1, 85:2, 85:15, 94:23, 94:25, 95:1, 109:14, 109:17, 112:5, 120:1, 128:14, 138:4, 163:2, 172:21, 189:6, 189:12, 189:24, 191:19, 197:18, 198:13, 198:18
**investigations** [1] - 42:7
**investigative** [5] - 163:18, 173:8, 173:15, 174:16, 175:9
**investigator** [12] - 6:17, 7:7, 17:11, 41:15, 98:25, 103:12, 103:14, 119:5, 164:18, 167:8, 176:22, 178:18
**investigator's** [1] - 176:10
**investigators** [2] - 14:5, 111:6
**involuntary** [1] - 19:14
**involved** [16] - 16:23, 17:6, 70:12, 88:10, 109:14, 135:23, 138:20, 191:8, 191:16, 191:18, 192:3, 192:8, 193:7, 198:10, 202:18
**involvement** [3] - 11:2, 33:7, 99:12
**involves** [1] - 26:23
**involving** [1] - 64:2
**irrelevance** [1] - 14:21
**irrelevant** [1] - 2:24
**issue** [10] - 3:4, 5:16,

9:10, 11:3, 17:6, 18:21, 207:22, 207:24, 210:10, 210:16
**issues** [4] - 4:13, 4:17, 127:9, 197:18
**item** [33] - 87:10, 88:17, 88:18, 106:18, 107:4, 115:12, 115:17, 115:20, 117:15, 120:9, 120:14, 123:10, 126:16, 130:7, 132:12, 132:16, 133:2, 142:25, 143:1, 147:5, 150:22, 150:25, 151:15, 153:13, 158:19, 158:24, 159:5, 159:8, 160:18, 160:21, 167:9, 168:20
**items** [60] - 17:10, 17:13, 77:18, 77:20, 77:22, 77:25, 78:4, 78:9, 78:12, 78:13, 78:19, 78:21, 90:24, 111:21, 111:24, 116:21, 117:6, 117:11, 117:14, 120:3, 120:6, 120:11, 120:16, 123:13, 129:24, 130:2, 130:5, 130:15, 130:17, 130:21, 131:20, 131:21, 137:19, 137:21, 137:24, 138:1, 141:4, 144:8, 151:4, 155:9, 155:11, 155:16, 156:6, 157:8, 157:9, 158:4, 158:6, 166:3, 166:20, 167:1, 167:13, 167:16, 167:19, 168:10, 168:14, 169:2, 182:2, 185:2, 187:18, 187:24
**itself** [8] - 7:15, 19:17, 23:7, 23:14, 113:6, 133:10, 152:16, 154:4

## J

**J-E-S-S** [1] - 84:7
**jail** [1] - 210:11
**Jamane** [8] - 129:7, 162:19, 162:21, 162:22, 163:1, 189:21, 196:13, 196:18
**James** [2] - 1:21, 192:11
**January** [5] - 175:5, 175:6, 175:15, 176:6, 179:20
**jeans** [3] - 62:1, 63:19, 168:23
**Jeans** [1] - 75:24
**JESS** [2] - 84:3, 213:11
**Jess** [5] - 16:24, 84:2, 84:7, 89:15, 91:11

**Jessup** [5] - 13:8, 13:12, 36:5, 36:6, 36:7
**job** [6] - 93:4, 95:8, 103:10, 103:22, 103:24, 207:23
**John** [2] - 33:23
**Johnson** [8] - 129:7, 162:19, 162:21, 162:22, 163:1, 189:22, 196:13, 196:18
**Jones** [21] - 15:14, 16:21, 48:15, 104:14, 106:10, 106:24, 110:7, 111:4, 111:10, 125:9, 161:10, 162:24, 163:13, 163:23, 164:6, 164:20, 165:4, 165:11, 167:20, 192:9, 192:17
**journal** [2] - 93:24
**joy** [1] - 203:15
**Judge** [6] - 1:13, 4:23, 7:23, 14:16, 139:22, 211:15
**judge** [2] - 8:10, 139:22
**July** [1] - 172:8
**jumping** [1] - 203:14
**June** [64] - 52:24, 53:9, 53:10, 63:8, 68:2, 68:15, 84:23, 85:1, 89:19, 92:12, 92:22, 93:17, 94:9, 96:1, 96:9, 98:14, 103:25, 109:13, 116:5, 116:6, 118:6, 118:24, 119:9, 119:13, 120:20, 122:15, 129:10, 133:9, 133:12, 134:22, 134:23, 135:1, 135:18, 136:3, 136:15, 137:14, 138:10, 138:12, 144:2, 144:13, 145:1, 145:15, 145:19, 146:1, 146:6, 146:7, 146:21, 146:22, 148:13, 148:17, 151:20, 157:22, 161:22, 181:9, 181:13, 184:25, 185:6, 192:16, 193:3
**juries** [1] - 50:3
**jurors** [2] - 2:5, 9:3
**jury** [40] - 3:18, 3:21, 4:12, 5:16, 7:16, 8:8, 10:1, 11:3, 11:19, 12:13, 15:7, 19:20, 19:25, 24:11, 25:2, 25:6, 25:23, 25:24, 36:10, 41:9, 55:12, 57:8, 58:5, 83:11, 85:11, 86:11, 98:16, 127:6, 127:10, 127:15, 132:18, 133:7, 151:21, 151:23, 155:7, 156:5, 179:6, 197:11, 197:14

**Jury** [5] - 1:14, 19:24, 83:24, 127:17, 197:21
**jury's** [1] - 6:23
**Jury's** [3] - 83:4, 127:12, 197:20
**justice** [2] - 11:17

## K

**K-9** [5] - 84:20, 129:20, 183:10, 183:13, 183:22
**K-E-T-T-E-R-M-A-N** [1] - 52:9
**Kansas** [1] - 40:17
**KEB-173** [2] - 139:5, 139:6
**KEB-973** [2] - 139:11, 139:14
**keep** [11] - 10:25, 21:4, 53:21, 70:5, 79:12, 83:3, 83:19, 93:10, 103:6, 127:8, 197:17
**Keith** [6] - 16:22, 52:3, 52:8, 69:22
**KEITH** [2] - 52:4, 213:6
**Kelly** [1] - 18:5
**Kelsey** [1] - 1:17
**kept** [1] - 148:25
**KETTERMAN** [2] - 52:4, 213:6
**Ketterman** [19] - 16:22, 52:3, 52:8, 52:12, 65:17, 69:21, 69:22, 69:24, 70:11, 70:22, 71:16, 71:21, 71:24, 72:10, 76:4, 76:8, 80:6, 185:22
**key** [3] - 112:12, 123:9, 212:19
**Kidwell** [6] - 104:21, 106:19, 106:20, 106:23, 107:1, 107:4
**killed** [6] - 5:9, 21:6, 30:21, 31:2, 33:17, 50:20
**killing** [2] - 33:8, 161:10
**Kind** [3] - 14:21, 50:8, 72:3
**kind** [25] - 6:7, 8:9, 10:18, 10:25, 11:5, 15:22, 15:23, 17:14, 22:21, 42:9, 42:17, 67:20, 84:19, 92:8, 92:17, 94:7, 95:2, 109:4, 120:1, 134:9, 166:2, 167:13, 179:14, 208:24, 209:8
**kinds** [3] - 7:21, 7:22
**kitchen** [4] - 113:3, 113:8, 113:9, 187:14
**knee** [2] - 105:15, 106:6

**knocked** [3] - 57:14, 59:8, 198:12
**Knoll** [9] - 58:2, 58:7, 58:10, 70:15, 70:23, 71:25, 72:1, 77:7, 77:24
**knowing** [2] - 68:23, 82:14
**knowledge** [21] - 61:10, 88:4, 102:11, 112:4, 135:9, 142:18, 149:20, 149:22, 150:7, 161:8, 163:1, 163:22, 168:7, 170:11, 187:25, 188:1, 195:25, 198:22, 201:16, 202:19, 204:11
**known** [5] - 12:12, 43:9, 43:14, 49:8, 63:11
**knows** [2] - 11:13, 193:15
**Kurland** [11] - 1:22, 2:6, 15:20, 16:12, 47:24, 49:5, 171:11, 173:13, 179:10, 195:18, 207:17
**KURLAND** [54] - 2:9, 2:12, 4:23, 6:13, 6:17, 6:21, 7:1, 7:9, 7:23, 8:25, 9:2, 9:5, 11:22, 12:4, 12:7, 12:24, 13:11, 13:18, 14:2, 14:15, 14:24, 34:10, 50:5, 65:16, 79:23, 82:10, 82:13, 89:13, 107:21, 170:5, 170:13, 170:18, 171:6, 171:12, 171:17, 173:14, 174:7, 179:11, 179:14, 179:18, 189:18, 190:22, 207:14, 207:19, 207:21, 208:17, 208:20, 210:7, 213:4, 213:7, 213:9, 213:10, 213:12, 213:18
**Kurland's** [1] - 20:15

## L

**Lab** [16] - 97:17, 97:21, 100:8, 100:12, 100:13, 100:20, 100:23, 101:2, 101:8, 111:1, 111:7, 120:12, 120:13, 120:15, 124:7, 139:24
**lab** [1] - 168:4
**labeled** [2] - 105:14, 117:15
**Labor** [1] - 15:17
**Ladies** [1] - 19:25
**ladies** [4] - 82:24, 98:16, 127:6, 127:18
**lady** [1] - 71:10

**laid** [1] - 120:14
**Lakers** [3] - 31:18, 31:19, 31:22
**Lane** [1] - 55:18, 55:24, 55:25, 56:2, 68:9, 68:16, 85:2, 87:3, 109:24, 110:22, 116:23, 117:18, 118:3, 118:19, 119:25, 121:1, 121:23, 129:16, 130:20, 130:23, 131:1, 131:18, 137:25, 138:1, 148:18, 155:19, 156:5, 156:10, 163:15, 163:21
**lane** [1] - 55:24
**language** [3] - 3:22, 14:3, 101:13
**large** [9] - 21:14, 21:25, 22:13, 109:19, 114:21, 129:19, 130:13, 131:7, 160:3
**largely** [1] - 29:17
**laser** [2] - 54:9, 118:12
**last** [18] - 8:18, 15:4, 15:5, 43:5, 55:23, 91:21, 109:6, 109:10, 121:11, 121:17, 124:25, 147:20, 156:24, 157:3, 175:12, 177:9, 194:13, 204:1
**Last** [2] - 52:8, 84:7
**lasts** [1] - 203:5
**late** [3] - 94:16, 198:21, 199:18
**latent** [3] - 164:23, 165:1, 165:9
**latex** [27] - 114:15, 114:16, 114:19, 114:20, 115:2, 136:2, 136:14, 136:18, 137:4, 141:1, 141:2, 141:5, 142:4, 142:16, 142:19, 142:22, 145:18, 156:16, 163:20, 165:19, 165:24, 166:4, 166:5, 166:7, 166:13, 166:20, 167:3
**Laura** [1] - 1:17
**law** [11] - 8:20, 9:19, 10:8, 14:5, 21:7, 32:20, 188:11, 204:12, 207:24, 208:1, 208:18
**LAWLOR** [28] - 14:16, 14:18, 14:21, 14:23, 16:13, 20:21, 50:15, 83:22, 199:5, 204:8, 204:13, 204:16, 204:24, 205:1, 205:4, 205:8, 205:13, 206:4, 206:6, 206:17, 206:20, 206:23, 207:1, 207:6, 207:12, 208:14, 213:4, 213:5

**Lawlor** [14] - 1:18, 14:17, 16:12, 20:19, 28:6, 44:12, 46:3, 46:24, 51:18, 204:6, 204:15, 206:2, 207:22, 208:13
**Lawlor's** [1] - 20:14
**lawn** [1] - 117:6
**lawyer** [1] - 7:19
**lay** [3] - 123:1, 123:11, 124:6
**laying** [2] - 87:13, 87:16
**lead** [11] - 6:17, 7:7, 17:11, 42:11, 173:8, 173:15, 176:22, 178:6, 178:18, 188:19
**leader** [1] - 43:19
**leading** [1] - 113:14
**leads** [2] - 42:10, 113:3
**learn** [2] - 163:8, 201:9
**learned** [5] - 40:6, 191:12, 191:14, 191:16, 191:18
**least** [9] - 10:6, 25:11, 39:20, 116:3, 180:12, 183:1, 187:24, 193:3, 200:15
**leave** [12] - 10:18, 13:18, 83:1, 94:6, 94:7, 118:2, 127:6, 152:6, 166:23, 197:15, 203:10, 203:25
**leaves** [4] - 87:13, 87:16, 152:14, 167:11
**leaving** [2] - 199:2, 207:12
**Left** [1] - 59:11
**left** [21] - 28:21, 57:7, 58:1, 59:10, 64:19, 64:20, 73:10, 77:6, 105:5, 105:24, 106:2, 106:6, 116:7, 116:16, 118:22, 121:12, 133:24, 152:18, 168:10, 182:20, 182:22
**left-hand** [1] - 105:5
**legal** [1] - 11:15
**legitimate** [1] - 6:7
**length** [1] - 10:1
**lenses** [1] - 186:21
**less** [3] - 69:5, 87:10, 96:1
**letter** [2] - 13:21, 15:3
**lettering** [1] - 130:9, 132:4, 133:1, 186:25, 187:1, 187:2, 187:5
**letters** [2] - 187:5, 187:7
**letting** [1] - 88:1
**license** [1] - 72:20
**lieutenant** [1] - 55:2
**life** [5] - 9:8, 9:17,

10:22, 12:2, 124:21
**lift** [3] - 88:4, 133:20, 134:14
**light** [7] - 10:1, 114:14, 140:22, 141:1, 181:14, 181:15, 186:24
**light-colored** [1] - 186:24
**lighting** [2] - 125:25, 139:13
**lights** [1] - 56:18
**limine** [1] - 211:20
**limit** [2] - 8:11, 179:15
**limitation** [1] - 40:22
**limitations** [1] - 5:23
**limited** [1] - 135:20
**limiting** [2] - 7:16, 212:15
**line** [5] - 8:7, 30:20, 91:2, 131:18, 184:12
**lines** [3] - 3:19, 4:13, 179:24
**link** [1] - 172:18
**linking** [1] - 167:16
**list** [1] - 79:17
**listed** [2] - 117:18, 138:9
**listen** [1] - 212:9
**listened** [1] - 23:2
**listening** [1] - 22:24
**lists** [1] - 139:3
**live** [6] - 8:3, 154:1, 159:3, 159:4, 160:22, 190:7
**living** [4] - 112:19, 113:12, 113:14, 187:14
**loaded** [1] - 154:3
**local** [1] - 148:2
**locate** [1] - 137:15
**located** [6] - 21:20, 129:19, 138:14, 138:17, 140:2, 140:7
**locating** [2] - 138:5, 138:7
**location** [37] - 10:2, 10:10, 43:17, 57:18, 59:10, 59:11, 63:24, 64:8, 65:6, 76:12, 76:16, 77:6, 81:25, 88:11, 90:14, 110:3, 110:14, 110:23, 119:11, 121:13, 122:1, 124:19, 130:17, 131:6, 133:16, 144:19, 155:11, 156:20, 156:22, 156:24, 157:1, 157:5, 157:18, 157:21, 163:13, 163:17, 168:5
**locations** [1] - 116:15
**lock** [1] - 112:12
**locked** [2] - 79:5, 79:6

**locker** [1] - 17:10
**lockers** [3] - 79:6, 79:7, 79:9
**logical** [1] - 4:8
**logo** [1] - 130:8
**Lombard** [1] - 1:25
**look** [38] - 8:19, 25:9, 36:1, 38:17, 51:11, 61:2, 63:11, 70:25, 74:16, 80:20, 82:21, 85:15, 85:20, 86:16, 88:11, 88:18, 106:23, 111:9, 114:5, 114:9, 120:7, 120:8, 120:17, 126:17, 126:22, 130:2, 131:20, 133:11, 133:15, 148:23, 150:8, 174:20, 184:5, 185:23, 200:4, 211:13, 211:15, 212:19
**looked** [22] - 25:25, 27:12, 27:24, 38:12, 38:14, 38:18, 45:16, 61:18, 71:7, 86:19, 87:6, 96:10, 123:25, 133:13, 133:18, 134:1, 143:25, 155:9, 159:15, 180:12, 208:16, 212:6
**looking** [20] - 17:25, 18:1, 18:7, 61:7, 70:23, 82:15, 82:19, 86:15, 86:24, 87:11, 89:25, 90:3, 90:4, 107:9, 131:17, 132:8, 148:20, 148:21, 205:25
**Looking** [2] - 170:11, 179:24
**lookout** [2] - 54:2, 54:4
**Looks** [3] - 26:14, 51:23, 143:13
**looks** [4] - 28:18, 69:9, 139:4, 150:16
**Los** [1] - 31:19
**losing** [1] - 195:12
**lost** [2] - 78:8, 180:4
**Lower** [1] - 28:21
**Luckily** [1] - 207:12
**lunch** [2] - 127:23, 157:13
**luncheon** [2] - 127:5, 127:12
**lying** [4] - 104:19, 104:20, 111:21, 111:23

