1

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION



     UNITED STATES OF AMERICA

            v.                              CRIMINAL CASE NO.
                                             AMD-04-029
     WILLIE MITCHELL,
     SHELTON HARRIS,
     SHELLY WAYNE MARTIN,
     SHAWN GARDNER,

            Defendants
     _____/

                      VOLUME XIX OF XXXVII
                     Monday, November 3, 2008
                      Baltimore, Maryland


     Before:  Honorable Andre M. Davis, Judge
                   And a Jury

     Appearances:
             On Behalf of the Government:
              Robert Harding, Esquire
              Michael Hanlon, Esquire
             On Behalf of Defendant Mitchell:
              Laura Kelsey Rhodes, Esquire
              Michael E. Lawlor, Esquire
             On Behalf of Defendant Harris:
              Gerard P. Martin, Esquire
              Paul Flannery, Esquire
             On Behalf of Defendant Martin:
              Thomas L. Crowe, Esquire
              James G. Pyne, Esquire
             On Behalf of Defendant Gardner:
              Adam H. Kurland, Esquire
              Barry Coburn, Esquire

     Reported by:
     Mary M. Zajac, RPR
     Room 5515, U.S. Courthouse
     101 West Lombard Street
     Baltimore, Maryland 21201

2

1              (Proceedings at 9:53 a.m.)

2              THE COURT:  We ready to proceed?

3              MR. HARDING:  Yes, Your Honor.

4              THE COURT:  All right.  We'll have the jury, please.

5     Who's the next witness?

6              MR. HARDING:  Shari Fickling, Your Honor.

7              THE COURT:  Mr. Harding, I'd like to have Mr. Reynolds

8     available for examination by Mr. Gardner as soon as he gets here,

9     outside the presence of the jury, so that we can wrap up the

10    Massiah/Henry issue.  Mr. Hanlon, that will be your matter?

11             MR. HANLON:  Yes.

12             THE COURT:  All right.  I've reviewed your submissions.

13    And thank you for them.

14             MR. HARDING:  I do have Dr. Rubio here this morning, to

15    follow Ms. Fickling, who's going to be a brief witness.  Would it

16    be all right to finish Dr. Rubio?

17             THE COURT:  Oh, absolutely, sure.

18             (Jury enters the courtroom.)

19             THE COURT:  Ladies and gentlemen, good morning.  I

20    trust you had a pleasant weekend.  We're ready to continue.  The

21    government will call its next witness.

22             MR. HARDING:  Thank you, Your Honor.  Your Honor, the

23    United States calls Shari Fickling.

24              SHARI FICKLING, GOVERNMENT'S WITNESS, SWORN

25             THE WITNESS:  Yes.

1          THE CLERK:  Be seated.  Speak directly toward the mike.

2     State your name and spell it for the record, please.

3          THE WITNESS:  Shari Fickling.  S-H-A-R-I, F as in

4     Frank, I-C-K  -- I C K L --

5          THE COURT:  Just a minute.  We may be getting some

6     interference from some other electronics in the courthouse.

7     We'll try to reboot the system.  Try that one more time, Ms.

8     Fickling.  We're not going to blame you.

9          THE WITNESS:  Okay.  Shari Fickling, S-H-A-R-I.

10    F-I-C-K-L-I-N-G.

11         THE COURT:  Thank you, ma'am.

12         DIRECT EXAMINATION

13    BY MR. HARDING:

14    Q    Good morning, Ms. Fickling.

15    A    Good morning.

16    Q    Can you tell us how old you are?

17    A    29.

18    Q    And how far did you get in school?

19    A    Twelfth grade.

20    Q    You grow up here in Baltimore?

21    A    Yes.

22    Q    Okay.  Are you employed right now?

23    A    Yes.

24    Q    And have you ever been convicted of a crime?

25    A    No.

1    Q    Ms. Fickling, are you connected to a person named Shamier

2    Delvison?

3    A    Yes.

4    Q    What is the connection?

5    A    She's my sister.

6    Q    She's your sister.  Okay.  And what about a gentleman by the

7    name of Andre Drake?  Do you have a connection to him?

8    A    Yes.

9    Q    What is that?

10   A    He's my children's father.  He's also my boyfriend.

11   Q    Your children's father and your boyfriend, is that what you

12   said?

13   A    Yes.

14   Q    Okay.  Was there a time when you were living with Andre

15   Drake?

16   A    It was a time when Andre was living with me.

17   Q    Oh, okay.  I'm sorry.  Andre was living with you.

18   A    Yes.

19   Q    Were you living with him back in 2004?

20   A    He was living with me back in 2004.

21   Q    Sorry.  He was living with you back in 2004?

22   A    Yes.

23   Q    In other words, you rented a place and he came and lived

24   with you, is that right?

25   A    Yes.

1    Q    And where was that place?

2    A    2731 Seamon Avenue.

3    Q    And what part of town is that in?

4    A    South Baltimore.

5    Q    South Baltimore.  Is that in Cherry Hill?

6    A    Yes.

7    Q    While you were living with your boyfriend, Andre Drake, did

8    another guy come and live with you for a while?

9    A    Yes.

10   Q    What was his name?

11   A    Shelton.

12   Q    You know Shelton's last name?

13   A    Harris.

14   Q    Okay.  How long have you known Shelton Harris?

15   A    It's probably over ten years now.

16   Q    How do you -- I mean, what's the connection between you and

17   Shelton?  How did you get to know him?

18   A    He was dating my sister.

19   Q    He was dating your sister?

20   A    Yes.

21   Q    Do you know, was he involved in rap music, Shelton Harris?

22   A    Yes.

23   Q    Okay.  Did you ever hear him perform?

24   A    No.

25   Q    Did you know the name of the rap group he was in?

1    A    No.

2    Q    Have you ever heard of Sheistyville?

3    A    Yes.

4    Q    What's that?

5    A    A name.

6    Q    Okay.  A name for what?

7    A    A name.  Just a name.

8    Q    Okay.  Is it connected to Shelton Harris in some way?

9    A    Yes.

10   Q    How so?

11   A    His music.

12   Q    Okay.  Have you ever heard of Shake Down Entertainment?

13   A    No.

14   Q    Okay.  Have you ever heard CD's of songs with Shelton's

15   voice on it, Shelton Harris's voice on it?

16   A    I heard of a CD with one of Shelton's songs on it, yes.

17   Q    Okay.  Did you at one time own such a CD?

18   A    Yes.

19   Q    Calling your attention to around November of 2003.  Did he

20   come, is that when he came to stay with you and Andre on Seamon

21   Avenue?

22   A    Yes.

23   Q    Was there some particular place in your house where he

24   stayed?

25   A    He slept in my living room.

1    Q    Okay.  Where did he sleep?

2    A    On my sofa.

3    Q    Okay.  Do you recall how long he stayed in your place with

4    you and Andre?

5    A    For a couple months.

6    Q    Did he have some place where he used to keep his stuff?

7    A    Yes.

8    Q    Where?

9    A    In the storage area in, between my kitchen and my living

10   room.

11   Q    Okay.  What else was in that storage area?

12   A    You talking about his things or you talking about my things?

13   Q    Your things.

14   A    Like, you had my son's toys was in there.  You have like a

15   water heater that was, that was in there.  Just little minor,

16   miscellaneous things.

17   Q    Okay.  And then was there a furnace in there?

18   A    Yes.

19   Q    Did Shelton have some kind of containers that he kept his

20   stuff in?

21   A    Yes.  He had crates, milk cartons, like crates.

22   Q    Crates?

23   A    Yes.

24   Q    Made out of plastic?

25   A    Yes.

1  Q    Okay.  Was that room locked?  Was that kept locked?

2  A    No.

3  Q    Okay.  Did Shelton used to write rap lyrics when he was

4  living out with you in Cherry Hill?

5  A    Used to write, yes.

6  Q    You say he used to write.  Do you know, specifically, did he

7  write raps, rap songs?

8  A    I guess.

9  Q    Okay.  Did he sing rap songs sometimes?

10 A    Yes.

11 Q    Okay.  Did he sing them a lot?

12 A    Yes, I guess.

13 Q    Okay.  Did you ever hear of a guy named Bo?

14 A    Yes.

15 Q    Okay.  Do you know what connection there was between Bo and

16 Shelton, if any?

17 A    His friend.

18 Q    His friend?  Did you ever meet Bo?

19 A    No.

20 Q    Okay.  Let me call your attention to January of 2004.

21 A    Um-hum.

22 Q    Did there come a time when the police raided your place?

23 A    Yes.

24 Q    It's a townhouse, right?

25 A    Yes.

1    Q    Okay.  Were you there at the time?

2    A    No.

3    Q    Let me show you what's been marked as Government Exhibit

4    SE-1.  Does this exhibit called SE-1, which is obviously a

5    semiautomatic handgun, does this belong to you, Ms. Fickling?

6    A    No, sir.

7    Q    Does it belong to Andre Drake, to your knowledge?

8    A    No, sir.

9    Q    Have you ever known Andre Drake to own a gun?

10   A    No, sir.

11   Q    Were you aware that that gun was in your apartment when the

12   police searched your place back in January of '04?

13   A    No, sir.

14   Q    Okay.  And I also have here a photograph, SE-4.  And I'm

15   going to call your attention to the border here.  Does this look

16   like one of the black plastic crates that Mr. Harris used to keep

17   his stuff in in your storage closet?

18   A    Yes.

19   Q    And do you recognize this -- you can't see it very well --

20   but do you recognize the black notebook on top of the crate?

21   A    Yes.

22   Q    Are you familiar with such a notebook?

23   A    Yes.

24   Q    Did Shelton Harris have such a notebook?

25   A    Yes.

1    Q    What did he keep in it?

2    A    His raps.

3    Q    Okay.  Did you ever see the gun that we just looked at on

4    top the notebook in that storage closet?

5    A    No.

6    Q    Did you know whether Mr. Harris had an appointment down at

7    Parole and Probation that morning when the police came into your

8    house?

9    A    Yes.

10   Q    You did know that?

11   A    Yeah.

12   Q    Okay.  Did he tell you that?

13   A    I knew that he went to see his probations on certain days.

14   Q    Okay.  Do you know, Ms. Fickling, is it permitted to take a

15   gun to Parole and Probation?

16            MR. FLANNERY:  Objection, Your Honor.

17            THE COURT:  Overruled.  You may answer if you know.

18   A    No.

19   Q    It's not permitted?

20   A    No.

21   Q    Okay.  No further questions, Your Honor.

22            CROSS EXAMINATION

23   BY MR. FLANNERY:

24   Q    Hi, Ms. Fickling.  Good morning.

25   A    Good morning.

1    Q    My name's Paul Flannery.  I'm one of the attorneys that

2    represent Shelton Harris.  Ms. Fickling, you testified that

3    Shelton Harris came to live with you on Seamon Avenue in November

4    of 2003, correct?

5    A    Yes.

6    Q    And he stayed with you a couple months?

7    A    Yes.

8    Q    Now, I take it that when he moved in, he brought some

9    personal belongings with him?

10   A    Yes.

11   Q    And you didn't root through all his personal belongings and

12   see what he was bringing into your house, correct?

13   A    No. I didn't root through any of his belongings.

14   Q    Okay.  I understand.  He kept his belongings in a storage

15   area between the kitchen and the living room?

16   A    Yes.

17   Q    But fair to say that you went inside that storage area very

18   frequently?

19   A    No, we didn't.  I haven't -- no, I haven't.  I didn't go

20   into the area often.  It was no need for me to go into the area.

21   Q    Do you recall testifying in this matter before the grand

22   jury in March of 2004, Ms. Fickling?

23   A    Um-hum.

24            THE COURT:  You have to say yes or no, Ms. Fickling.

25            THE WITNESS:  Yes.

1  Q    Ms. Fickling, did you and Mr. Drake, did you keep different

2  items inside that storage area, like brooms or things of that

3  nature?

4  A    Yes.

5  Q    So sometimes you'd have to go in there to get something like

6  that to clean the house or something to that effect?

7  A    If it was in there.

8  Q    Okay.  So you had an opportunity to view Mr. Harris's

9  belongings when they were inside that storage area at a certain

10 point?

11 A    Yes.

12 Q    So when you'd go in there, would you see his stuff there?

13 A    Yes.

14 Q    Okay.  And you never saw a gun in that closet?

15 A    No.

16 Q    You did see the rap notebook, though?

17 A    Yes, on top of the crates, yes.

18 Q    You never saw any weapon on top of that notebook?

19 A    No.

20 Q    Ms. Fickling, Shelton Harris helped you and Mr. Drake out

21 with the transportation of your son, correct?

22 A    Sometimes, yes.

23 Q    Okay.  And what types of hours was he responsible for in

24 helping out your son?  Like when was it that he would do, like

25 pick up your son or take him somewhere?

1    A    If, in the morning time and in the afternoon time.  Like

2    around 2:30, 3:00.

3    Q    So take him to school?

4    A    Yes.

5    Q    And then pick him up?

6    A    Well, actually wasn't school.  He start like, well, you

7    could say it's school.

8    Q    Okay.  Understood.  I have no further questions.  Thank you,

9    Ms. Fickling.

10                   CROSS EXAMINATION

11   BY MR. COBURN:

12   Q    Ms. Fickling, good morning.

13   A    Good morning.

14   Q    You're aware of something called Sheistyville, right?

15   A    Not really aware of it.  I heard it, heard it before.

16   Q    And you heard of it because it was your understanding that

17   that was the record label that Mr. Harris was involved in, is

18   that right?

19   A    Yes.

20   Q    And you knew someone by the name -- well, you knew some of

21   the other people or at least one other person who was involved in

22   Sheistyville, right?

23   A    I mean, yes.

24   Q    Did you know that person by the name of TM?

25   A    Yes.

1   Q    And it's correct that you didn't know anybody else besides,

2   aside from Mr. Harris and TM, you didn't know anybody else was

3   involved in Sheistyville, right?

4   A    No.

5   Q    Do you know Shawn Gardner?

6   A    No.

7   Q    Or Goo?

8   A    No.

9   Q    Thank you.

10   A    Um-hum.

11          MR. HARDING:  I have no further questions, Your Honor.

12          THE COURT:  Thank you very much, Ms. Fickling.  You're

13   excused.

14          MR. HARDING:  Your Honor, the United States calls Dr.

15   Ana Rubio.

16           DR. ANA RUBIO, GOVERNMENT'S WITNESS, SWORN

17          THE WITNESS:  I do.

18          THE CLERK:  Be seated.  Speak directly toward the make.

19   State your name and spell it for the record, please.

20          THE WITNESS:  My name is Ana Rubio.  A-N-A, R-U-B-I-O.

21          DIRECT EXAMINATION

22   BY MR. HARDING:

23   Q    Good morning, Dr. Rubio.

24   A    Good morning.

25   Q    Can you tell us how you're employed?

1    A    I am a medical examiner, Assistant Medical Examiner at the

2    Office of the Chief Medical Examiner for the State of Maryland.

3    Q    How long have you been employed by the medical examiner for

4    the State of Maryland?

5    A    Six years and eleven months.

6    Q    Okay.  Can you tell us, Dr. Rubio, what your educational

7    background is?

8    A    Yes.  I went to college and medical school in Spain.  After

9    that, I did a residency in clinical pharmacology and a Ph.D. in

10   clinical pharmacology.  As part of the Ph.D., I had a Fulbright

11   fellowship to come to the United States to do research with new

12   medicines.  And I came in 1988.

13         I did the fellowship at the University of Rochester in

14   Rochester, New York.  And after that, I started a residency in,

15   at the University of Rochester in New York in anatomic pathology

16   and neuropathology.

17         At the end of that, I work as a professor of

18   neuropathology at the University of Rochester for five years.

19   Before I did a fellowship in forensic pathology in Rochester as

20   well.

21         After that, I work as a medical examiner in Monroe

22   County in the state of New York before I came here at the, in

23   January of 2002.

24   Q    Okay.  So you had one other prior job as a medical examiner

25   before you came to the State of Maryland?

1   A    Yes.

2   Q    Okay.  How long does it take, just out of curiosity, to

3   complete a residency in pathology, Doctor?

4   A    Four years.

5   Q    Okay.

6   A    Plus one year of fellowship, if you want to be a medical

7   examiner.

8   Q    Oh, so it's five years?

9   A    Yes.

10  Q    And then you say you also did a fellowship in forensic

11  pathology.  How long does a fellowship take?

12  A    The fellowship takes one year.

13  Q    And where did you do that?

14  A    Where?

15  Q    Yes.

16  A    Also in New York.  In Rochester, New York.

17  Q    Okay.  Dr. Rubio, have you published dozens of articles or

18  coauthored dozens of articles in the area of forensic pathology

19  and related areas like neuropathy?

20  A    Yes.

21  Q    Okay.  Both in Spanish and in English?

22  A    Well, in pathology, I think only in English.

23  Q    Okay.  Have you had occasion to testify previously as an

24  expert in forensic pathology?

25  A    Yes, I have.

1    Q    Can you tell us approximately how many times and in what

2    courts you've testified?

3    A    I estimate between 80 and 100 times.  And I have testified

4    in several courts in the State of New York, in Bucks County,

5    Pennsylvania, Federal Court in Greenbelt, in Washington, D.C.,

6    and in the State of Maryland in multiple district courts, 12 or

7    13 counties, and also in Baltimore City.

8    Q    Okay.  Your Honor, I would like to ask the Court to qualify

9    Dr. Rubio as an expert in the area of forensic pathology.

10              THE COURT:  Any questions of the doctor?

11              MR. COBURN:  No thank you, Your Honor.

12              MR. LAWLOR:  No thank you.

13              THE COURT:  The witness will be accepted as an expert

14   as tendered.  Good morning, Dr. Rubio.

15              THE WITNESS:  Good morning.

16   BY MR. HARDING:

17   Q    Let me call your attention to February 28th of 2002, Doctor,

18   and ask, first of all, did you perform an autopsy or a medical

19   examination on a woman by the name of Lisa Brown?

20   A    Yes.  On February 28, 2002, I was the medical examiner

21   supervising the autopsy on Ms. Lisa Brown.

22   Q    You were supervising but there was someone else with you, is

23   that your --

24   A    Yes.  In the, at the Medical Examiner Office in the State of

25   Maryland, we are a training, teaching facility.  So it's like I

1    did my fellowship in Rochester, New York.  Some, every year we

2    have two or three doctors that are finishing their training in

3    forensic pathology so they do their one year training in our

4    office.  As such, they perform autopsies under the direct

5    supervision of a medical examiner.  In that way, they have the

6    step from being a pathologist but not a medical examiner, until

7    they are fully trained medical examiners.

8            Dr. Nicolaescu, he was the fellow at the time and I was

9    the medical examiner supervising the autopsy.

10   Q    Okay.  I have here an exhibit that has been marked as

11   Government Exhibit MB-26, which I'm putting on the screen, which

12   I hope you can see there on the projector in front of you.  Can

13   you see it all right, Doctor?

14   A    Yes.

15   Q    And I'm turning to the last page.  Is that your signature,

16   Doctor, and the signature of Dr. Nicolaescu?

17   A    Yes.

18   Q    Your Honor, I would like to offer Government Exhibit MB-26

19   as a report that Dr. Rubio and Dr. Nicolaescu completed on the

20   autopsy of Lisa Brown.

21           THE COURT:  It's admitted.

22   Q    Can you describe for us and do you have a copy of the

23   autopsy report with you, Doctor?

24   A    Yes.

25   Q    Feel free to look at your own copy.  But I wonder if I could

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 19 of 270

1    ask you to summarize the evidence of injury that is detailed in

2    the autopsy report.

3    A    Yes.  The evidence of injury was limited to gunshot wounds.

4    Ms. Brown had three gunshot wounds.  Do you want me to describe

5    them one by one?

6    Q    Yes, please.

7    A    In order to describe the gunshot wounds, we start from the

8    top of the head and go to the feet.  Because I don't know the

9    order of these wounds, in a standard way I just go from the one

10   that is highest in the body, first in the front and then in the

11   back.

12        So the first, the fact that I describe it first does

13   not indicate that is the first wound that she suffered.  I don't

14   know about that.

15        But Ms. Brown had three gunshot wounds.  One was a

16   through and through wound to the head.  The entrance was located

17   on the left cheek and just in front of the ear lobe, about here.

18   The entrance wound had, was a circular defect, a round defect

19   with abrasion.  In the photos you can see multiple small, about

20   1/16th of an inch round abrasions, which are scrapes of the skin,

21   surrounding the entrance wound.  That is what we call gunpowder

22   tattooing, or it's also called stippling, and indicates that the

23   end of the barrel was within a short distance from the skin.

24        The projectile entered the face and went from left to

25   right, a little bit downwards and a little bit back to front, and

1    injured the soft tissues and bones of the face without entering

2    the cranial cavity and injuring the brain.

3            Another gunshot wound was located on the upper back,

4    also.  So on the left side of the torso of the back.

5    Q    Excuse me, if I may, Doctor.  If I could go back to the

6    first wound for just a moment.

7    A    Yes.

8    Q    I'm pointing to a mark on her right cheek.  Is this the exit

9    wound for that first?

10   A    Yes.

11   Q    Okay.

12   A    The exit wound was pretty much about the cheek prominence.

13   Q    You say that the stippling surrounding the entrance wound

14   indicates that it was a close range firing.  Do you have any idea

15   how close?

16   A    No.  The distance really depends on the specific weapon and

17   the specific ammunition used.  Usually, in order to get gunpowder

18   stippling, the end of the barrel generically, I am not talking

19   about the specific weapon, has to be within four or five feet to

20   the most.  It could be within a few inches.

21   Q    Okay.  You say it was a through and through wound.  Does

22   that mean that no bullet was recovered that related to that

23   particular gunshot wound?

24   A    Yes.

25   Q    Okay.  And were you aware that Ms. Brown was sitting in the

1    front passenger seat of an automobile?

2    A    Yes.

3    Q    And you're aware of that because you have investigators that

4    actually go to the crime scenes and make records of that sort of

5    thing?

6    A    Yes.

7    Q    Or take pictures, is that correct?

8    A    Yes.

9    Q    When you say you have investigators, I mean the Office of

10    the Chief Medical Examiner does.

11    A    Yes.  They are forensic investigators that go to the scene

12    and take photographs.  In this case, they took Polaroids that

13    they are available in the record.

14    Q    Let me ask you something, Doctor.  If she were sitting in

15    the front passenger seat and the gun man were in the back seat,

16    would this entrance wound be consistent with her turning her head

17    to the left?

18    A    Yes.

19    Q    Also, you indicated that the bullet was going slightly

20    downward, is that correct?

21    A    Yeah, that's correct.

22    Q    The trajectory was slightly downwards, is that correct?

23    A    Yes.

24    Q    Does that indicate that the gun may have been held up high?

25    A    It may indicate that, yes.

1    Q    Okay.  All right.  Let's go on.  You said there was a second

2    wound to the left upper back.

3    A    Yes.  There's another gunshot wound where the entrance was

4    located on the back, close to the line of the shoulder, on the

5    left side of the back.  In this case, the entrance wound was a

6    round defect with an abrasion ring.  The abrasion ring was not

7    just going all around the wound but it was more pronounced in the

8    lower part of the wound, indicating that the projectile was going

9    upwards.

10        The bullet entered the soft tissues of the back and it

11   was traveling in some way parallel to the spine, the bones of the

12   spine, and entered the, the back of the head through the defect

13   that is in the bottom of the skull, this one called foramen

14   magnum.  And that communicates the brain with the spinal cord.

15   The projectile entered through that natural hole in the skull and

16   injured the brain, in this case injured the cerebellum and also

17   the cerebrum of the brain.

18        The projectile then was, stayed inside the head and was

19   recovered from the cranial cavity during the autopsy.

20   Q    Looking on the screen, Doctor, is this the entrance wound to

21   this second gunshot wound that you're talking about?

22   A    Yes.

23   Q    And you say that the bullet went into her head and actually

24   penetrated the brain stem, is that correct?

25   A    Yes.

1    Q    That would, I assume, by the way, cause instant death, is

2    that correct?

3    A    The injury in that location is associated with instant,

4    instantaneous death.

5    Q    Would the trajectory of this particular bullet be consistent

6    with her being slouched over in the seat already at the time that

7    the shot was fired?

8    A    Yes.  If she wasn't was slouched over, it would explain why

9    the projectile had such a sharp upwards direction.

10   Q    Okay.  By the way, on that first gunshot wound, you said

11   that was a through and through injury that did not enter her

12   brain.  Would that have been a fatal bullet all by itself?

13   A    That wouldn't be an immediately fatal bullet, bullet wound.

14   It would cause bleeding, pain.  It may have caused shock.  But

15   it's not per se immediately lethal.  It could have complications

16   but she could have survived with medical attention.

17   Q    Okay.  Now, you say there was a third injury, too, is that

18   correct?

19   A    Yes.  There's another gunshot wound.  This is a slightly

20   more complex wound.  The body, in the anatomic position, which is

21   standing with the body in a straight position and the hands, with

22   the palms of the hand looking upwards, the entrance was on the

23   right hand in this part of the hand, which is called the thenar

24   eminence.  It's the ball of the hand.  There's a round defect

25   there.

1          There's no signs of close range of fire.  There's no

2     stippling.  But something that in forensic pathology we learn is

3     that nobody has described real stippling on the palm of the hand

4     because of the skin being much thicker than in other parts of the

5     body.  So I cannot assume any kind of range of fire in this case.

6          The bullet entered the skin, soft tissues, muscles, and

7     the bones of, of the hand, and exited the back of the hand around

8     this location.  That was a through and through wound.

9          Associated with this wound was a graze wound that was

10    located on the left side of the neck.  And that is that picture

11    that's --

12    Q    Is that the picture that's on the screen right now, the

13    graze to the neck?

14    A    Yes.  So this graze on the neck was going from the center --

15    well, from the center of the neck to the left side downwards.  So

16    that would be consistent with a single gunshot wound that went

17    through and through in the hand and then grazed the neck.

18    Q    Would that be consistent -- you were just holding your hand

19    in a position like this.  Would it be, would that particular shot

20    that went through her hand and then grazed her neck, would that

21    be consistent with her holding her hand up as if to block --

22          MS. RHODES:  Objection, Your Honor.

23    Q    -- a bullet?

24          THE COURT:  Overruled.  You may answer.

25    A    Yes.  Gunshots wound that are in the hand sometimes are

Case 1:04-cr-00029-RDB   Document 689   Filed 06/12/09   Page 25 of 270

1    called defensive gunshot wounds because they could be consistent

2    with a defensive posturing of the hand trying to prevent, almost

3    a reflex, trying to prevent injury to other parts of the body

4    that are more valuable.

5    Q    Okay.  Now, with these three wounds, can you say for sure,

6    Doctor, how many bullets were fired to cause these three gunshot

7    wounds?

8    A    For sure?  No.

9    Q    Okay.  How many bullets were there, at least?

10   A    At least three.

11   Q    At least three bullets?

12   A    At least three bullets.

13   Q    Okay.

14          THE COURT:  Excuse me one moment, please, Mr. Harding.

15   Sorry to interrupt.

16          Mr. Hanlon, is there a concern that you need the

17   Court's assistance with?

18          MR. HANLON:  Just a sequestration issue, Your Honor.

19          THE COURT:  Yes.

20          MR. HANLON:  Do you want me to tell the Court now?

21          THE COURT:  Yes.

22          MR. HANLON:  This young lady is a possible government

23   witness, Your Honor.  I was just explaining to her about the

24   sequestration.

25          THE COURT:  Yes.  What is the witness' name?

Case 1:04-cr-00029-RDB   Document 689   Filed 06/12/09   Page 26 of 270

1          MR. HANLON:  Ms. Cheatham, Shanika Cheatham.

2          THE COURT:  Ms. Cheatham, good morning.

3          MS. CHEATHAM:  I was explaining to him that I've been

4     here for the duration of the trial before so I didn't understand

5     I couldn't stay.

6          MR. HANLON:  That's correct, Your Honor.  I wasn't

7     aware.  Just today that she had been.  It's not her fault but I

8     thought since now.

9          THE COURT:  All right.  Ms. Cheatham, because you could

10    possibly be a witness in this case, you should not have attended

11    any earlier proceedings.  And I'm afraid I'm going to have to ask

12    you to leave the courtroom at this time.  We can make available

13    to you at a later time a record of these proceedings so that you

14    can read about it, but it's not appropriate for you to be in the

15    courtroom.

16         I'm going to ask the agent to go out with Ms. Cheatham

17    and find out from her exactly what days during the trial she's

18    been present in the courtroom as best as you can, Agent.  Thank

19    you very much.

20         Sorry to interrupt, Mr. Harding.

21         MR. HANLON:  I apologize, Your Honor.

22         THE COURT:  Certainly.  Certainly.  It's quite

23    appropriate.  You may proceed, Mr. Harding.

24    BY MR. HARDING:

25    Q    Thank you, Your Honor.  Is there a toxicology report that is

1    typically done in connection with a medical examination, Dr.

2    Rubio?

3    A    Yes.

4    Q    Can you tell, first of all, tell the jurors what that is?

5    A    During the autopsy, we retain fluids from the body, blood,

6    urine, other fluids, some organs, the liver, kidney, the stomach

7    contents.  And we test them for the presence of alcohol and drugs

8    in the system.  This is a routine procedure we do in all the

9    cases.  In the majority of them we actually screen for the

10    presence of alcohol and drugs.  That was something that was done

11    in this case.

12    Q    What were the results of the toxicology exam?

13    A    The toxicology results were negative for alcohol and

14    negative for drugs.

15    Q    Okay.  By the way, is it you that does the toxicology exam

16    or do you have someone else, a specialist who does toxicology

17    work for the medical examiner?

18    A    There is a laboratory where there are specialists in

19    toxicology.  It's not myself.

20    Q    What was the cause of Ms. Brown's death, Dr. Rubio?

21    A    The cause of death was multiple gunshot wounds.

22    Q    Did you also perform a medical examination on the same day

23    of a man by the name of Oliver McCaffity?

24    A    Yes.

25    Q    I'm now showing you what's been marked Government Exhibit

1   MB-26.  I'm sorry.  Got the wrong one.  MB-27.  Does this have

2   your signature and that of Dr. Nicolaescu on it, also, Doctor?

3   A    Yes.

4   Q    Your Honor, I would like to offer MB-27 into evidence.

5         THE COURT:  It's admitted.

6   Q    Can you do the same thing for Mr. McCaffity that you did for

7   Ms. Brown?  Just proceed and tell us what the evidence of injury

8   was.

9   A    Yes.  Mr. McCaffity had also gunshot wounds.  He had two

10  gunshot wounds to the head, both of them.  The gunshot wound that

11  I labeled A, the first one I'm going to describe, was also a

12  through and through gunshot wound.

13        The entrance wound was located on the right side of the

14  face, above the cheek.  And it was also a round defect with

15  concentric abrasion ring, and also gunpowder stippling, tattooing

16  around entrance wound, indicating that there's close range of

17  fire.

18        The projectile entered the face, so injured the skin,

19  the soft tissue, the bones of the face, and exited on the left

20  side of the neck.  It was going right to left.  At close to the

21  exit, it perforated one of the big veins of the neck, the left

22  jugular artery -- sorry -- the left jugular vein.  That will be

23  associated with bleeding from that wound.

24        There's no bullet or bullet fragments recovered from

25  this through and through wound.  And the direction of the

1    projectile was right to left, back to front, and downwards.

2    Q     So again, this, this shot was fired downward, is that

3    correct?

4    A     That's correct.

5    Q     And Mr. McCaffity was seated in the driver's seat of the

6    vehicle, as you know, Dr. Rubio.

7    A     Yes.

8    Q     Would this injury be consistent with his turning his head to

9    the right when the gunshot was fired?

10   A     Yes.

11   Q     You say that it appears to be jugular, is that correct?

12   A     Yes.

13   Q     Would that be a fatal wound, Doctor?

14   A     That would be a rapidly fatal wound.  This wouldn't be

15   instantaneous but it would be associated with a large and

16   relatively rapid blood loss that would, that would produce death.

17   Q     Okay.  Now, can you tell us about the second gunshot wound?

18   A     Yes.  There's a superficial through and through gunshot

19   wound that was located on the back of the head.  It was on the

20   back, two inches below the top of the head and four inches to the

21   left of the mid, of the center of the head, on the left.

22          There's no evidence of gunpowder tattooing or any other

23   close range of firing.  But it's in an area of the head that is

24   covered with hair.

25          The bullet perforated the scalp without entering,

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 30 of 270

1    without penetrating the skull or going into the cranial cavity.

2    So it was really like a superficial gunshot wound of the back of

3    the head, injuring only the scalp.

4              The direction was back to front, left to right, and

5    slightly upwards.

6    Q    Okay.  And would this be consistent, if this were, Mr.

7    McCaffity is in the driver's seat, but his head was slumping

8    downward, would this be consistent with the gunshot wound you

9    just described?

10   A    It would be consistent.

11   Q    Thank you.  Did you recover a bullet from either of these

12   wounds, Doctor?

13   A    No.

14   Q    When you say that there was no stippling but that he had

15   long hair, does the presence of hair mean that there will be no

16   evidence of stippling?

17   A    The presence of this amount of hair would prevent stippling

18   from injuring the scalp, the skin of the scalp, yes.

19   Q    I see.  So you can't really say whether it was a close range

20   fire or a more distant fire?

21   A    No, I couldn't.

22   Q    What was the result of the toxicology exam, Doctor?

23   A    The toxicology exams were negative for both alcohol and

24   drugs.

25   Q    What was the cause of Mr. McCaffity's death, Doctor?

1    A    The cause of death was gunshot wounds to the head.

2    Q    For both Ms. Brown and Mr. McCaffity, Doctor, are the

3    injuries they suffered consistent with the gunman firing from the

4    back seat of a vehicle?

5    A    They are consistent, yes.

6    Q    Did you notice on either Mr. McCaffity or Ms. Brown any

7    significant injuries other than the gunshot wounds?

8    A    Mr. McCaffity had a few superficial scrapes on both knees.

9    Ms. Brown didn't have any other significant injuries.

10   Q    Do you know what could have caused -- well, let me ask you

11   this.  Are you aware that the air bags inflated in the car after

12   the injury, after the shooting took place?

13   A    I am aware that the car was involved in a collision.  I

14   don't remember if I was ever aware that the air bags deployed.

15   Q    Okay.  Let me go on now to the next one.  And this is not

16   one that you did yourself personally, Doctor.  It's the autopsy

17   of a man by the name of Darryl Wyche.  And the report is marked

18   government-exhibit W-43.  And it was apparently performed by Dr.

19   Stephen Radentz and Dr. Ellen C. Riemer, is that correct?

20   A    Yes, Dr. Riemer.

21   Q    Are you familiar with both of them?

22   A    Yes, I work with both them.

23   Q    Okay.  Dr. Radentz is no longer employed by the medical

24   examiner, is that correct?

25   A    No.  He's a medical examiner in Indianapolis now.

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 32 of 270

1  Q    Okay.  Just like the Colts, he left Baltimore for

2  Indianapolis.  You wouldn't understand that.

3  A    I heard about them.

4  Q    Oh, you did.  Okay.  Doctor, then, what I would like you to

5  do is the same thing you did for Ms. Brown and Mr. McCaffity.  Go

6  through and describe the injuries to Darryl Wyche.

7  A    Mr. Wyche, Mr. Darryl Wyche had a single gunshot wound to

8  the head.  The entrance wound was located on the left side of the

9  face -- well, left side of the head, immediately back of the left

10 ear lobe.  So about here.

11       The entrance wound was a round defect with an abrasion

12 ring.  And he had gunpowder stippling in the area around the

13 entrance wound.  So the stippling was involving the front of the

14 ear lobe and some of the face of the cheek.

15       The projectile entered the, injured the base of the

16 cranium and was traveling in back of the head, through the spine.

17 And it went through the first and the second cervical vertebrae,

18 which are the first bone here in the neck.  And inside the

19 cervical vertebrae is the spinal cord, which is a part of the, of

20 the nervous system that communicates the brain with the rest of

21 the body.  That is a very critical area of the brain because it

22 controls a lot of the movement and controls a lot of the heart

23 and respiratory functions.

24       So the projectile perforated that part of the spinal

25 cord and then went into the left -- sorry -- the right side of

1    the face and it was lodged in the soft tissues of the angle of

2    the jaw.

3            The bullet had what sometimes we call partial exit

4    because it lacerates the skin and it shows, but it actually

5    doesn't make it outside the body.  So through the external

6    examination, we could see that there was a bullet just

7    immediately below the partial exit wound.

8            THE COURT:  The jury is looking at the photograph

9    there, Dr. Rubio.

10   A    Oh.  Yes.

11   Q    You see it on your screen?

12   A    Yeah.  If you have the same image as I do, here where the

13   shiny part is.

14   Q    You know what, Doctor?  If you touch your screen, it's

15   supposed it light up on everyone's.  Okay.  It looks like yours

16   is a little bit off from ours.

17   A    I can see it because I know how the picture was.

18   Q    Okay.  Is this the bullet that was recovered in the autopsy?

19   A    Yes.

20   Q    As it is exiting, it never made it all the way out?

21   A    No.  It just, it's more partially shining through the skin.

22   Q    You say that it cut through the vertebrae.  Did it cause

23   injury to the cervical cord, to the spinal cord?

24   A    Yes.  The vertebrae, the spinal cord, and also the jugular

25   vein.

1    Q    So would this have been a fatal shot, Doctor?

2    A    This would have been an almost immediately lethal shot.

3    Q    Okay.  Now, Darryl Wyche was seated, as you know from your

4    investigator's photographs, in the passenger seat of the

5    automobile.  Would this shot be consistent with him either being,

6    would the gunman either have been slightly to his left or could

7    he have been turning his face slightly to the, to the left when

8    that shot was fired, Doctor?

9    A    Either one of those situations.

10   Q    What was the toxicology report on Darryl Wyche?

11   A    The toxicology was negative for alcohol and negative for

12   drugs.

13   Q    What was the cause of Darryl Wyche's death?

14   A    The cause of death was gunshot wound to the neck.

15   Q    And again, with this one bullet, Doctor, did you say that it

16   was traveling downward?

17   A    Yes.  Left to right, back to front, and downward.

18   Q    Okay.  Thank you.  I'm now going to move on to W-43.  Sorry.

19   W-44.  And call your attention, again, to the signature page, Dr.

20   Rubio.  This was also done by the same two who did Darryl Wyche,

21   Dr. Radentz and Dr. Riemer, is that correct?

22   A    That's correct.

23   Q    And I'm going to ask you to do the same thing with Anthony

24   Wyche that you did with the others.  Go through the evidence of

25   injury one by one.

1   A    Mr. Anthony Wyche had a, also, gunshot wounds.  He had three

2   gunshot wounds, two to the head and one to the upper back.

3         The first one I am going to describe, gunshot wound A,

4   to the back of the head, had an entrance wound located pretty

5   much on the top of the back of the head, very close to the center

6   of the back of the head.  And the entrance wound -- this is the

7   one.

8   Q    Is this the right picture I've got?

9   A    No.  This would be B.

10  Q    Oh.

11  A    This is it.  Yeah.  It's kind of hard to know what the

12  position, because the area of the skin around the entrance wound

13  has been shaved.  But there's no anatomic landmarks here.  So

14  what I am telling you is that this was located on top of the

15  head, really pretty much a quarter of an inch left of the center.

16        THE COURT:  Mr. Harding, I'm sorry, Doctor.  You have

17  the photograph, I think --

18  A    Upside down.

19        THE COURT:  -- reversed, if you look at the labeling.

20  Yes.  Sorry to interrupt, Doctor.

21  A    This has the label as it would be placed during the

22  photography.  So this would be the top and this is the bottom.

23        This is a round defect, also with a concentric abrasion

24  around.  There's no signs of close range of fire.  But before, in

25  order to take the photograph, he had cornrows and these had to be

1    cut and shaved.  So the absence of gunpowder tattooing or

2    stippling is not in this case informative of the range of fire

3    because the thick hair would have prevented the gunpowder from

4    injuring the skin.

5            So the projectile entered the back of the head and went

6    into the brain and injured multiple lobes of the brain, the

7    occipital lobe from both sides and also the temporal lobe on the

8    right side.  And the projectile was lodged in the bones of the

9    skull pretty much in this area, which is in the right temporal

10   bone of the head.

11           So from there, during the autopsy they recovered a

12   projectile.  And the direction of the wound was back to front,

13   left to right, and downward.

14   Q    Downward again?

15   A    Yes.

16   Q    Was there a bullet recovered associated with this wound,

17   Doctor?

18   A    Yes.

19   Q    I assume this would be a fatal injury, would it not, Doctor?

20   A    Yes.  Rapidly fatal.

21   Q    Sorry?

22   A    Rapidly fatal.

23   Q    Rapidly fatal.  Okay.  Let's go on the second one.

24   A    The second, the one I described second, gunshot wound B, is

25   what you see here in the photograph.  And it's a superficial

1    gunshot wound.  It's deeper than a graze but it has an entrance

2    here and an exit here.  And it just perforated the soft tissues

3    of the scalp.  It was located on the back of the head, one inch

4    below the top of the head and one inch to the right of the

5    center.  And the exit is just below, in front, and to the right

6    of the entrance wound.  So the direction of this was back to

7    front, left to right, and downward.

8    Q    Downward again?

9    A    Yes.

10   Q    There was no bullet recovered associated, at least by you in

11   your autopsy, because this is a through and through wound, I

12   assume, is that correct?

13   A    Yes.  This is a through and through wound.

14   Q    Okay.  Let's go on to the third one.

15   A    That would be gunshot wound C, and it was located on the

16   right side of the upper back, around the shoulder, in this area.

17   The entrance wound was a round defect.  Here.  The arm had been

18   raised and separated in order to see the wound.  And it's just at

19   the edge of the torso here.  And there's no signs of close range

20   of fire.

21        The projectile goes through the soft tissues and

22   muscles of the side of the chest and exits in the front of the

23   chest on the right side, also close to the arm.

24        So the direction of, never entered the chest cavity and

25   injured anything, just the soft tissues.  And the direction of

DIRECT EXAMINATION OF RUBIO                                    38

1    this wound was back to front, left to right, and downward.  I'm

2    sorry.  I was, I was -- disregard the direction.  The back to

3    front, slightly right to left, and no up and down deviation.  I

4    was reading the one for B.

5    Q    Okay.  So this is the only one where the bullet wasn't going

6    downward, is that correct?

7    A    Yes.

8    Q    When was the result of the toxicology exam on Anthony Wyche,

9    Doctor?

10   A    The toxicology was negative for drugs and alcohol.

11   Q    What was the cause of Anthony Wyche's death, Doctor?

12   A    The cause of death was multiple gunshot wounds.

13   Q    Finally, Doctor, I have here Government Exhibit S-180.  I'm

14   turning to the signature page.  Do you know Dr. Joseph Pestaner

15   and Craig M. E. Litwin?

16   A    Yes, I know both.

17   Q    Okay.  That is an autopsy report on a woman by the name of

18   Tonya Jones Spence, who's a little bit different in that she

19   received medical treatment before coming to your Medical

20   Examiner's Office, is that correct?

21   A    That's correct.

22   Q    And are the hospital records also part of your file, Doctor,

23   the hospital records of her treatment prior to being brought to

24   your office?

25   A    Yes.

1    Q    Okay.  First of all, could you tell us briefly, and not

2    excruciating detail, could you give us an idea of what kind of

3    medical treatment she received prior to coming to your office and

4    what her time of death was?

5         MS. RHODES:  Exhibit number?

6    Q    I'm sorry?  S-180.

7    A    Yes.  Ms., Ms. Jones Spence, she was flown to the University

8    Hospital and was, survived there until she was pronounced dead

9    about seven hours and ten minutes from the time she received the

10   injuries.  In that time, when she was found, she had difficulty

11   breathing and shallow, shallow breathing, but she was still alert

12   and conscious.

13        She was taken to the hospital and they noticed that she

14   had multiple gunshot wounds, and what they describe as a second

15   wound in the axilla.  So around the armpit.  And so immediately

16   they, they put a respirator, a breathing tube, they put a tube

17   also to the stomach.  They put several catheters in the veins to

18   give her fluids.  They opened the chest.

19        So first they put that tube to aspirate all the blood

20   that was in the chest.  And they also opened the chest under the

21   breast from side to side, open up.

22        They resected part of her lung.  And they opened the

23   pericardium, which is the membrane that surrounds the heart.  And

24   they tried to suture, to sew up the heart.

25        Also, as part of the treatment, they gave her some

1    medications and they gave her multiple, multiple bags of blood

2    and plasma, other fluids to recuperate.

3             They noted in several points during the medical records

4    that she had uncontrollable bleeding.  So in order to keep her

5    alive, they had to transfuse a lot of blood.

6             I think this is the summary of the treatment she

7    received.  She died in the operating room.  She was pronounced

8    dead in the operating room.

9    Q    Okay.  Was she still conscious when she arrived at Shock

10   Trauma, Maryland --

11   A    Yes.

12   Q    -- Hospital?  Shock Trauma?  Okay.  And then she died.  And

13   that's when she was taken over to your office, is that correct?

14   A    That's correct.

15   Q    Could you, as you did for the others, describe for us her

16   injuries?

17   A    Ms. Jones Spence had two types of injury.  One were gunshot

18   wounds and the other were additional injuries that were of the

19   blunt type.  First, I'll describe the gunshot wounds.

20            She had two gunshot wounds.  One of them was to the

21   right arm and axilla.  This is a complex, complex gunshot wound

22   where first the bullet was very superficial and entered and

23   exited the right arm, exiting at the axilla, and immediately

24   reentering the torso just below the exit wound.

25            So in this wound you can see a round defect here, which

1    would be the first entrance wound.  And then part of the tissue

2    that is abraded, which would be part of the exit wound and the

3    re-entrance.  You can see the wounds better when the arm is

4    raised and separated from the torso.

5          Then the projectile entered the chest cavity and

6    injured the lung and the right atrium of the heart.  The right

7    atrium, you know, the heart is divided in four chambers, two

8    ventricles and two atriums.  Any defect in the heart is going to

9    produce rapid bleeding because as the heart pumps, instead of the

10   blood going through the normal connection, it's going to leave

11   through the gunshot wound.  So that's why they tried to switch

12   her during the autopsy -- sorry -- during the surgery.

13         As part of my reviewing of the medical records, I noted

14   that during the surgery they recovered a bullet and they gave it

15   to, to an officer that was at the hospital at the time.  So at

16   autopsy they did not recover any bullets in relation to this

17   gunshot wound.

18   Q    I assume, Doctor, that a, if a projectile actually enters

19   the right atrium of the heart, that is an exceedingly serious

20   injury and yet she lived for several hours, is that correct?

21   A    Yes.  That will be quickly fatal injury in the absence of

22   medical attention.  With quick medical attention, this would be a

23   survival, survivable injury on itself.  So if she received this

24   injury, for example, at the doors of the operating room and they

25   were able to bring her in immediately, she may have been able to

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 42 of 270

1    survive it.

2    Q    And do you recall from the hospital report, Doctor, that she

3    received approximately 21 liters of blood during the time that

4    they were trying to save her life at the hospital?

5    A    I didn't.  But looking at the transfusion records, that is

6    consistent with her treatment.

7    Q    Okay.  Now, can you tell us about the second injury?

8    A    She had another gunshot wound to the right side of the back.

9    This was in this area of the back.  And the projectile was

10   traveling like parallel to the back.  So going from right to left

11   and slightly upwards, and was associated with fracture with a

12   part of the second thoracic vertebra.  And the bullet was staying

13   in the soft tissues just outside the bone.  And a large caliber

14   bullet was recovered during the autopsy in relationship with this

15   gunshot wound.

16          The direction was right to left, slightly back to

17   front, and upwards.

18   Q    Okay.  Now, you mentioned that there were some other

19   injuries that were not gunshot wounds?

20   A    Yes.

21   Q    Can you tell us what those were?

22   A    The injuries that were seen during the autopsy that were not

23   directly related to the gunshot wounds were some contusions and

24   abraded contusions.  So bruising and scraping that were located

25   on the right wrist and right forearm, contusions of the back of

1    the left hand, and abrasions on the back of the left shoulder.

2    So scrapes and bruises of right wrist, right forearm, left hand

3    and the left side of the back.

4         In addition, there was abnormal or what we call

5    pathological motion.  So when you try to move a joint, it

6    shouldn't go beyond the normal range.  In this case, the right

7    wrist and the right elbow were going beyond the range, which

8    could be consistent with either a fracture or a dislocation or a

9    ligament distortion.

10   Q    Okay.  So in addition to the abrasions, she either

11   dislocated or fractured her arm and wrist, is that correct?

12   A    That's correct.

13   Q    Would those injuries be consistent with a fall, Doctor, do

14   you know?

15   A    They are consistent with a fall.

16   Q    Okay.  What was the result of the toxicology report on --

17   A    The toxicology was negative for drugs and alcohol.

18   Q    And what was the cause of Ms. Jones Spence's death, Doctor?

19   A    The cause of death was gunshot wounds to the torso.

20   Q    Okay.  Leaving aside the murder of Tonya Jones Spence,

21   Doctor, and looking only at the other two double murders, the two

22   double murders that occurred in the automobiles.

23   A    Yes.

24   Q    From your standpoint as a forensic pathologist, do those

25   appear to have been carried out in a very similar fashion?

1    A    Very similar.

2    Q    No further questions, Your Honor.

3              MR. LAWLOR:  No questions, Your Honor.

4              MR. MARTIN:  No questions, Your Honor.

5              THE COURT:  Dr. Rubio, thank you very much.

6              THE WITNESS:  Thank you.

7              THE COURT:  You're excused.  I think we should take our

8    morning recess at this time, ladies and gentlemen.  We'll stand

9    in recess for 15 minutes.  Please leave your note pads on your

10   chairs.  Have no discussion of any of the evidence or about the

11   case.  Continue to keep an open mind.

12             Jury's excused for 15 minutes.

13             (Jury exits the courtroom.)

14             (Recess.)

15             MR. COBURN:  I think we should wait for counsel.

16             MR. LAWLOR:  What you were for Halloween, Your Honor?

17             THE COURT:  I'm sorry?

18             MR. LAWLOR:  Did you dress up for Halloween?

19             THE COURT:  I did, yes.

20             MR. LAWLOR:  What were you?  Don't say a judge.

21             THE COURT:  Yes, Mr. Coburn.

22             MR. COBURN:  Your Honor, before --

23             MR. HARDING:  Our witness is in the courtroom right

24   now.  This is some housekeeping matter?

25             MR. COBURN:  It relates to the witness but I don't have

45

1    any strong feelings about him stepping out.

2              THE COURT:  The sergeant can remain.

3              MR. COBURN:  Just wanted to let Your Honor know that

4    the next witness is the Daubert witness.  At least I understand

5    that to be correct.

6              MR. HANLON:  That's correct.

7              MR. COBURN:  This is the witness who the government

8    wants to express the conclusion about the firearms evidence and

9    so on.  So maybe he actually should step out of the courtroom as

10   we discuss it substantively.

11             THE COURT:  All right.  Sergeant, if you can step out.

12   I'll hear from you, Mr. Coburn.

13             MR. COBURN:  Well, I appreciate it very much, Your

14   Honor.  I mean, essentially, I think Judge Rakoff said it better

15   than I can say it.  What he's written in 2008 is basically the

16   last word on the subject.  He does a really comprehensive survey

17   of other opinions and the findings that he made during the course

18   of his Daubert hearing.  I think his conclusions are just utterly

19   unassailable.

20             It seems to me that it would be sort of a prudent thing

21   under the circumstances, given his conclusion that it's not

22   science and that, you know, conclusions should be expressed only

23   to the degree that it's more likely than not, I mean, that seems

24   prudent to me that that, those same limitations apply here.

25             That's essentially all I have on the issue, Your Honor.

1    I think he said it better than I can say it.

2              THE COURT:  I'm looking for your memo.

3              MR. COBURN:  For purposes of the record, Your Honor,

4    I'm not sure to what extent -- I guess there was a letter and

5    then there was a motion.  Then I submitted as much of the record

6    of Judge Rakoff's proceeding as I could find.  That's in the

7    Glynn case.  G-L-Y-N-N.

8              THE COURT:  Is Judge Rakoff's opinion part -- I guess

9    it's not.  You submitted that separately, correct?

10             MR. COBURN:  I thought it was one of the hard copies I

11   submitted to Your Honor.  If I failed to do that, then I

12   apologize to the Court.  But I was pretty sure that I had.

13             THE COURT:  Mr. Hanlon, what does the witness propose

14   to say here?

15             MR. HANLON:  Corporal Ensor, Your Honor, would testify

16   about essentially matching up cartridge casings and projectiles

17   in the Spence case and opining that the, in the case of three

18   projectiles recovered, that they were fired from the .357 Dan

19   Wesson revolver found in the woods.  He would essentially say

20   that the cartridges are a match for that weapon, without any

21   qualification or limitation, saying it's only more probable than

22   not or anything like that.  He would simply opine that it's a

23   match, that he has matched the two.  Along the lines and somewhat

24   similar to what the Court might expect from a fingerprint

25   comparison.

1          Corporal Ensor would also testify that he compared the

2     .40 caliber Glock handgun recovered from the woods in the Spence

3     case against, if I'm counting correctly, six cartridge casings

4     from the Lee crime, and again, they were a match.

5          THE COURT:  Mr. Coburn, I don't seem to be able to put

6     my hands on Judge Rakoff's opinion.

7          MR. COBURN:  Actually, actually have it, Your Honor.  I

8     can give Your Honor a copy.

9          THE COURT:  Can you hand up a copy?  I'm sure I have it

10    up here.

11         MR. COBURN:  Is it okay with Your Honor if it has some

12    markings on it?

13         THE COURT:  Sure.  Do you know whether he published it?

14         MR. COBURN:  He did.  I'm sure he did.

15         THE COURT:  Okay.  Wait a minute.  Let me pull it up.

16         MR. COBURN:  It's the F. Supp. 2d citation.  The

17    page --

18         THE COURT:  Oh, it's in Fed. Supp. already?

19         MR. COBURN:  It's actually not.  It's got blank F.

20    Supp. Second blank.  So they're publishing it.  But at lest when

21    I last looked at it a couple weeks ago, they hadn't actually got

22    the citation there.

23         THE COURT:  Do you have a Westlaw?

24         MR. COBURN:  Yes.

25         THE COURT:  Why don't you just give me that? 2008?

1          MR. COBURN:  It's WL-4293317.

2          (Pause in proceedings.)

3          THE COURT:  You don't expect to have the witness

4     describe what he does as scientific, do you, Mr. Hanlon?

5          MR. HANLON:  I really don't know if I discussed that

6     word with him, Your Honor.  It doesn't come to mind as something

7     I remembered.  I would probably want to ask the -- if the Court

8     wants me to avoid that word, I would want to instruct the

9     witness.  I really don't recollect whether the word "scientific"

10    has come up in my discussions with him or not.  I would not have

11    asked the question, Is this a scientific technique?

12         MR. COBURN:  The ultimate bottom line from our point of

13    view, Your Honor, is Judge Rakoff's bottom line, where he says

14    the witness can opine it's more likely than not, but nothing more

15    than that.  That's what we're seeking here as well.

16         (Pause in proceedings.)

17         THE COURT:  I don't think there's any dispute that it's

18    not scientific.

19         (Pause in proceedings.)

20         THE COURT:  I guess kind of what's troubling me, Mr.

21    Coburn, is, how did he settle on more likely than not?

22         MR. COBURN:  I guess --

23         THE COURT:  Why not, it is convincingly?

24         MR. COBURN:  I think that's, I personally think that is

25    a very fair question.  I'm not sure to what extent he really says

1    precisely what the rationale is for that.

2              THE COURT:  He doesn't.

3              MR. COBURN:  He does have a paragraph in here towards

4    the very end in which he talks about, is it, because I guess the

5    government had kind of a latter request.  Talks about --

6              THE COURT:  At least.

7              MR. COBURN:  To add the qualifier "at least."  That the

8    opinion would be, The matches were at least more likely than not.

9    He says on reflection, the qualifier serves only to add

10   uncertainty to what is otherwise clear-cut.  The opinions utilize

11   the methodology that permits him to determine, albeit it with

12   some subjectivity, but to inject -- you know, this doesn't really

13   answer Your Honor's question.

14             THE COURT:  Yeah.

15             MR. COBURN:  I mean, he's sort of trying to make a cut

16   here.  I mean, he's a great judge and trying to do it as best he

17   can.

18             THE COURT:  He is.

19             MR. COBURN:  But I don't really have that clear an

20   understanding as to why that particular formulation as opposed to

21   another.

22             THE COURT:  Well, I think under the circumstances that

23   I shouldn't, without the benefit of an adversarial process

24   involving the Office of the United States Attorney for the

25   District of Maryland, I don't think it would be appropriate for

50

1    me to embrace this somewhat, somewhat awkward formulation and

2    structure a witness' testimony.

3         He acknowledges, as does Judge Rakoff, that cross

4    examination is perfectly capable of mitigating some of the

5    subjective pitfalls, some of the pitfalls arising from the

6    subjective nature of ballistics.  If the witness is going to say

7    it's a match, I mean, I think you can attack that through cross

8    examination.

9         Mr. Hanlon, again, do I understand you to say he's not

10   going to say to a reasonable degree of some certainty?  He's just

11   going to say it's a match, based on my analysis.

12        MR. HANLON:  In fairness, Your Honor, how I probably

13   would have asked him would be, he would probably say to a

14   reasonable degree of something certainty because that's how I was

15   planning on asking the question.  Have you reached an opinion to

16   a reasonable degree of ballistics certainty about whether or not

17   there's a match here or whether there was a comparison.  And he

18   was going to answer yes, they're a match, or words to that

19   effect.

20        So I was planning on putting it into my question.  I

21   can't --

22        THE COURT:  Let's do it this way.  Why don't you just

23   say a reasonable degree of certainty, which, frankly, comes

24   pretty close, I think, Mr. Coburn, to more likely than not.  I

25   mean, if that's really the standard.  A reasonable degree of

1    certainty is preponderance.

2            MR. COBURN:  You know, and this may sound like a

3    quibble --

4            THE COURT:  As opposed to a reasonable degree of

5    ballistics certainly.  And certainly not a reasonable degree of

6    scientific certainty.  But just a reasonable degree of certainty.

7            MR. COBURN:  How would Your Honor feel about a

8    reasonable degree of probability?  Because a reasonable degree of

9    probability, I mean, that, that really does come pretty close.  I

10   mean, opinions get expressed by experts by that way all the time,

11   a reasonable degree of probability.

12           THE COURT:  Actually, I never heard that.  When do they

13   say a reasonable degree of probability?

14           MR. COBURN:  I was afraid Your Honor was going to ask

15   me that question.

16           THE COURT:  No.  Let's go with a reasonable degree of

17   certainty.  All right?  And you can cross examine.

18           MR. COBURN:  I want to still preserve the objection.

19           THE COURT:  Yes, of course.  To that extent, I'll say

20   that the motion is denied, with the caveat that the government

21   will not use reasonable degree of ballistics certainty or

22   reasonable degree of scientific certainty or reasonable degree of

23   professional certainty.  Just a reasonable degree of certainty.

24   Okay, Mr. Hanlon?

25           MR. HANLON:  That will be fine, Your Honor.

1              THE COURT:  All right?

2              MR. HANLON:  May I instruct the witness about the one

3     word?

4              THE COURT:  Yes.

5              MR. HANLON:  And should the witness come in?

6              THE COURT:  Yes.  Mr. Martin.

7              MR. MARTIN:  Your Honor, before you bring the jury

8     back.  One of Mr. Mr. Harding's witnesses today I think is a guy

9     named Mungo.

10             THE COURT:  Mungo.

11             MR. MARTIN:  Was a prisoner in the lockup during the

12    altercation.  So I think we have to do our, we have to have some

13    sort of argument and hearing, I think, before that witness comes

14    on.

15             THE COURT:  Okay.

16             MR. MARTIN:  Consistent with the motion that we filed.

17             THE COURT:  Is he this afternoon, Mr. Harding?

18             MR. HARDING:  Actually, he was going to be our next

19    witness, Your Honor.

20             THE COURT:  After?

21             MR. MARTIN:  I didn't know that.  I thought he was this

22    afternoon.

23             THE COURT:  After ballistics?

24             MR. HARDING:  I have one piece of information about

25    that.  He, he's a hostile witness and I haven't spoken to him in

1    a couple of years.  So I went down and spoke to him over the

2    break because he was brought over by the marshals this morning.

3    And I'm not exactly sure what he's going to do.  He doesn't want

4    to cooperate because he's getting out of jail in three months and

5    he's very afraid of these defendants, of course.  And he thinks

6    that if he's getting out of jail in three months, why should he

7    risk his life by testifying?

8            And I told him that if he testifies, as he did in the

9    grand jury, I have his grand jury transcript, then I would

10   recommend a Rule 35 for him.  And I'm making this as a Giglio

11   disclosure and I'm making it timely because I actually made that

12   promise within the last half hour.

13           THE COURT:  So should we voir dire him, Mr. Harding,

14   or --

15           MR. HARDING:  I don't know of a need to voir dire him

16   on the Giglio issue.

17           THE COURT:  No.  No.  I don't mean on the Giglio.  Mr.

18   Martin, what do you want to do?

19           MR. MARTIN:  I thought we were going to have some sort

20   of hearing on the whole issue.

21           THE COURT:  Right.

22           MR. MARTIN:  Before any of these witnesses testified,

23   which is why I brought it to your attention now.

24           THE COURT:  Now, I think where I left it was Mr.

25   Harding was going to doublecheck with Deputy Stoler and make sure

54

1    you had any and all pieces of paper that might bearing on this

2    whole issue.  And then I think what I thought is I would just

3    hear from you as to what you think what rulings you need from the

4    Court.

5              MR. MARTIN:  I haven't gotten anything, Your Honor, so

6    I don't --

7              THE COURT:  Okay.  So Mr. Harding, perhaps we can take

8    care of this now.  You did doublecheck with the marshal?

9              MR. HARDING:  Yes.  I went and met with Ted Stoler

10   twice.  Once was to prep him for his testimony because I envision

11   putting him on the stand tomorrow.

12             THE COURT:  All right.

13             MR. HARDING:  And the other is that I checked with him

14   about what documents.  He has been subpoenaed at least twice by

15   Mr. Martin, once a long time ago and once more recently.  And he

16   showed me what materials he had gathered.  There are a few slips

17   of paper.  And I don't, he showed them to me and I just glanced

18   at them.  I don't know why he hasn't turned them over to Mr.

19   Martin yet.  But I can assure the Court that they don't have any

20   particular significance.

21             One of them is a form that shows that Mr. Harris was

22   being transferred out to Allegheny County that day, which has

23   always been my understanding of why he was in the courthouse.

24   But I have no other knowledge of those documents nor do I know

25   why Mr. Stoler hasn't turned them over to Mr. Martin yet.

1          THE COURT:  What are the other pieces of paper?  And

2     why didn't you get a copy?

3          MR. HARDING:  I didn't ask for copies, Your Honor.  He

4     was showing them to me.  We were standing up in his lockup and it

5     wasn't a situation -- he said he was complying with a subpoena

6     that he had gotten from Mr. Martin and he quickly showed me the

7     documents.  And I didn't ask for copies and he didn't give me

8     copies.

9          THE COURT:  So in other words, your understanding is

10    that he's produced the documents to Mr. Martin?

11         MR. HARDING:  Well, I'm surprised, if Mr. Martin is

12    saying he hasn't gotten anything, I'm surprised to hear that

13    because it was over a week ago that Mr. Stoler said he was

14    getting these materials together for Mr. Martin in response to a

15    subpoena.

16         THE COURT:  Mr. Martin?

17         MR. MARTIN:  Your Honor, A, I don't have anything.  And

18    B, Mr. Harding is correct.  I did subpoena the same material two

19    years ago in one of those sealed subpoenas that I asked you to

20    sign.  And rather than comply with the subpoena, they sent the

21    sealed subpoena to the U.S. Attorney's Office.  And I never got

22    anything.

23         Now here we are again two years later and I still don't

24    have any of these documents.  I don't even know what I want to

25    argue to you until I had a chance to look and see what they have.

1          MR. HARDING:  Judge, I did get a copy of the subpoena

2     but there was no suggestion --

3          THE COURT:  But not the return?

4          MR. HARDING:  -- of the need to decide whether the

5     marshals should comply with it.  What Mr. Stoler told me at that

6     time a couple years ago was that he conferred with you and his

7     recollection -- this is my recollection of his recollection -- is

8     that you said that since you hadn't authorized the Rule 17

9     subpoena, it didn't, it didn't matter or didn't count or

10    something like that.

11         THE COURT:  Well, I had to have authorized it if it was

12    served.

13         MR. MARTIN:  You did authorize it, Your Honor.  I have

14    the order somewhere in my file.

15         THE COURT:  It sounds like what you may have described,

16    Mr. Harding, I'm speculating, if Mr. Martin called -- did you

17    speak to him before you served the subpoena?

18         MR. MARTIN:  I don't think so, Your Honor.

19         THE COURT:  Because if he called --

20         MR. MARTIN:  Somebody from my office might have, but I

21    didn't.

22         THE COURT:  Okay.  So if he called me before he got a

23    subpoena and said, if at that point I hadn't authorized the

24    subpoena, I clearly hadn't authorized the subpoena.  But the

25    subpoena didn't go out, presumably, without the Court's

1    authorization.

2         MR. MARTIN:  I didn't send any subpoenas out that you

3    didn't authorize, Your Honor.  If I could get the documents and

4    we could deal with it.  I don't want to -- I suppose the problem

5    is if there was something there that would cause you not to allow

6    any of this testimony, then I don't want this guy to testify

7    today.

8         THE COURT:  Here's the point, Mr. Martin, if I

9    understand it.  Your point is that you need to satisfy yourself

10   that the government, meaning the United States Attorney's Office,

11   didn't set all this up.

12        MR. MARTIN:  That's correct, Your Honor.

13        THE COURT:  And Mr. Harding is saying now for the

14   umpteenth time -- are you not, Mr. Harding -- the government

15   didn't set this up?

16        MR. MARTIN:  He is, Your Honor.  I accept that.  He is

17   saying that.

18        THE COURT:  And do I understand from what you just

19   said, Mr. Harding, that Mr. Harris was brought from Supermax into

20   the lockup for the purpose of a routine transfer from Supermax

21   out to Allegheny County?  Because, obviously, they'd have to

22   bring him over here.  You don't go from Supermax to Allegheny

23   county or anywhere else, for that matter.  You first come to the

24   marshal's lockup.

25        MR. HARDING:  Yes, and Stoler has already testified to

1    this in the grand jury.  Mr. Martin has the grand jury

2    transcript.  So he knows what Stoler is going to testify to.  He

3    is going to testify that this was part of a routine transfer.

4    The marshals have very limited time in Supermax.  They're

5    constantly shifting prisoners from Supermax to outlying

6    facilities unless they were upcoming court dates.  And that was

7    why Mr. Harris was in the lockup that day.

8               THE COURT:  By the way, are you prepared to represent,

9    Mr. Harding, as I presume you are, and you will ratify this later

10   today if necessary, that Ms. Manuelian, formerly your co-counsel

11   in this matter, also has absolutely nothing do with the transfer

12   of Mr. Harris?

13              MR. HARDING:  I am, Your Honor.  And I submitted a

14   pleading some time ago, many months ago, in which I thought I

15   undertook to explain why it would have been quite impossible for

16   either of us to have set this up, because of the timing of the

17   arrest of Mr. Hayes and the way he was brought over here on

18   Monday morning.

19              THE COURT:  Okay.  So it's in the record.

20              MR. HARDING:  Neither of us had any prior knowledge

21   that Mr. Harris was going to be in the lockup, whether Mr. Martin

22   believes it or not.  But even if we did, we couldn't have set it

23   up because Mr. Hayes was arrested far too late in the afternoon

24   on Friday for a come-up to have been done to have Mr. Harris

25   brought over here.

1          THE COURT:  All right.  I think, Mr. Martin, I'm

2    satisfied that we should go ahead and proceed.  And presumably

3    there won't be any surprises coming out on your cross examination

4    of any of the relevant witnesses.  But I don't see that there's

5    anything more than I can do.

6          Presumably, Deputy Stoler will bring his file.  And you

7    can certainly walk up and take a look at whatever's in there.

8          MR. MARTIN:  Thank you, Your Honor.

9          THE COURT:  All right.  Let's have the jury.

10         MR. HANLON:  Shall the officer take the stand, Your

11   Honor?

12         THE COURT:  Yes, please.  Sergeant or Corporal?

13         THE WITNESS:  It's sergeant now, sir.

14         THE COURT:  Yeah.  That's what I thought.

15         MR. HANLON:  Did I demote him, Your Honor?

16         THE COURT:  Yes, you did.

17         MR. HANLON:  I apologize.

18         THE COURT:  I thought I had promoted him, but it

19   appears you demoted him, Mr. Hanlon.

20         MR. HANLON:  Not intentional.

21         THE WITNESS:  Good morning, sir.

22         THE COURT:  Good morning.  My knowledge of military is,

23   you could fit in a thumb nail, in a thumb nail, but I do know

24   stripes.  And I can count.

25         MR. HANLON:  I apparently cannot.

1          THE COURT:  Of course, my sight is a different

2     question.

3          (Jury enters the courtroom.)

4          THE COURT:  Good morning.  Thank you for your patience,

5     ladies and gentlemen.  We're ready to continue.  The government

6     may call its next witness.

7          MR. HANLON:  Thank you, Your Honor.  The United States

8     calls Sergeant Mark Ensor to the stand.

9          SERGEANT MARK ENSOR, GOVERNMENT'S WITNESS, SWORN

10         THE WITNESS:  I do.

11         THE CLERK:  Be seated.  Speak directly toward the mike.

12    State your name and spell it for the record.

13         THE WITNESS:  My name is Sergeant Mark Kevin Ensor.  My

14    last name is spelled E-N-S-O-R.

15         DIRECT EXAMINATION

16    BY MR. HANLON:

17    Q    Sergeant, good morning.  Yes.  Still good morning to you.

18    A    Good morning.

19    Q    What do you do for a living?

20    A    I work at the Crime Laboratory for the Baltimore County

21    Police Department.

22    Q    And how long have you worked for the Crime Laboratory in

23    Baltimore County?

24    A    I've worked for the Baltimore County Police Department for

25    25 years, 21 years in the Crime Lab laboratory.

DIRECT EXAMINATION OF ENSOR

61

1    Q    What did you do -- I guess there were a few years there

2    where you were not in the lab but with the police department.

3    What did you do then?

4    A    I was a patrol officer in the Garrison precinct.

5    Q    Now, what position do you currently hold with the Crime Lab?

6    A    I'm a sergeant in charge of the Firearms and Tool Mark

7    Identification Unit, the Photography Laboratory, and the Latent

8    Print Identification Unit.

9    Q    Now, Sergeant, if it's all right, if you could move the

10   microphone a little bit closer to you.  Thank you.

11        And what specifically, you're in charge of that unit

12   and that encompasses a number of disciplines, is that right?

13   A    Yes, sir.

14   Q    What is your specific background?  In addition to being in

15   charge of the unit, do you do any technical work for the unit?

16   A    Yes, I do.  I'm a firearm and tool mark identification

17   expert.

18   Q    What is, for the benefit of the jury, what is firearms and

19   tool mark identification?

20   A    Firearms identification is the discipline of forensics which

21   has as its primary concerning determining if a fired bullet or

22   fired cartridge case had been fired from one particular firearm

23   to the exclusion of all others.

24   Q    Now, Sergeant, in part of this, I gather, means examining of

25   bullets and cartridge casings and things like that, is that

1  correct?

2  A     Yes, sir.

3  Q     I'm going to ask you in a moment how this identification

4  process works.  But if it's all right, talk to us, if you would,

5  about what a round of ammunition looks like and what its

6  component parts are.

7  A     Okay.  We were raised to believe that a bullet is simply

8  loaded into a firearm and fired from the weapon, believing that a

9  loaded round or a live round of ammunition is a bullet.  That's

10  actually incorrect.

11          I brought a model with me of a loaded round of

12  ammunition or a live round.

13          MR. COBURN:  Your Honor, objection until he's qualified

14  as an expert.

15          MR. HANLON:  That will be fine, Your Honor.

16          THE COURT:  Well, I think he can -- well, okay.  All

17  right.  Go ahead, Mr. Hanlon.

18  BY MR. HANLON:

19  Q     Fine, Your Honor.  Before we get into what you do for a

20  living, Sergeant, I may have jumped ahead a little bit.  Talk to

21  us a little bit more about your job experience.  You've been with

22  the lab for 21 years.  Have you been doing firearms examination

23  the entire time?

24  A     No, sir.

25  Q     What other kinds of work were you doing?

1    A    For four years I was a crime scene technician.  I responded

2    to crime scenes, identified, collected and preserved physical

3    evidence.

4    Q    And from there what kind of work did you do?

5    A    After that, for a period of three years, I was assigned to

6    the Maryland State Police Crime Laboratory, where I was training

7    as a firearm and tool mark identification expert.

8    Q    And that was three years, you mentioned?

9    A    Yes, sir.

10    Q    What did that training involve?

11    A    They followed a structured training syllabus offered by the

12    Association of Firearm and Tool Mark Examiners to walk me through

13    a process of education in the field.  At the same time, I was

14    required to do actual case work under the direct oversight of

15    their firearm and tool mark, court qualified firearm and tool

16    mark identification experts.  And I attended numerous schools.

17    Q    Do you have any kind of, did you have to go through any kind

18    of proficiency testing or quality control testing as part of your

19    job?

20    A    Yes, sir.

21    Q    What does that involve?

22    A    Well, during the training period, I was doing actual case

23    work to prove my proficiency under the identification experts.

24    Once I completed my training, we, Baltimore County Police

25    Department, signed on with a firm called Collaborative Testing,

1    who will send out blind tests for all the identification experts.

2    Every year I take a blind test in firearm identification and a

3    separate blind test in tool mark identification.

4            They send out simulated case work and ask for you to

5    make a determination.  You send your results in and then they

6    publish the results.  And all of my tests, I've come back as

7    properly completing the same.

8    Q    You've never failed such a test?

9    A    No, sir.

10   Q    And do you have any kind of certifications or memberships

11   with any associations in your field?

12   A    Yes, I do.

13   Q    What are those?

14   A    I'm a member in good standing of the Association of Firearm

15   and Tool Mark Examiners.  We refer to it as AFTE.  AFTE is an

16   international organization composed of firearm and tool,

17   court-qualified firearm and tool mark identification experts,

18   which have come together for the common purpose of identifying

19   the criteria we go by within our disciplines, what constitutes an

20   identification, what doesn't, and what kind of training is

21   necessary to be considered competent as a firearm and tool mark

22   examiner.

23   Q    In your career, Sergeant, would you be able to gauge a

24   number of firearms or cartridges or projectiles that you've

25   examined as a firearms and tool mark examiner?

1    A    It would be tens of thousands of firearms.  Several thousand

2    casings.  And several thousand bullets, at least.  It's hard to

3    say.

4    Q    Those have all been in connection with criminal cases at the

5    state and federal level?

6    A    Mostly, yes, sir.

7    Q    Have you had to testify as an expert witness in court

8    before?

9    A    Yes, I have.

10   Q    What courts?

11   A    Three times in the federal courts.  Once in front of Your

12   Honor, three times -- excuse me -- twice in Howard County Circuit

13   for the State of Maryland, twice in Howard County Circuit Court

14   for the State of Maryland, and the remainder in the Circuit Court

15   for Baltimore County.

16   Q    And in terms of how many times you've had to testify in

17   Baltimore County Circuit Court, is that the most frequent court

18   you appear in?

19   A    Yes.

20   Q    Is that fairly regularly that you've testified as an expert

21   there?

22   A    Yes, sir, a total of 68 times.

23   Q    Your Honor, at this time the government would offer Sergeant

24   Ensor as an expert in the area of firearms and tool mark

25   identification.

1          MR. COBURN:  I request a voir dire, Your Honor.

2          THE COURT:  Yes.

3          CROSS EXAMINATION (On Qualifications)

4    BY MR. COBURN:

5    Q    Sergeant Ensor, good morning, sir.

6    A    Good morning.

7    Q    Just to get a little bit more detail, if we could, about

8    your educational and work experience relating to what you're here

9    to testify about.  If I understand correctly, you graduated high

10   school in 1980, is that right?

11   A    Yes, sir.

12   Q    And you joined the Baltimore, is it the Baltimore County

13   Police Department in 1983?

14   A    Yes, sir.

15   Q    In between those two time periods, was there any, any

16   education relating to either forensics, firearms testing, or

17   anything like that?

18   A    No, sir.

19   Q    Okay.  So you became a police officer in Baltimore County in

20   1983, correct?

21   A    Yes, sir.

22   Q    And you were a patrol officer in the Baltimore County Police

23   Department from 1983 to 1988, is that correct?

24   A    Yes, sir.

25   Q    Then in 1988, and I believe you may have alluded to this

1   just briefly in response to one of Mr. Hanlon's questions, you

2   became a mobile evidence technician, is that right?

3   A    Yes, sir.

4   Q    And the function of a mobile evidence technician is

5   basically to gather evidence from a crime scene, correct?

6   A    Yes, sir.

7   Q    That was from 1988 to 1992, correct?

8   A    Yes.

9   Q    You became involved in performing firearms identifications

10  in 1992, is that correct?

11  A    I became -- well, I responded to the State Police and began

12  training in that field in '92.

13  Q    You began training in firearms identification with the

14  Maryland State Police in 1992, is that correct?

15  A    Yes, sir.  Yes, sir.

16  Q    Okay.  In terms of the education that you've had with

17  respect to firearms identification, in here, when we use that

18  term, we're talking about trying, essentially trying to compare

19  like one shell casing with another shell casing, a bullet with

20  another bullet, trying to determine where, you know, a shell

21  casing or a bullet was fired, from what gun.  Is that essentially

22  right?

23  A    Basically, yes, sir.

24  Q    Okay.  Have you, have you taken a course on that?

25  A    Yes, I have.

1   Q    And where was the, sort of the initial course you took?  And

2   I'm taking it this was back in 1992, right?

3   A    In 1992 I began a course with the State Police Crime

4   Laboratory.  I've had several courses that are associated with it

5   through the FBI laboratory, ATF, through the Association of

6   Firearm and Tool Mark Examiners, etc.

7   Q    In response, again, to one of Mr. Hanlon's questions, you

8   mentioned an organization called the AFTE, right?

9   A    Correct, yes, sir.

10  Q    And what does that stand for?

11  A    Association of Firearm and Tool Mark Examiners.

12  Q    In connection with your membership in the AFTE, do you

13  happen to know somebody who is a detective up in New York City by

14  the name of James Valenti, who also does firearms

15  identifications?

16            MR. HANLON:  Objection, Your Honor.

17            THE COURT:  Overruled.  You may answer.  Do you know

18  him?

19            THE WITNESS:  I don't know him offhand.  No, sir.

20  BY MR. COBURN:

21  Q    Okay.  Are you aware of an opinion that was issued by Judge

22  Jed Rakoff in the U.S. District Court for the Southern District

23  of New York just a month and a half ago, in 2008?

24            MR. HANLON:  Objection.

25            THE COURT:  The objection's sustained.

1   Q    Are you aware of any conclusions in courtrooms, any judicial

2   conclusions to the effect that, with respect to ballistics

3   identification testimony, it does not have sufficient rigor to be

4   received in evidence as science?

5          MR. HANLON:  Objection, Your Honor.

6          THE COURT:  Sustained.

7   Q    Do you agree or disagree with the proposition that

8   ballistics testimony does not have sufficient rigor to be

9   received in evidence as science?

10          MR. HANLON:  Objection, Your Honor.

11          THE COURT:  Sustained.

12   Q    Okay.  Is it correct that there is no reliable scientific

13   methodology which will permit an expert to testify that a casing

14   and a particular firearm are a match to any degree of certainty?

15   Is that correct?

16   A    First you need to define what "match" means.

17   Q    Okay.  Well, is it correct, then, to say that there is no

18   reliable scientific methodology --

19          THE COURT:  This seems to be going beyond

20   qualifications, Mr. Coburn.

21          MR. COBURN:  I'm happy to reserve until later, Your

22   Honor.

23          THE COURT:  It seems to me it's probably more

24   appropriate for your substantive cross.

25          MR. COBURN:  I do object to the qualification for the

1    reasons discussed previously, Your Honor.

2              THE COURT:  Well, I don't think you were objecting to

3    qualifications previously.  Are you objecting to the witness'

4    qualifications to testify as to his opinions?

5              MR. COBURN:  Well, depending on the degree of certainty

6    that he expresses, I am.

7              THE COURT:  All right.  I think your record is

8    preserved.

9              MR. COBURN:  Thank you, Your Honor.

10             THE COURT:  The witness will be accepted an expert as

11   tendered.

12             CONTINUED DIRECT EXAMINATION

13   BY MR. HANLON:

14   Q    Thank you, Your Honor.  Sergeant, let me ask you now about

15   what it is that you do in the field of firearms and tool mark

16   identification.  And I'm going to begin by asking you to describe

17   for us what a round of ammunition actually looks like and what

18   it's comprised of.

19   A    Okay.  As I referred to earlier, we were brought up to

20   believe that a bullet is loaded into a firearm and fired from the

21   firearm.  In reality, in reality, a loaded round of ammunition or

22   a loaded cartridge has four components.  The bullet is only one

23   component.

24             This is a rather large model of a cartridge.  You can

25   see that the bullet is the projectile that is forced out of the

1    cartridge casing, forced out of the gun to go down range and

2    strike the target.  The other components of the loaded round of

3    ammunition or cartridge would be the cartridge case, which is the

4    container that holds everything together, the primer, which is

5    the detonator, if you will, in the back, and the powder that's

6    inside, or the fuel.

7              When a firearm discharges a cartridge, what occurs is

8    the firing pin strikes the pressure sensitive primer on the back

9    and the pressure sensitive primer sends a spark through a small

10   hole into where the powder is.  That causes the powder to ignite

11   and burn.  When the powder burns, it changes from a solid state

12   to a gaseous state and builds up pressure much like shaking up a

13   bottle of champagne.

14             The bullet is then forced out of the cartridge and out

15   of the barrel and out of the firearm, much like the cork from the

16   bottle of champagne.

17             When we do comparisons in firearm and tool mark

18   identification, we either take a look at the markings that are

19   imparted on the bullet as it passes down through the barrel, the

20   rifling, or we take a look at the various areas that the

21   cartridge is struck by the firing pin or the cartridge case

22   strikes interior surfaces.

23             So the proper terminology we're looking at is cartridge

24   case.  That includes the fired primer and the bullet when

25   referring to recovered evidence at the crime scene.

1    Q    May I approach the witness, Your Honor?

2          THE COURT:  Yes.

3    Q    And Sergeant, I believe that you've touched on this already,

4    but I just want to ask a couple questions to make sure I

5    understand.  When a gun is actually fired, the round begins by

6    looking something like this before the gun is fired.  In the case

7    of a revolver, this is loaded into a clip.  And in the case, or

8    in the case of a revolver, this is loaded into the cylinders of

9    the revolver.  In a case of a semiautomatic weapon, it's loaded

10   into a clip, is that right?

11   A    That's right.

12   Q    And then it gets fired.  This item, which is the bullet, is

13   actually expelled from the weapon?

14   A    Yes, sir.

15   Q    And you'll recover that from wherever.  If it could be

16   recovered, it would be recovered from something the weapon was

17   fired at or on the ground or something like that, is that

18   correct?

19   A    That's correct.

20   Q    And the weapon, in your experience, leaves markings on this

21   bullet as it's being expelled through a barrel?

22   A    Yes, sir.

23   Q    This is the bullet, then.  In the case of the cartridge

24   casing, they're left both by revolvers and by semiautomatic

25   weapons, is that right?

1    A    Say it again.

2    Q    A cartridge casing is going to be left inside a revolver

3    after the revolver is fired, is that right?

4    A    That's correct.  The revolvers typically keep the cartridge

5    case inside.

6    Q    So you open up the revolver, you take out the cartridge

7    casings, they're empty and can be recovered in evidence, is that

8    right?

9    A    That's correct.

10   Q    In a case of a semiautomatic weapon -- I want to make sure I

11   understand correctly -- what happens to the cartridge casing in

12   the case of a firing from a semiautomatic handgun?

13   A    If it's functioning properly, it will extract the fired

14   cartridge case and throw it off to the side or perhaps directly

15   back from the firearm, and then the firearm will cycle and load

16   another cartridge into the chamber ready to be fired.

17   Q    Now, as a firearm and tool marks examiner, you examine

18   markings that are left on bullets and also cartridge casings, is

19   that right?

20   A    Yes, we do.

21   Q    What is it about these markings that allows you to identify

22   bullets and cartridge casings to particular firearms?

23   A    The manufacturing of firearms is an imperfect process.  When

24   these surfaces are made inside of the firearm, various accidental

25   or random characteristics are imparted to the surface.  We may

1    look at it from the naked eye and believe the metal is very

2    smooth.  But if you were to look underneath a comparison

3    microscope or under a microscope and look at those surfaces, you

4    would actually see they're a very rough surface inside the

5    firearm.

6            Again, these high and low spots are randomly created

7    during the manufacturing process.  So that results in a very

8    unique surface, as unique to that firearm as your fingerprint is

9    to you.

10            So when they cut the grooves in the rifling, or in the

11    barrel that we refer to as rifling, those surfaces that remain

12    are very unique to that interior of that barrel.  The part of the

13    firearm that supports the cartridge case when it's fired is

14    machined as well.  And it leaves a very unique surface with

15    individual characteristics.  The primer that strikes the

16    cartridge case also has very unique and individual

17    characteristics.

18            The ammunition is made out of a softer material than

19    the firearm.  The intent that is that the ammunition is

20    expendable, but you want the firearm to continue to perform and

21    last.  Those surfaces need to last.  So the harder surface of the

22    firearm imparts these characteristics on to the softer material

23    that make up the cartridge case and the bullet.

24    Q    Have you ever in your years of experience, Sergeant, ever

25    encountered two firearms that had the same markings, the exact

1    same interior grooves and characteristics?

2    A    No, not in individual characteristics, no.

3    Q    Firearms might be the same make, model, or caliber, but

4    they're not going to have the same characteristics?

5    A    That's correct.

6    Q    Let me ask you this.  You've talked so far about comparing a

7    bullet or cartridge casing to a particular firearm.  Is it

8    possible, using these same principles, to compare a bullet to a

9    bullet or a cartridge casing to a cartridge casing?

10   A    Yes, you can.

11   Q    And how do you go about doing that?

12   A    The reason it took three years to train as an identification

13   expert is we need to intimately understand what's going on inside

14   of the firearm.  You need to understand what the surfaces are

15   that impart these markings on the cartridge case or on the

16   bullet.  We need to be able to differentiate what may be

17   accidental characteristics that occur outside of the firearm or

18   during the manufacture of the ammunition from those that are

19   created during the process of being fired in a firearm.

20           Once you can properly identify those surfaces that

21   created the marks, you need to be able to determine if those

22   surfaces are unique to one particular surface or if they may be

23   class characteristics.  Class characteristics can be attributed

24   to multiple firearms.

25           For example, once you've properly learned how to

1      decipher the difference and you've been proven to be proficient,

2      then you can take a fired bullet without ever having the firearm

3      and take another fired bullet and compare these characteristics

4      and make a determination as to whether they're individual to one

5      surface, and if they are, what that surface is, and if there's

6      significant correspondence of individual characteristics.  In

7      other words, did both of these items get marked by the same

8      surface?

9             Once you make that determination, is that surface part

10     of a firearm and did this marking occur as a result of being

11     fired or simply being cycled in the gun?

12            So to put it more briefly, we can determine by looking

13     at the bullet without the gun what surface marked it and if it's

14     unique to that particular firearm, and was that ammunition simply

15     cycled in the gun or did it have to be fired in order to take

16     those markings on.

17     Q    Now, in making these comparisons, the comparisons between

18     bullet and bullets or between bullets and cartridge casings and

19     firearms, what kind of equipment do you use in making that

20     comparison?

21     A    Our primary piece of equipment is a comparison microscope.

22     I'm sure most of you have used a microscope sometime in the past.

23     A comparison microscope differs only that it has two different

24     stages.  We're not looking at one slide under one stage under one

25     sets of objective lenses.  We actually have two different stages.

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 77 of 270

1    And we can look at two different specimens in the same viewing

2    area at the same time and bring those microscopic marks up

3    directly opposed to each other so that we can compare them under

4    the same magnification, same light, same conditions.

5    Q    And that's how you make your comparisons?

6    A    Yes, sir.

7    Q    And what standard do you apply, Sergeant, in reaching an

8    opinion about whether or not a bullet can be matched to a bullet

9    or a bullet to a firearm or a cartridge to a firearm?  How much

10   of a similarity does there have to be?

11   A    First there has to be 100% agreement in class

12   characteristics, which means that the dimensions of the rifling,

13   for example, have to be the same.  If one groove is smaller than

14   the other groove, then they couldn't have been fired from the

15   same gun, if they're true representations of the rifling.

16        Once we have 100% agreement of class characteristics,

17   we need to determine if there are individual characteristics

18   apparent.  And if there are individual characteristics apparent,

19   is there a significant agreement of those individual

20   characteristics to suggest that only one surface could have

21   possibly made those markings.

22        This can be done in one particular area or it can be

23   done in several, add up those characteristics over several areas

24   if those surfaces were marked simultaneously.

25   Q    Is that how you make that comparison?

1   A    Yes, sir.

2   Q    Now, let me turn to the specific work that you did in this

3   case, Sergeant, if I may.  You became involved in the examination

4   of some items which have been recovered during the course of the

5   investigation of the June 7th, 2002 murder of the lady named

6   Tonya Jones Spence, is that correct?

7   A    That's correct.

8   Q    And your initial analysis involved some examinations and

9   comparisons of three possible projectiles or bullets, is that

10  right?

11  A    My initial examination consisted of examining two fired

12  projectiles or bullets and one loaded cartridge.

13  Q    Showing you what's been marked previously as Government's

14  Exhibits 54-C.  Your Honor, may I approach the witness?

15       THE COURT:  Yes.

16  Q    Sergeant, I'm going to put the item that I took out of that

17  envelope up on the screen.  But if you need to examine it

18  yourself as part of your work, there is a bit of a glare,

19  certainly let me know.

20       This is an item taken from a brown envelope and it's

21  marked here in a plastic bag.  The envelope reads, Fragments from

22  under balcony, is that correct?

23  A    That's correct.

24  Q    And this was marked for Baltimore County evidence purposes

25  as Item 9044-09, is that right?

1    A    That's correct.

2    Q    Did you undertake any initial examination of these metal

3    fragments?

4    A    The second examination, which was, occurred on 6/12 of '02,

5    I did examine these two fragments.

6    Q    And during your initial examination of these fragments, your

7    initial examination, were you able to reach any conclusions about

8    them?

9    A    Yes, I was.

10   Q    And what conclusions were you able to reach?

11   A    They were fragments of a bullet jacket material.  Bullets

12   are very frequently made of a softer metal, typically light in

13   the core.  Sometimes they have a harder metal shell that's, the

14   cores are pressed into called jacket material or jacketing.

15   These are two fragments from a bullet that had been fired from a

16   firearm.  It had rifling marks on these jacket, pieces of

17   jacketing.  They had struck, apparently struck a hard surface and

18   broken apart.

19   Q    So initially you're able to see rifling characteristics

20   associating these fragments with a weapon, is that right?

21   A    Yes.

22   Q    During your initial analysis, Sergeant, did you have a

23   weapon that you could compare these fragments to?

24   A    Initially, no.

25   Q    Ultimately, did you receive some items that were able to

1    make a comparison with these, with these two items?

2    A    Yes, I did.

3    Q    That happened later, is that right?

4    A    Yes, sir.

5    Q    Let me move on, then, for a moment.  Showing you

6    Government's Exhibit 6, which is taken from an envelope marked

7    from Shock Trauma.  May I approach the witness, Your Honor?

8              THE COURT:  Yes.

9    Q    I'm sorry.  This is not government's Exhibit S.  This is

10   Government's Exhibit S-4B.  I apologize.  Did you examine

11   Government's Exhibit S-4B, Sergeant?

12   A    Yes, I did.

13   Q    And again, let me know if you need me to bring the actual

14   item up.  For the jury's reference, once again, we have a piece

15   of metal.  There's a piece of gray metal and then there's a piece

16   of brownish metal and it's contained within a plastic bag.  Is

17   this the item or one of the items you examined as part of your

18   work here?

19   A    Yes, it is.

20   Q    What opinions, if any, or what findings did you make

21   concerning this item, which is Government's S-4B, marked as

22   coming from Shock Trauma?

23   A    Actually, S-4B is marked as coming from Shock Trauma.

24   You're correct.  From Officer Kidwell.  I was able to determine

25   that it was a .38 or caliber .357 caliber class bullet.  It had

1    been fired from a firearm that had six grooves with a right-hand

2    twist in its barrel.  It was either a jacket hollow point or a

3    jacketed soft point bullet, and a copper alloy jacket material.

4    Q    Now, you mentioned this, based on your examination, could be

5    a .357 or a .38 caliber?

6    A    That's correct.

7    Q    Let me ask you about that, Sergeant.  Are .357 and .38

8    caliber rounds ever interchangeable with one another?

9    A    Yes, they are.

10   Q    Under what circumstances can a .380 caliber round be fired

11   from a .357 weapon?

12   A    .38 caliber is actually only a name, in name only.  The

13   correct measurement for a .38 caliber bullet is .357 inches.  A

14   very popular military and police round was the .38 special.  The

15   bullet measured .357 inches in its diameter.

16           .357 magnum is another cartridge that has a bullet

17   that's the same size, same width, but the .357 magnum cartridge

18   is a more powerful cartridge.  You could place a .357 magnum

19   cartridge in a .357 magnum firearm and fire it without a problem.

20   But the .38 special revolvers typically will not allow you to

21   chamber a .357 magnum, the longer cartridge, because it's

22   designed for a lower pressure round.

23           So I could use a .357 magnum in a .357 magnum revolver.

24   And a .38 special could also be used in a .357 magnum revolver.

25   But you could not use a .357 magnum in a .38 special revolver.

1    Q    So there's a lot of interchangeability between what we've

2    commonly understood to be a .38 and .357, is that correct?

3    A    That's correct.

4    Q    In this case you can't quite tell.  This item appears to be

5    one or the other, is that correct?

6    A    That's correct.

7    Q    How are you able to go about, Sergeant, actually making that

8    determination about the caliber?  What is it about this that led

9    you to conclude that it was a .357 or a .38?

10   A    On the monitor it's somewhat dim, but you can see the base

11   of the bullet itself.  You can see the round base.  And you can

12   see, actually, a little bit of a cup in the middle.  On the

13   outside edge of that round base that you see is the bearing

14   surface of the bullet, that portion that fits in the barrel and

15   rides down through the rifling.

16        We can measure, do a measurement across that area and

17   determine its approximate bore size of the firearm that fired it.

18   Also, the rifling impressions that are made on the bullet itself

19   are measurable and we can measure those bullets, the grooves that

20   are in the rifling, the impressions that are made, anyhow, on the

21   bullet.

22        And the high spots in between the grooves are referred

23   to as lands.  We can measure them.  And we can calculate the

24   caliber of the firearm that they were fired from as well from

25   that.

1          As to limiting what type of firearm they were fired

2    from, the presence or absence of other markings, manufacturing

3    markings, such as a groove that's rolled into the side, such as a

4    cannelure, can help limit it within a particular class or caliber

5    designation.

6    Q    Let me show you one more envelope, Sergeant.  Envelope from

7    Government's Exhibit S-4A.  I'm giving you the envelope for it,

8    Sergeant.  Again, I'm putting Government's Exhibit S-4A, that is

9    the contents of that envelope, up on the screen.  Let me know if

10   you need to see it.

11         But once again, this particular envelope reflects the

12   recovery of an item designated bullet from back, from the Office

13   of the Chief Medical Examiner in this case, is that right?

14   A    That's correct.

15   Q    Did you also examine this item?

16   A    Yes, I did.

17   Q    There's a bit of a glare on it.  But what conclusions did

18   you reach concerning this item?

19   A    Again, this also was a caliber .38 or.357.  It was fired

20   from the barrel of a firearm having six grooves with a right

21   twist.  This was a jacketed hollow point bullet.  It had a copper

22   alloy jacketing material.

23   Q    And your examination and your conclusions are basically

24   somewhat similar to the other .357, .38 that we examined?

25   A    Yes.  As a matter of fact, I conducted an examination on the

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 84 of 270

1    rifling marks between the two bullets and I was able to say that

2    they had both been fired from the same firearm, at this point

3    firearm unknown.

4    Q    Let me ask you about that last point.  Again, at this stage

5    of the examination you had two bullets you determined to be

6    either a .38 or .357, Government's Exhibits S-4A and S-4B.  I'm

7    putting them both up on the screen.  We've talked about the

8    conclusions you reached for each one separately.  But you just

9    touched on conclusions you reached after doing a comparison

10   between these two, is that right?

11   A    That's correct.

12   Q    And again, I'm sorry to make you go through it again.  But

13   just so the record is clear, what conclusions did you reach after

14   comparing these two bullets, both .38, .357?

15   A    I was able to say they were fired from the same firearm to

16   the exclusion of all others.

17   Q    How were you able to, is that an opinion that you reached to

18   a reasonable degree of certainty, Sergeant?

19   A    Yes, it is.

20   Q    How were you able to reach that conclusion with respect to

21   these two bullets?

22   A    Again, when these two bullets were fired down to the barrel

23   of the firearm, the rifling inside of the firearm engaged the

24   side and left impressions and stria, or scratches, down the sides

25   of the bullets.  These are reproducible markings that we can

1    compare.  And these markings in the land area or the raised

2    portion of the rifling are considered to be individual

3    characteristics, unique to a particular surface.

4            In placing these two bullets on a comparison

5    microscope, I was able to compare these individual

6    characteristics.  And I saw substantial amount of agreement in

7    the stria that was left by the firearm that fired them,

8    sufficient that I could say only one particular firearm could

9    have fired both of those bullets.

10   Q    Now, at this stage of examination, again, you've touched on

11   this, you did not have an actual firearm to compare against these

12   bullets?

13   A    That's correct.

14   Q    Ultimately, were you provided with a series of firearms to

15   make such an analysis?

16   A    Eventually, I had several firearms to compare to.

17   Q    Moment please, Your Honor?

18          THE COURT:  Yes.

19   Q    At some point, Sergeant, were you provided with a .40

20   caliber Glock handgun?

21   A    Yes, I was.

22   Q    Let me put up on the screen what has been marked as

23   Government's Exhibit S-42 for purposes of this case.  And again,

24   if you need to see it personally, certainly let me know.

25          Government's Exhibit S-42 is a Glock handgun, is that

1  right?

2  A    That's correct.

3  Q    And I've removed it from a box indicating a recovery

4  location of woods behind 3301 Green Brush Court.  Your Honor, may

5  I approach the witness?

6          THE COURT:  Yes.

7  Q    Did you make a comparison or were you asked to render any

8  opinions, Sergeant, about any relationship between this .40

9  caliber Glock handgun and the projectiles that you've previously

10 testified about?

11 A    They were submitted under the same case number and I

12 automatically took this gun into consideration as to whether

13 those bullets could or could not have been fired in this gun.

14 Q    And what conclusions did you reach?

15 A    They could not have been fired from this gun.

16 Q    And why would the .38 and or .357 rounds you testified about

17 could not have been fired from this weapon?

18 A    For two reasons.  The .40 caliber is a much larger bore than

19 the .357.  And also, it has a different type of rifling inside,

20 referred to as polygonal rifling.

21 Q    Among other things, the caliber is simply not right, is that

22 correct?

23 A    That's correct.

24 Q    Now, on the subject of .40 caliber handguns.  Did you also

25 conduct an examination of the rounds with a .40 caliber Taurus

1    handgun marked as being recovered from a bedroom at 8618 Bramble

2    Lane?

3    A    I did examine that firearm and, again, it could not have

4    been used to fire those bullets.

5    Q    Just so we're very clear for the record.  Can you tell us

6    why the firearm from 8618 Bramble Lane could not have fired the

7    rounds that you previously testified about?

8    A    Again, the barrels are two different sizes.  The .40 caliber

9    is much larger than the .357 magnum.

10   Q    And have you reached those conclusions to a reasonable

11   degree of certainty, Sergeant?

12   A    Yes, I have.

13   Q    Let me show you another item which has been marked for this

14   case as Government's Exhibit S-41.  I'm putting it up on the

15   screen.  Your Honor, once again, may I approach the witness?

16          THE COURT:  Yes.

17   Q    I've showed you the box for this item.  And it also reflects

18   an item recovered from woods behind Green Brush Court, is that

19   correct, Sergeant?

20   A    That's correct.

21   Q    Sergeant Ensor, did you make a comparison between this

22   weapon -- first of all, did you examine this weapon?  Let me

23   start with the basics.

24   A    Yes, I did.

25   Q    What are its specs?  What's its make and model and caliber?

1    A    It's caliber .357 magnum revolver.  It's manufactured under

2    the name of Dan Wesson.  The model is not noted on here but it's

3    consistent with their Model 14 revolver.  It had serial number

4    304373.  It's manufactured in Monson, Massachusetts.  Again, it's

5    a caliber .357 magnum.  It had six lands and grooves with a

6    right-hand twist in its barrel.

7    Q    Now, did you make a comparison between this .357 revolver

8    and the .357 rounds that you previously testified about, which

9    have been marked as Government's S-4A and S-4B, recovered from

10   Shock Trauma and from the Office of the Chief Medical Examiner?

11   A    Yes, I did.

12   Q    And what conclusions did you reach with respect to the

13   comparison between this weapon and these bullets?

14   A    I was able to determine those bullets were fired from this

15   particular firearm to the exclusion of all others, more

16   specifically, the barrel in this firearm.

17   Q    When you say "to the exclusion of all others", that these

18   bullets were fired from this firearm to the exclusion of all

19   firearms?

20   A    Yes.

21   Q    And is that a conclusion you reached to a reasonable degree

22   of certainty?

23   A    Yes.

24   Q    Sergeant, what testing procedure did you follow in reaching

25   that conclusion?

1    A    Initially, with the firearm, we, or I, examine the firearm

2    to determine if it was in proper functioning condition.  And

3    indeed, it was found to be operable.

4          Once I made that determination, I marked ammunition

5    that I had in my stock at the laboratory, marked both the

6    cartridge cases and the bullets prior to firing them into a water

7    recovery tank.  Having fired them into the water recovery tank,

8    the bullets had taken on the rifling impressions and scratches,

9    referred to as stria, from having been fired in the firearm.

10         I took those bullets back into my laboratory and placed

11   them on a comparison microscope and found that the class

12   characteristics were 100% in agreement.

13         Looking for individual characteristics, I was able to

14   determine that there was a presence of individual

15   characteristics.  And then comparing them directly to the

16   evidence bullets on your monitor right now, I was able to say

17   that the individual characteristics had a significant amount of

18   agreement and that they could have only been created by the same

19   surfaces, that found to be the lands within the barrel of that

20   firearm.

21   Q    Now, part of this process actually, you touched on this,

22   actually involved confirming that the weapon, the firearm, was

23   operable, is that correct?

24   A    Yes, sir.

25   Q    By operable, does that mean that you tested it in some way

1    or test-fired it, and it was capable of actually expelling a

2    projectile by the action of an explosive?

3    A    That's correct.

4    Q    At any point, Sergeant, were you ever able to make any

5    comparison -- we've been talking about the two bullets that you

6    previously examined and found to be caliber .357 and .38.  Were

7    you ever able to make any comparison between those bullet

8    fragments, Government's Exhibit S-4C and the .357 firearm?

9    A    Yes, I was.

10   Q    And how is it, understanding you weren't able to reach a

11   conclusion as to the caliber of these particular fragments, how

12   were you able to make a comparison between the fragments and the

13   weapon?

14   A    Again, there's two fragments.  One of the fragments had the

15   impressions and stria associated with the lands inside of a

16   barrel, had two of those impressions.  The other had one

17   impression from the land surface within a barrel.

18          I was able to compare those fragments, impressions and

19   scratches within those land areas, again to the test fires that I

20   took in the revolver.  I was able to conclude that both of those

21   fragments had been fired from that particular barrel to the

22   exclusion of all others.

23   Q    So all of the bullets that you examined in this case you've

24   determined were fired from this weapon?

25   A    Yes, sir.

1    Q    Coming back to this Taurus that you previously testified

2    about, Sergeant Ensor.  And I'm going to put it back up on the

3    screen.  This has been marked as Government's Exhibit S-42.  You

4    were unable to match this Taurus against any of the bullets or

5    fragments that we previously talked about, is that right?

6    A    What's on the screen is the Glock.

7    Q    I'm sorry.  The Glock.  I apologize.  The Glock .40 caliber,

8    which has been marked as S-42.

9    A    Right.  None of the ammunition was fired from that Glock.

10   It was found to be comparable.

11   Q    Let me ask you about that.  Part your examination involved

12   test firing this weapon?

13   A    Yes.

14   Q    And again, it was operable, meaning it was found to be

15   capable of expelling a projectile by the action of an explosive?

16   A    Yes, sir.

17   Q    Is there a system called Drug-Fire, Sergeant Ensor?

18   A    There was at that time, yes, sir.

19   Q    What was, at that time what was Drug-Fire?

20   A    Drug-Fire was a computer imaging system that was developed

21   for the FBI under contract where we could image those portions of

22   the cartridge cases that are marked by the firearms and place

23   them into image archives, if you will, on their mainframe.  It

24   had the ability to search other images and look for consistencies

25   and then return possible associations to us in the forms of

1    images that we could compare digitally.  If we saw significant

2    correspondence in individual characteristics, we would then

3    respond to whatever jurisdiction had that other evidence and do a

4    direct comparison to see if we could possibly link up evidence

5    from two different crime scenes or evidence to a firearm

6    recovered at another location.

7    Q    Did there ever come a time, Sergeant, that you received any

8    information leading you to conduct any examination of this Glock

9    .40 caliber, S-42, from the Spence case, with any cartridge

10   casings of any other investigation?

11   A    Yes.  Utilizing the Drug-Fire system, there was an

12   association that was made with a Baltimore City case, Baltimore

13   City CC number 027C as in Charles 08012.  There was significant

14   agreement in class and individual characteristics.

15         Responding to Baltimore City, I was able to use their

16   equipment, compare it to their evidence directly.

17   Q    Now, the case number that you just referenced, Sergeant

18   Ensor -- a moment, Your Honor -- that related to the shooting on

19   March 11th, 2002 of an individual named Eric Lee and an

20   individual named Jacob Epps in a related case, is that correct,

21   Sergeant?

22   A    I don't have documentation that says specifically what the

23   Baltimore City case consisted of.

24   Q    Understood.  It was the Baltimore City, is that correct?

25   A    Yes, it was.

1    Q    Let me show you a series of items which have been taken out

2    of a, out of an envelope which has been marked as Government's

3    Exhibit Lee 2.  Your Honor, may I approach?

4              THE COURT:  Yes.

5    Q    Sergeant, I'm probably going to retrieve them from you in a

6    moment.  And I give you one additional page for your reference.

7    I've handed you a series of cartridge casings, is that right,

8    Sergeant?

9    A    That's correct.

10   Q    And for the record, they're all out of the envelope marked

11   Government's Exhibit Lee 2.  Taking a look at your paperwork,

12   including to refresh your recollection, if you need it, the

13   report I just handed you, do you recognize the cartridge casings

14   I just handed you?

15   A    Yes, I do.

16   Q    And what are they?

17   A    These are fired caliber .40 S and W cartridge cases that

18   bear the impressions that are consistent with Glock or Smith &

19   Wesson Sigma series firearms.

20              They were marked Q-1, Q-2, Q-3, Q-4, Q-6, and Q-C --

21   sorry -- Q-7 respectively by the city examiner.

22   Q    I'm going to attempt to fit these all on to the screen at

23   the same time, if I can.  Sergeant, we'll see if it works.

24   Unfortunately, it doesn't work terribly well.  Your Honor, I'm

25   going to make use of the table.  Is that all right?

1        THE COURT:  That's fine.  You may proceed, Mr. Hanlon.

2   Q    Sort of going on the fly, Your Honor, best way to do this.

3   Let me try it this way.

4        Sergeant Ensor, the particular cartridge casings that

5   you just examined, which are out of Government's Exhibit Lee 2,

6   are these cartridge casings that you had an opportunity to

7   examine?

8   A    Yes, they are.

9   Q    And I think you already touched on the initial conclusion

10  you drew.  What were the basic characteristics of these casings

11  right off the bat?

12  A    Again, they're a caliber .40 S and W, which is .40 Smith &

13  Wesson.  They can be fired in other firearms.  That chambering is

14  common to many manufacturers.

15       They had impressions on the primer area, the area I

16  referred to as the detonator.  The impression was of the firing

17  pin, which was elliptical in shape, somewhat egg-shaped.  It had

18  the impression the firing pin aperture, or the hole that the

19  firing pin passes through, which is rectangular.  And it had

20  breech face marks on the primer.  It had been fired.  The primer

21  was detonated.  The powder was gone and the bullet was gone.

22  Q    Now, these particular cartridge casings were labeled -- I

23  think you touched on this -- Q-1, Q-2, Q-3, Q-4, Q-6 and Q-7.  I

24  skipped Q-5, is that right?

25  A    That's correct.

1    Q      And they were labeled that, essentially, for reference

2    within that Baltimore City case, is that right?

3    A      Yes, sir.

4    Q      Did you examine these six .40 caliber cartridges and compare

5    them against the .40 caliber Glock that I have that is already in

6    evidence as Government's Exhibit S-42, from the Spence case?

7    A      Yes, I did.

8    Q      And what conclusions did you draw after comparing the Glock

9    .40 caliber to these six .40 caliber cartridges?

10   A      These six cartridges cases were fired in that Glock to the

11   exclusion of all others.

12   Q      And just so we're very clear.  This Glock from the Spence

13   case, it's your opinion, fired these six cartridges which have

14   been marked as Government's Exhibit Lee 2?

15   A      Yes, it did.

16   Q      How did you reach that conclusion in this case, if you could

17   walk us through it?

18   A      Again, having test-fired the Glock myself, I took the test

19   fires and placed them on the imaging system, referred to as Drug

20   F-i-r-e.  And I pulled up the Baltimore City case, Baltimore City

21   case 027-C as in Charles 08012.  And I was able to bring the

22   images side by side as I would on a comparison microscope and

23   compare the individual characteristics.

24            The primary individual characteristics utilized in this

25   particular case were created when the firearm was discharged.

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 96 of 270

1    The pressure that forced the bullet out of the barrel presses the

2    primer back against the breech face, the back end of the

3    cartridge case against the area where the firing pin had struck

4    it.  The primer flows back into the breech face into the firing

5    pin aperture.  Then as the barrel and the slide begin to recoil

6    together, the barrel unlocks by sliding down and a shear mark is

7    created.  That shear mark is created by an edge where two machine

8    surfaces come together in a random manner, forming a very

9    individual, very distinct mark.

10         If you were to take a look at the base of the model

11   that I used earlier, it has -- well, if you could pull the base

12   off for me and put it down flat with the firearm itself.  There

13   you go.

14         It has, the impression I'm talking about, you can

15   barely see it due to the glare, but you can see the rectangular,

16   raised portion in the center of the primer and the firing pin

17   mark in the center.  In that rectangular portion you can see the

18   scratches that are generated across that edge.  That occurred

19   when it unlocked during the firing sequence under pressure.

20   Q    And again, this is a conclusion you reached with respect to

21   all six of the shell casings that I removed from the Lee 2

22   envelope?

23   A    Yes, sir.

24   Q    I mentioned previously that I skipped Q-5 from that

25   Baltimore City Lee case.  Sergeant, do you have any knowledge

1    whether or not other shell casings from that Baltimore City

2    shooting were compared to other firearms that you may not have

3    been involved in yourself?

4    A    That, I wouldn't have knowledge of that.

5    Q    You just did these six, is that right?

6    A    Yes, I did.

7    Q    And the conclusions you've discussed today, are all of these

8    conclusions you've reached to a reasonable degree of certainly?

9    A    Yes, sir.

10   Q    I believe that's all my questions, Your Honor.  Thank you.

11   Thank you, Sergeant.

12              CROSS EXAMINATION

13   BY MR. COBURN:

14   Q    Good afternoon, Sergeant Ensor.

15   A    Good afternoon.

16   Q    The last exhibit that you testified about, if I remember

17   correctly, was Government's Exhibit Lee 2.  I wonder if Mr.

18   Hanlon would be kind enough to -- thank you so much.  Just going

19   to try to place these on the monitor.  And I think Mr. Hanlon was

20   absolutely right.  They don't come out too well because of the

21   glare.  Maybe we can see some of it.  Here we go.

22   A    That's better.

23   Q    I didn't put them all on but I'll try to wedge them on

24   there.  Now, this, if I understand correctly, Sergeant Ensor,

25   this is a group of cartridge casings which it's your

1    understanding were discharged in the course of that Baltimore

2    City homicide that you referred to by Baltimore City case number,

3    correct?

4    A    What you have on the monitor are cartridge cases, and

5    bullets as well.

6    Q    Okay.  So the comparison that you did, the one that Mr.

7    Hanlon was just asking you about, Q-1 through Q-4, Q-6 and Q-7,

8    is that bullets or is that cartridge casings or is it both?

9    A    It's cartridge cases.

10   Q    Just the cartridge casings.  Certain cartridge casings?

11   A    Yes, sir.

12   Q    Okay.  So if I understand you correctly, then, the images

13   that you used for this comparison were taken like electronically

14   from the Drug-Fire system, is that right?

15   A    Initially, yes, sir.

16   Q    And then you went down there and looked at them, is that

17   correct?

18   A    Yes, sir.

19   Q    And what you did was you testified you fired, you test-fired

20   the Glock, the Glock from the Spence homicide, the one that

21   apparently was not linked to any of the actual bullets in the

22   Spence homicide?  You test fired the Glock and you took those

23   cartridge casings after test-firing that weapon and compared them

24   to Q, the six that we talked about, Q-1 through 4, 6 and 7,

25   right, from the Baltimore City homicide?

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 99 of 270

1    A    I compared my test fires that I took myself in the Drug-Fire

2    database.  When I took the firearm to Baltimore City, their

3    examiner, James Wagster, took his own test fires in my presence

4    and I examined those test fires and compared them directly to his

5    evidence in that Baltimore City case number.

6    Q    And I think you said you used their equipment, right?

7    A    Yes, sir.

8    Q    Now, if I understood you correctly, and you, you know, you

9    were talking about the firing pin was elliptical and then

10   there -- probably didn't write quickly enough.  You said there

11   was a shear mark on the edge, is that correct?

12   A    There's a shear mark, there's a rectangular, raised portion

13   that surrounds the firing pin impression.  On that rectangular

14   raised portion on the primer, there's a shear mark that comes

15   from the edge of the firing pin aperture.

16   Q    Okay.  Maybe you could define some of these terms for all of

17   us so that we understand what you're referring to.  When you use

18   the word "primer", what's that?

19   A    The primer, again, if you have the model, is the portion on

20   the back of the cartridge case that is struck by the firing pin.

21   That serves as a detonator.  It sends a spark into the powder.

22   Q    Okay.  So then the shear mark on the edge, is that like what

23   you'd think of as a bottom of one of these shell casings or is it

24   on the side of the shell casing?

25   A    If you can hold up the specimen that you just had.

1   Q    Sure.

2   A    Put it back down on the surface.  Okay.  Now turn it up on

3   its edge.

4   Q    Okay.  Like that?

5   A    There you go.  You can see the primer area.  It's in that

6   area which we speak.

7   Q    So we're talking about a comparison that you made of a shear

8   mark that's in that area of the shell casing that we're looking

9   at right now, right?

10  A    Primarily, yes, sir.

11  Q    Primarily?

12  A    Yes.  What I also, what I also took into consideration was

13  the shape of the firing pin, the shape of the firing pin

14  aperture, and the nature of the machine marks on the breech face

15  which surround that.

16  Q    And it's your testimony, then, if I understand you

17  correctly, the shape of the firing pin is unique to this weapon,

18  right?

19  A    Yes.

20  Q    And the shape of the firing pin aperture, it's your

21  testimony, unique to this weapon, right?

22  A    The shape of the firing pin aperture was consistent.  We

23  talked earlier about class characteristics and individual

24  characteristics.  Glock creates these firing pin apertures by

25  piercing a hole, a rectangular hole in that breech face.  Many of

1    them are very consistent in their shape, their general shape.

2    Okay?  Now, the markings that are left by the edge itself are

3    unique.  The firing pin aperture's shape was consistent, but that

4    would be considered a class characteristics.  That's the first

5    thing I had to do, was make sure that the class characteristics

6    are consistent 100%.  And indeed they were.

7    Q    Now, Glock machine manufactures its weapons, right?  They're

8    --

9    A    That's right.

10   Q    -- mass produced, is that correct?

11   A    Yes, sir.

12   Q    So tell us, just to make sure that we're as clear as we can

13   be about this, just what is it, what specifically was it that was

14   unique, according to your testimony, between Q-1 through 4, 6 and

15   7, you know, the ones that were marked Lee 2, versus the Glock

16   from the Spence, that was recovered in the, the grassy area

17   behind where the Spence homicide happened.  What exactly was

18   unique?  What was unique there that you compared specifically, as

19   specifically as you can tell the ladies and gentlemen of the

20   jury?

21   A    Okay.  When the surface that the cartridge case sits against

22   in the firearm is manufactured by Glock, something called a

23   broach, which is a series of cutting knives, pass down over that

24   surface.  And they cut that finished surface so that all the

25   lines that are generated by these cutting edges are generated in

1    the same direction.  So they would be parallel breech face marks.

2    They're all cut in the same direction as what the firing pin

3    aperture is pierced into the primer, or into that surface as

4    well.

5           Again, they take and they stamp out, if you will, with

6    a separate tool, a separate process, that hole that's rectangular

7    in the breech face.  When they create that stamping, you have two

8    different tools that are creating an intersecting point where the

9    breech face comes across and where the hole begins.  That edge is

10   the result of two separate machining processes that have a

11   transfer of individual characteristics to those two areas,

12   coinciding at one point, that particular edge.  That edge is

13   extremely unique when two different machining processes

14   intersect.

15   Q    Two different machine processes intersect and they create a

16   unique shear edge --

17   A    They create a unique edge.

18   Q    -- when it's manufactured?

19   A    Now, the shear comes into play when the firing pin strikes

20   the primer and the pressures build up inside.  That primer

21   material that yielded to that firing pin blow also presses back

22   under the pressure into that hole.  And then it begins to balloon

23   into that hole, if you will.  That barrel and that slide slide

24   back together and then the barrel slips down and unlocks,

25   actually slides down across the breech face.

1          The shear is created when that unique surface drags up

2     across that portion of the primer that's now ballooned inside of

3     that breech face.

4     Q    And that's what creates the unique shear, is that right?

5     A    That's correct.

6     Q    Okay.  Now, you told the ladies and gentlemen that you use a

7     comparison microscope to do this, right?

8     A    Yes, I do.

9     Q    Does the microphone allow you to take pictures?

10    A    Yes, it does.

11    Q    And do you have any pictures of this particular shear,

12    unique shear?

13    A    At this time we weren't taking pictures of our comparisons.

14    I don't have any present -- I have a picture from Drug-Fire of

15    the shear but it's not something you can discern very easily as

16    far as, you can't do a comparison with that.

17    Q    Well, that would only be a picture from, from what's marked

18    as the Lee Exhibit Two, right?  And that's only from one side of

19    the comparison, then, right?

20    A    It actually has my specimen as well as Baltimore City

21    specimen, same series.

22    Q    So you have pictures of both?

23    A    Yes, I do.

24    Q    Okay.  May I retrieve them from the witness, Your Honor?

25              THE COURT:  Certainly.

1    A    As soon as I find them.

2    Q    Take your time.  While you're looking, can I pose another

3    question to you or maybe I should just wait?

4    A    Sure.  Shall I explain?

5    Q    Well, what are you holding in your right hand?

6    A    This is a printout from the Drug-Fire system.  Okay?  Again,

7    you can see --

8             THE COURT:  Well, we can't see that yet.

9    Q    Should I turn it on, Your Honor?

10   A    You can place it.

11   Q    May I approach the witness?

12            THE COURT:  Yes.

13   A    What you can see is, from our computer screen, one screen

14   that has three images.

15   Q    We should probably mark this, Your Honor.  Can we mark this

16   as Gardner Exhibit Seven?

17            THE COURT:  Well, you should pay attention to what

18   you're doing first.  You dropped one of the exhibits, Mr. Coburn.

19            MR. COBURN:  I'm sorry.  I apologize.

20            THE COURT:  Let's get those re-bagged.  Let's not --

21            MR. COBURN:  I'll give them to Mr Hanlon.  He probably

22   would prefer to do it.

23            THE COURT:  In fact, it looks like you're going to be a

24   little while.

25            MR. COBURN:  I think so.

1            THE COURT:  So perhaps you want to go ahead and finish

2     with that photograph exhibit and then we'll take lunch, or do you

3     want to break now?

4            MR. COBURN:  Breaking now is fine, Your Honor.

5            THE COURT:  All right.  Members of the jury, we'll

6     break at this time for lunch.  It's 12:58.  Please be back in the

7     jury room no later than 2:15 p.m. this afternoon.

8            Leave your note pads on your chairs.  Please have no

9     discussion about the evidence or about the case.  Continue to

10    keep an open mind about all issues.  The jury is excused until

11    2:15 p.m..

12            (Jury exits the courtroom.)

13            THE COURT:  Mr. Hanlon, at what time did you folks

14    expect Mr. Reynolds?

15            MR. HANLON:  I was actually going to ask the agent

16    about that now, Your Honor.  I think he's supposed to be here

17    presently.  Mr. Reynolds.  1:30, Your Honor.

18            THE COURT:  1:30?  How long do you think you're going

19    to be, Mr. Coburn?  I would like not to interrupt Sergeant

20    Ensor's testimony.  I assume Reynolds would be next?

21            MR. HANLON:  Yes, Your Honor.

22            MR. COBURN:  Something around 20 minutes to a half an

23    hour, if Your Honor would allow me to do that.

24            THE COURT:  Okay.  Perhaps what we should do is we

25    should interrupt the sergeant's testimony just to give you a

1    chance to examine Mr. Reynolds.  And then we'll bring the jury in

2    and finish with the Sergeant.  And then we'll go to Reynolds on

3    his direct.

4            You're not going to be more than 10 or 15 minutes on

5    the outside on Reynolds on this <u>Massiah</u> issue?

6            MR. COBURN:  No.

7            THE COURT:  All right.  That's what we'll do.

8            MR. HANLON:  Your Honor, I'm sorry if I missed it.  But

9    when should I make sure Mr. Reynolds is here, ready to go?

10           THE COURT:  2:15.  So what we'll do, before we bring

11   the jury out, we'll give Mr. Coburn an opportunity to examine Mr.

12   Reynolds on his contacts with Mr. Gardner and the proffer

13   sessions and the timing of all of that.  And then I'm assuming

14   that won't take more than 10, 10 minutes or so.  And then we'll

15   hear some brief argument.  Then we'll go back to Sergeant Ensor

16   with the jury.

17           MR. HANLON:  That's certainly fine with the government,

18   Your Honor.  One more thing, very minor matter.  The young lady,

19   Ms. Cheatham, who was the witness.

20           THE COURT:  Yes.  What can you tell us about that?

21           MR. HANLON:  Really nothing, Your Honor.  Basically,

22   what happened -- I shouldn't say that.  I'll tell the Court

23   whatever the Court wants to know.  She was a government witness.

24   She was under subpoena.  She would have testified about a couple

25   of background matters, nothing terribly critical.  She hasn't

1    been super enthusiastic about speaking with me.

2         So while we've left some messages telling her to be

3    here, she can come, sometimes we haven't gotten too much of a

4    response.  Candidly, I never told her in any of my voice mails,

5    By the way, Ms. Cheatham, if you come to court and I don't know

6    about it, don't come in.

7         So there was some back and forth there.  I did instruct

8    her this morning when I spoke to her not to come into court even

9    though she had been in before.  She evidently disagreed with me.

10   But I think that the government's decision here is going to be

11   that I just don't think we need to call her, Your Honor.  So I

12   was going to tell her if she wanted to, she could come back in,

13   unless any of the defense attorneys for any reason object to

14   that.

15             THE COURT:  How often and how frequent was she here?

16             MR. HANLON:  We haven't been able to discern anything

17   like that from her, Your Honor.  She tells us she doesn't

18   remember what it is she's been seeing when she's been in court.

19   She's told me a lot.  And she was able to.

20             THE COURT:  I'm sorry.  That's a quote?  She said,

21   "I've been here a lot?"

22             MR. HANLON:  That's a paraphrase, Your Honor.  She's

23   been here a great deal.  But she was unable to discern for the

24   agent what it is that she's heard or what it is that she's seen.

25             THE COURT:  Does she know the dates or the days of the

1    week?

2              MR. HANLON:  Not that we were able to discern, Your

3    Honor.

4              THE COURT:  I certainly obviously don't recognize or

5    certainly not recall every visitor.  But frankly, I don't recall

6    seeing her much, if I saw her at all.  I'm not saying she wasn't

7    here.  I've been, as you well know, I've been staring at the

8    spectators for six weeks now and I don't remember her being here.

9              MR. HANLON:  I was advised by one of my colleagues on

10   the defense side, Your Honor, that he was pretty sure he had seen

11   Ms. Cheatham here.  He was letting me know as a heads up.  That's

12   why I was looking out for her this morning.  So I think she has

13   been here a few times.  I don't know how many.

14             From the government's point of view, I don't think we

15   need to call her so it's going to become a moot point.

16             THE COURT:  Who is she related to?

17             MR. HANLON:  A former, I believe a former attachment of

18   Mr. Gardner's.  And she would have testified about some of the

19   circumstances of the Ambo Circle search.

20             THE COURT:  I see.  Okay.  Anybody want to call her?

21             MR. COBURN:  No, Your Honor.

22             THE COURT:  Okay.  So feel free to convey the message

23   to her, that if she wishes to come in the courtroom, she's free

24   to do so.

25             MR. HANLON:  Thank you, Your Honor.

1     THE COURT:  Thank you, counsel.  We're in recess until

2     2:15.

3          (Luncheon recess at 1 p.m.)

4          (Defendants present.  Jury not present.)

5          THE COURT:  Have Mr. Reynolds.

6          MR. HANLON:  Yes.

7          THE COURT:  All right.  Mr. Reynolds, good afternoon.

8     You're going to testify briefly early this afternoon.  And then

9     you'll be back in front of the jury later this afternoon.  Would

10    you raise your right hand and be sworn, please?

11         KAAZIM IBN-REYNOLDS, GOVERNMENT'S WITNESS, SWORN

12         THE WITNESS:  Yes.

13         THE CLERK:  Be seated.  Speak directly toward the mike.

14    State your name and spell it for the record, please.

15         THE COURT:  You can pull that down.

16         THE WITNESS:  Kaazim Ibn-Reynolds.  K-A-A-Z-I-M.

17    I-B-N hyphen R-E-Y-N-O-L-D-S.

18         CROSS EXAMINATION

19    BY MR. COBURN:

20    Q    Mr. Reynolds, good afternoon.

21    A    Good afternoon.

22    Q    My name's Barry Coburn.  How are you doing?

23    A    How are you doing?

24    Q    Good.  I want to ask you a few questions about events that I

25    gather happened like in 2003 or 2004.  Do you recall a time when

1   you were arrested and then had a meeting with prosecutors about

2   your case and possible cooperation?

3   A    Yes.

4   Q    Tell us when it was that you got arrested?

5   A    I think in March.

6   Q    Of what year?

7   A    '03.

8   Q    March of '03?  Okay.  And what were you arrested for?

9   A    A handgun.

10  Q    What were you charged with?

11  A    Possession of a handgun, felon in possession of a handgun,

12  and possession of narcotics, I believe.

13  Q    So a felon in possession of a handgun.  So you are being

14  charged federally, is that your understanding?

15  A    Yes.

16  Q    And also a narcotics violation?

17  A    Yes.

18  Q    And did there come a time when you had a meeting with some

19  prosecutors, federal prosecutors?

20  A    Yes.

21  Q    When was that?

22  A    I can't remember the exact date.

23  Q    What's your best recollection about when it was?

24  A    Maybe a few months after that.

25  Q    About three months after --

1    A    A few.  A few, few months, two.

2    Q    I'm sorry.  A few months after your arrest, which you think

3    was in March of '03, is that right?

4    A    Yes.

5    Q    Who arranged the meeting?

6    A    I believe my lawyer.

7    Q    What was that person's name?

8    A    Beth Farber.

9    Q    Was Ms. Farber there, too, at the meeting?

10   A    Yes.

11   Q    And who else was there?

12   A    Mr. Rob Harding, a Detective Kramer.  That's it.

13   Q    What was your understanding of what was supposed to happen

14   there?

15   A    They just wanted to ask me questions.

16   Q    Did you sign anything before the meeting started, like a

17   proffer agreement or anything like that?

18   A    Can't remember.

19   Q    Tell us what you remember about the meeting.  What happened?

20   A    He asked me where did I grow up at.  He knew some of the

21   history.  Actually, the officer was there, Kramer.  He knew, he

22   knew the history.  Where I used to be at.

23   Q    Anything else?

24   A    No.  That's about -- I mean, they just asked certain

25   questions of where I grew up, who I used to be with, who used to

1    be with me.

2    Q    Did they ask you anything about Shawn Gardner?

3    A    Not at that particular time.  I don't think at that, at that

4    meeting right there.

5    Q    Did you tell them anything about Shawn Gardner?

6    A    I may have said something.

7    Q    What do you recall saying, if anything?

8    A    The dude's locked up.  They already knew he was locked up.

9    They was in --

10    Q    What was he locked up for?

11    A    Excuse me?

12    Q    I'm sorry.  At the time of this meeting, what was he locked

13    up for?

14    A    I believe murder.

15    Q    So when you were meeting with the prosecutors, he was locked

16    up for murder?

17    A    Um-hum.

18    Q    You were letting them know that?

19    A    I think they already knew that.

20    Q    That he was locked up for murder?

21    A    Right.

22    Q    Do you know what murder he was locked up for at that point?

23    A    I was thinking it was for Darryl, Darryl Wyche and Tony

24    Wyche at that time.

25    Q    Okay.  Was there any other discussion between you and

1    anybody else at the meeting about Shawn Gardner?

2    A    It was questions asked.

3    Q    Like what?

4    A    I can't remember what exactly was asked.  But it was certain

5    questions asked.  Do I know what happened or was he alone or

6    questions like that.

7    Q    Was he alone for what?

8    A    For any murders that he'd committed.

9    Q    Do you remember what you said about that?

10    A    No.

11    Q    Okay.  When you left the meeting, what was your

12    understanding about what was going on between you and the

13    government, whether you all had, whether you were going to meet

14    again or whether there was any sort of continuing relationship

15    there?

16    A    I think it was going to be a continuing -- I didn't know

17    when we was going to meet again.  But I wasn't fully cooperating

18    at that time.

19    Q    You had more information to provide to them than you had so

20    far, is that right?

21    A    Yeah.

22    Q    And it was your understanding there were going to be

23    additional meetings in which you were going to tell them more

24    information, is that right?

25    A    No, it wasn't, it wasn't my understanding at that time.

CROSS EXAMINATION OF IBN-REYNOLDS ON VOIR DIRE BY COBURN          114

1    Q    What was your understanding about that?

2    A    We just met.  They asked the questions.  That was it.

3    Q    Okay.  Did you have any understanding about what was going

4    to happen after that or what might happen after that?

5    A    No, because I still was undecided on what I was doing.

6    Q    What were you undecided about?

7    A    About cooperating.

8    Q    Had you already started cooperating at this initial meeting?

9    A    When I gave them information about me and what I've done.

10   Q    What about when you gave the information about Mr. Gardner?

11   A    They had already knew that.

12   Q    They told you that?

13   A    I can't remember if they said it or Detective Kramer said

14   it.  I can't remember who said it.

15   Q    Okay.  So then do you remember anything else about this

16   meeting other than what you've told us about so far?

17   A    No.  I know it was a couple other meetings after that.

18   So --

19   Q    When were they?

20   A    I can't remember a date.

21   Q    About how long after the first meeting were the other

22   meetings?

23   A    A couple months.  Maybe a month or two.

24   Q    Pardon?

25   A    A month or two.

1    Q    A month or two?

2    A    Um-hum.

3    Q    So there were how many more meetings after the first

4    meeting?

5    A    Maybe two or three.

6    Q    And who attended those meetings?

7    A    I think for the next one, still was Beth Farber.  And then

8    my other lawyer, Andrew Graham.

9    Q    And what happened at those meetings?

10   A    Same questions.  It was, asked me questions about Gardner

11   again.

12   Q    What did you tell them?

13        MR. HANLON:  Objection, Your Honor, relevance.

14   Q    What was the subject matter that you discussed with them

15   about Gardner?

16   A    About -- the questions that they asked me?

17   Q    What did they ask you about and what did you tell them

18   about, without necessarily telling us every piece of information

19   you can?

20        MR. HANLON:  Objection, Your Honor.

21        THE COURT:  Overruled.  You may answer.

22   A    I can't remember what exactly meeting was it.  But it was

23   one meeting where they asked, where I actually said that I was

24   sharing a cell with Gardner.

25   Q    When did you start sharing a cell with Gardner?

1    A    Probably about in February.

2    Q    Of?

3    A    February or March, maybe.

4    Q    Of what year?

5    A    I think '03.

6    Q    Okay.  And was anyone else in the cell besides you and him?

7    A    No.

8    Q    Was there conversation between you and Mr. Gardner when you

9    were cell mates?

10   A    Casual conversation.

11   Q    Casual conversation?

12   A    Yeah.  I mean, I knew him from the street.  We knew each

13   other.

14   Q    Did he tell you anything about anything that he said he had

15   done?

16   A    That he had done?

17   Q    Yes.

18   A    No, he didn't say anything about what he done but he said

19   that what everybody was locked up, what he was involved in, what

20   case he was going for.

21   Q    Would you tell us about that, what he said about that?

22   A    He just got caught up in a murder in Baltimore County and he

23   was being charged for it federally and state.  And I said, I

24   don't think they can do that.  You need to check into that.  You

25   need to ask your lawyer how can they charge you for a murder for

1  the state and the federal.

2  Q    When did this conversation happen?

3  A    In the cell.

4  Q    How long after you were locked up with him?  How long after

5  you became cell mates?

6  A    Maybe about a week.

7  Q    What's your best estimate, if you can, about, you know, what

8  month and year it happened in?

9  A    '03.  March.

10  Q    And why were you having this conversation with him?

11  A    Just casual conversation.

12  Q    How many meetings with the prosecutors and Detective Kramer

13  had already occurred by the time you had this meeting?  I'm

14  sorry.  By the time you had this conversation with Mr. Gardner.

15  A    Maybe one.  One or two.

16  Q    And what was your understanding about your relationship, if

17  any, with the government by the time, by the time you were

18  talking to Mr. Gardner?

19  A    I didn't think I gave them an answer on it, if I was

20  cooperating or not.

21  Q    You had already had at least one or two proffer sessions

22  with them, is that right?

23  A    Yes.

24  Q    In which they had asked you questions and you had given them

25  answers, correct?

1    A    Yes.

2    Q    And you were thinking that anything you might learn from Mr.

3    Gardner might be an additional piece of information you could

4    give them, is that right?

5    A    I wasn't in a cell with Mr. Gardner when I had them

6    meetings.

7    Q    No.  The meetings, I think you've already told us, were

8    earlier, right, at least one or two of them?

9    A    Right.

10    Q    And you were anticipating that you either would or might

11    meet with them again, right?

12    A    I didn't know at that time.

13    Q    You thought you might, right?

14    A    Could be.

15         MR. HANLON:  Objection, Your Honor.

16         THE COURT:  Overruled.

17    Q    It could be, you said?

18    A    Could be.

19    Q    Okay.  And if another meeting with the government happened

20    and you decided to continue to cooperate with them, you were

21    thinking that what you would learn from Mr. Gardner you could

22    then tell them, correct?

23    A    No.  Because I wasn't trying to get information from Mr.

24    Gardner to hurt him.

25    Q    Pardon?

1    A    I said I wasn't trying to get information from Mr. Gardner

2    for them.

3    Q    What were you trying to do?

4    A    We just had casual conversation in the cell.

5    Q    And what else did Mr. Gardner tell you about what he had

6    gotten caught up in, if anything?

7    A    That, what happened at the place of the murders and how a

8    guy named Will Montgomery switched the story up on him, said he

9    done it, and lied.

10   Q    He said Will Montgomery had lied?

11   A    Yeah.

12   Q    What did he say Mr. Montgomery had lied about?

13   A    About him being the shooter.

14   Q    Did he say Mr. Montgomery had lied about anything else?

15   A    No.  He just said he switched the whole story up.

16   Q    In what way?

17   A    Made it seem like he was, he was the shooter.

18   Q    Did he say anything else about what Mr. Montgomery said?

19   A    Not that I can remember.

20   Q    Okay.  Did he say anything else about the incident he'd

21   gotten caught up in?  Like, for example, why he had gotten caught

22   up in it or anything like that?

23   A    Oh, well, he was, he got locked up, they raided his house or

24   something, took all his money.  And it was a, a proposition out

25   there for him where he can go and get 50,000 or a part of 50,000

1    for, to help Wayne get his lawyer.

2    Q    Pardon me?

3    A    To help Wayne get a lawyer.  So he went for --

4    Q    Did he tell you how he knew that Wayne needed a lawyer?

5    A    He got locked up.

6    Q    When did Wayne get locked up?

7    A    I don't know the date.

8    Q    What had Wayne gotten locked up for, if you had any

9    understanding about that?

10   A    Got locked up for murder.

11   Q    For murder.  Do you know what murder?

12   A    Darryl Wyche murder, Pete.

13   Q    Did Mr. Gardner tell you anything else about the matter that

14   he had gotten caught up?

15   A    That was it.  What Will said, how Will lied on him.

16   Q    Anything else?

17   A    I'm saying, what happened.  Actually, he was running or

18   something and he was out of breath, somebody was following him,

19   and he got pulled over by the police.  That's how he got locked

20   up.

21   Q    Did he tell you how he knew that, that Wayne needed a

22   lawyer?

23   A    How did -- repeat the question.

24   Q    What led him to think that he needed to get money for Wayne

25   to get a lawyer, based on your understanding?

CROSS EXAMINATION OF IBN-REYNOLDS ON VOIR DIRE BY COBURN          121

1    A    That's what he told me.

2    Q    Do you know how, you know, what led him to think that?

3    A    Nope.

4    Q    Did he say anything about that?

5    A    Absolutely not.

6    Q    Move the Court's indulgence just for a moment, please?

7              THE COURT:  Yes.

8              (Pause in proceedings.)

9    BY MR. COBURN:

10   Q    During either the first or the second meeting that you had

11   with the government, the proffer session, do you remember you

12   were describing one with Mr. Harding and Detective Kramer and

13   then there may have been another one after that?

14   A    Yes.

15   Q    What did the government say to you about what they were

16   asking you to do or wanted you to do?

17   A    They didn't say at that time.

18   Q    Did they say anything about why you were there or what they

19   were hoping to accomplish?

20   A    My charges, and what did I know about the murders that was

21   happening in South Baltimore area, something like that.

22   Q    They wanted to discuss your charges and what did you know

23   about the murders that were happening in the South Baltimore area

24   or something like that?

25   A    Yeah, something like that.

1    Q    Did they say anything else about what they were hoping to

2    accomplish?

3    A    Not at that time.

4    Q    It was your understanding that they wanted you to cooperate,

5    is that correct?

6    A    Yes.

7    Q    But it's your testimony that you hadn't made a decision yet,

8    right?

9    A    Right.

10   Q    When did you make that decision?

11   A    Probably when I got my new lawyer, Andrew Graham.

12   Q    When was that?

13   A    I can't remember the dates.

14   Q    Can you give us any sort of estimate at all?

15   A    Maybe around May.

16   Q    Of '03?

17   A    Probably May, June.

18   Q    Of '03?

19   A    Um-hum.

20   Q    And when you got Mr. Graham as your lawyer, how many meeting

21   at that point had you had with, that Mr. Harding had attended?

22   A    One or two.

23   Q    Thank you so much, Your Honor.

24        THE COURT:  Any questions, Mr. Hanlon?

25        REDIRECT EXAMINATION

1    BY MR. HANLON:

2    Q    Just briefly, Your Honor.  Mr. Reynolds, good afternoon.

3    A    Good afternoon.

4    Q    You and I have met several times, is that correct, to

5    discuss your testimony, get you ready for court, is that right?

6    A    Uh-huh.

7    Q    That's a yes?

8    A    Yes.

9    Q    Mr. Reynolds, in terms of some of the dates, you mentioned

10   that some of the events you testified about, in response to Mr.

11   Coburn's questions, took place in 2003.  And I want to just maybe

12   clear something up.  The very first meeting that you would have

13   had with the prosecutors in this case would have taken place

14   pursuant to something called a proffer letter, is that correct?

15   A    Yes.

16        THE COURT:  You can put it on the --

17   Q    Make sure I have it available, Your Honor.

18        THE COURT:  I'm sorry.  I thought you had it.

19   Q    I thought I did as well.  Let me show you this, Mr.

20   Reynolds.  You mentioned at some point you got Andy Graham as a

21   new attorney, is that right?

22   A    Yes.

23   Q    And at some point, you're aware that Mr. Harding, after you

24   informed us of the fact that you had had this contact with Mr.

25   Gardner, that you were cell mates with him, Mr. Harding sent a

1    letter to your attorney about that, is that right?

2    A    Yes.

3    Q    I'm going to put Government's Exhibit, I'll call it Reynolds

4    One for this hearing, Your Honor, for purposes of this motions

5    hearing.

6           THE COURT:  Very well.

7    Q    This letter is dated March 3rd of 2004, is that correct, Mr.

8    Reynolds?

9    A    Yes.

10   Q    And it's addressed to your attorney, Mr. Graham?

11   A    Yes.

12   Q    In it, it talks about a follow-up on our meeting with your

13   client on March 2nd of 2004, is that correct?

14   A    Yes.

15          THE COURT:  It says 22nd.

16   Q    Did I say something else, Your Honor?

17          THE COURT:  I thought you said March 2nd.

18   Q    I apologize.  March 22nd, 2004.  Sorry about that, Mr.

19   Reynolds.  In terms of the dates of the very first meeting, would

20   I be correct that this took place, this letter was sent a month

21   or two after that very first meeting you would have had with Ms.

22   Farber?

23   A    Yes.

24   Q    So would I be correct, Mr. Reynolds, if that first proffer,

25   you mentioned February or so of 2003.  I want to make sure you

1    weren't mistaken.  The first proffer would have been in early

2    February of 2004?

3    A    You said 2004?

4    Q    2004.  The first meeting between you and the government.

5    You mentioned you got arrested sometime in 2003, is that correct?

6    A    Yeah.  So it would have been in 2004.

7    Q    And then your first attorney had to leave the case and you

8    got a new attorney.  And by March 22nd of 2004, a couple months

9    later, thee's this follow-up meeting, is that correct?

10   A    Right.

11   Q    Your Honor, that's really all I had.

12            THE COURT:  All right.

13            MR. HANLON:  In terms of just the dates.

14            THE COURT:  You can step out, Mr. Reynolds.  We'll get

15   back to you this afternoon.  What was that case number, Mr.

16   Harding?  03 --

17            MR. HANLON:  Mr. Reynolds's case number?

18            THE COURT:  Yes.

19            MR. HANLON:  JFM-03-0454.  And Your Honor, if the Court

20   wishes, we could provide some of these dates.

21            THE COURT:  No.  I'm going to pull up the docket sheet.

22   The indictment in that case was returned on October 7th, 2003.

23   Defendant's initial appearance was on January 1st -- excuse me --

24   January 12th, 2004.  You want to be heard, Mr. Coburn?

25            MR. COBURN:  Thank you so much, Your Honor.

1          THE COURT:  I take it he hasn't been sentenced yet, Mr.

2    Hanlon?

3          MR. HANLON:  That is correct, Your Honor.

4          MR. COBURN:  Your Honor, can I mark an item as

5    Defendant Gardner's Exhibit Number Six?  I'll show it to Mr.

6    Hanlon.  May I show this document to Your Honor?

7          THE COURT:  Yes.

8          MR. COBURN:  Defendant's Exhibit Number Six.  This is a

9    proffer letter, standard proffer letter.  We've seen quite a

10   number of them in this case already.

11         In the government's submissions, and by the way, I just

12   would want to say, I don't have any reason whatsoever to believe

13   that the government, you know, isn't saying anything other than

14   precisely what it thinks happened in this case.  But in the

15   government's submission on this issue, it stated that the first

16   proffer session was, and unfortunately, I don't have it in front

17   of me right now, but I thought it was February 24th, 2004.

18   That's the first time that this gentleman came in to talk to Mr.

19   Harding and Detective Kramer, etc., about the possibility of

20   cooperating, according to the government's response to our motion

21   or its own motion in limine.

22         The reason that's important, I would submit to Your

23   Honor, is because he just testified that right around the time

24   that his previous lawyer, Beth Farber, came out of the case and

25   Mr. Graham came into the case, that's when he decided to

1    cooperate.  And that's, that's February 24th, 2004.

2         That's the first meeting and it is well before the

3    conversation that he is relating because he said the conversation

4    that he had with Mr. Gardner happened afterwards.  I believe he

5    said a month or so or a couple of months later.

6         So according to his testimony, he had -- first of all,

7    we know he's had one or two proffer sessions with the government.

8    And according to his testimony, he had made the decision to

9    cooperate with the government because, as Your Honor can see from

10   this document that's on the presenter right now, Defendant

11   Gardner's Exhibit Six, Mr. Graham's already his lawyer.

12        Given that fact, given that he's met once or twice with

13   the government pursuant to a formal proffer agreement and has

14   made the decision that he is cooperating, even if it's true that

15   he is not, you know, kind of actually intentionally interrogating

16   Mr. Gardner with the intention of eliciting information that he's

17   then going to convey to the government, the cooperating

18   relationship itself makes it mandatory that when he learns that

19   information, he has it turn it over.

20        Given that fact, he's a government agent.  And under

21   the cases we cited, the Wall case and the Henry case, if he's a

22   government agent getting information from a defendant and the

23   defendant is represented -- that's obviously conceded that Mr.

24   Gardner is arrested and represented in this case at the time --

25   that, I'd submit to Your Honor, based on the cases we've

1    submitted, is a patent <u>Massiah</u> problem.

2         THE COURT:  Let me see if I understand what your

3    position on the law is, Mr. Coburn.  Are you saying and arguing

4    that that there's some kind of per se rule that a cooperator is

5    not allowed to talk to a represented defendant, notwithstanding

6    any instructions that have been given and notwithstanding absence

7    of any government efforts to obtain disclosures or admissions by

8    the defendant?

9         MR. COBURN:  I don't know if I go that far.

10        THE COURT:  Well, how close to that are you coming?

11   Because when you use a label like he's a government agent, that

12   doesn't help me very much.  The question is --

13        MR. COBURN:  Sorry, Your Honor.

14        THE COURT:  -- whether through deliberate elicitation

15   with government encouragement or with some culpability on the

16   part of the government, the cooperating individual should be

17   deemed to be a government agent.

18        MR. COBURN:  Well, I should probably be clear and say

19   that I don't have, as an officer of the court, I mean, I just

20   done have a predicate here to allege that there's some, you know,

21   culpability, to use the Court's term, on the part of the

22   government.  I don't have any reason to assert that the court

23   kind of intentionally used him as a wind-up toy and put him in

24   the cell and said, you know, get, get what you can of Mr.

25   Gardner, and that they're standing here and not being straight

1    about it right now.

2         THE COURT:  Okay.  So that said, that said, I'm

3    hard-pressed to understand what the basis for a Massiah violation

4    is here.  If Mr. Gardner foolishly or inadvertently put his trust

5    in the witness and made disclosures which the witness, without

6    any culpability on the part of government prosecutors or agents,

7    turned over those disclosures to the government, I don't see a

8    violation of the Sixth Amendment.

9         MR. COBURN:  Just to be clear and make sure that I'm

10   clear, I'm relying mainly on what I cited in my reply memorandum

11   from the Wall case and the Henry case.

12        I don't think that to establish a Massiah violation

13   with respect to a cooperator's gathering of information from a

14   defendant that it is necessary for the government to be culpable.

15   I don't think the government has to do this intentionally.  I

16   don't believe that.  My understanding is that --

17        THE COURT:  The government's got to be culpable, Mr.

18   Coburn.

19        MR. COBURN:  I don't think so.

20        THE COURT:  I haven't looked very closely at those

21   cases.  But you seem to be contradicting your earlier answer.

22        Now, what is it that constitutes the violation of the

23   Sixth Amendment?  What is it?

24        MR. COBURN:  What it is, Your Honor, is that at the

25   time this conversation between Mr. Reynolds and Mr. Gardner

1     occurs, because of the fact that Mr. Reynolds is cooperating,

2     he's a "cooperator", quote-unquote, he is -- and this is not me

3     making this up, Your Honor, I mean, I'm telling Your Honor that

4     this is my understanding of what these cases stand for.

5           THE COURT:  I'm absolutely certain those cases don't

6     say that.

7           MR. COBURN:  I mean he is --

8           THE COURT:  I think you're overreading the cases.

9           MR. COBURN:  I may be, Your Honor.  But just to state

10    my position here.  My position is that he is functioning de facto

11    and de jure under those cases as a government agent.  He is a

12    government agent.  You know, I mean through --

13          THE COURT:  Let me give you a hypothetical.  Imagine a

14    defendant who's released on bail and there's an undercover agent

15    hanging out in a bar, and the defendant and a friend of his

16    should come to the bar and sit next to the undercover agent, who

17    overhears their conversation.  Would those disclosures and

18    admissions be admissible?

19          MR. COBURN:  They might be.

20          THE COURT:  Well, what's the difference?

21          MR. COBURN:  The difference is this is not, this is not

22    a situation in which he is overhearing a conversation between Mr.

23    Gardner and another cell mate.

24          THE COURT:  From Mr. Gardner's point of view, it's

25    worse, because from the record that's before the Court, Mr.

1    Gardner volunteered these statements to someone he recklessly --

2         MR. COBURN:  I didn't hear that.

3         THE COURT:  -- determined would not make the

4    disclosures to the government.

5         MR. COBURN:  I didn't hear him say that he volunteered

6    the information.

7         THE COURT:  That's the only inference.  To the

8    contrary, he said he didn't go after any information from Mr.

9    Gardner.

10        MR. COBURN:  But he said he was in casual conversation

11   with Mr. Gardner and during the conversation Mr. Gardner said the

12   following.

13        THE COURT:  I see.  So you think the difference is, in

14   my hypothetical, the agent's just sitting there, not

15   participating in the conversation, whereas here, the

16   individual -- so he's not allowed to talk to Mr. Gardner?  I

17   mean, your answer has to be yes, right?

18        MR. COBURN:  I wouldn't --

19        THE COURT:  Or he can talk to him but he can't tell the

20   government.  And if he tells the government, the can't government

21   can't use it.

22        MR. COBURN:  Only the last part.  I mean, I think he

23   can talk to him, and I think he can tell the government.  But I

24   think the way the law operates, my understanding is the

25   government cannot use it under these circumstances.

1           THE COURT:  All right.  Which is your strongest case?

2           MR. COBURN:  Both Henry and Wall, those are the two

3    cases.

4           THE COURT:  No.  Henry is clearly different.  Henry

5    clearly is different here.  Clearly, Henry involved culpable

6    government omissions, at most.

7           MR. COBURN:  The best thing to do, could I just suggest

8    to Your Honor?  I've got, in my reply memorandum, I've got a

9    block quote from the Wall case.

10          THE COURT:  I want to see the case.  I'm pulling it up

11   right now.

12          MR. COBURN:  And that quote basically kind of has a

13   long, long string cite with respect to, you know, and it's an

14   excellent summary of the law in this area.  And the Lentz case

15   that Mr. Hanlon relies on is just exactly consistent with what

16   that summary is.

17          MR. HANLON:  Your Honor, I have a copy of the case.

18          THE COURT:  I have it right here.

19          (Pause in proceedings.)

20          THE COURT:  All right.  First thing that jumps out at

21   me, Mr. Coburn, I'm looking at Judge Carter's decision in United

22   States v. Wall, W-A-L-L, not reported, 2001, Westlaw 83263,

23   District of Maine.

24          When they were placed in the medical unit, quote:

25   "Griffin asked Wall", Griffin the informant, "asked Wall whether

1    he was Mitchell Wall and initiated conversation about their

2    related conspiracy charges."

3         MR. COBURN:  I'm not --

4         THE COURT:  Just a moment.

5         MR. COBURN:  Okay.  I'm sorry.

6         THE COURT:  During a second encounter a week later the

7    defendant made additional statements and asked the informant to

8    speak to his private investigator about Deborah Leech, another

9    individual allegedly involved in the cases.

10        MR. COBURN:  Could I just --

11        THE COURT:  Just let me finish.

12        MR. COBURN:  Okay.  I apologize.

13        THE COURT:  Griffin participated in the conversation by

14   asking Wall questions about another person's use of cocaine on

15   the night she died.  And during the conversation, the informant

16   took notes of the conversation.

17        MR. COBURN:  Could I be allowed to just pull my

18   computer, Your Honor, so I can look at what Your Honor's looking

19   at?

20        THE COURT:  Mr. Hanlon will give you his copy.

21        MR. COBURN:  Okay.

22        THE COURT:  The informant was actually making buys for

23   the government long before he even encountered the defendant

24   Wall, who was effectively his codefendant, although charged in

25   separate indictments.  And he'd been told not to speak to any

1    other individuals involved in the case.  So -- okay.  You get the

2    flavor, Mr. Coburn.

3          MR. COBURN:  No, I do, Your Honor.  And I understand

4    exactly where Your Honor's coming from on this.  I'm not saying

5    that, you know, these cases that I'm citing for the Court, you

6    know, that these are, you know, that the facts of our case are on

7    all fours with these cases.  I'm just providing them to Your

8    Honor because they provide what I think is a great statement of

9    the law.

10         And what, like, for example what the Wall case says is,

11   the relevant question is whether, under the facts of this case, a

12   government agent, it also says a defendant can establish the

13   intentional creation of a situation by demonstrating that the

14   informant acted as a government agent and deliberately elicited

15   incriminating statements within the meaning of Massiah.

16         Whether under the facts of the case A government agent

17   elicited incriminating statements from Henry under Massiah.  And

18   the question is whether or not the government has communicated to

19   the informant that it has a focus on the person's talking to.

20         THE COURT:  Okay.  Here's what I think is a more

21   correct statement of the law, right here in this opinion.  It's

22   in first full paragraph on Page 4, if you've got the Westlaw

23   printout.

24         Judge Carter writes, quote:

25         "In order for the Sixth Amendment to require

1     suppression of a defendant's statement to a government informant,

2     a defendant must demonstrate that after the attachment of his or

3     her Sixth Amendment right to counsel, the government either

4     'intentionally created' or 'knowingly exploited' a situation

5     which the defendant would make incriminating statements to an

6     informant in the absence of counsel."

7            That's exactly what I said earlier.  This case is

8     exactly what I'm talking about.  That's what I meant by

9     government culpability.  Either through knowing exploitation or

10    the intentional creation of a situation notwithstanding

11    instructions from an agent or prosecutor that a reasonable person

12    would know is almost certain to result in incriminating

13    disclosures.

14           MR. COBURN:  But I mean, when the government, first of

15    all, has established a cooperating relationship with somebody

16    like Mr. Reynolds and has made known to Mr. Reynolds, by virtue

17    of its questioning, its interest in Mr. Gardner, and the

18    government then has nothing to do with putting the two of them

19    together.  I do think it's important to note that that warning

20    letter Mr. Harding wrote is after the statements are made, not

21    before.

22           THE COURT:  Well, it's after the government found out

23    that they were cell mates.

24           MR. COBURN:  Right.  And the government is exploiting

25    it.  I mean, the government exploits it when he cooperates with

1    them.  After the statement's made, he cooperates, provides that

2    information to the government.  The government seeks to use it.

3    I'm not suggesting that that's, you know, something anybody is

4    going to be prosecuted for.  But they are intentionally

5    exploiting the fact that this has occurred.

6             Seems to me --

7             THE COURT:  I think your parsing of "intentional

8    exploitation" is far too expansive, is far too expansive.

9             The government is perfectly entitled, to seems to me,

10   in a multidefendant indictment, everybody's represented by

11   counsel, they may even be a common defense agreement or some

12   sort.  Defendants may be released on bail or on recognizance and

13   they talk to each other.  They may even threaten each other.  Who

14   knows what they'll do?

15            But it's not improper exploitation for, two months

16   later, for one of those defendants to step away from the

17   conspiracy and enter into a cooperation agreement with the

18   government and then tell the government what was going on during

19   the post-indictment, pre-plea, pre-cooperation agreement

20   circumstances.  That's why you and every good lawyer on this

21   earth says to his or her client, don't say a word to anybody but

22   me.  That's why.

23            MR. COBURN:  Well, it is important to note, though, I

24   mean, that these statement by Mr. Gardner are made, you know, not

25   pre-cooperation, but, you know, post, the commencement of

1    cooperation.

2         THE COURT:  Well, obviously, we can't pin that down.

3    What's the date on the plea agreement?

4         MR. COBURN:  On the proffer agreement?

5         THE COURT:  No.  What's the date on the plea agreement?

6    Is it May 10th or something?

7         MR. COBURN:  Mr. Hanlon's going to have that.

8         MR. HANLON:  May 24th, 2004.

9         THE COURT:  May 24th.  All right.  Just so the record

10   is clear, Mr. Coburn, Mr. Reynolds was indicted federally on, as

11   I said, October 7th, 2003.  And he was probably almost certainly

12   right when he said he was arrested back in 2003 because we know

13   the way these felon in possession cases go, people get arrested

14   in Baltimore City.  I assume this was a city arrest.  Two, three,

15   four months go by while it's under review.  And then the federal

16   indictment typically comes many weeks later.

17        His initial appearance, as I said, was on January 12th,

18   2004.  Ms. Farber, from the Public Defender's Office, represented

19   him.  And Judge Motz struck the appearance of the Public Defender

20   on February 11th, 2004.  And Mr. Graham, by CJA appointment,

21   entered his appearance a few days later, on February 18th, 2004.

22        So it would appear that there was apparently at least

23   one proffer session before Ms. Farber got out, perhaps another

24   one right after Mr. Graham got in, and things were happening in

25   the late, in the mid to late February period, and I imagine

1    clearly in the March period.  And Mr. Harding's letter is dated

2    March 22nd, 2004, which Mr. Harding demonstrates was the first

3    time he learned that Mr. Reynolds and Mr. Gardner were cell

4    mates.

5         And Mr. Harding's letter couldn't be more clear in his

6    communication to Mr. Graham that Mr. Reynolds was not to elicit

7    statements from Mr. Gardner.

8         So those are the facts.  And I just don't see any basis

9    here for the Court to find that Mr. Reynolds engaged in a hunting

10   expedition on behalf of the government.

11        Now, to the extent that it was in the back of his mind

12   when he learned that Mr. Gardner might be charged federally.  Was

13   he thinking about maybe making that a part of his package with

14   the government?  Perhaps.  But the Court's not prepared to make

15   that finding.  And the Court credits his testimony that he wasn't

16   sure whether he was going to cooperate.  That makes sense.

17   Despite appearances, people sometimes wait to the very last

18   minute to enter into a cooperation agreement.

19        So anything else?  I think we're in agreement on the

20   law.  I think you're trying to make hay out of Wall and I don't

21   fault you for that.  But Wall does not go so far as to say that

22   simply because a person enters into a cooperation agreement by

23   itself, let alone makes a proffer, executes a proffer letter,

24   that somehow that constitutes culpable, deliberate elicitation.

25        The facts of Wall are about as far from this case as

1   one can get.

2          MR. COBURN:  I'm not disagreeing with Your Honor about

3   that issue.

4          THE COURT:  I know.  And I appreciate that, Mr. Coburn.

5   Look, this issue kind of slapped you in the face last week and

6   you had a duty to pursue it and I appreciate that.

7          MR. COBURN:  Thank you very much, Your Honor.

8          THE COURT:  So the Court is satisfied, having heard

9   from Mr. Martin, Ms. Rhodes, I forget who I didn't hear from, I

10  think it was mainly Mr. Crowe's issue, actually, that to the

11  extent that Mr. Coburn has moved to exclude Mr. Gardner's

12  statements coming in through Mr. Reynolds, the motion is denied

13  because the Court, for the reasons stated, finds no basis to

14  conclude that Mr. Gardner's Sixth Amendment right to counsel has

15  been violated.

16         And as I intimated last week, although I'll hear

17  further from you, Mr. Crowe, I believe under the circumstances a

18  limiting instruction, a more elaborate limiting instruction is

19  highly likely to mitigate any undue prejudice that arises from

20  the fact that this evidence will be argued by the government to

21  tie the Jones Spence murder to the alleged enterprise and will be

22  urged by the government as corroborating evidence as to Mr.

23  Montgomery's testimony.  Thank you, Mr. Coburn.

24         Let me just hear from Mr. Crowe briefly.  You can stay

25  there, Mr. Coburn, if you want.  We're going to bring Sergeant

1    Ensor back.

2              Agent, if you would retrieve the sergeant.  Yes, Mr.

3    Crowe.

4              MR. CROWE:  In light of what the Court has said, I

5    don't know that I have much more to say.  Do I understand that my

6    objection is preserved for the record and I don't have to object

7    during testimony?

8              THE COURT:  Absolutely.  And in this regard, I want to

9    be clear because I think it's fair.  Each of the defendants, I

10   will deem each of the defendants, because I believe each

11   defendant made a motion for severance.  I will deem -- perhaps I

12   shouldn't deem it.  I will infer that each of the defendants

13   would here renew their motion for severance.  I know you do, Mr.

14   Crowe.

15             MR. COBURN:  We'll renew, Your Honor.

16             THE COURT:  Mr. Martin?

17             MR. MARTIN:  Yes, sir.

18             MS. RHODES:  We would as well, Your Honor.

19             THE COURT:  All right.  So I'll deem all three

20   defendants, Mr. Mitchell, Mr. Harris, and Mr. Martin, to have

21   renewed their motion for severance.  And for the same reasons,

22   that is the Court is satisfied that a limiting instruction, a

23   cautionary instruction as to Mr. Gardner's statements will, will

24   mitigate any undue prejudice to the defendants.

25             MR. CROWE:  Does the Court intend to give that

1    instruction immediately after Mr. Reynolds relates the

2    conversation with Mr. --

3              THE COURT:  I will if you want me to.

4              MR. CROWE:  Yeah.  I think it would be best at that

5    point, yes.  But quite honestly, I'm not sure what instruction

6    the Court's going to give.

7              THE COURT:  Well, you know, it might be better to wait,

8    Mr. Crowe, in all honesty.  Normally, in a case, what I would do,

9    of course, I generally do not comment on the evidence in a case

10   when I instruct the jury.  I've thought about it here.  And this

11   may be, you know, one of those exceptions that proves the rule.

12             So I will invite counsel to be as creative as you like

13   and give me some elaborate final limiting instruction so that if

14   you, and again, it's up to counsel, but if you want to highlight,

15   because there have been a number of rulings similar to this

16   throughout the trial, as we all know.  To the extent counsel

17   would like to have me not just give sort of the abstract legal

18   principle to the jury about limited use of evidence, if you want

19   me to highlight it in the way of a comment on the evidence -- for

20   example, here I might say, and by the way, ladies and gentlemen,

21   you remember that testimony elicited by the government from Mr.

22   Reynolds as to a comment by Mr. Gardner; I remind you that that

23   evidence is not to be considered by any, by you against any

24   defendant.

25             Now, I leave it to counsel to decide whether you want

1    to go that far.  I hope I'm being clear.

2              MR. CROWE:  I believe you are.

3              THE COURT:  But I'm willing to give the jury a list, in

4    effect, of all those instances where I have limited their

5    consideration of some item of evidence or piece of testimony to a

6    particular defendant.

7              Whether that gives you more than it takes away from

8    you, you all can decide.  But frankly, I think in light of Mr.

9    Montgomery's testimony already, frankly, it's best if I not say

10   anything about it when the jury hears it.  And then at the end of

11   the case you may decide that you don't want me to give a limiting

12   instruction, anyway.

13             I'm certainly going to remind the government to hew

14   closely to the lines I've drawn.  And I'll expect the government

15   to be very alert in their argument not to step over those lines.

16             Again, if I'm being clear, where I've admitted evidence

17   against only one defendant, any mention of that evidence by the

18   government in closing argument must be tied directly to that

19   defendant.

20             MR. CROWE:  Thank you, Your Honor.

21             THE COURT:  All right.  So unless somebody feels

22   otherwise, I won't give a limiting instruction when Mr. Reynolds

23   testifies.  We'll handle it later.  Thank you.  We'll have the

24   jury back, please.  Welcome back, Sergeant.

25             I assume no other counsel has anything for Sergeant

1    Ensor?  Okay.

2              MR. LAWLOR:  Your Honor, it's Mr. Martin's birthday.

3              THE COURT:  He's still counting?

4              MR. MARTIN:  That's a good question, Your Honor.  I'm

5    trying not to.

6              MR. LAWLOR:  I still think the Court should overlook

7    that.  It's a big day.

8              THE COURT:  I appreciate that, Mr. Lawlor.

9              (Jury enters the courtroom.)

10             THE COURT:  Good afternoon, ladies and gentlemen.

11   Thank you for your patience while I took up a matter with

12   counsel.  We're ready to continue.

13             Whenever you're ready, Mr. Coburn.

14             CROSS EXAMINATION

15   BY MR. COBURN:

16   Q    Thank you so much, Your Honor.  Good afternoon again,

17   Sergeant Ensor.

18   A    Good afternoon.

19   Q    So there are a number of shell casings that are marked in an

20   envelope that has the name Lee on them, right?

21   A    That's correct.

22   Q    Okay.  And then there are other shell casings that you

23   produced when you test-fire the Glock that is seized in

24   connection with or nearby the scene of the Spence homicide,

25   correct?

1    A    That's correct.

2    Q    Now, this is the Glock, this is a .40 caliber Glock, right?

3    A    Yes, sir.

4    Q    Which is much bigger than a .357, right?

5    A    Yes, sir.

6    Q    In terms of the diameter of the bullet?

7    A    Yes.

8    Q    And I think you already testified in response to Mr.

9    Hanlon's questions that the bullets that actually were fired,

10    were recovered in the Spence homicide, could not have been fired

11    from this Glock?

12    A    That's correct.

13    Q    Impossible?

14    A    That's correct.

15    Q    Okay.  So how many test-fire cartridges did you produce out

16    of the Glock in order to make this comparison between the

17    cartridges that are in the Lee envelope and the ones you're

18    producing when you test fire?

19    A    Originally, I made two test fires out of the Glock for my

20    purposes at Baltimore County.  At least two, possibly three test

21    fires were taken at Baltimore City for their comparison purposes.

22    Q    So either four or five, correct?

23    A    Yes, sir.

24    Q    Now, those cartridges, and just to be sure, because some of

25    us know, spent a lot of time with guns and some people have never

1    held one, right?  I mean, the cartridge is not the thing that

2    goes flying forward out of the barrel of the gun, right?

3    A    The bullet is the projectile that comes out of the barrel.

4    The cartridge case, which would have a fired primer imbedded in

5    it still, is thrown from the side of the gun.

6    Q    It just pops right out of the side of the gun, either under,

7    either goes down or it goes off to the side, right?

8    A    With a Glock, it typically goes to the right and to,

9    slightly backward from the gun.  Depending on how it's held.  If

10   it's held sideways, it may eject straight up and to the back.

11   Q    And that cartridge casing, the thing that gets thrown out of

12   the gun in the way you just described, that's the thing that the

13   bullet was in before it was fired, right?

14   A    Yes, sir.

15   Q    And there's a bullet and there's an explosive charge and

16   it's all kind of contained in the cartridge, right?

17   A    Basically, yes, sir.

18   Q    I probably didn't say it quite right.  But that's

19   essentially right?

20   A    Yes, sir.

21   Q    And what we're talking about, when you talk about the

22   primer, you're talking about the flat, like the round, flat end

23   or something in the round, flat end of the metal cartridge,

24   right?

25   A    We're talking about a little disk of soft metal material in

1    the center of the cartridge, opposite the bullet on the end, on

2    the opposite of the bullet.

3    Q    And it's that little circle in the middle, right, which gets

4    hit by a device inside the gun, causing the explosive charge to

5    explode, and the bullet to go flying out the front?

6    A    In this case, yes.

7    Q    Okay.  So the cartridges that you test-fired, and I think

8    you told the jury that you, you fired that gun, and this is the

9    way it's normally done, right?  I mean, you fire the gun into a

10   large thing of water, like a tank, right, of water?

11   A    That's correct.

12   Q    And the notion is the water is going to slow down the bullet

13   and the bullet will basically be recoverable without being

14   damaged?

15   A    That's correct.

16   Q    And the cartridge is not going to get damaged because it's

17   just sort of getting tossed out of the gun, right?

18   A    The casing is tossed out of the gun.  Typically, it will

19   strike the ground.  But the marks that are remaining on it are

20   predominantly associated with the firearm.

21   Q    Now, the ones, the cartridges that you produced for this

22   comparison, either four or five of them, they haven't been

23   introduced into evidence, have they?

24   A    No, they haven't.

25   Q    Have you got them with you?

CROSS EXAMINATION OF ENSOR BY COBURN                 147

1    A    No.  I didn't bring them with me.

2    Q    Do you know where they are?

3    A    Yes, I have them back at our, I have the ones we test-fired

4    for Baltimore County purposes secured back at Baltimore County.

5    Q    What about the other ones?  The two or three that were

6    test-fired afterwards when you were in Baltimore City?  Where are

7    they?

8    A    Typically, Baltimore City will store them as part of the

9    case record, just like we do, in a secure location.

10   Q    So you have photos of them, right?

11   A    I'm sorry?

12   Q    You've got photographs of the four or five cartridges that

13   you produced when you were doing the test-firing?

14   A    The only photographs that I have remaining are the ones that

15   I handed you earlier, that are associated with the Drug-Fire

16   image.

17   Q    Okay.  All I got was one.  Am I wrong?  I'll mark this just

18   to make sure the record's clear.  Make it as Defendant's Exhibit

19   Number Seven.

20   A    If you take a look, that's actually a printout of a computer

21   screen.  You'll see there's images of three different cartridge

22   cases in the upper portion, and then there's a comparison in the

23   window in the middle.  So there's a total of five cartridges in

24   view in that particular printout.

25   Q    Can I put this on the DOAR presenter, Your Honor?

1          THE COURT:  Yes.  Has it been marked?

2          MR. COBURN:  I just marked it as Defendant's Seven.

3          THE COURT:  Well --

4          MR. COBURN:  Should I take it off?

5          THE COURT:  No.  No.  It's all right.  I just want to

6    make sure the numbering is appropriate.  It's not that it's all

7    that important.  Have we been numbering all defendants

8    sequentially or do we want Gardner's Seven?

9          MR. COBURN:  It should be Gardner's Seven.  I

10   appreciate Your Honor saying that.  I apologize.

11         THE COURT:  That's all right.  Gardner's Seven.

12   BY MR. COBURN:

13   Q    And I'll put that right on the sticker.  Okay.  But at this

14   moment, as we're here today, I mean, these are photographs of how

15   many of the ones that came out of the Lee envelope, just if I'm

16   using the right language here?  Right?  There's Q-1 through 4 and

17   then there's 6 and 7, right?

18   A    Let me explain the center window so you're not misled.  It

19   appears to be a picture of one cartridge case.  But what it is,

20   it's actually two dissected images brought up against each other.

21   If you look to the left of the image in the very center, you will

22   see a faint black line coming down through the scratches off to

23   the left-hand side of the firing pin impression.  What's left of

24   that is one cartridge case, I assume to be the Baltimore County

25   cartridge case.  What's right of that line is the Baltimore City

1  cartridge case.  So there's actually two cartridge cases

2  represented in that center image.

3          If you look above the white box in the middle in the

4  dark box, you will see three images across the top.  The image

5  all the way to the left is the Baltimore County case that's been

6  imaged.  The case in the middle is from the same case as the

7  casings that were matched from Baltimore City, but it doesn't

8  belong to this particular firearm.  And then the case, the third

9  one across is the one that was associated.

10          So a total of five cartridge cases represented in those

11  four images.

12  Q    So then are these five of the six questioned cartridges or

13  is this something else?

14  A    No.  What you're seeing, in the top row the image all the

15  way to the right is one of the six cartridge cases represented by

16  the Baltimore City case.

17  Q    And what are the other ones?

18  A    We would pick out a representative sample in this case.  The

19  Baltimore City examiner, prior to my inquiry, had already

20  determined that the six cartridge cases in evidence had been

21  fired from the same firearm, firearm unknown.  So when we match

22  them, we'll pick out one representative sample to photograph,

23  represents all six cartridge cases.

24  Q    And just so the ladies and gentlemen of the jury can --

25  actually, strike that question.  Let me just make sure that I at

1      least, you know, can try to come to as clear an understanding

2      about what you're referring to as I can.

3            Now, what we're talking about here, I think you told us

4      just before the lunch break, is something called a shear mark,

5      S-H-E-A-R, shear mark, or shear marks?

6      A    Yes, sir.

7      Q    Okay.  And tell me if this is right.  Shear marks are

8      produced by Glock pistols on cartridge case primers, correct?

9      A    That's correct.

10     Q    And the primer, like we already said, is on the flat part,

11     like if you were to stand a cartridge on end, it's the part that

12     it's standing up on, right?

13     A    That's correct.

14     Q    And it's in the middle of it, right?  That's the primer?

15     A    Yes.

16     Q    And Glock pistols, I think you told us, have a rectangular

17     firing pin, is that right?

18     A    No, that's not correct.

19     Q    That's incorrect?

20     A    The opening the firing pin passes through is rectangular.

21     Q    Okay.  A rectangular firing -- forgive me for interrupting

22     you.  Go right ahead.

23     A    The firing pin nose itself that strikes the primer is

24     elliptical.

25     Q    So the Glock pistol has a rectangular firing pin hole in the

1    breech face, is that right?

2    A    That's correct, yes, sir.

3    Q    Okay.  And when the cartridge case, after, when you pull the

4    trigger, when the cartridge case is forced backward from the

5    recoil of the gun, like a gun goes off, there's an explosion kind

6    of going forward, it forces the gun back, that's the recoil,

7    right?

8    A    Yes, sir.

9    Q    Okay.  The primer, this is again a little, I hope I have

10   this right, the primer imbeds itself in the firing pin hole, is

11   that right?

12   A    The primer imbeds itself in the firing pin hole in response

13   to the pressure that's built up inside of the cartridge case.

14   That same pressure is what causes recoil.  But the primer's

15   already flowed back into the firing pin aperture before recoil is

16   perceived.

17   Q    Okay.  And when that happens, it's correct, is it not, in a

18   Glock, that the barrel drops slightly as the action opens, is

19   that right?

20   A    That's correct.

21   Q    What's the action?

22   A    The action consists of, in this case we're talking about the

23   slide.  If you're familiar, if you've watched when somebody's

24   cycled by hand a semiautomatic handgun, they pulled the slide

25   back.  That's the portion that contains the striker or the firing

1    pin.  And that's the portion that comes up behind the cartridge

2    and supports the back.

3             The barrel starts to come back with the slide in

4    relationship to the frame.  When the barrel travels probably two

5    to four millimeters back, then the barrel stops and canters down

6    and the slide continues to come to the rear.

7    Q    You just anticipated my next question exactly.  The barrel

8    drops down, which forces the cartridge case also to move down

9    slightly, right?

10   A    That's correct.

11   Q    And that causes the lower edge of the imbedded primer to

12   shear downward and out of the firing pin hole, is that right?

13   A    Yes.  The edge of the firing pin hole shears that flow back,

14   that has flowed back inside.

15   Q    So basically what's happening is the action -- and this is a

16   mass produced gun, right?

17   A    Yes, sir.

18   Q    How many Glock .40's of this model were produced by Glock?

19   A    I have no way of knowing.

20   Q    Any estimate at all?

21   A    No.

22   Q    A lot, though?

23   A    Yes.

24   Q    Is that correct?

25   A    Yes.

1    Q    And what's happening here in this gun is that, you know, by

2    virtue of what you've just described here, I mean, there's a

3    bunch of things going on inside the gun once the bullet, once the

4    trigger is pulled, it's causing something to happen to the metal

5    right around, inside or around the primer, right?

6    A    That's correct.

7    Q    Okay.  And it's that thing that happens to the metal that

8    you're calling a shear or a shear mark, right?

9    A    Correct, yes.

10   Q    And that's what you're saying is absolutely unique to this

11   gun, right?

12   A    Yes.

13   Q    There's no other gun anywhere in the world that has the same

14   shear marks, correct?

15   A    That's my opinion.

16   Q    That's your opinion?

17   A    Yes.

18   Q    But of course, you've not actually examined every other

19   Glock 40 of this model manufactured by Glock?

20   A    That's correct.

21   Q    Okay.  But you hold that opinion, right?

22   A    Yes, I do.

23   Q    So then there have to have been some studies done proving

24   that, right?

25   A    Yes, there was.

1    Q    And what are they?

2    A    There's a number of studies.  As far as tool marks in

3    general are concerned, there's a Ruger 10 barrel study.  The

4    greatest probability of having a manufactured surface identical

5    to a previously manufactured surface occurs with consecutively

6    manufactured barrels, for example.  That's another form of tool

7    mark.  That's another form of generated stria that we're talking

8    about.

9         So one of the members of AFTE went to Ruger and had ten

10   consecutively manufactured barrels.  He watched the steps and

11   verified and certified that these indeed came off the machines

12   one right after another.  All ten of those then were taken and

13   test-fired.  Those test-fires were sent out to the firearms

14   examiners from around the world.  And the firearms examiners, to

15   the best of my knowledge, all the qualified, court-qualified

16   firearms identification experts came back with the same

17   conclusions.  Indeed, they were correct, that specific bullets

18   had been fired from specific barrels and excluding the others.

19   Q    And they were Glocks?

20   A    Those were Rugers.

21   Q    Rugers?

22   A    It was a cutting process.  It's similar to what we're

23   talking about as far as Glock is concerned.

24   Q    And they were looking at the shear marks that we're talking

25   about now?

1    A    Yes.  These are generated stria scratches, yes.

2    Q    And the shear marks around the primer, correct?

3    A    We're talking about bullets now.  You asked about --

4    Q    You're talking about a bullet, not about a cartridge?

5    A    We're talking about studies related to tool mark and

6    firearms identification.  The shear mark is a tool mark just as

7    the land impression is a tool mark, just as impressed tool marks

8    from machining.

9    Q    But my question, actually, Sergeant, was what studies have

10   been done to show that the shear marks are, is it on the primer

11   or around the primer?  What would be correct?

12   A    It's shear marks on the primer.

13   Q    On the primer.  Shear marks on the primer of a Glock are

14   unique?  What studies have been shown to show that?  Has Glock

15   ever done one?

16   A    Glock certainly hasn't.

17   Q    Glock has not?

18   A    No.

19   Q    Okay.  Who has then?

20   A    Well, I don't have a recollection of one specific to Glock.

21   There are numerous studies done in relation to the theory of tool

22   mark identification.

23   Q    What about shear marks on primers?  Any studies on that,

24   even like non Glocks?

25   A    Well, yes, there have.  Now you're going to tax my memory.

1    Q    I don't mean to, I mean, but do you know of any?

2    A    Yes, there have been.

3    Q    Can you tell us what they were?

4    A    We have validation studies that were done for the IVIS

5    computer ware.  We've come back and tried to validate, it's a

6    computerized system similar to Drug-Fire sponsored by the Bureau

7    of Alcohol, Tobacco and Firearms.

8              We try, in trying to validate that particular

9    instrument, we have come back and validated samples as to

10   generating consistent individual characteristics within these

11   things, within the standards, and being inconsistent with the

12   ones that are compared to in the relative study.  So numerous

13   studies have been done for various types of tool marks.

14   Generated stria as a result of breech faces, such as, which is in

15   the Glock, and for various tool surfaces that have been

16   manufactured.

17   Q    But are you aware of any studies that have been done

18   specifically with respect to --

19   A    Glock?  I don't recall any.

20   Q    Not just Glock.  Specifically with respect to the striated

21   surfaces of primers, right, of guns like this, to show that the

22   marks are, in fact, unique?

23   A    I don't, I don't recall any specific, but I'm certain

24   they've been done.

25   Q    Okay.  Now, I am just assuming that, I mean, you made a

1    remark during the course of your direct examination when Mr.

2    Hanlon was asking you questions, that these are like

3    fingerprints, right?  They're like fingerprints?

4    A    Similar to fingerprints.

5    Q    Similar to fingerprints?

6    A    Right.

7    Q    I think you indicated that you are actually the head of the

8    unit Baltimore County that deals not just with gun comparisons,

9    but also fingerprints, right?

10   A    That's correct.

11   Q    So you know about fingerprint comparison, right?

12   A    I'm not a qualified fingerprint identification expert, no.

13   Q    You supervise people who are, right?

14   A    I'm just an administrator.  I'm a paper pusher.

15   Q    Okay.  Well, have you ever heard of this notion of points of

16   comparison?

17   A    Yes.

18   Q    The number of points of comparison?

19   A    Yes.

20   Q    You ever watched a fingerprint comparison person testify

21   with a big blow-up of a fingerprint?

22   A    No.  I've helped them generate diagrams but I haven't

23   watched them testify.

24   Q    When you do this, I mean, when you look at the striation

25   marks on the primer at the bottom part of the cartridge that

1    we've just been talking about, how many points of comparison did

2    you find when you compared Q-1 through Q-4, you know, the other

3    two with the ones you test-fired?  How many points of comparison

4    were there?

5    A    First off, you're comparing apples and oranges.  We're

6    looking at Galton points with fingerprint identification.  Points

7    where the ridge detail splits.  You have bifurcations, ending

8    ridges and islands, etc.

9         But when we're looking at generated stria, we're

10   looking at ridge detail of a whole different matter.  This is the

11   removal of a material as opposed to an impression from another

12   material leaving a three dimensional scratch or stria.  What

13   we're looking at is not an ending point, when we're talking about

14   generating stria.  We're looking at the ridge that's remaining.

15   We're looking at the contours, making sure the contours are

16   consistent not only in count, but in breadth and character.

17   Q    But it's correct, is it not, that you're not looking for any

18   particular number of points of comparison, right?  I mean, you're

19   basically looking to see if it's your opinion that they're the

20   same?

21   A    Yes.

22   Q    Right?

23   A    Yes.

24   Q    Okay.  By the way, just so the ladies and gentlemen of the

25   jury who are going to have this back there with them when they

1    deliberate, can you show us where, on what we're looking at here,

2    what is it we're talking about?  In other words, where are these

3    little markings that you have testified it's in your opinion are

4    unique in the world?

5    A    Again, this is a very poor image.

6    Q    And I can zoom in a little bit, also, if it would help.

7    A    It's still a poor image.  It was generated in a very crude

8    manner.  At that time we didn't document our identifications with

9    photography.  This was just happenstance, as administrative log

10   showing the comparison and showing the basis of the comparison.

11        If you take a look at the center image, you will see

12   that there is a primer area and there's a rectangular raised

13   portion on that primer area.  In the center you'll see an oblong,

14   circular firing pin impression.  Off to our left you will see

15   that there's stria or scratches generated all the way across that

16   rectangular raised portion.

17        That's the -- excuse me -- that's the first place that

18   we'll go for the most substantial individual characteristics.

19   Other things --

20        THE COURT:  Excuse me, Sergeant.  One moment.

21        Although he said it's a poor image, Mr. Coburn, you

22   might want to try to zoom in.  The jury might find that useful,

23   slightly better look at it.

24   Q    Absolutely, Your Honor.  Am I getting it on the right part

25   here, sir?

CROSS EXAMINATION OF ENSOR BY COBURN

1    A    Yes, sir.  That looks a little bit better.

2    Q    Great.

3    A    So again, you can see the scratches that are generated, and

4    this is a very --

5         THE COURT:  Sergeant, if you touch that monitor in

6    front of you, it will make a mark.  But I have to caution you, as

7    we've seen, sometimes the mark is not exactly where you want to

8    touch it.  But feel free to touch the monitor.

9    Q    Your monitor is a little off to the right so you're going to

10   be slightly off to the right for what you intend to do.

11   A    Okay.  Again, the portion that I'm talking about --

12   Q    Not where you thought, right?

13   A    This isn't working.

14        THE COURT:  Can you erase it, please, Mr. Coburn?

15   Q    Absolutely, Your Honor.  I think it's like that.  I would do

16   it except I don't know exactly where to touch.

17   A    The portion I'm talking about is within the circle that I've

18   made this time.  The arrow is actually pointing just to the

19   left-hand side of it.  You can see that there is a disruption in

20   the patterns in the middle of that series of scratches.  That's

21   where the dividing line is between the images.  What's to the

22   left is my cartridge case and what's to the right is Baltimore

23   City's cartridge case.

24   Q    Now, when did you -- by the way, I guess you said there were

25   two -- when did you do the comparisons that you've testified

Case 1:04-cr-00029-RDB    Document 689    Filed 06/12/09    Page 161 of 270

1    about?  What were the dates, if you remember?

2    A    What were the dates?  6/26/02, I compared test-fires from

3    the Baltimore County Glock to the Baltimore City cartridge cases.

4    Q    Okay.

5    A    That is at their laboratory on their equipment.

6    Q    It is correct, is it not, that ballistics identification

7    does not have sufficient rigor to be received as science?  Is

8    that right?

9    A    I don't believe that to be true.

10   Q    Is it also correct that whatever else ballistics

11   identification could be called, it could not fairly be called

12   science?

13   A    I don't believe that to be true.

14   Q    Is it correct that the assessment, when you do a comparison,

15   is subjective?

16          MR. HANLON:  Objection, Your Honor.

17          THE COURT:  Overruled.  You may answer.

18   A    Yes, it's an opinion statement.

19   Q    It's subjective?

20   A    Yes.

21          THE COURT:  I'm a sorry, just one moment.  Ladies and

22   gentlemen, if any of you are distracted by the window washer,

23   please let me know and I'll bring that activity to a close.

24   Yeah.  Why don't we close, let's close the blinds.  Thank you.

25   This case has everything.

1          MR. COBURN:  It does.  It does.

2          THE COURT:  Sorry, Mr., Sergeant, sorry to interrupt

3    sergeant.

4    BY MR. COBURN:

5    Q    Not at all.  Now, are you familiar with a document called

6    the New York City Police Department Police Laboratory Firearms

7    Analysis Procedures Manual?

8    A    I don't believe I am, no.

9    Q    Never seen it?

10   A    Well, I don't know that I have.  I may have, just don't

11   recall.

12   Q    Okay.  Is it correct that the assumptions as to -- strike

13   that.  Is it correct that what you've testified about, firearms

14   identification rests on twin assumptions that the surface

15   contours of every gun are unique and that every time the gun is

16   fired some of those unique markings, along with markings caused

17   by the act of firing itself, are transferred to the shell casing

18   and bullet, leaving distinctive patterns, right?

19   A    That sounds accurate.

20   Q    They're two assumptions, right?

21   A    Yes.

22   Q    And they've never been definitively tested, is that right?

23   A    We've done many tests to come back, we've done many tests to

24   come back and determine if the basis of our conclusions is

25   dependable.  And our tests have validated our observations.

1    Q    And some of what we're talking about, what you've testified

2    in your opinion is the uniqueness of these markings here, I mean,

3    some of that's caused by wear and tear on the gun, right?

4    A    Some of it is, yes.

5    Q    Some of it's from the manufacturing, some of it's from the

6    wear and tear, right?

7    A    Yes.

8    Q    So since it's caused by wear and tear on the gun, then every

9    time the gun's fired, if it's fired a number of times, the

10   markings will change over time, right?

11   A    You can't make that assumption.  That's not a given.  There

12   are things that can occur outside a manufacture to mask or

13   obliterate the individual characteristics and install new

14   individual characteristics.  You can't make the assumption that

15   every time the gun's fired, that these surfaces are wearing

16   because the primer material, like I said earlier, is a softer

17   material than the breech face.  If there's, if there's no

18   intervening agent such as grit or something like that that may be

19   harder, it's entirely possible for those individual

20   characteristics to endure for extremely long periods of time.

21   Q    Okay.  But I mean, if some of uniqueness of these markings,

22   according to your opinion, are caused by wear and tear on the

23   gun, then they have to change over time, at least they could

24   change over time, right?

25   A    They could change, yes, they can.

1    Q    All right.  It's correct, is it not, that a gun barrel may

2    itself change slightly with each firing, such that it may leave

3    different impressions on a casing depending on when, during a

4    gun's life, a shot os fired, is that correct?

5    A    I'm sorry.  Say it again.

6    Q    Sure.  A gun barrel may itself change slightly with each

7    firing such that it may leave different impressions on a casing,

8    a shell casing like we're talking about here, depending on when

9    during the gun's life a shot is fired.  Is that correct?

10   A    If I could phrase that in my terms.  It's possible through

11   firing the gun that the individual characteristics can be masked,

12   such as debris building up on those surfaces and temporarily

13   obscuring them.  Or they can be obliterated, such as if there was

14   a grit, some kind of a hard mineral substance in the barrel when

15   the bullet was forced down, having an effect of sandpaper.

16        So yes, the individual characteristics can be

17   obliterated or masked over a period of time with firing.

18   Q    Is it also correct that ballistics examination not only

19   lacks the rigor of science, but suffers from greater uncertainty

20   than many other kinds of forensic evidence?  Is that correct?

21   A    Say it again, please.

22   Q    Is it correct that ballistics examination not only lacks the

23   rigor of science, but suffers from greater uncertainty than many

24   other kinds of forensic evidence?  Is that correct?

25   A    I don't believe so.

1    Q     You don't think that's right?

2    A     I don't think that's accurate.

3    Q     Okay.  Can I have the Court's indulgence just for a moment?

4          THE COURT:  Certainly.

5          (Pause in proceedings.)

6          MR. COBURN:  Thank you, Your Honor.  Nothing further.

7          THE COURT:  Redirect.

8          REDIRECT EXAMINATION

9    BY MR. HANLON:

10   Q     Just briefly, Your Honor.  Sergeant, I believe at the

11   beginning of your testimony you testified that, in response to

12   some of my questions, that you have been involved in the

13   examination of, I believe you said tens of thousands of firearms

14   and cartridges and bullets during the course of your career?

15   A     Yes.  Yes, sir.

16   Q     During the course of those tens of thousands of

17   examinations, have you ever come across two firearms that had the

18   same markings such that you could match the two of them?

19   A     No, I haven't.

20   Q     You supervise the activities of the firearms identification

21   lab in Baltimore County, is that right?

22   A     That's correct.

23   Q     Has anyone under your supervision ever reported to you or,

24   to your knowledge, have they ever found two firearms that had the

25   same markings?

1    A    No, they haven't.

2    Q    Are you aware of any examiner that you've worked with in

3    Baltimore City, Baltimore County, Anne Arundel County, Howard

4    County, anywhere else in the state, that has ever come across two

5    firearms with the same markings?

6    A    I'm not aware of anybody, no.

7    Q    Are you aware of any case in the world where an examiner

8    came across two firearms with the same markings, anything that's

9    ever been published or reported?

10   A    For clarification purposes, what we can call ident,

11   individual identification marks, I have no knowledge of having

12   substantial agreement in two firearms, whether sequentially

13   manufactured or otherwise.  Class characteristics, such as the

14   width of the rifling, etc., of course, there's been many examples

15   of consistencies.  There's been some subclass characteristics

16   that have been imparted on more than one firearm that transfer.

17           But if you can determine indeed that it's an individual

18   characteristic, it is what it says it is.  It's unique.  It's

19   individual to one particular surface.

20   Q    In the opinions you've rendered in this case about the

21   bullets you compared, the cartridges you compared, and firearms

22   you matched them to, did you make that determination based on

23   class characteristics or individual characteristics?

24   A    On both, class characteristics were in 100% agreement and

25   individual characteristics were in agreement substantially

1    sufficiently to make an identification.

2            MR. HANLON:  Thank you, Sergeant.  Nothing further.

3            MR. COBURN:  Can I have a couple additional, Your

4    Honor?

5            THE COURT:  Very briefly.

6            RECROSS EXAMINATION

7    BY MR. COBURN:

8    Q    Sergeant, how many other instances are you aware of from

9    your own experience in which a comparison has been based upon the

10   shear markings on the primer of a Glock that you just testified

11   about?

12   A    Many hundreds.  A Glock is a very popular firearm.  It's

13   very common for us to do comparisons on them.

14   Q    Has there ever been an article published about it, about

15   basing it on that?

16   A    I'm certain there are.  My most recent recollection about

17   the Glock shear marks and what makes them individual and what's

18   substantially sufficient to base a conclusion on is training I

19   received from Beta Tam, formerly from Los Angeles Police

20   Department Training Division on source tool recognition,

21   identification.

22            It was a class, it was a 40 hour class given in our

23   last training session with AFTE, and he addressed this particular

24   matter.

25   Q    Is that Beta Tam?

1    A    Beta Tam, yes.

2    Q    How do you spell the last name?  From LA?

3    A    I believe it's just T-A-M.

4    Q    Okay.

5    A    B-E-T-A.

6    Q    Finally, is it correct that sometimes firearms examiners

7    differ as to whether or not a comparison is accurate or not?

8    A    If we're talking about qualified, fully trained firearms

9    examiners, there are times that I've seen where firearms

10   examiners, one may feel that there's a sufficient correspondence

11   and another may not.  But I have yet to see a situation where two

12   examiners have conflicted in their opinion, one excluding a

13   firearm and one of them identifying a firearm.

14   Q    Thank you.

15              REDIRECT EXAMINATION

16   BY MR. HANLON:

17   Q    Just very briefly, Your Honor?

18              THE COURT:  All right.

19   Q    Focusing on the Lee case and the comparisons you did between

20   the county Glock and the Baltimore City cartridges, because

21   that's just what I'm remembering.  Your examinations were

22   cosigned by Mr. Wagster in the Baltimore City Firearms Lab, is

23   that correct?

24   A    That's correct.

25   Q    Thank you, Sergeant.

1       THE COURT:  Sergeant, thank you very much, sir.

2       THE WITNESS:  Thank you, Your Honor.

3       THE COURT:  You're excused.  Next witness.

4       MR. HARDING:  Your Honor, the United States calls

5  Gregory Mungo.

6       THE COURT:  Please face the clerk, Mr. Mungo.  Raise

7  your right hand.

8         GREGORY MUNGO, GOVERNMENT'S WITNESS, SWORN

9       THE WITNESS:  Yeah.

10      THE CLERK:  Please be seated.  Speak directly toward

11  the make.  State your name and spell it for the record.

12      THE WITNESS:  Gregory Mungo.

13      DIRECT EXAMINATION

14  BY MR. HARDING:

15  Q   Good afternoon.  Mr. Mungo.  Mr. Mungo, were you-

16      THE COURT:  I'm sorry.  Is that, how do you spell your

17  last name, Mr. Mungo?

18      THE WITNESS:  M-U-N-G-O.

19  BY MR. HARDING:

20  Q   Let me call your attention to June 13th of 2005, Mr. Mungo.

21  Were you locked up in a holding cell in this building on that

22  day?

23  A   Yes.

24  Q   I have, were you aware that there was a surveillance camera

25  trained on the cell that you and others were locked in that day,

1    upstairs in this building?

2    A    No.

3    Q    Okay.  I have an exhibit that I am marking as Government

4    Exhibit AH-1.  And what I want to do, Mr. Mungo, is play this if

5    I can.  All right.  We'll come back to this in a moment, Mr.

6    Mungo.

7              You were locked up at that time, Mr. Mungo, and you're

8    locked up now, too, is that correct?

9    A    Yes.

10   Q    Okay.  But calling your attention back to June 13th of 2005.

11   Do you remember when you were in that cell upstairs in this

12   building on that day, did a fight break out?

13   A    Yes.

14   Q    Okay.  And do you remember the two guys that were involved

15   in the fight, do you remember what they were wearing?

16   A    I guess the same thing I was wearing.

17   Q    Okay.  A white T-shirt?

18   A    No.  We had burgundy jumpers on.

19   Q    Okay.  Were there two guys involved in the fight?

20   A    Yes.

21   Q    Was one of them wearing a burgundy jump suit and one of them

22   wearing something else?

23              MR. MARTIN:  Objection, Your Honor, he's leading.

24              THE COURT:  Don't lead the witness.

25   Q    I would like to, I've got the play this videotape, Your

1    Honor, and I'm having a bit of technical difficulty.  Perhaps if

2    we could take an afternoon break.  Is that a possibility?

3          THE COURT:  Let's see if Ms. Arrington can help you

4    out.  The computer feed reaching the system at all?

5          MR. HARDING:  I tested this earlier, Your Honor.

6          THE COURT:  And it was working?

7          MR. HARDING:  It was fine.  So I don't know what the

8    problem is.

9          THE COURT:  We'll get some help here in a moment.

10   BY MR. HARDING:

11   Q    Okay.  Let me ask you, Mr. Mungo, when you were in the cell

12   that day, there were other guys in the cell, you said?

13   A    Yes.

14   Q    Did there come a time when some new guy was brought into the

15   cell?

16   A    New guys brought in there all the time.

17   Q    I'm sorry?

18   A    It's new guys brought in the cell all the time.

19   Q    Okay.  On one occasion when a new guy was brought into the

20   cell, did one of the other prisoners who was already in the cell

21   get up and start a fight?

22         MR. MARTIN:  Objection, Your Honor.

23         THE COURT:  Sustained.  Do not lead the witness.

24   Q    What, can you --

25         THE COURT:  Hold on just one moment.  Go ahead, Mr.

1    Harding.

2    Q    Tell us how the fight broke out.

3    A    I don't remember.

4    Q    Okay.  Let me call your attention to your grand jury

5    transcript at Page Three.  I'm going to ask you to read from Line

6    12 down to Line 25 on Page 3 of the transcript.

7              MR. KURLAND:  Objection.  It's hearsay.

8              THE COURT:  Only to yourself, Mr. Mungo.

9              Okay.  Mr. Harding.

10   BY MR. HARDING:

11   Q    Okay.  Mr. Mungo, does reading that transcript refresh your

12   recollection as to what happened that day?

13   A    No, sir.

14   Q    Do you remember testifying in the grand jury?

15             MR. MARTIN:  Objection.

16             THE COURT:  Overruled.  You may proceed.

17   Q    Do you remember testifying in the grand jury back on July

18   12th, 2005?

19   A    No.

20   Q    You don't remember?

21   A    Um-um.

22             THE COURT:  You have to say yes or no.

23   A    No.

24   Q    Do you remember being asked this question and giving the

25   following answer?

1          MR. MARTIN:  Objection, Your Honor.

2          THE COURT:  Objection's overruled.

3     Q    After that happened, did you hear the guy in the burgundy

4     jump suit say something?  And you answered, He asked him why he

5     was snitching.  Do you remember that, Mr. Mungo?

6     A    No.

7     Q    And do you remember the following question and answer?  And

8     then what happened?  Answer, They started fighting.  Do you

9     remember that?

10    A    No.

11    Q    Question:  Okay.  Now, did the marshals eventually --

12         MS. RHODES:  Objection, Your Honor.

13         THE COURT:  Overruled.

14    Q    Okay.  Now, did the marshals eventually come in and subdue

15    the two guys?  Answer, Yes.  Do you remember that?

16    A    No.

17         THE COURT:  Just one moment, Mr. Harding.  Thank you

18    very much, Carlos.  Mr. Harding says it was working previously.

19         MS. RHODES:  Your Honor, could we have a brief side bar

20    while this is being fixed?

21         THE COURT:  No.  Would you like some water, Mr. Mungo?

22         THE WITNESS:  No thank you.

23         (Pause in proceedings.)

24         THE COURT:  Thank you very much, Carlos.

25    BY MR. HARDING:

1   Q    I'm sorry for the delay, Your Honor, and everybody.  Can you

2   see your screen, Mr. Mungo?

3   A    Yes.

4   Q    Okay.  Now, someone's being brought into the cell there, as

5   you can see, Mr. Mungo.

6   A    Um-hum.

7        THE COURT:  You have to say yes or no.

8   A    Yes.

9   Q    Is that you right there, Mr. Mungo, in the middle of the

10  cell right now?

11  A    I can't tell.  I'm not sure.

12  Q    Okay.  We're going to get a better shot in a second.

13       Is that right at the door to the cell, Mr. Mungo?

14  A    Yes.

15  Q    Okay.  So if we go back to the beginning, would you be

16  sitting on the right-hand side of the picture that's on your

17  screen, sort of out of view at the moment?

18  A    I can't tell right now.  I know what I got on now.  I can

19  see when I get up, when I get up.

20  Q    Okay.  Okay.  A guy gets brought in a white T-shirt and red

21  pants.  Is that you that just jumped up and got out of the way?

22  A    Yes.

23  Q    Return to the questions I was asking you.  Let me back up

24  one.

25       THE COURT:  Does that help refresh your recollection,

Case 1:04-cr-00029-RDB   Document 689   Filed 06/12/09   Page 175 of 270

1    Mr. Mungo, as to what happened that day?

2    A    Not really.

3           THE COURT:  Not really?

4    BY MR. HARDING:

5    Q    Do you remember, just to repeat the previous question.

6    After that happened, did you --

7           MR. KURLAND:  Objection, Your Honor.

8           THE COURT:  The objection's overruled.  Go ahead, Mr.

9    Harding.

10   Q    After that happened, did you hear the guy in the burgundy

11   jump suit say something?  Answer:  He asked him why he was

12   snitching.  Do you recall that, Mr. Mungo?

13   A    No, sir.

14   Q    And then do you recall being asked a question:  And then

15   what happened?  Answer:  They started fighting?

16   A    No, sir.

17   Q    Question:  Okay.  Now, did the marshals eventually come in

18   and subdue the two guys?  Answer:  Yes.

19   A    No, sir.

20   Q    Question:  And when the two guys were subdued, did you hear

21   the bigger guy in the burgundy jump suit, did you hear him say

22   something?  Answer --

23           MS. RHODES:  Objection.

24           THE COURT:  Overruled.

25   Q    The little dude asked him, like, yo, what's going on?  He

1    said niggas need to stop running their mouths.  Do you recall

2    that?

3    A    No, sir.

4    Q    Do you recall toward the end of your short presentation in

5    the grand jury back in 2005, Mr. Mungo, a grand juror asked you:

6    Did you see how it got started?  Who started it?  Was there

7    punching, fighting?  What's your description of what actually

8    happened physically?

9              MR. MARTIN:  Objection.

10             THE COURT:  Overruled.

11   Q    And do you remember answering:  What actually happened was,

12   I'm sitting in the front.  In the front is like a little bench

13   soon as you come in.  As soon as the little dude came in, the

14   other dude, he was in the back of the room, the back bench.  He

15   said, yo, why you telling?  And he went straight to the little

16   dude and hit him.  So he threw the first punch and it was a fight

17   and he beat the little dude up he was fighting, he was fighting

18   him back.  Do you remember that, Mr. Mungo?

19   A    No, sir.

20   Q    Okay.  Did I come and see you in the cell block this

21   morning, Mr. Mungo?

22             MR. MARTIN:  Objection, Your Honor.

23             THE COURT:  Overruled.  You may answer.

24   A    Yes.

25   Q    And did you tell me that you didn't want to testify in this

1    trial?

2            MR. MARTIN:  Objection, Your Honor.

3            THE COURT:  The objection's overruled.  You may answer.

4    A    Yes, sir.

5    Q    Did you tell me that you were going to get out in a few

6    months, anyway?

7            MR. MARTIN:  Objection, Your Honor.

8            THE COURT:  Overruled.  You may answer.

9    A    I go home next year.

10   Q    Okay.  You go home next year.  But you have to do a few

11   months in a halfway house, is that correct?

12           MR. MARTIN:  Objection, Your Honor.

13   A    Yes.  If they credit halfway house, I'll get it.

14   Q    So didn't you tell me this morning that you were getting out

15   in 90 days?

16   A    I said it was possible for me to get out in 90 days.  I've

17   been in the city.  I don't know if I get halfway house or not.

18   Q    Okay.  And didn't you tell me that you didn't want to take

19   any chances --

20           MR. MARTIN:  Objection, Your Honor.

21   Q    -- by testifying in this trial?

22           THE COURT:  The objection's overruled.  You may answer.

23   A    I told you I don't remember nothing.

24   Q    Specifically, didn't you tell me that you didn't want to

25   testify in this trial --

Case 1:04-cr-00029-RDB   Document 689   Filed 06/12/09   Page 178 of 270

1          MR. MARTIN:  Objection.

2          MR. CROWE:  Objection.

3     Q    -- because you didn't want to take chances?

4     A    No.  I --

5          THE COURT:  Overruled.  Just a moment.  Overruled.  Now

6     you may answer.

7     A    I told you I didn't want to testify in the trial because I

8     don't remember anything.

9          MR. HARDING:  No further questions, Your Honor.

10         CROSS EXAMINATION

11    BY MR. MARTIN:

12    Q    Good afternoon, Mr. Mungo.

13    A    Good afternoon.

14    Q    I didn't come and see you in the cell block this morning,

15    did I?

16    A    No, sir.

17    Q    And you've never met me before, right?

18    A    No, sir.

19    Q    And other than that incident that took place in the cell

20    block, you never saw any of those people again, did you?

21    A    Humm?

22    Q    The people that were in the cell block with you that day,

23    you haven't seen any of those people since then, have you?

24    A    No, sir.

25    Q    Okay.  And you haven't talked to any of those people since

1    then?

2    A    No, sir.

3    Q    Okay.  There were, what, maybe a half a dozen or more other

4    people in the cell block with you, right?

5    A    Yes.

6    Q    Who first came to talk to you about this?

7    A    I can't remember.

8    Q    Was it an agent or was it a U.S. marshal, do you remember?

9    A    I don't, I'm not sure.

10   Q    Did anybody talk to you while you were still in the cell

11   block that day about this incident?

12   A    Not that I recall.

13   Q    Did someone come to visit you at some other place where you

14   were being incarcerated after this incident took place?

15   A    I can't remember.

16   Q    Do you remember at all how you ended up in the grand jury a

17   month later with Mr. Harding?

18   A    It was at, it was at court.

19   Q    It was at court?

20   A    I had a court date or something.

21   Q    And you came to a court date and then someone came and

22   talked to you about this incident in the cell block?

23   A    No.  They brought me out the cell block.

24   Q    They brought you up to the cell block?

25   A    They brought me out of the cell block.

1    Q    On that day?

2    A    No.

3    Q    Some other day?

4    A    Yes.

5    Q    And when they brought you out, did they take you to Mr.

6    Harding's office?

7    A    If you would say so.

8    Q    Do you know if they talked to anybody else who was in the

9    cell block that day?

10   A    I'm not sure.

11   Q    Okay.  Mr. Mungo, thank you very much.

12            MR. HARDING:  Nothing further, Your Honor, from the

13   government.

14            THE COURT:  Mr. Mungo is excused.  Thank you, sir.  You

15   just have the one witness or two or three?

16            MR. HANLON:  Our next witness would be Ernest Reynolds,

17   Your Honor.

18            THE COURT:  Do you have one after that?

19            MR. HANLON:  We could get another witness.  We actually

20   sent someone home a few minutes ago.

21            THE COURT:  Okay.  The reason I ask is I think we could

22   probably finish with Mr. Reynolds without taking a break.  Do you

23   think?

24            MR. HARDING:  That's totally up to the Court, Your

25   Honor.

1           THE COURT:  Okay.

2           MR. HARDING:  I'll certainly try.

3           THE COURT:  Let's see if we can do that.  Why don't you

4    go ahead and bring in Mr. Reynolds?

5           KAAZIM IBN-REYNOLDS, GOVERNMENT'S WITNESS, SWORN

6           THE WITNESS:  Yes.

7           THE CLERK:  Be seated.  Speak directly toward the mike

8    and state your name and spell it for the record, please.

9           THE WITNESS:  Kaazim Ibn-Reynolds.  K-A-A-Z-I-M.  I-B-N

10   hyphen R-E-Y-N-O-L-D-S.

11           DIRECT EXAMINATION

12   BY MR. HANLON:

13   Q    Good afternoon, Mr. Reynolds.

14   A    Good afternoon.

15   Q    How old are you, sir?

16   A    35.

17   Q    What, where did you grow up?

18   A    Baltimore City.

19   Q    Have you lived in the Baltimore area all of your life or

20   most of your life?

21   A    Yes.

22   Q    And your name is Kaazim Ibn-Reynolds, is that correct?

23   A    Yes.

24   Q    Were you born under another name?

25   A    Yes.

1    Q    What was your original name?

2    A    Ernest Pernell Reynolds.

3    Q    And when did you change your name from Ernest to Kaazim

4    Ibn-Reynolds?

5    A    Probably about four, four, five years ago.

6    Q    And why was that?

7    A    For religious reasons.

8    Q    It's still appropriate for me to call you Mr. Reynolds, is

9    that correct?

10   A    Yes.

11   Q    You are testifying today pursuant to a plea agreement that

12   you've reached in consultation with your attorney with the United

13   States Attorney's Office, is that right?

14   A    Yes.

15   Q    I'm going to show you on the screen what's been marked as

16   Government's Exhibit P-13.  Do you see the document, the piece of

17   paper on your screen?

18   A    Yes.

19   Q    Is this the front page or the first page of your plea

20   agreement with the government?

21   A    Yes.

22   Q    This agreement is an agreement that's dated March 24th (sic)

23   of 2004, is that right?

24   A    Yes.

25   Q    And you reached this agreement on consultation with your

1    attorney, Mr. Andrew Graham?

2    A    Yes.

3    Q    Under the terms of this agreement, Mr. Reynolds, you pled

4    guilty to being a felon in possession of a firearm, a handgun

5    charge, in violation of that federal law, is that right?

6    A    Yes.

7    Q    You admitted under the terms of this agreement to the very

8    facts, to the various facts, rather, concerning your offense and

9    they're laid out at Paragraph Seven of your plea.  And basically,

10   what it boils down to is that you admitted that on March 13th,

11   2003 you were in possession of a firearm at your home in

12   Baltimore, Maryland, is that right?

13   A    Yes.

14   Q    Am I correct, Mr. Reynolds, you got arrested or something

15   back in March of 2003 or so, you ultimately got indicted

16   federally, and then ultimately signed this plea agreement, is

17   that right?

18   A    Yes.

19   Q    Under the terms of this agreement you also agreed to

20   cooperate, that is to provide information to the government, to

21   testify if called upon, to provide information to law enforcement

22   if called upon to, is that right?

23   A    Yes.

24   Q    Mr. Reynolds, you and I have met a number of times in

25   preparation for your appearance here today, is that right?

1    A    Yes.

2    Q    What have I told you that your first and ultimate obligation

3    is under this plea agreement?

4    A    To tell the truth.

5    Q    Do you have an understanding that, are you awaiting

6    sentencing still on this federal handgun charge?

7    A    Yes.

8    Q    So it's been pending a couple of years awaiting the

9    completion of your cooperation, is that right?

10   A    Yes.

11   Q    Under the terms of this agreement -- unfortunately, it

12   carries over on to two pages -- but Paragraph 12, there's this

13   commitment where the government, this office, the U.S. Attorney's

14   Office, agrees that if it determines that you've provided

15   substantial assistance in the investigation, prosecution of other

16   people, that it may make a motion pursuant to a law called

17   Section 5K1.1, a sentencing guideline, to ask the Court to reduce

18   your sentence, is that right?

19   A    Yes.

20   Q    Fair to say that you're hopeful that when you get sentenced

21   on your handgun charge, that the government, me or Mr. Harding,

22   whoever the prosecutor is, will make a motion asking the

23   sentencing judge to reduce your sentence, is that correct?

24   A    Yes.

25   Q    Mr. Reynolds, have any promises been made to you about this,

1    about whether you're going to get a sentencing reduction or how

2    much of a reduction you might get?

3    A    No.

4    Q    Sitting here today, is it your understanding that ultimately

5    the judge is going to make that decision in your case?

6    A    Yes.

7    Q    Would it be fair to say that you're hopeful that in light of

8    your cooperation you'll get a lesser sentence, is that fair?

9    A    Yes.

10   Q    Now, this particular case involves a handgun charge and it

11   took place back in 2003.  I would like to step back a little bit

12   now and ask you a bit about your background, Mr. Reynolds.  How

13   far did you go in school?

14   A    My GED.

15   Q    You have your GED right now?

16   A    Yes.

17   Q    When did you get your GED?

18   A    1997.

19   Q    Now, prior to getting your GED, there was a period of time,

20   I gather, that you left school and were not in school for a

21   couple years before you got your GED?

22   A    Yes.

23   Q    How, what grade were you in when you left sort of formal

24   schooling?

25   A    Seventh grade.

1    Q    And when abouts was that, if you remember the year?

2    A    About '91.

3    Q    What have you done, Mr. Reynolds, to support yourself since

4    getting out of school, since leaving back in 1991 or so?

5    A    Sold drugs.

6    Q    When did you, if you remember, how old were you when you

7    first started selling drugs?

8    A    17.

9    Q    And that's an approximation, is that correct to say?

10   A    Approximately.

11   Q    In those days, Mr. Reynolds, were you ever known on the

12   street by a nickname?

13   A    Yes.

14   Q    What was your nickname?

15   A    Purple.

16   Q    Now, let me ask you about the early '90s or so.  When you

17   first started selling drugs, what kind of drugs did you sell?

18   A    Heroin.

19   Q    Anything else?

20   A    No.

21   Q    How did you get into that business?

22   A    Just being in the neighborhood.

23   Q    What neighborhood would that have been?  Where was it you

24   got your start?

25   A    Park Heights and Pratt and Monroe Street.

1   Q     What was the --

2   A     Pratt and Monroe Street.

3   Q     Park Heights and Pratt and Monroe Street?

4   A     Um-hum.

5   Q     That's a yes?

6   A     Yes.

7   Q     And when you first started out, Mr. Reynolds, how did it

8   work?  Did you have people working for you?  Did you work for

9   other people?  How did it work?

10  A     I worked for other people.

11  Q     Did you operate out of a, on the street or out of a stash

12  house or out of your car?  How did that work?

13  A     Street, stash house.

14  Q     Over time, did you eventually meet up with a group of people

15  you began to carry on business with sort of more regularly?

16  A     I met up with a lot of people.

17  Q     A lot of people?

18  A     Yeah.

19  Q     That's correct?

20  A     Yes.

21  Q     And a lot of people included who?  I mean, not their names.

22  But what were the relationships?  What did these people bring to

23  the table you would work with them for?

24  A     We sold drugs.

25  Q     Their relationship to you, I mean, did you buy from them?

1    Did they buy from you?  Did you sell together on the street?

2    When you say that you met a lot of people, what was, what were

3    the relationships like?

4    A    Sold drugs together.

5    Q    Is there an individual you know named Card, nicknamed Card?

6    A    Yes.

7    Q    What is his full name?

8    A    Willie Fryson.

9    Q    And Fryson, is that F-R-E-I-S-O-N?

10   A    No.

11   Q    I got it wrong?

12   A    Yeah.

13   Q    Sorry about that.  How is it spelled?

14   A    F-R-Y-S-O-N.

15   Q    F-R-Y-S-O-N?

16   A    Yes.

17   Q    Thank you, Mr. Reynolds.  Is there an individual you know

18   NA, nicknamed NA?

19   A    Yes.

20   Q    And what is his full name, if you know it?

21   A    Nathaniel Moultrie.

22   Q    Could you spell Moultrie for us?

23   A    I'm not sure how you spell his last name.

24   Q    That's all right.  I won't try to, either, because I might

25   get it wrong.

1          THE COURT:  Would you pull the microphone closer to

2     your mouth, please?  Thank you.

3     Q     Now, Mr. Reynolds, what kind of relationship did you have

4     with Card, Willie Fryson, and NA, Nathaniel Moultrie?

5     A     We was friends.

6     Q     And some point did there come a time when you began to do

7     business with Card and NA?

8     A     Yeah.

9     Q     What kind of business was that?

10    A     Sold drugs together.

11    Q     How long were you selling, you mentioned that you started

12    out on the street.  How long were you selling when you began to

13    have a business relationship with Card and with NA?

14    A     Say how old was I?

15    Q     How long had you been in the drug business?

16    A     That's when I started.

17    Q     With those two guys?

18    A     Yeah.

19    Q     Did you know them at that time?

20    A     Not NA, but Card.  NA wasn't here yet.

21    Q     Card and you started out first?

22    A     Yeah.

23    Q     And what kind of relationship did you have?

24    A     Best friends.

25    Q     How about in the drug business?  What was the business

1    relationship like?

2    A    I was basically his lieutenant.

3    Q    Lieutenant means somebody who sort of is a second in command

4    for somebody else?

5    A    Yes.

6    Q    And let me ask you something.  Over time, if you started out

7    on the street, did there come a time when you and Card sort of

8    moved off the street and began to have a little bit more success

9    in this drug business?

10    A    Yes.

11    Q    How about NA?  How did NA get in the mix?

12    A    Card met NA when they was locked up.

13    Q    About when was that, if you remember?

14    A    About '91, '92.

15    Q    And when NA got involved, what kind of role did NA -- it's

16    you and Card, now NA's there, what did NA do?

17    A    He was a lieutenant, too.

18    Q    So did the two of you sort of have the same level?

19    A    Yes.

20    Q    Now, did there come a time when you and Card and NA were

21    running shops?

22    A    Yes.

23    Q    Now, "shops" is my word and I don't know if it's the right

24    word, Mr. Reynolds.  Tell me how it operated.

25    A    A shop?

1    Q    Yeah.

2    A    Well, having a shop is you, you set up a shop, you have

3    people running back and forth to sell the drugs, particularly

4    down Pratt and Monroe Street we used a house.  People ran back

5    and forth to the house from the street, get the drugs, serve a

6    customer, get the money, bring it back to the house.

7    Q    Let me ask you a couple of little questions about this.  By

8    this point, where you and, where there's this shop being run,

9    there comes a time where you're actually running a shop, if

10   that's the correct terminology, is that right, Mr. Reynolds?

11   A    Yes.

12   Q    And during this time, you still carried on business with

13   Card and still carried on business with NA, is that right?

14   A    Yes.

15   Q    Did they have their own shops or did they work the same shop

16   with you?

17   A    They had their own shops.

18   Q    So the three of you all sort of had your own thing going on,

19   is that right?

20   A    Right.

21   Q    By what point approximately did you and Card and NA sort of

22   have your own shops doing your own thing?

23   A    You say around what time?

24   Q    Yeah.  By what year, approximately?

25   A    Maybe '93.

DIRECT EXAMINATION OF IBN-REYNOLDS                192

1  Q    Now, and that's maybe a couple years after you got into the

2  business?

3  A    Yes.

4  Q    Now, your shop, focusing on your shop for the moment.  You

5  mentioned that there would be houses and then there would be

6  people on the streets running money and running drugs, is that

7  correct?

8  A    Right.

9  Q    Let's talk about the houses.  If you're running your shop,

10 were you responsible for getting the drugs and then maybe sending

11 it down the line to the people working under you in your shop?

12 A    Yes.

13 Q    All right.  What would you, where would you send the drugs

14 that you got, the heroin you got?  Where would it go first?

15 A    It probably go to a safe house.

16 Q    A safe house.  Is that different from a stash house?

17 A    I wouldn't want to say it was.

18 Q    I'm sorry?

19 A    Still a stash house, but it's a safe stash house.

20 Q    So it's a safe stash house versus a stash house?

21 A    Yes.

22 Q    And what's a safe stash house?  What's the function?

23 A    Where it's not that much traffic coming to the house.

24 Q    Fewer people?

25 A    Few people.  One, two.

1    Q      Now, do the drugs from the safe stash house, do they get

2    sent on to another place?

3    A      Yeah, they get sent to the street stash house.

4    Q      So there's a safe stash house and then a street stash house,

5    is that right?

6    A      Yes.

7    Q      This is how your shop operated?

8    A      Yes.

9    Q      What happens at the street stash house?  What goes on there?

10   A      People from the street that we had working for us, runners,

11   maybe about five or six, come in with money, get the drugs, take

12   it back, serve it to the people.

13   Q      So you have runners who would go back and forth between the

14   street and the street stash house?

15   A      Yes.

16   Q      And then they would sell on the street and bring the money

17   back to the street stash house?

18   A      Yes.

19   Q      And then from the street stash house the money gets sent

20   back to the safe stash house?

21   A      Some kind of way during that day.

22   Q      Different specific methods used?

23   A      Yes.

24   Q      And then ultimately the money ends up in your hands, is that

25   correct?

1   A    Yes.

2   Q    Was there some part of the operation, either one of the

3   stash houses or anything else, where you would actually prepare

4   heroin or the people under you would prepare heroin to be sold?

5   A    At one of the stash houses?

6   Q    Yes, sir.

7   A    No.

8   Q    Where would that take place?  Where would the heroin

9   actually be prepared for sale?

10  A    Somewhere far away from the area.

11  Q    Why would it be far away?  What's the advantage of that?

12  A    Safer.

13  Q    From the police?

14  A    From everyone.

15  Q    All right.  Including the police?

16  A    Yeah.

17  Q    Are you more concerned about other people?

18  A    Concerned about everybody.

19  Q    Who else might you be concerned about to make sure your

20  drugs are sent far away?

21  A    Other drug dealers.

22  Q    Why would other drug dealers be a concern for you?

23  A    Robbery.

24  Q    Is that a problem you had to deal with in running your shop?

25  A    Not a big one.

1    Q    Why wasn't it a big one?

2    A    Because we was organized.

3    Q    Let me ask you about that.  You mentioned your shop and all

4    about that was being run under you, is that correct?

5    A    Yes.

6    Q    Let me ask you about NA and Card.  During the time that you

7    were running your shop, they were running their own?

8    A    Yes.

9    Q    Did the three of you have any kind of an ongoing

10   relationship?  Did you do any business together even though the

11   three of you were running your own shops?

12   A    Yeah, we was together.

13   Q    What do you mean by "together?"  Explain for the jury, if

14   you would, what do you mean by "together?"  If the three of you

15   were running your own shops, how were you together?

16   A    It was the same heroin.  It was cut the same way.  And

17   divided by three.

18   Q    Where was the heroin coming from?

19   A    I don't know where it was coming from.

20   Q    Which of the three of you was responsible for actually

21   getting the heroin?

22   A    Willie Fryson.

23   Q    And was it your understanding he had somebody that he was

24   getting it from?

25   A    Yes.

1  Q    Some supplier?  Did you ever, during the time that you were

2  doing business with Willie Fryson and NA and running your shop,

3  did you ever know who the supplier was?

4  A    No.

5  Q    Did you ever ask Card who the supplier was?

6  A    No.

7  Q    You think he would have told you if you'd asked him?

8  A    Probably.

9  Q    But you weren't interested?

10 A    No.

11 Q    Was this a good connect that you and NA and Card had?  Were

12 you satisfied with it?

13 A    It was steady.

14 Q    Steady?

15 A    Yes.

16 Q    You could get what you needed when you needed it?

17 A    Yes.

18 Q    How were the prices in '93, '94?

19 A    How was the prices?

20 Q    How were the prices?  Was it a good price?  Was it

21 expensive?

22 A    I wouldn't know because I didn't, I didn't buy it.

23 Q    You had to send your money up to somebody, though, to get

24 it, correct?

25 A    Willie would take care of all that.

1    Q    So the three of you are sort of making your own money in

2    your own shops, is that right?

3    A    Right.

4    Q    Did you ever share profits or split profits or do anything

5    like that?

6    A    No.  Not really.

7    Q    Everybody is just sort of keeping their own, is that right?

8    A    Right.

9    Q    But then you're all getting heroin from the same source, is

10   that right?

11   A    Right.

12   Q    And that was one sense of how you were together, you had

13   this common supplier?

14   A    Right.

15   Q    And you're all getting the same heroin?

16   A    Right.

17   Q    Let me ask you about something else.  Did the three of you

18   ever do anything -- I understand you run your own independent

19   shows -- did the three of you ever do anything to help each other

20   out or could you rely on one another for any purpose?

21   A    Yes.

22   Q    What would you rely on NA and Card for, aside from the fact

23   that you're getting heroin from the same place?

24   A    Anything.  I mean, if something was to happen in the street,

25   we would be together.

1    Q    What do you mean by "something happening in the street?"

2    A    Robbery.

3    Q    What might happen in the street?

4    A    Robbery.  Someone had a beef.  It was, that was the unit

5    right there.

6    Q    Someone had a beef with you on the street, you got somebody

7    that you've got a problem with?

8    A    Right.

9    Q    There was a unit you could rely on?

10   A    Right.

11   Q    That was the word you used?

12   A    Right.

13   Q    What would you, what did you feel you could rely on Card and

14   NA to do for you if you had a beef or a problem with somebody on

15   the street?

16            MR. CROWE:  Objection.

17            THE COURT:  Overruled.  You may answer.

18   A    They would be part of that beef.

19   Q    NA and Card would?

20   A    Yes.

21   Q    Did you have confidence in that?

22   A    Yes.

23   Q    Did that, did you feel more comfortable running your

24   business knowing that they were behind you if you needed their

25   help?

1    A    Of course.

2    Q    If they had had a beef with somebody on the street, if

3    somebody was challenging them or if they had a problem with

4    somebody, would you have backed them up?

5    A    It was my beef, too.

6              MR. CROWE:  Objection.

7              THE COURT:  Overruled.  Repeat your answer, please.

8              THE WITNESS:  It was my beef, too.

9    BY MR. HANLON:

10   Q    So one guy's beef was the unit's beef, is that fair to say?

11   A    Yes.

12   Q    About how long was it that you and NA and Card had this

13   ongoing relationship happening?

14   A    Until 1995, when I went to prison.

15   Q    You went to prison on a drug charge in '95, is that right?

16   A    Yes.

17   Q    And you did a fairly substantial jail sentence, is that

18   right, Mr. Reynolds?

19   A    Yes.

20   Q    And on the subject of your criminal record, you have a

21   couple of other drug charges in the 1990's, is that right?

22   A    Yes, yes.

23   Q    And then there's also the handgun charge in '03?

24   A    Yes.

25   Q    Going back to 1993, back to the time frame we've been

200

1    talking about, at some point did you meet an individual named Goo

2    and an individual named Wayne?

3    A    Yes.

4    Q    Which one of these individuals, which one of these guys did

5    you meet first?

6    A    Probably Wayne.

7    Q    And how did you know Wayne?  What kind of relationship did

8    you have with him?

9    A    I met Wayne through his brother.

10   Q    And what was Wayne's brother's name?

11   A    Al.

12   Q    How did you know Al?

13   A    We used to be together.

14   Q    Tell us what you mean by "used to be together?"

15   A    He used to be in South Baltimore with us.

16   Q    A member of the crew?

17   A    Yeah.

18   Q    Involved in the drug, in the drug operation?

19   A    Yes.

20   Q    So Al was involved in the drug transaction, in the drug

21   operation, excuse me, and eventually you meet his brother, Wayne?

22   A    Right.

23   Q    And how did that come about?  Did Al just introduce you to

24   him socially or did you just meet him for a purpose?

25   A    Socially.

1    Q    What kind of relationship after you met Wayne did you have

2    with Wayne?

3    A    For a while it was just, hey, what's going on, what's up.

4    Q    Pretty casual?

5    A    Yeah.

6    Q    At some point did it become more than that?

7    A    I think he went to foster camp, came home from foster camp.

8    Q    So Wayne went away for a while and then came home?

9    A    Yeah.

10   Q    What happened after Wayne came home?

11   A    I pulled him in.

12   Q    You pulled Wayne into what?

13   A    To the game.

14   Q    The "game" meaning what?

15   A    The drug game.

16   Q    And how did you go about pulling him in?

17   A    I needed someone to, that I knew that was reliable that

18   could cut, cut my heroin for me.

19   Q    Now I'm going to ask you a couple of questions.  I'm going

20   to ask you what "cutting heroin" means in a minute.  But what

21   made you think that Wayne would be reliable for that purpose?

22   A    Because he was there every day.

23   Q    Where every day?

24   A    Around the neighborhood.

25   Q    Why would that make him reliable?

1    A    I knew I could trust him.

2    Q    He knew what was going on?

3    A    Not, not all the way.

4    Q    Did you trust his brother, Al?

5    A    Yes.

6    Q    Did you feel comfortable bringing Wayne in because you

7    trusted his brother?

8    A    Yes.

9    Q    Do you see Wayne in the courtroom, Mr. Reynolds?

10    A    Yes.

11    Q    If you would, please identify his location and describe what

12    he's wearing.

13    A    Corner, white shirt.

14    Q    Your Honor, for the record, identifying the defendant, Mr.

15    Martin.

16          THE COURT:  So noted.

17    Q    Now, once Wayne got involved you approached him and -- how

18    did that work?  How did you actually approach Wayne?

19    A    I basically wanted to keep him away from everything.

20    Q    Tell us what you mean by that, please.

21    A    I wanted him to cut the heroin and basically like stay away

22    from everything that was going on.

23    Q    What would everything be?  What is it you wanted him to stay

24    away from?

25    A    The day-to-day street level stuff.

1  Q    Why not put him on the street?  Why start him out cutting

2  heroin?

3  A    That trust level was there.

4  Q    And what do you mean by "cutting heroin?"  What does that

5  mean?

6  A    Make it more.

7  Q    When you bought heroin, you and Card and NA would get this

8  heroin from that supplier, was it a fairly pure heroin?

9  A    I wouldn't say pure.

10 Q    Wasn't pure.  But would you mix it up to make the volume

11 bigger?

12 A    Yes.

13 Q    That process of mixing heroin with something to make it more

14 volume and diluting a little bit is called cutting, is that

15 right?

16 A    Yes.

17 Q    What would you cut your heroin with?

18 A    Bonita and quinine.

19 Q    These are chemicals that you would buy for that purpose?

20 A    Yes.

21 Q    So that was what you asked Wayne to do, to cut heroin?

22 A    Yes.  I had to show him first.

23 Q    You actually trained him and showed him how to do it?

24 A    Yeah.  I showed him.

25 Q    That involved mixing it with the chemicals, is that right?

1    A    Yes.

2    Q    Would Wayne or someone else then actually divide the heroin

3    after it was cut up, would he divide it up into something to be

4    sold?

5              MR. CROWE:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A    It was packaged.

8    Q    How was it packaged?

9    A    In bags, capsules.

10   Q    And why package it up in bags and capsules?  What was the

11   advantage of that?

12   A    That's how you make your money.

13   Q    That's how it gets sold on the street?

14   A    Yes.

15   Q    People buy it by the capsule?

16   A    Right.

17   Q    Now, at some point you met an individual named Goo?

18   A    Yes.

19   Q    How did you meet Goo?

20   A    Through Wayne.  He was a friend of Wayne's.

21   Q    How long, by the time you met with Goo, had Wayne already

22   gotten into the game, into the business, or was this before Wayne

23   got into the business?

24   A    This was after.

25   Q    How long had Wayne been in the business when Wayne

1  introduced you to Goo?

2  A    Probably about six months.

3  Q    Do you see Goo in court?

4  A    Yes.

5  Q    If you would, please tell us where he's sitting and what

6  he's wearing.

7  A    End table, striped shirt, glasses.

8  Q    Your Honor, for the record, identifying the defendant, Mr.

9  Gardner.

10        THE COURT:  So noted.

11  Q    At some point was there any thought of bringing Goo into the

12  business?

13  A    No, I didn't.  I didn't.

14  Q    You didn't want that?

15  A    It wasn't, it wasn't room at the time.

16  Q    At some point did Mr. Gardner, did Goo, get into the

17  business in any other capacity?

18  A    I think he was with NA.

19  Q    What makes you say that Goo, Mr. Gardner, was with NA?

20  A    NA told me.

21  Q    What did NA tell you about Goo's involvement with his, with

22  his shop?

23  A    That he brought Goo in.

24  Q    And what did -- did NA tell you what he brought Goo in to

25  do?

1    A    To cut heroin.

2    Q    Did there ever come a time, do you have any idea, Mr.

3    Reynolds, how long Goo worked for NA?

4    A    No.

5    Q    Did there ever come a time when Goo came over to your shop

6    or had any involvement cutting heroin in your shop?

7    A    No, not from my shop.

8    Q    But he remained with NA for a while?

9    A    Yeah, I believe so.

10   Q    Let me ask you.  Approximately when was it that you brought

11   Wayne into your shop, cutting heroin?

12   A    Probably about the middle of '93.

13   Q    And how long did Wayne stay with you?

14   A    Till I left.

15   Q    And that was in 1995, when you went to jail?

16   A    Yes.

17   Q    About when was it in '95, if you remember?

18   A    June.

19   Q    So about, if my math is correct, is that about two years,

20   mid '93 to mid '95?

21   A    Yes, that's about right.

22   Q    Now, Mr. Gardner, you indicated, Goo, according to what NA

23   told you, came in about six months -- strike that.  Do you know

24   when Goo started working for NA?

25   A    No.

1    Q    You met him about six months after Wayne started working for

2    you, is that right?

3    A    Right.

4    Q    Do you know if it was during 1994 that Mr. Gardner got

5    involved, '93 or '94?

6    A    Around that time.

7    Q    Now, during that period of time -- strike that.  As far as

8    you know, was Mr. Gardner, was Goo still working under NA when

9    you went to jail in June of '95?

10   A    Yes.

11   Q    Let me ask you a little bit about that period of time, the

12   two years that Wayne is cutting heroin for you.

13          It was heroin was the only drug that your shop did, is

14   that right?

15   A    Yes.

16   Q    And that was what the other shops did as far as you knew, is

17   that correct?

18   A    Yes.

19   Q    During that period of time, if you remember, and you and I

20   have spoken about this a couple of times in the past, couple of

21   times in the past, going over these quantities, is that correct?

22   A    Yes.

23   Q    About how much would you do in an average day in terms of

24   money?  How much money or revenue would your shop get in an

25   average day during that two year period?

1   A    Some days 10,000, some days 15, 17,000.

2   Q    So anywhere from 10 to 15 or $17,000, is that right?

3   A    Yeah, that's about right.

4   Q    And how much would -- you're selling it by the gel cap or by

5   the baggie, is that correct?

6   A    Right.

7   Q    How much would a gel cap or a baggie of heroin sell for?

8   How much would one dose sell for?

9   A    $10.

10   Q    In each one of those ten dollar quantities, how much heroin

11   would you put in each one of those gel caps or each one of those

12   baggies?

13   A    Probably about a third of a gram.

14   Q    So a third of a gram or so for $10, is that right?

15   A    Yeah.

16   Q    And you're making 10 or $15,000 per day?

17   A    Around that.

18   Q    About how much quantity of heroin, how much heroin, because

19   I don't want to do the math and get it wrong, about how much

20   heroin would you distribute a week or so out of your shop on

21   average?

22   A    Maybe --

23   Q    And I'm talking about cut heroin.  This is after you've

24   taken the chemical, you've mixed it all up, and you're selling it

25   in the gel caps.  How much product would you be putting out on

1    the street in an average week?

2    A    Maybe about 500 grams of cut heroin.

3    Q    500 grams of cut heroin in a week or so?

4    A    Week or so.

5    Q    Average week?

6    A    Average week.

7    Q    Were there weeks when it was more and weeks when it was

8    less?

9    A    Yeah.

10   Q    Now, in 1995, you went to jail.  And about when did you get

11   out of jail, Mr. Reynolds?

12   A    2002.

13   Q    Did you stay in touch with Wayne or Goo, Mr. Martin or Mr.

14   Gardner, during that time?

15   A    Briefly.  Not, not very much.

16   Q    You had a couple conversations, nothing drug-related or

17   anything like that, is that right?

18   A    No.

19   Q    In 2002, you got out of jail and came back to the Baltimore

20   area, is that right?

21   A    Yeah.

22   Q    Did you have occasion shortly after your release at that

23   time to visit with Mr. Martin, Wayne, at a halfway house?

24   A    Yes.

25   Q    And Mr. Wayne was at the halfway house also getting ready to

1    come home from something, is that right?

2    A    Yes.

3    Q    What did you and Wayne talk about during that visit at the

4    halfway house?

5    A    At that time, I haven't seen or talked to Wayne in about six

6    years.  I just asked him what he got locked up for.  He said a

7    gun.

8    Q    Did he say about, did he mention anything about what he was

9    up to at that time, what he had going or what he was looking to

10   do?

11   A    He just said he was going to come home and get some money.

12   Q    Did Mr. Wayne -- excuse me.  Did Mr. Martin, whom you knew

13   as Wayne, tell you anything about how he was intending to look

14   for money?

15   A    No.  Just said any ways necessary, whatever you got to do to

16   make some money.

17   Q    This conversation, I talked about a halfway house, it took

18   place at the Volunteers of America halfway house, right?

19   A    Yes.

20   Q    Did you have an understanding, Mr. Reynolds, of what Wayne

21   meant when he said he was willing to do anything to make some

22   money?

23            MR. CROWE:  Objection.

24            MR. MARTIN:  Objection.

25            THE COURT:  You can answer yes or no.

1    A    No.

2    Q    How long was this visit?

3    A    Probably about 15, 20 minutes.

4    Q    Did you make any plans with him or set up anything to meet

5    later on?

6    A    No, I just told him to call me, we exchanged.  I gave him my

7    number.

8    Q    Fairly casual visit?

9    A    Yes.

10   Q    At another time you were working, you were on work release

11   from a charge, is that right?

12   A    Um-hum.

13   Q    That's a yes?

14   A    Yes.

15   Q    Now, work release is when you're serving a sentence and

16   you're getting ready to go out, and during the course of the

17   sentence you're allowed to actually have a job and begin to sort

18   of get ready to come home, is that correct?

19   A    Yes.

20   Q    When was this particular work release that we're talking

21   about, when you had a job at Reisterstown Plaza?

22   A    When was it?

23   Q    Yeah.

24   A    '02.

25   Q    2002 again?

1    A    Yes.

2    Q    What kind of job were you doing at Reisterstown Plaza?

3    A    Music.

4    Q    And one day, did you have a visit from Goo or from Wayne?

5    A    From Goo.

6    Q    How did this visit come about?  Why did Goo come and visit

7    you?  Were you expecting him that day?

8    A    I don't think so.  He had just came home.

9    Q    He had been away as well and was coming home?

10   A    Um-hum.  Yes.

11   Q    How long did you and Goo, Mr. Gardner, visit that day?

12   A    Probably about ten minutes.

13   Q    And did he talk to you about anything about what he was

14   coming home for?

15   A    He said he got locked up on '95.

16   Q    What did, what if anything, did Mr. Gardner, Goo, tell you

17   about getting locked up on I-95?

18   A    He got pulled over.  He got locked up.

19   Q    Did Mr. Gardner tell you what he got pulled over for?

20   A    Not what he got pulled over for.  What I think he got locked

21   up for cocaine or something.

22   Q    And did Mr. Gardner tell you about anything about who he was

23   with when he got locked up?

24            MR. CROWE:  Objection.

25            THE COURT:  Sustained.

DIRECT EXAMINATION OF IBN-REYNOLDS                    213

1    Q    Did Mr. Gardner tell you or did Goo tell you anything about

2    Pennsylvania?

3    A    He mentioned it.

4    Q    What did Mr. Gardner tell you about Pennsylvania?

5    A    It's sweet, it's sweet in Pennsylvania.

6    Q    What did you understand Mr. Gardner to mean when he said it

7    was sweet in Pennsylvania?

8    A    It was a good money source.

9    Q    Did Mr. Gardner, when Mr. Gardner told you this, did he tell

10   you what he had going on in Pennsylvania, what was it a money

11   source for, what was sweet about it?

12   A    He just said you can make, you can make a lot of money.

13   Q    Doing what?

14   A    I would assume --

15        MR. MARTIN:  Objection.

16        THE COURT:  What's the basis for your assumption?

17   A    The type of business we was in.

18        THE COURT:  Overruled.  You may answer.

19   Q    What did you understand him to mean, Mr. Reynolds?

20   A    That it was a good money source up there.

21   Q    To do what?

22   A    To sell drugs.

23   Q    Did Mr., did Goo, did Mr. Gardner tell you anything about

24   why it was a good money source in Pennsylvania to sell, why it

25   was a good money source in Pennsylvania?

1    A    No.

2    Q    Did he mention anything about a small town?

3    A    He said something about a bar.

4    Q    Let me bring you forward a couple of years, to 2004.  In

5    2004, you were locked up, awaiting some resolution to the handgun

6    charge that we talked about today, is that correct?

7    A    Right.

8    Q    And obviously, you are not incarcerated at this time, Mr.

9    Reynolds, is that right?

10   A    Correct.

11   Q    I'm going to ask you briefly about a time when you were

12   incarcerated.  But since the time of your 2003 gun arrest and

13   your guilty plea in 2004, you do have one more conviction, is

14   that right, a 2007 gun drug charge?

15   A    Yes.

16   Q    I believe I neglected to ask you about that.  I apologize.

17   Was that in Baltimore?

18   A    Yes.

19   Q    Now, going back to 2004.  You were locked up for a while at

20   Supermax, is that right?

21   A    Yes.

22   Q    Did you have occasion to encounter Goo while in Supermax,

23   Mr. Gardner?

24   A    Yes.

25   Q    When did you, how did you come across Mr. Gardner in

1    Supermax?  How did that come about?

2    A    He was my cell buddy.

3    Q    How long were the two of you cell buddies or cell mates?

4    A    Probably about a week, week and a half.

5    Q    Not very long?

6    A    No.

7    Q    What caused you to cease being cell mates?

8    A    They moved me out of the jail.

9    Q    You got moved to another place?

10   A    Yes.

11   Q    As a federal prisoner, you sometimes get moved from place to

12   place --

13   A    Yes.

14   Q    -- during in federal pretrial detention, is that right?

15   A    Yes.

16   Q    During the time that you were sharing a cell with Mr.

17   Gardner, did he tell you anything about what he was locked up

18   for?

19   A    A murder.

20   Q    What did Mr. Gardner tell you, if anything, about this

21   murder that he was locked up for?

22   A    That a guy, the guy Will Montgomery switched the story up or

23   something.

24   Q    Will Montgomery switched the story up on him?

25   A    Yeah.

1    Q    What do you mean by "switched the story?"  Did Goo tell you

2    what he meant by that?

3    A    He said that he committed the murder when he didn't.

4    Q    Will Montgomery said Mr. Gardner committed the murder when

5    he didn't?

6    A    Yes.

7    Q    What did Mr. Gardner tell you about the murder itself?

8    A    That someone jumped off the patio, she was off the patio and

9    someone shot her.

10   Q    And Mr. Gardner described to you that this is what happened

11   at this murder?

12   A    Right.

13   Q    Did Mr. Gardner tell you why, understanding that he said

14   someone else did the murder, did Mr. Gardner tell you that he got

15   involved in this murder for any reason?

16           MR. COBURN:  Objection.

17           THE COURT:  Overruled.  You may answer.

18   A    It was a proposition made to him, it was like 50,000 in the

19   house.

20   Q    $50,000 in a house?

21   A    Yeah.

22   Q    Apartment?

23   A    Apartment.

24   Q    Did Mr. Gardner tell you whose apartment?

25   A    Darius.

1    Q    Did you know who Darius was when Mr. Gardner told you

2    Darius?

3    A    Yeah, I knew.  I knew Darius.

4    Q    Who was he?

5    A    He was another drug dealer.

6    Q    So Mr. Gardner told you that it was a proposition to him

7    that there was $50,000 inside Darius's apartment?

8    A    Right.

9    Q    And that's why they did this crime?

10   A    It was brought to him by somebody else.

11   Q    Did Mr. Gardner tell you who?

12   A    No.

13   Q    Did Mr. Gardner tell you anything specifically about why he

14   needed $50,000 or why he would want money?

15        MR. COBURN:  Objection, Your Honor, just for reasons

16   stated earlier.

17        MR. CROWE:  Objection.

18        THE COURT:  Overruled.

19   Q    Did Mr. Gardner tell you why he needed $50,000 or why he

20   needed money?

21   A    Well, of course he said he wouldn't get the whole 50,000

22   because it was other people.

23   Q    So he's going to have to divide it a little.  Why, did he

24   tell you why he needed the money, period?

25   A    To help Wayne get a lawyer.

1  Q    Why would Wayne -- strike that.  Did Mr. Gardner tell you

2  why Wayne needed a lawyer?

3  A    He was locked up for murder.

4  Q    Wayne was locked up?

5  A    Yeah.

6  Q    Did you know which murder he was locked up for, Wayne?

7  A    Yes.

8  Q    Which one?

9  A    Darryl Wyche.

10 Q    When Mr. Gardner told you that Wayne needed a lawyer, the

11 Wayne you understood that to be was Mr. Martin who you identified

12 today?

13 A    Yes.

14 Q    Just a moment, please, Your Honor.

15       (Pause in Proceedings.)

16       MR. HANLON:  Nothing further, Your Honor.

17       CROSS EXAMINATION

18 BY MR. LAWLOR:

19 Q    Sir, good afternoon.

20 A    Good afternoon.

21 Q    Now, you said that yourself, Mr. Card, and NA were a unit?

22 Is that what you said?

23 A    Yes.

24 Q    And that people didn't really mess around with you because

25 they knew that you guys were together?

1   A   Didn't say that.

2   Q   All right.  Is that a fair characterization, though?

3   A   People mess with people every day.

4   Q   All right.  But you said people didn't mess with you, right?

5   A   I didn't say that.

6   Q   All right.  Did you say that people didn't really rob you?

7   A   I say we didn't have that problem a lot.

8   Q   Okay.  And why is it that you didn't have that problem?

9   A   Because we was organized.

10  Q   You were organized.  So people knew that you guys were on

11  top of things and people knew that you were together, right?

12  A   Right.

13  Q   And that you would look out for each other?

14  A   Right.

15  Q   And go to bat for each other?

16  A   Exactly.

17  Q   Okay.  And you knew Wayne, right?

18  A   Yes.

19  Q   And you knew Goo, right?

20  A   Yes.

21  Q   And you knew them from the mid '90s, right?

22  A   Right.

23  Q   Or even earlier than that?

24  A   Early '90s.

25  Q   All right.  You know Bo?

1   A    No.

2   Q    Don't know him?  Okay.  So this guy Card, did he associate

3   with Hasim Rahman?

4   A    Yes.

5   Q    Was Rahman in the game, too?

6   A    No.

7   Q    Never?

8   A    Not that I know of.

9   Q    All right.  Did you know a guy named Woody?

10  A    Yes.

11  Q    Was he a stick-up guy?

12  A    I knew he was back some years ago.

13  Q    Okay.  Now, when you went away for jail, you were out of the

14  game, right?

15  A    When I went, when I went away to jail?

16  Q    When you went away to jail, right?

17  A    Of course.  I was in jail.

18  Q    All right.  So you couldn't, you know, you weren't in the

19  game any more, right?

20  A    Right.

21  Q    Just biding your time, right?

22  A    Right.

23  Q    And so you weren't a unit any more with Card or NA or

24  anybody like that, right?

25  A    Right.

1   Q    All right.  They continued to do their thing, that had

2   nothing to do with you?

3   A    No.

4   Q    Okay.  Thank you.

5        MR. MARTIN:  No questions, Your Honor.

6        CROSS EXAMINATION

7   BY MR. CROWE:

8   Q    Good afternoon, Mr. Reynolds.  My name is Tom Crowe and I

9   represent Shelly Martin.  My understanding is that you first

10  claim to have recruited Mr. Martin into your drug organization in

11  about 1993, is that correct?

12  A    Yes.

13  Q    And he was approximately 14 years old at that time, is that

14  right?

15  A    Around that age.

16  Q    And you didn't have any compunctions about bringing a

17  juvenile, even one as young as 14 years old, into your illegal

18  organization, did you?

19  A    No.

20  Q    That was something that was perfectly acceptable to you at

21  the time, is that correct?

22  A    Yes.

23  Q    Now, you've indicated that you met with Mr. Hanlon, I think

24  in response to his questions, several times.  Approximately how

25  many times have you met with the prosecutors in this case?

1    A    About three or four.

2    Q    Okay.  And were you aware of any requests that were made of

3    your lawyer, Andrew Graham, for any of the defense lawyers to

4    meet with you?

5              MR. HANLON:  Objection, Your Honor.

6              THE COURT:  Why don't you rephrase?

7    Q    Did you refuse to meet with any of the defense lawyers in

8    this case?

9    A    I think my lawyer did.

10   Q    You think your lawyer did.  And was that an action of your

11   lawyer that you approved of?

12             MR. HANLON:  Objection, Your Honor.

13             THE COURT:  Rephrase the question.

14   Q    Did you approve of your lawyer telling the defense lawyers

15   in this case that you wouldn't meet with them?

16             MR. HANLON:  Objection, Your Honor.

17             THE COURT:  You can rephrase it, Mr. Crowe.

18   Q    Would you have met with defense lawyers?

19   A    Yes.

20   Q    Okay.  Did you tell that to your lawyer?

21             MR. HANLON:  Objection, Your Honor.

22             THE COURT:  I'll overrule.  You can answer.

23   A    Yes.

24   Q    And what did he say?

25             MR. HANLON:  Objection.

1          THE COURT:  For limited purposes only, you can tell us

2     what your lawyer told you about meeting with the defense lawyers.

3     A    He said there's no need, I was cooperating with the

4     government.

5     Q    Because at that point you already made your deal with the

6     government, is that correct?

7     A    Yes.

8     Q    Now, you were under federal indictment at that time, is that

9     correct?

10    A    Yes.

11    Q    And that indictment was for being a felon in possession of a

12    firearm, is that right, also?

13    A    Yes.

14    Q    And sometime in March of 2003, the police busted into your

15    house, is that right?

16    A    Yes.

17    Q    And they found a firearm in your house, is that also

18    correct?

19    A    Yes.

20    Q    What type of handgun was it?

21    A    A .380.

22    Q    Pardon?

23    A    .380.

24    Q    .380?

25    A    Automatic.

1  Q    And did they find any drugs in your house at that time,

2  also?

3  A    No.

4  Q    Do you recall that you were indicted on two counts, one was

5  for possession of the firearm and one was for possession of the

6  firearm in furtherance of the drug crime?

7  A    Yes.

8  Q    And what was the -- now, you'd already been convicted of one

9  crime because you were a felon in possession, is that right?

10  A    Right.

11  Q    And what was the drug crime that you are using this .380 to

12  advance?

13  A    Going to South Baltimore every morning, I guess.

14  Q    And you're going to South Baltimore every morning armed?

15  A    No.

16  Q    Okay.  But you had, but you had the weapon to protect your

17  drugs, is that correct?

18  A    No.  Just, the weapon just was at the house.

19  Q    Just had nothing to do with the fact that you were a drug

20  dealer?

21  A    No.

22  Q    Okay.  You were, however, not indicted for actual drug

23  distribution by the federal government, were you?

24  A    No.

25  Q    Now, did your lawyers, either, either Ms. Farber from the

1    Federal Public Defender's Office, or when she was replaced by Mr.

2    Graham, did they tell you about the possible penalties you could

3    face if you went to trial?

4                    MR. HANLON:  Objection.

5                    THE COURT:  Well, do you know what the penalties are?

6    Or do you have an idea of what the penalties are?

7                    THE WITNESS:  I have an idea.

8    BY MR. CROWE:

9    Q    Okay.  What's your idea?

10   A    15, 15 years.

11   Q    Okay.  15 years?  Did anybody mention a possible mandatory

12   minimum of 15 years?

13   A    They may have.

14   Q    May have.  And do you have an expectation as to how much

15   time you're going to get when you're eventually sentenced on this

16   matter?

17   A    No.

18   Q    Now, you were originally arrested in 2003?

19   A    Yes.

20   Q    And we're sitting, we're here in this courtroom in November

21   of 2008, is that correct?

22   A    Yes.

23   Q    And am I right that you haven't been sentenced for that

24   offense yet?

25   A    Right.

1    Q    So for a period, so for most, except for a couple of brief

2    periods of pretrial detention, you've been free this entire

3    period of five years, is that right?

4    A    Minus a year.

5    Q    Pardon?

6    A    Minus a year.

7    Q    I'm sorry.  I couldn't hear you.

8    A    Minus a year.

9    Q    Minus a year.  So you spent basically a year inside, is that

10   right?

11   A    Yes.  State prison.

12   Q    State prison.  Was that in state prison on a different

13   charge?

14   A    Yes.

15   Q    Okay.  But once you made your deal with the federal

16   prosecutors, you were released on pretrial release, is that

17   correct?

18   A    Yes.

19   Q    And it's been important for you to be out for that period of

20   time, is that not right?

21   A    To who?

22   Q    To you.

23   A    Of course.

24   Q    In fact, you even wrote a letter to Mr. Harding saying that

25   it was important for you to be out so you could be with your

1    family and set a good example for your son, is that right?

2    A    Yes.

3    Q    Now, do you understand that under the plea agreement that

4    you have that the prosecutor has discretion as to whether or not

5    he is going to tell the judge that you should get credit for this

6    thing called substantial assistance, which Mr. Hanlon discussed

7    with you?

8    A    Yes.

9    Q    And you realize that, and you want them to be pleased with

10   your testimony, is that right?

11   A    Yes.

12   Q    And although your deal may not at least on paper be

13   contingent on any particular result, you want them to be happy

14   with your testimony here today, is that right, also?

15   A    They got a right to feel how they want to feel.

16   Q    Okay.  But you want them to feel happy?

17   A    Not necessarily.

18   Q    You don't necessarily want them to feel happy?

19   A    No.

20   Q    Okay.  Now, in all the period of time that you were with Mr.

21   Martin and Mr. Gardner, were you ever arrested with Mr. Martin

22   for any offense?

23   A    No.

24   Q    Were you ever arrested with Mr. Gardner for any offense?

25   A    No.

1    Q    You considered yourself fairly close to Mr. Martin and Mr.

2    Gardner?

3    A    Mr. Martin.

4    Q    Okay.  And is it my understanding that you did not, however,

5    know a man by the name of Willie, Willie Mitchell or Bo until

6    really sometime about the time when you, your last, your last

7    episode in prison?

8    A    Yes.

9    Q    Okay.  So you didn't know about this Willie Mitchell or Bo

10    until sometime in 2004, something of that nature?

11    A    Around that time.

12    Q    Pardon?

13    A    Around that time.

14    Q    Okay.  There's another individual who's on trial in this

15    case, his name is Shelton Harris.  He sometimes goes by the name

16    of Roc or Little Roc.  Do you know that person?

17    A    No.  I didn't know him then.

18    Q    Okay.  And you didn't know him until some, probably hadn't

19    even heard of him until sometime like 2004, is that right?

20    A    Correct.

21    Q    Now, your conversation, you were, you said you were a cell

22    buddy with Mr. Gardner or Goo for a period of about a week or one

23    and a half weeks?

24    A    Around that time.

25    Q    And that term "cell buddy" means that you shared a cell, is

1    that right?

2    A    Yes.

3    Q    And was anybody else in the cell with you at that time?

4    A    No.

5    Q    And isn't it also true that by the time, when you were a

6    cell buddy with Mr. Martin, that you had already signed something

7    called a proffer agreement?

8    A    You mean Mr. Gardner.

9    Q    I'm sorry.  Mr. Gardner.  Thank you for correcting me.

10   You'd already signed something called a proffer agreement with

11   the government, is that right?

12   A    Yes, I believe so.

13   Q    You'd started giving them information, is that right?

14   A    Not at that particular time, I don't think.

15   Q    Pardon?

16   A    I don't think at that particular time.

17   Q    Had you signed an agreement that you would give them

18   information?

19   A    I don't know.

20   Q    Might I have just a moment, Your Honor?

21        THE COURT:  Yes.

22   Q    Like to have marked as Martin's exhibit, Defendant Martin's

23   Exhibit 13, a copy of a proffer agreement.  I'm not very good at

24   this.  But let me see if I can put this on the screen for you.

25   You see that this is a letter which was written to your attorney,

1    Mr. Graham?

2    A    Yes.

3    Q    And you see that it's dated on February 24 of 2004?

4    A    Yes.

5    Q    And sir, is that your signature on the bottom of that --

6    A    Yes.

7    Q    -- agreement?  You're the person who signed Ernest Reynolds,

8    is that right?

9    A    Yes.

10   Q    And you and Mr. Graham both signed that agreement, is that

11   correct?

12   A    Yes.

13   Q    And in that agreement, do -- the first paragraph of that

14   agreement says, Mr. Graham, quote, "You have advised me that you

15   and your client wish to meet with the investigating officers for

16   the purpose of making a", quote, "'off-the-record'", unquote,

17   "proffer in connection with the above matter.  We are willing to

18   meet with you upon the following terms and conditions."

19           You see that?

20   A    Yes.

21   Q    And was it, in fact, true that you wanted to meet with the

22   prosecutors to make an off-the-record proffer at that time as the

23   letter you signed states?

24   A    Yes.

25   Q    Okay.  And that was before you became cell buddies with Mr.

1    Gardner, is that right?

2    A    Around that time, yeah.

3    Q    Well, if I will tell you that the record in this case

4    indicates that that was probably sometime in March of 2002, after

5    this letter, would you accept that?

6              MR. HANLON:  Objection, Your Honor.

7    Q    I'll rephrase, Your Honor.

8              THE COURT:  Rephrase it.

9    Q    When did you become cell buddies with Mr. --

10             THE COURT:  To the best of your recollection, Mr.

11   Reynolds.

12   Q    -- Gardner.

13             THE COURT:  When was it?

14   A    Sometime in March.

15   Q    Okay.  Sometime in March.  Sometime after this letter was

16   signed, is that right?

17   A    Yes.

18   Q    Okay.  And you knew that any information that you could turn

19   up on anybody, including somebody you'd lured into the business

20   as a 14-year-old, was something you could use to help you, is

21   that right?

22   A    No.

23   Q    You didn't know that?  Never, never occurred to you?

24   A    No.

25   Q    And it certainly wouldn't occur to you to make up something

1    to make the story a little better, is that right?

2    A    Make up something like what?

3    Q    Say he did something he didn't do.

4    A    He never told me he done anything he didn't do.

5    Q    Okay.  So you're saying that Mr. Gardner never told you that

6    he participated in this murder?

7    A    He said he was there.  He didn't say what happened.

8    Q    Okay.  Now, with respect to the meeting that you had with

9    Mr. Martin, I think you've described that as about a ten minute

10   meeting, is that right?

11   A    Ten, 15 minute meeting.

12   Q    Ten, 15 minute meeting.

13   A    You mean at VOA, right?

14   Q    At the Volunteers of America, that's correct.

15   A    Right.

16   Q    And you said that Mr. Martin made a statement to you that he

17   was going to do anything he could to make money, is that right?

18   A    He said any, any means by necessary.  He didn't say anything

19   he had to do.  He said any means necessary.

20   Q    You're correct.  Your phrasing, your phrasing is consistent

21   with what you said before.

22        And you further testified that you didn't really know

23   what that meant, is that right?

24   A    Correct.

25   Q    Did you get the indication from the way he was talking that

1   he really didn't know what he was going to do?

2   A    During that time, we was, I mean, we was drug dealers.  So I

3   suppose that we was going to sell drugs, he was going to sell

4   drugs.

5   Q    That was your supposition but he didn't say it, is that

6   right?

7   A    Right.

8   Q    Now, in connection with this, did he say something to, look,

9   I've had these guys that I've been in this organization and

10  enterprise with since 1994, basically the time you were dealing

11  with them, and when I get out, I'm just going to step back into

12  my place in this organization and everything's going to be sweet

13  for me?

14  A    Did he say that?

15  Q    Yeah.

16  A    No.

17  Q    He didn't say anything like that, did he?

18  A    No.

19  Q    The impression you got was that he didn't know what he was

20  going to do precisely, is that right?

21  A    Right.

22  Q    Okay.  May I just have a moment, Your Honor?

23          THE COURT:  Yes.

24          MR. CROWE:  Thank you.  That's all that I have.

25          THE COURT:  Mr. Coburn, we really need to break.

1          MR. COBURN:  Absolutely.  Not a problem for me to do it

2     tomorrow, Your Honor.

3          THE COURT:  Can you finish it today?  You don't think

4     you can finish today?

5          MR. COBURN:  I've got about a half hour.

6          THE COURT:  Mr. Reynolds, I understand that you've got

7     to go to work tomorrow but we're going to need you back here

8     tomorrow morning to complete your testimony.

9          Members of the jury, we will break at this time.

10    Please remember we'll start tomorrow at 11 a.m. and break on or

11    about 3:00, at or about 3:00.  I would like to try to get four

12    hours in.  We won't break for lunch.  We'll just have a brief

13    recess sometime around 1:00 and we'll try to get four hours in.

14         I trust that this will enable all of you to vote and

15    not be inconvenienced too terribly in doing so either in the

16    morning or in the evening.  But you will be out of here, I

17    promise you, by 3:00 tomorrow.

18         In the meantime, please leave your note pads on your

19    chairs, have no discussion about the case or any of the evidence

20    you've heard so far.  Continue to keep an open mind about all

21    issues.  Conduct no investigation of any sort, not online, not in

22    any books.  Do not visit any of the locations that have been

23    mentioned in the testimony.

24         Enjoy your evening.  You are excused until 11 a.m.

25    tomorrow morning.

1          (Jury exits the courtroom.)

2          THE COURT:  I'm sorry, Mr. Coburn.  I thought we might

3     be able to make it.

4          MR. COBURN:  I really appreciate it, Your Honor.  It's

5     not a problem at all.

6          THE COURT:  How are we doing, Mr. Harding?  It's Mr.

7     Harding's fault, that computer.  Not really, Mr. Harding.  How

8     are we doing?

9          MR. HARDING:  Good, Your Honor.  Going to be -- well,

10    you know, every prediction I make is premised on the assumption

11    that I have no idea what, like when Mr. Coburn got started with

12    Sergeant Ensor today, I nearly fainted.

13         THE COURT:  I understand.

14         MR. COBURN:  So did I.

15         MR. HARDING:  So I can't really say with certainty.

16    But if, if this were a just world, we'll be done on Thursday.

17         THE COURT:  Okay.  All right.  Mr. Kurland.

18         MR. KURLAND:  Just a couple of brief matters to bring

19    up.  The first, the most substantive one has to do with Mungo's

20    testimony.  And the way that I understood Mr. Harding's use --

21         THE COURT:  Let me be very clear.  I don't believe him.

22    I think he was totally incredible when he says he couldn't

23    remember.  And so this is the flip side of the Court 's ruling

24    previously.  The Court's going to admit the grand jury testimony

25    for the truth.  I don't think it's terribly prejudicial.

1   Frankly, the video absolutely corroborates that testimony.  And

2   so I'm going to admit it as substantive evidence.

3           MR. KURLAND:  Your Honor, a couple of things.

4           THE COURT:  And everybody's objection is noted and

5   preserved.

6           MR. KURLAND:  Judge, Your Honor, with respect to the

7   dual sovereignty instruction --

8           THE COURT:  I like what you submitted.  Do I have, has

9   the government responded yet?  I guess you have.

10          MR. HANLON:  We only, by way of the in-court colloquy

11  we had, Your Honor.

12          THE COURT:  Okay.  So you haven't submitted something?

13          MR. HANLON:  We haven't.  I was really planning on

14  just, whenever the Court wanted to, just commenting on Mr.

15  Kurland's as opposed to --

16          THE COURT:  Okay.  We can do that tomorrow.  But I

17  looked at what Mr. Kurland submitted this morning, I guess it was

18  this morning.

19          MR. KURLAND:  Yeah.  There were just a couple of

20  refinements.

21          Your Honor, two other quick things.  I noticed, I'm

22  just bringing this up now so we can have time to deal with them.

23  I noticed when the Spence murder exhibits were being shown,

24  they're in containers which say state exhibit blank.  So it's

25  very clear.  So at some point we need to come to some

1    accommodation.  As long as the Court's ruling is going to say

2    that that gets excised in an appropriate way.

3           THE COURT:  I appreciate that the Baltimore County case

4    is all over this one.  I appreciate that.

5           MR. KURLAND:  Judge, one other last thing is there's a

6    couple of, I want to at the appropriate time, I don't want to

7    expend money needlessly on some blow-up of some exhibits that I

8    might, that we might intend to use in closing argument.  But it's

9    nothing, you know, prejudicial or anything.  I just want at the

10   appropriate time to briefly highlight them so I can then go and

11   get them blown up.

12          THE COURT:  Okay.  Sure.  I mean, you show them to

13   government counsel, you don't have to show them to me.  If

14   government counsel have no problem or any counsel have no problem

15   with them, I'm not going to have a problem.

16          MR. KURLAND:  Well, no, I mean -- okay.  I'll deal with

17   that tomorrow morning.

18          THE COURT:  Okay.

19          MR. KURLAND:  Thank you very much, Your Honor.

20          THE COURT:  Mr. Harding?

21          MR. HARDING:  At some appropriate time, maybe not

22   tomorrow, I would like to first of all read the stipulation.

23          THE COURT:  Yes.

24          MR. HARDING:  Also, we have, Ms. Arrington and Mr.

25   Hanlon and I and the agents spent several hours on Friday going

1    through all the exhibits.

2            THE COURT:  I understand that and I appreciate it.

3            MR. HARDING:  We have several numbers that need to be

4    changed, we have to put on record so that it's clear that some

5    exhibits were admitted into evidence.  We all seem to be clear

6    that they were but Ms. Arrington's not sure it's on the record.

7            THE COURT:  Okay.

8            MR. HARDING:  And also, there are four exhibits that we

9    couldn't find.  The four arrays, photo arrays that Will

10   Montgomery was shown in which he picked out various people.  Now,

11   I have copies of these arrays but we, we'd be much better off

12   with the originals.

13           THE COURT:  All right.  If counsel could go through

14   your papers and make sure you didn't walk out with --

15           MR. HARDING:  In particular, Mr. Coburn, Your Honor.  I

16   spoke to Mr. Kurland about this.

17           THE COURT:  Yes.

18           MR. COBURN:  The minute he sort of turned in my

19   direction, I knew that was coming.

20           THE COURT:  Well, documents do have a way of

21   disappearing when they get near you, Mr. Coburn.

22           MR. COBURN:  They do.

23           THE COURT:  Not through any fault of your own.

24           All right.  I appreciate that.  And what I'm hoping,

25   Mr. Harding, that you can actually produce a, quote-unquote,

1    "final exhibit list" that actually -- this is unusual, we

2    normally wouldn't do this -- but in light of the volume of

3    exhibits, if you could just produce a final exhibit list that

4    shows every exhibit that has been admitted in the trial so that I

5    can say to the jury in my instructions, if it's not listed there,

6    ladies and gentlemen, it wasn't admitted.  It may have been

7    referred to.  You see what I'm getting at?

8              And so I hope that there will be time and I'm confident

9    there will be time for the word processor to be --

10             MR. HARDING:  Prior to jury deliberations?

11             THE COURT:  Prior to jury deliberation, yeah.  Not

12   something I want you to even think about for the next week or so.

13   All right.  Anything else?

14             MR. KURLAND:  Judge, could the government tell us who

15   for sure is going to testify tomorrow?

16             THE COURT:  Yeah.  Who have we got after Reynolds

17   tomorrow?

18             MR. HARDING:  Al Boroshok, who is a very brief witness,

19   and Rodney Hayes, Your Honor.

20             THE COURT:  Will he take, will that take the whole four

21   hours?

22             MR. HARDING:  Oh, yes.

23             THE COURT:  Oh, Hayes.

24             MR. HARDING:  Yes.

25             THE COURT:  Right.  Okay.  You still intend to call

1   Ellington?

2           MR. HARDING:  Yes.

3           THE COURT:  Do you really need him?

4           MR. HARDING:  Yes, he's very important, Your Honor.

5   Due to the arguments defense counsel are going to be making, he's

6   quite important.

7           THE COURT:  Okay.  We need to spend sometime, if we

8   have sometime tomorrow, let's talk about that.  I don't, I don't

9   think you get a drug expert in every drug case.  And I'm just not

10  sure you need one in this case.  But I'll hear you on, if there's

11  some particular discrete stuff you need.  But I'm not going to

12  let him summarize the government's case.

13          MR. HARDING:  That's not what we're going to use him

14  for.

15          THE COURT:  Well, I know that's not what you intend to

16  use him for.  In fact, this witness covered most of what

17  Ellington was going to cover or not -- I won't say most, but

18  certainly a lot of it.  So we can talk about it.

19          Thank you all very much.  We're in recess.  11:00

20  tomorrow morning.  We will break definitely by 3:00.

21          (Conclusion of Proceedings at 5:10 p.m.)

22

23

24

25

1                          INDEX

2

3                                                   PAGE

4   WITNESS: SHARI FICKLING
    DIRECT EXAMINATION BY MR. HARDING              3
5   CROSS EXAMINATION BY MR. FLANNERY              10
    CROSS EXAMINATION BY MR. COBURN                13
6
    WITNESS: DR. ANA RUBIO
7   DIRECT EXAMINATION BY MR. HARDING              14

8   WITNESS: SERGEANT MARK ENSOR
    DIRECT EXAMINATION BY MR. HANLON               60
9   CROSS EXAMINATION BY MR. COBURN (ON QUALIFICATIONS)   66
    CONT'D DIRECT EXAMINATION BY MR. HANLON        70
10  CROSS EXAMINATION BY MR. COBURN                97

11  WITNESS: KAAZIM IBN-REYNOLDS
    CROSS EXAMINATION BY MR. COBURN                109
12  REDIRECT EXAMINATION BY MR. HANLON             122

13  WITNESS: SERGEANT MARK ENSOR
    CROSS EXAMINATION BY MR. COBURN                143
14  REDIRECT EXAMINATION BY MR. HANLON             165
    RECROSS EXAMINATION BY MR. COBURN              167
15  REDIRECT EXAMINATION BY MR. HANLON             168

16  WITNESS: GREGORY MUNGO
    DIRECT EXAMINATION BY MR. HARDING              169
17  CROSS EXAMINATION BY MR. MARTIN                178

18  WITNESS: KAAZIM IBN-REYNOLDS
    DIRECT EXAMINATION BY MR. HANLON               181
19  CROSS EXAMINATION BY MR. LAWLOR                218
    CROSS EXAMINATION BY MR. CROWE                 221

20

21

22

23

24

25

<u>REPORTER'S CERTIFICATE</u>

1

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on November 3, 2008.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14          _____

            Mary M. Zajac,
15          Official Court Reporter

**$**

**$10** [2] - 208:9, 208:14
**$15,000** [1] - 208:16
**$17,000** [1] - 208:2
**$50,000** [4] - 216:20, 217:7, 217:14, 217:19

**'**

**'02** [2] - 79:4, 211:24
**'03** [8] - 110:7, 110:8, 111:3, 116:5, 117:9, 122:16, 122:18, 199:23
**'04** [1] - 9:12
**'90s** [3] - 186:16, 219:21, 219:24
**'91** [2] - 186:2, 190:14
**'92** [2] - 67:12, 190:14
**'93** [5] - 191:25, 196:18, 206:12, 206:20, 207:5
**'94** [2] - 196:18, 207:5
**'95** [5] - 199:15, 206:17, 206:20, 207:9, 212:15
**'intentionally** [1] - 135:4
**'knowingly** [1] - 135:4
**'off** [1] - 230:16
**'off-the-record'** [1] - 230:16

**0**

**027-C** [1] - 95:21
**027C** [1] - 92:13
**03** [1] - 125:16
**08012** [2] - 92:13, 95:21

**1**

**1** [1] - 109:3
**1/16th** [1] - 19:20
**10** [7] - 106:4, 106:14, 154:3, 208:2, 208:16, 241:5
**10,000** [1] - 208:1
**100** [1] - 17:3
**100%** [5] - 77:11, 77:16, 89:12, 101:6, 166:24
**101** [1] - 1:25
**109** [1] - 241:11
**10th** [1] - 137:6
**11** [2] - 234:10, 234:24
**11:00** [1] - 240:19
**11th** [2] - 92:19, 137:20
**12** [3] - 17:6, 172:6, 184:12

**122** [1] - 241:12
**12:58** [1] - 105:6
**12th** [3] - 125:24, 137:17, 172:18
**13** [3] - 17:7, 229:23, 241:5
**13th** [3] - 169:20, 170:10, 183:10
**14** [4] - 88:3, 221:13, 221:17, 241:7
**14-year-old** [1] - 231:20
**143** [1] - 241:13
**15** [12] - 44:9, 44:12, 106:4, 208:1, 208:2, 211:3, 225:10, 225:11, 225:12, 232:11, 232:12
**165** [1] - 241:14
**167** [1] - 241:14
**168** [1] - 241:15
**169** [1] - 241:16
**17** [2] - 56:8, 186:8
**17,000** [1] - 208:1
**178** [1] - 241:17
**181** [1] - 241:18
**18th** [1] - 137:21
**1980** [1] - 66:10
**1983** [3] - 66:13, 66:20, 66:23
**1988** [4] - 15:12, 66:23, 66:25, 67:7
**1990's** [1] - 199:21
**1991** [1] - 186:4
**1992** [5] - 67:7, 67:10, 67:14, 68:2, 68:3
**1993** [2] - 199:25, 221:11
**1994** [2] - 207:4, 233:10
**1995** [3] - 199:14, 206:15, 209:10
**1997** [1] - 185:18
**1:00** [1] - 234:13
**1:30** [2] - 105:17, 105:18
**1st** [1] - 125:23

**2**

**2** [7] - 93:3, 93:11, 94:5, 95:14, 96:21, 97:17, 101:15
**20** [2] - 105:22, 211:3
**2001** [1] - 132:22
**2002** [9] - 15:23, 17:17, 17:20, 78:5, 92:19, 209:12, 209:19, 211:25, 231:4
**2003** [15] - 6:19, 11:4, 109:25, 123:11, 124:25, 125:5, 125:22, 137:11,

**137:12, 183:11, 183:15,**
**185:11, 214:12, 223:14,**
**225:18**
**2004** [30] - 4:19, 4:20, 4:21, 8:20, 11:22, 109:25, 124:7, 124:13, 124:18, 125:2, 125:3, 125:4, 125:6, 125:8, 125:24, 126:17, 127:1, 137:8, 137:18, 137:20, 137:21, 138:2, 182:23, 214:4, 214:5, 214:13, 214:19, 228:10, 228:19, 230:3
**2005** [4] - 169:20, 170:10, 172:18, 176:5
**2007** [1] - 214:14
**2008** [6] - 1:11, 45:15, 47:25, 68:23, 225:21, 242:5
**2009** [1] - 242:10
**21** [3] - 42:3, 60:25, 62:22
**21201** [1] - 1:25
**218** [1] - 241:19
**221** [1] - 241:19
**22nd** [4] - 124:15, 124:18, 125:8, 138:2
**24** [1] - 230:3
**24th** [5] - 126:17, 127:1, 137:8, 137:9, 182:22
**25** [2] - 60:25, 172:6
**2731** [1] - 5:2
**28** [1] - 17:20
**28th** [1] - 17:17
**29** [1] - 3:17
**2:15** [4] - 105:7, 105:11, 106:10, 109:22
**2:30** [1] - 13:2
**2d** [1] - 47:16
**2nd** [2] - 124:13, 124:17

**3**

**3** [4] - 1:11, 172:6, 241:4, 242:5
**304373** [1] - 88:4
**3301** [1] - 86:4
**35** [2] - 53:10, 181:16
**357** [31] - 46:18, 80:25, 81:5, 81:7, 81:11, 81:13, 81:15, 81:16, 81:17, 81:18, 81:19, 81:21, 81:23, 81:24, 81:25, 82:2, 82:9, 83:24, 84:6, 84:14, 86:16, 86:19, 87:9, 88:1, 88:5, 88:7, 88:8, 90:6, 90:8, 144:4
**38** [17] - 80:25, 81:5,

**81:7, 81:12, 81:13,**
**81:14, 81:20, 81:24,**
**81:25, 82:2, 82:9, 83:19,**
**83:24, 84:6, 84:14,**
**86:16, 90:6**
**380** [5] - 81:10, 223:21, 223:23, 223:24, 224:11
**3:00** [5] - 13:2, 234:11, 234:17, 240:20
**3rd** [1] - 124:7

**4**

**4** [4] - 98:24, 101:14, 134:22, 148:16
**40** [19] - 47:2, 85:19, 86:8, 86:18, 86:24, 86:25, 87:8, 91:7, 92:9, 93:17, 94:12, 95:4, 95:5, 95:9, 144:2, 153:19, 167:22
**40's** [1] - 152:18

**5**

**50,000** [4] - 119:25, 216:18, 217:21
**500** [2] - 209:2, 209:3
**54-C** [1] - 78:14
**5515** [1] - 1:24
**5:10** [1] - 240:21
**5K1.1** [1] - 184:17

**6**

**6** [4] - 80:6, 98:24, 101:14, 148:17
**6/12** [1] - 79:4
**6/26/02** [1] - 161:2
**60** [1] - 241:8
**66** [1] - 241:9
**68** [1] - 65:22

**7**

**7** [3] - 98:24, 101:15, 148:17
**70** [1] - 241:9
**7th** [3] - 78:5, 125:22, 137:11

**8**

**80** [1] - 17:3
**83263** [1] - 132:22
**8618** [2] - 87:1, 87:6

**9**

**90** [2] - 177:15, 177:16
**9044-09** [1] - 78:25
**97** [1] - 241:10
**9:53** [1] - 2:1

**A**

**a.m** [3] - 2:1, 234:10, 234:24
**ability** [1] - 91:24
**able** [32] - 41:25, 47:5, 64:23, 75:16, 75:21, 79:7, 79:10, 79:19, 79:25, 80:24, 82:7, 84:1, 84:15, 84:17, 84:20, 85:5, 88:14, 89:13, 89:16, 90:4, 90:7, 90:10, 90:12, 90:18, 90:20, 92:15, 95:21, 107:16, 107:19, 108:2, 235:3
**abnormal** [1] - 43:4
**abouts** [1] - 186:1
**abraded** [2] - 41:2, 42:24
**abrasion** [6] - 19:19, 22:6, 28:15, 32:11, 35:23
**abrasions** [3] - 19:20, 43:1, 43:10
**absence** [5] - 36:1, 41:21, 83:2, 128:6, 135:6
**Absolutely** [5] - 121:5, 140:8, 159:24, 160:15, 234:1
**absolutely** [6] - 2:17, 58:11, 97:20, 130:5, 153:10, 236:1
**abstract** [1] - 141:17
**accept** [2] - 57:16, 231:5
**acceptable** [1] - 221:20
**accepted** [2] - 17:13, 70:10
**accidental** [2] - 73:24, 75:17
**accommodation** [1] - 237:1
**accomplish** [2] - 121:19, 122:2
**according** [6] - 101:14, 126:20, 127:6, 127:8, 163:22, 206:22
**accurate** [4] - 162:19, 165:2, 168:7, 242:8
**acknowledges** [1] - 50:3
**act** [1] - 162:17

**acted** [1] - 134:14
**action** [7] - 90:2, 91:15, 151:18, 151:21, 151:22, 152:15, 222:10
**activities** [1] - 165:20
**activity** [1] - 161:23
**actual** [6] - 63:14, 63:22, 80:13, 85:11, 98:21, 224:22
**Adam** [1] - 1:22
**add** [3] - 49:7, 49:9, 77:23
**addition** [3] - 43:4, 43:10, 61:14
**additional** [6] - 40:18, 93:6, 113:23, 118:3, 133:7, 167:3
**addressed** [2] - 124:10, 167:23
**administrative** [1] - 159:9
**administrator** [1] - 157:14
**admissible** [1] - 130:18
**admissions** [2] - 128:7, 130:18
**admit** [2] - 235:24, 236:2
**admitted** [8] - 18:21, 28:5, 142:16, 183:7, 183:10, 238:5, 239:4, 239:6
**advance** [1] - 224:12
**advantage** [2] - 194:11, 204:11
**adversarial** [1] - 49:23
**advised** [2] - 108:9, 230:14
**affixed** [1] - 242:9
**afraid** [3] - 26:11, 51:14, 53:5
**AFTE** [6] - 64:15, 68:8, 68:12, 154:9, 167:23
**afternoon** [27] - 13:1, 52:17, 52:22, 58:23, 97:14, 97:15, 105:7, 109:7, 109:8, 109:9, 109:20, 109:21, 123:2, 123:3, 125:15, 143:10, 143:16, 143:18, 169:15, 171:2, 178:12, 178:13, 181:13, 181:14, 218:19, 218:20, 221:8
**afterwards** [2] - 127:4, 147:6
**age** [1] - 221:15
**agent** [17] - 26:16, 105:15, 107:24, 127:20, 127:22, 128:11, 128:17, 130:11, 130:12, 130:14,

130:16, 134:12, 134:14, 134:16, 135:11, 163:18, 179:8
**Agent** [2] - 26:18, 140:2
**agent's** [1] - 131:14
**agents** [2] - 129:6, 237:25
**ago** [11] - 47:21, 54:15, 55:13, 55:19, 56:6, 58:14, 68:23, 180:20, 182:5, 220:12
**agree** [1] - 69:7
**agreed** [1] - 183:19
**agreement** [41] - 77:11, 77:16, 77:19, 85:6, 89:12, 89:18, 92:14, 111:17, 127:13, 136:11, 136:17, 136:19, 137:3, 137:4, 137:5, 138:18, 138:19, 138:22, 166:12, 166:24, 166:25, 182:11, 182:20, 182:22, 182:25, 183:3, 183:7, 183:16, 183:19, 184:3, 184:11, 227:3, 229:7, 229:10, 229:17, 229:23, 230:7, 230:10, 230:13, 230:14
**agrees** [1] - 184:14
**AH-1** [1] - 170:4
**ahead** [8] - 59:2, 62:17, 62:20, 105:1, 150:22, 171:25, 175:8, 181:4
**air** [2] - 31:11, 31:14
**AI** [6] - 200:11, 200:12, 200:20, 200:23, 202:4, 239:18
**al** [1] - 242:5
**albeit** [1] - 49:11
**alcohol** [7] - 27:7, 27:10, 27:13, 30:23, 34:11, 38:10, 43:17
**Alcohol** [1] - 156:7
**alert** [2] - 39:11, 142:15
**alive** [1] - 40:5
**allege** [1] - 128:20
**alleged** [1] - 139:21
**allegedly** [1] - 133:9
**Allegheny** [3] - 54:22, 57:21, 57:22
**allow** [4] - 57:5, 81:20, 103:9, 105:23
**allowed** [4] - 128:5, 131:16, 133:17, 211:17
**allows** [1] - 73:21
**alloy** [2] - 81:3, 83:22
**alluded** [1] - 66:25
**almost** [4] - 25:2, 34:2, 135:12, 137:11
**alone** [3] - 113:5, 113:7, 138:23

**altercation** [1] - 52:12
**Ambo** [1] - 108:19
**AMD-04-029** [2] - 1:6, 242:5
**Amendment** [5] - 129:8, 129:23, 134:25, 135:3, 139:14
**America** [2] - 210:18, 232:14
**AMERICA** [1] - 1:5
**ammunition** [13] - 20:17, 62:5, 62:9, 62:12, 70:17, 70:21, 71:3, 74:18, 74:19, 75:18, 76:14, 89:4, 91:9
**amount** [2] - 30:17, 85:6, 89:17
**Ana** [2] - 14:15, 14:20
**ANA** [3] - 14:16, 14:20, 241:6
**Analysis** [1] - 162:7
**analysis** [4] - 50:11, 78:8, 79:22, 85:15
**anatomic** [3] - 15:15, 23:20, 35:13
**Andre** [10] - 1:13, 4:7, 4:14, 4:16, 4:17, 5:7, 6:20, 7:4, 9:7, 9:9
**Andrew** [4] - 115:8, 122:11, 183:1, 223:3
**Andy** [1] - 123:20
**Angeles** [1] - 167:19
**angle** [1] - 33:1
**Anne** [1] - 166:3
**Answer** [6] - 173:8, 173:15, 175:11, 175:15, 175:18, 175:22
**answer** [14] - 10:17, 24:24, 49:13, 50:18, 68:17, 115:21, 117:19, 129:21, 131:17, 161:17, 172:25, 173:7, 176:23, 177:3, 177:8, 177:22, 178:6, 198:17, 199:7, 204:6, 210:25, 213:18, 216:17, 222:22
**answered** [1] - 173:4
**answering** [1] - 176:11
**answers** [1] - 117:25
**Anthony** [4] - 34:23, 35:1, 38:8, 38:11
**anticipated** [1] - 152:7
**anticipating** [1] - 118:10
**anyhow** [1] - 82:20
**anyway** [2] - 142:12, 177:6
**apart** [1] - 79:18
**apartment** [3] - 9:11, 216:24, 217:7

**Apartment** [2] - 216:22, 216:23
**aperture** [8] - 94:18, 96:5, 99:15, 100:14, 100:20, 100:22, 102:3, 151:15
**aperture's** [1] - 101:3
**apertures** [1] - 100:24
**apologize** [10] - 26:21, 46:12, 59:17, 80:10, 91:7, 104:19, 124:18, 133:12, 148:10, 214:16
**apparent** [2] - 77:18
**appear** [3] - 43:25, 65:18, 137:22
**appearance** [5] - 125:23, 137:17, 137:19, 137:21, 183:25
**appearances** [1] - 138:17
**Appearances** [1] - 1:15
**apples** [1] - 158:5
**apply** [2] - 45:24, 77:7
**appointment** [2] - 10:6, 137:20
**appreciate** [10] - 45:13, 139:4, 139:6, 143:8, 148:10, 235:4, 237:3, 237:4, 238:2, 238:24
**approach** [8] - 72:1, 78:14, 80:7, 86:5, 87:15, 93:3, 104:11, 202:18
**approached** [1] - 202:17
**appropriate** [10] - 26:14, 26:23, 49:25, 69:24, 148:6, 182:8, 237:2, 237:6, 237:10, 237:21
**approve** [1] - 222:14
**approved** [1] - 222:11
**approximate** [1] - 82:17
**approximation** [1] - 186:9
**archives** [1] - 91:23
**area** [37] - 7:9, 7:11, 11:15, 11:17, 11:20, 12:2, 12:9, 16:18, 17:9, 29:23, 32:12, 32:21, 35:12, 36:9, 37:16, 42:9, 65:24, 77:2, 77:22, 82:16, 85:1, 94:15, 96:3, 100:5, 100:6, 100:8, 101:16, 121:21, 121:23, 132:14, 159:12, 159:13, 181:19, 194:10, 209:20
**areas** [5] - 16:19, 71:20, 77:23, 90:19, 102:11
**argue** [1] - 55:25
**argued** [1] - 139:20

**arguing** [1] - 128:3
**argument** [5] - 52:13, 106:15, 142:15, 142:18, 237:8
**arguments** [1] - 240:5
**arises** [1] - 139:19
**arising** [1] - 50:5
**arm** [6] - 37:17, 37:23, 40:21, 40:23, 41:3, 43:11
**armed** [1] - 224:14
**armpit** [1] - 39:15
**arranged** [1] - 111:5
**arrays** [3] - 238:9, 238:11
**arrest** [4] - 58:17, 111:2, 137:14, 214:12
**arrested** [12] - 58:23, 110:1, 110:4, 110:8, 125:5, 127:24, 137:12, 137:13, 183:14, 225:18, 227:21, 227:24
**Arrington** [2] - 171:3, 237:24
**Arrington's** [1] - 238:6
**arrived** [1] - 40:9
**arrow** [1] - 160:18
**artery** [1] - 28:22
**article** [1] - 167:14
**articles** [2] - 16:17, 16:18
**Arundel** [1] - 166:3
**aside** [3] - 14:2, 43:20, 197:22
**aspirate** [1] - 39:19
**assert** [1] - 128:22
**assessment** [1] - 161:14
**assigned** [1] - 63:5
**assistance** [3] - 25:17, 184:15, 227:6
**Assistant** [1] - 15:1
**associate** [1] - 220:2
**associated** [11] - 23:3, 28:23, 29:15, 36:16, 37:10, 42:11, 68:4, 90:15, 146:20, 147:15, 149:9
**Associated** [1] - 24:9
**associating** [1] - 79:20
**Association** [4] - 63:12, 64:14, 68:5, 68:11
**association** [1] - 92:12
**associations** [2] - 64:11, 91:25
**assume** [10] - 23:1, 24:5, 36:19, 37:12, 41:18, 105:20, 137:14, 142:25, 148:24, 213:14
**assuming** [2] - 106:13, 156:25

**assumption** [4] - 163:11, 163:14, 213:16, 235:10
**assumptions** [3] - 162:12, 162:14, 162:20
**assure** [1] - 54:19
**ATF** [1] - 68:5
**atrium** [3] - 41:6, 41:7, 41:19
**atriums** [1] - 41:8
**attachment** [2] - 108:17, 135:2
**attack** [1] - 50:7
**attempt** [1] - 93:22
**attended** [4] - 26:10, 63:16, 115:6, 122:21
**attention** [13] - 6:19, 8:20, 9:15, 17:17, 23:16, 34:19, 41:22, 53:23, 104:17, 169:20, 170:10, 172:4
**attorney** [8] - 123:21, 124:1, 124:10, 125:7, 125:8, 182:12, 183:1, 229:25
**Attorney** [1] - 49:24
**Attorney's** [4] - 55:21, 57:10, 182:13, 184:13
**attorneys** [2] - 11:1, 107:13
**attributed** [1] - 75:23
**authorization** [1] - 57:1
**authorize** [2] - 56:13, 57:3
**authorized** [4] - 56:8, 56:11, 56:23, 56:24
**Automatic** [1] - 223:25
**automatically** [1] - 86:12
**automobile** [2] - 21:1, 34:5
**automobiles** [1] - 43:22
**autopsies** [1] - 18:4
**autopsy** [17] - 17:18, 17:21, 18:9, 18:20, 18:23, 19:2, 22:19, 27:5, 31:16, 33:18, 36:11, 37:11, 38:17, 41:12, 41:16, 42:14, 42:22
**available** [4] - 2:8, 21:13, 26:12, 123:17
**Avenue** [3] - 5:2, 6:21, 11:3
**average** [4] - 207:23, 207:25, 208:21, 209:1
**Average** [2] - 209:5, 209:6
**avoid** [1] - 48:8
**awaiting** [3] - 184:5, 184:8, 214:5

**aware** [19] - 9:11, 13:14, 13:15, 20:25, 21:3, 26:7, 31:11, 31:13, 31:14, 68:21, 69:1, 123:23, 156:17, 166:2, 166:6, 166:7, 167:8, 169:24, 222:2
**awkward** [1] - 50:1
**axilla** [3] - 39:15, 40:21, 40:23

# B

**B-E-T-A** [1] - 168:5
**backed** [1] - 199:4
**background** [4] - 15:7, 61:14, 106:25, 185:12
**backward** [2] - 145:9, 151:4
**bag** [2] - 78:21, 80:16
**bagged** [1] - 104:20
**baggie** [2] - 208:5, 208:7
**baggies** [1] - 208:12
**bags** [5] - 31:11, 31:14, 40:1, 204:9, 204:10
**bail** [2] - 130:14, 136:12
**balcony** [1] - 78:22
**ball** [1] - 23:24
**ballistics** [11] - 50:6, 50:16, 51:5, 51:21, 52:23, 69:2, 69:8, 161:6, 161:10, 164:18, 164:22
**balloon** [1] - 102:22
**ballooned** [1] - 103:2
**Baltimore** [68] - 1:12, 1:25, 3:20, 5:4, 5:5, 17:7, 32:1, 60:20, 60:23, 60:24, 63:24, 65:15, 65:17, 66:12, 66:19, 66:22, 78:24, 92:12, 92:15, 92:23, 92:24, 95:2, 95:20, 96:25, 97:1, 98:1, 98:2, 98:25, 99:2, 99:5, 103:20, 116:22, 121:21, 121:23, 137:14, 144:20, 144:21, 147:4, 147:6, 147:8, 148:24, 148:25, 149:5, 149:7, 149:16, 149:19, 157:8, 160:22, 161:3, 165:21, 166:3, 168:20, 168:22, 181:18, 181:19, 183:12, 200:15, 209:19, 214:17, 224:13, 224:14, 237:3
**bar** [4] - 130:15, 130:16, 173:19, 214:3
**barely** [1] - 96:15
**barrel** [33] - 19:23,

20:18, 71:15, 71:19, 72:21, 74:11, 74:12, 81:2, 82:14, 83:20, 84:22, 88:6, 88:16, 89:19, 90:16, 90:17, 90:21, 96:1, 96:5, 96:6, 102:23, 102:24, 145:2, 145:3, 151:18, 152:3, 152:4, 152:5, 152:7, 154:3, 164:1, 164:6, 164:14
**barrels** [4] - 87:8, 154:6, 154:10, 154:18
**Barry** [4] - 1:22, 109:22
**base** [7] - 32:15, 82:10, 82:11, 82:13, 96:10, 96:11, 167:18
**based** [6] - 50:11, 81:4, 120:25, 127:25, 166:22, 167:9
**basic** [1] - 94:10
**basics** [1] - 87:23
**basing** [1] - 167:15
**basis** [6] - 129:3, 138:8, 139:13, 159:10, 162:24, 213:16
**bat** [2] - 94:11, 219:15
**bear** [1] - 93:18
**bearing** [2] - 54:1, 82:13
**beat** [1] - 176:17
**became** [7] - 66:19, 67:2, 67:9, 67:11, 78:3, 117:5, 230:25
**become** [2] - 108:15, 201:6, 231:9
**bedroom** [1] - 87:1
**beef** [9] - 198:4, 198:6, 198:14, 198:18, 199:2, 199:5, 199:8, 199:10
**began** [7] - 67:11, 67:13, 68:3, 187:15, 189:6, 189:12, 190:8
**begin** [3] - 70:16, 96:5, 211:17
**beginning** [2] - 165:11, 174:15
**begins** [3] - 72:5, 102:9, 102:22
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [1] - 138:10
**behind** [5] - 86:4, 87:18, 101:17, 152:1, 198:24
**believes** [1] - 58:22
**belong** [3] - 9:5, 9:7, 149:8
**belongings** [5] - 11:9, 11:11, 11:13, 11:14, 12:9

**below** [5] - 29:20, 33:7, 37:4, 37:5, 40:24
**bench** [2] - 176:12, 176:14
**benefit** [2] - 49:23, 61:18
**best** [10] - 26:18, 49:16, 94:2, 110:23, 117:7, 132:7, 141:4, 142:9, 154:15, 231:10
**Best** [1] - 189:24
**Beta** [3] - 167:19, 167:25, 168:1
**Beth** [3] - 111:8, 115:7, 126:24
**better** [10] - 41:3, 45:14, 46:1, 97:22, 141:7, 159:23, 160:1, 174:12, 232:1, 238:11
**between** [29] - 5:16, 7:9, 8:15, 11:15, 17:3, 66:15, 76:17, 76:18, 82:1, 82:22, 84:1, 84:10, 86:8, 87:21, 88:7, 88:13, 90:7, 90:12, 101:14, 112:25, 113:12, 116:8, 125:4, 129:25, 130:22, 144:16, 160:21, 168:19, 193:13
**beyond** [3] - 43:6, 43:7, 69:19
**biding** [1] - 220:21
**bifurcations** [1] - 158:7
**big** [5] - 28:21, 143:7, 157:21, 194:25, 195:1
**bigger** [3] - 144:4, 175:21, 203:11
**birthday** [1] - 143:2
**bit** [19] - 19:25, 33:16, 38:18, 61:10, 62:20, 62:21, 66:7, 78:18, 82:12, 83:17, 159:6, 160:1, 171:1, 185:11, 185:12, 190:8, 203:14, 207:11
**black** [3] - 9:16, 9:20, 148:22
**blame** [1] - 3:8
**blank** [3] - 47:19, 47:20, 236:24
**bleeding** [4] - 23:14, 28:23, 40:4, 41:9
**blind** [3] - 64:1, 64:2, 64:3
**blinds** [1] - 161:24
**block** [13] - 24:21, 132:9, 176:20, 178:14, 178:20, 178:22, 179:4, 179:11, 179:22, 179:23, 179:24, 179:25, 180:9

**blood** [7] - 27:5, 29:16, 39:19, 40:1, 40:5, 41:10, 42:3
**blow** [3] - 102:21, 157:21, 237:7
**blow-up** [2] - 157:21, 237:7
**blown** [1] - 237:11
**blunt** [1] - 40:19
**Bo** [6] - 8:13, 8:15, 8:18, 219:25, 228:5, 228:9
**body** [8] - 19:10, 23:20, 23:21, 24:5, 25:3, 27:5, 32:21, 33:5
**boils** [1] - 183:10
**bone** [3] - 32:18, 36:10, 42:13
**bones** [5] - 20:1, 22:11, 24:7, 28:19, 36:8
**Bonita** [1] - 203:18
**books** [1] - 234:22
**border** [1] - 91:9
**bore** [2] - 82:17, 86:18
**born** [1] - 181:24
**Boroshok** [2] - 239:18
**bottle** [2] - 71:13, 71:16
**bottom** [7] - 22:13, 35:22, 48:12, 48:13, 99:23, 157:25, 230:5
**bought** [1] - 203:7
**box** [4] - 86:3, 87:17, 149:3, 149:4
**boyfriend** [4] - 4:10, 4:11, 5:7
**brain** [10] - 20:2, 22:14, 22:16, 22:17, 22:24, 23:12, 32:20, 32:21, 36:6
**Bramble** [2] - 87:1, 87:6
**breadth** [1] - 158:16
**break** [12] - 53:2, 105:3, 105:6, 150:4, 170:12, 171:2, 180:22, 233:25, 234:9, 234:10, 234:12, 240:20
**Breaking** [1] - 105:4
**breast** [1] - 39:21
**breath** [1] - 120:18
**breathing** [3] - 39:11, 39:16
**breech** [13] - 94:20, 96:2, 96:4, 100:14, 100:25, 102:1, 102:7, 102:9, 102:25, 103:3, 151:1, 156:14, 163:17
**brief** [7] - 2:15, 106:15, 173:19, 226:1, 234:12, 235:18, 239:18
**Briefly** [1] - 209:15
**briefly** [11] - 39:1, 67:1,

76:12, 109:8, 123:2,
139:24, 165:10, 167:5,
168:17, 214:11, 237:10
  **bring** [18] - 41:25, 52:7,
57:22, 59:6, 77:2, 80:13,
95:21, 106:1, 106:10,
139:25, 147:1, 161:23,
181:4, 187:22, 191:6,
193:16, 214:4, 235:18
  **bringing** [5] - 11:12,
202:6, 205:11, 221:16,
236:22
  **broach** [1] - 101:23
  **broke** [1] - 172:2
  **broken** [1] - 79:18
  **brooms** [1] - 12:2
  **brother** [4] - 200:9,
200:21, 202:4, 202:7
  **brother's** [1] - 200:10
  **brought** [24] - 11:8,
38:23, 53:2, 53:23,
57:19, 58:17, 58:25,
62:11, 70:19, 148:20,
171:14, 171:16, 171:18,
171:19, 174:4, 174:20,
179:23, 179:24, 179:25,
180:5, 205:23, 205:24,
206:10, 217:10
  **Brown** [11] - 17:19,
17:21, 18:20, 19:4,
19:15, 20:25, 28:7, 31:2,
31:6, 31:9, 32:5
  **brown** [1] - 78:20
  **Brown's** [1] - 27:20
  **brownish** [1] - 80:16
  **bruises** [1] - 43:2
  **bruising** [1] - 42:24
  **Brush** [2] - 86:4, 87:18
  **Bucks** [1] - 17:4
  **buddies** [3] - 215:3,
230:25, 231:9
  **buddy** [4] - 215:2,
228:22, 228:25, 229:6
  **build** [1] - 102:20
  **building** [4] - 164:12,
169:21, 170:1, 170:12
  **builds** [1] - 71:12
  **built** [1] - 151:13
  **bullet** [81] - 20:22,
21:19, 22:10, 22:23,
23:5, 23:12, 23:13, 24:6,
24:23, 28:24, 29:25,
30:11, 33:3, 33:6, 33:18,
34:15, 36:16, 37:10,
38:5, 40:22, 41:14,
42:12, 42:14, 61:21,
62:7, 62:9, 67:19, 67:20,
67:21, 70:20, 70:22,
70:25, 71:14, 71:19,
71:24, 72:12, 72:21,

72:23, 74:23, 75:7, 75:8,
75:9, 75:16, 76:2, 76:3,
76:13, 76:18, 77:8, 77:9,
79:11, 79:15, 80:25,
81:3, 81:13, 81:15,
81:16, 82:11, 82:14,
82:18, 82:21, 83:12,
83:21, 90:7, 94:21, 96:1,
144:6, 145:3, 145:13,
145:15, 146:1, 146:2,
146:5, 146:12, 146:13,
153:3, 155:4, 162:18,
164:15
  **bullets** [43] - 25:6, 25:9,
25:11, 25:12, 41:16,
61:25, 65:2, 73:18,
73:22, 76:18, 78:9,
78:12, 82:19, 84:1, 84:5,
84:14, 84:21, 84:22,
84:25, 85:4, 85:9, 85:12,
86:13, 87:4, 88:13,
88:14, 88:18, 89:6, 89:8,
89:10, 89:16, 90:5,
90:23, 91:4, 98:5, 98:8,
98:21, 144:9, 154:17,
155:3, 165:14, 166:21
  **Bullets** [1] - 79:11
  **bunch** [1] - 153:3
  **Bureau** [1] - 156:6
  **burgundy** [5] - 170:18,
170:21, 173:3, 175:10,
175:21
  **burn** [1] - 71:11
  **burns** [1] - 71:11
  **business** [22] - 186:21,
187:15, 189:7, 189:9,
189:13, 189:15, 189:25,
190:9, 191:12, 191:13,
192:2, 195:10, 196:2,
198:24, 204:22, 204:23,
204:25, 205:12, 205:17,
213:17, 231:19
  **busted** [1] - 223:14
  **buy** [5] - 187:25, 188:1,
196:22, 203:19, 204:15
  **buys** [1] - 133:22
  **BY** [52] - 3:13, 10:23,
13:11, 14:22, 17:16,
26:24, 60:16, 62:18,
66:4, 68:20, 70:13,
97:13, 109:19, 121:9,
123:1, 143:15, 148:12,
162:4, 165:9, 167:7,
168:16, 169:14, 169:19,
171:10, 172:10, 173:25,
175:4, 178:11, 181:12,
199:9, 218:18, 221:7,
225:8, 241:4, 241:5,
241:5, 241:7, 241:8,
241:9, 241:9, 241:10,

241:11, 241:12, 241:13,
241:14, 241:14, 241:15,
241:16, 241:17, 241:18,
241:19, 241:19

## C

  **calculate** [1] - 82:23
  **caliber** [35] - 42:13,
47:2, 75:3, 80:25, 81:5,
81:8, 81:10, 81:12,
81:13, 82:8, 82:24, 83:4,
83:19, 85:20, 86:9,
86:18, 86:21, 86:24,
86:25, 87:8, 87:25, 88:1,
88:5, 90:6, 90:11, 91:7,
92:9, 93:17, 94:12, 95:4,
95:5, 95:9, 144:2
  **camera** [1] - 169:24
  **camp** [2] - 201:7
  **Candidly** [1] - 107:4
  **cannelure** [1] - 83:4
  **cannot** [3] - 24:5, 59:25,
131:25
  **canters** [1] - 152:5
  **cap** [2] - 208:4, 208:7
  **capable** [3] - 50:4, 90:1,
91:15
  **capacity** [1] - 205:17
  **caps** [2] - 208:11,
208:25
  **capsule** [1] - 204:15
  **capsules** [2] - 204:9,
204:10
  **car** [3] - 31:11, 31:13,
187:12
  **Card** [24] - 188:5, 189:4,
189:7, 189:13, 189:20,
189:21, 190:7, 190:12,
190:16, 190:20, 191:13,
191:21, 195:6, 196:5,
196:11, 197:22, 198:13,
198:19, 199:12, 203:7,
218:21, 220:2, 220:23
  **care** [2] - 54:8, 196:25
  **career** [2] - 64:23,
165:14
  **Carlos** [2] - 173:18,
173:24
  **carried** [3] - 43:25,
191:12, 191:13
  **carries** [1] - 184:12
  **carry** [1] - 187:15
  **Carter** [1] - 134:24
  **Carter's** [1] - 132:21
  **cartons** [1] - 7:21
  **cartridge** [86] - 46:16,
47:3, 61:22, 61:25,
70:22, 70:24, 71:1, 71:3,

71:7, 71:14, 71:21,
71:23, 72:23, 73:2, 73:4,
73:6, 73:11, 73:14,
73:16, 73:18, 73:22,
74:13, 74:16, 74:23,
75:7, 75:9, 75:15, 76:18,
77:9, 78:12, 81:16,
81:17, 81:18, 81:19,
81:21, 89:6, 91:22, 92:9,
93:7, 93:13, 93:17, 94:4,
94:6, 94:22, 96:3, 97:25,
98:4, 98:8, 98:9, 98:10,
98:23, 99:20, 101:21,
145:1, 145:4, 145:11,
145:16, 145:23, 146:1,
146:16, 147:21, 148:19,
148:24, 148:25, 149:1,
149:10, 149:15, 149:20,
149:23, 150:8, 150:11,
151:3, 151:4, 151:13,
152:1, 152:8, 155:4,
157:25, 160:22, 160:23,
161:3
  **cartridges** [17] - 46:20,
64:24, 95:4, 95:9, 95:10,
95:13, 144:15, 144:17,
144:24, 146:7, 146:21,
147:12, 147:23, 149:12,
165:14, 166:21, 168:20
  **CASE** [1] - 1:6
  **case** [127] - 21:12, 22:5,
22:16, 24:5, 26:10,
27:11, 36:2, 43:6, 44:11,
46:7, 46:17, 47:3, 61:22,
63:14, 63:22, 64:4, 71:3,
71:21, 71:24, 72:6, 72:7,
72:8, 72:9, 72:23, 73:5,
73:10, 73:12, 73:14,
74:13, 74:16, 74:23,
75:15, 78:3, 82:4, 83:13,
85:23, 86:11, 87:14,
90:23, 92:9, 92:12,
92:17, 92:20, 92:23,
95:2, 95:6, 95:13, 95:16,
95:20, 95:21, 95:25,
96:3, 96:25, 98:2, 99:5,
99:20, 101:21, 105:9,
110:2, 116:20, 123:13,
125:7, 125:15, 125:17,
125:22, 126:10, 126:14,
126:24, 126:25, 127:21,
127:24, 129:11, 132:1,
132:9, 132:10, 132:14,
132:17, 134:1, 134:6,
134:10, 134:11, 134:16,
135:7, 138:25, 141:8,
141:9, 142:11, 145:4,
146:6, 147:9, 148:19,
148:24, 148:25, 149:1,
149:5, 149:6, 149:8,
149:16, 149:18, 150:8,

151:3, 151:4, 151:13,
151:22, 152:8, 160:22,
160:23, 161:25, 166:7,
166:20, 168:19, 185:5,
185:10, 221:25, 222:8,
222:15, 228:15, 231:3,
234:19, 237:3, 240:9,
240:10, 240:12
  **Case** [1] - 242:5
  **cases** [27] - 27:9, 65:4,
89:6, 91:22, 93:7, 93:17,
95:10, 98:4, 98:9,
127:21, 127:25, 129:21,
130:4, 130:5, 130:8,
130:11, 132:3, 133:9,
134:5, 134:7, 137:13,
147:22, 149:1, 149:10,
149:15, 149:20, 149:23,
161:3
  **casing** [19] - 67:19,
67:21, 69:13, 71:1,
72:24, 73:2, 73:11, 75:7,
75:9, 99:24, 100:8,
145:11, 146:18, 162:17,
164:3, 164:7, 164:8
  **casings** [26] - 46:16,
47:3, 61:25, 65:2, 73:7,
73:18, 73:22, 76:18,
92:10, 93:7, 93:13, 94:4,
94:6, 94:10, 94:22,
96:21, 97:1, 97:25, 98:8,
98:10, 98:23, 99:23,
143:19, 143:22, 149:7
  **Casual** [2] - 116:10,
116:11
  **casual** [5] - 117:11,
119:4, 131:10, 201:4,
211:8
  **catheters** [1] - 39:17
  **caught** [5] - 116:22,
119:6, 119:21, 120:14
  **caused** [7] - 23:14,
31:10, 162:16, 163:3,
163:8, 163:22, 215:7
  **causes** [3] - 71:10,
151:14, 152:11
  **causing** [2] - 146:4,
153:4
  **caution** [1] - 160:6
  **cautionary** [1] - 140:23
  **caveat** [1] - 51:20
  **cavity** [5] - 20:2, 22:19,
30:1, 37:24, 41:5
  **CC** [1] - 92:13
  **CD** [2] - 6:16, 6:17
  **CD's** [1] - 6:14
  **cease** [1] - 215:7
  **cell** [48] - 115:24,
115:25, 116:6, 116:9,
117:3, 117:5, 118:5,

119:4, 123:25, 128:24, 130:23, 135:23, 138:3, 169:21, 169:25, 170:11, 171:11, 171:12, 171:15, 171:18, 171:20, 174:4, 174:10, 174:13, 176:20, 178:14, 178:19, 178:22, 179:4, 179:10, 179:22, 179:23, 179:24, 179:25, 180:9, 215:2, 215:3, 215:7, 215:16, 228:21, 228:25, 229:3, 229:6, 230:25, 231:9

**center** [14] - 24:14, 24:15, 29:21, 35:5, 35:15, 37:5, 96:16, 96:17, 146:1, 148:18, 148:21, 149:2, 159:11, 159:13

**cerebellum** [1] - 22:16

**cerebrum** [1] - 22:17

**Certain** [1] - 98:10

**certain** [8] - 10:13, 12:9, 111:24, 113:4, 130:5, 135:12, 156:23, 167:16

**Certainly** [4] - 26:22, 103:25, 165:4

**certainly** [15] - 51:5, 59:7, 78:19, 85:24, 97:8, 106:17, 108:4, 108:5, 137:11, 142:13, 155:16, 181:2, 231:25, 240:18

**certainty** [18] - 50:10, 50:14, 50:16, 50:23, 51:1, 51:6, 51:17, 51:21, 51:22, 51:23, 69:14, 70:5, 84:18, 87:11, 88:22, 235:15

**CERTIFICATE** [1] - 242:1

**certifications** [1] - 64:10

**certified** [1] - 154:11

**certify** [2] - 242:3, 242:6

**cervical** [3] - 32:17, 32:19, 33:23

**chairs** [3] - 44:10, 105:8, 234:19

**challenging** [1] - 199:3

**chamber** [2] - 73:16, 81:21

**chambering** [1] - 94:13

**chambers** [1] - 41:7

**champagne** [2] - 71:13, 71:16

**chance** [2] - 55:25, 106:1

**chances** [2] - 177:19, 178:3

**change** [7] - 163:10,

163:23, 163:24, 163:25, 164:2, 164:6, 182:3

**changed** [1] - 238:4

**changes** [1] - 71:11

**character** [1] - 158:16

**characteristic** [1] - 166:18

**characteristics** [48] - 73:25, 74:15, 74:17, 74:22, 75:1, 75:2, 75:4, 75:17, 75:23, 76:3, 76:6, 77:12, 77:16, 77:17, 77:18, 77:20, 77:23, 79:19, 85:3, 85:6, 89:12, 89:13, 89:15, 89:17, 92:2, 92:14, 94:10, 95:23, 95:24, 100:23, 100:24, 101:4, 101:5, 102:11, 156:10, 159:18, 163:13, 163:14, 163:20, 164:11, 164:16, 166:13, 166:15, 166:23, 166:24, 166:25

**characterization** [1] - 219:2

**charge** [16] - 61:6, 61:11, 61:15, 116:25, 145:15, 146:4, 183:5, 184:6, 184:21, 185:10, 199:15, 199:23, 211:11, 214:6, 214:14, 226:13

**charged** [5] - 110:10, 110:14, 116:23, 133:24, 138:12

**charges** [4] - 121:20, 121:22, 133:2, 199:21

**Charles** [2] - 92:13, 95:21

**Cheatham** [8] - 26:1, 26:2, 26:9, 26:16, 106:19, 107:5, 108:11

**CHEATHAM** [1] - 26:3

**check** [1] - 116:24

**checked** [1] - 54:13

**cheek** [5] - 19:17, 20:8, 20:12, 28:14, 32:14

**chemical** [1] - 208:24

**chemicals** [2] - 203:19, 203:25

**Cherry** [2] - 5:5, 8:4

**chest** [7] - 37:22, 37:23, 37:24, 39:18, 39:20, 41:5

**Chief** [4] - 15:2, 21:10, 83:13, 88:10

**children's** [2] - 4:10, 4:11

**Circle** [1] - 108:19

**circle** [2] - 146:3, 160:17

**Circuit** [4] - 65:12,

65:13, 65:14, 65:17

**circular** [2] - 19:18, 159:14

**circumstances** [7] - 45:21, 49:22, 81:10, 108:19, 131:25, 136:20, 139:17

**citation** [2] - 47:16, 47:22

**cite** [1] - 132:13

**cited** [2] - 127:21, 129:10

**citing** [1] - 134:5

**city** [3] - 93:21, 137:14, 177:17

**City** [32] - 17:7, 68:13, 92:12, 92:13, 92:15, 92:23, 92:24, 95:2, 95:20, 96:25, 97:1, 98:2, 98:25, 99:2, 99:5, 103:20, 137:14, 144:21, 147:6, 147:8, 148:25, 149:7, 149:16, 149:19, 161:3, 162:6, 166:3, 168:20, 168:22, 181:18

**City's** [1] - 160:23

**CJA** [1] - 137:20

**claim** [1] - 221:10

**clarification** [1] - 166:10

**class** [14] - 75:23, 77:11, 77:16, 80:25, 83:4, 89:11, 92:14, 100:23, 101:4, 101:5, 166:23, 166:24, 167:22

**Class** [2] - 75:23, 166:13

**clean** [1] - 12:6

**clear** [21] - 49:10, 49:19, 84:13, 87:5, 95:12, 101:12, 123:12, 128:18, 129:9, 129:10, 137:10, 138:5, 140:9, 142:1, 142:16, 147:18, 150:1, 235:21, 236:25, 238:4, 238:5

**clear-cut** [1] - 49:10

**Clearly** [1] - 132:5

**clearly** [4] - 56:24, 132:4, 132:5, 138:1

**CLERK** [6] - 3:1, 14:18, 60:11, 109:13, 169:10, 181:7

**clerk** [1] - 169:6

**client** [3] - 124:13, 136:21, 230:15

**clinical** [2] - 15:9, 15:10

**clip** [2] - 72:7, 72:10

**close** [19] - 20:14, 20:15, 22:4, 24:1, 28:16,

28:20, 29:23, 30:19, 35:5, 35:24, 37:19, 37:23, 50:24, 51:9, 128:10, 161:23, 161:24, 228:1

**closely** [2] - 129:20, 142:14

**closer** [2] - 61:10, 189:1

**closet** [3] - 9:17, 10:4, 12:14

**closing** [2] - 142:18, 237:8

**co** [1] - 58:10

**co-counsel** [1] - 58:10

**coauthored** [1] - 16:18

**COBURN** [106] - 13:11, 17:11, 44:15, 44:22, 44:25, 45:3, 45:7, 45:13, 46:3, 46:10, 47:7, 47:11, 47:14, 47:16, 47:19, 47:24, 48:1, 48:12, 48:22, 48:24, 49:3, 49:7, 49:15, 49:19, 51:2, 51:7, 51:14, 51:18, 62:13, 66:1, 66:4, 68:20, 69:21, 69:25, 70:5, 70:9, 97:13, 104:19, 104:21, 104:25, 105:4, 105:22, 106:6, 108:21, 109:19, 121:9, 125:25, 126:4, 126:8, 128:9, 128:13, 128:18, 129:9, 129:19, 129:24, 130:7, 130:9, 130:19, 130:21, 131:2, 131:5, 131:10, 131:18, 131:22, 132:2, 132:7, 132:12, 133:3, 133:5, 133:10, 133:12, 133:17, 133:21, 134:3, 135:14, 135:24, 136:23, 137:4, 137:7, 139:2, 139:7, 140:15, 143:15, 148:2, 148:4, 148:9, 148:12, 162:1, 162:4, 165:6, 167:3, 167:7, 216:16, 217:15, 234:1, 234:5, 235:4, 235:14, 238:18, 238:22, 241:5, 241:9, 241:10, 241:11, 241:13, 241:14

**Coburn** [29] - 1:22, 44:21, 45:12, 47:5, 48:21, 50:24, 69:20, 104:18, 105:19, 106:11, 109:22, 125:24, 128:3, 129:18, 132:21, 134:2, 137:10, 139:4, 139:11, 139:23, 139:25, 143:13, 159:21, 160:14, 233:25, 235:2, 235:11, 238:15, 238:21

**Coburn's** [1] - 123:11

**cocaine** [2] - 133:14, 212:21

**codefendant** [1] - 133:24

**coinciding** [1] - 102:12

**Collaborative** [1] - 63:25

**colleagues** [1] - 108:9

**collected** [1] - 63:2

**college** [1] - 15:8

**collision** [1] - 31:13

**colloquy** [1] - 236:10

**Colts** [1] - 32:1

**come-up** [1] - 58:24

**comfortable** [2] - 198:23, 202:6

**Coming** [1] - 91:1

**coming** [15] - 38:19, 39:3, 59:3, 80:22, 80:23, 128:10, 134:4, 139:12, 148:22, 192:23, 195:18, 195:19, 212:9, 212:14, 238:19

**command** [1] - 190:3

**commencement** [1] - 136:25

**comment** [2] - 141:9, 141:19, 141:22

**commenting** [1] - 236:14

**commitment** [1] - 184:13

**committed** [3] - 113:8, 216:3, 216:4

**common** [5] - 64:18, 94:14, 136:11, 167:13, 197:13

**commonly** [1] - 82:2

**communicated** [1] - 134:18

**communicates** [2] - 22:14, 32:20

**communication** [1] - 138:6

**comparable** [1] - 91:10

**compare** [14] - 67:18, 75:8, 76:3, 77:3, 79:23, 85:1, 85:5, 85:11, 85:16, 90:18, 92:1, 92:16, 95:4, 95:23

**compared** [11] - 47:1, 97:2, 98:23, 99:1, 99:4, 101:18, 156:12, 158:2, 161:2, 166:21

**comparing** [5] - 75:6, 84:14, 89:15, 95:8, 158:5

**comparison** [42] - 46:25, 50:17, 74:2, 76:20, 76:21, 76:23,

77:25, 80:1, 84:9, 85:4, 86:7, 87:21, 88:7, 88:13, 89:11, 90:5, 90:7, 90:12, 92:4, 95:22, 98:6, 98:13, 100:7, 103:7, 103:16, 103:19, 144:16, 144:21, 146:22, 147:22, 157:11, 157:16, 157:18, 157:20, 158:1, 158:3, 158:18, 159:10, 161:14, 167:9, 168:7

**comparisons** [10] - 71:17, 76:17, 77:5, 78:9, 103:13, 157:8, 160:25, 167:13, 168:19

**competent** [1] - 64:21

**complete** [3] - 16:3, 234:8, 242:8

**completed** [2] - 18:19, 63:24

**completing** [1] - 64:7

**completion** [1] - 184:9

**complex** [3] - 23:20, 40:21

**complications** [1] - 23:15

**comply** [2] - 55:20, 56:5

**complying** [1] - 55:5

**component** [2] - 62:6, 70:23

**components** [2] - 70:22, 71:2

**composed** [1] - 64:16

**comprehensive** [1] - 45:16

**comprised** [1] - 70:18

**compunctions** [1] - 221:16

**computer** [7] - 91:20, 104:13, 133:18, 147:20, 156:5, 171:4, 235:7

**computerized** [1] - 156:6

**conceded** [1] - 127:23

**concentric** [2] - 28:15, 35:23

**concern** [2] - 25:16, 194:22

**Concerned** [1] - 194:18

**concerned** [4] - 154:3, 154:23, 194:17, 194:19

**concerning** [4] - 61:21, 80:21, 83:18, 183:8

**conclude** [3] - 82:9, 90:20, 139:14

**Conclusion** [1] - 240:21

**conclusion** [10] - 45:8, 45:21, 84:20, 88:21, 88:25, 90:11, 94:9, 95:16, 96:20, 167:18

**conclusions** [19] - 45:18, 45:22, 69:1, 69:2, 79:7, 79:10, 83:17, 83:23, 84:8, 84:9, 84:13, 86:14, 87:10, 88:12, 95:8, 97:7, 97:8, 154:17, 162:24

**condition** [1] - 89:2

**conditions** [1] - 77:4, 230:18

**Conduct** [1] - 234:21

**conduct** [2] - 86:25, 92:8

**conducted** [1] - 83:25

**conferred** [1] - 56:6

**confidence** [1] - 198:21

**confident** [1] - 239:8

**confirming** [1] - 89:22

**conflicted** [1] - 168:12

**connect** [1] - 196:11

**connected** [2] - 4:1, 6:8

**connection** [1] - 4:4, 4:7, 5:16, 8:15, 27:1, 41:10, 65:4, 68:12, 143:24, 230:17, 233:8

**conscious** [2] - 39:12, 40:9

**consecutively** [2] - 154:5, 154:10

**consideration** [3] - 86:12, 100:12, 142:5

**considered** [5] - 64:21, 85:2, 101:4, 141:23, 228:1

**consisted** [2] - 78:11, 92:23

**consistencies** [2] - 91:24, 166:15

**Consistent** [1] - 52:16

**consistent** [27] - 21:16, 23:5, 24:16, 24:18, 24:21, 25:1, 29:8, 30:6, 30:8, 30:10, 31:3, 31:5, 34:5, 42:6, 43:8, 43:13, 43:15, 88:3, 93:18, 100:22, 101:1, 101:3, 101:6, 132:15, 156:10, 158:16, 232:20

**consists** [1] - 151:22

**conspiracy** [2] - 133:2, 136:17

**constantly** [1] - 58:5

**constitute** [1] - 242:6

**constitutes** [3] - 64:19, 129:22, 138:24

**consultation** [2] - 182:12, 182:25

**CONT'D** [1] - 241:9

**contact** [1] - 123:24

**contacts** [1] - 106:12

**contained** [2] - 80:16, 145:16

**container** [1] - 71:4

**containers** [2] - 7:19, 236:24

**contains** [1] - 151:25

**contents** [2] - 27:7, 83:9

**contingent** [1] - 227:13

**continue** [5] - 2:20, 60:5, 74:20, 118:20, 143:12

**Continue** [1] - 44:11, 105:9, 234:20

**continued** [1] - 221:1

**CONTINUED** [1] - 70:12

**continues** [1] - 152:6

**continuing** [2] - 113:14, 113:16

**contours** [3] - 158:15, 162:15

**contract** [1] - 91:21

**contradicting** [1] - 129:21

**contrary** [1] - 131:8

**control** [1] - 63:18

**controls** [2] - 32:22

**contusions** [3] - 42:23, 42:24, 42:25

**conversation** [23] - 116:8, 116:10, 116:11, 117:2, 117:10, 117:11, 117:14, 119:4, 127:3, 129:25, 130:17, 130:22, 131:10, 131:11, 131:15, 133:1, 133:13, 133:15, 133:16, 141:2, 210:17, 228:21

**conversations** [1] - 209:16

**convey** [2] - 108:22, 127:17

**convicted** [2] - 3:24, 224:8

**conviction** [1] - 214:13

**convincingly** [1] - 48:23

**cooperate** [7] - 53:4, 118:20, 122:4, 127:1, 127:9, 138:16, 183:20

**cooperates** [2] - 135:25, 136:1

**cooperating** [11] - 113:17, 114:7, 114:8, 117:20, 126:20, 127:14, 127:17, 128:16, 130:1, 135:15, 223:3

**cooperation** [9] - 110:2, 136:17, 136:19, 136:25, 137:1, 138:18, 138:22,

184:9, 185:8

**cooperator** [2] - 128:4, 130:2

**cooperator's** [1] - 129:13

**copies** [5] - 46:10, 55:3, 55:7, 55:8, 238:11

**copper** [2] - 81:3, 83:21

**copy** [9] - 18:22, 18:25, 47:8, 47:9, 55:2, 56:1, 132:17, 133:20, 229:23

**cord** [6] - 22:14, 32:19, 32:25, 33:23, 33:24

**core** [1] - 79:13

**cores** [1] - 79:14

**cork** [1] - 71:15

**Corner** [1] - 202:13

**cornrows** [1] - 35:25

**Corporal** [3] - 46:15, 47:1, 59:12

**correct** [163] - 11:4, 11:12, 12:21, 14:1, 21:7, 21:20, 21:21, 21:22, 22:24, 23:2, 23:18, 26:6, 29:3, 29:4, 29:11, 31:19, 31:24, 34:21, 34:22, 37:12, 38:6, 38:20, 38:21, 40:13, 40:14, 41:20, 43:11, 43:12, 45:5, 45:6, 46:9, 55:18, 57:12, 62:1, 66:20, 66:23, 67:5, 67:7, 67:10, 67:14, 69:12, 69:15, 69:17, 72:18, 72:19, 73:4, 73:9, 75:5, 78:6, 78:7, 78:22, 78:23, 79:1, 80:24, 81:6, 81:13, 82:2, 82:3, 82:5, 82:6, 83:14, 84:11, 85:13, 86:2, 86:22, 86:23, 87:19, 87:20, 89:23, 90:3, 92:20, 92:24, 93:9, 94:25, 98:3, 98:17, 99:11, 101:10, 103:5, 117:25, 118:22, 122:5, 123:4, 123:14, 124:7, 124:13, 124:20, 124:24, 125:5, 125:9, 126:3, 134:21, 143:21, 143:25, 144:1, 144:12, 144:14, 144:22, 146:11, 146:15, 150:8, 150:9, 150:13, 150:18, 151:2, 151:17, 151:20, 152:10, 152:24, 153:6, 153:14, 153:20, 154:17, 155:2, 155:11, 157:10, 158:17, 161:6, 161:10, 161:14, 162:12, 162:13, 164:1, 164:4, 164:9, 164:18, 164:20,

164:22, 164:24, 165:22, 168:6, 168:23, 168:24, 170:8, 177:11, 181:22, 182:9, 183:14, 184:23, 186:9, 187:19, 191:10, 192:7, 193:25, 195:4, 196:24, 206:19, 207:17, 207:21, 208:5, 211:18, 214:6, 221:11, 221:21, 223:6, 223:9, 223:18, 224:17, 225:21, 226:17, 230:11, 232:14, 232:20

**Correct** [5] - 68:9, 153:9, 214:10, 228:20, 232:24

**correcting** [1] - 229:9

**correctly** [8] - 47:3, 66:9, 73:11, 97:17, 97:24, 98:12, 99:8, 100:17

**correspondence** [3] - 76:6, 92:2, 168:10

**corroborates** [1] - 236:1

**corroborating** [1] - 139:22

**cosigned** [1] - 168:22

**counsel** [19] - 44:15, 58:10, 109:1, 135:3, 135:6, 136:11, 139:14, 141:12, 141:14, 141:16, 141:25, 142:25, 143:12, 237:13, 237:14, 238:13, 240:5

**count** [3] - 56:9, 59:24, 158:16

**counties** [1] - 17:7

**counting** [2] - 47:3, 143:3

**counts** [1] - 224:4

**county** [2] - 57:23, 168:20

**County** [29] - 15:22, 17:4, 54:22, 57:21, 60:20, 60:23, 60:24, 63:24, 65:12, 65:13, 65:15, 65:17, 66:12, 66:19, 66:22, 78:24, 116:22, 144:20, 147:4, 148:24, 149:5, 157:8, 161:3, 165:21, 166:3, 166:4, 237:3

**couple** [27] - 7:5, 11:6, 47:21, 53:1, 56:6, 72:4, 106:24, 114:17, 114:23, 125:8, 127:5, 167:3, 184:8, 185:21, 191:7, 192:1, 199:21, 201:19, 207:20, 209:16, 214:4, 226:1, 235:18, 236:3,

236:19, 237:6
  **course** [20] - 45:17, 51:19, 53:5, 60:1, 67:24, 68:1, 68:3, 78:4, 98:1, 141:9, 153:18, 157:1, 165:14, 165:16, 166:14, 199:1, 211:16, 217:21, 220:17, 226:23
  **courses** [1] - 68:4
  **COURT** [299] - 1:1, 2:2, 2:4, 2:7, 2:12, 2:17, 2:19, 3:5, 3:11, 10:17, 11:24, 14:12, 17:10, 17:13, 18:21, 24:24, 25:14, 25:19, 25:21, 25:25, 26:2, 26:9, 26:22, 28:5, 33:8, 35:16, 35:19, 44:5, 44:7, 44:17, 44:19, 44:21, 45:2, 45:11, 46:2, 46:8, 46:13, 47:5, 47:9, 47:13, 47:15, 47:18, 47:23, 47:25, 48:3, 48:17, 48:20, 48:23, 49:2, 49:6, 49:14, 49:18, 49:22, 50:22, 51:4, 51:12, 51:16, 51:19, 52:1, 52:4, 52:6, 52:10, 52:15, 52:17, 52:20, 52:23, 53:13, 53:17, 53:21, 53:24, 54:7, 54:12, 55:1, 55:9, 55:16, 56:3, 56:11, 56:15, 56:19, 56:22, 57:8, 57:13, 57:18, 58:8, 58:19, 59:1, 59:9, 59:12, 59:14, 59:16, 59:18, 59:22, 60:1, 60:4, 62:16, 66:2, 68:17, 68:25, 69:6, 69:11, 69:19, 69:23, 70:2, 70:7, 70:10, 72:2, 78:15, 80:8, 85:18, 86:6, 87:16, 93:4, 94:1, 103:25, 104:8, 104:12, 104:17, 104:20, 104:23, 105:1, 105:5, 105:13, 105:18, 105:24, 106:7, 106:10, 106:20, 107:15, 107:20, 107:25, 108:4, 108:16, 108:20, 108:22, 109:1, 109:5, 109:7, 109:15, 115:21, 118:16, 121:7, 122:24, 123:16, 123:18, 124:6, 124:15, 124:17, 125:12, 125:14, 125:18, 125:21, 126:1, 126:7, 128:2, 128:10, 128:14, 129:2, 129:17, 129:20, 130:5, 130:8, 130:13, 130:20, 130:24, 131:3, 131:7, 131:13, 131:19, 132:1, 132:4,

132:10, 132:18, 132:20, 133:4, 133:6, 133:11, 133:13, 133:20, 133:22, 134:20, 135:22, 136:7, 137:2, 137:5, 137:9, 139:4, 139:8, 140:8, 140:16, 140:19, 141:3, 141:7, 142:3, 142:21, 143:3, 143:8, 143:10, 148:1, 148:3, 148:5, 148:11, 159:20, 160:5, 160:14, 161:17, 161:21, 162:2, 165:4, 165:7, 167:5, 168:18, 169:1, 169:3, 169:6, 169:16, 170:24, 171:3, 171:6, 171:9, 171:23, 171:25, 172:8, 172:16, 172:22, 173:2, 173:13, 173:17, 173:21, 173:24, 174:7, 174:25, 175:3, 175:8, 175:24, 176:10, 176:23, 177:3, 177:8, 177:22, 178:5, 180:14, 180:18, 180:21, 181:1, 181:3, 189:1, 198:17, 199:7, 202:16, 204:6, 205:10, 210:25, 212:25, 213:16, 213:18, 216:17, 217:18, 222:6, 222:13, 222:17, 222:22, 223:1, 225:5, 229:21, 231:8, 231:10, 231:13, 233:23, 233:25, 234:3, 234:6, 235:2, 235:6, 235:13, 235:17, 235:21, 236:4, 236:8, 236:12, 236:16, 237:3, 237:12, 237:18, 237:20, 237:23, 238:2, 238:7, 238:13, 238:17, 238:20, 238:23, 239:11, 239:16, 239:20, 239:23, 239:25, 240:3, 240:7, 240:15
  **court** [18] - 58:6, 63:15, 64:17, 65:7, 65:17, 107:5, 107:8, 107:18, 123:5, 128:19, 128:22, 154:15, 179:18, 179:19, 179:20, 179:21, 205:3, 236:10
  **Court** [32] - 17:5, 17:8, 25:20, 46:12, 46:24, 48:7, 54:4, 54:19, 65:13, 65:14, 65:17, 68:22, 86:4, 87:18, 106:22, 106:23, 125:19, 130:25, 134:5, 138:9, 138:15, 139:8, 139:13, 140:4, 140:22, 140:25, 143:6, 180:24, 184:17, 235:23, 236:14, 242:15

**Court's** [9] - 25:17, 56:25, 121:6, 128:21, 138:14, 141:6, 165:3, 235:24, 237:1
  **court-qualified** [2] - 64:17, 154:15
  **Courthouse** [1] - 1:24
  **courthouse** [2] - 3:6, 54:23
  **courtroom** [14] - 2:18, 26:12, 26:15, 26:18, 44:13, 44:23, 45:9, 60:3, 105:12, 108:23, 143:9, 202:9, 225:20, 235:1
  **courtrooms** [1] - 69:1
  **courts** [5] - 17:2, 17:4, 17:6, 65:10, 65:11
  **cover** [1] - 240:17
  **covered** [2] - 29:24, 240:16
  **Craig** [1] - 38:15
  **cranial** [3] - 20:2, 22:19, 30:1
  **cranium** [1] - 32:16
  **crate** [1] - 9:20
  **crates** [4] - 7:21, 9:16, 12:17
  **Crates** [1] - 7:22
  **create** [3] - 102:7, 102:15, 102:17
  **created** [8] - 74:6, 75:19, 75:21, 89:18, 95:25, 96:7, 103:1
  **created'** [1] - 135:4
  **creates** [2] - 100:24, 103:4
  **creating** [1] - 102:8
  **creation** [2] - 134:13, 135:10
  **creative** [1] - 141:12
  **credit** [2] - 177:13, 227:5
  **credits** [1] - 138:15
  **crew** [1] - 200:16
  **crime** [12] - 3:24, 21:4, 47:4, 63:1, 63:2, 67:5, 71:25, 92:5, 217:9, 224:6, 224:9, 224:11
  **Crime** [6] - 60:20, 60:22, 60:25, 61:5, 63:6, 68:3
  **CRIMINAL** [1] - 1:6
  **criminal** [2] - 65:4, 199:20
  **criteria** [1] - 64:19
  **critical** [2] - 32:21, 106:25
  **cross** [5] - 50:3, 50:7, 51:17, 59:3, 69:24
  **CROSS** [18] - 10:22,

13:10, 66:3, 97:12, 109:18, 143:14, 178:10, 218:17, 221:6, 241:5, 241:5, 241:9, 241:10, 241:11, 241:13, 241:17, 241:19, 241:19
  **CROWE** [16] - 140:4, 140:25, 141:4, 142:2, 142:20, 178:2, 198:16, 199:6, 204:5, 210:23, 212:24, 217:17, 221:7, 225:8, 233:24, 241:19
  **Crowe** [8] - 1:20, 139:17, 139:24, 140:3, 140:14, 141:8, 221:8, 222:17
  **Crowe's** [1] - 139:10
  **crude** [1] - 159:7
  **culpability** [4] - 128:15, 128:21, 129:6, 135:9
  **culpable** [4] - 129:14, 129:17, 132:5, 138:24
  **cup** [1] - 82:12
  **curiosity** [1] - 16:2
  **customer** [1] - 191:6
  **cut** [18] - 33:22, 36:1, 49:10, 49:15, 74:10, 101:24, 102:2, 195:16, 201:18, 202:21, 203:17, 203:21, 204:3, 206:1, 208:23, 209:2, 209:3
  **cutting** [10] - 101:23, 101:25, 154:22, 201:20, 203:1, 203:4, 203:14, 206:6, 206:11, 207:12
  **cycle** [1] - 73:15
  **cycled** [3] - 76:11, 76:15, 151:24
  **cylinders** [1] - 72:8

## D

**D.C** [1] - 17:5
  **damaged** [2] - 146:14, 146:16
  **Dan** [2] - 46:18, 88:2
  **Darius** [4] - 216:25, 217:1, 217:2, 217:3
  **Darius's** [1] - 217:7
  **dark** [1] - 149:4
  **Darryl** [11] - 31:17, 32:6, 32:7, 34:3, 34:10, 34:13, 34:20, 112:23, 120:12, 218:9
  **database** [1] - 99:2
  **date** [7] - 110:22, 114:20, 120:7, 137:3, 137:5, 179:20, 179:21
  **dated** [4] - 124:7, 138:1,

182:22, 230:3
  **dates** [9] - 58:6, 107:25, 122:13, 123:9, 124:19, 125:13, 125:20, 161:1, 161:2
  **dating** [2] - 5:18, 5:19
  **Daubert** [2] - 45:4, 45:18
  **Davis** [1] - 1:13
  **day-to-day** [1] - 202:25
  **days** [9] - 10:13, 26:17, 107:25, 137:21, 177:15, 177:16, 186:11, 208:1
  **de** [2] - 130:10, 130:11
  **dead** [2] - 39:8, 40:8
  **deal** [8] - 57:4, 107:23, 194:24, 223:5, 226:15, 227:12, 236:22, 237:16
  **dealer** [2] - 217:5, 224:20
  **dealers** [3] - 194:21, 194:22, 233:2
  **dealing** [1] - 233:10
  **deals** [1] - 157:8
  **death** [14] - 23:1, 23:4, 27:20, 27:21, 29:16, 30:25, 31:1, 34:13, 34:14, 38:11, 38:12, 39:4, 43:18, 43:19
  **Deborah** [1] - 133:8
  **debris** [1] - 146:12
  **decide** [4] - 56:4, 141:25, 142:8, 142:11
  **decided** [2] - 118:20, 126:25
  **decipher** [1] - 76:1
  **decision** [7] - 107:10, 122:7, 122:10, 127:8, 127:14, 132:21, 185:5
  **deem** [4] - 140:10, 140:11, 140:12, 140:19
  **deemed** [1] - 128:17
  **deeper** [1] - 37:1
  **defect** [11] - 19:18, 22:6, 22:12, 23:24, 28:14, 32:11, 35:23, 37:17, 40:25, 41:8
  **Defendant** [7] - 1:17, 1:18, 1:20, 1:21, 126:5, 127:10, 229:22
  **defendant** [19] - 127:22, 127:23, 128:5, 128:8, 129:14, 130:14, 130:15, 133:7, 133:23, 134:12, 135:2, 135:5, 140:11, 141:24, 142:6, 142:17, 142:19, 202:14, 205:8
  **defendant's** [1] - 135:1
  **Defendant's** [4] - 125:23, 126:8, 147:18,

148:2
**defendants** [8] - 53:5,
136:16, 140:9, 140:10,
140:12, 140:20, 140:24,
148:7
**Defendants** [3] - 1:9,
109:4, 136:12
**Defender** [1] - 137:19
**Defender's** [2] - 137:18,
225:1
**defense** [9] - 107:13,
108:10, 136:11, 222:3,
222:7, 222:14, 222:18,
223:2, 240:5
**defensive** [2] - 25:1,
25:2
**define** [2] - 69:16, 99:16
**definitely** [1] - 240:20
**definitively** [1] - 162:22
**degree** [24] - 45:23,
50:10, 50:14, 50:16,
50:23, 50:25, 51:4, 51:5,
51:6, 51:8, 51:11, 51:13,
51:16, 51:21, 51:22,
51:23, 69:14, 70:5,
84:18, 87:11, 88:21, 97:8
**delay** [1] - 174:1
**deliberate** [3] - 128:14,
138:24, 159:1
**deliberately** [1] -
134:14
**deliberation** [1] -
239:11
**deliberations** [1] -
239:10
**Delvison** [1] - 4:2
**demonstrate** [1] - 135:2
**demonstrates** [1] -
138:2
**demonstrating** [1] -
134:13
**demote** [1] - 59:15
**demoted** [1] - 59:17
**denied** [2] - 51:20,
139:12
**Department** [7] - 60:21,
60:24, 63:25, 66:13,
66:23, 162:6, 167:20
**department** [1] - 61:2
**dependable** [1] -
162:25
**deployed** [1] - 31:14
**Deputy** [2] - 53:25, 59:6
**describe** [13] - 18:22,
19:4, 19:7, 19:12, 28:11,
32:6, 35:3, 39:14, 40:15,
40:19, 48:4, 70:16,
202:11
**described** [8] - 24:3,
30:9, 36:24, 56:15,

145:12, 153:2, 216:10,
232:9
**describing** [1] - 121:12
**description** [1] - 176:7
**designated** [1] - 83:12
**designation** [1] - 83:5
**designed** [1] - 81:22
**Despite** [1] - 138:17
**detail** [4] - 39:2, 66:7,
158:7, 158:10
**detailed** [1] - 19:1
**Detective** [5] - 111:12,
114:13, 117:12, 121:12,
126:19
**detective** [1] - 68:13
**detention** [2] - 215:14,
226:2
**determination** [6] -
64:5, 76:4, 76:9, 82:8,
89:4, 166:22
**determine** [12] - 49:11,
67:20, 75:21, 76:12,
77:17, 80:24, 82:17,
88:14, 89:2, 89:14,
162:24, 166:17
**determined** [4] - 84:5,
90:24, 131:3, 149:20
**determines** [1] - 184:14
**determining** [1] - 61:21
**detonated** [1] - 94:21
**detonator** [3] - 71:5,
94:16, 99:21
**developed** [1] - 91:20
**deviation** [1] - 38:3
**device** [1] - 146:4
**diagrams** [1] - 157:22
**diameter** [2] - 81:15,
144:6
**died** [3] - 40:7, 40:12,
133:15
**differ** [1] - 168:7
**difference** [4] - 76:1,
130:20, 130:21, 131:13
**Different** [1] - 193:22
**different** [20] - 12:1,
38:18, 60:1, 76:23,
76:25, 77:1, 86:19, 87:8,
92:5, 102:8, 102:13,
102:15, 132:4, 132:5,
147:21, 158:10, 164:3,
164:7, 192:16, 226:12
**differentiate** [1] - 75:16
**differs** [1] - 76:23
**difficulty** [2] - 39:10,
171:1
**digitally** [1] - 92:1
**diluting** [1] - 203:14
**dim** [1] - 82:10
**dimensional** [1] -
158:12

**dimensions** [1] - 77:12
**dire** [3] - 53:13, 53:15,
66:1
**DIRECT** [12] - 3:12,
14:21, 60:15, 70:12,
169:13, 181:11, 241:4,
241:7, 241:8, 241:9,
241:16, 241:18
**direct** [5] - 18:4, 63:14,
92:4, 106:3, 157:1
**direction** [12] - 23:9,
28:25, 30:4, 36:12, 37:6,
37:24, 37:25, 38:2,
42:16, 102:1, 102:2,
238:19
**directly** [13] - 3:1,
14:18, 42:23, 60:11,
73:14, 77:3, 89:15,
92:16, 99:4, 109:13,
142:18, 169:10, 181:7
**disagree** [1] - 69:7
**disagreed** [1] - 107:9
**disagreeing** [1] - 139:2
**disappearing** [1] -
238:21
**discern** [4] - 103:15,
107:16, 107:23, 108:2
**discharged** [2] - 95:25,
98:1
**discharges** [1] - 71:7
**discipline** [1] - 61:20
**disciplines** [2] - 61:12,
64:19
**disclosure** [1] - 53:11
**disclosures** [6] - 128:7,
129:5, 129:7, 130:17,
131:4, 135:13
**discrete** [1] - 240:11
**discretion** [1] - 227:4
**discuss** [3] - 45:10,
121:22, 123:5
**discussed** [5] - 48:5,
70:1, 97:7, 115:14, 227:6
**discussion** [4] - 44:10,
105:9, 112:25, 234:19
**discussions** [1] - 48:10
**disk** [1] - 145:25
**dislocated** [1] - 43:11
**dislocation** [1] - 43:8
**dispute** [1] - 48:17
**disregard** [1] - 38:2
**disruption** [1] - 160:19
**dissected** [1] - 148:20
**distance** [2] - 19:23,
20:16
**distant** [1] - 30:20
**distinct** [1] - 96:9
**distinctive** [1] - 162:18
**distortion** [1] - 43:9
**distracted** [1] - 161:22

**distribute** [1] - 208:20
**distribution** [1] -
224:23
**District** [4] - 49:25,
68:22, 132:23
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 17:6
**divide** [3] - 204:2,
204:3, 217:23
**divided** [2] - 41:7,
195:17
**dividing** [1] - 160:21
**Division** [1] - 167:20
**DIVISION** [1] - 1:2
**DOAR** [1] - 147:25
**docket** [1] - 125:21
**doctor** [1] - 17:10
**Doctor** [34] - 16:3,
17:17, 18:13, 18:16,
18:23, 20:5, 21:14,
22:20, 25:6, 28:2, 29:13,
30:12, 30:22, 30:25,
31:2, 31:16, 32:4, 33:14,
34:1, 34:8, 34:15, 35:16,
35:20, 36:17, 36:19,
38:9, 38:11, 38:13,
38:22, 41:18, 42:2,
43:13, 43:18, 43:21
**doctors** [1] - 18:2
**document** [5] - 126:6,
127:10, 159:8, 162:5,
182:16
**documentation** [1] -
92:22
**documents** [7] - 54:14,
54:24, 55:7, 55:10,
55:24, 57:3, 238:20
**dollar** [1] - 208:10
**done** [26] - 27:1, 27:10,
34:20, 58:24, 77:22,
77:23, 114:9, 116:15,
116:16, 116:18, 119:9,
128:20, 146:9, 153:23,
155:10, 155:15, 155:21,
156:4, 156:13, 156:17,
156:24, 162:23, 186:3,
232:4, 235:16
**door** [1] - 174:13
**doors** [1] - 41:24
**dose** [1] - 208:8
**double** [2] - 43:21,
43:22
**doublecheck** [2] -
53:25, 54:8
**Down** [1] - 6:12
**down** [30] - 10:6, 35:18,
38:3, 53:1, 71:1, 71:19,
82:15, 84:22, 84:24,
96:6, 96:12, 98:16,
100:2, 101:23, 102:24,

102:25, 109:15, 137:2,
145:7, 146:12, 148:22,
152:5, 152:8, 164:15,
172:6, 183:10, 191:4,
192:11
**Downward** [2] - 36:14,
37:8
**downward** [10] - 21:20,
29:2, 30:8, 34:16, 34:17,
36:13, 37:7, 38:1, 38:6,
152:12
**downwards** [4] - 19:25,
21:22, 24:15, 29:1
**dozen** [1] - 179:3
**dozens** [2] - 16:17,
16:18
**DR** [2] - 14:16, 241:6
**Dr** [26] - 2:14, 2:16,
14:14, 14:23, 15:6,
16:17, 17:9, 17:14, 18:8,
18:16, 18:19, 27:1,
27:20, 28:2, 29:6, 31:18,
31:19, 31:20, 31:23,
33:9, 34:19, 34:21,
38:14, 44:5
**drags** [1] - 103:1
**Drake** [7] - 4:7, 4:15,
5:7, 9:7, 9:9, 12:1, 12:20
**draw** [1] - 95:8
**drawn** [1] - 142:14
**dress** [1] - 44:18
**drew** [1] - 94:10
**driver's** [2] - 29:5, 30:7
**dropped** [1] - 104:18
**drops** [2] - 151:18,
152:8
**drug** [24] - 189:15,
189:25, 190:9, 194:21,
194:22, 199:15, 199:21,
200:18, 200:20, 201:15,
207:13, 209:16, 214:14,
217:5, 221:10, 224:6,
224:11, 224:19, 224:22,
233:2, 240:9
**Drug** [11] - 91:17,
91:19, 91:20, 92:11,
95:19, 98:14, 99:1,
103:14, 104:6, 147:15,
156:6
**Drug-Fire** [10] - 91:17,
91:19, 91:20, 92:11,
98:14, 99:1, 103:14,
104:6, 147:15, 156:6
**drug-related** [1] -
209:16
**drugs** [27] - 27:7, 27:10,
27:14, 30:24, 34:12,
38:10, 43:17, 186:5,
186:7, 186:17, 187:24,
188:4, 189:10, 191:3,

191:5, 192:6, 192:10,
192:13, 193:1, 193:11,
194:20, 213:22, 224:1,
224:17, 233:3, 233:4
  **dual** [1] - 236:7
  **dude** [5] - 175:25,
176:13, 176:14, 176:16,
176:17
  **dude's** [1] - 112:8
  **due** [1] - 96:15
  **Due** [1] - 240:5
  **duration** [1] - 26:4
  **during** [38] - 22:19,
26:17, 35:21, 36:11,
40:3, 41:12, 41:14, 42:3,
42:14, 42:22, 45:17,
52:11, 63:22, 74:7,
75:18, 75:19, 78:4, 79:6,
96:19, 131:11, 133:15,
136:18, 140:7, 157:1,
164:3, 164:9, 165:14,
191:12, 193:21, 196:1,
207:4, 207:7, 207:25,
209:14, 210:3, 211:16,
215:14
  **During** [9] - 27:5, 79:22,
121:10, 133:6, 165:16,
195:6, 207:19, 215:16,
233:2
  **duty** [1] - 139:6

### E

  **E-N-S-O-R** [1] - 60:14
  **ear** [3] - 19:17, 32:10,
32:14
  **early** [3] - 109:8, 125:1,
186:16
  **Early** [1] - 219:24
  **earth** [1] - 136:21
  **easily** [1] - 103:15
  **edge** [15] - 37:19,
82:13, 96:7, 96:18,
99:11, 99:15, 99:22,
100:3, 101:2, 102:9,
102:12, 102:16, 102:17,
152:11, 152:13
  **edges** [1] - 101:25
  **education** [3] - 63:13,
66:16, 67:16
  **educational** [2] - 15:6,
66:8
  **effect** [5] - 12:6, 50:19,
69:2, 142:4, 164:15
  **effectively** [1] - 133:24
  **efforts** [1] - 128:7
  **egg** [1] - 94:17
  **egg-shaped** [1] - 94:17
  **either** [23] - 30:11, 31:6,

34:5, 34:6, 43:8, 43:10,
58:16, 66:16, 71:18,
81:2, 84:6, 118:10,
121:10, 135:3, 144:22,
145:6, 145:7, 146:22,
188:24, 194:2, 224:25,
234:15
  **Either** [2] - 34:9, 135:9
  **eject** [1] - 145:10
  **elaborate** [2] - 139:18,
141:13
  **elbow** [1] - 43:7
  **electronically** [1] -
98:13
  **electronics** [1] - 3:6
  **eleven** [1] - 15:5
  **elicit** [1] - 138:6
  **elicitation** [2] - 128:14,
138:24
  **elicited** [3] - 134:14,
134:17, 141:21
  **eliciting** [1] - 127:16
  **Ellen** [1] - 31:19
  **Ellington** [2] - 240:1,
240:17
  **elliptical** [3] - 94:17,
99:9, 150:24
  **embrace** [1] - 50:1
  **eminence** [1] - 23:24
  **employed** [4] - 3:22,
14:25, 15:3, 31:23
  **empty** [1] - 73:7
  **enable** [1] - 234:14
  **encompasses** [1] -
61:12
  **encounter** [2] - 133:6,
214:22
  **encountered** [2] -
74:25, 133:23
  **encouragement** [1] -
128:15
  **End** [1] - 205:7
  **end** [11] - 15:17, 19:23,
20:18, 49:4, 96:2,
142:10, 145:22, 145:23,
146:1, 150:11, 176:4
  **ended** [1] - 179:16
  **ending** [2] - 158:7,
158:13
  **ends** [1] - 193:24
  **endure** [1] - 163:20
  **enforcement** [1] -
183:21
  **engaged** [2] - 84:23,
138:9
  **English** [2] - 16:21,
16:22
  **Enjoy** [1] - 234:24
  **ENSOR** [3] - 60:9,
241:8, 241:13

  **Ensor** [18] - 46:15, 47:1,
60:8, 60:13, 65:24, 66:5,
87:21, 91:2, 91:17,
92:18, 94:4, 97:14,
97:24, 106:15, 140:1,
143:1, 143:17, 235:12
  **Ensor's** [1] - 105:20
  **enter** [3] - 23:11,
136:17, 138:18
  **entered** [12] - 19:24,
22:10, 22:12, 22:15,
24:6, 28:18, 32:15, 36:5,
37:24, 40:22, 41:5,
137:21
  **entering** [2] - 20:1,
29:25
  **enterprise** [2] - 139:21,
233:10
  **enters** [5] - 2:18, 41:18,
60:3, 138:22, 143:9
  **Entertainment** [1] -
6:12
  **enthusiastic** [1] - 107:1
  **entire** [2] - 62:23, 226:2
  **entirely** [1] - 163:19
  **entitled** [1] - 136:9
  **entrance** [22] - 19:16,
19:18, 19:21, 20:13,
21:16, 22:3, 22:5, 22:20,
23:22, 28:13, 28:16,
32:8, 32:11, 32:13, 35:4,
35:6, 35:12, 37:1, 37:6,
37:17, 41:1, 41:3
  **Envelope** [1] - 83:6
  **envelope** [14] - 78:17,
78:20, 78:21, 80:6, 83:6,
83:7, 83:9, 83:11, 93:2,
93:10, 96:22, 143:20,
144:17, 148:15
  **envision** [1] - 54:10
  **episode** [1] - 228:7
  **Epps** [1] - 92:20
  **equipment** [5] - 76:19,
76:21, 92:16, 99:6, 161:5
  **erase** [1] - 160:14
  **Eric** [1] - 92:19
  **Ernest** [4] - 180:16,
182:2, 182:3, 230:7
  **Esquire** [10] - 1:16,
1:16, 1:17, 1:18, 1:19,
1:19, 1:20, 1:21, 1:22,
1:22
  **essentially** [8] - 45:14,
45:25, 46:16, 46:19,
67:18, 67:21, 95:1,
145:19
  **establish** [2] - 129:12,
134:12
  **established** [1] - 135:15
  **estimate** [4] - 17:3,

117:7, 122:14, 152:20
  **et** [1] - 242:5
  **etc** [4] - 68:6, 126:19,
158:8, 166:14
  **evening** [2] - 234:16,
234:24
  **events** [2] - 109:24,
123:10
  **eventually** [6] - 173:11,
173:14, 175:17, 187:14,
200:21, 225:15
  **Eventually** [1] - 85:16
  **evidence** [42] - 19:1,
19:3, 28:4, 28:7, 29:22,
30:16, 34:24, 44:10,
45:8, 63:3, 67:2, 67:4,
67:5, 69:4, 69:9, 71:25,
73:7, 78:24, 89:16, 92:3,
92:4, 92:5, 92:16, 95:6,
99:5, 105:9, 139:20,
139:22, 141:9, 141:18,
141:19, 141:23, 142:5,
142:16, 142:17, 146:23,
149:20, 164:20, 164:24,
234:19, 236:2, 238:5
  **evidently** [1] - 107:9
  **exact** [2] - 74:25,
110:22
  **Exactly** [1] - 219:16
  **exactly** [12] - 26:17,
53:3, 101:17, 113:4,
115:22, 132:15, 134:4,
135:7, 135:8, 152:7,
160:7, 160:16
  **exam** [4] - 27:12, 27:15,
30:22, 38:8
  **examination** [27] - 2:8,
17:19, 27:1, 27:22, 33:6,
50:4, 50:8, 59:3, 62:22,
78:3, 78:11, 79:2, 79:4,
79:6, 79:7, 81:4, 83:23,
83:25, 84:5, 85:10,
86:25, 91:11, 92:8,
157:1, 164:18, 164:22,
165:13
  **EXAMINATION** [38] -
3:12, 10:22, 13:10,
14:21, 60:15, 66:3,
70:12, 97:12, 109:18,
122:25, 143:14, 165:8,
167:6, 168:15, 169:13,
178:10, 181:11, 218:17,
221:6, 241:4, 241:5,
241:5, 241:7, 241:8,
241:9, 241:9, 241:10,
241:11, 241:12, 241:13,
241:14, 241:14, 241:15,
241:16, 241:17, 241:18,
241:19, 241:19
  **examinations** [3] -

78:8, 165:17, 168:21
  **examine** [13] - 51:17,
73:17, 78:17, 79:5,
80:10, 83:15, 87:3,
87:22, 89:1, 94:7, 95:4,
106:1, 106:11
  **examined** [8] - 64:25,
80:17, 83:24, 90:6,
90:23, 94:5, 99:4, 153:18
  **examiner** [20] - 15:1,
15:3, 15:21, 15:24, 16:7,
17:20, 18:5, 18:6, 18:9,
27:17, 31:24, 31:25,
64:22, 64:25, 73:17,
93:21, 99:3, 149:19,
166:2, 166:7
  **Examiner** [6] - 15:1,
15:2, 17:24, 21:10,
83:13, 88:10
  **Examiner's** [1] - 38:20
  **Examiners** [4] - 63:12,
64:15, 68:6, 68:11
  **examiners** [7] - 18:7,
154:14, 168:6, 168:9,
168:10, 168:12
  **examining** [2] - 61:24,
78:11
  **example** [8] - 41:24,
75:25, 77:13, 119:21,
134:10, 141:20, 154:6,
227:1
  **examples** [1] - 166:14
  **exams** [1] - 30:23
  **exceedingly** [1] - 41:19
  **excellent** [1] - 132:14
  **except** [2] - 160:16,
226:1
  **exceptions** [1] - 141:11
  **exchanged** [1] - 211:6
  **excised** [1] - 237:2
  **exclude** [1] - 139:11
  **excluding** [2] - 154:18,
168:12
  **exclusion** [7] - 61:23,
84:16, 88:15, 88:17,
88:18, 90:22, 95:11
  **excruciating** [1] - 39:2
  **Excuse** [4] - 20:5,
25:14, 112:11, 159:20
  **excuse** [5] - 65:12,
125:23, 159:17, 200:21,
210:12
  **excused** [7] - 14:13,
44:7, 44:12, 105:10,
169:3, 180:14, 234:24
  **executes** [1] - 138:23
  **Exhibit** [33] - 9:3, 18:11,
18:18, 27:25, 38:13,
39:5, 80:6, 80:9, 80:10,
80:11, 83:7, 83:8, 85:23,

85:25, 87:14, 90:8, 91:3, 93:3, 93:11, 94:5, 95:6, 95:14, 97:17, 103:18, 104:16, 124:3, 126:5, 126:8, 127:11, 147:18, 170:4, 182:16, 229:23
  **exhibit** [11] - 9:4, 18:10, 31:18, 97:16, 105:2, 170:3, 229:22, 236:24, 239:1, 239:3, 239:4
  **Exhibits** [2] - 78:14, 84:6
  **exhibits** [7] - 104:18, 236:23, 237:7, 238:1, 238:5, 238:8, 239:3
  **exit** [9] - 20:8, 20:12, 28:21, 33:3, 33:7, 37:2, 37:5, 40:24, 41:2
  **exited** [3] - 24:7, 28:19, 40:23
  **exiting** [2] - 33:20, 40:23
  **exits** [4] - 37:22, 44:13, 105:12, 235:1
  **expansive** [2] - 136:8
  **expect** [4] - 46:24, 48:3, 105:14, 142:14
  **expectation** [1] - 225:14
  **expecting** [1] - 212:7
  **expedition** [1] - 138:10
  **expelled** [2] - 72:13, 72:21
  **expelling** [1] - 90:1, 91:15
  **expend** [1] - 237:7
  **expendable** [1] - 74:20
  **expensive** [1] - 196:21
  **experience** [5] - 62:21, 66:8, 72:20, 74:24, 167:9
  **expert** [14] - 16:24, 17:9, 17:13, 61:17, 62:14, 63:7, 65:7, 65:20, 65:24, 69:13, 70:10, 75:13, 157:12, 240:9
  **experts** [6] - 51:10, 63:16, 63:23, 64:1, 64:17, 154:16
  **explain** [4] - 23:8, 58:15, 104:4, 148:18
  **Explain** [1] - 195:13
  **explaining** [2] - 25:23, 26:3
  **explode** [1] - 146:5
  **exploitation** [3] - 135:9, 136:8, 136:15
  **exploited'** [1] - 135:4
  **exploiting** [2] - 135:24, 136:5
  **exploits** [1] - 135:25

  **explosion** [1] - 151:5
  **explosive** [4] - 90:2, 91:15, 145:15, 146:4
  **express** [1] - 45:8
  **expressed** [2] - 45:22, 51:10
  **expresses** [1] - 70:6
  **extent** [6] - 46:4, 48:25, 51:19, 138:11, 139:11, 141:16
  **external** [1] - 33:5
  **extract** [1] - 73:13
  **extremely** [2] - 102:13, 163:20
  **eye** [1] - 74:1

## F

  **F-I-C-K-L-I-N-G** [1] - 3:10
  **F-i-r-e** [1] - 95:20
  **F-R-Y-S-O-N** [1] - 188:14
  **face** [24] - 19:24, 20:1, 28:14, 28:18, 28:19, 32:9, 32:14, 33:1, 34:7, 94:20, 96:2, 96:4, 100:14, 100:25, 102:1, 102:7, 102:9, 102:25, 103:3, 139:5, 151:1, 163:17, 169:6, 225:3
  **faces** [1] - 156:14
  **facilities** [1] - 58:6
  **facility** [1] - 17:25
  **fact** [15] - 19:12, 83:25, 104:23, 123:24, 127:12, 127:20, 130:1, 136:5, 139:20, 156:22, 197:22, 224:19, 226:24, 230:21, 240:16
  **facto** [1] - 130:10
  **facts** [7] - 134:6, 134:11, 134:16, 138:8, 138:25, 183:8
  **failed** [2] - 46:11, 64:8
  **faint** [1] - 148:22
  **fainted** [1] - 235:12
  **Fair** [1] - 184:20
  **fair** [7] - 11:17, 48:25, 140:9, 185:7, 185:8, 199:10, 219:2
  **Fairly** [1] - 211:8
  **fairly** [5] - 65:20, 161:11, 199:17, 203:8, 228:1
  **fairness** [1] - 50:12
  **fall** [2] - 43:13, 43:15
  **familiar** [4] - 9:22, 31:21, 151:23, 162:5

  **family** [1] - 227:1
  **far** [21] - 3:18, 58:23, 75:6, 103:16, 113:20, 114:16, 128:9, 136:8, 138:21, 138:25, 142:1, 154:2, 154:23, 185:13, 194:10, 194:11, 194:20, 207:7, 207:16, 234:20
  **Farber** [8] - 111:8, 111:9, 115:7, 124:22, 126:24, 137:18, 137:23, 224:25
  **fashion** [1] - 43:25
  **fatal** [10] - 23:12, 23:13, 29:13, 29:14, 34:1, 36:19, 36:20, 36:22, 36:23, 41:21
  **father** [2] - 4:10, 4:11
  **fault** [4] - 26:7, 138:21, 235:7, 238:23
  **FBI** [2] - 68:5, 91:21
  **February** [12] - 17:17, 17:20, 116:1, 116:3, 124:25, 125:2, 126:17, 127:1, 137:20, 137:21, 137:25, 230:3
  **Fed** [1] - 47:18
  **Federal** [2] - 17:5, 225:1
  **federal** [12] - 65:5, 65:11, 110:19, 117:1, 137:15, 183:5, 184:6, 215:11, 215:14, 223:8, 224:23, 226:15
  **federally** [5] - 110:14, 116:23, 137:10, 138:12, 183:16
  **feed** [1] - 171:4
  **feelings** [1] - 45:17
  **feet** [2] - 19:8, 20:19
  **fellow** [1] - 18:8
  **fellowship** [8] - 15:11, 15:13, 15:19, 16:6, 16:10, 16:11, 16:12, 18:1
  **felon** [1] - 110:11, 110:13, 137:13, 183:4, 223:11, 224:9
  **few** [15] - 20:20, 31:8, 54:16, 61:1, 108:13, 109:24, 110:24, 111:1, 111:2, 137:21, 177:5, 177:10, 180:20
  **Few** [1] - 192:25
  **Fewer** [1] - 192:24
  **Fickling** [19] - 2:6, 2:15, 2:23, 3:3, 3:8, 3:9, 3:14, 4:1, 9:5, 10:14, 10:24, 11:2, 11:22, 11:24, 12:1, 12:20, 13:9, 13:12, 14:12
  **FICKLING** [2] - 2:24, 241:4

  **field** [4] - 63:13, 64:11, 67:12, 70:15
  **fight** [6] - 170:12, 170:15, 170:19, 171:21, 172:2, 176:16
  **fighting** [5] - 173:8, 175:15, 176:7, 176:17
  **file** [3] - 38:22, 56:14, 59:6
  **filed** [1] - 52:16
  **final** [3] - 141:13, 239:1, 239:3
  **Finally** [2] - 38:13, 168:6
  **findings** [2] - 45:17, 80:20
  **Fine** [1] - 62:19
  **fine** [6] - 51:25, 62:15, 94:1, 105:4, 106:17, 171:7
  **fingerprint** [7] - 46:24, 74:8, 157:11, 157:12, 157:20, 157:21, 158:6
  **fingerprints** [5] - 157:3, 157:4, 157:5, 157:9
  **finish** [7] - 2:16, 105:1, 106:2, 133:11, 180:22, 234:3, 234:4
  **finished** [1] - 101:24
  **finishing** [1] - 18:2
  **Fire** [10] - 91:17, 91:19, 91:20, 92:11, 98:14, 99:1, 103:14, 104:6, 147:15, 156:6
  **fire** [14] - 24:1, 24:5, 28:17, 30:20, 35:24, 36:2, 37:20, 81:19, 87:4, 143:23, 144:15, 144:18, 146:9
  **firearm** [80] - 61:16, 61:22, 62:8, 63:7, 63:15, 64:2, 64:16, 64:17, 64:21, 69:14, 70:20, 70:21, 71:7, 71:15, 71:17, 73:15, 73:17, 73:24, 74:5, 74:8, 74:13, 74:19, 74:20, 74:22, 75:7, 75:14, 75:17, 75:19, 76:2, 76:10, 76:14, 77:9, 79:16, 81:1, 81:19, 82:17, 82:24, 83:1, 83:20, 84:2, 84:3, 84:15, 84:23, 85:7, 85:8, 85:11, 87:3, 87:6, 88:15, 88:16, 88:18, 89:1, 89:9, 89:20, 89:22, 90:8, 92:5, 95:25, 96:12, 99:2, 101:22, 146:20, 149:8, 149:21, 166:16, 167:12, 168:13, 183:4, 183:11,

  223:12, 223:17, 224:5, 224:6
  **Firearm** [1] - 63:12, 64:14, 68:6, 68:11
  **firearms** [41] - 45:8, 61:18, 62:22, 64:24, 64:25, 65:1, 65:24, 66:16, 67:9, 67:13, 67:17, 68:14, 70:15, 73:22, 73:23, 74:25, 75:24, 76:19, 85:14, 85:16, 88:19, 91:22, 93:19, 94:13, 97:2, 154:13, 154:14, 154:16, 155:6, 162:13, 165:13, 165:17, 165:20, 165:24, 166:5, 166:8, 166:12, 166:21, 168:6, 168:8, 168:9
  **Firearms** [6] - 61:6, 61:20, 75:3, 156:7, 162:6, 168:22
  **fired** [79] - 23:7, 25:6, 29:2, 29:9, 34:8, 46:18, 61:21, 61:22, 62:8, 67:21, 70:20, 71:24, 72:5, 72:6, 72:12, 72:17, 73:3, 73:13, 73:16, 74:13, 75:19, 76:2, 76:3, 76:11, 76:15, 77:14, 78:11, 79:15, 81:1, 81:10, 82:17, 82:24, 83:1, 83:19, 84:2, 84:15, 84:22, 85:7, 85:9, 86:13, 86:15, 86:17, 87:6, 88:14, 88:18, 89:7, 89:9, 90:1, 90:21, 90:24, 91:9, 93:17, 94:13, 94:20, 95:10, 95:13, 95:18, 98:19, 98:22, 144:9, 144:10, 145:4, 145:13, 146:7, 146:8, 147:3, 147:6, 149:21, 154:13, 154:18, 158:3, 162:16, 163:9, 163:15, 164:4, 164:9
  **fires** [9] - 90:19, 95:19, 99:1, 99:3, 99:4, 144:19, 144:21, 154:13, 161:2
  **firing** [49] - 20:14, 29:23, 31:3, 71:8, 71:21, 73:12, 89:6, 91:12, 94:16, 94:18, 94:19, 96:3, 96:4, 96:16, 96:19, 98:23, 99:9, 99:13, 99:15, 99:20, 100:13, 100:17, 100:20, 100:22, 100:24, 101:3, 102:2, 102:19, 102:21, 147:13, 148:23, 150:17, 150:20,

150:21, 150:23, 150:25, 151:10, 151:12, 151:15, 151:25, 152:12, 152:13, 159:14, 162:17, 164:2, 164:7, 164:11, 164:17

**firm** [1] - 63:25

**First** [6] - 39:1, 40:19, 69:16, 77:11, 132:20, 158:5

**first** [53] - 17:18, 19:10, 19:12, 19:13, 20:6, 20:9, 23:10, 27:4, 28:11, 32:17, 32:18, 35:3, 39:19, 40:22, 41:1, 57:23, 87:22, 101:4, 104:18, 114:21, 115:3, 121:10, 123:12, 124:19, 124:21, 124:24, 125:1, 125:4, 125:7, 126:15, 126:18, 127:2, 127:6, 134:22, 135:14, 138:2, 159:17, 176:16, 179:6, 182:19, 184:2, 186:7, 186:17, 187:7, 189:21, 192:14, 200:5, 203:22, 221:9, 230:13, 235:19, 237:22

**fit** [2] - 59:23, 93:22

**fits** [1] - 82:14

**five** [12] - 15:18, 16:8, 20:19, 144:22, 146:22, 147:12, 147:23, 149:10, 149:12, 182:5, 193:11, 226:3

**fixed** [1] - 173:20

**FLANNERY** [3] - 10:16, 10:23, 241:5

**Flannery** [2] - 1:19, 11:1

**flat** [5] - 96:12, 145:22, 145:23, 150:10

**flavor** [1] - 134:2

**flip** [1] - 235:23

**flow** [1] - 152:13

**flowed** [2] - 151:15, 152:14

**flown** [1] - 39:7

**flows** [1] - 96:4

**fluids** [4] - 27:5, 27:6, 39:18, 40:2

**fly** [1] - 94:2

**flying** [2] - 145:2, 146:5

**focus** [1] - 134:19

**Focusing** [1] - 168:19

**focusing** [1] - 192:4

**folks** [1] - 105:13

**follow** [4] - 2:15, 88:24, 124:12, 125:9

**follow-up** [2] - 124:12, 125:9

followed [1] - 63:11

**following** [5] - 120:18, 131:12, 172:25, 173:7, 230:18

**foolishly** [1] - 129:4

**FOR** [1] - 1:2

**foramen** [1] - 22:13

**forced** [6] - 70:25, 71:1, 71:14, 96:1, 151:4, 164:15

**forces** [2] - 151:6, 152:8

**forearm** [2] - 42:25, 43:2

**foregoing** [1] - 242:6

**forensic** [11] - 15:19, 16:10, 16:18, 16:24, 17:9, 18:3, 21:11, 24:2, 43:24, 164:20, 164:24

**forensics** [2] - 61:20, 66:16

**forget** [1] - 139:9

**forgive** [1] - 150:21

**form** [3] - 54:21, 154:6, 154:7

**formal** [2] - 127:13, 185:23

**former** [1] - 108:17

**formerly** [2] - 58:10, 167:19

**forming** [1] - 96:8

**forms** [1] - 91:25

**formulation** [2] - 49:20, 50:1

**forth** [4] - 107:7, 191:3, 191:5, 193:13

**forward** [2] - 145:2, 151:6, 214:4

**foster** [2] - 201:7

**Four** [1] - 16:4

**four** [19] - 20:19, 29:20, 41:7, 63:1, 70:22, 137:15, 144:22, 146:22, 147:12, 149:11, 152:5, 182:5, 222:1, 234:11, 234:13, 238:8, 238:9, 239:20

**fours** [1] - 134:7

**fracture** [2] - 42:11, 43:8

**fractured** [1] - 43:11

**Fragments** [1] - 78:21

**fragments** [16] - 28:24, 79:3, 79:5, 79:6, 79:11, 79:15, 79:20, 79:23, 90:8, 90:11, 90:12, 90:14, 90:18, 90:21, 91:5

**frame** [2] - 152:4, 199:25

**Frank** [1] - 3:4

**frankly** [4] - 50:23,

108:5, 142:8, 142:9

**Frankly** [1] - 236:1

**free** [5] - 18:25, 108:22, 108:23, 160:8, 226:2

**FREISON** [1] - 188:9

**frequent** [2] - 65:17, 107:15

**frequently** [2] - 11:18, 79:12

**Friday** [2] - 58:24, 237:25

**friend** [4] - 8:17, 8:18, 130:15, 204:20

**friends** [2] - 189:5, 189:24

**front** [25] - 18:12, 19:10, 19:17, 19:25, 21:1, 21:15, 29:1, 30:4, 32:13, 34:17, 36:12, 37:5, 37:7, 37:22, 38:1, 38:3, 42:17, 65:11, 109:9, 126:16, 146:5, 160:6, 176:12, 182:19

**Fryson** [5] - 188:8, 188:9, 189:4, 195:22, 196:2

**FRYSON** [1] - 188:15

**fuel** [1] - 71:6

**Fulbright** [1] - 15:10

**full** [3] - 134:22, 188:7, 188:20

**fully** [3] - 18:7, 113:17, 168:8

**function** [2] - 67:4, 192:22

**functioning** [3] - 73:13, 89:2, 130:10

**functions** [1] - 32:23

**furnace** [1] - 7:17

**furtherance** [1] - 224:6

## G

**G-L-Y-N-N** [1] - 46:7

**Galton** [1] - 158:6

**game** [7] - 201:13, 201:14, 201:15, 204:22, 220:5, 220:14, 220:19

**GARDNER** [1] - 1:8

**Gardner** [85] - 1:21, 2:8, 14:5, 104:16, 106:12, 112:2, 112:5, 113:1, 114:10, 115:10, 115:15, 115:24, 115:25, 116:8, 117:14, 117:18, 118:3, 118:5, 118:21, 118:24, 119:1, 119:5, 120:13, 123:25, 127:4, 127:16, 127:24, 128:25, 129:4,

129:25, 130:23, 131:1, 131:9, 131:11, 131:16, 135:17, 136:24, 138:3, 138:7, 138:12, 141:22, 205:9, 205:16, 205:19, 206:22, 207:4, 207:8, 209:14, 212:11, 212:16, 212:19, 212:22, 213:1, 213:4, 213:6, 213:9, 213:23, 214:23, 214:25, 215:17, 215:20, 216:4, 216:7, 216:10, 216:13, 216:14, 216:24, 217:1, 217:6, 217:11, 217:13, 217:19, 218:1, 218:10, 227:21, 227:24, 228:2, 228:22, 229:8, 229:9, 231:1, 231:12, 232:5

**Gardner's** [10] - 108:18, 126:5, 127:11, 130:24, 139:11, 139:14, 140:23, 148:8, 148:9, 148:11

**Garrison** [1] - 61:4

**gaseous** [1] - 71:12

**gather** [4] - 61:24, 67:5, 109:25, 185:20

**gathered** [1] - 54:16

**gathering** [1] - 129:13

**gauge** [1] - 64:23

**GED** [5] - 185:14, 185:15, 185:17, 185:19, 185:21

**gel** [4] - 208:4, 208:7, 208:11, 208:25

**general** [2] - 101:1, 154:3

**generally** [1] - 141:9

**generate** [1] - 157:22

**generated** [9] - 96:18, 101:25, 154:7, 155:1, 158:9, 159:7, 159:15, 160:3

**Generated** [1] - 156:14

**generating** [2] - 156:10, 158:14

**generically** [1] - 20:18

**gentleman** [2] - 4:6, 126:18

**gentlemen** [11] - 2:19, 44:8, 60:5, 101:19, 103:6, 141:20, 143:10, 149:24, 158:24, 161:22, 239:6

**Gerard** [1] - 1:19

**Giglio** [3] - 53:10, 53:16, 53:17

**given** [6] - 45:21, 117:24, 127:12, 128:6, 163:11, 167:22

**Given** [2] - 127:12,

127:20

**glanced** [1] - 54:17

**glare** [4] - 78:18, 83:17, 96:15, 97:21

**glasses** [1] - 205:7

**Glock** [51] - 47:2, 85:20, 85:25, 86:9, 91:6, 91:7, 91:9, 92:8, 93:18, 95:5, 95:8, 95:10, 95:12, 95:18, 98:20, 98:22, 100:24, 101:7, 101:15, 101:22, 143:23, 144:2, 144:11, 144:16, 144:19, 145:8, 150:8, 150:16, 150:25, 151:18, 152:18, 153:19, 154:23, 155:13, 155:14, 155:16, 155:17, 155:20, 156:15, 156:19, 156:20, 161:3, 167:10, 167:12, 167:17, 168:20

**Glocks** [2] - 154:19, 155:24

**Glynn** [1] - 7:8

**Goo** [29] - 14:7, 200:1, 204:17, 204:19, 204:21, 205:1, 205:3, 205:11, 205:16, 205:19, 205:23, 205:24, 206:3, 206:5, 206:22, 206:24, 207:8, 209:13, 212:4, 212:5, 212:6, 212:11, 212:16, 213:1, 213:23, 214:22, 216:1, 219:19, 228:22

**Goo's** [1] - 205:21

**government** [83] - 2:21, 25:22, 31:18, 45:7, 49:5, 51:20, 57:10, 57:14, 60:5, 65:23, 106:17, 106:23, 113:13, 117:17, 118:19, 121:11, 121:15, 125:4, 126:13, 127:7, 127:9, 127:13, 127:17, 127:20, 127:22, 128:7, 128:11, 128:15, 128:16, 128:17, 128:22, 129:6, 129:7, 129:14, 129:15, 130:11, 130:12, 131:4, 131:20, 131:23, 131:25, 132:6, 133:23, 134:12, 134:14, 134:16, 134:18, 135:1, 135:3, 135:9, 135:14, 135:18, 135:22, 135:24, 135:25, 136:2, 136:9, 136:18, 138:10, 138:14, 139:20, 139:22, 141:21, 142:13, 142:14, 142:18, 180:13, 182:20, 183:20, 184:13, 184:21, 223:4, 223:6, 224:23, 229:11, 236:9, 237:13,

237:14, 239:14
**Government** [7] - 1:15, 9:3, 18:11, 18:18, 27:25, 38:13, 170:3
**Government's** [22] - 78:13, 80:6, 80:10, 80:11, 80:21, 83:7, 83:8, 84:6, 85:23, 85:25, 87:14, 88:9, 90:8, 91:3, 93:2, 93:11, 94:5, 95:6, 95:14, 97:17, 124:3, 182:16
**GOVERNMENT'S** [6] - 2:24, 14:16, 60:9, 109:11, 169:8, 181:5
**government's** [2] - 80:9, 107:10, 108:14, 126:11, 126:15, 126:20, 129:17, 240:12
**government-exhibit** [1] - 31:18
**grade** [3] - 3:19, 185:23, 185:25
**graduated** [1] - 66:9
**Graham** [15] - 115:8, 122:11, 122:20, 123:20, 124:10, 126:25, 137:20, 137:24, 138:6, 183:1, 222:3, 225:2, 230:1, 230:10, 230:14
**Graham's** [1] - 127:11
**gram** [2] - 208:13, 208:14
**grams** [2] - 209:2, 209:3
**grand** [12] - 11:21, 53:9, 58:1, 172:4, 172:14, 172:17, 176:5, 179:16, 235:24
**grassy** [1] - 101:16
**gray** [1] - 80:15
**graze** [4] - 24:9, 24:13, 24:14, 37:1
**grazed** [2] - 24:17, 24:20
**Great** [1] - 160:2
**great** [3] - 49:16, 107:23, 134:8
**greater** [2] - 164:19, 164:23
**greatest** [1] - 154:4
**Green** [2] - 86:4, 87:18
**Greenbelt** [1] - 17:5
**Gregory** [2] - 169:5, 169:12
**GREGORY** [2] - 169:8, 241:16
**grew** [1] - 111:25
**Griffin** [3] - 132:25, 133:13
**grit** [2] - 163:18, 164:14

**groove** [3] - 77:13, 77:14, 83:3
**grooves** [7] - 74:10, 75:1, 81:1, 82:19, 82:22, 83:20, 88:5
**ground** [2] - 72:17, 146:19
**group** [3] - 5:25, 97:25, 187:14
**grow** [3] - 3:20, 111:20, 181:17
**guess** [13] - 8:8, 8:12, 46:4, 46:8, 48:20, 48:22, 49:4, 61:1, 160:24, 170:16, 224:13, 236:9, 236:17
**guideline** [1] - 184:17
**guilty** [2] - 183:4, 214:13
**gun** [48] - 9:9, 9:11, 10:3, 10:15, 12:14, 21:15, 21:24, 67:21, 71:1, 72:5, 72:6, 76:11, 76:13, 76:15, 77:15, 86:12, 86:13, 86:15, 145:2, 145:5, 145:6, 145:9, 145:12, 146:4, 146:8, 146:9, 146:17, 146:18, 151:5, 151:6, 152:16, 153:1, 153:3, 153:11, 153:13, 157:8, 162:15, 163:3, 163:8, 163:23, 164:1, 164:6, 164:11, 210:7, 214:12, 214:14
**gun's** [4] - 163:9, 163:15, 164:4, 164:9
**gunman** [2] - 31:3, 34:6
**gunpowder** [7] - 19:21, 20:17, 28:15, 29:22, 32:12, 36:1, 36:3
**guns** [2] - 144:25, 156:21
**gunshot** [46] - 19:3, 19:4, 19:7, 19:15, 20:3, 20:23, 22:3, 22:21, 23:10, 23:19, 24:16, 25:1, 25:6, 27:21, 28:9, 28:10, 28:12, 29:9, 29:17, 29:18, 30:2, 30:8, 31:1, 31:7, 32:7, 34:14, 35:1, 35:2, 35:3, 36:24, 37:1, 37:15, 38:12, 39:14, 40:17, 40:19, 40:20, 40:21, 41:11, 41:17, 42:8, 42:15, 42:19, 42:23, 43:19
**Gunshots** [1] - 24:25
**guy** [16] - 5:8, 8:13, 52:8, 57:6, 119:8,

171:14, 171:19, 173:3, 174:20, 175:10, 175:21, 215:22, 220:2, 220:9, 220:11
**guys** [13] - 170:14, 170:19, 171:12, 171:16, 171:18, 173:15, 175:18, 175:20, 189:17, 200:4, 218:25, 219:10, 233:9

### H

**hair** [5] - 29:24, 30:15, 30:17, 36:3
**half** [7] - 53:12, 68:23, 105:22, 179:3, 215:4, 228:23, 234:5
**halfway** [8] - 177:11, 177:13, 177:17, 209:23, 209:25, 210:4, 210:17, 210:18
**Halloween** [2] - 44:16, 44:18
**hand** [25] - 23:22, 23:23, 23:24, 24:3, 24:7, 24:17, 24:18, 24:20, 24:21, 24:25, 25:2, 43:1, 43:2, 47:9, 81:1, 88:6, 104:5, 109:10, 148:23, 151:24, 160:19, 169:7, 174:16
**handed** [4] - 93:7, 93:13, 93:14, 147:15
**handgun** [19] - 9:5, 47:2, 73:12, 85:20, 85:25, 86:9, 87:1, 110:9, 110:11, 110:13, 151:24, 183:4, 184:6, 184:21, 185:10, 199:23, 214:5, 223:20
**handguns** [1] - 86:24
**handle** [1] - 142:23
**hands** [3] - 23:21, 47:6, 193:24
**hanging** [1] - 130:15
**Hanlon** [24] - 1:16, 2:10, 25:16, 46:13, 48:4, 50:9, 51:24, 59:19, 62:17, 94:1, 97:18, 97:19, 98:7, 104:21, 105:13, 122:24, 126:2, 126:6, 132:15, 133:20, 157:2, 221:23, 227:6, 237:25
**HANLON** [74] - 2:11, 25:18, 25:20, 25:22, 26:1, 26:6, 26:21, 45:6, 46:15, 48:5, 50:12, 51:25, 52:2, 52:5, 59:10, 59:15, 59:17, 59:20, 59:25, 60:7, 60:16,

62:15, 62:18, 68:16, 68:24, 69:5, 69:10, 70:13, 105:15, 105:21, 106:8, 106:17, 106:21, 107:16, 107:22, 108:2, 108:9, 108:17, 108:25, 109:6, 115:13, 115:20, 118:15, 123:1, 125:13, 125:17, 125:19, 126:3, 132:17, 137:8, 161:16, 165:9, 167:2, 168:16, 180:16, 180:19, 181:12, 199:9, 218:16, 222:5, 222:12, 222:16, 222:21, 222:25, 225:4, 231:6, 236:10, 236:13, 241:8, 241:9, 241:12, 241:14, 241:15, 241:18
**Hanlon's** [4] - 67:1, 68:7, 137:7, 144:9
**happenstance** [1] - 159:9
**happy** [4] - 69:21, 227:13, 227:16, 227:18
**hard** [6] - 35:11, 46:10, 65:2, 79:17, 129:3, 164:14
**hard-pressed** [1] - 129:3
**harder** [3] - 74:21, 79:13, 163:19
**HARDING** [53] - 2:3, 2:6, 2:14, 2:22, 3:13, 14:11, 14:14, 14:22, 17:16, 26:24, 44:23, 52:18, 52:24, 53:15, 54:9, 54:13, 55:3, 55:11, 56:1, 56:4, 57:25, 58:13, 58:20, 169:4, 169:14, 169:19, 171:5, 171:7, 171:10, 172:10, 173:25, 175:4, 178:9, 180:12, 180:24, 181:2, 235:9, 235:15, 237:21, 237:24, 238:3, 238:8, 238:15, 239:10, 239:18, 239:22, 239:24, 240:2, 240:4, 240:13, 241:4, 241:7, 241:16
**Harding** [37] - 1:16, 2:7, 25:14, 26:20, 26:23, 35:16, 52:17, 53:13, 53:25, 54:7, 55:18, 56:16, 57:13, 57:14, 57:19, 58:9, 111:12, 121:12, 122:21, 123:23, 123:25, 125:16, 126:19, 135:20, 138:2, 172:1, 172:9, 173:17, 173:18, 175:9, 179:17, 184:21,

226:24, 235:6, 235:7, 237:20, 238:25
**Harding's** [6] - 52:8, 138:1, 138:5, 180:6, 235:7, 235:20
**HARRIS** [1] - 1:7
**Harris** [21] - 1:18, 5:13, 5:14, 5:21, 6:8, 9:16, 9:24, 10:6, 11:2, 11:3, 12:20, 13:17, 14:2, 12:20, 57:19, 58:7, 58:12, 58:21, 58:24, 140:20, 228:15
**Harris's** [2] - 6:15, 12:8
**Hasim** [1] - 220:3
**hay** [1] - 138:20
**Hayes** [4] - 58:17, 58:23, 239:19, 239:23
**head** [26] - 19:8, 19:16, 21:16, 22:12, 22:18, 22:23, 28:10, 29:8, 29:19, 29:20, 29:21, 29:23, 30:3, 30:7, 31:1, 32:8, 32:9, 32:16, 35:2, 35:4, 35:5, 35:6, 35:15, 36:5, 36:10, 37:3, 37:4, 157:7
**heads** [1] - 108:11
**hear** [17] - 5:23, 8:13, 45:12, 54:3, 55:12, 106:15, 131:2, 131:5, 139:9, 139:16, 139:24, 173:3, 175:10, 175:20, 175:21, 226:7, 240:10
**heard** [16] - 6:2, 6:12, 6:14, 6:16, 13:15, 13:16, 32:3, 51:12, 107:24, 125:24, 139:8, 157:15, 228:19, 234:20
**hearing** [5] - 45:18, 52:13, 53:20, 124:4, 124:5
**hears** [1] - 142:10
**hearsay** [1] - 172:7
**heart** [8] - 32:22, 39:23, 39:24, 41:6, 41:7, 41:8, 41:9, 41:19
**heater** [1] - 7:15
**Heights** [2] - 186:25, 187:3
**held** [4] - 21:24, 145:1, 145:9, 145:10
**help** [12] - 83:4, 120:1, 120:3, 128:12, 159:6, 171:3, 171:9, 174:25, 197:19, 198:25, 217:25, 231:20
**helped** [2] - 12:20, 157:22
**helping** [1] - 12:24

**Henry** [7] - 127:21,
129:11, 132:2, 132:4,
132:5, 134:17
  **hereby** [1] - 242:3
  **hereunto** [1] - 242:9
  **Heroin** [1] - 186:18
  **heroin** [35] - 192:14,
194:4, 194:8, 195:16,
195:18, 195:21, 197:9,
197:15, 197:23, 201:18,
201:20, 202:21, 203:2,
203:4, 203:7, 203:8,
203:13, 203:17, 203:21,
204:2, 206:1, 206:6,
206:11, 207:12, 207:13,
208:7, 208:10, 208:18,
208:20, 208:23, 209:2,
209:3
  **hew** [1] - 142:13
  **Hi** [1] - 10:24
  **high** [4] - 21:24, 66:9,
74:6, 82:22
  **highest** [1] - 19:10
  **highlight** [3] - 141:14,
141:19, 237:10
  **highly** [1] - 139:19
  **Hill** [2] - 5:5, 8:4
  **history** [2] - 111:21,
111:22
  **hit** [2] - 146:4, 176:16
  **hold** [3] - 61:5, 99:25,
153:21
  **Hold** [1] - 171:25
  **holding** [4] - 24:18,
24:21, 104:5, 169:21
  **holds** [1] - 71:4
  **hole** [14] - 22:15, 71:10,
94:18, 100:25, 102:6,
102:9, 102:22, 102:23,
150:25, 151:10, 151:12,
152:12, 152:13
  **hollow** [2] - 81:2, 83:21
  **home** [13] - 177:9,
177:10, 180:20, 183:11,
201:7, 201:8, 201:10,
210:1, 210:11, 211:18,
212:8, 212:9, 212:14
  **homicide** [7] - 98:2,
98:20, 98:22, 98:25,
101:17, 143:24, 144:10
  **honestly** [1] - 141:5
  **honesty** [1] - 141:8
  **Honor** [184] - 2:3, 2:6,
2:22, 10:16, 10:21,
14:11, 14:14, 17:8,
17:11, 18:18, 24:22,
25:18, 25:23, 26:6,
26:21, 26:25, 28:4, 44:2,
44:3, 44:4, 44:16, 44:22,
45:3, 45:14, 45:25, 46:3,

46:11, 46:15, 47:7, 47:8,
47:11, 48:6, 48:13,
50:12, 51:7, 51:14,
51:25, 52:7, 52:19, 54:5,
55:3, 55:17, 56:13,
56:18, 57:3, 57:12,
57:16, 58:13, 59:8,
59:11, 59:15, 60:7,
62:13, 62:15, 62:19,
65:12, 65:23, 66:1,
68:16, 69:5, 69:10,
69:22, 70:1, 70:9, 70:14,
72:1, 78:14, 80:7, 85:17,
86:4, 87:15, 92:18, 93:3,
93:24, 94:2, 97:10,
103:24, 104:9, 104:15,
105:4, 105:16, 105:17,
105:21, 105:23, 106:8,
106:18, 106:21, 107:11,
107:17, 107:22, 108:3,
108:10, 108:21, 108:25,
115:13, 115:20, 118:15,
122:23, 123:2, 123:17,
124:4, 124:16, 125:11,
125:19, 125:25, 126:3,
126:4, 126:6, 126:23,
127:9, 127:25, 128:13,
129:24, 130:3, 130:9,
132:8, 132:17, 133:18,
134:3, 134:8, 139:2,
139:7, 140:15, 140:18,
142:20, 143:2, 143:4,
143:16, 147:25, 148:10,
159:24, 160:15, 161:16,
165:6, 165:10, 167:4,
168:17, 169:2, 169:4,
170:23, 171:1, 171:5,
171:22, 173:1, 173:12,
173:19, 174:1, 175:7,
176:22, 177:2, 177:7,
177:12, 177:20, 178:9,
180:12, 180:17, 180:25,
202:14, 205:8, 217:15,
218:14, 218:16, 221:5,
222:5, 222:12, 222:16,
222:21, 229:20, 231:6,
231:7, 233:22, 234:2,
235:4, 235:9, 236:3,
236:6, 236:11, 236:21,
237:19, 238:15, 239:19,
240:4
  **Honor's** [3] - 49:13,
133:18, 134:4
  **Honorable** [1] - 1:13
  **hope** [4] - 18:12, 142:1,
151:9, 239:8
  **hopeful** [2] - 184:20,
185:7
  **hoping** [3] - 121:19,
122:1, 238:24

**hospital** [6] - 38:22,
38:23, 39:13, 41:15,
42:2, 42:4
  **Hospital** [2] - 39:8,
40:12
  **hostile** [1] - 52:25
  **hour** [4] - 53:12,
105:23, 167:22, 234:5
  **hours** [7] - 12:23, 39:9,
41:20, 234:12, 234:13,
237:25, 239:21
  **house** [42] - 6:23, 10:8,
11:12, 12:6, 119:23,
177:11, 177:13, 177:17,
187:12, 187:13, 191:4,
191:5, 191:6, 192:15,
192:16, 192:19, 192:20,
192:22, 192:23, 193:1,
193:3, 193:4, 193:9,
193:14, 193:17, 193:19,
193:20, 209:23, 209:25,
210:4, 210:17, 210:18,
216:19, 216:20, 223:15,
223:17, 224:1, 224:18
  **housekeeping** [1] -
44:24
  **houses** [4] - 192:5,
192:9, 194:3, 194:5
  **Howard** [3] - 65:12,
65:13, 166:3
  **hum** [10] - 8:21, 11:23,
14:10, 112:17, 115:2,
122:19, 174:6, 187:4,
211:12, 212:10
  **Humm** [1] - 178:21
  **hundreds** [1] - 167:12
  **hunting** [1] - 138:9
  **hurt** [1] - 118:24
  **hyphen** [2] - 109:17,
181:10
  **hypothetical** [2] -
130:13, 131:14

## I

**I-95** [1] - 212:17
  **IBN** [6] - 109:11,
109:17, 181:5, 181:9,
241:11, 241:18
  **Ibn** [4] - 109:16, 181:9,
181:22, 182:4
  **IBN-REYNOLDS** [4] -
109:11, 181:5, 241:11,
241:18
  **Ibn-Reynolds** [4] -
109:16, 181:9, 181:22,
182:4
  **ICK** [1] - 3:4
  **idea** [7] - 20:14, 39:2,

206:2, 225:6, 225:7,
225:9, 235:11
  **ident** [1] - 166:10
  **identical** [1] - 154:4
  **Identification** [2] - 61:7,
61:8
  **identification** [31] -
61:16, 61:19, 61:20,
62:3, 63:7, 63:16, 63:23,
64:1, 64:2, 64:3, 64:17,
64:20, 65:25, 67:13,
67:17, 69:3, 70:16,
71:18, 75:12, 154:16,
155:6, 155:22, 157:12,
158:6, 161:6, 161:11,
162:14, 165:20, 166:11,
167:1, 167:21
  **identifications** [3] -
67:9, 68:15, 159:8
  **identified** [2] - 63:2,
218:11
  **identify** [3] - 73:21,
75:20, 202:11
  **identifying** [4] - 64:18,
168:13, 202:14, 205:8
  **ignite** [1] - 71:10
  **illegal** [1] - 221:17
  **image** [12] - 33:12,
91:21, 91:23, 147:16,
148:21, 149:2, 149:4,
149:14, 159:5, 159:7,
159:11, 159:21
  **imaged** [1] - 149:6
  **images** [10] - 91:24,
92:1, 95:22, 98:12,
104:14, 147:21, 148:20,
149:4, 149:11, 160:21
  **Imagine** [1] - 130:13
  **imagine** [1] - 137:25
  **imaging** [2] - 91:20,
95:19
  **imbedded** [2] - 145:4,
152:11
  **imbeds** [2] - 151:10,
151:12
  **immediately** [9] - 23:13,
23:15, 32:9, 33:7, 34:2,
39:15, 40:23, 41:25,
141:1
  **impart** [1] - 75:15
  **imparted** [3] - 71:19,
73:25, 166:16
  **imparts** [1] - 74:22
  **imperfect** [1] - 73:23
  **important** [8] - 126:22,
135:19, 136:23, 148:7,
226:19, 226:25, 240:4,
240:6
  **impossible** [1] - 58:15
  **Impossible** [1] - 144:13

**impressed** [1] - 155:7
  **impression** [10] - 90:17,
94:16, 94:18, 96:14,
99:13, 148:23, 155:7,
158:11, 159:14, 233:19
  **impressions** [11] -
82:18, 82:20, 84:24,
89:8, 90:15, 90:16,
90:18, 93:18, 94:15,
164:3, 164:7
  **improper** [1] - 136:15
  **IN** [1] - 1:1
  **in-court** [1] - 236:10
  **inadvertently** [1] -
129:4
  **incarcerated** [3] -
179:14, 214:8, 214:12
  **inch** [4] - 19:20, 35:15,
37:3, 37:4
  **inches** [5] - 20:20,
29:20, 81:13, 81:15
  **incident** [1] - 119:20,
178:19, 179:11, 179:14,
179:22
  **included** [1] - 187:21
  **includes** [1] - 71:24
  **Including** [1] - 194:15
  **including** [2] - 93:12,
231:19
  **inconsistent** [1] -
156:11
  **inconvenienced** [1] -
234:15
  **incorrect** [2] - 62:10,
150:19
  **incredible** [1] - 235:22
  **incriminating** [4] -
134:15, 134:17, 135:5,
135:12
  **indeed** [4] - 89:3, 101:6,
154:11, 166:17
  **Indeed** [1] - 154:17
  **independent** [1] -
197:18
  **INDEX** [1] - 241:1
  **Indianapolis** [2] -
31:25, 32:2
  **indicate** [3] - 19:13,
21:24, 21:25
  **indicated** [4] - 21:19,
157:7, 206:22, 221:23
  **indicates** [3] - 19:22,
20:14, 231:4
  **indicating** [3] - 22:8,
28:16, 86:3
  **indication** [1] - 232:25
  **indicted** [4] - 137:10,
183:15, 224:4, 224:22
  **indictment** [6] - 125:22,
136:10, 136:19, 137:16,

223:8, 223:11
  **indictments** [1] -
133:25
  **individual** [44] - 74:15,
74:16, 75:2, 76:4, 76:6,
77:17, 77:18, 77:19,
85:2, 85:5, 89:13, 89:14,
89:17, 92:2, 92:14,
92:19, 92:20, 95:23,
95:24, 96:9, 100:23,
102:11, 128:16, 131:16,
133:9, 156:10, 159:18,
163:13, 163:14, 163:19,
164:11, 164:16, 166:11,
166:17, 166:19, 166:23,
166:25, 167:17, 188:5,
188:17, 200:1, 200:2,
204:17, 228:14
  **individuals** [1] - 134:1,
200:4
  **indulgence** [2] - 121:6,
165:3
  **infer** [1] - 140:12
  **inference** [1] - 131:7
  **inflated** [1] - 31:11
  **informant** [8] - 132:25,
133:7, 133:15, 133:22,
134:14, 134:19, 135:1,
135:6
  **information** [22] -
52:24, 92:8, 113:19,
113:24, 114:9, 114:10,
115:18, 118:3, 118:23,
119:1, 127:16, 127:19,
127:22, 129:13, 131:6,
131:8, 136:2, 183:20,
183:21, 229:13, 229:18,
231:18
  **informative** [1] - 36:2
  **informed** [1] - 123:24
  **initial** [11] - 68:1, 78:8,
78:11, 79:2, 79:6, 79:7,
79:22, 94:9, 114:8,
125:23, 137:17
  **initiated** [1] - 133:1
  **inject** [1] - 49:12
  **injured** [8] - 20:1,
22:16, 28:18, 32:15,
36:6, 37:25, 41:6
  **injuries** [10] - 31:3,
31:7, 31:9, 32:6, 39:10,
40:16, 40:18, 42:19,
42:22, 43:13
  **injuring** [4] - 20:2, 30:3,
30:18, 36:4
  **injury** [18] - 19:1, 19:3,
23:3, 23:11, 23:17, 25:3,
28:7, 29:8, 31:12, 33:23,
34:25, 36:19, 40:17,
41:20, 41:21, 41:23,

41:24, 42:7
  **inquiry** [1] - 149:19
  **inside** [23] - 11:17,
12:2, 12:9, 22:18, 32:18,
71:6, 73:2, 73:5, 73:24,
74:4, 75:13, 84:23,
86:19, 90:15, 102:20,
103:2, 146:4, 151:13,
152:14, 153:3, 153:5,
217:7, 226:9
  **install** [1] - 163:13
  **instances** [2] - 142:4,
167:8
  **instant** [2] - 23:1, 23:3
  **instantaneous** [2] -
23:4, 29:15
  **instead** [1] - 41:9
  **instruct** [4] - 48:8, 52:2,
107:7, 141:10
  **instruction** [10] -
139:18, 140:22, 140:23,
141:1, 141:5, 141:13,
142:12, 142:22, 236:7
  **instructions** [3] - 128:6,
135:11, 239:5
  **instrument** [1] - 156:9
  **intend** [5] - 140:25,
160:10, 237:8, 239:25,
240:15
  **intending** [1] - 210:13
  **intent** [1] - 74:19
  **intention** [1] - 127:16
  **intentional** [4] - 59:20,
134:13, 135:10, 136:7
  **intentionally** [4] -
127:15, 128:23, 129:15,
136:4
  **interchangeability** [1] -
82:1
  **interchangeable** [1] -
81:8
  **interest** [1] - 135:17
  **interested** [1] - 196:9
  **interference** [1] - 3:6
  **interior** [3] - 71:22,
74:12, 75:1
  **international** [1] - 64:16
  **interrogating** [1] -
127:15
  **interrupt** [6] - 25:15,
26:20, 35:20, 105:19,
105:25, 162:2
  **interrupting** [1] -
150:21
  **intersect** [2] - 102:14,
102:15
  **intersecting** [1] - 102:8
  **intervening** [1] - 163:18
  **intimated** [1] - 139:16
  **intimately** [1] - 75:13

  **introduce** [1] - 200:23
  **introduced** [2] - 146:23,
205:1
  **investigating** [1] -
230:15
  **investigation** [4] - 78:5,
92:10, 184:15, 234:21
  **investigator** [1] - 133:8
  **investigator's** [1] - 34:4
  **investigators** [3] - 21:3,
21:9, 21:11
  **invite** [1] - 141:12
  **involve** [2] - 63:10,
63:21
  **Involved** [1] - 200:18
  **involved** [24] - 5:21,
13:17, 13:21, 14:3,
31:13, 67:9, 78:3, 78:8,
89:22, 91:11, 97:3,
116:19, 132:5, 133:9,
134:1, 165:12, 170:14,
170:19, 190:15, 200:20,
202:17, 203:25, 207:5,
216:15
  **involvement** [2] -
205:21, 206:6
  **involves** [1] - 185:10
  **involving** [2] - 32:13,
49:24
  **islands** [1] - 158:8
  **issue** [12] - 2:10, 25:18,
45:25, 53:16, 53:20,
54:2, 106:5, 126:15,
139:3, 139:5, 139:10
  **issued** [1] - 68:21
  **issues** [2] - 105:10,
234:21
  **item** [15] - 72:12, 78:16,
78:20, 80:14, 80:17,
80:21, 82:4, 83:12,
83:15, 83:18, 87:13,
87:17, 87:18, 126:4,
142:5
  **Item** [1] - 78:25
  **items** [7] - 12:2, 76:7,
78:4, 79:25, 80:1, 80:17,
93:1
  **itself** [15] - 23:12,
41:23, 82:11, 82:18,
96:12, 101:2, 127:18,
138:23, 150:23, 151:10,
151:12, 162:17, 164:2,
164:6, 216:7
  **IVIS** [1] - 156:4

**J**

  **jacket** [5] - 79:11,
79:14, 79:16, 81:2, 81:3

**jacketed** [2] - 81:3,
83:21
  **jacketing** [3] - 79:14,
79:17, 83:22
    **Jacob** [1] - 92:20
  **jail** [13] - 53:4, 53:6,
199:17, 206:15, 207:9,
209:10, 209:11, 209:19,
215:8, 220:13, 220:15,
220:16, 220:17
  **James** [3] - 1:21, 68:14,
99:3
  **January** [4] - 8:20, 9:12,
15:23, 125:23, 125:24,
137:17
  **jaw** [1] - 33:2
  **Jed** [1] - 68:22
  **JFM-03-0454** [1] -
125:19
  **job** [6] - 15:24, 62:21,
63:19, 211:17, 211:21,
212:2
  **joined** [1] - 66:12
  **joint** [1] - 43:5
  **Jones** [7] - 38:18, 39:7,
40:17, 43:18, 43:20,
78:6, 139:21
  **Joseph** [1] - 38:14
  **Judge** [15] - 1:13,
45:14, 46:6, 46:8, 47:6,
48:13, 50:3, 56:1, 68:21,
132:21, 134:24, 137:19,
236:6, 237:5, 239:14
  **judge** [4] - 44:20, 49:16,
184:23, 185:5, 227:5
  **judicial** [1] - 69:1
  **jugular** [4] - 28:22,
29:11, 33:24
  **July** [1] - 172:17
  **jump** [4] - 170:21,
173:4, 175:11, 175:21
  **jumped** [3] - 62:20,
174:21, 216:8
  **jumpers** [1] - 170:18
  **jumps** [1] - 132:20
  **June** [8] - 78:5, 122:17,
169:20, 170:10, 206:18,
207:9
  **jure** [1] - 130:11
  **jurisdiction** [1] - 92:3
  **juror** [1] - 176:5
  **jurors** [1] - 27:4
  **jury** [39] - 2:4, 2:9,
11:22, 33:8, 52:7, 53:9,
58:1, 59:9, 61:18,
101:20, 105:5, 105:7,
105:10, 106:1, 106:11,
106:16, 109:9, 141:10,
141:18, 142:3, 142:10,
142:24, 146:8, 149:24,

158:25, 159:22, 172:4,
172:14, 172:17, 176:5,
179:16, 195:13, 234:9,
235:24, 239:5, 239:10,
239:11
  **Jury** [8] - 1:14, 2:18,
44:13, 60:3, 105:12,
109:4, 143:9, 235:1
  **jury's** [1] - 80:14
  **Jury's** [1] - 44:12
  **juvenile** [1] - 221:17

**K**

  **K-A-A-Z-I-M** [2] -
109:16, 181:9
  **KAAZIM** [4] - 109:11,
181:5, 241:11, 241:18
  **Kaazim** [3] - 109:16,
181:9, 181:22, 182:3
  **keep** [10] - 7:6, 9:16,
10:1, 12:1, 40:4, 44:11,
73:4, 105:10, 202:19,
234:20
  **keeping** [1] - 197:7
  **Kelsey** [1] - 1:17
  **kept** [2] - 7:19, 8:1,
11:14
  **Kevin** [1] - 60:13
  **kidney** [1] - 27:6
  **Kidwell** [1] - 80:24
  **kind** [31] - 7:19, 24:5,
35:11, 39:2, 48:20, 49:5,
63:4, 63:17, 64:10,
64:20, 76:19, 97:18,
127:15, 128:4, 128:23,
132:12, 139:5, 145:16,
151:5, 164:14, 186:17,
189:3, 189:9, 189:23,
190:15, 193:21, 195:9,
200:7, 201:1, 212:2
  **kinds** [3] - 62:25,
164:20, 164:24
  **kitchen** [2] - 7:9, 11:15
  **knees** [1] - 31:8
  **knives** [1] - 101:23
  **knowing** [3] - 135:9,
152:19, 198:24
  **knowledge** [9] - 9:7,
54:24, 58:20, 59:22,
96:25, 97:4, 154:15,
165:24, 166:11
  **known** [5] - 5:14, 9:9,
135:16, 186:11
  **knows** [2] - 58:2,
136:14
  **Kramer** [6] - 111:12,
111:21, 114:13, 117:12,
121:12, 126:19

**Kurland** [4] - 1:22, 235:17, 236:17, 238:16
**KURLAND** [10] - 172:7, 175:7, 235:18, 236:3, 236:6, 236:19, 237:5, 237:16, 237:19, 239:14
**Kurland's** [1] - 236:15

# L

**LA** [1] - 168:2
**Lab** [3] - 60:25, 61:5, 168:22
**lab** [3] - 61:2, 62:22, 165:21
**label** [3] - 13:17, 35:21, 128:11
**labeled** [3] - 28:11, 94:22, 95:1
**labeling** [1] - 35:19
**Laboratory** [6] - 60:20, 60:22, 61:7, 63:6, 68:4, 162:6
**laboratory** [6] - 27:18, 60:25, 68:5, 89:5, 89:10, 161:5
**lacerates** [1] - 33:4
**lacks** [2] - 164:19, 164:22
**ladies** [9] - 44:8, 60:5, 101:19, 103:6, 141:20, 143:10, 149:24, 158:24, 239:6
**Ladies** [2] - 2:19, 161:21
**lady** [3] - 25:22, 78:5, 106:18
**laid** [1] - 183:9
**land** [4] - 85:1, 90:17, 90:19, 155:7
**landmarks** [1] - 35:13
**lands** [4] - 82:23, 88:5, 89:19, 90:15
**Lane** [2] - 87:2, 87:6
**language** [1] - 148:16
**large** [4] - 29:15, 42:13, 70:24, 146:10
**larger** [2] - 86:18, 87:9
**last** [21] - 5:12, 18:15, 45:16, 47:21, 53:12, 60:14, 74:21, 84:4, 97:16, 131:22, 138:17, 139:5, 139:16, 167:23, 168:2, 169:17, 188:23, 228:6, 237:5
**late** [3] - 58:23, 137:25
**Latent** [1] - 61:7
**latter** [1] - 49:5
**Laura** [1] - 1:17

**law** [9] - 128:3, 131:24, 132:14, 134:9, 134:21, 138:20, 183:5, 183:21, 184:16
**LAWLOR** [9] - 17:12, 44:3, 44:16, 44:18, 44:20, 143:2, 143:6, 218:18, 241:19
**Lawlor** [2] - 1:18, 143:8
**lawyer** [23] - 111:6, 115:8, 116:25, 120:1, 120:3, 120:4, 120:22, 120:25, 122:11, 122:20, 126:24, 127:11, 136:20, 217:25, 218:2, 218:10, 222:3, 222:9, 222:10, 222:11, 222:14, 222:20, 223:2
**lawyers** [6] - 222:3, 222:7, 222:14, 222:18, 223:2, 224:25
**lead** [2] - 170:24, 171:23
**leading** [2] - 92:8, 170:23
**learn** [3] - 24:2, 118:2, 118:21
**learned** [3] - 75:25, 138:3, 138:12
**learns** [1] - 127:18
**least** [19] - 13:21, 25:9, 25:10, 25:11, 25:12, 37:10, 45:4, 49:6, 49:7, 49:8, 54:14, 65:2, 117:21, 118:8, 137:22, 144:20, 150:1, 163:23, 227:12
**Leave** [1] - 105:8
**leave** [8] - 26:12, 41:10, 44:9, 125:7, 141:25, 164:2, 164:7, 234:18
**leaves** [2] - 72:20, 74:14
**leaving** [3] - 158:12, 162:18, 186:4
**Leaving** [1] - 43:20
**led** [3] - 82:8, 120:24, 121:2
**Lee** [15] - 47:4, 92:19, 93:3, 93:11, 94:5, 95:14, 96:21, 96:25, 97:17, 101:15, 103:18, 143:20, 144:17, 148:15, 168:19
**Leech** [1] - 133:8
**Left** [1] - 34:17
**left** [53] - 19:17, 19:24, 20:4, 21:17, 22:2, 22:5, 24:10, 24:15, 28:19, 28:20, 28:21, 28:22, 29:1, 29:21, 30:4, 32:1,

32:8, 32:9, 32:25, 34:6, 34:7, 35:15, 36:13, 37:7, 38:1, 38:3, 42:10, 42:16, 43:1, 43:2, 43:3, 53:24, 72:24, 73:2, 73:18, 84:24, 85:7, 101:2, 107:2, 113:11, 148:21, 148:23, 149:5, 159:14, 160:19, 160:22, 185:20, 185:23, 206:14
**left-hand** [2] - 148:23, 160:19
**legal** [1] - 141:17
**lenses** [1] - 76:25
**Lentz** [1] - 132:14
**less** [1] - 209:8
**lesser** [1] - 185:8
**lest** [1] - 47:20
**lethal** [2] - 23:15, 34:2
**letter** [16] - 46:4, 123:14, 124:1, 124:7, 124:20, 126:9, 135:20, 138:1, 138:5, 138:23, 226:24, 229:25, 230:23, 231:5, 231:15
**letting** [2] - 108:11, 112:18
**level** [4] - 65:5, 190:18, 202:25, 203:3
**lied** [5] - 119:9, 119:10, 119:12, 119:14, 120:15
**lieutenant** [2] - 190:2, 190:17
**Lieutenant** [1] - 190:3
**life** [6] - 42:4, 53:7, 164:4, 164:9, 181:19, 181:20
**ligament** [1] - 43:9
**light** [7] - 33:15, 77:4, 79:12, 140:4, 142:8, 185:7, 239:2
**likely** [6] - 45:23, 48:14, 48:21, 49:8, 50:24, 139:19
**limine** [1] - 126:21
**limit** [1] - 83:4
**limitation** [1] - 46:21
**limitations** [1] - 45:24
**limited** [5] - 19:3, 58:4, 141:18, 142:4, 223:1
**limiting** [7] - 83:1, 139:18, 140:22, 141:13, 142:11, 142:22
**Line** [2] - 172:5, 172:6
**line** [7] - 22:4, 48:12, 48:13, 148:22, 148:25, 160:21, 192:11
**lines** [4] - 46:23, 101:25, 142:14, 142:15
**link** [1] - 92:4

**linked** [1] - 98:21
**Lisa** [3] - 17:19, 17:21, 18:20
**list** [3] - 142:3, 239:1, 239:3
**listed** [1] - 239:5
**liters** [1] - 42:3
**Litwin** [1] - 38:15
**live** [4] - 5:8, 11:3, 62:9, 62:12
**lived** [4] - 4:23, 41:20, 181:19
**liver** [1] - 27:6
**living** [13] - 4:14, 4:16, 4:17, 4:19, 4:20, 4:21, 5:7, 6:25, 7:9, 8:4, 11:15, 60:19, 62:20
**load** [1] - 73:15
**loaded** [11] - 62:8, 62:9, 62:11, 70:20, 70:21, 70:22, 71:2, 72:7, 72:8, 72:9, 78:12
**lobe** [3] - 19:17, 32:10, 32:14, 36:7
**lobes** [1] - 36:6
**located** [12] - 19:16, 20:3, 22:4, 24:10, 28:13, 29:19, 32:8, 35:4, 35:14, 37:3, 37:15, 42:24
**location** [6] - 23:3, 24:8, 86:4, 92:6, 147:9, 202:11
**locations** [1] - 234:22
**locked** [35] - 8:1, 112:8, 112:10, 112:12, 112:15, 112:20, 112:22, 116:19, 117:4, 119:23, 120:5, 120:6, 120:8, 120:10, 120:19, 169:21, 169:25, 170:7, 170:8, 190:12, 210:6, 212:15, 212:17, 212:18, 212:20, 212:23, 214:5, 214:19, 215:17, 215:21, 218:3, 218:4, 218:6
**lockup** [6] - 52:11, 55:4, 57:20, 57:24, 58:7, 58:21
**lodged** [2] - 33:1, 36:8
**log** [1] - 159:9
**Lombard** [1] - 1:25
**Look** [1] - 139:5
**look** [24] - 9:15, 18:25, 35:19, 55:25, 59:7, 71:18, 71:20, 74:1, 74:2, 74:3, 77:1, 91:24, 93:11, 96:10, 133:18, 147:20, 148:21, 149:3, 157:24, 159:11, 159:23, 210:13, 219:13, 233:8
**looked** [5] - 10:3, 47:21,

98:16, 129:20, 236:17
**Looking** [2] - 22:20, 89:13
**looking** [25] - 23:22, 33:8, 42:5, 43:21, 46:2, 71:23, 72:6, 76:12, 76:24, 100:8, 104:2, 108:12, 132:21, 133:18, 154:24, 158:6, 158:9, 158:10, 158:13, 158:14, 158:15, 158:17, 158:19, 159:1, 210:9
**looks** [5] - 33:15, 62:5, 50:17, 104:23, 160:1
**Los** [1] - 167:19
**loss** [1] - 29:16
**low** [1] - 74:6
**lower** [3] - 22:8, 81:22, 152:11
**lunch** [4] - 105:2, 105:6, 150:4, 234:12
**Luncheon** [1] - 109:3
**lung** [2] - 39:22, 41:6
**lured** [1] - 231:19
**lyrics** [1] - 8:3

# M

**M-U-N-G-O** [1] - 169:18
**ma'am** [1] - 3:11
**machine** [4] - 96:7, 100:14, 101:7, 102:15
**machined** [1] - 74:14
**machines** [1] - 154:11
**machining** [3] - 102:10, 102:13, 155:8
**magnification** [1] - 77:4
**magnum** [13] - 22:14, 81:16, 81:17, 81:18, 81:19, 81:21, 81:23, 81:24, 81:25, 87:9, 88:1, 88:5
**mails** [1] - 107:4
**Maine** [1] - 132:23
**mainframe** [1] - 91:23
**majority** [1] - 27:9
**man** [4] - 21:15, 27:23, 31:17, 228:5
**mandatory** [2] - 127:18, 225:11
**manner** [3] - 96:8, 159:8, 242:8
**Manual** [1] - 162:7
**Manuelian** [1] - 58:10
**manufacture** [2] - 75:18, 163:12
**manufactured** [11] - 88:1, 88:4, 101:22, 102:18, 153:19, 154:4,

154:5, 154:6, 154:10, 156:16, 166:13
**manufacturers** [1] - 94:14
**manufactures** [1] - 101:7
**manufacturing** [4] - 73:23, 74:7, 83:2, 163:5
**March** [21] - 11:22, 92:19, 110:5, 110:8, 111:3, 116:3, 117:9, 124:7, 124:13, 124:17, 124:18, 125:8, 138:1, 138:2, 182:22, 183:10, 183:15, 223:14, 231:4, 231:14, 231:15
**mark** [37] - 20:8, 61:16, 61:19, 63:7, 63:15, 63:16, 64:3, 64:17, 64:21, 64:25, 65:24, 70:15, 71:17, 96:6, 96:7, 96:9, 96:17, 99:11, 99:12, 99:14, 99:22, 100:8, 104:15, 126:4, 147:17, 150:4, 150:5, 153:8, 154:7, 155:5, 155:6, 155:7, 155:22, 160:6, 160:7
**Mark** [7] - 60:8, 60:13, 61:6, 63:12, 64:15, 68:6, 68:11
**MARK** [3] - 60:9, 241:8, 241:13
**marked** [33] - 9:3, 18:10, 27:25, 31:17, 76:7, 76:13, 77:24, 78:13, 78:21, 78:24, 80:6, 80:21, 80:23, 85:22, 87:1, 87:13, 88:9, 89:4, 89:5, 91:3, 91:8, 91:22, 93:2, 93:10, 93:20, 95:14, 101:15, 103:17, 143:19, 148:1, 148:2, 182:15, 229:22
**marking** [2] - 76:10, 170:3
**markings** [25] - 47:12, 71:18, 72:20, 73:18, 73:21, 74:25, 75:15, 76:16, 77:21, 83:2, 83:3, 84:25, 85:1, 101:2, 159:3, 162:16, 163:2, 163:10, 163:21, 165:18, 165:25, 166:5, 166:8, 167:10
**marks** [25] - 73:17, 75:21, 77:2, 79:16, 84:1, 94:20, 100:14, 102:1, 146:19, 150:5, 150:7, 153:14, 154:2, 154:24,

155:2, 155:7, 155:10, 155:12, 155:13, 155:23, 156:13, 156:22, 157:25, 166:11, 167:17
**marshal** [2] - 54:8, 179:8
**marshal's** [1] - 57:24
**marshals** [6] - 53:2, 56:5, 58:4, 173:11, 173:14, 175:17
**MARTIN** [35] - 1:8, 44:4, 52:7, 52:11, 52:16, 52:21, 53:19, 53:22, 54:5, 55:17, 56:13, 56:18, 56:20, 57:2, 57:12, 57:16, 59:8, 140:17, 143:4, 170:23, 171:22, 172:15, 173:1, 176:9, 176:22, 177:2, 177:7, 177:12, 177:20, 178:1, 178:11, 210:24, 213:15, 221:5, 241:17
**Martin** [34] - 1:19, 1:20, 52:6, 53:18, 54:15, 54:19, 54:25, 55:6, 55:10, 55:11, 55:14, 55:16, 56:16, 57:8, 58:1, 58:21, 59:1, 139:9, 140:16, 140:20, 202:15, 209:13, 209:23, 210:12, 218:11, 221:9, 221:10, 227:21, 228:1, 228:3, 229:6, 232:9, 232:16
**Martin's** [3] - 143:2, 229:22
**Mary** [3] - 1:24, 242:3, 242:14
**MARYLAND** [1] - 1:2
**Maryland** [14] - 1:12, 1:25, 15:2, 15:4, 15:25, 17:6, 17:25, 40:10, 49:25, 63:6, 65:13, 65:14, 67:14, 183:12
**mask** [1] - 163:12
**masked** [2] - 164:11, 164:17
**mass** [2] - 101:10, 152:16
**Massachusetts** [1] - 88:4
**Massiah** [6] - 106:5, 128:1, 129:3, 129:12, 134:15, 134:17
**Massiah/Henry** [1] - 2:10
**match** [12] - 46:20, 46:23, 47:4, 50:7, 50:11, 50:17, 50:18, 69:14, 69:16, 91:4, 149:21, 165:18

**matched** [4] - 46:23, 77:8, 149:7, 166:22
**matches** [1] - 49:8
**matching** [1] - 46:16
**mate** [1] - 130:23
**material** [13] - 55:18, 74:18, 74:22, 79:11, 79:14, 81:3, 83:22, 102:21, 145:25, 158:11, 158:12, 163:16, 163:17
**materials** [2] - 54:16, 55:14
**mates** [7] - 116:9, 117:5, 123:25, 135:23, 138:4, 215:3, 215:7
**math** [2] - 206:19, 208:19
**matter** [17] - 2:10, 11:21, 44:24, 56:9, 57:23, 58:11, 83:25, 106:18, 115:14, 120:13, 143:11, 158:10, 167:24, 225:16, 230:17, 242:4, 242:8
**matters** [2] - 106:25, 235:18
**MB-26** [3] - 18:11, 18:18, 28:1
**MB-27** [2] - 28:1, 28:4
**McCaffity** [9] - 27:23, 28:6, 28:9, 29:5, 30:7, 31:2, 31:6, 31:8, 32:5
**McCaffity's** [1] - 30:25
**mean** [55] - 5:16, 13:23, 20:22, 21:9, 30:15, 45:14, 45:23, 49:15, 49:16, 50:7, 50:25, 51:9, 51:10, 53:17, 89:25, 111:24, 116:12, 128:19, 130:3, 130:7, 130:12, 131:17, 131:22, 135:14, 135:25, 136:24, 145:1, 146:9, 148:14, 153:2, 156:1, 156:25, 157:24, 158:18, 163:2, 163:21, 187:21, 187:25, 195:13, 195:14, 197:24, 198:1, 200:14, 202:20, 203:4, 203:5, 213:6, 213:19, 216:1, 229:8, 232:13, 233:2, 237:12, 237:16
**meaning** [4] - 57:10, 91:14, 134:15, 201:14
**means** [8] - 61:24, 69:16, 77:12, 190:3, 201:20, 228:25, 232:18, 232:19
**meant** [4] - 135:8, 210:21, 216:2, 232:23
**meantime** [1] - 234:18

**measurable** [1] - 82:19
**measure** [3] - 82:16, 82:19, 82:23
**measured** [1] - 81:15
**measurement** [2] - 81:13, 82:16
**medical** [25] - 15:1, 15:3, 15:8, 15:21, 15:24, 16:6, 17:18, 17:20, 18:5, 18:6, 18:7, 18:9, 23:16, 27:1, 27:17, 27:22, 31:23, 31:25, 38:19, 39:3, 40:3, 41:13, 41:22, 132:24
**Medical** [7] - 15:1, 15:2, 17:24, 21:10, 38:19, 83:13, 88:10
**medications** [1] - 40:1
**medicines** [1] - 15:12
**meet** [17] - 8:18, 113:13, 113:17, 118:11, 187:14, 200:1, 200:5, 200:21, 200:24, 204:19, 211:4, 222:4, 222:7, 222:15, 230:15, 230:18, 230:21
**meeting** [33] - 110:1, 110:18, 111:5, 111:9, 111:16, 111:19, 112:4, 112:12, 112:15, 113:1, 113:11, 114:8, 114:16, 114:21, 115:4, 115:22, 115:23, 117:13, 118:19, 121:10, 122:20, 123:12, 124:12, 124:19, 124:21, 125:4, 125:9, 127:2, 223:2, 232:8, 232:10, 232:11, 232:12
**meetings** [9] - 113:23, 114:17, 114:22, 115:3, 115:6, 115:9, 117:12, 118:6, 118:7
**member** [2] - 64:14, 200:16
**Members** [2] - 105:5, 234:9
**members** [1] - 154:9
**membership** [1] - 68:12
**memberships** [1] - 64:10
**membrane** [1] - 39:23
**memo** [1] - 46:2
**memorandum** [2] - 129:10, 132:8
**memory** [1] - 155:25
**mention** [4] - 142:17, 210:8, 214:2, 225:11
**mentioned** [14] - 42:18, 63:8, 68:8, 81:4, 96:24, 123:9, 123:20, 124:25,

125:5, 189:11, 192:5, 195:3, 213:3, 234:23
**mess** [3] - 218:24, 219:3, 219:4
**message** [1] - 108:22
**messages** [1] - 107:2
**met** [17] - 54:9, 114:2, 123:4, 127:12, 178:17, 183:24, 187:16, 188:2, 190:12, 200:9, 201:1, 204:17, 204:21, 207:1, 221:23, 221:25, 222:18
**metal** [7] - 74:1, 79:2, 79:12, 79:13, 80:15, 80:16, 145:23, 145:25, 153:4, 153:7
**methodology** [3] - 49:11, 69:13, 69:18
**methods** [1] - 193:22
**Michael** [2] - 1:16, 1:18
**microphone** [3] - 61:10, 103:9, 189:1
**microscope** [9] - 74:3, 76:21, 76:22, 76:23, 85:5, 89:11, 95:22, 103:7
**microscopic** [1] - 77:2
**mid** [5] - 29:21, 137:25, 206:20, 219:21
**middle** [9] - 82:12, 146:3, 147:23, 149:3, 149:6, 150:14, 160:20, 174:9, 206:12
**Might** [1] - 229:20
**might** [22] - 46:24, 54:1, 56:20, 75:3, 114:4, 118:2, 118:3, 118:10, 118:13, 130:19, 138:12, 141:7, 141:20, 159:22, 185:2, 188:24, 194:19, 198:3, 235:2, 237:8
**mike** [4] - 3:1, 60:11, 109:13, 181:7
**military** [2] - 59:22, 81:14
**milk** [1] - 7:21
**millimeters** [1] - 152:5
**millimeters** [1] - 152:5
**mind** [5] - 44:11, 48:6, 105:10, 138:11, 234:20
**mineral** [1] - 164:14
**minimum** [1] - 225:12
**minor** [2] - 7:15, 106:18
**Minus** [4] - 226:4, 226:6, 226:8, 226:9
**minute** [3] - 3:5, 47:15, 138:18, 201:20, 232:9, 232:11, 232:12, 238:18
**minutes** [9] - 39:9, 44:9, 44:12, 105:22, 106:4, 106:14, 180:20, 211:3, 212:12

**miscellaneous** [1] - 7:16
**misled** [1] - 148:18
**missed** [1] - 106:8
**mistaken** [1] - 125:1
**MITCHELL** [1] - 1:7
**Mitchell** [6] - 1:17, 133:1, 140:20, 228:5, 228:9, 242:5
**mitigate** [2] - 139:19, 140:24
**mitigating** [1] - 50:4
**mix** [2] - 190:11, 203:10
**mixed** [1] - 208:24
**mixing** [2] - 203:13, 203:25
**mobile** [2] - 67:2, 67:4
**Model** [1] - 88:3
**model** [9] - 62:11, 70:24, 75:3, 87:25, 88:2, 96:10, 99:19, 152:18, 153:19
**Moment** [1] - 85:17
**moment** [20] - 20:6, 25:14, 62:3, 80:5, 92:18, 93:6, 121:6, 133:4, 148:14, 159:20, 161:21, 165:3, 170:5, 171:9, 171:25, 173:17, 174:17, 178:5, 192:4, 218:14, 229:20, 233:22
**Monday** [2] - 1:11, 58:18
**money** [28] - 119:24, 120:24, 191:6, 192:6, 193:11, 193:16, 193:19, 193:24, 196:23, 197:1, 204:12, 207:24, 210:11, 210:14, 210:16, 210:22, 213:8, 213:10, 213:12, 213:20, 213:24, 213:25, 217:14, 217:20, 217:24, 232:17, 237:7
**monitor** [7] - 82:10, 89:16, 97:19, 98:4, 160:5, 160:8, 160:9
**Monroe** [5] - 15:21, 186:25, 187:2, 187:3, 191:4
**Monson** [1] - 88:4
**Montgomery** [9] - 119:8, 119:10, 119:12, 119:14, 119:18, 215:22, 215:24, 216:4, 238:10
**Montgomery's** [2] - 139:23, 142:9
**month** [8] - 68:23, 114:23, 114:25, 115:1, 117:8, 124:20, 127:5, 179:17

**months** [20] - 7:5, 11:6, 15:5, 53:4, 53:6, 58:14, 110:24, 110:25, 111:1, 111:2, 114:23, 125:8, 127:5, 136:15, 137:15, 177:6, 177:11, 205:2, 206:23, 207:1
**moot** [1] - 108:15
**morning** [40] - 2:14, 2:19, 3:14, 3:15, 10:7, 10:24, 10:25, 13:1, 13:12, 13:13, 14:23, 14:24, 17:14, 17:15, 26:2, 44:8, 53:2, 58:18, 59:21, 59:22, 60:4, 60:17, 60:18, 66:5, 66:6, 107:8, 108:12, 176:21, 177:14, 178:14, 224:13, 224:14, 234:8, 234:16, 234:25, 236:17, 236:18, 237:17, 240:20
**most** [11] - 20:20, 65:17, 76:22, 132:6, 159:18, 167:16, 181:20, 226:1, 235:19, 240:16, 240:17
**Mostly** [1] - 65:6
**motion** [12] - 43:5, 46:5, 51:20, 52:16, 126:20, 126:21, 139:12, 140:11, 140:13, 140:21, 184:16, 184:22
**motions** [1] - 124:4
**Motz** [1] - 137:19
**Moultrie** [3] - 188:21, 188:22, 189:4
**mouth** [1] - 189:2
**mouths** [1] - 176:1
**move** [5] - 34:18, 43:5, 61:9, 80:5, 152:8
**Move** [1] - 121:6
**moved** [6] - 11:8, 139:11, 190:8, 215:8, 215:9, 215:11
**movement** [1] - 32:22
**MR** [305] - 2:3, 2:6, 2:11, 2:14, 2:22, 3:13, 10:16, 10:23, 13:11, 14:11, 14:14, 14:22, 17:11, 17:12, 17:16, 25:18, 25:20, 25:22, 26:1, 26:6, 26:21, 26:24, 44:3, 44:4, 44:15, 44:16, 44:18, 44:20, 44:22, 44:23, 44:25, 45:3, 45:6, 45:7, 45:13, 46:3, 46:10, 46:15, 47:7, 47:11, 47:14, 47:16, 47:19, 47:24, 48:1, 48:5, 48:12, 48:22, 48:24, 49:3, 49:7,

49:15, 49:19, 50:12, 51:2, 51:7, 51:14, 51:18, 51:25, 52:2, 52:5, 52:7, 52:11, 52:16, 52:18, 52:21, 52:24, 53:15, 53:19, 53:22, 54:5, 54:9, 54:13, 55:3, 55:11, 55:17, 56:1, 56:4, 56:13, 56:18, 56:20, 57:2, 57:12, 57:16, 57:25, 58:13, 58:20, 59:8, 59:10, 59:15, 59:17, 59:20, 59:25, 60:7, 60:16, 62:13, 62:15, 62:18, 66:1, 66:4, 68:16, 68:20, 68:24, 69:5, 69:10, 69:21, 69:25, 70:5, 70:9, 70:13, 97:13, 104:19, 104:21, 104:25, 105:4, 105:15, 105:21, 105:22, 106:6, 106:8, 106:17, 106:21, 107:16, 107:22, 108:2, 108:9, 108:17, 108:21, 108:25, 109:6, 109:19, 115:13, 115:20, 118:15, 121:9, 123:1, 125:13, 125:17, 125:19, 125:25, 126:3, 126:4, 126:8, 128:9, 128:13, 128:18, 129:9, 129:19, 129:24, 130:7, 130:9, 130:19, 130:21, 131:2, 131:5, 131:10, 131:18, 131:22, 132:2, 132:7, 132:12, 132:17, 133:3, 133:5, 133:10, 133:12, 133:17, 133:21, 134:3, 135:14, 135:24, 136:23, 137:4, 137:7, 137:8, 139:2, 139:7, 140:4, 140:15, 140:17, 140:25, 141:4, 142:2, 142:20, 143:2, 143:4, 143:6, 143:15, 148:2, 148:4, 148:9, 148:12, 161:16, 162:1, 162:4, 165:6, 165:9, 167:2, 167:3, 167:7, 168:16, 169:4, 169:14, 169:19, 170:23, 171:5, 171:7, 171:10, 171:22, 172:7, 172:10, 172:15, 173:1, 173:25, 175:4, 175:7, 176:9, 176:22, 177:2, 177:7, 177:12, 177:20, 178:1, 178:2, 178:9, 178:11, 180:12, 180:16, 180:19, 180:24, 181:2, 181:12, 198:16, 199:6, 199:9, 204:5, 210:23, 210:24, 212:24, 213:15,

216:16, 217:15, 217:17, 218:16, 218:18, 221:5, 221:7, 222:5, 222:12, 222:16, 222:21, 222:25, 225:4, 225:8, 231:6, 233:24, 234:1, 234:5, 235:4, 235:9, 235:14, 235:15, 235:18, 236:3, 236:6, 236:10, 236:13, 236:19, 237:5, 237:16, 237:19, 237:21, 237:24, 238:3, 238:8, 238:15, 238:18, 238:22, 239:10, 239:14, 239:18, 239:22, 239:24, 240:2, 240:4, 240:13, 241:4, 241:5, 241:5, 241:7, 241:8, 241:9, 241:9, 241:10, 241:11, 241:12, 241:13, 241:14, 241:14, 241:15, 241:16, 241:17, 241:18, 241:19, 241:19
**MS** [7] - 24:22, 26:3, 39:5, 140:18, 173:12, 173:19, 175:23
**multidefendant** [1] - 136:10
**multiple** [9] - 17:6, 19:19, 27:21, 36:6, 38:12, 39:14, 40:1, 75:24
**Mungo** [29] - 52:9, 52:10, 169:5, 169:6, 169:12, 169:15, 169:17, 169:20, 170:4, 170:6, 170:7, 171:11, 172:8, 172:11, 173:5, 173:21, 174:2, 174:5, 174:9, 174:13, 175:1, 175:12, 176:5, 176:18, 176:21, 178:12, 180:11, 180:14
**MUNGO** [2] - 169:8, 241:16
**Mungo's** [1] - 235:19
**murder** [25] - 43:20, 78:5, 112:14, 112:16, 112:20, 112:22, 116:22, 116:25, 120:10, 120:11, 120:12, 139:21, 215:19, 215:21, 216:3, 216:4, 216:7, 216:11, 216:14, 216:15, 218:3, 218:6, 232:6, 236:23
**murders** [6] - 43:21, 43:22, 113:8, 119:7, 121:20, 121:23
**muscles** [2] - 24:6, 37:22
**music** [2] - 5:21, 6:11
**Music** [1] - 212:3
**must** [2] - 135:2, 142:18

**N**

**NA** [36] - 188:18, 189:4, 189:7, 189:13, 189:20, 190:11, 190:12, 190:15, 190:16, 190:20, 191:13, 191:21, 195:6, 196:2, 196:11, 197:22, 198:14, 198:19, 199:12, 203:7, 205:18, 205:19, 205:20, 205:21, 205:24, 206:3, 206:8, 206:22, 206:24, 207:8, 218:21, 220:23
**NA's** [1] - 190:16
**nail** [1] - 59:23
**naked** [1] - 74:1
**name** [44] - 3:2, 4:7, 5:10, 5:12, 5:25, 6:5, 6:6, 6:7, 13:20, 13:24, 14:19, 14:20, 17:19, 25:25, 27:23, 31:17, 38:17, 60:12, 60:13, 60:14, 68:14, 81:12, 88:2, 109:14, 111:7, 143:20, 168:2, 169:11, 169:17, 181:8, 181:22, 181:24, 182:1, 182:3, 188:7, 188:20, 188:23, 200:10, 221:8, 228:5, 228:15
**name's** [2] - 11:1, 109:22
**named** [12] - 4:1, 8:13, 52:9, 78:5, 92:19, 92:20, 119:8, 188:5, 200:1, 200:2, 204:17, 220:9
**names** [1] - 187:21
**narcotics** [2] - 110:12, 110:16
**Nathaniel** [2] - 188:21, 189:4
**natural** [1] - 22:15
**nature** [4] - 12:3, 50:6, 100:14, 228:10
**near** [1] - 238:21
**nearby** [1] - 143:24
**nearly** [1] - 235:12
**necessarily** [3] - 115:18, 227:17, 227:18
**necessary** [6] - 58:10, 64:21, 129:14, 210:15, 232:18, 232:19
**neck** [10] - 24:10, 24:13, 24:14, 24:15, 24:17, 24:20, 28:20, 28:21, 32:18, 34:14
**need** [32] - 11:20, 25:16, 53:15, 54:3, 56:4, 57:9, 69:16, 74:21,

75:13, 75:14, 75:16, 75:21, 77:17, 78:17, 80:13, 83:10, 85:24, 93:12, 107:11, 108:15, 116:24, 116:25, 176:1, 223:3, 233:25, 234:7, 236:25, 238:3, 240:3, 240:7, 240:10, 240:11
**needed** [13] - 120:4, 120:21, 120:24, 196:16, 198:24, 201:17, 217:14, 217:19, 217:20, 217:24, 218:2, 218:10
**needlessly** [1] - 237:7
**negative** [7] - 27:13, 27:14, 30:23, 34:11, 38:10, 43:17
**neglected** [1] - 214:16
**neighborhood** [3] - 186:22, 186:23, 201:24
**nervous** [1] - 32:20
**neuropathology** [2] - 15:16, 15:18
**neuropathy** [1] - 16:19
**Never** [3] - 162:9, 220:7, 231:23
**never** [15] - 12:14, 12:18, 33:20, 37:24, 51:12, 55:21, 64:8, 107:4, 144:25, 162:22, 178:17, 178:20, 231:23, 232:4, 232:5
**new** [8] - 15:11, 122:11, 123:21, 125:8, 163:13, 171:14, 171:18, 171:19
**New** [11] - 15:14, 15:15, 15:22, 16:16, 17:4, 18:1, 68:13, 68:23, 162:6, 171:16
**Next** [1] - 169:3
**next** [14] - 2:5, 2:21, 31:15, 45:4, 52:18, 60:6, 105:20, 115:7, 130:16, 152:7, 177:9, 177:10, 180:16, 239:12
**nickname** [2] - 186:12, 186:14
**nicknamed** [2] - 188:5, 188:18
**Nicolaescu** [4] - 18:8, 18:16, 18:19, 28:2
**niggas** [1] - 176:1
**night** [1] - 133:15
**NO** [1] - 1:6
**nobody** [1] - 24:3
**non** [1] - 155:24
**None** [1] - 91:9
**normal** [2] - 41:10, 43:6
**normally** [2] - 146:9, 239:2

**Normally** [1] - 141:8
**NORTHERN** [1] - 1:2
**nose** [1] - 150:23
**note** [5] - 44:9, 105:8, 135:19, 136:23, 234:18
**notebook** [6] - 9:20, 9:22, 9:24, 10:4, 12:16, 12:18
**noted** [6] - 40:3, 41:13, 88:2, 202:16, 205:10, 236:4
**notes** [1] - 133:16
**nothing** [10] - 48:14, 58:11, 106:21, 106:25, 135:18, 177:23, 209:16, 221:2, 224:19, 237:9
**Nothing** [4] - 165:6, 167:2, 180:12, 218:16
**notice** [1] - 31:6
**noticed** [3] - 39:13, 236:21, 236:23
**notion** [2] - 146:12, 157:15
**notwithstanding** [3] - 128:5, 128:6, 135:10
**November** [5] - 1:11, 6:19, 11:3, 225:20, 242:5
**number** [20] - 39:5, 61:12, 64:24, 86:11, 88:3, 92:13, 92:17, 98:2, 99:5, 125:15, 125:17, 126:10, 141:15, 143:19, 154:2, 157:18, 158:18, 163:9, 183:24, 211:7
**Number** [3] - 126:5, 126:8, 147:19
**Number(s** [1] - 242:5
**numbering** [2] - 148:6, 148:7
**numbers** [1] - 238:3
**numerous** [3] - 63:16, 155:21, 156:12

## O

**object** [3] - 69:25, 107:13, 140:6
**objecting** [2] - 70:2, 70:3
**objection** [4] - 51:18, 62:13, 140:6, 236:4
**Objection** [43] - 10:16, 24:22, 68:16, 68:24, 69:5, 69:10, 115:13, 115:20, 118:15, 161:16, 170:23, 171:22, 172:7, 172:15, 173:1, 173:12, 175:7, 175:23, 176:9, 176:22, 177:2, 177:7,

177:12, 177:20, 178:1, 178:2, 198:16, 199:6, 204:5, 210:23, 210:24, 212:24, 213:15, 216:16, 217:15, 217:17, 222:5, 222:12, 222:16, 222:21, 222:25, 225:4, 231:6
**Objection's** [1] - 173:2
**objection's** [4] - 68:25, 175:8, 177:3, 177:22
**objective** [1] - 76:25
**obligation** [1] - 184:2
**obliterate** [1] - 163:13
**obliterated** [2] - 164:13, 164:17
**oblong** [1] - 159:13
**obscuring** [1] - 164:13
**observations** [1] - 162:25
**obtain** [1] - 128:7
**obviously** [6] - 9:4, 57:21, 108:4, 127:23, 137:2, 214:8
**occasion** [4] - 16:23, 171:19, 209:22, 214:22
**occipital** [1] - 36:7
**occur** [4] - 75:17, 76:10, 163:12, 231:25
**occurred** [6] - 43:22, 79:4, 96:18, 117:13, 136:5, 231:23
**occurs** [3] - 71:7, 130:1, 154:5
**October** [2] - 125:22, 137:11
**OF** [3] - 1:2, 1:5, 1:11
**off-the-record** [1] - 230:22
**offense** [4] - 183:8, 225:24, 227:22, 227:24
**offer** [3] - 18:18, 28:4, 65:23
**offered** [1] - 63:11
**offhand** [1] - 68:19
**office** [7] - 18:4, 38:24, 39:3, 40:13, 56:20, 180:6, 184:13
**Office** [13] - 15:2, 17:24, 21:9, 38:20, 49:24, 55:21, 57:10, 83:12, 88:10, 137:18, 182:13, 184:14, 225:1
**officer** [7] - 41:15, 59:10, 61:4, 66:19, 66:22, 111:21, 128:19
**Officer** [1] - 80:24
**officers** [1] - 230:15
**official** [1] - 242:7
**Official** [1] - 242:15
**often** [2] - 11:20, 107:15

**old** [6] - 3:16, 181:15, 186:6, 189:14, 221:13, 221:17
**Oliver** [1] - 27:23
**omissions** [1] - 132:6
**ON** [1] - 241:9
**Once** [7] - 54:10, 63:24, 65:11, 75:20, 76:9, 77:16, 89:4
**once** [11] - 54:15, 75:25, 80:14, 83:11, 87:15, 127:12, 153:3, 202:17, 226:15
**one** [134] - 3:7, 6:16, 6:17, 9:16, 11:1, 13:21, 15:24, 16:6, 16:12, 18:3, 19:5, 19:9, 22:13, 25:14, 28:1, 28:11, 28:21, 31:15, 31:16, 34:9, 34:15, 34:25, 35:2, 35:3, 35:7, 36:23, 36:24, 37:3, 37:4, 37:14, 38:4, 38:5, 46:10, 52:2, 52:24, 55:19, 61:22, 67:1, 67:19, 68:7, 70:22, 75:22, 76:4, 76:24, 77:13, 77:20, 77:22, 78:12, 80:17, 81:8, 82:5, 83:6, 84:8, 85:8, 90:16, 93:6, 98:6, 98:20, 99:23, 102:12, 103:18, 104:13, 104:18, 108:9, 115:7, 115:23, 117:15, 117:21, 118:8, 121:12, 121:13, 127:7, 136:16, 137:23, 137:24, 139:1, 141:11, 142:17, 145:1, 147:17, 148:19, 148:24, 149:9, 149:15, 149:22, 154:9, 154:12, 155:15, 155:20, 161:21, 166:16, 166:19, 168:10, 168:12, 168:13, 170:21, 171:19, 171:20, 171:25, 173:17, 174:24, 180:15, 180:18, 194:2, 194:5, 194:25, 195:1, 197:12, 197:20, 199:10, 200:4, 208:8, 208:10, 208:11, 212:4, 214:13, 218:8, 221:17, 224:4, 224:5, 224:8, 228:22, 235:19, 237:4, 237:5, 240:10
**One** [12] - 19:15, 40:17, 40:20, 52:8, 54:21, 90:14, 106:18, 117:15, 122:22, 124:4, 159:20, 192:25
**ones** [10] - 101:15, 144:17, 146:21, 147:3,

**147:5**, 147:14, 148:15, 149:17, 156:12, 158:3
**ongoing** [2] - 195:9, 199:13
**online** [1] - 234:21
**open** [5] - 39:21, 44:11, 73:6, 105:10, 234:20
**opened** [3] - 39:18, 39:20, 39:22
**opening** [1] - 150:20
**opens** [1] - 151:18
**operable** [4] - 89:3, 89:23, 89:25, 91:14
**operate** [1] - 187:11
**operated** [2] - 190:24, 193:7
**operates** [1] - 131:24
**operating** [3] - 40:7, 40:8, 41:24
**operation** [3] - 194:2, 200:18, 200:21
**opine** [2] - 46:22, 48:14
**opining** [1] - 46:17
**opinion** [18] - 46:8, 47:6, 49:8, 50:15, 68:21, 77:8, 84:17, 95:13, 134:21, 153:15, 153:16, 153:21, 158:19, 159:3, 161:18, 163:2, 163:22, 168:12
**opinions** [7] - 45:17, 49:10, 51:10, 70:4, 80:20, 86:8, 166:20
**opportunity** [3] - 12:8, 94:6, 106:11
**opposed** [5] - 49:20, 51:4, 77:3, 158:11, 236:15
**opposite** [2] - 146:1, 146:2
**or.357** [1] - 83:19
**oranges** [1] - 158:5
**order** [10] - 19:7, 19:9, 20:17, 35:25, 37:18, 40:4, 56:14, 76:15, 134:25, 144:16
**organization** [6] - 64:16, 68:8, 221:10, 221:18, 233:9, 233:12
**organized** [3] - 195:2, 219:9, 219:10
**organs** [1] - 27:6
**original** [1] - 182:1
**originally** [1] - 225:18
**Originally** [1] - 144:19
**originals** [1] - 238:12
**os** [1] - 164:4
**otherwise** [3] - 49:10, 142:22, 166:13
**outlying** [1] - 58:5

**outside** [7] - 2:9, 33:5, 42:13, 75:17, 82:13, 106:5, 163:12
**overhearing** [1] - 130:22
**overhears** [1] - 130:17
**overlook** [1] - 143:6
**overreading** [1] - 130:8
**overrule** [1] - 222:22
**Overruled** [20] - 10:17, 24:24, 68:17, 115:21, 118:16, 161:17, 172:16, 173:13, 175:24, 176:10, 176:23, 177:8, 178:5, 198:17, 199:7, 204:6, 213:18, 216:17, 217:18
**overruled** [4] - 173:2, 175:8, 177:3, 177:22
**oversight** [1] - 63:14
**own** [19] - 6:17, 9:9, 18:25, 99:3, 126:21, 167:9, 191:15, 191:17, 191:18, 191:22, 195:7, 195:11, 195:15, 197:1, 197:2, 197:7, 197:18, 238:23

# P

**P-13** [1] - 182:16
**p.m** [3] - 105:7, 109:3, 240:21
**p.m.** [1] - 105:11
**package** [2] - 138:13, 204:10
**packaged** [2] - 204:7, 204:8
**pads** [3] - 44:9, 105:8, 234:18
**PAGE** [1] - 241:3
**Page** [3] - 134:22, 172:5, 172:6
**page** [9] - 18:15, 34:19, 38:14, 47:17, 93:6, 182:19
**pages** [2] - 184:12, 242:6
**pain** [1] - 23:14
**palm** [1] - 24:3
**palms** [1] - 23:22
**pants** [1] - 174:21
**paper** [6] - 54:1, 54:17, 55:1, 157:14, 182:17, 227:12
**papers** [1] - 238:14
**paperwork** [1] - 93:11
**paragraph** [3] - 49:3, 134:22, 230:13
**Paragraph** [1] - 183:9,

184:12
**parallel** [3] - 22:11, 42:10, 102:1
**paraphrase** [1] - 107:22
**Pardon** [7] - 114:24, 118:25, 120:2, 223:22, 226:5, 228:12, 229:15
**Park** [2] - 186:25, 187:3
**Parole** [2] - 10:7, 10:15
**parsing** [1] - 136:7
**part** [36] - 5:3, 15:10, 22:8, 23:23, 32:19, 32:24, 33:13, 38:22, 39:22, 39:25, 41:1, 41:2, 41:13, 42:12, 46:8, 58:3, 61:24, 63:18, 74:12, 76:9, 78:18, 80:17, 89:21, 119:25, 128:16, 128:21, 129:6, 131:22, 138:13, 147:8, 150:10, 150:11, 157:25, 159:24, 194:2, 198:18
**Part** [1] - 91:11
**partial** [2] - 33:3, 33:7
**partially** [1] - 33:21
**participated** [2] - 133:13, 232:6
**participating** [1] - 131:15
**particular** [40] - 6:23, 20:23, 23:5, 24:19, 49:20, 54:20, 61:22, 69:14, 73:22, 75:7, 75:22, 76:14, 77:22, 83:4, 83:11, 85:3, 85:8, 88:15, 90:11, 90:21, 94:4, 94:22, 95:25, 102:12, 103:11, 112:3, 142:6, 147:24, 149:8, 156:8, 158:18, 166:19, 167:23, 185:10, 211:20, 227:13, 229:14, 229:16, 238:15, 240:11
**particularly** [1] - 191:3
**parts** [3] - 24:4, 25:3, 62:6
**pass** [1] - 101:23
**passenger** [3] - 21:1, 21:15, 34:4
**passes** [3] - 71:19, 94:19, 150:20
**past** [3] - 76:22, 207:20, 207:21
**patent** [1] - 128:1
**pathological** [1] - 43:5
**pathologist** [2] - 18:6, 43:24
**pathology** [10] - 15:15, 15:19, 16:3, 16:11, 16:18, 16:22, 16:24,

17:9, 18:3, 24:2
**patience** [2] - 60:4, 143:11
**patio** [1] - 216:8
**patrol** [2] - 61:4, 66:22
**patterns** [2] - 160:20, 162:18
**Paul** [2] - 1:19, 11:1
**Pause** [8] - 48:2, 48:16, 48:19, 121:8, 132:19, 165:5, 173:23, 218:15
**pay** [1] - 104:17
**penalties** [2] - 225:2, 225:5, 225:6
**pending** [1] - 184:8
**penetrated** [1] - 22:24
**penetrating** [1] - 30:1
**Pennsylvania** [8] - 17:5, 213:2, 213:4, 213:5, 213:7, 213:10, 213:24, 213:25
**People** [4] - 191:4, 193:10, 204:15, 219:3
**people** [36] - 13:21, 137:13, 138:17, 144:25, 157:13, 178:20, 178:22, 178:23, 178:25, 179:4, 184:16, 187:8, 187:9, 187:10, 187:14, 187:16, 187:17, 187:21, 187:22, 188:2, 191:3, 192:6, 192:11, 192:24, 192:25, 193:12, 194:4, 194:17, 217:22, 218:24, 219:3, 219:4, 219:6, 219:10, 219:11, 238:10
**per** [3] - 23:15, 128:4, 208:16
**perceived** [1] - 151:16
**perfectly** [3] - 50:4, 136:9, 221:20
**perforated** [4] - 28:21, 29:25, 32:24, 37:2
**perform** [5] - 5:23, 17:18, 18:4, 27:22, 74:20
**performed** [1] - 31:18
**performing** [1] - 67:9
**perhaps** [5] - 54:7, 73:14, 105:1, 137:23, 140:11
**Perhaps** [3] - 105:24, 138:14, 171:1
**pericardium** [1] - 39:23
**period** [16] - 63:5, 63:22, 137:25, 138:1, 164:17, 185:19, 207:7, 207:11, 207:19, 207:25, 217:24, 226:1, 226:3, 226:19, 227:20, 228:22
**periods** [3] - 66:15,

163:20, 226:2
**permit** [1] - 69:13
**permits** [1] - 49:11
**permitted** [2] - 10:14, 10:19
**Pernell** [1] - 182:2
**person** [8] - 4:1, 13:21, 13:24, 135:11, 138:22, 157:20, 228:16, 230:7
**person's** [3] - 111:7, 133:14, 134:19
**personal** [2] - 11:9, 11:11
**personally** [3] - 31:16, 48:24, 85:24
**Pestaner** [1] - 38:14
**Pete** [1] - 120:12
**Ph.D** [2] - 15:9, 15:10
**pharmacology** [2] - 15:9, 15:10
**photo** [1] - 238:9
**photograph** [7] - 9:14, 33:8, 35:17, 35:25, 36:25, 105:2, 149:22
**photographs** [5] - 21:12, 34:4, 147:12, 147:14, 148:14
**photography** [2] - 35:22, 159:9
**Photography** [1] - 61:7
**photos** [2] - 19:19, 147:10
**phrase** [1] - 164:10
**phrasing** [1] - 232:20
**physical** [1] - 63:2
**physically** [1] - 176:8
**pick** [4] - 12:25, 13:5, 149:18, 149:22
**picked** [1] - 238:10
**picture** [8] - 24:10, 24:12, 33:17, 35:8, 103:14, 103:17, 148:19, 174:16
**pictures** [5] - 21:7, 103:9, 103:11, 103:13, 103:22
**piece** [9] - 52:24, 76:21, 80:14, 80:15, 115:18, 118:3, 142:5, 182:16
**pieces** [3] - 54:1, 55:1, 79:16
**pierced** [1] - 102:3
**piercing** [1] - 100:25
**pin** [35] - 71:8, 71:21, 94:17, 94:18, 94:19, 96:3, 96:5, 96:16, 99:9, 99:13, 99:15, 99:20, 100:13, 100:17, 100:20, 100:22, 100:24, 101:3, 102:2, 102:19, 102:21,

137:2, 148:23, 150:17, 150:20, 150:23, 150:25, 151:10, 151:12, 151:15, 152:1, 152:12, 152:13, 159:14
**pistol** [1] - 150:25
**pistols** [2] - 150:8, 150:16
**pitfalls** [1] - 50:5
**place** [29] - 4:23, 5:1, 6:23, 7:3, 7:6, 8:22, 9:12, 31:12, 81:18, 91:22, 97:19, 104:10, 119:7, 123:11, 123:13, 124:20, 159:17, 178:19, 179:13, 179:14, 185:11, 193:2, 194:8, 197:23, 210:18, 215:9, 215:11, 215:12, 233:12
**placed** [4] - 35:21, 89:10, 95:19, 132:24
**placing** [1] - 85:4
**planning** [2] - 50:15, 50:20, 236:13
**plans** [1] - 211:4
**plasma** [1] - 40:2
**plastic** [4] - 7:24, 9:16, 78:21, 80:16
**play** [3] - 102:19, 170:4, 170:25
**Plaza** [2] - 211:21, 212:2
**plea** [10] - 136:19, 137:3, 137:5, 182:11, 182:19, 183:9, 183:16, 184:3, 214:13, 227:3
**pleading** [1] - 58:14
**pleasant** [1] - 2:20
**pleased** [1] - 227:9
**pled** [1] - 183:3
**Plus** [1] - 16:6
**point** [30] - 12:10, 48:12, 56:23, 57:8, 57:9, 81:2, 81:3, 83:21, 84:2, 84:4, 85:19, 90:4, 102:8, 102:12, 108:14, 108:15, 112:22, 122:21, 123:20, 123:23, 130:24, 141:5, 158:13, 189:6, 191:8, 191:21, 200:1, 201:6, 204:17, 205:11, 205:16, 223:5, 236:25
**pointing** [2] - 20:8, 160:18
**Points** [1] - 158:6
**points** [7] - 40:3, 157:15, 157:18, 158:1, 158:3, 158:6, 158:12
**Polaroids** [1] - 21:12
**Police** [12] - 60:21,

60:24, 63:6, 63:24,
66:13, 66:22, 67:11,
67:14, 68:3, 162:6,
167:19
  **police** [10] - 8:22, 9:12,
10:7, 61:2, 66:19, 81:14,
120:19, 194:13, 194:15,
223:14
  **polygonal** [1] - 86:20
  **poor** [3] - 159:5, 159:7,
159:21
  **pops** [1] - 145:6
  **popular** [2] - 81:14,
167:12
  **portion** [15] - 82:14,
85:2, 96:16, 96:17,
99:12, 99:14, 99:19,
103:2, 147:22, 151:25,
152:1, 159:13, 159:16,
160:11, 160:17
  **portions** [1] - 91:21
  **pose** [1] - 104:2
  **position** [8] - 23:20,
23:21, 24:19, 35:12,
61:5, 128:3, 130:10
  **Possession** [1] -
110:11
  **possession** [10] -
110:11, 110:12, 110:13,
137:13, 183:4, 183:11,
223:11, 224:5, 224:9
  **possibility** [2] - 126:19,
171:2
  **possible** [10] - 25:22,
75:8, 78:9, 91:25, 110:2,
163:19, 164:10, 177:16,
225:2, 225:11
  **possibly** [4] - 26:10,
77:21, 92:4, 144:20
  **post** [2] - 136:19,
136:25
  **post-indictment** [1] -
136:19
  **posturing** [1] - 25:2
  **powder** [6] - 71:5,
71:10, 71:11, 94:21,
99:21
  **powerful** [1] - 81:18
  **Pratt** [4] - 186:25,
187:2, 187:3, 191:4
  **pre** [3] - 136:19, 136:25
  **pre-cooperation** [2] -
136:19, 136:25
  **pre-plea** [1] - 136:19
  **precinct** [1] - 61:4
  **precisely** [3] - 49:1,
126:14, 233:20
  **predicate** [1] - 128:20
  **prediction** [1] - 235:10
  **predominantly** [1] -

146:20
  **prefer** [1] - 104:22
  **prejudice** [2] - 139:19,
140:24
  **prejudicial** [2] - 235:25,
237:9
  **premised** [1] - 235:10
  **prep** [1] - 54:10
  **preparation** [1] - 183:25
  **prepare** [2] - 194:3,
194:4
  **prepared** [3] - 58:8,
138:14, 194:9
  **preponderance** [1] -
51:1
  **presence** [8] - 2:9, 27:7,
27:10, 30:15, 30:17,
83:2, 89:14, 99:3
  **present** [4] - 26:18,
103:14, 109:4
  **presentation** [1] - 176:4
  **presenter** [2] - 127:10,
147:25
  **presently** [1] - 105:17
  **preserve** [1] - 51:18
  **preserved** [4] - 63:2,
70:8, 140:6, 236:5
  **pressed** [2] - 79:14,
129:3
  **presses** [2] - 96:1,
102:21
  **pressure** [9] - 71:8,
71:9, 71:12, 81:22, 96:1,
96:19, 102:22, 151:13,
151:14
  **pressures** [1] - 102:20
  **Presumably** [1] - 59:6
  **presumably** [2] - 56:25,
59:2
  **presume** [1] - 58:9
  **pretrial** [3] - 215:14,
226:2, 226:16
  **Pretty** [1] - 201:4
  **pretty** [8] - 20:12, 35:4,
35:15, 36:9, 46:12,
50:24, 51:9, 108:10
  **prevent** [3] - 25:2, 25:3,
30:17
  **prevented** [1] - 36:3
  **previous** [2] - 126:24,
175:5
  **previously** [14] - 16:23,
70:1, 70:3, 78:13, 86:9,
87:7, 88:8, 90:6, 91:1,
91:5, 96:24, 154:5,
173:18, 235:24
  **price** [1] - 196:20
  **prices** [3] - 196:18,
196:19, 196:20
  **Primarily** [2] - 100:10,

100:11
  **primary** [3] - 61:21,
76:21, 95:24
  **primer** [40] - 71:4, 71:8,
71:9, 71:24, 74:15,
94:15, 94:20, 96:2, 96:4,
96:16, 99:14, 99:18,
99:19, 100:5, 102:3,
102:20, 103:2, 145:4,
145:22, 150:10, 150:14,
150:23, 151:9, 151:10,
151:12, 152:11, 153:5,
155:2, 155:10, 155:11,
155:12, 155:13, 157:25,
159:12, 159:13, 163:16,
167:10
  **primer's** [1] - 151:14
  **primers** [3] - 150:8,
155:23, 156:21
  **principle** [1] - 141:18
  **principles** [1] - 75:8
  **Print** [1] - 61:8
  **printout** [4] - 104:6,
134:23, 147:20, 147:24
  **prison** [6] - 199:14,
199:15, 226:11, 226:12,
228:7
  **prisoner** [2] - 52:11,
215:11
  **prisoners** [2] - 58:5,
171:20
  **private** [1] - 133:8
  **probability** [5] - 51:8,
51:9, 51:11, 51:13, 154:4
  **probable** [1] - 46:21
  **Probation** [2] - 10:7,
10:15
  **probations** [1] - 10:13
  **problem** [15] - 57:4,
81:19, 128:1, 171:8,
194:24, 198:7, 198:14,
199:3, 219:7, 219:8,
234:1, 235:5, 237:14,
237:15
  **procedure** [2] - 27:8,
88:24
  **Procedures** [1] - 162:7
  **proceed** [5] - 2:2,
26:23, 28:7, 59:2, 94:1,
172:14
  **proceeding** [1] - 46:6
  **proceedings** [11] -
26:11, 26:13, 48:2,
48:16, 48:19, 121:8,
132:19, 165:5, 173:23,
242:4, 242:7
  **Proceedings** [3] - 2:1,
218:15, 240:21
  **process** [10] - 49:23,
62:4, 63:13, 73:23, 74:7,

75:19, 89:21, 102:6,
154:22, 203:13
  **processes** [3] - 102:10,
102:13, 102:15
  **processor** [1] - 239:9
  **produce** [5] - 29:16,
41:9, 144:15, 238:25,
239:3
  **produced** [8] - 55:10,
101:10, 143:23, 146:21,
147:13, 150:8, 152:16,
152:18
  **producing** [1] - 144:18
  **product** [1] - 208:25
  **professional** [1] - 51:23
  **professor** [1] - 15:17
  **proffer** [21] - 106:12,
111:17, 117:21, 121:11,
123:14, 124:24, 125:1,
126:9, 126:16, 127:7,
127:13, 137:4, 137:23,
138:23, 229:7, 229:10,
229:23, 230:17, 230:22
  **proficiency** [2] - 63:18,
63:23
  **proficient** [1] - 76:1
  **profits** [2] - 197:4
  **projectile** [20] - 19:24,
22:8, 22:15, 22:18, 23:9,
28:18, 29:1, 32:15,
32:24, 36:5, 36:8, 36:12,
37:21, 41:5, 41:18, 42:9,
70:25, 90:2, 91:15, 145:3
  **projectiles** [6] - 46:16,
46:18, 64:24, 78:9,
78:12, 86:9
  **projector** [1] - 18:12
  **prominence** [1] - 20:12
  **promise** [2] - 53:12,
234:17
  **promises** [1] - 184:25
  **promoted** [1] - 59:18
  **pronounced** [3] - 22:7,
39:8, 40:7
  **proper** [2] - 71:23, 89:2
  **properly** [4] - 64:7,
73:13, 75:20, 75:25
  **propose** [1] - 46:13
  **proposition** [4] - 69:7,
119:24, 216:18, 217:6
  **prosecuted** [1] - 136:4
  **prosecution** [1] -
184:15
  **prosecutor** [3] - 135:11,
184:22, 227:4
  **prosecutors** [10] -
110:1, 110:19, 112:15,
117:12, 123:13, 129:6,
221:25, 226:16, 230:22
  **protect** [1] - 224:16

  **prove** [1] - 63:23
  **proven** [1] - 76:1
  **proves** [1] - 141:11
  **provide** [5] - 113:19,
125:20, 134:8, 183:20,
183:21
  **provided** [3] - 85:14,
85:19, 184:14
  **provides** [1] - 136:1
  **providing** [1] - 134:7
  **proving** [1] - 153:23
  **prudent** [2] - 45:20,
45:24
  **Public** [3] - 137:18,
137:19, 225:1
  **publish** [1] - 64:6
  **published** [4] - 16:17,
47:13, 166:9, 167:14
  **publishing** [1] - 47:20
  **pull** [7] - 47:15, 96:11,
109:15, 125:21, 133:17,
151:3, 189:1
  **pulled** [9] - 95:20,
120:19, 151:24, 153:4,
201:11, 201:12, 212:18,
212:19, 212:20
  **pulling** [1] - 132:10,
201:16
  **pumps** [1] - 41:9
  **punch** [1] - 176:16
  **punching** [1] - 176:7
  **pure** [3] - 203:8, 203:9,
203:10
  **Purple** [1] - 186:15
  **purpose** [7] - 57:20,
64:18, 197:20, 200:24,
201:21, 203:19, 230:16
  **purposes** [9] - 46:3,
78:24, 85:23, 124:4,
144:20, 144:21, 147:4,
166:10, 223:1
  **pursuant** [4] - 123:14,
127:13, 182:11, 184:16
  **pursue** [1] - 139:6
  **pusher** [1] - 157:14
  **Put** [1] - 100:2
  **put** [21] - 39:16, 39:17,
39:19, 47:5, 76:12,
78:16, 85:22, 91:2,
96:12, 97:23, 123:16,
124:3, 128:23, 129:4,
147:25, 148:13, 203:1,
208:11, 229:24, 238:4
  **putting** [8] - 18:11,
50:20, 54:11, 83:8, 84:7,
87:14, 135:18, 208:25
  **Pyne** [1] - 1:21

# Q

**Q-1** [7] - 93:20, 94:23, 98:7, 98:24, 101:14, 148:16, 158:2
**Q-2** [2] - 93:20, 94:23
**Q-3** [2] - 93:20, 94:23
**Q-4** [4] - 93:20, 94:23, 98:7, 158:2
**Q-5** [2] - 94:24, 96:24
**Q-6** [3] - 93:20, 94:23, 98:7
**Q-7** [3] - 93:21, 94:23, 98:7
**QC** [1] - 93:20
**qualification** [2] - 46:21, 69:25
**QUALIFICATIONS** [1] - 241:9
**qualifications** [3] - 69:20, 70:3, 70:4
**Qualifications** [1] - 66:3
**qualified** [7] - 62:13, 63:15, 64:17, 154:15, 157:12, 168:8
**qualifier** [2] - 49:7, 49:9
**qualify** [1] - 17:8
**quality** [1] - 63:18
**quantities** [2] - 207:21, 208:10
**quantity** [1] - 208:18
**quarter** [1] - 35:15
**questioned** [1] - 149:12
**questioning** [1] - 135:17
**questions** [34] - 10:21, 13:8, 14:11, 17:10, 44:2, 44:3, 44:4, 67:1, 68:7, 72:4, 97:10, 109:24, 111:15, 111:25, 113:2, 113:5, 113:6, 114:2, 115:10, 115:16, 117:24, 122:24, 123:11, 133:14, 144:9, 157:2, 165:12, 174:23, 178:9, 191:7, 201:19, 221:5, 221:24
**quibble** [1] - 51:3
**quick** [2] - 41:22, 236:21
**quickly** [3] - 41:21, 55:6, 99:10
**quinine** [1] - 203:18
**quite** [7] - 26:22, 58:15, 82:4, 126:9, 141:5, 145:18, 240:6
**quote** [10] - 107:20, 130:2, 132:9, 132:12, 132:24, 134:24, 230:14,

230:16, 238:25
**quote-unquote** [2] - 130:2, 238:25

# R

**R-E-Y-N-O-L-D-S** [2] - 109:17, 181:10
**R-U-B-I-O** [1] - 14:20
**Radentz** [3] - 31:19, 31:23, 34:21
**Rahman** [2] - 220:3, 220:5
**raided** [2] - 8:22, 119:23
**Raise** [1] - 169:6
**raise** [1] - 109:10
**raised** [9] - 37:18, 41:4, 62:7, 85:1, 96:16, 99:12, 99:14, 159:12, 159:16
**Rakoff** [3] - 45:14, 50:3, 68:22
**Rakoff's** [4] - 46:6, 46:8, 47:6, 48:13
**ran** [1] - 191:4
**random** [2] - 73:25, 96:8
**randomly** [1] - 74:6
**range** [12] - 20:14, 24:1, 24:5, 28:16, 29:23, 30:19, 35:24, 36:2, 37:19, 43:6, 43:7, 71:1
**rap** [6] - 5:21, 5:25, 8:3, 8:7, 8:9, 12:16
**rapid** [2] - 29:16, 41:9
**Rapidly** [1] - 36:20, 36:22, 36:23
**rapidly** [1] - 29:14
**raps** [2] - 8:7, 10:2
**rather** [3] - 55:20, 70:24, 183:8
**ratify** [1] - 58:9
**rationale** [1] - 49:1
**re** [2] - 41:3, 104:20
**re-bagged** [1] - 104:20
**re-entrance** [1] - 41:3
**reach** [9] - 79:7, 79:10, 83:18, 84:13, 84:20, 86:14, 88:12, 90:10, 95:16
**reached** [10] - 50:15, 84:8, 84:9, 84:17, 87:10, 88:21, 96:20, 97:8, 182:12, 182:25
**reaching** [3] - 77:7, 88:24, 171:4
**read** [3] - 26:14, 172:5, 237:22
**reading** [2] - 38:4, 172:11

**reads** [1] - 78:21
**ready** [11] - 2:2, 2:20, 60:5, 73:16, 106:9, 123:5, 143:12, 143:13, 209:25, 211:16, 211:18
**real** [1] - 24:3
**reality** [2] - 70:21
**realize** [1] - 227:9
**Really** [1] - 106:21
**really** [28] - 13:15, 20:16, 30:2, 30:19, 35:15, 45:16, 48:5, 48:9, 48:25, 49:12, 49:19, 50:25, 51:9, 125:11, 175:2, 175:3, 197:6, 218:24, 219:6, 228:6, 232:22, 233:1, 233:25, 235:4, 235:7, 235:15, 236:13, 240:3
**rear** [1] - 152:6
**reason** [7] - 75:12, 107:13, 126:12, 126:22, 128:22, 180:21, 216:15
**reasonable** [2] - 50:10, 50:14, 50:16, 50:23, 50:25, 51:4, 51:5, 51:6, 51:8, 51:11, 51:13, 51:16, 51:21, 51:22, 51:23, 84:18, 87:10, 88:21, 97:8, 135:11
**reasons** [6] - 70:1, 86:18, 139:13, 140:21, 182:7, 217:15
**reboot** [1] - 3:7
**receive** [1] - 79:25
**received** [11] - 38:19, 39:3, 39:9, 40:7, 41:23, 42:3, 69:4, 69:9, 92:7, 161:7, 167:19
**recent** [1] - 167:16
**recently** [1] - 54:15
**recess** [6] - 44:8, 44:9, 109:1, 109:3, 234:13, 240:19
**Recess** [1] - 44:14
**recklessly** [1] - 131:1
**recognition** [1] - 167:20
**recognizance** [1] - 136:12
**recognize** [4] - 9:19, 9:20, 93:13, 108:4
**recoil** [5] - 96:5, 151:5, 151:6, 151:14, 151:15
**recollect** [1] - 48:9
**recollection** [10] - 56:7, 93:12, 110:23, 155:20, 167:16, 172:12, 174:25, 231:10
**recommend** [1] - 53:10
**record** [27] - 3:2, 13:17,

14:19, 21:13, 26:13, 46:3, 46:5, 58:19, 60:12, 70:7, 84:13, 87:5, 93:10, 109:14, 130:25, 137:9, 140:6, 147:9, 169:11, 181:8, 199:20, 202:14, 205:8, 230:22, 231:3, 238:4, 238:6
**record'** [1] - 230:16
**record's** [1] - 147:18
**recorded** [1] - 242:3
**records** [2] - 21:4, 38:22, 38:23, 40:3, 41:13, 42:5
**recover** [3] - 30:11, 41:16, 72:15
**recoverable** [1] - 146:13
**recovered** [22] - 20:22, 22:19, 28:24, 33:18, 36:11, 36:16, 37:10, 41:14, 42:14, 46:18, 47:2, 71:25, 72:16, 73:7, 78:4, 87:1, 87:18, 88:9, 92:6, 101:16, 144:10
**recovery** [4] - 83:12, 86:3, 89:7
**RECROSS** [2] - 167:6, 241:14
**recruited** [1] - 221:10
**rectangular** [13] - 94:19, 96:15, 96:17, 99:12, 99:13, 100:25, 102:6, 150:16, 150:20, 150:21, 150:25, 159:12, 159:16
**recuperate** [1] - 40:2
**red** [1] - 174:20
**Redirect** [1] - 165:7
**REDIRECT** [6] - 122:25, 165:8, 168:15, 241:12, 241:14, 241:15
**reduce** [2] - 184:17, 184:23
**reduction** [2] - 185:1, 185:2
**reentering** [1] - 40:24
**refer** [2] - 64:15, 74:11
**reference** [2] - 80:14, 93:6, 95:1
**referenced** [1] - 92:17
**referred** [8] - 70:19, 82:22, 86:20, 89:9, 94:16, 95:19, 98:2, 239:7
**referring** [3] - 71:25, 99:17, 150:2
**refinements** [1] - 236:20
**reflection** [1] - 49:9
**reflects** [2] - 83:11,

87:17
**reflex** [1] - 25:3
**refresh** [3] - 93:12, 172:11, 174:25
**refuse** [1] - 222:7
**regard** [1] - 140:8
**regularly** [2] - 65:20, 187:15
**Reisterstown** [2] - 211:21, 212:2
**related** [9] - 16:19, 20:22, 42:23, 92:18, 92:20, 108:16, 133:2, 155:5, 209:16
**relates** [2] - 44:25, 141:1
**relating** [3] - 66:8, 66:16, 127:3
**relation** [2] - 41:16, 155:21
**relationship** [16] - 42:14, 86:8, 113:14, 117:16, 127:18, 135:15, 152:4, 187:25, 189:3, 189:13, 189:23, 190:1, 195:10, 199:13, 200:7, 201:1
**relationships** [2] - 187:22, 188:3
**relative** [1] - 156:12
**relatively** [1] - 29:16
**release** [5] - 209:22, 211:10, 211:15, 211:20, 226:16
**released** [3] - 130:14, 136:12, 226:16
**relevance** [1] - 115:13
**relevant** [2] - 59:4, 134:11
**reliable** [5] - 69:12, 69:18, 201:17, 201:21, 201:25
**relies** [1] - 132:15
**religious** [1] - 182:7
**rely** [4] - 197:20, 197:22, 198:9, 198:13
**relying** [1] - 129:10
**remain** [2] - 45:2, 74:11
**remainder** [1] - 65:14
**remained** [1] - 206:8
**remaining** [3] - 146:19, 147:14, 158:14
**remark** [1] - 157:1
**remember** [47] - 31:14, 97:16, 107:18, 108:8, 110:22, 111:18, 111:19, 113:4, 113:9, 114:13, 114:14, 114:15, 114:20, 115:22, 119:19, 121:11, 122:13, 141:21, 161:1,

170:11, 170:14, 170:15,
172:3, 172:14, 172:17,
172:20, 172:24, 173:5,
173:7, 173:9, 173:15,
175:5, 176:11, 176:18,
177:23, 178:8, 179:7,
179:8, 179:15, 179:16,
186:1, 186:6, 190:13,
206:17, 207:19, 234:10,
235:23

**remembered** [1] - 48:7
**remembering** [1] -
168:21
**remind** [2] - 141:22,
142:13
**removal** [1] - 158:11
**removed** [2] - 86:3,
96:21
**render** [1] - 86:7
**rendered** [1] - 166:20
**renew** [2] - 140:13,
140:15
**renewed** [1] - 140:21
**rented** [1] - 4:23
**repeat** [2] - 120:23,
175:5
**Repeat** [1] - 199:7
**rephrase** [2] - 222:6,
222:17, 231:7
**Rephrase** [2] - 222:13,
231:8
**replaced** [1] - 225:1
**reply** [2] - 129:10, 132:8
**report** [10] - 18:19,
18:23, 19:2, 26:25,
31:17, 34:10, 38:17,
42:2, 43:16, 93:13
**Reported** [1] - 1:23
**reported** [3] - 132:22,
165:23, 166:9
**Reporter** [1] - 242:15
**REPORTER'S** [1] -
242:1
**represent** [3] - 11:2,
58:8, 221:9
**representations** [1] -
77:15
**representative** [2] -
149:18, 149:22
**represented** [8] -
127:23, 127:24, 128:5,
136:10, 137:18, 149:2,
149:10, 149:15
**represents** [1] - 149:23
**reproducible** [1] - 84:25
**request** [2] - 49:5, 66:1
**requests** [1] - 222:2
**require** [1] - 134:25
**required** [1] - 63:14
**research** [1] - 15:11

**resected** [1] - 39:22
**reserve** [1] - 69:21
**residency** [3] - 15:9,
15:14, 16:3
**resolution** [1] - 214:5
**respect** [11] - 67:17,
69:2, 84:20, 88:12,
96:20, 129:13, 132:13,
156:18, 156:20, 232:8,
236:6
**respectively** [1] - 93:21
**respirator** [1] - 39:16
**respiratory** [1] - 32:23
**respond** [1] - 92:3
**responded** [3] - 63:1,
67:11, 236:9
**Responding** [1] - 92:15
**response** [10] - 55:14,
67:1, 68:7, 107:4,
123:10, 126:20, 144:8,
151:12, 165:11, 221:24
**responsible** [3] - 12:23,
192:10, 195:20
**rest** [1] - 32:20
**rests** [1] - 162:14
**result** [8] - 30:22, 38:8,
43:16, 76:10, 102:10,
135:12, 156:14, 227:13
**results** [5] - 27:12,
27:13, 64:5, 64:6, 74:7
**retain** [1] - 27:5
**retrieve** [3] - 93:5,
103:24, 140:2
**Return** [1] - 174:23
**return** [2] - 56:3, 91:25
**returned** [1] - 125:22
**revenue** [1] - 207:24
**reversed** [1] - 35:19
**review** [1] - 137:15
**reviewed** [1] - 2:12
**reviewing** [1] - 41:13
**revolver** [14] - 46:19,
72:7, 72:8, 72:9, 73:2,
73:3, 73:6, 81:23, 81:24,
81:25, 88:1, 88:3, 88:7,
90:20
**revolvers** [3] - 72:24,
73:4, 81:20
**Reynolds** [66] - 2:7,
105:14, 105:17, 105:20,
106:1, 106:2, 106:5,
106:9, 106:12, 109:5,
109:7, 109:16, 109:20,
123:2, 123:9, 123:20,
124:3, 124:8, 124:19,
124:24, 125:14, 129:25,
130:1, 135:16, 137:10,
138:3, 138:6, 138:9,
139:12, 141:1, 141:22,
142:22, 180:16, 180:22,

181:4, 181:9, 181:13,
181:22, 182:2, 182:4,
182:8, 183:3, 183:14,
183:24, 184:25, 185:12,
186:3, 186:11, 187:7,
188:17, 189:3, 190:24,
191:10, 199:18, 202:9,
206:3, 209:11, 210:20,
213:19, 214:9, 221:8,
230:7, 231:11, 234:6,
239:16
**REYNOLDS** [4] -
109:11, 181:5, 241:11,
241:18
**Reynolds's** [1] - 125:17
**RHODES** [6] - 24:22,
39:5, 140:18, 173:12,
173:19, 175:23
**Rhodes** [2] - 1:17,
139:9
**rides** [1] - 82:15
**ridge** [3] - 158:7,
158:10, 158:14
**ridges** [1] - 158:8
**Riemer** [3] - 31:19,
31:20, 34:21
**rifling** [17] - 71:20,
74:10, 74:11, 77:12,
77:15, 79:16, 79:19,
82:15, 82:18, 82:20,
84:1, 84:23, 85:2, 86:19,
86:20, 89:8, 166:14
**right-hand** [2] - 81:1,
88:6, 174:16
**rigor** [5] - 69:3, 69:8,
161:7, 164:19, 164:23
**ring** [2] - 22:6, 28:15,
32:12
**risk** [1] - 53:7
**Rob** [1] - 111:12
**rob** [1] - 219:6
**Robbery** [3] - 194:23,
198:2, 198:4
**Robert** [1] - 1:16
**Roc** [2] - 228:16
**Rochester** [7] - 15:13,
15:14, 15:15, 15:18,
15:19, 16:16, 18:1
**Rodney** [1] - 239:19
**role** [1] - 190:15
**rolled** [1] - 83:3
**room** [10] - 6:25, 7:10,
8:1, 11:15, 40:7, 40:8,
41:24, 105:7, 176:14,
205:15
**Room** [1] - 1:24
**root** [2] - 11:11, 11:13
**rough** [1] - 74:4
**round** [25] - 19:18,
19:20, 22:6, 23:24,

28:14, 32:11, 35:23,
37:17, 40:25, 62:5, 62:9,
62:11, 62:12, 70:17,
70:21, 71:2, 72:5, 81:10,
81:14, 81:22, 82:11,
82:13, 145:22, 145:23
**rounds** [5] - 81:8,
86:16, 86:25, 87:7, 88:8
**routine** [3] - 27:8,
57:20, 58:3
**row** [1] - 149:14
**RPR** [1] - 1:24
**RUBIO** [2] - 14:16,
241:6
**Rubio** [16] - 2:14, 2:16,
14:15, 14:20, 14:23,
15:6, 16:17, 17:9, 17:14,
18:19, 27:2, 27:20, 29:6,
33:9, 34:20, 44:5
**Ruger** [2] - 154:3, 154:9
**Rugers** [2] - 154:20,
154:21
**Rule** [2] - 53:10, 56:8
**rule** [2] - 128:4, 141:11
**ruling** [2] - 235:23,
237:1
**rulings** [2] - 54:3,
141:15
**run** [3] - 191:8, 195:4,
197:18
**runners** [2] - 193:10,
193:13
**running** [15] - 120:17,
176:1, 190:21, 191:3,
191:9, 192:6, 192:9,
194:24, 195:7, 195:11,
195:15, 196:2, 198:23

## S

**S-180** [2] - 38:13, 39:6
**S-41** [1] - 87:14
**S-42** [6] - 85:23, 85:25,
91:3, 91:8, 92:9, 95:6
**S-4A** [4] - 83:7, 83:8,
84:6, 88:9
**S-4B** [6] - 80:10, 80:11,
80:21, 80:23, 84:6, 88:9
**S-4C** [1] - 90:8
**S-H-A-R-I** [1] - 3:9
**safe** [8] - 192:15,
192:16, 192:19, 192:20,
192:22, 193:1, 193:4,
193:20
**Safer** [1] - 194:12
**sale** [1] - 194:9
**sample** [2] - 149:18,
149:22
**samples** [1] - 156:9

**sandpaper** [1] - 164:15
**satisfied** [4] - 59:2,
139:8, 140:22, 196:12
**satisfy** [1] - 57:9
**save** [1] - 42:4
**saw** [6] - 12:14, 12:18,
85:6, 92:1, 108:6, 178:20
**scalp** [5] - 29:25, 30:3,
30:18, 37:3
**scene** [5] - 21:11, 63:1,
67:5, 71:25, 143:24
**scenes** [3] - 21:4, 63:2,
92:5
**school** [10] - 3:18, 13:3,
13:6, 13:7, 15:8, 66:10,
185:13, 185:20, 186:4
**schooling** [1] - 185:24
**schools** [1] - 63:16
**science** [7] - 45:22,
69:4, 69:9, 161:7,
161:12, 164:19, 164:23
**scientific** [8] - 48:4,
48:9, 48:11, 48:18, 51:6,
51:22, 69:12, 69:18
**scrapes** [2] - 19:20,
31:8, 43:2
**scraping** [1] - 42:24
**scratch** [1] - 158:12
**scratches** [9] - 84:24,
89:8, 90:19, 96:18,
148:22, 155:1, 159:15,
160:3, 160:20
**screen** [22] - 18:11,
22:20, 24:12, 27:9,
33:11, 33:14, 78:17,
83:9, 84:7, 85:22, 87:15,
91:3, 91:6, 93:22,
104:13, 147:21, 174:2,
174:17, 182:15, 182:17,
229:24
**se** [2] - 23:15, 128:4
**SE-1** [2] - 9:4
**SE-4** [1] - 9:14
**sealed** [2] - 55:19,
55:21
**Seamon** [3] - 5:2, 6:20,
11:3
**search** [2] - 91:24,
108:19
**searched** [1] - 9:12
**seat** [8] - 21:1, 21:15,
23:6, 29:5, 30:7, 31:4,
34:4
**seated** [8] - 3:1, 14:18,
29:5, 34:3, 60:11,
109:13, 169:10, 181:7
**Second** [1] - 47:20
**second** [10] - 2:1,
22:21, 29:17, 32:17,
36:23, 36:24, 39:14,

42:7, 42:12, 79:4, 121:10, 133:6, 174:12, 190:3

**Section** [1] - 184:17
**secure** [1] - 147:9
**secured** [1] - 147:4
**see** [71] - 9:19, 10:3, 10:13, 11:12, 12:12, 12:16, 18:12, 18:13, 19:19, 30:19, 33:6, 33:11, 33:17, 36:25, 37:18, 40:25, 41:3, 55:25, 59:4, 70:25, 74:4, 79:19, 82:10, 82:11, 82:12, 82:13, 83:10, 85:24, 92:4, 93:23, 96:15, 96:17, 97:21, 100:5, 104:7, 104:8, 104:13, 108:20, 127:9, 128:2, 129:7, 131:13, 132:10, 138:8, 147:21, 148:22, 149:4, 158:19, 159:11, 159:13, 159:14, 160:3, 160:19, 168:11, 171:3, 174:2, 174:5, 174:19, 176:6, 176:20, 178:14, 181:3, 182:16, 202:9, 205:3, 229:24, 229:25, 230:3, 230:19, 239:7
**seeing** [3] - 107:18, 108:6, 149:14
**seeking** [1] - 48:15
**seeks** [1] - 136:2
**seem** [4] - 47:5, 119:17, 129:21, 238:5
**seized** [1] - 143:23
**sell** [10] - 186:17, 188:1, 191:3, 193:16, 208:7, 208:8, 213:22, 213:24, 233:3
**selling** [6] - 186:7, 186:17, 189:11, 189:12, 208:4, 208:24
**semiautomatic** [6] - 9:5, 72:9, 72:24, 73:10, 73:12, 151:24
**send** [6] - 57:2, 64:1, 64:4, 64:5, 192:13, 196:23
**sending** [1] - 192:10
**sends** [2] - 71:9, 99:21
**sense** [2] - 138:16, 197:12
**sensitive** [2] - 71:8, 71:9
**sent** [9] - 55:20, 123:25, 124:20, 154:13, 180:20, 193:2, 193:3, 193:19, 194:20

**sentence** [6] - 184:18, 184:23, 185:8, 199:17, 211:15, 211:17
**sentenced** [4] - 126:1, 184:20, 225:15, 225:23
**sentencing** [4] - 184:6, 184:17, 184:23, 185:1
**separate** [5] - 64:3, 102:6, 102:10, 133:25
**separated** [2] - 37:18, 41:4
**separately** [2] - 46:9, 84:8
**sequence** [1] - 96:19
**sequentially** [2] - 148:8, 166:12
**sequestration** [2] - 25:18, 25:24
**sergeant** [5] - 45:2, 59:13, 61:6, 140:2, 162:3
**SERGEANT** [3] - 60:9, 241:8, 241:13
**Sergeant** [61] - 45:11, 59:12, 60:8, 60:13, 60:17, 61:9, 61:24, 62:20, 64:23, 65:23, 66:5, 70:14, 72:3, 74:24, 77:7, 78:3, 78:16, 79:22, 80:11, 81:7, 82:7, 83:6, 83:8, 84:18, 85:19, 86:8, 87:11, 87:19, 87:21, 88:24, 90:4, 91:2, 91:17, 92:7, 92:17, 92:21, 93:5, 93:8, 93:23, 94:4, 96:25, 97:11, 97:14, 97:24, 105:19, 106:2, 106:15, 139:25, 142:24, 142:25, 143:17, 155:9, 159:20, 160:5, 162:2, 165:10, 167:2, 167:8, 168:25, 169:1, 235:12
**sergeant's** [1] - 105:25
**serial** [1] - 88:3
**series** [7] - 85:14, 93:1, 93:7, 93:19, 101:23, 103:21, 160:20
**serious** [1] - 41:19
**serve** [2] - 191:5, 193:12
**served** [2] - 56:12, 56:17
**serves** [2] - 49:9, 99:21
**serving** [1] - 211:15
**session** [4] - 121:11, 126:16, 137:23, 167:23
**sessions** [3] - 106:13, 117:21, 127:7
**set** [7] - 57:11, 57:15, 58:16, 58:22, 191:2, 211:4, 227:1

**sets** [1] - 76:25
**settle** [1] - 48:21
**seven** [1] - 39:9
**Seven** [7] - 104:16, 147:19, 148:2, 148:8, 148:9, 148:11, 183:9
**Seventh** [1] - 185:25
**Several** [1] - 65:1
**several** [13] - 17:4, 39:17, 40:3, 41:20, 65:2, 68:4, 77:23, 85:16, 123:4, 221:24, 237:25, 238:3
**severance** [3] - 140:11, 140:13, 140:21
**sew** [1] - 39:24
**Shake** [1] - 6:12
**shaking** [1] - 71:12
**Shall** [2] - 59:10, 104:4
**shallow** [2] - 39:11
**Shamier** [1] - 4:1
**Shanika** [1] - 26:1
**shape** [9] - 94:17, 100:13, 100:17, 100:20, 100:22, 101:1, 101:3
**shaped** [1] - 94:17
**share** [1] - 197:4
**shared** [1] - 228:25
**Shari** [4] - 2:6, 2:23, 3:3, 3:9
**SHARI** [3] - 2:24, 3:3, 241:4
**sharing** [3] - 115:24, 115:25, 215:16
**sharp** [1] - 23:9
**shaved** [2] - 35:13, 36:1
**Shawn** [4] - 14:5, 112:2, 112:5, 113:1
**SHAWN** [1] - 1:8
**SHEAR** [1] - 150:5
**shear** [29] - 96:6, 96:7, 99:11, 99:12, 99:14, 99:22, 100:7, 102:16, 102:19, 103:1, 103:4, 103:11, 103:12, 103:15, 150:4, 150:5, 152:12, 153:8, 153:14, 154:24, 155:2, 155:6, 155:10, 155:12, 155:23, 167:10, 167:17
**Shear** [2] - 150:7, 155:13
**shears** [1] - 152:13
**sheet** [1] - 125:21
**Sheistyville** [4] - 6:2, 13:14, 13:22, 14:3
**shell** [13] - 67:19, 67:20, 79:13, 96:21, 97:1, 99:23, 99:24, 100:8, 143:19, 143:22, 162:17,

164:8
**Shelly** [1] - 221:9
**SHELLY** [1] - 1:8
**Shelton** [14] - 5:11, 5:14, 5:17, 5:21, 6:8, 6:15, 7:19, 8:3, 8:16, 9:24, 11:2, 11:3, 12:20, 228:15
**SHELTON** [1] - 1:7
**Shelton's** [3] - 5:12, 6:14, 6:16
**shifting** [1] - 58:5
**shining** [1] - 33:21
**shiny** [1] - 33:13
**shirt** [4] - 170:17, 174:20, 202:13, 205:7
**shock** [1] - 23:14
**Shock** [6] - 40:9, 40:10, 80:7, 80:22, 80:23, 88:10
**shooter** [2] - 119:13, 119:17
**shooting** [3] - 31:12, 92:18, 97:2
**shop** [23] - 190:25, 191:2, 191:8, 191:9, 191:15, 192:4, 192:9, 192:11, 193:7, 194:24, 195:3, 195:7, 196:2, 205:22, 206:5, 206:6, 206:7, 206:11, 207:13, 207:24, 208:20
**shops** [9] - 190:21, 190:23, 191:15, 191:17, 191:22, 195:11, 195:15, 197:2, 207:16
**short** [2] - 19:23, 176:4
**shortly** [1] - 209:22
**shot** [11] - 23:7, 24:19, 29:2, 34:1, 34:2, 34:5, 34:8, 164:4, 164:9, 174:12, 216:9
**shoulder** [3] - 22:4, 37:16, 43:1
**show** [15] - 9:3, 83:6, 87:13, 93:1, 123:19, 126:5, 126:6, 155:10, 155:14, 156:21, 159:1, 182:15, 203:22, 237:12, 237:13
**showed** [6] - 54:16, 54:17, 55:6, 87:17, 203:23, 203:24
**Showing** [2] - 78:13, 80:5
**showing** [4] - 27:25, 55:4, 159:10
**shown** [3] - 155:14, 236:23, 238:10
**shows** [4] - 33:4, 54:21, 197:19, 239:4

**sic** [1] - 182:22
**side** [33] - 20:4, 22:5, 24:10, 24:15, 28:13, 28:20, 32:8, 32:9, 32:25, 36:8, 37:16, 37:22, 37:23, 39:21, 42:8, 43:3, 73:14, 83:3, 84:24, 95:22, 99:24, 103:18, 108:10, 145:5, 145:6, 145:7, 148:23, 160:19, 173:19, 174:16, 235:23
**sides** [2] - 36:7, 84:24
**sideways** [1] - 145:10
**sight** [1] - 60:1
**Sigma** [1] - 93:19
**sign** [2] - 55:20, 111:16
**signature** [7] - 18:15, 18:16, 28:2, 34:19, 38:14, 230:5, 242:10
**signed** [9] - 63:25, 183:16, 229:6, 229:10, 229:17, 230:7, 230:10, 230:23, 231:16
**significance** [1] - 54:20
**significant** [7] - 31:7, 31:9, 76:6, 77:19, 89:17, 92:1, 92:13
**signs** [3] - 24:1, 35:24, 37:19
**Similar** [2] - 157:4, 157:5
**similar** [7] - 43:25, 44:1, 46:24, 83:24, 141:15, 154:22, 156:6
**similarity** [1] - 77:10
**simply** [6] - 46:22, 62:7, 76:11, 76:14, 86:21, 138:22
**simulated** [1] - 64:4
**simultaneously** [1] - 77:24
**sing** [2] - 8:9, 8:11
**single** [2] - 24:16, 32:7
**sister** [4] - 4:5, 4:6, 5:18, 5:19
**sit** [1] - 130:16
**sits** [1] - 101:21
**sitting** [7] - 20:25, 21:14, 131:14, 174:16, 176:12, 205:5, 225:20
**Sitting** [1] - 185:4
**situation** [6] - 55:5, 130:22, 134:13, 135:4, 135:10, 168:11
**situations** [1] - 34:9
**Six** [5] - 15:5, 126:5, 126:8, 127:11
**six** [21] - 47:3, 81:1, 83:20, 88:5, 95:4, 95:9, 95:10, 95:13, 96:21,

97:5, 98:24, 108:8, 149:12, 149:15, 149:20, 149:23, 193:11, 205:2, 206:23, 207:1, 210:5

**Sixth** [5] - 129:8, 129:23, 134:25, 135:3, 139:14

**size** [2] - 81:17, 82:17

**sizes** [1] - 87:8

**skin** [10] - 19:20, 19:23, 24:4, 24:6, 28:18, 30:18, 33:4, 33:21, 35:12, 36:4

**skipped** [2] - 94:24, 96:24

**skull** [4] - 22:13, 22:15, 30:1, 36:9

**slapped** [1] - 139:5

**sleep** [1] - 7:1

**slept** [1] - 6:25

**slide** [8] - 76:24, 96:5, 102:23, 151:23, 151:24, 152:3, 152:6

**slides** [1] - 102:25

**sliding** [1] - 96:6

**slightly** [16] - 21:19, 21:22, 23:19, 30:5, 34:6, 34:7, 38:3, 42:11, 42:16, 145:9, 151:18, 152:9, 159:23, 160:10, 164:2, 164:6

**slips** [2] - 54:16, 102:24

**slouched** [2] - 23:6, 23:8

**slow** [1] - 146:12

**slumping** [1] - 30:7

**small** [3] - 19:19, 71:9, 214:2

**smaller** [1] - 77:13

**Smith** [2] - 93:18, 94:12

**smooth** [1] - 74:2

**snitching** [2] - 173:5, 175:12

**socially** [1] - 200:24

**Socially** [1] - 200:25

**sofa** [1] - 7:2

**soft** [11] - 20:1, 22:10, 24:6, 28:19, 33:1, 37:2, 37:21, 37:25, 42:13, 81:3, 145:25

**softer** [4] - 74:18, 74:22, 79:12, 163:16

**Sold** [3] - 186:5, 188:4, 189:10

**sold** [4] - 187:24, 194:4, 204:4, 204:13

**solid** [1] - 71:11

**Someone** [2] - 198:4, 198:6

**someone** [12] - 13:20, 17:22, 27:16, 131:1,

179:13, 179:21, 180:20, 201:17, 204:2, 216:8, 216:9, 216:14

**Sometime** [3] - 231:14, 231:15

**sometime** [10] - 76:22, 125:5, 223:14, 228:6, 228:10, 228:19, 231:4, 234:13, 240:7, 240:8

**sometimes** [10] - 8:9, 12:5, 24:25, 33:3, 107:3, 138:17, 160:7, 168:6, 215:11, 228:15

**Sometimes** [2] - 12:22, 79:13

**somewhat** [6] - 46:23, 50:1, 82:10, 83:24, 94:17

**somewhere** [2] - 12:25, 56:14

**Somewhere** [1] - 194:10

**son** [4] - 12:21, 12:24, 12:25, 227:1

**son's** [1] - 7:14

**songs** [4] - 6:14, 6:16, 8:7, 8:9

**soon** [4] - 2:8, 104:1, 176:13

**sorry** [32] - 4:17, 28:1, 28:22, 32:25, 35:16, 38:2, 39:6, 41:12, 44:17, 80:9, 84:12, 91:7, 93:21, 104:19, 106:8, 107:20, 111:2, 112:12, 117:14, 123:18, 133:5, 147:11, 161:21, 162:2, 164:5, 169:16, 171:17, 174:1, 192:18, 226:7, 229:9, 235:2

**Sorry** [10] - 4:21, 25:15, 26:20, 34:18, 35:20, 36:21, 124:18, 128:13, 162:2, 188:13

**sort** [24] - 21:4, 45:20, 49:15, 52:13, 53:19, 68:1, 113:14, 122:14, 136:12, 141:17, 146:17, 174:17, 185:23, 187:15, 190:3, 190:7, 190:18, 191:18, 191:21, 197:1, 197:7, 211:17, 234:21, 238:18

**Sort** [1] - 94:2

**sound** [1] - 51:2

**sounds** [2] - 56:15, 162:19

**source** [7] - 167:20, 197:9, 213:8, 213:11, 213:20, 213:24, 213:25

**South** [7] - 5:4, 5:5,

121:21, 121:23, 200:15, 224:13, 224:14

**Southern** [1] - 68:22

**sovereignty** [1] - 236:7

**Spain** [1] - 15:8

**Spanish** [1] - 16:21

**spark** [2] - 71:9, 99:21

**speaking** [1] - 107:1

**special** [4] - 81:14, 81:20, 81:24, 81:25

**specialist** [1] - 27:16

**specialists** [1] - 27:18

**specific** [10] - 20:16, 20:17, 20:19, 61:14, 78:2, 154:17, 154:18, 155:20, 156:23, 193:22

**specifically** [2] - 8:6, 61:11, 88:16, 92:22, 101:13, 101:18, 101:19, 156:18, 217:13

**Specifically** [2] - 156:20, 177:24

**specimen** [3] - 99:25, 103:20, 103:21

**specimens** [1] - 77:1

**specs** [1] - 87:25

**spectators** [1] - 108:8

**speculating** [1] - 56:16

**spell** [10] - 3:2, 14:19, 60:12, 109:14, 168:2, 169:11, 169:16, 181:8, 188:22, 188:23

**spelled** [2] - 60:14, 188:13

**Spence** [18] - 38:18, 39:7, 40:17, 43:20, 46:17, 47:2, 78:6, 92:9, 95:6, 95:12, 98:20, 98:22, 101:16, 101:17, 139:21, 143:24, 144:10, 236:23

**Spence's** [1] - 43:18

**spend** [1] - 240:7

**spent** [3] - 144:25, 226:9, 237:25

**spinal** [5] - 22:14, 32:19, 32:24, 33:23, 33:24

**spine** [3] - 22:11, 22:12, 32:16

**split** [1] - 197:4

**splits** [1] - 158:7

**spoken** [2] - 52:25, 207:20

**sponsored** [1] - 156:6

**spots** [2] - 74:6, 82:22

**stage** [3] - 76:24, 84:4, 85:10

**stages** [2] - 76:24, 76:25

**stamp** [1] - 102:5

**stamping** [1] - 102:7

**stand** [7] - 44:8, 54:11, 59:10, 60:8, 68:10, 130:4, 150:11

**standard** [4] - 19:9, 50:25, 77:7, 126:9

**standards** [1] - 156:11

**standing** [5] - 23:21, 55:4, 64:14, 128:25, 150:12

**standpoint** [1] - 43:24

**staring** [1] - 108:7

**start** [8] - 13:6, 19:7, 87:23, 115:25, 171:21, 186:24, 203:1, 234:10

**started** [18] - 15:14, 111:16, 114:8, 173:8, 175:15, 176:6, 186:7, 186:17, 187:7, 189:11, 189:16, 189:21, 190:6, 206:24, 207:1, 229:13, 235:11

**starts** [1] - 152:3

**stash** [19] - 187:11, 187:13, 192:16, 192:19, 192:20, 192:22, 193:1, 193:3, 193:4, 193:9, 193:14, 193:17, 193:19, 193:20, 194:3, 194:5

**State** [19] - 3:2, 14:19, 15:2, 15:4, 15:25, 17:4, 17:6, 17:24, 60:12, 63:6, 65:13, 65:14, 67:11, 67:14, 68:3, 109:14, 169:11, 226:11, 226:12

**state** [15] - 15:22, 65:5, 71:11, 71:12, 116:23, 117:1, 130:9, 166:4, 181:8, 226:12, 236:24

**statement** [6] - 134:8, 134:21, 135:1, 136:24, 161:18, 232:16

**statement's** [1] - 136:1

**statements** [9] - 131:1, 133:7, 134:15, 134:17, 135:5, 135:20, 138:7, 139:12, 140:23

**states** [1] - 230:23

**States** [9] - 2:23, 14:14, 15:11, 49:24, 57:10, 60:7, 132:22, 169:4, 182:13

**STATES** [2] - 1:1, 1:5

**stay** [7] - 6:20, 26:5, 139:24, 202:21, 202:23, 206:13, 209:13

**stayed** [4] - 6:24, 7:3, 11:6, 22:18

**staying** [1] - 42:12

**steady** [1] - 196:13

**Steady** [1] - 196:14

**stem** [1] - 22:24

**stenographically** [1] - 242:4

**step** [8] - 18:6, 45:9, 45:11, 125:14, 136:16, 142:15, 185:11, 233:11

**Stephen** [1] - 31:19

**stepping** [1] - 45:1

**steps** [1] - 154:10

**stick** [1] - 220:11

**stick-up** [1] - 220:11

**sticker** [1] - 148:13

**Still** [2] - 60:17, 192:19

**still** [17] - 39:11, 40:9, 51:18, 55:23, 114:5, 115:7, 143:3, 143:6, 145:5, 159:7, 179:10, 182:8, 184:6, 191:12, 191:13, 207:8, 239:25

**stippling** [12] - 19:22, 20:13, 20:18, 24:2, 24:3, 28:15, 30:14, 30:16, 30:17, 32:12, 32:13, 36:2

**stipulation** [1] - 237:22

**stock** [1] - 89:5

**Stoler** [8] - 53:25, 54:9, 54:25, 55:13, 56:5, 57:25, 58:2, 59:6

**stomach** [2] - 27:6, 39:17

**stop** [1] - 176:1

**stops** [1] - 152:5

**storage** [8] - 7:9, 7:11, 9:17, 10:4, 11:14, 11:17, 12:2, 12:9

**store** [1] - 147:8

**story** [6] - 119:8, 119:15, 215:22, 215:24, 216:1, 232:1

**straight** [4] - 23:21, 128:25, 145:10, 176:15

**Street** [3] - 1:25, 186:25, 187:2, 187:3, 187:13, 191:4

**street** [27] - 116:12, 186:12, 187:11, 188:1, 189:12, 190:7, 190:8, 191:5, 193:3, 193:4, 193:9, 193:10, 193:14, 193:16, 193:17, 193:19, 197:24, 198:1, 198:3, 198:6, 198:15, 199:2, 202:25, 203:1, 204:13, 209:1

**streets** [1] - 192:6

**stria** [11] - 84:24, 85:7, 89:9, 90:15, 154:7, 155:1, 156:14, 158:9,

158:12, 158:14, 159:15
**striated** [1] - 156:20
**striation** [1] - 157:24
**strike** [7] - 71:2, 146:19, 149:25, 162:12, 206:23, 207:7, 218:1
**striker** [1] - 151:25
**strikes** [5] - 71:8, 71:22, 74:15, 102:19, 150:23
**string** [1] - 132:13
**striped** [1] - 205:7
**stripes** [1] - 59:24
**strong** [1] - 45:1
**strongest** [1] - 132:1
**struck** [6] - 71:21, 79:17, 96:3, 99:20, 137:19
**structure** [1] - 50:2
**structured** [1] - 63:11
**studies** [10] - 153:23, 154:2, 155:5, 155:9, 155:14, 155:21, 155:23, 156:4, 156:13, 156:17
**study** [2] - 154:3, 156:12
**stuff** [6] - 7:6, 7:20, 9:17, 12:12, 202:25, 240:11
**subclass** [1] - 166:15
**subdue** [2] - 173:14, 175:18
**subdued** [1] - 175:20
**subject** [4] - 45:16, 86:24, 115:14, 199:20
**subjective** [4] - 50:5, 50:6, 161:15, 161:19
**subjectivity** [1] - 49:12
**submission** [1] - 126:15
**submissions** [2] - 2:12, 126:11
**submit** [2] - 126:22, 127:25
**submitted** [9] - 46:5, 46:9, 46:11, 58:13, 86:11, 128:1, 236:8, 236:12, 236:17
**subpoena** [13] - 55:5, 55:15, 55:18, 55:20, 55:21, 56:1, 56:9, 56:17, 56:23, 56:24, 56:25, 106:24
**subpoenaed** [1] - 54:14
**subpoenas** [2] - 55:19, 57:2
**substance** [1] - 164:14
**substantial** [6] - 85:6, 159:18, 166:12, 184:15, 199:17, 227:6
**substantially** [2] -

166:25, 167:18
**substantive** [3] - 69:24, 235:19, 236:2
**substantively** [1] - 45:10
**success** [1] - 190:8
**suffered** [2] - 19:13, 31:3
**suffers** [2] - 164:19, 164:23
**sufficient** [6] - 69:3, 69:8, 85:8, 161:7, 167:18, 168:10
**sufficiently** [1] - 167:1
**suggest** [2] - 77:20, 132:7
**suggesting** [1] - 136:3
**suggestion** [1] - 56:2
**suit** [4] - 170:21, 173:4, 175:11, 175:21
**summarize** [2] - 19:1, 240:12
**summary** [3] - 40:6, 132:14, 132:16
**super** [1] - 107:1
**superficial** [5] - 29:18, 30:2, 31:8, 36:25, 40:22
**Supermax** [8] - 57:19, 57:20, 57:22, 58:4, 58:5, 214:20, 214:22, 215:1
**supervise** [2] - 157:13, 165:20
**supervising** [3] - 17:21, 17:22, 18:9
**supervision** [2] - 18:5, 165:23
**Supp** [3] - 47:16, 47:18, 47:20
**supplier** [5] - 196:1, 196:3, 196:5, 197:13, 203:8
**support** [1] - 186:3
**supports** [2] - 74:13, 152:2
**suppose** [2] - 57:4, 233:3
**supposed** [3] - 33:15, 105:16, 111:13
**supposition** [1] - 233:5
**suppression** [1] - 135:1
**surface** [26] - 73:25, 74:4, 74:8, 74:14, 74:21, 75:22, 76:5, 76:8, 76:9, 76:13, 77:20, 79:17, 82:14, 85:3, 90:17, 100:2, 101:21, 101:24, 102:3, 103:1, 154:4, 154:5, 162:14, 166:19
**surfaces** [15] - 71:22, 73:24, 74:3, 74:11,

74:21, 75:14, 75:20, 75:22, 77:24, 89:19, 96:8, 156:15, 156:21, 163:15, 164:12
**surgery** [2] - 41:12, 41:14
**surprised** [2] - 55:11, 55:12
**surprises** [1] - 59:3
**surround** [1] - 100:15
**surrounding** [2] - 19:21, 20:13
**surrounds** [2] - 39:23, 99:13
**surveillance** [1] - 169:24
**survey** [1] - 45:16
**survivable** [1] - 41:23
**survival** [1] - 41:23
**survive** [1] - 42:1
**survived** [2] - 23:16, 39:8
**sustained** [1] - 68:25
**Sustained** [4] - 69:6, 69:11, 171:23, 212:25
**suture** [1] - 39:24
**sweet** [5] - 213:5, 213:7, 213:11, 233:12
**switch** [1] - 41:11
**switched** [5] - 119:8, 119:15, 215:22, 215:24, 216:1
**SWORN** [2] - 2:24, 14:16, 60:9, 109:11, 169:8, 181:5
**sworn** [1] - 109:10
**syllabus** [1] - 63:11
**system** [11] - 3:7, 27:8, 32:20, 91:17, 91:20, 92:11, 95:19, 98:14, 104:6, 156:6, 171:4

---

**T**

**T-A-M** [1] - 168:3
**T-shirt** [2] - 170:17, 174:20
**table** [3] - 93:25, 187:23, 205:7
**talks** [2] - 49:4, 124:12
**Talks** [1] - 49:5
**Tam** [3] - 167:19, 167:25, 168:1
**tank** [3] - 89:7, 146:10
**target** [1] - 71:2
**tattooing** [4] - 19:22, 28:15, 29:22, 36:1
**Taurus** [3] - 86:25, 91:1, 91:4

**tax** [1] - 155:25
**teaching** [1] - 17:25
**tear** [4] - 163:3, 163:6, 163:8, 163:22
**technical** [2] - 61:15, 171:1
**technician** [3] - 63:1, 67:2, 67:4
**technique** [1] - 48:11
**Ted** [1] - 54:9
**temporal** [2] - 36:7, 36:9
**temporarily** [1] - 164:12
**ten** [7] - 5:15, 39:9, 154:9, 154:12, 208:10, 212:12, 232:9
**Ten** [2] - 232:11, 232:12
**tendered** [2] - 17:14, 70:11
**tens** [3] - 65:1, 165:13, 165:16
**term** [3] - 67:18, 128:21, 228:25
**terminology** [2] - 71:23, 191:10
**terms** [14] - 65:16, 67:16, 99:16, 123:9, 124:19, 125:13, 144:6, 164:10, 183:3, 183:7, 183:19, 184:11, 207:23, 230:18
**terribly** [4] - 93:24, 106:25, 234:15, 235:25
**test** [28] - 27:7, 64:2, 64:3, 64:8, 90:1, 90:19, 91:12, 95:18, 98:19, 98:22, 98:23, 99:1, 99:3, 99:4, 143:23, 144:15, 144:18, 144:19, 144:20, 146:7, 147:3, 147:6, 147:13, 154:13, 158:3, 161:2
**test-fire** [2] - 143:23, 144:15
**test-fired** [8] - 90:1, 95:18, 98:19, 146:7, 147:3, 147:6, 154:13, 158:3
**test-fires** [2] - 154:13, 161:2
**test-firing** [2] - 98:23, 147:13
**tested** [3] - 89:25, 162:22, 171:5
**testified** [25] - 11:2, 17:2, 17:3, 53:22, 57:25, 65:20, 86:10, 86:16, 87:7, 88:8, 91:1, 97:16, 98:19, 104:24, 108:18, 123:10, 126:23, 144:8,

159:3, 160:25, 162:13, 163:1, 165:11, 167:10, 232:22
**testifies** [1] - 53:8, 142:23
**testify** [19] - 16:23, 46:15, 47:1, 57:6, 58:2, 58:3, 65:7, 65:16, 66:9, 69:13, 70:4, 109:8, 157:20, 157:23, 176:25, 177:25, 178:7, 183:21, 239:15
**testifying** [6] - 11:21, 53:7, 172:14, 172:17, 177:21, 182:11
**testimony** [44] - 50:2, 54:10, 57:6, 69:3, 69:8, 100:16, 100:21, 101:14, 105:20, 105:25, 122:7, 123:5, 127:6, 127:8, 138:15, 139:23, 140:7, 141:21, 142:5, 142:9, 165:11, 227:10, 227:14, 234:8, 234:23, 235:20, 235:24, 236:1
**testing** [4] - 63:18, 66:16, 88:24
**Testing** [1] - 63:25
**tests** [5] - 64:1, 64:6, 162:23, 162:25
**THE** [330] - 1:1, 1:2, 2:2, 2:4, 2:7, 2:12, 2:17, 2:19, 2:25, 3:1, 3:3, 3:5, 3:9, 3:11, 10:17, 11:24, 11:25, 14:12, 14:17, 14:18, 14:20, 17:10, 17:13, 17:15, 18:21, 24:24, 25:14, 25:19, 25:21, 25:25, 26:2, 26:9, 26:22, 28:5, 33:8, 35:16, 35:19, 44:5, 44:6, 44:7, 44:17, 44:19, 44:21, 45:2, 45:11, 46:2, 46:8, 46:13, 47:5, 47:9, 47:13, 47:15, 47:18, 47:23, 47:25, 48:3, 48:17, 48:20, 48:23, 49:2, 49:6, 49:14, 49:18, 49:22, 50:22, 51:4, 51:12, 51:16, 51:19, 52:1, 52:4, 52:6, 52:10, 52:15, 52:17, 52:20, 52:23, 53:13, 53:17, 53:21, 53:24, 54:7, 54:12, 55:1, 55:9, 55:16, 56:3, 56:11, 56:15, 56:19, 56:22, 57:8, 57:13, 57:18, 58:8, 58:19, 59:1, 59:9, 59:12, 59:13, 59:14, 59:16, 59:18, 59:21, 59:22,

60:1, 60:4, 60:10, 60:11,
60:13, 62:16, 66:2,
68:17, 68:19, 68:25,
69:6, 69:11, 69:19,
69:23, 70:2, 70:7, 70:10,
72:2, 78:15, 80:8, 85:18,
86:6, 87:16, 93:4, 94:1,
103:25, 104:8, 104:12,
104:17, 104:20, 104:23,
105:1, 105:5, 105:13,
105:18, 105:24, 106:7,
106:10, 106:20, 107:15,
107:20, 107:25, 108:4,
108:16, 108:20, 108:22,
109:1, 109:5, 109:7,
109:12, 109:13, 109:15,
109:16, 115:21, 118:16,
121:7, 122:24, 123:16,
123:18, 124:6, 124:15,
124:17, 125:12, 125:14,
125:18, 125:21, 126:1,
126:7, 128:2, 128:10,
128:14, 129:2, 129:17,
129:20, 130:5, 130:8,
130:13, 130:20, 130:24,
131:3, 131:7, 131:13,
131:19, 132:1, 132:4,
132:10, 132:18, 132:20,
133:4, 133:6, 133:11,
133:13, 133:20, 133:22,
134:20, 135:22, 136:7,
137:2, 137:5, 137:9,
139:4, 139:8, 140:8,
140:16, 140:19, 141:3,
141:7, 142:3, 142:21,
143:3, 143:8, 143:10,
148:1, 148:3, 148:5,
148:11, 159:20, 160:5,
160:14, 161:17, 161:21,
162:2, 165:4, 165:7,
167:5, 168:18, 169:1,
169:2, 169:3, 169:6,
169:9, 169:10, 169:12,
169:16, 169:18, 170:24,
171:3, 171:6, 171:9,
171:23, 171:25, 172:8,
172:16, 172:22, 173:2,
173:13, 173:17, 173:21,
173:22, 173:24, 174:7,
174:25, 175:3, 175:8,
175:24, 176:10, 176:23,
177:3, 177:8, 177:22,
178:5, 180:14, 180:18,
180:21, 181:1, 181:3,
181:6, 181:7, 181:9,
189:1, 198:17, 199:7,
199:8, 202:16, 204:6,
205:10, 210:25, 212:25,
213:16, 213:18, 216:17,
217:18, 222:6, 222:13,
222:17, 222:22, 223:1,

225:5, 225:7, 229:21,
231:8, 231:10, 231:13,
233:23, 233:25, 234:3,
234:6, 235:2, 235:6,
235:13, 235:17, 235:21,
236:4, 236:8, 236:12,
236:16, 237:3, 237:12,
237:18, 237:20, 237:23,
238:2, 238:7, 238:13,
238:17, 238:20, 238:23,
239:11, 239:16, 239:20,
239:23, 239:25, 240:3,
240:7, 240:15
**thee's** [1] - 125:9
**thenar** [1] - 23:23
**theory** [1] - 155:21
**they've** [2] - 156:24,
162:22
**thick** [1] - 36:3
**thicker** [1] - 24:4
**thinking** [4] - 112:23,
118:2, 118:21, 138:13
**thinks** [2] - 53:5, 126:14
**third** [5] - 23:17, 37:14,
149:8, 208:13, 208:14
**Thomas** [1] - 1:20
**thoracic** [1] - 42:12
**thousand** [2] - 65:1,
65:2
**thousands** [3] - 65:1,
165:13, 165:16
**threaten** [1] - 136:13
**three** [38] - 18:2, 19:4,
19:15, 25:5, 25:6, 25:10,
25:11, 25:12, 35:1,
46:17, 53:4, 53:6, 63:5,
63:8, 65:12, 75:12, 78:9,
104:14, 110:25, 115:5,
137:14, 140:19, 144:20,
147:5, 147:21, 149:4,
158:12, 180:15, 191:18,
195:9, 195:11, 195:14,
195:17, 195:20, 197:1,
197:17, 197:19, 222:1
**Three** [2] - 65:11, 172:5
**threw** [1] - 176:16
**throughout** [1] - 141:16
**throw** [1] - 73:14
**thrown** [2] - 145:5,
145:11
**thumb** [2] - 59:23
**Thursday** [1] - 235:16
**tie** [1] - 139:21
**tied** [1] - 142:18
**timely** [1] - 53:11
**timing** [2] - 58:16,
106:13
**tissue** [2] - 28:19, 41:1
**tissues** [8] - 20:1,
22:10, 24:6, 33:1, 37:2,

37:21, 37:25, 42:13
**TM** [2] - 13:24, 14:2
**Tobacco** [1] - 156:7
**today** [15] - 26:7, 52:8,
57:7, 58:10, 97:7,
148:14, 182:11, 183:25,
185:4, 214:6, 218:12,
227:14, 234:3, 234:4,
235:12
**together** [21] - 55:14,
64:18, 71:4, 96:6, 96:8,
102:24, 135:19, 188:1,
188:4, 189:10, 195:10,
195:12, 195:13, 195:14,
195:15, 197:12, 197:25,
200:13, 200:14, 218:25,
219:11
**Tom** [1] - 221:8
**tomorrow** [14] - 54:11,
234:2, 234:7, 234:8,
234:10, 234:17, 234:25,
236:16, 237:17, 237:22,
239:15, 239:17, 240:8,
240:20
**Tony** [1] - 112:23
**Tonya** [3] - 38:18,
43:20, 78:6
**took** [23] - 21:12, 31:12,
68:1, 75:12, 78:16,
86:12, 89:10, 90:20,
95:18, 98:22, 99:1, 99:2,
99:3, 100:12, 119:24,
123:11, 124:20, 133:16,
143:11, 178:19, 179:14,
185:11, 210:17
**Tool** [5] - 61:6, 63:12,
64:15, 68:6, 68:11
**tool** [25] - 61:16, 61:19,
63:7, 63:15, 64:3, 64:16,
64:17, 64:21, 64:25,
65:24, 70:15, 71:17,
73:17, 102:6, 154:2,
154:6, 155:5, 155:6,
155:7, 155:21, 156:13,
156:15, 167:20
**tools** [1] - 102:8
**top** [13] - 9:20, 10:4,
12:17, 12:18, 19:8,
29:20, 35:5, 35:14,
35:22, 37:4, 149:4,
149:14, 219:11
**torso** [5] - 20:4, 37:19,
40:24, 41:4, 43:19
**tossed** [2] - 146:17,
146:18
**total** [3] - 65:22, 147:23,
149:10
**totally** [2] - 180:24,
235:22
**touch** [6] - 33:14, 160:5,

160:8, 160:16, 209:13
**touched** [6] - 72:3,
84:9, 85:10, 89:21, 94:9,
94:23
**toward** [7] - 3:1, 14:18,
60:11, 109:13, 169:10,
176:4, 181:7
**towards** [1] - 49:3
**town** [2] - 5:3, 214:2
**townhouse** [1] - 8:24
**toxicology** [14] - 26:25,
27:12, 27:13, 27:15,
27:16, 27:19, 30:22,
30:23, 34:10, 34:11,
38:8, 38:10, 43:16, 43:17
**toy** [1] - 128:23
**toys** [1] - 7:14
**traffic** [1] - 192:23
**train** [1] - 75:12
**trained** [4] - 18:7,
168:8, 169:25, 203:23
**Training** [1] - 167:20
**training** [13] - 17:25,
18:2, 18:3, 63:6, 63:10,
63:11, 63:22, 63:24,
64:20, 67:12, 67:13,
167:18, 167:23
**trajectory** [2] - 21:22,
23:5
**transaction** [1] - 200:20
**transcribed** [1] - 242:7
**transcript** [6] - 53:9,
58:2, 172:5, 172:6,
172:11, 242:7
**transfer** [5] - 57:20,
58:3, 58:11, 102:11,
166:16
**transferred** [2] - 54:22,
162:17
**transfuse** [1] - 40:5
**transfusion** [1] - 42:5
**transportation** [1] -
12:21
**Trauma** [6] - 40:10,
40:12, 80:7, 80:22,
80:23, 88:10
**traveling** [4] - 22:11,
32:16, 34:16, 42:10
**travels** [1] - 152:4
**treatment** [6] - 38:19,
38:23, 39:3, 39:25, 40:6,
42:6
**trial** [10] - 26:4, 26:17,
141:16, 177:1, 177:21,
177:25, 178:7, 225:3,
228:14, 239:4
**tried** [3] - 39:24, 41:11,
156:5
**trigger** [2] - 151:4,
153:4

**troubling** [1] - 48:20
**true** [6] - 77:15, 127:14,
161:9, 161:13, 229:5,
230:21
**trust** [6] - 2:20, 129:4,
202:1, 202:4, 203:3,
234:14
**trusted** [1] - 202:7
**truth** [2] - 184:4, 235:25
**try** [12] - 3:7, 43:5, 94:3,
97:19, 97:23, 150:1,
156:8, 159:22, 181:2,
188:24, 234:11, 234:13
**Try** [1] - 3:7
**trying** [14] - 25:2, 25:3,
42:4, 49:15, 49:16,
67:18, 67:20, 118:23,
119:1, 119:3, 138:20,
143:5, 156:8
**tube** [3] - 39:16, 39:19
**turn** [5] - 78:2, 100:2,
104:9, 127:19, 231:18
**turned** [4] - 54:18,
54:25, 129:7, 238:18
**turning** [5] - 18:15,
21:16, 29:8, 34:7, 38:14
**Twelfth** [1] - 3:19
**twice** [5] - 54:10, 54:14,
65:12, 65:13, 127:12
**twin** [1] - 162:14
**twist** [3] - 81:2, 83:21,
88:6
**Two** [3] - 102:15,
103:18, 137:14
**two** [87] - 18:2, 28:9,
29:20, 34:20, 35:2,
40:17, 40:20, 41:7, 41:8,
43:21, 46:23, 55:18,
55:23, 66:15, 74:25,
76:23, 76:25, 77:1,
78:11, 79:5, 79:15, 80:1,
84:1, 84:5, 84:10, 84:14,
84:21, 84:22, 85:4,
86:18, 87:8, 90:5, 90:14,
90:16, 92:5, 96:7, 102:7,
102:10, 102:11, 102:13,
111:1, 114:23, 114:25,
115:1, 115:5, 117:15,
117:21, 118:8, 122:22,
124:21, 127:7, 132:2,
135:18, 136:15, 144:19,
144:20, 147:5, 148:20,
149:1, 152:4, 158:3,
160:25, 162:20, 165:17,
165:18, 165:24, 166:4,
166:8, 166:12, 168:11,
170:14, 170:19, 173:15,
175:18, 175:20, 180:15,
184:12, 189:17, 190:18,
192:25, 206:19, 207:12,

207:25, 215:3, 224:4, 236:21
**type** [5] - 40:19, 83:1, 86:19, 213:17, 223:20
**types** [3] - 12:23, 40:17, 156:13
**typically** [6] - 27:1, 73:4, 79:12, 81:20, 137:16, 145:8
**Typically** [2] - 146:18, 147:8

## U

**U.S** [5] - 1:24, 55:21, 68:22, 179:8, 184:13
**ultimate** [2] - 48:12, 184:2
**Ultimately** [2] - 79:25, 85:14
**ultimately** [4] - 183:15, 183:16, 185:4, 193:24
**Um-hum** [10] - 8:21, 11:23, 14:10, 112:17, 115:2, 122:19, 174:6, 187:4, 211:12, 212:10
**Um-um** [1] - 172:21
**umpteenth** [1] - 57:14
**unable** [2] - 91:4, 107:23
**unassailable** [1] - 45:19
**uncertainty** [3] - 49:10, 164:19, 164:23
**uncontrollable** [1] - 40:4
**undecided** [2] - 114:5, 114:6
**Under** [4] - 81:10, 183:3, 183:19, 184:11
**under** [36] - 18:4, 39:20, 45:21, 49:22, 63:14, 63:23, 74:3, 76:24, 77:3, 78:22, 86:11, 88:1, 91:21, 96:19, 102:22, 106:24, 127:20, 130:11, 131:25, 134:11, 134:16, 134:17, 137:15, 139:17, 145:6, 165:23, 181:24, 183:7, 184:3, 192:11, 194:4, 195:4, 207:8, 223:8, 227:3
**undercover** [2] - 130:14, 130:16
**underneath** [1] - 74:2
**Understood** [2] - 13:8, 92:24
**understood** [4] - 82:2, 99:8, 218:11, 235:20
**undertake** [1] - 79:2

**undertook** [1] - 58:15
**undue** [2] - 139:19, 140:24
**Unfortunately** [1] - 93:24
**unfortunately** [2] - 126:16, 184:11
**unique** [27] - 74:8, 74:12, 74:14, 74:16, 75:22, 76:14, 85:3, 100:17, 100:21, 101:3, 101:14, 101:18, 102:13, 102:16, 102:17, 103:1, 103:4, 103:12, 153:10, 155:14, 156:22, 159:4, 162:15, 162:16, 166:18
**uniqueness** [2] - 163:2, 163:21
**Unit** [2] - 61:7, 61:8
**unit** [9] - 61:11, 61:15, 132:24, 157:8, 198:4, 198:9, 218:21, 220:23
**unit's** [1] - 199:10
**UNITED** [2] - 1:1, 1:5
**United** [9] - 2:23, 14:14, 15:11, 49:24, 57:10, 60:7, 132:21, 169:4, 182:12
**University** [4] - 15:13, 15:15, 15:18, 39:7
**unknown** [2] - 84:3, 149:21
**unless** [3] - 58:6, 107:13, 142:21
**unlocked** [1] - 96:19
**unlocks** [2] - 96:6, 102:24
**unquote** [3] - 130:2, 230:16, 238:25
**unusual** [1] - 239:1
**up** [137] - 2:9, 3:20, 12:25, 13:5, 21:24, 24:21, 33:15, 38:3, 39:21, 39:24, 44:18, 46:16, 47:9, 47:10, 47:15, 48:10, 55:4, 57:11, 57:15, 58:16, 58:23, 58:24, 59:7, 68:13, 70:19, 71:12, 73:6, 74:23, 77:2, 77:23, 78:17, 80:14, 83:9, 84:7, 85:22, 87:14, 91:2, 92:4, 95:20, 99:25, 100:2, 102:20, 103:1, 108:11, 111:20, 111:25, 112:8, 112:10, 112:13, 112:16, 112:20, 112:22, 116:19, 116:22, 117:4, 119:6, 119:8, 119:15, 119:21, 119:22, 119:23, 120:5,

120:6, 120:8, 120:10, 120:14, 120:20, 123:12, 124:12, 125:9, 125:21, 128:23, 130:3, 132:10, 141:14, 143:11, 145:10, 148:20, 150:12, 151:13, 152:1, 157:21, 164:12, 169:21, 170:7, 170:8, 171:21, 174:19, 174:21, 174:23, 176:17, 179:16, 179:24, 180:24, 181:17, 187:14, 187:16, 190:12, 191:2, 193:24, 196:23, 199:4, 201:3, 203:10, 204:3, 204:10, 208:24, 210:6, 210:9, 211:4, 212:15, 212:17, 212:18, 212:21, 212:23, 213:20, 214:5, 214:19, 215:17, 215:21, 215:22, 215:24, 218:3, 218:4, 218:6, 220:11, 231:19, 231:25, 232:2, 235:19, 236:22, 237:7, 237:11
**upcoming** [1] - 58:6
**upper** [5] - 20:3, 22:2, 35:2, 37:16, 147:22
**Upside** [1] - 35:18
**upstairs** [2] - 170:1, 170:11
**upwards** [6] - 22:9, 23:9, 23:22, 30:5, 42:11, 42:17
**urged** [1] - 139:22
**urine** [1] - 27:6
**USA** [1] - 242:4
**useful** [1] - 159:22
**utilize** [1] - 49:10
**utilized** [1] - 95:24
**Utilizing** [1] - 92:11
**utterly** [1] - 45:18

## V

**Valenti** [1] - 68:14
**validate** [2] - 156:5, 156:8
**validated** [2] - 156:9, 162:25
**validation** [1] - 156:4
**valuable** [1] - 25:4
**various** [6] - 71:20, 73:24, 156:13, 156:15, 183:8, 238:10
**vehicle** [2] - 29:6, 31:4
**vein** [2] - 28:22, 33:25
**veins** [2] - 28:21, 39:17
**ventricles** [1] - 41:8
**verified** [1] - 154:11

**versus** [2] - 101:15, 192:20
**vertebra** [1] - 42:12
**vertebrae** [4] - 32:17, 32:19, 33:22, 33:24
**video** [1] - 236:1
**videotape** [1] - 170:25
**view** [6] - 12:8, 48:13, 108:14, 130:24, 147:24, 174:17
**viewing** [1] - 77:1
**violated** [1] - 139:15
**violation** [6] - 110:16, 129:3, 129:8, 129:12, 129:22, 183:5
**virtue** [2] - 135:16, 153:2
**visit** [10] - 179:13, 209:23, 210:3, 211:2, 211:8, 212:4, 212:6, 212:11, 234:22
**visitor** [1] - 108:5
**VOA** [1] - 241:25
**voice** [3] - 6:15, 107:4
**voir** [3] - 53:13, 53:15, 66:1
**VOLUME** [1] - 1:11
**volume** [3] - 203:10, 203:14, 239:2
**volunteered** [2] - 131:1, 131:5
**Volunteers** [2] - 210:18, 232:14
**vote** [1] - 234:14

## W

**W-43** [2] - 31:18, 34:18
**W-44** [1] - 34:19
**Wagster** [2] - 99:3, 168:22
**Wait** [1] - 47:15
**wait** [4] - 44:15, 104:3, 138:17, 141:7
**walk** [4] - 59:7, 63:12, 95:17, 238:14
**Wall** [14] - 127:21, 129:11, 132:2, 132:9, 132:22, 132:25, 133:1, 133:14, 133:24, 134:10, 138:20, 138:21, 138:25
**WALL** [1] - 132:22
**wants** [3] - 45:8, 48:8, 106:23
**ware** [1] - 156:5
**warning** [1] - 135:19
**washer** [1] - 161:22
**Washington** [1] - 17:5
**watched** [4] - 151:23,

154:10, 157:20, 157:23
**water** [7] - 7:15, 89:6, 89:7, 146:10, 146:12, 173:21
**Wayne** [50] - 120:1, 120:3, 120:4, 120:6, 120:8, 120:21, 120:24, 200:2, 200:6, 200:7, 200:9, 200:21, 201:1, 201:2, 201:8, 201:10, 201:12, 201:21, 202:6, 202:9, 202:17, 202:18, 203:21, 204:2, 204:20, 204:21, 204:22, 204:25, 206:11, 206:13, 207:1, 207:12, 209:13, 209:23, 209:25, 210:3, 210:5, 210:12, 210:13, 210:20, 212:4, 217:25, 218:1, 218:2, 218:4, 218:6, 218:10, 218:11, 219:17
**WAYNE** [1] - 1:8
**Wayne's** [2] - 200:10, 204:20
**ways** [1] - 210:15
**weapon** [26] - 12:18, 20:16, 20:19, 46:20, 62:8, 72:9, 72:13, 72:16, 72:20, 73:10, 79:20, 79:23, 81:11, 86:17, 87:22, 88:13, 89:22, 90:13, 90:24, 91:12, 98:23, 100:17, 100:21, 224:16, 224:18
**weapons** [2] - 72:25, 101:7
**wear** [4] - 163:3, 163:6, 163:8, 163:22
**wearing** [7] - 163:15, 170:15, 170:16, 170:21, 170:22, 202:12, 205:6
**wedge** [1] - 97:23
**week** [15] - 55:13, 108:1, 117:6, 133:6, 139:5, 139:16, 208:20, 209:1, 209:3, 209:5, 209:6, 215:4, 228:22, 239:12
**Week** [1] - 209:4
**weekend** [1] - 2:20
**weeks** [6] - 47:21, 108:8, 137:16, 209:7, 228:23
**Welcome** [1] - 142:24
**Wesson** [4] - 46:19, 88:2, 93:19, 94:13
**West** [1] - 1:25
**Westlaw** [4] - 47:23, 132:22, 134:22
**whatever's** [1] - 59:7

**whatsoever** [1] - 126:12
**whereas** [1] - 131:15
**Whereof** [1] - 242:9
**white** [4] - 149:3, 170:17, 174:20, 202:13
**whole** [6] - 53:20, 54:2, 119:15, 158:10, 217:21, 239:20
**width** [2] - 81:17, 166:14
**Willie** [9] - 188:8, 189:4, 195:22, 196:2, 196:25, 228:5, 228:9, 242:4
**WILLIE** [1] - 1:7
**willing** [3] - 142:3, 210:21, 230:17
**wind** [1] - 128:23
**wind-up** [1] - 128:23
**window** [3] - 147:13, 148:18, 161:22
**wish** [1] - 230:15
**wishes** [2] - 108:23, 125:20
**Witness** [1] - 242:9
**witness** [43] - 2:5, 2:15, 2:21, 17:13, 25:23, 26:10, 44:23, 44:25, 45:4, 45:7, 46:13, 48:3, 48:9, 48:14, 50:6, 52:2, 52:5, 52:13, 52:19, 52:25, 60:6, 65:7, 70:10, 72:1, 78:14, 80:7, 86:5, 87:15, 103:24, 104:11, 106:19, 106:23, 129:5, 169:3, 170:24, 171:23, 180:15, 180:16, 180:19, 239:18, 240:16
**WITNESS** [37] - 2:24, 2:25, 3:3, 3:9, 11:25, 14:16, 14:17, 14:20, 17:15, 44:6, 59:13, 59:21, 60:9, 60:10, 60:13, 68:19, 109:11, 109:12, 109:16, 169:2, 169:8, 169:9, 169:12, 169:18, 173:22, 181:5, 181:6, 181:9, 199:8, 225:7, 241:4, 241:6, 241:8, 241:11, 241:13, 241:16, 241:18
**witness'** [3] - 25:25, 50:2, 70:3
**witnesses** [3] - 52:8, 53:22, 59:4
**WL-4293317** [1] - 48:1
**woman** [2] - 17:19, 38:17
**wonder** [2] - 18:25, 97:17
**woods** [4] - 46:19, 47:2,

86:4, 87:18
**Woody** [1] - 220:9
**word** [11] - 45:16, 48:6, 48:8, 48:9, 52:3, 99:18, 136:21, 190:23, 190:24, 198:11, 239:9
**words** [5] - 4:23, 50:18, 55:9, 76:7, 159:2
**works** [2] - 62:4, 93:23
**world** [5] - 153:13, 154:14, 159:4, 166:7, 235:16
**worse** [1] - 130:25
**wound** [71] - 19:13, 19:16, 19:18, 19:21, 20:3, 20:6, 20:9, 20:12, 20:13, 20:21, 20:23, 21:16, 22:2, 22:3, 22:5, 22:7, 22:8, 22:20, 22:21, 23:10, 23:13, 23:19, 23:20, 24:8, 24:9, 24:16, 24:25, 28:10, 28:12, 28:13, 28:16, 28:23, 28:25, 29:13, 29:14, 29:17, 29:19, 30:2, 30:8, 32:7, 32:8, 32:11, 32:13, 33:7, 34:14, 35:3, 35:4, 35:6, 35:12, 36:12, 36:16, 36:24, 37:1, 37:6, 37:11, 37:13, 37:15, 37:17, 37:18, 38:1, 39:15, 40:21, 40:24, 40:25, 41:1, 41:2, 41:11, 41:17, 42:8, 42:15
**wounds** [25] - 19:3, 19:4, 19:7, 19:9, 19:15, 25:1, 25:5, 25:7, 27:21, 28:9, 28:10, 30:12, 31:1, 31:7, 35:1, 35:2, 38:12, 39:14, 40:18, 40:19, 40:20, 41:3, 42:19, 42:23, 43:19
**wrap** [1] - 2:9
**wrist** [4] - 42:25, 43:2, 43:7, 43:11
**write** [5] - 8:3, 8:5, 8:6, 8:7, 99:10
**writes** [1] - 134:24
**written** [2] - 45:15, 229:25
**wrote** [2] - 135:20, 226:24
**Wyche** [14] - 31:17, 32:6, 32:7, 34:3, 34:10, 34:20, 34:24, 35:1, 38:8, 112:23, 112:24, 120:12, 218:9
**Wyche's** [2] - 34:13, 38:11

## X

**XIX** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**year** [18] - 16:6, 16:12, 18:1, 18:3, 64:2, 110:6, 116:4, 117:8, 177:9, 177:10, 186:1, 191:24, 207:25, 226:4, 226:6, 226:8, 226:9
**years** [33] - 5:15, 15:5, 15:18, 16:4, 16:8, 53:1, 55:19, 55:23, 56:6, 60:25, 61:1, 62:22, 63:1, 63:5, 63:8, 74:24, 75:12, 182:5, 184:8, 185:21, 192:1, 206:19, 207:12, 210:6, 214:4, 220:12, 221:13, 221:17, 225:10, 225:11, 225:12, 226:3
**yielded** [1] - 102:21
**yo** [2] - 175:25, 176:15
**York** [10] - 15:14, 15:15, 15:22, 16:16, 17:4, 18:1, 68:13, 68:23, 162:6
**young** [3] - 25:22, 106:18, 221:17
**yourself** [8] - 31:16, 57:9, 78:18, 97:3, 172:8, 186:3, 218:21, 228:1

## Z

**Zajac** [3] - 1:24, 242:3, 242:14
**zoom** [2] - 159:6, 159:22