1

1                   IN THE UNITED STATES DISTRICT COURT
2                     FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION
3


4


5     UNITED STATES OF AMERICA

6          v.                              CRIMINAL CASE NO.
                                            AMD-04-029
7     WILLIE MITCHELL,
      SHELTON HARRIS,
8     SHELLY WAYNE MARTIN,
      SHAWN GARDNER,
9
          Defendants
10    _____/

11                    VOLUME XXI OF XXXVII
                    Wednesday, November 5, 2008
12                    Baltimore, Maryland

13

      Before:  Honorable Andre M. Davis, Judge
14                     And a Jury

15    Appearances:
            On Behalf of the Government:
16           Robert Harding, Esquire
             Michael Hanlon, Esquire
17          On Behalf of Defendant Mitchell:
             Laura Kelsey Rhodes, Esquire
18           Michael E. Lawlor, Esquire
            On Behalf of Defendant Harris:
19           Gerard P. Martin, Esquire
             Paul Flannery, Esquire
20          On Behalf of Defendant Martin:
             Thomas L. Crowe, Esquire
21           James G. Pyne, Esquire
            On Behalf of Defendant Gardner:
22           Adam H. Kurland, Esquire
             Barry Coburn, Esquire
23
      Reported by:
24    Mary M. Zajac, RPR
      Room 5515, U.S. Courthouse
25    101 West Lombard Street
      Baltimore, Maryland 21201

1          (Proceedings at 9:47 a.m.)

2          THE COURT:  We're ready to proceed?

3          MR. HARDING:  Your Honor, could I just take up a couple

4     of housekeeping matters?

5          THE COURT:  Certainly.

6          MR. HARDING:  I would like, with the Court's

7     permission, to go through some exhibit numbers.  Several exhibits

8     were admitted.  I mean, we used several exhibit numbers twice.

9     So I have to, by agreement with Ms. Arrington, I'm going to

10    change some of the exhibit numbers.  And also, we have some other

11    exhibits that we agree with Ms. Arrington were admitted into

12    evidence but which she does not have a record of it actually

13    having been mentioned and, therefore, may not be on the record

14    even though she agrees that they're in evidence.

15         So I'd like to list those items.

16         THE COURT:  All right.

17         MR. HARDING:  And also, Your Honor, a problem has come

18    up with the chemist stipulation.  Two defense counsel are now

19    unable to stipulate to one of the chemists.  And I have, this is

20    a State Police chemist.  I have told her this morning that I was

21    going to issue her a subpoena -- she says she's -- for tomorrow,

22    because this could delay the closing of the government's case.

23    She says that their policy is to honor subpoenas in the order

24    that they come in and she has subpoenas to a couple of other

25    courts tomorrow.

3

1          I told her that I would ask Your Honor for an order for

2     her to appear here regardless of what other subpoenas she has.  I

3     think they're for state court in Frederick, two different state

4     courts in Frederick.

5          And so I guess what I would like to ask the Court to do

6     is to draft a subpoena and -- I mean an order, a court order, to

7     Vonsella C. Johnson to appear in court tomorrow at 8:30 a.m.

8          THE COURT:  Without naming the counsel, can you just

9     tell me what the problem is as to this one seizure?

10          MR. HARDING:  Yes.  Yesterday I got, I got an e-mail

11     from Mr. Pyne, which Mr. Coburn also joined, saying, quote --

12          MR. MARTIN:  Cat's out of the bag, I guess.

13          MR. HARDING:  -- on May 7th, 1999.

14          THE COURT:  You can just summarize it, Mr. Harding.

15          MR. HARDING:  Okay.

16          THE COURT:  What is the problem?

17          MR. HARDING:  The problem seems to be that when Trooper

18     Bond submitted his report, he gave a total weight of 50.3 grams

19     for the crack that was taken out of the car that Mr. Martin wound

20     up being charged with.

21          THE COURT:  Right.

22          MR. HARDING:  But Gardner actually took the charge.

23          THE COURT:  Right.

24          MR. HARDING:  The chemist, however, the report says

25     weighs two items and comes up with a combined weight of 52.11

4

1    grams.  Actually, Your Honor, not to fault Mr. Pyne's addition, I

2    think it's 53.1 grams that the chemist comes up with.

3            THE COURT:  So what is the problem?  Either way it's

4    over 50.  What's the problem?

5            MR. HARDING:  Mr. Pyne, I believe, is going to say that

6    50.3 grams includes the weight of the little plastic baggie that

7    the crack was in and, therefore, the net weight may have been

8    under 50 grams.

9            So I have to, I'm bringing the chemist in with all of

10   her reports and notes tomorrow morning.  She wasn't able to

11   resolve the issue with me over the phone this morning.  But I

12   have no choice but to bring her in here tomorrow.

13           THE COURT:  But aren't there other crack seizures?  Or

14   is that the only one?

15           MR. HARDING:  Other crack seizures, yes, Your Honor.

16           THE COURT:  So I don't understand.  It's clearly more

17   than 50 total.  Why do we care that one is over 50 if the total

18   crack seized is more than 50?  Mr. Pyne?

19           MR. PYNE:  The total of crack seized from Mr. Martin

20   would not be over 50.

21           THE COURT:  No.  But I'm talking about the conspiracy.

22           MR. PYNE:  I understand.  If he's found to be part of

23   the conspiracy by the jury.

24           THE COURT:  Right.

25           MR. PYNE:  You're asking for a stipulation.  Your

1    Honor, Trooper Bond gives a total weight of the package --

2            THE COURT:  I understand that.  But what is the

3    difference if, if it's 49 grams and there's other crack?  I don't

4    get it.

5            MR. PYNE:  Trooper Bond weighs this.  It's observed --

6            THE COURT:  I understand that.  But I'm talking about

7    there's more than one seizure.  Why do we need to bring in a

8    chemist?

9            MR. PYNE:  I'm being asked to stipulate to something

10   that was weighed by one weight by a trooper and then it is

11   weighed two grams more by the chemist.

12           THE COURT:  So can't we include that in the

13   stipulation, Mr. Harding?  If that's the fact, just include it in

14   the stipulation.

15           MR. HARDING:  Well, Mr. Pyne will then argue that the

16   trooper's weight at least includes the little baggie and that,

17   therefore, it might not have been quite 50 grams.

18           THE COURT:  Well, he's going to argue that, anyway,

19   even if she comes in, because you couldn't clarify it on the

20   phone.  Why do we think she's going to clarify it --

21           MR. HARDING:  She's going to clarify it tomorrow when

22   she comes in with all her reports.  She didn't have all of her

23   reports in front of her.

24           She says she's going to call me later this afternoon.

25   She might be able to give me the information later this afternoon

6

1    over the phone.

2             THE COURT:  Well, I am not going to issue some order

3    requiring some chemist to come to federal court.  That's exactly

4    the kind of thing that we don't do.  So we'll just bring the jury

5    in on Friday.  I mean, it's no big deal.  We've got plenty of --

6             MR. PYNE:  I offer, if there's some type of explanation

7    that Mr. Harding could give that would account for it.  The

8    chemist report does not indicate whether it's a total weight, a

9    net weight.  So I --

10            THE COURT:  Is it possible for you, is she going to

11   have a report sometime today?

12            MR. HARDING:  She says that she's having them faxed to

13   her now and will call me on my cell phone later today.  I warned

14   her that I have my cell phone turned off.

15            THE COURT:  Okay.  So maybe you and Mr. Pyne -- and did

16   you say Mr. Coburn joined in that?

17            MR. HARDING:  Yes, he did, Your Honor.

18            THE COURT:  So maybe you can use the phone here in the

19   courtroom, whatever is easiest.  All of you just sit down with

20   your copies of the report and talk to her and find out what she's

21   going to say if she comes.  I mean, she can either clarify it to

22   Mr. Pyne's satisfaction.  And she might say, you're right, that

23   it included the plastic baggie.  Then we just include that in the

24   stipulation.  Or she might say, no, the trooper's weight was just

25   a rough estimation and we did it electronically, etc.  Okay?

1        Can we do that?  Otherwise, I'd just as soon wait and

2   bring her in on Friday or even bring her in next week.

3        In other words, I'm not holding you to your prediction,

4   Mr. Harding, that the government wag going to finish this week.

5   If you have to carry over until Monday, we carry over until

6   Monday.

7        MR. COBURN:  Your Honor, we're happy to do it exactly

8   the way you described.

9        THE COURT:  Okay.  So I think there's more than one way

10  to skin this cat.  And we can see --

11        MR. PYNE:  We aren't demanding that the chemist show

12  up, Your Honor.

13        THE COURT:  All right.  I realize you have a lot to do,

14  Mr. Harding.  And it would probably be easier for you to just

15  bring her in here and put her on the stand.  But I'm hoping it

16  won't take more than 10 or 15 minutes to just get her on the

17  phone and have her explain it to everybody.

18        MR. HARDING:  Okay, Your Honor.

19        THE COURT:  Thank you.

20        MR. KURLAND:  Your Honor, there's an unresolved

21  issue --

22        THE COURT:  I'm sorry.  Were you finished, Mr. Harding?

23  You still need to do the exhibit stuff?

24        MR. HARDING:  When the jury comes out I have to do the

25  exhibits.  I can't do it without the jury being here.

1          THE COURT:  Can we wait until after Hayes or do we need

2     to do it before Hayes?

3          MR. HARDING:  No, we can wait until after Hayes.

4          THE COURT:  Okay, great.

5          MR. KURLAND:  Your Honor, there's an unresolved legal

6     issue that can also wait until after Hayes, but I guess --

7          THE COURT:  What is that?

8          MR. KURLAND:  -- it's going to come up with respect to

9     the agent's testimony.  It's the issue with respect to whether or

10    not we can elicit from the case agents that Mr. Gardner is

11    incarcerated, in state custody, and that he is serving a life

12    sentence, particularly in light of the government's objection to

13    the conspiracy instructions which we're obviously going to

14    vigorously contest.  But the government sort of lays out how

15    they're going to argue their case.

16         We believe, and we have cited case law, that it's

17    legitimate to argue both with respect to Mr. Gardner's alleged

18    participation in the continuing conspiracy and his motivation

19    that he is serving a life sentence.  And the case law says that

20    the length of incarceration is a relevant issue for the jury to

21    consider as to whether or not somebody is still in a conspiracy.

22    It's a factual issue.

23         The case agents --

24         THE COURT:  Do you have a case cite for me?

25         MR. KURLAND:  Yes, I do, Your Honor.  Let me just get

9

1    that.  I apologize for not bringing it up to the podium.

2           The case citation, Your Honor, is United States v.

3    Massino, M-A-S-S-I-N-O.  It's blank F.3d Second Circuit 2008,

4    quoting United States v. Flaharty, F-L-A-H-A-R-T-Y, 296 F.3d 182,

5    which is a Second Circuit 2002 case.

6           THE COURT:  What's the date of Massino?

7           MR. KURLAND:  Your Honor, the cite I have here doesn't

8    have it.  But I know I looked it up once on Westlaw Lexis and I

9    believe the full cite, I'm not 100% certain, but right before the

10   break when Mr. Coburn and I filed something concerning both the

11   dual sovereignty instruction and this issue, in one of the

12   pleadings filed right before our one week break or during that

13   one week break, I think that I cited, I put in the Westlaw or

14   the --

15          THE COURT:  Okay.  I can get it.  I'll pull it up.

16          MR. KURLAND:  Again, it stands for the proposition that

17   while arrest or incarceration may constitute withdrawal --

18          THE COURT:  I'll look at it.  You don't need to read it

19   to me.  So your proposition is you want to ask the agent along

20   the lines of, Mr. Gardner's been incarcerated since 2002,

21   correct?  In fact, the way you would put it is, Mr. Gardner has

22   never been released from custody since his arrest on the day of

23   the Tonya Jones Spence murder?  Yes.  And in fact, he's serving a

24   life sentence, isn't he?  Yes.  That's basically.

25          MR. KURLAND:  Along the lines.  Also, apropos to the

1    Court's limiting instruction or explanatory instruction it gave

2    the jury yesterday concerning the difference between detainees

3    and prisoners, if we have to get back Stoler, we'll do that, too.

4    But both these agents, I think, will testify that they're aware

5    that Mr. Gardner is a prisoner, the others are detainees.

6              THE COURT:  No.  We're not getting into that.

7              MR. KURLAND:  Well, but then again, with serving the

8    life sentence.  They can and Stoler probably could too.  But I

9    believe these two case agents would be the witnesses that we

10   would either get the information from, either on cross

11   examination as part of the government's case, or as our own

12   witnesses in the defense case.

13             THE COURT:  All right.  Obviously, this would be a back

14   door way of you getting in the fact that Mr. Gardner has been

15   convicted.

16             MR. KURLAND:  I'm sorry.  No.  I didn't mean to

17   interrupt the judge.  I object to that.  No.

18             THE COURT:  I mean, let's be blunt.  It's a back door

19   way for you to get in what you want to get in.

20             MR. KURLAND:  No, Your Honor, it is not.

21             THE COURT:  That's exactly what it is.  Look, back door

22   way is not a pejorative when I use it that way.  Whether you come

23   in through the back door, whether you come in through the back

24   door, the front door, the side door, you know.

25             MR. KURLAND:  Judge, I understand that.  But I just

1    want to make it clear that, and I appreciate what the Court's

2    saying.  But again, we believe, and maybe it's a side door way

3    that sidesteps, I think, an important aspect, that the jury still

4    will not know, they could speculate, you're going to give them an

5    instruction not to speculate.  But the point is, the way the

6    government has indicted the case, we're allowed to put in

7    evidence.  They're going to put on evidence that Mr. Gardner

8    recites the same script and there's all this going on, back and

9    forth.

10         THE COURT:  I understand that.  Look, you're trying to

11   convince me of something that I'm already convinced of.  You

12   don't have to persuade me of that.

13         MR. KURLAND:  Oh.

14         THE COURT:  The point is, I understand.  But let's be

15   up front about it.  That's the effect of this.  But I'm going to

16   look at Massino.  It sounds like a correct statement of the law.

17   The jury's entitled to know, whatever evidence they have of

18   conspiratorial agreement, that he's been in custody.  And the

19   question is whether you get to show that he's serving a life

20   sentence.  In other words, the question is whether you get to

21   show more than that he has been in custody continuously since

22   June, whatever it was.

23         MR. KURLAND:  Seventh.

24         THE COURT:  2002.

25         MR. KURLAND:  Judge, the other thing is, and again,

1  this is where a potential stipulation broke down with the

2  government; it would also, depending on the Court's ruling, it

3  would also, we would also possibly want to go into the fact that

4  he, that he's in state custody, and subject to the several times

5  that he is brought over for proceedings here, other than that and

6  other than at the beginning of this trial, he is housed in an

7  entirely separate facility.

8          And then it becomes a factual issue because they're

9  going to put on evidence that, obviously, they're filing

10  identical pleadings.  But we're entitled to rebut that.

11          THE COURT:  I told you, you don't have to convince me

12  of that.

13          MR. KURLAND:  Then I will sit down.  Thank you, Your

14  Honor.  All right.

15          THE COURT:  Okay.  You don't have to respond to that

16  now.  But obviously, it's something that the Court's going to

17  have to hear you on.

18          MR. HARDING:  Judge, could Mr. Hanlon respond very

19  briefly, Your Honor?  And I have something I was trying to relate

20  to him that I wanted to bring up, also.

21          THE COURT:  Sure.  Go ahead.

22          MR. HARDING:  If the defense takes this track, I can of

23  course introduce the marshal's list of all the occasions when Mr.

24  Gardner has been brought to Supermax for court proceedings.

25          THE COURT:  Of course.

1          MR. HARDING:  It's a very long and copious list.  And

2    that would, of course, be something I would have to do.

3          THE COURT:  Absolutely.

4          MR. HARDING:  Not to mention all of the pleadings, the

5    pro se pleadings that the four defendants have submitted in

6    common.  They also show the ongoing concert in action.

7          But the main point, Your Honor, is that under Fourth

8    Circuit law, at least -- and Your Honor may review the pleading I

9    submitted on jury instructions just a few days ago, there's a

10   section on this -- under Fourth Circuit law, withdrawal from a

11   conspiracy requires a demonstration, an affirmative showing of

12   disavowal of the conspiracy with the intent to defeat the

13   conspiracy.  And under the case law of this circuit, Your Honor,

14   being incarcerated is not evidence of withdrawal from a

15   conspiracy.

16         That's the government's position on the law.  I expand

17   on it in more detail on that pleading I submitted a few days

18   earlier.  I think Mr. Hanlon would also like to respond.

19         THE COURT:  I appreciate that.  And I'm sure Mr.

20   Kurland would say, fine, but first you have to prove he's a

21   member of the conspiracy and this goes to membership, not just

22   withdrawal.  But I'll look, I'll certainly look at the

23   authorities.  Yes, Mr. Hanlon.

24         MR. HANLON:  On that last point, Your Honor, the issue,

25   again, would be that if we've established Mr. Gardner's presence

1    in the conspiracy as of 2002, if his membership is then

2    established and the issue here is continuation of the conspiracy

3    post arrest.  But fundamentally for the government, this becomes,

4    even assuming we assume some relevance, however slight, it

5    becomes a 403 problem.

6         We have a situation where the defense has taken the

7    position that the life sentence is this relevance for this

8    reason, for the reasons Mr. Harding stated, that relevance could

9    be of some minimal probativity.  Then on the other side, Your

10   Honor, we have a truckload of prejudice issues, confusion issues.

11        If we're going to get into this, then the case agents

12   presumably are going to have to testify about whether or not Mr.

13   Gardner had appeals pending during the times of the

14   conspiratorial conduct and post-conviction petitions.

15        THE COURT:  I don't know about that.  I don't know why

16   we have to get into that.  Again, my preference would be a

17   stipulation, but we'll cross that bridge when we get to it.

18   Frankly, frankly, I have to say a rational juror in this case

19   would have already concluded that Mr. Gardner's been convicted of

20   the Spence murder.  That's my suspicion.

21        MR. HANLON:  Respectfully, Your Honor, that's a very

22   large assumption.

23        THE COURT:  I don't think it's very large.  I don't

24   think it's very large.  In effect, you have retried Mr. Gardner

25   on that murder.

15

1          MR. HANLON:  Correct.

2          THE COURT:  Every witness you called in here on the

3    murder was a Baltimore County law enforcement official.

4          There was a mention of the fact that there's Baltimore

5    County case numbers and property numbers and all of that.  Will

6    Montgomery.  I mean, I appreciate it, Mr. Hanlon, but a juror

7    would have to really, really work hard to escape that inference.

8          MR. HANLON:  But of course --

9          THE COURT:  And it is just an inference.

10          MR. HANLON:  Of course, Your Honor, we've put in

11    similar evidence, Baltimore County, Baltimore City detectives,

12    state case numbers, for all of the murders charged.

13          THE COURT:  Yeah, but you didn't have anybody breathing

14    heavily, running in front of a woman going home to the murder

15    scene, and Mr. Holly, and a show-up.  You didn't have all of that

16    as to the others.  I mean, a juror would have to be absolutely

17    just not paying attention to have concluded that Mr. Gardner's

18    been convicted.

19          MR. HANLON:  It seems to me, Your Honor, we should

20    assume that the jury's not speculating.  But if we tell them that

21    there's been a disposition of this case and a life sentence --

22          THE COURT:  No.  We're not going that far.  We're not

23    going that far.  Even if I were to permit mention of life

24    sentence, which I'm not suggesting I'm going to, the fact is he's

25    been in custody ever since.

1              Anyway, we'll cross the bridge when we get to it.

2              MR. HANLON:  The government remains willing to work

3      with the defense on everything up to that one point.

4              THE COURT:  I'm going to ask for a report on your

5      efforts to achieve a stipulation in that regard.

6              MR. KURLAND:  Your Honor, also with respect to some

7      legal points, at some point when it comes to the argument on the

8      multiple conspiracy instructions, some of the other points Mr.

9      Harding raised, it's our position that the Supreme Court case law

10     with respect to durations of conspiracy is not, which is the

11     governing law, is not quite as draconian as the Fourth Circuit.

12     The Supreme Court frowns on never-ending conspiracies.  And

13     that's the substantive law as well.

14             THE COURT:  Okay.  All right.  We'll deal with it.  Can

15     we get Mr. Hayes back?

16             MR. KURLAND:  Your Honor, the dual sovereignty

17     instruction also needs to be given.  Thank you.

18             (Witness enters the courtroom.)

19             (Jury enters the courtroom.)

20             THE COURT:  Members of the jury, good morning.  Thank

21     you again for your patience.  We're ready to proceed.

22             Mr. Hayes, you remain under oath.  You understand?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.

25             CONT'D DIRECT EXAMINATION

1    BY MR. HARDING:

2    Q    Good morning, Mr. Hayes.

3    A    Good morning.

4    Q    Mr. Hayes, this exhibit on the screen right now, PH-18, this

5    is the photograph you identified as the section of Woodland

6    Avenue where you used to stand out there and distribute crack, is

7    that correct?

8    A    Yes.

9    Q    I neglected to ask you, or maybe you said this without my

10   asking you, was that near a residence of a relative of yours?

11   A    Yes.

12   Q    Which relative and --

13   A    My grandmother.

14   Q    Your grandmother's house?

15   A    Yes.

16   Q    Was that on the right-hand side of the street or the

17   left-hand side of the street?

18   A    The left.

19   Q    Over here?  So you used to stand right in front of her house

20   over here?

21   A    Down by where the pole at.

22   Q    Down by here?

23   A    Yeah.

24   Q    Okay.  And let me show you PH-20.  Is your grandmother's

25   house boarded up now?

1    A    Yes.

2    Q    Okay.  Is that what it looked like, though, when you were

3    standing out there?

4    A    No.

5    Q    Except for the fact that it's boarded up now?

6    A    Yes.

7    Q    Okay.  When we broke yesterday -- let me do one other thing.

8    On this aerial, MB-55, didn't really fit on our projection

9    equipment very well.  So would I'd like you to do is put a

10   post-it with an arrow on it pointing to where 2913 Edgecombe

11   Circle is on this map.  And there's already one on there for 2910

12   Dupont Avenue.  And I also want you to put on a post-it showing

13   where the location of that crime scene was on the night of

14   February 27th and 28th of 2002 so that the jurors will know

15   exactly where these locations are.

16            Could you use this pen and draw an arrow to where 2913

17   Edgecombe Circle is?  And also, could you use your pen and draw

18   where the crime scene was?

19            (Witness complies.)

20   Q    Okay.  May I now publish MB-55 to the jury, Your Honor?

21            THE COURT:  You may, yes.

22   Q    You told us about this letter that Mr. Mitchell wrote to TM

23   ordering him to, ordering a hit on Claudus Lassiter.  And the

24   letter was supposed to be given to Shelton Harris.  Do you recall

25   that testimony, Mr. Hayes?

1    A    Yes.

2    Q    Why was the letter sent to TM rather than to Shelton Harris?

3              MR. MARTIN:  Objection.  Foundation.

4              THE COURT:  Overruled.  You may answer.

5    A    Because I don't think he knew Mr. Harris address.

6              MR. MARTIN:  Objection.

7              MR. LAWLOR:  Objection.  Move to strike, Your Honor.

8              THE COURT:  Overruled.

9    BY MR. HARDING:

10   Q    Was Claudus Lassiter, you told us he was tight with a cousin

11   of yours.  Was he also tight with the Wyche brothers, Mr. Hayes?

12   A    Yes.

13   Q    How do you know that?

14   A    Because we all grew up and went to school together.

15   Q    Okay.  You told us about a .40 caliber gun that you had in

16   your hand when you confronted Mr. Hayes -- I'm sorry -- Mr.

17   Harris, after he pulled a knife on you out on Woodland Avenue

18   that day.  What kind of .40 caliber was that?

19   A    A Ruger.

20   Q    During the time period that you were on the street with

21   Shelton Hayes -- Shelton Harris, Mr. Hayes, did Mr. Harris use a

22   cell phone?

23   A    Not to my knowledge.

24   Q    Okay.  Were he and Mr. Mitchell together a lot?

25   A    Yes.

DIRECT EXAMINATION OF HAYES                    20

1    Q    Every day?

2    A    Probably about four days a week.

3    Q    Four days a week?

4    A    Yes.

5    Q    Can you tell us, Mr. Hayes, is it common for prisoners when

6    they're in jail to have either cell phones or access to cell

7    phones?

8              MR. LAWLOR:  Objection.  Foundation.

9              THE COURT:  Overruled.

10   A    Yes.

11   Q    Is that true in the prisons here in Baltimore --

12             MR. LAWLOR:  Objection.  Foundation.

13   Q    -- that you've been in, Mr. Hayes?

14             THE COURT:  Overruled.  You may answer.

15   A    Yes.

16   Q    That .40 caliber gun that you had with you when you

17   confronted Mr. Hayes on the street, when you confronted Mr.

18   Harris on the street after he pulled the knife on you, what

19   happened to that .40 caliber Ruger?

20   A    Sold it.

21   Q    Who did you sell it to?

22   A    My friend.

23   Q    Can you tell us what his name is?

24   A    Pulley.

25   Q    Pulley?

DIRECT EXAMINATION OF HAYES                          21

1   A    Yes.

2   Q    Do you know his real name?

3   A    Josh.

4   Q    Do you know Josh's last name?

5   A    No.

6   Q    Okay.  At this time, Your Honor, I would like to, with the

7   Court's permission, play some of the rap songs that are in the

8   transcript books that the jurors have been provided with already.

9   I wonder if I could ask the deputy clerk to circulate those

10  transcript books again, if they haven't already been circulated.

11  And ask them to follow along when we play them.  Wait.  Wait.

12  Wait.

13            THE COURT:  I think we collected them, didn't we?  I

14  imagine the witness will need one.

15  Q    Yes.  And I will ask the witness and the jurors and everyone

16  to turn to Tab Three.

17            First of all, Mr. Hayes, let me ask you, did I play

18  these rap music tunes with you on several occasions?

19  A    Yes.

20  Q    And did we go through them line by line and did I ask you

21  for input on the meanings of any words or phrases that were not

22  perfectly clear?

23  A    Correct.

24  Q    And so turning to that transcript that you have there in

25  front of you, does that look familiar?  Is that one that you

1    pored over with me and made changes on until you got it pretty

2    much correct?

3    A    Yes.

4    Q    Okay.  At this time I would like to ask Ms. Kelly to play

5    Track 11, which is the rap tune that appears at Tab Three in the

6    transcript book.

7              THE COURT:  Again, ladies and gentlemen, as I

8    instructed you previously, the transcript is provided to you

9    simply as an aid in your listening to the actual exhibit, which

10   the actual rap music song, including lyrics, that you're about to

11   hear.  If there's any difference between what you see on the

12   transcript and what you think you hear, you should be guided by

13   what you hear on the actual recording.  Ms. Kelly.

14             (CD played.)

15   BY MR. HARDING:

16   Q    Okay.  Mr. Hayes, I would like to ask you few questions

17   about some of these passages that we just heard.  First of all,

18   on Page Two of the transcript, you see about nearly halfway down

19   the page, it says, ay yo my nizzle's shit is fo rizzle.  Can you

20   tell us what that means?

21             MR. LAWLOR:  Objection.

22             MR. MARTIN:  Objection.

23             THE COURT:  Overruled.  You may answer.

24   A    My nizzle, that's nigga.  My man.  Fo rizzle is for real.

25   Q    Fo rizzle is for real?

DIRECT EXAMINATION OF HAYES                    23

1    A    Yeah.

2    Q    And nizzle is like my man?

3    A    Yeah.

4    Q    And then it says, so keep a pistol packed fo shizzle?

5    A    For sure.

6    Q    And then it says, I leave him flat on his back for my nizzle

7    Bo.  Do you know what "flat on his back" means?

8              MR. LAWLOR:  Objection.

9              THE COURT:  Overruled.

10   A    Yeah.

11   Q    What?

12   A    I guess he going to kill him for his man.

13             MR. LAWLOR:  Objection.  Move to strike.

14             THE COURT:  Overruled.

15   Q    And then it says, leave his ass hanging from a ceiling like

16   a mistletoe, I ain't playing, you better listen Mo.  Open up your

17   testicles and maybe get the best of you.  Got a four-fifth

18   that'll turn your ass vegetable.  What's a four-fifth?

19             MR. LAWLOR:  Objection.

20             THE COURT:  Overruled.

21   A    A .45 caliber handgun.

22   Q    Dress up in all black and show you what this Tec will do.

23   What's a Tec?

24   A    A Tec 9.

25   Q    And what's a Tec 9?

1   A    Like an assault rifle.

2   Q    Watch your brains fly all over the bitch next to you.

3   Homeboy, it's up to you.  I could put this pump to you.  What

4   does that mean?

5             MR. LAWLOR:  Objection.

6             THE COURT:  Overruled.

7   A    Pump is a shotgun.

8   Q    About four lines down from there, it says, you know I keep

9   the Mac loaded and I like to clap rodents.  What does that mean?

10            MR. LAWLOR:  Objection.

11            THE COURT:  Overruled.

12  A    Mac --

13            THE COURT:  Excuse me.  Counsel will have a standing

14  objection to Mr. Hayes's interpretation of these lyrics for the

15  jury.

16            MR. LAWLOR:  Thank you, Your Honor.

17            MR. MARTIN:  Thank you.

18            THE COURT:  Go ahead, Mr. Hayes.

19  A    A Mac is another semiautomatic weapon.  And a rodent is a

20  rat.

21  Q    And a rat is what exactly?

22  A    A person that's from the streets that turn and start

23  telling.

24  Q    So what does it mean to say, "I like to clap rodents?"

25  A    I like to kill them.

1    Q    And then it says, that's why Bo and Weaze on lock now.  Do

2    you know who Weaze is?

3    A    I heard of him.

4    Q    Who is he?

5              MR. LAWLOR:  Objection.

6              MR. MARTIN:  Objection.

7              THE COURT:  That's one of the defendants in this case.

8    Q    Which one?

9              THE COURT:  You have a standing objection.

10   A    Wayne.

11   Q    Wayne?

12   A    Yes.

13   Q    Who did you hear of him from?

14             MR. LAWLOR:  Objection.

15             THE COURT:  Overruled.

16   Q    Who told you about him?

17   A    Tony.  But also, I knew of him from in the county.

18   Q    You knew him personally in the county?

19   A    No.

20   Q    You knew of him in the county?

21   A    Yes.

22   Q    In the county, you mean Randallstown?

23   A    Yes.

24   Q    Where you grew up or where you went to school?

25   A    Yes.

DIRECT EXAMINATION OF HAYES                                    26

1   Q    And then it says, and every day on lockdown, niggas getting

2   shot down for running their mouth, clown.  What does that mean?

3   What does every day on lockdown mean?

4   A    When you locked up.

5   Q    Okay.  So when it says, that's why Bo and Weaze on lock now?

6   A    Yes.

7   Q    What does that mean?

8   A    Because somebody told on them, so they locked up.

9   Q    Okay.  In the next page, on Page Four, there's this sort of

10  refrain that we hear several times in this song.  It always

11  begins with, ay yo, my SD militant troops.  In the middle of that

12  it says, death before dishonor, never talk to homicide.  What

13  does that mean?

14  A    Never tell.

15  Q    And what does "homicide" mean in this context?

16  A    Homicide detectives.

17  Q    Okay.  Who, can you tell who's singing at the beginning of

18  this song, Mr. Hayes?

19  A    Mr. Harris.

20  Q    Is he, who's singing the refrain when the refrain comes on?

21  Who sings that?

22  A    Mr. Harris.

23  Q    Okay.  Are there places where somebody else comes, starts

24  singing in this song?

25  A    Yeah.  It's two other artists in there.

1    Q    And who are they?

2    A    Slo and TM.

3    Q    TM being Tony, Mark Herbert, the guy you've told us about

4    several times?

5    A    Yes.

6    Q    And Slo you identified as Marvin, is that correct?

7    A    Correct.

8    Q    Okay.  Let me call your attention to Page Five.  Two-thirds

9    of the way down that page, Mr. Hayes, it says, you need an army,

10   a K, and two fucking clips.  You never get close enough to get Bo

11   head hit.  What does that mean?

12   A    K is AK-47.  Clips is something to hold ammunition.  A head

13   hit mean killing a person.

14   Q    Okay.  So who is he talking to there when he says, you need

15   an army, a K, and two fucking clips, you never get close enough

16   to get Bo head hit?

17   A    Truthfully, I don't know.  He could be speaking to anyone.

18   Q    Is he speaking --

19   A    He could be speaking to anyone.

20   Q    Okay.  Too many soldiers on the front line, no surrendering?

21   A    What you mean?

22   Q    I was just reading the next two lines but I'm going to

23   withdraw that because I don't really have a question about it.

24   Later on, on Page Seven, a third of the way down the page, do you

25   know what he's referring to when he sings, Sunday night at

1   Lyles's party?  Do you know what that's a reference to, Mr.

2   Hayes?

3   A    When Mr. Mitchell had an incident down Hammerjacks.

4   Q    Okay.  And about four lines from the bottom of that page, it

5   says, you get the Ruge to your back.  Do you know what that's all

6   about?

7   A    A Ruger.

8   Q    Okay.  All right.  Let's play now the next one, which is

9   track two.  I'm only playing the beginning verses of this.  So

10  I'm going to ask Ms. Kelly to stop it when we get to the end of

11  the transcript, which is at Tab Four.

12          (CD played.)

13  Q    Just a few questions about this.  Who's singing this, these

14  verses, Mr. Hayes?

15  A    Mr. Harris.

16  Q    On Page One, about a third of the way down, it says, yo, you

17  think they call me Hard Roc for nothing?  Who is Hard Roc?

18  A    Mr. Harris.

19  Q    And then it says two-thirds of the way down the page, first

20  it says, cause these niggas want to stop me from blowing.  You

21  got kids?  I get my man Pill to stop 'em from growing.  Is that

22  what it said, Mr. Hayes?

23  A    Yes.

24  Q    What does it mean?

25  A    Stop me from blowing mean getting money.  Stop the kids from

1    growing, killing your kids.

2    Q    And who is Pill?

3    A    Dwight.

4    Q    Dwight is the guy you told us about earlier yesterday who

5    ran off with a .38, is that correct?

6    A    Yes.

7    Q    Did he do things for Shelton Harris?

8    A    I couldn't tell you.  I didn't hang with them like that.

9    Q    Okay.  And then it says, me and Narni on the block with

10   pills rocking and flowing.  What are pills rocking and flowing?

11   A    Selling your, selling all your drugs, the money flowing in.

12   Q    Okay.  Do you know who this Narni is that's mentioned in the

13   verse?

14   A    No.

15   Q    And then it says, cops posted on the block trying to fuck

16   with the flowin.  What does that mean?

17   A    Cops interfering with you making your money.

18   Q    Okay.  Over on the next page it says, the last sentence

19   says, when it's a beef with, when it's beef with the down, you

20   niggas know what I'm spraying.  What does mean?

21   A    I guess a nice gun he's spraying.

22   Q    What's the down?

23   A    Shake Down.

24   Q    And what's "beef" mean?

25   A    Trouble.

DIRECT EXAMINATION OF HAYES                    30

1    Q    Okay.  Let's go on to the next one, which is at Tab Five.

2    This is track eight.  Again, I'm going to ask Ms. Kelly just to

3    play the opening verses of this piece.  And I will tell her where

4    to stop unless she figures it out on her own, as she did the last

5    time.

6              (CD played.)

7    Q    Who's that singing those verses right there?

8    A    TM.

9    Q    Okay.  In the beginning, about a little over halfway down

10   Page One, he says B-O hold ya head, nigga.  What does that mean?

11   A    Stay up.

12   Q    Do you know where B-O was at the time this song was sung and

13   written?

14   A    Incarcerated.

15   Q    On Page Two it says, at the top, and the brains that we shot

16   cause we refuse to starve, I'm a break it down iller for the slow

17   ones, dog.  We was trying to build a label.  What does "build a

18   label" mean?

19   A    Build a rap label from the ground up.

20   Q    But was broke ass thugs, so we pulled off heists.  What does

21   "heists" mean?

22   A    Robberies.

23   Q    And we splattered blood.  Plus we grind on the strip.  What

24   does "grind on the strip" mean?

25   A    Hustle on the block.

1    Q    What block are they talking about?

2    A    Woodland Avenue.

3    Q    Even sold some bud.  What is that?

4    A    Weed.

5    Q    Is bud a kind of weed, a kind of marijuana?

6    A    It's the name of it.

7    Q    A name?

8    A    Yeah.

9    Q    And then it says, what the fuck niggas really think Shake

10   Down is?  Bunch of grimy ass niggas that was Sheisty since kids,

11   tote big guns and don't give a fuck bout shit.  Snatch your moms

12   up if we think she worth some brick.  What does that mean?

13   A    What part?

14   Q    Some brick.

15   A    Brick's a thousand grams.

16   Q    Of what?

17   A    Any kind of drug.

18   Q    Okay.  At the bottom of Page Two it says, we'll run in your

19   home with the, and then it says unintelligible.  Could you make

20   out what it said when we played that?

21   A    No.

22   Q    Do you know what a llama is, Mr. Hayes?

23   A    A nine millimeter.

24   Q    Okay.  And what's a fifth?

25   A    A .45, a .357.

DIRECT EXAMINATION OF HAYES                    32

1    Q    And then it says, put the Ruger to you nozzle, we want all

2    your shit.  What's a nozzle?

3    A    Your face.  Your nose.

4    Q    Okay.  And then a little further down on that same page,

5    Page Three, it says, now these monkeys playing gorillas, they

6    ain't built for this.  I got scars from when I slipped and got

7    pistol-whipped.  Thinking niggas was fam, they had the gun to my

8    head, but their fingers jammed.  Do you know what incident that

9    refers to?

10   A    Yeah.

11   Q    What?

12   A    Quincy and them thought Tony had something to do with his

13   brother getting killed.

14            MR. LAWLOR:  Objection.

15            THE COURT:  Overruled.

16   Q    Okay.  So what happened?

17   A    Well, like I said yesterday, I told Quincy that his brother

18   got killed.  So I end up getting locked up.  Little Tony was

19   still on the streets.  They asked Little Tony to speak to him for

20   a second.  Tony let him in the car.  He thought everything was

21   cool because they was my friends.  But they pulled Tony a move

22   and tried to kill Tony.

23   Q    Did Tony get away?

24   A    Yeah.

25   Q    Now, you told us earlier that you told Quincy who you

1    thought had killed his brother, Oliver McCaffity, is that

2    correct?

3    A    Yes.

4    Q    And did you, you didn't, or did you tell him that you

5    thought that TM had killed his brother?

6    A    No.

7    Q    So why did they go after TM?

8              MR. LAWLOR:  Objection.

9              MR. MARTIN:  Objection, Your Honor.

10             THE COURT:  Overruled.  You may answer.

11   A    Because Tony hung with the defendants.

12             MR. LAWLOR:  Objection, Your Honor.

13             MR. MARTIN:  Objection, Your Honor.

14             THE COURT:  Overruled.

15   Q    Then it says, nigga, you's a dead man.  Being at war with

16   the down.  I don't really have a question about that.

17             I'm going to turn to Page 4.  It says, two thirds of

18   the way down the page, O'Malley dishing 25 for the gun that I

19   tote.  What's that talking about?

20   A    Exile.

21   Q    Could you explain Exile?

22   A    You get caught with a gun, and you have a bad record, your

23   charges get enhanced.

24   Q    Okay.  Okay.  Let's go on to the next one, which is at tab

25   six.  And this time it's the final verses that I want to play.

1    So I'm going to ask Ms. Kelly to scroll through the song and try

2    to find, I'm going to give her a complete transcript of the whole

3    song, see if she can figure out where the verses are that I want

4    played for the jury.

5         THE COURT:  Members of the jury, let me instruct you as

6    I have previously, the fact that a lay person, a civilian, or a

7    group of civilians or a law enforcement officer or a group of

8    investigating officers may believe that someone has committed an

9    offense, or whether such persons discuss among themselves whether

10   a person or group of persons have committed an offense, or

11   whether it's the opinion of a civilian witness or a law

12   enforcement officer that a particular person committed an

13   offense, none of this is to be considered by you ever as evidence

14   of any defendant's guilt of an offense.

15        Your verdict in this case will be based solely on the

16   evidence presented in this case, in this courtroom, as I will

17   instruct you.  And what's not a part of the evidence for your

18   consideration in determining whether the government has proven

19   any defendant's guilt beyond a reasonable doubt as to any

20   offense, does not include the opinion or belief of guilt by

21   either a civilian witness or a law enforcement witness.

22        Furthermore, as I told you earlier and as I will tell

23   you again, although these four defendants are being tried

24   together before you, in a real sense what we have going on here

25   are four separate trials.  And your consideration of the evidence

1    in this case will be focused on the evidence as it relates to

2    each count in the indictment and separately as it relates to each

3    defendant.

4         So each defendant in this case is entitled to your fair

5    and impartial consideration of the evidence in accordance with my

6    instructions to you as to each count in which he may be charged.

7    And your verdict as to any particular defendant or as to any

8    particular count in the indictment when you are told to begin

9    your deliberations will not influence your verdict with respect

10   to any other defendant or any other count in the indictment

11   except as I may explain to you further in my instructions.

12        Thank you for your attention.  You may proceed, Mr.

13   Harding.

14        MR. HARDING:  I think Ms. Kelly has found the spot so

15   I'm going to ask her to just go ahead and play.  And we're going

16   to follow along, starting at the top of Page 1, Track 19, at Tab

17   6.

18        (CD played.)

19   BY MR. HARDING:

20   Q    Who's that singing right there, Mr. Hayes?

21   A    Mr. Harris.

22   Q    Okay.  On Page One, halfway down, it says, you make it

23   easier for us to just clap a nigga.  It's just me, Weaze and Bo

24   back to back.  What does that mean?

25   A    What you mean?

1    Q    What does me, Weaze and Bo back to back?

2    A    They against whoever.

3    Q    Okay.  And you already told us who Weaze is, is that

4    correct?

5    A    Correct.

6    Q    With niggas bobbing and weaving one of your blows.  Now it's

7    cracking nigga.  What does "cracking nigga" mean?

8    A    I don't know what they mean by that.

9    Q    Okay.  I hope God's guarding your soul.  I ain't just

10   rapping nigga.

11          And then over on the next page it says, my nigga Bo's a

12   looney tune, just ask a nigga.  This shit's about to balloon.

13   What's a looney tune?

14   A    Crazy.

15   Q    Okay.  And what's it mean to say "this shit's about to

16   balloon?"

17   A    Blow up.

18   Q    A little bit further down it says, we hit em hard.  We don't

19   be jabbing niggas.  Every heater you just got, we done had it

20   nigga.  What does that mean?

21   A    Heater mean guns.  They already had the guns that whoever

22   they rapping about had got.

23   Q    Okay.  Next we have at Tab Seven, and this is the last one,

24   Track 20, just the beginning.  So Ms. Kelly, I'll ask you to stop

25   it when you get to the end of the transcript.

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 37 of 278

1          (CD played.)

2    Q    Do you know who this guy is two-thirds of the way down on

3    the first page?  He says, you know what I'm saying, Cese?  Do you

4    know who this guys Cese is that he talks about?

5    A    No.

6    Q    All right.  Is little Weaze the same as Weaze?

7    A    Yes.

8    Q    Okay.

9          THE COURT:  The jury can put away transcripts now.

10          MR. HARDING:  No, because I'm going to move on to

11    another.  I'm done with the rap songs.  But I want to play

12    another tape if I may, Your Honor.

13          THE COURT:  All right.

14          MR. HARDING:  Maybe I asked you this already.  Whose

15    voice was that at that last song we just heard.

16          THE WITNESS:  Mr. Harris.

17          MR. HARDING:  Okay.  Your Honor, I have some new

18    transcripts and I prepared copies with Tab Nines on them.  And

19    I'm going to ask that they be circulated to the jury to simply be

20    inserted into the existing transcript books.

21          THE COURT:  All right.  Counsel have copies of the new

22    Tab Nine?

23          MR. HARDING:  Yes.  I provided copies several days ago,

24    Your Honor.

25          THE COURT:  All right.  You may distribute them to the

1   jury.  Ladies and gentlemen, you will find it convenient to

2   simply insert these additional, this additional transcript into

3   your booklets as Tab Nine.

4              MR. KURLAND:  Your Honor, if there's an extra copy, can

5   we have one?

6              THE COURT:  Let's see.  Now, Mr. Harding, is this a

7   duplicate of Tab One?  Or do I have a different book?

8              MR. HARDING:  No, Your Honor.  This is, what we're

9   doing here is that I played the same tape to Mr. Hayes and he

10  made some modifications.

11             THE COURT:  I see.

12             MR. HARDING:  And also identified the voice.  And so

13  this is a different version.

14             THE COURT:  I see.  Okay.

15             MR. HARDING:  Adapted for Mr. Hayes.

16             THE COURT:  All right.

17  BY MR. HARDING:

18  Q    Is what I just said correct, Mr. Hayes?

19  A    Yes.

20  Q    Did we go through that voice mail the same way we went

21  through each of those rap songs that we just played and give you

22  an opportunity to make any changes?

23  A    Right.

24  Q    Okay.  All right.  I'm going to ask Ms. Kelly, then, to play

25  W-33 and we'll try to follow along now at Tab Nine, beginning

DIRECT EXAMINATION OF HAYES                    39

1    with the top of the first page.

2              THE COURT:  Okay.  Again, you said W-33.  But it's

3    marked W-33B, the transcript.  Mr. Harding.

4              MR. HARDING:  Yes.  It's W-33B to differentiate it from

5    W-33, which is the first transcript in the book, although it's

6    not actually marked in the transcript book.

7              THE COURT:  All right.  Very fine.  And again, ladies

8    and gentlemen, the recording is the actual evidence that you are

9    to consider.  The transcript is simply provided as an aid to your

10   listening to the recording.  You may proceed, Ms. Kelly.

11             (Tape played.)

12   BY MR. HARDING:

13   Q    So if there's no person identified as speaking these lines,

14   Mr. Hayes, does that mean that you weren't sure who was talking

15   at that point, couldn't make it out?

16   A    Yes.

17   Q    But in the passages where it says Shelton Harris, do you

18   feel certain that that was Shelton Harris's voice that you heard?

19   A    Yes.

20   Q    And in the passages that you identified as Willie Mitchell,

21   do you feel certain that that was Willie Mitchell's voice that

22   you heard?

23   A    Yes.

24   Q    Okay.  Did there come a time when you got locked up in 2002,

25   Mr. Hayes?

1    A    Yes.

2    Q    Do you remember when you got locked up?

3    A    July the 15th or July the 16th.

4    Q    What did you get locked up for?

5    A    CDS.

6    Q    Okay.  So were you locked up for a while after that?

7    A    Two years.

8    Q    Okay.  So you got committed into the Department of

9    Corrections, is that correct?

10   A    Yes.

11   Q    And while you were in the Department of Corrections, did you

12   tell any of the other prisoners you ran into about what you knew

13   about the murder of Oliver McCaffity and Lisa Brown?

14   A    Yes.

15   Q    Who did you tell?

16   A    Felton Byrd.

17   Q    A guy named Felton Byrd?

18   A    Yes.

19   Q    Okay.  And then later on, in 2003, did you get interviewed

20   by some homicide detectives who came to see you where you were

21   locked up?

22   A    Yes.

23   Q    And was Detective Niedermeier one of those detectives?

24   A    Yes.

25   Q    Okay.  Did you, did you tell them that you didn't see Mr.

1    Mitchell or Mr. Harris that night and only tied them to the crime

2    later on through hearsay?

3    A    Correct.

4    Q    And was that true, Mr. Hayes?

5    A    Yes.  I seen Mr. Harris that night, but not Mr. Mitchell.

6    Q    Okay.  So that part wasn't true?

7    A    Yes.

8    Q    And so you didn't tell the exact truth?  You didn't tell the

9    complete truth to the detectives when they first came to see you.

10   Is that your testimony?

11   A    Correct.

12   Q    Did you remain locked up after that?

13   A    Yes.

14   Q    Let me call your attention now to February of 2004.  Do you

15   recall getting subpoenaed to testify in the federal grand jury?

16   A    Yes.

17   Q    And where were you when you got your subpoena?

18   A    Towson Pre-Release Detention Center.

19   Q    Pre-release Detention Center?

20   A    It's a pre-release unit out Towson.

21   Q    Okay.  Were you in some kind of a pre-release program?

22   A    Yes.

23   Q    What program was it?  Do you remember?

24   A    We used to go out to, to it's called MES, Maryland

25   Environmental Services.

DIRECT EXAMINATION OF HAYES                    42

1   Q    Okay.  Is that like a work release program, then?

2   A    Yes.

3   Q    So you actually got out of jail during the day and then go

4   back at night, or something like that?

5   A    Correct.

6   Q    Okay.  When you came to testify in the federal grand jury,

7   did you in fact testify in the federal grand jury?

8   A    Yes.

9   Q    Did you have any kind of federal charge hanging over your

10  head at that time?

11  A    No.

12  Q    Did you have any kind of charge at all hanging over your

13  head except for the fact that you were still, I guess you were

14  near the end of your sentence for that charge you picked up in

15  2002, is that correct?

16  A    Correct.

17  Q    Did you have any other charges pending besides that one?

18  A    No.

19  Q    Did I tell you, when you testified in the grand jury, that I

20  would let your probation officer know that you had cooperated

21  with the federal investigation?

22  A    Yes.

23  Q    Did that do you any good, by the way?

24  A    No.

25  Q    Did you hold back some information when you testified in the

DIRECT EXAMINATION OF HAYES                                43

1    grand jury that first time in 2004, Mr. Hayes?

2    A    Yes.

3    Q    And did you nevertheless give an account, a fairly detailed

4    account of what happened on the night of February 27th and 28th

5    of 2002?

6              MR. LAWLOR:  Objection to the characterization, Your

7    Honor.

8              THE COURT:  Overruled.  You may answer.

9    Q    The night that Oliver McCaffity and Lisa Brown got murdered?

10   A    Yes.

11   Q    In particular, though, did you, when you testified in the

12   grand jury, did you testify that that gun that Shelton Harris

13   wanted from you was a 9 millimeter?

14             MR. MARTIN:  Objection, Your Honor.

15   A    Yes.

16             MR. HARDING:  Your Honor, there was an objection.

17             THE COURT:  Yeah.  Yeah.  It's overruled.  Go ahead.

18   BY MR. HARDING:

19   Q    Was it, in fact, a 9 millimeter?

20   A    Correct.

21   Q    Okay.  There were -- let me see if I can rephrase this.

22   There were two guns that -- you had a 9 millimeter that you told

23   us about yesterday, is that correct?

24   A    Correct.

25   Q    The one that Mr., that Mr. Mitchell had when he got

1    arrested?

2    A    Correct.

3    Q    But then there was another gun that you got after that that

4    you had on your person and which you mentioned as recently as

5    this morning, which you pulled on Mr. Harris when he pulled a

6    knife on you when you two were out on Woodland Avenue.  Do you

7    recall that?

8    A    Yes.

9              MR. MARTIN:  Objection, leading.

10             THE COURT:  Overruled.

11   A    Yes.

12   Q    Okay.  And this morning you said that was a .40 caliber

13   Ruger, is that correct?

14   A    Correct.

15             MR. MARTIN:  Objection.

16   Q    Do you remember what kind of gun you said it was in the

17   grand jury?

18   A    A Beretta 9.

19   Q    Okay.  Do you remember, did you make a mistake in the grand

20   jury or why did you say it was a 9 millimeter Beretta?

21   A    Because I ain't want to cooperate for real.

22   Q    You still weren't sure you wanted to cooperate, is that

23   right?

24   A    Yes.

25   Q    Okay.  After that, after you testified in the grand jury,

DIRECT EXAMINATION OF HAYES                    45

1   did you get arrested again?

2   A    Yeah.

3   Q    In fact, you got arrested more than once, did you not?

4   A    Yes.

5   Q    Can you tell us what kind of charges you got arrested for?

6   A    Two marijuana charges and discharging a firearm, a reckless

7   endangerment.

8   Q    Okay.  The marijuana charges, were those possession charges?

9   A    Yes.

10  Q    Did there come a time when you got brought to the federal

11  courthouse building?

12  A    Yes.

13  Q    And did you find out there was a federal charge against you?

14  A    Yes.

15  Q    Calling your attention to June 10th of 2005.  Was that the

16  day you got arrested on the -- or what did you get arrested for,

17  first of all?

18  A    CDS.

19  Q    Where were you when you got arrested?

20  A    On Penhurst.  4100 block.

21  Q    Is that up in Park Heights?

22  A    Garrison Boulevard.

23  Q    And that's in Park Heights?

24  A    Yeah, in the community.

25  Q    Okay.  And after you got, how much drugs did you have on

1    you, by the way?

2    A    Six bags.

3    Q    Of what drug?

4    A    Crack.

5    Q    Okay.  So you got arrested for that.  Did you find out after

6    you got arrested that you had a, there was a federal warrant for

7    you?

8    A    Yes.

9    Q    Did you get released on your six bags of crack?

10   A    Yes.

11   Q    But did you get brought over to the federal courthouse

12   because of the open warrant on you for the federal charge?

13   A    Two days later.

14   Q    And what was the federal charge for, exactly?

15   A    Ammunition.

16   Q    Ammunition?

17   A    Yes.

18   Q    In other words, bullets?

19   A    Yes.

20   Q    Okay.  Can you tell us what happened when you got brought

21   over to the courthouse?

22   A    Agent Brian came and picked me up from Central Booking,

23   brought me in this building right here, I think it's on the

24   seventh floor or fifth floor, something.  I was going in the

25   bullpen.  I was sitting down because I couldn't figure out why I

1    had federal charges.  After I was sitting in the bullpen,

2    defendant, Mr. Harris, came and struck me in my face, called me a

3    rat bitch and struck me in my face.  Me and him got to tussling

4    in the bullpen.

5    Q    Okay.  Did you see him when you got first put into that

6    cell?

7    A    No.

8    Q    So you say that he came over to you, is that correct?

9    A    Correct.

10   Q    What did he say to you?

11   A    Called me a rat bitch.  Lying rat.

12   Q    Why?  Are you ratting?

13   A    Yes.

14   Q    And then what did he do?

15   A    He struck me.

16   Q    Okay.  I would like to ask Ms. Kelly now to play AH-1.  Can

17   you tell us, Mr. Hayes, what kind of clothes were you wearing

18   that day?

19   A    Some red We All One shorts and a white T-shirt.

20   Q    And do you remember what Mr. Harris was wearing?

21   A    A burgundy federal jumpsuit.

22          (Tape playing.)

23   Q    Is that you, Mr. Hayes?

24   A    Yeah.

25   Q    Okay.  Were you injured in that assault, Mr. Hayes?

1    A    Yeah.

2    Q    How so?

3    A    I had a scrape on my face, a scrape on my shoulder, and a

4    scrape on my knee.

5    Q    After that happened, did you go to court and have an initial

6    appearance?

7    A    Correct.

8    Q    And did you get an attorney?

9    A    Yes.

10   Q    After talking to your attorney, did you agree to cooperate

11   with the United States?

12   A    Yes.

13   Q    I've got here an exhibit that's been marked P-18.  Can you

14   see that on your screen?

15   A    Yes.

16   Q    So June 21st, 2005.  Was Alan Bussard your attorney?

17   A    Yes.

18   Q    And did you agree to come in and talk to me and other

19   prosecutors and agents about what you knew about criminal

20   activity?

21   A    Yes.

22   Q    On the understanding that nothing you said would be used

23   against you, is that correct?

24   A    Correct.

25   Q    And after that, did you testify in the grand jury again?

1    A    Yes.

2    Q    Is that when you testified about the letter that you told us

3    about the other day, about a hit being put out on Claudus

4    Lassiter?

5    A    Correct.

6    Q    Why didn't you mention that the first time you testified in

7    the grand jury?

8    A    Because I want to try cooperate with you all.

9    Q    Okay.  You had just omitted to tell us anything about it

10   when you came in the first time, is that correct?

11   A    Correct.

12   Q    Did you enter into a plea agreement after you testified in

13   the grand jury?

14   A    Yeah.

15   Q    I'm showing you what's been marked now P-11.  Does that look

16   like your plea agreement?

17   A    Yes.

18   Q    Can you tell us what you have to do pursuant to this plea

19   agreement, Mr. Hayes?

20   A    Tell the truth.

21   Q    And what, if anything, did you get in exchange for agreeing

22   to tell the truth and cooperate with the government?

23   A    My federal charge was dropped and I was sent back to state

24   custody.

25   Q    Did you agree to plead guilty to a handgun charge in state

DIRECT EXAMINATION OF HAYES                                    50

1    court?

2    A    Correct.

3    Q    And did you agree to a particular sentence on that handgun

4    charge?

5    A    Mandatory five years.

6    Q    Okay.  Let me call your attention to the stipulation on Page

7    Two.  First of all, it describes this incident when you got

8    caught with nine, with five 9 millimeter bullets in your pants

9    pocket.  Is that what you pled guilty to?

10   A    No.

11   Q    Actually, that's what you got arrested for on federal

12   charges, is that correct?

13   A    Correct.

14   Q    But you admitted that you had a gun for those nine, for

15   those five bullets, also, is that correct?

16   A    Correct.

17   Q    Which the police never recovered --

18   A    No.

19   Q    -- is that correct?  But you pled guilty to that handgun in

20   Baltimore County, isn't that correct?

21   A    Correct.

22   Q    Then it says, in consideration of the plea your client is

23   entering in state court and in the event that your client

24   provides substantial assistance in the investigation or

25   prosecution of others who have committed an offense, the

1    government agrees not to prosecute him in federal court for

2    violations of federal criminal laws related to the above

3    stipulated facts relating to the events of October 26th, 2004.

4    After Hayes is sentenced, this office will move expeditiously to

5    dismiss the indictment now pending against him in U.S. District

6    Court.

7            And it's already said earlier on in this thing that you

8    agree to plead guilty to a criminal information or indictment

9    against you in the Circuit Court of Baltimore County in which you

10   are charged with carrying and transporting a handgun in violation

11   of, and it gives the Maryland Criminal Code provision that you

12   pled guilty to.  Is that correct?

13   A    Yes.

14   Q    And it says that in return for the complete fulfillment by

15   your client of all of his obligations under this agreement, this

16   office agrees as follows:  A, receive a sentence of five years

17   for the offense to which your client is pleading guilty.  Is that

18   correct?

19   A    Correct.

20   Q    What would happen if you were to violate the terms of this

21   agreement by, for example, saying something untrue?

22   A    I could be sent back to state court and be retried again and

23   I could have federal charges brought back up against me.

24   Q    Could you also have new charges brought against you?

25   A    Yes.

1    Q    Is all that provided for in your agreement?

2    A    Yes.

3    Q    In Paragraph Four, Subparagraph E, does it say in the event

4    that your client fails to accept personal responsibility for his

5    conduct by failing to acknowledge his guilt or commits any

6    offense in violation of federal, state or local law, then this

7    office will be relieved of its obligation to your client as

8    reflected in this agreement?  Specifically, this office will be

9    free to prosecute your client for violations of federal criminal

10   laws for the conduct summarized in the stipulation, dot, dot,

11   dot.  As with any alleged breach of this agreement, the

12   government will bear the burden of convincing the Court of your

13   client's obstructive behavior.

14            Do you understand what that means, Mr. Hayes?

15   A    Yes.

16   Q    Who is it who decides if there's some accusation that you

17   breached your plea agreement or some suggestion that you said

18   something untrue?

19   A    The court system.

20   Q    And does it say that again in Paragraph Seven?

21   A    Yes.

22   Q    Whether or not your client has violated the terms of this

23   agreement shall be determined by the Circuit Court of Baltimore

24   County, which is the court that was going to sentence you, in an

25   appropriate proceeding at which his disclosures and documents

1   shall be admissible and at which this office shall be required to

2   establish his breech by a preponderance of the evidence.  Is that

3   correct?

4   A    Yes.

5   Q    Did you, in fact, serve your sentence that you got for that

6   handgun charge?

7   A    Yes.

8   Q    And are you out of jail now?

9   A    Yes.

10  Q    How much time did you actually do on that five year

11  sentence?

12  A    About three and a half years.

13  Q    And did you, how come you got out in less than five years?

14  A    Mandatory parole, good behavior.

15  Q    Okay.  I now want to play one last videotape.  This is the

16  Stop Snitching video, Your Honor.

17            THE COURT:  Very well.

18            MR. MARTIN:  What's that exhibit number, Mr. Harding?

19  I can look it up.

20            MR. HARDING:  It's an SS exhibit on the exhibit list.

21            (Video played.)

22            MS. RHODES:  Your Honor, we would move to strike that

23  last portion.  It has nothing to do with the earlier audio.

24            THE COURT:  Well, the request is denied.

25  BY MR. HARDING:

1    Q    Mr. Hayes, did you recognize one of those voices that came

2    on -- first of all, did you know the guy that was holding up the

3    cell phone there on the screen?

4    A    Yeah.

5    Q    Who is it?

6    A    Vials.

7    Q    Vials?

8    A    Yeah.

9    Q    That's his name?

10   A    Yeah.

11   Q    How do you know him?

12   A    I used to be hanging down his way.

13   Q    Where's his way?

14   A    Edmondson Avenue.

15   Q    Edmondson Avenue.  Is that in Southwest Baltimore?

16   A    Correct.

17   Q    When he was holding up that receiver, could you recognize

18   the voice or voices, any of the voices that --

19   A    One.

20   Q    -- came over the receiving?

21   A    One.

22   Q    -- came over the cell phone?

23   A    One voice.

24   Q    Whose voice was it?

25   A    Mr. Harris.

1    Q    What's he saying?

2    A    Talking about Tony telling.

3    Q    Okay.  Let me play it one more, I just want to play the

4    beginning of it one more time because it wasn't, the thing was on

5    so loud at the beginning that it was hard to hear exactly what he

6    said.  So I'm going to ask Ms. Kelly to play it one more time, at

7    least part way through.

8            (Playing.)

9    Q    So did you hear Mr. Harris's voice in that part?

10   A    Yes.

11   Q    Were that one voice there or two voices?

12   A    Two different voices.

13   Q    Which was the first?

14   A    It was the second voice.

15   Q    What was it saying?

16   A    They's ratting on the downs straight like that.

17   Q    Okay.  First somebody comes on and mentions Mark Herbert,

18   TM.  Did you hear that?

19   A    Yeah.

20   Q    Was that Mr. Harris?

21   A    No.

22   Q    Okay.  And then a voice comes on and says something about

23   ratting on shake down or ratting on the down, is that correct?

24   A    Yes.

25   Q    Is that the voice you recognize as Mr. Harris?

1    A    Yes.

2    Q    Okay.  And then we'll ask Ms. Kelly to play the rest of it

3    and you can tell me if you hear another voice in it.

4              (Playing.)

5    Q    So does another voice come on there, Mr. Hayes?

6    A    Yeah.

7    Q    And is that the voice that's talking about Will Montgomery?

8    A    Yes.

9    Q    Do you, did you know who that, whose voice that was?

10   A    No.

11   Q    Do you know who Will Montgomery is?

12   A    No.

13   Q    Would it be correct, Mr. Hayes, to say that both of the

14   times you testified in the grand jury were before you had a plea

15   agreement with the United States, a cooperation agreement with

16   the United States?

17   A    Correct.

18   Q    You told us this morning, Mr. Hayes, that the gun that you

19   had after you lost your 9 millimeter, when Mr. Mitchell got

20   arrested with it, was a .40 caliber Ruger, is that correct?

21   A    Yes.

22   Q    Did you tell us that that was TM's gun, also, or TM got it

23   for you?

24   A    Correct.

25   Q    And what was TM doing with it?

1    A    He was holding it.

2              MR. CROWE:  Objection.

3    Q    Holding it for who?

4              MR. LAWLOR:  Objection.

5    A    For Mr. Mitchell.

6              THE COURT:  Overruled.

7    Q    Where was he holding it?

8    A    Outside 2913.

9    Q    Outside 2913?

10   A    Yeah.

11   Q    Where outside 2913?

12   A    In the back yard, in the air conditioner vent.

13   Q    I'm sorry?  In the back yard?

14   A    In the air conditioner unit.

15   Q    In the air conditioning unit?

16   A    Yeah.

17   Q    Okay.  Was that a safe place to hide a gun?

18   A    Yeah.

19   Q    No further questions, Your Honor.

20             THE COURT:  Members of the jury, we'll take our morning

21   recess at this time.  Please leave your note pads on your chairs.

22   Have no discussion about the evidence or about the case.

23   Continue to keep an open mind.

24             The jury's excused for a 15 minute recess.

25             (Jury exits the courtroom.)

1          THE COURT:  Mr. Hayes may leave now.

2          (Witness exits the courtroom.)

3          THE COURT:  We'll stand in recess for 15 minutes.

4          (Recess at 11:28 a.m.)

5          (Witness enters the courtroom.)

6          THE COURT:  We'll have the jury, please.

7          (Jury enters the courtroom.)

8          THE COURT:  Good afternoon, ladies and gentlemen.

9    Counsel, you may cross examine when you're ready.

10         CROSS EXAMINATION

11   BY MR. LAWLOR:

12   Q    Thank you, Your Honor.  Mr. Hayes, how are you?

13   A    How you doing today?

14   Q    Good, thank you.  Let me, if I could, start by asking you

15   about the chronology of your involvement in this case.  Mr.

16   Harding sort of discussed this with you at the end of his

17   examination of you.

18              But it's fair to say the first time you were questioned

19   about any of these matters was in October of 2003.  Isn't it true

20   that you were questioned by Detective Niedermeier and Sergeant

21   Petri, if I'm pronouncing that right?

22   A    Yes.

23   Q    That was October of '03, right?

24   A    Yes.

25   Q    And you were locked up at the time?

1    A    Yes.

2    Q    And at the time you essentially told them, and tell me if

3    this is a fair characterization, that you didn't know much of

4    anything?

5    A    Right.

6    Q    And you affirmatively told them that the night Mr. McCaffity

7    and Ms. Brown were murdered, you affirmatively told them, I did

8    not see Mr. Harris nor did I see Mr. Mitchell?

9    A    Correct.

10    Q    And that was a lie, right?

11    A    Yes.

12    Q    All right.  And you didn't tell them, for that matter, about

13    any of the other things that you've discussed here in court over

14    the last couple days, did you?

15    A    No.

16    Q    About guns or drug dealing or robberies or letters or any of

17    that?

18    A    Nothing.

19    Q    Okay.  And you said you didn't know anything?

20    A    Right.

21    Q    Okay.  Then later on you were brought before a grand jury

22    here in this courthouse, in February of 2004, and you were asked

23    to testify then, right?

24    A    Correct.

25    Q    And you were under oath, right?

1    A    Yes.

2    Q    And you understood then what the meaning of that oath was,

3    right?

4    A    Correct.

5    Q    And you do here today, right?

6    A    Yes.

7    Q    And without going through everything that you've testified

8    about in that grand jury, let me ask you two things.  Number one,

9    is it fair to say that your testimony here is a lot more

10   expansive than it was in February of '04?

11   A    Yes.

12   Q    All right.  And is it also fair to say, is it a fact that

13   you lied to that grand jury?

14   A    Yes.

15   Q    Notwithstanding the fact that you were under oath?

16   A    Yes.

17   Q    Okay.  Then in October of 2006 you were arrested, right?

18   A    Yes.

19   Q    All right.  And now correct me or forgive me, because I'm

20   not entirely clear about this, but there were a string of

21   arrests, the times that you were arrested between October of 2004

22   and June of 2005, right?

23   A    Yes.

24   Q    How many times were you arrested in that six or eight

25   months?

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 61 of 278

1    A    Four times.

2    Q    All right.  You were arrested, and help me fill in the gaps

3    here.  You were arrested, on one occasion you were in possession

4    of six dime bags of crack?

5    A    Yeah.

6    Q    Another time you were arrested you were in possession of a

7    handgun?

8    A    Ammunition.

9    Q    All right.  Ammunition.  And on a separate occasion a

10   handgun, right?

11   A    Never got caught with a handgun.

12   Q    All right.  Didn't you plead guilty in state court to being

13   in possession of a handgun?

14   A    Yes.

15   Q    How do you plead guilty to a crime if you weren't, in fact,

16   ever in possession of a handgun?

17   A    Because --

18        THE COURT:  He didn't say he wasn't in possession.  He

19   said he wasn't arrested with a handgun.

20   Q    Okay.

21        THE COURT:  Let's move along, please.

22   Q    What were you arrested for in relation to that handgun?

23   A    Discharging a firearm.

24   Q    Discharging it.  Did you discharge it at somebody?

25   A    Yeah.

1    Q    Who was that?

2    A    I don't even know.

3    Q    Why did you do that?

4    A    Because he shot at me first.

5    Q    All right.  Some unknown person shot at you and you shot at

6    him?

7    A    Yeah.  I went to go see a female and I think her boyfriend

8    was stalking her.

9    Q    He was stalking you?

10   A    Stalking her.

11   Q    Stalking her.  I see.  Okay.  So in any event, between

12   October of '04 and June of '05, you had these string of arrests,

13   correct?

14   A    Correct.

15   Q    All right.  And then in June of '05 you had an altercation

16   with Mr. Harris in the lockup here in this building, right?

17   A    Correct.

18   Q    And that was, was that June 10th?

19   A    June the 13th.

20   Q    June 13th.  Okay.  And then just eight days later is when

21   you sat down and agreed to proffer to Mr. Harding and begin to

22   cooperate in this case, right?

23   A    Correct.

24   Q    All right.  And then on July 12th, you testified before the

25   grand jury a second time, correct?

1    A    Correct.

2    Q    All right.  And at that time, this is the first time that

3    you disclose information about this letter that you say was

4    received by your brother, right?

5    A    Yes.

6    Q    All right.  The letter from Mr. Mitchell purportedly

7    intended for Mr. Harris, correct?

8    A    Correct.

9    Q    All right.  And just so I'm not unclear, we're talking about

10   Mark Herbert, right?

11   A    Yes.

12   Q    Who goes by TM or Tony Montana, right?

13   A    Correct.

14   Q    And while he's actually no blood relation to you, it's fair

15   we're going to call him your brother, right?

16   A    Right.

17   Q    Okay.  So that was the first time you ever mentioned

18   anything about this letter, right?

19   A    Yes.

20   Q    All right.  And then on July 20th, 2005, you signed a plea

21   agreement that you made with Mr. Harding and agreed to a plea in

22   the state court, right?

23   A    Yes.

24   Q    All right.  So to sort of summarize, the first time you

25   talked to anyone, October, '03, you had no charges pending and no

1    real desire to be cooperative or tell the federal authorities

2    anything at that time, right?

3    A    The federal, federal authorities didn't even have the case

4    back then.

5    Q    They had nothing over you, right?

6    A    Right.

7    Q    And therefore you told them nothing?

8    A    Exactly.

9    Q    And February, '04, they had nothing over you, right?

10   A    Nothing.

11   Q    And you told them nothing essentially, right?

12   A    Nothing.

13   Q    No, I'm correct, you didn't tell them anything?

14   A    I told them something when I went to the grand jury the

15   first time.  I just didn't tell the whole truth.

16   Q    All right.  So you lied then because you had really no, it

17   was of no interest to you to be fully cooperative or even

18   truthful, notwithstanding your oath at that time, right?

19   A    Correct.

20   Q    All right.  But then by the time you have this fight with

21   Mr. Harris and then you enter this plea agreement, now you have a

22   whole bunch of things pending against you, right?

23   A    Not a whole bunch, just one thing.

24   Q    All right.  Well, you had the six dime bags of crack?

25   A    Beat it.

1   Q     You beat that.  But it was pending at the time, wasn't it?

2   Didn't you get arrested that day?

3   A     Yes.

4   Q     All right.  So at the time that you entered into this

5   arrangement with Mr. Harding and the federal government, that was

6   at least hanging over your head, right?

7   A     Right.

8   Q     As was the ammunition charge, right?

9   A     Right.

10  Q     And the handgun case or the discharge of the handgun case,

11  right?

12  A     I beat all that.  I came home.

13  Q     All right.  I understand that.  My question is, though, at

14  the time that you entered into this agreement, all those things

15  were floating over your head, right?

16  A     No.  You're not reading your paperwork right.

17  Q     Okay.  Fill in the details.

18  A     Came home from the handgun case December.  Went out Towson,

19  had parole violation.  I sat out Towson and came home.  I got

20  locked up two months later for a federal warrant.  Just so

21  happened when the police locked me up I had drugs on me.

22  Q     All right.  So you had drugs on you.  So that was pending

23  over you.  You ultimately pled, right?  Look at Paragraph One.

24  Transporting a handgun in violation of state law, right?

25  A     Right.

1    Q    In fact, it says carrying and transporting, to be completely

2    accurate, right?

3    A    Right.

4    Q    All right.  And that offense occurred in October of 2004,

5    right?

6    A    Right.

7    Q    And the date this agreement was signed was July 20th, 2005,

8    right?

9    A    Correct.

10   Q    So at the time that you met with Mr. Harding and the time

11   that you testified before the grand jury here, that was an issue

12   that had yet to be resolved, right?

13   A    What happened was I went to court with the state, it

14   happened in Baltimore City.  The girl sent the police to my house

15   in Baltimore County.  When the county police arrested me, I had

16   ammunition in my pocket.  The city had the case first, which was

17   a discharging a firearm case.  The case got nol processed so I

18   was released to the custody of Baltimore County because I was on

19   parole.

20          When I was out there, my parole issue was resolved.

21   Then I was released back to the streets without even being, like

22   two weeks after I was released from my parole, it was a federal

23   detainer put out on me for ammunition.

24   Q    Okay.  I'm not sure really what the difference is between

25   what you're saying and what I'm saying.  But ultimately, let's

CROSS EXAMINATION OF HAYES BY LAWLOR                    67

1    just leave it at this.  You reached the agreement as to the

2    handgun case in July of 2005, right?

3    A    Right.

4    Q    And the crack case was disposed of sometime thereafter,

5    right?

6    A    '06.

7    Q    All right.  And the ammunition case, that was pending

8    federally at the time?

9    A    Yes.

10   Q    You had a pending indictment charged here in this building

11   in front of Judge Quarles, right?

12   A    Correct.

13   Q    And that case was just dismissed.  They just let you go on

14   that one, right?

15   A    Exactly.

16   Q    All right.  So just picking up the chronology, then.  You

17   testified about the voice mail, right, and the voices that you

18   picked out here?

19   A    Yes.

20   Q    All right.  Did you ever testify about that in front of any

21   grand jury?

22   A    No.

23   Q    All right.  When was the first time that they asked you to

24   listen to that?

25   A    September the 1st, '08 or September the 2nd, '08.

1    Q    Okay.  How many times had you met with the prosecutors

2    between '05 and '08, between July of '05 and September, '08?

3    A    Probably like five or six times.

4    Q    Five or six times?

5    A    Yeah.

6    Q    And that was the first time they ever asked you anything

7    about this?

8    A    About the voice message?

9    Q    About the voice message?

10   A    Yeah.

11   Q    Okay.  And had they asked you about the letter to Mr.

12   Lassiter prior to the grand jury?

13   A    No.

14   Q    No, they hadn't?  They just plopped you down in there and

15   you spouted off about that letter?

16   A    Yeah.

17   Q    Okay.  In fact, you testified in front of the grand jury on

18   two different occasions, right?

19   A    Yes.

20   Q    On either of those occasions, was it Mr. Harding that

21   questioned you both times?

22   A    Yes.

23   Q    Okay.  On either of those occasions, did you testify about

24   the various drug distribution facts that you testified, the

25   packaging and the relationship between Mr. Mitchell and Mr.

Case 1:04-cr-00029-RDB   Document 691   Filed 06/12/09   Page 69 of 278

1    Martin and/or Mr. Mitchell and Mr. Martin and TM?  Did you ever

2    testify about any of that in front of a grand jury?

3              MR. CROWE:  Objection.

4              THE COURT:  Yeah.  Break the question down, please.

5    Q    Okay.  Did you ever testify -- you've testified about

6    various individuals and various instances of drug distribution

7    here in court today, right?

8    A    Yes.

9    Q    Or yesterday.  Did you ever testify about any of those facts

10   before the grand jury?

11   A    Can't recall.

12   Q    Okay.  What about these robberies?  Did you ever testify

13   about that?

14   A    They asked me questions about it in the grand jury.

15   Q    They did?  Okay.  Did you testify in the grand jury that Mr.

16   Harris and Mr. Mitchell were involved in robberies?

17   A    That's what some of the questions was about.

18   Q    Okay.  Let me ask you, let me take you through a couple

19   instances of the things that you testified to before the grand

20   jury.

21   A    Sure.

22   Q    Here you say, when Mr. Harding asked you a question, I think

23   it was yesterday, he essentially asked you what line of work Mr.

24   Mitchell was in.  And you said he was a producer, he was a drug

25   dealer, and he was a robber, right?

1    A    Um-hum.

2    Q    All right.  And you also testified, a separate question, you

3    testified about your relationship with him and his relationship

4    with TM, right?

5    A    Right.

6    Q    Were you asked about that -- in fact, let me just put it

7    this way.  You were asked about those same questions in front of

8    the grand jury, right?

9    A    Correct.

10   Q    All right.  And when you testified before the grand jury

11   about the things that Mr. Mitchell was involved in, you didn't

12   say that he was a robber or a drug dealer, did you?

13   A    I can't recall.

14   Q    All right.  Well, let me show it to you, then.  Here's the

15   question.  Follow along with me.  The bottom.  Let me just show

16   you this.  It's your testimony, is it not, from February 4th,

17   2004, before the federal grand jury, right?

18   A    Right.

19   Q    All right.  And the question was, Page Eight, the bottom.

20   Okay.  Can you tell us what line of work Bo was in at this time?

21   You said, I guess you would call it the producer business.  He

22   was trying to get a rap label off the ground and started.  Is

23   that what you said?

24   A    Yes.

25   Q    All right.  So nothing in there about the fact that he was a

1    robber or a drug dealer, right?

2    A    Right.

3    Q    All right.  So that's new information that we've only

4    learned, this is the third different jury that you've testified

5    in front of, but this is the first jury that's been provided this

6    information about drug dealing and robbing, right?

7    A    Correct.

8    Q    All right.  And let me ask you, if I could, a little bit

9    about the rap label.  You bought some of these CD's, right?

10   A    Yes.

11   Q    And we heard some of the music here in court today, right?

12   A    Right.

13   Q    And this was a, and your brother was involved in this,

14   right?

15   A    Right.

16   Q    Did you think your brother's efforts at making this label

17   go, at being successful, did you think that was an honest effort

18   on his behalf, that he really wanted to be a music --

19   A    Yeah.

20   Q    -- star?  Pardon?

21   A    Yes.

22   Q    Would you say a similar thing about Mr. Mitchell and Mr.

23   Harris?  That this was a genuine effort and genuine concern to be

24   in the music business?

25   A    Yes.

1    Q    All right.  And I mean, that's, I won't ask you to grade the

2    music, but it's not the worst thing you ever heard, is it?

3    A    No.

4    Q    Have you ever heard the phrase "poetic license?"

5    A    No.

6    Q    All right.  Have you listened to rap music?

7    A    Yes.

8    Q    All right.  And a lot of it, is that music that you like?

9    A    Yes.

10   Q    Okay.  And I won't hold you to this.  But is it fair to call

11   this sort of like gangsta rap, the music that we listened to here

12   in court?

13   A    Yes.

14   Q    And you've heard a lot of that?

15   A    Yes.

16   Q    And a lot of artists say similar things to the things that

17   were said on these tracks, right?

18   A    Right.

19   Q    About, and forgive my language, about killing people and

20   fucking people and dealing drugs and etc., etc., etc., right?

21   A    Right.

22   Q    That's very, very common, in fact, isn't it, in that genre?

23   A    Yes.

24   Q    In fact, your brother testified, we heard one of the tracks,

25   track five, that was him singing, right?

1    A    Um-hum.

2    Q    And he talked about killing people and, you know, I'm

3    paraphrasing, but killing people and splattering blood and things

4    of that ilk, did he not?

5    A    Yeah.

6    Q    Is that who your brother is?

7    A    No.

8    Q    Is he a killer?

9    A    No.

10   Q    All right.  So that was then just art, right?

11   A    Right.

12   Q    Okay.  He doesn't do those things, never did those things,

13   never will do those thing?

14   A    Never.

15   Q    It's not in his character?

16   A    Right.

17   Q    All right.  But he did say those things or sing about those

18   things?

19   A    Right.

20   Q    Okay.  Are you still close with your brother?

21   A    Yeah, I talk to him.

22   Q    Okay.  All right.  Now, forgive me for jumping back here.

23   Concerning this agreement that you reached with the government.

24   You could have been, in fact, you had charges pending federally,

25   right?

1    A    Right.

2    Q    And you could have been prosecuted for those federal

3    charges, right?

4    A    Correct.

5    Q    And you made an agreement with the government to have your

6    case sent back to the state court?

7    A    Correct.

8    Q    And you agreed to a sentence of five years, which you've

9    served, right?

10   A    Exactly.

11   Q    All right.  Now, I suppose it was in your interest to make

12   that particular agreement because you assumed that the sentence

13   you would receive here would be harsher than what you ultimately

14   received in state court, is that right?

15   A    Right.

16   Q    Did you understand that the sentence you would likely

17   receive in this building in front of Judge Quarles would be

18   terrifically worse than the one you ultimately received?

19   A    Yes.

20   Q    And that's still hanging over your head in a sense, right?

21   A    Yes.

22   Q    All right.  Mr. Harding walked you through the fact that

23   theoretically, if they, if they have a suspicion that you're

24   lying, not being cooperative, then they can ask the judge to

25   consider the truthfulness of your testimony here, right?

CROSS EXAMINATION OF HAYES BY LAWLOR                    75

1    A    Exactly.

2    Q    And they could seek to have those federal charges brought

3    back, right?

4    A    Yes.

5    Q    All right.  And you don't want that, right?

6    A    No.

7    Q    Have they ever said that they're going to prosecute you for

8    the perjury in front of the two different grand juries?

9    A    No.

10   Q    Okay.  You don't expect that to happen, do you?

11   A    It could.

12   Q    It could?

13   A    Yes.

14   Q    I know it could.  Do you expect it to?

15   A    I'm ready for whatever happen.

16   Q    Okay.  Again, not the question I asked.  Do you expect them

17   to prosecute you for perjury?

18   A    I don't know.

19   Q    All right.

20   A    It's in the court hands.

21   Q    It's in the court's hand or in Mr. Harding's hands?

22   A    The court system.

23   Q    All right.  The court makes the decision whether or not

24   you're going to be prosecuted for perjury?

25   A    That's what the paper said.

Case 1:04-cr-00029-RDB   Document 691   Filed 06/12/09   Page 76 of 278

1    Q    Okay.  All right.  Now, is it true that on the evening that

2    Mr. McCaffity and Ms. Brown lost their lives, that you saw Mr.

3    Harris?

4    A    Yeah.

5    Q    All right.  Did you see Mr. Mitchell that night?

6    A    No.

7    Q    Okay.  You also testified that TM sold drugs with Mr. Harris

8    and with Mr. Mitchell?

9    A    Correct.

10   Q    Okay.  When you testified before the grand jury in February

11   of '04, were you asked about that?

12   A    I think so.

13   Q    Okay.  And let's review your testimony.  We're on Page 20.

14   And you're asked about what Tony's involvement in the drug

15   business was, right?  You say, yes, that he sold crack cocaine,

16   right?

17   A    Um-hum.

18   Q    And you were asked if you were in business together and you

19   said no, right?

20   A    Um-hum.

21        THE COURT:  I'm sorry.  You have to say yes or no, Mr.

22   Hayes.

23   A    Yes.

24   Q    All right.  And then you were asked whether he was working

25   with Shelton and Bo.  And you said you suspect he could be?

1    A    Right.

2    Q    And suspecting something is like having a suspicion, right?

3    Is that fair?

4    A    Yes.

5    Q    It's different from knowing something, right?

6    A    Right.

7    Q    It's different from the testimony you gave in this courtroom

8    yesterday and today that you observed Mr. Mitchell and Mr. Harris

9    having direct dealings in the drug distribution business with TM,

10   right?

11   A    Right.

12   Q    So your testimony in front of that jury was a lie, right?

13   A    Yes.

14   Q    Okay.  And you testified, did you not, here today that, and

15   help clarify this for me.  But did you testify that a week, one

16   week after the Wyche brothers, after the Wyche brothers were

17   murdered that you gave Willie a gun?

18   A    Yeah.  About a week.

19   Q    About a week later?  That's what you testified to here

20   today?

21   A    Um-hum.

22   Q    Or yesterday?

23   A    Yesterday.

24   Q    All right.  You were asked about that in the grand jury in

25   February of '04, too, right?

CROSS EXAMINATION OF HAYES BY LAWLOR                78

1    A    Right.

2    Q    All right.  And then you said, Page 22, how long after these

3    two murders that you told us about was that that Tony gave the

4    gun to Bo?  And then you said some weeks later, probably two

5    weeks or so, right?

6    A    Right.

7    Q    All right.  So in February of '04, your testimony was you

8    gave a gun to Bo two weeks or more later, right?

9    A    Right.

10   Q    But now four years, four and a half years later, your

11   testimony is that you gave it to him a week later, right?

12   A    Right.

13   Q    Closer to the murders, right?

14   A    As I said earlier, before, I wasn't being truthful when I

15   was in the grand jury.

16   Q    Okay.  Well, that's what I'm getting at.  All right.  Well,

17   let's try to clear this particular point up.  Is it your

18   testimony still today under oath that it was a week later?

19   A    A week later.

20   Q    All right.  So about February of '04, four years and eight

21   months prior to today, it was a couple weeks or more later?

22   A    Right.

23   Q    All right.  And you're not one of those unique individuals

24   whose memory gets better with time, are you?

25   A    No.

CROSS EXAMINATION OF HAYES BY LAWLOR                79

1    Q    Okay.  Now, you also testified about the altercation that

2    you had in the lockup with Mr. Harris, right?

3    A    Right.

4    Q    Now, let me ask you this.  Prior to this, you didn't like

5    Mr. Harris at all, did you?

6    A    No.

7    Q    You didn't like Mr. Mitchell at all, did you?

8    A    No.  Bo cool, was cool.

9    Q    Bo was cool, did you say?

10   A    Yeah.

11   Q    All right.  You didn't like Mr. Harris, though, right?

12   A    At all.

13   Q    Disliked him immensely, is that fair to say?

14   A    Yeah.

15   Q    Still do?

16   A    Yes.

17   Q    All right.  And your disdain for him, I'm sure, was

18   exacerbated after the fight you had with him in the lockup,

19   right?

20   A    Yeah.

21   Q    You got an axe to grind against him, right?

22   A    Right.

23   Q    Okay.  And you know that he's close with Bo, right?

24   A    Correct.

25   Q    From the rap music business?

1   A    Um-hum.

2   Q    All right.  And so you testified here today, and the

3   incident, again, in the lockup, was in June of 2005, right?

4   A    June the 13th.

5   Q    June 13th.  And here today you say that when he approached

6   you, he called you a rat bitch?

7   A    Yeah.

8   Q    All right.  And you were asked about this in front of the

9   grand jury July of '05, right?  Is this your testimony?

10  A    Yeah.  He said, why you telling?  I know what he said.

11  Q    All right.  Hold on.  Let me ask the question.  Is this your

12  testimony July of '05 in front of the grand jury?

13  A    Correct.

14  Q    All right.  And that testimony that you gave was a day short

15  of a month after the incident?

16  A    Right.

17  Q    When the events would have been fresh in your memory, right?

18  A    Right.

19  Q    All right.  And at that time you said at the bottom, Page

20  Eight, the voice grew closer.  When I looked up it was Mr. Harris

21  in my face.  He asked me why I was telling, why I was snitching.

22  A    Right.

23  Q    Then he struck me in the face.

24  A    Right.

25  Q    So then a month after the incident you didn't say to that

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 81 of 278

1    grand jury that he called you a rat bitch.

2    A    Telling and snitching and rat bitch is the same thing.

3    Q    It is?

4    A    Exactly.

5    Q    All right.  Now, let me ask you this.  You've testified here

6    about a number of guns that you owned, co-owned, traded, gave

7    away, let people borrow, etc., correct?

8    A    Correct.

9    Q    All right.  So is it safe to say that now that you've paid

10   your debt to society, you're a law-abiding citizen?

11            MR. HARDING:  Objection.

12            THE COURT:  Sustained.

13   Q    All right.  You don't carry a gun any more, I assume, right?

14   A    No.

15   Q    All right.  At the time, though, during your drug

16   distribution days in '04, '05, and before that, you always

17   carried a gun, right?

18   A    Right.

19   Q    All right.  And why was that?

20   A    To protect myself.

21   Q    Against whom?

22   A    Other drug dealers.

23   Q    Why would you feel the need to protect yourself against

24   other drug dealers?

25   A    Because if I get in their way, they can do some harm to me.

1    Q    Like what?

2    A    Come at me, try rob me, shoot me, kill me, anything.

3    Q    All right.  And where, you lived in Reisterstown, Woodlawn

4    area?

5    A    Yeah.

6    Q    Park Heights?

7    A    Yeah.

8    Q    Tough neighborhood?

9    A    Yeah.

10   Q    Very tough neighborhood, isn't it?

11   A    Correct.

12   Q    All right.  Have you been around the city?

13   A    What you mean?

14   Q    I mean, have you been to other parts of the city of

15   Baltimore?

16   A    Yeah.

17   Q    All right.  Is it fair to say, or is it fair to say, I'm

18   asking you, that this is one of the toughest neighborhoods in the

19   entire city?

20   A    Correct.

21   Q    And drug dealing is common there, isn't it?

22   A    Yes.

23   Q    And people getting killed is far too common there, isn't it?

24   A    Yup.

25   Q    And you need to carry a gun to make sure that if you're

1   selling drugs, you're not going to get killed, right?

2   A    Right.

3   Q    By another drug dealer?

4   A    Right.

5   Q    Because that's all too common, right?

6   A    Right.

7   Q    And there's a lot of rumors, like you said, you testified

8   or, rather, you told the detectives back in October of '03 that

9   anything you knew about the McCaffity/Brown murder was just

10  hearsay, right?

11  A    Right.

12  Q    All right.  Because that's what floats around out there,

13  right?  A lot of hearsay, right?

14  A    Correct.

15  Q    A lot of people talk about what goes on in the street,

16  correct?

17  A    Correct.

18  Q    And a lot of things go on in the street, right?

19  A    Yes.

20  Q    All right.  And how many guns, I mean, how many guns have

21  you testified just in the short period of time that's relevant to

22  your testimony here today did you own or carry?  How many

23  different guns?

24  A    Three.

25  Q    All right.  There was a .38, right?

CROSS EXAMINATION OF HAYES BY LAWLOR                    84

1    A    Right.

2    Q    And you gave that gun to, is it Dwight?

3    A    I didn't give no gun to nobody.

4    Q    Tony did?

5    A    I ain't going to say that, neither.

6    Q    All right.  Well, I'm asking you just to testify truthfully.

7    Who gave the gun to Dwight?

8    A    Got it out of the ceiling.

9    Q    Pardon?

10   A    He took the gun out of the ceiling his self.

11   Q    Who did?

12   A    Dwight.

13   Q    How do you know that?

14   A    Because, hearsay.

15   Q    All right.  So it's hearsay.  All right.  Well, who told you

16   this hearsay?

17   A    Tony.

18   Q    Tony said that Dwight took it without authorization?

19   A    Correct.

20   Q    Did Tony see this?

21   A    I suppose so.

22   Q    All right.  And you also had a 9 millimeter?

23   A    Correct.

24   Q    And Tony gave that to Bo?

25   A    Correct.

1    Q    That's hearsay, also, right?

2    A    Yeah.  Hearsay, but I heard it from the horse's mouth.

3    Q    Who's the horse?

4    A    Tony.

5    Q    All right.  Where's Tony?

6    A    I don't even know.

7    Q    When do we get to hear from him?

8    A    Never.

9    Q    Never?  Okay.  Does he have a deal with the government?

10   A    They want to question him.

11   Q    They wanted to question him.  That's not my question.  My

12   question is, has he, like you, made a deal with the government?

13        MR. HARDING:  Objection.

14   A    No.

15        THE COURT:  Overruled.

16   Q    No, he has not?  So he doesn't have anything hanging over

17   his head, right?

18   A    No.

19   Q    All right.  So then it would be fair to say, probably be

20   helpful for this jury to hear what he has to say about the

21   incidents that you've testified to, right?

22        MR. HARDING:  Objection.

23   A    Correct.

24   Q    All right.

25        THE COURT:  I'm sorry.  Just a moment.  Is there a

1    basis, Mr. Harding?

2            MR. HARDING:  Yes.  Speculating about what would be

3    helpful for the jury, Your Honor.

4            THE COURT:  Okay.  You can cover it on redirect.

5    Overruled.  Go ahead, Mr. Lawlor.

6    BY MR. LAWLOR:

7    Q    Okay.  So you have a motive to be here, right?  You have a

8    deal with the government.  They could bang you for some perjury.

9    They could take your deal away.  You have a motive to be here,

10   right?

11   A    Right.

12   Q    Tony does not, right?

13   A    No.

14   Q    And he's not going to be called to testify by the government

15   in this case, is he?

16   A    No.

17   Q    All right.  And this letter that you got purportedly from

18   Mr. Mitchell, this went to Tony, right?

19   A    Yeah.  I didn't get --

20   Q    He opened it, right?

21   A    Right.

22   Q    All right.  And you only saw it because you looked over his

23   shoulder, or you were sitting next to him, right?

24   A    Right.

25   Q    So Tony would be a helpful, corroborative witness about the

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 87 of 278

1    content of that letter, wouldn't he?

2    A    Yes.

3    Q    All right.  And where's the letter?

4    A    I made Tony throw the letter in the toilet.

5    Q    You made him?

6    A    Yeah.

7    Q    All right.  How does that work?  How do you make Tony do

8    things?

9    A    Just tell him to throw it away.

10   Q    And he does what you say?

11   A    I ain't going to say he do exactly what I say.

12   Q    All right.  So getting back to the 9 millimeter, though, the

13   horse told you, Tony told you that he gave the gun to Bo, right?

14   A    Right.

15   Q    All right.  But I mean, that's hearsay, right?

16   A    Right.

17   Q    All right.  And I'm not trying to be cute here, but even you

18   understand the problem with hearsay, right?

19            MR. HARDING:  Objection, Your Honor.

20            THE COURT:  Sustained.

21   Q    All right.  And then at a later time you became, you came

22   into possession of another gun, right?

23   A    Right.

24   Q    Was that a .40 caliber?

25   A    Yes.

1    Q    Now, is this the gun that you lied about in front of the

2    grand jury?

3    A    Yes.

4    Q    All right.  What did you tell the grand jury?

5    A    It was a 9 millimeter Beretta.

6    Q    Who did you get the .40 from, the .40 caliber handgun from?

7    A    Tony.

8    Q    All right.  What did you do with that gun?

9    A    I sold it.

10   Q    Why did you do that?

11   A    Because I ain't want the gun no more.

12   Q    All right.  But you always carried a gun so you needed a

13   gun, right?

14   A    Yeah.

15   Q    You go get another one?

16   A    Yeah.

17   Q    All right.  What kind of gun did you get after that?

18   A     .357 Bulldog.

19   Q    Pardon me?

20   A     .357 Bulldog.

21   Q    All right.  How long did you have that gun for?

22   A    Until I got locked up.

23   Q    Did you ever have any occasion to have to use these guns?

24   A    Yeah.

25   Q    How many times is that?

1    A    I don't even know.

2    Q    Give us an estimate.

3    A    Probably about five times.

4    Q    Kill anyone?

5    A    No.

6    Q    What did you do with them?  Why did you need them, then?

7    A    I shot at somebody.

8    Q    Five different times?

9    A    Yeah.

10   Q    Why did you do that?

11   A    Because I was beefing.

12   Q    You beef with people, you kill them, try to kill them?

13   A    Yeah.

14   Q    So if you got a beef with somebody, you're the type of

15   person who's going to try to exact some revenge, right?

16   A    Exact.

17   Q    And you got a beef with Mr. Harris, right?

18   A    Yeah.

19   Q    Is that what you're doing here today, getting your revenge?

20   A    No.

21   Q    No?  You're here to be truthful, right?

22   A    Exactly.

23   Q    Like you were with the grand jury?

24        MR. HARDING:  Objection.

25        THE COURT:  Overruled.  You may answer.

1    Q     No further questions.

2    A     No.

3    Q     Strike it, Your Honor.

4          THE COURT:  All right.  Would you like some water, Mr.

5    Hayes?

6          THE WITNESS:  I'm cool.

7          CROSS EXAMINATION

8    BY MR. MARTIN:

9    Q     Mr. Hayes, good afternoon.

10   A     Good afternoon.

11   Q     You just got out of prison when?

12   A     Two months ago.

13   Q     Okay.  And you had been in since, for three and a half

14   years, right?

15   A     Yes.

16   Q     And while you were locked up in the Baltimore County

17   Department of Corrections as part of that prison sentence, is

18   that right?

19   A     What you say, sir?

20   Q     Were you in the Baltimore County Department of Corrections,

21   at least in April of '05?

22   A     Yes.

23   Q     Okay.  And while you were there, did you beat up a cell

24   mate?

25   A     No.

1    Q    Did you ever get charged with beating up an inmate named

2    Brian Taylor?

3              MR. HARDING:  Objection.

4              THE WITNESS:  That wasn't in '05.

5              THE COURT:  Just a moment, Mr. Hayes.  The objection's

6    overruled.  You may answer yes or no, did you ever get charged?

7              THE WITNESS:  Yes.

8    BY MR. MARTIN:

9    Q    And what happened?

10   A    I went on lockup.

11   Q    You went on lockup?

12   A    Yeah.

13   Q    What does that mean?

14   A    Segregation.  Out of population.

15   Q    Okay.  Did you beat him up?

16   A    Yeah.

17   Q    You were fighting over a newspaper, weren't you?

18   A    Yeah.

19   Q    I'm going to try not to go over the things that you've been

20   over.  You've been here long enough.  But I want to ask you a

21   couple questions.  The gun that was kept in the ceiling at your

22   house --

23   A    Um-hum.

24   Q    -- inside this, was a drop ceiling, right?

25   A    Yes.

1   Q    The gun that was kept there, that's a gun that you've

2   testified was taken by Dwight?

3   A    Yes.

4   Q    And you never saw that gun again, did you?

5   A    Never.

6   Q    Never saw Dwight again, either, did you?

7   A    Never.

8   Q    Now, you -- I'm trying to think of a way to -- you testified

9   about the altercation, the fight that you had with Mr. Harris in

10  the lockup?

11  A    Right.

12  Q    And when you testified today, did you not, that he called

13  you a rat bitch?

14  A    Right.

15  Q    You testified in the grand jury that he had said, why you

16  snitching, correct?

17  A    Right.

18  Q    Okay.  And is that the last time until this trial that you

19  saw Mr. Harris?

20  A    Yes.

21  Q    Okay.  So you hadn't seen him until you walked in here

22  yesterday?

23  A    Correct.

24  Q    Okay.  And the time before the altercation, the fight in the

25  lockup, the last time you saw him before that was when you pulled

1   a gun on him --

2   A    No.

3   Q    -- in front of your aunt's house?

4   A    No.

5   Q    Okay.  When did you see him?

6   A    In Mondawmin.

7   Q    Okay.  You saw him in Mondawmin.  When was that?

8   A    Like, probably like a week before I got locked up in July,

9   '02.

10  Q    Okay.  A week before you got locked up in July of '02?

11  A    Yeah.

12  Q    All right.  So, and when was it that you pulled the gun on

13  him on the street when you were with your girlfriend and you

14  pulled up in front of your grandmother's house?

15  A    This had to be like in May of '02.

16  Q    Okay.  May of '02.  Okay.  So you pulled a gun on him in May

17  of '02.  You saw him briefly in Mondawmin Mall?

18  A    Yeah.

19  Q    And then the next time you saw him was in the lockup?

20  A    Right.

21  Q    Okay.  You never told, and you've been -- I apologize for

22  going over something you might have gone over before.  I just

23  want you to clarify it for me.

24       You never told the grand jury in 2004 that Mr. Mitchell

25  was in the drug business, did you?

1    A    No.

2    Q    And you didn't tell them that Shelton Harris was in the drug

3    business, did you?

4    A    No.

5    Q    You did tell them that you were in the drug business,

6    though, isn't that right?

7    A    Correct.

8    Q    When you testified yesterday about coming back to the house

9    on the night of the homicides --

10   A    Um-hum.

11   Q    -- you came back in the house and you went downstairs and

12   Mr. Harris was there and he was jittery, right?

13   A    Right.

14   Q    And he was, he was jittery but he was sitting there, he was

15   smoking marijuana, right?

16   A    Right.

17   Q    And he was playing Play Station?

18   A    Yes.

19   Q    And you sat down in the same room and you packaged up your

20   drugs?

21   A    Right.

22   Q    You didn't say a word to him?

23   A    Nothing.  Just asked him where Little Tony at.

24   Q    All right.  And one of the things you said was that you

25   didn't talk to him because you and he didn't have that kind of

1    relationship?

2    A    No.

3    Q    Is that, is that you, you said that yesterday, didn't you?

4    A    Correct.

5    Q    So he wasn't somebody you could talk to?

6    A    Not like hold no conversation with.  What's the score of the

7    basketball game or something like that.

8    Q    So you just sat there and did your thing while he sat there

9    and did his thing?

10    A    Correct.

11    Q    Now, you testified about Mr. Mitchell, Bo, having your 9

12    millimeter when he was locked up, right?

13    A    Right.

14    Q    And that you lost that gun and that was a weapon that you no

15    longer had because the police took it?

16    A    Right.

17    Q    And you testified yesterday, you said he needed it for

18    protection, right?

19    A    Yes.

20    Q    Now, when you testified in the grand jury about that

21    incident, you told them you were only guessing what he needed to

22    for, isn't that right?

23    A    Yes.

24    Q    And you were guessing yesterday, weren't you?

25    A    No.

1    Q    So did he tell you he needed it for protection?

2    A    No.  Just like I told the last attorney, I wasn't being

3    truthful in the grand jury.

4    Q    All right.  So you lied about it.  When you said you were

5    guessing, you lied about it?

6    A    Right.

7    Q    You had the perfect opportunity there to tell them what you

8    knew and you didn't, right?

9    A    Right.

10   Q    And you testified yesterday that this incident where you,

11   where Mr. Harris pulled a knife on you and you pulled a gun out

12   on him in front of your grandmother's house, right?

13   A    Correct.

14   Q    You testified that, that he wanted the gun to kill Claudus

15   Lassiter?  That's what you said yesterday, right?

16   A    Correct.

17   Q    You didn't tell the grand jury that, did you?

18   A    No.

19   Q    And Mr. Harris didn't tell you that, either, did he?

20   A    No.

21   Q    You just figured that out by yourself, right?

22   A    I seen it in the letter.

23   Q    You seen it in the letter.  Okay.  And this is the letter

24   that we don't know where it is, do we?

25   A    It's probably in the bay somewhere.

1   Q    It's probably where?

2   A    In the bay.

3   Q    In the bay.  Because you told your brother flush it down the

4   toilet?

5   A    Yes.

6   Q    And he did what you told him to do?

7   A    Right.

8   Q    And so if he flushed the letter down the toilet, then

9   Shelton Harris never got it, did he?

10  A    No.

11  Q    And when you testified in the grand jury, you -- strike

12  that.  Yesterday you said that Shelton Harris dealt drugs on

13  Woodland Avenue, correct?

14  A    Correct.

15  Q    And when you testified in the grand jury, you never said

16  that he was dealing those drugs with Bo, did you?

17  A    No.

18  Q    Now, you've testified here today that you know Wayne?

19  A    I know of him.

20  Q    You know of him.  And you know of Goo?

21  A    Yes.

22  Q    All right.  Did you ever see Wayne and Goo?

23  A    Yeah.  Me and Goo used to mess with two of the same chicks.

24  Q    You and Goo?

25  A    Exactly.

1    Q    So you know Goo?

2    A    I don't know him.  I know of him.

3    Q    Okay.  And you testified yesterday, did you not, that you

4    saw Wayne and Goo with Bo in front of your grandmother's house?

5    A    No.  In front of my sister mother house.

6    Q    Your sister's house on Dupont?

7    A    Yeah.

8    Q    I'm sorry.  And you saw him with Bo one time?

9    A    One time.

10   Q    And when was that?

11   A    Probably like March or something, or February.  March of

12   2002.

13   Q    Shelton Harris wasn't with him, was he?

14   A    No.

15   Q    And clear this up for me.  Did you say today that at one

16   point in your life you thought Bo was cool?

17   A    Yeah.

18   Q    But you don't any more, do you?

19   A    Can't be cool now.

20   Q    Okay.  But at one point you liked him?

21   A    Yeah.

22   Q    But you never liked Shelton Harris?

23   A    I wouldn't say never.

24   Q    You wouldn't say never?

25   A    No.  I don't like him because he spit on my sister.

1   Q    He spit on your sister.  And that was before March or

2   February of '02, wasn't it?

3   A    Right.

4   Q    Okay.

5   A    It was around that time.

6   Q    Now, tell me what clubs that the rap group performed at.

7   A    The Five Seasons.

8   Q    Did you go there?

9   A    No.

10  Q    So you only know that because somebody told you that?

11  A    I heard it on the radio.

12  Q    So you heard the live performance on the radio?

13  A    Not the live.  Where they was going to be at.

14  Q    You heard on the radio that they were going to be there?

15  A    Yes.

16  Q    Did you hear that on 88.9?

17  A    Yes, sir.

18  Q    Okay.  And that's a radio station that you listen to late in

19  the evening, like after one a.m.?

20  A    Yes.

21  Q    And that's when you heard it, after one a.m.?

22  A    Yes.

23  Q    You ever listen to it any other time?

24  A    No.

25  Q    Now, was Shelton Harris selling drugs on Woodland Avenue

1    right before you went to the Hickey School?

2    A    I ain't sure.

3    Q    And your information that you testified to yesterday about

4    what happened in Hammerjacks, that all comes from some other

5    person telling you that?  You weren't there, right?

6    A    No.

7    Q    Yesterday you said that you saw, the last time you saw your

8    .38 was when Mr. Harris and TM and someone else were playing with

9    it in the basement?

10    A    Right.

11    Q    Who's that someone else?

12    A    Dwight.

13    Q    Dwight?

14    A    Yes.

15    Q    Dwight is the one who took the gun?

16    A    Exactly.

17    Q    Okay.  Now, at the time of the altercation in the lockup,

18    fight in the lockup that you and Mr. Harris had, up to that point

19    in time the only thing you had said to the federal grand jury or

20    Mr. Harding or anyone about Mr. Harris was that you saw him that

21    night and he looked jittery?

22    A    Correct.

23    Q    Hadn't said anything else about him, right?

24    A    Nothing.

25    Q    Okay.  That's all I have, Your Honor.  Thank you.

1          CROSS EXAMINATION

2     BY MR. CROWE:

3     Q    Good afternoon, Mr. Hayes.  My name is Tom Crowe and I

4     represent Shelly Martin.  Now, my understanding is that you came

5     home from prison to 2913 Edgecombe, is that right?

6     A    When?

7     Q    Pardon?

8     A    When?

9     Q    That was going to be my next question for you.  When did

10    you, when did you come home from prison to 2913 Edgecombe?

11    A    2001.

12    Q    And when was that in 2001?

13    A    December the 10th.

14    Q    And you've also testified that Mr. Mitchell and Shelton

15    Harris start hanging out at your sister's house, is that right?

16    A    Correct.

17    Q    They weren't hanging out there because they knew your

18    sister, were they?

19    A    As time went on.

20    Q    Okay.  But originally, I would, I mean, did they originally

21    know you?

22    A    No.

23    Q    Pardon?

24    A    No.

25    Q    I thought you said that you'd known Shelton Harris since you

1    were children?

2    A    Yeah, I did.  But they wasn't hanging down there because

3    they knew me.

4    Q    Were they hanging out there because they knew your brother

5    or half brother, Mark Herbert, who goes by the name of Tony

6    Montana?

7    A    Correct.

8    Q    And when you first came home, did you understand that they

9    already had a relationship with Tony Montana?

10   A    Yes.

11   Q    And that's because they were in the rap business together,

12   is that correct?

13   A    Correct.

14   Q    And did you, in fact, see them there quite frequently after

15   you came home on December 10 of 2001?

16   A    Yes.

17   Q    Did you see them there quite frequently up until whatever

18   time it was that Mr. Mitchell got arrested?

19   A    Yes.

20   Q    When we're talking about frequently, are we talking about

21   virtually every day?

22   A    Yeah.  Probably about.

23   Q    They would spend hours in the house there, is that correct?

24   A    Correct.

25   Q    Now, have you ever actually met Mr. Martin?

CROSS EXAMINATION OF HAYES BY CROWE                103

1    A    No, never.

2    Q    Never met him.  You just sort of know of him, is that

3    correct?

4    A    Correct.

5    Q    And am I, is it also correct that during this period of

6    time, from December of 2001 until whenever it was that Mr.

7    Mitchell got locked up, you only saw Mr. Martin one time?

8    A    One time.

9    Q    And that was not with Mr. Harris, was it?

10   A    No.

11   Q    It was with Mr. Mitchell and with Mr. Gardner, is that

12   correct?

13   A    Correct.

14   Q    And you saw them, I think you said, just hanging out in

15   front of your grandmother's house in the neighborhood?

16   A    No, not my grandmother.

17   Q    Okay.  Who's house was it?  I'm sorry.

18   A    My sister mother house.

19   Q    Your sister's mother's house.  Okay.  Now, you've been

20   played portions of a CD today.  And on that you've identified

21   some voices, is that correct?

22   A    Correct.

23   Q    Did you ever listen to all of the songs on that CD, whether

24   with Mr. Harding or maybe sometime on your own?

25   A    Yes.

1    Q    How many tracks are there on that?

2    A    I don't even know.  It's different CD's.  They just pull

3    them off the CD's and made a CD.  So I couldn't even tell you.

4    Q    Okay.  If you listened to the whole thing from beginning to

5    end, about how many hours would it be?

6    A    It would be a while because you have to keep stopping and

7    going back, stuff like that.

8    Q    Why -- you're going to have to educate me.  Why would you

9    have to keep stopping and going back?

10   A    Because I have to point stuff out and things like that, so.

11   Q    No.  What I'm asking you is if you just sat down and

12   listened to it straight through.

13   A    Probably about an hour and a half.  About 70 minutes or so.

14   Q    Okay.  My question wasn't very clear.  Now, Mr. Harding

15   showed you yesterday a 9 millimeter pistol, is that right?

16   A    Correct.

17   Q    And he told you that that was a weapon that had been taken

18   from Mr. Mitchell when he was arrested?

19   A    Correct.

20   Q    And you don't know that to be true, do you?  You just

21   accepted it because Mr. Harding told you that?

22   A    I know it's true because I had the gun in my possession

23   before.

24   Q    Okay.  Well, that's -- but you didn't know that it had been

25   seized from Mr. Mitchell when he was arrested?

1   A    Yes, I did.

2   Q    You did?  Okay.  And how did you know that before Mr.

3   Harding told you?

4   A    Because I was, when Tony got the information Bo got locked

5   up with the gun, I was right there.

6   Q    Okay.  And indeed, you identified that 9 millimeter pistol

7   as one that you had, that you and Tony Montana had and that you'd

8   handled and that you'd used, is that right?

9   A    I never said I used that gun.

10  Q    You had it and you handled it?

11  A    Yeah.

12  Q    Okay.  And do I understand that you were saying that you got

13  that gun maybe about, you're now saying about a week after the

14  Wyche brothers murder?

15  A    That I got it?

16  Q    That Mr. Montana got it.

17  A    No.  I didn't say that.

18  Q    Okay.  When do you understand that the nine, that Mr.

19  Montana, according to him, gave the 9 millimeter to Mr. Mitchell?

20  A    Yeah.  About a week or so after the Wyche brothers.  You

21  didn't say that the first time.

22  Q    And the exchange for that was a .40, is that correct?

23  A    No.  There wasn't no exchange.

24  Q    Okay.  How, how did the gun that you described as the dirty

25  .40 come into your possession?

1  A    Because Mr. Mitchell asked Tony can he hold the gun for him.

2  Q    Okay.  And do you know when he asked Tony to hold the gun

3  for him?

4  A    Not sure.

5  Q    You're not sure?

6  A    No.

7  Q    And that, as I understand, do you know when it would have

8  been with respect to either the McCaffity/Brown homicides or the

9  Wyche brothers homicides?

10 A    I can't understand what you're saying.

11 Q    Pardon?

12 A    I ain't understanding what you're saying.

13 Q    Do you know whether it was before or after either the,

14 either the McCaffity/Brown homicide?

15 A    I can't really put my finger on it.

16 Q    And you can't put, you can't date it, the exchange in terms

17 of --

18 A    I don't know the dates to them.

19 Q    Okay.  That's fair enough.  Now, Mr. Montana told you that

20 this, that Mr. Mitchell was concerned about this .40 caliber

21 weapon because it had some work on it, is that correct?

22 A    Correct.

23 Q    And you understood that to, your understanding was that that

24 had been involved in a crime?

25 A    Correct.

1    Q    And your suspicion was that, you said that you thought it

2    was involved in a murder, is that correct?

3    A    Correct.

4    Q    How long did you and Mr. Montana have this, this .40 caliber

5    weapon?

6    A    Before I even got it.  Probably about like two months or so.

7    Q    Pardon?

8    A    About two months before I even got it.

9    Q    Okay.  And was this the .40 caliber weapon that -- my

10   question was, how long did, when, when did you give up possession

11   of it?

12   A    Did I?

13   Q    Yeah.

14   A    When I gave up possession of it?  I sold that gun in like

15   June.

16   Q    This would be June of 2002?

17   A    Yes.

18   Q    And this is the weapon that you sold to this guy by the name

19   of Josh, is that correct?

20   A    Correct.

21   Q    Okay.  But in terms of when the .40 came into your

22   possession, whether it was before or after the McCaffity/Brown

23   murders or whether --

24   A    After.

25   Q    Pardon?

1    A    After.

2    Q    It was after, the .40 came into Montana's possession after

3    the McCaffity/Brown murders?

4    A    I don't know when it came in his possession.  I'm talking

5    about mine.

6    Q    When did it come into your possession?

7    A    After.

8    Q    And was that before or after the Wyche brothers?

9    A    Both.

10   Q    Pardon?

11   A    After both.

12   Q    After both of them?

13   A    Yes.

14   Q    And why do you know that it came into your possession after

15   the Wyche brothers murders?

16   A    Because I got the gun sometime in March or April, if I ain't

17   mistaken.

18   Q    Okay.  Okay.  Thank you very much.

19           CROSS EXAMINATION

20   BY MR. COBURN:

21   Q    Good afternoon, Mr. Hayes.

22   A    Good afternoon.

23   Q    So if I understand you correctly, you told Mr. Lawlor, he's

24   the gentleman sitting over there, that you lied when you

25   testified in the grand jury, is that right?

1    A    Yes.

2    Q    Now, when you testified in the grand jury and lied to the

3    grand jurors, before you testified you put up your right hand and

4    you swore the same oath that you swore in this courtroom when you

5    first started testifying yesterday, right?

6    A    Correct.

7    Q    And in that oath you swore that you would tell the truth,

8    the whole truth, and nothing but the truth, right?

9    A    Correct.

10   Q    And you violated that oath, the same oath that you swore in

11   this courtroom, when you testified in the grand jury, right?

12   A    Right.

13   Q    And you knew you were violating it at the time, right?

14   A    Correct.

15   Q    And you violated it because you thought it was in your

16   interest to lie, right?

17   A    I ain't want to be considered a snitch.

18   Q    Okay.  You didn't want to be considered a snitch and so you

19   intentionally lied to the grand jury and violated your oath to

20   tell the truth, right?

21   A    Right.

22   Q    Now, you understood that that was a felony, right?

23   A    Correct.

24   Q    That's called perjury, correct?

25   A    Correct.

110

1    Q    You testified two times in the grand jury, is that right?

2    A    Right.

3    Q    And just so we sort of kind of fill in the picture here a

4    little bit.  Even though you swear the same oath when you testify

5    in the grand jury, when you're in the grand jury room it's not an

6    open courtroom like this one, right?

7    A    Correct.

8    Q    There's no audience section like the big audience section

9    right behind me, correct?

10   A    No.

11   Q    It's your understanding that grand jury proceedings, at

12   least when they're ongoing, are secret, right?

13   A    Correct.

14   Q    The only people in the grand jury are the grand jurors,

15   twenty-something of them, something like that, right?

16   A    Correct.

17   Q    You, right?

18   A    Right.

19   Q    A court reporter, right?

20   A    Right.

21   Q    And the prosecutor or prosecutors, right?

22   A    Right.

23   Q    There's no judge present in the grand jury room?

24   A    I can't, I think it is a magistrate in there.

25   Q    You think there's a magistrate in the grand jury?

1    A    Yes.

2    Q    There's no defendants in the grand jury, right?

3    A    No.

4    Q    And there's no defense lawyers, right?

5    A    Right.

6    Q    Now, when you testified in the grand jury, you're not under

7    any time pressure, right?

8    A    Right.

9    Q    The government, the prosecutors, are just asking you

10   questions and you're answering them, right?

11   A    Yes.

12   Q    And then the prosecutors sometimes make it possible for the

13   grand jurors to put questions to you directly, right?

14   A    Right.

15   Q    And they ask the grand jurors whether they had any questions

16   both times you were in the grand jury, right?

17   A    Right.

18   Q    Okay.  You told Mr. Harding, did you not, that when you

19   testified in the grand jury the first time you were not, I think

20   you said you were not even cooperating then, right?

21   A    Right.

22   Q    And that means that you had not signed the cooperation plea

23   agreement that was based on what could have been your federal

24   charge, right?

25   A    Right.

1   Q    That's the document that you're looking at right there on

2   the screen.  That's the plea agreement, right?

3   A    Right.

4   Q    And that's dated July 20th, 2005?

5   A    Right.

6   Q    And the first time you testified in the grand jury was more

7   than a year before that, right?

8   A    Yes.

9   Q    It was in February, February 4th, 2004, correct?

10  A    Correct.

11  Q    But the fact of the matter is, when you were in the grand

12  jury on that occasion, you were locked up, right?

13  A    Right.

14  Q    You were locked up for possession of marijuana, is that

15  right?

16  A    The second time or the first time?

17  Q    The first time.

18  A    Yes.

19  Q    And you still had about seven months to serve on your

20  sentence, is that right?

21  A    No.  About three.

22  Q    About three?

23  A    Yeah.

24  Q    Okay.  Well, it may not be that big a point.  But we're

25  talking about testimony on February 4th, 2004, correct?

1    A    Correct.

2    Q    Referring to Page 4, Line 6.  I'll just put this, unless

3    there's any objection, put this on the presenter and ask you

4    whether you were asked the following questions and gave the

5    following answers?  Starting, it's Page 4 of the first

6    transcript, Line 6.  Actually, we can, we could start on Line

7    Two.

8         Question:  Okay.  Now you said you were locked up.  Can

9    you tell the ladies and gentlemen of the grand jury what you're

10   locked up for?  Answer:  Possession of marijuana.

11        Question: Okay.  And how much more time have you got to

12   serve on your sentence?  Answer:  Seven months.

13   A    That's the whole sentence.

14   Q    Okay.  Well, I just asked you how much more time you had to

15   serve on your sentence, right?

16   A    Three months with good behavior.

17   Q    With good behavior.  Okay.  It's correct, is it not, despite

18   the fact that you had not yet signed your cooperation agreement,

19   that came a little more than a year later, that the prosecutor

20   specifically --

21        (Phone ringing.)

22        MR. HARDING:  Sorry, Your Honor.

23   Q    Could happen to anybody.  That the prosecutor specifically

24   told you that he would call your probation officer, and I'm

25   talking about the first time you testified in the grand jury,

1    that he would call your probation officer and see if there was

2    any way your cooperation with us, meaning with the government,

3    could be taken into consideration in helping you with your

4    current status as a prisoner.  Did he say that to you?

5    A    Yes.

6    Q    So then he said he was going to do that because you were in

7    there testifying in the grand jury, right?

8    A    Right.

9    Q    Okay.  Forgive me, Your Honor.  I lost one piece of paper.

10   Can I go back and just check for it?

11          THE COURT:  Certainly.  Of course.

12   Q    You told Mr. Harding, did you not, in response to a question

13   that he asked you on direct examination, that you didn't get any

14   benefit from the fact that he made that call, right?

15   A    Right.

16   Q    But as far as you know, he made it, right?

17   A    I don't know if he did or not.

18   Q    You weren't there.  But he told you he was going to make it?

19   A    Correct.

20   Q    You don't know that he didn't make it, right?

21   A    Right.

22   Q    And you already told us, I believe in response to one of Mr.

23   Lawlor's questions, that you were released despite the fact that

24   you violated probation, right?

25   A    Right.

1   Q    And then sometime after your release, looks like about a

2   year later, you got arrested again, right?

3   A    Right.

4   Q    And this time you were arrested for an ammunition charge, do

5   I understand correctly?

6   A    Right.

7   Q    And this is in 2005, right?

8   A    Correct.

9   Q    When were you arrested on the ammunition charge in 2005?

10  A    June the 10th.

11  Q    Pardon?

12  A    June the 10th.  I was originally arrested October the 26th,

13  2004.

14  Q    You described that for us, right?  There was a state arrest?

15  A    Right.

16  Q    Do I understand correctly?

17  A    I had three charges altogether.

18  Q    And you beat that, I think you said?

19  A    I beat.  They closed my parole, they nol processed the

20  discharging a firearm.  I was released from Towson.  Two weeks

21  after I was released, the federal government put a federal

22  detainer out on me.

23  Q    And the federal detainer that the federal government put on

24  you two weeks after you were released, that was for the same

25  ammunition that you had originally been arrested for by the state

1    authorities, right?

2    A    Right.  The state couldn't charge me with carrying

3    ammunition.

4    Q    I see.  Okay.  So in June of 2005, you had been arrested

5    federally for possession of the ammunition, right?

6    A    Right.

7    Q    And then after that arrest, you testified again in the grand

8    jury, right?

9    A    Correct.

10   Q    That was on July 12th, 2005, right?

11   A    Right.

12   Q    Now, when you testified the second time in the grand jury,

13   you lied again, right?

14   A    Right.

15   Q    So you lied in violation of your oath both times when you

16   testified in the grand jury?

17   A    Correct.

18   Q    Okay.  And when you lied the second time when you testified

19   in the grand jury on July 12th of 2005, that was after you were

20   arrested by federal authorities for the ammunition, right?

21   A    Right.

22   Q    Because you told us that happened in June, a month earlier,

23   in 2005, correct?

24   A    Correct.

25   Q    So you knew you had that charge when you testified the

1    second time in the grand jury, correct?

2    A    Yes.

3    Q    Had there been any meetings between you or your lawyer and

4    the federal authorities before you came into the grand jury and

5    testified the second time?  Any proffer sessions, proffer letter,

6    anything like that?

7    A    Yeah.  I think, I think we did have a meeting.

8    Q    You think you did?

9    A    Yeah.

10   Q    Okay.  And then you went, after that meeting with the

11   federal authorities, that would have been, included at least one

12   of the prosecutors here to my left, is that right?

13   A    Yes.

14   Q    You went into the grand jury and you lied again, right?

15   A    Right.

16   Q    So then after you lied the second time in the grand jury on

17   July 12th of 2005, if I understand you correctly, you signed a

18   plea agreement with the government, correct?

19   A    I ain't signed a plea agreement until September, 2005.

20   Q    Let's see.

21   A    September the 27th.

22   Q    Okay.  The plea agreement, though, is dated July 20th of

23   2005, correct?

24   A    Correct.

25   Q    And it's on U.S. Attorney's office stationery, right?

1   A    Right.

2   Q    And we're going to be talking a little bit about what it

3   says.  But at the very end there, on the first page of signatures

4   there's a signature of what appears to be Robert R. Harding,

5   right?

6   A    Right.

7   Q    And under there, there's another signature, right?

8   A    Yes.

9   Q    And that's Dean Stocksdale, right?

10  A    Yes.

11  Q    He's a state prosecutor, right?

12  A    Right.

13  Q    Do you know him?

14  A    I seen him.  I don't know him.

15  Q    And next to his signature it says 9/27, that would be

16  September 27th, '05, right?

17  A    Right.

18  Q    And then on the next page there are some more signatures,

19  correct?

20  A    Correct.

21  Q    There's your signature, September 27th, '05?

22  A    Right.

23  Q    And then there's your lawyer, Alan Bussard's, signature,

24  same date, right?

25  A    Right.

1    Q    So then if I understand correctly, then, the date that this

2    letter was sent by the federal prosecutors to your lawyer, Alan

3    Bussard, I mean at least it's dated July 20th, 2005, right?

4    A    Right.

5    Q    That they made you this offer, right?

6    A    Right.

7    Q    Which you accepted a few months later in September of '05,

8    right?

9    A    Correct.

10   Q    And the date that the federal prosecutors made you this

11   offer, offered you this cooperation agreement was eight days

12   after you had knowingly lied under oath to a federal grand jury

13   for the second time, correct?

14   A    Correct.

15   Q    So then is it your testimony that in between those two

16   things, during that eight day period between July 2nd, when you

17   perjured yourself before the federal grand jury the second time,

18   and July 20th, when the federal prosecutors offered you the

19   benefits of this cooperation agreement, did you tell the federal

20   prosecutors that you had already committed perjury twice before

21   their grand jury when they had been asking you questions?

22   A    Yes, I did.

23   Q    You did tell them, during those eight days?

24   A    Yes.

25   Q    Would that have been at one of those proffer sessions that

1    you mentioned?

2    A    Yeah.

3    Q    Do you know if we have any record of any of those?  Is there

4    any written record that you're way aware of?

5    A    No, I don't know.

6    Q    Were you asked any questions about it during the course of

7    your direct examination that you can recall?

8    A    Questions about what?

9    Q    About the proffer session at which you told them that you

10   had perjured yourself twice when they had been asking you

11   questions before a federal grand jury?

12   A    Yeah.  Yeah, I told Mr. Harding.

13   Q    But my question is, do you know if there's any written

14   record of that?

15   A    I don't know.

16   Q    Okay.  Now, in this agreement, this cooperation agreement,

17   Page Two, it says, Subparagraph C, your client shall testify

18   fully and truthfully before grand juries and at all trials of

19   cases at which his testimony may be relevant.  Do you see that?

20   A    Yes.

21   Q    Now, when you agreed to this language, did you find that

22   like sort of in any way sort of amusing?  I mean, given that you

23   had already committed perjury twice?

24            MR. HARDING:  Objection.

25   Q    I withdraw that question.

1          THE COURT:  Sustained.

2     Q    Let me direct your attention now to the subparagraph

3     underneath Stipulation.  Now, this is where it talks about the

4     offense that you're working off, right?

5     A    Yeah.

6     Q    Says on October 26th, 2004, you got arrested on Tulsa Road

7     in Baltimore County and you had five 9 millimeter bullets in your

8     pants pocket, right?

9     A    Right.

10    Q    So those bullets were for a 9 millimeter semiautomatic

11    handgun, right?

12    A    Right.

13    Q    Would they have been for a Beretta or a Ruger?

14    A    No.

15    Q    Neither?

16    A    Neither.

17    Q    Neither one?  Okay.  Then it says right under there, in

18    Subparagraph B, does it not, in consideration of the plea your

19    client is entering in state court and in the event that your

20    client provides substantial assistance in the investigation or

21    prosecution of others who have committed an offense, the

22    government agrees not to prosecute him in federal court for

23    violations of federal criminal laws related to the above

24    stipulated facts relating to the events of October 26th, '04.

25    And it says they'll move expeditiously to dismiss the indictment

1    now pending against you, right?

2    A    Right.

3    Q    Do you understand, then, sir, that certain offenses can be

4    prosecuted either, or certain parts of certain offenses can be

5    prosecuted either in state or federal court?

6    A    Yes.

7    Q    One of the things which you've indicated that you had --

8    actually, strike that.  One of the questions generally about

9    grand juries, it's correct, is it not, that, is it your

10   understanding that if you say something wrong or you forget to

11   say something important, that you can always come back before the

12   grand jury and correct your testimony?

13   A    I was supposed to go back but I never went back.

14   Q    You were supposed to go back but you never went back.  I

15   mean, it's a fact, is it not, that Mr. Harding, when you

16   testified the first time before the grand jury, specifically told

17   you this, right?

18   A    After the second time.  Majority the second time when I was

19   at the grand jury, it was basically about the incident that

20   happened in lockup in here.

21   Q    Okay.  Did you ever go back in front of the grand jury?

22   A    Never.

23   Q    And correct the lies that you had told them?

24   A    Never.  I was supposed to but I never was subpoenaed to go

25   back in front of the grand jury.

1    Q    You never were subpoenaed to go back in front of the grand

2    jury?

3    A    Never.

4    Q    I see.

5         THE COURT:  How much more do you think you have, Mr.

6    Coburn?

7         MR. COBURN:  I've got a bit, Your Honor.  I would be

8    happy to break if the Court wanted to.

9         THE WITNESS:  I got --

10        MR. HARDING:  Your Honor, the witness.

11        THE COURT:  I really would like to finish this witness

12   before we break for lunch.  I realize we're already well into the

13   lunch hour.  Can you try to conclude it?

14        MR. COBURN:  Sure.  Happy to, Your Honor.  Is it okay

15   if I just take, say, five or ten more minutes, if possible?

16        THE COURT:  We'll, we've got redirect and there may be

17   some recross.  So I would ask you to just move through it as well

18   as you can.

19   BY MR. COBURN:

20   Q    Okay.  I certainly will, Your Honor.  You testified before

21   the grand jury the first time about what you told them was a 9

22   millimeter Beretta pistol?

23   A    Correct.

24   Q    Correct?

25   A    Yes.

1    Q    And that was a lie, right?

2    A    Yes.

3    Q    It was, in fact, a 9 millimeter Ruger, right?

4    A    .40 cal Ruger.

5    Q    .40 caliber Ruger.  And it was yours, right?

6    A    It end up being mine.

7    Q    It ended up being yours?

8    A    Correct.

9    Q    Okay.  You got the gun off the streets, is that right?

10   A    What gun?

11   Q    The one we were just talking about, the 9 millimeter Ruger.

12   A    No, I didn't.

13   Q    Did you tell the grand jury you got it off the streets?  Did

14   you tell the grand jury you got the Beretta off the streets?

15        MR. HARDING:  Correction, Your Honor.  It was a .40

16   caliber Ruger.

17   Q    Okay.  Is it a fact that you told the grand jury --

18   A    Yes.

19   Q    -- with respect to the 9 millimeter Beretta, you got it off

20   the streets?

21   A    Correct.

22   Q    And that was a lie, right?

23   A    Yes.

24   Q    All right.  Now, let me just ask you a few questions, and I

25   can do this very quickly, Your Honor.

Case 1:04-cr-00029-RDB   Document 691   Filed 06/12/09   Page 125 of 278

1        THE COURT:  All right.

2    Q    A few questions about the transcripts, the particular tapes

3    that we listened to when Mr. Harding was asking you questions.

4    A    Sure.

5    Q    In the first one, this is at Tab Three -- and with the

6    Court's permission, can I display these excerpts?

7        THE COURT:  Sure.

8    Q    I appreciate it very much, Your Honor.  The title is Pure

9    Shit, right?

10   A    Correct.

11   Q    Labeled Track 11, correct?

12   A    Correct.

13   Q    All right.  And it says, you're now tuned in to Hard Roc.

14   That's a nickname for Mr. Harris, right?

15   A    Correct.

16   Q    TM, right?

17   A    Right.

18   Q    That's the person you call your brother, right?

19   A    Correct.

20   Q    Tony Montana.  Also Mr. Herbert, correct?

21   A    Correct.

22   Q    And Slo, right?

23   A    Right.

24   Q    Where does it mention Goo there?

25   A    It doesn't.

1    Q    Okay.  Do you remember a couple of references in these

2    transcripts to somebody named Cesar?

3    A    Yes.

4    Q    On Page Five of the transcript, same one, Tab Three, you

5    talk about --

6    A    I talk about?

7    Q    I'm sorry.  You testified about.  See where it says the

8    youngest soldier of the shake down militant shit?

9    A    Correct.

10   Q    And refers to you need an army, a K, and two fucking clips?

11   A    Correct.

12   Q    And here you're talking about the youngest soldier, you're

13   talking about TM, is that right?

14   A    Right.

15            MR. HARDING:  Objection to "you're talking about."

16   Q    You told, you told this jury, in response to Mr. Harding's

17   questions, that that referred to TM, is that right?

18   A    Correct.

19   Q    Okay.  Turning to Tab Five, Page Three.  See the reference

20   in this song, second line down, to put the Ruger to you nozzle?

21   See that?

22   A    Yeah.

23   Q    There are actually a couple of references to a Ruger in

24   these songs, right?

25   A    Right.

1    Q    This is another one where the word "Ruge" is used.  And you

2    told Mr. Harding that that referred to a Ruger, right?

3    A    Right.

4    Q    Okay.  See the reference here to same shit with Hard Roc,

5    B-O, and Slo?

6    A    Yeah.

7    Q    Where's the reference to Goo there?  Is there one?

8    A    None.

9    Q    Let's look now very quickly at Tab Six.  Actually, just

10   before we leave Tab Five.  Here's the reference to the Ruge on

11   the last page, right?

12   A    Right.

13   Q    Where it says, nigga say he seen the Ruge?

14   A    Right.

15   Q    Tab Six.  See the reference to, it's just me, Weaze and Bo

16   back to back?

17   A    Right.

18   Q    Where's the reference to Goo there?

19   A    It's none.

20   Q    Finally, Track Seven.  Do you see there's references, Page

21   One, to what's called Little Weaze?  See that right there?

22   A    Yeah.

23   Q    And then there's one to Cese, right?

24   A    Right.

25   Q    Where's the reference to Goo there?  Is there one?

1    A    None.

2    Q    In fact, there's no reference to Goo anywhere in any of

3    these transcripts that you, or songs that you testified about, is

4    there?

5    A    Correct.

6    Q    Thank you.  Nothing further.

7             MR. KURLAND:  Court's indulgence.

8             THE COURT:  Redirect.  Go ahead, Mr. Harding.

9             REDIRECT EXAMINATION

10   BY MR. HARDING:

11   Q    Thank you, Your Honor.  Mr. Hayes, let me ask you, first of

12   all, about your first grand jury testimony because both Mr.

13   Lawlor and Mr. Martin asked you about whether you had discussed

14   the drug dealing of Mr. Harris and Mr. Mitchell in your first

15   grand jury testimony back in 2004.  I want to call your attention

16   to Page 26 of the transcript that is now on the screen.

17            Do you see where I asked you, okay.  Now, also, were

18   you aware of Shelton dealing drugs in the area of Woodland and

19   Lucille Avenues, also?  Do you see with what your answer is?

20   A    Yes, sir.

21   Q    And then I asked you if you worked with Shelton and you said

22   no, is that correct?

23   A    Correct.

24   Q    And Mr. Lawlor, I believe it was, showed you Page 20 where

25   you said, I asked you if TM was in the drug business with Shelton

1    and Bo and you said, I suspect he could be.  And you testified

2    just now on cross that that was misleading because you really

3    knew they were in the drug business, is that correct?

4    A    Correct.

5    Q    On the other hand, you didn't say in the grand jury that Bo

6    and Shelton were not in the drug business, did you?

7    A    No.

8    Q    In fact, you were never asked about Bo's drug business in

9    the grand jury, were you, Mr. Hayes?

10   A    Never.

11   Q    And Mr. Martin called your attention to your second grand

12   jury transcript and asked you if I had asked you in the grand

13   jury if you knew why Shelton Harris wanted that gun that he came

14   up to you on Woodland Avenue and requested from you that day when

15   you didn't want to give it to him.  Do you remember that?

16   A    Yes.

17   Q    And then he said that you said in the grand jury that you

18   guessed it was because he wanted to use it on Claudus Lassiter,

19   or words to that effect, correct?

20   A    Correct.

21   Q    But actually, I want to call your attention to Page Seven of

22   that transcript because the question I asked wasn't exactly, did

23   you know why Shelton wanted that gun, Mr. Hayes?  Isn't it true

24   that the question was, did Shelton say why he wanted a gun?  Do

25   you see that?

1    A    Yes.

2    Q    And your answer was not exactly that you guessed it was

3    because he wanted to do something with it.  Isn't it true that

4    your answer was, no, he never said why he wanted a gun.  Isn't

5    that correct, Mr. Hayes?

6    A    Correct.

7    Q    Isn't it a correct, Mr. Hayes, that this statement you made

8    in your original grand jury about --

9              MR. LAWLOR:  Your Honor, Mr. Harding not lead, please.

10             THE COURT:  Don't lead the witness.

11   Q    You told us already on direct about the 9 millimeter

12   Beretta, Mr. Hayes?

13   A    Yes.

14   Q    That you said you got off the street and, in fact, it was a

15   .40 caliber Ruger?

16   A    Yes.

17   Q    Is that correct?  And you just told us a little while ago

18   that you were misleading when you said that TM was working with

19   Shelton and Bo because you, in fact, knew he was working with Bo,

20   is that correct?

21   A    Correct.

22   Q    Isn't it true that in both your grand jury testimonies, Mr.

23   Hayes, those are the only misrepresentations in your whole

24   testimony?

25   A    Correct.

REDIRECT EXAMINATION OF HAYES                                    131

1    Q    And in fact, when you testified for the very first time in

2    2004, before you had any kind of agreement with the United

3    States, when you were just subpoenaed cold and without an

4    attorney to come into the grand jury, isn't it true that you

5    advised the grand jurors all about how you had met Bo through TM,

6    Tony, and that you and he and Shelton Harris used to smoke weed

7    together?  I'm now on Page Eight of your grand jury transcript.

8    Do you see that?

9    A    Yes.

10   Q    And you told the grand jurors all about the rap music

11   business that Bo had and how you had purchased 2 CD's?

12   A    Correct.

13   Q    And you told all about how Bo and Shelton had --

14              MR. LAWLOR:  Your Honor, not be displayed, please.

15              THE COURT:  Overruled.

16   Q    Do you recall defense counsel frequently putting your grand

17   jury transcript on the screen in front of you, Mr. Hayes?

18              MR. LAWLOR:  Your Honor, I object.

19              THE COURT:  Overruled.

20   Q    You told the grand jurors all about how you got to know, how

21   Shelton and Bo got to know each other at the Hickey School.  Do

22   you remember telling all about that?

23   A    Yes.

24   Q    To the grand jury?

25   A    Yes.

Case 1:04-cr-00029-RDB   Document 691   Filed 06/12/09   Page 132 of 278

1          MR. LAWLOR:  Objection, Your Honor.

2          THE COURT:  Overruled.

3    Q    You talked more about the rap music business that they had

4    together?

5    A    Correct.

6    Q    And do you remember that I called your attention to the

7    early part of 2002 and asked you about whether you had a .38

8    caliber revolver at that time, and you said, yes, I did?

9    A    Yes.

10   Q    And did you talk about how it was kept in the ceiling at

11   Edgecombe Circle, your sister's house?

12   A    Yes.

13   Q    And you explained that you needed it for protection for the

14   drug business?

15   A    Yes.

16   Q    And that you were selling crack cocaine on Woodland Avenue?

17   A    Correct.

18   Q    And then did I ask you about the time when the .38 caliber

19   went missing from the place where you had concealed it in your

20   sister's house?

21   A    Yes.

22   Q    And did you explain that you asked your brother, meaning

23   Tony, where it was?

24   A    Yes.

25   Q    And did he tell you that Dwight had taken it?

1    A    Yes.

2             MR. MARTIN:  Objection, Your Honor.  This is stuff you

3    kept out earlier and he's showing them the transcript.

4             THE COURT:  This is proper rehabilitation.  The

5    objection's overruled.

6             MR. HARDING:  Did you explain that.

7             MS. RHODES:  Can he not use the DOAR, Your Honor?

8             THE COURT:  Counsel can't use the DOAR for your

9    purposes and prevent the government from using the DOAR.  Please

10   conclude your redirect, Mr. Harding.

11   BY MR. HARDING:

12   Q    Did you explain to the grand jurors that Bo knew Dwight from

13   the Hickey School, also?

14   A    Correct.

15   Q    And that Dwight had tried to get into the rap music

16   business, also?

17   A    Yes.

18   Q    Okay.  Did you say that later on you remembered, you were

19   asked if you remembered coming back to Edgecombe Circle one night

20   and seeing something unusual in the neighborhood?  Did you

21   describe all about that murder crime scene outside your

22   neighborhood?

23   A    Yes.

24   Q    In the wee morning hours?

25   A    Yes.

REDIRECT EXAMINATION OF HAYES                                    134

1   Q    You said you were with your girlfriend and you'd seen a car

2   crashed into a tree?

3   A    Uh-huh.

4   Q    Is that correct?  Yellow tape all around it?

5   A    Yes.

6   Q    You thought it was a murder scene?

7   A    Yes.

8   Q    And did you then go back to Edgecombe Circle?

9   A    Yes.

10  Q    You told the grand jurors that?

11  A    Yes.

12  Q    And you say that you saw Little Roc when you went in the

13  house, isn't that correct?

14  A    Correct.

15  Q    And that he was jittery?  Isn't that the same word you used

16  in testifying in this trial?

17  A    Yes.

18  Q    You noticed, you asked him where your brother was, meaning

19  Tony, is that correct?

20  A    Correct.

21  Q    And he told you where your brother was, is that correct?

22  A    Yes.

23  Q    So you went over to Dupont and you asked Little Tony what

24  was going on?

25  A    Yeah.

1    Q    And he said he was like, those dudes are crazy?

2    A    Right.

3    Q    So you slammed the door and left because you knew what he

4    was talking about, is that correct, Mr. Hayes?

5    A    Correct.

6    Q    And did you explain to the grand jurors that you had already

7    reached a similar conclusion when you noticed how jittery Mr.

8    Hayes was, is that correct?

9    A    I am Mr. Hayes.

10   Q    When you noticed that Mr. Harris was all jittery?

11   A    Correct.

12        MS. RHODES:  Objection, Your Honor.  Showing --

13        THE COURT:  Okay.  I think, Mr., we get the point, Mr.

14   Harding.

15   Q    Did you tell the grand jurors that you thought there was a

16   possibility your .38 was involved in the homicide?

17   A    Yes.

18   Q    And then when you came back to testify two years later,

19   still before you'd entered into an agreement with the United

20   States, is that when you testified about the Claudus Lassiter

21   letter and also the assault in the marshal's lockup?

22   A    Yes.

23   Q    Your Honor, I would like to move the two transcripts into

24   evidence.  They've been so thoroughly gone over in the course of

25   this trial, Your Honor, that I think the best thing to do is

1    simply move them in as direct evidence.

2              THE COURT:  I'll hear from counsel on the other side.

3    I will probably require some redactions.  But I'll take your

4    request under consideration.

5    Q    I have just a few more questions because I know people are

6    getting hungry, Your Honor.

7              THE COURT:  They're way past hungry.  They're losing

8    weight.

9    Q    Well, we could stay for another hour.

10             THE COURT:  No.  Please, please conclude.  Please

11   conclude your redirect.

12   Q    You said that the discharging of the firearm charge you had

13   against you in the city was dismissed before you ever even came

14   back to federal court the second time to testify, is that

15   correct?

16   A    Yes.

17   Q    And there never was a county ammunition case, was there?

18   A    Never.

19   Q    Because carrying bullets isn't a crime in the State of

20   Maryland, is it?

21   A    No.

22   Q    It's just a federal crime, isn't that correct?

23   A    Correct.

24   Q    I believe it was Mr. Lawlor who pointed out to you that TM

25   is not a killer.  He asked your opinion of that?

1    A    Correct.

2    Q    What would you say if you were asked if Mr. Mitchell or Mr.

3    Harris was a killer?

4              MR. MARTIN:  Objection.

5              MR. LAWLOR:  Objection.

6              THE COURT:  Sustained.  Don't answer that.

7    BY MR. HARDING:

8    Q    You were asked if the information you had about the

9    Hammerjacks incident was hearsay, words to that effect, I believe

10   by Mr. Martin, is that correct?

11   A    Yes.

12   Q    But you knew about that partly from Mr. Mitchell himself,

13   did you not?

14   A    Correct.

15   Q    When you got out of jail on December 10th of 2001, how long

16   had you been locked up for?

17   A    Two months.

18   Q    So back in 2000, you already knew Shelton Harris and Mr.

19   Mitchell, is that correct?

20   A    Not in 2000, I ain't know Mr. Mitchell.

21   Q    You met him only when you came home at the end of 2001?

22   A    Yes.

23   Q    Okay.  But you knew Shelton Harris for, I believe you just

24   told us, several years, eight years or something, is that

25   correct?

1   A     Yeah.  More than that, probably.

2   Q     I have no further questions, Your Honor.

3              MR. LAWLOR:  Just a couple.

4              THE COURT:  No.  No more recross with this witness.

5   Mr. Hayes is excused.

6              MR. LAWLOR:  Your Honor, I haven't had recross.

7              THE COURT:  Mr. Hayes is excused.

8              MR. LAWLOR:  I object, Your Honor.

9              THE COURT:  Objection noted.

10             Ladies and gentlemen, I kept you way past the normal

11  lunch hour in order to try to conclude the examination of this

12  witness.  Thank you for your patience.

13             We will stand in recess at this time.  You will be

14  excused for your luncheon recess.  It is approximately 1:30 p.m.

15  Please be back in the jury room no later than 2:45 p.m. this

16  afternoon.  Please leave your note pads on your chairs.  Have no

17  further, no discussion about the case.  Continue to keep an open

18  mind about all issues.

19             Jury is excused until 2:45.

20             (Jury exits the courtroom.)

21             THE COURT:  In fact, ladies and gentlemen, if those of

22  you still in the courtroom can pass the word, since I know I'm

23  going to have to take up some matters with counsel, we'll resume

24  at about 2:45.  You all are excused until 3 p.m.  3 p.m.

25             (Jury exits the courtroom.)

1          THE COURT:  Counsel, I will give you a chance over the

2     luncheon recess to crystallize your argument and I promise you I

3     will permit you to make whatever record you need to make when we

4     resume at 2:45.

5          I was perfectly satisfied that Mr. Harding's redirect

6     opened no new matters, that it was classic rehabilitation.

7     There's no question that I think absolutely every one of the

8     cross examinations of Mr. Hayes clearly was encompassed by the

9     recent fabrication doctrine and that it was perfectly appropriate

10    for Mr. Harding in his redirect to employ the transcript of the

11    grand jury testimony of the witness in the manner in which he

12    did.  And I would be very much inclined to grant the government's

13    request to admit the grand jury testimony and the transcript of

14    the testimony as substantive evidence.

15         There will be, there will be a need for some

16    redactions.  In particular, I note that counsel objected, quite

17    appropriately, to the previously objected portion of the

18    testimony, which objection was sustained, regarding Mr. Harris's

19    status as Mr. Mitchell's quote-unquote "enforcer."

20         I saw on the transcript as Mr. Harding lingered over it

21    the testimony from Mr. Hayes that Mr. Harris used to

22    quote-unquote "beat up" people for Mr. Mitchell at Hickey, but

23    I'd already sustained the objection.

24         Mr. Harding may have lingered over that briefly and no

25    doubt one or two of the jurors might have taken note of it, but

1    my instruction stands that the jury is not to consider that.  And

2    that would be part of the transcript that I would require to be

3    redacted if the government persists in its request to admit the

4    transcript.

5          So those are my rulings.  There was nothing new

6    whatsoever opened up during the government's redirect

7    examination.  As I told you at the beginning of the trial, if I

8    have a weakness as a trial judge, in all candor, it's that I'm

9    too generous on recross examination.  And this is one instance on

10    which I thought a denial of generosity was entirely appropriate

11    and consistent with due process.  So that's the reason for my

12    rulings.  We'll stand in recess until 2:45 and I'll give counsel

13    an opportunity to make their record.

14          Mr. Kurland, I shall can't find that case that you

15    mentioned but I will tell you --

16          MR. KURLAND:  I have the Westlaw cite.

17          THE COURT:  All right.  If you'll give it to my law

18    clerk.  I am very much, very much strongly inclined not to admit

19    through the agents or, frankly, any other witness, your request

20    to show to the jury that Mr. Gardner is serving a life sentence.

21    I think you can achieve what you need to achieve simply by

22    showing that Mr. Gardner has been in continuous custody since his

23    arrest after the Jones Spence murder.  But I'll give you a chance

24    to be heard on that this afternoon.

25          We're in recess until 2:45.

1          (Luncheon recess at 1:30 p.m.)

2          (Defendants present in courtroom.  Jury not present.)

3          THE COURT:  All right.  We'll start with Mr. Lawlor and

4     work over to you, Mr. Kurland.

5          MR. LAWLOR:  Judge, I guess we have no objection to the

6     introduction, just from Mr. Mitchell's point of view, to the

7     introduction of Mr. Hayes's two grand jury transcripts, with

8     redactions that I can just put on the record now if the Court

9     would --

10          THE COURT:  If there's agreement, I don't need to know

11     what they are.

12          MR. LAWLOR:  I can take it up with Mr. Harding just as

13     to Mr. Mitchell after court today so as to not utilize the

14     Court's time.

15          THE COURT:  Okay.

16          MR. LAWLOR:  While I'm here, if I can take 60 seconds

17     to our objection which we were voicing during Mr. Harding's

18     redirect examination.

19          THE COURT:  Whatever time you need.

20          MR. LAWLOR:  Okay.  I think the Court, I think the

21     Court touched on this.  But our objection was and remains that

22     Mr. Harding was doing what might have otherwise been appropriate

23     redirect with the transcript, but he was putting it on the DOAR

24     and what he was putting on the DOAR involved inadmissible

25     evidence, including, I think the Court said, letting linger the

1    fact that there's testimony in this grand jury from February 4th,

2    2004 to the effect that when Mr. Harris was at Hickey with Mr.

3    Mitchell, Mr. Mitchell would utilize Mr. Harris to beat up other

4    inmates there.  So that would be our objection.

5         While I'm here, the Court also touched on the recross.

6    I do believe, just to flesh out the record from our point of

7    view.  That Mr. Harding did touch on some things that weren't

8    covered on direct or on cross that were covered on redirect,

9    which should, the Court should have permitted.

10        THE COURT:  And what were they, Mr. Lawlor?

11        MR. LAWLOR:  Well, there was, one thing was certainly

12   the number of lies that Mr., that Mr. Hayes told to the grand

13   jury.  Mr. Harding had the witness, Mr. Harding and the witness,

14   so the witness characterized the number of those.  And I don't

15   believe that that was accurate.  I would have, I would have

16   questioned Mr. Hayes about, at least about that.

17        THE COURT:  Okay.

18        MR. LAWLOR:  I think that's all I have.

19        THE COURT:  All right.  Thank you, Mr. Lawlor.  On the

20   issue of Mr. Mitchell's relationship with Mr. Harris and the

21   origin of that relationship at the Hickey School, there is

22   already, of course before today, evidence in the record that Mr.

23   Mitchell was a counselor, I believe is the word that was used, at

24   Hickey, that he met Mr. Harris at the Hickey School.

25        And it is quite apparent if the jury credits the mass

1       of government evidence, including the rap songs in which Mr.

2       Harris or the jury could find that Mr. Harris refers to Mr.

3       Mitchell as captain, and other evidence in the record, the jury

4       could clearly find beyond a reasonable doubt that Mr. Harris felt

5       a substantial loyalty to Mr. Mitchell, that he even looked up to

6       him, and that there's other evidence in the record that Mr.

7       Harris has, quote-unquote, "done work" for Mr. Mitchell, that was

8       Dobropolski, perhaps, as well as Montgomery.

9               So that I don't believe that the quick glance that the

10      jury may have gotten of that line in the transcript during Mr.

11      Harding's redirect examination of Mr. Hayes had a substantial

12      prejudicial effect.  So the Court's satisfied that its ruling

13      struck a fair balance under the circumstances.

14              Mr. Martin.

15              MR. MARTIN:  Your Honor, as regards to transcripts,

16      I'll make sure that my redaction match, I think they already do,

17      match Mr. Lawlor's.

18              THE COURT:  And by the way, I didn't mean to suggest

19      that you all needed to do that right away.  Obviously, I'm not

20      going to give the transcript today or even this week.  It will

21      simply be marked as an exhibit and I suspect I'll mention to the

22      jury that the transcript has been marked.  In fact, I'll have the

23      government mention that the transcript has been marked as an

24      exhibit and the jury may consider the testimony in the transcript

25      as well as the testimony here in court.

1          So there is time for you all to finalize your

2     redactions.

3          MR. MARTIN:  Thank you, Your Honor.  And I'll add my

4     objection to Mr. Lawlor's about the testimony.  I understand

5     there's a lot of evidence that Mr. Harris had a great deal of

6     affection for Mr. Mitchell.  I have a great deal of affection for

7     Ben Rosenberg but I'm not going to go beating people up for him.

8     And I don't think the conclusion necessarily follows.  And

9     especially with that witness, who didn't know it himself.  He

10    heard it triple hearsay.  So I just object again that that

11    evidence comes in.

12         We can all justify after the fact, which is what we're

13    doing here.  But I still think it was wrong.

14         THE COURT:  Well, again, it's not in.  The jury saw the

15    transcript.  And at the point the transcript was being used by

16    Mr. Harding, the transcript was not in evidence.  And so I take

17    your point.

18         MR. MARTIN:  In the brain.

19         THE COURT:  I understand.  It's on their eyeballs.  I

20    don't know if it's in their brain.  But it's on their eyeballs

21    and I appreciate that.  But we're not disagreeing too much, Mr.

22    Martin.

23         MR. MARTIN:  Thank you, Your Honor.

24         MR. LAWLOR:  I'm sorry, Judge.  Can I just add one

25    quick thing?  It appears that there were conversations between

145

1    Mr. Hayes and the government after his grand jury testimony, in

2    which he advised the government that he had lied to the grand

3    jury.

4              THE COURT:  We were all pleased to hear that,

5    certainly.

6              MR. LAWLOR:  I was thrilled to hear that.  But I wasn't

7    thrilled to hear it for the first time today, which is the fact.

8    And I've never been advised by the government, which I think they

9    had an obligation to advise us.

10             THE COURT:  On what basis?

11             MR. LAWLOR:  It's Giglio.

12             THE COURT:  It's Giglio?

13             MR. LAWLOR:  Yeah.  If a witness testifies before the

14   grand jury, after the grand jury comes to the government and

15   says, I lied there about X, Y and Z, the government has an

16   obligation under the discovery rules, has a due process

17   obligation, it's Brady or Giglio to advise us.  That's

18   impeachment evidence, the fact he lied before the grand jury.

19   They never told us that.

20             THE COURT:  Okay.  You all clearly knew he lied before

21   the grand jury.

22             MR. LAWLOR:  I absolutely did not know that.

23             THE COURT:  Mr. Martin knew it.

24             MR. LAWLOR:  I knew that when he started testifying

25   inconsistently with --

1          THE COURT:  I'm sorry.  Mr. Martin knew it.  We had a

2     colloquy two or three days ago, trial days, in which Mr. Martin

3     stood up and said, Mr. Hayes has lied.  Am I mixing up witnesses?

4          MR. MARTIN:  No.  What I said was he said one thing in

5     the first grand jury and one thing in the second grand jury, but

6     I didn't know -- there's a difference between that which is

7     ordinary impeachment and him going to the government when he's

8     all done in the grand jury and saying, you know, I lied there,

9     guys.  And then they have eight or nine proffer sessions

10    afterwards in which conveniently nothing gets written down and we

11    never see it.

12         So we're never told and we come in here to trial.  And

13    then we find out that he told them that he lied.  It should have

14    been disclosed.

15         THE COURT:  It was clear that he lied because he

16    testified differently in the second grand jury.  But I take the

17    point.  I see the point.

18         MR. MARTIN:  But he even lied the second time.

19         THE COURT:  I understand that.  That's your position.

20         MR. MARTIN:  Right.

21         THE COURT:  But that's for the jury to determine.

22         MR. LAWLOR:  Your Honor, he said, he testified that he

23    affirmatively advised the government that he lied in one or the

24    other.  And our position, Mr. Mitchell's position is that that

25    was not clear from the transcripts.  And we didn't know about

1    some of the things.  A lot of his testimony on direct examination

2    was not at all in his grand jury testimony.  So when he said,

3    yeah, I affirmatively lied about that, the exchange of guns, for

4    example, that he said one gun was a 9 millimeter, and in fact, it

5    was a .40 millimeter.

6                THE COURT:  And by the way, I missed, I totally missed

7    why that's important to this side of the aisle.

8                MR. LAWLOR:  You are asking the wrong lawyer about

9    that.  All the guns in this case --

10               THE COURT:  Talk about minutiae.

11               MR. LAWLOR:  Your Honor, it's the point.  It's the

12   point.

13               THE COURT:  I take it he lied because -- well, I don't

14   know why he lied.

15               MR. LAWLOR:  He's a liar, that's why he lied.  That's

16   another issue.

17               THE COURT:  All right.

18               MR. LAWLOR:  But our request is that you inquire of the

19   government whether they were aware of his falsities before the

20   grand jury, whether they disclosed it.  And if they didn't, then

21   we should return and decide what the sanction should be.

22               But they had an obligation to disclose that and they

23   didn't.

24               THE COURT:  Not now, Mr. Harding.  I'll give Mr.

25   Harding a chance to respond.  I don't know, frankly, off the top

1    of my head -- witness lies before the first grand jury, somewhat

2    contradicts himself the second time.  And then when he sits down

3    with the prosecution after the second grand jury appearance and,

4    quote-unquote, comes clean, I'm not sure if it's Giglio that,

5    that two or three lies on collateral matters rises to the level

6    of Giglio.

7            In other words, if the government had told you in

8    advance, assuming the government didn't tell you, and I certainly

9    accept that as true -- let's take the 9 millimeter versus the .40

10   caliber business.  That's not material to anything in this case.

11   You couldn't answer my question just now, Mr. Lawlor.

12           MR. LAWLOR:  Your Honor, can I answer that question?

13           THE COURT:  Just let me finish.  Let me finish.  And to

14   the extent it's Giglio, meaning impeachment, then clearly there's

15   been no harm because like most of the government witnesses here,

16   he's been impeached till Saturday.  The government impeached its

17   own witness, as it has routinely done in this case, as it has a

18   right to do.

19           So again, I have as great a regard for Brady and Giglio

20   as the next, but I don't see the importance here.

21           Again, I have a serious question as to the make and

22   model of the pistol.  I have total, I'm in the dark about any

23   materiality on that score.  But I'll hear from Mr. Harding and

24   then I'll give you a chance to respond.  Go ahead, Mr. Lawlor.

25           MR. LAWLOR:  Can I just briefly respond to one thing?

1    First of all, we're talking about one lie.  There were several.

2                    THE COURT:  I only used that as an example.

3                    MR. LAWLOR:  All right.  So I just, yeah.  That's only

4    one example.  And I was sort of being facetious about the guns

5    because there are so many.  But the 9 millimeter, my

6    understanding is the 9 millimeter was a throw-away.  He

7    testified, I gave him a 9 millimeter or received a 9 millimeter.

8    Here he testified that he got a .40 caliber which was presumably

9    tied to this case and that he said it was dirty.

10                   So that's not collateral, Your Honor.  That's very,

11   very germane to this case and that's the kind of thing I think

12   the government, if they were aware of it, and we're talking about

13   one specific instance here, one specific lie, but if they were

14   aware, and, obviously, they were because they brought it out, if

15   they were aware of the fact that he lied to the grand jury about

16   a throw-away 9 millimeter and then affirmatively said to them,

17   no, that wasn't it, the 9 millimeter was a lie -- I'll stop at

18   the fact that I think they have an obligation to tell us that he

19   lied, period.

20                   But particularly, you know, I was being a little

21   facetious about because there are so many guns.  But that and

22   talking about the difference of the 9 millimeter has nothing to

23   do with the case and a .40 millimeter that the next witness is

24   going to tie to these homicides.  I'll say with that, I'll leave

25   it at that.  But that's not collateral.

1          THE COURT:  Okay.  Mr. Crowe?

2          MR. CROWE:  Nothing, Your Honor.

3          THE COURT:  All right.  Mr. Kurland.

4          MR. KURLAND:  Good afternoon, Your Honor.

5          THE COURT:  Well, actually, Mr. Coburn, do you have

6    anything else on Hayes?

7          MR. COBURN:  On Hayes, Your Honor?

8          THE COURT:  Yes.

9          MR. COBURN:  I don't, Your Honor.

10          THE COURT:  All right.  Okay.  Mr. Kurland.

11          MR. KURLAND:  Your Honor, a couple things.  First, we

12    would ask the judge take judicial notice and inform the jury that

13    there are no magistrates or judges before the grand jury.

14          THE COURT:  I'm not going to do that.  Nobody chose to

15    clean that up, you know.

16          MR. MARTIN:  We didn't have a chance to.

17          THE COURT:  I didn't hear that.

18          MR. MARTIN:  I said we didn't have a chance to, Your

19    Honor.

20          MR. KURLAND:  That's right.  We had no re-redirect or

21    recross.

22          THE COURT:  Mr. Coburn had a chance to and Mr. Harding

23    had a chance to.  Again, I don't see the significance of it.

24          MR. KURLAND:  Your Honor, a couple other things then.

25    With respect to the Court's last comments before we went to lunch

151

1    concerning, I just want to make sure I have the language right,

2    that we'd able to bring out through either the government case

3    agents or other witnesses that Mr. Gardner was in continuous

4    custody since his, his state, I guess his state arrest on the

5    Jones Spence back in June, 2002, it's our position that that's

6    insufficient for two reasons.  One --

7         THE COURT:  First, tell me what it is in Massino that

8    you believe is helpful to you.  I mean, there's no question about

9    the general principle that the fact that a defendant has been

10   incarcerated is admissible.  I mean, it's relevant, it's

11   admissible, but it's not conclusive.

12        MR. KURLAND:  I understand that, Your Honor.  It makes

13   a jury issue.  The specific language is that while arrests --

14   sorry.  While arrest or incarceration may constitute a withdrawal

15   from a conspiracy, it does not follow that in every instance it

16   must, and whether a coconspirator's imprisonment constitutes

17   withdrawal must be decided by the jury in light of the length and

18   location of the internment, the nature of the conspiracy, and any

19   other available evidence.

20        Now, again, the government, and I believe --

21        THE COURT:  Let me find the passage that you --

22        MR. KURLAND:  It's where it quotes the Flaharty case.

23        THE COURT:  Where is it in the opinion?

24        MR. KURLAND:  Well, Your Honor, unfortunately, in the

25   blurb I have, I just have the blank F.3d cite.  But it quotes

152

1   <u>Flaharty</u> at 296 F.3d 182.  And the interior cite is 192 to 93.

2              THE COURT:  Okay.  Just give me one moment to take a

3   look at it.

4              (Pause in proceedings.)

5              THE COURT:  I couldn't find the case, Mr. Kurland.

6              MR. KURLAND:  Even with the Westlaw cite?

7              THE COURT:  Yeah.  I couldn't find it because I was

8   searching in reported opinions in the Second Circuit and this

9   isn't yet reported.  It will be but it's not yet reported.

10             MR. KURLAND:  Your Honor, it's my understanding, and

11  again --

12             THE COURT:  No.  I'll find it in a second.  Okay.  I

13  think I found the paragraph you're referring to.  Okay.  Just

14  give me a moment.

15             MR. KURLAND:  Sure.

16             (Pause in proceedings.)

17             THE COURT:  Okay.  I see.  And I think the government's

18  exactly right.  If that's a correct statement of the law in the

19  Second Circuit, suggesting that mere arrest and incarceration by

20  itself can constitute withdrawal, that is a minority rule.

21             MR. KURLAND:  We don't, Your Honor --

22             THE COURT:  Just a moment.

23             MR. KURLAND:  Sure.

24             THE COURT:  The law is really very clear that mere

25  arrest and incarceration will never by itself be sufficient

153

1    evidence of a withdrawal from a conspiracy.

2              MR. KURLAND:  We don't quarrel with that, Your Honor.

3              THE COURT:  Okay.  I didn't think so.  I didn't think

4    so.  Frankly, it seems to be some rather loose language that

5    they're quoting from Flaharty and that Escobar opinion.

6    Anyway --

7              MR. KURLAND:  Well, Your Honor, but the point is this.

8    The government, I believe it was in the fourth superseding

9    indictment, when they choose to extend the conspiracy period to

10   the point where it encompassed several years after, not just that

11   all of the defendants had been arrested, but also at least two

12   years past the time that Mr. Gardner had been convicted and

13   serving a life without possibility of parole sentence.

14             THE COURT:  Right.  Based on -- let's just be clear.

15   Based on Mr. Harris's attack on Mr. Hayes and the defendants'

16   concerted action in respect to the flesh and blood.

17             MR. KURLAND:  Alleged concerted action.

18             THE COURT:  Alleged concerted action.

19             MR. KURLAND:  But with respect to those two items, Your

20   Honor, and again, the government hasn't yet put on all the

21   evidence that it's going to put on with respect to that.  But we

22   are certainly entitled, or at least I would think, to put on a

23   defense giving the jury, the ultimate fact finder here, an

24   alternative explanation as to what on its face might appear to

25   look like not just concerted action, but conspiratorial action.

1          THE COURT:  No disagreement with that statement

2     whatsoever.

3          MR. KURLAND:  And part of that defense is going to

4     be -- and again, I'm always a little bit, you know, reluctant to

5     foreshadow the complete contours of the defense -- but to the

6     extent I have to now, is that it's obvious from the evidence that

7     Mr. Gardner knows to some degree or another both Mr. Mitchell

8     and, obviously, to a larger degree, Mr. Martin.  And it's

9     certainly relevant and probative for the jury to understand that

10    pleadings that are filed with the court, even unconventional

11    pleadings, pleadings of which Your Honor has written an opinion

12    on, in which there was no suggestion that in responding to a

13    written opinion published in F. Supp, it was in any way

14    responding to criminal action, we're entitled to argue to the

15    jury and to present to the jury that this is somebody serving a

16    life without the possibility of parole sentence, and as a kind of

17    act of kinship, not a conspiratorial act, you know, joins just by

18    joint not guilty pleas, with respect to legal pleadings.

19         And to say that we can't offer evidence of the fact

20    that he's serving a life without possibility of parole sentence

21    totally undercuts that.  And with all due respect --

22         THE COURT:  You're going to have to stop just making

23    that assertion and explain why the length of the sentence is

24    relevant.  I don't see it.  You can bring somebody from DOC and

25    somebody from Baltimore County, perhaps, to show through proper

1    records that Mr. Gardner has been in their respective custody

2    continuously from the date of his arrest through today.  You can

3    do that in the defense case.

4              MR. KURLAND:  But Judge, Your Honor, that doesn't help

5    us, for two reasons.

6              THE COURT:  Okay.  Tell me why, tell me why --

7              (Pause in proceedings while Mr. Kurland and Mr. Martin

8    confer.)

9              THE COURT:  Tell me why --

10              MR. KURLAND:  I will, Your Honor.

11              THE COURT:  -- the fact that Mr. Gardner is serving a

12    sentence of life without parole --

13              MR. KURLAND:  Because that.

14              THE COURT:  -- is relevant.

15              MR. KURLAND:  All right.  It is relevant because it

16    removes his incentive to be part of this conspiracy.

17              THE COURT:  Okay.  I absolutely categorically reject

18    that assertion as a matter of logic, as a matter of common sense,

19    and as a matter of law.  It does not remove his motivation.  It

20    just doesn't.

21              MR. KURLAND:  Well, I would argue that is a --

22              THE COURT:  There are people --

23              MR. KURLAND:  Jury question.

24              THE COURT:  There are -- it just doesn't.

25              MR. KURLAND:  Your Honor, also, with respect to the

1    proposition or the language that the Court has said we can go

2    into, continuous custody, that doesn't differentiate him from any

3    of the other defendants who've also been, if the jury's been

4    taking careful notes, figuring out the time that people are

5    leaving and coming and being locked up and not locked up, no one

6    has been unlocked up -- well, Mr. Mitchell and Mr., Mr. Mitchell,

7    Mr. Martin and Mr. Gardner haven't been, have been incarcerated

8    continuously, all of them, since between April and June, 2002.

9    Mr. Harris a little bit, a little bit later.

10           And that totally removes the legitimate factual

11   argument --

12           THE COURT:  It simply doesn't.  It simply means that

13   this defense is available to all four defendants, perhaps Mr.

14   Martin less so.  But all of the defendants who were arrested in

15   2002, I am reasonably confident their counsel are going to argue,

16   Ladies and gentlemen of the jury, the government has overreached.

17   The government's crazy.  There's no conspiracy after 2002.  These

18   guys were locked up, facing charges.  And if Mr. Harris attacked

19   Mr. Hayes, that was Mr. Harris's own doing.  If Mr. Mitchell

20   communicated a threat to somebody because of Mr. Mitchell's

21   charges, then in state court, that was Mr. Mitchell's doing.

22   This was not concerted action.  This had nothing to do with the

23   conspiracy.  There was no conspiracy at all.  But certainly,

24   ladies and gentlemen of the jury, this conspiracy, if any, if any

25   conspiracy, existed, it's clearly ended by mid 2002, ladies and

1    gentlemen of the jury.  And furthermore, ladies and gentlemen of

2    the jury, we have at least six conspiracies here.  The government

3    has utterly failed to prove a single conspiracy, and the Court

4    will give instructions along those lines.

5           So it's available to everybody.  The fact that Mr.

6    Gardner happens to be in custody in Baltimore County and then in

7    the DOC, as opposed to Mr. Mitchell and Mr. Harris, who are in

8    Baltimore City and then in federal custody, and the fact that Mr.

9    Martin comes along two years later and gets arrested and charged

10   federally with the gun and then gets indicted here, or having

11   already been indicted here, it's just, there's no distinction.

12   You're trying to draw a distinction as a matter of law that

13   doesn't exist as a matter of fact.

14           MR. KURLAND:  Well, no, Your Honor.  I will just say

15   and this will be, and I won't say the last word because the Court

16   always has the last word.

17           The last point that I would make is that in addition to

18   the comments the way the Court just articulated the theories,

19   that Mr. Gardner factually, factually has an even more factually

20   compelling argument that should be presented to the jury because

21   he isn't just locked up, he has been convicted and is locked up,

22   life without possibility of parole.  So to the extent that the

23   argument is available to all defendants on a general level, that

24   they've been locked up and incarcerated for, for six years, for

25   even Mr. Gardner it's even more factually compelling.

1          As the Court just instructed the jury a couple minutes

2    ago, that they're really sitting and deliberating in four

3    separate trials.

4          THE COURT:  And if you can figure out a way --

5          MR. KURLAND:  Trying.

6          THE COURT:  You're doing a good job of trying.  If you

7    can figure out a way to get that evidence before the jury, I

8    assure you the Court will admit.  I have told you, without in any

9    way, shape or form putting any pressure on Mr. Gardner's exercise

10   of his Fifth Amendment privilege.  If Mr. Gardner chooses to

11   testify -- and I'm not suggesting that's the only way you can do

12   it -- but clearly, if Mr. Gardner takes the stand, you will get

13   your wish.

14         But unless Mr. Gardner, as I said before, is willing

15   under oath to tell the Court that he has authorized you to

16   introduce evidence of his state court conviction on the Jones

17   Spence murder, the Court will continue to protect Mr. Gardner's

18   Sixth Amendment right.

19         Admittedly, that right is somewhat in tatters, as we

20   had the colloquy with Mr. Martin yesterday.  That right is

21   somewhat in tatters.  But Mr. Gardner is the captain of that

22   particular ship.

23         MR. KURLAND:  Your Honor, for the record, I just would

24   like to say that it's my understanding that other than the right

25   to plead guilty, to testify, or to waive jury trial, that all

1    other rights, issues, including the strategic issue, doesn't need

2    to be cleared.  And the other thing is --

3        THE COURT:  Absolutely.  And that's my point.  That to

4    put on evidence that Mr. Gardner has been convicted of the Jones

5    Spence murder is functionally the equivalent of a guilty plea.

6    That's exactly right.

7        MR. KURLAND:  A guilty plea?  No.  No.  But the right,

8    the thing that is solely up to the defendant is his right to

9    plead guilty in this case.

10       THE COURT:  But that's what he would be doing.  He

11   would be pleading guilty to one of the racketeering acts.  He

12   would be admitting to all of the elements, or nearly all of the

13   elements, of a rack, a murder in a rack, a racketeering murder,

14   one of the 1959 -- he'd be pleading guilty to that count.

15       MR. KURLAND:  Your Honor, just so the record is clear,

16   nearly all the elements is not the same as all elements.

17       THE COURT:  That's why I said functionally equivalent.

18   It would leave so much, little, it would leave so little for the

19   jury to have to decide to convict Mr. Gardner of that 1959 count

20   that the Court simply is not willing to permit you and Mr. Coburn

21   to plead him guilty without his permission.

22       MR. KURLAND:  Your Honor, I'd also then want to put on

23   the record, and I'll get the cases for it, to say with respect to

24   a particular legal issue, that it's a violation of the

25   defendant's Fifth amendment rights to say that it can only come

1    in if he testifies.

2              THE COURT:  I didn't say that.  If he stands up under

3    oath and says, yeah, Judge, let them do what they want to do,

4    that changes the entire, we're in a different world.

5              MR. KURLAND:  Well, I'm satisfied that our record is

6    made clear on that.

7              THE COURT:  Okay.

8              MR. KURLAND:  With respect to a related point to that

9    is dual sovereignty instruction.

10             THE COURT:  Let's save that.

11             MR. KURLAND:  Particularly in light of the testimony we

12   just heard from Mr. Hayes, at some point before the government

13   rests I think that the Court should give that instruction.

14             The other point -- let me just go down my little

15   checklist here, is that, and the last thing that I would like to

16   bring out has to do with, after the, the ballistics witnesses, I

17   think are going to testify now, I believe the government intends

18   to call Special Agent Ellington, which is the, which is the drug

19   expert.

20             THE COURT:  I'm going to hear, I'm going to hear from

21   Mr. Harding now.

22             MR. KURLAND:  Then respond?

23             THE COURT:  Yes.

24             MR. KURLAND:  Thank you, Judge.

25             THE COURT:  Mr. Harding, if you want to respond to

1    something and then we're ready to go.

2         MR. HARDING:  Mr. Hanlon is going to sponsor Agent

3    Ellington, Your Honor.

4         THE COURT:  Okay.  But first, what about this issue,

5    the alleged Giglio issue regarding Mr. Hayes's post grand jury

6    appearance proffer session?  Not really a proffer, a debriefing.

7         MR. HARDING:  I remember having a discussion in the

8    past with Mr. Hayes about his statement, that he didn't know what

9    the gun was going to be used for, what Shelton Harris wanted the

10   gun for.  And I remember going back and checking the transcript

11   and satisfying myself that it wasn't a lie, because the question

12   was as I pointed out.  What was misleading this morning was the

13   way Mr. Martin had phrased the question.

14        THE COURT:  No.  I'm not talking about that one.  I'm

15   talking about the Beretta versus the .40 caliber.

16        MR. HARDING:  I don't recall ever discussing that with

17   Mr. Hayes until last night, when I called agent, when I called

18   Benson, when he was driving Rodney Hayes home.

19        I asked him, I asked Benson, I told Benson that I

20   noticed that discrepancy.  When Rodney Hayes came in this

21   morning, he said that he, yes, there is that discrepancy and he's

22   not sure why he said it was a 9 millimeter back then.  He said he

23   wasn't trying to be cooperative or maybe he just got confused or

24   something to that effect.  In other words, it wasn't clear to me,

25   based on what he told me this morning, that he was admitting what

1    he admitted so clearly on the stand, which was that he was lying

2    about it.

3              THE COURT:  Okay.  Can you walk me through the gun

4    stuff, please, briefly?  What I mean by that is, are we now going

5    to hear that the, that the .40 caliber that Tony Montana

6    transferred to Mr. Hayes, having gotten it from Mr. Mitchell, was

7    the -- what was that?  Is there other evidence on that weapon?

8              MR. HARDING:  No.  There are a number of .40 calibers

9    that we've heard about already in this case, Your Honor.

10              THE COURT:  Right.

11              MR. HARDING:  Both Mr. Martin and Mr. Gardner had .40

12   calibers.  In fact, Montgomery testified that Martin told him he

13   had a .40 caliber that had three bodies on it.

14              THE COURT:  Right.  Right.  So all those guns that came

15   in the other day, I was quite surprised.  How many guns do we

16   have in this case?

17              MR. HARDING:  Actual physical guns?

18              THE COURT:  Yeah.

19              MR. HARDING:  Five physical guns.

20              THE COURT:  Five.  But we only have two, we have three

21   guns mentioned in the 924(c)'s, right?  Mr. Hanlon.  Maybe you

22   better come to the podium as well, Mr. Hanlon.  Both of you stand

23   there.  Help me out.

24              I got the idea that there's the, there's the, there's

25   the Wyche -- excuse me.  There's the McCaffity murder weapon that

1    shows up at the Lee homicide.

2              MR. HANLON:  Yes, Your Honor.  Wyche.

3              MR. HARDING:  Not the McCaffity.

4              THE COURT:  I'm sorry.  I'm sorry.  I'm sorry.  The

5    Wyche .40 caliber that shows up at the Lee homicide and the

6    second Lee homicide weapon is buried in the woods in Baltimore

7    County.  All right.  So I got that.  And we have the two weapons

8    that were buried in the woods.  And we have the 9 millimeter that

9    was seized from Mr. Mitchell.

10             MR. HARDING:  Yes.

11             MR. HANLON:  Yes, Your Honor.

12             THE COURT:  So what are the other two weapons?

13             MR. HANLON:  The Llama .45 caliber weapon.

14             THE COURT:  Which was seized from Mr. Martin?

15             MR. HANLON:  Mr. Harris.

16             THE COURT:  Mr. Harris.  I'm sorry.  In Cherry Hill.

17   And then what's the fifth?

18             MR. HANLON:  The fifth one, Your Honor, was the -- I

19   apologize.

20             THE COURT:  That's all right.  A lot of guns.

21             MR. HANLON:  Five weapons yesterday.  .45 caliber.

22             MR. HARDING:  There was a gun that Officer Willard

23   introduced that was seized from Mr. Martin in 1999, Your Honor.

24   That was not introduced.

25             THE COURT:  Was that a federal conviction?

1           MR. HARDING:  Yes.

2           THE COURT:  Okay.  All right.  So those are the five

3    physical weapons.  Now, the missing weapons are the McCaffity

4    weapon --

5           MR. HARDING:  Yes.  Or weapons.  We never established

6    that there was only one weapon in that case, Your Honor.  Even

7    though both --

8           THE COURT:  Oh, because, because they might have both,

9    there might have been two revolvers there.

10          MR. HARDING:  They were both .38 bullets but they were

11   too damaged to be compared.

12          THE COURT:  Right.  So you can't tell whether it was

13   one weapon or two weapons.

14          MR. HARDING:  Yes.

15          THE COURT:  All right.  So that weapon's never

16   recovered.

17          MR. HARDING:  Correct.

18          THE COURT:  Okay.  But the ballistics that we're going

19   to hear about today relate only to the Lee, to the Lee homicide

20   and the connections to the other two?

21          MR. HANLON:  Actually, we'll just hear about the Lee

22   homicide in connection to the Wyche murder, your Honor.  Having

23   established Lee Spence with the --

24          THE COURT:  I got it.  Okay.  I'm satisfied.

25          All right.  What do you want to do with Mr. Ellington?

1          MR. HANLON:  Your Honor, leaving aside what I think the

2     defense is saying is not controversial, about drug distribution,

3     weight, and drugs don't come from the United States and things

4     like that, it would be the government's intention to ask Special

5     Agent Ellington in his experience, having investigated cases, to

6     testify about some of the structures of the drug organizations

7     that he's actually investigated.  Investigations he's aware of or

8     investigations he's participated in.

9          Specifically, do they always have a specific name,

10    color or uniform?  Are they always exclusive to a particular

11    territory or, as he's seen, organizations that move in different

12    neighborhoods.

13         Do they maintain a constant cast of members or do

14    members sometimes move in and out?  Or do they sometimes have

15    situations where members of a given group may be working with

16    someone else on the side at the same time as the group?  Is there

17    always a strict chain of command within these organizations or

18    are there sometimes cases where there's no president or chief or

19    boss, but simply a group of people together?

20         And then finally, what are the kinds of things that

21    drug organizations do within their membership to help one

22    another, understanding the membership may be very loose and very

23    informal?

24         The agent is aware of some cases in which the only

25    component to the organization or the group has been simply being

1    there to provide protection for one another, to exchange items

2    like firearms or information, or to look out for one another.

3           In particular, Your Honor, an important point that is

4    true of drug organizations in general is that the need to protect

5    the members, to be able to go to other members of the group, if

6    nothing else, to get each other's back, is one of the hallmarks

7    of some of the more loosely fit drug trafficking organizations.

8    That, of course, kind of goes hand in hand with the relationship

9    between drugs and firearms, which we would do for purposes of the

10   924(c).

11          THE COURT:  I think with the exception of that last

12   piece, I don't think I'm going to admit that last piece because

13   that, to me, is absolute bootstrapping.

14          You can't start with the idea that something is an

15   organization and then give testimony that says, in effect, it's

16   not an organization at all.  It's a group of people who help each

17   other out.  There's got to be some more substantive, not

18   substantive -- and I don't know if, if you're seeing what I'm

19   saying, Mr. Hanlon.

20          But to say on the one hand an organization has these

21   characteristics, a drug organization has these characteristics --

22   and again, the first four or five items I don't have any

23   particular problem with.  But then to go further and say, oh, and

24   by the way, it is characteristic of what we're calling an

25   organization that if one person gets in trouble, he can call on

1    his friends to help him out.  That's really all it amounts to.

2    It's either an organization, and that has some determinable

3    meaning, or it's not an organization at all.  It's just a group

4    of people helping each other out.  It's just a group of people

5    helping each other out.  And I don't think a group of people

6    helping each other out is an organization.

7                MR. HANLON:  The fault --

8                THE COURT:  And again, don't get me wrong.  I'm not

9    saying there has to be formality.  There doesn't have to be

10   hierarchical positions.  And yes, people perform different

11   functions in a conspiracy.  But a conspiracy is not an

12   organization necessarily.

13               MR. HARDING:  And the fault might be mine for using the

14   word "organization", Your Honor.  I was trying to use the word,

15   some general word "group", "operation", whatever, whatever

16   general kind of word the Court wants to use for, for a drug

17   trafficking team.  I'm looking for -- well, essentially, a

18   general word that is, that denotes a conspiracy.

19               THE COURT:  Okay.  I don't think it would be terribly

20   helpful to the jury, particularly in light of the evidence that's

21   already in the record.  And again, Mr. Hayes was really quite

22   explicit.  Was it Mr. Hayes or Mr. Reynolds?

23               MR. MARTIN:  Reynolds.

24               THE COURT:  Reynolds.  Mr. Reynolds was very explicit

25   in the way the thing works.  And so again, I hope, I hope I'm

1    being clear, and I know I'm not, with respect to the last piece

2    of it.  In other words, what I'm directing you to stay away from

3    is what happens when one member of the organization has a beef or

4    gets into trouble, because in my judgment that's just friends

5    helping friends.  And it's not an indicium of an organization or

6    a drug gang.

7         And I might say particularly in light of the fact, as

8    the government has properly relied on here, three of these

9    defendants are childhood friends, or at least they go back years

10   and years and years.  And I'm concerned about the jury not being

11   able to make that assessment of the difference between friends

12   helping friends, childhood friends helping childhood friends, and

13   calling it an organization, let alone an organization with a

14   name.

15        So with the exception of the last piece, you can do all

16   the other stuff about drugs and all that.

17        MR. HANLON:  May I ask the Court one question?  I just

18   want to make sure I don't run afoul of any limits.  I think the

19   defense in this case and the defense will argue that one of

20   reasons that this is not an organization, why it is not a

21   conspiracy is because --

22        THE COURT:  Well, they're not going to say it's not a

23   conspiracy.  They're not, they're not going to plausibly say

24   that.  They're going to say it's nine conspiracies.

25        MR. HANLON:  True, Your Honor.  But it's sort of the

1    same thing.

2              THE COURT:  Well, no, it's not.

3              MR. HANLON:  Puts us in the same position because it's

4    still the question of whether or not there's a chargeable unit,

5    I'm using the word "unit" in its broadest terms.  Without naming

6    names, Your Honor, but I have some reason to believe that some of

7    the defense attorneys might draw a comparison between this

8    evidence on the one hand and, say, the structure of the Sopranos

9    or the Corleone crime family in movies and try to set a standard

10   for the jury that is very, very high.

11             The government feels that the experience of the agent

12   would be helpful in helping the jury to understand that they

13   don't, that drug, and I'm hesitant to find a word, but drug

14   people don't always use, don't always operate with anything that

15   approaches the level of an organization.  I guess that's the

16   point the government wants to make.

17             THE COURT:  I think you got, I think you're reasonably

18   clear on my ruling and we'll just rule on the objections as they

19   come one by one.  It may be that the defense is going to open the

20   door for you, Mr. Hanlon, to come back on redirect and do all

21   kinds of interesting things.

22             MR. HANLON:  May I ask one more thing, Your Honor?

23             THE COURT:  Yes.

24             MR. HANLON:  Routinely in 924(c) cases we would ask an

25   agent like Agent Ellington about the relationship between drug

1    trafficking and firearms.

2              THE COURT:  Sure.  That's part of your earlier proffer.

3    And yes, you can talk all you want about how drug organizations

4    or groups or drug dealers use guns, why they have guns, what's

5    important.  They trade guns.  They loan guns.  They carry guns.

6              MR. HANLON:  Understood, Your Honor.

7              THE COURT:  All right.  I hope there's nothing more to

8    say on that.  To the extent that I'm going to give everybody a

9    standing objection to Agent Ellington's testimony, not on the

10   basis of his expertise, I assume there's no objection on that

11   ground, but on the ground of the admissibility of his expert

12   opinion testimony.  Yes, Ms. Rhodes?

13             MS. RHODES:  Well, one item you may actually be glad to

14   hear, Your Honor, is that I've spoken to my colleagues and we

15   will all stipulate to the, that cocaine and heroin come from

16   overseas.  And we have also already heard testimony from

17   witnesses about what cutting is and what it's used for, to

18   increase volume and decrease purity.  So I think that some of the

19   areas are covered and it's not necessary for them to have, to

20   repeat that testimony with this expert.

21             We would just like the standing objection the Court has

22   mentioned in terms of his testimony.

23             THE COURT:  Yes.  You've got a standing objection.

24             MR. KURLAND:  Judge, I'll be very brief.  Two things.

25   So there's no confusion, I did the motion so I'm going to argue

1  for two seconds.  Mr. Coburn's actually going to examine the

2  witness, at least from Mr. Gardner's standpoint.

3          The other thing is, Your Honor, the government, in

4  response to, I think, something filed by Mr. Mitchell concerning

5  the rap music expert, they cited some case, I don't have it

6  before me, it's one of those Lexis or Westlaw unpublished

7  opinions but can be cited for a particular purpose, having to do

8  with a Fourth Circuit case in which a defense expert was not

9  allowed to testify as a small business expert.

10          Self-evident propositions, of which have there's

11  already been a lot of evidence in here that guns are used for

12  protection, is not expert testimony.  I mean, it's common sense

13  within the realm of the jury.  And I think that the line that the

14  Court drew, I mean, I appreciate the fact that we'll have a

15  standing objection.  But what the government is really trying to

16  do, in conjunction with their objections to certain jury

17  instructions and their insistence on trying to get certain jury

18  instructions, is basically ask the Court to give a directed

19  verdict by defining the conspiracy in such a way that we can't

20  put on a defense that is supported by jury instructions.  And the

21  same thing with respect to the expert testimony.

22          The ultimate issue that the jury ultimately has to

23  determine, and I know that there's no per se prohibition on

24  testimony on the ultimate issue, but nevertheless, with respect

25  to assisting the trier of fact, we're entitled to mount a factual

1    defense that the conspiracy that's charged isn't the one that's

2    been proved, that goes to the multiple conspiracies, which the

3    government is objecting to, for us getting an instruction on that

4    point.

5              And also the same with respect to the RICO, the RICO

6    enterprise.  And the judge, the Court will instruct very detailed

7    on the law concerning the definition of the enterprise.  And to

8    basically just have testifying from the podium, you know, great

9    to get my closing argument in under oath as well from a purported

10   expert.  That's really all this witness is going to testify to.

11             Once you stipulate to the drugs come from outside the

12   United States.  And by the way, that isn't even actually

13   essential to prove the charges.  It's the enterprise that has to

14   affect interstate commerce.  It's the testimony about the

15   interstate travel of some of the defendants to Pennsylvania and

16   to New York.  So you don't even need to prove that drugs don't

17   come from the United States to prove the interstate aspect.  But

18   we'll stipulate to where the drugs come from.  So that's not an

19   issue.

20             But even with respect to some of the other matters that

21   Mr. Hanlon has testified to, it's all stuff that under that, the

22   case that Mr. Harding attached to his motion objecting to Ms.

23   Rhodes's argument concerning the rap music testimony expert, is

24   just classic, basic small business enterprise.

25             I think one of the things that Mr. Hanlon wants this

1    witness to testify to is that organizations start small, get big

2    because they find cheaper suppliers.  I'll take away the mocking

3    tone.  I apologize.  They find cheaper suppliers and they use

4    aggressive sales tactics.  Well, you don't need a drug expert to

5    testify to that.  That's part and parcel, that's almost a direct

6    quote out of the government's submission with respect to that.

7         So while we appreciate the standing objection, I think

8    that there's very little other than the interstate commerce

9    aspect which is going to assist this trier of fact because it's

10   all, otherwise it's just all argument that this amorphous entity,

11   whether or not it is or isn't proved beyond a reasonable doubt to

12   be a RICO enterprise as a matter of law.  And that is part and

13   parcel of what we've been here for for seven or eight weeks.

14        And to simply have the government be able to use, argue

15   that, well, because the defense is mounting a certain type of

16   argument, that's why we need an expert, that puts the cart before

17   the horse.  The substance of the testimony still really goes to

18   the heart of what are unique jury issues, not unique, which are

19   jury issues aided by appropriate instructions and argument of

20   counsel.

21        And again, the small business case that the government

22   cites in support to keep out some of the defense evidence really

23   covers much of what Ellington seeks to testify to.  And some of

24   the other stuff has already been testified to six or seven times

25   by fact witnesses, like the guns are used for the protection or

1    the guns are interchangeable.

2              THE COURT:  Okay.  Thank you, Mr. Kurland.

3         The Court is keenly aware that, after Daubert, courts

4    have been particularly vigilant when it comes to expert testimony

5    on drug organizations, one, to make sure that we're not just

6    talking about lay opinion testimony in the guise of expert

7    testimony and vice versa, but also vigilant as to the necessity

8    and appropriateness of such testimony because it can be

9    prejudicial to a defendant.

10        But based on Mr. Hanlon's proffer and the Court's view

11   of the record in this case, the Court's satisfied that the more

12   limited nature of Agent Ellington's testimony will be helpful to

13   the jury, and there's no suggestion that Agent Ellington does not

14   satisfy the Daubert standards.  And therefore, the Court's going

15   to permit him to testify in the more limited fashion than I've

16   indicated.

17        So while you have a standing objection, I'm trustful

18   that counsel for the defense understand the limitation that I've

19   imposed on the government.  And if Mr. Hanlon should stray,

20   should, in your judgment, stray into an area that I've tried to

21   make clear I don't think he should go into, you should object and

22   the Court will rule on your objections.

23        All right.  We'll have the jury, please.

24             MR. HANLON:  Should the government bring out its

25   witness, Your Honor?

1          MS. RHODES:  Your Honor, can I ask what time we may be

2     finishing today?

3          THE COURT:  Well, it depends on the witness.  We've got

4     the ballistics and then Agent Ellington?

5          MR. HARDING:  Yes, Your Honor.

6          THE COURT:  Certainly, that's all we're going to get

7     to.

8          MS. RHODES:  Is it possible that we end by ten minutes

9     before five?

10          THE COURT:  Oh, certainly.  Sure.

11          MS. RHODES:  Thank you, Your Honor.

12          THE COURT:  Sure.

13          (Jury enters the courtroom.)

14          THE COURT:  Good afternoon, ladies and gentlemen.  Once

15     again, as always, thank you for your patience.  We're ready to

16     continue.  The government may call its next witness.

17          MR. HANLON:  Thank you, Your Honor.  United States

18     calls Karin Sullivan to the stand.

19          KARIN SULLIVAN, GOVERNMENT'S WITNESS, SWORN

20          THE WITNESS:  Yes.

21          THE CLERK:  Be seated.  Will you speak directly toward

22     the mike.  State your name and spell it for the record.

23          THE WITNESS:  My name is Karin Sullivan, K-A-R-I-N.

24     S-U-L-L-I-V-A-N.

25          DIRECT EXAMINATION

1    BY MR. HANLON:

2    Q     Ms. Sullivan, good afternoon.

3    A     Good afternoon.

4    Q     Where do you work?

5    A     I work in the Lab Division with the Baltimore Police

6    Department.

7    Q     And what is your position?

8    A     I'm a firearms and tool mark examiner.

9    Q     How long have you been a firearms and tool mark examiner?

10   A     Since 1992.

11   Q     Have you been with the Baltimore City Police Lab that entire

12   time?

13   A     Actually, I started with the police department in 1988.  I

14   was a Mobile Crime Lab Technician before being promoted to the

15   Firearms Identification Unit.

16   Q     And have you been with the Firearms Identification Unit

17   since you've ceased being a Mobile Crime Lab, Crime Tech?

18   A     Yes.

19   Q     Your work obviously involves doing examination and firearms

20   identification work, is that right?

21   A     Yes.

22   Q     And if you could, tell us a bit about the training you've

23   received in that capacity.

24   A     Well, to become a firearms and tool mark examiner with the

25   police department, you have to have a degree, Bachelor of Science

1    degree.  So I have my Bachelor of Science degree in biology.  As

2    I said, I was a Mobile Crime Lab Technician first before being

3    promoted to the Firearms Identification Unit.

4            It's a three year training period where you go to

5    several different armors courses, which is where they teach you

6    how to take a gun apart, put it back together.  I've been to

7    Interarms, where I've done the Walther PP and PPK series pistols,

8    Beretta, where I've done the 92 and 96 series pistols and the

9    1200 series shotgun, and Glock, where I've done the Model 17

10   through 23 pistols.

11           I've also been to several firearms manufacturers where

12   I actually got to go to the manufacturer and watched them to take

13   a piece of steel --

14           THE COURT:  Ms. Sullivan, I'm sorry.  We're going to

15   ask you to slow down just a bit.

16           THE WITNESS:  Okay.

17           MR. HANLON:  She was waiting a long time, Your Honor.

18           THE COURT:  Understood.

19           THE WITNESS:  Where I actually take the piece of steel

20   and raw material to finish product, meaning the gun.

21           I've been to Beretta, Pine Tree Castings, which make

22   Ruger firearms, Smith and Wesson, Wilson Arms, O.F. Mossberg &

23   Sons, and Colt Firearms.

24           I've also been to, they'll send you to the different

25   firearms identification labs.  I've been to the Maryland State

1    Police, Pennsylvania State Police, FBI headquarters, PG County

2    Lab, Metro DC, and the ATF in Rockville.

3             I've also been to the FBI Training Academy in Quantico,

4    Virginia for their gunpowder and gunshot residue school and their

5    shooting reconstruction school.

6    BY MR. HANLON:

7    Q    Ms. Sullivan, obviously, your job involves routinely

8    examining firearms and cartridges and cartridge casings and

9    projectiles, is that right?

10   A    Yes.

11   Q    Could you begin to tell us how many you've examined during

12   the course of your career?

13   A    Oh, thousands.  Hundreds of thousands.

14   Q    And does the lab, does your lab have any proficiency testing

15   system?

16   A    Yes.  They started a proficiency testing system and I

17   couldn't tell you what date, but it's been a long while.  And

18   even before the proficiency testing was out, our supervisor and

19   the supervisor that I trained under would make up a test for us

20   to do.  And what a proficiency test is, it's done by the

21   collaborative testing, which is actually a company now.  And they

22   will make up a test.

23            They'll send us some bullets or they could send us

24   cartridge cases or they could send us a tool mark.  And they'll

25   kind of give you a scenario; that this tool was found at a crime

1    scene and this hasp from a lock was found.  Did this tool cut

2    this lock?  And you have to do the test.  And then you send your

3    answers to the company and they let you know whether or not you

4    passed or fail.

5              So there will be, we'll do a firearms case and then a

6    tool mark.  Every year you have one of each.  So you're tested

7    actually twice a year.

8    Q    Have you ever failed one of those tests?

9    A    No, I have not failed any of those.

10   Q    Have you been qualified to testify as an expert witness in

11   court before?

12   A    Yes, I have.

13   Q    State and federal?

14   A    Yes, the State of Maryland for Howard County, Baltimore

15   City, and the Juvenile and District, and the United States

16   District Court of Maryland, here.

17   Q    Ever had a court refuse to accept you as an expert witness?

18   A    No, I have not.

19   Q    Ms. Sullivan, out of curiosity, have you ever -- I shouldn't

20   say curiosity because you and I have talked about it already --

21   have you ever testified for the defense in a criminal case?

22   A    Yes, I've testified for the defense in two criminal cases.

23   Q    You had testimony helpful to them so you provided it?

24   A    Yes, it was.

25   Q    Your Honor, at this time the government would tender Ms.

1    Sullivan as an expert in the field of firearms examination and

2    tool mark examination.

3             THE COURT:  Any questions, counsel?

4             MR. COBURN:  I don't have any voir dire.  Just

5    objection generally, not to Ms. Sullivan specifically, but for

6    the reasons we discussed earlier.

7             THE COURT:  Noted.  The witness will be accepted as an

8    expert in the field tendered.

9    BY MR. HANLON:

10   Q    Ms. Sullivan, you and I have obviously talked and gone over

11   some of the items you're going to testify about today, haven't we

12   not?

13   A    Yes, we have.

14   Q    The various examinations that you did in this case that

15   we're about to get into, did you have a co-examiner working with

16   you on each of those cases?

17   A    Yes.  Every case in the Baltimore lab, Baltimore Police

18   Department Lab, every single case, whether it's an identification

19   or when I say a non-identification, if I was to get a bullet

20   fragment that would never be identified to anything, always two

21   examiners look at everything in our lab.  So we always have a

22   co-examiner, two people, two firearms, qualified firearms

23   examiners that looked at it, and we will both sign the report.

24   That way, if God forbid something happened to one of us, there

25   would be somebody else to be able to testify.  And it helps so

1    that there's no misidentifications.

2    Q    Calling your attention to March and April of 2002, that time

3    frame, did you examine some firearms-related items obtained

4    during the investigation of a March 11th, 2002 shooting involving

5    a victim named Eric Lee and a victim named Jacob Epps?

6    A    Yes.  That was under the complaint number of 027-C as in

7    Charlie 08012.

8    Q    And we're going to talk about this case for a few minute,

9    Ms. Sullivan, but just to try to frame things.

10           One of the first things you did is examine various

11   items just specific to the Lee and Epps investigation, is that

12   right?

13   A    Yes.  I had bullets and cartridge cases that were recovered

14   from that crime scene and the victims.

15   Q    Ms. Sullivan, for the record, I'm going to be showing you

16   various items which have been entered into evidence variously as

17   Government's Exhibits Lee 1, 2, 3, and 4 for this Court's record.

18   But Your Honor, for the Court's information, all of these items

19   are individually marked with Q numbers and things like that.  So

20   I'll probably be using the Q numbers more often than not.

21              THE COURT:  Very well.

22              MR. HANLON:  May I approach the witness?

23              THE COURT:  Yes.

24   BY MR. HANLON:

25   Q    Ms. Sullivan, I've just handed you a set of cartridge

1    casings, is that right?

2    A    Yes.

3    Q    And these are from the Lee/Epps investigation.  And they're

4    designated Q-1, 2, 3, 4, and Q-7 -- I'm sorry -- and Q-6 and 7,

5    is that right?

6    A    Okay.  So this is Lee, Government Exhibit Lee 2, which on my

7    firearms report is Property Number 02015456.  And Q-1 stands for

8    questioned first cartridge case.  Q-2 stands for questioned

9    second cartridge case, and so on.  So the Q's are the cartridge

10   cases.  I have Q-1, Q-2, Q-3, Q-4, Q-6, and Q-7.

11   Q    Among the things that you did when you received this

12   evidence, did you examine the six cartridge cases?

13   A    Yes.  We'll get the evidence up.  I'll mark this little

14   black area on the cartridge case so I know exactly what cartridge

15   case came out of which envelope, where I'll sign it, the Q

16   number.  I'll put the property number on it.  And then I'll take

17   the cartridge case ands compare them on a microscope.

18         And these cartridge cases were all fired from the same

19   firearm.  And these cartridge cases bear class characteristics

20   most commonly fired from a Glock.  And they're .40 caliber.

21   Q    And moving a bit more quickly if I can, because this jury

22   has already heard a bit already about firearms identification and

23   the techniques used.  You made that determination based on

24   individual characteristics and things like that, is that right?

25   A    Yes.

1    Q    So it's a Glock.  And you determined that these particular Q

2    cartridges were from the same Glock, is that right?

3    A    Yes.  All of these cartridge cases were fired from the same

4    firearm.

5    Q    Now, ultimately, these six cartridges were compared by a

6    colleague of yours from Baltimore County named Sergeant Mark

7    Ensor, is that right?

8    A    Yes.

9    Q    And he compared them against a recovered Glock in a

10   Baltimore County case, is that right?

11   A    Yes.

12   Q    Putting those aside for the moment, if you have room there.

13   Let me show you the next batch.  Approach the witness once again,

14   Your Honor?

15        THE COURT:  Yes.

16   Q    Before I do that, Ms. Sullivan, I'm going to walk up to you

17   again, from the Lee case, a series of items which have been

18   designated for examination purposed as Q-1B, Q-1 Bravo, Q-4B,

19   Q-5B, and Q-6B.

20   A    Okay.  Now, when I say Q-1B, that's questioned first bullet,

21   Q-2B, that's questioned second bullet.  Now, these are, these are

22   all one government exhibit?

23   Q    Don't worry about the government exhibits, Ms. Sullivan,

24   because --

25   A    Okay.  Okay.  These bullets, Q-1B from property number, now

1    you've got me confused.

2    Q    Sorry.

3    A    5456, and Q-4B and 5B and 6B.  5B and 6B.  These are .40

4    caliber bullets that bear rifling class characteristics most

5    common to a Glock.

6    Q    Were you able to tell, based on your examination -- I

7    understand that it came from a Glock -- were you able to tell

8    just looking at these projectiles, these bullets, for sure

9    whether they came from the same firearm?

10   A    No.  They lacked sufficient markings to be identified as

11   either all being fired from the same firearm or being fired from

12   different firearms.  So they were never -- no, they couldn't be

13   identified to each other or to the Glock from Baltimore County.

14   Q    Which was going to be my next question.  You can't

15   necessarily tell whether this set of projectiles comes from the

16   same .40 caliber as the first set of cartridges you just looked

17   at?

18   A    Right.  The cartridge cases were fired with the Glock.  The

19   bullets, I can't tell.

20   Q    Putting them aside now and continuing to move through the

21   Lee case.  Let me show you the next batch.  Again, from the Lee

22   case number, Ms. Sullivan.  I'm going to show you items which

23   were marked for comparison purposes as Q-5, Q-8, Q-9, and Q-10.

24   And again, they may come from different property numbers but

25   they're under the same case number.  May I approach the witness,

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 185 of 278

1    Your Honor?

2              THE COURT:  Yes.

3    A    Okay.  Q-5, Q-8, Q-9 and Q-10 are .40 caliber cartridge

4    cases and all of these cartridge cases were fired in the same

5    firearm but they weren't fired in the Glock.  So they're fired in

6    a different firearm.

7    Q    And not the same firearm.  That's what you just said.

8    Different firearm than the other one?

9    A    Right.  All four of these were fired in one gun, the same

10   gun, but they weren't fired in the Glock.

11   Q    And again, let me now show you what's been marked for

12   comparison purposes again, from the Lee case, items designated

13   BF-1, Q-3B, and Q-7B.  Approaching the witness again, Your Honor?

14             THE COURT:  Yes.

15   A    Okay.  BF-1 is a bullet fragment one.  And Q-7B is a bullet.

16   And Q-3B is a bullet.  They are .40 caliber.  And these three

17   were fired in the same firearm and they bear rifling class

18   characteristics most common to Ruger firearms.

19   Q    So not a Glock this time, but a Ruger?

20   A    Right.  Not the Glock but to a Ruger.

21   Q    And again, without repeating everything, since I know the

22   jury's already heard a bit of this, all of this analysis is based

23   on comparison of individual markings, individual characteristics

24   on each one of these items, is that correct, Ms. Sullivan?

25   A    Yes.

1    Q    Now, initially when you went through these items, and I've

2    shown them to you in four categories, you just had the Lee case

3    to look at in comparing items, is that right?

4    A    Correct.  When I did this, all the evidence, this is from

5    the complaint number 027-C-08012.  So this is all the evidence

6    from the Epps and the Lee murder, shooting, murder.

7    Q    Shooting is fine.

8    A    Shooting.

9    Q    And if you could, Ms. Sullivan, could you just please sum up

10   what your findings were from the various Lee and Epps items you

11   just went through?

12   A    Okay.  There were two guns used in that crime.  One is a

13   Glock and the other one is a Ruger.  And the cartridge cases from

14   the Glock were all fired from the same firearm and then later on

15   were matched to the Glock from Baltimore County.  The Ruger, I

16   never got a gun, but the bullets are class to a Ruger, and

17   cartridge cases were all fired in the same firearm.

18   Q    Now, you've talked about this Glock that was eventually

19   compared against some of the items.  You never received a Ruger

20   to compare it.  So there's no Ruger we can talk about today, is

21   that right?

22   A    Correct, I never got a gun.

23   Q    Did there come a time when you had an opportunity to compare

24   some of these Lee items that we've been talking about today with

25   items from another case?

1    A    Yes.  And that comparison was done with James Wagster and

2    myself.  And the complaint number from Jimmy Wagster's case was

3    026-C as in Charles 17149.  The cartridge cases, which are Q-1,

4    2, 3, 4 and 5 were compared to the Lee and Epps cartridge cases,

5    my cartridge cases, Q-5, 8, 9, and 10 from 027-C-08012.  And

6    those cartridge cases were all fired in the same firearm.  So

7    those two different crimes, same gun used.

8         The bullets from 026-C-17149, which are class to Ruger

9    bullets, matched my bullets, my Ruger bullets from the Epps and

10   the Lee case.

11   Q    Let me walk through that a little bit if I may.  The other

12   case that you made comparisons with, you gave a case number.

13   Does that relate to a March 25th, 2002 shooting involving a

14   victim named Darryl Wyche and a victim named Anthony Wyche?

15   A    Yes.

16   Q    And one of the comparisons or one of the set of items from

17   the Wyche shooting that you made your comparison to -- and Your

18   Honor, for the record, the Court exhibits are Government's

19   Exhibits W-1, W-3, and W-4.

20        THE COURT:  Very well.

21   Q    But we'll be referring to Q exhibits, Q items for

22   convenience.

23        From the Wyche case, you made comparisons with some of

24   your items in the Lee case to Wyche items Q-1, Q-2, Q-3, Q-4, and

25   Q-5, is that right?

1    A    Yes.  Five cartridge cases from 17149 to Wyche.

2    Q    And I'm going to show these to the jury through our overhead

3    projection system, Ms. Sullivan.  Then I'll walk them up to you.

4    You can see how they're packaged.  These are cartridge casings,

5    is that right?

6    A    Cartridge cases, yes.

7    Q    And each one has a Q number, is that correct?

8    A    Yes, it does.

9    Q    And then we have our individual casings there.  That's Q-1

10   through 3.  And on the flip side here we have Q-4 and Q-5, all

11   from the Wyche case.  Am I reading that right?

12   A    Yes.

13   Q    Approach the witness, Your Honor?

14        THE COURT:  Yes.  Would you like some water, Ms.

15   Sullivan?

16   A    Sure.  That would be great.

17   Q    So you compared these Wyche cartridges, 1 through 5, in the

18   Wyche case.

19   A    Cartridge cases.

20   Q    Cartridge casings -- I'm sorry -- to several cartridge

21   casings from the Lee case, is that correct?

22   A    Yes.

23   Q    And do you have them handy?

24   A    I do.  Here's the cartridge cases from the Lee shooting.

25   Q    May I borrow them?

1    A    Um-hum.

2    Q    To try to keep them organized, I'm going to put them

3    together here.  And what conclusions did you draw about your

4    comparison between the Wyche cartridge casings and the Lee

5    cartridge casings, which were Q-5, Q-8, Q-9 and Q-10, for the

6    record?

7    A    All fired with the same firearm.

8    Q    And how did you reach that conclusion?  What specifically

9    about the casings?

10   A    Same thing.  Putting them on the comparison microscope,

11   looking for the individual markings that are on them.

12   Q    And in addition, Ms. Sullivan, you also received, we've been

13   talking about cartridge casings from the two, from the two cases.

14   You also had an opportunity to compare some bullets or

15   projectiles from the Lee case to bullets or projectiles from the

16   Wyche case, is that right?

17   A    Yes.

18   Q    And I'm going to put on the screen for the jury's reference

19   two Wyche items which have been labeled for comparison purposes

20   as Q-1B and Q-2B.  Purposes of publication to the jury here.

21   They've already been entered into evidence.  Approach the witness

22   one more time, Your Honor?

23   A    Yes.

24   Q    All right.  Ms. Sullivan, you compared Q-1, Q-1B and Q2-B

25   from the Wyche case to items from the Lee case, specifically,

1    projectiles labeled BF-1, Q-3B and Q-7B, is that right?

2    A    Yes.

3    Q    And what conclusions did you draw?

4    A    These bullets from the Lee matched the bullets from the

5    Wyche case.  They're .40 caliber and they have, their rifling

6    class characteristics, as I included on the report, are most

7    common to Ruger firearms.

8    Q    For all the same reasons that you've just stated and already

9    stated?

10   A    Yes.

11   Q    Now, without getting in all the Q stuff, I'm going to take a

12   stab, Ms. Sullivan, of just trying to sum up what it is you've

13   been talking about today, if we can.

14          You started off in your work just by making an

15   individualized comparison of items from the Lee shooting, is that

16   correct?

17   A    Yes.  I, my case, the Lee and Epps case came first.  And

18   there was two guns, a .40 caliber where the bullets are classed

19   to Ruger and another .40 caliber where they're classed to a

20   Glock.

21   Q    Do I have that right?

22   A    I think so.

23   Q    I may not have.

24   A    That's what I want to look and see.  Was it six cartridge

25   cases --

DIRECT EXAMINATION OF SULLIVAN                                     191

1     Q    Leaving aside the numbers, I just want to make sure the

2     relationships are correct.

3     A    Right.  That's what this is showing me, right?  There's two

4     guns for mine.  One's a Glock and one's a Ruger.  The top one you

5     put an R for the Ruger.  Is that why you did that?  And G for a

6     Glock.

7     Q    That was my attempt.

8     A    And then the next case was Jimmy Wagster's case, the Wyche

9     case.  And he had .40 caliber cartridge cases and bullets.  And

10    his cartridge cases from the Wyche and his bullets from the Wyche

11    match my cartridge cases and bullets from the Epps.

12          Then we get the Glock recovered in Baltimore County,

13    which is matched back to the Glock cartridge cases from the Lee

14    and the Epps.

15    Q    And that's what the examinations reveal in this case, Ms.

16    Sullivan?

17    A    Yes.

18    Q    Thank you, Ms. Sullivan.  Nothing further, Your Honor.

19          THE WITNESS:  Do you want all this stuff back?

20          THE COURT:  Yeah.  I would suggest, out of an abundance

21    of caution, Mr. Hanlon, that you re-package all the exhibits.

22          MR. HANLON:  I agree, Your Honor.

23          THE WITNESS:  The property numbers are all on there, so

24    you should be able to pop them right back in their envelopes.

25    Now, I may need all that stuff back for him, though.

1          THE COURT:  They'll bring it back to you, Ms. Sullivan.

2          THE WITNESS:  So don't go far.

3          MR. HANLON:  I promise the Court won't let me go far.

4    I've tried to escape.

5          CROSS EXAMINATION

6    BY MR. COBURN:

7    Q    Ms. Sullivan, good afternoon.

8    A    Good afternoon.

9    Q    Whenever you're ready.  Take your time.

10   A    Okay.

11   Q    Okay.  Let's go back to that, the chart that Mr. Hanlon was

12   just now showing you.

13   A    Can you push it up just a hair because there's something

14   here on the bottom I can't read.

15   Q    Yeah.  I think, actually, we're not supposed to do that.  In

16   fact, I think I probably showed you more than I'm supposed to

17   there.  Sorry about that.  Can you see what's displayed on it

18   right now?

19   A    Uh-huh.

20   Q    Okay.  So if I understand correctly, in the homicide, or

21   rather what's been referred to as the shooting relating to Lee

22   and Epps --

23   A    Hold on.  Let me get those out.  All right.  Lee and Epps.

24   That's the 8012.

25   Q    That's your number, right?

1    A    Yes.  7-C-8012.  Yes.  Okay.  All right.

2    Q    One of those guns is a Ruger?

3    A    Yes.

4    Q    Right?  And as far as you know, that gun, the one that's the

5    Ruger, has absolutely no connection to the Baltimore County case

6    that Sergeant Ensor was working on, is that right?

7    A    Yes.  Now, I don't know, all I know is about that Glock.

8    Q    Okay.  So let's just focus not on the Ruger, but on the

9    Glock.  And I think you said that in Mr. Hanlon's chart, the one

10   that we're looking at right now on the display, that's the bottom

11   one, right?  I think he put a G next to the bottom one.

12   A    Yeah.  He had it circled on there.  It's not there now.  But

13   that's what I think --

14   Q    I can try to put it back, although I probably would mess it

15   up.  In terms of like just so we can all kind of track this, your

16   understanding is that the bottom thing on this chart refers to

17   the Glock as opposed to the Ruger?

18   A    That's my understanding.

19   Q    Okay.  And with respect to that Glock, the six shell casings

20   that we're talking about are Q-1, Q-2, Q-3, Q-4, Q-6 and Q-7?  Is

21   that how you have them?  This gets pretty complicated.  And I

22   apologize.

23   A    All the Q's.  Q-1 through Q-4.  That's four.  Q-6 and Q-7.

24   Q    Okay.

25   A    Are the .40 S & W cartridge cases that were fired in the

1    same firearm and they bear class characteristics to the Glock.

2    So they were the ones that were matched to the Glock.  So they

3    have, what?  Four, five, six -- right.

4    Q    And those are shell casings, again, these are relating to

5    the Epps/Lee, the Jacob Epps/Eric Lee shooting, right?

6    A    If that's the 027-C-08012 case.  See, we don't get the names

7    of all these people.  We just get a complaint number.

8              THE COURT:  What he's asking you, I think, Ms.

9    Sullivan, if you can, to work off the chart that's on the monitor

10   there.

11   A    Okay.  All right.

12             THE COURT:  Go ahead, Mr. Coburn.

13             THE JURORS:  Can he slide the chart up?  I can't see

14   it.

15             MR. COBURN:  I think, actually, the problem is that the

16   jury doesn't have -- each one of these monitors kind of reflect a

17   different image.  Thanks a lot.  That's perfect.  How's that?

18             THE COURT:  The monitor's too low.

19   BY MR. COBURN:

20   Q    Thanks for telling me about that.  Can you see it, too, Ms.

21   Sullivan?

22   A    Yup, yup.

23   Q    Great.  Because your monitor's actually a little off to the

24   right.

25   A    So when --

1        THE COURT:  Just a moment.  Just a moment, please.

2    A    Oh, geez.

3        THE COURT:  I don't understand what the problem is.

4        MR. COBURN:  Just the jury's monitor got knocked off a

5    little bit, Your Honor.  Thank you, Ms.  Arrington.

6        THE COURT:  Thank you, Ms. Arrington.  Okay.  Don't fix

7    it if it's not broke.  Okay.  Go ahead, Mr. Coburn.

8    BY MR. COBURN:

9    Q    Thank you so much, Your Honor.  Okay.  So we're talking

10   about six Glock, I mean, and they're clearly Glock, shell casings

11   that are recovered as one of, I mean, there's two, there's two

12   guns in the Epps/Lee shooting.  One of them appears to be a

13   Glock, right?

14   A    Right.

15   Q    God, and I apologize to the Court.  I am just confused here

16   myself.  Do you remember --

17       THE COURT:  Take your time, Mr. Coburn.

18   Q    I appreciate it very much, Your Honor.  Do you remember at

19   one point during your testimony when you were responding to Mr.

20   Hanlon, saying that some bullets or shell casings came out of a

21   Glock that you could not ID them to the particular Glock used in

22   Baltimore County?

23   A    The bullets.

24   Q    The bullets?

25   A    Right.

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 196 of 278

1    Q    Okay.  The shell casings, Q-1 through 4, Q-6 and Q-7, are

2    the ones that Sergeant Ensor from Baltimore County worked on and

3    he came up with a link between those shell casings and the Glock,

4    what's on the chart here as the Glock recovered from woods,

5    right?

6    A    If that's where they got the Glock from the woods.  Yes.

7    What will generally happen is Baltimore County --

8              THE COURT:  I'm sorry.  I'm going to interrupt you, Ms.

9    Sullivan, and ask you just to listen to Mr. Coburn's questions

10   and just answer the questions.

11   A    Okay.

12             THE COURT:  Go ahead.

13   Q    I know you're trying, because I know you weren't in the

14   woods, right?

15   A    Right.

16   Q    You're looking at a gun that has a number on it and you're

17   just trying to refer to that number.  So I understand.  More than

18   one number.

19             So there is a .40 caliber Glock, right, that you were

20   asked, which you understood to be recovered from the woods,

21   right?

22   A    Okay.

23             THE COURT:  Can you just use the term "Baltimore County

24   gun?"

25   Q    Yes.

Case 1:04-cr-00029-RDB    Document 691    Filed 06/12/09    Page 197 of 278

1          THE COURT:  Okay.

2     Q    There's a .40 caliber Glock which you understood to be the

3     Baltimore County gun, right?

4     A    Yes.

5     Q    And you were asked to compare, to see whether or not you

6     could determine that a certain number of bullets that you

7     understood were recovered from what you understood to be the

8     Wyche double homicide, whether those -- is that right?  Am I

9     right so far?  No.  I'm wrong.  Okay.

10          THE COURT:  You want some water, Mr. Coburn?

11    Q    Maybe I can just --

12          MR. HANLON:  May I confer with counsel?

13          THE COURT:  Yes.  Please confer with Mr. Coburn.

14          THE WITNESS:  I was going to ask you if I could help

15    out there.

16          (Pause in proceedings.)

17    BY MR. COBURN:

18    Q    Let me see if I can pose the question this way.  With

19    respect to the Baltimore County gun, the Baltimore County .40

20    caliber Glock gun.

21    A    Okay.

22    Q    You were asked, and it was just the last part of your direct

23    testimony, to make a, see if you can make a comparison between

24    that gun and certain bullets, right?

25    A    And cartridge cases.

1    Q    Bullets and cartridge cases.  And where did they come from?

2    What's your understanding of where those items came from, the

3    bullets and the cartridge cases?

4    A    I have my bullets and cartridge cases under my case, which

5    is the Lee and the Epps case.  James Wagster had the Wyche case.

6    He and I compared those.  Mark Ensor from Baltimore County got

7    the Glock.  He came down and he compared my cartridge cases from

8    the Epps and the Lee case and all of it was all compared by Mark

9    Ensor and James Wagster.

10   Q    You can leave the Ensor part of it aside.  We've heard, he's

11   testified.  Okay?

12   A    Okay.

13   Q    So I'm just focusing on what you did, leaving what he did to

14   one side.  With respect to the Baltimore County gun, what did you

15   do?

16   A    I didn't do anything.

17   Q    No further questions.

18        THE COURT:  Any other questions?  Any redirect?  Thank

19   you very much, Ms. Sullivan.

20        THE WITNESS:  Thank you.

21        THE COURT:  You're excused.  Last witness for the day?

22        MR. HANLON:  United States calls Special Agent Doug

23   Ellington.

24        THE COURT:  All right.

25     SPECIAL AGENT DOUG ELLINGTON, GOVERNMENT'S WITNESS, SWORN

1           THE WITNESS:  I do.

2           THE CLERK:  Be seated.  Speak directly toward the mike.

3    State your name and spell it for the record, please.

4           THE WITNESS:  Douglas Ellington.  E-L-L-I-N-G-T-O-N.

5           DIRECT EXAMINATION

6    BY MR. HANLON:

7    Q    Good afternoon, sir.

8    A    Good afternoon.

9    Q    What do you do for a living?

10   A    I'm a Supervisory Special Agent for the United States Drug

11   Enforcement Administration.

12   Q    How long have you worked for the DEA?

13   A    Sixteen and a half years.

14   Q    And is that, have you worked anywhere else in law

15   enforcement?

16   A    Yes.  I worked for the United States Secret Service.

17   Q    For how many years?

18   A    A little over three.

19   Q    Were you a Special Agent there?

20   A    No.  I was in the uniformed division at the White House.

21   Q    Go from Secret Service to DEA?

22   A    Yes.

23   Q    If you could, Special Agent Ellington, could you tell us a

24   bit about your training and your experience and how you came to

25   be a DEA agent?

1    A    I've attended and completed the Federal Law Enforcement

2    Training Academy in Glencoe, Georgia, as well as the United

3    States Secret Service Training Academy in Beltsville, Maryland,

4    and the United States Drug Enforcement Administration Training

5    Academy in Quantico, Virginia.

6    Q    And when was that?

7    A    1992.

8    Q    And what kind of training did you receive at those

9    facilities?

10   A    Basic law enforcement training and, in Secret Service was

11   geared toward protection and the DEA was obviously geared toward

12   drug investigations.

13   Q    What kind of specific drug investigation training did you

14   receive?

15   A    I've had advanced training in, I've attended the DEA

16   advanced agent training.  I'm a certified firearms instructor, a

17   certified tactical instructor.  I've had advanced, or attended

18   schools for money laundering, financial investigations, advanced

19   undercover school, electronic mobile surveillance school,

20   interdiction school.

21   Q    Let me ask you a bit about your investigative experience,

22   Special Agent Ellington.  Since joining the DEA, goes without

23   saying, but you've done drug investigations?

24   A    That's correct.

25   Q    Approximately how many drug cases have you worked?

1    A    I've been involved in approximately 500 investigations over

2    the course of my career.

3    Q    Of those investigations, have they involved one individual

4    person arrested with drugs in some cases?

5    A    Yes.

6    Q    Have they involved larger organizations?

7    A    Yes, they have.

8    Q    In terms of some of the investigative activity you've done,

9    does that include surveillance of suspected drug activity?

10   A    Yes.

11   Q    Have you been involved in executing search warrants and

12   searching houses where drug activities --

13   A    Yes.

14   Q    -- have been going on?  Have you been involved in financial

15   investigations and seizures involving money?

16   A    Yes, I have.

17   Q    Have you debriefed cooperating witnesses, informants, people

18   who were involved in drug activity and agreed to provide

19   information to the government?

20   A    Yes, I have.

21   Q    About how many debriefings would you say you've done during

22   your career?

23   A    Approximately a thousand.

24   Q    And is that a pretty regular thing?

25   A    Yes, it is.

1    Q    When you speak to informants, what are the topics that you

2    typically cover with them?

3    A    Their methods of operation.  What's current in terms of, in

4    the drug trade.  How their techniques and different things that

5    are, they're using to further their drug trade.

6    Q    In your work as a DEA agent and also from your education and

7    your training, you also, do you have an understanding of where

8    drugs come from, where they originate, and how they're moved in

9    and out and throughout the United States?

10   A    Yes, I do.

11   Q    Your Honor, at this time the United States would tender

12   Special Agent Doug Ellington as an expert in the area of drug

13   trafficking, narcotics trafficking.

14            THE COURT:  Any questions?

15            CROSS EXAMINATION (On Qualifications)

16   BY MS. RHODES:

17   Q    Yes.  Good afternoon, Mr. Ellington.

18   A    Good afternoon.

19   Q    I just have a few questions for you.  You have been in this

20   field for how many years altogether?

21   A    In law enforcement, over 20.

22   Q    Okay.  And in, specifically with the Drug Enforcement

23   Administration?

24   A    Sixteen and a half.

25   Q    And in that time, have you had a chance to write any

1    articles that are available for general publication?

2    A    No.

3    Q    On your expertise?

4    A    No.

5    Q    Is any of your work, your work in the courtroom ever

6    subjected to peer review?

7    A    No.

8    Q    Okay.  Can you explain to the jury what peer review is in

9    the scientific sense?

10   A    It would be reviewed by people who are in the field that

11   could review what was being said.

12   Q    So in this case, it would be, it would be somebody who is

13   your equivalent experience would have to review what you are

14   saying and what your opinion is of a particular case, right?

15   A    That's correct.

16   Q    But the way you operate is that the Assistant U.S. Attorneys

17   will tell you we need an opinion on this case, right?

18   A    That's correct.

19   Q    Okay.  And you've never testified for a defense case, have

20   you?

21   A    No, I haven't.

22   Q    In your 20 year career, have you always been employed by the

23   United States government?

24   A    Yes.

25   Q    And always been paid by them?

1   A    Yes.

2   Q    So in your cases that you've testified, you've always work

3   with Assistant U.S. Attorneys, is that right?

4   A    That's correct.

5   Q    No further questions, Your Honor.

6            CROSS EXAMINATION (ON QUALIFICATIONS)

7   BY MR. CROWE:

8   Q    Good afternoon, Mr. Ellington.

9   A    Good afternoon.

10  Q    Do I understand that a great deal of the information which

11  you have gathered about drug organizations has come from

12  debriefing of individuals in individual cases?

13  A    I think some has come from debriefing, but some has also

14  come from other techniques of actually listening, for example,

15  wiretap investigations, things of that nature.  We actually

16  listen to the drug dealers talking themselves.

17  Q    But clearly, what you have heard, what you have learned from

18  people that you have interviewed and debriefed is an important

19  component of your knowledge base, is that correct?

20  A    Yes.

21  Q    And is it also correct that an important component of your

22  knowledge base is not only what you have learned from people, but

23  what you have read in agency publications and in reports of

24  investigations conducted by individuals other than yourself?

25  A    Yes.  And also what I've observed myself, being on the, YOU

1    know, in certain situations.

2    Q    And in many instances, is it difficult for you to, when you

3    testify with respect to a certain fact or specific observation,

4    for you to separate what you've learned from your own personal

5    experience as opposed to what has been told to you or what you

6    have read?

7    A    Well, often times what we are told is corroborated through

8    our own investigation as well.  So if a defendant or a

9    confidential source tells us something, we don't typically rely

10   on that just solely on its own.  We usually corroborate that

11   information through our own investigation as well.

12   Q    But to a degree, you are relying on what you are told and

13   what you have, what you have read, is that correct?

14   A    And my observations, that's correct.

15   Q    In terms of the testimony that you expect to give today, are

16   there any databases or statistics that you rely on?

17   A    Just the information, in terms of pricing and stuff like

18   that, regarding drugs that would come from our Intelligence

19   Division within the Drug Enforcement Administration.

20   Q    So that would only be with respect to pricing, is that

21   correct?

22   A    Trends, yes.  That would be correct.  Trends and prices.

23   Q    Your Honor, I would object to the agent's testifying on the

24   basis of Crawford.  It seems to me that he's relying on certain

25   information which he's obtained from other people.  And there's

1   no way for us to cross examine that.

2            THE COURT:  Your objection's noted.  Mr. Coburn.

3            CROSS EXAMINATION (On Qualifications)

4   BY MR. COBURN:

5   Q    Thank you, Your Honor.  Just very briefly.  Agent Ellington,

6   good afternoon.

7   A    Good afternoon.

8   Q    You're a DEA agent, right?

9   A    That's correct.

10  Q    And that stand for the Drug Enforcement Administration?

11  A    That's correct.

12  Q    That's a federal agency, right?

13  A    Yes, sir.

14  Q    You're not a local law enforcement agent?  You're not, let's

15  say, a Baltimore City police officer or something like that?  You

16  work for the federal government?

17  A    That's correct.

18  Q    With respect to the experience that you've had with respect

19  to, in drug investigations -- I'm just looking at your resume

20  here -- how much of it has focused on drug selling activities in

21  inner city Baltimore as opposed to, you know, importation from

22  abroad or what you regard as organizations encompassing more than

23  just one city?

24  A    I would say a large portion of my experience would involve

25  all levels of narcotic investigation.  But specifically, often

1    times street level drug dealing is, is a large position of our

2    investigation as well.

3    Q    You look at it insofar as the street level -- now, the DEA

4    typically doesn't get involved in a street bust, right?

5    A    No, we do.

6    Q    You do?

7    A    Yes, sir.

8    Q    Okay.  I mean, you would get involved in it insofar as it

9    would sort of play into sort of a larger aspect in the chain of

10    distribution, is that fair to say?

11    A    Yes, sir.

12    Q    Okay.  Thank you very much, Your Honor.

13            THE COURT:  All right.  Any additional questions, Mr.

14    Hanlon, on expertise?

15            MR. HANLON:  No, Your Honor.

16            THE COURT:  All right.  Now, ladies and gentlemen,

17    you've seen this before in this trial and I haven't given you

18    this instruction, but I will now.  As you well know, ordinarily

19    in a trial, witnesses are required to testify based solely on

20    their personal knowledge of the events about which they testify.

21    There is a category of witnesses, many of whom you've seen in

22    this trial, to whom we attach the label "expert."

23            An expert witness is a person who, such as Dr. Rubio,

24    for example, on account of her training, experience and study is

25    able to not testify limited to his or her personal knowledge

208

1    about the matters involved in the lawsuit, but actually to

2    testify by way of his or her opinion about certain matters, not

3    specifically based on the facts and circumstances of the

4    particular case.

5              The idea here is that an expert or person recognized as

6    an expert can help the jury understand the evidence and make

7    determinations about the facts by providing the jury with

8    information that would not otherwise be available to a normal

9    person serving on a jury.  And thus, for example, again, we had a

10   medical examiner in here to testify as to the deaths of certain

11   individuals.

12             The government here is tendering Agent Ellington as an

13   expert in the area of drug trafficking, manner and means and so

14   forth, and the Court will accept the agent as an expert

15   authorized to give you his opinions about certain matters that

16   may be helpful to you in your evaluation of the evidence in this

17   case.

18             Agent Ellington is not going to talk about, in his

19   testimony, any of the particulars of this case.  Rather, Mr.

20   Hanlon will put to him a series of general questions that, again,

21   are designed to provide you, through the agent's answers,

22   information that you may find helpful to you in your evaluation

23   of the actual evidence presented by the government in this case.

24             As is true with every witness and as I will further

25   instruct you, the fact that a witness is an expert does not mean

1  that you should give that witness' testimony any greater weight

2  or any let lesser weight than you would give to the testimony of

3  any other witness.  And indeed, as I will instruct you, the fact

4  that an expert offers an opinion on a particular matter does not

5  relieve you of your responsibility to evaluate all of the

6  evidence, follow my instructions on the law, including my

7  instructions on the evaluation of witness testimony, including

8  credibility, and to reach your own independent determination of

9  all facts that may be material and relevant in this case and

10  necessary to your decision.

11         So the agent will be accepted as an expert as tendered.

12  You may proceed.

13         CONT'D DIRECT EXAMINATION

14  BY MR. HANLON:

15  Q    Thank you, Your Honor.  Special Agent Ellington, let me ask

16  you a few questions to begin with about sort of the, about drugs

17  in general, sort of in a national sense.

18         Drugs like cocaine, heroin, marijuana, are they, are

19  they produced within the United States?

20  A    Marijuana can be, but heroin and cocaine are produced

21  outside of the United States.

22  Q    Whereabouts?

23  A    Cocaine is grown generally in South America, in the Andean

24  mountain region, countries such as Columbia, Bolivia, Peru.  It's

25  a plant.  It starts out in plant form, generally grown over 8,000

1    feet or above.  And then the plant is then transformed into a

2    paste form using various chemicals.  And then eventually it's

3    packaged in the form of cocaine hydrochloride in kilogram

4    quantities.  A kilogram is a thousand grams or 2.2 pounds.

5            Cocaine hydrochloride is water soluble, which means if

6    you pour it in water, it's going to dissolve.  But after it's

7    packaged in the kilogram quantity, it then makes its way through

8    any number of different smuggling techniques into the United

9    States.  Generally, a large portion of the cocaine that comes

10   into the United States comes in through the southwest border,

11   through Mexico, and into the country.

12           But there are any number of any other smuggling

13   techniques.  That they use planes, they use boats.  Sometimes

14   they'll body carry, which means they'll conceal the cocaine on

15   their body and smuggle it into the United States.

16           Heroin, on the other hand, probably 80% of the heroin

17   that we see, especially on the East Coast here, is produced in

18   Columbia as well.  But there are other countries that produce

19   heroin, countries such as Afghanistan and Pakistan, in the

20   southwest and southeast area of China.  Burma, Laos and Thailand

21   also produce heroin.  But just as in cocaine, it's packaged in

22   kilogram quantities and eventually smuggled into the United

23   States.

24           Generally, once the drugs make it into the United

25   States, they usually make their way to a source city.  A source

1    city would be a city such as New York, Miami, Atlanta, Houston,

2    LA. Then they're later distributed to smaller cities, what we

3    call consumer cities, cities such as Baltimore, Washington,

4    Richmond.

5              At that point in time, you generally, when the

6    kilograms are being transported across the country from source

7    cities to consumer cities, they're generally packaged in a

8    wholesale quantity.  And a wholesale quantity would be a

9    kilogram.  That's what we would refer to as a wholesale quantity.

10             At some point in time the drugs are eventually broken

11   down into street quantity or retail quantity, which would be a

12   smaller quantity of drugs.  That's really where, the street level

13   is really where the rubber meets the road in the sense of that's

14   really where most of the profits are made in the drug trade at

15   the street level.

16             If you take a good analogy, I like to use there, is if

17   you have a case of water that has 24 bottle of bottled water and

18   you buy that for five dollars, you could easily turn around, you

19   could turn around and sell that to someone else at a wholesale

20   level for $10 and you're going to make some profit.  But if you

21   broke that down, the 24 bottles, and you sold each bottle for a

22   dollar you're going to make much, much more money.  You're going

23   to make, obviously, $24.

24             Now, the problem there in the drug trade is that when

25   you break it down into that level, street level, even though

1    you're going to increase your profit, you're going to increase

2    your risk.

3              Any time in the drug trade, any time you increase your

4    risk, you're going to increase your profit.  But the street level

5    drugs is really where most of the money is made.  But as I said,

6    you're going to increase your risk.

7              If you have that same case of water and you sell it to

8    one person for $10 you've only had to interact with one person.

9    If you break the bottles down and sell them one at a time, you

10   interact with many more people.  And in the drug trade, the

11   reason that's risky, you don't know whether or not you're selling

12   to an undercover police officer or you might be selling to a

13   cooperating witness for the government.

14             So that's generally how the drugs make it into the

15   United States from the source countries and then eventually make

16   their way down to street level distribution.

17   Q    You have touched on this already, Special Agent.  But drugs

18   are going to be cheaper to buy in quantity in a source city in

19   New York than they will be in, say, a smaller, midsize city like

20   Baltimore, is that right?

21   A    That's correct.

22   Q    How about getting drugs in Baltimore by the unit versus

23   distribution in smaller towns outside Baltimore?  Is there going

24   to be a price differential there?

25   A    Yeah.  The smaller cities, as I said, you increase the risk,

1    you're going to increase the profit.  So if you're in small city,

2    generally the cost or the supply and demand is going to drive the

3    price up.

4            For example, if you went down to Houston, Texas, you

5    could probably buy a kilo of cocaine for, depending on the market

6    at that time, roughly around $11,000, anywhere from 10 or

7    $11,000.  Up in Baltimore right now a kilogram of cocaine is

8    going for as much as 25 to $30,000.

9            So if you were willing to take the risk and to drive

10   down to Houston, Texas and to purchase the cocaine down there and

11   then drive it back with taking the risk of perhaps being stopped

12   by a state trooper or somebody along the way, you're going to

13   increase that profit.

14           But I believe your question was, if it's in smaller

15   towns, is the price going to be higher?

16   Q    Say if you're moving from a New York to a Baltimore and then

17   from a Baltimore to a smaller town, is there going to be a price

18   differential moving away?

19   A    Yes, I would say there would be.

20   Q    You've also touched on this.  In terms of how the drugs are

21   moved around the United States.  It includes over grounds, by

22   interstate and car, things like that?

23   A    That's correct.  Just as I touched on at the beginning to

24   the country, moving the drugs around from city to city, you're

25   only limited by your imagination.  Often times we see vehicles

1    that have traps in them, tractor trailers that have traps in

2    them.  They're flown on airplane.  There any number of different

3    methods that drugs make it from Point A to Point B.

4    Q    Now, I asked you about marijuana at the beginning.  And

5    marijuana is a drug that is produced within the U.S., is that

6    right?

7    A    Yes, it can be.

8    Q    Also in Canada and Mexico?

9    A    Yes.

10   Q    And elsewhere?

11   A    Yes.

12   Q    Marijuana is moved into the United States or produced inside

13   and moved around the United States.  Is it similar to the way

14   other drugs are moved?

15   A    Yes.  The only difference with marijuana is because it's

16   bulkier than the others, it's really more difficult to move

17   marijuana around without being detected.  But generally, the same

18   principles and concepts and methods apply to marijuana as they

19   would heroin or cocaine.

20   Q    A kilogram of marijuana is generally going to be much

21   cheaper than a kilogram of cocaine or heroin, is that right?

22   A    Yes.

23   Q    Let me ask you in terms of, again, about how much money is

24   generated from all this activity.  Nationally speaking, the drug

25   industry in the United States, I don't know if I want to ask you

1    for a total number, but it's a lot of money, is that fair so say?

2    A    Yes, I would say in the billions of dollars.

3    Q    Billions?  How about within the State of Maryland?

4    A    That would be tough for me to -- I mean, there's millions of

5    dollars that would, you know, that can be made from the drug

6    trade.

7    Q    So it would be in the millions at least?

8    A    Yes.

9    Q    Let me ask you about breaking down the quantities in a

10   moment.  But let me ask you this.  What is the difference between

11   cocaine or powder cocaine and crack cocaine?

12   A    Crack cocaine is the base form of cocaine hydrochloride.  As

13   I said, cocaine hydrochloride is water soluble.  It's a

14   relatively simple process to change cocaine hydrochloride back

15   into its base form of crack cocaine.  You need boiling water.

16   You need, obviously, cocaine hydrochloride.  And you need sodium

17   bicarbonate, which is really baking soda.  And what you would do

18   is you would pour the cocaine hydrochloride into the boiling

19   water where it would dissolve.  And then at a ratio of four to

20   one, meaning if you had one ounce of cocaine hydrochloride, you

21   would need four ounces of sodium bicarbonate, you would add the

22   baking soda into the boiling water with the cocaine

23   hydrochloride.  And the chemical reaction would transform, it

24   pulls away the cocaine base from the other chemicals that were

25   used to produce the cocaine hydrochloride.

1          Those chemicals would be like, for example, acetone,

2    ether, gasoline, various things that are used to produce the

3    cocaine hydrochloride.  And those chemicals will often times

4    evaporate in the air.  That's why often times you'll hear people

5    who are what they call cooking cocaine, they'll talk about a

6    distinct odor.  Generally, that's what that odor is.  It's the

7    chemicals that are evaporating into the air.

8          After, it almost looks like when you're doing this

9    process, it looks like a lava lamp, where when the cocaine base

10   separates, it's tannish in color and it kind of looks like

11   globules in a lava lamp.

12         Once the separation has taken place, it's removed from

13   the heat source, it's cooled down.  And then they use filtration

14   where they'll take, basically, you're pouring the water away from

15   the cocaine base.  You let it dry.  It hardens up.  As I said,

16   it's best described as kind of a rice cake.  It's tan, waxy in

17   color.

18         Then after you poured away the water, you need to dry

19   the cocaine out.  At that time, basically what happens is you

20   just, you're removing all the water from the cocaine.  And

21   eventually you're left with like a chunky substance.  And then

22   depending on whether or not you're selling it at the wholesale

23   quantity or retail, you'll either break it down into whatever

24   quantity, whether it's an ounce quantity, a half an ounce.  And

25   generally, all the way, if you're breaking it all the way down to

1    street level distribution, usually it's sold in, either sold in

2    vials or little glassine baggies.  And usually, that there's

3    generally a tenth of a gram in each baggie.  And usually,

4    depending on what area you're selling in, will sell for about $10

5    a baggie or $10 dollars a vial.

6    Q    And that's crack cocaine?

7    A    That's crack cocaine.

8    Q    And the technical term, in case the jury's heard it, is

9    cocaine base?

10   A    That's correct.

11   Q    You mentioned, you touched on the next thing I wanted to

12   talk about, Special Agent Ellington, which is the sort of retail

13   level.  Using vials and baggies and smaller little containers is

14   a common methodology you've seen, is that right?

15   A    That's correct.

16   Q    And crack cocaine you've seen broken down into quantities as

17   little as a tenth of a gram, is that right?

18   A    That's correct.

19   Q    How about heroin?  Have you seen heroin sold for as little

20   as a tenth of a gram?

21   A    Yes.  That would be called -- sorry.

22   Q    Please go ahead.

23   A    Generally, that would be called what we call a dime bag and

24   it would be similar, it's sold in a tenth of a gram quantity.

25           THE COURT:  Would you like some water, Agent?

1        THE WITNESS:  Yes, please, sir.  Thank you.

2   BY MR. HANLON:

3   Q    Sorry, Special Agent.  How about powder cocaine?  Can that

4   be broken down into quantities less than a kilogram to sell on

5   the street?

6   A    Yes.  Generally, often times, it can be broken down as far

7   as it can be sold as well in vials, which would be roughly about

8   a tenth a gram.  But often times we see cocaine sold in, sold

9   in the quantity of a gram.  A gram, the best way to visualize a

10  gram would be the same as a Sweet'n Low bag or an Equal bag.

11  That would be a gram of cocaine.  Generally would sell for about

12  80 to a hundred dollars per gram.

13  Q    In your work as a drug investigator, one of the things you

14  try to do is figure out if, once you seize a quantity of

15  narcotics, whether it's cocaine or heroin or something else, is

16  to try to figure out if that's someone's personal use, something

17  they're going to use for themselves, or whether or not it's

18  something they may be planning to sell or distribute to another

19  party, is that right?

20  A    That's correct.

21  Q    Let me ask you about some of the items you look for in this

22  capacity.  Baggies and vials and the presence of that sort of

23  item.  Is that something you look for in proximity to drugs to

24  discern --

25  A    Yes.

1   Q    -- whether it's going to be distributed?

2   A    Yes, that's correct.

3   Q    How about, in some cases, money and things like that?

4   A    Scales, money, yes.  All that stuff.

5   Q    How about firearms?  In your experience, is there any

6   relationship between firearms and drug trafficking?

7   A    Yes.  Guns and firearms pretty much go hand in hand.  I'm

8   sorry, guns and drugs go hand in hand.  If you look at the

9   newspaper or if you watch the news, we pretty much see that in

10  this area on a pretty regular basis.

11          In the drug trade, if a drug dealer has a problem,

12  unlike the average citizen, he can't pick up the phone and dial

13  911 because, obviously, he's involved, he or she is involved in

14  illegal activity.  So they have to be ready, willing and able to

15  protect themselves, to protect their money, to protect their

16  drugs, to protect other people that they work for all the time.

17  It's an everyday occurrence.

18          The drug trade is pretty much survival of the fittest.

19  If you're not willing to use something to protect yourself,

20  basically, one of three things will happen.  Either you'll be

21  arrested by the police.  Your competitors will force you out of

22  business.  Or the worst case scenario is you'll end up dead.

23          The firearm is the most common tool that the drug

24  dealers use to protect what they have.  It's somewhat readily

25  easily accessible.  It's something that drug dealers use often to

1   provide the protection.  It's something that the drug dealers

2   will pass to each other often.  And there are several threats in

3   the drug trade that have reasons why the drug dealers need

4   firearms.

5           The first threat is the police.  Often times if drug

6   dealers are forced into a corner and they're looking at

7   significant jail time, there may only be one way out and that

8   would be to fight with the police to get out of that situation.

9           Another threat would obviously be from competitors.

10  The drug trade, there's a lot of money in the drug trade.  And

11  greed drives a lot of the violence associated with the drug

12  trade.  And competitors often see a fellow drug dealer who's

13  making a lot of money and they want a piece of that.  So the

14  competitors often are an area, a threat where drug dealers have

15  to address.

16          Another threat would be from individuals within your

17  own organization.  Similar kind of thing, where greed drives the

18  violence.  In the drug trade, I've had investigations where

19  brothers have killed each other over the fact that one brother

20  was making money in the drug trade and the other brothers didn't

21  feel that they were getting their fair share.

22          And the third or the last threat, the fourth threat

23  would be from what we call stick-up boys, or individuals who just

24  basically target drug dealers who are doing well and will either

25  try to rob their, rob them of their money or their drugs.

1    They're more or less opportunists.  Often times they'll just, you

2    know, it's easier, it's kind of like the school bully.  It's

3    easier to go and take the drugs away from somebody than it is to

4    go and pay 25 or $30,000 a kilo.

5              So there are several different areas where drug dealers

6    are facing threats and why they need a firearm to protect

7    themselves.

8    Q    One thing that you touched on, Special Agent, that I would

9    like to ask you about.  In your work, in your investigations,

10   have you encountered cases in which firearms were passed from one

11   drug dealer to another?

12   A    Yes, I have.

13   Q    One member of an organization to another?

14   A    Yes, I have.

15   Q    And why would firearms have to be passed from person to

16   person?

17   A    Well, often times in the drug world there may be different,

18   somebody might be facing a different threat.  In other words, if

19   you're within the organization and you know perhaps a rival

20   organization is coming after you and you don't have a firearm

21   readily accessible, you may ask somebody from, another member

22   within the organization if they have a firearm, to help protect

23   yourself.

24   Q    Let me ask you about, again, in your experience or

25   investigations you've become aware of, let me ask you about drug

1    organizations or drug groups in general.

2              The drug investigations you've done, they've varied in

3    terms of the size of the participants, the number of people

4    involved, is that correct?

5    A    That's correct.

6    Q    You've had cases involving as little as maybe one person on

7    the street by himself to two people, to cases involving hundreds,

8    is that right?

9    A    That's correct.

10   Q    I'm going to use organization or group or whatever.  But

11   when you've been, when you've been investigating more than one

12   person involved in drug trafficking, have the organizations or

13   groups you've looked at always had a name for their group?

14   A    Had a name?

15   Q    Had a name for themselves?

16   A    No, they didn't always have a name.  Often times we'll

17   assign a name to it for any number of reasons.  Sometimes if we

18   have an operation, we're required to assign a particular name to

19   the operation and the organization might adopt that name.  But

20   it's not something that they created.

21             But there are occasions where organizations do have

22   names.  And sometimes, especially when you're at the street

23   level, often times we see organizations that will name their

24   product.  And the reason they do that, it's more or less a

25   marketing technique because drug, their customers want to know

1    that if, for example, if they're selling crack cocaine and

2    they're selling it in vials, the different, the vials might have

3    a different color top.  And they might, they might market it as

4    red tops.  And the customers on the street know that when

5    they're, the individuals who are out selling the drug, if they

6    say red tops, they know that that particular drug is associated

7    with a certain person.  It's almost like a, they know that the

8    quality, a certain quality is going to be there.

9         They may call it, for example, there was a time on the

10   west side of Baltimore City when they were calling heroin, there

11   was, its code name was bin Laden.  And that was a certain drug

12   dealer who was marketing heroin and that was the name that he

13   gave it.  And everybody knew that when, you know, when the guys

14   on the street corners were yelling bin Laden, that that was a

15   certain product that everybody knew the quality of.

16   Q    Have you, aside from talking to me and me going over the

17   questions you're going to be answering today, have you ever heard

18   a group call the Randallstown/Park Heights organization?

19   A    No, I haven't.

20   Q    Have you ever heard a group called the Park

21   Heights/Randallstown organization?  Flip-flopping the names.

22   A    No, I haven't.

23   Q    As far as you know, is that a name that was given by law

24   enforcement to the group under investigation in this case or do

25   you know one way or the other?

1    A    I'm not really sure.

2    Q    The drug conspiracies or groups or organizations you've

3    investigated, has there always been in your experience or is

4    there generally a strict chain of command, somebody in charge,

5    somebody under him, lieutenants, and things like that?  Is there

6    always a chain of command?

7    A    Not always.  I've worked, you know, both ends of the

8    spectrum on that.  Sometimes it's very clear, very organized.

9    And then there are other times when it's very kind of flying by

10   the seat of their pants, not very much structure, kind of

11   loose-knit.  It all depends on the organization.  But they're

12   kind of both ends of the spectrum there.

13   Q    The groups that you've investigated, Special Agent

14   Ellington, have you ever seen instances where there was a

15   variance over time about who the membership was, people moving

16   in, new members, things like that?

17   A    Yes.  Often times we see that when, for example, when

18   somebody's arrested, somebody might move out of the organization

19   for a period of time and they serve a period of time of

20   incarceration, and they come back.  Often times within

21   organizations, especially organizations over a period of time,

22   their membership is going to fluctuate.  People are going to come

23   in.  People are going to come out.  Depending on any number of

24   reasons why.  Perhaps sometimes personality disputes, so they

25   said.  Sometimes people get arrested.  There are a number of

1  reasons why that may happen.

2  Q    On the subject of arrests, have you seen cases, again, in

3  your experience, where a person was arrested, continued to have

4  an involvement in a drug trafficking organization?

5  A    Yes, I have.

6  Q    How does that happen?

7  A    I've, we've had investigations where, actually, people have

8  been arrested and from inside an institution have gained access

9  to cellular telephones or various telephones and still are able

10 to run the organization from inside a correctional institution.

11      There are any number of ways that people who are

12 incarcerated can get the word out on the street.  And generally

13 what we find is if you have an organization that's somewhat

14 structured, when, if a member gets locked up, there's a certain

15 code where individuals will take care of other family members

16 while the individual's locked up and they'll provide them with

17 money while they're incarcerated as well.

18      So if the individual who's incarcerated is in good

19 standing, generally, the other members of that organization are

20 going to try to take care of him, him or her while they're

21 incarcerated.

22 Q    And again, on the subject of changes and things like that,

23 have you ever had cases in which a given group of people operated

24 in different neighborhoods, either at the same time or over

25 different periods of time?

1    A    Yes, I have.

2    Q    How does that operate?  Don't you want to stay in one area

3    where you have a customer base?

4    A    Yes.  Obviously, if you have a customer base, that's very

5    important.  But it's not uncommon where you have organizations

6    that may have different operations going on across the city.  Or

7    if you're dealing, especially at a wholesale level, meaning

8    you're dealing half kilos or kilos, you may have customers

9    throughout the city that you're supplying.

10   Q    Your Honor, I believe that's all I have for the agent.

11        THE COURT:  Thank you, Mr. Hanlon.  Ms. Rhodes, I know

12   that you had a matter that you needed to attend to.  Can we

13   conclude this witness?  It's getting kind of late.

14        MS. RHODES:  I think I'm going to be 20 minutes or so,

15   Your Honor.

16        THE COURT:  Really?

17        MS. RHODES:  Yeah.

18        THE COURT:  Oh, okay.  You're available tomorrow?

19        THE WITNESS:  Yes, sir.

20        THE COURT:  All right.  We will stand in recess, then,

21   ladies and gentlemen of the jury.  Please leave your note pads on

22   your chairs.  Have no discussion about the evidence or about any

23   aspect of the case.  Conduct no investigation.  Do not visit any

24   scenes.  Continue to keep an open mind about all issues.

25        I can tell you that we're very close.  We're very

1    close.  Whether the government will actually conclude its

2    presentation tomorrow is still somewhat up in the air.  Not

3    somewhat.  It is up in the air.  We are hopeful that that will

4    happen.

5              But for purposes of coming in tomorrow and

6    communicating with your employer, please assume that you will

7    need to be here on Friday of this week.  Remember, this is our

8    first week for five days.

9              I can assure you, however, that if you have to come in

10   on Friday, we will not be here, you will not be here any later

11   than one p.m.  And there's a good chance that even if you have to

12   come in on Friday to conclude a matter, we'll be able to excuse

13   you much earlier than one p.m.

14             So for now, please operate on the assumption that you

15   will have to come in on Friday.  And if it should turn out that

16   we don't need you on Friday, I will let you know first thing

17   tomorrow, or as soon as I find out tomorrow.

18             Thank you very much, ladies and gentlemen.  Have a good

19   evening.  You're excused until 9:30 tomorrow morning.

20             (Jury exits the courtroom.)

21             (Witness exits the courtroom.)

22             THE COURT:  Mr. Harding -- be seated for just one

23   second, please, folks.  Mr. Harding, any luck with the chemist

24   this afternoon?

25             MR. HARDING:  No, Your Honor.  So the, I mean, Mr. Pyne

1    and I were unable to resolve the issue.  So we're just bringing

2    the chemist in.  And I imagine she'll be a very brief witness

3    first thing in the morning.  We could interrupt Agent Ellington.

4              THE COURT:  So she was able on her own, without a court

5    order?  You didn't threaten her, did you?

6              MR. HARDING:  I actually did better.  I called the

7    Assistant State's Attorneys in Frederick.

8              THE COURT:  See, that's the way to it.

9              MR. HARDING:  Talked them into this.

10             THE COURT:  Great.

11             MR. HARDING:  They said they would, in the interest of

12   comity with their federal brethren --

13             THE COURT:  That's exactly what I was talking about.

14             MR. HARDING:  Yes.

15             THE COURT:  Comity among judges, comity among

16   prosecutors.  Excellent.  You satisfied, Mr. Pyne?

17             MR. PYNE:  Yes, Your Honor.

18             THE COURT:  Okay.  I think I'd rather not interrupt

19   Agent Ellington.  I mean, she won't have to wait long.  You can

20   put her on after that.

21             I'm betting Ms. Rhodes won't be 20 minute.  I'm betting

22   she'll be much closer to ten minutes because she'll have

23   overnight to refine her cross.  How much are you going to have,

24   Mr. Martin?

25             MR. MARTIN:  Five minutes.

229

1              THE COURT:  Mr. Crowe, Mr. Pyne?

2              MR. CROWE:  Probably five minutes.

3              THE COURT:  Mr. Coburn?

4              MR. COBURN:  Five.

5              THE COURT:  Okay.  So discounting Mr. Coburn by about

6     two minutes and Mr. Pyne about a minute, I think we'll be able to

7     get to her by 30 minutes after we start.  I won't say 10:00.

8              Who else have we got tomorrow?

9              MR. HARDING:  We have our two agents, Your Honor.  I

10    think we are going to finish tomorrow.

11             THE COURT:  We're going to finish tomorrow.  Do I dare

12    tell the jury that first thing?

13             MR. HARDING:  No, you'd better not.  Because we've got

14    Mr. Coburn here.

15             THE COURT:  Yes.

16             MR. COBURN:  That's rough.

17             THE COURT:  He said it affectionately, Mr. Coburn.

18             MR. COBURN:  I appropriate that, Your Honor.

19             THE COURT:  Yes, Mr. Harding.

20             MR. COBURN:  We still have this problem of the missing

21    photo arrays of the Montgomery, four arrays that Montgomery

22    picked out photos in.  And I was wondering if any of my -- oh,

23    I'm just informed --

24             THE COURT:  Mr. Hanlon just found them?

25             MR. HANLON:  I know their location.

230

1          THE COURT:  You know.

2          MR. KURLAND:  We don't have them.

3          THE COURT:  You're off the hook, Mr. Coburn.

4          MR. COBURN:  I think I've got a tort case.

5          THE COURT:  Okay.  Excellent.  And you need, you also

6     need to do the evidence thing that you mentioned.

7          MR. HARDING:  Yes.  And I will do that whenever the

8     Court wants me to.  But could the Court rule on my motion to use

9     the courtroom audiotapes in connection with the courtroom

10    disturbance evidence that we propose to put on?  I filed a

11    written --

12         THE COURT:  Do you have them?

13         MR. HARDING:  No.  I have never been able to get them

14    from the court reporters who --

15         THE COURT:  Jackie, are they readily available?  I did

16    it again.  I did it again.  I'm sorry, Mary.

17         Do you know if Ms. Sovich has them all prepared and

18    available to you?  Because you're going to need them tomorrow,

19    right?  I wish you had brought this up sooner.

20         MR. HARDING:  I did bring it up, Your Honor, about a

21    week ago.

22         THE COURT:  Okay.

23         MR. HARDING:  I don't --

24         THE COURT:  Has she assembled them, in other words?

25         MR. HARDING:  No.  No.  She hasn't.

1          THE COURT:  Is she going to be able to do that by the

2    end of the day tomorrow?

3          MR. HARDING:  I don't, I don't know, Your Honor.

4          MS. RHODES:  Your Honor, may I be excused?

5          THE COURT:  Yes, Ms. Rhodes.  Thank you.

6          Well, if it's my fault, I apologize, Mr. Harding.  But

7    I wish you had brought it up earlier.  I mean, yeah, you can get

8    them from Ms. Sovich.

9          MR. HARDING:  Okay.

10          THE COURT:  But you're going to burn the midnight oil.

11    I mean, assuming she's here and you can get this before she

12    leaves today, or first thing tomorrow?

13          MR. HARDING:  I'm going to try, Your Honor.  Yeah.

14    I'll try.  All I need is one date in particular.

15          THE COURT:  Just one date?

16          MR. HARDING:  The date when this all began is what I

17    was going to try to give the jurors a flavor for this, by playing

18    a tape from the day that this all began.

19          THE COURT:  Belinda, did we have FTR Gold then?  We

20    didn't, did we?  We did?  What was the date?  November 16th, 2004

21    or 5?

22          MR. MARTIN:  Five.

23          THE COURT:  Five.

24          MR. HARDING:  Yes.  That sounds about right, Your

25    Honor.

1          THE COURT:  We may have the tape informally.  Anyway,

2     you should feel free to communicate with the chief court reporter

3     that the Court will authorize you to get the one day tape, but

4     I'm not authorizing you to say to her she needs to stay late

5     tonight or come in early tomorrow to do that.  You're going to

6     have to put somebody on that.  Because it would be Ms. Cook's

7     tape, if I'm not mistaken.

8          MR. HARDING:  Ms. Cook, I think that's probably right,

9     Your Honor.

10          THE COURT:  And I think they've got all of Ms. Cook's

11     materials together because they, there were quite a number of

12     late filed transcripts.  So yeah, as soon as you leave here you

13     should try to speak to Ms. Sovich and maybe Belinda could help

14     out in that.

15          But yes, subject to hearing from counsel tomorrow, I'll

16     authorize your possession of that one tape.  And I presume, I'll

17     hear from counsel as to whether I permit you to play it to the

18     jury.

19          MR. HARDING:  Also, Your Honor, I have, I'm going to, I

20     intend to use as exhibits tomorrow some of the pro se pleadings

21     that the defendants have filed over the course of time.  And I

22     have them marked as exhibits.

23          THE COURT:  All right.  I'll hear from counsel tomorrow

24     to the admissibility of those.

25          MR. KURLAND:  Your Honor, one last thing.  The Court

233

1    made a comment earlier today, saying that it thought it was

2    obvious that the jury, in hearing this evidence, would have

3    concluded that Mr. Gardner had been tried and convicted of the

4    Spence murder in state court.  We disagree with that.  And while

5    we're not, we're not going to re-fight the Court's earlier

6    rulings, when it comes time --

7            THE COURT:  Did I actually say tried and convicted?

8            MR. KURLAND:  Yes.

9            THE COURT:  Okay.

10           MR. KURLAND:  And we disagree with that

11   characterization.  We think it's just the opposite, frankly.

12   That given everything --

13           THE COURT:  That he has not been tried?

14           MR. KURLAND:  No.  Tried and acquitted.  And that's the

15   prejudicial concern that we're concerned about as to why we're

16   even here, particularly in light of the fact --

17           THE COURT:  But I'm going to give the dual sovereignty.

18           MR. KURLAND:  But with respect to that, Your Honor, I

19   still want to hold on to my objection or make it or keep it on

20   the record.  But the other thing is the modification of the dual

21   sovereignty instruction that I submitted has a couple of lines

22   added back that the Court originally deleted.  And I think in

23   light of the fact that what we consider to be the overriding

24   concern that the jury might think that he was convicted,

25   acquitted, rather, I would hope the Court would, when it finally

234

1      gives it, will look, obviously, at one or two lines.

2                THE COURT:  That's the italicized portion that you

3      included?

4                MR. KURLAND:  Exactly, Your Honor.  Thanks, Judge.

5                THE COURT:  Thank you.  All right.  Looks like we've

6      got light at the end of this tunnel.

7                MR. LAWLOR:  Speaking about that, can we just chat

8      about scheduling for 30 seconds?

9                THE COURT:  You know, let's excuse the defendants.  We

10     don't need the defendants here for that.  But certainly, we can

11     talk about scheduling.  I think we should, for a few minutes.

12     The defendants are excused.  Thank you.

13                (Defendants exit the courtroom.)

14                THE COURT:  Mr. Lawlor.

15                MR. LAWLOR:  I have no affirmative input.  I'm just

16     sort of wondering, you know, if we're going to rest tomorrow or

17     we --

18                THE COURT:  Looks like government's going to rest

19     tomorrow.

20                MR. LAWLOR:  If they rest tomorrow, will we just do

21     motions on Friday?

22                THE COURT:  Just do motions on Friday.  Maybe visit for

23     a minute on jury instructions.

24                MR. LAWLOR:  Start the defense case on Monday?

25                THE COURT:  I realize your co-counsel stepped out, Mr.

1  Lawlor, but your absolute best guess.  I'm not going to hold you

2  to anything.  But I'm going to ask each of counsel this.  How

3  much time are you going to need to put on a defense?

4            MR. LAWLOR:  We have two outstanding issues.  And Ms.

5  Rhodes has been sort of directing traffic in terms of any defense

6  case.

7            THE COURT:  What are the two issues?

8            MR. LAWLOR:  There's the rap expert and then Coach

9  Lynch.  So if all that came in, we would be one day.  And then

10  subtract from there.  But no more than a day.

11            THE COURT:  Lynch isn't going to be permitted to

12  testify.

13            MR. LAWLOR:  All right.

14            THE COURT:  I think I made that pretty clear.  Although

15  I'll hear a little bit more argument on it.

16            MR. LAWLOR:  I mean, I'm not trying to get into all

17  that.

18            THE COURT:  No. I understand that.  I understand that.

19  But please, when you greet Ms. Rhodes either tonight or tomorrow

20  morning, remind her, as I said yesterday, that I have your motion

21  for ex parte, to put in the record your proffer of Coach Lynch's

22  testimony.  And my final determination will depend in significant

23  part --

24            MR. LAWLOR:  If we can work out a stipulation.

25            THE COURT:  On the stipulation, yes.  Okay.  So just

1    remind Ms. Rhodes.

2            Right now your best, your best understanding is you

3    don't anticipate more than those two witnesses?

4            MR. LAWLOR:  No.  No.  That's not right.  I'm saying

5    with those two witnesses we would be no more than one day.  I

6    think --

7            THE COURT:  And then another day?

8            MR. LAWLOR:  No.  No.  No.  With those two, we would be

9    a maximum of one day.  Without those two, let's call it a half a

10   day.

11           THE COURT:  Right.  But you don't have any other

12   witnesses?

13           MR. LAWLOR:  No, we do have other witnesses.  That's

14   what I'm saying.

15           THE COURT:  Okay.  Wait a minute.

16           MR. LAWLOR:  Stop me.

17           THE COURT:  Wait a minute, Mr. Lawlor.  It can't be

18   this hard.

19           MR. LAWLOR:  This is on you, Judge, not me.

20           THE COURT:  How many witnesses do you have?

21           MR. LAWLOR:  I have no idea.  I'm saying --

22           THE COURT:  Okay.

23           MR. LAWLOR:  -- Ms. Rhodes is dealings with this.

24           THE COURT:  I see.

25           MR. LAWLOR:  Let's call it five.  If we had five,

237

1    including Lynch and our rap expert, that would be one day.  If we

2    didn't have those two, we would have three and it would be half a

3    day.  That's hypothetical.

4             THE COURT:  Okay.  Thank you very much.

5             MR. LAWLOR:  My pleasure.

6             THE COURT:  Mr. Martin.

7             MR. MARTIN:  We'll have one overlap witness.  One of

8    his three would be one that we would call.  And we'll have maybe

9    two others and some documents.

10            THE COURT:  Okay.

11            MR. MARTIN:  Half a day at the most.

12            THE COURT:  All right.  Thank you.

13            MR. MARTIN:  Your Honor, could I ask you, you have an

14   aim here.  We're trying to figure out where we end, right?

15            THE COURT:  Right.

16            MR. MARTIN:  We're off on Tuesday, right?

17            THE COURT:  Right.  We're off Tuesday.

18            MR. MARTIN:  Okay.  I'm just trying to plan my week.

19            THE COURT:  Yeah.  I'm trying to do the same thing.

20            While you're there, Mr. Martin, I don't think I'm

21   letting anything out that people don't, that people care about.

22   There have been a number of individuals who are in custody who

23   have been subpoenaed by the defense and I'm just wondering

24   whether I see some --

25            MR. MARTIN:  I don't think it's us, Your Honor.

1          THE COURT:  I'm not trying to identify who it is.  I

2     don't even want to identify who it is.  I just want to touch base

3     on arrangements, and in contact with the marshals and so forth.

4     And I have not heard, since I authorized the subpoenas or the

5     writs, as it were, I have not heard from anybody suggesting

6     there's a problem.

7          I just want to say that if there is a problem, I need

8     to know about it like yesterday because I'm not going to be

9     terribly sympathetic if some defense witness --

10          MR. MARTIN:  Understand, Your Honor.

11          THE COURT:  -- doesn't show up because somebody didn't

12     do the right thing.  That's all.

13          MR. MARTIN:  Understand.  I think whoever issued the

14     writs should understand because it was a writ.

15          THE COURT:  Thank you, Mr. Martin.  Mr. Pyne, Mr.

16     Crowe.

17          MR. CROWE:  Your Honor, we hope to have two, possibly

18     three, witnesses.  My expectation is that it will take two to

19     three hours.  There's been considerable difficulty staying in

20     contact with some of these witnesses.

21          THE COURT:  Right.

22          MR. CROWE:  Even one member of the defendant's family.

23     But we're doing the best we can.

24          THE COURT:  Okay.  But you're thinking three hours max?

25          MR. CROWE:  I would think three hours.  There may be,

1    one of the witnesses was actually in the courtroom, I think, for

2    probably about a day.

3            THE COURT:  Okay.

4            MR. CROWE:  I'll send a letter to the Court explaining

5    the circumstances of that.

6            THE COURT:  All right.  Mr. Coburn.

7            MR. COBURN:  We have a few lay witnesses, each of whom

8    will be very fast.  I mean, they're called typically for, you

9    know, one purpose.  I would anticipate really just like a few

10   minutes for each one of them.  I don't think it's going to be

11   much government cross.

12           We have one particular lay witness who the Court, the

13   Court was kind enough to issue a writ for.  And just hearing what

14   Your Honor just said, I think I'd better do some due diligence

15   which I haven't done yet, to just make sure the writ's been taken

16   account of by the marshal service and they know when to transport

17   him, etc., etc., etc.

18           There is also an expert who we're in the process of

19   developing and I'm going to, I guess I will have to provide some

20   additional notice to the government at some point about this.

21   But there is a person who we're thinking of as what you would

22   call, I think, a flesh and blood defense expert.  You know,

23   somebody who can put this in perspective and talk about how

24   widespread it is and that sort of thing.  And I actually was just

25   talking to him today over the lunch break.

1          So I think we're going to try, obviously, if the court

2     allows it, we're going to try to elicit testimony like that.

3          THE COURT:  I can't imagine that I will.  But, you

4     know, I could be persuaded.  All right.  So here's what I'm

5     thinking, counsel.  And I'm happy to take defense witnesses out

6     of order.  So I hope counsel won't have any problem with that.

7     And so I'm hoping that you all will get all your witnesses lined

8     up so that we have plenty of witnesses around every day starting,

9     looks like next Monday.

10         So we'll be in session three, three days next week,

11    Monday, Wednesday, and Thursday.  And frankly, it would be my

12    hope, it's just a hope, not a ruling, it would be my hope that we

13    could get the entire defense case in in those three days.  I

14    realize that's optimistic.  But it's worth, it's worth a shot.

15         So if we were able to do that, get the entire defense

16    case in Monday the 10th, Wednesday the 12th, and Thursday the

17    13th, as you will recall from our schedule, we will not be in

18    session on the 17th and 18th, Monday and Tuesday.  So that would

19    give you plenty of time to hone your closing arguments.

20         And my guess is I might want to have a final charge

21    conference on the afternoon of the 18th.  We're not scheduled to

22    be in session.  And if there's a problem, I appreciate it.

23         MR. LAWLOR:  Actually, Judge, even if I had a problem,

24    Ms. Rhodes can be here.

25         THE COURT:  Right.  I don't need two lawyers here for

1    the charge conference.

2              MR. KURLAND:  That's Wednesday, Your Honor?

3              THE COURT:  That would be Tuesday, the 18th.

4              MR. COBURN:  I thought we were not in session.

5              THE COURT:  We're not in session.  But I'm saying if we

6    could possibly, if we could possibly scare up one lawyer from

7    each side, and the afternoon for a charge conference, that would

8    be very useful.  Because if we're able to finalize jury

9    instructions either with a conference or by e-mail and so forth

10   by the end of the day on Tuesday the 18th, then the 19th, 20th,

11   and 21st, we could devote exclusively to instructions and closing

12   argument.  Not because I think it's going to take three days but

13   it could take three days, in fairness to all of you.

14              My initial sense of it is that I'm going to give the

15   government four hours for closing total and each of you one hour

16   for closing.  So eight hours of closing.  We can't do that in one

17   day.  My instructions are likely to take the better part of five

18   hours minimum.  So if we could do instructions and closings the

19   19th, 20th and 21st, Friday the 21st, excuse the jury early on

20   Friday the 21st, then they come back for deliberations

21   Thanksgiving week, the 24th, the 25th, U wasn't going to bring

22   them in on the 26th.  But if they want to come in, assuming that

23   timeline somehow holds, if they begin deliberations on the 24th,

24   of course, there's the real possibility that they could reach a

25   verdict by the end of the day of the 25th.  But if they didn't, I

1    would give them the option either to return on the 26th, the day

2    before Thanksgiving, but I wouldn't keep them past 12:00 or 1:00

3    on the Wednesday before Thanksgiving if they choose to come in.

4    And then, of course, we'd be over into December if they don't

5    reach a verdict by then.

6          So I think that would be ideal from my perspective.

7    But of course that's all just right now pure speculation.  Mr.

8    Harding.

9          MR. HARDING:  Yes.  Just to make sure everything's

10   streamlined and efficient, Your Honor.  You made mention of some

11   people who've been writted in here.  I know from prior experience

12   that on occasion defense counsel writ people in and don't realize

13   that they're going to be asked questions that might involve them

14   incriminating themselves, that they're therefore going to need

15   attorneys that.  That can sometimes delay proceedings

16   considerably.  So I would ask the Court to monitor that

17   situation.

18         THE COURT:  Of course.  I will.  I'll be perfectly

19   blunt.  I don't think the writs have gone out early enough to

20   even get them here in time.  But we'll deal with that.  But yeah.

21   I'll have Ms. Shearer on standby to bring somebody over.

22         MR. HARDING:  Also, Your Honor, would your, is it going

23   to be the Court's, is the Court going to instruct defense counsel

24   to disclose who their witnesses are to us by tomorrow, for

25   example?

1    THE COURT:  No.  I'm not going to do that.  I don't

2  think they're required to do that.  I invite them to do that but

3  they're not required to do that.

4    MR. KURLAND:  Your Honor, a couple of the scheduling

5  issues.  With regard to, I know it's still relatively tentative,

6  but if the jury is, say, deliberating on the 24th and 25th, that

7  Wednesday of that week -- my mother just had heart surgery and

8  I'm going to be in Los Angeles with a ticket on that Wednesday.

9  And I just want to --

10    THE COURT:  Not a problem, Mr. Kurland.  First of all,

11  I don't require both counsel to be here to answer questions from

12  the jury and that kind of thing, or to receive a verdict.  If you

13  wanted to be present viva voce, we can get you on the phone.  But

14  your travel plans are sacrosanct.

15    MR. KURLAND:  Thank you, Your Honor.  Your Honor, the

16  other thing is with regard to, what's the Court's rule on how

17  far, how many minute call or hour call you want lawyers on while

18  the jury's deliberating?

19    THE COURT:  The closer you are, of course, the better.

20  But assuming they were to start deliberating on the 24th, I would

21  say that first day nobody needs to be around.  But I mean, we

22  have to, you know, do it as we go along, Mr. Kurland.

23    I would say you should plan, if we somehow, I would say

24  you should plan to be in Baltimore by midday on the second day of

25  deliberations.  I mean, just in rough outline.  Or if not in

1    Baltimore, certainly no more than an hour away.

2            MR. HARDING:  Judge, could we have at least one counsel

3    here for each defendant in case there are notes from the jury?

4            THE COURT:  Sure.  That's what I'm saying.  We need to

5    have one lawyer here within, you know, walking distance or

6    something.

7            MR. KURLAND:  Okay.  Judge, one other thing with regard

8    to --

9            THE COURT:  And by the way, on notes -- some of you

10   know this0, I try whenever possible to answer juror notes in

11   writing rather than bring them back into the courtroom.  You

12   can't always do that.  But of course I'm going to send in copies

13   of my instructions, one for each juror.  But we get, you know,

14   sort of a routine note of something, what I typically do is have

15   Belinda get you all on the phone.  We discuss it.  Because my

16   understanding of the law is that we don't need, we don't need the

17   presence of the defendants for written communications with the

18   jury.  It's only if I bring the jury back into the courtroom will

19   we need to bring the defendants in.

20           So I try to avoid courtroom responses.  And if we can

21   agree on a written response, I just send in a written response

22   and the record is preserved.

23           MR. KURLAND:  I mean, Mr. Coburn and I haven't had time

24   to specifically discuss this.  But if there's an issue with

25   respect to getting one of our witnesses here, it's conceivable

245

1   that some of the testimony, I don't know if the government would

2   stipulate to it, but some of it is prior testimony that has at

3   least been memorialized in one way or another.  But we still,

4   hopefully, we'll do everything we can --

5              THE COURT:  Sure.  And I'm sure the government will do

6   everything it can to reach stipulations.  Believe me, they want

7   out of here every bit as much as you folks do.

8              MR. KURLAND:  Judge, the other thing is with regard to

9   the order of closing, that's the order of the indictment,

10   correct?  So we go --

11              MR. MARTIN:  I'll save my place.

12              MR. KURLAND:  No.  But I want, my kids are coming.  I

13   don't want them to wait two and a half days.

14              THE COURT:  No.  I don't0.  You say your students are

15   coming?

16              MR. KURLAND:  Some of my, some of the students, my

17   children, this might be the last time they ever see me.  They see

18   me in appellate court all time.  They don't see me here.

19   Depending on the nature of it, I'm trying to get them just here

20   for one day.  But I told them that it's conceivable that closing

21   argument could take more than a day.

22              THE COURT:  All right.

23              MR. MARTIN:  Mr. Kurland told me after this experience

24   he's never going to try another case.

25              THE COURT:  I can understand that.

1              MR. MARTIN:  Your Honor, one other thing.

2              MR. KURLAND:  This is not the normal case.

3              MR. MARTIN:  On Friday, if we sit.

4              THE COURT:  We're out of here by one.

5              MR. MARTIN:  Okay.  I was going to ask you a favor.

6    Mr. Rosenberg is dying to have me at meeting at 8:30 in the

7    morning and I should be out of there by 10.  Could we start at

8    ten?

9              THE COURT:  Sure.

10             MR. MARTIN:  Okay.  Thank you.

11             THE COURT:  This coming Friday?

12             MR. MARTIN:  Yes, sir.

13             THE COURT:  Oh, yeah.  If we don't bring the jury in,

14   we'll definitely start at 10 or 10:15 or 10:30.

15             MR. LAWLOR:  Like we should have today, Your Honor.

16             THE COURT:  Like we should have today, Mr. Lawlor.  As

17   I declared in the snack bar this morning in your absence.  I

18   think I have a witness.

19             MR. COBURN:  I told him.

20             THE COURT:  Okay.  Good.

21             MR. MARTIN:  You were wrong about 8:00.

22             THE COURT:  I was dead wrong.

23             MR. LAWLOR:  If you decide to listen to what I'm saying

24   a little more, we wouldn't have these problems all the time.

25             THE COURT:  I'll see if I can't muster the strength to

1    do that, Mr. Lawlor.

2              We're in recess.   Thank you.

3              (Conclusion of Proceedings at 5:15 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

248

```
1                          INDEX

2

3                                              PAGE

4  WITNESS: RODNEY HAYES
   CONT'D DIRECT EXAMINATION BY MR. HARDING        17
5  CROSS EXAMINATION BY MR. LAWLOR                 58
   CROSS EXAMINATION BY MR. MARTIN                 90
6  CROSS EXAMINATION BY MR. CROWE                 101
   CROSS EXAMINATION BY MR. COBURN                108
7  REDIRECT EXAMINATION BY MR. HARDING            128

8  WITNESS: KARIN SULLIVAN
   DIRECT EXAMINATION BY MR. HANLON               175
9  CROSS EXAMINATION BY MR. COBURN                192

10 WITNESS: SPECIAL AGENT DOUG ELLINGTON
   DIRECT EXAMINATION BY MR. HANLON               199
11 CROSS EXAMINATION BY MS. RHODES (ON QUALIFICATIONS) 202
   CROSS EXAMINATION BY MR. CROWE (ON QUALIFICATIONS)  204
12 CROSS EXAMINATION BY MR. COBURN (ON QUALIFICATIONS) 206
   CONT'D DIRECT EXAMINATION BY MR. HANLON        209

13

14

15

16

17

18

19

20

21

22

23

24

25
```

249

1                        REPORTER'S CERTIFICATE

2

3              I, Mary M. Zajac, do hereby certify that I recorded

4       stenographically the proceedings in the matter of USA v. Willie

5       Mitchell, et al., Case Number(s) AMD-04-029, on November 5, 2008.

6              I further certify that the foregoing pages constitute

7       the official transcript of proceedings as transcribed by me to

8       the within matter in a complete and accurate manner.

9              In Witness Whereof, I have hereunto affixed my

10      signature this _____ day of _____, 2009.

11

12

13

14              _____

                Mary M. Zajac,
15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$10** [4] - 211:20, 212:8, 217:4, 217:5
**$11,000** [2] - 213:6, 213:7
**$24** [1] - 211:23
**$30,000** [2] - 213:8, 221:4

## '

**'02** [6] - 93:9, 93:10, 93:15, 93:16, 93:17, 99:2
**'03** [3] - 58:23, 63:25, 83:8
**'04** [9] - 60:10, 62:12, 64:9, 76:11, 77:25, 78:7, 78:20, 81:16, 121:24
**'05** [12] - 62:12, 62:15, 68:2, 80:9, 80:12, 81:16, 90:21, 91:4, 118:16, 118:21, 119:7
**'06** [1] - 67:6
**'08** [4] - 67:25, 68:2
**'em** [1] - 28:21

## 0

**02015456** [1] - 182:7
**026-C** [1] - 187:3
**026-C-17149** [1] - 187:8
**027-C** [1] - 181:6
**027-C-08012** [3] - 186:5, 187:5, 194:6
**08012** [1] - 181:7

## 1

**1** [3] - 35:16, 181:17, 188:17
**10** [6] - 7:16, 102:15, 187:5, 213:6, 246:7, 246:14
**100%** [1] - 9:9
**101** [2] - 1:25, 248:6
**108** [1] - 248:6
**10:00** [1] - 229:7
**10:15** [1] - 246:14
**10:30** [1] - 246:14
**10th** [7] - 45:15, 62:18, 101:13, 115:10, 115:12, 137:15, 240:16
**11** [2] - 22:5, 125:11
**11:28** [1] - 58:4
**11th** [1] - 181:4
**1200** [1] - 177:9

## 2

**128** [1] - 248:7
**12:00** [1] - 242:2
**12th** [5] - 62:24, 116:10, 116:19, 117:17, 240:16
**13th** [5] - 62:19, 62:20, 80:4, 80:5, 240:17
**15** [3] - 7:16, 57:24, 58:3
**15th** [1] - 40:3
**16th** [2] - 40:3, 231:20
**17** [2] - 177:9, 248:4
**17149** [2] - 187:3, 188:1
**175** [1] - 248:8
**17th** [1] - 240:18
**182** [2] - 9:4, 152:1
**18th** [4] - 240:18, 240:21, 241:3, 241:10
**19** [1] - 35:16
**192** [2] - 152:1, 248:9
**1959** [2] - 159:14, 159:19
**1988** [1] - 176:13
**199** [1] - 248:10
**1992** [2] - 176:10, 200:7
**1999** [2] - 3:13, 163:23
**19th** [2] - 241:10, 241:19
**1:00** [1] - 242:2
**1:30** [2] - 138:14, 141:1
**1st** [1] - 67:25

## 2

**2** [5] - 131:11, 181:17, 182:4, 182:6, 187:4
**2.2** [1] - 210:4
**20** [7] - 36:24, 76:13, 128:24, 202:21, 203:22, 226:14, 228:21
**2000** [2] - 137:18, 137:20
**2001** [6] - 101:11, 101:12, 102:15, 103:6, 137:15, 137:21
**2002** [19] - 9:5, 9:20, 11:24, 14:1, 18:14, 39:24, 42:15, 43:5, 98:12, 107:16, 132:7, 151:5, 156:8, 156:15, 156:17, 156:25, 181:2, 181:4, 187:13
**2003** [2] - 40:19, 58:19
**2004** [16] - 41:14, 43:1, 51:3, 59:22, 60:21, 66:4, 70:17, 93:24, 112:9, 112:25, 115:13, 121:6, 128:15, 131:2, 142:2, 231:20
**2005** [18] - 45:15, 48:16,

60:22, 63:20, 66:7, 67:2, 80:3, 112:4, 115:7, 115:9, 116:14, 116:10, 116:19, 116:23, 117:17, 117:19, 117:23, 119:3
**2006** [1] - 60:17
**2008** [3] - 1:11, 9:3, 249:5
**2009** [1] - 249:10
**202** [1] - 248:11
**204** [1] - 248:11
**206** [1] - 248:12
**209** [1] - 248:12
**20th** [8] - 63:20, 66:7, 112:4, 117:22, 119:3, 119:18, 241:10, 241:19
**21201** [1] - 1:25
**21st** [5] - 48:16, 241:11, 241:19, 241:20
**22** [1] - 78:2
**23** [1] - 177:10
**24** [2] - 211:17, 211:21
**24th** [4] - 241:21, 241:23, 243:6, 243:20
**25** [3] - 33:18, 213:8, 221:4
**25th** [4] - 187:13, 241:21, 241:25, 243:6
**26** [1] - 128:16
**26th** [6] - 51:3, 115:12, 121:6, 121:24, 241:22, 242:1
**27th** [5] - 18:14, 43:4, 117:21, 118:16, 118:21
**28th** [2] - 18:14, 43:4
**2910** [1] - 18:11
**2913** [7] - 18:10, 18:16, 57:8, 57:9, 57:11, 101:5, 101:10
**296** [2] - 9:4, 152:1
**2:45** [3] - 138:15, 138:19, 138:24, 139:4, 140:12, 140:25
**2nd** [2] - 67:25, 119:16

## 3

**3** [6] - 138:24, 181:17, 182:4, 187:4, 188:10
**30** [2] - 229:7, 234:8
**357** [3] - 31:25, 88:18, 88:20
**38** [7] - 29:5, 83:25, 100:8, 132:7, 132:18, 135:16, 164:10

## 4

**4** [7] - 33:17, 113:2, 113:5, 181:17, 182:4, 187:4, 196:1
**40** [43] - 19:15, 19:18, 20:16, 20:19, 44:12, 56:20, 87:24, 88:6, 105:22, 105:25, 106:20, 107:4, 107:9, 107:21, 108:2, 124:4, 124:5, 124:15, 130:15, 147:5, 148:9, 149:8, 149:23, 161:15, 162:5, 162:8, 162:11, 162:13, 163:5, 182:20, 184:3, 184:16, 185:3, 185:16, 190:5, 190:18, 190:19, 191:9, 193:25, 196:19, 197:2, 197:19
**403** [1] - 14:5
**4100** [1] - 45:20
**45** [4] - 23:21, 31:25, 163:13, 163:21
**49** [1] - 5:3
**4th** [2] - 70:16, 112:9, 112:25, 142:1

## 5

**5** [5] - 1:11, 187:4, 188:17, 231:21, 249:5
**50** [7] - 4:4, 4:8, 4:17, 4:18, 4:20, 5:17
**50.3** [2] - 3:18, 4:6
**500** [1] - 201:1
**52.11** [1] - 3:25
**53.1** [1] - 4:2
**5456** [1] - 184:3
**5515** [1] - 1:24
**58** [1] - 248:5
**5:15** [1] - 247:3
**5B** [2] - 184:3

## 6

**6** [3] - 35:17, 113:2, 113:6
**60** [1] - 141:16
**6B** [2] - 184:3

## 7

**7** [1] - 182:4
**7-C-8012** [1] - 193:1
**70** [1] - 104:13
**7th** [1] - 3:13

## 8

**8** [1] - 187:5
**8,000** [1] - 209:25
**80** [1] - 218:12
**80%** [1] - 210:16
**8012** [1] - 192:24
**88.9** [1] - 99:16
**8:00** [1] - 246:21
**8:30** [2] - 3:7, 246:6

## 9

**9** [35] - 23:24, 23:25, 43:13, 43:19, 43:22, 44:18, 44:20, 50:8, 56:19, 84:22, 87:12, 88:5, 95:11, 104:15, 105:6, 105:19, 121:7, 121:10, 123:21, 124:3, 124:11, 124:19, 130:11, 147:4, 148:9, 149:5, 149:6, 149:7, 149:16, 149:17, 149:22, 161:22, 163:8, 187:5
**9/27** [1] - 118:15
**90** [1] - 248:5
**911** [1] - 219:13
**92** [1] - 177:8
**924(c** [1] - 169:24
**924(c)** [1] - 166:10
**924(c)'s** [1] - 162:21
**93** [1] - 152:1
**96** [1] - 177:8
**9:30** [1] - 227:19
**9:47** [1] - 2:1

## A

**a.m** [5] - 2:1, 3:7, 58:4, 99:19, 99:21
**abiding** [1] - 81:10
**able** [20] - 4:10, 5:25, 151:2, 166:5, 168:11, 173:14, 180:25, 184:6, 184:7, 191:24, 207:25, 219:14, 225:9, 227:12, 228:4, 229:6, 230:13, 231:1, 240:15, 241:8
**abroad** [1] - 206:22
**absence** [1] - 246:17
**absolute** [2] - 166:13, 235:1
**absolutely** [5] - 15:16, 139:7, 145:22, 155:17, 193:5
**Absolutely** [2] - 13:3, 159:3

abundance [1] - 191:20
**Academy** [4] - 178:3, 200:2, 200:3, 200:5
**accept** [4] - 52:4, 148:9, 179:17, 208:14
**accepted** [4] - 104:21, 119:7, 180:7, 209:11
**access** [2] - 20:6, 225:8
**accessible** [2] - 219:25, 221:21
**accordance** [1] - 35:5
**according** [1] - 105:19
**account** [5] - 6:7, 43:3, 43:4, 207:24, 239:16
**accurate** [3] - 66:2, 142:15, 249:8
**accusation** [1] - 52:16
**acetone** [1] - 216:1
**achieve** [3] - 16:5, 140:21
acknowledge [1] - 52:5
**acquitted** [2] - 233:14, 233:25
**act** [2] - 154:17
**action** [8] - 13:6, 153:16, 153:17, 153:18, 153:25, 154:14, 156:22
**activities** [2] - 201:12, 206:20
**activity** [6] - 48:20, 201:8, 201:9, 201:18, 214:24, 219:14
**acts** [1] - 159:11
**Actual** [1] - 162:17
**actual** [5] - 22:9, 22:10, 22:13, 39:8, 208:23
**Adam** [1] - 1:22
**Adapted** [1] - 38:15
**add** [3] - 144:3, 144:24, 215:21
**added** [1] - 233:22
**addition** [3] - 4:1, 157:17, 189:12
**additional** [4] - 38:2, 207:13, 239:20
**address** [2] - 19:5, 220:15
**Administration** [5] - 199:11, 200:4, 202:23, 205:19, 206:10
**admissibility** [2] - 170:11, 232:24
**admissible** [3] - 53:1, 151:10, 151:11
**admit** [5] - 139:13, 140:3, 140:18, 158:8, 166:12
**admitted** [4] - 2:8, 2:11, 50:14, 162:1
**Admittedly** [1] - 158:19

**admitting** [2] - 159:12, 161:25
**adopt** [1] - 222:19
**advance** [1] - 148:8
**advanced** [4] - 200:15, 200:16, 200:17, 200:18
**advise** [2] - 145:9, 145:17
**advised** [4] - 131:5, 145:2, 145:8, 146:23
**aerial** [1] - 18:8
**affect** [1] - 172:14
**affection** [2] - 144:6
**affectionately** [1] - 229:17
**affirmatively** [5] - 59:6, 59:7, 146:23, 147:3, 149:16
**affixed** [1] - 249:9
**Afghanistan** [1] - 210:19
**afoul** [1] - 168:18
**afternoon** [7] - 5:24, 5:25, 58:6, 90:9, 90:10, 101:3, 108:21, 108:22, 138:16, 140:24, 150:4, 175:14, 176:2, 176:3, 192:7, 192:8, 199:7, 199:8, 202:17, 202:18, 204:8, 204:9, 206:6, 206:7, 227:24, 240:21, 241:7
**afterwards** [1] - 146:10
**agency** [2] - 204:23, 206:12
**AGENT** [2] - 198:25, 248:10
**Agent** [27] - 46:22, 160:18, 161:2, 165:5, 169:25, 170:9, 174:12, 174:13, 175:4, 198:22, 199:10, 199:19, 199:23, 200:22, 202:12, 206:5, 208:12, 208:18, 209:15, 212:17, 217:12, 217:25, 218:3, 221:8, 224:13, 228:3, 228:19
**agent** [13] - 9:19, 161:17, 165:24, 169:11, 169:25, 199:25, 200:16, 202:6, 206:8, 206:14, 208:14, 209:11, 226:10
**agent's** [1] - 8:9, 205:23, 208:21
**agents** [9] - 8:10, 8:23, 10:4, 10:9, 14:11, 48:19, 140:19, 151:3, 229:9
**aggressive** [1] - 173:4
**ago** [7] - 13:9, 37:23, 90:12, 130:17, 146:2,

158:2, 230:21
**agree** [8] - 2:11, 48:10, 48:18, 49:25, 50:3, 51:8, 191:22, 244:21
**agreed** [5] - 62:21, 63:21, 74:8, 120:21, 201:18
**agreeing** [1] - 49:21
**agreement** [35] - 2:9, 11:18, 49:12, 49:16, 49:19, 51:15, 51:21, 52:1, 52:8, 52:11, 52:17, 52:23, 56:15, 63:21, 64:21, 65:14, 66:7, 67:1, 73:23, 74:5, 74:12, 111:23, 112:2, 113:18, 117:18, 117:19, 117:22, 119:11, 119:19, 120:16, 131:2, 135:19, 141:10
**agrees** [4] - 2:14, 51:1, 51:16, 121:22
**AH-1** [1] - 47:16
**ahead** [11] - 12:21, 24:18, 35:15, 43:17, 86:5, 128:8, 148:24, 194:12, 195:7, 196:12, 217:22
**aid** [2] - 22:9, 39:9
**aided** [1] - 173:19
**aim** [1] - 237:14
**ain't** [13] - 23:16, 32:6, 36:9, 44:21, 84:5, 87:11, 88:11, 100:2, 106:12, 108:16, 109:17, 117:19, 137:20
**air** [7] - 57:12, 57:14, 57:15, 216:4, 216:7, 227:2, 227:3
**airplane** [1] - 214:2
**aisle** [1] - 147:7
**AK-47** [1] - 27:12
**al** [1] - 249:5
**Alan** [3] - 48:16, 118:23, 119:2
**alleged** [3] - 8:17, 52:11, 161:5
**Alleged** [2] - 153:17, 153:18
**allowed** [2] - 11:6, 171:9
**allows** [1] - 240:2
**almost** [3] - 173:5, 216:8, 223:7
**alone** [1] - 168:13
**altercation** [5] - 62:15, 79:1, 92:9, 92:24, 100:17
**alternative** [1] - 153:24
**altogether** [2] - 115:17, 202:20
**AMD-04-029** [2] - 1:6,

249:5
**Amendment** [2] - 158:10, 158:18
**amendment** [1] - 159:25
**AMERICA** [1] - 1:5
**America** [1] - 209:23
**Ammunition** [4] - 46:15, 46:16, 61:8, 61:9
**ammunition** [12] - 27:12, 65:8, 66:16, 66:23, 67:7, 115:4, 115:9, 115:25, 116:3, 116:5, 116:20, 136:17
**amorphous** [1] - 173:10
**amounts** [1] - 167:1
**amusing** [1] - 120:22
**analogy** [1] - 211:16
**analysis** [1] - 185:22
**Andean** [1] - 209:23
**Andre** [1] - 1:13
**ands** [1] - 182:17
**Angeles** [1] - 243:8
**answer** [16] - 19:4, 20:14, 22:23, 33:10, 43:8, 89:25, 91:6, 128:19, 130:2, 130:4, 137:6, 148:11, 148:12, 196:10, 243:11, 244:10
**Answer** [2] - 113:10, 113:12
**answering** [2] - 111:10, 223:17
**answers** [3] - 113:5, 179:3, 208:21
**Anthony** [1] - 187:14
**anticipate** [2] - 236:3, 239:9
**anyway** [1] - 5:18
**Anyway** [3] - 16:1, 153:6, 232:1
**apart** [1] - 177:6
**apologize** [7] - 9:1, 93:21, 163:19, 173:3, 193:22, 195:15, 231:6
**apparent** [1] - 142:25
**appeals** [1] - 14:13
**appear** [3] - 3:2, 3:7, 153:24
**appearance** [3] - 48:6, 148:3, 161:6
**Appearances** [1] - 1:15
**appellate** [1] - 245:18
**apply** [1] - 214:18
**appreciate** [9] - 11:1, 13:19, 15:6, 125:8, 144:21, 171:14, 173:7, 195:18, 240:22
**approach** [2] - 181:22, 184:25

**Approach** [3] - 183:13, 188:13, 189:21
**approached** [1] - 80:5
**approaches** [1] - 169:15
**Approaching** [1] - 185:13
**appropriate** [6] - 52:25, 139:9, 140:10, 141:22, 173:19, 229:18
**appropriately** [1] - 139:17
**appropriateness** [1] - 174:8
**April** [4] - 90:21, 108:16, 156:8, 181:2
**apropos** [1] - 9:25
**area** [11] - 82:4, 128:18, 174:20, 182:14, 202:12, 208:13, 210:20, 217:4, 219:10, 220:14, 226:2
**areas** [2] - 170:19, 221:5
**argue** [10] - 5:15, 5:18, 8:15, 8:17, 154:14, 155:21, 156:15, 168:19, 170:25, 173:14
**argument** [13] - 16:7, 139:2, 156:11, 157:20, 157:23, 172:9, 172:23, 173:10, 173:16, 173:19, 235:15, 241:12, 245:21
**arguments** [1] - 240:19
**armors** [1] - 177:5
**Arms** [1] - 177:22
**army** [3] - 27:9, 27:15, 126:10
**arrangement** [1] - 65:5
**arrangements** [1] - 238:3
**arrays** [2] - 229:21
**arrest** [11] - 9:17, 9:22, 14:3, 115:14, 116:7, 140:23, 151:4, 151:14, 152:19, 152:25, 155:2
**arrested** [41] - 44:1, 45:1, 45:3, 45:5, 45:16, 45:19, 46:5, 46:6, 50:11, 56:20, 60:17, 60:21, 60:24, 61:2, 61:3, 61:6, 61:19, 61:22, 65:2, 66:15, 102:18, 104:18, 104:25, 115:2, 115:4, 115:9, 115:12, 115:25, 116:4, 116:20, 121:6, 153:11, 156:14, 157:9, 201:4, 219:21, 224:18, 224:25, 225:3, 225:8
**arrests** [4] - 60:21, 62:12, 151:13, 225:2

**Arrington** [4] - 2:9, 2:11, 195:5, 195:6
**arrow** [2] - 18:10, 18:16
**art** [1] - 73:10
**articles** [1] - 203:1
**articulated** [1] - 157:18
**artists** [2] - 26:25, 72:16
**aside** [6] - 165:1, 183:12, 184:20, 191:1, 198:10, 223:16
**aspect** [5] - 11:3, 172:17, 173:9, 207:9, 226:23
**ass** [4] - 23:15, 23:18, 30:20, 31:10
**assault** [3] - 24:1, 47:25, 135:21
**assembled** [1] - 230:24
**assertion** [2] - 154:23, 155:18
**assessment** [1] - 168:11
**assign** [2] - 222:17, 222:18
**assist** [1] - 173:9
**assistance** [2] - 50:24, 121:20
**Assistant** [3] - 203:16, 204:3, 228:7
**assisting** [1] - 171:25
**associated** [2] - 220:11, 223:6
**assume** [5] - 14:4, 15:20, 81:13, 170:10, 227:6
**assumed** [1] - 74:12
**assuming** [5] - 14:4, 148:8, 231:11, 241:22, 243:20
**assumption** [2] - 14:22, 227:14
**assure** [2] - 158:8, 227:9
**ATF** [1] - 178:2
**Atlanta** [1] - 211:1
**attach** [1] - 207:22
**attached** [1] - 172:22
**attack** [1] - 153:15
**attacked** [1] - 156:18
**attempt** [1] - 191:7
**attend** [1] - 226:12
**attended** [3] - 200:1, 200:15, 200:17
**attention** [12] - 15:17, 27:8, 35:12, 41:14, 45:15, 50:6, 121:2, 128:15, 129:11, 129:21, 132:6, 181:2
**attorney** [5] - 48:8, 48:10, 48:16, 96:2, 131:4

**Attorney's** [1] - 117:25
**attorneys** [2] - 169:7, 242:15
**Attorneys** [3] - 203:16, 204:3, 228:7
**audience** [2] - 110:8
**audio** [1] - 53:23
**audiotapes** [1] - 230:9
**aunt's** [1] - 93:3
**authorities** [7] - 13:23, 64:1, 64:3, 116:1, 116:20, 117:4, 117:11
**authorization** [1] - 84:18
**authorize** [2] - 232:3, 232:16
**authorized** [3] - 158:15, 208:15, 238:4
**authorizing** [1] - 232:4
**available** [9] - 151:19, 156:13, 157:5, 157:23, 203:1, 208:8, 226:18, 230:15, 230:18
**Avenue** [11] - 17:6, 18:12, 19:17, 31:2, 44:6, 54:14, 54:15, 97:13, 99:25, 129:14, 132:16
**Avenues** [1] - 129:14
**average** [1] - 219:12
**avoid** [1] - 244:20
**aware** [11] - 10:4, 120:4, 128:18, 147:19, 149:12, 149:14, 149:15, 165:7, 165:24, 174:3, 221:25
**axe** [1] - 79:21
**ay** [2] - 22:19, 26:11

## B

**Bachelor** [2] - 176:25, 177:1
**bad** [1] - 33:22
**bag** [4] - 3:12, 217:23, 218:10
**baggie** [5] - 4:6, 5:16, 6:23, 217:3, 217:5
**baggies** [2] - 217:2, 217:13
**Baggies** [1] - 218:22
**bags** [4] - 46:2, 46:9, 61:4, 64:24
**baking** [2] - 215:17, 215:22
**balance** [1] - 143:13
**ballistics** [3] - 160:16, 164:18, 175:4
**balloon** [2] - 36:12, 36:16
**Baltimore** [54] - 1:12,

1:25, 15:3, 15:4, 15:11, 20:11, 50:20, 51:9, 52:23, 54:15, 66:14, 66:15, 66:18, 82:15, 90:16, 90:20, 121:7, 154:25, 157:6, 157:8, 163:6, 176:5, 176:11, 179:14, 180:17, 183:6, 183:10, 184:13, 186:15, 191:12, 193:5, 195:22, 196:2, 196:7, 196:23, 197:3, 197:19, 198:6, 198:14, 206:15, 206:21, 211:3, 212:20, 212:22, 212:23, 213:7, 213:16, 213:17, 223:10, 243:24, 244:1
**bang** [1] - 86:8
**bar** [1] - 246:17
**Barry** [1] - 1:22
**base** [11] - 204:19, 204:22, 215:12, 215:15, 215:24, 216:9, 216:15, 217:9, 226:3, 226:4, 238:2
**based** [9] - 34:15, 111:23, 161:25, 174:10, 182:23, 184:6, 185:22, 207:19, 208:3
**Based** [2] - 153:14, 153:15
**basement** [1] - 100:9
**Basic** [1] - 200:10
**basic** [1] - 172:24
**basis** [5] - 86:1, 145:10, 170:10, 205:24, 219:10
**basketball** [1] - 95:7
**batch** [2] - 183:13, 184:21
**bay** [3] - 96:25, 97:2, 97:3
**bear** [5] - 52:12, 182:19, 184:4, 185:17, 194:1
**Beat** [1] - 64:25
**beat** [8] - 65:1, 65:12, 90:23, 91:15, 115:18, 115:19, 139:22, 142:3
**beating** [2] - 91:1, 144:7
**became** [1] - 87:21
**become** [2] - 176:24, 221:25
**becomes** [3] - 12:8, 14:3, 14:5
**beef** [7] - 29:19, 29:24, 89:12, 89:14, 89:17, 168:3
**beefing** [1] - 89:11
**began** [2] - 231:16, 231:18
**begin** [5] - 35:8, 62:21,

178:11, 209:16, 241:23
**beginning** [12] - 12:6, 26:17, 28:9, 30:9, 36:24, 38:25, 55:4, 55:5, 104:4, 140:7, 213:23, 214:4
**begins** [1] - 26:11
**behalf** [1] - 71:18
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behavior** [4] - 52:13, 53:14, 113:16, 113:17
**behind** [1] - 110:9
**belief** [1] - 34:20
**Belinda** [3] - 231:19, 232:13, 244:15
**Beltsville** [1] - 200:3
**Ben** [1] - 144:7
**benefit** [1] - 114:14
**benefits** [1] - 119:19
**Benson** [3] - 161:18, 161:19
**Beretta** [4] - 44:18, 44:20, 88:5, 121:13, 123:22, 124:14, 124:19, 130:12, 161:15, 177:8, 177:21
**best** [8] - 23:17, 135:25, 216:16, 218:9, 235:1, 236:2, 238:23
**better** [8] - 23:16, 78:24, 162:22, 228:6, 229:13, 239:14, 241:17, 243:19
**betting** [1] - 228:21
**between** [23] - 10:2, 22:11, 60:21, 62:11, 66:24, 68:2, 68:25, 117:3, 119:15, 119:16, 144:25, 146:6, 156:8, 166:9, 168:11, 169:7, 169:25, 189:4, 196:3, 197:23, 215:10, 219:6
**beyond** [3] - 34:19, 143:4, 173:11
**BF-1** [3] - 185:13, 185:15, 190:1
**bicarbonate** [2] - 215:17, 215:21
**big** [5] - 6:5, 31:11, 110:8, 112:24, 173:1
**billions** [1] - 215:2
**Billions** [1] - 215:3
**bin** [2] - 223:11, 223:14
**biology** [1] - 177:1
**bit** [19] - 36:18, 71:8, 110:4, 118:2, 123:7, 154:4, 156:9, 176:22, 177:15, 182:21, 182:22, 185:22, 187:11, 195:5, 199:24, 200:21, 235:15,

245:7
**bitch** [7] - 24:2, 47:3, 47:11, 80:6, 81:1, 81:2, 92:13
**black** [2] - 23:22, 182:14
**blank** [2] - 9:3, 151:25
**block** [5] - 29:9, 29:15, 30:25, 31:1, 45:20
**blood** [5] - 30:23, 63:14, 73:3, 153:16, 239:22
**Blow** [1] - 36:17
**blowing** [2] - 28:20, 28:25
**blows** [1] - 36:6
**blunt** [2] - 10:18, 242:19
**blurb** [1] - 151:25
**BO** [3] - 30:10, 30:12, 127:5
**Bo** [32] - 23:7, 25:1, 26:5, 27:10, 27:16, 35:23, 36:1, 70:20, 76:25, 78:4, 78:8, 79:8, 79:9, 79:23, 84:24, 87:13, 95:11, 97:16, 98:4, 98:8, 98:16, 105:4, 127:15, 129:1, 129:5, 130:19, 131:5, 131:11, 131:13, 131:21, 133:12
**Bo's** [2] - 36:11, 129:8
**boarded** [2] - 17:25, 18:5
**boats** [1] - 210:13
**bobbing** [1] - 36:6
**bodies** [1] - 215:18
**body** [2] - 210:14, 210:15
**boiling** [3] - 215:15, 215:18, 215:22
**Bolivia** [1] - 209:24
**Bond** [3] - 3:18, 5:1, 5:5
**book** [4] - 22:6, 38:7, 39:5, 39:6
**Booking** [1] - 46:22
**booklets** [1] - 38:3
**books** [3] - 21:8, 21:10, 37:20
**bootstrapping** [1] - 166:13
**border** [1] - 210:10
**borrow** [2] - 81:7, 188:25
**boss** [1] - 165:19
**bottle** [2] - 211:17, 211:21
**bottled** [1] - 211:17
**bottles** [2] - 211:21, 212:9
**bottom** [9] - 28:4,

31:18, 70:15, 70:19,
80:19, 192:14, 193:10,
193:11, 193:16
   **bought** [1] - 71:9
   **Boulevard** [1] - 45:22
   **bout** [1] - 31:11
   **boyfriend** [1] - 62:7
   **boys** [1] - 220:23
   **Brady** [2] - 145:17,
148:19
   **brain** [2] - 144:18,
144:20
   **brains** [2] - 24:2, 30:15
   **Bravo** [1] - 183:18
   **breach** [1] - 52:11
   **breached** [1] - 52:17
   **break** [10] - 9:10, 9:12,
9:13, 30:16, 123:8,
123:12, 211:25, 212:9,
216:23, 239:25
   **Break** [1] - 69:4
   **breaking** [2] - 215:9,
216:25
   **breathing** [1] - 15:13
   **breech** [1] - 53:2
   **brethren** [1] - 228:12
   **Brian** [2] - 46:22, 91:2
   **brick** [2] - 31:12, 31:14
   **Brick's** [1] - 31:15
   **bridge** [2] - 14:17, 16:1
   **brief** [2] - 170:24, 228:2
   **briefly** [6] - 12:19,
93:17, 139:24, 148:25,
162:4, 206:5
   **bring** [19] - 4:12, 5:7,
6:4, 7:2, 7:15, 12:20,
151:2, 154:24, 160:16,
174:24, 192:1, 230:20,
241:21, 242:21, 244:11,
244:18, 244:19, 246:13
   **bringing** [3] - 4:9, 9:1,
228:1
   **broadest** [1] - 169:5
   **broke** [5] - 12:1, 18:7,
30:20, 195:7, 211:21
   **broken** [4] - 211:10,
217:16, 218:4, 218:6
   **brother** [18] - 32:13,
32:17, 33:1, 33:5, 63:4,
63:15, 71:13, 72:24,
73:6, 73:20, 97:3, 102:4,
102:5, 125:18, 132:22,
134:18, 134:21, 220:19
   **brother's** [1] - 71:16
   **brothers** [10] - 19:11,
77:16, 105:14, 105:20,
106:9, 108:8, 108:15,
220:19, 220:20
   **brought** [13] - 12:5,
12:24, 45:10, 46:11,

46:20, 46:23, 51:23,
51:24, 59:21, 75:2,
149:14, 230:19, 231:7
   **Brown** [4] - 40:13, 43:9,
59:7, 76:2
   **bud** [2] - 31:3, 31:5
   **build** [2] - 30:17
   **Build** [1] - 30:19
   **building** [5] - 45:11,
46:23, 62:16, 67:10,
74:17
   **built** [1] - 32:6
   **bulkier** [1] - 214:16
   **Bulldog** [2] - 88:18,
88:20
   **bullet** [6] - 180:19,
183:20, 183:21, 185:15,
185:16
   **Bullets** [1] - 198:1
   **bullets** [33] - 46:18,
50:8, 50:15, 121:7,
121:10, 136:19, 164:10,
178:23, 181:13, 183:25,
184:4, 184:8, 184:19,
186:16, 187:8, 187:9,
189:14, 189:15, 190:4,
190:18, 191:9, 191:10,
191:11, 195:20, 195:23,
195:24, 197:6, 197:24,
198:3, 198:4
   **bullpen** [3] - 46:25,
47:1, 47:4
   **bully** [1] - 221:2
   **bunch** [2] - 64:22, 64:23
   **Bunch** [1] - 31:10
   **burden** [1] - 52:12
   **burgundy** [1] - 47:21
   **buried** [2] - 163:6,
163:8
   **Burma** [1] - 210:20
   **burn** [1] - 231:10
   **business** [23] - 70:21,
71:24, 76:15, 76:18,
77:9, 79:25, 93:25, 94:3,
94:5, 102:11, 128:25,
129:3, 129:6, 129:8,
131:11, 132:3, 132:14,
133:16, 148:10, 171:9,
172:24, 173:21, 219:22
   **Bussard** [2] - 48:16,
119:3
   **Bussard's** [1] - 118:23
   **bust** [1] - 207:4
   **buy** [3] - 211:18,
212:18, 213:5
   **BY** [45] - 17:1, 19:9,
22:15, 35:19, 38:17,
39:12, 43:18, 53:25,
58:11, 86:6, 90:8, 91:8,
101:2, 108:20, 123:19,

128:10, 133:11, 137:7,
176:1, 178:6, 180:9,
181:24, 192:6, 194:19,
195:8, 197:17, 199:6,
202:16, 204:7, 206:4,
209:14, 218:2, 248:4,
248:5, 248:5, 248:6,
248:6, 248:7, 248:8,
248:9, 248:10, 248:11,
248:11, 248:12, 248:12
   **Byrd** [2] - 40:16, 40:17

## C

   **cake** [1] - 216:16
   **cal** [1] - 124:4
   **caliber** [37] - 19:15,
19:18, 20:16, 20:19,
23:21, 44:12, 56:20,
87:24, 88:6, 106:20,
107:4, 107:9, 124:5,
124:16, 130:15, 132:8,
132:18, 148:10, 149:8,
161:15, 162:5, 162:13,
163:5, 163:13, 163:21,
182:20, 184:4, 184:16,
185:3, 185:16, 190:5,
190:18, 190:19, 191:9,
196:19, 197:2, 197:20
   **calibers** [2] - 162:8,
162:12
   **Canada** [1] - 214:8
   **candor** [1] - 140:8
   **capacity** [2] - 176:23,
218:22
   **captain** [2] - 143:3,
158:21
   **car** [4] - 3:19, 32:20,
134:1, 213:22
   **care** [4] - 4:17, 225:15,
225:20, 237:21
   **career** [4] - 178:12,
201:2, 201:22, 203:22
   **careful** [1] - 156:4
   **carried** [2] - 81:17,
88:12
   **carry** [7] - 7:5, 81:13,
82:25, 83:22, 170:5,
210:14
   **carrying** [4] - 51:10,
66:1, 116:2, 136:19
   **cart** [1] - 173:16
   **Cartridge** [3] - 188:6,
188:19, 188:20
   **cartridge** [41] - 178:8,
178:24, 181:13, 181:25,
182:8, 182:9, 182:12,
182:14, 182:17, 182:18,
182:19, 183:3, 184:18,

185:3, 185:4, 186:13,
186:17, 187:3, 187:4,
187:5, 187:6, 188:1,
188:4, 188:20, 188:24,
189:4, 189:5, 189:13,
190:24, 191:9, 191:10,
191:11, 191:13, 193:25,
197:25, 198:1, 198:3,
198:4, 198:7
   **cartridges** [5] - 178:8,
183:2, 183:5, 184:16,
188:17
   **CASE** [1] - 1:6
   **Case** [1] - 249:5
   **case** [132] - 2:22, 8:10,
8:15, 8:16, 8:19, 8:23,
8:24, 9:2, 9:5, 10:9,
10:11, 10:12, 11:6,
13:13, 14:11, 14:18,
15:5, 15:12, 15:21, 16:9,
25:7, 34:15, 34:16, 35:1,
35:4, 57:22, 58:15,
62:22, 64:3, 65:10,
65:18, 66:16, 66:17,
67:2, 67:4, 67:7, 67:13,
74:6, 86:15, 136:17,
138:17, 140:14, 147:9,
148:10, 148:17, 149:9,
149:11, 149:23, 151:2,
151:22, 152:5, 155:3,
159:9, 162:9, 162:16,
164:6, 168:19, 171:5,
171:8, 172:22, 173:21,
174:11, 179:5, 179:21,
180:14, 180:17, 180:18,
181:8, 182:8, 182:9,
182:14, 182:15, 182:17,
183:10, 183:17, 184:21,
184:22, 184:25, 185:12,
186:2, 186:25, 187:2,
187:10, 187:12, 187:23,
187:24, 188:11, 188:18,
188:21, 189:15, 189:16,
189:25, 190:5, 190:17,
191:8, 191:9, 191:15,
193:5, 194:6, 198:4,
198:5, 198:8, 203:12,
203:14, 203:17, 203:19,
208:4, 208:17, 208:19,
208:23, 209:9, 211:17,
212:7, 217:8, 219:22,
223:24, 226:23, 230:4,
234:24, 235:6, 240:13,
240:16, 244:3, 245:24,
246:2
   **cases** [50] - 120:19,
159:23, 165:5, 165:18,
165:24, 169:24, 178:24,
179:22, 180:16, 181:13,
182:10, 182:12, 182:18,

185:3, 185:4, 186:13,
186:17, 187:3, 187:4,
187:5, 187:6, 188:1,
188:4, 188:20, 188:24,
189:4, 189:5, 189:13,
190:25, 191:9, 191:10,
191:11, 191:13, 193:25,
197:25, 198:1, 198:3,
198:4, 198:7, 200:25,
201:4, 204:2, 204:12,
219:3, 221:10, 222:6,
222:7, 225:2, 225:23
   **casings** [5] - 178:8,
182:1, 188:4, 188:9,
188:20, 188:21, 189:4,
189:5, 189:9, 189:13,
193:19, 194:4, 195:10,
195:20, 196:1, 196:3
   **cast** [1] - 165:13
   **Castings** [1] - 177:21
   **cat** [1] - 7:10
   **Cat's** [1] - 3:12
   **categorically** [1] -
155:17
   **categories** [1] - 186:2
   **category** [1] - 207:21
   **caught** [3] - 33:22, 50:8,
61:11
   **caution** [1] - 191:21
   **CD** [8] - 22:14, 28:12,
30:6, 35:18, 37:1,
103:20, 103:23, 104:3
   **CD's** [4] - 71:9, 104:2,
104:3, 131:11
   **CDS** [2] - 40:5, 45:18
   **ceased** [1] - 176:17
   **ceiling** [6] - 23:15, 84:8,
84:10, 91:21, 91:24,
132:10
   **cell** [9] - 6:13, 6:14,
19:22, 20:6, 47:6, 54:3,
54:22, 90:23
   **cellular** [1] - 225:9
   **Center** [2] - 41:18,
41:19
   **Central** [1] - 46:22
   **certain** [22] - 9:9, 39:18,
39:21, 122:3, 122:4,
171:16, 171:17, 173:15,
197:6, 197:24, 205:1,
205:3, 205:24, 208:2,
208:10, 208:15, 223:7,
223:8, 223:11, 223:15,
225:14
   **Certainly** [3] - 2:5,
134:11, 175:6
   **certainly** [11] - 13:22,
123:20, 142:11, 145:5,
148:8, 153:22, 154:9,
156:23, 175:10, 234:10,

244:1
**CERTIFICATE** [1] - 249:1
**certified** [2] - 200:16, 200:17
**certify** [2] - 249:3, 249:6
**Cesar** [1] - 126:2
**Cese** [3] - 37:3, 37:4, 127:23
**chain** [4] - 165:17, 207:9, 224:4, 224:6
**chairs** [3] - 57:21, 138:16, 226:22
**chance** [10] - 139:1, 140:23, 147:25, 148:24, 150:16, 150:18, 150:22, 150:23, 202:25, 227:11
**change** [2] - 2:10, 215:14
**changes** [4] - 22:1, 38:22, 160:4, 225:22
**character** [1] - 73:15
**characteristic** [1] - 166:24
**characteristics** [9] - 166:21, 182:19, 182:24, 184:4, 185:18, 185:23, 190:6, 194:1
**characterization** [3] - 43:6, 59:3, 233:11
**characterized** [1] - 142:14
**charge** [22] - 3:22, 42:9, 42:12, 42:14, 45:13, 46:12, 46:14, 49:23, 49:25, 50:4, 53:6, 65:8, 111:24, 115:4, 115:9, 116:2, 116:25, 136:12, 224:4, 240:20, 241:1, 241:7
**chargeable** [1] - 169:4
**charged** [9] - 3:20, 15:12, 35:6, 51:10, 67:10, 91:1, 91:6, 157:9, 172:1
**charges** [18] - 33:23, 42:17, 45:5, 45:6, 45:8, 47:1, 50:12, 51:23, 51:24, 63:25, 73:24, 74:3, 75:2, 115:17, 156:18, 156:21, 172:13
**Charles** [1] - 187:3
**Charlie** [1] - 181:7
**chart** [6] - 192:11, 193:9, 193:16, 194:9, 194:13, 196:4
**chat** [1] - 234:7
**cheaper** [4] - 173:2, 173:3, 212:18, 214:21
**check** [1] - 114:10

**checking** [1] - 161:10
**checklist** [1] - 160:15
**chemical** [1] - 215:23
**chemicals** [5] - 210:2, 215:24, 216:1, 216:3, 216:7
**chemist** [12] - 2:18, 2:20, 3:24, 4:2, 4:9, 5:8, 5:11, 6:3, 6:8, 7:11, 227:23, 228:2
**chemists** [1] - 2:19
**Cherry** [1] - 163:16
**chicks** [1] - 97:23
**chief** [2] - 165:18, 232:2
**childhood** [3] - 168:9, 168:12
**children** [2] - 102:1, 245:17
**China** [1] - 210:20
**choice** [1] - 4:12
**choose** [2] - 153:9, 242:3
**chooses** [1] - 158:10
**chose** [1] - 150:14
**chronology** [2] - 58:15, 67:16
**chunky** [1] - 216:21
**Circle** [5] - 18:11, 18:17, 132:11, 133:19, 134:8
**circled** [1] - 193:12
**circuit** [1] - 13:13
**Circuit** [10] - 9:3, 9:5, 13:8, 13:10, 16:11, 51:9, 52:23, 152:8, 152:19, 171:8
**circulate** [1] - 21:9
**circulated** [2] - 21:10, 37:19
**circumstances** [3] - 143:13, 208:3, 239:5
**citation** [1] - 9:2
**cite** [7] - 8:24, 9:7, 9:9, 140:16, 151:25, 152:1, 152:6
**cited** [4] - 8:16, 9:13, 171:5, 171:7
**cites** [1] - 173:22
**cities** [6] - 211:2, 211:3, 211:7, 212:25
**citizen** [2] - 81:10, 219:12
**City** [7] - 15:11, 66:14, 157:8, 176:11, 179:15, 206:15, 223:10
**city** [17] - 66:16, 82:12, 82:14, 82:19, 136:13, 206:21, 206:23, 210:25, 211:1, 212:18, 212:19, 213:1, 213:24, 226:6,

226:9
**civilian** [3] - 34:6, 34:11, 34:21
**civilians** [1] - 34:7
**clap** [3] - 24:9, 24:24, 35:23
**clarify** [6] - 5:19, 5:20, 5:21, 6:21, 77:15, 93:23
**class** [7] - 182:19, 184:4, 185:17, 186:16, 187:8, 190:6, 194:1
**classed** [2] - 190:18, 190:19
**classic** [2] - 139:6, 172:24
**Claudus** [6] - 18:23, 19:10, 49:3, 96:14, 129:18, 135:20
**clean** [2] - 148:4, 150:15
**clear** [18] - 11:1, 21:22, 60:20, 78:17, 98:15, 104:14, 146:15, 146:25, 152:24, 153:14, 159:15, 160:6, 161:24, 168:1, 169:18, 174:21, 224:8, 235:14
**cleared** [1] - 159:2
**clearly** [10] - 4:16, 139:8, 143:4, 145:20, 148:14, 156:25, 158:12, 162:1, 195:10, 204:17
**clerk** [2] - 21:9, 140:18
**CLERK** [2] - 175:21, 199:2
**client** [11] - 50:22, 50:23, 51:15, 51:17, 52:4, 52:7, 52:9, 52:22, 120:17, 121:19, 121:20
**client's** [1] - 52:13
**clips** [3] - 27:10, 27:15, 126:10
**Clips** [1] - 27:12
**close** [6] - 27:10, 27:15, 73:20, 79:23, 226:25, 227:1
**closed** [1] - 115:19
**Closer** [1] - 78:13
**closer** [3] - 80:20, 228:22, 243:19
**closing** [9] - 2:22, 172:9, 240:19, 241:11, 241:15, 241:16, 245:9, 245:20
**closings** [1] - 241:18
**clothes** [1] - 47:17
**clown** [1] - 26:2
**clubs** [1] - 99:6
**co** [4] - 81:6, 180:15, 180:22, 234:25

**co-counsel** [1] - 234:25
**co-examiner** [2] - 180:15, 180:22
**co-owned** [1] - 81:6
**Coach** [2] - 235:8, 235:21
**Coast** [1] - 210:17
**COBURN** [26] - 7:7, 108:20, 123:7, 123:14, 123:19, 150:7, 150:9, 180:4, 192:6, 194:15, 194:19, 195:4, 195:8, 197:17, 206:4, 229:4, 229:16, 229:18, 229:20, 230:4, 239:7, 241:4, 246:19, 248:6, 248:9, 248:12
**Coburn** [21] - 1:22, 3:11, 6:16, 9:10, 123:6, 150:5, 150:22, 159:20, 194:12, 195:7, 195:17, 197:10, 197:13, 206:2, 229:3, 229:5, 229:14, 229:17, 230:3, 239:6, 244:23
**Coburn's** [2] - 171:1, 196:9
**cocaine** [43] - 76:15, 132:16, 170:15, 209:18, 209:20, 210:3, 210:9, 210:14, 210:21, 213:5, 213:7, 213:10, 214:19, 214:21, 215:11, 215:12, 215:13, 215:14, 215:15, 215:16, 215:18, 215:20, 215:22, 215:24, 215:25, 216:3, 216:5, 216:9, 216:15, 216:19, 216:20, 217:6, 217:7, 217:9, 217:16, 218:3, 218:8, 218:11, 218:15, 223:1
**Cocaine** [2] - 209:23, 210:5
**coconspirator's** [1] - 151:16
**Code** [1] - 51:11
**code** [2] - 223:11, 225:15
**cold** [1] - 131:3
**collaborative** [1] - 178:21
**collateral** [3] - 148:5, 149:10, 149:25
**colleague** [1] - 183:6
**colleagues** [1] - 170:14
**collected** [1] - 21:13
**colloquy** [2] - 146:2, 158:20
**color** [4] - 165:10, 216:10, 216:17, 223:3

**Colt** [1] - 177:23
**Columbia** [2] - 209:24, 210:18
**combined** [1] - 3:25
**coming** [8] - 94:8, 133:19, 156:5, 221:20, 227:5, 245:12, 245:15, 246:11
**comity** [2] - 228:12, 228:15
**Comity** [1] - 228:15
**command** [3] - 165:17, 224:4, 224:6
**comment** [1] - 233:1
**comments** [2] - 150:25, 157:18
**commerce** [2] - 172:14, 173:8
**commits** [1] - 52:5
**committed** [8] - 34:8, 34:10, 34:12, 40:8, 50:25, 119:20, 120:23, 121:21
**common** [13] - 13:6, 20:5, 72:22, 82:21, 82:23, 83:5, 155:18, 171:12, 184:5, 185:18, 190:7, 217:14, 219:23
**commonly** [1] - 182:20
**communicate** [1] - 232:2
**communicated** [1] - 156:20
**communicating** [1] - 227:6
**communications** [1] - 244:17
**community** [1] - 45:24
**company** [2] - 178:21, 179:3
**compare** [5] - 182:17, 186:20, 186:23, 189:14, 197:5
**compared** [10] - 164:11, 183:5, 183:9, 186:19, 187:4, 188:17, 189:24, 198:6, 198:7, 198:8
**comparing** [1] - 186:3
**comparison** [11] - 169:7, 184:23, 185:12, 185:23, 187:1, 187:17, 189:4, 189:10, 189:19, 190:15, 197:23
**comparisons** [3] - 187:12, 187:16, 187:23
**compelling** [2] - 157:20, 157:25
**competitors** [4] - 219:21, 220:9, 220:12, 220:14

**complaint** [4] - 181:6, 186:5, 187:2, 194:7
**complete** [5] - 34:2, 41:9, 51:14, 154:5, 248:9
**completed** [1] - 200:1
**completely** [1] - 66:1
**complicated** [1] - 193:21
**complies** [1] - 18:19
**component** [3] - 165:25, 204:19, 204:21
**conceal** [1] - 210:14
**concealed** [1] - 132:19
**conceivable** [2] - 244:25, 245:20
**concepts** [1] - 214:18
**concern** [3] - 71:23, 233:15, 233:24
**concerned** [3] - 106:20, 168:10, 233:15
**concerning** [6] - 9:10, 10:2, 151:1, 171:4, 172:7, 172:23
**Concerning** [1] - 73:23
**concert** [1] - 13:6
**concerted** [5] - 153:16, 153:17, 153:18, 153:25, 156:22
**conclude** [8] - 123:13, 133:10, 136:10, 136:11, 138:11, 226:13, 227:1, 227:12
**concluded** [3] - 14:19, 15:17, 233:3
**Conclusion** [1] - 247:3
**conclusion** [2] - 135:7, 144:8, 189:8
**conclusions** [2] - 189:3, 190:3
**conclusive** [1] - 151:11
**conditioner** [2] - 57:12, 57:14
**conditioning** [1] - 57:15
**conduct** [3] - 14:14, 52:5, 52:10
**Conduct** [1] - 226:23
**conducted** [1] - 204:24
**confer** [3] - 155:8, 197:12, 197:13
**conference** [4] - 240:21, 241:1, 241:7, 241:9
**confident** [1] - 156:15
**confidential** [1] - 205:9
**confronted** [3] - 19:16, 20:17
**confused** [3] - 161:23, 184:1, 195:15
**confusion** [2] - 14:10, 170:25

**conjunction** [1] - 171:16
**connection** [3] - 164:22, 193:5, 230:9
**connections** [1] - 164:20
**consider** [6] - 8:21, 39:9, 74:25, 140:1, 143:24, 233:23
**considerable** [1] - 238:19
**considerably** [1] - 242:16
**consideration** [7] - 34:18, 34:25, 35:5, 50:22, 114:3, 121:18, 136:4
**considered** [3] - 34:13, 109:17, 109:18
**consistent** [1] - 140:11
**conspiracies** [5] - 16:12, 157:2, 168:24, 172:2, 224:2
**conspiracy** [32] - 4:21, 4:23, 8:13, 8:18, 8:21, 13:11, 13:12, 13:13, 13:15, 13:21, 14:1, 14:2, 16:8, 16:10, 151:15, 151:18, 153:1, 153:9, 155:16, 156:17, 156:23, 156:24, 156:25, 157:3, 167:11, 167:18, 168:21, 168:23, 171:19, 172:1
**conspiratorial** [4] - 11:18, 14:14, 153:25, 154:17
**constant** [1] - 165:13
**constitute** [4] - 9:17, 151:14, 152:20, 249:6
**constitutes** [1] - 151:16
**consumer** [2] - 211:3, 211:7
**CONT'D** [4] - 16:25, 209:13, 248:4, 248:12
**contact** [2] - 238:3, 238:20
**containers** [1] - 217:13
**content** [1] - 87:1
**contest** [1] - 8:14
**context** [1] - 26:15
**continuation** [1] - 14:2
**Continue** [3] - 57:23, 138:17, 226:24
**continue** [2] - 158:17, 175:16
**continued** [1] - 225:3
**continuing** [2] - 8:18, 184:20
**continuous** [3] - 140:22, 151:3, 156:2

**continuously** [3] - 11:21, 155:2, 156:8
**contours** [1] - 154:5
**contradicts** [1] - 148:2
**controversial** [1] - 165:2
**convenience** [1] - 187:22
**convenient** [1] - 38:1
**conveniently** [1] - 146:10
**conversation** [1] - 95:6
**conversations** [1] - 144:25
**convict** [1] - 159:19
**convicted** [9] - 10:15, 14:19, 15:18, 153:12, 157:21, 159:4, 233:3, 233:7, 233:24
**conviction** [3] - 14:14, 158:16, 163:25
**convince** [2] - 11:11, 12:11
**convinced** [1] - 11:11
**convincing** [1] - 52:12
**Cook** [1] - 232:8
**Cook's** [2] - 232:6, 232:10
**cooking** [1] - 216:5
**cool** [7] - 32:21, 79:8, 79:9, 90:6, 98:16, 98:19
**cooled** [1] - 216:13
**cooperate** [6] - 44:21, 44:22, 48:10, 49:8, 49:22, 62:22
**cooperated** [1] - 42:20
**cooperating** [3] - 111:20, 201:17, 212:13
**cooperation** [7] - 56:15, 111:22, 113:18, 114:2, 119:11, 119:19, 120:16
**cooperative** [4] - 64:1, 64:17, 74:24, 161:23
**copies** [5] - 6:20, 37:18, 37:21, 37:23, 244:12
**copious** [1] - 13:1
**cops** [1] - 29:15
**Cops** [1] - 29:17
**copy** [1] - 38:4
**Corleone** [1] - 169:9
**corner** [1] - 220:6
**corners** [1] - 223:14
**correct** [109] - 9:21, 11:16, 17:7, 22:2, 27:6, 29:5, 33:2, 36:4, 38:18, 40:9, 42:15, 43:23, 44:13, 47:8, 48:23, 49:10, 50:12, 50:15, 50:19, 50:20, 51:12, 51:18, 53:3, 55:23,

56:13, 56:20, 60:19, 62:13, 62:25, 63:7, 64:13, 81:7, 83:16, 92:16, 97:13, 102:12, 102:23, 103:3, 103:5, 103:12, 103:21, 105:22, 106:21, 107:2, 107:19, 109:24, 110:9, 112:9, 112:25, 113:17, 116:23, 117:1, 117:18, 117:23, 118:19, 119:13, 122:9, 122:12, 122:23, 125:11, 125:20, 128:22, 129:3, 129:19, 130:5, 130:7, 130:17, 130:20, 134:4, 134:13, 134:19, 134:21, 135:4, 135:8, 136:15, 136:22, 137:10, 137:19, 137:25, 152:18, 185:24, 188:7, 188:21, 190:16, 191:2, 200:24, 203:15, 203:18, 204:4, 204:19, 204:21, 205:13, 205:14, 205:21, 205:22, 206:9, 206:11, 206:17, 212:21, 213:23, 217:10, 217:15, 217:18, 218:20, 219:2, 222:4, 222:5, 222:9, 245:10
**Correct** [126] - 15:1, 21:23, 27:7, 36:5, 41:3, 41:11, 42:5, 42:16, 43:20, 43:24, 44:2, 44:14, 47:9, 48:7, 48:24, 49:5, 49:11, 50:2, 50:13, 50:16, 50:21, 51:19, 54:16, 56:17, 56:24, 59:9, 59:24, 60:4, 62:14, 62:17, 62:23, 63:1, 63:8, 63:13, 64:19, 66:9, 67:12, 70:9, 71:7, 74:4, 74:7, 76:9, 79:24, 80:13, 81:8, 82:11, 82:20, 83:14, 83:17, 84:19, 84:23, 84:25, 85:23, 92:23, 94:7, 95:4, 95:10, 96:13, 96:16, 97:14, 100:22, 101:16, 102:7, 102:13, 102:24, 103:4, 103:13, 103:22, 104:16, 104:19, 106:22, 106:25, 107:3, 107:20, 109:6, 109:9, 109:14, 109:23, 109:25, 110:7, 110:13, 110:16, 112:10, 113:1, 114:19, 115:8, 116:9, 116:17, 116:24, 117:24, 118:20, 119:9, 119:14, 123:23, 123:24, 124:8, 124:21, 125:10, 125:12, 125:15, 125:19, 125:21,

126:9, 126:11, 126:18, 128:5, 128:23, 129:4, 129:20, 130:6, 130:21, 130:25, 131:12, 132:5, 132:17, 133:14, 134:14, 134:20, 135:5, 135:11, 136:23, 137:1, 137:14, 164:17, 186:4, 186:22
**Correction** [1] - 124:15
**correctional** [1] - 225:10
**Corrections** [4] - 40:9, 40:11, 90:17, 90:20
**correctly** [6] - 108:23, 115:5, 115:16, 117:17, 119:1, 192:20
**corroborate** [1] - 205:10
**corroborated** [1] - 205:7
**corroborative** [1] - 86:25
**cost** [1] - 213:2
**Counsel** [5] - 24:13, 37:21, 58:9, 133:8, 139:1
**counsel** [23] - 2:18, 3:8, 131:16, 136:2, 138:23, 139:16, 140:12, 156:15, 173:20, 174:18, 180:3, 197:12, 232:15, 232:17, 232:23, 234:25, 235:2, 240:5, 240:6, 242:12, 242:23, 243:11, 244:2
**counselor** [1] - 142:23
**count** [6] - 35:2, 35:6, 35:8, 35:10, 159:14, 159:19
**countries** [1] - 209:24, 210:18, 210:19, 212:15
**country** [3] - 210:11, 211:6, 213:24
**County** [31] - 15:3, 15:5, 15:11, 50:20, 51:9, 52:24, 66:15, 66:18, 90:16, 90:20, 121:7, 154:25, 157:6, 163:7, 178:1, 179:14, 183:6, 183:10, 184:13, 186:15, 191:12, 193:5, 195:22, 196:2, 196:7, 196:23, 197:3, 197:19, 198:6, 198:14
**county** [6] - 25:17, 25:18, 25:20, 25:22, 66:15, 136:17
**couple** [14] - 2:3, 2:24, 59:14, 69:18, 78:21, 91:21, 126:1, 126:23, 138:3, 150:11, 150:24, 158:1, 233:21, 243:4

**course** [19] - 12:23, 12:25, 13:2, 15:8, 15:10, 114:11, 120:6, 135:24, 142:22, 166:8, 178:12, 201:2, 232:21, 241:24, 242:4, 242:7, 242:18, 243:19, 244:12

**courses** [1] - 177:5

**COURT** [368] - 1:1, 2:2, 2:5, 2:16, 3:8, 3:14, 3:16, 3:21, 3:23, 4:3, 4:13, 4:16, 4:21, 4:24, 5:2, 5:6, 5:12, 5:18, 6:2, 6:10, 6:15, 6:18, 7:9, 7:13, 7:19, 7:22, 8:1, 8:4, 8:7, 8:24, 9:6, 9:15, 9:18, 10:6, 10:13, 10:18, 10:21, 11:10, 11:14, 11:24, 12:11, 12:15, 12:21, 12:25, 13:3, 13:19, 14:15, 14:23, 15:2, 15:9, 15:13, 15:22, 16:4, 16:14, 16:20, 16:24, 18:21, 19:4, 19:8, 20:9, 20:14, 21:13, 22:7, 22:23, 23:9, 23:14, 23:20, 24:6, 24:11, 24:13, 24:18, 25:7, 25:9, 25:15, 32:15, 33:10, 33:14, 34:5, 37:9, 37:13, 37:21, 37:25, 38:6, 38:11, 38:14, 38:16, 39:2, 39:7, 43:8, 43:17, 44:10, 53:17, 53:24, 57:6, 57:20, 58:1, 58:3, 58:6, 58:8, 61:18, 61:21, 69:4, 76:21, 81:12, 85:15, 85:25, 86:4, 87:20, 89:25, 90:4, 91:5, 114:11, 121:1, 123:5, 123:11, 123:16, 125:1, 125:7, 128:8, 130:10, 131:15, 131:19, 132:2, 133:4, 133:8, 135:13, 136:2, 136:7, 136:10, 137:6, 138:4, 138:7, 138:9, 138:21, 139:1, 140:17, 141:3, 141:10, 141:15, 141:19, 142:10, 142:17, 142:19, 143:18, 144:14, 144:19, 145:4, 145:10, 145:12, 145:20, 145:23, 146:1, 146:15, 146:19, 146:21, 147:6, 147:10, 147:13, 147:17, 147:24, 148:13, 149:2, 150:1, 150:3, 150:5, 150:8, 150:10, 150:14, 150:17, 150:22, 151:7, 151:21, 151:23, 152:2, 152:5, 152:7, 152:12,

152:17, 152:22, 152:24, 153:3, 153:14, 153:18, 154:1, 154:22, 155:6, 155:9, 155:11, 155:14, 155:17, 155:22, 155:24, 156:12, 158:4, 158:6, 159:3, 159:10, 159:17, 160:2, 160:7, 160:10, 160:20, 160:23, 160:25, 161:4, 161:14, 162:3, 162:10, 162:14, 162:18, 162:20, 163:4, 163:12, 163:14, 163:16, 163:20, 163:25, 164:2, 164:8, 164:12, 164:15, 164:18, 164:24, 166:11, 167:8, 167:19, 167:24, 168:22, 169:2, 169:17, 169:23, 170:2, 170:7, 170:23, 174:2, 175:3, 175:6, 175:10, 175:12, 175:14, 177:14, 177:18, 180:3, 180:7, 181:21, 181:23, 183:15, 185:2, 185:14, 187:20, 188:14, 191:20, 192:1, 194:8, 194:12, 194:18, 195:1, 195:3, 195:6, 195:17, 196:8, 196:12, 196:23, 197:1, 197:10, 197:13, 198:18, 198:21, 198:24, 202:14, 206:2, 207:13, 207:16, 217:25, 226:11, 226:16, 226:18, 226:20, 227:22, 228:4, 228:8, 228:10, 228:13, 228:15, 228:18, 229:1, 229:3, 229:5, 229:11, 229:15, 229:17, 229:19, 229:24, 230:1, 230:3, 230:5, 230:12, 230:15, 230:22, 230:24, 231:1, 231:5, 231:10, 231:15, 231:19, 231:23, 232:1, 232:10, 232:23, 233:7, 233:9, 233:13, 233:17, 234:2, 234:5, 234:9, 234:14, 234:18, 234:22, 234:25, 235:7, 235:11, 235:14, 235:18, 235:25, 236:7, 236:11, 236:15, 236:17, 236:20, 236:22, 236:24, 237:4, 237:6, 237:10, 237:12, 237:15, 237:17, 237:19, 238:1, 238:11, 238:15, 238:21, 238:24, 239:3, 239:6, 240:3, 240:25, 241:3, 241:5, 242:18, 243:1, 243:10, 243:19, 244:4, 244:9, 245:5, 245:14, 245:22, 245:25,

246:4, 246:9, 246:11, 246:13, 246:16, 246:20, 246:22, 246:25

**court** [42] - 3:3, 3:6, 3:7, 6:3, 12:24, 48:5, 50:1, 50:23, 51:1, 51:22, 52:19, 52:24, 59:13, 61:12, 63:22, 66:13, 69:7, 71:11, 72:12, 74:6, 74:14, 75:20, 75:22, 75:23, 110:19, 121:19, 121:22, 122:5, 136:14, 141:13, 143:25, 154:10, 156:21, 158:16, 179:11, 179:17, 228:4, 230:14, 232:2, 233:4, 240:1, 245:18

**Court** [49] - 3:5, 16:9, 16:12, 51:6, 51:9, 52:12, 52:23, 123:8, 141:8, 141:20, 141:21, 141:25, 142:5, 142:9, 156:1, 157:3, 157:15, 157:18, 158:1, 158:8, 158:15, 158:17, 159:20, 160:13, 167:16, 168:17, 170:21, 171:14, 171:18, 172:6, 174:3, 174:22, 179:16, 187:18, 192:3, 195:15, 208:14, 230:8, 232:3, 232:25, 233:22, 233:25, 239:4, 239:12, 239:13, 242:16, 242:23, 249:15

**court's** [1] - 75:21

**Court's** [19] - 2:6, 10:1, 11:1, 12:2, 12:16, 21:7, 125:6, 128:7, 141:14, 143:12, 150:25, 174:10, 174:11, 174:14, 181:17, 181:18, 233:5, 242:23, 243:16

**courthouse** [4] - 45:11, 46:11, 46:21, 59:22

**Courthouse** [1] - 1:24

**courtroom** [27] - 6:19, 16:18, 16:19, 34:16, 57:25, 58:2, 58:5, 58:7, 77:7, 109:4, 109:11, 110:6, 138:20, 138:22, 138:25, 141:2, 175:13, 203:5, 227:20, 227:21, 230:9, 234:13, 239:1, 244:11, 244:18, 244:20

**courts** [3] - 2:25, 3:4, 174:3

**cousin** [1] - 19:10

**cover** [2] - 86:4, 202:2

**covered** [3] - 142:8, 170:19

**covers** [1] - 173:23

**Crack** [2] - 46:4, 215:12

**crack** [20] - 3:19, 4:7, 4:13, 4:15, 4:18, 4:19, 5:3, 17:6, 46:9, 61:4, 64:24, 67:4, 76:15, 132:16, 215:11, 215:15, 217:6, 217:7, 217:16, 223:1

**cracking** [2] - 36:7

**crashed** [1] - 134:2

**Crawford** [1] - 205:24

**Crazy** [1] - 36:14

**crazy** [2] - 135:1, 156:17

**created** [1] - 222:20

**credibility** [1] - 209:8

**credits** [1] - 142:25

**crime** [12] - 18:13, 18:18, 41:1, 61:15, 106:24, 133:21, 136:19, 136:22, 169:9, 178:25, 181:14, 186:12

**Crime** [4] - 176:14, 176:17, 177:2

**crimes** [1] - 187:7

**criminal** [8] - 48:19, 51:2, 51:8, 52:9, 121:23, 154:14, 179:21, 179:22

**Criminal** [1] - 51:11

**CRIMINAL** [1] - 1:6

**CROSS** [16] - 58:10, 90:7, 101:1, 108:19, 192:5, 202:15, 204:6, 206:3, 248:5, 248:5, 248:6, 248:6, 248:9, 248:11, 248:11, 248:12

**cross** [10] - 10:10, 14:17, 16:1, 58:9, 129:2, 139:8, 142:8, 206:1, 228:23, 239:11

**Crowe** [5] - 1:20, 101:3, 150:1, 229:1, 238:16

**CROWE** [12] - 57:2, 69:3, 101:2, 150:2, 204:7, 229:2, 238:17, 238:22, 238:25, 239:4, 248:6, 248:11

**crystallize** [1] - 139:2

**curiosity** [2] - 179:19, 179:20

**current** [2] - 114:4, 202:3

**custody** [15] - 8:11, 9:22, 11:18, 11:21, 12:4, 15:25, 49:24, 66:18, 140:22, 151:4, 155:1, 156:2, 157:6, 157:8, 237:22

**customer** [2] - 226:3, 226:4

**customers** [3] - 222:25, 223:4, 226:8

**cut** [1] - 179:1

**cute** [1] - 87:17

**cutting** [1] - 170:17

**D**

**damaged** [1] - 164:11

**dare** [1] - 229:11

**dark** [1] - 148:22

**Darryl** [1] - 187:14

**databases** [1] - 205:16

**date** [12] - 9:6, 66:7, 106:16, 118:24, 119:1, 119:10, 155:2, 178:17, 231:14, 231:15, 231:16, 231:20

**dated** [3] - 112:4, 117:22, 119:3

**dates** [1] - 106:18

**Daubert** [2] - 174:3, 174:14

**Davis** [1] - 1:13

**days** [19] - 13:9, 13:17, 20:2, 20:3, 37:23, 46:13, 59:14, 62:20, 81:16, 119:11, 119:23, 146:2, 227:8, 240:10, 240:13, 241:12, 241:13, 245:13

**DC** [1] - 178:2

**DEA** [9] - 199:12, 199:21, 199:25, 200:11, 200:15, 200:22, 202:6, 206:8, 207:3

**dead** [3] - 33:15, 219:22, 246:22

**deal** [10] - 6:5, 16:14, 85:9, 85:12, 86:8, 86:9, 144:5, 144:6, 204:10, 242:20

**dealer** [8] - 69:25, 70:12, 71:1, 83:3, 219:11, 220:12, 221:11, 223:12

**dealers** [12] - 81:22, 81:24, 170:4, 204:16, 219:24, 219:25, 220:1, 220:3, 220:6, 220:14, 220:24, 221:5

**dealing** [10] - 59:16, 71:6, 72:20, 82:21, 97:16, 128:14, 128:18, 207:1, 226:7, 226:8

**dealings** [2] - 77:9, 236:23

**dealt** [1] - 97:12

**Dean** [1] - 118:9

**death** [1] - 26:12

**deaths** [1] - 208:10
**debriefed** [2] - 201:17, 204:18
**debriefing** [3] - 161:6, 204:12, 204:13
**debriefings** [1] - 201:21
**debt** [1] - 81:10
**December** [6] - 65:18, 101:13, 102:15, 103:6, 137:15, 242:4
**decide** [3] - 147:21, 159:19, 246:23
**decided** [1] - 151:17
**decides** [1] - 52:16
**decision** [2] - 75:23, 209:10
**declared** [1] - 246:17
**decrease** [1] - 170:18
**defeat** [1] - 13:12
**defendant** [10] - 35:3, 35:4, 35:7, 35:10, 47:2, 151:9, 159:8, 174:9, 205:8, 244:3
**Defendant** [4] - 1:17, 1:18, 1:20, 1:21
**defendant's** [4] - 34:14, 34:19, 159:25, 238:22
**defendants** [18] - 13:5, 25:7, 33:11, 34:23, 111:2, 153:11, 156:3, 156:13, 156:14, 157:23, 168:9, 172:15, 232:21, 234:9, 234:10, 234:12, 244:17, 244:19
**Defendants** [3] - 1:9, 141:2, 234:13
**defendants'** [1] - 153:15
**defense** [37] - 2:18, 10:12, 12:22, 14:6, 16:3, 111:4, 131:16, 153:23, 154:3, 154:5, 155:3, 156:13, 165:2, 168:19, 169:7, 169:19, 171:8, 171:20, 172:1, 173:15, 173:22, 174:18, 179:21, 179:22, 203:19, 234:24, 235:3, 235:5, 237:23, 238:9, 239:22, 240:5, 240:13, 240:15, 242:12, 242:23
**defining** [1] - 171:19
**definitely** [1] - 246:14
**definition** [1] - 172:7
**degree** [6] - 154:7, 154:8, 176:25, 177:1, 205:12
**delay** [2] - 2:22, 242:15
**deleted** [1] - 233:22
**deliberating** [4] - 158:2,

243:6, 243:18, 243:20
**deliberations** [4] - 35:9, 241:20, 241:23, 243:25
**demand** [1] - 213:2
**demanding** [1] - 7:11
**demonstration** [1] - 13:11
**denial** [1] - 140:10
**denied** [1] - 53:24
**denotes** [1] - 167:18
**department** [2] - 176:13, 176:25
**Department** [6] - 40:8, 40:11, 90:17, 90:20, 176:6, 180:18
**deputy** [1] - 21:9
**describe** [1] - 133:21
**described** [4] - 7:8, 105:24, 115:14, 216:16
**describes** [1] - 50:7
**designated** [3] - 182:4, 183:18, 185:12
**designed** [1] - 208:21
**desire** [1] - 64:1
**despite** [2] - 113:17, 114:23
**detail** [1] - 13:17
**detailed** [2] - 43:3, 172:6
**details** [1] - 65:17
**detainees** [2] - 10:2, 10:5
**detainer** [2] - 66:23, 115:22, 115:23
**detected** [1] - 214:17
**Detective** [2] - 40:23, 58:20
**detectives** [6] - 15:11, 26:16, 40:20, 40:23, 41:9, 83:8
**Detention** [2] - 41:18, 41:19
**determinable** [1] - 167:2
**determination** [3] - 182:23, 209:8, 235:22
**determinations** [1] - 208:7
**determine** [3] - 146:21, 171:23, 197:6
**determined** [2] - 52:23, 183:1
**determining** [1] - 34:18
**developing** [1] - 239:19
**devote** [1] - 241:11
**dial** [1] - 219:12
**difference** [9] - 5:3, 10:2, 22:11, 66:24, 146:6, 149:22, 168:11, 214:15, 215:10

**Different** [1] - 185:8
**different** [33] - 3:3, 38:7, 38:13, 55:12, 68:18, 71:4, 75:8, 77:5, 77:7, 83:23, 89:8, 104:2, 160:4, 165:11, 167:10, 177:5, 177:24, 184:12, 184:24, 185:6, 187:7, 194:17, 202:4, 210:8, 214:2, 221:5, 221:17, 221:18, 223:2, 223:3, 225:24, 225:25, 226:6
**differential** [2] - 212:24, 213:18
**differentiate** [1] - 39:4, 156:2
**differently** [1] - 146:16
**difficult** [2] - 205:2, 214:16
**difficulty** [1] - 238:19
**diligence** [1] - 239:14
**dime** [3] - 61:4, 64:24, 217:23
**dire** [1] - 180:4
**DIRECT** [8] - 16:25, 175:25, 199:5, 209:13, 248:4, 248:8, 248:10, 248:12
**direct** [10] - 77:9, 114:13, 120:7, 121:2, 130:11, 136:1, 142:8, 147:1, 173:5, 197:22
**directed** [1] - 171:18
**directing** [2] - 168:2, 235:5
**directly** [3] - 111:13, 175:21, 199:2
**dirty** [2] - 105:24, 149:9
**disagree** [2] - 233:4, 233:10
**disagreeing** [1] - 144:21
**disagreement** [1] - 154:1
**disavowal** [1] - 13:12
**discern** [1] - 218:24
**discharge** [2] - 61:24, 65:10
**discharging** [4] - 45:6, 66:17, 115:20, 136:12
**Discharging** [2] - 61:23, 61:24
**disclose** [3] - 63:3, 147:22, 242:24
**disclosed** [2] - 146:14, 147:20
**disclosures** [1] - 52:25
**discounting** [1] - 229:5
**discovery** [1] - 145:16
**discrepancy** [2] -

161:20, 161:21
**discuss** [3] - 34:9, 244:15, 244:24
**discussed** [4] - 58:16, 59:13, 128:13, 180:6
**discussing** [1] - 161:16
**discussion** [4] - 57:22, 138:17, 161:7, 226:22
**disdain** [1] - 79:17
**dishing** [1] - 33:18
**dishonor** [1] - 26:12
**Disliked** [1] - 79:13
**dismiss** [2] - 51:5, 121:25
**dismissed** [2] - 67:13, 136:13
**display** [2] - 125:6, 193:10
**displayed** [2] - 131:14, 192:17
**disposed** [1] - 67:4
**disposition** [1] - 15:21
**disputes** [1] - 224:24
**dissolve** [2] - 210:6, 215:19
**distance** [1] - 244:5
**distinct** [1] - 216:6
**distinction** [2] - 157:11, 157:12
**distribute** [3] - 17:6, 37:25, 218:18
**distributed** [2] - 211:2, 219:1
**distribution** [9] - 68:24, 69:6, 77:9, 81:16, 165:2, 207:10, 212:16, 212:23, 217:1
**DISTRICT** [2] - 1:1, 1:2
**District** [3] - 51:5, 179:15, 179:16
**disturbance** [1] - 230:10
**division** [1] - 199:20
**Division** [2] - 176:5, 205:19
**DIVISION** [1] - 1:2
**DOAR** [5] - 133:7, 133:8, 133:9, 141:23, 141:24
**Dobropolski** [1] - 143:8
**DOC** [2] - 154:24, 157:7
**doctrine** [1] - 139:9
**document** [1] - 112:1
**documents** [2] - 52:25, 237:9
**dog** [1] - 30:17
**dollar** [1] - 211:22
**dollars** [5] - 211:18, 215:2, 215:5, 217:5, 218:12

**don't0** [1] - 245:14
**done** [15] - 36:19, 37:11, 143:7, 146:8, 148:17, 177:7, 177:8, 177:9, 178:20, 187:1, 200:23, 201:8, 201:21, 222:2, 239:15
**door** [10] - 10:14, 10:18, 10:21, 10:23, 10:24, 11:2, 135:3, 169:20
**dot** [2] - 52:10, 52:11
**double** [1] - 197:8
**doubt** [4] - 34:19, 139:25, 143:4, 173:11
**Doug** [2] - 198:22, 202:12
**DOUG** [2] - 198:25, 248:10
**Douglas** [1] - 199:4
**Down** [4] - 17:21, 17:22, 29:23, 31:10
**down** [55] - 6:19, 12:1, 12:13, 22:18, 24:8, 26:2, 27:9, 27:24, 28:3, 28:16, 28:19, 29:19, 29:22, 30:9, 30:16, 32:4, 33:16, 33:18, 35:22, 36:18, 37:2, 46:25, 54:12, 55:23, 62:21, 68:14, 69:4, 94:19, 97:3, 97:8, 102:2, 104:11, 126:8, 126:20, 146:10, 148:2, 160:14, 177:15, 198:7, 211:11, 211:21, 211:25, 212:9, 212:16, 213:4, 213:10, 215:9, 216:13, 216:23, 216:25, 217:16, 218:4, 218:6
**downs** [1] - 55:16
**downstairs** [1] - 94:11
**Dr** [1] - 207:23
**draconian** [1] - 16:11
**draft** [1] - 3:6
**draw** [6] - 18:16, 18:17, 157:12, 169:7, 189:3, 190:3
**Dress** [1] - 23:22
**drew** [1] - 171:14
**drive** [3] - 213:2, 213:9, 213:11
**drives** [1] - 220:11, 220:17
**driving** [1] - 161:18
**drop** [1] - 91:24
**dropped** [1] - 49:23
**Drug** [5] - 199:10, 200:4, 202:22, 205:19, 206:10
**drug** [96] - 31:17, 46:3, 59:16, 68:24, 69:6,

69:24, 70:12, 71:1, 71:6, 76:14, 77:9, 81:15, 81:22, 81:24, 82:21, 83:3, 93:25, 94:2, 94:5, 128:14, 128:25, 129:3, 129:6, 129:8, 132:14, 160:18, 165:2, 165:6, 165:21, 166:4, 166:7, 166:21, 167:16, 168:6, 169:13, 169:25, 170:3, 170:4, 173:4, 174:5, 200:12, 200:13, 200:23, 200:25, 201:9, 201:12, 201:18, 202:4, 202:5, 202:12, 204:11, 204:16, 206:19, 206:20, 207:1, 208:13, 211:14, 211:24, 212:3, 212:10, 214:5, 214:24, 215:5, 218:13, 219:6, 219:11, 219:18, 219:23, 219:25, 220:1, 220:3, 220:5, 220:10, 220:11, 220:12, 220:14, 220:18, 220:20, 220:24, 221:5, 221:11, 221:17, 221:25, 222:1, 222:2, 222:12, 222:25, 223:5, 223:6, 223:11, 224:2, 225:4
**drugs** [38] - 29:11, 45:25, 65:21, 65:22, 72:20, 76:7, 83:1, 94:20, 97:12, 97:16, 99:25, 128:18, 165:3, 166:9, 168:16, 172:11, 172:16, 172:18, 201:4, 202:8, 205:18, 209:16, 210:24, 211:10, 211:12, 212:5, 212:14, 212:17, 212:22, 213:20, 213:24, 214:3, 214:14, 218:23, 219:8, 219:16, 220:25, 221:3
**Drugs** [1] - 209:18
**dry** [2] - 216:15, 216:18
**dual** [5] - 9:11, 16:16, 160:9, 233:17, 233:20
**dudes** [1] - 135:1
**due** [4] - 140:11, 145:16, 154:21, 239:14
**duplicate** [1] - 38:7
**Dupont** [3] - 18:12, 98:6, 134:23
**durations** [1] - 16:10
**During** [1] - 19:20
**during** [15] - 9:12, 14:13, 42:3, 81:15, 103:5, 119:16, 119:23, 120:6, 140:6, 141:17, 143:10, 178:11, 181:4, 195:19, 201:21

**Dwight** [14] - 29:3, 29:4, 84:2, 84:7, 84:12, 84:18, 92:2, 92:6, 100:12, 100:13, 100:15, 132:25, 133:12, 133:15
**dying** [1] - 246:6

# E

E-L-L-I-N-G-T-O-N [1] - 199:4
**e-mail** [2] - 3:10, 241:9
**early** [4] - 132:7, 232:5, 241:19, 242:19
**easier** [4] - 7:14, 35:23, 221:2, 221:3
**easiest** [1] - 6:19
**easily** [2] - 211:18, 219:25
**East** [1] - 210:17
**Edgecombe** [7] - 18:10, 18:17, 101:5, 101:10, 132:11, 133:19, 134:8
**Edmondson** [2] - 54:14, 54:15
**educate** [1] - 104:8
**education** [1] - 202:6
**effect** [8] - 11:15, 14:24, 129:19, 137:9, 142:2, 143:12, 161:24, 166:15
**efficient** [1] - 242:10
**effort** [2] - 71:17, 71:23
**efforts** [2] - 16:5, 71:16
**Eight** [3] - 70:19, 80:20, 131:7
**eight** [11] - 30:2, 60:24, 62:20, 78:20, 119:11, 119:16, 119:23, 137:24, 146:9, 173:13, 241:16
**either** [24] - 6:21, 10:10, 20:6, 34:21, 68:20, 68:23, 92:6, 96:19, 106:8, 106:13, 106:14, 122:4, 122:5, 151:2, 167:2, 184:11, 216:23, 217:1, 220:24, 225:24, 235:19, 241:9, 242:1
**Either** [2] - 4:3, 219:20
**electronic** [1] - 200:19
**electronically** [1] - 6:25
**elements** [4] - 159:12, 159:13, 159:16
**elicit** [2] - 8:10, 240:2
**ELLINGTON** [2] - 198:25, 248:10
**Ellington** [23] - 160:18, 161:3, 164:25, 165:5, 169:25, 173:23, 174:13, 175:4, 198:23, 199:4,

199:23, 200:22, 202:12, 202:17, 204:8, 206:5, 208:12, 208:18, 209:15, 217:12, 224:14, 228:3, 228:19
**Ellington's** [2] - 170:9, 174:12
**elsewhere** [1] - 214:10
**em** [1] - 36:18
**employ** [1] - 139:10
**employed** [1] - 203:22
**employer** [1] - 227:6
**encompassed** [2] - 139:8, 153:10
**encompassing** [1] - 206:22
**encountered** [1] - 221:10
**end** [16] - 28:10, 32:18, 36:25, 42:14, 58:16, 104:5, 118:3, 124:6, 137:21, 175:8, 219:22, 231:2, 234:6, 237:14, 241:10, 241:25
**endangerment** [1] - 45:7
**ended** [2] - 124:7, 156:25
**ending** [1] - 16:12
**ends** [2] - 224:7, 224:12
**enforcement** [9] - 15:3, 34:7, 34:12, 34:21, 199:15, 200:10, 202:21, 206:14, 223:24
**Enforcement** [6] - 199:11, 200:1, 200:4, 202:22, 205:19, 206:10
**enforcer** [1] - 139:19
**enhanced** [1] - 33:23
**Ensor** [6] - 183:7, 193:6, 196:2, 198:6, 198:9, 198:10
**enter** [2] - 49:12, 64:21
**entered** [5] - 65:4, 65:14, 135:19, 181:16, 189:21
**entering** [1] - 50:23, 121:19
**enterprise** [5] - 172:6, 172:7, 172:13, 172:24, 173:12
**enters** [5] - 16:18, 16:19, 58:5, 58:7, 175:13
**entire** [5] - 82:19, 160:4, 176:11, 240:13, 240:15
**entirely** [3] - 12:7, 60:20, 140:10
**entitled** [6] - 11:17, 12:10, 35:4, 153:22, 154:14, 171:25

**entity** [1] - 173:10
**envelope** [1] - 182:15
**envelopes** [1] - 191:24
**Environmental** [1] - 41:25
**Epps** [13] - 181:5, 181:11, 186:6, 186:10, 187:4, 187:9, 190:17, 191:11, 191:14, 192:22, 192:23, 198:5, 198:8
**Epps/Eric** [1] - 194:5
**Epps/Lee** [2] - 194:5, 195:12
**Equal** [1] - 218:10
**equipment** [1] - 18:9
**equivalent** [3] - 159:5, 159:17, 203:13
**Eric** [1] - 181:5
**escape** [2] - 15:7, 192:4
**Escobar** [1] - 153:5
**especially** [5] - 144:9, 210:17, 222:22, 224:21, 226:7
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essential** [1] - 172:13
**essentially** [4] - 59:2, 64:11, 69:23, 167:17
**establish** [1] - 53:2
**established** [4] - 13:25, 14:2, 164:5, 164:23
**estimate** [1] - 89:2
**estimation** [1] - 6:25
**et** [1] - 249:5
**etc** [8] - 6:25, 72:20, 81:7, 239:17
**ether** [1] - 216:2
**evaluate** [1] - 209:5
**evaluation** [3] - 208:16, 208:22, 209:7
**evaporate** [1] - 216:4
**evaporating** [1] - 216:7
**evening** [3] - 76:1, 99:19, 227:19
**event** [4] - 50:23, 52:3, 62:11, 121:19
**events** [4] - 51:3, 80:17, 121:24, 207:20
**eventually** [6] - 186:18, 210:2, 210:22, 211:10, 212:15, 216:21
**everyday** [1] - 219:17
**evidence** [56] - 2:12, 2:14, 11:7, 11:17, 12:9, 13:14, 15:11, 34:13, 34:16, 34:17, 34:25, 35:1, 35:5, 39:8, 53:2, 57:22, 135:24, 136:1,

139:14, 141:25, 142:22, 143:1, 143:3, 143:6, 144:5, 144:11, 144:16, 145:18, 151:19, 153:1, 153:21, 154:6, 154:19, 158:7, 158:16, 159:4, 162:7, 167:20, 169:8, 171:11, 173:22, 181:16, 182:12, 182:13, 186:4, 186:5, 189:21, 208:6, 208:16, 208:23, 209:6, 226:22, 230:6, 230:10, 233:2
**evident** [1] - 171:10
**ex** [1] - 235:21
**exacerbated** [1] - 79:18
**exact** [2] - 41:8, 89:15
**Exact** [1] - 89:16
**exactly** [14] - 6:3, 7:7, 10:21, 18:15, 24:21, 46:14, 55:5, 87:11, 129:22, 130:2, 152:18, 159:6, 182:14, 228:13
**Exactly** [9] - 64:8, 67:15, 74:10, 75:1, 81:4, 89:22, 97:25, 100:16, 234:4
**EXAMINATION** [26] - 16:25, 58:10, 90:7, 101:1, 108:19, 128:9, 175:25, 192:5, 199:5, 202:15, 204:6, 206:3, 209:13, 248:4, 248:5, 248:5, 248:6, 248:6, 248:7, 248:8, 248:9, 248:10, 248:11, 248:11, 248:12, 248:12
**examination** [15] - 10:11, 58:17, 114:13, 120:7, 138:11, 140:7, 140:9, 141:18, 143:11, 147:1, 176:19, 180:1, 180:2, 183:18, 184:6
**examinations** [3] - 139:8, 180:14, 191:15
**examine** [6] - 58:9, 171:1, 181:3, 181:10, 182:12, 206:1
**examined** [1] - 178:11
**examiner** [6] - 176:8, 176:9, 176:24, 180:15, 180:22, 208:10
**examiners** [2] - 180:21, 180:23
**examining** [1] - 178:8
**example** [13] - 51:21, 147:4, 149:2, 149:4, 204:14, 207:24, 208:9, 213:4, 216:1, 223:1, 223:9, 224:17, 242:25

**Excellent** [2] - 228:16, 230:5
**Except** [1] - 18:5
**except** [2] - 35:11, 42:13
**exception** [2] - 166:11, 168:15
**excerpts** [1] - 125:6
**exchange** [6] - 49:21, 105:22, 105:23, 106:16, 147:3, 166:1
**exclusive** [1] - 165:10
**exclusively** [1] - 241:11
**excuse** [4] - 162:25, 227:12, 234:9, 241:19
**Excuse** [1] - 24:13
**excused** [10] - 57:24, 138:5, 138:7, 138:14, 138:19, 138:24, 198:21, 227:19, 231:4, 234:12
**executing** [1] - 201:11
**exercise** [1] - 158:9
**Exhibit** [1] - 182:6
**exhibit** [13] - 2:7, 2:8, 2:10, 7:23, 17:4, 22:9, 48:13, 53:18, 53:20, 143:21, 143:24, 183:22
**Exhibits** [2] - 181:17, 187:19
**exhibits** [9] - 2:7, 2:11, 7:25, 183:23, 187:18, 187:21, 191:21, 232:20, 232:22
**Exile** [2] - 33:20, 33:21
**exist** [1] - 157:13
**existed** [1] - 156:25
**existing** [1] - 37:20
**exit** [1] - 234:13
**exits** [6] - 57:25, 58:2, 138:20, 138:25, 227:20, 227:21
**expand** [1] - 13:16
**expansive** [1] - 60:10
**expect** [4] - 75:10, 75:14, 75:16, 205:15
**expectation** [1] - 238:18
**expeditiously** [2] - 51:4, 121:25
**experience** [15] - 165:5, 169:11, 199:24, 200:21, 203:13, 205:5, 206:18, 206:24, 207:24, 219:5, 221:24, 224:3, 225:3, 242:11, 245:23
**expert** [32] - 160:19, 170:11, 170:20, 171:5, 171:8, 171:9, 171:12, 171:21, 172:10, 172:23, 173:4, 173:16, 174:4,

174:6, 179:10, 179:17, 180:1, 180:8, 202:12, 207:22, 207:23, 208:5, 208:6, 208:13, 208:14, 208:25, 209:4, 209:11, 235:8, 237:1, 239:18, 239:22
**expertise** [3] - 170:10, 203:3, 207:14
**explain** [9] - 7:17, 33:21, 35:11, 132:22, 133:6, 133:12, 135:6, 154:23, 203:8
**explained** [1] - 132:13
**explaining** [1] - 239:4
**explanation** [2] - 6:6, 153:24
**explanatory** [1] - 10:1
**explicit** [2] - 167:22, 167:24
**extend** [1] - 153:9
**extent** [4] - 148:14, 154:6, 157:22, 170:8
**extra** [1] - 38:4
**eyeballs** [2] - 144:19, 144:20

# F

**F.3d** [4] - 9:3, 9:4, 151:25, 152:1
**fabrication** [1] - 139:9
**face** [7] - 32:3, 47:2, 47:3, 48:3, 80:21, 80:23, 153:24
**facetious** [2] - 149:4, 149:21
**facilities** [1] - 200:9
**facility** [1] - 12:7
**facing** [3] - 156:18, 221:6, 221:18
**fact** [67] - 5:13, 9:21, 9:23, 10:14, 12:3, 15:4, 15:24, 18:5, 34:6, 42:7, 42:13, 43:19, 45:3, 53:5, 60:12, 60:15, 61:15, 66:1, 68:17, 70:6, 70:25, 72:22, 72:24, 73:24, 74:22, 102:14, 112:11, 113:18, 114:14, 114:23, 122:15, 124:3, 124:17, 128:2, 129:8, 130:14, 130:19, 131:1, 138:21, 142:1, 143:22, 144:12, 145:7, 145:18, 147:4, 149:15, 149:18, 151:9, 153:23, 154:19, 155:11, 157:5, 157:8, 157:13, 162:12, 168:7, 171:14,

171:25, 173:9, 173:25, 192:16, 205:3, 208:25, 209:3, 220:19, 233:16, 233:23
**facts** [7] - 51:3, 68:24, 69:9, 121:24, 208:3, 208:7, 209:9
**factual** [4] - 8:22, 12:8, 156:10, 171:25
**factually** [4] - 157:19, 157:25
**fail** [1] - 179:4
**failed** [3] - 157:3, 179:8, 179:9
**failing** [1] - 52:5
**fails** [1] - 52:4
**fair** [17] - 35:4, 58:18, 59:3, 60:9, 60:12, 63:14, 72:10, 77:3, 79:13, 82:17, 85:19, 106:19, 143:13, 207:10, 215:1, 220:21
**fairly** [1] - 43:3
**fairness** [1] - 241:13
**falsities** [1] - 147:19
**fam** [1] - 32:7
**familiar** [1] - 21:25
**family** [3] - 169:9, 225:15, 238:22
**far** [11] - 15:22, 15:23, 82:23, 114:16, 192:2, 192:3, 193:4, 197:9, 218:6, 223:23, 243:17
**fashion** [1] - 174:15
**fast** [1] - 239:8
**fault** [4] - 4:1, 167:7, 167:13, 231:6
**favor** [1] - 246:5
**faxed** [1] - 6:12
**FBI** [2] - 178:1, 178:3
**February** [17] - 18:14, 41:14, 43:4, 59:22, 60:10, 64:9, 70:16, 76:10, 77:25, 78:7, 78:20, 98:11, 99:2, 112:9, 112:25, 142:1
**Federal** [1] - 200:1
**federal** [57] - 6:3, 41:15, 42:6, 42:7, 42:9, 42:21, 45:10, 45:13, 46:6, 46:11, 46:12, 46:14, 47:1, 47:21, 49:23, 50:11, 51:1, 51:2, 51:23, 52:6, 52:9, 64:1, 64:3, 65:5, 65:20, 66:22, 70:17, 74:2, 75:2, 100:19, 111:23, 115:21, 115:23, 116:20, 117:4, 117:11, 119:2, 119:10, 119:12, 119:17, 119:18,

119:19, 120:11, 121:22, 121:23, 122:5, 136:14, 136:22, 157:8, 163:25, 179:13, 206:12, 206:16, 228:12
**federally** [4] - 67:8, 73:24, 116:5, 157:10
**feet** [1] - 210:1
**fellow** [1] - 220:12
**felony** [1] - 109:22
**felt** [1] - 143:4
**Felton** [2] - 40:16, 40:17
**female** [1] - 62:7
**few** [14] - 13:9, 13:17, 22:16, 28:13, 119:7, 124:24, 125:2, 136:5, 181:8, 202:19, 209:16, 234:11, 239:7, 239:9
**field** [4] - 180:1, 180:8, 202:20, 203:10
**fifth** [6] - 23:17, 23:18, 31:24, 46:24, 163:17, 163:18
**Fifth** [2] - 158:10, 159:25
**fight** [7] - 64:20, 79:18, 92:9, 92:24, 100:18, 220:8, 233:5
**fighting** [1] - 91:17
**figure** [7] - 34:3, 46:25, 158:4, 158:7, 218:14, 218:16, 237:14
**figured** [1] - 96:21
**figures** [1] - 30:4
**figuring** [1] - 156:4
**filed** [7] - 9:10, 9:12, 154:10, 171:4, 230:10, 232:12, 232:21
**filing** [1] - 12:9
**fill** [2] - 61:2, 110:3
**Fill** [1] - 65:17
**filtration** [1] - 216:13
**final** [3] - 33:25, 235:22, 240:20
**finalize** [2] - 144:1, 241:8
**Finally** [1] - 127:20
**finally** [2] - 165:20, 233:25
**financial** [2] - 200:18, 201:14
**finder** [1] - 153:23
**findings** [1] - 186:10
**fine** [3] - 13:20, 39:7, 186:7
**finger** [1] - 106:15
**fingers** [1] - 32:8
**finish** [7] - 7:4, 123:11, 148:13, 177:20, 229:10, 229:11

**finished** [1] - 7:22
**finishing** [1] - 175:2
**firearm** [23] - 45:6, 61:23, 66:17, 115:20, 136:12, 182:19, 183:4, 184:9, 184:11, 185:5, 185:6, 185:7, 185:8, 185:17, 186:14, 186:17, 187:6, 189:7, 194:1, 219:23, 221:6, 221:20, 221:22
**firearms** [28] - 166:2, 166:9, 170:1, 176:8, 176:9, 176:19, 176:24, 177:11, 177:22, 177:25, 178:8, 179:5, 180:1, 180:22, 181:3, 182:7, 182:22, 184:12, 185:18, 190:7, 200:16, 219:5, 219:6, 219:7, 220:4, 221:10, 221:15
**Firearms** [4] - 176:15, 176:16, 177:3, 177:23
**firearms-related** [1] - 181:3
**fired** [17] - 182:18, 182:20, 183:3, 184:11, 184:18, 185:4, 185:5, 185:9, 185:10, 185:17, 186:14, 186:17, 187:6, 189:7, 193:25
**First** [8] - 21:17, 22:17, 50:7, 55:17, 149:1, 150:11, 151:7, 243:10
**first** [58] - 13:20, 28:19, 37:3, 39:1, 39:5, 41:9, 43:1, 45:17, 47:5, 49:6, 49:10, 54:2, 55:13, 58:18, 62:4, 63:2, 63:17, 63:24, 64:15, 66:16, 67:23, 68:6, 71:5, 102:8, 105:21, 109:5, 111:19, 112:6, 112:16, 112:17, 113:5, 113:25, 118:3, 122:16, 123:21, 125:5, 128:11, 128:12, 128:14, 131:1, 145:7, 146:5, 148:1, 161:4, 166:22, 177:2, 181:10, 182:8, 183:20, 184:16, 190:17, 220:5, 227:8, 227:16, 228:3, 229:12, 231:12, 243:21
**fit** [2] - 18:8, 166:7
**fittest** [1] - 219:18
**five** [22] - 50:5, 50:8, 50:15, 51:16, 53:10, 53:13, 68:3, 72:25, 74:8, 89:3, 121:7, 123:15, 164:2, 166:22, 175:9,

194:3, 211:18, 227:8, 229:2, 236:25, 241:17
**Five** [16] - 27:8, 30:1, 68:4, 89:8, 99:7, 126:4, 126:19, 127:10, 162:19, 162:20, 163:21, 188:1, 228:25, 229:4, 231:22, 231:23
**fix** [1] - 195:6
**Flaharty** [4] - 9:4, 151:22, 152:1, 153:5
**FLAHARTY** [1] - 9:4
**Flannery** [1] - 1:19
**flat** [2] - 23:6, 23:7
**flavor** [1] - 231:17
**flesh** [3] - 142:6, 153:16, 239:22
**flip** [1] - 188:10
**Flip** [1] - 223:21
**Flip-flopping** [1] - 223:21
**floating** [1] - 65:15
**floats** [1] - 83:12
**floor** [2] - 46:24
**flopping** [1] - 223:21
**flowin** [1] - 29:16
**flowing** [3] - 29:10, 29:11
**flown** [1] - 214:2
**fluctuate** [1] - 224:22
**flush** [1] - 97:3
**flushed** [1] - 97:8
**fly** [1] - 24:2
**flying** [1] - 224:9
**Fo** [2] - 22:24, 22:25
**fo** [2] - 22:19, 23:4
**focus** [1] - 193:8
**focused** [2] - 35:1, 206:20
**focusing** [1] - 198:13
**folks** [2] - 227:23, 245:7
**follow** [5] - 21:11, 35:16, 38:25, 151:15, 209:6
**Follow** [1] - 70:15
**following** [2] - 113:4, 113:5
**follows** [2] - 51:16, 144:8
**FOR** [1] - 1:2
**forbid** [1] - 180:24
**force** [1] - 219:21
**forced** [1] - 220:6
**foregoing** [1] - 249:6
**foreshadow** [1] - 154:5
**forget** [1] - 122:10
**forgive** [3] - 60:19, 72:19, 73:22
**Forgive** [1] - 114:9

**form** [6] - 158:9, 209:25, 210:2, 210:3, 215:12, 215:15
**formality** [1] - 167:9
**forth** [4] - 11:9, 208:14, 238:3, 241:9
**Foundation** [3] - 19:3, 20:8, 20:12
**four** [21] - 13:5, 20:2, 23:17, 23:18, 24:8, 28:4, 34:23, 34:25, 78:10, 78:20, 156:13, 158:2, 166:22, 185:9, 186:2, 193:23, 215:19, 215:21, 229:21, 241:15
**Four** [6] - 20:3, 26:9, 28:11, 52:3, 61:1, 194:3
**four-fifth** [2] - 23:17, 23:18
**Fourth** [4] - 13:7, 13:10, 16:11, 171:8
**fourth** [2] - 153:8, 220:22
**fragment** [2] - 180:20, 185:15
**frame** [2] - 181:3, 181:9
**Frankly** [2] - 14:18, 153:4
**frankly** [5] - 14:18, 140:19, 147:25, 233:11, 240:11
**Frederick** [3] - 3:3, 3:4, 228:7
**free** [2] - 52:9, 232:2
**frequently** [4] - 102:14, 102:17, 102:20, 131:16
**fresh** [1] - 80:17
**Friday** [3] - 6:5, 7:2, 227:7, 227:10, 227:12, 227:15, 227:16, 234:21, 234:22, 241:19, 241:20, 246:3, 246:11
**friend** [1] - 20:22
**friends** [9] - 32:21, 167:1, 168:4, 168:5, 168:9, 168:11, 168:12
**front** [29] - 5:23, 10:24, 11:15, 15:14, 17:19, 21:25, 27:20, 67:11, 67:20, 68:17, 69:2, 70:7, 71:5, 74:17, 75:8, 77:12, 80:8, 80:12, 88:1, 93:3, 93:14, 96:12, 98:4, 98:5, 103:15, 122:21, 122:25, 123:1, 131:17
**frowns** [1] - 16:12
**FTR** [1] - 231:19
**fuck** [3] - 29:15, 31:9, 31:11
**fucking** [4] - 27:10,

27:15, 72:20, 126:10
**fulfillment** [1] - 51:14
**full** [1] - 9:9
**fully** [2] - 64:17, 120:18
**functionally** [2] - 159:5, 159:17
**functions** [1] - 167:11
**fundamentally** [1] - 14:3
**Furthermore** [1] - 34:22
**furthermore** [1] - 157:1

## G

**gained** [1] - 225:8
**game** [1] - 95:7
**gang** [1] - 168:6
**gangsta** [1] - 72:1
**gaps** [1] - 61:2
**GARDNER** [1] - 1:8
**Gardner** [30] - 1:21, 3:22, 8:10, 9:21, 10:5, 10:14, 11:7, 12:24, 14:13, 14:24, 103:11, 140:20, 140:22, 151:3, 153:12, 154:7, 155:1, 155:11, 156:7, 157:6, 157:19, 157:25, 158:10, 158:12, 158:14, 158:21, 159:4, 159:19, 162:11, 233:3
**Gardner's** [8] - 8:17, 9:20, 13:25, 14:19, 15:17, 158:9, 158:17, 171:2
**Garrison** [1] - 45:22
**gasoline** [1] - 216:2
**gathered** [1] - 204:11
**geared** [2] - 200:11
**geez** [1] - 195:2
**general** [10] - 151:9, 157:23, 166:4, 167:15, 167:16, 167:18, 203:1, 208:20, 209:17, 222:1
**Generally** [6] - 210:9, 210:24, 216:6, 217:23, 218:6, 218:11
**generally** [16] - 122:8, 180:5, 196:7, 209:23, 209:25, 211:5, 211:7, 212:14, 213:2, 214:17, 214:20, 216:25, 217:3, 224:4, 225:12, 225:19
**generated** [1] - 214:24
**generosity** [1] - 140:10
**generous** [1] - 140:9
**genre** [1] - 72:22
**gentleman** [1] - 108:24
**gentlemen** [15] - 22:7,

38:1, 39:8, 58:8, 113:9, 138:10, 138:21, 156:16, 156:24, 157:1, 175:14, 207:16, 226:21, 227:18
**genuine** [2] - 71:23
**Georgia** [1] - 200:2
**Gerard** [1] - 1:19
**germane** [1] - 149:11
**Giglio** [8] - 145:11, 145:12, 145:17, 148:4, 148:6, 148:14, 148:19, 161:5
**girl** [1] - 66:14
**girlfriend** [2] - 93:13, 134:1
**given** [8] - 16:17, 18:24, 120:22, 165:15, 207:17, 223:23, 225:23, 233:12
**glad** [1] - 170:13
**glance** [1] - 143:9
**glassine** [1] - 217:2
**Glencoe** [1] - 200:2
**globules** [1] - 216:11
**Glock** [40] - 177:9, 182:20, 183:1, 183:2, 183:9, 184:5, 184:7, 184:13, 184:18, 185:5, 185:10, 185:19, 185:20, 186:13, 186:14, 186:15, 186:18, 190:20, 191:4, 191:6, 191:12, 191:13, 193:7, 193:9, 193:17, 193:19, 194:1, 194:2, 195:10, 195:13, 195:21, 196:3, 196:4, 196:6, 196:19, 197:2, 197:20, 198:7
**God** [2] - 180:24, 195:15
**God's** [1] - 36:9
**Gold** [1] - 231:19
**Goo** [11] - 97:20, 97:22, 97:23, 97:24, 98:1, 98:4, 125:24, 127:7, 127:18, 127:25, 128:2
**gorillas** [1] - 32:5
**governing** [1] - 16:11
**Government** [2] - 1:15, 182:6
**government** [74] - 7:4, 8:14, 11:6, 12:2, 14:3, 16:2, 34:18, 49:22, 51:1, 52:12, 65:5, 73:23, 74:5, 85:9, 85:12, 86:8, 86:14, 111:9, 114:2, 115:21, 115:23, 117:18, 121:22, 133:9, 140:3, 143:1, 143:23, 145:1, 145:2, 145:8, 145:14, 145:15, 146:7, 146:23, 147:19,

148:7, 148:8, 148:15, 148:16, 149:12, 151:2, 151:20, 153:8, 153:20, 156:16, 157:2, 160:12, 160:17, 168:8, 169:11, 169:16, 171:3, 171:15, 172:3, 173:14, 173:21, 174:19, 174:24, 175:16, 179:25, 183:22, 183:23, 201:19, 203:23, 206:16, 208:12, 208:23, 212:13, 227:1, 239:11, 239:20, 241:15, 245:1, 245:5
**GOVERNMENT'S** [2] - 175:19, 198:25
**Government's** [2] - 181:17, 187:18
**government's** [11] - 2:22, 8:12, 10:11, 13:16, 139:12, 140:6, 152:17, 156:17, 165:4, 173:6, 234:18
**grade** [1] - 72:1
**gram** [10] - 217:3, 217:17, 217:20, 217:24, 218:8, 218:9, 218:10, 218:11, 218:12
**grams** [10] - 3:18, 4:1, 4:2, 4:6, 4:8, 5:3, 5:11, 5:17, 31:15, 210:4
**grand** [138] - 41:15, 42:6, 42:7, 42:19, 43:1, 43:12, 44:17, 44:19, 44:25, 48:25, 49:7, 49:13, 56:14, 59:21, 60:8, 60:13, 62:25, 64:14, 66:11, 67:21, 68:12, 68:17, 69:2, 69:10, 69:14, 69:15, 69:19, 70:8, 70:10, 70:17, 75:8, 76:10, 77:24, 78:15, 80:9, 80:12, 81:1, 88:2, 88:4, 89:23, 92:15, 93:24, 95:20, 96:3, 96:17, 97:11, 97:15, 100:19, 108:25, 109:2, 109:3, 109:11, 109:19, 110:11, 110:5, 110:11, 110:14, 110:23, 110:25, 111:2, 111:6, 111:13, 111:15, 111:16, 111:19, 112:6, 112:11, 113:9, 113:25, 114:7, 116:7, 116:12, 116:16, 116:19, 117:1, 117:4, 117:14, 117:16, 119:12, 119:17, 119:21, 120:11, 120:18, 122:9, 122:12, 122:16, 122:19, 122:21, 122:25, 123:1,

123:21, 124:13, 124:14, 124:17, 128:12, 128:15, 129:5, 129:9, 129:11, 129:12, 129:17, 130:8, 130:22, 131:4, 131:5, 131:7, 131:10, 131:16, 131:20, 131:24, 133:12, 134:10, 135:6, 135:15, 139:11, 139:13, 141:7, 142:1, 142:12, 145:1, 145:2, 145:14, 145:18, 145:21, 146:5, 146:8, 146:16, 147:2, 147:20, 148:1, 148:3, 149:15, 150:13, 161:5

**grandmother** [2] - 17:13, 103:16

**grandmother's** [6] - 17:14, 17:24, 93:14, 96:12, 98:4, 103:15

**grant** [1] - 139:12

**Great** [2] - 194:23, 228:10

**great** [7] - 8:4, 144:5, 144:6, 148:19, 172:8, 188:16, 204:10

**greater** [1] - 209:1

**greed** [2] - 220:11, 220:17

**greet** [1] - 235:19

**grew** [3] - 19:14, 25:24, 80:20

**grimy** [1] - 31:10

**grind** [3] - 30:23, 30:24, 79:21

**ground** [4] - 30:19, 70:22, 170:11

**grounds** [1] - 213:21

**group** [20] - 34:7, 34:10, 99:6, 165:15, 165:16, 165:19, 165:25, 166:5, 166:16, 167:3, 167:4, 167:5, 167:15, 222:10, 222:13, 223:18, 223:20, 223:24, 225:23

**groups** [5] - 170:4, 222:1, 222:13, 224:2, 224:13

**growing** [2] - 28:21, 29:1

**grown** [2] - 209:23, 209:25

**guarding** [1] - 36:9

**guess** [13] - 3:5, 3:12, 8:6, 23:12, 29:21, 42:13, 70:21, 141:5, 151:4, 169:15, 235:1, 239:19, 240:20

**guessed** [2] - 129:18, 130:2

**guessing** [3] - 95:21, 95:24, 96:5

**guided** [1] - 22:12

**guilt** [4] - 34:14, 34:19, 34:20, 52:5

**guilty** [16] - 49:25, 50:9, 50:19, 51:8, 51:12, 51:17, 61:12, 61:15, 154:18, 158:25, 159:5, 159:7, 159:9, 159:11, 159:14, 159:21

**guise** [1] - 174:6

**gun** [79] - 19:15, 20:16, 29:21, 32:7, 33:18, 33:22, 43:12, 44:3, 44:16, 50:14, 56:18, 56:22, 57:17, 77:17, 78:4, 78:8, 81:13, 81:17, 82:25, 84:2, 84:3, 84:7, 84:10, 87:13, 87:22, 88:1, 88:8, 88:11, 88:12, 88:13, 88:17, 88:21, 91:21, 92:1, 92:4, 93:1, 93:12, 93:16, 95:14, 96:11, 96:14, 100:15, 104:22, 105:5, 105:9, 105:13, 105:24, 106:1, 106:2, 107:14, 108:16, 124:9, 124:10, 129:13, 129:23, 129:24, 130:4, 147:4, 157:10, 161:9, 161:10, 162:3, 163:22, 177:6, 177:20, 185:9, 185:10, 186:16, 186:22, 187:7, 193:4, 196:16, 196:24, 197:3, 197:19, 197:20, 197:24, 198:14

**gunpowder** [1] - 178:4

**guns** [34] - 31:11, 36:21, 43:22, 59:16, 81:6, 83:20, 83:23, 88:23, 147:3, 147:9, 149:4, 149:21, 162:14, 162:15, 162:17, 162:19, 162:21, 163:20, 170:4, 170:5, 171:11, 173:25, 174:1, 186:12, 190:18, 191:4, 193:2, 195:12, 219:8

**Guns** [1] - 219:7

**gunshot** [1] - 178:4

**guy** [6] - 27:3, 29:4, 37:2, 40:17, 54:2, 107:18

**guys** [4] - 37:4, 146:9, 156:18, 223:13

## H

**hair** [1] - 192:13

**half** [12] - 53:12, 78:10,

90:13, 102:5, 104:13, 199:13, 202:24, 216:24, 226:8, 236:9, 237:2, 245:13

**Half** [1] - 237:11

**halfway** [3] - 22:18, 30:9, 35:22

**hallmarks** [1] - 166:6

**Hammerjacks** [1] - 28:3, 100:4, 137:9

**hand** [15] - 17:16, 17:17, 19:16, 75:21, 109:3, 129:5, 166:8, 166:20, 169:8, 210:16, 219:7, 219:8

**handed** [1] - 181:25

**handgun** [20] - 23:21, 49:25, 50:3, 50:19, 51:10, 53:6, 61:7, 61:10, 61:11, 61:13, 61:16, 61:19, 61:22, 65:10, 65:18, 65:24, 67:2, 88:6, 121:11

**handled** [2] - 105:8, 105:10

**hands** [2] - 75:20, 75:21

**handy** [1] - 188:23

**hang** [1] - 29:8

**hanging** [2] - 23:15, 42:9, 42:12, 54:12, 65:6, 74:20, 85:16, 101:15, 101:17, 102:2, 102:4, 103:14

**HANLON** [42] - 13:24, 14:21, 15:1, 15:8, 15:10, 15:19, 16:2, 163:2, 163:11, 163:13, 163:15, 163:18, 163:21, 164:21, 165:1, 167:7, 168:17, 168:25, 169:3, 169:22, 169:24, 170:6, 174:24, 175:17, 176:1, 177:17, 178:6, 180:9, 181:22, 181:24, 191:22, 192:3, 197:12, 198:22, 199:6, 207:15, 209:14, 218:2, 229:25, 248:8, 248:10, 248:12

**Hanlon** [20] - 1:16, 12:18, 13:18, 13:23, 15:6, 161:2, 162:21, 162:22, 166:19, 169:20, 172:21, 172:25, 174:19, 191:21, 192:11, 195:20, 207:14, 208:20, 226:11, 229:24

**Hanlon's** [2] - 174:10, 193:9

**happy** [1] - 7:7, 123:8, 240:5

**Happy** [1] - 123:14

**hard** [4] - 15:7, 36:18, 55:5, 236:18

**Hard** [4] - 28:17, 125:13, 127:4

**hardens** [1] - 216:15

**Harding** [59] - 1:16, 3:14, 5:13, 6:7, 7:4, 7:14, 7:22, 14:8, 16:9, 35:13, 38:6, 39:3, 53:18, 58:16, 62:21, 63:21, 65:5, 66:10, 68:20, 69:22, 74:22, 86:1, 100:20, 103:24, 104:14, 104:21, 105:3, 111:18, 114:12, 118:4, 120:12, 122:15, 125:3, 127:2, 128:8, 130:9, 133:10, 135:14, 139:10, 139:20, 139:24, 141:12, 141:22, 142:7, 142:13, 144:16, 147:24, 147:25, 148:23, 150:22, 160:21, 160:25, 172:22, 227:22, 227:23, 229:19, 231:6, 242:8

**HARDING** [98] - 2:3, 2:6, 2:17, 3:10, 3:13, 3:15, 3:17, 3:22, 3:24, 4:5, 4:15, 5:15, 5:21, 6:12, 6:17, 7:18, 7:24, 8:3, 12:18, 12:22, 13:1, 13:4, 17:1, 19:9, 22:15, 35:14, 35:19, 37:10, 37:14, 37:17, 37:23, 38:8, 38:12, 38:15, 38:17, 39:4, 39:12, 43:16, 43:18, 53:20, 53:25, 81:11, 85:13, 85:22, 86:2, 87:19, 89:24, 91:3, 113:22, 120:24, 123:10, 124:15, 126:15, 128:10, 133:6, 133:11, 137:7, 161:2, 161:7, 161:16, 162:8, 162:11, 162:17, 162:19, 163:3, 163:10, 163:22, 164:1, 164:5, 164:10, 164:14, 164:17, 167:13, 175:5, 227:25, 228:6, 228:9, 228:11, 228:14, 229:9, 229:13, 230:7, 230:13, 230:20, 230:23, 230:25, 231:3, 231:9, 231:13, 231:16, 231:24, 232:8, 232:19, 242:9, 242:22, 244:2, 248:4, 248:7

**Harding's** [5] - 75:21, 126:16, 139:5, 141:17, 143:11

**harm** [2] - 81:25, 148:15

**HARRIS** [1] - 1:7

**Harris** [80] - 1:18, 18:24, 19:2, 19:5, 19:17, 19:21, 20:18, 26:19, 26:22, 28:15, 28:18, 29:7, 35:21, 37:16, 39:17, 41:1, 41:5, 43:12, 44:5, 47:2, 47:20, 54:25, 55:20, 55:25, 59:8, 62:16, 63:7, 64:21, 69:16, 71:23, 76:3, 76:7, 77:8, 79:2, 79:5, 79:11, 80:20, 89:17, 92:9, 92:19, 94:2, 94:12, 96:11, 96:19, 97:9, 97:12, 98:13, 98:22, 99:25, 100:8, 100:18, 100:20, 101:15, 101:25, 103:9, 125:14, 128:14, 129:13, 131:6, 135:10, 137:3, 137:18, 137:23, 139:21, 142:2, 142:3, 142:20, 142:24, 143:2, 143:4, 143:7, 144:5, 156:9, 156:18, 157:7, 161:9, 163:15, 163:16

**Harris's** [5] - 39:18, 55:9, 139:18, 153:15, 156:19

**harsher** [1] - 74:13

**hasp** [1] - 179:1

**HAYES** [1] - 248:4

**Hayes** [83] - 8:1, 8:2, 8:3, 8:6, 16:15, 16:22, 17:2, 17:4, 18:25, 19:11, 19:16, 19:21, 20:5, 20:13, 20:17, 21:17, 22:16, 24:18, 26:18, 27:9, 28:2, 28:14, 28:22, 31:22, 35:20, 38:9, 38:15, 38:18, 39:14, 39:25, 41:4, 43:1, 47:17, 47:23, 47:25, 49:19, 51:4, 52:14, 54:1, 56:5, 56:13, 56:18, 58:1, 58:12, 76:22, 90:5, 90:9, 91:5, 101:3, 108:21, 128:11, 129:9, 129:23, 130:5, 130:7, 130:12, 130:23, 131:17, 135:4, 135:8, 135:9, 138:5, 138:7, 139:8, 139:21, 142:12, 142:16, 143:11, 145:1, 146:3, 150:6, 150:7, 153:15, 156:19, 160:12, 161:8, 161:17, 161:18, 161:20, 162:6, 167:21, 167:22

**Hayes's** [3] - 24:14,

141:7, 161:5
**head** [12] - 27:11, 27:12, 27:16, 30:10, 32:8, 42:10, 42:13, 65:6, 65:15, 74:20, 85:17, 148:1
**headquarters** [1] - 178:1
**hear** [29] - 12:17, 22:11, 22:12, 22:13, 25:13, 26:10, 55:5, 55:9, 55:18, 56:3, 85:7, 85:20, 99:16, 136:2, 145:4, 145:6, 145:7, 148:23, 150:17, 160:20, 162:5, 164:19, 164:21, 170:14, 216:4, 232:17, 232:23, 235:15
**heard** [29] - 22:17, 25:3, 37:15, 39:18, 39:22, 71:11, 72:2, 72:4, 72:14, 72:24, 85:2, 99:11, 99:12, 99:14, 99:21, 140:24, 144:10, 160:12, 162:9, 170:16, 182:22, 185:22, 198:10, 204:17, 217:8, 223:17, 223:20, 238:4, 238:5
**hearing** - 232:15, 233:2, 239:13
**hearsay** [1] - 41:2, 83:10, 83:13, 84:14, 84:15, 84:16, 85:1, 87:15, 87:18, 137:9, 144:10
**Hearsay** [1] - 85:2
**heart** [2] - 173:18, 243:7
**heat** [1] - 216:13
**heater** [1] - 36:19
**Heater** [1] - 36:21
**heavily** [1] - 15:14
**Heights** [4] - 45:21, 45:23, 82:6, 223:18
**Heights/Randallstown** [1] - 223:21
**heists** [2] - 30:20, 30:21
**help** [10] - 61:2, 77:15, 155:4, 165:21, 166:16, 167:1, 197:14, 208:6, 221:22, 232:13
**Help** [1] - 162:23
**helpful** [10] - 85:20, 86:3, 86:25, 151:8, 167:20, 169:12, 174:12, 179:23, 208:16, 208:22
**helping** [8] - 114:3, 167:4, 167:5, 167:6, 168:5, 168:12, 169:12
**helps** [1] - 180:25
**Herbert** [5] - 27:3, 55:17, 63:10, 102:5,

125:20
**hereby** [1] - 249:3
**hereunto** [1] - 249:9
**heroin** [13] - 170:15, 209:18, 209:20, 210:16, 210:19, 210:21, 214:19, 214:21, 217:19, 218:15, 223:10, 223:12
**Heroin** [1] - 210:16
**hesitant** [1] - 169:13
**Hickey** [8] - 100:1, 131:21, 133:13, 139:22, 142:2, 142:21, 142:24
**hide** [1] - 57:17
**hierarchical** [1] - 167:10
**high** [1] - 169:10
**higher** [1] - 213:15
**Hill** [1] - 163:16
**himself** [4] - 137:12, 144:9, 148:2, 222:7
**hit** [6] - 18:23, 27:11, 27:13, 27:16, 36:18, 49:3
**Hold** [2] - 80:11, 192:23
**hold** [9] - 27:12, 30:10, 42:25, 72:10, 95:6, 106:1, 106:2, 233:19, 235:1
**holding** [5] - 7:3, 54:2, 54:17, 57:1, 57:7
**Holding** [1] - 57:3
**holds** [1] - 241:23
**Holly** [1] - 15:15
**home** [11] - 15:14, 31:19, 65:12, 65:18, 65:19, 101:5, 101:10, 102:8, 102:15, 137:21, 161:18
**Homeboy** [1] - 24:3
**homicide** [2] - 26:12, 26:15, 40:20, 106:14, 135:16, 163:1, 163:5, 163:6, 164:19, 164:22, 192:20, 197:8
**Homicide** [1] - 26:16
**homicides** [4] - 94:9, 106:8, 106:9, 149:24
**hone** [1] - 240:19
**honest** [1] - 71:17
**Honor** [175] - 2:3, 2:17, 3:1, 4:1, 4:15, 5:1, 6:17, 7:7, 7:12, 7:18, 7:20, 8:5, 8:25, 9:2, 9:7, 10:20, 12:14, 12:19, 13:7, 13:8, 13:13, 13:24, 14:10, 14:21, 15:10, 15:19, 16:6, 16:16, 18:20, 19:7, 21:6, 24:16, 33:9, 33:12, 33:13, 37:12, 37:17, 37:24,

38:4, 38:8, 43:7, 43:14, 43:16, 53:16, 53:22, 57:19, 58:12, 86:3, 87:19, 90:3, 100:25, 113:22, 114:9, 123:7, 123:10, 123:14, 123:20, 124:15, 124:25, 125:8, 128:11, 130:9, 131:14, 131:18, 132:1, 133:2, 133:7, 135:12, 135:23, 135:25, 136:6, 138:2, 138:6, 138:8, 143:15, 144:3, 144:23, 146:22, 147:11, 148:12, 149:10, 150:2, 150:4, 150:7, 150:9, 150:11, 150:19, 150:24, 151:12, 151:24, 152:10, 152:21, 153:2, 153:7, 153:20, 154:11, 155:4, 155:10, 155:25, 157:14, 158:23, 159:15, 159:22, 161:3, 162:9, 163:2, 163:11, 163:18, 163:23, 164:6, 164:22, 165:1, 166:3, 167:14, 168:25, 169:6, 169:22, 170:6, 170:14, 171:3, 174:25, 175:1, 175:5, 175:11, 175:17, 177:17, 179:25, 181:18, 183:14, 185:1, 185:13, 187:18, 188:13, 189:22, 191:18, 191:22, 195:5, 195:9, 195:18, 202:11, 204:5, 205:23, 206:5, 207:12, 207:15, 209:15, 226:10, 226:15, 227:25, 228:17, 229:9, 229:18, 230:20, 231:3, 231:4, 231:13, 231:25, 232:9, 232:19, 232:25, 233:18, 234:4, 237:13, 237:25, 238:10, 238:17, 239:14, 241:2, 242:10, 242:22, 243:4, 243:15, 246:1, 246:15
**honor** [1] - 2:23
**Honorable** [1] - 1:13
**hook** [1] - 230:3
**hope** [10] - 36:9, 167:25, 170:7, 233:25, 238:17, 240:6, 240:12
**hopeful** [1] - 227:3
**hopefully** [1] - 245:4
**hoping** [2] - 7:15, 240:7
**horse** [3] - 85:3, 87:13, 173:17
**horse's** [1] - 85:2
**hour** [7] - 104:13, 123:13, 136:9, 138:11, 241:15, 243:17, 244:1

**hours** [9] - 102:23, 104:5, 133:24, 238:19, 238:24, 238:25, 241:15, 241:16, 241:18
**House** [1] - 199:20
**house** [22] - 17:14, 17:19, 17:25, 66:14, 91:22, 93:3, 93:14, 94:8, 94:11, 96:12, 98:4, 98:5, 98:6, 101:15, 102:23, 103:15, 103:17, 103:18, 103:19, 132:11, 132:20, 134:13
**housed** [1] - 12:6
**housekeeping** [1] - 2:4
**houses** [1] - 201:12
**Houston** [3] - 211:1, 213:4, 213:10
**Howard** [1] - 179:14
**hum** [9] - 70:1, 73:1, 76:17, 76:20, 77:21, 80:1, 91:23, 94:10, 189:1
**hundred** [1] - 218:12
**Hundreds** [1] - 178:13
**hundreds** [1] - 222:7
**hung** [1] - 33:11
**hungry** [2] - 136:6, 136:7
**Hustle** [1] - 30:25
**hydrochloride** [11] - 210:3, 210:5, 215:12, 215:13, 215:14, 215:16, 215:18, 215:20, 215:23, 215:25, 216:3
**hypothetical** [1] - 237:3

## I

**ID** [1] - 195:21
**idea** [4] - 162:24, 166:14, 208:5, 236:21
**ideal** [1] - 242:6
**identical** [1] - 12:10
**Identification** [3] - 176:15, 176:16, 177:3
**identification** [5] - 176:20, 177:25, 180:18, 180:19, 182:22
**identified** [10] - 17:5, 27:6, 38:12, 39:13, 39:20, 103:20, 105:6, 180:20, 184:10, 184:13
**identify** [2] - 238:1, 238:2
**ilk** [1] - 73:4
**illegal** [1] - 219:14
**iller** [1] - 30:16
**image** [1] - 194:17
**imagination** [1] -

213:25
**imagine** [3] - 21:14, 228:2, 240:3
**immensely** [1] - 79:13
**impartial** [1] - 35:5
**impeached** [2] - 148:16
**impeachment** [3] - 145:18, 146:7, 148:14
**importance** [1] - 148:20
**important** [8] - 11:3, 122:11, 147:7, 166:3, 170:5, 204:18, 204:21, 226:5
**importation** [1] - 206:21
**imposed** [1] - 174:19
**imprisonment** [1] - 151:16
**IN** [1] - 1:1
**inadmissible** [1] - 141:24
**Incarcerated** [1] - 30:14
**incarcerated** [10] - 8:11, 9:20, 13:14, 151:10, 156:7, 157:24, 225:12, 225:17, 225:18, 225:21
**incarceration** [6] - 8:20, 9:17, 151:14, 152:19, 152:25, 224:20
**incentive** [1] - 155:16
**incident** [10] - 28:3, 32:8, 50:7, 80:3, 80:15, 80:25, 95:21, 96:10, 122:19, 137:9
**incidents** [1] - 85:21
**inclined** [2] - 139:12, 140:18
**include** [5] - 5:12, 5:13, 6:23, 34:20, 201:9
**included** [4] - 6:23, 117:11, 190:6, 234:3
**includes** [3] - 4:6, 5:16, 213:21
**including** [7] - 22:10, 141:25, 143:1, 159:1, 209:6, 209:7, 237:1
**inconsistently** [1] - 145:25
**increase** [9] - 170:18, 212:1, 212:3, 212:4, 212:6, 212:25, 213:1, 213:13
**incriminating** [1] - 242:14
**indeed** [2] - 105:6, 209:3
**independent** [1] - 209:8
**INDEX** [1] - 248:1
**indicate** [1] - 6:8
**indicated** [2] - 122:7, 174:16

**indicium** [1] - 168:5
**indicted** [3] - 11:6, 157:10, 157:11
**indictment** [9] - 35:2, 35:8, 35:10, 51:5, 51:8, 67:10, 121:25, 153:9, 245:9
**individual** [8] - 182:24, 185:23, 188:9, 189:11, 201:3, 204:12, 225:18
**individual's** [1] - 225:16
**individualized** [1] - 190:15
**individually** [1] - 181:19
**individuals** [10] - 69:6, 78:23, 204:12, 204:24, 208:11, 220:16, 220:23, 223:5, 225:15, 237:22
**indulgence** [1] - 128:7
**industry** [1] - 214:25
**inference** [2] - 15:7, 15:9
**influence** [1] - 35:9
**inform** [1] - 150:12
**informal** [1] - 165:23
**informally** [1] - 232:1
**informants** [2] - 201:17, 202:1
**information** [19] - 5:25, 10:10, 42:25, 51:8, 63:3, 71:3, 71:6, 100:3, 105:4, 137:8, 166:2, 181:18, 201:19, 204:10, 205:11, 205:17, 205:25, 208:8, 208:22
**informed** [1] - 229:23
**initial** [2] - 48:5, 241:14
**injured** [1] - 47:25
**inmate** [1] - 91:1
**inmates** [1] - 142:4
**inner** [1] - 206:21
**input** [2] - 21:21, 234:15
**inquire** [1] - 147:18
**insert** [1] - 38:2
**inserted** [1] - 37:20
**inside** [4] - 91:24, 214:12, 225:8, 225:10
**insistence** [1] - 171:17
**insofar** [2] - 207:3, 207:8
**instance** [3] - 140:9, 149:13, 151:15
**instances** [4] - 69:6, 69:19, 205:2, 224:14
**institution** [2] - 225:8, 225:10
**instruct** [6] - 34:5, 34:17, 172:6, 208:25, 209:3, 242:23
**instructed** [2] - 22:8,

158:1
**instruction** [11] - 9:11, 10:1, 11:5, 16:17, 140:1, 160:9, 160:13, 172:3, 207:18, 233:21
**instructions** [18] - 8:13, 13:9, 16:8, 35:6, 35:11, 157:4, 171:17, 171:18, 171:20, 173:19, 209:6, 209:7, 234:23, 241:9, 241:11, 241:17, 241:18, 244:13
**instructor** [2] - 200:16, 200:17
**insufficient** [1] - 151:6
**Intelligence** [1] - 205:18
**intend** [1] - 232:20
**intended** [1] - 63:7
**intends** [1] - 160:17
**intent** [1] - 13:12
**intention** [1] - 165:4
**intentionally** [1] - 109:19
**interact** [2] - 212:8, 212:10
**Interarms** [1] - 177:7
**interchangeable** [1] - 174:1
**interdiction** [1] - 200:20
**interest** [4] - 64:17, 74:11, 109:16, 228:11
**interesting** [1] - 169:21
**interfering** [1] - 29:17
**interior** [1] - 152:1
**internment** [1] - 151:18
**interpretation** [1] - 24:14
**interrupt** [4] - 10:17, 196:8, 228:3, 228:18
**interstate** [5] - 172:14, 172:15, 172:17, 173:8, 213:22
**interviewed** [2] - 40:19, 204:18
**introduce** [2] - 12:23, 158:16
**introduced** [2] - 163:23, 163:24
**introduction** [2] - 141:6, 141:7
**investigated** [4] - 165:5, 165:7, 224:3, 224:13
**investigating** [2] - 34:8, 222:11
**investigation** [13] - 42:21, 50:24, 121:20, 181:4, 181:11, 182:3, 200:13, 205:8, 205:11, 206:25, 207:2, 223:24,

226:23
**Investigations** [1] - 165:7
**investigations** [15] - 165:8, 200:12, 200:18, 200:23, 201:1, 201:3, 201:15, 204:15, 204:24, 206:19, 220:18, 221:9, 221:25, 222:2, 225:7
**investigative** [2] - 200:21, 201:8
**investigator** [1] - 218:13
**invite** [1] - 243:2
**involve** [2] - 206:24, 242:13
**involved** [20] - 69:16, 70:11, 71:13, 106:24, 107:2, 135:16, 141:24, 201:1, 201:3, 201:6, 201:11, 201:14, 201:18, 207:4, 207:8, 208:1, 219:13, 222:4, 222:12
**involvement** [1] - 58:15, 76:14, 225:4
**involves** [2] - 176:19, 178:7
**involving** [5] - 181:4, 187:13, 201:15, 222:6, 222:7
**issue** [27] - 2:21, 4:11, 6:2, 7:21, 8:6, 8:9, 8:20, 8:22, 9:11, 12:8, 13:24, 14:2, 66:11, 66:20, 142:20, 147:16, 151:13, 159:1, 159:24, 161:4, 161:5, 171:22, 171:24, 172:19, 228:1, 239:13, 244:24
**issued** [1] - 238:13
**issues** [10] - 14:10, 138:18, 159:1, 173:18, 173:19, 226:24, 235:4, 235:7, 243:5
**italicized** [1] - 234:2
**item** [2] - 170:13, 218:23
**items** [29] - 2:15, 3:25, 153:19, 166:1, 166:22, 180:11, 181:3, 181:11, 181:16, 181:18, 183:17, 184:22, 185:12, 185:24, 186:1, 186:3, 186:10, 186:19, 186:24, 186:25, 187:16, 187:21, 187:24, 189:19, 189:25, 190:15, 198:2, 218:21
**itself** [2] - 152:20, 152:25

**J**

**jabbing** [1] - 36:19
**Jackie** [1] - 230:15
**Jacob** [2] - 181:5, 194:5
**jail** [5] - 20:6, 42:3, 53:8, 137:15, 220:7
**James** [4] - 1:21, 187:1, 198:5, 198:9
**jammed** [1] - 32:8
**Jimmy** [2] - 187:2, 191:8
**jittery** [6] - 94:12, 94:14, 100:21, 134:15, 135:7, 135:10
**job** [2] - 158:6, 178:7
**Johnson** [1] - 3:7
**joined** [2] - 3:11, 6:16
**joining** [1] - 200:22
**joins** [1] - 154:18
**joint** [1] - 154:18
**Jones** [5] - 9:23, 140:23, 151:5, 158:16, 159:4
**Josh** [2] - 21:3, 107:19
**Josh's** [1] - 21:4
**judge** [6] - 10:17, 74:24, 110:23, 140:8, 150:12, 172:6
**Judge** [18] - 1:13, 10:25, 11:25, 12:18, 67:11, 74:17, 141:5, 144:24, 155:4, 160:3, 160:24, 170:24, 234:4, 236:19, 240:23, 244:2, 244:7, 245:8
**judges** [2] - 150:13, 228:15
**judgment** [2] - 168:4, 174:20
**judicial** [1] - 150:12
**July** [19] - 40:3, 62:24, 63:20, 66:7, 67:2, 68:2, 80:9, 80:12, 93:8, 93:10, 112:4, 116:10, 116:19, 117:17, 117:22, 119:3, 119:16, 119:18
**jumping** [1] - 73:22
**jumpsuit** [1] - 47:21
**June** [20] - 11:22, 45:15, 48:16, 60:22, 62:12, 62:15, 62:18, 62:19, 62:20, 80:3, 80:4, 80:5, 107:15, 107:16, 115:10, 115:12, 116:4, 116:22, 151:5, 156:8
**juries** [3] - 75:8, 120:18, 122:9
**juror** [5] - 14:18, 15:6,

15:16, 244:10, 244:13
**jurors** [16] - 18:14, 21:8, 21:15, 109:3, 110:14, 111:13, 111:15, 131:5, 131:10, 131:20, 133:12, 134:10, 135:6, 135:15, 139:25, 231:17
**JURORS** [1] - 194:13
**Jury** [11] - 1:14, 16:19, 57:25, 58:7, 138:19, 138:20, 138:25, 141:2, 155:23, 175:13, 227:20
**jury** [210] - 4:23, 6:4, 7:24, 7:25, 8:20, 10:2, 11:3, 13:9, 16:20, 18:20, 24:15, 34:4, 34:5, 37:9, 37:19, 38:1, 41:15, 42:6, 42:7, 42:19, 43:1, 43:12, 44:17, 44:20, 44:25, 48:25, 49:7, 49:13, 56:14, 57:20, 58:6, 59:21, 60:8, 60:13, 62:25, 64:14, 66:11, 67:21, 68:12, 68:17, 69:2, 69:10, 69:14, 69:15, 69:20, 70:8, 70:10, 70:17, 71:4, 71:5, 76:10, 77:12, 77:24, 78:15, 80:9, 80:12, 81:1, 85:20, 86:3, 88:2, 88:4, 89:23, 92:15, 93:24, 95:20, 96:3, 96:17, 97:11, 97:15, 100:19, 108:25, 109:2, 109:11, 109:19, 110:1, 110:5, 110:11, 110:14, 110:23, 110:25, 111:2, 111:6, 111:16, 111:19, 112:6, 112:12, 113:9, 113:25, 114:7, 116:8, 116:12, 116:16, 116:19, 117:1, 117:4, 117:14, 117:16, 119:12, 119:17, 119:21, 120:11, 122:12, 122:16, 122:19, 122:21, 122:25, 123:2, 123:21, 124:13, 124:14, 124:17, 126:16, 128:12, 128:15, 129:5, 129:9, 129:12, 129:13, 129:17, 130:8, 130:22, 131:4, 131:7, 131:17, 131:24, 138:15, 139:11, 139:13, 140:1, 140:20, 141:7, 142:1, 142:13, 142:25, 143:2, 143:3, 143:10, 143:22, 143:24, 144:14, 145:1, 145:3, 145:14, 145:18, 145:21, 146:5, 146:8, 146:16, 146:21, 147:2, 147:20, 148:1, 148:3, 149:15,

150:12, 150:13, 151:13, 151:17, 153:23, 154:9, 154:15, 156:16, 156:24, 157:1, 157:2, 157:20, 158:1, 158:7, 158:25, 159:19, 161:5, 167:20, 168:10, 169:10, 169:12, 171:13, 171:16, 171:17, 171:20, 171:22, 173:18, 173:19, 174:13, 174:23, 182:21, 188:2, 189:20, 194:16, 203:8, 208:6, 208:7, 208:9, 226:21, 229:12, 232:18, 233:2, 233:24, 234:23, 241:8, 241:19, 243:6, 243:12, 244:3, 244:18, 246:13

**jury's** [9] - 11:17, 15:20, 57:24, 156:3, 185:22, 189:18, 195:4, 217:8, 243:18

**justify** [1] - 144:12

**Juvenile** [1] - 179:15

# K

**K-A-R-I-N** [1] - 175:23

**Karin** [2] - 175:18, 175:23

**KARIN** [2] - 175:19, 248:8

**keenly** [1] - 174:3

**keep** [11] - 23:4, 24:8, 57:23, 104:6, 104:9, 138:17, 173:22, 189:2, 226:24, 233:19, 242:2

**Kelly** [12] - 22:4, 22:13, 28:10, 30:2, 34:1, 35:14, 36:24, 38:24, 39:10, 47:16, 55:6, 56:2

**Kelsey** [1] - 1:17

**kept** [5] - 91:21, 92:1, 132:10, 133:3, 138:10

**kids** [5] - 28:21, 28:25, 29:1, 31:10, 245:12

**kill** [7] - 23:12, 24:25, 32:22, 82:2, 89:12, 96:14

**Kill** [1] - 89:4

**killed** [7] - 32:13, 32:18, 33:1, 33:5, 82:23, 83:1, 220:19

**killer** [3] - 73:8, 136:25, 137:3

**killing** [5] - 27:13, 29:1, 72:19, 73:2, 73:3

**kilo** [2] - 213:5, 221:4

**kilogram** [9] - 210:3, 210:4, 210:7, 210:22, 211:9, 213:7, 214:20,

214:21, 218:4

**kilograms** [1] - 211:6

**kilos** [2] - 226:8

**kind** [34] - 6:4, 19:18, 31:5, 31:17, 41:21, 42:9, 42:12, 44:16, 45:5, 47:17, 88:17, 94:25, 110:3, 131:2, 149:11, 154:16, 166:8, 167:16, 178:25, 193:15, 194:16, 200:8, 200:13, 216:10, 216:16, 220:17, 221:2, 224:9, 224:10, 224:12, 226:13, 239:13, 243:12

**kinds** [2] - 165:20, 169:21

**kinship** [1] - 154:17

**knee** [1] - 48:4

**knife** [4] - 19:17, 20:18, 44:6, 96:11

**knit** [1] - 224:11

**knocked** [1] - 195:4

**knowing** [1] - 77:5

**knowingly** [1] - 119:12

**knowledge** [5] - 19:23, 204:19, 204:22, 207:20, 207:25

**known** [1] - 101:25

**knows** [1] - 154:7

**KURLAND** [72] - 7:20, 8:5, 8:8, 8:25, 9:7, 9:16, 9:25, 10:7, 10:16, 10:20, 10:25, 11:13, 11:23, 11:25, 12:13, 16:6, 16:16, 38:4, 128:7, 140:16, 150:4, 150:11, 150:20, 150:24, 151:12, 151:22, 151:24, 152:6, 152:10, 152:15, 152:21, 152:23, 153:2, 153:7, 153:17, 153:19, 154:3, 154:4, 155:10, 155:13, 155:15, 155:21, 155:23, 155:25, 157:14, 158:5, 158:23, 159:7, 159:15, 159:22, 160:5, 160:8, 160:11, 160:22, 160:24, 170:24, 230:2, 232:25, 233:8, 233:10, 233:14, 233:18, 234:4, 241:2, 243:4, 243:15, 244:7, 244:23, 245:8, 245:12, 245:16, 246:2

**Kurland** [12] - 1:22, 13:20, 140:14, 141:4, 150:3, 150:10, 152:5, 155:7, 174:2, 243:10, 243:22, 245:23

# L

**LA** [1] - 211:2

**Lab** [7] - 176:5, 176:11, 176:14, 176:17, 177:2, 178:2, 180:18

**lab** [4] - 178:14, 180:17, 180:21

**label** [7] - 30:17, 30:18, 30:19, 70:22, 71:9, 71:16, 207:22

**Labeled** [1] - 125:11

**labeled** [2] - 189:19, 190:1

**labs** [1] - 177:25

**lacked** [1] - 184:10

**Laden** [2] - 223:11, 223:14

**Ladies** [3] - 38:1, 138:10, 156:16

**ladies** [12] - 22:7, 39:7, 58:8, 113:9, 138:21, 156:24, 156:25, 157:1, 175:14, 207:16, 226:21, 227:18

**lamp** [2] - 216:9, 216:11

**language** [6] - 72:19, 120:21, 151:1, 151:13, 153:4, 156:1

**Laos** [1] - 210:20

**large** [6] - 14:22, 14:23, 14:24, 206:24, 207:1, 210:9

**larger** [2] - 154:8, 201:6, 207:9

**Lassiter** [7] - 18:23, 19:10, 49:4, 68:12, 96:15, 129:18, 135:20

**Last** [1] - 198:21

**last** [28] - 13:24, 21:4, 29:18, 30:4, 36:23, 37:15, 53:15, 53:23, 59:14, 92:18, 92:25, 96:2, 100:7, 127:11, 150:25, 157:15, 157:16, 157:17, 160:15, 161:17, 166:11, 166:12, 168:1, 168:15, 197:22, 220:22, 232:25, 245:17

**late** [4] - 99:18, 226:13, 232:4, 232:12

**laundering** [1] - 200:18

**Laura** [1] - 1:17

**lava** [2] - 216:9, 216:11

**law** [31] - 8:16, 8:19, 11:16, 13:8, 13:10, 13:13, 13:16, 15:3, 16:9, 16:11, 16:13, 34:7, 34:11, 34:21, 52:6,

65:24, 81:10, 140:17, 152:18, 152:24, 155:19, 157:12, 172:7, 173:12, 199:14, 200:10, 202:21, 206:14, 209:6, 223:23, 244:16

**Law** [1] - 200:1

**law-abiding** [1] - 81:10

**LAWLOR** [69] - 19:7, 20:8, 20:12, 22:21, 23:8, 23:13, 23:19, 24:5, 24:10, 24:16, 25:5, 25:14, 32:14, 33:8, 33:12, 43:6, 57:4, 58:11, 86:6, 130:9, 131:14, 131:18, 132:1, 137:5, 138:3, 138:6, 138:8, 141:5, 141:12, 141:16, 141:20, 142:11, 142:18, 144:24, 145:6, 145:11, 145:13, 145:22, 145:24, 146:22, 147:8, 147:11, 147:15, 147:18, 148:12, 148:25, 149:3, 234:7, 234:15, 234:20, 234:24, 235:4, 235:8, 235:13, 235:16, 235:24, 236:4, 236:8, 236:13, 236:16, 236:19, 236:21, 236:23, 236:25, 237:5, 240:23, 246:15, 246:23, 248:5

**Lawlor** [16] - 1:18, 86:5, 108:23, 128:13, 128:24, 136:24, 141:3, 142:10, 142:19, 148:11, 148:24, 234:14, 235:1, 236:17, 246:16, 247:1

**Lawlor's** [3] - 114:23, 143:17, 144:4

**laws** [3] - 51:2, 52:10, 121:23

**lawsuit** [1] - 208:1

**lawyer** [6] - 117:3, 118:23, 119:2, 147:8, 241:6, 244:5

**lawyers** [1] - 111:4, 240:25, 243:17

**lay** [4] - 34:6, 174:6, 239:7, 239:12

**lays** [1] - 8:14

**lead** [2] - 130:9, 130:10

**leading** [1] - 44:9

**learned** [4] - 71:4, 204:17, 204:22, 205:4

**least** [17] - 5:16, 13:8, 55:7, 65:6, 90:21, 110:12, 117:11, 119:3, 142:16, 153:11, 153:22, 157:2, 168:9, 171:2, 215:7, 244:2, 245:3

**leave** [13] - 23:6, 23:15, 57:21, 58:1, 67:1, 127:10, 138:16, 149:24, 159:18, 198:10, 226:21, 232:12

**leaves** [1] - 231:12

**leaving** [3] - 156:5, 165:1, 198:13

**Leaving** [1] - 191:1

**Lee** [37] - 163:1, 163:5, 163:6, 164:19, 164:21, 164:23, 181:5, 181:11, 181:17, 182:6, 183:17, 184:21, 185:12, 186:2, 186:6, 186:10, 186:24, 187:4, 187:10, 187:24, 188:21, 188:24, 189:4, 189:15, 189:25, 190:4, 190:15, 190:17, 191:13, 192:21, 192:23, 194:5, 198:5, 198:8

**Lee/Epps** [1] - 182:3

**left** [5] - 17:17, 17:18, 117:12, 135:3, 216:21

**left-hand** [1] - 17:17

**legal** [4] - 8:5, 16:7, 154:18, 159:24

**legitimate** [2] - 8:17, 156:10

**length** [3] - 8:20, 151:17, 154:23

**less** [5] - 53:13, 156:14, 218:4, 221:1, 222:24

**lesser** [1] - 209:2

**letter** [21] - 18:22, 18:24, 19:2, 49:2, 63:3, 63:6, 63:18, 68:11, 68:15, 86:17, 87:1, 87:3, 87:4, 96:22, 96:23, 97:8, 117:5, 119:2, 135:21, 239:4

**letters** [1] - 59:16

**letting** [2] - 141:25, 237:21

**level** [16] - 148:5, 157:23, 169:15, 207:1, 207:3, 211:12, 211:15, 211:20, 211:25, 212:4, 212:16, 217:1, 217:13, 222:23, 226:7

**levels** [1] - 206:25

**Lexis** [2] - 9:8, 171:6

**liar** [1] - 147:15

**license** [1] - 72:4

**lie** [9] - 59:10, 77:12, 109:16, 124:1, 124:22, 149:1, 149:13, 149:17, 161:11

**lied** [30] - 60:13, 64:16, 88:1, 96:4, 96:5, 108:24,

109:2, 109:19, 116:13, 116:15, 116:18, 117:14, 117:16, 119:12, 145:2, 145:15, 145:18, 145:20, 146:3, 146:8, 146:13, 146:15, 146:18, 146:23, 147:3, 147:13, 147:14, 147:15, 149:15, 149:19
**lies** [4] - 122:23, 142:12, 148:1, 148:5
**lieutenants** [1] - 224:5
**life** [15] - 8:11, 8:19, 9:24, 10:8, 11:19, 14:7, 15:21, 15:23, 98:16, 140:20, 153:13, 154:16, 154:20, 155:12, 157:22
**light** [8] - 8:12, 151:17, 160:11, 167:20, 168:7, 233:16, 233:23, 234:6
**likely** [2] - 74:16, 241:17
**limitation** [1] - 174:18
**limited** [4] - 174:12, 174:15, 207:25, 213:25
**limiting** [1] - 10:1
**limits** [1] - 168:18
**Line** [3] - 113:2, 113:6
**line** [8] - 21:20, 27:20, 69:23, 70:20, 126:20, 143:10, 171:13
**lined** [1] - 240:7
**lines** [9] - 9:20, 9:25, 24:8, 27:22, 28:4, 39:13, 157:4, 233:21, 234:1
**linger** [1] - 141:25
**lingered** [2] - 139:20, 139:24
**link** [1] - 196:3
**Lisa** [2] - 40:13, 43:9
**list** [4] - 2:15, 12:23, 13:1, 53:20
**listen** [8] - 23:16, 67:24, 99:18, 99:23, 103:23, 196:9, 204:16, 246:23
**listened** [5] - 72:6, 72:11, 104:4, 104:12, 125:3
**listening** [3] - 22:9, 39:10, 204:14
**live** [2] - 99:12, 99:13
**lived** [1] - 82:3
**lives** [1] - 76:2
**living** [1] - 199:9
**Llama** [1] - 163:13
**llama** [1] - 31:22
**loaded** [1] - 24:9
**loan** [1] - 170:5
**local** [2] - 52:6, 206:14
**location** [3] - 18:13, 151:18, 229:25

**locations** [1] - 18:15
**lock** [4] - 25:1, 26:5, 179:1, 179:2
**lockdown** [2] - 26:1, 26:3
**locked** [32] - 26:4, 26:8, 32:18, 39:24, 40:2, 40:4, 40:6, 40:21, 41:12, 58:25, 65:20, 65:21, 88:22, 90:16, 93:8, 93:10, 95:12, 103:7, 105:4, 112:12, 112:14, 113:8, 113:10, 137:16, 156:5, 156:18, 157:21, 157:24, 225:14, 225:16
**lockup** [12] - 62:16, 79:2, 79:18, 80:3, 91:10, 91:11, 92:10, 92:25, 93:19, 100:17, 100:18, 122:20, 135:21
**logic** [1] - 155:18
**Lombard** [1] - 1:25
**Look** [3] - 10:21, 11:10, 65:23
**look** [19] - 9:18, 11:16, 13:22, 21:25, 49:15, 53:19, 127:9, 152:3, 153:25, 166:2, 180:21, 186:3, 190:24, 207:3, 218:21, 218:23, 219:8, 234:1
**looked** [9] - 9:8, 18:2, 80:20, 86:22, 100:21, 143:5, 180:23, 184:16, 222:13
**looking** [8] - 112:1, 167:17, 184:8, 189:11, 193:10, 196:16, 206:19, 220:6
**Looks** [2] - 234:5, 234:18
**looks** [5] - 115:1, 216:8, 216:9, 216:10, 240:9
**looney** [2] - 36:12, 36:13
**loose** [3] - 153:4, 165:22, 224:11
**loose-knit** [1] - 224:11
**loosely** [1] - 166:7
**Los** [1] - 243:8
**losing** [1] - 136:7
**lost** [4] - 56:19, 76:2, 95:14, 114:9
**loud** [1] - 55:5
**low** [1] - 194:18
**Low** [1] - 218:10
**loyalty** [1] - 143:5
**Lucille** [1] - 128:19
**luck** [1] - 227:23
**lunch** [5] - 123:12,

123:13, 138:11, 150:25, 239:25
**luncheon** [2] - 138:14, 139:2
**Luncheon** [1] - 141:1
**lying** [2] - 74:24, 162:1
**Lying** [1] - 47:11
**Lyles's** [1] - 28:1
**Lynch** [3] - 235:9, 235:11, 237:1
**Lynch's** [1] - 235:21
**lyrics** [2] - 22:10, 24:14

# M

**M-A-S-S-I-N-O** [1] - 9:3
**Mac** [3] - 24:9, 24:12, 24:19
**magistrate** [2] - 110:24, 110:25
**magistrates** [1] - 150:13
**mail** [4] - 3:10, 38:20, 67:17, 241:9
**main** [1] - 13:7
**maintain** [1] - 165:13
**Majority** [1] - 122:18
**Mall** [1] - 93:17
**man** [5] - 22:24, 23:2, 23:12, 28:21, 33:15
**Mandatory** [2] - 50:5, 53:14
**manner** [3] - 139:11, 208:13, 249:8
**manufacturer** [1] - 177:12
**manufacturers** [1] - 177:11
**map** [1] - 18:11
**March** [7] - 98:11, 99:1, 108:16, 181:2, 181:4, 187:13
**Marijuana** [2] - 209:20, 214:12
**marijuana** [31] - 31:5, 45:6, 45:8, 94:15, 112:14, 113:10, 209:18, 214:4, 214:5, 214:15, 214:17, 214:18, 214:20
**mark** [7] - 176:8, 176:9, 176:24, 178:24, 179:6, 180:2, 182:13
**Mark** [7] - 27:3, 55:17, 63:10, 102:5, 183:6, 198:6, 198:8
**marked** [11] - 39:3, 39:6, 48:13, 49:15, 143:21, 143:22, 143:23, 181:19, 184:23, 185:11,

232:22
**market** [2] - 213:5, 223:3
**marketing** [2] - 222:25, 223:12
**markings** [3] - 184:10, 185:23, 189:11
**marshal** [1] - 239:16
**marshal's** [2] - 12:23, 135:21
**marshals** [1] - 238:3
**MARTIN** [46] - 1:8, 3:12, 19:3, 19:6, 22:22, 24:17, 25:6, 33:9, 33:13, 43:14, 44:9, 44:15, 53:18, 90:8, 91:8, 133:2, 137:4, 143:15, 144:3, 144:18, 144:23, 146:4, 146:18, 146:20, 150:16, 150:18, 167:23, 228:25, 231:22, 237:7, 237:11, 237:13, 237:16, 237:18, 237:25, 238:10, 238:13, 245:11, 245:23, 246:1, 246:3, 246:5, 246:10, 246:12, 246:21, 248:5
**Martin** [32] - 1:19, 1:20, 3:19, 4:19, 69:1, 101:4, 102:25, 103:7, 128:13, 129:11, 137:10, 143:14, 144:22, 145:23, 146:1, 146:2, 154:8, 155:7, 156:7, 156:14, 157:9, 158:20, 161:13, 162:11, 162:12, 163:14, 163:23, 228:24, 237:6, 237:20, 238:15
**Marvin** [1] - 27:6
**Mary** [4] - 1:24, 230:16, 249:3, 249:14
**MARYLAND** [1] - 1:2
**Maryland** [10] - 1:12, 1:25, 41:24, 51:11, 136:20, 177:25, 179:14, 179:16, 200:3, 215:3
**mass** [1] - 142:25
**Massino** [4] - 9:3, 9:6, 11:16, 151:7
**match** [3] - 143:16, 143:17, 191:11
**matched** [5] - 186:15, 187:9, 190:4, 191:13, 194:2
**mate** [1] - 90:24
**material** [3] - 148:10, 177:20, 209:9
**materiality** [1] - 148:23
**materials** [1] - 232:11
**matter** [13] - 59:12, 112:11, 155:18, 155:19,

157:12, 157:13, 173:12, 209:4, 226:12, 227:12, 249:4, 249:8
**matters** [5] - 2:4, 58:19, 138:23, 139:6, 148:5, 172:20, 208:1, 208:2, 208:15
**max** [1] - 238:24
**maximum** [1] - 236:9
**MB-55** [2] - 18:8, 18:20
**McCaffity** [8] - 33:1, 40:13, 43:9, 59:6, 76:2, 162:25, 163:3, 164:3
**McCaffity/Brown** [5] - 83:9, 106:8, 106:14, 107:22, 108:3
**mean** [68] - 2:8, 3:6, 6:5, 6:21, 10:16, 10:18, 15:6, 15:16, 24:4, 24:9, 24:24, 25:22, 26:2, 26:3, 26:7, 26:13, 26:15, 27:11, 27:13, 27:21, 28:24, 28:25, 29:16, 29:20, 29:24, 30:10, 30:18, 30:21, 30:24, 31:12, 35:24, 35:25, 36:7, 36:8, 36:15, 36:20, 36:21, 39:14, 72:1, 82:13, 82:14, 83:20, 87:15, 91:13, 101:20, 119:3, 120:22, 122:15, 143:18, 151:8, 151:10, 162:4, 171:12, 171:14, 195:10, 195:11, 207:8, 208:25, 215:4, 227:25, 228:19, 231:7, 231:11, 235:16, 239:8, 243:21, 243:25, 244:23
**meaning** [9] - 60:2, 114:2, 132:22, 134:18, 148:14, 167:3, 177:20, 215:20, 226:7
**meanings** [1] - 21:21
**means** [8] - 22:20, 23:7, 52:14, 111:22, 156:12, 208:13, 210:5, 210:14
**medical** [1] - 208:10
**meeting** [3] - 117:7, 117:10, 246:6
**meetings** [1] - 117:3
**meets** [1] - 211:13
**member** [6] - 13:21, 168:3, 221:13, 221:21, 225:14, 238:22
**members** [8] - 165:13, 165:14, 165:15, 166:5, 224:16, 225:15, 225:19
**Members** [3] - 16:20, 34:5, 57:20
**membership** [6] -

13:21, 14:1, 165:21, 165:22, 224:15, 224:22
**memorialized** [1] - 245:3
**memory** [2] - 78:24, 80:17
**mention** [8] - 13:4, 15:4, 15:23, 49:6, 125:24, 143:21, 143:23, 242:10
**mentioned** [10] - 2:13, 29:12, 44:4, 63:17, 120:1, 140:15, 162:21, 170:22, 217:11, 230:6
**mentions** [1] - 55:17
**mere** [2] - 152:19, 152:24
**MES** [1] - 41:24
**mess** [2] - 97:23, 193:14
**message** [2] - 68:8, 68:9
**met** [7] - 66:10, 68:1, 102:25, 103:2, 131:5, 137:21, 142:24
**methodology** [1] - 217:14
**methods** [3] - 202:3, 214:3, 214:18
**Metro** [1] - 178:2
**Mexico** [2] - 210:11, 214:8
**Miami** [1] - 211:1
**Michael** [2] - 1:16, 1:18
**microscope** [2] - 182:17, 189:10
**mid** [1] - 156:25
**midday** [1] - 243:24
**middle** [1] - 26:11
**midnight** [1] - 231:10
**midsize** [1] - 212:19
**might** [24] - 5:17, 5:25, 6:22, 6:24, 93:22, 139:25, 141:22, 153:24, 164:8, 164:9, 167:13, 168:7, 169:7, 212:12, 221:18, 222:19, 223:2, 223:3, 224:18, 233:24, 240:20, 242:13, 245:17
**mike** [2] - 175:22, 199:2
**militant** [2] - 26:11, 126:8
**millimeter** [34] - 31:23, 43:13, 43:19, 43:22, 44:20, 50:8, 56:19, 84:22, 87:12, 88:5, 95:12, 104:15, 105:6, 105:19, 121:7, 121:10, 123:22, 124:3, 124:11, 124:19, 130:11, 147:4,

147:5, 148:9, 149:5, 149:6, 149:7, 149:16, 149:17, 149:22, 149:23, 161:22, 163:8
**millions** [2] - 215:4, 215:7
**mind** [3] - 57:23, 138:18, 226:24
**mine** [4] - 108:5, 124:6, 167:13, 191:4
**minimal** [1] - 14:9
**minimum** [1] - 241:18
**minority** [1] - 152:20
**minute** [8] - 57:24, 181:8, 228:21, 229:6, 234:23, 236:15, 236:17, 243:17
**minutes** [14] - 7:16, 58:3, 104:13, 123:15, 158:1, 175:8, 226:14, 228:22, 228:25, 229:2, 229:6, 229:7, 234:11, 239:10
**minutiae** [1] - 147:10
**misidentifications** [1] - 181:1
**misleading** [3] - 129:2, 130:18, 161:12
**misrepresentations** [1] - 130:23
**missed** [2] - 147:6
**missing** [3] - 132:19, 164:3, 229:20
**mistake** [1] - 44:19
**mistaken** [2] - 108:17, 232:7
**mistletoe** [1] - 23:16
**MITCHELL** [1] - 1:7
**Mitchell** [57] - 1:17, 18:22, 19:24, 28:3, 39:20, 41:1, 41:5, 43:25, 56:19, 57:5, 59:8, 63:6, 68:25, 69:1, 69:16, 69:24, 70:11, 71:22, 76:5, 76:8, 77:8, 79:7, 86:18, 93:24, 95:11, 101:14, 102:18, 103:7, 103:11, 104:18, 104:25, 105:19, 106:1, 106:20, 128:14, 137:2, 137:12, 137:19, 137:20, 139:22, 141:13, 142:3, 142:23, 143:3, 143:5, 143:7, 144:6, 154:7, 156:6, 156:19, 157:7, 162:6, 163:9, 171:4, 249:5
**Mitchell's** [7] - 39:21, 139:19, 141:6, 142:20, 146:24, 156:20, 156:21
**mixing** [1] - 146:3

**Mo** [1] - 23:16
**mobile** [1] - 200:19
**Mobile** [3] - 176:14, 176:17, 177:2
**mocking** [1] - 173:2
**model** [1] - 148:22
**Model** [1] - 177:9
**modification** [1] - 233:20
**modifications** [1] - 38:10
**moment** [9] - 85:25, 91:5, 152:2, 152:14, 152:22, 183:12, 195:1, 215:10
**moms** [1] - 31:11
**Mondawmin** [3] - 93:6, 93:7, 93:17
**Monday** [7] - 7:5, 7:6, 234:24, 240:9, 240:11, 240:16, 240:18
**money** [17] - 28:25, 29:11, 29:17, 200:18, 201:15, 211:22, 212:5, 214:23, 215:1, 219:3, 219:4, 219:15, 220:10, 220:13, 220:20, 220:25, 225:17
**monitor** [3] - 194:9, 195:4, 242:16
**monitor's** [2] - 194:18, 194:23
**monitors** [1] - 194:16
**monkeys** [1] - 32:5
**Montana** [10] - 63:12, 102:6, 102:9, 105:7, 105:16, 105:19, 106:19, 107:4, 125:20, 162:5
**Montana's** [1] - 108:2
**Montgomery** [7] - 15:6, 56:7, 56:11, 143:8, 162:12, 229:21
**month** [3] - 80:15, 80:25, 116:22
**months** [11] - 60:25, 65:20, 78:21, 90:12, 107:6, 107:8, 112:19, 113:12, 113:16, 119:7, 137:17
**morning** [19] - 2:20, 4:10, 4:11, 16:20, 17:2, 17:3, 44:5, 44:12, 56:18, 57:20, 133:24, 161:12, 161:21, 161:25, 227:19, 228:3, 235:20, 246:7, 246:17
**Mossberg** [1] - 177:22
**most** [9] - 148:15, 182:20, 184:4, 185:18, 190:6, 211:14, 212:5,

219:23, 237:11
**mother** [3] - 98:5, 103:18, 243:7
**mother's** [1] - 103:19
**motion** [4] - 170:25, 172:22, 230:8, 235:20
**motions** [2] - 234:21, 234:22
**motivation** [2] - 8:18, 155:19
**motive** [2] - 86:7, 86:9
**mount** [1] - 171:25
**mountain** [1] - 209:24
**mounting** [1] - 173:15
**mouth** [2] - 26:2, 85:2
**Move** [2] - 19:7, 23:13
**move** [14] - 32:21, 37:10, 51:4, 53:22, 61:21, 121:25, 123:17, 135:23, 136:1, 165:11, 165:14, 184:20, 214:16, 224:18
**moved** [5] - 202:8, 213:21, 214:12, 214:13, 214:14
**movies** [1] - 169:9
**moving** [5] - 182:21, 213:16, 213:18, 213:24, 224:15
**MR** [372] - 2:3, 2:6, 2:17, 3:10, 3:12, 3:13, 3:15, 3:17, 3:22, 3:24, 4:5, 4:15, 4:19, 4:22, 4:25, 5:5, 5:9, 5:15, 5:21, 6:6, 6:12, 6:17, 7:7, 7:11, 7:18, 7:20, 7:24, 8:3, 8:5, 8:8, 8:25, 9:7, 9:16, 9:25, 10:7, 10:16, 10:20, 10:25, 11:13, 11:23, 11:25, 12:13, 12:18, 12:22, 13:1, 13:4, 13:24, 14:21, 15:1, 15:8, 15:10, 15:19, 16:2, 16:6, 16:16, 17:1, 19:3, 19:6, 19:7, 19:9, 20:8, 20:12, 22:15, 22:21, 22:22, 23:8, 23:13, 23:19, 24:5, 24:10, 24:16, 24:17, 25:5, 25:6, 25:14, 32:14, 33:8, 33:9, 33:12, 33:13, 35:14, 35:19, 37:10, 37:14, 37:17, 37:23, 38:4, 38:8, 38:12, 38:15, 38:17, 39:4, 39:12, 43:6, 43:14, 43:16, 43:18, 44:9, 44:15, 53:18, 53:20, 53:25, 57:2, 57:4, 58:11, 69:3, 81:11, 85:13, 85:22, 86:2, 86:6, 87:19, 89:24, 90:8, 91:3,

91:8, 101:2, 108:20, 113:22, 120:24, 123:7, 123:10, 123:14, 123:19, 124:15, 126:15, 128:7, 128:10, 130:9, 131:14, 131:18, 132:1, 133:2, 133:6, 133:11, 137:4, 137:5, 137:7, 138:3, 138:6, 138:8, 140:16, 141:5, 141:12, 141:16, 142:20, 142:11, 142:18, 143:15, 144:3, 144:18, 144:23, 144:24, 145:4, 145:11, 145:13, 145:22, 145:24, 146:4, 146:18, 146:20, 146:22, 147:8, 147:11, 147:15, 147:18, 148:12, 148:25, 149:3, 150:2, 150:4, 150:7, 150:9, 150:11, 150:16, 150:18, 150:20, 150:24, 151:12, 151:22, 151:24, 152:6, 152:10, 152:15, 152:21, 152:23, 153:2, 153:7, 153:17, 153:19, 154:3, 155:4, 155:10, 155:13, 155:15, 155:21, 155:23, 155:25, 157:14, 158:5, 158:23, 159:7, 159:15, 159:22, 160:5, 160:8, 160:11, 160:22, 160:24, 161:2, 161:7, 161:16, 162:8, 162:11, 162:17, 162:19, 163:2, 163:3, 163:10, 163:11, 163:13, 163:15, 163:18, 163:21, 163:22, 164:1, 164:5, 164:10, 164:14, 164:17, 164:21, 165:1, 167:7, 167:13, 167:23, 168:17, 168:25, 169:3, 169:22, 169:24, 170:6, 170:24, 174:24, 175:5, 175:17, 176:1, 177:17, 178:6, 180:4, 180:9, 181:22, 181:24, 191:22, 192:3, 192:6, 194:15, 194:19, 195:4, 195:8, 197:12, 197:17, 198:22, 199:6, 204:7, 206:4, 207:15, 209:14, 218:2, 227:25, 228:6, 228:9, 228:11, 228:14, 228:17, 228:25, 229:2, 229:4, 229:9, 229:13, 229:16, 229:18, 229:20, 229:25, 230:2, 230:4, 230:7, 230:13, 230:20, 230:23, 230:25, 231:3, 231:9, 231:13, 231:16, 231:22, 231:24, 232:8, 232:19,

232:25, 233:8, 233:10, 233:14, 233:18, 234:4, 234:7, 234:15, 234:20, 234:24, 235:4, 235:8, 235:13, 235:16, 235:24, 236:4, 236:8, 236:13, 236:16, 236:19, 236:21, 236:23, 236:25, 237:5, 237:7, 237:11, 237:13, 237:16, 237:18, 237:25, 238:10, 238:13, 238:17, 238:22, 238:25, 239:4, 239:7, 240:23, 241:2, 241:4, 242:9, 242:22, 243:4, 243:15, 244:2, 244:7, 244:23, 245:8, 245:11, 245:12, 245:16, 245:23, 246:1, 246:2, 246:3, 246:5, 246:10, 246:12, 246:15, 246:19, 246:21, 246:23, 248:4, 248:5, 248:5, 248:6, 248:6, 248:7, 248:8, 248:9, 248:10, 248:11, 248:12, 248:12

**MS** [12] - 53:22, 133:7, 135:12, 170:13, 175:1, 175:8, 175:11, 202:16, 226:14, 226:17, 231:4, 248:11

**multiple** [2] - 16:8, 172:2

**murder** [21] - 9:23, 14:20, 14:25, 15:3, 15:14, 40:13, 83:9, 105:14, 107:2, 133:21, 134:6, 140:23, 158:17, 159:5, 159:13, 162:25, 164:22, 186:6, 233:4

**murdered** [3] - 43:9, 59:7, 77:17

**murders** [6] - 15:12, 78:3, 78:13, 107:23, 108:3, 108:15

**music** [15] - 21:18, 22:10, 71:11, 71:18, 71:24, 72:2, 72:6, 72:8, 72:11, 79:25, 131:10, 132:3, 133:15, 171:5, 172:23

**must** [2] - 151:16, 151:17

**muster** [1] - 246:25

# N

**name** [25] - 20:23, 21:2, 21:4, 31:6, 31:7, 54:9, 101:3, 102:5, 107:18, 165:9, 168:14, 175:22,

175:23, 199:3, 222:13, 222:14, 222:15, 222:16, 222:17, 222:18, 222:19, 222:23, 223:11, 223:12, 223:23

**named** [8] - 40:17, 91:1, 126:2, 181:5, 183:6, 187:14

**names** [4] - 169:6, 194:6, 222:22, 223:21

**naming** [2] - 3:8, 169:5

**narcotic** [1] - 206:25

**narcotics** [2] - 202:13, 218:15

**Narni** [2] - 29:9, 29:12

**national** [1] - 209:17

**Nationally** [1] - 214:24

**nature** [4] - 151:18, 174:12, 204:15, 245:19

**nearly** [3] - 22:18, 159:12, 159:16

**necessarily** [3] - 144:8, 167:12, 184:15

**necessary** [2] - 170:19, 209:10

**necessity** [1] - 174:7

**need** [45] - 5:7, 7:23, 8:1, 9:18, 21:14, 27:9, 27:14, 81:23, 82:25, 89:6, 126:10, 139:3, 139:15, 140:21, 141:10, 141:19, 159:1, 166:4, 172:16, 173:4, 173:16, 191:25, 203:17, 215:15, 215:16, 215:21, 216:18, 220:3, 221:6, 227:7, 227:16, 230:5, 230:6, 230:18, 231:14, 234:10, 235:3, 238:7, 240:25, 242:14, 244:4, 244:16, 244:19

**needed** [7] - 88:12, 95:17, 95:21, 96:1, 132:13, 143:19, 226:12

**needs** [6] - 16:17, 232:4, 243:21

**neglected** [1] - 17:9

**neighborhood** [5] - 82:8, 82:10, 103:15, 133:20, 133:22

**neighborhoods** [3] - 82:18, 165:12, 225:24

**net** [2] - 4:7, 6:9

**Never** [14] - 26:14, 61:11, 73:14, 85:8, 85:9, 92:5, 92:6, 92:7, 103:2, 122:22, 122:24, 123:3, 129:10, 136:18

**never** [40] - 9:22, 16:12,

26:12, 27:10, 27:15, 50:17, 73:12, 73:13, 92:4, 93:21, 93:24, 97:9, 97:15, 98:22, 98:23, 98:24, 103:1, 105:9, 122:13, 122:14, 122:24, 123:1, 129:8, 130:4, 136:17, 145:8, 145:19, 146:11, 146:12, 152:25, 164:5, 164:15, 180:20, 184:12, 186:16, 186:19, 186:22, 203:19, 230:13, 245:24

**never-ending** [1] - 16:12

**nevertheless** [2] - 43:3, 171:24

**new** [7] - 37:17, 37:21, 51:24, 71:3, 139:6, 140:5, 224:16

**New** [4] - 172:16, 211:1, 212:19, 213:16

**news** [1] - 219:9

**newspaper** [2] - 91:17, 219:9

**next** [25] - 7:2, 24:2, 26:9, 27:22, 28:8, 29:18, 30:1, 33:24, 36:11, 86:23, 93:19, 101:9, 118:15, 118:18, 148:20, 149:23, 175:16, 183:13, 184:14, 184:21, 191:8, 193:11, 217:11, 240:9, 240:10

**Next** [1] - 36:23

**nice** [1] - 29:21

**nickname** [1] - 125:14

**Niedermeier** [2] - 40:23, 58:20

**nigga** [11] - 22:24, 30:10, 33:15, 35:23, 36:7, 36:10, 36:11, 36:12, 36:20, 127:13

**niggas** [8] - 26:1, 28:20, 29:20, 31:9, 31:10, 32:7, 36:6, 36:19

**night** [13] - 18:13, 27:25, 41:1, 41:5, 42:4, 43:4, 43:9, 59:6, 76:5, 94:9, 100:21, 133:19, 161:17

**nine** [6] - 31:23, 50:8, 50:14, 105:18, 146:9, 168:24

**Nine** [3] - 37:22, 38:3, 38:25

**Nines** [1] - 37:18

**nizzle** [3] - 22:24, 23:2, 23:6

**nizzle's** [1] - 22:19

**NO** [1] - 1:6

**Nobody** [1] - 150:14

**nobody** [2] - 84:3, 243:21

**nol** [2] - 66:17, 115:19

**non** [1] - 180:19

**non-identification** [1] - 180:19

**None** [2] - 127:8, 128:1

**none** [2] - 34:13, 127:19

**normal** [1] - 138:10, 208:8, 246:2

**NORTHERN** [1] - 1:2

**nose** [1] - 32:3

**note** [6] - 57:21, 138:16, 139:16, 139:25, 226:21, 244:14

**Noted** [1] - 180:7

**noted** [2] - 138:9, 206:2

**notes** [5] - 4:10, 156:4, 244:3, 244:9, 244:10

**Nothing** [8] - 59:18, 64:10, 64:12, 94:23, 100:24, 128:6, 150:2, 191:18

**nothing** [15] - 28:17, 48:22, 53:23, 64:5, 64:7, 64:9, 64:11, 70:25, 109:8, 140:5, 146:10, 149:22, 156:22, 166:6, 170:7

**notice** [2] - 150:12, 239:20

**noticed** [4] - 134:18, 135:7, 135:10, 161:20

**Notwithstanding** [1] - 60:15

**notwithstanding** [1] - 64:18

**November** [3] - 1:11, 231:20, 249:5

**nozzle** [2] - 32:1, 32:2, 126:20

**number** [32] - 53:18, 81:6, 142:12, 142:14, 162:8, 181:6, 182:16, 183:25, 184:22, 184:25, 186:5, 187:2, 187:12, 188:7, 192:25, 194:7, 196:16, 196:17, 196:18, 197:6, 210:8, 210:12, 214:2, 215:1, 222:3, 222:17, 224:23, 224:25, 225:11, 232:11, 237:22

**Number** [2] - 60:8, 182:7

**Number(s** [1] - 249:5

**numbers** [11] - 2:7, 2:8, 2:10, 15:5, 15:12, 181:19, 181:20, 184:24,

191:1, 191:23

# O

**O'Malley** [1] - 33:18

**O.F** [1] - 177:22

**oath** [17] - 16:22, 59:25, 60:2, 60:15, 64:18, 78:18, 109:4, 109:7, 109:10, 109:19, 110:4, 116:15, 119:12, 158:15, 160:3, 172:9

**object** [6] - 10:17, 131:18, 138:8, 144:10, 174:21, 205:23

**objected** [2] - 139:16, 139:17

**objecting** [2] - 172:3, 172:22

**objection** [21] - 8:12, 24:14, 25:9, 43:16, 113:3, 139:18, 139:23, 141:5, 141:17, 141:21, 142:4, 144:4, 170:9, 170:10, 170:21, 170:23, 171:15, 173:7, 174:17, 180:5, 233:19

**Objection** [41] - 19:3, 19:6, 19:7, 20:8, 20:12, 22:21, 22:22, 23:8, 23:13, 23:19, 24:5, 24:10, 25:5, 25:6, 25:14, 32:14, 33:8, 33:9, 33:12, 33:13, 43:6, 43:14, 44:9, 44:15, 57:2, 57:4, 69:3, 81:11, 85:13, 85:22, 87:19, 89:24, 91:3, 120:24, 126:15, 132:1, 133:2, 135:12, 137:4, 137:5, 138:9

**objection's** [3] - 91:5, 133:5, 206:2

**objections** [3] - 169:18, 171:16, 174:22

**obligation** [6] - 52:7, 145:9, 145:16, 145:17, 147:22, 149:18

**obligations** [1] - 51:15

**observation** [1] - 205:3

**observations** [1] - 205:14

**observed** [3] - 5:5, 77:8, 204:25

**obstructive** [1] - 52:13

**obtained** [2] - 181:3, 205:25

**obvious** [2] - 154:6, 233:2

**Obviously** [2] - 10:13,

143:19, 226:4
**obviously** [15] - 8:13,
12:9, 12:16, 149:14,
154:8, 176:19, 178:7,
180:10, 200:11, 211:23,
215:16, 219:13, 220:9,
234:1, 240:1
**occasion** [5] - 61:3,
61:9, 88:23, 112:12,
242:12
**occasions** [6] - 12:23,
21:18, 68:18, 68:20,
68:23, 222:21
**occurred** [1] - 66:4
**occurrence** [1] - 219:17
**October** [12] - 51:3,
58:19, 58:23, 60:17,
60:21, 62:12, 63:25,
66:4, 83:8, 115:12,
121:6, 121:24
**odor** [2] - 216:6
**OF** [3] - 1:2, 1:5, 1:11
**offense** [11] - 34:9,
34:10, 34:13, 34:14,
34:20, 50:25, 51:17,
52:6, 66:4, 121:4, 121:21
**offenses** [2] - 122:3,
122:4
**offer** [4] - 6:6, 119:5,
119:11, 154:19
**offered** [2] - 119:11,
119:18
**offers** [1] - 209:4
**office** [6] - 51:4, 51:16,
52:7, 52:8, 53:1, 117:25
**officer** [7] - 34:7, 34:12,
42:20, 113:24, 114:1,
206:15, 212:12
**Officer** [1] - 163:22
**officers** [1] - 34:8
**Official** [1] - 249:15
**official** [2] - 15:3, 249:7
**often** [13] - 181:20,
205:7, 206:25, 216:3,
216:4, 218:6, 218:8,
219:25, 220:2, 220:12,
220:14, 221:17, 222:23
**Often** [6] - 213:25,
220:5, 221:1, 222:16,
224:17, 224:20
**oil** [1] - 231:10
**Oliver** [3] - 33:1, 40:13,
43:9
**omitted** [1] - 49:9
**ON** [4] - 204:6, 248:11,
248:11, 248:12
**once** [5] - 9:8, 45:3,
183:13, 210:24, 218:14
**Once** [3] - 172:11,
175:14, 216:12

**One** [22] - 28:16, 30:10,
35:22, 38:7, 47:19,
54:19, 54:21, 54:23,
65:23, 98:9, 103:8,
122:7, 122:8, 127:21,
151:6, 181:10, 186:12,
193:2, 195:12, 221:8,
221:13, 237:7
**one** [176] - 2:19, 3:9,
4:14, 4:17, 5:7, 5:10,
7:9, 9:11, 9:12, 9:13,
16:3, 18:7, 18:11, 21:14,
21:25, 25:7, 25:8, 28:8,
30:1, 33:24, 36:6, 36:23,
38:5, 40:23, 42:17,
43:25, 53:15, 54:1, 55:3,
55:4, 55:6, 55:11, 60:8,
61:3, 64:23, 67:14,
72:24, 74:18, 77:15,
78:23, 82:18, 88:15,
94:24, 98:8, 98:15,
98:20, 99:19, 99:21,
100:15, 103:7, 105:7,
110:6, 114:9, 114:22,
117:11, 119:25, 121:17,
124:11, 125:5, 126:4,
127:1, 127:7, 127:23,
127:25, 133:19, 139:7,
139:25, 140:9, 142:11,
144:24, 146:4, 146:5,
146:23, 147:4, 148:25,
149:1, 149:4, 149:13,
152:2, 156:5, 159:11,
159:14, 161:14, 163:18,
164:6, 164:13, 165:21,
166:1, 166:2, 166:6,
166:20, 166:25, 168:3,
168:17, 168:19, 169:8,
169:19, 169:22, 170:13,
171:6, 172:1, 172:25,
174:5, 179:6, 179:8,
180:24, 183:22, 185:8,
185:9, 185:15, 185:24,
186:13, 187:16, 188:7,
189:22, 191:4, 193:4,
193:9, 193:11, 194:16,
195:11, 195:19, 196:18,
198:14, 201:3, 206:23,
212:8, 212:9, 215:20,
218:13, 219:20, 220:7,
220:19, 221:10, 222:6,
222:11, 223:25, 226:2,
227:11, 227:13, 227:22,
231:14, 231:15, 232:3,
232:16, 232:25, 234:1,
235:9, 236:5, 236:9,
237:1, 237:7, 237:8,
238:22, 239:1, 239:9,
239:10, 239:12, 241:6,
241:15, 241:16, 244:2,
244:5, 244:7, 244:13,

244:25, 245:3, 245:20,
246:1, 246:4
**One's** [1] - 191:4
**one's** [1] - 191:4
**ones** [3] - 30:17, 194:2,
196:2
**ongoing** [2] - 13:6,
110:12
**Open** [1] - 23:16
**open** [6] - 46:12, 57:23,
110:6, 138:17, 169:19,
226:24
**opened** [3] - 86:20,
139:6, 140:6
**opening** [1] - 30:3
**operate** [4] - 169:14,
203:16, 226:2, 227:14
**operated** [1] - 225:23
**operation** [4] - 167:15,
202:3, 222:18, 222:19
**operations** [1] - 226:6
**opinion** [13] - 34:11,
34:20, 136:25, 151:23,
153:5, 154:11, 154:13,
170:12, 174:6, 203:14,
203:17, 208:2, 209:4
**opinions** [3] - 152:8,
171:7, 208:15
**opportunists** [1] -
221:1
**opportunity** [5] - 38:22,
96:7, 140:13, 186:23,
189:14
**opposed** [4] - 157:7,
193:17, 205:5, 206:21
**opposite** [1] - 233:11
**optimistic** [1] - 240:14
**option** [1] - 242:1
**order** [10] - 2:23, 3:1,
3:6, 6:2, 138:11, 228:5,
240:6, 245:9
**ordering** [1] - 18:23
**ordinarily** [1] - 207:18
**ordinary** [1] - 146:7
**organization** [32] -
165:25, 166:15, 166:16,
166:20, 166:21, 166:25,
167:2, 167:3, 167:6,
167:12, 167:14, 168:3,
168:5, 168:13, 168:20,
169:15, 220:17, 221:13,
221:19, 221:20, 221:22,
222:10, 222:19, 223:18,
223:21, 224:11, 224:18,
225:4, 225:10, 225:13,
225:19
**organizations** [20] -
165:6, 165:11, 165:17,
165:21, 166:4, 166:7,
170:3, 173:1, 174:5,

201:6, 204:11, 206:22,
222:1, 222:12, 222:21,
222:23, 224:2, 224:21,
226:5
**organized** [2] - 189:2,
224:8
**origin** [1] - 142:21
**original** [1] - 130:8
**originally** [5] - 101:20,
115:12, 115:25, 233:22
**originate** [1] - 202:8
**otherwise** [3] - 141:22,
173:10, 208:8
**Otherwise** [1] - 7:1
**ounce** [3] - 215:20,
216:24
**ounces** [1] - 215:21
**outline** [1] - 243:25
**Outside** [2] - 57:8, 57:9
**outside** [5] - 57:11,
133:21, 172:11, 209:21,
212:23
**outstanding** [1] - 235:4
**overhead** [1] - 188:2
**overlap** [1] - 237:7
**overnight** [1] - 228:23
**overreached** [1] -
156:16
**overriding** [1] - 233:23
**Overruled** [23] - 19:4,
19:8, 20:9, 20:14, 22:23,
23:9, 23:14, 23:20, 24:6,
24:11, 25:15, 32:15,
33:10, 33:14, 43:8,
44:10, 57:6, 85:15, 86:5,
89:25, 131:15, 131:19,
132:2
**overruled** [3] - 43:17,
91:6, 133:5
**overseas** [1] - 170:16
**own** [13] - 10:11, 30:4,
83:22, 103:24, 148:17,
156:19, 205:4, 205:8,
205:10, 205:11, 209:8,
220:17, 228:4
**owned** [2] - 81:6

# P

**P-11** [1] - 49:15
**P-18** [1] - 48:13
**p.m** [8] - 138:14,
138:15, 138:24, 141:1,
227:11, 227:13, 247:3
**package** [2] - 5:1,
191:21
**packaged** [6] - 94:19,
188:4, 210:3, 210:7,
210:21, 211:7

**packaging** [1] - 68:25
**packed** [1] - 23:4
**pads** [3] - 57:21,
138:16, 226:21
**Page** [27] - 22:18, 26:9,
27:8, 27:24, 28:16,
30:10, 30:15, 31:18,
32:5, 33:17, 35:16,
35:22, 50:6, 70:19,
76:13, 78:2, 80:19,
113:2, 113:5, 120:17,
126:4, 126:19, 127:20,
128:16, 128:24, 129:21,
131:7
**PAGE** [1] - 248:3
**page** [19] - 22:19, 26:9,
27:9, 27:24, 28:4, 28:19,
29:18, 32:4, 33:18,
36:11, 37:3, 39:1, 118:3,
118:18, 127:11
**pages** [1] - 249:6
**paid** [2] - 81:9, 203:25
**Pakistan** [1] - 210:19
**pants** [1] - 50:8, 121:8,
224:10
**paper** [2] - 75:25, 114:3
**paperwork** [1] - 65:16
**paragraph** [1] - 152:13
**Paragraph** [3] - 52:3,
52:20, 65:23
**paraphrasing** [1] - 73:3
**parcel** [2] - 173:5,
173:13
**Pardon** [10] - 71:20,
84:9, 88:19, 101:7,
101:23, 106:11, 107:7,
107:25, 108:10, 115:11
**Park** [4] - 45:21, 45:23,
82:6, 223:20
**parole** [11] - 53:14,
65:19, 66:19, 66:20,
66:22, 115:19, 153:13,
154:16, 154:20, 155:12,
157:22
**part** [19] - 4:22, 10:11,
31:13, 34:17, 41:6, 55:7,
55:9, 90:17, 132:7,
140:2, 154:3, 155:16,
170:2, 173:5, 173:12,
197:22, 198:10, 235:23,
241:17
**parte** [1] - 235:21
**participants** [1] - 222:3
**participated** [1] - 165:8
**participation** [1] - 8:18
**particular** [24] - 34:12,
35:7, 35:8, 43:11, 50:3,
74:12, 78:17, 125:2,
139:16, 158:22, 159:24,
165:10, 166:3, 166:23,

171:7, 183:1, 195:21, 203:14, 208:4, 209:4, 222:18, 223:6, 231:14, 239:12
**Particularly** [1] - 160:11
**particularly** [6] - 8:12, 149:20, 167:20, 168:7, 174:4, 233:16
**particulars** - 208:19
**partly** [1] - 137:12
**parts** [2] - 82:14, 122:4
**party** [2] - 28:1, 218:19
**pass** [2] - 138:22, 220:2
**passage** [1] - 151:21
**passages** [3] - 22:17, 39:17, 39:20
**passed** [1] - 179:4, 221:10, 221:15
**past** [5] - 136:7, 138:10, 153:12, 161:8, 242:2
**paste** [1] - 210:2
**patience** [3] - 16:21, 138:12, 175:15
**Paul** [1] - 1:19
**Pause** [4] - 152:4, 152:16, 155:7, 197:16
**pay** [1] - 221:4
**paying** [1] - 15:17
**peer** [2] - 203:6, 203:8
**pejorative** [1] - 10:22
**pen** [2] - 18:16, 18:17
**pending** [1] - 14:13, 42:17, 51:5, 63:25, 64:22, 65:1, 65:22, 67:7, 67:10, 73:24, 122:1
**Penhurst** [1] - 45:20
**Pennsylvania** [2] - 172:15, 178:1
**people** [42] - 72:19, 72:20, 73:2, 73:3, 81:7, 82:23, 83:15, 89:12, 110:14, 136:5, 139:22, 144:7, 155:22, 156:4, 165:19, 166:16, 167:4, 167:5, 167:10, 169:14, 180:22, 194:7, 201:17, 203:10, 204:18, 204:22, 205:25, 212:10, 216:4, 219:16, 222:3, 222:7, 224:15, 224:25, 225:7, 225:11, 225:23, 237:21, 242:11, 242:12
**People** [2] - 224:22, 224:23
**per** [2] - 171:23, 218:12
**perfect** [2] - 96:7, 194:17
**perfectly** [4] - 21:22, 139:5, 139:9, 242:18
**perform** [1] - 167:10

**performance** [1] - 99:12
**performed** [1] - 99:6
**Perhaps** [1] - 224:24
**perhaps** [5] - 143:8, 154:25, 156:13, 213:11, 221:19
**period** [10] - 19:20, 83:21, 103:5, 119:16, 149:19, 153:9, 177:4, 224:19, 224:21
**periods** [1] - 225:25
**perjured** [2] - 119:17, 120:10
**perjury** [7] - 75:8, 75:17, 75:24, 86:8, 109:24, 119:20, 120:23
**permission** [4] - 2:7, 21:7, 125:6, 159:21
**permit** [5] - 15:23, 139:3, 159:20, 174:15, 232:17
**permitted** [2] - 142:9, 235:11
**persists** [1] - 140:3
**person** [25] - 24:22, 27:13, 34:6, 34:10, 34:12, 39:13, 44:4, 62:5, 89:15, 100:5, 125:18, 166:25, 201:4, 207:23, 208:5, 208:9, 212:8, 221:15, 221:16, 222:6, 222:12, 223:7, 225:3, 239:21
**personal** [5] - 52:4, 205:4, 207:20, 207:25, 218:16
**personality** [1] - 224:24
**personally** [1] - 25:18
**persons** [2] - 34:9, 34:10
**perspective** [2] - 239:23, 242:6
**persuade** [1] - 11:12
**persuaded** [1] - 240:4
**Peru** [1] - 209:24
**petitions** [1] - 14:14
**Petri** [1] - 58:21
**PG** [1] - 178:1
**PH-18** [1] - 17:4
**PH-20** [1] - 17:24
**Phone** [1] - 113:21
**phone** [13] - 4:11, 5:20, 6:1, 6:13, 6:14, 6:18, 7:17, 19:22, 54:3, 54:22, 219:12, 243:13, 244:15
**phones** [2] - 20:6, 20:7
**photo** [1] - 229:21
**photograph** [1] - 17:5
**photos** [1] - 229:22
**phrase** [1] - 72:4

**phrased** [1] - 161:13
**phrases** [1] - 21:21
**physical** [3] - 162:17, 162:19, 164:3
**pick** [1] - 219:12
**picked** [4] - 42:14, 46:22, 67:18, 229:22
**picking** [1] - 67:16
**picture** [1] - 110:3
**piece** [9] - 30:3, 114:9, 166:12, 168:1, 168:15, 177:13, 177:19, 220:13
**Pill** [2] - 28:21, 29:2
**pills** [2] - 29:10
**Pine** [1] - 177:21
**pistol** [6] - 23:4, 32:7, 104:15, 105:6, 123:22, 148:22
**pistol-whipped** [1] - 32:7
**pistols** [3] - 177:7, 177:8, 177:10
**place** [4] - 57:17, 132:19, 216:12, 245:11
**places** [1] - 26:23
**plan** [3] - 237:18, 243:23, 243:24
**planes** [1] - 210:13
**planning** [1] - 218:18
**plans** [1] - 243:14
**plant** [3] - 209:25, 210:1
**plastic** [2] - 4:6, 6:23
**plausibly** [1] - 168:23
**Play** [1] - 94:17
**play** [18] - 21:7, 21:11, 21:17, 22:4, 28:8, 30:3, 33:25, 35:15, 37:11, 38:24, 47:16, 53:15, 55:3, 55:6, 56:2, 207:9, 232:17
**played** [12] - 22:14, 28:12, 30:6, 31:20, 34:4, 35:18, 37:1, 38:9, 38:21, 39:11, 53:21, 103:20
**playing** [7] - 23:16, 28:9, 32:5, 47:22, 94:17, 100:8, 231:17
**Playing** [2] - 55:8, 56:4
**plea** [17] - 49:12, 49:16, 49:18, 50:22, 52:17, 56:14, 63:20, 63:21, 64:21, 111:22, 112:2, 117:18, 117:19, 117:22, 121:18, 159:5, 159:7
**plead** [7] - 49:25, 51:8, 61:12, 61:15, 158:25, 159:9, 159:21
**pleading** [5] - 13:8, 13:17, 51:17, 159:11, 159:14

**pleadings** [9] - 9:12, 12:10, 13:4, 13:5, 154:10, 154:11, 154:18, 232:20
**pleas** [1] - 154:18
**pleased** [1] - 145:4
**pleasure** [1] - 237:5
**pled** [4] - 50:9, 50:19, 51:12, 65:23
**plenty** [3] - 6:5, 240:8, 240:19
**plopped** [1] - 68:14
**Plus** [1] - 30:23
**pocket** [3] - 50:9, 66:16, 121:8
**podium** [3] - 9:1, 162:22, 172:8
**poetic** [1] - 72:4
**Point** [2] - 214:3
**point** [36] - 11:5, 11:14, 13:7, 13:24, 16:3, 16:7, 39:15, 78:17, 98:16, 98:20, 100:18, 104:10, 112:24, 135:13, 141:6, 142:6, 144:15, 144:17, 146:17, 147:11, 147:12, 153:7, 153:10, 157:17, 159:3, 160:8, 160:12, 160:14, 166:3, 169:16, 172:4, 195:19, 211:5, 211:10, 239:20
**pointed** [2] - 136:24, 161:12
**pointing** [1] - 18:10
**points** [2] - 16:7, 16:8
**pole** [1] - 17:21
**police** [12] - 50:17, 65:21, 66:14, 66:15, 95:15, 176:13, 176:25, 206:15, 212:12, 219:21, 220:5, 220:8
**Police** [6] - 2:20, 176:5, 176:11, 178:1, 180:17
**policy** [1] - 2:23
**pop** [1] - 191:24
**population** [1] - 91:14
**pored** [1] - 22:1
**portion** [5] - 53:23, 139:17, 206:24, 210:9, 234:2
**portions** [1] - 103:20
**pose** [1] - 197:18
**position** [10] - 13:16, 14:7, 16:9, 146:19, 146:24, 151:5, 169:3, 176:7, 207:1
**positions** [1] - 167:10
**possession** [19] - 45:8, 61:3, 61:6, 61:13, 61:16, 61:18, 87:22, 104:22,

105:25, 107:10, 107:14, 107:22, 108:2, 108:4, 108:6, 108:14, 112:14, 116:5, 232:16
**Possession** [1] - 113:10
**possibility** [6] - 135:16, 153:13, 154:16, 154:20, 157:22, 241:24
**possible** [5] - 6:10, 111:12, 123:15, 175:8, 244:10
**possibly** [4] - 12:3, 238:17, 241:6
**post** [5] - 14:3, 14:14, 18:10, 18:12, 161:5
**post-conviction** [1] - 14:14
**post-it** [2] - 18:10, 18:12
**posted** [1] - 29:15
**potential** [1] - 12:1
**pounds** [1] - 210:4
**pour** [2] - 210:6, 215:18
**poured** [1] - 216:18
**pouring** [1] - 216:14
**powder** [2] - 215:11, 218:3
**PP** [1] - 177:7
**PPK** [1] - 177:7
**Pre** [2] - 41:18, 41:19
**pre** [2] - 41:20, 41:21
**Pre-release** [2] - 41:18, 41:19
**pre-release** [2] - 41:20, 41:21
**prediction** [1] - 7:3
**preference** [1] - 14:16
**prejudice** [1] - 14:10
**prejudicial** [3] - 143:12, 174:9, 233:15
**prepared** [2] - 37:18, 230:17
**preponderance** [1] - 53:2
**presence** [3] - 13:25, 218:22, 244:17
**present** [5] - 110:23, 141:2, 154:15, 243:13
**presentation** [1] - 227:2
**presented** [3] - 34:16, 157:20, 208:23
**presenter** [1] - 113:3
**preserved** [1] - 244:22
**president** [1] - 165:18
**pressure** [2] - 111:7, 158:9
**presumably** [2] - 14:12, 149:8
**presume** [1] - 232:16

**pretty** [8] - 22:1, 193:21, 201:24, 219:7, 219:9, 219:10, 219:18, 235:14

**prevent** [1] - 133:9

**previously** [3] - 22:8, 34:6, 139:17

**price** [4] - 212:24, 213:3, 213:15, 213:17

**prices** [1] - 205:22

**pricing** [2] - 205:17, 205:20

**principle** [1] - 151:9

**principles** [1] - 214:18

**prison** [4] - 90:11, 90:17, 101:5, 101:10

**prisoner** [2] - 10:5, 114:4

**prisoners** [3] - 10:3, 20:5, 40:12

**prisons** [1] - 20:11

**privilege** [1] - 158:10

**pro** [2] - 13:5, 232:20

**probation** [4] - 42:20, 113:24, 114:1, 114:24

**probative** [1] - 154:9

**probativity** [1] - 14:9

**problem** [20] - 2:17, 3:9, 3:16, 3:17, 4:3, 4:4, 14:5, 87:18, 166:23, 194:15, 195:3, 211:24, 219:11, 229:20, 238:6, 238:7, 240:6, 240:22, 240:23, 243:10

**problems** [1] - 246:24

**proceed** [5] - 2:2, 16:21, 35:12, 39:10, 209:12

**proceeding** [1] - 52:25

**Proceedings** [2] - 2:1, 247:3

**proceedings** [10] - 12:5, 12:24, 110:11, 152:4, 152:16, 155:7, 197:16, 242:15, 249:4, 249:7

**process** [5] - 140:11, 145:16, 215:14, 216:9, 239:18

**processed** [2] - 66:17, 115:19

**produce** [4] - 210:18, 210:21, 215:25, 216:2

**produced** [5] - 209:19, 209:20, 210:17, 214:5, 214:12

**producer** [2] - 69:24, 70:21

**product** [3] - 177:20, 222:24, 223:15

**proffer** [11] - 62:21, 117:5, 119:25, 120:9, 146:9, 161:6, 170:2, 174:10, 235:21

**proficiency** [4] - 178:14, 178:16, 178:18, 178:20

**profit** [5] - 211:20, 212:1, 212:4, 213:1, 213:13

**profits** [1] - 211:14

**program** [3] - 41:21, 41:23, 42:1

**prohibition** [1] - 171:23

**projectiles** [6] - 178:9, 184:8, 184:15, 189:15, 190:1

**projection** [2] - 18:8, 188:3

**promise** [2] - 139:2, 192:3

**promoted** [2] - 176:14, 177:3

**pronouncing** [1] - 58:21

**proper** [2] - 133:4, 154:25

**properly** [1] - 168:8

**property** [5] - 15:5, 182:16, 183:25, 184:24, 191:23

**Property** [1] - 182:7

**propose** [1] - 230:10

**proposition** [3] - 9:16, 9:19, 156:1

**propositions** [1] - 171:10

**prosecute** [5] - 51:1, 52:9, 75:7, 75:17, 121:22

**prosecuted** [4] - 74:2, 75:24, 122:4, 122:5

**prosecution** [3] - 50:25, 121:21, 148:3

**prosecutor** [4] - 110:21, 113:19, 113:23, 118:11

**prosecutors** [11] - 48:19, 68:1, 110:21, 111:9, 111:12, 117:12, 119:2, 119:10, 119:18, 119:20, 228:16

**protect** [12] - 81:20, 81:23, 158:17, 166:4, 219:15, 219:16, 219:19, 219:24, 221:6, 221:22

**protection** [8] - 95:18, 96:1, 132:13, 166:1, 171:12, 173:25, 200:11, 220:1

**prove** [5] - 13:20, 157:3, 172:13, 172:16, 172:17

**proved** [2] - 172:2, 173:11

**proven** [1] - 34:18

**provide** [6] - 166:1, 201:18, 208:21, 220:1, 225:16, 239:19

**provided** [7] - 21:8, 22:8, 37:23, 39:9, 52:1, 71:5, 179:23

**provides** [2] - 50:24, 121:20

**providing** [1] - 208:7

**provision** [1] - 51:11

**proximity** [1] - 218:23

**publication** [2] - 189:20, 203:1

**publications** [1] - 204:23

**publish** [1] - 18:20

**published** [1] - 154:13

**pull** [2] - 9:15, 104:2

**pulled** [12] - 19:17, 20:18, 30:20, 32:21, 44:5, 92:25, 93:12, 93:14, 93:16, 96:11

**Pulley** [2] - 20:24, 20:25

**pulls** [1] - 215:24

**pump** [1] - 24:3

**Pump** [1] - 24:7

**purchase** [1] - 213:10

**purchased** [1] - 131:11

**pure** [1] - 242:7

**Pure** [1] - 125:8

**purity** [1] - 170:18

**purported** [1] - 172:9

**purportedly** [2] - 63:6, 86:17

**purpose** [2] - 171:7, 239:9

**purposed** [1] - 183:18

**purposes** [6] - 133:9, 166:9, 184:23, 185:12, 189:19, 227:5

**Purposes** [1] - 189:20

**pursuant** [1] - 49:18

**push** [1] - 192:13

**put** [46] - 7:15, 9:13, 9:21, 11:6, 11:7, 12:9, 15:10, 18:9, 18:12, 24:3, 32:1, 37:9, 47:5, 49:3, 66:23, 70:6, 106:15, 106:16, 109:3, 111:13, 113:2, 113:3, 115:21, 115:23, 126:20, 141:8, 153:20, 153:21, 153:22, 159:4, 159:22, 171:20, 177:6, 182:16, 189:2, 189:18, 191:5, 193:11, 193:14, 208:20, 228:20, 230:10, 232:6, 235:3,

235:21, 239:23

**Puts** [1] - 169:3

**puts** [1] - 173:16

**Putting** [3] - 183:12, 184:20, 189:10

**putting** [4] - 131:16, 141:23, 141:24, 158:9

**Pyne** [11] - 1:21, 3:11, 4:5, 4:18, 5:15, 6:15, 227:25, 228:16, 229:1, 229:6, 238:15

**PYNE** [8] - 4:19, 4:22, 4:25, 5:5, 5:9, 6:6, 7:11, 228:17

**Pyne's** [2] - 4:1, 6:22

**Q**

**Q's** [2] - 182:9, 193:23

**Q-1** [11] - 182:4, 182:7, 182:10, 183:18, 187:3, 187:24, 188:9, 189:24, 193:20, 193:23, 196:1

**Q-10** [3] - 184:23, 185:3, 189:5

**Q-1B** [5] - 183:18, 183:20, 183:25, 189:20, 189:24

**Q-2** [4] - 182:8, 182:10, 187:24, 193:20

**Q-2B** [3] - 183:21, 189:20

**Q-3** [3] - 182:10, 187:24, 193:20

**Q-3B** [3] - 185:13, 185:16, 190:1

**Q-4** [5] - 182:10, 187:24, 188:10, 193:20, 193:23

**Q-4B** [2] - 183:18, 184:3

**Q-5** [6] - 184:23, 185:3, 187:5, 187:25, 188:10, 189:5

**Q-5B** [1] - 183:19

**Q-6** [5] - 182:4, 182:10, 193:20, 193:23, 196:1

**Q-6B** [1] - 183:19

**Q-7** [5] - 182:4, 182:10, 193:20, 193:23, 196:1

**Q-7B** [3] - 185:13, 185:15, 190:1

**Q-8** [3] - 184:23, 185:3, 189:5

**Q-9** [3] - 184:23, 185:3, 189:5

**Q2-B** [1] - 189:24

**Qualifications** [2] - 202:15, 206:3

**QUALIFICATIONS** [4] -

204:6, 248:11, 248:11, 248:12

**qualified** [2] - 179:10, 180:22

**quality** [3] - 223:8, 223:15

**Quantico** [2] - 178:3, 200:5

**quantities** [5] - 210:4, 210:22, 215:9, 217:16, 218:4

**quantity** [14] - 210:7, 211:8, 211:9, 211:11, 211:12, 212:18, 216:23, 216:24, 217:24, 218:9, 218:14

**Quarles** [2] - 67:11, 74:17

**quarrel** [1] - 153:2

**questioned** [8] - 58:18, 58:20, 68:21, 142:16, 182:8, 183:20, 183:21

**questions** [37] - 22:16, 28:13, 57:19, 69:14, 69:17, 70:7, 90:1, 91:21, 111:10, 111:13, 111:15, 113:4, 114:23, 119:21, 120:6, 120:11, 122:8, 124:24, 125:2, 125:3, 126:17, 136:5, 138:2, 180:3, 196:9, 196:10, 198:17, 198:18, 202:14, 202:19, 204:5, 207:13, 208:20, 209:16, 223:17, 242:13, 243:11

**Questions** [1] - 120:8

**quick** [2] - 143:9, 144:25

**quickly** [3] - 124:25, 127:9, 182:21

**Quincy** [3] - 32:12, 32:17, 32:25

**quite** [9] - 5:17, 16:11, 102:14, 102:17, 139:16, 142:25, 162:15, 167:21, 232:11

**quote** [6] - 3:11, 139:19, 139:22, 143:7, 148:4, 173:6

**quote-unquote** [4] - 139:19, 139:22, 143:7, 148:4

**quotes** [2] - 151:22, 151:25

**quoting** [2] - 9:4, 153:5

**R**

**rack** [2] - 159:13

**racketeering** [2] - 159:11, 159:13
**radio** [4] - 99:11, 99:12, 99:14, 99:18
**raised** [1] - 16:9
**ran** [2] - 29:5, 40:12
**Randallstown** [1] - 25:22
**Randallstown/Park** [1] - 223:18
**rap** [22] - 21:7, 21:18, 22:5, 22:10, 30:19, 37:11, 38:21, 70:22, 71:9, 72:6, 72:11, 79:25, 99:6, 102:11, 131:10, 132:3, 133:15, 143:1, 171:5, 172:23, 235:8, 237:1
**rapping** [2] - 36:10, 36:22
**rat** [9] - 24:20, 24:21, 47:3, 47:11, 80:6, 81:1, 81:2, 92:13
**Rather** [1] - 208:19
**rather** [7] - 19:2, 83:8, 153:4, 192:21, 228:18, 233:25, 244:11
**ratio** [1] - 215:19
**rational** [1] - 14:18
**ratting** [4] - 47:12, 55:16, 55:23
**raw** [1] - 177:20
**re** [3] - 150:20, 191:21, 233:5
**re-fight** [1] - 233:5
**re-package** [1] - 191:21
**re-redirect** [1] - 150:20
**reach** [5] - 189:8, 209:8, 241:24, 242:5, 245:6
**reached** [3] - 67:1, 73:23, 135:7
**reaction** [1] - 215:23
**read** [5] - 9:18, 192:14, 204:23, 205:6, 205:13
**readily** [3] - 219:24, 221:21, 230:15
**reading** [3] - 27:22, 65:16, 188:11
**ready** [8] - 2:2, 16:21, 58:9, 75:15, 161:1, 175:15, 192:9, 219:14
**real** [7] - 21:2, 22:24, 22:25, 34:24, 44:21, 64:1, 241:24
**realize** [5] - 7:13, 123:12, 234:25, 240:14, 242:12
**Really** [1] - 226:16
**really** [29] - 15:7, 18:8, 27:23, 31:9, 33:16,

64:16, 66:24, 71:18, 106:15, 123:11, 129:2, 152:24, 158:2, 161:6, 167:1, 167:21, 171:15, 172:10, 173:17, 173:22, 211:12, 211:13, 211:14, 212:5, 214:16, 215:17, 224:1, 239:9
**realm** [1] - 171:13
**reason** [5] - 14:8, 140:11, 169:6, 212:11, 222:24
**reasonable** [3] - 34:19, 143:4, 173:11
**reasonably** [2] - 156:15, 169:17
**reasons** [10] - 14:8, 151:6, 155:5, 168:20, 180:6, 190:8, 220:3, 222:17, 224:24, 225:1
**rebut** [1] - 12:10
**receive** [6] - 51:16, 74:13, 74:17, 200:8, 200:14, 243:12
**received** [8] - 63:4, 74:14, 74:18, 149:7, 176:23, 182:11, 186:19, 189:12
**receiver** [1] - 54:17
**receiving** [1] - 54:20
**recent** [1] - 139:9
**recently** [1] - 44:4
**recess** [11] - 57:21, 57:24, 58:3, 138:13, 138:14, 139:2, 140:12, 140:25, 141:1, 226:20, 247:2
**Recess** [1] - 58:4
**recites** [1] - 11:8
**reckless** [1] - 45:6
**recognize** [3] - 54:1, 54:17, 55:25
**recognized** [1] - 208:5
**reconstruction** [1] - 178:5
**record** [28] - 2:12, 2:13, 33:22, 120:3, 120:4, 120:14, 139:3, 140:13, 141:8, 142:6, 142:22, 143:3, 143:6, 158:23, 159:15, 159:23, 160:5, 167:21, 174:11, 175:22, 181:15, 181:17, 187:18, 189:6, 199:3, 233:20, 235:21, 244:22
**recorded** [1] - 249:3
**recording** [3] - 22:13, 39:8, 39:10
**records** [1] - 155:1
**recovered** [9] - 50:17,

164:16, 181:13, 183:9, 191:12, 195:11, 196:4, 196:20, 197:7
**recross** [6] - 123:17, 138:4, 138:6, 140:9, 142:5, 150:21
**red** [3] - 47:19, 223:4, 223:6
**redacted** [1] - 140:3
**redaction** [1] - 143:16
**redactions** [4] - 136:3, 139:16, 141:8, 144:2
**redirect** [14] - 86:4, 123:16, 133:10, 136:11, 139:5, 139:10, 140:6, 141:18, 141:23, 142:8, 143:11, 150:20, 169:20, 198:18
**Redirect** [1] - 128:8
**REDIRECT** [2] - 128:9, 248:7
**refer** [2] - 196:17, 211:9
**reference** [11] - 28:1, 126:19, 127:4, 127:7, 127:10, 127:15, 127:18, 127:25, 128:2, 189:18
**references** [3] - 126:1, 126:23, 127:20
**referred** [3] - 126:17, 127:2, 192:21
**referring** [3] - 27:25, 152:13, 187:21
**Referring** [1] - 113:2
**refers** [4] - 32:9, 126:10, 143:2, 193:16
**refine** [1] - 228:23
**reflect** [1] - 194:16
**reflected** [1] - 52:8
**refrain** [3] - 26:10, 26:20
**refuse** [2] - 30:16, 179:17
**regard** [7] - 16:5, 148:19, 206:22, 243:5, 243:16, 244:7, 245:8
**regarding** [3] - 139:18, 161:5, 205:18
**regardless** [1] - 3:2
**regards** [1] - 143:15
**region** [1] - 209:24
**regular** [2] - 201:24, 219:10
**rehabilitation** [2] - 133:4, 139:6
**Reisterstown** [1] - 82:3
**reject** [1] - 155:17
**relate** [3] - 12:19, 164:19, 187:13
**related** [4] - 51:2, 121:23, 160:8, 181:3

**relates** [2] - 35:1, 35:2
**relating** [4] - 51:3, 121:24, 192:21, 194:4
**relation** [2] - 61:22, 63:14
**relationship** [10] - 68:25, 70:3, 95:1, 102:9, 142:20, 142:21, 166:8, 169:25, 219:6
**relationships** [1] - 191:2
**relative** [2] - 17:10, 17:12
**relatively** [2] - 215:14, 243:5
**Release** [1] - 41:18
**release** [5] - 41:19, 41:20, 41:21, 42:1, 115:1
**released** [9] - 9:22, 46:9, 66:18, 66:21, 66:22, 114:23, 115:20, 115:21, 115:24
**relevance** [3] - 14:4, 14:7, 14:8
**relevant** [9] - 8:20, 83:21, 120:19, 151:10, 154:9, 154:24, 155:14, 155:15, 209:9
**relied** [1] - 168:8
**relieve** [1] - 209:5
**relieved** [1] - 52:7
**reluctant** [1] - 154:4
**rely** [2] - 205:9, 205:16
**relying** [2] - 205:12, 205:24
**remain** [2] - 16:22, 41:12
**remains** [2] - 16:2, 141:21
**Remember** [1] - 227:7
**remember** [15] - 40:2, 41:23, 44:16, 44:19, 47:20, 126:1, 129:15, 131:22, 132:6, 161:7, 161:10, 195:16, 195:18
**remembered** [2] - 133:18, 133:19
**remind** [2] - 235:20, 236:1
**remove** [1] - 155:19
**removed** [1] - 216:12
**removes** [1] - 155:16, 156:10
**removing** [1] - 216:20
**repeat** [1] - 170:20
**repeating** [1] - 185:21
**rephrase** [1] - 43:21
**report** [9] - 3:18, 3:24, 6:8, 6:11, 6:20, 16:4, 180:23, 182:7, 190:6

**Reported** [1] - 1:23
**reported** [3] - 152:8, 152:9
**reporter** [2] - 110:19, 232:2
**Reporter** [1] - 249:15
**REPORTER'S** [1] - 249:1
**reporters** [1] - 230:14
**reports** [4] - 4:10, 5:22, 5:23, 204:23
**represent** [1] - 101:4
**request** [6] - 53:24, 136:4, 139:13, 140:3, 140:19, 147:18
**requested** [1] - 129:14
**require** [3] - 136:3, 140:2, 243:11
**required** [5] - 53:1, 207:19, 222:18, 243:2, 243:3
**requires** [1] - 13:11
**requiring** [1] - 6:3
**residence** [1] - 17:10
**residue** [1] - 178:4
**resolve** [2] - 4:11, 228:1
**resolved** [2] - 66:12, 66:20
**respect** [32] - 8:8, 8:9, 8:17, 16:6, 16:10, 35:9, 106:8, 124:19, 150:25, 153:16, 153:19, 153:21, 154:18, 154:21, 155:25, 159:23, 160:8, 168:1, 171:21, 171:24, 172:5, 172:20, 173:6, 193:19, 197:19, 198:14, 205:3, 205:20, 206:18, 233:18, 244:25
**Respectfully** [1] - 14:21
**respective** [1] - 155:1
**respond** [8] - 12:15, 12:18, 13:18, 147:25, 148:24, 148:25, 160:22, 160:25
**responding** [3] - 154:12, 154:14, 195:19
**response** [6] - 114:12, 114:22, 126:16, 171:4, 244:21
**responses** [1] - 244:20
**responsibility** [2] - 52:4, 209:5
**rest** [4] - 56:2, 234:16, 234:18, 234:20
**rests** [1] - 160:13
**resume** [3] - 138:23, 139:4, 206:19
**retail** [3] - 211:11, 216:23, 217:12

**retried** [2] - 14:24, 51:22
**return** [3] - 51:14, 147:21, 242:1
**reveal** [1] - 191:15
**revenge** [2] - 89:15, 89:19
**review** [4] - 13:8, 76:13, 203:6, 203:8, 203:11, 203:13
**reviewed** [1] - 203:10
**revolver** [1] - 132:8
**revolvers** [1] - 164:9
**Reynolds** [4] - 167:22, 167:23, 167:24
**RHODES** [12] - 53:22, 133:7, 135:12, 170:13, 175:1, 175:8, 175:11, 202:16, 226:14, 226:17, 231:4, 248:11
**Rhodes** [10] - 1:17, 170:12, 226:11, 228:21, 231:5, 235:5, 235:19, 236:1, 236:23, 240:24
**Rhodes's** [1] - 172:23
**rice** [1] - 216:16
**Richmond** [1] - 211:4
**RICO** [3] - 172:5, 173:12
**rifle** [1] - 24:1
**rifling** [3] - 184:4, 185:17, 190:5
**right-hand** [1] - 17:16
**rights** [2] - 159:1, 159:25
**ringing** [1] - 113:21
**rises** [1] - 148:5
**risk** [6] - 212:2, 212:4, 212:6, 212:25, 213:9, 213:11
**risky** [1] - 212:11
**rival** [1] - 221:19
**rizzle** [3] - 22:19, 22:24, 22:25
**road** [1] - 211:13
**Road** [1] - 121:6
**rob** [3] - 82:2, 220:25
**robber** [3] - 69:25, 70:12, 71:1
**Robberies** [1] - 30:22
**robberies** [3] - 59:16, 69:12, 69:16
**robbing** [1] - 71:6
**Robert** [2] - 1:16, 118:4
**Roc** [5] - 28:17, 125:13, 127:4, 134:12
**rocking** [2] - 29:10
**Rockville** [1] - 178:2
**rodent** [1] - 24:19
**rodents** [2] - 24:9,

24:24
**RODNEY** [1] - 248:4
**Rodney** [2] - 161:18, 161:20
**Room** [1] - 1:24
**room** [5] - 94:19, 110:5, 110:23, 138:15, 183:12
**Rosenberg** [2] - 144:7, 246:6
**rough** [3] - 6:25, 229:16, 243:25
**roughly** [2] - 213:6, 218:7
**routine** [1] - 244:14
**Routinely** [1] - 169:24
**routinely** [2] - 148:17, 178:7
**RPR** [1] - 1:24
**rubber** [1] - 211:13
**Rubio** [1] - 207:23
**Ruge** [4] - 28:5, 127:1, 127:10, 127:13
**Ruger** [35] - 19:19, 20:19, 28:7, 32:1, 44:13, 56:20, 121:13, 124:3, 124:4, 124:5, 124:11, 124:16, 126:20, 126:23, 127:2, 130:15, 177:22, 185:18, 185:19, 185:20, 186:13, 186:15, 186:16, 186:19, 186:20, 187:8, 187:9, 190:7, 190:19, 191:4, 191:5, 193:2, 193:5, 193:8, 193:17
**rule** [5] - 152:20, 169:18, 174:22, 230:8, 243:16
**rules** [1] - 145:16
**ruling** [4] - 12:2, 143:12, 169:18, 240:12
**rulings** [3] - 140:5, 140:12, 233:6
**rumors** [1] - 83:7
**run** [3] - 31:18, 168:18, 225:10
**running** [2] - 15:14, 26:2

## S

**S-U-L-L-I-V-A-N** [1] - 175:24
**sacrosanct** [1] - 243:14
**safe** [2] - 57:17, 81:9
**sales** [1] - 173:4
**sanction** [1] - 147:21
**sat** [5] - 62:21, 65:19, 94:19, 95:8, 104:11
**satisfaction** [1] - 6:22

**satisfied** [6] - 139:5, 143:12, 160:5, 164:24, 174:11, 228:16
**satisfy** [1] - 174:14
**satisfying** [1] - 161:11
**Saturday** [1] - 148:16
**save** [2] - 160:10, 245:11
**saw** [19] - 76:2, 86:22, 92:4, 92:6, 92:19, 92:25, 93:7, 93:17, 93:19, 98:4, 98:8, 100:7, 100:20, 103:7, 103:14, 134:12, 139:20, 144:14
**Scales** [1] - 219:4
**scare** [1] - 241:6
**scars** [1] - 32:6
**scenario** [2] - 178:25, 219:22
**scene** [7] - 15:15, 18:13, 18:18, 133:21, 134:6, 179:1, 181:14
**scenes** [1] - 226:24
**schedule** [1] - 240:17
**scheduled** [1] - 240:21
**scheduling** [3] - 234:8, 234:11, 243:4
**school** [8] - 19:14, 25:24, 178:4, 178:5, 200:19, 200:20, 221:2
**School** [5] - 100:1, 131:21, 133:13, 142:21, 142:24
**schools** [1] - 200:18
**Science** [2] - 176:25, 177:1
**scientific** [1] - 203:9
**score** [2] - 95:6, 148:23
**scrape** [3] - 48:3, 48:4
**screen** [7] - 17:4, 48:14, 54:3, 112:2, 128:16, 131:17, 189:18
**script** [1] - 11:8
**scroll** [1] - 34:1
**SD** [1] - 26:11
**se** [3] - 13:5, 171:23, 232:20
**search** [1] - 201:11
**searching** [2] - 152:8, 201:12
**Seasons** [1] - 99:7
**seat** [1] - 224:10
**seated** [3] - 175:21, 199:2, 227:22
**Second** [4] - 9:3, 9:5, 152:8, 152:19
**second** [27] - 32:20, 55:14, 62:25, 112:16, 116:12, 116:18, 117:1, 117:5, 117:16, 119:13,

119:17, 122:18, 126:20, 129:11, 136:14, 146:5, 146:16, 146:18, 148:2, 148:3, 152:12, 163:6, 182:9, 183:21, 227:23, 243:24
**seconds** [3] - 141:16, 171:1, 234:8
**Secret** [4] - 199:16, 199:21, 200:3, 200:10
**secret** [1] - 110:12
**section** [4] - 13:10, 17:5, 110:8
**see** [60] - 7:10, 22:11, 22:18, 34:3, 38:6, 38:11, 38:14, 40:20, 40:25, 41:9, 43:21, 47:5, 48:14, 59:8, 62:7, 62:11, 76:5, 84:20, 93:5, 97:22, 102:14, 102:17, 114:1, 116:4, 117:20, 120:19, 123:4, 127:20, 128:17, 128:19, 129:25, 131:8, 146:11, 146:17, 148:20, 150:23, 152:17, 154:24, 188:4, 190:24, 192:17, 194:13, 194:20, 197:5, 197:18, 197:23, 210:17, 213:25, 218:8, 219:9, 220:12, 222:23, 224:17, 236:24, 237:24, 245:17, 245:18, 246:25
**See** [8] - 126:7, 126:19, 126:21, 127:4, 127:15, 127:21, 194:6, 228:8
**seeing** [2] - 133:20, 166:18
**seek** [1] - 75:2
**seeks** [1] - 173:23
**Segregation** [1] - 91:14
**seize** [1] - 218:14
**seized** [6] - 4:18, 4:19, 104:25, 163:9, 163:14, 163:23
**seizure** [2] - 3:9, 5:7
**seizures** [3] - 4:13, 4:15, 201:15
**Self** [1] - 171:10
**self** [1] - 84:10
**Self-evident** [1] - 171:10
**sell** [8] - 20:21, 211:19, 212:7, 212:9, 217:4, 218:4, 218:11, 218:18
**Selling** [1] - 29:11
**selling** [12] - 29:11, 83:1, 99:25, 132:16, 206:20, 212:11, 212:12, 216:22, 217:4, 223:1, 223:2, 223:5

**semiautomatic** [2] - 24:19, 121:10
**send** [8] - 177:24, 178:23, 178:24, 179:2, 239:4, 244:12, 244:21
**sense** [3] - 34:24, 74:20, 155:18, 171:12, 203:9, 209:17, 211:13, 241:14
**sent** [6] - 19:2, 49:23, 51:22, 66:14, 74:6, 119:2
**sentence** [29] - 8:12, 8:19, 9:24, 10:8, 11:20, 14:7, 15:21, 15:24, 29:18, 42:14, 50:3, 51:16, 52:24, 53:5, 53:11, 74:8, 74:12, 74:16, 90:17, 112:20, 113:12, 113:13, 113:15, 140:20, 153:13, 154:16, 154:20, 154:23, 155:12
**sentenced** [1] - 51:4
**separate** [6] - 12:7, 34:25, 61:9, 70:2, 158:3, 205:4
**separately** [1] - 35:2
**separates** [1] - 216:10
**separation** [1] - 216:12
**September** [8] - 67:25, 68:2, 117:19, 117:21, 118:16, 118:21, 119:7
**Sergeant** [4] - 58:20, 183:6, 193:6, 196:2
**series** [5] - 177:7, 177:8, 177:9, 183:17, 208:20
**serious** [1] - 148:21
**serve** [5] - 53:5, 112:19, 113:12, 113:15, 224:19
**served** [1] - 74:9
**Service** [4] - 199:16, 199:21, 200:3, 200:10
**service** [1] - 239:16
**Services** [1] - 41:25
**serving** [11] - 8:11, 8:19, 9:23, 10:7, 11:19, 140:20, 153:13, 154:15, 154:20, 155:11, 208:9
**session** [7] - 120:9, 161:6, 240:10, 240:18, 240:22, 241:4, 241:5
**sessions** [3] - 117:5, 119:25, 146:9
**set** [5] - 169:9, 181:25, 184:15, 184:16, 187:16
**seven** [3] - 112:19, 173:13, 173:24
**Seven** [6] - 27:24, 36:23, 52:20, 113:12, 127:20, 129:21

**Seventh** [1] - 11:23
**seventh** [1] - 46:24
**Several** [1] - 2:7
**several** [14] - 2:8, 12:4,
21:18, 26:10, 27:4,
37:23, 137:24, 149:1,
153:10, 177:5, 177:11,
188:20, 220:2, 221:5
**Shake** [2] - 29:23, 31:9
**shake** [2] - 55:23, 126:8
**shall** [5] - 52:23, 53:1,
120:17, 140:14
**shape** [1] - 158:9
**share** [1] - 220:21
**SHAWN** [1] - 1:8
**Shearer** [1] - 242:21
**Sheisty** [1] - 31:10
**shell** [6] - 193:19,
194:4, 195:10, 195:20,
196:1, 196:3
**Shelly** [1] - 101:4
**SHELLY** [1] - 1:8
**Shelton** [31] - 18:24,
19:2, 19:21, 29:7, 39:17,
39:18, 43:12, 76:25,
94:2, 97:9, 97:12, 98:13,
98:22, 99:25, 101:14,
101:25, 128:18, 128:21,
128:25, 129:6, 129:13,
129:23, 129:24, 130:19,
131:6, 131:13, 131:21,
137:18, 137:23, 161:9
**SHELTON** [1] - 1:7
**ship** [1] - 158:22
**shirt** [1] - 47:19
**shit** [5] - 22:19, 31:11,
32:2, 126:8, 127:4
**Shit** [1] - 125:9
**shit's** [2] - 36:12, 36:15
**shizzle** [1] - 23:4
**shoot** [1] - 82:2
**shooting** [10] - 178:5,
181:4, 186:6, 187:13,
187:17, 188:24, 190:15,
192:21, 194:5, 195:12
**Shooting** [2] - 186:7,
186:8
**short** [2] - 80:14, 83:21
**shorts** [1] - 47:19
**shot** [7] - 26:2, 30:15,
62:4, 62:5, 89:7, 240:14
**shotgun** [2] - 24:7,
177:9
**shoulder** [2] - 48:3,
86:23
**show** [17] - 7:11, 11:19,
11:21, 13:6, 15:15,
17:24, 23:22, 70:14,
70:15, 140:20, 154:25,
183:13, 184:21, 184:22,

185:11, 188:2, 238:11
**show-up** [1] - 15:15
**showed** [3] - 104:15,
128:24, 192:16
**showing** [8] - 13:11,
18:12, 49:15, 133:3,
140:22, 181:15, 191:3,
192:12
**Showing** [1] - 135:12
**shown** [1] - 186:2
**shows** [2] - 163:1,
163:5
**side** [12] - 10:24, 11:2,
14:9, 17:16, 17:17,
136:2, 147:7, 165:16,
188:10, 198:14, 223:10,
241:7
**sidesteps** [1] - 11:3
**sign** [2] - 180:23,
182:15
**signature** [6] - 118:4,
118:7, 118:15, 118:21,
118:23, 249:10
**signatures** [2] - 118:3,
118:18
**signed** [6] - 63:20, 66:7,
111:22, 113:18, 117:17,
117:19
**significance** [1] -
150:23
**significant** [2] - 220:7,
235:22
**similar** [6] - 15:11,
71:22, 72:16, 135:7,
214:13, 217:24
**Similar** [1] - 220:17
**simple** [1] - 215:14
**simply** [13] - 22:9,
37:19, 38:2, 39:9, 136:1,
140:21, 143:21, 156:12,
159:20, 165:19, 165:25,
173:14
**sing** [1] - 73:17
**singing** [7] - 26:17,
26:20, 26:24, 28:13,
30:7, 35:20, 72:25
**single** [2] - 157:3,
180:18
**sings** [2] - 26:21, 27:25
**sister** [5] - 98:5, 98:25,
99:1, 101:18, 103:18
**sister's** [5] - 98:6,
101:15, 103:19, 132:11,
132:20
**sit** [3] - 6:19, 12:13,
246:3
**sits** [1] - 148:2
**sitting** [6] - 46:25, 47:1,
86:23, 94:14, 108:24,
158:2

**situation** [3] - 14:6,
220:8, 242:17
**situations** [2] - 165:15,
205:1
**Six** [3] - 46:2, 127:9,
127:15
**six** [16] - 33:25, 46:9,
60:24, 61:4, 64:24, 68:3,
68:4, 157:2, 157:24,
173:24, 182:12, 183:5,
190:24, 193:19, 194:3,
195:10
**Sixteen** [2] - 199:13,
202:24
**Sixth** [1] - 158:18
**size** [1] - 222:3
**skin** [1] - 7:10
**slammed** [1] - 135:3
**slide** [1] - 194:13
**slight** [1] - 14:4
**slipped** [1] - 32:6
**Slo** [4] - 27:2, 27:6,
125:22, 127:5
**slow** [2] - 30:16, 177:15
**small** [5] - 171:9,
172:24, 173:1, 173:21,
213:1
**smaller** [8] - 211:2,
211:12, 212:19, 212:23,
212:25, 213:14, 213:17,
217:13
**Smith** [1] - 177:22
**smoke** [1] - 131:6
**smoking** [1] - 94:15
**smuggle** [1] - 210:15
**smuggled** [1] - 210:22
**smuggling** [2] - 210:8,
210:12
**snack** [1] - 246:17
**Snatch** [1] - 31:11
**snitch** [2] - 109:17,
109:18
**Snitching** [1] - 109:18
**snitching** [3] - 80:21,
81:2, 92:16
**society** [1] - 81:10
**soda** [2] - 215:17,
215:22
**sodium** [2] - 215:16,
215:21
**sold** [14] - 31:3, 76:7,
76:15, 88:9, 107:14,
107:18, 211:21, 217:1,
217:19, 217:24, 218:7,
218:8
**Sold** [1] - 20:20
**soldier** [2] - 126:8,
126:12
**soldiers** [1] - 27:20
**solely** [4] - 34:15,

159:8, 205:10, 207:19
**soluble** [2] - 210:5,
215:13
**someone** [5] - 34:8,
100:8, 100:11, 165:16,
211:19
**sometime** [5] - 6:11,
67:4, 103:24, 108:16,
115:1
**sometimes** [7] - 111:12,
165:14, 165:18, 222:22,
224:24, 242:15
**Sometimes** [4] -
210:13, 222:17, 224:8,
224:25
**somewhat** [7] - 148:1,
158:19, 158:21, 219:24,
225:13, 227:2, 227:3
**somewhere** [1] - 96:25
**song** [9] - 22:10, 26:10,
26:18, 26:24, 30:12,
34:1, 34:3, 37:15, 126:20
**songs** [7] - 21:7, 37:11,
38:21, 103:23, 126:24,
128:3, 143:1
**Sons** [1] - 177:23
**soon** [3] - 7:1, 227:17,
232:12
**sooner** [1] - 230:19
**Sopranos** [1] - 169:8
**sorry** [23] - 7:22, 10:16,
19:16, 57:13, 76:21,
85:25, 98:8, 103:17,
126:7, 144:24, 146:1,
151:14, 163:4, 163:16,
177:14, 182:4, 188:20,
196:8, 217:21, 219:8,
230:16
**Sorry** [4] - 113:22,
184:2, 192:17, 218:3
**sort** [5] - 8:14, 26:9,
58:16, 63:24, 72:11,
103:2, 110:3, 120:22,
149:4, 168:25, 207:9,
209:16, 209:17, 217:12,
218:22, 234:16, 235:5,
239:24, 244:14
**soul** [1] - 36:9
**sounds** [2] - 11:16,
231:24
**source** [7] - 205:9,
210:25, 211:6, 212:15,
212:18, 216:13
**South** [1] - 209:23
**southeast** [1] - 210:20
**Southwest** [1] - 54:15
**southwest** [2] - 210:10,
210:20
**sovereignty** [5] - 9:11,
16:16, 160:9, 233:17,

233:21
**Sovich** [3] - 230:17,
231:8, 232:13
**speaking** [5] - 27:17,
27:18, 27:19, 39:13,
214:24
**Speaking** [1] - 234:7
**Special** [14] - 160:18,
165:4, 198:22, 199:10,
199:19, 199:23, 200:22,
202:12, 209:15, 212:17,
217:12, 218:3, 221:8,
224:13
**SPECIAL** [2] - 198:25,
248:10
**specific** [7] - 149:13,
151:13, 165:9, 181:11,
200:13, 205:3
**Specifically** [2] - 52:8,
165:9
**specifically** [10] -
113:20, 113:23, 122:16,
180:5, 189:8, 189:25,
202:22, 206:25, 208:3,
244:24
**spectrum** [2] - 224:8,
224:12
**speculate** [2] - 11:4,
11:5
**speculating** [1] - 15:20
**Speculating** [1] - 86:2
**speculation** [1] - 242:7
**spell** [2] - 175:22, 199:3
**Spence** [8] - 9:23,
14:20, 140:23, 151:5,
158:17, 159:5, 164:23,
233:4
**spend** [1] - 102:23
**spit** [2] - 98:25, 99:1
**splattered** [1] - 30:23
**splattering** [1] - 30:23
**spoken** [1] - 170:14
**sponsor** [1] - 161:2
**spot** [1] - 35:14
**spouted** [1] - 68:15
**spraying** [2] - 29:20,
29:21
**SS** [1] - 53:20
**stab** [1] - 190:12
**stalking** [2] - 62:8, 62:9
**Stalking** [1] - 62:10,
62:11
**stand** [12] - 7:15, 17:6,
17:19, 58:3, 138:13,
140:12, 158:12, 162:1,
162:22, 175:18, 206:10,
226:20
**standard** [1] - 169:9
**standards** [1] - 174:14
**standby** [1] - 242:21

**standing** [10] - 18:3, 24:13, 25:9, 170:9, 170:21, 170:23, 171:15, 173:7, 174:17, 225:19
**standpoint** [1] - 171:2
**stands** [5] - 9:16, 140:1, 160:2, 182:7, 182:8
**star** [1] - 71:20
**Start** [1] - 234:24
**start** [11] - 24:22, 58:14, 101:15, 113:6, 141:3, 166:14, 173:1, 229:7, 243:20, 246:7, 246:14
**started** [6] - 70:22, 109:5, 145:24, 176:13, 178:16, 190:14
**starting** [2] - 35:16, 240:8
**Starting** [1] - 113:5
**starts** [2] - 26:23, 209:25
**starve** [1] - 30:16
**state** [28] - 3:3, 8:11, 12:4, 15:12, 49:23, 49:25, 50:23, 51:22, 52:6, 61:12, 63:22, 65:24, 66:13, 74:6, 74:14, 115:14, 115:25, 116:2, 118:11, 121:19, 122:5, 151:4, 156:21, 158:16, 213:12, 233:4
**State** [9] - 2:20, 136:19, 175:22, 177:25, 178:1, 179:13, 179:14, 199:3, 215:3
**State's** [1] - 228:7
**statement** [5] - 11:16, 130:7, 152:18, 154:1, 161:8
**States** [32] - 9:2, 9:4, 48:11, 56:15, 56:16, 131:3, 135:20, 165:3, 172:12, 172:17, 175:17, 179:15, 198:22, 199:10, 199:16, 200:3, 200:4, 202:9, 202:11, 203:23, 209:19, 209:21, 210:9, 210:10, 210:15, 210:23, 210:25, 212:15, 213:21, 214:12, 214:13, 214:25
**STATES** [2] - 1:1, 1:5
**station** [1] - 99:18
**Station** [1] - 94:17
**stationery** [1] - 117:25
**statistics** [1] - 205:16
**status** [2] - 114:4, 139:19
**stay** [4] - 136:9, 168:2, 226:2, 232:4
**Stay** [1] - 30:11

**staying** [1] - 238:19
**steel** [2] - 177:13, 177:19
**stenographically** [1] - 249:4
**stepped** [1] - 234:25
**stick** [1] - 220:23
**stick-up** [1] - 220:23
**Still** [1] - 79:15
**still** [21] - 7:23, 8:21, 11:3, 32:19, 42:13, 44:22, 73:20, 74:20, 78:18, 112:19, 135:19, 138:22, 144:13, 169:4, 173:17, 225:9, 227:2, 229:20, 233:19, 243:5, 245:3
**stipulate** [6] - 2:19, 5:9, 170:15, 172:11, 172:18, 245:2
**stipulated** [2] - 51:3, 121:24
**Stipulation** [1] - 121:3
**stipulation** [12] - 2:18, 4:25, 5:13, 5:14, 6:24, 12:1, 14:17, 16:5, 50:6, 52:10, 235:24, 235:25
**stipulations** [1] - 245:6
**Stocksdale** [1] - 118:9
**Stoler** [2] - 10:3, 10:8
**stood** [1] - 146:3
**Stop** [4] - 28:25, 53:16, 236:16
**stop** [7] - 28:10, 28:20, 28:21, 30:4, 36:24, 149:17, 154:22
**stopped** [1] - 213:11
**stopping** [2] - 104:6, 104:9
**straight** [2] - 55:16, 104:12
**strategic** [1] - 159:1
**stray** [2] - 174:19, 174:20
**streamlined** [1] - 242:10
**Street** [1] - 1:25
**street** [25] - 17:16, 17:17, 19:20, 20:17, 20:18, 83:15, 83:18, 93:13, 130:14, 207:1, 207:3, 207:4, 211:11, 211:12, 211:15, 211:25, 212:4, 212:16, 217:1, 218:5, 222:7, 222:22, 223:4, 223:14, 225:12
**streets** [7] - 24:22, 32:19, 66:21, 124:9, 124:13, 124:14, 124:20
**strength** [1] - 246:25

**strict** [2] - 165:17, 224:4
**strike** [5] - 19:7, 23:13, 53:22, 97:11, 122:8
**Strike** [1] - 90:3
**string** [2] - 60:20, 62:12
**strip** [2] - 30:23, 30:24
**strongly** [1] - 140:18
**struck** [5] - 47:2, 47:3, 47:15, 80:23, 143:13
**structure** [2] - 169:8, 224:10
**structured** [1] - 225:14
**structures** [1] - 165:6
**students** [2] - 245:14, 245:16
**study** [1] - 207:24
**stuff** [13] - 7:23, 104:7, 104:10, 133:2, 162:4, 168:16, 172:21, 173:24, 190:11, 191:19, 191:25, 205:17, 219:4
**subject** [4] - 12:4, 225:2, 225:22, 232:15
**subjected** [1] - 203:6
**submission** [1] - 173:6
**submitted** [5] - 3:18, 13:5, 13:9, 13:17, 233:21
**subparagraph** [1] - 121:2
**Subparagraph** [3] - 52:3, 120:17, 121:18
**subpoena** [3] - 2:21, 3:6, 41:17
**subpoenaed** [5] - 41:15, 122:24, 123:1, 131:3, 237:23
**subpoenas** [4] - 2:23, 2:24, 3:2, 238:4
**substance** [2] - 173:17, 216:21
**substantial** [4] - 50:24, 121:20, 143:5, 143:11
**substantive** [4] - 16:13, 139:14, 166:17, 166:18
**subtract** [1] - 235:10
**successful** [1] - 71:17
**sufficient** [2] - 152:25, 184:10
**suggest** [2] - 143:18, 191:20
**suggesting** [4] - 15:24, 152:19, 158:11, 238:5
**suggestion** [3] - 52:17, 154:12, 174:13
**Sullivan** [30] - 175:18, 175:23, 176:2, 177:14, 178:7, 179:19, 180:1, 180:5, 180:10, 181:9, 181:15, 181:25, 183:16, 183:23, 184:22, 185:24,

186:9, 188:3, 188:15, 189:12, 189:24, 190:12, 191:16, 191:18, 192:1, 192:7, 194:9, 194:21, 196:9, 198:19
**SULLIVAN** [2] - 175:19, 248:8
**sum** [2] - 186:9, 190:12
**summarize** [2] - 3:14, 63:24
**summarized** [1] - 52:10
**Sunday** [1] - 27:25
**sung** [1] - 30:12
**Supermax** [1] - 12:24
**supermax** [1] - 153:8
**supervisor** [2] - 178:18, 178:19
**Supervisory** [1] - 199:10
**Supp** [1] - 154:13
**suppliers** [2] - 173:2, 173:3
**supply** [1] - 213:2
**supplying** [1] - 226:9
**support** [1] - 173:22
**supported** [1] - 171:20
**suppose** [2] - 74:11, 84:21
**supposed** [6] - 18:24, 122:13, 122:14, 122:24, 192:15, 192:16
**Supreme** [2] - 16:9, 16:12
**surgery** [1] - 243:7
**surprised** [1] - 162:15
**surrendering** [1] - 27:20
**surveillance** [2] - 200:19, 201:9
**survival** [1] - 219:18
**suspect** [3] - 76:25, 129:1, 143:21
**suspected** [1] - 201:9
**suspecting** [1] - 77:2
**suspicion** [4] - 14:20, 74:23, 77:2, 107:1
**sustained** [2] - 139:18, 139:23
**Sustained** [4] - 81:12, 87:20, 121:1, 137:6
**swear** [1] - 110:4
**Sweet'n** [1] - 218:10
**swore** [4] - 109:4, 109:7, 109:10
**SWORN** [2] - 175:19, 198:25
**sympathetic** [1] - 238:9
**system** [5] - 52:19, 75:22, 178:15, 178:16, 188:3

| **T** |
| --- |

**T-shirt** [1] - 47:19
**Tab** [17] - 21:16, 22:5, 28:11, 30:1, 35:16, 36:23, 37:18, 37:22, 38:3, 38:7, 38:25, 125:5, 126:4, 126:19, 127:9, 127:10, 127:15
**tab** [1] - 33:24
**tactical** [1] - 200:17
**tactics** [1] - 173:4
**talks** [2] - 37:4, 121:3
**tan** [1] - 216:16
**tannish** [1] - 216:10
**tape** [8] - 37:12, 38:9, 134:4, 231:18, 232:1, 232:3, 232:7, 232:16
**Tape** [2] - 39:11, 47:22
**tapes** [1] - 125:2
**target** [1] - 220:24
**tatters** [2] - 158:19, 158:21
**Taylor** [1] - 91:2
**teach** [1] - 177:5
**team** [1] - 167:17
**Tec** [4] - 23:22, 23:23, 23:24, 23:25
**Tech** [1] - 176:17
**technical** [1] - 217:8
**Technician** [2] - 176:14, 177:2
**technique** [1] - 222:25
**techniques** [5] - 182:23, 202:4, 204:14, 210:8, 210:13
**telephones** [2] - 225:9
**ten** [4] - 123:15, 175:8, 228:22, 246:8
**tender** [2] - 179:25, 202:11
**tendered** [2] - 180:8, 209:11
**tendering** [1] - 208:12
**tentative** [1] - 243:5
**tenth** [5] - 217:3, 217:17, 217:20, 217:24, 218:8
**term** [2] - 196:23, 217:8
**terms** [15] - 51:20, 52:22, 106:16, 107:21, 169:5, 170:22, 193:15, 201:8, 202:3, 205:15, 205:17, 213:20, 214:23, 222:3, 235:5
**terribly** [2] - 167:19, 238:9
**terrifically** [1] - 74:18
**territory** [1] - 165:11

**test** [4] - 178:19, 178:20, 178:22, 179:2
**tested** [1] - 179:6
**testicles** [1] - 23:17
**testified** [81] - 42:19, 42:25, 43:11, 44:25, 49:2, 49:6, 49:12, 56:14, 60:7, 62:24, 66:11, 67:17, 68:17, 68:24, 69:5, 69:19, 70:2, 70:3, 70:10, 71:4, 72:24, 76:7, 76:10, 77:14, 77:19, 79:1, 80:2, 81:5, 83:7, 83:21, 85:21, 92:2, 92:8, 92:12, 92:15, 94:8, 95:11, 95:17, 95:20, 96:10, 96:14, 97:11, 97:15, 97:18, 98:3, 100:3, 101:14, 108:25, 109:2, 109:3, 109:11, 110:1, 111:6, 111:19, 112:6, 113:25, 116:7, 116:12, 116:16, 116:18, 116:25, 117:5, 122:16, 123:20, 126:7, 128:3, 129:1, 131:1, 135:20, 146:16, 146:22, 149:7, 149:8, 162:12, 172:21, 173:24, 179:21, 179:22, 198:11, 203:19, 204:2
**testifies** [2] - 145:13, 160:1
**testify** [42] - 10:4, 14:12, 41:15, 42:6, 42:7, 43:12, 48:25, 59:23, 67:20, 68:23, 69:2, 69:5, 69:9, 69:12, 69:15, 77:15, 84:6, 86:14, 110:4, 120:17, 135:18, 136:14, 158:11, 158:25, 160:17, 165:6, 171:9, 172:10, 173:1, 173:5, 173:23, 174:15, 179:10, 180:11, 180:25, 205:3, 207:19, 207:20, 207:25, 208:2, 208:10, 235:12
**testifying** [6] - 109:5, 114:7, 134:16, 145:24, 172:8, 205:23
**testimonies** [1] - 130:22
**testimony** [65] - 8:9, 18:25, 41:10, 60:9, 70:16, 74:25, 76:13, 77:7, 77:12, 78:7, 78:11, 78:18, 80:9, 80:12, 80:14, 83:22, 112:25, 119:15, 120:19, 122:12, 128:12, 128:15, 130:24, 139:11, 139:13, 139:14,

139:18, 139:21, 142:1, 143:24, 143:25, 144:4, 145:1, 147:1, 147:2, 160:11, 166:15, 170:9, 170:12, 170:16, 170:20, 170:22, 171:12, 171:21, 171:24, 172:14, 172:23, 173:17, 174:4, 174:6, 174:7, 174:8, 174:12, 179:23, 195:19, 197:23, 205:15, 208:19, 209:1, 209:2, 209:7, 235:22, 240:2, 245:1, 245:2
**testing** [4] - 178:14, 178:16, 178:18, 178:21
**tests** [1] - 179:8
**Texas** [2] - 213:4, 213:10
**Thailand** [1] - 210:20
**Thanksgiving** [3] - 241:21, 242:2, 242:3
**that'll** [1] - 23:18
**THE** [391] - 1:1, 1:2, 2:2, 2:5, 2:16, 3:8, 3:14, 3:16, 3:21, 3:23, 4:3, 4:13, 4:16, 4:21, 4:24, 5:2, 5:6, 5:12, 5:18, 6:2, 6:10, 6:15, 6:18, 7:9, 7:13, 7:19, 7:22, 8:1, 8:4, 8:7, 8:24, 9:6, 9:15, 9:18, 10:6, 10:13, 10:18, 10:21, 11:10, 11:14, 11:24, 12:11, 12:15, 12:21, 12:25, 13:3, 13:19, 14:15, 14:23, 15:2, 15:9, 15:13, 15:22, 16:4, 16:14, 16:20, 16:23, 16:24, 18:21, 19:4, 19:8, 20:9, 20:14, 21:13, 22:7, 22:23, 23:9, 23:14, 23:20, 24:6, 24:11, 24:13, 24:18, 25:7, 25:9, 25:15, 32:15, 33:10, 33:14, 34:5, 37:9, 37:13, 37:16, 37:21, 37:25, 38:6, 38:11, 38:14, 38:16, 39:2, 39:7, 43:8, 43:17, 44:10, 53:17, 53:24, 57:6, 57:20, 58:1, 58:3, 58:6, 58:8, 61:18, 61:21, 69:4, 76:21, 81:12, 85:15, 85:25, 86:4, 87:20, 89:25, 90:4, 90:6, 91:4, 91:5, 91:7, 114:11, 121:1, 123:5, 123:9, 123:11, 123:16, 125:1, 125:7, 128:8, 130:10, 131:15, 131:19, 132:2, 133:4, 133:8, 135:13,

136:2, 136:7, 136:10, 137:6, 138:4, 138:7, 138:9, 138:21, 139:1, 140:17, 141:3, 141:10, 141:15, 141:19, 142:10, 142:17, 142:19, 143:18, 144:14, 144:19, 145:4, 145:10, 145:12, 145:20, 145:23, 146:1, 146:15, 146:19, 146:21, 147:6, 147:10, 147:13, 147:17, 147:24, 148:13, 149:2, 150:1, 150:3, 150:5, 150:8, 150:10, 150:14, 150:17, 150:22, 151:7, 151:21, 151:23, 152:2, 152:5, 152:7, 152:12, 152:17, 152:22, 152:24, 153:3, 153:14, 153:18, 154:1, 154:22, 155:6, 155:9, 155:11, 155:14, 155:17, 155:22, 155:24, 156:12, 158:4, 158:6, 159:3, 159:10, 159:17, 160:2, 160:7, 160:10, 160:20, 160:23, 160:25, 161:4, 161:14, 162:3, 162:10, 162:14, 162:18, 162:20, 163:4, 163:12, 163:14, 163:16, 163:20, 163:25, 164:2, 164:8, 164:12, 164:15, 164:18, 164:24, 166:11, 167:8, 167:19, 167:24, 168:22, 169:2, 169:17, 169:23, 170:2, 170:7, 170:23, 174:2, 175:3, 175:6, 175:10, 175:12, 175:14, 175:20, 175:21, 175:23, 177:14, 177:16, 177:18, 177:19, 180:3, 180:7, 181:21, 181:23, 183:15, 185:2, 185:14, 187:20, 188:14, 191:19, 191:20, 191:23, 192:1, 192:2, 194:8, 194:12, 194:13, 194:18, 195:1, 195:3, 195:6, 195:17, 196:8, 196:12, 196:23, 197:1, 197:10, 197:13, 197:14, 198:18, 198:20, 198:21, 198:24, 199:1, 199:2, 199:4, 202:14, 206:2, 207:13, 207:16, 217:25, 218:1, 226:11, 226:16, 226:18, 226:19, 226:20, 227:22, 228:4, 228:8, 228:10, 228:13, 228:15, 228:18, 229:1, 229:3, 229:5, 229:11, 229:15, 229:17, 229:19, 229:24,

230:1, 230:3, 230:5, 230:12, 230:15, 230:22, 230:24, 231:1, 231:5, 231:10, 231:15, 231:19, 231:23, 232:1, 232:10, 232:23, 233:7, 233:9, 233:13, 233:17, 234:2, 234:5, 234:9, 234:14, 234:18, 234:22, 234:25, 235:7, 235:11, 235:14, 235:18, 235:25, 236:7, 236:11, 236:15, 236:17, 236:20, 236:22, 236:24, 237:4, 237:6, 237:10, 237:12, 237:15, 237:17, 237:19, 238:1, 238:11, 238:15, 238:21, 238:24, 239:3, 239:6, 240:3, 240:25, 241:3, 241:5, 242:18, 243:1, 243:10, 243:19, 244:4, 244:9, 245:5, 245:14, 245:22, 245:25, 246:4, 246:9, 246:11, 246:13, 246:16, 246:20, 246:22, 246:25
**themselves** [7] - 34:9, 204:16, 218:17, 219:15, 221:7, 222:15, 242:14
**theoretically** [1] - 74:23
**theories** [1] - 157:18
**thereafter** [1] - 67:4
**therefore** [6] - 2:13, 4:7, 5:17, 64:7, 174:14, 242:14
**They's** [1] - 55:16
**They've** [2] - 135:24, 189:21
**they've** [3] - 157:24, 222:2, 232:10
**Thinking** [1] - 32:7
**thinking** [3] - 238:24, 239:21, 240:5
**third** [4] - 27:24, 28:16, 71:4, 220:22
**thirds** [4] - 27:8, 28:19, 33:17, 37:2
**this0** [1] - 244:10
**Thomas** [1] - 1:20
**thoroughly** [1] - 135:24
**thousand** [3] - 31:15, 201:23, 210:4
**thousands** [2] - 178:13
**threat** [8] - 156:20, 220:5, 220:9, 220:14, 220:16, 220:22, 221:18
**threaten** [1] - 228:5
**threats** [2] - 220:2, 221:6
**three** [25] - 53:12, 90:13, 112:21, 112:22,

115:17, 146:2, 148:5, 162:13, 162:20, 168:8, 177:4, 185:16, 199:18, 219:20, 237:2, 237:8, 238:18, 238:19, 238:24, 238:25, 240:10, 240:13, 241:12, 241:13
**Three** [8] - 21:16, 22:5, 32:5, 83:24, 113:16, 125:5, 126:4, 126:19
**thrilled** [2] - 145:6, 145:7
**throughout** [2] - 202:9, 226:9
**throw** [4] - 87:4, 87:9, 149:6, 149:16
**throw-away** [2] - 149:6, 149:16
**thugs** [1] - 30:20
**Thursday** [2] - 240:11, 240:16
**ticket** [1] - 243:8
**tie** [1] - 149:24
**tied** [2] - 41:1, 149:9
**tight** [2] - 19:10, 19:11
**timeline** [1] - 241:23
**title** [1] - 125:8
**TM** [23] - 18:22, 19:2, 27:2, 27:3, 30:8, 33:5, 33:7, 55:18, 56:22, 56:25, 63:12, 69:1, 70:4, 76:7, 77:9, 100:8, 125:16, 126:13, 126:17, 128:25, 130:18, 131:5, 136:24
**TM's** [1] - 56:22
**today** [37] - 6:11, 6:13, 58:13, 60:5, 69:7, 71:11, 77:8, 77:14, 77:20, 78:18, 78:21, 80:2, 80:5, 83:22, 89:19, 92:12, 97:18, 98:15, 103:20, 141:13, 142:22, 143:20, 145:7, 155:2, 164:19, 175:2, 180:11, 186:20, 186:24, 190:13, 205:15, 223:17, 231:12, 233:1, 239:25, 246:15, 246:16
**together** [11] - 19:14, 19:24, 34:24, 76:18, 102:11, 131:7, 132:4, 165:19, 177:6, 189:3, 232:11
**toilet** [3] - 87:4, 97:4, 97:8
**Tom** [1] - 101:3
**tomorrow** [27] - 2:21, 2:25, 3:7, 4:10, 4:12, 5:21, 226:18, 227:2, 227:5, 227:17, 227:19,

229:8, 229:10, 229:11, 230:18, 231:2, 231:12, 232:5, 232:15, 232:20, 232:23, 234:16, 234:19, 234:20, 235:19, 242:24

**tone** [1] - 173:3

**tonight** [2] - 232:5, 235:19

**Tony** [40] - 25:17, 27:3, 32:12, 32:18, 32:19, 32:20, 32:21, 32:22, 32:23, 33:11, 55:2, 63:12, 78:3, 84:4, 84:17, 84:18, 84:20, 84:24, 85:4, 85:5, 86:12, 86:18, 86:25, 87:4, 87:7, 87:13, 88:7, 94:23, 102:5, 102:9, 105:4, 105:7, 106:1, 106:2, 125:20, 131:6, 132:23, 134:19, 134:23, 162:5

**Tony's** [1] - 76:14

**Tonya** [1] - 9:23

**took** [5] - 3:22, 84:10, 84:18, 95:15, 100:15

**tool** [9] - 176:8, 176:9, 176:24, 178:24, 178:25, 179:1, 179:6, 180:2, 219:23

**top** [6] - 30:15, 35:16, 39:1, 147:25, 191:4, 223:3

**topics** [1] - 202:1

**tops** [2] - 223:4, 223:6

**tort** [1] - 230:4

**total** [9] - 3:18, 4:17, 4:19, 5:1, 6:8, 148:22, 215:1, 241:15

**totally** [3] - 147:6, 154:21, 156:10

**tote** [2] - 31:11, 33:19

**touch** [2] - 142:7, 238:2

**touched** [7] - 141:21, 142:5, 212:17, 213:20, 213:23, 217:11, 221:8

**Tough** [1] - 82:8

**tough** [2] - 82:10, 215:4

**toughest** [1] - 82:18

**toward** [4] - 175:21, 199:2, 200:11

**town** [1] - 213:17

**towns** [2] - 212:23, 213:15

**Towson** [5] - 41:18, 41:20, 65:18, 65:19, 115:20

**Track** [5] - 22:5, 35:16, 36:24, 125:11, 127:20

**track** [5] - 12:22, 28:9, 30:2, 72:25, 193:15

**tracks** [3] - 72:17, 72:24, 104:1

**tractor** [1] - 214:1

**trade** [16] - 170:5, 202:4, 202:5, 211:14, 211:24, 212:3, 212:10, 215:6, 219:11, 219:18, 220:3, 220:10, 220:12, 220:18, 220:20

**traded** [1] - 81:6

**traffic** [1] - 235:5

**trafficking** [6] - 166:7, 167:17, 170:1, 202:13, 208:13, 219:6, 222:12, 225:4

**trailers** [1] - 214:1

**trained** [1] - 178:19

**training** [10] - 176:22, 177:4, 199:24, 200:8, 200:10, 200:13, 200:15, 200:16, 202:7, 207:24

**Training** [1] - 178:3, 200:2, 200:3, 200:4

**transcribed** [1] - 249:7

**transcript** [40] - 21:8, 21:10, 21:24, 22:6, 22:8, 22:12, 22:18, 28:11, 34:2, 36:25, 37:20, 38:2, 39:3, 39:5, 39:6, 39:9, 113:6, 126:4, 128:16, 129:12, 129:22, 131:7, 131:17, 133:3, 139:10, 139:13, 139:20, 140:2, 140:4, 141:23, 143:10, 143:20, 143:22, 143:23, 143:24, 144:15, 144:16, 161:10, 249:7

**transcripts** [10] - 37:9, 37:18, 125:2, 126:2, 128:3, 135:23, 141:7, 143:15, 146:25, 232:12

**transferred** [1] - 162:6

**transform** [1] - 215:23

**transformed** [1] - 210:1

**transport** [1] - 239:16

**transported** [1] - 211:6

**transporting** [2] - 51:10, 66:1

**Transporting** [1] - 65:24

**traps** [2] - 214:1

**travel** [2] - 172:15, 243:14

**Tree** [1] - 177:21

**tree** [1] - 134:2

**Trends** [2] - 205:22

**trial** [12] - 12:6, 92:18, 134:16, 135:25, 140:7, 140:8, 146:2, 146:12, 158:25, 207:17, 207:19,

207:22

**trials** [3] - 34:25, 120:18, 158:3

**tried** [8] - 32:22, 34:23, 133:15, 174:20, 192:4, 233:3, 233:7, 233:13

**Tried** [1] - 233:14

**trier** [2] - 171:25, 173:9

**triple** [1] - 144:10

**trooper** [2] - 5:10, 213:12

**Trooper** [3] - 3:17, 5:1, 5:5

**trooper's** [2] - 5:16, 6:24

**troops** [1] - 26:11

**trouble** [2] - 166:25, 168:4

**Trouble** [1] - 29:25

**truckload** [1] - 14:10

**true** [14] - 20:11, 41:4, 41:6, 58:19, 76:1, 104:20, 104:22, 129:23, 130:3, 130:22, 131:4, 148:9, 166:4, 208:24

**True** [1] - 168:25

**trustful** [1] - 174:17

**truth** [9] - 41:8, 41:9, 49:20, 49:22, 64:15, 109:7, 109:8, 109:20

**truthful** [4] - 64:18, 78:14, 89:21, 96:3

**Truthfully** [1] - 27:17

**truthfully** [2] - 84:6, 120:18

**truthfulness** [1] - 74:25

**try** [27] - 34:1, 38:25, 49:8, 78:17, 82:2, 89:12, 89:15, 91:19, 123:13, 138:11, 169:9, 181:9, 189:2, 193:14, 218:14, 218:16, 220:25, 225:20, 231:13, 231:14, 231:17, 232:13, 240:1, 240:2, 244:10, 244:20, 245:24

**trying** [22] - 11:10, 12:19, 29:15, 30:17, 70:22, 87:17, 92:8, 157:12, 158:6, 161:23, 167:14, 171:15, 171:17, 190:12, 196:13, 196:17, 235:16, 237:14, 237:18, 237:19, 238:1, 245:19

**Trying** [1] - 158:5

**Tuesday** [5] - 237:16, 237:17, 240:18, 241:3, 241:10

**Tulsa** [1] - 121:6

**tune** [3] - 22:5, 36:12, 36:13

**tuned** [1] - 125:13

**tunes** [1] - 21:18

**tunnel** [1] - 234:6

**turn** [7] - 21:16, 23:18, 24:22, 33:17, 211:18, 211:19, 227:15

**turned** [1] - 6:14

**Turning** [1] - 126:19

**turning** [1] - 21:24

**tussling** [1] - 47:3

**twenty** [1] - 110:15

**twenty-something** [1] - 110:15

**twice** [5] - 2:8, 119:20, 120:10, 120:23, 179:7

**two** [57] - 3:3, 3:25, 5:11, 10:9, 26:25, 27:10, 27:15, 27:22, 28:9, 28:19, 33:17, 37:2, 43:22, 44:6, 55:11, 60:8, 65:20, 66:22, 68:18, 75:8, 78:3, 78:4, 78:8, 97:23, 107:6, 107:8, 110:1, 115:24, 119:15, 126:10, 135:18, 135:23, 139:25, 141:7, 146:2, 148:5, 151:6, 153:11, 153:19, 155:5, 157:9, 162:20, 163:7, 163:12, 164:9, 164:13, 164:20, 171:1, 179:22, 180:20, 180:22, 186:12, 187:7, 189:13, 189:19, 190:18, 191:3, 195:11, 222:7, 229:6, 229:9, 234:1, 235:4, 235:7, 236:3, 236:5, 236:8, 236:9, 237:2, 237:9, 238:17, 238:18, 240:25, 245:13

**Two** [16] - 2:18, 22:18, 27:8, 30:15, 31:18, 40:7, 45:6, 46:13, 50:7, 55:12, 90:12, 113:7, 115:20, 120:17, 137:17, 170:24

**two-thirds** [2] - 28:19, 37:2

**Two-thirds** [1] - 27:8

**type** [3] - 6:6, 89:14, 173:15

**typically** [5] - 202:2, 205:9, 207:4, 239:8, 244:14

### U

**U.S** [6] - 1:24, 51:5, 117:25, 203:16, 204:3, 214:5

**ultimate** [3] - 153:23,

171:22, 171:24

**ultimately** [6] - 65:23, 66:25, 74:13, 74:18, 171:22, 183:5

**Um-hum** [9] - 70:1, 73:1, 76:17, 76:20, 77:21, 80:1, 91:23, 94:10, 189:1

**unable** [2] - 2:19, 228:1

**unclear** [1] - 63:9

**uncommon** [1] - 226:5

**unconventional** [1] - 154:10

**under** [26] - 4:8, 13:7, 13:10, 13:13, 16:22, 51:15, 59:25, 60:15, 76:18, 111:6, 118:7, 119:12, 121:17, 136:4, 143:13, 145:16, 158:15, 160:2, 172:9, 172:21, 178:19, 181:6, 184:25, 198:4, 223:24, 224:5

**undercover** [2] - 200:19, 212:12

**undercuts** [1] - 154:21

**underneath** [1] - 121:3

**Understood** [2] - 170:6, 177:18

**understood** [7] - 60:2, 106:23, 109:22, 196:20, 197:2, 197:7

**unfortunately** [1] - 151:24

**uniform** [1] - 165:10

**uniformed** [1] - 199:20

**unintelligible** [1] - 31:19

**unique** [3] - 78:23, 173:18

**unit** [6] - 41:20, 57:14, 57:15, 169:4, 169:5, 212:22

**Unit** [3] - 176:15, 176:16, 177:3

**United** [32] - 9:2, 9:4, 48:11, 56:15, 56:16, 131:2, 135:19, 165:3, 172:12, 172:17, 175:17, 179:15, 198:22, 199:10, 199:16, 200:2, 200:4, 202:9, 202:11, 203:23, 209:19, 209:21, 210:8, 210:11, 210:15, 210:22, 210:24, 212:15, 213:21, 214:12, 214:13, 214:25

**UNITED** [2] - 1:1, 1:5

**unknown** [1] - 62:5

**unless** [3] - 30:4, 113:2, 158:14

**unlike** [1] - 219:12

**unlocked** [1] - 156:6
**unpublished** [1] - 171:6
**unquote** [4] - 139:19, 139:22, 143:7, 148:4
**unresolved** [2] - 7:20, 8:5
**untrue** [2] - 51:21, 52:18
**unusual** [1] - 133:20
**up** [121] - 2:3, 2:18, 3:20, 3:25, 4:2, 7:12, 8:8, 9:1, 9:8, 9:15, 11:15, 12:20, 15:15, 16:3, 17:25, 18:5, 19:14, 23:16, 23:22, 24:3, 25:24, 26:4, 26:8, 30:11, 30:19, 31:12, 32:18, 36:17, 39:24, 40:2, 40:4, 40:6, 40:21, 41:12, 42:14, 45:21, 46:22, 51:23, 53:19, 54:2, 54:17, 58:25, 65:20, 65:21, 67:16, 78:17, 80:20, 88:22, 90:16, 90:23, 91:1, 91:15, 93:8, 93:10, 93:14, 94:19, 95:12, 98:15, 100:18, 102:17, 103:7, 105:5, 107:10, 107:14, 109:3, 112:12, 112:14, 113:8, 113:10, 124:6, 124:7, 129:14, 137:16, 138:23, 139:22, 140:6, 141:12, 142:3, 143:5, 144:7, 146:3, 150:15, 156:5, 156:6, 156:18, 157:21, 157:24, 159:8, 160:2, 163:1, 163:5, 178:19, 178:22, 182:13, 183:16, 186:9, 188:3, 190:12, 192:13, 193:15, 194:13, 196:3, 213:3, 216:15, 219:12, 219:22, 220:23, 225:14, 225:16, 227:2, 227:3, 230:19, 230:20, 231:7, 238:11, 240:8, 241:6
**Up** [1] - 213:7
**USA** [1] - 249:4
**useful** [1] - 241:8
**utilize** [2] - 141:13, 142:3
**utterly** [1] - 157:3

**V**

**variance** [1] - 224:15
**varied** [1] - 222:2
**various** [10] - 68:24, 69:6, 180:14, 181:10,

181:16, 186:10, 210:2, 216:2, 225:9
**variously** [1] - 181:16
**vegetable** [1] - 23:18
**vehicles** [1] - 213:25
**vent** [1] - 57:12
**verdict** [7] - 34:15, 35:7, 35:9, 171:19, 241:25, 242:5, 243:12
**versa** [1] - 174:7
**verse** [1] - 29:13
**verses** [6] - 28:9, 28:14, 30:3, 30:7, 33:25, 34:3
**version** [1] - 38:13
**versus** [3] - 148:9, 161:15, 212:22
**vial** [1] - 217:5
**Vials** [2] - 54:6, 54:7
**vials** [6] - 217:2, 217:13, 218:7, 218:22, 223:2
**vice** [1] - 174:7
**victim** [4] - 181:5, 187:14
**victims** [1] - 181:14
**video** [1] - 53:16
**Video** [1] - 53:21
**videotape** [1] - 53:15
**view** [3] - 141:6, 142:7, 174:10
**vigilant** [2] - 174:4, 174:7
**vigorously** [1] - 8:14
**violate** [1] - 51:20
**violated** [5] - 52:22, 109:10, 109:15, 109:19, 114:24
**violating** [1] - 109:13
**violation** [6] - 51:10, 52:6, 65:19, 65:24, 116:15, 159:24
**violations** [3] - 51:2, 52:9, 121:23
**violence** [2] - 220:11, 220:18
**Virginia** [2] - 178:4, 200:5
**virtually** [1] - 102:21
**visit** [2] - 226:23, 234:22
**visualize** [1] - 218:9
**viva** [1] - 243:13
**voce** [1] - 243:13
**voice** [21] - 37:15, 38:12, 38:20, 39:18, 39:21, 54:18, 54:23, 54:24, 55:9, 55:11, 55:14, 55:22, 55:25, 56:3, 56:5, 56:7, 56:9, 67:17, 68:8, 68:9, 80:20

**voices** [7] - 54:1, 54:18, 55:11, 55:12, 67:17, 103:21
**voicing** [1] - 141:17
**voir** [1] - 180:4
**VOLUME** [1] - 1:11
**volume** [1] - 170:18
**Vonsella** [1] - 3:7

**W**

**W-1** [1] - 187:19
**W-3** [1] - 187:19
**W-33** [3] - 38:25, 39:2, 39:5
**W-33B** [2] - 39:3, 39:4
**W-4** [1] - 187:19
**wag** [1] - 7:4
**Wagster** [3] - 187:1, 198:5, 198:9
**Wagster's** [2] - 187:2, 191:8
**Wait** [5] - 21:11, 21:12, 236:15, 236:17
**wait** [6] - 7:1, 8:1, 8:3, 8:6, 228:19, 245:13
**waiting** [1] - 177:17
**waive** [1] - 158:25
**walk** [4] - 162:3, 183:16, 187:11, 188:3
**walked** [1] - 74:22, 92:21
**walking** [1] - 244:5
**Walther** [1] - 177:7
**wants** [4] - 167:16, 169:16, 172:25, 230:8
**war** [1] - 33:15
**warned** [1] - 6:13
**warrant** [3] - 46:6, 46:12, 45:20
**warrants** [1] - 201:11
**Washington** [1] - 211:3
**watch** [1] - 219:9
**Watch** [1] - 24:2
**watched** [1] - 177:12
**water** [16] - 90:4, 188:14, 197:10, 210:5, 210:6, 211:17, 212:7, 215:13, 215:15, 215:19, 215:22, 216:14, 216:18, 216:20, 217:25
**waxy** [1] - 216:16
**WAYNE** [1] - 1:8
**Wayne** [5] - 25:10, 25:11, 97:18, 97:22, 98:4
**ways** [1] - 225:11
**weakness** [1] - 140:8
**weapon** [14] - 24:19, 95:14, 104:17, 106:21,

107:5, 107:9, 107:18, 162:7, 162:25, 163:6, 163:13, 164:4, 164:6, 164:13
**weapon's** [1] - 164:15
**weapons** [7] - 163:7, 163:12, 163:21, 164:3, 164:5, 164:13
**wearing** [2] - 47:17, 47:20
**weaving** [1] - 36:6
**Weaze** [10] - 25:1, 25:2, 26:5, 35:23, 36:1, 36:3, 37:6, 127:15, 127:21
**Wednesday** [7] - 1:11, 240:11, 240:16, 241:2, 242:3, 243:7, 243:8
**wee** [1] - 133:24
**Weed** [1] - 31:4
**weed** [2] - 31:5, 131:6
**week** [25] - 7:2, 7:4, 9:12, 9:13, 20:2, 20:3, 77:15, 77:16, 77:18, 77:19, 78:11, 78:18, 78:19, 93:8, 93:10, 105:13, 105:20, 143:20, 227:7, 227:8, 230:21, 237:18, 240:10, 241:21, 243:7
**weeks** [8] - 66:22, 78:4, 78:5, 78:8, 78:21, 115:20, 115:24, 173:13
**weighed** [2] - 5:10, 5:11
**weighs** [2] - 3:25, 5:5
**weight** [14] - 3:18, 3:25, 4:6, 4:7, 5:1, 5:10, 5:16, 6:8, 6:9, 6:24, 136:8, 165:3, 209:1, 209:2
**Wesson** [1] - 177:22
**West** [1] - 1:25
**west** [1] - 223:10
**Westlaw** [5] - 9:8, 9:13, 140:16, 152:6, 171:6
**whatsoever** [2] - 140:6, 154:2
**Whereabouts** [1] - 209:22
**Whereof** [1] - 249:9
**whipped** [1] - 32:7
**white** [1] - 47:19
**White** [1] - 199:20
**who've** [2] - 156:3, 242:11
**whole** [8] - 34:2, 64:15, 64:22, 64:23, 104:4, 109:8, 113:13, 130:23
**wholesale** [6] - 211:8, 211:9, 211:19, 216:22, 226:7
**widespread** [1] - 239:24

**Willard** [1] - 163:22
**WILLIE** [1] - 1:7
**Willie** [4] - 39:20, 39:21, 77:17, 249:4
**willing** [6] - 16:2, 158:14, 159:20, 213:9, 219:14, 219:19
**Wilson** [1] - 177:22
**wiretap** [1] - 204:15
**wish** [3] - 158:13, 230:19, 231:7
**withdraw** [2] - 27:23, 120:25
**withdrawal** [8] - 9:17, 13:10, 13:14, 13:22, 151:14, 151:17, 152:20, 153:1
**witness** [50] - 15:2, 21:14, 21:15, 34:11, 34:21, 86:25, 123:10, 123:11, 130:10, 138:4, 138:12, 139:11, 140:19, 142:13, 142:14, 144:9, 145:13, 148:1, 148:17, 149:23, 171:2, 172:10, 173:1, 174:25, 175:3, 175:16, 179:10, 179:17, 180:7, 181:22, 183:13, 184:25, 185:13, 188:13, 189:21, 198:21, 207:23, 208:24, 208:25, 209:3, 209:7, 212:13, 226:13, 228:2, 237:7, 238:9, 239:12, 246:18
**Witness** [6] - 16:18, 18:19, 58:2, 58:5, 227:21, 249:9
**WITNESS** [24] - 16:23, 37:16, 90:6, 91:4, 91:7, 123:9, 175:19, 175:20, 175:23, 177:16, 177:19, 191:19, 191:23, 192:2, 197:14, 198:20, 198:25, 199:1, 199:4, 218:1, 226:19, 248:4, 248:8, 248:10
**witness'** [1] - 209:1
**witnesses** [25] - 10:9, 10:12, 146:3, 148:15, 151:3, 160:16, 170:17, 173:25, 201:17, 207:19, 207:21, 236:3, 236:5, 236:12, 236:13, 236:20, 238:18, 238:20, 239:1, 239:7, 240:5, 240:7, 240:8, 242:24, 244:25
**woman** [1] - 15:14
**wonder** [1] - 21:9
**wondering** [3] - 229:22, 234:16, 237:23

**Woodland** [9] - 17:5, 19:17, 31:2, 44:6, 97:13, 99:25, 128:18, 129:14, 132:16
**Woodlawn** [1] - 82:3
**woods** [6] - 163:6, 163:8, 196:4, 196:6, 196:14, 196:20
**word** [15] - 94:22, 127:1, 134:15, 138:22, 142:23, 157:15, 157:16, 167:14, 167:15, 167:16, 167:18, 169:5, 169:13, 225:12
**words** [11] - 7:3, 11:20, 21:21, 46:18, 129:19, 137:9, 148:7, 161:24, 168:2, 221:18, 230:24
**works** [1] - 167:25
**world** [2] - 160:4, 221:17
**worry** [1] - 183:23
**worse** [1] - 74:18
**worst** [2] - 72:2, 219:22
**worth** [3] - 31:12, 240:14
**wound** [1] - 3:19
**writ** [3] - 238:14, 239:13, 242:12
**writ's** [1] - 239:15
**write** [1] - 202:25
**writing** [1] - 244:11
**writs** [3] - 238:5, 238:14, 242:19
**writted** [1] - 242:11
**written** [10] - 30:13, 120:4, 120:13, 146:10, 154:11, 154:13, 230:11, 244:17, 244:21
**wrote** [1] - 18:22
**Wyche** [31] - 19:11, 77:16, 105:14, 105:20, 106:9, 108:8, 108:15, 162:25, 163:2, 163:5, 164:22, 187:14, 187:17, 187:23, 187:24, 188:1, 188:11, 188:17, 188:18, 189:4, 189:16, 189:19, 189:25, 190:5, 191:8, 191:10, 197:8, 198:5

## X

**XXI** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**yard** [2] - 57:12, 57:13

**year** [8] - 53:10, 112:7, 113:19, 115:2, 177:4, 179:6, 179:7, 203:22
**years** [23] - 40:7, 50:5, 51:16, 53:12, 53:13, 74:8, 78:10, 78:20, 90:14, 135:18, 137:24, 153:10, 153:12, 157:9, 157:24, 168:9, 168:10, 199:13, 199:17, 202:20
**yelling** [1] - 223:14
**Yellow** [1] - 134:4
**Yesterday** [4] - 3:10, 77:23, 97:12, 100:7
**yesterday** [24] - 10:2, 18:7, 29:4, 32:17, 43:23, 69:9, 69:23, 77:8, 77:22, 92:22, 94:8, 95:3, 95:17, 95:24, 96:10, 96:15, 98:3, 100:3, 104:15, 109:5, 158:20, 163:21, 235:20, 238:8
**yo** [3] - 22:19, 26:11, 28:16
**York** [4] - 172:16, 211:1, 212:19, 213:16
**YOU** [1] - 204:25
**you's** [1] - 33:15
**youngest** [2] - 126:8, 126:12
**yourself** [7] - 81:23, 96:21, 119:17, 120:10, 204:24, 219:19, 221:23
**yup** [1] - 194:22
**Yup** [2] - 82:24, 194:22

## Z

**Zajac** [3] - 1:24, 249:3, 249:14