1

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                      FOR THE DISTRICT OF MARYLAND
                             NORTHERN DIVISION
 3


 4


 5      UNITED STATES OF AMERICA

 6            v.                              CRIMINAL CASE NO.
                                               AMD-04-029
 7      WILLIE MITCHELL,
        SHELTON HARRIS,
 8      SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
 9
              Defendants
10      _____/

11                    VOLUME XXVI OF XXXVII
                      Monday, November 17, 2008
12                    Baltimore, Maryland

13
        Before:  Honorable Andre M. Davis, Judge
14                      And a Jury

15      Appearances:
                On Behalf of the Government:
16               Robert Harding, Esquire
                 Michael Hanlon, Esquire
17              On Behalf of Defendant Mitchell:
                 Laura Kelsey Rhodes, Esquire
18               Michael E. Lawlor, Esquire
                On Behalf of Defendant Harris:
19               Gerard P. Martin, Esquire
                 Paul Flannery, Esquire
20              On Behalf of Defendant Martin:
                 Thomas L. Crowe, Esquire
21               James G. Pyne, Esquire
                On Behalf of Defendant Gardner:
22               Adam H. Kurland, Esquire
                 Barry Coburn, Esquire
23
        Reported by:
24      Mary M. Zajac, RPR
        Room 5515, U.S. Courthouse
25      101 West Lombard Street
        Baltimore, Maryland 21201
```

2

1          (Proceedings at 9:40 a.m.)

2          THE COURT:  I hope everyone is well.  Ms. Rhodes, I

3     spoke to the court administrator at the Immigration Court.

4          MS. RHODES:  Thank you very much, Your Honor.  I find

5     them hard to reach.

6          THE COURT:  Yeah.  It's like a three minute thing you

7     got to go through on the phone before a human being comes on.

8          I've been flooded with e-mails and filings and cc'd on

9     correspondence among counsel.  So I'm happy to know that you all

10    have been busy.  I think we're still waiting for one juror.  Is

11    that right, Ms. Arrington?

12         THE CLERK:  Yes, sir.

13         THE COURT:  So what do you need a decision on?  Good

14    morning, Mr. Kurland.

15         MR. COBURN:  Good morning, Your Honor.  I'm responsible

16    for a lot of that flooding that Your Honor referred to.  So I

17    wanted to thank you again for your patience.

18         THE COURT:  Did you e-mail me from an airplane last

19    week?

20         MR. COBURN:  Actually --

21         THE COURT:  You were on American?  Is it American

22    that --

23         MR. COBURN:  No, it's a thing I have on my computer

24    where I can write them and then as soon I get off the plane, they

25    all send simultaneously.

1          THE COURT:  Okay.  So you didn't actually e-mail from

2     the plane?

3          MR. COBURN:  Just wrote it.

4          THE COURT:  I understand Lufthansa used to have

5     in-flight service and they didn't make enough money on it so they

6     canceled it.  But I used it a few times in Europe.  But

7     apparently, the cost is such now that they're going to be able to

8     provide it and make some money on it for people like you.

9          MR. COBURN:  Well, you know what's going to happen,

10    Your Honor, is once there's internet on the airplanes,

11    everybody's going to be able to talk on the phone.  So everyone's

12    going to be talking simultaneously.

13         THE COURT:  I understand they are actually doing that

14    in some places around the world.  The technology marches on.  So

15    what's your issues?  Is it this witness, Ms. Tyiesha --

16         MR. COBURN:  That's probably the most urgent thing,

17    Your Honor.

18         THE COURT:  Have you been able to reach a stipulation

19    with the government?

20         MR. COBURN:  The government is not inclined to

21    stipulate.  And, of course, I understand their perspective on

22    that.

23         THE COURT:  What is it that you want her to be able to

24    come in and say?

25         MR. COBURN:  I have a statement from her.  She

4

1    actually, she would sort of amplify on the statement she gave to

2    the police.

3            THE COURT:  To what effect?

4            MR. COBURN:  She would say that she was out there at

5    the same time as Andrea Smith and some other kids, and that two

6    people came down the stairs, that they did not come

7    simultaneously.  That there was one person who came down first

8    and ran, just walked down, ran down the stairs, I think she would

9    say ran, and then just, just ran off in some direction and

10   disappeared.

11           Then the second person, who she said was wearing a

12   baseball cap, came down the stairs, walked over to the victim and

13   shot.

14           THE COURT:  That's it?

15           MR. COBURN:  That's it.  So in other words, it implies,

16   I mean, it's our thesis, obviously, is that the first person

17   coming down the stairs is, that Mr. Gardner is not the shooter.

18   Let me put it that way.  And --

19           THE COURT:  The government doesn't contend that Mr.

20   Gardner is the shooter, does it?

21           MR. COBURN:  But they do say that both of them were

22   there.  That they both walk over when one of them fires the

23   shots.

24           THE COURT:  So you really want me -- how old is she?

25           MR. COBURN:  I think she's 17.  I don't want this at

1   all, Your Honor.

2           THE COURT:  Well, you got to make the call.  Do you

3   want me to arrest her or not?

4           MR. COBURN:  Would it be possible -- I don't know if

5   this is appropriate or within the realm of possibility at all --

6   if somebody from Your Honor's chambers called that phone number?

7           THE COURT:  No.  No.  I'm not going, I'm not going to

8   do half a loaf.  You're going to have to decide whether you want

9   an arrest warrant and you want me to send the marshals out to

10  pick her up or you're going to forego it.

11          Frankly, you haven't asked me, but my opinion is its of

12  no consequence.  It just wouldn't, it's not reasonably likely to

13  lead a juror to conclude on the basis of that proffer that Mr.

14  Gardner didn't aid and abet.  But it's your call.

15          MR. COBURN:  Well, I appreciate that very much, Your

16  Honor.  Is it possible for me to just consult with Mr. Kurland

17  about it?

18          THE COURT:  Of course.  What other issues do you have

19  while you're at the lectern?

20          MR. COBURN:  Well, of course, there is the Darryl Bacon

21  issue, and the issue of Adina Schwartz, the professor at John

22  Jay, the firearms person.

23          THE COURT:  On Darryl Bacon, he's here?  Or will be

24  here?

25          MR. HARDING:  Your Honor, he hasn't shown up yet.  And

6

1    it's possible that he will show up.  But the agent has been

2    looking for him as recently as this morning.

3            THE COURT:  I thought the agent actually located him

4    last week.

5            MR. HARDING:  Yes.  He located him over the weekend and

6    spoke to him.  And that's why we expect him here.  But he's not

7    here.  And so if he's not here relatively soon, we think that the

8    court might consider the idea of asking for a bench warrant on

9    behalf of the defense.  He's still a defense witness.

10           THE COURT:  Right.

11           MR. HARDING:  But in order to get the marshals

12   assisting Agent Klas in locating him, it might be a good thing to

13   do.

14           THE COURT:  All right.  Now, once again, Mr. Kurland --

15           MR. COBURN:  Coburn, Your Honor.

16           THE COURT:  -- Mr. Coburn, do you have, apart from

17   impeaching Mr. Bacon with that letter, do you have any hope or

18   expectation of eliciting affirmative probative evidence from him?

19           MR. COBURN:  Our position, Your Honor, is that the

20   letter, what he states in the letter is affirmative, probative

21   evidence, which is not, it's not just a question of cutting down

22   his credibility, but it is rather admissible, probative,

23   affirmative evidence.

24           THE COURT:  On what basis could the letter be

25   admissible for anything other than impeachment?

7

1          MR. COBURN:  It's, and I wish I had, you know, kind of

2     sat down and done more comprehensive research about the hearsay

3     issues over the weekend.  But I mean, it might be a present

4     sentence impression.  That's what I said in one of my submission

5     that I thought it could be.  But regardless, I think it has

6     indicia of reliability.

7          THE COURT:  But wait a second.  As I understand the

8     letter, it's kind of like a love letter in which he basically

9     says, you know, I respect you, I love you, you're my guy, I'm

10    doing well, I hope you're doing well, I will never forget all the

11    things you've done for me.  They put pressure on me but I didn't

12    really know anything.  And let's stay in touch.

13         MR. COBURN:  Well, the fact that he says "I don't know

14    anything" and the fact that he's basically saying --

15         THE COURT:  But he don't know anything about what?

16         MR. COBURN:  Well, anything of value.

17         THE COURT:  He doesn't say, I know you didn't commit

18    that Spence murder.

19         MR. COBURN:  Not explicitly.

20         THE COURT:  Well, he doesn't even say it implicitly.

21    He just --

22         MR. COBURN:  Well, my understanding is it's written at

23    a time when Mr. Gardner's already been convicted.

24         THE COURT:  Did he testify in the state trial?

25         MR. COBURN:  Bacon?

1          THE COURT:  Yes.

2          MR. COBURN:  I don't think so.

3          THE COURT:  Okay.  So what is he contradicting?

4          MR. COBURN:  Well, he's saying that the government is

5     telling him to lie, i mean, basically.

6          THE COURT:  And he was cross examined on that?

7          MR. COBURN:  Well, but I didn't have, I mean, I didn't

8     have that piece of paper in which he explicitly says that.

9          THE COURT:  And didn't, is my recollection correct that

10    he, he did lie?  I mean, he was impeached with prior inconsistent

11    statements before when he was here before.

12         MR. COBURN:  He was impeached but my submission to Your

13    Honor, that that sort of impeachment with prior inconsistencies

14    from his grand jury and so on is no substitute for something in

15    his own hand, where he explicitly say, A, I don't know anything,

16    and B, the government's trying to get me to lie about you.

17         THE COURT:  Well, I suppose --

18         MR. COBURN:  I think it's also a statement against

19    interest, at least in part.  It seems to me there are --

20         THE COURT:  What part is against his interest?

21         MR. COBURN:  I don't have it up here in front of me,

22    Your Honor.

23         THE COURT:  Okay.  And by the way, the government's

24    position is that he was a member of the enterprise, I mean, he

25    was associated with the enterprise?

9

1          MR. HARDING:  Yeah.  Actually, Mr. Hanlon's going to

2     handle this issue.

3          THE COURT:  Mr. Hanlon?

4          MR. HANLON:  Yes, Your Honor.  That is the government's

5     position.

6          THE COURT:  Can you refresh my recollection of Bacon's

7     overall place in this?

8          MR. HANLON:  I'll attempt, Your Honor.  I should be

9     competent to do that because I'm working on closing argument, but

10    we'll see.

11         Mr. Bacon testified that he had drug relationships with

12    Mr. Gardner and Mr. Mitchell during the 1990's and into the

13    2000's.

14         THE COURT:  Was he the Catonsville?

15         MR. HANLON:  He was one of the Catonsville group.

16    Catonsville comes up in his testimony, but some other

17    neighborhoods as well.

18         He dealt drugs with the various defendants, knew all of

19    them.  He testified to taking trips to New York with Mr. Martin

20    and Mr. Gardner.  He testified that Mr. Mitchell came along on

21    one of the trips to New York.  But Mr. Bacon did not say that Mr.

22    Mitchell engaged in any drug activity on that trip.  We heard

23    from Mr. Montgomery about some drug activity on the New York

24    trip.

25         Mr. Bacon also testified about planning and carrying

1    out robberies with Mr. Gardner and Mr. Martin.  He described some

2    instances where they would jump out on people to shake them down

3    for money.  Maybe somebody would wait in the car while Mr. Bacon

4    did it.

5              THE COURT:  Right.  Right.  There was that one incident

6    in particular where somebody stayed in the car, Mr. Martin stayed

7    in the car?

8              MR. HANLON:  Yes, Your Honor.

9              THE COURT:  And Bacon and Gardner jumped out on

10   somebody?

11             MR. HANLON:  Memory serves, yes, Your Honor.  He

12   basically, essentially, provides some body and some background to

13   the case.  He does not testify --

14             THE COURT:  -- to any to discrete charged incident,

15   does he?

16             MR. HANLON:  No.  He's locked up for most of the time.

17             THE COURT:  Does he testify to any of the racketeering

18   act or any of the substantive counts?

19             MR. HANLON:  He provides one piece of testimony that's

20   relevant to the Hammerjacks case, Your Honor.  He testifies that

21   in 2002, Mr. Gardner and Mr. Martin went to visit him.  He was

22   incarcerated.  And Mr. Martin and Mr. Gardner go out to visit him

23   and warn him that Bo's had some trouble and Bo could be in

24   trouble, and they wanted to advise him.  That's the closest it

25   ever gets.

1            Later on he has some conversation -- this is in the

2    wake of the Wyche murder.  Mr. Martin, Mr. Gardner again a pay

3    him a visit and they mentioned to him that Claudus Lassiter had

4    put their names, Gardner and Martin, Gardner and Martin in the,

5    in the Wyche investigation.  That's really the closest that Mr.

6    Bacon ever comes.  He was adamant on the stand that he had no

7    real information to provide about whether or not any of these

8    defendants did any of these murders.

9            THE COURT:  Right.  Okay.  Thank you, Mr. Hanlon.

10           MR. COBURN:  But, Your Honor, leaving the murders to

11   one side, even if Bacon is not the key witness with respect to

12   any of the five homicides in this case, I mean, he is either a or

13   the key witness with respect to kind of the long history of

14   alleged drug dealing by Mr. Gardner, particularly Mr. Gardner and

15   others, which are, they are predicate acts in the indictment.  I

16   mean, they're --

17           THE COURT:  And I think he's been fully examined on

18   those issues.  Look, I'm going to go ahead and issue the warrant

19   if you want me to issue the warrant.

20           MR. COBURN:  I do request it.

21           THE COURT:  I don't believe I'm going to postpone the

22   trial if they can't pick him up today.

23           MR. COBURN:  Hopefully, they will.  Agent Klas, I

24   think, has some information in terms of where he can be located.

25   Hopefully, there can be some communication with the marshals

1    about that.

2              And then the only other thing I think I need to be

3    bothering Your Honor with this morning is, I don't know if Your

4    Honor needs to resolve it at this particular second, but there

5    is --

6              THE COURT:  The expert?

7              MR. COBURN:  Exactly.

8              THE COURT:  Okay.  So I thought I signalled pretty

9    clearly last week that I was not going to admit the evidence.

10   But I didn't hear any argument on it.  Do you have something new?

11   I know you filed a couple of things in the last several days.

12             MR. COBURN:  I did.  I thought what Your Honor --

13             THE COURT:  Frame the issue for me.

14             MR. COBURN:  I will.  Just preliminarily, if I could,

15   very quickly.  I think what Your Honor was referring to last week

16   was when I made a proffer that I had a witness or two witnesses

17   who were, who were going to say that with respect to

18   bullet-to-bullet comparisons of expended to form projectiles,

19   that can't be done.  And Your Honor responded by saying, I'm not

20   going to let that testimony in because I've got an expert here

21   who's actually looked at the evidence, with demonstrable

22   expertise, so on, so forth.  So what I tried to do was to scale

23   it back.

24             I tried to meet that issue by saying that all I would

25   elicit, all I would seek to elicit from this particular professor

1    at John Jay College in New York is essentially testimony

2    authenticating the substance of my cross examination of Mr.

3    Ensor.  In other words, you know, she would testify about kind of

4    the inherent, intrinsic difficulties with respect to firearms

5    comparison, the fact that it's not quantitative, that there

6    aren't standards.  You know, the fact that, you know, there's

7    never been any research in terms of the unique quality of tool

8    marks and the fact that, you know -- what are they called -- I

9    mean, classification characteristics get mixed up with, you know,

10   the more unique characteristics.  I'm not using the right

11   terminology.

12         But it's this kind of thing.  But she would not express

13   any direct opinion with respect to these particular projectiles.

14   I wouldn't even show them to her.  She wouldn't say, this can't

15   be done.

16         So I was hoping that that would, you know, that would

17   address at least some of the Court's concern and seems, to me it

18   seems relatively innocuous.  It's been an issue that's been in

19   this case for a long time, at least since I filed the Daubert

20   motion and furnished parts of, or virtually all, I think, of the

21   record in Judge Rakoff's case to all parties and to the Court.

22         And I do have some issues in terms of the, which I

23   think Your Honor is already aware of, the sufficiency of the Rule

24   16 notice and 404, the fact that there was no 404(b) notice with

25   respect to Eric Lee.

1          I think when it's all put together that it would be, I

2   mean, I think it would be appropriate and important for the Court

3   to allow me to present this.

4          THE COURT:  This modified proffer that you just made

5   really sounds to me like Daubert evidence on admissibility, not

6   weight evidence before a jury.  I mean, I realize there may be a

7   fuzzy line between those two.

8          MR. COBURN:  I think sometimes there isn't a line.  I

9   mean --

10         THE COURT:  What I hear you saying is that she's going

11  to come in and not contradict or refute the government's

12  ballistics expert that she, the government ballistics expert did

13  what she said she did.  But you want your witness to come in and

14  say, but that's really hard to do.

15         MR. COBURN:  Well, she would refute it, actually.  She

16  wouldn't refute it, in other words, she wouldn't be looking at

17  the projectiles.

18         THE COURT:  Right.

19         MR. COBURN:  And she wouldn't say, you know, a

20  comparison between these expended projectiles versus these, that

21  can't be done.  Would not say that.

22         THE COURT:  Right.  She wants to say that doing this is

23  hard.

24         MR. COBURN:  Not just that it's hard.  What she would

25  do, Your Honor, I think, is that she would cut down the level of

1    certainty, and that would contradict the government's, both the

2    government's ballistics experts.

3              THE COURT:  Cut down the level of certainty by saying

4    it's really hard and you got to be good to do that.

5              MR. COBURN:  No.  It's more than that, Your Honor.

6              THE COURT:  What's the more?

7              MR. COBURN:  Can I borrow, can I run over and grab my

8    computer, Your Honor?

9              THE COURT:  Of course.  Let me hear from Mr. Hanlon

10   while you do that.  I think the agent wants to speak to you

11   briefly.

12             MR. HANLON:  Your Honor, the government's concern here

13   is that we've gone from, Mr. Coburn talks about this is a scaling

14   down of the opinion.  We've gone from, on Friday, we were going

15   to have a discrete opinion about squished fragments in this case

16   to now a critique of the entire science of firearms examination.

17   This is now 48 hours before the close of the defense case, after

18   discovery for four years.

19             The government, if I'd had Rule 16 of this prior to the

20   trial or prior to --

21             THE COURT:  That's really your principal point, isn't

22   it?

23             MR. HANLON:  It's a principal point, Your Honor, and

24   yes, that is a principal point.  If I'd had notice of this prior

25   to the trial or even before my witness took the stand, I would

1   have asked the witness about these points.  We're told that one

2   of the points the defense wants to make is that studies have

3   never been done.  Actually, some of my witnesses would have

4   testified, if asked, that studies have been done.  Well, then,

5   what kind of studies?  It raises all kind of issues that I would

6   have anticipated.  I was entitled to anticipate them in my

7   analysis.

8              We're now, after four years of discovery, we are

9   literally about to launch into a full-scale Daubertesque hearing

10  about the science of firearms examination.  That's not a scaling

11  back.  That's an explosion.

12             THE COURT:  Daubertesque, is that with a hyphen or

13  without?

14             MR. HANLON:  That's no hyphen, Your Honor.  It's a

15  Hanlonian term.  The government opposes it just on basic notice

16  ground.

17             THE COURT:  All right.  By the way, Mr. Hanlon, and I

18  guess I can ask Mr. Coburn, who is this professor?  Is she a

19  former law enforcement officer?

20             MR. COBURN:  No.

21             THE COURT:  What is she a former of?  I mean, what is

22  she formerly?

23             MR. HANLON:  Former associate in a law firm, Your

24  Honor.

25             MR. COBURN:  That's probably pretty much right, Your

1    Honor.

2              THE COURT:  Former associate in a law firm?

3              MR. COBURN:  She's been a professor at John Jay for a

4    long, long time, and has studied this over many, many years.  She

5    teaches forensics courses.  John Jay is a college in New York,

6    I'm sure Your Honor knows --

7              THE COURT:  I have a neighbor who's a professor who

8    actually commutes.

9              MR. COBURN:  I mean, she has made just an

10   extraordinarily extensive study of this area over many years.

11             THE COURT:  What has she done?

12             MR. COBURN:  What has she done?

13             THE COURT:  Yeah.  Other than read about it and talk to

14   people about it?

15             MR. COBURN:  Well, she's read about it.  She's talked

16   to people about it.  She's written about it.  She's taught it.  I

17   mean, she's done all those things.

18             THE COURT:  She ever fired a gun?

19             MR. COBURN:  I don't know the answer to that question,

20   Your Honor.  I mean, I suspect she has fired a gun.

21             THE COURT:  Why do you suspect that?  Because she lives

22   in New York?

23             MR. COBURN:  Well, I'm from New York, Your Honor.  And

24   of course, I have fired a gun, too.  But you know, it's, I mean,

25   she has, you know, the kind of expertise which typically would,

1    she's qualified ten times as an expert.

2              THE COURT:  What do you say about the, about the, about

3    the -- she's qualified on what?  In what?

4              MR. COBURN:  As an expert with respect to firearms and

5    tool mark identification.

6              THE COURT:  In what courts?

7              MR. COBURN:  That I don't know, Your Honor.  I suspect

8    mostly New York.

9              THE COURT:  She testified in front of Judge Rakoff?

10             MR. COBURN:  I believe she did.  I'm not certain about

11   that.  I know she wrote an affidavit.

12             THE COURT:  All right.  And what do you say about the

13   notice?

14             MR. COBURN:  Well, and I just want to preface this,

15   Your Honor, by saying, look, you know, I think I've got an

16   excellent relationship with the prosecutors in this case.  I

17   know, I know that there's no, there's nothing, no intentionality

18   with respect to this issue on their part.  But as I detailed a

19   couple times in the papers here, there is a problem with respect

20   to Rule 16 notice, and I'm talking specifically with respect to

21   Karen Sullivan.

22             All there is, there's no notice under Rule 16 provided

23   by the government ever prior to trial in this case of the

24   substance of the opinion testimony that they seek to elicit from

25   her.  All there is, which I attached to something that I filed,

```
1    is one shred of paper referring to kind of unidentified, you

2    know, something called BF-1.  Doesn't even say what BF-1 is.

3            I mean, from my point of view, Your Honor, and we're

4    talking here about uncharged conduct.

5            THE COURT:  How was her testimony different from the

6    other ballistics?

7            MR. COBURN:  The other guy, first of all, there's a lot

8    more paper with respect to Ensor.  And Ensor is talking about a

9    charged offense.

10           THE COURT:  Yeah.  I understand that.  But when you cut

11   to the chase, how is Sullivan's testimony different from the

12   other ballistics?

13           MR. COBURN:  Well, if you're talking about the actual

14   substance of what they said in the courtroom, it is different.

15           THE COURT:  In what sense?  I'm talking now in respect

16   to the Lee shooting.

17           MR. COBURN:  It's different in the sense that what

18   she's -- what he's talking about is matching shell, what Ensor

19   testifies about is matching a series of shell casings to a

20   recovered gun.

21           THE COURT:  Right.

22           MR. COBURN:  That's one thing.

23           THE COURT:  In contrast to Sullivan.

24           MR. COBURN:  In contrast to Sullivan who's talking

25   about they don't have the gun.  She's talking about matching a
```

1    bunch of squashed expended projectiles from one scene to a bunch

2    of, if I understand correctly, to a bunch of squashed expended

3    projectiles from another scene.

4            THE COURT:  Which she said were fired by the same

5    weapon.

6            MR. COBURN:  She did.

7            THE COURT:  So what's the relevance of they don't have

8    the gun?

9            MR. COBURN:  Well, that's one thing, actually, if Your

10   Honor were to allow it, that this expert would testify to.

11           THE COURT:  What's the relevance of the fact that the

12   government doesn't have the gun?  If she says this projectile and

13   this projectile came from the same weapon, who cares where the

14   weapon is?

15           MR. COBURN:  I wish I was a little more literate in the

16   science and could give Your Honor the kind of answer that the

17   Court really deserves to that question.  But I can tell Your

18   Honor that this professor would say that with respect to even the

19   level of reliability that's assigned generally to this kind of

20   testimony, it's much, it's much worse.  It's much less probable.

21   You know, I mean, the accuracy issue is much, is much more

22   egregious with respect to expended bullet-to-bullet comparisons

23   versus the kind of thing Ensor was testifying to.

24           THE COURT:  Okay.  Anything else, Mr. Coburn, on that?

25           MR. COBURN:  Well, there's also the absence of Rule

1    404(b) evidence concerning the Lee matter.

2              THE COURT:  Well, but --

3              MR. COBURN:  I don't mean to, and again, I really don't

4    want to point the finger.  The only reason I'm pointing it is

5    because they're pointing it at me.

6              THE COURT:  I understand you're pointing the finger

7    because they're standing on the rule when I hear you saying,

8    Well, judge, I didn't.  And that's not the way it works.

9              MR. COBURN:  I'm sorry.  I didn't catch the last thing

10   you said, Your Honor.

11             THE COURT:  In other words, I'm asking you why you

12   didn't provide notice.  And your answer so far has been, well,

13   Judge, they didn't provide notice.

14             MR. COBURN:  And that's why I couldn't.  And I'll tell

15   Your Honor in all candor, I think it's important for me to say

16   this on the record right now.  You know, I looked through all

17   this paper and I did not have anything approaching a clear

18   understanding of this kind of three way triangulated link that

19   the government is trying to prove up in this case connecting the

20   Spence homicide with the Lee homicide with the Wyche homicide

21   indirectly.  I just didn't have a good understanding of it

22   because I didn't get that notice.

23             THE COURT:  Okay.  Well, when did you first learn that

24   that was part of the government's submission?

25             MR. COBURN:  I knew at some point pretrial that there

1    was a link that existed out there -- and this is from our own

2    investigation.

3              THE COURT:  2008, 2007, or 2006?  When did you learn?

4              MR. COBURN:  It was before 2008 that I knew, that I

5    knew that the first link existed between the Spence murder

6    weapon, or rather, the secondary Spence weapon and another

7    homicide of somebody called Eric Lee.

8              But in terms of the other prong of it, the other part

9    linking, you know, Wyche to the Lee homicide, I don't recall

10   having anything like an understanding about that until this trial

11   started.

12             THE COURT:  All right.  Let me hear from Mr. Hanlon or

13   Mr. Harding as to when that discovery was produced.

14             MR. HANLON:  I don't have the exact dates, Your Honor.

15   But in April of 2004, we sent copies of Mark Ensor's reports and

16   Karen Sullivan's reports to the defense.  Mark Ensor's reports

17   reflected -- Mark Ensor's may have come later than 2004, Your

18   Honor, come to think of it, but Sullivan's were in 2004.  All the

19   discovery was made certainly by the beginning of '06.  We

20   produced the CV's in '06.

21             Ensor's reports, which the Court is aware of and which

22   Mr. Coburn is not disputing, I think, reference comparisons made

23   between cases by the respective criminal complaint numbers,

24   Baltimore City, Baltimore County.

25             Karen Sullivan's report is one of the simplest forensic

23

1    reports I've ever read.  It has one line saying, I looked at

2    these items from Baltimore City Case Number something, which was

3    the Lee, I looked at these items from some, Case Number

4    something, which is Wyche, and they matched.  I'm paraphrasing,

5    of course.  They were bullet fragments and shell casings, as I

6    recollect.  That's the connection, Your Honor.

7          I don't think that there's been any secret of the

8    government's intention to join the Spence and the Wyche case

9    through the Lee case throughout the life of this trial.  The

10   notion that there's been insufficient discovery is just

11   absolutely insupportable.

12         And I note, Your Honor, that Mr. Coburn's, what he

13   calls the scaled down approach, which is really to attack all

14   firearms examination, would not have been hindered by any lack of

15   discovery.  He certainly knew there was going to be firearms

16   examination.

17         So what I call the expanded, what he calls the scaled

18   down approach, the failure to give discovery about that is not

19   even explained even if there had been a defect in the

20   government's notices, which there hasn't been.

21         The defects Mr. Coburn complains of are more relevant

22   to what he was trying to do last week, which was to take what he

23   didn't understand to be a bullet fragment, even though if it was

24   called BF-1 -- and by the way, Your Honor these reports have a, I

25   believe, have a little guide at the bottom.

1          THE COURT:  A key?

2          MR. HANLON:  Says BF equals this, so forth.  I really

3   am taken aback that there's a suggestion there's been any lack of

4   discovery in this case.

5          THE COURT:  Okay.  Is there any other discovery on the

6   Lee shooting other than the ballistics?  Any statements or --

7          MR. HARDING:  Judge, you remember Kenny Welsh, the

8   detective, testified.  We turned over all of his reports as

9   Jencks material pretrial.

10          THE COURT:  He was the lead detective on the Lee

11   shooting?

12          MR. HARDING:  Yes.  He testified in this trial.  So it

13   was obvious that we were going to establish the link.

14          THE COURT:  Okay.  But you didn't have any witness

15   statements identifying the shooters in the Lee?

16          MR. HARDING:  No.

17          THE COURT:  Okay.

18          MR. HARDING:  That's why we never charged it.

19          THE COURT:  Okay.

20          MR. COBURN:  I actually don't recall about there being

21   anything about BF-1 equals anything.  This is like a cipher.  I

22   mean, that's what it was to me, basically.  Frankly, Your Honor,

23   it would have been better for me to say, for me to call on the

24   prosecutor at some point and say, you know, what the heck is

25   BF-1, and I wish I had.  But by the same token, Rule 16 puts an

1   obligation on them to furnish me, you know, with a fairly

2   detailed, you know, substance of the testimony and so on.  And

3   they're conceding that didn't happen.

4            THE COURT:  Well, you know, Mr. Coburn, and I don't say

5   this unkindly, but I have to say it because it's one of the

6   elephants in the room, is the history here is that you and Mr.

7   Kurland were scheduled for trial in, what?  September, '05?  Or

8   September, '06?

9            MR. MARTIN:  March or April.  Spring.

10           THE COURT:  It was the fall semester.

11           MR. MARTIN:  Originally, it was the spring.

12           MS. RHODES:  March, '06 it was about to go.

13           THE COURT:  Was it the spring semester, Mr. Kurland, or

14   the fall semester?

15           MR. KURLAND:  Judge, it was about two years earlier.

16   But I will say --

17           THE COURT:  But I mean, I seem to recall you always

18   slotted for the fall semester.  Is my recollection --

19           MR. KURLAND:  Judge, it's been so long and so

20   convoluted I can't say with certainty.  I just wanted to be

21   within one full semester, which the Court graciously has

22   accommodated that.  But even if it were two years ago -- I just

23   want to say one thing -- it's my recollection, and I could be

24   wrong because I hadn't focused in on this -- but had we gone to

25   trial separately I don't believe the government was prepared to

1   put on any of the Lee testimony at all in a separate trial.

2          THE COURT:  Be that as it may, my point is simply that

3   when Mr. Coburn says to the Court, I don't recall, part of the

4   burden there is the history of the missing discovery or the

5   failure to find certain discovery that was indisputably produced

6   by the government to Mr. Gardner's counsel.  And again, I'm not

7   being critical at all.  I'm certainly not intending to be.

8          But it seems pretty clear in the history of this case,

9   and I forget specifically what's on the record and what's not on

10  the record, the government produced discovery to Mr. Gardner well

11  in advance of its production to anybody else because Mr. Gardner

12  was severed and was scheduled for trial some two years ago,

13  either the spring semester or the fall semester.  And so that's

14  part of what the Court is looking at here.

15         MR. COBURN:  Well, I can understand that, Your Honor.

16  And I'm not disputing the fact that I had a Jencks production.  I

17  mean, as Your Honor knows and as I've stated a number of times

18  throughout these proceedings, I mean, you know, we tried, we made

19  extraordinary efforts to gather all that material, which had all

20  been sort of culled out into witness folders, back again and

21  provide them to our codefendants' counsel.

22         As far as I know, we did, you know.  I mean, but here

23  the issue is not so much that disclosure because here, you know,

24  what we're talking about is one sort of cryptic shred of paper

25  which does not comply.  It just unambiguously does not comply

1    with Rule 16 in terms of Sullivan's expert opinion and there

2    being no 404(b) notice.

3              I mean, you know, it seems -- and moreover, Your Honor,

4    there have been other mid-trial expert disclosures in this case.

5    You know, nobody has, you know, sort of suggested any particular

6    undue prejudice as a result.

7              THE COURT:  All right.  The Court's not going to permit

8    the testimony.  The Court finds that the rule has not been

9    complied with through no particular fault of Mr. Coburn.

10   Frankly, the whole Rakoff/Daubert ruling came about.  I credited

11   Mr. Coburn with even discovering it.  I've considered it.

12             This frankly seems to be really very much a part of

13   that; namely, really a Daubert issue.  And I appreciate, Mr.

14   Coburn, that you've tried to, as you put it, narrow or limit what

15   you want to do by way of expert testimony on the ballistics.  But

16   the Court is not satisfied that you have complied with Rule 16.

17             And furthermore, the Court, on the basis of the

18   proffer, fails to see the relevance of the evidence.  And I don't

19   mean to be flip, but it really does sound like what you want

20   Professor Schwartz to come in and say is what I said; namely,

21   that this is hard stuff, that you got to be really good to do it

22   right, and I've read a lot of material about it and I've written

23   about it.  I don't think it's going to be terribly helpful to the

24   jury at all.

25             The Court's general expert instruction, of course,

1   reminds the jury that they are not to accept an expert's opinion

2   just because it's an expert opinion, that they have to make their

3   own independent evaluation of credibility and the weight of all

4   the testimony.  And you are free to argue from a common sense

5   perspective and from the cross examination of the ballistics

6   experts that the jury should not highly credit the testimony

7   derived from the Lee homicide.

8          So that's the Court's ruling.  Your exception to the

9   ruling is preserved.

10         MR. COBURN:  Well, I appreciate Your Honor's comments

11  and also Your Honor hearing me out on it.

12         MR. KURLAND:  Your Honor, could I just put one other

13  thing on the record?

14         THE COURT:  Yes.

15         MR. KURLAND:  I am fairly certain, even though my mind

16  might have failed me on at least minor details, but with respect

17  to our preparation for the severed trial, I am fairly confident

18  that with respect to the Lee matter, the government provided no

19  404(b) notice with respect to that.  It wasn't until, I think,

20  almost at the dawn of this trial the government filed anything.

21         THE COURT:  And I have ruled.  And I reiterate my

22  ruling.  It's not 404(b) evidence.  It's not.

23         MR. KURLAND:  All right, Judge.  Thank you.

24         THE COURT:  Okay.  All right.  Ms. Rhodes.  Good

25  morning.

1          MS. RHODES:  Good morning, Your Honor.  On the Damita

2     Green issue, which is the tape that we'd asked to play for the

3     jury and to present the transcript of, Mr. Harding informed me

4     this morning that they are, they're willing to stipulate to that

5     transcript.

6          THE COURT:  I'm sorry.  Which transcript?

7          MS. RHODES:  Damita Green is the --

8          THE COURT:  No, I know who she is.  But I was a little

9     confused because it wasn't clear to me whether you were talking,

10     not just now, but even in your written materials, are you talking

11     about the police interview or are you talking about the grand

12     jury testimony?

13          MS. RHODES:  Grand jury.  They already --

14          THE COURT:  Are you talking about both?  What's the

15     government agreed should come in?

16          MS. RHODES:  Okay.  The grand jury, I already agreed.

17     They wanted it in and I agreed to that.  So that's already in.

18          THE COURT:  Is that the one we redacted or you

19     redacted?  There were certain redactions to that.

20          MS. RHODES:  Yes.  That's the one we did a couple of

21     redactions on.  Yes.

22          THE COURT:  Because you withdrew Mr. Lawlor's

23     objection.

24          MS. RHODES:  That is correct.

25          THE COURT:  Okay.  All right.

1          MS. RHODES:  Thank you for refreshing my recollection

2     on that.

3          THE COURT:  No.  You know, certain, certain benchmarks

4     help me remember what was going on.

5          MS. RHODES:  Unusual moments come to mind.

6          THE COURT:  Yes.  And all of Mr. Lawlor's moments are

7     unusual.  I had to do that, Mr. Lawlor.

8          MR. LAWLOR:  I'm just sitting here minding my own

9     business.

10          THE COURT:  So now you've agreed to the police

11     interview transcript?

12          MS. RHODES:  Well, I wanted this in.  I want --

13          THE COURT:  I'm sorry.  You want -- what's this?

14          MS. RHODES:  I wanted the police interview transcript

15     in and play the tape.  And the government has agreed to stipulate

16     to the transcript.  And I intend to play the tape today or when

17     we get to it.  But they want a couple of sentences excised.  And

18     so that's what I wanted to briefly discuss this morning.

19          THE COURT:  Because you don't?

20          MS. RHODES:  I prefer to have them in.

21          THE COURT:  All right.  Do you have a copy of the

22     transcript that I can look at when you --

23          MS. RHODES:  Yes, Your Honor.

24          THE COURT:  Thank you.

25          MS. RHODES:  You will also notice, Your Honor, this is

1   marked at the top as a defense exhibit because we have, this is a

2   slightly modified transcript.  In other words, we've inserted

3   some things that we think are missing from the tape recording.

4   That's kind of a separate issue.  I don't think the government

5   has a problem with that.  But that's --

6            THE COURT:  Let's make sure.  Whose witness was Ms.

7   Green?  Mr. Hanlon.  All right, Mr. Hanlon, I am holding in my

8   hand what is labeled at the top "revised transcript Mitchell

9   Exhibit Number Five."  So the question is, is that the transcript

10  that you have agreed with Ms. Rhodes should be admitted?

11           MR. HANLON:  Your Honor, I hate do this.  But Mr.

12  Harding's has been handling this little issue.  So can we -- I'm

13  sorry.

14           THE COURT:  I don't.  I don't care whether it's you or

15  Mr. Harding.  I just want the one who's handling it.

16           So my question, Mr. Harding, is just, is this the thing

17  that you've agreed should be admitted subject to Ms. Rhodes' and

18  your disagreement over one or two sentences?

19           MR. HARDING:  Yes.

20           THE COURT:  Okay.  All right.  I'm clear.  All right.

21  Ms. Rhodes, what do you want in and what is the government

22  objecting to?  By the way, Ms. Rhodes, the copy that I have has

23  interlineations.

24           MS. RHODES:  Yes.

25           THE COURT:  Is that the way it's going to go to the

1    jury?

2              MS. RHODES:  Yes, Your Honor.

3              THE COURT:  I guess there's no way to clean it up?

4              MS. RHODES:  I don't want it cleaned up.

5              THE COURT:  So how will it be explained to the jury?

6              MS. RHODES:  Well, that's part of --

7              THE COURT:  In other words --

8              MS. RHODES:  We're calling, we're calling Detective

9    Niedermeier, who is the one who --

10             THE COURT:  Prepared the transcript?

11             MS. RHODES:  Well, no, he didn't prepare the

12   transcript.  He interviewed her.  And this is, really, sort of

13   goes to something else, about how these transcripts are prepared

14   and how transcripts in general are prepared and how accurate they

15   are or are not.

16             THE COURT:  Okay.  Let me, I don't want to drag this

17   out.  But let me make sure I'm following.  Let's just take line

18   three.  Whoever prepared this transcript apparently misspelled or

19   misapprehended when she said Mollye Road, M-O-L-L-Y-E.  Whoever

20   prepared the transcript transcribed that oral statement as Marley

21   Road, M-A-R-L-E-Y.  Because you've crossed out Marley and you or

22   someone has written in Mollye, M-O-L-L-Y-E.

23             MS. RHODES:  Correct.

24             THE COURT:  And instead of Apartment 1-B, somebody has

25   crossed through the 1 so that it now says Apartment B.  What is

1    the point of giving the jury, just, this is just an example, of

2    giving a transcript that's been corrected by interlineation by

3    agreement?  What is the point of that?  What is that?

4              MS. RHODES:  Well, Your Honor, as the Court recalls

5    last time, last day we were in court, Thursday, Mr. Martin put in

6    a transcript of the voice mail that was something that they had

7    come up with, their version of it.  Okay?

8              THE COURT:  Right.

9              MS. RHODES:  In a sense, I'm doing two things at once

10   here.  And I am showing that this transcript, simply that there

11   are a lot of corrections.  In lieu of just putting in exactly

12   what the government had, I wanted to put in the corrections.

13   Some are, some are minor.  Some are, I mean, nothing is hugely

14   substantive.  But it's part of a bigger picture that I'm trying

15   to show the jury having to do with transcripts and the way people

16   hear things differently.  In other words --

17             THE COURT:  Go ahead.

18             MS. RHODES:  A number of things.  Like on, for example,

19   on page, Page Three -- actually, let me find.  Let's go to Page

20   4, about two-thirds of the way down, where Green says, the

21   interlineation initially is "yeah."  The word "yeah" was left

22   off.  It goes through, Darryl said he had to go out Essex, and he

23   said he had to go over, he said he had to go over east Baltimore.

24   Then he had to go back over West Baltimore.  And they have an

25   "it's" twice below.  It's just to show the jury that it's easy

1    to, even for somebody who works for the police department, knows

2    what they're doing, to make mistakes like this as they're

3    transcribing.  It's an illustration for the issue having to do

4    with the voice mail transcript.  And there are a number of these.

5         THE COURT:  Okay.  I mean, if the government doesn't

6    care, I suppose I shouldn't care too much.

7         MR. HARDING:  Your Honor, we do, we do care about the

8    interlineations issue.  This is the first I've heard of it.  This

9    is the first I've heard that one of the purposes was to attack

10   transcript preparation.

11        THE COURT:  Okay.

12        MR. HARDING:  And she flashed her interlineated version

13   in front of my eyes this morning but I really never even focused

14   on the fact that she was making insertions into the transcript.

15        MS. RHODES:  You specifically asked me if that's what I

16   was doing and I said yes.

17        THE COURT:  Okay.  There was, there was a

18   misunderstanding.

19        MS. RHODES:  Okay.

20        THE COURT:  Okay?  So Ms. Rhodes, I don't think I'm

21   going to let you do it.  But I'm going to hear you fully.  It's

22   one thing Mr. Martin, Mr. Flannery, quite appropriately, created

23   their own transcript.  And any defendant is entitled to offer an

24   alternative transcript, as are you.  And I appreciate if there's

25   not a word processing version of this somewhere that you can

1   quickly fix.  But I really hesitate to burden the jury with this

2   kind of edited document.  I mean, I appreciate you trying to show

3   that, consistent with the Court's instruction, that the

4   transcript is not the evidence, that it's the actual tape.  And

5   we've all the seen in other trials, and certainly in this one,

6   you're sitting there, you're reading through the transcript, even

7   on the voice mail, you could hear things that weren't showing up

8   in the transcript.

9        So it is, it is perfectly obvious that nearly any

10  transcript is going to vary somewhat from what you actually hear

11  on the tape.

12       So is there a word processing version of this somewhere

13  nearby, Mr. Harding?

14       MR. HARDING:  Well, one, you can simply take this typed

15  page and scan it, Your Honor.  That's what, that's what my,

16  that's what I did with one of the other transcripts.  You scan it

17  and then you make the changes yourself.  So this uninterlineated

18  version could be scanned in a matter of minutes and then we'd

19  have a Word Perfect version of it.

20       THE COURT:  You must have a good scanner because mine

21  doesn't work quite that well.  It's a pretty labor intensive,

22  when we tried to do it, it's very labor intensive to change a

23  scanned document.

24       MS. RHODES:  Mine as well.  If I could just continue

25  on.

36

1          THE COURT:  I suppose if you have the professional

2     version of Acrobat it's easier.  But anyway, go ahead, Ms.

3     Rhodes.

4          MS. RHODES:  Thank you, Your Honor.  The point, I mean,

5     it was not for lack of time or word processing that I did it this

6     way.  It is to show the jury how easy it is to misunderstand.

7          THE COURT:  But this is not the way to do that.  The

8     way to do that, in my opinion, is to create your own transcript,

9     not an interlineated, edited version of the government's

10    transcript, but create your own transcript and play the tape and

11    let the jury read your version of the transcript.

12          Now, I'm not even sure I would permit you, I suppose I

13    would, but if you were to say to me, Judge, I want the jury to

14    hold up, like, say, during closing argument, I want the jury to

15    hold up the two copies of the transcript and I want the jury to

16    compare our version with the government's version, I'm not sure

17    I'd permit you to do that because the transcript is not in

18    evidence.  It's not in evidence.  It's simply an aid to the

19    jury's listening to the tape.

20          MS. RHODES:  But in this case it will be in evidence.

21          THE COURT:  What?

22          MS. RHODES:  In this case it will be in evidence

23    because it's coming in --

24          THE COURT:  That's particularly why you should create

25    your own version or the government and the defense together agree

1    on a version.  But right now, we don't have an agreed version of

2    the transcript.

3            MS. RHODES:  Okay.

4            THE COURT:  The government's version of, the

5    government's version of the transcript is not in evidence.

6            MS. RHODES:  No, it's not now.  That's why I'm asking

7    to get in with corrections.  Your Honor, can I just explain the

8    whole picture?

9            THE COURT:  Go ahead.  Sure.

10           MS. RHODES:  Okay.  And perhaps it's just confusing me

11   because we're doing two things at once.

12           THE COURT:  Right.  Right.

13           MS. RHODES:  First, if we just look at the government's

14   transcript, okay?  That's over here.  They want to, maybe we

15   should get to that issue first, actually.  They want to excise a

16   couple of sentences.  Okay?  And their concern is that these are

17   sentences on Page Two, starting at the end of the first long

18   paragraph of Ms. Green, where it says, um, present with him was

19   Anthony Wyche and Shabazz, otherwise known as Deezo.  All three

20   of them left together and they got in the same car and they never

21   came back.  They dropped Deezo off, though.  I know they dropped

22   him off.

23           Starting around the middle of that sentence, I think

24   that all three of them left together and they got in the same

25   car, is what the government objects to, through Niedermeier's

1    question, How do you know they dropped Deezo off?  To Green's

2    next answer, Because he wasn't with them.  I know that they had

3    to drop him off because otherwise he would have drove.  He

4    wouldn't have got Anthony to drive him.

5           The government's position, according to Mr. Harding

6    this morning, is that that's speculative.

7           THE COURT:  Clearly it is.

8           MS. RHODES:  And that therefore it shouldn't come in.

9           THE COURT:  Right.

10          MS. RHODES:  But if we turn the page to Page 4, just

11    before that, the bottom of Three, Niedermeier says, Detective

12    Patton, do you have any questions?  And Detective Patton says,

13    you said they dropped off another person?  And she says, uh-huh.

14    Patton:  But you don't know that for certain, though?  Did you

15    talk to that person, Deezo, you said?  No, I didn't talk to him

16    personally and ask him.

17           The issue is effectively cross examined.  I mean, it's

18    clear that she didn't know for a fact.

19          And the reason that this is significant, and the Court

20    recalls, of course, she had no recollection whatsoever of

21    anything she had told or almost anything she had told the grand

22    jury or the detectives, is that Deezo contradicted this, what she

23    says about whether Anthony would have driven or not.  And so I

24    think this is important for us to get in, that she said something

25    that was the opposite of what Deezo said.

1          THE COURT:  Okay.  I'm afraid I agree with the

2     government.  The fact that Patton comes along several minutes

3     later and asked her a question that permits her to back off some

4     speculative assertion that she made a few pages earlier doesn't

5     cure the problem.  That's why this transcript isn't --

6          MS. RHODES:  Well, in the grand jury, she then says,

7     she then says something to the effect of, I don't know.

8          THE COURT:  You see, that -- I'm sorry.  Go ahead.

9          MS. RHODES:  And so I think that what we're, I can't

10    cross examine her because she remembers nothing.  So I think I'm

11    entitled to have in what, what I would have crossed her with.

12    This would have been the impeachment, then.  And so this is

13    impeachment within something that's coming in as past

14    recollection recorded.

15          THE COURT:  But you did impeach her.

16          MS. RHODES:  No.  The Court specifically said that what

17    I was doing was not impeachment because she had no recollection.

18          THE COURT:  But you impeached her by simply attempting

19    to refresh her recollection.  That's impeachment as well.  In

20    other words, during your cross examination you asked her about

21    who got in the car and so forth and so on.  And she said, I don't

22    remember.

23          Now -- you did.  And so --

24          MS. RHODES:  Your Honor, I don't remember if I asked

25    this particular question.  But the ruling, but the ruling was it

1    was not impeachment.  You ruled it's not impeachment if she has

2    no recollection.  And that's how we got into this question.

3              THE COURT:  But you still questioned her about it.

4              MS. RHODES:  Not everything, not everything in here.

5              THE COURT:  Well, Ms. Rhodes, I didn't tell you what

6    questions to ask.  My recollection is that you wanted the grand

7    jury transcript admitted under the rule as substantive evidence.

8    Mr. Lawlor had previously made an objection, before you began

9    your cross examination of Ms. Green, which the Court sustained.

10             And then when you did your cross examination, when the

11   witness' recollection failed and you couldn't refresh her

12   recollection, you wanted to introduce the transcript as

13   substantive evidence under the rule.  And my response was, Do you

14   want to withdraw your objection?  And you said, Yes, I'll

15   withdraw Mr. Lawlor's objection.

16             Thereafter, you and the government reached agreement to

17   admit the grand jury testimony as substantive evidence with

18   certain redactions.  So that's where it was.

19             Now -- correct me if I'm wrong -- now we're going

20   backwards further past the grand jury transcript stage.  Now

21   we're looking at the interview of the investigating detectives,

22   which was recorded and now transcribed.

23             And if I'm following you, there were certain things

24   that either she didn't say or her recollection simply failed when

25   she testified in the grand jury.  So now you want to go back and

1    you want to put in the statement to the detectives as substantive

2    evidence.  Right?

3              MS. RHODES:  Correct.

4              THE COURT:  And the government's position is, okay,

5    we'll agree to that, but we're not going to agree to the

6    manifestly speculative statements that she made to the

7    detectives, which, as you just pointed out, in fact, even within

8    the same interview, she contradicted herself.

9              So I'm not going to admit that portion of it.  But for

10   purposes of your cross examination, I understand what you are

11   saying.  I think I do.  She wasn't impeached through the use of

12   the grand jury testimony in terms.  But those statements that she

13   allegedly made both before the grand jury, and I believe the

14   record will speak for itself, I believe you actually used the

15   transcript of her interview with the detectives to question her.

16             Do you remember saying to the detectives so forth and

17   so on?  She said, no, I don't.  Well, the jury heard that.  So

18   yes, if the jury correctly follows my instructions on prior

19   inconsistent statements, the jury won't infer that she was lying

20   in the courtroom because she couldn't remember something that she

21   allegedly said to the detectives.  But the jury having heard your

22   good faith basis for questioning her about that statement, and

23   the jury saw that you had a transcript of the statement, and if

24   I'm not mistaken a portion of her, am I correct that a portion of

25   the recorded statement was played to the jury?

42

1              MS. RHODES:  No.

2              THE COURT:  No?  Okay.  So that's my point.  Sorry to

3      be so long winded.  But it's all in front of the jury.

4              MS. RHODES:  Okay.  So issue two then.

5              THE COURT:  Well, is there a second statement that the

6      government is objecting to?  Or is that the only one?  I mean,

7      those are two separate statements, I think.  Because the

8      government is saying, the government doesn't want in the middle

9      of Page Two or the sort of, quote-unquote, "correction" to that.

10             MS. RHODES:  I don't know what their position is on the

11     correction.

12             THE COURT:  Well, would you want the correction in if

13     the Court keeps out the original speculation?

14             MS. RHODES:  Yes, I would still want the correction in.

15             THE COURT:  Mr. Harding, do you care about pages,

16     bottom of Page 3, top of Page 4?  I guess it's really top of Page

17     4.

18             MR. HARDING:  Well, I guess I have to say I want that

19     out because it would be very confusing.

20             THE COURT:  I agree.  I agree.  So we would delete the

21     first four lines of four and all that portion of Page Three after

22     she says, All three of them left together, down to Niedermeier's

23     question, Approximately what time did they leave?

24             MS. RHODES:  Page Two you mean, I think.

25             THE COURT:  On Page Two, yes.  Okay.

1          MS. RHODES:  All right.  So the second issue, Your

2     Honor, is just that I thought that it would be, first of all,

3     cumbersome for the jury to have two transcripts, the government

4     one and then one with minor changes, and simpler for them to see

5     what the changes are if it were done by interlineation.  And I

6     think I'm entitled to show what the differences are.

7          I mean, in the case of what Mr. Martin has done with

8     the voice mail transcript, the jury will have to look at both to

9     see what the differences are.  I mean, that's just, they should

10    be doing that.  That doesn't mean one is right and one is wrong.

11         THE COURT:  Of course.  And I think the difference

12    here, one difference clearly is that Mr. Martin's, Mr. Martin

13    made substantive changes to the transcript.  I mean, substantive

14    changes.  What you've done here, and I salute you, obviously, I

15    don't know if you're right or if the transcript is right, but I

16    take you at your word that there was quite a bit of stuff, and I

17    have to say, by the way, I don't think I've ever had a trial

18    where I agreed 100% with the transcript, at least not since my

19    hearing started to fade a few years ago.  Or before then.

20         I'm trying to think of a way you can achieve what you

21    want to achieve, Ms. Rhodes.  I will tell you in all honesty one

22    of the things that bothers me the most is the editing marks in

23    the margin.  We all do that and it's very helpful.  But I'm not

24    going to give this to the jury with those check marks in the

25    margin.  It's just clutter.  It's noise.  And the jury's got a

1    hard enough job in this case.

2          Now, if you wanted to go through, I think, if you

3    wanted to go through in like a red pen -- Mr. Harding is shaking

4    his head -- but if you wanted to go through with like a red felt

5    tip, and whichever one of you over there has the best

6    handprinting, if you wanted to try to make some, I don't know,

7    half dozen or so of the major changes, I might permit you to do

8    that.  But, you know, I'm not going to --

9          MS. RHODES:  Well, I need to excise the part coming

10   out --

11         THE COURT:  Just to show you what I'm getting at.  Page

12   Seven, you added a T to the word "mean" so that it reads "meant"

13   and you struck the word "that" and you inserted U-H for uh.  So I

14   don't seed the benefit of putting in grunts.

15         MS. RHODES:  Your Honor, this case rises and falls on

16   the voice mail and I am making a comparison to the voice mail

17   transcript here.  It's demonstrative of the kind of thing that

18   people do when they listen to tapes.  And that's what it's about.

19   So uh and mean for meant, and leaving out the "and you",

20   something at the end there that was completely left off, this is

21   exactly what we're talking about in this case.

22         THE COURT:  All right.  Well, I'm sorry I just disagree

23   with you that this tape is all about the voice mail.  Frankly,

24   the significance of the voice mail has faded, in my judgment,

25   every day in this trial.  When we started, it was like the

1    centerpiece of the government's case.  And I can remember a

2    couple of years ago there were going to be all these witnesses

3    who were going to come in and identify the defendants' voices,

4    and the government didn't want to disclose the identity of the

5    witness, so I had to postpone the suppression hearings on the

6    voice identifications until the trial.  And that's part of the

7    reason now why we're sitting here on November 17th in what the

8    government said was going to take 12 trial days to put on its

9    case, here we are November 17th, a week and a half before

10   Thanksgiving, and we're desperately trying to get to the end of

11   it.

12              So the voice mail, frankly, is there and the jury will,

13   I suspect, listen to it several times during deliberations.  Who

14   knows whose voice is on that tape?  Certainly, the name "Wayne"

15   is spoken and "Shorty" is spoken.  And a couple of people,

16   particularly Mr. Hayes, seems to be well positioned to identify a

17   couple of voices on that tape.  But this case is not all about

18   the tape.

19              MS. RHODES:  Your Honor, I think that's something, a

20   decision that we on behalf of our client are entitled to make,

21   what is important.  And what's important for us to put in as part

22   of our defense.

23              THE COURT:  Of course.  Of course.

24              MS. RHODES:  And this is a way of doing that.

25              THE COURT:  Okay.  Well, let me hear from Mr. Harding.

1          MR. HARDING:  Crucially, Your Honor, this transcript is

2     not the government's transcript.

3          THE COURT:  You mean the one that's marked up or --

4          MR. HARDING:  The unmarked-up one is not the

5     government's transcript.  It was prepared by a secretary in the

6     police department.  It was not introduced into evidence.  We did

7     not play this tape for the jury.  It's not part of this case.  We

8     produced it to the defense in the generosity of our discovery.

9     But it's actually not even discoverable.  Only the tape is

10    discoverable.

11         THE COURT:  I think that's right.  I think that's

12    absolutely right.  If you weren't -- I mean, I think that's

13    absolutely right.

14         MR. HARDING:  Ms. Rhodes is now trying to create a

15    battle of transcripts.  She's trying to pit her transcript

16    against a transcript that is something produced over in the

17    police department years ago by a woman who's not a witness in

18    this case, and she's trying to make points.  But they're

19    completely irrelevant and she might just as well have gotten

20    somebody off the street to prepare a sort of straw man transcript

21    for her to attack.  This is not something the government has ever

22    sponsored.

23         THE COURT:  Thanks for reminding me of that, Mr.

24    Harding.  I mean, Mr. Harding, is your recollection the same as

25    mine?  That Ms. Rhodes did, in fact, use the transcript in her

1    cross examination of Ms. Green?  Or if you don't remember, that's

2    fine.

3             MR. HARDING:  I can't say that I specifically remember

4    that, Your Honor.  But I have one other point to make in

5    connection with the previous issue, which goes to why we're so

6    clear that this was speculation on the part of Damita Green.

7             In the grand jury on Page 11, she was asked, did you

8    see them leave together in the same car or did you just not see

9    them after they walked out the door?  Answer:  I didn't see them

10   after they walked out the door.

11            She didn't realize that Deezo had driven to Brandy's

12   apartment house to meet Darius, Darryl Wyche that night before

13   they went off to Washington.  She thought, she just assumed that

14   the Wyches were going to drop him off, not realizing that his car

15   was right there.  And that's the basis for her false assumption.

16            THE COURT:  All right.  Thank you, Mr. Harding.  Ms.

17   Rhodes, I have to say, I now have --

18            MS. RHODES:  Can I just add one thing, Your Honor, to

19   this?

20            THE COURT:  I'm going to permit you.  But just let me

21   say, because Mr. Harding really has brought me back to ground.

22   In fact, the government didn't use the transcript.  The jury's

23   never seen this transcript.  The government's not vouching for

24   this transcript.  So far as I can tell, the government never

25   intended to use transcript at trial.  And I think Mr. Harding is

48

1    absolutely right, the defense was not entitled to receive this

2    transcript.  Absolutely.  The statement is the recorded

3    statement.

4            And so it's perfectly clear now that you're not

5    entitled to put in this transcript.  Now, the government's agreed

6    to the admission of the tape.  And so I assume, Mr. Harding, the

7    government is not averse to having the jury review the transcript

8    while it listens to the tape, I mean the unedited but redacted --

9            MR. HARDING:  That's correct.

10           THE COURT:  -- transcript?  Okay.  All right.  I now

11   understand the issue, Ms. Rhodes, in a way that I didn't before

12   and I'm sorry wasted your time, if that's what I did.

13           MS. RHODES:  I just have to comment, Your Honor, that I

14   think it is disingenuous at best for the government to say that

15   this, some person over at the police department, we don't know

16   who, we're not vouching for her, did this, when, in fact, they

17   have already put in the transcript of Shelly Wayne Martin's

18   statement, transcribed by the very same Dolly Dobrsycki, and the

19   statement of my client transcribed by the same Dolly Dobrsycki.

20   So it seems that they do condone and support and vouch for her

21   abilities.

22           MR. HARDING:  For the record, Your Honor, we actually

23   modified those transcripts using the technique I described

24   earlier of having, having them scanned and then retyped.

25           THE COURT:  Okay.  Thank you, Mr. Harding.  All right.

49

1    So here's where we are, Ms. Rhodes.  The government agrees with

2    the redaction that the Court has ordered, Page Two and the top of

3    Page Four, to the admission of the taped interview of Ms. Green.

4    And I presume, by the way, since that's going to happen today, is

5    Niedermeier here today?

6             MS. RHODES:  We had called him for tomorrow, Your

7    Honor.

8             THE COURT:  Okay.  So it will be tomorrow.  So I assume

9    you'll have no objection to the government actually playing the

10   tape, actually working the tape, the computer?  Or not?

11            MS. RHODES:  I have the cassette to do it.

12            THE COURT:  Okay.  And you'll take care to delete those

13   portions that --

14            MS. RHODES:  Yes.  Yes.  And I will, with the Court's

15   permission, perhaps make my own transcript.  I have to think

16   about that, whether we want to use mine instead of Ms.

17   Dobrsycki's.

18            THE COURT:  Okay.  All right.  Any word from the jury

19   yet, Belinda?

20            THE CLERK:  She's here.

21            MR. KURLAND:  Two brief things.  One, after

22   consultation with Mr. Coburn, we would ask that the Court issue a

23   warrant for that witness.  You know, obviously, we would talk to

24   her.  No guarantee we would put her on.  But we certainly want

25   her to respond to the subpoena and have a chance to talk her, to

50

1    determine whether or not -- I don't want to mislead the Court and

2    say go out and have her arrested, and us not putting her on.

3    That's a possibility, if after talking to her we decide the whole

4    process has gotten her to the point that we don't think she'll be

5    a productive witness.  But we think it's necessary to get her

6    here.

7              THE COURT:  All right.  Do you have a phone number for

8    her mother?

9              MR. COBURN:  Yes, Your Honor.

10             THE COURT:  Give it to Ms. Arrington, please.

11             MR. KURLAND:  Your Honor, the other --  I'll just be

12    very brief on this.

13             THE COURT:  I'm sorry.  Can you give the phone number

14    to Ms. Arrington?

15             MR. COBURN:  Will do right now, Your Honor.

16             THE COURT:  And Ms. Arrington will call.  What's her

17    mother's name?  I mean, is her mother at work or something?

18    What's going on there?  You just don't know?

19             MR. COBURN:  I just don't know.

20             THE COURT:  All right.  Ms. Arrington will call and

21    I'll see if we can't avoid having to arrest.  She's 17 years old?

22             MR. COBURN:  I believe that's right.  I appreciate that

23    very much, Your Honor.

24             THE COURT:  Yes.

25             MR. KURLAND:  One other matter, again.  This comes up

1    with respect to how these grand jury transcripts that were just

2    discussed are being handled differently.  I just wanted for

3    clarification to, because this is obviously going to be important

4    with respect to closing arguments.  Several witnesses earlier

5    testified in this trial and their grand jury transcripts were

6    referenced and they either affirmed or denied making those

7    statements.

8              It's my understanding, consistent with a proposed

9    instruction that I submitted, which is a standard instruction

10   concerning the use of inconsistent statement for impeachment

11   purposes and also as substantive evidence if it qualifies as

12   grand jury testimony, there's about four or five witnesses, I

13   don't intend, unless the Court says it's absolutely necessary, to

14   actually get the physical copies of the grand jury transcripts

15   that were referred to in actual examination and admit them as

16   extra exhibits.  But I do certainly intend to argue that based on

17   prior inconsistent statements that were shown to the witness and

18   they ratified, that that is evidence in the record, without the

19   physical piece of paper of the grand jury transcript shown on

20   DOAR, but not actually moved into evidence.  That I can argue

21   that that is substantive evidence in the case which reflects in

22   the transcripts that I've gotten.  The standard instruction --

23             THE COURT:  Mr. Kurland, we went over this.

24             MR. KURLAND:  Well --

25             THE COURT:  Just a moment.  We clearly went over this.

52

1    In the draft of my instructions that I'm working on and expect to

2    get to you folks, hopefully before 6:00 tonight, it is my

3    intention to actually list specifically those grand jury

4    transcripts that are in evidence, available for the jury's

5    consideration.

6            Mr. Crowe, for example, if my memory serves correctly,

7    in his request for instructions, identified, I believe it was Mr.

8    Crowe, a specific witness whose testimony, or maybe not -- my

9    point is we discussed this.  And it is not sufficient for counsel

10   to have used the grand jury transcript to impeach a witness

11   without highlighting for the Court that you intend that testimony

12   to be admitted as substantive evidence.

13           So you really are going to need to give me a list, give

14   me and the government and other counsel a list of those witnesses

15   that you contend on the basis of grand jury testimony, those

16   witnesses whose trial testimony should be supplemented as a

17   substantive matter with their grand jury testimony.

18           Do you remember?  We went over this, really.  We spent

19   quite a few minutes talking about this.  The Court has to be

20   apprised at the time of the examination that it's intended that

21   grand jury testimony be admitted as substantive evidence.  And if

22   that wasn't done, I hesitate to say now that the jury has

23   available to it that testimony as substantive evidence.

24           Now, I'm not prepared to say that there weren't a

25   couple of instances that you may not be able to reconstruct and

1    there won't be any prejudice to anybody and I may be willing to

2    go ahead and do that.  But when that's come up, and it's come up

3    two, maybe three times.  Ms. Green and --

4            MR. COBURN:  Reynolds, Your Honor.

5            THE COURT:  Mr. Reynolds.  And I think maybe one other

6    witness.  We talked about it.  We agreed that the grand jury

7    transcript was in.  Appropriate redactions were made, etc.  But

8    you can't come in in closing argument and say, oh, by the way,

9    this contradicts the witness' trial testimony and now it's before

10   the jury as substantive evidence, when the government or some

11   other defendant didn't have the opportunity under the rule of

12   completeness or under any other rule to put in more of the grand

13   jury testimony.

14           MR. KURLAND:  Judge, my recollection of our discussion

15   is about 90% consistent with that, but in one significant way,

16   and I just want to put this on the record, a little bit

17   different.

18               The general rule is that when evidence is admitted

19   absent a limiting instruction at the time, even if it's otherwise

20   inadmissible hearsay, it's admissible for all purposes subject

21   to, you know, any, a limiting instruction the judge gives.

22   Otherwise, the jury can consider it for all purposes.

23               In the three or four instances that I am --

24           THE COURT:  By the way, I don't agree with you that

25   that's the general rule.  Go ahead.  Go ahead.

1           MR. KURLAND:  All right.  As in evidence -- we can deal

2     with that later after the trial is done.  Just between you and

3     me.  But separate from that, Judge, in the instances that I am

4     referring to, and many of these were not witnesses that I, that I

5     examined, if the grand jury transcript is put on the DOAR and the

6     statement and, this is a grand jury statement that you made, did

7     you not make the statement, I wouldn't want to do anything other

8     than what is already in the transcript record.  I'm not going to

9     refer to grand jury portions that were not even shown.

10           But it would be my position, Your Honor, that if there

11     was a colloquy before a witness and they were specifically

12     pointed to, did you say this before the grand jury, and they said

13     yes, I did, and that's inconsistent with their trial testimony,

14     then that is sufficiently in the record already before the jury,

15     even if you get the actual dailies and look at the transcripts,

16     to be able to argue that that statement not only impeaches them,

17     but is admissible as substantive evidence.

18           With all due respect, that's just basic evidence law

19     and the sufficient foundation has been laid.  And I thought, I

20     thought that the Court agreed with that, that if --

21           THE COURT:  As an abstract principle, of course I do.

22     But that's not how trials are run.  That's not how trials are

23     managed.  It's not you just throw it all up and decide what to do

24     later on.  That's not how I run a trial, Mr. Kurland.

25           MR. KURLAND:  Judge, I understand that, Your Honor.

1    But with respect to a particular sentence, if it's --

2              THE COURT:  You know, I don't know how many angels can

3    dance on the head of a pin and I don't think you know, Mr.

4    Kurland.  Let's not argue abstractions here.  Okay?  If you've

5    got a specific instance, if you can think of or bring to the

6    Court's attention a specific witness whose trial testimony

7    contradicted something the witness said in the grand jury and,

8    when confronted with that prior statement the witness didn't

9    adopt it, then yes.  That's what we're arguing about.  But I

10   can't think od any of those instances.  I honestly can't.

11             If you can, that's fine.  But I can't think of any of

12   those instances.

13             MR. KURLAND:  I'll give you one.  When one of the

14   Duganne sisters, who I cross examined.  She said, I showed her

15   her grand jury testimony because she said that she didn't name

16   other people from Baltimore who were part of the drug gang.  And

17   I showed her her grand jury transcript where she said three or

18   four name, none of these defendants.

19             That's an example where I believe that the record is

20   sufficient that she has, that she testified before the grand jury

21   differently than her in-court testimony and it's sufficiently in

22   the record to allow that to be argued as substantive evidence,

23   that those other three people --

24             THE COURT:  That there were other members of some

25   conspiracy?

1          MR. KURLAND:  No.  Specifically --

2          THE COURT:  You didn't even need evidence to argue

3     that.

4          MR. KURLAND:  But Judge, specific names of people,

5     specific names of people who were part of the Baltimore/Altoona

6     drug connection.  There were three or four names that were,

7     that's in the record, that is --

8          THE COURT:  Look, if that helps Mr. Gardner, I don't

9     expect there to be any objection from the government.  And that's

10    fine.  I mean, if that's the kind of thing you're talking about,

11    Mr. Kurland, I don't see any problem at all.

12         MR. KURLAND:  I will, I will make my list of the things

13    that's consistent.

14         THE COURT:  I think, I think that would be a wise, a

15    wise idea.  Do you want to respond, Mr. Hanlon?

16         MR. HANLON:  No, Your Honor, I profoundly do not care.

17    The government just had one thought about one of the other issues

18    that's been raised this morning.  The possibility of a bench

19    warrant for Mr. Bacon.  That's between the Court and the defense

20    and that's fine.  But it does occur to us, it doesn't sound to

21    the government as though it's certain that this letter would come

22    in, whether or not Mr. Bacon comes in.

23         THE COURT:  The letter's not coming in.  I mean, it's a

24    prior inconsistent statement and he can be confronted with it.

25    But no, I don't think the letter's coming in.

1          MR. HANLON:  If that's the case, is it appropriate to

2    subpoena Mr. Bacon and bring him back to court solely for

3    impeachment?

4          THE COURT:  No.  But Mr. Coburn insists that he's going

5    to elicit affirmative, probative evidence from Mr. Bacon.

6          MR. HANLON:  That's what I wanted to clarify.

7          THE COURT:  That's what you say, right, Mr. Coburn?

8          MR. COBURN:  I don't want to mislead the Court.

9          THE COURT:  No, of course not.  I asked you

10   specifically about an hour and a half ago, is Mr. Bacon going to

11   offer affirmative, probative evidence, and you said yes.

12         MR. COBURN:  Well, that's my view.  I think it's

13   consistent with what's -- I mean, I'm not intending to ask him

14   about things other than, you know, what he said in the letter.  I

15   mean, my view is that what is in the letter is not only -- first

16   of all, I think we should be entitled under these exceptional

17   circumstances, if we wanted to continue to impeach him, to do

18   that.  I mean, I think that's critical.

19         THE COURT:  No.  I'm not going to issue a warrant for a

20   government witness who's been thoroughly cross examined so that

21   he can be arrested and brought back to court in order to be

22   further impeached.  Now, you know, Mr. Coburn --

23         MR. COBURN:  I don't mean to push Your Honor on this.

24   I know this has been a long morning already.

25         THE COURT:  It's okay to push.

1    MR. COBURN:  I do think, it is my view that to ask him

2  about the things he said in that letter is affirmative probative

3  evidence.

4    THE COURT:  It's not affirmative probative evidence.

5    MR. COBURN:  Well, I mean, if I ask him about what he

6  wrote in there and he admits it, then I've got him on direct

7  examination --

8    THE COURT:  Why do we think he's going to deny writing

9  the letter?  Aren't you proffering that it's in his handwriting?

10  The government hasn't suggested to you that he didn't write it.

11  Right?

12    MR. COBURN:  They haven't suggested that.

13    THE COURT:  Did the agent question Mr. Bacon about the

14  letter when he saw him this weekend or spoke to him?

15    MR. COBURN:  I'm sure he did.

16    THE COURT:  I mean, I presume he did.

17    MR. HARDING:  Yes, he did, Your Honor.

18    THE COURT:  Okay.  So my only point is --

19    MR. HARDING:  He hasn't shown the letter to Mr. Bacon

20  and Mr. Bacon doesn't specifically remember this letter.

21    THE COURT:  But he admits to writing a letter or

22  sending at least one letter to Mr. Gardner?

23    MR. HARDING:  What he said was that if I wrote a letter

24  to Gardner, at least -- Agent Klas is here, perhaps we should ask

25  him.  As I understand it from Agent Klas, the response was

1      something like, well, if I wrote a letter to Gardner it was

2      because I was trying to deflect him from thinking I was a snitch.

3      I was very afraid at that point and I wanted to steer him off of

4      thinking I was a snitch.

5              THE COURT:  Of course, that's exactly what Mr. Bacon's

6      going to say more likely than not.  But Mr. Coburn --

7              MR. COBURN:  I actually was getting up to the podium

8      for something different.

9              THE COURT:  I know.  I know.  Go ahead.

10             MR. COBURN:  I was hoping to say just one sort of

11     totally non-controversial thing for a couple of seconds.

12             THE COURT:  What a challenge.

13             MR. COBURN:  Yeah, it will be.  My plane is at 5:30.

14             THE COURT:  Bye.

15             MR. COBURN:  I was thinking about leaving, I cut it

16     fairly close, but if I leave at four I think I can make it.  I

17     just wondered if Your Honor would be kind enough to say something

18     to the jury about the fact that I, you know, we were supposed to

19     be off and I've got something I couldn't, a proceeding I couldn't

20     change.

21             THE COURT:  Of course.  We need to take a recess.

22             So let me go back to Ms. Rhodes and Mr. Martin, Mr.

23     Kurland, see what we've got today.

24             MR. COBURN:  Thank you, Your Honor.

25             THE COURT:  Ms. Rhodes?

1          MS. RHODES:  Your Honor, we have the coming at one, I

2     think, two witnesses.  Mr. Crowe's first witness is here.  And I

3     believe Mr. Coburn was going to read, was going to put in some

4     transcript testimony.  And then I'm not sure if somebody else is

5     here yet.  I need to check on that over the break.

6          THE COURT:  One of your witnesses?

7          MS. RHODES:  Yes.

8          THE COURT:  Who do you have at one?

9          MS. RHODES:  We have somebody from AT&T and somebody

10    from Sprint.  Okay.

11         THE COURT:  And who's the third witness that you need

12    to check on?

13         MS. RHODES:  That would be Coach Lynch.  And I want to

14    make a proffer of his, of what he would say.

15         THE COURT:  I'm not going to take the time to do that

16    in the courtroom.  That's why I asked you to do the affidavit.

17         MS. RHODES:  I understand, Your Honor.  But when Mr.

18    Harding and I spoke to him on the phone, Mr. Harding indicated

19    there were things he was not going to stipulate to.  And so I

20    feel like the only way I can get this --

21         THE COURT:  No.  No.  Not only that, is he here now?

22         MS. RHODES:  He was supposed to be here at 11.

23         THE COURT:  All right.  Please send him out of the

24    courthouse.

25         MS. RHODES:  He was supposed to wait on the third

1    floor.

2              THE COURT:  Well, I don't want him in the courthouse.

3              MS. RHODES:  All right.

4              THE COURT:  All right?  So please, we're going to take

5    a recess.  Go up to him immediately, thank him very much for his

6    trouble, ask him to leave the courthouse immediately.

7              MS. RHODES:  All right.  Yes, Your Honor.

8              THE COURT:  I do not want him running into the juror in

9    the hallway.

10             MS. RHODES:  Your Honor, I instructed him to wait on

11   the third floor on a bench.  Okay?

12             THE COURT:  I appreciate that, Ms. Rhodes.  All right.

13   Let's stand in recess for 15 minutes.

14             (Recess at 11:00 a.m.)

15             (Defendants present in courtroom.)

16             THE COURT:  We'll have the jury, please.  The jury is

17   coming out, folks.

18             (Jury enters the courtroom.)

19             THE COURT:  Members of the jury, good morning and thank

20   you for your bountiful patience this morning.  We're ready to

21   continue.  We trust you had a pleasant weekend.

22             Mr. Crowe, you may call your witness.

23             MR. CROWE:  Your Honor, we call Joyce Martin Parsons.

24             THE COURT:  Ms. Martin, would you stand and be sworn by

25   the clerk, please?  I'm sorry.  Was it Ms. Parsons?

1            MR. CROWE:  Parsons.

2            JOYCE PARSONS, DEFENDANT MARTIN WITNESS, SWORN

3            THE WITNESS:  Yes.

4            THE CLERK:  Be seated.  Please speak directly toward

5       the mike.  State your name and spell it for the record, please.

6            THE WITNESS:  Joyce --

7            THE COURT:  I'm sorry, Ms. Parsons.  You can pull that

8       microphone down and put in a comfortable place for you, but we

9       need you to speak directly into it.  You can pull it lower if you

10      want to.  Thank you.

11           THE WITNESS:  Joyce Parsons.  P-A-R-S-O-N-S.

12           DIRECT EXAMINATION

13      BY MR. CROWE:

14      Q    Mrs. Parsons, I'm going to ask you to do something a little

15      unnatural.  Although I'm going to be asking you the questions and

16      it's normal for you to be looking at me, could you try, if you

17      can remember, to look at the jury for most of the answers?

18      A    Yes.

19      Q    Mrs. Parsons, how old are you?

20      A    54.

21      Q    Okay.  And are you presently working?

22      A    Yes.

23      Q    And where are you working?

24      A    Dollar General.

25           THE COURT:  I'm sorry.  Ms. Parsons, we need you to get

1    closer to the microphone.

2    A    Oh, Dollar General.

3    Q    And how long have you been working at the Dollar General?

4    A    Two years and a couple months.

5    Q    And what is your position there at the Dollar General?

6    A    Assistant manager.

7    Q    Okay.  And you're, in fact, the mother of Shelly Wayne

8    Martin?

9    A    Yes, I am.

10   Q    Now, what's your son's birthday?

11   A    X/XX/78 (redacted).

12   Q    Okay.  So he would have just turned 30 years old in July, is

13   that right?

14   A    Yes.

15   Q    And where was he born?

16   A    Roanoke, Virginia.

17   Q    And do you recall about how old your son was when you first

18   moved to the Baltimore area?

19   A    Nine years old.

20   Q    Okay.  And where did the family live initially?

21   A    On Stevens Wood.

22        THE COURT:  I'm sorry.

23   A    When I came to Maryland?

24   Q    Yes.

25   A    We lived on Stevens Wood Road.

1   Q    And was that a place where you lived with his sister, Mrs.

2   Broomfield?

3   A    Yes.

4   Q    Okay.  And where did you later move, if you can recall?

5   A    Live in Latin Hill.

6   Q    Okay.  And did there come a time when the family moved from

7   Baltimore County to Baltimore City?

8   A    Yes.

9   Q    Do you remember what grade your son, Shelly Wayne Martin,

10  was when you made that move?

11  A    He was in junior high.  Junior high.

12  Q    Junior high.  Okay.

13  A    Yes.

14  Q    And sort of the 7th, 8th or 9th grade, to the best you can

15  recall?

16  A    Yes.

17  Q    Okay.  Now, where were you living in the beginning of 2002?

18  A    I was living on Cree Court, Two Cree Court.

19  Q    Okay.  And when did you, do you recall when you bought that

20  house?

21  A    February, 2002.

22  Q    Okay.  And where were you living before you bought the

23  house, if you remember?

24  A    Cresas Point (phonetic).

25  Q    Pardon?

Case 1:04-cr-00029-RDB    Document 696    Filed 06/16/09    Page 65 of 281

1    A    Cresas Point Apartments.

2    Q    Okay.  And was that street address for that Two Sunmar Court

3    in Randallstown?

4    A    Sunmar Court, yes.

5    Q    Sunmar Court.  Excuse me.  And when was, when was it, if you

6    can recall, that you actually moved from Sunmar, Sunmar Court to

7    Two Cree Court?

8    A    I moved in February to Cree Court.

9    Q    Okay.  And did you purchase that house yourself?

10   A    Yes, I did.

11   Q    And did you purchase it with any contribution from your son,

12   Mr. Martin?

13   A    No, I didn't.

14   Q    Was it all your own money?

15   A    Yes, it was.

16   Q    Okay.  Now, when Mr. Martin moved into Two Cree Court, did

17   he have his own bedroom?

18   A    Yes, he did.

19   Q    And do you recall where that bedroom was?

20   A    In the basement.

21   Q    Okay.  And had he, in fact, just come home from serving a

22   prison sentence and from some time in a halfway house?

23   A    Yes.

24   Q    Do you recall about when it was in 2000 that he came home?

25   A    No.

1    Q     Pardon?  I'm sorry.  2002 that he came home.  Thank you, Mr.

2    Harding.

3    A     I guess it was like in February.

4    Q     Okay.

5    A     Or March.

6    Q     And did he come first to Sunmar Court or did he come

7    directly to Two Cree Court, if you can recall?

8    A     Sunmar Court.

9    Q     Came first to Sunmar Court?

10   A     Yes.

11   Q     Okay.  Now, I'm going to show you some photographs.  I'm

12   going to show you first what we have marked as Defendant Martin

13   Exhibit One.  I'm sorry.  This is Defendant Martin, I believe,

14   Exhibit 14-A.  Can you tell me what is depicted in that

15   photograph?

16   A     Yes.  That's the front of my house.

17   Q     Okay.  And is your house what appears to be an end unit in a

18   series of row homes or town homes?

19   A     Yes.

20   Q     Okay.  Can you see the area where it appears that the siding

21   changes and it becomes, it becomes white?

22   A     That's the end of my house.

23   Q     Okay.  So is this area where the white is shown, is that

24   part of your house or is that part of the adjoining unit?

25   A     That's part of the adjoining unit.

1    Q    So yours, essentially, stops where we see, where we see,

2    where we see the wood end there, is that correct?

3    A    Yes.

4    Q    Okay.  Let me show you next what is, has been marked as,

5    will be marked as Defendant Martin's Exhibit 14-B.  Can you tell

6    me what that shows?

7    A    That's going down towards the basement.

8    Q    Okay.  And where would the person, where would a person be

9    standing to have that view of the stairway going down to the

10   basement?

11   A    When they come in the front door.

12   Q    Okay.  So if you looked down there, that's the basement, is

13   that correct?

14   A    Yes.

15   Q    Now, you said that your son's bedroom was in the basement.

16   Was the basement down those stairs?

17   A    Yes.

18   Q    Can you see the door to his, to what was his bedroom in this

19   photograph?

20   A    No.

21   Q    Is it -- what is it, some place to the left, then?

22   A    Yes.

23   Q    Okay.  If you'll also notice, there's an area where it

24   appears that there are stairs going up.  Are there, in fact,

25   stairs that go up that are right, right next to the stairs going

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 68 of 281

1    down to the basement?

2    A    Yes.

3    Q    And where do those, where do those stairs going up lead to?

4    A    The first floor.

5    Q    Okay.  And what's on the first floor?

6    A    Living room, dining room, half bath, and a kitchen.

7    Q    Okay.  Show what you would be marked as Exhibit 14-C.  Can

8    you tell me what that photograph depicts?

9    A    That's leaving the first flooring going to the, it's a

10   landing and then it's up another flight of steps to the bedroom.

11   Q    Okay.  So is this area, is this area right here the landing

12   that you're speaking about?

13   A    No.

14   Q    Okay.  Is this area right here the first floor where you've

15   testified that the living room, the kitchen, the dining room, and

16   the bathroom are?

17   A    Yes.

18   Q    And is it then these stairs that we see here that go up to

19   the second floor?

20   A    Yes.

21   Q    Now, do those stairs go directly to a second floor or do

22   they go to a landing?

23   A    Go to a landing.

24   Q    So you then do basically a 180 degree turn to go up another

25   short flight of stairs to get to the second floor?

Case 1:04-cr-00029-RDB    Document 696    Filed 06/16/09    Page 69 of 281

1    A    Yes.

2    Q    Thank you.  Show you what will be marked as Exhibit 14-D.

3    Can you tell me what that picture shows?

4    A    Going to the landing to the second floor.

5    Q    Okay.  And then, finally, what is 14-E?  Can you tell me

6    what that, what is shown in that photograph?

7    A    That's my bedroom.

8    Q    Okay.  And that's on the second floor, is that correct?

9    A    Yes.

10   Q    And then, finally, what will be 14-F.  Can you tell me what

11   is shown in that photograph?

12   A    That's Shelly's bedroom.

13   Q    Now, all of these photos were taken a few weeks ago, is that

14   correct?

15   A    Yes.

16   Q    Is this the same furniture in Shelly's bedroom, which is

17   shown on 14-E, as was in fact there in March and April of 2002,

18   if you recall?

19   A    Yes.

20   Q    Okay.  Same furniture?

21   A    Yes.

22   Q    Okay.  Now, I want to direct your attention to Sunday, March

23   24, 2002.  And I realize we're speaking about a time that's more

24   than six and a half years ago.  Can you remember what you were

25   doing that day?

1    A    No, I don't.

2    Q    Do you remember where you were working that day?

3    A    I was working at Giant's.

4    Q    Okay.  Let me show you what is a payroll stub, which has

5    come out of Government's Exhibit W-5J.  This is a payroll stub.

6    Actually, let me show you a different one.  I don't know the

7    extent to which you can make it out there.  As you can see, that

8    is a payroll stub which is dated March 29, 2001, which is almost

9    a year earlier than the period we're talking about.  Is that a

10   payroll stub from the Giant at which you were working at that

11   time?

12   A    Yes.

13   Q    And how long had you been working at the Giant?

14   A    17 years.

15   Q    Okay.  And is that 17 years as of 2001 or 2002 or is that --

16   A    Oh, no.

17   Q    Okay.  When did you stop working at the Giant?

18   A    2005.

19   Q    Okay.  About the same time you got the job at the Dollar

20   General store, is that right?  This appears to show that your

21   year-to-date earnings through March 29 of 2001 was roughly in the

22   neighborhood of $8800.  Does that sound right?

23   A    Yes.

24   Q    So would the money that you'd been making at the Giant be

25   roughly, on an annual basis, be roughly in the neighborhood of 34

1   or $35,000?

2   A    Yes.

3   Q    What hours did you work when you were working at the Giant?

4   A    I work at night.

5   Q    Okay.  And specifically, directing your attention to March,

6   2002.  What would have been the hours that you would have worked?

7   A    11 to 7:30 or 12 to 8:30.

8   Q    And what would differentiate between an 11 to 7:30 or a 12

9   to 8:30 shift?

10  A    Sundays sometime I go in early because I used to be the

11  manager.

12  Q    Okay.

13  A    Some weeks.

14  Q    So you had to be there a little bit early to get things

15  ready for people, is that right?

16  A    Yes.

17  Q    And what was, what were you doing there?

18  A    I was a stock person.

19  Q    So restocking the shelves at night, is that right?

20  A    Yes.

21  Q    Okay.  And did you typically work on Sunday nights?

22  A    Yes.

23  Q    What time would you generally arrive home?

24  A    Between 7:30 and 8:30 in the morning.

25  Q    And when you got home at 7 or 8:30 in the morning after

1   working that long evening shift, what would you typically do?

2   A    Sometime I'd go and eat breakfast and sometime I go straight

3   upstairs.

4   Q    Okay.  And going straight upstairs is straight upstairs to

5   the second floor bedroom that we discussed a second ago?

6   A    Yes.

7   Q    Okay.  Did your son have a female friend when he first came

8   home in February of 2002 or so?

9   A    I don't know.

10  Q    Okay.  Were you, did you know a woman by the name of McCoy

11  or Kiki?

12  A    Kiki.

13  Q    Okay.  And do you know whether or not she was a friend of

14  your son's at that time?

15  A    I don't know.

16  Q    Okay.  How long have you known this person, Lakeisha McCoy

17  or Kiki?

18  A    For about a couple years.

19  Q    Okay.  And that was a couple of years as of when?

20  A    Before I moved to Cree Court.

21  Q    So she was a friend of your son's before he moved to Cree

22  Court, is that right?

23  A    Yes.

24  Q    Okay.  And obviously, you don't remember what happened the

25  night of Sunday, March 24 or the following day, Monday, of March

1    25, is that right?

2    A    No.

3    Q    Now, do you remember that Mr. Martin and your son, at Two

4    Cree Court, were searched in mid April of 2002?

5    A    Yes.

6    Q    And how did you learn about this?

7    A    I came home from work.  The front door was locked.  The

8    screen door was locked.  I couldn't get in my own house.  So I

9    went down my sister house.  And I came back home and we opened

10   the screen door.  And I went in and found out that they had been

11   in the house.

12   Q    Okay.  And by "they", you mean that law enforcement people

13   had been in the house?

14   A    Yes.

15   Q    Now, I understand you typically would not lock the screen

16   door, is that correct?

17   A    No.

18   Q    What was the condition of the normal entry door, the one

19   that we've seen on Government's Exhibit 14-A?

20   A    It was, the hinges was broke off the front door.  The side

21   of the door was busted in.

22   Q    And where were you returning from at the time that you went

23   into the house?

24   A    I was returning from work.

25   Q    Okay.  And that's because you would have been working your

1    normal overnight shift at Giant, is that correct?

2    A    Yes.

3    Q    Do you know a lawyer by the name of Harold Glaser?

4    A    Yes.

5    Q    And was he, in fact, your son's lawyer on some state charges

6    that he faced in 2002?

7    A    Yes.

8    Q    And you understand that those are some of the same charges

9    that are being tried in this court right now?

10   A    Yes.

11   Q    Did you have anything to do with raising money to hire Mr.

12   Glaser and paying Mr. Glaser?

13   A    Yes.

14   Q    Would you tell the members of the jury what you did?

15   A    Well, first, I asked my sister to loan me some money and

16   then I'll pay her back gradually.  And then through the time I

17   made installment payments with Glaser.

18   Q    Okay.

19   A    And he told me I had to have a certain amount of money

20   before we go to court.

21   Q    Okay.  And do you remember how much Mr. Glaser was paid in

22   total?

23   A    $10,000.

24   Q    Okay.  And what was the source of that $10,000?

25   A    Repeat yourself.

1    Q    Yeah.  Who supplied the money to pay Mr. Glaser?

2    A    I did.

3    Q    Okay.  Did you have any assistance from anybody?

4    A    My sister.

5    Q    Okay.  And would that sister be the same Mrs. Broomfield?

6    A    Yes.

7    Q    Do you know at about what time it was, and if you don't

8    remember, it's fine, but do you remember about when it was that

9    you started getting the money together for Mr. Glaser?

10   A    Before he had to go to court.  But I don't remember the

11   date.

12   Q    You don't remember the date.  That's fine.  It would be

13   unusual, unusual if you would.

14            Let me show you, finally, what's been marked as

15   government -- excuse me -- Defendant Martin Exhibit Five.  Can

16   you tell me what that is?

17   A    It's a ticket stub.

18   Q    Okay.  And do you know where this ticket stub was found?

19   A    It was in a drawer in Wayne's bedroom.

20   Q    And did you have anything to do with getting that ticket

21   stub to lawyers who were representing Mr. Martin?

22   A    Yes.

23   Q    And what did you do?

24   A    I, really, I don't recall.  I mailed it or I gave it to the

25   lawyer.

1    Q    But you know you had something to do with getting it to the

2    lawyer, is that correct?

3    A    Yeah.

4    Q    I'll also show you Defendant Martin's Exhibit 6, which is a

5    Capital One, which is a Capital One account summary.  Did you

6    have anything to do with getting this exhibit, getting this

7    matter to lawyers who were representing Mr. Martin?

8    A    Yes.

9    Q    And what did you do?

10   A    I don't recall how I got it to him, but I got it to a

11   lawyer.  I know.

12   Q    Was this something that had come in -- when did this come

13   in, if you can recall?

14   A    When did it come in the mail?  I don't know what day it came

15   in the mail.

16   Q    Okay.  And finally, I'm going to show you what's been marked

17   as Defendant Martin's Exhibit Seven.  Is that also a Capital One

18   paper?

19   A    Yes.

20   Q    And did you have anything to do with getting that to the

21   lawyers for Mr. Martin?

22   A    I don't recall.

23   Q    Okay.  Fair enough.  May I just speak with Mr. Pyne for a

24   second?

25             THE COURT:  Mr. Crowe, it's probably perhaps

1    unnecessary, but let me suggest that, with the agreement of

2    counsel, that you use a black marker to delete account number

3    information from that exhibit before it's finally --

4              MR. CROWE:  Your Honor, the difficulty with that is

5    that the account number matches up with the account number which

6    is shown on, shown on the movie receipt, which the government

7    introduced.

8              THE COURT:  Okay.

9              MR. CROWE:  So for that reason, we'd prefer to leave it

10   on.

11             THE COURT:  Okay.  Fine.

12             MR. CROWE:  Thank you.  I have nothing further.

13             THE COURT:  All right.

14             MR. COBURN:  Excuse me, Your Honor.  Just want to let

15   the Court know we're going to have some questions, also.  Should

16   we go after the government?

17             THE COURT:  Yes.

18             CROSS EXAMINATION

19   BY MR. HANLON:

20   Q    Ms. Parsons, good -- it's still good morning.  Good morning

21   to you.

22   A    Good morning.

23   Q    You were asked a few questions by Mr. Crowe near the end of

24   your testimony about some credit card bills and also about a

25   movie stub.  With respect to the movie stub, you found that in

1    your house and then you turned it over to your son's attorney, is

2    that right?

3    A    Yes.

4    Q    How did you, did you know to look for the movie stub because

5    your son asked you to look for the movie stub?

6    A    Yes.

7    Q    You were also asked, and this is subject, Your Honor, to

8    whatever redactions the defense may want to make, but I would

9    like to show the credit card bill to Ms. Parsons.

10            THE COURT:  I think it's all in, Mr. Hanlon.

11   Q    Zooming in just a little bit, Ms. Parsons.  Do you see the

12   credit card bill there?

13   A    Yes.

14   Q    In this particular instance, there's a balance in May of

15   2002 of about $428, is that correct?

16   A    Yes.

17   Q    Now, your son gets arrested at some point in 2002 and he's

18   been in jail for some time, is that right?

19   A    Yes.

20   Q    Prior to your son getting locked up, who was responsible for

21   paying the balance on this credit card bill?

22   A    No one.

23   Q    No one paid it?

24   A    No.

25   Q    Do you know if your son was making payments on it?

1    A    No.

2    Q    You don't know?

3    A    I don't know.

4    Q    You were not making payments or helping him with this

5    balance, is that correct?

6    A    No.

7    Q    You were asked some questions about getting money together

8    for Mr. Glaser on your son's behalf.  And you had to come up with

9    $10,000 to pay for the lawyer fees, is that right?

10   A    Yes.

11   Q    Mr. Martin would have known that you were getting that money

12   together, that you were making arrangements for him to have a

13   lawyer, is that correct?

14   A    Yes.

15   Q    And he would have been aware of the difficulty you were

16   having getting the money together, is that fair to say?

17   A    Yes.

18   Q    You were asked about, by Mr. Crowe about the search warrant

19   that happened at your house in April of 2002.  I'm sure that's

20   not a pleasant memory.  But I do need to ask you a few questions

21   just about some items.

22        Government's Exhibit W-5F is this piece of paper, Ms.

23   Martin.  Do you see it on your screen?

24   A    Yes.

25   Q    This is a, appears to be a phone bill, is that correct, a

1    Sprint phone bill?

2    A    Yes.

3    Q    And it's in the name of your son, Wayne Martin, is that

4    correct?

5    A    Yes.

6    Q    Do you recognize this number, 410-963-3912?

7    A    No, I don't.

8    Q    Don't know whether or not your son, Wayne, or any of your

9    children ever used this phone number?

10   A    No.

11   Q    Do you know one way or the other, Ms. Parsons, whether this

12   particular phone bill was found at Two Cree Court during the

13   search warrant we talked about?

14   A    Repeat yourself.

15   Q    Do you know whether or not this phone bill was found during

16   the search warrant?  Did you ever see a phone bill like this one

17   for this number in your house at Two Cree Court before that

18   search warrant happened?

19   A    No, I didn't.

20   Q    One more thing about this phone bill.  Again, W-F5.  I asked

21   you about the service name and it was Wayne Martin.  And then

22   there's an address there of 106 Sunmar Court, Baltimore,

23   Maryland.  Am I reading that right?

24   A    Yes.

25   Q    If I heard you correctly, is that the address that your

1    family lived at before moving to Cree Court?  Did I get that

2    right?

3    A    Yes.

4    Q    Government's Exhibit W-5G.  Another piece of paper which has

5    been marked as evidence in this case.  Have you ever seen this

6    piece of paper relating to the funeral of a Darryl and Anthony

7    Wyche?  Did you ever see this kind of paper at your house at Two

8    Cree Court?

9    A    No.

10   Q    Going to show you a few photographs, W-5C.  I'll zoom in a

11   little bit, Ms. Parsons.  Do you recognize this photograph?

12   A    Yes.

13   Q    Do you recognize any, either of the gentlemen in this

14   photograph?  Do you recognize that person?

15   A    That's Wayne.

16   Q    Your son, Wayne?

17   A    Yeah.

18   Q    And then over on the other side, do you recognize that

19   gentleman?

20   A    I can't make it out.

21   Q    Can't make out that gentleman?

22   A    No.

23   Q    Government's Exhibit W-5A, another photograph.  Do you

24   recognize this individual here?  And I can zoom in a little bit.

25   Do you recognize that gentleman?

1    A    Can't even see the face.

2    Q    Can't quite make out the face?

3    A    No.

4    Q    Last photograph.  W-5B.  It's a bit dark, Ms. Parsons, but

5    do you recognize that gentleman?

6    A    What gentleman?

7    Q    I think that probably answers that question.  Your Honor,

8    can I approach?

9         THE COURT:  Yes.

10   Q    W-5C.  Let me see if I can show it to you in person, ma'am.

11   Putting it in front of you.  You've identified your son in the

12   photograph.  And then there's another individual on the left side

13   of the photo.  Do you recognize the guy on the left?

14   A    Yeah.  That's Goo.

15   Q    Goo?

16   A    Yeah.

17   Q    And is Goo's full name Shawn Gardner?

18   A    Yes.

19   Q    And Government's Exhibit W-5A.  How about that gentleman

20   there in that photograph?

21   A    That's the same person.

22   Q    Mr. Gardner, Goo?

23   A    Yes.

24   Q    And again, finally, W-5B as in boy.  How about this

25   gentleman here?

1    A    That's Wayne.

2    Q    Thank you, ma'am.  Putting up on the screen in front of you,

3    Ms. Parsons, this is Government's Exhibit W-5H, some handwritten

4    notes.  It says "surveillance equipment" at the top and "spy

5    outlet" in the middle.  Do you see that language there at the top

6    and in the middle?

7    A    Yes.

8    Q    Have you ever seen, did you ever see notes like these around

9    the house at Two Cree Court?

10   A    No.

11   Q    Do you know whose handwriting it is on these two pieces of

12   paper?  I'm sorry.  Do you know whose handwriting it is on this

13   one piece of paper?

14   A    No.

15   Q    Mr. Crowe asked you a few questions about, I believe it's

16   W-5 -- W-5J.  Let me ask you just a few things about a few of the

17   pages in the address book, Ms. Parsons.  First of all, very front

18   page.  That's your name on the front page on the top there, is

19   that right?

20   A    Yes.

21   Q    And this is your address book, which is taken around about

22   the time of the search warrant at your address at Two Cree Court,

23   is that right?

24   A    Yes.

25   Q    Inside one of the pages there's a yellow post-it note that

1    we put here to help me find it.  But there's some handwriting

2    here that reads, Goo call, Darryl give me a hundred dollars.  Do

3    you see that?

4    A    Yes.

5    Q    Can you tell me whose handwriting "Goo call, Darryl give me

6    a hundred dollars" is?

7    A    That's my handwriting.

8    Q    And do you know what this would have been?  Is this a phone

9    message you would have written down?  Do you know what this

10   language means?

11   A    Just Goo called.

12   Q    So it's a message from Goo, calling that Darryl had given

13   him a hundred dollars?

14   A    That's what I wrote down, yes.

15   Q    Do you know who Darryl is?

16   A    I know two Darryls.  I don't know which one it was.

17   Q    What are the names of the two Darryls that you know?

18   A    Darryl White and Darryl Bacon.

19   Q    So there's a Darryl Bacon, that's one?

20   A    Um-hum.

21   Q    That's a yes, ma'am?

22   A    Yes.

23   Q    That's a yes?

24   A    Yes.

25   Q    And there was another.  Did you say Darryl, what was the

1    other one?

2    A    White.

3    Q    White, as in the color white?

4    A    I guess that's how it was.

5    Q    Have you ever known a Darryl Wyche?

6    A    I guess that's what his last name was, Wyche.

7    Q    So maybe not White.  Maybe it was Darryl Wyche?

8    A    Uh-huh.

9    Q    Another part of the phone book.  And again tell me if you

10   can't see this.  But there's another handwritten notation that

11   reads "Goo turn himself in, Goo call forward" and then there's a

12   two in parentheses.  Do you see that?

13   A    Yes.

14   Q    Do you know, would this have been another message that you

15   would have received and written down?

16   A    For him to call.  That's what it seems like now.

17   Q    Does that appear to be your handwriting or someone else's

18   handwriting?

19   A    That's my handwriting.

20   Q    So Goo called and you wrote down a message, is, he was

21   turning himself in and to have calls forwarded.  Am I reading

22   that correctly?

23   A    Yes.

24   Q    This is another notation in your book that reads "Goo girl",

25   is that correct?

1    A    Yes.

2    Q    And then under the notation "Goo girl" there's a number,

3    335-1517.  That appears to be a phone number, is that right?

4    A    Yes.

5    Q    And then the name Shanika?

6    A    Yes.

7    Q    And then there's an address, 82 Ambo, A-M-B-O, Circle?

8    A    Yes.

9    Q    Would this be contact information for a girlfriend of Goo,

10   Shawn Gardner, that you were writing down?

11   A    Yes.  It's probably when his daughter was born and I called

12   her about.

13   Q    Are you able to make that out, Ms. Parsons, here?

14   A    Yes.

15   Q    And that reads "Shawn Gardner" and there's an ID number at a

16   location in Jessup, Maryland, is that right?

17   A    Yes.

18   Q    Would this be contact information for Mr. Gardner in a time

19   when he was locked up some place?

20   A    Yes.

21   Q    Down here there's another number.  If I'm reading that

22   right, is that Goo again?

23   A    Yes.

24   Q    And it appears to be crossed out in this case.  And I'll see

25   if I can make it out.  Does it read 443-309, and I think that's

1    an 8347.  Have I read that correct?

2    A    It looks like it, yes.

3    Q    And this is a number that gets crossed out at some point?

4    A    Yes.

5    Q    Here again, is there a number for Goo at 410-446-6508?  Have

6    I read that correct?

7    A    Yes.

8    Q    And here up top, another crossed-out number that says Goo.

9    Is that right?

10   A    Yes.

11   Q    And that's, if I'm reading it right, 410-977-6145?  Do I

12   have that correct?

13   A    Yes.

14   Q    Here are a couple of notations.  We've established that

15   sometimes you would write phone numbers in your book here, but

16   sometimes you would also take down messages for people and

17   calendar things, like you have here.  This is Saturday, Friday,

18   things like that?  Is that right, Ms. Parsons?

19   A    Yes.

20   Q    In this case you've written down a notation, Goo got out 18

21   January.  Is that right?

22   A    Yes.

23   Q    And then right under Goo it indicates that Rodney equals 16.

24   Does that mean that someone named Rodney is getting out on the

25   16th of January?

1   A    I don't recall.  I don't recall what that was.

2   Q    That's fine.  I've read Goo got out 18 January, I've read

3   that correctly, is that right?

4   A    Yes.

5   Q    But you're not sure what Rodney equals 16 is?

6   A    No.

7   Q    Is that your handwriting, Ms. Parsons?

8   A    Yes.

9   Q    But you're just not sure, 100% sure of the meaning of that

10  notation?

11  A    Um-um.

12  Q    This is a notation for a Wayne cell phone, is that correct,

13  ma'am?

14  A    Yes.

15  Q    And it looks like there was a 443-677-3200 that is crossed

16  out in blue ink, is that right?

17  A    Yes.

18  Q    And then underneath, written in blue ink, is an 838-1933, is

19  that right?

20  A    Yes.

21  Q    Just to emphasize those last four digits.  The last four

22  digits are 1933, for the record, is that right, ma'am?

23  A    Yes.

24  Q    A couple of numbers here.  There's a number for a Goo, is

25  that correct, in black ink?

1   A    Yes.

2   Q    And then the number, there's a four, which I gather is

3   probably the beginning of a area code that didn't get finished.

4   Is that right, Ms. Parsons?

5   A    Yes.

6   Q    And then the rest of the Goo number is 984-0930, is that

7   correct?

8   A    Yes.

9   Q    And then over on the other side of this particular page is

10  Wayne M.  Is that Wayne M as in Wayne Martin, do you know?

11  A    I don't know.

12  Q    That's fine.  And there's a couple of numbers.  There's a

13  Wayne -- maybe this is part of the first number.  Wayne M 635 765

14  or S.  Is it possible that's something other than a phone number,

15  ma'am?

16  A    I don't know, I don't know what that was.

17  Q    And then underneath that there's an 866 567.  Do you know

18  what those numbers mean?

19  A    No.

20  Q    There's a notation for a Darryl Bacon.  Is that the Darryl

21  Bacon that you testified about a few minutes ago, one of the

22  Darryls that you know?

23  A    Yes.  Uh-huh.

24  Q    And Mr. Bacon is listed here as having a home, is that an H

25  as in home number, 175-6451.  Am I reading that correct?

1    A    That's his ID number.  That's not an H.  That's an ID

2    number.

3    Q    Got you.  That's an ID number.  I appreciate that.  Thank

4    you.  So that's his ID number.  And there's a 401 East Eager

5    Street.  What's East Eager Street, do you know?

6    A    That's a jail Downtown.

7    Q    And then there's a Wood.  Do you know who Wood is, by any

8    chance?

9    A    No, I don't recall that.  I don't know what that was.

10   Q    Here's some notes with some numbers and things.  Does Wayne

11   appear to be a reference to your son, Wayne Martin?

12   A    Yes.

13   Q    And then there's some numbers here.  Are these dollar

14   figures.  Do they look like dollar figures to you?

15   A    Yes.

16   Q    Do you have any idea, Ms. Martin, what it was that is being

17   calculated here in terms of these various dollar figures for

18   Wayne?

19   A    I was adding up my bills, look like.  Monthly bills.

20   Q    Do you have any idea what these numbers up above here would

21   have been for Wayne ending in 265?

22   A    No.

23   Q    Here's a number for Shelly, is that correct?

24   A    Yes.

25   Q    And do you know, ma'am, is that a phone number or is that

1   another kind of number?

2   A    That's his father phone number.

3   Q    And is this Mr. Martin, your son, Mr. Martin's father?

4   A    Yes.

5   Q    Is this another number, information for Goo, for Mr.

6   Gardner, ma'am?

7   A    Yes, I guess.

8   Q    And if I'm reading that correctly, is that a 56, it looks

9   like a 2, 9418?

10  A    Yes.

11  Q    Now, finally, I believe, there's another phone for a Shelly.

12  Is that a reference to your son, Mr. Martin, or to Mr. Martin's

13  father?

14  A    His father.

15  Q    Ms. Parsons, at some point did you sign some documents on

16  your son's behalf, legal papers and things like that, that he

17  wanted to, to do as part of his case?

18  A    Yes.  I was his power of attorney.

19  Q    At the time that you signed these pieces of paper, did you

20  have an understanding of what they meant?  Did you review them or

21  help your son draft them up or anything like that?

22  A    No, I didn't.

23  Q    You did not?

24  A    No.

25  Q    Showing you what's been marked into this case as part of

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 92 of 281

1    Government's Exhibit C-2.  And give me just a moment, ma'am.  One

2    part of Government's Exhibit C-2 is something called an

3    administrative notice.  Am I reading that correctly on the

4    screen?

5    A    Yes.

6    Q    And then there's a whole bunch of questions in this

7    administrative notice.  And there's some references to your son,

8    Shelly Wayne Martin, is that correct?

9    A    Yes.

10   Q    At the very end of this particular piece of paper, there's

11   this reference here, there's a page called jurat, and it says

12   it's subscribed to and sworn to, and then there's the name, if

13   I'm reading it correctly, Joyce Ann Martin on February 12th of

14   2005, is that right?

15   A    Yes.

16   Q    Is that your signature there, Ms. Parsons?

17   A    No, it's not.

18   Q    That's not your signature there?

19   A    No.

20   Q    Is there anyone else who goes by the name of Joyce Ann

21   Martin?

22   A    Not that I know of.

23   Q    But you don't know who signed this or how it came to be

24   signed?

25   A    No.  That's not my writing.  That's not my handwriting right

1    there.

2    Q    Did you authorize anyone to sign this piece of paper on your

3    behalf?

4    A    No.

5    Q    Do you have any idea what a jurat is, J-U-R-A-T, that word

6    at the top of the page?

7    A    No.

8    Q    Do you know who Michelle Mitchell is, identified here as a

9    notary?

10   A    I don't recall, I don't recall.

11   Q    You don't recall her?

12   A    Michelle Mitchell?  Was she a notary public?  Oh, yeah, I

13   think one time I went over her house.

14   Q    One time.  And did she notarize something for you?

15   A    Yes.

16   Q    But just so we're clear, that is not your signature there,

17   is that correct?

18   A    No.

19   Q    Do you recognize that signature here, which appears to read

20   Michelle Mitchell, signature of notary public?

21   A    Yes.

22   Q    And does that appear to be Ms. Mitchell's signature?  Would

23   you recognize that?

24   A    I wouldn't recognize it if it's her signature or not.  But

25   she signed papers.

1    Q    These various pieces of paper, did you ever deliver any of

2    them for your son?  Did you ever take any of them to the post

3    office or put them in envelopes or anything like that?

4    A    No.

5    Q    Focusing on Government's Exhibit C-2 just for a second.  I

6    showed you an administrative notice.  I'm going to try to break

7    this apart without hopefully ruining the whole thing.

8         In an envelope.  I'll zoom out a little bit.  Tell me

9    if you have any difficulty seeing it, Ms. Parsons.  The name at

10   the top is Shelly Wayne Martin at Two Cree Court, Randallstown,

11   Maryland.  That's the return address on this envelope, is that

12   right?

13   A    Yes.

14   Q    And then it's addressed to Robert Harding at the U.S.

15   Attorney's office, is that right?

16   A    Yes.

17   Q    Is that your handwriting on these envelopes?

18   A    It looks like it.  I'm not sure.

19   Q    This could be your handwriting?

20   A    I'm not sure.

21   Q    You're not sure?

22   A    I'm not sure.

23   Q    Let me show you some other envelopes which are also part of

24   the Government's Exhibit C-2.  Another envelope, and the same

25   exhibit, also addressed to Robert Harding.  This one in the name

1    of a Willie Edward Mitchell.  Do you know if this handwriting is

2    yours?

3    A    No.  I'm not sure.  No, that's not mine.

4    Q    From your view, ma'am, and if you can tell, does the

5    handwriting on the two return addresses appear to be the same?

6    A    No, they're not the same handwriting.

7    Q    You don't think that's the same handwriting there?

8    A    No.

9    Q    Can you see the two references to Robert Harding here, the

10   two addresses on these two envelopes, both part of Government's

11   Exhibit C-2?

12   A    Um-hum.  Yes.

13   Q    This one is on the one that was, that had a return address

14   to your son at Two Cree Court, is that correct?

15   A    Repeat yourself, what you said.

16   Q    You bet.  The one at the top, I've put two envelopes up on

17   the screen at the same time, both of them have addresses of

18   Robert Harding.  The one I circled has a return address on it to

19   Shelly Wayne Martin at Two Cree Court, is that right?

20   A    Yes.

21   Q    And then there's another one down here which has a return

22   address, it's a little bit blocked, but the name appears to be

23   Willie Edward Mitchell, is that correct?

24   A    Yes.

25   Q    Is the handwriting, we've talked about the handwriting up

1    here, is the handwriting on this one at the bottom, do you

2    recognize that handwriting or do you believe it to be yours?

3    A    No.

4    Q    How about the two handwritings, the two addresses to Mr.

5    Harding?  Do those two handwritten addresses appear to be written

6    by the same hand?

7    A    I don't know.

8    Q    Showing you part of what's been entered into evidence, Ms.

9    Parsons, as Government's Exhibit C-6.  This is a piece of paper

10   which is part of Government's Exhibit C-6, which is captioned

11   here or which is titled, A Motion to Dismiss for Lack of

12   Territorial Jurisdiction.  Am I reading that right?

13   A    Yes.

14   Q    And at the top of this page the return address or the filing

15   part name is Shawn Earl Gardner, care of Joyce Martin at Two Cree

16   Court.  Is that right?

17   A    Yes.

18   Q    Did you ever submit or help to prepare any of these pieces

19   of paper on Shawn Earl Gardner's behalf, Goo's behalf?

20   A    Yes.

21   Q    So you did some of these for Mr. Gardner?

22   A    I didn't do no paper.  I signed.  I was his power of

23   attorney.

24   Q    Did you sign any papers for Willie Edward Mitchell?

25   A    No.

1   Q    Do you know who Willie Edward Mitchell is?

2   A    Yes.

3   Q    Would you recognize him if you saw him?

4   A    Yes.

5   Q    Do you see him in court today, ma'am?

6   A    Yes.

7   Q    If you could, please identify him.  Tell us where he is and

8   what he's wearing.

9   A    He's right there.  Bo.

10  Q    Closest citizen to me, other than the attorney?

11  A    Yes.

12  Q    Your Honor, identifying the defendant, Mr. Mitchell.

13       THE COURT:  So noted.

14  Q    Would you recognize a Shelton Harris if you saw him in

15  court?

16  A    Yes.

17  Q    And do you see Mr. Harris in court?

18  A    He's right over there.

19  Q    And near the end of defense table?

20  A    No.  He right there.  In the middle.

21  Q    Can you tell us what color shirt he's wearing?

22  A    Blue.

23  Q    Your Honor, for the record, identifying Mr. Harris.

24       THE COURT:  So noted.

25  Q    Did you prepare any documents for Mr. Mitchell or Mr.

1   Harris, act as their powers of attorney or anything like that?

2   A    No.

3   Q    But you did for Mr. Gardner and you did for your son, Mr.

4   Martin?

5   A    Yes.

6   Q    The very last page of the same piece of paper I was asking

7   you.  Is that your signature, Ms. Martin?

8   A    Yes, that's my signature.

9   Q    Identified as Martin/Parsons.  Is that your full name?

10  A    Yes.

11  Q    Is that Mr. Gardner's signature below yours?

12  A    No.

13  Q    Did you sign this on his behalf?

14  A    Yes, I did.

15  Q    If you don't mind me asking, Ms. Parsons, what does PA stand

16  for?  Is that power of attorney?

17  A    Yes.

18  Q    Did you deposit this document in the mail or file with the

19  court for Mr. Gardner or anything like that?

20  A    No.

21  Q    What did you do with this after it was executed and signed

22  off?  Where did you actually take the piece of paper?

23  A    Someone picked it up.

24  Q    Do you remember who picked it up?

25  A    I don't recall her name right offhand.

1    Q   It was a legal document relative to a case that your son was

2    involved in.  You don't remember who took it or anything like

3    that?

4    A   I don't remember her name.

5    Q   Was it a young lady that picked it up, a female?

6    A   Yes.

7    Q   Do you know if this was a lady who knew Mr. Mitchell or Mr.

8    Harris?

9    A   Knew Mr. Mitchell.

10   Q   It was someone who was attached to Mr. Mitchell or knew Mr.

11   Mitchell?

12   A   Yes, uh-huh.

13   Q   And this was the individual that came to your house and

14   picked up this legal document and took it away, is that correct?

15   A   Yes.

16   Q   Was it your understanding it was going to be filed with the

17   court or sent to the U.S. Attorney's office or the court or

18   something like that?

19   A   Filed with the court, I think it was.

20   Q   On the subject of these court pleadings, Ms. Parsons, who

21   asked you or who told you to sign these documents?  How did you

22   get involved in it?

23   A   My son told me to sign for him.

24   Q   Your son, Mr. Martin?

25   A   Yes.

1    Q    Now, at some point you also became Mr. Gardner's power of

2    attorney.  How did that come about?

3    A    Because I was his Godmother.

4    Q    You're Mr. Gardner's, Goo's Godmother?

5    A    Yes.

6    Q    Who actually approached you and asked you to do that?  Did

7    Mr. Martin ask you to do that for Mr. Gardner or Mr. Gardner

8    asked you to do it himself?

9    A    Asked me to do it himself.

10   Q    Mr. Gardner did?

11   A    Yes.

12   Q    Now, at some point there was some testimony today about a

13   movie stub that was found in your house that you turned over to

14   the lawyers working with your son, is that right?

15   A    Yes.

16   Q    And the date on that stub, which I'm not sure I have in

17   front of me, is March 24th of 2002.  Does that sound correct?

18   A    Yes.

19   Q    Now, your son was, ended up getting arrested and went into

20   jail several weeks after that movie, about three weeks after

21   March 24th of 2002.  Does that sound right?

22   A    I'm not sure.

23   Q    To your knowledge, does your son typically keep movie stubs

24   from the movies he goes and sees?

25   A    I don't know.

1    Q    And then you were also asked some questions about a young

2    lady.  There was a name Lakeisha McCoy.  There was also a

3    nickname that you gave, Ms. Parsons.  Could you give it to us

4    again?

5    A    Kiki.

6    Q    Kiki?

7    A    Yes.

8    Q    And you do not know whether or not Kiki and your son had any

9    kind of relationship in 2002 or were seeing each other, is that

10   right?

11   A    Yes.  They were seeing each other.

12   Q    Do you remember seeing Kiki, Lakeisha McCoy, around your

13   house on March 24th or 25th of 2002?  On that date specifically.

14   A    I don't recall.  I don't know.  Plus, like I work at night.

15   Q    So you wouldn't have any way of knowing, is that fair to

16   say?

17   A    Yes.

18   Q    Your Honor, I believe that's all I have.

19            CROSS EXAMINATION

20   BY MR. MARTIN:

21   Q    Good afternoon, Ms. Parsons.

22   A    Good afternoon.

23   Q    Ms. Parsons, you identified Mr. Shelton Harris in the blue

24   shirt there?

25   A    Yes.

1    Q    You never saw him on the street, though, did you?

2    A    No.

3    Q    You saw him, you identified him because you were here in

4    court the day opening statements were made, isn't that right?

5    A    Correct.

6    Q    And that's the only way you know him?

7    A    Yes.

8    Q    You don't know him through your son, do you?

9    A    No.

10   Q    Thank you.

11             CROSS EXAMINATION

12   BY MR. COBURN:

13   Q    Ms. Parsons, good afternoon.

14   A    Good afternoon.

15   Q    I'm one of the lawyers representing Shawn Gardner.

16   A    Yes.

17   Q    Just a few questions, okay?

18   A    Yes.

19   Q    Now, you know Shawn Gardner as Goo, right?

20   A    Yes.

21   Q    How did you first get to know him?  How did you come to know

22   Mr. Gardner or Goo?

23   A    About a year after I moved to Baltimore, I was working at

24   the store called Sanitary Market.  And he used to come in there

25   ever day before he getting ready to go to school.

1    Q    I'm sorry.  Go ahead.

2    A    That's how I got to know him.  I knew him from there.

3    Q    And about how old was Goo or Mr. Gardner when you first got

4    to know him in that way, when he started coming and going in and

5    out of the store?

6    A    Elementary school.

7    Q    He was in elementary school?

8    A    Yes.

9    Q    So this was a while ago?

10   A    Yes.

11   Q    Where was the store located?

12   A    On Liberty Road in Randallstown.

13   Q    What kind of a store was it?

14   A    It was a small market, market store.

15   Q    Did you and Mr. Gardner become friends?

16   A    Yes.

17   Q    How did it happen that you became his Godmother?

18   A    Because he came, and when he was coming around the store,

19   and I just told him I was going to be his Godmother.

20   Q    And about when was that?

21   A    It was about, I don't know exactly right after I met him, I

22   don't know how long it was after I met him.  I don't know.

23   Q    Well, at the point you told him that you were going to

24   become his Godmother, did you feel like you knew him pretty well?

25   A    It was a while after I had met him.

1  Q    Okay.  How did he come to know your son, Shelly Wayne

2  Martin?  Did he know him in some other way or was that through

3  you?

4  A    I don't know.  I don't know how they got to know each other.

5  Q    Did he know you longer or did he know your son longer, if

6  you know that?

7  A    I think he knew me before he knew my son.

8  Q    Do you know about how long he knew you from before he kept,

9  got to know your son?

10  A    No.

11  Q    Okay.  You mentioned, in response to one of the questions

12  Mr. Hanlon was asking you, I think it was while you were looking

13  at this, while you were looking at this phone book at one point.

14  Do you remember when Mr. Hanlon, the gentleman over there, was

15  asking you questions about this phone book?

16  A    Yes.

17  Q    And whose phone book is this, Ms. Parsons?

18  A    It look like mine, they took out of my house.

19  Q    So it's your phone book, not Shelly Wayne Martin's phone

20  book?

21  A    No, it's mine.  It was the same one they took from my house.

22  Q    So all those phone numbers you had in there for Goo, those

23  are numbers that you wrote in your phone book?

24  A    Yes.

25  Q    Now, when you were involved with these pieces of paper, you

1    know, the legal mail, the envelopes that were addressed to Mr.

2    Harding, did you know what that was about?

3    A    No, I had no idea.

4    Q    You mentioned at one point that you knew that Goo's

5    daughter, Goo had a daughter who'd been born?

6    A    Yes.

7    Q    Do you remember when that was?

8    A    That was when I was living on Sunmar Court.  It was before

9    2002.  But I don't know what date or not.

10   Q    Before 2002?

11   A    Yes.

12   Q    Do you remember her name?  That's okay.

13   A    No.

14   Q    No problem.  Finally, do you remember testifying when Mr.

15   Crowe, the gentleman over there, was asking you questions about

16   Harold Glaser?

17   A    Yes.

18   Q    And you told Mr. Crowe that Mr. Glaser was representing your

19   son, Shelly Wayne Martin, in his, with respect to his legal

20   problems back in the year 2002.  Is that correct?

21   A    Yes.

22   Q    Who found Mr. Glaser?  Was that you or your son who found

23   him?

24   A    My son.

25   Q    Okay.  And then you told us about a payment arrangement that

1    you had with Mr. Glaser, right?

2    A    Yes.

3    Q    And did you tell the ladies and gentlemen of the jury that

4    this was sort of an installment payment plan that you had?

5    A    Yes.

6    Q    So you were supposed to be making payments over time, is

7    that right?

8    A    Yes.

9    Q    And during that time that you were making payments, it was

10   your understanding that Mr. Glaser was already representing your

11   son, right?

12   A    Yes.

13   Q    So while Mr. Glaser was your lawyer, you were making

14   payments which, in the end, before the trial, was supposed to

15   total $10,000, right?

16   A    Yes.

17   Q    And you were making those payments, right?

18   A    Yes.

19   Q    Even though it was hard, you made them, right?

20   A    Yes.

21   Q    Now, did your son ever express any dissatisfaction with Mr.

22   Glaser to you?  Did he say, I don't want Mr. Glaser as my lawyer?

23   A    I don't recall.  I don't know.

24   Q    You don't recall him doing that?

25   A    No.  I don't know.

1    Q    Okay.  So far as you knew, while you were making these

2    payments, Mr. Glaser was functioning as your son's lawyer, right?

3    A    Yes.

4    Q    And he's a private lawyer, right?  Obviously, since you were

5    paying him?  Excuse me.  The Court wasn't paying him.  You were,

6    right?

7    A    Yes.

8    Q    Thank you.  Nothing further.

9               REDIRECT EXAMINATION

10   BY MR. CROWE:

11   Q    Mr. Hanlon showed you a phone bill which he said was seized

12   from Two Cree Court for a telephone number in your son's name

13   where your son's address was listed as Sunmar Court.  Do you

14   recall that?

15   A    Yes.

16   Q    And Sunmar Court is where you lived before you moved to Two

17   Cree Court, is that correct?

18   A    Correct.

19   Q    Was there a period of time when your son was in a halfway

20   house before he came home to live permanently?

21   A    Yes.

22   Q    And while he was in the halfway house, were there times when

23   he would get furloughs and he would be able to spend some time at

24   home or an occasional night at home?

25   A    Yes.

1    Q    Okay.  And your recollection was that he first came to

2    Sunmar Court and then later to Cree Court, is that correct?

3    A    Correct.

4    Q    And is it also your recollection that he was finally

5    released from the halfway house sometime in March of 2002?

6    A    Before I moved to Cree Court he had, he was living with

7    Sunmar Court when we moved to Cree Court.  He was with me then.

8    Q    Okay.  But do you recall when he was released finally from

9    the halfway house, that is when he was able to spend every night

10   at home?  If you don't, that's fine.

11   A    I don't.

12   Q    That's okay.  It's been a long time ago.

13        You were asked by Mr. Coburn if you understood the

14   various papers that the son, that you signed on behalf of your

15   son or Mr. Gardner.  Did you even, did you try to read any of

16   them?

17   A    I tried to read them.  Still didn't understand them.

18   Q    Did they make any sense to you?

19   A    No.

20   Q    Okay.  Thank you very much.

21                RECROSS EXAMINATION

22   BY MR. HANLON:

23   Q    One question, Your Honor.  Ms. Parsons, if you remember, you

24   were asked by me and by Mr. Crowe and I think by Mr. Coburn about

25   Harold Glaser representing your son.  Do you know when Mr. Glaser

1    actually entered his appearance in your son's case?  That is,

2    when he actually began, when he notified the Court that he was

3    going to be your son's attorney?  Do you know when that happened?

4    A    No.  I don't remember.  No.

5    Q    Just a moment, Your Honor.  Thank you, Your Honor.  Thank

6    you, ma'am.

7              THE COURT:  Ms. Parsons, thank you very much.  You're

8    excused.

9              THE WITNESS:  Okay.  Thank you.

10             MS. RHODES:  We have another witness ready but I meed

11   to mark some exhibits and do a couple things before we call him.

12   Is it possible to take the lunch break at this time?

13             THE COURT:  Well, I was hoping to do a few more before

14   the lunch break.  I think Mr. Coburn and Mr. Kurland --

15             MR. COBURN:  I think we're ready.

16             THE COURT:  Will it take more than ten minutes or so?

17             MR. KURLAND:  Probably, Your Honor.

18             THE COURT:  More than 15?

19             MR. KURLAND:  15 is probably what it would take.  But

20   there's one brief matter, a sidebar.

21             THE COURT:  Let's give it a try.  What's the witness'

22   name again?  Refresh me.

23             MR. COBURN:  Jamane Johnson, Your Honor.

24             THE COURT:  Ladies and gentlemen, Mr. Coburn -- you

25   want to confer with counsel?

1          MR. KURLAND:  Well, I need to confer with Mr. Harding.

2     This has sort of changed the timing and Mr. Harding may have a

3     reason to want to do this --

4          THE COURT:  Go ahead and chat.

5          (Pause in Proceedings.)

6          MR. CROWE:  Your Honor, may I return the exhibits to

7     Ms. Arrington?

8          THE COURT:  Please.

9          MR. KURLAND:  Could we have a sidebar, myself and Mr.

10    Harding?

11         THE COURT:  You can't work it out between yourselves?

12         MR. KURLAND:  No.

13         THE COURT:  I would rather you do it yourself.  You

14    don't need me.

15         MR. KURLAND:  It's a matter of, because of trying to

16    switch around orders, I told Mr. Harding earlier that I expected

17    that he'd be able to look at the transcript over the lunch break.

18    He hasn't had an opportunity to do that.  We're trying it

19    accommodate the Court's schedule.  And that's why --

20         THE COURT:  Okay.  All right.  All right.  Members of

21    the jury, we'll break now for lunch.

22         What we are trying to put in place, there is a witness

23    who has testified in a previous proceeding, who the parties here

24    have agreed you may consider that witness' prior testimony for

25    purposes of these proceedings.  And I think what Mr. Kurland and

1    Mr. Coburn plan to do is that one of them will take the role of

2    the attorney who was asking the questions and the other one, or

3    somebody else, will take the role of the witness.

4            So the question will be read and then the witness'

5    answer will be read.  And you will be able to treat that

6    testimony as if the witness were actually here testifying.

7            The witness is the individual, I think, who's been

8    referred to in these proceedings as Momma or Jamane Johnson.

9            So we apparently have a few additional items to clarify

10   with respect to that procedure.  So I'm going to excuse you for

11   luncheon recess at this time.  Please leave your note pads on

12   your chairs.  Have no discussion about any of the evidence you've

13   heard so far or any aspect of the case.  Continue to keep an open

14   mind about all issues.  The jury's excused until 2 p.m.

15           (Jury exits the courtroom.)

16           THE COURT:  What's up?

17           MR. KURLAND:  No.  That was just, the Court's little

18   preamble was almost exactly what I would have proposed.  Just

19   explaining to the jury what's going on.  One other thing is --

20           THE COURT:  Well, but what's the problem?

21           MR. KURLAND:  The problem is is that the final edits of

22   the transcript, Mr. Harding hasn't had a chance --

23           THE COURT:  Please have a seat, everyone, for a moment.

24   I'm going to clarify.

25           MR. KURLAND:  Is that there are certain procedural

1    aspects of the testimony that, that have been edited out.  And

2    Mr. Harding just wanted an opportunity to look at them to make

3    sure that he agreed with the deletions.

4            THE COURT:  So there's no problem?

5            MR. KURLAND:  No.  No.

6            THE COURT:  It's just that Mr. Harding hasn't yet had a

7    chance to review the final transcript.

8            MR. KURLAND:  Exactly.  Exactly.

9            THE COURT:  All right.

10           MR. KURLAND:  That's all.  There's also one exhibit

11   that will go along with the testimony that Mr. Harding, I've

12   given a copy to, that I don't anticipate there being any problem

13   with.

14           THE COURT:  What is the exhibit?

15           MR. KURLAND:  The exhibit is Mr. Johnson was originally

16   charged in a 10 count state indictment.  He pled to Count Seven.

17   And there's an interlineation of the actual, I blotted out

18   everything except the Count Seven he pled to, the language.  The

19   parties have agreed that that actually --

20           THE COURT:  I'm sorry.  What is the exhibit?  Is it a

21   plea agreement?

22           MR. KURLAND:  No.  Not a plea agreement.

23           THE COURT:  What is it?

24           MR. KURLAND:  It's the language of the charge to which

25   he pled.

1          THE COURT:  And where does it appear?  What is the

2     exhibit?

3          MR. KURLAND:  No.  It's a blotted-out document of the

4     actual charging document that's referred to in his testimony.

5     The parties don't have a problem.

6          THE COURT:  Okay.  What is the exhibit?  Is it an

7     indictment?  Is it an information?

8          MR. KURLAND:  It's a piece of paper.

9          THE COURT:  What is it?

10         MR. KURLAND:  An indictment.  One paragraph.

11         THE COURT:  So it's an indictment?

12         MR. KURLAND:  Yes.

13         THE COURT:  That's all I was asking.  What is the

14     exhibit?  It's an indictment.

15         MR. KURLAND:  Well, there's one other issue.

16         Mr. Johnson has, I would say, three or four prior

17     convictions.  The prior convictions are of the 609(a)(1) variety

18     that the Court is going to have to make a ruling on as to whether

19     or not they're admissible to impeach.

20         THE COURT:  Wait.  No.  Let me explain.  When counsel

21     in a case in front of me have agreed to present prior testimony,

22     what I expect is to be totally uninvolved.  I expect -- which one

23     of you is going to play Johnson?

24         MR. COBURN:  I will, Your Honor.

25         THE COURT:  So Mr. Coburn is Momma.  And how many

1    lawyers are inquiring?

2         MR. KURLAND:  There's three, but I'm going to be all of

3    them because Mr. Harding doesn't want to read.

4         THE COURT:  And who are the lawyers?

5         MR. KURLAND:  Mr. Stocksdale, the State's Attorney, and

6    then two defense lawyers.  I was going to just simply say direct

7    examination and cross examination, and not even identify it's the

8    state's attorneys.

9         THE COURT:  Okay.  So you'll read the questions.

10        MR. KURLAND:  Yes.

11        THE COURT:  Mr. Coburn will read the answers.  I don't

12   expect to rule on any objections.  I don't even expect there to

13   be any objections.

14        MR. KURLAND:  Good.

15        THE COURT:  Right?

16        MR. KURLAND:  Yes.

17        THE COURT:  So what were you referring to just now

18   about the 609?

19        MR. KURLAND:  Oh, after that or before that --

20        THE COURT:  Before what?

21        MR. KURLAND:  Well, before, either before the testimony

22   or after the testimony, Mr. Johnson has several prior

23   convictions.

24        THE COURT:  All right.  But wait a second.  Wait a

25   second.  Is this not in the transcript?

1           MR. KURLAND:  Two of them are.  I believe one isn't.

2           THE COURT:  And they were admitted?

3           MR. KURLAND:  They were acknowledged during the

4     examination, yes.

5           THE COURT:  Okay.  So what is there for me to do except

6     sit here and listen?  That's what I'm trying to get to.

7           MR. KURLAND:  I believe there might well be one

8     additional prior conviction.

9           THE COURT:  That was not, that was not the subject of

10    the examination?

11          MR. KURLAND:  Yes.

12          THE COURT:  So why, why are we going to get into that?

13          MR. HARDING:  Judge, it's because I agreed to stipulate

14    to the admission of this transcript on condition that a list of

15    his prior convictions also come in.

16          THE COURT:  A list?

17          MR. HARDING:  A list.

18          THE COURT:  Are you talking about a separate exhibit?

19          MR. HARDING:  Yes.  A separate exhibit, like his rap

20    sheet.  Or a list.  It can be a list.

21          THE COURT:  I guess nothing in this trial is easy.

22    Absolutely nothing.

23          MR. HARDING:  It's important, Your Honor, because --

24          THE COURT:  Look, that's fine.  I just want to know how

25    we're going to do it.  Is there not some way -- I don't think we

1    should change the transcript to include it.  What's the missing

2    conviction, the one that he didn't acknowledge in the transcript?

3            MR. HARDING:  Well, there's one conviction since the

4    transcript in time.  There's one from 2006.  If he were --

5            THE COURT:  Is that the one that's not mentioned?

6            MR. KURLAND:  I believe so, Your Honor.

7            THE COURT:  Okay.  So the way we would do it is at the

8    end of the reading I would turn to the jury and say something

9    like, or you, Mr. Harding, would get up and say to the jury, I

10   guess I should do it, in addition to the two convictions that Mr.

11   Johnson acknowledged on the transcript, the parties have agreed

12   that Mr. Johnson has an additional conviction; namely, a

13   conviction for?

14           MR. HARDING:  Let me just clarify.  I don't necessarily

15   agree that there's only one.

16           THE COURT:  But we're only going to do one, is that

17   right?

18           MR. HARDING:  There are only two mentioned in the

19   transcript.  There may only be one.  I don't remember.  In any

20   case, there are a total of five prior convictions, one of which

21   is the robbery that he pled guilty to.  So that's clearly

22   mentioned.  So there are four narcotics convictions.  I just want

23   to get in a list of those narcotics convictions and the dates of

24   the arrest.

25           THE COURT:  The dates of the arrest or the dates of the

1  convictions?

2         MR. HARDING:  I don't have the dates of the conviction.

3         THE COURT:  Why are you entitled to get in the dates

4  somebody was arrested?  What's the relevance of that?

5         MR. HARDING:  Well, if it's better, I'll just get in

6  the year of the arrest or something like that.

7         THE COURT:  Or the year of the conviction.  It's

8  supposed to be impeachment by conviction of a crime.  You

9  yourself, Mr. Harding, have objected to testimony about arrests

10  of some people.

11        MR. HARDING:  No.  But these are convictions.

12        THE COURT:  Right.  That's why I'm saying, let's forget

13  about dates of arrest.  Let's talk about the date of the

14  conviction.

15        MR. HARDING:  Well, I may be able to get that over

16  lunch.  I have to talk to my agents.

17        THE COURT:  So here's what I'm going to expect you to

18  do over lunch.  Finalize the transcript.  Give me a copy so I can

19  follow along.  I assume all of counsel have copies.  And agree on

20  how we're going to add in the one or two additional convictions

21  for impeachment purposes, which I will be happy to recite to the

22  jury after Mr., after Mr. Kurland and Mr. Coburn finish with

23  their demonstration.  Okay?  But there won't be any objections

24  read in the transcript, correct?

25        MR. KURLAND:  Well, there might be one that's overruled

1    for the flow.  But I've tried to delete all those.

2              THE COURT:  Delete all of the objections.  Please.

3              MR. KURLAND:  All right.

4              THE COURT:  Do not read, because then, you know, you're

5    going to be reading, you're going to be reading for the judge,

6    too.  And that goes too far.

7              MR. KURLAND:  All right.  There's one court line I'll

8    take out.  Your Honor, the problem is these drug convictions,

9    particularly the stuff that happened after the testimony, are

10   609(a)(1) convictions, which it's up to the judge to rule under

11   403 whether they're admissible to impeach or not.

12             THE COURT:  All right.  They're admissible.

13             MR. KURLAND:  All right.

14             THE COURT:  Anything else?  Look, I really don't want

15   to stumble over there, Mr. Kurland.  Please, please, have it in

16   place.  You going to be ready to go immediately after lunch or do

17   you want Ms. Rhodes to go first?

18             MR. KURLAND:  As long as I can get a couple copies

19   made.  Yes.  Yes.  Yes.  Yes.

20             MR. COBURN:  Do you want me to sit up there when I do

21   it, Your Honor?

22             THE COURT:  Yes.  I want you to sit on the witness

23   stand.

24             MR. KURLAND:  We will be ready to go.

25             THE COURT:  Okay.  Ms. Rhodes, you have two telephone

1    people?

2              MS. RHODES:  Yes, Your Honor.

3              THE COURT:  And that third person?  Oh, the third

4    person was the coach --

5              MS. RHODES:  Has vanished, yes.

6              THE COURT:  And then, Mr. Crowe, do you have another?

7              MR. CROWE:  We don't, Your Honor.  But I have one thing

8    I would like to ask the Court.

9              THE COURT:  What is that?

10             MR. CROWE:  We have postponed an initial appearance on

11   a violation of supervised release before Magistrate Bredar.  In

12   the event this leaks over a little past two, may we be excused?

13             THE COURT:  Of course.  Of course.  Mr. Martin, you and

14   Mr. Flannery?

15             MR. MARTIN:  We have some documents that are certified

16   that we're going to put in.  There's an agreement with Mr.

17   Harding on one of them.

18             THE COURT:  So you can do that when we need to fill

19   some time.

20             MR. MARTIN:  When we have the time.

21             THE COURT:  And finally, Mr. Coburn, Mr. Kurland?

22             MR. COBURN:  I think --

23             THE COURT:  You can stay there.  You can stay there,

24   Mr. Coburn.  Apart from the transcript, what else do you have?

25             MR. COBURN:  Darryl Bacon.  I don't know whether he's

1    here or has been picked up or anything like that.  And then we

2    have Tyesha Collins.

3            THE COURT:  All right.  I've decided, Ms. Arrington

4    left a message for -- what's the mother's name again?

5            MR. COBURN:  Sarah Allen, Your Honor.

6            THE COURT:  Ms. Allen.  And I have decided that it's

7    inappropriate for the Court to issue an arrest warrant for a

8    minor to a six-year-old murder on the basis, and in fact, I

9    couldn't issue the arrest warrant for the minor.  I would have to

10   issue it for her mother because it's the mother who's responsible

11   for getting her here.  And based on your proffer this morning,

12   that the only point of her testimony, if she's called at all, is

13   to have her describe to the jury in contrast to other witnesses

14   that one of the perpetrators walked or ran away from the scene

15   before the shot was fired, whereas earlier testimony has both

16   perpetrators standing there and leaving together.

17           Now, whether this young person saw Mr. Montgomery, who

18   claims that he was close to the scene and turned and walked away,

19   or whether, in fact, this person saw one of the perpetrators

20   actually walk away before the shot was fired I don't think is

21   material and I think it would be an abuse of the Court's

22   authority to issue an arrest warrant for a mother who I guess the

23   marshals would have to go there and say, We have an arrest

24   warrant for you, Ms. Allen, but what the judge really wants is

25   for you to bring your daughter to court.  I'm not going there.

121

1          So I'm accepting your proffer.  Your objection is

2    noted.  And I do note that you indicated, and I appreciate the

3    candor, that you weren't even sure you were going to call this

4    witness.  What you were mainly interested in, at least as an

5    initial matter, was talking to her to see what she might say.

6    Because you haven't talked to her yet, correct?

7          MR. COBURN:  I have, I have talked to her.

8          THE COURT:  So that was the basis of your proffer?

9          MR. COBURN:  It was.

10         THE COURT:  Together with the statement you got from

11   the government?

12         MR. COBURN:  Yeah.  The proffer's actually a little

13   more expansive than the statement itself.

14         THE COURT:  All right.  Well, that's the Court's

15   ruling.  I'm not issuing a warrant for her, Ms. Allen.  Yes, Ms.

16   Rhodes.

17         MS. RHODES:  Just to clarify, Your Honor.  We do have a

18   couple other things this afternoon we can do, some exhibits, some

19   documents.

20         THE COURT:  Okay.

21         MS. RHODES:  That sort of thing.  Maybe another 20

22   minutes or so beyond the two witnesses.

23         THE COURT:  Okay.  Thank you.  We're in recess until

24   2:00.

25         (Luncheon Recess at 12:45 p.m.)

1          MR. HARDING:  Your Honor, I'm handing up a list of the

2     Jamane Johnson narcotics convictions and supporting

3     documentation.

4          THE COURT:  All right.  Thank you, Mr. Harding.

5          MR. HARDING:  I showed to Mr. Kurland.

6          THE COURT:  I'm sorry?

7          MR. HARDING:  I showed to it Mr. Kurland.

8          THE COURT:  Mr. Martin?

9          MR. MARTIN:  Yes, Your Honor.  Remember we had the

10    discussion the other day about Mark Herbert, TM, the witness who

11    had been here, Mr. Harding informed us that he'd been here in the

12    courtroom?

13         THE COURT:  Yes.

14         MR. MARTIN:  So he's here, Your Honor.  We've talked to

15    him.  And you may want to interrogate him before he goes on the

16    stand, if you're even going to decide whether you're going to let

17    him on the stand.

18         I would proffer to the Court that he would testify he

19    wasn't here for opening statements.  He was here for a couple of

20    days and saw some of the drug witnesses, the police come in.  He

21    may have seen Mr. Bacon testify.  But he was not here for Mr.

22    Hayes's testimony, which is the subject that we would have him

23    here on.

24         THE COURT:  Okay.

25         MR. MARTIN:  And he didn't see any of that and doesn't

1   know about any of that.

2           THE COURT:  All right.  Mr. Harding?

3           MR. HARDING:  Well, the agents disagree on how many

4   days he was here.  They have a larger figure, several weeks, in

5   fact, I believe, was their estimate.  And in any event, his

6   sister, Ayesha, with whom he was living back at the relevant time

7   period, has been here even more often and was here during Rodney

8   Hayes's testimony.

9           So we think there's a very clear violation of the

10  sequestration order here.  And it results from the defendant's

11  own conduct in this case.

12          THE COURT:  Here's the way I'm going to cure it, Mr.

13  Harding.  Mr. Martin can call the witness.  But before Mr. Martin

14  or any other defense counsel makes inquiry, I will permit you to

15  effectively impeach the witness in advance by showing,

16  questioning him as to his presence in the courtroom, ask him

17  whether he was aware of the rule on witnesses, and to find out

18  with whom he has spoken.

19          In other words, I'll let you do that first.  And then

20  after you have gone through that, then we'll hand the witness to

21  the defense.  And then, of course, you will have an opportunity

22  for further cross examination.

23          MR. HARDING:  Okay.  Well, he, of course, was never

24  subpoenaed to testify so he didn't violate the court order on

25  sequestration.

1            THE COURT:  Well, I appreciate that.  But any witness

2    is bound by the rule.  I'm not suggesting that he should have

3    known about it.  I'm just suggesting the kinds of interrogation

4    you're free to conduct.

5            MR. HARDING:  Okay, Your Honor.

6            THE COURT:  You could even ask him when he found out he

7    was going to be called as a witness.  I mean, so I'll leave it to

8    you as to how you wish to approach that.  Mr. Martin, if you're

9    objecting, I'll note your objection.

10           MR. MARTIN:  Yes, Your Honor.  I think the appropriate

11   way to do it would be either to do it outside the presence of the

12   jury or let Mr. Harding do it on his cross and not to let him

13   start that way.  But whatever you're going to do.  I'm not

14   actually calling him.

15           THE COURT:  I'm sorry?

16           MR. MARTIN:  He just wanted me to get up here and take

17   the heat, Your Honor.

18           THE COURT:  I should have known.

19           MR. MARTIN:  That's why I'm up here.

20           THE COURT:  I should have known.  All right.

21           MR. LAWLOR:  I never get any favorable rulings.  Mr.

22   Martin's --

23           THE COURT:  Which category does this one fall into, Mr.

24   Lawlor?

25           MR. LAWLOR:  So far, so good.

1          THE COURT:  All right.  Mr. Coburn?

2          MR. COBURN:  Hi, Your Honor.  I wanted to inquire

3     through the Court --

4          THE COURT:  Excuse me, Mr. Coburn.

5          By the way, Mr. Harding, I'm sorry to distract you.

6     Assuming you accept the Court's cure --

7          MR. HARDING:  Well --

8          THE COURT:  Or do you want just to forego all that and

9     wait until your cross to bring all that out?  It's up to you.

10    And you don't have to decide now, frankly.  If you want to think

11    about it, chat about it with the agents and/or Mr. Hanlon.  When

12    Mr. Lawlor calls him, I'll just look to you.  And if you stand

13    up, you'll go first.  And I'll instruct the jury that this is a

14    witness who admittedly was in the courtroom during an earlier

15    phase of the trial.  And therefore, I'm permitting you to inquire

16    of the witness before he's tendered to the defense for regular

17    questioning.

18         MR. HARDING:  Is he represented by counsel, may I ask?

19         MR. LAWLOR:  He is, Your Honor.  And he is, according

20    to what he told us, he's been advised by his counsel about his

21    testimony here.

22         THE COURT:  That it's okay for him to testify?

23         MR. LAWLOR:  I don't know what, I just know he talked

24    to his lawyer.  I told him to talk to his lawyer.  He told me the

25    name of his lawyer.  I said I could not and would not advise him

1    about the propriety of testifying.

2              THE COURT:  And he has not been served with a subpoena.

3              MR. LAWLOR:  He has not been served with a subpoena.

4              THE COURT:  So he's here as a volunteer.  So that

5    satisfies me.

6              MR. HARDING:  Okay.  I will, I will take advantage of

7    the Court's offer to question the witness first of all.  I'm a

8    little worried about the fact that he apparently is minimizing

9    how often he's been here, if my agents --

10             MR. MARTIN:  Your Honor, I may have been minimizing it.

11   I'm not saying he did.  I didn't ask him how many days he was

12   here.  I asked him what he saw.

13             THE COURT:  All right.

14             MR. MARTIN:  I didn't calculate days when I did it.

15             THE COURT:  All right.  It may be that I'm going to

16   recognize him and I may have a better idea than anybody else as

17   to how often he's been here.  But we'll just see how it goes.  Go

18   ahead, Mr. Coburn.

19             MR. COBURN:  Thank you so much, Your Honor.  I just

20   wanted to inquire, I guess I'm assuming, I wanted to inquire

21   through Your Honor since we haven't heard anything, I'm assuming

22   Darryl Bacon has not appeared?

23             MR. HANLON:  No, Your Honor.

24             THE COURT:  I haven't authorized the warrant.  What's

25   your report, Mr. Harding?  What's the best?

1          MR. HARDING:  No report.  No information.  He didn't

2     show.

3          MR. COBURN:  I do request a warrant, Your Honor.  It

4     doesn't have the same sort of sensitivity as, of course, the

5     other situation.

6          THE COURT:  And Mr. Kurland's going to be prepared to

7     go forward with him if he's brought in tomorrow morning?

8          MR. KURLAND:  Yes.

9          MR. COBURN:  Yes.

10         THE COURT:  All right.  Mr. Harding, do the agents at

11    least have a cell phone for him?  Are they able to make

12    telephonic contact?

13         MR. HARDING:  They do, yes.

14         THE COURT:  All right.  I would ask the agents --

15         MR. HARDING:  He's not been answering his phone,

16    obviously.

17         THE COURT:  All right.  I would ask the agent to simply

18    leave a voice mail for Mr. Bacon, specifically advising him, one,

19    that the call is at the direction of the Court; number two, that

20    the Court advised had him that he was subject to recall; and

21    number three, that if he doesn't appear by 3:30 this afternoon,

22    the Court will issue an arrest warrant for him.

23         MR. HARDING:  3:30 this afternoon?

24         THE COURT:  3:30 this afternoon is his deadline.

25         MR. HARDING:  Okay.  Just a bit of background here,

1    Your Honor.  I'm sure Your Honor recalls that he was specifically

2    named on the Stop Snitching video and is consequently terrified

3    of appearing in this courtroom.

4             THE COURT:  I fully understand that.  What I am hoping

5    is that he will call the agent back, arrange to meet the agent

6    some place, and get an escort back here this afternoon or

7    tomorrow morning.  Do his bit, and then he's, he's out of here.

8    I certainly, you know --

9             MR. HARDING:  The Court has ruled that the letter's not

10   coming in.  And Mr. Coburn, I thought, made it clear that they

11   didn't have anything to do with Mr. Bacon other than the letters.

12            THE COURT:  No.  It was just the opposite.  Now, Mr.

13   Coburn was obviously making good faith representations.  But he's

14   entitled to have the Court proceed on his representation that

15   he's going to elicit some affirmative evidence.

16            MR. KURLAND:  Well, Judge, before 3:30 --  I'm sorry.

17            THE COURT:  I'm finished with Mr. Bacon.

18            MR. COBURN:  Thank you, Your Honor.

19            THE COURT:  All right.  Do you want to take the stand,

20   Mr. Coburn?

21            MR. COBURN:  Yes, Your Honor.

22            MR. MARTIN:  Can I cross examine, Your Honor?

23            THE COURT:  You may.

24            MR. COBURN:  That's a scary prospect.

25            THE COURT:  So Mr. Kurland, Mr. Harding has handed me a

1    list of five convictions.  April, '98, April, '98, May, '99,

2    October, '99, and February, '06.  Can you tell me quickly which

3    two are mentioned in the transcript?

4              MR. KURLAND:  I'm not sure the dates.  But the

5    testimony that he testified to was in September 30th, 2004.  So

6    it's obviously the counts to which he pled, which is the, the

7    armed robbery.

8              THE COURT:  I'm sorry.  Do you know, Mr. Harding?

9              MR. HARDING:  I'm sorry.  I wasn't paying attention.

10             THE COURT:  Look, why don't I just do it this way?  At

11   the end of the examination, I'll just say, and it's stipulated by

12   the parties that Mr. Johnson has the following convictions?

13             MR. KURLAND:  Yes.

14             THE COURT:  Okay?  So I'll just read them off.

15             MR. KURLAND:  Mr. Harding's represented to me they're

16   all felonies which qualify under the rule.  And the Court has

17   already ruled under the 609(a)(1) the Court's ruled them

18   admissible.  So that's acceptable.

19             THE COURT:  All right.

20             MR. KURLAND:  When the jury comes, I'm going to call

21   Jamane Johnson.

22             THE COURT:  Exactly.  And I'll tell the jury that while

23   there are some witnesses whose grand, whose transcribed

24   testimony -- let me start over.  I will tell the jury that they

25   will have as exhibits the prior testimony, the transcript of the

1   prior testimony of certain witnesses who will be named later.

2   This witness, though being presented in this fashion, the

3   transcript itself is not being admitted.

4           MR. KURLAND:  Exactly, Your Honor.  And as you said

5   before, and to treat this just like any other live witness

6   testimony.

7           THE COURT:  Exactly.  All right.  We'll have the jury,

8   please.  Is Mr. Harris okay?

9           MR. LAWLOR:  Yes, Your Honor.

10          MS. RHODES:  Your Honor, given the Court's decision on

11  Coach Lynch, we have sort of standing by Coach Powers from Nausau

12  Community College in New York.  He can't be here until Wednesday

13  morning, though.

14          THE COURT:  Could we do him next?

15          MS. RHODES:  I'm sorry?

16          THE COURT:  We'll do him next.

17          MS. RHODES:  No, I said he can't be here until

18  Wednesday morning.

19          THE COURT:  Oh, no.  I'm not going to have any

20  witnesses on Wednesday morning.  There's a limit.  We're going to

21  finish the evidence tomorrow.  If he can't get down here

22  tomorrow, I'm sorry.  No.  We're not going to have any evidence

23  Wednesday morning.  We're going to have argument.  Okay.

24          Once again, the video is available, Ms. Rhodes, to get

25  that set up.  The live video.  Live video.

1          (Jury enters the courtroom.)

2          THE COURT:  You could get him to FedEx.

3          Good afternoon, ladies and gentlemen.  Thank you for

4     your patience.

5          I advised you before we broke for lunch, this next

6     witness is actually being called by way of a transcript of his

7     testimony in a prior proceeding.  Mr. Coburn will read the words

8     spoken by Mr. Jamane Johnson, known during this trial as Momma,

9     and Mr. Kurland will read all of the questions put to the witness

10    in this prior proceeding by all of the attorneys who appeared.

11    It won't be a single attorney, but Mr. Kurland will not identify

12    by name or occupation beyond attorney the individuals who were

13    doing the questioning.

14         Mr. Coburn will read the answers exactly as they appear

15    in the transcript of Mr. Johnson's prior testimony and you may

16    consider this testimony just as if Mr. Johnson were actually here

17    giving this testimony.

18         Now, I need to tell you that there will be transcripts

19    of prior testimony of at least two witnesses, and perhaps as many

20    as three, that have been or will be actually marked as exhibits

21    and available to you to review in the jury room during your

22    deliberations, just as you will be able to review most of the

23    exhibits that have been admitted in this case.  However, with

24    respect to the testimony of Mr. Johnson which you are about to

25    hear, the transcript itself is not being admitted into evidence.

1    Only the testimony of Mr. Johnson as given to you now by Mr.

2    Coburn playing the role of Mr. Johnson will be available to you

3    to consider.  But other than that, you may consider this

4    testimony, as I say, exactly as if it was Mr. Johnson sitting on

5    the stand rather than Mr. Coburn.

6              Mr. Kurland, you may call your next witness.

7              MR. KURLAND:  Mr. Gardner calls Jamane Johnson.

8              THE COURT:  Very well.  And I'll remind you, gentlemen,

9    that you need to read slowly.

10             MR. COBURN:  Thank you, Your Honor.

11             THE CLERK:  Raise your right hand.

12             THE COURT:  Let me.  No.  We don't need to play that.

13   There's a limit to the play acting.

14             MR. KURLAND:  The witness --

15             THE COURT:  And I will tell, I will tell the ladies and

16   gentlemen of the jury that at the time Mr. Johnson gave the

17   testimony you are about to hear, he was duly and appropriately

18   placed under oath in the fashion that you've come, you've become

19   accustomed to seeing.  But we don't have to swear Mr. Coburn.  Go

20   ahead, Mr. Kurland.

21             EXAMINATION OF JAMANE JOHNSON

22   (AS READ BY MR. KURLAND AND MR. COBURN):

23   Q    Thank you, Mr. Johnson.  You have a nickname?

24   A    Momma.

25   Q    Momma.  Do you even know the defendant's nickname?

1    A    No.

2    Q    Did you know Tonya Spence?

3    A    Yes.

4    Q    How long had you known Tonya Spence prior to June the 7th,

5    2002?

6    A    For more than ten years.

7    Q    Did you know she was married?

8    A    Yes.

9    Q    Do you know her husband's name?  What was that?

10   A    Darius Spence.

11   Q    In June of 2002, what was your relationship to her?

12   A    We was good, intimate friends.

13   Q    Okay.  And did you -- how often did you talk to her?

14   A    Every day.

15   Q    On June the 7th, 2002, shortly after 4:30, did you have

16   occasion to speak to Tonya?

17   A    Yeah.

18   Q    Okay.  And how did you do that?  Physically how was that

19   accomplished?

20   A    On the phone.

21   Q    And what type of phone were you using?

22   A    A cell phone.

23   Q    Okay.  And first of all, do you recognize the number

24   443-375-2168?

25   A    Yes.  That was Tonya's number.

EXAMINATION OF JAMANE JOHNSON                    134

1   Q    That was Tonya's phone.  And who was Lisa Young?

2   A    My mother.

3   Q    Okay.  And do you recognize the number 443-324-1107?

4   A    Yes.  That was my phone.

5   Q    And who did, who used that phone?

6   A    Me.

7   Q    Did anyone else other than you use that phone?

8   A    No.

9   Q    Were you charged in this case?

10  A    Yes.

11  Q    And did you eventually plead guilty?

12  A    Yes.

13  Q    What did you plead guilty to?

14  A    Conspiracy to robbery.

15            THE COURT:  Excuse me one moment.

16            A JUROR:  Could you slow down a bit?

17            THE COURT:  Slow down, please, gentlemen.

18            MR. COBURN:  Absolutely.

19            THE COURT:  Thank you.

20  Q    I'll go down to 33 and a third.

21            What did you plead guilty to?

22  A    Conspiracy to robbery.

23  Q    And who was it that you pled guilty conspiracy to rob of?

24  A    Darius Spence.

25  Q    And what was the sentence that you received?

1   A   A 15 year suspended sentence.

2   Q   Do you know an individual by the name of William Montgomery?

3   A   Yes.

4   Q   Prior to Tonya's death, did you, could you describe how you

5   knew Mr. Montgomery?

6   A   How did I know him?

7   Q   Yeah.  How'd you know him?

8   A   Just from around.

9   Q   Okay.  From the neighborhood?

10  A   Right.

11  Q   All right.  Prior to Tonya's death, did you have an

12  opportunity or occasion to speak with William Montgomery?

13  A   Yes.

14  Q   And where is it, if you recall, where is it that you spoke

15  with him?

16  A   On Mosher Street.

17  Q   Mosher Street.  And when you spoke with him, what did he say

18  to you?

19  A   He told me he's got, he had talked to Darius not long ago

20  about -- Darius take -- Darius wanted him to do something for

21  him.

22  Q   Okay.  What did Darius want, wanted him to do that he told

23  you?

24  A   Take care of me.

25  Q   All right.  What did you take that to mean?

1   A    Darius wanted him to kill me.

2   Q    Okay.  Well, you're here, right?

3   A    Right.

4   Q    So Darius -- so not, you were not killed by Mr. Montgomery,

5   is that right?

6   A    Right.

7   Q    Did he explain to you why he didn't kill you?

8   A    Yes.

9   Q    And what did he tell you?

10  A    That Dirty told him not to do it.

11  Q    And who is Dirty?

12  A    Guy from around the neighborhood.

13  Q    I mean, do you know his real name?

14  A    Davon Watson.

15  Q    Davon Watson?

16  A    Right.

17  Q    And how long have you known Davon Watson?

18  A    For a long time, too.

19  Q    For a long time?

20  A    Right.

21  Q    Was he a friend of yours?

22  A    I wouldn't say buddy-buddy friends, but we know each

23  other --

24  Q    Okay.

25  A    -- on terms to speak and stuff like that.

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 137 of 281

1  Q    And do you know whether or not he was a friend of Will

2  Montgomery's?

3  A    Right.  Yes.

4  Q    Okay.  He, yes, he was a friend of Will Montgomery's?

5  A    He was present -- they was friends.

6  Q    And did, after that conversation that you had with him, or

7  if it was during that conversation -- I'm not sure which one --

8  did Mr. Montgomery ever ask you to do something?

9  A    Yes.

10  Q    What did he ask you to do?

11  A    Show him where Darius live at.

12  Q    And why did he want to do that?  Why did he want you to show

13  him where Darius lived at?

14  A    So he could rob.

15  Q    So he could rob him?

16  A    Right.

17  Q    And did he ask you to do anything for him?

18  A    No.

19  Q    Okay.  Did he -- well, you just -- what did you do after he

20  ask you to show him where Darius lived?

21  A    I show him.

22  Q    After you -- how many times did you show Darius where --

23  excuse me -- showed Will Montgomery where Darius live?

24  A    Once.

25  Q    Once.  And -- I'm sorry -- I interchanged some names.  Let

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 138 of 281

1    me direct your attention to June 7th, 2002.  You had indicated

2    that you, shortly after 4:30, were speaking to Tonya Spence.  You

3    remember testifying to that?

4    A    Right.

5    Q    During that conversation, did you have an opportunity to get

6    a call from someone else?

7    A    Yes.

8    Q    And who was that someone else?

9    A    Will.

10   Q    And Will, what is Will's last name?

11   A    Montgomery.

12   Q    And what did Will Montgomery say to you?

13   A    He asked me where Darius was at.

14   Q    Okay.  And what did you tell him?

15   A    I didn't know.

16   Q    Okay.  And what -- did he ask you anything else?

17   A    Yes.  He asked --

18   Q    What did he ask you?

19   A    He asked me where my girl was at.

20   Q    Okay.

21   A    And I --

22   Q    I'm sorry.  You told him --

23   A    Yeah.  He asked me where my girl was at.

24   Q    And did you respond?

25   A    Right.

1    Q    What did you say?

2    A    I, well, I said why?  Is there something about to go down?

3    And he said, no.

4    Q    And how long was the conversation that you had with him?

5    A    Couple seconds.  Wasn't that long.

6    Q    Wasn't long?

7    A    Wasn't even a minute.

8    Q    Wasn't even a minute?

9    A    Then it says, witness nodding head yes.

10   Q    All right.  And at that point did you hang up your phone?

11   A    Right.  No.  I clicked back over Tonya and -- I clicked back

12   over.

13   Q    Okay.  So you clicked back over for Tonya?

14   A    Right.

15   Q    All right.  And did you continue speaking to her?

16   A    Sure.

17   Q    All right.  In this case -- excuse me.  Have you been

18   convicted of any crimes prior to coming into court today?

19   A    Yes.

20   Q    And what have you been convicted of?

21   A    Possession with intent to distribute.

22   Q    Okay.  Are you currently on probation?

23   A    Yeah.

24   Q    And what are you on probation for?

25   A    Conspiracy to rob.

1    Q    Okay.  And that was out of a charge in this courthouse?

2    A    Right.

3    Q    And who was the judge?

4    A    Dugan.

5    Q    Judge Dugan?

6    A    Says witness nodding head yes.

7    Q    Okay.  And where are you currently being housed?

8    A    DOC.

9    Q    DOC?

10   A    Again, witness nodding head yes.

11   Q    And why are you being housed there?

12   A    Because probation -- I mean, a parole violation.

13   Q    A parole violation?

14   A    Right.

15   Q    And what was the parole violation?

16   A    Possession with intent to distribute.

17   Q    Okay.  And have you already had your parole hearing for

18   that?

19   A    Yeah.

20   Q    Okay.  And what sentence did you get?

21   A    I, I had to finish up my time.

22   Q    Okay.  And how much time did you have to finish out?

23   A    Five years.

24   Q    Okay.  Mr. Johnson, when you were arrested, you were

25   originally arrested for and charged with the murder of Dar -- of

1    Tonya Spence, isn't that right?

2    A    Yes.

3    Q    Okay.  And then, in fact, you were able to work out an

4    agreement with the state that you would plead guilty to the

5    conspiracy to rob Darius --

6    A    Yes.

7    Q    -- Spence, isn't that correct?

8    A    Yes.

9    Q    Okay.  Now, do you recall being interviewed on several

10   occasions by detectives from the Baltimore County Police

11   Department?

12   A    Yes.

13   Q    Okay.  And do you recall being -- do you know what those

14   detectives' names are?  Do you remember?

15   A    Marll and Tincher.

16   Q    Okay.  And in fact, they're with you today, aren't they?

17   A    Right.

18   Q    I just want to make sure you remember who they are.  And do

19   you recall them coming to, I assume, your home on or about

20   September of 2002 to interview you?

21   A    Yes.

22   Q    Okay.  And at that time do you recall disclosing to those

23   detectives that you used to own a green Oldsmobile?

24   A    Yes.

25   Q    Okay.  And in fact, you did own a green Oldsmobile, didn't

1    you?

2    A    Yes.  Yeah.

3    Q    And you no longer own that Oldsmobile --

4    A    No.

5    Q    -- is that correct?  Okay.  And then is it fair to say that

6    you did own that Oldsmobile in June of 2002?

7    A    Right.

8    Q    Right.  And during that interview -- I'm sorry.  Do you

9    remember that once again the detectives interviewed you on 12/11,

10   which was the date that you were arrested?

11   A    Right.

12   Q    Okay.  And do you recall, and do you recall that you did not

13   show -- and do you recall that you did not show Mr. Montgomery

14   where Ms. Spence lived?

15   A    I don't believe, I don't think I was asked that.

16   Q    Okay.

17   A    I, I don't remember.

18   Q    Well, okay.  Well, do you recall saying that you thought

19   they lived on Sequoia Avenue near Wabash?

20   A    Right.  Right.

21   Q    You do remember saying that?

22   A    Says, witness noting head yes.

23   Q    So then it is, in fact, a correct statement that you did not

24   tell Mr. Montgomery, that you did not tell the detectives, and

25   that you told Mr. Montgomery or showed Mr. Montgomery where Mr.

1    and Mrs. Spence lived?

2              MR. COBURN:  The question is that you did not tell the

3    detectives that you told Mr. Montgomery or showed Mr. Montgomery

4    where Mr. And Mrs. Spence lived?  And the answer is, you say I

5    didn't talk?

6    Q    Is it fair to say, now that you remember --

7    A    Right.

8    Q    -- you said that he lived on Sequoia Avenue?

9    A    Right.

10   Q    -- that you did not, you did tell the detectives that they

11   lived -- you thought they lived on Sequoia Avenue?

12   A    Right.

13   Q    Okay.  And do you remember -- also recall, and is it fair to

14   say that you told those detectives you never showed Will where

15   Mrs. Spence and Darius lived?

16   A    Did I say that?

17   Q    Mm-hmm.

18   A    I don't know.  I might.

19   Q    You might have said that?

20   A    I might.  I, I mean, I don't know.

21   Q    Okay.  Now, you described your relationship with Mrs. Spence

22   as an intimate one.  Is it fair to say, Mr. Johnson, that you and

23   Ms. Spence were having an affair?

24   A    Yes.

25   Q    And is it fair to say that -- strike that.  Is it fair to

1    say that that affair had been going on for some time?

2    A    Yes.

3    Q    And is it also fair to say that Mr. Spence, shortly before

4    the murder, learned about the, that she was having an affair?

5    A    Yes.

6    Q    Okay.  Not necessarily with you, but that she was having an

7    affair?

8    A    Right.

9    Q    All right.  And at the time you received the alleged call

10   from Mr. Montgomery, where were you?

11   A    On Monroe Street.

12   Q    On Mosher Street?

13   A    Monroe.

14   Q    Oh, Monroe.  Is it Monroe Street?  And you were in a home or

15   out on the street?

16   A    Out on the street.

17   Q    And you were out on the street with some friends?

18   A    I'm not, I'm not quite sure she was out there, but, so --

19   Q    Okay.  Well, is it fair to say that you thought you were by

20   yourself when you were out on the street and received the call?

21   A    I don't know.  Probably people was outside.

22   Q    Okay.

23   A    I wasn't out there by myself.  I know other people was

24   outside.

25   Q    Were you having a conversation with those people or was it

1   just that people were outside and you received a phone call?

2   A    People was outside.

3   Q    And you received a phone call?

4   A    Right.

5   Q    Okay.  So you weren't at a, like, party or a gathering?

6   A    No.

7   Q    There was just people outside?

8   A    Right.

9   Q    And you -- okay.  Then is it fair to say, then, that there

10  isn't anybody, there wasn't anybody with you that could verify

11  that Mr. Montgomery called you?

12  A    No.

13  Q    It's just your word, isn't that correct?

14  A    Right.

15  Q    Okay.  And is it fair to say, Mr. Johnson, that one of the

16  businesses that you're in is the business of dealing narcotics?

17  A    No, I'm not in that business.

18  Q    You're not in that business?

19  A    The transcript says mm-mm or um-um.  I think that's a

20  negative.

21  Q    Okay.  Did I understand you correctly when you said that you

22  had been convicted of possession with intent to distribute?

23  A    Right.

24  Q    And that would be narcotics?

25  A    Right.

1    Q    Okay.  But despite that conviction, you deny that you're in

2    any type of business of dealing drugs?

3    A    Right.

4    Q    Okay.  Okay.  Is it fair, also, to say, Mr. Johnson, that

5    when you were interviewed by the detectives concerning your car,

6    you originally told them that you drive a gold-colored Cadillac?

7    A    I had one of them, too.

8    Q    Okay.  And is it fair to say that you didn't volunteer the

9    information that you drove a green Oldsmobile?

10   A    Right.

11   Q    Is it fair to say that on direct examination you testified

12   that you're the only one that uses your cell phone?

13   A    Right.

14   Q    Okay.  Then is it fair to say that during the time that

15   you've had that cell phone, you have never allowed anyone else to

16   make a phone call or that -- on that cell phone?

17   A    Well, I'm sure I did.

18   Q    Oh, okay.  You're sure that no one else has ever used your

19   cell phone?

20   A    Right.  Of course.

21   Q    Is it fair to say that other people have used your cell

22   phone?

23   A    Right.

24   Q    Mr. Johnson, in the case that you pleaded guilty to

25   conspiracy to rob Darius Spence, you were also charged with

1    murder, is that right?

2    A    Conspiracy.

3    Q    Okay.  I want to show you a photocopy of an indictment and

4    see -- did you ever look at the indictment charging you?

5    A    No.

6    Q    Why don't you take a look at that and see if that refreshes

7    your recollection with what you were charged with?  Feel free to

8    pick out to him whatever you want to.  The first count?

9    A    It says um-hum.

10   Q    You see where it says Jamane Antwon Johnson?

11   A    It says, witness nodding head yes.

12   Q    Aforesaid, feloniously, willfully and deliberately,

13   premeditated malice aforethought, did kill and murder one Tonya

14   Ann Jones Spence?  That was what you were charged with, right?

15   A    Okay.  Conspiracy to murder.

16   Q    I think you had testified on direct you don't know Aaron

17   Holly?

18   A    It says witness nodding head yes.

19   Q    And Shawn Gardner, is that correct?

20   A    Right.

21   Q    Whatever you did conspiracy-wise was actually with Will

22   Montgomery, isn't that right?

23   A    Right.

24   Q    Okay.  Now, in this indictment you are charged with

25   conspiracy to rob with a dangerous and deadly weapon in the sixth

1   count of Tonya Ann Jones Spence and not what you pleaded guilty

2   of, is that right?

3           MR. COBURN:  It says that's not what you pleaded guilty

4   of, is that right?  And the answer is right.

5   Q    You pleaded guilty to conspiracy to rob Darius Spence, is

6   that right?

7   A    Right.

8   Q    And that's the seventh count, do that I have right?

9   A    I don't know.  I have to read it first.  And it says there's

10  a pause.

11          No, I didn't con, I didn't plead guilty to conspiracy

12  Shawn Earl Gardner and Aaron Holly.

13  Q    I know he was going to get to that.  But as far as you

14  understand, you pleaded guilty to conspiracy to rob Darius

15  Spence?

16  A    Right.

17  Q    And this is the one count on this copy of the indictment

18  that has a checkmark to it, is that right?

19  A    Right.

20  Q    So you actually were able to plead guilty to conspiracy to

21  commit robbery rather than to commit robbery with a dangerous and

22  deadly weapon, is that right?

23  A    I guess.

24  Q    Well, I mean, your charge was reduced, wasn't it?

25  A    Right.

1    Q    Yes.  And as you pointed out, that what you pleaded guilty

2    to was conspiracy -- oh, I'm sorry.  At least what it says here

3    on the seventh count, that the conspiracy that you committed was

4    to conspiracy with Shawn Earl Gardner and Aaron Dwayne Holly, is

5    that right?

6    A    That's way, the way it reads right here, yeah.

7    Q    Okay.

8    A    I never seen it before.

9    Q    Okay.  So you never were actually charged with, as far as

10   this document is concerned, conspiring with Will Montgomery, is

11   that right?  Is it?

12   A    It don't say him, name on there.

13   Q    Were you represented by a lawyer?

14   A    Yes, I am.

15   Q    And what is it that you understand -- I mean, you were shown

16   an indictment, form indictment?

17   A    Right.

18   Q    What was it, what is your understanding as the evidence

19   which led to your guilty plea on that charge?

20   A    That I conspired with Will.

21   Q    What did you do with Will?

22   A    Show, pointed out apartment complex where I thought Darius

23   lived at.

24   Q    That's right.  Thank you.

25              Your Honor, that ends that.  I would just like to admit

1    Gardner Defense 12, which all the parties have seen it.  There's

2    no objection.

3              THE COURT:  All right.

4              MR. KURLAND:  Show it.

5              THE COURT:  Gardner 12.

6              MR. KURLAND:  How do I flip this on?

7              THE COURT:  You're going to have to toggle the source.

8              MR. KURLAND:  I'll just read it out.

9              THE COURT:  This is the document to which Mr. Johnson

10   referred during the reading of the prior testimony, ladies and

11   gentlemen, the seventh count of a charging document.  You want to

12   read it, Mr. Kurland?

13             MR. KURLAND:  I just probably better to have it up

14   there for 15 seconds and I'll take it down.

15             THE COURT:  All right.  Thank you, Mr. Kurland.  Thank

16   you, Mr. Coburn.

17             MR. COBURN:  Thank you, Your Honor.

18             THE COURT:  Ladies and gentlemen, it's agreed among the

19   parties that Mr. Johnson has five convictions that you may

20   consider in this case in evaluating the testimony you just heard

21   from Mr. Johnson.  There is an April 15th, 1998 conviction in

22   state court for possession with intent to distribute narcotics.

23   There is an April 27th, 1998 conviction for possession with

24   intent to distribute narcotics.  There is a May 5th, 1999

25   conviction for possession with intent to distribute narcotics.

1    There is an October 22nd, 1999 conviction for possession with

2    intent to distribute narcotics.  And there is a February 16th,

3    2006 conviction for Mr. Johnson of possession with intent to

4    distribute narcotics.

5            As I will instruct you in greater detail, you may

6    consider prior convictions of an individual witness in evaluating

7    the credibility of the witness and in determining what weight, if

8    any, you are to give or you choose to give to the testimony of

9    that witness.  Okay.

10           MR. LAWLOR:  Your Honor, may I go retrieve my next

11   witness?

12           THE COURT:  Mr. Lawlor.

13           MR. LAWLOR:  Your Honor, thank you.  Mr. Mitchell's

14   next witness will be Mark Herbert.  Your Honor, I understand the

15   government has some preliminary questions.

16           THE COURT:  Mr. Herbert, would you approach the witness

17   stand, please, and be sworn by the clerk?

18      MARK HERBERT, DEFENDANT MITCHELL WITNESS, SWORN

19           THE WITNESS:  Yes.

20           THE COURT:  You can be seated, please, Mr. Herbert.

21   Please get up as close as you can to that microphone.  You can

22   move the microphone around so that it's not directly in your

23   face.

24           We need you to speak directly into the microphone,

25   please, sir.  Please state your full name and spell it for the

1    record.

2              THE WITNESS:  Mark Herbert.  M-A-R-K.  H-E-R-B-E-R-T.

3              THE COURT:  Mr. Harding.

4              CROSS EXAMINATION

5    BY MR. HARDING:

6    Q    Good afternoon, Mr. Herbert.

7    A    Good morning.

8    Q    I'm Robert Harding, an Assistant United States Attorney.

9    I've met you before, haven't you?

10   A    Uh-huh.

11   Q    Okay.  Mr. Herbert, you've attended this trial on prior

12   days, isn't that correct?

13   A    Correct.

14   Q    And were you aware that the Court entered an order that no

15   one who was going to testify in this trial could sit in the

16   courtroom during the trial proceedings?

17   A    You saying do I know that?

18   Q    Yes.

19   A    Yes, I heard.  But I didn't know, at the time I didn't know.

20   Q    You didn't know you were going to be called to testify, is

21   that correct?

22   A    Yeah.  I didn't know.

23   Q    Is that because no one gave you a subpoena to come to court?

24   A    I got one now.  I mean, but I don't --

25   Q    You got one now?

1   A    I mean, they told me they subpoenaed me now but I don't

2   know.

3   Q    Who told you?

4   A    The lawyers.

5   Q    Which lawyers?

6   A    I don't -- I mean --

7   Q    The lawyers for whom?

8   A    They told me they subpoenaed.  They told me I get a

9   subpoena.

10  Q    They told you you'd get a subpoena?

11  A    Yeah.

12  Q    Well, have you gotten a subpoena?

13  A    No.

14  Q    So this, you didn't know you were going to be a witness in

15  this trial?

16  A    No.

17  Q    So you didn't know that you were violating the court order

18  by coming to court because the defense never issued you a

19  subpoena, is that correct?

20  A    Right.

21  Q    They never, when did they tell you that they wanted you to

22  come in and testify?

23  A    Like two weeks ago.

24  Q    Two weeks ago?

25  A    Yeah.  Something like two, three, something like that.

1    Q    You came to court for more than one day, didn't you?

2    A    Yeah.

3    Q    You came to court on a number of days?

4    A    Yeah.

5    Q    Over a period of several weeks, isn't that correct?

6    A    Yeah.

7    Q    And is it true, too, that your sister, Ayesha, has been in

8    the courtroom very often during the course of this trial?

9    A    Um-hum.

10          THE COURT:  You have to say yes or no, sir.

11   A    Oh, yes.

12   Q    And she was here on days when you were not here, is that

13   correct?

14   A    Yes.

15   Q    She's been here, for example, in the last few days?

16   A    Yes.

17   Q    Has she not?

18   A    Yes.

19   Q    You talk to your sister, don't you?

20   A    Occasionally, yes.

21   Q    You used to live with your sister, is that correct?

22   A    Yeah.

23   Q    Do you still live with your sister?

24   A    No.

25   Q    Do you live near your sister?

1          MR. LAWLOR:  Objection, Your Honor.

2          THE COURT:  Overruled.  You may answer.

3    A    Do I live near her?

4    Q    Yes.

5    A    I come around her but I don't actually live near her, no.

6    Q    Okay.  But you see her from time to time, is that correct?

7    A    Yes.

8    Q    Okay.  And so you're telling us that the reason why you came

9    to court all those times is because no one on the defense side of

10   this table told you they wanted you as a witness until a couple

11   of weeks ago, is that correct?

12   A    Correct.

13   Q    Did you continue to come to court after a couple of weeks

14   ago, when they told you you were going to be a witness?

15   A    No. I wasn't here for a while before they told me.

16   Q    I'm sorry?

17   A    I wasn't in court a few weeks prior before they told me.

18   Q    Oh --

19   A    I stopped coming.  I was going to work.

20   Q    How many, how many weeks did you come to court?

21   A    I really couldn't tell you.  I don't, it was more than two.

22   I guess I say that.

23   Q    More than two weeks?

24   A    About two.

25   Q    So you've heard the testimony of many witnesses?

1    A    Polices (sic).

2    Q    Polices.  But also some civilians?

3    A    Yeah.  Some civilians, but more polices.

4    Q    Okay.  Your Honor, the government objects to the testimony

5    of this witness for the obvious reasons.

6         THE COURT:  So noted.  The jury may take into account

7    the witness' presence in the courtroom during prior proceedings

8    in this trial in evaluating the witness' testimony.  But the

9    Court will permit counsel to question the witness.

10        DIRECT EXAMINATION

11   BY MR. LAWLOR:

12   Q    Thank you.  Mr. Herbert, before I get into the substance of

13   your testimony, let me ask you a couple quick questions.  Was a

14   subpoena necessary for your attendance here or so you could get

15   the day off from work?

16   A    Work.

17   Q    Okay.  And when is the first time that you and I ever laid

18   eyes on each other?

19   A    Two weeks ago.

20   Q    Two weeks?

21   A    Whenever it was.

22   Q    Okay.  That was the first time we ever spoke?

23   A    Yeah.

24   Q    Okay.  All right.  And now getting to the substance of your

25   testimony.  Do you go by a nickname?

1   A   Yeah.

2   Q   What's that?

3   A   TM.

4   Q   TM.  What's that short for?

5   A   Hmm?

6   Q   What's that stand for, TM?

7   A   Tony Montana.

8   Q   Okay.  And how old are you, sir?

9   A   24.

10  Q   Where do you work?

11  A   Hudak Demolition Company.

12  Q   Okay.  What do you do for them?

13  A   Demolition.

14  Q   Okay.  How long have you had that job?

15  A   About seven, eight months roughly.

16  Q   Okay.  Have you ever been convicted of a crime?

17  A   Yes.

18  Q   How many times?

19  A   Twice.

20  Q   Pardon me?  Talking about just convictions.

21  A   Twice.  I would say twice.

22  Q   Two times?  Is that for CDS, for drugs?

23  A   Yes.

24  Q   Did you ever serve time?

25  A   No.

1    Q    Just got probation when you were convicted?

2    A    Yes.

3    Q    Okay.  All right.  Do you know a gentleman by the name of

4    Rodney Hayes?

5    A    Yes.

6    Q    And how do you know him?

7    A    My sister brother.

8    Q    Okay.  He's not exactly your brother but you and he refer to

9    each other as brothers?

10   A    Yes.

11   Q    Okay.  You have no common parents but you have a common

12   sibling?

13   A    Yes.

14   Q    And your common sibling is Ayesha, right?

15   A    Yes.

16   Q    Were you here when Mr. Hayes testified?

17   A    No.

18   Q    Do you know a gentleman by the name of Willie Mitchell?

19   A    Yes.

20   Q    Do you know, does he go by Bo?

21   A    Yes.

22   Q    Do you know a gentleman by the name of Shelton Harris?

23   A    Yes.

24   Q    Does he go by Little Roc or Roc?

25   A    Whichever.

1   Q   Okay.

2   A   Yeah.

3   Q   When did you first, first meet Mr. Harris?

4   A   In probably like '99, something like that.

5   Q   '99?

6   A   Yes.

7   Q   What was the occasion?  How did you meet him?

8   A   I just met him around my grandmother neighborhood.

9   Q   Did you and he share a common interest?

10  A   Yes.

11  Q   What was that?

12  A   Music.

13  Q   Rap music?

14  A   Yes.

15  Q   Do you rap?

16  A   Yes.

17  Q   Okay.  Did there come a time when you -- there obviously

18  came a time when you met Mr. Mitchell, right?  When was that?

19  A   2001.

20  Q   Okay.  Now, did you and Bo and Roc rap together or work

21  together, rap?

22  A   Bo don't rap.  Me and Roc rap together.

23  Q   Okay.  Was there an entity that you all worked together at,

24  Shakedown?

25  A   Yeah.  That was the record.

1            MR. HARDING:  Objection to leading, Your Honor.

2            THE COURT:  Don't lead the witness.  Go ahead, Mr.

3     Lawlor.

4     Q    You all work together, is that right?

5     A    Yeah.

6     Q    Okay.  What was the name of the label?

7     A    Shakedown Entertainment.

8     Q    Was it also referred to as Sheistyville?

9     A    No.

10           MR. HARDING:  Objection.

11           THE COURT:  Overruled.

12    Q    I'm sorry.  What was the answer?

13    A    No.

14    Q    Okay.  Just Shakedown?

15    A    Uh-huh.

16    Q    All right.

17           THE COURT:  You have to say yes or no, Mr. Herbert.

18    A    Oh, yes.

19    Q    All right.  Now, what was Mr. Mitchell's role in Shakedown?

20    A    The CEO.

21    Q    Okay.  Did he rap?

22    A    No.

23    Q    Did he write lyrics?

24    A    No.

25    Q    And what was your role?

DIRECT EXAMINATION OF HERBERT BY LAWLOR

161

1    A    Rapping and writing music.

2    Q    And what was Roc's role?

3    A    Rapping and writing music.

4    Q    Were there other people that were involved in this?

5    A    Yes.

6    Q    And who were they?

7    A    Some twins and, I mean, it was, it was basically us, me, the

8    twins, Roc, Slo, Tony.

9    Q    Did people come and go?

10   A    Yeah.

11   Q    All right.  Now, where would you, did you record some CD's?

12   A    One CD.

13   Q    One CD?

14   A    Uh-huh.

15   Q    Did, did Rock and Bo work on some other CD's?

16   A    Me and Rock --

17   Q    No.  Did Rock and Bo work on some other CD's?

18   A    Oh, yeah, a CD.  This is before, before the CD I'm on.  One

19   other CD.

20   Q    You just worked on one?

21   A    Yeah.

22   Q    And what was that called?

23   A    Pure Shit.

24   Q    Pure Shit?

25   A    Uh-huh.

1    Q    Do you recall when that was recorded?

2    A    2002.

3    Q    You're aware of the fact that Mr. Mitchell was arrested,

4    incarcerated?

5    A    Yes.

6    Q    Was Pure Shit recorded after he was incarcerated?

7    A    Yes.

8    Q    Where did you record that, if I didn't already ask you that?

9    A    Just a random studio.  It was like no home studio or

10   nothing.  It was just a random studio.  I guess a little

11   building, basement like.

12   Q    Okay.  And someone had an equipment?

13   A    Yeah.

14   Q    Do you know who that was that had the equipment?

15   A    Can't think of his name.

16   Q    All right.  Did you have to pay to, for the time to use the

17   makeshift studio?

18   A    Yes.

19   Q    How much would that cost?

20   A    20, $35.  The price varies.  Different studio, different

21   prices.

22   Q    Okay.  But did you say approximately 20 to $30 an hour?

23   A    Yeah.

24   Q    And you made the CD, Pure Shit?

25   A    Yes.

1    Q    Now, was that like commercially copied?  Or how did you copy

2    it once you made the original?

3    A    Burnt it on, on the computer.  Just took the disk and put it

4    on the computer.

5    Q    You did that yourself?

6    A    Yes.

7    Q    And did you have like a graphic artist to make a label or

8    how did you write, how did pure, how did people know it was Pure

9    Shit?

10   A    We just wrote the name on the CD's.

11   Q    Did you sell them?

12   A    We tried to.  I mean --

13   Q    Who did?

14   A    Me and Rock.

15   Q    And how did you try to sell them?

16   A    Just random people.  Ask them, tell them to record music.

17   Would they like to help a local artist out, stuff like that.

18   Q    And did the CD ever get any air time?

19   A    You mean like the radio?

20   Q    Yeah.

21   A    One, like, a song, one song.

22   Q    One song got played?  On what station?

23   A    88.9.

24   Q    That's a local station?

25   A    Uh-huh.

1    Q    Okay.

2         THE COURT:  You have to say yes or no, Mr. Herbert.

3    A    Yes.

4    Q    Okay.  Now, let me ask you this.  You wrote lyrics?

5    A    Did I write lyrics?

6    Q    Yeah.

7    A    Yes.

8    Q    Now, what kind of things, like can you characterize the kind

9    of music, the kind of rap you were making or the kind of lyrics

10   you were writing?  What was the content?

11   A    I guess I would say like gangsta rap.

12   Q    Gangsta rap?

13   A    Yeah.  Rap music.  I don't know how to classify it.

14   Q    What kind of things would you rap about?

15   A    Stuff that go on, I mean, regular life that go on in

16   Baltimore City.  You know, regular stuff.

17   Q    Where did you live at the time, by the way?

18   A    In the Park Heights community.

19   Q    Okay.  So you said the regular stuff that went on in your

20   neighborhood?

21   A    Baltimore City neighborhoods.

22   Q    Baltimore City neighborhoods.  Fair enough.  Like what?  Can

23   you be a little more specific?  Like what?  A lot of stuff goes

24   on in Baltimore.

25   A    I mean, selling drugs.  Everything.

1    Q    Okay.  Murders?

2    A    Yeah.  Murder.

3    Q    Did you rap about murder?

4    A    Yeah.

5    Q    Now, were these lyrics that you wrote, were these things

6    that you had done, true things?

7    A    No.

8    Q    Or just things that came to you?

9    A    Just playing with words.

10   Q    Okay.  And did you listen to music like this as well?

11   A    Yes.

12   Q    Okay.  You listen to a lot of rap?

13   A    Yes.

14   Q    And what kind of rap did you listen to?

15   A    Gangsta music.  I don't know.  I don't know how to put it.

16   Q    All right.  Now, the stuff that you wrote and the stuff that

17   you listened to, were the themes similar?

18   A    Yes.

19   Q    Did you consider Bo and Rock good friends?

20   A    Yes.

21   Q    How often did you all work together, see each other?

22   A    We seen each other all the time.  Like, all the time.  Every

23   day.  I mean, not all the time we didn't see each other.  Just

24   seen them most every day, mostly every day.

25   Q    Now, was this rap thing something that you were hoping would

1    work, that would you succeed at?

2    A    Yeah.  Yes.

3    Q    Let me ask you a question.  After Bo got locked up, did you

4    ever get mail from him?

5    A    Yes.

6    Q    Did you ever get a letter from him that was addressed to

7    Rock?

8    A    I don't know.  More than likely, I mean everybody got mail

9    from whoever.

10   Q    Okay.  Let me ask you this, then.  Did you ever get a letter

11   from Bo that you opened that had instructions to murder a

12   gentleman by the name of Claudus Lassiter?

13   A    No.

14   Q    You never got a letter like that?

15   A    No.

16   Q    Had a map in it?

17   A    No.

18   Q    Something you might have opened in front of your brother?

19   A    No.

20   Q    Did your brother carry a gun?

21   A    No.  I mean, no.

22   Q    No, never, or no not all the time?

23   A    I mean, I seen one before, but, I mean, I don't, you know,

24   don't be around it like that, like that to see.  I don't know,

25   really.

1  Q    Did you ever have occasion, then, to take guns that belonged

2  to Mr. Hayes and lend them to people?

3  A    No.

4  Q    Did you ever take a gun that belonged to Mr. Hayes and lend

5  it to one of the twins?

6  A    No.

7  Q    Did you ever take a gun that belonged to Mr. Hayes and give

8  it to Willie?

9  A    No.

10  Q    Did you sell drugs around that time, 2000, 2001?

11  A    Yes.

12  Q    All right.  How did you obtain your drugs?

13  A    Stole them.

14  Q    How did you steal them?

15  A    Where I lived at is like a common drug neighborhood.  So I

16  just see somebody put their stash down and leave out my house and

17  go get it.

18  Q    You would go out after you saw someone put their stash and

19  take it when they weren't looking?

20  A    Yes.

21  Q    And then you would sell it?

22  A    Yes.

23  Q    Did you ever buy drugs from Mr. Mitchell?

24  A    No.

25  Q    Was Rock hustling at the time?

1    A    Yeah, I guess.  Yes.

2    Q    Were you working with him?  Was he hustling?  Were the two

3    of you enterprise or an outfit or anything like that?

4    A    No.

5    Q    Do you know where he got his drugs?

6    A    No.

7    Q    Did he buy them from Bo?

8    A    I don't know.  No.

9    Q    Did you ever, with or without Mr. Hayes, for that matter,

10   with Rock and Bo, vial up drugs, package drugs together?

11   A    Can you say that again?

12   Q    Sure.  Was there ever an occasion in the presence or outside

13   of the presence of Mr. Hayes, did you ever, with Rock and Bo,

14   vial up drugs, package drugs together?

15   A    No.

16   Q    All right.  How would Mr. Mitchell react when he was aware

17   of the fact that you were hustling?

18   A    We couldn't go to the studio.

19   Q    Say that again.

20   A    We couldn't go to the studio and stuff.

21   Q    Why was that?

22   A    Because he told us he wasn't doing that type stuff.  It was

23   a different way, music.

24   Q    Okay.  Were a lot of people out on Woodlawn hustling?

25   A    On where?

1    Q    On Woodlawn?

2    A    It's Woodland.  Yeah.  Yeah.  A couple people out there.

3    Q    Were they working together in groups or --

4    A    No.

5    Q    All right.  So what would happen if you were out hustling on

6    Woodlawn and you someone came up that you knew wanted to buy

7    drugs?  What would the street look like?  What would you do?

8    A    Can you say one more time?

9    Q    Sure.  If you were out hustling on Woodland and you saw a

10   customer, how would you react or how with other people react?

11   A    Everybody try to run to them and make the sale.

12   Q    Every man for himself?

13   A    Yeah.

14   Q    Now, you indicated that you just met me for the first time a

15   couple weeks ago, right?

16   A    Yes.

17   Q    Mr. Harding asked if you had met him on a prior occasion,

18   right?

19   A    Yes.

20   Q    And was that when you were testifying before a grand jury in

21   this matter?

22   A    Yes.

23   Q    Okay.  So you were subpoenaed to testify before the grand

24   jury and you did testify before the grand jury?

25   A    Yes.

1    Q    All right.  And you had been in court, you said, on several

2    occasions in this trial, right?

3    A    Yes.

4    Q    Okay.  And the two agents here, they were present when you

5    were present?

6    A    Yes.

7    Q    Okay.  Court's indulgence, please?

8         (Pause in Proceedings.)

9         MR. LAWLOR:  That's all I have.  Thank you.  Thank you,

10   Mr. Herbert.

11        THE COURT:  Mr. Harding.  Would you like some water,

12   Mr. Herbert?

13        THE WITNESS:  No.

14        CROSS EXAMINATION

15   BY MR. HARDING:

16   Q    Where were you living back in 2002, Mr. Herbert?

17   A    With my mother.  I mean at the beginning part of the year I

18   was living with my sister.

19   Q    And what's that address?

20   A    29, I think it's, it's either 10 or it's 13.  Something

21   like, it's one of them.

22   Q    What street?

23   A    Edgecombe Circle, North.

24   Q    And your mother lives very near there, doesn't she?

25   A    Yes.

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 171 of 281

1    Q    What street does she live on?

2    A    Dupont Avenue.

3    Q    And what's the address on Dupont?

4    A    2910.

5    Q    Okay.  It's 2910 Dupont for your mother and 2910 or 13 for

6    your sister?

7    A    Yes.

8    Q    Okay.  What's your sister's name?

9    A    Ayesha Hayes.

10   Q    Now, how old are you now, Mr. Herbert?

11   A    24.

12   Q    Okay.  And you said that you'd known Mr. Harris since about

13   1999.  So that would be nine years ago, since you were about 15?

14   A    Yeah.  Something like that.

15   Q    You're 24 now?

16   A    Yeah.

17   Q    Okay.  Would you say you grew up together, then, after --

18   A    No.  Not, not really.

19   Q    Okay.

20   A    I mean, like my grandmother just lived around there.  So I

21   would just come around the neighborhood.  I didn't live around

22   there, though.

23   Q    Okay.  But you became very tight with him, did you not?

24   A    Uh-huh.

25   Q    Very tight with Bo, also, after you met him in about, what

1   year did you meet him?

2   A    2001.

3   Q    And you became tight with him, also?

4   A    Um-hum.

5        THE COURT:  You have to say yes or no.

6   A    Yes.  Yes.

7   Q    In fact, you, before they got locked up, you saw them every

8   day?

9   A    Yes.

10  Q    And even after that, you frequently spoke to them while

11  they've been in jail, haven't you?

12  A    Yes.

13  Q    Because you could speak over the telephone pretty easily

14  from jail, right?

15  A    Say that again.

16  Q    You can speak pretty easily to people by telephone in jail,

17  right?

18  A    I don't know what you mean by easily.  But I talk to them

19  over the phone.

20  Q    Yeah.  I mean, they call you from jail, right?

21  A    Oh, yes.

22  Q    Both of them do?

23  A    Yes.

24  Q    And you go to visit them from time to time?

25  A    Yes.

1    Q    And you've also gotten letters, you told us, from Bo.  Have

2    you gotten letters from Mr. Harris, also?

3    A    I probably did but I can't point right to it.

4    Q    Okay.  Have you gone to visit them many times?

5    A    Several.  No, can't say many.  But a good bit.

6    Q    When you go over there, do you visit both of them or just

7    one of them?

8    A    Sometimes, it depends.  If I go, I mean, I go visit one one

9    day, one another day.

10   Q    I see.  Have you been more than a couple dozen times, you

11   think, since they've been locked up back in -- they've been

12   locked up a long time?

13   A    A couple dozen?

14   Q    Yeah.

15   A    No.  I can't say a couple dozen.  I don't even think it's

16   been over 12, truthfully.

17   Q    Okay.  Is that 12 for both of them or 12 apiece?

18   A    I say together.

19   Q    Okay.  Now, on the Shakedown Entertainment, you said you

20   didn't recognize the name Sheistyville, is that right?

21   A    No, I didn't say I didn't recognize it.  That wasn't the

22   name of the, the label.

23   Q    What was that the name of?

24   A    That's just a neighborhood name.

25   Q    Okay.  Did your Shakedown use it, also, in connection with

1    its rap music enterprise?

2    A    I really didn't understand the last part of it.

3    Q    Didn't Shakedown also use that name, Sheistyville?

4    A    Oh, yeah.  Yeah.  Yeah.  Yeah.  Yeah.  Yes, I mean.

5    Q    Didn't you guy call yourselves that as a group,

6    Sheistyville?

7    A    No.  That was just a neighborhood.  That's what we call our

8    neighborhood.

9    Q    Neighborhood being Park Heights?

10    A    Yeah.

11    Q    Okay.

12    A    Like Woodland.

13    Q    Okay.  A particular part of Park Heights, is that what

14    you're saying?

15    A    Yeah.  Kind of.

16    Q    And the people in the rap group, you gave us some names.

17    But really, it was just you and Shelton and a guy named Slo.

18    Remember Slo?

19    A    Yes.

20    Q    Okay.  And what's his name?

21    A    Slo?

22    Q    Yes.

23    A    Marvin.  I don't know his last name.

24    Q    You don't know his last name?

25    A    Nuh-uh.

1  Q    You've been rapping with him for years but you don't know

2  his last name?

3  A    I call him Slo.

4  Q    Right.  Okay.  And there were others who were in the group

5  at one point but kick, got kicked out or left, is that right?

6  A    Uh-huh.  They left.  Kicked out, left, whatever.

7  Q    Like the twins, whom you mentioned?

8  A    Um-hum.

9  Q    And a guy named Little White or Dwight.  Do you remember

10 him?

11 A    Yeah.

12 Q    He's another one, did he get kicked out or did he leave on

13 his own?

14 A    He just didn't come around.  He wasn't in the group long,

15 anyway.  He was never officially in the group.

16 Q    And of course, the leader was Bo, even though he didn't rap.

17 He was the producer, right?

18 A    The CEO.

19 Q    CEO, okay.  Did there come a time, Mr. Herbert, when Bo,

20 your friend, went to see, went to a party at Hammerjacks to see a

21 guy named Kevin Lyles?

22 A    Yeah.

23 Q    And he went there to, partly because he wanted to promote

24 you guys as a rap group, right?

25 A    Yes.

Case 1:04-cr-00029-RDB    Document 696    Filed 06/16/09    Page 176 of 281

1    Q    Speak to Kevin Lyles, maybe get you guys an interview with

2    an executive with Def Jam records?  Wouldn't that be nice?

3    A    Um-hum.

4    Q    Was that the idea?

5    A    Yes, I guess.  I really don't know.

6    Q    Okay.  Because you weren't there, right?

7    A    Right.

8    Q    You just know what he told you, right?

9    A    Right.

10   Q    And he got banked at that party, didn't he?  I mean, he got

11   beaten up afterwards with his cousin, Donte, right?

12   A    Yeah.

13   Q    His cousin is Donte Sands.  Do you know him?

14   A    Donte.  I don't know his last name.

15   Q    Okay.  Do you remember that after that, you heard that Bo

16   and Shelton were responsible for the murder of --

17              MR. LAWLOR:  Objection.

18              THE COURT:  You may complete the question.

19   Q    You heard, did you not, that Bo and Shelton were responsible

20   for a murder that occurred in Hasim Rahman's car, is that

21   correct?

22              MR. LAWLOR:  Objection.  Ask the jury be instructed to

23   disregard the question, Your Honor.

24              THE COURT:  The jury knows that counsel's questions are

25   not part of the evidence.  The question, Mr. Herbert, is did you

1    hear this?  There's been evidence in this case.  The question is

2    proper, did you hear this?  Not whether you believed it, not

3    whether you have an opinion about it.  Just did you hear this on

4    the street?

5            THE WITNESS:  After they was, after they was locked up?

6    Yes.

7            THE COURT:  Go ahead, Mr. Harding.  The answer was

8    after they were locked up.

9    BY MR. HARDING:

10   Q    After they were locked up, what?  You did hear it?

11   A    Bo, yeah.  He was locked up.

12   Q    In fact, after he was locked up, you talked to Bo, didn't

13   you?

14   A    Yeah.  I talked to him.

15   Q    And that was when he got locked up for the Hammerjacks

16   incident initially, right?

17   A    Yes.  That's what it supposed to have been.

18   Q    Okay.  But then he got charged with another double homicide

19   of a couple of guys near Wabash Avenue.  Do you remember that?

20   A    I don't remember but, yeah, that's what he was supposed to

21   be charged with, murder, something.

22   Q    Okay.  Do you remember, you had a conversation with him by

23   phone in jail and you asked him what was up with the two boys

24   across the track?  Do you remember that?

25   A    Yeah.  I mean --

1    Q    And he didn't, he didn't exactly deny it, did he?  He said,

2    quote, "I don't want to talk about this over the phone?"  Isn't

3    that what he told you?

4            MR. LAWLOR:  Objection to the characterization, Your

5    Honor.

6            THE COURT:  The objection's overruled.  You may answer.

7    Q    Isn't that what he told you?

8    A    Yes.  Something like, yeah, something like that.

9    Q    Now, you remember when your, what the guy you call your

10   brother, whom you're not really related to, Rodney Hayes, do you

11   remember when he got assaulted in jail by Mr. Harris, by Rock?

12   A    Yes.

13   Q    You actually spoke to Shelton on the phone right after that,

14   didn't you?

15   A    Uh-huh.

16           THE COURT:  You have to say yes or no.

17   A    Yes.

18   Q    And he told you why he did it, didn't he?

19   A    He said because he was lying, because Rodney lied on him.

20   Q    Actually, he said that he did it because Rodney was going to

21   testify against him, isn't that right?

22   A    He said because Rodney was lying on him.

23   Q    Okay.  And you asked him how he knew that?

24           MR. MARTIN:  Objection, Your Honor.

25           THE COURT:  Overruled.

1          MR. MARTIN:  It's a hearsay answer, Your Honor.

2          THE COURT:  Overruled.  You may answer.

3    BY MR. HARDING:

4    Q    Is that right?

5    A    Yes.

6    Q    And he said because his lawyer --

7          MR. MARTIN:  Objection, Your Honor, move to strike.

8          THE COURT:  The objection's overruled.  The motion is

9    denied.  Go ahead, Mr. Harding.

10   Q    He said it was because, Shelton said it was because his

11   lawyers told him, isn't that right?

12   A    Yeah.  Something like that.

13   Q    You've told us about Woodland Avenue.  Shelton Harris was

14   dealing crack out on Woodland Avenue, wasn't he, Mr. Montana?

15   Should I call you Herbert or Montana?

16   A    You can call me Mark.

17   Q    Okay.  I prefer to call you Herbert, Mr. Herbert, because

18   it's not considered courtroom decorum to call people by their

19   first names.

20         THE COURT:  We prefer last names in court, Mr. Herbert.

21   A    Okay.

22   Q    Rock sold crack out on Woodland Avenue, too, didn't he?

23   A    At a time.

24   Q    Actually, he did it for a long time, didn't he?

25   A    I don't know how long he did it.

1    Q    Did it for years, didn't he?

2    A    I don't know how long he did it.

3    Q    He did it in the 3500 block, isn't that right?

4    A    That's where we hung at.

5    Q    That's where you and he hung at?

6    A    I mean, my grandmother lived up that way.  So yeah, you

7    could say I hung up there.

8    Q    In fact, Rodney Hayes hung up there and sold crack on

9    Woodland Avenue in the 3500 block, isn't that right?

10   A    At a time.

11   Q    Well, he did it for a long time, too, didn't he?

12   A    Not on Woodland Avenue.

13   Q    Where?

14   A    I mean, he didn't always hang on Woodland.  I don't know

15   where he else, place he hung at.  I'm just saying he didn't

16   always hang on Woodland.

17   Q    And that's why you used to deal crack, also, isn't that

18   right?

19   A    Correct.

20   Q    Now, you actually came down to see me and another prosecutor

21   and some federal agents on two occasions, isn't that right, Mr.

22   Herbert?

23   A    Correct.

24   Q    The first time was in 2004, isn't that right?

25   A    I'm not really sure what year it was.  But I know I came

1    twice.

2    Q    Okay.  And do you remember telling us that you were in

3    frequent contact with Mr. Harris and Mr. Mitchell both, is that

4    correct?

5    A    I believe.

6    Q    Even though they were locked up?

7    A    I believe.

8    Q    Okay.  In fact, you told us that you'd just spoken with Mr.

9    Harris that very day when we had you come down to talk to us.  Do

10   you remember that?

11   A    Yeah.  I mean, I --

12   Q    And we went over what happened on the night of the murders

13   in Hasim Rahman's car, do you remember that?

14   A    Um-hum.

15          THE COURT:  You have to say yes or no.

16   A    Oh, yes.

17   Q    And it was me and my co-counsel at the time, Christine

18   Manuelian, and another, and two other agents.  Do you recall

19   that?

20   A    I don't know who was there.  I mean, it was other people

21   there but I don't know their names.

22   Q    Do you remember we told you we didn't believe you?

23   A    Uh-huh.  Yes.

24   Q    We made that very clear, didn't we?

25   A    Yes.

1   Q    Okay.  And then Rodney Hayes got arrested in 2005, the guy

2   you call your brother.  And that's when he got brought down here

3   and he got assaulted by Mr. Harris.  Do you remember that?

4   A    Yes.

5   Q    Okay.  And shortly after that, we actually brought you back

6   to testify in the grand jury.  Do you remember that?

7   A    Yeah.  Yes.

8   Q    Okay.  And you were served with a subpoena to testify in the

9   grand jury.  Do you remember that?

10  A    Twice.

11  Q    You got served with a subpoena the first time, too?

12  A    Yes.

13  Q    And we didn't put you in the grand jury, did we?

14  A    Yes.  I mean, no, you all didn't.

15  Q    We didn't believe you?

16  A    I don't know why you all just didn't.

17  Q    Okay.  But you knew we didn't believe you?

18  A    That's what you all said.

19  Q    Okay.  And then you got served with another subpoena and you

20  came in.  And you told us that you'd spoken to your lawyer?

21  A    Yes.

22  Q    Who was your lawyer?

23  A    Christy Needleman.

24  Q    Needleman?

25  A    Yes.

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 183 of 281

1   Q    Okay.  And you had her give me a phone call; do you recall

2   that?

3   A    Yes.

4   Q    Okay.  And you knew that she called me, right?

5   A    Yes.

6            MR. LAWLOR:  Objection, Your Honor.

7            THE COURT:  Overruled.

8   Q    Did you say yes?

9   A    Yes.

10  Q    Okay.  And she explained your rights to you, didn't she, Mr.

11  Herbert?

12           MR. MARTIN:  Your Honor, this is surely privileged.

13  Objection.

14           THE COURT:  The objection's overruled.

15  A    I'm not really sure on what you're asking me.

16  Q    Well, I'm sure she explained to you that you had a right not

17  to answer any questions that might incriminate you, for example,

18  right?

19  A    Oh, yes.

20  Q    Okay.  And in fact, when you came down to see me and the

21  agents and Ms. Manuelian, we told you that, also, right?

22  A    Yes.  Yes.

23  Q    Okay.  In other words, you could just not answer a question

24  if it meant you were going to have to admit to a crime by

25  answering it, is that right?  You understood that, right?

1    A     Yes.

2    Q     Okay.  But in fact, you did testify in the grand jury and

3    you answered every single question, right?

4    A     Yes.

5    Q     And that's because you had no intention of incriminating

6    yourself, isn't it?

7    A     Correct.

8    Q     For example, you've told us you have two narcotics

9    convictions, right, Mr. Herbert?

10   A     Yes.

11   Q     Do you remember that?

12   A     Yes.

13   Q     Do you remember testifying in the grand jury that those were

14   the only two occasions in your whole life when you had

15   distributed drugs, and you just happened to get arrested on those

16   only two times --

17   A     Yes.

18   Q     -- you ever, you ever dealt drugs?

19   A     Yes, I testified to that.

20   Q     And that's because you knew that if you admitted to dealing

21   drugs on other occasions, you could conceivably be charged with

22   it, isn't that right?

23   A     Correct.

24   Q     So you lied to the grand jury?

25   A     I never said I sold drugs but them two times you just asked

1    me, the first time.

2    Q    You mean you're claiming that the only two occasions in your

3    whole life just happened to be the two times when the police

4    arrested you and locked you up?

5    A    Yup.  I mean yes.

6    Q    Okay.  And you know that if you admitted to dealing drugs on

7    other occasions now, you could conceivably be prosecuted for

8    them, right?

9    A    I don't know.  I don't know that.

10   Q    You don't know that?

11   A    If I say that I sold drugs before, I didn't know that.

12   Q    One of those times you got arrested for dealing drugs was in

13   the 3500 block of Woodland Avenue?

14   A    Uh-huh.

15   Q    And you had a bag with 20 vials of crack in it at the time,

16   is that correct?

17   A    I guess.  If that's what the charge papers say.  I'm not

18   really sure.  It was a while ago.

19   Q    One time you made a sale to an undercover agent and then

20   tried to run away on foot when they tried to arrest you.  Do you

21   remember that?

22   A    I didn't serve an undercover.  I mean, I served a lady.  She

23   had marked money.  But I never served an undercover.

24   Q    You're right.  She paid you $10 in prerecorded -- she was a,

25   she was working as an agent of the police at the time and she

1    purchased a ten dollar vial of crack from you in the 3500 block

2    of Woodland Avenue.  And then when the arrest team responded, you

3    fled on foot and ran into 3505 --

4            MR. LAWLOR:  Objection, Your Honor.

5    Q    -- Woodland Avenue?

6            MR. LAWLOR:  Is that a question, Your Honor?

7            THE COURT:  I think it is.

8    Q    You ran into 3505 Woodland Avenue, Apartment 2-C?

9    A    I'm not really sure of the apartment.  But that happened,

10   something like that.

11   Q    But you did run into the building and hide in a back

12   bedroom, is that correct?

13   A    Uh-huh.

14   Q    But the police caught you, is that right?

15   A    Yeah.

16   Q    And that's when they found a brown paper bag containing 20

17   additional clear top vials of crack, is that right?

18   A    They didn't find it on me.

19   Q    No, they didn't find it on you.  They found it to the, in

20   the area where you had retrieved the vial that you sold to the,

21   to the woman that was working for the police, right?

22   A    I guess that's where they found it.  I guess that's where

23   they found it at.  I don't know where they found it.

24   Q    The other occasion you had a bag containing five crack vials

25   and you were observed making a sale to a woman near 3501 Woodland

1    Avenue, is that correct?

2    A    Yes.

3    Q    And you're asking us, just as you asked the grand jury, to

4    believe that those were, just happened to be the only two times

5    in your whole life that you ever dealt drugs, is that correct,

6    Mr. Herbert?

7    A    Can you repeat the question?

8    Q    You're asking us to believe, just as you did ask the grand

9    jury, that those were the only two occasions in your whole life

10   when you ever dealt drugs?

11   A    I'm telling you all the truth.  I ain't really asking you

12   all to believe me.  I'm just telling the truth.

13   Q    You also denied possessing a gun back in 2002, isn't that

14   correct?

15   A    Correct.

16   Q    And with respect to the letter that Mr. Lawlor was just

17   asking you about that you didn't seem to actually recall, a

18   letter from Bo addressed to Shelton Harris, you don't recall a

19   letter instructing, containing instructions about the murder of a

20   guy named Claudus Lassiter, is that right?

21   A    No.

22   Q    Do you remember we asked you about that when you came in to

23   testify in the grand jury?

24   A    Yes.

25   Q    No one had ever asked you about that before you came in to

1    the grand jury, is that right?

2    A    Correct.

3    Q    Okay.  The detectives never asked you about it?

4    A    And they asked me in that, the little room that they talk to

5    you in.

6    Q    Outside the grand jury room?

7    A    Yes.

8    Q    You mean the detectives, when we were there, asked you about

9    it?

10   A    Right.

11   Q    Yeah.  But nobody asked you before that day you came in to

12   the grand jury.  Do you remember that?

13   A    Right.

14   Q    And even though this letter had been sent, supposedly, three

15   years earlier, you immediately claimed that you had never opened

16   it.  Do you remember that?

17   A    I don't know if I immediately answered that.  But I told

18   you, if a letter had been sent for someone else, then I didn't

19   open it.

20   Q    Okay.  Now, you've told us already that you're very tight

21   with Bo and Rock, is that right?

22   A    Yes.

23   Q    And in fact, if we read some of the rap lyrics in these

24   songs that you participated in singing, there's frequent

25   reference to you in the songs.  Do you recall that?

1    A    Say it again.  It's reference?

2    Q    You're referred to in the songs, is that right?

3    A    Probably.

4    Q    The name, TM, is in the songs, right?

5    A    Some of them.  Yeah.  Some of them.

6    Q    And TM stands for Tony Montana.  Tell us who Tony Montana

7    was.

8    A    Scarface.

9    Q    Scarface from a movie, right?

10   A    Um-hum.

11   Q    Played by Al Pacino?

12   A    Correct.

13   Q    And he was a mobster, right?

14   A    No.

15   Q    A gangster?

16   A    Yeah.  I guess.

17   Q    In the movie?

18   A    I guess so.  I mean --

19   Q    You've seen the movie, haven't you?

20   A    Um-hum.

21        THE COURT:  You have to say yes or no.

22   A    Oh, yes, I seen the movie.

23   Q    Okay.  Here's some lyrics that you may recall.  Bo's

24   general, I'm the captain, Slo's Sergeant now.  TM stepped up from

25   a private.  No need to hide it.  He was loyal, dedicated, plus

1    survived riots.  Do you remember that?

2    A    Yeah.

3    Q    Okay.  This is Rock singing this, right?

4    A    Um-hum.

5    Q    And Rock wrote those lyrics, didn't he?

6    A    Um-hum.

7         THE COURT:  You have to say yes or no.

8    A    Yes.  I'm sorry.

9         THE COURT:  That's all right.  It happens.

10   Q    Here's another line in another song.  TM, the youngest

11   soldier of this Shakedown militant shit.  Do you remember that?

12   A    I really don't remember it but I see it and it says, I guess

13   it's true.

14   Q    Okay.  Let me see if I got another one here.  This one you

15   may not remember, I suppose.  This is from another song.  This is

16   Mr., this is Rock singing again.  TM in this bitch.  What does

17   that mean, Mr. Herbert?

18   A    I don't even know what song -- I don't know.  I mean, TM,

19   that just mean probably I was in the studio with them at the

20   time.  That don't mean, or he was giving me a shout out, you

21   know.  Just, you know.

22   Q    Means you're in the studio with him?

23   A    Studio.  He could have just been saying my name because we

24   rap together.  It don't necessarily mean I was there.  That's

25   just, you know, part of, I mean, that's my, I don't know how to

1    explain music to nobody.  I'm sorry.

2    Q    Your sister was very tight with Bo, too, wasn't she?

3    A    Um-hum.

4    Q    She was --

5            THE COURT:  You have to say yes or no.

6    A    Oh, yes.

7    Q    She had an intimate relationship with Mr. Mitchell?

8    A    I don't know what they did in the bedroom.

9    Q    Okay.  You didn't know that they were lovers, is that right?

10   A    I mean, I don't know what they do in the bedroom.  That

11   ain't my thing, watching and stuff.

12   Q    Might be playing Play Station Two in the bedroom?

13   A    I don't, I don't play video games.

14   Q    Okay.  And Ayesha's been coming to this trial, you told us

15   already, on days when you've been here and on days when you

16   haven't been here, right?

17   A    Yes.

18   Q    Because she still stays in close contact with Mr. Mitchell,

19   also, right?

20   A    Yes.

21   Q    In fact, when you, when you first learned about Mr. Lawlor

22   wanting to talk to you, wasn't it because he gave his business

23   Card to Ayesha to take to you?  Isn't that what happened?

24   A    Say it again?

25   Q    Did Ayesha bring you Mr. Lawlor's business card?

1   A    No.

2   Q    How did you find out Mr. Lawlor wanted to talk to you?

3   A    She gave my phone and name and called.

4   Q    She gave you a phone?

5   A    Yeah.  She just told me call him.  She didn't give me no

6   business card.  She gave me the number.

7   Q    Okay.  She was very tight with Bo back in 2002, also, wasn't

8   she?

9   A    Yes.

10  Q    Okay.  Mr. Herbert, let me ask you about your tattoos.

11       MR. LAWLOR:  Objection, Your Honor.

12       THE COURT:  Overruled.

13  Q    Tell us about the tattoo on your left bicep.

14  A    Bicep?

15  Q    That's your left arm.  Yes.

16       THE COURT:  He didn't ask you to show it.

17  A    No, I was looking.

18       THE COURT:  You need to remind yourself?  I understand.

19  A    It say, that's right here, right?

20  Q    Yeah.  Let's try right there.

21  A    Okay.  It say, Love, loyalty, Honor, before betrayal always.

22       THE COURT:  I'm sorry.  Say that again.

23  A    Love, loyalty, honor before betrayal always.

24  Q    Okay.  So that's sort of like, doesn't that mean something

25  like you would never snitch on anybody?  You would never get them

1    into trouble, isn't that right?

2              MR. LAWLOR:  Objection.

3    Q    If you were tight with them?

4              THE COURT:  Overruled.  You may answer.

5    A    You ask me is that what my tattoo mean?

6    Q    Yeah.

7    A    No, I mean, it's just a tattoo.  It say, love, loyalty,

8    honor.  I picked it out a book.  So, I mean, I don't know what

9    the person who made it concept, whatever it was.  I just thought

10   it would be good.

11   Q    So you would never betray anybody you were close to, would

12   you?

13   A    I mean, no.  No.

14   Q    No?

15   A    No.  Who would?

16   Q    Okay.  Let me ask you about another tattoo.  You have on

17   your right arm a tattoo that says STLT, right?

18   A    Um-hum.

19   Q    What does that stand for?

20              THE COURT:  You have to say yes or no.

21   A    Oh, yes.

22   Q    What does that stand for?

23   A    Street life thug.

24   Q    Well, didn't you tell the grand jury that it stood for Stay

25   True Loyal, Too?

1    A    Right.

2    Q    So that means sort of the same thing, right?

3    A    Stay True Loyal, Too.  Under that say fam first.

4    Q    Fam first?

5    A    Yeah.

6    Q    Family?

7    A    That's what that's all a part of one tattoo.

8    Q    And who's in your family?

9    A    My sister, my mother, my father, my son.

10   Q    What about Shakedown?  Is that part of your family?

11   A    No.  That's part of a business.

12   Q    Was that part of your family back in 2002?

13   A    I mean, it just was a label that I was trying to rap so we

14   could get out the streets there, you know, the ghetto, where we

15   from.

16   Q    Tell us about the tattoo on your neck.

17   A    Which one?

18   Q    SD.

19   A    SD not on my neck.

20   Q    Where is it?

21   A    I don't have SD on me.  I got SV on me.

22   Q    SV.

23   A    Yeah.

24   Q    What's that stand for?

25   A    My neighborhood.  Sheistyville.

1    Q     Sheistyville?

2    A     Yeah.

3    Q     Stands for your rap group, also, doesn't it?

4    A     No.  The rap group called Shakedown.

5    Q     Oh.  Mr. Herbert, you know what happens to snitches, right?

6    A     Do I know what happens to them?

7    Q     Yeah.

8    A     Nothing.

9    Q     Nothing?  You guys sang songs about them all the time.

10   A     Rap is 99% lies.

11   Q     Mr. Harris didn't think so, did he?

12   A     Repeat the question.

13   Q     Mr. Harris didn't think that was true, did he?

14         MR. MARTIN:  Objection to what Mr. Harris might have

15   thought.

16         THE COURT:  Sustained.  That means don't answer.

17         THE WITNESS:  Okay.

18   BY MR. HARDING:

19   Q     This is one of Mr. Harris's lyrics, isn't it?  To you it

20   might be entertainment, but I'm speaking the truth.  Death before

21   dishonor, never talk to homicide.  Rock didn't want to be a

22   studio gangster, right?

23   A     I don't know.  I mean, I don't know what he wanted to do.

24   Q     That's why he wrote about real crimes in his songs?

25   A     I don't know if they wrote crimes.  I don't know.  That's

1    just his creativity, writing.

2    Q    Now, even though you've been staying very close to Bo and

3    Shelton they never, there nevertheless came a time when they

4    thought that you had ratted on them, didn't there?

5                MR. LAWLOR:  Objection to what they knew, Your Honor.

6                THE COURT:  Overruled.  You may answer.

7    A    I didn't never hear you.  So can you say it again one more

8    time?

9    Q    There came a time when they thought you had ratted on them,

10   didn't there?

11   A    I don't know.

12   Q    Well, let me play you something, Mr. Herbert.

13               THE COURT:  Counsel aware what you're about to do, Mr.

14   Harding?

15               MR. HARDING:  I'm about to play the beginning of the

16   Stop Snitching video.

17               THE COURT:  All right.  Do you need to toggle the --

18   BY MR. HARDING:

19   Q    Yup.  Sure do.  Can you see this on your screen, Mr.

20   Herbert?

21   A    Yeah.  I can see something.  Ain't nothing playing, though.

22   Stopped.

23               THE COURT:  Just a moment, Mr. Harding.  Okay.  I guess

24   it's working.

25               MR. HARDING:  Not coming through very well.

1          THE COURT:  Are the speakers turned on?

2          MR. HARDING:  I thought they were.  Yeah, they're on.

3    Maybe I'm not plugged into the right hole.

4          (CD playing.)

5    BY MR. HARDING:

6    Q    They put your name out there, didn't they, for ratting on

7    down, isn't that right, Mr. Herbert?

8    A    Somebody did.

9    Q    Well, that must be a very scary thing, to have your name put

10   out there in the name famous Stop Snitching Two video?

11   A    I ain't worried about it.

12   Q    You ain't worried about it?

13   A    Um-um.

14   Q    Isn't it true that you think that by coming here today and

15   testifying for them that you can sort of escape the problem that

16   is created by the Stop Snitching video?

17   A    Say that again.  I don't --

18   Q    People think you're a snitch, isn't that right?

19   A    No.

20   Q    Some people do, isn't that right?

21   A    Might do.  I don't know.

22   Q    You did testify in the grand jury, didn't you?

23   A    That some people might think I'm a snitch?

24   Q    Yeah.

25   A    I didn't testify to that in no grand jury.  I don't think I

1    did, anyway.

2    Q    People thought you told the truth in the grand jury, isn't

3    that right?

4    A    What you mean, people thought I told -- I did tell the truth

5    in the grand jury.

6    Q    Okay.  People thought you were a snitch, isn't that right?

7    Isn't that what we just heard on the Stop Snitching?

8    A    I mean, yeah.  That was on the tape.  But all I heard,

9    te-te-te-te-te-te.  So I couldn't really --

10   Q    You didn't hear your name?

11   A    I heard the name.  But I don't know who that was talking

12   saying that I was -- I don't know that voice.  I don't know that.

13   That's behind me.

14   Q    That's behind you?

15   A    I mean, I'm not worried about that.  I got other things to

16   worry about.  Taking care of my child.  Not TV.

17   Q    No further questions, Your Honor.

18            MR. MARTIN:  Your Honor, Mr. Coburn has to leave, so

19   can we let him go ahead of us?

20            THE COURT:  Members of the jury, Mr. Coburn has another

21   pressing commitment, and with the Court's permission, he's going

22   to have to leave us a little early today.  And he won't be with

23   us tomorrow but he'll be re-joining us.  You may proceed, Mr.

24   Coburn.

25            CROSS EXAMINATION

1    BY MR. COBURN:

2    Q    Thank you so much, Your Honor.  Mr. Herbert, good afternoon.

3    A    Good afternoon.

4    Q    So if I understand it correctly, you do not have a pending

5    charge against you right now, is that right?

6    A    No.

7    Q    What I said is correct, right?

8    A    Do I have a pending charge?

9    Q    You don't have a charge, right?

10   A    No.

11   Q    And so you don't have a plea agreement with the government,

12   right?

13   A    No.  No.

14   Q    You don't have counsel -- well, strike that.  I mean, you

15   don't have counsel in a pending case right now, is that right?

16   A    No.

17   Q    That's right, right?

18   A    I mean, yeah, that's right.

19   Q    Okay.  You don't have a cooperation agreement with the

20   government that makes it incumbent on you to do certain things

21   and then says the government will do certain things, right?

22   A    No, not --

23   Q    Correct?

24   A    No, not that I know of.

25   Q    Okay.  You don't have a sentencing coming up at which the

1    government might speak on your behalf, right?

2    A    No.

3             MR. HARDING:  Objection to the leading, Your Honor.

4             THE COURT:  Overruled.  Go ahead, Mr. Coburn.

5    Q    Thank you, Your Honor.  And yet you are here testifying,

6    despite the fact that you have not actually received a subpoena,

7    correct, Mr. Herbert?

8    A    Right.

9    Q    The government just cross examined you and told you they

10   don't believe you, right?

11   A    Right.  Yes.

12   Q    Now, if I understand correctly, Mr. Herbert, you have known

13   Mr. Harris since you were about 15 years old, right?

14   A    Correct.

15   Q    And you met Bo back in 2001, right?

16   A    Correct.

17   Q    And in response to questions from Mr. Harding, you told us

18   this afternoon that you have been in frequent contact with both

19   of those gentlemen over the years, right?

20   A    Correct.

21   Q    You told us that you've been involved in Shakedown

22   Entertainment, right?

23   A    I'm no sure what you mean by that.

24   Q    Okay.  You rapped and wrote music, right?

25   A    Yeah.  Yes.

1    Q    And there was a CD made, right?

2    A    Yes.

3    Q    You've been in the studio making music for Shakedown

4    Entertainment, correct?

5    A    Yes.

6    Q    And you also testified about the sale of drugs on Woodland

7    Avenue, right?

8    A    That I sold?

9    Q    You said, you testified that you sold and that other people

10   sold on Woodland Avenue?

11   A    Yes.

12   Q    Correct?

13   A    Yes.

14   Q    And you mentioned the twins, right, during your testimony?

15   You mentioned some people you called the twins?

16   A    About rapping?

17   Q    No.  You just mentioned them this afternoon when you were

18   testifying before the jury, right?

19   A    Yeah.

20   Q    And you mentioned someone called Lil White, right?

21   A    No.

22   Q    You remember saying the name Lil White today here in the

23   courtroom?

24   A    He, he --

25   Q    He asked you about it?

1    A    Right.  And I just responded.

2    Q    Fair enough.  And he asked you about someone named Dwight,

3    right?

4    A    Yes.

5    Q    Who is Shawn Gardner?

6    A    I mean, he right there.

7    Q    Okay.  Did you mention his name at any point during your

8    testimony until right now?

9    A    No.

10   Q    Did you mention him in connection with Shakedown

11   Entertainment at all?

12   A    No.

13   Q    Thank you.  Nothing further.

14            THE WITNESS:  Okay.

15            CROSS EXAMINATION

16   BY MR. CROWE:

17   Q    Mr. Herbert, my name is Tom Crowe.  I represent a man named

18   Shelly Wayne Martin.  James Pyne, who's seated at the end of the

19   table in the white shirt, represents him, also.

20            Have you ever spoken to either Mr. Pyne or myself?

21   A    No.

22   Q    Have you ever seen Shelly Wayne Martin any place other than

23   in this courtroom?

24   A    No, not that I know.  I mean, I can't say yeah or no.  But I

25   don't recall ever seeing him.

1    Q    Thank you very much.

2                   CROSS EXAMINATION

3    BY MR. MARTIN:

4    Q    Mr. Herbert, just one question about something Mr. Harding

5    asked you.  He mentioned that you told him in 2004, when you came

6    down to the grand jury, that you had talked to Shelton Harris

7    that very day.  Do you recall that?

8    A    He saying I did.  So I mean, I might have.  I really might

9    have talked to him.

10   Q    Did Mr. Harris ever tell you to do anything other than come

11   down here and tell them the truth?

12   A    No.  He never told me do nothing.

13   Q    He didn't tell you to come down here and lie, did he?

14   A    No.

15   Q    Thank you.

16                   REDIRECT EXAMINATION

17   BY MR. LAWLOR:

18   Q    All right, Mr. Herbert, just a couple quick questions and

19   we'll get you out of here.

20           You were asked about a letter in the grand jury, right?

21   A    Uh-huh.

22           THE COURT:  You have to say yes or no.

23   A    Yes, yes, yes, yes.

24   Q    And who subpoenaed you to the grand jury?  The government?

25   A    Yes.

1    Q    Okay.  And was that on -- okay.  So that was July 19th,

2    2005, you testified before the grand jury, right?

3    A    Yeah.  I mean yes.

4    Q    And Mr. Harding asked you, didn't he, then, as he apparently

5    had outside of the presence of the grand jury, if I can read from

6    this, he questioned you, did I ask you about a letter that he --

7         MR. HARDING:  Objection, Your Honor.

8         THE COURT:  Why don't remove it from the DOAR, Mr.

9    Lawlor.  You can proceed.

10   Q    Okay.  Let me ask you if this is what Mr. Harding asked you

11   in front of the grand jury and the answers that you gave then in

12   2005.  Mr. Harding asked you, Did I ask you about a letter that

13   he, referring to Mr. Mitchell, sent to you addressed to Shelton

14   Harris?  You answered yes.

15        He asked you, Was that a letter that he sent to you

16   shortly after he got locked up in 2002?  Again, you answered yes.

17        Did you tell me, Mr. Harding asked you, you didn't open

18   the letter and then you gave it to Shelton Harris?  Answer was

19   yes.

20        Without opening, was the neck question.  And you said

21   yes.

22        Was that your testimony before the grand jury about

23   that letter?

24   A    If it's on the paper, I guess.  I mean yes.

25   Q    You gave truthful testimony before the grand jury?

1          MR. HARDING:  Objection.

2     A    Yes.

3          THE COURT:  Overruled.

4     Q    Now, Mr. Coburn just asked you this question.  But other

5     than the promise of a subpoena that I have not even yet provided

6     you, have I given you anything in exchange for your testimony

7     here today?

8     A    No.

9     Q    No money?

10    A    Nothing.

11    Q    No promise of years off some sentence that you would have to

12    serve?

13    A    No.

14    Q    Okay.  Mr. Harding just played for you that Stop Snitching

15    video?

16    A    Yes.

17    Q    Did I hear you correctly to say that you didn't recognize

18    that voice that was on the phone?

19    A    It was like three different voices.

20    Q    Did you recognize any of them?

21    A    No.  I mean --

22    Q    You know Mr. Harris's voice, right?

23    A    Yeah.

24    Q    And Mr. Mitchell voice?

25    A    Yeah.

1    Q    All right.

2    A    I mean yes, sir.

3    Q    Mr. Harding indicated to you that in 2005 and perhaps today

4    that I guess he doesn't believe you.  Did he say that?

5    A    Yes.

6    Q    What do we call those folks over there?

7              MR. HARDING:  Objection.

8              THE COURT:  Sustained.

9    Q    No further questions.

10             MR. HARDING:  Very briefly, Your Honor?

11             THE COURT:  Yes.

12             RECROSS EXAMINATION

13   BY MR. HARDING:

14   Q    Let me show you a couple more lines from these rap songs,

15   Mr. Herbert.

16             MR. LAWLOR:  Objection, Your Honor.  This is beyond the

17   scope.

18             THE COURT:  Overruled.

19   Q    It's not beyond the scope.  This is from the Pure Shit album

20   that you sung with Mr. Harris and Slo back in 2002.  Do you

21   remember Rock singing this line right here?  It's just me, Weaze

22   and Bo back to back?

23   A    Uh-huh.  Uh-huh.  Yes.

24   Q    Who's Weaze?

25   A    Can I say something?

1    Q    Mr. Martin, isn't he?

2    A    I can't answer that truthfully because I have a friend named

3    Weasel.

4    Q    Weasel?

5    A    Yeah.  And we call him Weaze.  So I really can't say.  You

6    see what I'm saying?  Like I mean, I don't really know who he was

7    talking about.

8    Q    Well, let's try this one.  There are lots of lines about

9    Weaze.  That's why Bo and Weaze on lock now and every day on lock

10   down.  Niggas getting shot down for running their mouth clown.

11   Bo was locked up with Mr. Martin, wasn't he?

12   A    I mean, I guess.  I don't, I don't know.  Yeah.  Yes.  He --

13   yeah.

14   Q    Did you know that this guy named Weaze was out of jail for

15   only a few weeks in 2002 before he got locked up again?

16              MR. CROWE:  Objection.

17              THE COURT:  The objection's overruled.

18   A    No.

19              THE COURT:  The answer was no.

20   Q    You say that, that these rap lyrics are just about

21   creativity.  But actually, they include a whole description of

22   what happened that night at Hammerjacks when it all went down.

23   Do you remember that?  These are real events, aren't they?

24   A    You said I wrote this?

25   Q    No.  I know you didn't write that.  I know Mr. Harris wrote

1   that.  But you helped to sing it, right?

2        THE COURT:  Do you want him to read it to you, Mr.

3   Herbert?

4   A    I can read it.

5        THE COURT:  Okay.

6   A    I'm just trying to see.  Now can you say your question

7   again, please?

8   Q    Do you remember participating in this rap on Track 11 of

9   Pure Shit?

10  A    I'm not sure what song is Track 11 because I don't own a

11  copy of the CD no more.  But it is on there.  I heard it before,

12  I'm pretty sure.

13  Q    Okay.  That's a description of what happened at Hammerjacks,

14  isn't it?

15  A    I guess.  I don't know.

16  Q    Sunday night at Lyles's party when it all went down, I

17  wasn't there, but if I was it would have been more clowns stabbed

18  and dragged out of the club, gagged and bagged.  Best believe we

19  gonna chase y'all down and shake y'all down?

20  A    Rock didn't write that.

21       THE COURT:  I'm sorry.  We can't hear you.

22  A    Rock didn't write that.

23  Q    Rock didn't write that?

24  A    That's not Rock writing that.  I mean, that's not a Rock

25  rap.

1    Q    It's not a Rock rap?

2    A    No.

3    Q    How do you know, Mr. Herbert?

4    A    How I know that that's not his rap?  Because that's, because

5    that's not Rock verse.

6    Q    How do you know?

7    A    What you mean, how I know?  Because I was on that song and I

8    know that's not --

9    Q    Well, who's verse was it?

10   A    That's Slo verse.

11   Q    Slo's verse?

12   A    Yeah.

13   Q    Okay.  Thank you.  I have no further questions.

14            THE COURT:  Thank you, Mr. Herbert.  You're excused.

15   Members of the jury, we'll take an afternoon recess at this time.

16   Again, Mr. Coburn won't be with us when you come back but he'll

17   be rejoining us before long.

18            Please leave your note pads on your chairs.  Have no

19   discussion about any of the evidence of the case so far.

20   Continue to keep an open mind.  Jury's excused for a 15 minute

21   recess.

22            (Jury exits the courtroom.)

23            THE COURT:  Mr. Harding, I'm going to return your list

24   and accompanying documents.  Yes, Mr. Kurland.

25            MR. KURLAND:  Your Honor, while we're still on the

1    record.  With respect to Mr. Bacon and the arrest warrant, given

2    the Court's ruling --

3         THE COURT:  Let me see if we've heard anything.  I

4    suspect we haven't.

5         MR. HANLON:  No, Your Honor.

6         MR. KURLAND:  As long as it's preserved for the record.

7    It's my understanding the Court would not allow the letter to be

8    admitted and I guess would not allow any inquiry concerning the

9    letter.  In light of the Court's ruling --

10        THE COURT:  You've overstated the Court's ruling.  Let

11   me make clear what the Court's ruling is.

12        The letter so far as I can tell is not admissible.  It

13   is a memorialization of arguably prior inconsistent statements.

14   My understanding from Mr. Coburn's proffer was that Mr. Coburn

15   was going to put Mr. Bacon on the stand, ask some substantive

16   questions of some, of some sort.  Yeah, that brought a smile to

17   my face as well, Mr. Kurland.

18        MR. KURLAND:  I have to do it tomorrow so I want to

19   make sure I know the Court's ruling.

20        THE COURT:  And then use the letter to impeach Mr.

21   Bacon, both any direct examination by Mr. Coburn and relatedly

22   and derivatively the prior direct, and I suppose cross

23   examination, that Mr. Bacon has offered in this trial.

24        I went back over the luncheon recess.  I looked at the

25   letter again and I reaffirm my view expressed this morning that

1    the letter does not, certainly not directly contradict anything

2    that Mr. Bacon testified to.

3          The government has proffered that if Mr. Bacon were

4    here, he would explain the letter as a lulling letter purposely

5    sent to Mr. Gardner at a time when he was cooperating with the

6    government and when he did not want those he was cooperating

7    against, including Mr. Gardner, to believe or learn or be

8    convinced that he was cooperating.  So it was a lulling letter.

9    That's what the government's proffer is as to what Mr. Bacon

10   would say.

11         So that's my ruling.  So I'm not saying you can't call

12   Mr. Bacon.  As you heard --

13         MR. KURLAND:  I understand, Your Honor.  I would only

14   add just, so the record's clear, because depending on the Court's

15   answer here it will determine whether or not it's even worth

16   pursuing.  It's my position that when in the letter, when he says

17   that the government's making me lie, that that isn't character

18   evidence.  That's actually evidence specifically that he's lying

19   in this case, in which there is no 609 impeachment issue.  I

20   would say that that's substantive evidence that should be able to

21   be pursued.

22         If the Court, if that is inconsistent with the Court's

23   ruling, then, then there's no need to get Mr. Bacon.  I just want

24   to preserve the record on that, if the Court's saying that that

25   can't be pursued.

1      THE COURT:  I'm hoping I can pull it up real quick.  I

2  don't think it says what you say.

3      MR. KURLAND:  There is a line in there, which is the

4  government, I don't want to --

5      THE COURT:  I don't think the letter uses the term --

6      MR. KURLAND:  No doubt.

7      THE COURT:  -- the government.

8      MR. KURLAND:  Okay.  Okay.  It might not.  Mr. Coburn's

9  magic box that has the letter -- does anybody have a solid copy

10  of the letter?

11      THE COURT:  Okay.  Here it is.  I have it.

12      MR. KURLAND:  And they were --

13      THE COURT:  They serve me a grand jury subpoena,

14  misspelled, perhaps, I was mad as shit because I didn't know

15  nothing about nothing.  You and blue pretty much know that but

16  when I got locked up they picked up my case and then --

17      MR. KURLAND:  The next line, Judge.

18      THE COURT:  And they were trying to get me to make up

19  shit on y'all because they think that y'all told me what was

20  going on.  So I don't see the word "government" in this letter.

21  I suppose it would be a reasonable inference that by "they", he

22  was alleging something against law enforcement.

23      MR. KURLAND:  I would agree that's a reasonable

24  inference.

25      THE COURT:  Yeah.  So it's an avowal of a lack of

1    knowledge in a general sense.  But he doesn't, except in that

2    general sense, doesn't contradict himself.

3        MR. KURLAND:  Well, he didn't say on the stand that the

4    government was trying to make him lie.  That's not consistent

5    with his -- I just --

6        THE COURT:  He doesn't say in the letter that the

7    government's trying to make him lie.  He doesn't use the word

8    "government."

9        MR. KURLAND:  Well, Your Honor, I understand that.  But

10   in the context of the "they", that it's clear that, that it's not

11   only a reasonable inference, it's an overpowering inference that

12   the reference to they, because he's talking about, when I got

13   locked up, they picked up my case.

14       THE COURT:  In fact, look at the next sentence, though,

15   or the next two sentences.  They got so mad at me and said they

16   were going to call me into court when y'all go to court and I

17   told them that I was going to fuck their whole case up, parens,

18   that they didn't have any evidence and they were trying to set

19   y'all up.

20       So he's telling Mr. Gardner that that's what he's going

21   to do when he goes to court and he didn't do that.

22       MR. KURLAND:  Your Honor, there's no need to have the

23   agents --

24       THE COURT:  Okay.  All right.  So I haven't formally

25   authorized the warrant and I won't do so.

1          If he's available tomorrow and if he comes in, then you

2     can rethink this.  But I'm not going to have him picked up.

3          MR. KURLAND:  Thank you, Your Honor.

4          THE COURT:  All right.  What do we have left?  Ms.

5     Rhodes, you still got telephone people standing by on hold?

6          MS. RHODES:  I've got two witnesses out there, yes,

7     Your Honor.

8          THE COURT:  They going to both be done in 20 minutes?

9          MS. RHODES:  No.

10         THE COURT:  60 minutes?

11         MS. RHODES:  Yeah.

12         THE COURT:  It's going to take that long?

13         MS. RHODES:  Well, no.  You only gave me two options.

14    I'm going to be probably 13 minutes with each one.  Mr. Harding,

15    God only knows.

16         THE COURT:  All right.  Who else we have out there?

17    That's it?  Okay.  Good.  So hopefully we'll finish them today.

18         MR. LAWLOR:  Judge excluded all of our witnesses.

19         THE COURT:  I'm sorry?

20         MR. LAWLOR:  I said you excluded all our witnesses.

21         THE COURT:  You wish I had.  With that, we'll stand in

22    recess.

23         (Recess at 4:00 p.m.)

24         THE COURT:  All right.  Get the witness in, please.

25    Get the jury in, please.  Mr. Hanlon, Mr. Harding, I forgot to

1    ask.  Would you, as soon as you get back to your office, please,

2    send me a Word copy of the indictment?  Or Word Perfect copy,

3    preferably Word Perfect.

4              MR. HARDING:  Word Perfect.  I hope I can, Your Honor.

5    It's been a long time.

6              THE COURT:  Yeah.  Send me whatever you can muster up,

7    whether it's a third superseding or the second.  I'd just like to

8    have it so I can plug it into my charge.

9              MR. HARDING:  Okay.

10             THE COURT:  If you can locate something.  And counsel,

11   I intend to get into your, get into your computers, hopefully not

12   too late tonight, a draft of my proposed charge so that we can,

13   so that we can review it carefully tomorrow, so that when we have

14   opening, closing arguments on Wednesday morning, you will have a

15   very good idea of what I'll be saying to the jury on Thursday.

16   So if you can be near your computers tonight with lots of paper

17   in the printer, expect, expect the instructions.

18             (Jury enters the courtroom.)

19             THE COURT:  You may call your next witness, Ms. Rhodes.

20             MS. RHODES:  Thank you very much, Your Honor.  I would

21   call Gavin Pinchback from Sprint to the phone, to the stand, Your

22   Honor.

23             THE COURT:  To the phone.  Mr. Pinchback, good

24   afternoon.  Thank you for your patience today, sir.  If you'll

25   stand and be sworn by the clerk.

Case 1:04-cr-00029-RDB   Document 696   Filed 06/16/09   Page 216 of 281

1              GAVIN PINCHBACK, DEFENDANT MITCHELL WITNESS, SWORN

2                   THE WITNESS:  I do.

3                   THE CLERK:  Be seated.  Speak directly toward the mike.

4       State your name and spell it for the record, please.

5                   THE WITNESS:  Yes.  My name is Gavin Pinchback.  That's

6       G-A-V-I-N.  Last name is P-I-N-C-H-B-A-C-K.

7                   DIRECT EXAMINATION

8       BY MS. RHODES:

9       Q    Good afternoon.  Thank you for waiting this afternoon.

10      A    Good afternoon.

11      Q    Can you give us your, can you give us your employer, please?

12      A    Yes.  I work for Sprint, a telecommunications company.

13      Q    All right.  And what are your responsibilities there?

14      A    I'm the Manager of Subpoena Compliance, which means that I

15      run a group that receives and responds to legal demands served on

16      the company for customer records.

17      Q    Okay.  And where's your, where is your office located?

18      A    It's Overland Park, Kansas.

19      Q    And how long have you worked there?

20      A    Eight years.

21      Q    And what have your responsibilities been during those eight

22      years?

23      A    For the last four years, I've been the manager of the

24      Subpoena Compliance Group.  For four years before that, I was a

25      human resources manager.

1    Q    Okay.  And what about before you worked for Sprint?

2    A    Before that, I worked as a regional loss prevention manager

3    for Circuit City and also a regional human resources manager for

4    Circuit City.

5    Q    What kind of training have you had with Sprint in terms of

6    the work, the legal compliance for subpoenas?

7    A    Everyone who comes into my department, including me, we have

8    an 11 week training program that details how to read Sprint

9    records, how to produce Sprint records.  We also have advanced

10   training with what are called our RF engineers or radio frequency

11   engineers, certain classes that they all have to take and we all

12   have to take.  We also have testimony training within my group

13   and also with our Sprint attorneys.

14   Q    And were you working with the company in 2002?

15   A    I was.

16   Q    Are you familiar with records from 2002 in general?

17   A    I am.

18   Q    Okay.  And have you had a chance to review the records we

19   provided you which were, in turn you had provided to the

20   government in response to their subpoena?

21   A    I have.

22   Q    Okay.  I'd like to call your attention to pages, this is

23   Government Exhibit T-3, Pages Nine and Ten of that exhibit.  And

24   I'm going to put a copy of Page Nine on the DOAR, Your Honor.

25   And I'm going to be marking on this, this is not the original

1    exhibit.  So I'm going to make some marks on this as we go

2    through your testimony.

3            First of all, can you just tell us, make sure, I'll get

4    to the top of the page here so you can see that.  Tell us what

5    we're looking at, please.

6    A    This is a call detail record from a particular phone.  And

7    actually, that phone number is 443-418-6204.  It's a list of the

8    incoming and outgoing calls from a certain time period for that

9    phone.

10    Q    Okay.  And do you know from your, from the subpoena who this

11    phone was assigned to?

12    A    I'd have to look at my notes.

13    Q    Sure.

14    A    This one was Jaquetta, or Jaquetta Smith.

15    Q    All right.  And just looking at the columns here, there's

16    duration.  I take it that's in seconds?

17    A    That is.

18    Q    And is that how the bills show up as well?

19    A    No.  The bills are rounded to the, are rounded up to the

20    nearest minute.

21    Q    Okay.  That's not to gouge the consumer, of course, right?

22    A    No.

23    Q    And then what about the repoll column.  What does that stand

24    for?

25    A    The repoll is a number for a switch.

1    Q     And what's a switch?

2    A     A switch is a centralized point for a collection of cell

3    sites or cell towers.  Kind of the central processing site for a

4    group of say 100 or 200 or 300 cell sites in a certain

5    geographical area.

6    Q     So this would be less specific than a cell tower location?

7    A     Oh, yes.

8    Q     Okay.  What, roughly what kind of geography or geographical

9    area would a repoll cover?

10   A     Generally covers, like I said, about 100, 200, 300 cell

11   sites.  So it might cover most of a city or a more rural area, a

12   very large, large area.

13   Q     Okay.  Now, on this, there's no indication of cell site

14   locations, is that right?

15   A     That's correct.

16   Q     And why is that?

17   A     It was not either asked for correctly at the time or not, or

18   just not provided at the time.

19   Q     Okay.  And is that something that you, you could have

20   provided back in 2002?

21   A     At the time that this was generated, yes.

22   Q     And how would that show up or how was that accomplished now?

23   A     Well, we use a very similar report now.  However, there are

24   additional columns for cell site information if you requested

25   that.

1  Q    So if that had been requested back in 2002, you could have

2  provided it to the government then?

3  A    That's correct.

4  Q    Okay.  All right.  And also, under repoll, the 400, does

5  that have any designation other than just the particular switch?

6  Does it give you any other information?

7  A    No.  Just that that's the switch.

8  Q    And does it tell you whether or not, what kind of a call it

9  might be or whether it's limited to an actual live call or an

10  e-mail or text or something like that that?

11  A    We use different switches for different types of calls.  For

12  instance, on the majority of these calls it's 400, which is a

13  switch in the Baltimore/Washington, DC area.  We do use other

14  switches called bulk messaging gateways for things like e-mail

15  and text.  And that would show a different number even if it was

16  in this area.

17  Q    Okay.  I want to direct your attention down, a little bit

18  down the page, about two, two-thirds of the way down to just

19  before, just before 4:00 on March 24th of '02.

20  A    Okay.

21  Q    Okay.  Just going from there all the way down to the end of

22  the page.  I want to direct you to a number, which is the second

23  one there after the 4 p.m., after 4 p.m., which is a call that

24  comes in at 16:14:56.  And the number, you indicated that the

25  number this phone is registered to is the 6204?  Right?  That's

1    the number that appears most of the time in that first number

2    column, right?

3    A    That's correct.

4    Q    Okay.  The number that's being called in this instance is

5    the 443-227-0515, is that right?

6    A    That's correct.

7    Q    Okay.  I'm going to highlight that number.  And it appears

8    several other times on this page, is that right?

9    A    Yes.

10   Q    Or a variation, a minor variation of it.  How many times do

11   you see it total on here?  Can you just give me the total?

12   A    The 0515 number appears five times, but there is one time

13   where it's actually 277-0515 instead of 227-0515.

14   Q    Okay.  So that's the one that's a slight variation?

15   A    That's correct.

16   Q    All right.  Thank you.  And I want to direct your attention

17   now to just a couple below, the one that starts at 17 -- sorry --

18   16:30:49.  Looks like the number is dialing itself.  What's that

19   about?

20   A    Normally, when you check your voice mail, you call in to

21   your own phone.  So it will show as the calling number and also

22   the called number.

23   Q    Okay.  So we call that a voice mail.  And below that, what's

24   the blank about?

25   A    In some cases, the numbers are not captured.  On this older

1    report, we are missing a column that we currently use, which

2    would have the dialed digits, the actual numbers dialed into the

3    phone.  Here we only have the called number field.  And it

4    apparently wasn't captured in this case.

5    Q    So the blank doesn't mean that nothing was dialed?

6    A    No.

7    Q    Okay.  What about other possibilities, long distance,

8    overseas, going into somebody's pager?  What about those things?

9    Could that be what this blank is about?

10   A    It's possible.

11   Q    And what are the other possibilities?

12   A    It's possible that even that was a call in to voice mail.

13   Without some of the other columns on the page, it's hard to tell

14   exactly what happened with that call and why those numbers don't

15   appear.

16   Q    Okay.  But it looks like since the voice mail, since the one

17   just above goes to voice mail that, is that less likely that the

18   blank means voice mail?

19   A    It could be.

20   Q    And in terms of, you said, capturing numbers.  Can you

21   explain what you mean by that, capturing numbers and how the new

22   system does that differently?

23   A    Actually, the system captures thing in the same way.  We

24   have a, essentially, the phone system is made up of a lot of

25   different computers and it captures all the numbers being dialed,

1    the numbers being received, those kind of things.  However, we

2    use a different variation of the report now.  And we have

3    expanded columns.

4           In this case, for instance, we don't have a dialed

5    digits column that I explained.  I also referred to the cell site

6    tower columns that could be on here, if that is requested.

7    Q    What about in terms of the blank?  Could that be somebody

8    who just started a number, dialed four or five digits, and then

9    never finished dialing?  Would it show up that way?

10   A    It wouldn't show up unless that person actually hit the talk

11   button to try to complete the call.  It could be that the call

12   was, the call was placed and then ended before contact was made.

13   But you would have to have hit the talk button to have it listed

14   on this list of calls.  That's the start, start date and time

15   where you hit the talk button, that's where the timer starts.

16   Q    Okay.  But then if it hadn't gone through, that wouldn't

17   really explain, you've got seven seconds there and then down

18   below, where I'm pointing at, you've got the blank with 22

19   seconds and 21 and 16.  So that doesn't seem consistent with a

20   partial number being dialed, does it?

21   A    It's possible.  But it seems that with that duration of

22   time, that it would have been connected to somebody.

23   Q    Okay.  Now, is there anything that can be done with the old

24   records from 2002 now to look into that further?

25   A    Unfortunately, no, other than looking at the bills.  On the

1   bills it might say the outgoing, who is the destination of the

2   outgoing call.  But the records that produce this record are no

3   longer in existence.

4   Q    Okay.  All right.  So I'm just going to ask you to do a

5   couple of quick totals here.  From the 4 p.m. entry.  Can you

6   tell me how many incoming and outgoing calls there are from 4

7   p.m. on down to the end of the page?

8   A    There are 6 incoming calls and there are 15 outgoing calls.

9   And that begins at 16:07.

10   Q    And so then the total for that column till the end, till the

11   bottom of the page is 21 calls total, right?

12   A    That's correct.

13   Q    And what about -- let's see.  You had said earlier we have

14   five in that total.  We've got five of the number which hasn't

15   been identified that ends in 0515, right?

16   A    That's correct.

17   Q    And how many of the blank ones do we have?

18   A    We have four blank ones.

19   Q    So five of the, five of the mystery number and four that are

20   blank are lost numbers, is that right?

21   A    Five to the 0515 number and four to the blank number, yes.

22   Q    Okay.  So I'm labeling that mystery/0515.  And four of the,

23   four for the lost number, then.

24          If we can go to the next page, Page Ten.  Just want to

25   do a couple of the same totals there.  This time going all the

1    way down to 7:35 a.m. in the morning, which is pretty near the

2    bottom.

3    A    There's a call at 7:35 and 35 seconds.  So are you including

4    that one?

5    Q    No.  No.  Up to 7:35.  So right before that one.  So it

6    would be just after the 7:34:46.

7    A    Okay.

8    Q    Okay.  So have you calculated the total number of calls on

9    that page up to, up to 7:30 a.m.?

10   A    There are 46 calls.

11   Q    And how many of those are incoming?

12   A    Four of those calls are incoming calls.

13   Q    And even though it may be obvious, but how do you tell which

14   are the incoming calls?

15   A    The last column on the sheet is a column called role, and

16   that indicates whether it's an incoming or outgoing call.  A one

17   means it's an incoming call be into the number that we ran the

18   report for, and a zero means it's an outgoing call, outbound from

19   that number.

20   Q    Okay.  And is it also just as certain a way of checking that

21   to look at the calling number?  Does that work as well?  Or is

22   the role really the way you should identify that?

23   A    Role is really how you should identify it.  But it should be

24   the, the number that we ran the search upon that shows up in the

25   calling number if it's an outbound call.

1    Q    Okay.  Then I'm going to ask you to, if you could again,

2    count up the 0515 numbers that show up on this page.

3    A    There are four of those.

4    Q    Okay.  And then in terms of the lost numbers, how many of

5    those do you see?

6    A    There are 14 blank called numbers.

7    Q    Okay.  And your total you had said was 46, which means four

8    were incoming, which you said.  And 42 were outgoing, then?

9    A    That's correct.

10   Q    And the other possibilities regarding this blank space is

11   that there's some, there could be some kind of glitch either in

12   the cell phone itself or in your collection method, is that

13   right?

14   A    It's possible.

15   Q    Okay.  Nothing further, Your Honor.  Thank you.

16            THE COURT:  Are you going to mark those?

17            MS. RHODES:  Yes, Your Honor.

18            THE COURT:  You want to staple them so they're a single

19   exhibit?

20            MS. RHODES:  Have them as one.

21            THE COURT:  So that's Mitchell number?

22            MS. RHODES:  That's Mitchell Ten, Your Honor.

23            THE COURT:  Mitchell Ten is admitted.  All right.

24            CROSS EXAMINATION

25   BY MR. HARDING:

1    Q    Good afternoon, Mr. Pinchback.

2    A    Good afternoon.

3    Q    My name's Robert Harding.  I'm an assistant United States

4    attorney here in Baltimore.  How are you?

5    A    I'm doing well, thank you.

6    Q    Thank you for traveling all this way to visit us.  Be sure

7    to go to the Inner Harbor tonight.

8    A    Okay.

9    Q    I just have about two questions for you, Mr. Pinchback.

10   A    Okay.

11   Q    You said that some of these calls that are listed on here as

12   only seven seconds or so, those could actually be connected

13   calls, is that right?

14   A    It's possible.

15   Q    Because there are quite a few that are seven or eight

16   seconds or single digit calls.  If you look just in the area

17   that, there's one that's only, there are a couple that are six

18   seconds and one that's three seconds.  Could those actually be

19   conversations?

20   A    I couldn't guess whether they were really conversations or

21   not, but they were connected on our network.  The way it

22   registers on the network is that when someone hits the talk

23   button, as soon as it hits the network, as soon as the network is

24   aware of the call, it starts the timer.  But it would not

25   indicate whether or not someone picked up on the other end for

1    certain.

2    Q    So you really don't know whether those are conversations or

3    not?

4    A    That's correct.

5    Q    And the other question I have is, back in 2002, cell site

6    information was provided by, it could be provided by a court

7    order, is that correct?

8    A    That's correct.

9    Q    But not by an ordinary administrative subpoena, is that

10   correct?

11   A    That's correct.

12   Q    And it was fairly rare, wasn't it, back then, to, talking

13   about six years ago now, to get cell site information, is that

14   fair to say?

15   A    Depends on what you consider rare.  My office processes

16   quite a few, quite a few requests.  As proportion of the total

17   requests, it was probably less then than it is now, yes.

18   Q    Okay.  Thank you.  I have no further questions.

19              THE COURT:  Mr. Pinchback, thank you very much.  You're

20   excused.

21              THE WITNESS:  Thank you, Your Honor.

22              THE COURT:  I believe we have one more witness.

23              MS. RHODES:  Yes.

24              THE COURT:  Your witness, Ms. Rhodes?

25              MS. RHODES:  Yes.  The defense would call Mr. Ridenour.

1        THE COURT:  Would you stand and be sworn, please, sir?

2        ERIC RIDENOUR, DEFENDANT MITCHELL WITNESS, SWORN

3        THE WITNESS:  I do.

4        THE CLERK:  Be seated.  Speak directly toward the mike.

5   State your name and spell it for the record, please.

6        THE WITNESS:  Eric Ridenour.  Last name is

7   R-I-D-E-N-O-U-R.

8        DIRECT EXAMINATION

9   BY MS. RHODES:

10  Q    Mr. Ridenour, thank you for joining us this afternoon.  Can

11  you tell us who you're employed by?

12  A    AT&T.

13  Q    All right.  And what do you do for AT&T?

14  A    I'm the manager of sales operations.

15  Q    And for what area?

16  A    For the Washington/Baltimore market.

17  Q    Okay.  And how do you come to us today to respond to the

18  subpoena?

19  A    I'm, I act as the custodian of records for our market.

20  Q    And have you had a chance to review the records that we

21  received or the government received from AT&T regarding some 2002

22  records?

23  A    Yes, I have.

24  Q    All right.  I'm going to -- now, before I do that.  Can you

25  tell us a bit more about how long you've worked with AT&T and

1    what your duties are right now?

2    A    I've been with AT&T for, it will be 16 years in February.

3    And I am responsible for the operations of our company-owned

4    retail stores, as well as our indirect agents.  Consist of

5    customer service as well as managing and operating the retail

6    locations.

7    Q    Okay.  And are you familiar with reviewing AT&T records and

8    their, their other provider records as well?

9    A    Yes.

10   Q    Okay.  Let me ask you first to start with explaining why

11   some of these exhibits have, even though you're from AT&T,

12   they've got other things on there like MCI.  What's that about?

13   A    Oh, on the subscriber record page?

14   Q    I'm sorry?

15   A    The subscriber record page?  Is that what you're referring

16   to?

17   Q    Yes.

18   A    MCI acts as a reseller for AT&T.

19   Q    Okay.  So even it may say MCI on there, they're AT&T

20   records?

21   A    Correct.  They say AT&T wireless up top.  I want to make

22   sure we're looking at the right ones.

23   Q    I'm just talking in general right now.  You have, AT&T has

24   records that go out that has other companies, to the lay person

25   seems like another company's name on it, is that right?

1  A    Well, AT&T sends call detail records to the MCI, but it

2  would have, it wouldn't necessarily look as if it were an MCI

3  document.

4           THE COURT:  Ms. Rhodes, if I may suggest.  I think the

5  witness needs to see a document before he can answer your

6  question.  And he just shook his head yes.  It's kind of

7  difficult.

8  Q    We were talking earlier about MCI being on, being on a bill

9  but it's AT&T records, right?

10  A    The way a reseller works is the customer is the customer of

11  MCI.  And AT&T, MCI purchases air time from AT&T.  Our customer

12  is MCI and then MCI then goes out and sells to an individual.  So

13  the end user receives a bill from MCI, not from AT&T.

14  Q    Okay.  I'm going to ask you to look at some of the records

15  you have up there.  This is Government T-17.  On that, can you,

16  can you turn to the page marked 560 in your records?

17  A    Okay.

18  Q    Okay.  And what is the, what's the subscriber number on

19  this, for this record?

20  A    443-691-9203.

21  Q    Court's indulgence.

22           THE COURT:  Certainly.

23  Q    I want to draw your attention to a couple of calls on here.

24  And we're looking at, the dates on this page are March 21st, is

25  that right?

1   A    Correct.

2   Q    In the middle of the page.  Okay.  And that's in 2002,

3   right?

4   A    Correct.

5   Q    Okay.  You see just down about in the middle of the page,

6   there are some indications, under call location, under that

7   column it says Hackensack, NJ, right?

8   A    Yes.

9   Q    Okay.  And do you see several of though entries?

10  A    Yes.

11  Q    Okay.  So that simply means it's a long distance call to New

12  Jersey, is that right?

13  A    It means that the exchange of the phone number that got

14  called was based out of Hackensack.

15  Q    Okay.  All right.  And I want to, I'm going to switch up on

16  you a little bit here and go to another document, which is

17  Government's N-67.  I think what you have in front of you is just

18  a list of handwritten phone numbers, which is a copy of N-67.

19  A    Correct.

20  Q    And does it have 410-905-1681 at the top?

21  A    Yes.

22  Q    Sorry.  It's W-67.  All right.  And I'm going to ask you if

23  you could -- okay.  On the left-hand column, about a third of the

24  way down, do you see the letters L-U-V-E, Luve?

25  A    Yes.

1    Q    Okay.  And what's the number you see for him?

2    A    410-365-5446.

3    Q    Okay.  And if you could look up on the top of the right-hand

4    column, where it says Shabazz.  What's the number there?

5    A    443-803-618.

6    Q    And the last number you can't read?

7    A    Can't read on this.

8    Q    Okay.  And then what about further down on that page, about

9    two-thirds of the way down?  You see something that says D-E-Z-O.

10   Deezo?

11   A    Yes.

12   Q    And what's the number there?

13   A    443-621-7441.

14   Q    Okay.  All right.  Now, turning the page.  If I could take

15   you, again, we're in Government W-67.  If you could go, let's

16   see, to the third page of that packet.  There's a second to last

17   number on that page.  It says Damita.  Do you see that?

18   A    Yes, I do.

19   Q    Okay.  And what's the number there?

20   A    410-262-0798.

21   Q    Okay.  And then on the next to last page, I think it's next

22   to last -- sorry, the third to the last page, there's just a

23   couple of names there.  Do you see Tyrone?  The second name

24   there.

25   A    Yes.

1    Q    Okay.  And what's the number you have for him?

2    A    410-258-5407.

3    Q    Okay.  Now, I'd like to go through a couple of page here,

4    about two pages on this document, and then a couple on the other

5    one just to see if we can spot any of those numbers here.

6         If we could go first to Page 561.  And at the top of

7    that page, what's the date?  The date of the records, not the

8    date it's printed out.

9    A    3/22.

10   Q    All right.  And do you see that the number that you said was

11   Damita, the 262-0798, do you see that number on the page?

12   A    Yes, I do.

13   Q    Okay.  And since I'm using the actual exhibit this time, I

14   am just going to use a temporary sticker on it.  That's about,

15   what, the fourth one down, right?  Okay.  And do you see that

16   again, that same number on the page?

17   A    Yes.

18   Q    Okay.  And where is that?  Okay.  Is that where the arrow is

19   indicated?

20   A    Yes.

21   Q    Okay.  And does she appear another time on that page?

22   A    Yes.

23   Q    And are all, all three of these calls so far from, calling

24   to a location in Baltimore?

25   A    They're calling to a mobile number with a Baltimore

1   exchange.

2   Q    To a mobile number with Baltimore exchange?

3   A    Right.

4   Q    And is there another one you see again calling that Damita

5   number?

6   A    Yes.

7   Q    Okay.  Let's turn the next page, Page 562.  Any additional

8   Damita calls on that page that you notice?

9   A    Yes.  Further down on the page.

10  Q    Again, is that calling a mobile number in Baltimore?

11  A    It's calling a mobile number with a Baltimore exchange.

12  Q    So it could actually be not in Baltimore, is that what you

13  mean?

14  A    Yeah.  I don't know where it's located.

15  Q    Okay.  All right.  And then if we could skip a couple of,

16  skip a couple of pages.  Okay.  Let's go to Page 883.  Okay.  I'm

17  going to ask you about another number, too.  You mentioned, you

18  mentioned the number for Shabazz earlier, which was the

19  443-803-618, and we couldn't read the last number.  Do you see

20  that about midway down on the page?  443-803-6182?

21  A    Which page number are we looking at?

22  Q    883.

23  A    Yes.

24  Q    Okay.  And did you -- okay.  On the next page as well, did

25  you come across that number again?

1   A    Yes.

2   Q    All right.  And that's 803-6182 number?

3   A    Correct.

4   Q    And is that 443, also, a Baltimore exchange, and is that a

5   mobile number?

6   A    That is a mobile number.  I don't know what the exchange is.

7   Q    Okay.  And how about, about further down?  Do you see that

8   number again, 11:21 -- sorry.  11:24 p.m.?

9   A    Yes.

10  Q    Okay.  And then we have a couple of, a couple numbers below

11  that we have that Luve number that you gave us before.  That was

12  the 365-5446, is that right?

13  A    Yes.

14  Q    And then again -- oh, that's the phone company.  (Phone

15  ringing.)  A couple, three down from the bottom, we have another

16  call for Shabazz or Deezo, which the 803-6182 number, right?

17  A    Correct.

18  Q    Okay.  Now, one other, if you could, if you could go, let's

19  see, two more pages past that.  I believe it is, where the top

20  time for March 24th is 5:05 p.m.  Do you see that page?

21  A    Yes.

22  Q    There is no number on.  Okay.  And there's a number of calls

23  there, again, to the number that we had identified as Damita,

24  which is the 0798.  Do you see those?

25  A    Yes, I do.

1    Q    Okay.  And this call, beginning of page is 3/24.  In fact,

2    all the calls on this entire page are March 24th, is that right?

3    A    Correct.

4    Q    Okay.  So this call is being made from the 691-9203 number

5    and it's calling to the number identified with Damita, is that

6    right?

7    A    Correct.

8    Q    Okay.  And the first call we see at this, on this page is at

9    6:15 p.m., right?

10   A    Correct.

11   Q    Okay.  The next one down is at 6:39, is that right?

12   A    Correct.

13   Q    And then right after that, another one at 6:40, is that

14   right?

15   A    Correct.

16   Q    And then another one at 7:16?

17   A    Correct.

18   Q    And another one at 7:21, right?

19   A    Correct.

20   Q    Now, can you tell us anything about, I mean, looking at the

21   length of these calls, anything about whether they were connected

22   or voice mail or that sort of thing?  Starting with the one at

23   the top, which is the higher one, the 6:15.  How long was that

24   call?

25   A    Approximately two minutes.

1    Q    Okay.  And that indicates, can you tell from anything on

2    this record whether it necessarily was a voice mail or a

3    connected call?

4    A    The C on the call indicates it was connected.

5    Q    The C -- I'm sorry.  Where?

6    A    The C under Column I.

7    Q    Okay.  That's the very last column, right?

8    A    Correct.

9    Q    Right there.  All right.  And then further down, the next

10   one, which is the 6:39.  One minute call.  And did that one go

11   through?

12   A    That was connected, also.

13   Q    Okay.  And was about at 6:40?

14   A    It was connected.  Indicator indicates dropped.

15   Q    So D means it connected and then dropped?

16   A    Correct.  It was a dropped call.

17   Q    Okay.  And how about the one at 7:16?

18   A    I'm not sure what the I indicates.

19   Q    It says it was 0.0 in terms of time.  So would that, does

20   that I mean nothing?

21   A    Incomplete.

22   Q    Incomplete.  Okay.  And then the last one there is at 7:21.

23   Another 0.0.

24   A    Also incomplete.

25   Q    And also I.  So presumably that one didn't go through,

1    either, is that correct?

2    A    That looks correct.

3    Q    Okay.  So the calls, whether completed or not, to Damita on

4    that page, then we've got five.  And those are between the hours

5    of 6:15 p.m. and 7:21 p.m. on March 24th, is that right?

6    A    Correct.

7    Q    Okay.  And the other calls -- take this off so it doesn't

8    make everybody seasick.  The other group of Damita calls we saw

9    were on the 23rd -- I'm sorry.  All right.  On Page 561, do you

10   have that?

11   A    Yes.

12   Q    Okay.  And how many calls did you see to her on that page?

13   A    Four.

14   Q    Okay.  And those were between the hours of 12:30, 12:33 p.m.

15   and 3 p.m.?

16   A    Correct.

17   Q    All right.  I want to direct your attention now to another

18   batch, which is just one page of this, 869.  Page 869.  Again,

19   part of T-17.  I hope you can find it because I'm not sure I can.

20   A    I have it.

21   Q    Okay.  And do you have, do you see any, or the number that

22   we had associated with Luve on that page?  That was the 365-5446.

23   A    Yes.

24   Q    Okay.  So we have that.  And this is, again, this is the

25   morning of March 23rd.  So we've got a call to him at 2:17 a.m.,

240

1    the morning of March 24th.  I said that wrong.  2:14 a.m.  Two

2    calls initially.  And then we had further down, at 3:53 in the

3    morning, a couple of calls again to that same number, right,

4    5446?

5    A    Correct.

6    Q    And then a batch of calls to another number, which you and I

7    have not talked about, the 5057 number, right?  And those, again,

8    are calls at 3:56 in the morning, 3:56, 3:57, right?

9    A    Correct.

10   Q    How many calls -- did you have a chance to notice how many

11   calls there were total between midnight and 4 a.m. on the 24th?

12   A    Fifteen.

13   Q    Okay.  Thank you.  No further questions, Your Honor.

14            MR. HARDING:  Mr. Ridenour, thank you very much for

15   coming here.  I don't have any questions for you.

16            THE WITNESS:  Thank you.

17            THE COURT:  Mr. Ridenour, thank you very much, sir.

18   You're excused.  Ladies and gentlemen of the jury, here's what I

19   can tell you about the upcoming schedule.

20            I anticipate that we will conclude all of the evidence

21   tomorrow.  I anticipate that the defense evidence will conclude

22   about midday, perhaps a little before lunch, perhaps a little

23   after lunch.  Thereafter, if it chooses to do so, under our rules

24   and practice, the government is permitted to offer what's

25   referred to as rebuttal evidence that, frankly, does not happen

1    very often.  And in those rare occasions when it does, it's very

2    short and abbreviated.  Because the government has the burden of

3    proof in a criminal case, it does have a final opportunity, if it

4    chooses to do so, to offer evidence to rebut any evidence that

5    may have been introduced by the defense.

6         So I don't know if the government will choose to do

7    that.  But again, if they choose to do that tomorrow, Mr.

8    Harding, Mr. Hanlon, will let me know.  And I assure you, it will

9    be fairly brief.

10        So I expect that you will be excused, I think, probably

11   at the latest by mid-afternoon tomorrow, perhaps a little later

12   rather than a little earlier.  But certainly, I anticipate that

13   all of the evidence will conclude by the end of the day tomorrow.

14        We'll resume on Wednesday morning with what I expect

15   will be a full day of closing argument.  You will recall that

16   closing argument is not a part of the evidence in the case but it

17   is a very important part of the case, particularly in a case of

18   this length, in which the attorneys have the opportunity to

19   summarize the evidence, to marshal it, to walk you back through

20   the witnesses and the exhibits that you've heard, and try to give

21   you a coherent vision of what each attorney thinks the case shows

22   and what you should be persuaded of.

23        Obviously, as I've said, what counsel say in closing

24   argument is not part of the evidence.  And it's for you and you

25   alone to decide what the facts are, who to believe, what to

1    believe, what weight to assign to any evidence.  But the closing

2    arguments, I'm sure, will be very helpful to you.

3         I don't anticipate that we will finish all of the

4    closing arguments before the end of the day on Wednesday.  And so

5    what I actually anticipate is that on Thursday morning, again,

6    presuming we start at about 9:30, Mr. Kurland will probably

7    present his closing argument, and then the government will have

8    an opportunity for a rebuttal closing argument, just as the

9    government has an opportunity to put on additional evidence if it

10   chooses after the defense have presented evidence, the government

11   has an opportunity to present additional argument to respond to

12   any arguments that might be made by the defense, but not to make

13   any new arguments.

14        So I anticipate that by late morning on Thursday you

15   will have had all of the evidence and all of the closing

16   arguments.

17        Either just before lunch or after lunch or maybe with

18   lunch in between, I will instruct you on the law.  Now, what I am

19   planning to do for the instructions is to give each of you a copy

20   of my instructions even before I begin reading them to you so

21   that you can follow along if you choose, and indeed, make notes

22   in the margins of my instructions if that should prove helpful to

23   you.

24        Right now, I anticipate that my instructions may well

25   take as many as, I don't know, three hours perhaps.  Perhaps a

1    little less.  Perhaps a little longer.  They haven't been

2    finalized yet.  But it will take some time because of the number

3    of charges and the relative complexity of the charges in this

4    case.

5              So with that, I'm anticipating that you will be able to

6    begin deliberations, I think, mid to late afternoon on Thursday

7    of this week.

8              Now, this is all my best hope in terms of how I think

9    thing are going to go and just to give you an idea.  And then you

10    will return on Friday and, as needed, in the subsequent days to

11    complete your deliberations.

12             So continue to keep an open mind about all issues.  You

13    haven't heard all of the evidence.  You haven't obviously heard

14    any closing arguments.  You haven't heard but a few of my

15    instructions on the law that will guide your deliberations.

16             Please leave your note pads in your chairs.  Have no

17    discussion about the case.  Conduct no investigation of any sort.

18    Continue to avoid any media, any exposure to media reports about

19    the case.

20             We'll look for you tomorrow morning at 9:30 to resume

21    the trial at that time.  Thank you, ladies and gentlemen.  You

22    are excused until 9:30 tomorrow morning.

23             (Jury exits the courtroom.)

24             THE COURT:  So, Ms. Rhodes, you'll have who tomorrow?

25             MS. RHODES:  Coach Lynch.  No, just kidding.  Davey D

244

1    is here from California.  So he would be our first witness,

2    barring something else urgent.  And then we have records from

3    several schools.  I don't know if this Coach Powers, he's only

4    available on Wednesday.  So I don't know if he's going to be

5    available to do anything via TV tomorrow.  But I will look into

6    that shortly.

7            We have Detective Niedermeier and a Police Officer

8    Seymour, who will be very brief, just about a page of the report

9    having to do with Hammerjacks case.

10           And we have somebody from a, from Solo Cup, an

11   employer.  And again, just the records.

12           THE COURT:  Okay.  Mr. Martin?  Just records?

13           MR. MARTIN:  Just records, Your Honor.

14           THE COURT:  Okay.  And they're coming in by

15   certificate?

16           MR. FLANNERY:  Yes.  Your Honor, we have, one is a

17   police report from Detective Laslett that the government has

18   stipulated to introducing.  It's simply an itemization.

19           THE COURT:  You don't have to tell me what it is.  I

20   just need to hear about the problems.

21           MR. FLANNERY:  The other record we have, and maybe it

22   is or it isn't a problem.  If you remember during Mr. Martin's

23   cross examination of Mr. Dobropolski, he was working off of some

24   public records of Mr. Dobropolski's institutional movement that

25   we would like to introduce for the matter that he was locked up,

1   showing the dates that he was locked up in the institutions that

2   he was locked up at.  And particularly, also on some of these

3   documents, it cites the address that he listed at the time of his

4   incarceration.

5          And the reason for that, Your Honor, is because of Mr.

6   Dobropolski's insistence on his reputation in Park Heights as

7   being an enforcer and having grown up there and been there and

8   that he was known on the streets as being there.  And it's our

9   contention, Mr. Dobropolski already acknowledged that he had only

10  been on the streets for the better part of sixty-some months in

11  his entire adult life.  But much of that was, according to these

12  records, what not at the time that he would have been growing up,

13  so to speak, in Park Heights, and also, according to many of

14  these records, that he wasn't even living in Park Heights.

15         THE COURT:  So let me see if I get this.  You want to

16  impeach --

17         MR. FLANNERY:  Not his character.

18         THE COURT:  Right.  I understand.  It's not going to

19  character.  You want to impeach his testimony insofar as he

20  claims to have had a reputation in the Park Heights community for

21  being a tough guy and/or enforcer by introducing records from,

22  are they all Division of Corrections or Baltimore County,

23  Baltimore City?  Anne Arundel?

24         MR. FLANNERY:  Many of them are from Division of

25  Corrections.  There are some Baltimore County.  There are some

1  Baltimore City.  There is certain, in order to get his initial

2  arrest date in '89, there's a true test copy of a CJS sheet.

3        THE COURT:  Okay.  But your point, if I'm following

4  this, your point is that you want to not prove where he lived

5  but -- here's what I think you're saying.  You want to show how

6  often he was locked up.  He's already testified that he was only

7  on the street five years.  So you want to try to put some meat on

8  that.  And you want to show that when he wasn't locked up,

9  according to Division of Correction records, he was apparently

10 giving the address, an address somewhere other than in Baltimore,

11 Park Heights.  Is that right?

12       MR. FLANNERY:  Yes.  And also, there's one final point,

13 is that for a large swath of time that these individuals,

14 particularly Mr. Harris, would have been in Park Heights, that he

15 was locked up for that, for the majority, if not all of that time

16 as well.

17       THE COURT:  Okay.  So is the government objecting?

18       MR. HARDING:  Very much so, Your Honor.  Rule 608(b)

19 says that that specific instances of the conduct of a witness for

20 the purpose of attacking or supporting the witness' character for

21 truthfulness, other than conviction of a crime as provided in

22 Rule 609, may be not proved by extrinsic evidence.

23       THE COURT:  But it's not character for truthfulness.

24       MR. HARDING:  I think they're attacking his testimony

25 about his reputation in Park Heights, his living in Park Heights

1    and knowing Park Heights' drug dealers.  That's what the point of

2    this appears to be.  It is impeachment in the classic sense.

3          THE COURT:  It's impeachment but it's not character for

4    truthfulness.  There's a distinction.  Okay.  Clearly,

5    impeachment on a collateral -- extrinsic impeachment on a

6    collateral issue is not allowed.  And I take it, Mr. Flannery,

7    your position is this is not a collateral issue?

8          MR. FLANNERY:  One, it's not a collateral issue.  And

9    it's really outside the rule, Your Honor, because we're not

10   impeaching his character for truthfulness.

11         THE COURT:  I understand that.  You're not impeaching

12   his character.  You're impeaching his testimony.

13         MR. FLANNERY:  Yes.

14         THE COURT:  Now --

15         MR. FLANNERY:  Can I say one other thing?

16         THE COURT:  Sure.

17         MR. FLANNERY:  We also have, just so you have a

18   complete picture.  We have, our paralegal, the documents are

19   here.  But our paralegal has created this summary chart that I'm

20   working off of.

21         THE COURT:  Do you have a copy that I can take with me

22   tonight and look at it?

23         MR. FLANNERY:  Sure.

24         THE COURT:  Okay.  Let me take a look at it.  I'll hear

25   some argument on this.  It sounds sort of like a stretch but

1    maybe it's not.  I mean, maybe it's not.  I mean, it's an awful

2    lot of pieces of paper.  And I guess you need a lot of pieces of

3    paper when you don't have a witness.  But other than --

4            MR. FLANNERY:  Really what we wanted to do, Your Honor,

5    we were seeking to admit it so that we could make particular, so

6    that we could corroborate, you know, certain arguments that,

7    really, that we would make.  If we had to, we would bring in our

8    paralegal to authenticate the summary.

9            THE COURT:  Well, but there's so much -- forgive the

10   use of the term -- garbage here.  If all you're interested in is

11   where he lived or where he, where he told DOC he lived, assuming

12   that the DOC records are based on what he told them as opposed to

13   what shows up in some J&C when he got convicted, it's going, it's

14   going to be tough for me to admit, to give this to the jury on

15   top of everything else.

16           So have you tried to reach a stipulation?  I mean, I

17   would think the stipulation on the -- again, he's already said he

18   was only on the street for five years.  So you don't need to

19   prove that.

20           MR. MARTIN:  It's years, the timing.

21           MR. FLANNERY:  It's really, like I said, Your Honor,

22   it's the particular years.  A is the timing.  He was locked up

23   for many of the particular years that Mr. Harris would have been

24   in Park Heights.  That's one.  Two --

25           THE COURT:  What's the point of that?  It was --

1          MR. FLANNERY:  Because, Your Honor --

2          THE COURT:  It was when Mr. Harris and he were not

3     locked up that the relevant evidence --

4          MR. FLANNERY:  When he was locked up -- Your Honor,

5     even the Court itself was surprised by the fact that Christopher

6     Dobropolski, an obviously --

7          THE COURT:  A white guy.

8          MR. FLANNERY:  Caucasian Polish living in Park Heights.

9          THE COURT:  No.  I didn't say he lived in Park Heights.

10    I don't think the record's going to reflect that.

11         MR. FLANNERY:  You questioned that he was from, that he

12    stated he was from Park Heights.  And not only is he from Park

13    Heights, but he's a well known enforcer that, you know, tooled

14    around with drug dealers and was beating people up in the Park

15    Heights area.  And that Mr. Harris knew him and that's the reason

16    that Mr. Harris was so inclined to then, you know --

17         THE COURT:  See, now it's going to sound like

18    impeachment on a collateral issue.  Okay?  I'll look at it.  I'll

19    look at it and I'll hear counsel.  Anything, Mr. Pyne, Mr. Crowe?

20         MR. CROWE:  Your Honor, I believe all we will have will

21    be a few exhibits to move in.

22         THE COURT:  Okay.  Any of them controversial?

23         MR. CROWE:  I don't believe so, no.

24         THE COURT:  I really would really like to start with

25    the jury at 9:30 tomorrow.  I don't know that we've ever done it.

1   You know, it would be really great.  It would be really, really

2   great.  You would all make me feel so good --

3          MR. LAWLOR:  Why start now, Your Honor?

4          THE COURT:  -- if we could actually bring the jury out

5   here at 9:29 and 30 seconds.

6          MR. KURLAND:  I think there was one or two days when we

7   got started right at 9:30.  Your Honor --

8          MS. RHODES:  Your Honor, I do have, also, about a 20

9   minute witness from MVA who will be --

10          THE COURT:  MVA?

11          MS. RHODES:  MVA, yes.

12          MR. KURLAND:  Your Honor, we just have some documents

13   that there should be no controversy over.  And I'm going to look

14   at the grand jury transcripts.  I think the only one that affects

15   us is Reynolds.  But I think that that was one that was on your

16   list, anyway.  And we'll just designate the areas.

17          The other thing, Your Honor, is I have, is I'm going to

18   talk to the government afterwards to see if they will agree to

19   the exhibits I want to use during my demonstrative --

20          THE COURT:  Yeah.  Share.

21          MR. KURLAND:  If there's a controversy, that's

22   something that, obviously, I'll have to take up with the Court.

23          THE COURT:  Absolutely.  Share your argument exhibits,

24   please, and bring them to my attention hopefully before the end

25   of the day tomorrow.  Yes, Mr. Harding?  Brief rebuttal case, if

1   any?

2            MR. HARDING:  Oh --

3            THE COURT:  As of right now.

4            MR. HARDING:  We have to discuss that.  I can't say

5   right now.

6            THE COURT:  All right.

7            MR. HARDING:  But I do want to point out that Ms.

8   Rhodes showed me some documents.  I don't know if she's still

9   intending to get them into evidence.  But I did not agree with

10  all of those documents.  She wanted newspaper articles in about

11  her client's football exploits and ones that mention Coach Lynch.

12  And things like records of his character evaluation that was done

13  when he applied for some kind of position with a sports program

14  of some sort.  And I think that it's --

15           THE COURT:  Okay.  I would hope, I would hope that the

16  direct and cross will be similar to what we had tonight.  That is

17  to say, very brief, and that we'll have plenty time tomorrow, and

18  I can hear counsel about some of these documents that the defense

19  want to put in.  Just please premark them.  Have them marked,

20  numbered, so that we can go through it pretty expeditiously.  And

21  I'll give you my rulings.  And I'll see you tomorrow morning at

22  9:30.

23           MR. KURLAND:  Your Honor, one last thing.  I apologize,

24  Your Honor.  With regard to the scheduling, because I want to

25  have some of the students come down because it's near their

1  finals, can I say with fair certainty that I'll be doing mine on

2  Thursday morning?

3           THE COURT:  Absolutely.  That's what I told the jury.

4           MR. KURLAND:  Okay.  I apologize, Your Honor.

5           THE COURT:  Sure.

6           (Conclusion of Proceedings at 5:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

253

1                              INDEX

2
                                                       PAGE
3       WITNESS: JOYCE PARSONS
        DIRECT EXAMINATION BY MR. CROWE                 62
4       CROSS EXAMINATION BY MR. HANLON                 77
        CROSS EXAMINATION BY MR. MARTIN                 101
5       CROSS EXAMINATION BY MR. COBURN                 102
        REDIRECT EXAMINATION BY MR. CROWE               107
6       RECROSS EXAMINATION BY MR. HANLON               108

7       WITNESS: JAMANE JOHNSON
        TESTIMONY BY TRANSCRIPT                         132
8
        WITNESS: MARK HERBERT
9       CROSS EXAMINATION BY MR. HARDING                152
        DIRECT EXAMINATION BY MR. LAWLOR                156
10      CROSS EXAMINATION BY MR. HARDING                170
        CROSS EXAMINATION BY MR. COBURN                 199
11      CROSS EXAMINATION BY MR. CROWE                  202
        CROSS EXAMINATION BY MR. MARTIN                 203
12      REDIRECT EXAMINATION BY MR. LAWLOR              203
        RECROSS EXAMINATION BY MR. HARDING              206
13
        WITNESS: GAVIN PINCHBACK
14      DIRECT EXAMINATION BY MS. RHODES                215
        CROSS EXAMINATION BY MR. HARDING                226
15
        WITNESS: ERIC RIDENOUR
16      DIRECT EXAMINATION BY MS. RHODES                229

17

18

19

20

21

22

23

24

25

254

REPORTER'S CERTIFICATE

1

2

3        I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on November 17,

6    2008.

7        I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10        In Witness Whereof, I have hereunto affixed my

11    signature this _____ day of _____, 2009.

12

13

14

15                        _____
                          Mary M. Zajac,
16                        Official Court Reporter

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 185:24
**$10,000** [4] - 74:23, 74:24, 79:9, 106:15
**$30** [1] - 162:22
**$35** [1] - 162:20
**$35,000** [1] - 71:1
**$428** [1] - 78:15
**$8800** [1] - 70:22

## '

**'02** [1] - 220:19
**'05** [1] - 25:7
**'06** [5] - 22:19, 22:20, 25:8, 25:12, 129:2
**'89** [1] - 246:2
**'98** [1] - 129:1
**'99** [4] - 129:1, 129:2, 159:4, 159:5

## 0

**0.0** [2] - 238:19, 238:23
**0515** [4] - 221:12, 224:15, 224:21, 226:2
**0798** [1] - 236:24

## 1

**1** [1] - 32:25
**1-B** [1] - 32:24
**10** [2] - 112:16, 170:20
**100** [2] - 219:4, 219:10
**100%** [2] - 43:18, 88:9
**101** [2] - 1:25, 253:4
**102** [1] - 253:5
**106** [1] - 80:22
**107** [1] - 253:5
**108** [1] - 253:6
**11** [7] - 47:7, 60:22, 71:7, 71:8, 208:8, 208:10, 217:8
**11:00** [1] - 61:14
**11:21** [1] - 236:8
**11:24** [1] - 236:8
**12** [8] - 45:8, 71:7, 71:8, 150:1, 150:5, 173:16, 173:17
**12/11** [1] - 142:9
**12:30** [1] - 239:14
**12:33** [1] - 239:14
**12:45** [1] - 121:25
**12th** [1] - 92:13
**13** [3] - 170:20, 171:5, 214:14

**132** [1] - 253:7
**14** [1] - 226:6
**14-A** [2] - 66:14, 73:19
**14-B** [1] - 67:5
**14-C** [1] - 68:7
**14-D** [1] - 69:2
**14-E** [2] - 69:5, 69:17
**14-F** [1] - 69:10
**15** [9] - 61:13, 109:18, 109:19, 135:1, 150:14, 171:13, 200:13, 209:20, 224:8
**152** [1] - 253:9
**156** [1] - 253:9
**15th** [1] - 150:21
**16** [11] - 13:24, 15:19, 18:20, 18:22, 24:25, 27:1, 27:16, 87:23, 88:5, 223:19, 230:2
**16:07** [1] - 224:9
**16:14:56** [1] - 220:24
**16:30:49** [1] - 221:18
**16th** [2] - 87:25, 151:2
**17** [7] - 1:11, 4:25, 50:21, 70:14, 70:15, 221:17, 254:5
**170** [1] - 253:10
**175-6451** [1] - 89:25
**17th** [2] - 45:7, 45:9
**18** [2] - 87:20, 88:2
**180** [1] - 68:24
**1933** [1] - 88:22
**199** [1] - 253:10
**1990's** [1] - 9:12
**1998** [2] - 150:21, 150:23
**1999** [3] - 150:24, 151:1, 171:13
**19th** [1] - 204:1

## 2

**2** [2] - 91:9, 111:14
**2-C** [1] - 186:8
**20** [7] - 121:21, 162:20, 162:22, 185:15, 186:16, 214:8, 250:8
**200** [2] - 219:4, 219:10
**2000** [2] - 65:24, 167:10
**2000's** [1] - 9:13
**2001** [7] - 70:8, 70:15, 70:21, 159:19, 167:10, 172:2, 200:15
**2002** [44] - 10:21, 64:17, 64:21, 66:1, 69:17, 69:23, 70:15, 71:6, 72:8, 73:4, 74:6, 78:15, 78:17, 79:19, 100:17, 100:21, 101:9, 101:13, 105:9,

105:10, 105:20, 108:5, 133:5, 133:11, 133:15, 138:1, 141:20, 142:6, 162:2, 170:16, 187:13, 192:7, 194:12, 204:16, 206:20, 207:15, 217:14, 217:16, 219:20, 220:1, 223:24, 228:5, 229:21, 232:2
**2004** [6] - 22:15, 22:17, 22:18, 129:5, 180:24, 203:5
**2005** [6] - 70:18, 92:14, 182:1, 204:2, 204:12, 206:3
**2006** [3] - 22:3, 116:4, 151:3
**2007** [1] - 22:3
**2008** [4] - 1:11, 22:3, 22:4, 254:6
**2009** [1] - 254:11
**202** [1] - 253:11
**203** [2] - 253:11, 253:12
**206** [1] - 253:12
**21** [2] - 223:19, 224:11
**21201** [1] - 1:15
**215** [1] - 253:14
**21st** [1] - 231:24
**22** [1] - 223:18
**226** [1] - 253:14
**227-0515** [1] - 221:13
**229** [1] - 253:16
**22nd** [1] - 151:1
**23rd** [2] - 239:9, 239:25
**24** [5] - 69:23, 72:25, 157:9, 171:11, 171:15
**24th** [9] - 100:17, 100:21, 101:13, 220:19, 236:20, 237:2, 239:5, 240:1, 240:11
**25** [1] - 73:1
**25th** [1] - 101:13
**262-0798** [1] - 234:11
**265** [1] - 90:21
**277-0515** [1] - 221:13
**27th** [1] - 150:23
**29** [3] - 70:8, 70:21, 170:20
**2910** [3] - 171:4, 171:5
**2:00** [1] - 121:24
**2:14** [1] - 240:1
**2:17** [1] - 239:25

## 3

**3** [2] - 42:16, 239:15
**3/22** [1] - 234:9
**3/24** [1] - 237:1
**30** [2] - 63:12, 250:5

**300** [2] - 219:4, 219:10
**30th** [1] - 129:5
**33** [1] - 134:20
**335-1517** [1] - 86:3
**34** [1] - 70:25
**35** [1] - 225:3
**3500** [4] - 180:3, 180:9, 185:13, 186:1
**3501** [1] - 186:25
**3505** [2] - 186:3, 186:8
**365-5446** [2] - 236:12, 239:22
**3:30** [4] - 127:21, 127:23, 127:24, 128:16
**3:53** [1] - 240:2
**3:56** [2] - 240:8
**3:57** [1] - 240:8

## 4

**4** [9] - 33:20, 38:10, 42:16, 42:17, 220:23, 224:5, 224:6, 240:11
**400** [2] - 220:4, 220:12
**401** [1] - 90:4
**403** [1] - 118:11
**404** [1] - 13:24
**404(b** [5] - 13:24, 21:1, 27:2, 28:19, 28:22
**410-258-5407** [1] - 234:2
**410-262-0798** [1] - 233:20
**410-365-5446** [1] - 233:2
**410-446-6508** [1] - 87:5
**410-905-1681** [1] - 232:20
**410-963-3912** [1] - 80:6
**410-977-6145** [1] - 87:11
**42** [1] - 226:8
**443** [1] - 236:4
**443-227-0515** [1] - 221:5
**443-309** [1] - 86:25
**443-324-1107** [1] - 134:3
**443-375-2168** [1] - 133:24
**443-418-6204** [1] - 218:7
**443-621-7441** [1] - 233:13
**443-677-3200** [1] - 88:15
**443-691-9203** [1] - 231:20
**443-803-618** [2] - 233:5,

235:19
**443-803-6182** [1] - 235:20
**46** [2] - 225:10, 226:7
**48** [1] - 15:17
**4:00** [2] - 214:23, 220:19
**4:30** [2] - 133:15, 138:2

## 5

**5057** [1] - 240:7
**54** [1] - 62:20
**5446** [1] - 240:4
**5515** [1] - 1:24
**56** [1] - 91:8
**560** [1] - 231:16
**561** [2] - 234:6, 239:9
**562** [1] - 235:7
**567** [1] - 89:17
**5:05** [1] - 236:20
**5:30** [2] - 59:13, 252:6
**5th** [1] - 150:24

## 6

**6** [2] - 76:4, 224:8
**60** [1] - 214:10
**608(b** [1] - 246:18
**609** [3] - 114:18, 211:19, 246:22
**609(a)(1** [3] - 113:17, 118:10, 129:17
**62** [1] - 253:3
**6204** [1] - 220:25
**635** [1] - 89:13
**691-9203** [1] - 237:4
**6:00** [1] - 52:2
**6:15** [3] - 237:9, 237:23, 239:5
**6:39** [2] - 237:11, 238:10
**6:40** [2] - 237:13, 238:13

## 7

**7** [1] - 71:25
**765** [1] - 89:13
**77** [1] - 253:4
**7:16** [2] - 237:16, 238:17
**7:21** [2] - 237:18, 238:22, 239:5
**7:30** [4] - 71:7, 71:8, 71:24, 225:9
**7:34:46** [1] - 225:6
**7:35** [3] - 225:1, 225:3,

225:5
**7th** [1] - 64:14, 133:4, 133:15, 138:1

**8**

**803-6182** [2] - 236:2, 236:16
**82** [1] - 86:7
**8347** [1] - 87:1
**838-1933** [1] - 88:18
**866** [1] - 89:17
**869** [2] - 239:18
**88.9** [1] - 163:23
**883** [2] - 235:16, 235:22
**8:30** [4] - 71:7, 71:9, 71:24, 71:25
**8th** [1] - 64:14

**9**

**90%** [1] - 53:15
**9418** [1] - 91:9
**984-0930** [1] - 89:6
**99%** [1] - 195:10
**9:29** [1] - 250:5
**9:30** [6] - 242:6, 243:20, 243:22, 249:25, 250:7, 251:22
**9:40** [1] - 2:1
**9th** [1] - 64:14

**A**

**a.m** [7] - 2:1, 61:14, 225:1, 225:9, 239:25, 240:1, 240:11
**Aaron** [3] - 147:16, 148:12, 149:4
**aback** [1] - 24:3
**abbreviated** [1] - 241:2
**abet** [1] - 5:14
**abilities** [1] - 48:21
**able** [18] - 3:7, 3:11, 3:18, 3:23, 52:25, 54:16, 86:13, 107:23, 108:9, 110:17, 111:5, 117:15, 127:11, 131:22, 141:3, 148:20, 211:20, 243:5
**absence** [1] - 20:25
**absent** [1] - 53:19
**absolutely** [5] - 23:11, 46:12, 46:13, 48:1, 51:13
**Absolutely** [4] - 48:2, 115:22, 134:18, 250:23, 252:3
**abstract** [1] - 54:21
**abstractions** [1] - 55:4

**abuse** [1] - 120:21
**accept** [2] - 28:1, 125:6
**acceptable** [1] - 129:18
**accepting** [1] - 121:1
**accommodate** [1] - 110:19
**accommodated** [1] - 25:22
**accompanying** [1] - 209:24
**accomplished** [2] - 133:19, 219:22
**according** [5] - 38:5, 125:19, 245:11, 245:13, 246:9
**account** [4] - 76:5, 77:2, 77:5, 156:6
**accuracy** [1] - 20:21
**accurate** [2] - 32:14, 254:9
**accustomed** [1] - 132:19
**achieve** [2] - 43:20, 43:21
**acknowledge** [1] - 116:2
**acknowledged** [3] - 115:3, 116:11, 245:9
**Acrobat** [1] - 36:2
**act** [3] - 10:18, 98:1, 229:19
**acting** [1] - 132:13
**activity** [2] - 9:22, 9:23
**acts** [2] - 11:15, 230:18
**actual** [9] - 19:13, 35:4, 51:15, 54:15, 112:17, 113:4, 220:9, 222:2, 234:13
**Adam** [1] - 1:22
**adamant** [1] - 11:6
**add** [3] - 47:18, 117:20, 211:14
**added** [1] - 44:12
**adding** [1] - 90:19
**addition** [1] - 116:10
**additional** [9] - 111:9, 115:8, 116:12, 117:20, 186:17, 219:24, 235:7, 242:9, 242:11
**address** [19] - 13:17, 65:2, 80:22, 80:25, 83:17, 83:21, 83:22, 86:7, 94:11, 95:13, 95:18, 95:22, 96:14, 107:13, 170:19, 171:3, 245:3, 246:10
**addressed** [6] - 94:14, 94:25, 105:1, 166:6, 187:18, 204:13
**addresses** [5] - 95:5,

95:10, 95:17, 96:4, 96:5
**Adina** [1] - 5:21
**adjoining** [2] - 66:24, 66:25
**administrative** [4] - 92:3, 92:7, 94:6, 228:9
**administrator** [1] - 2:3
**admissibility** [1] - 14:5
**admissible** [6] - 6:22, 6:25, 53:20, 54:17, 113:19, 118:11, 118:12, 129:18, 210:12
**admission** [3] - 48:6, 49:3, 115:14
**admit** [8] - 12:9, 40:17, 41:9, 51:15, 149:25, 183:24, 248:5, 248:14
**admits** [2] - 58:6, 58:21
**admitted** [14] - 31:10, 31:17, 40:7, 52:12, 52:21, 53:18, 115:2, 130:3, 131:23, 131:25, 184:20, 185:6, 210:8, 226:23
**admittedly** [1] - 125:14
**adopt** [1] - 55:9
**adult** [1] - 245:11
**advance** [2] - 26:11, 123:15
**advanced** [1] - 217:9
**advantage** [1] - 126:6
**advise** [2] - 10:24, 125:25
**advised** [3] - 125:20, 127:20, 131:5
**advising** [1] - 127:18
**affair** [4] - 143:23, 144:1, 144:4, 144:7
**affects** [1] - 250:14
**affidavit** [2] - 18:11, 60:16
**affirmed** [1] - 51:6
**affixed** [1] - 254:10
**Aforesaid** [1] - 147:12
**aforethought** [1] - 147:13
**afraid** [2] - 39:1, 59:3
**afternoon** [25] - 101:21, 101:22, 102:13, 102:14, 121:18, 127:21, 127:23, 127:24, 128:6, 131:3, 152:6, 199:2, 199:3, 200:18, 201:17, 209:15, 215:24, 216:9, 216:10, 227:1, 227:2, 229:10, 241:11, 243:6
**afterwards** [2] - 176:11, 250:18
**agent** [9] - 6:1, 6:3, 15:10, 58:13, 127:17,

128:5, 185:19, 185:25
**Agent** [4] - 6:12, 11:23, 58:24, 58:25
**agents** [12] - 117:16, 123:3, 125:11, 126:9, 127:10, 127:14, 170:4, 180:21, 181:18, 183:21, 213:23, 230:4
**ago** [22] - 25:22, 26:12, 43:19, 45:2, 46:17, 57:10, 69:13, 69:24, 72:5, 89:21, 103:9, 108:12, 135:19, 153:23, 153:24, 155:11, 155:14, 156:19, 169:15, 171:13, 185:18, 228:13
**agree** [12] - 36:25, 39:1, 41:5, 42:20, 53:24, 116:15, 117:19, 212:23, 250:18, 251:9
**agreed** [19] - 29:15, 29:16, 29:17, 30:10, 30:15, 31:10, 31:17, 37:1, 43:18, 48:5, 53:6, 54:20, 110:24, 112:3, 112:19, 113:21, 115:13, 116:11, 150:18
**agreement** [9] - 33:3, 40:16, 77:1, 112:21, 112:22, 119:16, 141:4, 199:11, 199:19
**agrees** [1] - 49:1
**ahead** [18] - 11:18, 33:17, 36:2, 37:9, 39:8, 53:2, 53:25, 59:9, 103:1, 110:4, 126:18, 132:20, 160:2, 177:7, 179:9, 198:19, 200:4
**aid** [2] - 5:14, 36:18
**Ain't** [1] - 196:21
**ain't** [4] - 187:11, 191:11, 197:11, 197:12
**air** [2] - 163:18, 231:11
**airplane** [1] - 2:18
**airplanes** [1] - 3:10
**al** [1] - 254:5
**Al** [1] - 189:11
**album** [1] - 206:19
**alleged** [2] - 11:14, 144:9
**allegedly** [2] - 41:13, 41:21
**alleging** [1] - 212:22
**Allen** [4] - 120:5, 120:6, 120:24, 121:15
**allow** [5] - 14:3, 20:10, 55:22, 210:7, 210:8
**allowed** [2] - 146:15, 247:6
**almost** [4] - 28:20,

38:21, 70:8, 111:18
**alone** [1] - 241:25
**alternative** [1] - 34:24
**Ambo** [1] - 86:7
**AMBO** [1] - 86:7
**AMD-04-029** [2] - 1:6, 254:5
**AMERICA** [1] - 1:5
**American** [2] - 2:21
**amount** [1] - 74:19
**amplify** [1] - 4:1
**analysis** [1] - 16:7
**AND** [1] - 132:22
**Andre** [1] - 1:13
**Andrea** [1] - 4:5
**angels** [1] - 2:11
**Ann** [4] - 92:13, 92:20, 147:14, 148:1
**Anne** [1] - 245:23
**annual** [1] - 70:25
**answer** [22] - 17:19, 20:16, 21:12, 38:2, 111:5, 143:4, 148:4, 155:2, 160:12, 177:7, 178:6, 179:1, 179:2, 183:17, 183:23, 193:4, 195:16, 196:6, 207:2, 207:19, 211:15, 231:5
**Answer** [2] - 47:9, 204:18
**answered** [4] - 184:3, 188:17, 204:14, 204:16
**answering** [2] - 127:15, 183:25
**answers** [5] - 62:17, 82:7, 114:11, 131:14, 204:11
**Anthony** [4] - 37:19, 38:4, 38:23, 81:6
**anticipate** [9] - 16:6, 112:12, 240:20, 240:21, 241:12, 242:3, 242:5, 242:14, 242:24
**anticipated** [1] - 16:6
**anticipating** [1] - 243:5
**Antwon** [1] - 147:10
**anyway** [4] - 36:2, 175:15, 198:1, 250:16
**Apart** [1] - 119:24
**apart** [2] - 6:16, 94:7
**Apartment** [3] - 32:24, 32:25, 186:8
**apartment** [3] - 47:12, 149:22, 186:9
**Apartments** [1] - 65:1
**apiece** [1] - 173:17
**apologize** [3] - 251:23, 252:4
**appear** [10] - 85:17, 90:11, 93:22, 95:5, 96:5,

113:1, 127:21, 131:14, 222:15, 234:21
**appearance** [2] - 109:1, 119:10
**Appearances** [1] - 1:15
**appeared** [2] - 126:22, 131:10
**appearing** [1] - 128:3
**applied** [1] - 251:13
**appreciate** [10] - 5:15, 27:13, 28:10, 34:24, 35:2, 50:22, 61:12, 90:3, 121:2, 124:1
**apprised** [1] - 52:20
**approach** [5] - 23:13, 23:18, 82:8, 124:8, 151:16
**approached** [1] - 100:6
**approaching** [1] - 21:17
**Appropriate** [1] - 53:7
**appropriate** [4] - 5:5, 14:2, 57:1, 124:10
**appropriately** [2] - 34:22, 132:17
**April** [9] - 22:15, 25:9, 69:17, 73:4, 79:19, 129:1, 150:21, 150:23
**area** [19] - 17:10, 63:18, 66:20, 66:23, 67:23, 68:11, 68:14, 89:3, 186:20, 219:5, 219:9, 219:11, 219:12, 220:13, 220:16, 227:16, 229:15, 249:15
**areas** [1] - 250:16
**arguably** [1] - 210:13
**argue** [6] - 28:4, 51:16, 51:20, 54:16, 55:4, 56:2
**argued** [1] - 55:22
**arguing** [1] - 55:9
**argument** [13] - 9:9, 12:10, 36:14, 53:8, 130:23, 241:15, 241:16, 241:24, 242:7, 242:8, 242:11, 247:25, 250:23
**arguments** [9] - 51:4, 215:14, 242:2, 242:4, 242:12, 242:13, 242:16, 243:14, 248:6
**arm** [2] - 192:15, 193:17
**armed** [1] - 129:7
**arrange** [1] - 128:5
**arrangement** [1] - 105:25
**arrangements** [1] - 79:12
**arrest** [16] - 5:3, 5:9, 50:21, 116:24, 116:25, 117:6, 117:13, 120:7, 120:9, 120:22, 120:23,

127:22, 185:20, 186:2, 210:1, 246:2
**arrested** [13] - 50:2, 57:21, 78:17, 100:19, 117:4, 140:24, 140:25, 142:10, 162:3, 182:1, 184:15, 185:4, 185:12
**arrests** [1] - 117:9
**Arrington** [7] - 2:11, 50:10, 50:14, 50:16, 50:20, 110:7, 120:3
**arrive** [1] - 71:23
**arrow** [1] - 234:18
**articles** [1] - 251:10
**artist** [2] - 163:7, 163:17
**Arundel** [1] - 245:23
**AS** [1] - 132:22
**aspect** [1] - 111:13
**aspects** [1] - 112:1
**assaulted** [2] - 178:11, 182:3
**assertion** [1] - 39:4
**assign** [1] - 242:1
**assigned** [2] - 20:19, 218:11
**assistance** [1] - 75:3
**Assistant** [2] - 63:6, 152:8
**assistant** [1] - 227:3
**assisting** [1] - 6:12
**associate** [2] - 16:23, 17:2
**associated** [2] - 8:25, 239:22
**assume** [4] - 48:6, 49:8, 117:19, 141:19
**assumed** [1] - 47:13
**Assuming** [1] - 125:6
**assuming** [3] - 126:20, 126:21, 248:11
**assumption** [1] - 47:15
**assure** [1] - 241:8
**AT&T** [17] - 60:9, 229:12, 229:13, 229:21, 229:25, 230:2, 230:7, 230:11, 230:18, 230:19, 230:21, 230:23, 231:1, 231:9, 231:11, 231:13
**attached** [2] - 18:25, 99:10
**attack** [3] - 23:13, 34:9, 46:21
**attacking** [2] - 246:20, 246:24
**attempt** [1] - 9:8
**attempting** [1] - 39:18
**attendance** [1] - 156:14
**attended** [1] - 152:11
**attention** [11] - 55:6, 69:22, 71:5, 129:9,

138:1, 217:22, 220:17, 221:16, 231:23, 239:17, 250:24
**attorney** [13] - 78:1, 91:18, 96:23, 97:10, 98:1, 98:16, 100:2, 109:3, 111:2, 131:11, 131:12, 227:4, 241:21
**Attorney** [2] - 114:5, 152:8
**Attorney's** [2] - 94:15, 99:17
**attorneys** [4] - 114:8, 131:10, 217:13, 241:18
**authenticate** [1] - 248:8
**authenticating** [1] - 13:2
**authority** [1] - 120:22
**authorize** [1] - 93:2
**authorized** [2] - 126:24, 213:25
**available** [8] - 52:4, 52:23, 130:24, 131:21, 132:2, 214:1, 244:4, 244:5
**Avenue** [17] - 142:19, 143:8, 143:11, 171:2, 177:19, 179:13, 179:14, 179:22, 180:9, 180:12, 185:13, 186:2, 186:5, 186:8, 187:1, 201:7, 201:10
**averse** [1] - 48:7
**avoid** [2] - 50:21, 243:18
**avowal** [1] - 212:25
**aware** [9] - 13:23, 22:21, 79:15, 123:17, 152:14, 162:3, 168:16, 196:13, 227:24
**awful** [1] - 248:1
**Ayesha** [6] - 123:6, 154:7, 158:14, 171:9, 191:23, 191:25
**Ayesha's** [1] - 191:14

---

# B

**background** [2] - 10:12, 127:25
**backwards** [1] - 40:20
**Bacon** [39] - 5:20, 5:23, 6:17, 7:25, 9:11, 9:21, 9:25, 10:3, 10:9, 11:6, 11:11, 56:19, 56:22, 57:2, 57:5, 57:10, 58:13, 58:19, 58:20, 84:18, 84:19, 89:20, 89:21, 89:24, 119:25, 122:21,

126:22, 127:18, 128:11, 128:17, 210:1, 210:15, 210:21, 210:23, 211:2, 211:3, 211:9, 211:12, 211:23
**Bacon's** [2] - 9:6, 59:5
**bag** [3] - 185:15, 186:16, 186:24
**bagged** [1] - 208:18
**balance** [3] - 78:14, 78:21, 79:5
**ballistics** [8] - 14:12, 15:2, 19:6, 19:12, 24:6, 27:15, 28:5
**Baltimore** [31] - 1:12, 1:25, 22:24, 23:2, 33:23, 33:24, 55:16, 63:18, 64:7, 80:22, 102:23, 141:10, 164:16, 164:21, 164:22, 164:24, 227:4, 234:24, 234:25, 235:2, 235:10, 235:11, 235:12, 236:4, 245:22, 245:25, 245:25, 246:1, 246:10
**Baltimore/Altoona** [1] - 56:5
**Baltimore/Washington** [1] - 220:13
**banked** [1] - 176:10
**barring** [1] - 244:2
**Barry** [1] - 1:22
**baseball** [1] - 4:12
**based** [4] - 51:16, 120:11, 232:14, 248:12
**basement** [8] - 65:20, 67:7, 67:10, 67:12, 67:15, 67:16, 68:1, 162:11
**basic** [2] - 16:15, 54:18
**basis** [9] - 5:13, 6:24, 27:17, 41:22, 47:15, 52:15, 70:25, 120:8, 121:8
**batch** [2] - 239:18, 240:6
**bath** [1] - 68:6
**bathroom** [1] - 68:16
**battle** [1] - 46:15
**beaten** [1] - 176:11
**beating** [1] - 249:14
**became** [4] - 100:1, 103:17, 171:23, 172:3
**become** [3] - 103:15, 103:24, 132:18
**becomes** [2] - 66:21
**bedroom** [14] - 65:17, 65:19, 67:15, 67:18, 68:10, 69:7, 69:12, 69:16, 72:5, 75:19, 186:12, 191:8, 191:10,

191:12
**began** [2] - 40:8, 109:2
**begin** [2] - 242:20, 243:6
**beginning** [6] - 22:19, 64:17, 89:3, 170:17, 196:15, 237:1
**begins** [1] - 4:12
**behalf** [10] - 6:9, 45:20, 79:8, 91:16, 93:3, 96:19, 98:13, 108:14, 200:1
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behind** [2] - 198:13, 198:14
**Belinda** [1] - 49:19
**belonged** [3] - 167:1, 167:4, 167:7
**below** [6] - 33:25, 98:11, 221:17, 221:23, 223:18, 236:10
**bench** [2] - 6:8, 56:18, 61:11
**benchmarks** [1] - 30:3
**benefit** [1] - 44:14
**Best** [1] - 208:18
**best** [4] - 44:5, 48:14, 64:14, 126:25, 243:8
**bet** [1] - 95:16
**betray** [1] - 193:11
**betrayal** [2] - 192:21, 192:23
**better** [5] - 24:23, 117:5, 126:16, 150:13, 245:10
**between** [12] - 14:7, 14:20, 22:5, 22:23, 54:2, 56:19, 71:8, 110:11, 239:4, 239:14, 240:11, 242:18
**Between** [1] - 71:24
**beyond** [4] - 121:22, 131:12, 206:16, 206:19
**BF** [1] - 24:2
**BF-1** [5] - 19:2, 23:24, 24:21, 24:25
**bicep** [1] - 192:13
**Bicep** [1] - 192:14
**bigger** [1] - 33:14
**bill** [12] - 78:9, 78:12, 78:21, 79:25, 80:1, 80:12, 80:15, 80:16, 80:20, 107:11, 231:8, 231:13
**bills** [7] - 77:24, 90:19, 218:18, 218:19, 223:25, 224:1
**birthday** [1] - 63:10
**bit** [16] - 43:16, 53:16, 71:14, 78:11, 81:11,

81:24, 82:4, 94:8, 95:22, 127:25, 128:7, 134:16, 173:5, 220:17, 229:25, 232:16

**bitch** [1] - 190:16
**black** [2] - 77:2, 88:25
**blank** [12] - 221:24, 222:5, 222:9, 222:18, 223:7, 223:18, 224:17, 224:18, 224:20, 224:21, 226:6, 226:10
**block** [4] - 180:3, 180:9, 185:13, 186:1
**blocked** [1] - 95:22
**blotted** [2] - 112:17, 113:3
**blotted-out** [1] - 113:3
**blue** [4] - 88:16, 88:18, 101:23, 212:15
**Blue** [1] - 97:22
**Bo** [30] - 10:23, 97:9, 158:20, 159:20, 159:22, 161:15, 161:17, 165:19, 166:3, 166:11, 168:7, 168:10, 168:13, 171:25, 173:1, 175:16, 175:19, 176:15, 176:19, 177:11, 177:12, 187:18, 188:21, 191:2, 192:7, 196:2, 200:15, 206:22, 207:9, 207:11
**Bo's** [2] - 10:23, 189:23
**body** [1] - 10:12
**book** [12] - 83:17, 83:21, 85:9, 85:24, 87:15, 104:13, 104:15, 104:17, 104:19, 104:20, 104:23, 193:8
**born** [3] - 63:15, 86:11, 105:5
**borrow** [1] - 15:7
**bothering** [1] - 12:3
**bothers** [1] - 43:22
**bottom** [7] - 23:25, 38:11, 42:16, 96:1, 224:11, 225:2, 236:15
**bought** [2] - 64:19, 64:22
**bound** [1] - 124:2
**bountiful** [1] - 61:20
**box** [1] - 212:9
**boy** [1] - 82:24
**boys** [1] - 177:23
**Brandy's** [1] - 47:11
**break** [6] - 60:5, 94:6, 109:12, 109:14, 110:17, 110:21
**breakfast** [1] - 72:2
**Bredar** [1] - 119:11
**brief** [6] - 49:21, 50:12,

109:20, 241:9, 244:8, 251:17
**Brief** [1] - 250:25
**briefly** [3] - 15:11, 30:18, 206:10
**bring** [8] - 55:5, 57:2, 120:25, 125:9, 191:25, 248:7, 250:4, 250:24
**broke** [2] - 73:20, 131:5
**Broomfield** [2] - 64:2, 75:5
**brother** [6] - 158:7, 158:8, 166:18, 166:20, 178:10, 182:2
**brothers** [1] - 158:9
**brought** [6] - 47:21, 57:21, 127:7, 182:2, 182:5, 210:16
**brown** [1] - 186:16
**buddy** [2] - 136:22
**buddy-buddy** [1] - 136:22
**building** [2] - 162:11, 186:11
**bulk** [1] - 220:14
**bullet** [6] - 12:18, 20:22, 23:5, 23:23
**bullet-to-bullet** [2] - 12:18, 20:22
**bunch** [4] - 20:1, 20:2, 92:6
**burden** [3] - 26:4, 35:1, 241:2
**Burnt** [1] - 163:3
**business** [9] - 30:9, 145:16, 145:17, 145:18, 146:2, 191:22, 191:25, 192:6, 194:11
**businesses** [1] - 145:16
**busted** [1] - 73:21
**busy** [1] - 2:10
**button** [4] - 223:11, 223:13, 223:15, 227:23
**buy** [3] - 167:23, 168:7, 169:6
**BY** [41] - 62:13, 77:19, 101:20, 102:12, 107:10, 108:22, 132:22, 152:5, 156:11, 170:15, 177:9, 179:3, 195:18, 196:18, 197:5, 199:1, 202:16, 203:3, 203:17, 206:13, 216:8, 226:25, 229:9, 253:3, 253:4, 253:4, 253:5, 253:5, 253:6, 253:7, 253:9, 253:9, 253:10, 253:10, 253:11, 253:11, 253:12, 253:12, 253:14, 253:14, 253:16
**Bye** [1] - 59:14

# C

**C-2** [5] - 92:1, 92:2, 94:5, 94:24, 95:11
**C-6** [2] - 96:9, 96:10
**Cadillac** [1] - 146:6
**calculate** [1] - 126:14
**calculated** [2] - 90:17, 225:8
**calendar** [1] - 87:17
**California** [1] - 244:1
**canceled** [1] - 3:6
**candor** [2] - 21:15, 121:3
**cap** [1] - 4:12
**Capital** [3] - 76:5, 76:17
**captain** [1] - 189:24
**captioned** [1] - 96:10
**captured** [2] - 221:25, 222:4
**captures** [2] - 222:23, 222:25
**capturing** [2] - 222:20, 222:21
**car** [11] - 10:3, 10:6, 10:7, 37:20, 37:25, 39:21, 47:8, 47:14, 146:5, 176:20, 181:13
**Card** [1] - 191:23
**card** [6] - 77:24, 78:9, 78:12, 78:21, 191:25, 192:6
**care** [10] - 31:14, 34:6, 34:7, 42:15, 49:12, 56:16, 96:15, 135:24, 198:16
**carefully** [1] - 215:13
**cares** [1] - 20:13
**carry** [1] - 166:20
**carrying** [1] - 9:25
**case** [63] - 10:13, 10:20, 11:12, 13:19, 13:21, 15:15, 15:17, 18:16, 18:23, 21:19, 23:8, 23:9, 24:4, 26:6, 27:4, 36:20, 36:22, 43:7, 44:1, 44:15, 44:21, 45:1, 45:9, 45:17, 46:7, 46:18, 51:21, 57:1, 81:5, 86:24, 87:20, 91:17, 91:25, 99:1, 109:1, 111:13, 113:21, 116:20, 123:11, 131:23, 134:9, 139:17, 146:24, 150:20, 177:1, 199:15, 209:19, 211:19, 212:16, 213:13, 213:17, 222:4, 223:4, 241:3, 241:16, 241:17, 241:21, 243:4, 243:17, 243:19, 244:9,

250:25
**CASE** [1] - 1:6
**Case** [3] - 23:2, 23:3, 254:5
**cases** [2] - 22:23, 221:25
**casings** [2] - 19:19, 23:5
**cassette** [1] - 49:11
**catch** [1] - 21:9
**category** [1] - 124:23
**Catonsville** [3] - 9:14, 9:15, 9:16
**Caucasian** [1] - 249:8
**caught** [1] - 186:14
**cc'd** [1] - 2:8
**CD** [10] - 161:12, 161:13, 161:18, 161:19, 162:24, 163:18, 197:4, 201:1, 208:11
**CD's** [4] - 161:11, 161:15, 161:17, 163:10
**CDS** [2] - 157:22
**cell** [19] - 88:12, 127:11, 133:22, 146:12, 146:15, 146:16, 146:19, 146:21, 219:2, 219:3, 219:4, 219:6, 219:10, 219:13, 219:24, 223:5, 226:12, 228:5, 228:13
**centerpiece** [1] - 45:1
**central** [1] - 219:3
**centralized** [1] - 219:2
**CEO** [3] - 160:20, 175:18, 175:19
**certain** [22] - 18:10, 26:5, 28:15, 29:19, 30:3, 38:14, 40:18, 40:23, 56:21, 74:19, 111:25, 130:1, 199:20, 199:21, 217:11, 218:8, 219:4, 225:20, 228:1, 246:1, 248:6
**Certainly** [2] - 45:14, 231:22
**certainly** [9] - 22:19, 23:15, 26:7, 35:5, 49:24, 51:16, 128:8, 211:1, 241:12
**certainty** [4] - 15:1, 15:3, 25:20, 252:1
**CERTIFICATE** [1] - 254:1
**certificate** [1] - 244:15
**certified** [1] - 119:15
**certify** [2] - 254:3, 254:7
**chairs** [3] - 111:12, 209:18, 243:16
**challenge** [1] - 59:12
**chambers** [1] - 5:6

**chance** [7] - 49:25, 90:8, 111:22, 112:7, 217:18, 229:20, 240:10
**change** [3] - 35:22, 59:20, 116:1
**changed** [1] - 110:2
**changes** [7] - 35:17, 43:4, 43:5, 43:13, 43:14, 44:7, 66:21
**character** [9] - 211:17, 245:17, 245:19, 246:20, 246:23, 247:3, 247:10, 247:12, 251:12
**characteristics** [2] - 13:9, 13:10
**characterization** [1] - 178:4
**characterize** [1] - 164:8
**charge** [10] - 112:24, 140:1, 148:24, 149:19, 185:17, 199:5, 199:8, 199:9, 215:8, 215:12
**charged** [14] - 10:14, 19:9, 24:18, 112:16, 134:9, 140:25, 146:25, 147:7, 147:14, 147:24, 149:9, 177:18, 177:21, 184:21
**charges** [4] - 74:5, 74:8, 243:3
**charging** [3] - 113:4, 147:4, 150:11
**chart** [1] - 247:19
**chase** [2] - 19:11, 208:19
**chat** [2] - 110:4, 125:11
**check** [4] - 43:24, 60:5, 60:12, 221:20
**checking** [1] - 225:20
**checkmark** [1] - 148:18
**child** [1] - 198:16
**children** [1] - 80:9
**choose** [4] - 151:8, 241:6, 241:7, 242:21
**chooses** [3] - 240:23, 241:4, 242:10
**Christine** [1] - 181:17
**Christopher** [1] - 249:5
**Christy** [1] - 182:23
**cipher** [1] - 24:21
**Circle** [2] - 86:7, 170:23
**circled** [1] - 95:18
**Circuit** [2] - 217:3, 217:4
**circumstances** [1] - 57:17
**cites** [1] - 245:3
**citizen** [1] - 97:10
**City** [10] - 22:24, 23:2, 64:7, 164:16, 164:21,

164:22, 217:3, 217:4, 245:23, 246:1
**city** [1] - 219:11
**civilians** [2] - 156:2, 156:3
**CJS** [1] - 246:2
**claimed** [1] - 188:15
**claiming** [1] - 185:2
**claims** [2] - 120:18, 245:20
**clarification** [1] - 51:3
**clarify** [5] - 57:6, 111:9, 111:24, 116:14, 121:17
**classes** [1] - 217:11
**classic** [1] - 247:2
**classification** [1] - 13:9
**classify** [1] - 164:13
**Claudus** [3] - 11:3, 166:12, 187:20
**clean** [1] - 32:3
**cleaned** [1] - 32:4
**clear** [15] - 21:17, 26:8, 29:9, 31:20, 38:18, 47:6, 48:4, 93:16, 123:9, 128:10, 181:24, 186:17, 210:11, 211:14, 213:10
**Clearly** [2] - 38:7, 247:4
**clearly** [4] - 12:9, 43:12, 51:25, 116:21
**CLERK** [6] - 2:12, 49:20, 62:4, 132:11, 216:3, 229:4
**clerk** [3] - 61:25, 151:17, 215:25
**clicked** [3] - 139:11, 139:13
**client** [2] - 45:20, 48:19
**client's** [1] - 251:11
**close** [5] - 15:17, 59:16, 120:18, 151:21, 191:18, 193:11, 196:2
**closer** [1] - 63:1
**Closest** [1] - 97:10
**closest** [2] - 10:24, 11:5
**closing** [14] - 9:9, 36:14, 51:4, 53:8, 215:14, 241:15, 241:16, 241:23, 242:1, 242:4, 242:7, 242:8, 242:15, 243:14
**clown** [1] - 207:10
**clowns** [1] - 208:17
**club** [1] - 208:18
**clutter** [1] - 43:25
**co** [1] - 181:17
**co-counsel** [1] - 181:17
**coach** [1] - 119:4
**Coach** [6] - 60:13, 130:11, 243:25, 244:3, 251:11

**Coburn** [49] - 1:22, 6:15, 6:16, 15:13, 16:18, 20:24, 22:22, 23:21, 25:4, 26:3, 27:9, 27:11, 27:14, 49:22, 57:4, 57:7, 57:22, 59:6, 60:3, 108:13, 108:24, 109:14, 109:24, 111:1, 113:25, 114:11, 117:22, 119:21, 119:24, 125:1, 125:4, 126:18, 128:10, 128:13, 128:20, 131:7, 131:14, 132:2, 132:5, 132:19, 150:16, 198:18, 198:20, 198:24, 200:4, 205:4, 209:16, 210:14, 210:21
**COBURN** [115] - 2:15, 2:20, 2:23, 3:3, 3:9, 3:16, 3:20, 3:25, 4:4, 4:15, 4:21, 4:25, 5:4, 5:15, 5:20, 6:15, 6:19, 7:1, 7:13, 7:16, 7:19, 7:22, 7:25, 8:2, 8:4, 8:7, 8:12, 8:18, 8:21, 11:10, 11:20, 11:23, 12:7, 12:12, 12:14, 14:8, 14:15, 14:19, 14:24, 15:5, 15:7, 16:20, 16:25, 17:3, 17:9, 17:12, 17:15, 17:19, 17:23, 18:4, 18:7, 18:10, 18:14, 19:7, 19:13, 19:17, 19:22, 19:24, 20:6, 20:9, 20:15, 20:25, 21:3, 21:9, 21:14, 21:25, 22:4, 24:20, 26:15, 28:10, 50:9, 50:15, 50:19, 50:22, 53:4, 57:8, 57:12, 57:23, 58:1, 58:5, 58:12, 58:15, 59:7, 59:10, 59:13, 59:15, 59:24, 77:14, 102:12, 109:15, 109:23, 113:24, 118:20, 119:22, 119:25, 120:5, 121:7, 121:9, 121:12, 125:2, 126:19, 127:3, 127:9, 128:18, 128:21, 128:24, 132:10, 132:22, 134:18, 143:2, 148:3, 150:17, 199:1, 253:5, 253:10
**Coburn's** [3] - 23:12, 210:14, 212:8
**code** [1] - 89:3
**codefendants'** [1] - 26:21
**coherent** [1] - 241:21
**collateral** [5] - 247:5, 247:6, 247:7, 247:8, 249:18
**collection** [2] - 219:2,

226:12
**college** [1] - 17:5
**College** [2] - 13:1, 130:12
**Collins** [1] - 120:2
**colloquy** [1] - 54:11
**color** [2] - 85:3, 97:21
**colored** [1] - 146:6
**column** [1] - 218:23, 221:2, 222:1, 223:5, 224:10, 225:15, 232:7, 232:23, 233:4, 238:7
**Column** [1] - 238:6
**columns** [5] - 218:15, 219:24, 222:13, 223:3, 223:6
**comfortable** [1] - 62:8
**coming** [21] - 4:17, 36:23, 39:13, 44:9, 56:23, 56:25, 60:1, 61:17, 103:4, 103:18, 128:10, 139:18, 141:19, 153:18, 155:19, 191:14, 196:25, 197:14, 199:25, 240:15, 244:14
**comment** [1] - 48:13
**comments** [1] - 28:10
**commercially** [1] - 163:1
**commit** [3] - 7:17, 148:21
**commitment** [1] - 198:21
**committed** [1] - 149:3
**common** [6] - 28:4, 158:11, 158:14, 159:9, 167:15
**communication** [1] - 11:25
**community** [2] - 164:18, 245:20
**commutes** [1] - 17:8
**companies** [1] - 230:24
**Company** [1] - 157:11
**company** [5] - 216:12, 216:16, 217:14, 230:3, 236:14
**company's** [1] - 230:25
**company-owned** [1] - 230:3
**compare** [1] - 36:16
**comparison** [2] - 13:5, 14:20, 44:16
**comparisons** [3] - 12:18, 20:22, 22:22
**competent** [1] - 9:9
**complains** [1] - 23:21
**complaint** [1] - 22:23
**complete** [5] - 176:18,

223:11, 243:11, 247:18, 254:9
**completed** [1] - 239:3
**completely** [2] - 44:20, 46:19
**completeness** [1] - 53:12
**complex** [1] - 149:22
**complexity** [1] - 243:3
**Compliance** [2] - 216:14, 216:24
**compliance** [1] - 217:6
**complied** [2] - 27:9, 27:16
**comply** [2] - 26:25
**comprehensive** [1] - 7:2
**computer** [5] - 2:23, 15:8, 49:10, 163:3, 163:4
**computers** [3] - 215:11, 215:16, 222:25
**con** [1] - 148:11
**conceding** [1] - 25:3
**conceivably** [2] - 184:21, 185:7
**concept** [1] - 193:9
**concern** [3] - 13:17, 15:12, 37:16
**concerned** [1] - 149:10
**concerning** [4] - 21:1, 51:10, 146:5, 210:8
**conclude** [4] - 5:13, 240:20, 240:21, 241:13
**Conclusion** [1] - 252:6
**condition** [2] - 73:18, 115:14
**condone** [1] - 48:20
**conduct** [4] - 19:4, 123:11, 124:4, 246:19
**Conduct** [1] - 243:17
**confer** [2] - 109:25, 110:1
**confident** [1] - 28:17
**confronted** [2] - 55:8, 56:24
**confused** [1] - 29:9
**confusing** [2] - 37:10, 42:19
**connected** [9] - 223:22, 227:12, 227:21, 237:21, 238:3, 238:4, 238:12, 238:14, 238:15
**connecting** [1] - 21:19
**connection** [5] - 23:6, 47:5, 56:6, 173:25, 202:10
**consequence** [1] - 5:12
**consequently** [1] - 128:2
**consider** [10] - 6:8,

53:22, 110:24, 131:16, 132:3, 150:20, 151:6, 165:19, 228:15
**consideration** [1] - 52:5
**considered** [2] - 27:11, 179:18
**Consist** [1] - 230:4
**consistent** [7] - 35:3, 51:8, 53:15, 56:13, 57:13, 213:4, 223:19
**Conspiracy** [5] - 134:14, 134:22, 139:25, 147:2, 147:15
**conspiracy** [13] - 55:25, 134:23, 141:5, 146:25, 147:21, 147:25, 148:5, 148:11, 148:14, 148:20, 149:2, 149:3, 149:4
**conspiracy-wise** [1] - 147:21
**conspired** [1] - 149:20
**conspiring** [1] - 149:10
**constitute** [1] - 254:7
**consult** [1] - 5:16
**consultation** [1] - 49:22
**consumer** [1] - 218:21
**contact** [7] - 86:9, 86:18, 127:12, 181:3, 191:18, 200:18, 223:12
**containing** [3] - 186:16, 186:24, 187:19
**contend** [2] - 4:19, 52:15
**content** [1] - 164:10
**contention** [1] - 245:9
**context** [1] - 213:10
**continue** [6] - 35:24, 57:17, 61:21, 139:15, 155:13, 243:12
**Continue** [3] - 111:13, 209:20, 243:18
**contradict** [4] - 14:11, 15:1, 211:1, 213:2
**contradicted** [3] - 38:22, 41:8, 55:7
**contradicting** [1] - 8:3
**contradicts** [1] - 53:9
**contrast** [3] - 19:23, 19:24, 120:13
**contribution** [1] - 65:11
**controversial** [2] - 59:11, 249:22
**controversy** [2] - 250:13, 250:21
**conversation** [7] - 11:1, 137:6, 137:7, 138:5, 139:4, 144:25, 177:22
**conversations** [3] - 227:19, 227:20, 228:2
**convicted** [7] - 7:23,

139:18, 139:20, 145:22, 157:16, 158:1, 248:13
  **conviction** [16] - 115:8, 116:2, 116:3, 116:12, 116:13, 117:2, 117:7, 117:8, 117:14, 146:1, 150:21, 150:23, 150:25, 151:1, 151:3, 246:21
  **convictions** [20] - 113:17, 114:23, 115:15, 116:10, 116:20, 116:22, 116:23, 117:1, 117:11, 117:20, 118:8, 118:10, 122:2, 129:1, 129:12, 150:19, 151:6, 157:20, 184:9
  **convinced** [1] - 211:8
  **convoluted** [1] - 25:20
  **cooperating** [3] - 211:5, 211:6, 211:8
  **cooperation** [1] - 199:19
  **copied** [1] - 163:1
  **copies** [5] - 22:15, 36:15, 51:14, 117:19, 118:18
  **copy** [15] - 30:21, 31:22, 112:12, 117:18, 148:17, 163:1, 208:11, 212:9, 215:2, 217:24, 232:18, 242:19, 246:2, 247:21
  **Correct** [38] - 32:23, 41:3, 102:5, 107:18, 108:3, 152:13, 155:12, 180:19, 180:23, 184:7, 184:23, 187:15, 188:2, 189:12, 199:23, 200:14, 200:16, 200:20, 201:12, 230:21, 232:1, 232:4, 232:19, 236:3, 236:17, 237:3, 237:7, 237:10, 237:12, 237:15, 237:17, 237:19, 238:8, 238:16, 239:6, 239:16, 240:5, 240:9
  **correct** [75] - 8:9, 29:24, 40:19, 41:24, 48:9, 67:2, 67:13, 69:8, 69:14, 73:16, 74:1, 76:2, 78:15, 79:5, 79:13, 79:25, 80:4, 85:25, 87:1, 87:6, 87:12, 88:12, 88:25, 89:7, 89:25, 90:23, 92:8, 93:17, 95:14, 95:23, 99:14, 100:17, 105:20, 107:17, 108:2, 117:24, 121:6, 141:7, 142:5, 142:23, 145:13, 147:19, 152:12, 152:21, 153:19, 154:5, 154:13, 154:21,

155:6, 155:11, 176:21, 181:4, 185:16, 186:12, 187:1, 187:5, 187:14, 199:7, 200:7, 201:4, 219:15, 220:3, 221:3, 221:6, 221:15, 224:12, 224:16, 226:9, 228:4, 228:7, 228:8, 228:10, 228:11, 239:1, 239:2
  **corrected** [1] - 33:2
  **Correction** [1] - 246:9
  **correction** [4] - 42:9, 42:11, 42:12, 42:14
  **corrections** [1] - 33:11, 33:12, 37:7
  **Corrections** [2] - 245:22, 245:25
  **correctly** [14] - 20:2, 41:18, 52:6, 80:25, 85:22, 88:3, 91:8, 92:3, 92:13, 145:21, 199:4, 200:12, 205:17, 219:17
  **correspondence** [1] - 2:9
  **corroborate** [1] - 248:6
  **cost** [2] - 3:7, 162:19
  **Counsel** [1] - 196:13
  **counsel** [20] - 2:9, 26:6, 26:21, 52:9, 52:14, 77:2, 109:25, 113:20, 117:19, 123:14, 125:18, 125:20, 156:9, 181:17, 199:14, 199:15, 215:10, 241:23, 249:19, 251:18
  **counsel's** [1] - 176:24
  **count** [8] - 112:16, 147:8, 148:1, 148:8, 148:17, 149:3, 150:11, 226:2
  **Count** [2] - 112:16, 112:18
  **counts** [2] - 10:18, 129:6
  **County** [5] - 22:24, 64:7, 141:10, 245:22, 245:25
  **Couple** [1] - 139:5
  **couple** [45] - 12:11, 18:19, 29:20, 30:17, 37:16, 45:2, 45:15, 45:17, 52:25, 59:11, 63:4, 72:18, 72:19, 87:14, 88:24, 89:12, 109:11, 118:18, 121:18, 122:19, 155:10, 155:13, 156:13, 169:2, 169:15, 173:10, 173:13, 173:15, 177:19, 203:18, 206:14, 221:17, 224:5, 224:25, 227:17, 231:23, 233:23,

234:3, 234:4, 235:15, 235:16, 236:10, 236:15, 240:3
  **course** [24] - 3:21, 5:18, 5:20, 15:9, 17:24, 23:5, 27:25, 38:20, 43:11, 45:23, 54:21, 57:9, 59:5, 59:21, 119:13, 123:21, 123:23, 127:4, 146:20, 154:8, 175:16, 218:21
  **courses** [1] - 17:5
  **court** [38] - 2:3, 6:8, 33:5, 55:21, 57:2, 57:21, 74:9, 74:20, 75:10, 97:5, 97:15, 97:17, 98:19, 99:17, 99:19, 99:20, 102:4, 118:7, 120:25, 123:24, 139:18, 150:22, 152:23, 153:17, 153:18, 154:1, 154:3, 155:9, 155:13, 155:17, 155:20, 170:1, 179:20, 213:16, 213:21, 228:6
  **COURT** [476] - 1:1, 2:2, 2:6, 2:13, 2:18, 2:21, 3:1, 3:4, 3:13, 3:18, 3:23, 4:3, 4:14, 4:19, 4:24, 5:2, 5:7, 5:18, 5:23, 6:3, 6:10, 6:14, 6:16, 6:24, 7:7, 7:15, 7:17, 7:20, 7:24, 8:1, 8:3, 8:6, 8:9, 8:17, 8:20, 8:23, 9:3, 9:6, 9:14, 10:5, 10:9, 10:14, 10:17, 11:9, 11:17, 11:21, 12:6, 12:8, 12:13, 14:4, 14:10, 14:18, 14:22, 15:3, 15:6, 15:9, 15:21, 16:12, 16:17, 16:21, 17:2, 17:7, 17:11, 17:13, 17:18, 17:21, 18:2, 18:6, 18:9, 18:12, 19:5, 19:10, 19:15, 19:21, 19:23, 20:4, 20:7, 20:11, 20:24, 21:2, 21:6, 21:11, 21:23, 22:3, 22:12, 24:1, 24:5, 24:10, 24:14, 24:17, 24:19, 25:4, 25:10, 25:13, 25:17, 26:2, 27:7, 28:14, 28:21, 28:24, 29:6, 29:8, 29:14, 29:18, 29:22, 29:25, 30:3, 30:6, 30:10, 30:13, 30:19, 30:21, 30:24, 31:6, 31:14, 31:20, 31:25, 32:3, 32:5, 32:7, 32:10, 32:16, 32:24, 33:8, 33:17, 34:5, 34:11, 34:17, 34:20, 35:20, 36:1, 36:7, 36:21, 36:24, 37:4, 37:9, 37:12, 38:7,

38:9, 39:1, 39:8, 39:15, 39:18, 40:3, 40:5, 41:4, 42:2, 42:5, 42:12, 42:15, 42:20, 42:25, 43:11, 44:11, 44:22, 45:23, 45:25, 46:3, 46:11, 46:23, 47:16, 47:20, 48:10, 48:25, 49:8, 49:12, 49:18, 50:7, 50:10, 50:13, 50:16, 50:20, 50:24, 51:23, 51:25, 53:5, 53:24, 54:21, 55:2, 55:24, 56:2, 56:8, 56:14, 56:23, 57:4, 57:7, 57:9, 57:19, 57:25, 58:4, 58:8, 58:13, 58:16, 58:18, 58:21, 59:5, 59:9, 59:12, 59:14, 59:21, 59:25, 60:6, 60:8, 60:11, 60:15, 60:21, 60:23, 61:2, 61:4, 61:8, 61:12, 61:16, 61:19, 61:24, 62:7, 62:25, 63:22, 76:25, 77:8, 77:11, 77:13, 77:17, 78:10, 82:9, 97:13, 97:24, 109:7, 109:13, 109:16, 109:18, 109:21, 109:24, 110:4, 110:8, 110:11, 110:13, 110:20, 111:16, 111:20, 111:23, 112:4, 112:6, 112:9, 112:14, 112:20, 112:23, 113:1, 113:6, 113:9, 113:11, 113:13, 113:20, 113:25, 114:4, 114:9, 114:11, 114:15, 114:17, 114:20, 114:24, 115:2, 115:5, 115:9, 115:12, 115:16, 115:18, 115:21, 115:24, 116:5, 116:7, 116:16, 116:25, 117:3, 117:7, 117:12, 117:17, 118:2, 118:4, 118:12, 118:14, 118:22, 118:25, 119:3, 119:6, 119:9, 119:13, 119:18, 119:21, 119:23, 120:3, 120:6, 121:8, 121:10, 121:14, 121:20, 121:23, 122:4, 122:6, 122:8, 122:13, 122:24, 123:2, 123:12, 124:1, 124:6, 124:15, 124:18, 124:20, 124:23, 125:1, 125:4, 125:8, 125:22, 126:2, 126:4, 126:13, 126:15, 126:24, 127:6, 127:10, 127:14, 127:17, 127:24, 128:4, 128:12, 128:17, 128:19, 128:23, 128:25, 129:8, 129:10,

129:14, 129:19, 129:22, 130:7, 130:14, 130:16, 130:19, 131:2, 132:8, 132:12, 132:15, 134:15, 134:17, 134:19, 150:3, 150:5, 150:7, 150:9, 150:15, 150:18, 151:12, 151:16, 151:20, 152:3, 154:10, 155:2, 156:6, 160:2, 160:11, 160:17, 164:2, 170:11, 172:5, 176:18, 176:24, 177:7, 178:6, 178:16, 178:25, 179:2, 179:8, 179:20, 181:15, 183:7, 183:14, 186:7, 189:21, 190:7, 190:9, 191:5, 192:12, 192:16, 192:18, 192:22, 193:4, 193:20, 195:16, 196:6, 196:13, 196:17, 196:23, 197:1, 198:20, 200:4, 203:22, 204:8, 205:3, 206:8, 206:11, 206:18, 207:17, 207:19, 208:2, 208:5, 208:21, 209:14, 209:23, 210:3, 210:10, 210:20, 212:1, 212:5, 212:7, 212:11, 212:13, 212:18, 212:25, 213:6, 213:14, 213:24, 214:4, 214:8, 214:10, 214:12, 214:16, 214:19, 214:21, 214:24, 215:6, 215:10, 215:19, 215:23, 226:16, 226:18, 226:21, 226:23, 228:19, 228:22, 228:24, 229:1, 231:4, 231:22, 240:17, 243:24, 244:12, 244:14, 244:19, 245:15, 245:18, 246:3, 246:17, 246:23, 247:3, 247:11, 247:14, 247:16, 247:21, 247:24, 248:9, 248:25, 249:2, 249:7, 249:9, 249:17, 249:22, 249:24, 250:4, 250:10, 250:20, 250:23, 251:3, 251:6, 251:15, 252:3, 252:5
  **Court** [83] - 2:3, 13:21, 14:2, 20:17, 22:21, 25:21, 26:3, 26:14, 27:8, 27:16, 27:17, 33:4, 38:19, 39:16, 40:9, 42:13, 49:2, 49:22, 50:1, 51:13, 52:11, 52:19, 54:20, 56:19, 57:8, 64:18, 65:2, 65:4, 65:5, 65:6, 65:7, 65:8, 65:16, 66:6, 66:7, 66:8, 66:9, 72:20, 72:22, 73:4,

77:15, 80:12, 80:17, 80:22, 81:1, 81:8, 83:9, 83:22, 94:10, 95:14, 95:19, 96:16, 105:8, 107:5, 107:12, 107:13, 107:16, 107:17, 108:2, 108:6, 108:7, 109:2, 113:18, 119:8, 120:7, 122:18, 125:3, 127:19, 127:20, 127:22, 128:9, 128:14, 129:16, 152:14, 156:9, 210:7, 211:22, 249:5, 250:22, 254:16
   **Court's** [26] - 13:17, 27:7, 27:25, 28:8, 35:3, 49:14, 55:6, 110:19, 111:17, 120:21, 121:14, 125:6, 126:7, 129:17, 130:10, 170:7, 198:21, 210:2, 210:9, 210:10, 210:11, 210:19, 211:14, 211:22, 211:24, 231:21
   **courthouse** [4] - 60:24, 61:2, 61:6, 140:1
   **Courthouse** [1] - 1:24
   **courtroom** [20] - 19:14, 41:20, 60:16, 61:15, 61:18, 111:15, 122:12, 123:16, 125:14, 128:3, 131:1, 152:16, 154:8, 156:7, 179:18, 201:23, 202:23, 209:22, 215:18, 243:23
   **courts** [1] - 18:6
   **cousin** [2] - 176:11, 176:13
   **cover** [2] - 219:9, 219:11
   **covers** [1] - 219:10
   **crack** [8] - 179:14, 179:22, 180:8, 180:17, 185:15, 186:1, 186:17, 186:24
   **create** [4] - 36:8, 36:10, 36:24, 46:14
   **created** [3] - 34:22, 197:16, 247:19
   **creativity** [2] - 196:1, 207:21
   **credibility** [3] - 6:22, 28:3, 151:7
   **credit** [5] - 28:6, 77:24, 78:9, 78:12, 78:21
   **credited** [1] - 27:10
   **Cree** [24] - 64:18, 65:7, 65:8, 65:16, 66:7, 72:20, 72:21, 73:4, 80:12, 80:17, 81:1, 81:8, 83:9, 83:22, 94:10, 95:14, 95:19, 96:15, 107:12,

107:17, 108:2, 108:6, 108:7
   **Cresas** [2] - 64:24, 65:1
   **crime** [4] - 117:8, 157:16, 183:24, 246:21
   **crimes** [3] - 139:18, 195:24, 195:25
   **criminal** [2] - 22:23, 241:3
   **CRIMINAL** [1] - 1:6
   **critical** [2] - 26:7, 57:18
   **critique** [1] - 15:16
   **CROSS** [18] - 77:18, 101:19, 102:11, 152:4, 170:14, 198:25, 202:15, 203:2, 226:24, 253:4, 253:4, 253:5, 253:9, 253:10, 253:10, 253:11, 253:11, 253:14
   **cross** [21] - 8:6, 13:2, 28:5, 38:17, 39:10, 39:20, 40:9, 40:10, 41:10, 47:1, 55:14, 57:20, 114:7, 123:22, 124:12, 125:9, 128:22, 200:9, 210:22, 244:23, 251:16
   **crossed** [7] - 32:21, 32:25, 39:11, 86:24, 87:3, 87:8, 88:15
   **crossed-out** [1] - 87:8
   **CROWE** [17] - 61:23, 62:1, 62:13, 77:4, 77:9, 77:12, 107:10, 110:6, 119:7, 119:10, 202:16, 207:16, 249:20, 249:23, 253:3, 253:5, 253:11
   **Crowe** [14] - 1:20, 52:6, 52:8, 61:22, 76:25, 77:23, 79:18, 83:15, 105:15, 105:18, 108:24, 119:6, 202:17, 249:19
   **Crowe's** [1] - 60:2
   **Crucially** [1] - 46:1
   **cryptic** [1] - 26:24
   **culled** [1] - 26:20
   **cumbersome** [1] - 43:3
   **Cup** [1] - 244:10
   **cure** [3] - 39:5, 123:12, 125:6
   **custodian** [1] - 229:19
   **customer** [6] - 169:10, 216:16, 230:5, 231:10, 231:11
   **cut** [3] - 14:25, 19:10, 59:15
   **Cut** [1] - 15:3
   **cutting** [1] - 6:21
   **CV's** [1] - 22:20

**D**

   **D-E-Z-O** [1] - 233:9
   **dailies** [1] - 54:15
   **Damita** [11] - 29:1, 29:7, 47:6, 233:17, 234:11, 235:4, 235:8, 236:23, 237:5, 239:3, 239:8
   **dance** [1] - 55:3
   **dangerous** [2] - 147:25, 148:21
   **Dar** [1] - 140:25
   **Darius** [21] - 47:12, 133:10, 134:24, 135:19, 135:20, 135:22, 136:1, 136:4, 137:11, 137:13, 137:20, 137:22, 137:23, 138:13, 141:5, 143:15, 146:25, 148:5, 148:14, 149:22
   **dark** [1] - 82:4
   **Darryl** [19] - 5:20, 5:23, 33:22, 47:12, 81:6, 84:2, 84:5, 84:12, 84:15, 84:18, 84:19, 84:25, 85:5, 85:7, 89:20, 119:25, 126:22
   **Darryls** [3] - 84:16, 84:17, 89:22
   **date** [13] - 70:21, 75:11, 75:12, 100:16, 101:13, 105:9, 117:13, 142:10, 223:14, 234:7, 234:8, 246:2
   **dated** [1] - 70:8
   **dates** [10] - 22:14, 116:23, 116:25, 117:2, 117:3, 117:13, 129:4, 231:24, 245:1
   **Daubert** [3] - 13:19, 14:5, 27:13
   **Daubertesque** [2] - 16:9, 16:12
   **daughter** [4] - 86:11, 105:5, 120:25
   **Davey** [1] - 243:25
   **Davis** [1] - 1:13
   **Davon** [3] - 136:14, 136:15, 136:17
   **dawn** [1] - 28:20
   **days** [14] - 12:11, 45:8, 122:20, 123:4, 126:11, 126:14, 152:12, 154:3, 154:12, 154:15, 191:15, 243:10, 250:6
   **DC** [1] - 220:13
   **deadline** [1] - 127:24
   **deadly** [2] - 147:25, 148:22

   **deal** [2] - 54:1, 180:17
   **dealers** [2] - 247:1, 249:14
   **dealing** [7] - 11:14, 145:16, 146:2, 179:14, 184:20, 185:6, 185:12
   **dealt** [4] - 9:18, 184:18, 187:5, 187:10
   **death** [2] - 135:4, 135:11
   **Death** [1] - 195:20
   **decide** [6] - 5:8, 50:3, 54:23, 122:16, 125:10, 241:25
   **decided** [2] - 120:3, 120:6
   **decision** [3] - 2:13, 45:20, 130:10
   **decorum** [1] - 179:18
   **dedicated** [1] - 189:25
   **Deezo** [9] - 37:19, 37:21, 38:1, 38:15, 38:22, 38:25, 47:11, 233:10, 236:16
   **Def** [1] - 176:2
   **defect** [1] - 23:19
   **defects** [1] - 23:21
   **Defendant** [10] - 1:17, 1:18, 1:20, 1:21, 66:12, 66:13, 67:5, 75:15, 76:4, 76:17
   **DEFENDANT** [4] - 62:2, 151:18, 216:1, 229:2
   **defendant** [3] - 34:23, 53:11, 97:12
   **defendant's** [2] - 123:10, 132:25
   **defendants** [3] - 9:18, 11:8, 55:18
   **Defendants** [2] - 1:9, 61:15
   **defendants'** [1] - 45:3
   **defense** [25] - 6:9, 15:17, 16:2, 22:16, 31:1, 36:25, 45:22, 46:8, 48:1, 56:19, 78:8, 97:19, 114:6, 123:14, 123:21, 125:16, 153:18, 155:9, 228:25, 240:21, 241:5, 242:10, 242:12, 251:18
   **Defense** [1] - 150:1
   **deflect** [1] - 59:2
   **degree** [1] - 68:24
   **Delete** [1] - 118:2
   **delete** [4] - 42:20, 49:12, 77:2, 118:1
   **deletions** [1] - 112:3
   **deliberately** [1] - 147:12
   **deliberations** [5] -

45:13, 131:22, 243:6, 243:11, 243:15
   **deliver** [1] - 94:1
   **demands** [1] - 216:15
   **Demolition** [2] - 157:11, 157:13
   **demonstrable** [1] - 12:21
   **demonstration** [1] - 117:23
   **demonstrative** [2] - 44:17, 250:19
   **denied** [3] - 51:6, 179:9, 187:13
   **deny** [3] - 58:8, 146:1, 178:1
   **department** [5] - 34:1, 46:6, 46:17, 48:15, 217:7
   **Department** [1] - 141:11
   **depicted** [1] - 66:14
   **depicts** [1] - 68:8
   **deposit** [1] - 98:18
   **derivatively** [1] - 210:22
   **derived** [1] - 28:7
   **describe** [2] - 120:13, 135:4
   **described** [3] - 10:1, 48:23, 143:21
   **description** [2] - 207:21, 208:13
   **deserves** [1] - 20:17
   **designate** [1] - 250:16
   **designation** [1] - 220:5
   **desperately** [1] - 45:10
   **despite** [2] - 146:1, 200:6
   **destination** [1] - 224:1
   **detail** [3] - 151:5, 218:6, 231:1
   **detailed** [2] - 18:18, 25:2
   **details** [2] - 28:16, 217:8
   **detective** [2] - 24:8, 24:10
   **Detective** [5] - 32:8, 38:11, 38:12, 244:7, 244:17
   **detectives** [17] - 38:22, 40:21, 41:1, 41:7, 41:15, 41:16, 41:21, 141:10, 141:23, 142:9, 142:24, 143:3, 143:10, 143:14, 146:5, 188:3, 188:8
   **detectives'** [1] - 141:14
   **determine** [2] - 50:1, 211:15
   **determining** [1] - 151:7
   **dialed** [7] - 222:2,

222:5, 222:25, 223:4, 223:8, 223:20

**dialing** [2] - 221:18, 223:9

**difference** - 43:11, 43:12

**differences** [2] - 43:6, 43:9

**Different** [1] - 162:20

**different** [15] - 19:5, 19:11, 19:14, 19:17, 53:17, 59:8, 70:6, 162:20, 168:23, 205:19, 220:11, 220:15, 222:25, 223:2

**differentiate** [1] - 71:8

**differently** [4] - 33:16, 51:2, 55:21, 222:22

**difficult** [1] - 231:7

**difficulties** [1] - 13:4

**difficulty** [3] - 77:4, 79:15, 94:9

**digit** [1] - 227:16

**digits** [5] - 88:21, 88:22, 222:2, 223:5, 223:8

**dining** [2] - 68:6, 68:15

**DIRECT** [8] - 62:12, 156:10, 216:7, 229:8, 253:3, 253:9, 253:14, 253:16

**direct** [14] - 13:13, 58:6, 69:22, 114:6, 138:1, 146:11, 147:16, 210:21, 210:22, 220:17, 220:22, 221:16, 239:17, 251:16

**directing** [1] - 71:5

**direction** [2] - 4:9, 127:19

**directly** [9] - 62:4, 62:9, 66:7, 68:21, 151:22, 151:24, 211:1, 216:3, 229:4

**Dirty** [2] - 136:10, 136:11

**disagree** [2] - 44:22, 123:3

**disagreement** [1] - 31:18

**disappeared** [1] - 4:10

**disclose** [1] - 45:4

**disclosing** [1] - 141:22

**disclosure** [1] - 26:23

**disclosures** [1] - 27:4

**discoverable** [2] - 46:9, 46:10

**discovering** [1] - 27:11

**discovery** [13] - 15:18, 16:8, 22:13, 22:19, 23:10, 23:15, 23:18, 24:4, 24:5, 26:4, 26:5,

26:10, 46:8

**discrete** [2] - 10:14, 15:15

**discuss** [2] - 30:18, 251:4

**discussed** [3] - 51:2, 52:9, 72:5

**discussion** [5] - 53:14, 111:12, 122:10, 209:19, 243:17

**dishonor** [1] - 195:21

**disingenuous** [1] - 48:14

**disk** [1] - 163:3

**Dismiss** [1] - 96:11

**disputing** [2] - 22:22, 26:16

**disregard** [1] - 176:23

**dissatisfaction** [1] - 106:21

**distance** [2] - 222:7, 232:11

**distinction** [1] - 247:4

**distract** [1] - 125:5

**distribute** [8] - 139:21, 140:16, 145:22, 150:22, 150:24, 150:25, 151:2, 151:4

**distributed** [1] - 184:15

**DISTRICT** [2] - 1:1, 1:2

**Division** [3] - 245:22, 245:24, 246:9

**DIVISION** [1] - 1:2

**DOAR** [4] - 51:20, 54:5, 204:8, 217:24

**Dobropolski** [3] - 244:23, 245:9, 249:6

**Dobropolski's** [2] - 244:24, 245:6

**Dobrsycki** [2] - 48:18, 48:19

**Dobrsycki's** [1] - 49:17

**DOC** [4] - 140:8, 140:9, 248:11, 248:12

**document** [14] - 35:2, 35:23, 98:18, 99:1, 99:14, 113:3, 113:4, 149:10, 150:9, 150:11, 231:3, 231:5, 232:16, 234:4

**documentation** [1] - 122:3

**documents** [12] - 91:15, 97:25, 99:21, 119:15, 121:19, 209:24, 245:3, 247:18, 250:12, 251:8, 251:10, 251:18

**Dollar** [5] - 62:24, 63:2, 63:3, 63:5, 70:19

**dollar** [4] - 90:13, 90:14,

90:17, 186:1

**dollars** [3] - 84:2, 84:6, 84:13

**Dolly** [2] - 48:18, 48:19

**done** [20] - 7:2, 7:11, 12:19, 13:15, 14:21, 16:3, 16:4, 17:11, 17:12, 17:17, 43:5, 43:7, 43:14, 52:22, 54:2, 165:6, 214:8, 223:23, 249:25, 251:12

**Donte** [2] - 176:11, 176:13, 176:14

**door** [11] - 47:9, 47:10, 67:11, 67:18, 73:7, 73:8, 73:10, 73:16, 73:18, 73:20, 73:21

**double** [1] - 177:18

**doubt** [1] - 212:6

**Down** [1] - 86:21

**down** [72] - 4:6, 4:7, 4:8, 4:12, 4:17, 6:21, 7:2, 10:2, 14:25, 15:3, 15:14, 23:13, 23:18, 33:20, 42:22, 62:8, 67:7, 67:9, 67:12, 67:16, 68:1, 73:9, 84:9, 84:14, 85:15, 85:20, 86:10, 87:16, 87:20, 95:21, 130:21, 134:16, 134:17, 134:20, 139:2, 150:14, 167:16, 180:20, 181:9, 182:2, 183:20, 197:7, 203:6, 203:11, 203:13, 207:10, 207:22, 208:16, 208:19, 220:17, 220:18, 220:21, 223:17, 224:7, 225:1, 232:5, 232:24, 233:8, 233:9, 234:15, 235:9, 235:20, 236:7, 236:15, 237:11, 238:9, 240:2, 251:25

**Downtown** [1] - 90:6

**dozen** [1] - 44:7, 173:10, 173:13, 173:15

**draft** [3] - 52:1, 91:21, 215:12

**drag** [1] - 32:16

**dragged** [1] - 208:18

**draw** [1] - 231:23

**drawer** [1] - 75:19

**drive** [2] - 38:4, 146:6

**driven** [2] - 38:23, 47:11

**drop** [2] - 38:3, 47:14

**dropped** [7] - 37:21, 38:1, 38:13, 238:14, 238:15, 238:16

**drove** [2] - 38:3, 146:9

**drug** [11] - 9:11, 9:22, 9:23, 11:14, 55:16, 56:6,

118:8, 122:20, 167:15, 247:1, 249:14

**drugs** [23] - 9:18, 146:2, 157:22, 164:25, 167:10, 167:12, 167:23, 168:5, 168:10, 168:14, 169:7, 184:15, 184:18, 184:21, 184:25, 185:6, 185:11, 185:12, 187:5, 187:10, 201:6

**due** [1] - 54:18

**Dugan** [2] - 140:4, 140:5

**Duganne** [1] - 55:14

**duly** [1] - 132:17

**Dupont** [2] - 171:2, 171:3, 171:5

**duration** [2] - 218:16, 223:21

**during** [24] - 9:12, 36:14, 39:20, 45:13, 80:12, 80:15, 106:9, 115:3, 123:7, 125:14, 131:8, 131:21, 137:7, 142:8, 146:14, 150:10, 152:16, 154:8, 156:7, 201:14, 202:7, 216:21, 244:22, 250:19

**During** [1] - 138:5

**duties** [1] - 230:1

**Dwayne** [1] - 149:4

**Dwight** [2] - 175:9, 202:2

**E**

**e-mail** [4] - 2:18, 3:1, 220:10, 220:14

**e-mails** [1] - 2:8

**Eager** [2] - 90:4, 90:5

**Earl** [4] - 96:15, 96:19, 148:12, 149:4

**early** [3] - 71:10, 71:14, 198:22

**earnings** [1] - 70:21

**easier** [1] - 36:2

**easily** [3] - 172:13, 172:16, 172:18

**East** [2] - 90:4, 90:5

**east** [1] - 33:23

**easy** [3] - 33:25, 36:6, 115:21

**eat** [1] - 72:2

**Edgecombe** [1] - 170:23

**edited** [3] - 35:2, 36:9, 112:1

**editing** [1] - 43:22

**edits** [1] - 111:21

**Edward** [4] - 95:1, 95:23, 96:24, 97:1

**effect** [2] - 4:3, 39:7

**effectively** [2] - 38:17, 123:15

**efforts** [1] - 26:19

**egregious** [1] - 20:22

**Eight** [1] - 216:20

**eight** [3] - 157:15, 216:21, 227:15

**Either** [1] - 242:17

**either** [12] - 11:12, 26:13, 40:24, 51:6, 81:13, 114:21, 124:11, 170:20, 202:20, 219:17, 226:11, 239:1

**Elementary** [1] - 103:6

**elementary** [1] - 103:7

**elephants** [1] - 25:6

**elicit** [5] - 12:25, 18:24, 57:5, 128:15

**eliciting** [1] - 6:18

**emphasize** [1] - 88:21

**employed** [1] - 229:11

**employer** [2] - 216:11, 244:11

**end** [21] - 37:17, 44:20, 45:10, 66:17, 66:22, 67:2, 77:23, 92:10, 97:19, 106:14, 116:8, 129:11, 202:18, 220:21, 224:7, 224:10, 227:25, 231:13, 241:13, 242:4, 250:24

**ended** [2] - 100:19, 223:12

**ending** [1] - 90:21

**ends** [2] - 149:25, 224:15

**enforcement** [3] - 16:19, 73:12, 212:22

**enforcer** [2] - 245:7, 245:21, 249:13

**engaged** [1] - 9:22

**engineers** [2] - 217:10, 217:11

**Ensor** [3] - 13:3, 19:8, 19:18, 20:23

**Ensor's** [4] - 22:15, 22:16, 22:17, 22:21

**entered** [3] - 96:8, 109:1, 152:14

**enterprise** [4] - 8:24, 8:25, 168:3, 174:1

**enters** [3] - 61:18, 131:1, 215:18

**Entertainment** [5] - 160:7, 173:19, 200:22, 201:4, 202:11

**entertainment** [1] -

195:20
  **entire** [3] - 15:16, 237:2, 245:11
  **entitled** [10] - 16:6, 34:23, 39:11, 43:6, 45:20, 48:1, 48:5, 57:16, 117:3, 128:14
  **entity** [1] - 159:23
  **entries** [1] - 232:9
  **entry** [2] - 73:18, 224:5
  **envelope** [3] - 94:8, 94:11, 94:24
  **envelopes** [6] - 94:3, 94:17, 94:23, 95:10, 95:16, 105:1
  **equals** [4] - 24:2, 24:21, 87:23, 88:5
  **equipment** [3] - 83:4, 162:12, 162:14
  **ERIC** [2] - 229:2, 253:15
  **Eric** [3] - 13:25, 22:7, 229:6
  **escape** [1] - 197:15
  **escort** [1] - 128:6
  **Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
  **essentially** [4] - 10:12, 13:1, 67:1, 222:24
  **Essex** [1] - 33:22
  **establish** [1] - 24:13
  **established** [1] - 87:14
  **estimate** [1] - 123:5
  **et** [1] - 254:5
  **etc** [1] - 53:7
  **Europe** [1] - 3:6
  **evaluating** [3] - 150:20, 151:6, 156:8
  **evaluation** [2] - 28:3, 251:12
  **evening** [1] - 72:1
  **event** [2] - 119:12, 123:5
  **events** [1] - 207:23
  **eventually** [1] - 134:11
  **evidence** [72] - 6:18, 6:21, 6:23, 12:9, 12:21, 14:5, 14:6, 21:1, 27:18, 28:22, 35:4, 36:18, 36:20, 36:22, 37:5, 40:7, 40:13, 40:17, 41:2, 46:6, 51:11, 51:18, 51:20, 51:21, 52:4, 52:12, 52:21, 52:23, 53:10, 53:18, 54:1, 54:17, 54:18, 55:22, 56:2, 57:5, 57:11, 58:3, 58:4, 81:5, 96:8, 111:12, 128:15, 130:21, 130:22, 131:25,

149:18, 176:25, 177:1, 209:19, 211:18, 211:20, 213:18, 240:20, 240:21, 240:25, 241:4, 241:13, 241:16, 241:19, 241:24, 242:1, 242:9, 242:10, 242:15, 243:13, 246:22, 249:3, 251:9
  **exact** [1] - 22:14
  **exactly** [10] - 33:11, 44:21, 59:5, 103:21, 111:18, 131:14, 132:4, 158:8, 178:1, 222:14
  **Exactly** [6] - 12:7, 112:8, 129:22, 130:4, 130:7
  **EXAMINATION** [35] - 62:12, 77:18, 101:19, 102:11, 107:9, 108:21, 132:21, 152:4, 156:10, 170:14, 198:25, 202:15, 203:2, 203:16, 206:12, 216:7, 226:24, 229:8, 253:3, 253:4, 253:4, 253:5, 253:5, 253:6, 253:9, 253:9, 253:10, 253:10, 253:11, 253:11, 253:12, 253:12, 253:14, 253:14, 253:16
  **examination** [24] - 13:2, 15:16, 16:10, 23:14, 23:16, 28:5, 39:20, 40:9, 40:10, 41:10, 47:1, 51:15, 52:20, 58:7, 114:7, 115:4, 115:10, 123:22, 129:11, 146:11, 210:21, 210:23, 244:23
  **examine** [2] - 39:10, 128:22
  **examined** [7] - 8:6, 11:17, 38:17, 54:5, 55:14, 57:20, 200:9
  **example** [7] - 33:1, 33:18, 52:6, 55:19, 154:15, 183:17, 184:8
  **excellent** [1] - 18:16
  **except** [3] - 112:18, 115:5, 213:1
  **exception** [1] - 28:8
  **exceptional** [1] - 57:16
  **exchange** [7] - 205:6, 232:13, 235:1, 235:2, 235:11, 236:4, 236:6
  **excise** [2] - 37:15, 44:9
  **excised** [1] - 30:17
  **excluded** [2] - 214:18, 214:20
  **excuse** [4] - 75:15, 111:10, 137:23, 139:17
  **Excuse** [5] - 65:5,

77:14, 107:5, 125:4, 134:15
  **excused** [9] - 109:8, 111:14, 119:12, 209:14, 209:20, 228:20, 240:18, 241:10, 243:22
  **executed** [1] - 98:21
  **executive** [1] - 176:2
  **exhibit** [17] - 31:1, 76:6, 77:3, 94:25, 112:10, 112:14, 112:15, 112:20, 113:2, 113:6, 113:14, 115:18, 115:19, 217:23, 218:1, 226:19, 234:13
  **Exhibit** [24] - 31:9, 66:13, 66:14, 67:5, 68:7, 69:2, 70:5, 73:19, 75:15, 76:4, 76:17, 79:22, 81:4, 81:23, 82:19, 83:3, 92:1, 92:2, 94:5, 94:24, 95:11, 96:9, 96:10, 217:23
  **exhibits** [12] - 51:16, 109:11, 110:6, 121:18, 129:25, 131:20, 131:23, 230:11, 241:20, 249:21, 250:19, 250:23
  **existed** [2] - 22:1, 22:5
  **existence** [1] - 224:3
  **exits** [3] - 111:15, 209:22, 243:23
  **expanded** [2] - 23:17, 223:3
  **expansive** [1] - 121:13
  **expect** [12] - 6:6, 52:1, 56:9, 113:22, 114:12, 117:17, 215:17, 241:10, 241:14
  **expectation** [1] - 6:18
  **expected** [1] - 110:16
  **expeditiously** [1] - 251:20
  **expended** [5] - 12:18, 14:20, 20:1, 20:2, 20:22
  **expert** [12] - 12:6, 12:20, 14:12, 18:1, 18:4, 20:10, 27:1, 27:4, 27:15, 27:25, 28:2
  **expert's** [1] - 28:1
  **expertise** [2] - 12:22, 17:25
  **experts** [2] - 15:2, 28:6
  **explain** [7] - 37:7, 113:20, 136:7, 191:1, 211:4, 222:21, 223:17
  **explained** [5] - 23:19, 32:5, 183:10, 183:16, 223:5
  **explaining** [2] - 111:19, 230:10
  **explicitly** [2] - 7:19, 8:8,

8:15
  **exploits** [1] - 251:11
  **explosion** [1] - 16:11
  **exposure** [1] - 243:18
  **express** [2] - 13:12, 106:21
  **expressed** [1] - 210:25
  **extensive** [1] - 17:10
  **extent** [1] - 70:7
  **extra** [1] - 51:16
  **extraordinarily** [1] - 17:10
  **extraordinary** [1] - 26:19
  **extrinsic** [2] - 246:22, 247:5
  **eyes** [2] - 34:13, 156:18

## F

  **F5** [1] - 80:20
  **face** [4] - 82:1, 82:2, 151:23, 210:17
  **faced** [1] - 74:6
  **fact** [43] - 7:13, 7:14, 13:5, 13:6, 13:8, 13:24, 20:11, 26:16, 34:14, 38:18, 39:2, 41:7, 46:25, 47:22, 48:16, 59:18, 63:7, 65:21, 67:24, 69:17, 74:5, 120:8, 120:19, 123:5, 126:8, 141:3, 141:16, 141:25, 142:23, 162:3, 168:17, 172:7, 177:12, 180:8, 181:8, 183:20, 184:2, 188:23, 191:21, 200:6, 213:14, 237:1, 249:5
  **facts** [1] - 241:25
  **fade** [1] - 43:19
  **faded** [1] - 44:24
  **faded** [3] - 28:16, 40:11, 40:24
  **fails** [1] - 27:18
  **failure** [2] - 23:18, 26:5
  **Fair** [3] - 76:23, 164:22, 202:2
  **fair** [19] - 79:16, 101:15, 142:5, 143:6, 143:13, 143:22, 143:25, 144:3, 144:19, 145:9, 145:15, 146:4, 146:8, 146:11, 146:14, 146:21, 228:14, 252:1
  **fairly** [6] - 25:1, 28:15, 28:17, 59:16, 228:12, 241:9
  **faith** [1] - 41:22, 128:13
  **fall** [5] - 25:10, 25:14,

25:18, 26:13, 124:23
  **falls** [1] - 44:15
  **false** [1] - 47:15
  **fam** [1] - 194:3
  **Fam** [1] - 194:4
  **familiar** [2] - 217:16, 230:7
  **family** [6] - 63:20, 64:6, 81:1, 194:8, 194:10, 194:12
  **Family** [1] - 194:12
  **famous** [1] - 197:10
  **far** [12] - 21:12, 26:22, 47:24, 107:1, 111:13, 118:6, 124:25, 148:13, 149:9, 209:19, 210:12, 234:23
  **fashion** [2] - 130:2, 132:18
  **father** [5] - 91:2, 91:3, 91:13, 91:14, 194:9
  **fault** [1] - 27:9
  **favorable** [1] - 124:21
  **February** [8] - 64:21, 65:8, 66:3, 72:8, 92:13, 129:2, 151:2, 230:2
  **federal** [1] - 180:21
  **FedEx** [1] - 131:2
  **fees** [1] - 79:9
  **felonies** [1] - 129:16
  **feloniously** [1] - 147:12
  **felt** [1] - 44:4
  **female** [2] - 72:7, 99:5
  **few** [21] - 3:6, 39:4, 43:19, 52:19, 69:13, 77:23, 79:20, 81:10, 83:15, 83:16, 89:21, 102:17, 109:13, 111:9, 154:15, 155:17, 207:15, 227:15, 228:16, 243:14, 249:21
  **field** [1] - 222:3
  **Fifteen** [1] - 240:12
  **figure** [1] - 123:4
  **figures** [3] - 90:14, 90:17
  **file** [1] - 98:18
  **filed** [5] - 12:11, 13:19, 18:25, 28:20, 99:16
  **Filed** [1] - 99:19
  **filing** [1] - 96:14
  **filings** [1] - 2:8
  **fill** [1] - 119:18
  **final** [4] - 111:21, 112:7, 241:3, 246:12
  **Finalize** [1] - 117:18
  **finalized** [1] - 243:2
  **finally** [10] - 69:5, 69:10, 75:14, 76:16, 77:3, 82:24, 91:11,

108:4, 108:8, 119:21
**Finally** [1] - 105:14
**finals** [1] - 252:1
**fine** [10] - 47:2, 55:11, 56:10, 56:20, 75:8, 75:12, 88:2, 89:12, 108:10, 115:24
**Fine** [1] - 77:11
**finger** [2] - 21:4, 21:6
**finish** [6] - 117:22, 130:21, 140:21, 140:22, 214:17, 242:3
**finished** [3] - 89:3, 128:17, 223:9
**firearms** [7] - 5:22, 13:4, 15:16, 16:10, 18:4, 23:14, 23:15
**fired** [6] - 17:18, 17:20, 17:24, 20:4, 120:15, 120:20
**fires** [1] - 4:22
**firm** [2] - 16:23, 17:2
**first** [51] - 4:7, 4:16, 19:7, 21:23, 22:5, 34:8, 34:9, 37:15, 37:17, 42:21, 43:2, 57:15, 60:2, 63:17, 66:6, 66:9, 66:12, 68:4, 68:5, 68:9, 68:14, 72:7, 74:15, 89:13, 102:21, 103:3, 108:1, 118:17, 123:19, 125:13, 126:7, 133:23, 147:8, 148:9, 156:17, 156:22, 159:3, 169:14, 179:19, 180:24, 182:11, 185:1, 191:21, 194:3, 194:4, 221:1, 230:10, 234:6, 237:8, 244:1
**First** [3] - 37:13, 83:17, 218:3
**five** [15] - 11:12, 51:12, 116:20, 129:1, 150:19, 186:24, 221:12, 223:8, 224:14, 224:19, 239:4, 246:7, 248:18
**Five** [4] - 31:9, 75:15, 140:23, 224:21
**fix** [1] - 35:1
**FLANNERY** [16] - 244:16, 244:21, 245:17, 245:24, 246:12, 247:8, 247:13, 247:15, 247:17, 247:23, 248:4, 248:21, 249:1, 249:4, 249:8, 249:11
**Flannery** [4] - 1:19, 34:22, 119:14, 247:6
**flashed** [1] - 34:12
**fled** [1] - 186:3
**flight** [3] - 3:5, 68:10,

68:25
**flip** [2] - 27:19, 150:6
**flooded** [1] - 2:8
**flooding** [1] - 2:16
**floor** [11] - 61:1, 61:11, 68:4, 68:5, 68:14, 68:19, 68:21, 68:25, 69:4, 69:8, 72:5
**flooring** [1] - 68:9
**flow** [1] - 118:1
**focused** [2] - 25:24, 34:13
**Focusing** [1] - 94:5
**folders** [1] - 26:20
**folks** [3] - 52:2, 61:17, 206:6
**follow** [2] - 117:19, 242:21
**following** [5] - 32:17, 40:23, 72:25, 129:12, 246:3
**follows** [1] - 41:18
**foot** [2] - 185:20, 186:3
**football** [1] - 251:11
**FOR** [1] - 1:2
**forego** [2] - 5:10, 125:8
**foregoing** [1] - 254:7
**forensic** [1] - 22:25
**forensics** [1] - 17:5
**forget** [3] - 7:10, 26:9, 117:12
**forgive** [1] - 248:9
**forgot** [1] - 214:25
**form** [2] - 12:18, 149:16
**formally** [1] - 213:24
**former** [2] - 16:19, 16:21
**Former** [2] - 16:23, 17:2
**formerly** [1] - 16:22
**forth** [4] - 12:22, 24:2, 39:21, 41:16
**forward** [2] - 85:11, 127:7
**forwarded** [1] - 85:21
**foundation** [1] - 54:19
**Four** [3] - 49:3, 225:12, 239:13
**four** [24] - 15:18, 16:8, 42:21, 51:12, 53:23, 55:18, 56:6, 59:16, 88:21, 89:2, 113:16, 116:22, 216:23, 216:24, 223:8, 224:18, 224:19, 224:21, 224:22, 224:23, 226:3, 226:7
**fourth** [1] - 234:15
**fragment** [1] - 23:23
**fragments** [2] - 15:15, 23:5
**Frame** [1] - 12:13

**frankly** [4] - 27:12, 45:12, 125:10, 240:25
**Frankly** [4] - 5:11, 14:22, 27:10, 44:23
**free** [3] - 28:4, 124:4, 147:7
**frequency** [1] - 217:10
**frequent** [3] - 181:3, 188:24, 200:18
**frequently** [1] - 172:10
**Friday** [3] - 15:14, 87:17, 243:10
**friend** [8] - 72:7, 72:13, 72:21, 136:21, 137:1, 137:4, 175:20, 207:2
**friends** [6] - 103:15, 133:12, 136:22, 137:5, 144:17, 165:19
**front** [17] - 8:21, 18:9, 34:13, 42:3, 66:16, 67:11, 73:7, 73:20, 82:11, 83:2, 83:17, 83:18, 100:17, 113:21, 166:18, 204:11, 232:17
**fuck** [1] - 213:17
**full** [6] - 16:9, 25:21, 82:17, 98:9, 151:25, 241:15
**full-scale** [1] - 16:9
**fully** [3] - 11:17, 34:21, 128:4
**functioning** [1] - 107:2
**funeral** [1] - 81:6
**furloughs** [1] - 107:23
**furnish** [1] - 25:1
**furnished** [1] - 13:20
**furniture** [2] - 69:16, 69:20
**furthermore** [1] - 27:17
**fuzzy** [1] - 14:7

## G

**G-A-V-I-N** [1] - 216:6
**gagged** [1] - 208:18
**games** [1] - 191:13
**gang** [1] - 55:16
**gangsta** [1] - 164:11
**Gangsta** [2] - 164:12, 165:15
**gangster** [2] - 189:15, 195:22
**garbage** [1] - 248:10
**GARDNER** [1] - 1:8
**Gardner** [50] - 1:21, 4:17, 4:20, 5:14, 9:12, 9:20, 10:1, 10:9, 10:21, 10:22, 11:2, 11:4, 11:14, 26:10, 26:11, 56:8,

58:22, 58:24, 59:1, 82:17, 82:22, 86:10, 86:15, 86:18, 91:6, 96:15, 96:21, 98:3, 98:19, 100:7, 100:10, 102:15, 102:19, 102:22, 103:3, 103:15, 108:15, 132:7, 147:19, 148:12, 149:4, 150:1, 150:5, 202:5, 211:5, 211:7, 213:20
**Gardner's** [6] - 7:23, 26:6, 96:19, 98:11, 100:1, 100:4
**gateways** [1] - 220:14
**gather** [2] - 26:19, 89:2
**gathering** [1] - 145:5
**Gavin** [2] - 215:21, 216:5
**GAVIN** [2] - 216:1, 253:13
**General** [5] - 62:24, 63:2, 63:3, 63:5, 70:20
**general** [9] - 27:25, 32:14, 53:18, 53:25, 189:24, 213:1, 213:2, 217:16, 230:23
**Generally** [1] - 219:10
**generally** [2] - 20:19, 71:23
**generated** [1] - 219:21
**generosity** [1] - 46:8
**gentleman** [13] - 81:19, 81:21, 81:25, 82:5, 82:6, 82:19, 82:25, 104:14, 105:15, 158:3, 158:18, 158:22, 166:12
**gentlemen** [12] - 81:13, 106:3, 109:24, 131:3, 132:8, 132:16, 134:17, 150:11, 150:18, 200:19, 240:18, 243:21
**geographical** [2] - 219:5, 219:8
**geography** [1] - 219:8
**Gerard** [1] - 1:19
**ghetto** [1] - 194:14
**Giant** [6] - 70:10, 70:13, 70:17, 70:24, 71:3, 74:1
**Giant's** [1] - 70:3
**girl** [4] - 85:24, 86:2, 138:19, 138:23
**girlfriend** [1] - 86:9
**given** [6] - 84:12, 112:12, 130:10, 132:1, 205:6, 210:1
**Glaser** [19] - 74:3, 74:12, 74:17, 74:21, 75:1, 75:9, 79:8, 105:16, 105:18, 105:22, 106:1,

106:10, 106:13, 106:22, 107:2, 108:25
**glitch** [1] - 226:11
**God** [1] - 214:15
**Godmother** [5] - 100:3, 100:4, 103:17, 103:19, 103:24
**gold** [1] - 146:6
**gold-colored** [1] - 146:6
**gonna** [1] - 208:19
**Goo** [27] - 82:14, 82:15, 82:22, 84:2, 84:5, 84:11, 84:12, 85:11, 85:20, 85:24, 86:2, 86:9, 86:22, 87:5, 87:8, 87:20, 87:23, 88:2, 88:24, 89:6, 91:5, 102:19, 102:22, 103:3, 104:22, 105:5
**Goo's** [4] - 82:17, 96:19, 100:4, 105:4
**gouge** [1] - 218:21
**government** [76] - 3:19, 3:20, 4:19, 8:4, 14:12, 15:19, 16:15, 18:23, 20:12, 21:19, 25:25, 26:6, 26:10, 28:18, 28:20, 29:15, 30:15, 31:4, 31:21, 33:12, 34:5, 36:25, 37:25, 39:2, 41:6, 42:6, 42:8, 43:3, 45:4, 45:8, 46:21, 47:22, 47:24, 48:7, 48:14, 49:1, 49:9, 52:14, 53:10, 56:9, 56:17, 56:21, 57:20, 58:10, 75:15, 77:6, 77:16, 121:11, 151:15, 156:4, 199:11, 199:20, 199:21, 200:1, 200:9, 203:24, 211:3, 211:6, 212:4, 212:7, 212:20, 213:4, 213:8, 217:20, 220:2, 229:21, 240:24, 241:2, 241:6, 242:7, 242:9, 242:10, 244:17, 246:17, 250:18
**Government** [4] - 1:15, 217:23, 231:15, 233:15
**Government's** [15] - 70:5, 73:19, 79:22, 81:4, 81:23, 82:19, 83:3, 92:1, 92:2, 94:5, 94:24, 95:10, 96:9, 96:10, 232:17
**government's** [25] - 8:16, 8:23, 9:4, 14:11, 15:1, 15:2, 15:12, 21:24, 23:8, 23:20, 36:9, 36:16, 37:4, 37:5, 37:13, 38:5, 41:4, 45:1, 46:2, 46:5, 47:23, 48:5, 211:9,

211:17, 213:7
**grab** [1] - 15:7
**graciously** [1] - 25:21
**grade** [2] - 64:9, 64:14
**gradually** [1] - 74:16
**Grand** [1] - 29:13
**grand** [63] - 8:14, 29:11, 29:16, 38:21, 39:6, 40:6, 40:17, 40:20, 40:25, 41:12, 41:13, 47:7, 51:1, 51:5, 51:12, 51:14, 51:19, 52:3, 52:10, 52:15, 52:17, 52:21, 53:6, 53:12, 54:5, 54:6, 54:9, 54:12, 55:7, 55:15, 55:17, 55:20, 129:23, 169:20, 169:23, 169:24, 182:6, 182:9, 182:13, 184:2, 184:13, 184:24, 187:3, 187:8, 187:23, 188:1, 188:6, 188:12, 193:24, 197:22, 197:25, 198:2, 198:5, 203:6, 203:20, 203:24, 204:2, 204:5, 204:11, 204:22, 204:25, 212:13, 250:14
**grandmother** [3] - 159:8, 171:20, 180:6
**graphic** [1] - 163:7
**great** [2] - 250:1, 250:2
**greater** [1] - 151:5
**Green** [10] - 29:2, 29:7, 31:7, 33:20, 37:18, 40:9, 47:1, 47:6, 49:3, 53:3
**green** [3] - 141:23, 141:25, 146:9
**Green's** [1] - 38:1
**grew** [1] - 171:17
**ground** [2] - 16:16, 47:21
**group** [13] - 9:15, 174:5, 174:16, 175:4, 175:14, 175:15, 175:24, 195:3, 195:4, 216:15, 217:12, 219:4, 239:8
**Group** [1] - 216:24
**groups** [1] - 169:3
**growing** [1] - 245:12
**grown** [1] - 245:7
**grunts** [1] - 44:14
**guarantee** [1] - 49:24
**guess** [32] - 16:18, 32:3, 42:16, 42:18, 66:3, 85:4, 85:6, 91:7, 115:21, 116:10, 120:22, 126:20, 148:23, 155:22, 162:10, 164:11, 168:1, 176:5, 185:17, 186:22, 189:16, 189:18, 190:12, 196:23, 204:24, 206:4, 207:12,

208:15, 210:8, 227:20, 248:2
**guide** [2] - 23:25, 243:15
**guilty** [15] - 116:21, 134:11, 134:13, 134:21, 134:23, 141:4, 146:24, 148:1, 148:3, 148:5, 148:11, 148:14, 148:20, 149:1, 149:19
**gun** [11] - 17:18, 17:20, 17:24, 19:20, 19:25, 20:8, 20:12, 166:20, 167:4, 167:7, 187:13
**guns** [1] - 167:1
**Guy** [1] - 136:12
**guy** [13] - 7:9, 19:7, 82:13, 174:5, 174:17, 175:9, 175:21, 178:9, 182:1, 187:20, 207:14, 245:21, 249:7
**guys** [4] - 175:24, 176:1, 177:19, 195:9

# H

**H-E-R-B-E-R-T** [1] - 152:2
**Hackensack** [2] - 232:7, 232:14
**half** [6] - 5:8, 44:7, 45:9, 57:10, 68:6, 69:24
**halfway** [5] - 65:22, 107:19, 107:22, 108:5, 108:9
**hallway** [1] - 61:9
**Hammerjacks** [6] - 10:20, 175:20, 177:15, 207:22, 208:13, 244:9
**hand** [7] - 8:15, 31:8, 96:6, 123:20, 132:11, 232:23, 233:3
**handed** [1] - 128:25
**handing** [1] - 122:1
**handle** [1] - 9:2
**handled** [1] - 51:2
**handling** [2] - 31:12, 31:15
**handprinting** [1] - 44:6
**handwriting** [21] - 58:9, 83:11, 83:12, 84:1, 84:5, 84:7, 85:17, 85:18, 85:19, 88:7, 92:25, 94:17, 94:19, 95:1, 95:5, 95:6, 95:7, 95:25, 96:1, 96:2
**handwritings** [1] - 96:4
**handwritten** [4] - 83:3, 85:10, 96:5, 232:18

hang [3] - 139:10, 180:14, 180:16
**Hanlon** [16] - 1:16, 9:3, 11:9, 15:9, 16:17, 22:12, 31:7, 56:15, 78:10, 104:12, 104:14, 107:11, 125:11, 214:25, 241:8
**HANLON** [23] - 9:4, 9:8, 9:15, 10:8, 10:11, 10:16, 10:19, 15:12, 15:23, 16:14, 16:23, 22:14, 24:2, 31:11, 56:16, 57:1, 57:6, 77:19, 108:22, 126:23, 210:5, 253:4, 253:6
**Hanlon's** [1] - 9:1
**Hanlonian** [1] - 16:15
**happy** [2] - 2:9, 117:21
**Harbor** [1] - 227:7
**hard** [9] - 2:5, 14:14, 14:23, 14:24, 15:4, 27:21, 44:1, 106:19, 222:13
**Harding** [70] - 1:16, 22:13, 29:3, 31:15, 31:16, 35:13, 38:5, 42:15, 44:3, 45:25, 46:24, 47:16, 47:21, 47:25, 48:6, 48:25, 60:18, 66:2, 94:14, 94:25, 95:9, 95:18, 96:5, 105:2, 110:1, 110:2, 110:10, 110:16, 111:22, 112:2, 112:6, 112:11, 114:3, 116:9, 117:9, 119:17, 122:4, 122:11, 123:2, 123:13, 124:12, 125:5, 126:25, 127:10, 128:25, 129:8, 152:3, 152:8, 169:17, 170:11, 177:7, 179:9, 196:14, 196:23, 200:17, 203:4, 204:4, 204:10, 204:12, 204:17, 205:14, 206:3, 209:23, 214:14, 214:25, 227:3, 241:8, 250:25
**HARDING** [80] - 5:25, 6:5, 6:11, 9:1, 24:7, 24:12, 24:16, 24:18, 31:19, 34:7, 34:12, 35:14, 42:18, 46:1, 46:4, 46:14, 47:3, 48:9, 48:22, 58:17, 58:19, 58:23, 115:13, 115:17, 115:19, 115:23, 116:3, 116:14, 116:18, 117:2, 117:5, 117:11, 117:15, 122:1, 122:5, 122:7, 123:3, 123:23, 124:5, 125:7, 125:18, 126:6, 127:1,

127:13, 127:15, 127:23, 127:25, 128:9, 129:9, 152:5, 160:1, 160:10, 170:15, 177:9, 179:3, 195:18, 196:15, 196:18, 196:25, 197:2, 197:5, 200:3, 204:7, 205:1, 206:7, 206:10, 206:13, 215:4, 215:9, 226:25, 240:14, 246:18, 246:24, 251:2, 251:4, 251:7, 253:9, 253:10, 253:12, 253:14
**Harding's** [2] - 31:12, 129:15
**Harold** [3] - 74:3, 105:16, 108:25
**HARRIS** [1] - 1:7
**Harris** [33] - 1:18, 97:14, 97:17, 97:23, 98:1, 99:8, 101:23, 130:8, 158:22, 159:3, 171:12, 173:2, 178:11, 179:13, 181:3, 181:9, 182:3, 187:18, 195:11, 195:13, 195:14, 200:13, 203:6, 203:10, 204:14, 204:18, 206:20, 207:25, 246:14, 248:23, 249:2, 249:15, 249:16
**Harris's** [2] - 195:19, 205:22
**Hasim** [2] - 176:20, 181:13
**hate** [1] - 31:11
**Hayes** [12] - 45:16, 158:4, 158:16, 167:2, 167:4, 167:7, 168:9, 168:13, 171:9, 178:10, 180:8, 182:1
**Hayes's** [2] - 122:22, 123:8
**head** [9] - 44:4, 55:3, 139:9, 140:6, 140:10, 142:22, 147:11, 147:18, 231:6
**hear** [24] - 12:10, 14:10, 15:9, 21:7, 22:12, 33:16, 34:21, 35:7, 35:10, 45:25, 131:25, 132:17, 177:1, 177:2, 177:3, 177:10, 196:7, 198:10, 205:17, 208:21, 244:20, 247:24, 249:19, 251:18
**heard** [23] - 9:22, 34:8, 34:9, 41:17, 41:21, 80:25, 111:13, 126:21, 150:20, 152:19, 155:25, 176:15, 176:19, 198:7, 198:8, 198:11, 208:11,

210:3, 211:12, 241:20, 243:13, 243:14
**hearing** [4] - 16:9, 28:11, 43:19, 140:17
**hearings** [1] - 45:5
**hearsay** [3] - 7:2, 53:20, 179:1
**heat** [1] - 124:17
**heck** [1] - 24:24
**Heights** [17] - 164:18, 174:9, 174:13, 245:6, 245:13, 245:14, 245:20, 246:11, 246:14, 246:25, 248:24, 249:8, 249:9, 249:12, 249:13, 249:15
**Heights'** [1] - 247:1
**help** [5] - 30:4, 84:1, 91:21, 96:18, 163:17
**helped** [1] - 208:1
**helpful** [4] - 27:23, 43:23, 242:2, 242:22
**helping** [1] - 79:4
**helps** [1] - 56:8
**HERBERT** [2] - 151:18, 253:8
**Herbert** [40] - 122:10, 151:14, 151:16, 151:20, 152:2, 152:6, 152:11, 156:12, 160:17, 164:2, 170:10, 170:12, 170:16, 171:10, 175:19, 176:25, 179:15, 179:17, 179:20, 180:22, 183:11, 184:9, 187:6, 190:17, 192:10, 195:5, 196:12, 196:20, 197:7, 199:2, 200:7, 200:12, 202:17, 203:4, 203:18, 206:15, 208:3, 209:3, 209:14
**hereby** [1] - 254:3
**hereunto** [1] - 254:10
**herself** [1] - 41:8
**hesitate** [2] - 35:1, 52:22
**Hi** [1] - 125:2
**hide** [2] - 186:11, 189:25
**high** [3] - 64:11, 64:12
**higher** [1] - 237:23
**highlight** [1] - 221:7
**highlighting** [1] - 52:11
**highly** [1] - 28:6
**Hill** [1] - 64:5
**himself** [6] - 85:11, 85:21, 100:8, 100:9, 169:12, 213:2
**hindered** [1] - 23:14
**hinges** [1] - 73:20
**hire** [1] - 74:11
**history** [4] - 11:13,

25:6, 26:4, 26:8
**hit** [3] - 223:10, 223:13, 223:15
**hits** [2] - 227:22, 227:23
**hmm** [1] - 143:17
**Hmm** [1] - 157:5
**hold** [3] - 36:14, 36:15, 214:5
**holding** [1] - 31:7
**hole** [1] - 197:3
**Holly** [3] - 147:17, 148:12, 149:4
**home** [21] - 65:21, 65:24, 66:1, 71:23, 71:25, 72:8, 73:7, 73:9, 89:24, 89:25, 107:20, 107:24, 108:10, 141:19, 144:14, 162:9
**homes** [1] - 66:18
**homicide** [8] - 21:20, 22:7, 22:9, 28:7, 177:18, 195:21
**homicides** [1] - 11:12
**honestly** [1] - 55:10
**honesty** [1] - 43:21
**honor** [2] - 192:23, 193:8
**Honor** [197] - 2:4, 2:15, 2:16, 3:10, 3:17, 5:1, 5:16, 5:25, 6:15, 6:19, 8:13, 8:22, 9:4, 9:8, 10:8, 10:11, 10:20, 11:10, 12:3, 12:4, 12:12, 12:15, 12:19, 13:23, 14:25, 15:5, 15:8, 15:12, 15:23, 16:14, 16:24, 17:1, 17:6, 17:20, 17:23, 18:7, 18:15, 19:3, 20:10, 20:16, 20:18, 21:10, 21:15, 22:14, 22:18, 23:6, 23:12, 23:24, 24:22, 26:15, 26:17, 27:3, 28:11, 28:12, 29:1, 30:23, 30:25, 31:11, 32:2, 33:4, 34:7, 35:15, 36:4, 37:7, 39:24, 43:2, 44:15, 45:19, 46:1, 47:4, 47:18, 48:13, 48:22, 49:7, 50:9, 50:11, 50:15, 50:23, 53:4, 54:10, 54:25, 56:16, 57:23, 58:17, 59:17, 59:24, 60:1, 60:17, 61:7, 61:10, 61:23, 77:4, 77:14, 78:7, 82:7, 97:12, 97:23, 101:18, 108:23, 109:5, 109:17, 109:23, 110:6, 113:24, 115:23, 116:6, 118:8, 118:21, 119:2, 119:7, 120:5, 121:17,

122:1, 122:9, 122:14, 124:5, 124:10, 124:17, 125:2, 125:19, 126:10, 126:19, 126:21, 126:23, 127:3, 128:1, 128:18, 128:21, 128:22, 130:4, 130:9, 130:10, 132:10, 149:25, 150:17, 151:10, 151:13, 151:14, 155:1, 156:4, 160:1, 176:23, 178:5, 178:24, 179:1, 179:7, 183:6, 183:12, 186:4, 186:6, 192:11, 192:21, 196:5, 198:17, 198:18, 199:2, 200:3, 200:5, 204:7, 206:10, 206:16, 209:25, 210:5, 211:13, 213:9, 213:22, 214:3, 214:7, 215:4, 215:20, 215:22, 217:24, 226:15, 226:17, 226:22, 228:21, 240:13, 244:13, 244:16, 245:5, 246:18, 247:9, 248:4, 248:21, 249:1, 249:4, 249:20, 250:3, 250:7, 250:8, 250:12, 250:17, 251:23, 251:24, 252:4
**Honor's** [2] - 5:6, 28:10
**Honorable** [1] - 1:13
**hope** [8] - 2:2, 6:17, 7:10, 215:4, 239:19, 243:8, 251:15
**Hopefully** [2] - 11:23, 11:25
**hopefully** [5] - 52:2, 94:7, 214:17, 215:11, 250:24
**hoping** [6] - 13:16, 59:10, 109:13, 128:4, 165:25, 212:1
**hour** [2] - 57:10, 162:22
**hours** [6] - 15:17, 71:3, 71:6, 239:4, 239:14, 242:25
**house** [30] - 47:12, 64:20, 64:23, 65:9, 65:22, 66:16, 66:17, 66:22, 66:24, 73:8, 73:9, 73:11, 73:13, 73:23, 78:1, 79:19, 80:17, 81:7, 83:9, 93:13, 99:13, 100:13, 101:13, 104:18, 104:21, 107:20, 107:22, 108:5, 108:9, 167:16
**housed** [2] - 140:7, 140:11
**How'd** [1] - 135:7
**Hudak** [1] - 157:11
**hugely** [1] - 33:13

**hum** [14] - 84:20, 95:12, 147:9, 154:9, 172:4, 175:8, 176:3, 181:14, 189:10, 189:20, 190:4, 190:6, 191:3, 193:18
**human** [3] - 2:7, 216:25, 217:3
**hundred** [2] - 84:2, 84:6, 84:13
**hung** [5] - 180:4, 180:5, 180:7, 180:8, 180:15
**husband's** [1] - 133:9
**hustling** [6] - 167:25, 168:2, 168:17, 168:24, 169:5, 169:9
**hyphen** [2] - 16:12, 16:14

**I**

**ID** [5] - 86:15, 90:1, 90:3, 90:4
**idea** [10] - 6:8, 56:15, 90:16, 90:20, 93:5, 105:3, 126:16, 176:4, 215:15, 243:9
**identification** [1] - 18:5
**identifications** [1] - 45:6
**Identified** [1] - 98:9
**identified** [8] - 52:7, 82:11, 93:8, 101:23, 102:3, 224:15, 236:23, 237:5
**identify** [7] - 45:3, 45:16, 97:7, 114:7, 131:11, 225:22, 225:23
**identifying** [3] - 24:15, 97:12, 97:23
**identity** [1] - 45:4
**illustration** [1] - 34:3
**immediately** [5] - 61:5, 61:6, 118:16, 188:15, 188:17
**Immigration** [1] - 2:3
**impeach** [9] - 39:15, 52:10, 57:17, 113:19, 118:11, 123:15, 210:20, 245:16, 245:19
**impeached** [5] - 8:10, 8:12, 39:18, 41:11, 57:22
**impeaches** [1] - 54:16
**impeaching** [4] - 6:17, 247:10, 247:11, 247:12
**impeachment** [18] - 6:25, 8:13, 39:12, 39:13, 39:17, 39:19, 40:1, 51:10, 57:3, 117:8, 117:21, 211:19, 247:2,

247:3, 247:5, 249:18
**implicitly** [1] - 7:20
**implies** [1] - 4:15
**important** [8] - 14:2, 21:15, 38:24, 45:21, 51:3, 115:23, 241:17
**impression** [1] - 7:4
**IN** [1] - 1:1
**in-court** [1] - 55:21
**in-flight** [1] - 3:5
**inadmissible** [1] - 53:20
**inappropriate** [1] - 120:7
**incarcerated** [3] - 10:22, 162:4, 162:6
**incarceration** [1] - 245:4
**incident** [3] - 10:5, 10:14, 177:16
**inclined** [2] - 3:20, 249:16
**include** [2] - 116:1, 207:21
**including** [3] - 211:7, 217:7, 225:3
**incoming** [9] - 218:8, 224:6, 224:8, 225:11, 225:12, 225:14, 225:16, 225:17, 226:8
**Incomplete** [2] - 238:21, 238:22
**incomplete** [1] - 238:24
**inconsistencies** [1] - 8:13
**inconsistent** [8] - 8:10, 41:19, 51:10, 51:17, 54:13, 56:24, 210:13, 211:22
**incriminate** [1] - 183:17
**incriminating** [1] - 184:5
**incumbent** [1] - 199:20
**indeed** [1] - 242:21
**independent** [1] - 28:3
**INDEX** [1] - 253:1
**indicate** [1] - 227:25
**indicated** [7] - 60:18, 121:2, 138:1, 169:14, 206:3, 220:24, 234:19
**indicates** [6] - 87:23, 225:16, 238:1, 238:4, 238:14, 238:18
**indication** [1] - 219:13
**indications** [1] - 232:6
**indicator** [1] - 238:14
**indicia** [1] - 7:6
**indictment** [13] - 11:15, 112:16, 113:7, 113:10, 113:11, 113:14, 147:3, 147:4, 147:24, 148:17,

149:16, 215:2
**indirect** [1] - 230:4
**indirectly** [1] - 21:21
**indisputably** [1] - 26:5
**individual** [7] - 81:24, 82:12, 99:13, 111:7, 135:2, 151:6, 231:12
**individuals** [2] - 131:12, 246:13
**indulgence** [2] - 170:7, 231:21
**infer** [1] - 41:19
**inference** [4] - 212:21, 212:24, 213:11
**information** [13] - 11:7, 11:24, 77:3, 86:9, 86:18, 91:5, 113:7, 127:1, 146:9, 219:24, 220:6, 228:6, 228:13
**informed** [2] - 29:3, 122:11
**inherent** [1] - 13:4
**initial** [3] - 119:10, 121:5, 246:1
**ink** [3] - 88:16, 88:18, 88:25
**Inner** [1] - 227:7
**innocuous** [1] - 13:18
**inquire** [4] - 125:2, 125:15, 126:20
**inquiring** [1] - 114:1
**inquiry** [2] - 123:14, 210:8
**inserted** [2] - 31:2, 44:13
**insertions** [1] - 34:14
**Inside** [1] - 83:25
**insistence** [1] - 245:6
**insists** [1] - 57:4
**insofar** [1] - 245:19
**installment** [2] - 74:17, 106:4
**instance** [5] - 55:5, 78:14, 220:12, 221:4, 223:4
**instances** [7] - 10:2, 52:25, 53:23, 54:3, 55:10, 55:12, 246:19
**instead** [3] - 32:24, 49:16, 221:13
**institutional** [1] - 244:24
**institutions** [1] - 245:1
**instruct** [3] - 125:13, 151:5, 242:18
**instructed** [2] - 61:10, 176:22
**instructing** [1] - 187:19
**instruction** [7] - 27:25, 35:3, 51:9, 51:22, 53:19,

53:21
**instructions** [11] - 41:18, 52:1, 52:7, 166:11, 187:19, 215:17, 242:19, 242:20, 242:22, 242:24, 243:15
**insufficient** [1] - 23:10
**insupportable** [1] - 23:11
**intend** [5] - 30:16, 51:13, 51:16, 52:11, 215:11
**intended** [2] - 47:25, 52:20
**intending** [3] - 26:7, 57:13, 251:9
**intensive** [1] - 35:21, 35:22
**intent** [8] - 139:21, 140:16, 145:22, 150:22, 150:24, 150:25, 151:2, 151:3
**intention** [3] - 23:8, 52:3, 184:5
**intentionality** [1] - 18:17
**interchanged** [1] - 137:25
**interest** [3] - 8:19, 8:20, 159:9
**interested** [2] - 121:4, 248:10
**interlineated** [2] - 34:12, 36:9
**interlineation** [4] - 33:2, 33:21, 43:5, 112:17
**interlineations** [2] - 31:23, 34:8
**internet** [1] - 3:10
**interrogate** [1] - 122:15
**interrogation** [1] - 124:3
**interview** [10] - 29:11, 30:11, 30:14, 40:21, 41:8, 41:15, 49:3, 141:20, 142:8, 176:1
**interviewed** [4] - 32:12, 141:9, 142:9, 146:5
**intimate** [3] - 133:12, 143:22, 191:7
**intrinsic** [1] - 13:4
**introduce** [2] - 40:12, 244:25
**introduced** [3] - 46:6, 77:7, 241:5
**introducing** [1] - 244:18, 245:21
**investigating** [1] - 40:21
**investigation** [3] - 11:5,

22:2, 243:17
**involved** [5] - 99:2, 99:22, 104:25, 161:4, 200:21
**irrelevant** [1] - 46:19
**issue** [36] - 5:21, 9:2, 11:18, 11:19, 12:13, 12:24, 13:18, 18:18, 20:21, 26:23, 27:13, 29:2, 31:4, 31:12, 34:3, 34:8, 37:15, 38:17, 42:4, 43:1, 47:5, 48:11, 49:22, 57:19, 113:15, 120:7, 120:9, 120:10, 120:22, 127:22, 211:19, 247:6, 247:7, 247:8, 249:18
**issued** [1] - 153:18
**issues** [9] - 3:15, 5:18, 7:3, 11:18, 13:22, 16:5, 56:17, 111:14, 243:12
**issuing** [1] - 121:15
**itemization** [1] - 244:18
**items** [4] - 23:2, 23:3, 79:21, 111:9
**itself** [7] - 41:14, 121:13, 130:3, 131:25, 221:18, 226:12, 249:5

## J

**J&C** [1] - 248:13
**jail** [10] - 78:18, 90:6, 100:20, 172:11, 172:14, 172:16, 172:20, 177:23, 178:11, 207:14
**Jam** [1] - 176:2
**JAMANE** [2] - 132:21, 253:7
**Jamane** [7] - 109:23, 111:8, 122:2, 129:21, 131:8, 132:7, 147:10
**James** [2] - 1:21, 202:18
**January** [3] - 87:21, 87:25, 88:2
**Jaquetta** [2] - 218:14
**Jay** [4] - 5:22, 13:1, 17:3, 17:5
**Jencks** [2] - 24:9, 26:16
**Jersey** [1] - 232:12
**Jessup** [1] - 86:16
**job** [3] - 44:1, 70:19, 157:14
**John** [4] - 5:21, 13:1, 17:3, 17:5
**Johnson** [30] - 109:23, 111:8, 112:15, 113:16, 113:23, 114:22, 116:11, 116:12, 122:2, 129:12,

129:21, 131:8, 131:16, 131:24, 132:1, 132:2, 132:4, 132:7, 132:16, 132:23, 140:24, 143:22, 145:15, 146:4, 146:24, 147:10, 150:9, 150:19, 150:21, 151:3
**JOHNSON** [2] - 132:21, 253:7
**Johnson's** [1] - 131:15
**join** [1] - 23:8
**joining** [2] - 198:23, 229:10
**Jones** [2] - 147:14, 148:1
**Joyce** [6] - 61:23, 62:6, 62:11, 92:13, 92:20, 96:15
**JOYCE** [2] - 62:2, 253:3
**Judge** [18] - 1:13, 13:21, 18:9, 21:13, 24:7, 25:15, 25:19, 28:23, 36:13, 53:14, 54:3, 54:25, 56:4, 115:13, 128:16, 140:5, 212:17, 214:18
**judge** [6] - 21:8, 53:21, 118:5, 118:10, 120:24, 140:3
**judgment** [1] - 44:24
**July** [2] - 63:12, 204:1
**jump** [1] - 10:2
**jumped** [1] - 10:9
**June** [5] - 133:4, 133:11, 133:15, 138:1, 142:6
**junior** [1] - 64:11
**Junior** [2] - 64:11, 64:12
**jurat** [2] - 92:11, 93:5
**JURAT** [1] - 93:5
**Jurisdiction** [1] - 96:12
**juror** [3] - 2:10, 5:13, 61:8
**JUROR** [1] - 134:16
**Jury** [7] - 1:14, 61:18, 111:15, 131:1, 209:22, 215:18, 243:23
**jury** [131] - 8:14, 14:6, 27:24, 28:1, 28:6, 29:3, 29:12, 29:13, 29:16, 32:1, 32:5, 33:1, 33:15, 33:25, 35:1, 36:6, 36:11, 36:13, 36:14, 36:15, 38:22, 39:6, 40:7, 40:17, 40:20, 40:25, 41:12, 41:13, 41:17, 41:18, 41:19, 41:21, 41:23, 41:25, 42:3, 43:3, 43:8, 43:24, 45:12, 46:7, 47:7,

48:7, 49:18, 51:1, 51:5, 51:12, 51:14, 51:19, 52:3, 52:10, 52:15, 52:17, 52:21, 52:22, 53:6, 53:10, 53:13, 53:22, 54:5, 54:6, 54:9, 54:12, 54:14, 55:7, 55:15, 55:17, 55:20, 59:18, 61:16, 61:19, 62:17, 74:14, 106:3, 110:21, 111:19, 116:8, 116:9, 117:22, 120:13, 124:12, 125:13, 129:20, 129:22, 129:24, 130:7, 131:21, 132:16, 156:6, 169:20, 169:24, 176:22, 176:24, 182:6, 182:9, 182:13, 184:2, 184:13, 184:24, 187:3, 187:9, 187:23, 188:1, 188:6, 188:12, 193:24, 197:22, 197:25, 198:2, 198:5, 198:20, 201:18, 203:6, 203:20, 203:24, 204:2, 204:5, 204:11, 204:22, 204:25, 209:15, 212:13, 214:25, 215:15, 240:18, 248:14, 249:25, 250:4, 250:14, 252:3
**Jury's** [1] - 209:20
**jury's** [5] - 36:19, 43:25, 47:22, 52:4, 111:14

## K

**Kansas** [1] - 216:18
**Karen** [3] - 18:21, 22:16, 22:25
**keep** [4] - 100:23, 111:13, 209:20, 243:12
**keeps** [1] - 42:13
**Kelsey** [1] - 1:17
**Kenny** [1] - 24:7
**kept** [1] - 104:8
**Kevin** [2] - 175:21, 176:1
**key** [3] - 11:11, 11:13, 24:1
**kick** [1] - 175:5
**kicked** [2] - 175:5, 175:12
**Kicked** [1] - 175:6
**kidding** [1] - 243:25
**kids** [1] - 4:5
**Kiki** [7] - 72:11, 72:12, 72:17, 101:5, 101:6, 101:8, 101:12
**kill** [3] - 136:1, 136:7, 147:13

**killed** [1] - 136:4
**Kind** [2] - 174:15, 219:3
**kind** [35] - 7:1, 7:8, 11:13, 13:3, 13:12, 16:5, 17:25, 19:1, 20:16, 20:19, 20:23, 21:18, 31:4, 35:2, 44:17, 56:10, 59:17, 81:7, 91:1, 101:9, 103:13, 164:8, 164:9, 164:14, 165:14, 217:5, 219:8, 220:8, 223:1, 226:11, 231:6, 251:13
**kinds** [1] - 124:3
**kitchen** [2] - 68:6, 68:15
**Klas** [4] - 6:12, 11:23, 58:24, 58:25
**knowing** [2] - 101:15, 247:1
**knowledge** [2] - 100:23, 213:1
**known** [14] - 37:19, 72:16, 79:11, 85:5, 124:3, 124:18, 124:20, 131:8, 133:4, 136:17, 171:12, 200:12, 245:8, 249:13
**knows** [6] - 17:6, 26:17, 34:1, 45:14, 176:24, 214:15
**KURLAND** [87] - 25:15, 25:19, 28:12, 28:15, 28:23, 49:21, 50:11, 50:25, 51:24, 53:14, 54:1, 54:25, 55:13, 56:1, 56:4, 56:12, 109:17, 109:19, 110:1, 110:9, 110:12, 110:15, 111:17, 111:21, 111:25, 112:5, 112:8, 112:10, 112:15, 112:22, 112:24, 113:3, 113:8, 113:10, 113:12, 113:15, 114:2, 114:5, 114:10, 114:14, 114:16, 114:19, 114:21, 115:1, 115:3, 115:7, 115:11, 116:6, 117:25, 118:3, 118:7, 118:13, 118:18, 118:24, 127:8, 128:16, 129:4, 129:13, 129:15, 129:20, 130:4, 132:7, 132:14, 132:22, 150:4, 150:6, 150:8, 150:13, 150:25, 210:6, 210:18, 211:13, 212:3, 212:6, 212:8, 212:12, 212:17, 212:23, 213:3, 213:9, 213:22, 214:3, 250:6, 250:12, 250:21, 251:23, 252:4
**Kurland** [28] - 1:22,

2:14, 5:16, 6:14, 25:7, 25:13, 51:23, 54:24, 55:4, 56:11, 59:23, 109:14, 110:25, 117:22, 118:15, 119:21, 122:5, 122:7, 128:25, 131:9, 131:11, 132:6, 132:20, 150:12, 150:15, 209:24, 210:17, 242:6

**Kurland's** [1] - 127:6

# L

**label** [4] - 160:6, 163:7, 173:22, 194:13
**labeled** [1] - 31:8
**labeling** [1] - 224:22
**labor** [2] - 35:21, 35:22
**Lack** [1] - 96:11
**lack** [4] - 23:14, 24:3, 36:5, 212:25
**ladies** [5] - 106:3, 131:3, 132:15, 150:10, 243:21
**Ladies** [3] - 109:24, 150:18, 240:18
**lady** [4] - 99:5, 99:7, 101:2, 185:22
**laid** [2] - 54:19, 156:17
**Lakeisha** [3] - 72:16, 101:2, 101:12
**landing** [5] - 68:10, 68:11, 68:22, 68:23, 69:4
**language** [4] - 83:5, 84:10, 112:18, 112:24
**large** [3] - 219:12, 246:13
**larger** [1] - 123:4
**Laslett** [1] - 244:17
**Lassiter** [3] - 11:3, 166:12, 187:20
**last** [32] - 2:18, 6:4, 12:9, 12:11, 12:15, 21:9, 23:22, 33:5, 85:6, 88:21, 98:6, 138:10, 154:15, 174:2, 174:23, 174:24, 175:2, 176:14, 179:20, 216:23, 225:15, 233:6, 233:16, 233:21, 233:22, 235:19, 238:7, 238:22, 251:23
**Last** [3] - 82:4, 216:6, 229:6
**late** [3] - 215:12, 242:14, 243:6
**latest** [1] - 241:11
**Latin** [1] - 64:5
**launch** [1] - 16:9
**Laura** [1] - 1:17

**law** [8] - 16:19, 16:23, 17:2, 54:18, 73:12, 212:22, 242:18, 243:15
**LAWLOR** [28] - 30:8, 124:21, 124:25, 125:19, 125:23, 126:3, 130:9, 151:10, 151:13, 155:1, 156:11, 170:9, 176:17, 176:22, 178:4, 183:6, 186:4, 186:6, 192:11, 193:2, 196:5, 203:17, 206:16, 214:18, 214:20, 250:3, 253:9, 253:12
**Lawlor** [11] - 1:18, 30:7, 40:8, 124:24, 125:12, 151:12, 160:3, 187:16, 191:21, 192:2, 204:9
**Lawlor's** [4] - 29:22, 30:6, 40:15, 191:25
**lawyer** [18] - 74:3, 74:5, 75:25, 76:2, 76:11, 79:9, 79:13, 106:13, 106:22, 107:2, 107:4, 125:24, 125:25, 149:13, 179:6, 182:20, 182:22
**lawyers** [12] - 75:21, 76:7, 76:21, 100:14, 102:15, 114:1, 114:4, 114:6, 153:4, 153:5, 153:7, 179:11
**lay** [1] - 230:24
**lead** [4] - 5:13, 24:10, 68:3, 160:2
**leader** [1] - 175:16
**leading** [2] - 160:1, 200:3
**leaks** [1] - 119:12
**learn** [4] - 21:23, 22:3, 73:6, 211:7
**learned** [2] - 144:4, 191:21
**least** [11] - 8:19, 13:17, 13:19, 28:16, 43:18, 58:22, 58:24, 121:4, 127:11, 131:19, 149:2
**leave** [14] - 42:23, 47:8, 59:16, 61:6, 77:9, 111:11, 124:7, 127:18, 167:16, 175:12, 198:18, 198:22, 209:18, 243:16
**leaving** [5] - 11:10, 44:19, 59:15, 68:9, 120:16
**lectern** [1] - 5:19
**led** [1] - 149:19
**Lee** [14] - 13:25, 19:16, 21:1, 21:20, 22:7, 22:9, 23:3, 23:9, 24:6, 24:10, 24:15, 26:1, 28:7, 28:18
**left** [16] - 33:21, 37:20,

37:24, 42:22, 44:20, 67:21, 82:12, 82:13, 120:4, 175:5, 175:6, 192:13, 192:15, 214:4, 232:23
**left-hand** [1] - 232:23
**legal** [7] - 91:16, 99:1, 99:14, 105:1, 105:19, 216:15, 217:6
**lend** [2] - 167:2, 167:4
**length** [2] - 237:21, 241:18
**less** [5] - 20:20, 219:6, 222:17, 228:17, 243:1
**letter** [47] - 6:17, 6:20, 6:24, 7:8, 56:21, 57:14, 57:15, 58:2, 58:9, 58:14, 58:19, 58:20, 58:21, 58:22, 58:23, 59:1, 166:6, 166:10, 166:14, 187:16, 187:18, 187:19, 188:14, 188:18, 203:20, 204:6, 204:12, 204:15, 204:18, 204:23, 210:7, 210:9, 210:12, 210:20, 210:25, 211:1, 211:4, 211:8, 211:16, 212:5, 212:9, 212:10, 212:20, 213:6
**letter's** [3] - 56:23, 56:25, 128:9
**letters** [4] - 128:11, 173:1, 173:2, 232:24
**level** [3] - 14:25, 15:3, 20:19
**Liberty** [1] - 103:12
**lie** [7] - 8:5, 8:10, 8:16, 203:13, 211:17, 213:4, 213:7
**lied** [2] - 178:19, 184:24
**lies** [1] - 195:10
**lieu** [1] - 33:11
**life** [8] - 23:9, 164:15, 184:14, 185:3, 187:5, 187:9, 193:23, 245:11
**light** [1] - 210:9
**likely** [4] - 5:12, 59:6, 166:8, 222:17
**Lil** [2] - 201:20, 201:22
**limit** [3] - 27:14, 130:20, 132:13
**limited** [1] - 220:9
**limiting** [2] - 53:19, 53:21
**line** [9] - 14:7, 14:8, 23:1, 32:17, 118:7, 190:10, 206:21, 212:3, 212:17
**lines** [3] - 42:21, 206:14, 207:8

**link** [4] - 21:18, 22:1, 22:5, 24:13
**linking** [1] - 22:9
**Lisa** [1] - 134:1
**list** [17] - 52:3, 52:13, 52:14, 56:12, 115:14, 115:16, 115:17, 115:20, 116:23, 122:1, 129:1, 209:23, 218:7, 223:14, 232:18, 250:16
**listed** [5] - 89:24, 107:13, 223:13, 227:11, 245:3
**listen** [6] - 44:18, 45:13, 115:6, 165:10, 165:12, 165:14
**listened** [1] - 165:17
**listening** [1] - 36:19
**listens** [1] - 48:8
**literally** [1] - 16:9
**literate** [1] - 20:15
**live** [15] - 63:20, 107:20, 130:5, 130:25, 137:11, 137:23, 154:21, 154:23, 154:25, 155:3, 155:5, 164:17, 171:1, 171:21, 220:9
**Live** [2] - 64:5, 130:25
**lived** [22] - 63:25, 64:1, 81:1, 107:16, 137:13, 137:20, 142:14, 142:19, 143:1, 143:4, 143:8, 143:11, 143:15, 149:23, 167:15, 171:20, 180:6, 246:4, 248:11, 249:9
**lives** [2] - 17:21, 170:24
**Living** [1] - 68:6
**living** [12] - 64:17, 64:18, 64:22, 68:15, 105:8, 108:6, 123:6, 170:16, 170:18, 245:14, 246:25, 249:8
**loaf** [1] - 5:8
**loan** [1] - 74:15
**local** [2] - 163:17, 163:24
**locate** [1] - 215:10
**located** [6] - 6:3, 6:5, 11:24, 103:11, 216:17, 235:14
**locating** [1] - 6:12
**location** [4] - 86:16, 219:6, 232:6, 234:24
**locations** [2] - 219:14, 230:6
**lock** [3] - 73:15, 207:9
**locked** [31] - 10:16, 73:7, 73:8, 78:20, 86:19, 166:3, 172:7, 173:11, 173:12, 177:5, 177:8,

177:10, 177:11, 177:12, 177:15, 181:6, 185:4, 204:16, 207:11, 207:15, 212:16, 213:13, 244:25, 245:1, 245:2, 246:6, 246:8, 246:15, 248:22, 249:3, 249:4
**Lombard** [1] - 1:25
**look** [32] - 18:15, 30:22, 37:13, 43:8, 54:15, 62:17, 78:4, 78:5, 90:14, 90:19, 104:18, 110:17, 112:2, 125:12, 147:4, 147:6, 169:7, 213:14, 218:12, 223:24, 225:21, 227:16, 231:2, 231:14, 233:3, 243:20, 244:5, 247:22, 247:24, 249:18, 249:19, 250:13
**Look** [5] - 11:18, 56:8, 115:24, 118:14, 129:10
**looked** [6] - 12:21, 21:16, 23:1, 23:3, 67:12, 210:24
**looking** [16] - 6:2, 14:16, 26:14, 40:21, 62:16, 104:12, 104:13, 167:19, 192:17, 218:15, 218:15, 223:25, 230:22, 231:24, 235:21, 237:20
**Looks** [1] - 221:18
**looks** [6] - 87:2, 88:15, 91:8, 94:18, 222:16, 239:2
**loss** [1] - 217:2
**lost** [3] - 224:20, 224:23, 226:4
**Love** [2] - 192:21, 192:23
**love** [3] - 7:8, 7:9, 193:7
**lovers** [1] - 191:9
**lower** [1] - 62:9
**loyal** [1] - 189:25
**Loyal** [2] - 193:25, 194:3
**loyalty** [3] - 192:21, 192:23, 193:7
**Lufthansa** [1] - 3:4
**lulling** [2] - 211:4, 211:8
**lunch** [13] - 109:12, 109:14, 110:17, 110:21, 117:16, 117:18, 118:16, 131:5, 240:22, 240:23, 242:17, 242:18
**luncheon** [2] - 111:11, 210:24
**Luncheon** [1] - 121:25
**LUVE** [1] - 232:24
**Luve** [3] - 232:24, 236:11, 239:22

lying [4] - 41:19, 178:19, 178:22, 211:18
Lyles [2] - 175:21, 176:1
Lyles's [1] - 208:16
Lynch [4] - 60:13, 130:11, 243:25, 251:11
lyrics [10] - 160:23, 164:4, 164:5, 164:9, 165:5, 188:23, 189:23, 190:5, 195:19, 207:20

**M**

M-A-R-K [1] - 152:2
M-A-R-L-E-Y [1] - 32:21
M-O-L-L-Y-E [2] - 32:19, 32:22
ma'am [12] - 82:10, 83:2, 84:21, 88:13, 88:22, 89:15, 90:25, 91:6, 92:1, 95:4, 97:5, 109:6
mad [2] - 212:14, 213:15
magic [1] - 212:9
Magistrate [1] - 119:11
mail [28] - 2:18, 3:1, 33:6, 34:4, 35:7, 43:8, 44:16, 44:23, 44:24, 45:12, 76:14, 76:15, 98:18, 105:1, 127:18, 166:4, 166:8, 220:10, 220:14, 221:20, 221:23, 222:12, 222:16, 222:17, 222:18, 237:22, 238:2
mailed [1] - 75:24
mails [1] - 2:8
major [1] - 44:7
majority [2] - 220:12, 246:15
makeshift [1] - 162:17
malice [1] - 147:13
man [3] - 46:20, 169:12, 202:17
managed [1] - 54:23
manager [7] - 63:6, 71:11, 216:23, 216:25, 217:2, 217:3, 229:14
Manager [1] - 216:14
managing [1] - 230:5
manifestly [1] - 41:6
manner [1] - 254:9
Manuelian [2] - 181:18, 183:21
map [1] - 166:16
March [21] - 25:9, 25:12, 66:5, 69:17, 69:22, 70:8, 70:21, 71:5,

72:25, 100:17, 100:21, 101:13, 108:5, 220:19, 231:24, 236:20, 237:2, 239:5, 239:25, 240:1
marches [1] - 3:14
margin [2] - 43:23, 43:25
margins [1] - 242:22
Mark [7] - 22:15, 22:16, 22:17, 122:10, 151:14, 152:2, 179:16
MARK [2] - 151:18, 253:8
mark [3] - 18:5, 109:11, 226:16
marked [15] - 31:1, 46:3, 66:12, 67:4, 67:5, 68:7, 69:2, 75:14, 76:16, 81:5, 91:25, 131:20, 185:23, 231:16, 251:19
marker [1] - 77:2
Market [1] - 102:24
market [4] - 103:14, 229:16, 229:19
marking [1] - 217:25
marks [4] - 13:8, 43:22, 43:24, 218:1
Marley [2] - 32:20, 32:21
Marll [1] - 141:15
married [1] - 133:7
marshal [1] - 241:19
marshals [4] - 5:9, 6:11, 11:25, 120:23
MARTIN [27] - 1:8, 25:9, 25:11, 62:2, 101:20, 119:15, 119:20, 122:9, 122:14, 122:25, 124:10, 124:16, 124:19, 126:10, 126:14, 128:22, 178:24, 179:1, 179:7, 183:12, 195:14, 198:18, 203:3, 244:13, 248:20, 253:4, 253:11
Martin [59] - 1:19, 1:20, 9:19, 10:1, 10:6, 10:21, 10:22, 11:2, 11:4, 33:5, 34:22, 43:7, 43:12, 59:22, 61:23, 61:24, 63:8, 64:9, 65:12, 65:16, 66:12, 66:13, 73:3, 75:15, 75:21, 76:7, 76:21, 79:11, 79:23, 80:3, 80:21, 89:10, 90:11, 90:16, 91:3, 91:12, 92:8, 92:13, 92:21, 94:10, 95:19, 96:15, 98:4, 98:7, 99:24, 100:7, 104:2, 105:19, 119:13, 122:8, 123:13,

124:8, 202:18, 202:22, 207:1, 207:11, 244:12
Martin's [10] - 43:12, 48:17, 67:5, 76:4, 76:17, 91:3, 91:12, 104:19, 124:22, 244:22
Martin/Parsons [1] - 98:9
Marvin [1] - 174:23
Mary [3] - 1:24, 254:3, 254:15
MARYLAND [1] - 1:2
Maryland [1] - 1:12, 1:25, 63:23, 80:23, 86:16, 94:11
matched [1] - 23:4
matches [1] - 77:5
matching [1] - 19:18, 19:19, 19:25
material [4] - 24:9, 26:19, 27:22, 120:21
materials [1] - 29:10
matter [14] - 2:11, 28:18, 35:18, 50:25, 52:17, 76:7, 109:20, 110:15, 121:5, 168:9, 169:21, 244:25, 254:4, 254:9
McCoy [4] - 72:10, 72:16, 101:2, 101:12
MCI [11] - 230:12, 230:18, 230:19, 231:1, 231:2, 231:8, 231:11, 231:12, 231:13
mean [133] - 4:16, 7:3, 8:5, 8:7, 8:10, 8:24, 11:12, 11:16, 13:9, 14:2, 14:6, 14:9, 16:21, 17:9, 17:17, 17:20, 17:24, 19:3, 20:21, 21:3, 24:22, 25:17, 26:17, 26:18, 26:22, 27:3, 27:19, 33:13, 34:5, 35:2, 36:4, 38:17, 42:6, 42:24, 43:7, 43:9, 43:10, 43:13, 44:12, 44:19, 46:3, 46:12, 46:24, 48:8, 50:17, 56:10, 56:23, 57:13, 57:15, 57:18, 57:23, 58:5, 58:16, 73:12, 87:24, 89:18, 124:7, 135:25, 136:13, 140:12, 143:20, 148:24, 149:15, 152:24, 153:1, 153:6, 161:7, 163:12, 163:19, 164:15, 164:25, 165:23, 166:8, 166:21, 166:23, 170:17, 171:20, 172:18, 172:20, 173:8, 174:4, 176:10, 177:25,

180:6, 180:14, 181:11, 181:20, 182:14, 185:2, 185:5, 185:22, 188:8, 189:18, 190:17, 190:18, 190:19, 190:20, 190:24, 190:25, 191:10, 192:24, 193:5, 193:7, 193:8, 193:13, 194:13, 195:23, 198:4, 198:8, 198:15, 199:14, 199:18, 200:23, 202:6, 202:24, 203:8, 204:3, 204:24, 205:21, 206:2, 207:6, 207:12, 208:24, 209:7, 222:5, 222:21, 235:13, 237:20, 238:20, 248:1, 248:16
meaning [1] - 88:9
Means [1] - 190:22
means [4] - 84:10, 194:2, 195:16, 216:14, 222:18, 225:17, 225:18, 226:7, 232:11, 232:13, 238:15
meant [4] - 44:12, 44:19, 91:20, 183:24
meat [1] - 246:7
media [2] - 243:18
meed [1] - 109:10
meet [6] - 12:24, 47:12, 128:5, 159:3, 159:7, 172:1
member [1] - 8:24
members [2] - 55:24, 74:14
Members [4] - 61:19, 110:20, 198:20, 209:15
memorialization [1] - 210:13
memory [2] - 52:6, 79:20
Memory [1] - 10:11
mention [3] - 202:7, 202:10, 251:11
mentioned [15] - 11:3, 104:11, 105:4, 116:5, 116:18, 116:22, 129:3, 175:7, 201:14, 201:15, 201:17, 201:20, 203:5, 235:17, 235:18
message [5] - 84:9, 84:12, 85:14, 85:20, 120:4
messages [1] - 87:16
messaging [1] - 220:14
met [10] - 103:21, 103:22, 103:25, 152:9, 159:8, 159:18, 169:14, 169:17, 171:25, 200:15
method [1] - 226:12
Michael [2] - 1:16, 1:18

Michelle [3] - 93:8, 93:12, 93:20
microphone [5] - 62:8, 63:1, 151:21, 151:22, 151:24
mid [4] - 27:4, 73:4, 241:11, 243:6
mid-afternoon [1] - 241:11
mid-trial [1] - 27:4
midday [1] - 240:22
middle [7] - 37:23, 42:8, 83:5, 83:6, 97:20, 232:2, 232:5
midnight [1] - 240:11
midway [1] - 235:20
might [25] - 6:8, 6:12, 7:3, 28:16, 44:7, 46:19, 115:7, 117:25, 121:5, 143:18, 143:19, 143:20, 166:18, 183:17, 195:14, 195:20, 197:23, 200:1, 203:8, 212:8, 219:11, 220:9, 224:1, 242:12
Might [2] - 191:12, 197:21
mike [3] - 62:5, 216:3, 229:4
militant [1] - 190:11
mind [6] - 28:15, 30:5, 98:15, 111:14, 209:20, 243:12
minding [1] - 30:8
mine [7] - 35:20, 46:25, 49:16, 95:3, 104:18, 104:21, 252:1
Mine [1] - 35:24
minimizing [2] - 126:8, 126:10
minor [6] - 28:16, 33:13, 43:4, 120:8, 120:9, 221:10
minute [7] - 2:6, 139:7, 139:8, 209:20, 218:20, 238:10, 250:9
minutes [11] - 35:18, 39:2, 52:19, 61:13, 89:21, 109:16, 121:22, 214:8, 214:10, 214:14, 237:25
misapprehended [1] - 32:19
mislead [2] - 50:1, 57:8
missing [4] - 26:4, 31:3, 116:1, 222:1
misspelled [2] - 32:18, 212:14
mistaken [1] - 41:24
mistakes [1] - 34:2
misunderstand [1] -

36:6
  **misunderstanding** [1] -
34:18
  **MITCHELL** [4] - 1:7,
151:18, 216:1, 229:2
  **Mitchell** [32] - 1:17,
9:12, 9:20, 9:22, 31:8,
93:8, 93:12, 93:20, 95:1,
95:23, 96:24, 97:1,
97:12, 97:25, 99:7, 99:9,
99:10, 99:11, 158:18,
159:18, 162:3, 167:23,
168:16, 181:3, 191:7,
191:18, 204:13, 205:24,
226:21, 226:22, 226:23,
254:5
  **Mitchell's** [3] - 93:22,
151:13, 160:19
  **mixed** [1] - 13:9
  **mobile** [6] - 234:25,
235:2, 235:10, 235:11,
236:5, 236:6
  **mobster** [1] - 189:13
  **modified** [3] - 14:4,
31:2, 48:23
  **Mollye** [2] - 32:19,
32:22
  **moment** [6] - 51:25,
92:1, 109:5, 111:23,
134:15, 196:23
  **moments** [2] - 30:5,
30:6
  **Momma** [5] - 111:8,
113:25, 131:8, 132:24,
132:25
  **Monday** [2] - 1:11,
72:25
  **money** [15] - 3:5, 3:8,
10:3, 65:14, 70:24,
74:11, 74:15, 74:19,
75:1, 75:9, 79:7, 79:11,
79:16, 185:23, 205:9
  **Monroe** [4] - 144:11,
144:13, 144:14
  **Montana** [3] - 157:7,
179:14, 179:15, 189:6
  **Montgomery** [20] -
9:23, 120:17, 135:2,
135:5, 135:12, 136:4,
137:8, 137:23, 138:11,
138:12, 142:13, 142:24,
142:25, 143:3, 144:10,
145:11, 147:22, 149:10
  **Montgomery's** [2] -
137:2, 137:4
  **Monthly** [1] - 90:19
  **months** [3] - 63:4,
157:15, 245:10
  **moreover** [1] - 27:3
  **morning** [41] - 2:14,

2:15, 6:2, 12:3, 28:25,
29:1, 29:4, 30:18, 34:13,
38:6, 56:18, 57:24,
61:19, 61:20, 71:24,
71:25, 77:20, 77:22,
120:11, 127:7, 128:7,
130:13, 130:18, 130:20,
130:23, 152:7, 210:25,
215:14, 225:1, 239:25,
240:1, 240:3, 240:8,
241:14, 242:5, 242:14,
243:20, 243:22, 251:21,
252:2
  **Mosher** [3] - 135:16,
135:17, 144:12
  **most** [8] - 3:16, 10:16,
43:22, 62:17, 131:22,
165:24, 219:11, 221:1
  **mostly** [2] - 18:8,
165:24
  **mother** [11] - 50:8,
50:17, 63:7, 120:10,
120:22, 134:2, 170:17,
170:24, 171:5, 194:9
  **mother's** [2] - 50:17,
120:4
  **motion** [2] - 13:20,
179:8
  **Motion** [1] - 96:11
  **mouth** [1] - 207:10
  **move** [5] - 64:4, 64:10,
151:22, 179:7, 249:21
  **moved** [12] - 51:20,
63:18, 64:6, 65:6, 65:8,
65:16, 72:20, 72:21,
102:23, 107:16, 108:6,
108:7
  **movement** [1] - 244:24
  **movie** [12] - 77:6,
77:25, 78:4, 78:5,
100:13, 100:20, 100:23,
189:9, 189:17, 189:19,
189:22
  **movies** [1] - 100:24
  **moving** [1] - 81:1
  **MR** [391] - 2:15, 2:20,
2:23, 3:3, 3:9, 3:16,
3:20, 3:25, 4:4, 4:15,
4:21, 4:25, 5:4, 5:15,
5:20, 5:25, 6:5, 6:11,
6:15, 6:19, 7:1, 7:13,
7:16, 7:19, 7:22, 7:25,
8:2, 8:4, 8:7, 8:12, 8:18,
8:21, 9:1, 9:4, 9:8, 9:15,
10:8, 10:11, 10:16,
10:19, 11:10, 11:20,
11:23, 12:7, 12:12,
12:14, 14:8, 14:15,
14:19, 14:24, 15:5, 15:7,
15:12, 15:23, 16:14,

16:20, 16:23, 16:25,
17:3, 17:9, 17:12, 17:15,
17:19, 17:23, 18:4, 18:7,
18:10, 18:14, 19:7,
19:13, 19:17, 19:22,
19:24, 20:6, 20:9, 20:15,
20:25, 21:3, 21:9, 21:14,
21:25, 22:4, 22:14, 24:2,
24:7, 24:12, 24:16,
24:18, 24:20, 25:9,
25:11, 25:15, 25:19,
26:15, 28:10, 28:12,
28:15, 28:23, 30:8,
31:11, 31:19, 34:7,
34:12, 35:14, 42:18,
46:1, 46:4, 46:14, 47:3,
48:9, 48:22, 49:21, 50:9,
50:11, 50:15, 50:19,
50:22, 50:25, 51:24,
53:4, 53:14, 54:1, 54:25,
55:13, 56:1, 56:4, 56:12,
56:16, 57:1, 57:6, 57:8,
57:12, 57:23, 58:1, 58:5,
58:12, 58:15, 58:17,
58:19, 58:23, 59:7,
59:10, 59:13, 59:15,
59:24, 61:23, 62:1,
62:13, 77:4, 77:9, 77:12,
77:14, 77:19, 101:20,
102:12, 107:10, 108:22,
109:15, 109:17, 109:19,
109:23, 110:1, 110:6,
110:9, 110:12, 110:15,
111:17, 111:21, 111:25,
112:5, 112:8, 112:10,
112:15, 112:22, 112:24,
113:3, 113:8, 113:10,
113:12, 113:15, 113:24,
114:2, 114:5, 114:10,
114:14, 114:16, 114:19,
114:21, 115:1, 115:3,
115:7, 115:11, 115:13,
115:17, 115:19, 115:23,
116:3, 116:6, 116:14,
116:18, 117:2, 117:5,
117:11, 117:15, 117:25,
118:3, 118:7, 118:13,
118:18, 118:20, 118:24,
119:7, 119:10, 119:15,
119:20, 119:22, 119:25,
120:5, 121:7, 121:9,
121:12, 122:1, 122:5,
122:7, 122:9, 122:14,
122:25, 123:3, 123:23,
124:5, 124:10, 124:16,
124:19, 124:21, 124:25,
125:2, 125:7, 125:18,
125:19, 125:23, 126:3,
126:6, 126:10, 126:14,
126:19, 126:23, 127:1,
127:3, 127:8, 127:9,

127:13, 127:15, 127:23,
127:25, 128:9, 128:16,
128:18, 128:21, 128:22,
128:24, 129:4, 129:9,
129:13, 129:15, 129:20,
130:4, 130:9, 132:7,
132:10, 132:14, 132:22,
134:18, 143:2, 148:3,
150:4, 150:6, 150:8,
150:13, 150:17, 151:10,
151:13, 152:5, 155:1,
156:11, 160:1, 160:10,
170:9, 170:15, 176:17,
176:22, 177:9, 178:4,
178:24, 179:1, 179:3,
179:7, 183:6, 183:12,
186:4, 186:6, 192:11,
193:2, 195:14, 195:18,
196:5, 196:15, 196:18,
196:25, 197:2, 197:5,
198:18, 199:1, 200:3,
202:16, 203:3, 203:17,
204:7, 205:1, 206:7,
206:10, 206:13, 206:16,
207:16, 209:25, 210:5,
210:6, 210:18, 211:13,
212:3, 212:6, 212:8,
212:12, 212:17, 212:23,
213:3, 213:9, 213:22,
214:3, 214:18, 214:20,
215:4, 215:9, 226:25,
240:14, 244:13, 244:16,
244:21, 245:17, 245:24,
246:12, 246:18, 246:24,
247:8, 247:13, 247:15,
247:17, 247:23, 248:4,
248:20, 248:21, 249:1,
249:4, 249:8, 249:11,
249:20, 249:23, 250:3,
250:6, 250:12, 250:21,
251:2, 251:4, 251:7,
251:23, 252:4, 253:3,
253:4, 253:4, 253:5,
253:5, 253:6, 253:9,
253:9, 253:10, 253:10,
253:11, 253:11, 253:12,
253:12, 253:14
  **MS** [93] - 2:4, 25:12,
29:1, 29:7, 29:13, 29:16,
29:20, 29:24, 30:1, 30:5,
30:12, 30:14, 30:20,
30:23, 30:25, 31:24,
32:2, 32:4, 32:6, 32:8,
32:11, 32:23, 33:4, 33:9,
33:18, 34:15, 34:19,
35:24, 36:4, 36:20,
36:22, 37:3, 37:6, 37:10,
37:13, 38:8, 38:10, 39:6,
39:9, 39:16, 39:24, 40:4,
41:3, 42:1, 42:4, 42:10,
42:14, 42:24, 43:1, 44:9,

44:15, 45:19, 45:24,
47:18, 48:13, 49:6,
49:11, 49:14, 60:1, 60:7,
60:9, 60:13, 60:17,
60:22, 60:25, 61:3, 61:7,
61:10, 109:10, 119:2,
119:5, 121:17, 121:21,
130:10, 130:15, 130:17,
214:6, 214:9, 214:11,
214:13, 215:20, 216:8,
226:17, 226:20, 226:22,
228:23, 228:25, 229:9,
243:25, 250:8, 250:11,
253:14, 253:16
  **Murder** [1] - 165:2
  **murder** [5] - 7:18,
11:2, 22:5, 120:8,
140:25, 144:4, 147:1,
147:13, 147:15, 165:3,
166:11, 176:16, 176:20,
177:21, 187:19
  **murders** [1] - 11:8,
11:10, 181:12
  **Murders** [1] - 165:1
  **Music** [1] - 159:12
  **music** [13] - 159:13,
161:1, 161:3, 163:16,
164:9, 164:13, 165:10,
165:15, 168:23, 174:1,
191:1, 200:24, 201:3
  **must** [2] - 35:20, 197:9
  **muster** [1] - 215:6
  **MVA** [3] - 250:9,
250:10, 250:11
  **mystery** [1] - 224:19
  **mystery/0515** [1] -
224:22

---

## N

  **N-67** [2] - 232:17,
232:18
  **name** [71] - 45:14,
50:17, 55:15, 55:18,
62:5, 72:10, 74:3, 80:3,
80:21, 82:17, 83:18,
85:6, 86:5, 92:12, 92:20,
94:9, 94:25, 95:22,
96:15, 98:9, 98:25, 99:4,
101:2, 105:12, 107:12,
109:22, 120:4, 125:25,
131:12, 133:9, 135:2,
136:13, 138:10, 149:12,
151:25, 158:3, 158:18,
158:22, 160:6, 162:15,
163:10, 166:12, 171:8,
173:20, 173:22, 173:23,
173:24, 174:3, 174:20,
174:23, 174:24, 175:2,
176:14, 189:4, 190:23,

192:3, 197:6, 197:9, 197:10, 198:10, 198:11, 201:22, 202:7, 202:17, 216:4, 216:5, 216:6, 229:5, 229:6, 230:25, 233:23
**name's** [1] - 227:3
**named** [11] - 87:24, 128:2, 130:1, 174:17, 175:9, 175:21, 187:20, 202:2, 202:17, 207:2, 207:14
**namely** [3] - 27:13, 27:20, 116:12
**names** [12] - 11:4, 56:4, 56:5, 56:6, 84:17, 137:25, 141:14, 174:16, 179:19, 179:20, 181:21, 233:23
**narcotics** [11] - 116:22, 116:23, 122:2, 145:16, 145:24, 150:22, 150:24, 150:25, 151:2, 151:4, 184:8
**narrow** [1] - 27:14
**Nausau** [1] - 130:11
**near** [12] - 77:23, 97:19, 142:19, 154:25, 155:3, 155:5, 170:24, 177:19, 186:25, 215:16, 225:1, 251:25
**nearby** [1] - 35:13
**nearest** [1] - 218:20
**nearly** [1] - 35:9
**necessarily** [5] - 116:14, 144:6, 190:24, 231:2, 238:2
**necessary** [3] - 50:5, 51:13, 156:14
**neck** [3] - 194:16, 194:19, 204:20
**need** [26] - 2:13, 12:2, 44:9, 52:13, 56:2, 59:21, 60:5, 60:11, 62:9, 62:25, 79:20, 110:1, 110:14, 119:18, 131:18, 132:9, 132:12, 151:24, 189:25, 192:18, 196:17, 211:23, 213:22, 244:20, 248:2, 248:18
**needed** [1] - 243:10
**Needleman** [2] - 182:23, 182:24
**needs** [2] - 12:4, 231:5
**negative** [1] - 145:20
**neighbor** [1] - 17:7
**neighborhood** [12] - 70:22, 70:25, 135:9, 136:12, 159:8, 164:20, 167:15, 171:21, 173:24,

174:7, 174:8, 194:25
**Neighborhood** [1] - 174:9
**neighborhoods** [3] - 9:17, 164:21, 164:22
**network** [4] - 227:21, 227:22, 227:23
**never** [32] - 7:10, 13:7, 16:3, 24:18, 34:13, 37:20, 47:23, 47:24, 102:1, 123:23, 124:21, 143:14, 146:15, 149:8, 149:9, 153:18, 153:21, 166:14, 166:22, 175:15, 184:25, 185:23, 188:3, 188:15, 192:25, 193:11, 195:21, 196:3, 196:7, 203:12, 223:9
**nevertheless** [1] - 196:3
**new** [3] - 12:10, 222:21, 242:13
**New** [10] - 9:19, 9:21, 9:23, 13:1, 17:5, 17:22, 17:23, 18:8, 130:12, 232:11
**newspaper** [1] - 251:10
**next** [20] - 38:2, 67:4, 67:25, 130:14, 130:16, 131:5, 132:6, 151:10, 151:14, 212:17, 213:14, 213:15, 215:19, 224:24, 233:21, 235:7, 235:24, 237:11, 238:9
**nice** [1] - 176:2
**nickname** [4] - 101:3, 132:23, 132:25, 156:25
**Niedermeier** [4] - 32:9, 38:11, 49:5, 244:7
**Niedermeier's** [2] - 37:25, 42:22
**Niggas** [1] - 207:10
**night** [10] - 47:12, 71:4, 71:19, 72:25, 101:14, 107:24, 108:9, 181:12, 207:22, 208:16
**nights** [1] - 71:21
**Nine** [3] - 63:19, 217:23, 217:24
**nine** [1] - 171:13
**NJ** [1] - 232:7
**NO** [1] - 1:6
**nobody** [3] - 27:5, 188:11, 191:1
**noise** [1] - 43:25
**non** [1] - 59:11
**non-controversial** [1] - 59:11
**none** [1] - 55:18
**normal** [3] - 62:16,

73:18, 74:1
**Normally** [1] - 221:20
**North** [1] - 170:23
**NORTHERN** [1] - 1:2
**notarize** [1] - 93:14
**notary** [3] - 93:9, 93:12, 93:20
**notation** [7] - 85:10, 85:24, 86:2, 87:20, 88:10, 88:12, 89:20
**notations** [1] - 87:14
**note** [7] - 23:12, 83:25, 111:11, 121:2, 124:9, 209:18, 243:16
**noted** [4] - 97:13, 97:24, 121:2, 156:6
**notes** [5] - 83:4, 83:8, 90:10, 218:12, 242:21
**nothing** [13] - 18:17, 33:13, 39:10, 77:12, 115:21, 115:22, 162:10, 196:21, 203:12, 212:15, 222:5, 238:20
**Nothing** [6] - 107:8, 195:8, 195:9, 202:13, 205:10, 226:15
**notice** [19] - 13:24, 15:24, 16:15, 18:13, 18:20, 18:22, 21:12, 21:13, 21:22, 27:2, 28:19, 30:25, 67:23, 92:3, 92:7, 94:6, 235:8, 240:10
**notices** [1] - 23:20
**notified** [1] - 109:2
**noting** [1] - 142:22
**notion** [1] - 23:10
**November** [4] - 1:11, 45:7, 45:9, 254:5
**Number** [3] - 23:2, 23:3, 31:9
**number** [109] - 5:6, 26:17, 33:18, 34:4, 50:7, 50:13, 77:2, 77:5, 80:6, 80:9, 80:17, 86:2, 86:3, 86:15, 86:21, 87:3, 87:5, 87:8, 88:24, 89:2, 89:6, 89:13, 89:14, 89:25, 90:1, 90:2, 90:3, 90:4, 90:23, 90:25, 91:1, 91:2, 91:5, 107:12, 127:19, 127:21, 133:23, 133:25, 134:3, 154:3, 192:6, 218:7, 218:25, 220:15, 220:22, 220:24, 220:25, 221:1, 221:4, 221:7, 221:12, 221:18, 221:21, 221:22, 222:3, 223:8, 223:20, 224:14, 224:19, 224:21, 224:23, 225:8,

225:17, 225:19, 225:21, 225:24, 225:25, 226:21, 231:18, 232:13, 233:1, 233:4, 233:6, 233:12, 233:17, 233:19, 234:1, 234:10, 234:11, 234:16, 234:25, 235:2, 235:5, 235:10, 235:11, 235:17, 235:18, 235:19, 235:21, 235:25, 236:2, 236:5, 236:6, 236:8, 236:11, 236:16, 236:22, 236:23, 237:4, 237:5, 239:21, 240:3, 240:6, 240:7, 243:2
**Number(s** [1] - 254:5
**numbered** [1] - 251:20
**numbers** [24] - 22:23, 87:15, 88:24, 89:12, 89:18, 90:10, 90:13, 90:20, 104:22, 104:23, 221:25, 222:2, 222:14, 222:20, 222:21, 222:25, 223:1, 224:20, 226:2, 226:4, 226:6, 232:18, 234:5, 236:10

## O

**oath** [1] - 132:18
**objected** [1] - 117:9
**objecting** [4] - 31:22, 42:6, 124:9, 246:17
**Objection** [21] - 155:1, 160:1, 160:10, 176:17, 176:22, 178:4, 178:24, 179:7, 183:6, 183:13, 186:4, 192:11, 193:2, 195:14, 196:5, 200:3, 204:7, 205:1, 206:7, 206:16, 207:16
**objection** [9] - 29:23, 40:8, 40:14, 40:15, 49:9, 56:9, 121:1, 124:9, 150:2
**objection's** [4] - 178:6, 179:8, 183:14, 207:17
**objections** [4] - 114:12, 114:13, 117:23, 118:2
**objects** [2] - 37:25, 156:4
**obligation** [1] - 25:1
**observed** [1] - 186:25
**obtain** [1] - 167:12
**obvious** [4] - 24:13, 35:9, 156:5, 225:13
**obviously** [4] - 4:16, 43:14, 49:23, 51:3, 72:24, 127:16, 128:13, 129:6, 159:17, 243:13, 249:6, 250:22

**Obviously** [2] - 107:4, 241:23
**occasion** [7] - 133:16, 135:12, 159:7, 167:1, 168:12, 169:17, 186:24
**occasional** [1] - 107:24
**Occasionally** [1] - 154:20
**occasions** [9] - 141:10, 170:2, 180:21, 184:14, 184:21, 185:2, 185:7, 187:9, 241:1
**occupation** [1] - 131:12
**occur** [1] - 56:20
**occurred** [1] - 176:20
**October** [2] - 129:2, 151:1
**od** [1] - 55:10
**OF** [4] - 1:2, 1:5, 1:11, 132:21
**offense** [1] - 19:9
**offer** [5] - 34:23, 57:11, 126:7, 240:24, 241:4
**offered** [1] - 210:23
**offhand** [1] - 98:25
**office** [6] - 94:3, 94:15, 99:17, 215:1, 216:17, 228:15
**Officer** [1] - 244:7
**officer** [1] - 16:19
**official** [1] - 254:8
**Official** [1] - 254:16
**officially** [1] - 175:15
**often** [8] - 123:7, 126:9, 126:17, 133:13, 154:8, 165:21, 241:1, 246:6
**old** [12] - 4:24, 50:21, 62:19, 63:12, 63:17, 63:19, 103:3, 120:8, 157:8, 171:10, 200:13, 223:23
**older** [1] - 221:25
**Oldsmobile** [5] - 141:23, 141:25, 142:3, 142:6, 146:9
**once** [3] - 3:10, 6:14, 33:9, 37:11, 142:9, 163:2
**Once** [3] - 130:24, 137:24, 137:25
**One** [22] - 49:21, 50:25, 60:6, 66:13, 76:5, 76:17, 80:20, 92:1, 93:14, 108:23, 111:19, 113:10, 161:12, 161:13, 161:18, 163:21, 163:22, 185:12, 185:19, 238:10, 247:8
**one** [177] - 2:10, 4:7, 4:22, 7:4, 9:15, 9:21, 10:5, 10:19, 11:11, 16:1, 19:1, 19:22, 20:1, 20:9,

22:25, 23:1, 25:5, 25:21, 25:23, 26:24, 28:12, 29:18, 29:20, 31:15, 31:18, 32:9, 34:9, 34:22, 35:5, 35:14, 35:16, 42:6, 43:4, 43:10, 43:12, 43:21, 44:5, 46:3, 46:4, 47:4, 47:18, 53:5, 53:15, 55:13, 56:17, 58:22, 59:10, 60:1, 60:8, 70:6, 73:18, 78:22, 78:23, 80:11, 80:16, 83:13, 83:25, 84:16, 84:19, 85:1, 89:21, 93:13, 94:25, 95:13, 95:16, 95:18, 95:21, 96:1, 102:15, 104:11, 104:13, 104:21, 105:4, 109:20, 111:1, 111:2, 112:10, 113:15, 113:22, 115:1, 115:7, 116:2, 116:3, 116:4, 116:5, 116:15, 116:16, 116:19, 116:20, 117:20, 117:25, 118:7, 119:7, 119:17, 120:14, 120:19, 124:23, 127:18, 134:15, 137:7, 143:22, 145:15, 146:7, 146:12, 146:18, 147:13, 148:17, 152:15, 152:23, 152:24, 152:25, 154:1, 155:9, 161:20, 163:21, 166:23, 167:5, 169:8, 170:21, 173:7, 173:8, 173:9, 175:5, 175:12, 187:25, 190:14, 194:7, 194:17, 195:19, 196:7, 203:4, 207:8, 214:14, 218:14, 220:23, 221:12, 221:14, 221:17, 222:16, 225:4, 225:5, 225:16, 226:20, 227:17, 227:18, 228:22, 234:5, 234:15, 235:4, 236:18, 237:11, 237:13, 237:16, 237:18, 237:22, 237:23, 238:10, 238:17, 238:22, 238:25, 239:18, 244:16, 246:12, 247:15, 248:24, 250:6, 250:14, 250:15, 251:23
 **ones** [4] - 224:17, 224:18, 230:22, 251:11
 **open** [5] - 111:13, 188:19, 204:17, 209:20, 243:12
 **opened** [4] - 73:9, 166:11, 166:18, 188:15
 **opening** [4] - 102:4, 122:19, 204:20, 215:14
 **operating** [1] - 230:5

**operations** [2] - 229:14, 230:3
 **opinion** [10] - 5:11, 13:13, 15:14, 15:15, 18:24, 27:1, 28:1, 28:2, 36:8, 177:3
 **opportunity** [11] - 53:11, 110:18, 112:2, 123:21, 135:12, 138:5, 241:3, 241:18, 242:8, 242:9, 242:11
 **opposed** [1] - 248:12
 **opposes** [1] - 16:15
 **opposite** [2] - 38:25, 128:12
 **options** [1] - 214:13
 **oral** [1] - 32:20
 **order** [8] - 6:11, 57:21, 123:10, 123:24, 152:14, 153:17, 228:7, 246:1
 **ordered** [1] - 49:2
 **orders** [1] - 110:16
 **ordinary** [1] - 228:9
 **original** [3] - 42:13, 163:2, 217:25
 **originally** [3] - 112:15, 140:25, 146:6
 **Originally** [1] - 25:11
 **otherwise** [3] - 37:19, 38:3, 53:19
 **Otherwise** [1] - 53:22
 **outbound** [2] - 225:18, 225:25
 **outfit** [1] - 168:3
 **outgoing** [8] - 218:8, 224:1, 224:2, 224:6, 224:8, 225:16, 225:18, 226:8
 **outlet** [1] - 83:5
 **outside** [9] - 124:11, 144:21, 144:24, 145:1, 145:2, 145:7, 168:12, 204:5, 247:9
 **Outside** [1] - 188:6
 **overall** [1] - 9:7
 **Overland** [1] - 216:18
 **overnight** [1] - 74:1
 **overpowering** [1] - 213:11
 **Overruled** [11] - 155:2, 160:11, 178:25, 179:2, 183:7, 192:12, 193:4, 196:6, 200:4, 205:3, 206:18
 **overruled** [5] - 117:25, 178:6, 179:8, 183:14, 207:17
 **overseas** [1] - 222:8
 **overstated** [1] - 210:10
 **own** [20] - 8:15, 22:1,

28:3, 30:8, 34:23, 36:8, 36:10, 36:25, 49:15, 65:14, 65:17, 73:8, 123:11, 141:23, 141:25, 142:3, 142:6, 175:13, 208:10, 221:21
 **owned** [1] - 230:3

## P

 **P-A-R-S-O-N-S** [1] - 62:11
 **P-I-N-C-H-B-A-C-K** [1] - 216:6
 **p.m** [15] - 111:14, 121:25, 214:23, 220:23, 224:5, 224:7, 236:8, 236:20, 237:9, 239:5, 239:14, 239:15, 252:6
 **PA** [1] - 98:15
 **Pacino** [1] - 189:11
 **package** [2] - 168:10, 168:14
 **packet** [1] - 233:16
 **pads** [3] - 111:11, 209:18, 243:16
 **page** [52] - 33:19, 35:15, 38:10, 83:18, 89:9, 92:11, 93:6, 96:14, 98:6, 218:4, 220:18, 220:22, 221:8, 222:13, 224:7, 224:11, 224:24, 225:9, 226:2, 230:13, 230:15, 231:16, 231:24, 232:2, 232:5, 233:8, 233:14, 233:16, 233:17, 233:21, 233:22, 234:3, 234:7, 234:11, 234:16, 234:21, 235:7, 235:8, 235:9, 235:20, 235:21, 235:24, 236:20, 237:1, 237:2, 237:8, 239:4, 239:12, 239:18, 239:22, 244:8
 **PAGE** [1] - 253:2
 **Page** [22] - 33:19, 37:17, 38:10, 42:9, 42:16, 42:21, 42:24, 42:25, 44:11, 47:7, 49:2, 49:3, 217:24, 224:24, 234:6, 235:7, 235:16, 239:9, 239:18
 **pager** [1] - 222:8
 **pages** [9] - 39:4, 42:15, 83:17, 83:25, 217:22, 234:4, 235:16, 236:19, 254:7
 **Pages** [1] - 217:23
 **paid** [3] - 74:21, 78:23, 185:24

**paper** [29] - 8:8, 19:1, 19:8, 21:17, 26:24, 51:19, 76:18, 79:22, 81:4, 81:6, 81:7, 83:12, 83:13, 91:19, 92:10, 93:2, 94:1, 96:9, 96:19, 96:22, 98:6, 98:22, 104:25, 113:8, 186:16, 204:24, 215:16, 248:2, 248:3
 **papers** [6] - 18:19, 91:16, 93:25, 96:24, 108:14, 185:17
 **paragraph** [2] - 37:18, 113:10
 **paralegal** [3] - 247:18, 247:19, 248:8
 **paraphrasing** [1] - 23:4
 **Pardon** [2] - 64:25, 66:1, 157:20
 **parens** [1] - 213:17
 **parentheses** [1] - 85:12
 **parents** [1] - 158:11
 **Park** [19] - 164:18, 174:9, 174:13, 216:18, 245:6, 245:13, 245:14, 245:20, 246:11, 246:14, 246:25, 247:1, 248:24, 249:8, 249:9, 249:12, 249:14
 **parole** [4] - 140:12, 140:13, 140:15, 140:17
 **Parsons** [33] - 61:23, 61:25, 62:1, 62:7, 62:11, 62:14, 62:19, 62:25, 77:20, 78:9, 78:11, 80:11, 81:11, 82:4, 83:3, 83:17, 86:13, 87:18, 88:7, 89:4, 91:15, 92:16, 94:9, 96:9, 98:15, 99:20, 101:3, 101:21, 101:23, 102:13, 104:17, 108:23, 109:7
 **PARSONS** [2] - 62:2, 253:3
 **part** [44] - 8:19, 8:20, 18:18, 21:24, 22:8, 26:3, 26:14, 27:12, 32:6, 33:14, 44:9, 45:6, 45:21, 46:7, 47:6, 55:16, 56:5, 66:24, 66:25, 85:9, 89:13, 91:17, 91:25, 92:2, 94:23, 95:10, 96:8, 96:10, 96:15, 170:17, 174:2, 174:13, 176:25, 190:25, 194:7, 194:10, 194:11, 194:12, 239:19, 241:16, 241:17, 241:24, 245:10
 **partial** [1] - 223:20

**participated** [1] - 188:24
 **participating** [1] - 208:8
 **particular** [18] - 10:6, 12:4, 12:25, 13:13, 27:5, 27:9, 39:25, 55:1, 78:14, 80:12, 89:9, 92:10, 174:13, 218:6, 220:5, 248:5, 248:22, 248:23
 **particularly** [7] - 11:14, 36:24, 45:16, 118:9, 241:17, 245:2, 246:14
 **parties** [8] - 13:21, 110:23, 112:19, 113:5, 116:11, 129:12, 150:1, 150:19
 **partly** [1] - 175:23
 **parts** [1] - 13:20
 **party** [4] - 145:5, 175:20, 176:10, 208:16
 **past** [4] - 39:13, 40:20, 119:12, 236:19
 **patience** [4] - 2:17, 61:20, 131:4, 215:24
 **Patton** [4] - 38:12, 38:14, 39:2
 **Paul** [1] - 1:19
 **Pause** [2] - 110:5, 170:8
 **pause** [1] - 148:10
 **pay** [5] - 11:2, 74:16, 75:1, 79:9, 162:16
 **paying** [5] - 74:12, 78:21, 107:5, 129:9
 **payment** [2] - 105:25, 106:4
 **payments** [8] - 74:17, 78:25, 79:4, 106:6, 106:9, 106:14, 106:17, 107:2
 **payroll** [4] - 70:4, 70:5, 70:8, 70:10
 **pen** [1] - 44:3
 **pending** [3] - 199:4, 199:8, 199:15
 **People** [4] - 145:2, 197:18, 198:2, 198:6
 **people** [42] - 3:8, 4:6, 10:2, 17:14, 17:16, 33:15, 44:18, 45:15, 55:16, 55:23, 56:4, 56:5, 71:15, 73:12, 87:16, 117:10, 119:1, 144:21, 144:23, 144:25, 145:1, 145:7, 146:21, 161:4, 161:9, 163:8, 163:16, 167:2, 168:24, 169:2, 169:10, 172:16, 174:16, 179:18, 181:20, 197:20, 197:23, 198:4, 201:9, 201:15, 214:5, 249:14

**Perfect** [4] - 35:19, 215:2, 215:3, 215:4
**perfectly** [2] - 35:9, 48:4
**Perhaps** [2] - 242:25, 243:1
**perhaps** [11] - 37:10, 49:15, 58:24, 76:25, 131:19, 206:3, 212:14, 240:22, 241:11, 242:25
**period** [5] - 70:9, 107:19, 123:7, 154:5, 218:8
**permanently** [1] - 107:20
**permission** [2] - 49:15, 198:21
**permit** [7] - 27:7, 36:12, 36:17, 44:7, 47:20, 123:14, 156:9
**permits** [1] - 39:3
**permitted** [1] - 240:24
**permitting** [1] - 125:15
**perpetrators** [3] - 120:14, 120:16, 120:19
**person** [21] - 4:7, 4:11, 4:16, 5:22, 38:13, 38:15, 48:15, 67:8, 71:18, 72:16, 81:14, 82:10, 82:21, 119:3, 119:4, 120:17, 120:19, 193:9, 223:10, 230:24
**personally** [1] - 38:16
**perspective** [2] - 3:21, 28:5
**persuaded** [1] - 241:22
**phase** [1] - 125:15
**phone** [70] - 2:7, 3:11, 5:6, 50:7, 50:13, 60:18, 79:25, 80:1, 80:9, 80:12, 80:15, 80:16, 80:20, 84:8, 85:9, 86:3, 87:15, 88:12, 89:14, 90:25, 91:2, 91:11, 104:13, 104:15, 104:17, 104:19, 104:22, 104:23, 107:11, 127:11, 127:15, 133:20, 133:21, 133:22, 134:1, 134:4, 134:5, 134:7, 139:10, 145:1, 145:3, 146:12, 146:15, 146:16, 146:19, 146:22, 172:19, 177:23, 178:2, 178:13, 183:1, 192:3, 192:4, 205:18, 215:21, 215:23, 218:6, 218:7, 218:9, 218:11, 220:25, 221:21, 222:3, 222:24, 226:12, 232:13, 232:18, 236:14
**Phone** [1] - 236:14

**phonetic)** [1] - 64:24
**photo** [1] - 82:13
**photocopy** [1] - 147:3
**photograph** [11] - 66:15, 67:19, 68:8, 69:6, 69:11, 81:11, 81:14, 81:23, 82:4, 82:12, 82:20
**photographs** [2] - 66:11, 81:10
**photos** [1] - 69:13
**physical** [2] - 51:14, 51:19
**Physically** [1] - 133:18
**pick** [3] - 5:10, 11:22, 147:8
**picked** [10] - 98:23, 98:24, 99:5, 99:14, 120:1, 193:8, 212:16, 213:13, 214:2, 227:25
**picture** [4] - 33:14, 37:8, 69:3, 247:18
**piece** [13] - 8:8, 10:19, 51:19, 79:22, 81:4, 81:6, 83:13, 92:10, 93:2, 96:9, 98:6, 98:22, 113:8
**pieces** [7] - 83:11, 91:19, 94:1, 96:18, 104:25, 248:2
**pin** [1] - 55:3
**Pinchback** [6] - 215:21, 215:23, 216:5, 227:1, 227:9, 228:19
**PINCHBACK** [2] - 216:1, 253:13
**pit** [1] - 46:15
**place** [10] - 9:7, 62:8, 64:1, 67:21, 86:19, 110:22, 118:16, 128:6, 180:15, 202:22
**placed** [2] - 132:18, 223:12
**places** [1] - 3:14
**plan** [2] - 106:4, 111:1
**plane** [3] - 2:24, 3:2, 59:13
**planning** [2] - 9:25, 242:19
**Play** [1] - 191:12
**play** [11] - 29:2, 30:15, 30:16, 36:10, 46:7, 113:23, 132:12, 132:13, 191:13, 196:12, 196:15
**played** [3] - 41:25, 163:22, 205:14
**Played** [1] - 189:11
**playing** [6] - 49:9, 132:2, 165:9, 191:12, 196:21, 197:4
**plea** [4] - 112:21, 112:22, 149:19, 199:11

**plead** [6] - 134:11, 134:13, 134:21, 141:4, 148:11, 148:20
**pleaded** [6] - 146:24, 148:1, 148:3, 148:5, 148:14, 149:1
**pleadings** [1] - 99:20
**pleasant** [2] - 61:21, 79:20
**pled** [6] - 112:16, 112:18, 112:25, 116:21, 129:6, 134:23
**plenty** [1] - 251:17
**plug** [1] - 215:8
**plugged** [1] - 197:3
**plus** [1] - 189:25
**Plus** [1] - 101:14
**podium** [1] - 59:7
**point** [37] - 15:21, 15:23, 15:24, 19:3, 21:4, 21:25, 24:24, 26:2, 33:1, 33:3, 36:4, 42:2, 47:4, 50:4, 52:9, 58:18, 59:3, 78:17, 87:3, 91:15, 100:1, 100:12, 103:23, 104:13, 105:4, 120:12, 139:10, 173:3, 175:5, 202:7, 219:2, 246:3, 246:4, 246:12, 247:1, 248:25, 251:7
**Point** [2] - 64:24, 65:1
**pointed** [4] - 41:7, 54:12, 149:1, 149:22
**pointing** [4] - 21:4, 21:5, 21:6, 223:18
**points** [3] - 16:1, 16:2, 46:18
**police** [14] - 4:2, 29:11, 30:10, 30:14, 34:1, 46:6, 46:17, 48:15, 122:20, 185:3, 185:25, 186:14, 186:21, 244:17
**Police** [2] - 141:10, 244:7
**Polices** [2] - 156:1, 156:2
**polices** [1] - 156:3
**Polish** [1] - 249:8
**portion** [4] - 41:9, 41:24, 42:21
**portions** [2] - 49:13, 54:9
**position** [11] - 6:19, 8:24, 9:5, 38:5, 41:4, 42:10, 54:10, 63:5, 211:16, 247:7, 251:13
**positioned** [1] - 45:16
**possessing** [1] - 187:13
**Possession** [2] - 139:21, 140:16

**possession** [6] - 145:22, 150:22, 150:23, 150:25, 151:1, 151:3
**possibilities** [3] - 222:7, 222:11, 226:10
**possibility** [3] - 5:5, 50:3, 56:18
**possible** [10] - 5:4, 5:16, 6:1, 89:14, 109:12, 222:10, 222:12, 223:21, 226:14, 227:14
**post** [2] - 83:25, 94:2
**post-it** [1] - 83:25
**postpone** [2] - 11:21, 45:5
**postponed** [1] - 119:10
**power** [4] - 91:18, 96:22, 98:16, 100:1
**Powers** [2] - 130:11, 244:3
**powers** [1] - 98:1
**practice** [1] - 240:24
**preamble** [1] - 111:18
**predicate** [1] - 11:15
**preface** [1] - 18:14
**prefer** [4] - 30:20, 77:9, 179:17, 179:20
**preferably** [1] - 215:3
**prejudice** [2] - 27:6, 53:1
**preliminarily** [1] - 12:14
**preliminary** [1] - 151:15
**premark** [1] - 251:19
**premeditated** [1] - 147:13
**preparation** [2] - 28:17, 34:10
**prepare** [4] - 32:11, 46:20, 96:18, 97:25
**prepared** [8] - 25:25, 32:13, 32:14, 32:18, 32:20, 46:5, 52:24, 127:6
**Prepared** [1] - 32:10
**prerecorded** [1] - 185:24
**presence** [6] - 123:16, 124:11, 156:7, 168:12, 168:13, 204:5
**present** [11] - 7:3, 14:3, 29:3, 37:18, 61:15, 113:21, 137:5, 170:4, 170:5, 242:7, 242:11
**presented** [2] - 130:2, 242:10
**presently** [1] - 62:21
**preserve** [1] - 211:24
**preserved** [2] - 28:9, 210:6
**pressing** [1] - 198:21
**pressure** [1] - 7:11

**presumably** [1] - 238:25
**presume** [2] - 49:4, 58:16
**presuming** [1] - 242:6
**pretrial** [2] - 21:25, 24:9
**pretty** [11] - 12:8, 16:25, 26:8, 35:21, 103:24, 172:13, 172:16, 208:12, 212:15, 225:1, 251:20
**prevention** [1] - 217:2
**previous** [2] - 47:5, 110:23
**previously** [1] - 40:8
**price** [1] - 162:20
**prices** [1] - 162:21
**principal** [3] - 15:21, 15:23, 15:24
**principle** [1] - 54:21
**printed** [1] - 234:8
**printer** [1] - 215:17
**prison** [1] - 65:22
**private** [2] - 107:4, 189:25
**privileged** [1] - 183:12
**probable** [1] - 20:20
**probation** [4] - 139:22, 139:24, 140:12, 158:1
**probative** [7] - 6:18, 6:20, 6:22, 57:5, 57:11, 58:2, 58:4
**problem** [13] - 18:19, 31:5, 39:5, 56:11, 105:14, 111:20, 111:21, 112:4, 112:12, 113:5, 118:8, 197:15, 244:22
**problems** [1] - 105:20, 244:20
**procedural** [1] - 111:25
**procedure** [1] - 111:10
**proceed** [2] - 128:14, 198:23, 204:9
**proceeding** [4] - 59:19, 110:23, 131:7, 131:10
**Proceedings** [4] - 2:1, 110:5, 170:8, 252:6
**proceedings** [7] - 26:18, 110:25, 111:8, 152:16, 156:7, 254:4, 254:8
**process** [1] - 50:4
**processes** [1] - 228:15
**proceed** [4] - 34:25, 35:12, 36:5, 219:3
**produce** [2] - 217:9, 224:2
**produced** [6] - 22:13, 22:20, 26:5, 26:10, 46:8, 46:16
**producer** [1] - 175:17

**production** [2] - 26:11, 26:16
**productive** [1] - 50:5
**professional** [1] - 36:1
**Professor** [1] - 27:20
**professor** [6] - 5:21, 12:25, 16:18, 17:3, 17:7, 20:18
**proffer** [11] - 5:13, 12:16, 14:4, 27:18, 60:14, 120:11, 121:1, 121:8, 122:18, 210:14, 211:9
**proffer's** [1] - 121:12
**proffered** [1] - 211:3
**proffering** [1] - 58:9
**profoundly** [1] - 56:16
**program** [2] - 217:8, 251:13
**projectile** [2] - 20:12, 20:13
**projectiles** [6] - 12:18, 13:13, 14:17, 14:20, 20:1, 20:3
**promise** [2] - 205:5, 205:11
**promote** [1] - 175:23
**prong** [1] - 22:8
**proof** [1] - 241:3
**proper** [1] - 177:2
**proportion** [1] - 228:16
**proposed** [3] - 51:8, 111:18, 215:12
**propriety** [1] - 126:1
**prosecuted** [1] - 185:7
**prosecutor** [2] - 24:24, 180:20
**prosecutors** [1] - 18:16
**prospect** [1] - 128:24
**prove** [4] - 21:19, 242:22, 246:4, 248:19
**proved** [1] - 246:22
**provide** [5] - 3:8, 11:7, 21:12, 21:13, 26:21
**provided** [11] - 18:22, 28:18, 205:5, 217:19, 219:18, 219:20, 220:2, 228:6, 246:21
**provider** [1] - 230:8
**provides** [2] - 10:12, 10:19
**public** [3] - 93:12, 93:20, 244:24
**pull** [3] - 62:7, 62:9, 212:1
**purchase** [2] - 65:9, 65:11
**purchased** [1] - 186:1
**purchases** [1] - 231:11
**Pure** [7] - 161:23,

161:24, 162:6, 162:24, 163:8, 206:19, 208:9
**pure** [1] - 163:8
**purpose** [1] - 246:20
**purposely** [1] - 211:4
**purposes** [7] - 34:9, 41:10, 51:11, 53:20, 53:22, 110:25, 117:21
**pursued** [2] - 211:21, 211:25
**pursuing** [1] - 211:16
**push** [38] - 4:18, 7:11, 11:4, 14:1, 26:1, 27:14, 28:12, 33:5, 33:12, 41:1, 45:8, 45:21, 48:5, 48:17, 49:24, 53:12, 53:16, 54:5, 60:3, 62:8, 84:1, 94:3, 95:16, 110:22, 119:16, 131:9, 163:3, 165:15, 167:16, 167:18, 182:13, 197:6, 197:9, 210:15, 217:24, 242:9, 246:7, 251:19
**puts** [1] - 24:25
**putting** [3] - 33:11, 44:14, 50:2
**Putting** [2] - 82:11, 83:2
**Pyne** [5] - 1:21, 76:23, 202:18, 202:20, 249:19

**Q**

**qualified** [2] - 18:1, 18:3
**qualifies** [1] - 51:11
**qualify** [1] - 129:16
**quality** [1] - 13:7
**quantitative** [1] - 13:5
**questioned** [3] - 40:3, 204:6, 249:11
**questioning** [4] - 41:22, 123:16, 125:17, 131:13
**questions** [31] - 38:12, 40:6, 62:15, 77:15, 77:23, 79:7, 79:20, 83:15, 92:6, 101:1, 102:17, 104:11, 104:15, 105:15, 111:2, 114:9, 131:9, 151:15, 156:13, 176:24, 183:17, 198:17, 200:17, 203:18, 206:9, 209:13, 210:16, 227:9, 228:18, 240:13, 240:15
**quick** [4] - 156:13, 203:18, 212:1, 224:5
**quickly** [3] - 12:15, 35:1, 129:2
**quite** [9] - 34:22, 35:21,

43:16, 52:19, 82:2, 144:18, 227:15, 228:16
**quote** [2] - 42:9, 178:2
**quote-unquote** [1] - 42:9

**R**

**R-I-D-E-N-O-U-R** [1] - 229:7
**racketeering** [1] - 10:17
**radio** [2] - 163:19, 217:10
**Rahman's** [2] - 176:20, 181:13
**Raise** [1] - 132:11
**raised** [1] - 56:18
**raises** [1] - 16:5
**raising** [1] - 74:11
**Rakoff** [1] - 18:9
**Rakoff's** [1] - 13:21
**Rakoff/Daubert** [1] - 27:10
**ran** [9] - 4:8, 4:9, 120:14, 186:3, 186:8, 225:17, 225:24
**Randallstown** [3] - 65:3, 94:10, 103:12
**random** [3] - 162:9, 162:10, 163:16
**rap** [30] - 115:19, 159:15, 159:20, 159:21, 159:22, 160:21, 164:9, 164:11, 164:12, 164:14, 165:3, 165:12, 165:14, 175:16, 175:24, 188:23, 190:24, 194:13, 195:3, 195:4, 206:14, 207:20, 208:8, 208:25, 209:1, 209:4
**Rap** [3] - 159:13, 164:13, 195:10
**rapped** [1] - 200:24
**rapping** [2] - 175:1, 201:16
**Rapping** [2] - 161:1, 161:3
**rare** [3] - 228:12, 228:15, 241:1
**rather** [6] - 6:22, 22:6, 110:13, 132:5, 148:21, 241:12
**ratified** [1] - 51:18
**ratted** [2] - 196:4, 196:9
**ratting** [1] - 197:6
**re** [1] - 198:23
**re-joining** [1] - 198:23
**reach** [3] - 2:5, 3:18,

248:16
**reached** [1] - 40:16
**react** [3] - 168:16, 169:10
**READ** [1] - 132:22
**read** [37] - 17:13, 17:15, 23:1, 27:22, 36:11, 60:3, 86:25, 87:1, 87:6, 88:2, 93:19, 108:15, 108:17, 111:4, 111:5, 114:3, 114:9, 114:11, 117:24, 118:4, 129:14, 131:7, 131:9, 131:14, 132:9, 148:9, 150:8, 150:12, 188:23, 204:5, 208:2, 208:4, 217:8, 233:6, 233:7, 235:19
**reading** [15] - 35:6, 80:23, 85:21, 86:21, 87:11, 89:25, 91:8, 92:3, 92:13, 96:12, 116:8, 118:5, 150:10, 242:20
**reads** [4] - 44:12, 84:2, 85:11, 85:24, 86:15, 149:6
**ready** [7] - 61:20, 71:15, 102:25, 109:10, 109:15, 118:16, 118:24
**reaffirm** [1] - 210:25
**real** [5] - 11:7, 136:13, 195:24, 207:23, 212:1
**realize** [3] - 14:6, 47:11, 69:23
**realizing** [1] - 47:14
**really** [55] - 4:24, 7:12, 11:5, 14:5, 14:14, 15:4, 15:21, 20:17, 21:3, 23:13, 24:2, 27:12, 27:13, 27:19, 27:21, 32:12, 34:13, 35:1, 42:16, 47:21, 52:13, 52:18, 75:24, 118:14, 120:24, 155:21, 166:25, 171:18, 174:2, 174:17, 176:5, 178:10, 180:25, 183:15, 185:18, 186:9, 187:11, 190:12, 198:9, 203:8, 207:5, 207:6, 223:17, 225:22, 225:23, 227:20, 228:2, 247:9, 248:7, 248:21, 249:24, 250:1
**Really** [1] - 248:4
**realm** [1] - 5:5
**reason** [8] - 21:4, 38:19, 45:7, 77:9, 110:3, 155:8, 245:5, 249:15
**reasonable** [3] - 212:21, 212:23, 213:11
**reasonably** [1] - 5:12

**reasons** [1] - 156:5
**rebut** [1] - 241:4
**rebuttal** [3] - 240:25, 242:8, 250:25
**receipt** [1] - 77:6
**receive** [1] - 48:1
**received** [10] - 85:15, 134:25, 144:9, 144:20, 145:1, 145:3, 200:6, 223:1, 229:21
**receives** [2] - 216:15, 231:13
**recently** [1] - 6:2
**recess** [9] - 59:21, 61:5, 61:13, 111:11, 121:23, 209:15, 209:21, 210:24, 214:22
**Recess** [3] - 61:14, 121:25, 214:23
**recite** [1] - 117:21
**recognize** [22] - 80:6, 81:11, 81:13, 81:14, 81:18, 81:24, 81:25, 82:5, 82:13, 93:19, 93:23, 93:24, 96:2, 97:3, 97:14, 126:16, 133:23, 134:3, 173:20, 173:21, 205:17, 205:20
**recollect** [1] - 23:6
**recollection** [19] - 8:9, 9:6, 25:18, 25:23, 30:1, 38:20, 39:14, 39:17, 39:19, 40:2, 40:6, 40:11, 40:12, 40:24, 46:24, 53:14, 108:1, 108:4, 147:7
**reconstruct** [1] - 52:25
**record** [34] - 13:21, 21:16, 26:9, 26:10, 28:13, 41:14, 48:22, 51:18, 53:16, 54:8, 54:14, 55:19, 55:22, 56:7, 62:5, 88:22, 97:23, 152:1, 159:25, 161:11, 162:8, 163:16, 210:1, 210:6, 211:24, 216:4, 218:6, 224:2, 229:5, 230:13, 230:15, 231:19, 238:2, 244:21
**record's** [2] - 211:14, 249:10
**recorded** [7] - 39:14, 40:22, 41:25, 48:2, 162:1, 162:6, 254:3
**recording** [1] - 31:3
**records** [31] - 176:2, 216:16, 217:9, 217:16, 217:18, 223:24, 224:2, 229:19, 229:20, 229:22, 230:7, 230:8, 230:20,

230:24, 231:1, 231:9, 231:14, 231:16, 234:7, 244:2, 244:11, 244:12, 244:13, 244:24, 245:12, 245:14, 245:21, 246:9, 248:12, 251:12
**recovered** [1] - 19:20
**RECROSS** [4] - 108:21, 206:12, 253:6, 253:12
**red** [2] - 44:3, 44:4
**redacted** [3] - 29:18, 29:19, 48:8
**redacted)** [1] - 63:11
**redaction** [1] - 49:2
**redactions** [5] - 29:19, 29:21, 40:18, 53:7, 78:8
**REDIRECT** [4] - 107:9, 203:16, 253:5, 253:12
**reduced** [1] - 148:24
**refer** [2] - 54:9, 158:8
**reference** [7] - 22:22, 90:11, 91:12, 92:11, 188:25, 189:1, 213:12
**referenced** [1] - 51:6
**references** [2] - 92:7, 95:9
**referred** [9] - 2:16, 51:15, 111:8, 113:4, 150:10, 160:8, 189:2, 223:5, 240:25
**referring** [6] - 12:15, 19:1, 54:4, 114:17, 204:13, 230:15
**reflect** [1] - 249:10
**reflected** [1] - 22:17
**reflects** [1] - 51:21
**refresh** [3] - 9:6, 39:19, 40:11
**Refresh** [1] - 109:22
**refreshes** [1] - 147:6
**refreshing** [1] - 30:1
**refute** [3] - 14:11, 14:15, 14:16
**regard** [1] - 251:24
**regarding** [2] - 226:10, 229:21
**regardless** [1] - 7:5
**regional** [2] - 217:2, 217:3
**registered** [1] - 220:25
**registers** [1] - 227:22
**regular** [4] - 125:16, 164:15, 164:16, 164:19
**reiterate** [1] - 28:21
**rejoining** [1] - 209:17
**related** [1] - 178:10
**relatedly** [1] - 210:21
**relating** [1] - 81:6
**relationship** [5] - 18:16, 101:9, 133:11, 143:21,

191:7
**relationships** [1] - 9:11
**relative** [2] - 99:1, 243:3
**relatively** [2] - 6:7, 13:18
**release** [1] - 119:11
**released** [2] - 108:5, 108:8
**relevance** [4] - 20:7, 20:11, 27:18, 117:4
**relevant** [4] - 10:20, 23:21, 123:6, 249:3
**reliability** [2] - 7:6, 20:19
**remember** [72] - 24:7, 30:4, 39:22, 39:24, 41:16, 41:20, 45:1, 47:1, 47:3, 52:18, 58:20, 62:17, 64:9, 64:23, 69:24, 70:2, 72:24, 73:3, 74:21, 75:8, 75:10, 75:12, 98:24, 99:2, 99:4, 101:12, 104:14, 105:7, 105:12, 105:14, 108:23, 109:4, 116:19, 138:3, 141:14, 141:18, 142:9, 142:17, 142:21, 143:6, 143:13, 175:9, 176:15, 177:19, 177:20, 177:22, 177:24, 178:9, 178:11, 181:2, 181:10, 181:13, 181:22, 182:3, 182:6, 182:9, 184:11, 184:13, 185:21, 187:22, 188:12, 188:16, 190:1, 190:11, 190:12, 190:15, 201:22, 206:21, 207:23, 208:8, 244:22
**Remember** [2] - 122:9, 174:18
**remembers** [1] - 39:10
**remind** [2] - 132:8, 192:18
**reminding** [1] - 46:23
**reminds** [1] - 28:1
**remove** [1] - 204:8
**Repeat** [4] - 74:25, 80:14, 95:15, 195:12
**repeat** [1] - 187:7
**repoll** [4] - 218:23, 218:25, 219:9, 220:4
**report** [9] - 22:25, 126:25, 127:1, 219:23, 222:1, 223:2, 225:18, 244:8, 244:17
**Reported** [1] - 1:23
**Reporter** [1] - 254:16
**REPORTER'S** [1] - 254:1
**reports** [8] - 22:15,

22:16, 22:21, 23:1, 23:24, 24:8, 243:18
**represent** [1] - 202:17
**representation** [1] - 128:14
**representations** [1] - 128:13
**represented** [3] - 125:18, 129:15, 149:13
**representing** [6] - 75:21, 76:7, 102:15, 105:18, 106:10, 108:25
**represents** [1] - 202:19
**reputation** [3] - 245:6, 245:20, 246:25
**request** [3] - 11:20, 52:7, 127:3
**requested** [3] - 219:24, 220:1, 223:6
**requests** [2] - 228:16, 228:17
**research** [2] - 7:2, 13:7
**reseller** [2] - 230:18, 231:10
**resolve** [1] - 12:4
**resources** [2] - 216:25, 217:3
**respect** [28] - 7:9, 11:11, 11:13, 12:17, 13:4, 13:13, 13:25, 18:4, 18:18, 18:19, 18:20, 19:8, 19:15, 20:18, 20:22, 28:16, 28:18, 28:19, 51:1, 51:4, 54:18, 55:1, 77:25, 105:19, 111:10, 131:24, 187:16, 210:1
**respective** [1] - 22:23
**respond** [5] - 49:25, 56:15, 138:24, 229:17, 242:11
**responded** [3] - 12:19, 186:2, 202:1
**responds** [1] - 216:15
**response** [5] - 40:13, 58:25, 104:11, 200:17, 217:20
**responsibilities** [2] - 216:13, 216:21
**responsible** [6] - 2:15, 78:20, 120:10, 176:16, 176:19, 230:3
**rest** [1] - 89:6
**restocking** [1] - 71:19
**result** [1] - 27:6
**results** [1] - 123:10
**resume** [2] - 241:14, 243:20
**retail** [2] - 230:4, 230:5
**rethink** [1] - 214:2

**retrieve** [1] - 151:10
**retrieved** [1] - 186:20
**return** [9] - 94:11, 95:5, 95:13, 95:18, 95:21, 96:14, 110:6, 209:23, 243:10
**returning** [2] - 73:22, 73:24
**retyped** [1] - 48:24
**review** [8] - 48:7, 91:20, 112:7, 131:21, 131:22, 215:13, 217:18, 229:20
**reviewing** [1] - 230:7
**revised** [1] - 31:8
**Reynolds** [3] - 53:4, 53:5, 250:15
**RF** [1] - 217:10
**Rhodes** [28] - 1:17, 2:2, 28:24, 31:10, 31:21, 31:22, 34:20, 36:3, 40:5, 43:21, 46:14, 46:25, 47:17, 48:11, 49:1, 59:22, 59:25, 61:12, 118:17, 118:25, 121:16, 130:24, 214:5, 215:19, 228:24, 231:4, 243:24, 251:8
**RHODES** [93] - 2:4, 25:12, 29:1, 29:7, 29:13, 29:16, 29:20, 29:24, 30:1, 30:5, 30:12, 30:14, 30:20, 30:23, 30:25, 31:24, 32:2, 32:4, 32:6, 32:8, 32:11, 32:23, 33:4, 33:9, 33:18, 34:15, 34:19, 35:24, 36:4, 36:20, 36:22, 37:3, 37:6, 37:10, 37:13, 38:8, 38:10, 39:6, 39:9, 39:16, 39:24, 40:4, 41:3, 42:1, 42:4, 42:10, 42:14, 42:24, 43:1, 44:9, 44:15, 45:19, 45:24, 47:18, 48:13, 49:6, 49:11, 49:14, 60:1, 60:7, 60:9, 60:13, 60:17, 60:22, 60:25, 61:3, 61:7, 61:10, 109:10, 119:2, 119:5, 121:17, 121:21, 130:10, 130:15, 130:17, 214:6, 214:9, 214:11, 214:13, 215:20, 216:8, 226:17, 226:20, 226:22, 228:23, 228:25, 229:9, 243:25, 250:8, 250:11, 253:14, 253:16
**Rhodes'** [1] - 31:17
**Ridenour** [5] - 228:25, 229:6, 229:10, 240:14, 240:17

**RIDENOUR** [2] - 229:2, 253:15
**right-hand** [1] - 233:3
**rights** [1] - 183:10
**ringing** [1] - 236:15
**riots** [1] - 190:1
**rises** [1] - 44:15
**Road** [4] - 32:19, 32:21, 63:25, 103:12
**Roanoke** [1] - 63:16
**rob** [9] - 134:23, 137:14, 137:15, 139:25, 141:5, 146:25, 147:25, 148:5, 148:14
**robberies** [1] - 10:1
**robbery** [6] - 116:21, 129:7, 134:14, 134:22, 148:21
**Robert** [7] - 1:16, 94:14, 94:25, 95:9, 95:18, 152:8, 227:3
**Roc** [5] - 158:24, 159:20, 159:22, 161:8
**Roc's** [1] - 161:2
**Rock** [24] - 161:15, 161:16, 161:17, 163:14, 165:19, 166:7, 167:25, 168:10, 168:13, 178:11, 179:22, 188:21, 190:3, 190:5, 190:16, 195:21, 206:21, 208:20, 208:22, 208:23, 208:24, 209:1, 209:5
**Rodney** [1] - 87:23, 87:24, 88:5, 123:7, 158:4, 178:10, 178:19, 178:20, 178:22, 180:8, 182:1
**Role** [1] - 225:23
**role** [8] - 111:1, 111:3, 132:2, 160:19, 160:25, 161:2, 225:15, 225:22
**Room** [1] - 183:9
**room** [8] - 25:6, 68:6, 68:15, 131:21, 188:4, 188:6
**roughly** [5] - 70:21, 70:25, 157:15, 219:8
**rounded** [2] - 218:19
**row** [1] - 66:18
**RPR** [1] - 1:24
**ruining** [1] - 94:7
**rule** [14] - 21:7, 27:8, 40:7, 40:13, 53:11, 53:12, 53:18, 53:25, 114:12, 118:10, 123:17, 124:2, 129:16, 247:9
**Rule** [10] - 13:23, 15:19, 18:20, 18:22, 20:25, 24:25, 27:1, 27:16,

schools [1] - 244:3
Schwartz [2] - 5:21, 27:20
science [3] - 15:16, 16:10, 20:16
scope [2] - 206:17, 206:19
screen [8] - 73:8, 73:10, 73:15, 79:23, 83:2, 92:4, 95:17, 196:19
SD [3] - 194:18, 194:19, 194:21
search [6] - 79:18, 80:13, 80:16, 80:18, 83:22, 225:24
searched [1] - 73:4
seasick [1] - 239:8
seat [1] - 111:23
seated [5] - 62:4, 151:20, 202:18, 216:3, 229:4
second [20] - 4:11, 7:7, 12:4, 42:5, 43:1, 68:19, 68:21, 68:25, 69:4, 69:8, 72:5, 76:24, 94:5, 114:24, 114:25, 215:7, 220:22, 233:16, 233:23
secondary [1] - 22:6
seconds [12] - 59:11, 139:5, 150:14, 218:16, 223:17, 223:19, 225:3, 227:12, 227:16, 227:18, 250:5
secret [1] - 23:7
secretary [1] - 46:5
see [86] - 9:10, 27:18, 39:8, 43:4, 43:9, 47:8, 47:9, 50:21, 56:11, 59:23, 66:20, 67:1, 67:2, 67:18, 68:18, 70:7, 78:11, 79:23, 80:16, 81:7, 82:1, 82:10, 83:5, 83:8, 84:3, 85:10, 85:12, 86:24, 95:9, 97:5, 97:17, 121:5, 122:25, 126:17, 147:4, 147:6, 147:10, 155:6, 165:21, 165:23, 166:24, 167:16, 173:10, 175:20, 180:20, 183:20, 190:12, 190:14, 196:19, 196:21, 207:6, 208:6, 210:3, 212:20, 218:4, 221:11, 224:13, 226:5, 231:5, 232:5, 232:9, 232:24, 233:1, 233:9, 233:16, 233:17, 233:23, 234:5, 234:10, 234:11, 234:15, 235:4, 235:19, 236:7, 236:19, 236:20, 236:24, 237:8, 239:12,

schedule [2] - 110:19, 240:19
scheduled [2] - 25:7, 26:12
scheduling [1] - 251:24
school [3] - 102:25, 103:6, 103:7

ruled [5] - 28:21, 40:1, 128:9, 129:17
rules [1] - 240:23
ruling [15] - 27:10, 28:8, 28:9, 28:22, 39:25, 113:18, 121:15, 210:2, 210:9, 210:10, 210:11, 210:19, 211:11, 211:23
rulings [2] - 124:21, 251:21
run [7] - 15:7, 54:22, 54:24, 169:11, 185:20, 186:11, 216:15
running [2] - 61:8, 207:10
rural [2] - 219:11

**S**

sale [4] - 169:11, 185:19, 186:25, 201:6
sales [1] - 229:14
salute [1] - 43:14
Sands [1] - 176:13
sang [1] - 195:9
Sanitary [1] - 102:24
Sarah [1] - 120:5
sat [1] - 7:2
satisfied [1] - 27:16
satisfies [1] - 126:5
Saturday [1] - 87:17
saw [14] - 41:23, 58:14, 97:3, 97:14, 102:1, 102:3, 120:17, 120:19, 122:20, 126:12, 167:18, 169:9, 172:7, 239:8
scale [2] - 12:22, 16:9
scaled [2] - 23:13, 23:17
scaling [2] - 15:13, 16:10
scan [2] - 35:15, 35:16
scanned [2] - 35:18, 35:23, 48:24
scanner [1] - 35:20
Scarface [2] - 189:8, 189:9
scary [2] - 128:24, 197:9
scene [4] - 20:1, 20:3, 120:14, 120:18

239:21, 245:15, 250:18, 251:21
See [1] - 249:17
seed [1] - 44:14
seeing [6] - 94:9, 101:9, 101:11, 101:12, 132:19, 202:25
seek [2] - 12:25, 18:24
seeking [1] - 248:5
seem [3] - 25:17, 187:17, 223:19
sees [1] - 100:24
seized [1] - 107:11
sell [4] - 163:11, 163:15, 167:10, 167:21
selling [1] - 164:25
sells [1] - 231:12
semester [2] - 25:10, 25:13, 25:14, 25:18, 25:21, 26:13
Send [1] - 215:6
send [4] - 2:25, 5:9, 60:23, 215:2
sending [1] - 58:22
sends [1] - 231:1
sense [8] - 19:15, 19:17, 28:4, 33:9, 108:18, 213:1, 213:2, 247:2
sensitivity [1] - 127:4
sent [7] - 22:15, 99:17, 188:14, 188:18, 204:13, 204:15, 211:5
sentence [9] - 7:4, 37:23, 55:1, 65:22, 134:25, 135:1, 140:20, 205:11, 213:14
sentences [5] - 30:17, 31:18, 37:16, 37:17, 213:15
sentencing [1] - 199:25
separate [6] - 26:1, 31:4, 42:7, 54:3, 115:18, 115:19
separately [1] - 25:25
September [4] - 25:7, 25:8, 129:5, 141:20
sequestration [2] - 123:10, 123:25
Sequoia [3] - 142:19, 143:8, 143:11
Sergeant [1] - 189:24
series [2] - 19:19, 66:18
serve [4] - 157:24, 185:22, 205:12, 212:13
served [8] - 26:2, 126:3, 182:8, 182:11, 182:19, 185:22, 185:23, 216:15
serves [2] - 10:11, 52:6

service [3] - 3:5, 80:21, 230:5
serving [1] - 65:21
set [2] - 130:25, 213:18
Seven [4] - 44:12, 76:17, 112:16, 112:18
seven [4] - 157:15, 223:17, 227:12, 227:15
seventh [3] - 148:8, 149:3, 150:11
Several [2] - 51:4, 173:5
several [12] - 12:11, 39:2, 45:13, 100:20, 114:22, 123:4, 141:9, 154:5, 170:1, 221:8, 232:9, 244:3
severed [2] - 26:12, 28:17
Seymour [1] - 244:8
Shabazz [4] - 37:19, 233:4, 235:18, 236:16
shake [2] - 10:2, 208:19
Shakedown [13] - 159:24, 160:7, 160:14, 160:19, 173:19, 173:25, 174:3, 190:11, 194:10, 195:4, 200:21, 201:3, 202:10
shaking [1] - 44:3
Shanika [1] - 86:5
Share [2] - 250:20, 250:23
share [1] - 159:9
Shawn [11] - 82:17, 86:10, 86:15, 96:15, 96:19, 102:15, 102:19, 147:19, 148:12, 149:4, 202:5
SHAWN [1] - 1:8
sheet [3] - 115:20, 225:15, 246:2
Sheistyville [5] - 160:8, 173:20, 174:3, 174:6, 194:25, 195:1
shell [3] - 19:18, 19:19, 23:5
Shelly [13] - 48:17, 63:7, 64:9, 90:23, 91:11, 92:8, 94:10, 95:19, 104:1, 104:19, 105:19, 202:18, 202:22
SHELLY [1] - 1:8
Shelly's [2] - 69:12, 69:16
Shelton [14] - 97:14, 101:23, 158:22, 174:17, 176:16, 176:19, 178:13, 179:10, 179:13, 187:18, 196:3, 203:6, 204:13, 204:18

SHELTON [1] - 1:7
shelves [1] - 71:19
shift [3] - 71:9, 72:1, 74:1
shirt [3] - 97:21, 101:24, 202:19
Shit [2] - 161:23, 161:24, 162:6, 162:24, 163:9, 206:19, 208:9
shit [3] - 190:11, 212:14, 212:19
shook [2] - 231:6
shooter [2] - 4:17, 4:20
shooters [1] - 24:15
shooting [3] - 19:16, 24:6, 24:11
short [3] - 68:25, 157:4, 241:2
shortly [6] - 133:15, 138:2, 144:3, 182:5, 204:16, 244:6
Shorty [1] - 45:15
shot [4] - 4:13, 120:15, 120:20, 207:10
shots [1] - 4:23
shout [1] - 190:20
Show [5] - 68:7, 69:2, 137:11, 149:22, 150:4
show [40] - 6:1, 13:14, 33:15, 33:25, 35:2, 36:6, 43:6, 44:11, 66:11, 66:12, 67:4, 70:4, 70:6, 70:20, 75:14, 76:4, 76:16, 78:9, 81:10, 82:10, 94:23, 127:2, 137:12, 137:20, 137:21, 137:22, 142:13, 147:3, 192:16, 206:14, 218:18, 219:22, 220:15, 221:21, 223:9, 223:10, 226:2, 246:5, 246:8
showed [1] - 55:14, 55:17, 94:6, 107:11, 122:5, 122:7, 137:23, 142:25, 143:3, 143:14, 251:8
showing [4] - 33:10, 35:7, 123:15, 245:1
Showing [2] - 91:25, 96:8
shown [12] - 5:25, 51:17, 51:19, 54:9, 58:19, 66:23, 69:6, 69:11, 69:17, 77:6, 149:15
shows [5] - 67:6, 69:3, 225:24, 241:21, 248:13
shred [2] - 19:1, 26:24
sibling [2] - 158:12, 158:14

sic) [1] - 156:1
side [6] - 11:11, 73:20, 81:18, 82:12, 89:9, 155:9
sidebar [2] - 109:20, 110:9
siding [1] - 66:20
sign [6] - 91:15, 93:2, 96:24, 98:13, 99:21, 99:23
signalled [1] - 12:8
signature [11] - 92:16, 92:18, 93:16, 93:19, 93:20, 93:22, 93:24, 98:7, 98:8, 98:11, 254:11
signed [7] - 91:19, 92:23, 92:24, 93:25, 96:22, 98:21, 108:14
significance [1] - 44:24
significant [2] - 38:19, 53:15
similar [3] - 165:17, 219:23, 251:16
simpler [1] - 43:4
simplest [1] - 22:25
simply [10] - 26:2, 33:10, 35:14, 36:18, 39:18, 40:24, 114:6, 127:17, 232:11, 244:18
simultaneously [3] - 2:25, 3:12, 4:7
sing [1] - 208:1
singing [4] - 188:24, 190:3, 190:16, 206:21
single [4] - 131:11, 184:3, 226:18, 227:16
sister [16] - 64:1, 73:9, 74:15, 75:4, 75:5, 123:6, 154:7, 154:19, 154:21, 154:23, 154:25, 158:7, 170:18, 171:6, 191:2, 194:9
sister's [1] - 171:8
sisters [1] - 55:14
sit [4] - 115:6, 118:20, 118:22, 152:15
site [6] - 219:3, 219:13, 219:24, 223:5, 228:5, 228:13
sites [3] - 219:3, 219:4, 219:11
sitting [4] - 30:8, 35:6, 45:7, 132:4
situation [1] - 127:5
six [4] - 69:24, 120:8, 227:17, 228:13
six-year-old [1] - 120:8
sixth [1] - 147:25
sixty [1] - 245:10
sixty-some [1] - 245:10
skip [2] - 235:15,

235:16
slight [1] - 221:14
slightly [1] - 31:2
Slo [7] - 161:8, 174:17, 174:18, 174:21, 175:3, 206:20, 209:10
Slo's [2] - 189:24, 209:11
slotted [1] - 25:18
slow [1] - 134:16
Slow [1] - 134:17
slowly [1] - 132:9
small [1] - 103:14
smile [1] - 210:16
Smith [2] - 4:5, 218:14
snitch [6] - 59:2, 59:4, 192:25, 197:18, 197:23, 198:6
snitches [1] - 195:5
Snitching [6] - 128:2, 196:16, 197:10, 197:16, 198:7, 205:14
sold [8] - 179:22, 180:8, 184:25, 185:11, 186:20, 201:8, 201:9, 201:10
soldier [1] - 190:11
solely [1] - 57:2
solid [1] - 212:9
Solo [1] - 244:10
someone [14] - 32:22, 85:17, 87:24, 99:10, 138:6, 138:8, 162:12, 167:18, 169:6, 188:18, 201:20, 202:2, 227:22, 227:25
Someone [1] - 98:23
sometime [3] - 71:10, 72:2, 108:5
Sometime [1] - 72:2
sometimes [3] - 14:8, 87:15, 87:16
Sometimes [1] - 173:8
somewhat [1] - 35:10
somewhere [3] - 34:25, 35:12, 246:10
son [43] - 63:17, 64:9, 65:11, 72:7, 73:3, 78:5, 78:17, 78:20, 78:25, 80:3, 80:8, 81:16, 82:11, 90:11, 91:3, 91:12, 91:21, 92:7, 94:2, 95:14, 98:3, 99:1, 99:23, 99:24, 100:14, 100:19, 100:23, 101:8, 102:8, 104:1, 104:5, 104:7, 104:9, 105:19, 105:22, 105:24, 106:11, 106:21, 107:19, 108:14, 108:15, 108:25, 194:9
son's [13] - 63:10,

67:15, 72:14, 72:21, 74:5, 78:1, 79:8, 91:16, 107:2, 107:12, 107:13, 109:1, 109:3
song [8] - 163:21, 163:22, 190:10, 190:15, 190:18, 208:10, 209:7
songs [7] - 188:24, 188:25, 189:2, 189:4, 195:9, 195:24, 206:14
soon [5] - 2:24, 6:7, 215:1, 227:23
Sorry [2] - 42:2, 232:22
sorry [42] - 21:9, 29:6, 30:13, 31:13, 39:8, 44:22, 48:12, 50:13, 61:25, 62:7, 62:25, 63:22, 66:1, 66:13, 83:12, 103:1, 112:20, 122:6, 124:15, 125:5, 128:16, 129:8, 129:9, 130:15, 130:22, 137:25, 138:22, 142:8, 149:2, 155:16, 160:12, 190:8, 191:1, 192:22, 208:21, 214:19, 221:17, 230:14, 233:22, 236:8, 238:5, 239:9
sort [23] - 4:1, 8:13, 26:20, 26:24, 27:5, 32:12, 42:9, 46:20, 59:10, 64:14, 106:4, 110:2, 121:21, 127:4, 130:11, 192:24, 194:2, 197:15, 210:16, 237:22, 243:17, 247:25, 251:14
sound [6] - 27:19, 56:20, 70:22, 100:17, 100:21, 249:17
sounds [2] - 14:5, 247:25
source [2] - 74:24, 150:7
space [1] - 226:10
speakers [1] - 197:1
speaking [5] - 68:12, 69:23, 138:2, 139:15, 195:20
specific [8] - 52:8, 55:5, 55:6, 56:4, 56:5, 164:23, 219:6, 246:19
specifically [14] - 18:20, 26:9, 34:15, 39:16, 47:3, 52:3, 54:11, 57:10, 58:20, 71:5, 101:13, 127:18, 128:1, 211:18
Specifically [1] - 56:1
speculation [2] - 42:13, 47:6
speculative [3] - 38:6,

39:4, 41:6
spell [4] - 62:5, 151:25, 216:4, 229:5
Spence [24] - 7:18, 21:20, 22:5, 22:6, 23:8, 133:2, 133:4, 133:10, 134:24, 138:2, 141:1, 141:7, 142:14, 143:1, 143:4, 143:15, 143:21, 143:23, 144:3, 146:25, 147:14, 148:1, 148:5, 148:15
spend [2] - 107:23, 108:9
spent [1] - 52:18
spoken [7] - 45:15, 123:18, 131:8, 181:8, 182:20, 202:20
sponsored [1] - 46:22
sports [1] - 251:13
spot [1] - 234:5
Spring [1] - 25:9
spring [3] - 25:11, 25:13, 26:13
Sprint [9] - 60:10, 80:1, 215:21, 216:12, 217:1, 217:5, 217:8, 217:9, 217:13
spy [1] - 83:4
squashed [2] - 20:1, 20:2
squished [1] - 15:15
stabbed [1] - 208:17
stage [1] - 40:20
stairs [12] - 4:6, 4:8, 4:12, 4:17, 67:16, 67:24, 67:25, 68:3, 68:18, 68:21, 68:25
stairway [1] - 67:9
stand [23] - 11:6, 15:25, 61:13, 61:24, 98:15, 118:23, 122:16, 122:17, 125:12, 128:19, 132:5, 151:17, 157:6, 193:19, 193:22, 194:24, 210:15, 213:3, 214:21, 215:21, 215:25, 218:23, 229:1
standard [2] - 51:9, 51:22
standards [1] - 13:6
standing [5] - 21:7, 67:9, 120:16, 130:11, 214:5
stands [1] - 189:6
Stands [1] - 195:3
staple [1] - 226:18
start [8] - 124:13, 129:24, 223:14, 230:10, 242:6, 249:24, 250:3
started [7] - 22:11,

43:19, 44:25, 75:9, 103:4, 223:8, 250:7
starting [1] - 37:17
Starting [2] - 37:23, 237:22
starts [3] - 221:17, 223:15, 227:24
stash [2] - 167:16, 167:18
State [3] - 62:5, 216:4, 229:5
state [6] - 7:24, 74:5, 112:16, 141:4, 150:22, 151:25
State's [1] - 114:5
state's [1] - 114:8
statement [3] - 3:25, 4:1, 8:18, 32:20, 41:1, 41:22, 41:23, 41:25, 42:5, 48:2, 48:3, 48:18, 48:19, 51:10, 54:6, 54:7, 54:16, 55:8, 56:24, 121:10, 121:13, 142:23
statements [12] - 8:11, 24:6, 24:15, 41:6, 41:12, 41:19, 42:7, 51:7, 51:17, 102:4, 122:19, 210:13
States [2] - 152:8, 227:3
STATES [2] - 1:1, 1:5
states [1] - 6:20
station [2] - 163:22, 163:24
Station [1] - 191:12
stay [3] - 7:12, 119:23
Stay [2] - 193:24, 194:3
stayed [2] - 10:6
staying [1] - 196:2
stays [1] - 191:18
steal [1] - 167:14
steer [1] - 59:3
stenographically [1] - 254:4
stepped [1] - 189:24
steps [1] - 68:10
Stevens [2] - 63:21, 63:25
sticker [1] - 234:14
still [10] - 2:10, 6:9, 40:3, 42:14, 77:20, 154:23, 191:18, 209:25, 214:5, 251:8
Still [1] - 108:17
stipulate [5] - 3:21, 29:4, 30:15, 60:19, 115:13
stipulated [2] - 129:11, 244:18
stipulation [3] - 3:18, 248:16, 248:17
STLT [1] - 193:17

**stock** [1] - 71:18
**Stocksdale** [1] - 114:5
**Stole** [1] - 167:13
**stood** [1] - 193:24
**Stop** [6] - 128:2,
196:16, 197:10, 197:16,
198:7, 205:14
**stop** [1] - 70:17
**Stopped** [1] - 196:22
**stopped** [1] - 155:19
**stops** [1] - 67:1
**store** [7] - 70:20,
102:24, 103:5, 103:11,
103:13, 103:14, 103:18
**stores** [1] - 230:4
**straight** [3] - 72:2, 72:4
**straw** [1] - 46:20
**Street** [9] - 1:25, 90:5,
135:16, 135:17, 144:11,
144:12, 144:14, 193:23
**street** [13] - 46:20, 65:2,
102:1, 144:15, 144:16,
144:17, 144:20, 169:7,
170:22, 171:1, 177:4,
246:7, 248:18
**streets** [3] - 194:14,
245:8, 245:10
**stretch** [1] - 247:25
**strike** [3] - 143:25,
179:7, 199:14
**struck** [1] - 44:13
**stub** [13] - 70:4, 70:5,
70:8, 70:10, 70:17,
75:18, 75:21, 77:25,
78:4, 78:5, 100:13,
100:16
**stubs** [1] - 100:23
**students** [1] - 251:21
**studied** [1] - 17:4
**studies** [3] - 16:2, 16:4,
16:5
**Studio** [1] - 190:23
**studio** [11] - 162:9,
162:10, 162:17, 162:20,
168:18, 168:20, 190:19,
190:22, 195:22, 201:3
**study** [1] - 17:10
**stuff** [13] - 27:21, 43:16,
118:9, 136:25, 163:17,
164:16, 164:19, 164:23,
165:16, 168:20, 168:22,
191:11
**Stuff** [1] - 164:15
**stumble** [1] - 118:15
**subject** [7] - 31:17,
53:20, 78:7, 99:20,
115:9, 122:22, 127:20
**submission** [3] - 7:4,
8:12, 21:24
**submit** [1] - 96:18

**submitted** [1] - 51:9
**Subpoena** [2] - 216:14,
216:24
**subpoena** [20] - 49:25,
57:2, 126:2, 126:3,
152:23, 153:9, 153:10,
153:12, 153:19, 156:14,
182:8, 182:11, 182:19,
200:6, 205:5, 212:13,
217:20, 218:10, 228:9,
229:18
**subpoenaed** [5] -
123:24, 153:1, 153:8,
169:23, 203:24
**subpoenas** [1] - 217:6
**subscribed** [1] - 92:12
**subscriber** [3] - 230:13,
230:15, 231:18
**subsequent** [1] -
243:10
**substance** [6] - 13:2,
18:24, 19:14, 25:2,
156:12, 156:24
**substantive** [19] -
10:18, 33:14, 40:7,
40:13, 40:17, 41:1,
43:13, 51:11, 51:21,
52:12, 52:17, 52:21,
52:23, 53:10, 54:17,
55:22, 210:15, 211:20
**substitute** [1] - 8:14
**succeed** [1] - 166:1
**sufficiency** [1] - 13:23
**sufficient** [3] - 52:9,
54:19, 55:20
**sufficiently** [2] - 54:14,
55:21
**suggest** [2] - 77:1,
231:4
**suggested** [3] - 27:5,
58:10, 58:12
**suggesting** [2] - 124:2,
124:3
**suggestion** [1] - 24:3
**Sullivan** [3] - 18:21,
19:23, 19:24
**Sullivan's** [5] - 19:11,
22:16, 22:18, 22:25, 27:1
**summarize** [1] - 241:19
**summary** [3] - 76:5,
247:19, 248:8
**Sunday** [4] - 69:22,
71:21, 72:25, 208:16
**Sundays** [1] - 71:10
**sung** [1] - 206:20
**Sunmar** [14] - 65:2,
65:4, 65:5, 65:6, 66:6,
66:8, 66:9, 80:22, 105:8,
107:13, 107:16, 108:2,
108:7

**superseding** [1] - 215:7
**supervised** [1] - 119:11
**supplemented** [1] -
52:16
**supplied** [1] - 75:1
**support** [1] - 48:20
**supporting** [2] - 122:2,
246:20
**suppose** [7] - 8:17,
34:6, 36:1, 36:12,
190:15, 210:22, 212:21
**supposed** [8] - 59:18,
60:22, 60:25, 106:6,
106:14, 117:8, 177:17,
177:20
**supposedly** [1] -
188:14
**suppression** [1] - 45:5
**surely** [1] - 183:12
**surprised** [1] - 249:5
**surveillance** [1] - 83:4
**survived** [1] - 190:1
**suspect** [5] - 17:20,
17:21, 18:7, 45:13, 210:4
**suspended** [1] - 135:1
**Sustained** [2] - 195:16,
206:8
**sustained** [1] - 40:9
**SV** [2] - 194:21, 194:22
**swath** [1] - 246:13
**swear** [1] - 132:19
**switch** [8] - 110:16,
218:25, 219:1, 219:2,
220:5, 220:7, 220:13,
232:15
**switches** [2] - 220:11,
220:14
**sworn** [5] - 61:24,
92:12, 151:17, 215:25,
229:1
**SWORN** [4] - 62:2,
151:18, 216:1, 229:2
**system** [3] - 222:22,
222:23, 222:24


## T

**T-17** [2] - 231:15,
239:19
**T-3** [1] - 217:23
**table** [3] - 97:19,
155:10, 202:19
**talks** [1] - 15:13
**tape** [19] - 29:2, 30:15,
30:16, 31:3, 35:4, 35:11,
36:10, 36:19, 44:23,
45:14, 45:17, 45:18,
46:7, 46:9, 48:6, 48:8,
49:10, 198:8

**taped** [1] - 49:3
**tapes** [1] - 44:18
**tattoo** [7] - 192:13,
193:5, 193:7, 193:16,
193:17, 194:7, 194:16
**tattoos** [1] - 192:10
**taught** [1] - 17:16
**te-te-te-te-te-te** [1] -
198:9
**teaches** [1] - 17:5
**team** [1] - 186:2
**technique** [1] - 48:23
**technology** [1] - 3:14
**telecommunications**
[1] - 216:12
**telephone** [5] - 107:12,
118:25, 172:13, 172:16,
214:5
**telephonic** [1] - 127:12
**temporary** [1] - 234:14
**ten** [4] - 18:1, 109:16,
133:6, 186:1
**Ten** [4] - 217:23,
224:24, 226:22, 226:23
**tendered** [1] - 125:16
**term** [3] - 16:15, 212:5,
248:10
**terminology** [1] - 13:11
**terms** [14] - 11:24, 13:7,
13:22, 22:8, 27:1, 41:12,
90:17, 136:25, 217:5,
222:20, 223:7, 226:4,
238:19, 243:8
**terribly** [1] - 27:23
**terrified** [1] - 128:2
**Territorial** [1] - 96:12
**test** [1] - 246:2
**testified** [24] - 9:11,
9:19, 9:20, 9:25, 16:4,
18:9, 24:8, 24:12, 40:25,
51:5, 55:20, 68:15,
89:21, 110:23, 129:5,
146:11, 147:16, 158:16,
184:19, 201:6, 201:9,
204:2, 211:2, 246:6
**testifies** [2] - 10:20,
19:19
**testify** [21] - 7:24,
10:13, 10:17, 13:3,
20:10, 122:18, 122:21,
123:24, 125:22, 152:15,
152:20, 153:22, 169:23,
169:24, 178:21, 182:6,
182:8, 184:2, 187:23,
197:22, 197:25
**testifying** [10] - 20:23,
105:14, 111:6, 126:1,
138:3, 169:20, 184:13,
197:15, 200:5, 201:18
**TESTIMONY** [1] - 253:7

**testimony** [81] - 9:16,
10:19, 12:20, 13:1,
18:24, 19:5, 19:11,
20:20, 25:2, 26:1, 27:8,
27:15, 28:4, 28:6, 29:12,
40:17, 41:12, 51:12,
52:8, 52:11, 52:15,
52:16, 52:17, 52:21,
52:23, 53:9, 53:13,
54:13, 55:6, 55:15,
55:21, 60:4, 77:24,
100:12, 110:24, 111:6,
112:1, 112:11, 113:4,
113:21, 114:21, 114:22,
117:9, 118:9, 120:12,
120:15, 122:22, 123:8,
125:21, 129:5, 129:24,
129:25, 130:1, 130:6,
131:7, 131:15, 131:16,
131:17, 131:19, 131:24,
132:1, 132:4, 132:17,
150:10, 150:20, 151:8,
155:25, 156:4, 156:8,
156:13, 156:25, 201:14,
202:8, 204:22, 204:25,
205:6, 217:12, 218:2,
245:19, 246:24, 247:12
**text** [2] - 220:10, 220:15
**Thanksgiving** [1] -
45:10
**THE** [499] - 1:1, 1:2, 2:2,
2:6, 2:12, 2:13, 2:18,
2:21, 3:1, 3:4, 3:13,
3:18, 3:23, 4:3, 4:14,
4:19, 4:24, 5:2, 5:7,
5:18, 5:23, 6:3, 6:10,
6:14, 6:16, 6:24, 7:7,
7:15, 7:17, 7:20, 7:24,
8:1, 8:3, 8:6, 8:9, 8:17,
8:20, 8:23, 9:3, 9:6,
9:14, 10:5, 10:9, 10:14,
10:17, 11:9, 11:17,
11:21, 12:6, 12:8, 12:13,
14:4, 14:10, 14:18,
14:22, 15:3, 15:6, 15:9,
15:21, 16:12, 16:17,
16:21, 17:12, 17:7, 17:11,
17:13, 17:18, 17:21,
18:2, 18:6, 18:9, 18:12,
19:5, 19:10, 19:15,
19:21, 19:23, 20:4, 20:7,
20:11, 20:24, 21:2, 21:6,
21:11, 21:23, 22:3,
22:12, 24:1, 24:5, 24:10,
24:14, 24:17, 24:19,
25:4, 25:10, 25:13,
25:17, 26:2, 27:7, 28:14,
28:21, 28:24, 29:6, 29:8,
29:14, 29:18, 29:22,
29:25, 30:3, 30:6, 30:10,
30:13, 30:19, 30:21,

30:24, 31:6, 31:14,
31:20, 31:25, 32:3, 32:5,
32:7, 32:10, 32:16,
32:24, 33:8, 33:17, 34:5,
34:11, 34:17, 34:20,
35:20, 36:1, 36:7, 36:21,
36:24, 37:4, 37:9, 37:12,
38:7, 38:9, 39:1, 39:8,
39:15, 39:18, 40:3, 40:5,
41:4, 42:2, 42:5, 42:12,
42:15, 42:20, 42:25,
43:11, 44:11, 44:22,
45:23, 45:25, 46:3,
46:11, 46:23, 47:16,
47:20, 48:10, 48:25,
49:8, 49:12, 49:18,
49:20, 50:7, 50:10,
50:13, 50:16, 50:20,
50:24, 51:23, 51:25,
53:5, 53:24, 54:21, 55:2,
55:24, 56:2, 56:8, 56:14,
56:23, 57:4, 57:7, 57:9,
57:19, 57:25, 58:4, 58:8,
58:13, 58:16, 58:18,
58:21, 59:5, 59:9, 59:12,
59:14, 59:21, 59:25,
60:6, 60:8, 60:11, 60:15,
60:21, 60:23, 61:2, 61:4,
61:8, 61:12, 61:16,
61:19, 61:24, 62:3, 62:4,
62:6, 62:7, 62:11, 62:25,
63:22, 76:25, 77:8,
77:11, 77:13, 77:17,
78:10, 82:9, 97:13,
97:24, 109:7, 109:9,
109:13, 109:16, 109:18,
109:21, 109:24, 110:4,
110:8, 110:11, 110:13,
110:20, 111:16, 111:20,
111:23, 112:4, 112:6,
112:9, 112:14, 112:20,
112:23, 113:1, 113:6,
113:9, 113:11, 113:13,
113:20, 113:25, 114:4,
114:9, 114:11, 114:15,
114:17, 114:20, 114:24,
115:2, 115:5, 115:9,
115:12, 115:16, 115:18,
115:21, 115:24, 116:5,
116:7, 116:16, 116:25,
117:3, 117:7, 117:12,
117:17, 118:2, 118:4,
118:12, 118:14, 118:22,
118:25, 119:3, 119:6,
119:9, 119:13, 119:18,
119:21, 119:23, 120:3,
120:6, 121:8, 121:10,
121:14, 121:20, 121:23,
122:4, 122:6, 122:8,
122:13, 122:24, 123:2,
123:12, 124:1, 124:6,

124:15, 124:18, 124:20,
124:23, 125:1, 125:4,
125:8, 125:22, 126:2,
126:4, 126:13, 126:15,
126:24, 127:6, 127:10,
127:14, 127:17, 127:24,
128:4, 128:12, 128:17,
128:19, 128:23, 128:25,
129:8, 129:10, 129:14,
129:19, 129:22, 130:7,
130:14, 130:16, 130:19,
131:2, 132:8, 132:11,
132:12, 132:15, 134:15,
134:17, 134:19, 150:3,
150:5, 150:7, 150:9,
150:15, 150:18, 151:12,
151:16, 151:19, 151:20,
152:2, 152:3, 154:10,
155:2, 156:6, 160:2,
160:11, 160:17, 164:2,
170:11, 170:13, 172:5,
176:18, 176:24, 177:5,
177:7, 178:6, 178:16,
178:25, 179:2, 179:8,
179:20, 181:15, 183:7,
183:14, 186:7, 189:21,
190:7, 190:9, 191:5,
192:12, 192:16, 192:18,
192:22, 193:4, 193:20,
195:16, 195:17, 196:6,
196:13, 196:17, 196:23,
197:1, 198:20, 200:4,
202:14, 203:22, 204:8,
205:3, 206:8, 206:11,
206:18, 207:17, 207:19,
208:2, 208:5, 208:21,
209:14, 209:23, 210:3,
210:10, 210:20, 212:1,
212:5, 212:7, 212:11,
212:13, 212:18, 212:25,
213:6, 213:14, 213:24,
214:4, 214:8, 214:10,
214:12, 214:16, 214:19,
214:21, 214:24, 215:6,
215:10, 215:19, 215:23,
216:2, 216:3, 216:5,
226:16, 226:18, 226:21,
226:23, 228:19, 228:21,
228:22, 228:24, 229:1,
229:3, 229:4, 229:6,
231:4, 231:22, 240:16,
240:17, 243:24, 244:12,
244:14, 244:19, 245:15,
245:18, 246:3, 246:17,
246:23, 247:3, 247:11,
247:14, 247:16, 247:21,
247:24, 248:9, 248:25,
249:2, 249:7, 249:9,
249:17, 249:22, 249:24,
250:4, 250:10, 250:20,
250:23, 251:3, 251:6,

251:15, 252:3, 252:5
**themes** [1] - 165:17
**Thereafter** [2] - 40:16,
240:23
**therefore** [2] - 38:8,
125:15
**thesis** [1] - 4:16
**they've** [4] - 172:11,
173:11, 230:12
**thinking** [3] - 59:2,
59:4, 59:15
**thinks** [1] - 241:21
**third** [10] - 60:11, 60:25,
61:11, 119:3, 134:20,
215:7, 232:23, 233:16,
233:22
**thirds** [3] - 33:20,
220:18, 233:9
**Thomas** [1] - 1:20
**thoroughly** [1] - 57:20
**Three** [3] - 33:19, 38:11,
42:21
**three** [23] - 2:6, 21:18,
32:18, 37:19, 37:24,
42:22, 53:3, 53:23,
55:17, 55:23, 56:6,
100:20, 113:16, 114:2,
127:21, 131:20, 153:25,
188:14, 205:19, 227:18,
234:23, 236:15, 242:25
**throughout** [2] - 23:9,
26:18
**throw** [1] - 54:23
**thug** [1] - 193:23
**Thursday** [6] - 33:5,
215:15, 242:5, 242:14,
243:6, 252:2
**ticket** [3] - 75:17, 75:18,
75:20
**tight** [7] - 171:23,
171:25, 172:3, 188:20,
191:2, 192:7, 193:3
**timer** [2] - 223:15,
227:24
**timing** [3] - 110:2,
248:20, 248:22
**Tincher** [1] - 141:15
**tip** [1] - 44:5
**titled** [1] - 96:11
**TM** [10] - 122:10, 157:3,
157:4, 157:6, 189:4,
189:6, 189:24, 190:10,
190:16, 190:18
**today** [17] - 11:22,
30:16, 49:4, 49:5, 59:23,
97:5, 100:12, 139:18,
141:16, 197:14, 198:22,
201:22, 205:7, 206:3,
214:17, 215:24, 229:17
**together** [23] - 14:1,

36:25, 37:20, 37:24,
42:22, 47:8, 75:9, 79:7,
79:12, 79:16, 120:16,
159:20, 159:21, 159:22,
159:23, 160:4, 165:21,
168:10, 168:14, 169:3,
171:17, 173:18, 190:24
**Together** [1] - 121:10
**toggle** [2] - 150:7,
196:17
**token** [1] - 24:25
**Tom** [1] - 202:17
**tomorrow** [22] - 49:6,
49:8, 127:7, 128:7,
130:21, 130:22, 198:23,
210:18, 214:1, 215:13,
240:21, 241:7, 241:11,
241:13, 243:20, 243:22,
243:24, 244:5, 249:25,
250:25, 251:17, 251:21
**tonight** [6] - 52:2,
215:12, 215:16, 227:7,
247:22, 251:16
**Tony** [4] - 157:7, 161:8,
189:6
**Tonya** [9] - 133:2,
133:4, 133:16, 138:2,
139:11, 139:13, 141:1,
147:13, 148:1
**Tonya's** [4] - 133:25,
134:1, 135:4, 135:11
**took** [6] - 15:25, 99:2,
99:14, 104:18, 104:21,
163:3
**tool** [2] - 13:7, 18:5
**tooled** [1] - 249:13
**top** [22] - 31:1, 31:8,
42:16, 49:2, 83:4, 83:5,
83:18, 87:8, 93:6, 94:10,
95:16, 96:14, 186:17,
218:4, 230:21, 232:20,
233:3, 234:6, 236:19,
237:23, 248:15
**total** [12] - 74:22,
106:15, 116:20, 221:11,
224:10, 224:11, 224:14,
225:8, 226:7, 228:16,
240:11
**totally** [2] - 59:11,
113:22
**totals** [1] - 224:5,
224:25
**touch** [1] - 7:12
**tough** [2] - 245:21,
248:14
**toward** [3] - 62:4,
216:3, 229:4
**towards** [1] - 67:7
**tower** [2] - 219:6, 223:6
**towers** [1] - 219:3

**town** [1] - 66:18
**Track** [2] - 208:8,
208:10
**track** [1] - 177:24
**training** [4] - 217:5,
217:8, 217:10, 217:12
**transcribed** [6] - 32:20,
40:22, 48:18, 48:19,
129:23, 254:8
**transcribing** [1] - 34:3
**TRANSCRIPT** [1] -
253:7
**transcript** [91] - 29:3,
29:5, 29:6, 30:11, 30:14,
30:16, 30:22, 31:2, 31:8,
31:9, 32:10, 32:12,
32:18, 32:20, 33:2, 33:6,
33:10, 34:4, 34:10,
34:14, 34:23, 34:24,
35:4, 35:6, 35:8, 35:10,
36:8, 36:10, 36:11,
36:15, 36:17, 37:2, 37:5,
37:14, 39:5, 40:7, 40:12,
40:20, 41:15, 41:23,
43:8, 43:13, 43:15,
43:18, 44:17, 46:1, 46:2,
46:5, 46:15, 46:16,
46:20, 46:25, 47:22,
47:23, 47:24, 47:25,
48:2, 48:5, 48:7, 48:10,
48:17, 49:15, 51:19,
52:10, 53:7, 54:5, 54:8,
55:17, 60:4, 110:17,
111:22, 112:7, 114:25,
115:14, 116:1, 116:2,
116:4, 116:11, 116:19,
117:18, 117:24, 119:24,
129:3, 129:25, 130:3,
131:6, 131:15, 131:25,
145:19, 254:8
**transcripts** [15] - 32:13,
32:14, 33:15, 35:16,
43:3, 46:15, 48:23, 51:1,
51:5, 51:14, 51:22, 52:4,
54:15, 131:18, 250:14
**traveling** [1] - 227:6
**treat** [2] - 111:5, 130:5
**trial** [41] - 7:24, 11:22,
15:20, 15:25, 18:23,
22:10, 23:9, 24:12, 25:7,
25:25, 26:1, 26:12, 27:4,
28:17, 28:20, 43:17,
44:25, 45:6, 45:8, 47:25,
51:5, 52:16, 53:9, 54:2,
54:13, 54:24, 55:6,
106:14, 115:21, 125:15,
131:8, 152:11, 152:15,
152:16, 153:15, 154:8,
156:8, 170:2, 191:14,
210:23, 243:21

**trials** [3] - 35:5, 54:22
**triangulated** [1] - 21:18
**tried** [12] - 12:22, 12:24, 26:18, 27:14, 35:22, 74:9, 108:17, 118:1, 163:12, 185:20, 248:16
**trip** [2] - 9:22, 9:24
**trips** [2] - 9:19, 9:21
**trouble** [4] - 10:23, 10:24, 61:6, 193:1
**true** [6] - 154:7, 165:6, 190:13, 195:13, 197:14, 246:2
**True** [2] - 193:25, 194:3
**trust** [1] - 61:21
**truth** [6] - 187:11, 187:12, 195:20, 198:2, 198:4, 203:11
**truthful** [1] - 204:25
**truthfully** [2] - 173:16, 207:2
**truthfulness** [4] - 246:21, 246:23, 247:4, 247:10
**try** [12] - 44:6, 62:16, 94:6, 108:15, 109:21, 163:15, 169:11, 192:20, 207:8, 223:11, 241:20, 246:7
**trying** [21] - 8:16, 21:19, 23:22, 33:14, 35:2, 43:20, 45:10, 46:14, 46:15, 46:18, 59:2, 110:15, 110:18, 110:22, 115:6, 194:13, 208:6, 212:18, 213:4, 213:7, 213:18
**turn** [7] - 38:10, 68:24, 85:11, 116:8, 217:19, 231:16, 235:7
**turned** [6] - 24:8, 63:12, 78:1, 100:13, 120:18, 197:1
**turning** [2] - 85:21, 233:14
**TV** [2] - 198:16, 244:5
**twice** [3] - 33:25, 157:21, 181:1
**Twice** [2] - 157:19, 157:21, 182:10
**twins** [6] - 161:7, 161:8, 167:5, 175:7, 201:14, 201:15
**two** [67] - 4:5, 12:16, 14:7, 25:15, 25:22, 26:12, 31:18, 33:9, 33:20, 36:15, 37:11, 42:4, 42:7, 43:3, 53:3, 60:2, 83:11, 84:16, 84:17, 85:12, 95:5, 95:9,

95:10, 95:16, 96:4, 96:5, 114:6, 116:10, 116:18, 117:20, 118:25, 119:12, 121:22, 127:19, 129:3, 131:19, 153:23, 153:25, 155:21, 155:23, 155:24, 168:2, 170:4, 177:23, 180:21, 181:18, 184:8, 184:14, 184:16, 184:25, 185:2, 185:3, 187:4, 187:9, 213:15, 214:6, 214:13, 220:18, 227:9, 233:9, 234:4, 236:19, 237:25, 250:6
**Two** [33] - 37:17, 42:9, 42:24, 42:25, 49:2, 49:21, 63:4, 64:18, 65:2, 65:7, 65:16, 66:7, 73:3, 80:12, 80:17, 81:7, 83:9, 83:22, 94:10, 95:14, 95:19, 96:15, 107:12, 107:16, 115:1, 153:24, 156:19, 156:20, 157:22, 191:12, 197:10, 240:1, 248:24
**two-thirds** [3] - 33:20, 220:18, 233:9
**Tyesha** [1] - 120:2
**Tyiesha** [1] - 3:15
**type** [3] - 133:21, 146:2, 168:22
**typed** [1] - 35:14
**types** [1] - 220:11
**typically** [5] - 17:25, 71:21, 72:1, 73:15, 100:23
**Tyrone** [1] - 233:23

## U

**U.S** [3] - 1:24, 94:14, 99:17
**UH** [1] - 44:13
**Um-hum** [13] - 84:20, 95:12, 154:9, 172:4, 175:8, 176:3, 181:14, 189:10, 189:20, 190:4, 190:6, 191:3, 193:18
**um-hum** [1] - 147:9
**Um-um** [2] - 88:11, 197:13
**um-um** [1] - 145:19
**unambiguously** [1] - 26:25
**uncharged** [1] - 19:4
**Under** [1] - 194:3
**under** [17] - 18:22, 40:7, 40:13, 53:11, 53:12, 57:16, 86:2, 87:23,

118:10, 129:16, 129:17, 132:18, 220:4, 232:6, 238:6, 240:23
**undercover** [3] - 185:19, 185:22, 185:23
**underneath** [2] - 88:18, 89:17
**understood** [2] - 108:13, 183:25
**undue** [1] - 27:6
**unedited** [1] - 48:8
**Unfortunately** [1] - 223:25
**unidentified** [1] - 19:1
**uninterlineated** [1] - 35:17
**uninvolved** [1] - 113:22
**unique** [2] - 13:7, 13:10
**unit** [3] - 66:17, 66:24, 66:25
**United** [2] - 152:8, 227:3
**UNITED** [2] - 1:1, 1:5
**unkindly** [1] - 25:5
**unless** [2] - 51:13, 223:10
**unmarked** [1] - 46:4
**unmarked-up** [1] - 46:4
**unnatural** [1] - 62:15
**unnecessary** [1] - 77:1
**unquote** [1] - 42:9
**Unusual** [1] - 30:5
**unusual** [2] - 30:7, 75:13
**up** [126] - 5:10, 5:25, 6:1, 8:21, 9:16, 10:16, 11:22, 13:9, 21:19, 32:3, 32:4, 33:7, 35:7, 36:14, 36:15, 46:3, 46:4, 50:25, 53:2, 54:23, 59:7, 61:5, 67:24, 67:25, 68:3, 68:10, 68:18, 68:24, 77:5, 78:20, 79:8, 83:2, 86:19, 87:8, 90:19, 90:20, 91:21, 95:16, 95:25, 98:23, 98:24, 99:5, 99:14, 100:19, 111:16, 116:9, 118:10, 118:20, 120:1, 122:1, 124:16, 124:19, 125:9, 125:13, 130:25, 139:10, 140:21, 150:13, 151:21, 166:3, 168:10, 168:14, 169:6, 171:17, 172:7, 173:11, 173:12, 176:11, 177:5, 177:8, 177:10, 177:11, 177:12, 177:15, 177:23, 180:6, 180:7, 180:8, 181:6, 185:4, 189:24, 199:25, 204:16,

207:11, 207:15, 212:1, 212:16, 212:18, 213:13, 213:17, 213:19, 214:2, 215:6, 218:18, 218:19, 219:22, 222:24, 223:9, 223:10, 225:9, 225:24, 226:2, 227:25, 230:21, 231:15, 232:15, 233:3, 244:25, 245:1, 245:2, 245:7, 245:12, 246:6, 246:8, 246:15, 248:13, 248:22, 249:3, 249:4, 249:14, 250:22
**Up** [1] - 225:5
**upcoming** [1] - 240:19
**upstairs** [3] - 72:3, 72:4
**urgent** [2] - 3:16, 244:2
**USA** [1] - 254:4
**user** [1] - 231:13
**uses** [2] - 146:12, 212:5

## V

**value** [1] - 7:16
**vanished** [1] - 119:5
**variation** [4] - 221:10, 221:14, 223:2
**varies** [1] - 162:20
**variety** [1] - 113:17
**various** [4] - 9:18, 90:17, 94:1, 108:14
**vary** [1] - 35:10
**verify** [1] - 145:10
**verse** [4] - 209:5, 209:9, 209:10, 209:11
**version** [16] - 33:7, 34:12, 34:25, 35:12, 35:18, 35:19, 36:2, 36:9, 36:11, 36:16, 36:25, 37:1, 37:4, 37:5
**versus** [2] - 14:20, 20:23
**via** [1] - 244:5
**vial** [4] - 168:10, 168:14, 186:1, 186:20
**vials** [3] - 185:15, 186:17, 186:24
**victim** [1] - 4:12
**video** [9] - 128:2, 130:24, 130:25, 191:13, 196:16, 197:10, 197:16, 205:15
**view** [7] - 19:3, 57:12, 57:15, 58:1, 67:9, 95:4, 210:25
**violate** [1] - 123:24
**violating** [1] - 153:17
**violation** [5] - 119:11, 123:9, 140:12, 140:13,

140:15
**Virginia** [1] - 63:16
**virtually** [1] - 13:20
**vision** [1] - 241:21
**visit** [8] - 10:21, 10:22, 11:3, 172:24, 173:4, 173:6, 173:8, 227:6
**voice** [24] - 33:6, 34:4, 43:8, 44:16, 44:23, 44:24, 45:6, 45:12, 45:14, 127:18, 198:12, 205:18, 205:22, 205:24, 221:20, 221:23, 222:12, 222:16, 222:17, 222:18, 237:22, 238:2
**voices** [3] - 45:3, 45:17, 205:19
**VOLUME** [1] - 1:11
**volunteer** [2] - 126:4, 146:8
**vouch** [1] - 48:20
**vouching** [2] - 47:23, 48:16

## W

**W-5** [1] - 83:16
**W-5A** [2] - 81:23, 82:19
**W-5B** [2] - 82:4, 82:24
**W-5C** [2] - 81:10, 82:10
**W-5F** [1] - 79:22
**W-5G** [1] - 81:4
**W-5H** [1] - 83:3
**W-5J** [2] - 70:5, 83:16
**W-67** [2] - 232:22, 233:15
**W-F5** [1] - 80:20
**Wabash** [2] - 142:19, 177:19
**Wait** [2] - 113:20, 114:24
**wait** [6] - 7:7, 10:3, 60:25, 61:10, 114:24, 125:9
**waiting** [2] - 2:10, 216:9
**wake** [1] - 11:2
**walk** [3] - 4:22, 120:20, 241:19
**walked** [6] - 4:8, 4:12, 47:9, 47:10, 120:14, 120:18
**wants** [4] - 14:22, 15:10, 16:2, 120:24
**warn** [1] - 10:23
**warrant** [22] - 5:9, 6:8, 11:18, 11:19, 49:23, 56:19, 57:19, 79:18, 80:13, 80:16, 80:18, 83:22, 120:7, 120:9,

120:22, 120:24, 121:15, 126:24, 127:3, 127:22, 210:1, 213:25

**Washington** [1] - 47:13

**Washington/ Baltimore** [1] - 229:16

**wasted** [1] - 48:12

**watching** [1] - 191:11

**water** [1] - 170:11

**Watson** [3] - 136:14, 136:15, 136:17

**WAYNE** [1] - 1:8

**Wayne** [28] - 45:14, 48:17, 63:7, 64:9, 80:3, 80:8, 80:21, 81:15, 81:16, 83:1, 88:12, 89:10, 89:13, 90:10, 90:11, 90:18, 90:21, 92:8, 94:10, 95:19, 104:1, 104:19, 105:19, 202:18, 202:22

**Wayne's** [1] - 75:19

**weapon** [7] - 20:5, 20:13, 20:14, 22:6, 147:25, 148:22

**wearing** [3] - 4:11, 97:8, 97:21

**Weasel** [2] - 207:3, 207:4

**Weaze** [6] - 206:21, 206:24, 207:5, 207:9, 207:14

**Wednesday** [8] - 130:12, 130:18, 130:20, 130:23, 215:14, 241:14, 242:4, 244:4

**week** [8] - 2:19, 6:4, 12:9, 12:15, 23:22, 45:9, 217:8, 243:7

**weekend** [4] - 6:5, 7:3, 58:14, 61:21

**weeks** [17] - 69:13, 71:13, 100:20, 123:4, 153:23, 153:24, 154:5, 155:11, 155:13, 155:17, 155:20, 155:23, 156:19, 156:20, 169:15, 207:15

**weight** [4] - 14:6, 28:3, 151:7, 242:1

**Welsh** [1] - 24:7

**West** [2] - 1:25, 33:24

**whatsoever** [1] - 38:20

**whereas** [1] - 120:15

**Whereof** [1] - 254:10

**whichever** [1] - 44:5

**Whichever** [1] - 158:25

**White** [7] - 84:18, 85:2, 85:3, 85:7, 175:9, 201:20, 201:22

**white** [5] - 66:21, 66:23,

85:3, 202:19, 249:7

**who'd** [1] - 105:5

**whole** [11] - 27:10, 37:8, 50:3, 92:6, 94:7, 184:14, 185:3, 187:5, 187:9, 207:21, 213:17

**Will's** [1] - 138:10

**willfully** [1] - 147:12

**William** [1] - 135:2, 135:12

**Willie** [7] - 95:1, 95:23, 96:24, 97:1, 158:18, 167:8, 254:4

**WILLIE** [1] - 1:7

**willing** [2] - 29:4, 53:1

**winded** [1] - 42:3

**wireless** [1] - 230:21

**wise** [3] - 56:14, 56:15, 147:21

**wish** [5] - 7:1, 20:15, 24:25, 124:8, 214:21

**withdraw** [2] - 40:14, 40:15

**withdrew** [1] - 29:22

**Witness** [1] - 254:10

**witness** [76] - 3:15, 6:9, 11:11, 11:13, 12:16, 14:13, 15:25, 16:1, 24:14, 26:20, 31:6, 45:5, 46:17, 49:23, 50:5, 51:17, 52:8, 52:10, 53:6, 54:11, 55:6, 55:7, 55:8, 57:20, 60:2, 60:11, 61:22, 109:10, 110:22, 111:3, 111:6, 111:7, 118:22, 121:4, 122:10, 123:13, 123:15, 123:20, 124:1, 124:7, 125:14, 125:16, 126:7, 130:2, 130:5, 131:6, 131:9, 132:6, 132:14, 139:9, 140:6, 140:10, 142:22, 147:11, 147:18, 151:6, 151:7, 151:9, 151:11, 151:14, 151:16, 153:14, 155:10, 155:14, 156:5, 156:9, 160:2, 214:24, 215:19, 228:22, 228:24, 231:5, 244:1, 246:19, 248:3, 250:9

**WITNESS** [25] - 62:2, 62:3, 62:6, 62:11, 109:9, 151:18, 151:19, 152:2, 170:13, 177:5, 195:17, 202:14, 216:1, 216:2, 216:5, 228:21, 229:2, 229:3, 229:6, 240:16, 253:3, 253:7, 253:8, 253:13, 253:15

**witness'** [8] - 40:11,

53:9, 109:21, 110:24, 111:4, 156:7, 156:8, 246:20

**witnesses** [23] - 12:16, 16:3, 45:2, 51:4, 51:12, 52:14, 52:16, 54:4, 60:2, 60:6, 120:13, 121:22, 122:20, 123:17, 129:23, 130:1, 130:20, 131:19, 155:25, 214:6, 214:18, 214:20, 241:20

**woman** [4] - 46:17, 72:10, 186:21, 186:25

**wondered** [1] - 59:17

**wood** [1] - 67:2

**Wood** [4] - 63:21, 63:25, 90:7

**Woodland** [17] - 169:2, 169:9, 174:12, 179:13, 179:14, 179:22, 180:9, 180:12, 180:14, 180:16, 185:13, 186:2, 186:5, 186:8, 186:25, 201:6, 201:10

**Woodlawn** [3] - 168:24, 169:1, 169:6

**word** [12] - 33:21, 34:25, 35:12, 36:5, 43:16, 44:12, 44:13, 49:18, 93:5, 145:13, 212:20, 213:7

**Word** [5] - 35:19, 215:2, 215:3, 215:4

**words** [12] - 4:15, 13:3, 14:16, 21:11, 31:2, 32:7, 33:16, 39:20, 123:19, 131:7, 165:9, 183:23

**works** [3] - 21:8, 34:1, 231:10

**world** [1] - 3:14

**worried** [4] - 126:8, 197:11, 197:12, 198:15

**worry** [1] - 198:16

**worse** [1] - 20:20

**worth** [1] - 211:15

**write** [10] - 2:24, 58:10, 87:15, 160:23, 163:8, 164:5, 207:25, 208:20, 208:22, 208:23

**writing** [9] - 58:8, 58:21, 86:10, 92:25, 161:1, 161:3, 164:10, 196:1, 208:24

**written** [10] - 7:22, 17:16, 27:22, 29:10, 32:22, 84:9, 85:15, 87:20, 88:18, 96:5

**wrote** [18] - 3:3, 18:11, 58:6, 58:23, 59:1, 84:14, 85:20, 104:23, 163:10,

164:4, 165:5, 165:16, 190:5, 195:24, 195:25, 200:24, 207:24, 207:25

**Wyche** [12] - 11:2, 11:5, 21:20, 22:9, 23:4, 23:8, 37:19, 47:12, 81:7, 85:5, 85:6, 85:7

**Wyches** [1] - 47:14


### X

**X/XX/78** [1] - 63:11

**XXVI** [1] - 1:11

**XXXVII** [1] - 1:11


### Y

**y'all** [6] - 208:19, 212:19, 213:16, 213:19

**year** [11] - 70:9, 70:21, 102:23, 105:20, 117:6, 117:7, 120:8, 135:1, 170:17, 172:1, 180:25

**year-to-date** [1] - 70:21

**years** [39] - 15:18, 16:8, 17:4, 17:10, 25:15, 25:22, 26:12, 43:19, 45:2, 46:17, 50:21, 63:4, 63:12, 63:19, 69:24, 70:14, 70:15, 72:18, 72:19, 133:6, 140:23, 171:13, 175:1, 180:1, 188:15, 200:13, 200:19, 205:11, 216:20, 216:22, 216:23, 216:24, 228:13, 230:2, 246:7, 248:18, 248:20, 248:22, 248:23

**yellow** [1] - 83:25

**York** [9] - 9:19, 9:21, 9:23, 13:1, 17:5, 17:22, 17:23, 18:8, 130:12

**young** [3] - 99:5, 101:1, 120:17

**Young** [1] - 134:1

**youngest** [1] - 190:10

**yourself** [11] - 35:17, 65:9, 74:25, 80:14, 95:15, 110:13, 117:9, 144:20, 163:5, 184:6, 192:18

**yourselves** [2] - 110:11, 174:5

**Yup** [2] - 185:5, 196:19


### Z

**Zajac** [3] - 1:24, 254:3, 254:15

164:4, 165:5, 165:16, 190:5, 195:24, 195:25, 200:24, 207:24, 207:25

**zero** [1] - 225:18

**zoom** [3] - 81:10, 81:24, 94:8

**Zooming** [1] - 78:11