```
                     IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION


        UNITED STATES OF AMERICA

              v.                           CRIMINAL CASE NO.
                                             AMD-04-029
        WILLIE MITCHELL,
        SHELTON HARRIS,
        SHELLY WAYNE MARTIN,
        SHAWN GARDNER,

              Defendants
        _____/

                         (Motions Hearing)
                         December 8, 2005
                         Baltimore, Maryland


        Before:  Honorable Andre M. Davis, Judge


        Appearances:
              On Behalf of the Government:
               Christine Manuelian, Esquire
              On Behalf of Defendant Mitchell:
               Laura Kelsey Rhodes, Esquire
               Timothy Sullivan, Esquire
              On Behalf of Defendant Harris:
               Gerard P. Martin, Esquire
               Joshua Treem, Esquire
              On Behalf of Defendant Martin:
               Thomas L. Crowe, Esquire
               James G. Pyne, Esquire
              On Behalf of Defendant Gardner:
               Adam H. Kurland, Esquire
               Barry Coburn, Esquire

              Also Present:  William Kanwisher, Esquire

        Transcribed by:
        Mary M. Zajac, RPR
        Room 5515, U.S. Courthouse
        101 West Lombard Street
        Baltimore, Maryland 21201
```

1    THE COURT: Please be seated. Good morning. Counsel,

2  good morning. Let me begin, Mr. Kanwisher, with your motion. I

3  want to express, frankly, my personal respect for you as a member

4  of the bar.

5    DEFENDANT MITCHELL: I object. I object. As I said

6  before, on November 16th, Judge Davis, for the record, I am

7  Willie Edward Mitchell, III, here by special visitation, under

8  threats, duress and coercion, not general, not pro se. The Court

9  lacks subject matter jurisdiction for lack of verified complaint

10  and for lack of verified complaint sworn under oath.

11    This Court by its own motion can dismiss the alleged

12  case and alleged charge against Willie Edward Mitchell, III, live

13  flesh and blood man. I do not understand these proceedings.

14    I do not consent. Furthermore, I do not understand

15  that, Willie Mitchell does not understand. I have not signed any

16  plea with any agent or agency affiliated with this Court that

17  compels me to perform certain terms and conditions.

18    I have no, I have no understanding of why these two

19  attorneys are still sitting here when they were fired on November

20  16th because they swore under oath, I mean they're sworn under

21  oath to this Court by doing business as the State of Maryland.

22  They also swore under oath to the bar association. And they have

23  agreed not to defend the United States of America

24  constitutionally and the United States District Court. And by

25  not, and by their own action of omission of not signing my

1    commercial contract of agreement for no conflict of interest,

2    they're conflicted to represent me, Willie Edward Mitchell, III,

3    live flesh and blood man.

4            Also, for the record, as I said on November 16th, if

5    anybody in the United States Attorney's Office, the United States

6    Attorney himself, or the United States Assistant Attorney, Ms.

7    Christine Manuelian, and Mr. Harding who's not here, feel they

8    represent me, they are also fired.

9            I'm not the name that shows on that indictment in all

10   capital letters, nor am I the surety of that name.  My name is

11   spelled in proper English grammar, capital W, lower case I, lower

12   case L, lower case I, lower case E, capital E, lower case D,

13   lower case W, lower case A, lower case R, lower case D, capital

14   M, lower case I, lower case T, lower case C, lower case H, lower

15   case L, lower case L.  The third, capital T, lower case H, lower

16   case I, lower case R, lower case D.

17           I am not a civil servant, meaning I'm not black,

18   Afro-American, Negro, African American, or any other thing that

19   describes a civil servant.

20           As of today, which is December 8, I demand these

21   charges be dismissed and I demand my release immediately.

22           THE COURT:  I thought there were two L's in Willie.

23           DEFENDANT HARRIS:  I object.  Just like I said on

24   November 16th, for the record, I am no other than Shelton Lee

25   Harris, Jr.,live flesh and blood man, here by special visitation,

1     under threats, duress and coercion, not general, not pro se.

2     This court lacks subject matter jurisdiction for lack of verified

3     complaint and for lack of verified complaint sworn under oath.

4     This court by its own motion can dismiss the alleged case and

5     alleged charge against me, Shelton Lee Harris, Jr., live flesh

6     and blood man.  I don't consent.  I don't understand any of these

7     court proceedings.  I didn't sign any contract with this court or

8     any agency affiliated with this court that compels me to perform

9     certain terms and conditions.

10           Again, for the record, if these attorneys, Gerry Martin

11     and Bill Kanwisher, think they represent me, they are fired.  I

12     sent an attorney contract by affidavit of commercial agreement of

13     no conflict of interest, which they did not respond to.

14     Therefore, the attorneys has agreed not to defend the Maryland

15     and United States Constitution they are sworn to uphold.  They

16     have also sworn an oath to the federal court doing business as

17     the State of Maryland and to the bar association.  So by their

18     own actions and omission of not signing the contract by

19     affidavit, there's a conflict of interest.

20           As a matter of fact, I want counsel.  Yet every

21     attorney I have spoken with has a conflict of interest because

22     they have sworn an oath to support my adversary, the United

23     States of America and the United States District Court.  If the

24     United States Attorney himself and Assistant United State's

25     Attorney Robert Harding, Christine Manuelian think they represent

1    me, they are fired.

2         Also, for the record, I am not black, colored, Negro or

3    Afro-American.  I demand to be released right now and I demand

4    these charges be dismissed right now.

5         DEFENDANT MARTIN:  I object for the record.  I am no

6    other than Shelly Wayne Martin, live flesh and blood man.  I am

7    here by special visitation under threat, duress and coercion, not

8    general and not pro se.  This Court lacks subject matter

9    jurisdiction for lack of a verified complaint and a lack of a

10   verified complaint sworn under oath.

11        This Court by its own motion can dismiss these alleged

12   charges and alleged case against Shelly Wayne Martin, live flesh

13   and blood man.

14        I do not consent and I do not understand any of these

15   court proceedings.  I did not sign any contract with this court,

16   any agent or agency affiliated with this court, that compels me

17   to act under certain terms and conditions.

18        Also, for the record, like I've stated, November 16th,

19   Jim Pyne and Thomas Crowe are fired and I don't know why they're

20   still here sitting beside me.  They're becoming a public

21   nuisance.  Why?  Because they have agreed not to defend the

22   United States and the Maryland Constitution they were sworn to

23   uphold.

24        They also have signed a contract with the federal court

25   doing business as the State of Maryland.  They also have sworn an

1    oath with the federal court doing business as the State of

2    Maryland.  They also have an sworn oath to the Bar Association,

3    along with the prosecutors.  So by their own actions and

4    omissions of not signing a commercial agreement of no conflict of

5    interest that I sent to them by affidavit, there's a conflict of

6    interest.

7          Also, for the record, I am not a civil servant, I am

8    not Afro-American, African-American, colored, Negro, or black.

9    And I demand these charges be released -- I mean, I demand these

10   charges be dismissed and I demand to be released.

11         DEFENDANT GARDNER:  I object for the record.  I am no

12   other than Shawn Earl Gardner, proper English grammar, live flesh

13   and blood man, here under special visitation, under threats,

14   duress and coercion, not general and not pro se.

15         This court lacks subject matter jurisdiction for lack

16   of verified complaint and lack of verified complaint sworn under

17   oath.  This Court by its own motion can dismiss this alleged case

18   and alleged charges against Shawn Earl Gardner, live flesh and

19   blood man.

20         I don't consent.  I don't understand any of these court

21   proceedings.  I didn't sign any contract with this court or any

22   agent or agency affiliated with this Court that can compel me to

23   perform under certain terms and conditions.

24         I do not understand any of these alleged charges in

25   Case Number AMD/04/029 in the District Court located at 101

1    Lombard Street, Baltimore, Maryland, 21201.

2              For the record, if Barry Coburn and Adam Kurland think

3    they represent me, he is fired.  If Ms. Manuelian or Mr. Harding

4    thinks he represents me, he is fired because I've sent, I've sent

5    my attorneys contracts by affidavit for commercial agreement on

6    no conflict of interest, which they did not respond.  Therefore,

7    they have agreed not to defend the Maryland and United States

8    Constitutions they have sworn to uphold.  They also have a sworn

9    oath to the federal courts doing business as the State of

10   Maryland.  They also have a sworn oath with the Bar Association,

11   along with the prosecutors.  So by their own actions and

12   omissions not signing the contract I sent by affidavit, there is

13   a conflict of interest.

14             As a matter of fact, I want counsel but every attorney

15   I have spoken with has sworn an oath to support the United States

16   of America and the United States District Court.

17             If the United States Attorney, Rob Ronstein (sic),

18   thinks he represents me, he is fired.

19             I am, I am not, I am not a civil servant, I am not a

20   black, colored, Afro-American or Negro.

21             DEFENDANT MARTIN:  I object also for the record.  That

22   if anybody in the United States Attorney's office think they

23   represent Shelly Wayne Martin, live flesh and blood man, they are

24   fired.  If the United States Attorney present here today, Ms.

25   Manuelian or Rob Harding, think they work for me, I fire them,

1   too.

2            THE COURT:  So as I was saying, Mr. Kanwisher --

3            DEFENDANT HARRIS:  I object.  I get what you said,

4    Judge Davis.  But are you aware that I have not waived my rights?

5    In fact, I have reserved my right to Uniform Commercial Code

6    1-207.  All those that agree, say aye.

7            DEFENDANT MITCHELL:  Aye.

8            DEFENDANT MARTIN:  Aye.

9            DEFENDANT GARDNER:  Aye.

10           THE COURT:  I'm addressing Mr. Kanwisher.  As I was

11   saying --

12           DEFENDANT HARRIS:  Have you sworn an oath to the

13   Constitution?

14           THE COURT:  -- the Court --

15           DEFENDANT HARRIS:  Have you sworn an oath to the

16   constitution.

17           DEFENDANT MITCHELL:  I object.

18           THE COURT:  Okay.  I would ask the marshals to remove

19   the defendants from the courtroom.

20           DEFENDANT MITCHELL:  I object.

21           DEFENDANT HARRIS:  Have you sworn an oath to the

22   Constitution?  I'm asking you a simple question.  Have you sworn

23   an oath to the constitution?  I take that as a yes.  All those

24   that agree, say aye.

25           DEFENDANT MITCHELL:  Aye.

1          DEFENDANT MARTIN:  Aye.

2          DEFENDANT GARDNER:  Aye.

3          THE COURT:  The Court will notify the marshals when the

4    defendants may be returned to their detention.

5          (Defendants exit the courtroom.)

6          THE COURT:  The Court finds, consistent with its

7    observations and admonishments to the defendants at the last

8    hearing, that each of the defendants has displayed, in the record

9    this morning, have willfully, knowingly and intentionally acted

10   to disrupt these proceedings, to thwart the orderly progress of

11   this case.  The defendants' actions have been utterly without

12   justification or excuse and by their actions they have

13   demonstrated unequivocally and unambiguously their desire to

14   waive their appearance for purposes of these proceedings today.

15         What the Court intends to do is to check regularly in

16   whatever way it can with the defendants to determine whether they

17   are willing to be present for proceedings in this case and as

18   soon as the Court is given reasonable assurance that the

19   defendants intend to comport themselves consistent with the

20   dignity of these proceedings that the Court is determined to

21   maintain, the defendants, and each of them, will of course be

22   welcome back into the courtroom.

23         Mr. Kanwisher, the Court expresses its personal

24   admiration for your many years of service.  The Court understands

25   that you are about to embark on a slightly different avenue in

1   your professional, and I suppose, personal life.  And so I am

2   granting the motion you have filed to withdraw as counsel to Mr.

3   Harris and wish you well and hope to see on a regular basis when

4   it's appropriate.

5          I understand that Mr. Treem has graciously agreed to

6   make himself available as successor counsel.  I have spoken to

7   Ms. Shearer about the appointment.  And if it hasn't already been

8   done, Mr. Treem, I notice you're here today, as you were at the

9   last hearing.  The appropriate paperwork will be completed

10  forthwith to enter your appearance in the case.

11         I think what this means clearly is that Mr. Harris,

12  because of the substitution of counsel, will not be in a position

13  to go to trial in March as we had planned.  As I think I

14  suggested on the record previously, this is not an unexpected

15  occurrence.  And frankly, it, to the extent that Mr. Harris's

16  trial is severed from Mr. Gardner's trial, it seems to me that it

17  largely takes care of any potential problem in having Mr. Harris

18  and Mr. Gardner tried together in light of government's desire,

19  understandable desire, to try Mr. Harris on both the original,

20  that is the superseding indictment, in the original case, as well

21  as the subsequent indictment arising from the incidents in the

22  marshal's lockup.

23         It would seem to me, although I'll hear further from

24  Mr. Martin and Mr. Treem in due course, it seems to me that the

25  case, if Mr. Harris is going to be tried by himself, there would

1    be little reason, frankly, again, although I'll hear from

2    counsel, little reason not to permit the government to proceed on

3    both indictments in one trial before a single jury.

4            So Mr. Kanwisher, you're welcome to stick around today

5    if you'd like or otherwise to step away and Mr. Treem can take

6    your place.  Which I know he's anxious to do.

7            MR. KANWISHER:  Your Honor, I thank you for your kind

8    words.  I think I'll move back.  Mr. Treem can take my seat.

9            THE COURT:  So as we have seen, the defendants have

10   elected to persist in their contumacious conduct.  I'm going to

11   hear from counsel respectively in a moment.

12           What the Court's interested in doing now, of course, is

13   to set up, to plan, brainstorm with you, to be as creative as we

14   can be to respond to this unfortunate series of events, maintain

15   the dignity of these proceedings, do what all of us can do as

16   best we can to insure that each defendant receives as fair a

17   trial as is humanly possible under the difficult circumstances

18   that the defendants have created for themselves and for us.

19           Let me be very clear, and I'll hear from counsel in a

20   moment, subject to hearing from counsel, it is the Court's

21   present intention not to permit any counsel to withdraw from this

22   case.

23           It would appear to the Court clearly, I think clearly,

24   that the Court will not be permitted by the defendants each to

25   engage in a waiver of counsel colloquy.  That, of course, has got

1    to be the understatement of the day.  By conduct, however, it's

2    reasonably clear, and I suspect will become increasingly clear on

3    occasions when I have the defendants in the courtroom, that the

4    defendants have waived counsel.

5         This is an unusual situation where a defendant waives

6    counsel without permitting the Court to engage in the kind of

7    careful detailed, sensitive inquiry of the defendant on the

8    record to insure the knowing, intelligent and voluntary nature of

9    such a waiver.

10        Certainly, as bizarre and strange, if you will, as the

11   defendants' conduct has been, I don't see any basis whatsoever

12   for a competency examination of any defendant.  Again, it is not

13   a finding but just some observations, before I hear from counsel.

14        These kinds of protestations, as we are all aware, have

15   become something of the rage in this district, and perhaps other

16   districts.  I have encountered this in, as I said before, in

17   another one of my cases.  And in that case I, in fact, did order

18   a competency examination of the defendant.  And the defendant

19   went to Butner and simply refused to participate in the

20   examination protocol and the report came back that the defendant

21   was competent but non-cooperative.

22        But I don't see any basis here whatsoever for any

23   legitimate concern that these defendants are competent.  But

24   again, I'll hear from counsel, as you wish.

25        So as I say, I suppose my plan is to, in effect, treat

1     the defendants' conduct as a knowing and voluntary waiver of

2     counsel, assign all counsel in this case to a more or less

3     standby role, and leave to counsel's own good judgment the extent

4     to which you elect to participate as counsel to your client.

5             I would be willing to consider some tweaking of the

6     normal Fourth Circuit requirements for dual counsel by which I

7     mean I would be willing to consider anything.  But certainly, I'd

8     be willing to consider the propriety of excusing one or the other

9     of counsel for each defendant at various stages of the

10    proceedings so that we don't have two lawyers sitting by,

11    twiddling their thumbs, in the course of these proceedings.

12            So I'm hope to any and an all creative, imaginative,

13    and any other recommendations.

14            But I am fairly firm without having yet heard from

15    counsel or considered any formal motions to withdraw, in my view,

16    that counsel should not be permitted to withdraw.

17            It's a very difficult situation, to say the least.  To

18    the extent that any proceeding requires the presence of a

19    defendant for purposes, for example, of an identification witness

20    or similar necessity, obviously, for purposes of voir dire the

21    defendant would rather be in the courtroom or at least displayed

22    to the jury, just for purposes of voir dire.  And again, we'll

23    need to be creative insofar as how we proceed in a case where the

24    defendants elected not just to be absent, which is effectively

25    what these defendants have done, but to be disruptive as well.

1          My tentative view of the matter is at this stage, would

2     be to proceed as I suggested before, to trial with Mr. Gardner in

3     March or April.  We've blocked out, I think, four months, March

4     through, I guess, June.  If Mr. Gardner goes to trial by himself,

5     it won't take four months to try the case as it would with two or

6     more defendants.  So I think we're going to save, marginally save

7     some time in that way.

8          I'm sensitive, of course, to, to what I would imagine

9     are going to be governmental concerns and I'm happy to consider,

10    Ms. Manuelian, any concerns the government chooses to express

11    regarding the timing of trial, the conduct of trials.  I'm one

12    who has always thought it was the government's prerogative to

13    decide in what order severed trials should proceed.  And so I

14    don't mean to suggest that I'm prepared to reject any government

15    view on which defendants should be tried first and so forth.

16         My sense that Mr. Gardner should be the one to go to

17    trial first obviously relates to the tentative schedule we've

18    already agreed upon with Mr. Gardner and Mr. Harris going in

19    March and Mr. Mitchell and Mr. --

20         MS. MANUELIAN:  Martin.

21         THE COURT:  -- Martin.  Thank you.  Going in September.

22    And so we've sort of already agreed that Gardner and Harris would

23    go first.  Harris has now got to be severed because Mr. Treem is

24    not available for trial in March.

25         I can imagine the government would say, Well, Judge, if

1    they're not going to be present and if counsel is simply going to

2    play a very passive role, maybe we should keep the two cases

3    joined.  But I'm disinclined to do that.

4         So there are issues to be covered.  And again, I'm

5    happy to consider any and all suggestions and views of counsel.

6         For the balance of the day, in view of the Court's

7    finding that the defendants have voluntarily elected to absent

8    themselves from these proceedings, I am prepared to go forward

9    with the hearing if the government has witnesses, or to take

10   argument on any of the outstanding motion issues in the

11   defendants' absence, and see what we can accomplish.

12        Another consideration would be, of course, in fairness

13   to counsel under the circumstances, to the extent that there are

14   discrete issues relevant to the trial of one defendant but not

15   the other, since it now looks like we're going to have at least

16   three trials and maybe four trials in this case, it may be that

17   we can disaggregate certain issues or separate out certain

18   hearings so that not all counsel will have to be present for all

19   the hearings if there are issues that are uniquely of interest

20   and concern to only one or fewer than all of the defendants.

21        So those are sort of my preliminary views.  Let me

22   start with defense counsel because I did get sort of an informal

23   report from Ms. Shearer in the last few days that apparently none

24   of the defendants, apparently, has agreed to meet with his

25   counsel since the last hearing.  And I'm further advised that

1    certain mail sent to the defendants by one to more counsel at

2    their places of detention has been returned to counsel refused or

3    non-deliverable.  And so I'm sure that counsel have much that

4    they need to put on the record.

5            So I'll start, as we typically have, with Mr. Sullivan

6    and Ms. Rhodes to see what the situation is with Mr. Mitchell.

7            MR. SULLIVAN:  Thank you, Your Honor.  Good morning.

8            THE COURT:  Perhaps you can pull the microphone over.

9    Thank you.

10           MR. SULLIVAN:  Your Honor, I appreciate the Court's

11   comments and the Court's tentative findings on how it wishes to

12   proceed.  Quite frankly, and no pun intended, I feel like I'm at

13   Pimlico and the government has announced that it's a thoroughbred

14   ready to race and I'm on an ass.  And I'm not inclined in a

15   federal death penalty case to not be able to do what I do best,

16   which is represent a client who's facing death.  And the Court

17   has indicated that this is an incredibly complicated and

18   frustrating position for all of us counsel.  And we met yesterday

19   collectively to try to brainstorm with resource counsel, David

20   Breck, and we tried to figure out how we can address this.

21           I think it's more crushing for my colleagues behind me,

22   Mr. Kurland and Mr. Coburn, because they're on the eve and we

23   have time.  So hopefully, you know, time heals all wounds.  And

24   maybe at some point Mr. Mitchell, who since November 16th has

25   returned our mail and refused to see us, will come around.

1            The problem that I see, Your Honor, is, and I

2      understand that the Court is not inclined to allow us to

3      withdraw.  But the problem that I see and the frustration that I

4      have is that I can't reconcile -- first of all, I can't reconcile

5      just being a potted plant.  That's number one.  And number two, I

6      can't reconcile what my roles and responsibilities are ethically

7      under the Maryland Model of Professional Conduct adopted by the

8      local rule of this Court.

9            You're correct that Mr. Mitchell has never

10     affirmatively expressed a desire for self-representation.  He has

11     put the Court in the conundrum of saying that he wants counsel

12     but he can't find counsel, which we all know is just a legal and

13     factual impossibility.

14           So the scope of my ability to, Ms. Rhodes and my

15     ability to represent Mr. Mitchell is just diminished because we

16     have no communications with Mr. Mitchell.  And moreover, we can't

17     diligently or effectively represent Mr. Mitchell because he's not

18     cooperating with us.  And we're now just talking about a

19     non-capital case where somebody can excuse himself, a jury can

20     make a finding and the Court, in the exercise of his or her

21     discretion now under Booker, can fashion a sentence that's

22     appropriate.

23           That's not what's going to happen in this case.  What's

24     going to happen in this case, Your Honor, is if the defendants

25     are found guilty, the death eligible, death authorized defenses,

1    we're going to proceed to a capital sentencing proceeding under

2    the Federal Death Penalty Act where the Court is just like a

3    standby counsel because the Court doesn't make the sentencing

4    determinations in this case.

5            And this kind of problem is fraught with land mines

6    that I have never seen before.  And I just, you know, part of me

7    says I'm ready.  Laura and I, Ms. Rhodes and I are ready willing

8    and able to do our very, very best for Mr. Mitchell.  But the

9    other part of me says that I don't want to be associated with

10   this train wreck that's about to occur in Mr. Mitchell's life

11   because this is positively the worse decision that this young man

12   has ever made.  And as helpless as other people feel, Ms. Rhodes

13   and I are incredibly helpless and frustrated and, frankly,

14   irritated at what's going on here.

15           It's germane to Mr. Mitchell, you know, we're in the

16   middle of a very interesting, both legally and philosophically

17   and academically, an evidentiary hearing on things that go on in

18   the Circuit Court in this city.  And that's slammed into a wall

19   now because we can't move forward with that in terms of putting

20   on a defense case.  So that's just one of the little things.

21           Some of the big things are mitigation, our ability to

22   not have allowed our mitigation specialist to meet with Mr.

23   Mitchell because I don't think that he has the right to pick and

24   choose, assuming he would see her, but I don't think he has the

25   right to pick and choose who he wants to see who's associated

1   with the defense team.  He either works with us or he works with

2   none of us.

3          And I think and what we talked about yesterday is that

4   I tried to, wasn't successful, but I wanted to try to get

5   preemptive mike time before they were disruptive so I could

6   articulate to Mr. Mitchell that, you know, although the Court has

7   made it quite clear that the Court's not playing with them and

8   won't tolerate it, the defense lawyers are in the same boat.  You

9   know, my blood pleasure is just, you know, even though I'm in

10  fine physical shape, my blood pressure is just, I'm about to

11  explode because I can't stand it.

12         I can't stand the way they're acting.  I can't stand

13  the way they don't realize that the government is never going to

14  acquiesce, nor forgetting about the Court for a second, the

15  government's never going to acquiesce in this kind of proceeding

16  to dismiss the death notice.  And as far as the conduct takes it,

17  it only makes matters worse for them because in this RICO

18  allegation they continue to work together post indictment and

19  have their own little enterprise going on right now.  Taking roll

20  call votes in court.

21         You know, their conduct is just so frustrating that

22  despite my, you know, the bipolar part of my brain, one part of

23  me wants to really work hard and try to overcome this obstacle

24  and try to get these defendants back on the reservation, to get

25  them to understand that all the lawyers in this case on our side

1    of the room are extremely competent, extremely vigilant,

2    extremely responsible members of the bar who take these cases not

3    because we make a lot of money but because this is what we do

4    best.  And that is save people's lives.

5         And I don't know why they're acting like this but I am

6    between and betwixt, Judge.  And know that I've articulated this

7    to Ms. Shearer.  I'm incredibly helpless and I'm incredibly

8    frustrated.

9         THE COURT:  Thank you very much, Mr. Sullivan.  Let me

10   say, by the way, I appreciate everything you just said.  What the

11   Court intends to do, so counsel should bear this in mind, the

12   Court intends to in some way that I will try to devise in respect

13   to return addresses and that kind of thing.  The Court intends to

14   arrange to mail transcripts of all the proceedings to each of the

15   defendants.  What I mean by return address is, I have the sense,

16   apparently, I have the sense that the defendants may be refusing

17   mail that comes from their counsel and perhaps the defendants

18   refuse mail that comes from the Court.

19        So the Court would intend, as I say, to devise a

20   mechanism to put into the United States Postal Service mail

21   addressed to the defendants bearing a return address that at

22   least on the face of the package will not cause a defendant to

23   refuse at least to open the package.

24        I haven't thought this through fully yet.  But I say

25   all this just to say that as you address the Court, bear in mind

1    you are also addressing your client, as Mr. Sullivan just did.

2    And I'm aware that your clients are refusing to meet with you,

3    refusing to read your mail, makes it nearly impossible for you to

4    do so.  So this may be, frankly, the last best chance that you

5    have in these proceedings that we will have on the record to

6    speak directly to your client.

7            So I can assure you that everything you say in open

8    court in their absence will be provided to them in written form

9    by way of the transcript.  Obviously, whether they want to read

10   it, understand it, and take it seriously is something none of us

11   has any control whatsoever over.

12           So I appreciate your comments, Mr. Sullivan.

13           Ms. Rhodes, anything more or different or to supplement

14   what Mr. Sullivan said?

15           MS. RHODES:  No, Your Honor.

16           THE COURT:  Mr. Martin?

17           MR. MARTIN:  Your Honor, I don't know whether Mr.

18   Sullivan did this or not, but I do think I consider it my role as

19   counsel, my duty, and I don't know whether Mr. Sullivan did this,

20   but I think I have to formally move to withdraw because that's

21   what he wants me to do.  At least I have to do that.

22           I echo what Mr. Sullivan said in some respects.  I

23   agree with him it may be a lot easier for me because it may well

24   be.  Who knows what could happen between now and then.  And what

25   happens between now and then will probably have a great effect on

1    his coming to a decision.

2           I believe that he doesn't really understand what he's

3    doing.  He may sound in court like he does.  But I don't think he

4    understands what he's doing here.  And I do know that if you were

5    to send him somewhere, it wouldn't do any good because he

6    wouldn't talk to anybody.

7           He has refused my mail.  I even put some mail without a

8    return address on it.  He's not happy about that, either.  He

9    told me this morning.

10          I echo that, Your Honor.  I don't know what we're going

11   to do but I guess I should defer to Mr. Coburn because they're

12   the ones that are most immediately affected by this.

13          I would say one of the things to talk about, we could

14   do is, for example, there are a lot of issues Mr. Coburn and Mr.

15   Kurland have to deal with right away but the rest of us have some

16   time to deal with.  You may want to deal with them separately

17   from us.  We don't even have to be there if we didn't want to.

18   That would, number one, greatly affect the Court's schedule, and

19   number two, allow us to get on with other things we have to do.

20   And maybe package these hearings for today separately.  That

21   might make some sense where we have common issues.  And I know

22   they're interested to get on with what needs to be dealt with

23   with them.

24          I do think when we deal with, for instance, the jury

25   questionnaire, we all ought to be here because I assume you're

1    going to use the same questionnaire for everybody.

2          In that regard, Your Honor, I think what we should,

3    maybe things probably have to be amended a little bit to deal

4    with this situation.  I haven't even thought through how we do

5    that yet.

6          One of the things that Mr. Sullivan said, we met with

7    David Breck now, defense counsel.  He never had an issue like

8    this.  One of the things we're going to try to do is figure out,

9    what do we ask the jurors and how they might react to something

10    like this.

11          One other comment, Your Honor.  You said you were

12    considering appointing us as standby counsel.  As Mr. Treem

13    points out, I think he's right, you can threaten all you want.

14    If they're not in the courtroom, I don't think we can be standby

15    counsel.  I don't think that would work.  I don't know how we

16    would deal with it.  I guess we'd just be counsel.  We are

17    counsel, though.  I don't know under any standard any one of us

18    would be allowed not to be here at a proceeding.  But we should

19    at least keep that in mind.

20          THE COURT:  Thank you very much, Mr. Martin.  Mr.

21    Treem, welcome to the team.  One thing is for certain, nobody

22    could ever blame you for this.

23          MR. TREEM:  Well, I guess that remains to be seen, Your

24    Honor.  I don't know.

25          THE COURT:  Mr. Treem, really, I just sincerely

1   appreciate your willingness.  You've given so much service to the

2   bar and to the Court.  And so saying this is above and beyond the

3   call of duty is, I guess, the second understatement of the day.

4          You really do the profession pride by the work, all of

5   you do, but in this instance in particular, it's extraordinary

6   and I appreciate it.

7          MR. TREEM:  Thank you for your comment.

8          THE COURT:  Mr. Crowe, Mr. Pyne.

9          MR. CROWE:  Yes, Your Honor.  This is a very sad state

10  of affairs we're in.  It's been bothering me.

11         THE COURT:  We need to get the mike back to you.  By

12  the way, so you know, I think you all know Judge Motz is in a

13  high security proceeding in Courtroom 1-A and I had no hesitation

14  in saying to him and to the marshals that we would squeeze in

15  here today for purposes of this hearing, particularly under what

16  I thought would be the circumstances to permit Judge Motz to

17  remain in 1-A for his trial.  That's why we're all here.

18         MR. CROWE:  Thank you, Your Honor.  This is a really

19  unfortunate turn of events and it really, this matter of subject

20  matter jurisdiction arising, we thought we were establishing a

21  relationship with him.  He has many admirable qualities.

22         We have had the same experience as other counsel.  Two

23  of our visits to Supermax have been refused.  Two others letters

24  have been returned.  We had scheduled meetings with Mr. Martin's

25  mother, we had two scheduled meetings and she didn't keep either

1    of them.

2            One thing that occurred to me is there's been a lot of

3    reference to the contracts which our clients have mailed to us.

4    It seems to me it would be appropriate, what I intend to do is to

5    file the contracts that I have received under seal so that the,

6    so that if the question does come up, they know what we're

7    talking about.

8            I know we may be different.  We have two contracts.  It

9    may just be the formatting is different.  Certainly, the import

10   of both of them is the same.

11           Your Honor, we've talked about the right to self

12   representation and the Model Rules of Professional Conduct.  I

13   don't think any of the cases were decided or any of the rules

14   were written with a situation that's even remotely like what we

15   have today.

16           Picking up on a couple of Mr. Martin's remarks, and Mr.

17   Sullivan's as well.  I don't know that the defendants have really

18   asserted a right to self-representation here.  I think they

19   clearly want to fire their counsel.  At least expressed a desire

20   to hire counsel who would act in accord with what they think the

21   law will be and their particular view of the law.

22           It seems to me from what little I know about these

23   cases, the right of self-representation has to be something which

24   is unequivocally asserted.

25           In terms of standby counsel, as I understand the law,

1    unless it's developed in a context entirely different from this,

2    what the Supreme Court indicated in the McKaskle case, that

3    standby counsel couldn't give unsolicited assistance or otherwise

4    interfere with the defendant's right to self-representation.  And

5    I don't think standby counsel could really function in the

6    context of the case if the defendants persist in their motions.

7            THE COURT:  Thank you, Mr. Crowe.

8            MR. CROWE: M-C-K-A-S-K-L-E, 465 United States, and the

9    particular proposition is Page 177.

10           THE COURT:  Mr. Pyne.

11           MR. PYNE:  I have nothing to add.

12           THE COURT:  Let me just say before I hear from Mr.

13   Coburn and Mr. Kurland, absolutely Mr. Martin's right, and you're

14   right, Mr. Crowe.  I used the term "standby counsel" very loosely

15   in my remarks.  I suppose in my head, the way I am

16   conceptualizing this is de facto what we're heading towards,

17   although I agree, I'll need to make additional efforts, I

18   suppose, de facto the defendants have asserted a right to

19   self-representation.  In other words, they have refused to

20   cooperate with appointed counsel.  They have asked, in effect,

21   that successor counsel be appointed.  They have neither permitted

22   the Court nor suggested remotely a rational basis for why the

23   eight of you cannot provide effective representation.

24           I certainly agree with you, Mr. Crowe.  We need to put

25   these so-called contracts in the record.  And I appreciate your

1    filing the motions.  I'm not sure they need to be under seal.

2              I have seen one of these contracts in one of my other

3    cases.  So I think I have a fairly good idea of what they provide

4    for.

5              So the first step in my very tentative, very tentative,

6    very preliminary analysis is that a defendant, while claiming

7    they want counsel, have in effect erected an absolute barrier to

8    the appointment of counsel.  That's my preliminary take on it.

9              So I don't think the Supreme Court or the Fourth

10   Circuit will permit a defendant to get away with that.

11             You know, it's as if the defendant is saying, I need a

12   counsel who went to a law school in New Dehli, India.  Well, you

13   know, you can stand here as long as you want and insist that's

14   the lawyer you want.  Or less exotically, I want, I want a black

15   lawyer.  Or I want a female lawyer.  I want a lawyer, Judge, I

16   really want a lawyer.  I want a lawyer.  I do not want to

17   represent myself.  But I want to a lawyer who went to University

18   of Maryland, not a lawyer who went to University of Baltimore.

19   Or I want a lawyer who went to Harvard.

20             I think the appellate courts are very likely to say

21   that such a defendant who is otherwise competent, who makes, who

22   insists on such a thing is de facto choosing self-representation

23   because no court ever is going to accede to such a demand.  No

24   matter how loudly and repeatedly such a demand is voiced.  So

25   that's the first stage.

1          So he wants self-representation de facto.

2          Now, the next thing is, I don't want to be present

3     because I'm being disruptive, I'm not going to cooperate with the

4     Court, I'm going to do everything I can out loud, repeatedly and

5     blatantly, contumacious behavior to disrupt and thwart the

6     proceedings.

7          So now we have a situation where a defendant, in my

8     preliminary analysis, and I emphasize it's strictly preliminary,

9     I'll be happy to look at the cases, who choose to represent

10    himself but who chooses not to be present.  So in that sort of

11    Star Trek like scenario, what you effectively become are standby

12    counsel to an absent defendant.

13         Now, there's no case law on this, I agree.  There's no

14    case law on this.  And I would, you know, you and I are going to

15    engage in colloquy.  And Mr. Sullivan is right.  What do you do?

16    When do you object?  What contentions do you advance?  How do you

17    cross examine?  And I agree, as hard as this is for me, I would

18    rather be up here than down there where you are.  No question

19    about it.  Your job is much harder than mine.  But that's what I

20    meant when I used this really very loose term of standby counsel.

21         Now, perhaps the better way to do it, the more sensible

22    way to do it, the legally sounder way to do it is to simply say

23    no, the defendants have not chosen self-representation.  You're

24    still lawyers.  You still represent a client.  But you represent

25    a client who's elected, one, to be absent, and two, not to

1    cooperate with you.

2          And frankly that's what I was focused on in listening

3    to Mr. Sullivan, because Mr. Sullivan doesn't want to be in that

4    position.  And I suppose, in all candor, that second mode of

5    analysis would, it would be more difficult for me to hold you in

6    the case in that second, in that second scenario than the first.

7    And that's another reason why I used the term, admittedly very

8    loosely, of standby counsel.

9          It would be very hard for me.  I'm not saying I will or

10   would not do it, but it would be very hard for me to say to a

11   lawyer, pretend you're doing what you normally do.  And that

12   would really hurt me.  I don't want to put myself in that

13   position.

14         So I'm trying to avoid having to do that and thus

15   resort to the idea of standby counsel.  And I suppose what I

16   contemplate is, and I'll hear from Mr. Coburn in a moment, but

17   assuming Mr. Gardner's case goes first, he's going to be sitting

18   back there in the lockup and Mr. Kurland and Mr. Coburn will be

19   sitting out here.  And several times a day Mr. Coburn and Mr.

20   Kurland will meet with their client to see if he's changed his

21   mind.  Mr. Coburn and Mr. Kurland will sit out here and give an

22   opening statement and will cross examine witnesses.  And Mr.

23   Gardner will sit back there with a video feed and an audio feed

24   and he'll be able to listen and look if he chooses.

25         And it will be sort of a representation, you know, with

1    your client sitting a hundred feet away from you.

2           Now, that's one conception of standby counsel.  Because

3    you're right, you can't, if he's really representing himself, you

4    can't interfere.  But I think it would be very hard for you to

5    interfere with him sitting back there.

6           All of those are just sort of thinking out loud and

7    none of us have faced this before and we'll see how it goes.