---

# M

**M-A-R-L-L** [1] - 108:10
**ma'am** [2] - 67:5, 107:22
**magazine** [7] - 153:25,

154:3, 154:7, 154:9, 154:25, 155:3, 186:8
**Magginson** [6] - 15:6, 22:7, 22:8, 22:9, 22:20
**Magginson's** [2] - 22:11, 23:10
**magic** [1] - 8:20
**mail** [4] - 15:6, 23:10, 23:19, 25:12
**mailed** [1] - 212:1
**main** [1] - 177:14
**maintained** [1] - 43:24
**maintaining** [1] - 93:1
**male** [1] - 71:5
**males** [4] - 55:6, 71:9, 71:12, 189:5
**mall** [2] - 41:5, 41:6
**man** [2] - 30:21, 146:24
**manner** [2] - 41:20, 214:8
**map** [4] - 54:10, 54:12, 90:7, 155:14
**March** [2] - 29:4, 48:6
**Marijuana** [1] - 160:7
**marijuana** [1] - 160:12
**mark** [2] - 78:15, 120:10
**Marked** [1] - 114:21
**marked** [31] - 56:18, 68:8, 72:12, 74:3, 75:8, 106:6, 106:16, 109:20, 114:8, 117:9, 117:15, 117:23, 129:23, 131:24, 132:12, 133:2, 136:7, 136:9, 139:7, 141:3, 142:13, 142:25, 144:15, 147:4, 147:11, 152:6, 153:12, 156:9, 156:15, 193:18, 195:8
**markings** [1] - 106:2
**marks** [1] - 105:23
**Marll** [12] - 17:5, 17:11, 108:4, 108:9, 108:14, 114:12, 114:23, 127:19, 127:22, 132:1, 151:17, 171:18
**MARLL** [2] - 108:5, 213:17
**marry** [1] - 25:21
**Marsh** [1] - 84:13
**MARTIN** [3] - 1:8, 83:23, 210:10
**Martin** [29] - 1:19, 1:20, 3:8, 6:5, 13:4, 20:7, 20:11, 28:25, 33:4, 33:14, 35:1, 38:11, 38:16, 38:21, 39:2, 39:8, 39:9, 39:11, 39:16, 42:3, 44:19, 48:1, 48:9, 83:9, 83:22, 162:9, 191:4, 210:9

**Martin's** [8] - 7:3, 7:5, 38:17, 38:24, 48:12, 48:21, 193:18, 194:8
**Mary** [1] - 1:24, 214:3, 214:14
**MARYLAND** [1] - 1:2
**Maryland** [6] - 1:12, 1:25, 36:7, 72:19, 75:4, 141:19
**master** [1] - 160:1
**match** [6] - 34:20, 36:11, 36:15, 36:19, 36:20, 75:25
**matched** [5] - 36:20, 75:23, 164:4, 164:6, 164:10
**matching** [3] - 73:22, 164:12, 164:15
**material** [3] - 167:20, 167:25, 205:24
**matter** [16] - 2:6, 6:12, 14:11, 41:14, 46:20, 65:9, 78:10, 99:9, 99:12, 160:2, 160:3, 160:5, 192:8, 214:4, 214:8
**matters** [5] - 2:19, 4:15, 8:9, 36:21, 194:19
**Maureen** [2] - 18:2, 200:3
**McGlynn** [1] - 97:21
**MCIJ** [1] - 36:5
**Mead** [5] - 90:8, 90:11, 90:12, 124:16, 135:22
**Mead's** [2] - 125:4, 125:5
**mean** [21] - 4:7, 4:23, 6:21, 7:2, 8:12, 13:9, 19:8, 30:16, 30:22, 39:23, 43:4, 47:6, 53:17, 91:4, 173:15, 180:4, 187:5, 203:12, 208:22, 209:25, 212:4
**meaning** [2] - 80:13, 152:11
**means** [1] - 212:14
**meant** [2] - 11:23, 90:7
**Meanwhile** [1] - 48:23
**measurement** [1] - 123:16
**mechanism** [1] - 112:13
**medical** [2] - 104:10, 104:11
**Medical** [1] - 104:12
**meet** [2] - 146:6, 200:14
**meeting** [12] - 172:7, 172:8, 172:13, 174:25, 175:8, 175:16, 191:8, 191:10, 191:17, 191:22, 192:2, 195:20
**member** [1] - 92:3

**Members** [1] - 197:14
**members** [7] - 49:13, 49:21, 111:1, 135:21, 139:24, 184:10, 205:17
**memory** [4] - 41:9, 51:11, 175:5, 206:13
**men** [21] - 55:15, 55:22, 56:8, 56:15, 56:23, 57:23, 58:5, 58:11, 58:14, 59:3, 59:7, 59:15, 59:20, 59:24, 60:7, 71:18, 71:22, 71:25, 72:14, 72:23, 86:24
**men's** [1] - 56:20
**Mental** [2] - 206:1, 206:9
**mental** [2] - 206:12, 206:15
**mentioned** [12] - 3:6, 32:15, 33:10, 47:15, 47:24, 49:5, 49:6, 54:15, 69:7, 72:24, 75:4, 134:9
**mentions** [1] - 202:23
**message** [1] - 23:19
**Messino** [1] - 9:20
**met** [5] - 26:3, 29:20, 104:20, 191:24, 208:9
**metallic** [1] - 107:13
**MICHAEL** [2] - 67:4, 213:8
**Michael** [6] - 1:16, 1:18, 16:22, 58:20, 67:3, 67:8
**microphone** [2] - 53:22, 155:15
**mid** [4] - 2:15, 3:10, 3:16, 99:18
**middle** [5] - 26:15, 130:21, 132:10, 149:12, 151:12
**midnight** [2] - 31:15, 116:6
**might** [18] - 4:15, 10:5, 11:14, 15:23, 17:18, 17:22, 26:15, 27:2, 40:2, 49:20, 66:10, 106:6, 119:6, 133:23, 150:19, 154:19, 173:8
**mike** [7] - 52:6, 67:6, 84:5, 85:13, 91:17, 102:23, 108:7
**Mike** [1] - 58:21
**miles** [2] - 163:13, 163:17
**milk** [1] - 207:2
**Mill** [1] - 40:25
**mimics** [1] - 29:17
**mind** [12] - 42:25, 72:15, 83:3, 127:9, 197:17, 205:22, 205:24, 205:25, 206:5, 206:11,

207:16, 207:22
**mine** [1] - 8:3
**minimum** [1] - 200:10
**minute** [4] - 43:21, 126:7, 174:25, 175:15, 179:3, 179:9, 184:5, 204:11
**minutes** [12] - 28:12, 28:15, 28:16, 57:16, 65:8, 65:9, 68:15, 83:4, 89:14, 172:13, 185:22, 191:2
**Miranda** [1] - 19:16
**mischaracterize** [1] - 30:12
**missed** [1] - 61:8
**misses** [1] - 3:4
**Missouri** [1] - 40:17
**misspoken** [1] - 17:17
**mistake** [1] - 139:11
**mistrial** [2] - 212:13, 212:17
**MITCHELL** [1] - 1:7
**Mitchell** [24] - 1:17, 3:7, 6:5, 13:4, 13:24, 14:9, 14:19, 28:20, 28:25, 29:4, 29:17, 32:4, 33:6, 33:15, 35:1, 42:3, 46:2, 46:13, 46:18, 82:21, 199:5, 201:10, 201:14, 214:5
**Mitchell's** [2] - 28:1, 46:3
**Model** [2] - 144:5, 147:6
**model** [1] - 147:19
**modifications** [2] - 3:14, 3:18
**moment** [8] - 79:19, 101:10, 126:13, 171:1, 171:6, 190:20, 195:18, 203:11
**moment's** [1] - 114:16
**Moment's** [1] - 65:11
**momentarily** [1] - 203:6
**momentous** [1] - 212:5
**moments** [2] - 93:13, 132:5
**Moments** [2] - 203:20, 203:21
**Momma** [5] - 163:2, 189:22, 209:2, 209:3, 209:6
**Monday** [1] - 1:11
**money** [4] - 195:22, 196:2, 196:6
**moniker** [2] - 32:7, 32:24
**monitor** [1] - 146:17
**monitored** [1] - 95:4
**Montgomery** [40] -

26:4, 26:12, 27:11, 27:22, 44:13, 44:18, 44:25, 45:6, 45:14, 164:15, 169:17, 169:19, 169:22, 169:24, 170:1, 170:8, 170:12, 171:23, 172:4, 172:14, 172:16, 173:3, 174:9, 174:10, 175:1, 175:18, 175:23, 180:1, 190:2, 190:4, 191:4, 192:3, 192:7, 195:20, 195:21, 196:5, 196:16, 196:20, 209:10
**Montgomery's** [4] - 170:16, 171:25, 173:9, 179:12
**month** [5] - 38:4, 38:20, 39:15, 172:3, 194:13
**months** [3] - 33:14, 38:4, 44:2
**Moore** [4] - 113:24, 114:2, 114:11, 117:10
**morning** [56] - 2:10, 2:11, 14:17, 15:3, 15:5, 16:7, 16:8, 17:7, 18:14, 19:23, 20:1, 20:22, 20:23, 22:11, 29:8, 34:12, 34:13, 37:21, 44:10, 44:11, 52:12, 52:13, 54:21, 65:17, 65:18, 67:11, 67:12, 79:24, 79:25, 82:24, 83:10, 83:22, 84:10, 89:14, 89:16, 103:4, 103:5, 116:6, 116:6, 118:24, 121:21, 181:8, 181:9, 181:10, 182:7, 182:14, 182:22, 197:19, 197:20, 204:19, 207:11, 209:22, 211:19, 211:22
**most** [4] - 16:5, 65:20, 116:4, 182:2
**Most** [1] - 198:8
**motion** [7] - 2:13, 9:6, 15:19, 211:20, 212:7, 212:13, 212:17
**motivation** [6] - 5:7, 10:21, 177:25, 178:4, 180:13, 180:22
**motive** [10] - 177:20, 178:3, 178:4, 178:14, 178:16, 178:20, 178:23, 180:16, 195:19, 206:12
**motorized** [1] - 146:13
**move** [8] - 16:20, 111:15, 129:13, 132:10, 147:12, 151:1, 174:6, 180:24
**Moved** [1] - 52:21
**moved** [3] - 138:17,

150:23, 166:2
**movement** [1] - 146:18
**movie** [3] - 41:1, 46:14, 46:20
**moving** [1] - 189:3
**MR** [206] - 2:9, 2:12, 4:23, 6:13, 6:17, 6:21, 7:1, 7:9, 7:23, 8:25, 9:2, 9:5, 11:22, 12:4, 12:7, 12:24, 13:11, 13:18, 14:2, 14:15, 14:16, 14:18, 14:21, 14:23, 14:24, 14:25, 15:2, 15:13, 16:1, 16:4, 16:8, 16:13, 16:16, 16:18, 16:20, 17:25, 18:9, 18:10, 18:15, 19:2, 19:13, 20:21, 34:10, 37:3, 44:9, 50:5, 50:15, 51:17, 52:2, 52:11, 65:13, 65:16, 67:2, 67:10, 79:23, 81:18, 81:21, 82:8, 82:10, 82:13, 83:7, 83:22, 83:23, 84:1, 84:9, 89:13, 91:13, 91:24, 98:5, 102:10, 102:19, 103:3, 107:21, 107:24, 108:3, 108:13, 127:4, 127:21, 170:5, 170:13, 170:18, 171:4, 171:6, 171:12, 171:17, 173:10, 173:14, 174:5, 174:7, 179:11, 179:14, 179:18, 189:1, 189:8, 189:14, 189:16, 189:18, 190:22, 191:1, 194:2, 195:6, 195:9, 195:12, 195:16, 197:4, 197:7, 197:10, 197:13, 197:24, 198:5, 198:7, 198:17, 198:21, 198:23, 198:25, 199:5, 199:8, 199:11, 199:13, 199:16, 199:20, 199:25, 200:2, 200:10, 200:23, 200:25, 201:2, 201:8, 201:11, 201:15, 201:20, 201:25, 202:3, 202:6, 202:9, 202:13, 202:15, 202:19, 203:1, 203:5, 203:9, 203:14, 203:20, 203:22, 203:24, 204:5, 204:8, 204:13, 204:16, 204:24, 205:1, 205:4, 205:8, 205:13, 205:21, 206:4, 206:6, 206:17, 206:20, 206:23, 207:1, 207:6, 207:12, 207:14, 207:19, 207:21, 208:14, 208:17, 208:20, 208:24, 209:3, 209:13, 209:16, 209:18,

209:24, 210:3, 210:7, 210:10, 210:14, 210:19, 211:4, 211:8, 211:17, 211:19, 212:4, 212:16, 213:4, 213:4, 213:5, 213:5, 213:7, 213:7, 213:9, 213:9, 213:10, 213:10, 213:12, 213:12, 213:14, 213:14, 213:15, 213:16, 213:18, 213:18, 213:19, 213:19
**MS** [5] - 45:22, 49:14, 49:23, 170:20, 171:9
**murder** [17] - 4:9, 6:6, 6:18, 9:13, 39:13, 47:1, 48:3, 48:5, 48:7, 48:16, 48:20, 48:24, 129:10, 165:4, 172:4, 192:9, 195:22
**murders** [1] - 3:10
**Muslim** [3] - 33:22, 34:2
**must** [2] - 9:24, 9:25

# N

**name** [66] - 15:14, 26:3, 32:3, 33:11, 34:2, 42:13, 42:15, 42:22, 43:9, 43:14, 43:16, 48:10, 48:12, 48:21, 49:7, 49:8, 49:20, 49:22, 49:25, 50:7, 50:10, 50:11, 50:12, 52:7, 52:8, 62:25, 67:7, 72:21, 75:5, 75:10, 75:13, 75:16, 78:16, 78:17, 78:18, 78:20, 78:23, 78:24, 79:7, 84:6, 84:7, 91:18, 91:21, 96:19, 97:22, 101:9, 102:24, 102:25, 108:8, 110:5, 128:9, 143:7, 143:10, 143:12, 158:7, 158:9, 158:14, 161:17, 162:5, 162:6, 163:3, 173:9, 190:1, 191:3, 202:24
**named** [6] - 33:16, 46:24, 49:12, 49:17, 79:15, 169:17
**names** [8] - 14:6, 33:22, 49:6, 50:4, 72:24, 143:6, 143:7
**Naming** [1] - 49:16
**Natasha** [3] - 22:20, 22:22, 200:11
**Nathaniel** [2] - 140:13, 173:17
**nature** [3] - 10:2, 111:8, 146:15
**NBA** [1] - 31:19

**near** [15] - 53:21, 55:17, 65:23, 86:2, 105:5, 109:23, 111:17, 111:21, 130:21, 146:24, 153:19, 153:21, 155:23, 156:24
**nearby** [3] - 54:13, 57:19, 86:25
**necessarily** [7] - 148:8, 166:20, 167:9, 169:5, 169:10, 193:11, 193:13
**necessary** [1] - 70:19
**neck** [2] - 110:1, 118:13
**need** [16] - 2:7, 12:9, 34:13, 40:14, 55:11, 59:18, 61:23, 94:14, 134:16, 173:12, 195:7, 205:15, 209:21, 209:24, 209:25, 210:6
**needed** [5] - 5:19, 95:9, 181:22
**needs** [2] - 8:8, 11:18
**negative** [2] - 167:5, 168:17
**negatives** [2] - 165:13, 165:15
**neglected** [1] - 116:21
**neighborhood** [17] - 18:12, 49:20, 61:19, 63:18, 67:24, 68:10, 68:12, 69:1, 70:5, 86:16, 86:24, 109:21, 133:10, 133:23, 156:3, 168:8, 185:19
**Neighborhoods** [1] - 49:25
**neighborhoods** [1] - 68:13
**neighboring** [1] - 85:8
**never** [11] - 6:6, 6:13, 6:18, 6:23, 7:6, 21:1, 24:22, 25:20, 25:25, 88:14, 172:15
**Never** [1] - 26:1
**Nevertheless** [1] - 47:18
**New** [4] - 130:8, 133:1, 156:25, 210:22
**new** [1] - 49:16
**next** [15] - 15:17, 15:22, 57:25, 83:8, 83:25, 87:14, 109:19, 130:18, 155:3, 183:8, 198:4, 209:25, 210:1, 211:4, 211:11
**Next** [3] - 67:1, 102:18, 211:7
**Nextel** [5] - 122:21, 123:19, 124:17, 126:20, 137:11
**nice** [3] - 180:2, 180:3,