8           Okay.  Mr. Coburn, Mr. Kurland.

9           MR. COBURN:  Thank you very much, Your Honor.  We

10   appreciate very much Your Honor's penetrating observations about

11   the situation.  And also the observations that have been made by

12   our codefendants.  And I don't know that I really have that much

13   substantively to add to what has already been said.  The

14   situation is obviously sui generis.  We're all feeling our way

15   along here.

16          I think kind of a fundamental issue from our point of

17   view is how, I should probably speak for myself because we're all

18   thinking this through individually, is how to address this in an

19   ethical fashion as an attorney and a member of the bar of this

20   Court.

21          And I think the first step in that process is exactly

22   what Mr. Martin did.  And I think that I am obligated to do what

23   he did.  And obviously, as I guess maybe it's not obvious, but as

24   a personal matter I'm hoping Your Honor denies the motion, but I

25   believe that ethically I'm required to move to withdraw under the

1    circumstances because the client has fired me.  So I would so

2    move.

3              And with Your Honor's permission, I would just like to

4    adopt the other representation and comments that were made by our

5    codefendant's counsel here.

6              The big question, at least as I see it, is given that

7    Your Honor is overwhelmingly likely to deny our motions to

8    withdraw under the circumstances, then, obviously, we understand

9    why Your Honor would take that action, is, What do we do in the

10   courtroom once the trial starts?  And it seems to me there are a

11   couple of different ways to argue that.

12             On the one hand, we're lawyers.  You know, we're not

13   clients.  So we don't really get under the ethical rules, at

14   least as I understand them, to make substantive decisions about

15   the case.  I mean, the leash that's permitted ethically to

16   lawyers, at least as I understand the rules, sort of extends so

17   far and no further.  But given that we don't have any

18   consultation with our client at all at this point, you know, if I

19   were to stand up and cross examine a witness and, you know,

20   assert that they had motive to lie or something because they're

21   cooperating, I would be doing that simply because I think it's

22   the appropriate thing to do.  But that's just a sort of a very

23   strange situation for a lawyer to be in because the lawyer's not

24   the client.

25             And so given that the client at this point hasn't

1    ordered me to defend him and, in fact, has told me to get out,

2    I'm just not sure where I would get off ethically, you know,

3    standing up and cross examining or making an impassioned opening

4    statement or pleading for his life during the penalty phase.

5         So that's a concern.  I mean, so that's sort of one

6    side of the ledger.  The other side of the ledger is that's

7    exactly what Professor Kurland and I very, very much want to do

8    because the notion of sitting here passively, you know,

9    watching -- and I've actually been in a trial like that.  Not a

10   death case.  But way back when I was a prosecutor.  I was in a

11   trial where the defendant refused to do anything and refused to

12   let his lawyer do anything.  So every word during the course of

13   the trial was said by the prosecution.

14        For that to happen in a case like this where, you know,

15   human life is at stake is hard, and it would be extremely hard to

16   take.

17        So I guess the big question is whether ethically Option

18   A is appropriate or option B is appropriate.  I have to concede

19   to Your Honor as I stand here, I don't know the answer to that

20   question.

21        THE COURT:  It seems to me, though, Mr. Coburn -- I

22   appreciate your sentiments -- but the idea that a government

23   witness ought to be impeached in a criminal case is indisputable.

24   Now, the details of how you do it, when you do it, is it every

25   witness, is it only important witnesses, do you even know who an

1    important witness is, I don't have too much concern about that.

2          But that's not to say that you haven't raised a very

3    serious point both ethically and in other ways and for other

4    reasons as well.  I absolutely am sensitive to that.  I'm

5    sensitive to that.

6          MR. COBURN:  Appreciate it very much.

7          THE COURT:  So I hear you.  And I appreciate what you

8    said.  I really do.  Mr. Kurland.

9          MR. KURLAND:  Thank you, Your Honor.  There's that old

10   saying, no good deed goes unpunished.  The scheduling concerns

11   with respect to Mr. Gardner, as I understand it back before I

12   even got into the case had to do with an accommodation to myself.

13   So I personally am struggling with the issue of what started out

14   as an accommodation in a multidefendant case now forces, I guess,

15   technically still my client, Mr. Gardner, to go to trial first,

16   largely out of the fortuity, it was not the government's choice,

17   but as an accommodation largely to myself and to Mr. Coburn's

18   representation.  So I've got a concern about that.

19         More fundamentally, I echo all of counsel's thoughts,

20   that I think ethically I have to, under the circumstances, make a

21   motion to withdraw.  On some other related matters --

22         THE COURT:  On that score, by the way, it seems to me,

23   without forcing all of this on Mr. Kurland, it seems to me Mr.

24   Crowe sort of volunteered to make a formal written motion,

25   attaching documents and so forth and spelling it out.  And then

1    what I contemplated, that all of you could simply join in that

2    motion and file sort of a one-page supplemental letter of

3    memorandum, if you want to do it that way.  But I agree, there

4    ought to be a formal motion.  Obviously, the government won't

5    take a position, I assume won't take a position one way or the

6    other, but may want to just offer some views.  And we'll do it

7    that way.

8            But I agree with all of you, that this ought to be a

9    formal written motion in the record spelling out as best you can

10   precisely the reason, not least among them is that your client

11   has directed you to withdraw from representation.

12           I'm sorry.  Go ahead, Mr. Kurland.

13           MR. KURLAND:  Just a couple other related matters.  In

14   the colloquy that took place at the November 16th hearing, Mr.

15   Gardner specifically was asked by the Court, do you wish to

16   represent yourself and he says, No, sir.  So I think at least

17   with respect to Mr. Gardner -- I appreciate the Court's analysis

18   as to what they are functionally doing.  But with respect to Mr.

19   Gardner, despite the conundrum that he's trying to create, which

20   no counsel could take the place, I think the existing record is

21   such that he has not asserted self-representation and, therefore,

22   our roles are either as counsel but not the plan B option, as

23   opposed to being standby counsel.

24           With respect to standby counsel to an absent defendant,

25   that really is the Law Review article that perhaps should be

1   written when the case is done.  But short of that, based on the

2   record, it would seem to be, I have to confess I've been

3   researching, I shouldn't say that, I've been researching other

4   matters which I hoped would ultimately get resolved and deal with

5   the case apart from the representation issue.

6          But it seems to me, or I have a concern that I want to

7   put on the record, based on the existing record, that with

8   respect to the Supreme Court case that Mr. Crowe read concerning

9   the standby counsel's obligation, if we are standby counsel, I

10  think it goes even beyond what Mr. Coburn said about the ethical

11  conundrum as to how to do what would seem to be the self-evident

12  thing of cross examining a government witness who is perhaps

13  lying or has a motive to lie.  But the client has made it clear,

14  and I think one of them, one of the other defendants made it

15  clear as they were walking out, however they left the

16  proceedings, that they're consenting or they're challenging the

17  jurisdiction of the court.

18         It seems to me that if we're standby counsel, the one

19  legal issue that has become loud and clear to all the defendants

20  in one decibel or another is they are challenging the

21  jurisdiction of the court and therefore to retain that issue

22  would be to do nothing, because to do anything as standby

23  counsel, it would seem to me, at least I think, I need to voice

24  it, would be inconsistent with what, what Mr. Crowe represented

25  from the Supreme Court case.

1          Because it seems to me the position of the clients are,

2     there's no jurisdiction.  They don't want to participate in any

3     way with the proceedings to give the proceedings any imprimatur

4     or any sort of legitimacy.  That being the case, if we are

5     standby counsel, if I understand the concept of standby counsel,

6     anything that we would do, even the allegedly self-evident things

7     of cross examining a government witness with motivation, is

8     inconsistent with their stated desire.

9          My assessment of the situation is that since we have

10     not been relieved by the Court, that we are unfortunately, at

11     least my first thinking through, in the unfortunate position

12     where, Mr. Sullivan doesn't want to be, in Plan B, that we are

13     lawyers representing clients who have tried to fire us, don't

14     want to participate in the proceedings, and have absented them

15     from the proceedings.

16          Now, the Court earlier indicated that that puts, you

17     don't want, the Court doesn't want to go there because that makes

18     it harder to refuse to allow the lawyers out of the case.  But I

19     don't think that there is a, and that's up to the Court,

20     obviously, and I'm not trying to get out of the case, I obviously

21     have my own time deadlines that I am concerned about, that I

22     don't want to prejudice Mr. Gardner by essentially forcing him to

23     trial first under these unique circumstances based solely on my

24     situation.

25          But I still am concerned that there might not be any

1    Option C in between.  The standby counsel, I would think we would

2    do nothing.

3            THE COURT:  In fact, listening to you, and I appreciate

4    your sort of horseback quick analysis there, Mr. Kurland.  My

5    recollection is that, the Fourth Circuit certainly, and I don't

6    recall the Supreme Court law, the Fourth Circuit, I think, says

7    there's no such things as hybrid counsel.  And really, I think

8    that's probably closer to what I'm talking about here under, as

9    you referred to it, Option One.

10           It would be a form of hybrid counsel which up until now

11   the Fourth Circuit simply says, and maybe the Supreme Court as

12   well, there's just no such thing.  You can't have joint

13   representation, in effect, client and lawyer.  But I believe some

14   states do recognize so-called hybrid counsel where the lawyer

15   does a little bit, the client does a little bit.  That's real

16   messy and I'm not anxious to go there.  But I suspect that in

17   terms of my preliminary thought process, it's probably closer to

18   that model than anything like a classic standby counsel

19   situation.

20           Go ahead.

21   MR. KURLAND:  Well, assuming we get through this one

22   way or another, I'm hoping that a couple, assuming I'll still in

23   this case and there's a trial date set in March, there are some

24   matters, scheduling, some other matters that I would hope on the

25   merits we can deal with sometime after this is all done.  But

1    other than that, with respect to the representation issue, I've

2    said all that I'm prepared to say.

3            I don't have the answer.  I would have to, I'm very

4    uncomfortable in the role of the traditional standby counsel

5    because that would essentially mean, as far as I'm concerned,

6    doing nothing because that's what the client has indicated.  He

7    wants a total challenge to the jurisdiction of the court and,

8    therefore, doing anything would be inconsistent with that.

9            THE COURT:  Sure.  Sure.  I think you make a good

10   point.  You know, my nightmare scenario -- this isn't it,

11   actually, despite appearances.  My nightmare scenario literally

12   would be to conduct a capital case with neither client nor lawyer

13   present.  That's my nightmare scenario.  And it may be, in view

14   of what you said, Mr. Kurland, in all honesty, it may be that I

15   have to live my nightmare scenario.  It may be.  I'm not

16   categorically ruling out, notwithstanding my earlier comments,

17   listening to you now, it may be that I have to live my nightmare

18   scenario.  And if that's the way the defendants push this, then,

19   you know, my back may be up against the very, very firm wall.

20           MR. KURLAND:  Judge, if I may add just two other

21   things.  One is that I don't hold out much hope on it.  Think

22   that it is a sliver of possibility that with respect to Mr.

23   Gardner, who I believe is very reluctant to do this and he's

24   shaking as he is reading and even forgot my name.  He knew, he

25   knew his other counsel's name.  But it is conceivable, and I

1    think, I haven't talked to Mr. Coburn, he might share this,

2    there's a sliver of hope that perhaps if he comes to court by

3    himself and, he might, might be able to conduct himself in a

4    manner that's not totally disruptive given that I think relative

5    to everybody else he is the least disruptive of the four.  I

6    think the Court indicated that in the last hearing by being able

7    to at least get to the colloquy with him.

8            The second thing is technically, and I haven't brought

9    this up to Mr. Gardner since he won't talk to me, since I'm a

10   member of the District Court of Maryland bar but I'm not a member

11   of the Maryland state bar, I do not violate all of his provisions

12   in the contract, which might make me the only lawyer in the room,

13   actually, who isn't disenfranchised, which again, no good deed

14   goes unpunished.  I don't want to necessarily go there but I just

15   want to put that on the record as well.  Thank you, Your Honor.

16           THE COURT:  Thank you.  And do you know, apropos your

17   comment about the objection to jurisdiction, I mean, one thing,

18   we got to try to be creative here.  And I'll hear from Ms.

19   Manuelian in a moment.  She's got a lot to deal with.  Part of

20   what sort of is under the surface of what all of you said, or at

21   least some of you, indeed, Mr. Sullivan said time heals all

22   wounds, I think it was Mr. Sullivan.  Well, we know they don't

23   heal all wounds.  But part of what we ought to consider, and the

24   government will, will weigh in on this and I'll consider very

25   seriously the government's views, it could be that time will heal

1    this wound.

2           Now, not merely time.  But what occurred to me

3    listening to Mr. Kurland, this would be intellectually dishonest

4    but not a violation of my oath, I don't think, perhaps one way to

5    cut through this, perhaps, just tying to be creative, is for the

6    Court to enter an order denying the Motion to Dismiss for lack of

7    jurisdiction and somehow certifying or permitting or inviting the

8    defendants to take an interlocutory appeal.

9           Now, on the face of it that's silly.  I'm the first to

10   admit that.  But if we could take an eight months or four month

11   hiatus while that took place, just something, I mean, you'd file

12   a brief in the Court of Appeals saying you want an interlocutory

13   appeal in the nature of, sort of a double jeopardy interlocutory

14   appeal.  The Fourth Circuit pretty quickly would, would send it

15   back.  And they'd invite a response from the government because,

16   after all, jurisdiction is fundamental, however silly the

17   underlying contention.  Just the challenge to jurisdiction is

18   fundamental.

19          And I would hope that a three-judge panel of the Fourth

20   Circuit would, you know, give it, give it consideration, write a

21   reasoned judgment affirming the Court's denial of the Motion to

22   Dismiss the indictment.  And then you'd have something to take to

23   your client, to say, Okay, has there been a change?

24          Again, on the face of it, it's silly.  It probably

25   wouldn't work.  There's no reason to think that their disrespect

1    for the Federal District Court would be any different for the

2    disrespect for the Federal Court of Appeals.

3            So just, again, I'm trying to be as creative as

4    possible, to think outside the box and see if there's a way that

5    we can bring this matter back to the semblance of a rational

6    federal proceeding.

7            Ms. Manuelian?

8            MS. MANUELIAN:  That's an interesting approach, Judge,

9    but I guess my question would be, who's going to represent the

10   defendants in the Fourth Circuit since they're objecting to any

11   counsel?  Who would be appointed to represent them?

12           It's unfortunate the Court couldn't necessarily ask for

13   an advisory opinion from the Fourth Circuit as to whether or not

14   there is any merit to this motion.  And even then I would imagine

15   that the defendants are not going to accept the result.

16           THE COURT:  I suppose, you make a good point and there

17   are lots of other even more telling problems with my proposal.

18   But maybe I could appoint a single counsel, since the

19   jurisdictional claim is common to all the defendants, I could

20   perhaps reach out and find a lawyer who would be willing to, you

21   know, in fact write an Anders brief on that question for purposes

22   of appeal.  But your point is well taken.

23           MS. MANUELIAN:  Judge, I think that, I think you've

24   already denied, have you not, the motions for subject matter

25   jurisdiction?  I don't know if you've done it by way of a written

1  order, but I certainly would encourage you to do that.  Is there

2  some way for us to get that to the defendants?  From the last

3  case I did, it's not going to make much of a difference.  I think

4  Judge Motz did the same thing.  It's really sort of irrelevant.

5          I do not believe that this is an issue of

6  self-representation.  I think it's dangerous, actually, for the

7  Court to go there for some of the reasons that were echoed by

8  counsel.

9          I think clearly, I agree, I think, more with the tack

10  that we took in the last case, which is that the defendants are

11  in effect waiving counsel because they, under any scenario, no

12  counsel will be acceptable to them.  So I think when we have a

13  situation like that, they're proceeding and saying, number one,

14  we don't want to participate; number two, we don't want to

15  participate with any attorney that you appoint to represent us.

16          There's a waiver on the record.  And therefore, the

17  Court is in a position now where we have to proceed with the

18  case.  And I think we then have to think about what's going to

19  happen in the appellate record.

20          What I would see the Fourth Circuit looking back to is

21  to determine whether or not the attorneys that the Court would

22  then order to stay in the case, which I think would cover any

23  ethical concerns that counsel might have, because they would be

24  operating pursuant to the Court's order, whether or not those

25  counsel move forward under the circumstances in a reasonable,

1    under a reasonable attorney standard.  And then everything that a

2    reasonable attorney would do, given the circumstances that were

3    presented to them.

4          Conceivably, I suppose one could say they did waive, if

5    the defendants are waiving their counsel and refusing to

6    participate in the proceedings, then we don't necessarily have to

7    go through this procedure.  And it would be the government

8    presenting its case and that would be the end of it.  But I don't

9    think that's the prudent way to proceed.

10          I think that the Fourth Circuit would be very

11   comfortable with a record, for example, of what we did in the

12   last trial, where they're now going to look back on the

13   circumstances and say every opportunity was given to the

14   defendants to participate.  They elected not to.  Every

15   opportunity was, there was no rational reason why the particular

16   attorneys who were appointed to represent them could not

17   represent them.  They were all highly capable and able counsel,

18   as all these attorneys are.  And therefore, proceeding under a

19   reasonable attorney standard, they did the best job they could to

20   challenge the government's evidence.  And under the

21   circumstances, the defendants received a fair trial.

22          Technically, they waived any right they had with

23   respect to being present or having their attorney represent them.

24          THE COURT:  Summarize for us, Ms. Manuelian, exactly

25   what happened and what Judge Motz did.

1          MS. MANUELIAN:  What Judge Motz did is he denied the

2     motion.  He found on the record that all counsel were present,

3     were highly competent, skilled attorneys, that the defendants had

4     not articulated a reason why they were incapable of representing

5     the defendant, their interests in the case.

6          THE COURT:  Were the defendants sufficiently well

7     behaved so that they could remain in the courtroom while Judge

8     Motz made those determinations?

9          MS. MANUELIAN:  Yes.  That's the slight difference from

10    what we have here.  They were sufficiently well behaved.  He went

11    through a very detailed colloquy on the record advising them of

12    all the scenarios, repeatedly assured them that the motion for

13    subject matter jurisdiction was well preserved.  Defense counsel

14    reiterated on behalf of their clients they're objecting to

15    subject matter jurisdiction, at their client's request, and it

16    was an argument to be preserved for purposes of appeal and not

17    waived by the fact that the attorneys would go forward

18    representing the interests of the defendants.

19          And then they, initially we were going to have the

20    defendants brought in every day but the judge decided that that

21    was going to be too disruptive to the proceedings.  So they were

22    not displayed before the jury.  And instead, they were brought in

23    after the jury was selected.  They were told that a jury was

24    selected.  Again, they were given an opportunity to --

25          THE COURT:  Was the jury in the box when that happened?

1          MS. MANUELIAN:  No.

2          THE COURT:  So the jury never saw the defendants at

3     all?

4          MS. MANUELIAN:  No.  They only saw pictures of the

5     defendants.

6          THE COURT:  Like in government evidence or were --

7          MS. MANUELIAN:  In government evidence.  We had

8     photographs that were used for the defendants.  They were told,

9     initially the judge said the defendants have elected, the

10    defendants are not here because they object to the subject matter

11    jurisdiction of the Court.

12         THE COURT:  Judge Motz actually told the jury that?

13         MS. MANUELIAN:  Yes, he did.  The jurors looked

14    somewhat confused.  I don't think they understood that.  I think

15    that it would be appropriate to simply say that the defendants

16    have elected not to participate.

17         You could have it in a variety of ways, as you see fit,

18    Judge, that will be the least prejudicial, if you can imagine, to

19    the defendants.

20         But no, the jury never had the defendants before them.

21         THE COURT:  And it was Mr. Purpura and --

22         MS. MANUELIAN:  Mr. Draper from the Public Defender's

23    Office.

24         THE COURT:  Mr. Draper.  What did they do?

25         MS. MANUELIAN:  They proceeded to question and cross

1   examine all the witnesses.  They had a defense in mind in terms

2   of, because it was an overwhelming case, they focused mostly on

3   the CCE count, to convince the jury that this was not a

4   continuing criminal enterprise.

5           They conceded on a number of issues, especially Mr.

6   Purpura, because the evidence was extremely overwhelming against

7   his defendant.

8           THE COURT:  When you say "they conceded", explain what

9   you mean by that.

10          MS. MANUELIAN:  They acknowledged that there had been a

11  drug distribution, that they were obtaining drugs illegally.  At

12  least Mr. Purpura did.

13          THE COURT:  And he did that in opening statement?

14          MS. MANUELIAN:  They did that in opening statement.

15  But then they went on to focus that this was not an enterprise.

16  And also, that this was an issue about intoxication and drug use,

17  that these pills were actually being obtained for the defendants,

18  for their own private use, at least Mr. Hudson.

19          THE COURT:  This was an Oxycontin case?

20          MS. MANUELIAN:  An Oxycontin health care fraud case.

21  So Your Honor, I --

22          MR. SULLIVAN:  Yeah.  Now lay all that on a death case.

23          MS. MANUELIAN:  I know we have a slight, we have a very

24  different situation here because, not so much because of the

25  guilt phase but because of the sentencing phase, where the

1   problems are going to be somewhat insurmountable.  And I'm not

2   exactly sure how to proceed on that.  I don't know you have a

3   choice, though, Judge.  You can't be, as you said, have the

4   defendants have the ability to essentially pull the whole

5   proceeding to a halt.

6         And we have to go forward in some fashion.  So the

7   issue about the disruptive nature of the defendants in the

8   courtroom -- Mr. Sullivan may remember the case that we had

9   involving a number of defendants who were attempting to, who were

10   somewhat disruptive in the proceedings.  As you know, the

11   marshals periodically will put the stun belts on the defendants

12   to control some of that behavior.  If that's what we need to do

13   to have a colloquy on the record, Judge, you know.

14         THE COURT:  You know, I wouldn't, Ms. -- I have to stop

15   you right there.  You don't use a stun belt to require a

16   defendant -- I mean, there are those that say you should never

17   use it.  But surely, surely, it would be a gross violation of a

18   defendant's constitutional rights to use a stun belt in order to

19   keep the defendant in the courtroom, where the option is just

20   putting the defendant out of the courtroom.

21         MS. MANUELIAN:  Well, no, I'm not suggesting that for

22   the proceedings.  Just, I wanted to be sure that there was some

23   way that, if we need to amplify this colloquy that you attempted

24   to have with the defendants the last time around --

25         THE COURT:  You mean threaten them with a stun belt?

1              MS. MANUELIAN:  No.  I don't know, frankly, that it

2    will make a difference for these defendants, to tell you the

3    truth.  I think, actually, the colloquy that you had the last

4    time was very sufficient, especially given how they behaved again

5    today.

6              THE COURT:  Okay.  Is your bottom line -- I'm sorry.

7    But your bottom line is, they haven't asked for

8    self-representation, they've asked to discharge counsel without

9    good reason, and therefore that request is denied and the lawyers

10   remain in the case as counsel?

11             MS. MANUELIAN:  Yes, Your Honor.  That would be the

12   government's position.  So we would, on that basis, object to any

13   withdrawal by the attorney.

14             THE COURT:  And any ethical consideration is covered by

15   the fact that the Court is ordering them to proceed with their

16   defense as a reasonable lawyer would under the circumstances,

17   which of course we don't really know what that is yet because

18   it's never happened, to our knowledge.

19             MS. MANUELIAN:  Well, under the circumstances, Your

20   Honor, defense counsel that is skilled, competent and experienced

21   would, in a case such as this, try and poke holes in the

22   government's evidence.

23             With respect to the evidence of dual counsel.  Your

24   Honor, I think, I agreed with some of the comments that Mr.

25   Martin made.  I don't think that under the circumstances, if

1  we're trying to preserve a record that the Fourth Circuit can

2  then look back at and say that these defendants received fair and

3  appropriate representation under the circumstances, that given

4  the law of the Fourth Circuit that there must be dual counsel in

5  a death penalty case, that you could excuse one or the other

6  counsel during the proceedings.  I wouldn't want to take that

7  risk.

8              THE COURT:  No.  Judge Nickerson did it in a case.

9              MS. MANUELIAN:  Is that the Anthony Jones case?

10              THE COURT:  No.  In other words, Judge Nickerson, in a

11  case where the government did not file the notice, excused the

12  second lawyer.

13              MS. MANUELIAN:  Oh, but we don't have the situation.

14  We only have that situation with Mr. Martin.

15              THE COURT:  Yeah.

16              MS. MANUELIAN:  And I don't know -- I agree.  That

17  might be a situation where we could try to do something different

18  than what the Fourth Circuit suggests.  But in the case of the

19  other three defendants who are facing the defendant penalty, I

20  wouldn't want to take that risk and create an appeal issue down

21  the road.

22              Your Honor, I am concerned.  There are just two other

23  things I just wanted to comment on that you mentioned earlier.  I

24  do believe that we're going to have an identification problem

25  with not having the defendants here.

1          THE COURT:  Oh, they will have to be here for any

2    identification witness.

3          MS. MANUELIAN:  That may be one of the situations where

4    I'm going to be very concerned, I'm sure the Court will be as

5    well, and counsel, about how disruptive they're going to be.

6    That's something we're going to have to try and deal with.

7          And the other issue I've had was scheduling, Your

8    Honor, for the trial is not exactly what we had envisioned in

9    this case.  And I was not privy to the last round of discussions

10   concerning why Mr. Treem is not available.  There's a possibility

11   we can push it back to later, a month or two, the trial, and keep

12   Mr. Gardner and Mr. --

13         THE COURT:  Mr. Harris.

14         MS. MANUELIAN:  -- yeah, together.

15         THE COURT:  Before we hear from Mr. Treem.  Ms.

16   Manuelian, can you say anything more about scheduling?  Because I

17   have to hear you on that, because that becomes an important

18   issue.  But again, remember, the Court is concerned with the

19   prospect of trying Mr. Gardner with Mr. Harris if Mr. Harris is

20   going to be tried on that second indictment.

21         MS. MANUELIAN:  Yes, Your Honor.

22         THE COURT:  Because I think the prejudice to Mr.

23   Gardner is palpable.

24         MS. MANUELIAN:  Your Honor, I know, I know that we have

25   since, I believe Mr. Harding has since briefed this issue for the

1    Court and filed a submission on that.  I do believe, and I agree

2    with Mr. Harding, and perhaps the Court doesn't agree, and we

3    certainly would like to be heard on that, since we filed the

4    motion, I don't think we've been, we really addressed the Court

5    on the issue that a jury instruction would be appropriate,

6    although a cautionary instruction would follow the issue of

7    compartmentalizing that evidence.

8         How many times that we have evidence that only pertains

9    to a particular defendant and on each occasion, cautionary

10   instructions are given, the jury follows them.  They come back

11   again parceling out as to a particular defendant.  And a hung

12   jury and don't necessarily lump every one together.  And the

13   particular witness in this case does not have any information,

14   testimony about Mr. Gardner.  It's very much limited to Mr.

15   Harris.

16        Again, I think, I would like to have the opportunity --

17   maybe at our next proceeding Mr. Harding can address this in

18   greater detail, if we can have an opportunity to discuss that.

19   But I am concerned about splitting this trial into three.  It's

20   going to be an incredible waste of the Court's time, the

21   resources, and the witnesses going back and forth over and over

22   again.

23        I'm not sure that there's a rational reason necessarily

24   for us to be submitting it the way we have.

25        My other concern, of course, is that we'd rather

1   proceed with Mr. Mitchell's case first.  But I know that there

2   was an issue about scheduling with Mr. Sullivan way back when.

3   But I don't know whether that issue is still alive and well.

4              THE COURT:  Would you rather proceed with Mr. Mitchell

5   first?

6              MS. MANUELIAN:  I believe so.

7              THE COURT:  If the choice were not to have the trial in

8   March at all and making Mr. Mitchell the first defendant to go to

9   trial in September, together with Mr. --

10             MS. MANUELIAN:  With Mr. Martin.

11             THE COURT:  -- with Mr. Martin, would that be the

12   government's preference?  Because frankly, what that would give

13   us is time for this thing to burn itself out.  Not that it will.

14   Not that it is likely to.  But it would give us that.

15             Now, it creates problems for Mr. Kurland and Mr.

16   Coburn.  But under the circumstances, as Mr. Kurland quite

17   correctly, I think, and candidly admitted, maybe he doesn't want

18   to be first to go to trial under these circumstances.  And since

19   the trial is scheduled in March really as an accommodation to Mr.

20   Kurland, if we're talking now about, say, the spring of '07 as

21   opposed to '06, maybe Mr. Kurland can arrange his schedule spring

22   of '07 as he's arranged his schedule spring of '06.

23             MR. KURLAND:  That won't be able to happen, Judge.  My

24   Dean Emeritus made an incredible accommodation.  I can't say for

25   certain but that's highly unlikely.  But again, the interest of

1   the client supersedes my, obviously, my schedule.  If that does

2   happen, though, since certain issues have been fully briefed, I

3   would certainly be --

4           THE COURT:  What about the summer of '07?

5           MS. MANUELIAN:  I'm not sure that the government will

6   want to delay.  I was hoping we could try and flip flop.  I

7   wasn't sure whether Mr. Sullivan was still tied up in the April,

8   May, June timeframe.  Of course, that could create problems with

9   Mr. Kurland.

10          THE COURT:  Yes.

11          MR. SULLIVAN:  Your Honor, just to alleviate any dream

12  that Ms. Manuelian had, my client in the Eastern District of

13  Pennsylvania had just realized that the Eastern District doesn't

14  have subject matter jurisdiction over them.  And so on January

15  9th until probably May of 2006, I will be in the City of

16  Brotherly Love defending him.

17          THE COURT:  Thank you, Mr. Sullivan.

18          MS. MANUELIAN:  Under those circumstances, Judge, is it

19  possible, I guess then we're back to the issue of Mr. Gardner and

20  Mr. Harris and trying them together.  If the Court were inclined

21  to go forward with them together, would we be able to try that in

22  between the summer months, according to schedules?

23          MR. TREEM:  Your Honor, the discussion I had with Ms.

24  Shearer when she approached me about entering this case was

25  predicated on my comment to her that I would not be available to

1    try this case until the fall, at the earliest, of '06.  As the

2    Court, I'm sure, is aware, I am getting ready for the last of the

3    Charles County arson trials, which starts in Greenbelt on

4    February 21st.  That's scheduled to go four weeks.

5            I also, essentially, I am, I am out of pocket, I'm not

6    even going to be in the office for the time beginning April 15

7    probably until the middle of May at the earliest for personal

8    reasons, which really precludes any investment in this case at

9    all until sometime in June or July.

10           And Your Honor, also, Mr. Martin and I are both

11   involved in the Bromwell defense case.  We have that to deal with

12   as well.  And although that case was now set for February of '07,

13   Judge Motz has made it very clear he would like to advance that

14   trial date, depending on the schedule that is adopted here.

15           So I appreciate Ms. Manuelian's desire to advance the

16   trial date.  I can't do it.  If that's what's going to happen,

17   I'm going to have to get out now.

18           THE COURT:  No.  And I have spoken to Judge Motz

19   concerning Mr. Martin 's commitments and I assured Judge Motz

20   that on that understanding that you just expressed, where I spoke

21   to Ms. Shearer about your coming into the case, that Judge Motz

22   had Mr. Martin for 2006.  I mean, that was my belief with your

23   coming in.

24           MS. MANUELIAN:  What were you planning, then, Judge, to

25   schedule the Harris trial?

1          THE COURT:  I was going to confer with you and Mr.

2    Treem and Mr. Martin.  And frankly, I assumed it was going to be

3    2007 because we already have Mr. Mitchell and Mr. Martin in the

4    fall and I knew that Mr. Treem couldn't do the Harris trial in

5    the spring of 2006.

6          So I mean, of necessity, I had been thinking all along

7    that Mr. Gardner would go in March and that we would have, in

8    fact, three trials, if not four.

9          MR. TREEM:  Your Honor, just to put another element

10   into this with respect to the Bromwell prosecution.  The

11   government has estimated four months.  Four months, which if we

12   start in October or November, which is I think what Judge Motz

13   was anticipating, would go into February.  Over seven before

14   we're available to even think about a substantive trial of Mr.

15   Harris.

16         So I think as a practical matter, we're talking about

17   sometime in late spring or early summer for a trial of Mr.

18   Harris, of '07, for a trial of Mr. Harris under any scenario.

19         MR. KURLAND:  Would Your Honor like to hear -- two

20   things.  Once again, I'm not indispensable to these proceedings,

21   obviously.  Anything that pushes Mr. Gardner's trial past August,

22   2006, I'm going to have to make a motion to withdraw on other

23   grounds.

24         The second part is, and this has nothing to do, I don't

25   want this to cap the entire argument on the merits, but with

1      respect to the joinder issue, just to briefly respond to some of

2      what Ms. Manuelian said.

3            She's conceded that the count in the second indictment

4      with respect to the obstruction is not related to Mr. Gardner at

5      all.  Under Rule 8-B -- limiting instructions, you conceded that.

6      Government conceded that.

7            Under Rule 8-B a joinder is inappropriate as a matter

8      of law to Mr. Gardner.  The government has argued it in their

9      motions.  They've argued it as if it's a prejudicial joinder

10     issue.  It's already joint counts in an existing indictment -- it

11     is not, it is as a matter of law improper under 8-B.  The

12     government didn't address that in their opening papers.  They

13     didn't address it in their response papers.  It's invalid as a

14     matter of law.

15           So the joinder issue, it seems to me, was plentily

16     argued as a matter of law.  We can't be joined with Mr. Harris if

17     the government insists on adding that count.  That just is kind

18     of an ancillary issue to the scheduling issues.  But we're going

19     to vigorously argue that --

20           THE COURT:  I'm sorry.  I have not studied the motion

21     papers, obviously.

22           Are you saying that as a matter of law two or more

23     defendants may not, two or more defendants joined in an

24     indictment may not be joined for trial on an indictment of one of

25     the defendants -- is that what you're saying?

1          MR. KURLAND:  No, Your Honor, the standard is -- two

2     things.  The first is the government has proceeded as if, in

3     their motion papers and even in Ms. Manuelian's representations

4     today, as if the standard is essentially the relief, that the

5     burden is on the defendant to prove relief from prejudicial

6     joinder.

7          Under Rule 8-B of joinder of defendants, all defendants

8     don't have to be charged in every count.  That is a true.

9          THE COURT:  Right.

10         MR. KURLAND:  However, the standard is for it to apply,

11    the indictment or information may charge two or more defendants

12    if they are alleged to have participated in the same act or

13    transaction.  That clearly doesn't apply here.  Or in the same

14    series of acts or transactions constituting an offense or

15    offenses.  That is the standard under 8-B with respect to joinder

16    of defendants, neither of which are made here.

17         The government has proceeded at the outset, the minute

18    they came in with that superseding indictment and indicated they

19    wanted to join it, they have ignored the rule and have argued to

20    the Court in their pleadings and in their representations that,

21    at this hearing, and at another hearing with some comments made

22    by Mr. Harding, they're arguing as if this is just the common

23    defendants making relief from prejudicial argument which is

24    usually almost always denied.  That is not the posture here and

25    it is wrong as a matter of law under Rule 8-B.  That's in our

1   moving papers.

2          And we are arguing, when we get to the merits, I am, I

3   won't say I'm confident, but I'm, I will vigorously argue that

4   any attempt to join Mr. Gardner in a trial with respect to that

5   superseding indictment is wrong as a matter of law --

6          THE COURT:  Couldn't they have gotten a superseding

7   indictment instead of a second indictment against Mr. Harris?

8   And just, instead of having two indictments, just add an

9   additional count naming Mr. Harris only for --

10          MR. KURLAND:  Judge, they would have had to have gone

11   back to the grand jury.

12          THE COURT:  Right.

13          MR. KURLAND:  And I don't know whether the same grand

14   jury is sitting or not.

15          THE COURT:  Probably not.

16          MR. KURLAND:  They could have re-presented it.  Had

17   they done that, had they not convened a new jury, then at least

18   we would be in a, putting aside the issue of prosecutorial abuse

19   of the grand jury to get around Rule 8-B, separate and apart from

20   that, that would be a different procedure or posture that does

21   not exist.

22          When the Court does rule with regards to the case, the

23   Court is going to be dealing with a second separate indictment of

24   a defendant and trying to join it, if the joinder issue comes

25   back, because there is some possibility of having Mr. Gardner

1    tried in the same indictment.  We would be in an 8-B situation,

2    which the government never addresses in any of their papers.

3            Again, I'm not going to say I'm confident, certainly,

4    with respect to the application of 8-B and the current procedural

5    posture of the case.

6            THE COURT:  Okay.  We're not here on a motion today or

7    right now, of course.  Appreciate sharing some of that.  This was

8    actually collateral, Ms. Manuelian's principal point, and that

9    had to do with the scheduling and whether we had three trials and

10   whether we go forward in March or not, and whether Mr. Treem

11   could accommodate a trial of Mr. Harris sooner than 2007.

12           I don't think you were finished, Ms. Manuelian.

13           MS. MANUELIAN:  No, Your Honor.  Today the only thing

14   we had planned to do by way of evidence was to present the

15   officers that were involved today, that Mr. Mitchell was arrested

16   on April 1st of 2002.  They're going to testify that they never

17   questioned him and he never indicated he wished to speak to

18   counsel.  They never talked to him or sought to question him.