180:4
**nickname** [6] - 32:7, 32:10, 32:19, 32:24, 33:2, 163:2
**nicknames** [1] - 32:17
**NIEDERMEIER** [1] - 213:3
**Niedermeier** [24] - 4:7, 6:2, 8:3, 9:16, 10:16, 12:24, 13:3, 14:8, 15:8, 15:10, 16:10, 19:21, 20:5, 20:8, 20:10, 20:17, 34:14, 37:7, 41:13, 43:23, 44:5, 44:10, 49:11, 51:24
**Niedermeier's** [2] - 12:21, 20:12
**night** [8] - 15:4, 15:5, 31:14, 48:24, 83:16, 116:20, 182:13, 199:2
**ninety** [1] - 160:14
**NO** [1] - 1:6
**nobody** [2] - 166:16, 186:10
**Nobody** [2] - 186:12, 186:13
**Noel** [10] - 33:11, 33:17, 46:24, 47:2, 47:18, 50:17, 51:7, 51:9, 51:16, 51:19
**non** [1] - 17:15
**non-controversial** [1] - 17:15
**none** [1] - 42:22
**None** [1] - 43:3
**normal** [1] - 112:16
**north** [1] - 163:17
**northeast** [1] - 69:9
**NORTHERN** [1] - 1:2
**Northwest** [1] - 122:14
**northwestern** [1] - 67:17
**note** [12] - 18:20, 62:2, 62:10, 62:12, 73:20, 83:1, 96:13, 101:4, 127:6, 128:21, 197:15, 212:11
**noted** [2] - 73:16, 106:2, 128:19
**notes** [15] - 29:21, 29:22, 30:1, 30:12, 46:16, 174:12, 174:14, 174:15, 174:19, 175:7, 175:22, 176:3, 176:9, 194:7, 202:13
**nothing** [11] - 11:25, 73:23, 78:8, 154:4, 167:14, 172:17, 172:18, 174:2, 188:2, 190:12
**Nothing** [9] - 65:13,

75:23, 79:21, 98:3, 102:8, 107:20, 167:16, 196:23
**notice** [5] - 85:24, 111:21, 112:13, 114:13, 147:19
**noticeable** [1] - 156:13
**noticed** [2] - 128:22, 147:18, 149:21
**notified** [2] - 87:25, 120:11
**notify** [1] - 63:21
**noting** [1] - 18:17
**Number** [5] - 92:16, 115:24, 117:18, 117:23, 121:24
**number** [38] - 16:20, 17:16, 17:17, 22:2, 22:13, 27:20, 36:24, 37:2, 39:22, 40:11, 69:2, 106:18, 108:23, 119:24, 124:23, 125:21, 126:4, 126:5, 126:10, 126:13, 128:5, 128:8, 128:11, 128:23, 139:10, 144:8, 144:9, 151:10, 154:8, 155:8, 162:1, 162:3, 164:9, 191:8, 195:17, 205:15, 207:7
**Number(s** [1] - 214:5
**numbers** [7] - 44:15, 70:24, 128:19, 143:5, 147:19, 147:24, 148:10
**numerous** [1] - 101:20

# O

**oath** [1] - 20:18
**object** [3] - 14:18, 89:8, 134:6
**objected** [1] - 7:10
**Objection** [14] - 45:22, 49:14, 49:23, 50:5, 51:17, 170:5, 170:13, 170:18, 170:20, 173:10, 174:5, 189:1, 189:8, 189:14
**objection** [12] - 7:11, 14:22, 18:20, 51:21, 179:13, 189:15, 199:4, 200:6, 200:9, 204:19, 212:10, 212:11
**objection's** [2] - 19:18, 19:19
**observation** [2] - 100:1, 100:6
**observations** [3] - 90:19, 98:21, 99:14
**observe** [4] - 55:1,

55:15, 56:8, 56:10
**observed** [6] - 55:5, 55:21, 129:24, 144:1, 146:21, 189:5
**observing** [1] - 204:20
**obstruct** [1] - 11:17
**obtain** [3] - 128:14, 136:24, 163:22
**Obtained** [1] - 139:21
**obtained** [12] - 93:24, 138:10, 161:25, 162:1, 162:4, 162:19, 163:4, 163:25, 166:12, 188:18, 188:22, 188:24
**obtaining** [1] - 101:9
**obtuse** [1] - 11:15
**obvious** [1] - 123:24
**Obviously** [1] - 16:8
**obviously** [5] - 5:24, 7:18, 12:21, 13:2, 34:15, 90:23, 101:13, 107:12, 131:14, 167:19, 177:11
**occasion** [2] - 53:9, 77:6, 85:20, 86:16, 133:11
**occasions** [3] - 101:20, 101:22, 101:25
**occur** [1] - 101:22
**occurred** [4] - 53:19, 162:17, 163:11, 181:12
**occurrence** [2] - 41:24, 102:3
**occurring** [1] - 101:8
**October** [2] - 1:11, 214:5
**odd** [2] - 73:23, 75:23
**OF** [3] - 1:2, 1:5, 1:11
**off-white** [1] - 3:24
**offense** [1] - 3:24
**offered** [1] - 208:9
**offhand** [1] - 11:7
**Office** [6] - 24:19, 24:24, 35:3, 193:20, 194:6, 194:9
**office** [2] - 29:7, 189:4
**Officer** [86] - 16:22, 16:24, 17:1, 18:16, 52:3, 52:8, 52:12, 53:22, 54:11, 55:10, 55:14, 56:12, 58:8, 58:13, 58:17, 58:21, 58:25, 59:9, 59:13, 59:14, 59:24, 60:2, 60:6, 60:19, 61:11, 62:12, 62:25, 63:14, 63:24, 64:16, 65:4, 65:13, 65:17, 66:23, 66:25, 69:21, 69:22, 69:24, 70:11, 70:21, 71:16, 71:21, 71:24, 72:10, 76:4, 76:8,

80:6, 84:2, 84:7, 84:10,
85:8, 85:14, 85:18,
86:23, 88:4, 89:14, 90:8,
90:12, 91:10, 91:11,
91:14, 91:19, 91:25,
94:13, 97:21, 98:3, 98:6,
101:18, 102:11, 102:15,
104:21, 106:19, 106:20,
106:23, 107:1, 107:4,
124:16, 125:4, 125:5,
129:20, 135:21, 185:22,
189:10, 199:22
  **OFFICER** [6] - 52:4,
84:3, 91:15, 213:6,
213:11, 213:13
  **officer** [38] - 52:17,
52:25, 58:20, 58:22,
67:18, 67:24, 68:3,
69:18, 79:11, 80:18,
84:15, 84:19, 89:10,
90:6, 90:11, 92:6, 92:7,
92:8, 92:9, 92:12, 92:19,
93:1, 93:4, 94:1, 94:2,
95:4, 96:23, 97:4,
106:21, 109:5, 120:2,
120:7, 120:10, 129:20,
133:16, 134:13, 144:18,
199:23
  **officer's** [2] - 7:17, 61:4
  **Officers** [2] - 18:10,
32:16
  **officers** [31] - 53:11,
54:22, 58:14, 63:22,
78:10, 79:10, 85:19,
86:22, 101:2, 101:9,
101:23, 102:5, 104:8,
110:19, 110:25, 118:10,
119:10, 119:11, 119:21,
121:7, 121:14, 121:25,
122:16, 127:25, 133:18,
149:9, 172:5, 181:20,
182:12, 183:16, 198:13
  **official** [1] - 214:7
  **Official** [1] - 214:15
  **often** [2] - 49:12, 110:18
  **old** [3] - 109:8, 169:13
  **Old** [1] - 68:9
  **once** [8] - 4:18, 57:19,
85:10, 120:9, 124:7,
141:7, 148:17, 168:2
  **Once** [7] - 103:17,
113:11, 116:7, 124:6,
142:9, 150:22, 150:25
  **one** [117] - 2:17, 3:3,
4:16, 7:15, 13:20, 18:22,
19:3, 24:19, 24:24,
25:23, 28:4, 28:15,
28:21, 33:21, 36:1, 38:1,
38:7, 38:13, 39:5, 41:13,
42:13, 42:15, 42:22,

43:21, 43:23, 44:21,
45:25, 46:21, 48:12,
49:21, 50:9, 50:16,
55:13, 57:15, 57:18,
58:9, 59:24, 60:8, 60:9,
60:11, 63:23, 63:24,
63:25, 64:5, 64:9, 64:11,
65:9, 68:17, 75:12,
75:19, 76:11, 76:18,
76:25, 77:3, 81:18,
81:22, 82:2, 82:10,
85:15, 87:25, 96:24,
97:18, 98:1, 100:13,
100:24, 101:1, 112:25,
119:15, 120:3, 123:14,
124:11, 128:24, 138:3,
139:22, 145:8, 146:21,
147:21, 149:8, 152:21,
156:12, 157:14, 158:15,
158:17, 163:4, 165:7,
167:6, 168:17, 168:20,
177:14, 183:20, 186:15,
188:11, 190:20, 192:3,
192:24, 193:21, 193:23,
194:9, 200:16, 201:15,
201:16, 205:8, 205:15,
207:7
  **One** [12] - 18:25, 72:23,
98:17, 98:18, 100:9,
133:18, 147:20, 150:17,
152:7, 159:8, 190:6,
192:19
  **one's** [2] - 9:19, 45:25
  **one-half** [1] - 200:16
  **one-on-one** [4] - 63:23,
63:24, 63:25, 64:5
  **one-on-ones** [2] - 64:5,
64:9
  **ones** [4] - 64:5, 64:9,
176:2, 176:3
  **online** [1] - 197:18
  **open** [10] - 7:21, 83:3,
97:13, 112:1, 112:9,
113:9, 127:9, 150:19,
158:2, 197:17
  **opened** [2] - 114:22,
159:11
  **operating** [1] - 80:18
  **operator** [1] - 146:16
  **opportunity** [10] - 2:14,
8:16, 10:10, 25:9, 25:17,
120:17, 121:19, 130:2,
138:23, 140:6
  **oppose** [1] - 15:9
  **opposed** [3] - 76:22,
112:16, 161:1
  **opposite** [6] - 56:2,
62:19, 130:23, 130:25,
132:2, 155:23
  **opulent** [2] - 187:24,

188:2
  **orange** [2] - 149:15,
149:17
  **order** [6] - 13:4, 17:5,
35:2, 154:23, 157:8,
157:10
  **orders** [1] - 35:3
  **ordinary** [1] - 39:21
  **organization** [11] -
13:24, 14:6, 14:9, 14:10,
14:19, 43:9, 49:20,
49:21, 50:1, 50:7
  **organizations** [3] -
43:4, 49:6, 50:4
  **original** [2] - 15:4,
23:24
  **originally** [1] - 142:22
  **ought** [1] - 200:5
  **outdoor** [1] - 112:22
  **outlined** [2] - 187:5,
187:7
  **outreach** [1] - 52:23
  **outside** [9] - 34:21,
97:19, 100:10, 101:14,
111:22, 113:6, 117:12,
117:14
  **overall** [1] - 104:18
  **overhead** [2] - 54:10,
88:18
  **overheard** [3] - 17:1,
198:23, 198:25
  **overrule** [1] - 173:11
  **Overruled** [8] - 45:24,
49:15, 49:24, 50:6,
170:6, 170:14, 170:19,
170:21
  **overruled** [1] - 19:19
  **Owings** [1] - 40:25
  **own** [8] - 23:18, 50:4,
125:12, 125:13, 170:16,
171:25, 183:14, 183:15

---

**P**

---

  **p.m** [17] - 26:12, 31:24,
31:25, 68:15, 110:16,
110:17, 127:11, 127:12,
127:13, 127:14, 127:17,
129:18, 184:12, 184:15,
197:21, 212:21
  **package** [1] - 103:19
  **packaging** [1] - 106:18
  **packet** [1] - 15:3
  **pad** [1] - 123:9
  **pads** [3] - 83:1, 127:7,
197:15
  **page** [4] - 93:24, 93:25,
175:12, 179:23
  **Page** [5] - 9:21, 179:24,

180:9, 180:12, 194:16
  **PAGE** [1] - 213:3
  **pages** [2] - 39:24, 214:6
  **pain** [1] - 206:12
  **paint** [2] - 10:18, 112:15
  **pair** [6] - 136:2, 136:14,
141:1, 141:5, 142:4,
156:16
  **pairs** [1] - 148:3
  **pale** [1] - 5:6
  **paper** [4] - 143:4, 143:5,
143:14, 160:4
  **papers** [1] - 160:8
  **paperwork** [2] - 158:12,
161:16
  **paragraph** [1] - 27:14
  **paragraphs** [3] -
100:18, 194:16, 194:20
  **paraphrasing** [1] -
30:22
  **Pardon** [1] - 194:22
  **parents** [1] - 165:10
  **Park** [1] - 14:9
  **parked** [1] - 77:23
  **parking** [2] - 122:14,
189:4
  **parole** [3] - 9:9, 9:18,
12:3
  **parroting** [1] - 27:6
  **part** [41] - 8:23, 10:16,
13:19, 26:23, 41:5, 42:8,
53:23, 54:12, 61:12,
67:15, 67:17, 68:12,
69:13, 72:3, 73:18, 86:2,
105:11, 109:16, 114:19,
122:2, 123:8, 123:9,
124:25, 127:1, 145:3,
154:4, 158:9, 159:9,
159:11, 176:15, 177:9,
179:25, 187:10, 189:6,
189:11, 189:24, 195:1,
195:21, 200:20, 204:1
  **partial** [1] - 6:4
  **participate** [1] - 90:2
  **participated** [2] -
183:12, 184:24
  **participating** [2] -
178:5, 180:13
  **participation** [2] - 9:20,
180:22
  **particular** [34] - 3:21,
12:23, 35:13, 37:17,
39:19, 54:15, 70:21,
74:1, 75:22, 86:24, 87:6,
88:5, 94:2, 94:6, 94:7,
94:22, 95:5, 96:10,
98:20, 119:3, 119:13,
123:10, 128:9, 130:21,
136:3, 159:5, 161:4,
177:4, 177:20, 178:19,

179:25, 198:13
  **particularly** [3] - 42:23,
178:23, 187:19
  **parties** [1] - 38:13
  **partner** [5] - 111:5,
135:21, 139:25, 192:5,
192:10
  **party** [1] - 6:25
  **pass** [1] - 191:11
  **passage** [1] - 179:17
  **passed** [3] - 33:17,
65:5, 111:4
  **passenger** [1] - 143:2
  **past** [2] - 116:17, 193:7
  **path** [15] - 121:22,
122:3, 137:22, 137:25,
149:1, 149:5, 156:10,
156:13, 156:14, 157:10,
181:7, 181:24, 182:3,
182:4, 182:6
  **Patrol** [3] - 67:21, 92:9,
94:4
  **patrol** [5] - 52:22,
67:23, 67:24, 72:12,
84:20, 84:22, 92:9, 92:19
  **Paul** [1] - 1:19
  **Pause** [7] - 33:20,
43:22, 108:2, 161:15,
171:3, 183:6, 190:21
  **people** [24] - 5:8, 11:18,
17:18, 22:13, 22:18,
22:19, 32:10, 32:24,
33:1, 33:17, 42:9, 47:12,
47:13, 47:15, 50:20,
51:19, 80:17, 94:20,
182:17, 187:21, 199:19,
201:21, 201:22, 202:20
  **People** [3] - 22:24, 23:4,
166:23
  **perfectly** [1] - 61:8
  **Perhaps** [1] - 15:6
  **perhaps** [7] - 2:7, 3:18,
7:15, 49:22, 99:18,
145:23, 198:3
  **perimeter** [13] - 53:15,
53:16, 53:17, 53:23,
54:1, 58:23, 68:24, 69:7,
69:8, 69:13, 87:2, 91:2,
198:10
  **period** [11] - 10:6, 11:7,
42:1, 42:13, 42:14,
42:24, 43:10, 48:1,
129:9, 189:21
  **periods** [1] - 38:6
  **permanent** [1] - 91:2
  **permissible** [1] - 3:23
  **permission** [1] - 155:13
  **permit** [1] - 11:24
  **permitted** [3] - 7:3,
9:15, 12:14