19   That was what I was planning to do today.

20           I don't know how the Court would like to proceed at

21   this point.

22           THE COURT:  Well, I think we should proceed with that.

23   I'll hear from Mr. Sullivan and see whether any consensus,

24   whether anything has emerged as a result of this colloquy.

25           Just a moment, Mr. Sullivan.  Yes, Mr. Coburn.

1          MR. COBURN:  Thank you so much, Your Honor.  I'm sorry

2    to have interjected myself here.  But I just wanted to suggest to

3    Your Honor, I think Your Honor is already envisioning this, that

4    if we could just, you know, pin down the scheduling issue to the

5    extent possible today before too much in the way of time and

6    resources gets devoted to the merits of other issues.  That would

7    be very much appreciated from my point of view.

8          From where I sit, you know, the Court was just very

9    incredibly, I think, attuned and sensitive to the issue when I

10   raised it many months ago, the fact that Professor Kurland is

11   just not, you know, a fungible commodity, and that it was

12   critical from my point of view, in terms of Mr. Gardner's

13   welfare, given that he was willing to participate and sacrificed

14   his ability to teach during an entire semester at Howard

15   University, that the trial go forward as scheduled and is

16   currently scheduled.

17          I still strongly feel that way.

18          I acknowledge that the landscape has changed in some

19   ways and acknowledge that this might be some sort of a hope that

20   if a year or two years passed, that maybe their perspective on

21   this may change and maybe they'll discover that they're actually,

22   what they've actually extracted from a white supremacy web site,

23   and so on.

24          You know, I can't really, I'll still here as counsel to

25   Mr. Gardner and I can't back way from the fact that Professor

1    Kurland has very graciously, I think, committed himself to try

2    this case as scheduled.  I believe it's still to be in Mr.

3    Gardner's interest for the case to go forward as scheduled in

4    March, without repeating what I said the last time when the issue

5    was addressed.  Your Honor remembers all that.

6           It's probably unnecessary for me to address this in

7    light of the Court's comments, but I just wanted to mention

8    briefly, with respect to the stun belt issue, I represented a

9    defendant in Federal Court in DC who was on trial for a year in a

10   capital case, who was wearing a stun belt during the course of

11   that entire year.  And if, in fact, the stun belt was utilized in

12   the courtroom to keep a defendant quiet, then as soon as the

13   defendant was talking, one of the marshals in the back with a

14   remote control device would activate the stun belt.  And then

15   what we would all witness would be the defendant screaming and

16   falling down on the floor in agony over a period of time.  I know

17   the defendant would probably sustain a third degree burn, as my

18   client did when he was stunned.  I'm not sure that's a very

19   practical alternative.

20          THE COURT:  Mr. Sullivan.

21          MR. SULLIVAN:  Thank you, Judge.  A couple

22   observations, Your Honor.  One is I've been yelled at many times

23   by Judge Luttig, Judge Wilkinson about certain positions that

24   I've taken.  So I think the Court's, you know, exercise at this

25   point about formalizing the denial of the client's position on

1    the subject matter jurisdiction, formalizing an opinion, I would

2    not be afraid to lead the charge because I think the Court would

3    give it the weight and consideration it deserves.  We can

4    expedite the schedule, ask the Court to shorten the briefing

5    schedule.  If they'd like to hear oral arguments or not.

6         And we would even have time probably to get cert denied

7    in the Supreme Court, if that's what the Court chose, with Chief

8    Justice Roberts, rather quickly before the summer months are

9    over.

10        So I think the if the Court is inclined to formalize

11   how it's dealt with the underlying issues, I guess I'm telling

12   the Court I'd be willing to litigate that position.

13        If it's a standby status or pro bono status or

14   whatever, I don't think that's an issue.  That's one of the ways

15   we can move forward.

16        Your Honor, on these issues that everyone is talking

17   about, I just want to remind, at the end of the day, the

18   sentencing jury will asked to weight whether the aggravating

19   factors sufficiently outweigh the mitigating factors.  And when

20   we have clients that are maintaining a position that is foreign

21   to all of us, in light of what the government wants to fashion,

22   no matter what protocol the Court wants to set in place, jurors

23   who can't look at the people are going to think the worse; that

24   they're dangerous, that they're so dangerous they can't be

25   brought into court.  That is an aggravating factor that cannot

1   even fit into this courtroom or courthouse.

2          On the other side of the coin, having clients in the

3   courtroom who are disruptive and obstructionist is an aggravating

4   factor that can't fit in the courtroom or this courthouse.

5          So I don't know the answer to that.  But I don't think

6   we should lose sight of that fact.

7          Aside from the fact that Your Honor ruled and we had

8   this colloquy and Your Honor kind of said that I could provide

9   you with cover, there are ABA guidelines that deal with death

10  penalty counsel and it's the standard that we have to apply.

11         There are folks that do this litigation, there are ABA

12  guidelines that deal with death penalty counsel and apply the

13  standard that we have to use.  You know, Higgs, I mean, forget,

14  Wiggins, from Judge Motz, sets a very high standard for

15  investigation and mitigation and doing what we need to do to

16  present a sentence of life for our clients and keep them from a

17  sentence of death.  That is a factual and legal impossibility to

18  do at this moment.

19         We cannot live up to those guidelines, which are not

20  mandatory, but are expectations of professional conduct.  We

21  can't take the first step to even remotely meet that.  And that's

22  what's frustrating.

23         And that's why I think that if the Court is inclined to

24  move forward with some sort of litigation to show the clients at

25  the end of the day that we took their case up to the Supreme

1    Court of the United States, there's no other court.  And if they

2    choose to not recognize the authority of the Fourth Circuit, and

3    if they choose not to recognize the authority of the Supreme

4    Court, then I don't really, you know, I don't really know what to

5    do at that point.

6            But I think I would agree, Your Honor, that expediting

7    appellate review may be a vehicle that would move the case in the

8    right, in the right direction.  And I was willing to wear that

9    protective suit, that armor.

10           THE COURT:  Thank you, Mr. Sullivan.  Ms. Manuelian,

11   and I regret that Mr. Harding isn't available to you.  The agents

12   are.  Are you able to say, assuming now that your choices are

13   Gardner in the spring alone, Mitchell and Martin in the fall

14   together, and Harris in late spring '07, that's one choice,

15   compared to Mitchell and Martin in the fall and Gardner and

16   Harris in late spring, early summer '07.  What would be the

17   government's preference?  And bearing in mind, you know, we've

18   got Mr. Kurland still to deal with.  But I want to ask you first.

19           MS. MANUELIAN:  Your Honor, I actually have a way to

20   call Mr. Harding on his cell phone.  And since we've been going

21   for some time.  If we can take a five minute break.

22           THE COURT:  Sure.

23           MS. MANUELIAN:  Let me call him, because I don't want

24   to make that decision by myself.

25           THE COURT:  Of course.  Of course.  Mr. Coburn, we're

1    going to take a break in a moment.  But I'm not going to say I'm

2    going to do what the government wants.

3          MR. COBURN:  Understood.

4          THE COURT:  But under the circumstances, I'd be willing

5    to call Dean Schmoke, who is a friend of mine, to see if some

6    further accommodation of Mr. Kurland couldn't be arranged.  It

7    sounds like we may be late enough in the spring, maybe even at

8    the end of the spring semester, to start the trial, say, the

9    first week of May, which is the earliest Mr. Treem's going to be

10   available, in any event.  It may be that Mr. Kurland wouldn't

11   have to withdraw if the trial is moved one year.

12         MR. COBURN:  Well, I tell Your Honor, from my own point

13   of view I would appreciate what Your Honor is saying.  You know,

14   my schedule is open to it.  If it's okay with Professor Kurland

15   to explore that alternative, I would be very grateful if Your

16   Honor would talk to Dean Schmoke about that.

17         Just as a point of clarification -- you don't mind, do

18   you, Mr. Kurland?

19         THE COURT:  The other possibility, by the way, is,

20   obviously, it's late in the fall semester, but maybe Professor

21   Kurland, if he's relieved from the March, '06 commitment, maybe

22   somebody can get a last minute sabbatical or something and he can

23   step in and teach a course or two next semester.  So it I may be

24   easier for Dean Schmoke to say, okay, next spring.

25         Before I hear from you, Mr. Kurland, let me finish

1    hearing from Mr. Coburn.

2            MR. COBURN:  Just as a point, I stood up as a point of

3    clarification.  That second option that you posed to Ms.

4    Manuelian, would that be Mr. Harris and Gardner together in one

5    trial or would they be sequentially?

6            THE COURT:  Well, I haven't ruled on the severance

7    issue yet but for right now I'm assuming they'd be together, I'm

8    assuming they'd be a joint trial.  But I haven't ruled on the

9    joinder issue.

10           MR. COBURN:  Okay.  I appreciate Your Honor clarifying

11   that.

12           THE COURT:  The other thing is, you know, I mean, I'm

13   full of ideas, most of them awful, but we can theoretically try

14   Harris this summer on that obstruction indictment.  But we can do

15   that in two days.  Okay?  Go ahead, Mr. Kurland.

16           MR. KURLAND:  Before you call Dean Schmoke, just so I'm

17   clear.  The proposal would be to essentially move Gardner's trial

18   essentially a year.

19           THE COURT:  Exactly.

20           MR. KURLAND:  I can't say that that wouldn't work for

21   sure, but I'm clearly not in a position to say it would work.  In

22   addition, without going into detail, I've got some very, I've got

23   some personal issues with a difficult ex-wife and custody that I

24   also need to shuffle around.  I would have to do.

25           I want to stay in this case.

1           THE COURT:  I know you do.  Absolutely.  And I want you

2     to.

3           MR. KURLAND:  I wish my client did.

4           THE COURT:  I tell you, the two things that are, that

5     I'm respectful of, respectful of and hopeful about respectively

6     is, I'm respectful of the government's prerogative.  The

7     government wants one trial and I understand that.  Frankly, I

8     should have added that as one of your choices, Ms. Manuelian.  I

9     mean, now we're talking, you know, summer of '07 for all four

10    defendants.  But I want to be respectful of the government's

11    prerogative.

12          But I'm also, because this is a death case, as you

13    outrageous as the defendants have been, and they have been, I

14    don't want to rush to judgment, to use the hackneyed phrase, any

15    of the cases in the hope that time will have an ameliorative

16    effect on whatever is going on here.

17          And I will tell you that I have spoken to Ms. Shearer

18    very briefly about some ideas this she has that we intend to talk

19    about to see if it isn't somebody, some members of the community,

20    some institutions in the community who might be able in some

21    appropriate way to communicate with these defendants.

22          And I notice, by the way, there's been a couple of

23    visitors with us today.  Can somebody identify these folks?  Are

24    they relatives of any of these defendants?

25          MR. SULLIVAN:  They're relatives of Mr. Mitchell's.

1          THE COURT:  Okay.  It may be that through community

2     efforts, institutional efforts, members of the bar, or other

3     persons in the community, together with the defendants' family,

4     can make it clear to these defendants that, given time and

5     opportunity to do so, that the course that they have started on

6     here is a plea for a death sentence.  It's as stark and as plain

7     as that.  It's suicide.

8          I don't know the details of what happened in Miami

9     yesterday but we've all heard the term "suicide by police

10    officers."  And what these defendants are doing in this case is

11    suicide by court trial, federal trial.  That's what it is.

12         So if there are members of the community that can get

13    that through to the defendants, particularly at a time when, you

14    know, this week is special in Maryland.  Surely, there's some

15    interest, not that a defendant ought to be able to control the

16    timing of a federal trial or any trial, but surely there's got to

17    be some interest on the part of the community to say to these

18    young men, don't commit suicide.

19         Yes, Mr. Coburn.

20         MR. COBURN:  Thank you, Your Honor.  For the record, I

21    just wanted to tell Your Honor how strongly I agree with the

22    observation that Your Honor made.  And I think it's appropriate

23    at this point to proffer to Your Honor that, you know, as I was

24    dealing with the situation, I've been in pretty extensive contact

25    with a number of Mr. Gardner's family members, at least one of

1    whom, who is his father, who lives in Philadelphia, came down to

2    see him this past Saturday and is extremely, extremely upset and

3    distressed about this turn of events.

4            And we have been exploring exactly the same possibility

5    that Your Honor has.

6            They would be probably less adept at bringing this

7    about than the Court would.  But you know, I mean, I personally

8    see maybe indirectly to reach out, for example, to the Reverend

9    Jesse Jackson, who I thought might very well take an interest in

10   the situation and might very well be somebody that I thought

11   might be disposed to listen to it.

12           You know, it seems to me that there are a host of

13   possibilities like that which might very well bear truth in this

14   case, which should be attempted given the gravity of the

15   situation.

16           THE COURT:  Okay.  Let's stand in recess for 20 minutes

17   and we'll reconvene.

18           If we're going to go forward with witnesses, Ms.

19   Manuelian, I'll do my best to try to do that before lunch, but it

20   may be that we have to resume at 2:00.  So don't excuse your

21   witnesses until we come back at 12:20.

22           If you and Mr. Harding come back and say, Judge, for

23   all the reasons and maybe additional reasons, and can talk with

24   your superiors, Judge, let's look to the fall, let's look to

25   Mitchell and Martin and maybe even, Judge, in the interim, let's

1    look to a joint trial of all four for sometime in '07, then that

2    might, that might happen.  But we'll see.  We're in recess.

3              (Recess.)

4              THE COURT:  So where are we?

5              MS. MANUELIAN:  Your Honor, we were all just discussing

6    that we weren't quite sure exactly what motions we really needed

7    to argue.  I think one thing that would be helpful is to just go

8    through and make sure what motions are left pending.

9              THE COURT:  Okay.

10             MS. MANUELIAN:  But I think there are a lot of motions

11   that probably the Court can decide on papers.

12             THE COURT:  Okay.

13             MS. MANUELIAN:  Of course I leave it to counsel to

14   articulate if there is something specifically they want to raise.

15             THE COURT:  Why don't we start with Mr. Coburn?

16             MR. COBURN:  Can I speak from here, Your Honor?

17             THE COURT:  Yes.

18             MR. COBURN:  There are a series of motions that have

19   been filed that we have adopted, have been filed by other counsel

20   challenging the application of the death penalty in this case,

21   specifically the death notices and so on.  And so I guess it

22   would probably be prudent for me to defer to the other counsel

23   who actually filed those motions.  I don't know whether they're

24   inclined to argue them or just submit on them.

25             The key issues from our point of view, the key issue

1   probably is the questionnaire.

2            THE COURT:  The jury questionnaire?

3            MR. COBURN:  Yes, Your Honor.

4            THE COURT:  All right.  Thank you.

5            MR. COBURN:  There are copies, copies of the

6   questionnaire, we have hard copies right now.

7            MR. KURLAND:  Your Honor, if I understand, this is to

8   the motions that are outstanding, whether or not we expect them

9   to be argued today.

10            THE COURT:  Well, what I was most interested in doing,

11   since I had you all here today, was to give you a chance to argue

12   or submit, but to argue on any common issues.  That's what I

13   propose to do.  So I didn't mean to surprise anybody with that

14   but I assumed that at least over the luncheon recess you could

15   look at what you filed and give me a sense of when you want to be

16   heard on any common issues.

17            As far as Mr. Gardner's concerned, the issues specific

18   to him, we will schedule a separate hearing and go over whatever

19   is pending as to Mr. Gardner.  Okay?

20            MR. KURLAND:  Thank you, Judge.

21            THE COURT:  All right.

22            MS. MANUELIAN:  Judge, would you like me to go through

23   what I think is outstanding at the moment?

24            THE COURT:  Sure.

25            MS. MANUELIAN:  Maybe that would be helpful.

1          THE COURT:  If you've got a ready list, that would be

2    helpful.

3          MS. MANUELIAN:  At this point we have --

4          THE COURT:  Ms. Arrington has just given me a list as

5    well.  Thank you.  Go ahead.

6          MS. MANUELIAN:  Okay.  We have the capital, the general

7    constitutional capital motions.  The government has filed two

8    responses to the death penalty motion.  One lumps Apprendi

9    argument and constitutional issues.  And I think the challenge

10   that was filed by Mr. Martin.  All of that is in one response and

11   those are primarily based on motions filed either Mr. Sullivan

12   and Mr. Martin and joint counsel.

13         THE COURT:  All right.  Do any of counsel want to be

14   heard on those issues in oral argument?  Okay.  All right.

15         MS. MANUELIAN:  Then we have the motions to dismiss the

16   death notices and the pretrial penalty phase evidentiary hearing.

17   That was a separate response that Mr. Harding did.  And that's

18   encompassed, and I think that pretty much covers those particular

19   motions.

20         Again, I think they were primarily filed by Mr. Martin,

21   Mr. Kanwisher and Mr. Sullivan, Ms. Rhodes.

22         THE COURT:  Does anybody want to be heard on those

23   motions or that motion?

24         MR. MARTIN:  No.

25         THE COURT:  All right.  Mr. Sullivan.

1          MR. SULLIVAN:  Mr. Harding.

2          THE COURT:  That's --

3          MS. MANUELIAN:  That's a Mr. Harding motion.

4          MR. SULLIVAN:  We can defer that to another day.  I

5    mean, there are just a couple points on those issues that I would

6    just like to either get the government's agreement on.  For

7    example, the section of victim impact evidence, which would also

8    be germane to Mr. Gardner, by the way, I need to see how the

9    government intends to limit, if at all, the victim impact

10   presentation in the penalty phase because there are some

11   constitutional parameters which we can develop and usually can

12   develop by agreement of counsel, if the government agrees to let

13   us know, one, what the actual victim impact testimony will be

14   from the witnesses to allow us the opportunity to come to court

15   to say that we think it's too prejudicial, it exceeds the

16   boundaries of Payne v. Tennessee.  Those are the kind of issues

17   that I'd like to address, and challenge the notice.

18          THE COURT:  But I take it, Ms. Manuelian, when you

19   refer to Mr. Harding's motions, you're not prepared today to take

20   up those issues?

21          MS. MANUELIAN:  No.  Those issues he specifically dealt

22   with in his aspect of the capital motion responses.

23          THE COURT:  Okay.  All right.  So we'll defer on, as I

24   promised, any issues as to which you're not comfortable

25   addressing today.

1          MS. MANUELIAN:  Then, Your Honor, I think we have the

2     suppression motions.  The only evidentiary issue that we feel we

3     have left to do is to handle the issue about Mr. Mitchell's April

4     1st, 2002 arrest.

5          THE COURT:  Remind me why that's relevant and what

6     that's all about.

7          MS. MANUELIAN:  As I recall, we had argued no Sixth

8     Amendment violations.  But at the end of the hearing, I wasn't

9     here, the Court raised a Fifth Amendment issue about, if Mr.

10    Mitchell had actually invoked his right to counsel, that any

11    subsequent questioning was going to be in violation of the Fifth

12    Amendment.

13         THE COURT:  Oh, is this the Judge Roger Brown issue and

14    all of that?

15         MS. MANUELIAN:  Yes.  It's an outbreak of that.  We

16    have evidence that Mr. Mitchell never invoked his right to

17    counsel when he was arrested on the arrest warrant.  So that

18    subsequent statement is not tainted.

19         THE COURT:  Okay.  I'm sorry.  Just let me get focused.

20         What was the date of the transport to Homicide?

21         MS. MANUELIAN:  April 1st of -- April 2nd of 2000 --

22         THE COURT:  Okay.

23         MS. MANUELIAN:  Yes, April 17th, 2002.

24         THE COURT:  So the April 1st arrest relates to the

25    Court's inquiry as to whether, with the Baltimore Circuit Court

1    doing what it does, how does a judge who issues a writ know

2    whether or not Edwards v. Arizona is in play when he or she

3    issues the writ authorizing a transport of a defendant from

4    Central Booking to Homicide.

5         MS. MANUELIAN:  I didn't know that you were focusing on

6    that, Judge.

7         THE COURT:  That was one of the ones that came up.

8    Yeah.  If a judge sitting in his chambers, at the request of the

9    police, says, Hey, Judge, I want to take this guy from Central

10   Booking over to Homicide for the purpose of, one, administering

11   Miranda, and two, seeing if he'll waive and questioning him, how

12   does the judge know whether, Edwards, how does the judge know

13   whether the right of silence was invoked by the defendant at the

14   time of the arrest that leaves him at Central Booking in the

15   first place?

16        MS. MANUELIAN:  I don't know that we can answer that

17   question, judge.  But what we can answer is whether, in fact,

18   there was any Fifth Amendment, whether this was an invocation of

19   a right to counsel on April 1st of 2002 that would create the

20   problem for the April 17, 2002 statement.

21        THE COURT:  And you've got the two arresting officers,

22   is that right?

23        MS. MANUELIAN:  Yes.  The investigator who was actually

24   handling the arrest that was the basis for the warrant, and then

25   Detective Benson, who participated in that arrest.

1          THE COURT:  What was he arrested for April 1st?

2          MS. MANUELIAN:  It was for the Hammerjacks assault that

3   is related to our case.

4          THE COURT:  Okay.

5          MS. MANUELIAN:  All right.  So that's the remaining

6   evidentiary issue.  And then other than that --

7          THE COURT:  He didn't make bail on that?

8          MS. MANUELIAN:  No, he didn't.

9          THE COURT:  Was that a shooting or was that --

10         MS. MANUELIAN:  An assault with a knife.

11         THE COURT:  With a knife.  Okay.

12         MS. MANUELIAN:  Judge, that's the only evidentiary

13   issue separate and apart from the identifications.  Other than

14   that, I think the rest of the suppression motions were probable

15   cause issues that we had and to ask the Court to simply rule on

16   the papers.  I don't know if the defendants have any disagreement

17   with that.

18         THE COURT:  All the rest are warrant searches?

19         MS. MANUELIAN:  Yeah.

20         THE COURT:  Anybody disagree with that?  Okay.  All

21   right.  What's next?

22         MR. SULLIVAN:  Your Honor, if I can comment on the open

23   evidentiary issues.

24         THE COURT:  Of course.

25         MR. SULLIVAN:  Two points.  One is that there is

1    pending my letter motion to Your Honor protesting the

2    government's submission of judge --

3           THE COURT:  Judge Brown.

4           MR. SULLIVAN:  -- Judge Brown's affirmation, Roger

5    Brown, that Mr. Harding submitted in support of their motion.  By

6    letter to Your Honor, we ask the Court either to strike it under

7    Crawford v. Washington or allow me permission to issue a Rule 17

8    subpoena for Judge Brown because I'm contending that the

9    affidavit, the affirmation of Judge Brown is testimonial in

10   nature, and under Crawford v. Washington should not be accepted

11   by this court even with, you know, assuming hearsay evidence is

12   admissible, it can kind of, proceeding with Mr. Mitchell --

13          THE COURT:  Well, I guess, Mr. Sullivan, I don't

14   understand, and maybe I'm forgetting what you said to me, but my

15   recollection is that you were not at all clear what you were

16   going to do about any of this.  In other words, what I mean is,

17   so I've seen Judge Brown's affidavit.  I want to be sensitive

18   here.  Well, you all know how I feel about it.  So I'm not sure

19   what Judge Brown's affidavit adds to anything.  I mean, it's sort

20   of nice, interesting, some might say shocking background, but it

21   doesn't add anything to the record that I think is going to be of

22   a decisional significance.  Now, maybe I'm wrong about that

23   because I don't know exactly what you were going to do with all

24   of that.

25          MR. SULLIVAN:  Well, let me proffer.

1          THE COURT:  You know, it seems to be sort of a, without

2    making any finding, it's sort of like this, as sometimes happens

3    in cases, some shocking revelation of what in my view is clearly

4    unconstitutional or certainly potentially unconstitutional

5    behavior on the part of the state court and the state prosecutor

6    and the state, and the city police.  But I'm not sure what, if

7    any, consequences there may be in this case.  That's what I'm

8    trying to say.

9          MR. SULLIVAN:  And I think, you know, Your Honor --

10          THE COURT:  By the way, I've been really since I've

11    seen Judge Brown's affidavit, in all honesty, I've been really

12    mulling over in my mind what, if any, appropriate -- what can I

13    say beyond what I've said on the bench, from the bench?  I

14    clearly have to write an opinion.  It seems me I clearly, clearly

15    have to write an opinion on this issue and get it circulated.

16          I came pretty close, frankly, one day not long after

17    reading Judge Brown's affidavit, I think, of actually calling my

18    good friend, Judge Holland, the Administrative Judge over there,

19    just to say, do you know about this?  But I didn't do that.

20          And I think probably about the only appropriate thing I

21    can do is to issue an opinion and hope that it gains notice and

22    hope that, if I'm right, and I think I'm right, hope that the

23    change occurs because I think on a wholesale basis, on a regular

24    wholesale basis, with the complicity of the Circuit Court for

25    Baltimore City, the constitutional and statutory rights of

1   detainees in Baltimore City are regularly violated.  That's my

2   belief.  That is my belief.

3          I don't see how it can be otherwise.  It may be the

4   case that these officers are going to come in here and say that

5   Mr. Mitchell never invoked his right to counsel and, frankly --

6   was it an on-view arrest of Mr. Mitchell on April 1st?

7          MS. MANUELIAN:  Warrant for Hammerjacks.

8          THE COURT:  It was a warrant.  But the majority of

9   assault cases, of course, there's not going to be any evidence

10  that questioning is going to elicit.  But you can think of a lot

11  of other cases where there would be a great incentive to police

12  to seek a Miranda waiver, waiver of right to counsel, where the

13  defendant invokes the right to counsel on Thursday, makes,

14  doesn't make bail, and a week later or four days later, two weeks

15  later, or a month later, as I suggested hypothetically, some

16  ballistics test comes back or some other scientific evidence

17  comes back and a new warrant gets issued for somebody who's

18  already at the Detention Center.  He's invoked his right to

19  counsel.  Maybe a related case.  Who knows the whole point of

20  this is counsel can never uncover any of this.

21         And a defendant is absolutely disabled from ever

22  saying, even at the threshold, because he's brought right down to

23  the homicide detectives, I don't want to go Homicide.  And it's

24  absolutely just so clear to me.  It's so clear to me.

25         What's really striking about Judge Brown's affidavit is

1    that Judge Brown seems to attest that he views it almost as a

2    responsibility of the Court to facilitate this, which is not the

3    view that a lot of judges would have.

4            So it may be that I have to issue, that I will issue an

5    opinion on this and see what response it gets among the bench and

6    bar in Baltimore City.

7            All of that to one side, Mr. Sullivan, go ahead.

8            MR. SULLIVAN:  Let me just focus Your Honor, then, on

9    the outstanding evidentiary matter that the government raised.

10   As the Court will note this morning, you know, I was fully

11   planning on calling Mr. Mitchell for the point that he invoked.

12   And the good faith basis is a report where it says April 1st,

13   2002, the Baltimore Police Department --

14           THE COURT:  Slow down.

15           MR. SULLIVAN:  April 1st, 2002 arrest by the Baltimore

16   Police Department, forms, it says individual was transported to

17   CD for questioning, then to CBIF for processing.  And if Mr.

18   Mitchell was cooperating with me and if Mr. Mitchell would

19   recognize this Court's jurisdiction and testified as Ms. Rhodes

20   and I expected Mr. Mitchell to testify, that he was asked to give

21   a statement, that he said he wanted to talk to his lawyer, and

22   that he was processed.

23           And I'm unaware of any, you know, talismanic recitation

24   that is required for invocation which would get this Court to

25   another kind of academic discussion about, constitutional

1    discussion about what really is required to invoke.

2           And that's where we were going in the evidentiary

3    portion of the case, to make that Arizona v. Robinson attack on

4    the government conduct in this case.

5           Now, we can't any longer.  And I'd ask the Court, I

6    guess, at this point, since Mr. Mitchell's not being tried until

7    September, that we kind of place this, while the Court's mulling

8    over whatever opinion the Court can write, we kind of just hold

9    this in abeyance, because if Mr. Mitchell does come around from

10   his present stance, he may be able to testify.

11          So I don't want his rights to be exhausted, given the

12   stature.  And the Court's discussion about, you're right.  It

13   would be fun cross examining a retired District Court judge, you

14   know.  Probably wouldn't get the opportunity.  But in terms of

15   where the motion is actually being directed to primarily, Your

16   Honor, this is not that urgent of a matter.

17          THE COURT:  All right.  Thank you, Mr. Sullivan.  I

18   will take under submission your request that Judge Brown's

19   affidavit not be accepted and considered.  And as you correctly

20   point out, we will cross that bridge when we need to and when we

21   can, given the uncertainty of Mr. Mitchell's situation.

22          MR. SULLIVAN:  Thank you.

23          THE COURT:  Okay.  Ms. Manuelian.

24          MS. MANUELIAN:  Next, Judge, the mental health motions.

25   I think this is initially the government's motion.  And again,

1    this is something Mr. Harding has spent time on.  So we need to

2    take that up at some point in time.  I don't know, I would

3    imagine the Court would want to hear some argument on this.

4              THE COURT:  Sure.  And that clearly is quintessentially

5    an individual issue, an issue for each individual defendant.

6              MS. MANUELIAN:  There is also, I believe, pending a

7    statement, a suppression, the issue regarding Mr. Harris's

8    statement to Police Officer Alvin Barnes.  And this is something,

9    again, that Mr. Harding responded to.  If I could just find it.

10             THE COURT:  Is that the phone call during the search?

11             MS. MANUELIAN:  Yeah.  And then we filed a supplemental

12   response.  Mr. Harding told me just before he left last week that

13   another pleading had been filed on Mr. Martin, Mr. Kanwisher.  Is

14   that correct, in response to our response?  Okay.  I don't think

15   I've seen it.

16             I think Mr. Harding said he had something he wanted to

17   supplement the issue with.

18             THE COURT:  Okay.  We don't need to get to that for a

19   good while in light of Mr. Harris's situation.

20             MS. MANUELIAN:  All right.

21             THE COURT:  Okay.

22             MS. MANUELIAN:  Then I think that whatever remaining

23   miscellaneous pretrial motions there are, and I don't have a good

24   handle on that.  There was some minor issues that we need to take

25   up.  Actually, before we get there, though, we do have a

1    duplicity motion, multiplicity motion, filed that we still have

2    to respond to for Mr. Gardner.  And the identification issues, as

3    I said earlier.

4              THE COURT:  I'm sorry.  What is the duplicity issue

5    again?  Just very briefly.

6              MR. KURLAND:  Your Honor, the government's charged in

7    Count One the RICO conspiracy and they've also charged -- let me

8    just get that in front of me -- they've also charged in Counts

9    Seven and Nine conspiracies to violate Section 1959(a)(5), which

10   is a conspiracy to commit an act of violence under RICO, to

11   maintain a position in the enterprise.

12             It's our argument that Counts Seven and Nine are

13   essentially lesser included offenses.  They're specialized RICO

14   conspiracies within the larger RICO conspiracy and we contend

15   that they are multiplicitous and, therefore, should either be

16   dismissed, or the government should elect which one they want to

17   proceed on.

18             THE COURT:  I should literally put that off until the

19   day of trial.  I mean literally.  Not that I would.  But I mean

20   in terms of what we need to get accomplished.

21             MR. KURLAND:  Well --

22             THE COURT:  I don't have the indictment in front of me.

23             MR. KURLAND:  It certainly doesn't need to be resolved

24   now.  But I would hope at the time, when we're dealing with some

25   specific scheduling issues as to Mr. Gardner, that we could have

1  it resolved or litigated, required to, at least, the actual eve

2  of the trial.

3        THE COURT:  Certainly.  I didn't mean to suggest that I

4  would actually wait until the eve of trial.

5        What are the two counts?

6        MR. KURLAND:  Seven and Nine, Your Honor.

7        THE COURT:  And what do they charge?

8        MR. KURLAND:  They are, they charge conspiracy to

9  violate Section 1959(a)(5), which is a conspiracy to commit an

10 act of violence under RICO to maintain or increase his position

11 in the RICO enterprise.  And the Count One RICO indictment

12 basically is essentially the same, is a greater included offense

13 of that.  You have to look at the statutes, Your Honor, to see

14 how multiplicitous it truly is.

15       THE COURT:  All right.  The government's going to file

16 a response?

17       MS. MANUELIAN:  Yes.

18       THE COURT:  And we'll be in a position to deal with it.

19 Okay.

20       MS. MANUELIAN:  Then, Your Honor, I think we had some

21 miscellaneous discovery issues and miscellaneous pretrial motions

22 and I don't have a breakdown of that.  I don't know what I've

23 missed on your list.

24       THE COURT:  Okay.  Well, we've got, for example, the

25 question of the rap lyrics.

1          MS. MANUELIAN:  Oh, yes.  Again, this was something

2     that Mr. Harding was handling because I've been in trial for a

3     while.

4          THE COURT:  All right.

5          MS. MANUELIAN:  So I don't know what he filed.  I saw

6     that there was some response filed or he may be in the process of

7     working on that.  Maybe Mr. Martin or Mr. Kanwisher can enlighten

8     me.  I don't know if they know anything.

9          MR. MARTIN:  I don't think anything's been filed, Your

10    Honor.

11         THE COURT:  All right.

12         MR. KURLAND:  With respect to the rap lyrics, it's our

13    position that it's inadmissible against Mr. Gardner regardless of

14    its admissibility.  I'm not clear on the government's position on

15    that.  But I would be very, very, we'd be very satisfied if the

16    government would, that your representation today that they don't

17    intend to offer that against Mr. Gardner.

18         MS. MANUELIAN:  I can't make that representation,

19    Judge.

20         THE COURT:  Okay.  All right.

21         MR. KURLAND:  Judge, that's obviously, then, not a

22    specific issue to just --

23         THE COURT:  Yeah, I think it covers everybody.

24         MS. MANUELIAN:  It does, Judge.

25         THE COURT:  I think, then, the only thing that's left

1    is the jury questionnaire.  Yes, Mr. Kurland?

2              MR. KURLAND:  There's an outstanding, very, very

3    important Brady issue which is noted in some of the pleadings we

4    filed November 16th with respect to the identification issue.  If

5    I could just briefly.

6              THE COURT:  Yes.  Go to the microphone, please.

7              MR. KURLAND:  Your Honor, with respect to the Tonya

8    Spence murder, we have the benefit of the entire state court

9    record.  Somebody who is a, one of the witnesses and made some

10   sort of identification and statements with respect to the

11   question, Andrea Smith has made several statements blatantly

12   inconsistent with the events that transpired.  This is all in the

13   pleadings.  The government obviously knows about that.  We

14   supplied the government with the actual statements, which are

15   clearly inconsistent.

16             We've also asked in the motion that to the extent Ms.

17   Smith has testified either at the grand jury or has made

18   additional statements to federal investigators since they've been

19   involved in the case, that those are also by nature inconsistent

20   with other statements that have already been made, regardless of

21   the substance of those statements, it's Brady impeachment

22   material.  It's essential to the core capital count against Mr.

23   Gardner.

24             And we'd ask the government if they would turn it over

25   as Brady material.  It largely goes to whether or not Mr.

1    Gardner's the shooter or not.  Provided information, at which at

2    one point she says that Holly is the shooter, another point she

3    says somebody else is the shooter.

4           Mr. Harding, at the last hearing, was, or two hearings

5    ago, stated that it's the government's position in this case that

6    they intend to prove that Mr. Gardner was the shooter.  To the

7    extent that Ms. Smith has made any additional statements to the

8    government, including grand jury testimony, whether or not she

9    says our guy's the shooter or not, is blatantly inconsistent,

10   regardless of what she says, with other statements she's made.

11   It's impeachment material that's central to the case and it

12   really needs to be turned over now.

13          The government basically has politely ignored us to

14   this point.

15          THE COURT:  Okay.  Are you in a position to respond,

16   Ms. Manuelian?

17          MS. MANUELIAN:  Judge, I think, as Mr. Kurland says,

18   this is incorporated -- correct me if I'm wrong -- in the

19   identification motions that were recently filed, is that right?

20          MR. KURLAND:  Yes.

21          MS. MANUELIAN:  Yes.  We don't have any additional

22   statements.  Just putting aside the merits of the claim, which we

23   will address in the motions response, we don't have any

24   additional statements.

25          MR. KURLAND:  Is that the representation of the

1   government, that Ms. Smith has not testified before the grand

2   jury?

3          MS. MANUELIAN:  Yes.

4          THE COURT:  Okay.  So one's taken care of.  I think

5   that leaves us with the jury questionnaire.  I have, I think,

6   only -- Mr. Coburn.

7          MR. COBURN:  Your Honor, there was a Bill of

8   Particulars filed, also.  I don't know whether it's productive

9   with respect to the Court, to save the Court time, to go through

10  them paragraph by paragraph.  But I just wanted to apprise Your

11  Honor that they have been filed.  I know that Mr. Martin filed a

12  Bill of Particulars, a Motion For Bill of Particulars, as have

13  we.

14         THE COURT:  I think that's probably best left until I

15  have you here yourself, Mr. Coburn.  Obviously, with Mr. Gardner

16  going to trial first, any request for Bill of Particulars --

17  well, not literally, but effectively any request for Bill of

18  Particulars filed by any of the defendants have been moot because

19  the defendants are going to get to see the government's case.

20  Not all of it, but certainly the core of it.

21         All right.  So I think I only have two proposed

22  questionnaires, the government and one from Mr. Martin.  Are

23  there any great differences between them?