**person** [19] - 28:4, 33:10, 37:18, 47:8, 47:11, 50:23, 63:7, 78:9, 96:5, 96:6, 100:9, 114:3, 140:6, 140:9, 161:21, 162:6, 168:24, 169:5, 177:24
**person's** [4] - 78:3, 79:7, 96:19, 177:25
**personal** [1] - 78:4
**personally** [1] - 88:10
**personnel** [5] - 110:19, 117:4, 131:21, 184:8, 184:14
**persons** [3] - 177:1, 177:3, 177:11
**perspective** [1] - 141:25
**persuaded** [2] - 8:18, 11:20
**persuades** [1] - 12:1
**Pete** [1] - 203:25
**Peter** [1] - 203:25
**Phil** [1] - 108:4
**Phillip** [2] - 17:4, 108:9
**PHILLIP** [2] - 108:5, 213:17
**phone** [156] - 23:14, 37:11, 37:16, 37:17, 37:24, 38:1, 38:4, 38:9, 38:10, 38:11, 38:12, 38:14, 38:17, 39:8, 39:9, 39:10, 39:11, 39:14, 39:16, 39:19, 40:3, 40:10, 40:11, 40:16, 43:24, 47:8, 48:6, 48:7, 48:8, 48:11, 48:17, 48:19, 48:23, 49:2, 49:3, 122:23, 123:1, 123:2, 123:4, 123:14, 123:25, 124:4, 124:5, 124:8, 124:10, 124:19, 124:20, 124:21, 124:23, 124:24, 125:1, 125:11, 125:12, 125:14, 125:23, 126:1, 126:4, 126:5, 126:6, 126:7, 126:8, 126:10, 126:12, 127:1, 127:24, 128:2, 128:5, 128:11, 128:12, 128:15, 128:18, 128:19, 128:22, 128:23, 128:25, 129:1, 129:12, 129:14, 136:16, 137:10, 137:11, 137:12, 137:13, 137:15, 137:16, 143:5, 156:15, 156:16, 156:17, 156:23, 161:20, 161:24, 161:25, 162:2, 162:3, 162:4, 162:5, 162:7, 162:11, 162:14, 162:15,

162:18, 162:23, 162:24, 163:5, 163:6, 163:10, 181:2, 184:19, 188:6, 188:7, 188:8, 189:20, 189:21, 190:1, 190:3, 196:13, 196:14, 196:18, 199:1, 200:7, 200:13, 201:5, 201:12, 202:2, 202:7, 202:8, 202:9, 202:10, 202:12, 202:21, 203:5, 203:6, 203:18, 204:4, 205:16, 206:21, 206:24
**phones** [4] - 37:12, 37:20, 38:3, 39:10
**phonetic** [1] - 50:21
**photo** [16] - 26:6, 26:17, 26:20, 26:24, 27:12, 27:24, 28:1, 28:2, 28:11, 95:22, 96:13, 96:21, 132:24, 141:25, 157:23, 160:18
**photograph** [56] - 44:18, 45:20, 45:25, 60:25, 62:10, 62:17, 65:21, 68:7, 68:12, 74:21, 86:2, 96:11, 96:12, 105:9, 105:18, 106:6, 106:10, 109:19, 111:12, 111:16, 113:18, 115:9, 115:13, 115:16, 120:13, 122:2, 127:24, 129:24, 131:4, 131:5, 131:6, 131:7, 132:2, 132:3, 132:4, 132:23, 133:2, 133:25, 137:7, 137:12, 139:2, 139:5, 139:12, 141:21, 141:24, 145:18, 145:20, 146:8, 146:20, 147:1, 149:4, 150:16, 150:18, 151:6, 158:1, 161:6
**photographed** [8] - 61:12, 73:18, 95:19, 104:17, 123:11, 123:21, 124:6, 146:24
**photographing** [1] - 111:2
**photographs** [18] - 14:13, 17:20, 38:25, 39:4, 62:4, 80:8, 95:21, 103:18, 104:18, 104:22, 111:8, 111:15, 140:17, 155:9, 167:21, 185:7, 187:11, 187:13
**photos** [3] - 27:19, 89:5, 132:8
**Physical** [2] - 206:1, 206:9
**physical** [5] - 10:9,

77:18, 106:14, 118:22, 206:11
**physically** [1] - 40:12
**pick** [6] - 10:17, 45:1, 87:22, 88:6, 145:5, 146:20
**picked** [14] - 36:2, 44:18, 44:23, 51:8, 113:22, 115:20, 120:18, 130:3, 131:21, 136:10, 146:23, 151:15, 153:8, 173:23
**picking** [2] - 117:6, 117:11
**picture** [14] - 10:19, 27:22, 28:1, 28:3, 28:20, 46:2, 60:16, 60:24, 80:25, 81:3, 81:7, 81:11, 81:13, 160:1
**pictured** [4] - 127:24, 137:6, 139:17, 145:9
**pictures** [2] - 26:6, 45:3, 45:10
**piece** [6] - 10:17, 115:9, 124:11, 143:14, 149:15, 149:17
**pieces** [5] - 106:14, 123:25, 124:3, 156:16, 186:15
**Pikesville** [4] - 52:15, 52:21, 53:2, 53:4
**pile** [5] - 149:9, 149:13, 149:23, 150:1, 150:4
**pistol** [2] - 160:22, 192:24
**Pittsburgh** [1] - 40:19
**place** [16] - 12:23, 13:15, 23:15, 35:13, 42:2, 76:21, 77:21, 79:2, 93:17, 94:9, 144:14, 163:16, 176:16, 183:8, 189:25, 204:25
**placed** [15] - 33:15, 50:23, 64:23, 78:2, 78:4, 78:14, 78:20, 86:25, 87:2, 95:6, 95:7, 96:24, 124:13, 146:23, 185:11
**places** [2] - 88:25, 122:6
**plain** [1] - 56:21
**plan** [3] - 18:17, 180:1, 206:12
**planning** [1] - 196:6
**plastic** [4] - 87:8, 142:12, 142:20, 160:3
**played** [10] - 23:7, 23:8, 24:10, 24:11, 25:6, 31:18, 41:1, 46:8, 179:6, 179:12
**playing** [2] - 31:20,

46:21
**Playtex** [1] - 142:16
**pleading** [1] - 3:19
**pleadings** [1] - 10:23
**pleasant** [1] - 20:1
**pleasure** [1] - 197:4
**pockets** [1] - 77:20
**point** [54] - 2:21, 3:4, 8:10, 8:14, 9:2, 9:6, 22:20, 25:5, 30:19, 31:20, 33:25, 58:13, 58:15, 64:22, 66:4, 69:17, 71:12, 71:17, 76:20, 77:5, 77:17, 82:1, 82:20, 85:1, 85:18, 88:17, 97:7, 100:7, 100:12, 101:3, 104:13, 113:15, 115:4, 118:2, 118:3, 118:6, 119:19, 121:5, 127:3, 128:4, 133:8, 133:10, 134:23, 135:1, 140:5, 148:13, 149:8, 150:7, 151:9, 156:6, 161:24, 169:16
**pointed** [4] - 28:5, 116:17, 129:21, 182:2
**pointer** [1] - 54:9, 54:12, 118:12
**pointing** [1] - 65:21
**points** [1] - 95:11
**police** [47] - 21:11, 27:8, 32:13, 43:16, 49:8, 49:12, 50:1, 50:3, 50:7, 50:11, 52:25, 53:11, 58:22, 63:22, 63:25, 68:3, 69:18, 77:23, 78:9, 78:22, 79:9, 80:16, 82:15, 82:20, 91:2, 91:6, 92:6, 92:7, 92:12, 101:23, 102:5, 104:8, 109:5, 110:19, 116:9, 131:21, 138:14, 140:2, 140:10, 172:5, 177:15, 177:17, 182:7, 182:12, 183:2, 183:16, 193:7
**Police** [16] - 52:15, 52:16, 67:14, 67:18, 77:1, 84:12, 84:14, 91:20, 92:4, 103:8, 106:21, 108:10, 108:17, 138:24, 139:19, 140:2
**porch** [2] - 71:5, 71:6
**portends** [1] - 10:20
**portion** [6] - 28:14, 105:5, 114:20, 115:2, 140:22, 168:23
**Portions** [1] - 30:10
**portions** [2] - 179:6, 179:11
**position** [5] - 2:23,

8:21, 9:11, 12:22, 92:25
**positive** [2] - 76:18, 168:20
**positively** [1] - 204:13
**possession** [2] - 124:18, 173:19
**possibility** [6] - 9:9, 9:18, 139:6, 167:24, 211:9, 212:14
**Possible** [1] - 56:11
**possible** [10] - 6:16, 9:4, 23:17, 53:20, 64:1, 105:14, 107:11, 107:15, 107:17, 184:9
**possibly** [2] - 18:1, 145:25
**Possibly** [1] - 60:24
**post** [1] - 197:25
**potential** [2] - 7:24, 45:9
**powder** [3] - 152:16, 159:2, 159:12
**pre** [5] - 29:12, 29:18, 29:21, 29:22, 29:24
**pre-interview** [5] - 29:12, 29:18, 29:21, 29:22, 29:24
**Precinct** [6] - 92:16, 116:7, 116:9, 116:12, 116:14, 116:16
**precinct** [24] - 52:15, 52:21, 52:22, 53:2, 53:11, 65:3, 67:14, 67:15, 68:5, 68:6, 68:13, 70:2, 79:1, 84:13, 85:5, 85:7, 85:8, 85:9, 92:15, 92:16, 92:18, 92:20, 97:17, 118:2
**precluded** [1] - 156:12
**prefer** [1] - 132:20
**preliminarily** [2] - 208:15, 211:14
**preparation** [1] - 26:23
**preparations** [1] - 203:9
**prepare** [1] - 15:8
**prepared** [7] - 24:13, 25:7, 25:8, 98:11, 99:8, 127:11, 186:7
**presence** [1] - 97:4
**Present** [1] - 204:21
**present** [29] - 11:12, 17:13, 22:22, 26:5, 101:19, 106:23, 107:6, 110:25, 116:25, 151:3, 179:21, 183:21, 194:21, 194:23, 194:25, 195:2, 199:9, 201:3, 202:6, 204:1, 204:7, 204:9, 204:17, 204:21, 204:22, 205:22, 206:3, 206:16,

207:22
**presumably** [1] - 15:22
**pretty** [5] - 12:13, 53:7, 74:2, 74:15
**preview** [1] - 198:3
**previously** [7] - 3:24, 14:19, 131:24, 140:1, 147:4, 147:11, 159:15
**primary** [2] - 192:5, 192:14
**print** [1] - 165:1
**printed** [1] - 130:12
**prints** [17] - 164:9, 164:12, 164:15, 164:17, 164:19, 164:25, 165:1, 165:7, 165:9, 165:10, 166:11, 166:13, 166:16, 166:21, 166:23
**prison** [7] - 9:8, 9:17, 12:8, 12:10, 13:8, 13:13, 36:7
**prisoner** [4] - 79:6, 93:1, 96:19, 100:20
**Prisoner** [1] - 79:11
**prisoners** [5] - 93:2, 93:7, 94:16, 94:18, 95:3
**pristine** [1] - 87:17
**private** [2] - 11:9, 164:19
**probative** [1] - 6:22
**probe** [1] - 149:1
**problem** [3] - 3:21, 14:10, 211:24
**problems** [1] - 208:5
**procedural** [1] - 120:1
**procedure** [6] - 35:6, 78:3, 120:6, 120:9, 127:25, 146:7
**procedures** [3] - 10:13, 34:23, 35:20
**proceed** [5] - 11:25, 83:6, 170:14, 171:11, 197:5
**proceeded** [2] - 69:17, 146:19
**proceeding** [4] - 4:22, 5:14, 197:23, 210:4
**proceedings** [11] - 3:3, 3:5, 4:3, 6:8, 14:7, 33:20, 43:22, 197:25, 210:5, 214:4, 214:7
**Proceedings** [6] - 2:1, 108:2, 161:15, 171:3, 183:6, 190:21
**process** [8] - 61:13, 64:1, 73:18, 76:6, 103:18, 128:4, 165:20
**processed** [9] - 100:8, 100:12, 100:13, 100:20, 100:23, 101:1, 164:23,

165:24, 166:11
**processing** [9] - 93:1, 93:2, 95:4, 97:18, 101:3, 101:5, 101:7, 107:17, 117:12
**produce** [1] - 72:19
**product** [1] - 19:11
**professes** [1] - 207:23
**professional** [2] - 185:10, 186:4
**professor** [1] - 207:15
**Proffer** [1] - 193:19
**proffer** [6] - 19:9, 169:24, 174:9, 174:14, 174:25, 195:19
**profile** [5] - 62:7, 62:20, 74:10, 82:1, 96:4
**progress** [1] - 156:7
**projectile** [2] - 152:17, 159:12
**promoted** [1] - 67:22
**pronouncing** [1] - 22:7
**proper** [1] - 12:17
**properly** [1] - 54:18
**Property** [2] - 115:23, 117:23
**property** [8] - 11:9, 79:6, 79:7, 79:12, 161:21, 162:6, 162:11, 163:6
**proposed** [2] - 4:14, 212:12
**proposition** [2] - 3:3, 208:2
**prosecute** [3] - 3:23, 170:1, 172:1
**prosecution** [4] - 3:8, 3:9, 3:25, 6:5
**prosecutorial** [1] - 177:17
**prosecutors** [2] - 172:5, 172:9
**prove** [3] - 206:13, 208:6, 208:9
**provide** [5] - 62:25, 193:11, 193:13, 208:10, 211:4
**Provide** [1] - 193:10
**provided** [16] - 15:10, 15:13, 25:5, 25:23, 25:24, 47:3, 50:17, 50:19, 51:15, 60:12, 74:7, 169:20, 170:24, 174:16, 178:7, 178:10
**providing** [1] - 15:15
**proximity** [3] - 136:15, 138:3, 156:18
**publish** [3] - 132:18, 151:21, 155:5
**published** [1] - 155:7

**publishes** [1] - 151:23
**pull** [3] - 154:21, 155:1
**pulled** [5] - 64:19, 65:23, 113:25, 134:13, 154:24
**pulling** [1] - 154:2
**purchased** [1] - 48:9
**Purple** [1] - 143:10
**purpose** [5] - 50:10, 118:16, 142:16
**purposes** [3] - 20:18, 55:10, 89:3
**pursue** [1] - 173:17
**pursued** [2] - 173:16, 173:23
**push** [1] - 211:11
**pushed** [1] - 145:24
**put** [32] - 10:9, 10:12, 11:7, 11:9, 11:10, 54:10, 60:3, 79:2, 79:4, 80:7, 88:17, 91:2, 91:6, 124:4, 124:9, 124:19, 124:20, 125:1, 125:3, 125:4, 125:5, 136:10, 136:13, 145:4, 146:11, 165:5, 172:15, 179:8, 182:7, 189:2, 210:21
**putting** [1] - 132:13
**Pyne** [3] - 1:21, 212:7, 212:11
**PYNE** [1] - 212:16

## Q

**quality** [1] - 24:2
**quantity** [2] - 21:14, 21:25
**quarrel** [1] - 205:5
**questioned** [2] - 20:6, 46:3
**questioning** [4] - 47:24, 171:22, 193:9, 195:19
**questions** [37] - 6:3, 7:21, 14:8, 34:14, 34:15, 36:21, 36:22, 37:11, 41:13, 44:3, 50:13, 51:22, 56:12, 65:19, 66:22, 72:16, 80:1, 81:16, 89:17, 91:9, 94:13, 97:21, 99:15, 107:21, 129:12, 145:7, 171:20, 172:12, 174:24, 187:9, 188:14, 189:19, 190:22, 193:10, 195:17, 196:12, 203:1
**quick** [4] - 9:5, 51:10, 81:18, 161:13
**quicker** [1] - 179:19
**quickly** [8] - 82:10,

107:25, 111:15, 191:12, 191:14, 191:17, 197:25, 212:6
**quite** [3] - 128:22, 131:8, 195:10
**quotations** [2] - 30:23, 31:1
**Quote** [1] - 206:9

## R

**radically** [1] - 8:11
**radio** [7] - 54:6, 58:14, 71:22, 73:23, 75:24, 87:8, 87:25
**railing** [1] - 57:16
**rain** [2] - 145:14, 145:22
**rains** [1] - 145:1
**raised** [1] - 209:22
**Rakoff** [1] - 211:15
**Ramble** [1] - 68:9
**ramp** [2] - 57:15, 57:16
**ran** [1] - 116:18
**Randallstown** [3] - 14:9, 109:18, 202:15
**rang** [1] - 125:24
**ranging** [1] - 103:15
**rank** [2] - 80:1, 108:19
**Rather** [1] - 114:19
**rather** [11] - 4:16, 7:12, 49:12, 68:21, 121:24, 123:23, 134:10, 136:18, 159:16, 185:3, 189:10
**rationale** [4] - 200:11, 200:25, 201:1, 201:2
**rationales** [1] - 205:23
**reach** [1] - 126:13
**read** [10] - 27:13, 51:12, 126:4, 126:12, 143:12, 179:16, 184:4, 194:17, 208:17, 212:7
**read-out** [1] - 126:12
**reading** [1] - 179:19
**ready** [8] - 20:2, 20:12, 20:19, 127:20, 154:22, 154:25, 186:11, 186:13
**Ready** [1] - 83:6
**real** [6] - 51:10, 107:25, 160:23, 160:24, 161:2
**realize** [2] - 30:22, 31:12
**realized** [2] - 143:25, 168:2
**really** [15] - 2:21, 10:25, 28:6, 30:14, 43:6, 46:19, 46:22, 72:2, 80:24, 172:15, 172:19, 191:7, 191:21, 205:5, 207:7
**rear** [7] - 121:23,