24         MR. COBURN:  There are some, there are some.  I should

25  let Mr. Martin address that.

1              THE COURT:  Mr. Martin.

2              MR. MARTIN:  Your Honor, number one, in my opinion

3      there are significant differences.  The death related question

4      isn't on there.

5              THE COURT:  Isn't?

6              MR. MARTIN:  I think I know why.  Judge Messitte

7      doesn't like to address that in the questionnaire.  I think he

8      likes to address them when he sees the jurors when they come in.

9      I understand things should work --

10             THE COURT:  So your understanding is Judge Messitte --

11             MR. MARTIN:  Well, maybe Mr. Treem can explain it

12     better than I can.

13             THE COURT:  Perhaps so.

14             MR. MARTIN:  Having been in front of Judge Messitte.

15             THE COURT:  Yeah.  Perhaps Ms. Manuelian can as well.

16     Mr. Treem, Mr. Martin is suggesting that Judge Messitte,

17     obviously, you tell the jury it's a death case, it's a capital

18     case in the questionnaire.  But do I understand that Judge

19     Messitte doesn't ask any, any death qualifying type questions in

20     the questionnaire?  Waits until --

21             MR. TREEM:  Your Honor, I think in there was some

22     reference to this being a death penalty case in the questionnaire

23     that went out to the jury, in kind of a preamble.  But the actual

24     questions in the questionnaire itself were, I think it was a

25     general question and I think this was a kind of an admonition

1    that they left the questions during the voir dire process.

2            I think the questionnaire that I think is referenced in

3    the government's cover letter, used by Judge Messitte in U.S. v.

4    Whiting, the questionnaire that apparently has evolved at least

5    in Judge Messitte's own practice, is not the questionnaire that

6    was used in Haynes and maybe not even in Higgs.

7            Your Honor, I also had a death case with Judge

8    Messitte.  Judge Messitte takes the view that he does a lot of it

9    so he engages in individual voir dire of every juror and

10   restricts them, I don't put any connotations on it, but restricts

11   involvement of counsel in voir dire.  So that whether Judge

12   Messitte establishes it, he has his own book of questions that

13   deal with a juror's attitudes toward the death penalty that are

14   not included in the questionnaire.  So counsel don't have the

15   opportunity to review, don't have the opportunity to do the

16   things like bump people out based on the questionnaire on their

17   answer in advance so they don't have to come to court.  That

18   opportunity doesn't occur until the ceremonial courtroom in

19   Greenbelt because of the way Judge Messitte believes capital voir

20   dire takes place.

21           My experience in other jurisdictions is that a limited

22   amount, don't have to have 50 pages of death penalty questions,

23   but I think it's helpful for all the parties because the defense

24   and government can agree on just the questionnaires, sometimes

25   does get rid of people from the panel if you ask a reasonable

1    amount of questions about a juror's attitude, not the stake-out

2    questions.  Not what you feel about Type A type of mitigation to

3    try to box a juror in, but to ask general questions about a

4    potential juror's belief in capital punishment, I think, saves a

5    lot of time in the end.

6              THE COURT:  I say -- yes, Mr. Coburn, sorry.

7              MR. COBURN:  I'm sorry, Your Honor.  I just want to

8    indicate, from our point of view we strongly agree with what Mr.

9    Sullivan and Mr. Martin said.  I mean, not to include death

10   qualifying questions in the questionnaire is to forgo a

11   tremendous opportunity.  I mean, these questions can be answered

12   without imposing on the Court's time, answered by the jury on

13   their own time.  And it gives the Court a jumping off point in

14   terms of conducting the witness-related inquiry.  It allows the

15   Court to be much more targeted in the type of questions it puts

16   forth in voir dire.

17             It's very much in the government's interest because

18   sometimes these types of questions will knock out, you know, a

19   potential juror pretty summarily.

20             THE COURT:  That's, frankly, my -- of course, as you

21   all know, I haven't done this before.  But that would be my

22   default position.  I don't want more people coming to the

23   courthouse to be sent away.  I want fewer people coming to the

24   courthouse who are going to be sent away.

25             So I certainly will confer with Judge Messitte and

1    Judge Chasanow and all my colleagues before we finalize the voir

2    dire, if not the questionnaire.  But Ms. Manuelian.

3           MS. MANUELIAN:  Your Honor, I hate to do this but I'm

4    not usually in this type of position.  But again, Mr. Harding had

5    done this.  And I have to say, I've looked, I was just sitting

6    here looking at everything very briefly.  This is also my first

7    capital case.

8           THE COURT:  I thought you had one.

9           MS. MANUELIAN:  No, no, I've done murder cases but not

10   death penalty.

11          And I would like to confer with Andrea Smith, who had

12   the Lexington Terrace case in front of Judge Blake and see what

13   the questionnaire was that they had there.

14          I certainly see the merit in some of what defense

15   counsel say.  I also see some questions in here in Mr. Martin's

16   proposed questionnaire that I would be objecting to as government

17   counsel.

18          THE COURT:  Give me a quick example of one.

19          MS. MANUELIAN:  Well, I think that there is, and maybe

20   this is standard, I don't know.  But I'm looking in the potential

21   punishment, the lengthy dissertation about that.

22          I would like to have an opportunity, if I could, to

23   take a look at what was done in the Lexington Terrace case and

24   get an example of something perhaps other than what we had with

25   Judge Messitte and see if Judge Chasanow, or Judge Williams, I

1   think, has done, and see what Judge Chasanow used as well.

2          When was the date by which these would have to be

3   mailed out?

4          THE COURT:  Well, of course, the jury section wants

5   them yesterday.  I understand that.  We need to get them out by

6   the first week of January, I think, at the latest, if we're going

7   to start the Gardner trial.  And by the way, you know, to a

8   certain extent the other three defendants have only a, shall we

9   say, inchoate interest here because we can always change

10  something later on.

11         So the focus here is on the Gardner trial for me.  So

12  we need to get it out, I would think, by the first week of

13  January at the absolute latest.  They're going to need, you know,

14  time to get it photocopied and mailed out and so forth.

15         So I would like to give it to them the first week of

16  January for mailing out the second week.

17         MS. MANUELIAN:  Could we have it by the second week,

18  Judge?  I'm going to be out for surgery and I'd like just to have

19  a little bit of overlap between leaving and coming back so that I

20  can straighten this out.  Because I don't want to leave Mr.

21  Harding with everything to deal with while I'm gone.

22         THE COURT:  Okay.  The jury term is April, right?

23         MS. MANUELIAN:  I don't know.

24         THE COURT:  Or is it May?  Actually, I think it's,

25  would you ask Belinda to come out, please?  Sharon, do you know?

1   January, February, March, April, May and June.

2           MR. SULLIVAN:  While the Court's thinking I just wanted

3   to tell Ms. Manuelian, so she understands, the Judge Chasanow

4   case in Greenbelt was judge only.

5           THE COURT:  Right.  That was non-jury.

6           MR. SULLIVAN:  So there isn't any --

7           THE COURT:  But didn't Judge Chasanow have another one

8   that was jury?

9           MR. SULLIVAN:  Well, she did Irby, which the jury came

10  back with a second degree, so it wasn't a death penalty case.

11  But she voir dired in that.

12          THE COURT:  Yes, Mr. Coburn.

13          MR. COBURN:  Your Honor, I just wanted to mention to

14  the Court that Ms. Manuelian and I were just talking about the

15  possibility of exchanging some objections and supplements on

16  these questionnaires within the next two weeks.

17          THE COURT:  That would be great.  Frankly, if you two

18  can agree on something with maybe two or three disagreements, I'm

19  going to use what you want.  You know, we can worry about

20  Mitchell and Martin and Harris down the line and they can, I

21  mean, you know.  So to the extent that you're in touch with Mr.

22  Harding and Ms. Manuelian, that would be very much appreciated.

23          But I need to get a final questionnaire into the hands

24  of our jury section no later than the second week of January.

25  And I think our jury terms commence January, April and so on.  So

1    in effect, we'll have a fresh panel starting in April.  And my

2    intention would be to send the questionnaires, you know, to the

3    people who would otherwise be on tap for the April term.  And

4    we'll send out however many questionnaires we need to send out.

5           I'm sure Judge Messitte and Judge Blake will have some

6    views about that.  Several hundred.  Then we'll start getting

7    them back by the, hopefully by the middle of February.  Frankly,

8    the beginning of February.

9           And then you all can start going through them and we

10   need to decide whether we need to send out some more if we're

11   going to include in the questionnaire, unlike Judge Messitte, a

12   little more information about death penalty litigation.

13          MR. COBURN:  I think that makes very good sense from

14   our point of view, Your Honor.  It might be a good idea when

15   we're setting the status hearings for us in the new year, that we

16   set something the first week of January, if possible, so we can

17   iron out anything between us and Ms. Manuelian, to work out.

18          THE COURT:  I'm about to do that right now.  So if

19   you'll take out your calendars.

20          MS. MANUELIAN:  Judge, we're canceled now for the

21   remaining hearings in December that you set up?

22          THE COURT:  That was going to be my first question.

23   The next scheduled appearance was next Wednesday, the 14th,

24   unless -- and you're not available correct, Ms. Manuelian?

25          MS. MANUELIAN:  Yes.

1        THE COURT:  So that's a good reason to cancel both that

2 hearing as well as, I think, we had one or two the following --

3 yeah, we had set aside the 20th and the 21st.  And so under the

4 circumstances, I see no benefit in holding those dates in.  If

5 anybody has a different perspective.  Hearing no objection, okay.

6        So we're off, we're off the calendar for the 14th, the

7 20th and the 21st.  The defendants will have achieved at least

8 that.

9        So let's, I'll schedule, I'd like to schedule, I

10 recognize this gets a little dicey, but I would like to schedule

11 either Monday the 9th or Tuesday the 10th, primarily now

12 concerned with, of course, really helps for the, I'm concerned

13 primarily with Mr. Coburn and government counsel and Mr. Kurland.

14 I would like to schedule the 9th or the 10th.

15        MS. MANUELIAN:  Your Honor, the 10th would be better

16 for me.  I was actually going to be back in the office on the

17 11th.  So that would work fine.

18        THE COURT:  Okay.  I'm not available the 11th.

19        MS. MANUELIAN:  The 10th is fine.

20        THE COURT:  Mr. Kirkland?

21        MR. KURLAND:  Kurland.

22        THE COURT:  Excuse me.  Mr. Kurland.

23        MR. KURLAND:  Tuesday is fine.  The 10th is fine.

24        THE COURT:  Okay.  Great.  So obviously, counsel, I

25 need not say it.  You are invited to all of these proceedings.  I

1    would frankly hope that at least one of the two of you in each

2    instance can make it.  But we're not going to defer under the

3    circumstances.  Okay.

4            MS. MANUELIAN:  Judge, on that date, what are we really

5    looking at?  All Gardner motions?

6            THE COURT:  What I'm hoping is that on the 10th or

7    actually before the 10th, I hope I will get a letter from you

8    and/or Mr. Kurland, Mr. Coburn saying, Judge, we've worked on the

9    questionnaire, we agree on the following, we disagree about the

10   following two or three or four questions.  And on the 10th that's

11   what we're going to begin with, the questionnaire.

12           And I expect to have the questionnaire finalized by the

13   afternoon of the tenth and get it printed and mailed out, if not

14   by the 13th, then certainly early that following week.

15           MR. KURLAND:  Your Honor, you indicated -- that's fine

16   with us.

17           THE COURT:  Okay.

18           MR. KURLAND:  You indicated something about, with

19   respect to multiplicity issue being litigated later on maybe

20   closer in the trial.  But will that be a response date that the

21   government has?  The government's been very flexible and very

22   helpful with respect to us.

23           I would just like to know what paperwork is going to

24   come in.

25           THE COURT:  Sure.  I'm going to give the government 30

1    days.  We don't have to take that up on the 10th.  The government

2    has 30 days to file a response to all remaining Gardner motions,

3    including the duplicity question.  All right.

4            The next date I would propose, again, with Mr. Kurland

5    and Mr. Coburn, would be the 26th of January, Thursday.

6            MR. COBURN:  That looks fine, Your Honor.

7            MR. KURLAND:  Your Honor, that's fine with me.  At this

8    point, though, I'm concerned about when we are going to set

9    aside, specifically, time with respect to what I anticipate to be

10   a one or two day evidentiary hearing on the identification

11   issues.  Is that what we're getting into now with these

12   statements?

13           THE COURT:  Not yet.  Again, let me hear from Ms.

14   Manuelian.  Remember, the government's taking the position that

15   it will not disclose the witnesses, some witnesses until two

16   weeks before trial.  As of today, that date is March 13th.  So

17   what I'm looking to do is to schedule a suppression hearing on

18   identification sometime the week of March 20th with the trial

19   starting not really on the 27th but sometime around April 18th or

20   20th.

21           So in effect what I'm saying is the government said,

22   we're going to give you two weeks because of this flexibility we

23   now have, you're actually going to get something close -- you

24   would have gotten it -- anyway.  But what you're now going to get

25   is something closer to four weeks.  Okay?  All right.

1          MR. KURLAND:  Jencks also, Judge?

2          THE COURT:  That's with the Jencks, also.  In other

3   words, the government's production and disclosure obligations is

4   March 13th.  That's when you're going to get everything, no later

5   than that.  Hopefully, Ms. Manuelian and Mr. Harding will see the

6   wisdom in doing it earlier rather than later.  So no later than

7   the 13th you will get disclosure and production.  All right?

8          MR. KURLAND:  Thank you, Your Honor.

9          THE COURT:  So far we've got the January 10th, the

10  primary purpose of which will be to finalize the questionnaire.

11  And perhaps we'll take up at that time the mental health issue as

12  to Mr. Gardner.  And perhaps by then Mr. Harding will be prepared

13  at least to address the rap lyrics issue.  Okay?

14          Next will be January 26th, will be the, any carry-over

15  issues from the 10th.  Okay?  So then we'll just schedule a

16  status conference, how about Thursday, the 23rd of February?

17          MS. MANUELIAN:  That's fine with the government, Your

18  Honor.

19          MR. COBURN:  That looks fine, Your Honor.

20          THE COURT:  Okay.

21          MS. MANUELIAN:  Are these all at ten?

22          THE COURT:  These are all at 10:00.  February 23rd.

23  And then we finally get, I think, to the meat of the matter.  The

24  government's production and disclosure will be no later than the

25  13th of March.  So I would propose hearings on the 23rd and the

1    24th, Thursday and Friday, on the identification issues.

2                 MR. KURLAND:  Would that also, Your Honor, probably

3    when you hear the multiplicity issues?

4                 THE COURT:  Yes.

5                 MR. KURLAND:  That's the 23rd?

6                 THE COURT:  March 23rd and 24th.

7                 MR. COBURN:  That's fine, Your Honor.

8                 MR. KURLAND:  That's fine, Your Honor.

9                 THE COURT:  Is that fine, Ms. Manuelian?

10                MS. MANUELIAN:  That's fine, Your Honor.

11                THE COURT:  Okay, great.  So in that light, then, I

12   propose we begin voir dire on the 17th of April.

13                MR. COBURN:  Very well.

14                THE COURT:  Now, when are the spring holidays?  When is

15   Easter?  When is Passover?

16                MS. MANUELIAN:  Easter is the 16th, Your Honor.

17                THE COURT:  Is the 16th?  Anybody know, when is

18   Passover?

19                MS. MANUELIAN:  Passover begins the 12th.

20                THE COURT:  The 12th.  Okay.  So I tell you what.  Tell

21   you what.  Let's make it the 24th.  April 24th.

22                MR. COBURN:  That's fine, Your Honor.

23                THE COURT:  For voir dire.  So that assuming we can get

24   the jury in the box, I don't think it's going to take two weeks,

25   but even assuming it takes two weeks, that means we have opening

1    statement on the 8th of May.  And so if the government's case

2    takes six weeks, the government rests approximately June, I guess

3    June 9th.  Yeah.  Sometime the week of June 12th.  So we get, we

4    get the guilt/innocence done by the 4th of July and we take a

5    break at that time and come back, if necessary, for a sentencing

6    proceeding sometime around July 10th.

7             MS. MANUELIAN:  Judge, is there a reason why you want

8    it postponed so far into April as opposed to starting a little

9    earlier in April?  So we don't extend so much into the summer so

10   we're getting then close to our September trial date.

11            THE COURT:  So you want to move it back to the 17th?

12            MS. MANUELIAN:  I was actually thinking the 10th.

13            MR. KURLAND:  That's right before Passover.

14            THE COURT:  That's exactly what I was thinking.

15            MS. MANUELIAN:  So then if we could move it at least

16   back to the 17th.

17            THE COURT:  Okay.  17th.  I just don't want to lose any

18   jurors for that kind of reason, although by then, I suppose if

19   won't be, it really won't be an issue.

20            All right.  So we'll start the voir dire on the 17th.

21   Let me see if I can -- I was looking to see whether there were

22   any -- yeah.  I wanted to give you advance notice of when we

23   would not sit.  Chances are we will not be in session the week of

24   Memorial Day, starting Monday, May 29th.  It may be that the

25   government, will have rested by then and that would be a good

1   thing.  But we will not be in session that week, the week of May

2   29th.

3          I'll be available a couple of days that week, not

4   including Monday, of course, which is a court holiday.  It may be

5   a time for motions or some such thing if it's time.  If we get

6   lucky on the timing, that's the way it will go.  Okay.  I think

7   that's better.  Yeah, we should finish this before the 4th of

8   July.

9          All right.  Mr. Sullivan, Mr. Pyne, and Mr., Ms.

10  Rhodes, Mr. Crowe, we're on for, I think, September 19th.  I'm

11  proceeding on the assumption -- well, I guess it's actually the

12  18th of September.  I'm proceeding on the assumption that those

13  dates will hold.  I think it's too soon to schedule any dates.

14         I tell you what I'd like you to do.  If you could set

15  aside the March dates that we just set, 23rd and 24th, and be

16  present at least for those, for part of those days.  Let me be

17  clear.

18         Either on the 23rd of March or the 24th of March I

19  would like all other counsel to be present so that we can then

20  schedule further motions proceedings as to the other defendants,

21  strictly speaking, not counting Mr. Martin and Mr. Treem, but

22  actually, I'd like them to be present as well.  And I'm just

23  talking about present for, you may want to see a part of that

24  suppression hearing because it will be an opportunity, I assume,

25  for you to get a look at some of the non law enforcement

1   witnesses.  But if you could just be here for, shall we say, the

2   beginning of the hearing on the 23rd?

3           MR. MARTIN:  Fine, Your Honor.

4           THE COURT:  At which time we will schedule further

5   motions hearings for the summer in anticipation of the September

6   trial.

7           MR. SULLIVAN:  Your Honor, Ms. Rhodes, we're sitting in

8   the Philadelphia case, we're sitting Monday through Thursday.  So

9   the 23rd, Ms. Rhodes can certainly be here.  The 24th, I can

10  certainly be here.

11          THE COURT:  Does Friday make more sense?

12          MR. SULLIVAN:  Either one.

13          THE COURT:  Let's say the 24th.  Because Mr. Kurland,

14  you're confident that the hearing's going to take more than just

15  a day?

16          MR. KURLAND:  Yes.

17          THE COURT:  Okay.  So on the 24th, all counsel will be

18  expected to be here at 10:00, when we will first schedule the

19  remaining matters, excepting Mr. Harris.  But I would like you to

20  be present.  Yes.

21          MR. TREEM:  I would like to be present on Friday.

22  Assuming my arson trial is over, the Court does sit on Friday

23  down there, of course.

24          THE COURT:  Understood.

25          MR. TREEM:  I trust Mr. Martin to be able to carry the

1    ball.

2               THE COURT:  Or at least your calendar.

3               (Laughter.)

4               THE COURT:  Yes, Mr. Crowe.

5               MR. CROWE:  Number one, when you have a hearing, I

6    think it would be wise to bring only one of them.

7               THE COURT:  That's exactly what I was getting to.  We

8    will bring Mr. Gardner to the courthouse.  We will bring him here

9    in the beginning, attempt to explain to him the proceeding.  And

10   I'm going to cover all this in writing before, well before this.

11              I'm going to bring him in, give him an opportunity to

12   comport himself consistently with the needs of the Court, and

13   urge him to cooperate with his counsel, to refrain in disruptive

14   behavior, and to participate in the proceedings in a dignified

15   way.  It will be up to Mr. Gardner what to do after that.

16              But I will also -- so he will be here for every

17   proceeding.  So whatever you need to do in the way of a come-up,

18   Ms. Manuelian, please insure that Mr. Gardner is brought for the

19   January 10th, January 26th, February 23rd, and the March 23rd and

20   March 24th proceedings.

21              In that light, I think it would be a good idea to bring

22   all of the defendants to the courthouse on the 24th of March,

23   which will give me, then, an opportunity to see whether anything

24   has changed.

25              MR. MARTIN:  Your Honor, one other thing.

1          THE COURT:  Yes.  Mr. Martin.

2          MR. MARTIN:  We waived argument on some of the death

3    motions.  There's one motion in particular, I don't want to argue

4    it to the Court today, but a Motion to Dismiss the death penalty

5    because of discrimination based on race.  There's a threshold

6    there that we think, Mr. Crowe and I talked about this, that we

7    think we've met.  That's, of course, review that, if you think

8    we've met it, then it would be something.  We can take it up some

9    other time but I wanted to call your attention to it.

10         THE COURT:  Thank you.  Thank you for flagging that for

11   me.

12         MR. KURLAND:  Your Honor, just a clarification with

13   respect to the scheduling.  I just want to make sure that I have

14   this.  That the Court is going to sit Monday through Thursday.

15   Then up to July 4th the only week that the Court has indicated in

16   which there won't be court is the week of Memorial Day week,

17   starting on May 29th.

18         THE COURT:  Correct, subject to the possibility that on

19   Tuesday of that week, perhaps on Wednesday, but subject to the

20   possibility that we could use Tuesday as either, depending on the

21   scheduling, on the progress, either as a charge conference or a

22   motions date, you know, motion for judgment and so forth.  So

23   subject to that, right now the presumption is we won't be in

24   session that week at all.

25         MR. KURLAND:  Okay.  Then starting on April 17th,

1    Monday through Thursday, but then absent any circumstances, no

2    Friday.

3              THE COURT:  Exactly.  Monday through Thursday, from

4    9:30 till about 5, not on Fridays.

5              MR. KURLAND:  Thank you, Your Honor.

6              THE COURT:  Mr. Coburn.

7              MR. COBURN:  Just one quick thing, Your Honor.  I don't

8    know if Your Honor anticipated issuing something in writing, but

9    ask Your Honor for a ruling with respect to the Motion to

10   Withdraw from Professor Kurland and me, denying it.  I just

11   wanted to withdraw -- is Your Honor then telling us we ought to

12   continue to defend this case in a manner that would clearly be

13   appropriate for a jury?

14             THE COURT:  Yes, Mr. Coburn.  The oral motion and the

15   docket will reflect that Mr. Coburn and Mr. Kurland made oral

16   motions to withdraw as counsel for Mr. Shawn Gardner.  For the

17   reasons stated on the record and for the reasons to be stated in

18   a written opinion, the motions of each are denied.

19             I'm hoping, Mr. Crowe, you will get your formal written

20   motion filed within the next week or so.  And I would ask other

21   counsel to join in that motion if you are so disposed.  And then

22   I expect to issue a more reasoned opinion in writing, both

23   denying the motion to withdraw and denying the pro se motions to

24   dismiss for lack of subject matter jurisdiction and, frankly,

25   indicating in some appropriate fashion that that issue is

1  appropriate for interlocutory review.

2          MR. CROWE:  I should have the motion to withdraw in by

3  the end of next week, Your Honor.

4          THE COURT:  That would be great, Mr. Crowe.  Thank you

5  very much.  And again, other counsel may have also made oral

6  motions to withdraw.  But to the extent that any such motions

7  have been made, let me be clear now; that any oral motion, not

8  just that made by Mr. Coburn, Mr. Kurland, any oral motion to

9  withdraw as directed by counsel, as directed by any defendant or

10 otherwise is denied and counsel continue to represent the

11 defendants pursuant to their appointment by this Court under the

12 Criminal Justice Act.

13         Thank you all very much.  Thank you for your good humor

14 and your good faith in trying to make all of this work for all of

15 us.  And I suppose I won't see you again before the new year.  I

16 wish you and your family well and good health and take the break

17 that all of you deserve.  And I wish you well, Ms. Manuelian, and

18 get back to us healthy.

19         We're in recess.

20         (Conclusion of Proceedings.)

21

22

23

24

25

<u>REPORTER'S CERTIFICATE</u>

1

2

3          I, Mary M. Zajac, do hereby certify that I transcribed

4   the proceedings in the matter of USA versus Willie Mitchell, III,

5   et al., Case Number(s) AMD-04-029, on December 8, 2005.

6          I further certify that the foregoing pages constitute

7   the official transcript of proceedings as transcribed by me to

8   the within matter.

9          In Witness Whereof, I have hereunto affixed my

10  signature this _____ day of _____, 2009.

11

12

13

14        _____

          Mary M. Zajac,

15        Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**'**

**'06** [4] - 52:21, 52:22, 54:1, 65:21
**'07** [9] - 52:20, 52:22, 53:4, 54:12, 55:18, 64:14, 64:16, 67:9, 70:1

**1**

**1-207** [1] - 8:6
**1-A** [2] - 24:13, 24:17
**101** [2] - 1:25, 6:25
**10:00** [2] - 99:22, 103:18
**10th** [14] - 96:11, 96:14, 96:15, 96:19, 96:23, 97:6, 97:7, 97:10, 98:1, 99:9, 99:15, 101:6, 101:12, 104:19
**11th** [2] - 96:17, 96:18
**12:20** [1] - 69:21
**12th** [3] - 100:19, 100:20, 101:3
**13th** [5] - 97:14, 98:16, 99:4, 99:7, 99:25
**14th** [2] - 95:23, 96:6
**15** [1] - 54:6
**16th** [10] - 2:6, 2:20, 3:4, 3:24, 5:18, 16:24, 34:14, 86:4, 100:16, 100:17
**17** [2] - 75:20, 77:7
**177** [1] - 26:9
**17th** [7] - 74:23, 100:12, 101:11, 101:16, 101:17, 101:20, 105:25
**18th** [2] - 98:19, 102:12
**1959(a)(5** [2] - 83:9, 84:9
**19th** [1] - 102:10
**1st** [9] - 59:16, 74:4, 74:21, 74:24, 75:19, 76:1, 79:6, 80:12, 80:15

**2**

**20** [1] - 69:16
**2000** [1] - 74:21
**2002** [7] - 59:16, 74:4, 74:23, 75:19, 75:20, 80:13, 80:15
**2005** [2] - 1:11, 108:5
**2006** [4] - 53:15, 54:22, 55:5, 55:22
**2007** [2] - 55:3, 59:11
**2009** [1] - 108:10
**20th** [4] - 96:3, 96:7,

98:18, 98:20
**21201** [2] - 1:25, 7:1
**21st** [3] - 54:4, 96:3, 96:7
**23rd** [1] - 99:16, 99:22, 99:25, 100:5, 100:6, 102:15, 102:18, 103:2, 103:9, 104:19
**24th** [1] - 100:1, 100:6, 100:21, 102:15, 102:18, 103:9, 103:13, 103:17, 104:20, 104:22
**26th** [3] - 98:5, 99:14, 104:19
**27th** [1] - 98:19
**29th** [3] - 101:24, 102:2, 105:17
**2:00** [1] - 69:20
**2nd** [1] - 74:21

**3**

**30** [2] - 97:25, 98:2

**4**

**465** [1] - 26:8
**4th** [3] - 101:4, 102:7, 105:15

**5**

**5** [1] - 106:4
**50** [1] - 90:22
**5515** [1] - 1:24

**8**

**8** [3] - 1:11, 3:20, 108:5
**8-B** [9] - 56:5, 56:7, 56:11, 57:7, 57:15, 57:25, 58:19, 59:1, 59:4
**8th** [1] - 101:1

**9**

**9:30** [1] - 106:4
**9th** [4] - 53:15, 96:11, 96:14, 101:3

**A**

**ABA** [2] - 63:9, 63:11
**abeyance** [1] - 81:9
**ability** [5] - 17:14, 17:15, 18:21, 47:4, 60:14

**able** [13] - 16:15, 18:8, 29:24, 39:3, 39:6, 43:17, 52:23, 53:21, 64:12, 67:20, 68:15, 81:10, 103:25
**absence** [2] - 15:11, 21:8
**absent** [6] - 13:24, 15:7, 28:12, 28:25, 34:24, 106:1
**absented** [1] - 36:14
**absolute** [2] - 27:7, 93:13
**absolutely** [4] - 26:13, 33:4, 79:21, 79:24
**Absolutely** [1] - 67:1
**abuse** [1] - 58:18
**academic** [1] - 80:25
**academically** [1] - 18:17
**accede** [1] - 27:23
**accept** [1] - 41:15
**acceptable** [1] - 42:12
**accepted** [2] - 77:10, 81:19
**accommodate** [1] - 59:11
**accommodation** [6] - 33:12, 33:14, 33:17, 52:19, 52:24, 65:6
**accomplish** [1] - 15:11
**accomplished** [1] - 83:20
**accord** [1] - 25:20
**according** [1] - 53:22
**achieved** [1] - 96:7
**acknowledge** [2] - 60:18, 60:19
**acknowledged** [1] - 46:10
**acquiesce** [2] - 19:14, 19:15
**act** [5] - 5:17, 25:20, 57:12, 83:10, 84:10
**acted** [1] - 9:9
**acting** [2] - 19:12, 20:5
**action** [2] - 2:25, 31:9
**actions** [5] - 4:18, 6:3, 7:11, 9:11, 9:12
**activate** [1] - 61:14
**acts** [1] - 57:14
**actual** [4] - 73:13, 84:1, 86:14, 89:23
**Adam** [2] - 1:21, 7:2
**add** [5] - 26:11, 30:13, 38:20, 58:8, 77:21
**added** [1] - 67:8
**adding** [1] - 56:17
**addition** [1] - 66:22

**additional** [7] - 26:17, 58:9, 69:23, 86:18, 87:7, 87:21, 87:24
**address** [16] - 16:20, 20:15, 20:21, 20:25, 22:8, 30:18, 51:17, 56:12, 56:13, 61:6, 73:17, 87:23, 88:25, 89:7, 89:8, 99:13
**addressed** [3] - 20:21, 51:4, 61:5
**addresses** [2] - 20:13, 59:2
**addressing** [3] - 8:10, 21:1, 73:25
**adds** [1] - 77:19
**adept** [1] - 69:6
**administering** [1] - 75:10
**Administrative** [1] - 78:18
**admirable** [1] - 24:21
**admiration** [1] - 9:24
**admissibility** [1] - 85:14
**admissible** [1] - 77:12
**admit** [1] - 40:10
**admitted** [1] - 52:17
**admittedly** [1] - 29:7
**admonishments** [1] - 9:7
**admonition** [1] - 89:25
**adopt** [1] - 31:4
**adopted** [3] - 17:7, 54:14, 70:19
**advance** [5] - 28:16, 54:13, 54:15, 90:17, 101:22
**adversary** [1] - 4:22
**advised** [1] - 15:25
**advising** [1] - 44:11
**advisory** [1] - 41:13
**affairs** [1] - 24:10
**affect** [1] - 22:18
**affected** [1] - 22:12
**affidavit** [12] - 4:12, 4:19, 6:5, 7:5, 7:12, 77:9, 77:17, 77:19, 78:11, 78:17, 79:25, 81:19
**affiliated** [4] - 2:16, 4:8, 5:16, 6:22
**affirmation** [2] - 77:4, 77:9
**affirmatively** [1] - 17:10
**affirming** [1] - 40:21
**affixed** [1] - 108:9
**afraid** [1] - 62:2
**African** [2] - 3:18, 6:8
**African-American** [1] - 6:8

**Afro** [4] - 3:18, 5:3, 6:8, 7:20
**Afro-American** [4] - 3:18, 5:3, 6:8, 7:20
**afternoon** [1] - 97:13
**agency** [4] - 2:16, 4:8, 5:16, 6:22
**agent** [3] - 2:16, 5:16, 6:22
**agents** [1] - 64:11
**aggravating** [3] - 62:18, 62:25, 63:3
**ago** [2] - 60:10, 87:5
**agony** [1] - 61:16
**agree** [19] - 8:6, 8:24, 21:23, 26:17, 26:24, 28:13, 28:17, 34:3, 34:8, 42:9, 49:16, 51:1, 51:2, 64:6, 68:21, 90:24, 91:8, 94:18, 97:9
**agreed** [9] - 2:23, 4:14, 5:21, 7:7, 10:5, 14:18, 14:22, 15:24, 48:24
**agreement** [6] - 3:1, 4:12, 6:4, 7:5, 73:6, 73:12
**agrees** [1] - 73:12
**ahead** [5] - 34:12, 37:20, 66:15, 72:5, 80:7
**ai** [1] - 108:5
**alive** [1] - 52:3
**allegation** [1] - 19:18
**alleged** [10] - 2:11, 2:12, 4:4, 4:5, 5:11, 5:12, 6:17, 6:18, 6:24, 57:12
**allegedly** [1] - 36:6
**alleviate** [1] - 53:11
**allow** [5] - 17:2, 22:19, 36:18, 73:14, 77:7
**allowed** [2] - 18:22, 23:18
**allows** [1] - 91:14
**almost** [2] - 57:24, 80:1
**alone** [1] - 64:13
**alternative** [2] - 61:19, 65:15
**Alvin** [1] - 82:8
**AMD-04-029** [2] - 1:6, 108:5
**AMD/04/029** [1] - 6:25
**ameliorative** [1] - 67:15
**amended** [1] - 23:3
**Amendment** [4] - 74:8, 74:9, 74:12, 75:18
**America** [3] - 2:23, 4:23, 7:16
**AMERICA** [1] - 1:4
**American** [6] - 3:18, 5:3, 6:8, 7:20

**amount** [2] - 90:22, 91:1
**amplify** [1] - 47:23
**analysis** [2] - 27:6, 28:8, 29:5, 34:17, 37:4
**ancillary** [1] - 56:18
**Anders** [1] - 41:21
**Andre** [1] - 1:13
**Andrea** [2] - 86:11, 92:11
**announced** [1] - 16:13
**answer** [6] - 32:19, 38:3, 63:5, 75:16, 75:17, 90:17
**answered** [2] - 91:11, 91:12
**Anthony** [1] - 49:9
**anticipate** [1] - 98:9
**anticipated** [1] - 106:8
**anticipating** [1] - 55:13
**anticipation** [1] - 103:5
**anxious** [2] - 11:6, 37:16
**anyway** [1] - 98:24
**apart** [3] - 35:5, 58:19, 76:13
**appeal** [6] - 40:8, 40:13, 40:14, 41:22, 44:16, 49:20
**Appeals** [2] - 40:12, 41:2
**appear** [1] - 11:23
**appearance** [3] - 9:14, 10:10, 95:23
**Appearances** [1] - 1:14
**appearances** [1] - 38:11
**appellate** [3] - 27:20, 42:19, 64:7
**application** [2] - 59:4, 70:20
**apply** [4] - 57:10, 57:13, 63:10, 63:12
**appoint** [2] - 41:18, 42:15
**appointed** [4] - 26:20, 26:21, 41:11, 43:16
**appointing** [1] - 23:12
**appointment** [3] - 10:7, 27:8, 107:11
**appreciate** [14] - 16:10, 20:10, 21:12, 24:1, 24:6, 26:25, 30:10, 32:22, 33:7, 34:17, 37:3, 54:15, 65:13, 66:10
**Appreciate** [2] - 33:6, 59:7
**appreciated** [2] - 60:7, 94:22
**Apprendi** [1] - 72:8

**apprise** [1] - 88:10
**approach** [1] - 41:8
**approached** [1] - 53:24
**appropriate** [17] - 10:4, 10:9, 17:22, 25:4, 31:22, 32:18, 45:15, 49:3, 51:5, 67:21, 68:22, 78:12, 78:20, 106:13, 106:25, 107:1
**April** [26] - 14:3, 53:7, 54:6, 59:16, 74:3, 74:21, 74:23, 74:24, 75:19, 75:20, 76:1, 79:6, 80:12, 80:15, 93:22, 94:1, 94:25, 95:1, 95:3, 98:19, 100:12, 100:21, 101:8, 101:9, 105:25
**apropos** [1] - 39:16
**argue** [8] - 31:11, 56:19, 58:3, 70:7, 70:24, 71:11, 71:12, 105:3
**argued** [6] - 56:8, 56:9, 56:16, 57:19, 71:9, 74:7
**arguing** [2] - 57:22, 58:2
**argument** [9] - 15:10, 44:16, 55:25, 57:23, 72:9, 72:14, 82:3, 83:12, 105:2
**arguments** [1] - 62:5
**arising** [2] - 10:21, 24:20
**Arizona** [2] - 75:2, 81:3
**armor** [1] - 64:9
**arrange** [2] - 20:14, 52:21
**arranged** [2] - 52:22, 65:6
**arrest** [8] - 74:4, 74:17, 74:24, 75:14, 75:24, 75:25, 79:6, 80:15
**arrested** [3] - 59:15, 74:17, 76:1
**arresting** [1] - 75:21
**Arrington** [1] - 72:4
**arson** [2] - 54:3, 103:22
**article** [1] - 34:25
**articulate** [2] - 19:6, 70:14
**articulated** [2] - 20:6, 44:4
**Aside** [1] - 63:7
**aside** [5] - 58:18, 87:22, 96:3, 98:9, 102:15
**aspect** [1] - 73:22
**ass** [1] - 16:14
**assault** [3] - 76:2, 76:10, 79:9
**assert** [1] - 31:20
**asserted** [4] - 25:18,