129:19, 132:17, 133:5, 157:2, 158:17, 159:6
**reason** [10] - 57:21, 98:20, 133:21, 148:8, 177:14, 179:25, 193:13, 195:21, 196:12, 201:18
**reasonably** [1] - 209:22
**reasons** [1] - 177:14
**reassembled** [3] - 126:23, 126:24, 126:25
**rebuts** [1] - 2:22
**recapitulate** [1] - 44:17
**receive** [5] - 23:25, 106:13, 138:13, 161:20, 189:10
**Received** [1] - 51:4
**received** [6] - 33:16, 60:8, 119:20, 175:22, 178:19, 189:6
**receives** [3] - 202:8, 202:10, 202:21
**Receives** [1] - 202:9
**recent** [1] - 4:19
**recently** [6] - 166:21, 167:10, 192:21, 194:6, 194:9, 194:12
**recess** [6] - 82:24, 83:4, 127:5, 127:12, 127:13, 212:20
**Recess** [3] - 83:5, 127:14, 212:21
**recognize** [9] - 19:16, 26:10, 26:12, 27:3, 27:20, 45:6, 45:13, 95:22, 136:1
**recollect** [1] - 70:21, 138:16, 161:16
**recollection** [6] - 7:14, 7:15, 61:24, 70:20, 94:14, 123:24, 176:14, 195:25
**record** [18] - 4:2, 5:18, 5:25, 7:14, 8:5, 36:14, 52:7, 58:8, 67:7, 73:14, 84:6, 91:18, 102:24, 117:23, 136:4, 136:7, 210:22
**recorded** [8] - 29:14, 29:16, 137:20, 176:6, 176:12, 179:1, 179:6, 214:3
**recorder** [1] - 30:9
**recording** [7] - 11:22, 23:18, 25:12, 30:17, 176:14, 176:16, 180:19
**recordings** [2] - 11:11, 11:21
**records** [26] - 15:17, 37:16, 37:24, 38:1, 38:12, 38:15, 38:17,

39:8, 39:10, 39:17, 39:24, 40:3, 40:8, 40:14, 40:21, 43:24, 48:2, 128:15, 129:12, 161:25, 162:4, 162:10, 163:4, 163:6, 163:9

**recover** [5] - 119:3, 120:14, 134:16, 166:20, 185:2

**recovered** [52] - 21:16, 21:24, 115:3, 115:6, 115:14, 119:7, 124:7, 124:19, 125:3, 126:20, 127:1, 131:10, 131:21, 132:17, 133:4, 135:3, 135:10, 135:12, 136:3, 136:15, 136:16, 141:5, 142:4, 143:24, 144:6, 147:1, 147:8, 147:21, 147:22, 148:15, 148:22, 150:13, 150:21, 151:13, 151:20, 153:10, 153:14, 155:11, 156:18, 156:20, 156:23, 157:1, 157:4, 161:20, 172:25, 173:1, 173:19, 181:3, 184:19, 184:22, 192:16, 196:14

**recovery** [13] - 17:18, 17:20, 116:21, 117:21, 127:23, 129:14, 136:21, 138:20, 143:1, 144:12, 148:12, 151:3, 156:15

**recross** [2] - 16:17, 20:16

**RECROSS** [4] - 50:14, 82:12, 213:5, 213:10

**red** [6] - 54:12, 109:23, 130:7, 186:25, 187:2

**redirect** [3] - 16:15, 20:9, 20:15

**REDIRECT** [8] - 44:8, 81:20, 102:9, 195:15, 213:5, 213:10, 213:15, 213:19

**Redirect** [1] - 195:5

**refer** [8] - 34:15, 37:5, 49:20, 50:9, 70:19, 123:8, 206:22

**reference** [13] - 14:9, 14:18, 42:4, 55:11, 61:23, 74:13, 97:22, 138:11, 165:2, 173:18, 176:11, 178:11

**referenced** [2] - 25:14, 32:3

**references** [3] - 4:2, 201:4, 201:11

**referred** [4] - 13:23, 14:6, 15:20, 176:11

**referring** [8] - 63:25,

70:5, 132:25, 174:19, 179:10, 179:23, 180:3, 207:16

**refers** [2] - 180:12, 202:23

**reflect** [2] - 8:16, 121:12

**reflected** [3] - 39:17, 39:20, 48:1

**reflecting** [2] - 143:1, 153:17

**reflects** [1] - 37:1

**refresh** [5] - 36:10, 41:9, 61:24, 70:19, 94:14

**regarding** [8] - 7:16, 7:22, 176:19, 180:21, 192:6, 192:9, 193:12, 212:8

**registered** [4] - 48:9, 128:8, 141:18, 162:7, 162:8

**Registered** [1] - 162:8

**registration** [2] - 141:10, 141:12

**reinforces** [1] - 3:2

**related** [2] - 3:4, 41:20

**relationship** [1] - 137:22

**relatively** [1] - 41:24

**relatives** [1] - 164:25

**relay** [1] - 178:20

**relayed** [1] - 180:18

**relevance** [2] - 6:15, 209:5

**relevant** [2] - 6:22, 189:21

**relying** [2] - 30:16, 174:20

**remain** [3] - 19:6, 19:11, 20:18

**remaining** [1] - 19:17

**remains** [1] - 106:24

**remember** [30] - 42:23, 46:12, 50:22, 53:5, 60:3, 63:14, 63:17, 65:4, 73:21, 75:21, 76:1, 96:9, 99:23, 99:24, 101:4, 135:23, 137:12, 154:17, 180:7, 187:10, 188:16, 188:20, 204:15, 204:16, 205:4, 207:18, 208:19, 212:10

**Remember** [1] - 204:12

**remembered** [3] - 153:2, 204:17, 206:14

**Remind** [1] - 198:16

**remind** [1] - 206:18

**Remington** [3] - 158:23, 159:24, 190:8

**removal** [1] - 88:15

**remove** [2] - 55:13,

133:19

**removed** [4] - 97:10, 146:10, 159:2, 159:12

**repeat** [4] - 58:9, 173:13, 177:22, 191:15

**repeating** [1] - 42:10

**replica** [4] - 160:25, 161:2, 161:4, 161:7

**report** [24] - 37:1, 47:3, 55:11, 61:23, 70:18, 90:16, 90:19, 90:21, 93:13, 93:17, 94:14, 98:8, 98:10, 98:22, 98:24, 99:8, 100:15, 103:25, 104:2, 104:4, 183:23, 184:4, 184:17, 185:23

**reported** [5] - 47:1, 104:3, 110:9, 155:25, 184:6

**Reported** [1] - 1:23

**Reporter** [1] - 214:15

**reporter** [2] - 58:9, 77:15

**reporter's** [1] - 11:8

**REPORTER'S** [1] - 214:1

**reports** [1] - 185:21

**represent** [1] - 191:4

**representation** [2] - 36:25, 39:24

**represents** [1] - 93:25

**request** [2] - 125:22, 184:8

**requesting** [1] - 88:2

**Rescue** [2] - 183:23, 183:24

**research** [2] - 2:17, 207:13

**residence** [20] - 22:9, 38:24, 58:3, 59:4, 59:6, 110:25, 114:11, 116:1, 116:16, 119:14, 119:15, 157:19, 157:24, 158:2, 158:4, 158:16, 158:18, 158:20, 164:19, 164:23

**residences** [1] - 155:23

**resident** [3] - 18:11, 77:10, 77:12

**residue** [1] - 168:13

**respect** [47] - 3:7, 3:8, 3:9, 4:6, 4:7, 4:11, 5:4, 5:16, 5:17, 5:22, 6:4, 8:5, 8:9, 9:6, 9:19, 11:1, 12:25, 13:19, 14:12, 14:13, 18:16, 19:17, 35:6, 36:11, 36:14, 37:24, 38:9, 38:12, 38:16, 39:7, 40:10, 40:24, 42:2, 42:7, 42:13,

80:15, 99:8, 117:14, 139:10, 157:18, 172:14, 175:8, 176:5, 176:21, 176:22, 180:25, 183:7

**respective** [1] - 137:20

**respectively** [2] - 20:7, 130:6

**respond** [5] - 67:25, 68:16, 103:15, 120:12, 210:24

**responded** [3] - 70:2, 116:8, 184:10

**responding** [1] - 92:9

**response** [5] - 6:11, 200:8, 210:17, 210:21, 211:1

**responses** [1] - 4:17

**responsible** [3] - 50:23, 93:1, 118:23

**rest** [1] - 166:9

**results** [1] - 167:5

**resume** [4] - 20:3, 55:21, 58:8, 127:11

**resumed** [1] - 20:5

**retired** [2] - 139:25, 192:13

**retrieve** [1] - 107:15

**return** [7] - 4:20, 118:3, 118:10, 119:5, 134:19, 135:16, 148:18

**returned** [1] - 97:25

**returning** [1] - 118:16

**review** [2] - 4:19, 25:17

**reviewed** [2] - 37:25, 139:23

**revolver** [14] - 150:15, 150:20, 151:6, 151:13, 152:1, 152:12, 152:13, 152:14, 153:7, 159:16, 161:7, 192:20

**Reynolds** [1] - 211:21

**Rhodes** [1] - 1:17

**RHODES** [5] - 45:22, 49:14, 49:23, 170:20, 171:9

**Rick** [5] - 31:9, 31:17, 46:4, 46:14, 46:21

**RICO** [1] - 13:23

**riding** [1] - 55:2

**ring** [2] - 125:23, 128:1

**rival** [1] - 160:16

**road** [3] - 72:17, 92:20, 163:13

**Road** [21] - 53:25, 54:17, 55:18, 56:1, 57:6, 58:1, 58:2, 58:7, 58:10, 58:18, 58:19, 59:12, 68:9, 68:25, 69:1, 69:4, 70:15, 70:23, 72:1, 85:22, 155:24

**robberies** [1] - 103:16

**Robert** [1] - 1:16

**Roca** [5] - 130:11, 132:4, 132:7, 156:25

**rocks** [16] - 149:9, 149:13, 149:23, 150:2, 150:5, 150:8, 150:11, 150:14, 150:21, 150:23, 151:1, 151:10, 151:13, 151:14, 151:20, 185:8

**rode** [1] - 116:16

**Rodney** [1] - 210:10

**role** [1] - 113:15

**rolls** [1] - 146:13

**romantically** [1] - 202:18

**room** [15] - 95:7, 97:3, 97:11, 97:20, 100:9, 100:10, 101:14, 107:25, 112:19, 113:12, 113:14, 127:11, 159:5, 187:15

**Room** [1] - 1:24

**rooms** [6] - 96:24, 97:1, 97:10, 97:13, 97:19, 99:17, 100:2, 187:14

**round** [6] - 154:1, 154:2, 154:21, 159:3, 159:4, 159:9, 159:20, 190:7

**rounds** [6] - 154:1, 154:8, 154:9, 154:11, 154:19, 159:15

**routine** [1] - 93:4

**Roy** [1] - 15:14

**RPR** [1] - 1:24

**rule** [4] - 5:17, 9:15, 14:22, 208:16

**Rule** [1] - 205:25

**ruled** [1] - 13:22

**Rules** [2] - 208:1, 208:2

**ruling** [4] - 9:12, 12:1, 14:4, 15:23

**rulings** [5] - 5:22, 5:24, 8:2, 209:21, 210:6, 210:23

**rumor** [1] - 42:9

**rumors** [2] - 33:7, 42:4

**run** [4] - 56:23, 122:5, 185:16, 197:25

**Runner** [1] - 40:25

**running** [2] - 23:4, 118:18

**runs** [1] - 69:4

**Rutherford** [3] - 18:11, 198:9, 199:22

**S**

**S-1** [11] - 54:11, 55:19,

57:9, 68:8, 68:17, 85:22, 87:4, 109:20, 109:24, 118:13, 155:14
**S-100A** [4] - 61:15, 61:16, 74:4, 95:22
**S-100B** [4] - 62:5, 74:10, 96:4
**S-100C** [3] - 62:19, 74:24, 96:15
**S-101** [1] - 116:23
**S-108** [1] - 111:16
**S-109** [1] - 112:1
**S-110** [1] - 112:19
**S-111** [1] - 112:8
**S-113** [1] - 115:17
**S-114** [1] - 113:2
**S-115** [1] - 113:5
**S-116** [1] - 113:11
**S-118** [2] - 113:18, 114:6
**S-121** [1] - 115:8
**S-122** [1] - 122:2
**S-124** [2] - 122:19, 122:20
**S-126** [1] - 123:7
**S-128** [1] - 123:18
**S-129** [1] - 127:24
**S-133** [1] - 131:4
**S-134** [1] - 129:24
**S-135** [2] - 131:4, 131:5
**S-140** [1] - 132:23
**S-141** [2] - 136:4, 136:7
**S-143** [1] - 139:1
**S-144** [1] - 139:17
**S-145** [2] - 139:7, 139:12
**S-147** [1] - 143:16
**S-148** [1] - 141:21
**S-149** [1] - 141:25
**S-151** [2] - 86:1, 86:6
**S-152** [3] - 86:12, 133:25, 145:9
**S-154** [1] - 142:6
**S-169** [1] - 151:12
**S-170** [1] - 157:23
**S-171** [1] - 158:1
**S-172** [1] - 158:5
**S-173** [1] - 158:11
**S-174** [1] - 158:15
**S-175** [1] - 159:25
**S-176** [1] - 160:8
**S-177** [1] - 158:19
**S-177A** [1] - 159:9
**S-178** [2] - 160:13, 160:18
**S-2** [1] - 114:8
**S-3** [1] - 114:21
**S-31** [1] - 132:12
**S-32** [2] - 133:3

**S-33** [1] - 126:16
**S-34** [1] - 136:10
**S-35** [1] - 137:16
**S-36** [2] - 88:17, 147:5
**S-41** [4] - 151:17, 151:18, 151:21, 151:23
**S-41A** [1] - 152:7
**S-42** [3] - 153:12, 155:5, 155:7
**S-42A** [1] - 154:5
**S-42B** [1] - 154:17
**S-4B** [2] - 106:17, 107:8
**S-4C** [2] - 117:9, 117:15
**S-51** [2] - 144:3, 144:4
**S-52** [1] - 141:12
**S-53** [1] - 141:3
**S-54** [1] - 142:13
**S-55** [1] - 143:1
**S-56** [1] - 111:12
**S-59** [6] - 63:2, 75:8, 75:13, 75:18, 96:21
**S-62** [1] - 44:17
**S-63** [1] - 44:21
**S-64** [1] - 44:25
**S-65** [2] - 45:14, 46:1
**S-66** [3] - 45:15, 45:21, 45:25
**S-67** [1] - 131:25
**S-99A** [2] - 104:24
**S-99B** [1] - 105:8
**S-99C** [1] - 105:17
**S-99D** [1] - 105:23
**S-99E** [1] - 106:9
**S-99F** [1] - 106:1
**S-A-L-A-D-I-N-O** [1] - 91:22
**S-P-E-N-C-E** [1] - 110:7
**Sa** [1] - 159:11
**safety** [1] - 78:10
**SALADINO** [2] - 91:15, 213:13
**Saladino** [8] - 17:1, 18:16, 91:14, 91:19, 96:23, 98:6, 101:18, 102:11
**sample** [4] - 35:19, 35:21, 35:25, 36:11
**samples** [4] - 34:19, 34:24, 35:4, 36:15
**sat** [3] - 25:20, 29:3, 57:15
**satisfied** [3] - 3:15, 148:21, 208:15
**Saturday** [1] - 2:13
**saw** [28] - 6:18, 16:24, 56:15, 60:22, 65:19, 65:24, 66:4, 66:7, 69:21, 71:5, 73:4, 73:5, 87:14, 88:20, 88:21, 89:7,