25:24, 26:18, 34:21
**assessment** [1] - 36:9
**assign** [1] - 13:2
**assistance** [1] - 26:3
**Assistant** [2] - 3:6, 4:24
**associated** [2] - 18:9, 18:25
**association** [2] - 2:22, 4:17
**Association** [2] - 6:2, 7:10
**assume** [3] - 22:25, 34:5, 102:24
**assumed** [2] - 55:2, 71:14
**assuming** [10] - 18:24, 29:17, 37:21, 37:22, 64:12, 66:7, 66:8, 77:11, 100:23, 100:25
**Assuming** [2] - 103:22
**assumption** [2] - 102:11, 102:12
**assurance** [1] - 9:18
**assure** [1] - 21:7
**assured** [2] - 44:12, 54:19
**attaching** [1] - 33:25
**attack** [1] - 81:3
**attempt** [2] - 58:4, 104:9
**attempted** [2] - 47:23, 69:14
**attempting** [1] - 47:9
**attention** [1] - 105:9
**attest** [1] - 80:1
**attitude** [1] - 91:1
**attitudes** [1] - 90:13
**attorney** [10] - 4:12, 4:21, 7:14, 30:19, 42:15, 43:1, 43:2, 43:19, 43:23, 48:13
**Attorney** [6] - 3:6, 4:24, 4:25, 7:17, 7:24
**Attorney's** [2] - 3:5, 7:22
**attorneys** [9] - 2:19, 4:10, 4:14, 7:5, 42:21, 43:16, 43:18, 44:3, 44:17
**attuned** [1] - 60:9
**audio** [1] - 29:23
**August** [1] - 55:21
**authority** [2] - 64:2, 64:3
**authorized** [1] - 17:25
**authorizing** [1] - 75:3
**available** [10] - 10:6, 14:24, 50:10, 53:25, 55:14, 64:11, 65:10, 95:24, 96:18, 102:3
**avenue** [1] - 9:25

**avoid** [1] - 29:14
**aware** [4] - 8:4, 12:14, 21:2, 54:2
**awful** [1] - 66:13
**aye** [2] - 8:6, 8:24
**Aye** [6] - 8:7, 8:8, 8:9, 8:25, 9:1, 9:2

**B**

**background** [1] - 77:20
**bail** [2] - 76:7, 79:14
**balance** [1] - 15:6
**ball** [1] - 104:1
**ballistics** [1] - 79:16
**Baltimore** [10] - 1:11, 1:25, 7:1, 27:18, 74:25, 78:25, 79:1, 80:6, 80:13, 80:15
**bar** [10] - 2:4, 2:22, 4:17, 20:2, 24:2, 30:19, 39:10, 39:11, 68:2, 80:6
**Bar** [2] - 6:2, 7:10
**Barnes** [1] - 82:8
**barrier** [1] - 27:7
**Barry** [2] - 1:21, 7:2
**based** [6] - 35:1, 35:7, 36:23, 72:11, 90:16, 105:5
**basis** [9] - 10:3, 12:11, 12:22, 26:22, 48:12, 75:24, 78:23, 78:24, 80:12
**bear** [3] - 20:11, 20:25, 69:13
**bearing** [2] - 20:21, 64:17
**become** [4] - 12:2, 12:15, 28:11, 35:19
**becomes** [1] - 50:17
**becoming** [1] - 5:20
**begin** [3] - 2:2, 97:11, 100:12
**beginning** [4] - 54:6, 95:8, 103:2, 104:9
**begins** [1] - 100:19
**Behalf** [5] - 1:15, 1:16, 1:17, 1:19, 1:20
**behalf** [1] - 44:14
**behaved** [3] - 44:7, 44:10, 48:4
**behavior** [4] - 28:5, 47:12, 78:5, 104:14
**behind** [1] - 16:21
**belief** [4] - 54:22, 79:2, 91:4
**believes** [1] - 90:19
**Belinda** [1] - 93:25
**belt** [7] - 47:15, 47:18,

**47:25, 61:8, 61:10, 61:11, 61:14
**belts** [1] - 47:11
**bench** [3] - 78:13, 80:5
**benefit** [2] - 86:8, 96:4
**Benson** [1] - 75:25
**beside** [1] - 5:20
**best** [9] - 11:16, 16:15, 18:8, 20:4, 21:4, 34:9, 43:19, 69:19, 88:14
**better** [4] - 28:21, 89:12, 96:15, 102:7
**between** [8] - 20:6, 21:24, 21:25, 37:1, 53:22, 88:23, 93:19, 95:17
**betwixt** [1] - 20:6
**beyond** [3] - 24:2, 35:10, 78:13
**big** [3] - 18:21, 31:6, 32:17
**Bill** [6] - 4:11, 88:7, 88:12, 88:16, 88:17
**bipolar** [1] - 19:22
**bit** [4] - 23:3, 37:15, 93:19
**bizarre** [1] - 12:10
**black** [5] - 3:17, 5:2, 6:8, 7:20, 27:14
**Blake** [2] - 92:12, 95:5
**blame** [1] - 23:22
**blatantly** [3] - 28:5, 86:11, 87:9
**blocked** [1] - 14:3
**blood** [11] - 2:13, 3:3, 3:25, 4:6, 5:6, 5:13, 6:13, 6:19, 7:23, 19:9, 19:10
**boat** [1] - 19:8
**bono** [1] - 62:13
**book** [1] - 90:12
**Booker** [1] - 17:21
**Booking** [2] - 75:4, 75:10, 75:14
**bothering** [1] - 24:10
**bottom** [2] - 48:6, 48:7
**boundaries** [1] - 73:16
**box** [4] - 41:4, 44:25, 91:3, 100:24
**Brady** [3] - 86:3, 86:21, 86:25
**brain** [1] - 19:22
**brainstorm** [2] - 11:13, 16:19
**break** [4] - 64:21, 65:1, 101:5, 107:16
**breakdown** [1] - 84:22
**Breck** [2] - 16:20, 23:7
**bridge** [1] - 81:20
**brief** [2] - 40:12, 41:21

**briefed** [2] - 50:25, 53:2
**briefing** [1] - 62:4
**briefly** [6] - 56:1, 61:8, 67:18, 83:5, 86:5, 92:6
**bring** [6] - 41:5, 104:6, 104:8, 104:11, 104:21
**bringing** [1] - 69:6
**Bromwell** [2] - 54:11, 55:10
**Brotherly** [1] - 53:16
**brought** [6] - 39:8, 44:20, 44:22, 62:25, 79:22, 104:18
**Brown** [6] - 74:13, 77:3, 77:5, 77:8, 77:9, 80:1
**Brown's** [7] - 77:4, 77:17, 77:19, 78:11, 78:17, 79:25, 81:18
**bump** [1] - 90:16
**burden** [1] - 57:5
**burn** [2] - 52:13, 61:17
**business** [5] - 2:21, 4:16, 5:25, 6:1, 7:9
**Butner** [1] - 12:19

**C**

**calendar** [2] - 96:6, 104:2
**calendars** [1] - 95:19
**cancel** [1] - 96:1
**canceled** [1] - 95:20
**candidly** [1] - 52:17
**candor** [1] - 29:4
**cannot** [2] - 26:23, 62:25, 63:19
**cap** [1] - 55:25
**capable** [1] - 43:17
**capital** [17] - 3:10, 3:11, 3:12, 3:13, 3:15, 17:19, 18:1, 38:12, 61:10, 72:6, 72:7, 73:22, 86:22, 89:17, 90:19, 91:4, 92:7
**care** [3] - 10:17, 46:20, 88:4
**careful** [1] - 12:7
**carry** [2] - 99:14, 103:25
**carry-over** [1] - 99:14
**Case** [2] - 6:25, 108:5
**case** [123] - 2:12, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 4:4, 5:12, 6:17, 9:11, 9:17, 10:10, 10:20, 10:25, 11:22, 12:17, 13:2, 13:23, 14:5, 15:16, 16:15, 17:19, 17:23, 17:24, 18:4, 18:20, 19:25, 26:2, 26:6, 28:13, 28:14, 29:6, 29:17,

31:15, 32:10, 32:14, 32:23, 33:12, 33:14, 35:1, 35:5, 35:8, 35:25, 36:4, 36:18, 36:20, 37:23, 38:12, 42:3, 42:10, 42:18, 42:22, 43:8, 44:5, 46:2, 46:19, 46:20, 46:22, 47:8, 48:10, 48:21, 49:5, 49:8, 49:9, 49:11, 49:18, 50:9, 51:13, 52:1, 53:24, 54:1, 54:8, 54:11, 54:12, 54:21, 58:22, 59:5, 61:2, 61:3, 61:10, 63:25, 64:7, 66:25, 67:12, 68:10, 69:14, 70:20, 76:3, 78:7, 79:4, 79:19, 81:3, 81:4, 86:19, 87:5, 87:11, 88:19, 89:17, 89:18, 89:22, 90:7, 92:7, 92:12, 92:23, 94:4, 94:10, 101:1, 103:8, 106:12
**CASE** [1] - 1:5
**cases** [12] - 12:17, 15:2, 20:2, 25:13, 25:23, 27:3, 28:9, 67:15, 78:3, 79:9, 79:11, 92:9
**categorically** [1] - 38:16
**cautionary** [2] - 51:6, 51:9
**CBIF** [1] - 80:17
**CCE** [1] - 46:3
**CD** [1] - 80:17
**cell** [1] - 64:20
**Center** [1] - 79:18
**central** [1] - 87:11
**Central** [3] - 75:4, 75:9, 75:14
**ceremonial** [1] - 90:18
**cert** [1] - 62:6
**certain** [12] - 2:17, 4:9, 5:17, 6:23, 15:17, 16:1, 23:21, 52:25, 53:2, 61:23, 93:8
**Certainly** [3] - 12:10, 25:9, 84:3
**certainly** [15] - 13:7, 26:24, 37:5, 42:1, 51:3, 53:3, 59:3, 78:4, 83:23, 88:20, 91:25, 92:14, 97:14, 103:9, 103:10
**CERTIFICATE** [1] - 108:1
**certify** [2] - 108:3, 108:6
**certifying** [1] - 40:7
**challenge** [5] - 38:7, 40:17, 43:20, 72:9, 73:17
**challenging** [3] - 35:16, 35:20, 70:20

**chambers** [1] - 75:8
**chance** [2] - 21:4, 71:11
**Chances** [1] - 101:23
**change** [4] - 40:23, 60:21, 78:23, 93:9
**changed** [3] - 29:20, 60:18, 104:24
**charge** [7] - 2:12, 4:5, 57:11, 62:2, 84:7, 84:8, 105:21
**charged** [4] - 57:8, 83:6, 83:7, 83:8
**charges** [7] - 3:21, 5:4, 5:12, 6:9, 6:10, 6:18, 6:24
**Charles** [1] - 54:3
**Chasanow** [5] - 92:1, 92:25, 93:1, 94:3, 94:7
**check** [1] - 9:15
**Chief** [1] - 62:7
**choice** [4] - 33:16, 47:3, 52:7, 64:14
**choices** [2] - 64:12, 67:8
**choose** [5] - 18:24, 18:25, 28:9, 64:2, 64:3
**chooses** [2] - 14:10, 28:10, 29:24
**choosing** [1] - 27:22
**chose** [1] - 62:7
**chosen** [1] - 28:23
**Christine** [3] - 1:15, 3:7, 4:25
**Circuit** [18] - 13:6, 18:18, 27:10, 37:5, 37:6, 37:11, 40:14, 40:20, 41:10, 41:13, 42:20, 43:10, 49:1, 49:4, 49:18, 64:2, 74:25, 78:24
**circulated** [1] - 78:15
**circumstances** [22] - 11:17, 15:13, 24:16, 31:1, 31:8, 33:20, 36:23, 42:25, 43:2, 43:13, 43:21, 48:16, 48:19, 48:25, 49:3, 52:16, 52:18, 53:18, 65:4, 96:4, 97:3, 106:1
**city** [2] - 18:18, 78:6
**City** [4] - 53:15, 78:25, 79:1, 80:6
**civil** [4] - 3:17, 3:19, 6:7, 7:19
**claim** [2] - 41:19, 87:22
**claiming** [1] - 27:6
**clarification** [3] - 65:17, 66:3, 105:12
**clarifying** [1] - 66:10
**classic** [1] - 37:18
**clear** [16] - 11:19, 12:2,

19:7, 35:13, 35:15, 35:19, 54:13, 66:17, 68:4, 77:15, 79:24, 85:14, 102:17, 107:7
**clearly** [14] - 10:11, 11:23, 25:19, 42:9, 57:13, 66:21, 78:3, 78:14, 82:4, 86:15, 106:12
**client** [24] - 13:4, 16:16, 21:1, 21:6, 28:24, 28:25, 29:20, 30:1, 31:1, 31:18, 31:24, 31:25, 33:15, 34:10, 35:13, 37:13, 37:15, 38:6, 38:12, 40:23, 53:1, 53:12, 61:18, 67:3
**client's** [2] - 44:15, 61:25
**clients** [10] - 21:2, 25:3, 31:13, 36:1, 36:13, 44:14, 62:20, 63:2, 63:16, 63:24
**close** [3] - 78:16, 98:23, 101:10
**closer** [4] - 37:8, 37:17, 97:20, 98:25
**Coburn** [31] - 1:21, 7:2, 16:22, 22:11, 22:14, 26:13, 29:16, 29:18, 29:19, 29:21, 30:8, 32:21, 35:10, 39:1, 52:16, 59:25, 64:25, 66:1, 68:19, 70:15, 88:6, 88:15, 91:6, 94:12, 96:13, 97:8, 98:5, 106:6, 106:14, 106:15, 107:8
**COBURN** [23] - 30:9, 33:6, 60:1, 65:3, 65:12, 66:2, 66:10, 68:20, 70:16, 70:18, 71:3, 71:5, 88:7, 88:24, 91:7, 94:13, 95:13, 98:6, 99:19, 100:7, 100:13, 100:22, 106:7
**Coburn's** [1] - 33:17
**Code** [1] - 8:5
**codefendant's** [1] - 31:5
**codefendants** [1] - 30:12
**coercion** [4] - 2:8, 4:1, 5:7, 6:14
**coin** [1] - 63:2
**collateral** [1] - 59:8
**colleagues** [2] - 16:21, 92:1
**collectively** [1] - 16:19
**colloquy** [10] - 11:25, 28:15, 34:14, 39:7,

44:11, 47:13, 47:23, 48:3, 59:24, 63:8
**colored** [3] - 5:2, 6:8, 7:20
**come-up** [1] - 104:17
**comfortable** [2] - 43:11, 73:24
**coming** [2] - 22:1, 54:21, 54:23, 91:22, 91:23, 93:19
**commence** [1] - 94:25
**comment** [6] - 23:11, 24:7, 39:17, 49:23, 53:25, 76:22
**comments** [7] - 16:11, 21:12, 31:4, 38:16, 48:24, 57:21, 61:7
**commercial** [4] - 3:1, 4:12, 6:4, 7:5
**Commercial** [1] - 8:5
**commit** [3] - 68:18, 83:10, 84:9
**commitment** [1] - 65:21
**commitments** [1] - 54:19
**committed** [1] - 61:1
**commodity** [1] - 60:11
**common** [5] - 22:21, 41:19, 57:22, 71:12, 71:16
**communicate** [1] - 67:21
**communications** [1] - 17:16
**community** [6] - 67:19, 67:20, 68:1, 68:3, 68:12, 68:17
**compared** [1] - 64:15
**compartmentalizing** [1] - 51:7
**compel** [1] - 6:22
**compels** [3] - 2:17, 4:8, 5:16
**competency** [2] - 12:12, 12:18
**competent** [6] - 12:21, 12:23, 20:1, 27:21, 44:3, 48:20
**complaint** [8] - 2:9, 2:10, 4:3, 5:9, 5:10, 6:16
**completed** [1] - 10:9
**complicated** [1] - 16:17
**complicity** [1] - 78:24
**comport** [2] - 9:19, 104:12
**concede** [1] - 32:18
**conceded** [5] - 46:5, 46:8, 56:3, 56:5, 56:6
**conceivable** [1] - 38:25
**Conceivably** [1] - 43:4

**concept** [1] - 36:5
**conception** [1] - 30:2
**conceptualizing** [1] - 26:16
**concern** [7] - 12:23, 15:20, 32:5, 33:1, 33:18, 35:6, 51:25
**concerned** [11] - 36:21, 36:25, 38:5, 49:22, 50:4, 50:18, 51:19, 71:17, 96:12, 98:8
**concerning** [3] - 35:8, 50:10, 54:19
**concerns** [4] - 14:9, 14:10, 33:10, 42:23
**Conclusion** [1] - 107:20
**conditions** [4] - 2:17, 4:9, 5:17, 6:23
**Conduct** [2] - 17:7, 25:12
**conduct** [11] - 11:10, 12:1, 12:11, 13:1, 14:11, 19:16, 19:21, 38:12, 39:3, 63:20, 81:4
**conducting** [1] - 91:14
**confer** [3] - 55:1, 91:25, 92:11
**conference** [2] - 99:16, 105:21
**confess** [1] - 35:2
**confident** [3] - 58:3, 59:3, 103:14
**conflict** [8] - 3:1, 4:13, 4:19, 4:21, 6:4, 6:5, 7:6, 7:13
**conflicted** [1] - 3:2
**confused** [1] - 45:14
**connotations** [1] - 90:10
**consensus** [1] - 59:23
**consent** [4] - 2:14, 4:6, 5:14, 6:20
**consenting** [1] - 35:16
**consequences** [1] - 78:7
**consider** [8] - 13:5, 13:7, 13:8, 14:9, 15:5, 21:18, 39:23, 39:24
**consideration** [4] - 15:12, 40:20, 48:14, 62:3
**considered** [2] - 13:15, 81:19
**considering** [1] - 23:12
**consistent** [2] - 9:6, 9:19
**consistently** [1] - 104:12
**conspiracies** [2] - 83:9, 83:14
**conspiracy** [5] - 83:7,

83:10, 83:14, 84:8, 84:9
**constitute** [1] - 108:6
**constituting** [1] - 57:14
**constitution** [2] - 8:16, 8:23
**Constitution** [4] - 4:15, 5:22, 8:13, 8:22
**constitutional** [6] - 47:18, 72:7, 72:9, 73:11, 78:25, 80:25
**constitutionally** [1] - 2:24
**Constitutions** [1] - 7:8
**consultation** [1] - 31:18
**contact** [1] - 68:24
**contemplate** [1] - 29:16
**contemplated** [1] - 34:1
**contend** [1] - 83:14
**contending** [1] - 77:8
**contention** [1] - 40:17
**contentions** [1] - 28:16
**context** [2] - 26:1, 26:6
**continue** [3] - 19:18, 106:12, 107:10
**continuing** [1] - 46:4
**contract** [9] - 3:1, 4:7, 4:12, 4:18, 5:15, 5:24, 6:21, 7:12, 39:12
**contracts** [6] - 7:5, 25:3, 25:5, 25:8, 26:25, 27:2
**control** [4] - 21:11, 47:12, 61:14, 68:15
**contumacious** [2] - 11:10, 28:5
**conundrum** [3] - 17:11, 34:19, 35:11
**convened** [1] - 58:17
**convince** [1] - 46:3
**cooperate** [4] - 26:20, 28:3, 29:1, 104:13
**cooperating** [2] - 17:18, 31:21, 80:18
**cooperative** [1] - 12:21
**copies** [3] - 71:5, 71:6
**core** [2] - 86:22, 88:20
**correct** [4] - 17:9, 82:14, 87:18, 95:24
**Correct** [1] - 105:18
**correctly** [2] - 52:17, 81:19
**Counsel** [1] - 2:1
**counsel** [127] - 4:20, 7:14, 10:2, 10:6, 10:12, 11:2, 11:11, 11:19, 11:20, 11:21, 11:25, 12:4, 12:6, 12:13, 12:24, 13:2, 13:4, 13:6, 13:9, 13:16, 13:16, 15:1, 15:5, 15:13, 15:18, 15:22,

15:25, 16:1, 16:2, 16:3, 16:18, 16:19, 17:11, 17:12, 18:3, 20:11, 20:17, 21:19, 23:7, 23:12, 23:15, 23:16, 23:17, 24:22, 25:19, 25:20, 25:25, 26:3, 26:5, 26:14, 26:20, 26:21, 27:7, 27:8, 27:12, 28:12, 28:20, 29:8, 29:15, 30:2, 31:5, 34:20, 34:22, 34:23, 34:24, 35:9, 35:18, 35:23, 36:5, 37:1, 37:7, 37:10, 37:14, 37:18, 38:4, 41:11, 41:18, 42:8, 42:11, 42:12, 42:23, 42:25, 43:5, 43:17, 44:2, 44:13, 48:8, 48:10, 48:20, 48:23, 49:4, 49:6, 50:5, 59:18, 60:24, 63:10, 63:12, 70:13, 70:19, 70:22, 72:12, 72:13, 73:12, 74:10, 74:17, 75:19, 79:5, 79:12, 79:13, 79:19, 79:20, 90:11, 90:14, 92:15, 92:17, 96:13, 96:24, 102:19, 103:17, 104:13, 106:16, 106:21, 107:5, 107:9, 107:10
**counsel's** [4] - 13:3, 33:19, 35:9, 38:25
**Count** [2] - 83:7, 84:11
**count** [6] - 46:3, 56:3, 56:17, 57:8, 58:9, 86:22
**counting** [1] - 102:21
**counts** [2] - 56:10, 84:5
**Counts** [2] - 83:8, 83:12
**County** [1] - 54:3
**couple** [8] - 25:16, 31:11, 34:13, 37:22, 61:21, 67:22, 73:5, 102:3
**course** [26] - 9:21, 10:24, 11:12, 11:25, 13:11, 14:8, 15:12, 32:12, 48:17, 51:25, 53:8, 59:7, 61:10, 64:25, 65:23, 68:5, 70:13, 76:24, 79:9, 91:20, 93:4, 96:12, 102:4, 103:23, 105:7
**COURT** [197] - 1:1, 2:1, 3:22, 8:2, 8:10, 8:14, 8:18, 9:3, 9:6, 11:9, 14:21, 16:8, 20:9, 21:16, 23:20, 23:25, 24:8, 24:11, 26:7, 26:10, 26:12, 32:21, 33:7, 33:22, 37:3, 38:9, 39:16,

41:16, 43:24, 44:6, 44:25, 45:2, 45:6, 45:12, 45:21, 45:24, 46:8, 46:13, 46:19, 47:14, 47:25, 48:6, 48:14, 49:8, 49:10, 49:15, 50:1, 50:13, 50:15, 50:22, 52:4, 52:7, 52:11, 53:4, 53:10, 53:17, 54:18, 55:1, 56:20, 57:9, 58:6, 58:12, 58:15, 59:6, 59:22, 61:20, 64:10, 64:22, 64:25, 65:4, 65:19, 66:6, 66:12, 66:19, 67:1, 67:4, 68:1, 69:16, 70:4, 70:9, 70:12, 70:15, 70:17, 71:2, 71:4, 71:10, 71:21, 71:24, 72:1, 72:4, 72:13, 72:22, 72:25, 73:2, 73:18, 73:23, 74:5, 74:13, 74:19, 74:22, 74:24, 75:7, 75:21, 76:1, 76:4, 76:7, 76:9, 76:11, 76:18, 76:20, 76:24, 77:3, 77:13, 78:1, 78:10, 79:8, 80:14, 81:17, 81:23, 82:4, 82:10, 82:18, 82:21, 83:4, 83:18, 83:22, 84:3, 84:7, 84:15, 84:18, 84:24, 85:4, 85:11, 85:20, 85:23, 85:25, 86:6, 87:15, 88:4, 88:14, 89:1, 89:5, 89:10, 89:13, 89:15, 91:6, 91:20, 92:8, 92:18, 93:4, 93:22, 93:24, 94:5, 94:7, 94:12, 94:17, 95:18, 95:22, 96:1, 96:18, 96:20, 96:22, 96:24, 97:6, 97:17, 97:25, 98:13, 99:2, 99:9, 99:20, 99:22, 100:4, 100:6, 100:9, 100:11, 100:14, 100:17, 100:20, 100:23, 101:11, 101:14, 101:17, 103:4, 103:11, 103:13, 103:17, 103:24, 104:2, 104:4, 104:7, 105:1, 105:10, 105:18, 106:3, 106:6, 106:14, 107:4
**Court** [115] - 2:8, 2:11, 2:16, 2:21, 2:24, 4:23, 5:8, 5:11, 6:17, 6:22, 6:25, 7:16, 8:14, 9:3, 9:6, 9:15, 9:18, 9:20, 9:23, 9:24, 11:23, 11:24, 12:6, 16:16, 17:2, 17:8, 17:11, 17:20, 18:2, 18:3, 18:18, 19:6, 19:14, 20:11, 20:12, 20:13,

20:18, 20:19, 20:25, 24:2, 26:2, 26:22, 27:9, 28:4, 30:20, 34:15, 35:8, 35:25, 36:10, 36:16, 36:17, 36:19, 37:6, 37:11, 39:6, 39:10, 40:6, 40:12, 41:1, 41:2, 41:12, 42:7, 42:17, 42:21, 45:11, 48:15, 50:4, 50:18, 51:1, 51:2, 51:4, 53:20, 54:2, 57:20, 58:22, 58:23, 59:20, 60:8, 61:9, 62:2, 62:4, 62:7, 62:10, 62:12, 62:22, 63:23, 64:1, 64:4, 69:7, 70:11, 74:9, 74:25, 76:15, 77:6, 78:24, 80:2, 80:10, 80:24, 81:5, 81:8, 81:13, 82:3, 88:9, 91:13, 91:15, 94:14, 103:22, 104:12, 105:4, 105:14, 105:15, 107:11, 108:15
**court** [32] - 4:2, 4:4, 4:7, 4:8, 4:16, 5:15, 5:16, 5:24, 6:1, 6:15, 6:20, 6:21, 19:20, 21:8, 22:3, 27:23, 35:17, 35:21, 38:7, 39:2, 62:25, 64:1, 68:11, 73:14, 77:11, 78:5, 86:8, 90:17, 102:4, 105:16
**Court's** [19] - 11:12, 11:20, 15:6, 16:10, 16:11, 19:7, 22:18, 34:17, 40:21, 42:24, 51:20, 61:7, 61:24, 74:25, 80:19, 81:7, 81:12, 91:12, 94:2
**courthouse** [6] - 63:1, 63:4, 91:23, 91:24, 104:8, 104:22
**Courthouse** [1] - 1:24
**Courtroom** [1] - 24:13
**courtroom** [16] - 8:19, 9:5, 9:22, 12:3, 13:21, 23:14, 31:10, 44:7, 47:8, 47:19, 47:20, 61:12, 63:1, 63:3, 63:4, 90:18
**courts** [2] - 7:9, 27:20
**cover** [4] - 42:22, 63:9, 90:3, 104:10
**covered** [2] - 15:4, 48:14
**covers** [2] - 72:18, 85:23
**Crawford** [2] - 77:7, 77:10
**create** [4] - 34:19, 49:20, 53:8, 75:19
**created** [1] - 11:18

creates [1] - 52:15
creative [6] - 11:13,
13:12, 13:23, 39:18,
40:5, 41:3
criminal [2] - 32:23,
46:4
CRIMINAL [1] - 1:5
Criminal [1] - 107:12
critical [1] - 60:12
cross [9] - 28:17, 29:22,
31:19, 32:3, 35:12, 36:7,
45:25, 81:13, 81:20
Crowe [14] - 1:19, 5:19,
24:8, 26:7, 26:14, 26:24,
33:24, 35:8, 35:24,
102:10, 104:4, 105:6,
106:19, 107:4
CROWE [5] - 24:9,
24:18, 26:8, 104:5, 107:2
crushing [1] - 16:21
current [1] - 59:4
custody [1] - 66:23
cut [1] - 40:5

D

dangerous [3] - 42:6,
62:24
date [11] - 37:23, 54:14,
54:16, 74:20, 93:2, 97:4,
97:20, 98:4, 98:16,
101:10, 105:22
dates [4] - 96:4, 102:13,
102:15
David [2] - 16:19, 23:7
Davis [3] - 1:13, 2:6, 8:4
days [7] - 15:23, 66:15,
79:14, 98:1, 98:2, 102:3,
102:16
DC [1] - 61:9
de [4] - 26:16, 26:18,
27:22, 28:1
deadlines [1] - 36:21
deal [17] - 22:15, 22:16,
22:24, 23:3, 23:16, 35:4,
37:25, 39:19, 50:6,
54:11, 63:9, 63:12,
64:18, 84:18, 90:13,
93:21
dealing [3] - 58:23,
68:24, 83:24
dealt [3] - 22:22, 62:11,
73:21
Dean [5] - 52:24, 65:5,
65:16, 65:24, 66:16
Death [1] - 18:2
death [30] - 16:15,
16:16, 17:25, 19:16,
32:10, 46:22, 49:5, 63:9,

63:12, 63:17, 67:12,
68:6, 70:20, 70:21, 72:8,
72:16, 89:3, 89:17,
89:19, 89:22, 90:7,
90:13, 90:22, 91:9,
92:10, 94:10, 95:12,
105:2, 105:4
December [4] - 1:11,
3:20, 95:21, 108:5
decibel [1] - 35:20
decide [3] - 14:13,
70:11, 95:10
decided [2] - 25:13,
44:20
decision [3] - 18:11,
22:1, 64:24
decisional [1] - 77:22
decisions [1] - 31:14
deed [2] - 33:10, 39:13
default [1] - 91:22
defend [2] - 2:23, 4:14,
5:21, 7:7, 32:1, 106:12
defendant [43] - 11:16,
12:5, 12:7, 12:12, 12:18,
12:20, 13:9, 13:19,
13:21, 15:14, 20:22,
27:6, 27:10, 27:11,
27:21, 28:7, 28:12,
32:11, 34:24, 44:5, 46:7,
47:16, 47:19, 47:20,
49:19, 51:9, 51:11, 52:8,
57:5, 58:24, 61:9, 61:12,
61:13, 61:15, 61:17,
68:15, 75:3, 75:13,
79:13, 79:21, 82:5, 107:9
DEFENDANT [17] - 2:5,
3:23, 5:5, 6:11, 7:21,
8:3, 8:7, 8:8, 8:9, 8:12,
8:15, 8:17, 8:20, 8:21,
8:25, 9:1, 9:2
Defendant [4] - 1:16,
1:17, 1:19, 1:20
defendant's [2] - 26:4,
47:18
defendants [88] - 8:19,
9:4, 9:7, 9:8, 9:16, 9:19,
9:21, 11:9, 11:18, 11:24,
12:3, 12:4, 12:23, 13:24,
13:25, 14:6, 14:15, 15:7,
15:20, 15:24, 16:1,
17:24, 19:24, 20:15,
20:16, 20:17, 20:21,
25:17, 26:6, 26:18,
28:23, 35:14, 35:19,
38:18, 40:8, 41:10,
41:15, 41:19, 42:2,
42:10, 43:5, 43:14,
43:21, 44:3, 44:6, 44:18,
44:20, 45:2, 45:5, 45:8,
45:9, 45:10, 45:15,

45:19, 45:20, 46:17,
47:4, 47:7, 47:9, 47:11,
47:24, 48:2, 49:2, 49:19,
49:25, 56:23, 56:25,
57:7, 57:11, 57:16,
57:23, 67:10, 67:13,
67:21, 67:24, 68:4,
68:10, 68:13, 76:16,
88:18, 88:19, 93:8, 96:7,
102:20, 104:22, 107:11
Defendants [2] - 1:9,
9:5
defendants' [5] - 9:11,
12:11, 13:1, 15:11, 68:3
Defender's [1] - 45:22
defending [1] - 53:16
defense [15] - 15:22,
18:20, 19:1, 19:8, 23:7,
46:1, 48:16, 48:20,
54:11, 90:23, 92:14
Defense [1] - 44:13
defenses [1] - 17:25
defer [5] - 22:11, 70:22,
73:4, 73:23, 97:2
degree [2] - 61:17,
94:10
Dehli [1] - 27:12
delay [1] - 53:6
deliverable [1] - 16:3
demand [9] - 3:20, 3:21,
5:3, 6:9, 6:10, 27:23,
27:24
demonstrated [1] - 9:13
denial [2] - 40:21, 61:25
denied [7] - 41:24, 44:1,
48:9, 57:24, 62:6,
106:18, 107:10
denies [1] - 30:24
deny [1] - 31:7
denying [4] - 40:6,
106:10, 106:23
Department [2] - 80:13,
80:16
describes [1] - 3:19
deserve [1] - 107:17
deserves [1] - 62:3
desire [7] - 9:13, 10:18,
10:19, 17:10, 25:19,
36:8, 54:15
despite [3] - 19:22,
34:19, 38:11
detail [2] - 51:18, 66:22
detailed [2] - 12:7,
44:11
details [2] - 32:24, 68:8
detainees [1] - 79:1
Detective [1] - 75:25
detectives [2] - 75:24
detention [2] - 9:4, 16:2
Detention [1] - 79:18

determinations [2] -
18:4, 44:8
determine [2] - 9:16,
42:21
determined [1] - 9:20
develop [2] - 73:11,
73:12
developed [1] - 26:1
device [1] - 61:14
devise [2] - 20:12,
20:19
devoted [1] - 60:6
dicey [1] - 96:10
difference [3] - 42:3,
44:9, 48:2
differences [2] - 88:23,
89:3
different [11] - 9:25,
21:13, 25:8, 25:9, 26:1,
31:11, 41:1, 46:24,
49:17, 58:20, 96:5
difficult [4] - 11:17,
13:17, 29:5, 66:23
dignified [1] - 104:14
dignity [2] - 9:20, 11:15
diligently [1] - 17:17
diminished [1] - 17:15
dire [11] - 13:20, 13:22,
90:1, 90:9, 90:11, 90:20,
91:16, 92:2, 100:12,
100:23, 101:20
directed [4] - 34:11,
81:15, 107:9
direction [1] - 64:8
directly [1] - 21:6
dired [1] - 94:11
disabled [1] - 79:21
disaggregate [1] -
15:17
disagree [1] - 76:20,
97:9
disagreement [1] -
76:16
disagreements [1] -
94:18
discharge [1] - 48:8
disclose [1] - 98:15
disclosure [3] - 99:3,
99:7, 99:24
discover [1] - 60:21
discovery [1] - 84:21
discrete [1] - 15:14
discretion [1] - 17:21
discrimination [1] -
105:5
discuss [1] - 51:18
discussing [1] - 70:5
discussion [4] - 53:23,
80:25, 81:1, 81:12
discussions [1] - 50:9

disenfranchised [1] -
39:13
dishonest [1] - 40:3
disinclined [1] - 15:3
Dismiss [3] - 40:6,
40:22, 105:4
dismiss [7] - 2:11, 4:4,
5:11, 6:17, 19:16, 72:15,
106:24
dismissed [4] - 3:21,
5:4, 6:10, 83:16
displayed [3] - 9:8,
13:21, 44:22
disposed [2] - 69:11,
106:21
disrespect [2] - 40:25,
41:2
disrupt [2] - 9:10, 28:5
disruptive [1] - 13:25,
19:5, 28:3, 39:4, 39:5,
44:21, 47:7, 47:10, 50:5,
63:3, 104:13
dissertation [1] - 92:21
distressed [1] - 69:3
distribution [1] - 46:11
District [9] - 2:24, 4:23,
6:25, 7:16, 39:10, 41:1,
53:12, 53:13, 81:13
district [1] - 12:15
DISTRICT [2] - 1:1, 1:2
districts [1] - 12:16
DIVISION [1] - 1:2
docket [1] - 106:15
documents [1] - 33:25
done [12] - 10:8, 13:25,
35:1, 37:25, 41:25,
58:17, 91:21, 92:5, 92:9,
92:23, 93:1, 101:4
double [1] - 40:13
down [9] - 28:18, 49:20,
60:4, 61:16, 69:1, 79:22,
80:14, 94:20, 103:23
Draper [2] - 45:22,
45:24
dream [1] - 53:11
drug [2] - 46:11, 46:16
drugs [1] - 46:11
dual [2] - 13:6, 48:23,
49:4
due [1] - 10:24
duplicity [1] - 83:1,
83:4, 98:3
duress [2] - 2:8, 4:1,
5:7, 6:14
during [7] - 32:4, 32:12,
49:6, 60:14, 61:10,
82:10, 90:1
duty [2] - 21:19, 24:3