89:18, 95:11, 95:14, 113:19, 114:12, 114:17, 122:24, 134:3, 134:6, 162:16, 162:18, 163:10
**scalp** [2] - 74:2, 74:15
**scene** [30] - 17:18, 21:6, 21:9, 21:10, 22:10, 34:21, 36:12, 36:16, 68:24, 70:3, 71:23, 72:18, 77:23, 88:1, 91:4, 103:12, 103:14, 103:18, 104:16, 110:19, 114:2, 117:4, 119:6, 124:16, 168:11, 173:4, 184:7, 184:14, 185:15, 185:16
**Scene** [1] - 117:10
**scenes** [1] - 103:15
**school** [3] - 178:14, 204:12, 207:24
**Scratches** [1] - 168:9
**scratches** [1] - 88:22
**screen** [9] - 28:6, 71:8, 88:24, 104:24, 105:4, 132:13, 136:13, 145:18, 187:23
**scribbling** [1] - 30:14
**Search** [4] - 183:23, 183:24, 184:10, 184:14
**search** [45] - 32:22, 32:23, 38:24, 85:19, 117:5, 118:24, 118:25, 119:1, 119:2, 119:14, 133:9, 134:23, 135:1, 135:3, 135:5, 135:7, 135:19, 135:20, 135:23, 138:11, 138:18, 139:21, 139:23, 140:14, 144:13, 149:5, 155:12, 155:19, 157:15, 157:21, 183:8, 183:10, 183:12, 183:18, 183:21, 183:22, 184:6, 184:8, 184:9, 184:11, 184:12, 184:13, 184:18, 184:24, 190:7
**searched** [7] - 21:7, 21:10, 22:8, 78:4, 139:25, 184:7
**searches** [9] - 17:12, 90:24, 120:24, 137:20, 155:8, 181:1, 182:25, 183:7, 184:1
**searching** [2] - 86:20, 122:16
**seat** [8] - 55:21, 58:8, 140:18, 143:17, 143:22, 143:25, 144:6
**seated** [3] - 52:6, 67:6, 102:23
**Second** [1] - 2:21
**second** [15] - 9:2, 9:5,

58:5, 58:11, 59:4, 59:6, 62:23, 76:12, 96:18, 128:24, 150:17, 156:14, 157:23, 157:24, 192:2
**seconds** [2] - 18:9, 18:16
**secretary** [1] - 211:22
**Section** [1] - 103:9
**section** [5] - 91:20, 122:21, 123:3, 123:8, 163:12
**secure** [1] - 79:12
**secured** [6] - 95:5, 97:19, 97:24, 100:10, 100:21, 101:14
**sedan** [1] - 158:8
**See** [2] - 54:11, 98:24
**see** [76] - 4:20, 6:15, 11:23, 12:10, 13:15, 26:10, 27:2, 28:3, 28:4, 30:5, 32:23, 41:10, 51:11, 55:12, 57:11, 59:8, 60:9, 60:15, 61:15, 62:5, 63:2, 65:19, 66:16, 66:17, 66:19, 68:10, 69:14, 69:17, 69:20, 71:2, 71:4, 73:7, 74:14, 80:24, 81:2, 81:13, 81:24, 83:19, 85:11, 87:7, 90:1, 96:11, 104:20, 104:24, 109:24, 118:21, 119:6, 119:22, 124:23, 126:25, 131:3, 131:6, 132:13, 133:19, 138:23, 144:16, 144:24, 145:19, 145:21, 146:8, 147:7, 148:23, 149:15, 151:12, 152:15, 152:20, 156:8, 160:2, 165:25, 167:4, 173:20, 187:24, 197:19, 200:4
**seeing** [1] - 96:12
**seek** [1] - 15:22
**seem** [3] - 4:7, 123:24, 200:19
**seized** [1] - 17:13
**seizure** [11] - 13:6, 13:7, 13:12, 17:13, 35:7, 35:9, 35:12, 35:16, 138:20, 139:21, 139:23
**selective** [2] - 10:17, 11:9
**sell** [1] - 200:21
**semi** [1] - 115:21
**semi-automatic** [1] - 115:21
**semiautomatic** [6] - 150:13, 150:15, 150:17, 153:10, 153:14, 192:25
**send** [2] - 119:11,

194:12
**sensation** [1] - 206:11
**sense** [4] - 4:16, 135:15, 201:3, 204:7, 204:9, 204:17, 204:21, 205:22, 206:3, 206:16
**sensing** [1] - 204:20
**sent** [6] - 15:3, 15:5, 23:12, 23:13, 23:15, 23:24, 194:5, 194:10
**sentence** [4] - 9:9, 9:18, 10:22, 12:3
**sentencing** [1] - 5:4
**separate** [8] - 3:4, 9:9, 9:14, 12:18, 41:6, 78:2, 96:24, 205:23
**separated** [2] - 79:12, 97:14
**separately** [2] - 60:1, 72:23
**separation** [1] - 97:15
**September** [8] - 175:4, 175:5, 175:6, 175:7, 175:16, 191:24, 193:20
**sequential** [2] - 147:25, 148:9
**serial** [3] - 147:19, 147:24, 148:9
**series** [2] - 12:20, 79:5
**service** [2] - 48:19, 67:25
**Services** [1] - 103:9, 103:11
**serving** [2] - 9:8, 9:17
**Session** [1] - 193:19
**session** [6] - 174:10, 174:14, 176:5, 176:6, 176:9, 195:2
**sessions** [8] - 175:1, 175:17, 175:23, 176:1, 193:23, 195:20, 196:10
**set** [4] - 53:14, 68:24, 206:6, 206:7
**sets** [1] - 187:23
**setting** [7] - 53:16, 53:23, 54:1, 69:7, 69:8, 69:13, 169:24
**Seven** [1] - 98:17
**several** [16] - 5:13, 38:4, 74:22, 83:12, 110:25, 118:9, 121:25, 135:20, 139:24, 148:14, 170:9, 170:11, 171:20, 184:1, 185:18, 198:12
**shaky** [1] - 54:20
**shape** [1] - 168:3
**shaped** [2] - 146:9, 146:11
**SHAWN** [1] - 1:8
**Shawn** [21] - 60:13,

60:14, 60:22, 61:11, 61:22, 73:14, 94:19, 95:14, 138:8, 139:4, 140:13, 141:19, 144:7, 157:20, 158:8, 158:10, 158:14, 161:21, 162:6, 164:13, 196:6
**shell** [1] - 185:25
**SHELLY** [1] - 1:8
**Shelly** [3] - 162:9, 191:4
**Shelton** [2] - 28:10, 28:23
**SHELTON** [1] - 1:7
**shift** [1] - 83:16
**shirt** [15] - 62:1, 63:19, 74:6, 75:25, 130:11, 132:6, 132:7, 132:16, 135:3, 156:25, 184:23, 186:23, 186:24, 186:25
**Shock** [3] - 17:20, 104:3, 104:4
**shooting** [13] - 18:6, 53:14, 53:15, 53:18, 56:11, 68:20, 90:3, 104:5, 104:6, 155:21, 163:16, 182:6
**shootings** [1] - 169:10
**short** [4] - 43:25, 199:22, 199:24, 200:1
**shorter** [4] - 17:16, 17:17, 63:15, 63:16
**shortly** [2] - 22:5, 22:10
**shot** [4] - 62:20, 74:10, 74:25, 96:4
**shots** [1] - 192:21
**shoulder** [3] - 105:6, 105:20, 105:24
**show** [48] - 13:11, 13:15, 26:9, 31:18, 38:9, 45:9, 51:10, 57:8, 58:5, 60:25, 61:15, 62:4, 64:22, 64:25, 65:7, 68:12, 76:5, 76:9, 80:2, 80:15, 81:23, 81:25, 88:16, 95:21, 104:22, 105:3, 109:20, 114:8, 122:2, 122:19, 129:23, 129:24, 131:3, 131:4, 131:20, 131:24, 139:7, 140:17, 140:21, 143:16, 145:17, 150:18, 153:2, 159:8, 179:4, 185:21, 193:17, 198:7
**show-up** [8] - 65:7, 76:5, 76:9, 80:2, 80:15, 81:23, 81:25, 198:7
**show-ups** [2] - 64:22, 64:25
**showed** [19] - 26:6, 26:17, 26:20, 27:10,

28:11, 39:23, 44:25, 45:14, 45:15, 88:13, 90:5, 90:7, 90:8, 114:1, 114:5, 175:13, 187:10, 187:13
**Showed** [1] - 28:15
**Showing** [16] - 63:2, 75:7, 86:1, 107:8, 115:8, 117:9, 123:7, 132:23, 133:2, 135:25, 141:3, 142:6, 144:3, 147:4, 153:12, 154:5
**showing** [7] - 74:3, 109:24, 114:23, 115:16, 126:16, 136:9, 139:12
**shown** [17] - 24:20, 25:4, 26:8, 26:11, 30:13, 44:13, 68:17, 96:21, 113:15, 113:23, 114:6, 114:10, 122:19, 132:2, 132:24, 139:1, 185:7
**shows** [8] - 28:14, 68:8, 113:18, 133:7, 140:18, 140:22, 149:11, 151:6
**shut** [1] - 18:19
**side** [28] - 22:21, 25:20, 27:15, 55:25, 56:2, 62:7, 66:20, 74:25, 82:1, 82:6, 89:4, 89:5, 89:7, 106:10, 114:15, 115:3, 118:20, 121:8, 130:23, 130:25, 131:9, 131:14, 131:17, 143:2, 202:22, 205:9
**sides** [2] - 57:15, 62:13
**sight** [2] - 56:21, 58:14
**sign** [1] - 112:5
**signature** [6] - 26:11, 26:14, 98:25, 99:2, 99:6, 214:10
**signatures** [1] - 26:15
**signed** [3] - 27:22, 28:20, 139:23
**signs** [1] - 187:24
**silent** [3] - 19:6, 19:11, 19:17
**similar** [2] - 74:5, 147:19
**simple** [1] - 211:20
**simply** [5] - 3:3, 5:8, 15:10, 19:6, 95:4
**single** [1] - 190:7
**sirens** [1] - 56:18
**sitting** [2] - 71:5, 73:10
**situation** [5] - 3:2, 198:10, 200:14, 208:6, 208:8
**six** [12] - 27:19, 60:19, 73:1, 95:17, 109:6, 109:10, 152:4, 152:7, 179:24, 185:24, 187:22,

192:21
**Six** [1] - 194:16
**size** [1] - 130:13
**sketches** [1] - 103:19
**skip** [1] - 26:1
**slept** [1] - 83:9
**slew** [1] - 4:11
**slide** [2] - 154:23, 154:25
**sliding** [1] - 113:13
**slightly** [3] - 86:11, 86:13, 141:24
**slip** [2] - 143:4, 143:5
**slot** [1] - 27:20
**slowly** [1] - 189:4
**small** [3] - 160:9, 160:11
**smaller** [2] - 114:22, 160:9
**Smith** [4] - 33:23, 34:2, 34:3
**Smith-Bey** [2] - 33:23, 34:2
**Smith-El** [2] - 33:23, 34:3
**snap** [1] - 124:10
**sneak** [1] - 9:11
**socializing** [1] - 201:23
**soil** [3] - 18:2, 200:3
**sold** [4] - 43:18, 148:3, 148:7
**someone** [5] - 54:2, 88:14, 178:19, 200:20, 207:8
**sometime** [4] - 40:2, 101:8, 110:14, 211:12
**Sometimes** [1] - 34:13
**sometimes** [6] - 42:11, 45:9, 70:7, 101:25, 122:5
**somewhere** [1] - 42:11
**son** [1] - 18:5
**Soon** [1] - 135:3
**soon** [4] - 9:4, 124:20, 143:24, 209:22
**sooner** [2] - 8:21, 185:3
**Sorry** [1] - 105:17
**sorry** [34] - 11:22, 14:16, 18:10, 36:1, 36:5, 43:12, 84:17, 90:7, 116:13, 121:18, 122:10, 125:16, 126:10, 130:24, 139:11, 139:15, 150:24, 160:11, 162:8, 162:9, 165:14, 166:9, 177:9, 179:9, 181:6, 186:25, 187:6, 191:13, 191:15, 193:22, 196:3, 196:5, 199:25, 210:2
**sort** [21] - 2:20, 3:4, 6:7, 11:6, 11:14, 11:15,

17:14, 19:12, 19:14, 19:15, 27:6, 93:4, 95:8, 97:4, 105:4, 106:23, 121:22, 156:11, 177:16, 197:18, 210:21
**sound** [3] - 31:25, 110:12, 207:11
**Sound** [1] - 204:6
**sounds** [1] - 208:12
**South** [26] - 53:24, 54:17, 55:5, 55:6, 55:18, 56:1, 56:7, 57:6, 58:1, 58:18, 58:19, 59:12, 68:25, 69:1, 69:4, 69:10, 69:17, 77:24, 85:21, 86:2, 87:9, 90:9, 143:23, 144:5, 147:6, 155:24
**south** [1] - 156:22
**Southwest** [2] - 33:15, 46:25
**sovereignty** [7] - 2:15, 3:11, 3:22, 4:13, 5:18, 8:6, 8:14
**space** [2] - 117:5, 121:17
**spare** [1] - 21:21
**speaking** [1] - 132:5
**specific** [7] - 14:3, 93:12, 99:19, 99:20, 155:11, 184:13, 194:15
**specifically** [12] - 22:19, 27:13, 46:4, 46:13, 68:2, 86:5, 89:25, 92:22, 92:23, 138:16, 142:15, 196:1
**Specifically** [2] - 128:25, 168:23
**SPECTATOR** [3] - 83:15, 83:17, 83:20
**speculate** [1] - 4:1
**speculating** [1] - 7:2
**Spell** [1] - 91:21
**spell** [6] - 52:7, 67:7, 84:6, 91:18, 102:24, 108:8
**spelling** [1] - 77:14
**Spence** [51] - 4:7, 4:8, 4:12, 4:21, 5:17, 9:13, 16:21, 18:1, 18:6, 48:15, 104:14, 110:7, 111:4, 111:22, 112:6, 115:5, 115:10, 116:1, 117:1, 124:22, 125:8, 125:9, 125:11, 125:14, 125:17, 125:19, 125:22, 126:14, 128:1, 128:10, 161:10, 164:4, 164:7, 165:4, 165:10, 165:11, 167:20, 172:4, 176:22, 180:25, 188:6, 192:9, 192:17,

195:22, 198:14, 199:15, 199:18, 208:22, 209:4
**Spence's** [15] - 5:23, 105:6, 105:20, 105:24, 106:10, 106:24, 111:10, 126:7, 126:8, 126:10, 162:24, 163:13, 163:23, 164:20, 188:11
**Spences's** [1] - 187:11
**spent** [5] - 30:8, 30:10, 152:4, 152:10, 185:25
**spoken** [1] - 137:21
**spread** [8] - 26:18, 27:10, 27:12, 27:24, 28:1, 28:2, 28:11, 53:19
**spreads** [2] - 26:6, 26:24
**squares** [1] - 186:25
**stand** [3] - 20:6, 80:5, 80:20
**standard** [2] - 4:25, 78:3
**standing** [2] - 71:7, 113:9
**star** [1] - 109:23
**start** [6] - 20:14, 31:25, 104:23, 171:21, 183:19, 184:2
**started** [13] - 9:4, 29:24, 31:24, 52:21, 59:11, 109:8, 125:25, 138:1, 150:23, 172:4, 172:9, 172:20
**starting** [1] - 135:4
**Starting** [1] - 156:5
**state** [32] - 3:8, 3:9, 3:25, 4:3, 5:10, 5:14, 5:25, 6:4, 6:7, 8:5, 9:8, 9:17, 10:8, 10:14, 12:8, 12:10, 13:8, 13:12, 19:7, 19:12, 75:4, 100:25, 101:15, 205:22, 205:24, 205:25, 206:5, 206:10, 206:16, 207:15, 207:22
**State** [11] - 4:9, 6:23, 6:24, 36:8, 36:9, 52:7, 67:7, 84:5, 91:17, 102:24, 108:7
**State's** [4] - 6:25, 24:19, 24:24, 35:3
**statement** [9] - 19:13, 36:18, 46:3, 205:1, 206:10, 206:13, 207:1, 207:8, 208:6
**statements** [3] - 170:17, 172:1, 200:21
**STATES** [2] - 1:1, 1:5
**States** [7] - 52:2, 67:2, 84:1, 91:13, 102:19, 108:3, 193:20