# E

**Earl** [2] - 6:12, 6:18
**earliest** [3] - 54:1, 54:7, 65:9
**early** [2] - 55:17, 64:16, 97:14
**easier** [2] - 21:23, 65:24
**Easter** [2] - 100:15, 100:16
**Eastern** [2] - 53:12, 53:13
**echo** [3] - 21:22, 22:10, 33:19
**echoed** [1] - 42:7
**Edward** [3] - 2:7, 2:12, 3:2
**Edwards** [2] - 75:2, 75:12
**effect** [9] - 12:25, 21:25, 26:20, 27:7, 37:13, 42:11, 67:16, 95:1, 98:21
**effective** [1] - 26:23
**effectively** [4] - 13:24, 17:17, 28:11, 88:17
**efforts** [3] - 26:17, 68:2
**eight** [2] - 26:23, 40:10
**either** [12] - 19:1, 22:8, 24:25, 34:22, 72:11, 73:6, 77:6, 83:15, 86:17, 96:11, 105:20, 105:21
**Either** [2] - 102:18, 103:12
**elect** [2] - 13:4, 83:16
**elected** [7] - 11:10, 13:24, 15:7, 28:25, 43:14, 45:9, 45:16
**element** [1] - 55:9
**elicit** [1] - 79:10
**eligible** [1] - 17:25
**embark** [1] - 9:25
**emerged** [1] - 59:24
**Emeritus** [1] - 52:24
**emphasize** [1] - 28:8
**encompassed** [1] - 72:18
**encountered** [1] - 12:16
**encourage** [1] - 42:1
**end** [7] - 43:8, 62:17, 63:25, 65:8, 74:8, 91:5, 107:3
**enforcement** [1] - 102:25
**engage** [3] - 11:25, 12:6, 28:15
**engages** [1] - 90:9
**English** [2] - 3:11, 6:12
**enlighten** [1] - 85:7
**enter** [2] - 10:10, 40:6

**entering** [1] - 53:24
**enterprise** [5] - 19:19, 46:4, 46:15, 83:11, 84:11
**entire** [4] - 55:25, 60:14, 61:11, 86:8
**entirely** [1] - 26:1
**envisioned** [1] - 50:8
**envisioning** [1] - 60:3
**erected** [1] - 27:7
**especially** [2] - 46:5, 48:4
**Esquire** [10] - 1:15, 1:16, 1:17, 1:18, 1:18, 1:19, 1:20, 1:21, 1:21, 1:22
**essential** [1] - 86:22
**essentially** [9] - 36:22, 38:5, 47:4, 54:5, 57:4, 66:17, 66:18, 83:13, 84:12
**establishes** [1] - 90:12
**establishing** [1] - 24:20
**estimated** [1] - 55:11
**et** [1] - 108:5
**ethical** [5] - 30:19, 31:13, 35:10, 42:23, 48:14
**ethically** [7] - 17:6, 30:25, 31:15, 32:2, 32:17, 33:3, 33:20
**eve** [1] - 16:22, 84:1, 84:4
**event** [1] - 65:10
**events** [4] - 11:14, 24:19, 69:3, 86:12
**evidence** [14] - 43:20, 45:6, 45:7, 46:6, 48:22, 48:23, 51:7, 51:8, 59:14, 73:7, 74:16, 77:11, 79:9, 79:16
**evident** [2] - 35:11, 36:6
**evidentiary** [9] - 18:17, 72:16, 74:2, 76:6, 76:12, 76:23, 80:9, 81:2, 98:10
**evolved** [1] - 90:4
**ex** [1] - 66:23
**ex-wife** [1] - 66:23
**exactly** [10] - 30:21, 32:7, 43:24, 47:2, 50:8, 69:4, 70:6, 77:23, 101:14, 104:7
**Exactly** [2] - 66:19, 106:3
**examination** [3] - 12:12, 12:18, 12:20
**examine** [4] - 28:17, 29:22, 31:19, 46:1
**examining** [4] - 32:3, 35:12, 36:7, 81:13
**example** [8] - 13:19,

22:14, 43:11, 69:8, 73:7, 84:24, 92:18, 92:24
**exceeds** [1] - 73:15
**excepting** [1] - 103:19
**exchanging** [1] - 94:15
**Excuse** [1] - 96:22
**excuse** [4] - 9:12, 17:19, 49:5, 69:20
**excused** [1] - 49:11
**excusing** [1] - 13:8
**exercise** [2] - 17:20, 61:24
**exhausted** [1] - 81:11
**exist** [1] - 58:21
**existing** [3] - 34:20, 35:7, 56:10
**exit** [1] - 9:5
**exotically** [1] - 27:14
**expect** [3] - 71:8, 97:12, 106:22
**expectations** [1] - 63:20
**expected** [2] - 80:20, 103:18
**expedite** [1] - 62:4
**expediting** [1] - 64:6
**experience** [2] - 24:22, 90:21
**experienced** [1] - 48:20
**explain** [3] - 46:8, 89:11, 104:9
**explode** [1] - 19:11
**explore** [1] - 65:15
**exploring** [1] - 69:4
**express** [2] - 2:3, 14:10
**expressed** [3] - 17:10, 25:19, 54:20
**expresses** [1] - 9:23
**extend** [1] - 101:9
**extends** [1] - 31:16
**extensive** [1] - 68:24
**extent** [7] - 10:15, 13:3, 13:18, 15:13, 60:5, 86:16, 87:7, 93:8, 94:21, 107:6
**extracted** [1] - 60:22
**extraordinary** [1] - 24:5
**extremely** [7] - 20:1, 20:2, 32:15, 46:6, 69:2

# F

**face** [3] - 20:22, 40:9, 40:24
**faced** [1] - 30:7
**facilitate** [1] - 80:2
**facing** [2] - 16:16, 49:19
**fact** [16] - 4:20, 7:14, 8:5, 12:17, 32:1, 37:3,

41:21, 44:17, 48:15, 55:8, 60:10, 60:25, 61:11, 63:6, 63:7, 75:17
**facto** [4] - 26:16, 26:18, 27:22, 28:1
**factor** [2] - 62:25, 63:4
**factors** [2] - 62:19
**factual** [2] - 17:13, 63:17
**fair** [3] - 11:16, 43:21, 49:2
**fairly** [2] - 13:14, 27:3
**fairness** [1] - 15:12
**faith** [2] - 80:12, 107:14
**fall** [6] - 54:1, 55:4, 64:13, 64:15, 65:20, 69:24
**falling** [1] - 61:16
**family** [3] - 68:3, 68:25, 107:16
**far** [9] - 19:16, 31:17, 38:5, 71:17, 99:9, 101:8
**fashion** [5] - 17:21, 30:19, 47:6, 62:21, 106:25
**father** [1] - 69:1
**February** [9] - 54:4, 54:12, 55:13, 94:1, 95:7, 95:8, 99:16, 99:22, 104:19
**Federal** [4] - 18:2, 41:1, 41:2, 61:9
**federal** [9] - 4:16, 5:24, 6:1, 7:9, 16:15, 41:6, 68:11, 68:16, 86:18
**feed** [2] - 29:23
**feet** [1] - 30:1
**female** [1] - 27:15
**few** [1] - 15:23
**fewer** [2] - 15:20, 91:23
**Fifth** [3] - 74:9, 74:11, 75:18
**figure** [2] - 16:20, 23:8
**file** [6] - 25:5, 34:2, 40:11, 49:11, 84:15, 98:2
**filed** [24] - 10:21, 51:1, 51:3, 70:19, 70:23, 71:15, 72:7, 72:10, 72:11, 72:20, 82:11, 82:13, 83:1, 85:5, 85:6, 85:9, 86:4, 87:19, 88:8, 88:11, 88:18, 106:20
**filing** [1] - 27:1
**final** [1] - 94:23
**finalize** [2] - 92:1, 99:10
**finalized** [1] - 97:12
**finally** [1] - 99:23
**findings** [1] - 16:11
**fine** [15] - 19:10, 96:17, 96:19, 96:23, 97:15,

98:6, 98:7, 99:17, 99:19, 100:7, 100:8, 100:9, 100:10, 100:22
**Fine** [1] - 103:3
**finish** [2] - 65:25, 102:7
**finished** [1] - 59:12
**fire** [3] - 7:25, 25:19, 36:13
**fired** [10] - 2:19, 3:8, 4:11, 5:1, 5:19, 7:3, 7:4, 7:18, 7:24, 31:1
**firm** [2] - 13:14, 38:19
**first** [36] - 14:15, 14:17, 14:23, 17:4, 27:5, 27:25, 29:6, 29:17, 30:21, 33:15, 36:11, 36:23, 40:9, 52:1, 52:5, 52:8, 52:18, 57:2, 63:21, 64:18, 65:9, 75:15, 88:16, 92:6, 93:6, 93:12, 93:15, 95:16, 95:22, 103:18
**fit** [3] - 45:17, 63:1, 63:4
**five** [1] - 64:21
**flagging** [1] - 105:10
**flesh** [9] - 2:13, 3:3, 3:25, 4:5, 5:6, 5:12, 6:12, 6:18, 7:23
**flexibility** [1] - 98:22
**flexible** [1] - 97:21
**flip** [1] - 53:6
**floor** [1] - 61:16
**flop** [1] - 53:6
**focus** [3] - 46:15, 80:8, 93:11
**focused** [3] - 29:2, 46:2, 74:19
**focusing** [1] - 75:5
**folks** [2] - 63:11, 67:23
**follow** [1] - 51:6
**following** [4] - 96:2, 97:9, 97:10, 97:14
**follows** [1] - 51:10
**FOR** [1] - 1:2
**forces** [1] - 33:14
**forcing** [2] - 33:23, 36:22
**foregoing** [1] - 108:6
**foreign** [1] - 62:20
**forget** [1] - 63:13
**forgetting** [2] - 19:14, 77:14
**forgo** [1] - 91:10
**forgot** [1] - 38:24
**form** [2] - 21:8, 37:10
**formal** [5] - 13:15, 33:24, 34:4, 34:9, 106:19
**formalize** [1] - 62:10
**formalizing** [1] - 61:25, 62:1

**formally** [1] - 21:20
**formatting** [1] - 25:9
**forms** [1] - 80:16
**forth** [6] - 14:15, 33:25, 51:21, 91:16, 93:14, 105:22
**forthwith** [1] - 10:10
**fortuity** [1] - 33:16
**forward** [12] - 15:8, 18:19, 42:25, 44:17, 47:6, 53:21, 59:10, 60:15, 61:3, 62:15, 63:24, 69:18
**four** [13] - 14:3, 14:5, 15:16, 39:5, 40:10, 54:4, 55:8, 55:11, 67:9, 70:1, 79:14, 97:10, 98:25
**Four** [1] - 55:11
**Fourth** [15] - 13:6, 27:9, 37:5, 37:6, 37:11, 40:14, 40:19, 41:10, 41:13, 42:20, 43:10, 49:1, 49:4, 49:18, 64:2
**Frankly** [3] - 67:7, 94:17, 95:7
**frankly** [15] - 2:3, 10:15, 11:1, 16:12, 18:13, 21:4, 29:2, 48:1, 52:12, 55:2, 78:16, 79:5, 91:20, 97:1, 106:24
**fraud** [1] - 46:20
**fraught** [1] - 18:5
**fresh** [1] - 95:1
**Friday** [5] - 100:1, 103:11, 103:21, 103:22, 106:2
**Fridays** [1] - 106:4
**friend** [2] - 65:5, 78:18
**front** [4] - 83:8, 83:22, 89:14, 92:12
**frustrated** [2] - 18:13, 20:8
**frustrating** [3] - 16:18, 19:21, 63:22
**frustration** [1] - 17:3
**full** [1] - 66:13
**fully** [3] - 20:24, 53:2, 80:10
**fun** [1] - 81:13
**function** [1] - 26:5
**functionally** [1] - 34:18
**fundamental** [3] - 30:16, 40:16, 40:18
**fundamentally** [1] - 33:19
**fungible** [1] - 60:11
**Furthermore** [1] - 2:14

# G

**gains** [1] - 78:21
**GARDNER** [4] - 1:8, 6:11, 8:9, 9:2
**Gardner** [50] - 1:20, 6:12, 6:18, 10:18, 14:2, 14:4, 14:16, 14:18, 14:22, 29:23, 33:11, 33:15, 34:15, 34:17, 34:19, 36:22, 38:23, 39:9, 50:12, 50:19, 50:23, 51:14, 53:19, 55:7, 56:4, 56:8, 58:4, 58:25, 60:25, 64:13, 64:15, 66:4, 71:19, 73:8, 83:2, 83:25, 85:13, 85:17, 86:23, 87:6, 88:15, 93:7, 93:11, 97:5, 98:2, 99:12, 104:8, 104:15, 104:18, 106:16
**Gardner's** [9] - 10:16, 29:17, 55:21, 60:12, 61:3, 66:17, 68:25, 71:17, 87:1
**general** [7] - 2:8, 4:1, 5:8, 6:14, 72:6, 89:25, 91:3
**generis** [1] - 30:14
**Gerard** [1] - 1:18
**germane** [2] - 18:15, 73:8
**Gerry** [1] - 4:10
**given** [18] - 9:18, 24:1, 31:6, 31:17, 31:25, 39:4, 43:2, 43:13, 44:24, 48:4, 49:3, 51:10, 60:13, 68:4, 69:14, 72:4, 81:11, 81:21
**government** [52] - 11:2, 14:10, 14:14, 14:25, 15:9, 16:13, 19:13, 32:22, 34:4, 35:12, 36:7, 39:24, 40:15, 43:7, 45:6, 45:7, 49:11, 53:5, 55:11, 56:8, 56:12, 56:17, 57:2, 57:17, 59:2, 62:21, 65:2, 67:7, 72:7, 73:9, 73:12, 80:9, 81:4, 83:16, 85:16, 86:13, 86:14, 86:24, 87:8, 87:13, 88:1, 88:22, 90:24, 92:16, 96:13, 97:21, 97:25, 98:1, 98:21, 99:17, 101:2, 101:25
**Government** [2] - 1:15, 56:6
**government's** [27] - 10:18, 14:12, 19:15, 33:16, 39:25, 43:20,

48:12, 48:22, 52:12, 64:17, 67:6, 67:10, 73:6, 77:2, 81:25, 83:6, 84:15, 85:14, 87:5, 88:19, 90:3, 91:17, 97:21, 98:14, 99:3, 99:24, 101:1
**governmental** [1] - 14:9
**graciously** [2] - 10:5, 61:1
**grammar** [2] - 3:11, 6:12
**grand** [6] - 58:11, 58:13, 58:19, 86:17, 87:8, 88:1
**granting** [1] - 10:2
**grateful** [1] - 65:15
**gravity** [1] - 69:14
**great** [6] - 21:25, 79:11, 88:23, 94:17, 100:11, 107:4
**Great** [1] - 96:24
**greater** [2] - 51:18, 84:12
**greatly** [1] - 22:18
**Greenbelt** [3] - 54:3, 90:19, 94:4
**gross** [1] - 47:17
**grounds** [1] - 55:23
**guess** [16] - 14:4, 22:11, 23:16, 23:23, 24:3, 30:23, 32:17, 33:14, 41:9, 53:19, 62:11, 70:21, 77:13, 81:6, 101:2, 102:11
**guidelines** [3] - 63:9, 63:12, 63:19
**guilt** [1] - 46:25
**guilt/innocence** [1] - 101:4
**guilty** [1] - 17:25
**guy** [1] - 75:9

# H

**hackneyed** [1] - 67:14
**halt** [1] - 47:5
**Hammerjacks** [2] - 76:2, 79:7
**hand** [1] - 31:12
**handle** [2] - 74:3, 82:24
**handling** [2] - 75:24, 85:2
**hands** [1] - 94:23
**happy** [4] - 14:9, 15:5, 22:8, 28:9
**hard** [8] - 19:23, 28:17, 29:9, 29:10, 30:4, 32:15, 71:6
**harder** [2] - 28:19,

36:18
**Harding** [26] - 3:7, 4:25, 7:3, 7:25, 50:25, 51:2, 51:17, 57:22, 64:11, 64:20, 69:22, 72:17, 73:1, 73:3, 77:5, 82:1, 82:9, 82:12, 82:16, 85:2, 87:4, 92:4, 93:21, 94:22, 99:5, 99:12
**Harding's** [1] - 73:19
**HARRIS** [6] - 1:7, 3:23, 8:3, 8:12, 8:15, 8:21
**Harris** [31] - 1:17, 3:25, 4:5, 10:3, 10:11, 10:17, 10:19, 10:25, 14:18, 14:22, 14:23, 50:13, 50:19, 51:15, 53:20, 54:25, 55:4, 55:15, 55:18, 56:16, 58:7, 58:9, 59:11, 64:14, 64:16, 66:4, 66:14, 94:20, 103:19
**Harris's** [3] - 10:15, 82:7, 82:19
**Harvard** [1] - 27:19
**hate** [1] - 92:3
**Haynes** [1] - 90:6
**head** [1] - 26:15
**heading** [1] - 26:16
**heal** [2] - 39:23, 39:25
**heals** [2] - 16:23, 39:21
**health** [4] - 46:20, 81:24, 99:11, 107:16
**healthy** [1] - 107:18
**hear** [19] - 10:23, 11:1, 11:11, 11:19, 12:13, 12:24, 26:12, 29:16, 33:7, 39:18, 50:15, 50:17, 55:19, 59:23, 62:5, 65:25, 82:3, 98:13, 100:3
**heard** [6] - 13:14, 51:3, 68:9, 71:16, 72:14, 72:22
**hearing** [22] - 9:8, 10:9, 11:20, 15:9, 15:25, 18:17, 24:15, 34:14, 39:6, 57:21, 66:1, 71:18, 72:16, 74:8, 87:4, 96:2, 98:10, 98:17, 102:24, 103:2, 104:5
**Hearing** [2] - 1:10, 96:5
**hearing's** [1] - 103:14
**hearings** [8] - 15:18, 15:19, 22:20, 87:4, 95:15, 95:21, 99:25, 103:5
**hearsay** [1] - 77:11
**helpful** [5] - 70:7, 71:25, 72:2, 90:23, 97:22
**helpless** [3] - 18:12,

18:13, 20:7
**helps** [1] - 96:12
**hereby** [1] - 108:3
**hereunto** [1] - 108:9
**hesitation** [1] - 24:13
**hiatus** [1] - 40:11
**Higgs** [2] - 63:13, 90:6
**high** [2] - 24:13, 63:14
**highly** [3] - 43:17, 44:3, 52:25
**himself** [12] - 3:6, 4:24, 10:6, 10:25, 14:4, 17:19, 28:10, 30:3, 39:3, 61:1, 104:12
**hire** [1] - 25:20
**hold** [4] - 29:5, 38:21, 81:8, 102:13
**holding** [1] - 96:4
**holes** [1] - 48:21
**holiday** [1] - 102:4
**holidays** [1] - 100:14
**Holland** [1] - 78:18
**Holly** [1] - 87:2
**Homicide** [4] - 74:20, 75:4, 75:10, 79:23
**homicide** [1] - 79:23
**honesty** [2] - 38:14, 78:11
**Honor** [104] - 11:7, 16:7, 16:10, 17:1, 17:24, 21:15, 21:17, 22:10, 23:2, 23:11, 23:24, 24:9, 24:18, 25:11, 30:9, 30:24, 31:7, 31:9, 32:19, 33:9, 39:15, 46:21, 48:11, 48:20, 48:24, 49:22, 50:8, 50:21, 50:24, 53:11, 53:23, 54:10, 55:9, 55:19, 57:1, 59:13, 60:1, 60:3, 61:5, 61:22, 62:16, 63:7, 63:8, 64:6, 64:19, 65:12, 65:13, 65:16, 66:10, 68:20, 68:21, 68:22, 68:23, 69:5, 70:5, 70:16, 71:3, 71:7, 74:1, 76:22, 77:1, 77:6, 78:9, 80:8, 81:16, 83:6, 84:6, 84:13, 84:20, 85:10, 86:7, 88:7, 88:11, 89:2, 89:21, 90:7, 91:7, 92:3, 94:13, 95:14, 96:15, 97:15, 98:6, 98:7, 99:8, 99:18, 99:19, 100:2, 100:7, 100:8, 100:10, 100:16, 100:22, 100:3, 103:7, 104:25, 105:12, 106:5, 106:7, 106:8, 106:9, 106:11, 107:3
**Honor's** [2] - 30:10,

31:3
**Honorable** [1] - 1:13
**hope** [14] - 10:3, 13:12, 37:24, 38:21, 39:2, 40:19, 60:19, 67:15, 78:21, 78:22, 83:24, 97:1, 97:7
**hoped** [1] - 35:4
**hopeful** [1] - 67:5
**Hopefully** [1] - 99:5
**hopefully** [2] - 16:23, 95:7
**hoping** [5] - 30:24, 37:22, 53:6, 97:6, 106:19
**horseback** [1] - 37:4
**host** [1] - 69:12
**Howard** [1] - 60:14
**Hudson** [1] - 46:18
**human** [1] - 32:15
**humanly** [1] - 11:17
**humor** [1] - 107:13
**hundred** [2] - 30:1, 95:6
**hung** [1] - 51:11
**hurt** [1] - 29:12
**hybrid** [2] - 37:7, 37:10, 37:14
**hypothetically** [1] - 79:15

**I**

**idea** [5] - 27:3, 29:15, 32:22, 95:14, 104:21
**ideas** [2] - 66:13, 67:18
**identification** [10] - 13:19, 49:24, 50:2, 83:2, 86:4, 86:10, 87:19, 98:10, 98:18, 100:1
**identifications** [1] - 76:13
**identify** [1] - 67:23
**ignored** [2] - 57:19, 87:13
**III** [4] - 2:7, 2:12, 3:2, 108:4
**illegally** [1] - 46:11
**imaginative** [1] - 13:12
**imagine** [5] - 14:8, 14:25, 41:14, 45:18, 82:3
**immediately** [2] - 3:21, 22:12
**impact** [3] - 73:7, 73:9, 73:13
**impassioned** [1] - 32:3
**impeached** [1] - 32:23
**impeachment** [2] - 86:21, 87:11
**import** [1] - 25:9
**important** [4] - 32:25,

33:1, 50:17, 86:3
**imposing** [1] - 91:12
**impossibility** [2] - 17:13, 63:17
**impossible** [1] - 21:3
**imprimatur** [1] - 36:3
**improper** [1] - 56:11
**IN** [1] - 1:1
**inadmissible** [1] - 85:13
**inappropriate** [1] - 56:7
**incapable** [1] - 44:4
**incentive** [1] - 79:11
**inchoate** [1] - 93:9
**incidents** [1] - 10:21
**inclined** [6] - 16:14, 17:2, 53:20, 62:10, 63:23, 70:24
**include** [2] - 91:9, 95:11
**included** [3] - 83:13, 84:12, 90:14
**including** [3] - 87:8, 98:3, 102:4
**inconsistent** [7] - 35:24, 36:8, 38:8, 86:12, 86:15, 86:19, 87:9
**incorporated** [1] - 87:18
**increase** [1] - 84:10
**increasingly** [1] - 12:2
**incredible** [2] - 51:20, 52:24
**incredibly** [5] - 16:17, 18:13, 20:7, 60:9
**indeed** [1] - 39:21
**India** [1] - 27:12
**indicate** [1] - 91:8
**indicated** [10] - 16:17, 26:2, 36:16, 38:6, 39:6, 57:18, 59:17, 97:15, 97:18, 105:15
**indicating** [1] - 106:25
**indictment** [20] - 3:9, 10:20, 10:21, 19:18, 40:22, 50:20, 56:3, 56:10, 56:24, 57:11, 57:18, 58:5, 58:7, 58:23, 59:1, 66:14, 83:22, 84:11
**indictments** [2] - 11:3, 58:8
**indirectly** [1] - 69:8
**indispensable** [1] - 55:20
**indisputable** [1] - 32:23
**individual** [4] - 80:16, 82:5, 90:9
**individually** [1] - 30:18
**informal** [1] - 15:22
**information** [4] - 51:13, 57:11, 87:1, 95:12
**inquiry** [3] - 12:7,

74:25, 91:14
**insist** [1] - 27:13
**insists** [2] - 27:22, 56:17
**insofar** [1] - 13:23
**instance** [3] - 22:24, 24:5, 97:2
**instead** [3] - 44:22, 58:7, 58:8
**institutional** [1] - 68:2
**institutions** [1] - 67:20
**instruction** [2] - 51:5, 51:6
**instructions** [2] - 51:10, 56:5
**insure** [3] - 11:16, 12:8, 104:18
**insurmountable** [1] - 47:1
**intellectually** [1] - 40:3
**intelligent** [1] - 12:8
**intend** [9] - 9:19, 20:19, 25:4, 67:18, 85:17, 87:6
**intended** [1] - 16:12
**intends** [5] - 9:15, 20:11, 20:12, 20:13, 73:9
**intention** [1] - 11:21, 95:2
**intentionally** [1] - 9:9
**interest** [16] - 3:1, 4:13, 4:19, 4:21, 6:5, 6:6, 7:6, 7:13, 15:19, 52:25, 61:3, 68:15, 68:17, 69:9, 91:17, 93:9
**interested** [3] - 11:12, 22:22, 71:10
**interesting** [3] - 18:16, 41:8, 77:20
**interests** [2] - 44:5, 44:18
**interfere** [3] - 26:4, 30:4, 30:5
**interim** [1] - 69:25
**interjected** [1] - 60:2
**interlocutory** [4] - 40:8, 40:12, 40:13, 107:1
**intoxication** [1] - 46:16
**invalid** [1] - 56:13
**investigation** [1] - 63:15
**investigator** [1] - 75:23
**investigators** [1] - 86:18
**investment** [1] - 54:8
**invite** [1] - 40:15
**invited** [1] - 96:25
**inviting** [1] - 40:7
**invocation** [2] - 75:18, 80:24
**invoke** [1] - 81:1

**invoked** [6] - 74:10, 74:16, 75:13, 79:5, 79:18, 80:11
**invokes** [1] - 79:13
**involved** [3] - 54:11, 59:15, 86:19
**involvement** [1] - 90:11
**involving** [1] - 47:9
**Irby** [1] - 94:9
**iron** [1] - 95:17
**irrelevant** [1] - 42:4
**irritated** [1] - 18:14
**issue** [58] - 23:7, 30:16, 33:5, 35:5, 35:19, 35:21, 38:1, 42:5, 46:16, 47:7, 49:20, 50:7, 50:18, 50:25, 51:5, 51:6, 52:2, 52:3, 53:19, 56:1, 56:10, 56:15, 56:18, 58:18, 58:24, 60:4, 60:9, 61:4, 61:8, 62:14, 66:7, 66:9, 70:25, 74:2, 74:3, 74:9, 74:13, 76:6, 76:13, 77:7, 78:15, 78:21, 80:4, 82:5, 82:7, 82:17, 83:4, 85:22, 86:3, 86:4, 97:19, 99:11, 99:13, 101:19, 106:22, 106:25
**issued** [1] - 79:17
**issues** [37] - 15:4, 15:10, 15:14, 15:17, 15:19, 22:14, 22:21, 46:5, 53:2, 56:18, 60:6, 62:11, 62:16, 66:23, 70:25, 71:12, 71:16, 71:17, 72:9, 72:14, 73:5, 73:16, 73:20, 73:21, 73:24, 75:1, 75:3, 76:15, 76:23, 82:24, 83:2, 83:25, 84:21, 98:11, 99:15, 100:1, 100:3
**issuing** [1] - 106:8
**itself** [2] - 52:13, 89:24

**J**

**Jackson** [1] - 69:9
**James** [1] - 1:20
**January** [13] - 53:14, 93:6, 93:13, 93:16, 94:1, 94:24, 94:25, 95:16, 98:5, 99:9, 99:14, 104:19
**Jencks** [2] - 99:1, 99:2
**jeopardy** [1] - 40:13
**Jesse** [1] - 69:9
**Jim** [1] - 5:19
**job** [2] - 28:19, 43:19
**join** [5] - 34:1, 57:19, 58:4, 58:24, 106:21

**joinder** [9] - 56:1, 56:7, 56:9, 56:15, 57:6, 57:7, 57:15, 58:24, 66:9
**joined** [4] - 15:3, 56:16, 56:23, 56:24
**joint** [5] - 37:12, 56:10, 66:8, 70:1, 72:12
**Jones** [1] - 49:9
**Joshua** [1] - 1:18
**Jr** [1] - 4:5
**Jr.,live** [1] - 3:25
**judge** [1] - 40:19, 44:20, 45:9, 75:1, 75:8, 75:12, 75:17, 77:2, 81:13, 94:4
**Judge** [90] - 1:13, 2:6, 8:4, 14:25, 20:6, 24:12, 24:16, 27:15, 38:20, 41:8, 41:23, 42:4, 43:25, 44:1, 44:7, 45:12, 45:18, 47:3, 47:13, 49:8, 49:10, 52:23, 53:18, 54:13, 54:18, 54:19, 54:21, 54:24, 55:12, 58:10, 61:21, 61:23, 63:14, 69:22, 69:24, 69:25, 71:20, 71:22, 74:13, 75:6, 75:9, 76:12, 77:3, 77:4, 77:8, 77:9, 77:17, 77:19, 78:11, 78:17, 78:18, 79:25, 80:1, 81:18, 81:24, 85:19, 85:21, 85:24, 87:17, 89:6, 89:10, 89:14, 89:16, 89:18, 90:3, 90:5, 90:7, 90:8, 90:11, 90:19, 91:25, 92:1, 92:12, 92:25, 93:1, 93:18, 94:3, 94:7, 95:5, 95:11, 95:20, 97:4, 97:8, 99:1, 101:7
**judges** [1] - 80:3
**judgment** [4] - 13:3, 40:21, 67:14, 105:22
**July** [5] - 54:9, 101:4, 101:6, 102:8, 105:15
**jumping** [1] - 91:13
**June** [7] - 14:4, 53:8, 54:9, 94:1, 101:2, 101:3
**jurisdiction** [21] - 2:9, 4:2, 5:9, 6:15, 24:20, 35:17, 35:21, 36:2, 38:7, 39:17, 40:7, 40:16, 40:17, 41:25, 44:13, 44:15, 45:11, 53:14, 62:1, 80:19, 106:24
**jurisdictional** [1] - 41:19
**jurisdictions** [1] - 90:21
**juror** [3] - 90:9, 91:3, 91:19

**juror's** [3] - 90:13, 91:1, 91:4
**jurors** [5] - 23:9, 45:13, 62:22, 89:8, 101:18
**jury** [38] - 11:3, 13:22, 17:19, 22:24, 44:22, 44:23, 44:25, 45:2, 45:12, 45:20, 46:3, 51:5, 51:10, 51:12, 58:11, 58:14, 58:17, 58:19, 62:18, 71:2, 86:1, 86:17, 87:8, 88:2, 88:5, 89:17, 89:23, 91:12, 93:4, 93:22, 94:5, 94:8, 94:9, 94:24, 94:25, 100:24, 106:13
**Justice** [2] - 62:8, 107:12
**justification** [1] - 9:12

**K**

**KANWISHER** [1] - 11:7
**Kanwisher** [10] - 1:22, 2:2, 4:11, 8:2, 8:10, 9:23, 11:4, 72:21, 82:13, 85:7
**keep** [7] - 15:2, 23:19, 24:25, 47:19, 50:11, 61:12, 63:16
**Kelsey** [1] - 1:16
**key** [2] - 70:25
**kind** [16] - 11:7, 12:6, 18:5, 19:15, 20:13, 30:16, 56:17, 63:8, 73:16, 77:12, 80:25, 81:7, 81:8, 89:23, 89:25, 101:18
**kinds** [1] - 12:14
**Kirkland** [1] - 96:20
**knife** [2] - 76:10, 76:11
**knock** [1] - 91:18
**knowing** [2] - 12:8, 13:1
**knowingly** [1] - 9:9
**knowledge** [1] - 48:18
**knows** [3] - 21:24, 79:19, 86:13
**KURLAND** [42] - 33:9, 34:13, 37:21, 38:20, 52:23, 55:19, 57:1, 57:10, 58:10, 58:13, 58:16, 66:16, 66:20, 67:3, 71:7, 71:20, 83:6, 83:21, 83:23, 84:6, 84:8, 85:12, 85:21, 86:2, 86:7, 87:20, 87:25, 96:21, 96:23, 97:15, 97:18, 98:7, 99:1, 99:8, 100:2, 100:5, 100:8, 101:13,

103:16, 105:12, 105:25, 106:5
**Kurland** [42] - 1:21, 7:2, 16:22, 22:15, 26:13, 29:18, 29:20, 29:21, 30:8, 32:7, 33:8, 33:23, 34:12, 37:4, 38:14, 40:3, 52:15, 52:16, 52:20, 52:21, 53:9, 60:10, 61:1, 64:18, 65:6, 65:10, 65:14, 65:18, 65:21, 65:25, 66:15, 86:1, 87:17, 96:13, 96:21, 96:22, 97:8, 98:4, 103:13, 106:10, 106:15, 107:8

**L**

**L's** [1] - 3:22
**lack** [10] - 2:9, 2:10, 4:2, 4:3, 5:9, 6:15, 6:16, 40:6, 106:24
**lacks** [4] - 2:9, 4:2, 5:8, 6:15
**land** [1] - 18:5
**landscape** [1] - 60:18
**largely** [4] - 10:17, 33:16, 33:17, 86:25
**larger** [1] - 83:14
**last** [17] - 9:7, 10:9, 15:23, 15:25, 21:4, 39:6, 42:2, 42:10, 43:12, 47:24, 48:3, 50:9, 54:2, 61:4, 65:22, 82:12, 87:4
**late** [5] - 55:17, 64:14, 64:16, 65:7, 65:20
**latest** [2] - 93:6, 93:13
**Laughter** [1] - 104:3
**Laura** [2] - 1:16, 18:7
**law** [16] - 25:21, 25:25, 27:12, 28:13, 28:14, 37:6, 49:4, 56:8, 56:11, 56:14, 56:16, 56:22, 57:25, 58:5, 102:25
**Law** [1] - 34:25
**lawyer** [20] - 27:14, 27:15, 27:16, 27:17, 27:18, 27:19, 29:11, 31:23, 32:12, 37:13, 37:14, 38:12, 39:12, 41:20, 48:16, 49:12, 80:21
**lawyer's** [1] - 31:23
**lawyers** [9] - 13:10, 19:8, 19:25, 28:24, 31:12, 31:16, 36:13, 36:18, 48:9
**lay** [1] - 46:22

**lead** [1] - 62:2
**leash** [1] - 31:15
**least** [32] - 13:17, 13:21, 15:15, 20:22, 20:23, 21:21, 23:19, 25:19, 31:6, 31:14, 31:16, 34:10, 34:16, 35:23, 36:11, 39:5, 39:7, 39:21, 45:18, 46:12, 46:18, 58:17, 68:25, 71:14, 84:1, 90:4, 96:7, 97:7, 99:13, 101:15, 102:16, 104:2
**leave** [2] - 13:3, 70:13, 93:20
**leaves** [2] - 75:14, 88:5
**leaving** [1] - 93:19
**ledger** [2] - 32:6
**Lee** [2] - 3:24, 4:5
**left** [7] - 35:15, 70:8, 74:3, 82:12, 85:25, 88:14, 90:1
**legal** [2] - 17:12, 35:19, 63:17
**legally** [2] - 18:16, 28:22
**legitimacy** [1] - 36:4
**legitimate** [1] - 12:23
**lengthy** [1] - 92:21
**less** [3] - 13:2, 27:14, 69:6
**lesser** [1] - 83:13
**letter** [5] - 34:2, 77:1, 77:6, 90:3, 97:7
**letters** [2] - 3:10, 24:23
**Lexington** [2] - 92:12, 92:23
**lie** [2] - 31:20, 35:13
**life** [5] - 10:1, 18:10, 32:4, 32:15, 63:16
**light** [6] - 10:18, 61:7, 62:21, 82:19, 100:11, 104:21
**likely** [3] - 27:20, 31:7, 52:14
**limit** [1] - 73:9
**limited** [2] - 51:14, 90:21
**limiting** [1] - 56:5
**line** [3] - 48:6, 48:7, 94:20
**list** [3] - 72:1, 72:4, 84:23
**listen** [2] - 29:24, 69:11
**listening** [4] - 29:2, 37:3, 38:17, 40:3
**literally** [4] - 38:11, 83:18, 83:19, 88:17
**litigate** [2] - 62:12
**litigated** [1] - 84:1,

97:19
**litigation** [3] - 63:11, 63:24, 95:12
**live** [11] - 2:12, 3:3, 4:5, 5:6, 5:12, 6:12, 6:18, 7:23, 38:15, 38:17, 63:19
**lives** [2] - 20:4, 69:1
**local** [1] - 17:8
**located** [1] - 6:25
**lockup** [2] - 10:22, 29:18
**Lombard** [2] - 1:25, 7:1
**look** [12] - 28:9, 29:24, 43:12, 49:2, 62:23, 69:24, 70:1, 71:15, 84:13, 92:23, 102:25
**looked** [2] - 45:13, 92:5
**looking** [6] - 42:20, 92:6, 92:20, 97:5, 98:17, 101:21
**looks** [3] - 15:15, 98:6, 99:19
**loose** [1] - 28:20
**loosely** [2] - 26:14, 29:8
**lose** [2] - 63:6, 101:17
**loud** [3] - 28:4, 30:6, 35:19
**loudly** [1] - 27:24
**Love** [1] - 53:16
**lower** [19] - 3:11, 3:12, 3:13, 3:14, 3:15, 3:16
**lucky** [1] - 102:6
**lump** [1] - 51:12
**lumps** [1] - 72:8
**lunch** [1] - 69:19
**luncheon** [1] - 71:14
**Luttig** [1] - 61:23
**lying** [1] - 35:13
**lyrics** [3] - 84:25, 85:12, 99:13