**stating** [1] - 50:23
**station** [4] - 21:21, 78:9, 78:22, 116:9
**stationed** [1] - 182:12
**Stationed** [1] - 55:4
**stations** [1] - 77:1
**stay** [4] - 54:25, 64:4, 76:8, 116:1
**stayed** [1] - 83:22
**Staying** [1] - 116:21
**stenographically** [1] - 214:4
**steps** [3] - 71:6, 163:18
**stick** [1] - 42:25
**sticking** [2] - 126:25, 137:13
**sticky** [2] - 114:15, 115:3
**still** [22] - 2:5, 8:4, 24:2, 41:14, 98:8, 100:15, 111:23, 114:17, 119:6, 122:8, 122:11, 124:9, 135:12, 142:20, 144:17, 148:14, 200:17, 203:2, 203:4, 206:24, 207:3, 207:5
**Still** [1] - 84:10
**stipulation** [2] - 12:20, 15:5
**stop** [9] - 16:23, 25:10, 59:10, 59:21, 69:24, 70:1, 71:18, 120:10
**stopped** [7] - 59:13, 61:19, 65:5, 70:4, 70:11, 86:22, 86:25
**stopping** [1] - 59:14
**store** [1] - 207:2
**stored** [1] - 23:14
**stores** [1] - 148:2
**storm** [44] - 16:25, 85:24, 86:8, 86:12, 86:17, 86:19, 87:6, 87:11, 88:5, 88:21, 89:18, 90:1, 90:5, 90:8, 133:11, 133:13, 133:15, 133:18, 133:19, 133:20, 133:25, 134:10, 134:19, 144:1, 144:16, 144:17, 144:19, 144:24, 145:3, 145:4, 145:8, 145:22, 146:9, 146:10, 146:12, 146:14, 146:19, 147:9, 147:15, 147:22, 157:5
**storms** [1] - 144:25
**story** [4] - 157:24, 209:2, 209:3
**story's** [1] - 209:6
**straight** [3] - 83:19, 179:3, 183:7
**street** [11] - 33:7, 42:5,

42:18, 43:9, 43:15, 66:12, 86:2, 86:8, 146:24, 173:21, 185:16
**Street** [1] - 1:25
**streets** [2] - 69:2, 70:9
**strike** [4] - 42:14, 97:7, 119:10, 169:13
**Strike** [1] - 180:10
**stuck** [1] - 114:13
**stuff** [10] - 3:3, 4:3, 42:4, 42:10, 65:21, 65:22, 166:4, 207:24, 209:8, 212:5
**style** [2] - 74:17, 130:8
**subject** [6] - 3:24, 71:7, 72:20, 81:3, 112:11, 137:3
**subjects** [6] - 60:8, 71:5, 78:10, 80:20, 82:3, 82:21, 97:14, 97:18
**submission** [1] - 211:13
**submit** [7] - 103:20, 103:21, 103:23, 103:24, 107:15, 212:12, 212:17
**submitted** [8] - 15:15, 15:19, 98:10, 98:22, 107:17, 115:23, 167:14, 211:16
**submitting** [1] - 167:24
**subscribed** [1] - 48:20
**subscriber** [1] - 129:3
**Subsection** [1] - 206:8
**subsequent** [1] - 90:24
**subsequently** [1] - 40:6
**substantial** [2] - 178:6, 195:21
**suddenly** [1] - 203:16
**sufficient** [1] - 132:22
**suggest** [2] - 18:24, 31:2
**suggested** [2] - 3:19, 211:25
**suggesting** [2] - 19:13, 27:2
**suggestion** [1] - 27:8
**suicides** [1] - 103:17
**suitable** [2] - 166:6, 166:7
**summarize** [1] - 200:19
**summary** [2] - 10:15, 36:22
**summertime** [1] - 89:23
**sun** [1] - 181:13
**sunlight** [1] - 89:23
**superseding** [2] - 10:5, 13:25
**supervisor** [3] - 94:1, 99:4, 120:11
**supply** [1] - 193:8

**supposed** [1] - 32:16
**surprise** [2] - 164:18, 165:7
**surrounding** [1] - 53:18
**surveillance** [3] - 41:10, 91:6, 183:2
**surveyor's** [2] - 149:19, 149:20
**suspect** [3] - 32:15, 102:1, 177:21
**suspects** [23] - 53:20, 54:7, 56:11, 60:8, 64:13, 65:24, 76:8, 79:13, 86:21, 100:19, 100:25, 101:19, 101:23, 116:18, 118:18, 118:23, 119:15, 120:25, 121:8, 121:13, 155:20, 155:25, 183:19
**suspicious** [1] - 103:17
**sustained** [3] - 7:11, 51:21, 189:17
**Sustained** [1] - 189:9
**sweatshirt** [2] - 129:22, 131:10
**SWORN** [6] - 52:4, 67:4, 84:3, 91:15, 102:21, 108:5
**system** [3] - 3:22, 136:1, 165:1

# T

**T-O-N-I** [1] - 67:8
**T-shirt** [8] - 75:25, 130:11, 132:6, 132:16, 156:25, 186:23, 186:24, 186:25
**Tab** [1] - 46:18
**table** [2] - 73:12, 132:10
**tactics** [1] - 92:10
**tag** [3] - 139:5, 139:10, 139:13
**tags** [1] - 55:13
**talkie** [34] - 16:24, 87:8, 87:15, 87:21, 88:6, 88:12, 88:20, 89:18, 133:17, 134:6, 143:23, 144:1, 144:5, 144:13, 144:14, 144:17, 144:18, 144:21, 144:25, 145:6, 145:11, 145:23, 146:2, 146:21, 146:23, 147:2, 147:7, 147:8, 147:11, 147:14, 147:15, 148:12, 157:4
**talkies** [3] - 147:18, 148:3, 148:9
**taller** [4] - 63:15, 63:16, 76:2, 76:3

**tap** [1] - 209:17
**tape** [37] - 22:24, 23:2, 23:7, 23:8, 23:10, 24:5, 24:10, 30:9, 30:16, 46:17, 91:4, 113:16, 113:18, 113:19, 114:1, 114:2, 114:5, 114:10, 114:12, 114:13, 114:15, 114:17, 115:3, 149:19, 149:20, 176:11, 176:12, 176:14, 176:16, 179:1, 179:5, 179:9, 179:11, 182:7, 212:9, 212:19
**Tape** [1] - 11:22
**taped** [3] - 29:22, 30:4, 179:20
**tapes** [4] - 15:20, 41:11, 209:24, 210:3
**tarnish** [1] - 88:25
**Taurus** [1] - 115:21
**Tavon** [2] - 75:10, 75:16
**teach** [1] - 208:20
**tear** [1] - 112:16
**tech** [2] - 97:21, 100:13
**technical** [1] - 178:4
**TECHNICIAN** [2] - 102:21, 213:16
**Technician** [12] - 17:19, 102:20, 103:11, 103:13, 103:21, 105:13, 106:5, 107:10, 113:24, 114:2, 114:11, 117:10
**technician** [5] - 103:14, 120:12, 120:13, 120:15, 124:7
**telephone** [7] - 122:22, 123:9, 123:20, 124:13, 124:17, 125:20, 126:20
**telephones** [1] - 144:9
**television** [2] - 46:5, 187:23
**temporary** [2] - 97:11, 97:25
**ten** [5] - 22:17, 30:7, 33:1, 65:8, 142:22
**Ten** [4] - 22:18, 29:9, 179:24, 180:12
**term** [2] - 37:13, 63:25
**terms** [8] - 18:21, 39:20, 54:1, 86:23, 130:17, 155:18, 165:9, 210:16
**terribly** [1] - 88:24
**test** [1] - 166:8
**tested** [2] - 167:3, 168:6
**testified** [20] - 6:3, 12:16, 12:24, 12:25, 13:3, 25:1, 34:18, 35:7, 36:23, 40:1, 41:9, 42:2, 80:15, 136:16, 159:17, 171:22, 183:1, 185:7,

188:6, 189:20
**testify** [17] - 4:22, 5:2, 5:10, 7:3, 7:4, 7:5, 15:14, 17:19, 25:1, 93:14, 93:23, 200:12, 200:18, 202:17, 204:4, 209:4, 210:1
**testifying** [6] - 4:9, 4:11, 4:25, 5:8, 7:2, 200:7
**testimony** [28] - 3:7, 5:23, 6:10, 7:16, 18:17, 18:24, 20:5, 20:13, 40:24, 48:21, 65:20, 81:8, 89:18, 157:13, 175:17, 177:5, 179:12, 180:7, 187:10, 188:5, 188:16, 188:20, 192:15, 199:4, 200:19, 211:21, 212:8, 212:9
**testimony's** [1] - 4:24
**testing** [5] - 166:25, 167:12, 167:25, 168:13, 168:16, 168:17, 169:1
**tests** [1] - 136:24
**Tevin** [2] - 63:1, 63:7
**THE** [237] - 1:1, 1:2, 2:2, 2:11, 4:18, 6:11, 6:15, 6:20, 6:25, 7:8, 7:10, 8:13, 9:1, 9:3, 11:20, 11:23, 12:6, 12:9, 13:10, 13:14, 14:1, 14:14, 14:17, 14:20, 14:22, 15:1, 15:12, 15:24, 16:2, 16:7, 16:11, 16:14, 16:17, 16:19, 17:24, 18:8, 18:14, 19:1, 19:7, 19:19, 19:23, 19:25, 28:6, 34:6, 34:7, 34:8, 35:18, 36:4, 37:6, 44:4, 44:6, 44:7, 45:24, 49:15, 49:24, 50:6, 51:18, 51:21, 51:23, 51:25, 52:1, 52:5, 52:6, 52:8, 55:9, 60:17, 61:1, 61:8, 65:12, 66:24, 66:25, 67:5, 67:6, 67:8, 70:17, 73:16, 77:16, 79:20, 81:19, 82:11, 82:23, 83:6, 83:8, 83:16, 83:18, 83:21, 83:25, 84:4, 84:5, 84:7, 85:13, 91:11, 91:16, 91:17, 91:19, 91:21, 91:22, 94:12, 102:15, 102:17, 102:18, 102:22, 102:23, 102:25, 107:22, 108:1, 108:6, 108:7, 108:9, 127:3, 127:5, 127:15, 127:18, 132:11, 132:19, 132:21,

139:9, 147:13, 151:22,
152:23, 155:6, 161:14,
170:6, 170:14, 170:19,
170:21, 171:2, 171:8,
171:11, 171:15, 173:11,
174:6, 174:20, 179:8,
179:13, 179:16, 183:5,
186:17, 189:2, 189:9,
189:15, 189:17, 190:24,
193:21, 193:22, 193:23,
193:24, 193:25, 195:5,
195:7, 195:11, 195:14,
196:3, 196:24, 197:1,
197:2, 197:6, 197:8,
197:11, 197:14, 197:22,
198:2, 198:6, 198:16,
198:20, 198:22, 198:24,
199:3, 199:7, 199:9,
199:12, 199:14, 199:17,
199:24, 200:1, 200:6,
200:17, 200:24, 201:1,
201:6, 201:9, 201:13,
201:19, 201:24, 202:1,
202:4, 202:8, 202:11,
202:14, 202:18, 202:25,
203:4, 203:8, 203:11,
203:18, 203:21, 203:23,
204:3, 204:6, 204:12,
204:15, 204:21, 204:25,
205:3, 205:6, 205:10,
205:24, 206:5, 206:8,
206:19, 206:21, 206:24,
207:4, 207:10, 207:17,
207:20, 208:12, 208:15,
208:19, 208:21, 209:1,
209:11, 209:14, 209:17,
209:21, 210:2, 210:5,
210:8, 210:12, 210:17,
211:1, 211:6, 211:12,
211:18, 212:3, 212:6,
212:18

**theater** [2] - 40:25, 41:3
**themselves** [6] - 11:5,
49:13, 49:16, 49:22,
78:11
**then-existing** [3] -
206:10, 206:15, 207:15
**theorize** [1] - 145:23
**there'd** [1] - 90:3
**thereabouts** [1] -
110:12
**thereafter** [4] - 22:5,
68:16, 85:1, 155:2
**therefore** [1] - 205:14
**They've** [1] - 152:6
**they've** [2] - 152:11,
166:21
**third** [3] - 10:5, 112:22,
156:19
**Thirteen** [2] - 84:16,

84:18
**Thomas** [1] - 1:20
**thousand** [1] - 180:5
**three** [24] - 4:15, 25:11,
25:18, 26:15, 27:20,
28:4, 28:21, 43:5, 44:2,
46:10, 71:6, 92:25,
100:19, 116:3, 152:7,
153:9, 157:4, 175:19,
175:20, 175:21, 176:3,
181:1, 183:1, 191:2
**Three** [11] - 55:6,
121:24, 129:20, 132:17,
133:5, 133:13, 144:1,
144:16, 156:25, 157:4,
206:8
**threshold** [1] - 8:7
**Thursday** [4] - 2:16,
3:12, 3:17, 4:14
**tie** [1] - 47:14
**tight** [2] - 74:1, 96:11
**Tight** [1] - 62:3
**tighter** [2] - 62:16,
62:18
**timely** [1] - 212:11
**Tincher** [2] - 139:25,
192:11
**tire** [1] - 21:21
**title** [3] - 103:10, 158:7,
158:9
**today** [20] - 2:18, 4:11,
16:3, 16:6, 16:9, 17:8,
17:23, 26:7, 56:13,
60:15, 72:8, 73:7, 94:9,
120:3, 120:16, 122:8,
122:11, 170:11, 197:2,
197:12
**together** [7] - 8:18,
25:25, 59:25, 124:4,
124:9, 124:10, 125:1
**toll** [3] - 48:2, 128:14,
162:10
**Tom** [1] - 191:3
**tomorrow** [16] - 16:3,
17:25, 18:4, 18:7, 18:11,
197:9, 197:19, 197:20,
198:3, 198:9, 198:14,
198:15, 199:18, 207:10,
209:12, 210:12
**TONI** [2] - 67:4, 213:8
**Toni** [16] - 16:22, 58:17,
58:20, 58:21, 58:25,
59:9, 59:13, 59:14,
59:24, 60:2, 60:6, 62:25,
63:24, 67:3, 67:8, 79:24
**tonight** [5] - 200:14,
208:17, 211:12, 211:24,
212:1
**Tonya** [14] - 16:21,
48:15, 104:14, 110:7,

111:4, 125:9, 161:10,
162:23, 163:23, 164:6,
164:19, 165:11, 167:20,
192:9
**took** [20] - 42:1, 78:12,
78:19, 90:5, 94:9, 96:13,
97:11, 97:24, 104:23,
105:24, 163:16, 163:19,
173:24, 174:1, 176:15,
180:2, 180:3, 180:4,
183:8, 185:15
**top** [11] - 21:20, 30:5,
30:20, 56:18, 87:13,
87:16, 109:23, 123:4,
126:9, 126:11, 161:18
**topics** [1] - 180:24
**torpedo** [2] - 146:9,
146:11
**torpedo-shaped** [2] -
146:9, 146:11
**toward** [6] - 52:6,
59:16, 67:6, 72:2, 84:5,
91:17, 102:23, 108:7
**towards** [2] - 55:5,
131:7
**Towards** [2] - 56:7,
130:22
**towed** [3] - 21:10,
138:19, 173:21
**tower** [10] - 40:3, 40:8,
40:14, 43:24, 163:6,
163:8, 163:12, 163:15
**town** [1] - 109:16
**toy** [1] - 133:23
**toys** [1] - 2:10
**track** [1] - 165:2
**trained** [1] - 26:21
**training** [3] - 26:23,
91:20, 92:10
**transcribed** [3] -
174:15, 175:9, 214:7
**transcript** [13] - 15:5,
15:11, 24:11, 24:13,
25:4, 25:5, 25:7, 25:8,
46:18, 179:5, 179:7,
179:20, 214:7
**transcripts** [6] - 11:9,
14:3, 24:15, 24:18,
25:11, 25:18
**transfer** [1] - 205:11
**transferred** [1] - 35:25
**transmission** [1] -
71:22
**transported** [4] - 29:7,
65:2, 76:25, 174:15
**Trauma** [1] - 17:20,
104:3, 104:4
**traumatic** [1] - 165:3
**treatment** [4] - 104:10,
104:11, 104:12, 116:25

**tree** [14] - 129:19,
129:21, 130:18, 130:19,
131:3, 131:6, 131:7,
131:9, 131:18, 132:17,
133:5, 149:18, 149:19
**trial** [10] - 2:15, 3:10,
3:16, 4:4, 4:9, 5:10,
5:15, 8:23, 20:2, 20:19
**trials** [1] - 3:5
**tried** [6] - 14:2, 32:6,
124:14, 133:18, 172:15,
172:17
**trigger** [2] - 154:2,
155:1, 155:2
**trouble** [1] - 211:22
**truck** [4] - 142:19,
146:8, 146:9, 146:17
**true** [5] - 73:19, 80:12,
80:13, 172:3, 188:22
**truly** [1] - 184:18
**trunk** [3] - 21:13,
141:22, 142:1, 142:3,
142:4, 142:12
**trust** [3] - 2:2, 2:3, 20:1
**truth** [1] - 201:3
**try** [11] - 15:9, 21:3,
32:23, 53:19, 54:9,
56:23, 134:14, 136:24,
144:24, 172:19, 185:12
**Trying** [1] - 60:9
**trying** [11] - 5:3, 9:11,
11:16, 26:2, 31:2, 34:20,
196:1, 203:2, 203:4,
208:8
**turn** [5] - 48:11, 71:12,
72:1, 124:14, 180:9
**Turn** [1] - 179:24
**turned** [3] - 30:8, 48:8,
176:16
**TV** [2] - 31:17, 146:17
**TV's** [1] - 187:24
**Two** [7] - 46:18, 64:10,
71:6, 87:8, 92:16,
103:11, 116:3
**two** [83] - 6:13, 10:6,
17:4, 18:9, 18:15, 26:9,
28:4, 28:21, 30:8, 33:17,
36:15, 38:1, 38:7, 38:13,
42:14, 42:15, 47:12,
47:13, 47:15, 50:20,
55:5, 55:6, 55:15, 55:16,
57:23, 59:3, 59:15,
59:23, 60:7, 62:4, 64:13,
64:15, 64:22, 66:9, 71:5,
71:9, 71:18, 71:22,
72:14, 72:23, 76:8, 79:1,
79:13, 79:16, 81:22,
84:21, 85:16, 86:24,
87:12, 94:16, 94:18,
94:20, 95:2, 95:11,