**M**

**mail** [9] - 16:1, 16:25, 20:14, 20:17, 20:18, 20:20, 21:3, 22:7
**mailed** [4] - 25:3, 93:3, 93:14, 97:13
**mailing** [1] - 93:16
**maintain** [4] - 9:21, 11:14, 83:11, 84:10
**maintaining** [1] - 62:20
**majority** [1] - 79:8
**man** [10] - 2:13, 3:3, 3:25, 4:6, 5:6, 5:13, 6:13, 6:19, 7:23, 18:11
**mandatory** [1] - 63:20
**manner** [2] - 39:4, 106:12

**MANUELIAN** [91] - 14:20, 41:8, 41:23, 44:1, 44:9, 45:1, 45:4, 45:7, 45:13, 45:22, 45:25, 46:10, 46:14, 46:20, 46:23, 47:21, 48:1, 48:11, 48:19, 49:9, 49:13, 49:16, 50:3, 50:14, 50:21, 50:24, 52:6, 52:10, 53:5, 53:18, 54:24, 59:13, 64:19, 64:23, 70:5, 70:10, 70:13, 71:22, 71:25, 72:3, 72:6, 72:15, 73:3, 73:21, 74:1, 74:7, 74:15, 74:21, 74:23, 75:5, 75:16, 75:23, 76:2, 76:5, 76:8, 76:10, 76:12, 76:19, 79:7, 81:24, 82:6, 82:11, 82:20, 82:22, 84:17, 84:20, 85:1, 85:5, 85:18, 85:24, 87:17, 87:21, 88:3, 92:3, 92:9, 92:19, 93:17, 93:23, 95:20, 95:25, 96:15, 96:19, 97:4, 99:17, 99:21, 100:10, 100:16, 100:19, 101:7, 101:12, 101:15
**Manuelian** [32] - 1:15, 3:7, 4:25, 7:3, 7:25, 14:10, 39:19, 41:7, 43:24, 50:16, 53:12, 56:2, 59:12, 64:10, 66:4, 67:8, 69:19, 73:18, 81:23, 87:16, 89:15, 92:2, 94:3, 94:14, 94:22, 95:17, 95:24, 98:14, 99:5, 100:9, 104:18, 107:17
**Manuelian's** [2] - 54:15, 57:3, 59:8
**March** [24] - 10:13, 14:3, 14:19, 14:24, 37:23, 52:8, 52:19, 55:7, 59:10, 61:4, 65:21, 94:1, 98:16, 98:18, 99:4, 99:25, 100:6, 102:15, 102:18, 104:19, 104:20, 104:22
**marginally** [1] - 14:6
**marshal's** [1] - 10:22
**marshals** [5] - 8:18, 9:3, 24:14, 47:11, 61:13
**MARTIN** [15] - 1:7, 5:5, 7:21, 8:8, 9:1, 21:17, 72:24, 85:9, 89:2, 89:6, 89:11, 89:14, 103:3, 104:25, 105:2
**Martin** [39] - 1:18, 1:19,

4:10, 5:6, 5:12, 7:23, 10:24, 14:20, 14:21, 21:16, 23:20, 30:22, 48:25, 49:14, 52:10, 52:11, 54:10, 54:19, 54:22, 55:2, 55:3, 64:13, 64:15, 69:25, 72:10, 72:12, 72:20, 82:13, 85:7, 88:11, 88:22, 88:25, 89:1, 89:16, 91:9, 94:20, 102:21, 103:25, 105:1
  **Martin's** [4] - 24:24, 25:16, 26:13, 92:15
  **Mary** [3] - 1:24, 108:3, 108:14
  **MARYLAND** [1] - 1:2
  **Maryland** [16] - 1:11, 1:25, 2:21, 4:14, 4:17, 5:22, 5:25, 6:2, 7:1, 7:7, 7:10, 17:7, 27:18, 39:10, 39:11, 68:14
  **material** [3] - 86:22, 86:25, 87:11
  **matter** [33] - 2:9, 4:2, 4:20, 5:8, 6:15, 7:14, 14:1, 24:19, 24:20, 27:24, 30:24, 41:5, 41:24, 44:13, 44:15, 45:10, 53:14, 55:16, 56:7, 56:11, 56:14, 56:16, 56:22, 57:25, 58:5, 62:1, 62:22, 80:9, 81:16, 99:23, 106:24, 108:4, 108:8
  **matters** [7] - 19:17, 33:21, 34:13, 35:4, 37:24, 103:19
  **McKaskle** [1] - 26:2
  **MCKASKLE** [1] - 26:8
  **mean** [29] - 2:20, 6:9, 13:7, 14:14, 20:15, 31:15, 32:5, 38:5, 39:17, 40:11, 46:9, 47:16, 47:25, 54:22, 55:6, 63:13, 66:12, 67:9, 69:7, 71:13, 73:5, 77:16, 77:19, 83:19, 84:3, 91:9, 91:11, 94:21
  **meaning** [1] - 3:17
  **means** [2] - 10:11, 100:25
  **meant** [1] - 28:20
  **meat** [1] - 99:23
  **mechanism** [1] - 20:20
  **meet** [5] - 15:24, 18:22, 21:2, 29:20, 63:21
  **meetings** [2] - 24:24, 24:25
  **member** [4] - 2:3,

30:19, 39:10
  **members** [5] - 20:2, 67:19, 68:2, 68:12, 68:25
  **memorandum** [1] - 34:3
  **Memorial** [2] - 101:24, 105:16
  **men** [1] - 68:18
  **mental** [2] - 81:24, 99:11
  **mention** [2] - 61:7, 94:13
  **mentioned** [1] - 49:23
  **merely** [1] - 40:2
  **merit** [2] - 41:14, 92:14
  **merits** [5] - 37:25, 55:25, 58:2, 60:6, 87:22
  **Messitte** [14] - 89:6, 89:10, 89:14, 89:16, 89:19, 90:3, 90:8, 90:12, 90:19, 91:25, 92:25, 95:5, 95:11
  **Messitte's** [1] - 90:5
  **messy** [1] - 37:16
  **met** [4] - 16:18, 23:6, 105:7, 105:8
  **Miami** [1] - 68:8
  **microphone** [2] - 16:8, 86:6
  **middle** [3] - 18:16, 54:7, 95:7
  **might** [19] - 22:21, 23:9, 36:25, 39:1, 39:3, 39:12, 42:23, 49:17, 60:19, 67:20, 69:9, 69:10, 69:11, 69:13, 70:2, 77:20, 95:14
  **mike** [2] - 19:5, 24:11
  **mind** [8] - 20:11, 20:25, 23:19, 29:21, 46:1, 64:17, 65:17, 78:12
  **mine** [2] - 28:19, 65:5
  **mines** [1] - 18:5
  **minor** [1] - 82:24
  **minute** [3] - 57:17, 64:21, 65:22
  **minutes** [1] - 69:16
  **Miranda** [2] - 75:11, 79:12
  **miscellaneous** [3] - 82:23, 84:21
  **missed** [1] - 84:23
  **MITCHELL** [6] - 1:6, 2:5, 8:7, 8:17, 8:20, 8:25
  **Mitchell** [35] - 1:16, 2:7, 2:12, 2:15, 3:2, 14:19, 16:6, 16:24, 17:9, 17:15, 17:16, 17:17, 18:8, 18:15, 18:23, 19:6, 52:4, 52:8, 55:3, 59:15, 64:13, 64:15, 69:25, 74:10,

74:16, 77:12, 79:5, 79:6, 80:11, 80:18, 80:20, 81:9, 94:20, 108:4
  **Mitchell's** [5] - 18:10, 52:1, 67:25, 74:3, 81:6, 81:21
  **mitigating** [1] - 62:19
  **mitigation** [4] - 18:21, 18:22, 63:15, 91:2
  **mode** [1] - 29:4
  **Model** [2] - 17:7, 25:12
  **model** [1] - 37:18
  **moment** [8] - 11:11, 11:20, 29:16, 39:19, 59:25, 63:18, 65:1, 71:23
  **Monday** [7] - 96:11, 101:24, 102:4, 103:8, 105:14, 106:1, 106:3
  **money** [1] - 20:3
  **month** [3] - 40:10, 50:11, 79:15
  **months** [8] - 14:3, 14:5, 40:10, 53:22, 55:11, 60:10, 62:8
  **moot** [1] - 88:18
  **moreover** [1] - 17:16
  **morning** [6] - 2:1, 2:2, 9:9, 16:7, 22:9, 80:10
  **most** [3] - 22:12, 66:13, 71:10
  **mostly** [1] - 46:2
  **mother** [1] - 24:25
  **motion** [41] - 2:2, 2:11, 4:4, 5:11, 6:17, 10:2, 15:10, 30:24, 33:21, 33:24, 34:2, 34:4, 34:9, 41:14, 44:2, 44:12, 51:4, 55:22, 56:20, 57:3, 59:6, 72:8, 72:23, 73:3, 73:22, 77:1, 77:5, 81:15, 81:25, 83:1, 86:16, 105:3, 105:22, 106:14, 106:20, 106:21, 106:23, 107:2, 107:7, 107:8
  **Motion** [5] - 40:6, 40:21, 88:12, 105:4, 106:9
  **Motions** [1] - 1:10
  **motions** [37] - 13:15, 26:6, 27:1, 31:7, 41:24, 56:9, 70:6, 70:8, 70:10, 70:18, 70:23, 71:8, 72:7, 72:11, 72:15, 72:19, 72:23, 73:19, 74:2, 76:14, 81:24, 82:23, 84:21, 87:19, 87:23, 97:5, 98:2, 102:5, 102:20, 103:5, 105:3, 105:22, 106:16, 106:18, 106:23, 107:6
  **motivation** [1] - 36:7

**motive** [2] - 31:20, 35:13
  **Motz** [13] - 24:12, 24:16, 42:4, 43:25, 44:1, 44:8, 45:12, 54:13, 54:18, 54:19, 54:21, 55:12, 63:14
  **move** [12] - 11:8, 18:19, 21:20, 30:25, 31:2, 42:25, 62:15, 63:24, 64:7, 66:17, 101:11, 101:15
  **moved** [1] - 65:11
  **moving** [1] - 58:1
  **MR** [110] - 11:7, 16:7, 16:10, 21:17, 23:23, 24:7, 24:9, 24:18, 26:8, 26:11, 30:9, 33:6, 33:9, 34:13, 37:21, 38:20, 46:22, 52:23, 53:11, 53:23, 55:9, 55:19, 57:1, 57:10, 58:10, 58:13, 58:16, 60:1, 61:21, 65:3, 65:12, 66:2, 66:10, 66:16, 66:20, 67:3, 67:25, 68:20, 70:16, 70:18, 71:3, 71:5, 71:7, 71:20, 72:24, 73:1, 73:4, 76:22, 76:25, 77:4, 77:25, 78:9, 80:8, 80:15, 81:22, 83:6, 83:21, 83:23, 84:6, 84:8, 85:9, 85:12, 85:21, 86:2, 86:7, 87:20, 87:25, 88:7, 88:24, 89:2, 89:6, 89:11, 89:14, 89:21, 91:7, 94:2, 94:6, 94:9, 94:13, 95:13, 96:21, 96:23, 97:15, 97:18, 98:6, 98:7, 99:1, 99:8, 99:19, 100:2, 100:5, 100:7, 100:8, 100:13, 100:22, 101:13, 100:3, 103:7, 103:12, 103:16, 103:21, 103:25, 104:5, 104:25, 105:2, 105:12, 105:25, 106:5, 106:7, 107:2
  **MS** [92] - 14:20, 21:15, 41:8, 41:23, 44:1, 44:9, 45:1, 45:4, 45:7, 45:13, 45:22, 45:25, 46:10, 46:14, 46:20, 46:23, 47:21, 48:1, 48:11, 48:19, 49:9, 49:13, 49:16, 50:3, 50:14, 50:21, 50:24, 52:6, 52:10, 53:5, 53:18, 54:24, 59:13, 64:19, 64:23, 70:5, 70:10, 70:13, 71:22, 71:25,

72:3, 72:6, 72:15, 73:3, 73:21, 74:1, 74:7, 74:15, 74:21, 74:23, 75:5, 75:16, 75:23, 76:2, 76:5, 76:8, 76:10, 76:12, 76:19, 79:7, 81:24, 82:6, 82:11, 82:20, 82:22, 84:17, 84:20, 85:1, 85:5, 85:18, 85:24, 87:17, 87:21, 88:3, 92:3, 92:9, 92:19, 93:17, 93:23, 95:20, 95:25, 96:15, 96:19, 97:4, 99:7, 99:21, 100:10, 100:16, 100:19, 101:7, 101:12, 101:15
  **mulling** [1] - 78:12, 81:7
  **multidefendant** [1] - 33:14
  **multiplicitous** [2] - 83:15, 84:14
  **multiplicity** [3] - 83:1, 97:19, 100:3
  **murder** [2] - 86:8, 92:9
  **must** [1] - 49:4

## N

**name** [5] - 3:9, 3:10, 38:24, 38:25
  **naming** [1] - 58:9
  **nature** [5] - 12:8, 40:13, 47:7, 77:10, 86:19
  **nearly** [1] - 21:3
  **necessarily** [5] - 39:14, 41:12, 43:6, 51:12, 51:23
  **necessary** [1] - 101:5
  **necessity** [2] - 13:20, 55:6
  **need** [5] - 13:23, 16:4, 24:11, 26:17, 26:24, 27:1, 27:11, 35:23, 47:12, 47:23, 63:15, 66:24, 73:8, 81:20, 82:1, 82:18, 82:24, 83:20, 83:23, 93:5, 93:12, 93:13, 94:23, 95:4, 95:10, 96:25, 104:17
  **needed** [1] - 70:6
  **needs** [3] - 22:22, 87:12, 104:12
  **Negro** [4] - 3:18, 5:2, 6:8, 7:20
  **never** [16] - 17:9, 18:6, 19:13, 19:15, 23:7, 45:2, 45:20, 47:16, 48:18, 59:2, 59:16, 59:17, 59:18, 74:16, 79:5, 79:20

**New** [1] - 27:12
**new** [4] - 58:17, 79:17, 95:15, 107:15
**Next** [2] - 81:24, 99:14
**next** [11] - 28:2, 51:17, 65:23, 65:24, 76:21, 94:16, 95:23, 98:4, 106:20, 107:3
**nice** [1] - 77:20
**Nickerson** [2] - 49:8, 49:10
**nightmare** [5] - 38:10, 38:11, 38:13, 38:15, 38:17
**Nine** [3] - 83:9, 83:12, 84:6
**NO** [1] - 1:5
**nobody** [1] - 23:21
**non** [5] - 12:21, 16:3, 17:19, 94:5, 102:25
**non-capital** [1] - 17:19
**non-cooperative** [1] - 12:21
**non-deliverable** [1] - 16:3
**non-jury** [1] - 94:5
**none** [4] - 15:23, 19:2, 21:10, 30:7
**normal** [1] - 13:6
**normally** [1] - 29:11
**NORTHERN** [1] - 1:2
**note** [1] - 80:10
**noted** [1] - 86:3
**nothing** [5] - 26:11, 35:22, 37:2, 38:6, 55:24
**notice** [7] - 10:8, 19:16, 49:11, 67:22, 73:17, 78:21, 101:22
**notices** [2] - 70:21, 72:16
**notify** [1] - 9:3
**notion** [1] - 32:8
**notwithstanding** [1] - 38:16
**November** [9] - 2:6, 2:19, 3:4, 3:24, 5:18, 16:24, 34:14, 55:12, 86:4
**nuisance** [1] - 5:21
**number** [10] - 17:5, 22:18, 22:19, 42:13, 42:14, 46:5, 47:9, 68:25, 89:2
**Number** [2] - 6:25, 104:5
**Number(s** [1] - 108:5

**O**

**oath** [19] - 2:10, 2:20,

2:21, 2:22, 4:3, 4:16, 4:22, 5:10, 6:1, 6:2, 6:17, 7:9, 7:10, 7:15, 8:12, 8:15, 8:21, 8:23, 40:4
**object** [12] - 2:5, 3:23, 5:5, 6:11, 7:21, 8:3, 8:17, 8:20, 28:16, 45:10, 48:12
**objecting** [3] - 41:10, 44:14, 92:16
**objection** [2] - 39:17, 96:5
**objections** [1] - 94:15
**obligated** [1] - 30:22
**obligation** [1] - 35:9
**obligations** [1] - 99:3
**observation** [1] - 68:22
**observations** [5] - 9:7, 12:13, 30:10, 30:11, 61:22
**obstacle** [1] - 19:23
**obstruction** [2] - 56:4, 66:14
**obstructionist** [1] - 63:3
**obtained** [1] - 46:17
**obtaining** [1] - 46:11
**obvious** [1] - 30:23
**obviously** [15] - 13:20, 14:17, 30:14, 30:23, 31:8, 36:20, 53:1, 55:21, 56:21, 65:20, 85:21, 86:13, 89:17, 96:24
**Obviously** [3] - 21:9, 34:4, 88:15
**occasion** [1] - 51:9
**occasions** [1] - 12:3
**occur** [2] - 18:10, 90:18
**occurred** [2] - 25:2, 40:2
**occurrence** [1] - 10:15
**occurs** [1] - 78:23
**October** [1] - 55:12
**OF** [2] - 1:2, 1:4
**offense** [2] - 57:14, 84:12
**offenses** [2] - 57:15, 83:13
**offer** [2] - 34:6, 85:17
**Office** [2] - 3:5, 45:23
**office** [3] - 7:22, 54:6, 96:16
**Officer** [1] - 82:8
**officers** [4] - 59:15, 68:10, 75:21, 79:4
**official** [1] - 108:7
**Official** [1] - 108:15
**old** [1] - 33:9
**omission** [2] - 2:25,

4:18
**omissions** [2] - 6:4, 7:12
**on-view** [1] - 79:6
**Once** [1] - 55:20
**once** [1] - 31:10
**one** [67] - 11:3, 12:17, 13:8, 14:11, 14:16, 15:14, 15:20, 16:1, 17:5, 18:20, 19:22, 22:13, 22:18, 23:17, 27:2, 28:25, 30:2, 31:12, 32:5, 34:2, 34:5, 35:14, 35:18, 35:20, 37:21, 39:17, 40:4, 42:13, 43:4, 49:5, 50:3, 51:12, 56:24, 61:13, 62:14, 64:14, 65:11, 66:4, 67:7, 67:8, 68:25, 70:7, 72:10, 73:13, 75:7, 75:10, 78:16, 80:7, 83:16, 86:9, 87:2, 88:22, 89:2, 92:8, 92:18, 94:7, 96:2, 97:1, 98:10, 103:12, 104:5, 104:6, 104:25, 105:3, 106:7
**One** [12] - 23:6, 23:8, 23:11, 23:21, 25:2, 37:9, 38:21, 61:22, 72:8, 76:25, 83:7, 84:11
**one's** [1] - 88:4
**one-page** [1] - 34:2
**ones** [2] - 22:12, 75:7
**open** [4] - 20:23, 21:7, 65:14, 76:22
**opening** [6] - 29:22, 32:3, 46:13, 46:14, 56:12, 100:25
**operating** [1] - 42:24
**opinion** [10] - 41:13, 62:1, 78:14, 78:15, 78:21, 80:5, 81:8, 89:2, 106:18, 106:22
**opportunity** [16] - 43:13, 43:15, 44:24, 51:16, 51:18, 68:5, 73:14, 81:14, 90:15, 90:18, 91:11, 92:22, 102:24, 104:11, 104:23
**opposed** [3] - 34:23, 52:21, 101:8
**Option** [3] - 32:17, 37:1, 37:9
**option** [4] - 32:18, 34:22, 47:19, 66:3
**oral** [7] - 62:5, 72:14, 106:14, 106:15, 107:5, 107:7, 107:8
**order** [7] - 12:17, 14:13, 40:6, 42:1, 42:22, 42:24,

47:18
**ordered** [1] - 32:1
**ordering** [1] - 48:15
**orderly** [1] - 9:10
**original** [2] - 10:19, 10:20
**otherwise** [6] - 11:5, 26:3, 27:21, 79:3, 95:3, 107:10
**ought** [7] - 22:25, 32:23, 34:4, 34:8, 39:23, 68:15, 106:11
**outbreak** [1] - 74:15
**outrageous** [1] - 67:13
**outset** [1] - 57:17
**outside** [1] - 41:4
**outstanding** [5] - 15:10, 71:8, 71:23, 80:9, 86:2
**outweigh** [1] - 62:19
**overcome** [1] - 19:23
**overlap** [1] - 93:19
**overwhelming** [2] - 46:2, 46:6
**overwhelmingly** [1] - 31:7
**own** [16] - 2:11, 2:25, 4:4, 4:18, 5:11, 6:3, 6:17, 7:11, 13:3, 19:19, 36:21, 46:18, 65:12, 90:5, 90:12, 91:13
**Oxycontin** [2] - 46:19, 46:20

**P**

**package** [3] - 20:22, 20:23, 22:20
**Page** [1] - 26:9
**page** [1] - 34:2
**pages** [2] - 90:22, 108:6
**palpable** [1] - 50:23
**panel** [3] - 40:19, 90:25, 95:1
**papers** [8] - 56:12, 56:13, 56:21, 57:3, 58:1, 59:2, 70:11, 76:16
**paperwork** [2] - 10:9, 97:23
**paragraph** [2] - 88:10
**parameters** [1] - 73:11
**parceling** [1] - 51:11
**Part** [1] - 39:19
**part** [10] - 18:6, 18:9, 19:22, 39:23, 55:24, 68:17, 78:5, 102:16, 102:23
**participate** [11] - 12:19, 13:4, 36:2, 36:14, 42:14, 42:15, 43:6, 43:14,

45:16, 60:13, 104:14
**participated** [2] - 57:12, 75:25
**particular** [9] - 24:5, 25:21, 26:9, 43:15, 51:9, 51:11, 51:13, 72:18, 105:3
**particularly** [2] - 24:15, 68:13
**Particulars** [5] - 88:8, 88:12, 88:16, 88:18
**parties** [1] - 90:23
**passed** [1] - 60:20
**passive** [1] - 15:2
**passively** [1] - 32:8
**Passover** [4] - 100:15, 100:18, 100:19, 101:13
**past** [2] - 55:21, 69:2
**Payne** [1] - 73:16
**penalty** [17] - 16:15, 32:4, 49:5, 49:19, 63:10, 63:12, 70:20, 72:8, 72:16, 73:10, 89:22, 90:13, 90:22, 92:10, 94:10, 95:12, 105:4
**Penalty** [1] - 18:2
**pending** [4] - 70:8, 71:19, 77:1, 82:6
**penetrating** [1] - 30:10
**Pennsylvania** [1] - 53:13
**people** [7] - 18:12, 62:23, 90:16, 90:25, 91:22, 91:23, 95:3
**people's** [1] - 20:4
**perform** [3] - 2:17, 4:8, 6:23
**perhaps** [14] - 12:15, 20:17, 28:21, 34:25, 35:12, 39:2, 40:4, 40:5, 41:20, 51:2, 92:24, 99:11, 99:12, 105:19
**Perhaps** [3] - 16:8, 83:19, 89:15
**period** [1] - 61:16
**periodically** [1] - 47:11
**permission** [2] - 31:3, 77:7
**permit** [4] - 11:2, 11:21, 24:16, 27:10
**permitted** [4] - 11:24, 13:16, 26:21, 31:15
**permitting** [2] - 12:6, 40:7
**persist** [2] - 11:10, 26:6
**personal** [6] - 2:3, 9:23, 10:1, 30:24, 54:7, 66:23
**personally** [2] - 33:13, 69:7
**persons** [1] - 68:3

**perspective** [2] - 60:20, 96:5

**pertains** [1] - 51:8

**phase** [5] - 32:4, 46:25, 72:16, 73:10

**Philadelphia** [2] - 69:1, 103:8

**philosophically** [1] - 18:16

**phone** [2] - 64:20, 82:10

**photocopied** [1] - 93:14

**photographs** [1] - 45:8

**phrase** [1] - 67:14

**physical** [1] - 19:10

**pick** [2] - 18:23, 18:25

**Picking** [1] - 25:16

**pictures** [1] - 45:4

**pills** [1] - 46:17

**Pimlico** [1] - 16:13

**pin** [1] - 60:4

**place** [8] - 11:6, 34:14, 34:20, 40:11, 62:22, 75:15, 81:7, 90:20

**places** [1] - 16:2

**plain** [1] - 68:6

**plan** [3] - 11:13, 12:25, 34:22

**Plan** [1] - 36:12

**planned** [2] - 10:13, 59:14

**planning** [3] - 54:24, 59:19, 80:11

**plant** [1] - 17:5

**play** [2] - 15:2, 75:2

**playing** [1] - 19:7

**plea** [2] - 2:16, 68:6

**pleading** [2] - 32:4, 82:13

**pleadings** [3] - 57:20, 86:3, 86:13

**pleasure** [1] - 19:9

**plentily** [1] - 56:15

**pocket** [1] - 54:5

**point** [33] - 16:24, 30:16, 31:18, 31:25, 33:3, 38:10, 41:16, 41:22, 59:8, 59:21, 60:7, 60:12, 61:25, 64:5, 65:12, 65:17, 66:2, 68:23, 70:25, 72:3, 79:19, 80:11, 81:6, 81:20, 82:2, 87:2, 87:14, 91:8, 91:13, 95:14, 98:8

**points** [3] - 23:13, 73:5, 76:25

**poke** [1] - 48:21

**police** [4] - 68:9, 75:9, 78:6, 79:11

**Police** [3] - 80:13, 80:16, 82:8

**politely** [1] - 87:13

**portion** [1] - 81:3

**posed** [1] - 66:3

**position** [24] - 10:12, 16:18, 29:4, 29:13, 34:5, 36:1, 36:11, 42:17, 48:12, 61:25, 62:12, 62:20, 66:21, 83:11, 84:10, 84:18, 85:13, 85:14, 87:5, 87:15, 91:22, 92:4, 98:14

**positions** [1] - 61:23

**positively** [1] - 18:11

**possibilities** [1] - 69:13

**possibility** [8] - 38:22, 50:10, 58:25, 65:19, 69:4, 94:15, 105:18, 105:20

**possible** [5] - 11:17, 41:4, 53:19, 60:5, 95:16

**post** [1] - 19:18

**Postal** [1] - 20:20

**postponed** [1] - 101:8

**posture** [3] - 57:24, 58:20, 59:5

**potential** [4] - 10:17, 91:4, 91:19, 92:20

**potentially** [1] - 78:4

**potted** [1] - 17:5

**practical** [2] - 55:16, 61:19

**practice** [1] - 90:5

**preamble** [1] - 89:23

**precisely** [1] - 34:10

**precludes** [1] - 54:8

**predicated** [1] - 53:25

**preemptive** [1] - 19:5

**preference** [2] - 52:12, 64:17

**prejudice** [2] - 36:22, 50:22

**prejudicial** [5] - 45:18, 56:9, 57:5, 57:23, 73:15

**preliminary** [6] - 15:21, 27:6, 27:8, 28:8, 37:17

**prepared** [5] - 14:14, 15:8, 38:2, 73:19, 99:12

**prerogative** [3] - 14:12, 67:6, 67:11

**presence** [1] - 13:18

**Present** [1] - 1:22

**present** [19] - 7:24, 9:17, 11:21, 15:1, 15:18, 28:2, 28:10, 38:13, 43:23, 44:2, 59:14, 63:16, 81:10, 102:16, 102:19, 102:22, 102:23, 103:20, 103:21

**presentation** [1] - 73:10

**presented** [2] - 43:3,

58:16

**presenting** [1] - 43:8

**preserve** [1] - 49:1

**preserved** [2] - 44:13, 44:16

**pressure** [1] - 19:10

**presumption** [1] - 105:23

**pretend** [1] - 29:11

**pretrial** [3] - 72:16, 82:23, 84:21

**pretty** [5] - 40:14, 68:24, 72:18, 78:16, 91:19

**previously** [1] - 10:14

**pride** [1] - 24:4

**primarily** [2] - 72:11, 72:20, 81:15, 96:11, 96:13

**primary** [1] - 99:10

**principal** [1] - 59:8

**printed** [1] - 97:13

**private** [1] - 46:18

**privy** [1] - 50:9

**pro** [6] - 2:8, 4:1, 5:8, 6:14, 62:13, 106:23

**probable** [1] - 76:14

**problem** [6] - 10:17, 17:1, 17:3, 18:5, 49:24, 75:20

**problems** [4] - 41:17, 47:1, 52:15, 53:8

**procedural** [1] - 59:4

**procedure** [2] - 43:7, 58:20

**proceed** [15] - 11:2, 13:23, 14:2, 14:13, 16:12, 18:1, 42:17, 43:9, 47:2, 48:15, 52:1, 52:4, 59:20, 59:22, 83:17

**proceeded** [3] - 45:25, 57:2, 57:17

**proceeding** [16] - 13:18, 18:1, 19:15, 23:18, 24:13, 41:6, 42:13, 43:18, 47:5, 51:17, 77:12, 101:6, 102:11, 102:12, 104:9, 104:17

**Proceedings** [1] - 107:20

**proceedings** [32] - 2:13, 4:7, 5:15, 6:21, 9:10, 9:14, 9:17, 9:20, 11:15, 13:10, 13:11, 15:8, 20:14, 21:5, 28:6, 35:16, 36:3, 36:14, 36:15, 43:6, 44:21, 47:10, 47:22, 49:6, 55:20, 96:25, 102:20,

104:14, 104:20, 108:4, 108:7

**process** [4] - 30:21, 37:17, 85:6, 90:1

**processed** [1] - 80:22

**processing** [1] - 80:17

**production** [3] - 99:3, 99:7, 99:24

**productive** [1] - 88:8

**profession** [1] - 24:4

**professional** [2] - 10:1, 63:20

**Professional** [2] - 17:7, 25:12

**Professor** [6] - 32:7, 60:10, 60:25, 65:14, 65:20, 106:10

**proffer** [2] - 68:23, 77:25

**progress** [2] - 9:10, 105:21

**promised** [1] - 73:24

**proper** [2] - 3:11, 6:12

**proposal** [2] - 41:17, 66:17

**propose** [4] - 71:13, 98:4, 99:25, 100:12

**proposed** [2] - 88:21, 92:16

**proposition** [1] - 26:9

**propriety** [1] - 13:8

**prosecution** [2] - 32:13, 55:10

**prosecutor** [2] - 32:10, 78:5

**prosecutorial** [1] - 58:18

**prosecutors** [2] - 6:3, 7:11

**prospect** [1] - 50:19

**protective** [1] - 64:9

**protestations** [1] - 12:14

**protesting** [1] - 77:1

**protocol** [2] - 12:20, 62:22

**prove** [2] - 57:5, 87:6

**provide** [3] - 26:23, 27:3, 63:8

**Provided** [1] - 87:1

**provided** [1] - 21:8

**provisions** [1] - 39:11

**prudent** [2] - 43:9, 70:22

**Public** [1] - 45:22

**public** [1] - 5:20

**pull** [2] - 16:8, 47:4

**pun** [1] - 16:12

**punishment** [2] - 91:4, 92:21

**purpose** [2] - 75:10, 99:10

**purposes** [7] - 9:14, 13:19, 13:20, 13:22, 24:15, 41:21, 44:16

**Purpura** [3] - 45:21, 46:6, 46:12

**pursuant** [2] - 42:24, 107:11

**push** [2] - 38:18, 50:11

**pushes** [1] - 55:21

**put** [12] - 16:4, 17:11, 20:20, 22:7, 26:24, 29:12, 35:7, 39:15, 47:11, 55:9, 83:18, 90:10

**puts** [2] - 36:16, 91:15

**putting** [4] - 18:19, 47:20, 58:18, 87:22

**Pyne** [5] - 1:20, 5:19, 24:8, 26:10, 102:9

**PYNE** [1] - 26:11

## Q

**qualifying** [2] - 89:19, 91:10

**qualities** [1] - 24:21

**questioned** [1] - 59:17

**questioning** [4] - 74:11, 75:11, 79:10, 80:17

**questionnaire** [27] - 22:25, 23:1, 71:1, 71:2, 71:6, 86:1, 88:5, 89:7, 89:18, 89:20, 89:22, 89:24, 90:2, 90:4, 90:5, 90:14, 90:16, 91:10, 92:2, 92:13, 92:16, 94:23, 95:11, 97:9, 97:11, 97:12, 99:10

**questionnaires** [5] - 88:22, 90:24, 94:16, 95:2, 95:4

**questions** [14] - 89:19, 89:24, 90:1, 90:12, 90:22, 91:1, 91:2, 91:3, 91:10, 91:11, 91:15, 91:18, 92:15, 97:10

**quick** [3] - 37:4, 92:18, 106:7

**quickly** [2] - 40:14, 62:8

**quiet** [1] - 61:12

**quintessentially** [1] - 82:4

**quite** [3] - 19:7, 52:16, 70:6

**Quite** [1] - 16:12

# R

**race** [1] - 16:14, 105:5
**rage** [1] - 12:15
**raise** [1] - 70:14
**raised** [4] - 33:2, 60:10, 74:9, 80:9
**rap** [3] - 84:25, 85:12, 99:13
**rather** [6] - 13:21, 28:18, 51:25, 52:4, 62:8, 99:6
**rational** [4] - 26:22, 41:5, 43:15, 51:23
**re** [1] - 58:16
**re-presented** [1] - 58:16
**reach** [2] - 41:20, 69:8
**react** [1] - 23:9
**read** [3] - 21:3, 21:9, 35:8
**reading** [2] - 38:24, 78:17
**ready** [5] - 16:14, 18:7, 54:2, 72:1
**real** [1] - 37:15
**realize** [1] - 19:13
**realized** [1] - 53:13
**really** [35] - 19:23, 22:2, 23:25, 24:4, 24:18, 24:19, 25:17, 26:5, 27:16, 28:20, 29:12, 30:3, 30:12, 31:13, 33:8, 34:25, 37:7, 42:4, 48:17, 51:4, 52:19, 54:8, 60:24, 64:4, 70:6, 78:10, 78:11, 79:25, 81:1, 87:12, 96:12, 97:4, 98:19, 101:19
**reason** [12] - 11:1, 11:2, 29:7, 34:10, 40:25, 43:15, 44:4, 48:9, 51:23, 96:1, 101:7, 101:18
**reasonable** [7] - 9:18, 42:25, 43:1, 43:2, 43:19, 48:16, 90:25
**reasonably** [1] - 12:2
**reasoned** [2] - 40:21, 106:22
**reasons** [7] - 33:4, 42:7, 54:8, 69:23, 106:17
**received** [3] - 25:5, 43:21, 49:2
**receives** [1] - 11:16
**recently** [1] - 87:19
**recess** [4] - 69:16, 70:2, 71:14, 107:19
**Recess** [1] - 70:3
**recitation** [1] - 80:23
**recognize** [5] - 37:14,

64:2, 64:3, 80:19, 96:10
**recollection** [2] - 37:5, 77:15
**recommendations** [1] - 13:13
**reconcile** [1] - 17:4, 17:6
**reconvene** [1] - 69:17
**record** [34] - 2:6, 3:4, 3:24, 4:10, 5:2, 5:5, 5:18, 6:7, 6:11, 7:2, 7:21, 9:8, 10:14, 12:8, 16:4, 21:5, 26:25, 34:9, 34:20, 35:2, 35:7, 39:15, 42:16, 42:19, 43:11, 44:2, 44:11, 47:13, 49:1, 68:20, 77:21, 86:9, 106:17
**refer** [1] - 73:19
**reference** [2] - 25:3, 89:22
**referenced** [1] - 90:2
**referred** [1] - 37:9
**reflect** [1] - 106:15
**refrain** [1] - 104:13
**refuse** [2] - 20:18, 20:23, 36:18
**refused** [8] - 12:19, 16:2, 16:25, 22:7, 24:23, 26:19, 32:11
**refusing** [4] - 20:16, 21:2, 21:3, 43:5
**regard** [1] - 23:2
**regarding** [2] - 14:11, 82:7
**regardless** [3] - 85:13, 86:20, 87:10
**regards** [1] - 58:22
**regret** [1] - 64:11
**regular** [2] - 10:3, 78:23
**regularly** [2] - 9:15, 79:1
**reiterated** [1] - 44:14
**reject** [1] - 14:14
**related** [7] - 33:21, 34:13, 56:4, 76:3, 79:19, 89:3, 91:14
**relates** [1] - 14:17, 74:24
**relationship** [1] - 24:21
**relative** [1] - 39:4
**relatives** [2] - 67:24, 67:25
**release** [1] - 3:21
**released** [3] - 5:3, 6:9, 6:10
**relevant** [2] - 15:14, 74:5
**relief** [1] - 57:4, 57:5, 57:23