97:14, 121:7, 121:11,
121:13, 121:17, 121:20,
123:13, 123:24, 124:3,
127:13, 130:5, 137:20,
142:18, 142:19, 148:8,
152:7, 155:20, 155:25,
156:16, 189:4, 191:2,
192:16, 194:13, 198:9,
205:16, 205:23
**Two-way** [1] - 87:8
**type** [9] - 17:18, 27:14,
96:10, 114:15, 124:21,
148:3, 160:15, 167:4,
172:22
**typographical** [1] -
93:21

## U

**U.S** [3] - 1:24, 194:6,
194:9
**ultimate** [1] - 151:3
**ultimately** [3] - 23:25,
64:25, 165:19
**Um-hum** [1] - 50:18
**umbrage** [1] - 7:24
**unavailable** [1] - 198:18
**unclear** [1] - 66:3
**uncommon** [3] - 34:1,
41:19
**uncovered** [2] - 21:13,
151:7
**under** [26] - 3:10, 3:21,
5:25, 7:11, 7:12, 8:5,
20:18, 21:20, 64:23,
76:22, 78:4, 86:25, 99:4,
105:20, 115:23, 117:5,
117:16, 143:22, 144:6,
150:21, 151:13, 153:15,
158:7, 181:17, 200:11,
208:2
**underbrush** [1] - 131:3
**undergoing** [1] -
104:10
**underneath** [5] -
143:25, 150:8, 153:7,
153:10, 185:8
**understood** [2] -
155:20, 191:7
**unfamiliar** [1] - 70:3
**unfenced** [1] - 66:13
**unfortunately** [2] -
41:24, 153:19
**unidentified** [3] -
164:17, 164:19, 165:7
**uniform** [2] - 56:13,
72:7
**uniformed** [3] - 58:22,
106:20

uniforms [1] - 110:19
unit [2] - 84:20, 144:15
Unit [5] - 108:11,
108:17, 109:6, 109:7,
135:21
UNITED [2] - 1:1, 1:5
United [7] - 52:2, 67:2,
84:1, 91:13, 102:19,
108:3, 193:19
units [2] - 68:23, 183:10
unknown [1] - 189:5
unless [1] - 109:1
unprotected [1] -
182:10
unsolved [1] - 109:9
unusual [3] - 11:15,
166:19, 167:8
Up [1] - 39:13
up [120] - 2:6, 2:9,
10:18, 14:11, 18:19,
25:21, 28:7, 34:20, 36:2,
38:9, 38:24, 42:10, 43:6,
48:2, 48:6, 48:11, 50:4,
51:8, 53:14, 53:16, 54:9,
55:4, 57:6, 57:14, 58:1,
58:18, 59:12, 59:16,
64:19, 65:7, 65:23,
66:11, 68:24, 69:13,
71:24, 72:1, 72:14,
72:17, 76:5, 76:9, 80:2,
80:5, 80:15, 80:20,
81:23, 81:25, 82:5,
82:10, 82:15, 82:20,
87:13, 87:22, 88:5, 88:6,
88:24, 91:3, 91:6,
109:18, 112:8, 113:22,
114:22, 115:16, 115:20,
116:7, 117:6, 117:11,
120:18, 123:5, 125:12,
125:22, 125:25, 126:12,
130:3, 131:21, 132:13,
132:21, 136:10, 140:21,
143:19, 145:6, 145:17,
146:8, 146:20, 146:23,
148:13, 149:11, 149:15,
150:19, 151:15, 152:21,
153:8, 154:24, 155:3,
159:11, 163:2, 164:12,
164:15, 171:7, 173:23,
179:14, 181:13, 182:7,
185:12, 186:15, 189:4,
195:19, 196:10, 198:7,
201:21, 203:15, 206:6,
206:7, 208:21, 210:15,
210:23, 212:3, 212:14,
212:19
updating [1] - 209:19
upper [1] - 105:5
ups [3] - 64:22, 64:25,
104:19

upstairs [2] - 158:17,
159:6
urgency [1] - 8:22
USA [1] - 214:4
useful [1] - 2:3
user [2] - 129:4, 129:7
uses [1] - 50:7
usual [1] - 211:21
Utilities [1] - 144:23
utilities [1] - 146:2
utilize [1] - 32:10

V

vague [1] - 205:19
value [3] - 90:2, 167:14,
167:16
variety [1] - 37:20
various [13] - 3:6,
29:11, 32:18, 33:22,
70:9, 95:11, 103:15,
120:24, 137:19, 137:21,
143:5, 167:13, 183:25
Various [2] - 38:6,
167:19
vegetable [3] - 160:2,
160:3, 160:5
vehicle [20] - 21:7, 22:8,
138:11, 138:21, 138:23,
139:17, 139:25, 140:1,
140:7, 140:10, 140:14,
140:18, 141:6, 141:10,
141:22, 142:5, 143:17,
144:7, 188:19
vehicles [1] - 189:12
verbally [1] - 72:21
verbatim [1] - 205:18
verified [1] - 94:10
verify [2] - 93:22, 129:3
verifying [1] - 128:5
version [4] - 23:21,
23:23, 23:25, 194:5
via [1] - 87:25
vibrate [1] - 125:24
vicinity [1] - 182:4
victim [17] - 18:1,
32:15, 36:20, 104:6,
104:7, 104:10, 104:13,
104:17, 104:23, 105:1,
107:5, 110:5, 111:4,
117:1, 125:9, 167:20
victim's [9] - 105:11,
105:14, 106:2, 106:6,
110:23, 114:11, 124:22,
168:4, 168:5
victims [1] - 47:11
video [2] - 11:10, 11:21
videos [1] - 11:21
view [18] - 11:12, 56:20,

80:23, 81:1, 81:10,
81:11, 82:1, 82:3, 82:4,
82:6, 86:11, 112:8,
130:14, 139:16, 150:1,
150:4, 156:12
visit [1] - 21:5
visited [1] - 83:12
visits [1] - 119:24
voice [5] - 15:6, 23:10,
23:18, 24:8, 25:11
VOLUME [1] - 1:11
volume [1] - 39:20
voluntariness [1] - 19:9

W

W-42 [1] - 46:16
W-66 [3] - 37:3, 37:7,
37:10
wagon [1] - 21:21
Wait [1] - 179:9
waiting [1] - 2:5
waive [1] - 171:13
walk [16] - 71:12, 71:24,
121:16, 121:19, 121:21,
140:17, 155:12, 155:14,
156:5, 158:4, 181:6,
181:8, 181:20, 185:16,
185:18, 202:4
walk-through [2] -
181:6, 181:8
walked [9] - 30:13,
71:25, 72:3, 72:14,
121:24, 181:3, 181:23,
181:24, 182:6
walkie [38] - 16:24,
87:8, 87:15, 87:21, 88:6,
88:12, 88:20, 89:18,
133:17, 134:4, 134:6,
143:23, 144:1, 144:5,
144:13, 144:14, 144:17,
144:18, 144:21, 144:25,
145:6, 145:11, 145:23,
146:2, 146:21, 146:23,
147:2, 147:7, 147:8,
147:11, 147:14, 147:15,
147:18, 148:3, 148:9,
148:12, 157:4
walkie-talkie [34] -
16:24, 87:8, 87:15,
87:21, 88:6, 88:12,
88:20, 89:18, 133:17,
134:6, 143:23, 144:1,
144:5, 144:13, 144:14,
144:17, 144:18, 144:21,
144:25, 145:6, 145:11,
145:23, 146:2, 146:21,
146:23, 147:2, 147:7,
147:8, 147:11, 147:14,

147:15, 148:12, 157:4
walkie-talkies [3] -
147:18, 148:3, 148:9
walking [2] - 59:12,
59:16
wall [2] - 79:5, 97:13
Walter [5] - 140:13,
173:1, 173:5, 173:7,
173:17
wants [3] - 5:22, 15:21,
171:13
warden [3] - 13:7,
13:12, 35:12
warrant [9] - 13:6, 13:7,
13:12, 35:7, 35:9, 35:12,
35:16, 139:21, 139:23
Washington [1] -
201:24
watch [3] - 57:23, 59:3,
146:18
watching [6] - 46:4,
46:14, 57:19, 70:15,
70:22, 187:21
water [3] - 34:7, 34:13,
183:4
Wayne [4] - 44:18,
162:9, 191:4
WAYNE [1] - 1:8
weapon [15] - 115:6,
115:18, 152:17, 153:17,
153:24, 154:17, 154:19,
154:21, 154:23, 154:24,
161:5, 161:9, 169:6
weapons [7] - 115:4,
161:9, 166:4, 166:5,
166:13, 167:1, 192:16
wear [7] - 112:16,
130:11, 132:4, 132:7,
156:25, 186:21
wearing [3] - 74:6,
99:22, 99:24
weather [1] - 145:19
Wednesday [5] - 15:25,
209:14, 209:16, 211:10,
211:14
week [23] - 2:16, 3:11,
3:16, 4:14, 8:12, 15:15,
15:18, 15:23, 34:16,
40:2, 98:17, 98:18,
98:20, 129:9, 187:22,
209:25, 210:1, 210:6,
210:15, 211:7, 211:11
weekend [1] - 2:13
weeks [2] - 88:11, 91:7
weird [3] - 7:21, 7:22,
7:25
welcome [2] - 66:24,
83:12
Welcome [1] - 20:17
Wesley [1] - 18:5

Wesson [5] - 150:20,
151:19, 152:2, 153:11,
192:20
West [7] - 1:25, 31:22,
31:24, 42:15, 43:9, 46:8,
46:10
wet [1] - 145:21
whatsoever [2] -
133:22, 137:4
wheel [1] - 21:19
wheels [1] - 146:13
whereas [1] - 13:5
Whereof [1] - 214:9
white [4] - 114:14,
130:8, 133:1, 141:1
White [1] - 84:13
who'd [1] - 140:6
whole [3] - 83:22,
93:25, 209:1
wife [5] - 4:9, 5:9, 209:7
wife's [4] - 4:10,
125:20, 128:2, 188:7
William [1] - 26:4
WILLIE [1] - 1:7
Willie [1] - 214:4
willing [1] - 177:15
Winchester [3] - 153:1,
159:17, 159:20
window [1] - 157:24
wiped [1] - 169:7
wires [3] - 123:4, 124:9,
124:10
wished [1] - 2:6
Wisniewski [5] - 18:11,
77:12, 198:11, 199:20,
200:1
Wisniewski's [1] -
199:24
withdrawal [3] - 9:21,
9:23, 9:25
witness [52] - 7:13,
7:20, 12:16, 12:17,
12:19, 13:20, 15:14,
17:14, 18:6, 27:1, 27:6,
32:15, 35:17, 45:9, 47:5,
55:8, 64:2, 64:19, 64:20,
65:6, 67:1, 70:16, 76:11,
76:13, 76:16, 76:17,
76:20, 80:19, 83:8,
83:25, 94:11, 102:18,
107:24, 139:8, 174:18,
177:1, 177:3, 177:5,
177:10, 177:16, 177:20,
177:23, 178:11, 179:5,
179:17, 197:2, 198:8,
198:17, 199:12, 199:13,
199:15
Witness [2] - 19:22,
51:14, 57:10, 127:16,
214:9

**WITNESS** [35] - 34:6, 34:8, 44:6, 51:25, 52:4, 52:5, 52:8, 66:24, 67:4, 67:5, 67:8, 84:3, 84:4, 84:7, 91:15, 91:16, 91:19, 91:22, 102:17, 102:21, 102:22, 102:25, 108:5, 108:6, 108:9, 193:22, 193:24, 197:1, 213:3, 213:6, 213:8, 213:11, 213:13, 213:16, 213:17

**witnesses** [32] - 4:11, 4:12, 5:13, 7:22, 9:16, 13:19, 14:5, 16:5, 16:20, 17:5, 17:16, 17:18, 26:24, 64:8, 76:16, 76:19, 81:23, 82:15, 138:10, 178:24, 188:19, 188:23, 188:24, 188:25, 189:3, 189:7, 189:11, 195:9, 198:9, 199:21, 200:4, 209:25

**witnesses'** [1] - 3:6
**witnessing** [1] - 200:15
**WM** [1] - 180:1
**woman** [1] - 198:11
**wood** [1] - 137:25
**wooded** [32] - 53:23, 54:13, 55:23, 55:24, 55:25, 65:23, 66:8, 66:9, 66:11, 66:12, 66:16, 66:20, 69:9, 87:3, 116:17, 116:19, 118:3, 118:14, 118:16, 118:19, 121:22, 122:3, 122:16, 126:21, 131:15, 133:9, 137:22, 148:14, 149:1, 149:5, 157:10, 192:16

**Wooden** [1] - 212:8
**Woodlawn** [9] - 65:2, 68:6, 68:13, 85:5, 85:7, 85:9, 92:16, 92:18, 116:9
**woods** [68] - 17:12, 18:3, 56:2, 56:5, 56:7, 56:16, 69:14, 69:15, 86:21, 118:10, 118:20, 118:21, 118:22, 119:21, 119:25, 120:25, 121:8, 121:19, 122:6, 122:8, 122:11, 123:17, 125:3, 125:23, 126:6, 126:23, 127:2, 128:6, 128:12, 128:15, 129:1, 129:14, 129:15, 129:16, 130:20, 130:25, 131:18, 132:8, 135:13, 135:16, 135:19, 137:14, 137:23, 148:18, 148:24, 155:9, 155:10, 155:20, 156:1, 156:7,

156:9, 156:12, 156:21, 157:8, 159:16, 161:9, 162:23, 165:20, 166:3, 167:1, 168:11, 168:14, 181:7, 181:20, 185:17, 198:10, 200:4

**Wooten** [1] - 212:8
**word** [9] - 30:25, 42:17, 119:20, 138:13, 161:13, 173:24, 174:1, 174:2
**words** [6] - 99:17, 100:1, 154:1, 199:9, 200:19, 203:1
**workers** [1] - 164:25
**world** [1] - 3:13
**World** [1] - 196:7
**worth** [1] - 118:9
**wound** [1] - 106:10
**write** [2] - 90:16, 90:21
**writing** [3] - 31:3, 131:25, 180:18
**written** [7] - 9:6, 30:18, 78:21, 78:23, 130:12, 178:25, 180:17
**wrote** [6] - 27:25, 46:16, 50:21, 78:16, 90:18, 93:13
**Wyche** [36] - 3:9, 21:6, 22:20, 22:22, 33:8, 39:13, 48:20, 48:24, 50:24, 51:1, 198:18, 198:25, 199:6, 199:10, 200:7, 200:11, 200:13, 200:18, 201:4, 201:12, 201:14, 201:16, 201:17, 201:19, 201:21, 202:6, 202:21, 202:23, 203:1, 203:6, 203:10, 203:24, 203:25, 206:18
**Wyche's** [4] - 200:20, 202:1, 202:22, 205:19

# X

**XVI** [1] - 1:11
**XXXVII** [1] - 1:11

# Y

**yard** [3] - 66:15, 129:19, 157:2
**yards** [4] - 66:13, 123:16, 137:24, 156:21
**year** [1] - 93:25
**years** [23] - 10:7, 12:12, 43:6, 52:18, 52:19, 53:6, 60:19, 67:19, 67:20, 67:21, 73:1, 84:16, 84:18, 84:21, 92:7,

95:17, 108:22, 108:23, 109:7, 109:10, 169:13, 170:9, 170:11
**yellow** [16] - 16:24, 87:8, 87:15, 88:6, 88:20, 133:17, 134:4, 134:6, 143:24, 144:12, 144:14, 145:11, 145:23, 146:20, 147:7, 148:3
**York** [4] - 130:8, 133:1, 157:1, 210:22
**yourself** [5] - 20:18, 51:13, 77:3, 127:19, 194:17

# Z

**Zajac** [3] - 1:24, 214:3, 214:14
**zoom** [2] - 105:3, 107:9