**relieved** [2] - 36:10, 65:21
**reluctant** [1] - 38:23
**remain** [3] - 24:17, 44:7, 48:10
**remaining** [5] - 76:5, 82:22, 95:21, 98:2, 103:19
**remains** [1] - 23:23
**remarks** [2] - 25:16, 26:15
**remember** [2] - 47:8, 50:18
**Remember** [1] - 98:14
**remembers** [1] - 61:5
**Remind** [1] - 74:5
**remind** [1] - 62:17
**remote** [1] - 61:14
**remotely** [3] - 25:14, 26:22, 63:21
**remove** [1] - 8:18
**repeatedly** [3] - 27:24, 28:4, 44:12
**repeating** [1] - 61:4
**report** [3] - 12:20, 15:23, 80:12
**Reporter** [1] - 108:15
**REPORTER'S** [1] - 108:1
**represent** [21] - 3:2, 3:8, 4:11, 4:25, 7:3, 7:23, 16:16, 17:15, 17:17, 27:17, 28:9, 28:24, 34:16, 41:9, 41:11, 42:15, 43:16, 43:17, 43:23, 107:10
**representation** [24] - 17:10, 25:12, 25:18, 25:23, 26:4, 26:19, 26:23, 27:22, 28:1, 28:23, 29:25, 31:4, 33:18, 34:11, 34:21, 35:5, 37:13, 38:1, 42:6, 48:8, 49:3, 85:16, 85:18, 87:25
**representations** [2] - 57:3, 57:20
**represented** [2] - 35:24, 61:8
**representing** [4] - 30:3, 36:13, 44:4, 44:18
**represents** [2] - 7:4, 7:18
**request** [6] - 44:15, 48:9, 75:8, 81:18, 88:16, 88:17
**require** [1] - 47:15
**required** [4] - 30:25, 80:24, 81:1, 84:1
**requirements** [1] - 13:6

**requires** [1] - 13:18
**researching** [2] - 35:3
**reservation** [1] - 19:24
**reserved** [1] - 8:5
**resolved** [3] - 35:4, 83:23, 84:1
**resort** [1] - 29:15
**resource** [1] - 16:19
**resources** [2] - 51:21, 60:6
**respect** [28] - 2:3, 20:12, 33:11, 34:17, 34:18, 34:24, 35:8, 38:1, 38:22, 43:23, 48:23, 55:10, 56:1, 56:4, 57:15, 58:4, 59:4, 61:8, 85:12, 86:4, 86:7, 86:10, 88:9, 97:19, 97:22, 98:9, 105:13, 106:9
**respectful** [4] - 67:5, 67:6, 67:10
**respectively** [2] - 11:11, 67:5
**respects** [1] - 21:22
**respond** [6] - 4:13, 7:6, 11:14, 56:1, 83:2, 87:15
**responded** [2] - 82:9
**response** [13] - 40:15, 56:13, 72:10, 72:17, 80:5, 82:12, 82:14, 84:16, 85:6, 87:23, 97:20, 98:2
**responses** [2] - 72:8, 73:22
**responsibilities** [1] - 17:6
**responsibility** [1] - 80:2
**responsible** [1] - 20:2
**rest** [3] - 22:15, 76:14, 76:18
**rested** [1] - 101:25
**restricts** [2] - 90:10
**rests** [1] - 101:2
**result** [2] - 41:15, 59:24
**resume** [1] - 69:20
**retain** [1] - 35:21
**retired** [1] - 81:13
**return** [4] - 20:13, 20:15, 20:21, 22:8
**returned** [4] - 9:4, 16:2, 16:25, 24:24
**revelation** [1] - 78:3
**Reverend** [1] - 69:8
**review** [4] - 64:7, 90:15, 105:7, 107:1
**Review** [1] - 34:25
**Rhodes** [11] - 1:16, 16:6, 17:14, 18:7, 18:12, 21:13, 72:21, 80:19, 102:10, 103:7, 103:9

**RHODES** [1] - 21:15
**RICO** [8] - 19:17, 83:7, 83:10, 83:13, 83:14, 84:10, 84:11
**rid** [1] - 90:25
**rights** [4] - 8:4, 47:18, 78:25, 81:11
**risk** [2] - 49:7, 49:20
**road** [1] - 49:21
**Rob** [2] - 7:17, 7:25
**Robert** [1] - 4:25
**Roberts** [1] - 62:8
**Robinson** [1] - 81:3
**Roger** [2] - 74:13, 77:4
**role** [4] - 13:3, 15:2, 21:18, 38:4
**roles** [2] - 17:6, 34:22
**roll** [1] - 19:19
**Ronstein** [1] - 7:17
**room** [2] - 20:1, 39:12
**Room** [1] - 1:24
**round** [1] - 50:9
**RPR** [1] - 1:24
**Rule** [6] - 56:5, 56:7, 57:7, 57:25, 58:19, 77:7
**rule** [4] - 17:8, 57:19, 58:22, 76:15
**ruled** [3] - 63:7, 66:6, 66:8
**Rules** [1] - 25:12
**rules** [3] - 25:13, 31:13, 31:16
**ruling** [2] - 38:16, 106:9
**rush** [1] - 67:14

# S

**sabbatical** [1] - 65:22
**sacrificed** [1] - 60:13
**sad** [1] - 24:9
**satisfied** [1] - 85:15
**Saturday** [1] - 69:2
**save** [4] - 14:6, 20:4, 88:9
**saves** [1] - 91:4
**saw** [3] - 45:2, 45:4, 85:5
**scenario** [9] - 28:11, 29:6, 38:10, 38:11, 38:13, 38:15, 38:18, 42:11, 55:18
**scenarios** [1] - 44:12
**schedule** [21] - 14:17, 22:18, 52:21, 52:22, 53:1, 54:14, 54:25, 62:4, 62:5, 65:14, 71:18, 96:9, 96:10, 96:14, 98:17, 99:15, 102:13, 102:20, 103:4, 103:18

**scheduled** [9] - 24:24, 24:25, 52:19, 54:4, 60:15, 60:16, 61:2, 61:3, 95:23

**schedules** [1] - 53:22

**scheduling** [11] - 33:10, 37:24, 50:7, 50:16, 52:2, 56:18, 59:9, 60:4, 83:25, 105:13, 105:21

**Schmoke** [4] - 65:5, 65:16, 65:24, 66:16

**school** [1] - 27:12

**scientific** [1] - 79:16

**scope** [1] - 17:14

**score** [1] - 33:22

**screaming** [1] - 61:15

**se** [5] - 2:8, 4:1, 5:8, 6:14, 106:23

**seal** [2] - 25:5, 27:1

**search** [1] - 82:10

**searches** [1] - 76:18

**seat** [1] - 11:8

**seated** [1] - 2:1

**second** [17] - 19:14, 24:3, 29:4, 29:6, 39:8, 49:12, 50:20, 55:24, 56:3, 58:7, 58:23, 66:3, 93:16, 93:17, 94:10, 94:24

**section** [3] - 73:7, 93:4, 94:24

**Section** [2] - 83:9, 84:9

**security** [1] - 24:13

**see** [39] - 10:3, 12:11, 12:22, 15:11, 16:6, 16:25, 17:1, 17:3, 18:24, 18:25, 29:20, 30:7, 31:6, 41:4, 42:20, 45:17, 59:23, 65:5, 67:19, 69:2, 69:8, 70:2, 73:8, 79:3, 80:5, 84:13, 88:19, 92:12, 92:14, 92:15, 92:25, 93:1, 96:4, 99:5, 101:21, 102:23, 104:23, 107:15

**seeing** [1] - 75:11

**seek** [1] - 79:12

**seem** [4] - 10:23, 35:2, 35:11, 35:23

**sees** [1] - 89:8

**selected** [2] - 44:23, 44:24

**self** [14] - 17:10, 25:11, 25:18, 25:23, 26:4, 26:19, 27:22, 28:1, 28:23, 34:21, 35:11, 36:6, 42:6, 48:8

**self-evident** [2] - 35:11, 36:6

**self-representation** [11]

- 17:10, 25:18, 25:23, 26:4, 26:19, 27:22, 28:1, 28:23, 34:21, 42:6, 48:8

**semblance** [1] - 41:5

**semester** [4] - 60:14, 65:8, 65:20, 65:23

**send** [6] - 22:5, 40:14, 95:2, 95:4, 95:10

**sense** [7] - 14:16, 20:15, 20:16, 22:21, 71:15, 95:13, 103:11

**sensible** [1] - 28:21

**sensitive** [6] - 12:7, 14:8, 33:4, 33:5, 60:9, 77:17

**sent** [8] - 4:12, 6:5, 7:4, 7:12, 16:1, 91:23, 91:24

**sentence** [4] - 17:21, 63:16, 63:17, 68:6

**sentencing** [5] - 18:1, 18:3, 46:25, 62:18, 101:5

**sentiments** [1] - 32:22

**separate** [6] - 15:17, 58:19, 58:23, 71:18, 72:17, 76:13

**separately** [2] - 22:16, 22:20

**September** [7] - 14:21, 52:9, 81:7, 101:10, 102:10, 102:12, 103:5

**sequentially** [1] - 66:5

**series** [3] - 11:14, 57:14, 70:18

**serious** [1] - 33:3

**seriously** [2] - 21:10, 39:25

**servant** [4] - 3:17, 3:19, 6:7, 7:19

**service** [2] - 9:24, 24:1

**Service** [1] - 20:20

**session** [3] - 101:23, 102:1, 105:24

**set** [10] - 11:13, 37:23, 54:12, 62:22, 95:16, 95:21, 96:3, 98:8, 102:14, 102:15

**sets** [1] - 63:14

**setting** [1] - 95:15

**Seven** [3] - 83:9, 83:12, 84:6

**seven** [1] - 55:13

**Several** [1] - 95:6

**several** [2] - 29:19, 86:11

**severance** [1] - 66:6

**severed** [3] - 10:16, 14:13, 14:23

**shaking** [1] - 38:24

**shall** [2] - 93:8, 103:1

**shape** [1] - 19:10

**share** [1] - 39:1

**sharing** [1] - 59:7

**Sharon** [1] - 93:25

**Shawn** [3] - 6:12, 6:18, 106:16

**SHAWN** [1] - 1:8

**Shearer** [6] - 10:7, 15:23, 20:7, 53:24, 54:21, 67:17

**SHELLY** [1] - 1:7

**Shelly** [3] - 5:6, 5:12, 7:23

**SHELTON** [1] - 1:7

**Shelton** [2] - 3:24, 4:5

**shocking** [2] - 77:20, 78:3

**shooter** [5] - 87:1, 87:2, 87:3, 87:6, 87:9

**shooting** [1] - 76:9

**short** [1] - 35:1

**shorten** [1] - 62:4

**show** [1] - 63:24

**shows** [1] - 3:9

**shuffle** [1] - 66:24

**sic** [1] - 7:17

**side** [5] - 19:25, 32:6, 63:2, 80:7

**sight** [1] - 63:6

**sign** [4] - 4:7, 5:15, 6:21

**signature** [1] - 108:10

**signed** [2] - 2:15, 5:24

**significance** [1] - 77:22

**significant** [1] - 89:3

**signing** [4] - 2:25, 4:18, 6:4, 7:12

**silence** [1] - 75:13

**silly** [3] - 40:9, 40:16, 40:24

**similar** [1] - 13:20

**simple** [1] - 8:22

**simply** [8] - 12:19, 15:1, 28:22, 31:21, 34:1, 37:11, 45:15, 76:15

**sincerely** [1] - 23:25

**single** [2] - 11:3, 41:18

**sit** [6] - 29:21, 29:23, 60:8, 101:23, 103:22, 105:14

**site** [1] - 60:22

**sitting** [13] - 2:19, 5:20, 13:10, 29:17, 29:19, 30:1, 30:5, 32:8, 58:14, 75:8, 92:5, 103:7, 103:8

**situation** [23] - 12:5, 13:17, 16:6, 23:4, 25:14, 28:7, 30:11, 30:14, 31:23, 36:9, 36:24, 37:19, 42:13, 46:24, 49:13, 49:14, 49:17, 59:1, 68:24, 69:10,

69:15, 81:21, 82:19

**situations** [1] - 50:3

**six** [1] - 101:2

**Sixth** [1] - 74:7

**skilled** [2] - 44:3, 48:20

**slammed** [1] - 18:18

**slight** [2] - 44:9, 46:23

**slightly** [1] - 9:25

**sliver** [2] - 38:22, 39:2

**Slow** [1] - 80:14

**Smith** [5] - 86:11, 86:17, 87:7, 88:1, 92:11

**so-called** [2] - 26:25, 37:14

**solely** [1] - 36:23

**Sometime** [1] - 101:3

**sometime** [7] - 37:25, 54:9, 55:17, 70:1, 98:18, 98:19, 101:6

**sometimes** [3] - 78:2, 90:24, 91:18

**somewhat** [3] - 45:14, 47:1, 47:10

**somewhere** [1] - 22:5

**soon** [3] - 9:18, 61:12, 102:13

**sooner** [1] - 59:11

**sorry** [8] - 34:12, 48:6, 56:20, 60:1, 74:19, 83:4, 91:6, 91:7

**sort** [22] - 14:22, 15:21, 15:22, 28:10, 29:25, 30:6, 31:16, 31:22, 32:5, 33:24, 34:2, 36:4, 37:4, 39:20, 40:13, 42:4, 50:25, 63:24, 77:19, 78:1, 78:2, 86:10

**sought** [1] - 59:18

**sound** [1] - 22:3

**sounder** [1] - 28:22

**sounds** [1] - 65:7

**speaking** [1] - 102:21

**special** [5] - 2:7, 3:25, 5:7, 6:13, 68:14

**specialist** [1] - 18:22

**specialized** [1] - 83:13

**specific** [3] - 71:17, 83:25, 85:22

**specifically** [5] - 34:15, 70:14, 70:21, 73:21, 98:9

**spelled** [1] - 3:11

**spelling** [1] - 33:25, 34:9

**Spence** [1] - 86:8

**spent** [1] - 82:1

**splitting** [1] - 51:19

**spoken** [4] - 4:21, 7:15, 10:6, 54:18, 67:17

**spring** [12] - 52:20, 52:21, 52:22, 55:5,

55:17, 64:13, 64:14, 64:16, 65:7, 65:8, 65:24, 100:14

**squeeze** [1] - 24:14

**stage** [2] - 14:1, 27:25

**stages** [1] - 13:9

**stake** [2] - 32:15, 91:1

**stake-out** [1] - 91:1

**stance** [1] - 81:10

**stand** [7] - 19:11, 19:12, 27:13, 31:19, 32:19, 69:16

**standard** [11] - 23:17, 43:1, 43:19, 57:1, 57:4, 57:10, 57:15, 63:10, 63:13, 63:14, 92:20

**standby** [25] - 13:3, 18:3, 23:12, 23:14, 24:25, 26:3, 26:5, 26:14, 28:11, 28:20, 29:8, 29:15, 30:2, 34:23, 34:24, 35:9, 35:18, 35:22, 36:5, 37:1, 37:18, 38:4, 62:13

**standing** [1] - 32:3

**Star** [1] - 28:11

**stark** [1] - 68:6

**start** [9] - 15:22, 16:5, 55:12, 65:8, 70:15, 93:7, 95:6, 95:9, 101:20

**started** [2] - 33:13, 68:5

**starting** [6] - 95:1, 98:19, 101:8, 101:24, 105:17, 105:25

**starts** [2] - 31:10, 54:3

**State** [5] - 2:21, 4:17, 5:25, 6:1, 7:9

**state** [6] - 24:9, 39:11, 78:5, 78:6, 86:8

**State's** [1] - 4:24

**statement** [10] - 29:22, 32:4, 46:13, 46:14, 74:18, 75:20, 80:21, 82:7, 82:8, 101:1

**statements** [11] - 86:10, 86:11, 86:14, 86:18, 86:20, 86:21, 87:7, 87:10, 87:22, 87:24, 98:12

**states** [1] - 37:14

**STATES** [2] - 1:1, 1:4

**States** [19] - 2:23, 2:24, 3:5, 3:6, 4:15, 4:23, 4:24, 5:22, 7:7, 7:15, 7:16, 7:17, 7:22, 7:24, 20:20, 26:8, 64:1

**stature** [1] - 81:12

**status** [2] - 62:13, 95:15, 99:16

**statutes** [1] - 84:13

**statutory** [1] - 78:25
**stay** [2] - 42:22, 66:25
**step** [5] - 11:5, 27:5, 30:21, 63:21, 65:23
**stick** [1] - 11:4
**still** [14] - 2:19, 5:20, 28:24, 33:15, 36:25, 37:22, 52:3, 53:7, 60:17, 60:24, 61:2, 64:18, 83:1
**stood** [1] - 66:2
**stop** [1] - 47:14
**straighten** [1] - 93:20
**strange** [2] - 12:10, 31:23
**Street** [2] - 1:25, 7:1
**strictly** [2] - 28:8, 102:21
**strike** [1] - 77:6
**striking** [1] - 79:25
**strongly** [3] - 60:17, 68:21, 91:8
**struggling** [1] - 33:13
**studied** [1] - 56:20
**stun** [8] - 47:11, 47:15, 47:18, 47:25, 61:8, 61:10, 61:11, 61:14
**stunned** [1] - 61:18
**subject** [16] - 2:9, 4:2, 5:8, 6:15, 11:20, 24:19, 41:24, 44:13, 44:15, 45:10, 53:14, 62:1, 105:18, 105:19, 105:23, 106:24
**submission** [3] - 51:1, 77:2, 81:18
**submit** [2] - 70:24, 71:12
**submitted** [1] - 77:5
**submitting** [1] - 51:24
**subpoena** [1] - 77:8
**subsequent** [3] - 10:21, 74:11, 74:18
**substance** [1] - 86:21
**substantive** [2] - 31:14, 55:14
**substantively** [1] - 30:13
**substitution** [1] - 10:12
**successful** [1] - 19:4
**successor** [2] - 10:6, 26:21
**sufficient** [1] - 48:4
**sufficiently** [3] - 44:6, 44:10, 62:19
**suggest** [3] - 14:14, 60:2, 84:3
**suggested** [4] - 10:14, 14:2, 26:22, 79:15
**suggesting** [2] - 47:21, 89:16

**suggestions** [1] - 15:5
**suggests** [1] - 49:18
**sui** [1] - 30:14
**suicide** [4] - 68:7, 68:9, 68:11, 68:18
**suit** [1] - 64:9
**SULLIVAN** [21] - 16:7, 16:10, 46:22, 53:11, 61:21, 67:25, 73:1, 73:4, 76:22, 76:25, 77:4, 77:25, 78:9, 80:8, 80:15, 81:22, 94:2, 94:6, 94:9, 103:7, 103:12
**Sullivan** [32] - 1:17, 16:5, 20:9, 21:1, 21:12, 21:14, 21:18, 21:19, 21:22, 23:6, 28:15, 29:3, 36:12, 39:21, 39:22, 47:8, 52:2, 53:7, 53:17, 59:23, 59:25, 61:20, 64:10, 72:11, 72:21, 72:25, 77:13, 80:7, 81:17, 91:9, 102:9
**Sullivan's** [1] - 25:17
**summarily** [1] - 91:19
**Summarize** [1] - 43:24
**summer** [9] - 53:4, 53:22, 55:17, 62:8, 64:16, 66:14, 67:9, 101:9, 103:5
**superiors** [1] - 69:24
**Supermax** [1] - 24:23
**supersedes** [1] - 53:1
**superseding** [4] - 10:20, 57:18, 58:5, 58:6
**supplement** [2] - 21:13, 82:17
**supplemental** [2] - 34:2, 82:11
**supplements** [1] - 94:15
**supplied** [1] - 86:14
**support** [4] - 4:22, 7:15, 77:5
**suppose** [10] - 10:1, 12:25, 26:15, 26:18, 29:4, 29:15, 41:16, 43:4, 101:18, 107:15
**suppression** [5] - 74:2, 76:14, 82:7, 98:17, 102:24
**supremacy** [1] - 60:22
**Supreme** [9] - 26:2, 27:9, 35:8, 35:25, 37:6, 37:11, 62:7, 63:25, 64:3
**surely** [3] - 47:17, 68:16
**Surely** [1] - 68:14
**surety** [1] - 3:10
**surface** [1] - 39:20
**surgery** [1] - 93:18

**surprise** [1] - 71:13
**suspect** [2] - 12:2, 37:16
**sustain** [1] - 61:17
**swore** [2] - 2:20, 2:22
**sworn** [19] - 2:10, 2:20, 4:3, 4:15, 4:16, 4:22, 5:10, 5:22, 5:25, 6:2, 6:16, 7:8, 7:10, 7:15, 8:12, 8:15, 8:21, 8:22

## T

**tack** [1] - 42:9
**tainted** [1] - 74:18
**talismanic** [1] - 80:23
**tap** [1] - 95:3
**targeted** [1] - 91:15
**teach** [2] - 60:14, 65:23
**team** [2] - 19:1, 23:21
**technically** [2] - 33:15, 39:8
**Technically** [1] - 43:22
**ten** [1] - 99:21
**Tennessee** [1] - 73:16
**tentative** [5] - 14:1, 14:17, 16:11, 27:5
**tenth** [1] - 97:13
**term** [6] - 26:14, 28:20, 29:7, 68:9, 93:22, 95:3
**terms** [13] - 2:17, 4:9, 5:17, 6:23, 18:19, 25:25, 37:17, 46:1, 60:12, 81:14, 83:20, 91:14, 94:25
**Terrace** [2] - 92:12, 92:23
**test** [1] - 79:16
**testified** [3] - 80:19, 86:17, 88:1
**testify** [3] - 59:16, 80:20, 81:10
**testimonial** [1] - 77:9
**testimony** [3] - 51:14, 73:13, 87:8
**THE** [198] - 1:1, 1:2, 2:1, 3:22, 8:2, 8:10, 8:14, 8:18, 9:3, 9:6, 11:9, 14:21, 16:8, 20:9, 21:16, 23:20, 23:25, 24:8, 24:11, 26:7, 26:10, 26:12, 32:21, 33:7, 33:22, 37:3, 38:9, 39:16, 41:16, 43:24, 44:6, 44:25, 45:2, 45:6, 45:12, 45:21, 45:24, 46:8, 46:13, 46:19, 47:14, 47:25, 48:6, 48:14, 49:8, 49:10, 49:15, 50:1,

50:13, 50:15, 50:22, 52:4, 52:7, 52:11, 53:4, 53:10, 53:17, 54:18, 55:1, 56:20, 57:9, 58:6, 58:12, 58:15, 59:6, 59:22, 61:20, 64:10, 64:22, 64:25, 65:4, 65:19, 66:6, 66:12, 66:19, 67:1, 67:4, 68:1, 70:5, 70:17, 71:2, 71:4, 71:10, 71:21, 71:24, 72:1, 72:4, 72:13, 72:22, 72:25, 73:2, 73:18, 73:23, 74:5, 74:13, 74:19, 74:22, 74:24, 75:7, 75:21, 76:1, 76:4, 76:7, 76:9, 76:11, 76:18, 76:20, 76:24, 77:3, 77:13, 78:1, 78:10, 79:8, 80:14, 81:17, 81:23, 82:4, 82:10, 82:18, 82:21, 83:4, 83:18, 83:22, 84:3, 84:7, 84:15, 84:18, 84:24, 85:4, 85:11, 85:20, 85:23, 85:25, 86:6, 87:15, 88:4, 88:14, 89:1, 89:5, 89:10, 89:13, 89:15, 91:6, 91:20, 92:8, 92:18, 93:4, 93:22, 93:24, 94:5, 94:7, 94:12, 94:17, 95:18, 95:22, 96:1, 96:18, 96:20, 96:22, 96:24, 97:6, 97:17, 97:25, 98:13, 99:2, 99:9, 99:20, 99:22, 100:4, 100:6, 100:9, 100:11, 100:14, 100:17, 100:20, 100:23, 101:11, 101:14, 101:17, 103:4, 103:11, 103:13, 103:17, 103:24, 104:2, 104:4, 104:7, 105:1, 105:10, 105:18, 106:3, 106:6, 106:14, 107:4
**themselves** [3] - 9:19, 11:18, 15:8
**theoretically** [1] - 66:13
**Therefore** [2] - 4:14, 7:6
**therefore** [7] - 34:21, 35:21, 38:8, 42:16, 43:18, 48:9, 83:15
**they've** [5] - 48:8, 60:22, 83:7, 83:8, 86:18
**They've** [1] - 56:9
**thinking** [7] - 30:6, 30:18, 36:11, 55:6, 94:2, 101:12, 101:14
**thinks** [2] - 7:4, 7:18
**third** [2] - 3:15, 61:17

**Thomas** [2] - 1:19, 5:19
**thoroughbred** [1] - 16:13
**thoughts** [1] - 33:19
**threat** [1] - 5:7
**threaten** [2] - 23:13, 47:25
**threats** [3] - 2:8, 4:1, 6:13
**three** [9] - 15:16, 40:19, 49:19, 51:19, 55:8, 59:9, 93:8, 94:18, 97:10
**three-judge** [1] - 40:19
**threshold** [2] - 79:22, 105:5
**thumbs** [1] - 13:11
**Thursday** [8] - 79:13, 98:5, 99:16, 100:1, 103:8, 105:14, 106:1, 106:3
**thwart** [2] - 9:10, 28:5
**tied** [1] - 53:7
**timeframe** [1] - 53:8
**timing** [3] - 14:11, 68:16, 102:6
**Timothy** [1] - 1:17
**Today** [1] - 59:13
**today** [22] - 3:20, 7:24, 9:14, 10:8, 11:4, 22:20, 24:15, 25:15, 48:5, 57:4, 59:6, 59:15, 59:19, 60:5, 67:23, 71:9, 71:11, 73:19, 73:25, 85:16, 98:16, 105:4
**together** [11] - 10:18, 19:18, 50:14, 51:12, 52:9, 53:20, 53:21, 64:14, 66:4, 66:7, 68:3
**tolerate** [1] - 19:8
**Tonya** [1] - 86:7
**took** [4] - 34:14, 40:11, 42:10, 63:25
**total** [1] - 38:7
**totally** [1] - 39:4
**touch** [1] - 94:21
**toward** [1] - 90:13
**towards** [1] - 26:16
**traditional** [1] - 38:4
**train** [1] - 18:10
**transaction** [1] - 57:13
**transactions** [1] - 57:14
**transcribed** [2] - 108:3, 108:7
**Transcribed** [1] - 1:23
**transcript** [2] - 21:9, 108:7
**transcripts** [1] - 20:14
**transpired** [1] - 86:12
**transport** [2] - 74:20, 75:3

transported [1] - 80:16
treat [1] - 12:25
Treem [18] - 1:18, 10:5, 10:8, 10:24, 11:5, 11:8, 14:23, 23:12, 23:21, 23:25, 50:10, 50:15, 55:2, 55:4, 59:10, 89:11, 89:16, 102:21
TREEM [7] - 23:23, 24:7, 53:23, 55:9, 89:21, 103:21, 103:25
Treem's [1] - 65:9
Trek [1] - 28:11
tremendous [1] - 91:11
trial [65] - 10:13, 10:16, 11:3, 11:17, 14:2, 14:4, 14:11, 14:17, 14:24, 15:14, 24:17, 31:10, 32:9, 32:11, 32:13, 33:15, 36:23, 37:23, 43:12, 43:21, 50:8, 50:11, 51:19, 52:7, 52:9, 52:18, 52:19, 54:14, 54:16, 54:25, 55:4, 55:14, 55:17, 55:18, 55:21, 56:24, 58:4, 59:11, 60:15, 61:9, 65:8, 65:11, 66:5, 66:8, 66:17, 67:7, 68:11, 68:16, 70:1, 83:19, 84:2, 84:4, 85:2, 88:16, 93:7, 93:11, 97:20, 98:16, 98:18, 101:10, 103:6, 103:22
trials [7] - 14:11, 14:13, 15:16, 54:3, 55:8, 59:9
tried [9] - 10:18, 10:25, 14:15, 16:20, 19:4, 36:13, 50:20, 59:1, 81:6
true [1] - 57:8
truly [1] - 84:14
trust [1] - 103:25
truth [2] - 48:3, 69:13
try [19] - 10:19, 14:5, 16:19, 19:4, 19:23, 19:24, 20:12, 23:8, 39:18, 48:21, 49:17, 50:6, 53:6, 53:21, 54:1, 61:1, 66:13, 69:19, 91:3
trying [10] - 29:14, 34:19, 36:20, 41:3, 49:1, 50:19, 53:20, 58:24, 78:8, 107:14
Tuesday [4] - 96:11, 96:23, 105:19, 105:20
turn [3] - 24:19, 69:3, 86:24
turned [1] - 87:12
tweaking [1] - 13:5
twiddling [1] - 13:11
Two [3] - 24:22, 24:23,

76:25
two [42] - 2:18, 3:22, 13:10, 14:5, 15:2, 17:5, 22:19, 24:25, 25:8, 28:25, 38:20, 42:14, 49:22, 50:11, 55:19, 56:22, 56:23, 57:1, 57:11, 58:8, 60:20, 65:23, 66:15, 67:4, 72:7, 75:11, 75:21, 79:14, 84:5, 87:4, 88:21, 94:16, 94:17, 94:18, 96:2, 97:1, 97:10, 98:10, 98:15, 98:22, 100:24, 100:25
tying [1] - 40:5
Type [1] - 91:2
type [4] - 89:19, 91:2, 91:15, 92:4
types [1] - 91:18
typically [1] - 16:5

U

U.S [2] - 1:24, 90:3
ultimately [1] - 35:4
unambiguously [1] - 9:13
unaware [1] - 80:23
uncertainty [1] - 81:21
uncomfortable [1] - 38:4
unconstitutional [2] - 78:4
uncover [1] - 79:20
Under [4] - 53:18, 56:5, 56:7, 57:7
under [54] - 2:7, 2:10, 2:20, 2:22, 4:1, 4:3, 5:7, 5:10, 5:17, 6:13, 6:16, 6:23, 11:17, 15:13, 17:7, 17:21, 18:1, 23:17, 24:15, 25:5, 27:1, 30:25, 31:8, 31:13, 33:20, 36:23, 37:8, 39:20, 42:11, 42:25, 43:1, 43:18, 43:20, 48:16, 48:19, 48:25, 49:3, 52:16, 52:18, 55:18, 56:11, 57:15, 57:25, 65:4, 77:6, 77:10, 81:18, 83:10, 84:10, 96:3, 97:2, 107:11
underlying [2] - 40:17, 62:11
understandable [1] - 10:19
understatement [2] - 12:1, 24:3
understood [1] - 45:14

Understood [2] - 65:3, 103:24
unequivocally [2] - 9:13, 25:21
unexpected [1] - 10:14
unfortunate [4] - 11:14, 24:19, 36:11, 41:12
unfortunately [1] - 36:10
Uniform [1] - 8:5
unique [1] - 36:23
uniquely [1] - 15:19
United [20] - 2:23, 2:24, 3:5, 3:6, 4:15, 4:22, 4:23, 4:24, 5:22, 7:7, 7:15, 7:16, 7:17, 7:22, 7:24, 20:20, 26:8, 64:1
UNITED [2] - 1:1, 1:4
University [3] - 27:17, 27:18, 60:15
unless [2] - 26:1, 95:24
unlike [1] - 95:11
unlikely [1] - 52:25
unnecessary [1] - 61:6
unpunished [2] - 33:10, 39:14
unsolicited [1] - 26:3
unusual [1] - 12:5
up [25] - 11:13, 25:6, 25:16, 28:18, 31:19, 32:3, 36:19, 37:10, 38:19, 39:9, 53:7, 63:19, 63:25, 66:2, 73:20, 75:7, 82:2, 82:25, 95:21, 98:1, 99:11, 104:15, 104:17, 105:8, 105:15
uphold [3] - 4:15, 5:23, 7:8
upset [1] - 69:2
urge [1] - 104:13
urgent [1] - 81:16
USA [1] - 108:4
utilized [1] - 61:11
utterly [1] - 9:11

V

variety [1] - 45:17
various [1] - 13:9
vehicle [1] - 64:7
verified [8] - 2:9, 2:10, 4:2, 4:3, 5:9, 5:10, 6:16
versus [1] - 108:4
victim [3] - 73:7, 73:9, 73:13
video [1] - 29:23
view [1] - 13:15, 14:1, 14:15, 15:6, 25:21, 30:17, 38:13, 60:7,

60:12, 65:13, 70:25, 78:3, 79:6, 80:3, 90:8, 91:8, 95:14
views [6] - 15:5, 15:21, 34:6, 39:25, 80:1, 95:6
vigilant [1] - 20:1
vigorously [2] - 56:19, 58:3
violate [3] - 39:11, 83:9, 84:9
violated [1] - 79:1
violation [3] - 40:4, 47:17, 74:11
violations [1] - 74:8
violence [2] - 83:10, 84:10
visitation [4] - 2:7, 3:25, 5:7, 6:13
visitors [1] - 67:23
visits [1] - 24:23
voice [1] - 35:23
voiced [1] - 27:24
voir [12] - 13:20, 13:22, 90:1, 90:9, 90:11, 90:19, 91:16, 92:1, 94:11, 100:12, 100:23, 101:20
voluntarily [1] - 15:7
voluntary [2] - 12:8, 13:1
volunteered [1] - 33:24
votes [1] - 19:20

W

wait [1] - 84:4
Waits [1] - 89:20
waive [3] - 9:14, 43:4, 75:11
waived [5] - 8:4, 12:4, 43:22, 44:17, 105:2
waiver [6] - 11:25, 12:9, 13:1, 42:16, 79:12
waives [1] - 12:5
waiving [2] - 42:11, 43:5
walking [1] - 35:15
wall [2] - 18:18, 38:19
wants [11] - 17:11, 18:25, 19:23, 21:21, 28:1, 38:7, 62:21, 62:22, 65:2, 67:7, 93:4
warrant [5] - 74:17, 75:24, 76:18, 79:8, 79:17
Warrant [1] - 79:7
Washington [2] - 77:7, 77:10
waste [1] - 51:20
watching [1] - 32:9
Wayne [3] - 5:6, 5:12,

7:23
WAYNE [1] - 1:7
ways [5] - 31:11, 33:3, 45:17, 60:19, 62:14
wear [1] - 64:8
wearing [1] - 61:10
web [1] - 60:22
Wednesday [2] - 95:23, 105:19
week [25] - 65:9, 68:14, 79:14, 82:12, 93:6, 93:12, 93:15, 93:16, 93:17, 94:24, 95:16, 97:14, 98:18, 101:3, 101:23, 102:1, 102:3, 105:15, 105:16, 105:19, 105:24, 106:20, 107:3
weeks [6] - 54:4, 79:14, 94:16, 98:16, 98:22, 98:25, 100:24, 100:25, 101:2
weigh [1] - 39:24
weight [2] - 62:3, 62:18
welcome [3] - 9:22, 11:4, 23:21
welfare [1] - 60:13
West [1] - 1:25
whatsoever [3] - 12:11, 12:22, 21:11
Whereof [1] - 108:9
white [1] - 60:22
Whiting [1] - 90:4
whole [2] - 47:4, 79:19
wholesale [2] - 78:23, 78:24
wife [1] - 66:23
Wiggins [1] - 63:14
Wilkinson [1] - 61:23
willfully [1] - 9:9
William [1] - 1:22
Williams [1] - 92:25
WILLIE [1] - 1:6
Willie [6] - 2:7, 2:12, 2:15, 3:2, 3:22, 108:4
willing [10] - 9:17, 13:5, 13:7, 13:8, 18:7, 41:20, 60:13, 62:12, 64:8, 65:4
willingness [1] - 24:1
wisdom [1] - 99:6
wise [1] - 104:6
wish [6] - 10:3, 12:24, 34:15, 67:3, 107:16, 107:17
wished [1] - 59:17
wishes [1] - 16:11
withdraw [1] - 10:2, 11:21, 13:15, 13:16, 17:3, 21:20, 30:25, 31:8, 33:21, 34:11, 55:22, 65:11, 106:11, 106:16,

106:23, 107:2, 107:6, 107:9

**Withdraw** [1] - 106:10
**withdrawal** [1] - 48:13
**witness** [11] - 13:19, 31:19, 32:23, 32:25, 33:1, 35:12, 36:7, 50:2, 51:13, 61:15, 91:14
**Witness** [1] - 108:9
**witness-related** [1] - 91:14
**witnesses** [12] - 15:9, 29:22, 32:25, 46:1, 51:21, 69:18, 69:21, 73:14, 86:9, 98:15, 103:1
**word** [1] - 32:12
**words** [5] - 11:8, 26:19, 49:10, 77:16, 99:3
**works** [2] - 19:1
**worry** [1] - 94:19
**worse** [3] - 18:11, 19:17, 62:23
**wound** [1] - 40:1
**wounds** [3] - 16:23, 39:22, 39:23
**wreck** [1] - 18:10
**writ** [2] - 75:1, 75:3
**write** [5] - 40:20, 41:21, 78:14, 78:15, 81:8
**writing** [3] - 104:10, 106:8, 106:22
**written** [8] - 21:8, 25:14, 33:24, 34:9, 35:1, 41:25, 106:18, 106:19

## Y

**year** [7] - 60:20, 61:9, 61:11, 65:11, 66:18, 95:15, 107:15
**years** [2] - 9:24, 60:20
**yelled** [1] - 61:22
**yesterday** [4] - 16:18, 19:3, 68:9, 93:5
**young** [2] - 18:11, 68:18
**yourself** [2] - 34:16, 88:15

## Z

**Zajac** [3] - 1:24, 108:3, 108:14